UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re BAIDU, INC. SECURITIES LITIGATION** | **CASE No.: 1:20-cv-03794-WFK-RLM**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Lead Plaintiffs Benjamin Paz Tchimino, Inveriones B Y J Limitada, Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on an investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Baidu, Inc. ("Baidu" or the "Company") and iQIYI, Inc. ("iQIYI"), as well as governmental and/or regulatory filings and reports, securities analysts' reports and advisories about the Baidu and iQIYI, press releases and other public statements and reports issued by the Baidu and iQIYI, media reports about Baidu and iQIYI, and Plaintiffs' investigation. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Baidu American Depositary Shares ("ADSs") between April 8, 2016 and August 13, 2020, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.    Baidu is one of the most well-known Internet companies based in the People's Republic of China ("PRC"). As the host of one of China's largest search engines, Baidu earns income through internet advertising and fees for various internet transactions. In addition, one of Baidu's primary assets was a company called iQIYI, a Chinese video streaming service, commonly referred to as the Netflix of China. Throughout the Class Period, Baidu owned a majority stake in

iQIYI, reported on iQIYI's financials and other metrics in its filings with the SEC and in other public statements, and consolidated iQIYI's financial statements with its own.

3.      iQIYI was the fastest growing segment of Baidu's business in terms of revenue. Baidu attempted to capitalize on iQIYI's success by selling off a minority interest in iQIYI through an initial public offering. However, to inflate Baidu's balance sheet and its statements of financial affairs, and to increase iQIYI's perceived value, Baidu and iQIYI: (i) significantly overstated iQIYI's daily active users by between 10%-50% throughout the Class Period; (ii) significantly overstated iQIYI's deferred revenue from subscriptions to iQIYI's video streaming services by between 86% and 260% throughout the Class Period; and (iii) misstated the value of a joint-venture designed to cover-up Defendants' wrong-doing.

4.      Baidu and iQIYI's house of cards began to fall on April 7, 2020, when Wolfpack Research ("Wolfpack") published a report (the "Wolfpack Report"[1]) revealing, for the first time, that iQIYI significantly and falsely inflated its customer base, its revenue, and other critical operating and performance measures. The Wolfpack Report cited to public and private information, including financial statements that iQIYI filed with the Chinese government, as well as other reliable Chinese sources, to support its findings that iQIYI engaged in a fraud, thereby misleading investors.

5.      Publication of the Wolfpack Report caused Baidu ADSs to fall $4.46 per share on April 8, 2020, the next full trading day, thereby damaging investors.

---

[1]  In addition to reviewing the Wolfpack Report, Plaintiffs' counsel was able to corroborate its substance through their review of the public filings referenced in the report, Chinese research reports on iQIYI's daily active users, and Chinese-language credit reports regarding iQIYI Variable Interest Entities ("VIEs").

6.      Then on August 13, 2020, after the market closed, iQIYI issued a press release disclosing that the "SEC's Division of Enforcement [was] seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020." Later that evening, iQIYI further disclosed on an investor call that NASDAQ had also launched an inquiry into the Wolfpack Report and its findings.

7.      On this news, Baidu ADSs fell an additional $7.83 per share, or 6%, to close at $116.74 on August 14, 2020, thereby further damaging investors.

## II.     JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa), as the alleged misstatements entered the market, and subsequent damages took place, within this judicial district.

11.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.     Plaintiffs

- 4 -

12.     Benjamin Paz Tchimino, as set forth in the previously filed Certification, incorporated herein by reference, purchased the Company's ADSs at artificially inflated prices during the Class Period and was damaged thereby.

13.     Inveriones B Y J Limitada, as set forth in the previously filed Certification, incorporated herein by reference, purchased the Company's ADSs at artificially inflated prices during the Class Period and was damaged thereby.

14.     Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, as set forth in the previously filed Certification, incorporated herein by reference, purchased the Company's ADSs at artificially inflated prices during the Class Period and was damaged thereby.

15.     Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987, as set forth in the previously filed Certification, incorporated herein by reference, purchased the Company's ADSs at artificially inflated prices during the Class Period and was damaged thereby.

**B.     Defendants**

**1.     Corporate Defendants**

16.     Defendant Baidu purports to provide Internet-based services in China and internationally, operating through three segments: search services; transaction services; and iQIYI. The Company was formerly known as Baidu.com, Inc. and changed its name to Baidu, Inc. in December 2008.

17.     Baidu is incorporated in the Cayman Islands and maintains its principal executive offices at No. 10 Shangdi 10th Street, Haidian District, Beijing, 100085, The People's Republic of China. Baidu ADSs are listed on the NASDAQ under the ticker symbol "BIDU." The Company's agent for service in the United States is CT Corporation System, located at 111 Eighth Avenue, New York, New York 10011.

18.     Defendant iQIYI, dubbed the "Netflix of China," purports to be an innovative market-leading online entertainment service in China. iQIYI's digital platform provides a collection of internet video content, including professionally produced content licensed from content providers and self-produced content. iQIYI also provides membership, content distribution, online advertising, live broadcasting, online gaming and literature, e-commerce, and talent agency services.

19.     iQIYI is incorporated in the Cayman Islands and maintains its principal executive offices at No. 2 Haidian North First Street, Haidian District, Beijing, 100086, The People's Republic of China. iQIYI ADSs are listed on NASDAQ under the ticker symbol "IQ." iQIYI's agent for service in the United States, as stated in the Registration Statement, is Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, NY 10017. iQIYI is a subsidiary of Baidu Holdings Limited.

**2.     Individual Defendants**

20.     Defendant Robin Yanhong Li ("Y. Li") is Baidu's co-founder and has served as the Company's Chief Executive Officer ("CEO") and Chairman during the Class Period. Y. Li has served as Baidu's Chairman of the Board of Directors since the Company's inception in January 2000, and as Baidu's CEO since February 2004. Y. Li also served as the Company's President from February 2000 to December 2003. Before founding Baidu, Y. Li worked as a staff engineer for Infoseek, and as a senior consultant for IDD Information Services. Y. Li currently serves on the board of New Oriental Education & Technology Group Inc., a provider of private educational services in China, and Ctrip.com International, Ltd., an online travel agency in China. Y. Li acts as the Vice Chairman of the Internet Society of China. Y. Li received a Bachelor's Degree in Information Science from Peking University in China and a Master's Degree in Computer Science from the State University of New York at Buffalo.

21.     Y. Li also has served as Chairman of iQIYI's Board of Directors from 2009 to the present.

22.     Defendant Herman Cheng-Chun Yu ("Yu") has served as Baidu's Chief Financial Officer ("CFO") since September 2017. Before joining Baidu, Yu served as the CFO of Weibo Corporation, a social media company in China, from 2015 to 2017. Before Weibo, Yu worked at SINA Corporation, a portal in China from 2004 to 2015, with his last eight years there as CFO. Yu began his career at Arthur Andersen and held various finance and accounting management positions at Adobe Systems Inc., Cadence Design Systems, Inc., and VeriFone Systems, Inc. Yu currently serves on the board of 58.com Inc., an online classifieds listing company, ZTO Express Inc., an express delivery company, and Ctrip.com International, Ltd., an online travel agency. Yu, a California Certified Public Accountant, received a Bachelor's Degree in Economics from the University of California, Santa Cruz, and a Master's Degree in Accountancy from the University of Southern California.

23.     Yu has also served as a Director of iQIYI since September 2017.

24.     Defendant Jennifer Xinzhe Li ("X. Li") served as Baidu's CFO from March 2008 until September 2017. Before joining Baidu, X. Li served as Controller of General Motors Acceptance Corporation's North American Operations from 2005 to 2008. Before that, X. Li worked at General Motors China, where she was responsible for overseeing finance functions of General Motors' wholly owned and joint venture businesses in China from 2001 to 2004, with her last post as its CFO. From 1994 to 2001, she held several other finance positions at General Motors in Canada, the United States, and Singapore. X. Li currently serves on the board of Philip Morris International, Inc. X. Li holds an M.B.A. Degree from the University of British Columbia in Vancouver, B.C., Canada, and a Bachelor of Arts Degree from Tsinghua University in China.

25.     Defendant Yu Gong ("Gong") is and was at all pertinent times iQIYI's CEO, Principal Executive Officer, and a Director of iQIYI's board. Before working at iQIYI, Gong was the President and Chief Operating Officer ("COO") of umessage.com, a mobile internet services solution provider in China. Before that, Gong served in the roles of Vice President, Senior Vice President, and COO at Sohu.com, from 2003 to 2008. From 1999 to 2003, Gong was the Founder and CEO of focus.cn, the then largest real estate search website in China. Gong received a Bachelor's Degree, a Master's Degree, and a Doctorate Degree in Automation Control from Tsinghua University.

26.     Defendant Xiaodong Wang ("Wang") is and was at all pertinent times iQIYI's CFO and Principal Financial and Accounting Officer. Wang has served as iQIYI's CFO since 2013 and oversees its finance and legal functions. Before officially joining iQIYI in 2017, Wang served as Vice President of Baidu for Financial Planning and Analysis, responsible for treasury, budgeting, and related analysis between 2009 and 2016. Between 2013 and 2016, Wang served at iQIYI on a secondment basis, while still employed by Baidu. From 2003 to 2009, Wang served as Senior Manager of General Motors in Shanghai, responsible for budgeting, cost control, pricing, and other related functions. From 1998 to 2000, Wang served in Dupont China as a Financial Specialist responsible for Dupont trading. Wang holds a Bachelor's Degree in Economics from Tsinghua University and a Master's Degree in Accounting and Finance from The London School of Economics and Political Science.

27.     Defendants Y. Li, Yu, X. Li, Gong, and Wang are collectively referred to herein as the "Individual Defendants."

28.     Baidu, iQIYI, and the Individual Defendants are referred to herein, collectively, as the "Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background**

29.     Baidu was incorporated in the Cayman Islands in January of 2000. Since its inception, Baidu has operated principally in China through Baidu Online Network Technology (Beijing) Co. Ltd., a wholly owned subsidiary in Beijing. Since June of 2001, Baidu has also conducted part of its operations in China through Baidu Netcom Science Technology Co., Ltd., a consolidated affiliated entity in Beijing, which holds the licenses and approvals needed to operate Baidu's websites and provide its online advertising services.

30.     During the Class Period, Baidu operated through three segments: (i) search services, which provided marketing services related to its customer internet search queries; (ii) transaction services, which included a variety of products including a meal delivery service, online maps, and a virtual wallet; and (iii) QIYI.

31.     Baidu listed its ADSs on the NASDAQ in August 2005 under the symbol BIDU.

B.     **Baidu and iQIYI Touted iQIYI as the "Netflix of China" While Raising $2 Billion from U.S. Investors in an IPO**

1.     **iQIYI's Online Streaming Service Business**

32.     Launched in 2010, iQIYI is a Beijing, China-based online streaming entertainment provider. iQIYI's online video platform features original content produced by iQIYI, a library of other professionally produced content, and user-generated content. According to iQIYI's 2018 Annual Report, filed with the SEC on Form 20-F, iQIYI touted itself to investors as the "leading internet video streaming service in China." Hailed as the "Netflix of China," iQIYI and Baidu marketed iQIYI to U.S. investors as the top online streaming entertainment provider in Asia—a market with billions of potential subscribing customers. As iQIYI boasted: "Through [its] curated

premium content, [iQIYI] attracts[s] a ***massive user base with tremendous user engagement, and generate[s] significant monetization opportunities***."[2]

33.     Like Netflix, iQIYI's customers primarily access iQIYI's entertainment offerings content through a monthly or annual subscription, which allows them to view iQIYI's entertainment programs. iQIYI represented, in its SEC filings, that the majority of its daily active users ("DAUs") were subscribing members "and, to a lesser extent, users who gain access to [iQIYI's] premium content library through paid video on-demand service." iQIYI also claimed to generate advertising revenue through various methods, such as commercials that run prior to streaming, pop-up advertisements, and product placement in videos.

34.     Critically, iQIYI's two primary sources of revenue—membership subscriptions and advertising—are both dependent on, and a function of, the number of customers subscribing to iQIYI's service and viewing its programs. Thus, it is vital to iQIYI to maintain and grow a large and active user base to generate revenue.

> **2.     iQIYI Was a Critical Asset to Baidu, and an Important and Fast Growing Part of Baidu's Revenues, Which Required Significant Cash Flows to Finance Its Growth**

35.     In November 2012, Baidu obtained the controlling interest in what was then named Qiyi.com, Inc. (now iQIYI, Inc. or iQIYI). Because iQIYI is a subsidiary and critical asset of Baidu, the Company discloses iQIYI's financial results as one of three reporting segments of its business.

36.     On February 27, 2018, iQIYI filed a registration statement on Form F-1 with the SEC in connection with iQIYI's IPO. After several amendments, the SEC declared the registration

---

[2]  All emphasis is added, unless otherwise stated.

statement (the "Registration Statement") effective on March 28, 2018.[3] On March 29, 2018, iQIYI conducted its initial public offering ("IPO") pursuant to the Offering Documents and issued 125 million ADSs to the public at the offering price of $18.00 per share. As a result of the offering, iQIYI received approximately $2,182,500,000 in proceeds upon the IPO's completion, after underwriting discounts and commission.

37.      At the time of the iQIYI IPO, Baidu owned approximately 69.7% of iQIYI. Today, even though iQIYI sold a minority position of its shares in the IPO, Baidu is still the majority owner of iQIYI. Further, based on iQIYI's offering price, Baidu's interest in iQIYI was valued at more than $5 billion.

38.      Throughout the Class Period, iQIYI was a fast growing and rapidly expanding part of Baidu's business, with revenue growth that outpaced Baidu's non-iQIYI business in every year of the Class Period. As such, iQIYI was one of Baidu's most critical assets.

39.      The chart below shows Baidu's iQIYI revenues and revenue growth versus Baidu's non-iQIYI revenue growth throughout the Class Period, in thousands of RMB:

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| Non-iQiyi Revenue | 47,549,915 | 62,673,419 | 60,269,517 | 67,681,000 | 78,271,000 | 79,711,000 |
| iQiyi Revenue | 2,873,552 | 5,295,760 | 11,283,329 | 17,378,000 | 24,989,000 | 28,994,000 |
| iQiyi Revenue as a % of Total Revenue | 5.70% | 7.79% | 15.77% | 20.43% | 24.20% | 26.67% |
| Change in Non-iiQIYI Revenue |  | 24.13% | -3.99% | 10.95% | 13.53% | 1.81% |
| Change in iQIYI Revenue |  | 45.74% | 53.07% | 35.07% | 30.46% | 13.81% |

---

[3]  On March 29, 2018, iQIYI filed a prospectus on Form 424B4 with the SEC in connection with the IPO ("Prospectus"), which incorporated and formed part of the Registration Statement. The Registration Statement and Prospectus are together referred to herein as the "iQIYI Offering Documents."

40.     iQIYI's business, and the revenue it generated, was therefore of great (and increasing) importance to Baidu and its investors, as it disproportionately, and positively, contributed to Baidu's growth. But iQIYI's ability to report revenue growth was also important because, as a capital-intensive business, if iQIYI could not sustain revenue and therefore cash flow growth, it would be required to raise additional capital in order to sustain itself, and in the process dilute Baidu's ownership of it. As iQIYI stated in its 2018 Annual Report:

> The operation of an internet video streaming platform ***requires significant and continuous investment*** in content and technology. Producing high-quality original content is costly and time-consuming and it will typically take a long period of time to realize returns on investment, if at all. To date, we have financed our operations primarily with net cash generated from operating activities, as well as financing activities such as placements of preferred shares, convertible notes and asset-based securities, the substantial financial support from Baidu, and the proceeds from our initial public offering. As of December 31, 2018, we had an outstanding loan balance of RMB700.0 million (US$101.8 million) to Baidu. ***In order to implement our growth strategies, we will incur additional capital in the future to cover, among others, costs to produce and license content.***

41.     Given iQIYI's importance to Baidu, and its need for continuous cash flows, the integrity of iQIYI's revenue reporting was of the utmost importance to Baidu investors.

42.     X. Li explicitly acknowledged the importance of iQIYI and its revenue growth to Baidu on an April 28, 2017 analyst call, stating in pertinent part, as follows:

> With regards to Q2 revenue, if you look at our business, essentially, it's the core business as well as iQiyi that are the main revenue contributors. Within the core business, there is search, we're also putting a lot of effort in the feed. The feed product, as [Qi Lu] mentioned earlier, from a user adoption perspective, it's progressing very well. We're in the early stage of monetizing the product. So we're not driving aggressively on the monetization front. For our core business, it continues to be very search-centric. And we are very excited to extend the services we can offer to our users and advertisers. And we expect a solid progress in that regard. And we should expect the search business to expand over the next few quarters. ***For the iQiyi business, as you would have seen from our 20-F, last year iQiyi had a very solid growth and contribution to our overall business. iQiyi is an integral part of the overall Baidu ecosystem. And they continue to deliver very strong top line growth driven by the business model of subscription user base.***

43.     Qi Lu, Baidu's then-COO, made a similar point on a July 26, 2017 earnings call, stating in pertinent part, as follows:

> ***IQiyi plays an increasingly important role in strengthening our overall mobile foundation.*** Its rich content and strong user base are ***key pieces*** to Baidu's overall ecosystem. We have made a lot of progress in establishing operational synergies in data and content across iQiyi and other Baidu products to spur long-term growth.

**C.     iQIYI Is a Complex and Opaque Organization**

44.     Following the IPO, iQIYI shares traded on the NASDAQ market, a major United States Securities Exchange. As a result, iQIYI was obligated to comply with heightened regulatory requirements, as well as the requirements of the federal securities laws. As part of those requirements, iQIYI was required to file accurate, audited, U.S. Generally Accepted Accounting Principles ("GAAP")-compliant financial statements with the SEC.

45.     Despite these requirements, before and during the Class Period, it was extremely difficult for investors to understand iQIYI's corporate structure and accounting methods. iQIYI operates in Asia through a complex web of on-shore and off-shore companies, resulting in an inherently unclear accounting structure. The following diagram sets forth the iQIYI's organizational structure:



46.     Further complicating matters, although iQIYI purportedly operates under GAAP and the U.S. Public Company Accounting Oversight Board ("PCAOB"), iQIYI explicitly

acknowledges that its "***annual report is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board***." As a result, gaining total clarity into iQIYI's subscriber numbers, financial information, and accounting for such financial information is difficult and, in some cases, functionally impossible.

47.     Further, much of the third-party research related to iQIYI's operations, such as mobile advertising data, financial research and governmental filings, were not easily accessible to the public because of limitations imposed by the Chinese government and language barriers. Accordingly, U.S. investors were forced to place increased reliance on the substantive representations and financial data contained in Baidu and iQIYI's SEC filings.

**D.      iQIYI's Daily Active User and Deferred Revenue Figures Were Crucial to Its Success**

48.     Despite the requirements that came with raising $2 billion of capital in the U.S., iQIYI's Offering Documents contained significantly inflated viewership and revenue numbers to make it appear as though iQIYI had significantly more active users than it actually did.

49.     Critically, the number of active users is one of the most important metrics investors look to when investing in a media company, such as iQIYI, or determining the value of its majority owner's interest therein. Because iQIYI generates a majority (over 75%) of its revenue through a combination of subscriptions to its online streaming service and advertisements on its platform, both revenue streams are highly dependent on the number of users subscribing to and watching iQIYI's programing.

50.     The most accurate way for investors to assess iQIYI's overall viewership numbers—and the revenues it generated therefrom—was by looking to the number of DAUs that were using iQIYI's platform. Indeed, most major online media and social media platforms,

including YouTube, TikTok and Facebook, rely on DAU as a critical user metric, and indicator for its business.

51.     iQIYI's Registration Statement and Annual Reports claimed iQIYI was the largest internet video streaming service in China for both mobile applications and PCs in terms of average DAUs and total user time spent on the platform. In its SEC filings, iQIYI defined mobile DAUs on its platform as the number of unique mobile devices that had accessed the iQIYI platform through its mobile app at least once during a day. iQIYI's SEC filings stated that a "***massive and highly engaged user base***," which includes DAUs, was one of iQIYI's key competitive strengths, and that iQIYI's success was "primarily attributable" to those key competitive strengths.

52.     The other key metric for assessing iQIYI's success and determining the value of Baidu's investment in it was its membership services revenue. Membership services revenue was primarily the revenue iQIYI generated from membership subscriptions for its streaming services. And because service subscriptions are generally for future services that are to be performed by iQIYI (such as annual and monthly subscriptions), GAAP required iQIYI to record subscription payments as deferred revenue that is recognized ratably over the term of the subscription.

53.     iQIYI's sale of customer memberships, which range from one month to twelve months, is its primary source of deferred revenue. For example, when iQIYI sells an annual subscription, iQIYI records the sale as deferred revenue because iQIYI has not yet provided twelve months of online streaming services. As iQIYI delivers its streaming services to its members each month, iQIYI recognizes that ratable portion of deferred revenue as earned revenue.

54.     Accordingly, daily active user metrics and deferred revenue were crucial metrics to investors and served as the two leading indicators for the growth and success of iQIYI's membership services and advertising revenues. Indeed, the two revenue streams that accounted for

over 75% of iQIYI's overall revenues. Thus, these metrics were of critical importance to investors seeking to value Baidu's investment in iQIYI.

### E.     Baidu and iQIYI Overstated Critical Metrics to Investors

#### 1.     Baidu and iQIYI Overstated iQIYI's Average Mobile Daily Active User Metrics, Thereby Misleading Investors About iQIYI's Success

55.     Throughout the Class Period, iQIYI and Baidu issued inflated DAU numbers to investors. Specifically, in iQIYI's Offering Documents and 2018 and 2019 Annual Reports, iQIYI provided historical mobile DAU data that was intentionally inflated.

56.     Similarly, Baidu provided investors with false and misleading iQIYI DAU numbers in its SEC filings.

57.     The iQIYI Offering Documents falsely stated that iQIYI's average mobile DAUs at the end of the year in 2015, 2016, and 2017 were 88.3 million, 125.4 million and 126 million respectively. The iQIYI Offering Documents stated, in pertinent part:

> *Membership services*. Our membership services revenue increased by 277.5% from RMB996.7 million in 2015 to RMB3,762.2 million in 2016, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 182.7% from 10.7 million as of December 31, 2015 to 30.2 million as of December 31, 2016. Excluding individuals with trial memberships, the number of subscribing members increased by 180.4% from 10.7 million as of December 31, 2015 to 30.0 million as of December 31, 2016. ***Between the fourth quarters of 2015 and 2016, our average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million,*** and our average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million. Daily average total user time spent on our iQIYI platform increased by 52.5% from 169.9 million hours in 2015 to 259.1 million hours in 2016.

> \*          \*          \*

> *Membership services.* Our membership services revenue increased by 73.7% from RMB3,762.2 million in 2016 to RMB6,536.0 million (US$1,004.6 million) in 2017, primarily driven by the increase in the number of subscribing members, which in turn results from the expansion of our user base and user engagement. The number of subscribing members increased by 68.4% from 30.2 million as of December 31, 2016 to 50.8 million as of December 31, 2017. "Subscribing

- 17 -

members" refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who used paid video on-demand service. The number of individuals with trial memberships has consistently accounted for less than 5% of the total number of subscribing members. Excluding individuals with trial memberships, the number of subscribing members increased by 66.8% from 30.0 million as of December 31, 2016 to 50.0 million as of December 31, 2017. ***Between the fourth quarters of 2016 and 2017, our average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million***, and our average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million. Daily average total user time spent on our iQIYI platform increased by 15.8% from 259.1 million hours in 2016 to 300.1 million hours in 2017.

58.     Likewise, iQIYI's 2018 Annual Report, dated and filed with the SEC on March 15, 2019 on Form 20-F, stated: "For the year of 2018 . . . ***our average mobile DAUs were 135.4 million***."

59.     iQIYI's 2019 Annual Report, dated and filed with the SEC on March 12, 2020 on Form 20-F, stated: "For the year of 2019 . . . ***our average mobile DAUs were 139.9 million***."

60.     Baidu executives similarly misrepresented iQIYI's daily active users to its own investors.

61.     On March 15, 2019, Baidu filed with the SEC its Annual Report for the year ended December 31, 2018 (the "2018 Baidu Annual Report") on Form 20-F signed by Defendant Y. Li. The 2018 Baidu Annual Report stated, with respect to iQIYI daily active views, that "For the year of 2018, iQIYI's . . . ***average mobile DAUs were 135 million***."

62.     On March 13, 2020, Baidu filed with the SEC its Annual Report for the year ended December 31, 2019 (the "2019 Baidu Annual Report") on Form 20-F signed by Defendant Y. Li. The 2019 Baidu Annual Report stated, with respect to iQIYI daily active views, that "For the year of 2019, iQIYI's . . . ***average mobile DAUs were 140 million***."

63.     Finally, on April 4, 2020, Baidu issued a Prospectus on Form 424B2 that stated, in pertinent part, that "[f]or the year of 2019, iQIYI's . . . ***average mobile DAUs were 139.9 million***."

64. As detailed below, however, iQIYI's reported DAU numbers were materially false and misleading because they were falsely and significantly overstated.

65. According to the Wolfpack Report, as well as data published by two leading industry research firms that cover China's mobile internet market—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—iQIYI's actual average mobile DAU's were substantially lower than those reported to investors.[4] Specifically, according to data from QuestMobile, the true average mobile DAUs for iQIYI for 2015, 2016, and 2017 were overstated by 50%, 33.4%, and 11.5%, respectively. Likewise, iQIYI's DAUs for the full years 2018 and 2019 were overstated by 10.4% and 22.5%, respectively. The chart below details the overstatement of iQIYI's DAU:

| iQIYI's Average Mobile Daily Active Users (in millions) | | | |
|---|---|---|---|
| **Time Period** | **DAUs as Disclosed by iQIYI** | **DAUs According to QuestMobile** | **Amount Overstated vs. QuestMobile** | **Percentage overstated vs. QuestMobile** |
| **2015 Q4** | 88.3 | 59.0 | 29.3 | 50.0% |
| **2016 Q4** | 125.4 | 94.0 | 31.4 | 33.4% |
| **2017 Q4** | 126.0 | 113.0 | 13.0 | 11.5% |
| **2018 (full year)** | 135.4 | 122.6 | 12.8 | 10.4% |
| **2019 (full year)** | 139.9 | 114.2 | 25.7 | 22.5% |

66. Aurora's data, as shown in the chart below, corroborates QuestMobile's data, and further supports that Defendants materially overstated iQIYI's average mobile DAU figures:

| **Month** | **iQIYI's Average Mobile DAUs According to Aurora** |
|---|---|
| December 2017 | 86.1 million[5] |

---

[4]  Plaintiffs were able to obtain the QuestMobile and Aurora data only after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are only published in Chinese and not readily obtainable by American investors.

[5]  http://www.199it.com/archives/711971.html, last viewed December 11, 2020.

| Month | iQIYI's Average Mobile DAUs According to Aurora |
|-------|-------------------------------------------------|
| March 2018 | 87.6 million |
| June 2018 | 86.3 million |
| September 2018 | 85.6 million[6] |
| December 2018 | 82.0 million |
| March 2019 | 87.5 million[7] |

67. According to Aurora's data, between December 2017 and March 2019, *iQIYI never had more than 90 million mobile DAUs*, despite iQIYI and Baidu reporting DAUs well in excess of that number during the same periods.

## 2. Defendants Materially Misstated iQIYI's Membership Services Revenue

68. As explained in the iQIYI Offering Documents and above, iQIYI's deferred revenue is generated from two sources. The primary source is the sale of customer memberships that range from one month to twelve months. According to GAAP, the receipt of membership fees is initially recorded as deferred revenue, and thereafter revenue is recognized ratably over the membership period as services are rendered. iQIYI purported to comply with this requirement, as disclosed in its 2018 Annual Report:

**Membership services**

The Group offers membership services to subscribing members with various privileges, which primarily including access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. ***When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered.*** Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services

---

[6] http://www.199it.com/archives/789526.html, last viewed December 11, 2020.

[7] http://www.199it.com/archives/872190.html, last viewed December 11, 2020.

such as other memberships, which the Group acquires and controls before they are transferred to subscribing members.

69.     A second and much smaller source of iQIYI's deferred revenue is virtual currency sold by its live broadcasting division. Cash received from the sale of virtual currency sold but not yet consumed by a customer is recorded as "Customer advances and deferred revenue."

70.     In all, customer memberships make up the largest portion of iQIYI's deferred revenue, representing at least 80% of total deferred revenue based on the relative revenue contributions of customer memberships and sales of virtual currency.

71.     An analysis of iQIYI's membership services revenue compared to its deferred revenues confirms that Defendants materially misstated iQIYI's membership revenue during the Class Period.

72.     To begin, iQIYI's 2018 Annual Report, filed on Form 20-F, describes the four sources of revenues: (i) membership services, (ii) online advertising services, (iii) content distribution, and (iv) others, including live broadcasting and online games.[8]

73.     Based on iQIYI's filings with the SEC over eight quarters, beginning with the quarter ended December 31, 2017, through the quarter ended September 30, 2019, membership services revenues combined with online advertising services revenues represented between approximately 75% to 86% of iQIYI's total consolidated revenues, with the balance being comprised of content distribution and other revenues. During this period, membership services revenues as a percentage of total revenues grew from 40% to over 50%.

---

[8]   A portion of live broadcasting revenues included sales of virtual currency. Other revenues represented from approximately 8% to 16% of total revenues of which broadcasting revenues was a part.

74.     iQIYI attributed the growth in its membership services revenues primarily to increases in the number of subscribing members. Specifically, iQIYI stated that membership revenues grew by 72% from 2017 to 2018, in-line with the 72% growth in the number of subscribing members. By September 31, 2019, the number of subscribing members had purportedly grown 31% over the prior twelve months, mirroring the reported growth in the membership services revenue over the same period.

75.     As discussed above, according to iQIYI's 2019 Annual Report, amounts received for subscriptions were initially reported as deferred revenue, a balance sheet account, and then recognized as income ratably as member services revenue over the subscription period. Thus, the balance in deferred revenue would necessarily *decrease* as the amounts were recognized over the subscription period as membership services revenue. As such, in a static environment without growth in the user subscription base, revenues would remain constant while deferred revenue balances would remain the same or decline. However, in a high-growth environment, with the amount of paying memberships increasing, like those reported by iQIYI, declining deferred revenue balances on existing contracts would be replaced by, and would grow from, the new increasing numbers of subscriptions.

76.     Accordingly, iQIYI's deferred revenues should track and be positively correlated with the increase in paying members and the corresponding increase in membership services revenue. Simply put, if paying members and membership services revenue are increasing, so should deferred revenue. And similarly, if deferred revenue decreases, membership services revenue and the number of paying members should decrease.

77.     However, as it pertains to iQIYI's performance during the Class Period, there was a material and significant divergence between the two reported amounts. In particular, at times

during the Class Period, iQIYI experienced increasing membership service revenue while at the same time experiencing decreasing deferred revenue. The inexplicable divergence between iQIYI's increasing subscriptions and membership services revenues, on the one hand, and its decreasing deferred revenue balances, on the other, indicates that Defendants were overstating the number of paying members and therefore the amount of membership services revenue. The chart below illustrates this stark divergence:



78.     As shown in the above table and discussed below, according to Plaintiffs' analysis of iQIYI's financial statements over numerous quarters, iQIYI reported a significant increase in the number of subscribing members and membership services revenue over the period beginning with the quarter ended December 31, 2017, through the quarter ended September 30, 2019.

79.     Through the Third Quarter ended September 30, 2018, there was a close relationship between changes in the number of paying members, membership services revenues, and deferred revenue balances. This correlation would be expected, based on iQIYI's accounting policies, as the number of paying members and membership services revenues increased, the balances of deferred revenues also increased.

80.     However, during the Fourth Quarter ended December 31, 2018, and the First Quarter ended March 31, 2019, the previous and highly correlated relationship between reported membership services revenue, the number of paying members, and deferred revenue balances changed dramatically. During these two quarterly accounting periods, while reported membership services revenues continued to grow steadily, deferred revenue balances declined significantly. With the reported number of paying members continuing to increase along with membership services revenue, a decline in deferred revenue balances was completely contrary to and inconsistent with the structure of iQIYI's subscription service and its accounting policies.

81.     The only innocent explanation for such a change would be a sudden and dramatic shortening in the average length of paying user subscription periods. For example, if iQIYI had suddenly switched from an average subscription period of six to eight months down to an average subscription period of two to three months, the deferred revenue balances would have been amortized quicker and declined relative to membership services revenue. However, no information contained in iQIYI's public filings indicates the occurrence of such an event. In fact, the opposite is true. Between the Third Quarter of 2018 and the First Quarter of 2019, iQIYI reported an *increase of 16.1 million paying subscribers* and an *increase in the average subscription* period from 6 months to 8 months.

82.     Beginning in the Second Quarter ended June 30, 2019, immediately following the sudden divergence of membership services revenue and deferred revenue balances, the balance of deferred revenue began to increase again and directly correlate with increases in membership services revenue and paying members. This return to normalcy raises red flags regarding what occurred during the prior two quarters that suddenly—and without explanation—reversed itself in the following periods. The most plausible explanation is that Defendants overstated iQIYI's membership services revenue in one or more periods and, by incorporating iQIYI's revenues into Baidu's, overstated Baidu's revenues as well.

### 3.     iQIYI's PRC-Based Credit Reports, Derived from Tax Filings in China, Further Belie the Deferred Revenue Reported to Investors

83.     Credit reports obtained by Plaintiffs based on PRC tax filings by iQIYI's VIEs further demonstrate that the deferred revenue amounts iQIYI reported in the Registration Statement are inaccurate.[9] In truth, iQIYI had much smaller amounts of deferred revenue from 2015 to 2017, as detailed in the table below:

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Offering Documents | 339,880 | 796,703 | 1,633,649 |

---

[9]  VIEs are entities controlled by a company by means other than a majority of voting rights. Chinese companies commonly use VIE structures to access foreign capital. iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. iQIYI conducts its business in China through VIEs, including: Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures, and Beijing iQIYI Cinema, and their respective subsidiaries. Certain contractual agreements: (i) give iQIYI or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs; (ii) obligate iQIYI to absorb losses of the VIEs that could potentially be significant to the VIEs; and (iii) entitle iQIYI or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs. Accordingly, FASB Accounting Standards Codification ("ASC") 810-25-38 requires companies, such as iQIYI, to consolidate VIEs in their financial statements if the company will absorb or receive the majority of the VIE's expected losses or returns. iQIYI purports to comply with GAAP by consolidating its VIEs and their subsidiaries as required by ASC 810 and SEC Regulation SX-3A-02.

| | | | |
|---|---|---|---|
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

84.     Specifically, iQIYI's deferred revenue for the years 2015, 2016, and 2017 were overstated by 261.7%, 165.5%, and 86.2%, respectively, when comparing iQIYI's tax filings to the representations made in the Offering Documents.

85.     Critically, the deferred revenue reported in iQIYI's credit reports are a more reliable source of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs.

86.     Indeed, filings with PRC tax authorities are likely the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts, but they are subject to penalties imposed in China for filing false documents with the Chinese State Administration for Industry and Commerce ("SAIC") or PRC tax authorities. Further, ASC Rule 810, and iQIYI's own accounting policies, required iQIYI to consolidate its VIEs' deferred revenue in its financial statements.

87.     Accordingly, iQIYI's VIEs PRC tax filings further demonstrate that iQIYI inflated its reported deferred revenue amounts for the years 2015, 2016, and 2017. And Baidu, by incorporating iQIYI's financials, including iQIYI's deferred revenues, into its own financial statements, inflated its reported deferred revenue amounts for the years 2015 through 2017.

### 4.     Defendants Misstated the Purchase Price and Improperly Recorded Deferred Revenues and Revenues in Connection with Its Investment in Xin'ai Sports Joint Venture

88.     Given the irreconcilable disparity between iQIYI's (i) paying user and revenue figures and (ii) overstated reported paying user and revenue figures, Defendants needed a way to

give the appearance that iQIYI's deferred revenue tracked the purported user and revenue growth that iQIYI was touting to investors. To do so, iQIYI used fraudulent accounting of an equity investment, in violation of GAAP, that generated RMB763,750[10] of deferred revenue for iQIYI out of thin air.

89.     On August 6, 2018, iQIYI issued a press release announcing that it would partner with Super Sports Media, a subsidiary of DDMC Group, to set up a joint venture named Beijing Xin'ai Sports Media Technology Co., Ltd ("Xin'ai"). The press release stated that existing members of both Super Sports Media and the tennis-focused membership program on iQIYI would receive full membership status in the new app. Xin'ai was important to iQIYI, as both Defendants and analysts indicated.

90.     On October 31, 2018, as part of iQIYI's earnings call for the Third Quarter of 2018, Defendant Yu stated that "the new joint venture will operate all sports-related content business, including the upgraded iQIYI Sports app, which brings together an extensive offering of sports content with smoother user experience."

91.     On August 20, 2019, as part of iQIYI's earnings call for the Second Quarter of 2019, Defendant Yu asserted that Xin'ai was "an important part of our content library." In the question-and-answer session, Defendant Yu reaffirmed that "sports content is obviously a very important racetrack for us."

92.     Indeed, an August 2019 analyst report from Industrial Securities echoed Defendant Yu's enthusiasm, stating that "sports content is highly valued by iQIYI" and "may become a new growth point for iQIYI." Further, an October 2019 analyst report from CCB International stated that iQIYI's plan to increase sports video content would "extend the company's audience base to

---

[10]  RMB amounts are in 1,000s.

more elderly and affluent viewers," which would help provide a "considerable increase" of paying subscribers.

93.     According to iQIYI's SEC filings, in July 2018, iQIYI acquired a 32% interest in Xin'ai for a combination of cash and noncash consideration totaling RMB796,000. iQIYI's 2018 Annual Report described its accounting for the investment, in pertinent part, as follows:

> **Equity method investments**
>
> In July 2018, the Company ***acquired a 32% outstanding equity interest*** amounting to RMB796,000 (US$115,773) in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Company has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. ***The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 (US$88,648) was recognized as basis differences and investment goodwill.*** As of December 31, 2018, the Group held 29% of Xin'ai's equity interest due to new financing investors' dilution.

94.     The non-cash portion of the consideration iQIYI purportedly paid to acquire its equity interest in Xin'ai totaled RMB763,750, and iQIYI recorded this non-cash consideration as "deferred revenue in relation to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."

95.     The RMB32,250 difference between the total acquisition price of RMB796,000 and the non-cash consideration of RMB763,750 represented the cash portion of the consideration. Based on these amounts, approximately 96% of the acquisition price was non-cash consideration that iQIYI recorded as deferred revenue related to property and services iQIYI was to provide to Xin'ai in the future.

96.     The notes to iQIYI's financial statements in its 2018 Annual Report disclose that iQIYI recognized total revenue from content licensed to an "equity investee" in the amount of RMB88,457 for the year ended December 31, 2018, and RMB443,503 for the year ended December 31, 2019. No cost of revenues is reported associated with the content licensed to the

equity investee. Moreover, 2018 was the first year iQIYI recognized revenue for content licensed to an equity investee, and iQIYI held no other significant equity method investments in 2018 and 2019, evidencing that the revenue iQIYI recognized in those years is ***directly attributable*** to iQIYI's equity method investment in Xin'ai. The Xin'ai joint venture is therefore the only possible source of this revenue from an equity investee that iQIYI reported in 2018 and 2019.

97.     As of December 31, 2018 and December 31, 2019, the remaining balance of deferred revenue in relation to services to be provided to Xin'ai totaled RMB726,155 and RMB579,864, respectively. These amounts were reported as part of amounts due to related parties in iQIYI's consolidated financial statements in its 2019 Annual Report. Based on the changes in the reported deferred revenue balances, iQIYI recognized RMB37,595 of the deferred revenue balance as revenue during the fourth quarter of 2018[11] and it recognized another RMB146,291 of the deferred revenue balance as revenue during the year ended December 31, 2019, all in connection with its investment into Xin'ai.[12]

98.     iQIYI described its accounting policy with respect to equity method investments in its 2018 Annual Report, which included iQIYI's policy of recording its investment at cost, as required by GAAP, as follows:

> Investments in entities in which the Group can exercise significant influence and holds an investment in voting common stock or in-substance common stock (or both) of the investee but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323 ("ASC 323"), Investments—Equity Method and Joint Ventures. ***Under the equity method, the Group initially records its investments at cost*** and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Group subsequently adjusts the carrying amount of the investments to recognize the Group's proportionate share of each equity

---

[11]   RMB763,750 minus RMB726,155.

[12]   RMB726,155 minus RMB579,864.

investee's net income or loss into earnings after the date of investment. The Group evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

99.     Based on the disclosures in iQIYI's financial statements in its 2018 Annual Report, iQIYI recorded its initial investment in Xin'ai to assets and liabilities (RMB in thousands), as shown below:

|  | Debit | Credit |
|---|---|---|
| Equity Investment in Xin'ai | 796,000 | |
| Cash | | 32,250 |
| Deferred Revenue | | 763,750 |

100.     iQIYI's accounting for the transaction is appropriate insofar as it purports to record the investment in Xin'ai at iQIYI's cost as required by GAAP. *See* ASC 323-10-30. In this case, the cost of the acquisition ***included*** the cash paid and iQIYI's cost of goods and services to be provided to Xin'ai, which iQIYI chose to record on the balance sheet as deferred revenue. The amount reported by iQIYI as deferred revenue represented an obligation (or liability) to provide Xin'ai with content, licenses of intellectual property and traffic support services at iQIYI's cost. Because GAAP requires these goods and services to be valued and transferred to Xin'ai at cost, no profit could be recognized by iQIYI upon fulfillment of its obligation.

101.     As disclosed in the notes to iQIYI's financial statements in its 2018 Annual Report, deferred revenue was considered a contract liability balance associated with a revenue contract, comprised of payments received from customers for services which had not yet been provided to the customer, as recounted below:

*Contract balances*

When either party to a ***revenue contract*** has performed, the Group presents the contract in the consolidated balance sheets as a contract asset or a contract liability, depending on the relationship between the entity's performance and the customer's payment.

\*       \*       \*

> Contract liabilities are mainly comprised of payments received for membership fees and virtual currency sold for which the corresponding services have not yet been provided to customers and are presented as "Customer advances and deferred revenue" on the consolidated balance sheets. The increase in customer advances and deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Group's customers.

102.    iQIYI's description of contract liabilities in its financial statements is consistent with GAAP, which provides that contract liabilities represent an obligation to transfer goods or services to a customer for which the entity has received consideration from the customer. *See* ASC 606-10-25.

103.    However, iQIYI's characterization of its obligation to transfer goods and services to Xin'ai as *deferred revenue* was improper. This was not a revenue contract. It was consideration given by iQIYI in an investment transaction—its equity investment in Xin'ai. It was a promise to transfer goods and services at cost as consideration for the purchase of a long-term investment. Therefore, under GAAP, the transaction should have been recorded as a liability, not as deferred revenue later to be recognized as revenue in iQIYI's income statement when the serviced are rendered as a culmination of an earnings process.

104.    To further illustrate the point, consider the same set of facts except that instead of promising to transfer content, licenses of intellectual property and traffic support services, iQIYI had promised to provide physical inventory (like goods) to Xin'ai. When the inventory was later transferred, the transaction would simply be reported as the satisfaction (or reduction) of the outstanding liability (or deferred revenue) and a corresponding reduction on the asset side of the balance sheet by reducing inventory by the amount of the cost of the goods transferred. There would be no effect on iQIYI's income statement—simply the offsetting reduction of an asset and a liability. The nature or form of the goods or services provided should have no impact on the

accounting and reporting of the transaction. This was not a revenue contract or a revenue producing transaction. It was an investment transaction, transferring one asset (the goods and services being transferred by iQIYI at cost) in exchange for another (the equity investment in Xin'ai). The timing of the transfers should make no difference, as it was part of the same transaction.

105.    The proper accounting entries for iQIYI to record its investment in Xin'ai are:

|  | Debit | Credit |
|---|---|---|
| Equity Investment in Xin'ai | 796,000 | |
| Cash | | 32,250 |
| Obligation to Transfer Assets to Xin'ai | | 763,750 |

In the correct accounting method, instead of crediting (increasing) deferred revenue by RMB763,750, iQIYI should have recorded the amount as a liability, an obligation, or payable in the amount of the cost of the goods and services that iQIYI owed to Xin'ai for the non-cash portion of the purchase price of the equity investment.

106.    iQIYI recorded the cost of licensed copyrights and produced content as assets on its consolidated balance sheet in its 2018 Annual Report. As with the physical inventory example, when iQIYI later transferred the licensed or produced content to Xin'ai, it should have simply offset the liability (the obligation to transfer assets to Xin'ai) against the asset (the cost of the content transferred), removing both the asset and liability from its balance sheet with no effect on iQIYI's income statement. By classifying the obligation as deferred revenue and later recognizing the transfer as revenue, iQIYI significantly overstated its reported revenues. Essentially, iQIYI's method of accounting for the acquisition, in which it recorded the non-cash portion of the acquisition as deferred revenue, impermissibly created "built-in" revenues to be recognized subsequent to the acquisition.

107.    The fact that the transfers of assets to Xin'ai were reported as revenues, rather than as a reduction in the assets, indicates that the associated costs of these assets were not removed

from iQIYI's financial statements, thereby overstating remaining assets or understating expenses, and thereby ***overstating income or profit***.

108.    In addition to overstating revenue, iQIYI also recognized profit on the overstated revenue. iQIYI's financial statements in the 2018 and 2019 Annual Reports disclosed transactions with related parties. The related-party transaction notes to the financial statements disclose revenue from related-parties and costs of revenue with related-parties. For both the years ended December 31, 2018 and 2019, the notes to iQIYI's financial statements in the 2018 and 2019 Annual Reports disclose revenue from content licensed to an equity investee (RMB88,457 in 2018 and RMB443,503 in 2019), but no associated cost of revenue is reported. The absence of reported cost of revenues associated with revenue from content licensed to equity investees indicates that iQIYI recognized profit on such revenue. As discussed above, based solely on the changes in the deferred revenue balances for the Xin'ai transaction, iQIYI improperly recognized revenue, and profit, of RMB37,595 during the fourth quarter of 2018,[13] and another RMB146,291 during the year ended December 31, 2019,[14] associated with its original equity investment in Xin'ai.

109.    The audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports, disclose that iQIYI made a RMB38.25 mm cash only investment into Xin'ai Sports and received 38.25% of the equity in return (rather than investing RMB32.25mm of cash and RMB763.75mm of non-cash consideration reported in iQIYI's financial statements for 32%). These facts are confirmed by the financial statements Xin'ai Sports' filed with the Shanghai Stock Exchange on August 7, 2018, as well as by Qixin (a respected third-party platform aggregating SAIC and other government records in PRC).

---

[13]   RMB763,750 minus RMB726,155.

[14]   RMB726,155 minus RMB579,864,

110.    If one accepts that Xin'ai Sports' financial statement treatment of iQIYI's investment in Xin'ai Sports is correct, and iQIYI invested cash of RMB38.25mm only, and no non-cash consideration, then iQIYI's financial statements understated the cash amount paid for the investment by RMB6.0mm. In addition, if no non-cash consideration was given in connection with the transaction, iQIYI therefore overstated the cost of its investment and overstated the amount that iQIYI reported as deferred revenue by RMB763,750[15] and overstated the amounts it subsequently reported as revenue by RMB37,595 in 2018 and RMB146,291 in 2019 for the amounts related to the purported non-cash consideration.

111.    By engaging in this sham accounting for its investment in Xin'ai Sports, iQIYI created RMB763,750 of deferred revenue, which it used to prop up and avoid detection of its fraudulent subscriber and revenue growth figures iQIYI was reporting to investors. *See supra* Section IV.E.4.

**F.    The Truth Behind iQIYI's Financial Performance Begins to Emerge**

**1.    April 7, 2020 – The Wolfpack Report Reveals the True Nature of iQIYI's Financial and Operating Metrics**

112.    On April 7, 2020, during market hours, Wolfpack released the Wolfpack Report detailing, among other things, how iQIYI had misled investors and failed to disclose pertinent information related to iQIYI's user numbers and revenue figures.

113.    The Wolfpack Report summarized its findings as:

Our research shows us that ***iQIYI, Inc. ("IQ") was committing fraud well before its IPO in 2018 and has continued to do so ever since.*** Like so many other China-based companies who IPO with inflated numbers, IQ is unable to legitimately grow

---

[15]    In this case, no deferred revenue would have been reported in connection with the acquisition and therefore the amounts recognized as revenue based on the changes in deferred revenue would not have existed in the first place.

their business enough to true up their financial statements. *We estimate IQ inflated its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%.*

*IQ does this by overstating its user numbers by approximately 42%-60%. Then, IQ inflates its expenses, the prices it pays for content, other assets and acquisitions in order to burn off fake cash to hide the fraud from its auditor and investors.*

114. The Wolfpack Report highlighted iQIYI's overstatement of DAUs, and stated, in pertinent part:

**QuestMobile**

In February 2020, QuestMobile published a special report titled "China Mobile Internet Amid COVID-19 Plague" which shows that IQ *overstates its DAU numbers by at least 42%.*

*The report shows that IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ.* Furthermore, the QuestMobile report shows IQ's DAUs did not grow between the 2019 and 2020 Chinese Lunar New Year[.]

115. With respect to iQIYI's contradicting membership growth and declining real deferred revenue figures, the Wolfpack Report stated, in pertinent part:

Between 3Q18 and 1Q19, IQ reported an increase of 16.1 million paying subscribers and an increase in the average subscription period from 6 months to 8 months. However, IQ's deferred revenue declined by 17% during the same period – *this mathematical contradiction shows that at least one of these numbers is made up.*

*With stable net membership growth and steady average revenue per user ("ARPU"), the deferred revenue curve should lead the realized revenue curve. Further, increasing average subscription periods should result in greater front-end accumulation of deferred revenues.*

\* \* \*

The relationship between IQ's deferred revenues and realized revenues is the opposite of what we would expect based on their claims – the realized revenue curve consistently leads the deferred revenue curve and the gap between the two is widening.

\* \* \*

Because IQ's management claimed it added 16.1 million net paying subscribers and that the average subscription period had increased from about 6 months to 8 months between 3Q18 and 1Q19, we expected to find significant growth in deferred revenue as the prepayments accumulated. However, we found the opposite.

*       *       *

IQ's deferred revenues declined from RMB 2,356.3 million at the end of 3Q18 to RMB 1,960.7 million at the end of 1Q19, a 17% decline during that 6-month period. This directly contradicts management's claims of growth in the number of paying subscribers and the average subscription period – ***it is mathematically impossible for both of those statements to be true given the corresponding decline in deferred revenues.***

116.    Publication of the Wolfpack Report caused Baidu ADSs to fall $4.46 per ADS, or 4%, to close at $97.33 on the next full trading day, April 8, 2020, thereby damaging investors.

### 2.    Defendants Continued to Reassure Investors that Their Reported Financial Figures Were Accurate

117.    Despite the devastating reality that began to emerge from the Wolfpack Report, Defendants doubled down on their false and misleading statements by reassuring investors that the report lacked merit. On April 7, 2020, iQIYI issued a press release on its website denying the allegations made in the Wolfpack Report and assuring investors that iQIYI was in compliance with all rules and regulations. The press release stated, in relevant part:

> The Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020. ***The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company***.

> The Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market.

### 3.    August 13, 2020 – iQIYI Discloses SEC and NASDAQ Investigations

118.    Approximately four months after the Wolfpack Report was made public, investors finally learned the true extent, and seriousness, of Defendants' wrongdoing. After the close of

business on August 13, 2020, iQIYI issued a press release announcing iQIYI's Financial Results

for the Second Quarter of 2020. The press release disclosed that the SEC's Division of

Enforcement had opened an investigation into iQIYI based on the allegations in the Wolfpack

Report and had requested financial records, operating records, and other documents from iQIYI as

part of the investigation. The press release further disclosed that iQIYI's Audit Committee had

engaged professional advisers to conduct an internal review of iQIYI's books and records. The

press release stated, in relevant part:

> The SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020 ("Wolfpack Report"). The Company is cooperating with the SEC. We cannot predict the timing, outcome, or consequences of the SEC investigation.

> In addition, shortly after the publication of the Wolfpack Report, the Company engaged professional advisers to conduct an internal review into certain of the key allegations in the Wolfpack Report and to report their findings to the Company's Audit Committee ("Internal Review"). These professional advisers have been examining the Company's books and records and undertaking testing procedures that, in their judgment, are necessary and appropriate to evaluating the key allegations in the Wolfpack Report, including accounting policy analysis, data analytics on whether the Company manufactured orders and inflated revenues and/or expenses. The Internal Review is ongoing and we cannot predict the timing for completion, outcome, or consequences of the Internal Review at this time.

119.    Later that night, iQIYI hosted an earnings call with analysts to discuss its financial

results for the Second Quarter of 2020. On the call, Defendant Wang revealed for the first time

that Defendants knew that NASDAQ and the SEC had opened inquiries into iQIYI based on the

Wolfpack Report *for about three to four months*—*i.e.*, shortly after the publication of the

Wolfpack Report. Defendant Wang explained:

> *I think a couple of weeks after the short seller report*, we received inquiry from both NASDAQ and SEC, the inquiry on a confidential basis. However, we still voluntarily to disclose this inquiry at this time because we want to be transparent to all investors. That's basically the logic behind.

120.     On August 13, 2020, Baidu hosted an earnings call where Defendant Yu similarly acknowledged the existence of the SEC investigation.

121.     On this news, Baidu ADSs fell $7.83 per ADS, or 6%, to close at $116.74 on August 14, 2020, thereby further damaging investors.

122.     Several analysts noted the potential impact of the SEC investigation on the Baidu ADSs price. On August 14, 2020, J.P. Morgan stated that, while iQIYI's better than expected margins were a positive for Baidu, "[o]n the other hand, sentiment on iQiyi will likely weaken on 1) weaker than-expected 3Q20 revenue guidance, and 2) SEC investigation into iQiyi's financial and operating records as well as M&A activities." That same day, UBS issued a report predicting a negative reaction in the Baidu ADSs price in relation to the revelation of the SEC investigation into iQIYI. DBS Group issued a report on August 16, 2020, stating that "[t]he softer-than-expected 3QFY20 revenue growth guidance (i.e. -6% to 2% y-o-y), and SEC investigation on iQIYI might create pressure to its share price in the near term."

### 4.     Post-Class Period Developments

123.     On October 5, 2020, Baidu filed a Form 6-K with the SEC disclosing interim financial results, and also stated that the SEC investigation into iQIYI based on the allegations in the Wolfpack Report was still ongoing.

124.     On March 9, 2021, iQIYI filed its Annual Report on Form 20-F with the SEC for the year ending December 31, 2020. The 2020 Annual Report revealed that the SEC's investigation into iQIYI based on the allegations in the Wolfpack Report was still ongoing, and that the SEC was still "seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in the Wolfpack Report." Baidu filed its 2020 Annual Report that same day, and also acknowledged that the SEC investigation was still ongoing.

125.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Baidu's securities, Plaintiffs and other Class members suffered significant losses and damages.

**G.   iQIYI Violated Applicable Chinese and U.S. Accounting Principles**

126.   As discussed above, iQIYI's purportedly GAAP-compliant reported revenues in its SEC filings were overstated as compared to iQIYI's financial reporting and tax filings with the PRC government. However, the significant difference in reported revenues in China and in the U.S. is not attributable to different standards in the two countries. Indeed, the accounting standards in China and the U.S. are the same with respect to the recording of deferred revenue and come with the same steep penalties and drastic consequences if the reporting company files inaccurate information.

127.   Accordingly, the significant disparity between iQIYI's reported revenue in China and the U.S. demonstrates that iQIYI overstated its revenue figures in its SEC filings.

**1.   The PRC Required iQIYI to File Accurate Financial Statements with Chinese Regulators**

128.   Among the many PRC governmental entities with supervision over corporations and their business activities in China is the State Administration for Market Regulation ("SAMR"). SAMR was created in 2018 through the merger of the State Intellectual Property Office and the SAIC. SAMR succeeded to the responsibilities and oversight previously carried out by the SAIC. Indeed, up until 2018, the SAIC was the Chinese government body that regulated industry and commerce in China. Now those responsibilities are undertaken by the SAMR.

129.   SAMR and the SAIC is and was primarily responsible for overseeing business-organizations, including business registrations, issuing and renewing business licenses, periodic filings and acts as the government supervisor and regulator of corporations. Pursuant to PRC law

and regulations, all Chinese companies are required to: (i) file audited financial statements pursuant to Chinese GAAP with the Chinese government annually or bi-annually; and (ii) file amendments to its business registration records whenever there is a change to its owners, business address, legal representative, and board of directors and etc. within 15 or 30 days of such changes depending on character of its business.

130.    Article 9 of the PRC Individual Proprietorship Enterprises Company Law requires registration of the enterprise's initial investor, and Article 15 of the same law requires filing of an amendment with the SAIC office whenever the investor is changed.

131.    Although the law does not specify any effect on the new investors as a result of a delayed SAIC registration except a monetary penalty, under PRC laws, a new owner's or investors' registration of ownership with the SAIC office is the conclusive way to determine the true owner or investor of an entity—especially when a third party claims the same interest in the entity. Therefore, in practice, the actual owners and investors will always have their interest registered with the SAIC office immediately after the interest is transferred, and the SAIC registration is often regarded as the final and necessary step in the closing of a transaction.

132.    PRC Company Law, Article 165 requires that every business entity file a financial statement that is audited by an accounting firm with the SAIC as part of the annual inspection. The financial statements are required to be prepared according to PRC GAAP, which, as discussed below, is the same as U.S. GAAP for all relevant purposes.

### a.    SAIC and SAMR Filings Are Reliable

133.    Under PRC law, the penalties for filing false SAIC filings include fines and revocation of the entity's business license. Moreover, if an entity's business license is revoked, the People's Bank of China requires the bank account of that entity to be closed.

134.    Without a business license, the entity cannot legally conduct business in the PRC. Thus, Baidu and iQIYI had a strong incentive to file accurate annual reports with the SAIC because their businesses could be shut down if either company was caught filing false financial statements.

135.    SAIC filings also must be signed by the legal representative of the entity submitting it. The legal representative also must certify to the accuracy of the financial statements by stating "I confirm that the content of the submitted company's annual inspection report is true."

136.    PRC law also requires financial statements filed with the SAIC by iQIYI's subsidiaries to be audited by Chinese CPA firms in conformance with Chinese GAAP. Further, the law requires that all revenue earned from any source by the entity must be recorded as revenue during the fiscal year such revenue is earned. This rule governs reporting both to the SAIC and to the State Tax Bureau, and it imposes an obligation to report all revenue (and related financial statement items) timely, completely, and accurately.

**b.    Chinese GAAP, U.S. GAAP, and iQIYI's Own Accounting Policies Were the Same for Revenue Recognition Purposes**

137.    Chinese GAAP is substantially similar to U.S. GAAP. In particular, for revenue recognition for the sale of goods, U.S. GAAP, Chinese GAAP, and iQIYI's stated revenue recognitions policy are the same.

138.    Indeed, global accounting regulators have issued reports specifically stating that there are no differences between U.S. GAAP and Chinese GAAP. For example, the Committee of European Securities Regulators ("CESR"), issued a report entitled "CESR's advice on the equivalence of Chinese, Japanese and US GAAPs (2007)," which explained that there were no significant differences between U.S. GAAP and International Financial Reporting Standards ("IFRS"). Moreover, according to the same report, there are no significant differences regarding revenue recognition between IFRS and Chinese GAAP. As a result of the similarity of the two,

- 41 -

there are no significant differences between U.S. GAAP and Chinese GAAP that can explain the differences in iQIYI's PRC filed financial statements and those it filed with the SEC.

139.   iQIYI's stated accounting policies also conform to the same revenue recognition accounting principles as U.S. or Chinese GAAP. In the Registration Statement, iQIYI's describes its revenue recognition policy as follows:

> Revenue is recognized only when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the related fee is reasonably assured under ASC subtopic 605-10, *Revenue Recognition: Overall*, or ASC 605-10.

140.   iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding membership services as follows:

*Membership services*

The Group offers membership services to subscribing members with various privileges, which primarily including access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which the Group acquires and controls before they are transferred to subscribing members.

141.   iQIYI's 2018 Form 20-F describes its revenue recognition policies regarding live broadcasting, in relevant part, as: "Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as 'Customer advances and deferred revenue.'"

142.   The iQIYI 2018 Annual Report describes its revenue recognition policies regarding contract balances as the following:

*Contract balances*

Contract liabilities are mainly comprised of payments received for membership fees and virtual currency sold for which the corresponding services have not yet been provided to customers and are presented as "Customer advances and deferred revenue" on the consolidated balance sheets. The increase in customer advances and deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Group's customers.

143.    The Chinese accounting standard governing revenue recognition for iQIYI's PRC subsidiaries, ASBE 14, is essentially the same. It states:

Chapter II Revenue from Selling Goods

Article 4. No revenue from selling goods may be recognized unless the following conditions are met simultaneously:

(1) The significant risks and rewards of ownership of the goods have been transferred to the buyer by the enterprise;

(2) The enterprise retains neither continuing management involvement to the degree usually associated with ownership, nor effective control over the goods sold;

(3) The relevant amount of revenue can be measured in a reliable way;

(4) The relevant economic benefits associated with the transaction will flow to the enterprise; and

(5) The relevant costs incurred or to be incurred can be measured in a reliable way.

144.    Thus, differences between U.S. GAAP and Chinese GAAP cannot be the cause of the huge differences in deferred revenue between iQIYI's SEC filed financial statements and its SAIC financial statements. Even if, despite all appearances, iQIYI's subsidiaries' PRC government filings were inaccurate, iQIYI should have disclosed that it filed inaccurate filings with the Chinese government. If the Chinese government discovered that iQIYI had filed false financial statements by consulting iQIYI's SEC filings, the Chinese government could impose substantial penalties on iQIYI's subsidiaries, including revocation of the responsible subsidiaries' business licenses, accounting for substantially all of iQIYI's revenues and assets.

c.    **iQIYI's Use of VIEs Does Not Explain the Divergence in U.S. and Chinese Reported Revenues**

- 43 -

145. As discussed above, iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. iQIYI conducts its business in China through the following VIEs: Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Beijing iQIYI Cinema, and their respective subsidiaries.

146. As discussed above, certain contractual agreements (i) give iQIYI or its wholly owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs; (ii) obligate iQIYI to absorb losses of the VIEs that could potentially be significant to the VIEs; and (iii) entitle iQIYI or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs.

147. ASC 810-25-38 requires companies to consolidate VIEs in their financial statements if iQIYI will absorb or receive the majority of the VIE's expected losses or returns. iQIYI purports to comply with GAAP by consolidating its VIEs and their subsidiaries as required by ASC 810 and SEC Regulation SX-3A-02. Accordingly, iQIYI's use of VIEs does not explain why iQIYI's deferred revenues it reported in the PRC are substantially different than the deferred revenues it reported in the U.S.

## V. Materially False and Misleading Statements

148. Plaintiffs allege that the Defendants made the following false and misleading statements of material fact highlighted in bold and italics within this section. As alleged herein, such statements artificially inflated or maintained the price of Baidu's publicly traded ADSs and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

### A. iQIYI's False and Misleading Statements

149. The following false and misleading statements were made by or on behalf of iQIYI.

### 1.    Defendants Misrepresented iQIYI's Daily Active Users

150.    On March 28, 2018, the SEC declared effective iQIYI's Registration Statement, which iQIYI filed on February 27, 2018 on Form F-1 with the SEC in connection with its IPO. The Registration Statement was signed by Defendants Gong, Wang, Y. Li, and Yu and contained materially false or misleading statements concerning iQIYI's DAU metrics.

151.    The Registration Statement stated that iQIYI's number of DAUs were higher than they actually were. For instance, the Registration Statement stated that iQIYI has "***a massive and highly engaged user base, which drives [its] revenue growth***."

152.    Similarly, the Registration Statement stated that, "[b]etween the fourth quarters of 2015 and 2016, ***[the Company's] average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million***, and [its] average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million."

153.    The Registration Statement also provided that, "[b]etween the fourth quarters of 2016 and 2017, ***[the Company's] average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million***, and [its] average mobile MAUs increased by 3.9% from 405.4 million to 421.3 million."

154.    On March 15, 2019, iQIYI filed with the SEC its 2018 Annual Report on Form 20-F for the year ended December 31, 2018 (the "iQIYI 2018 Annual Report"). Attached to the iQIYI 2018 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud. The iQIYI 2018 Annual Report stated that "[f]or the year of 2018, our average mobile MAUs were 454.5 million and ***our average mobile DAUs were 135.4 million.***"

155.     On March 12, 2020, iQIYI filed with the SEC its 2019 Annual Report on Form 20-F for the year ended December 31, 2019 (the "iQIYI 2019 Annual Report"). Attached to the iQIYI 2019 Annual Report were certifications pursuant to SOX signed by Defendants Gong and Wang, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud. The iQIYI 2019 Annual Report stated that "[f]or the year of 2019, our average mobile MAUs were 476.0 million and ***our average mobile DAUs were 139.9 million.***"

156.     The statements referenced in ¶¶148-153 were materially false and misleading because iQIYI had substantially fewer mobile DAUs than Defendants disclosed in the Registration Statement and 2018 and 2019 Annual Reports.

157.     Indeed, as set forth in Section IV.E.1, iQIYI overstated it DAUs for the fourth quarters of 2015, 2016, and 2017, and its DAUs for the full years 2018 and 2019, when compared to information compiled by QuestMobile, in the following amounts and percentages as shown in the following summary table:

| iQIYI's Average Mobile Daily Active Users (in millions) | | | | |
|---|---|---|---|---|
| Time Period | DAUs as Disclosed by iQIYI | DAUs According to QuestMobile | Amount Overstated vs. QuestMobile | Percentage Overstated vs. QuestMobile |
| 2015 Q4 | 88.3 | 59.0 | 29.3 | 50.0% |
| 2016 Q4 | 125.4 | 94.0 | 31.4 | 33.4% |
| 2017 Q4 | 126.0 | 113.0 | 13.0 | 11.5% |
| 2018 (full year) | 135.4 | 122.6 | 12.8 | 10.4% |
| 2019 (full year) | 139.9 | 114.2 | 25.7 | 22.5% |

158.     Further, a separate independent third-party research company—Aurora—reported that iQIYI's DAU were far below the DAU metrics disclosed by iQIYI. In the six monthly examinations between December 2017 and March 2019, iQIYI never had more than 90 million

mobile DAU despite iQIYI reporting 126 million mobile DAU for the fourth quarter of 2017 and 135.4 million mobile DAU for 2018.

| Month | iQIYI Mobile DAUs According to Aurora |
|---|---|
| December 2017 | 86.1 million[16] |
| March 2018 | 87.6 million |
| June 2018 | 86.3 million |
| September 2018 | 85.6 million[17] |
| December 2018 | 82.0 million |
| March 2019 | 87.5 million[18] |

### 2. Defendants Misrepresented iQIYI's Deferred Revenue

159. The Registration Statement also misrepresented the amount of iQIYI's deferred revenue. iQIYI's Registration Statement stated that iQIYI's customer advances and deferred revenue was **RMB339,880,000** as of December 31, 2015; **RMB796,703,000** as of December 31, 2016; and **RMB1,633,649,000** as of December 31, 2017.

160. The deferred revenue amounts were materially false and misleading because reliable data in third-party credit reports show that the deferred revenue of iQIYI's operating subsidiaries was substantially lower than Defendants disclosed in the Registration Statement.

161. Indeed, as set forth in Section IV.E.2, iQIYI credit reports show that the deferred revenue amounts iQIYI reported in the Registration Statement are inaccurate:

| iQIYI's Deferred Revenue (RMB in thousands) | | | |
|---|---|---|---|
| | 2015 | 2016 | 2017 |
| Deferred Revenue as Reported in Registration Statement | 339,880 | 796,703 | 1,633,649 |
| Deferred Revenue Reported for VIEs | 93,963 | 300,037 | 877,206 |
| Overstatement of Deferred Revenue | 245,917 | 496,666 | 756,443 |
| Percentage Overstatement of Deferred Revenue | 261.7% | 165.5% | 86.2% |

---

[16]  http://www.199it.com/archives/711971.html, last viewed December 11, 2020.

[17]  http://www.199it.com/archives/789526.html, last viewed December 11, 2020.

[18]  http://www.199it.com/archives/872190.html, last viewed December 11, 2020.

162. Notably, the deferred revenue that Defendants reported in the Registration Statement (¶157), was false and misleading. As discussed above, *see supra* Section IV.G, deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs, while the amounts that iQIYI provided in its Registration Statement were vastly overstated. Indeed, filings with the SAIC and PRC tax authorities are considered likely the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts but are subject to penalties imposed in China for false documents with the SAIC or PRC tax authorities. Additionally, ASC 810 and iQIYI's own accounting policies required iQIYI to consolidate its VIEs' deferred revenue in its financial statements.

163. Further, the iQIYI 2018 Annual Report, signed by defendant Y. Li, attached certifications pursuant to SOX, signed by Defendants Gong and Wang, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud. The iQIYI 2018 Annual Report repeated the false statement that iQIYI's customer advances and deferred revenue were ***RMB1,633,197,000*** as of December 31, 2017.

164. Defendants' statement above (¶161) was materially false and misleading for the same reasons set forth in ¶160.

### 3. Defendants Misled Investors About Their Equity Interest in Xin'ai Sports

165. On August 6, 2018, iQIYI issued a press release announcing iQIYI would partner with Super Sports Media, to set up joint venture Xin'ai. The press release stated that existing

members of both Super Sports Media and the tennis-focused membership program on iQIYI would receive full membership status in the new app.

166.    The iQIYI 2018 Annual Report, signed by defendant Y. Li, attached certifications pursuant to SOX, signed by Defendants Gong and Wang, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud. The iQIYI 2018 Annual Report stated the following, in pertinent part, about iQIYI's equity interest in Xin'ai:

> In July 2018, the Company acquired a 32% outstanding equity interest amounting to RMB796,000 (US$115,773) in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Company has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. ***The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 (US$88,648) was recognized as basis differences and investment goodwill.*** As of December 31, 2018, the Group held 29% of Xin'ai's equity interest due to new financing investors' dilution.
>
> As of December 31, 2017 and 2018, besides Xin'ai the Group held several other equity method investments through its subsidiaries or VIEs, all of which the Group can exercise significant influence but does not own a majority equity interest in or has control over. The other equity method investments were not significant. The carrying amount of the Group's equity method investments including Xin'ai was RMB10,363 and RMB810,553 (US$117,890) as of December 31, 2017 and 2018, respectively.

167.    Critically, the iQIYI 2018 Annual Report reported ***RMB763,750*** as "Acquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to [Xin'ai]."

168.    Similarly, the iQIYI 2019 Annual Report was signed by Defendant Y. Li, and attached certifications pursuant to SOX signed by Defendants Gong and Wang, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control

over financial reporting, and the disclosure of all fraud. The iQIYI 2019 Annual Report disclosed the following about iQIYI's equity investment in Xin'ai:

> In July 2018, the Group acquired a 32% outstanding equity interest amounting to RMB796,000 in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Group has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. ***The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 was recognized as basis differences and investment goodwill. As of December 31, 2019, the Group's equity interest was diluted to 26% of Xin'ai's total equity due to a subsequent round of equity financing.***
>
> As of December 31, 2018 and 2019, besides Xin'ai the Group held several other equity method investments through its subsidiaries or VIEs, all of which the Group can exercise significant influence but does not own a majority equity interest in or has control over. The other equity method investments were not significant. The carrying amount of the Group's equity method investments including Xin'ai was RMB810,553 and RMB663,376 (US$95,288) as of December 31, 2018 and 2019, respectively.

169.    Similarly, the iQIYI 2019 Annual Report reported ***RMB763,750*** as "Acquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue in relation to content distribution, licenses of intellectual property and traffic support services to be provided to [Xin'ai]."

170.    Defendants' above misstatements concerning iQIYI's interest in Xin'ai were materially false and misleading because the RMB763,750 figure was improperly classified as deferred revenue. Indeed, as set forth in Section IV.E.4, iQIYI's characterization of its obligation to transfer goods and services to Xin'ai as deferred revenue was improper because this was not a revenue transaction with a customer. Instead, it was a promise to transfer goods and services at cost as consideration for the purchase of a long-term investment and represented a liability, but not deferred revenue to later be recognized as revenue in iQIYI's income statement as a culmination of an earnings process.

171.     For these reasons, the iQIYI Defendants also overstated the amounts iQIYI reported

as revenue by RMB37,595 in 2018 and RMB146,291 in 2019 for the non-cash consideration it

purportedly transferred to Xin' ai, in 2018 and 2019 as partial satisfaction of its obligation in

connection with its equity investment.

### 4.     Defendants Misled Investors by Reassuring the Market that the Wolfpack Report Lacked Merit

172.     April 7, 2020, Wolfpack published its report and revealed to investors for the first

time that iQIYI's user numbers and deferred revenues were inflated. Despite the devastating reality

that began to emerge from the Wolfpack Report, however, Defendants continued issuing false and

misleading statements by reassuring investors that the report lacked merit. For instance, on April

7, 2020, iQIYI issued a press release on its website denying the allegations made in the Wolfpack

Report and assuring investors that iQIYI is in compliance with all rules and regulations. The press

release stated, in relevant part:

> The Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020. *The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company*.
>
> *The Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market*.

173.     Notably, iQIYI provided no details to refute the allegations in the Wolfpack Report.

The statements referenced in ¶170 were materially false and misleading for the same reasons set

forth in ¶¶154, 158, 160, 169.

174.     Further, these denials mattered to Baidu investors because: (i) iQIYI was the fastest

growing segment of Baidu's business in terms of revenue; (ii) Baidu continued to retain a majority

ownership stake in iQIYI, worth billions of dollars; (iii) iQIYI was only one of three reporting segments for Baidu; and (iv) Baidu incorporated iQIYI's financials into its own.

**B.** **Baidu's False and Misleading Statements**

175. The following false and misleading statements were made by or on behalf of Baidu.

**1.** **Defendants Misrepresented iQIYI's Daily Active Users**

176. On March 15, 2019, Baidu filed the 2018 Baidu Annual Report on a Form 20-F signed by Defendant Y. Li. Attached to the 2018 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

177. The 2018 Baidu Annual Report stated that, with respect to iQIYI daily active users, that "For the year of 2018, iQIYI's average mobile MAUs were 455 million, ***and its average mobile DAUs were 135 million***."

178. On March 13, 2020, Baidu filed with the SEC the 2019 Baidu Annual Report on a Form 20-F signed by Defendant Y. Li. Attached to the 2019 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting and the disclosure of all fraud.

179. The 2019 Baidu Annual Report stated that, with respect to iQIYI daily active users, that "[f]or the year of 2019, iQIYI's average mobile MAUs were 476 million, ***and its average mobile DAUs were 140 million***."

180. On April 4, 2020, Baidu issued a Prospectus on Form 424B2 which stated, in pertinent part, that "[f]or the year of 2019, iQIYI's average mobile MAUs were 476.0 million, and its ***average mobile DAUs were 139.9 million***."

181.     The statements referenced in ¶¶174-178 were materially false and misleading for the same reasons identified in ¶¶154-156. In short, data provided by two leading research firms that publish industry reports on China's mobile internet market, QuestMobile and Aurora, show iQIYI had substantially fewer mobile DAUs than Defendants disclosed in the Registration Statement.

### 2.     Baidu Defendants Misrepresented Baidu's Deferred Revenue

182.     On April 8, 2016, Baidu filed with the SEC its annual report for the year ended December 31, 2015 (the "2015 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li. Attached to the 2015 Baidu Annual Report were certifications pursuant SOX signed by Defendants Y. Li and X. Li, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

183.     The 2015 Baidu Annual Report stated that Baidu's deferred revenue was **_RMB375,672,000_** for 2015.

184.     On March 31, 2017, Baidu filed with the SEC its annual report for the year ended December 31, 2016 (the "2016 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li. Attached to the 2016 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and X. Li, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

185.     The 2016 Annual Report stated that Baidu's deferred revenues were **_RMB375,672,000_** for 2015 and **_RMB596,460,000_** for 2016.

186.     On March 15, 2018, Baidu filed with the SEC its annual report for the year ended December 31, 2017 (the "2017 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li. Attached to the 2017 Baidu Annual Report were certifications pursuant to SOX signed by

Defendants Y. Li and Yu, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

187.    The 2017 Annual Report stated that Baidu's deferred revenues were **RMB596,460,000** for 2016 and **RMB788,000,000** for 2017.

188.    On March 15, 2019, Baidu filed with the SEC the 2018 Baidu Annual Report on Form 20-F signed by Defendant Y. Li. Attached to the 2018 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

189.    The 2018 Baidu Annual Report stated that Baidu's deferred revenues were **RMB788,000,000** for 2017 and **RMB1,883,000,000** for 2018.

190.    On March 13, 2020, Baidu filed with the SEC the 2019 Baidu Annual Report on Form 20-F signed by Defendant Y. Li. Attached to the 2019 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu, attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.

191.    The 2019 Baidu Annual Report stated that Baidu's customer deposits and deferred revenues were **RMB9,221,000,000** for 2018 and **11,062,000,000,000** for 2019.

192.    The statements referenced in ¶¶180-189 above were materially false and/or misleading because they incorporated iQIYI's deferred revenue numbers which, as set forth in Section V.A.2 above, were materially false and misleading. Therefore, Baidu's deferred revenues were misstated for the same reasons that iQIYI's were.

## VI.    Loss Causation

193.    The truth regarding Defendants' fraud was revealed in a series of partial corrective disclosures that occurred on April 7, 2020 and August 13, 2020. The Baidu ADSs price fell precipitously as these news events alerted investors to the Defendants' fraud and the artificial inflation caused by Defendants' unlawful conduct exited the Baidu ADSs price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on August 13, 2020, that the full truth was known to the market, such that there was no longer any artificial inflation in the Baidu ADSs price attributable to the fraud.

194.    The declines in the Baidu ADSs price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations.

195.    These price declines removed the inflation from the price of the Baidu ADSs, causing real economic loss to investors who had purchased Baidu ADSs during the Class Period.

### A.    April 7, 2020 – First Partial Disclosure

196.    On April 7, 2020, Wolfpack Research released its report during trading hours, detailing the Defendants' fraud. The Wolfpack Report—citing to and relying on financial statements iQIYI filed with the Chinese Government, as well as other sources—explained that iQIYI significantly inflated its user base, its revenue, and other operating and performance measures.

197.    For example, *inter alia*, the Wolfpack Report found that "IQ inflated its 2019 revenue by approximately RMB 8-13 billion, or 27%-44%," and that iQIYI "overstat[ed] its user numbers by approximately 42%-60%." Similarly, the report stated that "IQ's average mobile DAUs were only 126.2 million during the first 10 days of the 2020 Chinese Lunar New Year, versus 180 million average mobile DAUs claimed by IQ." Furthermore, the Wolfpack Report

explained that Defendants misrepresented iQIYI's deferred revenues. Moreover, it stated that "IQ created ~$110 million of deferred revenue by overstating its purported contribution to its XIN'ai Sports (iQIYI Sports) JV," and further stated that iQIYI's "management uses [that] to inflate its revenues." The Wolfpack Report provided detailed support and citations for its conclusions and findings.

198.    Notably, according to the Wolfpack Report, its research proved that "iQIYI, Inc. ("IQ") was committing fraud well before its IPO in 2018 and has continued to do so ever since."

199.    Later that day, iQIYI issued a press release announcing that the "Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020."

200.    The Wolfpack Report partially (but incompletely) revealed some of the relevant truth about Defendants' prior misstatements concerning iQIYI's daily active users, revenue, deferred revenue, membership services, and its investment in Xin'ai.

201.    On this news, Baidu ADSs fell $4.46 per ADS, or 4%, to close at $97.33 on the next full trading day, April 8, 2020, damaging investors.

**B.    August 13, 2020 – Final Partial Disclosure**

202.    On August 13, 2020, the relevant truth was fully revealed. On that date, after the market closed, iQIYI issued a press release disclosing that the "SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in a report issued by short-seller firm Wolfpack Research in April 2020." Defendants also revealed to the public that iQIYI's Audit Committee had engaged professional advisers to conduct an internal review of iQIYI's books and records.

203.    Later that night, during an earnings call with analysts to discuss iQIYI's financial results for the Second Quarter of 2020, iQIYI further disclosed that NASDAQ had also launched an inquiry into the Wolfpack allegations. Notably, Defendants admitted on this call that they had known about the SEC and NASDAQ inquiries for months prior—shortly after the release of the Wolfpack Report.

204.    The August 13, 2020 disclosures that the SEC initiated an investigation into iQIYI and sought iQIYI's financial and operating records and that iQIYI's Audit Committee initiated its own internal review, as well as the disclosure that NASDAQ had also launched an inquiry into the Wolfpack allegations, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations concerning iQIYI's financial and operating performance and its investment in Xin' ai Sports.

205.    Moreover, the August 13, 2020 disclosures revealed new information that Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market. These disclosures revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding iQIYI's daily active users, deferred revenue, membership services, and investment in Xin'ai.

206.    On this news, Baidu ADSs fell $7.83 per ADS, or 6%, to close at $116.74 on August 14, 2020, damaging investors.

207.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of iQIYI's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL INDICIA OF SCIENTER

208.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over iQIYI's, Baidu's, and the Individual

Defendants' materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the numerous allegations above setting forth Defendants' knowledge of inflated user numbers and deferred revenue alleged above, Defendants' scienter is further evidenced by the following facts.

A. **iQIYI's User Numbers and Revenue Figures Were Critical to Its Core Operations**

209. The Individual Defendants' knowledge of iQIYI's inflated user numbers—in particular, DAU and membership service revenues—and deferred revenues can be inferred because these facts were critical to iQIYI's core operations.

210. Indeed, as set forth in Section IV.E.1, daily active users is one of the most important metrics investors look to when investing in a media company like iQIYI because it generates a vast majority—over 75%—of its revenue through a combination of selling subscriptions to its online streaming service and by selling advertisements on its platform. Both revenue streams depend almost entirely on the number of active users subscribing to and watching iQIYI programs.

211. Most major online media and social media platforms, including YouTube, TikTok and Facebook, use DAU as a critical user metric. And iQIYI was no different. The most accurate way for investors to assess iQIYI's overall viewership numbers (and the revenues it generated therefrom) was by looking to the number of DAU, that were using iQIYI's platform.  Similarly, this was the most accurate way for Baidu investors to value the Company's investment in iQIYI.

212. Indeed, iQIYI's Registration Statement and Annual Reports claimed iQIYI was the largest internet video streaming service in China for both mobile apps and PCs in terms of average

DAUs and total user time spent on the platform. In its SEC filings, iQIYI defined mobile DAUs on its platform as the number of unique mobile devices that had accessed the iQIYI platform through its mobile app at least once during a day. iQIYI's SEC filings in fact stated that a "massive and highly engaged user base," which includes DAU, was one of iQIYI's key competitive strengths and that the iQIYI's success "was primarily attributable" to those key competitive strengths.

213.    iQIYI touted in the Registration Statement that "[w]e are one of the largest internet companies in China in terms of user base." The Registration Statement flatly stated:

> *We have a massive and highly engaged user base, which drives our revenue growth*. Our ability to continue to effectively maintain and expand our user base will affect the growth of our business and our revenues going forward.

214.    The DAU metric was central to iQIYI's purported success because both it and the market expect China's non-paying internet video users to rapidly convert into paying customers. Indeed, iQIYI's monetization model centered on converting DAUs into paying members. As iQIYI explained in the Registration Statement:

> *Monetization Opportunities in the Internet Video Industry in China*
>
> *Internet video platforms in China currently generate revenues mainly from membership services and online advertising*. Monetization through derivative works is also expected to become an increasingly important revenue source. The industry has shifted from heavy reliance on online advertising revenues to a more balanced and diversified revenue generation model.
>
> [ ] *Chinese consumers are increasingly willing to pay fees to internet video platforms to access premium content and quality services*. According to the iResearch Report, paying ratio of internet video users in China, as measured by number of users who pay for video content related services during the year as a percentage of total number of internet video users in the same year, has increased from approximately 1.2% in 2012 to 13.2% in 2016, and is expected to further increase to 40.0% in 2022.

215.    The Registration Statement boasts that iQIYI "reshaped the internet video streaming industry in China by successfully cultivating users' willingness to pay for content."

216.    As Defendant Gong stated on iQIYI's May 17, 2019 Earnings Call, iQIYI's business is "mainly focused on converting free users into paying users." Each DAU that is not a paying member represents an attainable growth opportunity for the Company.

217.    Thus, inflating iQIYI's DAUs misled the market about its ability to attract more paying members. As an HSBC analyst report stated in August 2019, "[w]e expect iQIYI's live streaming and game business can leverage on iQIYI's 590m MAU and 120m DAU for traffic conversion and therefore could see upside to help drive faster growth in other revenue." The Individual Defendants undoubtedly followed the iQIYI's DAU metrics closely and fully understood that falsely inflating the DAU would materially mislead investors.

218.    Similarly, with respect to membership service revenues, as set forth in Sections IV.E.2 and 4, iQIYI's primary source of deferred revenue was the purchase of customer memberships, making membership service revenues one of iQIYI's top priorities. For instance, according to the iQIYI 2018 Annual Report, membership services accounted for 42.5% of revenues, which, according to the iQIYI 2019 Annual Report, increased year over year to 49.8% of revenues.

219.    In fact, the Individual Defendants themselves stressed the importance of membership service revenues to iQIYI's business. For example, Defendant Wang stated in an October 31, 2018 Press Release that "[m]embership services . . . [was] the biggest revenue contributor for [iQIYI]." Defendant Wang likewise stated in a February 21, 2019 announcement of Fourth Quarter results that "[m]embership business continued to be the main engine driving our growth." Moreover, Defendant Wang stated in a May 16, 2019 Press Release that "[m]embership

business again spearheaded the growth in the quarter, reflecting the strength and popularity of our vast library of premium content." Furthermore, Defendant Gong stated in a November 6, 2019 Press Release that "our subscription business contributed more than half of our total quarterly revenues for the first time." And again, in a February 27, 2020 Press Release Defendant Gong touted that "membership business continued to spearhead our overall growth throughout the year, driven by the increasing number of total subscribing members which reached 107 million at year end."

220.    Even the media recognized iQIYI's active users and membership services to be of utmost important to iQIYI's business. For example, a Seeking Alpha article published on March 28, 2018 explained that "[i]t's clear from iQIYI's strategy [] that it intends membership services to be the ***anchor*** of its business."

221.    Additionally, as set forth in Section IV.E.4, Xin'ai Sports represented a significant amount of iQIYI's business. Indeed, iQIYI and its analysts viewed Xin'ai Sports as a growth vehicle for the Company. For example, Defendant Gong explained on an October 31, 2018 Earnings Call for the Third Quarter of 2018 that "[t]he new joint venture will operate all sports-related content business, including the upgraded iQIYI Sports app, which brings together an extensive offering of sports content with smoother user experience." On August 20, 2019, as part of iQIYI's Earnings Call for the Second Quarter of 2019, Defendant Gong further explained that Xin'ai was "an important part of our content library" and similarly reaffirmed that "sports content is obviously a very important racetrack for us."

222.    Analysts likewise understood the transaction to be important for iQIYI. An August 22, 2019 analyst report from Industrial Securities echoed Defendant Gong's enthusiasm, stating that "sports content is highly valued by iQIYI" and "may become a new growth point for iQIYI."

Further, an October 23, 2019 analyst report from CCB International stated that iQIYI's plan to increase sports video content would "extend the company's audience base to include more elderly and affluent viewers," which would help provide a "considerable increase" of paying subscribers.

223.     And given Baidu's majority ownership of iQIYI, and that iQIYI was a critical asset (worth billions of dollars) and the principal driver of Baidu's growth during the Class Period, Individual Defendants Y. Li, X. Li, and Yu were well aware that iQIYI's performance was critical to Baidu as well.

224.     Therefore, the knowledge that iQIYI inflated its user numbers and deferred revenue figures can be imputed to the Individual Defendants.

### B.     That Defendants Waited Months to Tell Investors About the SEC and NASDAQ Investigations Supports a Strong Inference of Scienter

225.     Furthermore, as a way to conceal from investors Defendants' wrongdoing, Defendants hid from investors—for roughly four months—that the SEC and NASDAQ initiated investigations into the very topics that form the false and misleading statement alleged herein.

226.     The Wolfpack Report, published on April 7, 2020, first revealed certain of Defendants' wrongdoing, including the false inflation of iQIYI's DAUs and the gamesmanship surrounding iQIYI's deferred revenue. Shortly after the Wolfpack Report was released, Defendants received notice that the SEC and NASDAQ initiated investigations and sought documents related to the allegations in the Wolfpack Report. It was not until August 13, 2020, however, that Defendants revealed that such investigations existed. Defendant Wang admitted on that day that Defendants had received inquiries from both NASDAQ and the SEC within a "a couple weeks" of the release of the Wolfpack Report.

227.     Even if Defendants did not have an affirmative duty to disclose the investigations, not doing so supports an inference of scienter that they knew their financial and operating

performance metrics were inflated, yet were trying to downplay the Wolfpack Report by making investors think the allegations from the report were untrue and not serious enough to lead to potential regulatory consequences.

### C. Defendants' Financial Motivation to Inflate iQIYI's User Numbers and Deferred Revenue Supports a Strong Inference of Scienter

228.    Defendants Y. Li, iQIYI, and Baidu were each highly motivated to mislead investors about iQIYI's financial and operating performance in the Registration Statement and throughout the Class Period.

229.    iQIYI reaped $2.25 billion in cash from the IPO, which was the second largest IPO ever for a Chinese company in the United States. Following the IPO, and throughout the Class Period, Baidu owned a majority of iQIYI and maintained 92.7% voting control. With complete control over iQIYI, Baidu had the ability to, and did, enter into myriad related party transactions that provided benefits to Baidu. Additionally, Defendant Y. Li beneficially owned over 5.6 million shares of Baidu throughout the Class Period. As iQIYI's annual reports concede, Defendant Y. Li "has the majority voting power in Baidu and is deemed to beneficially own iQIYI's shares held by Baidu Holdings."

### D. Defendants Gong and Wang's SOX Certifications Support a Strong Inference of Scienter

230.    Accompanying iQIYI's 2018 and 2019 Annual Reports, which contained materially false and misleading statements, Defendants Gong and Wang executed certifications pursuant SOX Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to the iQIYI's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendants Gong and Wang were "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the Company's disclosure controls and procedures." The SOX Section 302 certifications further stated

that Defendants Gong and Wang "evaluat[ed] [] internal control over financial reporting," and that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." Defendants Gong and Wang also executed certifications pursuant to SOX Section 906, which accompanied the 2018 and 2019 Annual Reports, attesting to the accuracy of iQIYI's financial reporting.

231.    By signing these certifications, Defendants Gong and Wang certified that the of iQIYI's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access (and purported review of) iQIYI's financial data, as well as the materially false and misleading statements set forth above.

232.    Contrary to Defendants Gong's and Wang's representations, throughout the Class Period, iQIYI suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, Defendants' inflated user numbers and deferred revenue figures rendered Defendants' public statements materially false and misleading.

233.    Had Defendants Gong and Wang actually conducted the assessments and evaluations required, they would have discovered iQIYI's inflated user numbers and deferred revenue figures misrepresentations and the omissions contained within their public statements. Accordingly, Defendants Gong and Wang, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

### E.    Defendants Y. Li, X. Li, and Yu's SOX Certifications Support a Strong Inference of Scienter

234.    Accompanying Baidu's 2015 through 2019 Annual Reports, which contained materially false and misleading statements, Defendants Y. Li and X. Li, for the years 2015 and 2016, and Defendants Y. Li and Yu for the years 2017 through 2019, executed certifications pursuant SOX Section 302 attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud. The certifications stated that Defendants Y. Li, X. Li, and Yu were "responsible for establishing and maintaining disclosure controls and procedures" and "[e]valuated the effectiveness of the Company's disclosure controls and procedures." The SOX Section 302 certifications further stated that Defendants Y. Li, X. Li, and Yu "evaluat[ed] [] internal control over financial reporting," and that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e] report." Defendants Y. Li, X. Li, and Yu also executed certifications pursuant to SOX Section 906, which accompanied the 2015 through 2019 Annual Reports, attesting to the accuracy of the Company's financial reporting.

235.    By signing these certifications, Defendants Y. Li, X. Li, and Yu certified that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, evidencing their access (and purported review of) Baidu's financial data as well as the materially false and misleading statements set forth above.

236.    Contrary to Defendants Y. Li's, X. Li's, and Yu's representations, throughout the Class Period, Baidu suffered from severe internal control deficiencies and deficient disclosure controls and procedures, as evidenced by the fact that, as alleged herein, Defendants' inflated user

numbers and deferred revenue figures rendered Defendants' public statements materially false and misleading.

237.    Had Defendants Y. Li, X. Li, and Yu actually conducted the assessments and evaluations required, they would have discovered iQIYI's inflated user numbers and deferred revenue figures misrepresentations and omissions contained within Defendants' public statements. Accordingly, Defendants Y. Li, X. Li, and Yu, knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## VIII.   CONTROL PERSON ALLEGATIONS

### A.    Control of iQIYI

238.    Defendants Y. Li, Yu, Gong and Wang and Baidu, by virtue of their high-level and controlling positions at iQIYI, directly participated in the management of iQIYI, were directly involved in the day-to-day operations of iQIYI at the highest levels, and were privy to confidential proprietary information about iQIYI, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

239.    Defendants Gong and Wang, as senior executive officers of iQIYI, Defendants Gong and Yu as a member of the Board of Directors of iQIYI, Y. Li as Chair of the Board of Directors iQIYI, and Baidu as controlling shareholder of iQIYI—a publicly held company whose common stock was traded on the NASDAQ, and governed by the federal securities laws—each had a duty to disseminate prompt, accurate, and truthful information with respect to the iQIYI's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue. Defendants Y. Li, Yu, Gong and Wang and Baidu each violated these requirements and obligations during the Class Period.

240. Defendants Gong and Wang, as senior executive officers of iQIYI, Defendants Gong and Yu as a member of the Board of Directors of iQIYI, Y. Li as Chair of the Board of Directors iQIYI, and Baidu as controlling shareholder of iQIYI, were able to and did control the content of iQIYI's SEC filings, press releases, and other public statements issued by or on behalf of iQIYI during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this Action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Y. Li, Yu, Gong and Wang and Baidu are responsible for the accuracy of the public statements alleged herein.

241. Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Baidu ADSs by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Baidu's business, operations, and management, and the intrinsic value of the Baidu ADSs, and caused Plaintiffs and members of the Class to purchase Baidu ADSs at artificially inflated prices.

242. iQIYI is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

243. The scienter of the Individual Defendants and other employees and agents of the iQIYI is similarly imputed to iQIYI under *respondeat superior* and agency principles.

**B. Control of Baidu**

244. Defendants Y. Li, Yu, X. Li, by virtue of their high-level and controlling positions at Baidu, directly participated in the management of Baidu, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary

information about Baidu, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

245.    Defendants Y. Li, Yu, X. Li, as senior executive officers of Baidu, and Y. Li as Chair of the Board of Baidu—a publicly held company whose common stock was traded on the NASDAQ, and governed by the federal securities laws—each had a duty to disseminate prompt, accurate, and truthful information with respect to Baidu's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of Baidu's publicly-traded common stock would be based on accurate information. Defendants Y. Li, Yu, and X. Li each violated these requirements and obligations during the Class Period.

246.    Defendants Y. Li, Yu, X. Li, as senior executive officers of Baidu, and Y. Li as Chair of the Board of Baidu, were able to and did control the content of Baidu's SEC filings, press releases, and other public statements issued by or on behalf of Baidu during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this Action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, Defendants Y. Li, Yu, X. Li are responsible for the accuracy of the public statements alleged herein.

247.    Defendants Y. Li, Yu, and X. Li are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Baidu ADSs by disseminating materially false and misleading information, and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Baidu's business, operations,

and management, and the intrinsic value of the Baidu ADSs, and caused Plaintiffs and members of the Class to purchase Baidu ADSs at artificially inflated prices.

248.    Baidu is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

249.    The scienter of the Individual Defendants and other employees and agents of the Baidu is similarly imputed to Baidu under *respondeat superior* and agency principles.

## IX.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

250.    Plaintiffs bring this Action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Baidu ADSs during the Class Period and were damaged thereby. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

251.    The members of the Class are so numerous that joinder of all members is impracticable. According to its 2019 Annual Report filed with the SEC, Baidu had approximately 27,381,621 ordinary shares outstanding. Baidu ADSs were actively traded on the NASDAQ under the ticker symbol "BIDU." While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Baidu or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

252.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that are complained of herein.

253.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

254.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Baidu ADSs were artificially inflated during the Class Period because of the material misstatements or omissions alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants controlling persons of iQIYI and/or Baidu; and

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

255.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

256.    To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Baidu ADSs are traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Plaintiffs and other members of the Class purchased Baidu ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    Baidu ADSs met the requirements for listing and were listed and actively traded on the NASDAQ, which is a highly efficient and automated market;

(g)    as a regulated issuer, Baidu filed periodic public reports with the SEC;

(h)    Baidu regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i)      Baidu was followed by over forty securities analysts employed by major brokerage firms, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(j)      Baidu's ADSs were liquid and traded with moderate to heavy volume during the Class Period, with more than 5% of its outstanding ADSs trading weekly.

257.   As a result of the foregoing, the market for Baidu ADSs promptly digested current information regarding Baidu from publicly available sources and reflected such information in Baidu ADSs price. Under these circumstances, all persons and entities who purchased or otherwise acquired Baidu's securities during the Class Period suffered similar injuries through their purchase of Baidu ADSs at artificially inflated prices and thus, the presumption of reliance applies.

258.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Baidu ADSs.

259.   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased Baidu ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

260.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

261.   This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

262.     During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

263.     The Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's ADSs during the Class Period.

264.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

265.     The Individual Defendants, who are senior officers and/or a director of the Company or its subsidiary iQIYI, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members

of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

266.    As a result of the foregoing, the market price of Baidu ADSs was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Baidu ADSs during the Class Period in purchasing the ADSs at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

267.    Had Plaintiffs and the other members of the Class been aware that the market price of Baidu ADSs had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased Baidu ADSs at the artificially inflated prices that they did, or at all.

268.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

269.    By reason of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Baidu ADSs during the Class Period.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**Against Y. Li, Yu, and X. Li**

270.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

271.    During the Class Period, Defendants Y. Li, Yu, and X. Li participated in the operation and management of Baidu, and conducted and participated, directly and indirectly, in the conduct of Baidu's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Baidu's business practices.

272.    As officers and/or directors of a publicly owned company, Defendants Y. Li, Yu, and X. Li had a duty to disseminate accurate and truthful information with respect to Baidu's financial condition and results of operations, and to correct promptly any public statements issued by Baidu, which had become materially false or misleading.

273.    Because of their positions of control and authority as senior officers at Baidu, Defendants Y. Li, Yu, and X. Li were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Y. Li, Yu, and X. Li exercised their power and authority to cause Baidu to engage in the wrongful acts complained of herein. Defendants Y. Li, Yu, and X. Li therefore, were controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, Defendants Y. Li, Yu, and X. Li participated in the unlawful conduct alleged which artificially inflated the market price of Baidu ADS.

274.    Defendants Y. Li, Yu, and X. Li, therefore, acted as controlling persons of Baidu. By reason of their senior management positions at Baidu, Defendants Y. Li, Yu, and X. Li had the power to direct the actions of, and exercised the same to cause, Baidu to engage in the unlawful acts and conduct complained of herein. Defendants Y. Li, Yu, and X. Li exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complaint.

275.   By reason of the above conduct, Defendants Y. Li, Yu, and X. Li are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class Representatives;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

DATED:  June 22, 2022                     THE ROSEN LAW FIRM, P.A.
                                          PHILLIP KIM
                                          LAURENCE M. ROSEN
                                          JONATHAN STERN


                                          _____
                                              /s/Jonathan Stern
                                          JONATHAN STERN

                                          275 Madison Ave., 40th Floor
                                          New York, New York 10016
                                          Telephone: 212/686-1060
                                          212/202-3827 (fax)
                                          pkim@rosenlegal.com
                                          lrosen@rosenlegal.com
                                          jstern@rosenlegal.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT M. ROTHMAN
WILLIAM J. GEDDISH
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
wgeddish@rgrdlaw.com

*Attorneys for Plaintiffs and Lead Counsel for the
Class*