# Exhibit L

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 20-F**

**(Mark One)**

☐     **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020.**

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐     **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report. . . . . . . . . . . . . . . . . . . . . . .

**For the transition period from**       **to**

Commission file number: 001-38431

# iQIYI, Inc.

(Exact name of Registrant as specified in its charter)

**N/A**

(Translation of Registrant's name into English)

**Cayman Islands**

(Jurisdiction of incorporation or organization)

**9/F, iQIYI Innovation Building**
**No. 2 Haidian North First Street, Haidian District**
**Beijing 100080, People's Republic of China**

(Address of principal executive offices)

**Xiaodong Wang, Chief Financial Officer**
**E-mail: wangxiaodong@qiyi.com**
**9/F, iQIYI Innovation Building**
**No. 2 Haidian North First Street, Haidian District**
**Beijing 100080, People's Republic of China**
**Telephone: +86 10-6267-7171**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| American Depositary Shares, each representing seven Class A ordinary shares par value US$0.00001 per share | IQ | The Nasdaq Stock Market LLC (The Nasdaq Global Select Market) |
| Class A ordinary shares, par value US$0.00001 per share* | | The Nasdaq Stock Market LLC (The Nasdaq Global Select Market) |

(1)     *Not for trading, but only in connection with the listing on The Nasdaq Global Select Market of our American depositary shares, each representing seven Class A ordinary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**

(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

As of December 31, 2020, there were 5,486,200,941 ordinary shares outstanding, being the sum of 2,609,809,545 Class A ordinary shares (excluding 275,829,374 Class A ordinary shares issued to our depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards under our share incentive plans and 14,880,762 unvested restricted shares issued to certain employees) and 2,876,391,396 Class B ordinary shares.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. ☒ Yes ☐ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. ☐ Yes ☒ No

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "accelerated filer and large accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act:

| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ | Emerging growth company ☐ |
|---|---|---|---|

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

†The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has been to prepare the financial statements included in this filing:

| U.S. GAAP ☒ | International Financial Reporting Standards as issued by the International Accounting Standards Board ☐ | Other ☐ |
|---|---|---|

If "other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. ☐ Item 17 ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). ☐ Yes ☒ No

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. ☐ Yes ☐ No

**TABLE OF CONTENTS**

| | | |
|---|---|---:|
| INTRODUCTION | | 1 |
| | | |
| FORWARD-LOOKING INFORMATION | | 2 |
| | | |
| PART I | | |
| | | |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS | 3 |
| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 3 |
| ITEM 3. | KEY INFORMATION | 3 |
| ITEM 4. | INFORMATION ON THE COMPANY | 44 |
| ITEM 4.A. | UNRESOLVED STAFF COMMENTS | 70 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 70 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 90 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 99 |
| ITEM 8. | FINANCIAL INFORMATION | 102 |
| ITEM 9. | THE OFFER AND LISTING | 103 |
| ITEM 10. | ADDITIONAL INFORMATION | 104 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 116 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 117 |
| | | |
| PART II | | |
| | | |
| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 119 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 119 |
| ITEM 15. | CONTROLS AND PROCEDURES | 119 |
| ITEM 16.A. | AUDIT COMMITTEE FINANCIAL EXPERT | 120 |
| ITEM 16.B. | CODE OF ETHICS | 120 |
| ITEM 16.C. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 120 |
| ITEM 16.D. | EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES | 121 |
| ITEM 16.E. | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 121 |
| ITEM 16.F. | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 121 |
| ITEM 16.G. | CORPORATE GOVERNANCE | 121 |
| ITEM 16.H. | MINE SAFETY DISCLOSURE | 121 |
| | | |
| PART III | | |
| | | |
| ITEM 17. | FINANCIAL STATEMENTS | 122 |
| ITEM 18. | FINANCIAL STATEMENTS | 122 |
| ITEM 19. | EXHIBITS | 123 |

## INTRODUCTION

Unless otherwise indicated and except where the context otherwise requires, references in this annual report to:

- "ADSs" refers to our American depositary shares, each of which represents seven Class A ordinary shares;

- "AI" refers to artificial intelligence;

- "Baidu" refers to Baidu, Inc., our parent company and controlling shareholder;

- "China" or "PRC" refers to the People's Republic of China, excluding, for the purpose of this annual report only, Taiwan, Hong Kong, and Macau;

- "IP" refers to intellectual property;

- "IT" refers to information technology;

- "mobile DAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a day. Our mobile DAUs are calculated using internal company data that has not been independently verified, and we treat each distinguishable device as a separate user for purposes of calculating mobile DAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform;

- "mobile MAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a month. Our mobile MAUs are calculated using internal company data that has not been independently verified, and we treat each distinguishable device as a separate user for purposes of calculating mobile MAUs, although it is possible that some people may use more than one mobile device and multiple people may share one mobile device to access our platform;

- "RMB" and "Renminbi" refer to the legal currency of China;

- "shares" or "ordinary shares" refers to our Class A and Class B ordinary shares, par value $0.00001 per share;

- "subscribing members," refers to the individuals who purchased our monthly, quarterly or annual membership packages, including individuals with trial membership, and excluding individuals who pay for video on-demand services or stand-alone packages for sports paid content, online literature or online games; subscribing members are calculated using the number of unique iQIYI user accounts that have subscribed for the relevant services;

- "U.S. GAAP" refers to generally accepted accounting principles in the United States;

- "US$," "U.S. dollars," "$," and "dollars" refer to the legal currency of the United States;

- "video views" refers to the number of times a video is launched on our platform, regardless of time spent viewing the video;

- "WAP" refers to wireless application protocol; and

- "we," "us," "our company" and "our" refer to iQIYI, Inc., a Cayman Islands company, and its subsidiaries, and, in the context of describing our operations and combined and consolidated financial information, also include its consolidated affiliated entities in the PRC.

We present our financial results in RMB. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be, at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade. This annual report contains translations of certain foreign currency amounts into U.S. dollars for the convenience of the reader. Unless otherwise stated, all translations of Renminbi into U.S. dollars were made at the rate at RMB6.5250 to US$1.00, the exchange rate as set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System in effect as of December 31, 2020.

1

Case 1:20-cv-03794-DG-TAM    Document 65-12    Filed 03/03/23    Page 5 of 410 PageID #: 2993

## FORWARD-LOOKING INFORMATION

This annual report contains forward-looking statements that involve risks and uncertainties. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigations Reform Act of 1995.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and strategies;

- our ability to retain and increase the number of users, members and advertising customers, and expand our service offerings;

- our future business development, financial condition and results of operations;

- expected changes in our revenues, costs or expenditures;

- competition in our industry;

- relevant government policies and regulations relating to our industry;

- general economic and business conditions globally and in China; and

- assumptions underlying or related to any of the foregoing.

You should read this annual report and the documents that we refer to in this annual report and have filed as exhibits to this annual report completely and with the understanding that our actual future results may be materially different from what we expect. Other sections of this annual report discuss factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors emerge from time to time and it is not possible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. The forward-looking statements made in this annual report relate only to events or information as of the date on which the statements are made in this annual report. Except as required by law, we undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events.

Case 1:20-cv-03794-DG-TAM   Document 65-12   Filed 03/03/23   Page 6 of 410 PageID #: 2994

**PART I.**

**ITEM 1.**      **IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2.**      **OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3.**      **KEY INFORMATION**

**A.**      **Selected Financial Data**

**Selected Consolidated Financial Data**

The following selected consolidated statements of comprehensive loss data for the years ended December 31, 2018, 2019 and 2020, selected consolidated balance sheet data as of December 31, 2019 and 2020 and selected consolidated cash flows data for the years ended December 31, 2018, 2019 and 2020 have been derived from our audited consolidated financial statements included in this annual report beginning on page F-1. The following selected consolidated statements of comprehensive loss data for the years ended December 31, 2016 and 2017, selected consolidated balance sheet data as of December 31, 2016, 2017 and 2018 and selected consolidated cash flows data for the years ended December 31, 2016 and 2017 have been derived from our audited consolidated financial statements not included in this annual report. Our historical results for any period are not necessarily indicative of results to be expected for any future period.

The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our consolidated financial statements are prepared and presented in accordance with U.S. GAAP. Starting from January 1, 2018, we adopted a new revenue accounting standard ASC topic 606, *Revenue from Contracts with Customers* ("ASC 606"), which reclassifies value added taxes ("VAT") from cost of revenues to net against revenues among other changes. The consolidated statements of comprehensive loss data for the years ended December 31, 2018, 2019 and 2020 presented below have been prepared in accordance with ASC 606, while the consolidated statements of comprehensive loss data for the years ended December 31, 2016 and 2017 presented below have been prepared in accordance with the legacy revenue accounting standard ASC topic 605, *Revenue Recognition* ("ASC 605").

3

| | 2016(1) | 2017(1) | 2018 | 2019 | 2020 | |
|---|---|---|---|---|---|---|
| | **For the year ended December 31,** | | | | | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | **(in thousands, except for share and per share data)** | | | | | |
| **Selected Consolidated Statements of Comprehensive Loss Data:** | | | | | | |
| Total revenues | 11,237,407 | 17,378,350 | 24,989,116 | 28,993,658 | 29,707,215 | 4,552,830 |
| Operating costs and expenses | | | | | | |
| Cost of revenues(3) | (11,436,595) | (17,386,563) | (27,132,811) | (30,348,342) | (27,884,395) | (4,273,470) |
| Selling, general and administrative(3) | (1,765,824) | (2,674,990) | (4,167,889) | (5,236,007) | (5,187,835) | (795,070) |
| Research and development(3) | (824,482) | (1,269,806) | (1,994,652) | (2,667,146) | (2,675,494) | (410,037) |
| Total operating costs and expenses | (14,026,901) | (21,331,359) | (33,295,352) | (38,251,495) | (35,747,724) | (5,478,577) |
| Operating loss | (2,789,494) | (3,953,009) | (8,306,236) | (9,257,837) | (6,040,509) | (925,747) |
| Total other (expenses)/income, net | (271,440) | 208,512 | (676,194) | (967,050) | (943,368) | (144,578) |
| **Loss before income taxes** | (3,060,934) | (3,744,497) | (8,982,430) | (10,224,887) | (6,983,877) | (1,070,325) |
| Income tax (expense)/benefit | (13,088) | 7,565 | (78,801) | (51,852) | (23,276) | (3,567) |
| **Net loss** | **(3,074,022)** | **(3,736,932)** | **(9,061,231)** | **(10,276,739)** | **(7,007,153)** | **(1,073,892)** |
| Less: Net income attributed to non-controlling interests | — | — | 48,545 | 46,590 | 31,208 | 4,783 |
| Accretion of redeemable convertible preferred shares | (4,874,739) | 5,073,140 | (298,990) | — | — | — |
| Accretion of redeemable noncontrolling interests | — | — | — | (1,542) | (7,087) | (1,086) |
| Extinguishment and reissuance of Series B preferred shares | — | (363,279) | — | — | — | — |
| **Net (loss)/income attributable to ordinary shareholders** | **(7,948,761)** | **972,929** | **(9,408,766)** | **(10,324,871)** | **(7,045,448)** | **(1,079,761)** |
| Net (loss)/earnings per ordinary share: | | | | | | |
| Basic | (23.20) | 0.30 | | | | |
| Diluted | (23.20) | (1.15) | | | | |
| Net loss per Class A and Class B ordinary share(2): | | | | | | |
| Basic | | | (2.43) | (2.02) | (1.36) | (0.21) |
| Diluted | | | (2.43) | (2.02) | (1.36) | (0.21) |
| Net loss per ADS: | | | | | | |
| Basic | | | (17.01) | (14.14) | (9.52) | (1.47) |
| Diluted | | | (17.01) | (14.14) | (9.52) | (1.47) |
| **Shares used in net (loss)/earnings per ordinary share computation** | | | | | | |
| Basic | 342,548,237 | 342,548,237 | | | | |
| Diluted | 342,548,237 | 3,243,147,261 | | | | |
| Shares used in net loss per Class A and Class B ordinary share computation | | | | | | |
| Basic | | | 3,867,931,786 | 5,104,882,400 | 5,176,180,057 | 5,176,180,057 |
| Diluted | — | | 3,867,931,786 | 5,104,882,400 | 5,176,180,057 | 5,176,180,057 |

(1)   In accordance with the legacy revenue accounting standard (ASC 605), VAT is presented in cost of revenues rather than net against revenues.

(2)   Our ordinary shares are comprised of Class A ordinary shares and Class B ordinary shares. Each holder of Class A ordinary shares is entitled to one vote per share and each holder of Class B ordinary shares is entitled to ten votes per share on all matters submitted to them for a vote. Class B ordinary shares are convertible at any time by the holder thereof into Class A ordinary shares on a one-for-one basis. As holders of Class A and Class B ordinary shares have the same dividend right and the same participation right in our undistributed earnings, the basic and diluted loss per Class A ordinary share and Class B ordinary share are the same for all the periods presented during which there were two classes of ordinary shares.

(3)    Share-based compensation expenses were allocated in operating costs and expenses as follows:

| | For the year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (in thousands) | | | | | |
| **Selected Consolidated Statements of Comprehensive Loss Data:** | | | | | | |
| Cost of revenues | 9,479 | 34,895 | 83,351 | 171,053 | 201,970 | 30,953 |
| Selling, general and administrative | 30,447 | 130,994 | 368,598 | 675,278 | 851,416 | 130,485 |
| Research and development | 22,466 | 67,535 | 104,262 | 238,189 | 316,709 | 48,538 |
| Total | 62,392 | 233,424 | 556,211 | 1,084,520 | 1,370,095 | 209,976 |

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (in thousands) | | | | | |
| **Selected Consolidated Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | 964,207 | 733,010 | 4,586,405 | 5,934,742 | 10,915,282 | 1,672,840 |
| Restricted cash | — | — | 2,174,042 | 974,932 | 25,230 | 3,867 |
| Short-term investments | 902,978 | 779,916 | 6,061,832 | 4,579,313 | 3,358,174 | 514,663 |
| Total current assets | 5,154,305 | 5,700,528 | 19,853,443 | 20,272,838 | 22,290,424 | 3,416,158 |
| Total assets[1] | 13,631,636 | 20,200,899 | 44,759,698 | 44,792,550 | 48,185,429 | 7,384,740 |
| Total current liabilities[1] | 11,889,853 | 11,625,612 | 19,812,356 | 20,173,166 | 24,854,578 | 3,809,131 |
| Total liabilities[1] | 11,897,142 | 11,918,299 | 26,604,135 | 35,077,618 | 38,741,131 | 5,937,338 |
| Total mezzanine equity | 17,039,167 | 22,601,664 | — | 101,542 | 108,629 | 16,648 |
| Total shareholders' (deficit)/equity | (15,304,673) | (14,319,064) | 18,155,563 | 9,613,390 | 9,335,669 | 1,430,754 |

Note:

(1)    We adopted Accounting Standards Update ("ASU") No. 2016-02: *Leases* on January 1, 2019 using the modified retrospective transition method. Right-of-use assets ("ROU assets") and lease liabilities (including current and non-current) for operating leases are presented on the face of the consolidated balance sheets as of December 31, 2019 and 2020, while the consolidated balance sheets data as of December 31, 2016, 2017 and 2018 have been prepared in accordance with ASC topic 840, *Accounting for Leases* ("ASC 840"). For further information, see Note 13 to our consolidated financial statements included elsewhere in this annual report.

We adopted ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials (*"ASU 2019-02"*)* on January 1, 2020, using a prospective transition method, which includes the following major changes from previous legacy GAAP that are applicable to us:

- The content distinction for capitalization of production costs of an episodic television series and production costs of films is removed;

- We are required to test films and license agreements for program material for impairment at a film group level when the film or license agreements are predominantly monetized with other films and license agreements;

- We shall assess estimates of the use of a film in a film group and account for such changes prospectively;

- Cash outflows for the costs incurred to obtain rights for both produced and licensed content are required to be reported as operating cash outflows in the statement of cash flows.

For further information, see Notes 2, 8 and 10 to our consolidated financial statements included elsewhere in this annual report.

The following table presents our selected consolidated cash flows data for the years indicated.

|  | For the year ended December 31, |  |  |  |  |  |
|  | 2016 | 2017 | 2018 | 2019 | \multicolumn{2}{c}{2020} |
|  | RMB | RMB | RMB | RMB | RMB | US$ |
|  | (in thousands) |  |  |  |  |  |
| **Selected Consolidated Cash Flows Data:** | | | | | | |
| Net cash provided by /(used for) operating activities | 2,612,121 | 4,011,784 | 2,884,186 | 3,906,227 | (5,411,071) | (829,283) |
| Net cash (used for)/provided by investing activities | (6,663,100) | (10,660,674) | (20,949,094) | (11,749,571) | 159,296 | 24,412 |
| Net cash provided by financing activities | 3,411,766 | 6,561,110 | 23,474,959 | 7,880,306 | 9,373,906 | 1,436,615 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 14,681 | (143,417) | 617,386 | 112,265 | (91,293) | (13,991) |
| Net (decrease)/increase in cash, cash equivalents and restricted cash | (624,532) | (231,197) | 6,027,437 | 149,227 | 4,030,838 | 617,753 |
| Cash, cash equivalents and restricted cash at the beginning of the year | 1,588,739 | 964,207 | 733,010 | 6,760,447 | 6,909,674 | 1,058,954 |
| Cash, cash equivalents and restricted cash at the end of the year | 964,207 | 733,010 | 6,760,447 | 6,909,674 | 10,940,512 | 1,676,707 |

**B.      Capitalization and Indebtedness**

Not Applicable.

**C.      Reasons for the Offer and Use of Proceeds**

Not Applicable.

**D.      Risk Factors**

**Risks Related to Our Business and Industry**

*We have incurred net losses since our inception and may continue to incur losses in the future.*

We incurred net losses since our inception, including net losses in the amount of RMB9.1 billion, RMB10.3 billion and RMB7.0 billion (US$1.1 billion) in 2018, 2019 and 2020, respectively, primarily due to significant content and bandwidth costs. Our ability to achieve profitability is affected by various factors, many of which are beyond our control. For example, our revenues depend on the increased number of subscribing members and advertising customers' allocation of more budget to internet video streaming platforms. In addition, our users' willingness to pay and subscribe to our content depends on the quality and breadth of our content offerings and availability of alternative entertainment content offerings. The production and procurement of content, as well as bandwidth, have historically accounted for the majority of our cost of revenues. We expect our cost to increase as we are committed to producing and acquiring more high-quality and popular content to enrich user experience and to support our overseas expansion in order to achieve long-term success. Producing high-quality, popular original content is costly and time-consuming and it will typically take a long period of time to realize returns on investment, if at all. The market prices for professionally-produced content, especially popular TV series and movies, have increased significantly in China during the past few years. Although we have observed improving efficiency of content investment primarily as a result of better supply/demand dynamic and optimized cost structure, we expect our content production cost on a per-episode basis to exhibit moderate growth as compared to previous years. In 2018, 2019 and 2020, we incurred RMB27.1 billion, RMB30.3 billion and RMB27.9 billion (US$4.3 billion) in cost of revenues. If we cannot successfully realize satisfactory returns on our content investment and generate sufficient revenues, our financial condition and results of operations may be materially and adversely affected. We may continue to incur net losses in the foreseeable future due to our continued investments in content and technology. We may also continue to incur net losses in the foreseeable future due to changes in the macroeconomic and regulatory environment, competitive dynamics and our inability to respond to these changes in a timely and effective manner. It is not possible for us to accurately predict when we will be able to achieve profitability.

6

Table of Contents

***If we fail to anticipate user preferences and provide high-quality content, especially popular original content, in a cost-effective manner, we may not be able to attract and retain users to remain competitive.***

Our success depends on our ability to maintain and grow user time spent on our platform. To attract and retain users and compete against our competitors, we must continue to offer high-quality content, especially popular original content, in a cost-effective manner, which provides our users with a superior online entertainment experience. To this end, we must continue to produce new original content and source new professionally produced or other video content in a cost-effective manner. Given that we operate in a rapidly evolving industry, we need to anticipate user preferences and industry changes and respond to such changes in a timely and effective manner. If we fail to cater to the needs and preferences of our users, control our costs in doing so or fail to deliver superior user experience, we may suffer from reduced user traffic, and our business, financial condition and results of operations may be materially and adversely affected. Various phases of our original content production are outsourced to our content production partners. If they fail to generate quality content satisfactory to our demands or provide services upon terms commercially acceptable to us, we may be unable to provide high-quality original content offerings to our users.

We rely on our in-house team to generate creative ideas for original content and to supervise the original content origination and production process, and we intend to continue to invest resources in content production. We face fierce competition for qualified personnel in a limited pool of high-quality creative talent. Our competitors include well-capitalized companies that are capable of offering compensation packages more attractive to talents. If we are not able to compete effectively for talents or attract and retain top talents at reasonable costs, our original content production capabilities would be negatively impacted. Any deterioration in our in-house content production capability, inability to attract creative talents at reasonable costs or losses in personnel may materially and adversely affect our business and operating results. If we are unable to offer popular original content that meets user tastes and preferences in a cost-effective manner, our user experience may be adversely affected, we may suffer from reduced user traffic and our business, financial condition and results of operations may be materially and adversely affected.

***If we fail to procure content from content providers upon terms acceptable to us, our business may be materially and adversely affected.***

Our ability to provide our users with high-quality, popular content depends in part on our ability to procure content from studios and other content providers, as well as distributors and other licensors of content. We typically enter into license and sub-license agreements with third-party content providers and other IP holders. The license periods and the terms and conditions of such licenses vary. If content providers and other rights holders are no longer willing or able to license content to us upon terms acceptable to us, or, in the case where we obtained the right to distribute content through sub-license agreements, if the licensors lose their right to sub-license such content to us, our ability to offer content to our users will be adversely affected and/or our cost could further increase. For content sub-licensed and currently being showcased on our platform, we may be forced to remove such content as a result of our licensor's disputes with the original content provider, which may result in loss of user traffic and revenues. If we fail to remove such content in a timely manner, we may become the subject of adverse legal actions from the original content provider. As competition intensifies, we may see the cost of licensed content increase. As we seek to differentiate our service, we are increasingly focused on securing rights other than merely distribution and online streaming rights. We also acquire other forms of copyright such as rights to adapt the original content into online games, films, drama series, animation and other entertainment formats. We focus on offering an overall mix of content that appeals to our users in a cost-efficient manner. If we do not maintain a compelling mix of content, our user acquisition and retention may be adversely affected.

***If our efforts to retain members and attract new members are not successful, our business and results of operations will be materially and adversely affected.***

We have experienced significant membership growth in general over the past several years. Our ability to continue to retain members and attract new members will depend in part on our ability to consistently provide our members with compelling content choices, as well as a quality experience for selecting and viewing video content. Furthermore, the relative service levels, content offerings, pricing and related features of competitors may adversely impact our ability to attract and retain members. If we introduce new or adjust existing features, adjust pricing or service offerings, or change the mix of content in a manner that is not favorably received by our members, we may not be able to attract and retain members. Many of our members originate from organic growth. If our efforts to satisfy our existing members are not successful, we may not be able to attract new members, and as a result, our ability to maintain and/or grow our membership revenues will be adversely affected. Members may cancel or decide not to renew our service for many reasons, including a perception that they do not use the service sufficiently, payment inconveniences, the need to cut household expenses, availability of content is unsatisfactory, competitive services provide a better value or experience and customer service issues are not satisfactorily resolved. We are also exploring various opportunities and marketing strategies to better monetize our membership base, including offering early access privilege to certain drama series for an additional fee. Such initiatives may not be well received by our members and may have a negative impact on our reputation and results of operations. We must retain existing members and continually attract new members to increase our membership base. If we are unable to successfully compete with current

7

and new competitors in both retaining our existing members and attracting new members, our business will be adversely affected. Further, if an excessive number of members cancel or opt not to renew our service, we may be required to incur significantly higher marketing expenditures to attract new members than we currently anticipate. In addition, due to the intensified regulatory oversight on content supervision in 2019 and the uncertainty of certain content launch scheduling in the early stage of the COVID-19 pandemic in the first quarter of 2020, we have experienced delays and reschedules for certain new content offerings, which disturbed our content launch plans and imposed unfavorable impact on our advertising services, and our operating results were negatively affected. If the regulatory or administrative authorities impose new requirements relating to, among other things, content supervision and approval, we may not be able to offer a variety of content offerings in time, or at all, and we cannot assure you that we will continue to maintain our membership base in the future.

***If we fail to retain existing or attract new advertising customers to advertise on our platform, maintain and increase our wallet share of advertising budget or if we are unable to collect accounts receivable in a timely manner, our financial condition and results of operations may be materially and adversely affected.***

We generated a substantial part of our revenues from online advertising. Although online advertising revenue as a percentage of our total revenues has decreased recently, online advertising remains one of our largest sources of revenue. We cannot assure you that we will be able to retain our advertising customers in the future, attract new advertising customers continuously or be able to retain our advertising customers at all. If our advertising customers find that they can generate better returns elsewhere, or if our competitors provide better online advertising services to suit our advertising customers' goals, we may lose our advertising customers. We experienced a decline in our online advertising revenue between 2019 and 2020, which saw such revenue decrease by 17.5%. This is compared to a decline in our online advertising revenue by 11.3% between 2018 and 2019. In addition, third parties may develop and use certain technologies to block the display, and our members are able to skip the viewing, of our advertising customers' advertisements on our platform, which may in turn cause us to lose advertising customers and adversely affect our results of operations. If our advertising customers determine that their expenditures on internet video streaming platforms do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels such as television, newspapers and magazines or other internet channels such as search engines, news aggregation platforms, short-form video platforms, e-commerce platforms and social media platforms, and reduce or discontinue business with us. Since most of our advertising customers are not bound by long-term contracts, they may lessen or discontinue advertising arrangements with us easily without incurring material liabilities. Failure to retain existing advertising customers, or maintain their level of budget allocated to us, or attract new advertising customers to advertise on our platform may materially and adversely affect our financial conditions and results of operations. We may continue to experience deceleration in the growth or experience decline of our online advertising business, and we cannot assure you that we will be able to resume our historical growth in online advertising revenue.

Our brand advertising customers typically enter into online advertising agreements with us through various third-party advertising agencies. In China's advertising industry, advertising agencies typically have good relationships and maintain longer periods of cooperation with the brand advertising customers they represent. In addition to entering into advertising contracts directly with advertising customers, we also enter into advertising contracts with third-party advertising agencies, which represent advertising customers, even if we have direct contact with such advertisers. As a result, we rely on third-party advertising agencies for sales to, and collection of payment from, our brand advertisers. In consideration for the third-party advertising agencies' services, we offer them rebates based on the volume of business they bring to us. The financial soundness of our advertising customers and advertising agencies may affect our collection of accounts receivable. We make a credit assessment of our advertising customers and advertising agencies to evaluate the collectability of the advertising service fees before entering into an advertising contract. However, we cannot assure you that we are or will be able to accurately assess the creditworthiness of each advertising customer or advertising agency, and any inability of advertising customers or advertising agencies to pay us in a timely manner may adversely affect our liquidity and cash flows. In addition, there has been some consolidation among China's advertising agencies. If this trend continues, a small number of large advertising agencies may be in a position to demand higher rebate for advertising agency services, which could reduce our online advertising revenue.

In addition, we do not have long-term cooperation agreements or exclusive arrangements with third-party advertising agencies and they may elect to direct business opportunities to other advertising service providers, including our competitors. If we fail to retain and enhance the business relationships with third-party advertising agencies, we may suffer from a loss of advertising customers and our financial condition and results of operations may be materially and adversely affected.

8

***We operate in a capital intensive industry and require a significant amount of cash to fund our operations, content acquisitions and technology investments. If we cannot obtain sufficient capital, our business, financial condition and prospects may be materially and adversely affected.***

The operation of an internet video streaming platform requires significant and continuous investment in content and technology. Producing high-quality original content is costly and time-consuming and it will typically take a long period of time to realize returns on investment, if at all. To date, we have financed our operations primarily with net cash generated from operating activities, as well as financing activities such as placements of preferred shares, convertible notes and asset-based securities, bank loans, the substantial financial support from Baidu, and the proceeds from our initial public offering and follow-on offering of our ADSs. As of December 31, 2020, we had an outstanding loan balance of RMB700.0 million (US$107.3 million) to Baidu. In order to implement our growth strategies, we will incur additional capital in the future to cover, among others, costs to produce and license content. We may need to obtain additional financing, including equity offerings or debt financing, to fund the operation and expansion of business. Our ability to obtain additional financing in the future, however, is subject to a number of uncertainties, including those relating to:

- our future business development, financial condition and results of operations;

- general market conditions for financing activities by companies in our industry;

- macro-economic and other conditions in China and elsewhere; and

- our relationship with Baidu.

As a public company with a growing business, we expect to increasingly rely on net cash provided by operating activities, financing through capital markets and commercial banks for our liquidity needs. However, we cannot assure you that we will be successful in our efforts to further diversify our sources of liquidity and obtain financing. If we cannot obtain sufficient capital to meet our capital needs, we may not be able to execute our growth strategies and our business, financial condition and prospects may be materially and adversely affected.

***We have been and may again be subject to legal proceedings, claims and investigations in the ordinary course of business. If the outcomes of these proceedings are adverse to us, it could have a material adverse effect on our business, results of operations and financial condition.***

We are subject to various legal proceedings, claims and government investigations that have arisen in the ordinary course of business and have not yet been fully resolved. New legal proceedings, claims and investigations may arise in the future. The existence of litigation, claims, investigations and proceedings may harm our reputation, business and adversely affect the trading price of our ADSs.

Starting in April 2020, we and certain of our current and former officers and directors were named as defendants in putative securities class actions filed in federal court, captioned Lee v. iQIYI, Inc. et al., No. 1: 2020-cv-0183 (U.S. District Court for the Eastern District of New York, filed April 16, 2020) (the "Lee Case"); Shiferaw v. iQIYI, Inc. et al., No. 1: 2020-cv-03115 (U.S. District Court for the Southern District of New York, filed April 17, 2020) (the "Shiferaw Case"); Jenkins v. iQIYI, Inc. et al., No. 4:20-cv-02882 (U.S. District Court for the Northern District of California, filed April 27, 2020) (the "Jenkins Case"); and Le Rivage LLC v. iQIYI, Inc. et al., No. 1:20-cv-02653 (U.S. District Court for the Eastern District of New York, filed June 15, 2020) (the "Le Rivage Case"). All of these cases were purportedly brought on behalf of a class of persons who allegedly suffered damages as a result of alleged misstatements and omissions in the Company's public disclosure documents. On June 15, 2020, the Shiferaw Case was voluntarily dismissed by plaintiffs. On July 6, 2020, the court granted our motion to transfer the Jenkins Case to the U.S. District Court for the Eastern District of New York. The Lee Case, Jenkins Case, and Le Rivage Case remain in their preliminary stages. Regardless of the merit of particular claims, legal proceedings and investigations may result in reputational harm, be expensive, time consuming, disruptive to our operations and distracting to management. In the event we do not prevail or we enter into settlement arrangements in any of these proceedings or investigations, we may incur significant expenses which may materially adversely affect our results of operations.

The SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in the Wolfpack Report. We are cooperating with the SEC, and we cannot predict the duration, outcome, or impact of the SEC investigation.

9

Table of Contents

In addition, we are subject to legal proceedings in the ordinary course of business. We have been involved in litigation based on allegations of infringement of third-party copyright, including information network dissemination rights, and other rights, due to the content available on our platform. We have been subject to lawsuits in China for alleged unfair competition in connection with our platform. We may also face litigation or administrative actions for defamation, negligence, copyright and trademark infringement, or other purported injuries resulting from the content we provide or the nature of our services.

We were subject to a total of 1,416 lawsuits in China for alleged copyright infringement between January 1, 2018 and December 31, 2020, in connection with our platform. Approximately 67.8% of the lawsuits filed from January 1, 2018 through December 31, 2020 in connection with the iQIYI platform were rejected by relevant PRC courts, withdrawn by the plaintiffs or settled by the parties. As of December 31, 2020, a total of 380 lawsuits against us in connection with our platform were pending, with the aggregate amount of damages sought under these pending cases being RMB269.1 million (US$41.2 million).

The outcome of legal proceedings and investigations is inherently uncertain. If one or more legal matters were resolved against us or an indemnified third party in a reporting period for amounts in excess of management's expectations, our financial condition and operating results for that reporting period could be materially adversely affected. Further, such an outcome could result in significant compensatory, punitive or trebled monetary damages, disgorgement of revenue or profits, remedial corporate measures or injunctive relief against us that could materially adversely affect our financial condition and operating results.

***The success of our business depends on our ability to maintain and enhance our brand.***

We believe that maintaining and enhancing our iQIYI brand is of significant importance to the success of our business. Our well-recognized brand is critical to increasing our user base and, in turn, expanding our membership base and attractiveness to advertising customers and content providers. Since the internet video industry is highly competitive, maintaining and enhancing our brand depends largely on our ability to remain the market leader in China, which may be difficult and expensive. To the extent our content, in particular, our original content, is perceived as low quality or otherwise not appealing to users, our ability to maintain and enhance our brand may be adversely impacted.

***Our overseas operations may not be successful and may be adversely affected by legal, regulatory, political and economic risks.***

We began to expand our overseas business operations in late 2019. We have launched our multilingual iQIYI app, which currently supports ten languages and can be downloaded globally from major iOS and Android app stores. We also cooperate with local partners to promote our app and expand our user base. We are subject to PRC law in addition to the laws of the foreign countries and regions in which we operate. If any of our overseas investments or operations violate such laws, we could become subject to sanctions or other penalties, which could negatively affect our reputation, business and operating results.

Our overseas expansion may not be successful and may expose us to a number of risks inherent in doing business internationally, including:

- difficulties with staffing and managing foreign operations, which may be exacerbated as a result of distance, time zone, language and cultural differences;

- challenges in formulating effective local sales and marketing strategies targeting users from various jurisdictions and cultures, who have a diverse range of preferences and demands;

- challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

- challenges in producing and acquiring content that is appealing to local population and catering to local cultural environment, and screening out content that may be inappropriate, offensive or unwelcoming in certain countries or regions;

- challenges in recruiting quality local content creators to attract and engage local users;

- challenges in effectively managing overseas operations from our headquarters or new regional headquarters and establishing overseas IT systems and infrastructure;

- competitions from other participants in the market, including international leading companies;

- challenges in selecting suitable geographical regions for overseas expansion;

- currency exchange rate fluctuations and foreign exchange control risks;

10

- exposure to changes in macroeconomic conditions in foreign jurisdictions;

- political or social unrest or economic instability;

- difficulties and costs relating to compliance with applicable foreign laws and regulations and unexpected changes in laws or regulations;

- challenges in investing in countries and regions that restrict or may restrict foreign investment in the internet service provider, online video, entertainment, advertising or culture related industry, and unexpected changes in such restrictions;

- difficulties in and costs relating to the obtaining and keeping valid licenses, permits or other applicable governmental authorizations, content control from local authorities;

- complexity of intellectual property protection and enforcement regime overseas and the potential exposure of claims relating to intellectual property infringement;

- exposure to different tax jurisdictions that may subject us to greater fluctuations in our effective tax rate and potentially adverse tax consequences;

- exposure to different labor protection requirements and potential labor-related claims and disputes; and

- increased costs associated with doing business in foreign jurisdictions.

One or more of these factors could harm our overseas operations and consequently, could harm our overall business, financial condition and results of operations. In addition, the regulatory framework for online video content or other services we provide is still developing and remains uncertain in certain countries where we are exploring overseas operations. As we continue to expand our business overseas, we cannot assure you that we will be able to fully comply with the legal requirements of each foreign jurisdiction and successfully adapt our business model to local market conditions.

*We may be the subject of detrimental conduct by third parties, including complaints to regulatory agencies and the public dissemination of malicious assessments of our business, which could have a negative impact on our reputation and cause us to lose market share, users, advertisers and revenues, and adversely affect the price of our ADSs.*

We have been, and in the future may be, the target of anti-competitive, harassing or other detrimental conduct by third parties. Such conduct may include complaints, anonymous or otherwise, to regulatory agencies regarding our operations, accounting, revenues, business relationships, business prospects and business ethics. Additionally, allegations and other negative publicity, directly or indirectly against us, may be posted online or otherwise generally disseminated by anyone, whether or not related to us. We may be subject to regulatory investigations, lawsuits or public perception backlash as a result of such third-party conduct and may be required to expend significant time and incur substantial costs to address such third-party conduct, and there is no assurance that we will be able to conclusively refute each of the allegations within a reasonable period of time, or at all. Our reputation may also be negatively affected as a result of the public dissemination of anonymous allegations or malicious statements about our business, which in turn may cause us to lose market share, users, advertisers and revenues, and adversely affect the price of our ADSs.

*Increases in market price of professionally-produced content, or PPC, may have a material and adverse effect on our business, financial condition and results of operations.*

PPC constitutes a significant part of our content offerings. The market prices for PPC, especially TV series and movies, have increased significantly in China during the past few years. Due to the improving monetization prospects, internet video streaming platforms are generating more revenues and are competing aggressively to license popular content titles, which have in turn led to increases in licensing fees of PPC in general. As the market further grows, the expectations of copyright owners, distributors and industry participants may continue to rise, and as such they may demand higher licensing fees for PPC. Furthermore, with the expansion of our content library, we expect the costs for PPC to continue to increase. If we are unable to generate sufficient revenues to outpace the increase in market prices for PPC, we may incur more losses and our business, financial condition and results of operations may be adversely affected.

11

Table of Contents

*We operate in a highly competitive market and we may not be able to compete effectively.*

We face significant competition in China, primarily from Tencent Video and Youku. We compete for users, usage time and advertising customers. Some of our competitors have a longer operating history and significantly greater financial resources than we do, and, in turn, may be able to attract and retain more users, usage time and advertising customers. Our competitors may compete with us in a variety of ways, including by obtaining IP rights to popular content, conducting brand promotions and other marketing activities, and making investments in and acquisitions of our business partners. In addition, certain internet video streaming platforms may continue to derive their revenues from providing content that infringes third-party copyright and may not monitor their platforms for any such infringing content. As a result, we may be placed at a disadvantage to some of these companies that do not incur similar costs as we do with respect to content production, acquisition and monitoring. If any of our competitors achieves greater market acceptance than we do or is able to offer more attractive internet video content, our user traffic and our market share may decrease, which may result in a loss of advertising customers and members, as well as have a material and adverse effect on our business, financial condition and results of operations.

We face competition from traditional media such as major TV stations, which also provide and may increase their internet and on-demand video offerings. Most large companies in China allocate, and will likely continue to allocate, a significant portion of their advertising budgets to traditional media, particularly major TV stations. We also face increasing competition for users, user time and advertising budgets from other internet media and entertainment services, such as internet and social media platforms and short-form video platforms.

*The continued and collaborative efforts of our senior management and key employees are crucial to our success, and our business may be harmed if we lose their services.*

Our success depends on the continued and collaborative efforts of our senior management, especially our executive officers, including our founder, Dr. Yu Gong. If, however, one or more of our executives or other key personnel are unable or unwilling to continue to provide services to us, we may not be able to find suitable replacements easily or at all. Competition for management and key personnel is intense and the pool of qualified candidates is limited. We may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future. If any of our executive officers or key employees joins a competitor or forms a competing business, we may lose crucial business secrets, technological know-how, advertisers and other valuable resources. Each of our executive officers and key employees has entered into an employment agreement with us, which contains non-compete provisions. However, we cannot assure you that they will abide by the employment agreements or our efforts to enforce these agreements will be effective enough to protect our interests.

*The COVID-19 epidemic has had and could continue to have a material adverse impact on our business, operating results and financial condition.*

The COVID-19 pandemic has created unique global and industry-wide challenges, including challenges to many aspects of our business. Substantially all of our revenues and workforce are concentrated in China. The COVID-19 outbreak has impact on China's internet video industry in general. The extent to which COVID-19 impacts our financial position, results of operations and cash flows in 2021 will depend on the future developments of the outbreak, including new information concerning the global severity of and actions taken to contain the outbreak, which are highly uncertain and unpredictable. In addition, our financial position, results of operations and cash flows could be adversely affected to the extent that the outbreak harms the Chinese economy in general.

In the first part of 2020, in response to the intensifying efforts to contain the spread of COVID-19, the Chinese government took a number of actions, which included extending the Chinese New Year holiday, quarantining individuals suspected of having COVID-19, asking residents in China to stay at home and to avoid public gathering, among other things. During the early part of 2020, COVID-19 caused temporary closure of many corporate offices and store fronts across China, and we experienced growth in the number of subscribing members driven by the increased entertainment demand during the pandemic as a result. Subsequently, the number of subscribing members in the fourth quarter of 2020 decreased as compared with that in the second and the third quarter of 2020. Our member acquisition and engagement may fluctuate depending on factors beyond our control, and we cannot predict member acquisition and engagement levels as the situation of the pandemic changes. In addition, our online advertising services revenue decreased in 2020 as compared to 2019, due to the challenging macroeconomic environment in China. However, our online advertising services revenue has been rebounding since the second quarter of 2020. We cannot guarantee that such decrease will not occur again in the future.

12

Table of Contents

During the first part of 2020, we took a series of measures in response to the outbreak, including, among others, remote working arrangements for our employees. We temporarily shut down some of our premises and facilities, following all legal directions and safety guidelines with respect to our premises and facilities in operation. These measures, if taken again in the future, could reduce the capacity and efficiency of our operations, which in turn could negatively affect our results of operations.

Many of the quarantine measures within China have since been relaxed as of the date of this annual report. However, our results of operations may still be adversely affected to the extent that COVID-19 continues to affect the Chinese economy in general. In addition, the longer-term trajectory of COVID-19, both in terms of scope and intensity of the pandemic, in China, together with its impact on the industry and the broader economy are still difficult to assess or predict and face significant uncertainties that will be difficult to quantify. Relaxation of restrictions on economic and social activities may also lead to new cases which may lead to re-imposed restrictions. If there is not a material recovery in the COVID-19 situation, or the situation further deteriorates in China, our business, results of operations and financial condition could be materially and adversely affected.

***We face risks related to health epidemics and other outbreaks, as well as natural disasters, which could significantly disrupt our operations and adversely affect our business, financial condition or results of operation.***

In addition to the impact of COVID-19, our business could be materially and adversely affected by natural disasters, such as snowstorms, earthquakes, fires or floods, the outbreak of other widespread health epidemic, such as swine flu, avian influenza, severe acute respiratory syndrome, or SARS, Ebola, Zika or other events, such as wars, acts of terrorism, environmental accidents, power shortage or communication interruptions. Our business operations could be disrupted if any of our employees is suspected of having any transmissible health epidemic, since this may cause our employees to be quarantined and/or our offices to be temperately shut down. In addition, our results of operations may be adversely affected to the extent that any of these epidemics harms the Chinese economy in general.

We are also vulnerable to natural disasters and other calamities. Fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events may give rise to server interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide content and services on our platform.

***Increasing focus with respect to environmental, social and governance matters may impose additional costs on us or expose us to additional risks. Failure to adapt to or comply with the evolving expectations and standards on environmental, social and governance matters from investors and the PRC government may adversely affect our business, financial condition and results of operation.***

The PRC government and public advocacy groups have been increasingly focused on environment, social and governance ("ESG") issues in recent years, making our business more sensitive to ESG issues and changes in governmental policies and laws and regulations associated with environment protection and other ESG-related matters. Investor advocacy groups, certain institutional investors, investment funds, and other influential investors are also increasingly focused on ESG practices and in recent years have placed increasing importance on the implications and social cost of their investments. Regardless of the industry, increased focus from investors and the PRC government on ESG and similar matters may hinder access to capital, as investors may decide to reallocate capital or to not commit capital as a result of their assessment of a company's ESG practices. Any ESG concern or issue could increase our regulatory compliance costs. If we do not adapt to or comply with the evolving expectations and standards on ESG matters from investors and the PRC government or are perceived to have not responded appropriately to the growing concern for ESG issues, regardless of whether there is a legal requirement to do so, we may suffer from reputational damage and the business, financial condition, and the price of our ADSs could be materially and adversely effected.

***Our limited operating history makes it difficult to evaluate our business and prospects.***

We launched our platform and internet video streaming services in 2010 and have grown rapidly since then. However, due to our limited operating history, our historical growth rate may not be indicative of our future performance. We cannot assure you that our growth rate will be the same as in the past. In addition, we may in the future introduce new services or significantly expand our existing services, including those that currently are of relatively small scale or with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users and customers, our business and operating results may suffer as a result. We cannot assure you that we will be able to recoup our investments in introducing these new services or enhancing existing smaller business lines, and we may experience significant loss and impairment of asset value due to such efforts. Furthermore, as a technology-based entertainment company, we frequently introduce innovative products and services to our users and advertising customers in order to capture new market opportunities. However, we cannot assure you that our products and services will be well

13

received by our users and advertising customers. In addition, it is possible that our users and advertising customers may find our products and services objectionable. For example, there was media reporting in 2017 that the beta-testing version of our Vivi virtual assistant service was deemed by some of our users as offensive. We immediately suspended such service pending further modifications. If our existing or new products and services are not well received by our users and customers, we may suffer damages to our brand image and may not be able to maintain or expand our user and customer base, which in turn may have a material and adverse effect on our business, financial condition and results of operations. You should consider our prospects in light of the risks and uncertainties fast-growing companies with limited operating histories in a fast-evolving industry may encounter.

*We may not be able to manage our growth effectively or expand our offerings successfully.*

We have experienced rapid growth since we launched our services in 2010. To manage the further expansion of our business, products and offerings and the growth of our operations and personnel, we need to continuously expand and enhance our infrastructure and technology, and improve our operational and financial systems, procedures, compliance and controls. We also need to expand, train and manage our growing employee base. In addition, our management will be required to maintain and expand our relationships with talents, content providers, distributors, advertising customers, advertising agencies and other third parties. We cannot assure you that our current infrastructure, systems, procedures and controls will be adequate to support our expanding operations. If we fail to manage our expansion effectively, our business, results of operations and prospects may be materially and adversely affected.

We have been constantly endeavoring to develop new products and offerings that provide other contents, content formats or services such as, short-form videos, live broadcastings, online literatures and comics. However, our expansion of new products and offerings may result in unseen risks, challenges and uncertainties. We may incur additional expenditure to support our expansion and it may strain our managerial, financial, operational and other resources. Any failure in managing expenditures and evaluating user demands for new products and offerings could materially and adversely affect our business, financial condition and results of operations.

*We cannot guarantee our monetization strategies will be successfully implemented or generate sustainable revenues and profit.*

Our monetization model is evolving. We currently generate a substantial majority of our revenues from membership services and online advertising. We plan to strengthen revenue contribution from our other monetization methods, such as online games, live broadcasting, and IP licensing. We have no proven track record or experience in generating substantial revenues from other monetization methods. If our strategic initiatives do not enhance our monetization ability or enable us to develop new approaches to monetization, we may not be able to maintain or increase our revenues or recover any associated costs. In addition, we may in the future introduce new services to further diversify our revenue streams, including services with which we have little or no prior development or operating experience. If these new or enhanced services fail to engage users, customers or content partners, we may fail to attract or retain users or to generate sufficient revenues to justify our investments, and our business and operating results may suffer as a result.

*We have significant working capital requirements and have in the past experienced working capital deficits. If we experience such working capital deficits in the future, our business, liquidity, financial condition and results of operations may be materially and adversely affected.*

As a result of changes in our funding position and operating assets and liabilities, we had a working capital deficit (defined as total current assets deducted by total current liabilities) of RMB2,564.2 million (US$393.0 million) as of December 31, 2020. The holders of the 2023 Notes may require us to repurchase all or portion for cash on December 1, 2021, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest. As a result, RMB4,752.1 million (US$728.3 million) of the net carrying amount of the 2023 Notes was included in current liabilities as of December 31, 2020. For actions that we plan to take in order to manage our working capital, see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources." There can be no assurance, however, that we will be able to prudently manage our working capital, or raise additional equity or debt financing on terms that are acceptable to us. Our inability to take these actions as and when necessary could materially adversely affect our liquidity, results of operations, financial condition and ability to operate.

*Our business, prospects and financial results may be impacted by our relationship with third-party platforms.*

In addition to our iQIYI platform, we also distribute video content through third-party platforms. We generate membership service and online advertising service revenues through revenue-sharing arrangements with such third-party platforms, which include leading internet companies in China. However, there can be no assurance that our arrangements with those platforms will be extended or renewed after their respective expiration or that we will be able to extend or renew such arrangements on terms and conditions favorable to us. In addition, if any of such third-party platforms breaches its obligations under any of the agreements entered into with us or refuses to extend or renew it when the term expires, and we cannot find suitable replacement on a timely basis, or at all, we may suffer significant loss to our user base and revenue streams we have developed therefrom, or lose the opportunity to expand our business through such platform. We may be involved with legal or other disputes with third-party platforms that may affect our relationship with such platforms or have an adverse effect on our business.

14

***We face risks, such as unforeseen costs and potential liability in connection with content we produce, license and/or distribute through our platform.***

As a producer, licensor and distributor of content, we face potential liability for negligence, copyright and trademark infringement, or other claims based on the content that we produce, license, provide and/or distribute. We also may face potential liability for content used in promoting our service, including marketing materials and features on our platform such as user reviews. We are responsible for the production costs and other expenses of our original content. We also take on risks associated with production, such as completion and key talent risk. To the extent we do not accurately anticipate costs or mitigate risks, including for content that we obtain but ultimately does not appear on our platform, or if we become liable for content we produce, license and/or distribute, our business may suffer. Litigation to defend these claims could be costly and the expenses and damages arising from any liability or unforeseen production risks could harm our results of operations. We may not be indemnified against claims or costs of these types and we may not have insurance coverage for these types of claims.

***Videos and other content displayed on our platform may be found objectionable by PRC regulatory authorities and may subject us to penalties and other administrative actions.***

We are subject to PRC regulations governing internet access and the distribution of videos and other forms of information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet any content that, among other things, violates PRC laws and regulations, impairs the national dignity of China or the public interest, or is obscene, superstitious, frightening, gruesome, offensive, fraudulent or defamatory. Furthermore, as an internet video streaming platform, we are not allowed to (i) produce or disseminate programs that distort, parody or vilify classic literary works; (ii) re-edit, re-dub or re-caption the subtitles of classic literary works, radio and television programs, and network-based original audio-video programs, (iii) intercept program segments and splice them into new programs; or (iv) disseminate edited pieces of works that distort the originals. We shall strictly supervise our self-made content and the reprogramed videos uploaded by our users and shall not facilitate the dissemination of defective audio-video programs. Failure to comply with these requirements may result in monetary penalties, revocation of licenses to provide internet content or other licenses, suspension of the concerned platforms and reputational harm. In addition, these laws and regulations are subject to interpretation by the relevant authorities, and it may not be possible to determine in all cases the types of content that could cause us to be held liable as an internet content provider. For a detailed discussion, see "Item 4. Information on the Company—B. Business Overview—Government Regulation—Regulations on Internet Content Providers", "Item 4. Information on the Company—B. Business Overview—Government Regulations—Regulations on Internet Audio-video Program Services" and "Item 4. Information on the Company —B. Business Overview—Government Regulations—Regulations on Information Security, Censorship and Privacy."

Internet platform operators may also be held liable for the content displayed on or linked to its platform that is subject to certain restrictions. In addition to professionally produced content, we allow our users to upload other video content, such as internet movies, internet drama series, interactive videos, vertical or horizontal videos, short-form videos, micro-videos, and video blogs, or Vlogs, among others. Although we have adopted internal procedures to monitor the content displayed on our platform, due to the significant amount of content uploaded by our users, we may not be able to identify all videos or other content that may be illegal or otherwise objectionable. In addition, we may not be able to always keep these internal procedures abreast of changes in the PRC government's requirements for content display. See "Item 4. Information on the Company—Business Overview—Content Monitoring" for more details relating to our content monitoring procedures. Failure to identify and prevent illegal or inappropriate content from being displayed on our platform may subject us to liability, government sanctions or loss of licenses and/or permits.

To the extent that PRC regulatory authorities, such as Cyberspace Administration of China, which has promulgated the Provisions on the Governance of Network Information Content Ecology with effect from March 1, 2020, find any content displayed on our platform objectionable, they may require us to limit or eliminate the dissemination of such content on our platform in the form of take-down orders or otherwise. In the past, we have from time to time received phone calls and written notices from the relevant PRC regulatory authorities requesting us to delete or restrict certain content that the government deemed inappropriate or sensitive. The National Radio and Television Administration, or the NRTA (previously known as the State Administration of Press Publication, Radio, Film and Television, or the SAPPRFT), publishes from time to time lists of content that is objectionable, and we monitor content uploaded on to our platform and remove those referenced in the list. In addition, regulatory authorities may impose penalties on us for content displayed on or linked to our platform in cases of material violations or lacking proper license, including a revocation of our operating licenses or a suspension or shutdown of our online operations. Although we have not been materially penalized for our content so far, in the event that the PRC regulatory authorities find the video and other content on our platform objectionable and impose penalties on us or take other actions against us in the future, our business, results of operations and reputation may be materially and adversely affected. Moreover, the costs of compliance with these regulations may continue to increase as a result of more content uploaded by our users.

15

*We operate in a rapidly evolving industry. If we fail to keep up with the technological developments and users' changing requirements, our business, results of operations and prospects may be materially and adversely affected.*

The internet video streaming industry is rapidly evolving and subject to continuous technological changes. Our success will depend on our ability to keep up with the changes in technology and user behavior resulting from the technological developments. As we make our services available across a variety of mobile operating systems and devices, we are dependent on the interoperability of our services with popular mobile devices and mobile operating systems that we do not control, such as Android and iOS. Any changes in such mobile operating systems or devices that degrade the functionality of our services or give preferential treatment to competitive services could adversely affect usage of our services. Further, if the number of platforms for which we develop our services increases, which is typically seen in a dynamic and fragmented mobile services market such as China, it will result in an increase in our costs and expenses. If we fail to adapt our products and services to such changes in an effective and timely manner, we may suffer from decreased user traffic, which may result in reduced member base and number of advertising customers using our online advertising services. Furthermore, changes in technologies may require substantial capital expenditures in product development as well as in modification of products, services or infrastructure. We may not execute our business strategies successfully due to a variety of reasons such as technical hurdles, misunderstanding or erroneous prediction of market demand or lack of necessary resources. Failure to keep up with technological development may result in our products and services being less attractive, which, in turn, may materially and adversely affect our business, results of operations and prospects.

*We have been, and may continue to be, subject to liabilities for infringement, misappropriation or other violation of third-party intellectual property rights or other allegations based on the content available on our platform or services we provide.*

Our success depends, in large part, on our ability to operate our business without infringing, misappropriating or otherwise violating third-party rights, including third-party intellectual property rights. Companies in the internet, technology and media industries own, and are seeking to obtain, a large number of patents, copyrights, trademarks and trade secrets, and they are frequently involved in litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights or other related legal rights. There may be patents issued or pending that are held by others that cover significant aspects of our technologies, products, or services, and such third parties may attempt to enforce such rights against us. In addition, we may not have obtained licenses for all content we offer and the scope, type and term of the licenses we obtained for certain content may not be broad enough to cover all fashions we currently employ or may employ in the future. In addition, if any purported licensor does not actually have sufficient authorization relating to the content or right to license a content to us, or if such purported licensor had lost its authorization to sub-license content that we are distributing on our platform, and do not timely inform us of such loss of authorization, we may be subject to claims of intellectual property infringement from third parties.

Although we have set up certain procedures to enable copyright owners to provide us with notice of alleged infringement, given the volume of content available on our platform, it is not possible, and we do not attempt to, identify and remove or disable all potentially infringing content that may exist. Similarly, although we have set up screening processes to try to filter out or disable access to content that we have previously been informed is subject to claims of copyright or other intellectual property protection, we do not attempt to filter out or disable access to all potentially infringing content available through our services. As a result, third parties may take action and file claims against us if they believe that certain content available on our platform violates their copyrights or other intellectual property rights. We have been, and may in the future be, subject to such claims filed in China and other jurisdictions. We have been involved in litigation based on allegations of infringement of third-party copyright, including information network dissemination rights, and other rights, due to the content available on our platform. We were subject to a total of 1,416 lawsuits in China for alleged copyright infringement between January 1, 2018 and December 31, 2020, in connection with our platform. Approximately 67.8% of the lawsuits filed from January 1, 2018 through December 31, 2020 in connection with the iQIYI platform were rejected by relevant PRC courts, withdrawn by the plaintiffs or settled by the parties. As of December 31, 2020, a total of 380 lawsuits against us in connection with our platform were pending, with the aggregate amount of damages sought under these pending cases being RMB269.1 million (US$41.2 million).

Our platform allows users to search the internet for content that resides on certain third parties' servers and online platforms. While uncertainties still exist with respect to the legal standards as well as the judicial interpretation of such standards for determining liabilities for our providing links and access to content on third-party servers and websites that infringes others' copyrights and other intellectual property rights under PRC laws and the laws of other jurisdictions, third parties may take action and file claims against us if they believe that certain content we provide links or access to through our platform violates their copyrights or other intellectual property rights.

16

We cannot assure you that we will not be subject to copyright laws or legal proceedings initiated by third parties in other jurisdictions, such as the United States, as a result of the ability of users to access our videos and other content in the United States and other jurisdictions, the ownership of our ADSs by investors in the United States and other jurisdictions, the extraterritorial application of foreign law by foreign courts, the fact that we sub-licensed content from licensors who in turn obtained their authorizations from content providers in the United States and other jurisdictions or otherwise. In addition, as a publicly listed company, we may be exposed to increased risk of litigation. If a claim of infringement brought against us in the United States or other jurisdictions is successful, we may be required to, upon enforcement, (i) pay substantial statutory or other damages and fines, (ii) remove relevant content from our platform or (iii) enter into royalty or license agreements which may not be available on commercially reasonable terms or at all.

Moreover, although U.S. copyright laws, including the Digital Millennium Copyright Act (17 U.S.C. § 512), or the DMCA, provide safeguards or "safe harbors" from claims in the U.S. for monetary relief for copyright infringement for certain entities that host user-uploaded content or provide information location tools that may link to infringing content, these safe harbors only apply to companies that comply with specified statutory requirements. While we seek to voluntarily comply with DMCA safe harbor requirements, we cannot ensure that we satisfy all of the requirements of any DMCA safe harbor. It is possible that we could be subject to claims of copyright infringement or other violation of intellectual property rights in the U.S. and be required to pay substantial damages or prevented from offering all or part of our services in the U.S.

We have been subject to lawsuits in China for alleged unfair competition in connection with our platform. We may also face litigation or administrative actions for defamation, negligence, copyright and trademark infringement, or other purported injuries resulting from the content we provide or the nature of our services. Such litigation and administrative actions, with or without merits, may be expensive and time-consuming and may result in significant diversion of resources and management attention from our business operations. Furthermore, such litigation or administrative actions may adversely affect our brand image and reputation.

In addition, we operate our platform primarily through our consolidated affiliated entities and their subsidiaries, and our ability to monitor content as described above depends in large part on the experience and skills of the management of, and our control over, those consolidated affiliated entities. Our control over the management and operations of our consolidated affiliated entities through contractual arrangements may not be as effective as that through direct ownership. See "—Risks Related to Our Corporate Structure—We rely on contractual arrangements with our consolidated affiliated entities and their shareholders for our business operations, which may not be as effective as direct ownership in providing operational control."

***We may not be able to adequately protect our intellectual property rights, and any failure to protect our intellectual property rights could adversely affect our revenues and competitive position.***

We believe that trademarks, trade secrets, copyright, and other intellectual property we use are critical to our business. We rely on a combination of trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. Protection of intellectual property rights in China may not be as effective as in the United States or other jurisdictions, and as a result, we may not be able to adequately protect our intellectual property rights, which could adversely affect our revenues and competitive position. In addition, any unauthorized use of our intellectual property by third parties may adversely affect our revenues and our reputation. In particular, our members may abuse their membership privilege and illegally distribute paid content exclusively available to paid members, which could have a material and adverse effect on our financial condition, results of operations and prospects. Further, we may have difficulty addressing the threats to our business associated with piracy of our copyrighted content, particularly our original content. Our content and streaming services may be potentially subject to unauthorized consumer copying and illegal digital dissemination without an economic return to us. We adopt a variety of measures to mitigate risks associated with piracy, including by litigation and through technology measures. We cannot assure that such measures will be effective.

In addition, while we typically require our employees, consultants and contractors who may be involved in the development of intellectual property to execute agreements assigning such intellectual property to us, we may be unsuccessful in executing such an agreement with each party who in fact develops intellectual property that we regard as our own. In addition, such agreements may not be self-executing such that the intellectual property subject to such agreements may not be assigned to us without additional assignments being executed, and we may fail to obtain such assignments. In addition, such agreements may be breached. Accordingly, we may be forced to bring claims against third parties, or defend claims that they may bring against us related to the ownership of such intellectual property.

Furthermore, policing unauthorized use of proprietary technology is difficult and expensive, and we may need to resort to litigation to enforce or defend intellectual property or to determine the enforceability, scope and validity of our proprietary rights or those of others. Such litigation and an adverse determination in any such litigation could result in substantial costs and diversion of resources and management attention.

17

Table of Contents

***If our security measures are breached, or if our products and services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as insecure, users and advertising customers may curtail or stop using our products and services and our business and operating results may be harmed.***

Our products and services involve the storage and transmission of users' and advertising customers' information, particularly billing data, as well as original content, and security breaches expose us to a risk of loss of this information, loss of users, litigation and potential liability. We experience cyber-attacks of varying degrees on a regular basis, including hacking into our user accounts and redirecting our user traffic to other internet platforms, and we have been able to rectify attacks without significant impact to our operations in the past. Functions that facilitate interactivity with other internet platforms could increase the scope of access of hackers to user accounts. We take measures to protect against unauthorized intrusion into our users' data. Despite these measures we, our payment processing services or other third-party services we use could experience an unauthorized intrusion into our users' data. In the event of such a breach, current and potential users may become unwilling to provide the information to us necessary for them to become users or members. Additionally, we could face legal claims or regulatory fines or penalties for such a breach. The costs relating to any data breach could be material, and we currently do not carry insurance against the risk of a data breach. For these reasons, should an unauthorized intrusion into our users' data occur, our business could be adversely affected.

Our security measures may also be breached due to employee error, malfeasance or otherwise. For example, we face risks of users bypassing the membership verification process on our platform with illegal technology and manipulating our system into recognizing them as paid members. As a result, such users may illegally gain access to premium content without purchasing our membership. Additionally, outside parties may attempt to fraudulently induce employees, users or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data or accounts, or may otherwise obtain access to such data or accounts. Since our users and customers may use their accounts to establish and maintain online identities, unauthorized communications from accounts that have been compromised may damage their reputations and brands as well as ours. Furthermore, we face the risk of hackers gaining illegal access to and illegally distributing our original content that has not been released. While such incidents have not occurred in the past, we cannot assure you that they will not happen in the future. Any such breach or unauthorized access could result in significant legal and financial exposure, damage to our reputation and a loss of confidence in the security of our products and services that could have an adverse effect on our business and operating results. Because the techniques used to obtain unauthorized access, disable or degrade service or sabotage systems change frequently and often are not recognized until launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures and our reputation and relationships with users could be harmed, we may lose users and customers and we may be exposed to significant legal and financial risks, including legal claims and regulatory fines and penalties. Any of these actions could have a material and adverse effect on our business, reputation and operating results.

***We rely upon our partner to make our service available through smart TV.***

In smart TV video streaming market, only a small number of qualified license holders can provide internet audio and visual program service to the TV terminal users via smart TVs, set-top boxes and other electronic products. Most of those license holders are radio or TV stations. Private companies that wish to operate such business need to cooperate with those license holders to legally provide relevant services. We entered into a joint venture with Galaxy Internet Television Co., Ltd., our license partner, and the joint venture currently offers certain of our members the ability to receive streaming content through smart TV. If we are not successful in maintaining existing or creating new relationships, or if we encounter technological, content licensing, regulatory or other impediments to delivering our streaming content to our members via these devices, our ability to grow our business may be adversely impacted.

***Advertisements shown on our platform may subject us to penalties and other administrative actions.***

Under PRC advertising laws and regulations, we are obligated to monitor the advertising content shown on our platform to ensure that such content is true, accurate and in full compliance with applicable laws and regulations. In addition, where a special government review is required for specific types of advertisements prior to posting, such as advertisements relating to pharmaceuticals, medical instruments, agrochemicals and veterinary pharmaceuticals, we are obligated to confirm that such review has been performed and approval has been obtained from competent governmental authority. To fulfill these monitoring functions, we include clauses in all of our advertising contracts requiring that all advertising content provided by advertising agencies and advertisers must comply with relevant laws and regulations. Under PRC law, we may have claims against advertising agencies and advertisers for all damages to us caused by their breach of such representations. Violation of these laws and regulations may subject us to penalties, including fines, confiscation of our advertising income, orders to cease dissemination of the advertisements and orders to publish an announcement correcting the misleading information. In circumstances involving serious violations, such as posting a pharmaceutical product advertisement without approval, or posting an advertisement for fake pharmaceutical product, PRC governmental authorities may force us to terminate our advertising operation or revoke our licenses.

18

A majority of the advertisements shown on our platform are provided to us by third parties. Although we have implemented automated and manual content monitoring systems and significant efforts have been made to ensure that the advertisements shown on our platform are in full compliance with applicable laws and regulations, we cannot assure you that all the content contained in such advertisements is true and accurate as required by the advertising laws and regulations, especially given the large volume of in-feed ads and the uncertainty in the application of these laws and regulations. In addition, advertisers, especially in-feed advertisers, may through illegal technology evade our content monitoring procedures to show advertisements on our platform that do not comply with applicable laws and regulations. The inability of our systems and procedures to adequately and timely discover such evasions may subject us to regulatory penalties or administrative sanctions. Although we have not been subject to material penalties or administrative sanctions in the past for the advertisements shown on our platform, if we are found to be in violation of applicable PRC advertising laws and regulations in the future, we may be subject to penalties and our reputation may be harmed, which may have a material and adverse effect on our business, financial condition, results of operations and prospects.

***If we cannot maintain our corporate culture as we grow, we could lose the innovation, collaboration and focus that contribute to our business.***

We believe that a critical component of our success is our corporate culture, which fosters innovation and cultivates creativity. As we continue to expand and grow our business, we may find it difficult to maintain these valuable aspects of our corporate culture. Any failure to preserve our culture could undermine our reputation and negatively impact our ability to attract and retain employees, which would in turn jeopardize our future success.

***Our quarterly operating results may fluctuate, which makes our results of operations difficult to predict and may cause our quarterly results of operations to fall short of expectations.***

Our quarterly operating results have fluctuated in the past and may continue to fluctuate depending upon a number of factors, many of which are out of our control. Our operating results tend to be seasonal. For instance, we have experienced lower online advertising services revenue in the first quarter of each year in connection with the Chinese New Year holiday as advertisers limit their budget for online platforms and less blockbuster content is released during that period. Furthermore, our content distribution revenue may fluctuate significantly from quarter to quarter as a result of the varying availability of popular content titles for distribution and adjustments to our market strategies. For these reasons, comparing our operating results on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues in a given period may be significantly different from our historical or projected rates and our operating results in future quarters may fall below expectations.

***Disruption or failure of our IT systems, cybersecurity related threats or our failure to timely and effectively scale and adapt our existing technology and infrastructure could impair our users' online entertainment experience and adversely affect our reputation, business and operating results.***

Our ability to provide users with a high-quality online entertainment experience depends on the continuous and reliable operation of our IT systems. We cannot assure you that we will be able to procure sufficient bandwidth in a timely manner or on acceptable terms or at all. Failure to do so may significantly impair user experience on our platform and decrease the overall effectiveness of our platform to both users and advertisers. Disruptions, failures, unscheduled service interruptions or a decrease in connection speeds could hurt our reputation and cause our users and advertising customers to switch to our competitors' platforms. Our IT systems and proprietary content delivery network, or CDN, are vulnerable to damage or interruption as a result of fires, floods, earthquakes, power losses, telecommunications failures, undetected errors in software, computer viruses, hacking and other attempts to harm our systems. These interruptions may be due to unforeseen events that are beyond our control or the control of our third-party service providers. For example, we have experienced intermittent interruptions for up to 48 hours of viewer access to one popular drama title in the past. In addition, in February 2020, we have experienced intermittent interruption for approximately two hours of user access to our platform. Such interruption was caused by a malfunction at an internet data center, combined with slow response from our backup server supplier caused by the COVID-19 outbreak and a peak of user traffic on our platform. The interruption was fixed within approximately two hours and we have expanded the capacity of our servers hosted at internet data centers. Our platform has also experienced general intermittent interruptions in the past. These interruptions were caused by (i) overload of our servers; (ii) unexpected overflow of user traffic; (iii) service malfunction of payment gateway; and/or (iv) service malfunction of the telecommunications operators, such as power outage of internet data centers or network transmission congestion. We may continue to experience similar interruptions in the future despite our continuous efforts to improve our IT systems. Since we host our servers at third-party internet data centers, any natural disaster or unexpected closure of internet data centers operated by third-party providers may result in lengthy service interruptions. Furthermore, in the future experience, service disruptions, outages and other performance problems due to a variety of factors, including infrastructure changes and cybersecurity related threats as follows:

- our technology, system, networks and our users' devices have been subject to, and may continue to be the target of, cyber-attacks, computer viruses, malicious code, phishing attacks or information security breaches that could result in an unauthorized release, gathering, monitoring, misuse, loss or destruction of confidential, proprietary and other information of ours, our employees or sensitive information provided by our users, or otherwise disrupt our, our users' or other third parties' business operations;

19

Table of Contents

- we periodically encounter attempts to create false accounts or use our platform to send targeted and untargeted spam messages to our users, or take other actions on our platform for purposes such as spamming or spreading misinformation, and we may not be able to repel spamming attacks;

- the use of encryption and other security measures intended to protect our systems and confidential data may not provide absolute security, and losses or unauthorized access to or releases of confidential information may still occur;

- our security measures may be breached due to employee error, malfeasance or unauthorized access to sensitive information by our employees, who may be induced by outside third parties, and we may not be able to anticipate any breach of our security or to implement adequate preventative measures; and

- we may be subject to IT system failures or network disruptions caused by natural disasters, accidents, power disruptions, telecommunications failures, acts of terrorism or war, computer viruses, physical or electronic break-ins, or other events or disruptions.

If we experience frequent or persistent service disruptions, whether caused by failures of our own systems or those of third-party service providers, our users' experience with us may be negatively affected, which in turn, may have a material and adverse effect on our reputation. We cannot assure you that we will be successful in minimizing the frequency or duration of service interruptions.

As the number of our users increases and our users generate more content on our platform, we may be required to expand and adapt our technology and infrastructure to continue to reliably store and analyze this content. It may become increasingly difficult to maintain and improve the performance of our services, especially during peak usage times, as our services become more complex and our user traffic increases. If our users are unable to access our online application in a timely fashion, or at all, our user experience may be compromised and the users may seek other platforms to meet their needs, and may not return to iQIYI or use iQIYI as often in the future, or at all. This would negatively impact our ability to attract users and maintain the level of user engagement.

***If the technologies we use in operating our business fails, becomes unavailable, or does not operate to meet expectations, our business and results of operation may be adversely impacted.***

We utilize a combination of proprietary and third-party technologies to operate our business. These include the technologies that we have developed to recommend and monetize content to our users as well as enable fast and efficient delivery of content to our users and their various internet connected devices. For example, we use our own CDN, and third-party CDN services to support our operation. To the extent internet service providers do not interconnect with the CDN services we use, or if we experience difficulties in its operation, our ability to efficiently and effectively deliver our streaming content to our users could be adversely impacted and our business and results of operation could be adversely affected. Likewise, if our recommendation and monetization technology does not enable us to predict and recommend content that our users will enjoy, our ability to attract and retain users may be adversely affected. We also utilize third party technology to help market our service, process payments, and otherwise manage the daily operations of our business. If our technology or that of third parties we utilize in our operations fails or otherwise operates improperly, our ability to operate our service, retain existing users and add new users may be impaired. Also, any harm to our users' personal computers or other devices caused by software used in our operations could have an adverse effect on our business, results of operations and financial condition.

***Any lack of requisite permits for any of our internet video and other content or any of our business may expose us to regulatory sanctions.***

In 2009, the State Administration of Radio, Film and Television, or SARFT, released a Notice on Strengthening the Administration of Online Audio/Video Program Content. This notice reiterated, among other things, that all films and television shows released or published online must be in compliance with relevant regulations on the administration of radio, film and television. In other words, these films and television shows, whether produced in the PRC or overseas, must be pre-approved by SARFT, the authority of which is currently exercised by the National Radio and Television Administration, or the NRTA and the State Film Bureau, or the SFB, and distributors of these films and television shows must obtain an applicable permit before releasing them. In September 2014, the SAPPRFT, which replaced SARFT, reiterated that all the foreign TV dramas and films published to the public via internet must obtain their respective permit. In addition, all the foreign TV dramas and films published to the public via internet by competent license holders must be registered with the SAPPRFT before March 31, 2015 and all un-registered TV dramas and films will be prohibited from broadcasting via internet from April 1, 2015. In addition, online games are also subject to approval by the SAPPRFT, the authority of which is currently exercised by the State Administration of Press and Publication, or the SAPP, and approval by or filing with the Ministry of Culture. As mentioned in the news reports, between March and December 2018, such approval or filing of domestic online games were suspended, which may have been due to the institutional restructuring of game approval authorities involving the Ministry of Culture and Tourism and the SAPPRFT, and we cannot apply for such approval or filing during this period. Such suspension caused significant delays in the introduction of new games in the Chinese market.

20

Case 1:20-cv-03794-DG-TAM    Document 65-12    Filed 03/03/23    Page 24 of 410 PageID #: 3012

In terms of licensed third-party content published or online games distributed jointly with third parties, we obtain and rely on written representations from content providers and third-party operators regarding the NRTA, SFB, SAPP and other approval and filing status of these content and online games, and, to a lesser extent, require content providers and third-party operators to produce evidence demonstrating that they and the licensed content or the online games have received all requisite permits and approvals. We also import some foreign TV dramas and films and apply for the permits for and register such contents with the competent authorities by ourselves. However, we cannot assure you that our monitoring procedures with respect to licensed content and online games are fully adequate, and we cannot guarantee that the remedies provided by these content providers, if any, will be sufficient to compensate us for potential regulatory sanctions imposed by the NRTA, SFB or SAPP due to violations of the approval and permit requirements and for the foreign TV dramas and movies imported by us, we cannot assure you that we will be able to obtain the permits for or register such contents with the competent authorities in a timely manner or at all. Nor can we ensure that any such sanctions will not adversely affect either the general availability of video, online games or other content on our platform or our reputation. In addition, such risks may persist due to ambiguities and uncertainties relating to the implementation and enforcement of this notice. Although we have internal content monitoring procedures in place to review our procured content, we face risks of termination of permits and approvals, contractual misrepresentations and failure to honor representations or indemnify us against any claims or costs by content providers.

We have obtained the Value-added Telecommunications Business Operation License for information services via internet, or ICP License, the Permit for Internet Audio-Video Program Service, the Network Culture Business Permit, the Permit for Internet Drug Information Service, and other relevant permits required for operating our business. However, we have not obtained and are in the process of applying for or upgrading and expanding certain approvals or permits which are required or may be required for our operation of businesses. For example, we have not obtained and are planning to apply for the Permit for Internet News Information Service to publish current political news on our platform or disseminate such news through the internet. Beijing iQIYI has not obtained and is in the process of applying for the Internet Publishing Service License in relation to our online games, comics and online literature operation. We also have not obtained and are in the process of applying for adding and amending certain service items for our Permit for Internet Audio-Video Program Service, such as forwarding the audio-video programs uploaded by the users, rebroadcasting radio and TV channels, displaying current political audio-video news programs and providing video and audio live broadcasting of cultural activities, sports events and other activities organized by the general social groups. We are also planning to apply for adding online performances for the Network Culture Business of Beijing iQIYI and adding electronic data interchange as a permitted business for our Value-added Telecommunications Business Operation License. We are also filing several HTML5 online games operated by us with the Ministry of Culture. Although we are planning to apply or in the process of applying for such licenses and we maintain regular oral communication with relevant regulatory authorities, which have not objected to the operations of our business in question, if we fail to obtain, maintain or renew such licenses, or obtain any additional licenses and permits or make any records or filings required by new laws, regulations or executive orders required for our new business in a timely manner or at all, we could be subject to liabilities or penalties, and our operations could be adversely affected.

In addition, new laws and regulations may be adopted from time to time to address new issues that come to the authorities' attention, which may require us to obtain new license and permits, or take certain actions that may adversely affect our business operations. For example, we have voluntarily taken down certain online advertisements on our platform due to tightened regulations on online advertisements.

As the industry that we operate in is still evolving in China, new laws and regulations may be adopted from time to time to require additional licenses and permits other than those we currently have, and to address new issues that arise from time to time. We may not timely obtain or maintain all the required licenses or approvals or make all the necessary filings in the future. Nor can we assure you that we will be able to timely address all the change in policy, failure of which may subject us to liabilities or penalties, and our operations could be adversely affected.

***Undetected programming errors could adversely affect our user experience and market acceptance of our video content, which may materially and adversely affect our business and results of operations.***

Video content on our platform may contain programming errors that may only become apparent after their release. We receive user feedbacks in connection with programming errors affecting the user experience from time to time, and such errors may also come to our attention during our monitoring process. We generally have been able to resolve such programming errors in a timely manner. However, we cannot assure you that we will be able to detect and resolve all these programming errors effectively. Undetected audio or video programming errors or defects may adversely affect user experience, cause users to refrain from becoming our paid members or to cancel their membership subscriptions, and cause our advertising customers to reduce their use of our services, any of which could materially and adversely affect our business and results of operations.

21

*We have invested in or acquired complementary assets, technologies and businesses in the future, and such efforts may fail and may result in equity or earnings dilution.*

We have invested in and acquired, and may continue to invest in and acquire, assets, technologies and businesses that are complementary to our business in the future. For example, in July 2018, we acquired 100% equity stake in Skymoons. Acquired businesses or assets may not yield the results we expect. In addition, investments and acquisitions involve uncertainties and risks, including:

- potential ongoing financial obligations and unforeseen or hidden liabilities, including liability for infringement of third-party copyrights or other intellectual property;

- costs and difficulties of integrating acquired businesses and managing a larger business;

- in the case of investments where we do not obtain management and operational control, lack of influence over the controlling partner or shareholder, which may prevent us from achieving our strategic goals in the investments;

- possible loss of key employees of a target business;

- potential claims or litigation regarding our board's exercise of its duty of care and other duties required under applicable law in connection with any of our significant acquisitions or investments approved by the board;

- diversion of resources and management attention;

- regulatory hurdles and compliance risks, including the anti-monopoly and competition laws, rules and regulations of China and other jurisdictions; and

- enhanced compliance requirements for outbound acquisitions and investment under the laws and regulations of China.

Any failure to address these risks successfully may have a material and adverse effect on our financial condition and results of operations. Investments and acquisitions may require a significant amount of capital, which would decrease the amount of cash available for working capital or capital expenditures. In addition, if we use our equity securities to pay for investments and acquisitions, we may dilute the value of our ADSs and the underlying ordinary shares. If we borrow funds to finance investments and acquisitions, such debt instruments may contain restrictive covenants that could, among other things, restrict us from distributing dividends. Moreover, acquisitions may also generate significant amortization expenses related to intangible assets. We may also incur impairment charges to earnings for investments and acquired businesses and assets.

*We are subject to payment processing risk.*

Our members pay for our service using a variety of different online payment methods. We rely on third parties to process such payment. Acceptance and processing of these payment methods are subject to certain rules and regulations and require payment of interchange and other fees. To the extent there are increases in payment processing fees, material changes in the payment ecosystem, such as delays in receiving payments from payment processors and/or changes to rules or regulations concerning payment processing, our revenue, operating expenses and results of operation could be adversely impacted.

*Negative media coverage could adversely affect our business.*

Negative publicity about us or our business, shareholders, affiliates, directors, officers or other employees, as well as the industry in which we operate or the talents on our platform, can harm our operations. Such negative publicity could be related to a variety of matters, including:

- alleged misconduct or other improper activities committed by our shareholders, affiliates, directors, officers or other employees, or by third party suppliers;

- false or malicious allegations or rumors about us or our shareholders, affiliates, directors, officers or other employees, or by third party suppliers;

- user complaints about the quality of our products and services;

- copyright infringements involving us and content offered on our platform;

22

- security breaches of confidential user information;

- improper actions by fans; and

- governmental and regulatory investigations or penalties resulting from our failure to comply with applicable laws and regulations.

In addition, we are exploring various opportunities and marketing strategies to better monetize our membership base, including offering early access privilege to certain drama series for an additional fee. We may receive negative news reports, or negative publicity on influential TV shows, on such initiatives, which may negatively impact our reputation and results of operations. We may also be affected by publicity relating to third party service providers. For example, in September 2018, there was negative publicity involving certain senior officers of iResearch, the industry consultant we commissioned to prepare an industry report in connection with our initial public offering. According to a public announcement made by iResearch, certain senior officers of iResearch are cooperating with governmental investigations in China. Such publicity may raise questions as to the integrity of the industry data or opinions produced by iResearch, including the data included in iResearch's industry report produced in connection with our initial public offering, or otherwise have a negative impact on our reputation. In addition to traditional media, there has been an increasing use of social media platforms and similar devices in China, including instant messaging applications, such as Weixin/WeChat, social media websites and other forms of internet-based communications that provide individuals with access to a broad audience of users and other interested persons. The availability of information on instant messaging applications and social media platforms is virtually immediate as is its impact without affording us an opportunity for redress or correction. The opportunity for dissemination of information, including inaccurate information, is seemingly limitless and readily available. Information concerning our company, shareholders, directors, officers and employees may be posted on such platforms at any time. The risks associated with any such negative publicity or incorrect information cannot be completely eliminated or mitigated and may materially harm our reputation, business, financial condition and results of operations.

*A severe or prolonged downturn in the PRC or global economy could materially and adversely affect our business and financial condition.*

The global macroeconomic environment is facing challenges. The growth rate of the Chinese economy has gradually slowed in recent years and the trend may continue. There is considerable uncertainty over the long-term effects of the monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. Unrest, terrorist threats and the potential for war in the Middle East and elsewhere may increase market volatility across the globe. There have also been concerns on the relationship among China and other countries, including the surrounding Asian countries, which may potentially have economic effects. In particular, there is significant uncertainty about the future relationship between the United States and China with respect to trade policies, treaties, government regulations and tariffs. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any severe or prolonged slowdown in the global or PRC economy may materially and adversely affect our business, results of operations and financial condition. In addition, continued turbulence in the international markets may adversely affect our ability to access capital markets to meet liquidity needs.

Furthermore, in the wake of the United Kingdom's exit from the European Union on January 31, 2020 ("Brexit"), there remains uncertainty about the future relationship between the United Kingdom and the European Union. It remains unclear how Brexit would affect the fiscal, monetary and regulatory landscape within the United Kingdom, the European Union and globally, which may have a negative impact on our business and results of operations.

*Our operations depend on the performance of the internet infrastructure and telecommunications networks in China.*

The successful operation of our business depends on the performance of the internet infrastructure and telecommunications networks in China. Almost all access to the internet is maintained through state-owned telecommunications operators under the administrative control and regulatory supervision of the MIIT. Moreover, we have entered into contracts with various subsidiaries of a limited number of telecommunications service providers at provincial level and rely on them to provide us with data communications capacity through local telecommunications lines. We have limited access to alternative networks or services in the event of disruptions, failures or other problems with China's internet infrastructure or the telecommunications networks provided by telecommunications service providers. Our platform regularly serves a large number of users and advertisers. With the expansion of our business, we may be required to upgrade our technology and infrastructure to keep up with the increasing traffic on our platform. However, we have no control over the costs of the services provided by telecommunications service providers. If the prices we pay for telecommunications and internet services rise significantly, our results of operations may be materially and adversely affected. If internet access fees or other charges to internet users increase, our user traffic may decline and our business may be harmed.

23

***Our business is subject to complex and evolving Chinese and international laws and regulations regarding privacy and data protection. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are required by privacy and data protection laws in China and other jurisdictions, including, without limitation, the PRC Cybersecurity Law, to ensure the confidentiality, integrity and availability of the information of our users, members, advertising customers, and third-party content providers, which is also essential to maintaining their confidence in our services. However, the interpretation and application of such laws in China and elsewhere are often uncertain and in flux.

In November 2016, the Standing Committee of the National People's Congress promulgated the PRC Cybersecurity Law, which provides that network operators shall meet their cyber security obligations and shall take technical measures and other necessary measures to protect the safety and stability of their networks. The PRC Cyber Security Law is relatively new and subject to interpretation by the regulator. Although we only gain access to user information that is necessary for, and relevant to, the services provided, the data we obtain and use may include information that is deemed as "personal information" under the PRC Cybersecurity Law and related data privacy and protection laws and regulations. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Information Security, Censorship and Privacy."

While we take measures to comply with applicable data privacy and protection laws and regulations, we cannot guarantee the effectiveness of the measures undertaken by us and business partners. The activities of third parties such as our customers and business partners are beyond our control. If our business partners violate the PRC Cybersecurity Law and related laws and regulations, or fail to fully comply with the service agreements with us, or if any of our employees fails to comply with our internal control measures and misuses the information, we may be subject to penalties. Any failure or perceived failure to comply with all applicable data privacy and protection laws and regulations, or any failure or perceived failure of our business partners to do so, or any failure or perceived failure of our employees to comply with our internal control measures, may result in negative publicity and legal proceedings or regulatory actions against us, and could damage our reputation, discourage current and potential users and customers from using our services and subject us to claims, fines and damages, which could have a material adverse effect on our business and results of operations.

There are a number of legislative proposals in the European Union and the United States, at both the federal and state level, as well as other jurisdictions that could impose new obligations in areas affecting our business. New laws or regulations concerning data protection, or the interpretation and application of existing consumer and data protection laws or regulations, which is often uncertain and in flux, may be inconsistent with our practices. The introduction of new products or other actions that we may take may subject us to additional laws, regulations, or other government scrutiny. For example, the European Union adopted the General Data Protection Regulation, or the GDPR, which became effective on May 25, 2018. The GDPR imposes additional obligations on companies regarding the handling of personal data and provides certain individual privacy rights to persons whose data is stored. The GDPR requires submission of personal data breach notifications to designated European privacy regulator in each country our business operate in, and includes significant penalties for non-compliance with the notification obligation as well as other requirements of the regulation. Complying with new laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business. In addition, some countries are considering or have passed legislation implementing data protection requirements or requiring local storage and processing of data or similar requirements that could increase the cost and complexity of delivering our services.

***We have granted, and may continue to grant, share incentives, which may result in increased share-based compensation expenses.***

We adopted an equity incentive plan on October 18, 2010, or the 2010 Plan, which was amended and restated on November 3, 2014 and August 6, 2016. We also adopted an equity incentive plan on November 30, 2017, or the 2017 Plan. We account for compensation costs for all share-based awards using a fair-value based method and recognize expenses in our consolidated statements of comprehensive loss in accordance with U.S. GAAP. Under the 2010 Plan, we are authorized to grant options, stock appreciation rights, restricted stock units and other types of awards that the administrator of the 2010 Plan decides. Under the 2017 Plan, we are authorized to grant options, restricted shares and restricted share units. Under the 2010 Plan, as amended, the maximum aggregate number of shares which may be issued pursuant to all awards is 589,729,714 shares. Under the 2017 Plan, the maximum aggregate number of shares which may be issued pursuant to all awards is 720,000 shares. As of February 28, 2021, options to purchase a total of 413,376,684 ordinary shares are outstanding under the 2010 Plan, and 44,002 restricted share units were outstanding under the 2017 Plan. For the years ended December 31, 2018, 2019 and 2020, we recorded RMB556.2 million, RMB1,084.5 million and RMB1,370.1 million (US$210.0 million), respectively, in share-based compensation expenses. We believe the granting of share-based awards is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based awards in the future. As a result, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

24

***We are subject to changing law and regulations regarding regulatory matters, corporate governance and public disclosure that have increased both our costs and the risk of non-compliance.***

We are subject to rules and regulations by various governing bodies, including, for example, the SEC, which is charged with the protection of investors and the oversight of companies whose securities are publicly traded, and the various regulatory authorities in China and the Cayman Islands, and to new and evolving regulatory measures under applicable law. Our efforts to comply with new and changing laws and regulations have resulted in and are likely to continue to result in, increased general and administrative expenses and a diversion of management time and attention from revenue-generating activities to compliance activities.

Moreover, because these laws, regulations and standards are subject to varying interpretations, their application in practice may evolve over time as new guidance becomes available. This evolution may result in continuing uncertainty regarding compliance matters and additional costs necessitated by ongoing revisions to our disclosure and governance practices. If we fail to address and comply with these regulations and any subsequent changes, we may be subject to penalty and our business may be harmed.

***We have limited business insurance coverage.***

Insurance companies in China offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources, which could have an adverse effect on our results of operations and financial condition.

***Failure to maintain effective internal control over financial reporting could have a material and adverse effect on the trading price of our ADSs.***

We are subject to the reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act, adopted rules requiring every public company to include a report from management on the effectiveness of such company's internal control over financial reporting in its annual report on Form 20-F. In addition, the independent registered public accounting firm must report on the effectiveness of such company's internal control over financial reporting. If we fail to maintain effective internal control over financial reporting, we will not be able to conclude and our independent registered public accounting firm will not be able to report that we have effective internal control over financial reporting in accordance with the Sarbanes-Oxley Act of 2002 in our future annual report on Form 20-F covering the fiscal year in which this failure occurs. Effective internal control over financial reporting is necessary for us to produce reliable financial reports. Any failure to maintain effective internal control over financial reporting could result in the loss of investor confidence in the reliability of our financial statements, which in turn could have a material and adverse effect on the trading price of our ADSs. Furthermore, we may need to incur additional costs and use additional management and other resources as our business and operations further expand or in an effort to remediate any significant control deficiencies that may be identified in the future.

**Risks Related to Our Relationship with Baidu**

***We have limited experience operating as a stand-alone public company.***

We have limited experience conducting our operations as a stand-alone public company. Since we became a stand-alone public company in March 2018, we have faced and will continue to face enhanced administrative and compliance requirements, which may result in substantial costs.

In addition, as we are a public company, our management team needs to develop the expertise necessary to comply with the regulatory and other requirements applicable to public companies, including requirements relating to corporate governance, listing standards and securities and investor relations issues. While we were a private subsidiary of Baidu, we were indirectly subject to requirements to maintain an effective internal control over financial reporting under Section 404 of the Sarbanes–Oxley Act of 2002. However, as a stand-alone public company, our management has to evaluate our internal control system independently with new thresholds of materiality, and to implement necessary changes to our internal control system. We cannot guarantee that we will be able to do so continuously in an effective manner.

**We may have conflicts of interest with Baidu and, because of Baidu's controlling ownership interest in our company, we may not be able to resolve such conflicts on terms favorable to us.**

Conflicts of interest may arise between Baidu and us in a number of areas relating to our ongoing relationships. Potential conflicts of interest that we have identified include the following:

- *Our board members may have conflicts of interest*. Our directors Mr. Robin Yanhong Li, Mr. Herman Yu, Dr. Haifeng Wang and Dr. Dou Shen are also senior management of Baidu. These relationships could create, or appear to create, conflicts of interest when these persons are faced with decisions with potentially different implications for Baidu and us.

- *Sale of shares in our company*. Baidu may decide to sell all or a portion of our shares that it holds to a third party, including to one of our competitors, thereby giving that third party substantial influence over our business and our affairs. Such a sale could be in conflict with the interests of our employees or our other shareholders.

- *Developing business relationships with Baidu's competitors*. So long as Baidu remains our controlling shareholder, we may be limited in our ability to do business with its competitors. This may limit our ability to market our services for the best interests of our company and our other shareholders.

- *Allocation of business opportunities*. Business opportunities may arise that both we and Baidu find attractive, and which would complement our businesses. We may be prevented from taking advantage of new business opportunities that Baidu has entered into.

Although our company became a stand-alone public company in March 2018, we expect to operate, for as long as Baidu is our controlling shareholder, as a subsidiary of Baidu. Baidu may from time to time make strategic decisions that it believes are in the best interests of its business as a whole, including our company. These decisions may be different from the decisions that we would have made on our own. Baidu's decisions with respect to us or our business, including any related party transactions between Baidu and us, may be resolved in ways that favor Baidu and therefore Baidu's own shareholders, which may not coincide with the interests of our other shareholders. If Baidu were to compete with us, our business, financial condition, results of operations and prospects could be materially and adversely affected.

**Our agreements with Baidu may be less favorable to us than similar agreements negotiated with unaffiliated third parties. In particular, our master business cooperation agreement with Baidu limits the scope of business that we are allowed to conduct.**

We have entered into a master business cooperation agreement with Baidu and may enter into additional agreements with Baidu in the future. Under our master business cooperation agreement with Baidu, we agree during the non-competition period, which will end on the eighth anniversary of the date of execution of the agreement unless otherwise terminated earlier pursuant to the agreement, not to compete with Baidu in its core businesses. Such contractual limitations may affect our ability to expand our business and may adversely impact our growth and prospects. Furthermore, while Baidu has agreed not to compete with us in our long-form video businesses, existing business activities conducted by Baidu and its affiliates are not subject to such non-compete limitation. Potential conflicts of interest could arise in connection with the resolution of any dispute between Baidu and us, regarding the terms of the arrangements governing our agreements with Baidu including the master business cooperation agreement. For example, so long as Baidu continues to control us, we may not be able to bring a legal claim against Baidu in the event of contractual breach, notwithstanding our contractual rights under the master business cooperation agreement and other inter-company agreements to be entered into by Baidu and us from time to time.

**If our collaboration with Baidu is terminated or curtailed, or if we are no longer able to benefit from the synergies of our business cooperation with Baidu, our business may be adversely affected.**

Our controlling shareholder and strategic partner, Baidu, is one of the largest internet companies in China. Our business has benefited significantly from Baidu's advanced technological capabilities and strong market position in China. In addition, we have benefited from Baidu's financial support in the past. We cooperate with Baidu in a number of areas, including AI technology, cloud services and traffic. However, we cannot assure you that we will continue to maintain our cooperative relationships with Baidu and its affiliates in the future. To the extent we cannot maintain our cooperative relationships with Baidu at reasonable prices or at all, we will need to source other business partners to provide services, which could result in material and adverse effects to our business and results of operations. We may also need to obtain financing through other means if Baidu ceases to provide financial support to us. In addition, our current customers and content partners may react negatively to our carve-out from Baidu. Our inability to maintain a cooperative relationship with Baidu could materially and adversely affect our business, growth and prospects.

26

*Baidu will control the outcome of shareholder actions in our company.*

As of February 28, 2021, Baidu holds 52.2% of our outstanding ordinary shares, representing 91.6% of our total voting power. Baidu has advised us that it does not anticipate disposing of its voting control in us in the near future. Baidu's voting power gives it the power to control certain actions that require shareholder approval under Cayman Islands law, our memorandum and articles of association and the Nasdaq Stock Market requirements, including approval of mergers and other business combinations, changes to our memorandum and articles of association, the number of shares available for issuance under any share incentive plans, and the issuance of significant amounts of our ordinary shares in private placements.

Baidu's voting control may cause transactions to occur that might not be beneficial to you as a holder of ADSs and may prevent transactions that could have been beneficial to you. For example, Baidu's voting control may prevent a transaction involving a change of control of us, including transactions in which you as a holder of our ADSs might otherwise receive a premium for your securities over the then-current market price. In addition, Baidu is not prohibited from selling a controlling interest in us to a third party and may do so without your approval and without providing for a purchase of your ADSs. In addition, the significant concentration of share ownership may adversely affect the trading price of the ADSs due to investors' perception that conflicts of interest may exist or arise.

*We are a "controlled company" within the meaning of the Nasdaq Stock Market Rules and, as a result, will rely on exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.*

We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Baidu beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely, and will rely, on certain exemptions from corporate governance rules, including:

- an exemption from the rule that a majority of our board of directors must be independent directors;

- an exemption from the rule that the compensation of our chief executive officer must be determined or recommended solely by independent directors; and

- an exemption from the rule that our director nominees must be selected or recommended solely by independent directors.

As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements.

**Risks Related to Our Corporate Structure**

*If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.*

Foreign ownership of telecommunication businesses and certain other businesses, such as provision of internet video and online game services, is subject to restrictions under current PRC laws and regulations. For example, foreign investors are generally not allowed to own more than 50% of the equity interests in a commercial internet content provider or other value-added telecommunication service provider (other than operating e-commerce, domestic multi-party communication, store-and-forward, and call center) and the major foreign investor in a value-added telecommunication service provider in China must have experience in providing value-added telecommunications services overseas and maintain a good track record in accordance with the Guidance Catalog of Industries for Foreign Investment promulgated in 2007, as amended in 2011, 2015, 2017, 2018 and 2019, the Special Administrative Measures for Access of Foreign Investment (Negative List) (2020), and other applicable laws and regulations.

In addition, foreign investors are prohibited from investing in companies engaged in internet video, culture and publishing business and film/drama production and operation (including importation) business. We are a Cayman Islands company and our PRC subsidiaries are considered foreign-invested enterprises. Accordingly, none of our PRC subsidiaries is eligible to operate internet video and other businesses which foreign-owned companies are prohibited or restricted from conducting in China. To comply with PRC laws and regulations, we conduct such business activities through our consolidated affiliated entities in China, Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Intelligent Entertainment, and their subsidiaries. Our wholly owned subsidiaries, Beijing QIYI Century and iQIYI New Media, have entered into contractual arrangements with our consolidated affiliated entities and their respective shareholders, and such contractual arrangements enable us to exercise effective control over, receive substantially all of the economic benefits of, and have an exclusive option to purchase all or part of the equity interest and assets in our consolidated affiliated entities when and to the extent permitted by PRC law. Because of these contractual arrangements, we are the primary beneficiary of our consolidated affiliated entities in China and hence consolidate their financial results as our variable interest

27

entities under U.S. GAAP. If the PRC government finds that our contractual arrangements do not comply with its restrictions on foreign investment in online video and other foreign-restricted services, or if the PRC government otherwise finds that we, our consolidated affiliated entities, or any of their subsidiaries are in violation of PRC laws or regulations or lack the necessary permits or licenses to operate our business, the relevant PRC regulatory authorities, including the MIIT, NRTA, the SFB, the SAPP, the Ministry of Culture and the MOFCOM, would have broad discretion in dealing with such violations or failures, including, without limitation:

- revoking the business licenses and/or operating licenses of such entities;

- discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our PRC subsidiaries and consolidated affiliated entities;

- imposing fines, confiscating the income from our PRC subsidiaries or our consolidated affiliated entities, or imposing other requirements with which we or our consolidated affiliated entities may not be able to comply;

- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with our consolidated affiliated entities and deregistering the equity pledges of our consolidated affiliated entities, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over our consolidated affiliated entities; or

- restricting or prohibiting our use of the proceeds of any of our offshore financings to finance our business and operations in China.

In addition, in September 2009, the GAPP together with several other government agencies issued a notice, or the Circular 13, prohibiting foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. Other government agencies that also have the authority to regulate online game operations in China, such as the Ministry of Culture and the MIIT, did not join the GAPP in issuing the Circular 13. The GAPP was replaced by the SAPPRFT and later by the SAPP. To date, none of the GAPP, the SAPPRFT and the SAPP has issued any interpretation of the Circular 13. Due to the ambiguity among various regulations on online games and a lack of interpretations from the relevant PRC authorities governing online game operations, there are uncertainties regarding whether PRC authorities would consider our relevant contractual arrangements to be foreign investment in online game operation businesses. While we are not aware of any online game companies which use the same or similar contractual arrangements as ours having been penalized or ordered to terminate operation by PRC authorities claiming that the contractual arrangements constitute control over, or participation in, the operation of online game operations through indirect means, it is unclear whether and how the various regulations of the PRC authorities might be interpreted or implemented in the future. If our relevant contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, the relevant contractual arrangements may be challenged by the SAPP or other governmental authorities. If we were found to be in violation of the Circular 13 to operate our mobile game business, the SAPP, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending or revoking the relevant licenses and registrations. If we were found to be in violation of any existing or future PRC laws or regulations, including the MIIT notice and the Circular 13, the relevant regulatory authorities would have broad discretion in dealing with such violations.

Furthermore, it is uncertain whether any new PRC laws, rules or regulations relating to contractual arrangements will be adopted or if adopted, what they would provide. For example, the National People's Congress approved the Foreign Investment Law on March 15, 2019 and the State Council approved the Regulation on Implementing the Foreign Investment Law (the "Implementation Regulations") on December 12, 2019, effective from January 1, 2020. The Supreme People's Court of China issued a judicial interpretation on the Foreign Investment Law on December 27, 2019, effective from January 1, 2020. The Foreign Investment Law and the Implementation Regulations do not touch upon the relevant concepts and regulatory regimes that were historically suggested for the regulation of VIE structures, and thus this regulatory topic remains unclear under the Foreign Investment Law. Since the Foreign Investment Law and the Implementation Regulations are new, there are substantial uncertainties exist with respect to its implementation and interpretation and it is also possible that variable interest entities will be deemed as foreign invested enterprises and be subject to restrictions in the future. Such restrictions may cause interruptions to our operations, products and services and may incur additional compliance cost, which may in turn materially and adversely affect our business, financial condition and results of operations.

28

Any of these events could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If occurrences of any of these events results in our inability to direct the activities of our consolidated affiliated entities in China that most significantly impact their economic performance, and/or our failure to receive the economic benefits from our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

***We rely on contractual arrangements with our consolidated affiliated entities and their shareholders for our business operations, which may not be as effective as direct ownership in providing operational control.***

We have relied and expect to continue to rely on contractual arrangements with consolidated affiliated entities and their shareholders to operate our business in China. For a description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure" These contractual arrangements may not be as effective as direct ownership in providing us with control over our consolidated affiliated entities. For example, our consolidated affiliated entities and their shareholders could breach their contractual arrangements with us by, among other things, failing to conduct its operations in an acceptable manner or taking other actions that are detrimental to our interests.

If we had direct ownership of our consolidated affiliated entities in China, we would be able to exercise our rights as a shareholder to effect changes in the board of directors of our consolidated affiliated entities, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by our consolidated affiliated entities and their shareholders of their obligations under the contracts to exercise control over our consolidated affiliated entities. The shareholders of our consolidated affiliated entities may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate certain portion of our business through the contractual arrangements with our consolidated affiliated entities. If any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC law and arbitration, litigation and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. Therefore, our contractual arrangements with our consolidated affiliated entities may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

***Any failure by our consolidated affiliated entities or their shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.***

If our consolidated affiliated entities or their shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief, and claiming damages, which we cannot assure you will be effective under PRC law. For example, if the shareholders of our consolidated affiliated entities were to refuse to transfer their equity interests in our consolidated affiliated entities to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they were otherwise to act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All the agreements under our contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a consolidated affiliated entity should be interpreted or enforced under PRC law. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delay. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our consolidated affiliated entities, and our ability to conduct our business may be negatively affected. See "Risks Related to Doing Business in China—Uncertainties with respect to the PRC legal system could adversely affect us."

29

***The shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.***

The shareholders of our consolidated affiliated entities may have potential conflicts of interest with us. In particular, none of Mr. Ning Ya, who currently holds 50% of equity interest in iQIYI Pictures, and Mr. Xiaohua Geng, who currently holds 50% of the equity interests in Shanghai iQIYI and 100% of the equity interests in Beijing iQIYI, is our director or executive officer, and we cannot assure you that their interests will be aligned with ours. These shareholders may breach, or cause our consolidated affiliated entities to breach, or refuse to renew, the existing contractual arrangements we have with them and our consolidated affiliated entities, which would have a material and adverse effect on our ability to effectively control our consolidated affiliated entities and receive economic benefits from it. For example, the shareholders may be able to cause our agreements with our consolidated affiliated entities to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise, any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor. Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company. If we cannot resolve any conflict of interest or dispute between us and these shareholders, we would have to rely on legal proceedings, which could result in disruption of our business and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***Contractual arrangements in relation to our consolidated affiliated entities may be subject to scrutiny by the PRC tax authorities and they may determine that we or our PRC consolidated affiliated entities owe additional taxes, which could negatively affect our financial condition and the value of your investment.***

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities within ten years after the taxable year when the transactions are conducted. We could face material and adverse tax consequences if the PRC tax authorities determine that the VIE contractual arrangements were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of our consolidated affiliated entities in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our consolidated affiliated entities for PRC tax purposes, which could in turn increase their tax liabilities without reducing our PRC subsidiary's tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on our consolidated affiliated entities for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our variable interest entities' tax liabilities increase or if they are required to pay late payment fees and other penalties.

***We may lose the ability to use and enjoy assets held by our consolidated affiliated entities that are material to the operation of certain portion of our business if the entity goes bankrupt or becomes subject to a dissolution or liquidation proceeding.***

As part of our contractual arrangements with our consolidated affiliated entities, the entities hold certain assets that are material to the operation of certain portion of our business, including permits, domain names and most of our IP rights. If our consolidated affiliated entities go bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, our consolidated affiliated entities may not, in any manner, sell, transfer, mortgage or dispose of their assets or legal or beneficial interests in the business without our prior consent. If our consolidated affiliated entities undergo a voluntary or involuntary liquidation proceeding, the independent third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

***Uncertainties exist with respect to the interpretation and implementation of the newly enacted PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The National People's Congress approved the Foreign Investment Law on March 15, 2019 and the State Council approved the Regulation on Implementing the Foreign Investment Law (the "Implementation Regulations") on December 12, 2019, effective from January 1, 2020, to replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. However, since it is relatively new, uncertainties still exist in relation to its interpretation and implementation. For instance, under the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by foreign individuals, enterprises or other entities in China. Though it does not explicitly classify contractual arrangements as a form of foreign investment, there is no assurance that foreign investment via contractual arrangement would not be interpreted as a type of indirect foreign investment activities under the definition in the

30

Table of Contents

future. In addition, the definition contains a catch-all provision which includes investments made by foreign investors through means stipulated in laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions promulgated by the State Council to provide for contractual arrangements as a form of foreign investment. In any of these cases, it will be uncertain whether our contractual arrangements will be deemed to be in violation of the market access requirements for foreign investment under the PRC laws and regulations. Furthermore, if future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, corporate governance and business operations.

### *Recently introduced economic substance legislation of the Cayman Islands may adversely impact us or our operations.*

The Cayman Islands have enacted the International Tax Co-operation (Economic Substance) Law, (as amended) (the "Substance Law") introducing certain economic substance requirements for in-scope Cayman Islands entities which are engaged in certain "relevant activities," which in the case of exempted companies incorporated before January 1, 2019, will apply in respect of financial years commencing July 1, 2019, onwards. As we are a Cayman Islands company, compliance obligations include filing annual notifications for the Company. As it is a relatively new regime, it is anticipated that the Substance Law will evolve and be subject to further clarifications and amendments. Several other non-European Union jurisdictions, such as the British Virgin Islands, introduced similar legislations and requirements. We may need to allocate additional resources to keep updated with these developments and may have to make changes to our operations in order to comply with all the requirements under the Substance Law. Failure to satisfy the requirements may subject us to penalties under the Substance Law.

### Risks Related to Doing Business in China

### *Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.*

Substantially all of our operations are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic, social conditions and government policies in China generally. The Chinese economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over China's economy through allocating resources, controlling payment of foreign currency -denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. Such developments could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations.

### *Uncertainties with respect to the PRC legal system could adversely affect us.*

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions under the civil law system may be cited for reference but have limited precedential value. Since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and the enforcement of these laws, regulations and rules involves uncertainties.

In 1979, the PRC government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past three decades has significantly enhanced the protections afforded to various forms of foreign investments in China. However, China has not developed a fully integrated legal system, and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, the interpretation and enforcement of these laws and regulations involve uncertainties. Since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory provisions and contractual terms, it may be difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy. These uncertainties may affect our judgment on the relevance of legal requirements and our ability to enforce our contractual rights or tort claims. In addition, the regulatory uncertainties may be exploited through unmerited or frivolous legal actions or threats in attempts to extract payments or benefits from us.

31

Table of Contents

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all and may have retroactive effect. As a result, we may not be aware of our violation of any of these policies and rules until sometime after the violation. In addition, any administrative and court proceedings in China may be protracted, resulting in substantial costs and diversion of resources and management attention.

***We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business.***

We are a Cayman Islands holding company and we may rely on dividends and other distributions on equity from our PRC subsidiaries for our cash requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and for services of any debt we may incur. Our subsidiaries' ability to distribute dividends is based upon their distributable earnings. Current PRC regulations permit our PRC subsidiaries to pay dividends to their respective shareholders only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. In addition, each of our PRC subsidiaries and our consolidated affiliated entities is required to set aside at least 10% of its after-tax profits each year, if any, to fund a statutory reserve until such reserve reaches 50% of its registered capital. Each of such entities in China is also required to further set aside a portion of its after-tax profits to fund the employee welfare fund, although the amount to be set aside, if any, is determined at the discretion of its board of directors. These reserves are not distributable as cash dividends. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments to us. Any limitation on the ability of our PRC subsidiaries to distribute dividends or other payments to their respective shareholders could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our businesses, pay dividends or otherwise fund and conduct our business.

In response to the persistent capital outflow and RMB's depreciation against U.S. dollar in the fourth quarter of 2016, the People's Bank of China and the State Administration of Foreign Exchange, or SAFE, have implemented a series of capital control measures over recent months, including stricter vetting procedures for China-based companies to remit foreign currency for overseas acquisitions, dividend payments and shareholder loan repayments. For instance, the People's Bank of China issued the Circular on Further Clarification of Relevant Matters Relating to Offshore RMB Loans Provided by Domestic Enterprises, or the PBOC Circular 306, on November 22, 2016, which provides that offshore RMB loans provided by a domestic enterprise to offshore enterprises that it holds equity interests in shall not exceed 30% of the domestic enterprise's ownership interest in the offshore enterprise. The PBOC Circular 306 may constrain our PRC subsidiaries' ability to provide offshore loans to us. The PRC government may continue to strengthen its capital controls and our PRC subsidiaries' dividends and other distributions may be subjected to tighter scrutiny in the future. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The Cayman Islands, where iQIYI, Inc., the direct parent company of our PRC subsidiaries Beijing QIYI Century Science & Technology Co., Ltd., and Chongqing QIYI Tianxia Science & Technology Co., Ltd., is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, IQIYI Film Group HK Limited, which directly owns our PRC subsidiaries Beijing iQIYI New Media Science and Technology Co., Ltd., is incorporated in Hong Kong. However, if IQIYI Film Group HK Limited is not considered to be the beneficial owner of the dividends paid to it by Beijing iQIYI New Media Science and Technology Co., Ltd. under the tax circulars promulgated in February and October 2009, such dividends would be subject to withholding tax at a rate of 10%. If our PRC subsidiaries declare and distribute profits to us, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

32

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us to make loans to or make additional capital contributions to our PRC subsidiaries and consolidated affiliated entities, which could materially and adversely affect our liquidity and our ability to fund and expand our business.***

Any funds we transfer to our PRC subsidiaries, either as a shareholder loan or as an increase in registered capital, are subject to approval by or registration or filing with relevant governmental authorities in China. According to the relevant PRC regulations on foreign-invested enterprises, or FIEs, in China, capital contributions to our PRC subsidiaries are subject to filing with the MOFCOM in its foreign investment comprehensive management information system and registration with other governmental authorities in China. In addition, (a) any foreign loan procured by our PRC subsidiaries and consolidated affiliated entities is required to be registered with the SAFE or its local branches or filed with SAFE in its information system, and (b) each of our PRC subsidiaries and consolidated affiliated entities may not procure loans which exceed the difference between its registered capital and its total investment amount as recorded in the foreign investment comprehensive management information system or, as an alternative, only procure loans subject to the Risk-Weighted Approach and the Net Asset Limits. See "Item 4.B. Information on the Company—Business Overview—Regulation—Regulations on Foreign Exchange." Any medium or long term loan to be provided by us to our consolidated affiliated entities must also be approved by the NDRC. We may not obtain these government approvals or complete such registrations on a timely basis, if at all, with respect to future capital contributions or foreign loans by us to our PRC subsidiaries and consolidated affiliated entities. If we fail to receive such approvals or complete such registration or filing, our ability to capitalize our PRC operations may be negatively affected, which could adversely affect our liquidity and our ability to fund and expand our business. There is, in effect, no statutory limit on the amount of capital contribution that we can make to our PRC subsidiaries. This is because there is no statutory limit on the amount of registered capital for our PRC subsidiaries, and we are allowed to make capital contributions to our PRC subsidiaries by subscribing for their initial registered capital and increased registered capital, provided that the PRC subsidiaries complete the relevant filing and registration procedures. With respect to loans to the PRC subsidiaries by us, (i) if the relevant PRC subsidiaries adopt the traditional foreign exchange administration mechanism, or the Current Foreign Debt mechanism, the outstanding amount of the loans shall not exceed the difference between the total investment and the registered capital of the PRC subsidiaries and there is, in effect, no statutory limit on the amount of loans that we can make to our PRC subsidiaries under this circumstance because we can increase the registered capital of our PRC subsidiaries by making capital contributions to them, subject to the completion of the required registrations, and the difference between the total investment and the registered capital will increase accordingly; and (ii) if the relevant PRC subsidiaries adopt the foreign exchange administration mechanism as provided in the PBOC Notice No. 9, or the Notice No. 9 Foreign Debt mechanism, the risk-weighted outstanding amount of the loans, which shall be calculated based on the formula provided in the PBOC Notice No. 9, shall not exceed 200% of the net asset of the relevant PRC subsidiary. According to the PBOC Notice No. 9, after a transition period of one year since the promulgation of the PBOC Notice No. 9, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries. Currently, our PRC subsidiaries have the flexibility to choose between the Current Foreign Debt mechanism and the Notice No. 9 Foreign Debt mechanism. However, if the Notice No. 9 Foreign Debt Mechanism, or a more stringent foreign debt mechanism becomes mandatory and our PRC subsidiaries are no longer able to choose the Current Foreign Debt mechanism, our ability to provide loans to our PRC subsidiaries or our consolidated affiliated entities may be significantly limited, which may adversely affect our business, financial condition and results of operations.

In 2008, the SAFE promulgated the Circular on the Relevant Operating Issues Concerning the Improvement of the Administration of the Payment and Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, or SAFE Circular 142. SAFE Circular 142 regulates the conversion by FIEs of foreign currency into Renminbi by restricting the usage of converted Renminbi. SAFE Circular 142 provides that any Renminbi capital converted from registered capitals in foreign currency of FIEs may only be used for purposes within the business scopes approved by PRC governmental authority and such Renminbi capital may not be used for equity investments within China unless otherwise permitted by the PRC law. In addition, the SAFE strengthened its oversight of the flow and use of the Renminbi capital converted from registered capital in foreign currency of FIEs. The use of such Renminbi capital may not be changed without SAFE approval, and such Renminbi capital may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been utilized. On April 8, 2015, the SAFE promulgated the Circular on Reforming the Management Approach Regarding the Foreign Exchange Capital Settlement of Foreign-Invested Enterprises, or SAFE Circular 19. SAFE Circular 19 took effect as of June 1, 2015 and superseded SAFE Circular 142 on the same date. SAFE further promulgated Circular 16, effective on June 9, 2016, which, among other things, amend certain provisions of Circular 19. SAFE Circulars 19 and 16 launched a nationwide reform of the administration of the settlement of the foreign exchange capitals of FIEs and allows FIEs to settle their foreign exchange capital at their discretion, but continues to prohibit FIEs from using the Renminbi fund converted from their foreign exchange capitals for expenditure beyond their business scopes, and also prohibit FIEs from using such Renminbi fund to provide loans to persons other than affiliates unless otherwise permitted under its business scope. As a result, we are required to apply Renminbi funds converted from the net proceeds we received from our financing activities within the business scopes of our PRC subsidiaries. On October 23, 2019, the SAFE issued the Notice of the State Administration of Foreign Exchange on Further Facilitating Cross-border Trade and Investment, which, among other things, expanded the use of foreign exchange capital to domestic equity investment area. SAFE Circular 19, SAFE Circular 16 and other relevant rules and regulations may significantly limit our ability to transfer to and use in China any foreign currency, which may adversely affect our business, financial condition and results of operations.

33

***Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.***

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions in China and by China's foreign exchange policies. We cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

Any significant appreciation or depreciation of Renminbi may have a material and adverse effect on your investment. For example, to the extent that we need to convert U.S. dollars into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

***Our use of some leased properties could be challenged by third parties or governmental authorities, which may cause interruptions to our business operations.***

As of the date of this annual report, some of the lessors of our properties leased by us in China have not provided us with their property ownership certificates or any other documentation proving their right to lease those properties to us. If our lessors are not the owners of the properties and they have not obtained consents from the owners or their lessors or permits from the relevant governmental authorities, our leases could be invalidated. If this occurs, we may have to renegotiate the leases with the owners or other parties who have the right to lease the properties, and the terms of the new leases may be less favorable to us. Although we may seek damages from such lessors, such leases may be void and we may be forced to relocate. We can provide no assurance that we will be able to find suitable replacement sites on terms acceptable to us on a timely basis, or at all, or that we will not be subject to material liability resulting from third parties' challenges on our use of such properties. As a result, our business, financial condition and results of operations may be materially and adversely affected.

In addition, a substantial portion of our leasehold interests in leased properties have not been registered with the relevant PRC governmental authorities as required by relevant PRC laws. The failure to register leasehold interests may expose us to potential warnings and penalties up to RMB10,000 per unregistered leased property.

***The enforcement of the PRC Labor Contract Law and other labor-related regulations in the PRC may adversely affect our business and results of operations.***

The Standing Committee of the National People's Congress enacted the Labor Contract Law in 2008, and amended it on December 28, 2012. The Labor Contract Law introduced specific provisions related to fixed-term employment contracts, part-time employment, probationary periods, consultation with labor unions and employee assemblies, employment without a written contract, dismissal of employees, severance, and collective bargaining to enhance previous PRC labor laws. Under the Labor Contract Law, an employer is obligated to sign an unlimited-term labor contract with any employee who has worked for the employer for ten consecutive years. Further, if an employee requests or agrees to renew a fixed-term labor contract that has already been entered into twice consecutively, the resulting contract, with certain exceptions, must have an unlimited term, subject to certain exceptions. With certain exceptions, an employer must pay severance to an employee where a labor contract is terminated or expires. In addition, the PRC governmental authorities have continued to introduce various new labor-related regulations since the effectiveness of the Labor Contract Law.

Under the PRC Social Insurance Law and the Administrative Measures on Housing Fund, employees are required to participate in pension insurance, work-related injury insurance, medical insurance, unemployment insurance, maternity insurance, and housing funds and employers are required, together with their employees or separately, to pay the social insurance premiums and housing funds for their employees. If we fail to make adequate social insurance and housing fund contributions, we may be subject to fines and legal sanctions, and our business, financial conditions and results of operations may be adversely affected.

34

Table of Contents

These laws designed to enhance labor protection tend to increase our labor costs. In addition, as the interpretation and implementation of these regulations are still evolving, our employment practices may not be at all times be deemed in compliance with the regulations. As a result, we could be subject to penalties or incur significant liabilities in connection with labor disputes or investigations.

***The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in 2006 and amended in 2009, and some other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that the MOC be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that the MOC shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the Rules of Ministry of Commerce on Implementation of Security Review System of Mergers and Acquisitions of Domestic Enterprises by Foreign Investors issued by the MOC that became effective in September 2011 and the Measures for the Security Review of Foreign Investment promulgated by the NDRC and the MOC in December 2020 have established procedures and requirements that are expected to make merger and acquisition activities in China by foreign investors increasingly time-consuming and complex. These rules specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the competent authority, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the competent authority may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liability or penalties, limit our ability to inject capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing with such PRC residents or entities' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. In addition, such PRC residents or entities must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to any change of basic information (including change of such PRC citizens or residents, name and operation term), increases or decreases in investment amount, transfers or exchanges of shares, or mergers or divisions.

SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration with the local SAFE branches, our PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

We have notified all PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. As a result, we cannot assure you that all of our shareholders or beneficial owners who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit our PRC subsidiaries' ability to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

35

***If the chops of our PRC subsidiaries and our VIEs are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised.***

In China, a company chop or seal serves as the legal representation of the company towards third parties even when unaccompanied by a signature. Each legally registered company in China is required to maintain a company chop, which must be registered with the local Public Security Bureau. In addition to this mandatory company chop, companies may have several other chops which can be used for specific purposes. The chops of our PRC subsidiaries and VIEs are generally held securely by personnel designated or approved by us in accordance with our internal control procedures. To the extent those chops are not kept safely, are stolen or are used by unauthorized persons or for unauthorized purposes, the corporate governance of these entities could be severely and adversely compromised and those corporate entities may be bound to abide by the terms of any documents so chopped, even if they were chopped by an individual who lacked the requisite power and authority to do so. In addition, if the chops are misused by unauthorized persons, we could experience disruption to our normal business operations. We may have to take corporate or legal action, which could involve significant time and resources to resolve while distracting management from our operations.

***Any failure to comply with PRC regulations regarding the registration requirements for employee stock incentive plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Pursuant to SAFE Circular 37, PRC residents who participate in share incentive plans in overseas non-publicly-listed companies may submit applications to SAFE or its local branches for the foreign exchange registration with respect to offshore special purpose companies. In the meantime, our directors, executive officers and other employees who are PRC citizens or who are non-PRC residents residing in the PRC for a continuous period of not less than one year, subject to limited exceptions, and who have been granted share-based awards by us, may follow the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, promulgated by the SAFE in 2012. Pursuant to the 2012 SAFE notices, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, subject to a few exceptions, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiaries of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We, our directors, our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted share-based awards are subject to these regulations since we have become an overseas listed company. Failure to complete the SAFE registrations may subject them to fines, and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit our PRC subsidiaries' ability to distribute dividends to us. We have completed filing with the relevant SAFE branch for our equity incentive plans and are required to update our filing periodically or in the event of any material changes. We also face regulatory uncertainties that could restrict our ability to adopt additional incentive plans for our directors, executive officers and employees under PRC law. See "Item 4. Information on the Company—B. Business Overview—Government Regulations—Regulations on Employment and Social Welfare—Employee Stock Incentive Plan."

The State Administration of Taxation, or SAT, has issued certain circulars concerning employee share options and restricted shares. Under these circulars, our employees working in China who exercise or transfer share options or are granted restricted shares will be subject to PRC individual income tax. Our PRC subsidiaries have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC governmental authorities. See "Item 4. Information on the Company—Government Regulation—Regulations on Employment and Social Welfare—Employee Stock Incentive Plan."

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with its "de facto management body" within the PRC is considered a "resident enterprise" and will be subject to PRC enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, productions, personnel, accounts and properties of an enterprise. In 2009, the SAT issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect the SAT's general position on how the "de facto management body" test should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

36

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that iQIYI, Inc. is a PRC resident enterprise for enterprise income tax purposes, we may be required to withhold a 10% withholding tax from interest or dividends we pay to our shareholders that are non-resident enterprises, including the holders of our ADSs. In addition, non-resident enterprise shareholders (including our ADS holders) may be subject to PRC tax at a rate of 10% on gains realized on the sale or other disposition of the ADSs or ordinary shares, if such income is treated as sourced from within the PRC. Furthermore, if PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, interest or dividends paid to our non-PRC individual shareholders (including our ADS holders) and any gain realized on the transfer of the ADSs or ordinary shares by such holders may be subject to PRC tax at a rate of 20% (which, in the case of interest or dividends, may be withheld at source by us), if such gain is deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether non-PRC shareholders of iQIYI, Inc. would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that iQIYI, Inc. is treated as a PRC resident enterprise. Any such tax may reduce the returns on your investment in the ADSs.

*The audit report included in this annual report is prepared by an auditor who is not inspected by the U.S. Public Company Accounting Oversight Board and, as such, you are deprived of the benefits of such inspection. In addition, various legislative and regulatory developments related to U.S.-listed China-based companies due to lack of PCAOB inspection and other developments may have a material adverse impact on our listing and trading in the U.S. and the trading prices of our ADSs.*

Our auditor is registered with the Public Company Accounting Oversight Board (United States), or the PCAOB. Pursuant to laws in the United States, the PCAOB has authority to conduct regular inspections over independent registered public accounting firms registered with the PCAOB to assess their compliance with the applicable professional standards. Our auditor is located in China, a jurisdiction which does not allow the PCAOB to conduct inspections without the approval of the Chinese authorities. As a result, we understand that our auditor is not currently inspected by the PCAOB.

In May 2013, the PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the China Securities Regulatory Commission, or CSRC, and the PRC Ministry of Finance, which established a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations undertaken by the PCAOB, the CSRC or the PRC Ministry of Finance in the United States and the PRC. The PCAOB continued to discuss with the CSRC and the PRC Ministry of Finance on joint inspections in the PRC of PCAOB-registered audit firms that provide auditing services to Chinese companies that trade on U.S. stock exchanges.

On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting the continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. On April 21, 2020, the SEC and the PCAOB issued another joint statement reiterating the greater risks of insufficient disclosures from companies in many emerging markets, including China, compared to those from U.S. domestic companies. In discussing the specific issues related to these risks, the statement again highlighted the PCAOB's inability to inspect audit work and practices of accounting firms in China with respect to U.S. reporting companies. On June 4, 2020, the then U.S. President issued a memorandum ordering the President's Working Group on Financial Markets, or the PWG, to submit a report to the President within 60 days of the memorandum that includes recommendations for actions that can be taken by the executive branch and by the SEC or the PCAOB on Chinese companies listed on U.S. stock exchanges and their audit firms. On August 6, 2020, the PWG released the report. In particular, with respect to jurisdictions that do not grant the PCAOB sufficient access to fulfill its statutory mandate, or NCJs, the PWG recommended that enhanced listing standards be applied to companies from NCJs for seeking initial listing and remaining listed on U.S. stock exchanges. Under the enhanced listing standards, if the PCAOB does not have access to work papers of the principal audit firm located in a NCJ for the audit of a U.S.-listed company as a result of governmental restrictions, the U.S.-listed company may satisfy this standard by providing a co-audit from an audit firm with comparable resources and experience where the PCAOB determines that it has sufficient access to the firm's audit work papers and practices to inspect the co-audit. The report recommended a transition period until January 1, 2022 before the new listing standards apply to companies already listed on U.S. stock exchanges. Under the PWG recommendations, if we fail to meet the enhanced listing standards before January 1, 2022, we could face de-listing from the Nasdaq Global Select Market, deregistration from the SEC and/or other risks, which may materially and adversely affect, or effectively terminate our ADS trading in the United States. There were recent media reports about the SEC's proposed rulemaking in this regard. It is uncertain whether the PWG recommendations will be adopted, in whole or in part, and the impact of any new rule on us cannot be estimated at this time.

This lack of the PCAOB inspections in China prevents the PCAOB from fully evaluating audits and quality control procedures of our independent registered public accounting firm. As a result, we and investors in our ordinary shares are deprived of the benefits of such PCAOB inspections. The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our independent registered public accounting firm's audit procedures or quality control procedures as compared to auditors outside of China that are subject to the PCAOB inspections, which could cause investors and potential investors in our ADSs to lose confidence in our audit procedures and reported financial information and the quality of our financial statements.

37

On May 20, 2020, the U.S. Senate passed S. 945, the Holding Foreign Companies Accountable Act, or the Act. The Act was approved by the U.S. House of Representatives on December 2, 2020. On December 19, 2020, the Act was signed into law by then U.S. President. In essence, the Act requires the SEC to prohibit foreign companies from having its securities traded on U.S. securities exchanges or "over-the-counter" if a company retains a foreign accounting firm that cannot be inspected by the PCAOB for three consecutive years, beginning in 2021. The enactment of Act and any additional rulemaking efforts to increase U.S. regulatory access to audit information in China could cause investor uncertainty for affected SEC registrants, including us, the market price of our ADSs could be materially adversely affected, and our ADSs could be delisted if we are unable to meet the PCAOB inspection requirement in time.

***Proceedings instituted by the SEC against five PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act.***

Starting in 2011 the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, were affected by a conflict between U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under Chinese law, they could not respond directly to the U.S. regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the Chinese accounting firms, including our independent registered public accounting firm. A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepts that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms will receive matching Section 106 requests, and are required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. If they fail to meet specified criteria, the SEC retains authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Remedies for any future noncompliance could include, as appropriate, an automatic six-month bar on a single firm's performance of certain audit work, commencement of a new proceeding against a firm, or, in extreme cases, the resumption of the current proceeding against all four firms. The audit committee is aware of the policy restriction and regularly communicated with our independent auditor to ensure compliance. If additional remedial measures are imposed on the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, in administrative proceedings brought by the SEC alleging the firms' failure to meet specific criteria set by the SEC with respect to requests for the production of documents, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, U.S.-listed companies and the market price of our ordinary shares may be adversely affected.

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of our ADSs from the Nasdaq or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

*Uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft Anti-Monopoly Guidelines for Platform Economy and draft Personal Information Protection Law and how it may impact our business operations.*

In November 2020, the State Administration for Market Regulation, or the SAMR, published for comments the draft Guidelines to Anti-Monopoly in the Field of Platform Economy, or the Draft Anti-Monopoly Guidelines for Platform Economy. The Draft Anti-Monopoly Guidelines for Platform Economy provides operational standards and guidelines to be applied in identifying certain monopolistic acts of internet platforms which are prohibited to restrict unfair competition and safeguard users' interests, including without limitation, prohibiting personalized pricing using big data and analytics, selling products below cost without reasonable causes, actions or arrangements seen as exclusivity arrangements, using technology means to block competitors' interface, using bundle services to sell services or products. In addition, internet platforms' compulsory collection of user data may be viewed as abuse of dominant market position that may have the effect to eliminate or restrict competition. The Draft Anti-Monopoly Guidelines for Platform Economy further emphasizes that concentration of undertakings with the VIE structure will also be subject to the SAMR's anti-monopoly review if the thresholds for notification are met. The SAMR is currently soliciting comments on this draft and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. In October 2020, the Standing Committee of the National People's Congress officially released the draft for the first reading of the Personal Information Protection Law, or the Draft Personal Information Protection Law. The Draft Personal Information Protection Law provides the basic regime for personal information protection, including without limitation, stipulating an expanded definition of personal information, providing a long-arm jurisdiction in cross-border scenarios, emphasizing individual rights, and prohibiting rampant infringement of personal information, such as stealing, selling, or secretly collecting personal information. If the Draft Anti-Monopoly Guidelines for Platform Economy or the Draft Personal Information Protection Law is promulgated as an effective regulation in the future, we cannot assure you that our business operations will comply with such regulation in all respects and we may be ordered to terminate certain of our business operations that are deemed illegal by the regulatory authorities and become subject to fines and/or other sanctions.

*It may be difficult for overseas regulators to conduct investigation or collect evidence within China.*

Shareholder claims or regulatory investigation that are common in the United States generally are difficult to pursue as a matter of law or practicality in China. For example, in China, there are significant legal and other obstacles to providing information needed for regulatory investigations or litigation initiated outside China. Although the authorities in China may establish a regulatory cooperation mechanism with the securities regulatory authorities of another country or region to implement cross-border supervision and administration, such cooperation with the securities regulatory authorities in the Unities States may not be efficient in the absence of mutual and practical cooperation mechanism. Furthermore, according to Article 177 of the PRC Securities Law, or Article 177, which became effective in March 2020, no overseas securities regulator is allowed to directly conduct investigation or evidence collection activities within the territory of the PRC. While detailed interpretation of or implementation rules under Article 177 have yet to be promulgated, the inability for an overseas securities regulator to directly conduct investigation or evidence collection activities within China may further increase difficulties faced by you in protecting your interests.

**Risks Related to Our ADSs**

*The trading price of our ADSs has been volatile and may continue to be volatile regardless of our operating performance.*

The trading price of our ADSs has been volatile and has ranged from a low of US$14.35 to a high of US$46.23 since our ADSs started to trade on the Nasdaq Global Select Market on March 29, 2018. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including, but not limited to, the following:

- actual or anticipated fluctuations in our quarterly results of operations;

- changes in financial estimates by securities research analysts;

- conditions in online entertainment markets;

- announcements of new investments, acquisitions by us or our competitors, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- litigation, government investigation or other legal or regulatory proceeding; and

- general economic or political conditions in China or elsewhere in the world.

In addition, the stock market in general, and the market prices for internet-related companies and companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. Furthermore, the stock market in general has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of companies like us. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

In the past, shareholders of public companies have often brought securities class action suits against those companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.***

The trading market for our ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume for our ADSs to decline.

***Our dual-class voting structure limits your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our authorized and issued ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share.

Due to the disparate voting powers attached to these two classes of ordinary shares, Baidu, holder of our Class B ordinary shares, owns approximately 52.2% of our total issued and outstanding ordinary shares on an as-converted basis and 91.6% of the voting power of our outstanding shares as of February 28, 2021. Therefore, Baidu has decisive influence over matters requiring shareholders' approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control limits the ability of holders of Class A ordinary shares and ADSs to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

***Techniques employed by short sellers may drive down the market price of our ADSs.***

Short selling is the practice of selling securities that the seller does not own but rather has borrowed from a third party with the intention of buying identical securities back at a later date to return to the lender. The short seller hopes to profit from a decline in the value of the securities between the sale of the borrowed securities and the purchase of the replacement shares, as the short seller expects to pay less in that purchase than it received in the sale. As it is in the short seller's interest for the price of the security to decline, many short sellers publish, or arrange for the publication of, negative opinions regarding the relevant issuer and its business prospects in order to create negative market momentum and generate profits for themselves after selling a security short. These short attacks have, in the past, led to selling of shares in the market.

Public companies listed in the United States that have a substantial majority of their operations in China have been the subject of short selling. Much of the scrutiny and negative publicity has centered on allegations of a lack of effective internal control over financial reporting resulting in financial and accounting irregularities and mistakes, inadequate corporate governance policies or a lack of adherence thereto and, in many cases, allegations of fraud. As a result, many of these companies are now conducting internal and external investigations into the allegations and, in the interim, are subject to shareholder lawsuits and/or SEC enforcement actions.

40

Table of Contents

We are currently, and may in the future be, the subject of unfavorable allegations made by short sellers. See "Item 8. Financial Information—Legal Proceedings" for more information about the Wolfpack short seller report, including the related SEC investigation and class action lawsuits. Any such allegations may be followed by periods of instability in the market price of our ordinary shares and ADSs and negative publicity. If and when we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we could have to expend a significant amount of resources to investigate such allegations and/or defend ourselves. While we would strongly defend against any such short seller attacks, we may be constrained in the manner in which we can proceed against the relevant short seller by principles of freedom of speech, applicable federal or state law or issues of commercial confidentiality. Such a situation could be costly and time-consuming and could distract our management from growing our business. Even if such allegations are ultimately proven to be groundless, allegations against us could severely impact our business operations and shareholder's equity, and the value of any investment in our ADSs could be greatly reduced or rendered worthless.

***Because we do not expect to pay dividends in the foreseeable future, you must rely on price appreciation of our ADSs for return on your investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return to ADS holders will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which ADS holders purchased the ADSs.

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.***

Our memorandum and articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

***Provisions of our convertible senior notes could discourage an acquisition of us by a third party.***

In December 2018, we completed an offering of US$750 million in aggregate principal amount of convertible senior notes due 2023. In March 2019, we completed an offering of US$1.2 billion in aggregate principal amount of convertible senior notes due 2025. In December 2020, we completed an offering of US$800 million in aggregate principal amount of convertible senior notes due 2026. Certain provisions of our convertible senior notes could make it more difficult or more expensive for a third party to acquire us. The indenture for our convertible senior notes define a "fundamental change" to include, among other things: (i) any person or group becoming a beneficial owner of our company through gaining more than 50% voting power of our ordinary share capital or more than 50% of our outstanding Class A ordinary shares; (ii) any recapitalization, reclassification or change of our Class A ordinary shares or ADSs as a result of which these securities would be converted into, or exchanged for, stock, other securities, other property or assets or any share exchange, consolidation or merger or similar transaction pursuant to which our Class A ordinary shares or ADSs will be converted into cash, securities or other property or any sale, lease or other transfer in one transaction or series of transaction of all or substantially all our consolidated assets, to any person other than one of our subsidiaries or consolidated affiliated entities; (iii) the adoption of any plan or proposal relating to the liquidation or dissolution of our company; (iv) our ADSs ceasing to be listed or quoted on any of The Nasdaq Global Select Market, The Nasdaq Global Market or The New York Stock Exchange (or any of their respective successors) and none of the ADSs, Class A ordinary shares, other common equity and ADSs in respect of reference property is listed or quoted on one of The Nasdaq Global Select Market, The Nasdaq Global Market or The New York Stock Exchange (or any of their respective successors) within one trading day of such cessation; or (v) any change in or amendment to the laws, regulations and rules in the PRC that prohibits us from operating substantially all of our business operations and prevents us from continuing to derive substantially all of the economic benefits from our business operations. Upon the occurrence of a fundamental change, holders of these notes will have the right, at their option, to require us to repurchase all of their notes or any portion of the principal amount of such notes in integral multiples of US$1,000. In the event of a fundamental change, we may also be required to issue additional ADSs upon conversion of our convertible notes.

41

***Conversion of the convertible senior notes may dilute the ownership interest of existing shareholders, including holders who had previously converted their convertible senior notes.***

The conversion of some or all of the convertible senior notes will dilute the ownership interests of existing shareholders and existing holders of our ADSs. Any sales in the public market of the ADSs issuable upon such conversion may increase the opportunities to create short positions with respect to the ADSs, which could adversely affect prevailing market prices of our ADSs. In addition, the existence of the convertible senior notes may encourage short selling by market participants because the conversion of the convertible senior notes could depress the price of our ADSs.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Act (as amended) of the Cayman Islands (the "Companies Act") and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from requirements for companies incorporated in other jurisdictions such as the United States. We rely on the exemption available to foreign private issuers for the requirement under Nasdaq Rule 5605(c)(2)(A)(i) that each member of the audit committee must be an independent director as defined under Nasdaq Rule 5605(a)(2). Mr. Herman Yu, who is a member of our audit committee and who is a non-voting member of our audit committee, is not an independent director as defined under Nasdaq Rule 5605(a)(2). If we continue to rely on this and other exemptions available to foreign private issuers in the future, our shareholders may be afforded less protection than they otherwise would under the Nasdaq corporate governance listing standards applicable to U.S. domestic issuers.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

***Certain judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands exempted company and substantially all of our assets are located outside of the United States. Substantially all of our current operations are conducted in China. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.

Table of Contents

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A ordinary shares.***

Holders of our ADSs will only be able to exercise the voting rights with respect to the underlying Class A ordinary shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, ADS holders must vote by giving voting instructions to the depositary. If we ask for instructions of ADS holders, then upon receipt of such voting instructions, the depositary will try to vote the underlying Class A ordinary shares in accordance with these instructions. If we do not instruct the depositary to ask for instructions of ADS holders, the depositary may still vote in accordance with instructions given by holders of ADSs, but it is not required to do so. ADS holders will not be able to directly exercise your right to vote with respect to the underlying shares unless you withdraw the shares. When a general meeting is convened, an ADS holder may not receive sufficient advance notice to withdraw the shares underlying his or her ADSs to allow such holder to vote with respect to any specific matter. If we ask for instructions of holders of ADSs, the depositary will notify ADS holders of the upcoming vote and will arrange to deliver our voting materials to ADS holders. We have agreed to give the depositary at least 30 days' prior notice of shareholder meetings. Nevertheless, we cannot assure you that ADS holders will receive the voting materials in time to ensure that ADS holders can instruct the depositary to vote their shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out ADS holders' voting instructions. This means that an ADS holder may not be able to exercise the right to vote and may have no legal remedy if the shares underlying his or her ADSs are not voted as such holder requested.

***ADS holders may experience dilution of his or her holdings due to inability to participate in rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

***ADS holders may be subject to limitations on transfer of their ADSs***

Our ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.***

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including: (i) the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC; (ii) the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act; (iii) the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; (iv) the selective disclosure rules by issuers of material nonpublic information under Regulation FD; and (v) certain audit committee independence requirements in Rule 10A-3 of the Exchange Act.

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of Nasdaq Stock Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information, which would be made available to you, were you investing in a U.S. domestic issuer.

43

In addition, as a foreign private issuer whose securities are listed on the Nasdaq Global Select Market, we are permitted to follow certain home country corporate governance practices in lieu of the requirements of the Nasdaq Rules pursuant to Nasdaq Rule 5615(a)(3), which provides for such exemption to compliance with the Nasdaq Rule 5600 Series. We rely on the exemption available to foreign private issuers for the requirement under Nasdaq Rule 5605(c)(2)(A)(i) that each member of the audit committee must be an independent director as defined under Nasdaq Rule 5605(a)(2). Mr. Herman Yu, who is a member of our audit committee and is a non-voting member of our audit committee, is not an independent director as defined under Nasdaq Rule 5605(a)(2). In addition, in lieu of the requirements of Rule 5635(c) of the Nasdaq Rules that shareholder approval be required prior to the issuance of securities when a stock option or purchase plan is to be established or materially amended or other equity compensation arrangement made or materially amended, pursuant to which stock may be acquired by officers, directors, employees, or consultants, we elected to follow our home country practices with respect to the shareholder approval for material amendment to our 2010 Equity Incentive Plan. If we continue to rely on these and other exemptions available to foreign private issuers in the future, our shareholders may be afforded less protection than they otherwise would under the Nasdaq corporate governance listing standards applicable to U.S. domestic issuers. In addition, we follow home country practice with respect to annual shareholders meetings and did not hold an annual meeting of shareholders in 2020. Furthermore, as a result of our use of the "controlled company" exemptions, our investors will not have the same protection afforded to shareholders of companies that are subject to all of Nasdaq's corporate governance requirements.

***We may be a passive foreign investment company, or PFIC, which could result in adverse U.S. federal income tax consequences for U.S. shareholders.***

Generally, a non-U.S. corporation, such as our company, will be considered a PFIC for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (generally based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets may be determined by reference to the market price of the ADSs and Class A ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules, and because PFIC status is a fact-intensive determination made on an annual basis, no assurance can be given with respect to our PFIC status for the current or any future taxable year.

Based on the market price of our ADSs, the value of our assets and the composition of our assets and income, we believe that we were not a PFIC for our taxable year ended December 31, 2020. We do not presently expect to be a PFIC for the 2021 taxable year or the foreseeable future, but no assurance can be given in this regard. Fluctuations in the market price of our ADSs may cause us to become a PFIC for the current or subsequent taxable years because the value of our assets for the purpose of the asset test may be determined by reference to the market price of our ADSs. The composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets. In addition, because there are uncertainties in the application of the relevant rules, it is possible that the Internal Revenue Service, or IRS, may challenge our classification of certain income and assets as non-passive or our valuation of our tangible and intangible assets, each of which may result in our becoming a PFIC for the current or subsequent taxable years. Furthermore, we may also be a PFIC if we were not treated as the owner of our consolidated affiliated entities for U.S. tax purposes.

If we were treated as a PFIC for any taxable year during which a U.S. shareholder held an ADS or Class A ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. shareholder. See "Item 10. Additional Information—Taxation—U.S. Federal Income Tax Considerations—Passive Foreign Investment Company Considerations."

## ITEM 4.        INFORMATION ON THE COMPANY

### A.        History and Development of the Company

We launched qiyi.com under the QIYI brand in April 2010 as an internet video streaming service in China. Our holding company, Ding Xin, Inc., was incorporated in November 2009 in the Cayman Islands. Ding Xin, Inc. was subsequently renamed Qiyi.com, Inc. in August 2010 and later iQIYI, Inc. in November 2017. QIYI was rebranded as iQIYI in November 2011.

In March 2010, we established a wholly-owned PRC subsidiary, Beijing QIYI Century Science & Technology Co., Ltd., or Beijing QIYI Century. In November 2011, we obtained control over Beijing Xinlian Xinde Advertisement Media Co., Ltd. and in May 2012 we renamed it Beijing iQIYI Science & Technology Co., Ltd., or Beijing iQIYI, to operate our internet video streaming services. In December 2012, Shanghai iQIYI Culture Media Co., Ltd., or Shanghai iQIYI, was established as our exclusive advertising agent. In May 2013, we acquired the online video business of PPS. We primarily provide live broadcasting service through Shanghai Zhong Yuan Network Co., Ltd., or Shanghai Zhong Yuan, the operating entity of PPS. We have control over and are the primary beneficiary of Beijing iQIYI, Shanghai iQIYI and Shanghai Zhong Yuan through a series of contractual arrangements. Beijing iQIYI and Shanghai Zhong Yuan hold our ICP licenses and other licenses and permits necessary for our business operation.

44

In May 2017, we established a wholly-owned Cayman Islands subsidiary, iQIYI Film Group Limited. Subsequently, we established IQIYI Film Group HK Limited in June 2017, and Beijing iQIYI New Media Science and Technology Co., Ltd., or iQIYI New Media, in July 2017. iQIYI Film Group Limited holds 100% of the equity of IQIYI Film Group HK Limited, which in turn holds 100% of equity in iQIYI New Media. iQIYI Pictures (Beijing) Co., Ltd., or iQIYI Pictures, was established in December 2014, and Beijing iQIYI Intelligent Entertainment Technology Co., Ltd., or Intelligent Entertainment (previously known as Beijing iQIYI Cinema Management Co., Ltd., or Beijing iQIYI Cinema), was established in June 2017. We have control and are the primary beneficiary of iQIYI Pictures and Intelligent Entertainment through a series of contractual arrangements.

Between March 2010 and September 2014, Baidu made substantial investments in our company, and we issued ordinary shares and several series of preferred shares to Baidu Holdings. In our Series F preferred shares financing, which took place in November 2014, we issued 136,749,954 Series F preferred shares to Baidu Holdings, 341,874,885 Series F preferred shares to Xiaomi Ventures Limited and 68,374,978 Series F preferred to Prominent TMT Limited, an affiliate of Xiaomi Ventures Limited. In January 2017, we raised US$1.53 billion from the issuance of convertible notes to a group of investors. These notes were converted into Series G preferred shares in October 2017, including 215,484,776 Series G-1 preferred shares issued to Baidu Holdings and another investor, as well as 798,951,243 Series G-2 preferred shares issued to other investors. All preferred shares were converted into ordinary shares upon the completion of our initial public offering. In addition, in April 2018, we issued to Baidu Holdings an aggregate of 36,860,691 Class B ordinary shares, pursuant to a share purchase agreement we entered into with Baidu Holdings in February 2018.

On March 29, 2018, our ADS commenced trading on the Nasdaq Global Select Market under the symbol "IQ". On April 3, 2018, at the closing of our initial public offering, we issued and sold a total of 875,000,000 Class A ordinary shares, represented by ADSs at a public offering price of US$18.00 per ADS. On April 30, 2018, we issued and sold an additional 67,525,675 Class A ordinary shares, represented by ADSs at US$18.00 per ADS, at the closing of the over-allotment option exercised by the underwriters of our initial public offering.

On July 17, 2018, we completed the acquisition of 100% equity stake in Skymoons Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd., or Chengdu Skymoons (together with Skymoons Inc., "Skymoons"). The aggregate consideration consists of a fixed payment of RMB1.27 billion, as well as additional consideration valued at RMB730 million as of June 30, 2018 to be delivered in the event the acquiree satisfies the agreed upon performance benchmarks in the next two years.

In December 2018, we completed an offering of US$750 million in aggregate principal amount of convertible senior notes due 2023, or the 2023 Notes. The 2023 Notes have been offered in the United States to qualified institutional buyers pursuant to Rule 144A and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act. The initial conversion rate of the 2023 Notes is 37.1830 ADSs per US$1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately US$26.89 per ADS and represents a conversion premium of approximately 40% above the closing price of the ADSs on November 29, 2018, which was US$19.21 per ADS). The conversion rate for the 2023 Notes is subject to adjustment upon the occurrence of certain events. The 2023 Notes will bear interest at a rate of 3.75% per year, payable semi-annually in arrears on June 1 and December 1 of each year, beginning on June 1, 2019. The 2023 Notes will mature on December 1, 2023, unless previously repurchased, redeemed or converted in accordance with their terms prior to such date. The holders may require us to repurchase all or portion of the Notes for cash on December 1, 2021, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest. In connection with the offering of the 2023 Notes, we have entered into capped call transactions with certain counterparties, where we purchased capped call options at the price of US$67.5 million. The cap price of the capped call transactions is initially US$38.42 per ADS and is subject to adjustment under the terms of the capped call transactions.

In March 2019, we completed an offering of US$1.2 billion in aggregate principal amount of convertible senior notes due 2025, or the 2025 Notes. The 2025 Notes have been offered in the United States to qualified institutional buyers pursuant to Rule 144A and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act. The initial conversion rate of the 2025 Notes is 33.0003 ADSs per US$1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately US$30.30 per ADS and represents a conversion premium of 32.5% above the closing price of our ADSs on March 26, 2019, which was US$22.87 per ADS). The conversion rate for the 2025 Notes is subject to adjustment upon the occurrence of certain events. The 2025 Notes will bear interest at a rate of 2.00% per year, payable semi-annually in arrears on April 1 and October 1 of each year, beginning on October 1, 2019. The 2025 Notes will mature on April 1, 2025, unless previously repurchased, redeemed or converted in accordance with their terms prior to such date. The holders may require us to repurchase all or portion of the 2025 Notes for cash on April 1, 2023, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest. In connection with the offering of the 2025 Notes, we have entered into capped call transactions with certain counterparties, where we purchased capped call options at the price of US$84.5 million. The cap price of the capped call transactions is initially US$40.02 per ADS and is subject to adjustment under the terms of the capped call transactions.

45

Table of Contents

In December 2020, we completed a registered public offering of US$800 million in aggregate principal amount of convertible senior notes due 2026, or the 2026 Notes. The initial conversion rate of the 2026 Notes is 44.8179 ADSs per US$1,000 principal amount of Notes (which is equivalent to an initial conversion price of approximately US$22.31 per ADS and represents a conversion premium of approximately 27.5% over the price to public per ADSs in the ADSs offering concurrent with the offering of the 2026 Notes, which was US$17.50 per ADS). The conversion rate for the 2026 Notes is subject to adjustment upon the occurrence of certain events, but will not be adjusted for any accrued and unpaid interest. The 2026 Notes will bear interest at a rate of 4.00% per year, payable semi-annually in arrears on June 15 and December 15 of each year, beginning on June 15, 2021. The 2026 Notes will mature on December 15, 2026, unless repurchased, redeemed or converted in accordance with the terms of the Notes prior to such date. The holders may require us to repurchase all or part of the 2026 Notes for cash on August 1, 2024, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest.

Concurrently with the issuance of 2026 Notes, we also completed a registered follow-on public offering of 40,000,000 ADSs at a public offering price of US$17.50 per ADS.

Our principal executive offices are located at 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing, 100080 People's Republic of China. Our telephone number at this address is +86 10 6267-7171. Our registered office in the Cayman Islands is located at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services Inc., located at 801 2nd Avenue, Suite 403, New York, New York 10017.

SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC on www.sec.gov. You can also find information on our website http://ir.iqiyi.com. The information contained on our website is not a part of this annual report.

**B.       Business Overview**

iQIYI is an innovative market-leading online entertainment service in China. Our platform features iQIYI original content, as well as a comprehensive library of other professionally produced content (PPC), professional user generated content (PUGC) and user-generated content. Through our curated premium content, we attract a massive user base with tremendous user engagement, and generate significant monetization opportunities. For the year of 2020, our average mobile MAUs were 479.8 million and our average mobile DAUs were 115.6 million. On average, our users spent 8.4 billion hours per month watching video content on our platform through all devices.

We have one of the largest subscribing member base among all internet video streaming services in China. The number of subscribing members was 101.7 million as of December 31, 2020. Excluding individuals with trial memberships, the number of subscribing members was 100.7 million as of December 31, 2020. Beyond our core focus on content, we have also crafted new strategies to attract more users to become our subscribing members through additional privileges and individualized paid service packages that enhances the value of our membership.

With an illustrious track record of producing blockbuster original titles and the self-production capability spearheaded by over 50 in-house studios and partnership programs, iQIYI has become a symbol of high-quality video content. Since 2015, we have released many award-winning multi-genre original titles, such as *The Lost Tomb* (盗墓笔记), *The Mystic Nine* (老九门), *Burning Ice* (无证之罪), *Story of Yanxi Palace* (延禧攻略), *The Thunder* (破冰行动) and *The Bad Kids* (隐秘的角落). We also pioneered and produced a number of internet variety shows that are highly popular, such as *The Rap of China*, *Idol Producer*, *The Big Band* (乐队的夏天) and *Qipa Talk* (奇葩说), the last of which we released in 2014 and wrapped up its seventh season. Leveraging on our initial success, we have extended selected popular titles into multi-season format. In addition, we have deepened the application of big data and AI technology in our production activities, which not only strengthens our content quality, but also offers greater visibility on the return of our original content investment.

We have also built a comprehensive content library catering to the diverse tastes of our users, and cultivated emerging content providers. Equipped with our deep-learning predictive algorithms and massive user data, we have developed industry-leading tools to select third-party content. Our growing iQIYI partner accounts provide us with quality content that satisfy various user viewing preferences. Our platform also enables content providers to distribute content effectively and monetize their followings through revenue sharing arrangements with us. As a result, our PUGC is diversified with rich formats and typically of shorter runtime, while users receive personalized content through machine learning and intelligent recommendation algorithm.

We distinguish ourselves in the online entertainment industry by our leading technology platform powered by advanced AI, big data analytics and other core proprietary technologies. Our core proprietary technologies are critical to producing and procuring content that caters to user tastes, delivering superior entertainment experience to our users, improving operational efficiency, and increasing return on investment for our advertisers and monetization opportunities for content providers.

We have developed a diversified monetization model to capture multiple opportunities arising from the rapid growth of the online entertainment industry in China. We generate revenues through membership services, online advertising services and a suite of other monetization methods. We pioneered a large scale paid content subscription business in China. We appeal to advertisers through broad and efficient user reach, as well as innovative and effective advertising products. We have proven capabilities of adapting a single popular content title into a variety of entertainment products, creating multiple channels to amplify the popularity and monetary value of the original IP. Our sophisticated monetization model fosters an environment for high-quality content production and distribution on our platform, which in turn expands our user base and increases user engagement, creating a virtuous cycle.

We enjoy significant synergies with our parent company Baidu. Baidu has provided us with technology and infrastructure support. Our close cooperation in AI technology, user traffic and infrastructure sharing allows us to strengthen our respective leading market positions.

We have recently expanded our business overseas through the launch of our multilingual iQIYI app, which offer a curated selection of popular imported and local video content titles. Our iQIYI app currently supports interfaces in ten languages and can be downloaded globally from major iOS and Android app stores. We also seek collaboration with local partners to leverage their strong marketing capabilities and know-how in high-quality local contents.

**Our Products and Services**

We provide our users with a variety of products and services encompassing internet video, online games, live broadcasting, online literature, animations, e-commerce and social media platform.

**Video**

We produce, aggregate and distribute a wide variety of professionally produced content, or PPC, as well as a broad spectrum of other video content in a variety of formats.

*Professionally Produced Content (PPC)*

*iQIYI original content*

Our original content includes content produced in-house and content produced in collaboration with quality third-party partners. Our original content titles include popular variety shows, such as *The Rap of China*, *Idol Producer*, *Hot-Blood Dance Crew* (热血街舞团), *The Big Band* (乐队的夏天), *Fourtry* (潮流合伙人), popular internet drama series, such as *The Lost Tomb* (盗墓笔记), *The Mystic Nine* (老九门), *Tientsin Mystic* (河神), *Story of Yanxi Palace* (延禧攻略), *Golden Eyes* (黄金瞳), *The Thunder* (破冰行动), *The Bad Kids* (隐秘的角落) and animation *Beyond The Ocean* (四海鲸骑). iQIYI obtains the IP through production, adaptation or purchase from third parties, while the partners, typically established entertainment production companies, are responsible for content development and production. iQIYI maintains a high degree of control during the content development and production process.

We also adapt high-quality video IP into multiple entertainment products, such as online games, animations, online literature, and derivative merchandise.

*Licensed content*

In addition to original content, we also provide users with a curated selection of high-quality PPC from third parties. Leveraging our expertise in content selection, we have successfully debuted well-received titles such as drama series *iPartment* (爱情公寓), *In the Name of People* (人民的名义), *Go Go Squid* (亲爱的,热爱的), *Qing Yu Nian* (庆余年), *Reunion: The Sound of the Providence Season 2* (重启之极海听雷第二季), and variety show *Keep Running Season IV* (奔跑吧第四季). Our licensed content library also features a rich collection of movies, animations, documentaries and other content.

We license video content typically at fixed rates for a specified term. The average term of licenses varies depending on the type of content, with films and drama series having an average term of eight years and eleven years, respectively. Payments of licensing fees are generally made in installments upon signing of the contacts and during the license period. We also exchange rights to distribute licensed content with other internet video streaming services to enrich our content library. In certain cases, we have the right of first refusal to purchase new content produced by the licensor.

47

We leverage our content procurement team's insights and our AI-based big data analytics capabilities to optimize content procurement. We have established strong partnerships with content providers to ensure access to high-quality content.

### Other Video Content

In addition to professionally produced content, we also offer a broad base of other video content with all kinds of genres, formats and lengths of duration, such as internet movies and dramas, mini variety shows and animations, interactive videos, vertical or horizontal videos, as well as grassroot or influencer uploaded videos, edited video clips, and video blogs, or Vlogs, among others. Our other video content expands our library and allows us to capture a broader user base, drive user engagement and enhance user stickiness.

Our other video content is created and uploaded to our platform by a wide array of content providers. The content providers range from, among others, ordinary registered users, amateurs, semi-professional partners, to internet influencers, multi-channel networks and self-media, which collectively contribute to growing our creative user community. Content providers upload their videos onto their iQIYI partner accounts, an open platform we provide, to share, distribute and monetize their video content. We then evaluate the quality of uploaded videos before final approval. Users can subscribe for and follow their favorite iQIYI partner accounts.

### Other Products and Services

### Online Games, Literature and Comics

We distribute online games featured in various formats, including mobile games, webpage games, and H5 games. In addition to third-party games, we have also launched a number of popular online games adapted from same-name IP content, such as literature, drama series and films. We collaborate closely with IP providers and game development and distribution partners for game distribution and operation. We launched several new self-developed and licensed games following the acquisition of Skymoons in July 2018, and plan to further broaden our offerings, especially self-developed games that fully leverage the IP value in our content.

Online literature and comics play a critical role in premium IP incubation as its user base highly overlaps with that of our video content, thereby allowing us to monitor the trend of user tastes and identify the most appropriate IP for adaptation. High-quality original online literature and comics works are adapted into script for derivative entertainment products. At the same time, certain high-quality video content is also developed into online literature and comics to further drive user stickiness on our platform.

### iQIYI Show

iQIYI Show is our live broadcasting service. iQIYI Show enables users to follow their favorite hosts, celebrities and shows in real time through live broadcasting. We also edit selected live broadcasting content into short-form videos to help hosts grow their fan bases. iQIYI Show has strong interactive features to enhance user interaction and engagement.

### iQIYI Mall

iQIYI Mall is an e-commerce platform with a focus on entertainment-related merchandise, such as VR glasses. iQIYI Mall also sells other consumer products, such as electronics, apparel and accessories, beauty and skin care products.

### Suike

We are currently developing a video community app named "Suike", pursuing to build an ecosystem that empowers users to discover video content based on their interests, follow content creators, and interact with other users with the same interests.

### User Experience

We offer entertainment content across our user-friendly and feature-rich interfaces on our website, mobile app, PC client terminal, WAP, smart TV and VR device.

Our home page is a one-stop portal for users to access both trending and recommended content. Leveraging our big data analytics, we analyze user browsing behavior to understand their tastes and preference, and dynamically update the content shown on the home page to offer users with the most desirable content.

Our interface offers comprehensive viewing functions designed to enhance user experience. We provide various picture resolution and play options. Other key functions include screenshots, VR viewing, screen mirroring and video caching.

48

Case 1:20-cv-03794-DG-TAM    Document 65-12    Filed 03/03/23    Page 52 of 410 PageID #: 3040

We also offer various social elements in our video streaming interface. Users can comment on the video content, interact with other fans through iQIYI Paopao, and share video content through other popular internet social networks.

## Monetization

We generate revenues primarily through membership services, online advertising and content distribution. We also generate revenues from other monetization methods, including online games, live broadcasting, IP licensing, talent agency, online literature and e-commerce.

### *Membership Services*

Our membership services generally provide subscribing members with superior entertainment experience that is embodied in various membership privileges. Subscribing members have access to a large collection of VIP-only content comprised of drama series, movies, animations, and cartoons, etc., and have earlier access to certain content aired on iQIYI platform. Membership privileges generally include substantially ad-free streaming, 1080P/4K high-definition video, enhanced audio experience, accelerated downloads and others. Subscribing member privileges also include coupons and discounts on paid on-demand films, as well as special privilege in offline events, such as exclusive access to live concerts. We review and evaluate the price of our membership services and adjust the price accordingly, from time to time.

We primarily offer one membership package that generally grants members access through various mobile and other hardware devices. We also offer a broader selection of paid services with innovative privileges. Our members primarily include subscribing members and, to a lesser extent, users who gain access to our premium content library through paid video on-demand service. In November 2020, we increased the pricing of our monthly, quarterly and annual membership packages on non-iOS channels to the same level of iOS channels.

### *Online Advertising*

The prices of our advertising services depend upon various factors, including form and size of the advertising, level of sponsorship, popularity of the content or event in which the advertisements will be placed, and specific targeting requirements. Prices for the brand advertising service purchased by each advertiser or advertising agency are generally fixed under our sales contracts.

In addition to traditional pre-video and pop-up advertisements, we also launched various innovative advertising products and solutions. For example, video-out advertisement appears on the screen when the video is showing content related to the advertised product; soft product placement incorporates the advertised product into the production of our premium original content to facilitate a more natural advertisement viewing experience; content-integrated advertisement integrate brands with content itself, such as theme songs with lyrics embedding brand names of advertisers; and interactive advertisement that facilitates enhanced interaction between brands and users.

We also offer in-feed advertising and other forms of performance-based advertising, the prices of which are competitively priced through an online bidding process.

### *Content Distribution*

We monetize and enrich our content through content distribution. We sub-license procured third-party content within its authorized scope to other internet video streaming services. We also enter into barter agreements to exchange internet broadcasting rights of licensed content with other internet video streaming services. The barter agreement provides the licensee with the right to broadcast the licensed content, and the licensor retains the right to continue broadcasting and/or sub-licensing the exchanged content. We distribute our selected content to regions outside of China and/or to TV stations in China.

### *Online Games*

For our online games, we distribute both self-developed and third-party games. We launched several new self-developed and licensed games following the acquisition of Skymoons in July 2018, and plan to further broaden our offerings, especially self-developed games that fully leverage the IP value in our content. We monetize online games through users' in-app purchases of virtual gifts and game privileges.

### *Live Broadcasting*

We monetize live broadcasting through user purchase of virtual items on iQIYI Show, which can be used for tipping hosts. We share revenues with hosts and their agencies.

49

*IP Licensing*

We license our proprietary IP to third parties to develop derivative merchandise products, with a focus on long-term licensing. We also license our popular trademarks to third parties for use in their products. Our IP licensing business covers consumer products, joint marketing with other brands, online games licensing, as well as licensing of offline activities. We license both our own IPs and third-party IPs to which we have agency authorization. We collaborate with our partners generally through fixed-price licensing fees and/or revenue-sharing arrangements.

*Talent Agency*

We further monetize our self-produced content through our talent agency business.

*Online Literature*

We monetize our online literature through advertisement and paid reading on our platform, where readers can pay to gain access to our premium online literary titles.

*E-commerce*

We operate iQIYI Mall, an e-commerce platform where we offer products, such as VR glasses, to our users through direct sale and third-party merchants. Products offered at iQIYI Mall consist of peripheral products of films, drama series and variety shows, generating synergy with the video content on our platform. We charge third-party merchants commissions and service fees.

**Sales and Marketing**

*Advertising Sales*

For brand advertising, we sell our advertising services primarily through third-party advertising agencies, including members of American Association of Advertising Agencies, or 4As, and leading Chinese advertising agencies, and a portion of our brand advertising services directly to advertisers. We primarily sell our in-feed advertising service through third-party advertising agencies. We strategically leverage advertising agencies' existing long-term relationships and network resources to increase our sales and expand our advertiser base. Depending on the type of advertiser and content, the duration of an advertising framework agreement is typically 12 months.

We have an experienced sales team consisting of salespeople with prior experience at Chinese internet companies, members of 4As and domestic advertising agencies. We divide our sales team by regions across the country to ensure the delivery of targeted advertising solutions. We provide regular training to our sales team to help them provide advertisers with comprehensive information about our services.

*Brand Promotion*

iQIYI's brand values are youth, vitality and positivity. We believe that our high-quality video content and services lead to strong word-of-mouth referrals, which drives customer awareness of our brand in China. Our market position benefits significantly from our large and high-quality user base and our strong brand recognition.

Leveraging our in-depth understanding of user behavior, we employ a variety of online marketing programs and promotional activities to build our brand as part of our overall market strategy, including celebrity endorsement, hot topic dissemination through different media outlets, brand value embedment in blockbuster content, marketing alliance with Baidu, as well as resource exchange with major internet media platforms.

We host many offline activities to enhance our brand recognition. To increase members' loyalty, we organize special events for members such as on-site visits during the show productions. We also host innovative offline marketing activities such as VR advertisement.

We also execute marketing strategies aimed at young users to enhance user affinity. We use innovative technology to communicate with the younger generation, such as using AR to enable user interaction at bus stops. We use social media platforms to facilitate user engagement, such as allowing users to vote for contestants in variety shows. We attract young users by offering artist-fans interactions opportunities. We also collaborate with major wireless carriers to provide monthly unlimited data package for using iQIYI app on mobile devices.

*Content promotion*

We employ a variety of traditional and internet promotional activities to promote our content. We deploy outdoor brand advertisements, such as display ads in subway stations. Our promotional efforts are also focused on brand advertisements placed on internet video platforms and social media campaigns. Furthermore, we also organize offline promotional events attended by popular celebrities to raise the awareness of our content offerings.

*Intellectual Property and Copyright Protection*

We highly value our intellectual property rights, which are fundamental to our success and competitiveness. We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions to protect our intellectual property rights. As of December 31, 2020, we have applied for the registration of 7,531 patents, among which 980 patents of invention, 31 utility model patents and 3,571 patents of appearance have been registered with the State Administration for Market Regulation of the PRC, or the SAMR. We have applied for 4,578 trademarks, among which 4,011 have been registered with the Trademark Office of the State Administration for Industry & Commerce of the PRC. We have also registered 437 software copyrights with the Copyright Protection Center of the PRC. Our "爱奇艺" and " [QIYI] 爱奇艺 " trademarks have been recognized as well-known trademarks by the SAMR.

We employ a three-phase copyright protection scheme consisting of copyright management, network monitoring, and complaint or legal action. Our proprietary copyright management system registers all procured copyrights and ensures that licensed content on our platform do not exceed its scope and term of the licensing agreement. We developed a proprietary system to detect unauthorized use of iQIYI content on other internet platforms. We also establish various other channels for copyright protection. After a user registers and before each upload, we require the user to confirm that the content to be uploaded is in compliance with the terms and conditions set forth in the user agreement, to guarantee that he or she is the copyright owner or has obtained all necessary consents and authorizations for such content. We set technical barriers to deter illegal video content extractions. We encourage our users to report pirated content, and our copyright protection team promptly removes any suspected infringing content once we receive proper notification from the legitimate copyright owner. As a major market player in the video industry, we also attach great value to industrial response and feedback. We actively liaise with other major internet video streaming services to form industry union and collectively protect copyright.

**Content Monitoring**

We implement strict monitoring procedures to remove inappropriate or illegal content, including video, online literature, animations, iQIYI Show, comment postings, and content from other services. Text, images and videos are screened by our content monitoring team, which reviews our content on a 24/7 basis. Illegal and inappropriate content can generally be identified and removed promptly after it has been uploaded.

Our content monitoring team employs systematic monitoring procedures that include machine screening and manual review based on the latest laws and regulations. Our proprietary machine identification system automatically screens text, picture and video content. The text identification system screens text content based on pre-set key words and anti-spam system; the picture identification system screens picture content based on optical character recognition and pornographic-content detection; and the video identification system screens video content based on similarity analysis against our video database to analyze each frame and each second of video content. The machine screening process may have three possible outcomes: blocking content identified as illegal or inappropriate, releasing content that passes the screening, or flagging for manual review when the system cannot make a judgment. The content monitoring team manually reviews flagged content to make judgment on whether to block or to release, and the machine identification system conducts auto-learning based on the judgment from manual review. The content monitoring team also conducts random screening on content that has passed the machine screening process. We regularly communicate with relevant government authorities to stay abreast of relevant laws and regulations to ensure compliance. We provide periodic and comprehensive training to our monitoring team to ensure and enhance their understanding of regulatory requirements.

We conduct thorough background checks on our content providers. We request entities to provide us with copies of registration information and organization code certificate, and individuals to provide us with copies of official governmental ID. We request individuals to provide a mobile phone number, which is registered with one's ID. We monitor all live content broadcast on our platform in real time using both machine screening and manual review. Despite our content monitoring efforts, we may still be subject to risks arising from contents on our platform. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Videos and other content displayed on our platform may be found objectionable by PRC regulatory authorities and may subject us to penalties and other administrative actions."

51

Table of Contents

**Competition**

We primarily compete with Tencent Video and Youku for both users and advertising customers. We also compete with other internet media and entertainment services, such as internet and social platforms and short-form video platforms, as well as major TV stations. For a discussion of risks related to competition, see "Item 3. Key Information—D. Risk Factors—We operate in a highly competitive market and we may not be able to compete effectively."

**Seasonality**

Seasonal fluctuations have affected, and are likely to affect our business in the future. Historically, we have experienced lower online advertising services revenue in the first quarter of each year in connection with the Chinese New Year holiday as advertisers limit their budget for online platforms. For a discussion of risk related to seasonality and fluctuation of our operating results, see "Item 3. Key Information—D. Risk Factor—Risks Related to Our Business and Industry—Our quarterly operating results may fluctuate, which makes our results of operations difficult to predict and may cause our quarterly results of operations to fall short of expectations."

**Insurance**

As required by laws and regulations in China, we participate in various employee social benefits plans that are organized by municipal and provincial governments, including medical insurance, job-related injury insurance, maternity insurance and unemployment insurance. We do not have any business liability or disruption insurance coverage for our operations in China. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We have limited business insurance coverage."

**Government Regulations**

**PRC Regulations**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China.

**Regulations on Value-added Telecommunication Services**

On September 25, 2000, the State Council promulgated the Telecommunications Regulations of the People's Republic of China, or the Telecom Regulations, which was amended on July 29, 2014 and February 6, 2016. The Telecom Regulations is the primary PRC law governing telecommunication services and sets out the general regulatory framework for telecommunication services provided by PRC companies. The Telecom Regulations distinguishes between "basic telecommunication services" and "value-added telecommunication services." The Telecom Regulations defines value-added telecommunications services as telecommunications and information services provided through public network infrastructures. Pursuant to the Telecom Regulations, commercial operators of value-added telecommunications services must first obtain an operating license from the MIIT, or its provincial level counterparts.

The *Catalog of Telecommunications Business*, or the Catalog, which was issued as an attachment to the Telecom Regulations and updated in June 11, 2001, February 21, 2003, December 28, 2015 and June 6, 2019, further categorizes value-added telecommunication services into two classes: Class 1 value-added telecommunication services and Class 2 value-added telecommunication services. Information services provided via cable networks, mobile networks or internet fall within Class 2 value-added telecommunications services.

On July 3, 2017, the MIIT issued the *Measures on the Administration of Telecommunications Business Operating Permits*, or the Telecom License Measures, which became effective on September 1, 2017, to supplement the Telecom Regulations. The Telecom License Measures sets forth the types of licenses required to operate value-added telecommunications services and the qualifications and procedures for obtaining such licenses. The Telecom License Measures also provides that an operator providing value-added services in multiple provinces is required to obtain an inter-regional license, whereas an operator providing value-added services in one province is required to obtain an intra-provincial license. Any telecommunication services operator must conduct its business in accordance with the specifications in its license.

We engage in business activities that are value-added telecommunications services as defined in the Telecom Regulations and the Catalog. To comply with the relevant laws and regulations, Beijing iQIYI and Shanghai Zhong Yuan have each obtained the ICP License, which will remain effective until September 8, 2021 and May 11, 2021, respectively.

52

**Regulations on Foreign Direct Investment in Value-Added Telecommunications Companies**

Foreign direct investment in telecommunications companies in China is governed by the *Provisions on the Administration of Foreign-Invested Telecommunications Enterprises*, which was promulgated by the State Council on December 11, 2001 and amended on September 10, 2008 and February 6, 2016. These regulations require that foreign-invested value-added telecommunications enterprises in China must be established as Sino-foreign equity joint ventures and that the foreign investors may acquire up to 50% equity interests in such joint ventures. In addition, a major foreign investor in a value-added telecommunications business in China must demonstrate a good track record and experience in operating value-added telecommunications businesses. Moreover, foreign investors that meet these requirements must obtain approvals from the MIIT and the MOFCOM, to provide value-added telecommunication services in China and the MIIT and the MOFCOM retain considerable discretion in granting such approvals.

On July 13, 2006, the Ministry of Information Industry, or the MII, released the Notice on Strengthening the Administration of Foreign Investment in the Operation of Value-added Telecommunications Business, or the MII Notice, pursuant to which, for any foreign investor to invest in telecommunications businesses in China, a foreign-invested telecommunications enterprise must be established and such enterprise must apply for the relevant telecommunications business operation licenses. Furthermore, under the MII Notice, domestic telecommunications enterprises may not rent, transfer or sell a telecommunications business operation license to foreign investors in any form, and they may not provide any resources, premises, facilities and other assistance in any form to foreign investors for their illegal operation of any telecommunications business in China. In addition, under the MII Notice, the internet domain names and registered trademarks used by a value-added telecommunication service operator shall be legally owned by such operator or its shareholders.

Furthermore, the *Guidance Catalog of Industries for Foreign Investment*, or the Foreign Investment Catalog, the latest version of which was promulgated jointly by MOFCOM and the National Development and Reform Commission, or the NDRC, on June 28, 2017 and became effective on July 28, 2017, classifies businesses into three categories with regard to foreign investment: (i) "encouraged", (ii) "restricted", and (iii) "prohibited". The latter two categories are included in the negative list, which was first introduced into the Foreign Investment Catalog in 2017, and listed, in a unified manner, the restrictive measures for the entry of foreign investment. On June 28, 2018, MOFCOM and NDRC jointly promulgated the Special Administrative Measures (2018 Negative List) for Foreign Investment Access, or the Special Administrative Measures, which replaced the negative list attached to the Foreign Investment Catalog in 2017. On June 30, 2019, MOFCOM and NDRC jointly promulgated the Special Administrative Measures (2019 Negative List) for Foreign Investment Access, or the Special Administrative Measures, which replaced the 2018 Negative List. On June 23, 2020, MOFCOM and NDRC jointly promulgated the Special Administrative Measures (2020 Negative List) for Foreign Investment Access, which replaced the 2019 Negative List. Industries that are not listed in the Foreign Investment Catalog or the Special Administrative Measures are permitted areas for foreign investments, and are generally open to foreign investment unless specifically restricted by other PRC regulations. Our business falls under value-added telecommunications services, which are listed under the Special Administrative Measures.

In view of these restrictions on foreign direct investment in value-added telecommunications services and certain other types of businesses under which our business may fall, including internet culture services, internet audio-video program services and radio/television programs production and operation business, we have established various domestic consolidated affiliated entities to engage in value-added telecommunications services. For a detailed discussion of our consolidated affiliated entities, see "Item 4. Information on the Company—C. Organizational Structure." Due to the lack of interpretative guidance from the relevant PRC governmental authorities, there are uncertainties regarding whether PRC governmental authorities would consider our corporate structure and contractual arrangements to constitute foreign ownership of a value-added telecommunications business. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations." In order to comply with PRC regulatory requirements, we operate a substantial portion of our business through our consolidated affiliated entities, which we have contractual relationships with but we do not have actual ownership interests in. If our current ownership structure is found to be in violation of current or future PRC laws, rules or regulations regarding the legality of foreign investment in value-added telecommunications services and other types of businesses on which foreign investment is restricted or prohibited, we could be subject to severe penalties.

53

Table of Contents

**Regulations on Internet Content Providers**

The *Administrative Measures on Internet Information Services*, or the Internet Content Measures, which was promulgated by the State Council on September 25, 2000 and amended on January 8, 2011, set out guidelines on the provision of internet information services. The Internet Content Measures specifies that internet information services regarding news, publications, education, medical and health care, pharmacy and medical appliances, among other things, are required to be examined, approved and regulated by the relevant authorities. Internet information providers are prohibited from providing services beyond those included in the scope of their licenses or filings. Furthermore, the Internet Content Measures specifies a list of prohibited content. Internet information providers are prohibited from producing, copying, publishing or distributing information that is humiliating or defamatory to others or that infringes the legal rights of others. Internet information providers that violate such prohibition may face criminal charges or administrative sanctions. Internet information providers must monitor and control the information posted on their websites. If any prohibited content is found, they must remove the content immediately, keep a record of such content and report to the relevant authorities.

The Internet Content Measures classifies internet information services into commercial internet information services and non-commercial internet information services. Commercial internet information services refer to services that provide information or services to internet users with charge. A provider of commercial internet information services must obtain an ICP License. As a provider of commercial internet information services, Beijing iQIYI and Shanghai Zhong Yuan have each obtained an ICP License, which will remain effective until September 8, 2021 and May 11, 2021, respectively.

On December 15, 2019, the Office of the Central Cyberspace Affairs Commission promulgated the Provisions on the Governance of Network Information Content Ecology, or the Network Information Content Provisions. According to the Network Information Content Provisions, content platforms shall set up a mechanism for ecological governance of network information content, develop detailed rules for ecological governance of the network information content, and improve systems for user registration, account management, information release examination, posts and comments examination, among others. If a content platform violates the Network Information Content Provisions, the competent cyberspace authorities may hold interviews, give warnings and order the platform to make rectifications within a specified time limit. If the content platform fails to do so or if the circumstances are severe, the cyberspace authorities may order such platform to suspend its information update and impose other penalties. As a provider of commercial internet information services, we are required to comply with the Network Information Content Provisions. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Videos and other content displayed on our platform may be found objectionable by PRC regulatory authorities and may subject us to penalties and other administrative actions."

**Regulations on Internet Audio-video Program Services**

On December 20, 2007, the MII and the SARFT, jointly issued the *Administrative Provisions for the Internet Audio-Video Program Service*, or the Audio-video Program Provisions, which came into effect on January 31, 2008 and was amended on August 28, 2015. The Audio-video Program Provisions defines "internet audio-video program services" as producing, editing and integrating of audio-video programs, supplying audio-video programs to the public via the internet, and providing audio-video programs uploading and transmission services to a third party. Entities providing internet audio-video programs services must obtain an internet audio-video program transmission license. Applicants for such licenses shall be state-owned or state-controlled entities unless an internet audio-video program transmission license has been obtained prior to the effectiveness of the Audio-video Program Provisions in accordance with the then-in-effect laws and regulations. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services. According to the Audio-video Program Provisions and other relevant laws and regulations, audio-video programs provided by the entities supplying Internet audio-video program services shall not contain any illegal content or other content prohibited by the laws and regulations, such as any content against the basic principles in the PRC Constitution, any content that damages the sovereignty of the country or national security, and any content that disturbs social order or undermine social stability. An audio-video program that has already been broadcast shall be retained in full for at least 60 days. Movies, television programs and other media content used as Internet audio-video programs shall comply with relevant administrative regulations on programs broadcasts through radio, movie and television channels. Entities providing services related to Internet audio-video programs shall immediately delete the audio-video programs violating laws and regulations, keep relevant records, report relevant authorities and implement other regulatory requirements.

The *Categories of the Internet Audio-Video Program Services*, or the Audio-video Program Categories, promulgated by SAPPRFT on March 10, 2017, classifies internet audio/video programs into four categories: (I) Category I internet audio/video program service, which is carried out with a form of radio station or television station; (II) Category II internet audio/video program service, including (a) re-broadcasting service of current political news audio/video programs; (b) hosting, interviewing, reporting and commenting service of arts, entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; (c) producing (interviewing not included) and broadcasting service of arts, entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; (d) producing and broadcasting service of internet films/dramas; (e) aggregating and broadcasting service of films, television dramas and cartoons; (f) aggregating and broadcasting service of arts,

54

Table of Contents

entertainment, technology, finance and economics, sports, education and other specialized audio/video programs; and (g) live audio/video broadcasting service of cultural activities of common social organizations, sport events or other organization activities; and (III) Category III internet audio/video program service, including (a) aggregating service of online audio/video contents, and (b) re-broadcasting service of the audio/video programs uploaded by internet users; and (IV) Category IV internet audio/video program service, including (a) re-broadcasting of the radio/television program channels; (b) re-broadcasting of internet audio/video program channels; and (c) re-broadcasting of live internet-based audio/video programs.

On May 27, 2016, the SAPPRFT issued the *Notice on Relevant Issues concerning Implementing the Approval Works of Upgrading Mobile Internet Audio-Video Program Service*, or the Mobile Audio-Video Program Notice. The Mobile Audio-Video Program Notice provides that the mobile Internet audio-video program services shall be deemed Internet audio-video program service. Entities which have obtained the approvals to provide the Internet audio-video program services may use mobile WAP websites or mobile applications to provide audio-video program services. Entities with regulatory approvals may operate mobile applications to provide the audio-video program services. The types of the programs shall be within the permitted scope as provided in the licenses and such mobile applications shall be filed with the NRTA and/or SFB.

On November 4, 2016, the State Internet Information Office issued the *Administrative Regulations on Online Live-broadcasting Services*, or the Online Live-broadcasting Regulations, which came into effect on December 1, 2016. According to the Online Live-broadcasting Regulations, when providing internet news information services, both online live-broadcasting service providers and online live-broadcasting publishers must obtain the relevant licenses for providing internet news information service and may only carry out internet news information services within the scope of their licenses. All online live-broadcasting service providers (whether or not providing internet news information) must take certain actions to operate their services, including establishing platforms for monitoring live-broadcasting content.

On March 16, 2018, the SAPPRFT issued the *Notice on Further Regulating the Transmission Orders of Internet Audio-video Programs*, or the SAPPRFT Notice No. 21. According to the SAPPRFT Notice No. 21, online platforms shall not illegally capture, edit, or reprogram audio-video programs, shall strengthen the administration of audio-video programs, such as online movie clips and trailers, shall strengthen the management of the naming or sponsorship of the various programs, and the relevant authorities shall strengthen their administration and supervision over online audio-video platforms, as well as radio and television stations on content management. Among other, SAPPRFT Notice No. 21 requires that online audio-video platforms shall not produce or disseminate programs that distort, parody or vilify classic literary works; shall not re-edit, re-dub, or re-caption the subtitles of classic literary works, radio and television programs, network-based original audio-video programs or intercept certain program segments and splice them into new programs; and shall not disseminate edited pieces of works that distort the originals. Online platforms shall strictly supervise reprogramed videos uploaded by users and shall not facilitate the dissemination of defective audio-video programs. In addition, when receiving a complaint about defective programs from copyright owners, broadcasting agencies or producing agencies, online platforms shall immediately delete such programs.

On October 31, 2018, the State Administration of Radio and Television issued the *Notice on Further Strengthening the Management of Radio and Television and Network Audiovisual Programs* ("Notice 60"). According to Notice 60, all radio and television broadcasting institutes, network audiovisual program service institutes and program production institutes shall stick to the right political direction and strengthen value guidance; pursue people-centered creative orientation to curb bad tendencies such as pursuing celebrities, pan-entertainment and so on; persist in providing high-quality content, constantly innovate programs, and strictly control the remuneration of guests; and strengthen the governance of TV series, network series (including network movies) to promote the benign development of the industry; shall strengthen the use and management of ratings (click-through rate) survey data and resolutely crack down on ratings (click-through rate) forgeries, etc. Notice 60 further provides that as to main network audiovisual programs, the total remuneration of all guests in each program shall not exceed 40% of the total cost of the program, the total remuneration of main guests in each program shall not exceed 40% of the total remuneration of all guests, and information such as the names, salaries and cost proportion of the guests shall be reported to the State Administration of Radio and Television before going online. Meanwhile, the total remuneration of all actors of each TV series and network series (including network movies) shall not exceed 40% of the total cost of production, of which the total remuneration of main actors shall not exceed 70% of the total remuneration of all actors.

On December 27, 2018, the State Administration of Radio and Television issued the *Notice on the Upgrading of the Network Audiovisual Program Information Recording System* ("Notice 158"). According to the Notice 158, the State Administration of Radio and Television has added a new module called "Main Network Movies and Teleplays Information Recording System" ("Recording System") in "*Network Play, Micro Film and other Network Audiovisual Program Information Recording System*". Since February 15, 2019, before the production of main network movies and teleplays (including network plays, network movies and network animations), the producers shall provide relevant information, such as name, type, content outline, budget making, etc. Main network movies and teleplays shall include network series (network animations) with total investment of more than RMB5 million and network movies with an investment of more than RMB1 million. After shooting and production of main network movies and teleplays, the producers

55

shall provide relevant information, such as the expected broadcasting platform, amount of actual investment, actor's remuneration and so on in the Recording System, and submit the finished programs to the relevant radio and television administrative departments. Main network series, network movies and network animations with on-line filing numbers could be broadcasted and promoted on the home pages of various audio-visual program websites, or could be used for investment promotion, membership recommendation, online recommendation and program optimization of audio-visual program websites. Beijing iQiyi has obtained an internet audio-video program transmission license which will remain effective until October 23, 2021, covering certain audio-video program services as provided in category II and Shanghai Zhong Yuan has obtained an internet audio-video program transmission license which will remain effective until March 23, 2023, covering certain audio-video program services as provided in category II, category III and category IV.

**Regulations on Production and Operation of Radio/Television Programs**

On July 19, 2004, the SARFT promulgated the Administrative Measures on the Production and Operation of Radio and Television Programs, or the Radio and Television Program Production Measures, which came into effect on August 20, 2004 and was amended on August 28, 2015 and October 31, 2018. The Radio and Television Program Production Measures provides that any business that produces or operates radio or television programs must first obtain a Radio and Television Program Production and Operation Permit. Entities holding such permits shall conduct their business within the permitted scope as provided in their permits. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services. Each of Beijing iQIYI, Shanghai Zhong Yuan and iQIYI Pictures has obtained a Radio and Television Program Production and Operation Permit for their respective businesses.

**Regulations on Online Culture Administration**

According to the *Interim Administrative Provisions on Internet Culture*, or the Internet Culture Provisions, promulgated by the Ministry of Culture, or the MOC, on February 17, 2011, and amended on December 15, 2017. Internet culture activities include: (i) production, reproduction, import, release or broadcast of internet culture products (such as online music, online game, online performance and cultural products by certain technical means and copied to the internet for spreading); (ii) distribution or publication of cultural products on internet; and (iii) exhibitions, competitions and other similar activities concerning internet culture products. The Internet Culture Provisions further classifies internet cultural activities into commercial internet cultural activities and non-commercial internet cultural activities. Entities engaging in commercial internet cultural activities must apply to the relevant authorities for a Network Cultural Business Permit, while non-commercial cultural entities are only required to report to related culture administration authorities within 60 days of the establishment of such entity. If any entity engages in commercial internet culture activities without approval, the cultural administration authorities or other relevant government may order such entity to cease to operate Internet culture activities as well as levying penalties including administrative warning, fines up to RMB30,000 and listing such entity on the cultural market blacklist to impose credit penalty in case of continued non-compliance. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned services except online music. Each of Beijing iQIYI and Shanghai Zhong Yuan has obtained a Network Cultural Business Permit from the relevant authorities.

**Regulations on Online Advertising Services**

On April 24, 2015, the Standing Committee of the National People's Congress enacted the *Advertising Law of the People's Republic of China*, or the New Advertising Law, effective on September 1, 2015 and amended on October 26, 2018.

The New Advertising Law increases the potential legal liability of advertising services providers and strengthens regulations of false advertising. On July 4, 2016, the State Administration for Industry and Commerce, or the SAIC, issued the Interim Measures of the Administration of Online Advertising, or the SAIC Interim Measures, effective on September 1, 2016. The New Advertising Law and the SAIC Interim Measures require that online advertisements may not affect users' normal internet use and internet pop-up ads must display a "close" sign prominently and ensure one-key closing of the pop-up windows. The SAIC Interim Measures provides that all online advertisements must be marked "Advertisement" so that viewers can easily identify them as such. Moreover, the SAIC Interim Measures treats paid search results as advertisements that are subject to PRC advertisement laws, and requires that paid search results be conspicuously identified on search result pages as advertisements. The New Advertising Law and SAIC Interim Measures require us to conduct more stringent examination and monitoring of our advertisers and the content of their advertisements.

56

**Regulations on Internet Publishing**

On February 4, 2016, the SAPPRFT and MIIT jointly issued the *Rules for the Administration for Internet Publishing Services*, or the Internet Publishing Rules, which became effective on March 10, 2016, to replace the Provisional Rules for the Administration for Internet Publishing that had been jointly issued by the SAPPRFT and the MIIT on June 27, 2002. The Internet Publishing Rules defines "internet publications" as digital works that are edited, produced, or processed to be published and provided to the public through the internet, including (i) original digital works, such as pictures, maps, games, and comics; (ii) digital works with content that is consistent with the type of content that has been published in media such as books, newspapers, periodicals, audio-visual products, and electronic publications; (iii) digital works in the form of online databases compiled by selecting, arranging, and compiling other types of digital works; and (iv) other types of digital works identified by the SAPP. Under the Internet Publishing Rules, internet operators distributing such publications via internet are required to apply for an internet publishing license with the relevant governmental authorities and for SAPP approval before distributing internet publications. Shanghai Zhong Yuan currently holds an internet publishing license to provide the internet publications to the public through the internet, while Beijing iQIYI is in the process of applying for the internet publishing license.

**Regulations on Online Games**

In September 2009, the General Administration of Press and Publication, or the GAPP, together with the National Copyright Administration, and the National Office of Combating Pornography and Illegal Publications jointly issued the *Notice on Further Strengthening on the Administration of Pre-examination and Approval of Online Game and the Examination and Approval of Imported Online Game*, or the Circular 13. The Circular 13 states that foreign investors are not permitted to invest in online game operating businesses in the PRC via wholly foreign-owned entities, Sino-foreign equity joint ventures or cooperative joint ventures or to exercise control over or participate in the operation of domestic online game businesses through indirect means, such as other joint venture companies or contractual or technical arrangements. If our contractual arrangements were deemed under the Circular 13 to be an "indirect means" for foreign investors to exercise control over or participate in the operation of a domestic online game business, our contractual arrangements might be challenged by the SAPP. We are not aware of any online game companies which use the same or similar contractual arrangements having been challenged by the GAPP, the SAPPRFT or the SAPP as using those contractual arrangements as an "indirect means" for foreign investors to exercise control over or participate in the operation of a domestic online game business or having been penalized or ordered to terminate operations since the Circular 13 became effective. However, it is unclear whether and how the Circular 13 might be interpreted or implemented in the future. See "Key Information—D. Risk Factors—If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations."

**Regulations on E-Commerce**

The Standing Committee of the National People's Congress enacted the *PRC E-Commerce Law* on August 31, 2018, which came into effect on January 1, 2019. Under the PRC E-Commerce Law, E-Commerce refers to operating activities of selling goods or providing services through the internet or other information networks. The PRC E-Commerce Law generally applies to: (i) platform operators, which refer to legal persons or unincorporated organizations that provide network places of business, transaction matching, information release and other services to enable the transaction parties to carry out independent transaction activities; (ii) operators on the platform, which refer to e-commerce operators that sell goods or provide services to customers through e-commerce platforms; and (iii) other e-commerce operators that sell goods or provide services through self-established websites or other network services. The PRC E-Commerce Law also provides rules in relation to e-commerce contracts, dispute settlements, e-commerce development as well as legal liabilities involved in e-commerce.

**Regulations on Information Security, Censorship and Privacy**

The Standing Committee of the National People's Congress, China's national legislative body, enacted the *Decisions on the Maintenance of Internet Security* on December 28, 2000 and amended them on August 27, 2009 that may subject persons to criminal liabilities in China for any attempt to use the internet to: (i) gain improper entry to a computer or system of strategic importance; (ii) disseminate politically disruptive information; (iii) leak state secrets; (iv) spread false commercial information or (v) infringe upon intellectual property rights. In 1997, the Ministry of Public Security issued the *Administration Measures on the Security Protection of Computer Information Network with International*

57

Table of Contents

*Connections* which was amended in 2011 and prohibits using the internet to leak state secrets or to spread socially destabilizing materials. If an ICP license holder violates these measures, the PRC government may revoke its ICP license and shut down its websites. Pursuant to the *Ninth Amendment to the Criminal Law* issued by the Standing Committee of the National People's Congress on August 29, 2015, effective on November 1, 2015, any ICP provider that fails to fulfill the obligations related to internet information security as required by applicable laws and refuses to take corrective measures, will be subject to criminal liability for (i) any large-scale dissemination of illegal information; (ii) any severe effect due to the leakage of users' personal information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (i) sells or provides personal information to others unlawfully or (ii) steals or illegally obtains any personal information will be subject to criminal liability in severe situations.

The *Cybersecurity Law of the PRC*, or the PRC Cybersecurity Law, which was promulgated on November 7, 2016 by the Standing Committee of the National People's Congress and came into effect on June 1, 2017, provides that network operators shall meet their cyber security obligations and shall take technical measures and other necessary measures to protect the safety and stability of their networks. Under the PRC Cybersecurity Law, network operators are subject to various security protection-related obligations, including: (i) network operators shall comply with certain obligations regarding maintenance of the security of internet systems; (ii) network operators shall verify users' identities before signing agreements or providing certain services such as information publishing or real-time communication services; (iii) when collecting or using personal information, network operators shall clearly indicate the purposes, methods and scope of the information collection, the use of information collection, and obtain the consent of those from whom the information is collected; (iv) network operators shall strictly preserve the privacy of user information they collect, and establish and maintain systems to protect user privacy; (v) network operators shall strengthen management of information published by users, and when they discover information prohibited by laws and regulations from publication or dissemination, they shall immediately stop dissemination of that information, including taking measures such as deleting the information, preventing the information from spreading, saving relevant records, and reporting to the relevant governmental agencies.

On January 23, 2019, the SAMR, the Office of the Central Cyberspace Affairs Commission, the MIIT and the Ministry of Public Security jointly issued the Announcement on Carrying out Special Campaigns against Mobile Internet Application Programs Collecting and Using Personal Information in Violation of Laws and Regulations, or "the App Announcement," which prohibits mobile app operators from collecting personal information irrelevant to their services, or forcing users to give authorization in disguised manner. According to the App Announcement, mobile app operators shall indicate to users the rules for collecting and using personal information in a simple, concise and easy-to-understand manner, with permission independently granted by the user. Furthermore, coercive or excessive collection of personal information, collection and use of personal information without user permission, leakage and loss of information or possible leakage and loss of personal information without any remedial measure, illegal use of personal information are prohibited. On November 28, 2019, the SAMR, the Office of the Central Cyberspace Affairs Commission, the MIIT and the Ministry of Public Security jointly issued the Measures for the Determination of the Collection and Use of Personal Information by Apps in Violation of Laws and Regulations, which provides guidance for the regulatory authorities to identify the illegal collection and use of personal information through mobile apps, and for the app operators to conduct self-examination and self-correction and for other participants to voluntarily monitor compliance.

On August 22, 2019, the Office of the Central Cyberspace Affairs Commission promulgated the Cyber Protection of Children's Personal Information Provisions, effective on October 1, 2019, which requires, among others, that network operators who collect, store, use, transfer and disclose personal information of children under the age of 14 shall establish special rules and user agreements for the protection of children's personal information, inform the children's guardians in a noticeable and clear manner, and shall obtain the consent of the children's guardians.

While we take measures to comply with all applicable data privacy and protection laws and regulations, we cannot guarantee the effectiveness of the measures undertaken by us and business partners. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—Our business is subject to complex and evolving Chinese and international laws and regulations regarding privacy and data protection. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business."

Case 1:20-cv-03794-DG-TAM    Document 65-12    Filed 03/03/23    Page 62 of 410 PageID #: 3050

**Regulations on Intellectual Property Rights**

*Regulations on copyright*

The Copyright Law of the PRC, or the Copyright Law, which took effect on June 1, 1991 and was latest amended on November 11, 2020 and effective on June 1, 2021, provides that Chinese citizens, legal persons, or other organizations shall, whether published or not, own copyright in their copyrightable works, which include, among others, works of literature, art, natural science, social science, engineering technology and computer software. Copyright owners enjoy certain legal rights, including right of publication, right of authorship and right of reproduction. The Copyright Law as revised in 2001 extends copyright protection to Internet activities and products disseminated over the Internet. In addition, Copyright Law provides for a voluntary registration system administered by the China Copyright Protection Center, or the CPCC. According to the Copyright Law, an infringer of the copyrights shall be subject to various civil liabilities, which include ceasing infringement activities, apologizing to the copyright owners and compensating the loss of copyright owner. Infringers of copyright may also subject to fines and/or administrative or criminal liabilities in severe situations.

The *Computer Software Copyright Registration Measures*, or the Software Copyright Measures, promulgated by the National Copyright Administration on April 6, 1992 and amended on May 26, 2000 and February 20, 2002, regulates registrations of software copyright, exclusive licensing contracts for software copyright and assignment agreements. The National Copyright Administration, or the NCA administers software copyright registration and the CPCC, is designated as the software registration authority. The CPCC shall grant registration certificates to the Computer Software Copyrights applicants which meet the requirements of both the Software Copyright Measures and the *Computer Software Protection Regulations (Revised in 2013)*.

The Provisions of the Supreme People's Court on Certain Issues Related to the Application of Law in the Trial of Civil Cases Involving Disputes on Infringement of the Information Network Dissemination Rights specifies that disseminating works, performances or audio-video products by the internet users or the internet service providers via the internet without the permission of the copyright owners shall be deemed to have infringed the right of dissemination of the copyright owner.

The *Measures for Administrative Protection of Copyright Related to Internet*, which was jointly promulgated by the NCA and the MIIT on April 29, 2005 and became effective on May 30, 2005, provides that upon receipt of an infringement notice from a legitimate copyright holder, an ICP operator must take remedial actions immediately by removing or disabling access to the infringing content. If an ICP operator knowingly transmits infringing content or fails to take remedial actions after receipt of a notice of infringement that harms public interest, the ICP operator could be subject to administrative penalties, including an order to cease infringing activities, confiscation by the authorities of all income derived from the infringement activities, or payment of fines.

On May 18, 2006, the State Council promulgated the *Regulations on the Protection of the Right to Network Dissemination of Information* (as amended in 2013). Under these regulations, an owner of the network dissemination rights with respect to written works, performance or audio or video recordings who believes that information storage, search or link services provided by an Internet service provider infringe his or her rights may require that the Internet service provider delete, or disconnect the links to, such works or recordings.

As of December 31, 2020, we have registered 437 software copyrights in the PRC.

*Patent law*

According to the *Patent Law of the PRC* (Revised in 2008), the State Intellectual Property Office is responsible for administering patent law in the PRC. The patent administration departments of provincial, autonomous region or municipal governments are responsible for administering patent law within their respective jurisdictions. The Chinese patent system adopts a first-to-file principle, which means that when more than one person file different patent applications for the same invention, only the person who files the application first is entitled to obtain a patent of the invention. To be patentable, an invention or a utility model must meet three criteria: novelty, inventiveness and practicability. A patent is valid for twenty years in the case of an invention and ten years in the case of utility models and designs. The Patent Law of the PRC was recently amended on October 17, 2020 and the revised version will come into effect on June 1, 2021. As of December 31, 2020, we have applied for approximately 7,531 patents in the PRC, among which 4,582 have been registered.

59

Table of Contents

*Trademark law*

Trademarks are protected by the *Trademark Law of the PRC* (Revised in 2019) which was adopted in 1982 and subsequently amended in 1993, 2001, 2013 and 2019 respectively as well as by the *Implementation Regulations of the PRC Trademark Law* adopted by the State Council in 2002 and as most recently amended on April 29, 2014. The Trademark Office of the SAMR handles trademark registrations. The Trademark Office grants a ten-year term to registered trademarks and the term may be renewed for another ten-year period upon request by the trademark owner. A trademark registrant may license its registered trademarks to another party by entering into trademark license agreements, which must be filed with the Trademark Office for its record. As with patents, the Trademark Law has adopted a first-to-file principle with respect to trademark registration. If a trademark applied for is identical or similar to another trademark which has already been registered or subject to a preliminary examination and approval for use on the same or similar kinds of products or services, such trademark application may be rejected. Any person applying for the registration of a trademark may not injure existing trademark rights first obtained by others, nor may any person register in advance a trademark that has already been used by another party and has already gained a "sufficient degree of reputation" through such party's use. As of December 31, 2020, we have applied for registration of 4,578 trademarks with the Trademark Office of the SAMR, among which 4,011 have been registered.

*Regulations on domain names*

The MIIT promulgated the Measures on Administration of Internet Domain Names, or the Domain Name Measures, on August 24, 2017, which took effect on November 1, 2017 and replaced the Administrative Measures on China Internet Domain Names promulgated by MII on November 5, 2004. According to the Domain Name Measures, the MIIT is in charge of the administration of PRC internet domain names. The domain name registration follows a first-to-file principle. Applicants for registration of domain names shall provide the true, accurate and complete information of their identities to domain name registration service institutions. The applicants will become the holder of such domain names upon the completion of the registration procedure. As of December 31, 2020, we have registered 168 domain names in the PRC.

**Regulations on Foreign Exchange**

*General administration of foreign exchange*

Under the *PRC Foreign Currency Administration Rules* promulgated on January 29, 1996 and most recently amended on August 5, 2008 and various regulations issued by the SAFE and other relevant PRC government authorities, Renminbi is convertible into other currencies for current account items, such as trade-related receipts and payments and payment of interest and dividends. The conversion of Renminbi into other currencies and remittance of the converted foreign currency outside the PRC for of capital account items, such as direct equity investments, loans and repatriation of investment, requires the prior approval from the SAFE or its local office.

Payments for transactions that take place within the PRC must be made in Renminbi. Unless otherwise approved, PRC companies may not repatriate foreign currency payments received from abroad or retain the same abroad. Foreign-invested enterprises may retain foreign exchange in accounts with designated foreign exchange banks under the current account items subject to a cap set by the SAFE or its local office. Foreign exchange proceeds under the current accounts may be either retained or sold to a financial institution engaged in settlement and sale of foreign exchange pursuant to relevant SAFE rules and regulations. For foreign exchange proceeds under the capital accounts, approval from the SAFE is generally required for the retention or sale of such proceeds to a financial institution engaged in settlement and sale of foreign exchange.

Pursuant to the *Circular of the SAFE on Further Improving and Adjusting Foreign Exchange Administration Policies for Direct Investment*, or the SAFE Circular No. 59 promulgated by SAFE on November 19, 2012, which became effective on December 17, 2012 and was further amended on May 4, 2015 and on October 10, 2018, approval is not required for opening a foreign exchange account and depositing foreign exchange into the accounts relating to the direct investments. SAFE Circular No. 59 also simplified foreign exchange-related registration required for the foreign investors to acquire the equity interests of Chinese companies and further improve the administration on foreign exchange settlement for foreign-invested enterprises.

Pursuant to the *Circular on Further Simplifying and Improving the Foreign Currency Management Policy on Direct Investment*, or the SAFE Circular No. 13, effective from June 1, 2015, which cancels the administrative approvals of foreign exchange registration of direct domestic investment and direct overseas investment and simplifies the procedure of foreign exchange-related registration, the investors shall register with banks for direct domestic investment and direct overseas investment.

60

Table of Contents

The Circular on *Reforming the Management Approach regarding the Settlement of Foreign Capital of Foreign-invested Enterprise*, or the SAFE Circular No. 19, which was promulgated by the SAFE on March 30, 2015 and became effective on June 1, 2015, provides that a foreign-invested enterprise may, according to its actual business needs, settle with a bank the portion of the foreign exchange capital in its capital account for which the relevant foreign exchange administration has confirmed monetary capital contribution rights and interests (or for which the bank has registered the injection of the monetary capital contribution into the account). Pursuant to the SAFE Circular No.19, for the time being, foreign-invested enterprises are allowed to settle 100% of their foreign exchange capitals on a discretionary basis; a foreign-invested enterprise shall truthfully use its capital for its own operational purposes within the scope of business; where an ordinary foreign-invested enterprise makes domestic equity investment with the amount of foreign exchanges settled, the invested enterprise shall first go through domestic re-investment registration and open a corresponding account for foreign exchange settlement pending payment with the foreign exchange administration or the bank at the place where it is registered.

The Circular on *Reforming and Regulating Policies on the Control over Foreign Exchange Settlement of Capital Accounts*, or the SAFE Circular No. 16, which was promulgated by the SAFE and became effective on June 9, 2016, provides that enterprises registered in the PRC may also convert their foreign debts from foreign currency into Renminbi on self-discretionary basis. The SAFE Circular No. 16 also provides an integrated standard for conversion of foreign exchange under capital account items (including but not limited to foreign currency capital and foreign debts) on self-discretionary basis, which applies to all enterprises registered in the PRC.

According to the *Measures for Reporting of Information on Foreign Investment*, which was promulgated by the MOFCOM and the SAMR, which has replaced the SAIC, became effective on January 1, 2020, the Administrative Regulations on the Company Registration, which was promulgated by the State Council on June 24, 1994, became effective on July 1, 1994 and latest amended on February 6, 2016, and other laws and regulations governing the foreign invested enterprises and company registrations, the foreign invested enterprise shall be registered with the SAMR and shall submit investment information to the competent commercial authorities through the enterprise registration system and the national enterprise credit information publicity system.

Based on SAFE Circular No.13 and other laws and regulations relating to foreign exchange, when setting up a new foreign-invested enterprise, the foreign invested enterprise shall register with the bank located at its registered place after obtaining the business license, and if there is any change in capital or other changes relating to the basic information of the foreign-invested enterprise, including without limitation any increase in its registered capital or total investment, the foreign invested enterprise shall register such changes with the bank located at its registered place after obtaining the approval from or completing the filing with competent authorities. Pursuant to the relevant foreign exchange laws and regulations, the above-mentioned foreign exchange registration with the banks will typically take less than four weeks upon the acceptance of the registration application.

Based on the forgoing, if we intend to provide funding to our wholly foreign owned subsidiaries through capital injection at or after their establishment, we shall register the establishment of and any follow-on capital increase in our wholly foreign owned subsidiaries with the SAMR or its local counterparts, file such via the FICMIS and register such with the local banks for the foreign exchange related matters.

***Loans by the Foreign Companies to their PRC Subsidiaries***

A loan made by foreign investors as shareholders in a foreign invested enterprise is considered to be foreign debt in China and is regulated by various laws and regulations, including the Regulation of the People's Republic of China on Foreign Exchange Administration, the Interim Provisions on the Management of Foreign Debts, the Statistical Monitoring of Foreign Debts Tentative Provisions, the Detailed Rules for the Implementation of Provisional Regulations on Statistics and Supervision of External Debt, and the Administrative Measures for Registration of Foreign Debts. Under these rules and regulations, a shareholder loan in the form of foreign debt made to a PRC entity does not require the prior approval of SAFE. However, such foreign debt must be registered with and recorded by SAFE or its local branches within 15 business days after entering into the foreign debt contract. Pursuant to these rules and regulations, the balance of the foreign debts of a foreign invested enterprise shall not exceed the difference between the total investment and the registered capital of the foreign invested enterprise, or Total Investment and Registered Capital Balance.

Pursuant to the Interim Provisions of the State Administration for Industry and Commerce on the Ratio of the Registered Capital to the Total Investment of a Sino-Foreign Equity Joint Venture Enterprise, or the Provisions on Ratio of the Registered Capital to the Total Investment, promulgated by SAIC on February 17, 1987 and effective on March 1, 1987, with respect to a Sino-foreign equity join venture, the registered capital shall be (i) no less than 7/10 of its total investment, if the total investment is US$3 million or under US$3 million; (ii) no less than 1/2 of its total investment, if the total investment is ranging from US$3 million to US$10 million (including US$10 million), provided that the registered capital shall not be less than US$2.1 million if the total investment is less than US$4.2 million; (iii) no less than 2/5 of its total investment, if the total investment is ranging from US$10 million to US$30 million (including US$30 million), provided that the registered capital shall not be less than US$5 million if the total investment is less than US$12.5 million; and (iv) no less than 1/3 of its total investment, if the total investment exceeds US$30 million, provided that the registered capital shall not be less than US$12 million if the total investment is less than US$36 million.

61

Table of Contents

On January 11, 2017, the PBOC promulgated the Notice of the People's Bank of China on Matters concerning the Macro-Prudential Management of Full-Covered Cross-Border Financing, or the PBOC Notice No. 9. Pursuant to the PBOC Notice No. 9, within a transition period of one year from January 11, 2017, the foreign invested enterprises may adopt the currently valid foreign debt management mechanism, or Current Foreign Debt Mechanism, or the mechanism as provided in the PBOC Notice No. 9, or Notice No. 9 Foreign Debt Mechanism, at their own discretion. The PBOC Notice No. 9 provides that, enterprises may conduct independent cross-border financing in RMB or foreign currencies as required. Pursuant to the PBOC Notice No. 9, the outstanding cross-border financing of an enterprise (the outstanding balance drawn, here and below) shall be calculated using a risk-weighted approach, or Risk-Weighted Approach, and shall not exceed the specified upper limit, namely: risk-weighted outstanding cross-border financing ≤ the upper limit of risk-weighted outstanding cross-border financing. Risk-weighted outstanding cross-border financing ∑ outstanding amount of RMB and foreign currency denominated cross-border financing * maturity risk conversion factor * type risk conversion factor + ∑ outstanding foreign currency denominated cross-border financing * exchange rate risk conversion factor. Maturity risk conversion factor shall be 1 for medium- and long-term cross-border financing with a term of more than one year and 1.5 for short-term cross-border financing with a term of less than one year. Type risk conversion factor shall be 1 for on-balance-sheet financing and 1 for off-balance -sheet financing (contingent liabilities) for the time being. Exchange rate risk conversion factor shall be 0.5. The PBOC Notice No. 9 further provides that the upper limit of risk-weighted outstanding cross-border financing for enterprises shall be 200% of its net assets, or Net Asset Limits. Enterprises shall file with SAFE in its capital item information system after entering into the relevant cross-border financing contracts and prior to three business day before drawing any money from the foreign debts.

Based on the foregoing, if we provide funding to our wholly foreign owned subsidiaries through shareholder loans, the balance of such loans shall not exceed the Total Investment and Registered Capital Balance and we will need to register such loans with SAFE or its local branches in the event that the Current Foreign Debt Mechanism applies, or the balance of such loans shall be subject to the Risk-Weighted Approach and the Net Asset Limits and we will need to file the loans with SAFE in its information system in the event that the Notice No. 9 Mechanism applies. According to the PBOC Notice No. 9, after a transition period of one year from January 11, 2017, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date of this annual report, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries.

### *Offshore investment*

Under the Circular of the SAFE on Issues Concerning the Foreign Exchange Administration over the Overseas Investment and Financing and Round-trip Investment by Domestic Residents via Special Purpose Vehicles, or the SAFE Circular 37, issued by the SAFE and effective on July 4, 2014, PRC residents are required to register with the local SAFE branch prior to the establishment or control of an offshore special purpose vehicle, or SPV, which is defined as offshore enterprises directly established or indirectly controlled by PRC residents for offshore equity financing of the enterprise assets or interests they hold in China. An amendment to registration or subsequent filing with the local SAFE branch by such PRC resident is also required if there is any change in basic information of the offshore company or any material change with respect to the capital of the offshore company. At the same time, the SAFE has issued the Operation Guidance for the Issues Concerning Foreign Exchange Administration over Round-trip Investment regarding the procedures for SAFE registration under the SAFE Circular 37, which became effective on July 4, 2014 as an attachment of Circular 37.

Under the relevant rules, failure to comply with the registration procedures set forth in the SAFE Circular 37 may result in restrictions on the foreign exchange activities of the relevant onshore company, including the payment of dividends and other distributions to its offshore parent or affiliates, and may also subject relevant PRC residents to penalties under PRC foreign exchange administration regulations.

### *Regulations on dividend distribution*

The principal laws and regulations regulating the dividend distribution of dividends by foreign-invested enterprises in the PRC include the *Company Law* of the PRC, as amended in 2004, 2005, 2013 and 2018, the Foreign Investment Law and the Implementation Regulations. Under the current regulatory regime in the PRC, foreign-invested enterprises in the PRC may pay dividends only out of their retained earnings, if any, determined in accordance with PRC accounting standards and regulations. A PRC company is required to set aside as statutory reserve funds at least 10% of its after-tax profit, until the cumulative amount of such reserve funds reaches 50% of its registered capital unless laws regarding foreign investment provide otherwise. A PRC company shall not distribute any profits until any losses from prior fiscal years have been offset. Profits retained from prior fiscal years may be distributed together with distributable profits from the current fiscal year.

62

As of December 31, 2020, Beijing QIYI Century, Chongqing QIYI Tianxia Science & Technology Co., Ltd., iQIYI New Media, Tianjin iQIYI Network & Technology Co., Ltd., Chengdu iQIYI Culture Promotion Co., Ltd., Beijing iQIYI Network & Technology Co., Ltd., Shanghai iQIYI Network & Technology Co., Ltd., Beijing iQIYI Interactive Technology Co., Ltd., Shanghai iQIYI New Media Technology Co., Ltd., Changsha iQIYI Culture & Technology Co., Ltd., iQIYI Creative Entertainment (Dong Yang) Real-estate Co., Ltd., Chengdu iQIYI Intelligence Innovation Technology Co., Ltd., and Hainan iQIYI Information Technology Co., Ltd., our wholly foreign-owned subsidiaries are in an accumulated loss position. Beijing QIYI Century, Chongqing QIYI Tianxia Science & Technology Co., Ltd., iQIYI New Media, Tianjin iQIYI Network & Technology Co., Ltd., Chengdu iQIYI Culture Promotion Co., Ltd., Beijing iQIYI Network & Technology Co., Ltd., Shanghai iQIYI Network & Technology Co., Ltd., Beijing iQIYI Interactive Technology Co., Ltd., Shanghai iQIYI New Media Technology Co., Ltd., Changsha iQIYI Culture & Technology Co., Ltd., iQIYI Creative Entertainment (Dong Yang) Real-estate Co., Ltd., Chengdu iQIYI Intelligence Innovation Technology Co., Ltd., and Hainan iQIYI Information Technology Co., Ltd. have not and will not be able to pay dividends to our offshore entities until they generate accumulated profits and meet the requirements for statutory reserve funds.

### Regulations on Taxation

#### Enterprise Income Tax

On March 16, 2007, the Standing Committee of the National People's Congress promulgated the *Law of the PRC on Enterprise Income Tax*, or the EIT Law, which was amended on February 24, 2017 and December 29, 2018. On December 6, 2007, the State Council enacted the *Regulations for the Implementation of the Law on Enterprise Income Tax*, which came into effect on January 1, 2008 and was amended on April 23, 2019. Under the EIT Law and its implementing regulations, both resident enterprises and non-resident enterprises are subject to tax in the PRC. Resident enterprises are defined as enterprises that are established in China in accordance with PRC laws, or that are established in accordance with the laws of foreign countries but are actually or in effect controlled from within the PRC. Non-resident enterprises are defined as enterprises that are organized under the laws of foreign countries and whose actual management is conducted outside the PRC, but who have established institutions or premises in the PRC or income generated from inside the PRC. Under the EIT Law and relevant implementing regulations, a uniform corporate income tax rate of 25% is applied. However, if non-resident enterprises have not formed permanent establishments or premises in the PRC, or if their permanent establishment or premises in the PRC have no actual relationship to the relevant income derived in the PRC, enterprise income tax is set at the rate of 10% with respect to their income sourced from inside the PRC.

#### Value-added Tax

The *Provisional Regulations of the PRC on Value-added Tax* were promulgated by the State Council on December 13, 1993 and came into effect on January 1, 1994 which were subsequently amended on November 10, 2008 and came into effect on January 1, 2009 and most recently amended on February 6, 2016 and November 19, 2017. The *Detailed Rules for the Implementation of the Provisional Regulations of the PRC on Value-added Tax* (Revised in 2011) was promulgated by the Ministry of Finance on December 25, 1993 and subsequently amended on December 15, 2008 and October 28, 2011, or collectively, VAT Law. On November 19, 2017, the State Council promulgated *The Decisions on Abolishing the Provisional Regulations of the PRC on Business Tax and Amending the Provisional Regulations of the PRC on Value-added Tax*, or Order 691. According to the VAT Law and Order 691, all enterprises and individuals engaged in the sale of goods, the provision of processing, repair and replacement services, sales of services, intangible assets, real property and the importation of goods within the territory of the PRC are the taxpayers of VAT. The VAT tax rates generally applicable are simplified as 17%, 11%, 6% and 0%, and the VAT tax rate applicable to the small-scale taxpayers is 3%. The *Notice of the Ministry of Finance and the SAT on Adjusting Value-added Tax Rates*, or the Notice, was promulgated on April 4, 2018 and came into effect on May 1, 2018. The Notice adjusted the VAT tax rates of 17% and 11% to 16% and 10%, respectively. According to the *Announcement on Relevant Policies for Deepening Value-Added Tax Reform*, with effect from April 1, 2019, the VAT tax rate of 16% and 10% are changed into 13% and 9%, respectively.

As of the date of this annual report, our PRC subsidiaries and consolidated affiliated entities are generally subject to 3%, 6%, 9% or 13% VAT rate.

#### Dividend Withholding Tax

The EIT Law provides that since January 1, 2008, an income tax rate of 10% will normally be applicable to dividends declared to non-PRC resident enterprise investors which do not have an establishment or place of business in the PRC, or which have an establishment or place of business that is not effectively connected with the relevant income, to the extent such dividends are derived from sources within the PRC.

Table of Contents

Pursuant to an Arrangement Between the Mainland of China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Incomes, or the Double Tax Avoidance Arrangement, and other applicable PRC laws, if a Hong Kong resident enterprise is determined by the competent PRC tax authority to have satisfied the relevant conditions and requirements under such Double Tax Avoidance Arrangement and other applicable laws, the 10% withholding tax on the dividends the Hong Kong resident enterprise receives from a PRC resident enterprise may be reduced to 5%. However, based on the *Circular on Certain Issues with Respect to the Enforcement of Dividend Provisions in Tax Treaties*, or the SAT Circular 81, issued on February 20, 2009 by the SAT, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from such reduced income tax rate due to a structure or arrangement that is primarily tax-driven, such PRC tax authorities may adjust the preferential tax treatment. According to the *Circular on Several Questions regarding the "Beneficial Owner" in Tax Treaties*, which was issued on February 3, 2018 by the SAT and will take effect on April 1, 2018, when determining the applicant's status as a "beneficial owner" with respect to the tax treatment of dividends, interest or royalties under certain tax treaties, several factors, including whether the applicant is obligated to pay more than 50% of his or her income over a twelve-month period to residents of a third country or region, whether the business operated by the applicant constitutes actual business activities; and whether the counterparty country or region to the tax treaty does not levy any tax, exempts the relevant income from tax or levies tax at an extremely low rate, will be taken into account and be analyzed according to the actual circumstances of specific cases. This circular further provides that applicants who intend to prove his or her "beneficial owner" status shall submit the relevant documents to the relevant tax bureau according to the *Announcement on Issuing the Measures for the Administration of Non-Resident Taxpayers' Enjoyment of the Treatment under Tax Agreements*.

### Tax on Indirect Transfer

On February 3, 2015, the SAT issued the *Circular on Issues of Enterprise Income Tax on Indirect Transfers of Assets by Non-PRC Resident Enterprises*, or Circular 7. Pursuant to Circular 7, an "indirect transfer" of assets, including equity interests in a PRC resident enterprise, by a non-PRC resident enterprises, may be recharacterized and treated as a direct transfer of PRC taxable assets, if such arrangement does not have a reasonable commercial purpose and was established for the purpose of avoiding payment of PRC enterprise income tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax. When determining whether there is a "reasonable commercial purpose" of the transaction arrangement, features to be taken into consideration include, inter alia, whether the main value of the equity interest of the relevant offshore enterprise derives directly or indirectly from PRC taxable assets; whether the assets of the relevant offshore enterprise mainly consist of direct or indirect investments in China, or whether its income is mainly derived from China; and whether the offshore enterprise and its subsidiaries that directly or indirectly hold PRC taxable assets have a real commercial nature which is evidenced by their actual function and risk exposure. According to Circular 7, where the payor fails to withhold any or sufficient tax, the transferor shall declare and pay such tax to the tax authority by itself within the statutory time limit. Late payment of applicable tax will subject the transferor to default interest. Circular 7 does not apply to sales of shares by investors through a public stock exchange where such shares were acquired on a public stock exchange. On October 17, 2017, the SAT issued the Circular on Issues of Tax Withholding regarding Non-PRC Resident Enterprise Income Tax, or SAT Circular 37, which was amended on June 15, 2018. SAT Circular 37 further elaborates the relevant implemental rules regarding the calculation, reporting and payment obligations of the withholding tax by the non-resident enterprises. Nonetheless, there remain uncertainties as to the interpretation and application of Circular 7. Circular 7 may be determined by the tax authorities to be applicable to our offshore transactions or sale of our shares or those of our offshore subsidiaries where non-resident enterprises, being the transferors, were involved.

### Regulations on Employment and Social Welfare

### Labor Contract Law

The Labor Contract Law of the PRC, or the Labor Contract Law, which took effect on January 1, 2008 and was amended on December 28, 2012, is primarily aimed at regulating rights and obligations of employer and employee relationships, including the establishment, performance and termination of labor contracts. Pursuant to the Labor Contract Law, labor contracts shall be concluded in writing if labor relationships are to be or have been established between employers and the employees. Employers are prohibited from forcing employees to work above certain time limit and employers shall pay employees for overtime work in accordance to national regulations. In addition, employee wages shall be no lower than local standards on minimum wages and shall be paid to employees timely.

### Social Insurance and Housing Fund

As required under the Regulation of Insurance for Labor Injury implemented on January 1, 2004 and amended in 2010, the *Provisional Measures for Maternity Insurance of Employees of Corporations* implemented on January 1, 1995, the Decisions on the Establishment of a Unified Program for Old-Aged Pension Insurance of the State Council issued on July 16, 1997, the Decisions on the Establishment of the Medical Insurance Program for Urban Workers of the State Council promulgated on December 14, 1998, the Unemployment Insurance Measures promulgated on January 22, 1999 and the Social Insurance Law of the PRC implemented on July 1, 2011 and amended in 2018, employers are required to provide their employees in the PRC with welfare benefits covering pension insurance, unemployment insurance, maternity insurance, labor injury insurance and medical insurance.

64

In accordance with the *Regulations on the Management of Housing Fund* which was promulgated by the State Council in 1999 and amended in 2002 and 2019, employers must register at the designated administrative centers and open bank accounts for depositing employees' housing funds. Employer and employee are also required to pay and deposit housing funds, with an amount no less than 5% of the monthly average salary of the employee in the preceding year in full and on time. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—The enforcement of the PRC Labor Contract Law and other labor-related regulations in the PRC may adversely affect our business and results of operations."

### Employee Stock Incentive Plan

Pursuant to the Notice of Issues Related to the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Listed Company, or Circular 7, which was issued by the SAFE on February 15, 2012, employees, directors, supervisors, and other senior management who participate in any stock incentive plan of an publicly-listed overseas company and who are PRC citizens or non-PRC citizens residing in China for a continuous period of no less than one year, subject to a few exceptions, are required to register with SAFE through a qualified domestic agent, which may be a PRC subsidiary of such overseas listed company, and complete certain other procedures.

In addition, the SAT has issued certain circulars concerning employee stock options and restricted shares. Under these circulars, employees working in the PRC who exercise stock options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of an overseas listed company are required to file documents related to employee stock options and restricted shares with relevant tax authorities and to withhold individual income taxes of employees who exercise their stock option or purchase restricted shares. If the employees fail to pay or the PRC subsidiaries fail to withhold income tax in accordance with relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC governmental authorities.

### M&A Rules and Overseas Listing

On August 8, 2006, six PRC governmental and regulatory agencies, including MOFCOM and the China Securities Regulatory Commission, or the CSRC, promulgated the *Rules on Acquisition of Domestic Enterprises by Foreign Investors*, or the M&A Rules, governing the mergers and acquisitions of domestic enterprises by foreign investors that became effective on September 8, 2006 and was revised on June 22, 2009. The M&A Rules, among other things, requires that if an overseas company established or controlled by PRC companies or individuals, or PRC Citizens, intends to acquire equity interests or assets of any other PRC domestic company affiliated with the PRC Citizens, such acquisition must be submitted to the MOFCOM for approval. The M&A Rules also requires that an offshore SPV formed for overseas listing purposes and controlled directly or indirectly by the PRC Citizens shall obtain the approval of the CSRC prior to overseas listing and trading of such SPV's securities on an overseas stock exchange.

65

Case 1:20-cv-03794-DG-TAM   Document 65-12   Filed 03/03/23   Page 69 of 410 PageID #: 3057

C.        **Organizational Structure**

The following diagram illustrates our current corporate structure, which include our significant subsidiaries and consolidated affiliated entities as of the date of this annual report:



For details of contractual arrangements, see " —Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders."

Equity interest.

Notes

(1)   The shareholders of Intelligent Entertainment are Dr. Yu Gong, our founder, director and chief executive officer, and Mr. Xianghua Yang, our senior vice president, each holding 50% of equity interest.

(2)   The shareholders of iQIYI Pictures are Dr. Yu Gong and Mr. Ning Ya, senior vice president of the company and president of iQIYI Pictures, each holding 50% of equity interest.

(3)   The shareholders of Shanghai iQIYI are Dr. Yu Gong and Mr. Xiaohua Geng, our senior vice president, each holding 50% of equity interest.

66

(4)    The shareholder of Beijing iQIYI is Mr. Xiaohua Geng, holding 100% of equity interest.

(5)    The shareholder of Shanghai Zhong Yuan is Dr. Yu Gong, holding 100% of equity interest.

**Contractual Arrangements with the Consolidated Affiliated Entities and Their Respective Shareholders**

Current PRC laws and regulations impose certain restrictions or prohibitions on foreign ownership of companies that engage in certain value -added telecommunication services, Internet audio-video program services and certain other businesses. We are a company registered in the Cayman Islands. Beijing QIYI Century and iQIYI New Media, our PRC subsidiaries, are considered foreign-invested enterprises. To comply with PRC laws and regulations, we primarily conduct our business in China through Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Intelligent Entertainment (previously known as Beijing iQIYI Cinema Management Co., Ltd., or Beijing iQIYI Cinema), our consolidated affiliated entities in the PRC, based on a series of contractual arrangements by and among Beijing QIYI Century, iQIYI New Media, our consolidated affiliated entities and their shareholders.

The following is a summary of the currently effective contractual arrangements among Beijing QIYI Century, Beijing iQIYI, Beijing iQIYI's shareholders and iQIYI, Inc.

*Loan Agreement*

Pursuant to the amended and restated loan agreement dated January 30, 2013 between Beijing QIYI Century and Mr. Xiaohua Geng, the sole shareholder of Beijing iQIYI, Beijing QIYI Century made loans in an aggregate amount of RMB27 million to Mr. Geng for the acquisition and capitalization of Beijing iQIYI. Pursuant to the amended and restated loan agreement, Mr. Geng can only repay the loans by the sale of all his equity interest in Beijing iQIYI to iQIYI, Inc. insofar as permitted under PRC law and pay all of the proceeds from sale of such equity interests to iQIYI, Inc. In the event that Mr. Geng sells his equity interests in Beijing iQIYI to iQIYI, Inc. with a price equivalent to or less than the amount of the principal, the loans will be interest free. If the price is higher than the amount of the principal, the excess amount will be paid to Beijing QIYI Century as the loan interest to or cost for capital occupancy to the extent allowed under PRC law. The initial loan maturity date is June 23, 2021 unless otherwise decided by Beijing QIYI Century. On December 21, 2020, Beijing QIYI Century executed a confirmation letter to extend the term of the loan agreement to June 23, 2031.

*Share Pledge Agreement*

Pursuant to the amended and restated equity pledge agreement dated January 30, 2013, Mr. Xiaohua Geng has pledged all of his equity interest in Beijing iQIYI to guarantee his and Beijing iQIYI's performance of his obligations under, where applicable, the amended and restated exclusive technology consulting and services agreement and the amended and restated loan agreement. If Beijing iQIYI or Mr. Geng breach their contractual obligations under these agreements, Beijing QIYI Century, as pledgee, will have the right to dispose of the pledged equity interests. Mr. Geng agrees that, during the term of the equity pledge agreements, he will not dispose of the pledged equity interests or create or allow any encumbrance on the pledged equity interests, and he also agrees that Beijing QIYI Century's rights relating to the equity pledge should not be prejudiced by the legal actions of Mr. Geng, his successor or his assignee. During the term of the amended and restated equity pledge agreement,

Beijing QIYI Century has the right to receive all of the dividends and profits distributed on the pledged equity. The amended and restated equity pledge agreement will terminate on the date when Beijing iQIYI and Mr. Geng have completed all their obligations under the amended and restated exclusive technology consulting and services agreement and the amended and restated loan agreement unless otherwise unilaterally terminated by Beijing QIYI Century.

*Exclusive Purchase Option Agreement*

Pursuant to the amended and restated exclusive purchase option agreement dated January 30, 2013 by and among iQIYI, Inc., Beijing QIYI Century, Beijing iQIYI, and Mr. Xiaohua Geng, Mr. Geng irrevocably grants iQIYI, Inc. or its designee an exclusive option to purchase at its discretion, to the extent permitted under PRC law, all or part of his equity interests in Beijing iQIYI. In addition, the purchase price should equal the amount that Mr. Geng contributed to Beijing iQIYI as registered capital for the equity interest to be purchased, or be the lowest price permitted by applicable PRC law. If any dividends or assets of other form were distributed, such dividends or distributions, including the purchase consideration received if the exclusive purchase option is exercised, will have to be repaid by Mr. Geng to iQIYI, Inc. Without the prior written consent of iQIYI, Inc., Beijing iQIYI may not amend its articles of associate, increase or decrease the registered capital, sell or otherwise dispose of its assets or beneficial interest, create or allow any encumbrance on its assets or other beneficial interests, provide any loans to any third parties, enter into any material contract with a value of more than RMB300,000 (except those contracts entered into in the ordinary course of business), merge with or acquire any other persons or make any investments, or distribute dividends to the shareholders. Mr. Geng agrees that, without the prior written consent of iQIYI, Inc., he will not dispose of his equity interests in Beijing iQIYI or create or allow any encumbrance on the equity interests, and will not cause Beijing iQIYI to provide any persons with any loans. The initial term of the amended and restated exclusive purchase option agreement is ten years and can be renewed at the discretion of iQIYI, Inc. On December 21, 2020, iQIYI, Inc. executed a confirmation letter to extend the term of the amended and restated exclusive purchase option agreement to November 22, 2032.

*Business Operation Agreement*

Pursuant to the amended and restated business operation agreement dated January 30, 2013 by and among Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng, Beijing QIYI Century agrees to provide Beijing iQIYI with performance guarantees with respect to any contracts, agreements and transactions Beijing iQIYI entered into in connection with its business. As a counter-guarantee, Beijing iQIYI agrees to offer all its account receivables and assets as collateral. The initial term of the business operation agreement is ten years and can be renewed at the discretion of Beijing QIYI Century. On December 21, 2020, Beijing QIYI Century executed a confirmation letter to extend the term of the business operation agreement to January 30, 2033.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing iQIYI agrees to provide Beijing QIYI Century with services, including internet information services, online advertising and other services reasonably necessary within the scope of Beijing QIYI Century's business. Beijing iQIYI agrees to use, on the website it operates, technology services provided by Beijing QIYI Century, including but not limited to, P2P download and video on-demand system. As consideration for the internet information services and other services provided by Beijing iQIYI, Beijing QIYI Century agrees to pay specified service fees to Beijing iQIYI. Beijing iQIYI has the right to waive the service fees. The initial term of the business cooperation agreement is ten years and can be renewed at the discretion of Beijing QIYI Century. On December 21, 2020, Beijing QIYI Century executed a confirmation letter to extend the term of the business cooperation agreement to November 23, 2031.

*Commitment Letter*

Pursuant to the commitment letter dated January 30, 2013, under the condition that Beijing iQIYI remains as a consolidated affiliated entity of us under U.S. GAAP and the relevant contractual arrangements remain in effect, iQIYI, Inc. and Beijing QIYI Century undertake to provide financial support to Beijing iQIYI for any financial loss that might affect its business operation occurred before and after the execution of the commitment letter as permitted by relevant laws. Such financial support shall be forgiven by iQIYI, Inc. and Beijing QIYI Century. As of December 31, 2020, iQIYI has provided RMB785.8 million (US$120.4 million) in financial support to Beijing iQIYI under this commitment letter, all of which has been forgiven.

*Shareholder Voting Rights Trust Agreement*

Pursuant to the amended and restated shareholder voting rights trust agreement dated January 30, 2013 by and between Beijing QIYI Century and Mr. Xiaohua Geng, Mr. Geng has agreed to irrevocably entrust a person designated by Beijing QIYI Century to represent him to exercise all the voting rights and other shareholders' rights to which he is entitled as the shareholder of Beijing iQIYI. The agreement will remain effective for as long as Mr. Geng remains the shareholder of Beijing iQIYI unless Beijing QIYI Century unilaterally terminates the agreement by written notice.

*Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century has the sole and exclusive right to provide specified technology consulting and services to Beijing iQIYI. Beijing iQIYI agrees to accept such services and, without the prior written consent of Beijing QIYI Century, may not accept the same or similar technology consulting and services provided by any third party during the term of the agreement. Beijing iQIYI agrees to pay specified service fees to Beijing QIYI Century on a quarterly basis. Beijing QIYI Century has the right to adjust the calculation basis and payment method through written confirmation, without the prior consent of Beijing iQIYI. All the benefits and interests generated from the agreement, including but not limited to software copyrights, intellectual property rights, know-how and trade secrets, will be Beijing QIYI Century's sole and exclusive rights. The term of the exclusive technology consulting and services agreement is ten years and can be renewed at the discretion of Beijing QIYI Century. On December 21, 2020, Beijing QIYI Century executed a confirmation letter to extend the term of the exclusive technology consulting and services agreement to November 23, 2031.

*Trademark License Agreement*

Pursuant to the trademark license agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century grants Beijing iQIYI trademark licenses to use the trademarks held by Beijing QIYI Century in specified areas. Beijing QIYI Century may not grant trademark licenses to third parties. Beijing iQIYI agrees to pay specified usage fees to Beijing QIYI Century. The term of this trademark license agreement is five years and is afterwards automatically renewed for one additional year each year, unless terminated by Beijing QIYI Century by written notice.

68

Table of Contents

*Software Usage License Agreement*

Pursuant to the software usage license agreement, which took effect on November 23, 2011 by and between Beijing QIYI Century and Beijing iQIYI, Beijing QIYI Century grants Beijing iQIYI non-exclusive rights to use specified software in China. Beijing iQIYI agrees not to sublicense such software usage rights, and agrees to pay specified usage fees to Beijing QIYI Century. The term of this software usage license agreement is five years and can be renewed at the discretion of Beijing QIYI Century. On December 2, 2016 and December 21, 2020, respectively, Beijing QIYI Century executed a confirmation letter to extend the term of the software usage license agreement to December 1, 2031.

*Power of Attorney*

On January 30, 2013, Beijing QIYI Century granted iQIYI, Inc. irrevocable power of attorney under the amended and restated shareholder voting rights trust agreement. Pursuant to the irrevocable power of attorney, iQIYI, Inc. may exercise all shareholder rights during the term of the amended and restated shareholder voting rights trust agreement and may transfer such rights to a designated third party without written notice to Beijing QIYI Century.

*Spousal Consent Letter*

The spouse of the shareholder of Beijing iQIYI signed a spousal consent letter. Under the spousal consent letter, the signing spouse unconditionally and irrevocably agreed that the spouse is aware of the above-mentioned loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, and shareholder voting rights trust agreement, and has no objection regarding the contractual arrangements aforesaid. The signing spouse committed not to impose any adverse assertions upon the validity of such contractual arrangement based on the existence or termination of the marital relationship with the relevant shareholder, or exert any impediment or adverse influence over the relevant shareholder's performance of any contractual arrangement or claim rights on Beijing iQIYI.

The contractual arrangements by and among iQIYI, Inc., Beijing QIYI Century, Shanghai iQIYI, and the shareholders of Shanghai iQIYI, including loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, commitment letter, shareholder voting rights trust agreement, spousal consent letter and exclusive technology consulting and services agreement, are substantially the same as the corresponding contractual arrangements discussed above.

The contractual arrangements by and among iQIYI, Inc., Beijing QIYI Century, Shanghai Zhong Yuan, and the shareholder of Shanghai Zhong Yuan, including loan agreement, share pledge agreement, exclusive purchase option agreement, business operation agreement, commitment letter, shareholder voting rights trust agreement, spousal consent letter and exclusive technology consulting and services agreement, are substantially the same as the corresponding contractual arrangements discussed above.

The contractual arrangements by and among iQIYI, Inc., iQIYI New Media, Intelligent Entertainment, and the shareholders of Intelligent Entertainment, including loan agreements, share pledge agreements, exclusive purchase option agreement, exclusive management consulting and business cooperation agreement, commitment letter, power of attorney and spousal consent letters, are substantially the same as the corresponding contractual arrangements discussed above.

The contractual arrangements by and among iQIYI, Inc., iQIYI New Media, iQIYI Pictures, and the shareholders of iQIYI Pictures, including loan agreements, share pledge agreements, exclusive purchase option agreement, exclusive management consulting and business cooperation agreement, commitment letters, power of attorney and spousal consent letter, are substantially the same as the corresponding contractual arrangements discussed above.

In the opinion of Jingtian & Gongcheng, our PRC legal counsel:

•   the ownership structure of our consolidated affiliated entities and our wholly-foreign owned subsidiaries are in compliance with PRC laws or regulations currently in effect; and

•   the contractual arrangements among our wholly-foreign owned subsidiaries, consolidated affiliated entities and their respective shareholder(s), either individually or taken as a whole, are valid and legally binding upon each party to such arrangement and are enforceable against each party thereto in accordance with their terms, and do not contravene any PRC laws or regulations currently in effect.

69

Table of Contents

However, there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may in the future take a view that is contrary to the above opinion of our PRC legal counsel. We have been further advised by our PRC counsel that if the PRC government finds that the agreements that establish the structure for operating our internet video streaming business and related business do not comply with PRC government restrictions on foreign investment in internet video streaming and related businesses, we could be subject to severe penalties including being prohibited from continuing operations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure—If the PRC government finds that the agreements that establish the structure for operating certain of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations." and "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China —Uncertainties with respect to the PRC legal system could adversely affect us."

## D.        Property, Plant and Equipment

Our principal executive offices are located in Beijing, China, where we lease premises of approximately 68,452 square meters. We own office premises of approximately 17,570 square meters in Shanghai. We also lease offices in Shanghai, Chongqing and various other cities, with an aggregate area of approximately 33,670 square meters. We lease our premises from unrelated third parties. Below is a summary of the term of each of our current leases, and we plan to renew most of these leases when they expire:

| Leased properties | Term | Area (square meters) |
| --- | :---: | :---: |
| Beijing | 1, 3, 5, 6 and 20 years | 68,452 |
| Shanghai | 1, 3 and 20 years | 2,920 |
| Chongqing | 2 years | 6,682 |
| Others | 1, 2, 3, 5 and 10 years | 24,097 |
| Total | | 102,152 |

Our main IT infrastructure include internet data centers (IDC) and content delivery networks (CDN). We lease IDC facilities from China Telecom, China Unicom and China Mobile. Our bandwidth provider includes self-built CDN, cooperating bandwidth, commercial CDN and Internet Exchange.

## ITEM 4.A.        UNRESOLVED STAFF COMMENTS

Not Applicable.

## ITEM 5.        OPERATING AND FINANCIAL REVIEW AND PROSPECTS

The following discussion of our financial condition and results of operations is based upon and should be read in conjunction with our consolidated financial statements and the related notes included in this annual report. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3. Key Information—D. Risk Factors" in this annual report. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

## A.        Operating Results

### Overview

We have developed multiple monetization methods to capture entertainment market opportunities in China. We generate revenues through (i) membership services, (ii) online advertising services, (iii) content distribution, and (iv) others.

**Selected Income Statement Items**

*Total Revenues*

We derive our revenues from (i) membership services, (ii) online advertising services, (iii) content distribution and (iv) others. Starting from January 1, 2018, we adopted ASC 606, which reclassifies VAT from cost of revenues to net against revenues among other changes. The consolidated statements of comprehensive loss data for the years ended December 31, 2018, 2019 and 2020 presented below have been prepared in accordance with ASC 606. The following table presents our revenue lines and as percentages of our total revenues for the years presented.

| | 2018 | | 2019 | | 2020 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Revenues:** | | | | | | | |
| Membership services | 10,622,769 | 42.5 | 14,435,611 | 49.8 | 16,491,030 | 2,527,361 | 55.5 |
| Online advertising services | 9,328,061 | 37.3 | 8,270,600 | 28.5 | 6,822,115 | 1,045,535 | 23.0 |
| Content distribution | 2,162,643 | 8.7 | 2,544,221 | 8.8 | 2,660,074 | 407,674 | 9.0 |
| Others | 2,875,643 | 11.5 | 3,743,226 | 12.9 | 3,733,996 | 572,260 | 12.5 |
| **Total revenues** | 24,989,116 | 100.0 | 28,993,658 | 100.0 | 29,707,215 | 4,552,830 | 100.0 |

**Membership services**

We offer membership packages to provide our members with (i) access to streaming of a library of premium content, (ii) certain commercial skipping and other viewing privilege, (iii) merchandise selection and privilege, (iv) higher community status in our iQIYI Paopao social platform. We also offer a broader selection of paid services with innovative privileges. We generate a small portion of our membership services revenue from on-demand content purchase by our users and the sale of the right to membership services through the cooperation with other parties, where we recognize revenue on a net basis when we do not control the specified services before they are transferred to the customer.

*Online advertising services*

Our advertising revenues are recognized net of advertising agency rebates in 2018, 2019 and 2020. Most of our advertising services are in the form of brand advertising.

*Content distribution*

We distribute video content licensed from third parties by sub-licensing such content to other third-party internet video streaming platforms, and as consideration receive either cash or the right to broadcast certain licensed content from such platforms on our platform. We also distribute selected premium content to regions outside of China and/or to TV stations in China.

*Others*

We generate revenues from various other channels, such as online games, live broadcasting, and talent agency business. We generate revenues from online games both by distributing third-party online games and sharing revenues with them, and offering our self-developed online games. We launched several new self-developed and licensed games following the acquisition of Skymoons in July 2018, and plan to further broaden our offerings, especially self-developed games that fully leverage the IP value in our content. We generate revenues from live broadcasting through the sale and consumption of virtual items purchased by viewers of our live broadcasting shows. We generate revenues from talent agency services, primarily from celebrity endorsement contracts for the artists we represent. In addition, we also generate revenues from IP licensing, online literature and e-commerce.

*Operating Costs and Expenses*

Our operating costs and expenses consist of (i) cost of revenues, (ii) selling, general and administrative expenses and (iii) research and development expenses.

*Cost of revenues*. Our cost of revenues mainly consists of content costs, bandwidth costs and others. Content costs mainly consist of costs for original content, which includes amortization and impairment of capitalized produced content and expenses recorded when production costs exceed the total revenues to be earned; licensed content, which includes amortization and impairment of licensed copyrights; and revenue sharing cost for content uploaded by partners and cost incurred for live broadcasting hosts. Bandwidth costs are the fees we pay to telecommunications carriers and other service providers for telecommunications and other content delivery-related services. We expect that our cost of revenues will increase in the foreseeable future as we are committed to producing and acquiring more high-quality and popular content to enrich user experience and to support our overseas expansion in order to achieve long-term success.

71

*Selling, general and administrative expenses*. Our selling expenses primarily consist of promotional and marketing expenses and compensation for our sales and marketing personnel. We expect our selling and marketing expenses to increase in the foreseeable future as we plan to engage in more selling and marketing activities to attract new users and advertisers and to promote our brand recognition and content titles, as well as to grow our business.

Our general and administrative expenses consist primarily of salaries and benefits for our general and administrative personnel and fees and expenses for legal, accounting and other professional services. We expect our general and administrative expenses to be relatively stable or slightly increase in the foreseeable future as we remain committed to the disciplined operation.

*Research and development expenses*. Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expect our research and development expenses to slightly increase in the foreseeable future as we continue to develop new products and services to attract users and increase user engagement, and expand our monetization efforts.

## Taxation

We had income tax expense of RMB78.8 million, RMB51.9 million and RMB23.3 million (US$3.6 million) in 2018, 2019 and 2020, respectively. We are subject to various rates of income tax under different jurisdictions. The following summarizes major factors affecting our applicable tax rates in the Cayman Islands, Hong Kong and the PRC.

## Cayman Islands

We are an exempted company incorporated in the Cayman Islands. Under the current laws of the Cayman Islands, we are not subject to income, corporation or capital gains tax in the Cayman Islands. In addition, our payment of dividends to our shareholders, if any, is not subject to withholding tax in the Cayman Islands.

## Hong Kong

Our subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under the Hong Kong tax laws, we are exempted from the Hong Kong income tax on our foreign-derived income. Hong Kong does not impose a withholding tax on dividends.

## Singapore

Generally, entities in Singapore are subject to a unified 17% tax rate. Under the Singapore tax laws, certain entities may be entitled to preferential tax treatments. Our subsidiary in Singapore was granted a five-year Development and Expansion Incentive ("DEI") commencing from September 15, 2020, which awards a concessionary tax rate of 10% on qualifying income, subject to certain terms and conditions imposed. Singapore does not impose a withholding tax on dividends.

## PRC

Generally, our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries are subject to enterprise income tax on their taxable income in the PRC at a rate of 25%. The enterprise income tax is calculated based on the entity's global income as determined under PRC tax laws and accounting standards.

An enterprise may benefit from a preferential tax rate of 15% under the EIT Law if it qualifies as a High and New Technology Enterprise, or HNTE. A HNTE certificate is normally effective for a period of three years. Certain of our PRC subsidiaries and VIEs, including Beijing QIYI Century, Beijing iQIYI and Shanghai Zhong Yuan, are qualified as HNTE. The related tax holiday under such HNTE certificates of our entities will expire in 2021 or 2022. An enterprise may also benefit from preferential tax treatments under the EIT law if it qualifies as a Software Enterprise, or SE. Chengdu Skymoons Interactive Network Game Co., Ltd, or Skymoons Interactive, qualified as a SE, is entitled to an exemption from the enterprise income tax for two years beginning from 2017, and a reduced tax rate of 12.5% for the subsequent three years.

Our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries are subject to VAT at a rate of 3%, 6%, 9% or 13% on the services we provide and related surcharges.

If our holding company in the Cayman Islands or our subsidiary outside of the PRC were deemed to be a "resident enterprise" under the EIT Law, it would be subject to enterprise income tax on its worldwide income at a rate of 25%. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders."

Table of Contents

**Impact of COVID-19 on Our Operations and Financial Performance**

Substantially all of our revenues and workforce are concentrated in China. Our results of operations and financial condition in 2020 have been and will continue to be affected by the spread of COVID-19. The COVID-19 outbreak has impact on China's internet video industry in general. The extent to which COVID-19 impacts our financial position, results of operations and cash flows in 2021 will depend on the future developments of the outbreak, including new information concerning the global severity of and actions taken to contain the outbreak, which are highly uncertain and unpredictable. In addition, our financial position, results of operations and cash flows could be adversely affected to the extent that the outbreak harms the Chinese economy in general.

In the first part of 2020, in response to the intensifying efforts to contain the spread of COVID-19, the Chinese government took a number of actions, which included extending the Chinese New Year holiday, quarantining individuals suspected of having COVID-19, asking residents in China to stay at home and to avoid public gathering, among other things. During the early part of 2020, COVID-19 caused temporary closure of many corporate offices and store fronts across China, and we experienced growth in the number of subscribing members driven by the increased entertainment demand during the pandemic as a result. Subsequently, the number of subscribing members in the fourth quarter of 2020 decreased as compared with that in the second and the third quarter of 2020. Our member acquisition and engagement may fluctuate depending on factors beyond our control, and we cannot predict member acquisition and engagement levels as the situation of the pandemic changes. In addition, our online advertising services revenue decreased in 2020 as compared to 2019, due to the challenging macroeconomic environment in China. However, our online advertising services revenue has been rebounding since the second quarter of 2020. We cannot guarantee that such decrease will not occur again in the future.

During the first part of 2020, we took a series of measures in response to the outbreak, including, among others, remote working arrangements for our employees. We temporarily shut down some of our premises and facilities, following all legal directions and safety guidelines with respect to our premises and facilities in operation. These measures, if taken again in the future, could reduce the capacity and efficiency of our operations, which in turn could negatively affect our results of operations. We strive to provide quality original content to maintain and expand our user base. In addition, we work closely with premium content providers to curate a comprehensive repertoire of blockbuster content. We will pay close attention to the development of the COVID-19 outbreak, perform further assessment of its impact and take relevant measures to minimize the impact.

As of December 31, 2020, we had RMB10,915.3 million (US$1,672.8 million) and RMB25.2 million (US$3.9 million) in cash and cash equivalents and restricted cash, respectively. Our cash and cash equivalents primarily consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased. Our principal sources of liquidity have been cash generated from operating activities, as well as the proceeds we received from our public offerings of ordinary shares and our offerings of convertible senior notes.

We believe this level of liquidity is sufficient to successfully navigate an extended period of uncertainty. See also "*Item 3. Key Information—D. Risk Factors— Risks Related to Doing Business in China—We face risks related to health epidemics and other outbreaks, as well as natural disasters, which could significantly disrupt our operations and adversely affect our business, financial condition or results of operation.*"

**Critical accounting policies, judgment and estimates**

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make estimates and assumptions that affect our reporting of, among other things, assets and liabilities, contingent assets and liabilities and total revenues and expenses. On an on-going basis, we evaluate our estimates based on historical experience and on various other assumptions that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Since our financial reporting process inherently relies on the use of estimates and assumptions, our actual results could differ from what we expect. This is especially true with some accounting policies that require higher degrees of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements included elsewhere in this annual report. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our consolidated financial statements.

73

Table of Contents

### Consolidation of Affiliated Entities

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on value-added telecommunication services, internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses, we operate our internet platform and conduct our value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities through our subsidiaries, which obligate us to absorb losses of the affiliated entities that could potentially be significant to them or entitle us to receive economic benefits from the affiliated entities that could potentially be significant to them. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by ASC topic 810, *Consolidation,* because we hold all the variable interests of the affiliated entities and are the primary beneficiary of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurred. We will also continuously reconsider whether we are the primary beneficiary of our affiliated entities as facts and circumstances change. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure."

### Revenue recognition

Our revenues are derived principally from membership services, online advertising services and content distribution. Revenue is recognized when control of promised goods or services is transferred to our customers in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services. VAT are presented as a reduction of revenues. Our revenue recognition policies are set forth as follows.

### Membership services

We offer membership services to subscribing members with various privileges, which primarily include access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others.

When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as "Customer advances and deferred revenue" on the consolidated balance sheets and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from subscribing members for on-demand content purchases and early access to premium content. We are the principal in our relationships where partners, including consumer electronics manufacturers (TVs and cell phones), mobile operators, internet service providers and online payment agencies, provide access to the membership services or payment processing services as we retain control over its service delivery to our subscribing members. Typically, payments made to the partners, are recorded as cost of revenues. For the sale of the right to other membership services, through strategic cooperation with other parties, we recognize revenue on a net basis when we do not control the specified services before they are transferred to the customer.

### Online advertising services

We sell advertising services primarily to third-party advertising agencies and a small portion are sold directly to advertisers. Advertising contracts are signed to establish the price and advertising services to be provided. Pursuant to the advertising contracts, we provide advertisement placements on its websites in different formats, including but not limited to video, banners, links, logos, brand placement and buttons. We perform a credit assessment of the customer to assess the collectability of the contract price prior to entering into contracts. For contracts where we provide customers with multiple performance obligations, primarily for advertisements to be displayed in different spots, placed under different forms and occur at different times, we would evaluate all the performance obligations in the arrangement to determine whether each performance obligation is distinct. Consideration is allocated to each performance obligation based on its standalone selling price and revenue is recognized as each performance obligation is satisfied through our display of the advertisements in accordance with the revenue contracts.

We provide various sales incentives to our customers for meeting certain cumulative purchase volume requirements, including cash rebates to certain third-party advertising agencies and noncash credits which can be used to acquire future online advertising services in certain bundled arrangements, which are negotiated on a contract by contract basis with customers. We account for cash rebates granted to customers as variable consideration which is measured based on the most likely amount of incentive to be provided to customers. Noncash credits granted to customers are considered options to acquire additional services that provide customers with a material right. The contract consideration related to these customer options to acquire additional services are deferred and recognized as revenue when future services are transferred or when the options expire.

*Content distribution*

We generate revenues from sub-licensing content licensed from vendors for cash or through nonmonetary exchanges mainly with other online video broadcasting companies. The exclusive licensing agreements we enter into with the vendors has a specified license period and provide us rights to sub-license these contents to other parties. We enter into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, we are entitled to receive the sub-license fee under the sub-licensing arrangements and do not have any future obligation once we have provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sublicense period). The sub-licensing of content represents a license of functional intellectual property which grants a right to use our licensed copyrights and is recognized at the point in time when the licensed copyright is made available for the customer's use and benefit.

We also enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges based on the fair value of the asset received. Barter sublicensing revenues are recognized in accordance with the same revenue recognition criteria above. We estimate the fair value of the licensed copyrights received using a market approach based on various factors, including the purchase price of similar non-exclusive and/or exclusive contents, broadcasting schedule, cast and crew, theme, popularity and box office. The transaction price of barter transaction revenues is calculated on the individual content asset basis. For a significant barter sublicensing transaction, we further review the fair value by analyzing against the cost of the licensed copyrights bartered out and/or engage a third-party valuation firm to assess the reasonableness of its fair value. The attributable cost of sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright.

*Others*

Other revenues mainly include revenues from online games and live broadcasting.

*Online games*

We operate mobile games including both self-developed (after the business acquisition of Skymoons) and licensed mobile games and generate mobile game revenues from the sale of in-game virtual items, including items, avatars, skills, privileges or other in-game consumables, features or functionality, within the games.

We record revenue generated from mobile games on a gross basis if we act as the principal in the mobile game arrangements under which we control the specified services before they are provided to the customer. In addition, when we act as the principal, we are primarily responsible for fulfilling the promise to provide maintenance services and have discretion in setting the price for the services to the customer. Otherwise, we record revenue on a net basis based on the ratios pre-determined with the online games developers when all the revenue recognition criteria set forth in ASC 606 are met, which is generally when the user purchases virtual currencies issued by the game developers.

For transactions where we are the principal, we determine that the in-game virtual items are identified as performance obligations. We provide on-going services to the end-users who purchase virtual items to gain an enhanced game-playing experience. Accordingly, we recognize revenues ratably over the estimated average playing period of these paying players, starting from the point in time when virtual items are delivered to the players' accounts.

*Live broadcasting*

We operate a live broadcasting platform, iQIYI Show, whereby our users can follow their favorite hosts and shows in real time through live broadcasting. Our users can purchase virtual currency for usage in iQIYI Show to acquire consumable virtual gifts, which are simultaneously presented to hosts to show their support or time-based virtual items, which enables users to enjoy additional functions and privileges for a specified time period.

We operate the live broadcasting platform and determine the price of virtual items sold. Therefore, revenues derived from the sale of virtual items are recorded on a gross basis as we act as the principal in the transaction. Costs incurred from services provided by the hosts are recognized as cost of revenues. To facilitate the sale of virtual items, we bundle special privileges and virtual items as a package at a discounted price and we allocate the arrangement consideration to each performance obligation based on their relative standalone selling prices. Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as "Customer advances and deferred revenue" on the consolidated balance sheets.

75

Table of Contents

*Contract balances*

When either party to a revenue contract has performed, we present the contract in the consolidated balance sheets as a contract asset or a contract liability, depending on the relationship between the entity's performance and the customer's payment. Contract assets represent unbilled amounts related to our rights to consideration for advertising services delivered and are included in "Prepayments and other assets" on the consolidated balance sheets. Contract liabilities are our obligation to transfer goods or services to customers for which we have received consideration from customers, which are comprised of: i) payments received for membership fees and other services; ii) virtual currency sold for which the corresponding services have not yet been provided to customers; and iii) noncash credits granted to customers. Contract liabilities are primarily presented as "Customer advances and deferred revenue" on the consolidated balance sheets.

*Practical Expedients and Exemptions*

We do not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which we recognize revenue at the amount to which we have the right to invoice for services performed.

*Business Combinations*

We account for our business combinations using the acquisition method of accounting in accordance with ASC topic 805, *Business Combinations* ("ASC 805"). The acquisition method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. We also evaluate all contingent consideration arrangements to determine if the arrangements are compensatory in nature. If we determine that a contingent consideration arrangement is compensatory, the arrangement would be accounted for outside of the business combination and recorded as compensation expense in the post-acquisition financial statements of the combined entity. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons.

*Long-term investments*

Our long-term investments consist of equity securities without readily determinable fair values, equity method investments, available-for-sale debt securities accounted for at fair value and equity securities with readily determinable fair value.

Equity investments, except for those accounted for under the equity method, those that result in consolidation of the investee and certain other investments, are measured at fair value in accordance with ASC topic 321, *Investments—Equity Securities* ("ASC 321") and any changes in fair value are recognized in earnings. For equity securities without readily determinable fair values and do not qualify for the existing practical expedient in ASC topic 820, *Fair Value Measurements and Disclosures* ("ASC 820") to estimate fair value using the net asset value per share (or its equivalent) of the investment, we elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any. Equity securities with readily determinable fair values are measured at fair value, and any changes in fair value are recognized in earnings.

Investments in entities in which we can exercise significant influence and hold an investment in voting common stock or in-substance common stock (or both) of the investee but do not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323, *Investments—Equity Method and Joint Ventures* ("ASC 323"). Under the equity method, we initially record our investments at cost and the difference between the cost of the equity investee and the amount of the underlying equity in the net assets of the equity investee is accounted for as if the investee was a consolidated subsidiary. We subsequently adjust the carrying amount of the investments to recognize our proportionate share of each equity investee's net income or loss into earnings after the date of investment. Intra-entity profits and losses shall be eliminated until realized by us or investee as if the investee was consolidated. We evaluate the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in the consolidated statements of comprehensive loss when the decline in value is determined to be other-than-temporary.

76

Available-for-sale debt securities are convertible debt instruments issued by private companies, which are measured at fair value, with interest income recorded in earnings and unrealized gains or losses recorded in accumulated other comprehensive income.

### *Adoption of ASU 2019-02*

In March 2019, the FASB issued ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02") which includes the following major changes from previous legacy GAAP that are applicable to us:

- the content distinction for capitalization of production costs of an episodic television series and production costs of films is removed;

- entities are required to test films and license agreements for program material for impairment at a film group level when the film or license agreements are predominantly monetized with other films and license agreements;

- entities shall assess estimates of the use of a film in a film group and account for such changes prospectively;

- cash outflows for the costs incurred to obtain rights for both produced and licensed content are required to be reported as operating cash outflows in the statement of cash flows.

We adopted ASU 2019-02 on January 1, 2020, using a prospective transition method. For the year ended December 31, 2020, cash outflows for the costs incurred to acquire licensed copyrights are reported as operating cash outflows in the consolidated statement of cash flows whereas they were reported as investing cash outflows prior to the adoption of ASU 2019-02. There was no material impact to the consolidated balance sheet or consolidated statement of comprehensive loss. See the updated accounting policies for Produced Content and Licensed Copyrights for further details.

### *Produced content, net*

We produce original content in-house and collaborates with external parties. Produced content primarily consists of films, episodic series, variety shows and animations. The costs incurred in the physical production of original content includes direct production costs, production overhead and acquisition costs. Production costs for original content that are predominantly monetized in a film group are capitalized and reported separately as non-current assets with caption of "Produced content, net" on the consolidated balance sheets. Production costs for original content predominantly monetized on its own are capitalized to the extent that they are recoverable from total revenues expected to be earned ("ultimate revenue"); otherwise, they are expensed as cost of revenues. Ultimate revenue estimates include revenue expected to be earned from all sources, including exhibition, licensing, or exploitation of produced content if we have demonstrated a history of earning such revenue. We estimate ultimate revenue to be earned during the estimated useful lives of produced content based on anticipated release patterns and historical results of similar produced content, which are identified based on various factors, including cast and crew, target audience and popularity. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Exploitation costs are expensed as incurred.

Based on factors including historical and estimated future viewership consumption patterns, we amortize film costs for produced content that is predominantly monetized in a film group. For produced content that is monetized on its own, we consider historical and estimated usage patterns to determine the pattern of amortization for film costs. Based on the estimated patterns, we amortize produced content using an accelerated method over its estimated useful lives within ten years, beginning with the month of first availability and such costs are included in "Cost of revenues" in the consolidated statements of comprehensive loss.

### *Licensed copyrights, net*

Licensed copyrights consist of professionally-produced content, such as films, television series, variety shows and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability is recorded when the cost of the content is known, the content is accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our platform. Licensed copyrights are presented on the consolidated balance sheets as current and non-current based on estimated time of usage.

The licensed copyrights include the right to broadcast and, in some instances, the right to sublicense. The broadcasting right, refers to the right to broadcast the content on our own websites and the sublicensing right, refers to the right to sublicense the underlying content to external parties. When licensed copyrights include both broadcasting and sublicensing rights, the content costs are allocated to these two rights upon initial recognition, based on the relative proportion of the estimated total revenues that will be generated by each right over its estimated useful lives.

77

For the right to broadcast the contents on our own websites that generates online advertising and membership services revenues, based on factors including historical and estimated future viewership patterns, the content costs are amortized using an accelerated method by content categories over the shorter of each content's contractual period or estimated useful lives within ten years, beginning with the month of first availability. Content categories accounting for most of our content include newly released drama series, newly released movies, animations, library drama series and library movies. Estimates of future viewership consumption patterns and estimated useful lives are reviewed periodically, at least on an annual basis and revised, if necessary. Revisions to the amortization patterns are accounted for as a change in accounting estimate prospectively in accordance with ASC topic 250, *Accounting Changes and Error Corrections* ("ASC 250"). For the right to sublicense the content to external parties that generates direct content distribution revenues, the content costs are amortized based on its estimated usage pattern and recorded as cost of revenues.

**Impairment of licensed copyrights and produced content**

Our business model is mainly subscription and advertising based, as such the majority of the content assets (licensed copyrights and produced content) are predominantly monetized with other content assets, whereas a smaller portion of the content assets are predominantly monetized at a specific title level such as variety shows and investments in a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Because the identifiable cash flows related to content launched on the Mainland China platform are largely independent of the cash flows of other content launched on the overseas platform, we have identified two separate film groups. We review our film groups and individual content for impairment when there are events or changes in circumstances that indicate the fair value of a film group or individual content may be less than its unamortized costs. Examples of such events or changes in circumstances include, a significant adverse change in technological, regulatory, legal, economic, or social factors that could affect the fair value of the film group or the public's perception of a film or the availability of a film for future showings, a significant decrease in the number of subscribers or forecasted subscribers, or the loss of a major distributor, a change in the predominant monetization strategy of a film that is currently monetized on its own, actual costs substantially in excess of budgeted costs, substantial delays in completion or release schedules, or actual performance subsequent to release failing to meet expectations set before release such as a significant decrease in the amount of ultimate revenue expected to be recognized.

When such events or changes in circumstances are identified, we assess whether the fair value of an individual content (or film group) is less than its unamortized film costs, determines the fair value of an individual content (or film group) and recognizes an impairment charge for the amount by which the unamortized capitalized costs exceed the individual content's (or film group's) fair value. We mainly use a discounted cash flow approach to determine the fair value of an individual content or film group, for which the most significant inputs include the forecasted future revenues, costs and operating expenses attributable to an individual content or the film group and the discount rate. An impairment loss attributable to a film group is allocated to individual licensed copyrights and produced content within the film group on a pro rata basis using the relative carrying values of those assets as we cannot estimate the fair value of individual contents in the film group without undue cost and effort.

*Goodwill*

Goodwill represents the excess of the purchase price over the fair value of the identifiable net assets acquired in a business combination. We assess goodwill for impairment in accordance with ASC subtopic 350-20, *Intangibles – Goodwill and Other: Goodwill* ("ASC 350-20"), which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

A reporting unit is defined as an operating segment or one level below an operating segment referred to as a component. We determine reporting units by first identifying its operating segments, and then assesses whether any components of these segments constituted a business for which discrete financial information is available and where our segment manager regularly reviews the operating results of that component. We have one reporting unit because components below the consolidated level either did not have discrete financial information or their operating results were not regularly reviewed by the segment manager.

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment*, which simplifies the accounting for goodwill impairment by eliminating Step two from the goodwill impairment test. If the carrying amount of a reporting unit exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess, versus determining an implied fair value in Step two to measure the impairment loss. We adopted this guidance on a prospective basis on January 1, 2020 with no material impact on its consolidated financial statements and related disclosures as a result of adopting the new standard.

78

We have the option to assess qualitative factors first to determine whether it is necessary to perform the quantitative impairment test in accordance with ASC 350-20. If we believe, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. The quantitative goodwill impairment test, used to identify both the existence of impairment and the amount of impairment loss, compares the fair value of a reporting unit with its carrying amount, including goodwill. If the carrying amount of a reporting unit is greater than zero and its fair value exceeds its carrying amount, goodwill of the reporting unit is considered not impaired.

As of December 31, 2019 and 2020, the carrying amount of a reporting unit is greater than zero and the fair value of our reporting unit was substantially greater than the respective carrying value, and therefore goodwill related to our reporting unit was not impaired.

### Impairment of long-lived assets other than goodwill

We evaluate long-lived assets, such as fixed assets and purchased or acquired intangible assets with finite lives other than licensed copyrights and produced content, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC subtopic 360-10, *Property, Plant and Equipment: Overall* ("ASC 360-10"). When such events occur, we assess the recoverability of the long-lived assets based on the undiscounted future cash flows the long-lived assets are expected to generate at the lowest level of identifiable cash flows. We recognize an impairment loss when the estimated undiscounted future cash flow expected to result from the use of the long-lived assets plus net proceeds expected from the eventual disposition of the long-lived assets, if any, is less than their carrying values. If we identify an impairment, we reduce the carrying value of the long-lived assets to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different.

### Income taxes

We follow the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. We record a valuation allowance to offset deferred tax assets if, based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. We have elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss.

We apply the provisions of ASC topic 740, *Accounting for Income Taxes* ("ASC 740"), to account for uncertainty in income taxes. ASC 740 prescribes a recognition threshold a tax position is required to meet before being recognized in the financial statements. We recognize in our consolidated financial statements the benefit of a tax position if a tax return position or future tax position is "more likely than not" to be sustained under examination based solely on the technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. Our estimated liability for unrecognized tax benefits are periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and or developments with respect to tax audits, and the expiration of the statute of limitations. As each audit is concluded, adjustments, if any, are recorded in our financial statements. Additionally, in future periods, changes in facts and circumstances, and new information may require us to adjust the recognition and measurement estimates with regard to changes in individual tax position. Changes in recognition and measurement estimates are recognized in the period which the change occurs.

### Share-based compensation

We account for share-based compensation in accordance with ASC topic 718, *Compensation-Stock Compensation* ("ASC 718").

We have elected to recognize share-based compensation using the straight-line method for all share-based awards granted with graded vesting based on service conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved. Forfeiture rates are estimated based on historical experience and future expectations of employee turnover rates and are periodically reviewed. If required vesting conditions are not met and the share-based awards are forfeited, previously recognized compensation expense relating to those awards are reversed. We elect to estimate forfeitures at the time of grant and revised, if necessary, in the subsequent period if actual forfeitures differ from initial estimates. To the extent we revise these estimates in the future, the share-based payments could be materially impacted in the period of revision, as well as in following periods. Share-based compensation expense was recorded net of estimated forfeitures such that expense was recorded only for those share-based awards that are expected to vest.

79

For the year ended December 31, 2018, we account for share-based awards issued to non-employees in accordance with ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees* ("ASC 505-50"). The measurement date of the fair value of a share-based award issued to a non-employee is the date on which the counterparty's performance is completed as there is no associated performance commitment. The expense is recognized in the same manner as if we had paid cash for the services provided by non-employees.

In June 2018, the FASB issued ASU 2018-07, *Improvements to Nonemployee Share-Based Payment Accounting (Topic 718)* ("ASU 2018-07"). Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which will reduce volatility in our consolidated statements of comprehensive loss. We adopted ASU 2018-07 from January 1, 2019, using the modified retrospective method. The impact of adopting ASU 2018-07 was insignificant.

We, with the assistance of an independent third-party valuation firm, determined the fair value of share-based awards granted to employees and non-employees, if applicable.

### *Adoption of ASU 2016-13*

In June 2016, the Financial Accounting Standards Board ("FASB") issued ASU 2016-13, *Measurement of Credit Losses on Financial Instruments*, which replaces the incurred loss impairment guidance in legacy GAAP and establishes a single allowance framework for financial assets carried at amortized cost with a methodology that requires consideration of a broader range of information to estimate credit losses. We adopted ASU 2016-13 on January 1, 2020, using a modified retrospective transition method, which resulted in a cumulative-effect adjustment to increase the opening balance of accumulated deficit on January 1, 2020 by RMB94,048, among which credit losses related to accounts receivable and contract assets amounted to RMB83,726.

We maintain an allowance for credit losses for accounts receivable, contract assets and receivables from online payment agencies, which is recorded as an offset to accounts receivable, contract assets and receivables from online payment agencies, and the estimated credit losses charged to the allowance is classified as "Selling, general and administrative" in the consolidated statements of comprehensive loss. When similar risk characteristics exist, we assess collectability and measure expected credit losses on a collective basis for a pool of assets, whereas if similar risk characteristics do not exist, we assess collectability and measures expected credit losses on an individual asset basis. In determining the amount of the allowance for credit losses, we consider historic collection experience, the age of the accounts receivable and contract assets balances, credit quality of our customers, current economic conditions, reasonable and supportable forecasts of future economic conditions, and other factors that may affect the customer's ability to pay.

For debt securities, the allowance for credit losses reflects our estimated expected losses over the contractual lives of the debt securities and is recorded as a charge to "Other income/(loss), net" in the consolidated statements of comprehensive loss. Estimated allowances of credit losses are determined by considering reasonable and supportable forecasts of future economic conditions in addition to information about past events and current conditions.

### Recent Accounting Pronouncements

In August 2020, the FASB issued ASU No. 2020-06, *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"), which focuses on amending the legacy guidance on convertible instruments and the derivatives scope exception for contracts in an entity's own equity. ASU 2020-06 simplifies an issuer's accounting for convertible instruments by reducing the number of accounting models that require separate accounting for embedded conversion features. ASU 2020-06 also simplifies the settlement assessment that entities are required to perform to determine whether a contract qualifies for equity classification. Further, ASU 2020-06 enhances information transparency by making targeted improvements to the disclosures for convertible instruments and earnings-per-share (EPS) guidance, i.e., aligning the diluted EPS calculation for convertible instruments by requiring that an entity use the if-converted method and that the effect of potential share settlement be included in the diluted EPS calculation when an instrument may be settled in cash or shares, adding information about events or conditions that occur during the reporting period that cause conversion contingencies to be met or conversion terms to be significantly changed. This update will be effective for fiscal years beginning after December 15, 2021, and interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, and interim periods within those fiscal years. Entities can elect to adopt the new guidance through either a modified retrospective method of transition or a fully retrospective method of transition. We are currently in the process of evaluating the impact of adopting ASU 2020-06 on its consolidated financial statements and related disclosures.

80

**Results of Operations**

The following table summarizes our consolidated results of operations and as percentages of our total revenues for the years presented.

| | For the year ended December 31, | | | | | | |
| | 2018 | | 2019 | | 2020 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (in thousands, except for percentages) | | | | | | |
| **Revenues:** | | | | | | | |
| Membership services | 10,622,769 | 42.5 | 14,435,611 | 49.8 | 16,491,030 | 2,527,361 | 55.5 |
| Online advertising services | 9,328,061 | 37.3 | 8,270,600 | 28.5 | 6,822,115 | 1,045,535 | 23.0 |
| Content distribution | 2,162,643 | 8.7 | 2,544,221 | 8.8 | 2,660,074 | 407,674 | 9.0 |
| Others | 2,875,643 | 11.5 | 3,743,226 | 12.9 | 3,733,996 | 572,260 | 12.5 |
| **Total revenues** | **24,989,116** | **100.0** | **28,993,658** | **100.0** | **29,707,215** | **4,552,830** | **100.0** |
| **Operating costs and expenses:** | | | | | | | |
| Cost of revenues(1) | (27,132,811) | (108.6) | (30,348,342) | (104.7) | (27,884,395) | (4,273,470) | (93.9) |
| Selling, general and administrative(1) | (4,167,889) | (16.7) | (5,236,007) | (18.1) | (5,187,835) | (795,070) | (17.5) |
| Research and development(1) | (1,994,652) | (8.0) | (2,667,146) | (9.2) | (2,675,494) | (410,037) | (9.0) |
| Total operating costs and expenses | (33,295,352) | (133.3) | (38,251,495) | (131.9) | (35,747,724) | (5,478,577) | (120.4) |
| **Operating loss** | **(8,306,236)** | **(33.3)** | **(9,257,837)** | **(31.9)** | **(6,040,509)** | **(925,747)** | **(20.4)** |
| Total other expenses, net | (676,194) | (2.7) | (967,050) | (3.3) | (943,368) | (144,578) | (3.2) |
| **Loss before income taxes** | **(8,982,430)** | **(36.0)** | **(10,224,887)** | **(35.2)** | **(6,983,877)** | **(1,070,325)** | **(23.6)** |
| Income tax benefit | (78,801) | (0.3) | (51,852) | (0.2) | (23,276) | (3,567) | (0.1) |
| Net loss | **(9,061,231)** | **(36.3)** | **(10,276,739)** | **(35.4)** | **(7,007,153)** | **(1,073,892)** | **(23.7)** |

Note:

(1)   Share-based compensation expense was allocated as follows:

| | For the year ended December 31, | | | |
| | 2018 | 2019 | 2020 | |
| | RMB | RMB | RMB | US$ |
| | (in thousands) | | | |
| Cost of revenues | 83,351 | 171,053 | 201,970 | 30,953 |
| Selling, general and administrative | 368,598 | 675,278 | 851,416 | 130,485 |
| Research and development | 104,262 | 238,189 | 316,709 | 48,538 |
| Total | 556,211 | 1,084,520 | 1,370,095 | 209,976 |

***Year Ended December 31, 2020 Compared with Year Ended December 31, 2019***

***Revenues***

Our revenues increased by 2.5% from RMB28,993.7 million in 2019 to RMB29,707.2 million (US$4,552.8 million) in 2020.

*Membership services*. Our membership services revenue increased by 14.2% from RMB14,435.6 million in 2019 to RMB16,491.0 million (US$2,527.4 million) in 2020, primarily driven by the increase in the members' willingness to pay for the premium content that we have been offering, especially our self-produced blockbuster titles, such as the Mist Theater (迷雾剧场) that was launched in June 2020, and other operational initiatives we have introduced. The number of subscribing members has historically been the main driver for our membership services revenue. We track the number of subscribing members as a key indicator for membership revenue growth, and our operational efforts have also been primarily aimed at growing this number. We have seen significant fluctuation in the number of subscribing members throughout 2020. The number of subscribing members as of March 31, 2020 was 118.9 million, an increase of 23% as compared to March 31, 2019, primarily driven by our strong content launch and the increased entertainment demand during the mass COVID-19-related quarantine in early 2020. However, the number of subscribing members decreased by 4.9% year-over-year to 101.7 million as of December 31, 2020, as compared to 106.9 million as of December 31, 2019, mainly attributable to the weakening in certain content categories, particularly films, that resulted from the COVID-19 pandemic. Excluding individuals with trial memberships, the number of subscribing members decreased by 4.8% from 105.7 million as of December 31, 2019 to 100.7 million as of December 31, 2020. Despite the fluctuation in the number of subscribing members, we achieved growth in membership services revenue for the whole year of 2020 as members were more willing to pay for the premium content that we have been offering. We are dedicated to providing more diversified original content on our platform to increase both the number of subscribing members and the members' willingness to pay.

Table of Contents

*Online advertising services*. Our online advertising services revenue decreased by 17.5% from RMB8,270.6 million in 2019 to RMB6,822.1 million (US$1,045.5 million) in 2020, as a result of the challenging macroeconomic environment in China, and the tightened advertising budget of advertisers and intensified competition in the advertising industry, as well as the tightened regulatory environment and the uncertainty of certain content scheduling in the early stage of the COVID-19 pandemic in the first quarter of 2020. Our online advertising services revenue has been rebounding since the second quarter of 2020 as our advertisers gradually recovered their advertising budgets. Average brand advertising revenue per brand advertiser increased by 11.3% from RMB5.9 million in 2019 to RMB6.6 million (US$1.0 million) in 2020. Average brand advertising revenue per brand advertiser is the main driver for our online advertising services revenue. We track the average brand advertising revenue per brand advertiser as a key indicator to evaluate our advertising services business and adapt our sales strategy, advertisement solutions and content scheduling accordingly.

*Content distribution*. Our content distribution revenue increased by 4.6% from RMB2,544.2 million in 2019 to RMB2,660.1 million (US$407.7 million) in 2020, primarily caused by the increase of high-quality content that were available for distribution to other platforms.

*Others*. Other revenues was RMB3,734.0 million (US$572.3 million), which remained stable as compared to RMB3,743.2 million in 2019.

### Cost of revenues

Our cost of revenues decreased by 8.1% from RMB30,348.3 million in 2019 to RMB27,884.4 million (US$4,273.5 million) in 2020.

*Content cost*. Content cost decreased by 6.1% from RMB22,246.8 million in 2019 to RMB20,885.5 million (US$3,200.8 million) in 2020. The RMB1,361.3 million decrease was primarily due to lower content costs recorded relating to licensed copyrights and self-produced content, more shorter length content to satisfy the diversified users' demand, as well as update of accounting estimates of future viewership consumption patterns and useful lives of content assets to better reflect the expected usage of these content assets.

Bandwidth cost. Our bandwidth cost decreased by 16.2% from RMB2,920.0 million in 2019 to RMB2,445.7 million (US$374.8 million) in 2020, primarily as a result of the enhanced operational efficiency supporting our user traffic.

### Gross (loss)/profit

As a result of the foregoing, we had gross loss of RMB1,354.7 million and gross profit of RMB1,822.8 million (US$$279.4 million) in 2019 and 2020, respectively. Our gross (loss)/profit are calculated by subtracting cost of revenues from revenues. Our gross (loss)/profit as a percentage of total revenues improved from 2019 to 2020, which was primarily attributed by the decrease of content cost while the membership services revenue increases. We expect our cost of revenues to continue to increase as we are committed to producing and acquiring more high-quality and popular content to enrich user experience and to support our overseas expansion in order to achieve long-term success. We will devote more resources on original content productions. Although we achieved gross profit in 2020, we cannot guarantee that we will continue to be able to hold such position in the future. For specific factors that may constrain our ability to reverse our gross loss, see "Item 3. Key Information—D. Risk Factors—Risk Factors—Risks Related to Our Business and Industry—We have incurred net losses since our inception and may continue to incur losses in the future."

### Selling, general and administrative expenses

Selling expenses decreased by 13.4% from RMB3,984.2 million in 2019 to RMB3,448.5 million (US$528.5 million) in 2020, primarily due to the decrease in marketing and promotional expenses. Our marketing and promotional expenses decreased by 16.4% from RMB2,757.2 million in 2019 to RMB2,304.8 million (US$353.2 million) in 2020, which was primarily due to the lower spending on user acquisition channels, offline branding activities and content promotions.

General and administrative expenses increased by 38.9% from RMB1,251.8 million in 2019 to RMB1,739.3 million (US$266.6 million) in 2020, primarily due to the increase in personnel compensation expenses and provision for credit losses. Our general and administrative personnel compensation expenses increased by 13.9% from RMB808.1 million in 2019 to RMB920.3 million (US$141.0 million) in 2020, primarily due to increased share based compensation expenses. Our general and administrative personnel headcount increased from 551 as of December 31, 2019 to 563 as of December 31, 2020.

82

*Research and development expenses*

Our research and development expenses was RMB2,675.5 million (US$410.0 million) in 2020, which remained stable as compared with RMB2,667.1 million in 2019. Our research and development personnel compensation expenses increased slightly from RMB2,357.5 million in 2019 to RMB2,376.0 million (US$364.1 million) in 2020, primarily due to the slightly increased share based compensation expenses.

*Income tax expense*

In 2019, RMB51.9 million income tax expense was recognized, which resulted from RMB129.2 million current year income tax and RMB77.3 million deferred income tax benefit. In 2020, RMB23.3 million (US$3.6 million) income tax expense was recognized, which resulted from RMB65.3 million (US$10.0 million) current year income tax and RMB42.0 million (US$6.4 million) deferred income tax benefit.

*Net loss*

As a result of the foregoing, we had net losses of RMB10,276.7 million and RMB7,007.2 million (US$1,073.9 million) in 2019 and 2020, respectively.

*Year Ended December 31, 2019 Compared with Year Ended December 31, 2018*

For a detailed description of the comparison of our operating results for the year ended December 31, 2019 to the year ended December 31, 2018, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Results of Operation—Year Ended December 31, 2019 Compared with Year Ended December 31, 2018" of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 12, 2020.

**Inflation**

To date, inflation in the PRC has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the year-over-year percent changes in the consumer price index for December 2018, 2019 and 2020 were increases of 1.9%, 4.5% and 0.2%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in the PRC. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

**Impact of Foreign Currency Fluctuation**

See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment." and "Item 11. Quantitative and Qualitative Disclosures About Market Risk—Foreign Exchange Risk."

**Impact of Governmental Policies**

See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China" and "Item 4. Information on the Company—B. Business Overview—Government Regulations."

**B.      Liquidity and Capital Resources**

As of December 31, 2020, we had RMB10,915.3 million (US$1,672.8 million) and RMB25.2 million (US$3.9 million) in cash and cash equivalents and restricted cash, respectively. Our cash and cash equivalents primarily consist of cash on hand and highly liquid investments, which are unrestricted from withdrawal or use, or which have original maturities of three months or less when purchased. Our restricted cash mainly represents restricted deposits used as collateral against short-term loans. As of December 31, 2020, we had RMB3,358.2 million (US$514.7 million) in short-term investments. Our short-term investments consisted of held-to-maturity debt securities and available-for-sale debt securities with maturities of less than one year purchased from commercial banks and other financial institutions.

83

Table of Contents

Our total current liabilities were RMB24,854.6 million (US$3,809.1 million) as of December 31, 2020, which primarily included RMB7,561.5 million (US$1,158.9 million) in accounts and notes payable, RMB4,752.1 million (US$728.3 million) in current portion of convertible senior notes, RMB3,444.9 million (US$528.0 million) in customer advances and deferred revenue and RMB2,966.0 million (US$454.6 million) in short-term loans.

Historically, we have not been profitable nor generated positive net cash flows (if excluding the net proceeds we received in our initial public offering, our convertible notes offerings and our ADSs offering). Accounts and notes payable amounted to RMB8,212.4 million and RMB7,561.5 million (US$1,158.9 million) as of December 31, 2019 and 2020, respectively. A substantial majority of our accounts and notes payable is due to third party content providers. The decrease in accounts and notes payable was primarily because we shortened the number of turnover days by financing arrangements mentioned as follows.

We prudently manage our working capital to support our business and operations. In terms of financing activities, we have been actively seeking additional financings to improve our liquidity position. In April 2018, we completed the initial public offering of our ADSs, and received net proceeds of RMB14.9 billion.

We have conducted the below debt and equity financing activities since our initial public offering:

- In December 2018, we completed an offering of US$750 million in aggregate principal amount of convertible senior notes due 2023. In March 2019, we completed an offering of US$1.2 billion in aggregate principal amount of convertible senior notes due 2025. In connection with these convertible notes offering, we also entered into capped call transactions. The holders of the 2023 Notes may require us to repurchase all or portion for cash on December 1, 2021, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest. As a result, RMB4,752.1 million (US$728.3 million) of the net carrying amount of the 2023 Notes was included in the current liabilities as of December 31, 2020.

- In December 2020, we completed the offering of the US$800 million convertible senior notes due 2026 and 40,000,000 ADSs at the price of US$17.50 per ADS. The underwriters exercised their option in full to purchase an additional US$100 million aggregate principal amount of the convertible senior notes due 2026 and their option in part to purchase 4,594,756 additional ADSs, which closed on January 8, 2021.

We have also conducted the following asset-backed debt securities transactions and structured payable arrangements:

- In December 2018 and November 2019, our suppliers sold certain receivables due from us, which were recorded as accounts payable in our consolidated balance sheets totaling RMB525.3 million and RMB587.0 million, respectively, to certain financial institutions at a discount. The factored receivables were further transferred to a securitization vehicle and used to securitize debt securities issued to third-party investors with a stated interest rate ranging from 5.0%-5.5% for gross proceeds of RMB446.0 million and RMB500.0 million, respectively. Concurrently, we also entered into an agreement with the financial institutions to extend the repayment of the underlying payables to mirror the repayment terms for the asset-back debt securities, maturing from December 2019 to November 2021.

- In 2020, we entered into structured payable arrangements with certain banks and other financial institutions, pursuant to which the suppliers' receivables collection process was accelerated through selling their receivables from us to the contracting banks and other financial institutions at a discount. We were legally obligated to pay the banks or other financial institutions in the amount totaling RMB395.9 million (US$60.7 million), maturing within one year. As of December 31, 2020, the outstanding borrowings from the factoring arrangements were RMB390.3 million (US$59.8 million), which is repayable within one year.

In terms of business initiatives, we will (i) continue to pursue strategies to increase our revenues from membership services, online games services, live broadcasting services and in-feed advertising services, where customers usually prepay for our services, (ii) continue to work closely with our advertising customers and suppliers in order to optimize our payment terms, and (iii) continue to strengthen our content production capabilities in order to gain more pricing power over our content sourcing efforts.

We believe that our current cash and cash equivalents, restricted cash, short-term investments and proceeds and lines of credit/financing available to us and our anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures for at least the next 12 months. We may, however, need additional capital in the future to fund our continued operations. The issuance and sale of additional equity would result in further dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could result in operating covenants that would restrict our operations. We have taken a series of measures to improve our working capital position. As we will continue to invest in both original and licensed content and technology to support our growth, we may not be able to improve our working capital position or to maintain

the surplus beyond the next 12 months. In the future, should we require additional liquidity and capital resources to fund our business and operations, we may need to obtain additional financing, including financing from new and/or existing shareholders, and financing generated through capital market and commercial banks. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business and Industry—We have significant working capital requirements and have historically experienced working capital deficits. If we continue to experience such working capital deficits in the future, our business, liquidity, financial condition and results of operations may be materially and adversely affected."

As of December 31, 2020, 19.9% of our cash and cash equivalents, restricted cash and short-term investments were held in the PRC, while 11.8% of our cash and cash equivalents, restricted cash and short-term investments were held by our consolidated affiliated entities and their subsidiaries.

Although we consolidate the results of our consolidated affiliated entities and their subsidiaries, we only have access to the assets or earnings of our consolidated affiliated entities and their subsidiaries through our contractual arrangements with our consolidated affiliated entities and their shareholders. See "Item 4. Information on the Company—C. Organizational Structure" For restrictions and limitations on liquidity and capital resources as a result of our corporate structure, see "Item 5. Operating and Financial Review and Prospects—Holding company structure." We may make additional capital contributions to our PRC subsidiaries, establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, make loans to our PRC subsidiaries, or acquire offshore entities with business operations in China in offshore transactions. However, most of these uses are subject to PRC regulations and approvals. For example:

- capital contributions to our PRC subsidiaries must be registered with the SAMR or its local counterparts, and reported to the competent commerce authorities through the enterprise registration system and the National Enterprise Credit Information Publicity System; and

- loans by us to our PRC subsidiaries to finance their activities cannot exceed the difference between its registered capital and its total investment amount as recorded in the foreign investment comprehensive management information system or, as an alternative, only procure loans subject to the Risk-Weighted Approach and the Net Asset Limits and must be registered with SAFE or its local branches or filed with SAFE in its information system.

See "Item 4. Information on the Company—B. Business Overview—Government Regulations—Regulations on Foreign Exchange." There is, in effect, no statutory limit on the amount of capital contribution that we can make to our PRC subsidiaries. This is because there is no statutory limit on the amount of registered capital for our PRC subsidiaries, and we are allowed to make capital contributions to our PRC subsidiaries by subscribing for their initial registered capital and increased registered capital, provided that the PRC subsidiaries complete the relevant filing and registration procedures. With respect to loans to the PRC subsidiaries by us, (i) if the relevant PRC subsidiaries determine to adopt the traditional foreign exchange administration mechanism, or the Current Foreign Debt mechanism, the outstanding amount of the loans shall not exceed the difference between the total investment and the registered capital of the PRC subsidiaries and there is, in effect, no statutory limit on the amount of loans that we can make to our PRC subsidiaries under this circumstance since we can increase the registered capital of our PRC subsidiaries by making capital contributions to them, subject to the completion of relevant registrations, and the difference between the total investment and the registered capital will increase accordingly; and (ii) if the relevant PRC subsidiaries determine to adopt the foreign exchange administration mechanism as provided in the PBOC Notice No. 9, or the Notice No. 9 Foreign Debt mechanism, the risk-weighted outstanding amount of the loans, which shall be calculated based on the formula provided in the PBOC Notice No. 9, shall not exceed 200% of the net asset of the relevant PRC subsidiary. According to the PBOC Notice No. 9, after a transition period of one year since the promulgation of the PBOC Notice No. 9, the PBOC and SAFE will determine the cross-border financing administration mechanism for the foreign-invested enterprises after evaluating the overall implementation of the PBOC Notice No. 9. As of the date hereof, neither PBOC nor SAFE has promulgated and made public any further rules, regulations, notices or circulars in this regard. It is uncertain which mechanism will be adopted by PBOC and SAFE in the future and what statutory limits will be imposed on us when providing loans to our PRC subsidiaries.

A majority of our future revenues are likely to continue to be in the form of Renminbi. Under existing PRC foreign exchange regulations, Renminbi may be converted into foreign exchange for current account items, including profit distributions, interest payments and trade and service related foreign exchange transactions.

Our PRC subsidiaries may convert Renminbi amounts that they generate in their own business activities, including technical consulting and related service fees pursuant to their contracts with the consolidated affiliated entities, as well as dividends they receive from their own subsidiaries, into foreign exchange and pay them to their non-PRC parent companies in the form of dividends. However, current PRC regulations permit our PRC subsidiaries to pay dividends to us only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. Each of our PRC subsidiaries is required to set aside at least 10% of its after-tax profits after making up previous years' accumulated losses each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. These reserves are not distributable as cash dividends. Furthermore, capital account transactions, which include foreign direct investment and loans, must be approved by and/or registered with SAFE and its local branches. The total amount of loans we can make to our PRC subsidiaries cannot exceed statutory limits and must be registered with the local counterpart of SAFE. The statutory limit for the total amount of foreign debts of a foreign-invested company is the difference between the amount of total investment as approved by the MOFCOM and the amount of registered capital of such foreign-invested company, however, there are uncertainties regarding the interpretation of the Foreign Investment Law and the PBOC Notice No. 9, as well as their impact on the implementation of the Provisions on Ratio of the Registered Capital to the Total Investment.

The following table sets forth a summary of our cash flows for the periods indicated.

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2018** | **2019** | **2020** | |
| | **RMB** | **RMB** | **RMB** | **US$** |
| | (in thousands) | | | |
| **Summary Consolidated Cash Flow Data:** | | | | |
| Net cash provided by/(used for) operating activities | 2,884,186 | 3,906,227 | (5,411,071) | (829,283) |
| Net cash (used for)/provided by investing activities | (20,949,094) | (11,749,571) | 159,296 | 24,412 |
| Net cash provided by financing activities | 23,474,959 | 7,880,306 | 9,373,906 | 1,436,615 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 617,386 | 112,265 | (91,293) | (13,991) |
| Net increase in cash, cash equivalents and restricted cash | 6,027,437 | 149,227 | 4,030,838 | 617,753 |
| Cash, cash equivalents and restricted cash at the beginning of the year | 733,010 | 6,760,447 | 6,909,674 | 1,058,954 |
| Cash, cash equivalents and restricted cash at the end of the year | 6,760,447 | 6,909,674 | 10,940,512 | 1,676,707 |

*Net cash provided by/(used for) operating activities*

Net cash used for operating activities was RMB5,411.1 million (US$829.3 million) in 2020, as compared to net cash provided by operating activities of RMB3,906.2 million in 2019, which was primary due to an increase of cash outflow for operating assets and liabilities by RMB12,406.5 million from RMB4,206.6 million in 2019 to RMB16,613.3 million (US$2,546.1 million) in 2020 and a decrease of non-cash items by RMB180.3 million from RMB18,389.7 million in 2019 to RMB18,209.4 million (US$2,790.7 million) in 2020, offset by a decrease in net loss by RMB3,269.5 million from RMB10,276.7 million to RMB7,007.2 million (US$1,073.9 million) in 2020. The increase of cash outflow for operating assets and liabilities was primarily due to the reclassification of cash outflows for costs incurred to acquire licensed contents from investing activities to operating activities starting from January 1, 2020 due to the adoption of ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials*. The decrease in non-cash items was primarily due to decreases of amortization and impairment of licensed copyrights, decreases of amortization and impairment of intangible assets and increases of barter transaction revenues, which was offset by increases of amortization and impairment of produced content, driven by continuous business expansion to maintain our market leadership.

Net cash provided by operating activities increased from RMB2,884.2 million in 2018 to RMB3,906.2 million in 2019, due to the combined effect of an increase in net loss by RMB1,215.5 million from RMB9,061.2 million in 2018 to RMB10,276.7 million in 2019, an increase of non-cash items by RMB2,870.1 million from RMB15,519.6 million in 2018 to RMB18,389.7 million in 2019, and an increase of cash outflow for operating assets and liabilities by RMB632.4 million from RMB3,574.2 million in 2018 to RMB4,206.6 million in 2019. The increase of non-cash items was primarily due to increases of amortization and impairment of licensed copyrights and intangible assets, which are driven by continuous business expansion to maintain our market leadership, accretion on convertible senior notes, fair value change and impairment of long-term investments, share-based compensation, as a result of retaining and providing long-term incentives to key employees, and decrease of non-cash barter sublicensing revenues driven by increased cash sub-license transactions. The increase of cash outflow for operating assets and liabilities was primarily because we shortened the number of turnover days.

Table of Contents

*Net cash (used for)/provided by investing activities*

Net cash provided by investing activities of RMB159.3 million (US$24.4 million) in 2020, as compared to net cash used for investing activities RMB11,749.6 million in 2019, which was primary due to (i) a decrease in acquisition of licensed copyrights by RMB11,957.5 million from RMB11,957.5 million in 2019 to nil in 2020 because of the reclassification of cash outflows for costs incurred to acquire licensed contents from investing activities to operating activities starting from January 1, 2020 due to the adoption of ASU 2019-02; and (ii) decreased cash outflow from purchasing of debt securities by RMB7,778.6 million from RMB22,959.3 million in 2019 to RMB15,180.7 million (US$2,326.5 million) in 2020, and (iii) decreased cash inflow from maturities of debt securities by RMB8,105.0 million from RMB24,739.2 million in 2019 to RMB16,634.2 million (US$2,549.3 million) in 2020.

Net cash used for investing activities decreased from RMB20,949.1 million in 2018 to RMB11,749.6 million in 2019 primarily due to (i) decreased cash outflow from investing in debt securities by RMB6,664.1 million from net cash outflow of RMB4,884.2 million in 2018 to net cash inflow of RMB1,779.9 million in 2019; (ii) a decrease of acquisition of licensed copyrights by RMB1,084.6 million from RMB13,042.1 million in 2018 to RMB11,957.5 million in 2019 because we have increased our expenditures on original content production; and (iii) there was no significant business acquisition in 2019 like the acquisition of Skymoons in the amount of RMB1,018.0 million in 2018.

*Net cash provided by financing activities*

Net cash provided by financing activities increased from RMB7,880.3 million in 2019 to RMB9,373.9 million (US$1,436.6 million) in 2020, primarily due to net cash inflow generated by proceeds from follow-on offering of our ADSs of RMB4,457.0 million (US$683.1 million) in 2020, which was offset by decreases of net cash inflow of convertible senior notes by RMB2,758.6 million from issuance of the 2025 Notes in 2019 of RMB7,909.5 million and issuance of the 2026 Notes of RMB5,150.9 million (US$789.4 million) in 2020.

Net cash provided by financing activities decreased from RMB23,475.0 million in 2018 to RMB7,880.3 million in 2019, primarily due to (i) proceeds of RMB14,896.8 million from our IPO in 2018, and (ii) decrease of net cash inflow from loans by RMB3,402.2 million from RMB3,751.8 million in 2018 to RMB349.6 million in 2019, partially offset by increase of net cash inflow generated by issuance of convertible senior notes and purchase of capped calls by RMB2,772.5 million from RMB4,569.9 million in 2018 to RMB7,342.4 million in 2019.

*Capital Expenditures*

Our capital expenditures are incurred primarily in connection with leasehold improvements, computers and servers. Our capital expenditures were RMB611.9 million, RMB740.2 million and RMB240.8 (US$36.9 million) in the years ended December 31, 2018, 2019 and 2020, respectively.

Our capital expenditures may increase in the future as our business offerings continue to diversify, as well as delayed expenditures in 2020 due to COVID-19 pandemic. We currently plan to fund these expenditures with our current cash and cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

**Holding Company Structure**

iQIYI, Inc. is a holding company with no material operations of its own. We conduct our operations primarily through our PRC subsidiaries, our consolidated affiliated entities and their subsidiaries in China. As a result, iQIYI, Inc.'s ability to pay dividends depends upon dividends paid by our PRC subsidiaries. If our existing PRC subsidiaries or any newly formed ones incur debt on their own behalf in the future, the instruments governing their debt may restrict their ability to pay dividends to us. In addition, our wholly foreign-owned subsidiaries in China are permitted to pay dividends to us only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. Under PRC law, each of our subsidiaries and our consolidated affiliated entities in China is required to set aside at least 10% of its after-tax profits each year, if any, to fund certain statutory reserve funds until such reserve funds reach 50% of its registered capital. In addition, each of our wholly foreign-owned subsidiaries in China may allocate a portion of its after-tax profits based on PRC accounting standards to enterprise expansion funds and staff bonus and welfare funds at its discretion, and our consolidated affiliated entities may allocate a portion of their after-tax profits based on PRC accounting standards to a discretionary surplus fund at its discretion. The statutory reserve funds and the discretionary funds are not distributable as cash dividends. Remittance of dividends by a wholly foreign-owned company out of China is subject to examination by the banks designated by SAFE. Our PRC subsidiaries have not paid dividends and will not be able to pay dividends until they generate accumulated profits and meet the requirements for statutory reserve funds.

The table below sets forth the respective revenues contribution and assets of iQIYI, Inc. and our wholly-owned subsidiaries and our consolidated affiliated entities as of the dates and for the years indicated:

| | Total revenues(1) | | | Total assets | | |
| | For the year ended December 31, | | | As of December 31, | | |
| | 2018 | 2019 | 2020 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| iQIYI, Inc. and its wholly-owned subsidiaries | 8.0% | 7.3% | 7.7% | 53.9% | 52.2% | 53.0% |
| Consolidated affiliated entities | 92.0% | 92.7% | 92.3% | 46.1% | 47.8% | 47.0% |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Notes:

(1)    The percentages exclude the inter-company transactions and balances between iQIYI, Inc. and its wholly-owned subsidiaries and the consolidated affiliated entities.

## C.      Research and Development, Patents and Licenses, etc.

*Technology*

Technology is the bedrock of our products and services. Approximately half of our employees, excluding general and administrative employees, are engineers dedicated to technological innovation and breakthrough. We utilize AI technology to drive the entire business, including video content creation, purchase, production, tagging, distribution, monetization and customer service, to achieve automation and intelligence in the entire business process. Our advanced technologies facilitate better content production, enhanced operation efficiency and superior user experience. To maintain our industry-leading position, we have established extensive cooperation with many industry-leading research institutes.

*Technologies to enhance Content Production and Operation Efficiency*

We empower content production and monetization cycle by applying various technologies. Leveraging our massive user data and big data analytics, we have developed a comprehensive system for script evaluation and casting. Our holistic data analysis supports content investment strategy through advanced algorithms that forecast video views and film box office, which result in more monetization opportunities and higher user value. Promising monetization capabilities then encourage the generation and distribution of more high-quality content on iQIYI platform, creating a virtuous cycle.

Our technologies also enhance our efficiency. We have leveraged AI, big data, and cloud computing technologies to distribute our massive content to targeted users accurately. Our user and content tagging system precisely analyzes user profile and conduct content recommendation. We provide personalized content distribution by intelligent recommendations. We balance user experience with video monetization by utilizing personalized and automatic advertising customized to video scenarios, video-in, video-out and other ad-marketing technology. We provide timely response and feedback service through AI-based autonomous service robots and online customer service center.

*Technologies to Enhance User Experience*

Our advanced video, audio and AI technologies provide users with superior viewing experience in a cost-effective manner. We are one of a few internet video streaming services in China providing concurrent 4K high-definition video quality, HDR (High Dynamic Range) imaging, Dolby Atmos® audio effect and immersive experience via 360 VR for live video streaming. We provide users with clear and smooth video play through adaptive coding technology. Leveraging our big data analytics, features such as AI Radar and Watch Me Only support real-time recognition and search of information from video images, or allow users to view only the segments featuring particular artists. We have one of the world's largest P2P and CDN-based HCDN (hybrid content delivery network), which seamlessly distributes and transmits massive internet video with high quality and low bandwidth cost. We apply advanced deep learning technology to areas such as advanced content tagging, user profiling, developing knowledge graph and content recommendation. Users are given recommendations based on automatic classification of their tags. Our iQIYI VR app provides an immersive viewing experience via 360 VR. QiYu 4K VR HMD is one of the first 4K mobile VR devices in the world with 3D audio.

In the years ended December 31, 2018, 2019 and 2020, our research and development expenditures, including share-based compensation expenses for research and development staff, were RMB1,994.7 million, RMB2,667.1 million and RMB2,675.5 (US$410.0 million), respectively, representing 8.0%, 9.2% and 9.0% of our total revenues for the years ended December 31, 2018, 2019 and 2020, respectively. Our research and development expenses consist primarily of personnel-related costs (including share-based compensation expenses).

D.    **Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the period from January 1, 2018 to December 31, 2020 that are reasonably likely to have a material effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions.

E.    **Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. In addition, we have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or product development services with us.

E.    **Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations by specified categories as of December 31, 2020.

| | Payment due by period | | | | | |
| | **Total** | **2021** | **2022** | **2023** | **2024** | **2025 and after** |
|---|---|---|---|---|---|---|
| | (in RMB thousands) | | | | | |
| Long-Term Debt and Convertible Senior Notes Obligations[1] | 21,403,433 | 1,500,109 | 548,916 | 5,443,692 | 365,400 | 13,545,316 |
| Capital Lease Obligations[2] | 31,683 | 14,052 | 14,052 | 3,579 | — | — |
| Operating Lease Obligations[3] | 1,231,441 | 206,475 | 200,204 | 145,255 | 78,449 | 601,058 |
| Purchase Obligations[4] | 21,881,290 | 10,504,596 | 6,264,638 | 3,439,884 | 1,291,700 | 380,472 |
| **Total** | 44,547,847 | 12,225,232 | 7,027,810 | 9,032,410 | 1,735,549 | 14,526,846 |

Notes:

(1)    In 2019, we entered into a two-year loan agreement with JPMorgan Chase Bank, N.A., pursuant to which we were entitled to borrow a secured RMB denominated loan of RMB800.0 million for general working capital purposes. In 2019, we drew down RMB447.9 million with an interest rate of 3.55%. Pursuant to the agreement, the principal shall be repaid by installments from 2019 to 2021. Principal repayments were made on the loan when they became due and amounted to RMB3.0 million and RMB34.2 million (US$5.2 million) for the years ended December 31, 2019 and 2020, respectively.

In November 2019, our suppliers sold certain 2019 receivables due from us (the "2019 factored receivables") which were recorded as accounts payable in our consolidated balance sheets totaling RMB587.0 million to the financial institutions at a discount. The 2019 factored receivables were further transferred to a securitization vehicle and used to securitize debt securities issued to third-party investors with a stated interest of 5.1% for gross proceeds of RMB500.0 million. Concurrently, we also entered into an agreement with the financial institutions to extend the repayment of the underlying payables to mirror the repayment terms for the asset-back debt securities, maturing in November 2021. The borrowings have an effective interest rate of 5.97%.

As of December 31, 2020, the outstanding borrowings from our asset-backed debt securities were RMB498.3 million (US$76.4 million), which will mature in one year and are included in "Long-term loans, current portion" in the consolidated balance sheets.

On December 4, 2018, we issued US$750 million convertible senior notes (the "2023 Notes"). The 2023 Notes are senior, unsecured obligations of us, and interest is payable semi-annually in cash at a rate of 3.75% per annum on June 1 and December 1 of each year, beginning on June 1, 2019. The 2023 Notes will mature on December 1, 2023 unless redeemed, repurchased or converted prior to such date. The holders may require us to repurchase all or a portion of the 2023 Notes for cash on December 1, 2021, or upon a fundamental change.

On March 29, 2019, we issued US$1,200 million convertible senior notes (the "2025 Notes"). The 2025 Notes are senior, unsecured obligations of us, and interest is payable semi-annually in cash at a rate of 2.00% per annum on October 1 and April 1 of each year, beginning on October 1, 2019. The 2025 Notes will mature on April 1, 2025 unless redeemed, repurchased or converted prior to such date. The holders may require us to repurchase all or a portion of the 2025 Notes for cash on April 1, 2023, or upon a fundamental change.

On December 21, 2020, we issued US$800 million convertible senior notes (the "2026 Notes"). The 2026 Notes are senior, unsecured obligations of us, and interest is payable semi-annually in cash at a rate of 4.00% per annum on June 15 and December 15 of each year, beginning on June 15, 2021. The 2026 Notes will mature on December 15, 2026, unless repurchased, redeemed or converted prior to such date. The holders may require us to repurchase all or a portion of the 2026 Notes for cash on August 1, 2024, or upon a fundamental change.

The 2023 Notes, the 2025 Notes and the 2026 Notes are collectively referred to as the "Notes". As of December 31, 2020, the principal amount of the liability component of the Notes were RMB17,953.7 million (US$2,751.5 million), unamortized debt discount were RMB1,274.9 million (US$195.4 million), and net carrying amount of the liability component were RMB16,678.8 million (US$2,556.1 million), respectively. RMB4,752.1 million (US$728.3 million) of the 2023 Notes will become repayable within the next twelve months and are classified as "Convertible senior notes, current portion" in the consolidated balance sheets. As of December 31, 2020, the carrying amount of the equity component of the Notes were RMB1,744.2 million (US$267.3 million), respectively.

For further information, please see "Loans Payable" under Note 14 and "Convertible Senior Notes" under Note 15 to our consolidated financial statements included elsewhere in this annual report.

(2)    Capital lease obligations represent our obligations for the finance leases of fixed assets.

(3)    Operating lease obligations represent our obligations for leasing office premises and internet data center facilities.

(4)    Purchase obligations represent our future minimum payments under non-cancelable agreements for licensed copyrights, produced content and property management fees.

Other than the contractual obligations set forth above, we do not have any contractual obligations that are long-term debt obligations, capital/operating lease obligations, purchase obligations or other long-term liabilities reflected on our balance sheet as of December 31, 2020.

**G.    Safe Harbor**

See "Forward-Looking Statements."

**ITEM 6.    DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES**

**A.    Directors and Executive Officers**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Robin Yanhong Li | 52 | Chairman of the Board |
| Yu Gong | 52 | Chief Executive Officer and Director |
| Herman Yu | 50 | Director |
| Chuan Wang | 51 | Director |
| Haifeng Wang | 49 | Director |
| Dou Shen | 41 | Director |
| Sam Hanhui Sun | 48 | Independent Director |
| Jane Jie Sun | 52 | Independent Director |
| Xiaodong Wang | 46 | Chief Financial Officer |
| Xiaohui Wang | 52 | Chief Content Officer |
| Wenfeng Liu | 42 | Chief Technology Officer |
| Xiangjun Wang | 43 | Chief Marketing Officer |
| Xianghua Yang | 44 | Senior Vice President |
| Youqiao Duan | 51 | Senior Vice President |

*Robin Yanhong Li* has served as the chairman of our board of directors since 2009. Mr. Li is the co-founder, chairman and chief executive officer of Baidu. Prior to founding Baidu, Mr. Li worked as an engineer for Infoseek, a pioneer in the internet search engine industry, from 1997 to 1999. Mr. Li currently serves on the boards of New Oriental Education & Technology Group Inc. (NYSE: EDU) and Trip.com Group Limited (Nasdaq: TCOM). Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Yu Gong* is the founder, chief executive officer and director of our company, and oversees our overall strategy and business operations. Prior to founding iQIYI, Dr. Gong was the president and chief operating officer of umessage.com, a top mobile internet services solution provider in China. Prior to that, Dr. Gong served in the roles of vice president, senior vice president, and chief operating officer at Sohu.com, a Nasdaq-listed company, from 2003 to 2008. From 1999 to 2003, Dr. Gong was the founder and chief executive officer of focus.cn, the then largest real estate search website in China, which was sold to Sohu.com. (Nasdaq: SOHU) Dr. Gong received a bachelor's degree, a master's degree and a doctorate degree in automation control from Tsinghua University.

*Herman Yu* has served as our director since 2017. Mr. Yu is currently the chief financial officer of Baidu. Prior to joining Baidu in September 2017, Mr. Yu was the chief financial officer of Weibo Corporation (Nasdaq: WB) between 2015 and 2017. From 2004 to 2015, Mr. Yu worked at Sina Corporation (Nasdaq: SINA), serving as its chief financial officer in the last eight years. Mr. Yu began his career in the Silicon Valley, where he held various finance and accounting management positions at Adobe Systems Inc., Cadence Design Systems, Inc. and VeriFone Systems, Inc. Mr. Yu serves on the boards of 58.com Inc. (NYSE: WUBA) and ZTO Express Inc. (NYSE: ZTO). Mr. Yu, a California Certified Public Accountant, holds a bachelor's degree in economics from the University of California and a master's degree in accountancy from the University of Southern California.

*Chuan Wang* has served as our director since 2014. Mr. Wang is a co-founder of Xiaomi Corporation and joined Xiaomi in 2012. Mr. Wang is currently a senior vice president of Xiaomi Corporation. Mr. Wang is also a co-founder of Beijing Duokan Technology, where he served as chief executive officer since inception in 2010. From 2005 to 2011, Mr. Wang served as the general manager of Beijing Thunder Stone Century Technology Co., Ltd. Mr. Wang serves on the boards of Xunlei Limited (Nasdaq: XNET) and Zhejiang Huace Film & TV Co., Ltd. (300133: CH). Mr. Wang holds a bachelor's degree from Beijing University of Technology.

*Haifeng Wang*, Ph.D. has served as our director since June 2018. Dr. Wang joined Baidu in 2010 and was promoted to chief technology officer in May 2019. Dr. Wang oversees our intelligent cloud business, research and development efforts in artificial intelligence as well as other technology groups. From 2014 to 2017, Dr. Wang oversaw Baidu's core search products. Currently he serves as president of National Engineering Laboratory for Deep Learning Technology and Applications. Dr. Wang is a fellow of the Association for Computational Linguistics (ACL). He obtained his bachelor's, master's, and Ph.D. degrees in computer science at the Harbin Institute of Technology.

*Dr. Dou Shen* has served as our director since September 2019. Dr. Shen currently serves as executive vice president of Baidu. Dr. Shen has served in various other roles since joining Baidu in 2012, including in search, display advertising and financial services group. Prior to Baidu, Dr. Shen served as a researcher at Microsoft's AdCenter Labs. He was also founder of Buzzlabs, a social media analytics company that was later acquired by IAC-owned CityGrid Media. Dr. Shen is currently the vice-chair of KDDC (China chapter of ACM in data-mining). Dr. Shen holds a bachelor's degree in engineering from North China Electric Power University, a master's degree in engineering from Tsinghua University, and a Ph.D. in computer science from Hong Kong University of Science and Technology.

*Sam Hanhui Sun* has served as our independent director since March 2018. Mr. Sun has been the chairman of VSP Zhuhai Asset Management Company since January 2021 and a venture partner at Blue Lake Capital since 2016. From 2010 to 2015, Mr. Sun served various positions at Qunar Cayman Islands Limited, a Nasdaq-listed company, including Qunar's president in 2015 and its chief financial officer from 2010 to 2015. From 2007 to 2009, Mr. Sun was the chief financial officer of KongZhong Corporation, a Nasdaq-listed company. From 2004 to 2007, Mr. Sun served in several financial controller positions at Microsoft China R&D Group, Maersk China Co. Ltd., and SouFun.com. From 1995 to 2004, Mr. Sun worked in KPMG's auditing practice group. Mr. Sun currently serves as a director on the boards of Yirendai Ltd. (NYSE: YRD) and CAR Inc. (SEHK: 699). Mr. Sun received a bachelor's degree in business administration from Beijing Institute of Technology in 1993. He is a Certified Public Accountant in China.

*Jane Jie Sun* has served as our director since June 2018. Ms. Sun currently serves as the chief executive officer and a member of the board of directors of Trip.com Group Limited (Nasdaq: TCOM) ("Trip.com"). Ms. Sun first joined Trip.com as its chief financial officer in 2005, and later served as its chief operating officer and co-president, before serving as its chief executive officer in 2016. Ms. Sun is a member of International Chamber of Commerce Executive Board, a member of JPMorgan Asia Pacific Council, a member of Standard Chartered Bank International Advisory Board, vice chair of the World Travel & Tourism Council, a member of Vice-Chancellor's Circle of Oxford University, a member of the President's Advisory Council for Public Health of Brown University, co-chair of the Development Advisory Board of University of Michigan and Shanghai Jiao Tong University Joint Institute, and a member of the board of directors and business leaders group committee of Business China. In 2019, she was awarded an Asia Society Asia Game Changer award and joined as a member of the Asia Society Board of Trustee. Forbes named her one of the Emergent 25 Asia's Latest Star Businesswomen in 2018, and one of the Most Influential and Outstanding Businesswomen in China in 2017. She was also named one of Fortune's Top 50 Most Powerful Women in Business, and one of FastCompany's Most Creative People in Business in 2017. During her tenure at Trip.com, she also won the Institutional Investor Awards for the Best CEO and the Best CFO. Ms. Sun received her bachelor's degree from the business school of the University of Florida with high distinction. She also obtained her LLM degree from Peking University Law School.

Table of Contents

*Xiaodong Wang* has served as our chief financial officer since 2013 and is in charge of our finance and legal functions. Between 2013 and 2016, Mr. Wang served in our company on a secondment basis. Prior to officially joining iQIYI in 2017, Mr. Wang served as vice president of Baidu for financial planning and analysis, responsible for treasury, budgeting and related analysis between 2009 and 2016. From 2003 to 2009, Mr. Wang served as senior manager of General Motors in Shanghai, responsible for budgeting, cost control, pricing and other related functions. From 1998 to 2000, Mr. Wang served in Dupont China as financial specialist responsible for Dupont trading. Mr. Wang holds a bachelor's degree in economics from Tsinghua University and a master's degree in accounting and finance from The London School of Economics and Political Science.

*Xiaohui Wang* joined us in 2016 as our chief content officer. Mr. Wang is responsible for the procurement, production and operations of content business. From 2019, Mr. Wang also serves as president of our newly formed Professional Content Business Group (PCG). Prior to joining iQIYI, Mr. Wang was vice president of China National Radio, where he served in various positions from 1990 to 2016, including director of news center from 2002 to 2006, director of finance office from 2006 to 2007, and vice president from 2007 to 2016. Mr. Wang holds a bachelor's degree in journalism from Jilin University, a master's degree in business administration from Cheong Kong Graduate School of Business and a Ph.D. in literature from the Communication University of China.

*Wenfeng Liu* joined us in 2012 and is our chief technology officer. From 2019, Mr. Liu also serves as president of our newly formed Infrastructure and Intelligent Content Distribution Business Group (IIG). Mr. Liu served as our vice president of technology, IT operation, product marketing and business development. Prior to joining us, Mr. Liu served as research and development manager from 2011 to 2012 at VMware China Research Center, where he led the research, development and distribution of various update and maintenance releases of Vmware vSphere projects. From 2003 to 2011, Mr. Liu served in various senior positions at Intel China Research Center, including the role of research and development manager between 2007 to 2011, in which position he spearheaded Intel's various global R&D initiatives. Mr. Liu holds a bachelor's degree and a master's degree in computer science from Zhejiang University.

*Xiangjun Wang* joined us in 2009 and is our chief marketing officer, responsible for marketing and advertising sales. Since 2009, Ms. Wang has held various positions related to our sales and marketing functions. Prior to joining us, Ms. Wang was a sales director responsible for advertising sales at Sohu.com (Nasdaq: SOHU), where she served various positions from 2003 to 2009. Ms. Wang holds an associate's degree from Donghua University.

*Xianghua Yang* joined us in 2010 and is our senior vice president responsible for membership business. From 2019, Mr. Yang also serves as president of our newly formed Membership and Oversea Business Group (MOG). Mr. Yang led iQIYI Pictures from 2014 to 2016 and led our mobile business department from 2010 to 2014. Prior to joining iQIYI, Mr. Yang served as deputy general manager of wireless business department at Sohu.com, responsible for R&D, marketing and mobile business. Mr. Yang holds both bachelor's and master's degrees in hydraulic and hydroelectric engineering from Tsinghua University.

*Youqiao Duan* joined us in 2012 and is our senior vice president responsible for intelligent device business. Prior to joining us, Mr. Duan was senior director responsible for investment business at Skyworth Group, where he worked from 2008 to 2012. Prior to that, he served as director at Asiamedia, responsible for DVB and IPTV business. From 2002 to 2006, he worked at DTVIA where he last served as vice president of DVB business. From 1999 to 2002, he worked at focus.cn where he last served as vice president. Mr. Duan holds a bachelor's degree in automation control from Tsinghua University.

**B.      Compensation of Directors and Executive Officers**

For the fiscal year ended December 31, 2020, we paid an aggregate of RMB35.9 million (US$5.5 million) in cash to our executive officers and directors. We have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. Our PRC subsidiaries and consolidated affiliated entity are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, unemployment insurance and other statutory benefits and a housing provident fund. For share incentive grants to our officers and directors, see "—B. Compensation of Directors and Executive Officers—Share Incentive Plans."

**Employment Agreements and Indemnification Agreements**

We have entered into an employment agreement with each of our executive officers. Under these agreements, each of our executive officers is employed at will. We may terminate employment for cause. We may also terminate an executive officer's employment without cause upon 60-day advance written notice. In such case of termination by us, we will provide severance payments to the executive officer as agreed by us and the executive officer. The executive officer may resign at any time with a 60-day advance written notice.

Table of Contents

Each executive officer has agreed to hold, both during and after the termination or expiry of his or her employment agreement, in strict confidence and not to use, except as required in the performance of his or her duties in connection with the employment or pursuant to applicable law, any of our confidential information or trade secrets, any confidential information or trade secrets of our customers or prospective customers, or the confidential or proprietary information of any third party received by us and for which we have confidential obligations. The executive officers have also agreed to disclose in confidence to us all inventions, designs and trade secrets which they conceive, develop or reduce to practice during the executive officer's employment with us and to assign all right, title and interest in them to us, and assist us in obtaining and enforcing patents, copyrights and other legal rights for these inventions, designs and trade secrets.

In addition, each executive officer has agreed to be bound by non-competition and non-solicitation restrictions during the term of his or her employment and typically for one year following the last date of employment. Specifically, each executive officer has agreed not to (i) approach our suppliers, clients, direct or end customers or contacts or other persons or entities introduced to the executive officer in his or her capacity as a representative of us for the purpose of doing business with such persons or entities that will harm our business relationships with these persons or entities; (ii) assume employment with or provide services to any of our competitors, or engage, whether as principal, partner, licensor or otherwise, any of our competitors, without our express consent; or (iii) seek directly or indirectly, to solicit the services of, or hire or engage, any person who is known to be employed or engaged by us; or (iv) otherwise interfere with our business or accounts.

We have also entered into indemnification agreements with each of our directors and executive officers. Under these agreements, we agree to indemnify our directors and executive officers against liabilities and expenses incurred by such persons in connection with claims made by reason of their being a director or officer of our company.

**Share Incentive Plans**

***The 2010 Plan***

We adopted the 2010 Plan on October 18, 2010, which was subsequently amended and restated on November 3, 2014, August 6, 2016 and September 15, 2020, for the purpose of granting share based compensation awards either through a proprietary interest in our long-term success, or compensation based on fulfilling certain performance goals to employees, officers, directors and consultants to incentivize their performance and promote the success of our business. Under the 2010 Plan, the maximum aggregate number of shares which may be issued pursuant to all awards is 589,729,714 shares. As of February 28, 2021, options to purchase a total of 413,376,684 ordinary shares were outstanding under the 2010 Plan.

The following paragraphs summarize the terms of the 2010 Plan.

*Types of Awards*. The Plan permits the awards of options, share appreciation rights, share grants and restricted share units.

*Plan Administration*. A committee consisting of at least two individuals determined by our board acts as the plan administrator. The plan administrator will determine the participants who are to receive awards, the number of awards to be granted, and the terms and conditions of each award grant. The plan administrator can amend outstanding awards and interpret the terms of the 2010 Plan and any award agreement.

*Award Agreement*. Options to purchase ordinary shares granted under the 2010 Plan are evidenced by an award agreement that sets forth the terms and conditions for each grant.

*Exercise Price*. The excises price of an option or a share appreciation right will be determined by the plan administrator, but shall not be less than the fair market value on the grant date of the respective option or share appreciation right. In certain circumstances, such as a recapitalization, a spin-off, reorganization, merger, separation and split-up, the plan administrator may adjust the exercise price of outstanding options and share appreciation rights.

*Eligibility*. We may grant awards to our employees, directors or consultants or employees, directors or consultants or our affiliates.

*Term of the Awards*. Unless otherwise determined by the board of directors, the term of each option or share appreciation right granted under the 2010 Plan shall not exceed ten years from date of the grant.

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule, which is set forth in the award agreement.

93

*Acceleration of Awards upon Change in Control*. The plan administrator may determine, at the time of grant or thereafter, that an award shall become vested and exercisable, in full or in part, in the event that a change in control of our company occurs.

*Transfer Restrictions*. Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination*. The plan shall terminate on October 17, 2030 provided that our board may terminate the plan at any time and for any reason.

### The 2017 Plan

We also adopted the 2017 Plan on November 30, 2017, which was further amended on December 7, 2017, for the purpose of promoting the success and enhance the value of iQIYI, Inc., by linking the personal interests of the members of the board, employees, consultants and other individuals to those of our shareholders and, by providing an incentive for outstanding performance, to generate superior returns for our shareholders. Under the 2017 Plan, the maximum aggregate number of ordinary shares which may be issued pursuant to all awards is 720,000 ordinary shares, all of which have been granted. As of February 28, 2021, 143,125 restricted share units were outstanding under the 2017 Plan.

The following paragraphs summarize the terms of the 2017 Plan.

*Types of Awards*. The Plan permits the awards of options, restricted shares and restricted share units.

*Plan Administration*. A committee of one or more members of the board acts as the plan administrator. The plan administrator will determine the participants who are to receive awards, the type or types of awards to be granted, the number of awards to be granted, and the terms and conditions of each award grant. The plan administrator can amend outstanding awards and interpret the terms of the 2017 Plan and any award agreement.

*Award Agreement*. Awards granted under the 2017 Plan are evidenced by an award agreement that sets forth the terms and conditions for each grant.

*Exercise Price*. The excises price of an option will be determined by the plan administrator, but shall not be less than the fair market value on the grant date of the respective option or share appreciation right. In certain circumstances, such as a recapitalization, a spin-off, reorganization, merger, separation and split-up, the plan administrator may adjust the exercise price of outstanding options and share appreciation rights.

*Eligibility*. We may grant awards to our employees, consultants, and all members of the board, and other individuals.

*Term of the Awards*. The term of each option or share appreciation right granted under the 2017 Plan shall not exceed ten years from date of the grant.

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule, which is set forth in the relevant award agreement.

*Transfer Restrictions*. Awards may not be transferred in any manner by the recipient other than by will or the laws of descent and distribution, except as otherwise provided by the plan administrator.

*Termination*. The plan shall terminate on November 29, 2027, provided that our board may terminate the plan at any time and for any reason. The shares reserved and to be issued under the 2010 Plan and the 2017 Plan have been registered on the Form S-8 on May 24, 2018.

94

Table of Contents

The following table summarizes, as of February 28, 2021, the outstanding options and restricted share units that we granted to our directors and executive officers:

| Name | Class A Ordinary Shares Underlying Options and Restricted Share Units Awarded | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Yu Gong | 146,000,116 | 0.25 to 0.51 | Various dates from 2010/10/18 to 2020/10/16 | Various dates from 2024.12.15 to 2030.10.18 |
| Haifeng Wang | *(1) | N/A | N/A | N/A |
| Dou Shen | *(1) | N/A | N/A | N/A |
| Xiaodong Wang | * | 0.51 | Various dates from 2015/2/23 to 2020/10/16 | Various dates from 2025/2/23 to 2030/10/16 |
| Xiaohui Wang | * | 0.51 | Various dates from 2016/8/5 to 2020/10/16 | Various dates from 2026/8/5 to 2030/10/16 |
| Xiangjun Wang | * | 0.25 to 0.51 | Various dates from 2010/10/18 to 2020/10/16 | Various dates from 2020/10/18 to 2030/10/16 |
| Xianghua Yang | * | 0.25 to 0.51 | Various dates from 2010/10/18 to 2020/10/16 | Various dates from 2020/10/18 to 2030/10/16 |
| Youqiao Duan | * | 0.25 to 0.51 | Various dates from 2012/5/8 to 2020/4/1 | Various dates from 2022/5/8 to 2030/4/1 |
| Wenfeng Liu | * | 0.30 to 0.51 | Various dates from 2014/12/5 to 2020/10/16 | Various dates from 2024/12/5 to 2030/10/16 |
| Total | 218,639,807 | | | |

Notes:

\*    The aggregate number of ordinary shares exercisable from all options granted is less than 1% of our total issued and outstanding ordinary shares.

(1)    In the form of restricted share units.

As of February 28, 2021, other grantees as a group held options to purchase 194,824,971 Class A ordinary shares of our company, with exercise prices ranging from US$0.25 to US$0.51 per share, and 55,031 restricted share units.

**C.    Board Practices**

**Board of Directors**

Our board of directors consists of eight directors. Baidu has the right to appoint a majority of our directors as long as it holds no less than 50% of the voting power of our Company. In addition, some of our directors are also senior management of Baidu. See "Item 3. Key Information—Risk Factors—Risks Related to Our Carve-out from Baidu and Our Relationship with Baidu—We may have conflicts of interest with Baidu and, because of Baidu's controlling ownership interest in our company, we may not be able to resolve such conflicts on terms favorable to us." A director is not required to hold any shares in our company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested provided (i) such director, if his interest in such contract or arrangement is material, has declared the nature of his interest at the earliest meeting of the board at which it is practicable for him to do so, either specifically or by way of a general notice and (ii) if such contract or arrangement is a transaction with a related party, such transaction has been approved by the audit committee. The directors may exercise all the powers of the company to borrow money, mortgage its undertaking, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. None of our non-executive directors has a service contract with us that provides for benefits upon termination of service.

95

**Committees of the Board of Directors**

We have established an audit committee and a compensation committee under the board of directors. We have adopted a charter for each of the two committees. Each committee's members and functions are described below.

*Audit Committee*. Our audit committee consists of Sam Hanhui Sun, Herman Yu and Jane Jie Sun, and is chaired by Mr. Sam Hanhui Sun. We have determined that Sam Hanhui Sun and Jane Jie Sun satisfy the "independence" requirements of Rule 5605(a)(2) of the Listing Rules of the Nasdaq Stock Market and meet the independence standards under Rule 10A-3 under the Exchange Act. We have determined that members including Sam Hanhui Sun and Jane Jie Sun qualify as "audit committee financial experts." Mr. Herman Yu is a non-voting member of the audit committee. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

- reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent registered public accounting firm; and

- reporting regularly to the board.

*Compensation Committee*. Our compensation committee consists of Sam Hanhui Sun and Herman Yu, and is chaired by Mr. Herman Yu. We have determined that Sam Hanhui Sun satisfies the "independence" requirements of Rule 5605(a)(2) of the Listing Rules of the Nasdaq Stock Market. The compensation committee assists the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which their compensation is deliberated upon. The compensation committee is responsible for, among other things:

- reviewing the total compensation package for our executive officers and making recommendations to the board with respect to it;

- approving and overseeing the total compensation package for our executives other than the three most senior executives;

- reviewing the compensation of our directors and making recommendations to the board with respect to it; and

- periodically reviewing and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, and employee pension and welfare benefit plans.

**Duties of Directors**

Under Cayman Islands law, our directors owe fiduciary duties to our company, including a duty of loyalty, a duty to act honestly and a duty to act in what they consider in good faith to be in our best interests. Our directors must also exercise their powers only for a proper purpose. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and Commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association. Our company has the right to seek damages if a duty owed by our directors is breached. In limited exceptional circumstances, a shareholder may have the right to seek damages in our name if a duty owed by our directors is breached.

96

**Terms of Directors and Officers**

Our officers are elected by and serve at the discretion of the shareholders. Our directors are not subject to a term of office and hold office until such time as they are removed from office by the shareholders. A director will be removed from office automatically if, among other things, the director (i) becomes bankrupt or makes any arrangement or composition with his creditors; or (ii) is found to be or becomes of unsound mind.

**D.      Employees**

We had 8,577, 8,889 and 7,721 employees as of December 31, 2018, 2019 and 2020, respectively. As of December 31, 2020, we had 4,185 employees in Beijing and 3,536 employees in other cities in China and overseas. The following table sets forth the number of our employees by function as of December 31, 2020:

| | |
|---|---:|
| Research and development | 3,474 |
| Content production and operation | 2,071 |
| Sales and marketing | 1,613 |
| General and administrative | 563 |
| Total | 7,721 |

Our success depends on our ability to attract, retain and motivate qualified employees. We offer employees competitive salaries, performance-based cash bonuses and other incentives. We believe that we maintain a good working relationship with our employees, and we have not experienced any material labor disputes. None of our employees are represented by labor unions.

As required by laws and regulations in China, we participate in various employee social benefits plans that are organized by municipal and provincial governments, including housing funds, pension, medical insurance, job-related injury insurance, maternity insurance and unemployment insurance. We are required under PRC law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We typically enter into standard confidentiality and employment agreements with our employees. These contracts include a standard non-compete covenant that prohibits the employee from competing with us, directly or indirectly, during his or her employment as well as certain period of time after employment is terminated.

**E.      Share Ownership**

Except as specifically noted, the following table sets forth information with respect to the beneficial ownership of our ordinary shares as of February 28, 2021:

•      each of our directors and executive officers; and

•      each person known to us to own beneficially more than 5% of our ordinary shares.

The calculations in the table below are based on 5,524,994,360 ordinary shares outstanding as of February 28, 2021, comprising of 2,648,602,964 Class A ordinary shares (excluding 269,199,247 Class A ordinary shares issued to our depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards under our share incentive plans, and the 14,880,762 unvested restricted shares issued to certain employees) and 2,876,391,396 Class B ordinary shares.

97

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days, including through the exercise of any option, warrant, or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Ordinary Shares Beneficially Owned | | | | |
| | Class A Ordinary Shares Beneficially Owned (†) | | Class B Ordinary Shares Beneficially Owned (††) | | Voting Power (†††) |
| | Number | % | Number | % | % |
| **Directors and Executive Officers:**** | | | | | |
| Robin Yanhong Li(1) | 7,933,331 | * | 2,876,391,396 | 100.0 | 91.6 |
| Yu Gong(2) | 119,387,385 | 4.3 | — | — | * |
| Herman Yu | — | — | — | — | — |
| Chuan Wang(3) | — | — | — | — | — |
| Haifeng Wang | * | * | — | — | * |
| Dou Shen | * | * | — | — | * |
| Sam Hanhui Sun(4) | — | — | — | — | — |
| Jane Jie Sun(5) | — | — | — | — | — |
| Xiaodong Wang | * | * | — | — | * |
| Xiaohui Wang | * | * | — | — | * |
| Wenfeng Liu | * | * | — | — | * |
| Xiangjun Wang | * | * | — | — | * |
| Xianghua Yang | * | * | — | — | * |
| Youqiao Duan | * | * | — | — | * |
| All directors and executive officers as a group | 195,491,280 | 6.9 | 2,876,391,396 | 100.0 | 91.7 |
| **Principal Shareholders:** | | | | | |
| Baidu Holdings(6) | 7,933,331 | * | 2,876,391,396 | 100.0 | 91.6 |
| Xiaomi Ventures Limited(7) | 341,874,885 | 12.9 | — | — | 1.1 |

Notes:

*     Less than 1%.

* *    Except for Robin Yanhong Li, Herman Yu, Haifeng Wang and Dou Shen, and as indicated otherwise below, the business address of our directors and executive officers is 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing 100080, China. The business address of Robin Yanhong Li, Herman Yu, Haifeng Wang, and Dou Shen is Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, China.

†     For each person and group included in this column, percentage ownership is calculated by dividing the number of Class A ordinary shares beneficially owned by such person or group, including Class A ordinary shares that such person or group has the right to acquire within 60 days of February 28, 2021, by the sum of the total number of Class A ordinary shares outstanding as of February 28, 2021 and the number of Class A ordinary shares underlying the options held by such person or group that are exercisable within 60 days of February 28, 2021.

††    For each person and group included in this column, percentage ownership is calculated by dividing the number of Class B ordinary shares beneficially owned by such person or group, including Class B ordinary shares that such person or group has the right to acquire within 60 days of February 28, 2021, by the sum of the total number of Class B ordinary shares outstanding as of February 28, 2021 and the number of Class B ordinary shares underlying the options held by such person or group that are exercisable within 60 days of February 28, 2021.

†††   For each person or group included in this column, percentage of total voting power represents voting power based on both Class A and Class B ordinary shares held by such person or group, including Class A and Class B ordinary shares that such person or group has the right to acquire within 60 days of February 28, 2021, with respect to all outstanding shares of our Class A and Class B ordinary shares as a single class. Each holder of Class A ordinary shares is entitled to one vote per Class A ordinary share. Each holder of our Class B ordinary shares is entitled to ten votes per Class B ordinary share. Our Class B ordinary shares are convertible at any time by the holder into Class A ordinary shares on a share-for-share basis.

(1)   Mr. Li has the majority voting power in Baidu and is deemed to beneficially own iQIYI's shares held by Baidu Holdings.

98

(2)  Representing (i) 112,952,211 Class A ordinary shares that Dr. Gong may purchase upon exercise of options within 60 days of February 28, 2021, and (ii) 6,435,174 Class A ordinary shares held by Cannes Ventures Limited, a company incorporated in the Cayman Islands. Cannes Ventures Limited is wholly-owned by Dr. Gong. The registered address of Cannes Ventures Limited is 190 Elgin Avenue, George Town, Grand Cayman, Cayman Islands.

(3)  The business address of Mr. Chuan Wang is No.006, Floor 6, Building 6, Yard 33, Middle Xierqi Road, Haidian District, Beijing 100085, China.

(4)  The business address of Sam Hanhui Sun is 3-4-802, 17 Fen-si-ting Avenue, Dongcheng District, Beijing 100009, China.

(5)  The business address of Jane Jie Sun is 968 Jin Zhong Road, Shanghai 200335, China.

(6)  Representing 7,933,331 Class A ordinary shares, in the form of ADSs, and 2,876,391,396 Class B ordinary shares held by Baidu Holdings Limited, a company incorporated in British Virgin Islands. Baidu Holdings is a wholly owned subsidiary of Baidu. The business address of Baidu Holdings Limited is No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, China.

(7)  Representing 341,874,885 Class A ordinary shares held by Xiaomi Ventures Limited as of December 31, 2018, as reported in a Schedule 13G filed by Xiaomi Ventures Limited on February 1, 2019. Xiaomi Ventures Limited is a company incorporated in British Virgin Islands. Xiaomi Ventures Limited is beneficially owned and controlled by Xiaomi Corporation. The registered address of Xiaomi Ventures Limited is c/o P.O. Box 2221, Road Town, Tortola, British Virgin Islands.Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering in April 2018. Holders of our Class B ordinary shares may choose to convert their Class B ordinary shares into the same number of Class A ordinary shares at any time. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstance.

We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. To our knowledge, as of February 28, 2021, 2,304,185,134 of our Class A ordinary shares are held by three record holders in the United States, representing 41.7% of our total issued and outstanding ordinary shares as of such date (excluding 269,199,247 Class A ordinary shares reserved for future issuances upon the exercising or vesting of awards granted under the issuer's share incentive plans, and the 14,880,762 unvested restricted shares issued to certain employees). As of February 28, 2021, none of our Class B ordinary shares are held by record holders in the United States.

For options and restricted share units granted to our officers, directors and employees, see "—B. Compensation of Directors and Executive Officers—Share Incentive Plans."

## ITEM 7.  MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS

### A.  Major Shareholders

See "Item 6. Directors, Senior Management and Employees—E. Share Ownership."

### B.  Related Party Transactions

#### Contractual Arrangements with our VIEs

See "Item 4. Information on the Company—C. Organizational Structure."

#### Transactions with Shareholders and Affiliates

##### *Baidu*

We enjoy significant business synergies with Baidu primarily in the form of complementary content offerings for users and cross-sale of each other's services.

##### *Master Business Cooperation Agreement*

We have entered into a master business cooperation agreement with Baidu on January 19, 2018.

Under the master business cooperation agreement, we and Baidu agree to cooperate with each other in areas including but not limited to AI technology, smart devices/DuerOS (the dialog-type AI system and open platform developed by Baidu), cloud services, online advertising, internet traffic, data and content, and to treat each other as the most preferred strategic partner in our areas of cooperation.

Table of Contents

Specifically, (i) Baidu agrees to cooperate with us on leveraging AI technology to further improve our user experience; (ii) we and Baidu agree to share sales channel resources to promote smart devices/DuerOS and increase iQIYI's market share in its industry; (iii) Baidu agrees to provide support for our cloud computing infrastructure and provide us with cloud computing infrastructure services on Baidu's most favored terms; (iv) we and Baidu agree to cross sell our respective advertising services, and Baidu agrees to grant us priority to advertise on its platform; (v) we and Baidu agree to leverage our respective services to increase user traffic; and (vi) we and Baidu agree to allow our respective registered users and content providers to log onto each other's platforms.

Under this agreement, (i) Baidu agrees not to compete with us in providing video content services that are the same as or substantially similar to our long-form video businesses (with the exception of existing business activities conducted by Baidu and its affiliates and of the business activities conducted by the entity that currently operates Baidu's online video business), and (ii) we agree not to compete with Baidu in any business that is the same as or substantially similar to Baidu's core businesses (with the exception of existing business activities conducted by us or our affiliates). Long-form video business means long-form video content services currently provided by iQIYI, such long-form video content includes, but is not limited to, movies, TV series, network series, cartoons, variety shows, documentaries, etc. Whether any service is Baidu's core business or is the same as or substantially similar to Baidu's core business shall be determined by Baidu and us in a commercially reasonable manner.

The master business cooperation agreement will expire on the eighth anniversary of the date of execution, extendable for a term of eight years upon agreement by both parties. In the event we are no longer controlled by Baidu, either we or Baidu may terminate this agreement.

### Loan Agreement

Under the master business cooperation agreement, Baidu will provide us with a RMB650.0 million (US$99.6 million) loan, which will mature on the fifth anniversary of the grant date. We entered into a loan agreement with Baidu with respect to such loan on January 19, 2018. The loan is interest free.

### Share Purchase Agreement and Ticket Business Cooperation Agreement

On February 12, 2018, we entered into a share purchase agreement with Baidu Holdings, pursuant to which we would issue to Baidu Holdings an aggregate of 36,860,691 Class B ordinary shares. The transaction has closed in April 2018. As consideration for the issuance of such shares and subject to the conditions set forth in the share purchase agreement, Baidu Holdings agreed to (i) undertake certain non-compete obligations towards us with respect to the online movie ticket and show ticket booking business of Baidu Holdings and its affiliates, (ii) direct user traffic related to such ticket business to us, (iii) provide us with technological support with respect to our ticket booking business, (iv) license certain domain names and certain intellectual property rights to us and (v) enter into a ticket business cooperation agreement with us, which has been signed concurrently.

### Termination of Certain Agreements

Pursuant to certain service agreements entered into between Baidu and us in 2011, Baidu was obligated to provide us with user traffic support. We had entered into a termination agreement with Baidu in January 2018, pursuant to which such earlier service agreements (including the traffic support obligations of Baidu therein) were terminated, in exchange for Baidu paying a fee of US$27.0 million to us. The excess of the fee received by us over the book value of the recorded favorable contract asset, amounting to RMB104.2 million, was accounted for as a deemed contribution from the controlling shareholder.

### Transactions with Baidu

For the years ended December 31, 2018, 2019 and 2020, we generated membership services revenue of RMB19.9 million, RMB20.9 million and RMB19.8 million (US$3.0 million), respectively, advertising services revenue of RMB189.5 million, RMB67.5 million and RMB113.9 million (US$17.5 million), respectively, and other revenues of RMB29.3 million, RMB12.3 million and RMB15.4 million (US$2.4 million), respectively, from Baidu.

We incurred cost of revenues for license fees in the amount of RMB8.9 million, RMB23.1 million and RMB13.7 million (US$2.1 million) for the years ended December 31, 2018, 2019 and 2020, respectively. We also incurred cost of revenues for bandwidth in the amount of RMB601.1 million, RMB976.5 million and RMB1,007.5 million (US$154.4 million) for the years ended December 31, 2018, 2019 and 2020, respectively. We also incurred cost of revenues for traffic acquisition and other services in relation with our ticket booking service in the amount of RMB126.6 million, RMB479.5 million and nil for the years ended December 31, 2018, 2019 and 2020, respectively. We incurred selling, general and administrative expenses for advertising services provided by Baidu in the amount of RMB10.8 million, RMB1.8 million and RMB2.5 million (US$0.4 million) for the years ended December 31, 2018, 2019 and 2020, respectively. We incurred research and development expenses for cloud services provided by Baidu in the amount of RMB5.1 million, RMB19.5 million and RMB7.4 million (US$1.1 million) for the years ended December 31, 2018, 2019 and 2020, respectively.

100

As of December 31, 2018, 2019 and 2020, we had RMB103.0 million, RMB35.6 million and RMB38.3 million (US$5.9 million), respectively, due from Baidu. The balance mainly represents amounts due from Baidu for advertising, membership and other services.

As of December 31, 2018, 2019 and 2020, we had RMB421.9 million, RMB1,015.9 million and RMB1,037.8 million (US$159.1 million), respectively, due to Baidu. The related party balances mainly represented accrued expenses for bandwidth services and cloud services provided by Baidu. As of December 31, 2018, 2019 and 2020, we had RMB700.0 million, RMB700.0 million and RMB700.0 million (US$107.3 million), respectively, in loans due to Baidu. As of December 31, 2018, 2019 and 2020, the total outstanding balance represents an interest-free loan of RMB50.0 million that is due on demand, and an interest-free loan of RMB650.0 million provided by Baidu in January 2018 that will mature in January 2023.

On April 12, 2018, we issued to Baidu Holdings an aggregate of 36,860,691 Class B ordinary shares pursuant to a share purchase agreement with Baidu Holdings entered into in February 2018, in exchange for Baidu providing traffic acquisition and other services in relation with our ticket booking service, which was recorded as intangible assets.

### Other Transactions with Related Parties

For the years ended December 31, 2018, 2019 and 2020, we generated content distribution revenue of RMB88.5 million, RMB443.5 million and RMB176.2 million (US$27.0 million), respectively, from equity investees. For the years ended December 31, 2018, 2019 and 2020, we purchased content from equity investees in the amount of RMB182.9 million, RMB909.5 million and RMB1,455.9 million (US$223.1 million), respectively. Other related party transactions, including services provided by/to our equity method investees and other investees measured using measurement alternative in the ordinary course of business were insignificant for each of the years presented.

As of December 31, 2018, 2019 and 2020, we had RMB127.6 million, RMB242.7 million and RMB97.2 million (US$14.9 million), respectively, due from other related parties. The balance mainly represents amounts due from our equity investees for content distribution services or paid in advance by us for licensed copyrights acquisition. We had loan receivables due from our equity investees of RMB104.0 million, RMB105.9 million and nil as of December 31, 2018, 2019 and 2020, respectively. The balance as of December 31, 2019 represents loans provided to one of our equity investee with an interest rate of 5%, which was fully repaid during 2020.

As of December 31, 2018, 2019 and 2020, we had RMB851.8 million, RMB950.3 million and RMB1,018.4 million (US$156.1 million), respectively, due to other related parties. The related party balances mainly represented, (i) deferred revenues in relation to content distribution, IP licensing, advertising services and traffic support services to be provided to one of our equity investees; (ii) amounts owed to our equity investees for licensed copyrights; and (iii) advances made by one of our equity investee for online advertising services as of December 31, 2020.

### Shareholders Agreement

Other than provisions with respect to registration rights, the description of which is set forth below, all provisions and rights under our sixth amended and restated shareholders agreement terminated upon consummation of our initial public offering.

*Demand Registration Rights.* At any time after the earlier of (i) the four-year period following the date of the shareholders agreement or (ii) 180 days after the effective date of the registration statement for a public offering, holders of at least 30% of the registrable securities then outstanding, or Existing Initiating Holders, holders of at least 30% of the registrable securities issued or issuable upon conversion of the Series F preferred shares then outstanding, or Series F Initiating Holders, and holders of at least 30% of the registrable securities issued or issuable upon conversion of the Series G preferred shares then outstanding, or Series G Initiating Holders, have the right to demand that we file a registration statement covering the registration of any registrable securities of such holders. We have the right to defer filing of a registration statement for a period of not more than 90 days after the receipt of the request of the initiating holders under certain conditions, but we cannot exercise the deferral right more than once in any twelve-month period and we cannot register any other share during such twelve-month period. We are not obligated to effect a demand registration if we have, within the six-month period prior to the date of a demand registration request, already effected a registration. We are not obligated to effect more than four demand registrations initiated by the Existing Initiating Holders, more than two demand registrations initiated by the Series F Initiating Holders, or more than two demand registrations initiated by the Series G Initiating Holders, other than demand registration to be effected pursuant to registration statement on Form F-3, for which an unlimited number of demand registrations shall be permitted.

101

*Piggyback Registration Rights.* If we propose to file a registration statement for a public offering of our securities, we must offer holders of our registrable securities an opportunity to include in the registration the number of registrable securities of the same class or series as those proposed to be registered. If the managing underwriters of any underwritten offering determine in its view the number of registrable securities exceeds the maximum offering size, the registrable securities shall allocate first to us, second to each of holders requesting for the inclusion of their registrable securities pursuant to the piggyback registration, and third to holders of our other securities with such priorities among them as we shall determine.

*Form F-3 Registration Rights.* Any of the Existing Initiating Holders, Series F Initiating Holders and Series G Initiating Holders may request us in writing to file an unlimited number of registration statements on Form F-3. Promptly after receiving such request, we shall give written notice of the proposed registration and within 20 days of such notice, we shall effect the registration of the securities on Form F-3.

*Expenses of Registration.* We will bear all registration expenses, other than underwriting discounts and selling commissions incurred in connection with any demand, piggyback or F-3 registration.

**Employment Agreements and Indemnification Agreements**

See "Item 6. Directors, Senior Management and Employees—B. Compensation of Directors and Executive Officers—Employment Agreements and Indemnification Agreements."

**Share Option Grants**

See "Item 6. Directors, Senior Management and Employees—B. Compensation of Directors and Executive Officers—Share Incentive Plans."

**C.      Interests of Experts and Counsel**

Not applicable.

**ITEM 8.          FINANCIAL INFORMATION**

**A.      Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

Following the publication in April 2020 of a short seller report by Wolfpack Research, or the Wolfpack Report, the SEC has asked us to produce certain financial, operating, and other documents and records. We also engaged professional advisers, including a Big Four accounting firm that is not our auditor, to conduct an internal review into certain of the key allegations in the Wolfpack Report and to report their findings to our audit committee. The SEC has also sought the production of certain documents and records from us related to such internal review and other related information. We are cooperating with the SEC. Our internal review within the agreed scope has been substantially completed and did not uncover any evidence that would substantiate the allegations.

Furthermore, starting in April 2020, we and certain of our current and former officers and directors were named as defendants in putative securities class actions filed in federal court, captioned Lee v. iQIYI, Inc. et al., No. 1: 2020-cv-0183 (U.S. District Court for the Eastern District of New York, filed April 16, 2020) (the "*Lee Case*"); Shiferaw v. iQIYI, Inc. et al., No. 1: 2020-cv-03115 (U.S. District Court for the Southern District of New York, filed April 17, 2020) (the "*Shiferaw Case*"); Jenkins v. iQIYI, Inc. et al., No. 4:20-cv-02882 (U.S. District Court for the Northern District of California, filed April 27, 2020) (the "*Jenkins Case*"); and Le Rivage LLC v. iQIYI, Inc. et al., No. 1:20-cv-02653 (U.S. District Court for the Eastern District of New York, filed June 15, 2020) (the "*Le Rivage Case*"). All of these cases were purportedly brought on behalf of a class of persons who allegedly suffered damages as a result of alleged misstatements and omissions in the Company's public disclosure documents. On June 15, 2020, the Shiferaw Case was voluntarily dismissed by plaintiffs. On July 6, 2020, the court granted our motion to transfer the Jenkins Case to the U.S. District Court for the Eastern District of New York. The Lee Case, Jenkins Case, and Le Rivage Case remain in their preliminary stages.

We will have to defend against these putative securities class action lawsuits, as applicable, including any appeals of such lawsuits should our initial defense be unsuccessful. We are currently unable to estimate the possible outcome or loss or possible range of loss, if any, associated with the resolution of these lawsuits. In the event that our initial defense of these lawsuits is unsuccessful, we cannot assure you that we will prevail in any appeal. Any adverse outcome of these cases, including any plaintiff's appeal of a judgment in these lawsuits, could have a material adverse effect on our business, financial condition, results of operation, cash flows, and reputation. Similarly, we are currently unable to predict the duration, outcome, or impact of the SEC investigation of iQIYI, or from the SEC's review of the documents and records requested from us. The litigation or SEC investigation process may utilize a significant portion of our resources and divert management's attention from the day-to-day operations, all of which could harm our business.

102

As of December 31, 2020, 380 cases against us were pending before various courts in China. The aggregate amount of damages sought under these pending cases is approximately RMB269.1 million. We are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial.

In addition, as of December 31, 2020, 1,242 cases brought by us against others for copyright and trademark infringement, unfair competition and other commercial disputes were pending before various courts in China. The aggregate amount of damages we are seeking under these pending cases is approximately RMB924.2 million.

**Dividend Policy**

Our board of directors has complete discretion on whether to distribute dividends. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant.

We do not have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company incorporated in the Cayman Islands. We may rely on dividends from our subsidiaries in China for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends to us. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—We may rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us and any tax we are required to pay could have a material and adverse effect on our ability to conduct our business." If we pay any dividends, we will pay our ADS holders to the same extent as holders of our Class A ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**ITEM 9.        THE OFFER AND LISTING**

**A.    Offering and Listing Details.**

See "—C. Markets."

**B.    Plan of Distribution**

Not applicable.

**C.    Markets**

Our ADSs have been listed on the Nasdaq Global Select Market under the symbol "IQ" since March 29, 2018.

**D.    Selling Shareholders**

Not applicable.

**E.    Dilution**

Not applicable.

**F.    Expenses of the Issue**

Not applicable.

Table of Contents

**ITEM 10.        ADDITIONAL INFORMATION**

**A.        Share Capital**

Not applicable.

**B.        Memorandum and Articles of Association**

The following are summaries of material provisions of our currently effective ninth amended and restated memorandum and articles of association, as well as the Companies Act (as amended) insofar as they relate to the material terms of our ordinary shares.

**Board of Directors**

See "Item 6. Directors, Senior Management and Employees—C. Board Practices."

**Ordinary Shares**

*General.* All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are non-residents of the Cayman Islands may freely hold and vote their ordinary shares. Our company will issue only non-negotiable shares, and will not issue bearer or negotiable shares.

*Register of Members.* Under Cayman Islands law, we must keep a register of members and there should be entered therein:

• the names and addresses of the members, a statement of the shares held by each member, of the amount paid or agreed to be considered as paid, on the shares of each member and whether each relevant category of shares held by a member carries voting rights under the articles of association of the company, and if so, whether such voting rights are conditional;

• the date on which the name of any person was entered on the register as a member; and

• the date on which any person ceased to be a member.

Under Cayman Islands law, the register of members of our company is prima facie evidence of the matters set out therein (i.e. the register of members will raise a presumption of fact on the matters referred to above unless rebutted) and a member registered in the register of members is deemed as a matter of Cayman Islands law to have legal title to the shares as set against its name in the register of members. Once our register of members has been updated, the shareholders recorded in the register of members should be deemed to have legal title to the shares set against their name in the register of members.

If the name of any person is incorrectly entered in or omitted from our register of members, or if there is any default or unnecessary delay in entering on the register the fact of any person having ceased to be a member of our company, the person or member aggrieved (or any member of our company or our company itself) may apply to the Cayman Islands Grand Court for an order that the register be rectified, and the Court may either refuse such application or it may, if satisfied of the justice of the case, make an order for the rectification of the register.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors (provided always that dividends may be declared and paid only out of funds of the Company lawfully available therefor, namely out of either profit, retained earnings or our share premium account, and provided further that a dividend may not be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business).

*Classes of Ordinary Shares.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares (and a further class of authorized but undesignated shares). Except for conversion rights and voting rights, the Class A ordinary shares and Class B ordinary shares shall carry equal rights and rank *pari passu* with one another, including but not limited to the rights to dividends (subject to the ability of the board of directors, under our current memorandum and articles of association, to determine that a dividend shall be paid wholly or partly by the distribution of specific assets (which may consist of the shares or securities of any other company) and to settle all questions concerning such distribution (including fixing the value of such assets, determining that cash payment shall be made to some shareholders in lieu of specific assets and vesting any such specific assets in trustees on such terms as the directors think fit)) and other capital distributions.

*Conversion.* Class B ordinary shares may be converted into the same number of Class A ordinary shares by the holders thereof at any time, while Class A ordinary shares cannot be converted into Class B ordinary shares under any circumstances.

104

*Voting Rights*. Holders of Class A ordinary shares and Class B ordinary shares shall, at all times, vote together as one class on all matters submitted to a vote by the members at any general meeting of the Company. Each Class A ordinary share shall be entitled to one vote on all matters subject to the vote at general meetings of our company, and each Class B ordinary share shall be entitled to ten votes on all matters subject to the vote at general meetings of our company. Voting at any meeting of shareholders is by show of hands unless a poll is demanded. A poll may be demanded by the chairman of such meeting or any one shareholder present in person or by proxy.

Walkers (Hong Kong), our counsel as to Cayman Islands law, has advised that such voting structure is in compliance with current Cayman Islands law as in general terms, a company and its shareholders are free to provide in the articles of association for such rights as they consider appropriate, subject to such rights not being contrary to any provision of the Companies Act and not inconsistent with common law.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attached to the ordinary shares cast by those shareholders entitled to vote who are present in person or by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting, while a special resolution requires the affirmative vote of a majority of no less than two-thirds of the votes attached to the ordinary shares cast by those shareholders who are present in person or by proxy (or, in the case of corporations, by their duly authorized representatives) at a general meeting. Both ordinary resolutions and special resolutions may also be passed by a unanimous written resolution signed by all the shareholders of our company, as permitted by the Companies Act and our memorandum and articles of association. A special resolution will be required for important matters such as a change of name or making changes to our memorandum and articles of association.

*Transfer of Ordinary Shares.* Any of our shareholders may transfer all or any of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

However, our board of directors may, in its absolute discretion, decline to register any transfer of any ordinary share which is not fully paid up or on which our company has a lien. Our board of directors may also decline to register any transfer of any ordinary share unless:

- the instrument of transfer is lodged with us, accompanied by the certificate for the ordinary shares to which it relates and such other evidence as our board of directors may reasonably require to show the right of the transferor to make the transfer;

- the instrument of transfer is in respect of only one class of shares;

- the instrument of transfer is properly stamped, if required;

- a fee of such maximum sum as the Nasdaq Global Select Market may determine to be payable, or such lesser sum as the board of directors may from time to time require, is paid to the Company in respect thereof; and

- in the case of a transfer to joint holders, the transfer is not to more than four joint holders.

If our directors refuse to register a transfer they are required, within three months after the date on which the instrument of transfer was lodged, to send to each of the transferor and the transferee notice of such refusal.

*Liquidation*. On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of ordinary shares or, on a winding up, with the sanction of a special resolution of the Company and any other sanction required by the Companies Act), assets available for distribution among the holders of ordinary shares will be distributed among the holders of the ordinary shares in proportion to the par value of the shares held by them (subject to, on a winding up where the assets available for distribution amongst the shareholders of the Company shall be more than sufficient to repay the whole of the share capital at the commencement of the winding up, a deduction from ordinary shares in respect of which there are monies due of all monies payable to the Company for unpaid calls or otherwise). If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that, as nearly as may be, the losses are borne by our shareholders in proportion to the par value of the shares held by them. We are a "limited liability" company registered under the Companies Act, and under the Companies Act, the liability of our members is limited to the amount, if any, unpaid on the shares respectively held by them. Our current memorandum of association contains a declaration that the liability of our members is so limited.

*Calls on Ordinary Shares and Forfeiture of Ordinary shares*. Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their ordinary shares (together with any interests which may have accrued). The ordinary shares that have been called upon and remain unpaid are subject to forfeiture.

105

*Redemption. Repurchase and Surrender of Ordinary Shares*. We may issue shares on terms that such shares are subject to redemption, at our option or at the option of the holders thereof, on such terms and in such manner as may be determined, before the issue of such shares, by our board of directors or by an ordinary resolution of our shareholders. Our company may also repurchase any of our shares provided that the manner and terms of such purchase have been approved by our board of directors or by ordinary resolution of our shareholders, or are otherwise authorized by our memorandum and articles of association. Under the Companies Act, the redemption or repurchase of any share may be paid out of our company's profits or out of the proceeds of a fresh issue of shares made for the purpose of such redemption or repurchase, or out of capital (including share premium account and capital redemption reserve) if our company can, immediately following such payment, pay its debts as they fall due in the ordinary course of business. In addition, under the Companies Act no such share may be redeemed or repurchased (a) unless it is fully paid up, (b) if such redemption or repurchase would result in there being no shares outstanding other than shares held as treasury shares, or (c) if the company has commenced liquidation. In addition, our company may accept the surrender of any fully paid share for no consideration.

*Variations of Rights of Shares*. If at any time, our share capital is divided into different classes of shares, all or any of the rights attached to any such class may (subject to any rights or restrictions for the time being attached to any class of share) only be materially adversely varied with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class. The rights conferred upon the holders of the shares of any class issued with preferred or other rights will not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be materially adversely varied by the creation or issue of further shares ranking *pari passu* with or subsequent to such existing class of shares or the redemption or purchase of any shares of any class by the Company. The rights of the holders of shares shall not be deemed to be materially adversely varied by the creation or issue of shares with preferred or other rights including, without limitation, the creation of shares with enhanced or weighted voting rights.

*General Meetings of Shareholders and Shareholder Proposals*. As a Cayman Islands exempted company, we are not obliged by the Companies Act to call shareholders' annual general meetings. Our current memorandum and articles of association provide that we may (but are not obliged to) in each year hold a general meeting as our annual general meeting in which case we shall specify the meeting as such in the notices calling it, and the annual general meeting shall be held at such time and place as may be determined by our directors.

Shareholders' annual general meetings and any other general meetings of our shareholders may be convened by a majority of our board of directors or our chairman. Advance notice of at least seven calendar days is required for the convening of our annual general shareholders' meeting and any other general meeting of our shareholders. A quorum required for a general meeting of shareholders consists of one or more shareholders holding shares in our Company which carry in aggregate (or representing by proxy) not less than one-third of all votes attaching to all shares in our Company in issue and entitled to vote at such general meeting, present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to put any proposal before a general meeting. However, these rights may be provided in a company's articles of association. Our current memorandum and articles of association allow our shareholders holding shares representing in aggregate not less than one-third of all votes attaching to all issued and outstanding shares of the Company that as at the date of the deposit of such requisition carry the right to vote at general meetings of the Company, to requisition an extraordinary general meeting of the shareholders, in which case our directors are obliged to call such meeting and to put the resolutions so requisitioned to a vote at such meeting; however, our current memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders.

*Inspection of Books and Record*s. Holders of our ordinary shares have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records.

*Changes in Capital*. Our shareholders may from time to time by ordinary resolution:

• increase our share capital by such sum, to be divided into shares of such classes and amount, as the resolution shall prescribe;

• consolidate and divide all or any of our share capital into shares of a larger amount than our existing shares;

• sub-divide our existing shares, or any of them into shares of a smaller amount, provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced share shall be the same as it was in case of the share from which the reduced share is derived; or

• cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and diminish the amount of our share capital by the amount of the shares so canceled.

Our shareholders may by special resolution, subject to confirmation by the Grand Court of the Cayman Islands on an application by our company for an order confirming such reduction, reduce our share capital or any capital redemption reserve in any manner permitted by law.

*Exempted Company*. We are an exempted company with limited liability under the Companies Act of the Cayman Islands. The Companies Act in the Cayman Islands distinguishes between ordinary resident companies and exempted companies. Any company that is registered in the Cayman Islands but conducts business mainly outside of the Cayman Islands may apply to be registered as an exempted company. The requirements for an exempted company are essentially the same as for an ordinary company except for the exemptions and privileges listed below:

- an exempted company does not have to file an annual return of its shareholders with the Registrar of Companies;

- an exempted company's register of members is not required to be open to inspection;

- an exempted company does not have to hold an annual general meeting;

- an exempted company may issue no par value shares;

- an exempted company may obtain an undertaking against the imposition of any future taxation (such undertakings are usually given for 30 years in the first instance);

- an exempted company may register by way of continuation in another jurisdiction and be deregistered in the Cayman Islands;

- an exempted company may register as a limited duration company; and

- an exempted company may register as a segregated portfolio company.

"Limited liability" means that the liability of each shareholder is limited to the amount unpaid by the shareholder on that shareholder's shares of the company (except in exceptional circumstances, such as involving fraud, the establishment of an agency relationship or an illegal or improper purpose or other circumstances in which a court may be prepared to pierce or lift the corporate veil).

**Registered Office and Objects**

Our registered office in the Cayman Islands is located at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands, or at such other location within the Cayman Islands as our directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Act or any other law of the Cayman Islands.

**Differences in Corporate Law**

The Companies Act is derived, to a large extent, from the older Companies Acts of England but does not follow recent United Kingdom statutory enactments, and accordingly there are significant differences between the Companies Act and the current Companies Act of England. In addition, the Companies Act differs from laws applicable to United States corporations and their shareholders. Set forth below is a summary of the significant differences between the provisions of the Companies Act applicable to us and the comparable provisions of the laws applicable to companies incorporated in Delaware and their shareholders.

*Mergers and Similar Arrangements.* The Companies Act permits mergers and consolidations between Cayman Islands companies and between Cayman Islands companies and non-Cayman Islands companies. For these purposes, (a) "merger" means the merging of two or more constituent companies and the vesting of their undertaking, property and liabilities in one of such companies as the surviving company and (b) a "consolidation" means the combination of two or more constituent companies into a combined company and the vesting of the undertaking, property and liabilities of such companies to the consolidated company. In order to effect such a merger or consolidation, the directors of each constituent company must approve a written plan of merger or consolidation, which must then be authorized by (a) a special resolution of the shareholders of each constituent company, and (b) such other authorization, if any, as may be specified in such constituent company's articles of association. The written plan of merger or consolidation must be filed with the Registrar of Companies together with a declaration as to (amongst other matters) the solvency of the consolidated or surviving company, a statement of the assets and liabilities of each constituent company and an undertaking that a copy of the certificate of merger or consolidation will be given to the members and creditors of each constituent company and that notification of the merger or consolidation will be published in the Cayman Islands Gazette. Dissenting shareholders have the right to be paid the fair value of their shares (which, if not agreed between the parties, will be determined by the Cayman Islands court) if they follow the required procedures, subject to certain exceptions. Court approval is not required for a merger or consolidation which is effected in compliance with these statutory procedures.

In addition, there are statutory provisions that facilitate the reconstruction and amalgamation of companies, provided that the arrangement is approved by a majority in number of each class of shareholders or creditors (representing 75% by value) with whom the arrangement is to be made and who must, in addition, represent three-fourths in value of each such class of shareholders or creditors, as the case may be, that are present and voting either in person or by proxy at a meeting, or meetings, convened for that purpose. The convening of the meetings and subsequently the arrangement must be sanctioned by the Grand Court of the Cayman Islands. While a dissenting shareholder or creditor has the right to express to the court the view that the transaction ought not to be approved, the court would nevertheless be likely to approve the arrangement if it determines that:

- the statutory provisions as to the required majority vote have been met;

- the shareholders have been fairly represented at the meeting in question and the statutory majority are acting bona fide without coercion of the minority to promote interests adverse to those of the class; and

- the arrangement is such that may be reasonably approved by an intelligent and honest man of that class acting in respect of his interest.

Where a scheme or contract involving the transfer of shares or any class of shares in a company to another company has, within four months after the making of the offer, been approved by the holders of not less than ninety per cent in value of the shares affected, the offeror may, within a two-month period commencing on the expiration of such four-month period, require the holders of the remaining shares to transfer such shares on the terms of the offer. Dissenting shareholders may object by filing proceedings in the Grand Court of the Cayman Islands, but such objections are unlikely to be successful where the offer has been accepted by holders of 90% in value of the shares affected unless there is evidence that shareholders have been treated in an unfair or prejudicial manner.

If an arrangement and reconstruction of a Cayman Islands company is approved by at least 90% in value of the shareholders (as descried above), a dissenting shareholder would have no rights comparable to the appraisal rights which it would have if the company in question were a Delaware corporation (being the right to receive payment in cash for the judicially determined value of its shares).

*Shareholders' Suits.* In the ordinary course, litigation brought in the name of the company must be brought by the company acting by its board, such that shareholders cannot sue in the name of the company. However, in certain circumstances (including where the alleged wrongdoer is in control of the company), shareholders in Cayman Islands companies may cause proceedings to be brought derivatively for and on behalf of the company against third parties, including the company's directors.

*Indemnification of Directors and Executive Officers and Limitation of Liability.* The ability of Cayman Islands companies to provide in their articles of association for indemnification of officers and directors is limited, insofar as it is not permissible for the directors to contract out of the core fiduciary duties they owe to the company, nor would any indemnity be effective if it were held by the Cayman Islands courts to be contrary to public policy, which would include any attempt to provide indemnification against civil fraud or the consequences of committing a crime. Our current memorandum and articles of association provide that our directors and officers shall be indemnified against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such director or officer, other than by reason of such person's own dishonesty, willful default or fraud, in or about the conduct of our company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such director or officer in defending (whether successfully or otherwise) any civil proceedings concerning our company or its affairs in any court whether in the Cayman Islands or elsewhere. This standard of conduct is generally the same as permitted under the Delaware General Corporation Law for a Delaware corporation. In addition, we have entered into indemnification agreements with each of our directors and executive officers that will provide such persons with additional indemnification beyond that provided in our current memorandum and articles of association.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers or persons controlling us under the foregoing provisions, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

*Anti-Takeover Provisions in the Memorandum and Articles of Association.* Some provisions of our current memorandum and articles of association may discourage, delay or prevent a change in control of our company or management that shareholders may consider favorable, including provisions that authorize our board of directors to issue preferred shares in one or more series and to designate the price, rights, preferences, privileges and restrictions of such preferred shares without any further vote or action by our shareholders.

However, under Cayman Islands law, our directors may only exercise the rights and powers granted to them under our memorandum and articles of association, as amended and restated from time to time, for a proper purpose and for what they believe in good faith to be in the best interests of our company.

*Directors' Fiduciary Duties.* Under Delaware corporate law, a director of a Delaware corporation has a fiduciary duty to the corporation and its shareholders. This duty has two components: the duty of care and the duty of loyalty. The duty of care requires that a director act in good faith, with the care that an ordinarily prudent person would exercise under similar circumstances. Under this duty, a director must inform himself of and disclose to shareholders, all material information reasonably available regarding a significant transaction. The duty of loyalty requires that a director act in a manner he or she reasonably believes to be in the best interests of the corporation. He or she must not use his or her corporate position for personal gain or advantage. This duty prohibits self-dealing by a director and mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally. In general, actions of a director are presumed to have been made on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation. However, this presumption may be rebutted by evidence of a breach of one of the fiduciary duties. Should such evidence be presented concerning a transaction by a director, a director must prove the procedural fairness of the transaction and that the transaction was of fair value to the corporation.

As a matter of Cayman Islands law, a director of a Cayman Islands company is in the position of a fiduciary with respect to the company and therefore he owes duties to the company including the following—a duty to act in good faith in the best interests of the company, a duty not to make a personal profit based on his or her position as director (unless the company permits him to do so), a duty not to put himself in a position where the interests of the company conflict with his or her personal interest or his or her duty to a third party and a duty to exercise powers for the purpose for which such powers were intended. A director of a Cayman Islands company owes to the company a duty to act with skill and care and the test in the Cayman Islands against which that duty is measured is both objective and subjective.

*Shareholder Proposals.* Under the Delaware General Corporation Law, a shareholder has the right to put any proposal before the annual meeting of shareholders, provided it complies with the notice provisions in the governing documents. The Delaware General Corporation Law does not provide shareholders an express right to put any proposal before the annual meeting of shareholders, but in keeping with common law, Delaware corporations generally afford shareholders an opportunity to make proposals and nominations provided that they comply with the notice provisions in the certificate of incorporation or bylaws. A special meeting may be called by the board of directors or any other person authorized to do so in the governing documents, but shareholders may be precluded from calling special meetings.

Cayman Islands law provides shareholders with only limited rights to requisition a general meeting, and does not provide shareholders with any right to table resolutions at a general meeting. However, these rights may be provided in a company's articles of association. Our current memorandum and articles of association provides that, on the requisition of shareholders holding shares representing in aggregate not less than one-third (1/3) of all votes attaching to all issued and outstanding shares of the Company that as at the date of the deposit of such requisition carry the right to vote at general meetings of the Company, the board shall convene an extraordinary general meeting. However, our current memorandum and articles of association do not provide our shareholders with any right to put any proposals before annual general meetings or extraordinary general meetings not called by such shareholders. As an exempted Cayman Islands company, we are not obliged by law to call shareholders' annual general meetings.

*Cumulative Voting.* Under the Delaware General Corporation Law, cumulative voting for elections of directors is not permitted unless the corporation's certificate of incorporation specifically provides for it. Cumulative voting potentially facilitates the representation of minority shareholders on a board of directors since it permits the minority shareholder to cast all the votes to which the shareholder is entitled on a single director, which increases the shareholder's voting power with respect to electing such director. Cayman Islands law does not prohibit cumulative voting, but our current articles of association do not provide for cumulative voting. As a result, our shareholders are not afforded any less protections or rights on this issue than shareholders of a Delaware corporation.

*Appointment of Directors.* For so long as Baidu Holdings and its affiliates collectively hold no less than 50% of the voting power of the Company, Baidu shall be entitled to appoint, remove and replace a majority of the directors.

The board of directors may, by the affirmative vote of a simple majority of the remaining directors present and voting at a meeting of the board of directors, appoint any person as a director, to fill a casual vacancy on the board of directors that is not a Baidu Holdings appointed director or as an addition to the existing board of directors. A vacancy on the board of directors created by the removal of a non-Baidu Holdings appointed director may be filled by way of an ordinary resolution of the Company's shareholders or by the affirmative vote of a simple majority of the remaining directors present and voting at a meeting of the board of directors.

109

Each director whose term of office expires shall be eligible for re-election at a meeting of the Company's shareholders or re-appointment by the board of directors.

*Removal of Directors.* Under the Delaware General Corporation Law, a director of a corporation with a classified board may be removed only for cause with the approval of a majority of the outstanding shares entitled to vote, unless the certificate of incorporation provides otherwise. Under our current memorandum and articles of association, directors not appointed by Baidu Holdings may be removed by ordinary resolution of our shareholders or pursuant to an existing written agreement between the director and the Company.

*Transactions with Interested Shareholders.* The Delaware General Corporation Law contains a business combination statute applicable to Delaware public corporations whereby, unless the corporation has specifically elected not to be governed by such statute by amendment to its certificate of incorporation or bylaws that is approved by its shareholders, it is prohibited from engaging in certain business combinations with an "interested shareholder" for three years following the date that such person becomes an interested shareholder. An interested shareholder generally is a person or a group who or which owns or owned 15% or more of the target's outstanding voting stock or who or which is an affiliate or associate of the corporation and owned 15% or more of the corporation's outstanding voting stock within the past three years. This has the effect of limiting the ability of a potential acquirer to make a two-tiered bid for the target in which all shareholders would not be treated equally. The statute does not apply if, among other things, prior to the date on which such shareholder becomes an interested shareholder, the board of directors approves either the business combination or the transaction which resulted in the person becoming an interested shareholder. This encourages any potential acquirer of a Delaware corporation to negotiate the terms of any acquisition transaction with the target's board of directors.

Cayman Islands law has no comparable statute. As a result, we cannot avail ourselves of the types of protections afforded by the Delaware business combination statute. However, although Cayman Islands law does not regulate transactions between a company and its significant shareholders, it does provide that such transactions must be entered into bona fide in the best interests of the company and for a proper corporate purpose and not with the effect of constituting a fraud on the minority shareholders.

*Dissolution; Winding Up*. Under the Delaware General Corporation Law, unless the board of directors approves the proposal to dissolve, dissolution must be approved by shareholders holding 100% of the total voting power of the corporation. Only if the dissolution is initiated by the board of directors may it be approved by a simple majority of the corporation's outstanding shares. Delaware law allows a Delaware corporation to include in its certificate of incorporation a supermajority voting requirement in connection with dissolutions initiated by the board.

Under Cayman Islands law, a company may be wound up either voluntarily or compulsorily. A company may be wound up by the Grand Court of the Cayman Islands for a number of reasons, including: (i) the company has passed a special resolution requiring the company to be wound up by the Grand Court; (ii) the company is unable to pay its debts; and (iii) the Grand Court is of opinion that it is just and equitable that the company should be wound up.

*Variation of Rights of Shares*. Under the Delaware General Corporation Law, a corporation may vary the rights of a class of shares with the approval of a majority of the outstanding shares of such class, unless the certificate of incorporation provides otherwise. Under our current articles of association, we may only materially adversely vary the rights attached to any class of shares (subject to any rights or restrictions for the time being attached to any class of share) with the consent in writing of the holders of two-thirds of the issued shares of that class or with the sanction of a resolution passed at a separate meeting of the holders of the shares of that class by the holders of two-thirds of the issued shares of that class.

*Amendment of Governing Documents.* Under the Delaware General Corporation Law, a corporation's certificate of incorporation may be amended only if adopted and declared advisable by the board of directors and approved by a majority of the outstanding shares entitled to vote and the bylaws may be amended with the approval of a majority of the outstanding shares entitled to vote and may, if so provided in the certificate of incorporation, also be amended by the board of directors. Under the Companies Act, our memorandum and articles of association may only be amended by special resolution of our shareholders.

*Rights of Non-Resident or Foreign Shareholders*. There are no limitations imposed by our current memorandum and articles of association on the rights of non-resident or foreign shareholders to hold or exercise voting rights on our shares. In addition, there are no provisions in our current memorandum and articles of association governing the ownership threshold above which shareholder ownership must be disclosed.

*Directors' Power to Issue Shares*. Under our current memorandum and articles of association, our board of directors is empowered to issue or allot shares or grant options and warrants with or without preferred, deferred, qualified or other special rights or restrictions.

110

**C.**  **Material Contracts**

   We have not entered into any material contracts other than in the ordinary course of business and other than those described in "*Item 4. Information on the Company*" or elsewhere in this annual report on Form 20-F.

**D.**  **Exchange Controls**

   See "Item 4. Information on the Company—B. Business Overview—Government Regulations—Regulations on Foreign Exchange" and "Item 4. Information on the Company—B. Business Overview—Government Regulations—Regulations on Dividend Distribution."

**E.**  **Taxation**

   The following summary of Cayman Islands, People's Republic of China and U. S. federal income tax considerations generally applicable to an investment in our ADSs or Class A ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or Class A ordinary shares, such as tax consequences under state, local and other tax laws. To the extent that the discussion relates to matters of Cayman Islands tax law, it represents the opinion of Walkers (Hong Kong), our Cayman Islands counsel. To the extent that the discussion relates to matters of PRC tax law, it represents the opinion of Jingtian & Gongcheng, our PRC counsel.

**Cayman Islands Taxation**

   The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us or holders of our ADSs or Class A ordinary shares levied by the government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in or, after execution, brought within the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made by or to our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

   The Enterprise Income Tax Law provides that an enterprise established under the laws of a foreign country or region but whose "de facto management body" is located in the PRC is treated as a PRC resident enterprise for PRC tax purposes and consequently subject to the PRC income tax at the rate of 25% on its global income. The implementing rules of the Enterprise Income Tax Law merely define the location of the "de facto management body" as an "organizational body which effectively manages and controls the production and business operation, personnel, accounting, properties and other aspects of operations of an enterprise." Based on a review of surrounding facts and circumstances, we do not believe that we should be considered a PRC resident enterprise for PRC tax purposes. However, there is limited guidance and implementation history of the Enterprise Income Tax Law, and if we are treated as a PRC resident enterprise for PRC tax purposes, we will be subject to PRC tax on our global income at a uniform tax rate of 25%.

   PRC income tax at the rate of 10% will be withheld from payments of interest or dividends we make to investors that are "non-resident enterprises" of the PRC, if such investors do not have an establishment or place of business in the PRC, or if they have such establishment or place of business in the PRC but the relevant income is not effectively connected with such establishment or place of business, to the extent such interest or dividends are deemed to be sourced within the PRC.

   Furthermore, any gain realized on the transfer of the ADSs or shares by such investors would also be subject to PRC income tax at 10% if such gain is regarded as income derived from sources within the PRC.

   Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the interest or dividends we pay or any gains realized from the transfer of our ADSs or shares to be income derived from sources within the PRC, such interest or dividends and gains earned by non-resident individuals would be subject to the 20% PRC individual income tax (which may be withheld at source).

   These rates could be reduced by applicable tax treaties or similar arrangements between China and the jurisdiction of the investor. For example, for investors in Hong Kong, the tax rate is reduced to 7% for interest payments and 5% for dividends. However, it is unclear whether non-PRC shareholders would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that we are treated as a PRC resident enterprise.

**U.S. Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or Class A ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or Class A ordinary shares as capital assets for U.S. federal income tax purposes. This discussion is based on the applicable provisions of the Internal Revenue Code of 1986, as amended, or the Code, the Treasury Regulations promulgated thereunder, pertinent judicial decisions, interpretive rulings of the IRS and such other authorities as we have considered relevant. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with all the tax considerations to any particular investor or to persons that may be subject to special treatment under U.S. federal income tax laws, including:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding the ADSs or Class A ordinary shares as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own ADSs or ordinary shares representing 10% or more of our voting power or value;

- persons whose functional currency is other than the U.S. dollar; or

- persons who acquired ADSs or Class A ordinary shares pursuant to the exercise of any employee share option or otherwise as compensation.

U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of ownership and disposition of ADSs or Class A ordinary shares.

The discussion below of the U.S. federal income tax considerations will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of the ADSs or Class A ordinary shares and you are, for U.S. federal income tax purposes:

- an individual citizen or resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the supervision of a court within the United States and one or more U.S. persons has or have the authority to control all substantial decisions of the trust or (ii) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

112

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or Class A ordinary shares, or of persons who hold the ADSs or Class A ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or Class A ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you will be treated as the holder of the underlying Class A ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, or state, local or foreign tax laws or the Medicare tax on certain net investment income. We have not sought, and will not seek, a ruling from the IRS or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

### Taxation of Dividends or Other Distributions on the ADSs or Class A Ordinary Shares

Subject to the discussion under "—*Passive Foreign Investment Company Considerations*" below, the gross amount of all our distributions to you with respect to the ADSs or Class A ordinary shares will be included in your gross income as dividend income on the day actually or constructively received by the depositary, in the case of ADSs, or by you, in the case of Class A ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to calculate our earnings and profits on the basis of U.S. federal income tax principles, you should expect to treat the full amount of the distribution as a dividend for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to individuals and certain other non-corporate holders, dividends paid on our ADSs may be subject to reduced rates of taxation provided that (1) our ADSs are readily tradeable on an established securities market in the United States, or otherwise, in the event we are deemed to be a PRC "resident enterprise" under the PRC tax law, we are eligible for the benefit of the income tax treaty between the United States and the PRC, or the Treaty, (2) we are not a PFIC (as discussed below) for either the taxable year in which the dividend is paid or the preceding taxable year and (3) certain holding period and other requirements are met. Because our ADSs are listed on the Nasdaq Global Select Market and will accordingly be considered to be readily tradable on an established securities market in the United States, and we believe that we were not a PFIC for U.S. federal income tax purposes for our taxable year ended December 31, 2020 and we do not expect to be a PFIC in subsequent years, we believe that we are a qualified foreign corporation with respect to dividends paid on the ADSs, but not with respect to dividends paid on our ordinary shares. In the event that we are deemed to be a PRC resident enterprise under PRC tax law, we may be eligible for the benefits of the Treaty. If we are eligible for such benefits, dividends we pay on our ordinary shares, regardless of whether such shares are represented by our ADSs, would be eligible for the reduced rates of taxation applicable to qualified dividend income, as discussed above. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or Class A ordinary shares.

Dividends will generally be treated as income from foreign sources for U.S. foreign tax credit purposes and will generally constitute passive category income. In the event that we are deemed to be a PRC resident enterprise under the PRC tax law and dividends paid on our ADSs or Class A ordinary shares are subject to PRC withholding taxes, depending on your particular facts and circumstances, you may be eligible, subject to a number of complex limitations, to claim a foreign tax credit in respect of any foreign withholding taxes imposed (at a rate not exceeding the applicable Treaty rate) on dividends received on the ADSs or Class A ordinary shares. If you do not elect to claim a foreign tax credit for foreign taxes withheld, you may instead, subject to applicable limitations, claim a deduction, for U.S. federal income tax purposes, in respect of such withholdings, but only for a year in which you elect to do so for all creditable foreign income taxes. The rules governing the foreign tax credit are complex. You are advised to consult your tax advisor regarding the availability of the foreign tax credit under your particular circumstances.

### Sale or Other Taxable Disposition of the ADSs or Class A Ordinary Shares

Subject to the discussion under "—*Passive Foreign Investment Company Considerations*" below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or Class A ordinary share equal to the difference between the amount realized for the ADS or Class A ordinary share and your tax basis in the ADS or Class A ordinary share. The gain or loss will generally be capital gain or loss, which will be long-term capital gain or loss if your holding period for the shares exceeds one year at the time of disposition. Long-term capital gains are generally eligible for a preferential rate of taxation for individuals and certain other non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S.-source income or loss for foreign tax credit limitation purposes, in which event you may not be able

113

to use the foreign tax credit arising from any PRC tax imposed on the disposition of the ADSs or Class A ordinary shares unless such credit can be applied (subject to applicable limitations) against tax due on other income derived from foreign sources in the same category. However, in the event we are deemed to be a PRC resident enterprise under PRC tax law, we may be eligible for the benefits of the Treaty. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or Class A ordinary shares, a U.S. Holder that is eligible for the benefits of the Treaty may elect to treat such gain as PRC-source income for foreign tax credit purposes. You should consult your tax advisor regarding the tax consequences in case any PRC tax is imposed on gain on a disposition of the ADSs or Class A ordinary shares, including the availability of the foreign tax credit and the election to treat any gain as PRC-source, under your particular circumstances.

### *Passive Foreign Investment Company Considerations*

A non-U.S. corporation, such as our company, is considered a PFIC for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the shares. Although the law in this regard is not entirely clear, we treat our consolidated affiliated entities as being owned by us for U.S. federal income tax purposes because we exercise effective control over them and we are entitled to substantially all of their economic benefits and, as a result, we consolidate their results of operations in our combined and consolidated financial statement. If it were determined, however, that we are not the owner of our consolidated affiliated entities for U.S. federal income tax purposes, we would likely be treated as a PFIC for our taxable year ended December 31, 2020 and for subsequent taxable years.

Assuming we are the owner of our consolidated affiliated entities in the PRC for U.S. federal income tax purposes, based on our current and expected income and assets and the current market value of our ADSs, we do not presently expect to be a PFIC for the 2020 taxable year or the foreseeable future. However, given the lack of authority and the highly factual nature of the analysis, no assurance can be given. The determination as to whether we are a PFIC must be made annually after the end of each taxable year, and consequently, our PFIC status may change. While we do not anticipate becoming a PFIC, changes in the nature of our income or assets or the value of our ADSs may cause us to become a PFIC for the current or any subsequent taxable year. In particular, because the total value of our assets for purposes of the asset test may be calculated using the market price of the ADSs, our PFIC status may depend in large part on the market price of the ADSs, which may fluctuate considerably. The composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets. In addition, because there are uncertainties in the application of the relevant rules, it is possible that the IRS may challenge our classification of certain income and assets as non-passive or our valuation of our tangible and intangible assets, each of which may result in our becoming a PFIC for the current or subsequent taxable years. If we are a PFIC for any year during which you hold the ADSs or the Class A ordinary shares we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADSs or Class A ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to such ADSs or Class A ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold the ADSs or the Class A ordinary shares you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ADSs or Class A ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or Class A ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain would be allocated ratably over your holding period for the ADSs or Class A ordinary shares;

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, would be treated as ordinary income; and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or Class A ordinary shares cannot be treated as capital, even if you hold the ADSs or Class A ordinary shares as capital assets.

114

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding paragraphs. The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury Regulations. We expect that the ADSs will continue to be listed on the Nasdaq Global Select Market which is a qualified exchange for these purposes. Consequently, assuming that the ADSs are regularly traded, if you are a holder of ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC. However, a mark-to-market election may not be made with respect to our Class A ordinary shares as they are not marketable stock. If you make a valid mark-to-market election for the ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs as of the close of your taxable year over your adjusted basis in such ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs in a year in which we are a PFIC, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs, as well as to any loss realized on the actual sale or disposition of the ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs. Your basis in the ADSs will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in certain investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and Class A ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or Class A ordinary shares.

If you hold ADSs or Class A ordinary shares in any year in which we are a PFIC, you will generally be required to file an annual information report containing such information as the U.S. Treasury may require.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in the ADSs or Class A ordinary shares.

**F.      Dividends and Paying Agents**

Not Applicable.

**G.      Statement by Experts**

Not Applicable.

**H.      Documents on Display**

We previously filed with the SEC our registration statement on Form F-1 (Registration No. 333-223263), as amended, including the prospectus contained therein, to register our Class A ordinary shares in relation to our initial public offering. We have also filed with the SEC a related registration statement on F-6 (Registration No. 333-223709) to register the ADSs.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the Securities and Exchange Commission at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1 -800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

115

We will furnish JPMorgan Chase Bank, N.A., the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with Nasdaq Stock Market Rule 5250(d), we will post this annual report on our website *ir.iqiyi.com*. In addition, we will provide hardcopies of our annual report to shareholders, including ADS holders, free of charge upon request.

**I.       Subsidiary Information**

Not applicable.

**ITEM 11.       QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

*Foreign Exchange Risk*

Our revenues and expenses are mainly denominated in Renminbi. Although our exposure to foreign exchange risks should be limited in general, the value of your investment in our ADSs will be affected by the exchange rate between U.S. dollar and Renminbi because the value of our business is effectively denominated in RMB, while our ADSs will be traded in U.S. dollars.

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. The value of the Renminbi against the U.S. dollar and other currencies is affected by changes in China's political and economic conditions and by China's foreign exchange policies, among other things. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. To the extent that we need to convert U.S. dollars into Renminbi for our operations or capital expenditures, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

The RMB appreciated by 6.27% against the U.S. dollar in 2020. As of December 31, 2020, we had RMB-denominated cash and cash equivalents, restricted cash and short-term investments of RMB2,728.0 million, and U.S. dollar-denominated cash and cash equivalents, restricted cash and short-term investments of US$1,772.3 million. Assuming we had converted RMB2,728.0 million into U.S. dollars at the exchange rate of RMB6.5250 for US$1.00 as of the end of 2020, our U.S. dollar cash balance would have been US$2,190.4 million. If the RMB had depreciated by 10% against the U.S. dollar, our U.S. dollar cash balance would have been US$2,152.4 million instead. Assuming we had converted US$1,772.3 million into RMB at the exchange rate of RMB6.5250 for US$1.00 as of the end of 2020, our RMB cash balance would have been RMB14,292.3 million. If the RMB had appreciated by 10% against the U.S. dollar, our RMB cash balance would have been RMB13,135.9 million instead. In addition, we had U.S. dollar-denominated short-term loans and convertible senior notes of US$2,569.0 million as of December 31, 2020. A hypothetical 10% increase in the exchange rate of the U.S. dollar against the RMB would have resulted in an increase of RMB1,676.3 million (US$256.9 million) in the value of our short-term loans and U.S. dollar-denominated convertible senior notes as of December 31, 2020.

*Interest Rate Risk*

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash, which is mostly held in interest-bearing bank deposits. Interest-earning instruments carry a degree of interest rate risk. We have not been exposed to material risks due to changes in interest rates, and we have not used any derivative financial instruments to manage our interest risk exposure. However, our future interest income may fall short of expectations due to changes in market interest rates.

116

**ITEM 12.**        **DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES**

**A.**        **Debt Securities**

In December 2020, we completed a registered public offering of US$800 million in aggregate principal amount of convertible senior notes due 2026, or the 2026 Notes. The 2026 Notes are senior, unsecured obligations of us, and interest is payable semi-annually in cash at a rate of 4.00% per annum on June 15 and December 15 of each year, beginning on June 15, 2021. The 2026 Notes will mature on December 15, 2026, unless repurchased, redeemed or converted prior to such date. The holders may require the Company to repurchase all or a portion of the 2026 Notes for cash on August 1, 2024, or upon a fundamental change.

Please refer to Exhibits 4.64 and 4.65 to this annual report for the base indenture and supplemental indenture for the 2026 Notes.

**B.**        **Warrants and Rights**

Not applicable.

**C.**        **Other Securities**

Not applicable.

**D.**        **American Depositary Shares**

**Fees and Charges Our ADS holders May Have to Pay**

The depositary may charge each person to whom ADSs are issued, including, without limitation, issuances against deposits of shares, issuances in respect of share distributions, rights and other distributions, issuances pursuant to a stock dividend or stock split declared by us or issuances pursuant to a merger, exchange of securities or any other transaction or event affecting the ADSs or deposited securities, and each person surrendering ADSs for withdrawal of deposited securities or whose ADRs are canceled or reduced for any other reason, US$5.00 for each 100 ADSs (or any portion thereof) issued, delivered, reduced, canceled or surrendered, as the case may be. The depositary may sell (by public or private sale) sufficient securities and property received in respect of a share distribution, rights and/or other distribution prior to such deposit to pay such charge.

The following additional charges shall be incurred by the ADR holders, by any party depositing or withdrawing shares or by any party surrendering ADSs and/or to whom ADSs are issued (including, without limitation, issuance pursuant to a stock dividend or stock split declared by us or an exchange of stock regarding the ADRs or the deposited securities or a distribution of ADSs), whichever is applicable:

- a fee of up to US$0.05 per ADS for any cash distribution made pursuant to the deposit agreement;

- an aggregate fee of US$0.05 per ADS per calendar year (or portion thereof) for services performed by the depositary in administering the ADRs (which fee may be charged on a periodic basis during each calendar year and shall be assessed against holders of ADRs as of the record date or record dates set by the depositary during each calendar year and shall be payable in the manner described in the next succeeding provision);

- a fee for reimbursement of such fees, charges and expenses as are incurred by the depositary and/or any of the depositary's agents

(including, without limitation, the custodian and expenses incurred on behalf of holders in connection with compliance with foreign exchange control regulations or any law or regulation relating to foreign investment) in connection with the servicing of the shares or other deposited securities, the sale of securities (including, without limitation, deposited securities), the delivery of deposited securities or otherwise in connection with the depositary's or its custodian's compliance with applicable law, rule or regulation (which fees and charge shall be assessed on a proportionate basis against holders as of the record date or dates set by the depositary and shall be payable at the sole discretion of the depositary by billing such holders or by deducting such charge from one or more cash dividends or other cash distributions);

- a fee for the distribution of securities (or the sale of securities in connection with a distribution), such fee being in an amount equal to the fee for the execution and delivery of ADSs which would have been charged as a result of the deposit of such securities (treating all such securities as if they were shares) but which securities or the net cash proceeds from the sale thereof are instead distributed by the depositary to those holders entitled thereto;

117

- stock transfer or other taxes and other governmental charges;

- SWIFT, cable, telex and facsimile transmission and delivery charges incurred at your request in connection with the deposit or delivery of shares, ADRs or deposited securities;

- transfer or registration fees for the registration of transfer of deposited securities on any applicable register in connection with the deposit or withdrawal of deposited securities;

- in connection with the conversion of foreign currency into U.S. dollars, JPMorgan Chase Bank, N.A. shall deduct out of such foreign currency the fees, expenses and other charges charged by it and/or its agent (which may be a division, branch or affiliate) so appointed in connection with such conversion; and

- fees of any division, branch or affiliate of the depositary utilized by the depositary to direct, manage and/or execute any public and/or private sale of securities under the deposit agreement.

JPMorgan Chase Bank, N.A. and/or its agent may act as principal for such conversion of foreign currency.

We will pay all other charges and expenses of the depositary and any agent of the depositary (except the custodian) pursuant to agreements from time to time between us and the depositary. The charges described above may be amended from time to time by agreement between us and the depositary.

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us for certain expenses we incur that are related to establishment and maintenance of the ADS program upon such terms and conditions as we and the depositary may agree from time to time. In 2020, we received US$1.5 million from the depository for expenses incurred in connection with the establishment and maintenance of the ADS program.

118

PART II.

ITEM 13.          DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES

None.

ITEM 14.          MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS

**Material Modifications to the Rights of Security Holders**

See "Item 10. Additional Information—B. Memorandum and Articles of Association—Ordinary Shares" for a description of the rights of securities holders, which remain unchanged.

**Use of Proceeds**

The following "Use of Proceeds" information relates to: the Registration Statement on Form F-3, as amended (File No. 333-251359) that became effective immediately upon filing on December 15, 2020, and the applicable prospectus supplements in relation to our offering of 40,000,000 ADSs, each representing seven Class A ordinary shares of our company, at a price to public of US$17.50 per ADS (the "Follow-on Offering"), and US$800 million in aggregate principal amount of 4.00% senior notes due 2026 (the "2026 Notes Offering"). Goldman Sachs (Asia) L.L.C., BofA Securities, Inc. and J.P. Morgan Securities LLC were the representatives of the underwriters for the offerings.

We received net proceeds of US$680.8 million from the Follow-on Offering, and net proceeds of US$786.0 million from 2026 Notes Offering, each after deducting the underwriters' discounts and commissions.

For the period from December 15, 2020 to December 31, 2020, we had not yet used the net proceeds from the Follow-on Offering and the 2026 Notes Offering. We intend to use the remainder of the proceeds from the above Follow-on Offering and 2026 Notes Offering as disclosed in the applicable prospectus supplements to the Registration Statement on Form F-3.

ITEM 15.          CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this annual report.

Based upon that evaluation, our management has concluded that, as of December 31, 2020, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15 (f) and 15d-15(f) under the Securities Exchange Act of 1934, as amended.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with Generally Accepted Accounting Principles (GAAP) in the United States of America and includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of our company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of consolidated financial statements in accordance with GAAP, and that receipts and expenditures of our company are being made only in accordance with authorizations of our management and directors; and (3) provide reasonable assurance regarding prevention or timely detection of the unauthorized acquisition, use or disposition of our company's assets that could have a material effect on the consolidated financial statements.

119

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

As required by Section 404 of the Sarbanes-Oxley Act of 2002 and related rules as promulgated by the Securities and Exchange Commission, our management including our Chief Executive Officer and Chief Financial Officer assessed the effectiveness of internal control over financial reporting as of December 31, 2019 using the criteria set forth in the report "*Internal Control—Integrated Framework (2013)*" published by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2020.

**Attestation Report of the Independent Registered Public Accounting Firm**

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our company's internal control over financial reporting as of December 31, 2020, as stated in its report, which appears on page F-5 of this annual report on Form 20-F.

**Changes in Internal Control over Financial Reporting**

As described in Note 2 to the audit report included in this annual report, Summary of Significant Accounting Policies, we adopted ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02") on January 1, 2020, using a prospective transition method. Upon the adoption of ASU 2019-02, we have modified certain internal controls over financial reporting to address risks associated with the changes of accounting policy for licensed copyrights and produced content and related disclosure requirements. This includes adjusting controls to address risks associated with the impairment assessment of licensed copyrights and produced content under ASU 2019-02. We have also implemented additional controls associated with the determination of film groups, the identification of events or changes in circumstances that may indicate the fair value of a film group may be less than its unamortized costs and the review of the valuation methodology and key assumptions used to determine the fair value of our film groups. Except for these changes, there have been no other changes in our internal control over financial reporting during the year ended December 31, 2020 that materially affected, or are reasonably likely to materially affect, internal control over financial reporting.

## ITEM 16.A.    AUDIT COMMITTEE FINANCIAL EXPERT

Our board of directors has determined that members including Sam Hanhui Sun and Jane Jie Sun, independent directors and member of our audit committee, are audit committee financial experts.

## ITEM 16.B.    CODE OF ETHICS

Our board of directors has adopted a code of ethics that applies to all of the directors, officers and employees of us and our subsidiaries, whether they work for us on a full-time, part-time, consultative, or temporary basis. Certain provisions of the code apply specifically to our chief executive officer, chief financial officer, senior finance officer, controller, senior vice presidents, vice presidents and any other persons who perform similar functions for us. We have posted a copy of our code of business conduct and ethics on our website at http://ir.iqiyi.com.

## ITEM 16.C.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

The following table sets forth the aggregate fees by the categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our independent registered public accounting firm, for the periods indicated. We did not pay any other fees to our auditors during the periods indicated below.

| | 2019 | 2020 |
|---|---|---|
| | RMB | RMB |
| | (in thousands) | |
| Audit fees[1] | 12,742 | 16,515 |
| Audit related fees[2] | 1,068 | 2,990 |

Notes:

(1)  "Audit fees" means the aggregate fees billed for professional services rendered by Ernst & Young Hua Ming LLP for the audit of our annual financial statements.

(2)  "Audit-related fees" means, for the year ended December 31, 2020, the aggregate fees billed for services provided in connection with the offering of the Notes.

120

The policy of our audit committee is to pre-approve all audit and non-audit services provided by Ernst & Young Hua Ming LLP, including audit services and audit-related services as described above.

## ITEM 16.D.    EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES

We rely on the exemption provided by Rule 10A-3(b)(i)(D) under the Exchange Act. Mr. Herman Yu is a non-voting member of our audit committee and only has observer status on our audit committee. Based on our assessment, such reliance does not materially adversely affect the ability of the audit committee to act independently or to satisfy the other requirements of Rule 10A-3 under the Exchange Act.

## ITEM 16.E.    PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS

None.

## ITEM 16.F.    CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT

Not applicable.

## ITEM 16.G.    CORPORATE GOVERNANCE

As a Cayman Islands company listed on the Nasdaq Global Select Market, we are subject to the Nasdaq Stock Market Rules corporate governance listing standards. However, Nasdaq Stock Market Rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq Stock Market Rules. We rely on the exemption available to foreign private issuers for the requirement under Nasdaq Rule 5605(c)(2)(A)(i) that each member of the audit committee must be an independent director as defined under Nasdaq Rule 5605(a)(2). Mr. Herman Yu, who is a member of our audit committee and is a non-voting member of our audit committee, is not an independent director as defined under Nasdaq Rule 5605(a)(2). If we continue to rely on this and other exemptions available to foreign private issuers in the future, our shareholders may be afforded less protection than they otherwise would under the Nasdaq corporate governance listing standards applicable to U.S. domestic issuers.

In addition, Nasdaq Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, Nasdaq Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Walkers (Hong Kong), our Cayman Islands counsel, has provided a letter to the Nasdaq Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholders meetings every year. We followed home country practice and did not hold an annual meeting of shareholders in 2020. We may, however, hold annual shareholders meetings in the future.

Furthermore, Nasdaq Rule 5635(c) requires shareholder approval prior to the issuance of securities when a stock option or purchase plan is to be established or materially amended or other equity compensation arrangement made or materially amended, pursuant to which stock may be acquired by officers, directors, employees, or consultants. We elected to follow our home country practice and did not obtain shareholder approval for the material amendment to our 2010 Plan.

We also rely on exemptions afforded to controlled companies. We are a "controlled company" as defined under the Nasdaq Stock Market Rules because Baidu beneficially owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we are permitted to elect to rely, and currently rely, on certain exemptions from corporate governance rules, including:

- an exemption from the rule that a majority of our board of directors must be independent directors;

- an exemption from the rule that the compensation of our chief executive officer must be determined or recommended solely by independent directors; and

- an exemption from the rule that our director nominees must be selected or recommended solely by independent directors.

A majority of the members of our board of directors are not independent directors. Not all members of our compensation committee are independent directors, and we do not have a nomination and corporate governance committee. As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements.

## ITEM 16.H.    MINE SAFETY DISCLOSURE

Not applicable.

**PART III.**

**ITEM 17.**          **FINANCIAL STATEMENTS**

We have elected to provide financial statements pursuant to Item 18.

**ITEM 18.**          **FINANCIAL STATEMENTS**

The consolidated financial statements of iQIYI, Inc. and its subsidiaries are included at the end of this annual report.

122

**ITEM 19.**          **EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 1.1 | Ninth Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated herein by reference to Exhibit 3.2 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 2.1 | Registrant's Specimen American Depositary Receipt (included in Exhibit 2.3) |
| 2.2 | Registrant's Specimen Certificate for Class A ordinary shares (incorporated herein by reference to Exhibit 4.2 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 2.3 | Deposit Agreement, among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated herein by reference to Exhibit 4.3 to the registration statement on Form S-8 (File No. 333-225165) filed with the SEC on May 24, 2018) |
| 2.4 | Shareholders Agreement between the Registrant and other parties thereto dated October 26, 2017 (incorporated herein by reference to Exhibit 4.4 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 2.5 | Description of Securities (incorporated herein by reference to Exhibit 2.5 to the annual report on Form 20-F (File No. 001-38431) filed with the SEC on March 12, 2020) |
| 4.1 | Third Amended and Restated 2010 Equity Incentive Plan (incorporated herein by reference to Exhibit 10.1 to the registration statement on Form F-3 (File No. 333-251359), filed with the SEC on December 16, 2020) |
| 4.2 | 2017 Share Incentive Plan (incorporated herein by reference to Exhibit 10.2 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.3 | Form of Indemnification Agreement between the Registrant and its directors and executive officers (incorporated herein by reference to Exhibit 10.3 to the registration statement on Form F-1(File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.4 | Form of Employment Agreement between the Registrant and its executive officers (incorporated herein by reference to Exhibit 10.4 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.5 | Master Business Cooperation Agreement between Baidu Holdings and iQIYI, Inc. dated January 19, 2018 (incorporated herein by reference to Exhibit 10.5 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.6 | English translation of the Amended and Restated Shareholder Voting Rights Trust Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 (incorporated herein by reference to Exhibit 10.7 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.7 | English translation of the Amended and Restated Share Pledge Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 (incorporated herein by reference to Exhibit 10.8 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.8 | English translation of the Commitment Letter from iQIYI, Inc. and Beijing QIYI Century to Beijing iQIYI dated January 30, 2013 (incorporated herein by reference to Exhibit 10.9 to the registration statement on Form F-1 (File No. 333223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.9 | English translation of the Amended and Restated Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng dated January 30, 2013 (incorporated herein by reference to Exhibit 10.10 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.10 | English translation of the Amended and Restated Loan Agreement between Beijing QIYI Century and Mr. Xiaohua Geng dated January 30, 2013 (incorporated herein by reference to Exhibit 10.11 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.11 | English translation of the Amended and Restated Business Operation Agreement among Beijing QIYI Century, Beijing iQIYI and Mr. Xiaohua Geng dated January 30, 2013 (incorporated herein by reference to Exhibit 10.12 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.12 | English translation of Power of Attorney by Beijing QIYI Century to iQIYI, Inc. dated January 30, 2013 (incorporated herein by reference to Exhibit 10.13 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |

123

| Exhibit Number | Description |
| --- | --- |
| 4.13 | English translation of Spousal Consent Letter of Ms. Ying Zhang dated September 26, 2016 (incorporated herein by reference to Exhibit 10.14 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.14 | English translation of Loan Agreement among Beijing QIYI Century, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 (incorporated herein by reference to Exhibit 10.15 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.15 | English translation of Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Shanghai iQIYI, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 (incorporated herein by reference to Exhibit 10.16 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.16 | English translation of Share Pledge Agreement among Beijing QIYI Century, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 (incorporated herein by reference to Exhibit 10.17 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.17 | English translation of Shareholder Voting Rights Trust Agreement among Mr. Xiaohua Geng, Dr. Yu Gong and Beijing QIYI Century dated October 25, 2013 (incorporated herein by reference to Exhibit 10.18 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.18 | English translation of Business Operation Agreement among Beijing QIYI Century, Shanghai iQIYI, Mr. Xiaohua Geng and Dr. Yu Gong dated October 25, 2013 (incorporated herein by reference to Exhibit 10.19 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.19 | English translation of Exclusive Technology Consulting and Service Agreement among Beijing QIYI Century and Shanghai iQIYI dated October 25, 2013 (incorporated herein by reference to Exhibit 10.20 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.20 | English translation of Commitment Letter between iQIYI, Inc. and Shanghai iQIYI dated October 25, 2013 (incorporated herein by reference to Exhibit 10.21 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.21 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated September 26, 2016 (incorporated herein by reference to Exhibit 10.22 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.22 | English translation of Spousal Consent Letter of Ms. Ying Zhang dated September 26, 2016 (incorporated herein by reference to Exhibit 10.23 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.23 | English translation of Business Operation Agreement among Beijing QIYI Century, Shanghai Zhong Yuan and Dr. Yu Gong dated January 14, 2014 (incorporated herein by reference to Exhibit 10.24 to the registration statement on Form F1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.24 | English translation of Loan Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 (incorporated herein by reference to Exhibit 10.25 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.25 | English translation of Commitment Letter from iQIYI, Inc. to Shanghai Zhong Yuan dated January 14, 2014 (incorporated herein by reference to Exhibit 10.26 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.26 | English translation of Exclusive Technology Consulting and Service Agreement between Beijing QIYI Century and Shanghai Zhong Yuan dated January 14, 2014 (incorporated herein by reference to Exhibit 10.27 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.27 | English translation of Exclusive Purchase Option Agreement among iQIYI, Inc., Beijing QIYI Century, Dr. Yu Gong and Shanghai Zhong Yuan dated January 14, 2014 (incorporated herein by reference to Exhibit 10.28 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.28 | English translation of Shareholder Voting Rights Trust Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 (incorporated herein by reference to Exhibit 10.29 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.29 | English translation of Share Pledge Agreement between Beijing QIYI Century and Dr. Yu Gong dated January 14, 2014 (incorporated herein by reference to Exhibit 10.30 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |

| Exhibit Number | Description |
| --- | --- |
| 4.30 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated September 26, 2016 (incorporated herein by reference to Exhibit 10.31 to the registration statement on Form F-1 (File No. 333-223263), as amended, initially filed with the SEC on February 27, 2018) |
| 4.31 | English translation of Exclusive Management Consulting and Business Cooperation Agreement among iQIYI New Media, Beijing iQIYI Cinema, Dr. Yu Gong and Mr. Xianghua Yang dated July 27, 2017 (incorporated herein by reference to Exhibit 10.32 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.32 | English translation of Exclusive Share Purchase Agreement among iQIYI New Media, Dr. Yu Gong, Mr. Xianghua Yang and Beijing iQIYI Cinema dated July 27, 2017 (incorporated herein by reference to Exhibit 10.33 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.33 | English translation of Loan Agreement between iQIYI New Media and Mr. Xianghua Yang dated July 27, 2017 (incorporated herein by reference to Exhibit 10.34 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.34 | English translation of Loan Agreement between iQIYI New Media and Dr. Yu Gong dated July 27, 2017 (incorporated herein by reference to Exhibit 10.35 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.35 | English translation of Share Pledge Agreement among iQIYI New Media, Dr. Yu Gong and Beijing iQIYI Cinema dated July 27, 2017 (incorporated herein by reference to Exhibit 10.36 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.36 | English translation of Share Pledge Agreement among iQIYI New Media, Mr. Xianghua Yang and Beijing iQIYI Cinema dated July 27, 2017 (incorporated herein by reference to Exhibit 10.37 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.37 | English translation of Power of Attorney by Mr. Xianghua Yang to iQIYI New Media dated July 27, 2017 (incorporated herein by reference to Exhibit 10.38 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.38 | English translation of Power of Attorney by Dr. Yu Gong to iQIYI New Media dated July 27, 2017 (incorporated herein by reference to Exhibit 10.39 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.39 | English translation of Spousal Consent Letter of Ms. Congyu Lin dated July 27, 2017 (incorporated herein by reference to Exhibit 10.40 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.40 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated July 27, 2017 (incorporated herein by reference to Exhibit 10.41 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.41 | English translation of Power of Attorney by iQIYI New Media to QIYI, Inc. dated July 27, 2017 (incorporated herein by reference to Exhibit 10.42 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.42 | English translation of Commitment Letter by QIYI, Inc. to Beijing iQIYI Cinema dated July 27, 2017 (incorporated herein by reference to Exhibit 10.43 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.43 | English translation of Exclusive Management Consulting and Business Cooperation Agreement among iQIYI New Media, iQIYI Pictures, Dr. Yu Gong and Mr. Ning Ya dated August 30, 2017 (incorporated herein by reference to Exhibit 10.44 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.44 | English translation of Exclusive Share Purchase Agreement among iQIYI New Media, iQIYI Pictures, Dr. Yu Gong and Mr. Ning Ya dated August 30, 2017 (incorporated herein by reference to Exhibit 10.45 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.45 | English translation of Loan Agreement between iQIYI New Media and Mr. Ning Ya dated August 30, 2017 (incorporated herein by reference to Exhibit 10.46 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.46 | English translation of Loan Agreement between iQIYI New Media and Dr. Yu Gong dated August 30, 2017 (incorporated herein by reference to Exhibit 10.47 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |

125

| Exhibit Number | Description |
|---|---|
| 4.47 | English translation of Share Pledge Agreement among iQIYI New Media, Mr. Ning Ya and iQIYI Pictures dated August 30, 2017 (incorporated herein by reference to Exhibit 10.48 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.48 | English translation of Share Pledge Agreement among iQIYI New Media, Dr. Yu Gong and iQIYI Pictures dated August 30, 2017 (incorporated herein by reference to Exhibit 10.49 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.49 | English translation of Power of Attorney by Mr. Ning Ya to iQIYI New Media dated August 30, 2017 (incorporated herein by reference to Exhibit 10.50 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.50 | English translation of Power of Attorney by Dr. Yu Gong to iQIYI New Media dated August 30, 2017 (incorporated herein by reference to Exhibit 10.51 of the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.51 | English translation of Spousal Consent Letter of Ms. Yihong Mou dated August 30, 2017 (incorporated herein by reference to Exhibit 10.52 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.52 | English translation of Exclusive Technology Consulting and Service Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 (incorporated herein by reference to Exhibit 10.53 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.53 | English translation of Software Licensing Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 (incorporated herein by reference to Exhibit 10.54 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.54 | English translation of Trademark Licensing Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 (incorporated herein by reference to Exhibit 10.55 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.55 | English translation of Business Cooperation Agreement between Beijing QIYI Century and Beijing Xinlian Xinde Advertisement Media Co., Ltd. dated December 1, 2011 (incorporated herein by reference to Exhibit 10.56 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.56 | English translation of Loan Agreement between Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing QIYI Century dated January 19, 2018 (incorporated herein by reference to Exhibit 10.67 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.57 | Share Purchase Agreement dated February 12, 2018 by and between iQIYI, Inc. and Baidu Holdings (incorporated herein by reference to Exhibit 10.68 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.58 | English translation of Ticket Business Cooperation Agreement dated February 12, 2018 by and between Baidu Holdings and iQIYI, Inc. (incorporated herein by reference to Exhibit 10.69 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 4.59 | English translation of Share Purchase Agreement among Beijing iQIYI Technology Co., Ltd., iQIYI, Inc., Yunpeng He, Pu Zhang, Xingyou Zhou, Wei Du, Kun Meng, Skymoons (BVI) Group Limited, Chengdu Skymoons Digital Entertainment Co., Ltd. and Skymoons Inc., dated July 10, 2018 (incorporated herein by reference to Exhibit 4.66 to the annual report on Form 20-F (File No. 001-38431) filed with the SEC on March 15, 2019) |
| 4.60* | English translation of form Confirmation Letter executed by Beijing QIYI Century, dated December 21, 2020 |
| 4.61* | English translation of Confirmation Letter executed by the Registrant, dated December 21, 2020 |
| 4.62 | Indenture, dated December 4, 2018 constituting $750 million 3.75% Convertible Senior Notes due 2023 (incorporated herein by reference to Exhibit 4.67 to the annual report on Form 20-F (File No. 001-38431) filed with the SEC on March 15, 2019) |
| 4.63 | Indenture, dated March 29, 2019 constituting $1.2 billion 2.00% Convertible Senior Notes due 2025 (incorporated herein by reference to Exhibit 4.61 to the annual report on Form 20-F (File No. 001-38431) filed with the SEC on March 12, 2020) |
| 4.64* | Indenture, dated December 21, 2020, between the Registrant and Citibank, N.A., as trustee |
| 4.65* | First Supplemental Indenture, dated December 21, 2020, between the Registrant and Citibank, N.A., as trustee |
| 8.1* | Principal Subsidiaries and Consolidated Affiliated Entities of the Registrant |

| Exhibit Number | Description |
|---|---|
| 11.1 | Code of Business Conduct and Ethics of the Registrant (incorporated herein by reference to Exhibit 99.1 to the registration statement on Form F-1 (File No. 333-223263) filed with the SEC on February 27, 2018) |
| 12.1* | CEO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 12.2* | CFO Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 13.1** | CEO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 13.2** | CFO Certification Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 15.1* | Consent of Walkers (Hong Kong) |
| 15.2* | Consent of Jingtian & Gongcheng |
| 15.3* | Consent of Ernst & Young Hua Ming LLP, Independent Registered Public Accounting Firm |
| 101.INS* | Inline XBRL Instance Document — the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104* | Cover Page Interactive Data File — the cover page XBRL tags are embedded within the Exhibit 101 Inline XBRL document set |

*     Filed herewith.

* *     Furnished herewith.

       Instruments defining the rights of holders of certain issues of long-term debt of the Registrant and of certain consolidated subsidiaries, for which financial statements are required to be filed with this annual report, including (i) a two-year loan agreement we entered with JPMorgan Chase Bank, N.A. in 2019, pursuant to which we were entitled to borrow a secured RMB denominated loan of RMB800.0 million for general working capital purposes, and (ii) standard terms of the asset-backed debt securities securitized by certain of our payables to our suppliers issued to third party investors, which raised gross proceeds of RMB946.0 million, have not been filed as exhibits to this annual report because the authorized principal amount of any one of such issues does not exceed 10% of the total assets of the Registrant and our subsidiaries on a consolidated basis. The Registrant agrees to furnish a copy of each of such instrument to the SEC upon request.

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

**iQIYI, INC.**

By:  /s/ Yu Gong

Name: Yu Gong

Title:  Director and Chief Executive Officer

Date:March 9, 2021

128

**iQIYI, INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2019 and 2020 | F-6 |
| Consolidated Statements of Comprehensive Loss for the Years Ended December 31, 2018, 2019 and 2020 | F-9 |
| Consolidated Statements of Changes in Shareholders' Equity for the Years Ended December 31, 2018, 2019 and 2020 | F-11 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2018, 2019 and 2020 | F-13 |
| Notes to Consolidated Financial Statements | F-14 |

F-1

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Shareholders and the Board of Directors of iQIYI, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of iQIYI, Inc. (the "Company") as of December 31, 2019 and 2020, the related consolidated statements of comprehensive loss, changes in shareholders' (deficit)/equity and cash flows for each of the three years in the period ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2020, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 9, 2021 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standard**

As discussed in Note 2 to the consolidated financial statements, the Company changed its method for accounting for licensed copyrights and produced content using a prospective transition method in the year ended December 31, 2020.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Impairment of Mainland China film group content assets*

| | |
|---|---|
| *Description of the Matter* | At December 31, 2020, the carrying value of the Company's licensed copyrights and produced content, net of impairment charges, were RMB7,470,394 thousands (US$1,144,888 thousands) and RMB6,556,084 thousands (US$1,004,764 thousands), respectively. As discussed in Note 2 to the consolidated financial statements, the majority of the Company's content assets (licensed copyrights and produced content) are predominantly monetized together with other content assets. Film groups are reviewed for impairment when there are events or changes in circumstances that indicate the fair value of a film group may be less than its unamortized costs and an impairment charge is recognized for the amount by which the unamortized capitalized costs exceed the film group's fair value. As disclosed in Note 25 of the consolidated financial statements, the outbreak of coronavirus ("COVID-19") during the first quarter of 2020 has negatively impacted the Company's operations and financial performance and resulted in a downward adjustment to forecasted advertising revenues for the Mainland China film group. The Company performed an impairment test as of March 31, 2020 and recognized an impairment charge of RMB390,299 thousands (US$59,816 thousands) related to licensed copyrights and RMB209,701 thousands (US$32,138 thousands) related to produced content for the year ended December 31, 2020, respectively. |
| | Auditing management's estimated fair value of the Mainland China film group required complex auditor judgment due to the significant estimation required by management in forecasting the amount and timing of expected future cash flows and the underlying assumptions used in the discounted cash flow approach. In particular, the fair value estimate was sensitive to significant assumptions such as forecasted future revenues, costs and operating expenses attributable to the film group, and the discount rate. These significant assumptions are forward looking and could be materially affected by future economic and market conditions, changes in user traffic on the Company's platform, and changes in viewership trends of its content, all of which could also be impacted by the ongoing uncertainties around the duration and severity of COVID-19. |

F-2

Table of Contents

| | |
|---|---|
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's film group impairment review process, including controls over management's review of the significant assumptions described above. |

To test impairment measurement of the China Mainland film group, we performed audit procedures that included, among others, evaluating the significant assumptions used to estimate fair value and tested the completeness and accuracy of underlying data used in the assessment. We involved our valuation specialists to assist in assessing the Company's valuation methodology and evaluating the discount rate by comparing it to a discount rate that was independently developed using observable market information. We assessed the reasonableness of the significant assumptions described above by comparing them to the Company's business plans, historical trends, and current industry and economic outlook.

**Amortization of content assets**

| | |
|---|---|
| *Description of the Matter* | For the year ended December 31, 2020, amortization expenses related to licensed copyrights and produced content were RMB11,473,222 thousands (US$1,758,348 thousands) and RMB4,118,953 thousands (US$631,257 thousands), respectively. As discussed in Note 2 to the consolidated financial statements, based on factors including historical and estimated future viewership consumption patterns, the Company's content assets are amortized using an accelerated method by content categories over the shorter of their respective contractual periods or estimated useful lives within ten years, beginning with the month of first availability. |

Auditing the amortization of the Company's content assets required complex and subjective auditor judgment due to the judgment required by management in estimating future viewership consumption patterns for different content categories. If actual viewership consumption patterns differ from these estimates, the pattern and/or period of amortization would be changed and could materially affect the timing of recognition of content amortization. These assumptions are forward looking and can be affected by changes in user traffic on the Company's platform and changes in viewership trends of its content.

F-3

*How We Addressed the Matter in Our Audit*

We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the Company's content assets amortization assessment process. For example, we tested controls over management's review of the amortization method and the significant assumptions, including the historical and forecasted video views used to develop its estimated future viewership consumption patterns by content categories.

To test the amortization of content assets, we performed audit procedures that included, among others, evaluating the amortization method and testing the completeness and accuracy of the underlying data from the systems used in determining estimated viewership consumption patterns. We assessed management's estimated viewership consumption patterns by considering historical and current viewing trends, including comparing previous estimates of consumption patterns to actual results.

/s/ Ernst & Young Hua Ming LLP

We have served as the Company's auditor since 2017.
Beijing, The People's Republic of China
March 9, 2021

F-4

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of iQIYI, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited iQIYI, Inc.'s internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). In our opinion, iQIYI, Inc. (the "Company") maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2019 and 2020, the related consolidated statements of comprehensive loss, changes in shareholders' (deficit)/equity and cash flows for each of the three years in the period ended December 31, 2020, and the related notes and our report dated March 9, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 9, 2021

F-5

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2019 AND 2020**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, 2019 RMB | As of December 31, 2020 RMB | As of December 31, 2020 US$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 5,934,742 | 10,915,282 | 1,672,840 |
| Restricted cash | | 974,932 | 25,230 | 3,867 |
| Short-term investments | 4 | 4,579,313 | 3,358,174 | 514,663 |
| Accounts receivable, net of allowance of RMB144,574 and RMB360,299 (US$55,218) as of December 31, 2019 and 2020, respectively | 6 | 3,627,749 | 3,344,433 | 512,557 |
| Prepayments and other assets | 7 | 3,719,228 | 3,515,855 | 538,828 |
| Amounts due from related parties | 24 | 211,993 | 96,111 | 14,730 |
| Licensed copyrights, net | 8 | 1,224,881 | 1,035,339 | 158,673 |
| **Total current assets** | | **20,272,838** | **22,290,424** | **3,416,158** |
| **Non-current assets:** | | | | |
| Fixed assets, net | 12 | 1,754,367 | 1,393,467 | 213,558 |
| Long-term investments | 5 | 2,982,154 | 3,202,828 | 490,855 |
| Deferred tax assets, net | 16 | 34,916 | 51,347 | 7,869 |
| Licensed copyrights, net | 8 | 6,287,330 | 6,435,055 | 986,215 |
| Intangible assets, net | 9 | 813,960 | 627,198 | 96,122 |
| Produced content, net | 10 | 4,355,221 | 6,556,084 | 1,004,764 |
| Prepayments and other assets | 7 | 3,508,476 | 2,699,423 | 413,705 |
| Operating lease assets | 13 | 722,742 | 1,001,857 | 153,541 |
| Goodwill | 11 | 3,888,346 | 3,888,346 | 595,915 |
| Amounts due from related parties | 24 | 172,200 | 39,400 | 6,038 |
| **Total non-current assets** | | **24,519,712** | **25,895,005** | **3,968,582** |
| **Total assets** | | **44,792,550** | **48,185,429** | **7,384,740** |

F-6

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, 2019 RMB | 2020 RMB | 2020 US$ |
|---|---|---|---|---|
| **LIABILITIES, MEZZANINE EQUITY AND SHAREHOLDERS' EQUITY** | | | | |
| **Current liabilities** (including current liabilities of the consolidated VIEs without recourse to the primary beneficiary of RMB12,093,465 and RMB12,127,963 (US$1,858,692) as of December 31, 2019 and 2020, respectively): | | | | |
| Accounts and notes payable | | 8,212,449 | 7,561,532 | 1,158,855 |
| Amounts due to related parties | 24 | 1,604,258 | 1,778,783 | 272,610 |
| Customer advances and deferred revenue | | 3,081,407 | 3,444,917 | 527,957 |
| Short-term loans | 14 | 2,618,170 | 2,965,957 | 454,553 |
| Long-term loans, current portion | 14 | 736,814 | 909,034 | 139,316 |
| Convertible senior notes, current portion | 15 | — | 4,752,061 | 728,285 |
| Operating lease liabilities, current portion | 13 | 125,412 | 201,307 | 30,852 |
| Accrued expenses | | 2,611,217 | 2,261,985 | 346,664 |
| Other liabilities | | 1,183,439 | 979,002 | 150,039 |
| **Total current liabilities** | | **20,173,166** | **24,854,578** | **3,809,131** |
| **Non-current liabilities** (including non-current liabilities of the consolidated VIEs without recourse to the primary beneficiary of RMB1,932,830 and RMB1,148,695 (US$176,045) as of December 31, 2019 and 2020, respectively): | | | | |
| Long-term loans | 14 | 880,278 | - | - |
| Convertible senior notes | 15 | 12,296,868 | 11,926,715 | 1,827,849 |
| Deferred tax liabilities | 16 | 30,136 | 4,588 | 703 |
| Amounts due to related parties | 24 | 1,061,883 | 977,407 | 149,794 |
| Operating lease liabilities | 13 | 402,732 | 767,676 | 117,651 |
| Other non-current liabilities | | 232,555 | 210,167 | 32,210 |
| **Total non-current liabilities** | | **14,904,452** | **13,886,553** | **2,128,207** |
| **Total liabilities** | | **35,077,618** | **38,741,131** | **5,937,338** |
| **Commitments and contingencies** | 18 | | | |

F-7

**iQIYI, INC.**

**CONSOLIDATED BALANCE SHEETS**
**AS OF DECEMBER 31, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares and per share data)**

| | Note | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2019 | 2020 | 2020 |
| | | RMB | RMB | US$ |
| **Mezzanine equity:** | | | | |
| Redeemable noncontrolling interests | 19 | 101,542 | 108,629 | 16,648 |
| **Shareholders' equity:** | | | | |
| Class A ordinary shares (US$0.00001 par value; 94,000,000,000 shares authorized as of December 31, 2019 and 2020, respectively; 2,603,890,438 and 2,900,519,681 shares issued as of December 31, 2019 and 2020, respectively; 2,259,125,125 and 2,609,809,545 shares outstanding as of December 31, 2019 and 2020, respectively) | 20 | 142 | 165 | 25 |
| Class B ordinary shares (US$0.00001 par value; 5,000,000,000 and 5,000,000,000 shares authorized as of December 31, 2019 and 2020, respectively; 2,876,391,396 and 2,876,391,396 shares issued and outstanding as of December 31, 2019 and 2020, respectively) | 20 | 183 | 183 | 28 |
| Additional paid-in capital | | 41,298,328 | 47,687,483 | 7,308,427 |
| Accumulated deficit | 21 | (33,834,357) | (40,973,853) | (6,279,518) |
| Accumulated other comprehensive income | 26 | 2,106,718 | 2,542,680 | 389,683 |
| Noncontrolling interests | | 42,376 | 79,011 | 12,109 |
| **Total shareholders' equity** | | **9,613,390** | **9,335,669** | **1,430,754** |
| **Total liabilities, mezzanine equity and shareholders' equity** | | **44,792,550** | **48,185,429** | **7,384,740** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS), and per share (or ADS) data)**

| | Note | 2018 RMB | 2019 RMB | 2020 RMB | 2020 US$ |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Membership services (including related party amounts of RMB19,981, RMB27,247 and RMB25,571 (US$3,919) for the years ended December 31, 2018, 2019 and 2020, respectively) | | 10,622,769 | 14,435,611 | 16,491,030 | 2,527,361 |
| Online advertising services (including related party amounts of RMB202,808, RMB77,126 and RMB206,624 (US$31,666) for the years ended December 31, 2018, 2019 and 2020, respectively) | | 9,328,061 | 8,270,600 | 6,822,115 | 1,045,535 |
| Content distribution (including related party amounts of RMB88,457, RMB443,503 and RMB176,227 (US$27,008) for the years ended December 31, 2018, 2019 and 2020, respectively) | | 2,162,643 | 2,544,221 | 2,660,074 | 407,674 |
| Others (including related party amounts of RMB29,296, RMB48,877 and RMB54,064 (US$8,286) for the years ended December 31, 2018, 2019 and 2020, respectively) | | 2,875,643 | 3,743,226 | 3,733,996 | 572,260 |
| **Total revenues** | | **24,989,116** | **28,993,658** | **29,707,215** | **4,552,830** |
| **Operating costs and expenses:** | | | | | |
| Cost of revenues (including related party amounts of RMB789,116, RMB1,565,850 and RMB1,111,729 (US$170,380) for the years ended December 31, 2018, 2019 and 2020, respectively) | | (27,132,811) | (30,348,342) | (27,884,395) | (4,273,470) |
| Selling, general and administrative (including related party amounts of RMB11,666, RMB5,581 and RMB5,045 (US$773) for the years ended December 31, 2018, 2019 and 2020, respectively) | | (4,167,889) | (5,236,007) | (5,187,835) | (795,070) |
| Research and development (including related party amounts of RMB5,114, RMB19,486 and RMB7,412 (US$1,136) for the years ended December 31, 2018, 2019 and 2020, respectively) | | (1,994,652) | (2,667,146) | (2,675,494) | (410,037) |
| **Total operating costs and expenses** | | **(33,295,352)** | **(38,251,495)** | **(35,747,724)** | **(5,478,577)** |
| **Operating loss** | | **(8,306,236)** | **(9,257,837)** | **(6,040,509)** | **(925,747)** |

F-9

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS), and per share (or ADS) data)**

| | Note | Year ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2018 | 2019 | 2020 | 2020 |
| | | RMB | RMB | RMB | US$ |
| **Other income/(expenses)** | | | | | |
| Interest income (including related party amounts of RMB2,202, RMB4,856 and RMB1,247 (US$191) for the years ended December 31, 2018, 2019 and 2020, respectively) | | 213,969 | 402,145 | 157,477 | 24,134 |
| Interest expenses | | (94,711) | (914,371) | (1,066,320) | (163,421) |
| Foreign exchange (loss)/gain, net | | (970,796) | (190,210) | 43,274 | 6,632 |
| Loss from equity method investments | | (16,965) | (155,073) | (224,489) | (34,404) |
| Other income/(loss), net | | 192,309 | (109,541) | 146,690 | 22,481 |
| **Total other expenses, net** | | **(676,194)** | **(967,050)** | **(943,368)** | **(144,578)** |
| **Loss before income taxes** | | **(8,982,430)** | **(10,224,887)** | **(6,983,877)** | **(1,070,325)** |
| Income tax expense | 16 | (78,801) | (51,852) | (23,276) | (3,567) |
| **Net loss** | | **(9,061,231)** | **(10,276,739)** | **(7,007,153)** | **(1,073,892)** |
| Less: Net income attributable to noncontrolling interests | | 48,545 | 46,590 | 31,208 | 4,783 |
| **Net loss attributable to iQIYI, Inc.** | | **(9,109,776)** | **(10,323,329)** | **(7,038,361)** | **(1,078,675)** |
| Accretion of redeemable convertible preferred shares | | (298,990) | — | — | — |
| Accretion of redeemable noncontrolling interests | 19 | — | (1,542) | (7,087) | (1,086) |
| **Net loss attributable to ordinary shareholders** | | **(9,408,766)** | **(10,324,871)** | **(7,045,448)** | **(1,079,761)** |
| **Net loss per Class A and Class B ordinary share:** | 22 | | | | |
| Basic | | (2.43) | (2.02) | (1.36) | (0.21) |
| Diluted | | (2.43) | (2.02) | (1.36) | (0.21) |
| **Net loss per ADS (1 ADS equals 7 Class A ordinary shares):** | 22 | | | | |
| Basic | | (17.01) | (14.14) | (9.52) | (1.47) |
| Diluted | | (17.01) | (14.14) | (9.52) | (1.47) |
| **Shares used in net loss per Class A and Class B ordinary share computation:** | 22 | | | | |
| Basic | | 3,867,931,786 | 5,104,882,400 | 5,176,180,057 | 5,176,180,057 |
| Diluted | | 3,867,931,786 | 5,104,882,400 | 5,176,180,057 | 5,176,180,057 |
| | | | | | |
| **Other comprehensive income** | | | | | |
| Foreign currency translation adjustments | 26 | 1,787,553 | 228,974 | 433,497 | 66,436 |
| Unrealized losses on available-for-sale debt securities | 26 | (689) | (297) | (98) | (15) |
| **Total other comprehensive income, net of tax** | 26 | **1,786,864** | **228,677** | **433,399** | **66,421** |
| **Comprehensive loss** | | **(7,274,367)** | **(10,048,062)** | **(6,573,754)** | **(1,007,471)** |
| Less: Comprehensive income attributable to noncontrolling interests | | 48,589 | 48,495 | 28,645 | 4,390 |
| **Comprehensive loss attributable to iQIYI, Inc.** | | **(7,322,956)** | **(10,096,557)** | **(6,602,399)** | **(1,011,861)** |

The accompanying notes are an integral part of the consolidated financial statements.

F-10

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' (DEFICIT)/EQUITY**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares)**

| | Ordinary shares | | Additional paid-in capital | Accumulated other comprehensive income | Accumulated deficit | Noncontrolling interests | Total shareholders' (deficit)/equity |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
|---|---|---|---|---|---|---|---|
| **Balances as of January 1, 2018** | 342,548,237 | 23 | 600,834 | 93,126 | (15,016,867) | 3,820 | (14,319,064) |
| Cumulative effect of adopting ASC 606 | — | — | — | — | 916,147 | — | 916,147 |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (9,109,776) | 48,545 | (9,061,231) |
| Issuance of ordinary shares upon IPO and underwriters' partial exercise of over-allotment option, net of issuance costs | 942,525,675 | 58 | 14,836,252 | — | — | — | 14,836,310 |
| Conversion of all outstanding redeemable convertible preferred shares to ordinary shares | 3,728,823,500 | 234 | 22,900,420 | — | — | — | 22,900,654 |
| Issuance of Class B ordinary shares pursuant to business cooperation agreement with Baidu | 36,860,691 | 4 | 609,340 | — | — | — | 609,344 |
| Capital contribution from parent company pursuant to the traffic acquisition service contract termination (Note 9) | — | — | 104,200 | — | — | — | 104,200 |
| Equity component of convertible senior notes, net of issuance costs | — | — | 361,571 | — | — | — | 361,571 |
| Purchase of capped call | — | — | (464,825) | — | — | — | (464,825) |
| Exercise of share-based awards | 25,059,198 | 2 | 70,999 | — | — | — | 71,001 |
| Accretion of redeemable convertible preferred shares | — | — | — | — | (298,990) | — | (298,990) |
| Other comprehensive income | — | — | — | 1,786,820 | — | 44 | 1,786,864 |
| Issuance of a subsidiary's shares to noncontrolling interest holders | — | — | 15,989 | — | — | 3,511 | 19,500 |
| Contingent consideration classified as equity pursuant to the business combination | — | — | 75,159 | — | — | — | 75,159 |
| Acquisition of noncontrolling interests pursuant to the business combinations | — | — | — | — | — | 62,712 | 62,712 |
| Share-based compensation | — | — | 556,211 | — | — | — | 556,211 |
| **Balances as of December 31, 2018** | 5,075,817,301 | 321 | 39,666,150 | 1,879,946 | (23,509,486) | 118,632 | 18,155,563 |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (10,323,329) | 46,590 | (10,276,739) |
| Equity component of convertible senior notes, net of issuance costs | — | — | 987,691 | — | — | — | 987,691 |
| Purchase of capped call | — | — | (567,140) | — | — | — | (567,140) |
| Exercise of share-based awards | 59,699,220 | 4 | 151,153 | — | — | — | 151,157 |
| Other comprehensive income | — | — | — | 226,772 | — | 1,905 | 228,677 |
| Issuance of subsidiaries' shares to noncontrolling interest holders | — | — | — | — | — | 6,750 | 6,750 |
| Acquisition of noncontrolling interests in subsidiaries | — | — | (44,066) | — | — | (20,934) | (65,000) |
| Accretion of redeemable noncontrolling interests | — | — | — | — | (1,542) | — | (1,542) |
| Dividends paid and payable by a subsidiary | — | — | — | — | — | (90,547) | (90,547) |
| Deemed disposal of a subsidiary's shares | — | — | 20,020 | — | — | (20,020) | — |
| Share-based compensation | — | — | 1,084,520 | — | — | — | 1,084,520 |
| **Balances as of December 31, 2019** | 5,135,516,521 | 325 | 41,298,328 | 2,106,718 | (33,834,357) | 42,376 | 9,613,390 |
| Cumulative effect of adopting ASU 2016-13 | — | — | — | — | (94,048) | — | (94,048) |
| Net loss attributable to iQIYI, Inc. | — | — | — | — | (7,038,361) | 31,208 | (7,007,153) |
| Issuance of ordinary shares upon follow-on offering, net of issuance costs | 280,000,000 | 18 | 4,451,951 | — | — | — | 4,451,969 |
| Equity component of convertible senior notes, net of issuance costs | — | — | 394,956 | — | — | — | 394,956 |
| Exercise of share-based awards | 70,684,420 | 5 | 193,097 | — | — | — | 193,102 |
| Other comprehensive income | — | — | — | 435,962 | — | (2,563) | 433,399 |
| Issuance of subsidiaries' shares to noncontrolling interest holders | — | — | (918) | — | — | 10,527 | 9,609 |
| Accretion of redeemable noncontrolling interests | — | — | — | — | (7,087) | — | (7,087) |
| Dividends paid and payable by a subsidiary | — | — | — | — | — | (22,563) | (22,563) |
| Share-based compensation | — | — | 1,370,095 | — | — | — | 1,370,095 |
| Others | — | — | (20,026) | — | — | 20,026 | - |
| **Balances as of December 31, 2020** | 5,486,200,941 | 348 | 47,687,483 | 2,542,680 | (40,973,853) | 79,011 | 9,335,669 |
| **Balances as of December 31, 2020, in US$** | | 53 | 7,308,427 | 389,683 | (6,279,518) | 12,109 | 1,430,754 |

The accompanying notes are an integral part of the consolidated financial statements.

F-11

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"))

| | Note | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2018** | **2019** | **2020** | **2020** |
| | | **RMB** | **RMB** | **RMB** | **US$** |
| **Cash flows from operating activities:** | | | | | |
| Net loss | | (9,061,231) | (10,276,739) | (7,007,153) | (1,073,892) |
| **Adjustments to reconcile net loss to net cash provided by operating activities** | | | | | |
| Depreciation of fixed assets | | 312,138 | 476,068 | 480,396 | 73,624 |
| Amortization and impairment of intangible assets | | 346,672 | 972,760 | 317,579 | 48,671 |
| Amortization and impairment of licensed copyrights | | 12,236,239 | 12,743,323 | 11,863,521 | 1,818,164 |
| Amortization and impairment of produced content | | 2,265,543 | 2,977,181 | 4,534,116 | 694,883 |
| Impairment of long-lived assets | | — | — | 143,534 | 21,998 |
| Provision for credit losses | | 107,223 | 58,006 | 265,540 | 40,696 |
| Unrealized foreign exchange loss/(gain) | | 940,479 | 155,079 | (51,819) | (7,942) |
| Loss/(gain) on disposal of fixed assets | | 4,184 | 13,257 | (20,991) | (3,217) |
| Accretion on convertible senior notes and asset-backed debt securities | | 24,544 | 379,916 | 501,033 | 76,787 |
| Barter transaction revenue | | (1,082,964) | (682,941) | (1,376,912) | (211,021) |
| Share-based compensation | | 556,211 | 1,084,520 | 1,370,095 | 209,976 |
| Share of losses on equity method investments | | 16,965 | 155,073 | 224,489 | 34,404 |
| Fair value change and impairment of long-term investments | | (189,639) | 162,350 | 33,928 | 5,200 |
| Fair value change of assets and liabilities remeasured at fair value on a recurring basis | | 13,005 | 5,711 | — | — |
| Interest and other investment income | | — | (25,272) | 49,622 | 7,605 |
| Deferred income tax benefit | | (45,086) | (77,312) | (41,979) | (6,434) |
| Amortization of deferred income | | (5,346) | (12,446) | (14,969) | (2,294) |
| Other non-cash expenses/(income) | | 19,496 | 4,183 | (67,750) | (10,384) |
| **Changes in operating assets and liabilities** | | | | | |
| Accounts receivable | | (543,988) | (810,774) | 8,841 | 1,355 |
| Amounts due from related parties | | (155,361) | 45,717 | 144,423 | 22,134 |
| Licensed copyrights | | — | — | (10,527,700) | (1,613,441) |
| Produced content | | (4,544,977) | (3,596,339) | (6,728,467) | (1,031,183) |
| Prepayments and other assets | | (735,191) | (854,906) | 1,166,105 | 178,713 |
| Accounts payable | | 583,099 | (654,987) | (605,394) | (92,781) |
| Amounts due to related parties | | 435,911 | 460,964 | 77,049 | 11,808 |
| Customer advances and deferred revenue | | 466,961 | 880,844 | 429,510 | 65,825 |
| Accrued expenses and other liabilities | | 817,530 | 132,551 | (580,615) | (88,981) |
| Other non-current liabilities | | 101,769 | 190,440 | 2,897 | 444 |
| **Net cash provided by/(used for) operating activities** | | **2,884,186** | **3,906,227** | **(5,411,071)** | **(829,283)** |
| **Cash flows from investing activities:** | | | | | |
| Acquisition of fixed assets | | (611,910) | (740,163) | (240,750) | (36,897) |
| Acquisition of intangible assets | | (387,539) | (127,505) | (144,978) | (22,219) |
| Acquisition of licensed copyrights from related parties | | (58,660) | (324,040) | — | — |
| Acquisition of licensed copyrights from third parties | | (12,983,396) | (11,633,509) | — | — |
| Purchase of long-term investments | | (883,375) | (706,149) | (1,050,810) | (161,044) |
| Proceeds from disposal of long-term investments | | — | 3,000 | 40,000 | 6,130 |
| Acquisition of business, net of cash acquired | | (1,018,002) | (5,798) | (5,798) | (889) |
| Film investments made as passive investor | | (2,932) | (3,250) | — | — |
| Proceeds from film investments as passive investor | | 6,173 | 27,420 | 1,612 | 247 |

F-12

**iQIYI, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"))**

| | Note | Year ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2018** | **2019** | **2020** | **2020** |
| | | **RMB** | **RMB** | **RMB** | **US$** |
| Loans provided to related parties | | (41,370) | — | — | — |
| Loans provided to third parties | | (359,000) | (46,000) | (9,655) | (1,480) |
| Repayment of loans provided to related parties | | 5,000 | 22,000 | 100,000 | 15,326 |
| Repayment of loans provided to third parties | | 270,000 | 4,500 | — | — |
| Purchases of held-to-maturity debt securities | | (6,638,660) | (8,500,890) | (3,367,103) | (516,031) |
| Maturities of held-to-maturity debt securities | | 2,060,400 | 9,894,325 | 5,202,271 | 797,283 |
| Purchases of available-for-sale debt securities | | (19,465,250) | (14,458,369) | (11,813,599) | (1,810,513) |
| Maturities of available-for-sale debt securities | | 19,159,427 | 14,844,857 | 11,431,950 | 1,752,023 |
| Other investing activities | | — | — | 16,156 | 2,476 |
| **Net cash (used for)/provided by investing activities** | | **(20,949,094)** | **(11,749,571)** | **159,296** | **24,412** |
| **Cash flows from financing activities:** | | | | | |
| Proceeds from loans from related parties | | 650,000 | — | — | — |
| Proceeds from short-term loans | | 3,387,008 | 2,738,224 | 3,559,525 | 545,521 |
| Repayments of short-term loans | | (639,933) | (3,166,503) | (3,219,083) | (493,346) |
| Proceeds from long-term loans and borrowings from third party investors, net of issuance costs | | 453,802 | 945,749 | — | — |
| Repayments of long-term loans and borrowings from third party investors | | (99,119) | (167,837) | (709,192) | (108,688) |
| Proceeds from issuance of convertible senior notes, net of issuance costs | | 5,034,663 | 7,909,506 | 5,150,888 | 789,408 |
| Purchase of capped calls | | (464,825) | (567,140) | — | — |
| Proceeds from issuance of subsidiaries' shares | | 19,500 | 106,750 | 9,609 | 1,473 |
| Acquisition of noncontrolling interests in a subsidiary | | — | (65,000) | — | — |
| Proceeds from initial public offering, net of issuance costs | | 14,896,761 | — | — | — |
| Capital contribution from parent company | | 170,548 | — | — | — |
| Proceeds from issuance of ordinary shares in the follow-on offering, net of issuance costs | | — | — | 4,457,007 | 683,066 |
| Proceeds from exercise of share options | | 66,554 | 146,954 | 196,597 | 30,130 |
| Finance lease payments | | — | (397) | (9,020) | (1,382) |
| Dividends paid by subsidiaries | | — | — | (62,425) | (9,567) |
| **Net cash provided by financing activities** | | **23,474,959** | **7,880,306** | **9,373,906** | **1,436,615** |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | | 617,386 | 112,265 | (91,293) | (13,991) |
| **Net increase in cash, cash equivalents and restricted cash** | | **6,027,437** | **149,227** | **4,030,838** | **617,753** |
| Cash, cash equivalents and restricted cash at the beginning of the year | | 733,010 | 6,760,447 | 6,909,674 | 1,058,954 |
| Cash, cash equivalents and restricted cash at the end of the year | | 6,760,447 | 6,909,674 | 10,940,512 | 1,676,707 |
| **Supplemental disclosures of cash flow information:** | | | | | |
| Cash paid for interest | | 46,390 | 436,651 | 502,985 | 77,086 |
| Cash paid for income taxes | | 20,054 | 171,259 | 97,863 | 14,998 |
| Acquisition of fixed assets included in accounts payable | | 259,948 | 84,605 | 30,341 | 4,650 |
| Acquisition of long-term investments with non-cash consideration | | 763,750 | 7,500 | 4,000 | 613 |

The accompanying notes are an integral part of the consolidated financial statements.

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

## 1.    ORGANIZATION AND BASIS OF PRESENTATION

iQIYI, Inc. (the "Company") was incorporated under the laws of the Cayman Islands on November 27, 2009. It was formerly known as Ding Xin, Inc. and changed its name to Qiyi.com, Inc. on August 30, 2010 and iQIYI, Inc. on November 30, 2017. The Company completed its initial public offering ("IPO") on April 3, 2018.

The Company, its wholly-owned subsidiaries, variable interest entities ("VIEs") and VIEs' subsidiaries are hereinafter collectively referred to as the "Group". The Group is an innovative platform in China offering a diverse collection of high-quality internet video content, including professionally-produced content licensed from professional content providers and self-produced content, on its platform. The Group provides membership services, online advertising services, content distribution services, live broadcasting services and online games services. The Group's principal geographic market is in the People's Republic of China ("PRC"). The Company does not conduct any substantive operations of its own but conducts its primary business operations through its wholly-owned subsidiaries, VIEs and VIEs' subsidiaries in the PRC.

As of December 31, 2020, the Company's major subsidiaries, VIEs and VIEs' subsidiaries are as follows:

| | Place of Incorporation | Date of Establishment/Acquisition | Effective interest held |
|---|---|---|---|
| **Subsidiaries:** | | | |
| Beijing QIYI Century Science & Technology Co., Ltd. ("Beijing QIYI Century") | PRC | March 8, 2010 | 100% |
| iQIYI HK Limited ("QIYI HK", formerly known as Qiyi.com HK Limited) | Hong Kong | April 14, 2011 | 100% |
| iQIYI Media Limited | Cayman | May 26, 2017 | 100% |
| iQIYI Film Group HK Limited | Hong Kong | June 12, 2017 | 100% |
| Beijing iQIYI New Media Science & Technology Co., Ltd. ("iQIYI New Media") | PRC | July 27, 2017 | 100% |
| Skymoons Inc. | Cayman | Acquired on July 17, 2018 | 100% |
| Special (Hong Kong) Co., Ltd. | Hong Kong | Acquired on July 17, 2018 | 80% |
| Shanghai iQIYI Network & Technology Co., Ltd. | PRC | September 6, 2018 | 100% |
| Beijing iQIYI Interactive Technology Co., Ltd. | PRC | January 31, 2019 | 100% |
| iQIYI International Singapore Pte, Ltd. | Singapore | February 11, 2020 | 100% |
| | | | |
| **VIEs and VIEs' subsidiaries:** | | | |
| Beijing iQIYI Science & Technology Co., Ltd. ("Beijing iQIYI", formerly known as Beijing Xinlian Xinde Advertisement Media Co., Ltd.) | PRC | Acquired on November 23, 2011 | Nil |
| Shanghai iQIYI Culture Media Co., Ltd. ("Shanghai iQIYI") | PRC | December 19, 2012 | Nil |
| Shanghai Zhong Yuan Network Co., Ltd. ("Shanghai Zhong Yuan") | PRC | Acquired on May 11, 2013 | Nil |
| iQIYI Pictures (Beijing) Co., Ltd. ("iQIYI Pictures") | PRC | December 31, 2014 | Nil |
| Beijing iQIYI Intelligent Entertainment Technology Co., Ltd. ("Intelligent Entertainment", formerly known as Beijing iQIYI Cinema Management Co., Ltd.) | PRC | June 28, 2017 | Nil |
| Chengdu Skymoons Interactive Network Game Co., Ltd. ("Skymoons Interactive") | PRC | Acquired on July 17, 2018 | Nil |

F-14

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

In July 2018, the Company and its subsidiaries Beijing iQIYI and Shanghai Zhong Yuan acquired a controlling equity interest in Skymoons Inc, Chengdu Skymoons and their subsidiaries (collectively referred to as "Skymoons").

PRC laws and regulations prohibit or restrict foreign ownership of companies that engage in value-added telecommunication services, internet audio-video program services and certain other businesses. To comply with these foreign ownership restrictions, the Group operates its websites and primarily conducts its business in the PRC through the VIEs. The paid-in capital of the VIEs was mainly funded by the Company through loans extended to the authorized individuals who were the shareholders of the VIEs. The Company has entered into certain agreements with the shareholders of the VIEs through the Company or its wholly-owned subsidiaries in the PRC, including loan agreements for the paid-in capital of the VIEs and share pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs. In addition, the Company or its wholly-owned subsidiaries has entered into shareholder voting rights trust agreements, powers of attorney and exclusive purchase option agreements with the VIEs and nominee shareholders of the VIEs, which give the Company or its wholly-owned subsidiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Commitment letters have been entered into which obligate the Company to absorb losses of the VIEs that could potentially be significant to the VIEs and certain exclusive agreements have been entered into that entitle the Company or its wholly-owned subsidiaries to receive economic benefits from the VIEs that potentially could be significant to the VIEs.

Despite the lack of legal majority ownership, the Company has effective control of the VIEs through a series of contractual arrangements (the "Contractual Arrangements") and a parent-subsidiary relationship exists between the Company and the VIEs. Through the Contractual Arrangements, the shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Company. In addition, through the other exclusive agreements, which consist of the business operation agreements/exclusive management consulting and business cooperation agreements, exclusive technology consulting and services agreements, trademark license agreements and software usage license agreements and business cooperation agreement, the Company, through its wholly-owned subsidiaries in the PRC, have the right to receive economic benefits from the VIEs that potentially could be significant to the VIEs. Lastly, through the commitment letters, the Company has the obligation to absorb losses of the VIEs that could potentially be significant to the VIEs. Therefore, the Company is considered the primary beneficiary of the VIEs and consolidates the VIEs and their subsidiaries as required by Accounting Standards Codification ("ASC") topic 810 ("ASC 810"), *Consolidation*.

The principal terms of the Contractual Arrangements are further described below:

*Loan Agreements*

Pursuant to the loan agreement amongst Beijing QIYI Century and the shareholder of Beijing iQIYI, amended and restated on January 30, 2013, Beijing QIYI Century provided a RMB27 million interest-free loan to the shareholder of Beijing iQIYI solely for funds necessary for the capital injection to Beijing iQIYI. The loan can be repaid only with the proceeds from the sale of all of the equity interest in Beijing iQIYI to the Company or its designated representative(s) if permitted under PRC laws. The term of the loan agreement expires on June 23, 2021 originally, which was extended on December 21, 2020 for another ten years and can be further extended upon the written notification from Beijing QIYI Century.

The loan agreement entered into between Beijing QIYI Century and the shareholders of Shanghai iQIYI dated October 25, 2013, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of Shanghai iQIYI is RMB10 million and the term of the loan agreement will expire on October 24, 2023.

The loan agreement entered into between Beijing QIYI Century and the shareholder of Shanghai Zhong Yuan, amended on January 14, 2014, contains terms similar to the terms described above, except that the total amount of the loan to the shareholder of Shanghai Zhong Yuan is RMB20 million and the term of the loan agreement will expire on January 13, 2024.

F-15

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

The loan agreement entered into between iQIYI New Media and the shareholders of Intelligent Entertainment dated July 27, 2017, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of Intelligent Entertainment is RMB20 million and the term of the loan agreement will expire on July 26, 2027.

The loan agreement entered into between iQIYI New Media and the shareholders of iQIYI Pictures dated August 30, 2017, contains terms similar to the terms described above, except that the total amount of loans extended to the shareholders of iQIYI Pictures is RMB100 million and the term of the loan agreement will expire on August 29, 2027.

*Exclusive Purchase Option Agreements*

Pursuant to the exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Beijing iQIYI and its shareholder, amended and restated on January 30, 2013, the shareholder granted the Company an exclusive irrevocable option to purchase, all or part of the equity interests held by its shareholder, when and to the extent permitted under PRC law, at an amount equal to the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. In addition, Beijing iQIYI's shareholder granted the Company an exclusive right to designate one or more persons to purchase all the equity interests in Beijing iQIYI. Without the prior written consent of the Company, Beijing iQIYI may not: (i) amend its articles of association, (ii) increase or decrease the registered capital, (iii) sell or otherwise dispose of its assets or beneficial interest, (iv) create or allow any encumbrance on its assets or other beneficial interests, (v) extend any loans to third parties, (vi) enter into any material contract with a value of more than RMB300 (except those contracts entered into in the ordinary course of business), (vii) merge with or acquire any other persons or make any investments, or (viii) distribute dividends to its shareholders. Beijing iQIYI's shareholder also agrees that he will not dispose the equity interests in Beijing iQIYI nor create or allow any encumbrance on the equity interests and extend any loans to individuals without the prior written consent of the Company. The shareholder should remit to the Company any amount that is paid by the Company or its designated person(s) in connection with the purchased equity interest. Any and all dividends and other capital distributions from Beijing iQIYI to its shareholders should be repaid to the Company. The agreement will terminate when Beijing iQIYI's shareholder transfers all of his equity interests in Beijing iQIYI to the Company or its designated person(s) or upon expiration of the term of business of the Company or Beijing iQIYI. The original term of the agreement is ten years, which was extended on December 21, 2020 for another ten years and may be further renewed at the discretion of the Company.

The exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Shanghai iQIYI and its shareholders dated October 25, 2013, the exclusive purchase option agreement amongst the Company, Beijing QIYI Century, Shanghai Zhong Yuan and its shareholder, amended on January 14, 2014, the exclusive purchase option agreement amongst iQIYI New Media, Intelligent Entertainment and its shareholders on July 27, 2017, and the exclusive purchase option agreement amongst iQIYI New Media, iQIYI Pictures and its shareholders on August 30, 2017, contain terms similar to the terms described above.

*Commitment Letters*

Pursuant to the commitment letter dated January 30, 2013, under the condition that Beijing iQIYI remains as a consolidated affiliated entity of the Company under United States generally accepted accounting principles ("U.S. GAAP") and the relevant contractual arrangements remain in effect, the Company commits to provide unlimited financial support to Beijing iQIYI, if Beijing iQIYI requires any form of reasonable financial support for its normal business operations. If Beijing iQIYI incurs any losses and as a result cannot repay its loans from the Company and Beijing QIYI Century, the Company and Beijing QIYI Century would unconditionally forgive their loans to Beijing iQIYI, if Beijing iQIYI provides sufficient proof for its loss and incapacity to repay.

The commitment letters executed by the Company for Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures and Intelligent Entertainment, contain terms similar to the terms described above.

*Shareholder Voting Rights Trust Agreements and Powers of Attorney*

Pursuant to the shareholder voting rights trust agreement amongst Beijing QIYI Century and Beijing iQIYI's shareholder, amended and restated on January 30, 2013, Beijing iQIYI's shareholder agreed to entrust all the rights to exercise its voting power and any other rights as Beijing iQIYI's shareholder to the person(s) designated by Beijing QIYI Century. Beijing iQIYI's shareholder

F-16

iQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

agreed to irrevocably appoint the person(s) designated by Beijing QIYI Century as his attorney-in-fact to represent him to exercise all the voting rights and other shareholders' rights on his behalf on all matters requiring shareholder approval. The agreement will remain effective for as long as the shareholder remains the shareholder of Beijing iQIYI unless Beijing QIYI Century unilaterally terminates the agreement by written notice. Pursuant to an irrevocable power of attorney, Beijing QIYI Century granted all of its rights under the shareholder voting rights trust agreement to the Company.

The shareholder voting rights trust agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, and the shareholder voting rights trust agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, contain terms similar to the terms described above except under the shareholder voting rights trust agreements, the person designated by Beijing QIYI Century as the attorney-in-fact to represent the shareholders of Shanghai iQIYI and Shanghai Zhong Yuan must be approved by the Company. The powers of attorney amongst the Company, iQIYI New Media and the shareholders of iQIYI Pictures and the powers of attorney amongst the Company, iQIYI New Media and the shareholders of Intelligent Entertainment are substantially the same as the terms discussed above.

*Exclusive Technology Consulting and Services Agreements*

Pursuant to the exclusive technology consulting and services agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing QIYI Century has the sole and exclusive right to provide to Beijing iQIYI specified technology consulting and services in return for service fees. Beijing iQIYI agrees to accept such services and, without the prior written consent of Beijing QIYI Century, may not accept the same or similar technology consulting and services provided by any third party during the term of the agreement. Beijing iQIYI agrees to pay specified service fees to Beijing QIYI Century on a quarterly basis. Beijing QIYI Century has the right to unilaterally adjust the amount of the service fee through written confirmation, without prior consent from Beijing iQIYI. All the benefits and interests generated from the agreement, including but not limited to software copyrights, intellectual property rights, know-how and trade secrets, become the sole and exclusive rights of Beijing QIYI Century. The agreement has a term of ten years originally, which was extended on December 21, 2020 for another ten years, unless Beijing QIYI Century unilaterally terminates the agreement by giving written notification at least thirty days prior to the expiration of the agreement. The agreement can also be further renewed at the discretion of Beijing QIYI Century.

The exclusive technology consulting and services agreement amongst Beijing QIYI Century and Shanghai iQIYI on October 25, 2013, the exclusive technology consulting and services agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan, amended on January 14, 2014, the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and Intelligent Entertainment on July 27, 2017, and the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and iQIYI Pictures on August 30, 2017, contain terms similar to the terms described above.

*Share Pledge Agreements*

Pursuant to the share pledge agreement amongst Beijing QIYI Century and Beijing iQIYI's shareholder, amended and restated on January 30, 2013, Beijing iQIYI's shareholder has pledged all of his equity interest in Beijing iQIYI to guarantee his and Beijing iQIYI's performance of their obligations under, the exclusive technology consulting and services agreement and the amended and restated loan agreement. During the term of the share pledge agreement, Beijing QIYI Century has the right to receive all of the dividends and profits distributed on the pledged equity. If Beijing iQIYI or its shareholder breaches its respective contractual obligations, Beijing QIYI Century, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholder of Beijing iQIYI agrees not to dispose of the pledged equity interests, create or allow any encumbrance on the pledged equity interests or take any actions that would prejudice Beijing QIYI Century's interest. The share pledge agreement will expire after Beijing iQIYI and its shareholder has completed all their obligations under the exclusive technology consulting and services agreement and the amended and restated loan agreement unless otherwise unilaterally terminated by Beijing QIYI Century.

The share pledge agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, the share pledge agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, the share pledge agreement amongst iQIYI New Media and Intelligent Entertainment's shareholders on July 27, 2017, and the share pledge agreement amongst iQIYI New Media and iQIYI Pictures' shareholders on August 30, 2017, contain terms similar to the terms described above except that the pledged equity interest is only to guarantee performance of their obligations under the loan agreements.

F-17

iQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Business Operation Agreements / Exclusive Management Consulting and Business Cooperation Agreements*

Pursuant to the business operation agreement amongst Beijing QIYI Century, Beijing iQIYI and its shareholder, amended and restated on January 30, 2013, Beijing iQIYI agrees to accept the proposal provided by Beijing QIYI Century from time to time relating to employment, daily business and financial management. This agreement can only be unilaterally revoked/amended by Beijing QIYI Century. The agreement has a term of ten years originally, which was extended on December 21, 2020 for another ten years and is further renewable at the discretion of Beijing QIYI Century.

The business operation agreement amongst Beijing QIYI Century and Shanghai iQIYI's shareholders dated October 25, 2013, the business operation agreement amongst Beijing QIYI Century and Shanghai Zhong Yuan's shareholder, amended on January 14, 2014, the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and Intelligent Entertainment on July 27, 2017, and the exclusive management consulting and business cooperation agreement amongst iQIYI New Media and iQIYI Pictures on August 30, 2017, contain terms similar to the terms described above.

*Trademark License Agreement and Software Usage License Agreement*

Pursuant to the trademark license agreement and the software usage license agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing QIYI Century granted a non-exclusive and non-transferable license, without sublicensing rights, to Beijing iQIYI to use its trademarks and software. Beijing iQIYI may only use the licenses in its own business operations. Beijing QIYI Century has the right to adjust the service fees at its sole discretion. The initial term of the two agreements is five years and the software usage license agreement may be extended upon the written consent of Beijing QIYI Century. The trademark license agreement is automatically extended for successive one-year periods after its expiration unless Beijing QIYI Century early terminates the agreement in accordance with the provisions of the agreement. The software usage license agreement was extended for another five years after its initial term, and was extended for another ten years on December 21, 2020.

*Business Cooperation Agreement*

Pursuant to the business cooperation agreement amongst Beijing QIYI Century and Beijing iQIYI effective November 23, 2011, Beijing iQIYI agrees to provide Beijing QIYI Century with services, including internet information services, online advertising and other services reasonably necessary within the scope of Beijing QIYI Century's business. Beijing iQIYI agrees to use, technology services provided by Beijing QIYI Century on its website, including but not limited to, P2P download and video on-demand systems. Beijing QIYI Century agrees to pay specified service fees to Beijing iQIYI as consideration for the internet information services and other services provided by Beijing iQIYI. Beijing iQIYI has the right to waive the service fees at its discretion. The original term of this agreement is ten years, which was extended on December 21, 2020 for another ten years and can be further renewed at Beijing QIYI Century's discretion.

In the opinion of the Company's legal counsel, (i) the ownership structure relating to the VIEs of the Company is in compliance with existing PRC laws and regulations; and (ii) each of the contractual arrangements with the VIEs and their shareholders, and the Contractual Arrangements taken as a whole, are valid and legally binding upon each party to such agreement under PRC laws; is enforceable against each party thereto in accordance with its terms; and does not contravene any applicable PRC laws or regulations currently in effect.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability to enforce its rights under these contractual arrangements. Furthermore, the VIEs' shareholders may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC law, the Company may be subject to penalties, including but not be limited to: the cancelation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other penalties may result in a material and adverse effect on the Company's ability to conduct its operations. As a result, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

F-18

**IQIYI, INC.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

The carrying amounts of the assets, liabilities and the results of operations of the VIEs and VIEs' subsidiaries included in the Company's consolidated balance sheets and statements of comprehensive loss are as follows:

| | As of December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | 882,743 | 855,749 | 131,149 |
| Short-term investments | 169,565 | 825,352 | 126,491 |
| Accounts receivable, net | 2,839,945 | 2,928,385 | 448,795 |
| Licensed copyrights, net | 716,008 | 764,904 | 117,227 |
| Prepayments and other assets | 3,202,489 | 2,968,839 | 454,994 |
| **Total current assets** | **7,810,750** | **8,343,229** | **1,278,656** |
| **Non-current assets:** | | | |
| Fixed assets, net | 856,116 | 726,986 | 111,415 |
| Long-term investments | 2,130,467 | 2,217,776 | 339,889 |
| Licensed copyrights, net | 1,640,582 | 992,549 | 152,115 |
| Produced content, net | 4,355,221 | 6,129,754 | 939,426 |
| Operating lease assets | 649,273 | 755,309 | 115,756 |
| Goodwill | 2,412,989 | 2,412,989 | 369,807 |
| Others | 1,552,160 | 1,078,362 | 165,266 |
| **Total non-current assets** | **13,596,808** | **14,313,725** | **2,193,674** |
| **Total assets** | **21,407,558** | **22,656,954** | **3,472,330** |
| **LIABILITIES** | | | |
| **Third-party liabilities** | | | |
| **Current liabilities:** | | | |
| Accounts payable | 4,193,022 | 3,718,306 | 569,855 |
| Customer advances and deferred revenue | 2,982,011 | 3,407,352 | 522,200 |
| Short-term loans | 624,000 | 1,100,694 | 168,689 |
| Long-term loans, current portion (i) | 732,213 | 937,782 | 143,721 |
| Operating lease liabilities, current portion | 95,905 | 101,866 | 15,612 |
| Accrued expenses and other liabilities | 3,466,314 | 2,861,963 | 438,615 |
| **Total current liabilities** | **12,093,465** | **12,127,963** | **1,858,692** |
| **Non-current liabilities:** | | | |
| Long-term loans (i) | 937,782 | — | — |
| Operating lease liabilities | 364,853 | 637,381 | 97,683 |
| Other non-current liabilities | 630,195 | 511,314 | 78,362 |
| **Total non-current liabilities** | **1,932,830** | **1,148,695** | **176,045** |
| **Amounts due to the Company and its subsidiaries** | **13,583,317** | **16,558,843** | **2,537,754** |
| **Total liabilities** | **27,609,612** | **29,835,501** | **4,572,491** |

| | For the year ended December 31, | | | |
|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 |
| | RMB | RMB | RMB | US$ |
| Total revenues | 22,982,783 | 26,887,129 | 27,412,800 | 4,201,195 |
| Net loss | (2,749,657) | (3,341,662) | (1,360,562) | (208,515) |
| Net cash provided by operating activities | 4,548,220 | 2,494,045 | 980,975 | 150,341 |
| Net cash used for investing activities | (6,671,588) | (3,409,845) | (625,675) | (95,889) |
| Net cash provided by/(used for) financing activities | 2,202,196 | 1,180,387 | (380,298) | (58,283) |

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

(i) In accordance with the arrangement as described in Note 14, the Group consolidates the securitization vehicles as it is a VIE for which the Group considers itself the primary beneficiary given the Group has the power to govern the activities that most significantly impact its economic performance and is obligated to absorb losses that could potentially be significant to the VIE. As of December 31, 2019 and 2020, RMB424,000 and RMB527,000 (US$80,766), respectively, of the loan is repayable within one year and is included in "Long-term loans, current portion" and the remaining balance of RMB527,000 and nil, respectively, of the loan is included in non-current liabilities in the carrying amounts of the liabilities of the VIEs and VIEs' subsidiaries.

Unrecognized revenue-producing assets held by the VIEs include certain internet content provisions and other licenses, domain names and trademarks. The internet content provisions and other licenses, which are held by the VIEs that provide the relevant services, are required under relevant PRC laws, rules and regulations for the operation of Internet businesses in the PRC, and therefore are integral to the Company's operations. The VIEs and VIEs' subsidiaries contributed an aggregate of 92%, 93% and 92% of the Group's consolidated revenues for the years ended December 31, 2018, 2019 and 2020, respectively, after elimination of inter-company transactions. As of December 31, 2020, there was no pledge or collateralization of the VIEs and VIEs' subsidiaries' assets that can only be used to settled obligations of the VIEs and VIEs' subsidiaries, other than aforementioned in the share pledge agreements, business operation agreements and collateralization of a VIE's office building as described in Note 14.

The VIEs' third-party creditors did not have recourse to the general credit of the Company in normal course of business. The Company did not provide or intend to provide financial or other support not previously contractually required to the VIEs and VIEs' subsidiaries during the years presented.

## 2.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of consolidation*

The consolidated financial statements have been prepared in accordance with U.S. GAAP. The consolidated financial statements of the Group include the financial statements of the Company, its subsidiaries, VIEs and VIEs' subsidiaries in which the Company is the primary beneficiary. The results of the subsidiaries are consolidated from the date on which the Group obtained control and continues to be consolidated until the date that such control ceases. A controlling financial interest is typically determined when a company holds a majority of the voting equity interest in an entity. However, if the Company demonstrates its ability to control the VIEs through power to govern the activities which most significantly impact its economic performance and is obligated to absorb losses of the VIEs that could potentially be significant to the VIEs or the right to receive benefits from the VIEs that could potentially be significant to the VIEs, then the entity is consolidated. All intercompany balances and transactions between the Company, its subsidiaries, VIEs and VIEs' subsidiaries have been eliminated in consolidation.

*Use of estimates*

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the standalone selling prices of performance obligations of revenue contracts, accrued sales rebates for online advertising revenues, the allowance for credit losses of accounts receivable, contract assets, amounts due from related parties, and debt securities, future viewership consumption patterns and useful lives of licensed copyrights and produced content, future revenues generated by the broadcasting and sublicensing rights of content assets (licensed and produced), useful lives of certain finite-lived intangible assets, fair values of certain debt and equity investments, recoverability and useful lives of long-lived assets, recoverability of indefinite-lived intangible assets and goodwill, ultimate revenue of produced content predominantly monetized on its own, fair values of licensed copyrights and produced content monetized as a film group or individually, the purchase price allocation and fair value of noncontrolling interests with respect to business combinations, fair value of share options to purchase the Company's ordinary shares, fair value of nonmonetary content exchanges, fair value of financial instruments, forfeiture rates for share options granted, valuation allowances on deferred tax assets and income tax uncertainties, among others. Management bases these estimates on its historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

*Comparative Information*

Certain items in the consolidated statements of cash flows and the financial information of the VIEs and VIEs' subsidiaries have been adjusted to conform with the current year's presentation to facilitate comparison.

IQIYI, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued
### (Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
### except for number of shares (or ADS) and per share (or ADS) data)

*Convenience translation*

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.5250 per US$1.00 on December 31, 2020, the last business day in fiscal year 2020, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

*Foreign currency translation and transactions*

The Company's functional currency is the US$ and its reporting currency is the RMB. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC topic 830, *Foreign Currency Matters* ("ASC 830"). The functional currency of the subsidiaries in the Cayman Islands and Hong Kong is the U.S. dollar. The functional currencies of the subsidiaries, VIEs and VIEs' subsidiaries in Mainland China are the RMB. The Company uses the monthly average exchange rate for the year and the exchange rate at the balance sheet date to translate the operating results and financial position to its reporting currency, respectively. Translation differences are recorded in accumulated other comprehensive income, a component of shareholders' equity.

Transactions denominated in foreign currencies are re-measured into the functional currency at the exchange rates prevailing on the transaction dates. Financial assets and liabilities denominated in foreign currencies are re-measured into the functional currency at the exchange rates prevailing at the balance sheet date.

*Cash and cash equivalents*

Cash and cash equivalents primarily consist of cash, money market funds, investments in interest bearing demand deposit accounts, time deposits, and highly liquid investments with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

*Restricted Cash*

Cash that is restricted as to withdrawal or for use or pledged as security is reported separately on the consolidated balance sheets. The Group's restricted cash mainly represents restricted deposits used as security against short-term loans.

*Short-term investments*

All highly liquid investments with maturities of greater than three months, but less than twelve months, are classified as short-term investments.

Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments. The Company accounts for short-term investments in accordance with ASC topic 320, *Investments—Debt and Equity Securities* ("ASC 320"). The Company classifies the short-term investments as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings.

The securities that the Company has the positive intent and the ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. The Company determines realized gains or losses on sale of held-to-maturity securities on a specific identification method, and records such gains or losses in earnings. Held-to-maturity debt securities purchased from a financial institution and pledged as collateral for certain long-term loans, are classified as "Short-term investments" on the consolidated balance sheets when maturing within the next twelve months and "Long-term investments" on the consolidated balance sheets if maturing beyond the next twelve months.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

F-21

Table of Contents

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale securities are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income. Realized gains or losses are included in earnings during the period in which the gain or loss is realized.

### *Adoption of ASU 2016-13*

In June 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") 2016-13, *Measurement of Credit Losses on Financial Instruments*, which replaces the incurred loss impairment guidance in legacy GAAP and establishes a single allowance framework for financial assets carried at amortized cost with a methodology that requires consideration of a broader range of information to estimate credit losses. The Group adopted ASU 2016-13 on January 1, 2020, using a modified retrospective transition method, which resulted in a cumulative-effect adjustment to increase the opening balance of accumulated deficit on January 1, 2020 by RMB94,048, among which credit losses related to accounts receivable and contract assets amounted to RMB83,726 (US$12,832).

The Group maintains an allowance for credit losses for accounts receivable, contract assets and receivables from online payment agencies, which is recorded as an offset to accounts receivable, contract assets and receivables from online payment agencies, and the estimated credit losses charged to the allowance is classified as "Selling, general and administrative" in the consolidated statements of comprehensive loss. When similar risk characteristics exist, the Group assesses collectability and measure expected credit losses on a collective basis for a pool of assets, whereas if similar risk characteristics do not exist, the Group assesses collectability and measures expected credit losses on an individual asset basis. In determining the amount of the allowance for credit losses, the Group considers historic collection experience, the age of the accounts receivable and contract assets balances, credit quality of the Group's customers, current economic conditions, reasonable and supportable forecasts of future economic conditions, and other factors that may affect the customer's ability to pay.

For debt securities, the allowance for credit losses reflects the Group's estimated expected losses over the contractual lives of the debt securities and is recorded as a charge to "Other income/(loss), net" in the consolidated statements of comprehensive loss. Estimated allowances of credit losses are determined by considering reasonable and supportable forecasts of future economic conditions in addition to information about past events and current conditions.

### *Accounts receivable, net*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for credit losses. An estimate for the allowance for credit losses is discussed above ("Adoption of ASU 2016-13"). The receivable balances are written off when they are deemed uncollectible. The Group generally does not require collateral from its customers.

### *Receivables from Online Payment Agencies, net*

Receivables from online payment agencies are cash due from the third-party online payment service providers for clearing transactions. The cash was paid or deposited by customers or users through these online payment agencies for services provided by the Group. The Group carefully considers and monitors the credit worthiness of the third-party payment service providers used and provides an allowance for credit losses as discussed in "Adoption of ASU 2016-13". Receivable balances are written off when they are deemed uncollectible. The balances are included in "Prepayments and other assets" on the consolidated balance sheets. As of December 31, 2019 and 2020, allowance for credit losses provided for the receivables from online payment agencies were insignificant.

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Fixed assets, net*

Fixed assets are stated at cost and are depreciated using the straight-line method over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Office furniture and equipment | 3 to 5 years |
| Leasehold improvements | over the shorter of lease terms or estimated useful lives of the assets |
| Office building | 43 years |
| Others | 5 years |

Repair and maintenance costs are expensed as incurred, whereas the cost of renewals and betterments that extend the useful lives of the assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in the consolidated statements of comprehensive loss.

All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when ready for their intended use.

*Business Combinations*

The Company accounts for its business combinations using the acquisition method of accounting in accordance with ASC topic 805, *Business Combinations* ("ASC 805"). The acquisition method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Group acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The Group also evaluates all contingent consideration arrangements to determine if the arrangements are compensatory in nature. If the Group determines that a contingent consideration arrangement is compensatory, the arrangement would be accounted for outside of the business combination and recorded as compensation expense in the post-acquisition financial statements of the combined entity. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Group determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons.

*Long-term investments*

The Group's long-term investments consist of equity securities without readily determinable fair values, equity method investments, available-for-sale debt securities accounted for at fair value and equity securities with readily determinable fair value.

F-23

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Equity investments, except for those accounted for under the equity method, those that result in consolidation of the investee and certain other investments, are measured at fair value in accordance with ASC topic 321, *Investments—Equity Securities* ("ASC 321") and any changes in fair value are recognized in earnings. For equity securities without readily determinable fair values and do not qualify for the existing practical expedient in ASC topic 820, *Fair Value Measurements and Disclosures* ("ASC 820") to estimate fair value using the net asset value per share (or its equivalent) of the investment, the Group elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any. Equity securities with readily determinable fair values are measured at fair value, and any changes in fair value are recognized in earnings.

Investments in entities in which the Group can exercise significant influence and holds an investment in voting common stock or in-substance common stock (or both) of the investee but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323, *Investments—Equity Method and Joint Ventures* ("ASC 323"). Under the equity method, the Group initially records its investment at cost and the difference between the cost of the equity investee and the amount of the underlying equity in the net assets of the equity investee is accounted for as if the investee was a consolidated subsidiary. The Group subsequently adjusts the carrying amount of the investments to recognize the Group's proportionate share of each equity investee's net income or loss into earnings after the date of investment. Intra-entity profits and losses shall be eliminated until realized by the Group or investee as if the investee was consolidated. The Group evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in the consolidated statements of comprehensive loss when the decline in value is determined to be other-than-temporary.

Available-for-sale debt securities are convertible debt instruments issued by private companies, which are measured at fair value, with interest income recorded in earnings and unrealized gains or losses recorded in accumulated other comprehensive income.

*Adoption of ASU 2019-02*

In March 2019, the FASB issued ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02") which includes the following major changes from previous legacy GAAP that are applicable to us:

•  the content distinction for capitalization of production costs of an episodic television series and production costs of films is removed;

•  entities are required to test films and license agreements for program material for impairment at a film group level when the film or license agreements are predominantly monetized with other films and license agreements;

•  entities shall assess estimates of the use of a film in a film group and account for such changes prospectively;

•  cash outflows for the costs incurred to obtain rights for both produced and licensed content are required to be reported as operating cash outflows in the statement of cash flows.

The Group adopted ASU 2019-02 on January 1, 2020, using a prospective transition method. For the year ended December 31, 2020, cash outflows for the costs incurred to acquired licensed copyrights are reported as operating cash outflows in the Group's consolidated statement of cash flows whereas they were reported as investing cash outflows prior to the adoption of ASU 2019-02. There was no material impact to the consolidated balance sheet or consolidated statement of comprehensive loss. See the Group's updated accounting policies for Produced Content and Licensed Copyrights for further details.

F-24

**IQIYI, INC.**

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued
### (Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
### except for number of shares (or ADS) and per share (or ADS) data)

Cash paid for content, which includes both licensed copyrights and produced content, is RMB17,009,167 (US$2,606,769) for the year ended December 31, 2020.

### *Produced content, net*

The Group produces original content in-house and collaborates with external parties. Produced content primarily consists of films, episodic series, variety shows and animations. The costs incurred in the physical production of original content includes direct production costs, production overhead and acquisition costs. Production costs for original content that are predominantly monetized in a film group are capitalized and reported separately as non-current assets with caption of "Produced content, net" on the consolidated balance sheets. Production costs for original content predominantly monetized on its own are capitalized to the extent that they are recoverable from total revenues expected to be earned ("ultimate revenue"); otherwise, they are expensed as cost of revenues. Ultimate revenue estimates include revenue expected to be earned from all sources, including exhibition, licensing, or exploitation of produced content if the Group has demonstrated a history of earning such revenue. The Group estimates ultimate revenue to be earned during the estimated useful lives of produced content based on anticipated release patterns and historical results of similar produced content, which are identified based on various factors, including cast and crew, target audience and popularity. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Exploitation costs are expensed as incurred.

Based on factors including historical and estimated future viewership consumption patterns, the Group amortizes film costs for produced content that is predominantly monetized in a film group. For produced content that is monetized on its own, the Group considers historical and estimated usage patterns to determine the pattern of amortization for film costs. Based on the estimated patterns, the Group amortizes produced content using an accelerated method over its estimated useful lives within ten years, beginning with the month of first availability and such costs are included in "Cost of revenues" in the consolidated statements of comprehensive loss.

### *Licensed copyrights, net*

Licensed copyrights consist of professionally-produced content such as films, television series, variety shows and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability is recorded when the cost of the content is known, the content is accepted by the Group in accordance with the conditions of the license agreement and the content is available for its first showing on the Group's websites. Licensed copyrights are presented on the consolidated balance sheets as current and non-current based on estimated time of usage.

The Group's licensed copyrights include the right to broadcast and, in some instances, the right to sublicense. The broadcasting right, refers to the right to broadcast the content on its own websites and the sublicensing right, refers to the right to sublicense the underlying content to external parties. When licensed copyrights include both broadcasting and sublicensing rights, the content costs are allocated to these two rights upon initial recognition, based on the relative proportion of the estimated total revenues that will be generated by each right over its estimated useful lives.

For the right to broadcast the contents on its own websites that generates online advertising and membership services revenues, based on factors including historical and estimated future viewership patterns, the content costs are amortized using an accelerated method by content categories over the shorter of each content's contractual period or estimated useful lives within ten years, beginning with the month of first availability. Content categories accounting for most of the Group's content include newly released drama series, newly released movies, animations, library drama series and library movies. Estimates of future viewership consumption patterns and estimated useful lives are reviewed periodically, at least on an annual basis and revised, if necessary. Revisions to the amortization patterns are accounted for as a change in accounting estimate prospectively in accordance with ASC topic 250, *Accounting Changes and Error Corrections* ("ASC 250"). For the right to sublicense the content to external parties that generates direct content distribution revenues, the content costs are amortized based on its estimated usage pattern and recorded as cost of revenues.

### *Change in accounting estimates of licensed copyrights and produced content*

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

In 2020, the Group reviewed and revised its estimates of the estimated future viewership consumption patterns and extended the estimated useful lives of its licensed copyrights and produced content to better reflect the usage of these content assets. As a result of these revisions, amortization expense decreased by RMB680,444 (US$104,283), net loss decreased by RMB680,444 (US$104,283), and basic and diluted net loss per Class A and Class B ordinary share decreased by RMB0.13 (US$0.02) for the year ended December 31, 2020.

*Impairment of licensed copyrights and produced content*

The Group's business model is mainly subscription and advertising based, as such the majority of the Group's content assets (licensed copyrights and produced content) are predominantly monetized with other content assets, whereas a smaller portion of the Group's content assets are predominantly monetized at a specific title level such as variety shows and investments in a proportionate share of certain rights to films including profit sharing, distribution and/or other rights. Because the identifiable cash flows related to content launched on the Group's Mainland China platform are largely independent of the cash flows of other content launched on the Group's overseas platform, the Group has identified two separate film groups. The Group reviews its film groups and individual content for impairment when there are events or changes in circumstances that indicate the fair value of a film group or individual content may be less than its unamortized costs. Examples of such events or changes in circumstances include, a significant adverse change in technological, regulatory, legal, economic, or social factors that could affect the fair value of the film group or the public's perception of a film or the availability of a film for future showings, a significant decrease in the number of subscribers or forecasted subscribers, or the loss of a major distributor, a change in the predominant monetization strategy of a film that is currently monetized on its own, actual costs substantially in excess of budgeted costs, substantial delays in completion or release schedules, or actual performance subsequent to release failing to meet expectations set before release such as a significant decrease in the amount of ultimate revenue expected to be recognized.

When such events or changes in circumstances are identified, the Group assesses whether the fair value of an individual content (or film group) is less than its unamortized film costs, determines the fair value of an individual content (or film group) and recognizes an impairment charge for the amount by which the unamortized capitalized costs exceed the individual content's (or film group's) fair value. The Group mainly uses a discounted cash flow approach to determine the fair value of an individual content or film group, for which the most significant inputs include the forecasted future revenues, costs and operating expenses attributable to an individual content or the film group and the discount rate. An impairment loss attributable to a film group is allocated to individual licensed copyrights and produced content within the film group on a pro rata basis using the relative carrying values of those assets as the Group cannot estimate the fair value of individual contents in the film group without undue cost and effort.

*Partner-generated content ("PGC")*

The Group collaborates with a large number of selected partners to supplement its video content portfolio with PGC, and incentivizes them to submit high-quality content through the Group's revenue-sharing mechanism. Under such arrangements, the Group shares with the partners a portion of the revenues derived from either online advertising services or membership services based on various factors agreed upon. As the Group is the primary obligor of online advertising services and membership services, such revenues are recorded on a gross basis. Revenue sharing costs incurred and payable to partners are recognized as cost of revenues when the criteria of those pre-agreed factors are met.

*Goodwill and intangible assets*

<u>Goodwill</u>

Goodwill represents the excess of the purchase price over the fair value of the identifiable net assets acquired in a business combination. The Group assesses goodwill for impairment in accordance with ASC subtopic 350-20, *Intangibles—Goodwill and Other: Goodwill* ("ASC 350-20"), which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

A reporting unit is defined as an operating segment or one level below an operating segment referred to as a component. The Group determines its reporting units by first identifying its operating segments, and then assesses whether any components of these segments constituted a business for which discrete financial information is available and where the Company's segment manager regularly reviews the operating results of that component. The Group determined that it has one reporting unit because components below the consolidated level either did not have discrete financial information or their operating results were not regularly reviewed by the segment manager.

In January 2017, the FASB issued ASU 2017-04, *Simplifying the Test for Goodwill Impairment*, which simplifies the accounting for goodwill impairment by eliminating Step two from the goodwill impairment test. If the carrying amount of a reporting unit exceeds its fair value, an impairment loss shall be recognized in an amount equal to that excess, versus determining an implied fair value in Step two to measure the impairment loss. The Group adopted this guidance on a prospective basis on January 1, 2020 with no material impact on its consolidated financial statements and related disclosures as a result of adopting the new standard.

F-26

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The Group has the option to assess qualitative factors first to determine whether it is necessary to perform the quantitative impairment test in accordance with ASC 350-20. If the Group believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Group considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. The quantitative goodwill impairment test, used to identify both the existence of impairment and the amount of impairment loss, compares the fair value of a reporting unit with its carrying amount, including goodwill. If the carrying amount of a reporting unit is greater than zero and its fair value exceeds its carrying amount, goodwill of the reporting unit is considered not impaired.

As of December 31, 2019 and 2020, the carrying amount of a reporting unit is greater than zero and the fair value of the Group's reporting unit was substantially greater than the respective carrying value, and therefore goodwill related to the Group's reporting unit was not impaired.

*Intangible assets*

Intangible assets with finite lives are carried at cost less accumulated amortization and impairment loss, if any. Intangible assets with finite lives are amortized using the straight-line method over the estimated economic lives.

Intangible assets have estimated economic lives as follows:

| | |
|---|---|
| Traffic acquisition agreement | 1-2 years |
| Intellectual property rights | 1-10 years |
| Online literature | 1-10 years |
| Trademarks | 10-22 years |
| User list | 5 years |
| Domain names | 10-22 years |
| Published mobile games | 2-4 years |
| Technology | 5 years |
| Others | 2 to 20 years |

Intangible assets with an indefinite useful life are not amortized and are tested for impairment annually or more frequently if events or changes in circumstances indicate that they might be impaired in accordance with ASC subtopic 350-30, *Intangibles-Goodwill and Other: General Intangibles Other than Goodwill* ("ASC 350-30").

Mobile games in development with an indefinite useful life are those that have not achieved technological feasibility as of the acquisition date and have no alternative future use.

*Impairment of Long-Lived Assets Other Than Goodwill*

The Group evaluates long-lived assets, such as fixed assets and purchased or acquired intangible assets with finite lives other than licensed copyrights and produced content, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC subtopic 360-10, *Property, Plant and Equipment: Overall* ("ASC 360-10"). When such events occur, the Group assesses the recoverability of the long-lived assets based on the undiscounted future cash flows the long-lived assets are expected to generate at the lowest level of identifiable cash flows. The Group recognizes an impairment loss when the estimated undiscounted future cash flow expected to result from the use of the long-lived assets plus net proceeds expected from the eventual disposition of the long-lived assets, if any, is less than their carrying values. If the Group identifies an impairment, the Group reduces the carrying value of the long-lived assets to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Group uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different.

F-27

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Revenue recognition*

The Group's revenues are derived principally from membership services, online advertising services and content distribution. Revenue is recognized when control of promised goods or services is transferred to the Group's customers in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services. Value added taxes ("VAT") are presented as a reduction of revenues.

The Group's revenue recognition policies are set forth as follows:

*Membership services*

The Group offers membership services to subscribing members with various privileges, which primarily include access to exclusive and ad-free streaming of premium content 1080P/4K high-definition video, Dolby Audio, and accelerated downloads and others. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as "Customer advances and deferred revenue" on the consolidated balance sheets and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from subscribing members for on-demand content purchases and early access to premium content. The Group is the principal in its relationships where partners, including consumer electronics manufacturers (TVs and cell phones), mobile operators, internet service providers and online payment agencies, provide access to the membership services or payment processing services as the Group retains control over its service delivery to its subscribing members. Typically, payments made to the partners, are recorded as cost of revenues. For the sale of the right to other membership services through strategic cooperation with other parties, the Group recognizes revenue on a net basis when the Group does not control the specified services before they are transferred to the customer.

*Online advertising services*

The Group sells advertising services primarily to third-party advertising agencies and a small portion are sold directly to advertisers. Advertising contracts are signed to establish the price and advertising services to be provided. Pursuant to the advertising contracts, the Group provides advertisement placements on its websites in different formats, including but not limited to video, banners, links, logos, brand placement and buttons. The Group performs a credit assessment of the customer to assess the collectability of the contract price prior to entering into contracts. For contracts where the Group provides customers with multiple performance obligations, primarily for advertisements to be displayed in different spots, placed under different forms and occur at different times, the Group would evaluate all the performance obligations in the arrangement to determine whether each performance obligation is distinct. Consideration is allocated to each performance obligation based on its standalone selling price and revenue is recognized as each performance obligation is satisfied through the Group's display of the advertisements in accordance with the revenue contracts.

The Group provides various sales incentives to its customers for meeting certain cumulative purchase volume requirements, including cash rebates to certain third-party advertising agencies and noncash credits which can be used to acquire future online advertising services in certain bundled arrangements, which are negotiated on a contract by contract basis with customers. The Group accounts for cash rebates granted to customers as variable consideration which is measured based on the most likely amount of incentive to be provided to customers. Noncash credits granted to customers are considered options to acquire additional services that provide customers with a material right. The contract consideration related to these customer options to acquire additional services are deferred and recognized as revenue when future services are transferred or when the options expire.

*Content distribution*

The Group generates revenues from sub-licensing content licensed from vendors for cash or through nonmonetary exchanges mainly with other online video broadcasting companies. The exclusive licensing agreements the Group enters into with the vendors has a specified license period and provides the Group rights to sub-license these contents to other parties. The Group enters into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, the Group is entitled to receive the sub-license fee under the sub-licensing arrangements and does not have any future obligation once it has provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sub-license period). The sub-licensing of content represents a license of functional intellectual property which grants a right to use the Group's licensed copyrights and is recognized at the point in time when the licensed copyright is made available for the customer's use and benefit.

F-28

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The Group also enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. The Group accounts for these nonmonetary exchanges based on the fair value of the asset received. Barter sublicensing revenues are recognized in accordance with the same revenue recognition criteria above. The Group estimates the fair value of the licensed copyrights received using a market approach based on various factors, including the purchase price of similar non-exclusive and/or exclusive contents, broadcasting schedule, cast and crew, theme, popularity and box office. The transaction price of barter transaction revenues is calculated on the individual content asset basis. For a significant barter sublicensing transaction, the Company further reviews the fair value by analyzing against the cost of the licensed copyrights bartered out and/or engages a third-party valuation firm to assess the reasonableness of its fair value. The attributable cost of sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright.

The Group recognized barter sublicensing revenues of RMB1,082,964, RMB682,941 and RMB1,376,912 (US$211,021) and related costs of RMB1,026,140, RMB570,201 and RMB1,052,181 (US$161,254) for the years ended December 31, 2018, 2019 and 2020, respectively.

*Others*

Other revenues mainly include revenues from live broadcasting and online games.

Live broadcasting

The Group operates a live broadcasting platform, iQIYI Show, whereby users can follow their favorite hosts and shows in real time through live broadcasting. Users can purchase virtual currency for usage in iQIYI Show to acquire consumable virtual gifts, which are simultaneously presented to hosts to show their support or time-based virtual items, which enables users to enjoy additional functions and privileges for a specified time period.

The Group operates the live broadcasting platform and determines the price of virtual items sold. Therefore, revenues derived from the sale of virtual items are recorded on a gross basis as the Group acts as the principal in the transaction. Costs incurred from services provided by the hosts are recognized as cost of revenues. To facilitate the sale of virtual items, the Group bundles special privileges and virtual items as a package at a discounted price and the Group allocates the arrangement consideration to each performance obligation based on their relative standalone selling prices. Revenue from the sale of consumable virtual gifts is recognized when consumed by the user, or, in the case of time-based virtual items, recognized ratably over the period each virtual item is made available to the user. Virtual currency sold but not yet consumed by the purchasers is recorded as "Customer advances and deferred revenue" on the consolidated balance sheets.

Online games

The Group operates mobile games including both self-developed (after the business acquisition described in Note 3) and licensed mobile games and generates mobile game revenues from the sale of in-game virtual items, including items, avatars, skills, privileges or other in-game consumables, features or functionality, within the games.

The Group records revenue generated from mobile games on a gross basis if the Group acts as the principal in the mobile game arrangements under which the Group controls the specified services before they are provided to the customer. In addition, when the Group acts as the principal, it is primarily responsible for fulfilling the promise to provide maintenance services and has discretion in setting the price for the services to the customer. Otherwise, the Group records revenue on a net basis based on the ratios pre-determined with the online games developers when all the revenue recognition criteria set forth in ASC topic 606, *Revenue from Contracts with Customers* ("ASC 606") are met, which is generally when the user purchases virtual currencies issued by the game developers.

F-29

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

For transactions where the Group is the principal, the Group determines that the in-game virtual items are identified as performance obligations. The Group provides on-going services to the end-users who purchase virtual items to gain an enhanced game-playing experience. Accordingly, the Group recognizes revenues ratably over the estimated average playing period of these paying players, starting from the point in time when virtual items are delivered to the players' accounts.

*Contract balances*

When either party to a revenue contract has performed, the Group presents the contract in the consolidated balance sheets as a contract asset or a contract liability, depending on the relationship between the entity's performance and the customer's payment.

Contract assets represent unbilled amounts related to the Group's rights to consideration for advertising services delivered and are included in "Prepayments and other assets" on the consolidated balance sheets. As of December 31, 2019 and 2020, contract assets were RMB1,875,704 and RMB1,509,586 (US$231,354), respectively, net of an allowance for credit losses of RMB7,225 and RMB9,275 (US$1,421), respectively. The decrease in the balance of contract assets was primarily due to less outstanding advertising contracts as of December 31, 2020 compared to the prior year for which the Group had commenced to provide advertisement placements but had not completed all specified advertising services in the contract, which corresponds to when the Group has the right to bill its customers.

Contract liabilities are the Group's obligation to transfer goods or services to customers for which the Group has received consideration from customers, which are comprised of: i) payments received for membership fees and other services; ii) virtual currency sold for which the corresponding services have not yet been provided to customers; and iii) noncash credits granted to customers. Contract liabilities are primarily presented as "Customer advances and deferred revenue" on the consolidated balance sheets. Balances of contract liabilities were RMB3,954,763 and RMB4,476,940 (US$686,121) as of December 31, 2019 and December 31, 2020, respectively. The increase in contract liabilities as compared to the year ended December 31, 2019 is a result of the increase in consideration received from the Group's customers. Revenue recognized for the year ended December 31, 2020 that was included in contract liabilities as of January 1, 2020 was RMB2,964,114 (US$454,270).

*Practical Expedients and Exemptions*

The Group does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which the Group recognizes revenue at the amount to which it has the right to invoice for services performed.

**Cost of Revenues**

Cost of revenues consists primarily of content costs, bandwidth costs and others.

**Advertising expenses**

Advertising expenses, primarily marketing spend in channel coverage and content related promotion are included in "Selling, general and administrative" and are expensed when incurred. Advertising expenses for the years ended December 31, 2018, 2019 and 2020 were RMB2,268,753, RMB2,757,214 and RMB2,304,782 (US$353,223), respectively.

**Research and development expenses**

Research and development expenses consist primarily of personnel-related expenses (including share-based compensation cost) incurred for the development of, enhancement to, and maintenance of the Group's websites as well as costs associated with new product development and enhancement. Depreciation expenses and other operating costs are also included in research and development expenses. The Group recognizes research and development expenses costs as expense when incurred.

F-30

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Government subsidies*

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. There are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies with certain conditions are recorded as "Other liabilities" or "Other non-current liabilities" when received and will be recognized as income in "Other income/(expense), net" or as a reduction of specific operating costs and expenses when the conditions are met. The government subsidies with no further conditions to be met are recognized as income in "Other income/(expense), net" or as a reduction of specific operating costs and expenses for which the grants are intended to compensate.

*Leases*

The Group adopted ASU No.2016-02, *Leases* (Topic 842) ("ASU 2016-02") by using the modified retrospective method through a cumulative-effect adjustment on January 1, 2019. The Group has elected the package of practical expedients on the adoption date, which allows the Group not to reassess (1) whether any expired or existing contracts as of the adoption date are or contain a lease, (2) lease classification for any expired or existing leases as of the adoption date and (3) initial direct costs for any expired or existing leases. The Group has lease agreements with lease and non-lease components, which are generally accounted for separately. For internet data center facilities leases, the Group accounts for the lease and non-lease components as a single lease component. Lastly, the Group elected the short-term lease exemption for all contracts with lease terms of 12 months or less.

The Group determines if an arrangement is a lease or contains a lease at lease inception. For operating leases, the Group recognizes a right-of-use asset ("ROU asset") and a lease liability based on the present value of the lease payments over the lease term in the consolidated balance sheets at commencement date. For finance leases, assets are included in "Fixed assets, net" in the consolidated balance sheets. Finance lease liabilities are included in "Other liabilities" and "Other non-current liabilities" in the consolidated balance sheets. As most of the Company's leases do not provide an implicit rate, the Company estimates its incremental borrowing rate based on the information available at the commencement date in determining the present value of lease payments. The incremental borrowing rate is estimated to approximate the interest rate on a collateralized basis with similar terms and payments, and in economic environments where the leased asset is located. Renewal options are included in the lease term if the Group is reasonably certain to exercise those options while options to terminate the lease are only included in the lease term if the Group is reasonably certain not to exercise those options. Lease expense is recorded on a straight-line basis over the lease term.

*Income taxes*

The Group follows the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. The Group records a valuation allowance to offset deferred tax assets if, based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. The Group has elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss.

The Group applies the provisions of ASC topic 740, *Accounting for Income Taxes* ("ASC 740"), to account for uncertainty in income taxes. ASC 740 prescribes a recognition threshold a tax position is required to meet before being recognized in the financial statements. The Group recognizes in its consolidated financial statements the benefit of a tax position if a tax return position or future tax position is "more likely than not" to be sustained under examination based solely on the technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. The Group's estimated liability for unrecognized tax benefits are periodically assessed for adequacy and may be affected by changing interpretations of laws, rulings by tax authorities, changes and or developments with respect to tax audits, and the expiration of the statute of limitations. As each audit is concluded, adjustments, if any, are recorded in the Group's consolidated financial statements. Additionally, in future periods, changes in facts and circumstances, and new information may require the Group to adjust the recognition and measurement of estimates with regards to changes in individual tax position. Changes in recognition and measurement of estimates are recognized in the period which the change occurs.

F-31

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Loss per share*

The Company computes loss per Class A and Class B ordinary shares in accordance with ASC topic 260, *Earnings per Share* ("ASC 260") using the two-class method. Under the two-class method, net income is allocated between ordinary shares and participating securities based on dividends declared (or accumulated) and participating rights in undistributed earnings as if all the earnings for the reporting period had been distributed. Prior to the Company's IPO, the redeemable convertible preferred shares are participating securities because they are entitled to receive dividends or distributions on an as converted basis. After the Company's IPO and for the years ended December 31, 2018, 2019 and 2020, the two-class method is applicable because the Company has two classes of ordinary shares outstanding, Class A and Class B ordinary shares, respectively. The Company adjusts for the accretion of the redeemable noncontrolling interests in the calculation of income available to ordinary shareholders of the Company used in the loss per share calculation. The participating rights (liquidation and dividend rights) of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting and conversion (Note 20). As a result, and in accordance with ASC 260, the undistributed loss for each year is allocated based on the contractual participation rights of the Class A and Class B ordinary shares, respectively. As the liquidation and dividend rights are identical, the undistributed loss is allocated on a proportionate basis.

Diluted loss per share is calculated by dividing net loss attributable to ordinary shareholders, as adjusted for the accretion related to the redeemable convertible preferred shares, by the weighted average number of ordinary and dilutive ordinary equivalent shares outstanding during the period. Ordinary equivalent shares include ordinary shares issuable upon the conversion of convertible senior notes using the if-converted method and ordinary shares issuable upon the exercise of share options and vesting of restricted share units, using the treasury stock method. Ordinary share equivalents are excluded from the computation of diluted loss per share if their effects are anti-dilutive.

*Share-based compensation*

The Company accounts for share-based compensation in accordance with ASC topic 718, *Compensation-Stock Compensation* ("ASC 718").

The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards granted with graded vesting based on service conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved. Forfeiture rates are estimated based on historical experience and future expectations of employee turnover rates and are periodically reviewed. If required vesting conditions are not met and the share-based awards are forfeited, previously recognized compensation expense relating to those awards are reversed. The Company elects to estimate forfeitures at the time of grant and revised, if necessary, in the subsequent period if actual forfeitures differ from initial estimates. To the extent the Company revises these estimates in the future, the share-based payments could be materially impacted in the period of revision, as well as in following periods. Share-based compensation expense was recorded net of estimated forfeitures such that expense was recorded only for those share-based awards that are expected to vest.

For the year ended December 31, 2018, the Company accounts for share-based awards issued to non-employees in accordance with ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees* ("ASC 505-50"). The measurement date of the fair value of a share-based award issued to a non-employee is the date on which the counterparty's performance is completed as there is no associated performance commitment. The expense is recognized in the same manner as if the Company had paid cash for the services provided by non-employees.

In June 2018, the FASB issued ASU 2018-07, *Improvements to Nonemployee Share-Based Payment Accounting (Topic 718)* ("ASU 2018-07"). Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which will reduce volatility in the consolidated statements of comprehensive loss. The Company adopted ASU 2018-07 from January 1, 2019, using the modified retrospective method. The impact of adopting ASU 2018-07 was insignificant.

The Company, with the assistance of an independent third-party valuation firm, determined the fair value of share-based awards granted to employees and non-employees, if applicable.

F-32

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Fair Value Measurements*

Accounting guidance defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be recorded at fair value, the Group considers the principal or most advantageous market in which it would transact and it considers assumptions that market participants would use when pricing the asset or liability.

Accounting guidance establishes a fair value hierarchy that requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. Accounting guidance establishes three levels of inputs that may be used to measure fair value:

Level 1—Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets

Level 2—Include other inputs that are directly or indirectly observable in the marketplace

Level 3—Unobservable inputs which are supported by little or no market activity

Accounting guidance also describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

Financial assets and liabilities of the Group primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, amounts due from related parties, prepayments and other assets, long-term investments, accounts and notes payable, short-term loans, income tax payable, amounts due to related parties, accrued expenses, other liabilities, convertible senior notes and long-term loans. The carrying amounts of these financial instruments, except for long-term equity investments without readily determinable fair values, long-term equity method investments, long-term held-to-maturity debt securities, long-term available-for-sale debt security, convertible senior notes and long-term loans, approximate their fair values because of their generally short maturities. The carrying amounts of long-term loans approximate their fair values due to the fact that the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities.

*Commitments and contingencies*

In the normal course of business, the Group is subject to contingencies, such as legal proceedings and claims arising out of its business, which cover a wide range of matters. Liabilities for contingencies are recorded when it is probable that a liability has been incurred and the amount of the assessment can be reasonably estimated.

If the assessment of a contingency indicates that it is probable that a loss is incurred and the amount of the liability can be estimated, then the estimated liability is accrued in the Group's consolidated financial statements. If the assessment indicates that a potential loss contingency is not probable, but is reasonably possible, or is probable but cannot be estimated, then the nature of the contingent liability, together with an estimate of the range of possible loss, if determinable and material, would be disclosed.

Loss contingencies considered remote are generally not disclosed unless they involve guarantees, in which case the nature of the guarantee would be disclosed.

F-33

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Concentration of risks*

*Concentration of credit risks*

Financial instruments that potentially subject the Group to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, contract assets, amounts due from related parties and receivables from online payment agencies. The carrying amounts of these assets represent the Group's maximum exposure to credit risk. As of December 31, 2020, the Group has RMB10,940,512 (US$1,676,707) in cash, cash equivalents and restricted cash, which is held in cash and demand deposits with several financial institutions in the PRC and international financial institutions outside of the PRC, respectively.. In the event of bankruptcy of one of these financial institutions, the Group may not be able to claim its cash and demand deposits back in full. The Group continues to monitor the financial strength of the financial institutions.

Accounts receivable, contract assets, amounts due from related parties and receivables from online payment agencies are typically unsecured and denominated in RMB, derived from revenue earned from customers and agencies in the PRC, which are exposed to credit risk. The risk is mitigated by credit evaluations the Group performs on its customers and its ongoing monitoring process of outstanding balances. The Group maintains an allowance for credit losses and actual losses have generally been within management's expectations. As of December 31, 2019 and 2020, the Group had no single customer with a balance exceeding 10% of the total accounts receivable and contract asset balance.

*Business and economic risks*

The Group participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Group's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; and risks associated with the Group's ability to attract and retain employees necessary to support its growth. The Group's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

*Currency convertibility risk*

Substantially all of the Group's operating activities are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through the People's Bank of China or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

*Foreign currency exchange rate risk*

The functional currency and the reporting currency of the Company are the US$ and the RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, restricted cash, short-term investments, long-term held-to-maturity debt securities, convertible senior notes and accounts and notes payable denominated in U.S. dollars. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The depreciation of the US$ against RMB was approximately 6.27% in 2020. Most of the Company's revenues and costs are denominated in RMB, while a portion of cash and cash equivalents, restricted cash, short-term investments, long-term held-to-maturity debt securities, convertible senior notes and accounts and notes payable are denominated in U.S. dollars. Any significant fluctuation of RMB may materially and adversely affect the Company's cash flows, revenues, earnings and financial position in U.S. dollars.

F-34

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Segment reporting*

In accordance with ASC subtopic 280-10, *Segment Reporting: Overall*, the Group's chief operating decision maker ("CODM") has been identified as the Chief Executive Officer, who reviews the consolidated results of operations when making decisions about allocating resources and assessing performance of the Group as a whole; hence, the Group has only one operating segment. The Group does not distinguish between markets or segments for the purpose of internal reporting. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented.

*Comprehensive loss*

Comprehensive loss is defined as the changes in equity of the Group during a period from transactions and other events and circumstances excluding transactions resulting from investments by owners and distributions to owners. Among other disclosures, ASC topic 220, *Comprehensive Income*, requires that all items that are required to be recognized under current accounting standards as components of comprehensive loss be reported in a financial statement that is displayed with the same prominence as other financial statements. For each of the years presented, the Company's comprehensive loss includes net loss, foreign currency translation adjustments and unrealized losses on available-for-sale debt securities and is presented in the consolidated statements of comprehensive loss.

*Impact of COVID-19*

For the year ended December 31, 2020, COVID-19 has had limited impact on the Group's operations, including delays in the production and scheduling of certain new content, lower work efficiency and productivity and service quality. However, COVID-19 has resulted in a decline in the Group's online advertising revenues, an increase in expected credit losses and impairment charges to the Group's content assets during 2020. There are still uncertainties of COVID-19's future impact, and the extent of the impact will depend on a number of factors, including the duration and severity of the pandemic; the uneven impact to certain industries; and the macroeconomic impact of government measures to contain the spread of COVID-19 and related government stimulus measures. As a result, certain of the Group's estimates and assumptions, including the fair value of the Group's film groups, allowance for credit losses, the fair value of non-marketable equity securities and fair value of financial assets or long-lived assets subject to impairment assessments, require increased judgment and carry a higher degree of variability and volatility that could result in material changes to the Group's estimates in future periods.

*Recent accounting pronouncements*

In August 2020, the FASB issued ASU No. 2020-06, *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity* ("ASU 2020-06"), which focuses on amending the legacy guidance on convertible instruments and the derivatives scope exception for contracts in an entity's own equity. ASU 2020-06 simplifies an issuer's accounting for convertible instruments by reducing the number of accounting models that require separate accounting for embedded conversion features. ASU 2020-06 also simplifies the settlement assessment that entities are required to perform to determine whether a contract qualifies for equity classification. Further, ASU 2020-06 enhances information transparency by making targeted improvements to the disclosures for convertible instruments and earnings-per-share (EPS) guidance, i.e., aligning the diluted EPS calculation for convertible instruments by requiring that an entity use the if-converted method and that the effect of potential share settlement be included in the diluted EPS calculation when an instrument may be settled in cash or shares, adding information about events or conditions that occur during the reporting period that cause conversion contingencies to be met or conversion terms to be significantly changed. This update will be effective for the Group's fiscal years beginning after December 15, 2021, and interim periods within those fiscal years. Early adoption is permitted, but no earlier than fiscal years beginning after December 15, 2020, and interim periods within those fiscal years. Entities can elect to adopt the new guidance through either a modified retrospective method of transition or a fully retrospective method of transition. The Group is currently in the process of evaluating the impact of adopting ASU 2020-06 on its consolidated financial statements and related disclosures.

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

3.   **BUSINESS COMBINATIONS**

*Acquisition of Skymoons*

On July 17, 2018 (the "acquisition date"), the Group completed the acquisition of a 100% equity stake in Skymoons Inc. and Chengdu Skymoons Digital Entertainment Co., Ltd. (collectively, "Skymoons"). Headquartered in Chengdu, China, Skymoons focuses on the development and global publishing of mobile games. The Group completed the acquisition of Skymoons on July 17, 2018, the date on which control was obtained to govern the financial and operating policies of Skymoons and obtained benefits from its activities. The Group believes Skymoons is a natural extension to its business and will strengthen its media platform and overall ecosystem. The results of Skymoons' operations have been included in the consolidated financial statements of the Group since the acquisition date.

The aggregate payment for the acquisition of Skymoons consists of a fixed payment of cash of RMB1,157.0 million, as well as a contingent payment of up to RMB130.0 million in cash and issuance of 23,777,706 Class A ordinary shares if specified adjusted net profit targets are met post-acquisition (the "Earn-Out").

The acquisition-date fair value of the consideration transferred totaled RMB1,242.9 million, which consisted of the fixed payment of cash amounting to RMB1,157.0 million and the portion of the Earn-Out payment described above of RMB85.9 million, which are not contingent on the continued employment. RMB1,018.6 million of the Earn-Out is contingent on the continued employment of certain key employees for the three years following the acquisition date, and was accounted for as a transaction separate from the business combination based on its economic substance and will be recorded as post-combination compensation expense in the Group's consolidated financial statements over the requisite service period.

On July 23, 2019, the Group waived the specified adjusted net profit targets of the Earn-Out. Other terms, such as the payment schedule of the Earn-Out, remain unchanged and the Earn-Out is still contingent on the continued employment of certain key employees for three years post acquisition.

The Group has completed the valuation necessary to assess the fair value of tangible and intangible assets acquired and liabilities assumed, resulting from which the amount of goodwill was determined and recognized as of the acquisition date. The following table summarizes the estimated aggregate fair values of assets acquired and liabilities assumed as of the acquisition date:

| | RMB | Useful lives (Years) |
|---|---|---|
| Published mobile games | 366,000 | 2 |
| Mobile games in development (i) | 240,000 | indefinite lived |
| Technology | 101,000 | 5 |
| Others | 27,023 | 2 to 10 |
| Intangible assets | 734,023 | |
| Cash and cash equivalents | 189,313 | |
| Other current assets | 403,387 | |
| Other non-current assets | 30,162 | |
| Fixed assets | 2,574 | |
| Long-term investments | 49,043 | |
| Goodwill | 588,857 | |
| Current liabilities | (466,793) | |
| Long-term loans | (87,794) | |
| Deferred tax liabilities | (137,811) | |
| Noncontrolling interests | (62,047) | |
| Total consideration | 1,242,914 | |

(i)

F-36

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Mobile games in development are those that are not completed as of the acquisition date and have no alternative future use. The Group considers its mobile games in development to be in-process research and development ("IPR&D").

The fair value of accounts receivable acquired was RMB97,819. Gross contractual accounts receivable acquired totaled RMB101,750 and the Company's best estimate of the contractual cash flows not expected to be collected at acquisition date totaled RMB3,931.

The excess of the purchase price over tangible assets, identifiable intangible assets and liabilities assumed was recorded as goodwill. The goodwill recognized is attributable primarily to expected synergies and the assembled workforce of Skymoons. The goodwill is not deductible for tax purposes.

The unaudited pro forma revenue and net loss for the year ended December 31, 2018 is not presented as the historical financial information of the acquired business of Skymoons prepared under US GAAP is not available without undue cost, given the acquiree underwent a reorganization prior to the Company's acquisition.

The amount of revenue and net loss of Skymoons included in the Group's consolidated statements of comprehensive loss from the acquisition date to December 31, 2018 was RMB 375.2 million and RMB237.9 million, respectively.

**4.    SHORT-TERM INVESTMENTS**

As of December 31, 2019 and 2020, the Group's short-term investments consist of held-to-maturity debt securities and available-for-sale debt securities with maturities of less than one year purchased from commercial banks and other financial institutions.

In 2019, the Group purchased US$71,000 of held-to-maturity debt securities with an original maturity of two years from a financial institution and pledged them as collateral against certain long-term loans. As of December 31, 2019, the carrying value of the long-term held-to-maturity debt securities was RMB495,710 and included in "Long-term investments". As of December 31, 2020, the carrying amount of long-term held-to-maturity debt securities, current portion of RMB463,715 (US$71,067) was included in "Short-term investments" as it will mature within the next twelve months. For the years ended December 31, 2019 and 2020, the gross unrecognized holding losses were RMB4,911 and nil, respectively, and the gross unrecognized holding gains were nil and nil, respectively for the years ended December 31, 2019 and 2020.

**5.    LONG-TERM INVESTMENTS**

The Group's long-term investments primarily consist of equity investments without readily determinable fair value and equity method investments.

Equity investments without readily determinable fair value

As of December 31, 2019 and 2020, the carrying amount of the Company's equity investments without readily determinable fair value were as follows:

|  | As of December 31, | | |
|  | 2019 | 2020 | 2020 |
|  | RMB | RMB | US$ |
|---|---|---|---|
| Initial cost basis | 1,797,421 | 2,654,055 | 406,752 |
| Cumulative unrealized gains | 196,663 | 235,258 | 36,055 |
| Cumulative unrealized losses (including impairment) | (181,274) | (247,468) | (37,926) |
| Total carrying amount | 1,812,810 | 2,641,845 | 404,881 |

Impairment charges recognized on equity investments measured using the measurement alternative were nil, RMB169,374 and RMB73,199 (US$11,218) for the years ended December 31, 2018, 2019 and 2020, respectively.

F-37

Case 1:20-cv-03794-DG-TAM Document 65-12 Filed 03/03/23 Page 169 of 410 PageID #: 3157

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Total realized and unrealized gains and losses for equity securities without readily determinable fair values for the years ended December 31, 2018, 2019 and 2020 are as follows:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2020 | 2020 |
| | RMB | RMB | RMB | US$ |
| Gross unrealized gains (upward adjustments) | 189,639 | 7,024 | 38,595 | 5,915 |
| Gross unrealized losses (downward adjustments excluding impairment) | — | — | (495) | (76) |
| | | | | |
| Net unrealized gains on equity securities held | 189,639 | 7,024 | 38,100 | 5,839 |
| Net realized gains on equity securities sold | — | — | — | — |
| | | | | |
| Total net gains recognized in other income, net | 189,639 | 7,024 | 38,100 | 5,839 |

Equity method investments

In July 2018, the Group acquired a 32% outstanding equity interest amounting to RMB796,000 in Beijing Xin'ai Sports Media Technology co., LTD (or "Xin'ai") that is engaged in the operation of a sports content platform. The Group has significant influence over the investee and therefore accounts for its equity interest as an equity method investment. The excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 was recognized as basis differences and investment goodwill. As of December 31, 2019 and 2020, the Group's equity interest in Xin'ai was diluted to 26% and 24%, respectively, due to subsequent rounds of equity financing.

As of December 31, 2019 and 2020, the Group also held several other equity method investments through its subsidiaries or VIEs, all of which the Group can exercise significant influence but does not own a majority equity interest in or has control over. The other equity method investments were not significant. The carrying amount of the Group's equity method investments including Xin'ai was RMB663,376 and RMB510,426 (US$78,226) as of December 31, 2019 and 2020, respectively.

**6.    ACCOUNTS RECEIVABLE, NET**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Accounts receivable | 3,772,323 | 3,704,732 | 567,775 |
| Allowance for credit losses | (144,574) | (360,299) | (55,218) |
| Accounts receivable, net | 3,627,749 | 3,344,433 | 512,557 |

The following table presents movement of the allowance for credit losses:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | 2019 | 2020 | 2020 |
| | RMB | RMB | RMB | US$ |
| Balance at the beginning of the year | 24,686 | 94,856 | 144,574 | 22,157 |
| Cumulative effect of adopting ASU 2016-13 | — | — | 72,366 | 11,091 |
| Provisions | 85,745 | 72,259 | 202,108 | 30,974 |
| Write-offs | (15,575) | (22,541) | (58,749) | (9,004) |
| Balance at the end of the year | 94,856 | 144,574 | 360,299 | 55,218 |

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

7.    **PREPAYMENTS AND OTHER ASSETS**

The current and non-current portions of prepayments and other assets consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| **Current portion:** | | | |
| Contract assets (i) | 1,875,704 | 1,509,586 | 231,354 |
| VAT prepayments | 507,135 | 805,360 | 123,427 |
| Prepaid licensed copyrights | 311,144 | 378,025 | 57,935 |
| Receivables from online payment agencies | 386,795 | 304,353 | 46,644 |
| Advances to suppliers | 207,204 | 213,686 | 32,749 |
| Prepaid expenses | 82,657 | 58,150 | 8,912 |
| Deposits and prepaid rental fees | 133,692 | 57,829 | 8,863 |
| Others (ii) | 214,897 | 188,866 | 28,944 |
| | 3,719,228 | 3,515,855 | 538,828 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| **Non-current portion:** | | | |
| Prepaid licensed copyrights | 3,006,109 | 2,036,411 | 312,094 |
| Licensed copyrights prepaid assets (iii) | 325,504 | 474,073 | 72,655 |
| Deposits and prepaid rental fees | 22,269 | 154,627 | 23,698 |
| Others | 154,594 | 34,312 | 5,258 |
| | 3,508,476 | 2,699,423 | 413,705 |

(i)     The allowance for credit losses on contract assets was RMB7,225 and RMB9,275 (US$1,421) as of December 31, 2019 and December 31, 2020, respectively. The provision charged against the allowance was RMB21,478 for the year ended December 31, 2018. The reversals charged against the allowance were RMB14,253 and RMB9,310 (US$1,427) for the years ended December 31, 2019 and 2020, respectively. Cumulative effect of adopting ASU 2016-13 on the opening balance of contract assets was RMB11,360 (US$1,741). Write-offs charged against the allowance were nil, nil, and nil for the years ended December 31, 2018, 2019 and 2020, respectively.

(ii)    The allowance for credit losses on other current assets were nil and RMB73,688 (US$11,293) as of December 31, 2019 and December 31, 2020, respectively. The provision charged against the allowance were nil, nil, and RMB73,688 (US$11,293) for the year ended December 31, 2018, 2019 and 2020, respectively. No reversal and write-offs were charged against the allowance for the year ended December 31, 2018, 2019 and 2020, respectively.

(iii)   Licensed copyrights prepaid assets are recognized when the Group has yet to receive the content copyrights from the counterparty under nonmonetary exchanges but the counterparty has already received the content copyrights from the Group.

F-39

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

## 8.   LICENSED COPYRIGHTS, NET

| | As of December 31, 2019 | | | |
| --- | --- | --- | --- | --- |
| | Gross carrying value | Accumulated amortization | Impairment amount | Net carrying value |
| | RMB | RMB | RMB | RMB |
| **Licensed copyrights** | | | | |
| —Broadcasting rights | 32,038,423 | (24,500,895) | (25,317) | 7,512,211 |
| —Sublicensing rights | 4,632,586 | (4,632,586) | — | — |
| | 36,671,009 | (29,133,481) | (25,317) | 7,512,211 |
| **Less: current portion** | | | | |
| —Broadcasting rights | 11,752,412 | (10,502,214) | (25,317) | 1,224,881 |
| —Sublicensing rights | 4,632,586 | (4,632,586) | — | — |
| | 16,384,998 | (15,134,800) | (25,317) | 1,224,881 |
| **Licensed copyrights—non-current** | | | | |
| —Broadcasting rights | 20,286,011 | (13,998,681) | — | 6,287,330 |
| —Sublicensing rights | — | — | — | — |
| | 20,286,011 | (13,998,681) | — | 6,287,330 |

| | As of December 31, 2020 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Gross carrying value | Accumulated amortization | Impairment amount | Net carrying value | |
| | RMB | RMB | RMB | RMB | US$ |
| **Licensed copyrights** | | | | | |
| —Broadcasting rights | 37,511,847 | (29,687,867) | (353,586) | 7,470,394 | 1,144,888 |
| —Sublicensing rights | 5,962,743 | (5,962,743) | — | — | — |
| | 43,474,590 | (35,650,610) | (353,586) | 7,470,394 | 1,144,888 |
| **Less: current portion** | | | | | |
| —Broadcasting rights | 8,661,499 | (7,591,792) | (34,368) | 1,035,339 | 158,673 |
| —Sublicensing rights | 5,962,743 | (5,962,743) | — | — | — |
| | 14,624,242 | (13,554,535) | (34,368) | 1,035,339 | 158,673 |
| **Licensed copyrights—non-current** | | | | | |
| —Broadcasting rights | 28,850,348 | (22,096,075) | (319,218) | 6,435,055 | 986,215 |
| —Sublicensing rights | — | — | — | — | — |
| | 28,850,348 | (22,096,075) | (319,218) | 6,435,055 | 986,215 |

Amortization expense of RMB12,055,624, RMB12,743,323 and RMB11,473,222 (US$1,758,348) for the years ended December 31, 2018, 2019 and 2020, respectively, was recognized as cost of revenues. Estimated amortization expense relating to the existing licensed copyrights for each of the next three years is as follows:

| | RMB | US$ |
| --- | --- | --- |
| Within 1 year | 3,681,159 | 564,162 |
| Between 1 and 2 years | 1,351,417 | 207,114 |
| Between 2 and 3 years | 804,217 | 123,252 |

To supplement cash flow disclosure of investing activities in 2018 and 2019, acquisition of licensed copyrights included in current liabilities for the years ended December 31, 2018 and 2019 amounted to RMB6,336,656 and RMB5,486,374, respectively. Acquisition of licensed copyrights from nonmonetary content exchanges for the years ended December 31, 2018 and 2019 amounted to RMB642,262 and RMB967,536, respectively.

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**9.     INTANGIBLE ASSETS, NET**

Finite-lived intangible assets

| | As of December 31, 2019 | | |
|---|---|---|---|
| | Gross carrying value | Accumulated amortization and impairment | Net carrying value |
| | RMB | RMB | RMB |
| Intellectual property rights (i) | 479,276 | (190,086) | 289,190 |
| Traffic acquisition agreement (ii) | 546,150 | (546,150) | — |
| Published mobile games (iii) | 457,753 | (316,671) | 141,082 |
| Trademarks (ii) | 204,563 | (143,620) | 60,943 |
| User list | 3,396 | (849) | 2,547 |
| Online literature | 162,610 | (40,014) | 122,596 |
| Domain names | 140,631 | (99,145) | 41,486 |
| Technology (iii) | 101,730 | (29,650) | 72,080 |
| Others (ii) | 31,739 | (20,005) | 11,734 |
| | 2,127,848 | (1,386,190) | 741,658 |

| | As of December 31, 2020 | | | |
|---|---|---|---|---|
| | Gross carrying value | Accumulated amortization and impairment | Net carrying value | Net carrying value |
| | RMB | RMB | RMB | US$ |
| Intellectual property rights (i) | 473,360 | (190,057) | 283,303 | 43,418 |
| Traffic acquisition agreement (ii) | 546,150 | (546,150) | — | — |
| Published mobile games (iii) | 499,880 | (462,852) | 37,028 | 5,675 |
| Trademarks (ii) | 165,281 | (110,854) | 54,427 | 8,341 |
| Online literature | 151,168 | (53,645) | 97,523 | 14,946 |
| Domain names | 186,650 | (108,671) | 77,979 | 11,951 |
| Technology (iii) | 101,730 | (49,996) | 51,734 | 7,929 |
| Others (ii) | 31,738 | (21,318) | 10,420 | 1,597 |
| | 2,155,957 | (1,543,543) | 612,414 | 93,857 |

Intangible assets

| | As of December 31, | | |
|---|---|---|---|
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Finite-lived intangible assets | 741,658 | 612,414 | 93,857 |
| Indefinite-lived intangible assets | 72,302 | 14,784 | 2,265 |
| Total | 813,960 | 627,198 | 96,122 |

(i)     Intellectual property rights include various rights the Company acquires either individually or in a bundle to broadcast, operate, publish, translate, distribute and/or adapt various forms of media, including but not limited to online games, literature and films.

F-41

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

(ii)  In February 2018, the Company entered into a share purchase agreement with Baidu, pursuant to which the Company issued an aggregate of 36,860,691 Class B ordinary shares to Baidu in exchange for an asset acquisition of traffic acquisition agreement, trademarks and non-compete amounting to RMB599,150. As consideration for the issuance of such shares and subject to the conditions set forth in the share purchase agreement, Baidu agreed to (i) undertake certain non-compete obligations towards the Company with respect to the online movie ticket and show ticket booking business of Baidu and its affiliates; (ii) direct user traffic related to such ticket business to the Company; (iii) provide the Company with technological support with respect to the Company's ticket booking business; (iv) license certain trademarks and certain intellectual property rights to the Company; and (v) enter into a ticket business cooperation agreement with the Company, which has been signed concurrently. The transaction was closed on April 12, 2018 and accounted for as an asset acquisition, whereby intangible assets were recorded by the Company. The useful lives of traffic acquisition agreement and non-compete are four years and the useful life of trademarks is two years.

In 2019, the Group revised the useful life of traffic acquisition agreement from 4 years to 1.72 years due to the decrease in economic benefit expected from the acquired set of assets for the remaining contractual period of the agreement. As of December 31, 2019, the acquired set of assets are fully amortized.

For the year ended December 31, 2019, the amount of amortization expense and net loss included in the Group's consolidated statements of comprehensive loss were RMB479,497 and RMB10,276,739, net loss per Class A and Class B ordinary share was RMB2.02, compared to amortization expense and net loss of RMB159,538 and RMB9,956,780, net loss per Class A and Class B ordinary share of RMB1.96, if the useful life of the traffic acquisition agreement remain unchanged.

(iii)  The addition of intangible assets RMB707,000 is generated from the acquisition of Skymoons occurred on July 17, 2018 (Note 3), of which RMB366,000 was attributed to published mobile games with a useful life of two years, RMB101,000 attributable to technology with a useful life of five years and RMB240,000 attributable to mobile games in development. Once the mobile games in development achieve technological feasibility, they will be amortized over a maximum of four years.

For the year ended December 31, 2019, the Group recognized RMB99,096 of impairment charges for mobile games in development because the carrying amount of mobile games in development exceeded its fair value. The carrying amount of mobile games in development was RMB72,302, and RMB14,784 (US$2,265), as of December 31, 2019 and 2020, respectively.

Nil, RMB99,096, and RMB15,391 (US$2,359) of impairment charges were recognized on intangible assets for the years ended December 31, 2018, 2019 and 2020, respectively.

Amortization expense was RMB346,672, RMB873,664 and RMB302,188 (US$46,312) for the years ended December 31, 2018, 2019 and 2020, respectively. Estimated amortization expense relating to the existing intangible assets for each of the next five years is as follows:

|  | RMB | US$ |
|---|---|---|
| Within 1 year | 150,419 | 23,053 |
| Between 1 and 2 years | 131,667 | 20,179 |
| Between 2 and 3 years | 88,014 | 13,489 |
| Between 3 and 4 years | 66,654 | 10,215 |
| Between 4 and 5 years | 60,401 | 9,257 |

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

## 10.   PRODUCED CONTENT, NET

|  | As of December 31, 2019 RMB |
| --- | ---: |
| Released, less amortization | 891,574 |
| In production | 3,074,946 |
| In development | 388,701 |
|  | 4,355,221 |

|  | As of December 31, 2020 RMB | 2020 US$ |
| --- | ---: | ---: |
| **Released, less amortization and impairment** |  |  |
| — Predominantly monetized with other contents | 1,857,095 | 284,612 |
| — Predominantly monetized on its own | 78,023 | 11,958 |
|  | 1,935,118 | 296,570 |
| **In production, less impairment** |  |  |
| — Predominantly monetized with other contents | 3,741,973 | 573,482 |
| — Predominantly monetized on its own | 82,088 | 12,581 |
|  | 3,824,061 | 586,063 |
| **In development, less impairment** |  |  |
| — Predominantly monetized with other contents | 666,087 | 102,082 |
| — Predominantly monetized on its own | 130,818 | 20,049 |
|  | 796,905 | 122,131 |
|  | 6,556,084 | 1,004,764 |

Amortization expense of RMB3,023,628 (US$463,391) and RMB1,095,325 (US$167,866) was recognized as cost of revenues in the consolidated statements of comprehensive loss for the year ended December 31, 2020, for produced content predominantly monetized with other content assets and for produced content predominantly monetized on its own, respectively. Amortization expense for produced content was RMB2,265,543 and RMB2,977,181 for the year ended December 31, 2018 and 2019, respectively.

Estimated amortization expense relating to the existing produced content for each of the next three years is as follows:

|  | RMB | US$ |
| --- | ---: | ---: |
| Within 1 year | 826,792 | 126,711 |
| Between 1 and 2 years | 296,293 | 45,409 |
| Between 2 and 3 years | 197,041 | 30,198 |

## 11.   GOODWILL

The goodwill of RMB3,888,346 and RMB3,888,346 (US$595,915) as of December 31, 2019 and 2020 represented the goodwill of RMB1,475,357 pushed down from the acquisition of the Company by Baidu in 2012, the goodwill of RMB1,800,750 generated from the acquisition of Shanghai Zhong Yuan by the Company in 2013 and the goodwill of RMB612,239 mainly generated from the acquisition of Skymoons in 2018 (Note 3).

The Group performed a quantitative assessment by estimating the fair value of the Group as a reporting unit based on the Company's market capitalization for the years ended December 31, 2019 and 2020. The fair value of the Group exceeded its carrying value as of December 31, 2019 and 2020, respectively, and therefore the Group's goodwill was not impaired.

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

## 12.　FIXED ASSETS, NET

Fixed assets consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Computer equipment | 2,436,926 | 2,343,061 | 359,090 |
| Office building | 588,685 | 588,685 | 90,220 |
| Leasehold improvements | 129,010 | 141,065 | 21,619 |
| Office furniture and equipment | 132,693 | 135,759 | 20,806 |
| Others | 18,891 | 19,757 | 3,028 |
| | 3,306,205 | 3,228,327 | 494,763 |
| Less: Accumulated depreciation | (1,632,225) | (1,860,149) | (285,080) |
| Construction in progress | 80,387 | 25,289 | 3,875 |
| | 1,754,367 | 1,393,467 | 213,558 |

Impairment charges in the amount of nil, nil and RMB95,111 (US$14,576) were recognized on fixed assets for the years ended December 31, 2018, 2019 and 2020, respectively.

Depreciation expense was RMB312,138, RMB476,068 and RMB480,396 (US$73,624) for the years ended December 31, 2018, 2019 and 2020, respectively.

## 13.　LEASES

Leases are classified as operating lease and finance lease in accordance with ASU 2016-02. The Group's operating leases mainly related to offices facilities and IDC facilities. For leases with terms greater than 12 months, the Group records the related asset and obligation at the present value of lease payments over the term.

As of December 31, 2019 and 2020, the operating lease's weighted average remaining lease terms were 9.8 years and 8.6 years, respectively, and weighted average discount rates were 5.42% and 5.46%, respectively. As of December 31, 2019 and 2020, the finance lease's weighted average remaining lease terms were 3.0 years and 2.0 years, respectively, and weighted average discount rates were 5.50% and 5.50%, respectively.

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| **Finance lease** | | | |
| Computer equipment | 20,334 | 40,882 | 6,265 |
| Accumulated depreciation | (1,212) | (11,434) | (1,752) |
| **Computer equipment, net** | 19,122 | 29,448 | 4,513 |
| Finance lease liabilities, current portion | 6,684 | 17,767 | 2,723 |
| Finance lease liabilities | 10,348 | 11,513 | 1,764 |
| **Total finance lease liabilities** | 17,032 | 29,280 | 4,487 |

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The components of lease cost were as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Operating lease costs(i) | 183,578 | 173,815 | 26,638 |
| Finance lease costs | | | |
| Amortization of ROU assets | 579 | 25,010 | 3,833 |
| Interest on lease liabilities | — | 4,251 | 651 |
| **Total finance lease costs** | 579 | 29,261 | 4,484 |

(i)    Excluding cost of short-term contracts. Short-term lease costs for the years ended December 31, 2019 and 2020 were RMB357 million and RMB451 million (US$69 million).

Finance lease costs were recorded as cost of revenues and interest expenses. For the years ended December 31, 2019 and 2020, the amount of interest expense for finance leases was nil and RMB 4,251 (US$ 651). Variable lease costs were immaterial for the years ended December 31, 2019 and 2020. For the years ended December 31, 2019 and 2020, no lease costs for operating and finance leases were capitalized.

Cash paid for amounts included in the measurement of lease liabilities:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Operating cash payments for operating leases | 208,560 | 208,493 | 31,953 |
| Operating cash payments for finance leases | — | 662 | 101 |
| Financing cash payments for finance leases | 397 | 9,020 | 1,382 |

ROU assets obtained in exchange for lease obligations:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2020 | 2020 |
| | RMB | RMB | US$ |
| Operating leases | 323,242 | 359,168 | 55,045 |
| Finance leases | 18,950 | 15,208 | 2,331 |

Future lease payments under lease liabilities as of December 31, 2020 were as follows:

| | Operating leases | | Finance leases | |
| --- | --- | --- | --- | --- |
| | RMB | US$ | RMB | US$ |
| **Year ending December 31,** | | | | |
| 2021 | 206,475 | 31,644 | 14,052 | 2,154 |
| 2022 | 200,204 | 30,683 | 14,052 | 2,154 |
| 2023 | 145,255 | 22,261 | 3,579 | 549 |
| 2024 | 78,449 | 12,023 | — | — |
| 2025 | 74,624 | 11,437 | — | — |
| Thereafter | 526,434 | 80,678 | — | — |
| Total future lease payments | 1,231,441 | 188,726 | 31,683 | 4,857 |
| Less: Imputed interest | (262,458) | (40,223) | (2,403) | (370) |
| Total lease liability balance | 968,983 | 148,503 | 29,280 | 4,487 |

F-45

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**14.    LOANS PAYABLE**

*Short-term Loans*

Short-term loans as of December 31, 2019 and 2020 amounted to RMB2,618,170 and RMB2,965,957 (US$454,553), respectively, which consisted of secured RMB denominated borrowings from financial institutions in the PRC that are repayable within one year. As of December 31, 2019 and 2020, the repayments of primarily all of the short-term loans are guaranteed by subsidiaries within the Group and either collateralized by an office building of one of the Group's VIEs with a carrying amount of RMB561,515 and RMB548,474 (US$84,057), respectively, or collateralized by restricted cash balances totaling US$138,572 and US$3,550 (equivalent to RMB23,164), respectively, or collateralized by other receivables totaling nil and US$5,414 (equivalent to RMB35,326), respectively. The weighted average interest rate for the outstanding borrowings as of December 31, 2019 and 2020 was 4.05% and 4.30%, respectively. As of December 31, 2019 and 2020, the aggregate amounts of unused lines of credit for short-term loans were RMB1,620,520 and RMB830,054 (US$127,211), respectively.

*Structured payable arrangements*

In 2020, the Group entered into structured payable arrangements with banks or other financial institutions ("factoring arrangements"). Under the factoring arrangements, the suppliers' receivables collection process was accelerated through selling its receivables from the Group to the banks or other financial institutions at a discount. The Group was legally obligated to pay the banks or other financial institutions in the amount totaling RMB395,943 (US$60,681), maturing within one year.

As a result of the factoring arrangements, the payment terms of the Group's original accounts payables were substantially modified and considered extinguished as the nature of the original liability has changed from accounts payables to loan borrowings from banks or other financial institutions. The proceeds from borrowings from banks or other financial institutions is a financing activity and is reported as "Proceeds from short-term loans" on the consolidated statements of cash flows. As of December 31, 2020, the outstanding borrowings from the factoring arrangements were RMB390,317 (US$59,819), which is repayable within one year and are included in "Short-term loans" in the consolidated balance sheets.

*Long-term Loans*

In 2017, the Group borrowed a secured RMB denominated loan of RMB299,000 with an interest rate of 4.47% for a three-year term from the Bank of China for its general working capital purposes. Pursuant to the agreement, the principal shall be repaid by installments from 2017 to 2020. As of December 31, 2018, 2019 and 2020, the repayment of the loan is guaranteed by a subsidiary of the Group and collateralized by an office building of one of the Group's VIEs with a carrying amount of RMB561,515 and RMB548,474 (US$84,057), respectively. Principal repayments were made on the loan when they became due and amounted to RMB10,000, RMB10,000 and RMB274,000 (US$41,992) for the years ended December 31, 2018, 2019 and 2020, respectively. The loan was fully repaid as of December 31, 2020.

In 2019, the Group entered into a two-year loan agreement with JPMorgan Chase Bank, N.A., pursuant to which the Group is entitled to borrow a secured RMB denominated loan of RMB800,000 for its general working capital purposes. In 2019, the Group drew down RMB447,949 with an interest rate of 3.55%. Pursuant to the agreement, the principal shall be repaid in installments from 2019 to 2021. As of December 31, 2019 and 2020, the repayment of the loan is collateralized by two-year maturity held-to-maturity debt securities with a stated cost of US$71,000 and US$71,000 (equivalent to RMB463,275), respectively (Note 4). Principal repayments were made on the loan when they became due and amounted to RMB2,954 and RMB34,213 (US$5,243) for the years ended December 31, 2019 and 2020, respectively. The amount repayable within the next twelve months are classified as "Long-term loans, current portion" in the consolidated balance sheets.

*Borrowings from third-party investors*

*Asset-backed debt securities*

In December 2018, the Group entered into a series of transactions ("reverse factoring arrangement") in order to re-finance certain payables due to its suppliers. In the reverse factoring arrangement, the Group's suppliers sold certain 2018 receivables due

F-46

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

from the Group (the "2018 factored receivables") amounting to RMB525,279 to the financial institutions at a discount. The 2018 factored receivables were recorded as accounts payables in the Group's consolidated balance sheets. The 2018 factored receivables were further transferred to a securitization vehicle and used to securitize debt securities issued to third-party investors with a stated interest of 5.0%-5.5% for gross proceeds of RMB446,000. Concurrently, the Group also entered into an agreement with the financial institutions to extend the repayment of the underlying payables to mirror the repayment terms for the asset-back debt securities with maturities in December 2019 and December 2020. Under such arrangement, the payable obligation between the Group and the suppliers was considered settled and the Group was legally obligated to pay the financial institutions thereafter. As the 2018 factored receivables were sold to the financial institutions and used to securitize the debt securities, the factored receivables are viewed as collateral for raising loans through the issuance of 2018 asset-backed debt securities. The borrowings have an effective interest rate of 7.00%.

In November 2019, the Group entered into a similar reverse factoring arrangement whereby the Group's suppliers sold certain 2019 receivables due from the Group (the "2019 factored receivables") amounting to RMB587,000 to the financial institutions at a discount. The 2019 factored receivables were recorded as accounts payables in the Group's consolidated balance sheets. The 2019 factored receivables were further transferred to a securitization vehicle and used to securitize debt securities issued to third-party investors with a stated interest of 5.1% for gross proceeds of RMB500,000. Concurrently, the Group also entered into an agreement with the financial institutions to extend the repayment of the underlying payables to mirror the repayment terms for the 2019 asset-back debt securities which mature in November 2021. The borrowings have an effective interest rate of 5.97%.

The proceeds raised from issuance of the asset-backed debt securities were used by the financial institutions to factor the supplier invoices. At the same time, the credit terms of the Group's corresponding trade payables were extended to mirror the maturity of the asset-backed debt securities.

*Accounting for asset-backed debt securities*

The securitization vehicle was designed by the Group with the sole purpose to acquire receivable balances from the Group's suppliers in order to securitize the senior asset-backed securities with guaranteed returns sold to third-party investors. The Group has a variable interest in the securitization vehicle through its interest in the subordinated asset-backed securities issued by the securitization vehicle which bear the residual loss. As a result, the Group considers itself the primary beneficiary and consolidates the securitization vehicle given the Group has (i) the power to govern the activities that most significantly impact its economic performance, and (ii) is obligated to absorb losses that could potentially be significant to the securitization vehicle.

As a result of the series of transactions described above, the payment terms of the Group's original trade payables were substantially modified and considered extinguished as the nature of the original liability has changed from that of a trade payable to loan borrowings from third-party investors. The proceeds from borrowings from third-party investors is a financing activity and reported as "Proceeds from long-term loans and borrowings from third party investors, net of issuance costs" on the consolidated statements of cash flows.

As of December 31, 2019 and 2020, the outstanding borrowings from asset-backed debt securities were RMB898,097 and RMB498,252 (US$76,360). RMB74,992 and RMB371,058 (US$56,867) of 2018 asset-backed debt securities was repaid when it became due in December 2019 and December 2020. RMB29,921 (US$4,586) of 2019 asset-backed debt securities was repaid when it became due in October 2020. RMB498,252 (US$76,360) of asset-backed debt securities will mature in one year and are included in "Long-term loans, current portion" in the consolidated balance sheets.

As of December 31, 2020, aggregate loan principal payments on long-term loans and borrowings from third party investors are due according to the following schedule:

|  | As of December 31, 2020 | |
|  | RMB | US$ |
| --- | --- | --- |
| within 1 year | 910,882 | 139,599 |
| between 1-2 year | - | - |
| Thereafter | - | - |
|  | 910,882 | 139,599 |

F-47

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**15.       CONVERTIBLE SENIOR NOTES**

*2023 Convertible Senior Notes*

On December 4, 2018, the Company issued US$750 million convertible senior notes (the "2023 Notes"). The 2023 Notes are senior, unsecured obligations of the Company, and interest is payable semi-annually in cash at a rate of 3.75% per annum on June 1 and December 1 of each year, beginning on June 1, 2019. The 2023 Notes will mature on December 1, 2023 unless redeemed, repurchased or converted prior to such date.

The initial conversion rate of the 2023 Notes is 37.1830 of the Company's ADS per US$1,000 principal amount of the 2023 Notes (which is equivalent to an initial conversion price of approximately US$26.89 per ADS). Prior to June 1, 2023, the 2023 Notes will be convertible at the option of the holders only upon the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2019, if the last reported sale price of ADSs for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price; (2) during the five business day period after any ten consecutive trading day period in which the trading price per US$1,000 principal amount of notes was less than 98% of the product of the last reported sale price of the ADSs and the conversion rate on each such trading day; (3) if the Company calls the notes for a tax redemption; or (4) upon the occurrence of specified corporate events. Thereafter, the 2023 Notes will be convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date. The conversion rate is subject to adjustment in some events but is not adjusted for any accrued and unpaid interest. In addition, following a make-whole fundamental change that occurs prior to the maturity date or following the Company's delivery of a notice of a tax redemption, the Company will increase the conversion rate for a holder who elects to convert its notes in connection with such a corporate event or such tax redemption. Upon conversion, the Company will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

The holders may require the Company to repurchase all or a portion of the 2023 Notes for cash on December 1, 2021, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest.

In connection with the issuance of the 2023 Notes, the Company purchased capped call options (the "2023 Capped Call") on the Company's ADS with certain counterparties at a price of US$67.5 million. The counterparties agreed to sell to the Company up to approximately 27.9 million of the Company's ADSs upon the Company's exercise of the 2023 Capped Call. The exercise price is equal to the 2023 Notes' initial conversion price and the cap price is US$38.42 per ADS, subject to certain adjustments under the terms of the capped call transactions. The capped call transactions are expected to reduce potential dilution to existing holders of the ordinary shares and ADSs of the Company upon conversion of the 2023 Notes and/or offset any potential cash payments that the Company is required to make in excess of the principal amount of any converted notes, as the case may be, with such reduction and/or offset subject to a cap.

*2025 Convertible Senior Notes*

On March 29, 2019, the Company issued US$1,200 million convertible senior notes (the "2025 Notes"). The 2025 Notes are senior, unsecured obligations of the Company, and interest is payable semi-annually in cash at a rate of 2.00% per annum on October 1 and April 1 of each year, beginning on October 1, 2019. The 2025 Notes will mature on April 1, 2025 unless redeemed, repurchased or converted prior to such date.

The initial conversion rate of the 2025 Notes is 33.0003 of the Company's ADS per US$1,000 principal amount of the 2025 Notes (which is equivalent to an initial conversion price of approximately US$30.30 per ADS). Prior to October 1, 2024, the 2025 Notes will be convertible at the option of the holders only upon the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on June 30, 2019, if the last reported sale price of ADSs for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price; (2) during the five business day period after any ten consecutive trading day period in which the trading price per US$1,000 principal amount of notes was less than 98% of the product of the last reported sale price of the ADSs and the conversion rate on each such trading day; (3) if the Company calls

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

the notes for a tax redemption; or (4) upon the occurrence of specified corporate events. Thereafter, the 2025 Notes will be convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date. The conversion rate is subject to adjustment in some events but is not adjusted for any accrued and unpaid interest. In addition, following a make-whole fundamental change that occurs prior to the maturity date or following the Company's delivery of a notice of a tax redemption, the Company will increase the conversion rate for a holder who elects to convert its notes in connection with such a corporate event or such tax redemption. Upon conversion, the Company will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

The holders may require the Company to repurchase all or a portion of the 2025 Notes for cash on April 1, 2023, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest.

In connection with the issuance of the 2025 Notes, the Company purchased capped call options (the "2025 Capped Call") on the Company's ADS with certain counterparties at a price of US$84.5 million. The counterparties agreed to sell to the Company up to approximately 39.6 million of the Company's ADSs upon the Company's exercise of the 2025 Capped Call. The exercise price is equal to the 2025 Notes' initial conversion price and the cap price is US$40.02 per ADS, subject to certain adjustments under the terms of the capped call transactions. The capped call transactions are expected to reduce potential dilution to existing holders of the ordinary shares and ADSs of the Company upon conversion of the 2025 Notes and/or offset any potential cash payments that the Company is required to make in excess of the principal amount of any converted notes, as the case may be, with such reduction and/or offset subject to a cap.

*2026 Convertible Senior Notes*

On December 21, 2020, the Company issued US$800 million convertible senior notes (the "2026 Notes"). The 2026 Notes are senior, unsecured obligations of the Company, and interest is payable semi-annually in cash at a rate of 4.00% per annum on June 15 and December 15 of each year, beginning on June 15, 2021. The 2026 Notes will mature on December 15, 2026 unless redeemed, repurchased or converted prior to such date. The Company offered an additional US$100 million principal amount of the 2026 Notes simultaneously, pursuant to the underwriters' option to purchase additional notes (Note 27).

F-49

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The initial conversion rate of the 2026 Notes is 44.8179 of the Company's ADS per US$1,000 principal amount of the 2026 Notes (which is equivalent to an initial conversion price of approximately US$22.31 per ADS). Prior to June 15, 2026, the 2026 Notes will be convertible at the option of the holders only upon the following circumstances: (1) during any calendar quarter commencing after the calendar quarter ending on March 31, 2021, if the last reported sale price of ADSs for at least 20 trading days (whether or not consecutive) during a period of 30 consecutive trading days ending on, and including, the last trading day of the immediately preceding calendar quarter is greater than or equal to 130% of the conversion price; (2) during the five business day period after any ten consecutive trading day period in which the trading price per US$1,000 principal amount of notes was less than 98% of the product of the last reported sale price of the ADSs and the conversion rate on each such trading day; (3) if the Company calls the notes for a tax redemption; or (4) upon the occurrence of specified corporate events. Thereafter, the 2026 Notes will be convertible at the option of the holders at any time until the close of business on the second scheduled trading day immediately preceding the maturity date. The conversion rate is subject to adjustment in some events but is not adjusted for any accrued and unpaid interest. In addition, following a make-whole fundamental change that occurs prior to the maturity date or following the Company's delivery of a notice of a tax redemption, the Company will increase the conversion rate for a holder who elects to convert its notes in connection with such a corporate event or such tax redemption. Upon conversion, the Company will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

The holders may require the Company to repurchase all or a portion of the 2026 Notes for cash on August 1, 2024, or upon a fundamental change, at a repurchase price equal to 100% of the principal amount, plus accrued and unpaid interest.

*Accounting for Convertible Senior Notes*

As the conversion option may be settled in cash at the Company's option, the Company separated the 2023 Notes, the 2025 Notes and the 2026 Notes (collectively as the "Notes") into liability and equity components in accordance with ASC subtopic 470-20, *Debt with Conversion and Other Options*. The carrying amount of the liability component was calculated by measuring the fair value of a similar liability that does not have an associated conversion feature. The carrying amount of the equity component representing the conversion option was determined by deducting the fair value of the liability component from the initial proceeds and recorded as additional paid-in capital. The difference between the principal amount of the 2023 Notes and the liability component is considered debt discount and is amortized at an effective interest rate of 7.04% to accrete the discounted carrying value of the 2023 Notes to its face value on December 1, 2021, the put date of the 2023 Notes. The difference between the principal amount of the 2025 Notes and the liability component is considered debt discount and is amortized at an effective interest rate of 6.01% to accrete the discounted carrying value of the 2025 Notes to its face value on April 1, 2023, the put date of the 2025 Notes. The difference between the principal amount of the 2026 Notes and the liability component is considered debt discount and is amortized at an effective interest rate of 6.94% to accrete the discounted carrying value of the 2026 Notes to its face value on August 1, 2024, the put date of the 2026 Notes.

The cost of the 2023 Capped Call and 2025 Capped Call of US$67.5 million and US$84.5 million were recorded as a reduction of the Company's additional paid-in capital on the consolidated balance sheets with no subsequent changes in fair value recorded.

The net proceeds from the issuance of the 2023 Notes, the 2025 Notes and the 2026 Notes were US$736.7 million, US$1,179.0 million and US$786.0 million (equivalent to RMB5,150,888), after deducting underwriting discounts and offering expenses of US$13.3 million, US$21.0 million and US$14.0 million (equivalent to RMB91,690) from the initial proceeds of US$750 million, US$1,200 million and US$800 million, respectively. Debt issuance costs were allocated to the liability and equity components based on the same proportion as the recognized amounts of liability and equity components determined above.

F-50

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The carrying amount of the Notes as of December 31, 2019 and 2020 were as follows:

|  | As of December 31, 2019 | As of December 31, 2020 | |
|  | RMB | RMB | US$ |
|---|---|---|---|
| Liability component: | | | |
| Principal | 13,577,850 | 17,953,650 | 2,751,517 |
| Less: unamortized debt discount | 1,280,982 | 1,274,874 | 195,383 |
| Net carrying amount | 12,296,868 | 16,678,776 | 2,556,134 |
| Equity component: | | | |
| Carrying amount | 1,349,262 | 1,744,219 | 267,313 |

For the years ended December 31, 2018, 2019 and 2020, the amount of interest cost recognized relating to both the contractual interest coupon and amortization of the discount on the liability component were RMB23.9 million, RMB669.8 million and RMB799.2 million (US$122.5 million), respectively. As of December 31, 2020, the liability component of the 2023 Notes, the 2025 Notes and the 2026 Notes will be accreted up to the principal amount of US$750 million, US$1,200 million and US$800 million over a remaining period of 0.92 years, 2.25 years and 3.59 years, respectively. The amount repayable within the next twelve months are classified as "Convertible senior notes, current portion" on the consolidated balance sheets.

The aggregate scheduled maturities of RMB4,896.5 million (US$750.4 million), RMB7,834.3 million (US$1,200.7 million) and RMB5,222.9 million (US$800.4 million) of the 2023 Notes, the 2025 Notes and the 2026 Notes will be repaid when they become due in 2023, 2025 and 2026, respectively, assuming there is no conversion of the Notes, no redemption of the Notes prior to their maturities and the convertible senior notes bondholders hold the Notes until their maturities and the Company elects to fully settle the Notes in cash.

16.    **INCOME TAXES**

*Cayman Islands*

Under the current laws of the Cayman Islands, the Company is not subject to tax on income or capital gains. Additionally, upon payment of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

*Singapore*

Under the Singapore tax laws, subsidiaries in Singapore are subject to a unified 17% tax rate, except for certain entities that are entitled to preferential tax treatments, and there are no withholding taxes in Singapore on remittance of dividends. iQIYI International Singapore Pte, Ltd. was granted a five-year Development and Expansion Incentive ("DEI") commencing from September 15, 2020, which awards a concessionary tax rate of 10% on qualifying income, subject to certain terms and conditions imposed. An entity could re-apply for DEI upon the expiry of prior one, subject to the terms and conditions and amendments thereof.

F-51

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*China*

Effective from January 1, 2008, the PRC's statutory Enterprise Income Tax ("EIT") rate is 25%. In accordance with the implementation rules of EIT Law, a qualified "High and New Technology Enterprise" ("HNTE") is eligible for a preferential tax rate of 15% with HNTE certificate effective for a period of three years and a "Software Enterprise" ("SE") is entitled to a two-year income tax exemption starting from the first profit making year, followed by a reduction of half the applicable tax rate for the subsequent three years. An entity must file required supporting documents with the tax authority and ensure fulfillment of the relevant HNTE criteria before using the preferential rate. An entity could re-apply for the HNTE certificate when the prior certificate expires. The SE is subject to relevant governmental authorities' annual assessment based on self-assessment supporting documents filed with the tax authorities each year.

Certain PRC subsidiaries and VIEs, including Beijing QIYI Century, Shanghai Zhong Yuan and Beijing iQIYI are qualified HNTEs and enjoy a reduced tax rate of 15% for the years presented, which will expire in 2021 or 2022. Chengdu Skymoons Interactive Network Game Co., Ltd, qualified as a SE, is entitled to an exemption from the enterprise income tax for two years beginning from 2017, and a reduced tax rate of 12.5% for the subsequent three years. The qualification as a "SE" is subject to annual evaluation by the relevant authorities in China.

The other PRC subsidiaries and consolidated VIEs and VIE's subsidiaries are subject to the 25% EIT rate.

According to the current EIT Law and its implementation rules, foreign enterprises, which have no establishment or place in China but derive dividends, interest, rents, royalties and other income (including capital gains) from sources in China or which has an establishment or place in China but the aforementioned incomes are not connected with the establishment or place shall be subject to PRC withholding tax ("WHT") at 10% (a further reduced WHT rate may be available according to the applicable double tax treaty or arrangement provided that the foreign enterprise is the tax resident of the jurisdiction where it is located and it is the beneficial owner of the dividends, interest and royalties income).

The Group's loss before income taxes consists of:

|  | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | **2018** | **2019** | **2020** | **2020** |
|  | **RMB** | **RMB** | **RMB** | **US$** |
| Non-PRC | (670,529) | (1,243,926) | (1,130,036) | (173,186) |
| PRC | (8,311,901) | (8,980,961) | (5,853,841) | (897,139) |
|  | (8,982,430) | (10,224,887) | (6,983,877) | (1,070,325) |

Income tax expense for the years ended December 31, 2018, 2019 and 2020 consists of:

|  | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | **2018** | **2019** | **2020** | **2020** |
|  | **RMB** | **RMB** | **RMB** | **US$** |
| Current income tax expense | 123,887 | 129,164 | 65,255 | 10,001 |
| Deferred income tax benefit | (45,086) | (77,312) | (41,979) | (6,434) |
|  | 78,801 | 51,852 | 23,276 | 3,567 |

F-52

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The reconciliation of total tax expense computed by applying the respective statutory income tax rate to pre-tax loss is as follows:

| | For the year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2018** | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| Income tax benefit at PRC statutory rate | (2,245,608) | (2,556,222) | (1,745,969) | (267,581) |
| Effect of differing tax rates in different jurisdictions | 172,111 | 293,976 | 291,884 | 44,733 |
| Non-deductible expenses | 380,327 | 436,312 | 516,236 | 79,117 |
| Research and development super-deduction | (40,466) | (66,026) | (159,919) | (24,509) |
| Effect of PRC preferential tax rates and tax holiday | 709,165 | 707,518 | 243,964 | 37,389 |
| Other adjustments | (51,451) | 104,484 | 57,018 | 8,738 |
| Change in valuation allowance | 1,154,723 | 1,131,810 | 820,062 | 125,680 |
| Income tax expense | 78,801 | 51,852 | 23,276 | 3,567 |

The tax effects of temporary differences that give rise to the deferred tax balances at December 31, 2019 and 2020 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **US$** |
| Deferred tax assets: | | | |
| Accrued expenses and others | 83,324 | 117,387 | 17,990 |
| Bad debt provision | 32,654 | 104,458 | 16,009 |
| Net operating losses carried forward | 801,430 | 1,078,698 | 165,318 |
| Recorded cost relating to capitalized assets | 2,943,758 | 3,363,003 | 515,403 |
| Fixed assets depreciation | 17,967 | 18,651 | 2,858 |
| Valuation allowance | (3,751,855) | (4,571,917) | (700,677) |
| Deferred tax assets, net | 127,278 | 110,280 | 16,901 |
| Deferred tax liabilities: | | | |
| Long-lived assets arising from acquisitions | 122,498 | 63,521 | 9,735 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **US$** |
| Classification in the consolidated balance sheets: | | | |
| Deferred tax assets, net | 34,916 | 51,347 | 7,869 |
| Deferred tax liabilities | 30,136 | 4,588 | 703 |

Valuation allowances have been provided on the net deferred tax assets where, based on all available evidence, it was considered more likely than not that some portion or all of the recorded deferred tax assets will not be realized in future periods.

Realization of the net deferred tax assets is dependent on factors including future reversals of existing taxable temporary differences and adequate future taxable income, exclusive of reversing deductible temporary differences and tax loss or credit carry forwards. The Group evaluates the potential realization of deferred tax assets on an entity-by-entity basis. As of December 31, 2019 and 2020, valuation allowances were provided against deferred tax assets in entities where it was determined it was more likely than not that the benefits of the deferred tax assets will not be realized.

F-53

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

As of December 31, 2019 and 2020, the Group had tax losses of RMB4,641,219 and RMB6,529,485 (US$1,000,687) deriving from entities in the PRC, Hong Kong and Singapore. The tax losses in the PRC can be carried forward for five years to offset future taxable income and the period was extended to ten years for entities qualified as HNTE in 2020 and thereafter. The tax losses in Hong Kong and Singapore can be carried forward without an expiration date.

The Group did not record any dividend withholding tax, as there were no taxable outside basis differences noted as of the end of the periods presented.

The Group evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the consolidated financial statements. The Group elects to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss. As of the years ended December 31, 2018, 2019 and 2020, there was no significant impact from tax uncertainties on the Group's financial position and result of operations. The Group did not record any interest and penalties related to an uncertain tax position for each of the years ended December 31, 2018, 2019 and 2020. The Group does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Group's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax filings from 2015 through 2020 remain open to examination by the respective tax authorities. The Group may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

**17.    EMPLOYEE DEFINED CONTRIBUTION PLAN**

Full-time employees of the Company's subsidiaries, VIEs and VIE's subsidiaries in the PRC participate in a government mandated defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the subsidiaries, VIEs and VIE's subsidiaries of the Company make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Group has no legal obligation for the benefits beyond the contributions made. The total amount for such employee benefits which are expensed as incurred were RMB544,965, RMB660,414 and RMB490,245 (US$75,133) for the years ended December 31, 2018, 2019 and 2020, respectively.

**18.    COMMITMENTS AND CONTINGENCIES**

*Commitments for property management fees*

Future minimum payments under non-cancelable agreements for property management fees consist of the following as of December 31, 2020:

|  | RMB | US$ |
|---|---|---|
| 2021 | 24,174 | 3,705 |
| 2022 | 25,277 | 3,874 |
| 2023 | 19,100 | 2,927 |
| 2024 | 6,050 | 927 |
| 2025 and thereafter | 35,758 | 5,480 |
|  | 110,359 | 16,913 |

F-54

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Commitments for Licensed Copyrights and Produced Content*

Future minimum payments under non-cancelable agreements for licensed copyrights and produced content consist of the following as of December 31, 2020:

|  | RMB | US$ |
|---|---|---|
| 2021 | 10,480,422 | 1,606,195 |
| 2022 | 6,239,361 | 956,224 |
| 2023 | 3,420,784 | 524,258 |
| 2024 | 1,285,650 | 197,034 |
| 2025 and thereafter | 344,714 | 52,830 |
|  | 21,770,931 | 3,336,541 |

*Capital commitment*

As of December 31, 2020, commitments for the purchase of fixed assets are immaterial.

*Litigation, claims and assessments*

The Group is involved in a number of claims pending in various courts, in arbitration, or otherwise unresolved as of December 31, 2020. These claims are substantially related to alleged copyright infringement as well as routine and incidental matters to its business, among others. Adverse results in these claims may include awards of damages and may also result in, or even compel, a change in the Group's business practices, which could impact the Group's future financial results. The Group has accrued RMB43,571 and RMB32,704 (US$5,012) in "Accrued expenses" in the consolidated balance sheet as of December 31, 2019 and 2020. The Group recognized losses of RMB16,259, RMB37,461 and RMB4,489 (US$668) for the years ended December 31, 2018, 2019 and 2020.

Starting in April 2020, the Group and certain of its current and former officers and directors were named as defendants in putative securities class actions filed in federal court. All of these cases were purportedly brought on behalf of a class of persons who allegedly suffered damages as a result of alleged misstatements and omissions in the Group's public disclosure documents. As the cases remain in their preliminary stages, the likelihood of any unfavorable outcome or the amount or range of any potential loss cannot be reasonably estimated at the issuance date of the consolidated financial statements. As a result, as of December 31, 2020, the Group did not record any liabilities for the loss contingencies pertaining to the cases described above.

The Group is unable to estimate the reasonably possible loss or a range of reasonably possible losses for proceedings in the early stages or where there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. Although the results of unsettled litigations and claims cannot be predicted with certainty, the Group does not believe that, as of December 31, 2020, there was at least a reasonable possibility that the Group may have incurred a material loss, or a material loss in excess of the accrued expenses, with respect to such loss contingencies. The losses accrued include judgments made by the court and out-of-court settlements after December 31, 2020, but related to cases arising on or before December 31, 2020. The Group is in the process of appealing certain judgments for which losses have been accrued.

**19.    REDEEMABLE NONCONTROLLING INTERESTS**

In October 2019, one of the Group's VIE's subsidiary completed a round of preferred shares financing with RMB100,000 from third-party preferred shareholders. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of the Group, these preferred shares are accounted for as redeemable noncontrolling interests.

The Group accounts for the changes in accretion to the redemption value in accordance with ASC topic 480, *Distinguishing Liabilities from Equity.* The Group elects to use the effective interest method to account for the changes of redemption value over the period from the date of issuance to the earliest redemption date of the noncontrolling interests.

F-55

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The movement in the carrying value of the redeemable noncontrolling interests is as follows:

|  | 2019 | 2020 | 2020 |
|---|---|---|---|
|  | RMB | RMB | US$ |
| Balance as of January 1 | — | 101,542 | 15,562 |
| Issuance of subsidiary shares | 100,000 | — | — |
| Accretion of redeemable noncontrolling interests | 1,542 | 7,087 | 1,086 |
| Balance as of December 31 | 101,542 | 108,629 | 16,648 |

**20.    ORDINARY SHARES**

On February 2, 2018, the Company issued 7,500,251 ordinary shares to Cannes Ventures Limited pursuant to the exercise of certain options.

Upon completion of the Company's IPO on April 3, 2018, 1,231,841,032 Class A ordinary shares and 2,496,982,468 Class B ordinary shares were issued upon conversion of all redeemable convertible preferred shares. In addition, immediately following the closing of the IPO, the Memorandum and Articles of Association were amended and restated such that the authorized share capital of the Company was reclassified and redesignated into 100,000,000,000 shares comprising of (i) 94,000,000,000 Class A ordinary shares; (ii) 5,000,000,000 Class B ordinary shares; and (iii)1,000,000,000 reserved shares at par value of US$0.00001 per share. The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting and conversion rights. Each share of Class A ordinary shares is entitled to one vote per share and is not convertible into Class B ordinary shares under any circumstances. Each share of Class B ordinary shares is entitled to ten votes per share and is convertible into one Class A ordinary share at any time by the holder thereof. Upon any transfer of Class B ordinary shares by the holder thereof to any person or entity that is not an affiliate of such holder, such Class B ordinary shares would be automatically converted into an equal number of Class A ordinary shares.

Upon completion of the Company's IPO, 875,000,000 Class A ordinary shares (125,000,000 ADS equivalent) were issued on April 3, 2018, and 67,525,675 Class A ordinary shares (9,646,525 ADS equivalent) were issued on April 30, 2018 pursuant to the underwriters' partial exercise of their option to purchase additional ADSs.

On April 12, 2018, the Company issued 36,860,691 Class B ordinary shares pursuant to a share purchase agreement with Baidu to acquire certain intangible assets relating to an online movie ticket and show ticket booking business.

On September 24, 2018, 399,083,573 Class A ordinary shares were issued to the Company's depositary bank for bulk issuance of ADSs reserved for future issuances upon the exercise or vesting of awards under the 2010 Equity Incentive Plan and the 2017 Incentive Plan. As of December 31, 2020, 275,829,374 Class A ordinary shares are deemed issued but not outstanding as they have not been transferred to grantees.

On August 19, 2019 and August 14, 2020, 11,888,853 and 10,917,811 restricted Class A ordinary shares were issued to certain key employees in relation to the acquisition of Skymoons (Note 3).  As of December 31, 2020, 14,880,762 restricted Class A ordinary shares are issued but not outstanding as they are still contingent on the continued employment of grantees.

Upon completion of the follow-on offering, 280,000,000 Class A ordinary shares (40,000,000 ADS equivalent) were issued on December 21, 2020, and 32,163,292 Class A ordinary shares (4,594,756 ADS equivalent) were issued on January 8, 2021 pursuant to the underwriters' partial exercise of their option to purchase additional ADSs (Note 27).

As of December 31, 2020, there were 2,609,809,545 and 2,876,391,396 Class A and Class B ordinary shares outstanding. As of December 31, 2019 and 2020, there were no preferred shares issued and outstanding.
.

F-56

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**21.    PROFIT APPROPRIATION AND RESTRICTED NET ASSETS**

The Company's subsidiaries, VIEs and the VIEs' subsidiaries in China are required to make appropriations to certain non-distributable reserve funds. In accordance with the laws applicable to China's WFOE, its subsidiaries have to make appropriations from its after-tax profit (as determined under Generally Accepted Accounting Principles in the PRC ("PRC GAAP")) to non-distributable reserve funds including (i) general reserve fund, (ii) enterprise expansion fund, and (iii) staff bonus and welfare fund. General reserve fund is at least 10% of the after-tax profits calculated in accordance with the PRC GAAP.

Appropriation is not required if the reserve fund has reached 50% of the registered capital of the respective company. The appropriation of the other two reserve funds is at the Company's discretion. At the same time, the Company's VIEs, in accordance with the China Company Laws, must make appropriations from its after-tax profit (as determined under the PRC GAAP) to non-distributable reserve funds including (i) statutory surplus fund, and (ii) discretionary surplus fund. Statutory surplus fund is at least 10% of the after-tax profits calculated in accordance with PRC GAAP.

General reserve fund and statutory surplus fund are restricted for set off against losses, expansion of production and operation or increase in register capital of the respective company. These reserves are not transferable to the Company in the form of cash dividends, loans or advances. These reserves are therefore not available for distribution except in liquidation.

As of December 31, 2019 and 2020, the Company's PRC subsidiaries, VIEs and VIEs' subsidiaries had appropriated RMB 23,073 and RMB31,494 (US$4,827), respectively, in its statutory reserves.

Under the PRC laws and regulations, the subsidiaries, VIEs and the VIEs' subsidiaries incorporated in the PRC are restricted in their ability to transfer a portion of their net assets to the Group either in the form of dividends, loans or advances of the combined and consolidated net assets as of December 31, 2020. Even though the Group currently does not require any such dividends, loans or advances from the PRC subsidiaries, VIEs and VIEs' subsidiaries for working capital and other funding purposes, the Company may in the future require additional cash resources from its PRC subsidiaries, VIEs and VIEs' subsidiaries due to changes in business conditions, to fund future acquisitions and development, or merely declare and pay dividends to or distribution to its shareholders. Amounts of net assets restricted include paid-in capital of the Company's PRC subsidiaries and the net assets of the VIEs and VIEs' subsidiaries in which the Company has no legal ownership, totaling RMB19,339,513 (US$2,963,910) as of December 31, 2020.

**22.    LOSS PER SHARE**

Basic loss per share is computed using the weighted average number of the ordinary shares outstanding during the period. Diluted loss per share is computed using the weighted average number of ordinary shares and potential ordinary shares outstanding during the period under the treasury stock method. Upon completion of the Company's IPO on April 3, 2018, all redeemable convertible preferred shares were converted into 1,231,841,032 Class A ordinary shares and 2,496,982,468 Class B ordinary shares. The effect of convertible senior notes, share options and restricted share units were excluded from the computation of diluted net loss per share for the years ended December 31, 2018, 2019 and 2020, as its effect would be anti-dilutive.

F-57

iQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

Basic and diluted loss per Class A and Class B ordinary share for the years ended December 31, 2018, 2019 and 2020 are calculated as follows:

| | Year ended December 31, | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2018 | | 2019 | | 2020 | | 2020 | |
| | Class A | Class B | Class A | Class B | Class A | | Class B | |
| | RMB | RMB | RMB | RMB | RMB | US$ | RMB | US$ |
| Numerator: | | | | | | | | |
| Net loss attributable to iQIYI, Inc. | (3,841,616) | (5,268,160) | (4,506,557) | (5,816,772) | (3,127,160) | (479,257) | (3,911,201) | (599,418) |
| Accretion of redeemable noncontrolling interests | — | — | (673) | (869) | (3,149) | (482) | (3,938) | (604) |
| Accretion of redeemable convertible preferred shares | (126,085) | (172,905) | — | — | — | — | — | — |
| Net loss attributable to iQIYI, Inc.'s ordinary shareholders | (3,967,701) | (5,441,065) | (4,507,230) | (5,817,641) | (3,130,309) | (479,739) | (3,915,139) | (600,022) |
| Denominator: | | | | | | | | |
| Weighted average number of ordinary shares outstanding, basic | 1,631,116,600 | 2,236,815,186 | 2,228,491,004 | 2,876,391,396 | 2,299,788,661 | 2,299,788,661 | 2,876,391,396 | 2,876,391,396 |
| Weighted average number of ordinary shares outstanding, diluted | 1,631,116,600 | 2,236,815,186 | 2,228,491,004 | 2,876,391,396 | 2,299,788,661 | 2,299,788,661 | 2,876,391,396 | 2,876,391,396 |
| Net loss per share, basic | (2.43) | (2.43) | (2.02) | (2.02) | (1.36) | (0.21) | (1.36) | (0.21) |
| Net loss per share, diluted | (2.43) | (2.43) | (2.02) | (2.02) | (1.36) | (0.21) | (1.36) | (0.21) |

## 23.   SHARE-BASED COMPENSATION

*2010 Equity Incentive Plan*

On October 18, 2010, the Company adopted its 2010 Equity Incentive Plan (the "2010 Plan"), which permits the grant of restricted shares, options and share appreciation rights to the employees, directors, officers and consultants of the Company. Under the plan, a total of 58,875,478 ordinary shares were initially reserved for issuance and subsequently increased to 589,729,714 ordinary shares. The 2010 Plan is valid and effective for an original term of ten years, and further extended to twenty years on September 15, 2020 commencing from its adoption. Except for service conditions, there were no other vesting conditions for all the awards under the 2010 Plan. Any unvested portion of the options will be forfeited upon the termination of the grantee's service for any reason. In the event the grantee's service is terminated for cause other than death or permanent disability, the vested portion of the options will be expired upon 90 days following such termination.

The Company has granted share options under the 2010 Plan to its employees and directors. Options granted to employees and directors vest over a four-year period, with 25% of the awards vesting on the first anniversary, and the remaining 75% of the awards vesting on a quarterly basis thereafter.

F-58

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The following table sets forth the summary of option activity under the Company's 2010 Plan:

| | Options Outstanding | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | Aggregate Intrinsic Value |
|---|---|---|---|---|
| | | (US$) | (In years) | (US$ in thousands) |
| Outstanding, December 31, 2019 | 406,912,618 | 0.48 | | |
| Granted | 88,611,584 | 0.51 | | |
| Forfeited/Expired | (12,111,374) | 0.51 | | |
| Exercised | (62,714,554) | 0.44 | | |
| Outstanding, December 31, 2020 | 420,698,274 | 0.49 | 7.42 | 846,289 |
| Vested and expected to vest as of December 31, 2020 | 401,055,919 | 0.48 | 7.34 | 807,293 |
| Exercisable as of December 31, 2020 | 245,054,484 | 0.47 | 6.58 | 497,590 |

As of December 31, 2020, the unrecognized compensation cost, adjusted for estimated forfeitures, related to non-vested share options granted to the Group's employees and directors was RMB2,205,351 (US$337,985). Total unrecognized compensation cost is expected to be recognized over a weighted-average period of 2.68 years and may be adjusted for future changes in estimated forfeitures.

The weighted average grant date fair value of the share options granted during the years ended December 31, 2018, 2019 and 2020 were US$2.19, US$2.83 and US$2.37, respectively. The total fair value of options vested during the years ended December 31, 2018, 2019 and 2020 were RMB267,599, RMB832,594 and RMB1,222,571 (US$187,367), respectively. Total intrinsic value of options exercised for the years ended December 31, 2018, 2019 and 2020 were 282,212, RMB1,055,675 and RMB888,668 (US$136,194).

The Company uses the binomial tree option pricing model to estimate the fair value of share options with the assistance of an independent third-party valuation firm. The assumptions used to value the share options granted to employees and non-employees were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2018 | 2019 | 2020 |
| Fair value of ordinary shares (US$) | 2.57~3.84 | 2.27~3.88 | 2.60~3.42 |
| Risk-free interest rate (%) | 2.86~3.08 | 1.64~2.76 | 0.60~0.78 |
| Expected volatility (%) | 41.3~42.1 | 39.6~51.0 | 48.2~50.4 |
| Expected dividend yield | — | — | — |
| Expected exercise multiple | 2.3 | 2.3 | 2.2~2.8 |

Prior to the Company's IPO, the estimated fair value of the Company's ordinary shares at their respective grant dates, was determined with the assistance of an independent third-party valuation firm. Upon the completion of IPO, the estimated fair value of the Company's ordinary shares was based on the Company's share price. The risk-free interest rate for periods within the contractual life of the options is based on the U.S. treasury yield curve in effect at the time of grant for a term consistent with the contractual term of the awards. Expected volatility was estimated based on the historical volatility ordinary shares of several comparable companies in the same industry until the Company determined it had adequate historical volatility of its share price during 2019. The dividend yield is estimated based on our expected dividend policy over the expected term of the options. The expected exercise multiple is based on management's estimation, which the Company believes is representative of the future.

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*2017 Share Incentive Plan*

On November 30, 2017, the Company adopted its 2017 Share Incentive Plan (the "2017 Plan"). Under the 2017 Plan, the Company is authorized to grant options, restricted shares and restricted share units to members of the board, employees, consultants and other individuals for which the maximum aggregate number of ordinary shares which may be issued pursuant to all awards is 720,000 ordinary shares. The 2017 Plan is valid and effective for a term of ten years commencing from its adoption. Except for service conditions, there are no other vesting conditions for all the awards issued under the 2017 Plan. Any unvested portion of the options will be forfeited either (i) upon the termination of the grantee's service for any reason; or (ii) upon the grantee's scope of service no longer being involved in the business of the Company. In the event the grantee's service is terminated for cause or takes place prior to an IPO other than death or permanent disability, the vested portion of the options will also be forfeited upon such termination.

In December 2017, the Company granted 720,000 restricted share units under the 2017 Plan to non-employees. All restricted shares vest over a four-year period, with 25% of the awards vesting on an annual basis.

The following table sets forth the summary of RSU activity under the Company's 2017 Plan:

|  | Number of shares |
|---|---|
| **Restricted Shares** |  |
| Unvested, December 31, 2019 | 165,000 |
| Vested | (44,000) |
| Forfeited | (77,000) |
| Unvested, December 31, 2020 | 44,000 |

The total fair value of the restricted shares vested during the years ended December 31, 2018, 2019 and 2020 was 455, RMB175, and RMB611 (US$94), respectively. The weighted average grant date fair value of the restricted share units granted during the years ended December 31, 2018, 2019 and 2020 were nil. As of December 31, 2020, there was RMB581 (US$89) unrecognized share-based compensation cost related to restricted shares, which will be recognized over a weighted-average vesting period of 0.96 years.

The following table sets forth the amount of share-based compensation expense included in each of the relevant financial statement line items:

|  | Year ended December 31, | | | |
|---|---|---|---|---|
|  | **2018** | **2019** | **2020** | **2020** |
|  | **RMB** | **RMB** | **RMB** | **US$** |
| Cost of revenues | 83,351 | 171,053 | 201,970 | 30,953 |
| Selling, general and administrative | 368,598 | 675,278 | 851,416 | 130,485 |
| Research and development | 104,262 | 238,189 | 316,709 | 48,538 |
|  | 556,211 | 1,084,520 | 1,370,095 | 209,976 |

F-60

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**24.    RELATED PARTY TRANSACTIONS**

*a)    The table below sets forth the major related parties and their relationships with the Group:*

| Name of related parties | Relationship with the Group |
|---|---|
| Baidu and its subsidiaries ("Baidu Group") | Controlling shareholder of the Company |
| Others | Equity investees (Note 5) |

*b)    The Group had the following related party transactions with the major related parties:*

| | For the year ended December 31, | | | |
|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2020 |
| | RMB | RMB | RMB | US$ |
| Membership services | | | | |
| Membership services revenue earned from memberships sold to Baidu Group | 19,855 | 20,886 | 19,799 | 3,034 |
| Membership services revenue earned from memberships sold by Others | 126 | 6,361 | 5,772 | 885 |
| Online advertising revenues | | | | |
| Advertising services provided to Baidu Group | 189,461 | 67,452 | 113,934 | 17,461 |
| Advertising services provided to Others | 13,347 | 9,674 | 92,690 | 14,205 |
| Content distribution revenues | | | | |
| Content licensed to Others (iii) | 88,457 | 443,503 | 176,227 | 27,008 |
| Other revenues | | | | |
| Other services provided to Baidu Group | 29,296 | 12,343 | 15,430 | 2,365 |
| Others | — | 36,534 | 38,634 | 5,921 |
| Interest income | | | | |
| Loans due from Others | 2,202 | 4,856 | 1,247 | 191 |
| | 342,744 | 601,609 | 463,733 | 71,070 |
| Cost of revenues | | | | |
| License fees to Baidu Group | 8,923 | 23,064 | 13,691 | 2,098 |
| Bandwidth fees to Baidu Group | 601,065 | 976,523 | 1,007,461 | 154,400 |
| Traffic acquisition and other services provided by Baidu Group (i) | 126,644 | 479,497 | — | — |
| Others (ii) | 52,484 | 86,766 | 90,577 | 13,882 |
| Selling, general and administrative | | | | |
| Advertising services provided by Baidu Group | 10,844 | 1,825 | 2,466 | 378 |
| Others | 822 | 3,756 | 2,579 | 395 |
| Research and development | | | | |
| Cloud services provided by Baidu Group | 5,114 | 19,486 | 7,412 | 1,136 |
| | 805,896 | 1,590,917 | 1,124,186 | 172,289 |

(i)    On April 12, 2018, the Company issued to Baidu an aggregate of 36,860,691 Class B ordinary shares pursuant to a share purchase agreement with Baidu entered into in February 2018, in exchange for Baidu providing traffic acquisition and other services in relation with ticket booking service, which was recorded as intangible assets.

F-61

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

(ii)   The transactions mainly represent revenue sharing arrangements with various equity investees. The Group entered into a revenue sharing arrangement in 2018 to become the exclusive sales agent for an equity investee and provided a minimum guarantee of RMB100,000 of annual sales for a one year period. RMB32,642, RMB67,358 and nil were recognized as cost of revenues for the years ended December 31, 2018, 2019 and 2020, respectively.

(iii)   The transactions mainly represent revenues derived from content distributed to Investee A and Investee B.

For the years ended December 31, 2018, 2019 and 2020, the Group purchased content from equity investees in an amount of RMB182,897, RMB909,450 and RMB1,455,933 (US$223,132), respectively.

*c)*   *The Group had the following related party balances with the major related parties:*

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **US$** |
| **Amounts due from related parties, current:** | | | |
| Due from Baidu Group (i) | 35,560 | 38,346 | 5,877 |
| Loans receivable from Others (ii) | 105,934 | — | — |
| Due from Others (iii) | 70,499 | 57,765 | 8,853 |
| | 211,993 | 96,111 | 14,730 |
| **Amounts due from related parties, non-current:** | | | |
| Due from Others (iv) | 172,200 | 39,400 | 6,038 |
| | 172,200 | 39,400 | 6,038 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **US$** |
| **Amounts due to related parties, current:** | | | |
| Loans due to Baidu Group (v) | 50,000 | 50,000 | 7,663 |
| Due to Baidu Group (vi) | 1,014,283 | 1,035,659 | 158,722 |
| Deferred revenue in relation to services to be provided to an equity investee (vii) | 169,677 | 164,810 | 25,258 |
| Due to Others (viii) | 370,298 | 528,314 | 80,967 |
| | 1,604,258 | 1,778,783 | 272,610 |
| **Amounts due to related parties, non-current:** | | | |
| Loans due to Baidu Group (v) | 650,000 | 650,000 | 99,617 |
| Due to Baidu Group (vi) | 1,570 | 2,138 | 328 |
| Deferred revenue in relation to services to be provided to an equity investee (vii) | 410,187 | 325,227 | 49,843 |
| Due to Others | 126 | 42 | 6 |
| | 1,061,883 | 977,407 | 149,794 |

(i)   The balance mainly represents amounts due from Baidu Group for advertising, membership and other services.

(ii)   The balance as of December 31, 2019 represents loans provided to a Group's equity investee with an interest rate of 5%, which was fully repaid during 2020.

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

(iii)  The balance mainly represents amounts due from or advances made to equity investees for content distribution services and other services.

(iv)   The balance represents prepaid licensed copyrights for the Group's equity investees.

(v)    The total outstanding balance represents an interest-free loan of RMB50,000, which is due on demand and an interest-free loan of RMB650,000 provided by Baidu in January 2018 that will mature in January 2023.

(vi)   The balance mainly represents amounts owed to Baidu for bandwidth and cloud services provided to the Group.

(vii)  The balance represents deferred revenue in relation to content distribution, licenses of intellectual property and traffic support services to be provided to investee A.

(viii) The balance mainly represents amounts owed to the Group's equity investees for licensed copyrights and advances made for online advertising services.

F-63

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

### 25.   FAIR VALUE MEASUREMENTS

The following table sets forth the financial instruments measured or disclosed at fair value on a recurring basis by level within the fair value hierarchy as of December 31, 2019 and 2020 and non-recurring fair value measurements as of December 31, 2019 and 2020:

| | Fair Value Measurements | | | | |
| --- | --- | --- | --- | --- | --- |
| | Quoted Prices in Active Market for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total Gain/ (Losses) | |
| | RMB | RMB | RMB | RMB | US$ |
| *Recurring* | | | | | |
| **As of December 31, 2019:** | | | | | |
| Cash equivalents | | | | | |
| Time deposits | | 3,646,041 | | | |
| Money market fund | 894,899 | | | | |
| Short-term investments | | | | | |
| Available-for-sale debt securities | | 890,459 | | | |
| Held-to-maturity debt securities | | 3,688,854 | | | |
| Long-term investments | | | | | |
| Available-for-sale debt security | | | 10,259 | | |
| Held-to-maturity debt securities | | 490,799 | | | |
| Prepayment and other assets | | | | | |
| Option to purchase equity interests of a listed company | | | 14 | | |
| Convertible senior notes | | 14,142,006 | | | |
| | | | | | |
| **As of December 31, 2020:** | | | | | |
| Cash equivalents | | | | | |
| Time deposits | | 2,520,868 | | | |
| Money market fund | 197,973 | | | | |
| Short-term investments | | | | | |
| Available-for-sale debt securities | | 1,253,514 | | | |
| Held-to-maturity debt securities | | 2,104,660 | | | |
| Long-term investments | | | | | |
| Equity investments at fair value with readily determinable fair value | 39,750 | | | | |
| Convertible senior notes, current portion | | 4,966,667 | | | |
| Convertible senior notes, non-current portion | | 12,077,775 | | | |
| | | | | | |
| *Non-recurring* | | | | | |
| **As of December 31, 2019:** | | | | | |
| Long-term investments | | | — | (169,374) | |
| Intangible assets, net | | | 72,302 | (99,096) | |
| Equity investments without readily determinable fair value | | | 44,198 | 7,024 | |
| | | | | | |
| **For the year ended December 31, 2020:** | | | | | |
| Mainland China film group-Licensed copyrights as of March 31, 2020 | | | 7,186,037 | (390,299) | (59,816) |
| Mainland China film group-Produced content as of March 31, 2020 | | | 4,124,114 | (209,701) | (32,138) |
| Produced content monetized on its own as of December 31, 2020 | | | 40,152 | (205,462) | (31,488) |
| Long-term investments as of June 30, 2020 | | | — | (73,199) | (11,218) |
| Intangible assets, net as of September 30, 2020 | | | — | (15,391) | (2,359) |
| Equity investments without readily determinable fair value as of September 30, 2020 | | | 102,251 | 38,100 | 5,839 |
| Fixed assets, net as of September 30, 2020 | | | — | (95,111) | (14,576) |
| Prepayments and other assets as of September 30, 2020 | | | 110,000 | (48,423) | (7,421) |

F-64

**iQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

*Recurring*

The fair value of time deposits is determined based on the prevailing interest rates in the market. Due to maturities of less than one year, the carrying values of short-term investments approximate their fair values. The Group estimated the fair value of long-term held-to-maturity debt securities using the income approach, based on quoted market interest rates of similar instruments (Level 2) and presents the fair value for disclosure purposes only.

The Company carries the convertible senior notes at face value less unamortized debt discount and issuance costs on its consolidated balance sheets, and presents the fair value for disclosure purposes only. The fair value of the convertible senior notes are classified as Level 2 fair value measurements based on dealer quotes. For further information on the convertible senior notes see Note 15.

*Non-recurring*

The outbreak of coronavirus (COVID-19) during the first quarter of 2020 has negatively impacted the Group's operations and financial performance and resulted in a downward adjustment to forecasted advertising revenues for the Mainland China film group. As a result, the Group performed an assessment to determine whether the fair value of the Mainland China film group was less than its unamortized film costs as of March 31, 2020 with the assistance of a third-party valuation firm. The Group uses a discounted cash flow approach to estimate the fair value. The Group estimated the most likely future cash flows based on historical results, economic useful lives or license periods and perception of future performance. The Group has incorporated those cash outflows necessary to generate the cash inflows, including future production, operation, exploitation and administrative costs, which were estimated at 32%-37% of revenue in aggregate. The discount rate was determined to be the weighted average cost of capital of the Mainland China film group at 15%. As of March 31, 2020, the fair value of the Mainland China film group was less than its corresponding carrying value and resulted in the Group recognizing an impairment charge of RMB390,299 (US$59,816) related to licensed copyrights (Note 8) and RMB209,701 (US$32,138) related to produced content (Note 10), respectively. The impairment charge was recognized as cost of revenues in the consolidated statement of comprehensive loss for the year ended December 31, 2020. The fair value information presented is not as of the period's end, and is sensitive to changes in the unobservable inputs used to determine fair value and such changes could result in the fair value at the reporting date to be different from the fair value presented.

In addition, due to adverse changes in the expected performance of certain produced content and the reduced amount of ultimate revenue expected to be recognized, the Group performed an assessment to determine whether the fair value was less than unamortized content costs. The Group uses a discounted cash flow approach to estimate the fair value of the produced content titles predominantly monetized on its own. The significant unobservable inputs (level 3) include forecasted future revenues, productions costs required to complete the content and exploitation and participation costs. The Group considers historical performance of similar content, the forecasted performance and/or preliminary actual performance subsequent to release of the produced content in estimating the fair value. An impairment charge of RMB205,462 (US$31,488) was recognized for produced content predominantly monetized on its own and was recognized as cost of revenues in the consolidated statement of comprehensive loss for the year ended December 31, 2020.

The Group measures certain financial assets, including equity method investments at fair value on a non-recurring basis only if an impairment charge were to be recognized. For equity investments accounted for under the measurement alternative, the equity investment is measured at fair value on a nonrecurring basis when there is an orderly transaction for identical or similar investments of the same issuer. The fair values of these investments were categorized as Level 3 in the fair value hierarchy. The fair values of the Group's privately held investments as disclosed are determined based on the observable transaction price of recent rounds of financing and a price adjustment for the different rights and obligations between a similar instrument of the same issuer with an observable price change in an orderly transaction and the investment held by the Group. The Group's long-term investments were determined to be impaired as of March 31, 2020 and June 30, 2020, respectively, and the impairment charges were recognized in the consolidated statement of comprehensive loss for the year ended December 31, 2020.

The Group uses an income approach to determine the fair value of mobile games in development with the assistance of an independent third-party valuation firm (Note 9). Judgments involved in determining the fair value of mobile games in development includes forecasts of future cash flows, which are based on the Group's best estimate of expected revenues and operating costs and expenses, working capital levels, as well as the risk-adjusted discount rate determined based on comparable companies operating in similar businesses and adjusted for an appropriate risk premium for the related asset (Level 3).

F-65

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

In the third quarter of 2020, the Group received a unilateral vacancy notice from a third-party lessor for one of its leased film production premises. The Group considered such notice as an impairment indicator for relevant long-lived assets associated with the leased property, including its related construction in process and leasehold improvements. Therefore, the Group performed an impairment assessment of the relevant long-lived assets based on estimates of the future cash flows that can be recovered from the lessor (Level 3). An impairment charge of RMB143,534 (US$21,998) was recognized as "Selling, general and administrative" in the consolidated statements of comprehensive loss for the year ended December 31, 2020.

**26.    ACCUMULATED OTHER COMPREHENSIVE INCOME**

The changes in accumulated other comprehensive income by component, net of tax, were as follows:

|  | Foreign currency translation adjustment | Unrealized gain on available-for-sale debt securities | Total |
|---|---|---|---|
|  | RMB | RMB | RMB |
| Balance at December 31, 2017 | 91,618 | 1,508 | 93,126 |
| Other comprehensive income before reclassification | 1,787,553 | 58,335 | 1,845,888 |
| Amounts reclassified from accumulated other comprehensive income | — | (59,024) | (59,024) |
| Net current-period other comprehensive income/(loss) | 1,787,553 | (689) | 1,786,864 |
| Other comprehensive income attributable to noncontrolling interests | — | (44) | (44) |
| Balance at December 31, 2018 | 1,879,171 | 775 | 1,879,946 |
| Other comprehensive income before reclassification | 228,974 | 9,338 | 238,312 |
| Amounts reclassified from accumulated other comprehensive income | — | (9,635) | (9,635) |
| Net current-period other comprehensive income/(loss) | 228,974 | (297) | 228,677 |
| Other comprehensive (income)/loss attributable to noncontrolling interests and redeemable noncontrolling interests | (1,926) | 21 | (1,905) |
| Balance at December 31, 2019 | 2,106,219 | 499 | 2,106,718 |
| Other comprehensive income before reclassification | 433,497 | 14,071 | 447,568 |
| Amounts reclassified from accumulated other comprehensive income | — | (14,169) | (14,169) |
| Net current-period other comprehensive income/(loss) | 433,497 | (98) | 433,399 |
| Other comprehensive loss/(income) attributable to noncontrolling interests and redeemable noncontrolling interests | 2,571 | (8) | 2,563 |
| Balance at December 31, 2020 | 2,542,287 | 393 | 2,542,680 |
| Balance at December 31, 2020 in US$ | 389,623 | 60 | 389,683 |

The amounts reclassified out of accumulated other comprehensive income represent realized gains on the available-for-sale debt securities upon their maturity. The amounts reclassified were determined on the basis of specific identification.

Losses on intracompany foreign currency transactions that are of a long-term-investment nature in the amount of nil, nil and RMB1,232,683 (US$188,917) are included in the foreign currency translation adjustment for the years ended December 31, 2018, 2019 and 2020, respectively.

F-66

IQIYI, INC.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

The following table sets forth the tax benefit/(expense) allocated to each component of other comprehensive income for the years ended December 31, 2018, 2019 and 2020:

|  | For the year ended December 31, | | | |
|  | 2018 | 2019 | 2020 | 2020 |
|  | RMB | RMB | RMB | US$ |
| Unrealized gains on available-for-sale debt securities | | | | |
| Other comprehensive income before reclassification | (1,499) | (1,672) | (2,601) | (399) |
| Amounts reclassified from accumulated other comprehensive income | 1,405 | 1,727 | 2,611 | 400 |
| Net current-period other comprehensive (income)/loss | (94) | 55 | 10 | 1 |

**27.   SUBSEQUENT EVENTS**

In connection with the issuance of the 2026 Notes on December 21, 2020, an additional US$100,000 principal amount was issued on January 8, 2021 pursuant to the underwriters' exercise of their option to purchase additional notes. The net proceeds received by the Company for this issuance of 2026 Notes was US$98,250 (equivalent to RMB641,081).

In connection with the follow-on offering on December 21, 2020, 32,163,292 Class A ordinary shares (4,594,756 ADS equivalent) were issued on January 8, 2021 pursuant to the underwriters' partial exercise of their option to purchase additional ADSs. The net proceeds received by the Company for this issuance of additional Class A ordinary shares was US$78,197 (equivalent to RMB510,235).

F-67

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**28.    CONDENSED FINANCIAL INFORMATION OF THE PARENT COMPANY**

**Condensed Balance Sheets**

| | Note | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2019 | 2020 | 2020 |
| | | RMB | RMB | US$ |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 2,774,681 | 5,101,693 | 781,869 |
| Short-term investments | | 1,237,730 | 263,005 | 40,307 |
| Prepayments and other assets | | 16,849 | 9,313 | 1,427 |
| Amounts due from entities within the Group | | 17,967,978 | 20,666,711 | 3,167,312 |
| **Total current assets** | | **21,997,238** | **26,040,722** | **3,990,915** |
| **Total non-current assets** | | **—** | **—** | **—** |
| **Total assets** | | **21,997,238** | **26,040,722** | **3,990,915** |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **Current liabilities** | | | | |
| Convertible senior notes | | — | 4,752,061 | 728,285 |
| Accrued expenses and other liabilities | | 99,823 | 89,905 | 13,779 |
| **Total current liabilities** | | **99,823** | **4,841,966** | **742,064** |
| **Non-current liabilities** | | | | |
| Convertible senior notes | 15 | 12,296,868 | 11,926,715 | 1,827,849 |
| Other non-current liabilities | | 29,533 | 15,383 | 2,357 |
| **Total non-current liabilities** | | **12,326,401** | **11,942,098** | **1,830,206** |
| **Total liabilities** | | **12,426,224** | **16,784,064** | **2,572,270** |
| **Commitments and contingencies** | 18 | | | |
| **Shareholders' equity:** | | | | |
| Class A ordinary shares (US$0.00001 par value; 94,000,000,000 shares authorized as of December 31, 2019 and 2020, respectively; 2,603,890,438 and 2,900,519,681 shares issued as of December 31, 2019 and 2020, respectively; 2,259,125,125 and 2,609,809,545 shares outstanding as of December 31, 2019 and 2020, respectively) | 20 | 142 | 165 | 25 |
| Class B ordinary shares (US$0.00001 par value; 5,000,000,000 and 5,000,000,000 shares authorized as of December 31, 2019 and 2020, respectively; 2,876,391,396 and 2,876,391,396 shares issued and outstanding as of December 31, 2019 and 2020, respectively) | 20 | 183 | 183 | 28 |
| Additional paid-in capital | | 41,298,328 | 47,687,483 | 7,308,427 |
| Accumulated deficit | 21 | (33,834,357) | (40,973,853) | (6,279,518) |
| Accumulated other comprehensive income | 26 | 2,106,718 | 2,542,680 | 389,683 |
| **Total shareholders' equity** | | **9,571,014** | **9,256,658** | **1,418,645** |
| **Total liabilities and shareholders' equity** | | **21,997,238** | **26,040,722** | **3,990,915** |

**IQIYI, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued**
**(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),**
**except for number of shares (or ADS) and per share (or ADS) data)**

**Condensed Statements of Comprehensive Loss**

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2020** |
| | **RMB** | **RMB** | **RMB** | **US$** |
| **Operating costs and expenses:** | | | | |
| Selling, general and administrative | (48,253) | (14,946) | (36,408) | (5,580) |
| | | | | |
| **Operating loss** | | | | |
| Share of losses of subsidiaries, VIEs and VIEs' subsidiaries | (8,573,048) | (9,593,221) | (7,320,787) | (1,121,960) |
| Interest income | 260,360 | 133,930 | 24,343 | 3,731 |
| Interest expenses | (25,550) | (603,449) | (642,718) | (98,501) |
| Foreign exchange (loss)/gain, net | (694,907) | (118,439) | 913,974 | 140,073 |
| Other (expense)/income, net | (28,378) | (127,204) | 23,235 | 3,562 |
| | | | | |
| **Net loss** | **(9,109,776)** | **(10,323,329)** | **(7,038,361)** | **(1,078,675)** |
| | | | | |
| Accretion of redeemable convertible preferred shares | (298,990) | — | — | — |
| Accretion of redeemable noncontrolling interests | — | (1,542) | (7,087) | (1,086) |
| | | | | |
| **Net loss attributable to ordinary shareholders** | **(9,408,766)** | **(10,324,871)** | **(7,045,448)** | **(1,079,761)** |
| | | | | |
| **Other comprehensive income** | | | | |
| Foreign currency translation adjustments | 1,787,553 | 227,048 | 436,068 | 66,830 |
| Unrealized losses on available-for-sale debt securities | (733) | (276) | (106) | (16) |
| | | | | |
| **Total other comprehensive income, net of tax** | **1,786,820** | **226,772** | **435,962** | **66,814** |
| | | | | |
| **Comprehensive loss** | **(7,322,956)** | **(10,096,557)** | **(6,602,399)** | **(1,011,861)** |

F-69

IQIYI, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2018, 2019 AND 2020—continued
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares (or ADS) and per share (or ADS) data)

**Condensed Statements of Cash Flows**

|  | Year ended December 31, | | | |
|---|---|---|---|---|
|  | 2018 | 2019 | 2020 | 2020 |
|  | RMB | RMB | RMB | US$ |
| Net cash provided by/(used for) operating activities | 87,322 | (122,370) | (836,700) | (128,230) |
| Net cash used for investing activities | (17,575,740) | (7,268,873) | (6,634,576) | (1,016,793) |
| Net cash provided by financing activities | 19,703,701 | 7,489,321 | 9,804,491 | 1,502,604 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 269,735 | 95,695 | (6,203) | (950) |
| | | | | |
| Net increase in cash, cash equivalents and restricted cash | 2,485,018 | 193,773 | 2,327,012 | 356,631 |
| Cash, cash equivalents and restricted cash at the beginning of the year | 95,890 | 2,580,908 | 2,774,681 | 425,238 |
| Cash, cash equivalents and restricted cash at the end of the year | 2,580,908 | 2,774,681 | 5,101,693 | 781,869 |

**Basis of presentation**

For the presentation of the parent company only condensed financial information, the Company records its investments in subsidiaries and VIEs under the equity method of accounting as prescribed in ASC 323. The subsidiaries, VIEs and VIEs' subsidiaries losses are reported as "Share of losses of subsidiaries, VIEs and VIEs' subsidiaries" on the condensed statements of comprehensive loss. Under the equity method of accounting, the Company's carrying amount of its investment in subsidiaries for its share of the subsidiaries, VIEs and VIEs' subsidiaries cumulative losses was reduced to nil as of December 31, 2019 and 2020, respectively and the carrying amount of "Amounts due from entities within the Group" was further adjusted and the Company committed to provide financial support to its VIEs as disclosed in Note 1.

The subsidiaries did not pay any dividends to the Company for the periods presented.

The Company does not have significant commitments or long-term obligations as of the period end other than those presented.

The parent company only financial statements should be read in conjunction with the Company's consolidated financial statements.

F-70

**Exhibit 4.60**

# Confirmation Letter

Beijing Qiyi Century Science & Technology Co., Ltd. ("**Qiyi Century**") and _____ have entered into _____ dated _____ (the "_____ **Agreement**"), whereby it is provided that the term of the agreement shall commence on _____ and end on _____, which term shall be renewable upon confirmation thereof by Qiyi Century in writing. Based on the above provision, it is hereby confirmed by Qiyi Century that the term of the agreement shall be renewed for a period of 10 years and end on _____.

(No text below)

Beijing Qiyi Century Science & Technology Co., Ltd. (seal)

Dated:          December 21, 2020

**Schedule A**

The following schedule sets forth similar Confirmation Letters Qiyi Century entered into with other parties. Other than the information set forth below, there is no material difference between such other Confirmation Letters and this exhibit.

| Original Agreement | Counterparties of Original Agreement | Execution Date of Original Agreement | Initial Term of Original Agreement | Updated Termination Date of Original Agreement |
|---|---|---|---|---|
| Loan Agreement | Xiaohua Geng | January 30, 2013 | June 24, 2011 – June 23, 2021 | June 23, 2031 |
| Software Usage License Agreement | Beijing Xinlian Xinde Advertisement Media Co., Ltd., Xiaohua Geng | May 31, 2012 | November 23, 2011 – December 1, 2021 | December 1, 2031 |
| Business Cooperation Agreement | Beijing Xinlian Xinde Advertisement Media Co., Ltd., Xiaohua Geng | December 1, 2011 | November 23, 2011 – November 23, 2021 | November 23, 2031 |
| Business Operation Agreement | Xiaohua Geng | January 30, 2013 | January 30, 2013 – January 30, 2023 | January 30, 2033 |
| Exclusive Technology Consulting and Services Agreement | Beijing Xinlian Xinde Advertisement Media Co., Ltd., Xiaohua Geng | December 1, 2011 | November 23, 2011 – November 23, 2021 | November 23, 2031 |

2

**Exhibit 4.61**

**Confirmation Letter**

Qiyi.com, Inc.("**Qiyi Cayman**", which has been renamed to iQIYI, Inc. as of November 30, 2017) and GENG Xiaohua (ID number: ***) have entered into an Amended and Restated Exclusive Call Option Agreement dated January 30, 2013 (the "**Agreement**"), whereby it is provided that the Agreement shall become effective as of November 23, 2012 for a term of ten years, which term shall be renewable upon confirmation thereof by Qiyi Cayman in writing prior to its expiration. Based on the above provision and considering the Agreement shall expire on November 22, 2022, it is hereby confirmed by Qiyi Cayman that the term of the Agreement shall be renewed for a period of 10 years and expire on November 22, 2032.

(No text below)

On behalf of

iQIYI, Inc.

By:      /s/GONG Yu
Dated:      December 21, 2020

Exhibit 4.64

**INDENTURE**

**Dated as of**

**December 21, 2020**

**Between**

**IQIYI, INC.**

**as Company**

**and**

**CITIBANK, N.A.**

**as Trustee**

———

**DEBT SECURITIES**

## CROSS-REFERENCE TABLE

| Trust Indenture Act Section | Indenture Section |
|---|---|
| § 310(a) | 11.04(a) |
| (b) | 11.04(b), 11.05 |
| § 311 | 11.01(f) |
| § 312(a) | 10.03 |
| (b) | 11.09 |
| (c) | 11.09 |
| § 313(a) | 10.01(a) |
| (b) | 10.01(a) |
| (c) | 10.01(b) |
| (d) | 10.01(b) |
| § 314(a)(1) | 10.02 |
| (a)(2) | 10.02 |
| (a)(4) | 6.08 |
| (c) | 16.01(a) |
| (e) | 16.01(b) |
| § 315(a)(1) | 11.02(b)(i) |
| (a)(2) | 11.02(b)(ii) |
| (b) | 11.03 |
| (c) | 11.02(a) |
| (d) | 11.02(b) |
| (e) | 7.08 |
| § 316(a) (last sentence) | 1.01 (definition of "Outstanding") |
| (a)(1) | 7.06 |
| (b) | 7.07 |
| (c) | 8.02(e), 14.02(d) |
| § 317(a) | 7.03, 7.04 |
| (b) | 6.03(c) |
| §318 | 16.02 |

Note:  This Cross-Reference Table shall not, for any purpose, be deemed to be part of the Indenture.

**TABLE OF CONTENTS**

**Page**

ARTICLE I

DEFINITIONS

| | | |
|---|---|---|
| Section 1.01 | Definitions. | 1 |
| Section 1.02 | Rules of Construction | 9 |

ARTICLE II

FORMS OF SECURITIES

| | | |
|---|---|---|
| Section 2.01 | Form Generally. | 10 |
| Section 2.02 | Form of Trustee's Certificate of Authentication. | 10 |

ARTICLE III

THE DEBT SECURITIES

| | | |
|---|---|---|
| Section 3.01 | Amount Unlimited; Issuable in Series | 11 |
| Section 3.02 | Denominations | 13 |
| Section 3.03 | Execution, Authentication, Delivery and Dating. | 13 |
| Section 3.04 | Temporary Securities. | 16 |
| Section 3.05 | Registrar. | 16 |
| Section 3.06 | Transfer and Exchange. | 17 |
| Section 3.07 | Mutilated, Destroyed, Lost and Stolen Securities. | 21 |
| Section 3.08 | Payment of Interest; Interest Rights Preserved. | 22 |
| Section 3.09 | Cancellation | 23 |
| Section 3.10 | Computation of Interest | 23 |
| Section 3.11 | Currency of Payments in Respect of Securities. Any series, payment of the principal of, premium, if any, and interest on, Securities of such series shall be made in U.S. Dollars. | 23 |
| Section 3.12 | CUSIP Numbers | 24 |

ARTICLE IV

REDEMPTION OF SECURITIES

| | | |
|---|---|---|
| Section 4.01 | Applicability of Right of Redemption | 24 |
| Section 4.02 | Selection of Securities to be Redeemed. | 24 |
| Section 4.03 | Notice of Redemption. | 25 |

Section 4.04    Deposit of Redemption Price                                      25

Section 4.05    Securities Payable on Redemption Date                            26

Section 4.06    Securities Redeemed in Part                                      26

Section 4.07    Tax Redemption                                                   27

## ARTICLE V

### SINKING FUNDS

Section 5.01    Applicability of Sinking Fund.                                    27

Section 5.02    Mandatory Sinking Fund Obligation                                28

Section 5.03    Optional Redemption at Sinking Fund Redemption Price             28

Section 5.04    Application of Sinking Fund Payment.                             29

## ARTICLE VI

### PARTICULAR COVENANTS OF THE COMPANY

Section 6.01    Payments of Principal, Premium and Interest                      30

Section 6.02    Maintenance of Office or Agency; Paying Agent.                   30

Section 6.03    To Hold Payment in Trust.                                        30

Section 6.04    Merger, Consolidation and Sale of Assets                         32

Section 6.05    Additional Amounts                                              33

Section 6.06    Payment for Consent                                             35

Section 6.07    Compliance Certificate                                          35

Section 6.08    Conditional Waiver by Holders of Securities                      36

Section 6.09    Statement by Officers as to Default                             36

## ARTICLE VII

### REMEDIES OF TRUSTEE AND SECURITYHOLDERS

Section 7.01    Events of Default                                               36

Section 7.02    Acceleration; Rescission and Annulment.                          38

Section 7.03    Other Remedies                                                  39

Section 7.04    Trustee as Attorney-in-Fact                                      40

Section 7.05    Priorities                                                      40

Section 7.06    Control by Securityholders; Waiver of Past Defaults             41

Section 7.07    Limitation on Suits                                             42

Section 7.08     Undertaking for Costs                                                    42

Section 7.09     Remedies Cumulative; Delay or Omission Not Waiver                        43

## ARTICLE VIII

## CONCERNING THE SECURITYHOLDERS

Section 8.01     Evidence of Action of Securityholders                                   43

Section 8.02     Proof of Execution or Holding of Securities                             44

Section 8.03     Persons Deemed Owners.                                                   44

Section 8.04     Effect of Consents                                                       45

## ARTICLE IX

## SECURITYHOLDERS' MEETINGS

Section 9.01     Purposes of Meetings                                                     45

Section 9.02     Call of Meetings by Trustee                                              45

Section 9.03     Call of Meetings by Company or Securityholders                          46

Section 9.04     Qualifications for Voting                                                46

Section 9.05     Regulation of Meetings.                                                  46

Section 9.06     Voting                                                                   47

Section 9.07     No Delay of Rights by Meeting                                            47

## ARTICLE X

## REPORTS BY THE COMPANY AND THE TRUSTEE AND

## SECURITYHOLDERS' LISTS

Section 10.01    Reports by Trustee.                                                      47

Section 10.02    Reports by the Company                                                   48

Section 10.03    Securityholders' Lists                                                   48

## ARTICLE XI

## CONCERNING THE TRUSTEE

Section 11.01    Rights of Trustees; Compensation and Indemnity                          49

Section 11.02    Duties of Trustee.                                                       52

Section 11.03    Notice of Defaults                                                       53

Section 11.04    Eligibility; Disqualification.                                          54

Section 11.05    Resignation and Notice; Removal                                         54

iii

Section 11.06     Successor Trustee by Appointment.                                              56

Section 11.07     Successor Trustee by Merger                                                    57

Section 11.08     Right to Rely on Opinion of Counsel and/or Officers' Certificate              58

Section 11.09     Communications by Securityholders with Other Securityholders                  58

## ARTICLE XII

## SATISFACTION AND DISCHARGE; DEFEASANCE

Section 12.01     Applicability of Article                                                       58

Section 12.02     Satisfaction and Discharge of Indenture                                        58

Section 12.03     Defeasance upon Deposit of Moneys or U.S. Government Obligations               59

Section 12.04     Repayment to Company                                                           62

Section 12.05     Indemnity for U.S. Government Obligations                                      62

Section 12.06     Deposits to Be Held in Escrow                                                  62

Section 12.07     Application of Trust Money.                                                     63

## ARTICLE XIII

## IMMUNITY OF CERTAIN PERSONS

Section 13.01     No Personal Liability                                                          63

## ARTICLE XIV

## SUPPLEMENTAL INDENTURES

Section 14.01     Without Consent of Securityholders                                             64

Section 14.02     With Consent of Securityholders; Limitations.                                  65

Section 14.03     Trustee Protected                                                              67

Section 14.04     Effect of Execution of Supplemental Indenture                                  67

Section 14.05     Notation on or Exchange of Securities                                          67

Section 14.06     Conformity with TIA                                                            67

## ARTICLE XV

## SUBORDINATION OF SECURITIES

Section 15.01     Agreement to Subordinate                                                       68

Section 15.02     Distribution on Dissolution, Liquidation and Reorganization; Subrogation of Securities     68

Section 15.03     No Payment on Securities in Event of Default on Senior Indebtedness            69

iv

| Section 15.04 | Payments on Securities Permitted | 70 |
| Section 15.05 | Authorization of Securityholders to Trustee to Effect Subordination | 70 |
| Section 15.06 | Notices to Trustee | 71 |
| Section 15.07 | Trustee as Holder of Senior Indebtedness | 72 |
| Section 15.08 | Modifications of Terms of Senior Indebtedness | 72 |
| Section 15.09 | Reliance on Judicial Order or Certificate of Liquidating Agent | 72 |
| Section 15.10 | Satisfaction and Discharge; Defeasance and Covenant Defeasance | 72 |
| Section 15.11 | Trustee Not Fiduciary for Holders of Senior Indebtedness | 72 |

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

| Section 16.01 | Certificates and Opinions as to Conditions Precedent. | 73 |
| Section 16.02 | Trust Indenture Act Controls | 74 |
| Section 16.03 | Notices to the Company and Trustee | 74 |
| Section 16.04 | Notices to Securityholders; Waiver | 75 |
| Section 16.05 | Legal Holiday | 76 |
| Section 16.06 | Judgment Currency | 76 |
| Section 16.07 | Effects of Headings and Table of Contents | 76 |
| Section 16.08 | Successors and Assigns | 76 |
| Section 16.09 | Severability | 76 |
| Section 16.10 | Benefits of Indenture | 77 |
| Section 16.11 | Counterparts | 77 |
| Section 16.12 | Governing Law; Waiver of Trial by Jury | 77 |
| Section 16.13 | Submission to Jurisdiction | 78 |
| Section 16.14 | Waiver of Immunity | 78 |
| Section 16.15 | Force Majeure | 78 |

EXHIBITS

EXHIBIT A        Form of Security
EXHIBIT B        Form of Compliance Certificate

INDENTURE dated as of December 21, 2020, between iQIYI, Inc., an exempted company incorporated in the Cayman Islands (the "Company"), and Citibank, N.A., as trustee (the "Trustee").

**WITNESSETH:**

WHEREAS, the Company has duly authorized the execution and delivery of this Indenture to provide for the issuance of debentures, notes, bonds or other evidences of indebtedness (the "Securities") in an unlimited aggregate principal amount to be issued from time to time in one or more series as provided in this Indenture; and

WHEREAS, all things necessary to make this Indenture a valid and legally binding agreement of the Company, in accordance with its terms, have been done.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That, in consideration of the premises and the purchase of the Securities by the Holders (as defined below) thereof for the equal and proportionate benefit of all of the present and future Holders of the Securities, each party agrees and covenants as follows:

**ARTICLE I**

**DEFINITIONS**

Section 1.01        Definitions.

(a)        Unless otherwise defined in this Indenture or the context otherwise requires, all terms used herein shall have the meanings assigned to them in the Trust Indenture Act.

(b)        Unless the context otherwise requires, the terms defined in this Section 1.01(b) shall for all purposes of this Indenture have the meanings hereinafter set forth, the following definitions to be equally applicable to both the singular and the plural forms of any of the terms herein defined:

"Additional Amounts" has the meaning provided in Section 6.05(a).

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agents" means the Paying Agents, the Registrar, and any other agent appointed under the terms of this Indenture.

"Bankruptcy Code" means Title 11 of the United States Code.

"Board of Directors" means the board of directors elected or appointed by the shareholders of the Company to manage its business or any committee of such board duly authorized to take the action purported to be taken by such committee.

"Board Resolution" means any resolution of the Board of Directors taking an action which it is authorized to take and adopted at a meeting duly called and held at which a quorum of disinterested members (if so required) was present and acting throughout or adopted by written resolution executed by every member of the Board of Directors.

"Business Day" means a day other than a Saturday, Sunday or a day on which banking institutions or trust companies in The City of New York, Hong Kong or Beijing are authorized or obligated by law, regulation or executive order to remain closed

"Capital Stock" of any Person means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Shares and limited liability or partnership interests (whether general or limited), but excluding any debt securities convertible or exchangeable into such equity.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Company" means the Person named as the "Company" in the recitals, until a successor Person shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Company" shall mean such successor Person.

"Company Order" means a written request or order signed in the name of the Company by (i) two Officers or (ii) one Officer and either a Treasurer, an Assistant Treasurer, a Secretary or an Assistant Secretary of the Company.

"Consolidated Affiliated Entity" of any Person means any corporation, association or other entity which is or is required to be consolidated with such Person under Accounting Standards Codification subtopic 810-10, *Consolidation: Overall* (including any changes, amendments or supplements thereto) or, if such Person prepares its financial statements in accordance with accounting principles other than U.S. GAAP, the equivalent of Accounting Standards Codification subtopic 810-10, *Consolidation: Overall* under such accounting principles.  Unless otherwise specified herein, each reference to a Consolidated Affiliated Entity will refer to a Consolidated Affiliated Entity of the Company.

"Controlled Entity" of any Person means a Subsidiary or a Consolidated Affiliated Entity of such Person.

"Corporate Trust Office," or other similar term, means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered, which office at the date hereof is located at (a) for note transfer/surrender purposes, 480 Washington Boulevard, 30th Floor, Jersey City, New Jersey 07310, Facsimile: (973) 461-7191 or (973) 461-7192, Attention: Agency & Trust - iQIYI, Inc., and (b) for all other purposes, 388 Greenwich Street, New York, New York 10013, Facsimile: (212) 816-5527, Attention: Agency & Trust - iQIYI, Inc., or such other address as the Trustee may designate from time to time by notice to the

2

Holders and the Company, or the principal corporate trust officer of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Holders and the Company).

"Covenant Defeasance" has the meaning provided in Section 12.03(c).

"CUSIP" means the identification number provided by the Committee on Uniform Securities Identification Procedures.

"Default" has the meaning provided in Section 11.03.

"Defaulted Interest" has the meaning provided in Section 3.08(b).

"Depositary" means, with respect to the Securities of any series issuable in whole or in part in the form of one or more Global Securities, the Person designated as Depositary by the Company pursuant to Section 3.01 until a successor Depositary shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Depositary" shall mean or include each Person who is then a Depositary hereunder, and if at any time there is more than one such Person, "Depositary" as used with respect to the Securities of any such series shall mean the Depositary with respect to the Securities of that series.

"Discharged" has the meaning provided in Section 12.03(b).

"Event of Default" has the meaning provided in Section 7.01.

"Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended.

"External Legal Counsel" means an external legal firm of nationally recognized standing that is reasonably acceptable to the Trustee.

"FATCA" has the meaning provided in Section 6.05(a)(viii).

"Floating Rate Security" means a Security that provides for the payment of interest at a variable rate determined periodically by reference to an interest rate index specified pursuant to Section 3.01.

"Global Security" means any Security that evidences all or part of a series of Securities, issued in fully-registered certificated form to the Depositary for such series in accordance with Section 3.03 and bearing the legend prescribed in Section 3.03(f).

"Holder," "Holder of Securities," or "Securityholder" mean the Person in whose name Securities are registered in the Register.

"Indebtedness" means any and all obligations of a Person for money borrowed which, in accordance with U.S. GAAP, would be reflected on the balance sheet of such Person as a liability on the date as of which Indebtedness is to be determined.

3

"Indenture" means this instrument and all indentures supplemental hereto entered into pursuant to the applicable provisions hereof and shall include the terms of particular series of Securities established as contemplated by Section 3.01.

"Independent Tax Consultant" means an independent accounting firm or consultant of nationally recognized standing.

"Interest Payment Date" means, with respect to any Security, the Stated Maturity of an installment of interest on such Security.

"ISIN" means the International Securities Identification Number.

"Issue Date" means, with respect to any Security, the date on which such Security is originally issued under this Indenture.

"Judgment Currency" has the meaning provided in Section 16.06.

"Legal Defeasance" has the meaning provided in Section 12.03(b).

"Mandatory Sinking Fund Payment" has the meaning provided in Section 5.01(b).

"Maturity" means, with respect to any Security, the date on which the principal of such Security shall become due and payable as therein and herein provided, whether by declaration, call for redemption or otherwise.

"Members" has the meaning provided in Section 3.03(h).

"Officer" means the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, any Vice President, the Treasurer or the Secretary of the Company or, in the event that the Company is a partnership or a limited liability company that has no such officers, a person duly authorized under applicable law by the general partner, managers, members or a similar body to act on behalf of the Company.

"Officers' Certificate" means a certificate signed by two Officers of the Company, one of whom is the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer, or by an Officer and either an Assistant Treasurer or an Assistant Secretary of the Company.

"Opinion of Counsel" means an opinion in writing reasonably acceptable to the Trustee signed by legal counsel, who may be counsel to the Company or who may be other counsel, that meets the applicable requirements provided for in Section 16.01.

"Optional Sinking Fund Payment" has the meaning provided in Section 5.01(b).

"Original Issue Discount Security" means any Security that is issued with "original issue discount" within the meaning of Section 1273(a) of the Code and the regulations thereunder and any other Security designated by the Company as issued with original issue discount for United States federal income tax purposes.

4

"Outstanding" means, when used with respect to Securities, as of the date of determination, all Securities theretofore authenticated and delivered under this Indenture, except:

(i)        Securities theretofore cancelled by the Paying Agent or delivered to the Paying Agent for cancellation;

(ii)       Securities or portions thereof for which payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Company) in trust or set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent) for the Holders of such Securities or Securities as to which the Company's obligations have been Discharged; provided, however, that if such Securities or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

(iii)      Securities that have been paid pursuant to Section 3.07(b) or in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to this Indenture, other than any such Securities in respect of which there shall have been presented to a Responsible Officer of the Trustee proof satisfactory to it that such Securities are held by a protected purchaser in whose hands such Securities are valid obligations of the Company;

provided, however, that in determining whether the Holders of the requisite principal amount of Securities of a series Outstanding have performed any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action) hereunder, Securities owned by the Company or any other obligor upon the Securities of such series or any Affiliate of the Company or of such other obligor shall be disregarded and deemed not to be Outstanding unless the Company, such Affiliate or such other obligor owns all of such Securities, except that, in determining whether the Trustee shall be protected in relying upon any such action, only Securities of such series for which the Trustee has received written notice to be so owned shall be so disregarded. Securities so owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to act with respect to such Securities and that the pledgee is not the Company or any other obligor upon such Securities or any Affiliate of the Company or of such other obligor. In case of a dispute as to such right, the decision of the Trustee upon the advice of counsel shall be full protection to the Trustee. Upon request of the Trustee, the Company shall furnish to the Trustee promptly an Officers' Certificate listing and identifying all such Securities, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to the provisions of Section 11.01, the Trustee shall be entitled to accept such Officers' Certificate as conclusive evidence of the facts therein set forth and of the fact that all such Securities not listed therein are Outstanding for the purpose of any such determination. In determining whether the Holders of the requisite principal amount of Outstanding Securities of a series have performed any action hereunder, the principal amount of an Original Issue Discount Security that shall be deemed to be Outstanding for such purpose shall be the amount of the principal thereof that would be due and payable as of the date of such determination upon a declaration of acceleration of the Maturity thereof pursuant to Section 7.02.

5

"<u>Paying Agent</u>" means any Person authorized by the Company to pay the principal of, premium, if any, or interest on any Securities on behalf of the Company.  The Company may act as Paying Agent with respect to Securities of any series issued hereunder.

"<u>Payment Default</u>" has the meaning provided in Section 7.01(e).

"<u>Person</u>" means any individual, corporation, firm, limited liability company, partnership, joint venture, undertaking, association, joint stock company, trust, unincorporated organization, trust, state, government or any agency or political subdivision thereof or any other entity (in each case whether or not being a separate legal entity).

"<u>Place of Payment</u>" has the meaning provided in Section 3.01(f).

"<u>PRC</u>" means the People's Republic of China, excluding, for purposes of this definition, the Hong Kong Special Administrative Region, the Macau Special Administrative Region and Taiwan.

"<u>Predecessor Security</u>" means, with respect to any Security, every previous Security evidencing all or a portion of the same debt as that evidenced by such particular Security, and, for the purposes of this definition, any Security authenticated and delivered under Section 3.07 in lieu of a lost, destroyed or stolen Security shall be deemed to evidence the same debt as the lost, destroyed or stolen Security.

"<u>Preferred Shares</u>," as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) that is preferred as to the payment of dividends upon liquidation, dissolution or winding up.

"<u>Prospectus</u>" means the prospectus, dated December 15, 2020, relating to the offering of Securities.

"<u>Record Date</u>" means, with respect to any interest payable on any Security on any Interest Payment Date, the close of business on such date specified in such Security for the payment of interest pursuant to Section 3.01.

"<u>Redemption Date</u>" means, when used with respect to any Security to be redeemed, in whole or in part, the date fixed for such redemption by or pursuant to this Indenture and the terms of such Security, which, in the case of a Floating Rate Security, unless otherwise specified pursuant to Section 3.01, shall be an Interest Payment Date only.

"<u>Redemption Price</u>" means, when used with respect to any Security to be redeemed, in whole or in part, the price at which it is to be redeemed pursuant to the terms of the Security and this Indenture.

"<u>Register</u>" has the meaning provided in Section 3.05(a).

"<u>Registrar</u>" has the meaning provided in Section 3.05(a).

"<u>Relevant Jurisdiction</u>" has the meaning provided in Section 6.05(a).

6

"Responsible Officer" means, with respect to the Trustee, any managing director, vice president, senior trust officer, trust associate, relationship manager, transaction manager, client service manager, any trust officer or any other officer located at the Corporate Trust Office of the Trustee who customarily performs functions similar to those performed by any persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and in each such case, who shall have direct responsibility for the day to day administration of this Indenture.

"SEC" means the United States Securities and Exchange Commission, as constituted from time to time.

"Security" or "Securities" means any security or securities, as the case may be, duly authenticated by the Trustee and delivered under this Indenture.

"Security Custodian" means the custodian with respect to any Global Security appointed by the Depositary, or any successor Person thereto, and shall initially be the Paying Agent.

"Senior Indebtedness" means the principal of, premium, if any, or interest on (i) Indebtedness of the Company, whether outstanding on the date hereof or thereafter created, incurred, assumed or guaranteed, for money borrowed other than (A) any Indebtedness of the Company which when incurred, and without respect to any election under Section 1111(b) of the Bankruptcy Code, was without recourse to the Company, (B) any Indebtedness of the Company to any of its Subsidiaries, (C) Indebtedness to any employee of the Company, (D) any liability for taxes, (E) Trade Payables and (F) any Indebtedness of the Company which is expressly subordinate in right of payment to any other Indebtedness of the Company, and (ii) renewals, extensions, modifications and refundings of any such Indebtedness. For purposes of the foregoing and the definition of "Senior Indebtedness," the phrase "subordinated in right of payment" means debt subordination only and not lien subordination, and accordingly, (x) unsecured indebtedness shall not be deemed to be subordinated in right of payment to secured indebtedness merely by virtue of the fact that it is unsecured, and (y) junior liens, second liens and other contractual arrangements that provide for priorities among Holders of the same or different issues of indebtedness with respect to any collateral or the proceeds of collateral shall not constitute subordination in right of payment. This definition may be modified or superseded by a supplemental indenture.

"Significant Subsidiary" means a Subsidiary of the Company that meets the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X under the Exchange Act. Each of the Company's consolidated affiliated entities will be deemed to be a "subsidiary" for the purposes of the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X.

"Special Record Date" has the meaning provided in Section 3.08(b)(i).

"Stated Maturity" means, when used with respect to any Security or any installment of interest thereon, the date specified in such Security as the fixed date on which the

7

principal (or any portion thereof) of or premium, if any, on such Security or such installment of interest is due and payable.

"Subsidiary" of any Person means (i) any corporation, association or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total ordinary voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or Persons performing similar functions) or (ii) any partnership, joint venture limited liability company or similar entity of which more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, is, in the case of clauses (i) and (ii), voting at the time owned or controlled, directly or indirectly, by (A) such Person, (B) such Person and one or more Subsidiaries of such Person or (C) one or more Subsidiaries of such Person.  Unless otherwise specified herein, each reference to a Subsidiary will refer to a Subsidiary of the Company.

"Successor Company" has the meaning provided in Section 3.06(i).

"Successor Jurisdiction" has the meaning provided in Section 6.05(d).

"Tax Change" has the meaning provided in Section 4.07(a).

"Taxes" has the meaning provided in Section 6.05(a).

"Total Equity" as of any date, means the total equity attributable to the Company's shareholders on a consolidated basis determined in accordance with U.S. GAAP, as shown on the consolidated balance sheet of the Company for the most recent fiscal quarter.

"Trade Payables" means accounts payable or any other Indebtedness or monetary obligations to trade creditors created or assumed by the Company or any Subsidiary of the Company in the ordinary course of business (including guarantees thereof or instruments evidencing such liabilities).

"Trust Indenture Act" or "TIA" means the Trust Indenture Act of 1939, as amended.

"Trustee" means the Person named as the "Trustee" in the first paragraph of this Indenture until a successor Trustee shall have become such with respect to one or more series of Securities pursuant to the applicable provisions of this Indenture, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Securities of any series shall mean the Trustee with respect to Securities of that series.

"U.S. Dollars" or "US$" means such currency of the United States as at the time of payment shall be legal tender for the payment of public and private debts.

"U.S. GAAP" refers to generally accepted accounting principles in the United States.

8

"U.S. Government Obligations" means securities that are (i) direct obligations of the United States for the payment of which its full faith and credit is pledged or (ii) obligations of an agency or instrumentality of the United States the payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States, and shall also include a depositary receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Obligation or a specific payment of interest on or principal of any such U.S. Government Obligation held by such custodian for the account of the holder of a depositary receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depositary receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of interest on or principal of the U.S. Government Obligation evidenced by such depositary receipt.

"United States" shall mean the United States of America (including the States and the District of Columbia), its territories and its possessions and other areas subject to its jurisdiction.

"Voting Stock" of a Person means all classes of Capital Stock of such Person then outstanding and normally entitled to vote in the election of directors, managers or trustees, as applicable, of such Person.

Section 1.02    Rules of Construction.  For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the words "herein", "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision;

(b)    references to "Article" or "Section" or other subdivision herein are references to an Article, Section or other subdivision of the Indenture, unless the context otherwise requires; and

(c)    references to any agreement, instrument, statute or regulation defined or referred to herein or in any instrument establishing the terms of any Securities (or executed in connection therewith) are references to such agreement, instrument, statute or regulation as from time to time amended, modified, supplemented or replaced, including (in the case of agreements or instruments) by waiver or consent and by succession of comparable successor agreements, instruments, statutes or regulations.

9

## ARTICLE II

## FORMS OF SECURITIES

Section 2.01        Form Generally.

(a)        The Securities of each series shall be substantially in the form set forth in Exhibit A attached hereto or as shall be established pursuant to a Company Order, Officers' Certificate or in one or more indentures supplemental hereto, in each case with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification or designation and such legends or endorsements placed thereon as the Company may deem appropriate and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange on which any series of the Securities may be listed or of any automated quotation system on which any such series may be quoted, or to conform to usage, all as determined by the officers executing such Securities as conclusively evidenced by their execution of such Securities.

(b)        The terms and provisions of the Securities shall constitute, and are hereby expressly made, a part of this Indenture, and, to the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture expressly agree to such terms and provisions and to be bound thereby.

Section 2.02        Form of Trustee's Certificate of Authentication.

(a)        Only such of the Securities as shall bear thereon a certificate substantially in the form of the Trustee's certificate of authentication hereinafter recited, executed by the Trustee by manual signature, shall be valid or become obligatory for any purpose or entitle the Holder thereof to any right or benefit under this Indenture.

(b)        Each Security shall be dated the date of its authentication.

(c)        The form of the Trustee's certificate of authentication to be borne by the Securities shall be substantially as follows:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Securities of the series designated therein referred to in the within-mentioned Indenture.

Date of authentication: _____        CITIBANK. N.A., as Trustee

By:        _____
          Name:
          Title:

10

**ARTICLE III**

**THE DEBT SECURITIES**

Section 3.01    Amount Unlimited; Issuable in Series.  The aggregate principal amount of Securities which may be authenticated and delivered under this Indenture is unlimited.  The Securities may be issued from time to time in one or more series.  There shall be set forth in a Company Order, Officers' Certificate or in one or more indentures supplemental hereto, prior to the issuance of Securities of any series:

(a)    the title of the Securities of the series (which shall distinguish the Securities of such series from the Securities of all other series, except to the extent that additional Securities of an existing series are being issued);

(b)    any limit upon the aggregate principal amount of the Securities of the series that may be authenticated and delivered under this Indenture (except for Securities authenticated and delivered upon transfer of, or in exchange for, or in lieu of, other Securities of such series pursuant to Section 3.04, 3.06, 3.07, 4.06, or 14.05) and the percentage or percentages of principal amount at which the Securities of the series will be issued;

(c)    the dates on which or periods during which the Securities of the series may be issued, and the dates on, or the range of dates within, which the principal of and premium, if any, on the Securities of such series are or may be payable or the method by which such date or dates shall be determined or extended;

(d)    the rate or rates at which the Securities of the series shall bear interest, if any, or the method by which such rate or rates shall be determined, the date or dates from which such interest shall accrue, or the method by which such date or dates shall be determined, the Interest Payment Dates on which any such interest shall be payable, and the Record Dates for the determination of Holders to whom interest is payable on such Interest Payment Dates or the method by which such date or dates shall be determined, the right, if any, to extend or defer interest payments and the duration of such extension or deferral;

(e)    if the amount of payment of principal of, premium, if any, or interest on, the Securities of the series may be determined with reference to an index, formula or other method;

(f)    the place or places, if any, in addition to or instead of the Corporate Trust Office of the Trustee where the principal of, premium, if any, and interest on Securities of the series shall be payable, and where Securities of any series may be presented for registration of transfer, exchange or conversion, and the place or places where notices and demands to or upon the Company in respect of the Securities of such series may be made (each such place, the "Place of Payment");

(g)    the price or prices at which, the period or periods within which or the date or dates on which, and the terms and conditions upon which Securities of the series may be redeemed, in whole or in part, at the option of the Company, if the Company is to have that option;

11

(h)        the obligation or right, if any, of the Company to redeem, purchase or repay Securities of the series pursuant to any sinking fund, amortization or analogous provisions or at the option of a Holder thereof and the price or prices at which, the period or periods within which or the date or dates on which and the terms and conditions upon which Securities of the series shall be redeemed, purchased or repaid, in whole or in part, pursuant to such obligation;

(i)        if other than denominations of US$2,000 and multiples of US$1,000 in excess thereof, the denominations in which Securities of the series shall be issuable;

(j)        if other than the principal amount thereof, the portion of the principal amount of the Securities of the series which shall be payable upon declaration of acceleration of the Maturity thereof pursuant to Section 7.02;

(k)        whether the Securities of the series are to be issued as Original Issue Discount Securities and the amount of discount or premium, if any, with which such Securities may be issued;

(l)        provisions, if any, for the defeasance of Securities of the series in whole or in part and any addition or change in the provisions related to satisfaction and discharge;

(m)        whether the Securities of the series are to be issued in whole or in part in the form of one or more Global Securities and, in such case, (i) the Depositary for such Global Security or Securities, (ii) the form of legend in addition to or in lieu of that in Section 3.03(f) which shall be borne by such Global Security and (iii) the terms and conditions, if any, upon which interests in such Global Security or Securities may be exchanged in whole or in part for the individual Securities represented thereby;

(n)        the date as of which any Global Security of the series shall be dated if other than the original issuance of the first Security of the series to be issued;

(o)        the form of the Securities of the series;

(p)        whether the Securities of the series are subject to subordination and the terms of such subordination;

(q)        whether the Securities of the series shall be secured;

(r)        the securities exchange(s) or automated quotation system(s) on which the Securities of the series will be listed or admitted to trading, as applicable, if any;

(s)        any restriction or condition on the transferability of the Securities of the series;

(t)        any addition or change in the provisions related to compensation and reimbursement of the Trustee which applies to the Securities of the series;

12

(u)       any addition or change in the provisions related to supplemental indentures set forth in Sections 14.01, 14.02 and 14.04 which applies to the Securities of the series;

(v)       provisions, if any, granting special rights to Holders upon the occurrence of specified events;

(w)       any addition to or change in the Events of Default which applies to any Securities of the series and any change in the right of the Trustee or the requisite Holders of such Securities to declare the principal amount thereof due and payable pursuant to Section 7.02 and any addition or change in the provisions set forth in Article VII which applies to Securities of the series;

(x)       any addition to or change in the covenants set forth in Article VI which applies to the Securities of the series

(y)       if the Securities of such series are to be convertible into or exchangeable for any securities or property of any Person (including the Company), the terms and conditions upon which such Securities will be so convertible or exchangeable, and any additions or changes to this Indenture, if any, to permit or facilitate such conversion or exchange; and

(z)       any other terms of the Securities of the series (which terms shall not be inconsistent with the provisions of this Indenture, except as permitted by Section 14.01, but which may modify or delete any provision of this Indenture insofar as it applies to such series), including any terms which may be required by or advisable under the laws of the United States or regulations thereunder or advisable (as determined by the Company) in connection with the marketing of Securities of the series.

All Securities of any one series shall be substantially identical, except as to denomination and except as may otherwise be provided herein or set forth in a Company Order, Officers' Certificate or in one or more indentures supplemental hereto; provided that, if additional Securities of an outstanding series are issued, such additional Securities shall not have the same CUSIP, ISIN or other identifying number unless such additional Securities are fungible with the outstanding Securities of such series for U.S. federal income tax purposes.

Section 3.02       Denominations.  In the absence of any specification pursuant to Section 3.01 with respect to Securities of any series, the Securities of such series shall be issuable only as Securities in denominations of US$2,000 and multiples of US$1,000 in excess thereof, and shall be payable only in U.S. Dollars.

Section 3.03       Execution, Authentication, Delivery and Dating.

(a)       The Securities shall be executed in the name and on behalf of the Company by an Officer.  Such signatures may be the manual or facsimile signatures of the present or any future such Officer.  If the Person whose signature is on a Security no longer holds that office at the time the Security is authenticated and delivered, the Security shall nevertheless be valid.

13

(b)        At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Securities of any series executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Securities and, if required pursuant to Section 3.01, a supplemental indenture, Company Order or Officers' Certificate setting forth the terms of the Securities of a series.  The Trustee shall thereupon authenticate and deliver such Securities without any further action by the Company.  The Company Order shall specify the principal amount of Securities to be authenticated and the date on which the original issue of Securities is to be authenticated.

(c)        In authenticating the first Securities of any series and accepting the additional responsibilities under this Indenture in relation to such Securities, the Trustee shall receive, and (subject to Section 11.02) shall be fully protected in relying upon, an Officers' Certificate, prepared in accordance with Section 16.01 stating that the conditions precedent, if any, provided for in the Indenture have been complied with, and an Opinion of Counsel, prepared in accordance with Section 16.01 and substantially in the form set forth below:

(i)        that the form or forms of such Securities have been established in accordance with Article II and Section 3.01 and in conformity with the other provisions of this Indenture;

(ii)        that the terms of such Securities have been established in accordance with Section 3.01 and in conformity with the other provisions of this Indenture;

(iii)        that such Securities, when authenticated and delivered by the Trustee and issued by the Company in the manner and subject to any conditions specified in such Opinion of Counsel, will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting the enforcement of creditors' rights and to general equity principles; and

(iv)        that all conditions precedent, if any, provided for in the Indenture in respect of the authentication and delivery by the Company of such Securities have been complied with.

Notwithstanding the provisions of the preceding paragraph, if all Securities of a series are not to be originally issued at one time, it shall not be necessary to deliver the Officers' Certificate or Opinion of Counsel otherwise required pursuant to such preceding paragraph at or prior to the authentication of each Security of such series if such Officers' Certificate or Opinion of Counsel is delivered at or prior to the authentication upon original issuance of the first Security of such series to be issued; provided that nothing in this clause (c) is intended to derogate Trustee's rights to receive an Officers' Certificate and Opinion of Counsel under Section 16.01.

(d)        The Trustee shall have the right to decline to authenticate and deliver the Securities under this Section 3.03 if the issue of the Securities pursuant to this Indenture will affect the Trustee's own rights, duties or immunities under the Securities and this Indenture or otherwise.

14

(e)      Each Security shall be dated the date of its authentication.

(f)      If the Company shall establish pursuant to Section 3.01 that the Securities of a series are to be issued in whole or in part in the form of one or more Global Securities, then the Company shall execute and the Trustee shall authenticate and deliver one or more Global Securities that (i) shall represent an aggregate amount equal to the aggregate principal amount of the Outstanding Securities of such series to be represented by such Global Securities, (ii) shall be registered, if in registered form, in the name of the Depositary for such Global Security or Securities or the nominee of such Depositary, (iii) shall be delivered by the Trustee to such Depositary or pursuant to such Depositary's instruction and (iv) shall bear a legend substantially to the following effect:

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR THE INDIVIDUAL SECURITIES REPRESENTED HEREBY, THIS GLOBAL SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.

The aggregate principal amount of each Global Security may from time to time be increased or decreased by adjustments made on the records of the Security Custodian, as provided in this Indenture.

(g)      Each Depositary designated pursuant to Section 3.01 for a Global Security in registered form must, at the time of its designation and at all times while it serves as such Depositary, be a clearing agency registered under the Exchange Act and any other applicable statute or regulation.

(h)      Members of, or participants in, the Depositary ("Members") shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Depositary or by the Security Custodian under such Global Security, and the Depositary may be treated by the Company, the Trustee, the Paying Agent and the Registrar and any of their agents as the absolute owner of such Global Security for all purposes whatsoever.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Trustee, the Paying Agent or the Registrar or any of their agents from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Members, the operation of customary practices of the Depositary governing the exercise of the rights of an owner of a beneficial interest in any Global Security.  The Holder of a Global Security may grant proxies and otherwise authorize any Person, including Members and Persons that may hold interests through Members, to take any action that a Holder is entitled to take under this Indenture or the Securities.

(i)      No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose unless there appears on such Security a certificate of authentication substantially in one of the forms provided for herein duly executed by the Trustee by manual signature of an authorized signatory of the Trustee, and such certificate upon any Security shall

15

be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder and is entitled to the benefits of this Indenture.

Section 3.04    Temporary Securities.

(a)    Pending the preparation of definitive Securities of any series, the Company may execute and, upon receipt of a Company Order, the Trustee shall authenticate and deliver, temporary Securities that are printed, lithographed, typewritten, mimeographed or otherwise reproduced, in any authorized denomination, substantially of the tenor of the definitive Securities in lieu of which they are issued, in registered form and with such appropriate insertions, omissions, substitutions and other variations as the officers executing such temporary Securities may determine, as conclusively evidenced by their execution of such temporary Securities.  Any such temporary Security may be in global form, representing all or a portion of the Outstanding Securities of such series.  Every such temporary Security shall be executed by the Company and shall be authenticated and delivered by the Trustee upon the same conditions and in substantially the same manner, and with the same effect, as the definitive Security or Securities in lieu of which it is issued.

(b)    If temporary Securities of any series are issued, the Company shall cause definitive Securities of such series to be prepared without unreasonable delay.  After the preparation of definitive Securities of such series, the temporary Securities of such series shall be exchangeable for definitive Securities of such series upon surrender of such temporary Securities at the office or agency maintained by the Company in a Place of Payment for such purposes provided in Section 6.02, without charge to the Holder.  Upon surrender for cancellation of any one or more temporary Securities of any series, the Company shall execute and the Trustee shall authenticate and deliver in exchange therefor a like principal amount of definitive Securities of the same series of authorized denominations and of like tenor.  Until so exchanged, the temporary Securities of any series shall in all respects be entitled to the same benefits under this Indenture as definitive Securities of such series.

(c)    Upon any exchange of a portion of a temporary Global Security for a definitive Global Security or for the individual Securities represented thereby pursuant to this Section 3.04 or Section 3.06, the temporary Global Security shall be endorsed by the Trustee to reflect the reduction of the principal amount evidenced thereby, whereupon the principal amount of such temporary Global Security shall be reduced for all purposes by the amount so exchanged and endorsed.

Section 3.05    Registrar.

(a)    The Company shall keep, at an office or agency to be maintained by it in a Place of Payment where Securities may be presented for registration or presented and surrendered for registration of transfer or of exchange, and where Securities of any series that are convertible or exchangeable may be surrendered for conversion or exchange, as applicable (the "Registrar"), a security register for the registration and the registration of transfer or of exchange of the Securities (the registers maintained in such office and in any other office or agency of the Company in a Place of Payment being herein sometimes collectively referred to as the "Register"), as in this Indenture provided, which Register shall during normal office hours be

16

open for inspection by the Trustee.  Such Register shall be in written form or in any other form capable of being converted into written form within a reasonable time.  The Company may have one or more co-Registrars; the term "Registrar" includes any co-registrar. In acting hereunder and in connection with the Notes, the Registrar shall act solely as agents of the Company, and will not thereby assume any obligations towards or relationship of agency or trust for or with any Holder.

(b)       The Company shall enter into an appropriate agency agreement with any Registrar or co-Registrar not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Company shall notify the Trustee of the name and address of each such agent.  If the Company fails to maintain a Registrar for any series, the Trustee shall act as such.  The Company or any Affiliate thereof may act as Registrar, co-Registrar or transfer agent.

(c)       The Company hereby initially appoints Citibank, N.A. located at the Corporate Trust Office as Registrar in connection with the Securities and this Indenture, until such time as another Person is appointed as such in replacement of the Trustee as such. In the case that the Trustee serves as Registrar, it will be entitled as Registrar to the same rights of compensation, reimbursement and indemnification under Section 11.01 and Section 11.02 as if it were Trustee.  No Person shall at any time be appointed as or act as Registrar unless such Person is at such time empowered under applicable law to act as such Registrar.

Section 3.06       Transfer and Exchange.

(a)       *Transfer*.

(i)       Upon surrender for registration of transfer of any Security of any series at the Registrar, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee, one or more new Securities of the same series for like aggregate principal amount of any authorized denomination or denominations.  The transfer of any Security shall not be valid as against the Company or the Trustee unless registered at the Registrar at the request of the Holder, or at the request of his, her or its attorney duly authorized in writing.

(ii)       Notwithstanding any other provision of this Section, unless and until it is exchanged in whole or in part for the individual Securities represented thereby, a Global Security representing all or a portion of the Securities of a series may not be transferred except as a whole by the Depositary for such series to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor Depositary for such series or a nominee of such successor Depositary.

(b)       *Exchange*.

(i)       At the option of the Holder, Securities of any series (other than a Global Security, except as set forth below) may be exchanged for other Securities of the same series for like aggregate principal amount of any authorized denomination or denominations, upon surrender of the Securities to be exchanged at the Registrar.

17

(ii)         Whenever any Securities are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Securities that the Holder making the exchange is entitled to receive.

(c)         *Exchange of Global Securities for Individual Securities*.  Except as provided below, owners of beneficial interests in Global Securities shall not be entitled to receive individual Securities.

(i)         Individual Securities shall be issued to all owners of beneficial interests in a Global Security in exchange for such interests if at any time the Depositary for the Securities of a series notifies the Company that it is unwilling or unable to continue as Depositary for the Securities of such series or if at any time the Depositary for the Securities of such series shall no longer be eligible under Section 3.03(g) and, in each case, a successor Depositary is not appointed by the Company within 90 days of such notice.

In connection with the exchange of an entire Global Security for individual Securities pursuant to this subsection (c), such Global Security shall be deemed to be surrendered to the Paying Agent for cancellation, and the Company shall execute, and the Trustee, upon receipt of a Company Order for the authentication and delivery of individual Securities of such series, shall authenticate and deliver to each beneficial owner identified by the Depositary in exchange for its beneficial interest in such Global Security, an equal aggregate principal amount of individual Securities of authorized denominations.

(ii)         The owner of a beneficial interest in a Global Security shall be entitled to receive an individual Security in exchange for such interest if an Event of Default has occurred and is continuing.  Upon receipt by the Security Custodian and Registrar of instructions from the Holder of a Global Security directing the Security Custodian and Registrar to (x) issue one or more individual Securities in the amounts specified to the owner of a beneficial interest in such Global Security and (y) debit or cause to be debited an equivalent amount of beneficial interest in such Global Security, subject to the rules and regulations of the Depositary:

(A)         the Security Custodian and Registrar shall notify the Company and the Trustee of such instructions, identifying the owner and amount of such beneficial interest in such Global Security;

(B)         the Company shall promptly execute and the Trustee, upon receipt of a Company Order for the authentication and delivery of individual Securities of such series, shall authenticate and deliver to such beneficial owner individual Securities in an equivalent amount to such beneficial interest in such Global Security; and

(C)         the Security Custodian and Registrar shall decrease such Global Security by such amount in accordance with the foregoing.  In the event that the individual Securities are not issued to each such beneficial

18

owner promptly after the Registrar has received a request from the Holder of a Global Security to issue such individual Securities, the Company expressly acknowledges, with respect to the right of any Holder to pursue a remedy pursuant to Section 7.07, the right of any beneficial Holder of Securities to pursue such remedy with respect to the portion of the Global Security that represents such beneficial Holder's Securities as if such individual Securities had been issued.

(iii)     If specified by the Company pursuant to Section 3.01 with respect to a series of Securities, the Depositary for such series of Securities may surrender a Global Security for such series of Securities in exchange in whole or in part for individual Securities of such series on such terms as are acceptable to the Company and such Depositary.  Thereupon, the Company shall execute, and the Trustee shall authenticate and deliver at the expense of the Company, without service charge,

(A)     to each Person specified by such Depositary a new individual Security or Securities of the same series, of any authorized denomination as requested by such Person in aggregate principal amount equal to and in exchange for such Person's beneficial interest in the Global Security; and

(B)     to such Depositary a new Global Security in a denomination equal to the difference, if any, between the principal amount of the surrendered Global Security and the aggregate principal amount of individual Securities delivered to Holders thereof.

(iv)     In any exchange provided for in clauses (i) through (iii), the Company shall execute and the Trustee shall authenticate and deliver individual Securities in registered form in authorized denominations.

(v)     Upon the exchange in full of a Global Security for individual Securities, such Global Security shall be cancelled by the Paying Agent.  Individual Securities issued in exchange for a Global Security pursuant to this Section shall be registered in such names and in such authorized denominations as the Depositary for such Global Security, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Registrar.  The Registrar shall deliver such Securities to the Persons in whose names such Securities are so registered.

(d)     All Securities issued upon any registration of transfer or exchange of Securities shall be valid obligations of the Company evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered for such registration of transfer or exchange.

(e)     Every Security presented or surrendered for registration of transfer or exchange, or for payment shall (if so required by the Company, the Trustee or the Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form

19

satisfactory to the Company, the Trustee and the Registrar, duly executed by the Holder thereof or by his, her or its attorney duly authorized in writing.

(f)        No service charge shall be made for any registration of transfer or exchange of Securities.  The Company may require payment of a sum sufficient to cover any tax, assessment or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Securities, other than those expressly provided in this Indenture to be made at the Company's own expense or without expense or charge to the Holders.

(g)        The Company shall not be required to (i) register, transfer or exchange Securities of any series during a period beginning at the opening of business 15 calendar days before the day of the transmission of a notice of redemption of Securities of such series selected for redemption under Section 4.03 and ending at the close of business on the day of such transmission, or (ii) register, transfer or exchange any Security so selected for redemption in whole or in part, except the unredeemed portion of any Security being redeemed in part.

(h)        Prior to the due presentation for registration of transfer or exchange of any Security, the Company, the Trustee, the Paying Agent, the Registrar, any co-Registrar or any of their agents may deem and treat the Person in whose name a Security is registered as the absolute owner of such Security (whether or not such Security shall be overdue and notwithstanding any notation of ownership or other writing thereon) for all purposes whatsoever, and none of the Company, the Trustee, the Paying Agent, the Registrar, any co-Registrar or any of their agents shall be affected by any notice to the contrary.

(i)        In case a successor Company ("Successor Company") has executed an indenture supplemental hereto with the Trustee pursuant to Article XIV, any of the Securities authenticated or delivered pursuant to such transaction may, from time to time, at the request of the Successor Company, be exchanged for other Securities executed in the name of the Successor Company with such changes in phraseology and form as may be appropriate, but otherwise identical to the Securities surrendered for such exchange and of like principal amount; and the Trustee, upon Company Order of the Successor Company, shall authenticate and deliver Securities as specified in such Company Order for the purpose of such exchange.  If Securities shall at any time be authenticated and delivered in any new name of a Successor Company pursuant to this Section 3.06 in exchange or substitution for or upon registration of transfer of any Securities, such Successor Company, at the option of the Holders but without expense to them, shall provide for the exchange of all Securities at the time Outstanding for Securities authenticated and delivered in such new name.

(j)        Each Holder of a Security agrees to indemnify the Company and the Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Security in violation of any provision of this Indenture and/or applicable United States federal or state securities laws.

(k)        The Trustee shall have no responsibility or obligation to any beneficial owner of a Global Security, a member of, or a participant in, the Depositary or other Person with respect to the accuracy of the records of the Depositary or its nominee or of any participant or

20

member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any participant, member, beneficial owner or other Person (other than the Depositary) of any notice (including any notice of redemption or purchase) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to such Notes.  All notices and communications to be given to the Holders and all payments to be made to Holders in respect of the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Security).  The rights of beneficial owners in any Global Security shall be exercised only through the Depositary subject to the applicable rules and procedures of the Depositary.  The Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its members, participants and any beneficial owners.

(l)        The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Security other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(m)        Neither the Trustee nor any agent of the Trustee shall have any responsibility for any actions taken or not taken by the Depositary.

Section 3.07        <u>Mutilated, Destroyed, Lost and Stolen Securities</u>.

(a)        If (i) any mutilated Security is surrendered to the Trustee at its Corporate Trust Office or (ii) the Company and the Trustee receive evidence to their satisfaction of the destruction, loss or theft of any Security, and there is delivered to the Company and the Trustee security and/or indemnity satisfactory to them to save each of them and any Paying Agent harmless, and neither the Company nor the Trustee receives notice that such Security has been acquired by a protected purchaser, then the Company shall execute and upon Company Order the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Security, a new Security of the same series and of like tenor, form, terms and principal amount, bearing a number not contemporaneously Outstanding, and neither gain nor loss in interest shall result from such exchange or substitution.

(b)        In case any such mutilated, destroyed, lost or stolen Security has become or is about to become due and payable, the Company in its discretion may, instead of issuing a new Security, pay the amount due on such Security in accordance with its terms.

(c)        Upon the issuance of any new Security under this Section 3.07, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) in connection therewith.

(d)        Every new Security of any series issued pursuant to this Section shall constitute an original additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Security shall be at any time enforceable by anyone, and shall be entitled

21

to all the benefits of this Indenture equally and proportionately with any and all other Securities of that series duly issued hereunder.

(e)       The provisions of this Section 3.07 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Securities.

Section 3.08        Payment of Interest; Interest Rights Preserved.

(a)        Interest on any Security which is payable, and is punctually paid or duly provided for, on any Interest Payment Date shall be paid to the Person in whose name such Security (or one or more Predecessor Securities) is registered at the close of business on the Record Date for such interest notwithstanding the cancellation of such Security upon any transfer or exchange subsequent to the Record Date.  Payment of interest on Securities shall be made at the Corporate Trust Office (except as otherwise specified pursuant to Section 3.01) or, at the option of the Company, by check mailed to the address of the Person entitled thereto as such address shall appear in the Register or, in accordance with arrangements satisfactory to the Trustee, by wire transfer to an account designated by the Holder.

(b)        Any interest on any Security that is payable, but is not punctually paid or duly provided for, on any Interest Payment Date (herein called "Defaulted Interest") shall forthwith cease to be payable to the Holder on the relevant Record Date by virtue of his, her or its having been such a Holder, and such Defaulted Interest may be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i)        The Company may elect to make payment of any Defaulted Interest to the Persons in whose names such Securities (or their respective Predecessor Securities) are registered at the close of business on a special record date for the payment of such Defaulted Interest (a "Special Record Date"), which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of Defaulted Interest proposed to be paid on each such Security and the date of the proposed payment, and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such Defaulted Interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Interest as in this clause provided.  Thereupon the Trustee shall fix a Special Record Date for the payment of such Defaulted Interest which shall be not more than 15 calendar days and not less than 10 calendar days prior to the date of the proposed payment and not less than 10 calendar days after the receipt by the Trustee of the notice of the proposed payment.  The Trustee shall promptly notify the Company of such Special Record Date and, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to the Holders of such Securities at their addresses as they appear in the Register, not less than 10 calendar days prior to such Special Record Date.  Notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor having been mailed as aforesaid, such Defaulted Interest shall be paid to the Persons in whose names such Securities (or

22

their respective Predecessor Securities) are registered at the close of business on such Special Record Date and shall no longer be payable pursuant to the following clause (ii).

(ii)     The Company may make payment of any Defaulted Interest on Securities in any other lawful manner not inconsistent with the requirements of any securities exchange on which such Securities may be listed or of any automated quotation system on which any such Securities may be quoted, and upon such notice as may be required by such exchange or quotation system, as applicable, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

(c)     Subject to the foregoing provisions in this Section 3.08, each Security delivered under this Indenture in exchange or substitution for, or upon registration of transfer of, any other Security shall carry all the rights to interest accrued and unpaid, and to accrue, which were carried by such other Security.

Section 3.09     Cancellation.  Unless otherwise specified pursuant to Section 3.01 for Securities of any series, all Securities surrendered for payment, redemption, registration of transfer or exchange or credit against any sinking fund or otherwise shall, if surrendered to any Person other than the Paying Agent, be delivered to the Paying Agent for cancellation and shall be promptly cancelled by it and, if surrendered to the Paying Agent, shall be promptly cancelled by it.  The Company may at any time deliver to the Paying Agent for cancellation any Securities previously authenticated and delivered hereunder that the Company may have acquired in any manner whatsoever, and all Securities so delivered shall be promptly cancelled by the Paying Agent.  No Securities shall be authenticated in lieu of or in exchange for any Securities cancelled as provided in this Section, except as expressly permitted by this Indenture.  The Paying Agent shall dispose of all cancelled Securities held by it in accordance with its then customary procedures, unless otherwise directed by a Company Order, and deliver a certificate of such disposal to the Company upon its request therefor.  The acquisition of any Securities by the Company shall not operate as a redemption or satisfaction of the Indebtedness represented thereby unless and until such Securities are surrendered to the Paying Agent for cancellation.

Section 3.10     Computation of Interest.  Except as otherwise specified pursuant to Section 3.01 for Securities of any series, interest on the Securities of each series shall be computed on the basis of a 360-day year of twelve 30-day months.

Section 3.11     Currency of Payments in Respect of Securities. Any series, payment of the principal of, premium, if any, and interest on, Securities of such series shall be made in U.S. Dollars.

23

Section 3.12      CUSIP Numbers.  The Company in issuing any Securities may use CUSIP, ISIN or other similar numbers, if then generally in use, and thereafter with respect to such series, the Trustee may use such numbers in any notice of redemption or exchange, as a convenience to Holders, with respect to such series; provided that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Securities or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Securities, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Company shall promptly notify the Trustee of any change in the CUSIP, ISIN or other similar numbers.

## ARTICLE IV

## REDEMPTION OF SECURITIES

Section 4.01      Applicability of Right of Redemption.  Redemption of Securities (other than pursuant to a sinking fund, amortization or analogous provision) permitted by the terms of any series of Securities shall be made (except as otherwise specified pursuant to Section 3.01 for Securities of any series) in accordance with this Article; provided, however, that if any such terms of a series of Securities shall conflict with any provision of this Article, the terms of such series shall govern.

Section 4.02      Selection of Securities to be Redeemed.

(a)      If the Company shall at any time elect to redeem all or any portion of the Securities of a series then Outstanding, it shall at least 15 calendar days (or such shorter period acceptable to the Trustee) prior to the date the notice of redemption is to be mailed, notify the Trustee of such Redemption Date and of the principal amount of Securities to be redeemed.  If less than all of the Securities of a series are to be redeemed, the Securities for redemption will be selected as follows: (i) if the Securities are listed on a securities exchange then in compliance with the rules of such securities exchange and if the Securities are held through the clearing systems then in compliance with the rules and procedures of the clearing systems, or (ii) if the Securities are not listed on a securities exchange or held through the clearing systems, then by lot or such other method as the trustee shall deem to be fair and appropriate in its sole and absolute discretion or as otherwise required by applicable law; provided that the unredeemed portion of the principal amount of any Security shall be in an authorized denomination (which shall not be less than the minimum authorized denomination) for such Security.  In any case where more than one Security of such series is registered in the same name, the Trustee may treat the aggregate principal amount so registered as if it were represented by one Security of such series.  The Trustee shall, as soon as practicable, notify the Company in writing of the Securities and portions of Securities so selected.

(b)      For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Securities shall relate, in the case of any Security redeemed or to be redeemed only in part, to the portion of the principal amount of such Security that has been or is to be redeemed.  If the Company shall so direct, Securities registered in the name of the Company, any Affiliate or any Subsidiary thereof shall not be included in the Securities selected for redemption.

24

Section 4.03        Notice of Redemption.

(a)        Notice of redemption shall be given by the Company or, at the Company's request, by the Trustee in the name and at the expense of the Company, not less than 30 nor more than 60 calendar days prior to the Redemption Date, to the Holders of Securities of any series to be redeemed in whole or in part pursuant to this Article, in the manner provided in Section 16.04; provided that the Trustee be provided with the draft notice at least 15 days prior to sending such notice of redemption.  Any notice given in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the Holder receives such notice.  Failure to give such notice, or any defect in such notice to the Holder of any Security of a series designated for redemption, in whole or in part, shall not affect the sufficiency of any notice of redemption with respect to the Holder of any other Security of such series.

(b)        All notices of redemption shall identify the Securities to be redeemed (including CUSIP, ISIN or other similar numbers, if available) and shall state:

(i)        such election by the Company to redeem Securities of such series pursuant to provisions contained in this Indenture or the terms of the Securities of such series in a Company Order, Officers' Certificate or a supplemental indenture establishing such series, if such be the case;

(ii)        the Redemption Date;

(iii)        the Redemption Price;

(iv)        if less than all Outstanding Securities of any series are to be redeemed, the identification (and, in the case of partial redemption, the principal amounts) of the Securities of such series to be redeemed;

(v)        that on the Redemption Date the Redemption Price shall become due and payable upon each such Security to be redeemed, and that, if applicable, interest thereon shall cease to accrue on and after said date;

(vi)        the Place or Places of Payment where such Securities are to be surrendered for payment of the Redemption Price; and

(vii)        if applicable, that the redemption is for a sinking fund, if such is the case.

Section 4.04        Deposit of Redemption Price.  On or prior to 11:00 a.m., New York City time, one Business Day prior to the Redemption Date for any Securities, the Company shall deposit with the Paying Agent (or, if the Company is acting as its own Paying Agent, segregate and hold in trust as provided in Section 6.03) an amount of money in the currency in which such Securities are denominated sufficient to pay the Redemption Price of such Securities or any portions thereof that are to be redeemed on that date.

25

Section 4.05        <u>Securities Payable on Redemption Date</u>.  If notice of redemption has been given as above provided, any Securities so to be redeemed shall, on the Redemption Date, become due and payable at the Redemption Price and from and after such date (unless the Company shall Default in the payment of the Redemption Price) such Securities shall cease to bear interest, and, except as provided in Section 12.07, such Securities shall cease from and after the Redemption Date to be entitled to any benefit or security under the Indenture, and the Holders thereof shall have no right in respect of such Securities except the right to receive the Redemption Price thereof and unpaid interest to the Redemption Date.  Upon surrender of any such Security for redemption in accordance with said notice, such Security shall be paid by the Paying Agent with the moneys deposited in accordance with Section 4.04 above at the Redemption Price (unless the Company shall Default in the payment of the Redemption Price); <u>provided</u>, <u>however</u>, that (unless otherwise provided pursuant to Section 3.01) installments of interest that have a Stated Maturity on or prior to the Redemption Date for such Securities shall be payable according to the terms of such Securities and the provisions of Section 3.08.

If any Security called for redemption shall not be so paid upon surrender thereof for redemption, the principal thereof shall, until paid or duly provided for, bear interest from the Redemption Date at the rate prescribed therefor in the Security.

Section 4.06        <u>Securities Redeemed in Part</u>.  Any Security that is to be redeemed only in part shall be surrendered at the Corporate Trust Office or such other office or agency of the Company as is specified pursuant to Section 3.01 with, if the Company, the Registrar or the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Company, the Registrar and the Trustee duly executed by the Holder thereof or his, her or its attorney duly authorized in writing, and the Company shall execute, and the Trustee shall authenticate and deliver to the Holder of such Security, without service charge, a new Security or Securities of the same series, of like tenor and form, of any authorized denomination as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Security so surrendered; <u>provided</u> that if a Global Security is so surrendered, the Company shall execute, and the Trustee shall authenticate and deliver to the Depositary for such Global Security, without service charge, a new Global Security in a denomination equal to and in exchange for the unredeemed portion of the principal of the Global Security so surrendered.  In the case of a Security providing appropriate space for such notation, at the option of the Holder thereof, the Registrar, in lieu of delivering a new Security or Securities as aforesaid, may make a notation on such Security of the payment of the redeemed portion thereof.

26

Section 4.07        Tax Redemption.

(a)        Each series of Securities may be redeemed at any time, at the option of the Company, in whole but not in part, upon written notice as described below, at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest, if any, to, but not including, the Redemption Date, if (i) as a result of any change in, or amendment to, the laws or regulations of the Relevant Jurisdiction (or, in the case of Additional Amounts payable by a successor Person to the Company, the applicable Successor Jurisdiction), or any change in the official application or official interpretation of such laws or regulations, which change or amendment becomes effective on or after the Issue Date (or, in the case of Additional Amounts payable by a successor Person to the Company, the date on which such successor Person to the Company became such pursuant to the applicable provisions of this Indenture) (a "Tax Change"), the Company or any such successor Person to the Company is, or would be, obligated to pay Additional Amounts upon the next payment of principal, premium, if any, or interest in respect of such Securities and (ii) such obligation cannot be avoided by the Company or any such successor Person to the Company taking reasonable measures available to it, provided that changing the jurisdiction of the Company or such successor Person to Company is not a reasonable measure for purposes of this Section 4.07(a).

(b)        Prior to the giving of any notice of redemption of the Securities pursuant to Section 4.07(a), the Company or any such successor Person to the Company shall deliver to the Trustee (i) a notice of such redemption election, (ii) an opinion of External Legal Counsel or an opinion of an Independent Tax Consultant to the effect that the Company or any such successor Person to the Company is, or would become, obligated to pay such Additional Amounts as the result of a Tax Change and (iii) an Officers' Certificate from the Company or any such successor Person to the Company, stating that such amendment or change has occurred, describing the facts leading thereto and stating that such requirement cannot be avoided by the Company or any such successor Person to the Company taking reasonable measures available to it. The Trustee shall be entitled to rely conclusively upon such Officers' Certificate and opinion as sufficient evidence of the conditions precedent described in Section 4.07(a), in which event it shall be conclusive and binding on the relevant Holders.

(c)        Any redemption of Securities pursuant to Section 4.07 shall be made (except as otherwise specified pursuant to Section 3.01 for Securities of any series) in accordance with this Article; provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Company or any such successor Person to the Company would be required to pay Additional Amounts if a payment in respect of such Securities was then due.

**ARTICLE V**

**SINKING FUNDS**

Section 5.01        Applicability of Sinking Fund.

(a)        Redemption of Securities permitted or required pursuant to a sinking fund for the retirement of Securities of a series by the terms of such series of Securities shall be made

27

in accordance with such terms of such series of Securities and this Article, except as otherwise specified pursuant to Section 3.01 for Securities of such series; provided, however, that if any such terms of a series of Securities shall conflict with any provision of this Article, the terms of such series shall govern.

(b)      The minimum amount of any sinking fund payment provided for by the terms of Securities of any series is herein referred to as a "Mandatory Sinking Fund Payment," and any payment in excess of such minimum amount provided for by the terms of Securities of any series is herein referred to as an "Optional Sinking Fund Payment." If provided for by the terms of Securities of any series, the cash amount of any Mandatory Sinking Fund Payment may be subject to reduction as provided in Section 5.02.

Section 5.02      Mandatory Sinking Fund Obligation. The Company may, at its option, satisfy any Mandatory Sinking Fund Payment obligation, in whole or in part, with respect to a particular series of Securities by (a) delivering to the Paying Agent Securities of such series in transferable form theretofore purchased or otherwise acquired by the Company or redeemed at the election of the Company pursuant to Section 4.03 or (b) receiving credit for Securities of such series (not previously so credited) acquired by the Company and theretofore delivered to the Paying Agent. The Paying Agent shall credit such Mandatory Sinking Fund Payment obligation with an amount equal to the Redemption Price specified in such Securities for redemption through operation of the sinking fund and the amount of such Mandatory Sinking Fund Payment shall be reduced accordingly. If the Company shall elect to so satisfy any Mandatory Sinking Fund Payment obligation, it shall deliver to the Trustee and the Paying Agent not less than 45 calendar days prior to the relevant sinking fund payment date a written notice signed on behalf of the Company by an Officer, which shall designate the Securities (and portions thereof, if any) so delivered or credited and which shall be accompanied by such Securities (to the extent not theretofore delivered) in transferable form. In case of the failure of the Company, at or before the time so required, to give such notice and deliver such Securities, the Mandatory Sinking Fund Payment obligation shall be paid entirely in moneys.

Section 5.03      Optional Redemption at Sinking Fund Redemption Price. In addition to the sinking fund requirements of Section 5.02, to the extent, if any, provided for by the terms of a particular series of Securities, the Company may, at its option, make an Optional Sinking Fund Payment with respect to such Securities. Unless otherwise provided by such terms, (a) to the extent that the right of the Company to make such Optional Sinking Fund Payment is not exercised in any year, it shall not be cumulative or carried forward to any subsequent year, and (b) such optional payment shall operate to reduce the amount of any Mandatory Sinking Fund Payment obligation as to Securities of the same series. If the Company intends to exercise its right to make such optional payment in any year, it shall deliver to the Trustee and the Paying Agent not less than 45 calendar days prior to the relevant sinking fund payment date a certificate signed by an Officer, stating that the Company shall exercise such optional right, and specifying the amount which the Company shall pay on or before the next succeeding sinking fund payment date. Such certificate shall also state that no Event of Default has occurred and is continuing.

28

Section 5.04        Application of Sinking Fund Payment.

(a)        If the sinking fund payment or payments made in funds pursuant to either Section 5.02 or 5.03 with respect to a particular series of Securities plus any unused balance of any preceding sinking fund payments made in funds with respect to such series shall exceed US$50,000 (or a lesser sum if the Company shall so request, or such equivalent sum for Securities denominated other than in U.S. Dollars), it shall be applied by the Paying Agent on the sinking fund payment date next following the date of such payment; provided that, if the date of such payment shall be a sinking fund payment date, such payment shall be applied on such sinking fund payment date to the redemption of Securities of such series at the Redemption Price specified pursuant to Section 4.03(b). The Securities of such series shall be selected, in the manner provided in Section 4.02, for redemption on such sinking fund payment date, a sufficient principal amount of Securities of such series to absorb said funds, as nearly as may be, and shall, at the expense and in the name of the Company, thereupon cause notice of redemption, prepared by the Company, of the Securities to be given in substantially the manner provided in Section 4.03(a) for the redemption of Securities in part at the option of the Company, except that the notice of redemption shall also state that the Securities are being redeemed for the sinking fund. Any sinking fund moneys not so applied by the Paying Agent to the redemption of Securities of such series shall be added to the next sinking fund payment received in funds by the Paying Agent and, together with such payment, shall be applied in accordance with the provisions of this Section 5.04. Any and all sinking fund moneys held by the Paying Agent on the last sinking fund payment date with respect to Securities of such series, and not held for the payment or redemption of particular Securities of such series, shall be applied by the Paying Agent to the payment of the principal of the Securities of such series at Maturity.

(b)        On or prior to each sinking fund payment date, the Company shall pay to the Paying Agent a sum equal to all interest accrued to, but not including, the Redemption Date on Securities to be redeemed on such sinking fund payment date pursuant to this Section 5.04.

(c)        The Paying Agent shall not redeem any Securities of a series with sinking fund moneys or mail any notice of redemption of Securities of such series by operation of the sinking fund during the continuance of a Default in payment of interest on any Securities of such series or of any Event of Default (other than an Event of Default occurring as a consequence of this paragraph) of which the Paying Agent has written notice, except that if the notice of redemption of any Securities of such series shall theretofore have been mailed in accordance with the provisions hereof, the Paying Agent shall redeem such Securities if funds sufficient for that purpose shall be deposited with the Paying Agent in accordance with the terms of this Article. Except as above provided, any moneys in the sinking fund at the time any such Default or Event of Default shall occur and any moneys thereafter paid into the sinking fund shall, during the continuance of such Default or Event of Default, be held as security for the payment of all the Securities of such series; provided, however, that in case such Default or Event of Default shall have been cured or waived as provided herein, such moneys shall thereafter be applied on the next sinking fund payment date on which such moneys are required to be applied pursuant to the provisions of this Section 5.04.

29

ARTICLE VI

## PARTICULAR COVENANTS OF THE COMPANY

The Company hereby covenants and agrees as follows:

Section 6.01      Payments of Principal, Premium and Interest.  The Company, for the benefit of each series of Securities, shall duly and punctually pay or cause to be paid the principal of, premium, if any, and interest on, each series of Securities, at the dates and place and in the manner provided in the Securities and in this Indenture.

Section 6.02      Maintenance of Office or Agency; Paying Agent.

(a)      The Company shall maintain in each Place of Payment for any series of Securities, if any, an office or agency where Securities may be presented or surrendered for payment, where Securities of such series may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Company in respect of the Securities and this Indenture may be served.  The Company shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.  The Company hereby initially appoints the Trustee as Paying Agent to receive all presentations, surrenders, notices and demands.  So long as the Trustee serves as Paying Agent, it will be entitled as Paying Agent to the same rights of compensation, reimbursement and indemnification under Section 11.01 and Section 11.02 as if it were Trustee. In acting hereunder and in connection with the Notes, the Paying Agent shall act solely as agents of the Company, and will not thereby assume any obligations towards or relationship of agency or trust for or with any Holder.

(b)      The Company may also from time to time designate different or additional offices or agencies where the Securities of any series may be presented or surrendered for any or all such purposes (in or outside of such Place of Payment), and may from time to time rescind any such designations; provided, however, that no such designation or rescission shall in any manner relieve the Company of its obligations described in the preceding paragraph.  The Company shall give prompt written notice to the Trustee of any such additional designation or rescission of designation and of any change in the location of any such different or additional office or agency.  The Company shall enter into an appropriate agency agreement with any Paying Agent not a party to this Indenture.  The agreement shall implement the provisions of this Indenture that relate to such agent.  The Company shall notify the Trustee of the name and address of each such agent.  The Company or any Affiliate thereof may act as Paying Agent.

Section 6.03      To Hold Payment in Trust.

(a)      If the Company or an Affiliate thereof shall at any time act as Paying Agent with respect to any series of Securities, then, on or before the date on which the principal of, premium, if any, or interest on any of the Securities of that series by their terms or as a result of the calling thereof for redemption shall become payable, the Company or such Affiliate shall

segregate and hold in trust for the benefit of the Holders of such Securities or the Trustee a sum sufficient to pay such principal, premium, if any, or interest which shall have so become payable until such sums shall be paid to such Holders or otherwise disposed of as herein provided, and shall notify the Trustee of its action or failure to act in that regard.

Upon any proceeding under the Bankruptcy Code or any applicable state bankruptcy laws with respect to the Company or any Affiliate thereof, if the Company or such Affiliate is then acting as Paying Agent, the Trustee shall promptly replace the Company or such Affiliate as Paying Agent.

(b)      If the Company shall appoint, and at the time have, a Paying Agent for the payment of the principal of, premium, if any, or interest on any series of Securities, then prior to 11:00 a.m., New York City time, one Business Day prior to the date on which the principal of, premium, if any, or interest on any of the Securities of that series shall become payable as above provided, whether by their terms or as a result of the calling thereof for redemption, the Company shall deposit with such Paying Agent a sum sufficient to pay such principal, premium, if any, or interest, such sum to be held in trust for the benefit of the Holders of such Securities or the Trustee, and (unless such Paying Agent is the Trustee), the Company or any other obligor of such Securities shall promptly notify the Trustee of its payment or failure to make such payment.

(c)      If the Paying Agent shall be a Person other than the Trustee, the Company shall cause such Paying Agent to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section 6.03, that such Paying Agent shall:

(i)      comply with the provisions of the Trust Indenture Act applicable to it as Paying Agent;

(ii)      hold all moneys held by it for the payment of the principal of, premium, if any, or interest on the Securities of that series in trust for the benefit of the Holders of such Securities until such sums shall be paid to such Holders or otherwise disposed of as herein provided;

(iii)      give to the Trustee notice of any Default by the Company or any other obligor upon the Securities of that series in the making of any payment of the principal of, premium, if any, or interest on the Securities of that series; and

(iv)      at any time during the continuance of any such Default, upon the written request of the Trustee, pay to the Trustee all sums so held in trust by such Paying Agent.

(d)      Anything in this Section 6.03 to the contrary notwithstanding, the Company may at any time, for the purpose of obtaining a release, satisfaction or discharge of this Indenture or for any other reason, pay or cause to be paid to the Trustee all sums held in trust by the Company or by any Paying Agent other than the Trustee as required by this Section 6.03, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Company or such Paying Agent and, upon such payment by a Paying Agent to the

31

Trustee, such Paying Agent shall be released from all further liability with respect to such moneys.

(e)        Any money deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal of, premium, if any, or interest on any Security of any series and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Company upon Company Order along with any interest that has accumulated thereon as a result of such money being invested at the direction of the Company (or, if then held by the Company, shall be discharged from such trust), and the Holder of such Security shall thereafter, as an unsecured general creditor, look only to the Company for payment of such amounts without interest thereon, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 6.04        Merger, Consolidation and Sale of Assets.  Except as otherwise provided as contemplated by Section 3.01 with respect to any series of Securities:

(a)        The Company shall not consolidate with or merge into any other Person in a transaction in which the Company is not the surviving entity, or convey, transfer or lease its properties and assets substantially as an entirety to, any Person, unless

(i)        any Person formed by such consolidation or into or with which the Company is merged or to whom the Company has conveyed, transferred or leased its properties and assets substantially as an entirety is a corporation, partnership, trust or other entity validly existing under the laws of the British Virgin Islands, Cayman Islands or Hong Kong and such Person expressly assumes by an indenture supplemental to this Indenture all the obligations of the Company under this Indenture and the Securities, including the obligation to pay Additional Amounts with respect to any jurisdiction in which it is organized or resident for tax purposes;

(ii)        immediately after giving effect to the transaction, no Event of Default, and no event which, after notice or lapse of time or both, would become an Event of Default, shall have occurred and be continuing; and

(iii)        the Company has delivered to the Trustee an Officers' Certificate and an opinion of External Legal Counsel, each stating that such consolidation, merger, conveyance, transfer or lease and such supplemental indenture comply with this Indenture and that all conditions precedent therein provided for relating to such transaction have been complied with.

(b)        Upon any consolidation with or merger into any other entity, or any sale other than for cash, or any conveyance or lease, of all or substantially all of the assets of the Company in accordance with this Section 6.04, the successor entity formed by such consolidation or into or with which the Company is merged or to which the Company is sold or to which such conveyance, transfer or lease is made shall succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture with the same effect as if such successor entity had been named as the Company herein, and thereafter, except in the

32

case of a lease, the predecessor Company shall be relieved of all obligations and covenants under this Indenture and the Securities, and from time to time such entity may exercise each and every right and power of the Company under this Indenture, in the name of the Company, or in its own name; and any act or proceeding by any provision of this Indenture required or permitted to be done by the Board of Directors or any officer of the Company may be done with like force and effect by the like board of directors or officer of any entity that shall at the time be the successor of the Company hereunder.  In the event of any such sale or conveyance, but not any such lease, the Company (or any successor entity which shall theretofore have become such in the manner described in this Section 6.04) shall be discharged from all obligations and covenants under this Indenture and the Securities and may thereupon be dissolved and liquidated.

Section 6.05        Additional Amounts.

(a)        All payments of principal, premium, if any, and interest made by or on behalf of the Company in respect of any Security shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature (collectively, "Taxes") imposed or levied by or within the British Virgin Islands, Cayman Islands, Hong Kong, the PRC or any jurisdiction where the Company or the Paying Agent is otherwise considered by a taxing authority to be a resident for tax purposes (in each case, including any political subdivision or any authority therein or thereof having power to tax) (the "Relevant Jurisdiction"), unless such withholding or deduction of such Taxes is required by law.  If the Company is required to make such withholding or deduction, the Company shall pay such additional amounts ("Additional Amounts") as will result in receipt by each Holder of Securities of such amounts as would have been received by such Holder had no such withholding or deduction of such Taxes been required, except that no such Additional Amounts shall be payable:

(i)        in respect of any such Taxes that would not have been imposed, deducted or withheld but for the existence of any connection (whether present or former) between the Holder or beneficial owner of a Security and the Relevant Jurisdiction other than merely holding such Security or receiving principal, premium, if any, or interest in respect thereof (including such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein);

(ii)        in respect of any Security presented for payment (where presentation is required) more than 30 days after the relevant date, except to the extent that the Holder thereof would have been entitled to such Additional Amounts on presenting the same for payment on the last day of such 30-day period.  For this purpose, the "relevant date" in relation to any Security means the later of (a) the due date for such payment or (b) the date such payment was made or duly provided for;

(iii)        in respect of any Taxes that would not have been imposed, deducted or withheld but for a failure of the Holder or beneficial owner of a Security to comply with a timely request by the Company addressed to the Holder or beneficial owner to provide information concerning such Holder's or beneficial owner's nationality,

33

residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request is required under the tax laws of such jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable to such Holder;

(iv)    in respect of any Taxes imposed as a result of a Security being presented for payment (where presentation is required) in the Relevant Jurisdiction, unless such Security could not have been presented for payment elsewhere;

(v)    in respect of any estate, inheritance, gift, sale, transfer, personal property or similar Taxes;

(vi)    to any Holder of a Security that is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of a Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner or beneficial owner been the Holder thereof;

(vii)    in respect of any such Taxes withheld or deducted from any payment under or with respect to any Security where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC or any other directive implementing the conclusions of the ECOFIN Council meeting of November 26–27, 2000 on the taxation of saving income or any law implementing or complying with, or introduced in order to conform to, any such directive;

(viii)    with respect to any withholding or deduction that is imposed in connection with Sections 1471-1474 of the U.S. Internal Revenue Code and U.S. Treasury regulations thereunder ("FATCA"), any intergovernmental agreement between the United States and any other jurisdiction implementing or relating to FATCA or any non-U.S. law, regulation or guidance enacted or issued with respect thereto;

(ix)    any such Taxes payable otherwise than by deduction or withholding from payments under or with respect to any Security; or

(x)    any combination of Taxes referred to in the preceding clauses (i) through (ix) above.

(b)    In the event that any withholding or deduction for or on account of any Taxes is required and Additional Amounts are payable with respect thereto, at least 10 Business Days prior to each date of payment of principal of, premium, if any, or interest on the Securities, the Company shall furnish to the Trustee and the Paying Agent, if other than the Trustee, an Officers' Certificate specifying the amount required to be withheld or deducted on such payments to such Holders, certifying that the Company shall pay such amounts required to be withheld to the appropriate governmental authority and certifying to the fact that the Additional Amounts will be payable and the amounts so payable to each Holder, and that the Company will

34

pay to the Trustee or such Paying Agent the Additional Amounts required to be paid; provided that no such Officers' Certificate will be required prior to any date of payment of principal of, premium, if any, or interest on such Securities if there has been no change with respect to the matters set forth in a prior Officers' Certificate.  The Trustee and each Paying Agent shall be entitled to rely on the fact that any Officers' Certificate contemplated by this Section 6.05(b) has not been furnished as evidence of the fact that no withholding or deduction for or on account of any Taxes is required.  The Company covenants to indemnify the Trustee and any Paying Agent for and to hold them harmless against any loss, liability or reasonably incurred expense without fraudulent activity, gross negligence or willful misconduct on their part arising out of or in connection with actions taken or omitted by any of them in reliance on any such Officers' Certificate furnished pursuant to this Section 6.05(b) or on the fact that any Officers' Certificate contemplated by this Section 6.05(b) has not been furnished.

(c)    Whenever in this Indenture there is mentioned, in any context, the payment of principal, premium, if any, or interest in respect of any Security, such mention shall be deemed to include the payment of Additional Amounts provided for in this Indenture, to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof pursuant to this Indenture.

(d)    Sections 6.05(a), (b) and (c) shall apply in the same manner with respect to the jurisdiction in which any successor Person to the Company is organized or resident for tax purposes or any authority therein or thereof having the power to tax (a "Successor Jurisdiction"), substituting such Successor Jurisdiction for the Relevant Jurisdiction.

(e)    If the Company or its successor is required to make any deduction or withholding from any payments or deliveries with respect to the Notes, it shall deliver to the Trustee, the Paying Agent and the Holders official tax receipts evidencing the remittance to the relevant tax authorities of the amounts so withheld or deducted.

(f)    The obligation of the Company to make payments of Additional Amounts under this Section 6.05 shall survive any termination, defeasance or discharge of this Indenture.

Section 6.06    Payment for Consent.  The Company will not, and will not permit any of its Controlled Entities to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or any series of the Securities unless such consideration is offered to be paid and is paid to all Holders of such series of Securities as may be affected thereby that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to consent, waiver or amendment.

Section 6.07    Compliance Certificate.  The Company shall furnish to the Trustee (a) annually, within 120 days after the end of each fiscal year of the Company (with fiscal year ends on December 31), and (b) within 14 days of a written request from the Trustee, a certificate in or substantially in the form attached hereto as Exhibit B from the principal executive officer, principal financial officer, principal accounting officer or treasurer as to his or her knowledge of the Company's compliance with all conditions and covenants under this Indenture (which compliance shall be determined without regard to any period of grace or requirement of notice provided under this Indenture), specifying if any Default has occurred and, in the event that any Default has occurred, specifying each such Default and the nature and status thereof of which such person may have knowledge.

35

Section 6.08    Conditional Waiver by Holders of Securities.  Anything in this Indenture to the contrary notwithstanding, the Company may fail or omit in any particular instance to comply with a covenant or condition set forth herein with respect to any series of Securities if the Company shall have obtained and filed with the Trustee, prior to the time of such failure or omission, evidence (as provided in Article VIII) of the consent of the Holders of a majority in aggregate principal amount of the Securities of such series affected by such waiver and at the time Outstanding, either waiving such compliance in such instance or generally waiving compliance with such covenant or condition, but no such waiver shall extend to or affect such covenant or condition except to the extent so expressly waived, or impair any right consequent thereon and, until such waiver shall have become effective, the obligations of the Company and the duties of the Trustee in respect of any such covenant or condition shall remain in full force and effect.

Section 6.09    Statement by Officers as to Default.  The Company shall deliver to the Trustee as soon as possible and in any event within 30 calendar days after the Company becomes aware of the occurrence of any Event of Default or an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default, an Officers' Certificate setting forth the details of such Event of Default or Default and the action which the Company proposes to take with respect thereto.

## ARTICLE VII

## REMEDIES OF TRUSTEE AND SECURITYHOLDERS

Section 7.01    Events of Default.  Except where otherwise indicated by the context or where the term is otherwise defined for a specific purpose, the term "Event of Default" as used in this Indenture with respect to Securities of any series shall mean one of the following described events unless it is either inapplicable to a particular series or it is specifically deleted or modified in the manner contemplated in Section 3.01:

(a)    the Company fails to pay principal or premium, if any, in respect of a Security of such series by the due date for such payment (whether at Stated Maturity or upon acceleration, repurchase, redemption or otherwise);

(b)    the Company fails to pay interest on a Security of such series within 30 days after the due date for such payment;

(c)    the Company defaults in the performance of or breaches its obligations under Section 6.04;

(d)    the Company, subject to the provisions of Section 6.08, defaults in the performance of or breaches any covenant or agreement in this Indenture or under the Securities of such series (other than a default specified in clause (a), (b) or (c) above) and such default or breach continues for a period of 60 consecutive days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Securities of such series then Outstanding;

36

(e)        (i) there occurs with respect to any indebtedness of the Company or any of its Significant Subsidiaries, whether such indebtedness exists as of the date hereof or shall hereafter be created, (A) an event of default that has resulted in the holder thereof declaring the principal of such indebtedness to be due and payable prior to its stated maturity or (B) a failure to make a payment of principal, interest or premium when due (after giving effect to the expiration of any applicable grace period therefor, a "Payment Default") and (ii) the outstanding principal amount of such indebtedness, together with the outstanding principal amount of any other indebtedness of such Persons under which there has been a Payment Default or the maturity of which has been so accelerated, is equal to or exceeds US$60,000,000, and in each case, such indebtedness is not discharged, or such acceleration is not otherwise cured or rescinded, within 30 days;

(f)        one or more final judgments or orders for the payment of money are rendered against the Company or any of the Significant Subsidiaries and are not paid or discharged, and there is a period of 90 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons (net of any amounts that the Company's insurance carriers have paid or agreed to pay with respect thereto under applicable policies) to exceed US$60,000,000, during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(g)        the entry by a court having jurisdiction in the premises of (i) a decree or order for relief in respect of the Company or any of the Significant Subsidiaries in an involuntary case or proceeding under any applicable bankruptcy, insolvency or other similar law or (ii) a decree or order adjudging the Company or any of the Significant Subsidiaries bankrupt or insolvent, or approving as final and nonappealable a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Company or any of the Significant Subsidiaries under any applicable bankruptcy, insolvency or other similar law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator, or other similar official of the Company or any of the Significant Subsidiaries or of any substantial part of its or their respective property, or ordering the winding up or liquidation of their respective affairs (or any similar relief granted under any foreign laws), and in any such case the continuance of any such decree or order for relief or any such other decree or order unstayed and in effect for a period of 90 consecutive calendar days;

(h)        the commencement by the Company or any of the Significant Subsidiaries of a voluntary case or proceeding under any applicable federal, state or foreign bankruptcy, insolvency or other similar law or of any other case or proceeding to be adjudicated bankrupt or insolvent, or the consent by the Company or any Significant Subsidiary to the entry of a decree or order for relief in respect of the Company or any of the Significant Subsidiaries in an involuntary case or proceeding under any applicable bankruptcy, insolvency or other similar law or the commencement of any bankruptcy or insolvency case or proceeding against the Company or any Significant Subsidiary, or the filing by the Company or any Significant Subsidiary of a petition or answer or consent seeking reorganization or relief with respect to the Company or any of the Significant Subsidiaries under any applicable bankruptcy, insolvency or other similar law, or the consent by the Company or any Significant Subsidiary to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee,

37

sequestrator, or other similar official of the Company or any of the Significant Subsidiaries or of any substantial part of its or their respective property pursuant to any such law, or the making by the Company or any of the Significant Subsidiaries of a general assignment for the benefit of creditors in respect of any indebtedness as a result of an inability to pay such indebtedness as it becomes due, or the admission by the Company or any of the Significant Subsidiaries in writing of the inability of the Company to pay its debts generally as they become due, or the taking of corporate action by the Company or any of the Significant Subsidiaries that resolves to commence any such action;

(i)      the Securities of such series or the Indenture is or becomes or is claimed by the Company to be unenforceable, invalid or ceases to be in full force and effect otherwise than is permitted by the Indenture; or

(j)      the occurrence of any other Event of Default with respect to Securities of such series as provided in Section 3.01;

provided, however, that a Default under Section 7.01(d) above will not constitute an Event of Default until the Trustee or the Holders of 25% or more in aggregate principal amount of the Securities of such series then Outstanding provide written notice to the Company of the Default and the Company does not cure such Default within the time specified in Section 7.01(d) above after receipt of such notice.  In the case of such notice given to the Company by the Holders, the Company will provide a copy of such notice to the Trustee.

Section 7.02      Acceleration; Rescission and Annulment.

(a)      Except as otherwise provided as contemplated by Section 3.01 with respect to any series of Securities, if any one or more of the above-described Events of Default (other than an Event of Default specified in Section 7.01(g) or 7.01(h)) shall happen with respect to Securities of any series at the time Outstanding, then, and in each and every such case, during the continuance of any such Event of Default, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Securities of such series then Outstanding may declare the principal (or, if the Securities of that series are Original Issue Discount Securities, such portion of the principal amount as may be specified in the terms of that series) of and all accrued but unpaid interest on all the Securities of such series then Outstanding to be due and payable immediately by a notice in writing to the Company (and to the Trustee if given by Holders), and upon any such declaration such principal amount (or specified amount) shall become immediately due and payable.  If an Event of Default specified in Section 7.01(g) or 7.01(h) occurs and is continuing, then in every such case, the principal amount of all of the Securities of that series then Outstanding shall automatically, and without any declaration or any other action on the part of the Trustee or any Holder, become due and payable immediately.  Upon payment of such amounts in the currency in which such Securities are denominated, all obligations of the Company in respect of the payment of principal of and interest on the Securities of such series shall terminate.

(b)      In the event of a declaration of acceleration with respect to the Securities of any series because of an Event of Default specified in Section 7.01(e) above shall occur, the declaration of acceleration with respect to the Securities of such series shall be automatically

38

annulled if the Default triggering such Event of Default pursuant to Section 7.01(e) above shall be remedied or cured by the Company or any of the Significant Subsidiaries or waived by the holders of the relevant indebtedness within 30 days after the declaration of acceleration with respect thereto and if:

(i)        the annulment of the acceleration with respect to the Securities of such series would not conflict with any judgment or decree of a court of competent jurisdiction; and

(ii)       all Events of Default with respect to the Securities of such series, other than the non-payment of principal, premium, if any, or interest on the Securities of such series that became due solely because of such acceleration, have been cured or waived as provided in Section 7.06.

(c)        At any time after such a declaration of acceleration with respect to the Securities of any series has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as hereinafter provided in this Article, the Holders of at least a majority in aggregate principal amount of the Securities of such series at the time Outstanding may, subject to Sections 7.06 and 14.02, waive all past Defaults and rescind and annul such acceleration if:

(i)        the rescission of the acceleration with respect to the Securities of such series would not conflict with any judgment or decree of a court of competent jurisdiction; and

(ii)       all Events of Default with respect to the Securities of such series, other than the non-payment of principal, premium, if any, or interest on the Securities of such series that became due solely because of such acceleration, have been cured or waived as provided in Section 7.06.

(d)        No rescission as provided in this Section 7.02 shall affect any subsequent default or impair any right consequent thereon.

(e)        For all purposes under this Indenture, if a portion of the principal of any Original Issue Discount Securities shall have been accelerated and declared due and payable pursuant to the provisions hereof, then, from and after such declaration, unless such declaration has been rescinded and annulled, the principal amount of such Original Issue Discount Securities shall be deemed, for all purposes hereunder, to be such portion of the principal thereof as shall be due and payable as a result of such acceleration, and payment of such portion of the principal thereof as shall be due and payable as a result of such acceleration, together with interest, if any, thereon and all other amounts owing thereunder, shall constitute payment in full of such Original Issue Discount Securities.

Section 7.03        Other Remedies.  If the Company shall fail for a period of 30 calendar days to pay any installment of interest on the Securities of any series or shall fail to pay the principal of and premium, if any, on any of the Securities of such series when and as the same shall become due and payable, whether at Maturity, or by call for redemption (other than pursuant to the sinking fund), by declaration as authorized by this Indenture, or otherwise, or shall fail for a period of 30 calendar days to make any required sinking fund payment as to a series of Securities, then, upon demand of the Trustee, the Company shall pay to the Paying Agent, for the benefit of the Holders of Securities of such series then Outstanding, the whole amount which then shall have become due and payable on all the Securities of such series, with interest on the overdue principal and premium, if any, and (so far as the same may be legally enforceable) on the overdue installments of interest at the rate borne by the Securities of such series, and all amounts owing the Trustee and any predecessor trustee hereunder under Section 11.01(a).

In case the Company shall fail forthwith to pay such amounts upon such demand, the Trustee, in its own name and as trustee of an express trust, shall be entitled and empowered to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Company or any other obligor upon the Securities of such series, and collect the moneys adjudged or decreed to be payable out of the property of the Company or any other obligor upon the Securities of such series, wherever situated, in the manner provided by law.  Every recovery of judgment in any such action or other proceeding, subject to the payment to the Trustee of all amounts owing the Trustee and any predecessor trustee hereunder under Section 11.01(a), shall be for the ratable benefit of the Holders of such series of Securities which shall be the subject of such action or proceeding.  All rights of action upon or under any of the Securities or this Indenture may be enforced by the Trustee without the possession of any of the Securities and without the production of any thereof at any trial or any proceeding relative thereto.

39

Section 7.04    Trustee as Attorney-in-Fact. Nothing herein contained shall be deemed to authorize or empower the Trustee to consent to or accept or adopt, on behalf of any Holder of Securities, any plan of reorganization or readjustment affecting the Securities or the rights of any Holder thereof, or to authorize or empower the Trustee to vote in respect of the claim of any Holder of any Securities in any such proceeding.

Section 7.05    Priorities. Any moneys or properties collected by the Trustee, or, after an Event of Default, any moneys or other property distributable in respect of the Company's obligations under this Indenture, in either case with respect to a series of Securities under this Article VII shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such moneys or properties and, in the case of the distribution of such moneys or properties on account of the Securities of any series, upon presentation of the Securities of such series, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

First: To the payment of all amounts (including indemnity payments) due to the Trustee, Paying Agent, Registrar and any other Agent and any predecessor trustee, paying agent, registrar and other Agent under Section 11.01(a) and the reasonably incurred expenses and disbursements of its agents, delegates, attorneys and counsel.

Second: In case the principal of the Outstanding Securities of such series shall not have become due and be unpaid, to the payment of interest on the Securities of such series, in the chronological order of the Stated Maturity of the installments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon the overdue installments of

40

interest at the rate borne by such Securities, such payments to be made ratably to the Persons entitled thereto.

Third:        In case the principal of the Outstanding Securities of such series shall have become due, by declaration or otherwise, to the payment of the whole amount then owing and unpaid upon the Securities of such series for principal and premium, if any, and interest, with interest on the overdue principal and premium, if any, and (to the extent that such interest has been collected by the Trustee) upon overdue installments of interest at the rate borne by the Securities of such series, and in case such moneys shall be insufficient to pay in full the whole amounts so due and unpaid upon the Securities of such series, then to the payment of such principal and premium, if any, and interest without preference or priority of principal and premium, if any, over interest, or of interest over principal and premium, if any, or of any installment of interest over any other installment of interest, or of any Security of such series over any other Security of such series, ratably to the aggregate of such principal and premium, if any, and accrued and unpaid interest.

Fourth:        Any surplus then remaining shall be paid to the Company, its successors or assigns, or to whomsoever may be determined by a court of competent jurisdiction to be so entitled.

Section 7.06        Control by Securityholders; Waiver of Past Defaults.  The Holders of a majority in principal amount of the Securities of any series at the time Outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, or of exercising any trust or power hereby conferred upon the Trustee with respect to the Securities of such series; provided, however, that, subject to the provisions of Section 11.02, the Trustee shall have the right to decline to follow any such direction if the Trustee being advised by counsel determines that the action so directed may not lawfully be taken or would involve the Trustee in personal liability.  The Holders of not less than a majority in aggregate principal amount of such series of Securities at the time Outstanding may on behalf of all Holders of the Securities of such series waive any existing or past Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default (i) in the payment of principal of, premium, if any, or interest on (or Additional Amount payable in respect of), the Securities of such series then Outstanding, in which event the consent of all Holders of the Securities of such series then Outstanding affected thereby is required, or (ii) in respect of a covenant or provision which under Section 14.02 cannot be modified or amended without the consent of the Holder of each Security of such series then Outstanding affected thereby.  Upon any such waiver, the Company, the Trustee and the Holders of the Securities of such series shall be restored to their former positions and rights hereunder, respectively; provided that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 7.06, said Default or Event of Default shall for all purposes of the Securities of such series and this Indenture be deemed to have been cured and to be not continuing.

41

Section 7.07        Limitation on Suits.  No Holder of any Security of any series shall have any right to institute any action, suit or proceeding at law or in equity for the execution of any trust hereunder or for the appointment of a receiver or for any other remedy hereunder, in each case with respect to an Event of Default with respect to such series of Securities, unless (i) such Holder previously shall have given to the Trustee written notice of one or more of the Events of Default herein specified with respect to such series of Securities, (ii) the Holders of not less than 25% in aggregate principal amount of the Securities of such series then Outstanding shall have requested the Trustee in writing to take action in respect of the matter complained of, (iii) there shall have been offered to the Trustee pre-funding, security and/or indemnity satisfactory to it against the costs, expenses and liabilities to be incurred therein or thereby, and (iv) the Trustee, for 60 calendar days after receipt of such notification, request and offer of pre-funding, security and/or indemnity, shall have failed to institute any such action, suit or proceeding and have not received from the Holders of a majority in aggregate principal amount of the Securities of such series then Outstanding a direction inconsistent with such request; and such notification, request and offer of pre-funding, security and/or indemnity are hereby declared in every such case to be conditions precedent to any such action, suit or proceeding by any Holder of any Security of such series; it being understood and intended that no one or more of the Holders of Securities of such series shall have any right in any manner whatsoever by his, her, its or their action to enforce any right hereunder, except in the manner herein provided, and that every action, suit or proceeding at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all Holders of the Outstanding Securities of such series; provided, however, that nothing in this Indenture or in the Securities of such series shall affect or impair the obligation of the Company, which is absolute and unconditional, to pay the principal of, premium, if any, and interest on, the Securities of such series to the respective Holders of such Securities at the respective due dates in such Securities stated, or affect or impair the right, which is also absolute and unconditional, of such Holders to institute suit to enforce the payment thereof.

Section 7.08        Undertaking for Costs.  All parties to this Indenture and each Holder of any Security, by such Holder's acceptance thereof, shall be deemed to have agreed that any court may in its discretion require, in any action, suit or proceeding for the enforcement of any right or remedy under this Indenture, or in any action, suit or proceeding against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such action, suit or proceeding of an undertaking to pay the costs of such action, suit or proceeding, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such action, suit or proceeding, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided, however, that the provisions of this Section 7.08 shall not apply to any action, suit or proceeding instituted by the Trustee, to any action, suit or proceeding instituted by any one or more Holders of Securities holding in the aggregate more than 10% in principal amount of the Securities of any series Outstanding, or to any action, suit or proceeding instituted by any Holder of Securities of any series for the enforcement of the payment of the principal of, premium, if any, or the interest on, any of the Securities of such series, on or after the respective due dates expressed in such Securities.

42

Case 1:20-cv-03794-DG-TAM   Document 65-12   Filed 03/03/23   Page 254 of 410
PageID #: 3242

Section 7.09     Remedies Cumulative; Delay or Omission Not Waiver.  No remedy herein conferred upon or reserved to the Trustee or to the Holders of Securities of any series is intended to be exclusive of any other remedy or remedies, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute.  No delay or omission of the Trustee or of any Holder of the Securities of any series to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Default or Event of Default or an acquiescence therein; and every power and remedy given by this Article VII to the Trustee and to the Holders of Securities of any series, respectively, may be exercised from time to time and as often as may be deemed expedient by the Trustee or by the Holders of Securities of such series, as the case may be.  In case the Trustee or any Holder of Securities of any series shall have proceeded to enforce any right under this Indenture and the proceedings for the enforcement thereof shall have been discontinued or abandoned because of waiver or for any other reason, or shall have been adjudicated adversely to the Trustee or to such Holder of Securities, then and in every such case, subject to any determinations in such proceedings, the Company, the Trustee and the Holders of the Securities of such series shall severally and respectively be restored to their former positions and rights hereunder, and thereafter all rights, remedies and powers of the Trustee and the Holders of the Securities of such series shall continue as though no such proceedings had been taken, except as to any matters so waived or adjudicated.

## ARTICLE VIII

## CONCERNING THE SECURITYHOLDERS

Section 8.01     Evidence of Action of Securityholders.  Whenever in this Indenture it is provided that the Holders of a specified percentage or a majority in aggregate principal amount of the Securities or of any series of Securities may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action the Holders of such specified percentage or majority have joined therein may be evidenced by (a) any instrument or any number of instruments of similar tenor executed by Securityholders in person, by an agent or by a  proxy appointed in writing, including through an electronic system for tabulating consents operated by the Depositary for such series or otherwise (such action becoming effective, except as herein otherwise expressly provided, when such instruments or evidence of electronic consents are delivered to the Trustee and, where it is hereby expressly required, to the Company), or (b) by the record of the Holders of Securities voting in favor thereof at any meeting of Securityholders duly called and held in accordance with the provisions of Article IX, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Securityholders.

43

Section 8.02        Proof of Execution or Holding of Securities.  Proof of the execution of any instrument by a Securityholder or his, her or its agent or proxy and proof of the holding by any Person of any of the Securities shall be sufficient if made in the following manner:

(a)        The fact and date of the execution by any Person of any such instrument may be proved (i) by the certificate of any notary public or other officer in any jurisdiction who, by the laws thereof, has power to take acknowledgments or proof of deeds to be recorded within such jurisdiction, that the Person who signed such instrument did acknowledge before such notary public or other officer the execution thereof, or (ii) by the affidavit of a witness of such execution sworn to before any such notary or other officer.  Where such execution is by a Person acting in other than his or her individual capacity, such certificate or affidavit shall also constitute sufficient proof of his or her authority.

(b)        The ownership of Securities of any series shall be proved by the Register of such Securities or by a certificate of the Registrar for such series.

(c)        The record of any Holders' meeting shall be proved in the manner provided in Section 9.06.

(d)        The Trustee may require such additional proof of any matter referred to in this Section 8.02 as it shall deem appropriate or necessary, so long as the request is a reasonable one.

(e)        If the Company shall solicit from the Holders of Securities of any series any action, the Company may, at its option, fix in advance a record date for the determination of Holders of Securities entitled to take such action, but the Company shall have no obligation to do so.  Any such record date shall be fixed at the Company's discretion; provided that such record date shall not be more than 30 calendar days prior to the first solicitation of any consent or waiver or more than 30 calendar days prior to the date of the most recent list of Holders furnished to the Trustee prior to such solicitation pursuant to Section 312 of the TIA.  If such a record date is fixed, such action may be sought or given before or after the record date, but only the Holders of Securities of record at the close of business on such record date shall be deemed to be Holders of Securities for the purpose of determining whether Holders of the requisite proportion of Outstanding Securities of such series have authorized or agreed or consented to such action, and for that purpose the Outstanding Securities of such series shall be computed as of such record date.

Section 8.03        Persons Deemed Owners.

(a)        The Company, the Trustee and any agent of the Company or the Trustee may treat the Person in whose name any Security is registered in the Register as the owner of such Security for the purpose of receiving payment of principal of and premium, if any, and (subject to Section 3.08) interest, if any, on, such Security and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Company, the Trustee nor any agent of the Company or the Trustee shall be affected by notice to the contrary.  All payments made to any Holder, or upon his, her or its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys payable upon such Security.

(b)        None of the Company, the Trustee, any Paying Agent or the Registrar shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

Section 8.04        Effect of Consents.  After an amendment, supplement, waiver or other action becomes effective as to any series of Securities, a consent to it by a Holder of such series of Securities is a continuing consent conclusive and binding upon such Holder and every subsequent Holder of the same Securities or portion thereof, and of any Security issued upon the transfer thereof or in exchange therefor or in place thereof, even if notation of the consent is not made on any such Security.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

# ARTICLE IX

## SECURITYHOLDERS' MEETINGS

Section 9.01        Purposes of Meetings.  A meeting of Securityholders of any or all series may be called at any time and from time to time pursuant to the provisions of this Article IX for any of the following purposes:

(a)        to give any notice to the Company or to the Trustee, or to give any directions to the Trustee, or to consent to the waiving of any Default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Securityholders pursuant to any of the provisions of Article VIII;

(b)        to remove the Trustee and nominate a successor trustee pursuant to the provisions of Article XI;

(c)        to consent to the execution of an Indenture or of indentures supplemental hereto pursuant to the provisions of Section 14.02; or

(d)        to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Securities of any one or more or all series, as the case may be, under any other provision of this Indenture or under applicable law.

Section 9.02        Call of Meetings by Trustee.  The Trustee may at any time call a meeting of all Securityholders of all series that may be affected by the action proposed to be taken, to take any action specified in Section 9.01, to be held at such time and at such place as the Trustee shall determine.  Notice of every meeting of the Securityholders of a series, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be mailed to Holders of Securities of such series at their addresses as they shall appear on the Register.  Such notice shall be mailed not less than 20 nor more than 90 calendar days prior to the date fixed for the meeting.

45

Section 9.03        Call of Meetings by Company or Securityholders.  In case at any time the Company or the Holders of at least 10% in aggregate principal amount of the Securities of a series (or of all series, as the case may be) then Outstanding that may be affected by the action proposed to be taken shall have requested the Trustee to call a meeting of Securityholders of such series (or of all series), by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have mailed the notice of such meeting within 20 days after receipt of such request, then the Company or such Securityholders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 9.01, by mailing notice thereof as provided in Section 9.02.

Section

9.04        Qualifications for Voting.  To be entitled to vote at any meeting of Securityholders, a Person shall (a) be a Holder of one or more Securities affected by the action proposed to be taken at the meeting or (b) be a Person appointed by an instrument in writing as proxy by a Holder of one or more such Securities.  The only Persons who shall be entitled to be present or to speak at any meeting of Securityholders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

Section 9.05        Regulation of Meetings.

(a)        Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Securityholders, in regard to proof of the holding of Securities and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall deem fit.

(b)        The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Securityholders as provided in Section 9.03, in which case the Company or the Securityholders calling the meeting, as the case may be, shall in like manner appoint a temporary chair.  A permanent chairman and a permanent secretary of the meeting shall be elected by majority vote of the meeting.

(c)        At any meeting of Securityholders of a series, each Securityholder of such series of such Securityholder's proxy shall be entitled to one vote for each US$1,000 principal amount of Securities of such series Outstanding held or represented by him or her; provided, however, that no vote shall be cast or counted at any meeting in respect of any Security challenged as not Outstanding and ruled by the chairman of the meeting to be not Outstanding.  The chairman of the meeting shall have no right to vote other than by virtue of Securities of such series held by him or her or instruments in writing as aforesaid duly designating him or her as the Person to vote on behalf of other Securityholders.  At any meeting of the Securityholders duly called pursuant to the provisions of Section 9.02 or 9.03, the presence of Persons holding or representing Securities in an aggregate principal amount sufficient to take action upon the business for the transaction of which such meeting was called shall be necessary to constitute a quorum, and any such meeting may be adjourned from time to time by a majority of those

46

present, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

47

Section 9.06        Voting.  The vote upon any resolution submitted to any meeting of Securityholders of a series shall be by written ballots on which shall be subscribed the signatures of the Holders of Securities of such series or of their representatives by proxy and the principal amounts of the Securities of such series held or represented by them.  The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting.  A record in duplicate of the proceedings of each meeting of Securityholders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken threat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was mailed as provided in Section 9.02.  The record shall show the principal amounts of the Securities voting in favor of or against any resolution.  The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee.

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 9.07        No Delay of Rights by Meeting.  Nothing contained in this Article IX shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Securityholders of any series or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Securityholders of such series under any of the provisions of this Indenture or of the Securities of such series.

## ARTICLE X

## REPORTS BY THE COMPANY AND THE TRUSTEE AND SECURITYHOLDERS' LISTS

Section 10.01        Reports by Trustee.

(a)        Any Trustee's report required under Section 313(a) of the Trust Indenture Act shall be transmitted on or before April 1 in each year following the date hereof, so long as any Securities are Outstanding hereunder, and shall be dated as of a date convenient to the Trustee no more than 60 nor less than 45 days prior thereto.

(b)        The Trustee shall, at the time of the transmission to the Holders of Securities of any report pursuant to the provisions of this Section 10.01, file a copy of such report with each securities exchange upon which the Securities are listed or each automated quotation system on which the Securities are quoted, if any, and also with the SEC in respect of a Security listed and registered on a national securities exchange or automated quotation system, if any.  The Company agrees to notify the Trustee when, as and if the Securities become listed or delisted on any securities exchange or admitted to trading on any automated quotation system and of any delisting thereof.

48

The Company shall reimburse the Trustee for all expenses incurred in the preparation and transmission of any report pursuant to the provisions of this Section 10.01 and of Section 10.02.

Section 10.02    Reports by the Company.  The Company shall file with the Trustee and the SEC, and transmit to Holders, such information, documents and other reports, and such summaries thereof, as may be required pursuant to the Trust Indenture Act at the times and in the manner provided in the Trust Indenture Act; provided that, any such information, documents or reports required to be filed with the SEC pursuant to Section 13 or 15(d) of the Exchange Act shall be filed with the Trustee within 30 calendar days after the same is filed with the SEC; provided further that the filing of the reports specified in Section 13 or 15(d) of the Exchange Act by an entity that is the direct or indirect parent of the Company shall satisfy the requirements of this Section 10.02 so long as such entity is an obligor or guarantor on the Securities; provided further that the reports of such entity shall not be required to include condensed consolidating financial information for the Company in a footnote to the financial statements of such entity.

Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).  It is expressly understood that materials transmitted electronically by the Company to the Trustee or filed pursuant to the SEC's EDGAR system (or any successor electronic filing system) shall be deemed filed with the Trustee and transmitted to Holders for purposes of this Section 10.02.

Section 10.03    Securityholders' Lists.  The Company covenants and agrees that it shall furnish or cause to be furnished to the Trustee:

(a)    semi-annually, within 15 calendar days after each Record Date, but in any event not less frequently than semi-annually, a list in such form as the Trustee may reasonably require of the names and addresses of the Holders of Securities to which such Record Date applies, as of such Record Date, and

(b)    at such other times as the Trustee may request in writing, within 30 calendar days after receipt by the Company of any such request, a list of similar form and content as of a date not more than 15 calendar days prior to the time such list is furnished;

provided, however, that so long as the Trustee shall be the Registrar, such lists shall not be required to be furnished.

49

## ARTICLE XI

## CONCERNING THE TRUSTEE

Section 11.01          Rights of Trustees; Compensation and Indemnity.  The Trustee accepts the trusts created by this Indenture upon the terms and conditions hereof, including the following, to all of which the parties hereto and the Holders from time to time of the Securities agree:

(a)          The Trustee shall be entitled to such compensation as the Company and the Trustee shall from time to time agree in writing for all services rendered by it hereunder (including in any agent capacity in which it acts).  The compensation of the Trustee shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust.  The Company shall reimburse the Trustee promptly upon its request for all out-of-pocket expenses, disbursements and advances properly incurred or made by the Trustee (including, without limitation, the reasonably incurred expenses and disbursements of its agents, delegates, attorneys and counsel), except any such expense, disbursement or advance caused by its own gross negligence, fraudulent activity or willful misconduct (as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment).

The Company also agrees to indemnify each of the Trustee and any predecessor Trustee and their respective officers, employees and directors hereunder for, and to hold it harmless against, any and all loss, liability, damage, claim, or expense incurred without its own gross negligence, fraudulent activity or willful misconduct (as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder and the performance of its duties (including in any agent capacity in which it acts), as well as the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder, except those caused by its own gross negligence, fraudulent activity or willful misconduct (as determined by a competent court of appropriate jurisdiction in a final, non-appealable judgment). The Trustee shall notify the Company promptly of any claim for which it may seek indemnity; provided, however, that the failure to so notify the Company shall not affect the obligations of the Company hereunder to indemnify. In the absence of a Default or an Event of Default, the Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld.

As security for the performance of the obligations of the Company under this Section 11.01(a), the Trustee shall have a lien upon all property and funds held or collected by the Trustee as such, except funds held in trust by the Trustee to pay principal of and interest on any Securities.  Notwithstanding any provisions of this Indenture to the contrary, the obligations of the Company to compensate and indemnify the Trustee under this Section 11.01(a) shall survive the resignation or removal of the Trustee, any satisfaction and discharge under Article XII , the payment of any Securities and the termination of this Indenture for any reason.  In addition to and without prejudice to its other rights hereunder, when the Trustee incurs expenses or renders services after an Event of Default specified in clause (g) or (h) of Section 7.01 occurs, the expenses and compensation for the services are intended to constitute expenses of administration under the Bankruptcy Code or any applicable state bankruptcy, insolvency or similar laws.

50

(b)        The Trustee may execute any of the trusts or powers hereof and perform any duty hereunder either directly or by its agents, delegates and attorneys and shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(c)        The Trustee shall not be responsible in any manner whatsoever for the correctness of the recitals herein or in the Securities (except its certificates of authentication thereon) contained, all of which are made solely by the Company; and the Trustee shall not be responsible or accountable in any manner whatsoever for or with respect to the validity or execution or sufficiency of this Indenture or of the Securities (except its certificates of authentication thereon), and the Trustee makes no representation with respect thereto, except that the Trustee represents that it is duly authorized to execute and deliver this Indenture, authenticate the Securities and perform its obligations hereunder and that the statements made by it in a Statement of Eligibility on Form T-1 supplied to the Company are true and accurate, subject to the qualifications set forth therein.  The Trustee shall not be accountable for the use or application by the Company of any Securities, or the proceeds of any Securities.

(d)        The Trustee may consult with counsel of its selection, and, subject to Section 11.02, the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by the Trustee hereunder in reliance thereon.

(e)        The Trustee, subject to Section 11.02, may rely upon the certificate of the Secretary or one of the Assistant Secretaries of the Company as to the adoption of any Board Resolution or resolution of the stockholders of the Company, and any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by, and whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee may rely upon, an Officers' Certificate of the Company (unless other evidence in respect thereof be herein specifically prescribed).

(f)        Subject to Section 11.04, the Trustee or any agent of the Trustee, in its individual or any other capacity, may become the owner or pledgee of Securities and, subject to Sections 310(b) and 311 of the TIA, may otherwise deal with the Company with the same rights it would have had if it were not the Trustee or such agent.

(g)        Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law.  The Trustee shall be under no liability for interest on or investment of any money received by it hereunder except as otherwise agreed in writing with the Company. To the extent the Company does not provide the written instructions to the Trustee, such funds on deposit in the shall remain uninvested

(h)        Any action taken by the Trustee pursuant to any provision hereof at the request or with the consent of any Person who at the time is the Holder of any Security shall be conclusive and binding in respect of such Security upon all future Holders thereof or of any Security or Securities which may be issued for or in lieu thereof in whole or in part, whether or

51

not such Security shall have noted thereon the fact that such request or consent had been made or given.

(i)    The Trustee shall be entitled to conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(j)    The Trustee shall not be under any obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of any of the Holders of the Securities, pursuant to any provision of this Indenture, unless one or more of the Holders of the Securities shall have offered to the Trustee pre-funding, security and/or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred by it therein or thereby.

(k)    The Trustee shall not be liable for any action taken, suffered or omitted to be taken by it in good faith and believed by it to be authorized or within its discretion or within the rights or powers conferred upon it by this Indenture.

(l)    The Trustee shall not be deemed to have knowledge or be charged with notice of any Default or Event of Default with respect to any Securities unless a Responsible Officer of the Trustee has actual knowledge by way of written notice thereof or unless the Holders of not less than 25% of the Outstanding Securities notify the Trustee thereof by a written notice to the Trustee that is received by the Trustee at its Corporate Trust Office and such notice references such Securities , the Company and this Indenture.

(m)    The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of Indebtedness or other paper or document; provided, however, that the Trustee, may, but shall not be required to, make further inquiry or investigation into such facts or matters as it may see fit at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation.

(n)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, Citibank, N.A. in each of its capacities hereunder (including, as of the date of this Indenture, the Paying Agent and the Registrar), and to each agent, custodian and other person employed to act hereunder.

(o)    In no event shall the Trustee be responsible or liable for special, indirect, punitive, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit, goodwill or opportunity), whether or not foreseeable, even if the Trustee has been advised of the possibility of such loss or damage and regardless of the form of action.  The provisions of this Section  11.01(o) shall survive the termination or discharge of this Indenture and the resignation or removal of the Trustee.

52

(p)      The Trustee may request that the Company deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officers' Certificate may be signed by any person authorized to sign an Officers' Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(q)      The permissive right of the Trustee to take or refrain from taking action hereunder shall not be construed as a duty.

(r)      The Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture.

(s)      The Trustee may refrain from taking any action in any jurisdiction if taking such action in that jurisdiction would, in the reasonable opinion of the Trustee based on written legal advice received from qualified legal counsel in the relevant jurisdiction, be contrary to any law of that jurisdiction or, to the extent applicable, the State of New York.  Furthermore, the Trustee may refrain from taking such action if, in the reasonable opinion of the Trustee based on such legal advice, it would otherwise render the Trustee liable to any person in that jurisdiction or the State of New York and there has not been offered to the Trustee pre-funding, security and/or indemnity satisfactory to it against the liabilities to be incurred therein or thereby, or the Trustee would not have the legal capacity to take such action in that jurisdiction by virtue of applicable law in that jurisdiction or the State of New York or by virtue of a written order of any court or other competent authority in that jurisdiction that the Trustee does not have such legal capacity.

Section 11.02      Duties of Trustee.

(a)      If one or more of the Events of Default specified in Section 7.01 with respect to the Securities of any series shall have happened, then, during the continuance thereof, the Trustee shall, with respect to such Securities, exercise such of the rights and powers vested in it by this Indenture, and shall use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)      Unless and until an Event of Default specified in Section 7.01 with respect to the Securities of any series shall have happened which at the time is continuing,

(i)      the Trustee undertakes to perform such duties and only such duties with respect to the Securities of that series as are specifically set out in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee, whose duties and obligations shall be determined solely by the express provisions of this Indenture; and

(ii)      the Trustee shall be entitled to conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, in the absence of bad faith on the part of the Trustee, upon certificates and opinions furnished to it pursuant to the express provisions of this Indenture; provided that, in the case of any such certificates or opinions which, by the provisions of this Indenture, are specifically

53

required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts, statements, opinions or conclusions stated therein).

(c)     None of the provisions of this Indenture shall be construed as relieving the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, or its own willful misconduct, except that, anything in this Indenture contained to the contrary notwithstanding,

(i)     the Trustee shall not be liable to any Holder of Securities or to any other Person for any error of judgment made in good faith by a Responsible Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     the Trustee shall not be liable to any Holder of Securities or to any other Person with respect to any action taken or omitted to be taken by it in good faith, in accordance with the direction of Securityholders given as provided in Section 7.06, relating to the time, method and place of conducting any proceeding for any remedy available to it or exercising any trust or power conferred upon it by this Indenture;

(iii)     none of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate pre-funding, security and/or indemnity against such risk or liability is not reasonably assured to it; and

(iv)     this subsection (c) shall not be construed to limit the effect of subsection (b) of this Section 11.02.

(d)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 11.02.

Section 11.03     Notice of Defaults.  Within 90 calendar days after the occurrence thereof and if known to the Trustee, the Trustee shall give to the Holders of the Securities of a series notice of each Default or Event of Default with respect to the Securities of such series known to the Trustee, by transmitting such notice to Holders at their addresses as the same shall then appear on the Register, unless such Default shall have been cured or waived before the giving of such notice (the term "Default" being hereby defined to be the events specified in Section 7.01, which are, or after notice or lapse of time or both would become, Events of Default as defined in said Section).  Except in the case of a Default or Event of Default in payment of the principal of, premium, if any, or interest on, any of the Securities of such series when and as the same shall become payable, or to make any sinking fund payment as to Securities of the same series, the Trustee shall be protected in withholding such notice, if and so long as a Responsible Officer or Responsible Officers of the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders of the Securities of such series (it being understood that the trustee does not have an affirmative duty to ascertain whether or not any such notice is in the interests of such Holders).

Section 11.04          <u>Eligibility; Disqualification</u>.

(a)          The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA.  The Trustee shall have a combined capital and surplus of at least US$50 million as set forth in its most recent published annual report of condition and shall have a Corporate Trust Office.  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 11.04, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

(b)          The Trustee shall comply with Section 310(b) of the TIA; <u>provided</u>, <u>however</u>, that there shall be excluded from the operation of Section 310(b)(i) of the TIA any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Company are Outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.  If the Trustee has or shall acquire a conflicting interest within the meaning of Section 310(b) of the TIA, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of, the Trust Indenture Act and this Indenture.  If Section 310(b) of the TIA is amended any time after the date of this Indenture to change the circumstances under which a Trustee shall be deemed to have a conflicting interest with respect to the Securities of any series or to change any of the definitions in connection therewith, this Section 11.04 shall be automatically amended to incorporate such changes.

Section 11.05          <u>Resignation and Notice; Removal</u>.  The Trustee, or any successor to it hereafter appointed, may at any time resign and be discharged of the trusts hereby created with respect to any one or more or all series of Securities by giving to the Company notice in writing.  Such resignation shall take effect upon the appointment of a successor Trustee and the acceptance of such appointment by such successor Trustee.  Any Trustee hereunder may be removed with respect to any series of Securities at any time by the filing with such Trustee and the delivery to the Company of an instrument or instruments in writing signed by the Holders of a majority in principal amount of the Securities of such series then Outstanding, specifying such removal and the date when it shall become effective.

If at any time:

(1)          the Trustee shall fail to comply with the provisions of Section 310(b) of the TIA after written request therefor by the Company or by any Holder who has been a *bona fide* Holder of a Security for at least six months, or

(2)          the Trustee shall cease to be eligible under Section 11.04 and shall fail to resign after written request therefor by the Company or by any Holder who has been a *bona fide* Holder of a Security for at least six months, or

(3)          the Trustee shall become incapable of acting or shall be adjudged a bankrupt or insolvent or a receiver of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

55

then, in any such case, (i) the Company by written notice to the Trustee may remove the Trustee and appoint a successor Trustee with respect to all Securities, or (ii) subject to Section 315(e) of the TIA, any Securityholder who has been a *bona fide* Holder of a Security for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee with respect to all Securities and the appointment of a successor Trustee or Trustees.

Upon its resignation or removal, any Trustee shall be entitled to the payment of compensation for the services rendered hereunder by such Trustee and to the payment of all reasonable expenses incurred hereunder and all moneys then due to it hereunder.  The Trustee's rights to indemnification and its lien provided in Section 11.01(a) shall survive its resignation or removal, the satisfaction and discharge of this Indenture and the termination of this Indenture for any reason.

56

Section 11.06          Successor Trustee by Appointment.

(a)          In case at any time the Trustee shall resign, or shall be removed (unless the Trustee shall be removed as provided in Section 11.04(b), in which event the vacancy shall be filled as provided in Section 11.04(b)), or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver of the Trustee or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation with respect to the Securities of one or more series, a successor Trustee with respect to the Securities of that or those series (it being understood that any such successor Trustee may be appointed with respect to the Securities of one or more or all of such series and that at any time there shall be only one Trustee with respect to the Securities of any series) may be appointed by the Holders of a majority in aggregate principal amount of the Securities of that or those series then Outstanding, by an instrument or instruments in writing signed in duplicate by such Holders and filed, one original thereof with the Company and the other with the successor Trustee; provided that, until a successor Trustee shall have been so appointed by the Holders of Securities of that or those series as herein authorized, the Company, or, in case all or substantially all the assets of the Company shall be in the possession of one or more custodians or receivers lawfully appointed, or of trustees in bankruptcy or reorganization proceedings (including a trustee or trustees appointed under the provisions of the Bankruptcy Code), or of assignees for the benefit of creditors, such receivers, custodians, trustees or assignees, as the case may be, by an instrument in writing, shall appoint a successor Trustee with respect to the Securities of such series.  Subject to the provisions of Sections 11.04 and 11.05, upon the appointment as above provided of a successor Trustee with respect to the Securities of any series, the Trustee with respect to the Securities of such series shall cease to be Trustee hereunder.  After any such appointment other than by the Holders of Securities of that or those series, the Person making such appointment shall forthwith cause notice thereof to be mailed to the Holders of Securities of such series at their addresses as the same shall then appear on the Register but any successor Trustee with respect to the Securities of such series so appointed shall, immediately and without further act, be superseded by a successor Trustee appointed by the Holders of Securities of such series in the manner above prescribed, if such appointment be made prior to the expiration of one year from the date of the mailing of such notice by the Company, or by such receivers, trustees or assignees.

(b)          If any Trustee with respect to the Securities of one or more series shall resign or be removed and a successor Trustee shall not have been appointed by the Company or by the Holders of the Securities of such series or, if any successor Trustee so appointed shall not have accepted its appointment within 30 calendar days after such appointment shall have been made, the resigning Trustee may, on behalf of and at the expense of the Company, appoint its own successor or the retiring Trustee or the Company may apply to any court of competent jurisdiction for the appointment of a successor Trustee.  If in any other case a successor Trustee shall not be appointed pursuant to the foregoing provisions of this Section 11.06 within three months after such appointment might have been made hereunder, the Holder of any Security of the applicable series or any retiring Trustee at the expense of the Company may apply to any court of competent jurisdiction to appoint a successor Trustee.  Such court may thereupon, in any such case, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

57

(c)        Any successor Trustee appointed hereunder with respect to the Securities of one or more series shall execute, acknowledge and deliver to its predecessor Trustee and to the Company, or to the receivers, trustees, assignees or court appointing it, as the case may be, an instrument accepting such appointment hereunder, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations with respect to such series of such predecessor Trustee with like effect as if originally named as Trustee hereunder, and such predecessor Trustee, upon payment of its charges and disbursements then unpaid, shall thereupon become obligated to pay over, and such successor Trustee shall be entitled to receive, all moneys and properties held by such predecessor Trustee as Trustee hereunder, subject nevertheless to its lien provided for in Section 11.01(a).  Nevertheless, on the written request of the Company or of the successor Trustee or of the Holders of at least 10% in aggregate principal amount of the Securities of such series then Outstanding, such predecessor Trustee, upon payment of its said charges and disbursements, shall execute and deliver an instrument transferring to such successor Trustee upon the trusts herein expressed all the rights, powers and trusts of such predecessor Trustee and shall assign, transfer and deliver to the successor Trustee all moneys and properties held by such predecessor Trustee, subject nevertheless to its lien provided for in Section 11.01(a); and, upon request of any such successor Trustee and the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Trustee all such authority, rights, powers, trusts, immunities, duties and obligations.

Section 11.07        Successor Trustee by Merger.  Any Person into which the Trustee or any successor to it in the trusts created by this Indenture shall be merged or converted, or any Person with which it or any successor to it shall be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Trustee or any such successor to it shall be a party, or any Person to which the Trustee or any successor to it shall sell or otherwise transfer all or substantially all of the corporate trust business of the Trustee, shall be the successor Trustee under this Indenture without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided that such Person shall be otherwise qualified and eligible under this Article.  In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture with respect to one or more series of Securities, any of such Securities shall have been authenticated but not delivered by the Trustee then in office, any successor to such Trustee may adopt the certificate of authentication of any predecessor Trustee, and deliver such Securities so authenticated; and in case at that time any of the Securities shall not have been authenticated, any successor to such Trustee may authenticate such Securities either in the name of any predecessor Trustee hereunder or in the name of the successor Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Securities or in this Indenture provided that the certificate of the Trustee shall have; provided, however, that the right to adopt the certificate of authentication of any predecessor Trustee or authenticate Securities in the name of any predecessor Trustee shall apply only to its successor or successors by merger, conversion or consolidation.

58

Section 11.08        Right to Rely on Opinion of Counsel and/or Officers' Certificate.  Subject to Section 11.02, and subject to the provisions of Section 16.01 with respect to the opinions and certificates required thereby, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith or willful misconduct on the part of the Trustee, be deemed to be conclusively proved and established by an Opinion of Counsel and/or Officers' Certificate with respect thereto delivered to the Trustee, and such Opinion of Counsel and/or Officers' Certificate, in the absence of bad faith or willful misconduct on the part of the Trustee, shall be full warrant to the Trustee for any action taken, suffered or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 11.09        Communications by Securityholders with Other Securityholders.  Holders of Securities may communicate pursuant to Section 312(b) of the TIA with other Holders with respect to their rights under this Indenture or the Securities.  The Company, the Trustee, the Registrar and anyone else shall have the protection of Section 312(c) of the TIA with respect to such communications.

## ARTICLE XII

## SATISFACTION AND DISCHARGE; DEFEASANCE

Section 12.01        Applicability of Article.  If, pursuant to Section 3.01, provision is made for the defeasance of Securities of a series and if the Securities of such series are denominated and payable only in U.S. Dollars (except as provided pursuant to Section 3.01), then the provisions of this Article shall be applicable except as otherwise specified pursuant to Section 3.01 for Securities of such series.

Section 12.02        Satisfaction and Discharge of Indenture.

(a)        This Indenture, with respect to the Securities of any series (if all series issued under this Indenture are not to be affected), shall cease to be of further effect (except as to any surviving rights of registration of transfer or exchange of such Securities herein expressly provided for and rights to receive payments of principal of, premium, if any, and interest on, such Securities) when:

(i)        either:

(A)        all Securities of such series that have been authenticated, except (x) lost, stolen or destroyed Securities that have been replaced or paid and (y) Securities for whose payment money has been deposited in trust and thereafter repaid to the Company, have been delivered to the Paying Agent for cancellation; or

(B)        all Securities of such series that have not been delivered to the Paying Agent for cancellation have become due and payable by reason of the mailing of a notice of redemption or otherwise or will become due and payable within one year and the Company has irrevocably deposited or caused to be

59

deposited with the Trustee or the Paying Agent as trust funds in trust solely for the benefit of the Holders, cash in U.S. Dollars, U.S. Government Obligation, or a combination of cash in U.S. Dollars and U.S. Government Obligation, in amounts as will be sufficient (in the case of a deposit not entirely in cash, in the opinion of an internationally recognized investment bank, appraisal firm or firm of independent public accountants), without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedness on such Securities not delivered to the Paying Agent for cancellation for principal, premium, if any, and accrued interest to the Stated Maturity or Redemption Date, as the case may be; provided, however, in the event a petition for relief under the Bankruptcy Code or any applicable state bankruptcy, insolvency or other similar law is filed with respect to the Company within 91 days after the deposit and the Trustee or the Paying Agent (as the case may be) is required to return the moneys then on deposit with the Trustee or the Paying Agent (as the case may be) to the Company, the obligations of the Company under this Indenture with respect to such Securities shall not be deemed terminated or discharged;

(ii)      no Default or Event of Default under this Indenture has occurred and is continuing on the date of the deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit) and the deposit will not result in a breach or violation of, or constitute a default under, any other instrument to which the Company is a party or by which it is bound;

(iii)     the Company has paid or caused to be paid all sums payable by it under this Indenture with respect to all Securities of such series; and

(iv)     the Company has delivered irrevocable instructions to the Trustee or the Paying Agent (as the case may be) under this Indenture to apply the deposited money toward the payment of the Securities of such series at the Stated Maturity or Redemption Date, as the case may be.

(b)      The Company shall deliver an Officers' Certificate and an opinion of External Legal Counsel (which opinion may be subject to customary assumptions and exclusions) to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

(c)      Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee or the Paying Agent (as the case may be) pursuant to subclause (A)(y) of clause (i) of Section 12.02(a), the obligations of the Trustee or the Paying Agent (as the case may be) under Section 12.07 and Section 6.03(e) shall survive such satisfaction and discharge.

Section 12.03      Defeasance upon Deposit of Moneys or U.S. Government Obligations.

(a)      The Company may, at its option and at any time, elect to have either Section 12.03(b) or Section 12.03(c) applied to all Outstanding Securities of any series upon compliance with the conditions set forth below in this Section 12.03.

60

(b)        Upon the Company's exercise under Section 12.03(a) of the option applicable to this Section 12.03(b), the Company shall, subject to the satisfaction of the conditions set forth in Section 12.03(d), be deemed to have been Discharged from its obligations with respect to all Outstanding Securities of such series on the date such conditions are satisfied ("Legal Defeasance").  For this purpose, "Legal Defeasance" means that the Company shall be deemed to have paid and Discharged the entire Indebtedness represented by the Securities of such series then Outstanding and to have satisfied all of its other obligations under the Securities of such series and this Indenture, except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

(i)        the rights of Holders of the Securities of such series then Outstanding to receive payments in respect of the principal of, or interest or premium on the Securities when such payments are due from the trust referred to in Section 12.03(d);

(ii)        the Company's obligations concerning issuing temporary Securities, registration of Securities, mutilated, destroyed, lost or stolen Securities and the maintenance of an office or agency for payment and money for security payments held in trust;

(iii)        the rights, powers, trusts, duties and immunities of the Trustee, and the Company's obligations in connection therewith; and

(iv)        this Section 12.03(b) and Section 12.03(c) with respect to the Securities of such series.

Following the Company's exercise of its Legal Defeasance option, payment of the Securities of such series may not be accelerated because of an Event of Default.  Subject to compliance with this Article XII, the Company may exercise its option under this Section 12.03(b) notwithstanding the prior exercise of its option under Section 12.03(c).

"Discharged" means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by, and obligations under, the Securities of a series and to have satisfied all the obligations under this Indenture relating to the Securities of such series (and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging the same), except (A) the rights of Holders of Securities of such series to receive, from the trust fund described in clause (i) of 12.03(d), payment of the principal of, premium, if any, or interest on such Securities when such payments are due, (B) the Company's obligations with respect to Securities of such series under Sections 3.04, 3.06, 3.07, 6.02, 6.03, 12.06 and 12.07 and (C) the rights, powers, trusts, duties and immunities of the Trustee hereunder.

(c)        Upon the Company's exercise under Section 12.03(a) of the option applicable to this Section 12.03(c), the Company shall, subject to the satisfaction of the conditions set forth in Section 12.03(d), be released from its obligations under the covenants contained in Section 6.04, Section 6.06 and as provided pursuant to Section 3.01(x), on and after the date the conditions set forth in Section 12.03(d) are satisfied ("Covenant Defeasance").  For this purpose, "Covenant Defeasance" means that, with respect to this Indenture and the Securities of such Series then Outstanding, the Company may omit to comply with and shall

61

have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document, and such omission to comply shall not constitute a Default or an Event of Default under Section 7.01, but, except as specified above, the remainder of this Indenture and the Securities shall be unaffected thereby.  In addition, upon the Company's exercise under Section 12.03(a) of the option applicable to this Section 12.03(c), subject to the satisfaction of the conditions set forth in Section 12.03(d), Sections 7.01(c), 7.01(d) (only with respect to covenants that are released as a result of such Covenant Defeasance), 7.01(e) and 7.01(f), in each case, shall not constitute Events of Default.

(d)      The following shall be the conditions to the exercise of either the Legal Defeasance option under Section 12.03(b) or the Covenant Defeasance option under Section 12.03(c):

(i)      the Company must irrevocably deposit with the Trustee or the Paying Agent as trust funds, in trust, for the benefit of the Holders of all Securities subject to Legal Defeasance or Covenant Defeasance, cash in U.S. Dollars, U.S. Government Obligation, or a combination of cash in U.S. Dollars and U.S. Government Obligation, in amounts as will be sufficient, in the opinion of a nationally recognized investment bank, appraisal firm or firm of independent public accountants to pay the principal of, or interest and premium on such Securities that are then Outstanding on the Stated Maturity or Redemption Date, as the case may be, and the Company must specify whether such Securities are being defeased to maturity or to a particular Redemption Date;

(ii)      in the case of Legal Defeasance, the Company must deliver to the Trustee an opinion of External Legal Counsel of recognized standing with respect to U.S. federal income tax matters that is acceptable to the Trustee confirming that (A) the Company has received from, or there has been published by, the U.S. Internal Revenue Service a ruling or (B) since the date of this Indenture, there has been a change in the applicable federal income tax law, in either case to the effect that, and based thereon such opinion of External Legal Counsel will confirm that, the beneficial owners of the Securities then Outstanding will not recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(iii)      in the case of Covenant Defeasance, the Company must deliver to the Trustee an opinion of External Legal Counsel of recognized standing with respect to U.S. federal income tax matters that is acceptable to the Trustee confirming that the beneficial owners of the Securities of such series then Outstanding will not recognize income, gain or loss for federal income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

62

(iv)        no Default or Event of Default must have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit);

(v)        the Company must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by it with the intent of preferring the Holders of Securities over the Company's other creditors with the intent of defeating, hindering, delaying or defrauding its creditors or others; and

(vi)        the Company must deliver to the Trustee an Officers' Certificate and an opinion of External Legal Counsel, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 12.04        Repayment to Company.  The Trustee and any Paying Agent shall promptly pay to the Company (or to its designee) upon Company Order any excess moneys or U.S. Government Obligations held by them at any time, including any such moneys or U.S. Government Obligations held by the Trustee under any escrow trust agreement entered into pursuant to Section 12.06.  The provisions of the last paragraph of Section 6.03 shall apply to any moneys or U.S. Government Obligations held by the Trustee or any Paying Agent under this Article that remains unclaimed for two years after the Maturity of any series of Securities for which moneys or U.S. Government Obligations have been deposited pursuant to Section 12.03.

Section 12.05        Indemnity for U.S. Government Obligations.  The Company shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the deposited U.S. Government Obligations or the principal or interest received on such U.S. Government Obligations.

Section 12.06        Deposits to Be Held in Escrow.  Any deposits with the Trustee referred to in Section 12.03 above shall be irrevocable (except to the extent provided in Sections 12.04 and 12.07) and shall be made under the terms of an escrow trust agreement.  As contemplated under this Article 12, if any Outstanding Securities of a series are to be redeemed prior to their Stated Maturity, whether pursuant to any optional redemption provisions or in accordance with any mandatory or optional sinking fund requirement, the applicable escrow trust agreement shall provide therefor and the Company shall make such arrangements as are satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company.  The agreement shall provide that, upon satisfaction of any Mandatory Sinking Fund Payment requirements, whether by deposit of moneys, application of proceeds of deposited U.S. Government Obligations or, if permitted, by delivery of Securities, the Trustee shall pay or deliver over to the Company as excess moneys pursuant to Section 12.04 all funds or obligations then held under the agreement and allocable to the sinking fund payment requirements so satisfied.

If Securities of a series with respect to which such deposits are made may be subject to later redemption at the option of the Company or pursuant to Optional Sinking Fund Payments, the applicable escrow trust agreement may, at the option of the Company, provide therefor.  In the case of an optional redemption in whole or in part, such agreement shall require the Company to deposit with the Trustee on or before the date notice of redemption is given funds sufficient to pay the Redemption Price of the Securities to be redeemed together with all unpaid interest thereon to the Redemption Date.  Upon such deposit of funds, the Trustee shall pay or

63

deliver over to the Company as excess funds pursuant to Section 12.04 all funds or obligations then held under such agreement and allocable to the Securities to be redeemed.  In the case of exercise of Optional Sinking Fund Payment rights by the Company, such agreement shall, at the option of the Company, provide that upon deposit by the Company with the Trustee of funds pursuant to such exercise the Trustee shall pay or deliver over to the Company as excess funds pursuant to Section 12.04 all funds or obligations then held under such agreement for such series and allocable to the Securities to be redeemed.

Section 12.07        Application of Trust Money.

(a)        Neither the Trustee nor any other paying agent shall be required to pay interest on any moneys deposited pursuant to the provisions of this Indenture, except such as it shall agree with the Company in writing to pay thereon.  Any moneys so deposited for the payment of the principal of, or premium, if any, or interest on the Securities of any series and remaining unclaimed for two years after the date of the maturity of the Securities of such series or the date fixed for the redemption of all the Securities of such series at the time Outstanding, as the case may be, shall be applied as provided in Section 6.03(e).

(b)        Subject to the provisions of clause (a) above, any moneys or U.S. Government Obligations which at any time shall be deposited by the Company or on its behalf with the Trustee or any other paying agent for the purpose of paying the principal of, premium, if any, and interest on any of the Securities shall be and are hereby assigned, transferred and set over to the Trustee or such other paying agent in trust for the respective Holders of the Securities for the purpose for which such moneys or U.S. Government Obligations shall have been deposited; provided that such moneys or U.S. Government Obligations need not be segregated from other funds except to the extent required by law.

**ARTICLE XIII**

**IMMUNITY OF CERTAIN PERSONS**

Section 13.01        No Personal Liability.  No recourse shall be had for the payment of the principal of, or the premium, if any, or interest on, any Security or for any claim based thereon or otherwise in respect thereof or of the Indebtedness represented thereby, or upon any obligation, covenant or agreement of this Indenture, against any incorporator, stockholder, officer or director, as such, past, present or future, of the Company or of any successor thereto, either directly or through the Company or any successor thereto, whether by virtue of any constitutional provision, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly agreed and understood that this Indenture and the Securities are solely corporate obligations, and that no personal liability whatsoever shall attach to, or be incurred by, any incorporator, stockholder, officer or director, as such, past, present or future, of the Company or of any successor thereto, either directly or through the Company or any successor corporation, because of the incurring of the Indebtedness hereby authorized or under or by reason of any of the obligations, covenants, promises or agreements contained in this Indenture or in any of the Securities, or to be implied herefrom or therefrom, and that all liability, if any, of that character against every such incorporator, stockholder, officer and director is, by the acceptance of the Securities and as a condition of, and as part of the consideration for, the execution of this Indenture and the issue of the Securities expressly waived and released.

64

**ARTICLE XIV**

## SUPPLEMENTAL INDENTURES

Section 14.01 <u>Without Consent of Securityholders</u>. Except as otherwise provided as contemplated by Section 3.01 with respect to any series of Securities, the Company and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any one or more of or all the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency contained herein or in any supplemental indenture; <u>provided</u>, <u>however</u>, that such amendment does not materially and adversely affect the rights of Holders;

(b) to evidence the succession of another corporation to the Company, or successive successions, and the assumption by such successor of the covenants and obligations of the Company contained in the Securities of one or more series and in this Indenture or any supplemental indenture;

(c) to comply with the rules of any applicable Depositary;

(d) to secure any series of Securities;

(e) to add to the covenants and agreements of the Company, to be observed thereafter and during the period, if any, in such supplemental indenture or indentures expressed, and to add Events of Default, in each case for the protection or benefit of the Holders of all or any series of the Securities (and if such covenants, agreements and Events of Default are to be for the benefit of fewer than all series of Securities, stating that such covenants, agreements and Events of Default are expressly being included for the benefit of such series as shall be identified therein), or to surrender any right or power herein conferred upon the Company;

(f) to make any change in any series of Securities that does not adversely affect the legal rights under this Indenture of any Holder of such Securities in any material respect;

(g) to evidence and provide for the acceptance of an appointment under this Indenture of a successor Trustee; <u>provided</u> that the successor Trustee is otherwise qualified and eligible to act as such under the terms hereof;

(h) to conform the text of this Indenture or any series of the Securities to any provision of the section entitled "Description of Debt Securities" in the Prospectus to the extent that such provision in the Prospectus was intended to be a verbatim recitation of a provision of this Indenture or such series of the Securities as evidenced by an Officers' Certificate;

(i) to make any amendment to the provisions of this Indenture relating to the transfer and legending of Securities as permitted by this Indenture, including, but not limited to, facilitating the issuance and administration of any series of the Securities or, if incurred in compliance with this Indenture, additional Securities; <u>provided</u>, <u>however</u>, that (i) compliance with this Indenture as so amended would not result in any series of the Securities being

65

transferred in violation of the U.S. Securities Act of 1933, as amended, or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Securities;

(j)        to change or eliminate any of the provisions of this Indenture; provided that any such change or elimination shall become effective only when there is no Outstanding Security of any series created prior to the execution of such supplemental indenture that is entitled to the benefit of such provision and as to which such supplemental indenture would apply;

(k)        to make any amendment to this Indenture necessary to qualify this Indenture under the Trust Indenture Act;

(l)        to add guarantors or co-obligors with respect to any series of Securities; and

(m)        to establish the form and terms of Securities of any series as permitted in Section 3.01, or to provide for the issuance of additional Securities in accordance with the limitations set forth in this Indenture, or to add to the conditions, limitations or restrictions on the authorized amount, terms or purposes of issue, authentication or delivery of the Securities of any series, as herein set forth, or other conditions, limitations or restrictions thereafter to be observed.

Subject to the provisions of Section 14.03, the Trustee is authorized to join with the Company in the execution of any such supplemental indenture, to make the further agreements and stipulations which may be therein contained and to accept the conveyance, transfer, assignment, mortgage or pledge of any property or assets thereunder.

Any supplemental indenture authorized by the provisions of this Section 14.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Securities at the time Outstanding, notwithstanding any of the provisions of Section 14.02.

Section 14.02        With Consent of Securityholders; Limitations.

(a)        With the consent of the Holders (evidenced as provided in Article VIII) of a majority in aggregate principal amount of the Outstanding Securities of each series affected by such supplemental indenture voting separately, the Company and the Trustee may, from time to time and at any time, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any provisions of this Indenture or of modifying in any manner the rights of the Holders of the Securities of such series to be affected; provided, however, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Security of each such series affected thereby,

(i)        change the Stated Maturity of the principal of and premium, if any, or any installment of interest on any Security;

(ii)        reduce the principal amount of, payments of interest on or stated time for payment of interest on any Security;

66

(iii)     change any obligation of the Company to pay Additional Amounts with respect to any Security;

(iv)     reduce the amount of the principal of an Original Issue Discount Security that would be due and payable upon a declaration of acceleration of the Maturity thereof pursuant to Section 7.02;

(v)     impair the right to institute suit for the enforcement of any payment due on or with respect to any Security;

(vi)     reduce the percentage in principal amount of the Outstanding Securities of any series, the consent of whose Holders is required for any supplemental indenture;

(vii)     reduce the percentage in principal amount of the Outstanding Securities of any series, the consent of whose Holders is required for any waiver of compliance with certain provisions of this Indenture or certain Defaults hereunder and their consequences provided for in this Indenture;

(viii)     modify any of the provisions of this Section 14.02, Section 7.06 or Section 6.08, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Security affected thereby; provided, however, that this clause shall not be deemed to require the consent of any Holder with respect to changes in the references to the "Trustee" and concomitant changes in this Section 14.02 and Section 6.08, or the deletion of this proviso, in accordance with the requirements of Sections 11.06 and 14.01(g);

(ix)     amend, change or modify any provision of this Indenture or the related definition affecting the ranking of any series of Securities in a manner which adversely affects the Holders of such Securities; or

(x)     reduce the amount of the premium payable upon the redemption or repurchase of any Security or change the time at which any Security may be redeemed or repurchased as described in Section 4.07 or as provided pursuant to Section 3.01, whether through an amendment or waiver of provisions in the covenants, definitions or otherwise.

(b)     A supplemental indenture that changes or eliminates any provision of this Indenture which has expressly been included solely for the benefit of one or more particular series of Securities or which modifies the rights of the Holders of Securities of such series with respect to such covenant or other provision, shall be deemed not to affect the rights under this Indenture of the Holders of Securities of any other series.

(c)     It shall not be necessary for the consent of the Securityholders under this Section 14.02 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

67

(d)        The Company may set a record date pursuant to Section 8.02(e) for purposes of determining the identity of the Holders of each series of Securities entitled to give a written consent or waive compliance by the Company as authorized or permitted by this Section 14.02.

(e)        Promptly after the execution by the Company and the Trustee of any supplemental indenture pursuant to the provisions of this Section 14.02, the Company shall mail a notice, setting forth in general terms the substance of such supplemental indenture, to the Holders of Securities at their addresses as the same shall then appear in the Register.  Any failure of the Company to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such supplemental indenture.

Section 14.03        Trustee Protected.  Upon the request of the Company, accompanied by the Officers' Certificate and Opinion of Counsel required by Section 16.01 stating that the execution of such supplemental indenture to be entered into pursuant to Section 14.01 or Section 14.02 is authorized or permitted by this Indenture, and evidence reasonably satisfactory to the Trustee of consent of the Holders if the supplemental indenture is to be executed pursuant to Section 14.02, the Trustee shall join with the Company in the execution of said supplemental indenture unless said supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into said supplemental indenture.  The Trustee shall be fully protected in relying upon such Officers' Certificate and Opinion of Counsel.

Section 14.04        Effect of Execution of Supplemental Indenture.  Upon the execution of any supplemental indenture pursuant to the provisions of this Article XIV, this Indenture shall be deemed to be modified and amended in accordance therewith and, except as herein otherwise expressly provided, the respective rights, limitations of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the Holders of all of the Securities or of the Securities of any series affected, as the case may be, shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 14.05        Notation on or Exchange of Securities.  Securities of any series authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article may bear a notation in the form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Company or the Trustee shall so determine, new Securities so modified as to conform, in the opinion of the Trustee and the Board of Directors of the Company, to any modification of this Indenture contained in any such supplemental indenture may be prepared and executed by the Company and authenticated and delivered by the Trustee in exchange for the Securities then Outstanding in equal aggregate principal amounts, and such exchange shall be made without cost to the Holders of the Securities.

Section 14.06        Conformity with TIA.  Every supplemental indenture executed pursuant to the provisions of this Article shall conform to the requirements of the Trust Indenture Act as then in effect.

**ARTICLE XV**

**SUBORDINATION OF SECURITIES**

Section 15.01       Agreement to Subordinate.  In the event a series of Securities is designated as subordinated pursuant to Section 3.01, and except as otherwise provided in a Company Order, Officers' Certificate or in one or more indentures supplemental hereto, the Company, for itself, its successors and assigns, covenants and agrees, and each Holder of Securities of such series by his, her or its acceptance thereof, likewise covenants and agrees, that the payment of the principal of, premium, if any, or interest on each and all of the Securities of such series is hereby expressly subordinated, to the extent and in the manner hereinafter set forth, in right of payment to the prior payment in full of all Senior Indebtedness.  In the event a series of Securities is not designated as subordinated pursuant to Section 3.01(p), this Article XV shall have no effect upon such series of Securities.

Section 15.02       Distribution on Dissolution, Liquidation and Reorganization; Subrogation of Securities.  Subject to Section 15.01, upon any distribution of assets of the Company upon any dissolution, winding up, liquidation or reorganization of the Company, whether in bankruptcy, insolvency, reorganization or receivership proceedings or upon an assignment for the benefit of creditors or any other marshalling of the assets and liabilities of the Company or otherwise (subject to the power of a court of competent jurisdiction to make other equitable provision reflecting the rights conferred in this Indenture upon the Senior Indebtedness and the holders thereof with respect to the Securities and the holders thereof by a lawful plan of reorganization under the Bankruptcy Code or any applicable state bankruptcy laws):

(a)       the holders of all Senior Indebtedness shall be entitled to receive payment in full of the principal, premium, if any, or interest thereon before the Holders of the Securities are entitled to receive any payment upon the principal of, premium, if any, or interest on Indebtedness evidenced by the Securities; and

(b)       any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to which the Holders of the Securities or the Trustee would be entitled except for the provisions of this Article XV in respect of the principal of, premium, if any, or interest, on the Securities shall be paid by the liquidation trustee or agent or other Person making such payment or distribution, whether a trustee in bankruptcy, a receiver or liquidating trustee or otherwise, directly to the holders of Senior Indebtedness or their representative or representatives or to the trustee or trustees under any indenture under which any instruments evidencing any of such Senior Indebtedness may have been issued, ratably according to the aggregate amounts remaining unpaid on account of the principal of, premium, if any, or interest on the Senior Indebtedness held or represented by each, to the extent necessary to make payment in full of all Senior Indebtedness remaining unpaid, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness; and

(c)       in the event that, notwithstanding the foregoing, any payment or distribution of assets of the Company of any kind or character in respect of the principal of, premium, if any, or interest on Indebtedness evidenced by the Securities, whether in cash, property or securities prohibited by the foregoing, shall be received by the Trustee or the Holders of the Securities before all Senior Indebtedness is paid in full, such payment or distribution shall

69

be paid over, upon and pursuant to the terms of a Company Order to a Responsible Officer of the Trustee, to the holder of such Senior Indebtedness identified in such Company Order or his, her or its representative or representatives or to the trustee or trustees under any indenture identified in such Company Order under which any instrument evidencing any of such Senior Indebtedness may have been issued, ratably as aforesaid, as calculated by the Company, for application to payment of all Senior Indebtedness remaining unpaid until all such Senior Indebtedness shall have been paid in full, after giving effect to any concurrent payment or distribution to the holders of such Senior Indebtedness.

(d)      Subject to the payment in full of all Senior Indebtedness, the Holders of the Securities shall be subrogated to the rights of the holders of Senior Indebtedness (to the extent that distributions otherwise payable to such holder have been applied to the payment of Senior Indebtedness) to receive payments or distributions of cash, property or securities of the Company applicable to Senior Indebtedness until the principal of, premium, if any, or interest on the Securities shall be paid in full and no such payments or distributions to the Holders of the Securities of cash, property or securities otherwise distributable to the holders of Senior Indebtedness shall, as between the Company, its creditors other than the holders of Senior Indebtedness, and the Holders of the Securities be deemed to be a payment by the Company to or on account of the Securities.  It is understood that the provisions of this Article XV are and are intended solely for the purpose of defining the relative rights of the Holders of the Securities, on the one hand, and the holders of the Senior Indebtedness, on the other hand.  Nothing contained in this Article XV or elsewhere in this Indenture or in the Securities is intended to or shall impair, as between the Company, its creditors other than the holders of Senior Indebtedness, and the Holders of the Securities, the obligation of the Company, which is unconditional and absolute, to pay to the Holders of the Securities the principal of, premium, if any, or interest on the Securities as and when the same shall become due and payable in accordance with their terms, or to affect the relative rights of the Holders of the Securities and creditors of the Company other than the holders of Senior Indebtedness, nor shall anything herein or in the Securities prevent the Trustee or the Holder of any Security from exercising all remedies otherwise permitted by applicable law upon default under this Indenture, subject to the rights, if any, under this Article XV of the holders of Senior Indebtedness in respect of cash, property or securities of the Company received upon the exercise of any such remedy.  Upon any payment or distribution of assets of the Company referred to in this Article XV, the Trustee, subject to the provisions of Section 15.05, shall be entitled to conclusively rely upon a certificate of the liquidating trustee or agent or other person making any distribution to the Trustee for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereof and all other facts pertinent thereto or to this Article XV.

Section 15.03      No Payment on Securities in Event of Default on Senior Indebtedness.  Subject to Section 15.01, no payment by the Company on account of principal (or premium, if any), sinking funds or interest, if any, on the Securities shall be made at any time if: (i) a default on Senior Indebtedness exists that permits the holders of such Senior Indebtedness to accelerate its maturity and (ii) the default is the subject of judicial proceedings or the Company has received notice of such default.  The Company may resume payments on the Securities when full payment of amounts then due for principal (premium, if any), sinking funds and interest on Senior Indebtedness has been made or duly provided for in money or money's worth.

70

In the event that, notwithstanding the foregoing, any payment shall be received by the Trustee when such payment is prohibited by the preceding paragraph of this Section 15.03, such payment shall be held in trust for the benefit of, and shall be paid over or delivered to, the holders of such Senior Indebtedness or their respective representatives, or to the trustee or trustees under any indenture pursuant to which any of such Senior Indebtedness may have been issued, as their respective interests may appear, as calculated by the Company, but only to the extent that the holders of such Senior Indebtedness (or their representative or representatives or a trustee) notify the Trustee in writing within 90 calendar days of such payment of the amounts then due and owing on such Senior Indebtedness and only the amounts specified in such notice to the Trustee shall be paid to the holders of such Senior Indebtedness and it has received a written notice from the Company pursuant to Section 15.06 hereof that verifies the notice from the holders of the Senior Indebtedness and confirms that payments subject to such notice are prohibited under this Article XV and to instruct the Trustee to make the payments as provided for in such Company Order.

Section 15.04    Payments on Securities Permitted.  Subject to Section 15.01, nothing contained in this Indenture or in any of the Securities shall (a) affect the obligation of the Company to make, or prevent the Company from making, at any time except as provided in Sections 15.02 and 15.03, payments of principal of (or premium, if any) or interest, if any, on the Securities or (b) prevent the application by the Trustee of any moneys or assets deposited with it hereunder to the payment of or on account of the principal of, premium, if any, or interest on the Securities, unless a Responsible Officer of the Trustee shall have received (i) written notice of any fact prohibiting the making of such payment from the Company, or (ii) from the holder of any Senior Indebtedness or from the trustee for any such holder, together with proof satisfactory to the Trustee of such holding of Senior Indebtedness or of the authority of such trustee, together with a Company Order confirming such holding of Senior Indebtedness or authority of such trustee and directing the Trustee to comply with such notice in accordance with the terms of this Article XV, more than two Business Days prior to the date fixed for such payment.

Section 15.05    Authorization of Securityholders to Trustee to Effect Subordination.  Subject to Section 15.01, each Holder of Securities by his acceptance thereof authorizes and directs the Trustee on his, her or its behalf to take such action as may be necessary or appropriate to effectuate the subordination as provided in this Article XV.

71

Section 15.06        Notices to Trustee. The Company shall give prompt written notice to a Responsible Officer of the Trustee of any fact known to the Company that would prohibit the making of any payment of moneys or assets to or by the Trustee in respect of the Securities of any series pursuant to the provisions of this Article XV. Subject to Section 15.01, notwithstanding the provisions of this Article XV or any other provisions of this Indenture, neither the Trustee nor any Paying Agent (other than the Company) shall be charged with knowledge of the existence of any Senior Indebtedness or of any fact which would prohibit the making of any payment of moneys or assets to or by the Trustee or such Paying Agent, unless and until a Responsible Officer of the Trustee shall have received (in the case of a Responsible Officer of the Trustee) either (i) written notice thereof from the Company, or (ii) from the holder of any Senior Indebtedness or from the trustee for any such holder, together with proof satisfactory to the Trustee of such holding of Senior Indebtedness or of the authority of such trustee, together with a Company Order confirming such holding of Senior Indebtedness or authority of such trustee and directing the Trustee to comply with such notice in accordance with the terms of this Article XV, and, prior to the receipt of any such written notice, the Trustee shall be entitled in all respects conclusively to presume that no such facts exist; provided, however, that if at least two Business Days prior to the date upon which by the terms hereof any such moneys or assets may become payable for any purpose (including, without limitation, the payment of either the principal of, premium, if any, or interest on any Security) a Responsible Officer of the Trustee shall not have received with respect to such moneys or assets the notices provided for in this Section 15.06, then, anything herein contained to the contrary notwithstanding, the Trustee shall have full power and authority to receive such moneys or assets and to apply the same to the purpose for which they were received, and shall not be affected by any notice to the contrary which may be received by it within two Business Days prior to such date. The Trustee shall be entitled to conclusively rely on the delivery to it of a written notice by a Person representing himself to be a holder of Senior Indebtedness (or a trustee on behalf of such holder) to establish that such a notice has been given by a holder of Senior Indebtedness or a trustee on behalf of any such holder; provided, however, the Trustee shall not act under this Article XV and shall in all cases be fully protected in refraining from acting under this Article XV unless and until it has received the aforementioned Company Order instructing it to do so. In the event that the Trustee determines in good faith that further evidence is required with respect to the right of any Person as a holder of Senior Indebtedness to participate in any payment or distribution pursuant to this Article XV, the Trustee may request such Person to furnish evidence to the reasonable satisfaction of the Trustee as to the amount of Senior Indebtedness held by such Person, the extent to which such Person is entitled to participate in such payment or distribution and any other facts pertinent to the rights of such Person under this Article XV and, if such evidence is not furnished, the Trustee may defer any payment to such Person pending its receipt of the aforementioned Company Order and/or judicial determination as to the right of such Person to receive such payment. The Trustee shall not incur any liability for its reliance upon any such notice, evidence, order or other writing delivered to it hereunder that it believes to be genuine. The Trustee may consult with legal counsel (who may be counsel for the Company) and other experts selected by it in connection with any notice, evidence, order or other request received by it under this Article XV, and shall not be liable for any action take or not taken by it.

72

Section 15.07        Trustee as Holder of Senior Indebtedness.  Subject to Section 15.01, the Trustee in its individual capacity shall be entitled to all the rights set forth in this Article XV in respect of any Senior Indebtedness at any time held by it to the same extent as any other holder of Senior Indebtedness and nothing in this Indenture shall be construed to deprive the Trustee of any of its rights as such holder.  Nothing in this Article XV shall apply to claims of, or payments to, the Trustee under or pursuant to Sections 7.05 or 11.01.

Section 15.08        Modifications of Terms of Senior Indebtedness.  Subject to Section 15.01, any renewal or extension of the time of payment of any Senior Indebtedness or the exercise by the holders of Senior Indebtedness of any of their rights under any instrument creating or evidencing Senior Indebtedness, including, without limitation, the waiver of default thereunder, may be made or done all without notice to or assent from the Holders of the Securities or the Trustee.  No compromise, alteration, amendment, modification, extension, renewal or other change of, or waiver, consent or other action in respect of, any liability or obligation under or in respect of, or of any of the terms, covenants or conditions of any indenture or other instrument under which any Senior Indebtedness is Outstanding or of such Senior Indebtedness, whether or not such release is in accordance with the provisions of any applicable document, shall in any way alter or affect any of the provisions of this Article XV or of the Securities relating to the subordination thereof.

Section 15.09        Reliance on Judicial Order or Certificate of Liquidating Agent.  Subject to Section 15.01, upon any payment or distribution of assets of the Company referred to in this Article XV, the Trustee and the Holders of the Securities shall be entitled to conclusively rely upon any order or decree entered by any court of competent jurisdiction in which such insolvency, bankruptcy, receivership, liquidation, reorganization, dissolution, winding up or similar case or proceeding is pending, or a certificate of the trustee in bankruptcy, liquidating trustee, custodian, receiver, assignee for the benefit of creditors, agent or other person making such payment or distribution, delivered to the Trustee or to the Holders of Securities, for the purpose of ascertaining the Persons entitled to participate in such payment or distribution, the holders of Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article XV.

Section 15.10        Satisfaction and Discharge; Defeasance and Covenant Defeasance.  Subject to Section 15.01, moneys and U.S. Government Obligations deposited in trust with the Trustee pursuant to and in accordance with Article XII and not, at the time of such deposit, prohibited to be deposited under Sections 15.02 or 15.03 shall not be subject to this Article XV.

Section 15.11        Trustee Not Fiduciary for Holders of Senior Indebtedness.  With respect to the holders of Senior Indebtedness, the Trustee undertakes to perform or observe only such of its covenants and obligations as are specifically set forth in this Article XV, and no implied covenants or obligations with respect to the holders of Senior Indebtedness shall be read into this Indenture against the Trustee.  The Trustee shall not be deemed to owe any fiduciary duty to the holders of Senior Indebtedness.  The Trustee shall not be liable to any such holder if it shall pay over or distribute to or on behalf of Holders of Securities or the Company, or any other Person, moneys or assets to which any holder of Senior Indebtedness shall be entitled by virtue of this Article XV or otherwise. For the avoidance of doubt, (i) when acting under this Article, the Trustee shall have all of the rights, benefits, privileges, protections and indemnities provided to the Trustee under Article 7 of this Indenture, and (ii) the Trustee shall not have any duty to take any discretionary action or exercise any discretionary powers in acting under this Article.

73

ARTICLE XVI

## MISCELLANEOUS PROVISIONS

Section 16.01        Certificates and Opinions as to Conditions Precedent.

(a)        Upon any request or application by the Company to the Trustee to take any action under any of the provisions of this Indenture, the Company shall furnish to the Trustee an Officers' Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with and an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent have been complied with, except that in the case of any such application or demand as to which the furnishing of such document is specifically required by any provision of this Indenture relating to such particular application or request, no additional certificate or opinion need be furnished.

(b)        Each certificate or opinion provided for in this Indenture and delivered to the Trustee with respect to compliance with a condition or covenant provided for in this Indenture (other than the certificates provided pursuant to Section 6.05 of this Indenture) shall include (i) a statement that the Person giving such certificate or opinion has read such covenant or condition; (ii) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (iii) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable such Person to express an informed view or opinion as to whether or not such covenant or condition has been complied with; and (iv) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

(c)        Any certificate, statement or opinion of an officer of the Company may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his or her certificate, statement or opinion is based are erroneous.  Any certificate, statement or opinion of counsel may be based, insofar as it relates to factual matters, upon a certificate, statement or opinion of, or representations by, an officer or officers of the Company stating that the information with respect to such factual matters is in the possession of the Company, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate, statement or opinion or representations with respect to such matters are erroneous.

(d)        Any certificate, statement or opinion of an officer of the Company or of counsel to the Company may be based, insofar as it relates to accounting matters, upon a certificate or opinion of, or representations by, an accountant or firm of accountants, unless such officer or counsel, as the case may be, knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the accounting matters upon which his or her certificate, statement or opinion may be based are erroneous.  Any certificate or opinion of any firm of independent registered public accountants filed with the Trustee shall contain a statement that such firm is independent.

74

(e)         In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(f)         Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 16.02      Trust Indenture Act Controls.  If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with a provision included in this Indenture which is required to be included in this Indenture by any of the provisions of Sections 310 to 318, inclusive, of, the TIA, such imposed duties or incorporated provision shall control.

Section 16.03      Notices to the Company and Trustee.  Any notice or demand authorized or permitted by this Indenture to be made upon, given or furnished to, or filed with, the Company or the Trustee shall be sufficiently made, given, furnished or filed for all purposes if it shall be mailed, by regular mail or overnight courier, delivered or faxed to:

(a)         the Company, at iQIYI, Inc., 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing 100080, The People's Republic of China, Attention: Secretary, or at such other address or facsimile number as may have been furnished in writing to the Trustee by the Company.

(b)         the Trustee, at the Corporate Trust Office, Attention: Agency and Trust – iQIYI, Inc.

Any such notice, demand or other document shall be in the English language.  Anything herein to the contrary notwithstanding, no such notice or demand shall be effective as to the Trustee unless it is actually received by the Trustee at its Corporate Trust Office.

The Trustee and the Agents agree to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, pdf, facsimile transmission or other similar unsecured electronic methods; provided, however, that the Trustee and the Agents shall have received an incumbency certificate listing persons designated to give such instructions or directions and containing specimen signatures of such designated persons, which such incumbency certificate shall be amended and replaced whenever a person is to be added or deleted from the listing.  If the Company elects to give the Trustee and the Agents e-mail or facsimile instructions (or instructions by a similar electronic method), the Trustee's and the Agents' understanding of such instructions shall be deemed controlling.  The Trustee and the Agents shall have no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of the Company (other than to verify that the signature on a pdf or facsimile transmission is the signature of a person authorized to give instructions and directions on behalf of the

75

Company).  The Trustee and the Agents shall not be liable for any losses, liabilities, costs or expenses arising directly or indirectly from the Trustee's and the Agents' reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The Company agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee and the Agents, including without limitation the risk of the Trustee and the Agents acting on unauthorized instructions, and the risk or interception and misuse by third parties.

   Section 16.04  <u>Notices to Securityholders; Waiver</u>.  Any notice required or permitted to be given to Securityholders shall be sufficiently given (unless otherwise herein expressly provided), if to Holders, if given in writing by first class mail, postage prepaid, to such Holders at their addresses as the same shall appear on the Register.

   (a)  In the event of suspension of regular mail service or by reason of any other cause it shall be impracticable to give notice by mail, then such notification as shall be given with the approval of the Trustee shall constitute sufficient notice for every purpose hereunder.

   (b)  Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance on such waiver.  In any case where notice to Holders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Holder shall affect the sufficiency of such notice with respect to other Holders, and any notice that is mailed in the manner herein provided shall be conclusively presumed to have been duly given.  In any case where notice to Holders is given by publication, any defect in any notice so published as to any particular Holder shall not affect the sufficiency of such notice with respect to other Holders, and any notice that is published in the manner herein provided shall be conclusively presumed to have been duly given.

76

Section 16.05        Legal Holiday.  Unless otherwise specified pursuant to Section 3.01, in any case where any Interest Payment Date, Redemption Date or Maturity of any Security of any series shall not be a Business Day at any Place of Payment for the Securities of that series, then payment of principal and premium, if any, or interest need not be made at such Place of Payment on such date, but may be made on the next succeeding Business Day at such Place of Payment with the same force and effect as if made on such Interest Payment Date, Redemption Date or Maturity and no interest shall accrue on such payment for the period from and after such Interest Payment Date, Redemption Date or Maturity, as the case may be, to such Business Day if such payment is made or duly provided for on such Business Day.

Section 16.06        Judgment Currency.  To the fullest extent permitted by law, the obligations of the Company to any Holder under this Indenture or the Securities of any series, as the case may be, shall, notwithstanding any judgment in a currency (the "Judgment Currency") other than U.S. Dollars, be discharged only to the extent that on the Business Day following receipt by such Holder or the Trustee, as the case may be, of any amount in the Judgment Currency, such Holder or the Trustee, as the case may be, may in accordance with normal banking procedures purchase the U.S. Dollars with the Judgment Currency.  If the amount of U.S. Dollars so purchased is less than the amount originally to be paid to such Holder or the Trustee, as the case may be, in U.S. Dollars, the Company agrees, as a separate obligation and notwithstanding such judgment, to pay the difference, and if the amount of U.S. Dollars so purchased exceeds the amount originally to be paid to such Holder, such Holder or the Trustee, as the case may be, agrees to pay to or for the account of the Company such excess; provided that such Holder shall not have any obligation to pay any such excess as long as a Default by the Company in its obligations under this Indenture or such series of Securities has occurred and is continuing, in which case such excess may be applied by such Holder to such obligations.  In the event the Trustee is required or requested to make such purchases of U.S. Dollars with the Judgment Currency, the Trustee will in good faith select a recognized banking institution in The City of New York through which the Trustee will purchase the U.S. Dollars with the Judgment Currency; provided that the Trustee will not be liable for any losses or shortfalls in amounts so paid as a result of the foreign exchange rate applied by such banking institution to such purchases of the U.S. Dollars with the Judgment Currency in accordance with normal banking procedures.

Section 16.07        Effects of Headings and Table of Contents.  The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 16.08        Successors and Assigns.  All covenants and agreements in this Indenture by the parties hereto shall bind their respective successors and assigns and inure to the benefit of their permitted successors and assigns, whether so expressed or not.

Section 16.09        Severability.  If any provision hereof shall be held to be invalid, illegal or unenforceable under applicable law, then the remaining provisions hereof shall be construed as though such invalid, illegal or unenforceable provision were not contained herein.

Section 16.10        Benefits of Indenture.  Nothing in this Indenture expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or to give to, any Person other than the parties hereto and their successors and the Holders of the Securities any benefit or any right, remedy or claim under or by reason of this Indenture or any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Indenture contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Holders of the Securities.

Section 16.11        Counterparts.  This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 16.12        Governing Law; Waiver of Trial by Jury.  This Indenture and the Securities shall be deemed to be contracts made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the law of said State.

EACH OF THE COMPANY AND THE TRUSTEE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS INDENTURE.

78

Section 16.13        Submission to Jurisdiction.  The Company irrevocably and unconditionally submits to the non-exclusive jurisdiction of any U.S. federal or New York State court located in the Borough of Manhattan, The City of New York over any suit, action or proceeding arising out of or relating to this Indenture or the Securities.  Service of any process, summons, notice or document by registered mail addressed to the Company's agent, Cogency Global Inc., at the address 122 East 42nd Street, 18th Floor, New York, NY 10168, shall be effective service of process against the Company for any suit, action or proceeding brought in any such court. The Company irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum.  A final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon the Company and may be enforced in any other courts to whose jurisdiction the Company is or may be subject, by suit upon judgment.  The Company further agrees that nothing herein shall affect any Holder's right to effect service of process in any other manner permitted by law or bring a suit action or proceeding (including a proceeding for enforcement of a judgment) in any other court or jurisdiction in accordance with applicable law.

Section 16.14        Waiver of Immunity.  To the extent that the Company or any of its properties, assets or revenues may have or may hereafter become entitled to, or have attributed to each of the Company, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from the giving of any relief in any such legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any Cayman Islands, PRC, New York state or U.S. federal court, from service of process, from attachment upon or prior to judgment, from attachment in aid of execution of judgment, or from execution of judgment, or other legal process or proceeding for the giving of any relief or for the enforcement of any judgment, in any such court in which proceedings may at any time be commenced, with respect to the obligations and liabilities of the Company or any other matter under or arising out of or in connection with this Indenture, the Company hereby irrevocably and unconditionally waives or will waive such right to the extent permitted by applicable law, and agree not to plead or claim, any such immunity and consent to such relief and enforcement.

Section 16.15        Force Majeure.  In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

[Signatures on following page]

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

IQIYI, INC.,
as Company


By:      /s/ Xiaodong Wang
Name:   Xiaodong Wang
Title:    Chief Financial Officer


CITIBANK, N.A.,
as Trustee

By:      /s/ Danny Lee
Name:   Danny Lee
Title:    Senior Trust Officer


A-1

**EXHIBIT A**

FORM OF SECURITY

FACE OF NOTE

[*For Inclusion in a Global Security only* -- UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR THE INDIVIDUAL SECURITIES REPRESENTED HEREBY, THIS GLOBAL SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.]

IQIYI, INC.

___% Note Due _____

PRINCIPAL AMOUNT: _____
CUSIP: _____
No.: _____

IQIYI, Inc., an exempted company incorporated in the Cayman Islands (the "Company," which term includes any successor thereto under the Indenture referred to on the reverse hereof), for value received, hereby promises to pay to _____, or registered assigns, the principal sum of _____ (_____) (or such other principal amount as shall be set forth in the Schedule of Increases or Decreases in Note attached hereto) on _____, or on such earlier date as the principal hereof may become due in accordance with the provisions of this Note.

Interest Rate: _____% per annum.

Interest Payment Dates: _____ and _____ of each year, commencing on _____.

Interest Record Dates: _____ and _____.

Reference is made to the further provisions of this Note set forth on the reverse hereof. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been manually signed by the Trustee under the Indenture referred to on the reverse hereof.

A-2

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

IQIYI, INC.

By:     _____

Name:   Xiaodong Wang
Title:  Chief Financial Officer

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

CITIBANK, N.A.,
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By:     _____

Authorized Officer

A-3

REVERSE OF NOTE

IQIYI, INC.

___% Note Due _____

        This Note is one of a duly authorized issue of debt securities of the Company of the series designated as the "___% Note due _____" (the "Notes"), all issued or to be issued under and pursuant to an Indenture, dated as of December 21, 2020 (the "Base Indenture"), duly executed and delivered by and between the Company and Citibank, N.A., as trustee (the "Trustee," which term includes any successor trustee)[, as supplemented by the Supplemental Indenture, dated as of _____ (the "Supplemental Indenture"), duly executed and delivered by and between the Company and the Trustee]. The Base Indenture [as supplemented and amended by the Supplemental Indenture] is referred to herein as the "Indenture". Capitalized terms used herein and not otherwise defined shall have the meanings given them in the Indenture.

        1. Interest. The Company promises to pay interest on the principal amount of this Note at a rate of ___% per annum. The Company will pay interest semi-annually on _____ and _____ of each year. If a payment date is not a Business Day as defined in the Indenture at a Place of Payment, payment may be made at that place on the next succeeding day that is a Business Day, and no interest shall accrue for the intervening period. Interest shall be computed on the basis of a 360-day year of twelve 30-day months.

        2. Method of Payment. The Company shall pay interest on the Notes (except Defaulted Interest), if any, to the Persons in whose name such Notes are registered at the close of business on the Record Date referred to on the face of this Note for such interest installment. In the event that the Notes or a portion thereof are called for redemption, and the Redemption Date is subsequent to a Record Date with respect to any Interest Payment Date and prior to such Interest Payment Date, interest on such Notes will instead be paid upon presentation and surrender of such Notes as provided in the Indenture. Payment of interest on the Notes shall be made, in the currency of the United States of America that at the time is legal tender for payment of public and private debts, at the Corporate Trust Office or, at the option of the Company, by check mailed to the address of the Person entitled thereto as such address shall appear in the Register or, in accordance with arrangements satisfactory to the Trustee, by wire transfer to an account designated by the Holder.

        3. Paying Agent and Registrar. Initially, Citibank, N.A., will act as Paying Agent and Registrar. The Company may change or appoint any Paying Agent or Registrar without notice to any Noteholder. The Company may act in any such capacity.

        4. Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 ("TIA") as in effect on the date the Indenture is qualified. The Notes are subject to all such terms, and Noteholders are referred to the Indenture and TIA for a statement of such terms. The Notes are unsecured general obligations of the Company and constitute the series designated on the face of this Note as the "___% Note due _____," initially limited to US$_____ in aggregate principal

A-4

amount.  The Company will furnish to any Noteholder upon written request and without charge a copy of the Base Indenture [and the Supplemental Indenture].  Requests may be made to: 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing 100080, The People's Republic of China, Attention: Secretary.

5. Redemption and Repurchase.  [The Notes are subject to optional redemption, and may be the subject of a mandatory redemption or offer to purchase, as further described in the Indenture.]  [The Company shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.]

6. Denominations, Transfer, Exchange.  The Notes are in registered form without coupons in the denominations of US$_____ or any integral multiple of US$1,000 in excess thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture.  The Notes may be presented for exchange or for registration of transfer (duly endorsed or with the form of transfer endorsed thereon duly executed if so required by the Company or the Registrar) at the office of the Registrar or at the office of any transfer agent designated by the Company for such purpose.  The Company need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part.

7. Persons Deemed Owners.  The registered Noteholder may be treated as its owner for all purposes.

8. Amendments, Supplements and Waivers.  The Indenture and the Notes may be amended or supplemented as provided in the Indenture.  Any consent or waiver by the Noteholders as provided in the Indenture shall be conclusive and binding upon such Holders and upon all future Noteholders and holders of any security issued upon the registration of transfer hereof or in exchange herefor or in lieu hereof, whether or not notation of such consent or waiver is made upon the Notes.

9. Defaults and Remedies.  The Events of Default relating to the Notes are defined in Section 7.01 of the Base Indenture.  Upon the occurrence of an Event of Default, the rights and obligations of the Company, the Trustee and the Noteholders shall be as set forth in the applicable provisions of the Indenture.

10. No Recourse Against Others.  No recourse under or upon any obligation, covenant or agreement contained in the Indenture or the Notes, or because of any indebtedness evidenced thereby, shall be had against any incorporator as such, or against any past, present or future stockholder, officer, director or employee, as such, of the Company or of any successor, either directly or through the Company or any successor, under any rule of law, statute or constitutional provision or by the enforcement of any assessment or by any legal or equitable proceeding or otherwise, all such liability being expressly waived and released by the acceptance hereof and as part of the consideration for the issue hereof.

11. Authentication.  This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

A-5

12. <u>Governing Law</u>.  The Base Indenture, the Supplemental Indenture and this Note shall be deemed to be contracts made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the law of said State.

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) unto

[PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE]

_____

_____

[PLEASE PRINT OR TYPE NAME AND ADDRESS, INCLUDING ZIP CODE, OF ASSIGNEE]

_____

the within Note and all rights thereunder, hereby irrevocably constituting and appointing
_____ Attorney to transfer such Note on the books of the
Company, with full power of substitution in the premises.

Signature: _____

Dated: _____

_____

NOTICE:  The signature to this assignment must correspond with the name as written upon the face of the within Note in every particular without alteration or enlargement or any change whatsoever.

SIGNATURE GUARANTEE

[Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.]

A-7

SCHEDULE OF INCREASES OR DECREASES IN NOTE*

The initial principal amount of this Note is US$_____.  The following increases or decreases in a part of this Note have been made:

| Date | Amount of decrease in principal amount of this Note | Amount of increase in principal amount of this Note | Principal amount of this Note following such decrease (or increase) | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| | | | | |

_____

* Insert in Global Notes.

A-8

**EXHIBIT B**

FORM OF COMPLIANCE CERTIFICATE

This Compliance Certificate is delivered pursuant to Section 6.07 of the Indenture, dated as of December 21, 2020, as amended, supplemented or modified from time to time (the "**Indenture**"), between iQIYI, Inc, an exempted company incorporated in the Cayman Islands (the "**Company**") and Citibank, N.A., as trustee (the "**Trustee**"). Capitalized terms defined in the Indenture are used herein as therein defined.

The undersigned hereby certifies to the Trustee as follows:

1. I am the duly elected, qualified and acting [title] or [title], as the case may be, of the Company.

2. I have reviewed and am familiar with the contents of this Compliance Certificate.

3. I have reviewed the terms of the Indenture.

4. A review has been conducted of the activities of the Company's performance under the Indenture, in each case since the [Issue Date/date of last Compliance Certificate], and since the [Issue Date/date of last Compliance Certificate] the Company has been in compliance with all conditions and covenants under the Indenture]/[if there has been a default in the fulfillment of any obligation under the Indenture, specifying each such default and the nature and status thereof.]

[*Signature page follows*]

B-1

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date set forth below.

IQIYI, INC.

By: _____
Name:
Title:

Date:   [●], 20[•]

[*Signature Page to Form of Compliance Certificate*]

IQIYI, INC.

AND

CITIBANK, N.A.,

as Trustee

FIRST SUPPLEMENTAL INDENTURE

Dated as of December 21, 2020

to Indenture

Dated as of December 21, 2020

4.00% Convertible Senior Notes due 2026

**TABLE OF CONTENTS**

PAGE

ARTICLE 1
DEFINITIONS

Section 1.01.    *Definitions*                                                                **2**
Section 1.02.    *References to Interest*                                                      14
Section 1.03.    *References to Principal*                                                     14

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01.    *Scope of Supplemental Indenture.*                                            14
Section 2.02.    *Designation and Amount*                                                      14
Section 2.03.    *Form of Notes*                                                               15
Section 2.04.    *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts*  16
Section 2.05.    *Exchange and Registration of Transfer of Notes; Depositary*                  17
Section 2.06.    *Mutilated, Destroyed, Lost or Stolen Notes*                                  19
Section 2.07.    *Cancellation of Notes Paid, Converted, Etc*                                  20
Section 2.08.    *Additional Notes; Repurchases*                                               **20**

ARTICLE 3
SATISFACTION AND DISCHARGE

Section 3.01.    *Applicability of Article 12 of the Base Indenture*                           21
Section 3.02.    *Satisfaction and Discharge.*                                                 21

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

Section 4.01.    *Maintenance of Office or Agency*                                             21
Section 4.02.    *Appointments to Fill Vacancies in Trustee's Office*                          22
Section 4.03.    *Provisions as to Paying Agent.*                                              22
Section 4.04.    *Existence*                                                                   23
Section 4.05.    *Additional Amounts*                                                          24
Section 4.06.    *Stay, Extension and Usury Laws*                                              26
Section 4.07.    *Statements as to Defaults.*                                                  26
Section 4.08.    *Further Instruments and Acts*                                                27
Section 4.09.    *No Conditional Waiver.*                                                      27

ARTICLE 5
[INTENTIONALLY OMITTED]

ARTICLE 6

DEFAULTS AND REMEDIES

| Section 6.01. | *Applicability of Article VII of the Base Indenture* | 27 |
| Section 6.02. | *Events of Default.* | 27 |
| Section 6.03. | *Acceleration; Rescission and Annulment* | 28 |
| Section 6.04. | *Additional Interest* | 30 |
| Section 6.05. | *Payments of Notes on Default; Suit Therefor* | 30 |
| Section 6.06. | *Application of Monies Collected by Trustee* | 32 |
| Section 6.07. | *Proceedings by Holders* | 33 |
| Section 6.08. | *Proceedings by Trustee* | 34 |
| Section 6.09. | *Remedies Cumulative and Continuing* | 34 |
| Section 6.10. | *Direction of Proceedings and Waiver of Defaults by Majority of Holders.* | 35 |
| Section 6.11. | *Notice of Defaults and Events of Default* | 35 |
| Section 6.12. | *Undertaking to Pay Costs* | 36 |

ARTICLE 7

CONCERNING THE TRUSTEE

| Section 7.01. | *Monies and ADSs to Be Held in Trust* | 36 |
| Section 7.02. | *Compensation and Expenses of Trustee.* | 36 |

ARTICLE 8

CONCERNING THE HOLDERS

| Section 8.01. | *Who Are Deemed Absolute Owners* | 37 |
| Section 8.02. | *Company-Owned Notes Disregarded* | 37 |
| Section 8.03. | *Revocation of Consents* | 38 |

ARTICLE 9

[INTENTIONALLY OMITTED]

ARTICLE 10

SUPPLEMENTAL INDENTURES

| Section 10.01. | *Supplemental Indentures Without Consent of Holders.* | 38 |
| Section 10.02. | *Supplemental Indentures with Consent of Holders* | 39 |

ARTICLE 11

CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

| Section 11.01. | *Company May Consolidate, Etc.* | 40 |
| Section 11.02. | *Successor Corporation to Be Substituted* | 41 |
| Section 11.03. | *Opinion of Counsel to Be Given to Trustee* | 41 |

ii

ARTICLE 12
NO SUBORDINATION

Section 12.01.    *Non-Subordination of Notes*                                                          42

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01.    *Conversion Privilege*                                                                42
Section 14.02.    *Conversion Procedure; Settlement Upon Conversion*                                     45
Section 14.03.    *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes*    49
Section 14.04.    *Adjustment of Conversion Rate*                                                        52
Section 14.05.    *Adjustments of Prices*                                                                63
Section 14.06.    *Class A Ordinary Shares to Be Fully Paid*                                             63
Section 14.07.    *Effect of Recapitalizations, Reclassifications and Changes of the Class A Ordinary Shares*    63
Section 14.08.    *Certain Covenants*                                                                    65
Section 14.09.    *Responsibility of Trustee*                                                            66
Section 14.10.    *Notice to Holders Prior to Certain Actions*                                           67
Section 14.11.    *Stockholder Rights Plans*                                                             67
Section 14.12.    *Limit on Issuance of ADSs Upon Conversion*                                            68
Section 14.13.    *Termination of Depositary Receipt Program*                                            68
Section 14.14.    *Exchange In Lieu Of Conversion*                                                       68

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01.    *Repurchase at Option of Holders*                                                      69
Section 15.02.    *Repurchase at Option of Holders Upon a Fundamental Change*                            71
Section 15.03.    *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice*              74
Section 15.04.    *Deposit of Repurchase Price or Fundamental Change Repurchase Price*                   75
Section 15.05.    *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*                     76

ARTICLE 16
OPTIONAL REDEMPTION

Section 16.01.    *Applicability of Article IV and Article V of the Base Indenture*                      76
Section 16.02.    *Optional Redemption for Changes in the Tax Law of the Relevant Taxing Jurisdiction*   77

ARTICLE 17
MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 17.01. | *Provisions Binding on Company's Successors* | 78 |
| Section 17.02. | *Official Acts by Successor Corporation* | 78 |
| Section 17.03. | *Addresses for Notices, Etc.* | 79 |
| Section 17.04. | *Legal Holidays* | 79 |
| Section 17.05. | *Governing Law; Waiver of Trial by Jury.* | 79 |
| Section 17.06. | *No Security Interest Created* | 79 |
| Section 17.07. | *Benefits of Indenture.* | 79 |
| Section 17.08. | *Execution in Counterparts.* | 79 |
| Section 17.09. | *Severability.* | 80 |
| Section 17.10. | *Calculations* | 80 |
| Section 17.11. | *USA PATRIOT Act* | 80 |

**EXHIBIT**

| | | |
|---|---|---|
| Exhibit A | Form of Note | A-1 |

FIRST SUPPLEMENTAL INDENTURE dated as of December 21, 2020 (this "Supplemental Indenture") between IQIYI, INC., a Cayman Islands exempted company, as issuer (the "**Company**," as more fully set forth in Section 1.01) and Citibank, N.A., a national banking association, as trustee (the "**Trustee**," as more fully set forth in Section 1.01), supplementing the Indenture dated as of December 21, 2020 between the Company and the Trustee (the "**Base Indenture**" and the Base Indenture, as amended and supplemented by this Supplemental Indenture, and as it may be further amended or supplemented from time to time with respect to the Notes, the "**Indenture**").

W I T N E S S E T H:

WHEREAS, the Company executed and delivered the Base Indenture to the Trustee to provide, among other things, for the issuance, from time to time, of the Company's Securities, in an unlimited aggregate principal amount, in one or more series to be established by the Company under, and authenticated and delivered as provided in, the Base Indenture;

WHEREAS, Sections 2.01, 2.02 and 3.01 of the Base Indenture provide for the Company to issue Securities thereunder in the form set forth in Exhibit A thereto or established pursuant to a Company Order, Officers' Certificates or in one or more indentures supplemental thereto;

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issuance of a single series of Securities designated as its 4.00% Convertible Senior Notes due 2026 (the "**Notes**"), initially in an aggregate principal amount not to exceed US$800,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Underwriters pursuant to the exercise of their option to purchase additional Notes as set forth in the Underwriting Agreement), and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Supplemental Indenture;

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note, the Form of Notice of Conversion, the Form of Fundamental Change Repurchase Notice, the Form of Repurchase Notice and the Form of Assignment and Transfer to be borne by the Notes are to be substantially in the forms hereinafter provided;

WHEREAS, the conditions set forth in the Base Indenture for the execution and delivery of this Supplemental Indenture have been complied with; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee, as in this Supplemental Indenture provided, the valid, binding and legal obligations of the Company, and this Supplemental Indenture a valid agreement according to its terms, have been done and performed, and the execution of this Supplemental Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

1

NOW, THEREFORE, THIS SUPPLEMENTAL INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

## ARTICLE 1
### DEFINITIONS

Section 1.01. *Definitions.* For all purposes of the Indenture, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Article 1 shall have the respective meanings assigned to them in this Article 1 and include the plural as well as the singular and, to the extent applicable, supersede the definitions thereof in the Base Indenture;

(b) all words, terms and phrases defined in the Base Indenture (but not otherwise defined herein) shall have the same meanings as in the Base Indenture;

(c) the words "herein," "hereof," "hereunder" and other words of similar import (i) when used with regard to any specified Article, Section or sub-division, refer to such Article, Section or sub-division of this Supplemental Indenture and (ii) otherwise, refer to the Indenture as a whole and not to any particular Article, Section or other subdivision; and

(d) Section 1.01 of the Base Indenture is amended and supplemented, solely with respect to the Notes, by inserting the following additional defined terms in their appropriate alphabetical positions and deleting any defined terms therein that are also defined in this Section 1.01:

"**Additional ADSs**" shall have the meaning specified in Section 14.03(a).

"**Additional Amounts**" shall have the meaning specified in Section 4.05(a).

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 6.04, as applicable.

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing seven Class A Ordinary Shares of the Company as of the date of this Supplemental Indenture, and deposited with the ADS Custodian.

"**ADS Custodian**" means JPMorgan Chase Bank, N.A., with respect to the ADSs delivered pursuant to the Deposit Agreement, or any successor entity thereto.

2

"**ADS Depositary**" means JPMorgan Chase Bank, N.A., as depositary for the ADSs, or any successor entity thereto.

"**ADS Price**" shall have the meaning specified in Section 14.03(c).

"**Affiliate**" shall have the meaning specified in the Base Indenture; *provided* that, notwithstanding anything to the contrary herein or therein, the determination of whether one Person is an "**Affiliate**" of another Person for purposes of the Indenture shall be made based on the facts at the time such determination is made or required to be made, as the case may be, hereunder.

"**Agents**" means the Paying Agent, the Transfer Agent, the Registrar, the Conversion Agent and the Bid Solicitation Agent, in each case, unless the Company is acting in such capacity.

"**Applicable PRC Rate**" means (i) in the case of deduction or withholding of PRC income tax, 10%, (ii) in the case of deduction or withholding of PRC value added tax (including any related local levies), 6.72%, or (iii) in the case of deduction or withholding of both PRC income tax and PRC value added tax (including any related local levies), 16.72%.

"**Base Indenture**" shall have the meaning specified in the first paragraph of this Supplemental Indenture.

"**Bid Solicitation Agent**" means the Company or the Person appointed by the Company to solicit bids for the Trading Price of the Notes in accordance with Section 14.01(b)(i).  The Company shall initially act as the Bid Solicitation Agent.

"**Business Day**" means, with respect to any Note, each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in the State of New York, the Cayman Islands or, in the case of a payment under the Indenture, Place of Payment, are authorized or obligated by law or executive order to close.

"**Cash Settlement**" shall have the meaning specified in Section 14.02(a).

"**Change in Law**" shall have the meaning specified in clause (e) of the definition of "Fundamental Change" below.

"**Change in Tax Law**" shall have the meaning specified in Section 16.02(b).

"**Class A Ordinary Shares**" means the Class A ordinary shares of the Company, par value US$0.00001 per share, at the date of this Supplemental Indenture, subject to Section 14.07.

"**Class B Ordinary Shares**" means the Class B ordinary shares of the Company, par value US$0.00001 per share, at the date of this Supplemental Indenture, subject to Section 14.07.

"**Clause A Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause B Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause C Distribution**" shall have the meaning specified in Section 14.04(c).

"**close of business**" means 5:00 p.m. (New York City time).

"**Combination Settlement**" shall have the meaning specified in Section 14.02(a).

"**Commission**" means the U.S. Securities and Exchange Commission.

"**Common Equity**" of any Person means Capital Stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"**Company**" shall have the meaning specified in the first paragraph of this Supplemental Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Group**" shall have the meaning specified in clause (e) of the definition of "Fundamental Change" below.

"**Company Notice**" shall have the meaning specified in Section 15.01(a).

"**Conversion Agent**" shall have the meaning specified in Section 4.01.

"**Conversion Consideration**" shall have the meaning specified in Section 14.14(a).

"**Conversion Date**" shall have the meaning specified in Section 14.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 14.01(a).

"**Conversion Price**" means as of any time, US$1,000, *divided by* the Conversion Rate as of such time.

"**Conversion Rate**" shall have the meaning specified in Section 14.01(a).

"**Custodian**" means the Trustee, as custodian for The Depository Trust Company, with respect to the Global Notes, or any successor entity thereto.

"**Daily Conversion Value**" means, for each of the 40 consecutive Trading Days during the Observation Period, 2.5% of the product of (a) the Conversion Rate in effect immediately after the close of business on such Trading Day and (b) the Daily VWAP for such Trading Day.

"**Daily Measurement Value**" means the Specified Dollar Amount (if any), *divided by* 40.

4

"**Daily Settlement Amount**," for each of the 40 consecutive Trading Days during the Observation Period, shall consist of:

(a)        cash in an amount equal to the lesser of (i) the Daily Measurement Value and (ii) the Daily Conversion Value on such Trading Day; and

(b)        if the Daily Conversion Value on such Trading Day exceeds the Daily Measurement Value, a number of ADSs equal to (i) the difference between the Daily Conversion Value and the Daily Measurement Value, *divided by* (ii) the Daily VWAP for such Trading Day.

"**Daily VWAP**" means, for each of the 40 consecutive Trading Days during the relevant Observation Period, the per ADS volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "IQ <equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one ADS on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for this purpose by the Company).  The "**Daily VWAP**" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including, without limitation, the Redemption Price, the Fundamental Change Repurchase Price, the Repurchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**Deposit Agreement**" means the Deposit Agreement, dated as of March 28, 2018, among the Company, the ADS Depositary, and the holders and owners from time to time of the ADSs issued thereunder, delivered thereunder or, if amended or supplemented as provided therein, as so amended or supplemented.

"**Depositary**" means, with respect to each Global Note and notwithstanding anything to the contrary in the Base Indenture, the Person specified in Section 2.05(d) as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of the Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Designated Financial Institution**" shall have the meaning specified in Section 14.14(a).

"**Distributed Property**" shall have the meaning specified in Section 14.04(c).

"**DTC**" means The Depository Trust Company, a New York corporation.

5

"**Effective Date**" shall have the meaning specified in Section 14.03(c), except that, as used in Section 14.04 and Section 14.05, "**Effective Date**" means the first date on which ADSs trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant share split or share combination, as applicable.

"**Event of Default**" shall have the meaning specified in Section 6.02, notwithstanding anything to the contrary in the Base Indenture.

"**Ex-Dividend Date**" means the first date on which the ADSs trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from the Company or, if applicable, from the seller of the ADSs on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Exchange Election**" shall have the meaning specified in Section 14.14(a).

"**Expiring Rights**" means any rights, options or warrants to purchase Class A Ordinary Shares or ADSs that expire on or prior to the Maturity Date.

"**Form of Assignment and Transfer**" means the "Form of Assignment and Transfer" attached as Attachment 4 to the Form of Note attached hereto as Exhibit A.

"**Form of Fundamental Change Repurchase Notice**" means the "Form of Fundamental Change Repurchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

"**Form of Note**" means the "Form of Note" attached hereto as Exhibit A.

"**Form of Notice of Conversion**" means the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**Form of Repurchase Notice**" means the "Form of Repurchase Notice" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Fundamental Change**" shall be deemed to have occurred at the time after the Notes are originally issued if any of the following occurs:

(a)     except as described in clause (b) below, (A) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries, the employee benefit plans of the Company and its Subsidiaries and any Permitted Holder, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Company's ordinary share capital (including ordinary share capital held in the form of ADSs) representing more than 50% of the voting power of the Company's ordinary share capital or (B) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act

6

files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of more than 50% of the Company's then outstanding Class A Ordinary Shares (including Class A Ordinary Shares held in the form of ADSs); *provided*, however, that for purposes of clause (B), in calculating the beneficial ownership percentage of the Class A Ordinary Shares held by any Permitted Holder, any Class A Ordinary Shares (including Class A Ordinary Shares held in the form of ADSs) issued or issuable on conversion of Class B Ordinary Shares, or conversion, exchange or exercise of other securities, in any such case  beneficially owned directly or indirectly by any Permitted Holder on December 16, 2020 or issued or issuable by the Company to any Permitted Holder after December 16, 2020 pursuant to rights attached to, or a dividend or other distribution on, any such Class B Ordinary Shares or other securities so owned on the date hereof (or any Class A Ordinary Shares into which they may convert or be exchanged or exercised) shall be excluded from both the numerator and denominator;

(b)        the consummation of (A) any recapitalization, reclassification or change of the Class A Ordinary Shares or the ADSs (other than changes resulting from a subdivision or combination) as a result of which the Class A Ordinary Shares or the ADSs would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation or merger of the Company or any similar transaction pursuant to which the Class A Ordinary Shares or the ADSs will be converted into cash, securities or other property; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries and Consolidated Affiliated Entities, taken as a whole, to any Person other than one of the Company's Subsidiaries or Consolidated Affiliated Entities; *provided*, *however*, that a transaction described in clause (B) in which the holders of all classes of the Company's ordinary share capital immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions vis-à-vis each other as such ownership immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (b);

(c)        the shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company;

(d)        the ADSs (or Class A Ordinary Shares or other Common Equity or American Depositary Shares in respect of Reference Property) cease to be listed or quoted on any of The Nasdaq Global Select Market, The Nasdaq Global Market or The New York Stock Exchange (or any of their respective successors) and none of the ADSs, Class A Ordinary Shares, other Common Equity and American Depositary Shares in respect of Reference Property is listed or quoted on one of The Nasdaq Global Select Market, The Nasdaq Global Market or The New York Stock Exchange (or any of their respective successors) within one Trading Day of such cessation; or

7

(e)        any change in or amendment to the laws, regulations and rules of the PRC or the official interpretation or official application thereof (a "**Change in Law**") that results in (x) the Company, its Subsidiaries and its Consolidated Affiliated Entities (collectively, the "**Company Group**") (as in existence immediately subsequent to such Change in Law), as a whole, being legally prohibited from operating substantially all of the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) as of the last date of the period described in the Company's consolidated financial statements for the most recent fiscal quarter and (y) the Company being unable to continue to derive substantially all of the economic benefits from the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) in the same manner as reflected in the Company's consolidated financial statements for the most recent fiscal quarter;

*provided, however*, that a transaction or transactions described in clause (a) or (b) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by holders of the ADSs, excluding cash payments for fractional ADSs and cash payments made pursuant to dissenters' appraisal rights, in connection with such transaction or transactions consists of shares of Common Equity or American Depositary Shares in respect of Common Equity that are listed or quoted on any of The Nasdaq Global Select Market, The Nasdaq Global Market or The New York Stock Exchange (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions and as a result of such transaction or transactions such consideration, excluding cash payments for fractional ADSs, becomes Reference Property for the Notes.

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 15.02(c).

"**Fundamental Change Repurchase Date**" shall have the meaning specified in Section 15.02(a).

"**Fundamental Change Repurchase Notice**" shall have the meaning specified in Section 15.02(b)(i).

"**Fundamental Change Repurchase Price**" shall have the meaning specified in Section 15.02(a).

"**Global Note**" shall have the meaning specified in Section 2.05(d) and shall constitute a Global Security for purposes of the Base Indenture.

"**Indenture**" shall have the meaning specified in the first paragraph of this Supplemental Indenture.

"**Interest Payment Date**" means each June 15 and December 15 of each year, beginning on June 15, 2021.

8

"**Last Reported Sale Price**" of the ADSs on any date means the closing sale price per ADS (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the principal U.S. national or regional securities exchange on which the ADSs are traded.  If the ADSs are not listed for trading on a U.S. national or regional securities exchange on the relevant date, the "**Last Reported Sale Price**" shall be the last quoted bid price for the ADSs in the over-the-counter market on the relevant date as reported by OTC Markets Group Inc. or a similar organization.  If the ADSs are not so quoted, the "**Last Reported Sale Price**" shall be the average of the mid-point of the last bid and ask prices for the ADSs on the relevant date from each of at least three nationally recognized independent investment banking firms selected by the Company for this purpose.

"**Make-Whole Fundamental Change**" means any transaction or event described in clause (a), (b), (d) or (e) of the definition of Fundamental Change (determined after giving effect to any exceptions to or exclusions from such definition, including in the *proviso* immediately succeeding clause (e) of the definition thereof, but without regard to the *proviso* in clause (b) of the definition thereof).

"**Market Disruption Event**" means, for the purposes of determining amounts due upon conversion, (a) a failure by the primary U.S. national or regional securities exchange or market on which the ADSs are listed or admitted for trading to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the ADSs for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant stock exchange or otherwise) in the ADSs or in any options contracts or futures contracts relating to the ADSs.

"**Maturity Date**" means December 15, 2026.

"**Measurement Period**" shall have the meaning specified in Section 14.01(b)(i).

"**Merger Event**" shall have the meaning specified in Section 14.07(a).

"**New Listing Reference Date**" shall have the meaning specified in Section 15.02(e).

"**Note**" or "**Notes**" shall have the meaning specified in the third paragraph of the recitals of this Supplemental Indenture.

"**Notice of Conversion**" shall have the meaning specified in Section 14.02(b).

"**Observation Period**" with respect to any Note surrendered for conversion means: (i) subject to clause (ii), if the relevant Conversion Date occurs prior to June 15, 2026, the 40 consecutive Trading Day period beginning on, and including, the second Trading Day immediately succeeding such Conversion Date; (ii) if the relevant Conversion Date occurs on or after the date of the Company's issuance of a Redemption Notice with respect to the Notes pursuant to Section 16.02 and prior to the relevant Redemption Date, the 40 consecutive Trading

9

Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding such Redemption Date; and (iii) subject to clause (ii), if the relevant Conversion Date occurs on or after June 15, 2026, the 40 consecutive Trading Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding the Maturity Date.

"**open of business**" means 9:00 a.m. (New York City time).

"**Optional Redemption**" shall have the meaning specified in Section 16.02.

"**Ordinary Shares**" means the Class A Ordinary Shares and the Class B Ordinary Shares.

"**outstanding**" when used with reference to Notes, shall, subject to the provisions of Section 8.02, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under the Indenture, except:

(a)     Notes theretofore canceled by the Trustee or accepted by the Trustee for cancellation;

(b)     Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited in trust with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c)     Notes that have been paid pursuant to Section 3.07 of the Base Indenture or Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 3.07 of the Base Indenture unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d)     Notes converted pursuant to Article 14 and required to be cancelled pursuant to Section 2.07;

(e)     Notes redeemed pursuant to Article 16; and

(f)     Notes repurchased by the Company pursuant to the third sentence of Section 2.08.

"**Paying Agent**" shall have the meaning specified in Section 4.01.

"**Paying Agent Office**" means the designated office of the Paying Agent at which at any time the Indenture shall be administered, which office at the date hereof is the Corporate Trust Office or such other address as the Paying Agent may designate from time to time by notice to the Holders and the Company, or the designated office of any successor paying agent (or such

10

other address as such successor paying agent may designate from time to time by notice to the Holders and the Company).

"**Permitted Exchange**" means The Stock Exchange of Hong Kong, London Stock Exchange or The Stock Exchange of Singapore.

"**Permitted Holder**" means (i) any holder or "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Class B Ordinary Shares as of the date hereof and permitted transferees of such holder or beneficial owner under the terms of the Class B Ordinary Shares as of the date hereof and (ii) any "group" within the meaning of Section 13(d) of the Exchange Act consisting of one or more Permitted Holders.

"**Physical Notes**" means permanent certificated Notes in registered form issued in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof.

"**Physical Settlement**" shall have the meaning specified in Section 14.02(a).

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note and shall constitute a Predecessor Security for purposes of the Base Indenture; and, for the purposes of this definition, any Note authenticated and delivered under Section 3.07 of the Base Indenture in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Prospectus Supplement**" means the preliminary prospectus supplement dated December 15, 2020, as supplemented by the related pricing term sheet dated December 16, 2020, in each case, relating to the offering and sale of the Notes.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Class A Ordinary Shares (directly or in the form of ADSs) (or other applicable security) have the right to receive any cash, securities or other property or in which the Class A Ordinary Shares (directly or in the form of ADSs) (or such other security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of security holders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, statute, contract or otherwise). The definition of "Record Date" in the Base Indenture shall not apply to the Notes, and, solely for purposes of the Notes, references to "Record Date" in the Base Indenture shall be deemed to be references to "Regular Record Date" as such term is defined in this Supplemental Indenture.

"**Redemption Date**" shall have the meaning specified in Section 16.02(b).

"**Redemption Notice**" shall have the meaning specified in specified in Section 16.02(b) .

"**Redemption Price**" shall have the meaning specified in Section 16.02(b).

11

"**Redemption Reference Date**" shall have the meaning specified in Section 14.03(g).

"**Redemption Reference Price**" shall have the meaning specified in Section 14.03(g).

"**Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Regular Record Date**," with respect to any Interest Payment Date, shall mean the June 1 or December 1 (whether or not such day is a Business Day) immediately preceding the applicable June 15 or December 15 Interest Payment Date, respectively.

"**Relevant Jurisdiction**" shall have the meaning specified in Section 4.05(a).

"**Relevant Taxing Jurisdiction**" shall have the meaning specified in Section 4.05(a).

"**Repurchase Date**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Expiration Time**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Notice**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Price**" shall have the meaning specified in Section 15.01(a).

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the principal U.S. national or regional securities exchange or market on which the ADSs are listed or admitted for trading. If the ADSs are not so listed or admitted for trading, "**Scheduled Trading Day**" means a Business Day.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Settlement Amount**" has the meaning specified in Section 14.02(a)(iv).

"**Settlement Method**" means, with respect to any conversion of Notes, Physical Settlement, Cash Settlement or Combination Settlement, as elected (or deemed to have been elected) by the Company.

"**Settlement Notice**" has the meaning specified in Section 14.02(a)(iii).

"**Specified Dollar Amount**" means the maximum cash amount per US$1,000 principal amount of Notes to be received upon conversion as specified in the Settlement Notice related to any converted Notes (or deemed specified pursuant to Section 14.02(a)(iii)).

"**Spin-Off**" shall have the meaning specified in Section 14.04(c).

"**Subsidiary**" means, notwithstanding anything in the Base Indenture to the contrary, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests

12

(including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person. For the avoidance of doubt, the term "Subsidiary" or "Subsidiaries" should include the Company's Consolidated Affiliated Entities, including its variable interest entities and their Subsidiaries.

"**Successor Company**" shall have the meaning specified in Section 11.01(a).

"**Supplemental Indenture**" shall have the meaning specified in the first paragraph of this Supplemental  Indenture.

"**Trading Day**" means a day on which (i) trading in the ADSs (or other security for which a closing sale price must be determined) generally occurs on The Nasdaq Global Select Market or, if the ADSs (or such other security) are not then listed on The Nasdaq Global Select Market, on the principal other U.S. national or regional securities exchange on which the ADSs (or such other security) are then listed or, if the ADSs (or such other security) are not then listed on a U.S. national or regional securities exchange, on the principal other market on which the ADSs (or such other security) are then traded and (ii) a Last Reported Sale Price for the ADSs (or closing sale price for such other security) is available on such securities exchange or market; *provided* that, if the ADSs (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day; and *provided*, *further*, that for purposes of determining amounts due upon conversion only, "**Trading Day**" means a day on which (x) there is no Market Disruption Event and (y) trading in the ADSs generally occurs on The Nasdaq Global Select Market or, if the ADSs are not then listed on The Nasdaq Global Select Market, on the principal other U.S. national or regional securities exchange on which the ADSs are then listed or, if the ADSs are not then listed on a U.S. national or regional securities exchange, on the principal other market on which the ADSs are then listed or admitted for trading, except that if the ADSs are not so listed or admitted for trading, "**Trading Day**" means a Business Day.

"**Trading Price**" means, with respect to the Notes on any date of determination, the average of the secondary market bid quotations obtained by the Bid Solicitation Agent for US$1,000,000 principal amount of Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects for this purpose; *provided* that if three such bids cannot reasonably be obtained by the Bid Solicitation Agent but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, that one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one bid for US$1,000,000 principal amount of Notes from a nationally recognized securities dealer on any determination date, then the Trading Price per US$1,000 principal amount of Notes on such determination date shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate.

"**Transfer Agent**" means Citibank, N.A., including any successor transfer agent.

"**Trigger Event**" shall have the meaning specified in Section 14.04(c).

13

"**Underwriters**" means Goldman Sachs (Asia) L.L.C., BofA Securities, Inc. and J.P. Morgan Securities LLC.

"**Underwriting Agreement**" means that certain Underwriting Agreement, dated as of December 16, 2020, among the Company and the Underwriters.

"**unit of Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Valuation Period**" shall have the meaning specified in Section 14.04(c).

Section 1.02. *References to Interest.* Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in the Indenture shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to Section 6.04. Unless the context otherwise requires, any express mention of Additional Interest in any provision hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

Section 1.03. *References to Principal.* Unless the context otherwise requires, any reference to the principal of, or the principal amount of, any Security or Note in the Base Indenture or this Supplemental Indenture shall be deemed to include the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if, in such context, the Redemption Price, the Repurchase Price and/or the Fundamental Change Repurchase Price (as applicable) is, was or would be payable in accordance with Article 15 or Article 16, as applicable. Unless the context otherwise requires, any express mention of the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price in any provision hereof shall not be construed as excluding the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price, as applicable, in those provisions hereof where such express mention is not made.

ARTICLE 2
Issue, Description, Execution, Registration and Exchange of Notes

Section 2.01. *Scope of Supplemental Indenture.* This Supplemental Indenture amends and supplements the provisions of the Base Indenture, to which provisions reference is hereby made. The changes, modifications and supplements to the Base Indenture effected by this Supplemental Indenture shall be applicable only with respect to, and shall only govern the terms of, the Notes, which may be issued from time to time in accordance herewith, and shall not apply to any other Securities that may be issued under the Base Indenture unless a supplemental indenture with respect to such other Securities specifically incorporates such changes, modifications and supplements. For all purposes under the Base Indenture, the Notes shall constitute a single series of Securities. The provisions of this Supplemental Indenture shall supersede, with respect to the Notes, any conflicting provisions in the Base Indenture.

Section 2.02. *Designation and Amount.* The Notes are hereby created and authorized as a single series of Securities under the Base Indenture. The Notes shall be designated as the

14

"4.00% Convertible Senior Notes due 2026." The aggregate principal amount of Notes that may be authenticated and delivered under the Indenture is initially limited to US$800,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Underwriters pursuant to the exercise of their option to purchase additional Notes as set forth in the Underwriting Agreement), subject to Section 2.08 and except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes to the extent expressly permitted under the Indenture.

Section 2.03. *Form of Notes.* The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of the Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of the Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of the Indenture as may be required by the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officer executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of the Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect redemptions, repurchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Registrar, at the direction of the Trustee in such manner and upon instructions given by the Holder of such Notes in accordance with the Indenture. Payment of principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, a Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

15

Section 2.04.  *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts.*  (a) Notwithstanding Section 3.02 of the Base Indenture, the Notes shall be issuable in registered form without coupons in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof.  Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of such Note.  Notwithstanding Section 3.10 of the Base Indenture, accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of the number of days actually elapsed over a 30-day month.

(b)        Section 3.08(a) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.04(b), and any reference in the Base Indenture to Section 3.08(a) shall, with respect to the Notes, be deemed to refer instead to this Section 2.04(b), as the context may require. The Person in whose name any Note (or its Predecessor Note) is registered on the Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date.  The principal amount of any Note (x) in the case of any Physical Note, shall be payable at the office or agency of the Company maintained by the Company for such purposes in the contiguous United States, which shall initially be the Paying Agent Office and (y) in the case of any Global Note, shall be payable by wire transfer of immediately available funds to the account of the Depositary or its nominee.  The Company shall pay, or cause the Paying Agent to pay (to the extent funded by the Company), the interest (i) on any Physical Notes to Holders holding Physical Notes by wire transfer in immediately available funds to the account within the United States specified by the Holder or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c)        Section 3.08(b) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.04(c), and any reference in the Base Indenture to Section 3.08(b) shall, with respect to the Notes, be deemed to refer instead to this Section 2.04(c), as the context may require. Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i)        The Company may elect to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner.  The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee in its sole discretion shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such

16

deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided.  Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment.  The Company shall promptly notify the Trustee and Holders of the proposed payment of such Defaulted Amounts and the special record date therefor at its address as it appears in the Register or by electronic means to the Depositary in the case of Global Notes, not less than 10 days prior to such special record date.  Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so delivered, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.04(c).  The Trustee shall have no responsibility whatsoever for the calculation of any Defaulted Amounts.

(ii)    The Company may make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after written notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Section 2.05.  *Exchange and Registration of Transfer of Notes; Depositary.*

(a)    Section 3.06(j) of the Base Indenture shall not apply to the Notes.

(b)    Section 3.06(f) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.05(b), and any reference in the Base Indenture to section 3.06(f) shall, with respect to the Notes, be deemed to refer instead to this Section 2.05(b), as the context may require. No service charge shall be imposed by the Company, the Transfer Agent, the ADS Depositary, the Trustee, the Registrar, any co-Registrar or the Paying Agent for any exchange or registration of transfer of Notes, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of new Notes issued upon such exchange or registration of transfer being different from the name of the Holder of the old Notes surrendered for exchange or registration of transfer.

(c)    Section 3.06(g) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.05(c), and any reference in the Base Indenture to section 3.06(g) shall, with respect to the Notes, be deemed to refer instead to this Section 2.05(c), as the context may require. None of the Company, the Trustee, the Registrar or any co-Registrar

17

shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion, (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in accordance with Article 15 or (iii) any Notes selected for redemption in accordance with Article 16.

(d)    So long as the Notes are eligible for book-entry settlement with the Depositary, unless otherwise required by law, subject to the second paragraph from the end of Section 2.05(e), all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary.  The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note shall be effected through the Depositary in accordance with the Indenture and the applicable procedures of the Depositary therefor.

The Depositary shall be a clearing agency registered under the Exchange Act.  The Company initially appoints The Depository Trust Company to act as Depositary with respect to each Global Note.  Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee as custodian for Cede & Co.

(e)    Section 3.06(c) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.05(e), and any reference in the Base Indenture to section 3.06(c) shall, with respect to the Notes, be deemed to refer instead to this Section 2.05(e), as the context may require.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days or (iii) an Event of Default with respect to the Notes has occurred and is continuing and, subject to the Depositary's applicable procedures, a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note, the Company shall execute, and the Trustee, upon receipt of an Officers' Certificate and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding to such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Trustee such Global Notes shall be canceled.

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(e) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, or, in the case of clause (iii) of the immediately preceding paragraph, the relevant beneficial owner, shall

18

instruct the Trustee.  Upon execution and authentication, the Trustee shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

At such time as all interests in a Global Note have been converted, canceled, repurchased, redeemed or transferred, such Global Note shall be, upon receipt thereof, canceled by the Trustee in accordance with standing procedures and existing instructions of the Depositary.  At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, repurchased, redeemed or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and existing instructions of the Depositary, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Trustee, to reflect such reduction or increase.

None of the Company, the Trustee, any agent of the Company or any agent of the Trustee shall have any responsibility or liability for the payment of amounts to beneficial holders, any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(f)     Any Note or ADS (including the Class A Ordinary Shares represented thereby) delivered upon the conversion or exchange of any Note that is repurchased or owned by any Affiliate of the Company (or any Person who was an Affiliate of the Company at any time during the three months immediately preceding) may not be resold by such Affiliate (or such Person, as the case may be) unless registered under the Securities Act or resold pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act in a transaction that results in such Note or ADS, as the case may be, no longer being a "restricted security" (as defined under Rule 144 under the Securities Act).  The Company shall cause any Note that is repurchased or owned by it to be surrendered to the Trustee for cancellation in accordance with Section 2.07.

Section 2.06.  *Mutilated, Destroyed, Lost or Stolen Notes.*

(a)     Section 3.07(b) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.06(a), and any reference in the Base Indenture to section 3.07(b) shall, with respect to the Notes, be deemed to refer instead to this Section 2.06(a), as the context may require.

In case any Note that has matured or is about to mature or has been surrendered for required repurchase or is about to be converted in accordance with Article 14 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be.

19

(b)        Section 3.07(c) of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.06(b), and any reference in the Base Indenture to section 3.07(c) shall, with respect to the Notes, be deemed to refer instead to this Section 2.06(b), as the context may require.

No service charge shall be imposed by the Company, the Trustee, the Transfer Agent, the Registrar, any co-Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen.

Section 2.07.  *Cancellation of Notes Paid, Converted, Etc.*  Section 3.09 of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 2.07, and any reference in the Base Indenture to section 3.09 shall, with respect to the Notes, be deemed to refer instead to this Section 2.07, as the context may require. The Company shall cause all Notes surrendered for the purpose of payment, repurchase, redemption, registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's agents, Subsidiaries, Consolidated Affiliated Entities or Affiliates), to be delivered and surrendered to the Trustee for cancellation.  All Notes delivered to the Trustee shall be canceled promptly by it, and except for Notes surrendered for transfer or exchange, no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of the Indenture.  The Trustee shall dispose of all cancelled Notes held by it in accordance with its customary procedures and, after such disposition, shall deliver a certificate of such cancellation and disposition to the Company, at the Company's written request in a Company Order.

Section 2.08.  *Additional Notes; Repurchases.*  The Company may, without the consent of the Holders and notwithstanding Section 2.02, reopen the Indenture and issue additional Notes hereunder with the same terms as the Notes initially issued hereunder (except for any differences in the issue price, the issue date and interest accrued, if any) in an unlimited aggregate principal amount; *provided* that if any such additional Notes are not fungible with the Notes initially issued hereunder for U.S. federal income tax or securities law purposes, such additional Notes shall have a separate CUSIP number.  Prior to the issuance of any such additional Notes, the Company shall deliver to the Trustee a Company Order, an Officers' Certificate and an Opinion of Counsel, such Officers' Certificate and Opinion of Counsel to cover such matters required by Section 16.01 of the Base Indenture.  In addition, the Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), repurchase Notes in the open market or otherwise, whether by the Company or through its Subsidiaries or Consolidated Affiliated Entities or through a private or public tender or exchange offer or through counterparties to private agreements. The Company shall cause any Notes so repurchased to be surrendered to the Trustee for cancellation in accordance with Section 2.07, and they will no longer be considered "outstanding" under the Indenture upon their cancellation.  The Company may also enter into cash-settled swaps or other derivatives with respect to the Notes.  For the avoidance of doubt, any Notes underlying such cash-settled swaps

20

or other derivatives shall not be required to be surrendered to the Trustee for cancellation in accordance with Section 2.07 and will continue to be considered "outstanding" for purposes of the Indenture, subject to the provisions of Section 8.02.

## ARTICLE 3
### SATISFACTION AND DISCHARGE

Section 3.01. *Applicability of Article 12 of the Base Indenture.* Article 12 of the Base Indenture shall not apply to the Notes. Instead the provisions set forth in this Article 3 shall, with respect to the Notes, supersede in their entirety Article 12 of the Base Indenture, and all references in the Base Indenture to Article 12 thereof and the provisions therein, as the case may be, shall, with respect to the Notes, be deemed to be references to this Article 3 or the applicable provisions set forth in this Article 3, respectively.

Section 3.02. *Satisfaction and Discharge.* The Indenture shall upon request of the Company contained in an Officers' Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute instruments acknowledging satisfaction and discharge of the Indenture as reasonably requested by the Company, when (a) (i) all Notes theretofore authenticated and delivered (other than Notes which have been destroyed, lost or stolen and which have been replaced, paid or converted as provided in Section 2.06) have been delivered to the Trustee for cancellation; or (ii) the Company has deposited with the Trustee or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, any Redemption Date, any Repurchase Date, any Fundamental Change Repurchase Date, upon conversion or otherwise, cash, ADSs or a combination thereof, as applicable, solely to satisfy the Company's Conversion Obligation, sufficient, without consideration of reinvestment, to pay all of the outstanding Notes and all other sums due and payable under the Indenture by the Company; and (b) the Company has delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of the Indenture have been complied with. Notwithstanding the satisfaction and discharge of the Indenture, the obligations of the Company to the Trustee under Section 11.01 of the Base Indenture shall survive.

## ARTICLE 4
### PARTICULAR COVENANTS OF THE COMPANY

Section 4.01. *Maintenance of Office or Agency.* Section 6.02 of the Base Indenture shall be superseded by this Section 4.01, and any reference in the Base Indenture to Section 6.02 shall be deemed to refer instead to this Section 4.01. The Company will maintain in the contiguous United States of America an office or agency where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Supplemental Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office

21

or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Paying Agent Office.

The Company may also from time to time designate as co-Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the contiguous United States of America for such purposes.  The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.  The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company initially designates Citibank, N.A. as the Paying Agent, Custodian, Registrar and Conversion Agent and the Paying Agent Office shall be considered as one such office or agency of the Company for each of the aforesaid purposes.

Section 4.02.  *Appointments to Fill Vacancies in Trustee's Office.*  The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 11.05 of the Base Indenture, a Trustee, so that there shall at all times be a Trustee hereunder.

Section 4.03.  *Provisions as to Paying Agent.* Section 6.03 of the Base Indenture shall be superseded by this Section 4.03, and any reference in the Base Indenture to Section 6.03 shall be deemed to refer instead to this Section 4.03.

(a)    If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.03:

(i)    that it will hold all sums held by it as such agent for the payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes for the benefit of the Holders of the Notes;

(ii)    that it will give the Trustee prompt written notice of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

(iii)    that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held in trust.

The Company shall, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, deposit with the Paying Agent a sum in immediately available funds sufficient to pay such principal (including the Redemption Price,

22

the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or accrued and unpaid interest and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of any failure to take such action; *provided* that such deposit must be received by the Paying Agent by 10:00 a.m., New York City time, on the relevant due date.

(b)      If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

(c)      Anything in this Section 4.03 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held by the Company in trust or by any Paying Agent as required by this Section 4.03, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts.  Upon the occurrence of any event specified in Section 6.02(i) or Section 6.02(j), the Trustee or one of its affiliates shall automatically become the Paying Agent.

(d)      Subject to applicable escheatment laws, any money or property deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, or in satisfaction of its Conversion Obligation with respect to, any Note and remaining unclaimed for two years after such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or interest has become due and payable, or such Conversion Obligation became due, shall be paid or delivered, as the case may be, to the Company on request of the Company contained in an Officers' Certificate, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such money or property, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 4.04.  *Existence*.  Subject to Article 11, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

23

Section 4.05.  *Additional Amounts.* Section 6.05 of the Base Indenture shall be superseded by this Section 4.05, and any reference in the Base Indenture to Section 6.05 shall be deemed to refer instead to this Section 4.05.

(a)      All payments and deliveries made by, or on behalf of, the Company or any successor to the Company under or with respect to the Indenture and the Notes, including payments of principal (including, if applicable, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and payments of cash and/or deliveries of ADSs (together with payments of cash for any fractional ADS) upon conversion of the Notes, shall be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Company or any successor to the Company is, for tax purposes, organized or resident or doing business (each, as applicable, a "**Relevant Taxing Jurisdiction**") or through which payment is made or deemed made (together with each Relevant Taxing Jurisdiction, a "**Relevant Jurisdiction**," and in each case, any political subdivision or taxing authority thereof or therein), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Company or any successor to the Company shall pay to each Holder such additional amounts ("**Additional Amounts**") as may be necessary to ensure that the net amount received by the Holders after such withholding or deduction (and after deducting any taxes on the Additional Amounts) will equal the amounts that would have been received by such Holders had no such withholding or deduction been required; *provided* that no Additional Amounts shall be payable:

(i)      for or on account of:

(A)      any tax, duty, assessment or other governmental charge that would not have been imposed but for:

(1)      the existence of any present or former connection between the Holder or beneficial owner of such Note and the Relevant Jurisdiction, other than merely holding such Note or the receipt of payments thereunder, including such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(2)      the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on such Note or the payment of cash and/or the delivery of ADSs (together with payment of cash for any fractional ADS) upon conversion of such Note became due and payable pursuant to

24

the terms thereof or was made or duly provided for, unless the Holder would have been entitled to such Additional Amounts on the last day of the 30-day period;

         (3)      the failure of the Holder or beneficial owner to comply with a timely request from the Company or any successor of the Company, addressed to the Holder, to provide certification, information, documents or other evidence concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Jurisdiction, or to make any declaration or satisfy any other reporting requirement relating to such matters, if and to the extent that due and timely compliance with such request is required by statute, regulation or administrative practice of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable; or

         (4)      the presentation of such Note (in cases in which presentation is required) for payment in the Relevant Jurisdiction, unless such Note could not have been presented for payment elsewhere;

         (B)      any estate, inheritance, gift, sale, transfer, excise, personal property or similar tax, assessment or other governmental charge;

         (C)      any tax, duty, assessment or other governmental charge that is payable otherwise than by withholding from payments or deliveries under or with respect to the Notes;

         (D)      any tax, assessment, withholding or deduction required by sections 1471 through 1474 of the Code ("**FATCA**"), any current or future Treasury regulations or rulings promulgated thereunder, any law, regulation or other official guidance enacted in any jurisdiction implementing FATCA, any intergovernmental agreement between the United States and any other jurisdiction to implement FATCA or any law enacted by such other jurisdiction to give effect to such agreement, or any agreement with the U.S. Internal Revenue Service under FATCA; or

         (E)      any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (A), (B), (C) or (D); or

         (ii)      with respect to any payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on such Note or the payment of cash and/or the delivery of ADSs (together with payment of cash for any fractional ADS) upon conversion of such Note to a Holder, if the Holder is a fiduciary, partnership or person other than the sole beneficial owner of that payment to the extent that such payment would be required to be included in the income under the laws of the Relevant Jurisdiction, for tax purposes, of a beneficiary or

25

settlor with respect to the fiduciary, a partner or member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner, member or beneficial owner been the Holder thereof.

(b)        The Trustee and the Paying Agent shall also be entitled to make any withholding or deduction pursuant to an agreement described in Section 1471(b) of the Code or otherwise imposed pursuant to FATCA and any regulations or agreements thereunder or official interpretations thereof.

(c)        Any reference in the Indenture or the Notes in any context to the payment of cash and/or the delivery of ADSs (together with payments of cash for any fractional ADS), as applicable, upon conversion of any Note or the payment of principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on any Note or any other amount payable with respect to such Note, shall be deemed to include payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable with respect to that amount pursuant to this Section 4.05.

(d)        If the Company or its successor is required to make any deduction or withholding from any payments or deliveries with respect to the Notes, it shall deliver to the Trustee, the Paying Agent and the Holders official tax receipts evidencing the remittance to the relevant tax authorities of the amounts so withheld or deducted.

(e)        The Trustee shall have no obligation to determine whether any Additional Amounts are payable under the Indenture or the amount thereof.

(f)        The foregoing obligations shall survive termination or discharge of the Indenture.

Section 4.06.  *Stay, Extension and Usury Laws.*  The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of the Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.07. *Statements as to Defaults*. The Company shall deliver to the Trustee, as soon as possible, and in any event within 30 days after the Company becomes aware of the occurrence of any Default, an Officers' Certificate setting forth the details of such Default, its status and the action that the Company is taking or proposing to take in respect thereof.

26

Section 4.08.  *Further Instruments and Acts.*  Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Supplemental Indenture.

Section 4.09.  *No Conditional Waiver.* Section 6.08 of the Base Indenture shall not apply to the Notes.

ARTICLE 5
[INTENTIONALLY OMITTED]

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01.  *Applicability of Article VII of the Base Indenture.*  Article VII of the Base Indenture shall not apply to the Notes. Instead, the provisions set forth in this Article 6 shall, with respect to the Notes, supersede in its entirety Article VII of the Base Indenture, and all references in the Base Indenture to Article VII thereof and the provisions therein, as the case may be, shall, with respect to the Notes, be deemed to be references to this Article 6 and the applicable provisions set forth in this Article 6, respectively.

Section 6.02.  *Events of Default.*  Each of the following events shall be an "**Event of Default**" with respect to the Notes:

(a)  default in any payment of interest or Additional Amounts, if any, on any Note when due and payable and the default continues for a period of 30 days;

(b)  default in the payment of principal of any Note when due and payable on the Maturity Date, upon Optional Redemption, upon any required repurchase, upon declaration of acceleration or otherwise;

(c)  failure by the Company to comply with its obligation to convert the Notes in accordance with the Indenture upon exercise of a Holder's conversion right and such failure continues for a period of five Business Days;

(d)  failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 15.02(c), notice of a Make-Whole Fundamental Change in accordance with Section 14.03(a) or notice of a specified corporate event in accordance with Section 14.01(b)(ii) or 14.01(b)(iii), in each case, when due and such failure continues for a period of five Business Days;

(e)  failure by the Company to comply with its obligations under Article 11;

(f)  failure by the Company for 60 days after written notice from the Trustee or by the Trustee at the request of the Holders of at least 25% in aggregate principal amount of the Notes

27

then outstanding has been received by the Company to comply with any of its other agreements contained in the Notes or the Indenture;

(g)        default by the Company or any Significant Subsidiary of the Company with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed in excess of US$60 million (or the foreign currency equivalent thereof) in the aggregate by the Company and/or any such Significant Subsidiary, whether such indebtedness now exists or shall hereafter be created (i) resulting in such indebtedness becoming or being declared due and payable prior to its stated maturity or (ii) constituting a failure to pay the principal or interest of any such debt when due and payable at its stated maturity, upon required repurchase, upon declaration of acceleration or otherwise and in each case, such indebtedness is not discharged, or such acceleration is not otherwise cured or rescinded, within 30 days;

(h)        a final judgment for the payment of US$60 million (or the foreign currency equivalent thereof) or more (excluding any amounts covered by insurance) rendered against the Company or any Significant Subsidiary of the Company, which judgment is not paid, bonded or otherwise discharged or stayed within 60 days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(i)        the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

(j)        an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 consecutive days.

Section 6.03.  *Acceleration; Rescission and Annulment.*  If one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in Section 6.02(i) or Section 6.02(j) with respect to the Company or any of its Significant Subsidiaries), unless the principal of all of the Notes shall have already become due and payable, the Trustee may by notice in writing to the Company, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.02, by notice in writing to the Company and to the Trustee may, and the Trustee at the request of such Holders accompanied by security, pre-funding and/or indemnity satisfactory to the Trustee and otherwise subject to the limitations set forth in the Indenture, shall, declare 100% of the principal of, and accrued and unpaid interest on, all the Notes to be due and payable immediately, and upon any such declaration the same shall become and shall automatically be immediately due and payable, notwithstanding anything contained in the Indenture or in the Notes to the contrary.  If an Event of Default specified in Section 6.02(i) or Section 6.02(j) with respect to the Company or any of its

28

Significant Subsidiaries occurs and is continuing, 100% of the principal of, and accrued and unpaid interest on, all Notes shall become and shall automatically be immediately due and payable without any action on the part of the Trustee. If an Event of Default occurs and is continuing, the Agents and any other agents of the Company appointed under the Indenture will be required to act on the direction of the Trustee.

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum in immediately available funds sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest to the extent that payment of such interest is enforceable under applicable law, and on such principal at the rate per annum borne by the Notes at such time *plus* one percent) and amounts due to the Trustee pursuant to Section 11.01 of the Base Indenture, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all existing Events of Default under the Indenture, other than the nonpayment of the principal of and accrued and unpaid interest on Notes that shall have become due solely by such acceleration, shall have been cured pursuant to Section 6.02 or waived pursuant to Section 6.10, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon.  Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal (including the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, any Notes, (ii) a failure to repurchase any Notes when required or (iii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes.

29

Section 6.04.  *Additional Interest*.  Notwithstanding anything in the Indenture or in the Notes to the contrary, to the extent the Company elects, the sole remedy for an Event of Default relating to (i) the Company's failure to file with the Trustee pursuant to Section 314(a)(1) of the Trust Indenture Act any documents or reports that the company is required to file with the SEC pursuant to Section 13 or 15(d) of the Exchange Act or (ii) the Company's failure to comply with its obligations as set forth in Section 10.02 of the Base Indenture shall after the occurrence of such an Event of Default (which will be the 60th day after written notice is provided to the Company pursuant to Section 6.02(f)) consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to:

(a)       0.25% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the date on which such an Event of Default first occurs and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 180th day immediately following, and including, the date on which such Event of Default first occurred; and

(b)       if such Event of Default has not been cured or validly waived prior to the 181st day immediately following, and including, the date on which such Event of Default first occurred, 0.50% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the 181st day immediately following, and including, the date on which such an Event of Default first occurred and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 360th day immediately following, and including, the date on which such Event of Default first occurred.

If the Company so elects, such Additional Interest shall be payable in the same manner and on the same dates as the stated interest payable on the Notes.  On the 361st day after such Event of Default (if the Event of Default with respect to the Company's failure to file is not cured or waived prior to such 361st day), the Notes shall be immediately subject to acceleration as provided in Section 6.03.  In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.04 or the Company elected to make such payment but does not pay the Additional Interest when due, the Notes shall be immediately subject to acceleration as provided in Section 6.03.

In order to elect to pay Additional Interest as the sole remedy during the first 360 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Company must notify in writing all Holders of the Notes, the Trustee and the Paying Agent of such election prior to the beginning of such 360-day period.  Upon the Company's failure to timely give such written notice, the Notes shall be immediately subject to acceleration as provided in Section 6.03.

Section 6.05.  *Payments of Notes on Default; Suit Therefor.*  If an Event of Default described in clause (a) or (b) of Section 6.02 shall have occurred, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate per annum borne by the Notes at such time *plus*

30

one percent, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 11.01 of the Base Indenture.  If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may at its sole discretion and without further notice institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated; *provided* that the Trustee will not be bound to make any such proceeding unless (i) it shall have been so directed by the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, (ii) it shall have been indemnified, pre-funded and/or secured to its satisfaction and (iii) the Trustee is satisfied that the act or exercise of any of the rights or powers vested in it by the Indenture will not result in any of its directors, officers, employees or agents incurring personal liability.

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.05, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 11.01 of the Base Indenture; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for reasonable compensation, expenses, advances and disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under Section 11.01 of the Base Indenture, incurred by it up to the date of such distribution.  To the extent that such payment of reasonable compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property that the

31

Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under the Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of the Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under the Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.10 or any rescission and annulment pursuant to Section 6.03 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders, and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders, and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.06. *Application of Monies Collected by Trustee.* Any monies or property collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due the Trustee under Section 11.01 of the Base Indenture and any payments due to the Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar;

**Second**, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on the Notes in default in the order of the date due of the payments of such interest with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate per annum borne by the Notes at such time, *plus* one percent (including, without duplication, any Additional Interest on such overdue payments pursuant to Section 6.04), such payments to be made ratably to the Persons entitled thereto;

32

**Third**, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate per annum borne by the Notes at such time *plus* one percent, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price and any cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price and any cash due upon conversion) and accrued and unpaid interest; and

**Fourth**, to the payment of the remainder, if any, to the Company.

Section 6.07. *Proceedings by Holders.* Except to enforce the right to receive payment of principal (including, if applicable, the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price) or interest when due, or the right to receive payment or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of the Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a)  such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

(b)  Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to pursue the remedy;

(c)  such Holders shall have offered to the Trustee such security, pre-funding and/or indemnity satisfactory to it against any loss, liability or expense to be incurred therein or thereby;

(d)  the Trustee does not comply with such written request within 60 days after the later of its receipt of such written request and the offer of security, pre-funding and/or indemnity; and

(e)  no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60-day period pursuant to Section 6.10, it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of the

33

Indenture to affect, disturb or prejudice the rights of any other Holder (it being further  understood that the Trustee shall not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to any other Holder), or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders (except as otherwise provided herein).  For the protection and enforcement of this Section 6.07, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of the Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, (y) accrued and unpaid interest on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in the Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

Section 6.08.  *Proceedings by Trustee.*  In case of an Event of Default, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by the Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in the Indenture or in aid of the exercise of any power granted in the Indenture, or to enforce any other legal or equitable right vested in the Trustee by the Indenture or by law; *provided* that the Trustee will not be bound to make any such proceeding unless (i) it shall have been so directed by the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, (ii) it shall have been indemnified, pre-funded and/or secured to its satisfaction and (iii) the Trustee is satisfied that the act or exercise of any of the rights or powers vested in it by the Indenture will not result in any of its directors, officers, employees or agents incurring personal liability.

Section 6.09.  *Remedies Cumulative and Continuing.*  Except as provided in Section 3.07(e) of the Base Indenture, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in the Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.07, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

34

Section 6.10. *Direction of Proceedings and Waiver of Defaults by Majority of Holders.* The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.02 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided, however*, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction.  The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder (it being understood that the Trustee shall not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to any other Holder), or if it is not provided with security, pre-funding and/or indemnity to its satisfaction.  In addition, the Trustee will not be required to expend its own funds under any circumstances. The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.02 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (i) a default in the payment of accrued and unpaid interest on, or the principal (including, if applicable, the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price) of, the Notes when due that has not been cured pursuant to the provisions of Section 6.02, (ii) a failure by the Company to pay or deliver, or cause to be delivered, as the case may be, the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected.  Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.10, said Default or Event of Default shall for all purposes of the Notes and the Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.11. *Notice of Defaults and Events of Default.*  Section 11.03 of the Base Indenture shall be superseded by this Section 6.11, and any reference in the Base Indenture to Section 11.03 shall be deemed to refer instead to this Section 6.11. If a Default or Event of Default occurs and is continuing and is notified in writing to a Responsible Officer of the Trustee, the Trustee shall, within 90 days after the Responsible Officer of the Trustee receives such written notice or obtains such knowledge, send to all Holders (at the Company's expense) as the names and addresses of such Holders appear upon the Register, notice of all Defaults known to a Responsible Officer, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that the Trustee shall not be deemed to have knowledge of any occurrence of a Default or an Event of Default unless a Responsible Officer of the Trustee has received written notice of such Default or Event of Default describing the circumstances of such, and identifying the Indenture, the Notes, the Company and the circumstances constituting such Event of Default.  Except in the case of a Default in the payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding

35

such notice if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not any such notice is in the interests of the Holders).

Section 6.12.  *Undertaking to Pay Costs.*  All parties to the Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under the Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.12 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.02, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest on any Note (including, but not limited to, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price with respect to the Notes being repurchased as provided in this Supplemental Indenture) on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note, or receive the consideration due upon conversion, in accordance with the provisions of Article 14.

## ARTICLE 7
### CONCERNING THE TRUSTEE

Section 7.01.  *Monies and ADSs to Be Held in Trust.*  Section 11.01(g) of the Base Indenture shall be superseded by this Section 7.01, and any reference in the Base Indenture to Section 8.03 shall be deemed to refer instead to this Section 7.01. All monies and ADSs received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received.  Money and ADSs held by the Trustee in trust or by the Paying Agent hereunder need not be segregated from other funds or property except to the extent required by law.  Neither the Trustee nor the Paying Agent shall be under any liability for interest on any money or ADSs received by it hereunder.

Section 7.02. *Compensation and Expenses of Trustee*. The Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar shall be entitled to the compensation to be agreed upon in writing with the Company for all services rendered by it under this Indenture, and the Company  agrees promptly to pay such compensation and to reimburse the Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar for its out-of-pocket expenses (including reasonable fees and expenses of counsel) incurred by it in connection with the services rendered by it under this Indenture.  The Company hereby agrees to indemnify the Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar and their respective officers, directors, agents and employees and any successors thereto for, and to hold it harmless against, any loss, liability or expense (including reasonable fees and expenses of counsel) incurred without gross

36

negligence or willful misconduct on its part, as determined by a final, non-appealable decision of a court of competent jurisdiction, arising out of or in connection with its acting as the Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar hereunder. The obligations of the Company under this paragraph shall survive the payment of the Notes, the termination of the Indenture and the resignation or removal of the Paying Agent, the Transfer Agent, the Conversion Agent and the Registrar.

# ARTICLE 8
CONCERNING THE HOLDERS

Section 8.01. *Who Are Deemed Absolute Owners.* Section 8.03 of the Base Indenture shall be superseded by this Section 8.01, and any reference in the Base Indenture to Section 8.03 shall be deemed to refer instead to this Section 8.01. The Company, the Trustee, any Paying Agent, any Transfer Agent, any Conversion Agent and any Registrar shall deem the Person in whose name a Note shall be registered upon the Register to be, and shall treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Registrar) for the purpose of receiving payment of or on account of the principal (including any Redemption Price, any Repurchase Price and any Fundamental Change Repurchase Price) of and (subject to Section 2.04) accrued and unpaid interest on such Note, for the purpose of conversion of such Note and for all other purposes under the Indenture; and none of the Company, the Trustee, any Transfer Agent, any Paying Agent, any Conversion Agent or any Registrar shall be affected by any notice to the contrary. The sole registered holder of a Global Note shall be the Depositary or its nominee. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or ADSs so paid or delivered, effectual to satisfy and discharge the liability for monies payable or ADSs deliverable upon any such Note. Notwithstanding anything to the contrary in the Indenture or the Notes following an Event of Default, any owner of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such owner's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of the Indenture.

Section 8.02. *Company-Owned Notes Disregarded.* In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company, by any Subsidiary thereof or by any Affiliate of the Company or any Subsidiary thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes in respect of which a Responsible Officer is notified in writing shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.02 if the pledgee shall establish its right to so act with respect to such Notes and that the pledgee is not the Company, a Subsidiary thereof or an Affiliate of the Company or a Subsidiary thereof. Within five days of acquisition of the Notes by any of the above described persons or entities, the Company shall furnish to the Trustee promptly an Officers' Certificate listing and identifying all

37

Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 11.02 of the Base Indenture, the Trustee shall be entitled to accept such Officers' Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

Section 8.03.  *Revocation of Consents.*  At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01 of the Base Indenture, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Supplemental Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02 of the Base Indenture, revoke such action so far as concerns such Note.

ARTICLE 9
[INTENTIONALLY OMITTED]

ARTICLE 10
SUPPLEMENTAL INDENTURES

Section 10.01.  *Supplemental Indentures Without Consent of Holders*.  Section 14.01 of the Base Indenture shall be superseded by this Section 10.01, and any reference in the Base Indenture to Section 14.01 shall be deemed to refer instead to this Section 10.01.  The Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense and direction, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a)         to cure any ambiguity, omission, defect or inconsistency;

(b)         to provide for the assumption by a Successor Company of the obligations of the Company under the Indenture and the Notes pursuant to Article 11;

(c)         to add guarantees with respect to the Notes;

(d)         to secure the Notes;

(e)         to add to the covenants or Events of Default of the Company for the benefit of the Holders or surrender any right or power conferred upon the Company under the Indenture or the Notes;

(f)         upon the occurrence of any transaction or event described in Section 14.07(a), to (i) provide that the Notes are convertible into Reference Property, subject to Section 14.03, and (ii) effect the related changes to the terms of the Notes described under Section 14.07(a), in each case, in accordance with Section 14.07;

38

(g)     to make any change that does not adversely affect the rights or interests of any Holder in any material respect;

(h)     to conform the provisions of the Indenture or the Notes to the "Description of the Notes" section of the Prospectus Supplement, as certified by the Company in an Officers' Certificate;

(i)     to comply with any requirement of the Commission in connection with the qualification of the Indenture under the Trust Indenture Act;

(j)     to irrevocably elect a Settlement Method and/or a Specified Dollar Amount as specified in Section 14.02(a)(iii)(B), or eliminate the Company's right to elect a Settlement Method; or

(k)     make changes in connection with an acceptance for listing of the Class A Ordinary Shares on a Permitted Exchange in accordance with Section 15.02(e).

Upon the written request of the Company, the Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to, but may in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under the Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02.  *Supplemental Indentures with Consent of Holders.*  Section 14.02(a) of the Base Indenture shall be superseded by this Section 10.02, and any reference in the Base Indenture to Section 14.02(a) shall be deemed to refer instead to this Section 10.02. With the consent (evidenced as provided in Article VIII of the Base Indenture, as amended and supplemented by Article 8 of this Supplemental Indenture) of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (determined in accordance with Article VIII of the Base Indenture, as amended and supplemented by Article 8 of this Supplemental Indenture) and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes), the Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided*, *however*, that, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a)     reduce the amount of Notes whose Holders must consent to an amendment;

(b)     reduce the rate of or extend the stated time for payment of interest on any Note;

39

(c)        reduce the principal of or extend the Maturity Date of any Note;

(d)        make any change that adversely affects the conversion rights of any Notes;

(e)        reduce the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price of any Note or amend or modify in any manner adverse to the Holders the Company's obligation to make such payments, whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(f)        make any Note payable in a currency other than U.S. dollars;

(g)        change the ranking of the Notes;

(h)        impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Note;

(i)        change the Company's obligation to pay Additional Amounts on any Note; or

(j)        make any change in this Article 10 that requires each Holder's consent or in the waiver provisions in Section 6.03 or Section 6.10.

## ARTICLE 11
### CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01.  *Company May Consolidate, Etc. on Certain Terms.*  Section 6.04 of the Base Indenture shall be superseded by this Article 11, and any reference in the Base Indenture to Section 6.04 shall be deemed to refer instead to this Article 11. Subject to the provisions of Section 11.02, the Company shall not consolidate with, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, unless:

(a)        the resulting, surviving or transferee Person (the "**Successor Company**"), if not the Company, shall be a corporation organized and existing under the laws of the United States of America, any State thereof, the District of Columbia, the Cayman Islands, the British Virgin Islands, Bermuda or Hong Kong and the Successor Company (if not the Company) shall expressly assume, by supplemental indenture all of the obligations of the Company under the Notes and the Indenture (including, for the avoidance of doubt, the obligation to pay Additional Amounts pursuant to Section 4.05); and

(b)        immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing under the Indenture.

For purposes of this Section 11.01, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Company to another Person, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company

40

on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Company to another Person.

Section 11.02. *Successor Corporation to Be Substituted.* In case of any such consolidation, merger, sale, conveyance, transfer or lease and upon the assumption by the Successor Company, by supplemental indenture, executed and delivered to the Trustee of the due and punctual payment of the principal of and accrued and unpaid interest on all of the Notes (including, for the avoidance of doubt, any Additional Amounts), the due and punctual delivery or payment, as the case may be, of any consideration due upon conversion of the Notes (including, for the avoidance of doubt, any Additional Amounts) and the due and punctual performance of all of the covenants and conditions of the Indenture to be performed by the Company, such Successor Company (if not the Company) shall succeed to and, except in the case of a lease of all or substantially all of the Company's properties and assets, shall be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such Successor Company thereupon may cause to be signed, and may issue either in its own name or in the name of the Company any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such Successor Company instead of the Company and subject to all the terms, conditions and limitations in the Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes that previously shall have been signed and delivered by the Officers of the Company to the Trustee for authentication, and any Notes that such Successor Company thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under the Indenture as the Notes theretofore or thereafter issued in accordance with the terms of the Indenture as though all of such Notes had been issued at the date of the execution hereof. In the event of any such consolidation, merger, sale, conveyance or transfer (but not in the case of a lease), upon compliance with this Article 11 the Person named as the "Company" in the first paragraph of this Supplemental Indenture (or any successor that shall thereafter have become such in the manner prescribed in this Article 11) may be dissolved, wound up and liquidated at any time thereafter and, except in the case of a lease, such Person shall be released from its liabilities as obligor and maker of the Notes and from its obligations under the Indenture and the Notes.

In case of any such consolidation, merger, sale, conveyance, transfer or lease, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 11.03. *Opinion of Counsel to Be Given to Trustee.* No consolidation, merger, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officers' Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or lease and any such assumption and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this Article 11.

41

ARTICLE 12
NO SUBORDINATION

Section 12.01.  *Non-Subordination of Notes* .  Article XV of the Base Indenture shall not apply to the Notes.

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01.  *Conversion Privilege.*

(a)        Subject to and upon compliance with the provisions of this Article 14, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is US$1,000 principal amount or an integral multiple thereof) of such Note (i) subject to satisfaction of the conditions described in Section 14.01(b), at any time prior to the close of business on the Business Day immediately preceding June 15, 2026 under the circumstances and during the periods set forth in Section 14.01(b), and (ii) regardless of the conditions described in Section 14.01(b), on or after June 15, 2026 and prior to the close of business on the Business Day immediately preceding the Maturity Date, in each case, at an initial conversion rate of 44.8179 ADSs (subject to adjustment as provided in this Article 14, the "**Conversion Rate**") per US$1,000 principal amount of Notes (subject to, and in accordance with, the settlement provisions of Section 14.02, the "**Conversion Obligation**").

(b)        (i) Prior to the close of business on the Business Day immediately preceding June 15, 2026, a Holder may surrender all or any portion of its Notes for conversion at any time during the five Business Day period immediately after any ten consecutive Trading Day period (the "**Measurement Period**") in which the Trading Price per US$1,000 principal amount of Notes, as determined following a request by a Holder of Notes in accordance with this subsection (b)(i), for each Trading Day of the Measurement Period was less than 98% of the product of the Last Reported Sale Price of the ADSs on each such Trading Day and the Conversion Rate on each such Trading Day.  The Trading Prices shall be determined by the Bid Solicitation Agent pursuant to this subsection (b)(i) and the definition of Trading Price set forth in this Supplemental Indenture.  The Company shall provide written notice to the Bid Solicitation Agent (if other than the Company) of the three independent nationally recognized securities dealers selected by the Company pursuant to the definition of Trading Price, along with appropriate contact information for each.  The Bid Solicitation Agent (if other than the Company) shall have no obligation to determine the Trading Price per US$1,000 principal amount of Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request (or, if the Company is acting as Bid Solicitation Agent, the Company shall have no obligation to determine the Trading Price per US$1,000 principal amount of Notes) unless a Holder provides the Company with reasonable evidence that the Trading Price per US$1,000 principal amount of Notes on any Trading Day would be less than 98% of the product

42

of the Last Reported Sale Price of the ADSs on such Trading Day and the Conversion Rate on such Trading Day, at which time the Company shall instruct the Bid Solicitation Agent (if other than the Company) in writing to determine, or if the Company is acting as Bid Solicitation Agent, the Company shall determine, the Trading Price per US$1,000 principal amount of Notes beginning on the next Trading Day and on each successive Trading Day until the Trading Price per US$1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate.  At such time as the Company directs the Bid Solicitation Agent in writing to solicit bid quotations, the Company shall provide the Bid Solicitation Agent with the names and contact details of the three independent nationally recognized securities dealers the Company selects, and the Company will direct those securities dealers to provide bids to the Bid Solicitation Agent.  If (x) the Company is not acting as Bid Solicitation Agent, and the Company does not, when the Company is required to, instruct the Bid Solicitation Agent to determine the Trading Price per US$1,000 principal amount of Notes when obligated as provided in the preceding sentence, or if the Company instructs the Bid Solicitation Agent in writing to obtain bids and the Bid Solicitation Agent fails to make such determination, or (y) the Company is acting as Bid Solicitation Agent and the Company fails to make such determination when obligated as provided in the preceding sentence, then, in either case, the Trading Price per US$1,000 principal amount of Notes shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate on each Trading Day of such failure.  If the Trading Price condition set forth above has been met, the Company shall so notify the Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing.  If, at any time after the Trading Price condition set forth above has been met, the Trading Price per US$1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate for such date, the Company shall so notify in writing the Holders, the Trustee and the Conversion Agent (if other than the Trustee).

(ii) If, prior to the close of business on the Business Day immediately preceding June 15, 2026, the Company elects to:

(A) issue to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per share that is less than the average of the Last Reported Sale Prices of the ADSs, *divided by* the number of Class A Ordinary Shares then represented by one ADS, for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance; or

(B) distribute to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) the Company's assets, securities or rights to purchase securities of the Company, which distribution has a per share value, as determined by the Board of Directors, exceeding 10% of (i) the Last Reported Sale Price of the ADSs on the Trading Day preceding the date

43

of announcement for such distribution, *divided by* (ii) the number of Class A Ordinary Shares then represented by one ADS,

then, in either case, the Company shall notify all Holders of the Notes, the Trustee and the Conversion Agent (if other than the Trustee) in writing at least 43 Scheduled Trading Days prior to the Ex-Dividend Date for such issuance or distribution.  Once the Company has given such notice, a Holder may surrender all or any portion of its Notes for conversion at any time until the earlier of (1) the close of business on the Business Day immediately preceding the Ex-Dividend Date for such issuance or distribution and (2) the Company's announcement that such issuance or distribution will not take place, in each case, even if the Notes are not otherwise convertible at such time.

(iii)    If a transaction or event that constitutes a Fundamental Change or a Make-Whole Fundamental Change occurs prior to the close of business on the Business Day immediately preceding June 15, 2026, regardless of whether a Holder has the right to require the Company to repurchase the Notes pursuant to Section 15.02, or if the Company is a party to a consolidation, merger, binding share exchange, or transfer or lease of all or substantially all of its assets that occurs prior to the close of business on the Business Day immediately preceding June 15, 2026, in each case, pursuant to which the ADSs would be converted into cash, securities or other assets, all or any portion of a Holder's Notes may be surrendered for conversion at any time from or after the actual effective date of such transaction until 35 Trading Days after the actual effective date of such transaction or, if such transaction also constitutes a Fundamental Change, until the related Fundamental Change Repurchase Date.  The Company shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing as promptly as practicable following the date the Company publicly announces such transaction.

(iv)    Prior to the close of business on the Business Day immediately preceding June 15, 2026, a Holder may surrender all or any portion of its Notes for conversion at any time during any calendar quarter commencing after the calendar quarter ending on March 31, 2021 (and only during such calendar quarter), if the Last Reported Sale Price of the ADSs for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on, and including, the last Trading Day of the immediately preceding calendar quarter is greater than or equal to 130% of the Conversion Price on each applicable Trading Day.  The Company shall determine at the beginning of each calendar quarter commencing after March 31, 2021 whether the Notes may be surrendered for conversion in accordance with this clause (iv) and shall notify the Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing if the Notes become convertible in accordance with this clause (iv).

(v)    If the Company calls all of the Notes for redemption pursuant to Article 16, then a Holder may surrender all or any portion of its Notes for conversion at any time prior to the close of business on the second Business Day prior to the Redemption Date, even if the Notes are not otherwise convertible at such time.  After that time, the right to convert the Notes on account of the Company's delivery of a Redemption Notice shall

44

expire under this clause (v), unless the Company defaults in the payment of the Redemption Price, in which case a Holder may convert all or any portion of its Notes until the Redemption Price has been paid or duly provided for.

Section 14.02.  *Conversion Procedure; Settlement Upon Conversion.*

(a)        Subject to this Section 14.02, Section 14.03(b) and Section 14.07(a), upon conversion of any Note, the Company shall pay or deliver, as the case may be, to the converting Holder, in respect of each US$1,000 principal amount of Notes being converted, cash ("**Cash Settlement**"), ADSs, together with cash, if applicable, in lieu of delivering any fractional ADSs in accordance with subsection (j) of this Section 14.02 ("**Physical Settlement**") or a combination of cash and ADSs, together with cash, if applicable, in lieu of delivering any fractional ADS in accordance with subsection (j) of this Section 14.02 ("**Combination Settlement**"), at its election, as set forth in this Section 14.02.

(i)        All conversions for which the relevant Conversion Date occurs after the Company's issuance of a Redemption Notice with respect to the Notes and prior to the related Redemption Date, and all conversions for which the relevant Conversion Date occurs on or after June 15, 2026 shall be settled using the same Settlement Method.

(ii)        Except for any conversions for which the relevant Conversion Date occurs after the Company's issuance of a Redemption Notice with respect to the Notes but prior to the related Redemption Date, and any conversions for which the relevant Conversion Date occurs on or after June 15, 2026, the Company shall use the same Settlement Method for all conversions with the same Conversion Date, but the Company shall not have any obligation to use the same Settlement Method with respect to conversions with different Conversion Dates.

(iii)        (A) If, in respect of any Conversion Date (or the period described in the third immediately succeeding set of parentheses, as the case may be), the Company elects a Settlement Method, the Company shall deliver a written notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Conversion Date (or such period, as the case may be) to converting Holders, the Trustee and the Conversion Agent (if other than the Trustee) no later than the close of business on the Trading Day immediately following the relevant Conversion Date (or, in the case of any conversions for which the relevant Conversion Date occurs after the date of issuance of a Redemption Notice with respect to the Notes and prior to the related Redemption Date, in such Redemption Notice or on or after June 15, 2026, no later than June 15, 2026).  If the Company does not elect a Settlement Method prior to the deadline set forth in the immediately preceding sentence, the Company shall no longer have the right to elect Cash Settlement or Physical Settlement and the Company shall be deemed to have elected Combination Settlement in respect of its Conversion Obligation, and the Specified Dollar Amount per US$1,000 principal amount of Notes shall be equal to US$1,000.  Such Settlement Notice shall specify the relevant Settlement Method and in the case of an election of Combination Settlement, the relevant Settlement Notice shall

45

indicate the Specified Dollar Amount per US$1,000 principal amount of Notes. If the Company delivers a Settlement Notice electing Combination Settlement in respect of its Conversion Obligation but does not indicate a Specified Dollar Amount per US$1,000 principal amount of Notes in such Settlement Notice, the Specified Dollar Amount per US$1,000 principal amount of Notes shall be deemed to be US$1,000.

(B)      By notice to Holders, the Trustee and the Conversion Agent (if other than the Trustee), the Company may, prior to June 15, 2026, at its option, irrevocably elect to satisfy its Conversion Obligation with respect to the Notes through any Settlement Method that the Company is then permitted to elect (including Combination Settlement with the Specified Dollar Amount of US$1,000 or with an ability to continue to set the Specified Dollar Amount at or above any specific amount set forth in such election notice) for all Conversion Dates occurring subsequent to the delivery of such notice. Concurrently with providing notice to all Holders, the Trustee and the Conversion Agent (if other than the Trustee) of an election to irrevocably fix the Settlement Method, the Company shall promptly issue a report on Form 6-K or press release announcing that the Company has elected to irrevocably fix the Settlement Method. Notwithstanding the foregoing, no such irrevocable election shall affect any Settlement Method theretofore elected (or deemed to be elected) with respect to any Notes pursuant to this Section 14.02. For the avoidance of doubt, such an irrevocable election, if made, shall be effective without the need to amend the Indenture or the Notes, including pursuant to Section 10.01(j). However, the Company may nonetheless choose to execute such an amendment at the Company's option.

(iv)      The cash, ADSs or a combination of cash and ADSs, as applicable, in respect of any conversion of Notes (the "**Settlement Amount**") shall be computed as follows:

(A)      if the Company elects to satisfy its Conversion Obligation in respect of such conversion by Physical Settlement, the Company shall deliver to the converting Holder in respect of each US$1,000 principal amount of Notes being converted a number of ADSs equal to the Conversion Rate in effect immediately after the close of business on the Conversion Date;

(B)      if the Company elects to satisfy its Conversion Obligation in respect of such conversion by Cash Settlement, the Company shall pay to the converting Holder in respect of each US$1,000 principal amount of Notes being converted cash in an amount equal to the sum of the Daily Conversion Values for each of the 40 consecutive Trading Days during the related Observation Period; and

(C)      if the Company elects (or is deemed to have elected) to satisfy its Conversion Obligation in respect of such conversion by Combination

46

Settlement, the Company shall pay or deliver, as the case may be, in respect of each US$1,000 principal amount of Notes being converted, a Settlement Amount equal to the sum of the Daily Settlement Amounts for each of the 40 consecutive Trading Days during the related Observation Period.

(v)    The Daily Settlement Amounts (if applicable) and the Daily Conversion Values (if applicable) shall be determined by the Company promptly following the last day of the Observation Period.  Promptly after such determination of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering any fractional ADS, the Company shall notify the Trustee and the Conversion Agent (if other than the Trustee) in writing of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering fractional ADSs.  The Trustee and the Conversion Agent (if other than the Trustee) shall have no responsibility for any such determination.

(b)    Subject to Section 14.02(e), before any Holder of a Note shall be entitled to convert a Note as set forth above, such Holder shall (i) in the case of a Global Note, comply with the procedures of the Depositary in effect at that time and, if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h) and (ii) in the case of a Physical Note (1) complete, manually sign and deliver a duly completed irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile, PDF or other electronic transmission thereof) (a "**Notice of Conversion**") at the office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any ADSs to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Conversion Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h).  The Trustee (and if different, the Conversion Agent) shall notify the Company of any conversion pursuant to this Article 14 on the Conversion Date, or promptly following instructions for such conversion.  No Notice of Conversion with respect to any Notes may be delivered, and no Notes may be surrendered for conversion, by a Holder thereof if such Holder has also delivered a Fundamental Change Repurchase Notice or Repurchase Notice to the Company in respect of such Notes and has not validly withdrawn such Fundamental Change Repurchase Notice or Repurchase Notice, as the case may be, in accordance with Section 15.03.

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c)    A Note shall be deemed to have been converted immediately prior to the close of business on the date (the "**Conversion Date**") that the Holder has complied with the

47

requirements set forth in subsection (b) above.  Except as set forth in Section 14.03(b) and Section 14.07(a), the Company shall pay or deliver, as the case may be, the consideration due in respect of the Conversion Obligation on the second Business Day immediately following the relevant Conversion Date, if the Company elects Physical Settlement, or on the second Business Day immediately following the last Trading Day of the relevant Observation Period, in the case of any other Settlement Method.  If any ADSs are due to a converting Holder, the Company shall issue or cause to be issued, and deliver (if applicable) to such Holder, or such Holder's nominee or nominees, the full number of ADSs to which such Holder shall be entitled, in book-entry format through the Depositary, in satisfaction of the Company's Conversion Obligation.

(d)        In case any certificated Note shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by the Company or Trustee, with payment of a sum sufficient to cover any documentary, stamp or similar issue or transfer tax or similar governmental charge required by law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e)        If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp, issue, transfer or similar tax due on the delivery of any ADSs upon conversion of the Notes or the issuance of the underlying Class A Ordinary Shares, unless the tax is due because the Holder requests such ADSs (or the Class A Ordinary Shares) to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax.  The Company shall pay the ADS Depositary's fees for the issuance of the ADSs.

(f)        Except as provided in Section 14.04, no adjustment shall be made for dividends on any ADSs issued upon the conversion of any Note as provided in this Article 14.

(g)        Upon the conversion of an interest in a Global Note, the Trustee, or the Custodian at the direction of the Trustee, shall make a notation on such Global Note as to the reduction in the principal amount represented thereby.  The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

(h)        Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below.  The Company's settlement of the full Conversion Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited.  Upon a conversion of Notes into a combination of cash and ADSs, accrued and unpaid interest will be deemed to be paid first out of the cash paid upon such conversion.  Notwithstanding the foregoing, if Notes are converted after the close of business on a Regular

48

Record Date and prior to the open of business on the corresponding Interest Payment Date, Holders of such Notes as of the close of business on such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the conversion.  However, Notes surrendered for conversion during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by an amount in U.S. dollars equal to the amount of interest payable on the Notes so converted (regardless of whether the converting Holder was the holder of record on the corresponding Regular Record Date); *provided* that no such payment shall be required (1) for conversions following the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified a Redemption Date that is after a Regular Record Date and on or prior to the second Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the third Business Day immediately succeeding such Interest Payment Date); (3) if the Company has specified a Fundamental Change Repurchase Date that is after a Regular Record Date and on or prior to the Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the second Business Day immediately succeeding such Interest Payment Date); or (4) to the extent of any Defaulted Amounts, if any Defaulted Amounts exists at the time of conversion with respect to such Note. Neither the Trustee nor the Conversion Agent (if other than the Trustee) will have any duty to determine or verify determination by the Company of whether any of the conditions to conversion have been satisfied.

(i)        The Person in whose name any ADSs shall be issuable upon conversion shall be treated as a stockholder of record as of the close of business on the relevant Conversion Date (if the Company elects to satisfy the related Conversion Obligation by Physical Settlement) or the last Trading Day of the relevant Observation Period (if the Company elects to satisfy the related Conversion Obligation by Combination Settlement), as the case may be.  Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j)        The Company shall not issue any fractional ADSs upon conversion of the Notes and shall instead pay cash in lieu of delivering any fractional ADS issuable upon conversion based on the Daily VWAP for the relevant Conversion Date (in the case of Physical Settlement) or based on the Daily VWAP for the last Trading Day of the relevant Observation Period (in the case of Combination Settlement). For each Note surrendered for conversion, if the Company has elected (or is deemed to have elected) Combination Settlement, the full number of ADSs that shall be issued upon conversion thereof shall be computed on the basis of the aggregate Daily Settlement Amounts for the relevant Observation Period and any fractional shares remaining after such computation shall be paid in cash.

Section 14.03. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes.*  (a) If a Make-Whole Fundamental Change occurs prior to the Maturity Date and a Holder elects to convert its Notes in connection with such Make-Whole Fundamental Change, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional ADSs (the "**Additional ADSs**"), as described below.  A conversion of

49

Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Fundamental Change if the relevant Notice of Conversion is received by the Conversion Agent from, and including, the Effective Date of the Make-Whole Fundamental Change up to, and including, the second Business Day immediately prior to the related Fundamental Change Repurchase Date (or, in the case of a Make-Whole Fundamental Change that would have been a Fundamental Change but for the *proviso* in clause (b) of the definition thereof, the 35th Trading Day immediately following the Effective Date of such Make-Whole Fundamental Change). The Company shall provide written notification to Holders, the Trustee and the Conversion Agent (if other than the Trustee) of the Effective Date of any Make-Whole Fundamental Change and issue a press release announcing such Effective Date no later than five Business Days after such Effective Date.

(b)         Upon surrender of Notes for conversion in connection with a Make-Whole Fundamental Change, the Company shall, at its option, satisfy the related Conversion Obligation by Physical Settlement, Cash Settlement or Combination Settlement in accordance with Section 14.02; *provided*, *however*, that if, at the effective time of a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property following such Make-Whole Fundamental Change is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make-Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the ADS Price for the transaction and shall be deemed to be an amount of cash per US$1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional ADSs), *multiplied by* such ADS Price. In such event, the Conversion Obligation shall be paid to Holders in cash on the second Business Day following the Conversion Date.

(c)         The number of Additional ADSs, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below, based on the date on which the Make-Whole Fundamental Change occurs or becomes effective (the "**Effective Date**") and the price (the "**ADS Price**") paid (or deemed to be paid) per ADS in the Make-Whole Fundamental Change. If the holders of the ADSs receive in exchange for their ADSs only cash in a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the ADS Price shall be the cash amount paid per ADS. Otherwise, the ADS Price shall be the average of the Last Reported Sale Prices of the ADSs over the five Trading Day period ending on, and including, the Trading Day immediately preceding the Effective Date of the Make-Whole Fundamental Change. The Board of Directors shall make appropriate adjustments to the ADS Price, in its good faith determination, to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex-Dividend Date, Effective Date (as such term is used in Section 14.04) or expiration date of the event occurs during such five consecutive Trading day period.

(d)         The ADS Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate of the Notes is otherwise adjusted. The adjusted ADS Prices shall equal the ADS Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the ADS Price adjustment and the denominator of which

50

is the Conversion Rate as so adjusted.  The number of Additional ADSs set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 14.04.

(e)       The following table sets forth the number of Additional ADSs by which the Conversion Rate shall be increased per US$1,000 principal amount of Notes pursuant to this Section 14.03 for each ADS Price and Effective Date set forth below:

| | ADS price | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Effective Date | US$17.50 | US$20.00 | US$22.31 | US$25.00 | US$30.00 | US$40.00 | US$50.00 | US$60.00 | US$70.00 | US$80.00 | US$100.00 | US$125.00 |
| December 21, 2020 | 12.3249 | 10.0285 | 8.5038 | 7.1948 | 5.5630 | 3.7935 | 2.8512 | 2.2590 | 1.8477 | 1.5433 | 1.1194 | 0.7798 |
| December 15, 2021 | 12.3249 | 9.7760 | 8.1004 | 6.7104 | 5.0557 | 3.3715 | 2.5176 | 1.9918 | 1.6299 | 1.3629 | 0.9921 | 0.6954 |
| December 15, 2022 | 12.3249 | 9.4100 | 7.5289 | 6.0508 | 4.4067 | 2.8678 | 2.1296 | 1.6837 | 1.3789 | 1.1546 | 0.8436 | 0.5947 |
| December 15, 2023 | 12.3249 | 8.6605 | 6.5666 | 5.0880 | 3.5890 | 2.2838 | 1.6870 | 1.3337 | 1.0939 | 0.9176 | 0.6730 | 0.4772 |
| December 15, 2024 | 12.3249 | 7.0005 | 5.2945 | 4.0012 | 2.6707 | 1.6160 | 1.1864 | 0.9405 | 0.7737 | 0.6506 | 0.4793 | 0.3417 |
| December 15, 2025 | 12.3249 | 6.2385 | 4.0964 | 2.6628 | 1.4863 | 0.8385 | 0.6234 | 0.4987 | 0.4120 | 0.3474 | 0.2567 | 0.1839 |
| December 15, 2026 | 12.3249 | 5.1820 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The exact ADS Prices and Effective Dates may not be set forth in the table above, in which case:

(i)       if the ADS Price is between two ADS Prices in the table above or the Effective Date is between two Effective Dates in the table, the number of Additional ADSs shall be determined by a straight-line interpolation between the number of Additional ADSs set forth for the higher and lower ADS Prices and the earlier and later Effective Dates, as applicable, based on a 365-day year;

(ii)       if the ADS Price is greater than US$125.00 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate; and

(iii)       if the ADS Price is less than US$17.50 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the Conversion Rate per US$1,000 principal amount of Notes exceed 57.1428 ADSs, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 14.04.

(f)       Nothing in this Section 14.03 shall prevent an adjustment to the Conversion Rate pursuant to Section 14.04.

(g)       If the Holder elects to convert its Notes in connection with the Company's election to redeem the Notes in respect of a Change in Tax Law pursuant to Article 16, the Conversion Rate shall be increased by a number of Additional ADSs determined pursuant to this Section 14.03(g).  The Company shall settle conversions of Notes as described in Section 14.02 and, for the avoidance of doubt, pay Additional Amounts, if any, with respect to any such conversion.

A conversion shall be deemed to be "in connection with" the Company's election to redeem the Notes in respect of a Change in Tax Law if the relevant Notice of Conversion is received by the Conversion Agent during the period from, and including, the date the Company provides the related Redemption Notice to Holders until the close of business on the second Business Day immediately preceding the Redemption Date (or, if the Company fails to pay the Redemption Price, such later date on which the Company pays the Redemption Price).

Simultaneously with providing such Redemption Notice, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time.

The number of Additional ADSs by which the Conversion Rate will be increased in the event the Company elects to redeem the Notes in respect of a Change in Tax Law will be determined by reference to the table in clause (e) above based on the Redemption Reference Date and the Redemption Reference Price (each as defined below), but determined for purposes of this Section 14.03(g) as if (x) the Holder had elected to convert its Notes in connection with a Make-Whole Fundamental Change, (y) the applicable "Redemption Reference Date" were the "Effective Date" as specified in clause (c) above and (z) the applicable "Redemption Reference Price" were the "ADS price" as specified in clause (c) above.  For this purpose, the date on which the Company delivers a Redemption Notice is a "**Redemption Reference Date**" and the average of the Last Reported Sale Prices of the ADSs over the five Trading Day immediately preceding, the date the Company delivers such Redemption Notice is the "**Redemption Reference Price**."

Section 14.04.  *Adjustment of Conversion Rate.*  If the number of Class A Ordinary Shares represented by the ADSs is changed, after the date of this Supplemental Indenture, for any reason other than one or more of the events described in this Section 14.04, the Company shall make an appropriate adjustment to the Conversion Rate such that the number of Class A Ordinary Shares represented by the ADSs upon which conversion of the Notes is based remains the same.

Notwithstanding the adjustment provisions described in this Section 14.04, if the Company distributes to holders of the Class A Ordinary Shares any cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company (but excluding Expiring Rights) and a corresponding distribution is not made to holders of the ADSs, but, instead, the ADSs shall represent, in addition to Class A Ordinary Shares, such cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company, then an adjustment to the Conversion Rate described in this Section 14.04 shall not be made until and unless a corresponding distribution (if any) is made to holders of the ADSs, and such adjustment to the Conversion Rate shall be based on the distribution made to the holders of the

52

ADSs and not on the distribution made to the holders of the Class A Ordinary Shares.  However, in the event that the Company issues or distributes to all holders of the Class A Ordinary Shares any Expiring Rights, notwithstanding the immediately preceding sentence, the Company shall adjust the Conversion Rate pursuant to Section 14.04(b) (in the case of Expiring Rights described in clause (b) below entitling holders of the Class A Ordinary Shares for a period of not more than 45 calendar days after the announcement date of such issuance to subscribe for or purchase Class A Ordinary Shares or ADSs) or Section 14.04(c) (in the case of all other Expiring Rights).

For the avoidance of doubt, if any event described in this Section 14.04 results in a change to the number of Class A Ordinary Shares represented by the ADSs, then such a change shall be deemed to satisfy the Company's obligation to effect the relevant adjustment to the Conversion Rate on account of such an event to the extent to which such change reflects what a corresponding change to the Conversion Rate would have been on account of such event.

The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs, except that the Company shall not make any adjustments to the Conversion Rate if Holders of the Notes participate (other than in the case of a (x) share split or share combination or (y) a tender or exchange offer), at the same time and upon the same terms as holders of the ADSs and solely as a result of holding the Notes, in any of the transactions described in this Section 14.04, without having to convert their Notes, as if they held a number of ADSs equal to the Conversion Rate, *multiplied by* the principal amount (expressed in thousands) of Notes held by such Holder.  Neither the Trustee nor the Conversion Agent shall have any responsibility to monitor the accuracy of any calculation of adjustment of the Conversion Rate and the same shall be conclusive and binding on the Holders, absent manifest error.  Notice of such adjustment to the Conversion Rate shall be given by the Company promptly in writing to the Holders, the Trustee and the Conversion Agent and shall be conclusive and binding on the Holders, absent manifest error.

(a)        If the Company exclusively issues Class A Ordinary Shares as a dividend or distribution on the Class A Ordinary Shares, or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

53

where,

CR0    =    the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date of such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split or share combination, as applicable;

CR1    =    the Conversion Rate in effect after the open of business on such Ex-Dividend Date or Effective Date, as applicable;

OS0    =    the number of Class A Ordinary Shares outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date, as applicable (before giving effect to any such dividend, distribution, split or combination) ; and

OS1    =    the number of Class A Ordinary Shares outstanding immediately after giving effect to such dividend, distribution, share split or share combination.

Any adjustment made under this Section 14.04(a) shall become effective immediately after the open of business on the Ex-Dividend Date for such dividend or distribution, or immediately after the open of business on the Effective Date for such share split or share combination, as applicable.  If any dividend or distribution of the type described in this Section 14.04(a) is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(b)    If the Company issues to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) (other than in connection with a stockholder rights plan) any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than the average of the Last Reported Sale Prices of the Class A Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Class A Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

54

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such issuance; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date; |
| $OS_0$ | = | the number of Class A Ordinary Shares outstanding immediately prior to the open of business on such Ex-Dividend Date; |
| X | = | the total number of Class A Ordinary Shares (directly or in the form of ADSs) deliverable pursuant to such rights, options or warrants; and |
| Y | = | the number of Class A Ordinary Shares equal to (i) the aggregate price payable to exercise such rights, options or warrants, *divided by* (ii) the quotient of (a) the average of the Last Reported Sale Prices of the ADSs over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants *divided by* (b) the number of Class A Ordinary Shares then represented by one ADS. |

Any increase made under this Section 14.04(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the Ex-Dividend Date for such issuance. To the extent that Class A Ordinary Shares or ADSs are not delivered after the expiration of such rights, options or warrants, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of Class A Ordinary Shares actually delivered (directly or in the form of ADSs). If such rights, options or warrants are not so issued, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such Ex-Dividend Date for such issuance had not occurred.

For purposes of this Section 14.04(b) and Section 14.01(b)(ii)(A), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than such average of the Last Reported Sale Prices of the Class A Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Class A Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement for such issuance, and in determining the aggregate offering price of such Class A Ordinary Shares or ADSs, there shall be taken into account any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

55

(c)      If the Company distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs), excluding (i) dividends, distributions or issuances as to which an adjustment was effected pursuant to Section 14.04(a) or Section 14.04(b), (ii) dividends or distributions paid exclusively in cash as to which an adjustment was effected pursuant to Section 14.04(d), and (iii) Spin-Offs as to which the provisions set forth below in this Section 14.04(c) shall apply (any of such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities of the Company, the "**Distributed Property**"), then the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

$CR_0$  =  the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such distribution;

$CR_1$  =  the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date;

$SP_0$  =  the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and

FMV  =  the fair market value (as determined by the Board of Directors) of the Distributed Property with respect to each outstanding Class A Ordinary Share (directly or in the form of ADSs) on the Ex-Dividend Date for such distribution.

Any increase made under the portion of this Section 14.04(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution.  If such distribution is not so paid or made, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such distribution had not been declared.  Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, in respect of each US$1,000 principal amount thereof, at the same time and upon the same terms as holders of the ADSs receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate in effect on the Record Date for the ADSs for the distribution.

With respect to an adjustment pursuant to this Section 14.04(c) where there has been a payment of a dividend or other distribution on the Class A Ordinary Shares (directly or in the

56

form of ADSs) of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (a "**Spin-Off**"), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

CR$_0$      =      the Conversion Rate in effect immediately prior to the end of the Valuation Period;

CR$_1$      =      the Conversion Rate in effect immediately after the end of the Valuation Period;

FMV$_0$      =      the average of the Last Reported Sale Prices of the Capital Stock or similar equity interest distributed to holders of the Class A Ordinary Shares (directly or in the form of ADSs) applicable to one Class A Ordinary Share (determined by reference to the definition of Last Reported Sale Price as set forth in Section 1.01 as if references therein to the ADSs were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and

MP$_0$      =      the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the Valuation Period.

The increase to the Conversion Rate under the preceding paragraph shall occur at the close of business on the last Trading Day of the Valuation Period; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the Valuation Period, references to "10" in the preceding paragraph shall be deemed to be replaced with such lesser number of Trading Days as have elapsed between the Ex-Dividend Date of such Spin-Off and the Conversion Date in determining the Conversion Rate and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any Trading Day that falls within the relevant Observation Period for such conversion and within the Valuation Period, references to "10" in the preceding paragraph shall be deemed to be replaced with such lesser number of Trading Days as have elapsed between the Ex-Dividend Date of such Spin-Off and such Trading Day in determining the Conversion Rate as of such Trading Day.

For purposes of this Section 14.04(c) (and subject in all respect to Section 14.11), rights, options or warrants distributed by the Company to all holders of the Class A Ordinary Shares (directly or in the form of ADSs) entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Class A Ordinary Shares (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such Class A Ordinary Shares (directly or in the form of ADSs); (ii) are not exercisable; and (iii) are also issued in respect of

57

future issuances of the Class A Ordinary Shares (directly or in the form of ADSs), shall be deemed not to have been distributed for purposes of this Section 14.04(c) (and no adjustment to the Conversion Rate under this Section 14.04(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 14.04(c). If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Supplemental Indenture, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex-Dividend Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 14.04(c) was made, (1) in the case of any such rights, options or warrants that shall all have been redeemed or purchased without exercise by any holders thereof, upon such final redemption or purchase (x) the Conversion Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Conversion Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per Ordinary Share redemption or purchase price received by a holder or holders of Class A Ordinary Shares (directly or in the form of ADSs) with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Class A Ordinary Shares (directly or in the form of ADSs) as of the date of such redemption or purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been issued.

For purposes of Section 14.04(a), Section 14.04(b) and this Section 14.04(c), if any dividend or distribution to which this Section 14.04(c) is applicable also includes one or both of:

(A)    a dividend or distribution of Class A Ordinary Shares (directly or in the form of ADSs) to which Section 14.04(a) is applicable (the "**Clause A Distribution**"); or

(B)    a dividend or distribution of rights, options or warrants to which Section 14.04(b) is applicable (the "**Clause B Distribution**"),

then (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this 0 is applicable (the "**Clause C Distribution**") and any Conversion Rate adjustment required by this Section 14.04(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Conversion Rate adjustment required by Section 14.04(a) and Section 14.04(b) with respect

58

thereto shall then be made, except that, if determined by the Company (I) the "Ex-Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex-Dividend Date of the Clause C Distribution and (II) any Class A Ordinary Shares (directly or in the form of ADSs) included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date" within the meaning of Section 14.04(a) or "outstanding immediately prior to the open of business on such Ex-Dividend Date" within the meaning of Section 14.04(b).

(d)        If any cash dividend or distribution is made to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs), the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - C}$$

where,

$CR_0$    =    the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such dividend or distribution;

$CR_1$    =    the Conversion Rate in effect immediately after the open of business on the Ex-Dividend Date for such dividend or distribution;

$SP_0$    =    the Last Reported Sale Price of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

C    =    the amount in cash per Class A Ordinary Share the Company distributes to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs).

Any increase pursuant to this Section 14.04(d) shall become effective immediately after the open of business on the Ex-Dividend Date for such dividend or distribution.  If such dividend or distribution is not so paid, the Conversion Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.  Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "SP0" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, for each US$1,000 principal amount of Notes, at the same time and upon the same terms as holders of the ADSs, the amount of cash that such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate on the Record Date for such cash dividend or distribution.

(e)        If the Company or any of its Subsidiaries make a payment in respect of a tender or exchange offer for the Class A Ordinary Shares (directly or in the form of ADSs), to the extent

59

that the cash and value of any other consideration included in the payment per Ordinary Share exceeds the average of the Last Reported Sale Prices of the ADSs (divided by the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{AC + (SP_1 \times OS_1)}{OS_0 \times SP_1}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; |
| AC | = | the aggregate value of all cash and any other consideration (as determined by the Board of Directors) paid or payable for Class A Ordinary Shares or ADSs, as the case may be, purchased in such tender or exchange offer; |
| $OS_0$ | = | the number of Class A Ordinary Shares outstanding immediately prior to the date such tender or exchange offer expires (prior to giving effect to the purchase of all Class A Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer); |
| $OS_1$ | = | the number of Class A Ordinary Shares outstanding immediately after the date such tender or exchange offer expires (after giving effect to the purchase of all Class A Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer); and |
| $SP_1$ | = | the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires. |

The increase to the Conversion Rate under this Section 14.04(e) shall occur at the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the 10 Trading Days immediately following, and including, the Trading Day next succeeding the expiration date of any tender or exchange offer, references to "10" or "10th" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed between the date that such tender or exchange offer expires and the Conversion Date in determining the Conversion Rate and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any Trading Day that falls within the relevant Observation Period for such conversion and within the 10 Trading Days immediately following, and including, the Trading Day next succeeding the expiration date of any tender or exchange offer, references to "10" or "10th" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as

have elapsed between the expiration date of such tender or exchange offer and such Trading Day in determining the Conversion Rate as of such Trading Day.

(f)        Notwithstanding this Section 14.04 or any other provision of the Indenture or the Notes, if a Conversion Rate adjustment becomes effective on any Ex-Dividend Date, and a Holder that has converted its Notes on or after such Ex-Dividend Date and on or prior to the related Record Date would be treated as the record holder of the ADSs as of the related Conversion Date as described under Section 14.02(i) based on an adjusted Conversion Rate for such Ex-Dividend Date, then, notwithstanding the Conversion Rate adjustment provisions in this Section 14.04, the Conversion Rate adjustment relating to such Ex-Dividend Date shall not be made for such converting Holder. Instead, such Holder shall be treated as if such Holder were the record owner of the ADSs on an unadjusted basis and participate in the related dividend, distribution or other event giving rise to such adjustment. Notwithstanding this Section 14.04 or any other provision of the Indenture or the Notes, the Company shall not be required to adjust the Conversion Rate unless such adjustment would require an increase or decrease of at least one percent; provided, however, that any such minor adjustments that are not required to be made will be carried forward and taken into account in any subsequent adjustment, and provided, further, that any such adjustment of less than one percent that has not been made shall be made upon the occurrence of (i) the Effective Date for any Fundamental Change or Make-Whole Fundamental Change, (ii) in the case of any Note to which Physical Settlement applies, the relevant Conversion Date, and, in the case of any Note to which Cash Settlement or Combination Settlement applies, each Trading Day of the applicable Observation Period and (iii) every one year anniversary of the first date of original issuance of the Notes. In addition, the Company shall not account for such deferrals when determining whether any of the conditions to the conversion have been satisfied or what number of ADSs a Holder would have held on a given day had it converted its Notes.

(g)        Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of Class A Ordinary Shares or ADSs or any securities convertible into or exchangeable for Class A Ordinary Shares or ADSs or the right to purchase Class A Ordinary Shares or ADSs or such convertible or exchangeable securities.

(h)        In addition to those adjustments required by clauses (a), (b), (c), (d) and (e) of this Section 14.04, and to the extent permitted by applicable law and subject to the applicable rules of The Nasdaq Global Select Market and any other securities exchange on which any of the Company's securities are then listed, the Company from time to time may increase the Conversion Rate by any amount for a period of at least 20 Business Days if the Board of Directors determines that such increase would be in the Company's best interest, and the

61

Company may (but is not required to) increase the Conversion Rate to avoid or diminish any income tax to holders of the Class A Ordinary Shares or the ADSs or rights to purchase Class A Ordinary Shares or ADSs in connection with a dividend or distribution of Class A Ordinary Shares or ADSs (or rights to acquire Class A Ordinary Shares or ADSs) or similar event.

(i)        Notwithstanding anything to the contrary in this Article 14, the Conversion Rate shall not be adjusted:

(i)        upon the issuance of any Class A Ordinary Shares or ADSs pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in Class A Ordinary Shares or ADSs under any plan;

(ii)        upon the issuance of any Class A Ordinary Shares or ADSs or options or rights to purchase those Class A Ordinary Shares or ADSs pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of the Company's Subsidiaries;

(iii)        upon the repurchase of any Ordinary Shares pursuant to an open-market share repurchase program or other buyback transaction that is not a tender offer or exchange offer of the nature described in clause (e) of this Section 14.04 above;

(iv)        upon the issuance of any Class A Ordinary Shares or ADSs pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (ii) of this subsection and outstanding as of the date the Notes were first issued;

(v)        solely for a change in the par value of the Class A Ordinary Shares or ADSs; or

(vi)        for accrued and unpaid interest, if any.

(j)        All calculations and other determinations under this Article 14 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of an ADS.

(k)        Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly deliver to the Trustee (and the Conversion Agent if not the Trustee) an Officers' Certificate setting forth (i) the adjusted Conversion Rate, (ii) the subsection of this Section 14.04 pursuant to which such adjustment has been made, showing in reasonable detail the facts upon which such adjustment is based, and (iii) the date as of which such adjustment is effective, and such Officers' Certificate shall be conclusive evidence of the accuracy of such adjustment absent manifest error.  Unless and until a Responsible Officer of the Trustee shall have received such Officers' Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect.  Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion

62

Rate and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Conversion Rate to each Holder at its last address appearing on the Register. Failure to deliver such notice shall not affect the legality or validity of any such adjustment. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such certificate or the information and calculations contained therein.

(l) For purposes of this Section 14.04, the number of Class A Ordinary Shares at any time outstanding shall not include Class A Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs) so long as the Company does not pay any dividend or make any distribution on Class A Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs), but shall include Class A Ordinary Shares issuable in respect of scrip certificates issued in lieu of fractions of Class A Ordinary Shares.

Section 14.05. *Adjustments of Prices.* Whenever any provision of this Supplemental Indenture requires the Company to calculate the Last Reported Sale Prices, the Daily VWAPs, the Daily Conversion Values, the Daily Settlement Amounts, the ADS Price for purposes of a Make-Whole Fundamental Change or the Redemption Reference Price for purposes of our election to redeem the notes in connection with changes in tax laws over a span of multiple days, the Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Conversion Rate that becomes effective pursuant to Section 14.04, or any event requiring an adjustment to the Conversion Rate pursuant to Section 14.04 where the Ex-Dividend Date, Effective Date or expiration date, as the case may be, of the event occurs, at any time during the period when such Last Reported Sale Prices, ADS Prices, the Daily VWAPs, the Daily Conversion Values or the Daily Settlement Amounts are to be calculated.

Section 14.06. *Class A Ordinary Shares to Be Fully Paid.* The Company shall provide, free from preemptive rights, out of its authorized but unissued Class A Ordinary Shares or Class A Ordinary Shares held in treasury, a sufficient number of Class A Ordinary Shares that corresponds to the number of ADSs due upon conversion of the Notes from time to time as such Notes are presented for conversion (assuming delivery of the maximum number of Additional ADSs pursuant to Section 14.03 and that at the time of computation of such number of Class A Ordinary Shares, all such Notes would be converted by a single Holder and that Physical Settlement were applicable).

Section 14.07. *Effect of Recapitalizations, Reclassifications and Changes of the Class A Ordinary Shares.*

(a) In the case of:

(i) any recapitalization, reclassification or change of the ADSs or Class A Ordinary Shares (other than changes resulting from a subdivision or combination),

(ii) any consolidation, merger, combination or similar transaction involving the Company,

63

(iii)        any sale, lease or other transfer to a third party of the consolidated assets of the Company and the Company's Subsidiaries substantially as an entirety or

(iv)        any statutory share exchange,

in each case, as a result of which the ADS or the Class A Ordinary Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Merger Event**"), then, prior to or at the effective time of such Merger Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture permitted under Section 10.01(f) providing that, at and after the effective time of such Merger Event, the right to convert each US$1,000 principal amount of Notes shall be changed into a right to convert such principal amount of Notes into the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of ADSs equal to the Conversion Rate immediately prior to such Merger Event would have owned or been entitled to receive (the "**Reference Property**," with each "**unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one ADS is entitled to receive) upon such Merger Event; *provided*, *however*, that at and after the effective time of the Merger Event (A) the Company shall continue to have the right to determine the form of consideration to be paid or delivered, as the case may be, upon conversion of Notes in accordance with Section 14.02 and (B) (I) any amount payable in cash upon conversion of the Notes in accordance with Section 14.02 shall continue to be payable in cash, (II) any ADSs that the Company would have been required to deliver upon conversion of the Notes in accordance with Section 14.02 shall instead be deliverable in the amount and type of Reference Property that a holder of that number of ADSs would have been entitled to receive in such Merger Event and (III) the Daily VWAP shall be calculated based on the value of a unit of Reference Property that a holder of one ADS would have received in such transaction.

If the Merger Event causes the ADSs or Class A Ordinary Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of holder election), then (i) the Reference Property into which the Notes will be convertible shall be deemed to be the weighted average of the types and amounts of consideration actually received by the holders of ADSs, and (ii) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause (i) attributable to one ADS.  If the holders of the ADSs or Class A Ordinary Shares receive only cash in such Merger Event, then for all conversions for which the relevant Conversion Date occurs after the effective date of such Merger Event (A) the consideration due upon conversion of each US$1,000 principal amount of Notes shall be solely cash in an amount equal to the Conversion Rate in effect on the Conversion Date (as may be increased by any Additional ADSs pursuant to Section 14.03), *multiplied by* the price paid per ADS or Class A Ordinary Share, as applicable, in such Merger Event and (B) the Company shall satisfy the Conversion Obligation by paying cash to converting Holders on the second Business Day immediately following the relevant Conversion Date.  The Company shall provide written notice to Holders, the Trustee and the Conversion Agent (if other than the Trustee) of such weighted average as soon as practicable after such determination is made.

64

Such supplemental indenture described in the second immediately preceding paragraph shall (i) provide for anti-dilution and other adjustments that shall be as nearly equivalent as is practicable to the adjustments provided for in this Article 14 (it being understood that no such adjustments shall be required with respect to any portion of the Reference Property that does not consist of shares of Common Equity (however evidenced) or depositary receipts in respect thereof) and (ii) contains such other provisions that the Board of Directors determines in good faith are appropriate to preserve the economic interest of the Holders and to give effect to the provisions in this Section 14.07.  If, in the case of any Merger Event, the Reference Property includes shares of stock, securities or other property or assets (including cash or any combination thereof) of a Person other than the Company or the successor or purchasing Person, as the case may be, in such Merger Event, then such other Person shall also execute such supplemental indenture, and such supplemental indenture shall contain such additional provisions to protect the interests of the Holders of the Notes, including the right of Holders to require the Company to repurchase their Notes upon a Fundamental Change pursuant to Section 15.02 and the right of Holders to require the Company to repurchase their Notes on August 1, 2024 pursuant to Section 15.01, as the Board of Directors shall consider necessary by reason of the foregoing.

(b)        When the Company executes a supplemental indenture pursuant to subsection (a) of this Section 14.07, the Company shall promptly file with the Trustee an Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or properties or asset that will comprise a unit of Reference Property after any such Merger Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with, and shall promptly deliver notice thereof to all Holders. The Company shall cause notice of the execution of such supplemental indenture to be delivered to each Holder within 20 days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture.

(c)        The Company shall not become a party to any Merger Event unless its terms are consistent with this Section 14.07.  None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into cash, ADSs or a combination of cash and ADSs, as applicable, as set forth in Section 14.01 and Section 14.02 prior to the effective date of such Merger Event.

(d)        The above provisions of this Section shall similarly apply to successive Merger Events.

Section 14.08.  *Certain Covenants.*  (a) The Company covenants that all ADSs delivered upon conversion of Notes, and all Class A Ordinary Shares represented by such ADSs, will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

(b)        The Company covenants that, if any ADSs to be provided for the purpose of conversion of Notes hereunder, or any Class A Ordinary Shares represented by such ADSs, require registration with or approval of any governmental authority under any federal or state law before such ADSs may be validly issued upon conversion, the Company will, to the extent then

65

permitted by the rules and interpretations of the Commission, secure such registration or approval, as the case may be.

(c)        The Company further covenants that if at any time the ADSs shall be listed on any national securities exchange or automated quotation system the Company will list and keep listed, so long as the ADSs shall be so listed on such exchange or automated quotation system, any ADSs deliverable upon conversion of the Notes.

(d)        The Company further covenants to take all actions and obtain all approvals and registrations required with respect to the conversion of the Notes into ADSs and the issuance, and deposit into the ADS facility, of the Class A Ordinary Shares represented by such ADSs. The Company also undertakes to maintain, as long as any Notes are outstanding, the effectiveness of a registration statement on Form F-6 relating to the ADSs and an adequate number of ADSs available for issuance thereunder such that ADSs can be delivered in accordance with the terms of the Indenture, the Notes and the Deposit Agreement upon conversion of the Notes.

Section 14.09.  *Responsibility of Trustee.*  The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same.  The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any ADSs, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto.  Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any ADSs or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion, the accuracy or inaccuracy of any mathematical calculation or formulae under the Indenture, whether by the Company or any Person so authorized by the Company for such purpose under the Indenture or the failure by the Company to comply with any of the duties, responsibilities or covenants of the Company contained in this Article.  Without limiting the generality of the foregoing, neither the Trustee nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to Section 14.07 relating either to the kind or amount of ADSs or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such Section 14.07 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 11.02 of the Base Indenture, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officers' Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto.  Neither the Trustee nor the Conversion Agent shall be responsible for determining whether any event contemplated by Section 14.01(b) has occurred that makes the Notes eligible for conversion or no longer eligible therefor until the Company has delivered to the Trustee and the Conversion Agent the notices referred to in Section 14.01(b) with respect to the commencement or termination of such conversion rights, on which notices the Trustee and the Conversion Agent may conclusively rely, and the Company agrees to deliver such notices to the Trustee and the Conversion Agent immediately after the occurrence of any such event or at such other times as shall be provided for in Section 14.01(b).  Except as otherwise expressly provided herein, neither the Trustee nor any other agent acting under the Indenture (other than the Company, if acting in such capacity) shall have any obligation to make any calculation or to determine whether the Notes may be surrendered for conversion pursuant to the Indenture, or to notify the Company or the Depositary or any of the Holders if the Notes have become convertible pursuant to the terms of the Indenture.

66

Section 14.10.  *Notice to Holders Prior to Certain Actions.*  In case of any:

(a)        action by the Company or one of its Subsidiaries that would require an adjustment in the Conversion Rate pursuant to Section 14.04 or Section 14.11;

(b)        Merger Event; or

(c)        voluntary or involuntary dissolution, liquidation or winding-up of the Company or any of its Subsidiaries;

then, in each case (unless notice of such event is otherwise required pursuant to another provision of the Indenture), the Company shall cause to be filed with the Trustee and the Conversion Agent (if other than the Trustee) and to be delivered to each Holder at its address appearing on the Register, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such action by the Company or one of its Subsidiaries or, if a record is not to be taken, the date as of which the holders of Class A Ordinary Shares or ADSs, as the case may be, of record are to be determined for the purposes of such action by the Company or one of its Subsidiaries, or (ii) the date on which such Merger Event, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Class A Ordinary Shares or ADSs, as the case may be, of record shall be entitled to exchange their Class A Ordinary Shares or ADSs, as the case may be, for securities or other property deliverable upon such Merger Event, dissolution, liquidation or winding-up.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of such action by the Company or one of its Subsidiaries, Merger Event, dissolution, liquidation or winding-up.

Section 14.11.  *Stockholder Rights Plans.*  To the extent that the Company has a rights plan in effect upon conversion of the Notes, each ADS, if any, delivered upon such conversion shall be entitled to receive (either directly or in respect of the Class A Ordinary Shares underlying such ADSs) the appropriate number of rights, if any, and the certificates representing the ADSs delivered upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such stockholder rights plan, as the same may be amended from time to time. However, if, prior to any conversion of Notes, the rights have separated from the Class A Ordinary Shares underlying the ADSs in accordance with the provisions of the

67

applicable stockholder rights plan, the Conversion Rate shall be adjusted at the time of separation as if the Company distributed to all or substantially all holders of the Class A Ordinary Shares Distributed Property as provided in Section 14.04(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 14.12. *Limit on Issuance of ADSs Upon Conversion.* Notwithstanding anything to the contrary in the Indenture, if an event occurs that would result in an increase in the Conversion Rate by an amount in excess of limitations imposed by any shareholder approval rules or listing standards of any national or regional securities exchange that are applicable to the Company, the Company will, at its option, either obtain stockholder approval of any issuance of ADSs upon conversion of the Notes in excess of such limitations or pay cash in lieu of delivering any ADSs otherwise deliverable upon conversions in excess of such limitations based on the Daily VWAP for each Trading Day of the relevant Observation Period in respect of which, in lieu of delivering ADSs, the Company pays cash pursuant to this Section 14.12.

Section 14.13. *Termination of Depositary Receipt Program.* If the Class A Ordinary Shares cease to be represented by ADSs issued under a depositary receipt program sponsored by the Company, all references in the Indenture to the ADSs shall be deemed to have been replaced by a reference to the number of Class A Ordinary Shares (and other property, if any) represented by the ADSs on the last day on which the ADSs represented the Class A Ordinary Shares and as if the Class A Ordinary Shares and the other property had been distributed to holders of the ADSs on that day. In addition, all references to the Last Reported Sale Price of the ADSs will be deemed to refer to the Last Reported Sale Price of the Class A Ordinary Shares, and other appropriate adjustments, including adjustments to the Conversion Rate, will be made to reflect such change. In making such adjustments, where currency translations between U.S. dollars and any other currency are required, the exchange rate in effect on the date of determination will apply. The Company shall provide written notice to the Holders, the Trustee and the Conversion Agent (if other than the Trustee) upon the occurrence of the foregoing.

Section 14.14. *Exchange In Lieu Of Conversion.* (a) When a Holder surrenders its Notes for conversion, the Company may, at its election (an "**Exchange Election**"), cause, on or prior to the Business Day immediately following the Conversion Date, such Notes to be transferred to one or more financial institutions designated by the Company (each, a "**Designated Financial Institution**") for exchange in lieu of conversion. In order to accept any Notes surrendered for conversion, the Designated Financial Institution(s) must agree to timely pay and/or deliver, as the case may be, in exchange for such Notes, the cash, ADSs or a combination thereof, at the Company's election, that would otherwise be due upon conversion pursuant to Section 14.02 (the "**Conversion Consideration**"). If the Company makes an Exchange Election, the Company shall, by the close of business on the Business Day following the relevant Conversion Date, notify in writing the Trustee, the Conversion Agent (if other than the Trustee) and the Holder surrendering Notes for conversion that the Company has made the Exchange Election and the Company shall promptly notify the Designated Financial Institution(s) of the relevant deadline for delivery of the Conversion Consideration and the type of Conversion Consideration to be paid and/or delivered, as the case may be.

68

(b)        Any Notes delivered to the Designated Financial Institution(s) shall remain outstanding, subject to applicable procedures of the Depositary.  If the Designated Financial Institution(s) agree(s) to accept any Notes for exchange but does not timely pay and/or deliver, as the case may be, the related Conversion Consideration, or if such Designated Financial Institution(s) does not accept the Notes for exchange, the Company shall pay and/or deliver, as the case may be, the relevant Conversion Consideration, as, and at the time, required pursuant to the Indenture as if the Company had not made the Exchange Election.

(c)        The Company's designation of any Designated Financial Institution(s) to which the Notes may be submitted for exchange does not require such Designated Financial Institution(s) to accept any Notes.

(d)        The Company shall cooperate with the Conversion Agent to cause such Notes to be delivered to the Designated Financial Institution(s) and the Conversion Agent shall be entitled to receive and conclusively rely upon the Company's instructions in connection with effecting any Exchange Election and shall have no liability in respect of such Exchange Election outside of its control.

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01.  *Repurchase at Option of Holders*.  (a) Each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash on August 1, 2024 (the "**Repurchase Date**"), all of such Holder's Notes, or any portion thereof that is an integral multiple of US$1,000 principal amount, at a repurchase price (the "**Repurchase Price**") that is equal to 100% of the principal amount of the Notes to be repurchased, *plus* accrued and unpaid interest to, but excluding, the Repurchase Date; *provided* that any such accrued and unpaid interest shall be paid not to the Holders submitting the Notes for repurchase on the Repurchase Date but instead to the Holders of such Notes at the close of business on the Regular Record Date immediately preceding the Repurchase Date.  Not later than 20 Business Days prior to the Repurchase Date, the Company shall mail a notice (the "**Company Notice**") by first class mail to the Trustee, to the Paying Agent and to each Holder at its address shown in the Register (and to beneficial owners as required by applicable law).  The Company Notice shall include a form of Repurchase Notice to be completed by a holder and shall state:

(i)        the last date on which a Holder may exercise its repurchase right pursuant to this Section 15.01 (the "**Repurchase Expiration Time**");

(ii)        the Repurchase Price;

(iii)        the Repurchase Date;

(iv)        the name and address of the Conversion Agent and Paying Agent;

69

(v)  that the Notes with respect to which a Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Repurchase Notice in accordance with the terms of the Indenture;

(vi)  that the Holder shall have the right to withdraw any Notes surrendered prior to the Repurchase Expiration Time; and

(vii)  the procedures a Holder must follow to exercise its repurchase rights under this Section 15.01 and a brief description of those rights.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Company Notice shall be prepared by the Company.

Simultaneously with providing the Company Notice, the Company shall publish a notice containing the information included in the Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.01.

Repurchases of Notes under this Section 15.01 shall be made, at the option of the Holder thereof, upon:

(A)  delivery to the Paying Agent by the Holder of a duly completed notice (the "**Repurchase Notice**") in the form set forth in Attachment 3 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in global notes, if the Notes are Global Notes, in each case during the period beginning at any time from the open of business on the date that is 20 Business Days prior to the Repurchase Date until the close of business on the second Business Day immediately preceding the Repurchase Date; and

(B)  delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Repurchase Notice (together with all necessary endorsements) at the Paying Agent Office, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Repurchase Price therefor.

Each Repurchase Notice shall state:

(A)  in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

70

(B)      the portion of the principal amount of the Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

(C)      that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and the Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Repurchase Notice contemplated by this Section 15.01 shall have the right to withdraw, in whole or in part, such Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date by delivery of a duly completed written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

The Paying Agent shall promptly notify the Company of the receipt by it of any Repurchase Notice or written notice of withdrawal thereof.

No Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered for repurchase pursuant to this Section 15.01 by a Holder thereof to the extent such Holder has also delivered a Fundamental Change Repurchase Notice with respect to such Note in accordance with Section 15.02 and not validly withdrawn such Fundamental Change Repurchase Notice in accordance with Section 15.03.

(b)      Notwithstanding the foregoing, no Notes may be repurchased by the Company at the option of the Holders on the Repurchase Date if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such Repurchase Date (except in the case of an acceleration resulting from a default by the Company in the payment of the Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a Default by the Company in the payment of the Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 15.02. *Repurchase at Option of Holders Upon a Fundamental Change.* (a) If a Fundamental Change occurs at any time, each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes, or any portion thereof that is equal to US$1,000 or an integral multiple of US$1,000, on the Business Day (the "**Fundamental Change Repurchase Date**") notified in writing by the Company as set forth in Section 15.02(c) that is not less than 20 Business Days or more than 35 Business Days following the date of the Fundamental Change Company Notice, at a repurchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest thereon to, but excluding, the Fundamental Change Repurchase Date (the "**Fundamental Change Repurchase Price**"), unless the Fundamental Change Repurchase Date falls after a Regular Record Date but on or prior to

71

the Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay the full amount of accrued and unpaid interest to Holders of record as of such Regular Record Date on such Interest Payment Date, and the Fundamental Change Repurchase Price shall be equal to 100% of the principal amount of Notes to be repurchased pursuant to this Article 15.

(b)       Repurchases of Notes under this Section 15.02 shall be made, at the option of the Holder thereof, upon:

(i)       delivery to the Paying Agent by a Holder of a duly completed notice (the "**Fundamental Change Repurchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in Global Notes, if the Notes are Global Notes, in each case on or before the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date; and

(ii)       delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Fundamental Change Repurchase Notice (together with all necessary endorsements for transfer) at the Paying Agent Office, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Repurchase Price therefor.

The Fundamental Change Repurchase Notice in respect of any Notes to be repurchased shall state:

(i)       in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

(ii)       the portion of the principal amount of Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

(iii)       that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and the Indenture;

*provided, however,* that if the Notes are Global Notes, the Fundamental Change Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Fundamental Change Repurchase Notice contemplated by this Section 15.02 shall have the right to withdraw, in whole or in part, such Fundamental Change Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

72

The Paying Agent shall promptly notify the Company of the receipt by it of any Fundamental Change Repurchase Notice or written notice of withdrawal thereof.

No Fundamental Change Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered for repurchase pursuant to this Section 15.02 by a Holder thereof to the extent such Holder has also delivered a Repurchase Notice with respect to such Note in accordance with Section 15.01 and not validly withdrawn such Repurchase Notice in accordance with Section 15.03.

(c)        On or before the 20th calendar day after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders, the Trustee and the Paying Agent (if other than the Trustee) a written notice (the "Fundamental Change Company Notice") of the occurrence of the effective date of the Fundamental Change and of the repurchase right at the option of the Holders arising as a result thereof.  In the case of Physical Notes, such notice shall be by first class mail or, in the case of Global Notes, such notice shall be delivered in accordance with the applicable procedures of the Depositary.  Simultaneously with providing such notice, the Company shall publish a notice containing the information set forth in the Fundamental Change Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time.  Each Fundamental Change Company Notice shall specify:

(i)        the events causing the Fundamental Change;

(ii)        the date of the Fundamental Change;

(iii)        the last date on which a Holder may exercise the repurchase right pursuant to this Article 15;

(iv)        the Fundamental Change Repurchase Price;

(v)        the Fundamental Change Repurchase Date;

(vi)        the name and address of the Paying Agent and the Conversion Agent, if applicable;

(vii)        if applicable, the Conversion Rate and any adjustments to the Conversion Rate;

(viii)        that the Notes with respect to which a Fundamental Change Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Repurchase Notice in accordance with the terms of the Indenture; and

(ix)        the procedures that Holders must follow to require the Company to repurchase their Notes.

73

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.02.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company and delivered to the Trustee no later than 2 Business Days (or such shorter period as is acceptable to the Trustee) prior to the date the Fundamental Change Company Notice is to be sent.

(d)        Notwithstanding the foregoing, no Notes may be repurchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

(e)        If a Fundamental Change described in clause (d) of the definition thereof has occurred and the Class A Ordinary Shares have been accepted for listing on a Permitted Exchange, then, on and after the later to occur of (x) the date of such acceptance for listing on a Permitted Exchange or (y) the effective date of such Fundamental Change (the "**New Listing Reference Date**"), Section 14.07 shall be deemed to apply mutatis mutandis as if the Reference Property for the Notes were the Class A Ordinary Shares; provided that the supplemental indenture required in Section 14.07 to reflect the replacement of the ADSs with the Class A Ordinary Shares shall be executed no later than five Business Days after the New Listing Reference Date. The Company shall notify Holders and the Conversion Agent (if other than the Trustee) in writing as promptly as reasonably practicable following the date the Company executes such supplemental indenture and shall substantially concurrently with such notice either post such supplemental indenture on the Company's website or disclose the same in a current report on Form 6-K (or any successor form) that is filed with the Commission.

Section 15.03.  *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice.* A Repurchase Notice or Fundamental Change Repurchase Notice may be withdrawn (in whole or in part) by means of a duly completed written notice of withdrawal delivered to the Paying Agent in accordance with this Section 15.03 at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date or prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date, as the case may be, specifying:

74

(i)        the principal amount of the Notes with respect to which such notice of withdrawal is being submitted, which principal amount must be in principal amounts of US $1,000 or an integral multiple of US $1,000,

(ii)       if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(iii)      the principal amount, if any, of such Note that remains subject to the original Repurchase Notice or Fundamental Change Repurchase Notice, as the case may be, which portion must be in principal amounts of US$1,000 or an integral multiple of US$1,000;

*provided*, *however*, that if the Notes are Global Notes, the notice must comply with appropriate procedures of the Depositary.

Section 15.04.  *Deposit of Repurchase Price or Fundamental Change Repurchase Price.*  (a)  The Company will deposit with the Paying Agent, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in Section 4.03(b) on or prior to 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, an amount of money sufficient to repurchase all of the Notes to be repurchased at the appropriate Repurchase Price or Fundamental Change Repurchase Price.  Subject to receipt of funds and/or Notes by the Paying Agent, payment for Notes surrendered for repurchase (and not withdrawn in accordance with Section 15.03) will be made on the later of (i) the Repurchase Date or Fundamental Change Repurchase Date, as the case may be (*provided* the Holder has satisfied the conditions in Section 15.01 or Section 15.02, as the case may be) and (ii) the time of book-entry transfer or the delivery of such Note to the Paying Agent by the Holder thereof in the manner required by Section 15.01 or Section 15.02, as applicable, by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee.  The Paying Agent shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Repurchase Price or Fundamental Change Repurchase Price, as the case may be.

(b)        If by 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, the Paying Agent holds money sufficient to make payment on all the Notes or portions thereof that are to be repurchased on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, then, with respect to the Notes that have been properly surrendered for repurchase to the Paying Agent and not validly withdrawn, on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, (i) such Notes will cease to be outstanding, (ii) interest will cease to accrue on such Notes (whether or not book-entry transfer of the Notes has been made or the Notes have been delivered to the Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate (other than the right to receive the Repurchase Price or Fundamental Change Repurchase Price, as the case may be).

75

(c)        Upon surrender of a certificated Note that is to be repurchased in part pursuant to Section 15.01 or Section 15.02, the Company shall execute and instruct the Trustee who shall authenticate and deliver to the Holder a new certificated Note in an authorized denomination equal in principal amount to the unrepurchased portion of the certificated Note surrendered.

Section 15.05.  *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*.  In connection with any repurchase offer, the Company will, if required:

(a)        comply with the provisions of Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act;

(b)        file a Schedule TO or other required schedule under the Exchange Act; and

(c)        otherwise comply with all federal and state securities laws in connection with any offer by the Company to repurchase the Notes;

in each case, so as to permit the rights and obligations under this Article 15 to be exercised in the time and in the manner specified in this Article 15.

The Company shall not be required to purchase, or to make an offer to purchase, the Notes upon a Fundamental Change if a third party makes such an offer in the same manner, at the same time, for the same or greater price and otherwise in compliance with the requirements for an offer made by us as set forth above in this Section 15.05 and such third party purchases all Notes properly surrendered and not validly withdrawn under its offer in the same manner, at the same time, for the same or greater price and otherwise in compliance with the requirements for an offer made by us as set forth above in this Section 15.05.

Notwithstanding anything to the contrary in the Indenture, to the extent that the provisions of any federal or state securities laws or other applicable laws or regulations adopted after the date on which the Notes are first issued conflict with the provisions of the Indenture relating to the Company's obligations to repurchase the Notes upon a Fundamental Change, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under such provisions of the Indenture by virtue of such conflict.

# ARTICLE 16
## OPTIONAL REDEMPTION

Section 16.01.  *Applicability of Article IV and Article V of the Base Indenture*.  Article IV and Article V of the Base Indenture shall not apply to the Notes. Instead the provisions set forth in this Article 16 shall, with respect to the Notes, supersede in their entirety Article IV of the Base Indenture, and all references in the Base Indenture to Article IV thereof and the provisions therein, as the case may be, shall, with respect to the Notes, be deemed to be references to this Article 16 or the applicable provisions set forth in this Article 16, respectively.

Section 16.02. *Optional Redemption for Changes in the Tax Law of the Relevant Taxing Jurisdiction*. Other than as described in this Article 16, the Notes may not be redeemed by the Company at its option prior to maturity. If the Company has, or on the next Interest Payment Date would, become obligated to pay to the Holder of any Note Additional Amounts, as a result of:

(a)        any change or amendment on or after December 16, 2020 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date that is after December 16, 2020, after such later date) in the laws or any rules or regulations of a Relevant Taxing Jurisdiction; or

(b)        any change on or after December 16, 2020 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date that is after December 16, 2020, after such later date) in an interpretation, administration or application of such laws, rules or regulations by any legislative body, court, governmental agency, taxing authority or regulatory or administrative authority of such Relevant Taxing Jurisdiction (including the enactment of any legislation and the announcement or publication of any judicial decision or regulatory or administrative interpretation or determination); (each, a "**Change in Tax Law**"), the Company may, at its option, redeem all but not part of the Notes (an "**Optional Redemption**") (except in respect of certain Holders that elect otherwise as described below) at a "**Redemption Price**" equal to 100% of the principal amount plus accrued and unpaid interest, if any, to, but not including the date on which the Notes are redeemed (the "**Redemption Date**"), including, any Additional Amounts with respect to such Redemption Price; provided that the Company may only redeem the Notes if: (i) the Company cannot avoid such obligations by taking commercially reasonable measures available to the Company (provided that changing the jurisdiction of incorporation of the Company shall be deemed not to be a commercially reasonable measure); and (ii) the Company delivers to the Trustee an opinion of outside legal counsel or a tax advisor of recognized standing in the Relevant Taxing Jurisdiction and an Officers' Certificate attesting to such Change in Tax Law and obligation to pay Additional Amounts.

Notwithstanding anything to the contrary herein, neither the Company nor any successor Person may redeem any of the Notes in the case that Additional Amounts are payable in respect of PRC withholding tax at the Applicable PRC Rate or less solely as a result of the Company or its successor Person being considered a PRC tax resident.

If the Redemption Date occurs after a Regular Record Date and on or prior to the corresponding Interest Payment Date, the Company shall pay on the Interest Payment Date the full amount of accrued and unpaid interest, if any, due on such Interest Payment Date to the record holder of the Notes on the Regular Record Date corresponding to such Interest Payment Date, and the Redemption Price payable to the Holder who presents a Note for redemption shall be equal to 100% of the principal amount of such Note, including, for the avoidance of doubt, any Additional Amounts with respect to such Redemption Price.

The Company shall give Holders of Notes (with a copy to the Trustee) not less than 43 Scheduled Trading Days' but no more than 60 Scheduled Trading Days' notice (a "**Redemption**

77

**Notice**") prior to the Redemption Date. Simultaneously with providing such notice, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time. The Redemption Date must be a Business Day and cannot fall after the Maturity Date.

Upon receiving such Redemption Notice, each Holder shall have the right to elect to not have its Notes redeemed, in which case the Company shall not be obligated to pay any Additional Amounts on any payment with respect to such Notes solely as a result of such Change in Tax Law that resulted in the obligation to pay such Additional Amounts (whether upon conversion, required repurchase, maturity or otherwise, and whether in cash, ADSs, or a combination thereof, Reference Property or otherwise) after the Redemption Date (or, if the Company fails to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price), and all future payments with respect to such Notes shall be subject to the deduction or withholding of such Relevant Taxing Jurisdiction and taxes required by law to be deducted or withheld as a result of such Change in Tax Law; *provided* that, notwithstanding the foregoing, if a Holder electing not to have its Notes redeemed converts its Notes in connection with the Company's election to redeem the Notes in respect of such Change in Tax Law pursuant to Section 14.03(g) the Company shall be obligated to pay Additional Amounts, if any, with respect to such conversion.

Subject to the applicable procedures of DTC in the case of Global Notes, a Holder electing to not have its Notes redeemed must deliver to the Company, with a copy to the Paying Agent a written notice of election so as to be received by the Company and the Paying Agent or otherwise by complying with the requirements for conversion in Section 14.02(b) prior to the close of business on the second Business Day immediately preceding the Redemption Date. A Holder may withdraw any notice of election (other than such a deemed notice of election in connection with a conversion) by delivering to the Company and the Paying Agent a written notice of withdrawal prior to the close of business on the Business Day immediately preceding the Redemption Date (or, if the Company fails to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price). If no election is made, the Holder shall have its Notes redeemed without any further action.

No Notes may be redeemed if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date.

## ARTICLE 17
### MISCELLANEOUS PROVISIONS

Section 17.01.  *Provisions Binding on Company's Successors.*  All the covenants, stipulations, promises and agreements of the Company contained in the Indenture shall bind its successors and assigns whether so expressed or not.

Section 17.02.  *Official Acts by Successor Corporation.*  Any act or proceeding by any provision of the Indenture authorized or required to be done or performed by any board,

78

committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 17.03.  *Addresses for Notices, Etc.*  So long as and to the extent that the Notes are represented by Global Notes and such Global Notes are held by DTC, notices to owners of beneficial interests in the global notes may be given by delivery of the relevant notice to DTC for communication by it to entitled account holders.

Section 17.04.  *Legal Holidays.*  Section 16.05 of the Base Indenture shall, with respect to the Notes, be superseded in its entirety by this Section 17.04, and any reference in the Base Indenture to section 16.05 shall, with respect to the Notes, be deemed to refer instead to this Section 17.04, as the context may require. In any case where any Interest Payment Date, Fundamental Change Repurchase Date, Redemption Date, Repurchase Date, Conversion Date or Maturity Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue in respect of the delay.

Section 17.05. *Governing Law; Waiver of Trial by Jury*. This Supplemental Indenture and the Notes shall be deemed to be contracts made under the law of the State of New York, and for all purposes shall be governed by and construed in accordance with the law of said State.

EACH OF THE COMPANY AND THE TRUSTEE HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SUPPLEMENTAL INDENTURE.

Section 17.06.  *No Security Interest Created.*  Nothing in the Indenture or in the Notes, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

Section 17.07. *Benefits of Indenture*. Nothing in this Supplemental Indenture expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or to give to, any Person other than the parties hereto and their successors and the Holders of the Notes any benefit or any right, remedy or claim under or by reason of the Indenture or any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in the Indenture contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Holders of the Notes.

Section 17.08. *Execution in Counterparts*.  This Supplemental Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or PDF transmission shall constitute

79

effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 17.09. *Severability*. If any provision hereof shall be held to be invalid, illegal or unenforceable under applicable law, then the remaining provisions hereof shall be construed as though such invalid, illegal or unenforceable provision were not contained herein.

Section 17.10. *Calculations*.  Except as otherwise provided herein, the Company shall be responsible for making all calculations called for under the Notes.  These calculations include, but are not limited to, determinations of the Last Reported Sale Prices of the ADSs, the Daily VWAPs, the Daily Conversion Values, the Daily Settlement Amounts, accrued interest payable on the Notes, the number of Additional ADSs to be added to the Conversion Rate upon a Make-Whole Fundamental Change, if any, and the Conversion Rate of the Notes.  The Company shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders.  The Company shall provide a schedule of its calculations to each of the Trustee, the Paying Agent and the Conversion Agent, and each of the Trustee, the Paying Agent and the Conversion Agent is entitled to rely conclusively and without liability upon the accuracy of the Company's calculations without independent verification.  The Trustee will forward the Company's calculations to any registered Holder of Notes upon the written request of that Holder at the sole cost and expense of the Company.

Section 17.11. *USA PATRIOT Act.*  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee.  The parties to the Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA PATRIOT Act.

[*Remainder of page intentionally left blank*]

80

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first written above.

IQIYI, INC.

By:   /s/ Xiaodong Wang
      Name:  Xiaodong Wang
      Title:   Chief Financial Officer

CITIBANK, N.A., as Trustee

By:   /s/ Danny Lee
      Name:  Danny Lee
      Title:   Senior Trust Officer

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[*For Inclusion in a Global Security only* -- UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR THE INDIVIDUAL SECURITIES REPRESENTED HEREBY, THIS GLOBAL SECURITY MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.]

A-1

IQIYI, INC.

4.00% Convertible Senior Note due 2026

No. [_____]          [Initially][1] US$_____

CUSIP No. [_____]

ISIN No. [_____]

iQIYI, Inc., a company duly organized and validly existing under the laws of the Cayman Islands (the "**Company**," which term includes any successor company or corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to [CEDE & CO.][2] [_____][3], or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto][4] [of US$[_____]][5], which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed US$800,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Underwriters pursuant to the exercise of their option to purchase additional Notes as set forth in the Underwriting Agreement) in aggregate at any time, in accordance with the rules and procedures of the Depositary, on December 15, 2026, and interest thereon as set forth below.

This Note shall bear interest at the rate of 4.00% per year from December 21, 2020, or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until December 15, 2026. Interest is payable semi-annually in arrears on each June 15 and December 15, commencing on June 15, 2021, to Holders of record at the close of business on the preceding June 1 and December 1 (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 6.03 of the within-mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to Section 6.03, and any express mention of the payment of Additional Interest in any provision therein shall not be construed as excluding Additional Interest in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.04(c) of the Indenture.

---

[1]               Include if a Global Note.
[2]               Include if a Global Note.
[3]               Include if a Physical Note.
[4]               Include if a Global Note.
[5]               Include if a Physical note.

The Company shall pay the principal of and interest on this Note, so long as such Note is a Global Note, by wire transfer in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note.  As provided in and subject to the provisions of the Indenture, the Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose.  The Company has initially designated Citibank, N.A. as its Paying Agent, Conversion Agent and Registrar in respect of the Notes and the Paying Agent Office as a place where Notes may be presented for payment or for registration of transfer.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into cash, ADSs or a combination of cash and ADSs, as applicable, on the terms and subject to the limitations set forth in the Indenture.  Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York (without regard to the conflicts of laws provisions thereof).**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually by the Trustee under the Indenture.

[*Remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

IQIYI, INC.

By: _____

　　　Name:
　　　Title:

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

CITIBANK, N.A.,
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By: _____

　　　Authorized signatory

[FORM OF REVERSE OF NOTE]

IQIYI, INC.
4.00% Convertible Senior Note due 2026

This Note is one of a duly authorized issue of Notes of the Company, designated as its 4.00% Convertible Senior Notes due 2026 (the "**Notes**"), limited to the aggregate principal amount of US$800,000,000 (as increased by an amount equal to the aggregate principal amount of any additional Notes purchased by the Underwriters pursuant to the exercise of their option to purchase additional Notes as set forth in the Underwriting Agreement), all issued or to be issued under and pursuant to an Indenture dated as of December 21, 2020 (the "**Base Indenture**"), as amended and supplemented by the First Supplemental Indenture dated as of December 21, 2020  (herein called the "**Supplemental Indenture**"; the Base Indenture, as amended and supplemented by the Supplemental Indenture, and as it may be further amended or supplemented from time to time, the "**Indenture**") each between the Company and Citibank, N.A. (the "**Trustee**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the Holders of the Notes.  Additional Notes may be issued in an unlimited aggregate principal amount, subject to certain conditions specified in the Indenture.  Capitalized terms used in this Notes and not defined in this Note shall have the respective meanings set forth in the Indenture.

In case certain Events of Default shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture. In case certain Events of Default relating to a bankruptcy (or similar proceeding) with respect to the Company or a Significant Subsidiary of the Company shall have occurred, the principal of, and interest on, all Notes shall automatically become immediately due and payable, as set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments and deliveries in respect of the principal amount on the Maturity Date, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, as the case may be, to the Holder who surrenders a Note to the Paying Agent to collect such payments in respect of the Note.  The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

Subject to the terms and conditions of the Indenture, Additional Amounts will be paid in connection with any payments made and deliveries caused to be made by the Company or any successor to the Company under or with respect to the Indenture and the Notes, including, but not limited to, payments of principal (including, if applicable the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and the payment of cash and/or deliveries of ADSs (together with payments for any fractional ADS) upon conversion of the Notes to ensure that the net amount received by the beneficial owner after any applicable withholding or deduction (and after deducting any taxes on the Additional

Amounts) will equal the amount that would have been received by such beneficial owner had no such withholding or deduction been required.

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein.  It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay or cause to be delivered, as the case may be, the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on, and the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money or ADSs, as the case may be, herein prescribed.

The Notes are issuable in registered form without coupons in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof.  At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Company may not redeem the Notes prior to the Maturity Date, except in the event of certain Changes in Tax Law as described in Section 16.02 of the Supplemental Indenture. No sinking fund is provided for the Notes.

The Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Repurchase Date at a price equal to the Repurchase Price.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Fundamental Change Repurchase Date at a price equal to the Fundamental Change Repurchase Price.

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, during certain periods and upon the occurrence of certain conditions specified in the Indenture,

prior to the close of business on the Business Day immediately preceding the Maturity Date, to convert any Notes or portion thereof that is US$1,000 or an integral multiple thereof, into cash, ADSs or a combination of cash and ADSs, as applicable, at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN  = joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

**SCHEDULE A6**

SCHEDULE OF EXCHANGES OF NOTES

IQIYI, INC.
4.00% Convertible Senior Notes due 2026

The initial principal amount of this Global Note is [_____] UNITED STATES DOLLARS (US$[_____]).  The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
| | | | | |

---

6          Include if a global note.

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

To:     IQIYI, INC.

        JPMORGAN CHASE BANK, N.A., as Depositary for the ADSs

        CITIBANK, N.A., as Conversion Agent

        The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, into cash, ADSs or a combination of cash and ADSs, as applicable, in accordance with the terms of the Indenture referred to in this Note, and directs that any cash payable and ADSs deliverable upon such conversion, together with any cash payable for any fractional ADS, and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below.  If any ADSs or any portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any in accordance with Section 14.02(d) and Section 14.02(e) of the Supplemental Indenture.  Any amount required to be paid to the undersigned on account of interest accompanies this Note. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

Dated:  _____          _____

                                           _____
                                           Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program

1

pursuant to Securities and Exchange
Commission Rule 17Ad-15 if ADSs
are to be issued, or Notes are to be
delivered, other than to and in the
name of the registered holder.
Fill in for registration of ADSs if
to be issued, and Notes if to
be delivered, other than to and in the
name of the registered holder:

_____

(Name)

_____

(Street Address)

_____

(City, State and Zip Code)
Please print name and address

Principal amount to be converted (if less than all):  US$_____,000

NOTICE:  The above signature(s) of the Holder(s) hereof must
correspond with the name as written upon the face of the Note in
every particular without alteration or enlargement or any change
whatever.

_____

Social Security or Other Taxpayer
Identification Number

**ATTACHMENT 2**

[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]

To:      IQIYI, INC.

         CITIBANK, N.A., as Paying Agent

        The undersigned registered owner of this Note hereby acknowledges receipt of a notice from iQIYI, Inc. (the "**Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Repurchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 15.02 of the Supplemental Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, and (2) if such Fundamental Change Repurchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest thereon to, but excluding, such Fundamental Change Repurchase Date. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

        In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

        Certificate Number(s): _____

Dated:        _____

                                           Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if ADSs

are to be issued, or Notes are to be
delivered, other than to and in the
name of the registered holder.
Fill in for registration of ADSs if
to be issued, and Notes if to
be delivered, other than to and in the
name of the registered holder:

_____
(Name)


_____
(Street Address)


_____
(City, State and Zip Code)
Please print name and address

_____
Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all):  US$_____,000

NOTICE:  The above signature(s) of the Holder(s) hereof must
correspond with the name as written upon the face of the Note in
every particular without alteration or enlargement or any change
whatever.

**ATTACHMENT 3**

[FORM OF REPURCHASE NOTICE]

To:      iQIYI, Inc.

        Citibank, N.A., as Paying Agent

        The undersigned registered owner of this Note hereby acknowledges receipt of a notice from iQIYI, Inc. (the "**Company**") regarding the right of Holders to elect to require the Company to repurchase the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, and requests and instructs the Company to repurchase the entire principal amount of this Notes, or the portion thereof (that is US$1,000 principal amount of an integral multiple thereof) below designated, in accordance with the applicable provisions of the Indenture referred to in this Note, at the Repurchase Price from the registered Holder hereof. Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Indenture.

        In the case of certificated Notes, the certificate numbers of the Notes to be purchased are as set forth below:

        Certificate Number(s): _____

Dated:      _____

                                   _____
                                   Signature(s)

                                   _____
                                   Social Security or Other Taxpayer
                                   Identification Number

                                   Principal amount to be repaid (if less than all):  US$_____,000

                                   NOTICE:  The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

**ATTACHMENT 4**

[FORM OF ASSIGNMENT AND TRANSFER]

For value received _____ hereby sell(s), assign(s) and transfer(s) unto _____ (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints _____ attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

Dated: _____    _____

_____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed by an
eligible Guarantor Institution (banks, stock
brokers, savings and loan associations and
credit unions) with membership in an approved
signature guarantee medallion program pursuant
to Securities and Exchange Commission
Rule 17Ad-15 if Notes are to be delivered, other
than to and in the name of the registered holder.

NOTICE:  The signature on the assignment must correspond with the name as written upon the face of the Note in every particular
without alteration or enlargement or any change whatever.

**Exhibit 8.1**

**List of Significant Subsidiaries and Consolidated Affiliated Entities of iQIYI, Inc.**

| Subsidiaries | Place of Incorporation |
| --- | --- |
| Beijing QIYI Century Science & Technology Co., Ltd. | PRC |
| Beijing iQIYI Interactive Technology Co., Ltd. | PRC |
| Shanghai iQIYI Network & Technology Co., Ltd. | PRC |
| Chongqing QIYI Tianxia Science & Technology Co., Ltd. | PRC |
| Beijing iQIYI New Media Science & Technology Co., Ltd. | PRC |
| iQIYI Film Group HK Limited | Hong Kong |
| iQIYI HK Limited | Hong Kong |
| Special (Hong Kong) Co., Ltd. | Hong Kong |
| Magic Prime Group Limited | BVI |
| iQIYI Film Group Limited | Cayman Islands |
| iQIYI Media Limited | Cayman Islands |
| Skymoons Inc. | Cayman Islands |

| Consolidated Affiliated Entities | Place of Incorporation |
| --- | --- |
| Beijing iQIYI Science & Technology Co., Ltd. | PRC |
| Shanghai iQIYI Culture Media Co., Ltd. | PRC |
| Shanghai Zhong Yuan Network Co., Ltd. | PRC |
| iQIYI Pictures (Beijing) Co., Ltd. | PRC |
| Beijing iQIYI Intelligent Entertainment Technology Co., Ltd. | PRC |
| Chengdu Skymoons Digital Entertainment Co., Ltd. | PRC |
| Chengdu Skymoons Interactive Network Game Co., Ltd. | PRC |

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Yu Gong, certify that:

1.   I have reviewed this annual report on Form 20-F of iQIYI, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.   The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date:        March 9, 2021

By:        /s/ Yu Gong
Name:      Yu Gong
Title:     Chief Executive Officer

EXHIBIT 12.2

**Certification by the Principal Financial Officer**

**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Xiaodong Wang, certify that:

1.  I have reviewed this annual report on Form 20-F of iQIYI, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date:       March 9, 2021

By:       /s/ Xiaodong Wang
Name:     Xiaodong Wang
Title:     Chief Financial Officer

**EXHIBIT 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of iQIYI, Inc. (the "Company") on Form 20-F for the year ended December 31, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Yu Gong, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    March 9, 2021


By:    /s/ Yu Gong
Name:    Yu Gong
Title:    Chief Executive Officer

**EXHIBIT 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of iQIYI, Inc. (the "Company") on Form 20-F for the year ended December 31, 2020 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Xiaodong Wang, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:        March 9, 2021

By:        /s/ Xiaodong Wang
Name:      Xiaodong Wang
Title:       Chief Financial Officer

**EXHIBIT 15.1**

**Partners:**
Paul Aherne **
Joanne Collett *
Mark Cummings *****
Stuart D'Addona ****
Nicholas Davies ***
Shamar Ennis ***
James Gaden ****
Kristen Kwok **
Jo Lit *
Callum McNeil **
Alice Molan ******
Andrew Randall **
Rupen Shah *******
Denise Wong **

9 March 2021

JWYL/Q0149-H05009

iQIYI, Inc.
Intertrust Corporate Services (Cayman) Limited
190 Elgin Avenue, George Town
Grand Cayman KY1-9005
Cayman Islands

Dear Sirs

**iQIYI, Inc.**

We consent to the reference to our firm under the heading "Item 10.B. Additional Information—Memorandum and Articles of Association" and "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation" in iQIYI, Inc.'s Annual Report on Form 20-F for the year ended 31 December 2020 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2021.

We further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-225165) pertaining to iQIYI, Inc.'s 2000 Equity Incentive Plan and 2017 Share Incentive Plan and the Registration Statement (Form F-3 No. 333-251359) of the summary of our opinion under the heading "Item 10.B. Additional Information—Memorandum and Articles of Association" and "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation" in the Annual Report.

We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,


/s/ Walkers (Hong Kong)
Walkers (Hong Kong)

**Walkers (Hong Kong)**
滙嘉律師事務所 (香港)

15th Floor, Alexandra House, 18 Chater Road, Central, Hong Kong
**T** +852 2284 4566 **F** +852 2284 4560  www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

*England and Wales; **BVI; ***Cayman Islands; ****New South Wales (Australia); *****Ireland; ******Victoria (Australia); *******Bermuda

競 天 公 誠 律 師 事 務 所
## JINGTIAN & GONGCHENG

34/F, Tower 3, China Central Place, 77 Jianguo Road, Beijing 100025, China
Telephone: (86-10) 5809-1000     Facsimile: (86-10) 5809-1100

To: iQIYI, Inc.
Intertrust Corporate Services (Cayman) Limited,
190 Elgin Avenue, George Town,
Grand Cayman KY1-9005,
Cayman Islands

March 9, 2021

Dear Sir/Madam:

We hereby consent to the reference of our name under the heading "Item 4.C. Information on the Company—Organizational Structure" and "Item 10.E. Additional Information—Taxation—People's Republic of China Taxation" in iQIYI, Inc.'s Annual Report on Form 20-F for the year ended December 31, 2020 (the "Annual Report"), which will be filed with the Securities and Exchange Commission (the "SEC") in the month of March 2021, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-225165) pertaining to iQIYI, Inc.'s 2010 Equity Incentive Plan and 2017 Share Incentive Plan and the Registration Statement (Form F-3 No. 333-251359) of the summary of our opinion under the heading "Item 4.C. Information on the Company—Organizational Structure" and "Item 10.E. Additional Information—Taxation—People's Republic of China Taxation" in the Annual Report. We also consent to the filing of this consent letter with the SEC as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ Jingtian & Gongcheng
Jingtian & Gongcheng

**Exhibit 15.3**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-8 No. 333-225165) pertaining to the 2010 Equity Incentive Plan and 2017 Share Incentive Plan of iQIYI, Inc., and

(2) Registration Statement (Form F-3 No. 333-251359) of iQIYI, Inc.;

of our reports dated March 8, 2021, with respect to the consolidated financial statements of iQIYI, Inc. and the effectiveness of internal control over financial reporting of iQIYI, Inc. included in this Annual Report (Form 20-F) of iQIYI, Inc. for the year ended December 31, 2020.


/s/ Ernst & Young Hua Ming LLP
Beijing, The People's Republic of China
March 9, 2021