# Exhibit S

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 20-F

<u>(Mark One)</u>

☐    **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**or**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016.**

**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For    the transition period from          to**

**or**

☐    **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date    of event requiring this shell company report**

**Commission file number: 000-51469**

# Baidu, Inc.

**(Exact name of Registrant as specified in its charter)**

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**Baidu Campus**
**No. 10 Shangdi 10th Street**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Address of principal executive offices)**

**Jennifer Xinzhe Li, Chief Financial Officer**
**Telephone: +(86 10) 5992-8888**
**Email: ir@baidu.com**
**Facsimile: +(86 10) 5992-0000**
**Baidu Campus**
**No. 10 Shangdi 10th Street,**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (ten American depositary shares representing one Class A ordinary share, par value US$0.00005 per share) | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |
| Class A ordinary shares, par value US$0.00005 per share* | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

\*    Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

Securities registered or to be registered pursuant to Section 12(g) of the Act:

**None**

**(Title of Class)**

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:

**None**

**(Title of Class)**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**27,325,551 Class A ordinary shares and 7,401,254 Class B ordinary shares, par value US$0.00005 per share, as of December 31, 2016.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes  ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer          ☒                    Accelerated filer          ☐                    Non-accelerated filer          ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒          International Financial Reporting Standards as issued by the International          Other ☐
                      Accounting Standards Board ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐

Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.    Yes ☐    No ☐

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING INFORMATION | | 1 |
| PART I | | 2 |
| Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
| Item 2. | Offer Statistics and Expected Timetable | 2 |
| Item 3. | Key Information | 2 |
| Item 4. | Information on the Company | 43 |
| Item 4A. | Unresolved Staff Comments | 80 |
| Item 5. | Operating and Financial Review and Prospects | 80 |
| Item 6. | Directors, Senior Management and Employees | 110 |
| Item 7. | Major Shareholders and Related Party Transactions | 119 |
| Item 8. | Financial Information | 120 |
| Item 9. | The Offer and Listing | 121 |
| Item 10. | Additional Information | 122 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 131 |
| Item 12. | Description of Securities Other than Equity Securities | 131 |
| PART II | | 133 |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 133 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 133 |
| Item 15. | Controls and Procedures | 133 |
| Item 16A. | Audit Committee Financial Expert | 134 |
| Item 16B. | Code of Ethics | 134 |
| Item 16C. | Principal Accountant Fees and Services | 134 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 135 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 135 |
| Item 16F. | Change in Registrant's Certifying Accountant | 135 |
| Item 16G. | Corporate Governance | 135 |
| Item 16H. | Mine Safety Disclosure | 135 |
| PART III | | 136 |
| Item 17. | Financial Statements | 136 |
| Item 18. | Financial Statements | 136 |
| Item 19. | Exhibits | 136 |
| SIGNATURES | | 143 |

i

Table of Contents

## INTRODUCTION

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "we," "us," "our company," "our," or "Baidu" refers to Baidu, Inc., its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated affiliated entities in China, including but not limited to Beijing Baidu Netcom Science Technology Co., Ltd., or Baidu Netcom;

- "user traffic" or "traffic" refers generally to page views and the reach of a website, with "page views" measuring the number of web pages viewed by internet users over a specified period of time except that multiple page views of the same page viewed by the same user on the same day are counted only once, and "reach" measuring the number of internet users and typically expressed as the percentage of all internet users who visit a given website;

- "China" or "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excluding Taiwan, Hong Kong and Macau;

- "shares" or "ordinary shares" refers to our ordinary shares, which include both Class A ordinary shares and Class B ordinary shares;

- "ADSs" refers to our American depositary shares, and we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share on May 12, 2010, which has the same effect as a 10-for-1 ADS split;

- "U.S. GAAP" refers to generally accepted accounting principles in the United States;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "$", "dollars", "US$" or "U.S. dollars" refers to the legal currency of the United States; and

- all discrepancies in any table between the amounts identified as total amounts and the sum of the amounts listed therein are due to rounding.

## FORWARD-LOOKING INFORMATION

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by terminology such as "may," "will," "expect," "anticipate," "future," "intend," "plan," "believe," "estimate," "is/are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our growth strategies;

- our future business development, results of operations and financial condition;

- our ability to attract and retain users and customers and generate revenue and profit from our customers;

- our ability to retain key personnel and attract new talent;

- competition in the internet search, online marketing and other businesses in which we engage;

- the outcome of ongoing or any future litigation, including those relating to intellectual property rights; and

1

**Table of Contents**

- PRC governmental regulations and policies relating to the internet, internet search and online marketing and the implementation of a corporate structure involving variable interest entities in China.

We would like to caution you not to place undue reliance on these forward-looking statements and you should read these statements in conjunction with the risk factors disclosed in "Item 3D. Key Information—Risk Factors." Those risks are not exhaustive. We operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

## PART I

**Item 1.        Identity of Directors, Senior Management and Advisers**

Not applicable.

**Item 2.        Offer Statistics and Expected Timetable**

Not applicable.

**Item 3.        Key Information**

**A.    Selected Financial Data**

The following table presents the selected consolidated financial information for our company. The selected consolidated statements of comprehensive income data for the three years ended December 31, 2014, 2015 and 2016 and the consolidated balance sheets data as of December 31, 2015 and 2016 have been derived from our audited consolidated financial statements, which are included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive income data for the years ended December 31, 2012 and 2013 and the selected consolidated balance sheets data as of December 31, 2012, 2013 and 2014 have been derived from our audited consolidated financial statements for the years ended December 31, 2012, 2013 and 2014, which are not included in this annual report, with certain adjustment being made to the selected consolidated balance sheet data as of December 31, 2013 as a result of our exchange of shares in Qunar Cayman Islands Limited, or Qunar, with Ctrip.com International, Ltd., or Ctrip. Our historical results do not necessarily indicate results expected for any future periods. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our audited consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

2

Table of Contents

| | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (In thousands except per share and per ADS data) | | | | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | | | |
| Revenues: | | | | | | |
| Online marketing services | 22,245,643 | 31,802,219 | 48,495,215 | 64,037,006 | 64,525,115 | 9,293,550 |
| Others | 60,383 | 141,705 | 557,103 | 2,344,723 | 6,024,249 | 867,672 |
| Total revenues | 22,306,026 | 31,943,924 | 49,052,318 | 66,381,729 | 70,549,364 | 10,161,222 |
| Operating costs and expenses: | | | | | | |
| Cost of revenues | (6,448,545) | (11,471,839) | (18,885,450) | (27,458,030) | (35,278,945) | (5,081,225) |
| Selling, general and administrative | (2,501,336) | (5,173,533) | (10,382,142) | (17,076,383) | (15,070,586) | (2,170,616) |
| Research and development | (2,304,825) | (4,106,832) | (6,980,962) | (10,175,762) | (10,150,753) | (1,462,013) |
| Total operating costs and expenses | (11,254,706) | (20,752,204) | (36,248,554) | (54,710,175) | (60,500,284) | (8,713,854) |
| Operating profit | 11,051,320 | 11,191,720 | 12,803,764 | 11,671,554 | 10,049,080 | 1,447,368 |
| Interest income | 866,465 | 1,308,542 | 1,992,818 | 2,362,632 | 2,341,631 | 337,265 |
| Interest expense | (107,857) | (447,084) | (628,571) | (1,041,394) | (1,157,562) | (166,724) |
| Income (loss) from equity method investments | (294,229) | 22,578 | (19,943) | 3,867 | (1,025,727) | (147,735) |
| Other income, net, including exchange gains or losses | 449,738 | 140,951 | 336,338 | 24,909,964 | 4,301,785 | 619,586 |
| Income before income taxes | 11,965,437 | 12,216,707 | 14,484,406 | 37,906,623 | 14,509,207 | 2,089,760 |
| Income taxes | (1,574,159) | (1,828,930) | (2,231,172) | (5,474,377) | (2,913,594) | (419,645) |
| Net income | 10,391,278 | 10,387,777 | 12,253,234 | 32,432,246 | 11,595,613 | 1,670,115 |
| Less: Net loss attributable to non-controlling interests | (64,750) | (162,880) | (943,698) | (1,231,927) | (36,656) | (5,280) |
| Net income attributable to Baidu, Inc. | 10,456,028 | 10,550,657 | 13,196,932 | 33,664,173 | 11,632,269 | 1,675,395 |
| Earnings per share for Class A and Class B ordinary shares[1] | | | | | | |
| Basic | 298.62 | 300.66 | 374.88 | 954.56 | 319.47 | 46.01 |
| Diluted | 298.29 | 300.23 | 373.43 | 951.49 | 318.62 | 45.89 |
| Earnings per ADS (1 Class A ordinary share is represented by 10 ADSs) | | | | | | |
| Basic | 29.86 | 30.07 | 37.49 | 95.46 | 31.95 | 4.60 |
| Diluted | 29.83 | 30.02 | 37.34 | 95.15 | 31.86 | 4.59 |

(1) As holders of Class A and Class B ordinary shares have the same dividend right and the same participation right in our undistributed earnings, the basic and diluted net income per Class A ordinary share and Class B ordinary share are the same for all the periods presented during which there were two classes of ordinary shares. The weighted average number of ordinary shares represents the sum of the weighted average number of Class A and Class B ordinary shares. Please see "Earnings Per Share" under Note 17 to our audited consolidated financial statements included in this annual report for additional information regarding the computation of the per share amounts and the weighted average numbers of Class A and Class B ordinary shares.

3

Table of Contents

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **2016** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | (In thousands) | | | | | |
| **Consolidated Balance Sheets Data:** | | | | | | |
| Cash and cash equivalents | 11,880,632 | 9,691,797 | 13,852,725 | 9,959,932 | 10,898,463 | 1,569,705 |
| Restricted cash | 395,029 | 259,533 | 413,010 | 95,997 | 317,521 | 45,733 |
| Short-term investments | 20,604,223 | 27,481,642 | 42,698,831 | 57,969,242 | 78,943,065 | 11,370,166 |
| Goodwill | 3,877,564 | 16,864,350 | 17,418,895 | 15,395,573 | 15,342,096 | 2,209,721 |
| Long-term investments, net | 803,499 | 1,259,473 | 3,544,923 | 37,958,591 | 45,690,363 | 6,580,781 |
| Total assets | 45,668,890 | 70,357,365 | 99,118,062 | 147,853,308 | 181,997,391 | 26,213,076 |
| Total liabilities | 18,453,765 | 30,320,538 | 45,065,679 | 63,637,592 | 84,254,996 | 12,135,243 |
| Total Baidu, Inc. shareholders' equity | 26,055,229 | 37,796,492 | 51,072,424 | 80,255,663 | 92,273,542 | 13,290,154 |
| Total equity | 26,181,842 | 40,036,827 | 52,157,881 | 80,267,837 | 92,250,419 | 13,286,824 |

**Exchange Rate Information**

Our business is primarily conducted in China and almost all of our revenues are denominated in RMB. However, periodic reports made to shareholders will include current period amounts translated into U.S. dollars using the then current exchange rates, for the convenience of the readers. The conversion of RMB into U.S. dollars in this annual report is based on the exchange rate set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. Unless otherwise noted, all translations from RMB to U.S. dollars and from U.S. dollars to RMB in this annual report were made at a rate of RMB6.9430 to US$1.00, the exchange rate in effect as of December 30, 2016. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be, at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade. On March 24, 2017, the noon buying rate was RMB6.8803 to US$1.00.

The following table sets forth information concerning exchange rates between the RMB and the U.S. dollar for the periods indicated.

| | Exchange Rate | | | |
|---|---|---|---|---|
| **Period** | **Period-End** | **Average** | **Low** | **High** |
| | (RMB per U.S. Dollar) | | | |
| 2012 | 6.2301 | 6.2990 | 6.3879 | 6.2221 |
| 2013 | 6.0537 | 6.1412 | 6.2438 | 6.0537 |
| 2014 | 6.2046 | 6.1704 | 6.2591 | 6.0402 |
| 2015 | 6.4778 | 6.2869 | 6.4896 | 6.1870 |
| 2016 | 6.9430 | 6.6549 | 6.9580 | 6.4480 |
| September | 6.6685 | 6.6702 | 6.6790 | 6.6600 |
| October | 6.7735 | 6.7303 | 6.7819 | 6.6685 |
| November | 6.8837 | 6.8402 | 6.9195 | 6.7534 |
| December | 6.9430 | 6.9198 | 6.9580 | 6.8771 |
| 2017 | | | | |
| January | 6.8768 | 6.8907 | 6.9575 | 6.8360 |
| February | 6.8665 | 6.8694 | 6.8821 | 6.8517 |
| March (through March 24, 2017) | 6.8803 | 6.8976 | 6.9132 | 6.8785 |

Source: Federal Reserve Statistical Release

(1)   Annual averages are calculated using the average of month-end rates of the relevant year. Monthly averages are calculated using the average of the daily rates during the relevant period.

4

**Table of Contents**

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.    Risk Factors**

**Risks Related to Our Business**

*If we fail to retain existing customers or attract new customers for our online marketing services, our business, results of operations and growth prospects could be seriously harmed.*

We generate substantially all of our revenues from online marketing services, a substantial majority of which are derived from our pay-for-performance, or P4P, services. Our online marketing customers will not continue to do business with us if their investment does not generate sales leads and ultimately consumers, or if we do not deliver their web pages in an appropriate and effective manner. Our P4P customers may choose to discontinue their business with us, which are not subject to fixed-term contracts. In addition, third parties may develop and use certain technologies to block the display of our customers' advertisements and other marketing products on our Baidu platform, which may in turn cause us to lose customers and adversely affect our results of operations. Furthermore, as our auction-based P4P services enable our customers to bid for priority placement of their paid sponsored links, we may lose customers if they find the bidding mechanism not cost effective or otherwise not attractive. Additionally, if our users do not increase their search frequencies on our platform, or our content ecosystem fails to offer rich and quality content that meets users' tastes and preferences, or our users spend more time with or otherwise satisfy their search demands on competing platforms, or we otherwise experience user traffic decline due to any reason, it would be difficult for us to attract new customers or retain existing customers. Failure to retain our existing customers or attract new customers for our online marketing services could seriously harm our business, results of operations and growth prospects.

In recent years, our revenues from online advertising have increased. We believe our large user base and traffic provide advertisers with a broad reach and optimal monetization results. However, we cannot assure you that we will be able to continue to attract new advertisers or retain our existing advertisers. If our advertisers determine that their expenditures on our platform do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels, such as television, outdoor media and other online marketing platforms, and reduce or discontinue business with us. Since most of our advertisers are not bound by long-term contracts, they may amend or terminate advertising arrangements with us easily without incurring liabilities. Failure to retain existing advertisers or attract new ones to advertise on our platform may materially and adversely affect our business, financial condition, results of operations and prospects.

We have in the past removed, and may in the future again remove, questionable paid search listings of some customers to ensure the quality and reliability of our search results. Such removal, whether temporary or permanent, may cause the affected customers to discontinue their business with us. We also examine the relevant business licenses and bank accounts of prospective customers prior to business engagement, as a quality control measure. In addition, since early May 2016, we have taken steps to implement measures requested by PRC regulatory authorities, such as modifying paid search practices and limiting the amount of displays. We have also proactively implemented numerous additional measures to deliver a better user experience and build a safer and more trustworthy platform for users, including turning down customers who do not meet our new requirements, creating a customer credibility ranking system and weighing customer credibility more highly in the ranking algorithm, reducing the number of sponsored links, and making upgrades to our user feedback system and user

5

Table of Contents

protection programs. Such measures have had a negative impact on the number of customers and our revenues in the short term. PRC regulations on online marketing services are evolving, and uncertainties remain with respect to the implementation of and compliance with new regulations that may emerge, which in turn may have a material adverse impact on our business, results of operations and growth prospects.

### *If online marketing does not further grow in China, our ability to increase revenue and profitability could be materially and adversely affected.*

While the internet has developed to a more advanced stage in China, customers have many channels to do online marketing and promotion. As users may not spend as much time on internet search products as they used to, many current and potential customers may not use internet search products as their one of the main online marketing channels to promote their products and services, and thus may not allocate a significant portion of their marketing budgets to online marketing through internet search products such as our P4P services, as compared to other methods of online marketing. Our ability to increase revenue and profitability from online marketing on PC and mobile internet may be adversely impacted by a number of factors, many of which are beyond our control, including:

- difficulties associated with developing a larger user base with demographic characteristics attractive to online marketing customers and maintaining and increasing user engagement;

- increased competition and potential re-allocation of marketing budgets and downward pressure on online marketing prices;

- higher customer acquisition costs due in part to the limited experience of small to medium-sized enterprises, or SMEs, with the internet as a marketing channel or due to competition;

- ineffectiveness of our online marketing delivery, tracking and reporting systems; and

- decreased use of internet or online marketing in China.

### *Our business depends on a strong brand, and if we are not able to maintain and enhance our brand, our business and results of operations may be harmed.*

We believe that our brand "Baidu" has contributed significantly to the success of our business. We also believe that maintaining and enhancing the "Baidu" brand is critical to increasing the number of our users, customers, Baidu Union members and content providers. We have conducted various marketing and brand promotion activities, but we cannot assure you that these activities will achieve the brand promotion effect expected by us. If we fail to maintain and further promote the "Baidu" brand, or if we incur excessive expenses in this effort, our business and results of operations may be materially and adversely affected.

In addition, any negative publicity about our company, our products and services, our employees, our business practices, or our search results or the platform to which our search results link, regardless of its veracity, could harm our brand image and in turn adversely affect our business and results of operations. We cannot assure you that we will be able to defuse negative publicity to the satisfaction of our investors, users, customers and business partners. From time to time, there have been negative publicities about our company and our business practice, which adversely affected our public image and reputation during the period of certain intense negative publicities. For example, in 2016, Chinese media reported that a Chinese college student had died from cancer following unsuccessful treatment received at a hospital that the student had found through a paid search listing on Baidu. The negative publicity surrounding this incident has resulted in significant adverse impact on our public image and reputation. Intense negative publicities may divert our management's attention and may adversely impact our business. We cannot assure you that our brand, public image and reputation will not be materially and adversely affected in the future.

6

**Table of Contents**

***We face significant competition and may suffer from loss of users and customers as a result.***

We face significant competition in almost every aspect of our business, including competition from other companies that seek to provide internet search services to users and provide online marketing services to customers, as well as other companies that provide transaction or internet video services. In the Chinese internet market, our main competitors include China-based internet companies, such as Tencent, Alibaba, Sohu, Qihoo 360 and ByteDance. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), user experience of the search results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites/wapsites. For transaction services, our primary competitors include China-based internet companies such as Meituan-Dianping, Elema, Koubei, AutoNavi, Alipay and Weixin Pay. For iQiyi, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video. Some of our competitors have significant financial resources, long operating histories and are experienced in attracting and retaining their users, accommodating their users' habits and preferences and managing customers. They may use their experience and resources to compete with us in a variety of ways, including competing for users and their time, customers, distributors, content, strategic partners and networks of third-party websites/wapsites, investing more heavily in research and development and making investments and acquisitions. If any of our competitors provides comparable or better Chinese language search experience, transaction services or internet video services, our user traffic could decline significantly. Additionally, if the channels that we use to distribute services or products to our users and customers are no longer available to us, we may experience a decline in user traffic. Any such decline in traffic could weaken our brand and result in loss of users and customers, which could have a material and adverse effect on our results of operations.

We also face competition from other types of advertising media, such as newspapers, magazines, yellow pages, billboards, other forms of outdoor media, television, radio and mobile applications. Large companies in China generally allocate, and may continue to allocate, a limited portion of their budgets to online marketing, as opposed to traditional advertising and other forms of advertising media. If these companies do not devote a larger portion of their marketing budgets to online marketing services provided by us, or if our existing customers reduce the amount they spend on online marketing, our results of operations and growth prospects could be adversely affected.

***If our expansions into new businesses are not successful, our future results of operations and growth prospects may be materially and adversely affected.***

As part of our growth strategy, we enter into new businesses from time to time by leveraging our large internet user base to generate additional revenue streams and through our development of new business lines or strategic investments in or acquisitions of other businesses. Expansions into new businesses may present operating, marketing and compliance challenges that differ from those that we currently encounter. If we cannot address new challenges and provide exceptional quality services, we may not be able to compete effectively. As a result, we may not be able to recover costs incurred for investing in, developing and marketing new businesses, and may not achieve profitability from these businesses. In that case, our future results of operations and growth prospects may be materially and adversely affected. In addition, we may encounter regulatory uncertainties related to new business we enter into.

***If we fail to continue to innovate and provide products, services and high-quality internet experience that attract and retain users, we may not be able to generate sufficient user traffic to remain competitive.***

Our success depends on providing products and services to attract users and enable users to have a high-quality internet experience. In order to attract and retain users and compete against our competitors, we must continue to invest significant resources in research and development to enhance our internet search technology, artificial intelligence (AI) and autonomous driving technology improve our existing products and services and introduce additional high-quality products and services. If we are unable to anticipate user preferences or industry changes, or if we are unable to enhance the quality of our products and services on a timely basis or fail

7

**Table of Contents**

to provide sufficient content, we may suffer a decline in the size of our user base. Our results of operations may also suffer if our innovations do not respond to the needs of our users, are not appropriately timed with market opportunities or are not effectively brought to market. As search technology, AI and new forms of devices and applications continue to develop, we may expend significant resources in research and development and strategic investments and acquisitions in order to remain competitive.

*If our content ecosystem fails to continually offer quality content in a cost effective manner, we may experience declines in user traffic and user engagement, our business and results of operations may be harmed.*

We operate a content ecosystem consisting of our core search products, iQiyi, Baidu Maps, Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baijiahao, Baidu Newsfeed and various other products. The success of our content ecosystem depends on our ability to attract content owners to contribute quality content to our platform by leveraging our user traffic and enhance user engagement through provision of attractive content, so as to create a virtuous cycle. We have relied and will continue to rely on third parties for part of the content offered in our content ecosystem. As the competition for quality content becomes increasingly intense in China, we cannot assure you that we will be able to manage our content acquisition costs effectively and generate sufficient revenues to outpace future increase in content spending. We may also be unable to renew some of our content licensing agreements upon their expiration or termination and any renewal of the content licensing agreements may involve higher costs or less favorable terms. If we are not able to license popular premium content on commercially reasonable terms or renew our content licensing agreement, our financial condition and results of operations may be materially and adversely affected. In addition, we have users contribute their originally produced content to our various products, such as Baidu Post Bar, Baidu Knows and Baidu Encyclopedia, and we also invite self-media professionals to set up Baijiahao accounts on our platform and publish their content on our platform. If these parties fail to develop and maintain high-quality and engaging content, if our desired premium content becomes exclusive to our competitors, or if a large number of our existing relationships are terminated, the attractiveness of our content offerings to users may be severely impaired. If we are unable to offer content that meets users' tastes and preferences on a continuing basis and in a cost effective manner, our user experience may deteriorate, we may suffer from reduced user traffic, our business and results of operations may be harmed.

*Our expansion into financial services may subject us to regulatory, credit, operational and reputational risks, each of which may have a material adverse effect on our business, results of operations and financial condition.*

We began to provide financial services in China in recent years. Our financial services mainly include Baidu Consumer Credit, through which we offer education loans and consumer financing in industry sectors such as travel, beauty, home decoration and home rentals.

PRC laws and regulations concerning the internet finance industry, particularly those governing credit lending, are evolving. Although we have taken careful measures to comply with the laws and regulations that are applicable to the financial services that we offer, the PRC government authorities may promulgate new policies, rules and regulations regulating the internet finance industry. If our financial services, especially our innovative solutions, were deemed to violate any PRC laws or regulations, our business, financial conditions and results of operations may be materially and adversely affected. We cannot assure you that our practices would not be deemed to violate any PRC laws or regulations. Moreover, developments in the internet finance industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies that may limit or restrict online consumer financing services like those we offer, which could materially and adversely affect our business and operations. Furthermore, we cannot rule out the possibility that the PRC government will institute a new licensing regime covering our financial services in the future. If such a licensing regime were introduced, we cannot assure you that we would be able to obtain any newly required license in a timely manner, or at all, which could materially and adversely affect our business and impede our ability to continue our operations.

8

**Table of Contents**

As part of our financial services, we have adopted what we believe to be a new approach to credit risk management, through leveraging our big data and computing analytical capabilities, and have taken various other measures to monitor and limit credit risks. However, the risk of nonpayment of loans is inherent in the finance business, and we are subject to credit risks resulting from defaults by consumers. While we employ statistical modelling and big data to carefully assess credit risks, credit risks are exacerbated in microcredit and consumer financing because there is relatively limited information available about the credit histories of the borrowers. There can be no assurances that our credit assessment and risk management are or will be sufficient to result in lower delinquencies. As we expand into new sub-sectors of consumer financing, our limited operational experience and lack of familiarity with the new areas may render our risk management less effective, thus exacerbating our credit risks. Furthermore, our ability to manage the quality and the associated credit risks of our loan portfolio may have significant impact on our results of operations. Deterioration in the overall quality of loan portfolio and increased exposure to credit risks may occur due to a variety of reasons, including factors beyond our control, such as a slowdown in the growth of the PRC or global economies or a liquidity or credit crisis in the PRC or global financial sectors, which may adversely affect the liquidity of our borrowers or their ability to repay or roll over their debt. Any significant deterioration in the asset quality of our financial services business and significant increase in associated credit risks may have a material adverse effect on our business, results of operations and financial condition.

Our financial services business also faces additional operational risks with respect to illegal or fraudulent activities, such as illegally accessing and using another's Baidu Wallet account, and providing false credit and other information or creating fictitious or "phantom" transactions with collaborators in order to obtain loans from us. Although we have implemented various measures to detect and reduce the occurrence of illegal or fraudulent activities, there can be no assurance that such measures will be effective in combating fraudulent activities. Significant increases in illegal or fraudulent activity could negatively impact our brand and reputation, lead us to take additional steps to reduce such risks, and cause us to incur additional expenses and costs, which may adversely affect our business, results of operations and financial condition.

Negative publicity about our partners, outsourced service providers or other counterparties, such as negative publicity about their debt collection practices and any failure by them to adequately protect the information of borrowers, to comply with applicable laws and regulations or to otherwise meet required quality and service standards could harm our reputation. Furthermore, any negative development in the internet finance industry, such as bankruptcies of companies providing similar services, or negative perception of the industry as a whole, could compromise our image, undermine the trust and credibility we have established and impose a negative impact on our business and results of operations.

***If we fail to keep up with rapid changes in technologies and user behavior, our future success may be adversely affected.***

Our future success will depend on our ability to respond to rapidly changing technologies, adapt our products and services to evolving industry standards and improve the performance and reliability of our products and services. Our failure to adapt to such changes could harm our business. In addition, changes in user behavior resulting from technological developments may also adversely affect us. For example, the number of people accessing the internet through mobile devices, including mobile phones, tablets, digital assistants and other hand-held devices, and television set-top devices, has increased in recent years, and we expect this trend to continue while 4G/5G and more advanced mobile communications technologies are broadly implemented. If we fail to develop products and technologies that are compatible with all mobile devices and operating systems, or if the products and services we develop are not widely accepted and used by users of various mobile devices and operating systems, our position in the mobile internet market may be adversely affected. In addition, the widespread adoption of new internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or integrate our products, services or infrastructure. If we fail to keep up with rapid technological changes to remain competitive, or consequently fail to retain users with products and service of exceptional quality, our future success may be adversely affected.

9

Table of Contents

*Interruption or failure of our own information technology and communications systems or those of third-party service providers we rely upon could impair our ability to provide products and services, which could damage our reputation and harm our results of operations.*

Our ability to provide products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could interrupt our services. Service interruptions could reduce our revenue and profit and damage our brand if our systems are perceived to be unreliable. Our systems are vulnerable to damage or interruption as a result of terrorist attacks, wars, earthquakes, floods, fires, power loss, telecommunications failures, undetected errors or "bugs" in our software, computer viruses, interruptions in access to our platform through the use of "denial of service" or similar attacks, hacking or other attempts to harm our systems, and similar events. Some of our systems are not fully redundant, and our disaster recovery planning does not account for all possible scenarios. In February 2017, the service of Mobile Baidu was inaccessible to users for forty-three minutes due to a system failure, which adversely affected our user experience then.

Our servers, which are hosted at third-party or our own internet data centers, are vulnerable to break-ins, sabotage and vandalism. The occurrence of natural disasters or closure of an internet data center by a third-party provider without adequate notice could result in lengthy service interruptions. In addition, our domain names are resolved into internet protocol (IP) addresses by systems of third-party domain name registrars and registries. Any interruptions or failures of those service providers' systems, which are beyond our control, could significantly disrupt our own services. If we experience frequent or persistent system failures on our platform, whether due to interruptions and failures of our own information technology and communications systems or those of third-party service providers that we rely upon, our reputation and brand could be severely harmed. The steps we take to increase the reliability and redundancy of our systems may cause us to incur heavy costs and reduce our operating margin, and may not be successful in reducing the frequency or duration of service interruptions.

*More people are using devices other than personal computers to access the internet. If users do not widely adopt versions of our search technology, products and services developed for these devices, our business could be adversely affected.*

The number of people who access the internet through devices other than personal computers, including mobile phones, smartphones, handheld computers, smart home devices and other smart devices, is increasing dramatically. The varying display sizes, functionality, and memory associated with some alternative devices may require us to tailor the user experience and interfaces to those devices and the versions of our products and services developed for these devices may not be compelling to users, manufacturers, or distributors of devices. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not work or be accessible on these devices. Some manufacturers may also elect not to include our products on their devices. In addition, search queries are increasingly being conducted through apps and services tailored to particular devices. A shift in user behavior to perform search queries on other devices or apps rather than a search engine could affect our share of the search market over time. As new devices and new platforms are continually being released, it is difficult to predict the future channels to access search. We may encounter challenges in developing versions of our products and services for use on these alternative devices, and we may need to devote significant resources to the creation, support, and maintenance of our products and services tailored for such devices. If we are unable to attract and retain a substantial number of alternative device manufacturers, distributors, and users to adopt and use our products and services, or if we are slow to develop products and technologies that are more compatible with alternative devices, we may fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

*We may not be able to manage our expanding operations effectively.*

We have significantly expanded our operations in recent years. We expect this expansion trend to continue as we grow our user and customer base and explore new opportunities. To manage the further expansion of our

10

**Table of Contents**

business and growth of our operations and personnel, we need to continually improve our operational and financial systems, procedures and controls, and expand, train, manage and maintain good relations with our growing employee base. We have experienced labor disputes in the past. Although these disputes were resolved promptly, we cannot assure you that there will not be any new labor dispute in the future. In addition, we must maintain and expand our relationships with other websites, internet companies and other third parties. Our current and future personnel, systems, procedures and controls may not be adequate to support our expanding operations.

***We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations.***

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property in internet-related industries, particularly in China, are uncertain and still evolving. As we face increasing competition and as litigation becomes more common in China in resolving commercial disputes, we face a higher risk of being the subject of intellectual property infringement claims. We may be subject to administrative actions brought by the PRC State Copyright Bureau and in the most severe scenario criminal prosecution for alleged copyright infringement, and as a result may be subject to fines and other penalties and be required to discontinue infringing activities. Furthermore, as we expand our operations outside of China, we may be subject to claims brought against us in jurisdictions outside of China.

Our search products and services link to materials in which third parties may claim ownership of trademarks, copyrights or other rights. Our audio and video player, Baidu Media Player, enables users to play multimedia files, which may be protected by copyright or other intellectual property rights. In addition, as we adopt new technologies and roll out new products and services, we face the risk of being subject to intellectual property infringement claims that may arise from our use of new technologies and provision of new products and services. Our products and services including those based on cloud computing technology, such as Baidu Netdisk, Baidu WenKu and Baidu Post Bar, allow our users to upload, store and share documents, images, audios and videos on our servers, or share, link to or otherwise provide access to contents from other websites, and we also operate distribution platforms whereby developers can upload, share and sell their applications or games to users. Although we have made commercially reasonable efforts to request users or developers to comply with applicable intellectual property laws, we cannot ensure that all of our users or developers have the rights to upload or share these contents or applications. In addition, we have been and may continue to be subject to copyright or trademark infringement and other related claims from time to time, in China and internationally.

We have been making continuous efforts to keep ourselves informed of and to comply with all applicable laws and regulations affecting our business. However, PRC laws and regulations are evolving, and uncertainties still exist with respect to the legal standards as well as the judicial interpretation of the standards for determining liabilities of internet search and other internet service providers for providing links to contents on third-party websites that infringe upon others' copyrights or hosting such contents, or providing information storage space, file sharing technology or other internet services that are used by internet users to disseminate such contents. The Supreme People's Court of China promulgated a judicial interpretation on infringement of the right of dissemination through internet in December 2012. This judicial interpretation, like certain court rulings and certain other judicial interpretations, provide that the courts will place the burden on internet service providers to remove not only links or contents that have been specifically mentioned in the notices of infringement from right holders, but also links or contents they "should have known" to contain infringing content. The interpretation further provides that where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it has a higher duty of care with respect to internet users' infringement of third-party copyrights. A guidance on the trial of audio/video sharing copyright disputes promulgated by the Higher People's Court of Beijing in December 2012 provides that where an internet service provider has directly obtained economic benefits from any audio/video contents made available by an internet

11

**Table of Contents**

user who has no authorization for sharing such contents, the internet service provider shall be presumed to be at fault. These interpretations could subject us and other internet service providers to significant administrative burdens and litigation risks.

We conduct our business operations primarily in China. There might be claims that we are subject to U.S. copyright laws, including the legal standards for determining indirect liability for copyright infringement, although we believe such claims are without merits. We cannot assure you that we will not be subject to copyright infringement lawsuits or other proceedings in the U.S. or elsewhere in the future.

Intellectual property litigation is expensive and time-consuming and could divert resources and management attention from the operations of our business. We are currently named as defendant in certain copyright infringement suits in connection with Baidu Netdisk, Baidu Post Bar, Mobile Baidu, iQiyi and certain other products or services. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." There is no guarantee that the courts will accept our defenses and rule in our favor. If there is a successful claim of infringement, we may be required to discontinue the infringing activities, pay substantial fines and damages and/or enter into royalty or license agreements that may not be available on commercially acceptable terms, if at all. Our failure to obtain a license of the rights on a timely basis could harm our business. Any intellectual property litigation by third parties and/or negative publicity alleging our intellectual property infringement could have an adverse effect on our business, reputation, financial condition or results of operations. To address the risks relating to intellectual property infringement, we may have to substantially modify, limit or terminate some of our search services. Any such change could materially affect user experience and in turn have an adverse impact on our business.

***We have been and may again be subject to claims and investigations based on the content found on our platform, the results in our paid search listings or other products and services we offer.***

In addition to the content developed by ourselves and posted on our platform, our users are free to post information on Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baidu WenKu and other sections of our platform, and our P4P customers may create text-based descriptions, image descriptions and other phrases to be used as text, image or keywords in our search listings, and users can also use our personal cloud computing service, Baidu Netdisk, to upload, store and share documents, images, audios and videos on our cloud servers. We have been and may continue to be subject to claims and investigations for intellectual property infringement, defamation, negligence or other legal theories based on the content found on our platform, the results in our paid search listings or our other products and services, which, with or without merit, may result in diversion of management attention and financial resources and negative publicity on our brand and reputation. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." Furthermore, if the content posted on our platform or found, stored or shared through our other products and services contains information that government authorities find objectionable, our platform or relevant products or services may be shut down and we may be subject to other penalties. See "—Risks Related to Doing Business in China—Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our platform and negative publicity in international media."

We have been, and in the future may again be, subject to claims, investigations or negative publicity based on the results in our paid search listings. Claims have been filed against us after we allowed certain customers to register keywords containing trademarks, trade names or brand names owned by others and displayed links to such customers' websites in our paid search listings. While we maintain a database of certain well-known trademarks and continually update our system algorithms and functions aiming at preventing customers from submitting a keyword containing the well-known trademarks that are owned by others, it is not possible for us to completely prevent our customers from bidding on keywords that contain trademarks, trade names or brand names owned by others. In 2016, PRC regulatory authorities required that we take several remedial measures, including: (i) immediately modifying our practice of providing online marketing services to medical,

12

**Table of Contents**

pharmaceutical, health care and other similar businesses, and refraining from providing online marketing services to medical organizations that do not have requisite qualifications from competent regulatory authorities; (ii) modifying our existing auction-based paid search practices, indicating clearly paid search results and the associated risks, and limiting the percentage of marketing information to no more than 30% on each web page; and (iii) establishing and enhancing user protection mechanisms and establishing a system to compensate users harmed by fraudulent marketing information. Such measures have had a negative impact on the number of customers and our revenues in the short term. In addition, there has been negative publicity about fraudulent information in our paid search listings. Although we have been continually enhancing our technology, control and oversight to prevent fraudulent websites, web pages and information from our paid search listings, there is no guarantee that the measures we have taken are effective at all times. Claims, investigations and negative publicity based on the results in our paid search listings, regardless of their merit, may divert management attention, severely disrupt our operations, adversely affect our results of operations and harm our reputation.

***Our business may be adversely affected if we were found to have failed to fulfill the additional obligations under the new online advertising rules.***

Although the PRC Advertising Law has not specified "paid search results" as a form of advertising, the Interim Administration Measures of Internet Advertising, or the Internet Advertising Measures, which was promulgated by the State Administration for Industry and Commerce and became effective on September 1, 2016, characterizes "paid search results" as a form of internet advertising from the perspective of regulating online advertising business. Pursuant to the Internet Advertising Measures, we are subject to additional legal obligations to monitor our P4P customers' listings on our website during the course of our provision of P4P services. For example, we must examine, verify and record identity information of our P4P customers, such as name, address and contact information, and maintain an updated verification of such information on a regular basis. Moreover, we must examine supporting documentation provided by our P4P customers. Where a special government review is required for specific categories of advertisements before posting, we must confirm that the review has been performed and approval has been obtained. If the content of the advertisement is inconsistent with the supporting documentation, or the supporting documentation is incomplete, the advertisement cannot be published. Failure to comply with these obligations may subject us to fines and other administrative penalties. If advertisements shown on our platform are in violation of relevant PRC advertising laws and regulations, or if the supporting documentation and government approvals provided to us by our P4P customers in connection with the advertising content are not complete or accurate, we may be subject to legal liabilities and our reputation could be harmed. See "Item 4.B. Information on the Company—Business Overview—Regulations— Regulations on Advertisements and Online Advertising."

***We may be subject to patent infringement claims with respect to our P4P platform.***

Our technologies and business methods, including those relating to our P4P platform, may be subject to third-party claims or rights that limit or prevent their use. In June 2005, we applied for a patent in China for our P4P platform, but our application was rejected on the ground that it is not patentable. Certain U.S.-based companies, including Overture Services Inc., have been granted patents in the United States relating to P4P platforms and similar business methods and related technologies. While we believe that we are not subject to U.S. patent laws since we conduct our business operations primarily in China, we cannot assure you that U.S. patent laws would not be applicable to our business operations, or that holders of patents relating to a P4P platform would not seek to enforce such patents against us in the United States or China.

Many parties are actively developing and seeking protection for internet-related technologies, including patent protection. They may hold patents issued or pending that relate to certain aspects of our technologies, products, business methods or services. Any patent infringement claims, regardless of their merits, could be time-consuming and costly to us. If we were sued for patent infringement claims with respect to our P4P platform and

13

Table of Contents

were found to infringe upon the patents and were not able to adopt non-infringing technologies, we may be severely limited in our ability to operate our P4P platform, which would have a material and adverse effect on our results of operations and prospects.

***Our business may be adversely affected by third-party software applications or practices that interfere with our receipt of information from, or provision of information to, our users, which may impair our users' experience.***

Our business may be adversely affected by third-party malicious or unintentional software applications that make changes to our users' computers and interfere with our products and services. These software applications may change our users' internet experience by hijacking queries to our platform, altering or replacing our search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience, which users may associate with our platform. These software applications may be difficult to remove or disable, may reinstall themselves and may circumvent other applications' efforts to block or remove them.

In addition, our business may be adversely affected by the practices of third-party website owners, content providers and developers which interfere with our ability to crawl and index their web pages and contents including applications. The ability to provide a superior user experience is critical to our success. If we are unable to successfully combat malicious third-party software applications that interfere with our products and services, our reputation may be harmed. If a significant number of website owners, content providers and developers prevent us from indexing and including their high-quality web pages and contents including applications in our search results, or if we cannot effectively combat web spam from low-quality and irrelevant content websites, the quality of our search results may be impaired, which may damage our reputation and deter our current and potential users from using our products and services.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We rely on a combination of copyright, trademark and trade secret laws, as well as nondisclosure agreements and other methods to protect our intellectual property rights. The protection of intellectual property rights in China may not be as effective as those in the United States or other countries. The steps we have taken may be inadequate to prevent the misappropriation of our technology. Reverse engineering, unauthorized copying or other misappropriation of our technologies could enable third parties to benefit from our technologies without paying us. Moreover, unauthorized use of our technology could enable our competitors to offer products and services that compete with ours, which could harm our business and competitive position. We have in the past resorted to litigation to enforce our intellectual property rights, and may have to do so from time to time in the future. There is no guarantee that the competent courts will accept our claims and rule in our favor. Such litigation may result in substantial costs and diversion of resources and management attention.

***Our success depends on the continuing and collaborative efforts of our management team and other key personnel, and our business may be disrupted if we lose their services and are not able to find their successors in a timely manner.***

Our success depends heavily upon the continuing services of our management team, in particular our chairman and chief executive officer, Robin Yanhong Li. If one or more of our executives or other key personnel are unable or unwilling to continue in their present positions and we are not able to find their successors in a timely manner, and our business may be disrupted and our financial condition and results of operations may be adversely affected. Competition for management and key personnel is intense, the pool of qualified candidates is

14

**Table of Contents**

limited, and we may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future.

If any of our executives or other key personnel joins a competitor or forms a competing company, we may not be able to successfully retain customers, distributors, know-how and key personnel. Each of our executive officers and key employees has entered into an employment agreement with us, containing confidentiality and non-competition provisions. If any disputes arise between any of our executives or key personnel and us, we cannot assure you the extent to which any of these agreements may be enforced.

***We rely on highly skilled personnel. If we are unable to retain or motivate them or hire additional qualified personnel, we may not be able to grow effectively.***

Our performance and future success depend on the talents and efforts of highly skilled individuals. We will need to continue to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization and business operations. Competition in the internet industry for qualified employees is intense. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees. As competition in the internet industry intensifies, it may be more difficult for us to hire, motivate and retain highly skilled personnel. If we do not succeed in attracting additional highly skilled personnel or retaining or motivating our existing personnel, we may be unable to grow effectively.

***Our strategy of investments and acquiring complementary businesses and assets may fail.***

As part of our business strategy, we have pursued, and intend to continue to pursue, selective strategic investments and acquisitions of businesses and assets that complement our existing business and help us execute our growth strategies. For example, we invested in Ctrip by exchanging our shares in Qunar for shares of Ctrip and subscribed for additional Ctrip shares in 2015 and 2016. We intend to make other strategic investments and acquisitions in the future if suitable opportunities arise. Investments and acquisitions involve uncertainties and risks, including:

- potential ongoing financial obligations and unforeseen or hidden liabilities, including liability for infringement of third-party copyrights or other intellectual property;

- failure to achieve the intended objectives, benefits or revenue-enhancing opportunities;

- costs and difficulties of integrating acquired businesses and managing a larger business;

- potentially significant goodwill impairment charges;

- high acquisition and financing costs;

- possible loss of key employees of a target business;

- potential claims or litigation regarding our board's exercise of its duty of care and other duties required under applicable law in connection with any of our significant acquisitions or investments approved by the board;

- diversion of resources and management attention; and

- in the case of acquisitions of businesses or assets outside of China, the need to integrate operations across different business cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries.

Any failure to address these risks successfully may have a material and adverse effect on our financial condition and results of operations. Investments and acquisitions may require a significant amount of capital

15

Table of Contents

investment, which would decrease the amount of cash available for working capital or capital expenditures. In addition, if we use our equity securities to pay for investments and acquisitions, we may dilute the value of our ADSs and the underlying ordinary shares. If we borrow funds to finance investments and acquisitions, such debt instruments may contain restrictive covenants that could, among other things, restrict us from distributing dividends. Moreover, acquisitions may also generate significant amortization expenses related to intangible assets. We may also incur impairment charges to earnings for investments and acquired businesses and assets which are determined to be impaired, and recognize the proportional share of the net losses of the investees to the extent of the amount of the investments for the equity method investments.

*We are subject to risks and uncertainties faced by companies in a rapidly evolving industry.*

We operate in the rapidly evolving internet industry, which makes it difficult to predict our future results of operations. Accordingly, you should consider our future prospects in light of the risks and uncertainties experienced by companies in evolving industries. Some of these risks and uncertainties relate to our ability to:

- maintain our leading position in the Chinese language internet search market;

- offer attractive, useful and innovative products and services to attract and retain a larger user base;

- attract users' continuing use of internet search services;

- retain existing customers and attract additional customers and increase spending per customer;

- upgrade our technology to support increased traffic and expanded product and service offerings;

- further enhance our brand;

- respond to competitive market conditions;

- respond to evolving user preferences or industry changes;

- respond to changes in the regulatory environment and manage legal risks, including those associated with intellectual property rights;

- maintain effective control of our costs and expenses;

- execute our strategic investments and acquisitions and post-acquisition integrations effectively;

- attract, retain and motivate qualified personnel and maintain good relations with a young and growing work force; and

- build profitable operations in new markets and other overseas internet markets we have entered into.

If we are unsuccessful in addressing any of these risks and uncertainties, our business may be materially and adversely affected.

*Our historical growth rate may not be indicative of our future growth rate.*

We have experienced substantial growth in recent years. Our total revenues grew at a compound annual growth rate of 33.4% from 2012 to 2016. Our growth was driven in part by the growth in China's internet and online marketing industries, which may not be indicative of future growth or be sustainable. Our past growth rate may not be indicative of our future growth rate.

*Our indebtedness could adversely affect our financial condition and our ability to obtain additional capital on reasonable terms when necessary.*

As of December 31, 2016, we had an aggregate of US$6.4 billion of outstanding indebtedness that will mature between 2017 and 2025 and we may incur additional indebtedness in the future. Our current and future

16

**Table of Contents**

debt requires us to dedicate a portion of our cash flow to service interest and principal payments and may limit our ability to engage in other transactions. Our ability to pay interest and repay the principal for our indebtedness is dependent upon our ability to manage our business operations, generate sufficient cash flows to service such debt and the other factors discussed in this section. There can be no assurance that we will be able to manage any of these risks successfully.

We may require additional capital to support our business growth or to respond to business opportunities, challenges or unforeseen circumstances. Our ability to obtain additional capital, if and when required, will depend on our business plans, investor demand, our operating performance, the condition of the capital markets, and other factors, and our indebtedness may limit our ability to borrow additional funds. We may have difficulty incurring new debt on terms that we would consider to be commercially reasonable, if at all. In addition, we may also need to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or that the terms of any refinancing may not be as favorable as the terms of our existing debt.

***Our results of operations may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.***

Our results of operations may fluctuate as a result of a number of factors, many of which are beyond our control. For these reasons, comparing our results of operations on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues may be significantly different from our historical or projected figures. Our results of operations in future quarters may fall below expectations. Any of these events could cause the price of our ADSs to fall. Any of the risk factors listed in this "Risk Factors" section, and in particular the following factors, could cause our results of operations to fluctuate from quarter to quarter:

- general economic conditions in China and economic conditions specific to the internet, internet search and online marketing industries;

- our ability to continue to attract users to our platform despite the emergence of mobile applications and other services;

- our ability to attract additional customers and increase spending per customer;

- the announcement or introduction of new or enhanced products and services by us or our competitors;

- the amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure;

- the results of our acquisitions of, or investments in, other businesses or assets;

- PRC regulations or government actions pertaining to activities on the internet, including various forms of entertainment, online payment and activities otherwise affecting our online marketing customers, and those relating to the products and services we provide;

- unforeseen events, such as negative publicity arising from widespread media coverage and other sources and labor disputes; and

- geopolitical events, natural disasters or epidemics.

Because of the rapid growth of our business, our historical results of operations may not be useful to you in predicting our future results of operations. Our user traffic tends to be seasonal. For example, we generally experience less user traffic during public holidays and other special event periods in China. In addition, advertising and other marketing spending in China has historically been cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. As we continue to grow, we expect that the cyclicality and seasonality in our business may cause our results of operations to fluctuate.

17

Table of Contents

*A severe and prolonged global economic recession and the slowdown in the Chinese economy may adversely affect our business, results of operations and financial condition.*

The global macroeconomic environment is facing challenges, including the escalation of the European sovereign debt crisis since 2011, the end of quantitative easing by the U.S. Federal Reserve and the economic slowdown in the Eurozone in 2014. The growth of the Chinese economy has slowed since 2012 and such slowdown may continue. According to the National Bureau of Statistics of China, China's gross domestic product (GDP) growth slowed to 6.7% in 2016. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Africa, Ukraine and Syria. There have also been concerns about the tensions in the relationship between China and other countries, including surrounding Asian countries, which may potentially lead to foreign investors closing down their business or withdrawing their investment in China and thus exiting the China market, and other economic effects. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any prolonged slowdown in the global or Chinese economy may have a negative impact on our business, results of operations and financial condition, and continued turbulence in the international markets may adversely affect our ability to access the capital markets to meet liquidity needs. Our customers may reduce or delay spending with us, while we may have difficulty expanding our customer base fast enough, or at all, to offset the impact of decreased spending by our existing customers. In addition, to the extent we offer credit to any customer and the customer experiences financial difficulties due to the economic slowdown, we could have difficulty collecting payment from the customer.

*Because we rely to a large extent on distributors in providing our online marketing services, failure to retain key distributors or attract additional distributors could materially and adversely affect our business. Moreover, there is no assurance that our direct sales model in some key geographic markets will continue to be successful.*

Online marketing is at a development stage in China and is not as widely accepted by or available to businesses in China as in the United States. As a result, we rely, to a large extent, on a nationwide distribution network of third-party distributors for our sales to, and collection of payment from, our customers. If our distributors do not provide quality services to our customers or otherwise breach their contracts with our customers, we may lose customers and our results of operations may be materially and adversely affected. Since most of our distributors are not bound by long-term contracts, we cannot assure you that we will continue to maintain favorable relationships with them. If we fail to retain our key distributors or attract additional distributors on terms that are commercially reasonable, our business and results of operations could be materially and adversely affected.

We have transitioned to using our direct sales force to serve customers in some key geographic markets, such as Beijing, Shanghai, Suzhou and major cities in Guangdong Province. There is no assurance that our direct sales model in those markets will continue to be successful. If we fail to maintain an adequate direct sales force, retain existing customers and continue to attract new customers in those markets, our business, results of operations and prospects could be materially and adversely affected.

*We rely on our Baidu Union members for a significant portion of our revenues. If we fail to retain existing Baidu Union members or attract additional members, our revenue growth and profitability may be adversely affected.*

We pay Baidu Union members a portion of our revenues based on click-throughs by users of Baidu Union members' properties. Some of our Baidu Union members, however, may compete with us in one or more areas of our business. Therefore, they may decide in the future to terminate their relationships with us. If our Baidu Union members decide to use a competitor's or their own internet search services, our user traffic may decline, which

18

**Table of Contents**

may adversely affect our revenues. If we fail to attract additional Baidu Union members, our revenue growth may be adversely affected. In addition, if we have to share a larger portion of our revenues to retain existing Baidu Union members or attract additional members, our profitability may be adversely affected.

***There is no assurance that our expansions into services provided by Baidu Nuomi and Baidu Deliveries will be successful.***

Baidu Nuomi and Baidu Deliveries are important components of our transaction services. We have limited experiences in operating these services, as we started to participate in the relevant market in recent years. The success of Baidu Nuomi and Baidu Deliveries depends on our ability to:

- respond to the changes in the rapidly developing market in China;

- adopt a business model or adapt the existing model to meet the marketing demands;

- expand the selection, price and popularity of local deals available on our platform;

- acquire new users who purchase local deals on our platform, and retain our existing users and have them continue to purchase local deals on our platform;

- attract new local merchants and retain existing local merchants to offer more local deals on our platform;

- attract, train and retain qualified personnel, particularly management, technical, marketing, sales and customer service personnel with expertise that we need for our transaction services;

- combat fraudulent or fictitious transactions, such as those aiming to artificially inflate the third-party sellers' or service providers' ratings on our platform and obtain sales-based monetary incentives provided by our platform; and

- effectively compete with other companies that are currently in, or may in the future enter the businesses of providing transaction services.

We operate Baidu Nuomi and Baidu Deliveries in a highly competitive market. The players in this market may compete with us in a variety of ways, including adopting more aggressive pricing policies, devoting greater resources to marketing and promotional campaigns, investing more heavily in research and development, and making acquisitions for the expansion of their products and services. Increased competition such as the price war in the market may force us to lower the price we charge local merchants or provide more subsidized discounts to users, and require us to increase our marketing and promotional efforts and capital commitment, which would negatively affect our profitability. There can be no assurance that we will be able to compete effectively against current or future competitors, and such competitive pressures may have an adverse impact on our business, financial condition and results of operations.

***Our overseas operations may not be successful.***

We have launched products and services in local languages to internet users in several countries. It is uncertain when the operation will become profitable, if at all. In particular, we rely on local telecommunication operators and service providers to provide us with network services and data center hosting services, and our systems for these international products and services are not redundant across different regions and data centers. Any interruption to the internet infrastructure or any data center may render our products and services in the region unavailable.

We face certain risks inherent in doing business internationally, including:

- difficulties in developing, staffing and simultaneously managing a foreign operation as a result of distance, language and cultural differences;

19

**Table of Contents**

- challenges in formulating effective local sales and marketing strategies targeting users from various jurisdictions and cultures, who have a diverse range of preferences and demands;

- challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

- dependence on local platforms in marketing our international products and services overseas;

- challenges in selecting suitable geographical regions for international business;

- longer customer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- compliance with applicable foreign laws and regulations and unexpected changes in laws or regulations;

- exposure to different tax jurisdictions that may subject us to greater fluctuations in our effective tax rate and potentially adverse tax consequences; and

- increased costs associated with doing business in foreign jurisdictions.

One or more of these factors could harm our overseas operations and consequently, could harm our overall results of operations.

***If we are unable to adapt or expand our existing technology infrastructure to accommodate greater traffic, content or additional customer requirements, our business may be harmed.***

Our Baidu platform regularly serves a large number of users and customers and delivers a large number of daily page views. Our technology infrastructure is highly complex and may not provide satisfactory service in the future, especially as the number of users and customers increases. We may be required to upgrade our technology infrastructure to keep up with the increasing traffic on our Baidu platform, such as increasing the capacity of our servers and the sophistication of our software. If we fail to adapt our technology infrastructure to accommodate greater traffic or customer requirements, our users and customers may become dissatisfied with our services and switch to our competitors' websites, which could harm our business.

***If we fail to detect fraudulent click-throughs, our customers' confidence in us could be damaged and our revenues could decline.***

We are exposed to the risk of click-through fraud on our paid search results. Click-through fraud occurs when a person clicks paid search results for a reason other than to view the underlying content of search results. Although our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively and thus capture and prevent some fraudulent click-throughs, there is no assurance that our anti-spam technology is able to detect and stop all fraudulent click-throughs. If we fail to detect fraudulent clicks or otherwise are unable to prevent this fraudulent activity, the affected customers may experience a reduced return on investments, or ROI, in our online marketing services and lose confidence in the integrity of our systems, and we may have to issue refunds to our customers. If this happens, we may be unable to retain existing customers or attract new customers for our online marketing services, and our online marketing revenues could decline. In addition, affected customers may also file legal actions against us claiming that we have over-charged or failed to refund them. Any such claims or similar claims, regardless of their merits, could be time-consuming and costly for us to defend against and could also adversely affect our brand and our customers' confidence in the integrity of our systems. We experienced a number of incidents involving fraudulent click-throughs in recent years. Although the amount of revenue involved in these incidents was immaterial, such cases of fraudulent click-throughs, if occurring on a large-scale and widespread manner, may damage the reputation of our search ecosystem.

20

**Table of Contents**

***The successful operation of our business depends upon the performance and reliability of the internet infrastructure and fixed telecommunications networks in China.***

Our business depends on the performance and reliability of the internet infrastructure in China. Almost all access to the internet is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. In addition, the national networks in China are connected to the internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the internet. It is unpredictable whether a more sophisticated internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's internet infrastructure. In addition, the internet infrastructure in China may not support the demands associated with continued growth in internet usage.

We rely heavily on China Telecommunications Corporation, or China Telecom, China United Network Communications Group Company Limited, or China Unicom, and China Mobile Communications Corporation, or China Mobile, to provide us with network services and data center hosting services. We have entered into contracts with various local branches or subsidiaries of China Telecom, China Unicom and China Mobile to obtain data communications capacity. We have limited access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of these companies, or if these companies otherwise fail to provide the services. Any unscheduled service interruption could damage our reputation and result in a decrease in our revenues. Furthermore, we have no control over the costs of the services provided by these telecommunication companies. If the prices that we pay for telecommunications and internet services rise significantly, our gross margins could be adversely affected. In addition, if internet access fees or other charges to internet users increase, our user traffic may decrease, which in turn may harm our revenues.

***Failure of information security and privacy concerns could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.***

The internet industry is facing significant challenges regarding information security and privacy, including the storage, transmission and sharing of confidential information. We transmit and store over our systems confidential and private information of our users, customers, distributors and Baidu Union members, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information.

We are required by PRC law to ensure the confidentiality, integrity, availability and authenticity of the information of our users, customers, distributors and Baidu Union members, which is also essential to maintain their confidence in our online products and services. We have adopted strict information security policies and deployed advanced measures to implement the policies, including, among others, advanced encryption technologies. However, advances in technology, increased level of sophistication and diversity of our products and services, increased level of expertise of hackers, new discoveries in the field of cryptography or others could still result in a compromise or breach of the measures that we use. Because of our leading market position in the internet industry in China, we believe we are a particularly attractive target for security breaches and hacking attacks. We have experienced in the past, and may experience in the future, such attacks. In December 2012, the Standing Committee of the PRC National People's Congress promulgated the Decision on Strengthening Network Information Protection, or the Network Information Protection Decision, to enhance the legal protection of information security and privacy on the internet. The Network Information Protection Decision also requires internet operators to take measures to ensure confidentiality of information of users. In July 2013, the MIIT promulgated the Provisions on Protection of Personal Information of Telecommunication and Internet Users to regulate the collection and use of users' personal information in the provision of telecommunication service and internet information service in China. In November 2016, the Standing Committee of the National People's Congress promulgated the PRC Cyber Security Law, which requires, among others, that network operators take security measures to protect the network from unauthorized interference, damage and unauthorized access and

21

**Table of Contents**

prevent data from being divulged, stolen or tampered with. Significant capital, managerial and human resources are required to comply with legal requirements, enhance information security and to address any issues caused by security failures. If we are unable to protect our systems, hence the information stored in our systems, from unauthorized access, use, disclosure, disruption, modification or destruction, such problems or security breaches could cause loss or give rise to our liabilities to the owners of confidential information, such as our users, customers, distributors and Baidu Union members, subject us to penalties imposed by administrative authorities, and disrupt our operations. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

Furthermore, concerns have been expressed from time to time about whether our products, services or processes could compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, and any negative publicity on our information safety or privacy protection mechanism and policy, even if unfounded, could damage our reputation and brand and adversely affect our business and results of operations.

*If we fail to maintain an effective system of internal control over financial reporting, we may lose investor confidence in the reliability of our financial statements.*

We are subject to reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on the company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of our internal control over financial reporting. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. We have been subject to these requirements since the fiscal year ended December 31, 2006.

Our management has concluded that our internal control over financial reporting was effective as of December 31, 2016. See "Item 15. Controls and Procedures." Our independent registered public accounting firm has issued an attestation report, which has concluded that our internal control over financial reporting was effective in all material aspects as of December 31, 2016. However, if we fail to maintain effective internal control over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal control over financial reporting at a reasonable assurance level. This could in turn result in loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs, management time and other resources in an effort to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

*We have limited business insurance coverage.*

The insurance industry in China is still at a development stage. Insurance companies in China offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources.

*We face risks related to health epidemics, severe weather conditions and other outbreaks.*

Our business could be adversely affected by the effects of avian influenza, severe acute respiratory syndrome (SARS), the influenza A virus, Ebola virus, severe weather conditions or other epidemic or outbreak. Health or other government regulations adopted in response to an epidemic, severe weather conditions such as

22

Table of Contents

snow storm, flood or hazardous air pollution, or other outbreaks may require temporary closure of our offices or internet cafes where many users access our platform. Such closures may disrupt our business operations and adversely affect our results of operations.

**Risks Related to Our Corporate Structure**

*PRC laws and regulations governing our businesses and the validity of certain of our contractual arrangements are uncertain. If we are found to be in violation, we could be subject to sanctions. In addition, changes in PRC laws and regulations or changes in interpretations thereof may materially and adversely affect our business.*

The PRC government restricts or imposes conditions on foreign investment in internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses. We and our PRC subsidiaries are considered foreign persons or foreign-invested enterprises under PRC foreign investment related laws. As a result, we and our PRC subsidiaries are subject to PRC legal restrictions on or conditions for foreign ownership of internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses. Due to these restrictions and conditions, we operate our platform and conduct value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses in China through our consolidated affiliated entities. As all the nominee shareholders of our consolidated affiliated entities are either PRC citizens or PRC domestic enterprises, these entities are therefore considered as PRC domestic enterprises under PRC law. The "nominee shareholders" refer to those shareholders who have pledged their equity interest in our consolidated affiliated entities to us and entered into exclusive equity purchase and transfer option agreements with us as part of the contractual arrangements. Our contractual arrangements with our consolidated affiliated entities and the nominee shareholders allow us to have the power to direct the activities of these entities that most significantly impact their economic performance. These contractual arrangements demonstrate our ability and intention to continue to exercise the ability to absorb substantially all of the profits and the expected losses of the affiliated entities. In 2014, 2015 and 2016, we derived approximately 27%, 31% and 35% of our total revenues, respectively, from our consolidated affiliated entities through contractual arrangements.

There are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including, but not limited to, the laws and regulations governing our business, or the enforcement and performance of our contractual arrangements with our consolidated affiliated entities, including but not limited to Baidu Netcom and the nominee shareholders. These laws and regulations may be subject to change, and their official interpretation and enforcement may involve substantial uncertainty. New laws and regulations that affect existing and proposed future businesses may also be applied retroactively.

Although we believe we comply with current PRC laws and regulations, we cannot assure you that the PRC government would agree that our contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. The PRC government has broad discretion in determining penalties for violations of laws and regulations. If the PRC government determines that we do not comply with applicable law, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, block our websites, require us to restructure our operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business. Any of these or similar occurrences could significantly disrupt our business operations or restrict us from conducting a substantial portion of our business operations, which could materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of any of our consolidated affiliated entities that most significantly impact its economic performance, and/or our failure to receive the economic benefits from any of our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

23

Table of Contents

***Our contractual arrangements with our consolidated affiliated entities in China and the individual nominee shareholders may not be as effective in providing control over these entities as direct ownership.***

Since PRC law restricts or imposes conditions on foreign equity ownership in internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution companies in China, we operate our platform and conduct our value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses through our consolidated affiliated entities in China. We have no equity interest in any of these entities and must rely on contractual arrangements to control and operate the businesses and assets held by our consolidated affiliated entities, including the domain names and trademarks that have been transferred from our subsidiaries to our consolidated affiliated entities in accordance with requirements of PRC law. These contractual arrangements may not be as effective in providing control over these entities as direct ownership. For example, our consolidated affiliated entities and the individual nominee shareholders could breach their contractual arrangements with us by, among other things, failing to operate our business, such as using the domain names and trademarks our subsidiaries have transferred to them or maintaining our platform, in an acceptable manner or taking other actions that are detrimental to our interests. If our consolidated affiliated entities or the individual nominee shareholders fail to perform their obligations under these contractual arrangements, we may have to incur substantial costs to enforce such arrangements, and rely on legal remedies under PRC law, including contract remedies, which may not be sufficient or effective. If we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to have the power to direct the activities that most significantly affect the economic performance of our consolidated affiliated entities, and we may lose control over the assets owned by our consolidated affiliated entities, including our *Baidu.com* domain name and website, and any other domain names and websites we have access to may not attract a large number of users and customers at the same level as *Baidu.com*. As a result, our ability to conduct our business may be materially and adversely affected, and we may not be able to consolidate the financial results of the relevant affiliated entities into our consolidated financial statements in accordance with U.S. GAAP, which may materially and adversely affect our results of operations and damage our reputation. In addition, we are in the process of updating the registration of new nominee shareholders of some consolidated affiliated entities with PRC governmental authorities, and we may not be able to claim against any third parties who acquire equity interests in good faith in the relevant consolidated affiliated entities from the original nominee shareholders before the new nominee shareholders are registered.

***Our contractual arrangements with our consolidated affiliated entities in China may result in adverse tax consequences to us.***

As a result of our corporate structure and the contractual arrangements between our subsidiaries and each of our consolidated affiliated entities in China, we are subject to VAT at a rate of 6% as a result of the VAT reform program on both revenues generated by our consolidated affiliated entities' operations in China and revenues derived from our subsidiaries' contractual arrangements with these consolidated affiliated entities. Where our consolidated affiliated entity is qualified as a VAT general taxpayer, the VAT charged by our subsidiaries on the revenues obtained from such consolidated affiliated entity based on the contractual arrangement between our subsidiaries and such consolidated affiliated entity will constitute input VAT for the consolidated affiliated entity, and will be creditable against output VAT arising in connection with VAT taxable activities carried out by the consolidated affiliated entity. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation" for more information on the VAT reform program. Moreover, we would be subject to adverse tax consequences if the PRC tax authorities were to determine that the contracts between our subsidiaries and these consolidated affiliated entities were not on an arm's-length basis and therefore constituted a favorable transfer pricing. Under the PRC Enterprise Income Tax Law, or the EIT Law, an enterprise must submit its annual tax return together with information on related-party transactions to the PRC tax authorities. The PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. For example, the PRC tax authorities could request that our consolidated affiliated entities adjust their taxable income upward for PRC tax purposes. Such adjustment could

24

Table of Contents

adversely affect us by increasing our consolidated affiliated entities' tax expenses without reducing our subsidiaries' tax expenses, which could subject our consolidated affiliated entities to interest due on late payments and other penalties for under-payment of taxes.

### *We may have exposure to greater than anticipated tax liabilities.*

We are subject to enterprise income tax, or EIT, business tax, VAT, and other taxes in many provinces and cities in China and our tax structure is subject to review by various local tax authorities. The determination of our provision for income tax and other tax liabilities requires significant judgment. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. For example, if our P4P service is classified as a form of advertisement distribution service, we may be required to pay a cultural business construction fee, which is a 3% surcharge in addition to the applicable value-added tax. In addition, if this classification of P4P services were to be retroactively applied, we might be subject to sanctions, including payment of delinquent fees and fines for the revenues generated from our P4P services prior to the classification. Moreover, under the EIT Law, the PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. Particularly, the State Administration of Tax issued a Public Notice, or Public Notice 16, on March 18, 2015, to further regulate and strengthen the transfer pricing administration on outbound payments by a PRC enterprise to its overseas related parties. In addition to emphasizing that outbound payments by a PRC enterprise to its overseas related parties must comply with arm's-length principles, Public Notice 16 specifies certain circumstances whereby such payments are not deductible for the purpose of the enterprise income tax of the PRC enterprise, including payments to an overseas related party which does not undertake any function, bear any risk or has no substantial operation or activities, payments for services which do not enable the PRC enterprise to obtain direct or indirect economic benefits, or for services that are unrelated to the functions and risks borne by the PRC enterprise, or relate to the protection of the investment interests of the direct or indirect investor of the PRC enterprise, or for services that have already been purchased from a third party or undertaken by the PRC enterprise itself, and royalties paid to an overseas related party which only owns the legal rights of the intangible assets but has no contribution to the creation of such intangible assets. Although we believe all our related party transactions, including all payments by our PRC subsidiaries and consolidated affiliated entities to our non-PRC entities, are made on an arm's-length basis and our estimates are reasonable, the ultimate decisions by the relevant tax authorities may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

### *The individual nominee shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may adversely affect our business. We do not have any arrangements in place to address such potential conflicts.*

We have designated individuals who are PRC nationals to be the nominee shareholders of our consolidated affiliated entities in China. For example, Robin Yanhong Li, our chairman, chief executive officer and co-founder, is also the principal nominee shareholder of Baidu Netcom, which is our principal consolidated affiliated entity.

Although the individual nominee shareholders are contractually obligated to act in good faith and in our best interest, they may still have potential conflicts of interest with us. For example, some individual nominee shareholders of our consolidated affiliated entities do not have a significant equity stake in our company other than the share options granted to them. We cannot assure you that when conflicts of interest arise, any or all of these individuals will act in the best interests of our company or such conflicts will be resolved in our favor. In addition, these individuals may breach, cause our consolidated affiliated entities to breach or refuse to renew, the existing contractual arrangements with us. Currently, we do not have any arrangements to address potential conflicts of interest between these individuals and our company, except that we could exercise our transfer option under the exclusive equity purchase and transfer option agreement with the relevant individual nomine shareholder to request him/her to transfer all of his/her equity ownership in the relevant consolidated affiliated

25

**Table of Contents**

entity to a PRC entity or individual designated by us. We rely on Mr. Robin Yanhong Li, who is also a director of our company, to abide by the Cayman Islands law, which provides that directors owe a fiduciary duty to the company, and those who are also directors or officers of our PRC subsidiaries to abide by PRC law, which provides that directors and officers owe a fiduciary duty to the company. Such fiduciary duty requires directors and/or officers to act in good faith and in the best interests of the company and not to use their positions for personal gains. There are, however, no specific provisions under the Cayman Islands or PRC law on how to address potential conflicts of interest. If we cannot resolve any conflict of interest or dispute between us and the individual nominee shareholders of our consolidated affiliated entities, we would have to rely on legal proceedings, which could disrupt our business, distract management and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

*We may be unable to collect long-term loans to the nominee shareholders of our consolidated affiliated entities in China.*

As of the date of this annual report, we have made long-term loans in an aggregate principal amount of RMB7.7 billion (US$1.1 billion) to the nominee shareholders of our consolidated affiliated entities. We extended these loans to enable the nominee shareholders to fund the capitalization of these entities. Certain of our consolidated affiliated entities are currently going through governmental registrations and filings in connection with their recent increase of registered capital, which we anticipate will be completed in the next few months, and the increased portion of the registered capital will be funded promptly afterwards. We may in the future provide additional loans to the nominee shareholders of our consolidated affiliated entities in China in connection with any increase in their capitalization to the extent necessary and permissible under applicable law. Our ability to ultimately collect these loans will depend on the profitability of these consolidated affiliated entities and their operational needs, which are uncertain.

*We are in the process of registering the pledges of equity interests by nominee shareholders of some of our consolidated affiliated entities, and we may not be able to enforce the equity pledges against any third parties who acquire the equity interests in good faith in the relevant consolidated affiliated entities before the pledges are registered.*

The nominee shareholders of each of our consolidated affiliated entities have pledged all of their equity interests in the relevant consolidated affiliated entities to our subsidiaries pursuant to equity pledge agreements under the contractual arrangements. An equity pledge agreement becomes effective among the parties upon execution. However, according to the PRC Property Rights Law, an equity pledge is not perfected as a security property right unless it is registered with the relevant local administration for industry and commerce. We are in the process of registering the pledge relating to Baidu Netcom, as well as certain other consolidated affiliated entities, relating to recent increases of their registered capital and equity interest transfer, which we anticipate will be completed in the next few months. Prior to the completion of the registration, we may not be able to successfully enforce the equity pledge against any third parties who have acquired property right interests in good faith in the equity interests in the relevant consolidated affiliated entities.

**Risks Related to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on our business and operations.*

Most of our business operations are conducted in China. Accordingly, our business, results of operations, financial condition and prospects are affected by economic, political and social conditions in China generally and by continued economic growth in China as a whole.

China's economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation

26

**Table of Contents**

of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

Growth of China's economy has been uneven, both geographically and among various sectors of the economy, and the growth of the Chinese economy has slowed down since 2012. Some of the government measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. Any stimulus measures designed to boost the Chinese economy may contribute to higher inflation, which could adversely affect our results of operations and financial condition. For example, certain operating costs and expenses, such as employee compensation and office operating expenses, may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets.

### Uncertainties with respect to the PRC legal system could adversely affect us.

We conduct our business primarily through our subsidiaries and consolidated affiliated entities in China. Our operations in China are governed by PRC laws and regulations. Our subsidiaries are generally subject to laws and regulations applicable to foreign investments in China. The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value.

PRC laws and regulations have significantly enhanced the protections afforded to various forms of foreign investments in China for the past decades. However, China has not developed a fully integrated legal system and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, because these laws and regulations are relatively new, and because of the limited volume of published decisions and their nonbinding nature, the interpretation and enforcement of these laws and regulations involve uncertainties.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all. As a result, we may not be aware of our potential violation of these policies and rules. In addition, any litigation in China may be protracted and result in substantial costs and diversion of resources and management attention.

### We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet and related business and companies.

The PRC government regulates the internet and related industry extensively, including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the internet industry. These internet-related laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainty. As a result, under certain circumstances it may be difficult to determine what actions or omissions may be deemed to be violations of applicable laws and regulations. Issues, risks and uncertainties relating to PRC government regulation of the internet industry include, but are not limited to, the following:

- We only have contractual control over our websites. We do not own the websites due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including online information services.

- The licensing requirements relating to the internet business in China are uncertain and evolving. This means that permits, licenses or operations at some of our PRC subsidiaries and consolidated affiliated

27

Table of Contents

entities may be subject to challenge, or we may not be able to obtain or renew certain permits or licenses, including without limitation, a Value-Added Telecommunication Business Operating License, which is issued by the MIIT, an Internet News License, which is issued by the State Council News Office, a Short Messaging Service Access Code Certificate, which is issued by the MIIT, an Online Audio/Video Program Transmission License, which is issued by the State Administration of Press Publication, Radio, Film and Television, or the SAPPRFT, a Radio and Television Program Production License, which is issued by the SAPPRFT, a Surveying and Mapping Qualification Certificate for internet map services, which is issued by the National Administration of Surveying, Mapping and Geo-information, an Internet Culture Business Permit with the permitted scope of business covering online game operation and online game virtual currency issuance or trading, which is issued by the Ministry of Culture, an Internet Publication License, which is issued by the SAPPRFT, a Payment Service Permit, which is issued by the People's Bank of China, a Qualification Certificate for Internet Drug Information Services, which is issued by provincial branch of the State Food and Drug Administration, and a China Air Transport Sales Agency Services Certificate, which is issued by China Air Transport Association. Failure to obtain or renew these permits and licenses may significantly disrupt our business, or subject us to sanctions, requirements to increase capital or other conditions or enforcement, or compromise enforceability of related contractual arrangements, or have other harmful effects on us.

- New laws and regulations may be promulgated to regulate internet activities, including online advertising and online payment. Other aspects of our online operations may be regulated in the future. If these new laws and regulations are promulgated, additional licenses may be required for our online operations. If our operations do not comply with these new regulations at the time they become effective, or if we fail to obtain any licenses required under these new laws and regulations, we could be subject to penalties.

We provide value-added telecommunications services through our consolidated affiliated entities, which hold the required licenses. In July 2006, the MIIT issued the Notice of the Ministry of Industry and Information Technology on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services. This notice prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. According to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by the license holder in its provision of value-added telecommunications services. The notice also requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain these facilities in the regions covered by its license. Baidu Netcom and Beijing BaiduPay Science and Technology Co., Ltd., or BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites.

We operate application and mobile game platforms through certain of our consolidated affiliated entities. In September 2009, the GAPP (currently known as the SAPPRFT) together with several other government agencies issued a notice, or the Circular 13, prohibiting foreign investors from participating in online game operating businesses in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form. Other government agencies that also have the authority to regulate online game operations in China, such as the Ministry of Culture and the MIIT, did not join the GAPP in issuing the Circular 13. Due to the ambiguity among various regulations on online games and a lack of interpretations from the relevant PRC authorities governing online game operations, it is uncertain whether PRC authorities would consider our relevant contractual arrangements to be foreign investment in online game operation businesses. While we are not aware of any online game companies that use contractual arrangements similar to ours having been penalized or ordered to terminate operation by PRC authorities claiming that the contractual

28

Table of Contents

arrangements constitute control over, or participation in, the operation of online game operations through indirect means, it is unclear whether and how the various regulations of the PRC authorities might be interpreted or implemented in the future. If our relevant contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, the relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If our operation of mobile game platforms were found to be in violation of the Circular 13, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending or revoking the relevant licenses and registrations.

As we enter into new businesses, we may encounter additional regulatory uncertainties. For example, it remains unclear whether the provision of online payment services by BaiduPay will require BaiduPay to apply for a Value-Added Telecommunication Business Operating License for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. However, Baidu Netcom, parent company of BaiduPay, has received a Trans-Regional Value-Added Telecommunication Business Operating License with a permitted operation scope covering online data processing and transaction processing businesses. Baidu Netcom plans to submit an application to allow its subsidiary BaiduPay to operate online data processing and transaction processing businesses in 2017. Another example, the current PRC legal framework on traffic and transportation does not cover autonomous cars or autonomous driving. Therefore, it remains uncertain what additional compliance requirements we need to meet in order to undertake a public road testing of our autonomous driving cars in China. There is also no guarantee that the public road testing of our autonomous driving cars in other locations fully complies with local laws and regulations. If our public road testing is deemed by local enforcement authority as a violation of the applicable traffic and transportation laws, we may have to suspend the testing, and the progress of our research and development of autonomous cars may be adversely affected.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business.

***Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The Ministry of Commerce published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. While the Ministry of Commerce solicited comments on the draft, substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company should be treated as a foreign-invested enterprise, or an FIE. According to the definition set forth in the draft, FIEs refer to enterprises established in China pursuant to PRC law that are solely or partially invested by foreign investors. The draft specifically provides that entities established in China (without direct foreign equity ownership) but "controlled" by foreign investors, through contract or trust for example, will be treated as FIEs. Once an entity falls within the

29

**Table of Contents**

definition of FIE, it may be subject to foreign investment "restrictions" or "prohibitions" set forth in a "negative list" to be separately issued by the State Council later. If an FIE proposes to conduct business in an industry subject to foreign investment "restrictions" in the "negative list," the FIE must go through a market entry clearance by the Ministry of Commerce before being established. If an FIE proposes to conduct business in an industry subject to foreign investment "prohibitions" in the "negative list," it must not engage in the business. However, an FIE, during the market entry clearance process, may apply in writing to be treated as a PRC domestic enterprise if its foreign investor(s) is/are ultimately "controlled" by PRC government authorities and its affiliates and/or PRC citizens. In this connection, "control" is broadly defined in the draft to cover the following summarized categories: (i) holding 50% of more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations.

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "—Risks Related to Our Corporate Structure" and "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders." Under the draft Foreign Investment Law, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is included in the "negative list" as restricted industry, the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC government authorities and its affiliates or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

Through our dual-class share structure, Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, a PRC citizen, possessed and controlled 54.3% of the voting power of our company as of February 28, 2017. The draft Foreign Investment Law has not taken a position on what actions will be taken with respect to the existing companies with a VIE structure, whether or not these companies are controlled by Chinese parties. Moreover, it is uncertain whether the internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses, in which our variable interest entities operate, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as Ministry of Commerce market entry clearance, to be completed by companies with existing VIE structure like us, we face uncertainties as to whether such clearance can be timely obtained, or at all.

The draft Foreign Investment Law, if enacted as proposed, may also materially impact our corporate governance practice and increase our compliance costs. For instance, the draft Foreign Investment Law imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs.

***Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites and negative publicity in international media.***

The PRC government has adopted regulations governing internet access and distribution of news and other information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, contains terrorism or extremism content, or is reactionary, obscene, superstitious, fraudulent or defamatory. Failure to comply with these requirements may result in the

30

**Table of Contents**

revocation of licenses to provide internet content and other licenses and the closure of the concerned websites. In the past, failure to comply with these requirements has resulted in the closure of certain websites. The website operator may also be held liable for the censored information displayed on or linked to the website.

In particular, the MIIT has published regulations that subject website operators to potential liability for content displayed on their websites and the actions of users and others using their systems, including liability for violations of PRC laws and regulations prohibiting the dissemination of content deemed to be socially destabilizing. The Ministry of Public Security has the authority to order any local internet service provider to block any internet website at its sole discretion. From time to time, the Ministry of Public Security has stopped the dissemination over the internet of information which it believes to be socially destabilizing. The State Secrecy Bureau is also authorized to block any website it deems to be leaking state secrets or failing to meet the relevant regulations relating to the protection of state secrets in the dissemination of online information. Furthermore, we are required to report any suspicious content to relevant governmental authorities, and to undergo computer security inspections. If we fail to implement the relevant safeguards against security breaches, our websites may be shut down and our business and ICP licenses may be revoked.

The Anti-Terrorism Law, which took effect on January 1, 2016, further requires internet service providers to verify the identity of their users, and to not provide services to anyone whose identity is unclear or who declines verification. Although the identity verification requirements are already embodied in some internet related regulations, the Anti-Terrorism Law extends these requirements to all types of internet services. The internet service providers are also required to provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities.

Although we attempt to monitor the content in our search results and on our online communities such as Baidu Post Bar, we are not able to control or restrict the content of other internet content providers linked to or accessible through our websites, or content generated or placed on our Baidu Post Bar message boards or our other online communities by our users. To the extent that PRC regulatory authorities find any content displayed on our websites illegal, they may require us to limit or eliminate the dissemination of such information on our websites. To the extent that PRC regulatory authorities find any content displayed on our websites objectionable, they may suggest that we limit or eliminate the dissemination of such information on our websites. If third-party websites linked to or accessible through our websites conduct unlawful activities such as online gambling on their websites, PRC regulatory authorities may require us to report such unlawful activities to relevant authorities and to remove the links to such websites, or they may suspend or shut down the operation of these third-party websites. PRC regulatory authorities may also temporarily block access to certain websites for a period of time for reasons beyond our control. Any of these actions may reduce our user traffic and adversely affect our business. In addition, we may be subject to penalties for violations of those regulations arising from information displayed on or linked to our websites, including a suspension or shutdown of our online operations.

Moreover, our compliance with PRC regulations governing internet access and distribution of news and other information over the internet may subject us to negative publicity or even legal actions outside of China. In May 2011, eight New York residents filed a lawsuit against us before the U.S. District Court for the Southern District of New York accusing us of aiding Chinese censorship in violation of the U.S. Constitution. In March 2014, the U.S. District Court for the Southern District of New York granted our motion for judgment on the pleadings based upon the First Amendment to the U.S. Constitution and dismissed the plaintiffs' complaint in its entirety. Even though we have won the case, our reputation may be adversely affected among users and investors outside of China.

***The discontinuation of any of the preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition.***

Pursuant to the EIT Law, as further clarified by subsequent tax regulations implementing the EIT Law, foreign-invested enterprises and domestic enterprises are subject to EIT at a uniform rate of 25%. Certain

31

**Table of Contents**

enterprises may still benefit from a preferential tax rate of 15% under the EIT Law if they qualify as "High and New Technology Enterprises strongly supported by the state," subject to certain general factors described in the EIT Law and the related regulations.

A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online Network Technology (Beijing) Co., Ltd., or Baidu Online, and Baidu Netcom are entitled to enjoy a preferential tax rate of 15% due to their qualification as "High and New Technology Enterprise," which has a term of three years. If any or some of these PRC subsidiaries and consolidated affiliated entities fail to maintain the "High and New Technology Enterprise" qualification, their applicable EIT rate will be up to 25%. Furthermore, Baidu Online was entitled to a preferential income tax rate of 10% from 2013 to 2015 due to its "Key Software Enterprise" status designated by the relevant government authorities. Baidu China was also entitled to a preferential income tax rate of 10% for 2015 due to its "Key Software Enterprise" status designated by the relevant government authorities. Both Baidu Online and Baidu China will file with the local tax authority for the preferential tax rate of 10% for a "Key Software Enterprise" for 2016 before the end of May 2017, and will be subject to relevant governmental authorities' assessment. However, there is no assurance that Baidu Online and Baidu China will continue to enjoy the preferential tax rate as a "Key Software Enterprise." See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax."

The discontinuation of any of the above-mentioned preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain our current effective tax rate in the future.

***If our PRC subsidiaries declare and distribute dividends to their respective offshore parent companies, we will be required to pay more taxes, which could have a material and adverse effect on our result of operations.***

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The British Virgin Islands, where Baidu Holdings Limited, the direct parent company of our PRC subsidiaries Baidu Online and Baidu International Technology (Shenzhen) Co., Ltd., or Baidu International, is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, Baidu (Hong Kong) Limited, which directly owns our PRC subsidiaries Baidu China and Baidu Times, is incorporated in Hong Kong. However, if Baidu (Hong Kong) Limited is not considered to be the beneficial owner of dividends paid to it by Baidu China and Baidu Times under the tax circulars promulgated in February and October 2009, such dividends would be subject to withholding tax at a rate of 10%. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

***We may be deemed a PRC resident enterprise under the EIT Law, which could subject us to PRC taxation on our global income, and which may have a material and adverse effect on our results of operations.***

Under the EIT Law and related regulations, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a PRC resident enterprise and is subject to the EIT at the rate of 25% on its worldwide income as well as PRC EIT reporting obligations. The related regulations define the term

32

Table of Contents

"de facto management body" as "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise." The State Administration of Taxation issued a SAT Circular 82 in April 2009, which provides certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled overseas-incorporated enterprise is located in China. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." Although the SAT Circular 82, the additional guidance and amendment apply only to overseas registered enterprises controlled by PRC enterprises, not to those controlled by PRC individuals or foreigners, the criteria set forth in SAT Circular 82 may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises or individuals. If we are deemed a PRC resident enterprise, we may be subject to the EIT at 25% on our global income, except that the dividends we receive from our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed as "dividends among qualified PRC resident enterprises." If we are deemed a PRC resident enterprise and earn income other than dividends from our PRC subsidiaries, a 25% EIT on our global income could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

***Under PRC tax laws, dividends payable by us and gains on the disposition of our shares or ADSs may be subject to PRC taxation.***

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the EIT at the rate of 10% upon the dividends payable by us or upon any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our non-PRC resident enterprise shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident enterprise shareholders and ADS holders are subject to the EIT, your investment in our shares or ADSs could be materially and adversely affected.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is possible that such dividends and gains earned by non-resident individuals may be subject to PRC individual income tax at a rate of 20%. If we are required under PRC tax laws to withhold PRC income tax on dividends payable to our non-PRC investors that are non-resident individuals or if you are required to pay PRC income tax on the transfer of our shares or ADSs, the value of your investment in our shares or ADSs may be materially and adversely affected.

***Our subsidiaries and consolidated affiliated entities in China are subject to restrictions on paying dividends and making other payments to our holding company.***

Baidu, Inc. is our holding company incorporated in the Cayman Islands. As a result of the holding company structure, it currently relies on dividend payments from our subsidiaries in China. However, PRC regulations currently permit payment of dividends only out of accumulated profits, as determined in accordance with PRC accounting standards and regulations. Our subsidiaries and consolidated affiliated entities in China are also required to set aside a portion of their after-tax profits according to PRC accounting standards and regulations to fund certain reserve funds. The PRC government also imposes controls on the conversion of RMB into foreign currencies and the remittance of foreign currencies out of China. We may experience difficulties in completing the administrative procedures necessary to obtain and remit foreign currency. See "—Governmental control of

33

Table of Contents

currency conversion may affect the value of your investment." Furthermore, if our subsidiaries or consolidated affiliated entities in China incur debt on their own in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments. If our subsidiaries and consolidated affiliated entities in China are unable to pay dividends or make other payments to us, we may be unable to pay dividends on our ordinary shares and ADSs.

***Governmental control of currency conversion may affect the value of your investment.***

The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of foreign currency out of China. We receive most of our revenues in RMB. Under our current structure, our income at the Cayman Islands holding company level will primarily be derived from dividend payments from our PRC subsidiaries. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders or ADS holders.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business.***

Baidu, Inc. is our offshore holding company conducting operations in China through our PRC subsidiaries and consolidated affiliated entities. We may make loans to our PRC subsidiaries and consolidated affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Loans by Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries, which are treated as foreign-invested enterprises under PRC law, are subject to PRC regulations and foreign exchange loan registrations. Such loans to any of our PRC subsidiaries to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of SAFE. The statutory limit for the total amount of foreign debts of a foreign-invested enterprise is the difference between the amount of total investment as approved by the Ministry of Commerce or its local counterpart and the amount of registered capital of such foreign-invested enterprise. Any medium or long-term loans by Baidu, Inc. or any of our offshore subsidiaries to our consolidated affiliated entities, which are domestic PRC entities, must be approved by the National Development and Reform Commission and SAFE, or their relevant local counterparts. We may also decide to finance our PRC subsidiaries by means of capital contributions. These capital contributions must be approved by the Ministry of Commerce or its local counterpart. Meanwhile, we are not likely to finance the activities of our consolidated affiliated entities by means of capital contributions given the PRC legal restrictions on foreign ownership of internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses.

In June 2016, SAFE promulgated SAFE Circular No. 16, which removed certain restrictions previously provided under several SAFE circulars, including SAFE Circular No. 142, in respect of conversion by a foreign-invested enterprise of foreign currency registered capital into RMB and use of such RMB capital. However, SAFE Circular No. 16 continues to prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, and providing loans to non-affiliated enterprises except as permitted in the business scope.

34

Table of Contents

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, including SAFE Circulars referred to above, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or consolidated affiliated entities or additional capital contributions by us to our PRC subsidiaries, and conversion of such loans or capital contributions into RMB. If we fail to complete such registrations or obtain such approvals, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our ability to fund and expand our business.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The Notice on Issues Relating to the Administration of Foreign Exchange in Fund-Raising and Round-Trip Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or SAFE Circular No. 75, and a series of implementation rules and guidance issued by SAFE, including the circular relating to operating procedures that came into effect in July 2011, require PRC residents and PRC corporate entities to register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which became effective on June 1, 2015. In accordance with SAFE Notice 13, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC

35

Table of Contents

resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

As it is uncertain how the SAFE regulations described above will be interpreted or implemented, we cannot predict how these regulations will affect our business operations or future strategy. For example, we may be subject to more stringent review and approval process with respect to our foreign exchange activities, such as remittance of dividends and foreign currency-denominated borrowings, which may adversely affect our results of operations and financial condition. In addition, if we decide to acquire a PRC domestic company, we cannot assure you that we or the owners of such company will be able to obtain the necessary approvals or complete the necessary filings and registrations required by the SAFE regulations. This may restrict our ability to implement our acquisition strategy and could adversely affect our business and prospects.

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC optionees fail to comply with these regulations in the future, we or our PRC optionees and their local employers may be subject to fines and legal sanctions.

***PRC regulations establish complex procedures for some acquisitions conducted by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, adopted by six PRC regulatory agencies in August 2006 and amended in June 2009, among other things, established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. In addition, the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises, issued by the Ministry of Commerce in August 2011, specify that mergers and acquisitions by foreign investors involved in "an industry related to national security" are subject to strict review by the Ministry of Commerce, and prohibit any activities attempting to bypass such security review, including by structuring the transaction through a proxy or contractual control arrangement. We believe that our business is not in an industry related to national security, but we cannot preclude the possibility that the Ministry of Commerce or other government agencies may publish explanations contrary to our understanding or broaden the scope of such security reviews in the future, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited. Moreover, the Anti-Monopoly Law requires that the Ministry of Commerce be notified in advance of any concentration of undertaking if certain filing thresholds are triggered. We may grow our business in part by directly acquiring complementary businesses in China. Complying with the requirements of the laws and regulations mentioned above and other PRC regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share. Our ability to expand our business or maintain or expand our market share through future acquisitions would as such be materially and adversely affected.

36

Table of Contents

***Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, and as such, investors may be deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities. In May 2013, PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the China Securities Regulation Commission, or the CSRC, and the Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations undertaken by PCAOB, the CSRC or the Ministry of Finance in the United States and the PRC, respectively. PCAOB continues to be in discussions with the CSRC and the Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with PCAOB and audit Chinese companies that trade on U.S. exchanges.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

***Proceedings instituted by the SEC against certain PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act.***

In December 2012, the SEC brought administrative proceedings against five accounting firms in China, including our independent registered public accounting firm, alleging that they had refused to produce audit work papers and other documents related to certain other China-based companies under investigation by the SEC. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of these firms from practicing before the SEC for a period of six months. The decision is neither final nor legally effective unless and until reviewed and approved by the SEC. On February 12, 2014, four of these PRC-based accounting firms appealed to the SEC against this decision. In February 2015, each of the four PRC-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the CSRC. If the firms do not follow these procedures, the SEC could impose penalties such as suspensions, or it could restart the administrative proceedings.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with

37

**Table of Contents**

the requirements of the Exchange Act. Such a determination could ultimately lead to our delisting from the NASDAQ Global Select Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

*Fluctuation in the value of the RMB may have a material and adverse effect on your investment.*

The value of the RMB against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in China's political and economic conditions and foreign exchange policies. The conversion of RMB into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The PRC government allowed the RMB to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably, and in recent years the RMB has depreciated significantly against the U.S. dollar. Since October 1, 2016, the RMB has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB has depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and there is no guarantee that the RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Our revenues and costs are mostly denominated in RMB. Any significant revaluation of RMB may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, an appreciation of RMB against the U.S. dollar would make any new RMB denominated investments or expenditures more costly to us, to the extent that we need to convert U.S. dollars into RMB for such purposes. An appreciation of RMB against the U.S. dollar would also result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated financial assets into RMB, as RMB is our reporting currency, and foreign exchange losses reported in earnings for certain RMB denominated loans that overseas entities borrowed from our PRC entities. Conversely, a significant depreciation of the RMB against the U.S. dollar may significantly reduce our earnings translated in the U.S. dollars, which in turn could adversely affect the price of our ADSs. Additionally, a depreciation of RMB against the U.S. dollar would result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated notes and other indebtedness into RMB, as RMB is our reporting currency.

*We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.*

Pursuant to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises, or Circular 698, issued by the State Administration of Taxation, which became effective retroactively as of January 1, 2008, where a non-resident enterprise investor transfers equity interests in a PRC resident enterprise indirectly by way of disposing of equity interests in an overseas holding company, the non-resident enterprise investor, being the transferor, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC withholding tax at the rate of up to 10%. In addition, the PRC resident enterprise may be required to provide necessary assistance to support the enforcement of Circular 698.

On February 3, 2015, the State Administration of Tax issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or Public Notice 7.

38

**Table of Contents**

Public Notice 7 has introduced a new tax regime that is significantly different from that under Circular 698. Public Notice 7 extends its tax jurisdiction to not only indirect transfers set forth under Circular 698 but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under Circular 698 and Public Notice 7. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under Circular 698 and Public Notice 7. As a result, we may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under Circular 698 and Public Notice 7, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

## Risks Related to Our ADSs

*The trading price of our ADSs has been volatile and may continue to be volatile regardless of our operating performance.*

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly results of operations;

- changes in financial estimates by securities research analysts;

- conditions in internet search and online marketing markets;

39

Table of Contents

- changes in the operating performance or market valuations of other internet search or internet companies;

- announcements by us or our competitors or other internet companies of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- litigation, government investigation or other legal or regulatory proceeding; and

- general economic or political conditions in China or elsewhere in the world.

In addition, the stock market in general, and the market prices for internet-related companies and companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. In particular, the global financial crisis and the ensuing economic recessions in many countries have contributed and may continue to contribute to extreme volatility in the global stock markets. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

*Substantial future sales or the perception of sales of our ADSs in the public market could cause the price of our ADSs to decline.*

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

*You may not have the same voting rights as the holders of our ordinary shares and may not receive voting materials in time to be able to exercise your right to vote.*

Except as described in this annual report and in the deposit agreement, holders of our ADSs will not be able to exercise voting rights attached to the shares evidenced by our ADSs on an individual basis. Holders of our ADSs will appoint the depositary or its nominee as their representative to exercise the voting rights attached to the shares represented by the ADSs. You may not receive voting materials in time to instruct the depositary to vote, and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. Upon our written request, the depositary will mail to you a shareholder meeting notice which contains, among other things, a statement as to the manner in which your voting instructions may be given, including an express indication that such instructions may be given or deemed given to the depositary to give a discretionary proxy to a person designated by us if no instructions are received

40

Table of Contents

by the depositary from you on or before the response date established by the depositary. However, no voting instruction will be deemed given and no such discretionary proxy will be given with respect to any matter as to which we inform the depositary that (i) we do not wish such proxy given, (ii) substantial opposition exists, or (iii) such matter materially and adversely affects the rights of shareholders.

***You may not be able to participate in rights offerings and may experience dilution of your holdings as a result.***

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. Under the deposit agreement for the ADSs, the depositary will not offer those rights to ADS holders unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act of 1933, or exempt from registration under the Securities Act with respect to all holders of ADSs. We are under no obligation to file a registration statement with respect to any such rights or underlying securities or to endeavor to cause such a registration statement to be declared effective. In addition, we may not be able to take advantage of any exemptions from registration under the Securities Act. Accordingly, holders of our ADSs may be unable to participate in our rights offerings and may experience dilution in their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***You may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited, because we are incorporated under Cayman Islands law, conduct most of our operations in China and all of our executive officers reside outside of the United States.***

We are incorporated in the Cayman Islands, and conduct most of our operations in China through our subsidiaries and consolidated affiliated entities in China. All of our executive officers and a majority of our directors reside outside of the United States and some or all of the assets of these persons are located outside of the United States. As a result, it may not be possible to effect service of process within the United States or elsewhere outside of China upon our executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws.

It may also be difficult or impossible for you to bring an action against us or against our directors and executive officers in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and executive officers. There is no statutory recognition in the Cayman Islands of judgments obtained in the United States, although the courts of the Cayman Islands will generally recognize and enforce a non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. Moreover, our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of judgment of courts.

Our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2016 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against our directors and us, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court

41

**Table of Contents**

in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States, and provides significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before the federal courts of the United States.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

**_Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial._**

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering. Our co-founder, chairman and chief executive officer, Robin Yanhong Li, who acquired our shares prior to our initial public offering, holds our Class B ordinary shares. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate (as defined in our memorandum and articles of association) of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time Robin Yanhong Li and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share will be automatically and immediately converted into one Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

Due to the disparate voting powers attached to these two classes, certain shareholders have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage or prevent others from pursuing any potential merger, takeover or other change of control transactions with our company, which could deprive our shareholders and ADS holders of an opportunity to receive a premium for their shares or ADSs as part of a sale of our company and might reduce the price of our ADSs.

**_Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs._**

Our articles of association include certain provisions that could limit the ability of others to acquire control of our company, and therefore may deprive the holders of our ordinary shares and ADSs of the opportunity to sell their ordinary shares or ADSs at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure.

- Our board of directors has the authority, without approval by the shareholders, to issue up to a total of 10,000,000 preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may fix the designations, preferences, powers and other rights of the shares of a series of preferred shares.

- Our board of directors has the right to elect directors to fill a vacancy created by the increase of the board of directors or the resignation, death or removal of a director, which prevents shareholders from having the sole right to fill vacancies on our board of directors.

42

Table of Contents

***We may be classified as a passive foreign investment company, which could result in adverse U.S. federal income tax consequence to U.S. Holders of our ADSs or ordinary shares.***

A non-U.S. corporation, such as our own, will be considered a passive foreign investment company, or "PFIC", for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets is generally determined by reference to the market price of the ADSs and ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules and because PFIC status is a fact-intensive determination made on an annual basis, no assurance may be given with respect to our PFIC status for the current or any future taxable year.

Although under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive," we may have been a PFIC for 2015, we believe under more reasonable approaches for our circumstances, based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, that we were not a PFIC for our taxable year ended December 31, 2015. In addition, we do not believe that we were a PFIC for our taxable year ended December 31, 2016 even under the least favorable interpretations of what portion of goodwill and certain other assets are treated as "passive." However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2017 or for the foreseeable future. However, our PFIC status for the current taxable year ending December 31, 2017 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year).

If we were treated as a PFIC for any taxable year during which a U.S. Holder (defined below) held an ADS or an ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Item 10.E. Additional Information—Taxation—United States Federal Income Tax Considerations—Passive Foreign Investment Company."

**Item 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in the Cayman Islands in January 2000. Since our inception, we have conducted our operations in China principally through Baidu Online, our wholly owned subsidiary in Beijing, China. Since June 2001, we also have conducted part of our operations in China through Baidu Netcom, a consolidated affiliated entity in Beijing, China, which holds the licenses and approvals necessary to operate our platform and provide value-added telecommunication-based online advertising services. In more recent years, we have established additional subsidiaries inside and outside of China and assisted in establishing additional PRC consolidated affiliated entities to conduct part of our operations.

On August 5, 2005, we listed our ADSs on The NASDAQ National Market (later renamed The NASDAQ Global Market) under the symbol "BIDU". We and certain selling shareholders of our company completed the initial public offering of 4,604,224 ADSs, each then representing one Class A ordinary share, on August 10, 2005. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split. Our ADSs are currently traded on The NASDAQ Global Select Market.

In December 2008, our shareholders approved our name change from Baidu.com, Inc. to Baidu, Inc. In November 2009, we moved into our new corporate headquarters, which we name as Baidu Campus. Our principal executive offices are located at Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, the People's Republic of China. Our telephone number at this address is +86 (10) 5992-8888.

43

Table of Contents

In November 2012, we obtained the controlling interest in Qiyi.com, Inc., or iQiyi, a prior equity method investee, and have since then consolidated its financial results into our consolidated financial statements. In May 2013, we acquired the online video business of PPStream Inc., or PPS, and have merged it with iQiyi and have since then consolidated its financial results into our consolidated financial statements. In the first quarter of 2017, iQiyi completed the issuance of certain convertible notes to a group of investors for an aggregate investment amount of US$1.53 billion, and we invested US$300 million in iQiyi as part of the note issuance.

In October 2013, we acquired 100% equity interest of 91 Wireless from NetDragon Websoft Inc., or NetDragon, and the other shareholders of 91 Wireless, and have since then consolidated its financial results into our consolidated financial statements.

We consolidated the financial results of Qunar, an online travel services provider, in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In November 1, 2013, Qunar listed its ADSs, each representing three Class B ordinary shares of Qunar, on NASDAQ in connection with its initial public offering. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares in Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar, and we have become a major shareholder of Ctrip since October 2015. We subsequently acquired additional ordinary shares of Ctrip in 2016.

## B.    Business Overview

We are the leading Chinese language internet search provider. As a technology-based media company, we aim to provide the best and most equitable way for people to find what they are looking for. We provide our users with many channels to access information and services. In addition to serving individual internet search users, we provide an effective platform for businesses to reach potential customers.

Our business currently consists of three segments, namely, search services, transaction services and iQiyi. Search services are keyword-based marketing services targeted at and triggered by internet users' search queries, which mainly include our P4P services and other online marketing services. Transaction services include Baidu Nuomi, Baidu Deliveries, Baidu Mobile Game, Baidu Wallet, Baidu Maps and others. iQiyi is an online video platform with a content library that includes licensed movies, television series, cartoons, variety shows and other programs.

Our *Baidu.com* website is the largest website in China and the fourth largest website globally, as measured by average daily visitors and page views during the three-month period ended December 31, 2016, according to Alexa.com, an internet analytics firm. In addition, our "Baidu" brand is one of the highest ranking brands in China in BrandZ Top 50 Most Valuable Chinese Brands 2016, a study published by Millward Brown Optimor, a brand strategy research company.

We conduct our operations primarily in China. Revenues generated from our operations in China accounted for approximately 99.5%, 98.9% and 97.8% of our total revenues in 2014, 2015 and 2016, respectively.

We serve four types of online participants:

*Users.* We offer Chinese language search on our Baidu platform that enables users to find relevant information online, including web pages, news, images, documents and multimedia files, through links provided on our website. We also offer transaction platforms, such as *Nuomi.com,* to connect online and offline services provided by third-parties. We provide a broad range of products and services to enrich user experience, including search services, transaction services and iQiyi. Our products and services can be accessed through PCs and mobile devices. We aspire to provide the best experience to our users. To this end, we have invested in advanced technology such as artificial intelligence and deep learning.

44

**Table of Contents**

*Customers.* We deliver online marketing services to a diverse customer base operating in a variety of industries. In 2016, we had approximately 982,000 active online marketing customers. Consistent with previously reported numbers, the number of active online marketing customers excluded those for our group-buying and delivery related businesses. Our online marketing customers consist of SMEs throughout China, large domestic companies and Chinese divisions and subsidiaries of large, multinational companies. We have a diverse customer base in terms of industries and geographical locations. Our defined industries in which our customers operate include retail and ecommerce, local services, medical and healthcare, network service, financial services, education, online games, transportation, construction and decoration, and business services. Customers in our top five industries contributed approximately 50% of our total online marketing revenues in 2016. Although we have customers located throughout China, we have a more active and larger customer base in coastal regions, reflecting the current general economic demographics in China.

Customers for our transaction services primarily consist of merchants that act as service providers on our transaction platforms, such as *Nuomi.com*. The merchants that operate on our transaction platforms mainly cover businesses such as restaurants, hotels and cinemas.

Customers for iQiyi primarily consist of advertisers, who are counted as part of our online marketing customers and subscription users of online video contents.

We reach and serve our customers through our direct sales force as well as a network of third-party distributors across China. As many of our customers are SMEs, we use distributors to help us identify potential SME customers, collect payments and assist SMEs in setting up accounts with us and using our online marketing services. We have also engaged third-party agencies to identify and reach potential customers outside of China. Customers use our products and services through PCs and mobile devices. Mobile revenues accounted for 63.2% of our total revenues for 2016.

Since early May 2016, we have been implementing measures to improve customer quality and foster a healthy environment to enhance user experience and drive long-term sustainable growth. We have taken proactive measures requiring all customers on our platform to submit ICP licenses and verify enterprise bank accounts. The implementation of new and stricter regulations on online marketing and our self-imposed proactive measures will have a short-term impact on our business. We believe these measures will be beneficial in the long term, and we remain confident in our long-term outlook, underpinned by our fundamental value proposition of search and our ongoing investments in technology.

*Baidu Union Members*. Baidu Union consists of a large number of third-party web content, software and mobile application providers. Baidu Union members can display on their properties our customers' promotional links that match the content of such members' properties. Some Baidu Union members also embed some of our products and services into their properties. We allow Baidu Union members to provide high-quality and relevant search results to their users without the cost of building and maintaining advanced search capabilities in-house and to monetize their traffic through revenue sharing arrangements with us. We reward Baidu Union members by sharing with these members revenues as a percentage of total revenues recognized by us. Because we have implemented measures to deliver a better user experience and build a safer and more trustworthy platform for users since May 2016, the revenue contributed by Baidu Union members slightly decreased in 2016.

*Content Providers.* Our content providers mainly consist of video copyright holders, map data owners, apps owners who list their apps on our app store for users to download, users who contribute their valuable and copyrighted content to our products, and self-media authors such as those who publish their content through Baijiahao accounts. These content providers contribute rich contents and resources to our content ecosystem, and in return we provide a broad platform for them to present their content. If we generate revenue from utilizing third-party contents, we will purchase these contents or share revenue with the content providers based on the terms of pre-agreed contracts.

45

**Table of Contents**

**Search Services**

*Search Products and Services for Users*

We focus on offering products and services that enable our users to find relevant information quickly and easily. We offer our main products and services to users through *Baidu.com* free of charge generally. These products and services can be accessed through PCs, mobile and other non-mobile devices.

**Baidu Web Search.** Baidu's web search allows users to locate information through search queries. After typing a search query, users generally receive a list of ranked search results, which may include our customers' content presented in a specific format. Users can then access the desired information by examining the returned search snippets, or clicking on the hypertext links displayed in the search results. The number of average monthly active users of mobile search, defined as users who used the service at least once in a given month, was approximately 665 million for December 2016, an increase of 1.7% over the corresponding period in the prior year.

We have integrated many features into our web search system to help users easily access the right information out of a huge number of web pages. The Baidu web search includes, but not limited to, the following features:

- Query Suggestion—based on the keywords in users' search queries and their search history, we recommend related topics (such as books, historical figures, movies and games) that may be of interest to users in order to unleash their potential demands. With our machine learning and big data analytics technologies, we predict the queries that the users may need later on and display them in the dropdown list under the search box.

- Instant Search—returns search results when a user is typing a search query to speed up the search process and save time, by leveraging on our innovative asynchronous pre-fetch technology and big data prediction capability.

- In-depth Answers—provides relevant and in-depth answers to search inquiries using our deep learning technology to locate, summarize and integrate relevant information from massive data.

- Rich Content—by analyzing users' intention and the content of search pages, provides users with more structural and in-depth data in the snippets of search results. For example, we directly display answers, marked in red, in the search result snippets for Q&A-type query; we directly display valuable sub-links and images in search result snippets.

- Scene-based Search—provides users with an information and service aggregation of different aspects of one query. Users may access rich resources more conveniently and enjoy the immersive experience.

- Recommendation for Web Search—recommends interesting results (such as books, music, novels, movies, and games) to enhance user engagements and satisfaction. We have developed sophisticated algorithms and launched several innovative features including entity-collection recommendation, post-click keywords recommendation, interactive recommendation, task-oriented recommendation and knowledge graph-based recommendation.

- HTTPS Connection—has significantly advanced the security of our products by protecting the information and privacy of our PC and mobile users through HTTPS protocols.

- English Language Resources—addresses the ever-growing needs among our users to search English language resources by providing a wealth of high-quality English webpage data. To improve the English search experience of our users, we made significant improvements to our English query understanding and English web result ranking. We also leverage our Baidu machine translation technology to present users with Chinese translations of English snippets and webpages.

46

Table of Contents

In order to improve mobile user experience, we have also undertaken a series of product innovations and developments, including but not limited to, the following features:

- Enriched Services—are connected with our mobile search function, such as takeout delivery, movie ticket bookings, hotel reservations, flight bookings, home services and other types of local lifestyle services, which expand the usefulness of our search services. We also select and recommend suitable services to users based on their interest, location, time of the day and other mobile situational traits in order to improve user experience.

- Multi-modal Search—allows users to obtain accurate, fast and rich search results by simply talking to the PC or mobile device, or by taking or uploading a picture. As methods through which users express their requests become more diversified, the interaction between search engines and users is also expanding to include multi-media input and output models such as text, voice and images. Multi-media interactive search provides users with a more convenient, diverse and imaginative mobile search experience.

- Colloquial Language Understanding—provides higher quality search results using semantic analyzing technology in response to increasingly colloquial voice inputs from users.

- Results from Mobile Applications—complements resources from traditional web pages. Our mobile search can obtain and present unique information in mobile applications. Users can view search results from mobile applications and launch such applications directly, if they are already installed on the mobile device, or download such mobile applications.

- Re-formatting of Search Results—allows us to improve the mobile viewing experience and information gathering efficiency of users by processing and re-formatting search results into compatible and easy-to-read content for mobile device users.

- Newsfeed for users—Newsfeed provides users with personalized newsfeed to meet their personal interests reflected in their past online behaviors, such as search and browsing, and their demographics. Newsfeed brings users fresh, tailored content, creating a virtuous cycle of content push-and-pull. Newsfeed complements our core search products and existing content ecosystem, and contributes strongly to user loyalty.

**Baidu Image Search.** Baidu Image Search enables users to search for images on the internet by term queries or various categories and offers advanced features, such as search by image file type and search within a designated website or web page. Baidu Image Search is accessible through both web page and mobile device. Baidu Image Search also allows users to search information on an image or search other similar images by allowing users to upload an image or enter its uniform resource locator (URL).

**Baidu Post Bar.** Baidu Post Bar is a social media platform that attracts users through topics of common interest. Users post text, image, audio and video content and reply to original content, thus forming social networks around topics of discussions. Baidu Post Bar draws new users through close integration with search and user-generated content. Baidu Post Bar has become a leading platform for celebrity fans, online game players, online novel readers and virtual local communities as well as a platform that reflects current cultural trends.

**Baidu Knows.** Baidu Knows provides users with a query-based searchable community to share knowledge and experiences. Through Baidu Knows, registered users can post specific questions for other users to respond as well as respond to questions posted by others. Baidu Knows is accessible through both web page and mobile application. Baidu users can also search, read and browse questions and answers contributed by registered users of Baidu Knows. Baidu Knows has also invited institutional and personal experts in many fields such as medical care, maternal and child health, education, finance and law to address users' questions.

**Baidu Encyclopedia.** Baidu Encyclopedia is an evolving encyclopedia compiled by registered users. Registered users can share their knowledge by adding new terms and new content in Baidu Encyclopedia. Baidu

47

Table of Contents

Encyclopedia's contents are generated by registered users who are experts in their respective fields, including medical care and studio arts. Baidu users can also search, read and browse all terms and content contributed by registered users of Baidu Encyclopedia. Baidu Encyclopedia has produced a number of characteristic columns, such as Encyclopedia of Intangible Cultural Heritage, Digital Museum, Recorder of History, etc., which aim to meet the high-quality content requirements of users.

**Baidu WenKu.** Baidu WenKu is an online document sharing platform, through which registered users of our Baidu platform can search, browse or read, by categories, documents in various formats such as Microsoft WORD, PDF and Microsoft Excel. Baidu WenKu also allows registered users to upload documents to and download from this user-created documents database. Taking advantage of big data and artificial intelligence technology, Baidu WenKu actively recommends content and provides personalized resources to enable our users to easily find what they are looking for.

**Hao123.com**. Hao123.com is a popular Chinese website directory navigation site in China.

**Mobile Baidu.** As one of our flagship mobile applications, Mobile Baidu, formerly named Baidu Mobile Search, enables users to access our search, news-feed contents and services using mobile devices, including WAP-enabled mobile phones. Mobile Baidu supports text, voice and image search to better serve users of mobile devices. The updated Mobile Baidu app features enhanced voice input, improved news-feed display and a more personalized mobile home page.

**Baidu Mobile Assistant.** Baidu Mobile Assistant is a mobile application marketplace designed for Android mobile devices. The platform offers an extensive and diversified array of applications, and selects and recommends high-quality applications based on big data analytics. Baidu Mobile Assistant presents contents of applications to users, helping them to find the most suitable applications. Baidu Mobile Assistant helps improve users' phone management, allowing users to download, upgrade, manage and delete applications easily and conveniently. Additionally, Baidu Mobile Assistant helps users connect to shared WiFi hotspots, optimize device memory and clean junk files.

**Baidu Mobile Guardian.** Baidu Mobile Guardian is a comprehensive phone security software, using mobile anti-virus technology. It can provide users with free system optimization, mobile handset accelerator, garbage data cleaning, system vulnerability defense, virus sweeper, data privacy, harassing phone intercept, secure payment and other features. Throughout 2016, Baidu Mobile Guardian was recognized as one of the top-ranked players by AV-Test, an authoritative international testing organization.

**Duer.** Duer is an intelligent personal virtual assistant that provides secretarial search service to users. Duer provides high-quality personal assistant services such as performing tasks, information seeking, answering questions and casual chatting through conversational/voice user interface. Its implementation leverages our search, natural language processing and speech technologies, as well as image recognition and other machine learning technologies.

**Baijiahao.** Baijiahao is a platform for content owners to publish contents and manage their fans. Baijiahao not only supports various content formats, including characters, pictures, graphs, video, live broadcast, augmented reality and virtual reality, but also provides smart writing assistant and copyrights protection to content owners. The contents gathered in Baijiahao are integrated with users, personalized search results. In addition, Baijiahao can help content owners to interact with their fans and arrange marketing campaigns.

*Search Products and Services for Customers*

We focus on providing customers with cost-effective and targeted marketing solutions. We generate a large majority of our revenues from online marketing services, including online marketing services based on search queries, contextuals, audience attributes, media and placement attributes and online marketing services of other forms. Our online marketing services generally comprise text links, images, multimedia files and interactive forms.

48

Table of Contents

*Online Marketing Services Based on Search Queries*

Online marketing services based on search queries are keyword-based marketing services targeted at and triggered by internet users' search queries, which include our P4P services and other search query–based online marketing services, for example, BrandZone. Typically, a P4P customer pays us when users click on one of its website links on Baidu search result pages or Baidu Union members' properties, while a Brand-Link customer pays us based on the duration of the placement on Baidu search result pages. Users could reach our P4P sponsored links and Brand-Link on either mobile or non-mobile devices.

**P4P.** Our auction-based P4P services enable our customers to bid for priority placement of their paid sponsored links. Our P4P platform enables our customers to reach users who search for information related to their products or services. Customers may use our automated online tools to create text/image-based advertisement of their web pages and bid on keywords that trigger the display of their web page information and links. Our P4P platform features an automated online sign-up process that allows customers to activate and manage their accounts at any time.

Our P4P platform is an online marketplace that introduces internet search users to customers who bid for priority placement of paid sponsored links in the search results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on the quality factor of a sponsored link for a search query in addition to the price bid on that keyword. The quality factor of a sponsored link for a search query is determined based on the relevance, quality, customer reviews, credibility of customers and certain other factors. The relevance is determined based on our analysis of past search and click-through results. Our P4P online marketing customers may choose to set a daily limit on the amount spent and may also choose to target only users accessing our website from specified regions in China and/or during specific time period of the day.

Phoenix Nest, one of our current online marketing systems, is designed to improve relevance in paid search and increase value for customers, thus driving monetization efficiency. We have made enhancements continually to our Phoenix Nest platform. We have opened online marketing on mobile search to all customers to allow them to promote their products and services. In order to help customers achieve better ROI from mobile search campaigns, we provide a series of special management tools in Phoenix Nest, including upgraded site building tool such as SiteApp for enhanced user experience, online chatting tool for better user engagement, mobile statistics analysis tool for enhanced conversion tracking, and performance reporting for managing campaign effectiveness. We have provided additional geo-targeting options in Phoenix Nest to enable customers to engage in city-level and distance proximity bidding. Moreover, we have launched Phoenix Nest App (Android and iOS) allowing customers to manage their online marketing anywhere and anytime. Leveraging on our ability to precisely recognize the search intent of users and matching the intent with the website content of the customers, our dynamic marketing solutions (Products Ads) present marketing content in varying formats, including living images, product discount information, and photo and textual illustrations of specific merchandise.

In 2016, we further upgraded Phoenix Nest by incorporating artificial intelligence technology. Using big data to analyze internet users' intentions and scenarios, we can recommend personalized products and services, and stimulate demands of internet users, which increases our customers' website traffic. Since we can identify internet users' demands and also understand our customers' business, we are able to provide intelligent and creative services by automatically generating creative ideas that directly respond to the needs of internet users and thus achieve fully automated machine writing of customer marketing materials.

**Local Express.** Local Express provides merchants with a turn-key solution to easily participate in our online marketing and transaction services, without high start-up costs or the need for infrastructure investment. Local Express merchant accounts can be accessed by users via search, Baidu Maps and Baidu Nuomi. Local Express helps local merchants to reach users more effectively.

**Baidu Newsfeed**. Baidu Newsfeed can help customers precisely target the right newsfeed users based on their personal interests reflected in their past online behaviors, such as search and browsing, and their

49

**Table of Contents**

demographics, and deliver in-feed ads to target users. Appearing below the Baidu search box in Mobile Baidu, Baidu Newsfeed complements our core search products and existing content ecosystem and enables us to access alternative advertisers, such as real estate customers. The news-feed platform has grown rapidly since its launch in May 2016, in terms of content volume, user numbers and average user time spent. Baidu Newsfeed, together with P4P services and Local Express, offers our customers a complete and integrated marketing solution and builds a full marketing closed loop from stimulating and guiding demands to promoting transformation.

**BrandZone.** BrandZone is our flagship branding display marketing product. The marketing message for a customer can integrate text description, image and video, and appear in a prominent position of the search result page. The display position for BrandZone includes not only our web search but also various vertical search products, such as Baidu Knows and Baidu Image Search. BrandZone allows the brand image of an advertiser to be displayed in all the vertical search products in a structured and uniform manner.

**Aladdin.** Aladdin is a form of commercialization of our Baidu data open platform. Based on our analysis of user search needs, we collaborate with vertical websites, who supply us with high quality and structured data for our inclusion in the search results to our users, and in return receive high-quality user traffic generated by us. We generate revenues from Aladdin service typically based on the duration of contract, while some customers pay us based on the number of clicks on our customers' links that we help to generate.

*Online Marketing Services Based on Contextuals, Audience Attributes, Media and Placement Attributes*

Online marketing services based on contextuals, audience attributes, media and placement attributes refer to our programmatic marketing service transaction system, which is composed of four part: supply-side platform (SSP); demand-side platform (DSP); Baidu exchange service platform (BES); and data-management platform (DMP).

SSP covers media resources of Baidu and third-party Baidu Union members. SSP intelligently manages media advertising space inventory and optimizes marketing spending by analyzing matching content, target audience and characteristics of different media and platforms. SSP has connected more advertising resources through technological upgrades. SSP currently supports a number of main-stream media formats, including textual links, images, open screen, interstitial, banner, information flow and video. SSP also supports native advertisement placement.

DSP is an integrated sales service platform for advertisers and advertising agents, providing programmatic media buy service. DSP supports PC web, WAP, in-app, and in-stream traffic multi-screen advertisement placement. DSP also supports the advertisement placement of standard creativity, intelligent creativity and customized creativity, as well as multiple payment methods including CPT, CPM, CPC and CPA.

BES is a traffic transaction platform that combines DSP with media resources, by leveraging the traffic advantage and big-data capabilities of BES. BES automatically conducts the ad-media buy process on behalf of advertisers using a digital platform, i.e. a programmatic buy process. The primary method for conducting such programmatic buy process is real time bidding, or RTB, which secures advertisement display opportunities in a very short period of time by bidding on the target audience. In addition to RTB, we also support programmatic premium buying (PPB) and guaranteed delivery (GD) methods. PPB targets specific high-quality media resources and engages in programmatic buy only after reaching agreement on the terms of the purchase with the advertisers. GD is conducted based on the agreed-upon price and time period reached by both sides to the transaction.

DMP collects data from the various parties in a programmatic buy process and stores, integrates, analyzes and optimizes such data. DMP integrates data from advertisers, Baidu and third-party DMPs, which cover searches, offline visits, target audience tags, sequential placements and crowd portraits, in order to improve the effectiveness and accuracy of DSP.

**Table of Contents**

*Other Search Products and Services for Customers*

**Baidu Cloud.** Baidu Cloud is a cloud computing platform that offers IaaS (Infrastructure as a Service), PaaS (Platform as a Service) and SaaS (Software as a Service) to enterprise customers and developers to build, test and deploy applications on our scalable and reliable infrastructure. Baidu Cloud is based on the same cloud computing technology that supports our search and marketing system. Baidu Cloud provides a comprehensive set of product services, such as IaaS-like computing, storage and network, PaaS-like security, database, data analysis, multimedia, mobile application development, IOT, marketing cloud and AI platform. SaaS, serving as marketing cloud, enables our customers to buy applications as they need.

**Transaction Services**

We offer products and services that enable or facilitate our users and customers to conduct online and offline transactions.

**Baidu Nuomi.** Baidu Nuomi offers multiple services and products to its users, including entertainment (such as film, transportation ticketing and tourism), dining, hotel reservation, health and beauty services. Baidu Nuomi users can access the services through *Nuomi.com*, Baidu Nuomi's mobile application and additional channels such as Mobile Baidu and Baidu Maps.

Baidu Nuomi is part of our services ecosystem, and is integrated with Baidu Search and Baidu Maps, which helps provide more user services, including supporting Baidu Search and Baidu Maps. Baidu Nuomi supports Baidu Search with richer, more localized results, enhancing mobile search's role. Baidu Nuomi supports Baidu Maps by contributing a large number of points of interest, and has added advanced, AI-driven features such as customized restaurant and retail store recommendations.

**Baidu Deliveries.** Baidu Deliveries, formerly branded as Baidu Takeout Delivery, is an online platform on which users can order food deliveries from a wide range of quality restaurants and vendors. Leveraging our map, big data, artificial intelligence and other technology capabilities, Baidu Deliveries is able to provide users with personalized restaurant selection as well as reliable deliveries through our proprietary Intelligent Real-time Delivery Network system. In addition to food, Baidu Deliveries has also expanded its delivery services into other product categories, such as grocery stores, convenience stores, flower shops, as well as other on-demand courier related services. When accessing from mobile devices, users can search for restaurants or other local merchants based on their locations.

**Baidu Wallet.** Baidu Wallet, formerly branded as BaiduPay, provides online and mobile payment services and enables our users to complete a closed loop transaction in a seamless manner. Through integration with Baidu and third-party products, Baidu Wallet fulfills payment in a wide array of scenarios, including purchases of movie tickets, services provided by Baidu Nuomi, Baidu Deliveries and daily commutes. Baidu Wallet has continued to grow, reaching 100 million activated accounts as of December 31, 2016.

**Baidu Consumer Credit.** Baidu Consumer Credit offers education loans and consumer financing in industry sectors such as travel, beauty, home decoration and home rentals, through partnership with a large number of educational institutions and other companies and merchants. We are creating an innovative platform to provide internet financial services, which give our users more convenience and faster approval, with the help of our AI-based risk control technologies including facial and fingerprint recognition, optical character recognition (OCR) of identification documents, and live detection.

**Baidu Wealth Management.** We aim to provide more fair, more creditworthy and more transparent wealth management service to investors by leveraging our strengths in big data and technology. For our customers, we analyze their risk profiles using our own artificial intelligence technology. For investment products, we use Baidu data analytical capabilities to more holistically analyze their potential risks and returns. Furthermore, we have established a team of experienced wealth management professionals to serve our customers.

51

Table of Contents

**Baidu Maps.** In 2016, Baidu Maps data is mainly collected by ourselves, complemented by third-party suppliers and web information. Baidu Maps provides users with services relating to locations, routes, and local merchants on their PCs and mobile devices in both offline and online modes. Baidu Maps for mobile devices (Baidu Mobile Maps) increasingly serves as a gateway for users to conduct local searches. Baidu Maps also provides indoor maps for large shopping malls. In addition to Mainland China, Baidu Maps coverage has expanded to over 200 countries and regions to serve Chinese travelers overseas. It has an open platform that integrates location-based services from third-party partners. Baidu Maps also works with developers and provides open map services to third-party apps and websites. The number of monthly active users of Baidu Mobile Maps, defined as users who used the service at least once in a given month, was approximately 341 million for December 2016, an increase of 13% over the corresponding period in the prior year.

**Baidu Mobile Game.** Baidu Mobile Game platform collaborates with Chinese and international licensed content providers to provide a diverse array of licensed and healthy games to users, hosting dedicated mobile channels and up-to-date licensed games, and has attracted a large community of mobile game players. Our platform connects users with game content providers and we share revenues from game operations with game developers on our platform.

**Baidu Netdisk.** Baidu Netdisk, our personal cloud computing service, allows users to upload documents, images, audios and videos to its cloud servers, stores the uploaded data with security control and provides real-time back-ups, and making the data accessible across different devices including tablets, smartphones and desktops. Users can also share their data through Baidu Netdisk. In 2016, Baidu Netdisk launched super membership services and a series of new member benefits.

**International Products and Services.** We offer numerous mobile products and services for emerging and developed markets around the world. Our smartphone applications for overseas markets include DU Battery Saver, DU Speed Booster, ES File Explorer, Photo Wonder, Simeji Japanese input method, and others. In early 2016, we introduced our mobile advertising platform DU Ad Platform to Android developers outside of China. DU Ad Platform is now available for developers in approximately 200 countries and regions worldwide.

**iQiyi**

**iQiyi and PPS.** Established in April 2010, iQiyi is a leading online video platform in China, streaming both licensed and self-made movies, television series, variety shows, cartoons and other contents, which are either produced by iQiyi or provided by content providers under licensing arrangements. iQiyi is dedicated to serving Chinese users with the best possible online video experience, along with various services, such as reading, gaming, social network, movie ticketing, live streaming and e-commerce business. iQiyi provides online community services to facilitate user communication and interaction. Users can search and watch ad-supported iQiyi.com videos free of charge. Paying subscribers can enjoy premium services on iQiyi, including ad-free video streaming and access to premium content. In May 2013, we acquired the online video business of PPS and have merged PPS with iQiyi. Following the merger, PPS has operated as a sub-brand of iQiyi. iQiyi's mobile application maintained its industry leadership with 125 million daily active users, 480 million monthly active users, and 335 billion minutes monthly user time in December 2016, according to Alexa.com, an internet analytics firm.

**Sales and Distribution**

We offer search and transaction services directly and through our distribution network. We have direct sales presence in Beijing, Shanghai, Suzhou and major cities in Guangdong Province, covering the major regional markets for our online marketing services.

Our search service distributors provide numerous services, including identifying customers, collecting payments, assisting customers in setting up accounts with us, suggesting keywords to maximize ROI and

52

**Table of Contents**

engaging in other marketing and educational services aimed at acquiring customers. We offer discounts to distributors as consideration for their services. We have relied on distributors for several reasons. Our P4P customer base in China is geographically diverse and fragmented, as many of our P4P customers are SMEs located in different regions in China. Moreover, SMEs are generally less experienced with online marketing as compared to large companies and therefore benefit from the extensive services provided by distributors. Finally, secure online payment and credit card systems are in early stages of development in China. Distributors serve as an important channel to reach SME customers throughout China and collect payments from them. We offer our online marketing services to medium and large corporate customers through third-party agencies and our direct sales force. We have also engaged third-party agencies to identify and reach the potential customers outside of China.

Transaction services reach customers and promote our transaction services via distributors in most cities because customers in these areas are geographically diverse and fragmented. Our distributors identify customers and assist customers to set up accounts in order to improve market share and penetrate rate in these areas. We also provide transaction services directly in several first and second tier cities based on the high population concentration and well-constructed infrastructure.

**Marketing**

We focus on continually improving the quality of our products and services, as we believe satisfied users and customers are more likely to recommend our products and services to others. Through these efforts and the increased use of internet in China, we have built our brand with modest marketing expenditures.

We have implemented a number of marketing initiatives designed to promote our brand awareness among potential users, customers and Baidu Union members. In addition to our brand positioning in the market, we have also initiated a series of marketing activities to promote our products and technologies among existing and potential users and customers. In the Baidu World Conference held in September 2016, we showcased Baidu artificial intelligence platform, "Baidu Brain," and its key functions, and announced that we would open its key capabilities and underlying technologies to developers and enterprises. At the Wuzhen Internet Conference held in November 2016, we operated the first experience station for Baidu autonomous driving cars and demonstrated the technology capacities and concepts of Baidu autonomous driving cars. In November 2016, we held Baidu Moments Sales Summit and published a new Baidu commercial brand "powered by intelligence" and promoted our Baidu Newsfeed advertisement strategy. At the ABC Summit held on November 30, 2016, we introduced the ABC concept of future information technology development, i.e., AI, big data, and cloud computing.

**Competition**

The internet search, transaction service and internet video service industries in China are rapidly evolving and highly competitive.

For internet search, our primary competitors include U.S.-based internet search providers providing Chinese language internet search services and China-based internet companies. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance) and safety and user experience of search results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites. We also face competition from traditional advertising media.

*U.S.-based Internet Search Providers.* U.S.-based internet search providers such as Google have a strong global presence, well established brand names, more users and customers and significantly greater financial resources than we do. We may also continue to face competition from other existing competitors and new entrants in the Chinese language search market.

53

Table of Contents

*China-based Internet Companies.* Chinese internet companies, such as Alibaba, Tencent, Sohu, Qihoo 360 and ByteDance, offer a broad range of online services, including search services. These companies have widely recognized brand names in China and significant financial resources. We compete with these portals primarily for user traffic, user time, display advertisement and online marketing.

*Other Advertising Media.* Other advertising media, such as newspapers, yellow pages, magazines, billboards, other forms of outdoor media, television, radio and mobile applications compete for a share of our customers' marketing budgets. Large enterprises currently spend a relatively small percentage of their marketing budgets on online marketing as compared to other advertising media.

For transaction services, our primary competitors include China-based internet companies such as Meituan-Dianping, Elema, Koubei, AutoNavi, Alipay and Weixin Pay. We leverage our user traffic, product design and various market campaigns to enhance users' reliance on our platforms and services.

For iQiyi, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video. We compete with these market players for both users and advertisers primarily on the basis of user base and demographics, quality and quantity of video content, brand name and user experience.

## Technology

We operate four research labs under the umbrella of Baidu Research, the Augmented Reality (AR) Lab, the Silicon Valley Artificial Intelligence (AI) Lab, the Beijing Deep Learning Lab and the Beijing Big Data Lab. We established the Baidu Institute of Deep Learning, currently known as the Beijing Deep Learning Lab, in January 2013. We opened the Silicon Valley AI Lab in May 2014, enhancing our research and development capabilities in Silicon Valley. In August 2014, we and the United Nation announced and started strategic cooperation and jointly established the Big Data Lab. In January 2017, we announced the establishment of our AR Lab focusing on augmented reality technology.

In 2015, our autonomous driving project at the Beijing Deep Learning Lab reached a key milestone by completing rigorous fully autonomous tests under a variety of complex environmental conditions. We have been recognized as one of the leading AI innovators globally after investing in AI for many years. In 2016, we established our Autonomous Driving Business Unit.

We have developed a proprietary technological infrastructure which consists of technologies for web search, mobile, P4P, targetizement, large-scale systems, AI and autonomous driving technology. Our established infrastructure serves as the backbone for both our PC and mobile platforms.

### Web Search Technology

Our web search is powered by a set of advanced technologies including, among others, the following:

*Link Analysis.* Link analysis is a technique that determines the importance of a web page by evaluating the combination of the anchor texts and the number of web pages linked to that web page. We treat a link from web page A to web page B as a "vote" by page A in favor of page B. The subject of the "vote" is described in the anchor texts of that link. The more "votes" a web page gets, the higher the importance.

*Ranking.* We compare search queries with the content of web pages to help determine relevance. We have significantly improved the relevancy and freshness of ranking using our machine learning modules to analyze the rich internet and user interaction data and prioritize the search results. For example, our technology determines the proximity of individual search terms to each other on a given web page, and prioritizes results where the search terms are near each other. Other aspects of a page's content are also considered. We have innovatively applied our machine learning technology to better understand the semantics beyond simple text of the keywords

54

Table of Contents

inputted by our users, allowing us to provide more relevant search results to users. Starting from 2013, we applied deep learning technology in our search ranking system, and such technology is playing an increasingly important role in search.

*Information Extraction.* We extract information from a web page using high performance algorithms and information extraction techniques. Our techniques enable us to understand web page content, delete extraneous data, build link structures, identify duplicate and junk pages and decide whether to include or exclude a web page based on its quality. Our techniques can process millions of web pages quickly. In addition, our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively.

*Web Crawling.* Our powerful computer clusters and intelligent scheduling algorithms allow us to crawl web pages efficiently. We can easily scale up our system to collect an ever-growing number of Chinese web pages. Our spider technology enables us to refresh web indices at intervals ranging from every few minutes to every few weeks. We set the index refresh frequency based on our knowledge of internet search users' needs and the nature of the information. For example, our news index is typically updated every five minutes, and can be as frequent as every minute, throughout the day given the importance of timely information for news. We also mine multimedia and other forms of files from web page repositories.

*Knowledge Graph.* We build our knowledge graph by extracting and aggregating the content from multiple sources and classify them into billions of entities, where each entity is a well-defined structure data, consisting of various attributes and operations. We also developed applied technology based on our knowledge graph that uses existing data and generates rich new knowledge to satisfy the demands of users. Our knowledge graph provides powerful connection between entities and online services in a wide range of areas.

*Natural Language Processing.* We analyze and understand user queries and web pages by using various natural language processing techniques, including, among others, word segmentation, named entity recognition, entity linking, syntax and semantic analysis, sentiment analysis, summarization, generation, paraphrasing and language dependent encoding, all of which enhance the accuracy of our search results. For Q&A type searches, we provide relevant and in-depth answers to search inquiries by using our deep analysis and learning technology to locate, summarize and consolidate relevant information from massive data. For voice search, we understand user queries via context-aware analysis and provide answers via dialogue management and generation technologies. For feed recommendation, we model both users and contents from a variety of semantic perspectives to improve the accuracy and diversity of recommendations.

*Multimedia Technologies.* We work on developing intelligent algorithms and systems to better understand human spoken languages, identify audio contents, and recognize the meaning of images and videos. These technologies will enable users to access information in a most natural way, and help our search engine better organize the vast amount of multimedia contents on the web. For example, our speech recognition technology has been applied to our mobile search on smartphones, and our face recognition technology has been applied to generate relevant photos when a person is searched. We have also launched similar image search engine, which can recognize the object and scene in the image that users want to search for and return an image that contains the most similar object and scene.

*Aladdin* aims at discovering useful information of the "Hidden Web," which usually refers to the invisible database of the numerous websites and the part of the internet that traditional search engine technology may not be able to index. The resulted Aladdin platform enriches our search index and hence provides richer search results to our users. Our Aladdin platform, which not only provides a better and faster way to integrate new "hidden web" information into our search index, but also revolutionizes the search result presentation of the search result page.

*MIP (Mobile Instant Pages)* is a set of open technical standards applying to mobile webpages, which accelerates the loading of mobile webpages by adopting MIP-HTML norms, MIP-JS operating environment and MIP-Cache system. When mobile websites use this backend technology, the speed at which they can be visited

55

**Table of Contents**

from both Baidu Search and Baidu Newsfeed is improved significantly. This not only enhances user experience, but also increases websites' page visit traffic. Nearly one billion webpages have adopted this technology to optimize user experience in China.

***P4P Technology***

Our P4P platform serves billions of relevant, targeted sponsored links each day based on search terms users enter or content they view on the web page. Our key P4P technology includes:

*P4P Auction System.* We use a web-based auction system to enable customers to bid for positions and automatically deliver relevant, targeted promotional links on Baidu's properties and Baidu Union members' properties. The system starts by screening the relevance between the sponsored links and a particular query. Our intelligent ranking system takes into consideration the quality factor of a sponsored link for a search query in addition to the price bid on the keyword. The quality factor of a sponsored link for a search query is determined based on the relevance and certain other factors. The relevance is determined based on the analysis of past search and click-through results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on both the quality factor of a sponsored link for a search query and the price bid on that keyword. We employ a dynamic mechanism in determining the minimum bidding price for each keyword.

Phoenix Nest is designed to generate more relevant results. Phoenix Nest helps customers more easily find users' favorite search terms to bid on, and provides customers with more tools for budget management and more data for the effective measurement of ROI. We have been continually improving our click-through rate, or CTR, estimation technology. For example, we have introduced deep neutral network, or DNN, technology into our CTR estimation. We have also developed a new generation Phoenix Nest deep learning network CTR estimation modeling system, which enables the estimation of clicks on different combinations of advertisement materials and significantly improved the timeliness of the model estimations. In 2016, we were the first to introduce FPGA (Field-Programmable Gate Array) into CTR model-based online services to optimize the click-through rates in online marketing, which has significantly improved users experience.

Generative Triggering Model, which includes query rewrite and auto-trigger technologies, has broken the status quo where traditional index-trigger is unduly restricted by literal meaning, and instead formed a sophisticated set of real-time sequence deep learning system to fully understand the search intent of users, enabling more accurate match between search intents and search results. We continue to enrich our business knowledge database in order to better understand the search intent of our users, and to present dynamic results in order to satisfy user demand, enhancing the realization of long-tail website flow.

*P4P Billing System.* We record every click and charge customers a fee by multiplying the number of clicks by the cost per click. Our system is designed to detect fraudulent clicks based on factors such as click patterns and timestamps. This system also computes the amount a Baidu Union member or a distributor should be paid. The billing information is integrated with our internal Oracle ERP financial system.

*P4P Customer Service System.* This system offers data and tools to analyze data for our customers to evaluate and optimize the performance of our online marketing services provided to them. Through this system, our customers can also manage information relating to online marketing services such as their budgets and time periods for the services.

*ProTheme Contextual Promotion Technology.* Our ProTheme technology employs techniques that consider factors such as theme finding, keyword analysis, word frequency and the overall link structure of the web to analyze the content of individual web pages and to match sponsored links in our P4P platform to the web pages almost instantaneously. With this targeting technology, we can automatically provide contextually relevant promotional links. For example, our technology can provide links offering tickets to fans of a specific sports team or a news story about that team.

56

Table of Contents

*Targetizement Technology*

Our targetizement technology matches our customers' promotional links with their targeted internet users. Our automatic algorithm can analyze a user's audience attributes based on his or her past search experience and display promotional links that the user may be interested in viewing.

*Large-Scale Systems and Technologies*

*Large Size Cluster Management.* In order to provide highly efficient and stable search services, we have developed an automated management platform for large size clusters. The platform enables us to intelligently manage and allocate resources and automatically debug and relocate services, thereby allowing tens of thousands of different source requests on the Baidu search engine and other non-search business to function stably across multiple internet data centers and thousands of servers.

*Storage.* We have developed an efficient, distributed and structured storage system to support our search services. Our storage system supports PB-level holistic, sequential data storage, and ten thousand times of real-time processing per second per device. Our storage system also has dynamic data attribute addition and subtraction function and historical data management capability.

*Distributed Computing System.* We have developed our proxy computing system, a comprehensive set of ultra-large scale distributed computer system, to increase the utility rate of idle resources, providing a strong base support for our core operations. Our proxy computing system has realized various distributed computing software stacks, such as resource isolation, resource distribution, computing modeling and application framework, and supports commonly used computing modules such as MapReduce, Spark, Stream and WebService.

*Indexing Technology.* Our indexing technology supports billions of daily search requests on over tens of thousands of servers located across multiple internet data centers of different network operators. Through our indexing technology, we have been able to index over one hundred billion of web pages without utilizing additional resources and have improved the freshness of indexed information.

*Artificial Intelligence (AI)*

We have been investing in AI for many years and have been recognized as one of the leading AI innovators globally. AI enables computers to simulate the working mechanisms of human brains, and to learn and be trained with extremely complicated models. The core AI technology is AI supercomputer, which is a super-speed heterogeneous computing cluster designed for AI-based applications and has integrated heterogeneous computing server, GPU Box and FPGA, among others developed by us in house. Currently, our AI mainly comprises three types of technologies, namely, parameter, sample and feature training, computing capabilities (servers and GPU clusters) and big data (webpages, search data, image and video data and locating data). Integrating these three types of AI technologies, we are able to apply AI into areas such as natural language processing, speech recognition, image recognition processing, user portrait and other capabilities. Our Conversational Interfaces has been recognized by MIT Technology Review as one of the ten breakthrough technologies in 2016. Our AI has now been applied to Baidu Search, Duer, Autonomous Driving Car, Baidu Cloud and other products.

From September 2016, we open-sourced our AI platform "PaddlePaddle" to the developer community, providing access to Baidu technology in areas of voice and image recognition, natural language processing, and machine learning. PaddlePaddle is accessible to developers from all over the world and thus promotes the popular use of AI.

57

**Table of Contents**

**Autonomous Driving Car**

We believe autonomous driving is an important area for future growth where AI has helped us take an early lead. With the goal of achieving Level 4 Autonomy, i.e., fully autonomous driving, we have leveraged our technical accumulation in AI and deep learning, and developed some industry-leading technologies in the autonomous driving car field, including environment sensing, behavior prediction, planning control, operation system, high precision localization, high precision map and system safety. In 2016, our autonomous driving cars completed multiple urban public road testings in a number of locations in China and California.

**Intellectual Property**

We rely on a combination of trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. We have 2,421 issued patents in China covering invention, utility model and design, and intend to apply for more patents to protect our core technologies and intellectual property. We also enter into confidentiality, non-compete and invention assignment agreements with our employees and consultants and nondisclosure agreements with selected third parties. " 百度 ", our company's name "Baidu" in Chinese, has been recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning " 百度 ", and the related logos, we have applied for registration of various other trademarks. We also have registered certain trademarks in the United States, Brazil, Hong Kong, Japan, Singapore, South Korea, Indonesia, the European Union and several other jurisdictions. In addition, we have registered our domain name *Baidu.com* and certain other websites with China National Network Information Center, or CNNIC. We have also successfully registered *.Baidu* top-level domain names with the Internet Corporation for Assigned Names and Numbers (ICANN).

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement or other violations of intellectual property rights. Furthermore, the application of laws governing intellectual property rights in China and abroad is uncertain and evolving and could involve substantial risks to us. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations" and "—We may be subject to patent infringement claims with respect to our P4P platform."

**Regulations**

The PRC government extensively regulates the telecommunications industry, including the internet sector. The State Council, the MIIT and other relevant government authorities have promulgated an extensive regulatory scheme governing internet-related services. This section summarizes the principal PRC laws and regulations relating to our business.

In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations" our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations" the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.

China's internet industry, online advertising market and e-commerce market are evolving. There are substantial uncertainties regarding the interpretation and application of existing or proposed PRC laws and

58

**Table of Contents**

regulations. We cannot assure you that the PRC regulatory authorities would find that our corporate structure and our business operations comply with PRC laws and regulations. If the PRC government finds us to be in violation of PRC laws and regulations, we may be required to pay fines and penalties, obtain certain licenses or permits and change, suspend or discontinue our business operations until we comply with applicable PRC laws and regulations.

### Regulations on Value-Added Telecommunications Services and Internet Content Services

*Internet content services.* The Telecommunications Regulations promulgated by the PRC State Council in September 2000 categorize all telecommunication businesses in the PRC as either basic or value-added. Internet content services, or ICP services, are classified as value-added telecommunication businesses. Pursuant to the Telecommunications Regulations, commercial operators of value-added telecommunications services must first obtain an operating license from the MIIT or its provincial level counterparts. The Administrative Measures on Internet Information Services, also promulgated by the PRC State Council in September 2000, require companies engaged in the provision of commercial internet content services to obtain an ICP license from the relevant government authorities before providing any commercial internet content services within the PRC. "Commercial internet content services" generally refer to provision of information service through public telecommunication network or internet for a fee. The Catalog of Classification of Telecommunications Services promulgated by the MIIT in December 2015 and taking effect from March 1, 2016 further divides ICP services into information publication platform and delivery services, information search and inquiry services, information communities platform services, instant message services, and information securities and management services. We do not believe our P4P services conducted by our certain PRC subsidiaries are categorized as part of internet content services that require an ICP license under these regulations. Although Baidu Online conducts part of the P4P business by, among other things, examining and filtering P4P keywords, interacting with potential P4P customers, engaging in sales activities with our customers, P4P search results are displayed on the websites operated by Baidu Netcom, including *Baidu.com.* Baidu Netcom, as the owner of our domain name *Baidu.com* and holder of the necessary licenses and approvals, such as an ICP license, operates the website to list P4P search results and display other marketing and advertising content as an online advertising service provider.

The Administrative Measures for Telecommunication Business Operating License, promulgated by the MIIT with latest amendments becoming effective in April 2009, set forth the types of licenses required for value-added telecommunications services and the qualifications and procedures for obtaining such licenses. For example, a value-added telecommunications service operator providing commercial value-added services in multiple provinces is required to obtain an inter-regional license, whereas a value-added telecommunications service operator providing the same services in one province is required to obtain a local license.

*Content regulation.* National security considerations are an important factor in the regulation of internet content in China. The National People's Congress, the PRC's national legislature, has enacted laws with respect to maintaining the security of internet operation and internet content. Under these laws and applicable regulations, violators may be subject to penalties, including criminal sanctions, for internet content that:

- opposes the fundamental principles stated in the PRC constitution;

- compromises national security, divulges state secrets, subverts state power or damages national unity;

- harms the dignity or interests of the state;

- incites ethnic hatred or racial discrimination or damages inter-ethnic unity;

- undermines the PRC's religious policy or propagates heretical teachings or feudal superstitions;

- disseminates rumors, disturbs social order or disrupts social stability;

- disseminates obscenity or pornography, encourages gambling, violence, murder or fear or incites the commission of a crime;

59

**Table of Contents**

- insults or slanders a third party or infringes upon the lawful rights and interests of a third party; or

- is otherwise prohibited by law or administrative regulations.

ICP operators are required to monitor their websites, including electronic bulletin boards. They may not post or disseminate any content that falls within the prohibited categories and must remove any such content from their websites. The PRC government may shut down the websites of ICP license holders that violate any of the above-mentioned content restrictions and revoke their ICP licenses.

*Restrictions on Foreign Ownership in Value-Added Telecommunications Services*

Pursuant to the Provisions on Administration of Foreign-Invested Telecommunications Enterprises, promulgated by the PRC State Council with latest amendments becoming effective in September 2008, the ultimate foreign equity ownership in a value-added telecommunications service provider must not exceed 50%. However, the Guidance Catalog of Industries for Foreign Investment, as recently amended in 2015, allows a foreign investor to own more than 50% of the total equity interest in an e-commerce business. The MIIT further released an announcement in June 2015 to remove the restriction on foreign equity for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. In order to acquire any equity interest in a value-added telecommunication business in China, a foreign investor must satisfy a number of stringent performance and operational experience requirements, including demonstrating a good track records and experience in operating value-added telecommunication business overseas. Foreign investors that meet these requirements must obtain approvals from the MIIT and the Ministry of Commerce (or the Ministry of Commerce's authorized local counterparts), which retain considerable discretion in granting approvals. According to publicly available information, the PRC government has issued telecommunication business operating licenses to only a limited number of foreign-invested companies. We believe that it would be impracticable for us to acquire any equity interest in our consolidated affiliated entities without diverting management attention and resources. Moreover, we believe that our contractual arrangements with these entities and the individual nominee shareholders provide us with sufficient and effective control over these entities. Accordingly, we currently do not plan to acquire any equity interest in any of these entities.

A Notice on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, issued by the MIIT in July 2006, prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. Pursuant to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by such license holders in their provision of value-added telecommunications services. The notice further requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain the facilities in the regions covered by its license. If a license holder fails to comply with the requirements in the notice and cure such non-compliance, the MIIT or its local counterparts have the discretion to take measures against such license holders, including revoking their Value-Added Telecommunication Business Operating Licenses.

Due to the restrictions under these PRC regulations, we operate our websites mainly through our PRC consolidated affiliated entities, such as Baidu Netcom, and operate an online payment platform through BaiduPay. Baidu Netcom and BaiduPay are our PRC consolidated affiliated entities, and are considered domestic PRC entities under PRC law given that the nominee shareholders are PRC citizens or PRC entities.

Each of Baidu Netcom, BaiduPay and some of our other PRC consolidated affiliated entities holds a Value-Added Telecommunication Business Operating License. In compliance with the Notice of the MIIT on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, Baidu

60

**Table of Contents**

Netcom and BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites. It remains unclear whether the provision of online payment services by BaiduPay will require BaiduPay to apply for a Value-Added Telecommunication Business Operating License for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT, although in practice many companies conducting such business do not apply for such license. Baidu Netcom, parent company of BaiduPay, has received a Trans-Regional Value-Added Telecommunication Business Operating License with the permitted operation scope covering online data processing and transaction processing businesses. Baidu Netcom plans to submit an application to allow its subsidiary BaiduPay to operate online data processing and transaction processing businesses in 2017.

*Regulations on Mobile Internet Applications*

On August 1, 2016, the State Internet Information Office promulgated the Administrative Provisions on Mobile Internet Application Information Services, or the Mobile Application Administrative Provisions. Pursuant to the Mobile Application Administrative Provisions, mobile internet application refers to application software that runs on mobile smart devices providing information services after being pre-installed, downloaded or embedded through other means. Mobile internet application providers refer to the owners or operators of mobile internet applications. Internet application stores refer to platforms which provide services related to online browsing, searching and downloading of application software and releasing of development tools and products through the internet.

Pursuant to the Mobile Application Administrative Provisions, an internet application program provider must verify a user's mobile phone number and other identity information under the principle of mandatory real name registration at the back-office end and voluntary real name display at the front-office end. An internet application provider must not enable functions that can collect a user's geographical location information, access user's contact list, activate the camera or recorder of the user's mobile smart device or other functions irrelevant to its services, nor is it allowed to conduct bundle installations of irrelevant application programs, unless it has clearly indicated to the user and obtained the user's consent on such functions and application programs. In respect of an internet application store service provider, the Mobile Application Administrative Provisions requires that, among others, it must file a record with the local authority within 30 days after it rolls out the internet application store service online. It must also examine the authenticity, security and legality of internet application providers on its platform, establish a system to monitor application providers' credit and file a record of such information with relevant governmental authorities. If an application provider violates the regulations, the internet application store service provider must take measures to stop the violations, including warning, suspension of release, withdrawal of the application from the platform, keeping a record and reporting the incident to the relevant governmental authorities.

In December 2016, the MIIT promulgated the Interim Measures on the Administration of Pre-Installation and Distribution of Applications for Mobile Smart Terminals to enhance the administration of mobile applications. The Interim Measures require, among others, that mobile phone manufacturers and internet information service providers shall ensure that a mobile application, as well as its ancillary resource files, configuration files and user data can be uninstalled by a user on a convenient basis, unless it is a basic function software, which refers to a software that supports the normal functioning of hardware and operating system of a mobile smart device. The Interim Measures will come into effect on July 1, 2017.

*Regulations on Internet Information Search Service*

In June 2016, the State Internet Information Office promulgated the Administrative Provisions on Internet Information Search Services, or the Search Services Administrative Provisions, which took effect on August 1, 2016. Pursuant to the Search Services Administrative Provisions, internet information search service refers to the service whereby users can search for information that is collected from the internet and processed by computer

61

**Table of Contents**

technology. The Search Services Administrative Provisions requires that an internet information search service provider must not publish any information or contents prohibited by law in the form of links, abstracts, snapshots, associative words, related search or recommendations or otherwise. If an internet information search service provider identifies any search results that contain any information, website or application that is prohibited by law, it must stop displaying the search results, record and report it to the relevant governmental authority. In addition, an internet information search service provider is prohibited from seeking illegitimate interest by means of unauthorized disconnection of links, or provision of search results containing false information. If an internet information search service provider engages in paid search services, it must examine and verify the qualifications of its customers of the paid search services, specify the maximum percentage of search results as paid search results on a webpage, clearly distinguish paid search results from natural search results, and notably identify the paid search information item by item.

### *Regulations on News Display*

Displaying news on a website and disseminating news through the internet are highly regulated in the PRC. The Provisional Measures for Administrating Internet Websites Carrying on the News Displaying Business, jointly promulgated by the State Council News Office and the MIIT in November 2000, require an ICP operator (other than a government authorized news unit) to obtain State Council News Office approval to post news on its website or disseminate news through the internet. Furthermore, the disseminated news must come from government-approved sources pursuant to contracts between the ICP operator and the sources, copies of which must be filed with the relevant government authorities.

In September 2005, the State Council News Office and the MIIT jointly issued the Provisions on the Administration of Internet News Information Services, requiring internet news information service organizations to provide services as approved by the State Council News Office, subject to annual inspection under the provisions. Pursuant to the provisions, no internet news information service organizations may take the form of a foreign-invested enterprise, whether a joint venture or a wholly foreign-owned enterprise, and no cooperation between internet news information service organizations and foreign-invested enterprises is allowed prior to the security evaluation by the State Council News Office.

Baidu Netcom obtained the Internet News License, which permits it to publish internet news pursuant to the relevant PRC laws and regulations, in December 2006, and had the license renewed in June 2010. The Internet News License is subject to annual inspection by relevant government authorities.

### *Regulations on Internet Drug Information Services*

According to the Measures for the Administration of Internet Drug Information Services, issued by the State Food and Drug Administration in July 2004, an ICP operator publishing drug-related information must obtain a qualification certificate from the State Food and Drug Administration or its provincial level counterpart.

Baidu Netcom obtained the Qualification Certificate for Internet Drug Information Services, which permits it to publish drug-related information on its website, in November 2007, and had the certificate renewed in September 2012. We have several other entities in our group that have obtained the Qualification Certificate for Internet Drug Information Services.

### *Regulations on Internet Culture Activities*

The amended Internet Culture Administration Measures, promulgated by the Ministry of Culture and becoming effective in April 2011, require ICP operators engaging in "internet culture activities" to obtain a permit from the Ministry of Culture. The "internet culture activities" include, among other things, online dissemination of internet cultural products (such as audio-video products, games, performances of plays or programs, works of art and cartoons) and the production, reproduction, importation, distribution and broadcasting

**Table of Contents**

of internet cultural products. Imported internet cultural products are subject to content review by the Ministry of Culture before they are disseminated online, while domestic internet cultural products must be filed with the local branch of the Ministry of Culture within 30 days following the online dissemination. Service providers are also required to conduct self-review of the content of internet cultural products before they are put on internet or submitted to the Ministry of Culture for approvals or filings. Baidu Netcom was granted an Internet Culture Business Permit in April 2007, which was renewed again in November 2013. Some other entities in our group were also granted an Internet Culture Business Permit.

The Several Suggestions on the Development and Administration of the Internet Music, issued by the Ministry of Culture and becoming effective in November 2006, reiterate the requirement for the internet service provider to obtain the Internet Culture Business Permit to carry on any business of internet music products. In addition, foreign investors are prohibited from engaging in the internet culture business operation.

Furthermore, the Notice on Strengthening and Improving the Content Review of Online Music, issued by Ministry of Culture in August 2009, provides that only "internet culture operating entities" approved by the Ministry of Culture may engage in the production, release, dissemination (including providing direct links to music products) and importation of online music products. Internet culture operating entities should establish strict self-monitoring system of online music content and set up special department in charge of such monitoring. In October 2015, the Ministry of Culture promulgated a notice, which took effect on January 1, 2016, to further strengthen its regulation over online music, including requiring online platform allowing users to upload self-created or performed music to set up real-time monitoring system and requiring the online music service providers to make quarterly filings of information related to their content self-review with the local counterpart of the Ministry of Culture from April 1, 2016.

### *Regulations on Internet Publishing*

On February 4, 2016, the State Administration of Press, Publication, Radio, Film and Television, or the SAPPRFT, and the MIIT jointly issued the Administrative Provisions on Internet Publishing Services, or the Internet Publishing Regulation, which took effect on March 10, 2016 and replaced the Interim Provisions for the Administration of Internet Publishing promulgated in 2002. The Internet Publishing Regulation requires that any entity engaged in provision of online publications to the public via information network shall obtain an Internet Publication License, which will have a term of five years, from the SAPPRFT. Online publications refer to digital works with editing, production, processing and other publishing features, provided to the public via information network, which mainly include: (i) informative and thoughtful text, pictures, maps, games, animation, audio and video digitizing books and other original digital works in fields such as literature, art and science; (ii) digital works consistent with the content of published books, newspapers, periodicals, audio-visual products and electronic publications; (iii) the network literature database or other digital works formed through aforementioned works by selecting, organizing, compiling and other means; and (iv) other types of digital works determined by the SAPPRFT. The servers and storage facilities used by internet publishers must be located within the territory of the PRC. The Internet Publishing Regulation also requires internet service providers providing manual intervention search ranking, advertising, promotion and other services to customers providing internet publishing services, shall check and examine the Internet Publication Licenses obtained by their customers and business scope of such licenses. Certain entities in our group have obtained the Internet Publication Licenses.

### *Regulations on Broadcasting Audio/Video Programs through the Internet*

In December 2007, the State Administration of Radio, Film and Television, or the SARFT (currently known as SAPPRFT) and the MIIT jointly promulgated the Rules for the Administration of Internet Audio and Video Program Services, commonly known as "Document 56", which took effect on January 31, 2008. Pursuant to the Document 56, an online audio/video service provider must obtain an Online Audio/Video Program Transmission

63

Table of Contents

License, which has a term of three years, and operate in accordance with the scope of business as stipulated in the license. Furthermore, Document 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to some official answers to press inquiries published on the SARFT's website in February 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Document 56 may re-register and continue to operate without becoming state-owned or controlled, provided that the providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Document 56 was issued. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned businesses.

The PRC government has also promulgated a series of special regulatory measures governing live-streaming services. In November 2016, the State Internet Information Office promulgated the Administrative Provisions on Internet Live-streaming Service, which took effect on December 1, 2016. Pursuant to the Administrative Provisions, internet live-streaming service refers to continuous publishing of real-time information to the public on internet by means of video, audio, graphics, text or other forms, and an internet live-streaming service provider refers to an operator of the platform providing internet live-streaming service. In accordance with the administrative provisions, an internet live-streaming service provider must verify and register the identity information of publishers of live-streaming programs and users on its platform, and file the identity information of the publishers with the local governmental authority for record. Any internet live-streaming service provider engaging in news service must obtain internet news information service qualification and operate within the permitted scope of such qualification. In September 2016, the SAPPRFT issued a Circular on Strengthening Administration of Live-streaming Service of Network Audio/Video Programs. Pursuant to the circular, any entity that intends to engage in live audio/video broadcasting of major political, military, economic, social, cultural or sport events or activities, or live audio/video broadcasting of general social or cultural groups activities, general sporting events or other organizational events must obtain an Online Audio/Video Program Transmission License with permitted operation scope covering the above business activities. Any entity or individual without qualification is prohibited from broadcasting live audio/radio programs on news, variety show, sports, interviews, commentary or other forms of programs through online live-streaming platform or online live broadcasting booth, nor are they permitted to start a live broadcasting channel for any audio or radio programs. In addition, no entity or individual other than licensed radio stations or television stations are allowed to use "radio station," "television station," "broadcasting station," "TV" or other descriptive terms exclusive to television and radio broadcasting organizations to engage in any business on the internet without approval.

Baidu Netcom has renewed its Online Audio/Video Program Transmission License, which remains valid until July 2018. iQiyi has an Online Audio/Video Program Transmission License that is valid until October 2018. Another entity in our group has an Online Audio/Video Program Transmission License that is valid until March 2017, and the entity is in the process of renewing such license.

### Regulations on Payment Services by Non-financial Institutions

Pursuant to the People's Bank of China's Measures Concerning Payment Services by Non-financial Institutions, which took effect in September 2010, and its implementation rules, non-financial institutions that have been providing monetary transfer services as an intermediary between payees and payers, including online payment, issuance and acceptance of prepaid card or bank card, and other payment services as specified by the People's Bank of China, must obtain a license from the People's Bank of China prior to September 1, 2011, in order to continue providing monetary transfer services. BaiduPay applied for the license after the regulations mentioned above were promulgated and prior to September 1, 2011, and was granted the license for online payment in July 2013.

In addition, in December 2015, the People's Bank of China promulgated the Administrative Measures on the Online Payment Business of Non-Bank Payment Institutions, or the Measures on Online Payment Business. The Measures on Online Payment Business requires payment institutions to comply with the "Know Your Client" principle and establish a client identification mechanism. Payment institutions shall register and verify

**Table of Contents**

real-name and basic identification of clients that open account with them. In addition, the Measures on Online Payment Business categorizes online payment accounts of individuals into three types, with each type subject to particular use of purposes and different limits on the amounts that can be paid from the accounts. Individuals that pass more verifications are entitled to open accounts that are allowed be used for more purposes and have higher caps on the amount payable through these accounts. For example, an individual client whose identity is verified by the payment institution or by a partner authorized by the payment institution face to face, or whose basic identity information is subject to multiple cross-validation by at least five legal and safe external channels in a non-face-to-face manner, may open Type-III payment accounts, the balance in which may be used for consumption, account transfers, and procurement of financial products. The accumulative amount of balance payment transactions through all payment accounts of the individual shall not exceed RMB200,000 (US$28,806) during a year (excluding account transfers from the payment account to the client's same-name bank account). An individual client that passes the verification of basic identity information in a non-face-to-face manner through at least one legal and safe external channel and opening a payment account with the institution for the first time may open a Type-I payment account, the balance in which may be used for consumption and account transfers only. The accumulative amount of balance payment transactions through such payment account shall not exceed RMB1,000 (US$144) (including account transfer from the payment account to the client's same-name bank account), from the date of the opening of the account.

In April 2016, the General Office of the State Council issued the Implementing Scheme for Special Rectification of Internet Financial Risks, which reiterates that a non-bank payment institution must not misappropriate or possess clients' reserves, and instead it must open a reserve account with the People's Bank of China or a qualified commercial bank. In addition, a non-bank payment institution must not use schemes to carry out inter-bank clearing business in a disguised form. Instead, a non-bank payment institution must operate inter-bank payment business through the inter-bank clearing system of the People's Bank of China or a qualified clearing institution.

In January 2017, the General Office of the People's Bank of China issued a Notice on Matters regarding Centralized Deposit and Management of Client's Reserves of Payment Institutions. Pursuant to the notice, commencing from April 17, 2017, a non-bank payment institution must deposit a certain percentage of its clients' reserve that it collects into a special deposit account and no interest will accrue on the deposited amount. The People's Bank of China will determine the deposit percentage for a non-bank payment institution based on the category of payment business, risk control and compliance ratings of the non-bank payment institution. The deposit percentage ranges from 12% to 20% for an operator of online payment business, 10% to 18% for an operator of bank card bill acceptance and clearance business and 16% to 24% for an operator of issuance and acceptance of pre-paid card business. If an entity engages in more than one type of payment businesses, the highest of the respective deposit percentages applicable to each payment business of this entity will apply.

*Regulations relating to Consumer Finance and Microcredit*

We currently engage in consumer finance business by providing microcredit services to our customers through two of our subsidiaries. The Guidance on the Pilot Establishment of Microcredit Companies, jointly promulgated by the China Banking Regulatory Commission and the People's Bank of China in 2008, allows provincial governments to approve the establishment of microcredit companies on a trial basis. Following this guidance, many provincial governments in China, including that of Shanghai and Chongqing, promulgated local implementing rules on the administration of local microcredit companies. The implementing rules issued by the Shanghai and Chongqing municipal governments provide that the sources of funds of a microcredit company must be limited to the capital contributions paid by its shareholders, monetary donations, and loans provided by no more than two banking financial institutions. The Shanghai Financial Services Office, the regulatory entity for microcredit companies in Shanghai, together with other local government authorities in Shanghai issued additional administrative measures regulating microcredit companies in Shanghai, which require the paid capital contribution of a newly established microcredit company must be no less than RMB200 million (US$28.8 million), and provide that the authorities in Shanghai will provide additional supports to microcredit

65

**Table of Contents**

companies that are established by the large-scale internet services enterprises and mainly engage in internet microcredit business. In addition, pursuant to a circular issued by the Chongqing Financial Works Office, the regulatory entity for microcredit companies in Chongqing, the authorities in Chongqing have permitted certain qualified microcredit companies to conduct a cross-region microcredit business on the internet. We engage in microcredit businesses through two subsidiaries in Shanghai and Chongqing, both of which have obtained special approval for establishment of a microcredit company from the local governmental authorities.

### *Regulations on Platform Services relating to Sales of Securities Investment Fund*

We provide wealth management services through a variety of investment products, including, among others, securities investment fund. In accordance with the Interim Provisions on the Administration of the Business Operations of Securities Investment Fund Distributors through Third-Party E-Commerce Platforms issued by the CSRC in March 2013, a third-party e-commerce platform for securities investment fund sales refers to the information system providing supporting services for online trading activities between fund investors and fund distributors. To qualify as an operator of third-party e-commerce platform, an entity must satisfy a series of conditions, including, among others, that (i) it must be a PRC-incorporated entity with its website accessible within China; (ii) it must obtain a license for the relevant telecommunication business for more than three years; (iii) it must have a sound credibility record without being subject to any substantial administrative or criminal penalty in the past three years. Pursuant to the interim provisions, if a third-party e-commerce platform engages in activities such as opening fund share trading accounts, publicizing and promoting the fund, processing subscription and redemption of fund shares, or providing investment consultation or complaint settlement services relating to the fund, the operator of the platform will be deemed as conducting securities investment fund sales business, and therefore must obtain a license for fund sales business. As we provide third-party platform services to our customers and securities investment fund distributors on our wealth management platform and do not provide fund sales-related services specified in the interim provisions, we believe we do not engage in securities investment fund sales business and therefore are in compliance with relevant requirements.

### *Regulations on Internet Map Services*

According to the Administrative Rules of Surveying Qualification Certificate, as amended by the National Administration of Surveying, Mapping and Geo-information (formerly known as the State Bureau of Surveying and Mapping) in August 2014, the provision of internet map services by any non-surveying and mapping enterprise is subject to the approval of the National Administration of Surveying, Mapping and Geo-information and requires a Surveying and Mapping Qualification Certificate. Internet maps refer to maps called or transmitted through internet. Pursuant to the Notice on Further Strengthening the Administration of Internet Map Services Qualification issued by the National Administration of Surveying, Mapping and Geo-information in December 2011, any entity without applying for a Surveying and Mapping Qualification Certificate for internet map services is prohibited from providing any internet map services. Baidu Netcom currently provides online traffic information inquiry services as well as internet map services and has obtained a Surveying and Mapping Qualification Certificate for internet map services. Another entity in our group has also obtained the Surveying and Mapping Qualification Certificate.

### *Regulations on Online Games*

Pursuant to the Administrative Provisions on Internet Publishing Services and the Circular on Mobile Game Publishing Service, the online games services provided on our websites by our online game operator partners may be deemed as a type of "online publication service" provided by us, and we may be required to obtain an Internet Publication License from the SAPPRFT. Beijing Perusal and another entity in our group have obtained the Internet Publication Licenses. The required approval by the SAPPRFT of each online game provided on our websites is handled by our online game operator partners.

In June 2010, the Ministry of Culture promulgated the Interim Administration Measures of Online Games. In accordance with these measures, an ICP service provider operating online games, must obtain an Internet

66

Table of Contents

Culture Business Permit. Baidu Netcom and some other entities in our group have obtained an Internet Culture Business Permit for operating online games. These measures also specify that the Ministry of Culture is responsible for the censorship of imported online games and the filing of records of domestic online games. The procedures for the filing of records of domestic online games must be conducted with the Ministry of Culture within 30 days after the commencement date of the online operation of these online games or the occurrence date of any material alteration of these online games. The approval by or filing with the Ministry of Culture of each online game provided on our websites has been handled primarily by our online game operator partners.

In September 2009, the GAPP (currently known as the SAPPRFT) together with several other government agencies issued a Circular 13, which explicitly prohibits foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. The Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. We offer online games provided by our game operator partners on our websites owned and operated by our consolidated affiliated entities. We have also acquired 91 Wireless, which operates two leading smartphone application distribution platforms in China as well as a mobile game platform through its consolidated affiliated entities. If our contractual arrangements were deemed to be "indirect means" or "disguised form" under the Circular 13, our relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If we were found to be in violation of the Circular 13 to operate our online game platform, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending and revoking the relevant licenses and registrations.

### *Regulations on Online Game Virtual Currency*

The Interim Administration Measures of Online Games require companies that (i) issue online game virtual currency (including prepaid cards and/or pre-payment or prepaid card points), or (ii) offer online game virtual currency transaction services to apply for the Internet Culture Business Permit from provincial branches of the Ministry of Culture. The regulations prohibit companies that issue online game virtual currency from providing services that would enable the trading of such virtual currency. Any company that fails to submit the requisite application will be subject to sanctions, including but not limited to termination of operation, confiscation of incomes and fines. The regulations also prohibit online game operators from allocating virtual items or virtual currency to players based on random selection through lucky draw, wager or lottery that involves cash or virtual currency directly paid by the players. In addition, companies that issue online game virtual currency must comply with certain specific requirements, for example, online games virtual currency can only be used for products and services related to the issuance company's own online games. Pursuant to an Circular issued by the Ministry of Culture in December 2016, which will take effect on May 1, 2017, an online game operator must not allow online game virtual currency to exchange for legal currency or items, except in the case of termination of online game operation where the online game operator may refund the balance of online game virtual currency to players in the form of legal currency or in other means acceptable to the players. Moreover, pursuant to the circular, regulations applicable to online game virtual currency also apply to such other virtual items where the virtual items are issued by the online game operator, can be exchangeable for other virtual items or value-added services related to the games, and can be purchased with legal currency or online game virtual currency or exchanged for with online game virtual currency. Baidu Netcom and some other entities in our group have obtained the Internet Culture Business Permit for issuing online game virtual currency.

67

Table of Contents

*Regulations on Advertisements and Online Advertising*

The PRC government regulates advertising, including online advertising, principally through the State Administration for Industry and Commerce. The PRC Advertising Law, as recently amended in April 2015, outlines the regulatory framework for the advertising industry, and allows foreign investors to own up to all equity interests in PRC advertising companies.

We conduct our value-added telecommunication-based online advertising business through Baidu Netcom, which is one of our consolidated affiliated entities in China and holds a business license that covers value-added telecommunication-based online advertising in its business scope. Our subsidiaries Baidu Times and Baidu China have also expanded their respective business license to cover advertising in their respective business scope.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the contents of the advertisements they prepare or distribute are true and in full compliance with applicable laws and regulations. For example, pursuant to PRC Advertising Law, advertisements must not contain, among other prohibited contents, terms such as "the state-level", "the highest grade", "the best" or other similar words. In addition, where a special government review is required for certain categories of advertisements before publishing, the advertisers, advertising operators and advertising distributors are obligated to confirm that such review has been performed and the relevant approval has been obtained. Pursuant to the PRC Advertising Law, the use of internet to distribute advertisements shall not affect the normal use of the internet by users. Particularly, advertisements distributed on internet pages such as pop-up advertisements shall be indicated with conspicuous mark for close to ensure the close of such advertisements by one click. Where internet information service providers know or should know that illegal advertisements are distributed using their services, they shall prevent such advertisements from being distributed.

In addition to the above regulations, the Internet Advertising Measures also sets forth certain compliance requirements for online advertising businesses. For example, search engine service provider must indicate paid search results as an advertisement and distinguish paid search results from natural search results on their websites. Advertising operators and distributors of internet advertisement must examine, verify and record identity information, such as name, address and contact information, of advertisers, and maintain an updated verification record on a regular basis. Moreover, advertising operators and advertising distributors must examine supporting documentation provided by advertisers and verify the contents of the advertisements against supporting documents before publishing. If the contents of advertisements are inconsistent with the supporting documentation, or the supporting documentation is incomplete, advertising operators and distributors must refrain from providing design, production, agency or publishing services. The Internet Advertising Measures also prohibits the following activities: (i) providing or using applications and hardware to block, filter, skip over, tamper with, or cover up lawful advertisements; (ii) using network access, network equipment and applications to disrupt the normal transmission of lawful advertisements or adding or uploading advertisements without authorization; and (iii) harming the interests of a third party by using fake statistics or traffic data.

Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In the case of serious violations, the State Administration for Industry and Commerce or its local branches may force the violator to terminate its advertising operation or even revoke its business license. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties.

*Tort Liability Law*

In accordance with the PRC Tort Liability Law, which became effective in July 2010, internet users and internet service providers bear tortious liabilities in the event that they infringe upon other persons' rights and interests through the internet. Where an internet user conducts tortious acts through internet services, the infringed person has the right to request the internet service provider take necessary actions such as deleting

68

**Table of Contents**

contents, screening and de-linking. Failing to take necessary actions after being informed, the internet service provider will be subject to joint and several liabilities with the internet user with regard to the additional damages incurred. Where an internet service provider knows that an internet user is infringing upon other persons' rights and interests through its internet service but fails to take necessary actions, it is jointly and severally liable with the internet user.

### Regulations on Intellectual Property Rights

China has adopted legislation governing intellectual property rights, including patents, copyrights, trademarks, and domain names.

*Patent.* The PRC Patent Law provides for patentable inventions, utility models and designs, which must meet three conditions: novelty, inventiveness and practical applicability. The State Intellectual Property Office under the State Council is responsible for examining and approving patent applications. A patent is valid for a term of twenty years in the case of an invention and a term of ten years in the case of utility models and designs.

*Copyright.* The PRC Copyright Law and its implementation rules extend copyright protection to products disseminated over the internet and computer software. There is a voluntary registration system administered by the China Copyright Protection Center. Creators of protected works enjoy personal and property rights, including, among others, the right of disseminating the works through information network.

Pursuant to the relevant PRC regulations, rules and interpretations, ICP operators will be jointly liable with the infringer if they (i) participate in, assist in or abet infringing activities committed by any other person through the internet, (ii) are or should be aware of the infringing activities committed by their website users through the internet, or (iii) fail to remove infringing content or take other action to eliminate infringing consequences after receiving a warning with evidence of such infringing activities from the copyright holder. The court will determine whether an internet service provider should have known of their internet users' infringing activities based on how obvious the infringing activities are by taking into consideration a number of factors, including (i) the information management capabilities that the provider should have based on the possibility that the services provided by it may trigger infringing acts, (ii) the degree of obviousness of the infringing content, (iii) whether it has taken the initiative to select, edit, modify or recommend the contents involved, (iv) whether it has taken positive and reasonable measures against infringing acts, and (v) whether it has set up convenient programs to receive notices of infringement and made timely and reasonable responses to the notices. Where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it shall have a higher duty of care with respect to the internet user's act of infringement of others' copyrights. Advertisements placed for or other benefits particularly connected with specific contents may be deemed as direct economic benefits from such contents, but general advertising fees or service fees charged by an internet service provider for its internet services will not be included. In addition, where an ICP operator is clearly aware of the infringement of certain content against another's copyright through the internet, or fails to take measures to remove relevant contents upon receipt of the copyright holder's notice, and as a result, it damages the public interest, the ICP operator could be ordered to stop the tortious act and be subject to other administrative penalties such as confiscation of illegal income and fines. An ICP operator is also required to retain all infringement notices for a minimum of six months and to record the content, display time and IP addresses or the domain names related to the infringement for a minimum of 60 days.

An internet service provider may be exempted from liabilities for providing links to infringing or illegal content or providing other internet services which are used by its users to infringe others' copyright, if it does not know and does not have constructive knowledge that such content is infringing upon other parties' rights or is illegal. However, if the legitimate owner of the content notifies the internet service provider and requests removal of the links to the infringing content, the internet service provider would be deemed to have constructive knowledge upon receipt of such notification, but would be exempted from liabilities if it removes or disconnects

69

**Table of Contents**

the links to the infringing content at the request of the legitimate owner. At the request of the alleged infringer, the internet service provider should immediately restore links to content previously disconnected upon receipt of initial non-infringing evidence.

We have adopted measures to mitigate copyright infringement risks. For example, our policy is to remove links to web pages and materials uploaded by the users if we know these web pages or materials contain materials that infringe upon third-party rights or if we are notified by the legitimate copyright holder of the infringement with proper evidence.

*Software Products*. The Computer Software Copyright Registration Measures promulgated by the China Copyright Office on February 20, 2002, regulates software copyright registration, exclusive licensing contracts of software copyright and transfer agreements. Although such registration is not mandatory under PRC law, software copyright owners are encouraged to go through the registration process and registered software may receive better protection.

*Trademark*. The PRC Trademark Law and its implementation rules protect registered trademarks. The Trademark Office under the State Administration for Industry and Commerce handles trademark registrations and grants a term of ten years to registered trademarks. Trademark license agreements must be filed with the Trademark Office for record. " 百度 " is recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning " 百度 " and the related logos, we have applied for registration of various other trademarks.

*Domain name*. Domain names are protected under the Administrative Measures on the Internet Domain Names promulgated by the MIIT in November 2004. The MIIT is the major regulatory body responsible for the administration of the PRC internet domain names, under supervision of which the China Internet Network Information Center, or CNNIC, is responsible for the daily administration of .cn domain names and Chinese domain names. We have registered *Baidu.cn*, *Baidu.com.cn*, *hao123.com* and certain other domain names with CNNIC.

### Regulations on Information Security

The National People's Congress has enacted legislation that prohibits use of the internet that breaches the public security, disseminates socially destabilizing content or leaks state secrets. Breach of public security includes breach of national security and infringement on legal rights and interests of the state, society or citizens. Socially destabilizing content includes any content that incites defiance or violations of PRC laws or regulations or subversion of the PRC government or its political system, spreads socially disruptive rumors or involves cult activities, superstition, obscenities, pornography, gambling or violence. State secrets are defined broadly to include information concerning PRC national defense, state affairs and other matters as determined by the PRC authorities.

Pursuant to applicable regulations, ICP operators must complete mandatory security filing procedures and regularly update information security and censorship systems for their websites with local public security authorities, and must also report any public dissemination of prohibited content.

On December 27, 2015, the Standing Committee of the National People's Congress promulgated Anti-Terrorism Law, which took effect on January 1, 2016. According to the Anti-Terrorism Law, telecommunication service operators or internet service providers shall (i) carry out pertinent anti-terrorism publicity and education to society; (ii) provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities; (iii) implement network security, information monitoring systems as well as safety and technical prevention measures to avoid the dissemination of terrorism information, delete the terrorism information, immediately halt its dissemination, keep relevant

70

Table of Contents

records and report to the competent departments once the terrorism information is discovered; and (iv) examine customer identities before providing services. Any violation of the Anti-Terrorism Law may result in severe penalties, including substantial fines.

In November 2016, the Standing Committee of the National People's Congress promulgated the Cyber Security Law, which will become effective on June 1, 2017. In accordance with the Cyber Security Law, network operators must comply with applicable laws and regulations and fulfill their obligations to safeguard network security in conducting business and providing services. Network service providers must take technical and other necessary measures as required by laws, regulations and mandatory requirements to safeguard the operation of networks, respond to network security effectively, prevent illegal and criminal activities, and maintain the integrity, confidentiality and usability of network data.

In addition, the State Secrecy Bureau has issued provisions authorizing the blocking of access to any website it deems to be leaking state secrets or failing to comply with the relevant legislation regarding the protection of state secrets during online information distribution. Specifically, internet companies in China with bulletin boards, chat rooms or similar services must apply for specific approval prior to operating such services.

Furthermore, the Provisions on Technological Measures for Internet Security Protection, promulgated by the Ministry of Public Security, require all ICP operators to keep records of certain information about its users (including user registration information, log-in and log-out time, IP address, content and time of posts by users) for at least 60 days and submit the above information as required by laws and regulations. The Network Information Protection Decision states that ICP operators must request identity information from users when ICP operators provide information publication services to the users. If ICP operators come across prohibited information, they must immediately cease the transmission of such information, delete the information, keep relevant records, and report to relevant government authorities.

Baidu Netcom, BaiduPay and some other entities in our group are ICP operators, and are therefore subject to the regulations relating to information security. They have taken measures to comply with these regulations. They are registered with the relevant government authority in accordance with the mandatory registration requirement. Baidu Netcom's policy is to remove links to web pages which to its knowledge contain information that would be in violation of PRC laws or regulations. In addition, we monitor our websites to ensure our compliance with the above-mentioned laws and regulations.

### *Regulations on Internet Privacy*

The PRC Constitution states that PRC law protects the freedom and privacy of communications of citizens and prohibits infringement of these rights. In recent years, PRC government authorities have enacted legislation on internet use to protect personal information from any unauthorized disclosure. The Network Information Protection Decision provides that electronic information that identifies a citizen or involves privacy of any citizen is protected by law and must not be unlawfully collected or provided to others. ICP operators collecting or using personal electronic information of citizens must specify the purposes, manners and scopes of information collection and uses, obtain consent of the relevant citizens, and keep the collected personal information confidential. ICP operators are prohibited from disclosing, tampering with, damaging, selling or illegally providing others with, collected personal information. ICP operators are required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. The Administrative Measures on Internet Information Services prohibit an ICP operator from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. Pursuant to the Internet Electronic Messaging Service Administrative Measures, ICP operators that provide electronic messaging services must keep users' personal information confidential and must not disclose the personal information to any third party without the users' consent or unless required by law. According to the Provisions on Protection of Personal Information of Telecommunication and Internet Users, telecommunication business operators and ICP operators are responsible for the security of the personal information of users they collect or use in the course of their

71

**Table of Contents**

provision of services. Without obtaining the consent from the users, telecommunication business operators and ICP operators may not collect or use the users' personal information. The personal information collected or used in the course of provision of services by the telecommunication business operators or ICP operators must be kept in strict confidence, and may not be divulged, tampered with or damaged, and may not be sold or illegally provided to others. The ICP operators are required to take certain measures to prevent any divulge, damage, tamper or loss of users' personal information. In accordance with the Cyber Security Law, network operators must not collect personal information irrelevant to their services. In the event of any unauthorized disclosure, damage or loss of collected personal information, network operators must take immediate remedial measures, notify the affected users and report the incidents to the relevant authorities in a timely manner. If any user knows that a network operator illegally collects and uses his or her personal information in violation of laws, regulations or any agreement with the user, or the collected and stored personal information is inaccurate or wrong, the user has the right to request the network operator to delete or correct the relevant collected personal information. We collect and use our users' personal information only if our users give their informed consent, and we believe we have taken appropriate measures to protect the security of our users' personal information.

The relevant telecommunications authorities are further authorized to order ICP operators to rectify unauthorized disclosure. ICP operators are subject to legal liability, including warnings, fines, confiscation of illegal gains, revocation of licenses or filings, closing of the relevant websites, administrative punishment, criminal liabilities, or civil liabilities, if they violate relevant provisions on internet privacy. Pursuant to the Ninth Amendment to the Criminal Law issued by the Standing Committee of the National People's Congress in August 2015 and becoming effective in November 2015, any ICP provider that fails to fulfill the obligations related to internet information security administration as required by applicable laws and refuses to rectify upon orders, will be subject to criminal liability for (i) any dissemination of illegal information in large scale; (ii) any severe effect due to the leakage of the client's information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (i) sells or provides personal information to others unlawfully, or (ii) steals or illegally obtains any personal information, will be subject to criminal liability in severe situations. The PRC government, however, has the power and authority to order ICP operators to turn over personal information if an internet user posts any prohibited content or engages in illegal activities on the internet.

### Regulations on Foreign Exchange

#### Foreign Currency Exchange

Pursuant to the Foreign Currency Administration Rules, as amended, and various regulations issued by SAFE and other relevant PRC government authorities, RMB is freely convertible to the extent of current account items, such as trade related receipts and payments, interest and dividends. Capital account items, such as direct equity investments, loans and repatriation of investment, unless expressly exempted by laws and regulations, still require prior approval from SAFE or its provincial branch for conversion of RMB into a foreign currency, such as U.S. dollars, and remittance of the foreign currency outside of the PRC. After a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, became effective on June 1, 2015, instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals will be required to apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

Payments for transactions that take place within the PRC must be made in RMB. Foreign currency revenues received by PRC companies may be repatriated into China or retained outside of China in accordance with requirements and terms specified by SAFE.

#### Dividend Distribution

Wholly foreign-owned enterprises and Sino-foreign equity joint ventures in the PRC may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and

72

Table of Contents

regulations. Additionally, these foreign-invested enterprises may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the enterprise's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to employee welfare and bonus funds at their discretion. These reserves are not distributable as cash dividends.

*Foreign Exchange Registration of Offshore Investment by PRC Residents*

Pursuant to SAFE's Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment via Overseas Special Purpose Vehicles, or SAFE Circular No. 75, issued in October 2005, and a series of implementation rules and guidance, including the circular relating to operating procedures that came into effect in July 2011, PRC residents, including PRC resident natural persons or PRC companies, must register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE No. Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. After SAFE Notice 13 became effective on June 1, 2015, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock

73

**Table of Contents**

Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. Failure of the option holders to complete their SAFE registrations may subject these PRC employees to fines and legal sanctions and may also limit the ability of the overseas publicly listed company to contribute additional capital into its PRC subsidiary and limit the PRC subsidiary's ability to distribute dividends.

### Regulations on Labor

The Labor Contract Law, which became effective in January 2008, and its implementation rules, impose more restrictions on employers and have been deemed to increase labor costs for employers, compared to the Labor Law, which became effective in January 1995. For example, pursuant to the Labor Contract Law, an employer is obliged to sign labor contract with unlimited term with an employee if the employer continues to hire the employee after the expiration of two consecutive fixed-term labor contracts. The employer has to compensate the employee upon the expiration of a fixed-term labor contract, unless the employee refuses to renew such contract on terms the same as or more favorable to the employee than those contained in the expired contract. The employer also has to indemnify an employee if the employer terminates a labor contract without a cause permitted by law. In addition, under the Regulations on Paid Annual Leave for Employees, which became effective in January 2008, employees who have served more than one year for an employer are entitled to a paid vacation ranging from 5 to 15 days per year, depending on their length of service. Employees who waive such vacation time at the request of employers must be compensated for three times their regular salaries for each waived vacation day.

### Regulations on Taxation

For a discussion of applicable PRC tax regulations, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation."

**C.    Organizational Structure**

The following is a list of our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:

| Name | Place of Formation | Relationship |
| --- | --- | --- |
| Baidu Holdings Limited | British Virgin Islands | Wholly owned subsidiary |
| Baidu (Hong Kong) Limited | Hong Kong | Wholly owned subsidiary |
| Baidu Online Network Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu (China) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu.com Times Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu International Technology (Shenzhen) Co., Ltd. | China | Wholly owned subsidiary |
| Beijing Baidu Netcom Science Technology Co., Ltd. | China | Consolidated affiliated entity |
| Beijing Perusal Technology Co., Ltd. | China | Consolidated affiliated entity |
| Beijing BaiduPay Science and Technology Co., Ltd. | China | Consolidated affiliated entity |
| Qiyi.com, Inc. | Cayman Islands | Majority-owned subsidiary |
| 91 Wireless Websoft Limited | Cayman Islands | Wholly owned subsidiary |

**Table of Contents**

The following diagram illustrates our corporate structure, including our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:



---

\*    The diagram above omits the names of subsidiaries and consolidated affiliated entities that are insignificant individually and in the aggregate.

(1)  Beijing Baidu Netcom Science Technology Co., Ltd. is 99.5% owned by Mr. Robin Yanhong Li, our chairman and chief executive officer, and 0.5% owned by Mr. Hailong Xiang, an employee of ours. Please see "Item 6.E. Directors, Senior Management and Employees—Share Ownership" for Mr. Robin Yanhong Li's beneficial ownership in our company. Mr. Hailong Xiang's beneficial ownership of our company is less than 1% of our total outstanding shares.

(2)  Beijing Perusal Technology Co., Ltd. is 50% owned by Mr. Xiaodong Wang and 50% owned by Mr. Zhixiang Liang. Both Mr. Xiaodong Wang and Mr. Zhixiang Liang are employees of ours, and their respective beneficial ownership in our company is less than 1% of our total outstanding shares.

(3)  Beijing BaiduPay Science and Technology Co., Ltd. is 54.8% owned by Beijing Baidu Netcom Science Technology Co., Ltd., 5.4% owned by Mr. Zhixiang Liang and 39.8% owned by another consolidated affiliated entity controlled by us.

**Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders**

PRC laws and regulations restrict and impose conditions on foreign investment in internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses. Accordingly, we operate these businesses in China through our consolidated affiliated entities. We have entered into a series of contractual arrangements with our consolidated affiliated entities and the nominee shareholders of our consolidated affiliated entities. These contractual arrangements enable us to:

- receive substantially all of the economic benefits from our consolidated affiliated entities in consideration for the services provided by our subsidiaries;

- exercise effective control over our consolidated affiliated entities; and

- hold an exclusive option to purchase all or part of the equity interests in our consolidated affiliated entities when and to the extent permitted by PRC law.

75

**Table of Contents**

We do not have any equity interests in our consolidated affiliated entities. However, as a result of contractual arrangements, we have effective control over and are considered the primary beneficiary of these companies, and we have consolidated the financial results of these companies in our consolidated financial statements. If our consolidated affiliated entities or the nominee shareholders fail to perform their respective obligations under the contractual arrangements, we could be limited in our ability to enforce the contractual arrangements that give us effective control over our consolidated affiliated entities. Further, if we are unable to maintain effective control, we would not be able to continue to consolidate the financial results of our consolidated affiliated entities in our financial statements. In 2014, 2015 and 2016, we derived approximately 27%, 31% and 35% of our total revenues, respectively, from our consolidated affiliated entities through contractual arrangements. For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulations." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

***Contractual Arrangements relating to Baidu Netcom, Beijing Perusal and BaiduPay***

The following is a summary of the material provisions of the agreements among (i) our wholly-owned PRC subsidiary, Baidu Online, (ii) each of Baidu Netcom, Beijing Perusal and BaiduPay, our principal consolidated affiliated entities, and (iii) the nominee shareholders of these consolidated affiliated entities.

*Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay a monthly service fee to Baidu Online based on the formula as provided in the agreement in exchange for the technology consulting and services provided by Baidu Online. Under the agreement, the monthly service fee is equal to the product of the standard monthly fee for page view per thousand times multiplied by the actual times of page view for the month divided by 1,000. Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The exclusive technology consulting and services agreement between Baidu Online and each of Beijing Perusal and BaiduPay contains substantially the same terms as those between Baidu Online and Baidu Netcom described above, except that the service fee under the exclusive technology consulting and services agreement with BaiduPay is calculated and paid on a quarterly basis. Each of the agreements shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

In 2014, 2015 and 2016, Baidu Netcom only paid an insignificant amount of service fees to Baidu Online due to Baidu Netcom's accumulated loss position. Beijing Perusal did not pay any service fees to Baidu Online due to Beijing Perusal's operating loss in 2014, 2015 and 2016. BaiduPay has not paid any service fees to Baidu Online due to BaiduPay's break-even or loss position since its inception.

*Operating Agreement*

Pursuant to the operating agreement by and among Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the right to appoint senior executives of Baidu Netcom. The nominee shareholders of Baidu Netcom must appoint candidates recommended by Baidu Online as their

76

**Table of Contents**

representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The operating agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and the respective nominee shareholders contains substantially the same terms as those described above. Each of the agreements shall be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom have entered into a software license agreement and a web layout copyright license agreement. Pursuant to these license agreements, Baidu Online has granted to Baidu Netcom the right to use, including but not limited to, a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement have been renewed and are in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The web layout copyright license agreements that Baidu Online has entered into with each of Beijing Perusal and BaiduPay contain substantially the same terms as the one between Baidu Online and Baidu Netcom described above. Each of the agreements is in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement by and among Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have irrevocably granted Baidu Online an exclusive option to purchase, or require any of the nominee shareholders of Baidu Netcom to transfer to another person designated by Baidu Online, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital corresponding to the purchased equity interest or the minimum amount of consideration permitted by applicable PRC law. The nominee shareholders shall remit to Baidu Online any amount that is paid by Baidu Online or its designated person in connection with the purchased equity interest after deducting taxes and fees incurred from the transfer of the purchased equity interest. Baidu Online has sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions from Baidu Netcom to the nominee shareholders shall be paid to Baidu Online in full. Baidu Online shall provide unlimited financial support to Baidu Netcom, if Baidu Netcom shall become in need of any form of reasonable financial support in the normal operation of business. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online shall unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement shall terminate upon the nominee shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person or upon expiration of the term of business of Baidu Online or Baidu Netcom.

The exclusive equity purchase and transfer option agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and the respective nominee shareholders contains substantially the same terms as those

77

**Table of Contents**

described above. Each of the agreements shall terminate upon the nominee shareholders of Beijing Perusal or BaiduPay have transferred all their equity interests in Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person or upon expiration of the term of business of Baidu Online or the relevant consolidated affiliated entity.

*Loan Agreements*

Pursuant to loan agreements between Baidu Online and the nominee shareholders of Baidu Netcom, Baidu Online provided interest-free loans with an aggregate amount of RMB2.2 billion (US$312.7 million) to the nominee shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from sale of the nominee shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The term of each loan is ten years from the date of the agreement and can be extended with the written consent of both parties before expiration. With some of the loan agreements amended and renewed, the earliest will expire on January 17, 2027.

The loan agreements between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contain substantially the same terms as those described above, except that the amount of loans extended to the nominee shareholders is RMB3.2 billion (US$460.5 million) and RMB216.7 million (US$31.2 million), respectively. The term of the loans will expire on June 19, 2026 and October 17, 2026, respectively, and can be extended with the written consent of both parties before expiration.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement between Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom agree to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu Online. Each of the nominee shareholders of Baidu Netcom has executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as his/her attorney-in-fact to vote on his/her behalf on all matters requiring shareholder approval. The proxy agreement shall be in effect for an unlimited term unless terminated in writing by Baidu Online. The power of attorney shall be in effect for as long as the nominee shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements and powers of attorney between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above. Each of the proxy agreements shall be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney shall be in effect for as long as the relevant nominee shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement between Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and service agreement. If Baidu Netcom or the nominee shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The nominee shareholders of Baidu Netcom agree not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge will expire two years after expiration of the term of or the fulfillment by Baidu Netcom and the nominee shareholders of their respective obligations under the exclusive technology consulting and service agreement and the loan agreement.

78

**Table of Contents**

Each of the equity pledge agreements between Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above.

We are in the process of perfecting the equity pledges of Baidu Netcom and BaiduPay described above by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law, due to a recent increase in the registered capital.

Through the design of the aforementioned agreements, the nominee shareholders of these affiliated entities effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the affiliated entities' economic performance. Baidu Online obtains the ability to approve decisions made by the affiliated entities and the ability to acquire the equity interests in the affiliated entities when permitted by PRC law. Baidu Online is obligated to absorb a majority of the expected losses from the affiliated entities' activities through providing unlimited financial support to the affiliated entities and is entitled to receive a majority of residual returns from the affiliated entities through the exclusive technology consulting and service fees. As a result of these contractual arrangements, Baidu Online is determined to be the primary beneficiary of these affiliated entities. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between us and these affiliated entities through these contractual arrangements, and we consolidate these affiliated entities through Baidu Online.

We have also entered into contractual arrangements with several other affiliated entities and their respective nominee shareholders through our subsidiaries other than Baidu Online, which results in these subsidiaries being the primary beneficiary of the relevant affiliated entities. As a result of these contractual arrangements, there exists a parent-subsidiary relationship between us and the relevant affiliated entities, and we consolidate these affiliated entities through subsidiaries besides Baidu Online.

**D.    Property, Plant and Equipment**

Our corporate headquarters, Baidu Campus, is located in Shangdi, an area designated by the Beijing municipal government as the center of the city's information technology industry. We also own another office building, Baidu Science Park, in Beijing. Besides Beijing, we own and occupy office buildings in Shanghai and Shenzhen.

We also lease some offices in Beijing, Tokyo (Japan), California (USA), Thailand, Brazil, Egypt, Indonesia and many other cities in China.

We host our servers in China at the internet data centers of China Telecom, China Unicom and China Mobile in ten selected cities in China, and we also have content delivery network locations in various cities across China. We plan to deploy two additional data centers in 2017. We also have a data center of our own in Shanxi and plan to build another one in Beijing, the first stage of which was completed in the first half of 2016.

In December 2011, we commenced construction of an office building in Shenzhen, which will serve as our international center in Southern China. Our capital expenditure in connection with the construction of this office building in Shenzhen was RMB128.3 million (US$18.5 million) in 2016. We currently expect to complete the planned construction in 2018.

In September 2012, we commenced construction of Shanxi Cloud Computing Center, which will serve as one of our internet data centers in China. Our capital expenditure in connection with the construction of Shanxi Cloud Computing Center was RMB324.6 million (US$46.8 million) in 2016. We expect to fully complete the planned construction in 2018.

In April 2014, we commenced construction of part of Beijing Cloud Computing Center, which will serve as our internet data center in Beijing. Our capital expenditure in connection with the construction of Beijing Cloud

79

**Table of Contents**

Computing Center was RMB55.7 million (US$8.0 million) in 2016. We have completed the first phase of construction in 2016, and we are in the process of planning the rest of the construction work with the completion date not determinable at this stage.

We currently plan to fund these expenditures with our cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

**Item 4A.        Unresolved Staff Comments**

None.

**Item 5.        Operating and Financial Review and Prospects**

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3.D. Key Information—Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A.    Operating Results**

**Overview**

Our operations are primarily based in China, where we derive almost all of our revenues. Total revenues in 2016 were RMB70.5 billion (US$10.2 billion), a 6.3% increase over 2015. Operating profit in 2016 was RMB10.0 billion (US$1.4 billion), a 13.9% decrease over 2015. Net income attributable to Baidu, Inc. in 2016 was RMB11.6 billion (US$1.7 billion), a 65.4% decrease over 2015. Mobile revenues accounted for 63.2% of our total revenues in 2016.

Our total assets as of December 31, 2016 were RMB182.0 billion (US$26.2 billion), of which cash and cash equivalent amounted to RMB10.9 billion (US$1.6 billion). Our total liabilities as of December 31, 2016 were RMB84.3 billion (US$12.1 billion), accounting for 46.3% of total liabilities and equity. As of December 31, 2016, our retained earnings accumulated to RMB85.7 billion (US$12.3 billion).

We consolidated the financial results of Qunar in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar since October 2015 and recognized a disposition gain of RMB24.4 billion. We subsequently acquired additional ordinary shares of Ctrip in 2016.

**Reorganization of Operating Segments**

In the second quarter of 2015, we reorganized our operating segments from one operating segment into three operating segments, namely search services, transaction services and iQiyi. The primary reason for such reorganization is that our chief operating decision maker increasingly assesses the performance of our company and makes decisions in respect of the allocation of company resources by analyzing the operational results of these three business units separately. We will continually assess the reasonableness of our operating segments because we operate in a rapidly evolving internet industry with technology trend shifted, and there may be changes in our business strategy accordingly.

80

**Table of Contents**

**Revenues**

We generate revenues from the provision of search services, transaction services and iQiyi. The following table sets forth our revenues by segment, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | |
| | 2014 | 2015 | 2016 | |
| | RMB | RMB | RMB | US$ |
| | (In thousands, except percentages) | | | |
| Revenues: | | | | |
| Search Services | 43,727,459 | 55,667,478 | 55,375,031 | 7,975,663 |
| Transaction Services | 3,822,456 | 7,005,941 | 4,894,486 | 704,953 |
| iQiyi | 2,873,552 | 5,295,760 | 11,283,329 | 1,625,137 |

*Revenue Generation*

*Search Services*. Search services are keyword-based marketing services targeted at and triggered by internet users' search queries, which include our P4P services and other online marketing services, such as BrandZone, Aladdin and mobile application distribution. Search services contribute the largest proportion of our total revenues among our three operating segments.

A majority of our revenues from search services are derived from our P4P services. Our P4P platform is an online marketplace that introduces internet search users to customers who pay us a fee based on click-throughs for priority placement of their links in the search results. We recognize P4P revenues when a user clicks on a customer's link in the search results, based on the amount that the customer has agreed to pay for each click-through. The number of online marketing customers and average revenue per customer are considered as primary drivers of our P4P services. We believe our efforts to grow the customer base, improve customer experience and optimize their marketing budget allocation/spending effectiveness on our P4P platform are expected to drive our future revenue growth.

We also provide our customers with other performance-based and display-based online marketing services. For other performance-based online marketing services, our customers pay us based on performance criteria other than click-throughs, such as the number of telephone calls brought to our customers, the number of users registered with our customers, or the number of minimum click-throughs. For display-based online marketing services, our customers pay us based on the duration or the number of display of the advertisement placed on our properties and Baidu Union members' properties.

Our search services have historically been driven by the general increase in our customers' online marketing budgets. We expect the number of our online marketing customers to grow and our customer mix may change. However, we expect our online marketing customer base to remain diverse for the foreseeable future. Any prolonged economic slowdown in China may cause our customers to decrease or delay their online marketing spending and as a result, hamper our efforts to grow our customer base. Any of these consequences could negatively affect our search service revenues.

Our search customers are increasingly seeking marketing solutions with measurable results in order to maximize their ROI. To meet customers' needs, we will continue to evaluate the effectiveness of our various products and services and adjust the mix of our service offerings to optimize our customers' ROI. We expect that we will continue to earn a majority of our revenues from our search services.

*Transaction Services*. Transaction services include Baidu Nuomi, Baidu Deliveries, Baidu Mobile Game, Baidu Wallet, Baidu Maps and others. Revenues of transaction services are mainly generated by Baidu Nuomi, Baidu Deliveries and Baidu Mobile Game.

81

**Table of Contents**

GMV is defined as the value of confirmed orders of products and services, regardless whether the products or services are consumed or delivered. The GMV of transaction services refer to GMV generated by the Baidu platform through products such as Baidu Nuomi, Baidu Deliveries, Baidu Wallet and Baidu Maps.

Baidu Nuomi operates an online local commerce marketplace that connects merchants with users by offering goods and services provided by third-party merchants with discount prices. Baidu Nuomi generates revenue primarily by acting as a marketing agent for local merchants. Baidu Nuomi presents its revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants.

Baidu Deliveries operates an online platform on which users can place restaurant delivery orders. Baidu Deliveries presents its revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, to whom we provide online marketing and technology support services. Such revenue is typically a percentage of the transaction amount of orders processed through Baidu Deliveries platform. Baidu Deliveries also generates delivery revenue by providing food distribution services to users.

Baidu Mobile Game operates a mobile game platform on which registered users can access games provided by third-party game developers. Baidu Mobile Game generates revenue primarily by acting as an agent and presents its revenue on a net basis, representing the amount billed to registered users less the amount paid to game developers. The business of Baidu Mobile Game will be disposed in 2017 as we entered into an equity transfer agreement with a third-party purchaser in January 2017.

*iQiyi*. iQiyi is an online video platform with a content library that includes copyrighted movies, television series, cartoons, variety shows and other programs. iQiyi derives a majority of its revenues from online advertising services. As is customary in the advertising industry in China, iQiyi offers commissions to third-party advertising agencies and recognizes revenue net of these commissions. iQiyi also derives an increasing portion of its revenues from other sources, such as subscription services and sub-licensing of licensed contents to other online video websites.

### Revenue Collection

For most search services, we collect payments both from our customers directly and through our distributors. We require our P4P customers to pay a deposit before using our P4P services and remind them by an automated notice to replenish the accounts after their account balance falls below a designated amount. We deduct the amount due to us from the deposit paid by a customer when a user clicks on the customer's link in the search results. In addition, we offer payment terms to some of our customers other than P4P customers based on their historical marketing placements and credibility. We also offer longer payment terms to certain qualified distributors, consistent with industry practice.

For most transaction services, we collect payments directly from users when they purchase goods or services on our platforms. We settle with merchants or other third parties in accordance with the terms agreed upon.

For most services provided by iQiyi, customers may enter into different payment terms based on their historical marketing placements and credibility. Users are also encouraged to purchase subscription services to get enhanced user experience, and such payments are collected from the users by iQiyi or through agents such as China Mobile.

As of December 31, 2016, we had accounts receivable of RMB4.1 billion (US$591.9 million), net of allowance of RMB177.4 million (US$25.6 million).

82

Table of Contents

**Operating Costs and Expenses**

Our operating costs and expenses consist of cost of revenues, selling, general and administrative expenses, and research and development expenses. Share-based compensation expenses are allocated among the above three categories of operating costs and expenses, based on the nature of the work of the employees who have received share-based compensation. Our total operating costs and expenses increased significantly from 2014 to 2016 due to the growth of our business.

*Cost of Revenues*

The following table sets forth the components of our cost of revenues both in absolute amount and as a percentage of total revenues for the periods indicated.

| | For the Years Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2014** | | **2015** | | **2016** | | |
| | **RMB** | **%** | **RMB** | **%** | **RMB** | **US$** | **%** |
| | **(In thousands, except percentages)** | | | | | | |
| Total revenues | 49,052,318 | 100.0 | 66,381,729 | 100.0 | 70,549,364 | 10,161,222 | 100.0 |
| **Cost of revenues:** | | | | | | | |
| Sales tax and surcharges | (3,597,763) | (7.3) | (4,644,357) | (7.0) | (4,718,468) | (679,601) | (6.7) |
| Traffic acquisition costs | (6,328,155) | (12.9) | (8,860,861) | (13.3) | (10,372,516) | (1,493,953) | (14.7) |
| Bandwidth costs | (2,847,770) | (5.8) | (3,716,747) | (5.6) | (4,716,416) | (679,305) | (6.7) |
| Depreciation of servers and other equipment | (1,987,690) | (4.1) | (2,559,623) | (3.9) | (3,074,893) | (442,877) | (4.4) |
| Operational costs | (2,217,555) | (4.5) | (3,881,609) | (5.9) | (4,429,713) | (638,011) | (6.3) |
| Content costs | (1,871,906) | (3.8) | (3,745,063) | (5.6) | (7,863,585) | (1,132,592) | (11.1) |
| Share-based compensation expenses | (34,611) | (0.1) | (49,770) | (0.1) | (103,354) | (14,886) | (0.1) |
| Total cost of revenues | (18,885,450) | (38.5) | (27,458,030) | (41.4) | (35,278,945) | (5,081,225) | (50.0) |

*Traffic Acquisition Costs*. Traffic acquisition costs typically represent the portion of our online marketing revenues that we share with our Baidu Union members. We typically pay a Baidu Union member, based on a pre-agreed arrangement, a portion of the online marketing revenues generated from valid click-throughs by users of that member's properties.

*Bandwidth Costs*. Bandwidth costs are the fees we pay to telecommunications carriers such as China Telecom and China Unicom for telecommunications services and for hosting our servers at their internet data centers. We expect our bandwidth costs, as variable costs, to increase with the increasing number of racks of servers and the increasing traffic on our websites and mobile platform. Our bandwidth costs could also increase if the telecommunications carriers increase their service charges.

*Depreciation of Servers and Other Equipment*. We include in our cost of revenues depreciation expenses of servers and other computer hardware that are directly related to our business operations and technical support.

*Operational Costs*. Operational costs include primarily salary and benefit expenses, intangible assets amortization, payment platform charges, delivery cost of Baidu Deliveries and Baidu Nuomi, and other expenses incurred by our operating and technical support personnel. Salary and benefit expenses include wages, bonuses, medical insurance, unemployment insurance, pension benefits, employee housing fund and other welfare benefits.

*Content Costs*. Content costs consist primarily of the fees we paid for the licensed content from copyright owners or content distributors, and the amortization of the licensed copyrights for video content.

83

Table of Contents

*Operating Expenses*

The following table sets forth the components of our operating expenses both in absolute amount and as a percentage of total revenues for the periods indicated.

| | For the Years Ended December 31, | | | | | | |
| | 2014 | | 2015 | | 2016 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (In thousands, except percentages) | | | | | | |
|---|---|---|---|---|---|---|---|
| Total revenues | 49,052,318 | 100.0 | 66,381,729 | 100.0 | 70,549,364 | 10,161,222 | 100.0 |
| Cost of revenues | (18,885,450) | (38.5) | (27,458,030) | (41.4) | (35,278,945) | (5,081,225) | (50.0) |
| **Operating expenses:** | | | | | | | |
| Selling, general and administrative | (10,382,142) | (21.2) | (17,076,383) | (25.7) | (15,070,586) | (2,170,616) | (21.4) |
| Selling and marketing | (8,298,558) | (16.9) | (14,503,787) | (21.8) | (12,413,245) | (1,787,879) | (17.6) |
| General and administrative | (2,083,584) | (4.3) | (2,572,596) | (3.9) | (2,657,341) | (382,737) | (3.8) |
| Research and development | (6,980,962) | (14.2) | (10,175,762) | (15.3) | (10,150,753) | (1,462,013) | (14.4) |
| Total costs and operating expenses | (36,248,554) | (73.9) | (54,710,175) | (82.4) | (60,500,284) | (8,713,854) | (85.8) |

*Selling, General and Administrative Expenses*

Our selling and marketing expenses primarily consist of promotional and marketing expenses and compensation for our sales and marketing personnel.

Our general and administrative expenses consist primarily of salaries and benefits for our general and administrative personnel and fees and expenses for legal, accounting and other professional services.

*Research and Development Expenses*

Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expense research and development costs as they are incurred, except for capitalized software development costs that fulfill the capitalization criteria under Accounting Standards Codification, or ASC, subtopic 350-40, Intangibles-Goodwill and Other: Internal-Use Software.

*Share-based Compensation Expenses*

Baidu, Inc. grants options and restricted shares to our employees, directors and consultants as share-based compensation awards. As of December 31, 2016, there was RMB323.4 million (US$46.6 million) unrecognized share-based compensation cost related to options of Baidu, Inc., which is expected to be recognized over a weighted-average vesting period of 2.8 years. As of December 31, 2016, there was RMB5.4 billion (US$775.1 million) unrecognized share-based compensation cost related to restricted shares, which is expected to be recognized over a weighted-average vesting period of 3.2 years. To the extent the actual forfeiture rate is different from our original estimate, actual share-based compensation cost related to these awards may be different from our expectation.

Other subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in the aggregate.

84

**Table of Contents**

The following table sets forth the allocation of our share-based compensation expenses both in absolute amount and as a percentage of total share-based compensation expenses among our employees based on the nature of work which they were assigned to perform.

|  | For the Year Ended December 31, | | | | | | |
|  | 2014 | | 2015 | | 2016 | | |
|  | RMB | % | RMB | % | RMB | US$ | % |
|  | (In thousands, except percentages) | | | | | | |
| **Allocation of Share-based Compensation Expenses** | | | | | | | |
| Cost of revenues | 34,611 | 3.6 | 49,770 | 3.6 | 103,354 | 14,886 | 5.9 |
| Selling, general and administrative | 426,052 | 44.3 | 486,760 | 35.1 | 429,234 | 61,823 | 24.4 |
| Research and development | 502,077 | 52.1 | 850,588 | 61.3 | 1,227,400 | 176,782 | 69.7 |
| Total share-based compensation expenses | 962,740 | 100.0 | 1,387,118 | 100.0 | 1,759,988 | 253,491 | 100.0 |

**Taxation**

*Cayman Islands and BVI*

We are not subject to income or capital gain tax under the current laws of the Cayman Islands and the British Virgin Islands. Additionally, none of these jurisdictions currently impose a withholding tax on dividends.

*Hong Kong*

Our subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under Hong Kong tax law, our subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there is no withholding tax in Hong Kong on remittance of dividends.

*Japan*

Our subsidiaries in Japan with paid-in capital in excess of JPY100 million are subject to a national corporate income tax rate of 25.5% through March 31, 2015, and since April 1, 2015 the income tax rate has been reduced to 23.9%. The subsidiaries with paid-in capital of no more than JPY100 million will be taxed at a rate of 15% on the first JPY8 million and at 23.9% on the portion over JPY8 million from April 1, 2015. In addition to this national corporate income tax, our subsidiaries are subject to another national tax called a local corporation tax. Additionally, local income taxes, which are local inhabitant tax, enterprise tax and special local corporation tax, are also imposed on corporate income. The resulting effective corporate income tax rates of our Japanese subsidiaries range from approximately 34% to 37%.

*PRC Enterprise Income Tax*

Effective from January 1, 2008, the PRC's statutory enterprise income tax, or EIT, rate is 25%. An enterprise may benefit from a preferential tax rate of 15% under the EIT Law if it qualifies as a "High and New Technology Enterprise" strongly supported by the state. Pursuant to the Administrative Measures on the Recognition of High and New Technology Enterprises, as amended in January 2016, the provincial counterparts of the Ministry of Science and Technology, the Ministry of Finance and the State Administration of Taxation make joint determination on whether an enterprise is qualified as a "High and New Technology Enterprise" under the EIT Law. In making such determination, these government agencies consider, among other factors, ownership of core technology, whether the key technology supporting the core products or services fall within the scope of high and new technology strongly supported by the state as specified in the measures, the ratios of research and development personnel to total personnel, the ratio of research and development expenditures to

85

**Table of Contents**

annual sales revenues, the ratio of revenues attributed to high and new technology products or services to total revenues, and other measures set forth in relevant guidance. All enterprises that had been granted the "High and New Technology Enterprise" status before the effectiveness of the EIT Law are required to be re-examined in accordance with the measures mentioned above before they can be entitled to the preferential tax rate. A "High and New Technology Enterprise" certificate is effective for a period of three years. A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online and Baidu Netcom, obtained the "High and New Technology Enterprise" certificates. The related tax holiday under such "High and New Technology Enterprise" certificates of these entities will expire in 2017, 2018 or 2019.

If any entity fails to maintain the "High and New Technology Enterprise" qualification under the EIT Law, their tax rates will increase, which could have a material and adverse effect on our results of operations and financial position. Historically, all of the PRC subsidiaries and consolidated affiliated entities mentioned above successfully re-applied for the certificates when the prior ones expired.

An enterprise may benefit from a preferential tax rate of 10% under the EIT law if it qualifies as a "Key Software Enterprise." Enterprises wishing to enjoy the status of a "Key Software Enterprise" must file required supporting documents with the tax authorities before applying the preferential corporate income tax rate. These enterprises will be subject to relevant governmental authorities' assessment each year as to whether they are entitled to the preferential tax rate of 10%. Baidu Online was entitled to a preferential income tax rate of 10% from 2013 to 2015 due to its "Key Software Enterprise" status. Baidu China was also entitled to a preferential income tax rate of 10% for 2015 due to its "Key Software Enterprise" status. Prior to May 2016, a "Key Software Enterprise" used to be designated jointly by the National Development and Reform Commission, the MIIT, the Ministry of Commerce, the Ministry of Finance and the State Administration of Taxation. In May 2016, the four PRC governmental authorities jointly issued a notice, pursuant to which an enterprise may be entitled to the preferential income tax rate of 10% by filing with the local tax authority with supporting documentation proving its qualifications to be a "Key Software Enterprise" during its annual income tax filing process. The "Key Software Enterprise" status of Baidu Online and Baidu China for 2016 will be filed with tax authorities before the end of May 2017 and will be subject to relevant governmental authorities' assessment.

If our PRC subsidiaries or consolidated affiliated entities that have enjoyed preferential tax treatment no longer qualify for the treatment, we will consider available options under applicable law that would enable us to qualify for alternative preferential tax treatment. To the extent we are unable to offset the impact of the expiration of existing preferential tax treatment with new tax exemptions, tax incentives or other tax benefits, the expiration of existing preferential tax treatment may cause our effective tax rate to increase. The amount of income tax payable by our PRC subsidiaries and consolidated affiliated entities in the future will depend on various factors, including, among other things, the results of operations and taxable income of, and the statutory tax rate applicable to, each of the entities. Our effective tax rate depends partially on the extent of the relative contribution of each of our subsidiaries and consolidated affiliated entities to our consolidated taxable income. In 2014, 2015 and 2016, our consolidated effective tax rate was 15.41%, 14.44% and 20.08%, respectively.

*Withholding Tax*

Under the EIT Law and its implementation rules, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its non-resident enterprise investors, and proceeds from any such non-resident enterprise investor's disposition of assets (after deducting the net value of such assets) shall be subject to a 10% EIT, namely withholding tax, unless the non-resident enterprise investor's jurisdiction of incorporation has a tax treaty or arrangement with China that provides for a reduced withholding tax rate or an exemption from withholding tax. The Caishui (2008) No. 1 Notice clarifies that undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 will be exempted from any withholding tax.

Table of Contents

The British Virgin Islands, where Baidu Holdings Limited, the sole shareholder of certain of our PRC subsidiaries such as Baidu Online, was incorporated, does not have such a tax treaty with China.

Hong Kong, where Baidu (Hong Kong) Limited, our wholly owned subsidiary and the sole shareholder of certain of our PRC subsidiaries such as Baidu Times and Baidu China, was incorporated, has a tax arrangement with China that provides for a lower withholding tax rate of 5% on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. However, pursuant to a SAT Circular 81 issued by the State Administration of Taxation in February 2009, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from the reduced withholding tax rate on dividends due to a structure or arrangement designed for the primary purpose of obtaining favorable tax treatment, the PRC tax authorities may adjust the preferential tax treatment. Moreover, pursuant to a SAT Circular 601 issued by the State Administration of Taxation in October 2009, a resident of a contracting state will not qualify for the benefits under the tax treaties or arrangements, if it is not the "beneficial owner" with respect to dividend, interest and royalty income. According to SAT Circular 601, a "beneficial owner" shall have ownership and right to dispose of the income or the rights and properties giving rise to the income, and generally engages in substantive business activities. An agent or conduit company will not be regarded as a "beneficial owner" and, therefore, will not qualify for treaty benefits. A conduit company normally refers to a company that is set up primarily for the purpose of evading or reducing taxes or transferring or accumulating profits. In August 2015, the State Administration of Taxation promulgated the Administrative Measures for Non-Resident Taxpayers to Enjoy Treatments under Tax Treaties, or SAT Circular 60, which became effective on November 1, 2015. SAT Circular 60 provides that non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises may, if they determine by self-assessment that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply for the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-filing examinations by the relevant tax authorities.

If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, the dividend payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

### Tax Residence

Under the EIT Law and its implementation rules, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a resident enterprise and will be subject to the EIT at the rate of 25% on its worldwide income. The term "de facto management body" refers to "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise."

Pursuant to SAT Circular 82 issued by the State Administration of Taxation in April 2009, an overseas registered enterprise controlled by a PRC company or a PRC company group will be classified as a "resident enterprise" with its "de facto management body" located within China if the following requirements are satisfied: (i) the senior management and core management departments in charge of its daily operations are mainly located in the PRC; (ii) its financial and human resources decisions are subject to determination or approval by persons or bodies located in the PRC; (iii) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (iv) no less than half of the enterprise's directors or senior management with voting rights reside in the PRC. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. Although the SAT Circular 82, the additional guidance and its amendment only apply to overseas

87

Table of Contents

registered enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners, the determining criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If our offshore entities are deemed PRC resident enterprises, these entities may be subject to the EIT at the rate of 25% on their global incomes, except that the dividends distributed by our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed "dividends among qualified resident enterprises."

Should our offshore entities be deemed as PRC resident enterprises, such changes could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

### PRC Business Tax and VAT

In November 2011, the Ministry of Finance and the State Administration of Taxation jointly issued two circulars setting out the details of the pilot VAT reform program, which change the charge of sales tax from business tax to VAT for certain pilot industries. The VAT reform program initially applied only to the pilot industries in Shanghai, and was expanded to eight additional regions, including, among others, Beijing and Guangdong province, in 2012. In August 2013, the program was further expanded nationwide. In May 2016, the pilot program was extended to cover additional industry sectors such as construction, real estate, finance and consumer services.

With respect to all of our PRC entities for the period immediately prior to the implementation of the VAT reform program, revenues from our services are subject to a 5% PRC business tax. Revenues from our online advertising distribution services are subject to an additional 3% cultural business construction fee.

Our entities located in Shanghai, Beijing and Guangdong Province fall within the scope of the program and have been recognized as the VAT general taxpayers since January 1, 2012, September 1, 2012 and November 1, 2012, respectively, the effective time of the program in each of the regions. Our entities located outside of Shanghai, Beijing and Guangdong Province have been subject to VAT since August 1, 2013. From the applicable effective time onwards, these entities are required to pay VAT instead of business tax for services that are deemed by the relevant tax authorities to be within the pilot industries at a rate of 6%. In addition, cultural business construction fee is imposed at the rate of 3% on revenues derived from our online advertising distribution services.

### PRC Urban Maintenance and Construction Tax and Education Surcharge

Any entity, foreign-invested or purely domestic, or individual that is subject to consumption tax, VAT and business tax is also required to pay PRC urban maintenance and construction tax. The rates of urban maintenance and construction tax are 7%, 5% or 1% of the amount of consumption tax, VAT and business tax actually paid depending on where the taxpayer is located. All entities and individuals who pay consumption tax, VAT and business tax are also required to pay education surcharge at a rate of 3%, and local education surcharges at a rate of 2%, of the amount of VAT, business tax and consumption tax actually paid.

88

**Table of Contents**

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods indicated. The period-to-period comparisons of results of operations should not be relied upon as indicative of future performance.

| | For the Years Ended December 31, | | | |
| | 2014 | 2015 | 2016 | |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | |
| Revenues: | | | | |
|    Online marketing services | 48,495,215 | 64,037,006 | 64,525,115 | 9,293,550 |
|    Others | 557,103 | 2,344,723 | 6,024,249 | 867,672 |
|    Total revenues | 49,052,318 | 66,381,729 | 70,549,364 | 10,161,222 |
| Operating costs and expenses:(1) | | | | |
|    Cost of revenues | (18,885,450) | (27,458,030) | (35,278,945) | (5,081,225) |
|    Selling, general and administrative | (10,382,142) | (17,076,383) | (15,070,586) | (2,170,616) |
|    Research and development | (6,980,962) | (10,175,762) | (10,150,753) | (1,462,013) |
|    Total operating costs and expenses | (36,248,554) | (54,710,175) | (60,500,284) | (8,713,854) |
| Operating profit | 12,803,764 | 11,671,554 | 10,049,080 | 1,447,368 |
| Interest income | 1,992,818 | 2,362,632 | 2,341,631 | 337,265 |
| Interest expense | (628,571) | (1,041,394) | (1,157,562) | (166,724) |
| Other income, net, including exchange gains or losses | 336,338 | 24,909,964 | 4,301,785 | 619,586 |
| Income / (loss) from equity method investments | (19,943) | 3,867 | (1,025,727) | (147,735) |
| Taxation | (2,231,172) | (5,474,377) | (2,913,594) | (419,645) |
| Net income | 12,253,234 | 32,432,246 | 11,595,613 | 1,670,115 |
| Less: Net loss attributable to non-controlling interests | (943,698) | (1,231,927) | (36,656) | (5,280) |
| Net income attributable to Baidu, Inc. | 13,196,932 | 33,664,173 | 11,632,269 | 1,675,395 |
| | | | | |
| *(1) Share-based compensation expenses:* | | | | |
|    *Cost of revenues* | *(34,611)* | *(49,770)* | *(103,354)* | *(14,886)* |
|    *Selling, general and administrative* | *(426,052)* | *(486,760)* | *(429,234)* | *(61,823)* |
|    *Research and development* | *(502,077)* | *(850,588)* | *(1,227,400)* | *(176,782)* |
| | *(962,740)* | *(1,387,118)* | *(1,759,988)* | *(253,491)* |

***Year Ended December 31, 2016 Compared to Year Ended December 31, 2015***

    ***Consolidated revenues.*** Our total revenues increased by 6.3% from RMB66.4 billion in 2015 to RMB70.5 billion (US$10.2 billion) in 2016. Our online marketing revenues increased slightly by 0.8% from RMB64.0 billion in 2015 to RMB64.5 billion (US$9.3 billion) in 2016. The number of our active online marketing customers decreased from approximately 1,049,000 in 2015 to approximately 982,000 in 2016 while the average revenue per customer increased from approximately RMB60,500 in 2015 to approximately RMB65,300 (US$9,405) in 2016. The decrease of our active online marketing customers was primarily due to the measures we have implemented since May 2016, which included turning down customers who do not meet our new requirements, in order to deliver a better user experience and build a safer and more trustworthy

89

Table of Contents

platform for users. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying and delivery related businesses. The other revenues increased by 156.9% from RMB2.3 billion in 2015 to RMB6.0 billion (US$867.7 million) in 2016, which was mainly due to the growth of subscription services of iQiyi.

***Consolidated operating costs and expenses.*** Our consolidated operating costs and expenses increased by 10.6% from RMB54.7 billion in 2015 to RMB60.5 billion (US$8.7 billion) in 2016. This increase was primarily due to the expansion of our business, and in particular the content cost of iQiyi.

*Cost of Revenues.* Our cost of revenues increased by 28.5% from RMB27.5 billion in 2015 to RMB35.3 billion (US$5.1 billion) in 2016. This increase was primarily due to the following factors:

- *Traffic Acquisition Costs.* Our traffic acquisition costs increased by 17.1% from RMB8.9 billion in 2015 to RMB10.4 billion (US$1.5 billion) in 2016. Traffic acquisition costs represent 14.7% of total revenues in 2016, compared to 13.3% in 2015. The increase in our traffic acquisition costs mainly reflected the change in the mix of Baidu Union members.

- *Bandwidth Costs and Depreciation Expenses.* Our bandwidth costs increased by 26.9% from RMB3.7 billion in 2015 to RMB4.7 billion (US$679.3 million) in 2016. Our depreciation expenses of servers and other equipment increased by 20.1% from RMB2.6 billion in 2015 to RMB3.1 billion (US$442.9 million) in 2016. The increases in these costs were mainly due to our investment in increasing our network infrastructure capacity.

- *Sales Tax and Surcharges.* Our sales tax and surcharges increased by 1.6% from RMB4.6 billion in 2015 to RMB4.7 billion (US$679.6 million) in 2016, in line with the increase in revenues.

- *Operational Costs.* Our operational costs increased by 14.1% from RMB3.9 billion in 2015 to RMB4.4 billion (US$638.0 million) in 2016, primarily due to the increases of delivery cost of Baidu Deliveries and staff-related costs, which were partially offset by the decrease of payment platform charges and intangible amortization expenses.

- *Content Costs.* Our content costs increased by 110.0% from RMB3.7 billion in 2015 to RMB7.9 billion (US$1.1 billion) in 2016, primarily due to the increase in video content costs of iQiyi.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses decreased by 11.7% from RMB17.1 billion in 2015 to RMB15.1 billion (US$2.2 billion) in 2016. This decrease was primarily due to the following factors:

- Total salaries and benefits and staff-related expenses decreased by 3.2% from RMB4.3 billion in 2015 to RMB4.1 billion (US$594.6 million) in 2016, primarily due to the decreased headcount of certain business resulting from the change from the direct sales model to distribution model during 2016;

- Marketing and promotion expenses decreased by 20.9% from RMB9.8 billion in 2015 to RMB7.8 billion (US$1.1 billion) in 2016, primarily due to the reduced promotional spending relating to our transaction services;

- Total office operating expenses decreased by 22.0% from RMB658.4 million in 2015 to RMB513.6 million (US$74.0 million) in 2016, primarily as a result of reduced office rental expenses as new buildings owned by us went into service;

- Share-based compensation expenses allocated to selling, general and administrative expenses decreased by 11.8% from RMB486.8 million in 2015 to RMB429.2 million (US$61.8 million) in 2016.

*Research and Development Expenses.* Our research and development expenses remained flat at RMB10.2 billion (US$1.5 billion) in 2016.

90

**Table of Contents**

*Operating profit*. As a result of the foregoing, we generated an operating profit of RMB10.0 billion (US$1.4 billion) in 2016, a 13.9% decrease from RMB11.7 billion in 2015.

*Other income, net, including exchange gains or losses*. Our other income, net, including exchange gains or losses was RMB4.3 billion (US$619.6 million) in 2016, compared to RMB24.9 billion in 2015. The other income, net, including exchange gains or losses in 2016, mainly consisted of the investment gain recognized as a result of Baidu's exchange of Uber (Cayman), Ltd., or Uber China, shares with Xiaoju Kuaizhi, Inc., or Didi.

*Income (loss) from equity method investments*. We had loss from equity method investments of RMB1.0 billion (US$147.7 million) in 2016, as compared to income from equity method investments of RMB3.9 million in 2015 mainly due to the loss pick up of our significant investee, Ctrip.

*Taxation.* Our income tax expenses decreased by 46.8% from RMB5.5 billion in 2015 to RMB2.9 billion (US$419.6 million) in 2016, primarily due to the significant tax expense recognized in 2015 in relation our exchange of Qunar shares with Ctrip. The effective tax rate for 2016 was 20.1% as compared to 14.4% in 2015. Excluding the share exchange transaction impact for the past two years, the effective tax rate was flat year-over-year.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. decreased from RMB33.7 billion in 2015 to RMB11.6 billion (US$1.7 billion) in 2016.

### Year Ended December 31, 2015 Compared to Year Ended December 31, 2014

*Consolidated revenues.* Our total revenues increased by 35.3% from RMB49.1 billion in 2014 to RMB66.4 billion in 2015. This increase was due to a substantial increase in our revenues from online marketing services. Our online marketing revenues increased by 32.0% from RMB48.5 billion in 2014 to RMB64.0 billion in 2015. This increase was mainly attributable to the increase in the number of our active online marketing customers from approximately 813,000 in 2014 to approximately 1,049,000 in 2015, and the increase in the average revenue per customer from approximately RMB59,400 in 2014 to approximately RMB60,500 in 2015. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying related businesses.

*Consolidated operating costs and expenses.* Our consolidated operating costs and expenses increased by 50.9% from RMB36.2 billion in 2014 to RMB54.7 billion in 2015. This increase was primarily due to the expansion of our business, and in particular the expansion of our mobile platform and transaction related services.

*Cost of Revenues.* Our cost of revenues increased by 45.4% from RMB18.9 billion in 2014 to RMB27.5 billion in 2015. This increase was primarily due to the following factors:

- *Traffic Acquisition Costs*. Our traffic acquisition costs increased by 40.0% from RMB6.3 billion in 2014 to RMB8.9 billion in 2015. Traffic acquisition costs represent 13.3% of total revenues in 2015, compared to 12.9% in 2014. The increase in our traffic acquisition costs mainly reflected the increased contribution of Baidu Union members.

- *Bandwidth Costs and Depreciation Expenses*. Our bandwidth costs increased by 30.5% from RMB2.8 billion in 2014 to RMB3.7 billion in 2015. Our depreciation expenses of servers and other equipment increased by 28.8% from RMB2.0 billion in 2014 to RMB2.6 billion in 2015. The increases in these costs were mainly due to our investment in increasing our network infrastructure capacity.

- *Sales Tax and Surcharges.* Our sales tax and surcharges increased by 29.1% from RMB3.6 billion in 2014 to RMB4.6 billion in 2015, in line with the increase in revenues.

- *Operational Costs*. Our operational costs increased by 75.0% from RMB2.2 billion in 2014 to RMB3.9 billion in 2015, primarily due to the increase of delivery cost of Baidu Nuomi and Baidu Deliveries business, payment platform charges and staff-related costs.

91

**Table of Contents**

- *Content Costs.* Our content costs increased by 100.1% from RMB1.9 billion in 2014 to RMB3.7 billion in 2015, primarily due to the increase in video content costs of iQiyi, one of our subsidiaries.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses increased by 64.5% from RMB10.4 billion in 2014 to RMB17.1 billion in 2015. This increase was primarily due to the following factors:

- Total salaries and benefits and staff-related expenses increased by 31.1% from RMB3.3 billion in 2014 to RMB4.3 billion in 2015, primarily due to the increased headcount to support our expanded online marketing services during 2015;

- Marketing and promotion expenses increased by 98.4% from RMB4.9 billion in 2014 to RMB9.8 billion in 2015, primarily due to the increased marketing and promotion activities relating to our transaction services and mobile products;

- Total office operating expenses increased by 24.9% from RMB527.0 million in 2014 to RMB658.4 million) in 2015, primarily as a result of increase and expansion of our offices;

- Total traveling, communication and business development expenses increased by 35.8% from RMB276.5 million in 2014 to RMB375.6 million in 2015, primarily due to the increased headcount and activities to support our expanded online marketing services;

- Share-based compensation expenses allocated to selling, general and administrative expenses increased by 14.2% from RMB426.1 million in 2014 to RMB486.8 million in 2015.

*Research and Development Expenses.* Our research and development expenses increased by 45.8% from RMB7.0 billion in 2014 to RMB10.2 billion in 2015, primarily due to the increase in staff-related costs of research and development staff.

*Operating profit.* As a result of the foregoing, we generated an operating profit of RMB11.7 billion in 2015, an 8.8% decrease from RMB12.8 billion in 2014.

*Other income, net, including exchange gains or losses.* Our other income, net, including exchange gains or losses was RMB24.9 billion in 2015, compared to RMB336.3 million in 2014. The other income, net, including exchange gains or losses in 2015 was primarily attributable to the disposition gain of RMB24.4 billion recognized as a result of our exchange of Qunar shares with Ctrip.

*Income (loss) from equity method investments.* We had income from equity method investments of RMB3.9 million in 2015, as compared to loss from equity method investments of RMB19.9 million in 2014.

*Taxation.* Our income tax expenses increased by 145.4% from RMB2.2 billion in 2014 to RMB5.5 billion in 2015, primarily due to the tax expense recognized in relation to our exchange of Qunar shares with Ctrip.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB13.2 billion in 2014 to RMB33.7 billion in 2015.

92

Table of Contents

### Segment Revenues

The following table sets forth our revenues by segment and year-over-year change rate for the periods indicated, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | | | |
| | 2014 | 2015 | | 2016 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | | (In thousands, except percentages) | | | | |
| Revenues: | | | | | | |
| Search Services | 43,727,459 | 55,667,478 | 27.3 | 55,375,031 | 7,975,663 | (0.5) |
| Transaction Services | 3,822,456 | 7,005,941 | 83.3 | 4,894,486 | 704,953 | (30.1) |
| iQiyi | 2,873,552 | 5,295,760 | 84.3 | 11,283,329 | 1,625,137 | 113.1 |

*Search Services.* Our search services revenues decreased by 0.5% from RMB55.7 billion in 2015 to RMB55.4 billion (US$8.0 billion) in 2016. This decrease was primarily due to the implementing measures that we have taken to deliver a better user experience and build a safer and more trustworthy platform for users since May 2016, which had a negative impact on the number of customers and our revenues in the short term. The total number of paid clicks increased by 10.6% from 2015 to 2016.

Our search services revenues increased by 27.3% from RMB43.7 billion in 2014 to RMB55.7 billion in 2015. This increase was primarily attributable to the increase in the number of active online marketing customers of our search services and the increase in the average revenue per customer. The total number of paid clicks increased by 34.1% from 2014 to 2015.

*Transaction Services.* Our transaction services revenues decreased by 30.1% from RMB7.0 billion in 2015 to RMB4.9 billion (US$705.0 million) in 2016. Since October 2015, we have ceased to consolidate the financial results of Qunar, which was previously part of our transaction services in our consolidated financial statements from July 2011 to October 2015. Excluding the impact of Qunar, the revenues of transaction services increased by 32.4% from 2015 to 2016. Excluding the impact of Qunar, the GMV of transaction services increased by 84.2% from 2015 to 2016.

Our transaction services revenues increased by 83.3% from RMB3.8 billion in 2014 to RMB7.0 billion in 2015.

*iQiyi.* Our iQiyi revenues increased by 113.1% from RMB5.3 billion in 2015 to RMB11.3 billion (US$1.6 billion) in 2016. This increase was mainly attributable to the increase in online marketing revenues and subscription services revenues.

iQiyi revenues increased by 84.3% from RMB2.9 billion in 2014 to RMB5.3 billion in 2015. This increase was mainly attributable to the increase in online marketing revenues and subscription services revenues.

### Segment Operating Costs and Expenses

The following table sets forth our operating costs and expenses by segment and year-over-year change rate for the periods indicated:

| | Year ended December 31, | | | | | |
| | 2014 | 2015 | | 2016 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | | (In thousands, except percentages) | | | | |
| Operating Costs and Expenses: | | | | | | |
| Search Services | (23,179,666) | (27,549,641) | 18.9 | (28,222,224) | (4,064,845) | 2.4 |
| Transaction Services | (9,796,434) | (20,151,386) | 105.7 | (17,280,521) | (2,488,913) | (14.2) |
| iQiyi | (3,983,851) | (7,679,198) | 92.8 | (14,048,498) | (2,023,404) | 82.9 |

93

Table of Contents

*Search Services*. Operating costs and expenses of search services mainly consist of traffic acquisition costs, staff related costs, business tax and surcharges, depreciation and intangible amortization expenses, bandwidth costs and marketing and promotion expenses.

Operating costs and expenses of search services were RMB28.2 billion (US$4.1 billion) in 2016, compared to RMB27.5 billion in 2015. The increase was primarily due to a 13.9% increase in traffic acquisition costs, a 20.3% increase in depreciation of servers and other equipment, and a 16.9% increase in bandwidth costs partially offset by a 74.8% decrease in payment platform charges, a 24.6% decrease in promotional expenses and a 129.1% decrease in bad debt provision, all compared to the figures in 2015.

Operating costs and expenses of search services were RMB27.5 billion in 2015, compared to RMB23.2 billion in 2014. The increase was primarily due to a 27.4% increase in traffic acquisition costs, a 28.3% increase in staff related costs, a 21.8% increase in business tax and surcharges, and a 15.4% increase in depreciation and intangible amortization expenses, compared to the figures in 2014.

*Transaction Services*. Operating costs and expenses of transaction services mainly consist of marketing and promotion expenses, staff related costs, depreciation and intangible amortization expenses, bandwidth costs, traffic acquisition costs and payment platform charges.

Operating costs and expenses of transaction services were RMB17.3 billion (US$2.5 billion) in 2016, compared to RMB20.2 billion in 2015. The decrease was primarily a result of a 31.0% decrease in marketing and promotion expenses, 22.3% decrease in staff related costs and a 40.1% decrease in business tax and surcharges, partially offset by a 298.8% increase of delivery cost of Baidu Deliveries and Baidu Nuomi, all compared to the figures in 2015.

Operating costs and expenses of transaction services were RMB20.2 billion in 2015, compared to RMB9.8 billion in 2014. The increase was primarily a result of a 157.9% increase in marketing and promotion expenses, a 53.9% increase in staff related costs and a 128.0% increase in traffic acquisition costs, compared to the figures in 2014.

*iQiyi*. Operating costs and expenses of iQiyi mainly consist of content costs, bandwidth costs, staff related costs, marketing and promotion expenses, and business tax and surcharges.

Operating costs and expenses of iQiyi were RMB14.0 billion (US$2.0 billion) in 2016, compared to RMB7.7 billion in 2015. The increase was primarily due to a 121.7% increase in content costs, a 58.7% increase in bandwidth costs, a 49.0% increase in staff related costs, and an 82.9% increase in business tax and surcharges, compared to the figures in 2015.

Operating costs and expenses of iQiyi were RMB7.7 billion in 2015, compared to RMB4.0 billion in 2014. The increase was primarily due to a 136.0% increase in content costs, a 80.5% increase in bandwidth costs, a 44.6% increase in staff related costs, and a 79.8% increase in marketing and promotion expenses, compared to the figures in 2014.

**Inflation**

Inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the annual average percent changes in the consumer price index in China for 2014, 2015 and 2016 were 2.0%, 1.4% and 2.0%, respectively. The year-over-year percent change in the consumer price index for January 2015, 2016 and 2017 was increase of 0.8%, 1.8% and 2.5%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally,

94

**Table of Contents**

because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

**Foreign Currency**

The average exchange rate between U.S. dollar and RMB has declined from RMB8.2264 per U.S. dollar in July 2005 to RMB6.9198 per U.S. dollar in December 2016. As of December 31, 2016, we recorded RMB2.0 billion (US$291.3 million) of net foreign currency translation loss in accumulated other comprehensive income as a component of shareholders' equity. We have not hedged exposures to exchange fluctuations using any hedging instruments. See also "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." and "Item 11. Quantitative and Qualitative Disclosures about Market Risk—Foreign Exchange Risk."

**Critical Accounting Policies**

We prepare financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities and the disclosure of our contingent assets and liabilities at the end of each fiscal period and the reported amounts of revenues and expenses during each fiscal period. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

*Consolidation of Affiliated Entities*

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on value-added telecommunication services, internet, value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses, we operate our websites and conduct our value-added telecommunication-based online advertising, online audio and video services and mobile application distribution businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities through our subsidiaries, which obligate them to absorb a majority of the risk of loss and receive a majority of the residual returns from the affiliated entities' activities. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities through our subsidiaries, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by SEC Regulation SX-3A-02 and ASC topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities through the subsidiaries, which are the primary beneficiaries of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurred. We will also continuously reconsider whether we are the primary beneficiaries of our affiliated entities as facts and circumstances change. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

95

**Table of Contents**

***Segment Reporting***

We historically had only one single reportable segment because our chief operating decision maker, or CODM, formerly relied on the consolidated results of operations when making decisions on allocating our resources and assessing our performance. Beginning in the quarter ended June 30, 2015, we have changed our reportable segments as a result of significant growth in our operations and expansion of services to multiple businesses in recent years. Our chief executive officer, who has been identified as the CODM, reviews the operating results of different service lines in order to allocate resources and assess our performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280, or ASC 280, *Segment Reporting*.

We have reorganized our operation into three segments since the second quarter of 2015, consisting of the Search Services, Transaction Services and iQiyi. Search Services mainly include our P4P services and other online marketing services. Transaction Services include Baidu Nuomi, Baidu Deliveries, Baidu Mobile Game, Baidu Wallet, Baidu Maps and others. iQiyi is an online video platform with a content library that includes licensed movies, television series, cartoons, variety shows and other programs. We do not allocate any share-based compensation expenses to these segments as the CODM does not use this information to measure the performance of the operating segments.

***Revenue Recognition***

We recognize revenues based on the following principles:

**(1)    *Performance-based online marketing services***

*Cost-per-click.* Our auction-based P4P platform enables a customer to place its website link and related description on our search result list on the website which could be accessed through personal computers or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on our website and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's relevance to the keyword searched. Customer pays us only when a user clicks on one of its website links. Other than the auction-based P4P platform, we have certain vertical platforms from which we generate revenue through pre-determined prices per click. Revenue is recognized when a user clicks on one of the customer-sponsored website links, as there is persuasive evidence of an arrangement, the fee is fixed or determinable and collection is reasonably assured, as prescribed by ASC topic 605, or ASC 605, *Revenue Recognition*.

*Other performance-based online marketing services.* To the extent we provide online marketing services based on performance criteria other than cost-per-click, such as the number of downloads (and user registration) of mobile applications, the number of incremental end users and the total incremental revenue generated, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

**(2)    *Display-based online advertising services***

For display-based online advertising services such as text links, banners, icons or other forms of graphical advertisements in the websites or mobile applications, we recognize revenue, in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on a specified webpage or mobile applications, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements. For certain display-based contractual agreements, we may also provide certain performance guarantees, in which cases revenue is recognized at the later of the completion of the time commitment or performance guarantee.

96

**Table of Contents**

*(3)   Revenue-sharing online marketing services*

We conduct certain online marketing services as an agent, such as Baidu Nuomi and Baidu Deliveries, by offering goods and services supplied by third-party partners. The revenues from these services are presented on a net basis as we are not the primary obligor in the arrangements in accordance with ASC subtopic 605-45, or ASC 605-45, *Revenue Recognition: Principal Agent Consideration*. We recognize revenue share for provision of online promotional services based on a negotiated amount or a fixed rate representing the amount billed to registered users less the amount paid to third-party partners, when all the revenue recognition criteria set forth in ASC 605 are met.

*(4)   Subscription services*

We provide subscription services which require us to stand ready to provide registered users with access to online documents sharing platform, personal cloud computing service and premium content provided by iQiyi. Access to these services are available to subscribers throughout the subscription period, and revenue is recognized ratably as services are provided over the subscription period.

*(5)   Online marketing services involving Baidu Union*

Baidu Union is the program through which we expand distribution of our customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. We make payments to Baidu Union members for acquisition of traffic. We recognize gross revenue for the amount of fees we receive from our customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

*(6)   Barter transactions*

*Nonmonetary exchanges of licensed copyrights of video contents.*

We enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies, or OVBC, from time to time. The exchanged licensed copyrights provide rights for each respective party only to broadcast the licensed copyrights received on its own website; meanwhile, each party retains the right to continue broadcasting and/or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges in accordance with ASC topic 845, or ASC 845, *Nonmonetary Transactions*, and record the transaction based on the fair value of the asset surrendered.

We estimate the fair value of the contents surrendered by deriving an "average transaction price" using actual cash sublicensing transactions for the same content with comparable counterparties, when available. The comparability of counterparties is assessed based on a number of factors, including relative size and scale, as well as market share of online viewership traffic they generate. In instances when we do not have actual cash sublicensing transactions for the same content as reference points, the estimates of fair value of the content surrendered is derived using an average transaction price of cash sub-licenses of content that is similar in nature with comparable counterparties. To assess whether the content is similar in nature to the bartered content, we consider, amongst others, (i) the type and the popularity of the content (i.e. movie, television series); (ii) the geographic origination source of the content; and (iii) the unique visitor statistics for each OVBC.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, or ASC 926, *Entertainment—Films*. We recognized barter sublicensing revenues of RMB423.8 million (US$61.0 million) and RMB366.25 million and the related costs of RMB369.2 million (US$53.2 million) and RMB277.82 million for the year ended December 31, 2016 and 2015, respectively. The barter sublicensing revenues and the related cost of barter sublicensing were insignificant for the year ended December 31, 2014.

97

**Table of Contents**

*Other nonmonetary exchanges.*

We engage in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follows the guidance set forth in ASC 845. While nonmonetary transactions are generally recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. We also engage in certain advertising barter transactions and follows the guidance set forth in ASC subtopic 605-20, or ASC 605-20, *Revenue Recognition: Services*. The advertising barter transactions generally are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which is generally nil. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

## (7) *Other revenue recognition related policies*

In accordance with ASC subtopic 605-25, or ASC 605-25, *Revenue Recognition: Multiple-Deliverable Revenue Arrangements*, for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and occurred at different times, we evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered a separate unit of accounting, we allocate the total consideration of the arrangement based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence of selling price, or VSOE, third-party evidence or TPE of selling price, or management's best estimate of the selling price, or BESP, and recognize revenue as each deliverable is provided. We consider all reasonably available information in determining the BESP, including both market and entity-specific factors. For the arrangements with all deliverable items to be determined as a single unit of accounting due to lack of value on a standalone basis or a contingent revenue feature, we recognize the revenue at the point when last deliverable item has been provided.

We deliver some of our online marketing services to end customers through engaging third party distributors. In this context, we may provide cash incentives to distributors. The cash incentives are accounted for as reduction of revenue in accordance with ASC subtopic 605-50, or ASC 605-50, *Revenue Recognition: Customer Payments and Incentives.*

We provide sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. We account for these award credits granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits is recorded as deferred revenue based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

We provide certain online marketing services as an agent by offering goods and services provided by third-party partners. We present revenues from such services on a net basis as we are not the primary obligor in the arrangement in accordance with ASC subtopic 605-45, or ASC 605-45, *Revenue Recognition: Principal Agent Consideration*.

### *Share-based Compensation*

We account for share-based compensation in accordance with ASC topic 718, or ASC 718, *Compensation-Stock Compensation*. We have elected to recognize share-based compensation using the straight-line method for

98

**Table of Contents**

all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award, or the modified awards. The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified award, we recognize share-based compensation over the vesting periods of the replacement award, which comprises (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term, and (ii) any unrecognized compensation cost of the original awards, using either the original term or the new term, whichever results in higher expenses for each reporting period.

We account for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50, or ASC 505-50, *Equity: Equity-based Payments to Non-Employees*. We use the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 also requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

*Income Taxes*

We recognize income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. We record valuation allowance against the amount of deferred tax assets that we determine is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date. For reconciliation of tax computed by applying the respective statutory income tax rate to pre-tax income, please see "Income taxes" under Note 12 to our audited consolidated financial statements.

We comply with the provisions of ASC topic 740, or ASC 740, *Income Taxes,* in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. We have elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2014, 2015 and 2016, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

We adopted ASU No. 2015-17, *Income Taxes (Topic 740), Balance Sheet Classification of Deferred Taxes*, which require that all deferred tax liabilities and assets be classified as noncurrent in the consolidated balance sheet starting from the fourth quarter of 2015 on a retrospective basis.

*Accounts Receivable, net of Allowance*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. We generally do not require collateral from our customers.

We maintain allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. We review the accounts receivable on a periodic basis and make general and specific

99

Table of Contents

allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, we consider many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### Loan and Interest Receivables, net of Allowance

Loan and interest receivables consist primarily of micro loans to individual borrowers. Loan amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by us to the borrowers relating to the micro loans generally range from 1 to 36 months. The cash flows related to micro loans are included in the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represents our best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of loans. We consider many factors in assessing the collectability of the loan receivables, including but not limited to, the age of the amounts due, payment history and, creditworthiness of the borrower, financial conditions of the customer, purposes and terms of the loans and the economic conditions to determine the allowance of credit loss.

### Impairment of Long-Lived Assets Other Than Goodwill

We evaluate long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360, or ASC 360, *Property, Plant and Equipment*.

When such events occur, we assess the recoverability of the assets group based on the undiscounted future cash flow the assets group is expected to generate and recognize an impairment loss when estimated undiscounted future cash flow expected to result from the use of the assets group plus net proceeds expected from disposition of the assets group, if any, is less than the carrying value of the assets group. If we identify an impairment, we reduce the carrying amount of the assets group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in our impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheet. The impairment charges of long-lived assets are RMB1.6 million, nil and RMB1.0 million (US$0.1 million) for 2014, 2015 and 2016, respectively.

### Impairment of Goodwill

We assess goodwill for impairment in accordance with ASC subtopic 350-20, or ASC 350-20, *Intangibles—Goodwill and Other: Goodwill*, which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

As of December 31, 2015 and December 31, 2016, we had three reporting units, consisting of search services, transaction services and iQiyi. The goodwill was reassigned to the reporting units affected using a relative fair value allocation approach.

We have the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If we believe, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the

100

**Table of Contents**

qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and we are not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then we must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

In 2016, we performed a qualitative assessment for Search Services reporting unit. Based on the requirements of ASC350-20, we evaluated all relevant factors, including but not limited to macroeconomic conditions, industry and market conditions, financial performance, and our share price. We weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of the reporting unit, and further impairment testing on goodwill was unnecessary as of December 31, 2016. We elected to assess goodwill for impairment using the two-step process for Transaction Service and iQiyi reporting units. Significant management judgment is involved in determining the estimates and assumptions, and actual results may differ from the estimates and assumptions used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit, which could trigger future impairment. The judgment in estimating the fair value of reporting units includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expense growth rates, future capital expenditure and working capital level, as well as discount rate determined by Weighted Average Cost of Capital approach and the selection of comparable companies operating in similar businesses. We also reviewed marketplace data to assess the reasonableness of our assumptions, such as discount rate, operating margins and working capital level. The fair value of Transaction Service and iQiyi exceeded their respective carrying amount, and therefore goodwill related to these reporting units were not impaired and we were not required to perform further testing.

The impairment charges of goodwill are nil for 2014, 2015 and 2016.

### *Impairment of Long-term Investments*

Our long-term investments consist of cost method investments and equity method investments in privately-held companies, held-to-maturity investments with original and remaining maturities of greater than 12 months, and available-for-sale investments.

We periodically review our cost method investments and equity method investments for impairment. If we conclude that any of such investments is impaired, we will assess whether such impairment is other-than-temporary. Factors we consider to make such determination include the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

For long-term held-to-maturity investments, we evaluate whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with our policy and ASC topic 320, or ASC 320, *Investments—Debt and Equity Securities*. When we intend to sell an impaired debt security or it is more-likely-than-not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary

101

Table of Contents

impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made. When we do not intend to sell an impaired debt security and it is more-likely-than-not that it will not be required to sell prior to recovery of its amortized cost basis, we must determine whether or not it will recover its amortized cost basis. If we conclude that it will not, an other-than-temporary impairment exists and that portion of the credit loss is recognized in earnings, while the portion of loss related to all other factors is recognized in other comprehensive income.

As available-for-sale investment is reported at fair value, an impairment loss on the long-term available-for-sale securities would be recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

The fair value determination, particularly for investments in privately-held companies, requires significant judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary. If impairment is considered other-than-temporary, we will write down the asset to its fair value and take the corresponding charge to the consolidated financial statements. The impairment charges of long-term investments are RMB93.4 million, RMB117.0 million and RMB245.3 million (US$35.3 million) for 2014, 2015 and 2016, respectively.

### Transfers of Financial Assets

We account for transfers of financial assets in accordance with ASC Topic 860, or ASC 860, *Transfers and Servicing*. For a transfer of financial assets to be considered as a sale, the assets would be removed from our consolidated balance sheets. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured borrowing, the assets remain on the consolidated balance sheets and the sale proceeds are recognized as our liability.

Pursuant to ASC 860, the transactions of Baidu Wealth Management do not constitute a sale of the underlying securities for accounting purposes. We account for these transactions as secured borrowings included in "Accounts payable and accrued liabilities" on the consolidated balance sheets, and assets pledged are accounted for as trading securities included in short term investments on the consolidated balance sheets. The cash flows related to purchases and maturities of trading securities investments are included in the cash flows from investing activities category, and the proceeds and payments related to the sale of financial products are included in the cash flow from financing activities in the consolidated statement of cash flows.

### Business Combination

We account for business combinations using the purchase method of accounting in accordance with ASC topic 805, or ASC 805, *Business Combinations.* The purchase method accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

102

Table of Contents

In a business combination achieved in stages, we re-measured our previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

**B.    Liquidity and Capital Resources**

As of December 31, 2016, our principal source of liquidity was RMB89.8 billion (US$12.9 billion) of cash, cash equivalents and short-term investments. Our cash and cash equivalents consist of cash on hand and investments in interest bearing demand deposit accounts, time deposits, money market funds and other liquid investments which have original maturities of three months or less. The short-term investments primarily consist of fixed-rate and adjustable-rate debt investments with original maturity of less than one year. We believe that our current cash, cash equivalents, short-term investments and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs, including our cash needs for working capital and capital expenditures, for at least the next 12 months. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our existing cash is insufficient to meet our requirements, we may seek to sell additional equity securities, debt securities or borrow from banks.

Furthermore, cash transfers from our PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to their parent companies outside of China or our company, or otherwise satisfy their foreign currency denominated obligations. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Governmental control of currency conversion may affect the value of your investment." As of December 31, 2016, our PRC subsidiaries and consolidated affiliated entities held RMB84.0 billion (US$12.1 billion) of cash, cash equivalents and short-term investments, RMB318.3 million (US$45.9 million) of which were in the form of foreign currencies.

In December 2014, we entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which we borrowed a two-year unsecured loan of US$150.0 million and a three-year unsecured loan of US$150.0 million. Both loans were intended for our general working capital and with a floating interest rate. In connection with the loan agreements, we entered into two interest swap agreements, pursuant to which the loans will be settled in a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans. In December 2016, the loan with a term of two years was fully repaid when it became due. As of December 31, 2016, we had an outstanding balance of US$150.0 million for the three-year loan, which will be due in December 2017.

In July 2015, we entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$150.0 million with a floating interest rate for general working capital purposes. In August 2015, we drew down US$150.0 million with a term of two years under the facility commitment. In connection with the loan agreement, we entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan. As of December 31, 2016, we had an outstanding balance of US$150.0 million, which will be due in August 2017.

103

Table of Contents

In August 2015, we entered into a loan agreement with HSBC, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$200.0 million, with a fixed annual interest rate of 1.42%, for general working capital purposes. In August 2015, we drew down US$200.0 million with a term of two years under the facility commitment. As of December 31, 2016, we had an outstanding balance of US$200.0 million, which will be due in August 2017.

In September 2015, we entered into a banking facility agreement with China Merchants Bank (Shanghai Branch), pursuant to which we were entitled to borrow a RMB denominated loan of RMB100.0 million (US$14.4 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by the People's Bank of China. The loan was intended for general working capital purposes. In September 2015, we drew down RMB9.9 million (US$1.4 million) with a fixed interest rate of 4.60%. In November and December 2015, the rest of RMB90.1 million (US$13.0 million) was drawn down with a fixed interest rate of 4.35%. By the end of December, 2016, the loan had been fully repaid.

In January 2016, iQiyi entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which iQiyi was entitled to borrow a RMB denominated loan of RMB200.0 million (US$28.8 million) for one year with a fixed annual interest rate at 95% of benchmark one-year lending rate published by the People's Bank of China. The loan was intended for general working capital purposes. In January 2016, iQiyi drew down RMB53.7 million (US$7.7 million) with a fixed interest rate of 4.13%. In February 2016, iQiyi drew down RMB20.5 million (US$3.0 million) with a fixed interest rate of 4.13%. In December 2016, additional RMB25.8 million (US$3.7 million) was drawn down with a fixed interest rate of 4.13%. As of December 31, 2016, iQiyi had an outstanding balance of RMB100.0 million (US$14.4 million) under the facility, RMB53.7 million (US$7.7 million) of which will be due in January 2017, RMB20.5 million (US$3.0 million) of which will be due in February 2017 and RMB25.8 million (US$3.7 million) of which will be due in December 2017.

In June 2016, we entered into a five-year US$2.0 billion revolving syndicated loan agreement with a group of 21 arrangers. The facilities, a US$1.0 billion five-year unsecured floating rate loan and a US$1.0 billion five-year unsecured revolving facility, were priced at 110 basis points over LIBOR. The use of proceeds of the facilities were intended for general corporate purposes. In June 2016 and November 2016, we drew down US$500.0 million and US$500.0 million under the facilities, respectively. In connection with the facilities, we entered into three interest rate swap agreements, pursuant to which US$500.0 million of the loans will be settled with a fixed annual interest rate of 2.11%, US$250.0 million of the loans will be settled with a fixed annual interest rate of 2.10%, and US$250.0 million of the loans will be settled with a fixed annual interest rate of 2.78%. As of December 31, 2016, we had an outstanding balance of US$1.0 billion under the two facilities, US$500.0 million of which will be due in June 2021 and US$500.0 million of which will be due in November 2021.

In July 2016, we entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB200.0 million (US$28.8 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for our consumer credit business. In July 2016, we drew down RMB50.0 million (US$7.2 million) with a fixed interest rate of 4.35%. In August 2016, additional RMB80.0 million (US$11.5 million) was drawn down with a fixed interest rate of 4.35%. As of December 31, 2016, we had an outstanding balance of RMB130.0 (US$18.7 million) under the facility agreement, RMB50.0 million (US$7.2 million) of which will be due in July 2017 and RMB80.0 million (US$11.5 million) of which will be due in August 2017.

In July 2016, we entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB150.0 million (US$21.6 million) for one year with interest rate based on Loan Prime Rate (LPR) plus 48.5 basis points. This facility is reserved for our consumer credit business. In September 2016, we drew down RMB150.0 million

104

**Table of Contents**

(US$21.6 million) with an interest rate of 4.78% under the facility. As of December 31, 2016, we had an outstanding balance of RMB150.0 million (US$21.6 million), which will be due in September 2017.

In August, 2016, we entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB150.0 million (US$21.6 million) for one year with interest rate based on LPR plus 26.75 basis points. This facility is reserved for our consumer credit business. In August 2016, we drew down RMB150.0 million (US$21.6 million) with an interest rate of 4.56% under the facility. As of December 31, 2016, we had an outstanding balance of RMB150.0 million (US$21.6 million), which will be due in August 2017.

In November 2016, we entered into a loan agreement with International Finance Corporation, pursuant to which we borrowed an unsecured RMB denominated loan of RMB500.0 million (US$72.0 million) with a term of one year. The loan is intended for our consumer credit business exclusively. In December 2016, we drew down RMB500.0 million (US$72.0 million) with a fixed interest rate of 4.92%. As of December 31, 2016, we had an outstanding balance of RMB500.0 million (US$72.0 million), which will be due in December 2017.

In December 2016, we entered into a loan agreement with China Merchants Bank (Shanghai Branch), pursuant to which we borrowed an unsecured RMB denominated loan of RMB85.0 million (US$12.2 million) with a term of one year. The loan is to be used for our consumer credit business exclusively. In December 2016, we drew down RMB85.0 million (US$12.2 million) with a fixed interest rate of 4.18%. As of December 31, 2016, we had an outstanding balance of RMB85.0 million (US$12.2 million), which will be due in December 2017.

We have conducted the following four rounds of issuances of debt securities, which remain outstanding as of the date of this annual report:

- In November 2012, we issued an aggregate of US$1.5 billion senior unsecured notes in two equal tranches, due in 2017 and 2022, with stated annual interest rates of 2.25% and 3.50%, respectively. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2016, the total carrying value and estimated fair value of these notes were US$1.5 billion and US$1.5 billion. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2016. We are not subject to any financial covenants or other significant restrictions under the notes. During 2016, we paid an aggregate of US$43.1 million in interest payments related to these notes.

- In August 2013, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2018, with stated annual interest rate of 3.25%. The net proceeds from the sale of the notes were used for general corporate purposes, including merger and acquisition activities. As of December 31, 2016, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2016. We are not subject to any financial covenants or other significant restrictions under the notes. During 2016, we paid an aggregate of US$32.5 million in interest payments related to these notes.

- In June 2014, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2019, with stated annual interest rate of 2.75%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2016, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2016. We are not subject to any financial covenants or other significant restrictions under the notes. During 2016 we paid an aggregate of US$27.5 million in interest payments related to these notes.

- In June 2015, we issued an aggregate of US$750.0 million senior unsecured notes due in 2020, with stated annual interest rate of 3.00%, and an aggregate of US$500.0 million senior unsecured notes due

105

Table of Contents

in 2025, with stated annual interest rate of 4.13%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2016, the total carrying value and estimated fair value were US$750.0 million and US$753.0 million, respectively, with respect to the notes due in 2020, and US$500.0 million and US$507.0 million, respectively, with respect to the notes due in 2025. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2016. We are not subject to any financial covenants or other significant restrictions under the notes. During 2016, we paid an aggregate of US$43.1 million in interest payments related to these notes.

We may use the net proceeds from our issuance and sale of the notes to fund the operations of our PRC subsidiaries by making additional capital contribution to our existing PRC subsidiaries, injecting capital to establish new PRC subsidiaries and/or providing loans to our PRC subsidiaries. Such transfer of funds from Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries is subject to the PRC regulatory restrictions and procedures: (i) capital increase of the existing PRC subsidiaries and establishment of new PRC subsidiaries must be approved by the Ministry of Commerce or its local counterpart and registered with SAFE or its local counterpart; and (ii) loans to any of our PRC subsidiaries must not exceed the statutory limit, which is the difference between the amount of total investment as approved by or filed with the Ministry of Commerce or its local counterpart and the amount of registered capital of the PRC subsidiary, and must be registered with the local counterpart of SAFE. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business."

As of December 31, 2016, we had RMB43.1 billion (US$6.2 billion) in long-term loans and notes payables (including current portion of RMB8.7 billion (US$1.2 billion)) and had RMB1.1 billion (US$160.6 million) in short-term loans.

### Cash Flows and Working Capital

As of December 31, 2014, 2015 and 2016, we had RMB56.6 billion, RMB67.9 billion and RMB89.8 billion (US$12.9 billion) in cash, cash equivalents and short-term investments.

The following table sets forth a summary of our cash flows for the years indicated.

| | For the Years Ended December 31, | | | |
| | 2014 | 2015 | 2016 | |
| | RMB | RMB | RMB | US$ |
| | (In thousands) | | | |
| Net cash generated from operating activities | 17,937,175 | 19,771,122 | 22,258,297 | 3,205,861 |
| Net cash used in investing activities | (22,467,774) | (31,621,128) | (35,910,759) | (5,172,225) |
| Net cash generated from financing activities | 8,611,960 | 7,778,032 | 14,446,680 | 2,080,755 |
| Effect of exchange rate changes on cash | 79,567 | 179,181 | 144,313 | 20,785 |
| Net increase (decrease) in cash and cash equivalents | 4,160,928 | (3,892,793) | 938,531 | 135,176 |
| Cash and cash equivalents at beginning of the period | 9,691,797 | 13,852,725 | 9,959,932 | 1,434,529 |
| Cash and cash equivalents at end of the period | 13,852,725 | 9,959,932 | 10,898,463 | 1,569,705 |

106

**Table of Contents**

*Operating Activities*

Net cash generated from operating activities increased to RMB22.3 billion (US$3.2 billion) in 2016 from RMB19.8 billion in 2015. This increase was primarily due to the integrated effect of decrease in net income, as adjusted for share exchange impact, other non-operating items, non-cash items and changes in working capital.

Net cash generated from operating activities increased to RMB19.8 billion in 2015 from RMB17.9 billion in 2014. This increase was primarily due to the integrated effect of growth in net income, as adjusted for non-cash items and the effects of changes in working capital and other activities.

*Investing Activities*

Net cash used in investing activities increased to RMB35.9 billion (US$5.2 billion) in 2016 from RMB31.6 billion in 2015. This increase was primarily due to the increased acquisition of intangible assets, investment in loans and purchase of short-term investments. In 2016, we reclassified the net cash from changes in loan receivables from operating activities to investing activities. The impact on the cash flow statement for 2015 was insignificant.

Net cash used in investing activities increased to RMB31.6 billion in 2015 from RMB22.5 billion in 2014. This increase was primarily due to the increased acquisition of fixed assets and intangible assets, purchase of long-term investments and disposal of subsidiaries which resulted in the reduction of cash balance.

*Financing Activities*

Net cash generated from financing activities increased to RMB14.4 billion (US$2.1 billion) in 2016 from RMB7.8 billion in 2015. The increase was primarily due to proceeds from sale of financial products and net proceeds from short-term and long-term debt in 2016.

Net cash generated from financing activities was RMB7.8 billion in 2015, compared to net cash of RMB8.6 billion generated from financing activities in 2014. The decrease was primarily due to the repayment of long-term loans and the payment for share repurchase program, partially offset by the proceeds from the non-controlling interest shareholders and proceeds from loans and notes issued in 2015.

**Capital Expenditures**

We made capital expenditures of RMB4.8 billion, RMB5.2 billion and RMB4.2 billion (US$603.4 million) in 2014, 2015 and 2016, representing 9.8%, 7.9% and 5.9% of our total revenues, respectively. In 2016, our capital expenditures were primarily attributable to the purchase of servers, network equipment and other computer hardware to increase our network infrastructure capacity. We funded our capital expenditures primarily with net cash flow generated from operating activities.

We commenced construction of office buildings in Shenzhen in December 2011, and Shanxi Cloud Computing Center in September 2012, and we expect to complete the planned construction of these projects in 2018. We commenced construction of part of the internet data center of Beijing Cloud Computing Center in April 2014. The first phase of construction was completed in 2016, and we are in the process of planning the rest of the construction work with the completion date not determinable at this stage. See "Item 4.D. Information on the Company—Property, Plant and Equipment" for more details of our capital expenditures associated with these projects.

Our capital expenditures may increase in the future as our business continues to grow, in connection with the expansion and improvement of our network infrastructure and the construction of additional office buildings and cloud computing based data centers. We currently plan to fund these expenditures with our current cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

107

**Table of Contents**

*Holding Company Structure*

Baidu, Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries and consolidated affiliated entities in China. As a result, although other means are available for us to obtain financing at the holding company level, Baidu, Inc.'s ability to pay dividends to the shareholders and to service any debt it may incur may depend upon dividends paid by our PRC subsidiaries and license and service fees paid by our PRC consolidated affiliated entities. If any of our subsidiaries incurs debt on its own behalf in the future, the instruments governing such debt may restrict its ability to pay dividends to Baidu, Inc. In addition, our PRC subsidiaries and consolidated affiliated entities are required to make appropriations to certain statutory reserve funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies.

Our PRC subsidiaries, being foreign-invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely, a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of our PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the board of directors of the PRC subsidiaries.

Our consolidated affiliated entities must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of our consolidated affiliated entities is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are at the discretion of our consolidated affiliated entities.

Under PRC laws and regulations, our PRC subsidiaries and consolidated affiliated entities are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. The amounts restricted include the paid up capital and the statutory reserve funds of our PRC subsidiaries and the net assets of our consolidated affiliated entities in which we have no legal ownership, totaling approximately RMB7.5 billion, RMB10.6 billion and RMB13.7 billion (US$2.0 billion) as of December 31, 2014, 2015 and 2016, respectively.

**C.    Research and Development**

We have a team of experienced engineers who are mostly based in Beijing, Shanghai, Shenzhen and Sunnyvale, California. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We have also recruited experienced engineers globally. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, artificial intelligence and deep learning.

In the three years ended December 31, 2014, 2015 and 2016, our research and development expenditures, including share-based compensation expenses for research and development staff, were RMB7.0 billion, RMB10.2 billion and RMB10.2 billion (US$1.5 billion), representing 14.2%, 15.3% and 14.4% of our total revenues for 2014, 2015 and 2016, respectively. Our research and development expenses consist primarily of personnel-related costs. We have expensed substantially all of the development costs for the research and development of products and new functionality as incurred, except for certain internal-use software.

**D.    Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2016 that are reasonably likely to have a

108

Table of Contents

material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

### E.    Off-Balance Sheet Arrangements

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any off-balance sheet derivative instruments. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

### F.    Contractual Obligations

The following table sets forth our contractual obligations by specified categories as of December 31, 2016.

| | | Payment Due by Period | | | |
| | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| --- | --- | --- | --- | --- | --- |
| | | | (In RMB thousands) | | |
| Long-Term Debt Obligations[1] | 48,112,978 | 9,916,612 | 15,705,088 | 13,129,076 | 9,362,202 |
| Capital Lease Obligations[2] | 7,437 | 7,099 | 338 | — | — |
| Operating Lease Obligations[3] | 6,023,794 | 3,018,985 | 2,229,244 | 745,448 | 30,117 |
| Purchase Obligations[4] | 10,249,627 | 7,101,567 | 1,781,325 | 387,444 | 979,291 |
| Total | 64,393,836 | 20,044,263 | 19,715,995 | 14,261,968 | 10,371,610 |

(1)   The long-term debt obligations represent (i) a two-year loan and a three-year loan from Bank of China (Los Angeles Branch), (ii) a two-year loan from Sumitomo Mitsui Banking Corporation, (iii) a two-year loan from Hong Kong and Shanghai Banking Corporation Limited, (iv) senior unsecured notes due in 2017 and 2022, (v) senior unsecured notes due in 2018, (vi) senior unsecured notes due in 2019, (vii) senior unsecured notes due in 2020, (viii) senior unsecured notes due in 2025, and (ix) a five-year loan under revolving facility from a syndicated group of 21 lenders. The total interest to be paid for these loans is (i) RMB25.8 million (US$3.7 million), (ii) RMB11.1 million (US$1.6 million), (iii) RMB15.0 million (US$2.2 million), (iv) RMB1.2 billion (US$174.4 million), (v) RMB451.3 million (US$65.0 million), (vi) RMB477.3 million (US$68.8 million), (vii) RMB546.8 million (US$78.8 million), (viii) RMB1.2 billion (US$175.3 million) and (ix) RMB764.1 million (US$110.0 million), respectively. Please see "Loans Payable" under Note 10 and "Notes Payable" under Note 11 to our audited consolidated financial statements.

(2)   Capital lease obligations represent our obligations for leasing servers, and the total amount of interest to be paid is RMB171.1 thousand (US$24.6 thousand).

(3)   Operating lease obligations represent our obligations for leasing premises and bandwidth.

(4)   Purchase obligations consist primarily of expenditures in connection with the expansion and improvement of network infrastructure, our plan to build or acquire additional office buildings and cloud computing-based data centers, and expenditures for video content.

Other than the contractual obligations set forth above, we do not have any contractual obligations that are long-term debt obligations, capital (finance) lease obligations, purchase obligations or other long-term liabilities reflected on our balance sheet.

109

**Table of Contents**

**Item 6.        Directors, Senior Management and Employees**

**A.      Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Robin Yanhong Li | 48 | Chairman and Chief Executive Officer |
| Qi Lu | 55 | Vice Chairman, Group President and Chief Operating Officer |
| Jennifer Xinzhe Li | 49 | Chief Financial Officer |
| Ya-Qin Zhang | 51 | President |
| Hailong Xiang | 39 | Senior Vice President |
| James Ding | 51 | Independent Director |
| Brent Callinicos | 51 | Independent Director |
| Yuanqing Yang | 52 | Independent Director |

*Robin Yanhong Li* is co-founder, chairman and chief executive officer of our company, and oversees our overall strategy and business operations. Mr. Li has been serving as the chairman of our board of directors since our inception in January 2000 and as our chief executive officer since January 2004. Mr. Li served as our president from February 2000 to December 2003. Prior to founding our company, Mr. Li worked as a staff engineer for Infoseek, a pioneer in the internet search engine industry, from July 1997 to December 1999. Mr. Li was a senior consultant for IDD Information Services from May 1994 to June 1997. Mr. Li currently serves on the board of New Oriental Education & Technology Group Inc., a NYSE-listed company that provides private educational services in China, and on the board of Ctrip.com International, Ltd., a NASDAQ-listed company that provides travel services in China. Mr. Li also acts as the vice chairman of the Internet Society of China (ISC). Mr. Li has also been a vice chairman of All-China Federation of Industry & Commerce since December 2012. Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Qi Lu* joined us in January 2017 as group president and chief operating officer and has served as a director and the vice chairman of the board of directors since February 2017. Dr. Lu is in charge of products, technology, sales, marketing and operations, including our intelligent driving business. Prior to joining us, Dr. Lu most recently served as Microsoft's global executive vice president and led one of Microsoft's three business units. Dr. Lu joined Microsoft in 2009 as president of its Online Services Group. Earlier in his career, Dr. Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies, and subsequently executive vice president in 2007. Dr. Lu holds both bachelor and master degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University. He holds over 40 US patents and has authored many papers in his field.

*Jennifer Xinzhe Li* has served as our chief financial officer since March 2008 and is in charge of our overall finance functions. Ms. Li has extensive experience in U.S. GAAP reporting and in developing and leading finance and accounting teams before she joined us. Prior to joining Baidu, Ms. Li served as controller of General Motors Acceptance Corporation (GMAC)'s North American Operations from 2005 to 2008. Prior to that, Ms. Li worked at General Motors China, where she was responsible for overseeing finance functions of General Motors' wholly owned and joint venture businesses in China from 2001 to 2004, with the last post as its chief financial officer. From 1994 to 2001, she held several other finance positions at General Motors in Canada, the United States and Singapore. Ms. Li currently serves on the Board of Philip Morris International, Inc. Ms. Li holds an M.B.A. degree from the University of British Columbia in Vancouver, B.C., Canada and a bachelor of art degree from Tsinghua University in China.

*Ya-Qin Zhang* joined us in September 2014. He currently serves as president in charge of technology, emerging business, and global business operations. Prior to joining us, Dr. Zhang was Microsoft Corporation's

110

Table of Contents

corporate vice president and the chairman of Microsoft Asia-Pacific R&D Group for a decade, leading Microsoft's overall research and development efforts in the Asia-Pacific region. Before joining Microsoft in 1999, Dr. Zhang was a director for the Multimedia Technology Laboratory at Sarnoff Corp. Dr. Zhang currently serves on the board of Tarena International, Inc. (NASDAQ: TEDU) and ChinaCache International Holdings Ltd. (NASDAQ: CCIH). Dr. Zhang received his bachelor's and master's degrees in electrical engineering from the University of Science and Technology of China, and a Ph.D. in electrical engineering from George Washington University.

*Hailong Xiang* has served as our senior vice president since October 2014 and as general manager of our search related business since April 2016. He is in charge of our search related business products and sales force management. Mr. Xiang joined us in February 2005 following our acquisition of Shanghai Qilang, an internet services firm established by Mr. Xiang in 2000. Mr. Xiang received his bachelor's degree in computer science from East China Normal University.

*James Ding* has served as our independent director since our initial public offering in August 2005. Mr. Ding is currently a general partner and managing director of GSR Ventures, an early stage venture fund focusing on technology, media and telecom investment in China. Prior to that, Mr. Ding served as a co-chairman of the board of directors of AsiaInfo-Linkage Inc., a former NASDAQ-listed company, from July 2010 to January 2014. Prior to that, Mr. Ding served as the chairman of the board of AsiaInfo from April 2003 to July 2010, and a member of the board since AsiaInfo's inception in 1993. Mr. Ding served as the chief executive officer and president of AsiaInfo from 1999 to 2003 and as senior vice president and chief technology officer of AsiaInfo from 1993 to 1999. Mr. Ding also serves as an independent director of Huayi Brothers Media Corporation, a ChiNext Shenzhen-listed company. Mr. Ding received a master's degree in information science from the University of California, Los Angeles and a bachelor's degree in chemistry from Peking University in China.

*Brent Callinicos* has served as our independent director since October 2015, and as the chairman of our audit committee since April 2016. Mr. Callinicos most recently served as the chief financial officer of Uber Technologies Inc. from September 2013 to March 2015, where he remains an advisor. Prior to joining Uber, he worked at Google from January 2007 to September 2013, where he last served as vice president, treasurer and chief accountant. He also led green energy investments and financial services at Google Inc. From 1992 to 2007, he served in a variety of increasingly senior roles at Microsoft Corporation, where he last served as corporate vice-president and divisional chief financial officer of the Platforms and Services Division, and oversaw Microsoft's Worldwide Licensing and Pricing and Microsoft Financing. He currently serves on the board of directors of PVH Corp., a NYSE-listed company, and two private companies. From January 2017 to present, he also serves as chief operation officer and chief financial officer of Hyperloop One. Mr. Callinicos is a certified public accountant. Mr. Callinicos received a bachelor's degree from the University of North Carolina at Chapel Hill and an M.B.A. degree from the Kenan-Flagler School of Business at Chapel Hill.

*Yuanqing Yang* has served as our independent director since October 2015. Mr. Yang is currently the chairman and chief executive officer of Lenovo Group Limited, a Hong Kong-listed company. Mr. Yang joined Lenovo in 1989 and has led the company from the initial China-based PC maker to a diversified global technology leader. In 2011, FinanceAsia named Mr. Yang the Best CEO in China. In 2004 and 2012, Mr. Yang was named one of the "CCTV China Annual Economic Figures." He was listed on Barron's list of Best CEOs in 2013, 2014 and 2015. In 2014, Mr. Yang won an Edison Achievement Award for Innovation. Mr. Yang currently serves as a member of the Chinese People's Political Consultative Conference. Mr. Yang holds a master's degree in computer science from the University of Science and Technology of China.

**B.    Compensation**

In 2016, we paid an aggregate of approximately RMB38.9 million (US$5.6 million) in cash compensation and granted options to purchase an aggregate of 27,253 Class A ordinary shares and 9,184 restricted Class A

111

**Table of Contents**

ordinary shares to our executive officers as of the date of this annual report as a group. We also paid an aggregate of approximately RMB0.6 million (US$89.4 thousand) in cash compensation and granted options to purchase an aggregate of 433 restricted Class A ordinary shares to our non-executive directors as of the date of this annual report as a group. Our PRC subsidiaries and consolidated affiliated entities are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, housing fund, unemployment insurance and other statutory benefits. Other than the above-mentioned statutory contributions mandated by applicable PRC law, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company except as required under applicable PRC law.

Our board of directors and shareholders approved the issuance of up to 5,040,000 ordinary shares upon exercise of awards granted under our 2000 option plan. Our 2000 option plan terminated in January 2010 upon the expiration of its ten-year term. At the annual general meeting held on December 16, 2008, our shareholders approved a 2008 share incentive plan, which has reserved an additional 3,428,777 Class A ordinary shares for awards to be granted pursuant to its terms. As of December 31, 2016, options to purchase an aggregate of 358,118 Class A ordinary shares and an aggregate of 983,964 restricted Class A ordinary shares had been granted under the 2008 share incentive plan.

112

**Table of Contents**

The following table summarizes, as of December 31, 2016, the outstanding options and restricted Class A ordinary shares that we granted to our current directors and executive officers and to other individuals as a group. Each Class A ordinary share is represented by 10 ADSs.

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Robin Yanhong Li | 3,607 | 133.86 | February 11, 2009 | February 11, 2019 |
| | 4,247 | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | 4,515 | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | 10,598 | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | 2,415 | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | 443(1) | — | February 24, 2014 | N/A |
| | 11,977 | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | 3,282(1) | — | February 11, 2015 | N/A |
| | 43,904 | 2,069.00 | April 16, 2015 | April 16, 2025 |
| | 43,904(1) | — | April 16, 2015 | N/A |
| | 2,638 | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | 9,060 | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | 3,532(1) | — | October 27, 2016 | N/A |
| Jennifer Xinzhe Li | * | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *(1) | — | February 24, 2014 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | *(1) | — | February 11, 2015 | N/A |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| Ya-Qin Zhang | *(1) | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| Hailong Xiang | * | 1,501.70 | July 21, 2011 | July 21, 2021 |
| | * | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | *(1) | — | July 18, 2013 | N/A |
| | * | 1,112.00 | July 18, 2013 | July 18, 2023 |
| | *(1) | — | February 24, 2014 | N/A |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *(1) | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| James Ding | *(1) | — | February 25, 2016 | N/A |
| Brent Callinicos | *(1) | — | October 22, 2015 | N/A |
| | *(1) | — | February 25, 2016 | N/A |
| | *(1) | — | July 28, 2016 | N/A |
| Yuanqing Yang | *(1) | — | October 22, 2015 | N/A |
| | *(1) | — | February 25, 2016 | N/A |
| Other individuals as a group | 740,366 | — | — | — |

\*    The options and restricted shares in aggregate held by each of these directors and officers represent less than 1% of our total outstanding shares.
(1)    Restricted shares.

113

**Table of Contents**

The following paragraphs summarize the key terms of our 2008 share incentive plan adopted on December 16, 2008.

**2008 Share Incentive Plan**

*Types of Awards.* We may grant the following types of awards under our 2008 share incentive plan:

- options;

- restricted shares;

- restricted share units; and

- any other form of awards granted to a participant pursuant to the 2008 plan.

*Plan Administration.* The compensation committee of our board of directors administers our 2008 share incentive plan, but may delegate to a committee of one or more members of our board of directors the authority to grant or amend awards to participants other than independent directors and executive officers. The compensation committee will determine the provisions and terms and conditions of each award grant, including, but not limited to, the exercise price, the grant price or purchase price, any restrictions or limitations on the award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an award, based in each case on such considerations as the committee in its sole discretion determines. The compensation committee has the sole power and discretion to cancel, forfeit or surrender an outstanding award (whether or not in exchange for another award or combination or awards).

*Award Agreement.* Awards granted under our 2008 share incentive plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each award which may include the term of an award, the provisions applicable in the event the participant's employment or service ends, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an award.

*Eligibility.* We may grant awards to employees, directors and consultants of our company or any of our related entities, which include our subsidiaries or any entities in which we hold a substantial ownership interest. However, we may grant ISOs only to our employees and employees of our majority-owned subsidiaries.

*Acceleration of Awards upon Corporate Transactions.* The outstanding awards will accelerate (i) upon occurrence of a change-of-control corporate transaction where any person acquires at least 50% of the total combined voting power of our outstanding securities or the incumbent board members no longer constitute at least 50% of our board, or (ii) upon occurrence of any other change-of-control corporate transaction in which the successor entity does not assume our outstanding awards under our 2008 share incentive plan, provided that the plan participant remains an employee, consultant or member of our board of directors on the effective date of the corporate transaction. In such event, each outstanding award will become fully exercisable and all forfeiture restrictions on such award will lapse immediately prior to the specified effective date of the corporate transaction.

If the successor entity assumes our outstanding awards and later terminates the grantee's employment or service without cause within 12 months of the corporate transaction, or if the grantee resigns voluntarily with good reason, the outstanding awards automatically will become fully vested and exercisable. The compensation committee may also, in its sole discretion, upon or in anticipation of a corporate transaction, accelerate awards, purchase the awards from the plan participants, replace the awards, or provide for the payment of the awards in cash.

*Exercise Price and Term of Awards.* The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the compensation committee, the determination of which shall be final,

114

Table of Contents

binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices of options mentioned in the preceding sentence shall be effective without the approval of our shareholders or the approval of the affected grantees. If we grant an ISO to an employee, who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of our share capital, the exercise price cannot be less than 110% of the fair market value of our ordinary shares on the date of that grant. The compensation committee will determine the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting. The term may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of our share capital.

*Restricted Shares and Restricted Share Units.* The compensation committee is also authorized to make awards of restricted shares and restricted share units. Except as otherwise determined by the compensation committee at the time of the grant of an award or thereafter, upon termination of employment or service during the applicable restriction period, restricted shares that are at the time subject to restrictions shall be forfeited or repurchased in accordance with the respective award agreements.

*Vesting Schedule*. The compensation committee determines, and the award agreement specifies, the vesting schedule of options and other awards granted. The compensation committee determines the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting, and also determines any conditions that must be satisfied before all or part of an option may be exercised. At the time of grant for restricted share units, the compensation committee specifies the date on which the restricted share units become fully vested and non-forfeitable, and may specify such conditions to vesting as it deems appropriate.

*Amendment and Termination.* With the approval of our board of directors, the compensation committee may at any time amend, suspend or terminate our 2008 share incentive plan. Amendments to our 2008 share incentive plan are subject to shareholder approval, to the extent required by law, or by stock exchange rules or regulations. Any amendment, suspension or termination of our 2008 share incentive plan must not adversely affect in any material way awards already granted without written consent of the recipient of such awards. Unless terminated earlier, our 2008 share incentive plan shall continue in effect for a term of ten years from the date of adoption.

## C.    Board Practices

### Board of Directors

Our board of directors has five directors. A director is not required to hold any shares in the company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested. A director may exercise all the powers of the company to borrow money, mortgage its undertakings, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. The remuneration to be paid to the directors is determined by the board of directors. There is no age limit requirement for directors.

### Committees of the Board of Directors

We have three committees under the board of directors: an audit committee, a compensation committee and a corporate governance and nominating committee. We have adopted a charter for each of the three committees.

### Audit Committee

Our audit committee consists of Brent Callinicos, James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act. Our board of directors has determined that Mr. Callinicos is an audit committee financial expert as defined in the instructions to Item 16A of the Form 20-F. The audit committee oversees our accounting and

115

**Table of Contents**

financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;

- pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing annually the independence and quality control procedures of the independent auditors;

- reviewing and approving all proposed related party transactions;

- discussing the annual audited financial statements with the management;

- meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

- attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

In 2016, our audit committee held meetings or passed resolutions by unanimous written consent six times.

### Compensation Committee

Our compensation committee consists of James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving our compensation structure, including all forms of compensation relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting while his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

In 2016, our compensation committee held meetings or passed resolutions by unanimous written consent five times.

### Corporate Governance and Nominating Committee

Our corporate governance and nominating committee consists of James Ding and Yuanqing Yang, both of whom satisfy the "independence" requirements of Rule 5605(a) (2) of the NASDAQ Stock Market Rules. The corporate governance and nominating committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee is responsible for, among other things:

- recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

116

**Table of Contents**

- reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

- overseeing the board in the board's annual review of its own performance and the performance of the management; and

- considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required or required to be disclosed under the applicable laws or otherwise considered to be material.

In 2016, our corporate governance and nominating committee passed resolutions by unanimous written consent once.

**Terms of Directors and Executive Officers**

All directors hold office until their successors have been duly elected and qualified. None of our directors is subject to a fixed term of office. In addition, the service agreements between us and the directors do not provide benefits upon termination of their services. Director nomination is subject to the approval of our corporate governance and nominating committee. Our shareholders may remove any director by ordinary resolution and may in like manner appoint another person in his stead. A valid ordinary resolution requires a majority of the votes cast at a shareholder meeting that is duly constituted and meets the quorum requirement. Officers are elected by and serve at the discretion of the board of directors.

**D.   Employees**

We had 46,391, 41,467 and 45,887 employees as of December 31, 2014, 2015 and 2016, respectively. As of December 31, 2016, we had 2,594 employees in management and administration, 19,562 employees in research and development, 6,442 employees in operation and service, and 17,289 employees in sales and marketing. As of December 31, 2016, we had 28,920 employees in Beijing, 16,147 employees outside of Beijing but within China, and 820 employees outside of China. We also hire temporary employees and contractors from time to time. Our employees are not covered by any collective bargaining agreement. We consider our relations with our employees to be generally good. However, as our operations and employee base further expand, we cannot assure you that we will always be able to maintain good relations with all of our employees. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may not be able to manage our expanding operations effectively."

**E.   Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our shares as of February 28, 2017 by:

- each of our current directors and executive officers; and

- each person known to us to own beneficially more than 5% of our shares.

117

Table of Contents

See "—B. Compensation" for more details on options and restricted shares granted to our directors and executive officers.

| Directors and Executive Officers: | Shares Beneficially Owned | |
| --- | --- | --- |
| | Number(1) | %(2) |
| Robin Yanhong Li(3) | 5,607,622 | 16.1% |
| Qi Lu | * | * |
| Jennifer Xinzhe Li | * | * |
| Ya-Qin Zhang | * | * |
| Hailong Xiang | * | * |
| James Ding(4) | * | * |
| Brent Callinicos | * | * |
| Yuanqing Yang(5) | * | * |
| All Directors and Executive Officers as a Group(6) | 5,636,595 | 16.2% |
| **Principal Shareholders:** | | |
| Handsome Reward Limited(7) | 5,490,000 | 15.8% |
| Baillie Gifford & Co (Scottish partnership)(8) | 2,467,540 | 7.1% |

\*    Less than 1% of our total outstanding Class A ordinary shares and Class B ordinary shares.

\*\*   Except for James Ding, Yuanqing Yang and Brent Callinicos, the business address of our directors and executive officers is c/o Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(1)   The number of shares beneficially owned by each named director and executive officer includes the shares beneficially owned by such person, the shares underlying all options held by such person that have vested or will vest within 60 days after February 28, 2017, and restricted shares held by such person that will vest within 60 days after February 28, 2017. The options and restricted shares were granted under our 2008 share incentive plan.

(2)   Percentage of beneficial ownership of each named director and executive officer is based on 34,748,746 ordinary shares (consisting of 27,372,492 Class A ordinary shares and 7,376,254 Class B ordinary shares) of our company outstanding as of February 28, 2017, the number of ordinary shares underlying options that have vested or will vest within 60 days after February 28, 2017, and the number of restricted shares that will vest within 60 days after February 28, 2017, each as held by such person as of that date.

(3)   Includes (i) 37,665 Class A Ordinary Shares directly held by Mr. Li on record; (ii) 21,481 Class A ordinary shares in the form of ADSs held in the brokerage account of the administrator of the issuer's employee stock option program; (iii) 5,097 restricted Class A Ordinary Shares that had vested as of February 28, 2017; (iv) 53,379 Class A Ordinary Shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of February 28, 2017; and (v) 5,490,000 Class B Ordinary Shares held by Handsome Reward Limited, a British Virgin Islands company wholly owned and controlled by Mr. Li, and excludes 1,510,000 Class B Ordinary Shares and 49,600 Class A Ordinary Shares in the form of ADSs owned by Melissa Ma, Mr. Li's wife, of which Mr. Li disclaims beneficial ownership.

(4)   The business address of Mr. Ding is 56/F, China World Tower 3, No. 1 Jianguomenwai Street, Chaoyang District, Beijing 100004, PRC.

(5)   The business address of Mr. Yang is c/o Lenovo, No. 6 Shangdi West Road, Haidian District, Beijing 100085, PRC.

(6)   Includes ordinary shares, ordinary shares issuable upon exercise of options and restricted shares, held by all of our directors and executive officers as a group.

(7)   Represents 5,490,000 Class B ordinary shares held by Handsome Reward Limited, a British Virgin Island company wholly owned and controlled by Mr. Robin Yanhong Li. The business address of Handsome Reward Limited is c/o Robin Yanhong Li, Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(8)   Represents 2,467,540 Class A ordinary shares in the form of ADSs held by Baillie Gifford & Co (Scottish partnership), as reported on the Schedule 13G filed by Baillie Gifford & Co (Scottish partnership) on January 13, 2017. The percentage of beneficial ownership was calculated based on the total number of our ordinary shares outstanding as of February 28, 2017. The address of Baillie Gifford & Co (Scottish partnership) is Calton Square, 1 Greenside Row, Edinburgh EH1 3AN, Scotland, UK.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering in 2005. Holders of our Class B ordinary shares may choose to convert their Class B ordinary shares into the same number of Class A ordinary shares at any time. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our ADSs—Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial."

118

**Table of Contents**

As of February 28, 2017, 34,748,746 of our ordinary shares were issued and outstanding. To our knowledge, approximately 79.5% of our total outstanding ordinary shares were held by four record shareholders in the United States, including approximately 78.7% held by The Bank of New York Mellon, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

**Item 7.        Major Shareholders and Related Party Transactions**

**A.    Major Shareholders**

Please refer to "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

**B.    Related Party Transactions**

See "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders."

Our subsidiaries, consolidated affiliated entities, and the subsidiaries of the consolidated affiliated entities have engaged, during the ordinary course of business, in a number of customary transactions with each other. All of these inter-company balances have been eliminated in consolidation.

As of December 31, 2014, 2015 and 2016, we had RMB50.1 thousand, RMB2.0 billion and RMB356.7 million (US$51.4 million), respectively, due from related parties. The decrease of the balance from December 31, 2015 to December 31, 2016 was primarily due to repayment of loans that we had provided to certain investees, offset by the increased transactions amount incurred in the ordinary course of business with certain investees that were determined to be related parties. The increase of the balance from December 31, 2014 to December 31, 2015 was primarily due to unsettled loans provided to certain investees and amount incurred by transactions in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of March 30, 2017 was RMB321.9 million (US$46.4 million).

As of December 31, 2014, 2015 and 2016, we had RMB8.4 million, RMB785.9 million and RMB458.7 million (US$66.1 million), respectively, due to related parties. The decrease of the balance from December 31, 2015 to December 31, 2016 was primarily due to repayment of loans that certain investees had provided to us, offset by the increased transactions amount incurred in the ordinary course of business with certain investees that were determined to be related parties. The increase of the balance from December 31, 2014 to December 31, 2015 was primarily due to an unsettled loan provided by certain investee, as well as amount incurred by transactions in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of March 30, 2017 was RMB359.5 million (US$51.8 million).

For the year ended December 31, 2015 and 2016, the related party transactions mainly represented the online marketing services that we provided to Ctrip (including Qunar), which was in the total amount of RMB89.2 million and RMB630.8 million (US$90.9 million), respectively.

In 2014, 2015 and 2016, with the approval from our board of directors, we reimbursed Mr. Robin Yanhong Li the fees and expenses incurred in connection with his use of an aircraft beneficially owned by his family member for our business purposes. The hourly rate for use of the aircraft was determined based on an analysis of market rates for the charter of comparable aircrafts. The service charges for the use of the aircraft for 2014, 2015 and 2016 were insignificant.

In 2014, 2015 and 2016, certain subsidiaries of ours rent an office building owned by the family members of Mr. Hailong Xiang, one of our executive officers. The amount of rental expenses for 2014, 2015 and 2016 were insignificant.

119

**Table of Contents**

**Share Options and Restricted Shares Grants**

Please refer to "Item 6.B. Directors, Senior Management and Employees—Compensation."

**C.     Interests of Experts and Counsel**

Not applicable.

**Item 8.          Financial Information**

**A.     Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

From time to time, we have been involved in litigation or other disputes regarding, among other things, copyright and trademark infringement, defamation, unfair competition and labor disputes. Our search results provide links to materials, and our P4P, Baidu Post Bar, Baidu Netdisk, Baidu Nuomi, iQiyi and certain other products or services may contain materials, in which others may allege to own copyrights, trademarks or image rights or which others may claim to be defamatory or objectionable. We have received notice letters from third parties asserting copyright infringement, unfair competition, defamation, breach of contract and labor-related claims against us.

In 2016, 1,781 complaints were filed against us before various courts in China, the U.S. and Brazil, and the aggregate amount of the damages sought in these complaints totals approximately RMB496.6 million (US$71.5 million). As of December 31, 2016, 754 cases against us were pending before various courts in China, the U.S. and Brazil. The aggregate amount of damages sought under these pending cases is approximately RMB678.3 million (US$97.7 million).

For many of these legal proceedings, we are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial. However, we believe that such proceedings, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material and adverse effect on our results of operations, financial position and cash flows.

**Dividend Policy**

Baidu, Inc., our holding company in the Cayman Islands, has never declared or paid any dividends on our ordinary shares, nor do we have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

Our board of directors has complete discretion as to whether to distribute dividends, subject to Cayman Islands law. Even if our board of directors decides to pay dividends, the form, frequency and amount of our dividends will depend upon our future operations and earnings, capital requirements and surplus, financial condition, contractual restrictions and other factors that our board of directors may deem relevant. If we pay any dividends, our depositary will distribute such dividends to our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

120

Table of Contents

B.    **Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.        The Offer and Listing**

A.    **Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Market since August 5, 2005. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "BIDU." Prior to May 12, 2010, one ADS represented one Class A ordinary share. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split.

The following table provides the high and low trading prices for our ADSs on NASDAQ for (i) the years 2012, 2013, 2014, 2015 and 2016, (ii) each of the four quarters of 2015 and 2016, and (iii) each of the past six full months.

|  | Trading Price | |
|---|---|---|
|  | High | Low |
| **Annual Highs and Lows** |  |  |
| 2012 | 154.15 | 85.96 |
| 2013 | 181.25 | 82.98 |
| 2014 | 251.99 | 140.66 |
| 2015 | 234.67 | 100.00 |
| 2016 | 201.00 | 139.61 |
| **Quarterly Highs and Lows** |  |  |
| First Quarter 2015 | 234.67 | 199.70 |
| Second Quarter 2015 | 223.95 | 188.60 |
| Third Quarter 2015 | 210.00 | 100.00 |
| Fourth Quarter 2015 | 217.97 | 135.31 |
| First Quarter 2016 | 193.73 | 139.61 |
| Second Quarter 2016 | 201.00 | 155.28 |
| Third Quarter 2016 | 197.80 | 155.28 |
| Fourth Quarter 2016 | 187.24 | 159.54 |
| **Monthly Highs and Lows** |  |  |
| September 2016 | 197.80 | 171.77 |
| October 2016 | 187.24 | 171.89 |
| November 2016 | 177.35 | 159.54 |
| December 2016 | 173.00 | 160.79 |
| January 2017 | 183.00 | 165.82 |
| February 2017 | 188.54 | 171.73 |
| March 2017 (through March 30, 2017) | 178.86 | 166.00 |

B.    **Plan of Distribution**

Not applicable.

C.    **Markets**

Our ADSs have been listed on NASDAQ since August 5, 2005 under the symbol "BIDU".

121

**Table of Contents**

**D.    Selling Shareholders**

Not applicable.

**E.    Dilution**

Not applicable.

**F.    Expenses of the Issue**

Not applicable.

**Item 10.    Additional Information**

**A.    Share Capital**

Not applicable.

**B.    Memorandum and Articles of Association**

The following are summaries of material provisions of our third amended and restated memorandum and articles of association, as well as the Companies Law (2016 Revision) insofar as they relate to the material terms of our ordinary shares.

**Registered Office and Objects**

The Registered Office of our company is at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands or at such other place as our board of directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Law (2016 Revision), as amended from time to time, or any other law of the Cayman Islands.

**Board of Directors**

See "Item 6.C. Directors, Senior Management and Employees—Board Practices—Board of Directors."

**Ordinary Shares**

*General.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are nonresidents of the Cayman Islands may freely hold and vote their shares.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Companies Law.

*Conversion.* Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder (as defined in our articles of incorporation), such Class B ordinary shares shall be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time our chairman and chief executive officer, Robin Yanhong Li, and his affiliates collectively own less than 5% of the

122

Table of Contents

total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share shall be automatically and immediately converted into one share of Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

*Voting Rights.* All of our shareholders have the right to receive notice of shareholders' meetings and to attend, speak and vote at such meetings. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to 10 votes. A shareholder may participate at a shareholders' meeting in person, by proxy or by telephone conference or other communications equipment by means of which all the shareholders participating in the meeting can communicate with each other. At any shareholders' meeting, a resolution put to the vote of the meeting shall be decided on a poll conducted by the chairman of the meeting.

A quorum for a shareholders' meeting consists of one or more shareholders holding at least one third of the paid up voting share capital present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. We shall, if required by the Companies Law, hold a general meeting of shareholders as our annual general meeting and shall specify the meeting as such in the notices calling it. Our board of directors may call extraordinary general meetings, and they must on shareholders' requisition convene an extraordinary general meeting. A shareholder requisition is a requisition of shareholders holding at the date of deposit of the requisition not less than a majority of the voting power represented by the issued shares of our company as at that date carries the right of voting at general meetings of our company. Advance notice of at least five days is required for the convening of our annual general meeting and other shareholders' meetings.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the ordinary shares cast in a general meeting. A special resolution is required for matters such as a change of name. Holders of the ordinary shares may effect certain changes by ordinary resolution, including consolidating and dividing all or any of our share capital into shares of larger amount than our existing share capital and canceling any shares.

*Transfer of Shares.* Subject to the restrictions of our memorandum and articles of association, as applicable, any of our shareholders may transfer any or all of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

Our board of directors may, in their absolute discretion (except with respect to a transfer from a shareholder to its affiliate(s)), decline to register any transfer of shares without assigning any reason thereof. If our board of directors refuses to register a transfer they shall notify the transferee within two months of such refusal. Notwithstanding the foregoing, if a transfer complies with the holder's transfer obligations and restrictions set forth under applicable law (including but not limited to U.S. securities law provisions related to insider trading) and our articles of association, our board of directors shall promptly register such transfer. Further, any director is authorized to confirm in writing addressed to the registered office to authorize a share transfer and to instruct that the register of members be updated accordingly, provided that the transfer complies with the holder's transfer obligations and restrictions set forth under applicable law and our articles of association and such holder is not the director who authorizes the transfer or an entity affiliated with such director. Any director is authorized to execute a share certificate in respect of such shares for and on behalf of our company.

The registration of transfers may be suspended at such time and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended for more than 45 days in any year.

*Liquidation.* On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of ordinary shares may be distributed among the holders of the ordinary shares as determined by the liquidator, subject to sanction of a special

123

Table of Contents

resolution of our company. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by such shareholders respectively.

*Calls on Shares and Forfeiture of Shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. The shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption of Shares.* Subject to the provisions of the Companies Law and our articles of association, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner as our board of directors may determine.

*Repurchase of Shares.* Subject to the provisions of the Companies Law and our articles of association, our board of directors may authorize repurchase of our shares in accordance with the manner of purchase specified in our articles of association without seeking shareholder approval.

*Variations of Rights of Shares.* All or any of the special rights attached to any class of shares may, subject to the provisions of the Companies Law, be varied either with the written consent of the holders of a majority of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Inspection of Books and Records.* No holders of our ordinary shares who is not a director shall have any right of inspecting any of our accounts, books or documents except as conferred by the Companies Law or authorized by the directors or by us in general meeting. However, we will make this annual report, which contains our audited financial statements, available to shareholders and ADS holders. See "Item 10.H. Additional Information—Documents on Display."

### Preferred Shares

Our board of directors has the authority, without shareholder approval, to issue up to a total of 10,000,000 shares of preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may set the designations, preferences, powers and other rights of the shares of a series of preferred shares. While the issuance of preferred shares provides us with flexibility in connection with possible acquisitions or other corporate purposes, it could, among other things, have the effect of delaying, deferring or preventing a change of control transaction and could adversely affect the market price of our ADSs. We have no current plan to issue any preferred shares.

**C.   Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

**D.   Exchange Controls**

See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Foreign Exchange."

**E.   Taxation**

The following summary of the material Cayman Islands, People's Republic of China and United States federal income tax consequences of an investment in our ADSs or ordinary shares is based upon laws and

124

**Table of Contents**

relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or ordinary shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Tax Considerations**

According to Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, the Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within, the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Tax Considerations**

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the 10% EIT on the dividends payable by us or any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is also possible that such dividends and gains earned by non-resident individuals may be subject to the 20% PRC individual income tax. It is uncertain whether, if we are considered a PRC resident enterprise, holders of our shares or ADSs would be able to claim the benefit of tax treaties or arrangements entered into between China and other jurisdictions.

If we are required under the PRC tax law to withhold PRC income tax on our dividends payable to our non-PRC resident shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident shareholders and ADS holders are subject to the EIT or the individual income tax, your investment in our shares or ADSs could be materially and adversely affected.

**United States Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or ordinary shares as capital assets. This discussion is based on the tax laws of the United States as in effect on the date of this annual report on Form 20-F and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this annual report on Form 20-F, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

125

**Table of Contents**

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own 10% or more of our voting shares;

- persons whose functional currency is other than the U.S. dollar; or

- persons who acquired ADSs or ordinary shares pursuant to the exercise of any employee share option or otherwise as consideration.

**U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of ownership and disposition of ADSs or ordinary shares.**

The discussion below of the U.S. federal income tax consequences will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- a citizen or individual resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the supervision of a court within the United States and the control of one or more United States persons or (ii) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or ordinary shares, or of persons who hold the ADSs or ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you will be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, or state, local or non-U.S. tax laws. We have not sought, and will not seek, a ruling from the Internal Revenue Service (the "IRS"), or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

*Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, the gross amount of all our distributions to you with respect to the ADSs or ordinary shares will be included in your gross income as

126

**Table of Contents**

dividend income on the date of receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution paid will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to non-corporate U.S. Holders (including individual U.S. Holders), dividends may be taxed at the lower applicable capital gains rate provided that (i) the ADSs or ordinary shares are readily tradable on an established securities market in the United States or we are eligible for the benefit of the income tax treaty between the United States and the PRC, (ii) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend was paid or for the preceding taxable year, (iii) certain holding period requirements are met, and (iv) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the NASDAQ Global Select Market will generally be considered to be readily tradable on an established securities market in the United States. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

For U.S. foreign tax credit purposes, dividends paid on the ADSs or ordinary shares generally will be treated as income from foreign sources and generally will constitute passive category income. If PRC withholding taxes apply to dividends paid to you with respect to the ADSs or ordinary shares, you may be able to obtain a reduced rate of PRC withholding taxes under the income tax treaty between the United States and the PRC if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends that are non-refundable under the income tax treaty between the United States and the PRC may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

*Sale, Exchange or Other Disposition of the ADSs or ordinary shares*

Subject to the passive foreign investment company rules discussed below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss will generally be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC "resident enterprise" under PRC tax law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or ordinary shares, a U.S. Holder that is eligible for the benefits of the income tax treaty between the United States and the PRC may elect to treat such gain as PRC source income. U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

*Passive Foreign Investment Company*

A non-U.S. corporation, such as our own, is considered a passive foreign investment company or "PFIC" for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test"). We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in

Table of Contents

which we own, directly or indirectly, more than 25% (by value) of the shares. Although the law in this regard is not entirely clear, we treat our variable interest entities as being owned by us for United States federal income tax purposes because we control their management decisions and we are entitled to substantially all of their economic benefits and, as a result, we consolidate their results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of our variable interest entities for United States federal income tax purposes, we would likely be treated as a PFIC for our taxable year ended December 31, 2017 and for subsequent taxable years.

Although under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive", we may have been a PFIC for 2015, we believe under more reasonable approaches for our circumstances, based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, that we were not a PFIC for our taxable year ended December 31, 2015. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2017 or for the foreseeable future. In addition, we do not believe that we were a PFIC for our taxable year ended December 31, 2016 even under the least favorable interpretations of what portion of goodwill and certain other assets are treated as "passive." However, our PFIC status for the current taxable year ending December 31, 2017 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year).

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In particular, because the total value of our assets for purposes of the asset test will generally be calculated using the market price of the ADSs and ordinary shares, our PFIC status will depend in large part on the market price of the ADSs and ordinary shares, which may fluctuate considerably. Accordingly, fluctuations in the market price of the ADSs and ordinary shares may result in our being a PFIC for any year. If we are a PFIC for any year during which you hold the ADSs or ordinary shares, we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADSs or ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to the ADSs or ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold ADSs or ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ADSs or ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs or ordinary shares,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, will be treated as ordinary income, and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or ordinary shares cannot be treated as capital, even if you hold the ADSs or ordinary shares as capital assets.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding

128

Table of Contents

paragraphs. The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury regulations. We expect that the ADSs will continue to be listed on the NASDAQ Global Select Market, which is a qualified exchange for these purposes, and, consequently, assuming that the ADSs are regularly traded, if you are a holder of ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC. However, a mark-to-market election may not be made with respect to our ordinary shares as they are not marketable stock. If you make a valid mark-to-market election for the ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs as of the close of your taxable year over your adjusted basis in such ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs, as well as to any loss realized on the actual sale or disposition of the ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs. Your basis in the ADSs will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or ordinary shares.

If you hold ADSs or ordinary shares in any year in which we are a PFIC, you will be required to file an annual information report containing such information as the U.S. Treasury may require.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in ADSs or ordinary shares.

### *Medicare Tax*

An additional 3.8% tax is imposed on a portion or all of the net investment income of certain individuals with a modified adjusted gross income of over $200,000 (or $250,000 in the case of joint filers or $125,000 in the case of married individuals filing separately) and on the undistributed net investment income of certain estates and trusts. For these purposes, "net investment income" generally includes interest, dividends (including dividends paid with respect to the ADSs or ordinary shares), annuities, royalties, rents, net gain attributable to the disposition of property not held in a trade or business (including net gain from the sale, exchange or other taxable disposition of an ADS or ordinary share) and certain other income, reduced by any deductions properly allocable to such income or net gain. U.S. Holders are urged to consult their tax advisors regarding the applicability of this tax to their income and gains in respect of an investment in the ADSs or ordinary shares.

### *Information Reporting and Backup Withholding*

Dividend payments with respect to ADSs or ordinary shares and proceeds from the sale, exchange or redemption of ADSs or ordinary shares may be subject to information reporting to the IRS and possible U.S.

129

Table of Contents

backup withholding. Backup withholding will not apply to you, however, if you furnish a correct taxpayer identification number and make any other required certification or that are otherwise exempt from backup withholding. U.S. Holders that are required to establish their exempt status generally must provide such certification on IRS Form W-9. You should consult your tax advisor regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding can be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS and furnishing any required information in a timely manner.

Individual U.S. Holders and certain entities may be required to submit to the IRS certain information with respect to his or her beneficial ownership of the ADSs or ordinary shares, if such ADSs or ordinary shares are not held on his or her behalf by a financial institution. This law also imposes penalties if an individual U.S. Holder is required to submit such information to the IRS and fails to do so.

**F.    Dividends and Paying Agents**

Not applicable.

**G.    Statement by Experts**

Not applicable.

**H.    Documents on Display**

We previously filed with the SEC our registration statement on Form F-1, as amended and prospectus under the Securities Act of 1933, with respect to our ordinary shares. We have also previously filed with the SEC our registration statement on Form F-3 with respect to the sale of debt securities by our company on a continuous basis, a prospectus under the Securities Act with respect to our issuance of US$1.5 billion senior unsecured notes in two equal tranches, due in 2017 and 2022 with stated interest rates of 2.25% and 3.50%, respectively, a prospectus under the Securities Act with respect to our issuance of US$1.0 billion senior unsecured notes due in 2018 with stated interest rate of 3.25%, a prospectus under the Securities Act with respect to our issuance of US$1.0 billion senior unsecured notes due in 2019 with stated interest rate of 2.75%, and a prospectus under the Securities Act with respect to our issuance of US$1.25 billion senior unsecured notes in two tranches consisting of US$750 million notes due in 2020 with stated interest rate of 3.00% and US$500 million notes due in 2025 with stated interest rate of 4.125%.

We are subject to the periodic reporting and other informational requirements of the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. Copies of reports and other information, when so filed, may be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the Commission at 1-800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish The Bank of New York Mellon, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity

130

**Table of Contents**

with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at http://ir.baidu.com. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.    Subsidiary Information**

Not applicable.

**Item 11.    Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to excess cash invested in short-term instruments with original maturities of less than a year. Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates, or we may suffer losses in principal if we have to sell securities which have declined in market value due to changes in interest rates. We have not been, and do not expect to be, exposed to material interest rate risks, and therefore have not used any derivative financial instruments to manage our interest risk exposure, other than interest swap agreements entered into in connection with the loan agreement with Bank of China (Los Angeles Branch) dated December 2014, the loan agreement with Sumitomo Mitsui Banking Corporation dated July 2015 and the loan agreement with a group of 21 arrangers dated June 2016. See "Item 5.B. Operating and Financial Review and Prospects—Liquidity and Capital Resources."

**Foreign Exchange Risk**

Most of our revenues and costs are denominated in RMB, while a portion of our cash and cash equivalents, short-term financial assets, long-term investments, long-term loans payable and notes payable are denominated in U.S. dollars. Our exposure to foreign exchange risk primarily relates to those financial assets and financial liabilities denominated in U.S. dollars. Any significant revaluation of RMB against the U.S. dollar may materially affect our earnings and financial position, and the value of, and any dividends payable on, our ADS in U.S. dollars. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." In addition, we commenced operation in Japan in late 2007. To the extent we need to make capital injections into our Japan operation by converting U.S. dollars into Japanese Yen, we will be exposed to the fluctuations in the exchange rate between the U.S. dollar and the Japanese Yen. We have not hedged exposures denominated in foreign currencies using any derivative financial instruments.

The RMB depreciated by 6.70% against the U.S. dollar in 2016. A hypothetical 10% increase in the exchange rate of the U.S. dollar against the RMB would have resulted in an increase of RMB4.3 billion (US$621.4 million) in the value of our U.S. dollar-denominated long-term loans payable and notes payable at December 31, 2016.

**Item 12.    Description of Securities Other than Equity Securities**

**A.    Debt Securities**

Not applicable.

131

**Table of Contents**

**B.**  **Warrants and Rights**

Not applicable.

**C.**  **Other Securities**

Not applicable.

**D.**  **American Depositary Shares**

**Fees and Charges Our ADS holders May Have to Pay**

The Bank of New York Mellon, the depositary of our ADS program, collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. The depositary's corporate trust office at which the ADSs will be administered is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at 225 Liberty Street, 21st Floor, New York, New York 10286.

| Persons depositing or withdrawing shares must pay: | For: |
|---|---|
| US$5.00 (or less) per 1,000 ADSs (or portion of 1,000 ADSs) | • Issuance of ADSs, including issuances resulting from a distribution of shares or rights or other property |
| US$0.05 (or less) per ADS | • Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| US$0.02 (or less) per ADS | • Any cash distribution to registered ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed had been shares and the shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to registered ADS holders |
| US$0.02 (or less) per ADS per calendar year (if the depositary has not collected any cash distribution fee during that year) | • Depositary services |
| Expenses of the depositary | • Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |
| | • Converting foreign currency to U.S. dollars |
| Registration or transfer fees | • Transfer and registration of shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw shares |
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

132

**Table of Contents**

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with investor relationship programs and any other program related to our ADS facility and the travel expense of our key personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. In 2017, we received approximately US$4.2 million (after tax) reimbursement from the depositary for our expenses incurred in connection with investor relationship programs related to the ADS facility and the travel expense of our key personnel in connection with such programs.

**PART II**

**Item 13.   Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.   Material Modifications to the Rights of Security Holders and Use of Proceeds**

None.

**Item 15.   Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2016, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2016.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

133

**Table of Contents**

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2016, as stated in its report, which appears on page F-2 of this annual report on Form 20-F.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 16A.        Audit Committee Financial Expert**

Our board of directors has determined that Mr. Brent Callinicos, an independent director (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and chairman of our audit committee, is an audit committee financial expert.

**Item 16B.        Code of Ethics**

Our board of directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors in July 2005. We have posted a copy of our code of business conduct and ethics on our website at http://ir.baidu.com.

**Item 16C.        Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated.

|  | 2015 | 2016 |
|---|---|---|
| Audit fees[1] | US$3,673,825 | US$2,677,284 |
| Audit-related fees[2] | US$ 229,184 | US$ 284,664 |
| Tax fees[3] | US$ 52,355 | US$ 30,502 |

(1)    "Audit fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements and assistance with and review of documents filed with the SEC. In 2015 and 2016, the audit refers to financial audit and audit pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

(2)    "Audit-related fees" means fees billed in 2015 and 2016 for professional services rendered by our principal auditors associated with certain due diligence projects.

(3)    "Tax fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for tax compliance, tax advice, and tax planning. In 2015 and 2016, the tax fees refer to fees paid to our principal auditors for reviewing the compliance of our tax documentation and providing tax advices.

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee. Our audit committee has adopted a combination of two approaches in pre-approving proposed services: general pre-approval and specific pre-approval. With general approval, proposed services are pre-approved without consideration of specific case-by-case services; with specific approval, proposed services require the specific pre-approval of the audit committee. Unless a type of service has received general pre-approval, it will require specific pre-approval by our audit committee. Any proposed services exceeding pre-approved cost levels or budgeted amounts will also require specific pre-approval by our audit committee.

134

**Table of Contents**

All requests or applications for services to be provided by our independent auditors that do not require specific approval by our audit committee will be submitted to our chief financial officer and must include a detailed description of the services to be rendered. The chief financial officer will determine whether such services are included within the list of services that have received the general pre-approval of the audit committee. The audit committee will be informed on a timely basis of any such services. Requests or applications to provide services that require specific approval by our audit committee will be submitted to the audit committee by both our independent auditors and our chief financial officer and must include a joint statement as to whether, in their view, the request or application is consistent with the SEC's rules on auditor independence.

**Item 16D.        Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E.        Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

On October 22, 2015, our board of directors authorized a share repurchase program, under which we may repurchase up to US$2.0 billion of our ADSs or ordinary shares over 24 months from October 22, 2015 through October 21, 2017. The share repurchase program was publicly announced on October 29, 2015.

We did not conduct any repurchase under this program in 2016.

The table below is a summary of the shares repurchased by us in 2017. All shares were repurchased in the open market pursuant to the share repurchase program announced on October 29, 2015.

| Period | Total Number of ADSs Purchased | Average Price Paid Per ADS | Total Number of ADSs Purchased as Part of the Publicly Announced Plan | Approximate Dollar Value of ADSs that May Yet Be Purchased Under the Plan |
|---|---|---|---|---|
| March 1 – March 29 | 687,610 | $169.41 | 687,610 | $1,883,512,951 |
| **Total** | **687,610** | **$169.41** | **687,610** | **$1,883,512,951** |

**Item 16F.        Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.        Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholder meetings every year. We follow home country practice with respect to annual meetings and did not hold an annual meeting of shareholders in 2016. We may, however, hold annual shareholder meetings in the future if there are significant issues that require shareholders' approvals.

Other than the annual meeting practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.

**Item 16H.        Mine Safety Disclosure**

Not applicable.

**Table of Contents**

**PART III**

**Item 17.      Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.      Financial Statements**

The consolidated financial statements of Baidu, Inc., its subsidiaries and its consolidated affiliated entities are included at the end of this annual report.

**Item 19.      Exhibits**

| Exhibit Number | Description of Document |
| --- | --- |
| 1.1 | Third Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated by reference to Exhibit 99.2 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 2.1 | Registrant's Specimen American Depositary Receipt (incorporated by reference to Exhibit 1 of the prospectus filed with the Securities and Exchange Commission on January 5, 2009 pursuant to Rule 424(b)(3) under the Securities Act) |
| 2.2 | Registrant's Specimen Certificate for Class A Ordinary Shares (incorporated by reference to Exhibit 4.2 of Amendment No. 5 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on August 2, 2005) |
| 2.3 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 2.4 | Indenture, dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.5 | First Supplemental Indenture dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.6 | Form of 2.250% Notes due 2017 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.7 | Form of 3.500% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.8 | Second Supplemental Indenture dated August 6, 2013 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.9 | Form of 3.250% Notes due 2018 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.10 | Third Supplemental Indenture dated June 9, 2014 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.11 | Form of 2.750% Notes due 2019 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |

136

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 2.12 | Fourth Supplemental Indenture dated June 30, 2015 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.13 | Form of 3.00% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.14 | Form of 4.125% Notes due 2025 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 4.1 | 2000 Option Plan (amended and restated effective December 16, 2008) (incorporated by reference to Exhibit 99.3 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.2 | 2008 Share Incentive Plan (incorporated by reference to Exhibit 99.4 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.3 | Form of Indemnification Agreement between the Registrant and the Registrant's directors (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.4 | Form of Employment Agreement between the Registrant and an Executive Officer of the Registrant (incorporated by reference to Exhibit 10.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.5 | Translation of Exclusive Technology Consulting and Services Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.6 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.6 | Translation of Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.7 | Translation of Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.5 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.8 | Translation of Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 99.8 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.9 | Translation of Proxy Agreement dated August 9, 2004 among Baidu Online, Baidu Netcom, Robin Yanhong Li and Eric Yong Xu (incorporated by reference to Exhibit 99.9 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.10 | Translation of the form of Technology Consulting and Services Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.19 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.11 | Translation of the form of Operating Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.20 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |

137

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.12 | Translation of the form of Web Layout Copyright License Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.21 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.13 | Translation of the form of Proxy Agreement among Baidu Online, a consolidated affiliated PRC entity and the shareholders of the consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.22 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.14 | Translation of the form of Equity Pledge Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.23 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.15 | Translation of the form of Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.24 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.16 | Translation of the form of Loan Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.17 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal, dated as of April 22, 2010 (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.18 | Translation of the Web Layout Copyright License Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal (incorporated by reference to Exhibit 4.27 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.19 | Translation of the Technology Consulting and Services Agreement dated February 28, 2008 between Baidu Online and BaiduPay and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.33 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.20 | Translation of the Web Layout Copyright License Agreement dated February 28, 2008 between Baidu Online and BaiduPay (incorporated by reference to Exhibit 4.35 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.21 | Translation of the supplementary agreements, dated March 11, 2010 and April 22, 2010 to the Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.22 | Translation of the supplementary agreement dated March 1, 2010 to the Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.23 | Translation of the supplementary agreement dated April 22, 2010 to the Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.24 | Translation of the supplementary agreement to the Loan Agreement among Robin Yanhong Li, Baidu Netcom and Baidu Online dated September 6, 2011 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.25 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.26 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.27 | Translation of Supplementary Agreement among Baidu Online, BaiduPay, Baidu Netcom and Hu Cai dated September 6, 2011 (incorporated by reference to Exhibit 4.79 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.28 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.80 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.29 | Translation of the Supplementary Agreement to Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.74 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.30 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.64 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.31 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.32 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Beijing Perusal dated August 15, 2013 (incorporated by reference to Exhibit 4.66 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.33 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated August 15, 2013 (incorporated by reference to Exhibit 4.67 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.34* | Translation of the Termination Agreements among Baidu Online, Beijing Perusal, Jiping Liu and Yazhu Zhang, former individual shareholders of Beijing Perusal, dated March 15, 2016 and May 3, 2016, respectively |
| 4.35* | Translation of the Amended and Restated Loan Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 |

139

**Table of Contents**

| Exhibit Number | Description of Document |
| --- | --- |
| 4.36* | Translation of the Equity Transfer Agreements between Jiping Liu and Zhixiang Liang, between Jiping Liu and Xiaodong Wang, and between Yazhu Zhang and Xiaodong Wang, all dated May 3, 2016 |
| 4.37* | Translation of Proxy Agreement among Zhixiang Liang and Baidu Online and of Proxy Agreement among Xiaodong Wang and Baidu Online, both dated May 3, 2016 |
| 4.38* | Translation of the Operating Agreement among Baidu Online, Beijing Perusal, Zhixiang Liang, and Xiaodong Wang, dated May 3, 2016 |
| 4.39* | Translation of the Amended and Restated Equity Pledge Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 |
| 4.40* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreements among Baidu Online, Zhixiang Liang and Beijing Perusal, and among Baidu Online, Xiaodong Wang and Beijing Perusal, both dated June 20, 2016 |
| 4.41* | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of Beijing Perusal, dated May 3, 2016 |
| 4.42* | Translation of Irrevocable Power of Attorney issued by Xiaodong Wang, the individual shareholder of Beijing Perusal, dated May 3, 2016 |
| 4.43* | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Baidu Netcom, Robin Yanhong Li and Zhan Wang dated June 13, 2016 |
| 4.44* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 |
| 4.45* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Yanhong Li dated January 18, 2017 |
| 4.46* | Translation of the Equity Transfer Agreement between Zhan Wang and Hailong Xiang dated June 13, 2016 |
| 4.47* | Translation of the Proxy Agreement among Robin Yanhong Li, Hailong Xiang and Baidu Online dated June 13, 2016 |
| 4.48* | Translation of the Operating Agreement among Baidu Online, Baidu Netcom, Robin Yanhong Li, Hailong Xiang dated June 13, 2016 |
| 4.49* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 |
| 4.50* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Yanhong Li dated January 18, 2017 |
| 4.51* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Hailong Xiang and Baidu Netcom dated January 18, 2017 |
| 4.52* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Yanhong Li and Baidu Netcom dated January 18, 2017 |
| 4.53* | Translation of Irrevocable Power of Attorney issued by Robin Yanhong Li, an individual shareholder of Baidu Netcom, dated June 13, 2016 |
| 4.54* | Translation of Irrevocable Power of Attorney issued by Hailong Xiang, an individual shareholder of Baidu Netcom, dated June 13, 2016 |

140

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.55* | Translation of the Termination of Power of Attorney issued by Zhixiang Liang to Zhan Wang, dated October 18, 2016 |
| 4.56* | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of BaiduPay, dated October 18, 2016 |
| 4.57* | Translation of Acceptance of the Irrevocable Power of Attorney by Hailong Xiang, dated October 18, 2016 |
| 4.58* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Zhixiang Liang, dated October 18, 2016 |
| 4.59* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online, Zhixiang Liang and BaiduPay, dated October 18, 2016 |
| 4.60* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Zhixiang Liang, dated October 18, 2016 |
| 4.61* | Translation of the Amended and Restated Operating Agreement among Baidu Online, BaiduPay, Zhixiang Liang, Baidu Netcom, and An Yi Heng Tong (Beijing) Co., Ltd., dated October 18, 2016 |
| 4.62 | Loan Agreement between Baidu, Inc. and Bank of China, Los Angeles Branch dated December 9, 2014 (incorporated by reference to Exhibit 4.73 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2015) |
| 4.63 | Share Exchange Agreement among Baidu, Inc., Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 24, 2015 (incorporated by reference to Exhibit 2 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.64 | Standstill Agreement between Baidu, Inc. and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 3 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.65 | Registration Rights Agreement between Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 4 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 5, 2015) |
| 4.66 | Facility Agreement between Baidu, Inc. and Sumitomo Mitsui Banking Corporation dated July 17, 2015 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on April 8, 2016) |
| 4.67 | Facility Agreement between Baidu, Inc. and The Hong Kong and Shanghai Banking Corporation Limited dated August 25, 2015 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on April 8, 2016) |
| 4.68* | US$2,000,000,000 Facilities Agreement between the Registrant and other parties thereto dated June 8, 2016 |
| 4.69* | Note Purchase Agreement among Qiyi.com, Inc., Baidu Holdings Limited and other parties thereto dated January 11, 2017 |
| 8.1* | List of Principal Subsidiaries and Consolidated Affiliated Entities |

141

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.14 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder (Hong Kong) LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Ernst & Young Hua Ming LLP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith
\*\*     Furnished herewith

142

**Table of Contents**

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Baidu, Inc.

By:  /s/ Robin Yanhong Li
    Name: Robin Yanhong Li
    Title: Chairman and Chief Executive Officer

Date: March 31, 2017

143

**Table of Contents**

BAIDU, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page(s) |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 – F-3 |
| Consolidated Balance Sheets as of December 31, 2015 and 2016 | F-4 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2014, 2015 and 2016 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2014, 2015 and 2016 | F-6 – F-7 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2014, 2015 and 2016 | F-8 |
| Notes to the Consolidated Financial Statements | F-9 – F-64 |

F-1

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Baidu, Inc.

We have audited the accompanying consolidated balance sheets of Baidu, Inc. (the "Company") as of December 31, 2016 and 2015, and the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Baidu, Inc. at December 31, 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Baidu, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 31, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 31, 2017

F-2

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of Baidu, Inc.

We have audited Baidu, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Baidu, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Baidu, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Baidu, Inc. as of December 31, 2016 and 2015, and the related consolidated statements of comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2016 of Baidu, Inc., and our report dated March 31, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 31, 2017

F-3

Table of Contents

BAIDU, INC.
CONSOLIDATED BALANCE SHEETS
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares and per share data)

| | Notes | As of December 31, 2015 RMB | 2016 RMB | 2016 US$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 9,959,932 | 10,898,463 | 1,569,705 |
| Restricted cash | | 95,997 | 317,521 | 45,733 |
| Short-term investments | 4 | 57,969,242 | 78,943,065 | 11,370,166 |
| Accounts receivable, net of allowance of RMB189,563 and RMB177,401 (US$25,551) for 2015 and 2016, respectively | 5 | 3,926,986 | 4,109,324 | 591,866 |
| Loans and interest receivable, current portion net of allowances of RMB8,945 and RMB48,722 (US$7,017) for 2015 and 2016, respectively | | 227,107 | 1,800,397 | 259,311 |
| Amounts due from related parties | 19 | 1,940,559 | 345,594 | 49,776 |
| Other current assets, net | 6 | 4,113,840 | 3,344,516 | 481,710 |
| **Total current assets** | | **78,233,663** | **99,758,880** | **14,368,267** |
| **Non-current assets:** | | | | |
| Fixed assets, net | 7 | 10,627,127 | 11,294,348 | 1,626,724 |
| Intangible assets, net | 8 | 3,334,619 | 3,872,227 | 557,718 |
| Goodwill | 8 | 15,395,573 | 15,342,096 | 2,209,721 |
| Long-term investments, net | 4 | 37,958,591 | 45,690,363 | 6,580,781 |
| Deferred tax assets, net | 12 | 1,008,174 | 1,100,230 | 158,466 |
| Loans and interest receivable, non current portion net of allowances of nil and RMB69,457 (US$10,004) for 2015 and 2016, respectively | | 122,093 | 2,708,817 | 390,151 |
| Amounts due from related parties | 19 | 9,725 | 11,153 | 1,606 |
| Other non-current assets | | 1,163,743 | 2,219,277 | 319,642 |
| **Total non-current assets** | | **69,619,645** | **82,238,511** | **11,844,809** |
| **Total assets** | | **147,853,308** | **181,997,391** | **26,213,076** |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB14,391,610 and RMB20,914,589 (US$3,012,327) as of December 31, 2015 and 2016, respectively): | 1 | | | |
| Short-term loans | 10 | 100,000 | 1,115,000 | 160,593 |
| Accounts payable and accrued liabilities | 9 | 17,840,192 | 28,654,086 | 4,127,047 |
| Customer advances and deposits | | 5,420,230 | 6,031,681 | 868,743 |
| Deferred revenue | | 375,672 | 596,460 | 85,908 |
| Deferred income | | 559,855 | 566,104 | 81,536 |
| Long-term loans, current portion | 10 | 974,520 | 3,468,296 | 499,539 |
| Notes payable, current portion | 11 | — | 5,203,315 | 749,433 |
| Amounts due to related parties | 19 | 785,945 | 458,687 | 66,065 |
| Capital lease obligation | | 46,088 | 8,416 | 1,212 |
| **Total current liabilities** | | **26,102,802** | **46,102,045** | **6,640,076** |
| **Non-current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB2,718,124 and RMB1,107,864 (US$159,566) as of December 31, 2015 and 2016, respectively): | 1 | | | |
| Deferred income | | 17,413 | 27,828 | 4,008 |
| Long-term loans | 10 | 3,239,676 | 6,822,109 | 982,588 |
| Notes payable | 11 | 30,702,116 | 27,648,477 | 3,982,209 |
| Deferred tax liabilities | 12 | 3,441,290 | 3,589,235 | 516,957 |
| Capital lease obligation | | 8,435 | 348 | 50 |
| Other non-current liabilities | | 125,860 | 64,954 | 9,355 |
| **Total non-current liabilities** | | **37,534,790** | **38,152,951** | **5,495,167** |
| **Total liabilities** | | **63,637,592** | **84,254,996** | **12,135,243** |
| **Commitments and contingencies** | 14 | | | |
| **Redeemable noncontrolling interests** | 15 | **3,947,879** | **5,491,976** | **791,009** |
| **Equity** | | | | |
| Class A ordinary shares, par value US$0.00005 per share, 825,000,000 shares authorized, and 27,113,541 shares and 27,325,551 shares issued and outstanding as at December 31, 2015 and 2016, respectively | 16 | 12 | 12 | 2 |
| Class B ordinary shares, par value US$0.00005 per share, 35,400,000 shares authorized, and 7,492,921 shares and 7,401,254 shares issued and outstanding as at December 31, 2015 and 2016, respectively | 16 | 3 | 3 | — |
| Additional paid-in capital | | 6,402,349 | 8,322,787 | 1,198,731 |
| Retained earnings | 16 | 74,659,355 | 85,733,706 | 12,348,222 |
| Accumulated other comprehensive loss | 16 | (806,056) | (1,782,966) | (256,801) |
| **Total Baidu, Inc. shareholders' equity** | | **80,255,663** | **92,273,542** | **13,290,154** |
| **Noncontrolling interests** | | **12,174** | **(23,123)** | **(3,330)** |
| **Total equity** | | **80,267,837** | **92,250,419** | **13,286,824** |
| **Total liabilities, redeemable noncontrolling interests and equity** | | **147,853,308** | **181,997,391** | **26,213,076** |

The accompanying notes are an integral part of the consolidated financial statements.

F-4

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares and per share (or ADS) data)

| | Notes | 2014 RMB | 2015 RMB | 2016 RMB | 2016 US$ |
|---|---|---|---|---|---|
| Revenues: | | | | | |
| Online marketing services | | 48,495,215 | 64,037,006 | 64,525,115 | 9,293,550 |
| Others | | 557,103 | 2,344,723 | 6,024,249 | 867,672 |
| **Total revenues** | | **49,052,318** | **66,381,729** | **70,549,364** | **10,161,222** |
| Operating costs and expenses: | | | | | |
| Cost of revenues | | (18,885,450) | (27,458,030) | (35,278,945) | (5,081,225) |
| Selling, general and administrative | | (10,382,142) | (17,076,383) | (15,070,586) | (2,170,616) |
| Research and development | | (6,980,962) | (10,175,762) | (10,150,753) | (1,462,013) |
| **Total operating costs and expenses** | | **(36,248,554)** | **(54,710,175)** | **(60,500,284)** | **(8,713,854)** |
| **Operating profit** | | **12,803,764** | **11,671,554** | **10,049,080** | **1,447,368** |
| Other income: | | | | | |
| Interest income | | 1,992,818 | 2,362,632 | 2,341,631 | 337,265 |
| Interest expense | | (628,571) | (1,041,394) | (1,157,562) | (166,724) |
| Foreign exchange income, net | | 75,780 | 181,802 | 508,312 | 73,212 |
| Income (loss) from equity method investments | 4 | (19,943) | 3,867 | (1,025,727) | (147,735) |
| Others, net | 4 | 260,558 | 24,728,162 | 3,793,473 | 546,374 |
| **Total other income, net** | | **1,680,642** | **26,235,069** | **4,460,127** | **642,392** |
| **Income before income taxes** | | **14,484,406** | **37,906,623** | **14,509,207** | **2,089,760** |
| Income taxes | 12 | (2,231,172) | (5,474,377) | (2,913,594) | (419,645) |
| **Net income** | | **12,253,234** | **32,432,246** | **11,595,613** | **1,670,115** |
| Net loss attributable to noncontrolling interests | | 943,698 | 1,231,927 | 36,656 | 5,280 |
| **Net income attributable to Baidu, Inc.** | | **13,196,932** | **33,664,173** | **11,632,269** | **1,675,395** |
| Earnings per share for Class A and Class B ordinary shares: | 17 | | | | |
| Basic | | 374.88 | 954.56 | 319.47 | 46.01 |
| Diluted | | 373.43 | 951.49 | 318.62 | 45.89 |
| Earnings per ADS (1 Class A ordinary share equals 10 ADSs): | 17 | | | | |
| Basic | | 37.49 | 95.46 | 31.95 | 4.60 |
| Diluted | | 37.34 | 95.15 | 31.86 | 4.59 |
| Weighted average number of Class A and Class B ordinary shares outstanding: | | | | | |
| Basic | | 35,062,466 | 34,921,782 | 34,665,238 | 34,665,238 |
| Diluted | | 35,198,474 | 35,034,470 | 34,757,086 | 34,757,086 |
| Other comprehensive loss: | 16 | | | | |
| Foreign currency translation adjustment | | (422,925) | (644,896) | (589,870) | (84,959) |
| Unrealized gains (losses) on available-for-sale investments, net of reclassification | | (17,698) | 294,559 | (60,393) | (8,698) |
| **Other comprehensive loss, net of tax** | | **(440,623)** | **(350,337)** | **(650,263)** | **(93,657)** |
| **Comprehensive income** | | **11,812,611** | **32,081,909** | **10,945,350** | **1,576,458** |
| Comprehensive loss (income) attributable to noncontrolling interests and redeemable noncontrolling interests | | 923,545 | 1,055,726 | (289,991) | (41,767) |
| **Comprehensive income attributable to Baidu, Inc.** | | **12,736,156** | **33,137,635** | **10,655,359** | **1,534,691** |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from operating activities:** | | | | |
| Net income | 12,253,234 | 32,432,246 | 11,595,613 | 1,670,115 |
| Adjustments to reconcile net income to net cash generated from operating activities: | | | | |
| Depreciation of fixed assets and computer parts | 2,223,907 | 2,886,254 | 3,451,422 | 497,108 |
| Gain on disposal of fixed assets | (24,395) | (24,233) | (83,641) | (12,047) |
| Amortization of intangible assets and licensed copyrights | 1,748,387 | 2,974,658 | 4,876,135 | 702,310 |
| Deferred income tax, net | (693,448) | 2,260,739 | (13,561) | (1,953) |
| Share-based compensation | 962,740 | 1,387,118 | 1,759,988 | 253,491 |
| Provision for doubtful accounts | 77,472 | 246,878 | 268,564 | 38,681 |
| Investment income | (1,932,046) | (2,709,222) | (4,971,008) | (715,974) |
| Net gain from step-acquisition and settlement of pre-existing relationship | (75,229) | — | — | — |
| Assets impairment | 95,049 | 116,978 | 421,395 | 60,694 |
| Loss (income) from equity method investments | 19,943 | (3,867) | 1,025,727 | 147,735 |
| Gain on disposal of subsidiaries | — | (24,435,554) | (1,246,617) | (179,550) |
| Other non-cash expenses (income) | 32,435 | 52,959 | (463,372) | (66,739) |
| Changes in operating assets and liabilities, net of effects of acquisitions and disposals: | | | | |
| Restricted cash | (51,077) | (1,555,178) | (221,524) | (31,906) |
| Accounts receivable | (1,462,086) | (868,564) | (238,198) | (34,308) |
| Other assets | (1,628,737) | (1,736,825) | 236,106 | 34,006 |
| Amounts due from related parties | 370,970 | (795,977) | 1,593,537 | 229,517 |
| Customer advances and deposits | 1,313,806 | 1,468,595 | 646,444 | 93,107 |
| Accounts payable and accrued liabilities | 5,028,890 | 7,179,338 | 3,711,093 | 534,509 |
| Deferred revenue | (61,790) | 210,763 | 220,788 | 31,800 |
| Deferred income | 104,391 | 19,099 | 16,664 | 2,400 |
| Amounts due to related parties | (365,241) | 664,917 | (327,258) | (47,135) |
| **Net cash generated from operating activities** | **17,937,175** | **19,771,122** | **22,258,297** | **3,205,861** |
| **Cash flows from investing activities:** | | | | |
| Acquisition of fixed assets | (4,827,163) | (5,229,616) | (4,189,187) | (603,368) |
| Acquisition of computer parts | (4,302) | (20,634) | (25,894) | (3,730) |
| Proceeds from disposal of fixed assets | 20,422 | 33,271 | 55,180 | 7,948 |
| Acquisition of businesses, net of cash acquired (Note 3) | (328,891) | (332,679) | — | — |
| Disposal of subsidiaries and business | — | (3,541,228) | 274,715 | 39,567 |
| Acquisition of intangible assets | (1,563,746) | (2,492,855) | (6,294,473) | (906,593) |
| Capitalization of software costs | — | (31,351) | (214) | (31) |
| Purchases of held-to-maturity investments | (55,356,781) | (50,207,364) | (47,633,880) | (6,860,706) |
| Maturities of held-to-maturity investments | 37,449,747 | 51,961,778 | 46,143,249 | 6,646,010 |
| Purchases of available-for-sale investments | (78,033,523) | (126,155,824) | (182,342,203) | (26,262,740) |
| Sales and maturities of available-for-sale investments | 81,931,252 | 110,652,993 | 173,820,615 | 25,035,378 |
| Purchases of other long-term investments | (1,777,331) | (5,940,309) | (4,005,136) | (576,860) |
| Sales of other long-term investments | 22,362 | 23,141 | 303,398 | 43,698 |
| Cash distribution from long-term investments | 180 | 8,233 | 4,892 | 705 |
| Micro loan origination and disbursement | — | (451,578) | (7,920,321) | (1,140,764) |
| Principal payments received on micro loans | — | 102,894 | 3,555,655 | 512,121 |
| Purchases of trading investments | — | — | (8,968,318) | (1,291,707) |
| Maturities of trading investments | — | — | 1,311,163 | 188,847 |
| **Net cash used in investing activities** | **(22,467,774)** | **(31,621,128)** | **(35,910,759)** | **(5,172,225)** |

F-6

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from financing activities:** | | | | |
| Restricted cash (served) released as collateral for borrowings | (102,400) | 102,400 | — | — |
| Proceeds from issuance of subsidiaries' shares | 1,846,819 | 3,527,945 | 660,773 | 95,171 |
| Payments to acquire subsidiaries' shares from noncontrolling interests | (622,961) | — | — | — |
| Proceeds from short-term loans | 92,432 | 100,000 | 3,252,472 | 468,453 |
| Repayments of short-term loans | — | (84,850) | (1,940,642) | (279,511) |
| Proceeds from long-term loans | 1,807,646 | 2,161,701 | 6,633,228 | 955,384 |
| Repayments of long-term loans | (347,659) | (2,173,010) | (1,041,720) | (150,039) |
| Net proceeds from sale of financial products | — | — | 10,425,507 | 1,501,587 |
| Payments on financial products | — | — | (3,666,561) | (528,095) |
| Payment of dividends by a subsidiary to noncontrolling interests | (337,964) | — | — | — |
| Proceeds from issuance of notes payable | 6,156,016 | 10,354,491 | — | — |
| Payments of capital lease obligation | (72,817) | (58,837) | (52,508) | (7,563) |
| Repurchase of ordinary shares | — | (6,376,964) | — | — |
| Proceeds from exercise of share options | 192,848 | 225,156 | 176,131 | 25,368 |
| **Net cash generated from financing activities** | **8,611,960** | **7,778,032** | **14,446,680** | **2,080,755** |
| Effect of exchange rate changes on cash and cash equivalents | 79,567 | 179,181 | 144,313 | 20,785 |
| **Net increase (decrease) in cash and cash equivalents** | **4,160,928** | **(3,892,793)** | **938,531** | **135,176** |
| Cash and cash equivalents at beginning of the year | 9,691,797 | 13,852,725 | 9,959,932 | 1,434,529 |
| Cash and cash equivalents at end of the year | 13,852,725 | 9,959,932 | 10,898,463 | 1,569,705 |
| **Supplemental disclosures:** | | | | |
| Interests paid | 592,759 | 867,039 | 1,110,657 | 159,968 |
| Income taxes paid | 2,798,040 | 2,763,119 | 2,402,114 | 345,976 |
| **Non-cash investing and financing activities:** | | | | |
| Capital lease obligation | 94,336 | 6,081 | 6,750 | 972 |
| Acquisition of fixed assets included in accounts payable and accrued liabilities | 1,131,870 | 1,028,171 | 903,000 | 130,059 |
| Acquisition of other non-current assets included in accounts payable and accrued liabilities | 39,437 | 44,215 | 36,753 | 5,294 |
| Non-cash acquisitions of investments | 75,229 | 24,431,441 | 2,963,425 | 426,822 |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(Amounts in thousands of Renminbi ("RMB"), and in thousands of U.S. Dollars ("US$"), except for number of shares)

| | Attributable to Baidu, Inc. | | | | | | Total shareholders' equity |
| | Ordinary shares | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income (loss) | Noncontrolling interests | |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
|---|---|---|---|---|---|---|---|
| **Balances at December 31, 2013** | **35,030,373** | **15** | **3,058,142** | **34,557,077** | **181,258** | **2,240,335** | **40,036,827** |
| Net income | — | — | — | 13,196,932 | | (943,698) | 12,253,234 |
| Other comprehensive income (loss) | — | — | — | — | (460,776) | 20,153 | (440,623) |
| Business combination | — | — | — | — | — | 150,000 | 150,000 |
| Acquisition of subsidiaries' redeemable shares from noncontrolling shareholders | — | — | (406,285) | — | — | (216,676) | (622,961) |
| Accretion of redeemable noncontrolling interests | — | — | — | (52,683) | — | — | (52,683) |
| Dividends distribution by a subsidiary | — | — | — | — | — | (337,964) | (337,964) |
| Exercise of share-based awards | 75,863 | — | 199,773 | — | — | 8,033 | 207,806 |
| Share-based compensation | — | — | 798,971 | — | — | 160,274 | 959,245 |
| Issuance of subsidiary shares | — | — | — | — | — | 5,000 | 5,000 |
| **Balances at December 31, 2014** | **35,106,236** | **15** | **3,650,601** | **47,701,326** | **(279,518)** | **1,085,457** | **52,157,881** |
| Net income | — | — | — | 33,664,173 | — | (1,231,927) | 32,432,246 |
| Other comprehensive income (loss) | — | — | — | — | (526,538) | 34,130 | (492,408) |
| Business combination | — | — | 3,384 | — | — | 7,551 | 10,935 |
| Issuance of subsidiary shares | — | — | 975,679 | — | — | 959,391 | 1,935,070 |
| Issuance of convertible notes by a disposed subsidiary | — | — | 278,316 | — | — | 281,259 | 559,575 |
| Exercise of share-based awards | 103,952 | — | 254,003 | — | — | 24,571 | 278,574 |
| Share-based compensation | — | — | 1,240,366 | — | — | 143,355 | 1,383,721 |
| Accretion of redeemable noncontrolling interests | — | — | — | (329,180) | — | — | (329,180) |
| Repurchase and retirement of ordinary shares | (603,726) | — | — | (6,376,964) | | — | (6,376,964) |
| Disposal of subsidiaries | — | — | — | — | — | (1,291,613) | (1,291,613) |
| **Balances at December 31, 2015** | **34,606,462** | **15** | **6,402,349** | **74,659,355** | **(806,056)** | **12,174** | **80,267,837** |
| Net income | — | — | — | 11,632,269 | — | (36,656) | 11,595,613 |
| Other comprehensive income (loss) | — | — | — | — | (976,910) | 1,239 | (975,671) |
| Exercise of share-based awards | 120,343 | — | 172,747 | — | — | — | 172,747 |
| Share-based compensation | — | — | 1,747,691 | — | — | 120 | 1,747,811 |
| Accretion of redeemable noncontrolling interests | — | — | — | (557,918) | — | — | (557,918) |
| **Balances at December 31, 2016** | **34,726,805** | **15** | **8,322,787** | **85,733,706** | **(1,782,966)** | **(23,123)** | **92,250,419** |
| **Balances at December 31, 2016, in US$** | | **2** | **1,198,731** | **12,348,222** | **(256,801)** | **(3,330)** | **13,286,824** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 1. ORGANIZATION, CONSOLIDATION AND PRESENTATION OF FINANCIAL STATEMENTS

Baidu, Inc. ("Baidu" or the "Company") was incorporated under the laws of the Cayman Islands on January 18, 2000.

As of December 31, 2016, the Company has subsidiaries incorporated in countries and jurisdictions including the People's Republic of China ("PRC"), Hong Kong, Japan, Cayman Islands and British Virgin Islands ("BVI"). As of December 31, 2016, the Company also effectively controls a number of variable interest entities ("VIEs") through the Primary Beneficiaries, as defined below. The VIEs include:

- Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), controlled through Baidu Online Network Technology (Beijing) Co., Ltd. ("Baidu Online"), one of the Company's wholly-owned subsidiaries;

- Beijing Perusal Technology Co., Ltd. ("Beijing Perusal"), controlled through Baidu Online; and

- Beijing BaiduPay Science and Technology Co., Ltd. ("BaiduPay"), controlled through Baidu Online; and

- Other VIEs controlled through Primary Beneficiaries other than Baidu Online.

The Company, its subsidiaries, VIEs and subsidiaries of the VIEs are hereinafter collectively referred to as the "Group". The Group offers internet search solutions and online marketing solutions, operates an online payment platform which enables users to make payments online, develops and markets scalable web/mobile application software and provides related services, offers transaction services and conducts online advertising business through online video contents broadcasting. The Group's principal geographic market is in the PRC. The Company does not conduct any substantive operations of its own, but conducts its primary business operations through its subsidiaries and VIEs in the PRC.

PRC laws and regulations prohibit or restrict foreign ownership of internet content, advertising, audio and video services, and mobile application distribution businesses. To comply with these foreign ownership restrictions, the Group operates its websites and primarily provides services subject to such restriction in the PRC through the VIEs, the PRC legal entities that were established or whose equity shares were held by the individuals authorized by the Group. The paid-in capital of the VIEs was mainly funded by the Group through loans extended to the authorized individuals who were the shareholders of the VIEs. The Group has entered into proxy agreements or power of attorney and exclusive equity purchase option agreement with the VIEs and nominee shareholders of the VIEs through the Group's subsidiaries ("Primary Beneficiaries"), which give the Primary Beneficiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Certain exclusive agreements have been entered into with the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, which obligate the Primary Beneficiaries to absorb a majority of the risk of loss from the VIEs' activities and entitle the Primary Beneficiaries to receive a majority of their residual returns. In addition, the Group has entered into certain agreements with the shareholders of the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, including loan agreements for the paid-in capital of the VIEs and share pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs.

Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Primary Beneficiaries and the VIEs through the aforementioned agreements with the shareholders of the VIEs. The shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Primary Beneficiaries. In addition, through the other exclusive agreements, which consist of operating agreements, technology consulting and services agreements and license agreements, the Primary

F-9

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Beneficiaries, by themselves or their wholly-owned subsidiaries in the PRC, demonstrate their ability and intention to continue to exercise the ability to absorb substantially all of the profits and all of the expected losses of the VIEs. The VIEs are subject to operating risks, which determine the variability of the Company's interest in those entities. Based on these contractual arrangements, the Company consolidates the VIEs as required by SEC Regulation S-X Rule 3A-02 and Accounting Standards Codification ("ASC") topic 810 ("ASC 810"), *Consolidation*, because the Company holds all the variable interests of the VIEs through the Primary Beneficiaries.

Unrecognized revenue-producing assets held by the VIEs include certain internet content provisions and other licenses, domain names and trademarks. The internet content provisions and other licenses, which are held by the VIEs that provide the relevant services, are required under relevant PRC laws, rules and regulations for the operation of Internet businesses in the PRC, and therefore are integral to the Company's operations.

The principal terms of the agreements entered into amongst the VIEs, their respective shareholders and the Primary Beneficiaries are further described below.

*Loan Agreements*

Pursuant to loan agreements amongst the shareholders of Baidu Netcom and Baidu Online, Baidu Online provided interest-free loans with an aggregate amount of RMB890.00 million (US$128.19 million) to the shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from sale of the shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The terms of the loan agreements will expire on December 30, 2025 at the earliest and can be extended with the written consent of both parties before its expiration.

Each of the loan agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above, except that the amount of the loans extended to the respective shareholders is RMB3.20 billion (US$460.45 million) and RMB216.72 million (US$31.21 million), respectively. The term of the loan agreements will expire on June 19, 2026 and October 17, 2026, respectively, and can be extended with the written consent of both parties before its expiration.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement amongst the shareholders of Baidu Netcom, Baidu Netcom and Baidu Online, the shareholders of Baidu Netcom irrevocably granted Baidu Online or its designated person(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The shareholders should remit to Baidu Online any amount that is paid by Baidu Online or its designated person(s) in connection with the purchased equity interest. Baidu Online or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions from Baidu Netcom to its shareholders should be paid to Baidu Online in full amount. Baidu Online would provide unlimited financial support to Baidu Netcom if, in the normal operation of business, Baidu Netcom would become in need of any form of reasonable financial support. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online should unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement will terminate when the shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or Baidu Netcom.

F-10

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Each of the exclusive equity purchase and transfer option agreements amongst Baidu Online and Beijing Perusal, BaiduPay and their respective shareholders contains substantially the same terms as those described above. Each of the agreements will terminate upon the shareholders of Beijing Perusal or BaiduPay have transferred all their equity interests in Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online, Beijing Perusal or BaiduPay.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom agreed to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu Online. The shareholders of Baidu Netcom have each executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. The proxy agreement would be in effect for an unlimited term unless terminated in writing by Baidu Online earlier. The power of attorney would be in effect for as long as the shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements amongst Baidu Online and the shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above. Each of the proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

*Operating Agreement*

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the power to appoint senior executives of Baidu Netcom. The shareholders of Baidu Netcom must appoint the candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of Baidu Online or Baidu Netcom expires and extension is denied by the relevant approval authorities.

Each of the operating agreements amongst Baidu Online and Beijing Perusal, BaiduPay and their respective shareholders contains substantially the same terms as those described above. Each of the agreements will be in effect for an unlimited term, until the term of business of Baidu Online, Beijing Perusal or BaiduPay expires and extension is denied by the relevant approval authorities.

*Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and

F-11

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom pays a monthly service fee to Baidu Online based upon a pre-agreed formula as defined in the agreement. Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Each of the exclusive technology consulting and services agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains substantially the same terms as those described above, except for the formula calculating the service fees. Baidu Netcom and Beijing Perusal should pay Baidu Online a monthly service fee equal to the product of the standard monthly fee for page view per thousand times multiplied by the actual times of page view for the month divided by 1,000; and the agreement between Baidu Online and BaiduPay does not provide a formula to calculate the quarterly fee, as BaiduPay has yet to achieve profitability. Each of the agreements will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom entered into a software license agreement and a web layout copyright license agreement (collectively, the "License Agreements"). Pursuant to the License Agreements between Baidu Online and Baidu Netcom, Baidu Online has granted to Baidu Netcom the right to use (including but not limited to) a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement were renewed since their original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Baidu Online entered into web layout copyright license agreements with both Beijing Perusal and BaiduPay. Each of the license agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains substantially the same terms as those described above. Each of the web layout copyright license agreements was renewed since original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and services agreement. If Baidu Netcom or its shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholders of Baidu Netcom agreed not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term or the fulfillment by Baidu Netcom and its shareholders of their respective obligations under the exclusive technology consulting and services agreement and the loan agreement.

Each of the equity pledge agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains substantially the same terms, including term period, as those described above.

F-12

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The equity pledges of BaiduPay described above are in the process of perfecting by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law, due to recent increases in registered capital.

Through the design of the aforementioned agreements, the shareholders of the VIEs effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the VIEs' economic performance. Baidu Online obtains the ability to approve decisions made by the VIEs and the ability to acquire the equity interests in the VIEs when permitted by PRC law. Baidu Online is obligated to absorb a majority of the expected losses from the VIEs' activities through providing unlimited financial support to the VIEs and is entitled to receive a majority of residual returns from the VIEs through the exclusive technology consulting and service fees. As a result of these contractual agreements, Baidu Online is determined to be the primary beneficiary of the VIEs. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Company and the VIEs through these contractual agreements, and the Company consolidates the VIEs through Baidu Online.

There are similar agreements entered into by Primary Beneficiaries besides Baidu Online with their VIEs and the respective shareholders, which resulted in a parent-subsidiary relationship between the Company and these VIEs.

In the opinion of the Company's legal counsel, (i) the ownership structure relating to the VIEs of the Company is in compliance with existing PRC laws and regulations; and (ii) the contractual arrangements with the VIEs and their shareholders are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability, through the Primary Beneficiaries, to enforce its rights under these contractual arrangements. Furthermore, shareholders of the VIEs may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC law, the Company may be subject to penalties, which may include but not be limited to, the cancellation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other penalties may result in a material and adverse effect on the Company's ability to conduct its operations. In such case, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

F-13

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The following tables set forth the financial statement balances and amounts of the VIEs and their subsidiaries were included in the consolidated financial statements after the elimination of intercompany balances and transactions among VIEs and their subsidiaries within the Group:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | 2016 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| **Assets** | | | |
| Current | | | |
| Cash and cash equivalents | 4,723,964 | 3,087,230 | 444,654 |
| Short-term investments | 2,453,680 | 6,660,861 | 959,364 |
| Accounts receivable, net | 2,881,902 | 3,851,220 | 554,691 |
| Others | 3,413,409 | 3,247,152 | 467,687 |
| | 13,472,955 | 16,846,463 | 2,426,396 |
| Non-current | | | |
| Fixed assets, net | 1,829,170 | 1,437,596 | 207,057 |
| Long-term investments, net | 2,802,774 | 4,615,850 | 664,821 |
| Others | 1,838,240 | 3,833,368 | 552,119 |
| | 6,470,184 | 9,886,814 | 1,423,997 |
| Total | 19,943,139 | 26,733,277 | 3,850,393 |
| **Third-party liabilities** | | | |
| Current | | | |
| Accounts payable and accrued liabilities | 10,680,518 | 12,695,344 | 1,828,510 |
| Customer advances and deposits | 1,367,536 | 1,653,538 | 238,159 |
| Others | 2,343,556 | 6,565,707 | 945,658 |
| | 14,391,610 | 20,914,589 | 3,012,327 |
| Non-current | 2,718,124 | 1,107,864 | 159,566 |
| Total | 17,109,734 | 22,022,453 | 3,171,893 |
| **Inter-company liabilities*** | | | |
| Inter-company payable to subsidiaries for technology consulting and service fees | 2,702,300 | 2,096,020 | 301,890 |
| Others | 1,271,024 | 2,729,302 | 393,101 |
| Total | 3,973,324 | 4,825,322 | 694,991 |

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Total revenues | 13,166,712 | 20,668,198 | 24,602,805 | 3,543,541 |
| Net loss | (352,125) | (4,398,409) | (463,610) | (66,774) |
| Net cash provided by operating activities | 1,392,039 | 3,563,049 | 2,736,579 | 394,149 |
| Net cash used in investing activities | (2,430,505) | (7,024,700) | (9,470,988) | (1,364,106) |
| Net cash provided by financing activities | 1,778,444 | 5,935,317 | 5,097,675 | 734,218 |

\*   Inter-company liabilities represent payable balances of each VIE due to its Primary Beneficiary. Amounts payable to other non-VIE subsidiaries within the Group were included in third party liabilities.

F-14

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

As of December 31, 2016, there was no pledge or collateralization of the VIEs' assets other than aforementioned equity pledge agreements. The amount of the net liabilities of the VIEs was RMB114.50 million (US$16.49 million) as of December 31, 2016. The creditors of the VIEs' third-party liabilities did not have recourse to the general credit of the Primary Beneficiaries in normal course of business. The Company did not provide or intend to provide financial or other supports not previously contractually required to the VIEs during the years presented.

### Basis of Presentation

The consolidated financial statements are prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

### Principles of Consolidation

The consolidated financial statements include the financial statements of the Company, its subsidiaries, VIEs and subsidiaries of the VIEs. All inter-company transactions and balances between the Company, its subsidiaries, VIEs and subsidiaries of the VIEs are eliminated upon consolidation. The Company included the results of operations of acquired businesses from the respective dates of acquisition.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the accounts receivable allowances, credit loss allowance for micro loan receivables, fair values of options to purchase the Company's or its subsidiaries' ordinary shares, fair values of certain debt and equity investments, amortization and net realizable value of licensed copyrights, impairment of long-lived assets, long-term investments and goodwill, the purchase price allocation and fair value of noncontrolling interests with respect to business combinations and acquisition of equity method investees, and deferred tax valuation allowance, redeemable noncontrolling interests among others. Management bases the estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

### Comparative Information

Certain items in the consolidated financial statements have been adjusted to conform with the current year's presentation to facilitate comparison.

### Currency Translation for Financial Statements Presentation

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.9430 per US$1.00 on December 30, 2016, the last business day in fiscal year 2016, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

F-15

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Foreign Currency*

The Company's functional currency is the US$. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC topic 830 ("ASC 830"), *Foreign Currency Matters*. The Company uses the RMB as its reporting currency. The Company uses the average exchange rate for the year and the exchange rate at the balance sheet date to translate its operating results and financial position, respectively. Any translation gains (losses) are recorded in other comprehensive income (loss). Transactions denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing on the transaction dates. Assets and liabilities denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in earnings as a component of other income.

*Segment Reporting*

The Company historically had only one single reportable segment because the Company's chief operating decision maker ("CODM") formerly relied on the consolidated results of operations when making decisions on allocating resources and assessing performance of the Company. Beginning in the quarter ended June 30, 2015, the Company changed its reportable segments as a result of significant growth in the Company's operations and expansion of services to multiple businesses in recent years. The Company's chief executive officer, who has been identified as the CODM, now reviews the operating results of different service lines in order to allocate resources and assess the Company's performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280 ("ASC 280"), *Segment Reporting*.

*Business Combinations*

The Company accounts for its business combinations using the purchase method of accounting in accordance with ASC topic 805 ("ASC 805"), *Business Combinations*. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Company acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, the Company remeasures its previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal

F-16

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Company determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

### Cash and Cash Equivalents

Cash and cash equivalents

Cash and cash equivalents primarily consist of cash, money market funds investment, investments in interest bearing demand deposit accounts, time deposits, and highly liquid investments with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

Restricted cash

Restricted cash mainly consists of the cash reserved in escrow accounts for the remaining payments in relation to compensation for post-combination services, and the cash balances deposited at certain banks as online payment service deposits.

### Accounts Receivable, net of allowance

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. The Company generally does not require collateral from its customers.

The Company maintains allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, the Company considers many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### Receivables from Online Payment Agencies, net of allowance

Receivables from online payment agencies are cash due from the third-party online payment service providers for clearing transactions. The cash was paid or deposited by customers or users through these online payment agencies for services provided by the Company. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Receivable balances are written off after all collection efforts have been exhausted. The balances are included in "Other current assets, net" on the consolidated balance sheets. As of December 31, 2015 and 2016, no allowance for doubtful accounts was provided for the receivables from online payment agencies.

### Loan and Interest Receivables, net of allowance

Loan and interest receivables consist primarily of micro loans to individual borrowers. Such amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by the Company to the borrowers related to the

F-17

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

micro loans generally range from one month to thirty-six months. The cash flows related to micro loans are included within the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represent the Company's best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of debts. The Company considers many factors in assessing the collectability of the loan receivables including, but not limited to, the age of the amounts due, the borrower's payment history, creditworthiness, financial conditions of the customers, purposes and terms of the loans, and the economic conditions to determine the allowance of credit loss.

### *Investments*

Short-term investments

All highly liquid investments with original maturities of greater than three months, but less than twelve months, are classified as short-term investments. Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments. The Company accounts for short-term investments in accordance with ASC topic 320 ("ASC 320"), *Investments – Debt and Equity Securities.* The Company classifies the short-term investments in debt and equity securities as "held-to-maturity", "trading" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the short-term investments are determined on a specific identification method, and such gains and losses are reflected in earnings during the period in which gains or losses are realized.

The securities that the Company has the positive intent and the ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. When the Company intends to sell an impaired debt security or it is more-likely-than-not that it will be required to sell prior to recovery of its amortized cost basis, an other-than-temporary impairment is deemed to have occurred. In these instances, the other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made. When the Company does not intend to sell an impaired debt security and it is more-likely-than-not that it will not be required to sell prior to recovery of its amortized cost basis, the Company must determine whether or not it will recover its amortized cost basis. If the Company concludes that it will not, an other-than-temporary impairment exists and that portion of the credit loss is recognized in earnings, while the portion of loss related to all other factors is recognized in other comprehensive income.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive income (loss). Realized gains or losses are included in earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities is recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

F-18

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Long-term investments

The Company's long-term investments consist of cost method investments, equity method investments, held-to-maturity investments with original and remaining maturities of greater than 12 months, and available-for-sale investments.

In accordance with ASC subtopic 325-20 ("ASC 325-20"), *Investments-Other: Cost Method Investments*, the Company carries at cost its investments in investees which do not have readily determinable fair value and the Company does not have significant influence. The Company only adjusts for other-than-temporary declines in fair value and distributions of earnings that exceed the Company's share of earnings since its investment. Management regularly evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

Investments in entities in which the Company can exercise significant influence but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323 ("ASC 323"), *Investments-Equity Method and Joint Ventures*. Under the equity method, the Company initially records its investment at cost and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Company subsequently adjusts the carrying amount of its investment to recognize the Company's proportionate share of each equity investee's net income or loss into earnings after the date of investment. The Company will discontinue applying the equity method if an investment (and additional financial supports to the investee, if any) has been reduced to zero. If the Company is not required to advance additional funds to an investee and the equity-method investment in ordinary shares is reduced to zero, the Company would recognize losses based on its percentage of the investment with the same liquidation preference for further investments made with a higher liquidation preference than ordinary shares. Such losses are first applied to those investments of a lower liquidation preference before being further applied to the investments of a higher liquidation preference. The Company evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

Long-term held-to-maturity investments and long-term available-for-sale investments are measured in the same manner as short-term held-to-maturity investments and short-term available-for-sale investments, respectively.

*Transfers of Financial Assets*

The Company accounts for transfers of financial assets in accordance with ASC Topic 860 ("ASC 860"), *Transfers and Servicing*. For a transfer of financial assets to be considered as a sale, the assets would be removed from the Company's consolidated balance sheets. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured borrowing, the assets remain on the consolidated balance sheets and the sale proceeds are recognized as the Company's liability.

Pursuant to ASC 860, the transactions of Baidu Wealth Management do not constitute a sale of the underlying securities for accounting purposes. The Company accounts these transactions as secured borrowings included in "Accounts payable and accrued liabilities" on the consolidated balance sheets, and assets pledged are accounted for as trading securities included in short term investments on the consolidated balance sheets. The cash flows

F-19

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

related to purchases and maturities of trading securities investments are included within the cash flows from investing activities category, and the proceeds and payments related to the sale of financial products are included within the cash flow from financing activities in the consolidated statement of cash flows.

### *Fair Value Measurements of Financial Instruments*

Financial instruments are in the form of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, loan and interest receivables, amounts due from and due to related parties, other receivables, long-term investments, short-term loans, accounts payable and accrued liabilities, customer advances and deposits, derivative instruments, capital lease obligation, notes payable and long-term loans. The carrying amounts of these financial instruments, except for long-term cost method investments, long-term equity method investments, long-term available-for-sale investments, long-term held-to-maturity investments, derivative instruments, notes payable and long-term loans, approximate their fair values because of their generally short maturities. Available-for-sale investments and derivative instruments were adjusted to fair value at each reporting date. The carrying amounts of long-term held-to-maturity investments and long-term loans approximate their fair values due to the fact that the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities. The fair value of notes payable is either extracted directly from the quoted market price or evaluated using an equivalent market interest rate for a similar bond without a conversion option with the assistance of a third party valuation firm.

### *Research, Development and Computer Software*

#### Capitalization of software developed for internal use

The Company capitalized certain internal use software development costs in accordance with ASC subtopic 350-40 ("ASC 350-40"), *Intangibles-Goodwill and Other: Internal-Use Software*, amounting to nil, RMB32.73 million and RMB4.02 million (US$579.26 thousand) for the years ended December 31, 2014, 2015 and 2016, respectively. The Company capitalizes certain costs relating to software acquired, developed, or modified solely to meet the Company's internal requirements and for which there are no substantive plans to market the software. These costs mainly include payroll and payroll-related costs for employees who are directly associated with and who devote time to the internal-use software projects during the application development stage. Capitalized internal-use software costs are included in "Intangible assets, net". The amortization expense for capitalized software costs amounted to RMB28.24 million, RMB13.24 million and RMB6.74 million (US$970.52 thousand) for the years ended December 31, 2014, 2015 and 2016, respectively. The unamortized amount of capitalized internal use software development costs was RMB32.73 million and RMB30.01 million (US$4.32 million) as of December 31, 2015 and 2016, respectively.

#### Research and development expenses

Research and development expenses consist primarily of personnel-related costs. The Company expensed substantially all development costs incurred in the research and development of new products and new functionality added to the existing products except for certain internal use software development costs.

F-20

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

*Fixed Assets*

Fixed assets are stated at cost less accumulated depreciation. Depreciation is recorded on a straight-line basis over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Office building | – 45 years |
| Office building related facility, machinery and equipment | – 15 years |
| Computer equipment | – 3 or 5 years |
| Office equipment | – 3 or 5 years |
| Vehicles | – 5 years |
| Leasehold improvements | – over the shorter of lease terms or estimated useful lives of the assets |

Fixed assets have no estimated residual value except for the office building and its related facility, machinery and equipment, which have an estimated residual value of 4% of the cost.

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful life of fixed assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in earnings.

All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when they are ready for their intended use.

Interest costs are capitalized if they are incurred during the acquisition, construction or production of a qualifying asset and such costs could have been avoided if expenditures for the assets have not been made. Capitalization of interest costs commences when the activities to prepare the asset are in progress and expenditures and borrowing costs are being incurred. Interest costs are capitalized until the assets are ready for their intended use. Interest costs capitalized for the years ended December 31, 2014, 2015 and 2016 were insignificant.

*Licensed Copyrights of Video Content*

The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net", respectively, at the lower of amortized cost or net realizable value. In accordance with ASC topic 920 ("ASC 920"), *Entertainment-Broadcasters*, costs incurred in purchased copyrights of video content are capitalized and amortized over the shorter of the license period or projected useful life of the video content. Any licensed copyrights that do not meet the criteria to be recorded are included in the commitments disclosure. The Company amortizes the licensed copyrights in "Cost of revenues" on an accelerated or on a straight line basis, as appropriate. If expectations of the usefulness of a video content are revised downward, the unamortized cost is written down to the estimated net realizable value. A write-down from unamortized cost to a lower estimated net realizable value establishes a new cost basis.

*Goodwill and Intangible Assets*

Goodwill

The Company assesses goodwill for impairment in accordance with ASC subtopic 350-20 ("ASC 350-20"), *Intangibles – Goodwill and Other: Goodwill*, which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

F-21

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

As of December 31, 2016, the Company had three reporting units, representing Search Services, Transaction Services and online video business ("iQiyi").

The Company has the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If the Company believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and the Company is not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then the Company must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

The Company performed a qualitative assessment for the Search Services reporting unit. Based on the requirements of ASC 350-20, the Company evaluated all relevant factors including, but not limited to, macroeconomic conditions, industry and market conditions, financial performance, and the share price of the Company. The Company weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of each of the reporting units, and further impairment testing on goodwill was unnecessary as of December 31, 2016.

The Company elected to assess goodwill for impairment using the two-step process for Transaction Services and iQiyi reporting units. Significant management judgment is involved in determining these estimates and assumptions, and actual results may differ from those used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit which could trigger future impairment. The judgment in estimating the fair value of reporting units includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expenses growth rates, future capital expenditure and working capital level, as well as discount rate determined by Weighted Average Cost of Capital approach and the selection of comparable companies operating in similar businesses. The Company also reviewed marketplace data to assess the reasonableness of assumptions such as discount rate, operating margins, and working capital level. The fair value of Transaction Services and iQiyi exceeded their carrying amounts, and therefore goodwill related to these reporting units were not impaired and the Company was not required to perform further testing.

Intangible assets

Intangible assets with finite lives are carried at cost less accumulated amortization. Land use rights are amortized using a straight-line method over the shorter of their estimated economic lives or the terms of the related land use right contracts. All other intangible assets with finite lives except for the sublicensing rights obtained from barter transactions and certain licensed copyrights are amortized using the straight-line method over the estimated economic lives.

F-22

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Intangible assets have weighted average economic lives from the date of purchase as follows:

| | |
|---|---|
| Land use rights | – 50 years |
| Customer relationships | – 3.3 years |
| Software | – 4.1 years |
| Trademarks | – 10.0 years |
| User list | – 3.5 years |
| Licensed copyrights of video contents | – 3.2 years |
| Others | – 5.9 years |

Intangible assets with an indefinite useful life are not amortized and are tested for impairment annually or more frequently if events or changes in circumstances indicate that they might be impaired in accordance with ASC subtopic 350-30 ("ASC 350-30"), *Intangibles-Goodwill and Other: General Intangibles Other than Goodwill.*

### Impairment of Long-Lived Assets Other Than Goodwill

The Company evaluates long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360 ("ASC 360"), *Property, Plant and Equipment*. When such events occur, the Company assesses the recoverability of the asset group based on the undiscounted future cash flow the asset group is expected to generate and recognizes an impairment loss when estimated undiscounted future cash flow expected to result from the use of the asset group plus net proceeds expected from disposition of the asset group, if any, is less than the carrying value of the asset group. If the Company identifies an impairment, the Company reduces the carrying amount of the asset group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Company uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

### Revenue Recognition

The Company recognizes revenue in accordance with ASC topic 605 ("ASC 605"), *Revenue Recognition.* Revenue is recognized when the following four revenue recognition criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been provided, (iii) the selling price is fixed or determinable, and (iv) collectability is reasonably assured.

Performance-based online marketing services

*Cost-per-click*

The Company's auction-based pay-for-performance ("P4P") platform enables a customer to place its website link and related description on the Company's search result list on the website which could be accessed through personal computer or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on the Company's website and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's

F-23

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

relevance to the keyword searched. Customers pay the Company only when a user clicks on one of its website links. Other than the auction-based P4P platform, the Company has certain vertical platforms from which it generates revenue through pre-determined prices per click. Revenue is recognized when all of the revenue recognition criteria set forth in ASC 605 are met, which is generally when a user clicks on one of the customer-sponsored website links.

*Other performance-based online marketing services*

To the extent the Company provides online marketing services based on performance criteria other than cost-per-click, such as the number of downloads (and user registration) of mobile applications, the number of incremental end users and the total incremental revenue generated, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

Display-based online advertising services

For display-based online advertising services such as text links, banners, icons or other forms of graphical advertisements in the websites or mobile applications, the Company recognizes revenue in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on a specified webpage or mobile applications, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements. For certain display-based contractual agreements, the Company may also provide certain performance guarantees, in which cases revenue is recognized at the later of the completion of the time commitment or performance guarantee.

Revenue-sharing services

The Company provides certain services as an agent by offering goods and services provided by third-party partners. The revenues from such services are presented on a net basis as the Company is not the primary obligor in the arrangement in accordance with ASC subtopic 605-45 ("ASC 605-45"), *Revenue Recognition: Principal Agent Consideration*. The Company recognizes revenue share for provision of online promotional services based on a negotiated amount or a fixed rate representing the amount billed to registered users less the amount paid to third-party partners, when all the revenue recognition criteria set forth in ASC 605 are met.

*Online game services*

The Company operates online game platforms on which registered users can access games provided by third-party game developers. The rights and obligations of each party to the arrangement indicate that the Company is acting as an agent because the game developer is the primary obligor in the arrangement in accordance with ASC 605-45. The Company recognizes the shared revenue from these online promotional services, on a net basis, based on the ratios pre-determined with the online game developers when all the revenue recognition criteria set forth in ASC 605 are met, which is generally when the user purchases virtual currencies issued by the game developers.

*Services provided by Baidu Nuomi*

The Company generates revenue from services as a marketing agent by offering goods and services provided by third-party merchant partners at a discount through the website or mobile application that connects merchants to users. The Company presents revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, in accordance with ASC 605-45. The Company acts as an agent rather than as the

F-24

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

principal in the delivery of the products or services as it does not assume the risks and rewards of ownership of products nor is it responsible for the actual fulfillment of services. Both of these are the responsibilities of the merchants. The Company recognizes revenue when all of the criteria prescribed in ASC 605 are met, which is generally when the merchants provide the services or when the products are delivered to the users. Since the Company's paying users have the ability to request for a full refund before redemption for the products or services offered by the merchants, the underlying sale from which the Company earns the related commission revenue as an agent is not culminated until its paying users actually redeem.

*Services provided by Baidu Deliveries*

The Company generates revenue from takeout delivery services as a marketing agent by offering foods, drinks and snacks provided by third-party merchant partners at a discount through the website or mobile application that connects merchants to users. The Company presents revenue on a net basis, representing the amount billed to registered users less the amount paid to merchants, in accordance with ASC 605-45. The Company acts as an agent rather than as the principal in the delivery of the products or services as it does not assume the risks and rewards of ownership of products nor is it responsible for the actual fulfillment of services. Both of these are the responsibilities of the merchants. The Company recognizes revenue when all of the criteria prescribed in ASC 605 are met, which is generally when the foods, drinks or snacks are delivered to the users.

The Company also provides delivery services and charges a fee to users if the merchants do not provide such services. The Company recognizes delivery fees from users as part of its takeout delivery services revenue. The costs for providing the delivery services are included in cost of revenues.

Subscription services

The Company provides subscription services which requires the Company to stand ready to provide registered users with access to online documents sharing platform, personal cloud computing service and premium content provided by iQiyi. Access to these services are available to subscribers throughout the subscription period, and revenue is recognized ratably as services are provided over the subscription period.

Online marketing services involving Baidu Union

Baidu Union is the program through which the Company expands distribution of its customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. The Company makes payments to Baidu Union members for acquisition of traffic. The Company recognizes gross revenue for the amount of fees it receives from its customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

Barter transactions

*Nonmonetary exchanges of licensed copyrights of video contents*

The Company enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies ("OVBC") from time to time. The exchanged licensed copyrights provide rights for each respective party only to broadcast the licensed copyrights received on its own website; meanwhile, each party retains the right to continue broadcasting and/or sublicense the rights to the content it surrendered in the exchange. The Company accounts for these nonmonetary exchanges in accordance with ASC topic 845 ("ASC 845"), *Nonmonetary Transactions*, and records the transaction based on the fair value of the asset surrendered.

F-25

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The Company estimates the fair value of the contents surrendered by deriving an "average transaction price" using actual cash sublicensing transactions for the same content with comparable counterparties, when available. The comparability of counterparties is assessed based on a number of factors, including relative size and scale, as well as market share of online viewership traffic they generate. In instances when the Company does not have actual cash sublicensing transactions for the same content as reference points, the estimates of fair value of the content surrendered is derived using an average transaction price of cash sub-licenses of content that is similar in nature with comparable counterparties. To assess whether the content is similar in nature to the bartered content, the Company considers, amongst others, (i) the type and the popularity of the content (i.e. movie, television series); (ii) the geographic origination source of the content; and (iii) the unique visitor statistics for each OVBC.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926 ("ASC 926"), *Entertainment – Films*. The Company recognized barter sublicensing revenues of RMB366.25 million and RMB423.80 million (US$61.04 million) and related costs of RMB277.82 million and RMB369.24 million (US$53.18 million) for the years ended December 31, 2015 and 2016, respectively. The barter sublicensing revenues and the related cost of barter sublicensing revenues were insignificant for the year ended December 31, 2014.

*Other nonmonetary exchanges*

The Company engages in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follows the guidance set forth in ASC 845. While nonmonetary transactions are generally recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. The Company also engages in certain advertising barter transactions and follows the guidance set forth in ASC subtopic 605-20 ("ASC 605-20"), *Revenue Recognition: Services*. The advertising barter transactions generally are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which is generally nil. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

Other revenue recognition related policies

In accordance with ASC subtopic 605-25 ("ASC 605-25"), *Revenue Recognition: Multiple-Deliverable Revenue Arrangements,* for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and occur at different time, the Company would evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered a separate unit of accounting, the Company allocates the total consideration of the arrangements based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence ("VSOE") of selling price, third-party evidence ("TPE") of selling price, or management's best estimate of the selling price ("BESP"), and recognizes revenue as each service deliverable is provided. The Company considers all reasonably available information in determining the BESP, including both market and entity-specific factors. For the arrangements with deliverable items to be determined as a single unit of accounting due to lack of value on a standalone basis or a contingent revenue feature, the Company recognizes the revenue at the point of last deliverable item has been provided.

F-26

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The Company delivers some of its online marketing services to end customers through engaging third-party distributors. In this context, the Company may provide cash incentives to distributors. The cash incentives are accounted for as reduction of revenue in accordance with ASC subtopic 605-50 ("ASC 605-50"), *Revenue Recognition: Customer Payments and Incentives*.

The Company provides sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. The Company accounts for these award credits granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits is recorded as deferred revenue, based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

The Company provides coupons and credits to the end users in certain businesses, including services provided by Baidu Nuomi and Baidu Deliveries, for expanding market share. The coupons and credits can be used to reduce the purchase price or to redeem for gifts. Coupons issued to end users as a result of a concurrent sale are recognized as reductions of the corresponding revenue in accordance with ASC 605-50. Coupons issued to end users for free and without concurrent sales are recognized as advertising and promotional expenses upon the actual usage of the coupons. Credits provided to end users for redeeming gifts in the future are accrued as advertising and promotional expenses upon issuance.

### Cost of Revenues

Cost of revenues consists primarily of sales taxes (including business tax and value-added tax) and surcharges, traffic acquisition costs, bandwidth costs, depreciation, content costs, payroll and related costs of operations.

The Company incurs sales taxes and surcharges in connection with the provision of online marketing services, technical and consultative service fees charged by its subsidiaries to VIEs and other taxable services in the PRC. In accordance with ASC 605-45, the Company includes the sales tax and surcharges incurred on its online marketing revenues in cost of revenues. The sales tax and surcharges in cost of revenues for the years ended December 31, 2014, 2015 and 2016 were RMB3.60 billion, RMB4.64 billion and RMB4.72 billion (US$679.60 million), respectively. Traffic acquisition costs represent the amounts paid or payable to Baidu Union members who direct search queries to the Company's websites or distribute the Company's customers' paid links through their properties. These payments are primarily based on revenue sharing arrangements under which the Company pays its Baidu Union members and other business partners a percentage of the fees it earns from its online marketing customers.

### Advertising and Promotional Expenses

Advertising and promotional expenses, including advertisements through various forms of media and kinds of marketing and promotional activities, are included in "Selling, general and administrative expense" in the consolidated statements of comprehensive income and are expensed when incurred. Advertising and promotional expenses for the years ended December 31, 2014, 2015 and 2016 were RMB4.93 billion, RMB9.80 billion and RMB7.74 billion (US$1.12 billion), respectively.

### Government Subsidies

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local

F-27

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

governments. For certain government subsidies, there are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies of non-operating nature with no further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government subsidies with certain operating conditions are recorded as liabilities when received and will be recorded as operating income when the conditions are met.

*Leases*

Leases are classified as either capital or operating leases. Leases that transfer substantially all the benefits and risks incidental to the ownership of assets are accounted for as capital leases as if there was an acquisition of an asset and incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred.

*Income Taxes*

The Company recognizes income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. The Company records a valuation allowance against the amount of deferred tax assets that it determines is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date.

The Company applies the provisions of ASC topic 740 ("ASC 740"), *Income Taxes*, in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company has elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2014, 2015 and 2016, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

The Company early adopted ASU No. 2015-17, *Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes*, which required that all deferred tax liabilities and assets be classified as noncurrent in the consolidated balance sheet since the fourth quarter of 2015 on a retrospective basis.

*Share-based Compensation*

The Company accounts for share-based compensation in accordance with ASC topic 718 ("ASC 718"), *Compensation-Stock Compensation*. The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award

F-28

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the replacement award, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of the original award, using either the original term or the new term, whichever results in higher expenses for each reporting period.

The Company accounts for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50 ("ASC 505-50"), *Equity: Equity-based Payments to Non-Employees*. The Company uses the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### Earnings Per Share ("EPS")

The Company computes earnings per Class A and Class B ordinary shares in accordance with ASC topic 260 ("ASC 260"), *Earnings Per Share*, using the two-class method. Under the provisions of ASC 260, basic net income per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. The Company accounts for the accretion of the redeemable noncontrolling interests in the calculation of income available to ordinary shareholders of the Company used in the earnings per share calculation.

Diluted net income per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, restricted shares subject to forfeiture, and contracts that may be settled in the Company's stock or cash. The dilutive effect of outstanding stock options and restricted shares is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted net income per share of Class A ordinary shares assumes the conversion of Class B ordinary shares, while the diluted net income per share of Class B ordinary shares does not assume the conversion of such shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting rights. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted net income per share of Class A ordinary shares, the undistributed earnings are equal to net income for that computation.

For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

### Contingencies

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, if such estimate can be made and material, or states that such estimate is immaterial if it can be estimated but immaterial, or discloses that an estimate cannot be made. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involves complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

### Concentration of Risks

Concentration of credit risk

Financial instruments that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, amounts due from related parties and loans receivables. As of December 31, 2016, the Company has RMB90.16 billion (US$12.99 billion) in cash and cash equivalents, restricted cash, and short-term investments, 90.22% and 9.78% of which are held by financial institutions in the PRC and international financial institutions outside of the PRC, respectively. The Company's total cash and cash equivalents, restricted cash, and short-term investments held at China Merchants Bank, Bank of China and China Construction Bank exceeded 10%, representing 33.79%, 19.53% and 16.40% of the Company's total cash and cash equivalents, restricted cash, and short-term investments as of December 31, 2016, respectively.

PRC state-owned banks, such as Bank of China, are subject to a series of risk control regulatory standards, and PRC bank regulatory authorities are empowered to take over the operation and management when any of those banks faces a material credit crisis. The Company does not foresee substantial credit risk with respect to cash and cash equivalents, restricted cash and short-term investments held at the PRC state-owned banks. Meanwhile, China does not have an official deposit insurance program, nor does it have an agency similar to what was the Federal Deposit Insurance Corporation (FDIC) in the U.S. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable international financial institutions with high rating rates to place its foreign currencies. The Company regularly monitors the rating of the international financial institutions to avoid any potential defaults. There has been no recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and derived from revenue earned from customers and agents in China, which are exposed to credit risk. The risk is mitigated by credit evaluations the Company performs on its customers and its ongoing monitoring process of outstanding balances. The Company maintains reserves for estimated credit losses and these losses have generally been within its expectations. As of December 31, 2016 and 2015, the Company had no single customer with a receivable balance exceeding 10% of the total accounts receivable balance.

F-30

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

No customer or any Baidu Union member generated greater than 10% of total revenues in any of the years presented.

Amounts due from related parties are typically unsecured and repayable on demand. In evaluating the collectability of the amounts due from related parties balance, the Company considers many factors, including the related parties' repayment history and their credit-worthiness. An allowance for doubtful accounts is made when collection of the full amount is no longer probable.

Business and economic risks

The Company participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

The Company's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

Currency convertibility risk

Substantially all of the Company's businesses are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through Bank of China or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

Foreign currency exchange rate risk

The functional currency and the reporting currency of the Company are the US$ and RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, short-term investments, long-term investments and notes payable denominated in the US$. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The appreciation of the US$ against RMB was approximately 7.18% in 2016. Most of revenues and costs of the Company are denominated in RMB, while a portion of cash and cash equivalents, short-term financial assets, investments and notes payable are denominated in U.S. dollars. Any significant revaluation of RMB may materially and adversely affect the Company's cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, the ADS in US$.

*Derivative Instruments*

ASC topic 815 ("ASC 815"), *Derivatives and Hedging*, requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other

F-31

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

comprehensive income depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings. The estimated fair values of derivative instruments are determined at discrete points in time based on the relevant market information. These estimates are calculated with reference to the market rates using industry standard valuation techniques. The fair value of the derivative instruments held by the Company was insignificant for all years presented.

*Recent Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09 ("ASU 2014-09"), *Revenue from Contracts with Customers.* ASU 2014-09 supersedes the revenue recognition requirements in ASC 605, and requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. ASU 2014-09 is originally effective for the annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. ASU 2015-14, *Revenue from Contracts with Customers*, defers the effective date of ASU 2014-09 by one year. As a result, ASU 2014-09 is effective for annual reporting periods beginning after December 15, 2017 and interim periods therein. Early adoption is permitted to the original effective date. The Company currently anticipates adopting the new standard effective January 1, 2018, using the modified retrospective method. The cumulative effect of initially applying the guidance will be recognized at the date of initial application. The Company is still in the process of completing a detailed analysis of the impact this guidance will have on its consolidated financial statements and related disclosures.

In January 2016, the FASB issued ASU No. 2016-01 ("ASU 2016-01"), *Financial Instruments.* ASU 2016-01 requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. An entity may choose to measure equity investments that do not have readily determinable fair values at cost minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. ASU 2016-01 also simplifies the impairment assessment of equity investments without readily determinable fair values by requiring a qualitative assessment to identify impairment. When a qualitative assessment indicates that impairment exists, an entity is required to measure the investment at fair value. For public business entities, the amendments are effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements

In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases.* ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13 ("ASU 2016-13"), *Financial Instruments – Credit Losses (Topic 326), Measurement of Credit Losses on Financial Instrument*s. ASU 2016-13 changes the impairment model for most financial assets and certain other instruments. The standard will replace "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the

F-32

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

other-than-temporary impairment model. The standard is effective for public business entities for annual periods beginning after December 15, 2019, and interim periods therein. Early adoption is permitted. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements

In November 2016, the FASB issued Accounting Standards Update No. 2016-18 ("ASU 2016-18"), *Statement of Cash Flows (Topic 230): Restricted Cash*. ASU 2016-18 requires companies to include amounts generally described as restricted cash and restricted cash equivalents in cash and cash equivalents when reconciling beginning-of-period and end-of-period total amounts shown on the statement of cash flows. This standard is effective for public business entities in the first quarter of 2018. Early adoption is permitted. The Company is currently evaluating the effect that this guidance will have on our consolidated financial statements and related disclosures.

In January 2017, the FASB issued Accounting Standards Update No. 2017-04("ASU 2017-04"), *Intangibles – Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*. ASU 2017-04 eliminates the requirement to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, entities will record an impairment charge based on the excess of a reporting unit's carrying amount over its fair value. This standard is effective for public business entities in the first quarter of 2020. Early adoption is permitted. The Company is currently evaluating the effect that this guidance will have on our consolidated financial statements and related disclosures.

3.  **BUSINESS COMBINATIONS**

*Business Combinations in 2016:*

No business combinations occurred during the year ended December 31, 2016.

*Business Combinations in 2015:*

During the year ended December 31, 2015, the Company completed two business combinations, which the Company expected to complement its existing businesses and achieve significant synergies. The total purchase consideration was RMB331.95 million. The acquired entities were considered insignificant, both individually and in aggregate. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

Neither the results of operations since the acquisition dates nor the pro forma results of operations of the acquirees were presented because the effects of these business combinations, both individually and in aggregate, were not significant to the Company's consolidated results of operations.

*Business Combinations in 2014:*

During the year ended December 31, 2014, the Company completed several business combinations, which the Company expected to complement its existing businesses and achieve significant synergies. The acquired entities were considered insignificant, both individually and in aggregate. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

The Company completed the valuations necessary to assess the fair values of the tangible and intangible assets acquired and liabilities assumed and the fair value of noncontrolling interests, resulting from which the amount of goodwill was determined and recognized as of the respective acquisition dates. The following table

F-33

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

summarizes the estimated aggregate fair values of the assets acquired, liabilities assumed and the noncontrolling interests as of the respective dates of acquisition:

| | RMB |
|---|---|
| | (In thousands) |
| Purchase consideration | 398,410 |
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | (95,961) |
| Intangible assets, net | 249,452 |
| Deferred tax liabilities, non-current | (67,945) |
| Pre-existing equity interests | (91,677) |
| Noncontrolling interests | (150,000) |
| Goodwill | 554,541 |

Goodwill, which is not tax deductible, is primarily attributable to the synergies expected to be achieved from the acquisitions.


4.  INVESTMENTS

*Short-term Investments*

As of December 31, 2016, all of the short-term held-to-maturity investments were time deposits in commercial banks with maturities of less than one year. The short-term available-for-sale investments are debt securities with maturities of less than one year purchased from commercial banks and other financial institutions, and equity securities of a publicly listed company. The short-term trading investments are debt securities the Company intends to trade within one year.

During the years ended December 31, 2014, 2015 and 2016, the Company recorded interest income from its short-term investments of RMB1.81 billion, RMB2.20 billion and RMB2.32 billion (US$334.78 million) in the consolidated statements of comprehensive income, respectively.


*Long-term Investments*

The Company's long-term investments consist of cost method investments, equity method investments, held-to-maturity investments with original and remaining maturities of greater than 12 months and available-for-sale investments.


Cost method investments

The carrying amount of cost method investments was RMB7.30 billion and RMB12.94 billion (US$1.86 billion) as of December 31, 2015 and 2016, respectively. The Company's investments in preferred shares of the investees are not considered in-substance common stock since these preferred shares contain terms such as dividend and liquidation preferences over the ordinary shares of the investees. In addition, the preferred shares do not have mandatory redemption features nor readily determinable fair values. As a result, these investments in preferred shares are accounted for under the cost method.

In 2016, the Company exchanged its equity shares of Uber (Cayman), Ltd. ("Uber China"), with Xiaoju Kuaizhi, Inc. ("Didi"), a China based ridesharing company,upon the merger of the two companies. The Company recognized a total gain of RMB1.99 billion (US$287.02 million) in "Other income, net", and the retained investment in Didi was accounted for as a cost method investment.

F-34

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Equity method investments

*Equity Investment in Ctrip.com International, Ltd. ("Ctrip")* On October 26, 2015, the Company completed a share exchange transaction with Ctrip ("Ctrip transaction"), a company engaged in the online travelling business. The Company exchanged its beneficially owned 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of its majority-owned subsidiary Qunar Cayman Islands Limited ("Qunar") in exchange for 11,488,381 newly-issued ordinary shares of Ctrip. The Company recognized a total gain of RMB24.42 billion from the Ctrip transaction in "Other income, net" in the consolidated statements of comprehensive income for the year ended December 31, 2015. In 2016, further shares were acquired by the Company, and as of December 31, 2016 the Company held 20.49% of Ctrip's outstanding shares. The Company accounts for the investment in Ctrip as an equity method investment in accordance with ASC 323 due to its significant influence over the entity.

The following tables set forth the summarized financial information of Ctrip:

|  | As of September 30,* | | |
| --- | --- | --- | --- |
|  | **2015** | **2016** | **2016** |
|  | **RMB** | **RMB** | **US$** |
|  |  | **(In thousands)** |  |
| Current assets | 25,750,458 | 52,222,057 | 7,521,541 |
| Non-current assets | 23,500,517 | 83,336,195 | 12,002,909 |
| Current liabilities | 18,873,779 | 33,173,779 | 4,778,018 |
| Non-current liabilities | 17,492,002 | 31,127,826 | 4,483,339 |
| Noncontrolling interests | 1,063,306 | 3,678,212 | 529,773 |

|  | For the twelve months ended September 30,* | | | |
| --- | --- | --- | --- | --- |
|  | **2014** | **2015** | **2016** | **2016** |
|  | **RMB** | **RMB** | **RMB** | **US$** |
|  |  | **(In thousands)** | | |
| Total revenues | 7,280,123 | 10,484,967 | 17,641,715 | 2,540,935 |
| Gross profit | 4,962,670 | 7,072,995 | 12,668,586 | 1,824,656 |
| Income (loss) from operations | 433,052 | (115,056) | (1,680,672) | (242,067) |
| Net income | 625,520 | 2,052,526 | (2,176,932) | (313,543) |
| Net income attributable to the investees | 728,644 | 2,207,503 | (2,000,291) | (288,102) |

\*   The Company adopted one-quarter lag in reporting its share of equity income in Ctrip

During the year ended December 31, 2016, the Company derecognized a group of assets sold to a third party and deconsolidated several subsidiaries due to the loss of a controlling equity interest in the subsidiary or substantive participating rights granted to other minority shareholders of the subsidiaries. An aggregate gain of RMB1.42 billion (US$204.32 million) was recognized in "Other income, net" during the year ended December 31, 2016 accordingly. The Company's retained interest in these subsidiaries were accounted for as equity method investments. Fair values of investments retained were estimated by using the income approach or market approach. Inputs used in these methodologies primarily included future cash flows, discount rate, and the selection of comparable companies operating in similar businesses. The transactions with these equity investees are aggregately disclosed in Note 19.

As of December 31, 2015 and 2016, the Company held several other equity method investments besides Ctrip through its subsidiaries or VIEs, all of which were accounted for under the equity method since the Company can exercise significant influence but does not own a majority equity interest in or control them. The carrying amount

F-35

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

of all of the equity method investments was RMB28.54 billion and RMB32.26 billion (US$4.65 billion) as of December 31, 2015 and 2016, respectively. The Company excluded the summarized information for these other equity method investments, as the other equity investees were insignificant for all the years presented.

Long-term held-to-maturity investments were time deposits in commercial banks with original and remaining maturities of greater than one year. The held-to-maturity investments are stated at amortized cost. Long-term available-for-sale equity investments represent investments in the equity securities of publicly listed companies. As the Company does not have significant influence over the investees, the investments were classified as available-for-sale and reported at fair value.

The methodology used in the determination of fair values for held-to-maturity investments and available-for-sale investments were summarized in Note 21.

The total impairment charges on long-term investments were RMB93.42 million, RMB116.98 million and RMB245.33 million (US$35.33 million) for the years ended December 31, 2014, 2015 and 2016, respectively.

The short-term held-to-maturity debt investments as well as the short-term available-for-sale investments will mature within one year; whereas the long-term held-to-maturity debt investments as well as the long-term available-for-sale debt investments will mature after one year through two years.

| | As of December 31, 2015 | | | | | |
| | Cost or Amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value |
| | RMB | RMB | RMB (In thousands) | RMB | RMB | RMB |
| **Short-term investments** | | | | | | |
| **Held-to-maturity investments** | | | | | | |
| Fixed-rate investments | 36,942,840 | 197,848 | (6,592) | | | 37,134,096 |
| **Available-for-sale investments** | | | | | | |
| Fixed-rate debt investments | 6,872,077 | | | 86,322 | | 6,958,399 |
| Adjustable-rate debt investments | 13,137,500 | | | 187,885 | | 13,325,385 |
| Equity investments | 600,543 | | | 142,075 | | 742,618 |
| **Long-term investments:** | | | | | | |
| **Held-to-maturity investments** | | | | | | |
| Fixed-rate investments | 1,838,953 | | (32,507) | | | 1,806,446 |
| **Available-for-sale investments** | | | | | | |
| Equity investments | 322,269 | | | | (45,304) | 276,965 |

F-36

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

| | As of December 31, 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Cost or Amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value | Fair value |
| | RMB | RMB | RMB | RMB | RMB | RMB | US$ |
| | | | | (In thousands) | | | |
| **Short-term investments** | | | | | | | |
| **Held-to-maturity investments** | | | | | | | |
| Fixed-rate investments | 41,802,170 | 70,018 | (3,547) | | | 41,868,641 | 6,030,339 |
| **Available-for-sale investments** | | | | | | | |
| Fixed-rate debt investments | 14,352,711 | | | 31,197 | (6,052) | 14,377,856 | 2,070,842 |
| Adjustable-rate debt investments | 14,673,620 | | | 313,196 | | 14,986,816 | 2,158,550 |
| Equity investments | 32,899 | | | | (4,112) | 28,787 | 4,146 |
| **Trading securities** | 7,685,697 | | | 61,739 | | 7,747,436 | 1,115,863 |
| **Long-term investments:** | | | | | | | |
| **Available-for-sale investments** | | | | | | | |
| Equity investments | 527,596 | | | | (31,084) | 496,512 | 71,513 |

5.  ACCOUNTS RECEIVABLE

| | As of December 31, | | |
|---|---|---|---|
| | 2015 | 2016 | 2016 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| Accounts receivable | 4,116,549 | 4,286,725 | 617,417 |
| Allowance for doubtful accounts | (189,563) | (177,401) | (25,551) |
| | 3,926,986 | 4,109,324 | 591,866 |

The movements in the allowance for doubtful accounts were as follows:

| | 2014 | 2015 | 2016 | 2016 |
|---|---|---|---|---|
| | RMB | RMB | RMB | US$ |
| | | | (In thousands) | |
| Balance as of January 1 | 43,814 | 93,877 | 189,563 | 27,303 |
| Amounts charged to expenses | 50,063 | 115,261 | 39,568 | 5,699 |
| Amounts written off | — | (19,575) | (51,730) | (7,451) |
| Balance as of December 31 | 93,877 | 189,563 | 177,401 | 25,551 |

F-37

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 6. OTHER CURRENT ASSETS

|  | As of December 31, | | |
|---|---|---|---|
|  | 2015 | 2016 | 2016 |
|  | RMB | RMB | US$ |
|  |  | (In thousands) |  |
| Prepaid expenses | 339,264 | 389,182 | 56,054 |
| Advances to suppliers | 1,953,717 | 922,621 | 132,885 |
| Tax prepayments | 3,074 | 52,500 | 7,562 |
| Receivables from online payment agencies | 318,528 | 409,912 | 59,040 |
| Deposits | 380,152 | 238,559 | 34,360 |
| Purchased copyrights | 432,730 | 593,301 | 85,453 |
| Others | 686,375 | 738,441 | 106,356 |
|  | 4,113,840 | 3,344,516 | 481,710 |

## 7. FIXED ASSETS

|  | As of December 31, | | |
|---|---|---|---|
|  | 2015 | 2016 | 2016 |
|  | RMB | RMB | US$ |
|  |  | (In thousands) |  |
| Computer equipment | 12,520,942 | 15,192,502 | 2,188,175 |
| Office building | 3,094,551 | 3,247,212 | 467,696 |
| Office building related facility, machinery and equipment | 1,593,090 | 1,772,428 | 255,283 |
| Vehicles | 31,450 | 45,267 | 6,520 |
| Office equipment | 433,144 | 546,442 | 78,704 |
| Leasehold improvements | 302,304 | 315,745 | 45,477 |
| Construction in progress | 682,314 | 755,037 | 108,747 |
|  | 18,657,795 | 21,874,633 | 3,150,602 |
| Accumulated depreciation | (8,030,668) | (10,580,285) | (1,523,878) |
|  | 10,627,127 | 11,294,348 | 1,626,724 |

The Company obtained certain computer servers and equipment by entering into capital leases. The gross amount and the accumulated depreciation of these servers and equipment were RMB224.71million and RMB174.63million, respectively, as of December 31, 2015 and RMB220.78 million (US$31.80 million) and RMB209.73 million (US$30.21 million), respectively, as of December 31, 2016. Future minimum lease payments of RMB7.44 million are payable in the amounts of RMB7.10 million, RMB0.34 million, nil, nil and nil in 2017, 2018, 2019, 2020, and 2021, respectively.

Depreciation expense of the fixed assets, including assets under capital leases, was RMB2.19 billion, RMB2.87 billion and RMB3.43 billion (US$493.90 million) for the years ended December 31, 2014, 2015 and 2016, respectively. The Company recognized impairment loss on fixed assets of nil, nil and nil for the years ended December 31, 2014, 2015 and 2016, respectively.

F-38

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 8.  GOODWILL AND INTANGIBLE ASSETS

### Goodwill

As of December 31, 2014, the Company had three reporting units, consisting of Qunar, iQiyi, and the rest of the Group. Immediately upon the change in segment reporting in the quarter ended June 30, 2015, there were four reporting units representing Search Services, Qunar, iQiyi, and Transaction Services excluding Qunar. The goodwill was reassigned to the reporting units affected using a relative fair value allocation approach. However, as more fully described in Note 4, subsequent to the share exchange transaction with Ctrip the Company no longer controls Qunar. Accordingly, Qunar was no longer a reporting unit and the goodwill balance related to Qunar was derecognized. As a result, there were three reporting units as of December 31, 2015 and 2016.

The changes in carrying amount of goodwill for each reporting unit before June 30, 2015 were as follow:

| | Baidu | Qunar | iQiyi | Total |
|---|---|---|---|---|
| | RMB | RMB | RMB | RMB |
| | | (In thousands) | | |
| Balance at December 31, 2013 | 11,283,149 | 2,293,007 | 3,288,194 | 16,864,350 |
| Goodwill acquired | 566,628 | — | (12,087) | 554,541 |
| Foreign currency translation adjustment | 4 | — | — | 4 |
| Balance at December 31, 2014 | 11,849,781 | 2,293,007 | 3,276,107 | 17,418,895 |
| Goodwill acquired | 269,679 | — | — | 269,679 |
| Balance before reorganization at June 30, 2015 | 12,119,460 | 2,293,007 | 3,276,107 | 17,688,574 |

The changes in carrying amount of goodwill for each reporting unit after June 30, 2015 were as follow:

| | Search Services | Transaction Services excluding Qunar | Qunar | iQiyi | Total |
|---|---|---|---|---|---|
| | RMB | RMB | RMB | RMB | RMB |
| | | | (In thousands) | | |
| Balance after reorganization at June 30, 2015 | 10,822,664 | 1,296,796 | 2,293,007 | 3,276,107 | 17,688,574 |
| Goodwill disposed in Ctrip transaction (Note 4) | — | — | (2,293,007) | — | (2,293,007) |
| Foreign currency translation adjustment | 6 | — | — | — | 6 |
| Balance at December 31, 2015 | 10,822,670 | 1,296,796 | — | 3,276,107 | 15,395,573 |
| Goodwill disposed | (37,781) | (15,706) | — | — | (53,487) |
| Foreign currency translation adjustment | 10 | — | — | — | 10 |
| Balance at December 31, 2016 | 10,784,899 | 1,281,090 | — | 3,276,107 | 15,342,096 |
| Balance at December 31, 2016, in US$ | 1,553,348 | 184,515 | — | 471,858 | 2,209,721 |

F-39

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

*Intangible Assets*

Finite-lived intangible assets

|  | As of December 31, 2015 | | |
|  | Gross carrying value | Accumulated amortization | Net carrying value |
|  | RMB | RMB | RMB |
|  |  | (In thousands) |  |
| Land use right | 464,165 | (44,428) | 419,737 |
| Customer relationships | 472,013 | (364,310) | 107,703 |
| Software | 513,470 | (352,099) | 161,371 |
| Trademarks | 613,032 | (144,983) | 468,049 |
| User list | 699,872 | (497,283) | 202,589 |
| Licensed copyrights of video contents | 3,039,164 | (1,478,285) | 1,560,879 |
| Others | 776,522 | (375,797) | 400,725 |
|  | 6,578,238 | (3,257,185) | 3,321,053 |

|  | As of December 31, 2016 | | | |
|  | Gross carrying value | Accumulated amortization | Net carrying value | Net carrying value |
|  | RMB | RMB | RMB | US$ |
|  |  | (In thousands) |  |  |
| Land use right | 464,165 | (53,711) | 410,454 | 59,119 |
| Customer relationships | 463,061 | (462,239) | 822 | 118 |
| Software | 536,085 | (416,268) | 119,817 | 17,257 |
| Trademarks | 596,332 | (205,098) | 391,234 | 56,350 |
| User list | 698,960 | (657,288) | 41,672 | 6,002 |
| Licensed copyrights of video contents | 5,608,338 | (2,993,166) | 2,615,172 | 376,663 |
| Others | 730,508 | (451,965) | 278,543 | 40,119 |
|  | 9,097,449 | (5,239,735) | 3,857,714 | 555,628 |

The Company recognized impairment loss on intangible assets of RMB1.63 million, nil and RMB0.82 million (US$118.38 thousand) for the years ended December 31, 2014, 2015 and 2016, respectively. Amortization expense of intangible assets for the years ended December 31, 2014, 2015 and 2016 was RMB1.59 billion, RMB2.50 billion and RMB4.66 billion (US$670.56 million), respectively. Estimated amortization expense relating to the existing intangible assets with finite lives for each of the next five years is as follows:

|  | RMB | US$ |
|  | (In thousands) | |
| For the years ending December 31, |  |  |
| 2017 | 1,294,079 | 186,386 |
| 2018 | 918,017 | 132,222 |
| 2019 | 467,234 | 67,296 |
| 2020 | 329,390 | 47,442 |
| 2021 | 204,624 | 29,472 |

F-40

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Indefinite-lived intangible assets

|  | As of December 31, | | |
|---|---|---|---|
|  | **2015** | **2016** | **2016** |
|  | **RMB** | **RMB** | **US$** |
|  | | **(In thousands)** | |
| Domain names | 9,360 | 9,360 | 1,348 |
| Trademarks | 4,206 | 5,153 | 742 |
|  | 13,566 | 14,513 | 2,090 |

## 9. ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

|  | As of December 31, | | |
|---|---|---|---|
|  | **2015** | **2016** | **2016** |
|  | **RMB** | **RMB** | **US$** |
|  | | **(In thousands)** | |
| Accrued payroll and welfare | 1,629,794 | 1,444,600 | 208,066 |
| Tax payable | 334,058 | 793,476 | 114,284 |
| Interest payable | 127,799 | 101,656 | 14,642 |
| Users' and distributors' deposits | 888,098 | 659,858 | 95,039 |
| Purchase of fixed assets and spare parts | 1,495,958 | 1,208,378 | 174,043 |
| Traffic acquisition costs | 1,852,949 | 1,968,206 | 283,481 |
| Bandwidth costs | 1,080,657 | 1,353,090 | 194,885 |
| Content acquisition costs | 1,821,217 | 3,360,291 | 483,983 |
| Funds collected on behalf of service providers | 1,640,460 | 1,606,328 | 231,359 |
| Payable to merchants | 801,282 | 468,637 | 67,498 |
| Secured borrowings | — | 6,758,946 | 973,491 |
| Accrued other operating expenses | 5,112,984 | 6,482,215 | 933,633 |
| Others | 1,054,936 | 2,448,405 | 352,643 |
|  | 17,840,192 | 28,654,086 | 4,127,047 |

## 10. LOANS PAYABLE

### *Short-term Loans*

On September 22, 2015, the Company entered into a banking facility agreement with China Merchants Bank (Shanghai Branch), pursuant to which the Company is entitled to borrow a RMB denominated loan of RMB100.00 million (US$14.40 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by People's Bank of China. The loan is intended for the general working capital purposes. In September 2015, the Company drew down RMB9.90 million (US$1.43 million) with a fixed interest rate of 4.60%. In November and December 2015, the remaining of RMB90.10 million (US$12.98 million) was drawn down with a fixed interest rate of 4.35%. The loan was fully repaid when it became due before December 31, 2016.

F-41

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

On July 11, 2016, the Company entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB200.00 million (US$28.81 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by People's Bank of China. This facility is reserved for the consumer credit business. On July 19, 2016, the Company drew down RMB50.00 million (US$7.20 million) with a fixed interest rate of 4.35%. On August 8, 2016, additional RMB80.00 million (US$11.52 million) was drawn down with a fixed interest rate of 4.35%.

On July 11, 2016, the Company entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB150.00 million (US$21.60 million) for one year with interest rate based on Loan Prime Rate ("LPR") plus 48.50 basis points. This facility is reserved for the consumer credit business. On September 23, 2016, the Company drew down RMB150 million (US$21.60 million) with an interest rate of 4.78% under the facility commitment.

On August 12, 2016, the Company entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB150.00 million (US$21.60 million) for one year with interest rate based on LPR plus 26.75 basis points. This facility is reserved for the consumer credit business. On August 16, 2016, the Company drew down RMB150.00 million (US$21.60 million) with an interest rate of 4.56% under the facility commitment.

On January 22, 2016, iQiyi entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which iQiyi is entitled to borrow a RMB denominated loan of RMB200.00 million (US$28.81 million) for one year with a fixed annual interest rate at 95% of benchmark one-year lending rate published by the People's Bank of China. The loan is intended for general working capital purposes. On January 29, 2016, iQiyi drew down RMB53.70 million (US$7.73 million) with a fixed interest rate of 4.13%. On February 26, 2016, iQiyi drew down RMB20.50 million (US$2.95 million) with a fixed interest rate of 4.13%. On December 14, 2016, additional RMB25.80 million (US$3.72 million) was drawn down with a fixed interest rate of 4.13%.

On November 17, 2016, the Company entered into a loan agreement with International Finance Corporation, pursuant to which the Company is entitled to borrowed an unsecured RMB denominated loans of RMB500.00 million (US$72.01 million) with a term of one year, and to be used for the consumer credit business exclusively. On December 9, 2016, the Company drew down RMB500.00 million (US$72.01 million) with a fixed interest rate of 4.92%.

On December 19, 2016, the Company entered into a loan agreement with China Merchants Bank (Shanghai Branch), pursuant to which the Company is entitled to borrowed an unsecured RMB denominated loans of RMB85.00 million (US$12.24 million) with a term of one year. Pursuant to the agreement the loan shall be used by Company for the consumer credit business exclusively. On December 19, 2016, the Company drew down RMB85.00 million (US$12.24 million) with a fixed interest rate of 4.18%.

*Long-term Loans*

On December 9, 2014, the Company entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which the Company borrowed two unsecured US$ denominated loans of RMB1.04 billion (US$150.00 million) with a term of two years and RMB1.04 billion (US$150.00 million) with a term of three

F-42

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

years. Both loans are intended for the general working capital of the Company and have a floating interest rate. In connection with the loan agreements, the Company entered into two interest swap agreements, pursuant to which the loans will be settled with a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans. On December 9, 2016, the loan with a term of two years was fully repaid when it became due. The remaining balance of the loan with a term of three years was classified to "Long-term loans, current portion" as current liability.

On July 17, 2015, the Company entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB1.04 billion (US$150.00 million) with a floating interest rate. The loan is intended for the general working capital of the Company. On August 10, 2015, the Company drew down RMB1.04 billion (US$150.00 million) with a term of two years under the facility commitment. In connection with the loan agreement, the Company entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan. Amount repayable within twelve months was classified to "Long-term loans, current portion" as current liability.

On August 25, 2015, the Company entered into a loan agreement with HSBC, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB1.39 billion (US$200.00 million) with a fixed annual interest rate of 1.42%. The loan is intended for the general working capital of the Company. On August 28, 2015, the Company drew down RMB1.39 billion (US$200.00 million) with a term of two years under the facility commitment. The amount repayable within twelve months was classified to "Long-term loans, current portion" as current liability.

On June 8, 2016, the Company entered into a five-year revolving syndicated loan agreement with a group of 21 arrangers, pursuant to which the Company is entitled to borrow an unsecured US$ denominated floating rate loan of RMB6.94 billion (US$1.00 billion) with a term of five years and to borrow an unsecured US$ denominated revolving loan of RMB6.94 billion (US$1.00 billion) for five years. The facility is intended for the general working capital of the Company. On June 22, 2016, the Company drew down RMB3.46 billion (US$500.00 million) under the facility commitment. On November 25, 2016, the Company drew down an additional RMB1.74 billion (US$250.00 million) under the facility commitment. On November 26, 2016, an additional RMB1.74 billion (US$250.00 million) was drawn down under the facility commitment. In connection with the facility agreements, the Company entered into three interest rate swap agreements, pursuant to which the loans will be settled with a fixed annual interest rate of 2.11%, 2.10% and 2.78% respectively, during the respective term of the loans.

The interest rate swap agreements met the definition of a derivative in accordance with ASC 815. The fair value of the derivatives related to the interest rate swap agreements were insignificant for the years ended December 31, 2014, 2015 and 2016.

## 11. NOTES PAYABLE

On November 28, 2012, the Company issued and sold two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750.00 million which will mature on November 28, 2017 (the "2017 Notes"), and (ii) an aggregate principal amount of US$750.00 million which will mature on November 28, 2022 (the "2022 Notes"). On August 6, 2013, the Company issued and publicly sold another tranche of unsecured senior notes with an aggregate principal amount of US$1.00 billion which will mature on August 6, 2018 (the "2018 Notes"). On June 9, 2014, the Company issued and publicly sold the fourth tranche of unsecured senior notes with an aggregate principal amount of US$1.00 billion which will mature on June 9, 2019 (the "2019 Notes"). On

F-43

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

June 30, 2015, the Company issued and publicly sold two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750.00 million which will mature on June 30, 2020 (the "2020 Notes"), and (ii) an aggregate principal amount of US$500.00 million which will mature on June 30, 2025 (the "2025 Notes").The 2017 Notes, 2018 Notes, 2019 Notes, 2020 Notes, 2022 Notes and 2025 Notes are collectively referred to as the "Notes".

The 2017 Notes bear interest at the rate of 2.25% per annum and the 2022 Notes bear interest at the rate of 3.50% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on May 28, 2013. The 2018 Notes bear interest at the rate of 3.25% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on February 6, 2014. The 2019 Notes bear interest at the rate of 2.75% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on December 9, 2014. The 2020 Notes bear interest at the rate of 3.00% per annum and the 2025 Notes bear interest at the rate of 4.13% per annum. Interest is payable semi-annually in arrears on and of each year, beginning on December 30, 2015. At maturity, the Notes are payable at their principal amount plus accrued and unpaid interest thereon.

The net proceeds from the Notes, which will be used for general corporate purposes, were RMB6.19 billion, RMB7.75 billion and nil for the years ended December 31, 2014, 2015 and 2016, respectively.

The Notes do not contain any financial covenants or other significant restrictions. In addition, the Notes are unsecured and rank lower than any secured obligation of the Group and have the same liquidation priority as any other unsecured liabilities of the Group, but senior to those expressly subordinated obligations, if any. The Company may, at its discretion, redeem all or any portion of the Notes at any time, at the principal amount plus any unpaid interest. As of December 31, 2016, the Company does not intend to redeem any portion of the Notes prior to the stated maturity dates. The Company has the obligation to redeem the Notes if a change in control occurs as defined in the indenture of the Notes.

The Notes were issued at a discount amounting to RMB 74.36 million (US$ 10.71 million). The issuance costs of RMB 149.59 million (US$ 21.55 million) were presented as a direct deduction from the principal amount of the Notes on the consolidated balance sheets. Both the discount and the issuance costs are amortized as interest expense using the effective interest rate method through the maturity dates of the Notes. The effective interest rate was 2.36%, 3.39%, 3.00%, 3.13%, 3.59% and 4.22% for the 2017 Notes, the 2018 Notes, the 2019 Notes, the 2020 Notes, the 2022 Notes and the 2025 Notes, respectively.

The principal amount and unamortized discount and debt issuance costs as of December 31, 2015 and 2016 were as follows:

|  | As of December 31, | | |
|  | 2015 | 2016 | 2016 |
|  | RMB | RMB | US$ |
|  |  | (In thousands) | |
| Principal amount | 30,869,300 | 32,987,800 | 4,751,231 |
| Unamortized discount and debt issuance costs | (167,184) | (136,008) | (19,589) |
|  | 30,702,116 | 32,851,792 | 4,731,642 |

F-44

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The following table summarizes the aggregate required repayments of the principal amounts of the Company's long-term debts, including the notes payable and loans payable (Note 10), in the succeeding five years and thereafter:

|  | RMB | US$ |
| --- | --- | --- |
|  | (In thousands) | |
| For the years ending December 31, | | |
| 2017 | 8,678,750 | 1,250,000 |
| 2018 | 6,943,000 | 1,000,000 |
| 2019 | 6,943,000 | 1,000,000 |
| 2020 | 5,207,250 | 750,000 |
| 2021 | 6,943,000 | 1,000,000 |
| Thereafter | 8,678,750 | 1,250,000 |

## 12. INCOME TAXES

### Cayman Islands and BVI

Under the current laws of the Cayman Islands and BVI, the Company is not subject to tax on income or capital gains. Additionally, upon payments of dividends by the Company to its shareholders, neither Cayman Islands nor BVI withholding tax will be imposed.

### Hong Kong

Under the Hong Kong tax laws, subsidiaries in Hong Kong are subject to the Hong Kong profits tax rate at 16.5% and they may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

### Japan

Under the Japan tax laws, a company with paid-in capital in excess of JPY100 million was subject to a national corporate income tax rate of 25.5% up to March 31, 2015 and from April 1, 2015 the income tax rate has been reduced to 23.9%. A company with paid-in capital equal to JPY100 million or less will be taxed at a tax rate of 15% on the first JPY8 million and at 23.9% on the portion over JPY8 million from April 1, 2015. Local income taxes, which are local inhabitant tax and enterprise tax, are also imposed on corporate income. The resulting effective corporate income tax rates of the Company's Japanese subsidiaries range from approximately 34% to 37%.

### China

Effective from January 1, 2008, the PRC's statutory, Enterprise Income Tax ("EIT") rate is 25%. Preferential EIT rates at 15% and 10% are available for qualified "High and New Technology Enterprises" ("HNTEs") and "Key Software Enterprise" ("KSE"). The HNTE certificate is effective for a period of 3 years and the KSE is subject to relevant governmental authorities' assessment annually based on self-assessment supporting documents filed with the tax authorities each year.

Baidu Online enjoyed a reduced tax rate of 10% as a qualified KSE in 2014 and 2015. Baidu China also enjoyed a reduced tax rate of 10% as qualified KSE in 2015. Certain other PRC subsidiaries and VIEs, including Baidu Netcom, are qualified HNTEs and enjoy a reduced tax rate of 15% for the years presented, which will expire in

F-45

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

2017, 2018 or 2019. An entity must file required supporting documents with the tax authorities before using the preferential rates. Whether the entity is entitled to enjoy preferential rate as a KSE is subject to relevant governmental authorities' assessment each year. An entity could re-apply for the HNTE certificate when the prior certificate expires. Historically, all of the Company's subsidiaries and VIEs successfully re-applied for the certificates when the prior ones expired.

A certificate for the current year might be obtained in the following year as a result of the stringent inspection and approval process by the governmental authorities. The Company would record an income tax reversal in the year when the certificate is obtained for the over-paid or over-accrued provisional tax in connection with the grant of a more favorable tax rate for the prior year.

Under the current EIT Law, dividends for earnings derived from January 1, 2008 and onwards paid by PRC entities to any of their foreign non-resident enterprise investors are subject to a 10% withholding tax. A lower tax rate will be applied if tax treaty or arrangement benefits are available. Under the tax arrangement between the PRC and Hong Kong, the reduced withholding tax rate for dividends paid by PRC entities is 5% provided the Hong Kong investors meet the requirements as stipulated by relevant PRC tax regulations, such as the beneficiary owner test. Capital gains derived from PRC are also subject to a 10% PRC withholding tax.

Moreover, the current EIT Law treats enterprises established outside of China with "effective management and control" located in China as PRC resident enterprises for tax purposes. The term "effective management and control" is generally defined as exercising overall management and control over the business, personnel, accounting, properties, etc. of an enterprise. The Company, if considered a PRC resident enterprise for tax purposes, would be subject to the PRC Enterprise Income Tax at the rate of 25% on its worldwide income for the period after January 1, 2008. As of December 31, 2016, the Company has not accrued for PRC tax on such basis. The Company will continue to monitor its tax status.

Income (loss) before income taxes consists of:

|  | For the years ended December 31, | | | |
|  | 2014 | 2015 | 2016 | 2016 |
|  | RMB | RMB | RMB | US$ |
|  | | (In thousands) | | |
| PRC | 17,783,174 | 16,877,599 | 18,193,808 | 2,620,453 |
| Non-PRC | (3,298,768) | 21,029,024 | (3,684,601) | (530,693) |
|  | 14,484,406 | 37,906,623 | 14,509,207 | 2,089,760 |

Except for the investment related gain recognized, the pre-tax losses from non-PRC operations consist primarily of operating costs, administration expenses, interest expenses and share-based compensation expenses.

F-46

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Income taxes consist of:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Current income tax | 2,942,173 | 3,213,638 | 3,461,853 | 498,612 |
| Income tax refund due to reduced tax rate | (17,553) | — | (534,698) | (77,013) |
| Adjustments of deferred tax assets due to change in tax rates | 28,146 | 79,947 | (12,085) | (1,741) |
| Deferred income tax (benefit) expense | (721,594) | 2,180,792 | (1,476) | (213) |
| | 2,231,172 | 5,474,377 | 2,913,594 | 419,645 |

The reconciliation of the actual income taxes to the amount of tax computed by applying the aforementioned statutory income tax rate to pre-tax income is as follows:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| | | (In thousands, except for per share data) | | |
| Expected taxation at PRC statutory tax rate | 3,587,693 | 9,476,656 | 3,627,302 | 522,441 |
| Effect of differing tax rates in different jurisdictions | 676,663 | (5,253,700) | 735,566 | 105,944 |
| Non-taxable income | (12,504) | (65,411) | (73,226) | (10,547) |
| Non-deductible expenses | 123,245 | 165,264 | 114,534 | 16,496 |
| Research and development super-deduction | (538,305) | (767,858) | (725,800) | (104,537) |
| Effect of PRC preferential tax rates and tax holiday | (1,897,184) | (1,547,392) | (1,851,421) | (266,660) |
| Effect of tax rate changes on deferred taxes | 28,146 | 79,947 | (12,085) | (1,741) |
| Over-accrued EIT for previous years | (153,121) | (248,673) | (519,631) | (74,842) |
| PRC withholding tax | — | 2,470,733 | 282,838 | 40,737 |
| Addition to valuation allowance | 416,539 | 1,164,811 | 1,335,517 | 192,354 |
| Taxation for the year | 2,231,172 | 5,474,377 | 2,913,594 | 419,645 |
| Effective tax rate | 15.41% | 14.44% | 20.08% | 20.08% |
| Effect of preferential tax rates inside the PRC on basic earnings per Class A and Class B ordinary share | 53.61 | 44.31 | 53.41 | 7.69 |

F-47

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The tax effects of temporary differences that gave rise to the deferred tax balances at December 31, 2015 and 2016 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | 2016 |
| | RMB | RMB (In thousands) | US$ |
| Deferred tax assets: | | | |
| Provision for doubtful receivables | 120,612 | 137,901 | 19,862 |
| Accrued expenses, payroll and others | 1,745,810 | 2,715,136 | 391,061 |
| Fixed assets depreciation | 19,659 | 26,421 | 3,805 |
| Net operating loss carry-forward | 1,320,496 | 1,727,031 | 248,744 |
| Less: valuation allowance | (2,198,403) | (3,506,259) | (505,006) |
| Deferred tax assets, net | 1,008,174 | 1,100,230 | 158,466 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | 2016 |
| | RMB | RMB (In thousands) | US$ |
| Deferred tax liabilities: | | | |
| Long-lived assets arising from acquisitions | 359,531 | 248,251 | 35,756 |
| Withholding tax on PRC subsidiaries' undistributed earnings | 592,719 | 632,859 | 91,151 |
| Withholding tax on capital gains derived from PRC | 2,489,040 | 2,708,125 | 390,050 |
| | 3,441,290 | 3,589,235 | 516,957 |

As of December 31, 2016, the Company had net losses of approximately RMB16.50 billion (US$2.38 billion) deriving from entities in the PRC, Hong Kong and Japan. The net loss in the PRC and Japan can be carried forward for five years and nine years, respectively, to offset future net profit for income tax purposes. The net loss of entities in the PRC and Japan will begin to expire in 2018, if not utilized. The net loss in Hong Kong can be carried forward without an expiration date.

The Company evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company elects to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2015 and 2016, there was no significant impacts from tax uncertainty on the Company's financial position and result of operations. The Company does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Company's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax years of 2012 through 2016 remain open to examination by the respective tax authorities. The Company may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

The Company accrued withholding tax of RMB580.72 million for the potential remittance of earnings from the PRC subsidiaries to their offshore parent companies in the form of dividend distribution as of December 31, 2013, because the Company believes that the underlying dividends will be distributed in the future considering future merger and acquisition activities. The Company did not provide for additional deferred income taxes and foreign withholding taxes on the undistributed earnings of foreign subsidiaries in 2014, 2015 and 2016 on the

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

basis of its intent to permanently reinvest foreign subsidiaries' earnings. As of December 31 2016, the total amount of undistributed earnings from the PRC subsidiaries for which no withholding tax has been accrued was RMB89.52 billion (US$12.89 billion). Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable. In the case of its VIEs in the PRC, undistributed earnings were insignificant as of each of the balance sheet dates.

**13.  EMPLOYEE DEFINED CONTRIBUTION PLAN**

Full time employees of the Group in the PRC participate in a government mandated multi-employer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the Group make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has no legal obligation for the benefits beyond the contributions. The total amounts for such employee benefits, which were expensed as incurred, were RMB1.64 billion, RMB2.23 billion and RMB2.29 billion (US$329.61 million) for the years ended December 31, 2014, 2015 and 2016, respectively.

**14.  COMMITMENTS AND CONTINGENCIES**

*Capital Commitments*

The Company's capital commitments primarily relate to commitments in connection with the expansion and improvement of its network infrastructure and its plan to build additional office buildings and cloud computing based data centers. Total capital commitments contracted but not yet reflected in the financial statements amounted to RMB 1.23 billion (US$177.16 million) as of December 31, 2016. All of the commitments relating to the network infrastructure are to be fulfilled in 2021 and the commitments relating to the office building and cloud computing based data centers will be settled in installments as various stages of the construction plan are completed in the next four to six years.

*Operating Lease Commitments*

The Company leases facilities in the PRC under non-cancelable operating leases expiring on different dates. Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. Total rental expense for offices was RMB525.31 million, RMB647.09 million and RMB494.37 million (US$71.20 million) for the years ended December 31, 2014, 2015 and 2016, respectively. Total operating lease expense for Internet Data Centre ("IDC") facilities was RMB2.85 billion, RMB3.72 billion and RMB4.72 billion (US$679.82 million) for the years ended December 31, 2014, 2015 and 2016 respectively.

Future minimum payments under non-cancelable operating leases with initial terms of one-year or more consist of the following as of December 31, 2016:

|  | RMB | US$ |
|---|---|---|
|  | (In thousands) | |
| 2017 | 3,018,986 | 434,824 |
| 2018 | 1,390,004 | 200,202 |
| 2019 | 839,240 | 120,876 |
| 2020 | 569,100 | 81,967 |
| 2021 | 176,348 | 25,399 |
| Thereafter | 30,117 | 4,338 |
|  | 6,023,795 | 867,606 |

F-49

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The Group's lease arrangements have no renewal options, rent escalation clauses and restriction or contingent rents.

### Commitments for Licensed Copyrights

The Company enters into non-cancelable licensing agreements with third-party vendors to acquire licensed copyrights of video contents for its online video platform.

Future minimum payments under non-cancelable licensing agreements consist of the following as of December 31, 2016:

|  | RMB | US$ |
| --- | --- | --- |
|  | (In thousands) | |
| 2017 | 5,990,656 | 862,835 |
| 2018 | 1,489,234 | 214,495 |
| 2019 | 200,348 | 28,856 |
| 2020 | 196,718 | 28,333 |
| 2021 | 164,425 | 23,682 |
| Thereafter | 979,291 | 141,047 |
|  | 9,020,672 | 1,299,248 |

### Guarantees

The Company accounts for guarantees in accordance with ASC topic 460 ("ASC 460"), *Guarantees.* Accordingly, the Company evaluates its guarantees if any to determine whether (a) the guarantee is specifically excluded from the scope of ASC 460, (b) the guarantee is subject to ASC 460 disclosure requirements only, but not subject to the initial recognition and measurement provisions, or (c) the guarantee is required to be recorded in the financial statements at fair value.

The corporate by-laws require that the Company indemnify its officers and directors, as well as those who act as directors and officers of other entities at the Company's request, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceedings arising out of their services to the Company. In addition, the Company entered into separate indemnification agreements with each director and each executive officer of the Company that provide for indemnification of these directors and officers under similar circumstances and under additional circumstances. The indemnification obligations are more fully described in the by-laws and the indemnification agreements. The Company purchases standard directors and officers insurance to cover claims or a portion of the claims made against its directors and officers. Since a maximum obligation is not explicitly stated in the Company's by-laws or in the indemnification agreements and will depend on the facts and circumstances that arise out of any future claims, the overall maximum amount of the obligations cannot be reasonably estimated.

Historically, the Company was not required to make payments related to these obligations, and the fair value for these obligations was nil on the consolidated balance sheets as of December 31, 2015 and 2016.

### Litigation

The Group was involved in certain cases pending in various PRC and U.S. courts and arbitration as of December 31, 2016. These cases include copyright infringement cases, unfair competition cases, and defamation

F-50

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

cases, among others. Adverse results in these lawsuits may include awards of damages and may also result in, or even compel, a change in the Company's business practices, which could result in a loss of revenue or otherwise harm the business of the Company.

For many proceedings, the Company is currently unable to estimate the reasonably possible loss or a range of reasonably possible losses as the proceedings are in the early stages, and/or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible losses cannot be made. However, the Company believes that such matters, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material adverse effect on the Company's consolidated results of operations, financial position and cash flows. With respect to the limited number of proceedings for which the Company was able to estimate the reasonably possible losses or the range of reasonably possible losses, such estimated loss amounts were insignificant.

## 15. REDEEMABLE NONCONTROLLING INTERESTS

| | 2014 | 2015 | 2016 | |
| --- | --- | --- | --- | --- |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Balance as of January 1 | — | 1,894,502 | 3,947,879 | 568,613 |
| Other comprehensive income | — | 142,071 | 325,408 | 46,869 |
| Issuance of subsidiary shares | 1,841,819 | 1,582,126 | 660,771 | 95,170 |
| Accretion of redeemable noncontrolling interests | 52,683 | 329,180 | 557,918 | 80,357 |
| Balance as of December 31 | 1,894,502 | 3,947,879 | 5,491,976 | 791,009 |

On November 14, 2014, iQiyi completed a round of preferred shares financing. The new preferred shareholders acquired 13.42% of the then outstanding equity interest of iQiyi for a total consideration of US$300.00 million.

On October 1, 2015, Xiaodu Life Technology Ltd ("Xiaodu"), a wholly-owned subsidiary of the Company primarily engaged in the business of takeout delivery services, issued 250,000,000 preferred shares to certain shareholders for a total consideration of US$250.00 million. On May 31, 2016, Xiaodu issued an additional 42,105,264 preferred shares to certain other shareholders for a total consideration of US$100.00 million. The consideration has been fully paid by shareholders at September 30, 2016. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of Xiaodu, these preferred shares are accounted for as redeemable noncontrolling interests.

The Company accounts for the changes in accretion to the redemption value in accordance with ASC topic 480 ("ASC 480"), *Distinguishing Liabilities from Equity*. The Company elects to use the effective interest method for the changes of redemption value over the period from the date of issuance to the earliest redemption date of the noncontrolling interest.

## 16. SHAREHOLDERS' EQUITY

*Ordinary Shares*

The authorized share capital consisted of 870,400,000 ordinary shares at a par value of US$0.00005 per share, of which 825,000,000 shares were designated as Class A ordinary shares, 35,400,000 as Class B ordinary shares,

F-51

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

and 10,000,000 shares designated as preferred shares. The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting and conversion rights. Each share of Class A ordinary shares is entitled to one vote per share and is not convertible into Class B ordinary shares under any circumstances. Each share of Class B ordinary shares is entitled to ten votes per share and is convertible into one Class A ordinary share at any time by the holder thereof. Upon any transfer of Class B ordinary shares by the holder thereof to any person or entity that is not an affiliate of such holder, such Class B ordinary shares would be automatically converted into an equal number of Class A ordinary shares. The number of Class B ordinary shares transferred to Class A ordinary shares was 45,000, nil and 91,667 in the years ended December 31, 2014, 2015 and 2016, respectively.

As of December 31, 2016, there were 27,325,551 and 7,401,254 Class A and Class B ordinary shares outstanding, respectively. As of December 31, 2015 and 2016, there were no preferred shares issued and outstanding.

On July 30, 2015, the Company announced a share repurchase program in which the Company proposed to acquire up to an aggregate of US$1.00 billion of its shares over the next 12 months. On October 29, 2015, the Company announced another share repurchase program under which the Company proposed to acquire up to an aggregate of US$2.00 billion of its shares over the next 24 months in the open market or through privately negotiated transactions, depending on market conditions and in accordance with applicable rules and regulations. The Company repurchased 603,726 and 0 Class A ordinary shares from the open market with an aggregate purchase price of US$990.16 million and nil during the years ended December 31, 2015 and 2016. The repurchased shares were cancelled under Cayman Islands law upon repurchase and the difference between the par value and the repurchase price was debited to retained earnings.

*Retained Earnings*

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Company's PRC subsidiaries, being foreign invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of the Company's PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the Company's subsidiaries.

In accordance with the China Company Laws, the Company's VIEs must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of the Company's VIEs is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are made at the discretion of the Company's VIEs.

General reserve and statutory surplus funds are restricted to set-off against losses, expansion of production and operation and increasing registered capital of the respective company. Staff welfare and bonus fund and statutory public welfare funds are restricted to capital expenditures for the collective welfare of employees. The reserves

F-52

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

are not allowed to be transferred to the Company in terms of cash dividends, loans or advances, nor are they allowed for distribution except under liquidation.

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2015 | 2016 | 2016 |
|  | RMB | RMB | US$ |
|  |  | (In thousands) |  |
| PRC statutory reserve funds | 417,911 | 441,391 | 63,574 |
| Unreserved retained earnings | 74,241,444 | 85,292,315 | 12,284,648 |
| Total retained earnings | 74,659,355 | 85,733,706 | 12,348,222 |

Under PRC laws and regulations, there are restrictions on the Company's PRC subsidiaries and VIEs with respect to transferring certain of their net assets to the Company either in the form of dividends, loans, or advances. Amounts of net assets restricted include paid in capital and statutory reserve funds of the Company's PRC subsidiaries and the net assets of the VIEs in which the Company has no legal ownership, totaling RMB10.58 billion and RMB13.70 billion (US$1.97 billion) as of December 31, 2015 and 2016, respectively.

Furthermore, cash transfers from the Company's PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of the PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to the Company, or otherwise satisfy their foreign currency denominated obligations.

F-53

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

*Accumulated Other Comprehensive Income (Loss)*

The changes in accumulated other comprehensive income (loss) by component, net of tax, were as follows:

| | Foreign currency translation adjustment RMB | Unrealized gains on available-for-sale investments RMB (In thousands) | Total RMB |
|---|---|---|---|
| Balance at December 31, 2013 | 158,355 | 22,903 | 181,258 |
| Other comprehensive income (loss) before reclassification | (422,925) | 27,327 | (395,598) |
| Amounts reclassified from accumulated other comprehensive income | — | (45,025) | (45,025) |
| Net current-period other comprehensive loss | (422,925) | (17,698) | (440,623) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (20,153) | — | (20,153) |
| Balance at December 31, 2014 | (284,723) | 5,205 | (279,518) |
| Other comprehensive income (loss) before reclassification | (644,896) | 489,010 | (155,886) |
| Amounts reclassified from accumulated other comprehensive income | — | (194,451) | (194,451) |
| Net current-period other comprehensive income (loss) | (644,896) | 294,559 | (350,337) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (176,201) | — | (176,201) |
| Balance at December 31, 2015 | (1,105,820) | 299,764 | (806,056) |
| Other comprehensive income (loss) before reclassification | (589,870) | 480,102 | (109,768) |
| Amounts reclassified from accumulated other comprehensive income | — | (540,495) | (540,495) |
| Net current-period other comprehensive loss | (589,870) | (60,393) | (650,263) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (326,640) | (7) | (326,647) |
| Balance at December 31, 2016 | (2,022,330) | 239,364 | (1,782,966) |
| Balance at December 31, 2016, in US$ | (291,277) | 34,476 | (256,801) |

The amounts reclassified out of accumulated other comprehensive income represent realized gains on the available-for-sale investments upon their sales, which were then recorded in "Other income, net" in the consolidated statements of comprehensive income. The amounts reclassified were determined on the basis of specific identification.

F-54

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The following table sets forth the tax effect allocated to each component of other comprehensive income for the years ended December 31, 2015 and 2016:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2015 | 2016 | 2016 |
|  | RMB | RMB | RMB | US$ |
|  |  |  | (In thousands) |  |
| Unrealized gains on available-for-sale investments |  |  |  |  |
| Unrealized holding gains (losses) during the year | 1,680 | (68,303) | (119,708) | (17,242) |
| Reclassified for gains realized | — | 28,885 | 110,418 | 15,904 |
| Net unrealized gains (losses) | 1,680 | (39,418) | (9,290) | (1,338) |
| Other comprehensive income (loss) | 1,680 | (39,418) | (9,290) | (1,338) |

## 17.  EARNINGS PER SHARE ("EPS")

A reconciliation of net income attributable to Baidu, Inc. in the consolidated statements of comprehensive income to the numerator for the computation of basic and diluted per share for the years ended December 31, 2014, 2015 and 2016 is as follows:

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2015 | 2016 | 2016 |
|  | RMB | RMB | RMB | US$ |
|  |  |  | (In thousands) |  |
| Net income attributable to Baidu, Inc. | 13,196,932 | 33,664,173 | 11,632,269 | 1,675,395 |
| Accretion of the redeemable noncontrolling interests | (52,683) | (329,180) | (557,918) | (80,357) |
| Numerator for EPS computation | 13,144,249 | 33,334,993 | 11,074,351 | 1,595,038 |

F-55

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The following table sets forth the computation of basic and diluted net income attributable to Baidu, Inc. per share for Class A and Class B ordinary shares.

| | For the years ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2014** | | **2015** | | **2016** | | | |
| | Class A RMB | Class B RMB | Class A RMB | Class B RMB | Class A RMB | Class A US$ | Class B RMB | Class B US$ |
| | (In thousands, except for number of shares, per share and per ADS data) | | | | | | | |
| **Earnings per share – basic:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. | 10,328,517 | 2,815,732 | 26,182,538 | 7,152,455 | 8,709,905 | 1,254,487 | 2,364,446 | 340,551 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,551,463 | 7,511,003 | 27,428,861 | 7,492,921 | 27,263,984 | 27,263,984 | 7,401,254 | 7,401,254 |
| Denominator used for earnings per share | 27,551,463 | 7,511,003 | 27,428,861 | 7,492,921 | 27,263,984 | 27,263,984 | 7,401,254 | 7,401,254 |
| **Earnings per share – basic** | 374.88 | 374.88 | 954.56 | 954.56 | 319.47 | 46.01 | 319.47 | 46.01 |
| **Earnings per share – diluted:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. for diluted computation | 10,339,397 | 2,804,852 | 26,205,544 | 7,129,449 | 8,716,163 | 1,255,388 | 2,358,188 | 339,650 |
| Reallocation of net income attributable to Baidu, Inc. as a result of conversion of Class B to Class A shares | 2,804,852 | — | 7,129,449 | — | 2,358,188 | 339,650 | — | — |
| Allocation of net income attributable to Baidu, Inc. | 13,144,249 | 2,804,852 | 33,334,993 | 7,129,449 | 11,074,351 | 1,595,038 | 2,358,188 | 339,650 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,551,463 | 7,511,003 | 27,428,861 | 7,492,921 | 27,263,984 | 27,263,984 | 7,401,254 | 7,401,254 |
| Conversion of Class B to Class A ordinary shares | 7,511,003 | — | 7,492,921 | — | 7,401,254 | 7,401,254 | — | — |
| Share-based awards | 136,008 | — | 112,688 | — | 91,848 | 91,848 | — | — |
| Denominator used for earnings per share | 35,198,474 | 7,511,003 | 35,034,470 | 7,492,921 | 34,757,086 | 34,757,086 | 7,401,254 | 7,401,254 |
| **Earnings per share – diluted** | 373.43 | 373.43 | 951.49 | 951.49 | 318.62 | 45.89 | 318.62 | 45.89 |
| **Earnings per ADS:** | | | | | | | | |
| Denominator used for earnings per ADS – basic | 275,514,630 | | 274,288,610 | | 272,639,840 | 272,639,840 | | |
| Denominator used for earnings per ADS – diluted | 351,984,740 | | 350,344,700 | | 347,570,860 | 347,570,860 | | |
| **Earnings per ADS – basic** | 37.49 | | 95.46 | | 31.95 | 4.60 | | |
| **Earnings per ADS – diluted** | 37.34 | | 95.15 | | 31.86 | 4.59 | | |

The Company did not include certain stock options and restricted shares in the computation of diluted earnings per share for the years ended December 31, 2014, 2015 and 2016 because those stock options and restricted shares were anti-dilutive for earnings per share for the respective years.

## 18.  SHARE-BASED AWARDS PLAN

*Baidu, Inc.*

Incentive compensation plans

In December 2008, the Company adopted a share incentive plan (the "2008 Plan"), which provides for the granting of share incentives, including incentive share options ("ISOs"), restricted shares and any other form of award pursuant to the 2008 Plan, to members of the board, employees and consultants of the Company. However, the Company may grant ISOs only to its employees. The Company reserved 3,428,777 ordinary shares for issuance under the 2008 Plan, which will expire in the year 2018. The vesting schedule, time and condition to

F-56

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

exercise options will be determined by the compensation committee. The term of the options may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of the Company's share capital.

Under the 2008 Plan, share options are subject to vesting schedules varying from two to four years, the exercise price of an option may be amended or adjusted at the discretion of the compensation committee, the determination of which would be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices would be effective without the approval of the Company's shareholders or the approval of the affected grantees. If the Company grants an ISO to an employee who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of the Company's share capital, the exercise price cannot be less than 110% of the fair market value of the Company's ordinary shares on the date of that grant.

Starting from February 15, 2006, the Company granted restricted Class A ordinary shares of the Company ("Restricted Shares"). Terms for the Restricted Shares are the same as share options except that Restricted Shares do not require exercise and have a two to four years vesting term.

Share options

The following table summarizes the option activity for the year ended December 31, 2016:

| | Number of shares | Weighted average exercise price (US$) | Weighted average remaining contractual life (Years) | Aggregate intrinsic value (US$ in thousands) |
|---|---|---|---|---|
| **Share options** | | | | |
| Outstanding, December 31, 2015 | 220,165 | 1,437.70 | 7.55 | 115,458 |
| Granted | 50,409 | 1,684.20 | | |
| Exercised | (26,933) | 1,011.90 | | |
| Expired/Cancelled | (31) | 1,067.00 | | |
| Forfeited | (12,371) | 1,505.80 | | |
| Outstanding, December 31, 2016 | 231,239 | 1,537.40 | 7.25 | 61,621 |
| Vested and expected to vest at December 31, 2016 | 205,508 | 1,507.80 | 7.12 | 58,927 |
| Exercisable at December 31, 2016 | 114,141 | 1,279.30 | 6.06 | 51,362 |

The aggregate intrinsic value in the table above represents the difference between the Company's closing stock price on the last trading day in 2016 and the exercise price.

Total intrinsic value of options exercised for the years ended December 31, 2014, 2015 and 2016 was RMB224.80 million, RMB199.88 million and RMB142.57 million (US$20.53 million), respectively. The total fair value of options vested during the years ended December 31, 2014, 2015 and 2016 was RMB149.22 million, RMB149.00 million and RMB 224.94 million (US$32.40 million), respectively.

As of December 31, 2016, there was RMB323.43 million (US$46.58 million) unrecognized share-based compensation cost related to share options. That deferred cost is expected to be recognized over a weighted-average vesting period of 2.8 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

F-57

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

The fair value of each option award was estimated on the date of grant using the Black-Scholes-Merton valuation model. The volatility assumption was estimated based on historical volatility of the Company's share price applying the guidance provided by ASC 718. Assumptions of the expected term were based on the vesting and contractual terms and employee demographics. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the assumptions used to estimate the fair values of the share options granted in the years presented:

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Risk-free interest rate | 1.52%~1.77% | 1.31%~1.36% | 1.13%~1.47% |
| Dividend yield | — | — | — |
| Expected volatility range | 40.96%~41.59% | 40.04%~40.57% | 38.91%~40.09% |
| Weighted average expected volatility | 41.36% | 40.21% | 39.37% |
| Expected life (in years) | 4.57 | 5.02~5.13 | 5.75~5.92 |

In addition, the Company recognizes share-based compensation expense net of an estimated forfeiture rate and therefore only recognizes compensation cost for those shares expected to vest over the service period of the award. The estimation of the forfeiture rate is primarily based on historical experience of employee turnover. To the extent the Company revises this estimate in the future, the share-based payments could be materially impacted in the year of revision, as well as in the following years.

The exercise price of options granted during the years 2014, 2015 and 2016 equaled the market price of the ordinary shares on the grant date. The weighted-average grant-date fair value of options granted during the years 2014, 2015, and 2016 was US$755.00, US$790.00, and US$ 659.70, respectively.

Restricted shares

Restricted shares activity for the year ended December 31, 2016 was as follows:

|  | Number of shares | Weighted average grant date fair value (US$) |
|---|---|---|
| **Restricted shares** |  |  |
| Unvested, December 31, 2015 | 344,534 | 1,853.50 |
| Granted | 526,960 | 1,755.90 |
| Vested | (93,409) | 1,716.50 |
| Cancelled | (242) | 1,743.10 |
| Forfeited | (70,572) | 1,831.50 |
| Unvested, December 31, 2016 | 707,271 | 1,800.70 |

The total fair value of the restricted shares vested during the years ended December 31, 2014, 2015 and 2016 was RMB324.41 million, RMB700.66 million, RMB1.11 billion (US$160.34 million), respectively. The weighted-average grant-date fair value of the restricted shares granted during the years 2014, 2015, and 2016 was US$1,815.60, US$1,979.30, and US$1,755.90, respectively.

As of December 31, 2016, there was RMB5.38 billion (US$775.05 million) unrecognized share-based compensation cost related to restricted shares. That deferred cost will be recognized over a weighted-average

F-58

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

vesting period of 3.23 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

### *Subsidiaries*

The Company's subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in aggregate, for the year ended December 31, 2016.

The following table summarizes the total share-based compensation cost recognized by the Group:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2016 |
| | RMB | RMB | RMB | US$ |
| | | (In thousands) | | |
| Expensed as cost of revenues | 34,611 | 49,770 | 103,354 | 14,886 |
| Expensed as selling, general and administrative | 426,052 | 486,760 | 429,234 | 61,823 |
| Expensed as research and development | 502,077 | 850,588 | 1,227,400 | 176,782 |
| Capitalized as part of internal-used software | — | 1,381 | 214 | 31 |

## 19.  RELATED PARTY TRANSACTIONS

The related party transactions mainly represented online marketing services provided by the Company to Ctrip (including Qunar), the total transaction amounts for the years ended December 31, 2015 and 2016 was RMB89.24 million and RMB630.76 million (US$90.85 million), respectively. Other related party transactions, including the reimbursements to Mr. Robin Yanhong Li's use of an aircraft beneficially owned by his family member for the Company's business purposes and the rental expense for an office building owned by the family members of an executive officer, were insignificant for each of the years presented.

As of December 31, 2015 and 2016, amounts due from/due to related parties were as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | 2016 |
| | RMB | RMB | US$ |
| | | (In thousands) | |
| **Amounts due from related parties, current:** | | | |
| Qunar (i) | 1,869,380 | 24,985 | 3,599 |
| Ctrip (ii) | 30,950 | 286,533 | 41,269 |
| Other related parties (ii) | 40,229 | 34,076 | 4,908 |
| **Total** | 1,940,559 | 345,594 | 49,776 |
| **Amounts due from related parties, non-current:** | | | |
| Other related parties (iii) | 9,725 | 11,153 | 1,606 |
| **Amounts due to related parties, current:** | | | |
| Qunar (iv) | 711,433 | 274,968 | 39,604 |
| Ctrip | 6,966 | 124,705 | 17,961 |
| Other related parties | 67,546 | 59,014 | 8,500 |
| **Total** | 785,945 | 458,687 | 66,065 |

(i)   The balance as of December 31, 2015 mainly represents short-term interest-bearing loans of RMB1,774.00 million provided by the Company to Qunar, which was a majority-owned subsidiary of the Company prior

F-59

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

      to October 26, 2015 and became a majority-owned subsidiary of Ctrip on December 31, 2015. These loans were fully repaid in March 2016.

(ii)     Balances in connection with services provided between the Company and its equity method investees arose in the ordinary course of business.

(iii)    The balances mainly represent rental deposits paid in advance to the related party of one of the executive officers. Pursuant to the rental agreements, certain subsidiaries of the Company rent an office building owned by the family members of the executive officer.

(iv)    The balance as of December 31, 2015 mainly represents a short-term interest-bearing loan provided by Qunar to the Company of US$100.00 million in October 2015. The loan was fully repaid in March 2016.

## 20.  SEGMENT REPORTING

The operations of the Company are organized into three segments, consisting of Search Services, Transaction Services, and iQiyi. Search Services are keyword-based marketing services targeted at and triggered by internet user's search queries, which mainly include P4P services and other online marketing services. Transaction Services include Baidu Nuomi, Baidu Deliveries, Baidu Mobile Game, Baidu Wallet, Baidu Map and others. iQiyi represents the online video business.

The Company derives the results of the segments directly from its internal management reporting system. The CODM measures the performance of each segment based on metrics of revenue and earnings from operations and uses these results to evaluate the performance of, and to allocate resources to, each of the segments. The Company does not allocate any share-based compensation expenses to its segments as the CODM does not use this information to measure the performance of the operating segments. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented.

The table below provides a summary of the Group's operating segment results for the years ended December 31, 2014, 2015 and 2016.

|  | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2015 | 2016 | 2016 |
|  | RMB | RMB | RMB | US$ |
|  | | (In thousands) | | |
| **Search Services** | | | | |
| Revenues | 43,727,459 | 55,667,478 | 55,375,031 | 7,975,663 |
| Operating profit | 20,547,793 | 28,117,837 | 27,152,807 | 3,910,818 |
| **Transaction Services** | | | | |
| Revenues | 3,822,456 | 7,005,941 | 4,894,486 | 704,953 |
| Operating loss | (5,973,978) | (13,145,445) | (12,386,035) | (1,783,960) |
| **iQiyi** | | | | |
| Revenues | 2,873,552 | 5,295,760 | 11,283,329 | 1,625,137 |
| Operating loss | (1,110,299) | (2,383,438) | (2,765,169) | (398,267) |
| **Inter-segment** | | | | |
| Revenues | (1,371,149) | (1,587,450) | (1,003,482) | (144,531) |
| Operating profit (loss) | 302,988 | 469,718 | (192,535) | (27,732) |
| **Segment operating profit** | 13,766,504 | 13,058,672 | 11,809,068 | 1,700,859 |
| Unallocated expenses | (962,740) | (1,387,118) | (1,759,988) | (253,491) |
| **Group consolidated operating profit** | 12,803,764 | 11,671,554 | 10,049,080 | 1,447,368 |

F-60

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 21.   FAIR VALUE MEASUREMENT

ASC topic 820 ("ASC 820"), *Fair Value Measurements and Disclosures,* establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 – Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets

Level 2 – Include other inputs that are directly or indirectly observable in the marketplace

Level 3 – Unobservable inputs which are supported by little or no market activity

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

### *Assets and Liabilities Measured or Disclosed at Fair Value*

In accordance with ASC 820, the Company measures available-for-sale investments and trading investments at fair value on a recurring basis. The fair value of time deposits are determined based on the prevailing interest rates in the market. The fair values of the Company's held-to-maturity investments as disclosed are determined based on the discounted cash flow model using the discount curve of market interest rates. The fair value of the Company's available-for-sale debt investments and trading investments are measured using the income approach, based on quoted market interest rates of similar instruments and other significant inputs derived from or corroborated by observable market data. The fair values of the Company's available-for-sale equity investments in the equity securities of publicly listed companies are measured using quoted market prices.

The Company measures certain financial assets, including equity method investments and cost method investments, at fair value on a nonrecurring basis only if an impairment charge were to be recognized. The Company's non-financial assets, such as intangible assets, goodwill and fixed assets, would be measured at fair value only if they were determined to be impaired on an other-than-temporary basis.

The fair value of the long-term notes payable is disclosed using quoted market price.

F-61

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

Assets and liabilities measured or disclosed at fair value are summarized below:

| | | Fair value measurement or disclosure at December 31, 2015 using | | | |
|---|---|---|---|---|---|
| | **Total fair value at December 31, 2015**<br>**RMB** | **Quoted prices in active markets for identical assets (Level 1)**<br>**RMB** | **Significant other observable inputs (Level 2)**<br>**RMB**<br>**(In thousands)** | **Significant unobservable inputs (Level 3)**<br>**RMB** | **Total losses**<br>**RMB** |
| ***Fair value disclosure (Notes 2 and 4)*** | | | | | |
| Cash equivalents | | | | | |
| Time deposits | 678,000 | | 678,000 | | |
| Money market fund | 608,353 | 608,353 | | | |
| Short-term investments | | | | | |
| Held-to-maturity investments | | | | | |
| Fixed-rate investments | 37,134,096 | | 37,134,096 | | |
| Long-term investments | | | | | |
| Held-to-maturity investments | | | | | |
| Fixed-rate investments | 1,806,446 | | 1,806,446 | | |
| Long-term notes payable | 30,714,586 | 30,714,586 | | | |
| ***Fair value measurements*** | | | | | |
| *Recurring* | | | | | |
| Short-term investments | | | | | |
| Available-for-sale investments | | | | | |
| Fixed-rate debt investments | 6,958,399 | | 6,958,399 | | |
| Adjustable-rate debt investments | 13,325,385 | | 13,325,385 | | |
| Equity investments | 742,618 | 742,618 | | | |
| Long-term investments | | | | | |
| Available-for-sale investments | | | | | |
| Equity investments | 276,965 | 276,965 | | | |
| *Non-recurring* | | | | | |
| Long-term investments | — | — | — | — | (116,978) |
| **Total assets measured at fair value** | 21,303,367 | 1,019,583 | 20,283,784 | — | (116,978) |

F-62

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

In 2015, the value of a cost method investment was written down to zero, as a result of declining financial performance and a change in the business circumstances of the investee. The corresponding impairment charge incurred was recorded in earnings for the year then ended.

| | Total fair value at December 31, 2016 | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Total losses | |
|---|---|---|---|---|---|---|---|
| | RMB | US$ | RMB | RMB (In thousands) | RMB | RMB | US$ |
| **_Fair value disclosure (Notes 2 and 4)_** | | | | | | | |
| Cash equivalents | | | | | | | |
| Time deposits | 1,674,172 | 241,131 | | 1,674,172 | | | |
| Money market fund | 4,419,206 | 636,498 | 4,419,206 | | | | |
| Short-term investments | | | | | | | |
| Held-to-maturity investments | | | | | | | |
| Fixed-rate investments | 41,868,641 | 6,030,339 | | 41,868,641 | | | |
| Long-term notes payable | 33,252,561 | 4,789,365 | 33,252,561 | | | | |
| **_Fair value measurements_** | | | | | | | |
| _Recurring_ | | | | | | | |
| Short-term investments | | | | | | | |
| Available-for-sale investments | | | | | | | |
| Fixed-rate debt investments | 14,377,856 | 2,070,842 | | 14,377,856 | | | |
| Adjustable-rate debt investments | 14,986,816 | 2,158,550 | | 14,986,816 | | | |
| Equity investments | 28,787 | 4,146 | 28,787 | | | | |
| Trading securities | 7,747,436 | 1,115,863 | | 7,747,436 | | | |
| Long-term investments Available-for-sale investments | | | | | | | |
| Equity investments | 496,512 | 71,513 | 496,512 | | | | |
| _Non-recurring_ | | | | | | | |
| Long-term investments | — | — | — | — | — | (150,745) | (21,712) |
| Intangible assets | | | | | | (822) | (118) |
| **Total assets measured at fair value** | 37,637,407 | 5,420,914 | 525,299 | 37,112,108 | — | (151,567) | (21,830) |

In 2016, the value of certain cost method investments and an equity method investment were written down to zero, as a result of declining financial performance and a change in the business circumstances of the investee. The corresponding impairment charges incurred were recorded in earnings for the year then ended.

F-63

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2014, 2015 and 2016

## 22.  SUBSEQUENT EVENTS

### Disposal of Baidu Mobile Game Business

On January 13, 2017, the Company entered into an agreement with two third-party companies, for the disposition of the Company's mobile game business for a total purchase price of approximately RMB1.20 billion (US$172.69 million) in cash.

### Issuance of Convertible Note

On January 25, 2017, iQiyi issued US$1.53 billion convertible notes (the "iQiyi Notes") in a private placement, among which US$300.00 million was purchased by the Company and the rest US$1.23 billion was purchased by external investors. The iQiyi Notes bear interest at a coupon rate of 1.5% per annum with a maturity date of January 25, 2018, and can be converted into preferred shares in a qualified financing or at the iQiyi's election. The proceeds will be used for general working capital purpose.

### Share Repurchase Program

In March 2017, the Company started the share repurchase program announced on October 29, 2015. Until March 29, 2017, the Company repurchased 68,761 Class A ordinary shares from the open market at an aggregated purchase price of US$116.49 million. The repurchased shares will be cancelled under Cayman Island law upon repurchase and the difference between the par value and the repurchase price will be debited to retained earnings.

F-64

**Exhibit 4.34**

**Termination Agreement**

This Termination Agreement (this "**Agreement**") is entered into as of May 3, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a WFOE duly organized and validly current under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Beijing Perusal Technology Co., Ltd.**, a limited liability company duly organized and validly current under the PRC laws, with its registered address at A2 2F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

**Party C: Jiping Liu,** a PRC citizen, ID No.:                    , and
      **Yazhu Zhang**, a PRC citizen, ID No.:

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as the "Other Parties."

WHEREAS

(1)    Each Party executed the documents listed in Exhibit 1 (collectively the "**Control Documents**") prior to the date hereof;

(2)    Party C is the shareholder of Party B, holding in aggregate 100% of the equity interests in Party B, of which Jiping Liu holds 80% and Yazhu Zhang holds 20% of Party B;

(3)    Jiping Liu executed a Capital Contribution Transfer Agreement dated May 3, 2016 with Zhixiang Liang and Xiaodong Wang, to transfer 50% of the equity interests in Party B to Zhixiang Liang and 30% to Xiaodong Wang; Yazhu Zhang executed a Capital Contribution Transfer Agreement dated May 3, 2016 with Xiaodong Wang to transfer the 20% equity interests it holds in Party B to Xiaodong Wang; and

(4)    Each Party agrees to terminate all of the Control Documents as agreed herein.

Upon friendly consultation, the Parties agree as follows:

**1.**    **Termination of Control Documents**

1.1    The Parties hereby irrevocably agree and acknowledge that each of the Control Documents shall terminate and cease to have any effect as of the date hereof.

1

1.2    As of the date hereof, each Party will cease to enjoy any of its rights under all and/or any of the Control Documents, and cease to fulfill any of its obligations under all and/or any of the Control Documents; provided, however that (1) the rights and obligations already exercised and fulfilled by the Parties based on the current Control Documents shall remain valid; (2) Party C will remain obliged to repay the entire loan already paid by Party A to Party C in accordance with the Amended and Restated Loan Agreement 5; and (3) in connection with the equity of Party B pledged by Party C to Party A under the current Control Documents, Party A, Party B and Party C shall file an application to the competent AIC where Party B is domiciled within fifteen (15) working days after the date hereof to go through the registration procedures to release the pledge on the equity.

1.3    Except otherwise provided in the above Section 1.2, each of the Parties hereby irrevocably and unconditionally waive any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties hereto, arising directly or indirectly in connection with or as a result of all and/or any of the current Control Documents.

1.4    Without prejudice to the generality of the above Sections 1.2 and 1.3, as of the date hereof, each of the Parties hereby waives any commitment, debt, claim, demand, obligation and liability of any sort or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties hereto and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, arising in connection with or as a result of the current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.    Representations and Warranties**

2.1    **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal right, power and authority to execute this Agreement and all contracts and documents to which it is a party as mentioned herein, and the execution of this Agreement truly reflects its intention;

(2) its execution and performance of this Agreement will not constitute a breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or any need to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents to which it is a party as mentioned herein, and for its compliance with and performance of its obligations hereunder and thereunder.

**3.    Covenants**

3.1    To smoothly terminate the rights and obligations under the current Control Documents, each party shall execute all documents and take all actions that are necessary or appropriate, actively assist the Other Parties in obtaining relevant government approvals and/or registration documents and go through relevant termination procedures.

**4.    Dissolution and Termination of Agreement**

4.1    Except for the circumstances expressly provided herein, the Parties agree that this Agreement may be dissolved or terminated:

(1) by all the Parties through negotiation, all expenses and losses thus incurred shall be borne by all the Parties respectively.

(2) by the non-defaulting Party if the purpose of this Agreement cannot be realized due to a Party's breach of its obligations hereunder.

**5.    Liabilities for Breach and Indemnification**

5.1    Any Party is deemed in breach of this Agreement if it violates or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

5.2    Unless otherwise specifically agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Parties for any cost, liabilities or any loss incurred (including without limitation any interest and lawyer's fees payable or lost as a result of such breach). The total amount of indemnity paid by the defaulting Party to the non-defaulting Parties shall be the loss incurred by such breach.

**6.    Governing Law and Dispute Resolution**

6.1    The conclusion, validity, interpretation, performance and resolution of disputes hereunder shall be governed by and construed in accordance with the laws of the PRC.

6.2    All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through amicable consultation.

3

6.3   Any Party may submit the dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in Beijing in accordance with its then effective arbitration rules and procedures. The arbitral tribunal consists of three arbitrators appointed in accordance with the arbitration rules, one designated by the claimant, one by the respondent and the third arbitrator shall be appointed by the previous two arbitrators after consultation or by the CIETAC. The arbitration shall be conducted in confidential manner and in Chinese. The arbitral award shall be final and binding upon both Parties.

6.4   During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**7.   Confidentiality**

7.1   The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for a disclosure:

(1) to the auditor, lawyer and such other staff engaged in the ordinary course of business, provided that such persons must be subject to a confidentiality obligation with respect to any information relating to this Agreement that is acquired during such engagement; and

(2) that relates to the materials and documents that may be otherwise accessible from a public source, or pursuant to an express requirement from a law, regulation or relevant stock exchange authority.

**8.   Miscellaneous**

8.1   This Agreement shall become effective upon signed by all the Parties.

8.2   The Parties may amend or modify this Agreement upon consultation among the Parties. Any such amendment or modification must be made in writing and become effective upon signed by all the Parties.

8.3   Should any provision hereof be held invalid or unenforceable, such provision shall be deemed absent without affecting the validity of the other provisions hereof, and the Parties shall negotiate to seek a new provision to the extent permissible by law to ensure that the intent of the original provision can be realized to the maximum extent.

8.4   Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall constitute its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

4

8.5   This Agreement is made in four counterparts, one for each Party, and all counterparts shall be equally binding.

[Remainder of the page intentionally left blank]

5

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Baidu Online Network Technology (Beijing) Co., Ltd. (stamp)**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

Signature page of Termination Agreement

6

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Beijing Perusal Technology Co., Ltd.**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

Signature page of Termination Agreement

7

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Jiping Liu**

Signature:    /s/ Jiping Liu _____

Signature page of Termination Agreement

8

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Yazhu Zhang**

Signature:    /s/ Yazhu Zhang_____

Signature page of Termination Agreement

9

**Exhibit 1**

Schedule of Control Documents

| No. | Document Name | Parties | Execution Date |
|---|---|---|---|
| 1 | Business Operating Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Beijing Perusal Technology Co., Ltd., Jiping Liu and Yazhu Zhang | June 23, 2006 |
| 2 | Supplemental Articles to Business Operating Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Beijing Perusal Technology Co., Ltd., Jiping Liu and Yazhu Zhang | April 22, 2010 |
| 3 | Amended and Restated Loan Agreement 5 | Baidu Online Network Technology (Beijing) Co., Ltd. and Jiping Liu | December 16, 2015 |
| 4 | Amended and Restated Loan Agreement 5 | Baidu Online Network Technology (Beijing) Co., Ltd. and Yazhu Zhang | December 16, 2015 |
| 5 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement 5 | Baidu Online Network Technology (Beijing) Co., Ltd., Jiping Liu and Beijing Perusal Technology Co., Ltd. | December 16, 2015 |
| 6 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement 5 | Baidu Online Network Technology (Beijing) Co., Ltd., Yazhu Zhao and Beijing Perusal Technology Co., Ltd. | December 16, 2015 |
| 7 | Voting Proxy Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Jiping Liu and Yazhu Zhang | June 23, 2006 |

10

| No. | Document Name | Parties | Execution Date |
|-----|---------------|---------|----------------|
| 8 | Voting Proxy Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Jiping Liu and Yazhu Zhang | May 17, 2008 |
| 9 | Amended and Restated Equity Pledge Contract 5 | Baidu Online Network Technology (Beijing) Co., Ltd. and Jiping Liu | December 16, 2015 |
| 10 | Amended and Restated Equity Pledge Contract 5 | Baidu Online Network Technology (Beijing) Co., Ltd. and Yazhu Zhang | December 16, 2015 |
| 11 | Sections 1.2, 1.3, 1.4, 1.5, 1.6 and 1.7 of Supplementary Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Beijing Perusal Technology Co., Ltd., Jiping Liu and Yazhu Zhang | September 6, 2011 |
| 12 | Power of Attorney | Jiping Liu | June 23, 2006 |
| 13 | Power of Attorney | Yazhu Zhang | June 23, 2006 |

11

**Termination Agreement**

This Termination Agreement (this "**Agreement**") is entered into as of March 15, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a WFOE duly organized and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Beijing Perusal Technology Co., Ltd.**, a limited liability company duly organized and validly existing under the PRC laws, with its registered address at A2 2F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

**Party C: Jiping Liu**, a PRC citizen, ID No.:               , and
    **Yazhu Zhang**, a PRC citizen, ID No.:

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as the "Other Parties."

WHEREAS

(1)    Each Party executed the documents listed in Exhibit 1 (collectively the "**Control Documents**") prior to the date hereof; and

(2)    Each Party agrees to terminate all of the Control Documents as agreed herein.

Upon friendly consultation, the Parties agree as follows:

**1.    Termination of Control Documents**

1.1    The Parties hereby irrevocably agree and acknowledge that each of the Control Documents shall terminate and cease to have any effect as of the date hereof.

1.2    As of the date hereof, each Party will cease to enjoy any of its rights under all and/or any of the Control Documents, and cease to fulfill any of its obligations under all and/or any of the Control Documents; the Control Documents shall cease to be binding on the Parties. The Parties shall restore to the state prior to the execution of the Control Documents by sticking to the principles of fairness, reasonableness and honesty.

1.3    Except otherwise provided in the above Section 1.2, each of the Parties hereby irrevocably and unconditionally waive any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties hereto, arising directly or indirectly in connection with or as a result of all and/or any of the Control Documents.

12

1.4   Without prejudice to the generality of the above Sections 1.2 and 1.3, as of the date hereof, each of the Parties hereby waives any commitment, debt, claim, demand, obligation and liability of any sort or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties hereto and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, arising in connection with or as a result of the Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.   Representations and Warranties**

2.1   **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal right, power and authority to execute this Agreement and all contracts and documents to which it is a party as mentioned herein, and the execution of this Agreement truly reflects its intention;

(2) its execution and performance of this Agreement will not constitute a breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or any need to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents to which it is a party as mentioned herein, and for its compliance with and performance of its obligations hereunder and thereunder.

**3.   Covenants**

3.1   To smoothly terminate the rights and obligations under the Control Documents, each party shall execute all documents and take all actions that are necessary or appropriate, actively assist the Other Parties in obtaining relevant government approvals and/or registration documents and go through relevant termination procedures.

**4.   Dissolution and Termination of Agreement**

4.1   Except for the circumstances expressly provided herein, the Parties agree that this Agreement may be dissolved or terminated:

13

(1) by all the Parties through negotiation, all expenses and losses thus incurred shall be borne by all the Parties respectively.

(2) by the non-defaulting Party if the purpose of this Agreement cannot be realized due to a Party's breach of its obligations hereunder.

**5.    Liabilities for Breach and Indemnification**

5.1    Any Party is deemed in breach of this Agreement if it violates or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

5.2    Unless otherwise specifically agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Parties for any cost, liabilities or any loss incurred (including without limitation any interest and lawyer's fees payable or lost as a result of such breach). The total amount of indemnity paid by the defaulting Party to the non-defaulting Parties shall be the loss incurred by such breach.

**6.    Governing Law and Dispute Resolution**

6.1    The conclusion, validity, interpretation, performance and resolution of disputes hereunder shall be governed by and construed in accordance with the laws of the PRC.

6.2    All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through amicable consultation.

6.3    Any Party may submit the dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in Beijing in accordance with its then effective arbitration rules and procedures. The arbitral tribunal consists of three arbitrators appointed in accordance with the arbitration rules, one designated by the claimant, one by the respondent and the third arbitrator shall be appointed by the previous two arbitrators after consultation or by the CIETAC. The arbitration shall be conducted in confidential manner and in Chinese. The arbitral award shall be final and binding upon both Parties.

6.4    During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**7.    Confidentiality**

7.1    The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for a disclosure:

14

(1) to the auditor, lawyer and such other staff engaged in the ordinary course of business, provided that such persons must be subject to a confidentiality obligation with respect to any information relating to this Agreement that is acquired during such engagement; and

(2) that relates to the materials and documents that may be otherwise accessible from a public source, or pursuant to an express requirement from a law, regulation or relevant stock exchange authority.

**8.    Miscellaneous**

8.1    This Agreement shall become effective upon signed by all the Parties.

8.2    The Parties may amend or modify this Agreement upon consultation among the Parties. Any such amendment or modification must be made in writing and become effective upon signed by all the Parties.

8.3    Should any provision hereof be held invalid or unenforceable, such provision shall be deemed absent without affecting the validity of the other provisions hereof, and the Parties shall negotiate to seek a new provision to the extent permissible by law to ensure that the intent of the original provision can be realized to the maximum extent.

8.4    Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall constitute its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

8.5    This Agreement is made in four counterparts, one for each Party, and all counterparts shall be equally binding.

[Remainder of the page intentionally left blank]

15

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Baidu Online Network Technology (Beijing) Co., Ltd. (stamp)**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

Signature page of Termination Agreement

16

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Beijing Perusal Technology Co., Ltd.**

Signature:    /s/ Zhan Wang

Name: Zhan Wang
Title: Legal Representative

Signature page of Termination Agreement

17

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Jiping Liu**

Signature:    /s/ Jiping Liu

Signature page of Termination Agreement

18

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Termination Agreement to be duly executed by its authorized representative on its behalf with immediate effect as of the date first written above.

**Yazhu Zhang**

Signature:    /s/ Yazhu Zhang

Signature page of Termination Agreement

19

**Exhibit 1**

Schedule of Control Documents

| No. | Document Name | Parties | Execution Date |
|-----|---------------|---------|----------------|
| 1 | Amended and Restated Loan Agreement 6 | Baidu Online Network Technology (Beijing) Co., Ltd. and Jiping Liu | March 1, 2016 |
| 2 | Amended and Restated Loan Agreement 6 | Baidu Online Network Technology (Beijing) Co., Ltd. and Yazhu Zhang | March 1, 2016 |
| 3 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement 6 | Baidu Online Network Technology (Beijing) Co., Ltd., Jiping Liu and Beijing Perusal Technology Co., Ltd. | March 1, 2016 |
| 4 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement 6 | Baidu Online Network Technology (Beijing) Co., Ltd., Yazhu Zhao and Beijing Perusal Technology Co., Ltd. | March 1, 2016 |
| 5 | Amended and Restated Equity Pledge Contract 6 | Baidu Online Network Technology (Beijing) Co., Ltd. and Jiping Liu | March 1, 2016 |
| 6 | Amended and Restated Equity Pledge Contract 6 | Baidu Online Network Technology (Beijing) Co., Ltd. and Yazhu Zhang | March 1, 2016 |
| 7 | Payment Instruction Letter | Jiping Liu | March 1, 2016 |
| 8 | Payment Instruction Letter | Yazhu Zhang | March 1, 2016 |

20

**Exhibit 4.35**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on June 20, 2016 in Beijing, by and between:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
        Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Xiaodong Wang**
        ID Card No.:

WHEREAS,

1.    Party A is a foreign invested enterprise incorporated under the laws of the PRC,

2.    Party B is a Chinese citizen, holding 50% of equity interests of Beijing Perusal Technology Co., Ltd. ("Perusal"), and is the shareholder of Perusal;

3.    On May 3, 2016, Party A provided Party B with an interest-free loan of RMB1.02344 billion (RMB1,023,440,000), used towards the investment in Perusal. With regards to such loan, Party A and Party B signed a Loan Agreement (the "Original Loan Agreement") on May 3, 2016.

4.    The Parties propose to amend and restate the Original Loan Agreement as expressed herein.

Party A and Party B, through friendly consultation, agree as follows:

1.    In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB1.59844 billion yuan (RMB1,598,440,000) to Party B, and Party B agrees to accept such loan.

2.    Party B confirms the receipt of such loan and has applied part of such loan equal to RMB 645,940,000 toward payment of transfer price to acquire the equity interests of Perusal, and the remaining RMB952,500,000 will be used to pay the newly increased registered capital of Perusal subscribed by it.

3.    The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    (1)    Party B leaves or is dismissed from Party A or an affiliated company of Party A;

    (2)    Party B's death, lack or limitation of civil capacity;

    (3)    Party B engages in criminal act or is involved in criminal activities;

    (4)    Any third party files a claim against Party B that exceeds RMB100,000; or

1

(5)  Subject to the laws of the PRC, Party A or a person designated by Party A is permitted to invest in Perusal to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Perusal to Party B pursuant to the provisions of the Exclusive Equity Purchase and Transfer Agreement mentioned in Article 4 hereof, to exercise the option.

4.  The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designate other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Perusal held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Perusal to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance with the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the subscription price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to execute the Exclusive Equity Purchase and Transfer Agreement with respect to the above.

5.  The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall, to the extent permissible by the PRC laws and as required by Party A's written notice, transfer the equity interest in Perusal to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6.  The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Perusal to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, Party B agrees to pay such excess amount over the principal of proceeds, net of the individual income tax and other taxes and fees payable by Party B, to Party A at its decision to the extent permissible by the law.

7.  The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if all of the following requirements are met:

(1)  Party B has transferred all his equity interests in Perusal to Party A and/or its designated person; and

(2)  Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8.  To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Perusal to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

2

9. Party A hereby represents and warrants to Party B that, as of the execution date of this Agreement:

   (1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

   (2) Party A has the right to execute and perform this Agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

   (3) The principal of the loan to Party B is legally owned by Party A;

   (4) The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any promise made by Party A to a third party; and

   (5) This Agreement, once executed, shall constitute a legal, valid and enforceable obligations of Party A.

10. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

   (1) Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Perusal;

   (2) Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

   (3) The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any promise made by Party B to a third party;

   (4) This Agreement, once executed, shall constitute a legal, valid and enforceable obligation of Party B;

   (5) Party B has paid contribution in full for the equity interests he holds in Perusal in accordance with applicable laws and regulations;

   (6) Except pursuant to the provisions stipulated in the equity pledge agreement and exclusive equity purchase and transfer option agreement, Party B did not create any mortgage, pledge or other security over his equity interest in Perusal, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

   (7) There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Perusal held by Party B;

   (8) Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes, during the term of this Agreement:

   (1) not to sell, transfer, pledge or otherwise dispose of his equity interests or other interests in Perusal, nor to allow the creation of any other security interest over his equity interests without the prior written consent of Party A, except pledges or other rights created for the benefit of Party A;

3

(2)  not to vote for, support or execute any shareholder resolutions at Perusal's shareholder's meetings that permit the sale, transfer, pledge or other disposal of, or the creation of any other security interest on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except those made to Party A;

(3)  not to vote for, support or execute any shareholder resolutions at Perusal's shareholder meetings that permit Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)  to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Perusal;

(5)  to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain his ownership of equity interests in Perusal;

(6)  to refrain from any act and/or omission that may materially affect the assets, business and liabilities of Perusal without the prior written consent of Party A;

(7)  to appoint any person nominated by Party A as executive director of Perusal, upon Party A's request;

(8)  in connection with Party A's exercise of the subscription right provided hereunder, to transfer promptly and unconditionally all equity interests in Perusal held by Party B to Party A and/or its designated person, to the extent and within the scope permissible under the laws of the PRC;

(9)  not to request Perusal to distribute dividends or profits to it;

(10)  once Party B transfers his equity interest in Perusal to Party A or its designated person, to repay the consideration he receives as the principal and the interests or capital use cost to Party A to the extent permitted under the laws of the PRC;

(11)  to strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that suffices to affect the validity and enforceability of this Agreement.

12.  Party B, as the shareholder of Perusal, undertakes to cause Perusal, during the term of this Agreement:

(1)  not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2)  to maintain its existence and handle matters prudently and affectively according to good financial and business rules and practices;

(3)  not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4)  not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except the liabilities (i) arising from the ordinary or day-to-day course of business, rather than through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

4

(5) to operate all businesses on a continued basis and maintain the value of its assets;

(6) not to execute any material contracts (for the purpose of this item, a contract will be deemed material if its value exceeds RMB [100,000]) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7) to provide all information about its operations and financial affairs at Party A's request;

(8) not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9) not to distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10) to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11) to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain tis ownership of its assets;

(12) to strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Perusal and Party A and other agreements, duly perform its obligations under the Service Agreement and such other agreements, and refrain from any act or omission that suffice to affect the validity and enforceability of the Service Agreement.

13. This Agreement shall be binding on, and only for the benefits of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14. Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15. The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

(1) Both Parties shall strive to settle any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, any party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its then-current rules at the time of application. The arbitration award shall be final and conclusive and binding upon the Parties.

(2) The arbitration shall take place in Beijing.

(3) The arbitration language shall be Chinese.

5

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a gross negligence, fraud, or other material misconduct; or (b) upon Party A's bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any one clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is incurred or becomes due before the expiration or early termination of this Agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, and each Party shall hold one counterpart. Both counterparts shall have the same legal effect.

[No text below]

6

[No text on this page]

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Agreement to be duly executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal representative/authorized representative: /s/ Hailong Xiang
Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Xiaodong Wang**
Signature:   /s/ Xiaodong Wang

7

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on June 20, 2016 in Beijing, by and between:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
　　Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Zhixiang Liang**
　　ID Card No.:

WHEREAS,

　　1.　Party A is a foreign invested enterprise incorporated under the laws of the PRC,

　　2.　Party B is a Chinese citizen, holding 50% of equity interests of Beijing Perusal Technology Co., Ltd. ("Perusal"), and is the shareholder of Perusal;

　　3.　On May 3, 2016, Party A provided Party B with an interest-free loan of RMB 1.02344 billion (1,023,440,000) yuan, used towards the investment in Perusal. With regards to such loan, Party A and Party B signed a Loan Agreement (the "Original Loan Agreement") on May 3, 2016.

　　4.　The Parties propose to amend and restate the Original Loan Agreement as expressed herein.

Party A and Party B, through friendly consultation, agree as follows:

　　1.　In accordance with the terms and conditions of this Agreement, Party A agrees to provide an interest-free loan in the amount of RMB1.59844 billion yuan (RMB1,598,440,000) to Party B, and Party B agrees to accept such loan.

　　2.　Party B confirms the receipt of such loan and has applied part of such loan equal to RMB645,940,000 toward payment of transfer price to acquire the equity interests of Perusal, and the remaining RMB952,500,000 will be used to pay the newly increased registered capital of Perusal subscribed by it.

　　3.　The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

　　　　(1)　Party B leaves or is dismissed from Party A or an affiliated company of Party A;

　　　　(2)　Party B's death, lack or limitation of civil capacity;

　　　　(3)　Party B engages in criminal act or is involved in criminal activities;

　　　　(4)　Any third party files a claim against Party B that exceeds RMB100,000; or

8

(5) Subject to the laws of the PRC, Party A or a person designated by Party A is permitted to invest in Perusal to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Perusal to Party B pursuant to the provisions of the Exclusive Equity Purchase and Transfer Option Agreement mentioned in Article 4 hereof, to exercise the option.

4. The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designate other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Perusal held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Perusal to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance with the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the subscription price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to execute the Exclusive Equity Purchase and Transfer Option Agreement with respect to the above.

5. The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall, to the extent permissible by the PRC laws and as required by Party A's written notice, transfer the equity interest in Perusal to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6. The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Perusal to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, Party B agrees to pay such excess amount over the principal of proceeds, net of the individual income tax and other taxes and fees payable by Party B, to Party A at its decision to the extent permissible by the law.

7. The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if all of the following requirements are met:

(1) Party B has transferred all his equity interests in Perusal to Party A and/or its designated person; and

(2) Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8. To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Perusal to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

9

9.    Party A hereby represents and warrants to Party B that, as of the execution date of this Agreement:

(1)    Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

(2)    Party A has the right to execute and perform this Agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has taken necessary actions to get all necessary and appropriate approvals and authorizations;

(3)    The principal of the loan to Party B is legally owned by Party A;

(4)    The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any promise made by Party A to a third party; and

(5)    This Agreement, once executed, shall constitute a legal, valid and enforceable obligations of Party A.

10.    Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

(1)    Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Perusal;

(2)    Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

(3)    The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any promise made by Party B to a third party;

(4)    This Agreement, once executed, shall constitute a legal, valid and enforceable obligation of Party B;

(5)    Party B has paid contribution in full for the equity interests he holds in Perusal in accordance with applicable laws and regulations;

(6)    Except pursuant to the provisions stipulated in the equity pledge agreement and exclusive equity purchase and transfer option agreement, Party B did not create any mortgage, pledge or other security over his equity interest in Perusal, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Perusal held by Party B;

(8)    Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes, during the term of this Agreement:

(1)    not to sell, transfer, pledge or otherwise dispose of his equity interests or other interests in Perusal, nor to allow the creation of any other security interest over his equity interests without the prior written consent of Party A, except pledges or other rights created for the benefit of Party A;

10

(2)     not to vote for, support or execute any shareholder resolutions at Perusal's shareholder's meetings that permit the sale, transfer, pledge or other disposal of, or the creation of any other security interest on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except those made to Party A;

(3)     not to vote for, support or execute any shareholder resolutions at Perusal's shareholder meetings that permit Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)     to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Perusal;

(5)     to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain his ownership of equity interests in Perusal;

(6)     to refrain from any act and/or omission that may materially affect the assets, business and liabilities of Perusal without the prior written consent of Party A;

(7)     to appoint any person nominated by Party A as executive director of Perusal, upon Party A's request;

(8)     in connection with Party A's exercise of the subscription right provided hereunder, to transfer promptly and unconditionally all equity interests in Perusal held by Party B to Party A and/or its designated person, to the extent and within the scope permissible under the laws of the PRC;

(9)     not to request Perusal to distribute dividends or profits to it;

(10)    once Party B transfers his equity interest in Perusal to Party A or its designated person, to repay the consideration he receives as the principal and the interests or capital use cost to Party A to the extent permitted under the laws of the PRC;

(11)    to strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that suffices to affect the validity and enforceability of this Agreement.

12.   Party B, as the shareholder of Perusal, undertakes to cause Perusal, during the term of this Agreement:

(1)     not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2)     to maintain its existence and handle matters prudently and affectively according to good financial and business rules and practices;

(3)     not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4)     not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except the liabilities (i) arising from the ordinary or day-to-day course of business, rather than through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

11

(5)    to operate all businesses on a continued basis and maintain the value of its assets;

(6)    not to execute any material contracts (for the purpose of this item, a contract will be deemed material if its value exceeds RMB [100,000]) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)    to provide all information about its operations and financial affairs at Party A's request;

(8)    not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)    not to distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)    to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)    to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain tis ownership of its assets;

(12)    to strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Perusal and Party A and other agreements, duly perform its obligations under the Service Agreement and such other agreements, and refrain from any act or omission that suffice to affect the validity and enforceability of the Service Agreement.

13.    This Agreement shall be binding on, and only for the benefits of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.    Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.    The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16.    Arbitration

(1)    Both Parties shall strive to settle any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, any party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its then-current rules at the time of application. The arbitration award shall be final and conclusive and binding upon the Parties.

(2)    The arbitration shall take place in Beijing.

(3)    The arbitration language shall be Chinese.

12

17. This Agreement shall become effective on the date of execution. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B receives the loan, and shall expire as of the date on which both Parties complete their obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a gross negligence, fraud, or other material misconduct; or (b) upon Party A's bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the subject matter herein and supersedes and replaces all prior verbal and written agreements and understandings between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any one clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is incurred or becomes due before the expiration or early termination of this Agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, and each Party shall hold one counterpart. Both counterparts shall have the same legal effect.

[No text below]

13

[No text on this page]

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Agreement to be duly executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal representative/authorized representative: /s/ Hailong Xiang
Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**
Signature:    /s/ Zhixiang Liang

14

**Exhibit 4.36**

**Equity Transfer Agreement**

This Equity Transfer Agreement (this "**Agreement**") is entered into as of May 3, 2016 in Beijing, PRC by and between:

**Party A: Jiping Liu (Transferor)**
ID No.:
Address:

**Party B: Zhixiang Liang (Transferee)**
ID No.:
Address:

The Parties above are collectively referred to as the "Parties," individually as a "Party."

WHEREAS

(1)     Party A holds 80% equity interests in Beijing Perusal Technology Co., Ltd. (the "Company"), representing a capital contribution of RMB100,400;

(2)     Party A is willing to transfer to Party B part of its capital contribution in the Company amounting to RMB627,500,000, representing 50% equity interests of the Company (the "Subject Equity"); and

(3)     Party B intends to accept the transfer of the Subject Equity.

Upon friendly consultation, the Parties agree as follows:


**1.     Transfer of Target Equity**

1.1     Party A agrees to transfer to Party B, and Party B agrees to accept the transfer of, 50% of the equity interests it holds in the Company, at a price of RMB645,940,000 (the "Transfer Price").

1.2     Party B agrees to pay the Transfer Price to Party A in one lump sum within three months after this Agreement takes effect.

1.3     The Parties shall take all necessary actions and execute all necessary documents to complete the procedures for shareholder change registration, including but not limited to filing a change application to the AIC, amending the Company's articles of association, and going through relevant change registration procedures.

1.4     The closing date of the equity transfer shall be the date on which the AIC change registration procedures are completed. As of the closing date Party A will cease to own, and Party B will become a shareholder of the Company and start to own, the Subject Equity and all rights and interests affiliated therewith, and Party B shall exercise its rights and fulfill its obligations and duties in accordance with the Company's articles of association.

1

**2.    Warranties**

Party A warrants that the equity interests it intends to transfer to Party B are legally owned by Party A and Party A has full right of disposal on such equity. Party A further guarantees that the equity transferred is free of any mortgage, pledge or guarantee or any claims from any third party. otherwise all liabilities thus arising shall be borne by Party A.

**3.    Expenses, Costs and Taxes**

All costs and taxes incurred by the Parties in connection with the execution and performance of this Agreement shall be borne by the Parties respectively; all expenses relating to registration shall be borne by the Company.

**4.    Liabilities for Breach**

If either Party materially breaches any provision provided hereunder, the non-defaulting Party may terminate this Agreement and claim damages against the defaulting Party. This Article will not affect any other right entitled by either Party in accordance with the law.

**5.    Governing Law and Dispute Resolution**

5.1    The conclusion, validity, interpretation, performance, amendment and termination of this Agreement as well as the resolution of disputes hereunder shall be governed by the laws of the People's Republic of China.

5.2    Any disputes arising from the interpretation and performance of the terms hereunder shall first be resolved by the Parties through consultation in good faith. In case of a failure to reach an agreement to resolve a dispute between the Parties within thirty (30) days after a Party makes the request of consultation in writing, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing. The arbitral award shall be final and binding upon both Parties.

5.3    In the occurrence of any dispute arising as a result of interpretation and performance of this Agreement or during the process of arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**6.    Miscellaneous**

6.1    The Parties may amend and supplement this Agreement in writing. The agreements to amend and/or supplement this Agreement between the Parties constitute integral parts of this Agreement and shall have equal legal effect as this Agreement.

6.2    Should any one or more provisions hereunder be held invalid, void or unenforceable in any respect in accordance with any law or regulation, the validity, legality or enforceability of the other provisions hereof will not be affected or prejudiced in any respect. The Parties shall negotiate in faith to seek to replace such invalid, void or unenforceable provision(s) with valid one(s) to the maximum extent permissible by the law and closest to the expectations of the Parties, to accomplish an economic effect as similar as possible.

2

6.3   This Agreement shall be concluded as of the date on which both Parties affix their signatures and seals, and shall become effective as of the date on which the approval authority renders its approval till the date on which both Parties complete their respective obligations hereunder.

6.4   This Agreement is made in five counterparts, one for each Party, one retained by the Company and the other two shall be filed to relevant approval authority for record. All counterparts shall be equally binding.

[Remainder of the page intentionally left blank]

3

(Signature page of the Equity Transfer Agreement)

**IN WITNESS WHEREOF**, each party hereto has executed this Equity Transfer Agreement as of the date first written above.

**Party A: Jiping Liu**

Signature:  /s/ Jiping Liu

**Party B: Zhixiang Liang**

Signature:  /s/ Zhixiang Liang

4

**Equity Transfer Agreement**

This Equity Transfer Agreement (this "**Agreement**") is entered into as of May 3, 2016 in Beijing, PRC by and between:

**Party A: Jiping Liu (Transferor)**
ID No.:
Address: 201 Block N, Portofino Lake Garden, Shahe, Nanshan District, Shenzhen, Guangdong Province

**Party B: Xiaodong Wang (Transferee)**
ID No.:
Address:

The Parties above are collectively referred to as the "Parties," individually as a "Party."

WHEREAS

(1)    Party A holds 80% equity interests in Beijing Perusal Technology Co., Ltd. (the "Company"), representing a capital contribution of RMB100,400;

(2)    Party A is willing to transfer to Party B part of its capital contribution in the Company amounting to RMB376,500,000, representing 30% equity interests of the Company (the "Subject Equity"); and

(3)    Party B intends to accept the transfer of the Subject Equity.

Upon friendly consultation, the Parties agree as follows:

**1.    Transfer of Target Equity**

1.1    Party A agrees to transfer to Party B, and Party B agrees to accept the transfer of, 30% of the equity interests it holds in the Company, at a price of RMB387,560,000 (the "Transfer Price").

1.2    Party B agrees to pay the Transfer Price to Party A in one lump sum within three months after this Agreement takes effect.

1.3    The Parties shall take all necessary actions and execute all necessary documents to complete the procedures for shareholder change registration, including but not limited to filing a change application to the AIC, amending the Company's articles of association, and going through relevant change registration procedures.

1.4    The closing date of the equity transfer shall be the date on which the AIC change registration procedures are completed. As of the closing date Party A will cease to own, and Party B will become a shareholder of the Company and start to own, the Subject Equity and all rights and interests affiliated therewith, and Party B shall exercise its rights and fulfill its obligations and duties in accordance with the Company's articles of association.

5

**2.    Warranties**

Party A warrants that the equity interests it intends to transfer to Party B are legally owned by Party A and Party A has full right of disposal on such equity. Party A further guarantees that the equity transferred is free of any mortgage, pledge or guarantee or any claims from any third party. otherwise all liabilities thus arising shall be borne by Party A.

**3.    Expenses, Costs and Taxes**

All costs and taxes incurred by the Parties in connection with the execution and performance of this Agreement shall be borne by the Parties respectively; all expenses relating to registration shall be borne by the Company.

**4.    Liabilities for Breach**

If either Party materially breaches any provision provided hereunder, the non-defaulting Party may terminate this Agreement and claim damages against the defaulting Party. This Article will not affect any other right entitled by either Party in accordance with the law.

**5.    Governing Law and Dispute Resolution**

5.1    The conclusion, validity, interpretation, performance, amendment and termination of this Agreement as well as the resolution of disputes hereunder shall be governed by the laws of the People's Republic of China.

5.2    Any disputes arising from the interpretation and performance of the terms hereunder shall first be resolved by the Parties through consultation in good faith. In case of a failure to reach an agreement to resolve a dispute between the Parties within thirty (30) days after a Party makes the request of consultation in writing, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing. The arbitral award shall be final and binding upon both Parties.

5.3    In the occurrence of any dispute arising as a result of interpretation and performance of this Agreement or during the process of arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**6.    Miscellaneous**

6.1    The Parties may amend and supplement this Agreement in writing. The agreements to amend and/or supplement this Agreement between the Parties constitute integral parts of this Agreement and shall have equal legal effect as this Agreement.

6.2    Should any one or more provisions hereunder be held invalid, void or unenforceable in any respect in accordance with any law or regulation, the validity, legality or enforceability of the other provisions hereof will not be affected or prejudiced in any respect. The Parties shall negotiate in faith to seek to replace such invalid, void or unenforceable provision(s) with valid one(s) to the maximum extent permissible by the law and closest to the expectations of the Parties, to accomplish an economic effect as similar as possible.

6

6.3    This Agreement shall be concluded as of the date on which both Parties affix their signatures and seals, and shall become effective as of the date on which the approval authority renders its approval till the date on which both Parties complete their respective obligations hereunder.

6.4    This Agreement is made in five counterparts, one for each Party, one retained by the Company and the other two shall be filed to relevant approval authority for record. All counterparts shall be equally binding.

[Remainder of the page intentionally left blank]

7

[Signature page of the Equity Transfer Agreement]

**IN WITNESS WHEREOF**, each party hereto has executed this Equity Transfer Agreement as of the date first written above.

**Party A: Jiping Liu**

Signature:    /s/ Jiping Liu

**Party B: Xiaodong Wang**

Signature:    /s/ Xiaodong Wang

8

**Equity Transfer Agreement**

This Equity Transfer Agreement (this "**Agreement**") is entered into as of May 3, 2016 in Beijing, PRC by and between:

**Party A: Yazhu Zhang (Transferor)**
ID No.:
Address: 201 Block N, Portofino Lake Garden, Shahe, Nanshan District, Shenzhen, Guangdong Province

**Party B: Xiaodong Wang (Transferee)**
ID No.:
Address:

The Parties above are collectively referred to as the "Parties," individually as a "Party."

WHEREAS

(1)    Party A holds 20% equity interests in Beijing Perusal Technology Co., Ltd. (the "Company"), representing a capital contribution of RMB25,100 (the "Subject Equity"); and

(2)    Party A is willing to transfer to Party B, and Party B intends to accept the transfer of the Subject Equity.

Upon friendly consultation, the Parties agree as follows:

**1.    Transfer of Target Equity**

1.1    Party A agrees to transfer to Party B, and Party B agrees to accept the transfer of, 20% of the equity interests it holds in the Company, at a price of RMB258,380,000 (the "Transfer Price").

1.2    Party B agrees to pay the Transfer Price to Party A in one lump sum within three months after this Agreement takes effect.

1.3    The Parties shall take all necessary actions and execute all necessary documents to complete the procedures for shareholder change registration, including but not limited to filing a change application to the AIC, amending the Company's articles of association, and going through relevant change registration procedures.

1.4    The closing date of the equity transfer shall be the date on which the AIC change registration procedures are completed. As of the closing date Party A will cease to own, and Party B will become a shareholder of the Company and start to own, the Subject Equity and all rights and interests affiliated therewith, and Party B shall exercise its rights and fulfill its obligations and duties in accordance with the Company's articles of association.

9

**2.   Warranties**

Party A warrants that the equity interests it intends to transfer to Party B are legally owned by Party A and Party A has full right of disposal on such equity. Party A further guarantees that the equity transferred is free of any mortgage, pledge or guarantee or any claims from any third party. otherwise all liabilities thus arising shall be borne by Party A.

**3.   Expenses, Costs and Taxes**

All costs and taxes incurred by the Parties in connection with the execution and performance of this Agreement shall be borne by the Parties respectively; all expenses relating to registration shall be borne by the Company.

**4.   Liabilities for Breach**

If either Party materially breaches any provision provided hereunder, the non-defaulting Party may terminate this Agreement and claim damages against the defaulting Party. This Article will not affect any other right entitled by either Party in accordance with the law.

**5.   Governing Law and Dispute Resolution**

5.1   The conclusion, validity, interpretation, performance, amendment and termination of this Agreement as well as the resolution of disputes hereunder shall be governed by the laws of the People's Republic of China.

5.2   Any disputes arising from the interpretation and performance of the terms hereunder shall first be resolved by the Parties through consultation in good faith. In case of a failure to reach an agreement to resolve a dispute between the Parties within thirty (30) days after a Party makes the request of consultation in writing, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing. The arbitral award shall be final and binding upon both Parties.

5.3   In the occurrence of any dispute arising as a result of interpretation and performance of this Agreement or during the process of arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**6.   Miscellaneous**

6.1   The Parties may amend and supplement this Agreement in writing. The agreements to amend and/or supplement this Agreement between the Parties constitute integral parts of this Agreement and shall have equal legal effect as this Agreement.

6.2   Should any one or more provisions hereunder be held invalid, void or unenforceable in any respect in accordance with any law or regulation, the validity, legality or enforceability of the other provisions hereof will not be affected or prejudiced in any respect. The Parties shall negotiate in faith to seek to replace such invalid, void or unenforceable provision(s) with valid one(s) to the maximum extent permissible by the law and closest to the expectations of the Parties, to accomplish an economic effect as similar as possible.

10

6.3    This Agreement shall be concluded as of the date on which both Parties affix their signatures and seals, and shall become effective as of the date on which the approval authority renders its approval till the date on which both Parties complete their respective obligations hereunder.

6.4    This Agreement is made in five counterparts, one for each Party, one retained by the Company and the other two shall be filed to relevant approval authority for record. All counterparts shall be equally binding.

[Remainder of the page intentionally left blank]

11

[Signature page of the Equity Transfer Agreement]

**IN WITNESS WHEREOF**, each party hereto has executed this Equity Transfer Agreement as of the date first written above.

**Party A: Yazhu Zhang**

Signature:    /s/ Yazhu Zhang

**Party B: Xiaodong Wang**

Signature:    /s/ Xiaodong Wang

12

**Exhibit 4.37**

**Voting Proxy Agreement**

This Voting Proxy Agreement (this " **Agreement**") is entered into as of May 3, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and between:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Zhixiang Liang**
ID No.:

**WHEREAS**

1.    Party B, a PRC citizen, is a shareholder of Beijing Perusal Technology Co., Ltd. ("Perusal"), and owns 50% of the equity interests in Perusal as of the date hereof ("Party B's Equity").

2.    Party B agrees to entrust a PRC company or individual designated by Party A, and Party A agrees to accept such entrustment, based on the terms and subject to the conditions set forth herein, to exercise his rights as a shareholder of Perusal on his behalf.

**NOW,THEREFORE**, the parties to this Agreement hereby agree as follows:

1.    Party B hereby agrees to irrevocably entrust the entity or individual designated by Party A to exercise on his behalf all shareholder's voting rights and other shareholder's rights empowered by the law and Perusal's articles of association at the shareholders' meeting of Perusal, including, but not limited to, with respect to the sale, transfer, pledge or disposal of all or part of Party B's equity interests in Perusal and the appointment and election of directors and chairman of Perusal at the shareholders' meetings of Perusal as the authorized representative of Perusal's shareholder.

2.    Party A agrees to designate an entity or individual permissible by relevant applicable law to accept the entrustment by Party B granted in Article 1 of this Agreement, and such entity or individual shall exercise Party B's voting rights and other shareholder's rights on behalf of Party B pursuant to this Agreement.

3.    Party B hereby acknowledges that, regardless how his equity interests in Perusal will change, he shall entrust the entity or individual designated by Party A with all of his shareholder's voting rights and other shareholder's rights. If Party B transfers his equity interests in Perusal to any individual or company other than Baidu, Inc., Party A, or the individuals or entities designated by Party A (each, a " **Transferee**"), Party B shall cause such Transferee to, concurrently with the execution of the equity transfer documents, sign an agreement with the same terms and conditions as this Agreement to entrust the person designated by Party A with the shareholder's voting rights and other shareholder's rights of the Transferee.

4.    Party B hereby acknowledges that if Party A withdraws the appointment of the relevant entity or individual to whom Party B has entrusted his shareholder's voting rights and other shareholder's rights, he will withdraw his entrustment and authorization to such entity or individual and authorize another entity or individual designated by Party A to exercise his shareholder's voting rights and other shareholder's rights at the shareholders' meeting of Perusal.

1

5. This Agreement is executed by the Parties or their respective legal or authorized representatives as of the date first written above and becomes effective on the same day.

6. This Agreement shall remain permanently valid unless early terminated by Party A in writing. If any Party's operating term expires within the valid term of this Agreement, such Party shall renew its operating term in time to enable this Agreement to continue to be valid and implemented. If a Party's application to renew its operating term fails to obtain the approval or consent of any competent authority, this Agreement shall terminate at the expiry of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

7. This Agreement shall remain valid for so long as Party B continues to hold any equity interest in Perusal. Throughout the term of this Agreement, unless otherwise provided by law, Party B shall in no case cancel, early terminate or revoke this Agreement. notwithstanding the foregoing, Party A shall be entitled to terminate this Agreement at any time by sending a written notice to Party B thirty (30) days in advance.

8. Any amendment to, and/or cancellation of, this Agreement shall be agreed by the Parties in writing. Any amendment and supplementary agreement hereto duly executed by both Parties is an integral part of, and shall be equally binding with, this Agreement.

9. Should any provision hereof be rendered invalid or unenforceable due to its inconsistency with relevant law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the other provisions hereof.

10. All notices or other correspondences required to be sent by any Party hereunder shall be written in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time via personal delivery, mail or fax. The notices shall be deemed to have been duly served (a) upon sent if sent by personal delivery, (b) on the tenth (10th) day after the post-prepaid registered airmail is sent (shown on the postmark) if sent by mail, or on the fourth day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if sent via fax.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.
Address: 3F Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn: Zhan Wang
Fax: 010-59927435
Tel: 010-59925049

Party B: Zhixiang Liang
Address: Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax: 010-59928888
Tel: 010-59927435

2

11. Except with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement as Party A sees fit, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

12. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information: (a) that is known or will be known by the public (not due to a discretional disclosure by the Party receiving such information); (b) that is required to be disclosed by applicable law or rules or regulations of a stock exchange; or (c) that needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to a confidential obligation similar to that provided in this Article). A disclosure by any staff or agency engaged by any Party shall be deemed a disclosure made by such Party, and such Party shall take the responsibilities for breach. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

13.

   (1) The formation, validity, interpretation, performance, amendment and termination of and settlement of disputes under this Agreement shall be governed by the laws of the PRC.

   (2) Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties, any Party may refer such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing and the language used shall be Chinese. The arbitral award shall be final and binding upon both Parties.

14. This Agreement, once effective, constitutes the entire agreement and understanding between the Parties with respect to the matters contained herein, and fully supersedes all prior oral and written agreements and understandings between the Parties with respect to the matters contained herein.

15. This Agreement is made in duplicate, one for each Party, and both counterparts shall be equally binding.

[No text below]

3

[This page contains no body text]

**IN WITNESS WHEREOF**, each party hereto has executed this Agreement as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd. (company seal)**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

**Party B: Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

4

**Voting Proxy Agreement**

This Voting Proxy Agreement (this " **Agreement**") is entered into as of May 3, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Xiaodong Wang**
ID No.:

**WHEREAS**

1.  Party B, a PRC citizen, is a shareholder of Beijing Perusal Technology Co., Ltd. ("Perusal"), and owns 50% of the equity interests in Perusal as of the date hereof ("Party B's Equity").

2.  Party B agrees to entrust a PRC company or individual designated by Party A, and Party A agrees to accept such entrustment, based on the terms and subject to the conditions set forth herein, to exercise his rights as a shareholder of Perusal on his behalf.

**NOW, THEREFORE**, the parties to this Agreement hereby agree as follows:

1.  Party B hereby agrees to irrevocably entrust the entity or individual designated by Party A to exercise on his behalf all shareholder's voting rights and other shareholder's rights empowered by the law and Perusal's articles of association at the shareholders' meeting of Perusal, including, but not limited to, with respect to the sale, transfer, pledge or disposal of all or part of Party B's equity interests in Perusal and the appointment and election of directors and chairman of Perusal at the shareholders' meetings of Perusal as the authorized representative of Perusal's shareholder.

2.  Party A agrees to designate an entity or individual permissible by relevant applicable law to accept the entrustment by Party B granted in Article 1 of this Agreement, and such entity or individual shall exercise Party B's voting rights and other shareholder's rights on behalf of Party B pursuant to this Agreement.

3.  Party B hereby acknowledges that, regardless how his equity interests in Perusal will change, he shall entrust the entity or individual designated by Party A with all of his shareholder's voting rights and other shareholder's rights. If Party B transfers his equity interests in Perusal to any individual or company other than Baidu, Inc., Party A, or the individuals or entities designated by Party A (each, a "Transferee"), Party B shall cause such Transferee to, concurrently with the execution of the equity transfer documents, sign an agreement with the same terms and conditions as this Agreement to entrust the person designated by Party A with the shareholder's voting rights and other shareholder's rights of the Transferee.

4.  Party B hereby acknowledges that if Party A withdraws the appointment of the relevant entity or individual to whom Party B has entrusted his shareholder's voting rights and other shareholder's rights, he will withdraw his entrustment and authorization to such entity or individual and authorize another entity or individual designated by Party A to exercise his shareholder's voting rights and other shareholder's rights at the shareholders' meeting of Perusal.

5

5.  This Agreement is executed by the Parties or their respective legal or authorized representatives as of the date first written above and becomes effective on the same day.

6.  This Agreement shall remain permanently valid unless early terminated by Party A in writing. If any Party's operating term expires within the valid term of this Agreement, such Party shall renew its operating term in time to enable this Agreement to continue to be valid and implemented. If a Party's application to renew its operating term fails to obtain the approval or consent of any competent authority, this Agreement shall terminate at the expiry of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

7.  This Agreement shall remain valid for so long as Party B continues to hold any equity interest in Perusal. Throughout the term of this Agreement, unless otherwise provided by law, Party B shall in no case cancel, early terminate or revoke this Agreement. notwithstanding the foregoing, Party A shall be entitled to terminate this Agreement at any time by sending a written notice to Party B thirty (30) days in advance.

8.  Any amendment to, and/or cancellation of, this Agreement shall be agreed by the Parties in writing. Any amendment and supplementary agreement hereto duly executed by both Parties is an integral part of, and shall be equally binding with, this Agreement.

9.  Should any provision hereof be rendered invalid or unenforceable due to its inconsistency with relevant law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the other provisions hereof.

10. All notices or other correspondences required to be sent by any Party hereunder shall be written in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time via personal delivery, mail or fax. The notices shall be deemed to have been duly served (a) upon sent if sent by personal delivery, (b) on the tenth (10th) day after the post-prepaid registered airmail is sent (shown on the postmark) if sent by mail, or on the fourth day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if sent via fax.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.
Address: 3F Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn: Zhan Wang
Fax: 010-59927435
Tel: 010-59925049

Party B: Xiaodong Wang
Address:
Fax: 010-59927435
Tel: 010-59928888

6

11. Except with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may transfer its rights and obligations hereunder to any third party as it deems needed. Party A may only need to send a written notice to Party B at the time of such transfer and does not need to obtain Party B's consent with respect to such transfer.

12. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement shall belong to confidential information, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except the information: (a) that is known or will be known by the public (not due to a discretional disclosure by the Party receiving such information); (b) that is required to be disclosed by applicable law or rules or regulations of a stock exchange; or (c) that needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to a confidential obligation similar to that provided in this Article). A disclosure by any staff or agency engaged by any Party shall be deemed a disclosure made by such Party, and such Party shall take the responsibilities for breach. This Article shall survive any invalidity, amendment, termination, dissolution or inoperability of this Agreement for any reason whatsoever.

13.

    (1) The formation, validity, interpretation, performance, amendment and termination of and settlement of disputes under this Agreement shall be governed by the laws of the PRC.

    (2) Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties, any Party may refer such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing and the language used shall be Chinese. The arbitral award shall be final and binding upon both Parties.

14. This Agreement, once becoming effective, constitutes the entire agreement and understanding between the Parties with respect to the matters contained herein, and fully supersedes all prior oral and written agreements and understandings between the Parties with respect to the matters contained herein.

15. This Agreement is made in duplicate, one for each Party, and both counterparts shall be equally binding.

[No text below]

7

[This page contains no body text]

**IN WITNESS WHEREOF**, each party hereto has executed this Agreement as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd. (company seal)**

Signature:   /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

**Party B: Xiaodong Wang**

Signature:   /s/ Xiaodong Wang

8

**Exhibit 4.38**

**Business Operating Agreement**

This Business Operating Agreement (this "Agreement") is entered into as of May 3, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Beijing Perusal Technology Co., Ltd.**
Registered Address: A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

**Party C: Zhixiang Liang**, a PRC citizen, ID No.: , and

**Party D: Xiaodong Wang**, a PRC citizen, ID No.:          .

**WHEREAS:**

1. Party A is a wholly foreign-owned enterprise duly incorporated and validly existing under the laws of the PRC, which has the technology expertise and practical experience in the development and design of computer software, and also has rich experience and a team of professionals specializing in information technology and service;

2. Party B is a limited liability company duly incorporated and validly existing under PRC law, which may carry out Internet information service and such other value-added telecommunication business with the approval of Beijing Communications Administration, and may carry out Internet advertising business with the approval of Beijing Administration for Industry and Commerce (AIC);

3. Party C and Party D are shareholders of Party B, in which Party C and Party D respectively own 50% of the equity interests in Party B;

4. Party A has established a business relationship with Party B by entering into an Exclusive Technology Consulting and Services Agreement and supplementary articles thereto ( the "Services Agreement"), a Web Layout Copyright License Agreement, a Trademark License Agreement and a Domain Name License Agreement; and

5. Pursuant to the above-mentioned agreements between Party A and Party B, Party B shall pay certain sums of money to Party A, and the daily operations of Party B will have a material effect on Party B's ability to pay such account payable to Party A;

**NOW THEREFORE,** through negotiations, all parties to this Agreement hereby agree as follows:

1. Party A agrees, subject to the satisfaction of the relevant provisions herein by Party B, to be the guarantor of Party B in the contracts, agreements or transactions entered into between Party B and any third party in connection with Party B's business and operations, to provide full guarantees for the performance of such contracts, agreements or transactions by Party B. As counter-guarantee, Party B agrees to pledge the accounts receivable in its operations and all of its assets to Party A. According to the aforesaid guarantee arrangement, Party A, when necessary, is willing to enter into written guarantee contracts with Party B's counterparties to assume the guarantor's liabilities. Party B, Party C and Party D shall take all necessary actions (including, but not limited to, executing the relevant documents and filing the relevant registrations) to carry out the counter-guarantee arrangement with Party A.

1

2. In consideration of the requirements of Article 1 hereof and to ensure the performance of the various business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B, together with its shareholders Party C and Party D, hereby jointly agree that, without Party A's prior written consent, Party B shall not engage in any transaction that may materially affect its assets, liabilities, rights or operations (except that Party B may, in the ordinary course of its business, enter into business contracts or agreements, sell or purchase assets and create liens in favor of relevant counter parties as required by law.), including, but not limited to, the following:

    2.1    To borrow money from any third party or assume any debt;

    2.2    To sell to or acquire from any third party any asset or rights, including, but not limited to, any intellectual property rights;

    2.3    To provide guarantee for any third party using its assets or intellectual property rights as collaterals; or

    2.4    To assign to any third party its business contracts.

3. In order to ensure the performance of the various business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B, together with its shareholders Party C and Party D, hereby jointly agree to accept advice and guidance provided by Party A from time to time relating to its corporate policies on matters such as employment and dismissal of employees, daily operations and management, and financial management.

4. Party B, together with its shareholders Party C and Party D, hereby jointly agree that Party C and Party D shall appoint candidates recommended by Party A as directors of Party B, and Party B shall appoint Party A's senior executive officers recommended by Party A as its president, chief financial officer and other senior executive officers. If any of the above-mentioned senior executive officers of Party A leaves Party A, whether voluntarily or as a result of dismissal by Party A, he or she shall also lose his/her right to hold any position at Party B, and Party B shall appoint other senior executive officers of Party A recommended by Party A to fill such a position. The persons recommended by Party A in accordance with this Article 4 shall comply with the legal requirements regarding the qualifications of directors, presidents, chief financial officers, and other senior executive officers.

5. Party B, together with its shareholders Party C and Party D, hereby jointly agree and confirm that Party B shall first seek a guarantee from Party A if Party B needs any guarantee for its performance of any of its contracts or for any borrowing for working capital purposes in the course of its operations. In such cases, Party A shall have the obligation to provide the appropriate guarantee to Party B at Party A's sole discretion.

2

6. In the event that any of the agreements between Party A and Party B terminates or expires, Party A shall have the right, but not the obligation, to terminate all agreements between Party A and Party B including, but not limited to, the Services Agreement.

7. Any amendment or supplement to this Agreement shall be made in writing. The amendment or supplement duly executed by all parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

8. Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

9. None of Party B, Party C and Party D shall assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A. Party B, Party C and Party D hereby agree that Party A may assign its rights and obligations under this Agreement as Party A sees fit, in which case Party A only needs to give a written notice to Party B, Party C and Party D and no further consent of Party B, Party C and Party D is required.

10. Each party acknowledges and confirms that any oral or written materials exchanged pursuant to this Agreement are confidential. Each party shall keep confidential all such materials and not disclose any such materials to any third party without the prior written consent from the other party except in the following situations: (a) such materials are or will become known by the public (through no fault of the receiving party); (b) any materials as required to be disclosed by the applicable laws or rules of the stock exchange; or (c) any materials disclosed by each party to its legal or financial advisors relating to the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions set forth in this Article 10. Any disclosure of confidential information by the personnel of any party or by the entity engaged by such party shall be deemed as a disclosure by such party, and such party shall be liable for the breach under this Agreement. This Article 10 shall survive the invalidity, cancellation, termination or unenforceability of this Agreement for any reason.

11. This Agreement shall be governed by and interpreted in accordance with the laws of the PRC.

12. Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the parties in good faith through negotiations. In case no resolution can be reached by the parties through negotiations, either party may refer such dispute to the China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be in Beijing, and the language of the proceedings shall be Chinese. The arbitral award shall be final and binding upon both of the Parties.

3

13. This Agreement shall be executed by a duly authorized representative of each party and become effective as of the date first written above.

14. Once effective, this Agreement shall constitute the entire agreement of the parties hereto with respect to the subject matters hereof and supersede all prior oral and written agreements and understandings by the parties with respect to the subject matters hereof.

15. This Agreement shall remain permanently valid unless early terminated as expressly agreed in this Agreement or decided by Party A in writing. If the duration of operation (including any extension thereof) of Party A or Party B is expired or terminated for other reasons within the aforesaid term of this Agreement, such Party shall renew its duration of operation in time to enable this Agreement to continue to be valid and implemented. If a Party's application to renew its duration of operation fails to obtain the approval or consent of any competent authority, this Agreement shall be terminated simultaneously.

16. During the term of this Agreement, none of Party B, Party C and Party D may early terminate or dissolve this Agreement unless Party A commits a gross negligence or fraud toward Party B. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by issuing a thirty (30) days' prior written notice to Party B, Party C and Party D.

17. All notices or other correspondences required to be sent by any Party hereunder shall be written in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time via personal delivery, registered mail, post prepaid mail, recognized express delivery service or fax. The notices shall be deemed to have been duly served (a) upon sent if sent by personal delivery, (b) on the tenth (10th) day after the post-prepaid registered airmail is sent (shown on the postmark) if sent by mail, or on the fourth day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if sent via fax.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Address: 3F Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn: Zhan Wang
Fax: 010-59927435
Tel: 010-59925049

**Party B: Beijing Perusal Technology Co., Ltd.**
Address: A2 2F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing
Attn: Zhan Wang
Fax: 010-59927435
Tel: 010-59925049

**Party C:**
Address: Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn: Zhixiang Liang
Fax: 010-59927435
Tel: 010-59928888

4

**Party D:**
Address: Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn: Xiaodong Wang
Fax: 010-59927435
Tel: 010-59928888

18.   This Agreement is made in four originals, with each party holding one original. All originals shall have the same legal effect.

[No text below on this page]

5

[This pages contains no body text]

**IN WITNESS THEREOF,** each party hereto has caused this Agreement to be duly executed by himself/herself or a duly authorized representative on its behalf as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd. (company seal)**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

**Party B: Beijing Perusal Technology Co., Ltd.**

Signature:    /s/ Zhan Wang
Name: Zhan Wang
Title: Legal Representative

**Party C:**

**Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

**Party D:**

**Xiaodong Wang**

Signature:    /s/ Xiaodong Wang

6

**Exhibit 4.39**

### AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on June 20, 2016:

**Pledgee**:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
Address: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Pledgor**:

**Party B: Zhixiang Liang**
ID No.:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC owning 50% equity interests in Beijing Perusal Technology Co., Ltd. ("Perusal"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB1,598,440,000 (the "Loan"), of which Party B pledges his equity interests for RMB1,580,000,000.

4. Party A and Perusal entered into an Exclusive Technology Consulting and Services Agreement dated June 23, 2006 with infinite term (the "Services Agreement"), pursuant to which Perusal shall pay Party A technical consulting and services fee (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to collect Service Fees from Perusal, Party B agrees to pledge all his equity interest in Perusal as security for performance of his obligations under the Loan Agreement and for the Service Fees. Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations and to be bound hereby:

1

1.    **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in Perusal legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.


2.    **Pledge**

The Pledgor will pledge all of his Equity Interest in Perusal to the Pledgee as security for (i) all his obligations under the Loan Arrangement and (ii) all the obligations of Perusal under the Services Agreement. For purpose of this Agreement, "Pledge" refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.


3.    **Rate of Pledge and Term of Pledge**

3.1 Rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Perusal and when the pledge is registered with the Administration for Industry and Commerce and shall remain in effect until two (2) years after the obligations under the Principal Agreement will have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan Arrangement or Perusal does not perform his obligations under the Services Agreement.

2

4.    **Physical Possession of Documents**

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his Certificate of Capital Contribution and the Register of Shareholders of Perusal to the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receive dividends from the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Perusal (See Appendix I) after the execution of this Agreement.

5.    **Representations and Warranties of the Pledgor**

5.1 The Pledgor is the legal owner of the Equity Interest pledged and has adopted shareholders' resolutions to approve the Pledge (See Appendix II).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.    **Covenants of the Pledgor**

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions;

6.1.3 timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

3

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he/she will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he/she will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events, which may decrease the value of the Equity Interest or affect the Pledgor's performance of the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 Under the permission of the applied laws or regulations, the Pledgor shall use his/her best efforts to cooperate with all the registration, record or other procedures relating to the Pledge as required by relevant laws and regulations.


7.    **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1  Pledgor fails to perform his obligations under the Loan Arrangement and supplementary agreements;

7.1.2 Perusal fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreements;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4  The Pledgor breaches the covenants under Article 6 hereof;

7.1.5  The Pledgor breaches any other provision of this Agreement;

4

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8  Perusal is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a force majeure event;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of Perusal only partially performs or refuses to perform the payment obligation under the Services Agreements; and

7.1.12The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreements or requesting to exercise the Pledge in accordance with Article 8 hereof.

8.    **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreements, whichever is later.

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

5

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreements are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.    **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.    **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Perusal's Register of Shareholders.

11.    **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Perusal no longer has any outstanding obligations under the Services Agreements. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

6

12.    **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.    Force Majeure

13.1 Force Majeure, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

14.    **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

15.    **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the Parties.

16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Telephone: | 010-59928888 |

| Party B: | Zhixiang Liang |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Telephone: | 010-59928888 |

17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19. **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

8

20.    **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21.    **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one original. Both originals have the same legal effect.

[no text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

/s/: Zhixiang Liang

10

Appendices:

I.    Register of Shareholders of Beijing Perusal Technology Co., Ltd.

II.   Resolutions of the Shareholders' Meeting of Beijing Perusal Technology Co., Ltd.

11

**Appendix I**

**Register of shareholders of Beijing Perusal Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Zhixiang Liang |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB1.58 billion |
| Percentage of Share Capital: | 50% |
| Number of the certificate of capital contribution: | |

| | |
|---|---|
| Name of the Shareholder: | Xiaodong Wang |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB1.58 billion |
| Percentage of Share Capital: | 50% |
| Number of the certificate of capital contribution: | |

Zhixiang Liang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Xiaodong Wang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Perusal Technology Co., Ltd.

Beijing Perusal Technology Co., Ltd.

Signature:    /s/ Hailong Xiang
Name: Hailong Xiang
Title: Legal representative

Stamp:
Date: June 20, 2016

12

**Appendix II**

**Resolutions of the Shareholders' Meeting
of Beijing Perusal Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated June 20, 2016 between the shareholders of Beijing Perusal Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company that:

It is approved that the shareholders of the Company pledge all of their equity interest in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered on June 20, 2016 by the undersigned shareholders.

Shareholder: Zhixiang Liang

/s/: Zhixiang Liang

Xiaodong Wang

/s/: Xiaodong Wang

13

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on June 20, 2016:

**Pledgee:**

**Party A:**      **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:        Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Pledgor**:

**Party B:**      **Xiaodong Wang**
ID No.:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC owning 50% equity interests in Beijing Perusal Technology Co., Ltd. ("Perusal"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB1,598,440,000 (the "Loan"), of which Party B pledges his equity interests for RMB1,580,000,000.

4. Party A and Perusal entered into an Exclusive Technology Consulting and Services Agreement dated June 23, 2006 with infinite term (the "Services Agreement"), pursuant to which Perusal shall pay Party A technical consulting and services fee (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to collect Service Fees from Perusal, Party B agrees to pledge all his equity interest in Perusal as security for performance of his obligations under the Loan Agreement and for the Service Fees. Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

14

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations and to be bound hereby:

1. **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in Perusal legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.


2. **Pledge**

The Pledgor will pledge all of his Equity Interest in Perusal to the Pledgee as security for (i) all his obligations under the Loan Arrangement and (ii) all the obligations of Perusal under the Services Agreement. For purpose of this Agreement, "Pledge" refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.


3. **Rate of Pledge and Term of Pledge**

3.1 Rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Perusal and when the pledge is registered with the Administration for Industry and Commerce and shall remain in effect until two (2) years after the obligations under the Principal Agreement will have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan Arrangement or Perusal does not perform his obligations under the Services Agreement.

15

4.     **Physical Possession of Documents**

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his Certificate of Capital Contribution and the Register of Shareholders of Perusal to the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receive dividends from the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Perusal (See Appendix I) after the execution of this Agreement.

5.     **Representations and Warranties of the Pledgor**

5.1 The Pledgor is the legal owner of the Equity Interest pledged and has adopted shareholders' resolutions to approve the Pledge (See Appendix II).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.     **Covenants of the Pledgor**

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions;

6.1.3 timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

16

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he/she will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he/she will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events, which may decrease the value of the Equity Interest or affect the Pledgor's performance of the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 Under the permission of the applied laws or regulations, the Pledgor shall use his/her best efforts to cooperate with all the registration, record or other procedures relating to the Pledge as required by relevant laws and regulations.

7.    **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform his obligations under the Loan Arrangement and supplementary agreements;

7.1.2 Perusal fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreements;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches the covenants under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

17

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8  Perusal is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a force majeure event;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of Perusal only partially performs or refuses to perform the payment obligation under the Services Agreements; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreements or requesting to exercise the Pledge in accordance with Article 8 hereof.

8.    **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreements, whichever is later.

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

18

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreements are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.    **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.    **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Perusal's Register of Shareholders.

11.    **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Perusal no longer has any outstanding obligations under the Services Agreements. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

19

12.    **Fees and Other Charges**

12.1 [The Pledgor] shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.    Force Majeure

13.1 Force Majeure, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

14.    **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

15.    **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the Parties.

20

16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A:      Baidu Online Network Technology (Beijing) Co., Ltd.
Address:      Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Telephone:    010-59928888

Party B:      Xiaodong Wang
Address:      Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Telephone:    010-59928888

17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19. **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

21

20.    **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21.    **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one original. Both originals have the same legal effect.

[no text below]

22

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Xiaodong Wang**

/s/: Xiaodong Wang

23

Appendices:

    I.     Register of Shareholders of Beijing Perusal Technology Co., Ltd.

    II.    Resolutions of the Shareholders' Meeting of Beijing Perusal Technology Co., Ltd.

**Appendix I**

**Register of shareholders of Beijing Perusal Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Zhixiang Liang |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB1.58 billion |
| Percentage of Share Capital: | 50% |
| Number of the certificate of capital contribution: | |

| | |
|---|---|
| Name of the Shareholder: | Xiaodong Wang |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB1.58 billion |
| Percentage of Share Capital: | 50% |
| Number of the certificate of capital contribution: | |

Zhixiang Liang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Xiaodong Wang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Perusal Technology Co., Ltd.

Beijing Perusal Technology Co., Ltd.

Signature:   /s/ Hailong Xiang

Name: Hailong Xiang
Title: Legal representative

Stamp:
Date: June 20, 2016

25

**Appendix II**

**Resolutions of the Shareholders' Meeting of Beijing Perusal Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated June 20, 2016 between the shareholders of Beijing Perusal Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company that:

It is approved that the shareholders of the Company pledge all of their equity interest in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered on June 20, 2016 by the undersigned shareholders.

Shareholder: Zhixiang Liang

/s/: Zhixiang Liang

Xiaodong Wang

/s/: Xiaodong Wang

26

**Exhibit 4.40**

**Amended And Restated Exclusive Equity Purchase and Transfer Option Agreement**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on June 20, 2016:

**Party A:**     **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:     Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**     **Zhixiang Liang**
ID No.:

**Party C:**     **Beijing Perusal Technology Co., Ltd.**
Address:     A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the " **PRC**"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and human resources in information technology and services;

2. Party C, a liability limited company incorporated in the PRC, carries out the business of value-added telecommunication services such as Internet information services;

3. Party B is a shareholder of Party C, owning 50% equity interests in Party C (the "**Equity Interest**");

4. Party A and Party B entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party B obtains an interest-free loan up to RMB1,598,440,000 (the "**Loan Arrangement**") in connection with his investment in Party C;

5. Party A and Party C entered into a series of agreement on June 23, 2006, including the Exclusive Technology Consulting and Service Agreement (the "**Services Agreements**"); and

6. Party A and Party B entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated June 20, 2016;

1

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1. **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party B hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons (" **Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from Party B (the "**Transferor**"), a portion or all of the equity interests held by Party B in Party C (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the " **Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest (" **Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in a substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

2

1.5 Payment

Payment manner of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2.    **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

3

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

4

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party C.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party C to repay the loan.

3.    **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

5

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4.    **Assignment of Agreement**

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party B and Party C and no further consent of Party B or Party C is required.

5.    **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 This Agreement shall come into force when it is duly executed by each of the Parties and expires when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6.    **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6

6.2    Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.    **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.    **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59928888 |
| Telephone: | 010-59928888 |

| | |
|---|---|
| Party B: | Zhixiang Liang |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59927435 |
| Telephone: | 010-59928888 |

| | |
|---|---|
| Party C: | Beijing Perusal Technology Co., Ltd. |
| Address: | A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing |
| Facsimile: | 010-59927435 |
| Telephone: | 010-59928888 |

7

9. **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

    a.    Materials that are or will become known by the public (through no fault of the receiving party);

    b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

    c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Miscellaneous**

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2  Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

11.3   Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

/s/: Zhixiang Liang

**Party C: Beijing Perusal Technology Co., Ltd.**

/s/: Hailong Xiang

Seal of Beijing Perusal Technology Co., Ltd.

10

**Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on June 20, 2016:

**Party A:**     **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:     Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**     **Xiaodong Wang**
ID No.:

**Party C:**     **Beijing Perusal Technology Co., Ltd.**
Address:     A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and human resources in information technology and services;

2. Party C, a liability limited company incorporated in the PRC, carries out the business of value-added telecommunication services such as Internet information services;

3. Party B is a shareholder of Party C, owning 50% equity interests in Party C (the "**Equity Interest**");

4. Party A and Party B entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party B obtains an interest-free loan up to RMB1,598,440,000 (the "**Loan Arrangement**") in connection with his investment in Party C;

5. Party A and Party C entered into a series of agreement on June 23, 2006, including the Exclusive Technology Consulting and Service Agreement (the "**Services Agreements**"); and

6. Party A and Party B entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated June 20, 2016;

11

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1.    **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party B hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from Party B (the "**Transferor**"), a portion or all of the equity interests held by Party B in Party C (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in a substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

12

1.5 Payment

Payment manner of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

13

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

14

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party C.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party C to repay the loan.

3.    **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

15

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4.    **Assignment of Agreement**

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party B and Party C and no further consent of Party B or Party C is required.

5.    **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 This Agreement shall come into force when it is duly executed by each of the Parties and expires when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6.    **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

16

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.    **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.    **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59928888 |
| Telephone: | 010-59928888 |

| | |
|---|---|
| Party B: | Xiaodong Wang |
| Address: | Room 1806 288 Fengyang Road, Huangpu District, Shanghai |
| Facsimile: | 010-59927435 |
| Telephone: | 010-59928888 |

| | |
|---|---|
| Party C: | Beijing Perusal Technology Co., Ltd. |
| Address: | A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing |
| Facsimile: | 010-59927435 |
| Telephone: | 010-59928888 |

17

9.    **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

   a.    Materials that are or will become known by the public (through no fault of the receiving party);

   b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

   c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10.    **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11.    **Miscellaneous**

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2    Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

18

11.3  Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

19

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang
_____

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Xiaodong Wang**

/s/: Xiaodong Wang
_____

**Party C: Beijing Perusal Technology Co., Ltd.**

/s/: Hailong Xiang
_____

Seal of Beijing Perusal Technology Co., Ltd.

20

**Exhibit 4.41**

### Irrevocable Power of Attorney

I, Zhixiang Liang, citizen of the People's Republic of China (the " PRC") with ID No.            , being the shareholder holding 50% equity interests of Beijing Perusal Technology Co., Ltd. ("Perusal"), hereby irrevocably appoint Hailong Xiang with the following powers and rights during the term of this Power of Attorney, with respect to my current and future equity interests in Perusal ("My Equity"):

I hereby appoint Hailong Xiang as my sole and exclusive agent, to exercise, on my behalf, all voting rights of shareholder in accordance with PRC laws and Perusal's Articles of Association at the shareholders' meetings of Perusal, including but not limited to the right to sell or transfer any or all of equity interests of Perusal held by me and to designate and appoint the general manager of Perusal as my authorized representative on the shareholders' meeting of Perusal.

The authorization and appointment are conditioned on that Hailong Xiang is acting as an employee of Baidu Online Network Technology (Beijing) Co., Ltd ("Baidu Online") and Baidu Online approves the authorization and appointment. Once Hailong Xiang loses his title or position in Baidu Online or Baidu Online notifies me to terminate the authorization and appointment, I will withdraw the authorization and appointment immediately and designate/authorize the other individual nominated by Baidu Online to exercise the full voting rights on my behalf at the shareholders' meetings of Perusal.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof so long as I hold equity interests in Perusal.

Signature:    /s/ Zhixiang Liang

Date: May 3, 2016

1

**Exhibit 4.42**

**Irrevocable Power of Attorney**

I, Xiaodong Wang, citizen of the People's Republic of China (the " PRC") with ID No.          , being the shareholder holding 50% equity interests of Beijing Perusal Technology Co., Ltd. ("Perusal"), hereby irrevocably appoint Hailong Xiang with the following powers and rights during the term of this Power of Attorney, with respect to my current and future equity interests in Perusal ("My Equity"):

I hereby appoint Hailong Xiang as my sole and exclusive agent, to exercise, on my behalf, all voting rights of shareholder in accordance with PRC laws and Perusal's Articles at the shareholders' meetings of Perusal, including but not limited to the right to sell or transfer any or all of equity interests of Perusal held by me and to designate and appoint the general manager of Perusal as my authorized representative on the shareholders' meeting of Perusal.

The authorization and appointment are conditioned on that Hailong Xiang is acting as an employee of Baidu Online Network Technology (Beijing) Co., Ltd ("Baidu Online") and Baidu Online approves the authorization and appointment. Once Hailong Xiang loses his title or position in Baidu Online or Baidu Online notifies me of the termination of the authorization and appointment, I will withdraw the authorization and appointment immediately and designate/authorize the other individual nominated by Baidu Online to exercise the full voting rights on my behalf at the shareholders' meetings of Perusal.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof so long as I hold equity interests in Perusal.

Signature:    /s/ Xiaodong Wang

Date: May 3, 2016

1

**Exhibit 4.43**

**Termination Agreement of Current Control Documents**

This Termination Agreement of Current Control Documents (this "**Agreement**") is entered into as of June 13, 2016 in Beijing by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a Wholly Foreign Owned Enterprise duly organized and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Beijing Baidu Netcom Science Technology Co., Ltd.**, a limited liability company duly organized and validly existing under the PRC laws, with its registered address at 2/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C: Yanhong Li,** a PRC citizen, ID No.:                              , and

**Party D: Zhan Wang,** a PRC citizen, ID No.:

In this Agreement, each of the Parties above are collectively referred to as the "Parties," and individually as a "Party."

WHEREAS

(1)    All the Parties hereto executed an Updated Agreement to Business Operating Agreement and its Supplementary Agreement dated August 26, 2011, as attached hereto as Appendix 1 (the "Updated Agreement");

(2)    Party A, Party C and Party D executed a Voting Proxy Agreement dated August 26, 2011, as attached hereto as Appendix 2 (the "Proxy Agreement");

(3)    All the Parties hereto executed a Supplementary Agreement dated on September 6, 2011, as attached hereto as Appendix 3 (the "Supplementary Agreement");

(4)    Party A, Party B and Party D executed an Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement dated December 31, 2015, as attached hereto as Appendix 4 (the "Option Agreement");

(5)    Party A and Party D executed an Amended and Restated Equity Pledge Agreement dated December 31, 2015, as attached hereto as Appendix 5 (the "Pledge Agreement");

(6)    Party A and Party D executed an Amended and Restated Loan Agreement dated December 31, 2015, as attached hereto as Appendix 6 (the "Loan Agreement");

All the above agreements are collectively referred as the "Current Control Documents";

1

(7) Pursuant to the Current Control Documents, Party D, as required by Party A and Party B, has transferred all of its equity interests in Party B to the permitted assigns of Party A and Party B, and agreed to pay the entire transfer price of the equity interest to Party A; and

(8) Each Party agrees to terminate all of the current Control Documents as agreed herein.

Upon friendly consultation, the Parties agree as follows:

**1.    Termination of Current Control Documents**

1.1    All the Parties hereby irrevocably agree and acknowledge that the Updated Agreement shall terminate and cease to have any effect as of the date hereof.

1.2    Party A, Party C and Party D hereby irrevocably agree and acknowledge that the Proxy Agreement shall terminate and cease to have any effect as of the date hereof.

1.3    All the Parties hereby irrevocably agree and acknowledge that the Supplementary Agreement shall terminate and cease to have any effect as of the date hereof.

1.4    Party A, Party B and Party D hereby irrevocably agree and acknowledge that the Option Agreement shall terminate and cease to have any effect as of the date hereof.

1.5    Party A and Party D hereby irrevocably agree and acknowledge that the Pledge Agreement shall terminate and cease to have any effect as of the date hereof, and the Parties shall immediately apply to competent AIC to handle registration for release of the pledge.

1.6    Party A and Party D hereby irrevocably agree and acknowledge that the Loan Agreement shall terminate and cease to have any effect as of the date hereof.

1.7    As of the date hereof, each Party will cease to enjoy any of its rights under the Current Control Documents, and cease to fulfill any of its obligations under the Current Control Documents.

1.8    Each of the Parties hereby irrevocably and unconditionally waives any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties hereto, arising directly or indirectly in connection with or as a result of the Current Control Documents.

2

1.9     Without prejudice to the generality of the above Sections 1.2 and 1.3, as of the date hereof, each of the Parties hereby waives any commitment, debt, claim, demand, obligation and liability of any sort or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the other Parties hereto and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, arising in connection with or as a result of the Current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.     Consideration**

2.1     The Parties understand the precondition for the above Article 1 to become effective is that Party D has executed relevant equity transfer document as required by Party A and Party B to transfer all of its equity interests in Party B to a transferee accepted by Party A and Party B, and agreed to pay the entire transfer price of such equity transfer to Party A (in such manner as Party D designating the transferee in writing to pay the transfer price directly to Party A's account), and Party A has received such transfer price in full amount.

**3.     Representations and Warranties**

As of the date hereof, each of the Parties hereby represents and warrants to the other Parties, jointly and severally, that:

3.1     it has obtained necessary authorizations to execute this Agreement; its execution and performance of this Agreement will not constitute a conflict, limitation or breach of any law, regulation or agreement by which it is bound or affected;

3.2     this Agreement, once executed, constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with the provisions hereof; and

3.3     there are no litigations, arbitrations or legal, administrative or other proceedings or government investigations relating to the subject matters hereof.

**4.     Covenants**

4.1     To smoothly terminate the rights and obligations under the Current Control Documents, each party shall execute all documents and take all actions that are necessary or appropriate, actively assist the other Parties in obtaining relevant government approvals and/or registration documents and go through relevant termination procedures.

3

**5.    Liabilities for Breach**

5.1    Any Party who is in breach of this Agreements and thus renders this Agreement not performable in whole or in part shall take the liabilities for breach and indemnify the other Parties for any loss thus incurred.

**6.    Confidentiality**

6.1    The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, no Party shall disclose to any third party any relevant materials, but the following circumstances shall be excluded: (a) materials that are or will become known by the public (through no fault of the receiving party); (b) materials required to be disclosed by the applicable laws or rules; and (c) materials disclosed by each Party to its potential investors, legal or financial advisors relating the transactions contemplated by this Agreement, and such investors, legal or financial advisors shall comply with the confidentiality provisions similar to this article. The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the Party itself. This Article 6 shall survive any termination of this Agreement for any reason whatsoever.

**7.    Governing Law and Dispute Resolution**

7.1    The conclusion, validity, interpretation, performance, amendment and resolution of disputes hereunder shall be governed by the laws of the PRC.

7.2    All controversies, claims, disputes arising from the interpretation or performance of this Agreement, or in case of breach, termination or invalidity, shall first be resolved by the Parties through amicable consultation. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a written request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing. The arbitral award shall be final and binding upon the Parties. The arbitration cost shall be decided by the arbitral award.

7.3    During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**8.    Miscellaneous**

8.1    This Agreement shall become effective upon signed by all the Parties.

4

8.2     This Agreement is made in four counterparts, one for each Party, and all counterparts shall be equally binding.

8.3     The Parties may amend or supplement this Agreement with a written agreement. Any such amendment and/or supplement is an integral part of, and shall be equally binding as this Agreement.

8.4     The invalidity of any provision hereof shall not affect the validity of the other provisions hereof.

[Remainder of the page intentionally left blank]

5

**IN WITNESS WHEREOF**, each party hereto has caused this Agreement to be executed by its duly authorized representative on its behalf as of the date first written above.


**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (stamp)**

Signature:    /s/ Hailong Xiang
Name:
Title: Legal Representative


**Party B:**

**Beijing Baidu Netcom Science Technology Co., Ltd. (stamp)**

Signature:    /s/ Zhixiang Liang
Name:
Title:


**Party C:**

**Yanhong Li**

Signature:    /s/ Yanhong Li


**Party D:**

**Zhan Wang**

Signature:    /s/ Zhan Wang

6

**Exhibit 4.44**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on January 18, 2017 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**
     Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing


**Party B:    Hailong Xiang**
     ID Card No.:
     Residence:

WHEREAS,

1.   Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (PRC); and

2.   Party B, a Chinese citizen, is the shareholder of Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom");

3.   Party A and Party B have entered into a series of loan agreements (collectively the "Original Loan Agreement") listed in Appendix 1 hereof, and both Parties hereto now agree to execute this Agreement to amend and restate the Original Loan Agreements. This Agreement shall supersede and replace the Original Loan Agreements as of the effective time provided herein.

Party A and Party B, through friendly consultation, agree as follows:

1.   In accordance with the terms and conditions of this Agreement, the Parties acknowledge that Party B has obtained from Party A, and Party A agrees to accept, an interest-free loan in an aggregate amount of RMB10.8564 million yuan (RMB10,856,400).

2.   Party B confirms the receipt of such loan and has applied the entirety of such loan toward the payment of its subscribed contribution in Baidu Netcom.

3.   The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    (1)   Party B leaves or is dismissed from Party A or an affiliated company of Party A;

    (2)   Party B dies, loses civil capacity or with limited civil capacity;

    (3)   Party B engages in criminal act or is involved in criminal activities;

    (4)   Any third party files a claim against Party B that exceeds RMB100,000; or

    (5)   Subject to the laws of the PRC, Party A or a person designated by Party A is permitted to invest in Baidu Netcom to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Baidu Netcom to Party B pursuant to the provisions of the Exclusive Equity Purchase and Transfer Option Agreement mentioned in article 4 hereof, to exercise the option.

1

4.  The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designate other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Baidu Netcom held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Baidu Netcom to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance with the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the subscription price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to execute the Exclusive Equity Purchase and Transfer Option Agreement with respect to the above.

5.  The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall, to the extent permissible by the PRC laws and as required by Party A's written notice, transfer the equity interest in Baidu Netcom to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6.  The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Baidu Netcom to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, Party B agrees to pay such excess amount over the principal of proceeds, net of the individual income tax and other taxes and fees payable by Party B, to Party A at its decision to the extent permissible by the law.

7.  The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if all of the following requirements are met:

    (1)  Party B has transferred all his equity interests in Baidu Netcom to Party A and/or its designated person; and

    (2)  Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount (including principal and the maximum interests as permitted by the applicable laws at the time) permitted by applicable laws to Party A.

8.  To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Baidu Netcom to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

9.  Party A hereby represents and warrants to Party B that, as of the execution date of this Agreement:

    (1)  Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

    (2)  Party A has the right to execute and perform this Agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has obtained all necessary and appropriate approvals and authorizations in connection with the execution and performance of this Agreement;

2

(3)    The principal of the loan to Party B is legally owned by Party A;

(4)    The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any promise made by Party A to a third party; and

(5)    This Agreement, once executed, shall constitute a legal, valid and enforceable obligations of Party A.

10.    Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

(1)    Baidu Netcom is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Baidu Netcom;

(2)    Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

(3)    The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any promise made by Party B to a third party;

(4)    This Agreement, once executed, shall constitute a legal, valid and enforceable obligation of Party B;

(5)    Party B has paid contribution in full for the equity interests he holds in Baidu Netcom in accordance with applicable laws and regulations;

(6)    Except pursuant to the provisions stipulated in the equity pledge agreement and exclusive equity purchase and transfer option agreement, Party B did not create any mortgage, pledge or other security over his equity interest in Baidu Netcom, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Baidu Netcom held by Party B;

(8)    Baidu Netcom has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes, during the term of this Agreement:

(1)    not to sell, transfer, pledge or otherwise dispose of his equity interests or other interests in Baidu Netcom, nor to allow the creation of any other security interest over his equity interests without the prior written consent of Party A, except pledges or other rights created for the benefit of Party A;

(2)    not to vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder's meetings that permit the sale, transfer, pledge or other disposal of, or the creation of any other security interest on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except those made to Party A or its designated person;

3

(3)   not to vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder meetings that permit Baidu Netcom to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)   to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Baidu Netcom;

(5)   to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain his ownership of equity interests in Baidu Netcom;

(6)   to refrain from any act and/or omission that may materially affect the assets, business and liabilities of Baidu Netcom without the prior written consent of Party A;

(7)   to appoint any person nominated by Party A as director/executive director of Baidu Netcom, upon Party A's request;

(8)   in connection with Party A's exercise of the subscription right provided hereunder, to transfer promptly and unconditionally all equity interests in Baidu Netcom held by Party B to Party A and/or its designated person, to the extent and within the scope permissible under the laws of the PRC;

(9)   not to request Baidu Netcom to distribute dividends or profits to it;

(10)  once Party B transfers his equity interest in Baidu Netcom to Party A or its designated person, to repay the consideration he receives as the principal and the interests or capital use cost to Party A to the extent permitted under the laws of the PRC;

(11)  to strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that suffices to affect the validity and enforceability of this Agreement.

12.   Party B, as the shareholder of Baidu Netcom, undertakes to cause Baidu Netcom, during the term of this Agreement:

(1)   not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2)   to maintain its existence and handle matters prudently and affectively according to good financial and business rules and practices;

(3)   not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4)   not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except the liabilities (i) arising from the ordinary or day-to-day course of business, rather than through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

(5)   to operate all businesses on a continued basis and maintain the value of its assets;

(6)   not to execute any material contracts (for the purpose of this item, a contract will be deemed material if its value exceeds RMB100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

4

(7)    to provide all information about its operations and financial affairs at Party A's request;

(8)    not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)    not to distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)   to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)   to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets;

(12)   to strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Baidu Netcom and Party A and other agreements, duly perform its obligations under the Service Agreement and such other agreements, and refrain from any act or omission that suffice to affect the validity and enforceability of the Service Agreement.

13.   This Agreement shall be binding on, and only for the benefits of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.   Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.   The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16.   Arbitration

(1)    Both Parties shall strive to settle any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, any party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its then-current rules at the time of application. The arbitration award shall be final and conclusive and binding upon the Parties.

(2)    The arbitration shall take place in Beijing.

(3)    The arbitration language shall be Chinese.

17.   This Agreement shall be concluded as of the date of execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and end on the date when each Party has completed its obligations hereunder.

18.   Party B shall not terminate or revoke this Agreement under any circumstances unless (a) Party A commits a gross negligence, fraud, or other material misconduct; or (b) upon Party A's bankruptcy.

5

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the transaction herein and supersedes and replaces all prior verbal discussions and written agreements between the Parties. This Agreement shall supersede the original loan agreement entered into by the Parties and other relevant parties, and such original loan agreement shall terminate immediately after the effectiveness of this Agreement.

21. This Agreement is severable. The invalidity or unenforceability of any one clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall strictly protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is incurred or becomes due before the expiration or early termination of this Agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, and each Party shall hold one counterpart. Both counterparts shall have the same legal effect.

[No text below]

6

[No text on this page]

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Agreement to be duly executed by its legal or authorized representative on its behalf as of the date first written above.

**Party  A:      Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal representative/authorized representative: /s/ Hailong Xiang
Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party  B:    Hailong Xiang**
Signature:    /s/ Hailong Xiang

7

**Appendix I**

**The Original Loan Agreement**

| Number | Contract Name | Parties | Date |
|---|---|---|---|
| 1 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Hailong Xiang | June 13, 2016 |

8

**Exhibit 4.45**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on January 18, 2017 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:    Yanhong Li**
ID Card No.:
Residence:

WHEREAS,

1. Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (PRC);

2. Party B, a Chinese citizen, is the shareholder of Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"); and

3. Party A, Party B and other relevant parties have entered into a series of loan agreements (collectively the "Original Loan Agreements") listed in Appendix 1 hereof, and both Parties hereto now agree to execute this Agreement to amend and restate the Original Loan Agreements. This Agreement shall supersede and replace the Original Loan Agreements as of the effective time provided herein.

Party A and Party B, through friendly consultation, agree as follows:

1. In accordance with the terms and conditions of this Agreement, the Parties acknowledge that Party B has obtained from Party A, and Party A agrees to accept, a loan in an aggregate amount of RMB2,160,423,600 yuan.

2. Party B confirms the receipt of such loan and has applied the entirety of such loan toward the payment of its subscribed contribution in Baidu Netcom.

3. The term of the loan under this Agreement shall commence on the date Party B receives such loan to the date 10 years from the execution of this Agreement, which may be extended upon mutual written consent of the Parties. During the term of the loan or the extended term of the loan, Party A has the right to cause the loan to be due immediately by written notice, and require Party B to repay the loan in accordance to this Agreement in the event any of the following circumstances occur to Party B:

    (1)    Party B leaves or is dismissed from Party A or an affiliated company of Party A;

    (2)    Party B dies, loses civil capacity or with limited civil capacity;

    (3)    Party B engages in criminal act or is involved in criminal activities;

    (4)    Any third party files a claim against Party B that exceeds RMB100,000; or

    (5)    Subject to the laws of the PRC, Party A or a person designated by Party A is permitted to invest in Baidu Netcom to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued a written notice relating to the equity purchase of Baidu Netcom to Party B pursuant to the provisions of the Exclusive Equity Purchase and Transfer Option Agreement mentioned in article 4 hereof, to exercise the option.

1

4. The parties herein agree and confirm that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but not the obligation to purchase or designate other persons (including natural person, legal entity or any other entity) to purchase the equity interests of Baidu Netcom held by Party B in whole or in part (hereinafter referred to as "Option Right"), but Party A shall issue a written notice to purchase equity interests to Party B. Upon Party A's issuance of a written notice to exercise such Option, Party B shall, in accordance with Party A's wishes and instructions, immediately transfer all of its equity interests in Baidu Netcom to Party A or other persons as designated by Party A at the original investment price ("Original Investment Price") or at another price agreed upon by Party A where the law otherwise requires. The Parties hereby agree and acknowledge, when Party A exercises its Option Right, if in accordance with the applicable laws at the time, the lowest price of the equity interests permitted is higher than the Original Investment Price, then the subscription price of Party A or other persons designated by Party A shall be the lowest price permitted by the laws. The parties agree to execute the Exclusive Equity Purchase and Transfer Option Agreement with respect to the above.

5. The parties herein agree and confirm that Party B may repay the loan only by the following methods: the borrower (or his successors or assignees) shall, to the extent permissible by the PRC laws and as required by Party A's written notice, transfer the equity interest in Baidu Netcom to Party A or its designated person and use the proceeds to repay the loan when the loan is due and Party A gives a written notice, or through another method as mutually agreed by the parties herein.

6. The Parties herein agree and confirm that this loan is an interest-free loan unless there are different provisions in this Agreement. But if the loan is due and Party B has to transfer his equity interests in Baidu Netcom to Party A or its designated person and the proceeds exceed the loan principal due to the legal requirement or other reasons, Party B agrees to pay such excess amount over the principal of proceeds, net of the individual income tax and other taxes and fees payable by Party B, to Party A at its decision to the extent permissible by the law.

7. The parties agree and confirm that Party B shall be deemed to have completed his obligations under this Agreement only if all of the following requirements are met:

(1) Party B has transferred all his equity interests in Baidu Netcom to Party A and/or its designated person; and

(2) Party B has repaid the total amount of proceeds from the equity interest transfer or the maximum amount permitted by applicable laws to Party A as agreed in Articles 5 and 6 hereof.

8. To secure the performance of debt under this Agreement, Party B agrees to pledge all of his equity interests in Baidu Netcom to Party A (the "Equity Pledge"). The parties agree to execute an equity pledge agreement for the above matters.

9. Party A hereby represents and warrants to Party B that, as of the execution date of this Agreement:

(1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

2

(2) Party A has the right to execute and perform this Agreement. The execution and performance by Party A of this agreement comply with its business scope, Articles or other institutional documents, and Party A has obtained all necessary and appropriate approvals and authorizations in connection with the execution and performance of this Agreement;

(3) The principal of the loan to Party B is legally owned by Party A;

(4) The execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any promise made by Party A to a third party; and

(5) This Agreement, once executed, shall constitute a legal, valid and enforceable obligations of Party A.

10. Party B hereby represents and warrants to Party A that, from the execution date of this agreement until this Agreement terminates:

(1) Baidu Netcom is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is the legal holder of the equity interest of Baidu Netcom;

(2) Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with its business scope, Articles or other institutional documents, and Party B has taken necessary actions to obtain all necessary and appropriate approvals and authorizations;

(3) The execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any promise made by Party B to a third party;

(4) This Agreement, once executed, shall constitute a legal, valid and enforceable obligation of Party B;

(5) Party B has paid contribution in full for the equity interests he holds in Baidu Netcom in accordance with applicable laws and regulations;

(6) Except pursuant to the provisions stipulated in the equity pledge agreement and exclusive equity purchase and transfer option agreement, Party B did not create any mortgage, pledge or other security over his equity interest in Baidu Netcom, make any offer to a third party to transfer his equity, make acceptance for the offer to a third party to purchase his equity, or execute any agreement with a third party to transfer his equity;

(7) There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests of Baidu Netcom held by Party B;

(8) Baidu Netcom has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes, during the term of this Agreement:

(1) not to sell, transfer, pledge or otherwise dispose of his equity interests or other interests in Baidu Netcom, nor to allow the creation of any other security interest over his equity interests without the prior written consent of Party A, except pledges or other rights created for the benefit of Party A;

3

(2) not to vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder's meetings that permit the sale, transfer, pledge or other disposal of, or the creation of any other security interest on, any of his legal or beneficiary equity interests without the prior written consent of Party A, except those made to Party A or its designated person;

(3) not to vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder meetings that permit Baidu Netcom to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4) to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Baidu Netcom;

(5) to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain his ownership of equity interests in Baidu Netcom;

(6) to refrain from any act and/or omission that may materially affect the assets, business and liabilities of Baidu Netcom without the prior written consent of Party A;

(7) to appoint any person nominated by Party A as director/executive director of Baidu Netcom, upon Party A's request;

(8) in connection with Party A's exercise of the subscription right provided hereunder, to transfer promptly and unconditionally all equity interests in Baidu Netcom held by Party B to Party A and/or its designated person, to the extent and within the scope permissible under the laws of the PRC;

(9) not to request Baidu Netcom to distribute dividends or profits to it;

(10) once Party B transfers his equity interest in Baidu Netcom to Party A or its designated person, to pay the entire consideration he receives to Party A as agreed in Articles 5 and 6 and to the extent permitted under the laws of the PRC;

(11) to strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that suffices to affect the validity and enforceability of this Agreement.

12. Party B, as the shareholder of Baidu Netcom, undertakes to cause Baidu Netcom, during the term of this Agreement:

(1) not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2) to maintain its existence and handle matters prudently and affectively according to good financial and business rules and practices;

(3) not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4) not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except the liabilities (i) arising from the ordinary or day-to-day course of business, rather than through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

(5) to operate all businesses on a continued basis and maintain the value of its assets;

4

(6)     not to execute any material contracts (for the purpose of this item, a contract will be deemed material if its value exceeds RMB100,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)     to provide all information about its operations and financial affairs at Party A's request;

(8)     not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)     not to distribute dividends to the shareholders in any way without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)    to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)    to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets;

(12)    to strictly comply with the terms of the Exclusive Technology Service Agreement ("Service Agreement") entered into between Baidu Netcom and Party A and other agreements, duly perform its obligations under the Service Agreement and such other agreements, and refrain from any act or omission that suffice to affect the validity and enforceability of the Service Agreement.

13.   This Agreement shall be binding on, and only for the benefits of, all parties hereto and their respective successors and assignees. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.   Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.   The execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16.   Arbitration

(1)     Both Parties shall strive to settle any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through friendly consultation. In case no settlement can be reached within thirty (30) days after one party requests for settlement, any party can submit such matter to China International Economic and Trade Arbitration Commission (the "CIETAC") in accordance with its then-current rules at the time of application. The arbitration award shall be final and conclusive and binding upon the Parties.

(2)     The arbitration shall take place in Beijing.

(3)     The arbitration language shall be Chinese.

17.   This Agreement shall be concluded as of the date of execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and end on the date when each Party has completed its obligations hereunder.

5

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A commits a gross negligence, fraud, or other material misconduct; or (2) upon Party A's bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreement of the Parties with respect to the transaction herein and supersedes and replaces all prior verbal discussions and written agreements between the Parties. This Agreement shall supersede the original loan agreement entered into by the Parties and other relevant parties, and such original loan agreement shall terminate immediately after the effectiveness of this Agreement.

21. This Agreement is severable. The invalidity or unenforceability of any one clause shall not affect the validity or enforceability of other clauses herein.

22. Each Party shall strictly protect the confidentiality of information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is incurred or becomes due before the expiration or early termination of this Agreement shall survive such expiration or early termination. Section 15, 16, and 22 shall survive the termination of this Agreement.

24. This Agreement shall be executed in two counterparts, and each Party shall hold one counterpart. Both counterparts shall have the same legal effect.

[No text below]

6

[No text on this page]

**IN WITNESS WHEREOF**, each party hereto has executed or caused this Agreement to be duly executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Legal representative/authorized representative: /s/ authorized signatory
Company seal: /s/ Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:    Yanhong Li**
Signature:    /s/ Yanhong Li

7

Appendix 1

Original Loan Agreement

| No. | Contract Name | Parties | Date of Execution |
|---|---|---|---|
| 1 | Amended and Restated Loan Contract | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu | 20050322 |
| 2 | Loan Agreement for Capital Increase | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20060210 |
| 3 | Loan Agreement for Capital Increase | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20080306 |
| 4 | Supplementary Agreement to Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu; Haoyu Shen | 20110111 |
| 5 | Update Agreement of Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Haoyu Shen; Zhan Wang | 20140301 |
| 6 | Supplementary Agreement to Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Zhan Wang | 20140301 |
| 7 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20151130 |
| 8 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20151231 |

8

**Exhibit 4.46**

**Equity Transfer Agreement**

This Equity Transfer Agreement (this "**Agreement**") is entered into as of June 13, 2016 in Beijing, the People's Republic of China ("PRC") by and between:

**Transferor:** Zhan Wang, a PRC citizen, ID No.:

**Transferee:** Hailong Xiang, a PRC citizen, ID No.:

The Parties above are collectively referred to as the "Parties," individually as a "Party."

**Definitions**

Unless otherwise agreed hereunder, the following terms shall have the following meanings:

"Target" means Beijing Baidu Netcom Science Technology Co.,Ltd., whose registered address is at 2/F Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing.

"Transfer Subject" means the aggregate 0.5% equity interests of the Target held by the Transferor (corresponding to the registered capital of RMB4.45 million).

WHEREAS

(1)    The Target is a limited liability company duly incorporated and validly existing under the PRC laws, with its registered capital of RMB890 million. As of the date hereof the shareholding structure of the Target is set forth as follows:

| No. | Shareholder | Amount of Contribution (RMB10,000) | Shareholding Percentage |
|-----|-------------|------------------------------------|-------------------------|
| 1 | Yanhong Li | 88,555 | 99.5% |
| 2 | Zhan Wang | 445 | 0.5% |
| **Total** | | **89,000** | **100%** |

(2)    The Transferor intends to transfer to the Transferee, and the Transferee is willing to accept the transfer of, the aggregate 0.5% equity interests of the Target the Transferor holds.

NOW THEREFORE, in accordance with the relevant PRC laws, rules and regulations, based on the principals of voluntariness, fairness and honesty and upon friendly consultation, with respect to the matters regarding the transfer of the 0.5% equity interest in the Target, the Parties agree as follows:

1

**1.  Transfer Subject**

1.1    The Transfer Subject of this Agreement is the aggregate 0.5% of the equity interests it holds in the Target, and the Transferor agrees to transfer the Transfer Subject to the Transferee.

**2.  Target**

2.1    The Target involved herein is legally existing and has independent legal person status.

2.2    The Target owns legal approval or licensing documents involved in its conduct of business.

**3.  Transfer Price and Payment**

3.1    Transfer price: the Parties agree that the price of the Transfer Subject hereunder shall be RMB4.45 million.

3.2    Means of payment: the Transferee will pay the price in cash to the bank account designated by the Transferor in writing.

**4.  Registration Changes**

4.1    The Transferor shall cause the Target to handle the equity change registration procedures of the Target with the registration authority. The date when the registration authority completes the equity change registration procedures and issues new business license of the Target shall be deemed as the date when the transaction is accomplished.

**5.  Representations and Warranties of the Transferor**

5.1    The Transferor has fully paid up its contribution to the registered capital of the Target, and its contribution has been verified and a capital verification report has been obtained therefor. There are no fake or escaped contributions.

5.2    The Transferor owns legal, valid and full right of disposal on the Transfer Subject hereunder, and the Transfer Subject it holds is free of pledge or any other form of security or third party interest.

**6.  Representations and Warranties of the Transferee**

6.1    The acceptance of the Transfer Subject hereunder by the Transferee is in compliance with the provisions of law and regulations and does not violate any industrial policy in the PRC.

6.2    All certificates and materials submitted to the Transferor for purposes of executing this Agreement are true and complete.

6.3    All approval procedures necessary for execution of this Agreement have been duly and validly obtained.

2

**7.    Transaction Expenses**

The transaction expenses arising in connection with the transaction hereunder shall be borne in accordance with provisions of relevant law.


**8.    Liabilities for Breach**

8.1    Any Party in violation of this Agreement shall take full compensation responsibilities for any loss incurred to the other Parties as a result of its breach.

8.2    The liabilities to be taken by any Party for its breach of this Agreement shall not be relieved due to termination of this Agreement.


**9.    Amendment and Termination of Agreement**

9.1    The Parties may amend or terminate this Agreement through negotiations. Matters not covered herein may be subject to a written supplementary agreement between the Parties.

9.2    In any of the following cases, this Agreement may be terminated:

9.2.1 by either Party, if the purposes of this Agreement cannot be realized for an event of force majeure or any reason not contributable to either Party;

9.2.2 by a Party, if the other Party is incapacitated for performance of this Agreement;

9.2.3 by a Party, if the purposes of this Agreement cannot be realized due to the other Party is in serious breach;

9.2.4 by a Party, if the other Party breaches any of its representations and warranties of Articles 5 and 6 hereof.


**10.    Governing Law and Dispute Resolution**

10.1    This Agreement shall be governed by the laws of the People's Republic of China.

10.2    Any disputes arising from the interpretation and performance of the terms hereunder shall first be resolved by the Parties through consultation in good faith. In case of a failure to reach an agreement to resolve a dispute between the Parties, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing. The arbitral award shall be final and binding upon both Parties.


**11.    Effectiveness**

This Agreement shall become effective upon executed by the Parties on the date first written above.

**12.   Miscellaneous**

12.1   The Parties may amend and supplement this Agreement in writing, which shall be attached to this Agreement as appendices. The appendices shall have equal legal effect as this Agreement.

12.2   This Agreement is made in four counterparts, one for each Party and the others shall be filed to relevant registration authority for record.

[Remainder of the page intentionally left blank]

4

[This page contains no body text and is the signature page of the Equity Transfer Agreement]

**Transferor:**

**Zhan Wang**

Signature:    /s/ Zhan Wang

**Transferee:**

**Hailong Xiang**

Signature:    /s/ Hailong Xiang

5

**Exhibit 4.47**

**Voting Proxy Agreement**

This Voting Proxy Agreement (this " **Agreement**") is entered into as of June 13, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and between:

**Party  A:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**

**Yanhong Li**, ID No.                                              ; and

**Hailong Xiang**, ID No.

**WHEREAS**

1.    Party B are citizens of the PRC and shareholders of Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom") owning 100% equity interests in Baidu Netcom ("Party B's Equity").

2.    Party B agrees to entrust a PRC company or individual designated by Party A, and Party A agrees to accept such entrustment, based on the terms and subject to the conditions set forth herein, to exercise their rights as shareholders of Baidu Netcom on their behalf.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.    Party B hereby agrees to irrevocably entrust the entity or individual designated by Party A to exercise on their behalf all shareholder's voting rights and other shareholder's rights empowered by the law and Baidu Netcom's articles of association at the shareholders' meeting of Baidu Netcom, including, but not limited to, with respect to the sale, transfer, pledge or disposal of all or part of Party B's equity interests in Baidu Netcom; convening, attending and presiding over shareholders' meeting of Baidu Netcom as authorized representative of Baidu Netcom's shareholder; election and replacement executive director, director, supervisor, manager and other executive officer; considering and approving profit distribution and loss make-up plans of Baidu Netcom; adopting resolution regarding merger, division, liquidation or change of corporate form of Baidu Netcom; deciding upon business strategy and investment plan of Baidu Netcom; and change of articles of association of Baidu Netcom.

2.    Party A agrees to designate an entity or individual permissible by relevant applicable laws to accept the entrustment by Party B granted in Article 1 of this Agreement, and such entity or individual shall exercise Party B's voting rights and other shareholder's rights on behalf of Party B pursuant to this Agreement.

3.    Party B hereby agrees and irrevocably acknowledges that, regardless of any change of their equity interests in Baidu Netcom, they shall entrust the entity or individual designated by Party A with all of their shareholder's voting rights and other shareholder's rights.

1

4.  Party B hereby agrees and irrevocably acknowledges that if Party A withdraws the appointment of the relevant entity or individual to whom Party B has entrusted their shareholder's voting rights and other shareholder's rights, they will withdraw his entrustment and authorization to such entity or individual and authorize another entity or individual designated by Party A to exercise their shareholder's voting rights and other shareholder's rights at the shareholders' meeting of Baidu Netcom. During the term of this Agreement, Party B waives and will not exercise any and all rights regarding Party B's Equity entrusted to Party A under this Agreement.

5.  This Agreement shall be executed by the Parties or their respective legal or authorized representatives and become effective as of the date first written above. This Agreement shall remain permanently valid unless otherwise expressly provided under this Agreement or terminated by Party A in writing. If any Party's operating term expires within the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If a Party's application to renew its operating term fails to obtain the approval or consent of any competent authority, this Agreement shall terminate at the expiry of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

6.  This Agreement shall remain valid as long as Party B continues to hold any equity interest in Baidu Netcom. During the term of this Agreement, unless otherwise provided by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by sending a written notice to Party B thirty (30) days in advance.

7.  Any amendment to, and/or termination of, this Agreement shall be agreed by the Parties in writing. Any amendment or supplement hereto which is duly executed by the Parties is an integral part of, and shall have equal binding effect with, this Agreement.

8.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with relevant law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the other provisions hereof.

9.  All notices or other correspondences required to be sent by any Party hereunder shall be written in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time by hand, via mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with the day of sending shown on the postmark), or on the fourth day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if it is sent via fax.

2

Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.
Address:    3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn:       Yanhong Li
Fax:        010-59927435
Tel:        010-58003399

Party B:

Yanhong Li
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:        010-59927435
Tel:        010-58003399

Hailong Xiang
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:        010-59927435
Tel:        010-58003399

10. Except with Party A's prior written consent, Party B shall not transfer their rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement as Party A considers it necessary to do so, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

11. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not due to an unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable law or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to a confidential obligation similar to that provided in this Article. Disclosure by any employee or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

12.

(1)  The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2)  Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If resolution is reached by the Parties, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its then effective arbitration rules. The arbitration shall be held in Beijing and the language used shall be Chinese. The arbitral award shall be final and binding upon both Parties.

3

13.    This Agreement, once becoming effective, constitutes the entire agreement and understanding between the Parties with respect to the matters contained herein, and fully supersedes all prior oral and written agreements and understandings between the Parties with respect to the matters contained herein.

14.    This Agreement is made in three originals, with each Party holding one original, and each original shall have the same effect.

[No text below]

4

[This page contains no body text]

**IN WITNESS WHEREOF**, each party has executed this Agreement as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

/s/:   Hailong Xiang
_____
Title: Legal Representative

**Party B:**

/s/:   Yanhong Li
_____

/s/:   Hailong Xiang
_____

5

**Exhibit 4.48**

**Business Operating Agreement**

This Business Operating Agreement (this "Agreement") is entered into as of June 13, 2016 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and among:

**Party A:**   **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**   **Beijing Baidu Netcom Science Technology Co., Ltd.**
Registered Address: 2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:**

**Yanhong Li**, a PRC citizen, ID No.                    ; and

**Hailong Xiang**, a PRC citizen, ID No.

**WHEREAS:**

1.  Party A is a wholly foreign-owned enterprise duly incorporated and validly existing under the laws of the PRC, which has the technology expertise and practical experience in the development and design of computer software, and also has rich experience and human resources specializing in information technology and services;

2.  Party B is a limited liability company duly incorporated and validly existing under PRC law;

3.  Party C is shareholders of Party B owning 100% equity interests in Party B;

4.  Party A and Party B have established business relationship by entering into an Exclusive Technology Consulting and Services Agreement; and

5.  Pursuant to the above-mentioned agreement between Party A and Party B, Party B shall make certain payments to Party A, and the daily operations of Party B will have a material effect on Party B's ability to make such payment to Party A.

**NOW THEREFORE,** through negotiations, all parties to this Agreement hereby agree as follows:

1.  Party A agrees, subject to satisfaction of applicable provisions herein by Party B, to be the guarantor of Party B in the contracts, agreements or transactions entered into between Party B and any third party in connection with Party B's business and operations, to provide full guarantees for performance of such contracts, agreements or transactions by Party B. As counter-guarantee, Party B agrees to pledge the accounts receivable in its operations and all of its assets to Party A. According to the aforesaid guarantee arrangement, Party A, when necessary, is willing to enter into written guarantee contracts with Party B's counterparties to assume the guarantor's liabilities. Party B and Party C shall take all necessary actions (including, but not limited to, executing relevant documents and filing relevant registrations) to carry out the counter-guarantee arrangement with Party A.

1

2.  In consideration of the requirements of Article 1 hereof and to ensure performance of the various business agreements between Party A and Party B and payment by Party B of the amounts payable to Party A thereunder, Party B and Party C hereby agree that, without Party A's prior written consent, Party B shall not engage in any transaction that may materially affect its assets, liabilities, rights or operations (other than execution of any business contract or agreement, sale or purchase of any asset by Party B in its ordinary course of business and receipt of legal rights by applicable counterparties as a result thereof), including, but not limited to, the following:

    2.1    To borrow money from any third party or assume any debt;

    2.2    To sell to or acquire from any third party any asset or right, including, but not limited to, any intellectual property rights;

    2.3    To provide guarantee for any third party using its assets or intellectual property rights as collaterals; or

    2.4    To assign to any third party its business contracts.

3.  In order to ensure the performance of the various business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B and Party C hereby agree to accept advice and guidance provided by Party A from time to time relating to its policies on matters such as employment and dismissal of employees, daily operations and management, and financial management.

4.  In the event that any agreement between Party A and Party B terminates or expires, Party A shall have the right, but not the obligation, to terminate all agreements between Party A and Party B, including, but not limited to, the Services Agreement.

5.  Any amendment or supplement to this Agreement shall be made in writing. The amendment or supplement duly executed by all parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

6.  Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of jurisdiction of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

7.  Neither Party B or Party C may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A. Party B and Party C hereby agree that Party A may assign its rights and obligations under this Agreement as Party A considers it necessary to do so, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

2

8.  Each party acknowledges and confirms that any oral or written information exchanged pursuant to this Agreement are confidential. Each party shall keep confidential all such information and not disclose any such information to any third party without the prior written consent from the other party except for any information which: (a) is or will become known to the public (without any fault of the receiving party); (b) is required to be disclosed by the applicable laws or rules of stock exchange; or (c) is disclosed by each party to its legal or financial advisor relating to the transactions contemplated by this Agreement, provided that such legal or financial advisor shall comply with the confidentiality provisions set forth in this Article 10. Disclosure of any confidential information by the employee of or any entity engaged by any Party shall be deemed as disclosure by such Party, and such disclosing Party shall be liable for breach under this Agreement. This Article 10 shall survive the invalidity, cancellation, termination or unenforceability of this Agreement for any reason.

9.  This Agreement shall be governed by and interpreted in accordance with the laws of the PRC.

10. Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. IF no resolution is reached by the Parties through negotiations, any Party may submit such dispute to the China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be in Beijing, and the language of the proceedings shall be Chinese. The arbitral award shall be final and binding upon all of the Parties.

11. This Agreement shall be executed by a duly authorized representative of each Party and become effective as of the date first written above.

12. Once effective, this Agreement shall constitute the entire agreement of the Parties with respect to the subject matters hereof and supersede all prior oral and written agreements and understandings by the Parties with respect to the subject matters hereof.

13. This Agreement shall remain permanently valid unless early terminated as expressly agreed in this Agreement or decided by Party A in writing. If the duration of operation (including any extension thereof) of Party A or Party B is expired or terminated for any other reason within the aforesaid term of this Agreement, such Party shall timely renew its duration of operation to enable this Agreement to continue to be valid and implementable. If a Party's application to renew its duration of operation fails to obtain the approval or consent of any competent authority, this Agreement shall be terminated simultaneously with the expiration or termination of the duration of operation of such Party, unless such Party has transferred its rights and obligations pursuant to Article 7 of this Agreement.

14. During the term of this Agreement, unless otherwise required under applicable laws, neither Party B or Party C may early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by issuing a thirty (30) days' prior written notice to Party B and Party C. During the term of this Agreement, if Party B or Party C is found in breach of this Agreement and fails to correct such breach within fourteen (14) days upon receipt of written notice regarding such breach from Party A, Party A may terminate this Agreement with notice to Party B and Party C in writing.

3

15. All notices or other correspondences required to be sent by any Party hereunder shall be written in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time via personal delivery, registered mail, post prepaid mail, recognized express delivery service or fax. The notices shall be deemed to have been duly served (a) upon sent if sent by personal delivery, (b) on the tenth (10th) day after the post-prepaid registered airmail is sent (shown on the postmark) if sent by mail, or on the fourth day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if sent via fax.

**Party A:** **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attention:  Hailong Xiang
Fax:        010-59927435
Tel:        010-59925049

**Party B:** **Beijing Baidu Netcom Science Technology Co., Ltd.**
Address:    2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attention:  Zhixiang Liang
Fax:        010-59927435
Tel:        010-59928888

**Party C:**
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attn:       Yanhong Li/Hailong Xiang
Fax:        010-59927435
Tel:        010-59928888

16. This Agreement is made in four originals, with each party holding one original. All originals shall have the same legal effect.

[No text below]

4

[This pages contains no body text]

**IN WITNESS THEREOF,** each Party has caused this Agreement to be duly executed by himself or its duly authorized representative as of the date first written above.

**Party A:**    **Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

/s/:    Hailong Xiang
_____
Title: Legal Representative

**Party B:**    **Beijing Baidu Netcom Science Technology Co., Ltd. (seal)**

/s/:    Zhixiang Liang
_____
Title: Legal Representative

**Party C:**

/s/:    Yanhong Li
_____

/s/:    Hailong Xiang
_____

5

**Exhibit 4.49**

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on January 18, 2017:

**Pledgee**:

**Party A:**     **Baidu Online Network Technology (Beijing) Co., Ltd.**
         Registered Address: 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Pledgor:**

**Party B:**     **Hailong Xiang**
         ID No.
         Address: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC owning 0.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into a Amended and Restated Loan Agreement dated June 13, 2016, whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB10,856,400 (the "Loan").

4. Party A and Baidu Netcom entered into an Exclusive Technology Consulting and Services Agreement dated March 22, 2005 (the "Services Agreement"), pursuant to which Baidu Netcom shall pay Party A technical consulting and services fee (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Arrangement and Party A will be able to collect Service Fees from Baidu Netcom, Party B agrees to pledge his equity interest in Baidu Netcom as security for the Loan and the Service Fees. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

6. Party A and Party B have entered into a series of equity pledge agreements (collectively the "Original Equity Pledge Agreement") listed in Appendix I hereof, and both Parties hereto now agree to execute this Agreement to amend and restate the Original Equity Pledge Agreement. This Agreement shall supersede and replace the Original Equity Pledge Agreement as of the effective time provided herein.

1

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations and to be bound hereby:

1. **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in Baidu Netcom legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. **Pledge**

The Pledgor will pledge all of his Equity Interest in Baidu Netcom to the Pledgee as security for (i) all his obligations under the Loan Arrangement and (ii) all obligations of Baidu Netcom under the Services Agreement. For purpose of this Agreement, "Pledge" refers to the priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure.

3. **Rate of Pledge and Term of Pledge**

3.1 Rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Baidu Netcom and registered with the applicable authority of industrial and commercial administration, and shall remain in effect until two (2) years after obligations under the Principal Agreement have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the Pledge in accordance with this Agreement in the event that the Pledgor fails to perform his obligations under the Loan Arrangement or Baidu Netcom fails perform its obligations under the Services Agreement.

2

4.    **Physical Possession of Documents**

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver his capital contribution certificate and the register of shareholders of Baidu Netcom to the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receive dividends from the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Baidu Netcom (See Appendix II) after execution of this Agreement.

5.    **Representations and Warranties of the Pledgor**

5.1 The Pledgor is the legal owner of the Equity Interest and has adopted shareholders' resolutions to approve the Pledge (See Appendix III).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.    **Covenants of the Pledgor**

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have any effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

6.1.3 timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

3

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events which may decrease the value of the Equity Interest or affect the Pledgor's performance of the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall use his best efforts to cooperate with all the registration, record or other procedures relating to the Pledge as required by relevant laws and regulations.

7.    **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform his obligations under the Loan Arrangement;

7.1.2 Baidu Netcom fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreements;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches the covenants under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

4

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8  Baidu Netcom is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a force majeure event;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of Baidu Netcom only partially performs or refuses to perform the payment obligation under the Services Agreements; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreements or requesting to exercise the Pledge in accordance with Article 8 hereof.

8.    **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreements, whichever is later.

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

5

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreements are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.    **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.    **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Baidu Netcom's Register of Shareholders.

11.    **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Baidu Netcom no longer has any outstanding obligations under the Services Agreements. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

6

12.    **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.    Force Majeure

13.1 A Force Majeure event refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war; provided, however, that any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

14.    **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

15.    **Dispute Resolution**

15.1    This Agreement shall be governed by and construed in accordance with PRC law.

7

15.2 The Parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the Parties.

16.    **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A:       Baidu Online Network Technology (Beijing) Co., Ltd.
Address:       Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:           5992-7435
Telephone:     5992-8888

Party B:       Hailong Xiang
Address:       Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Telephone:

17.    **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18.    **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19.    **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

8

20. **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21. **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one original. Both originals have the same legal effect.

[no text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/:   Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Hailong Xiang**

/s/:   Hailong Xiang

10

Appendices:

1. The Original Equity Pledge Agreement
2. Register of Shareholders of Beijing Baidu Netcom Technology Co., Ltd.
3. Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.

11

**Appendix I**

**The Original Equity Pledge Agreement**

| Number | Contract Name | Parties | Date |
|--------|---------------|---------|------|
| 1 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Hailong Xiang | June 13, 2016 |

12

**Appendix II**

**Register of shareholders of Beijing Baidu Netcom Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Yanhong Li |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB2,160,423,600 |
| Percentage of Share Capital: | 99.5% |
| Number of the certificate of capital contribution: | 001 |

Yanhong Li holds 99.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

| | |
|---|---|
| Name of the Shareholder: | Hailong Xiang |
| ID number: | |
| Residence | |
| Contribution Amount: | RMB10,856,400 |
| Percentage of Share Capital: | 0.5% |
| Number of the certificate of capital contribution: | 002 |

Hailong Xiang holds 0.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Baidu Netcom Technology Co., Ltd.

Beijing Baidu Netcom Technology Co., Ltd.

Signature:    /s/ Zhixiang Liang

Name: Zhixiang Liang
Title: Legal representative
Date: January 18, 2017

13

**Appendix III**

**Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated January 18, 2017 between the shareholders of Beijing Baidu Netcom Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company that:

It is approved that the shareholders of the Company pledge all of their equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered on January 18, 2017 by the undersigned shareholders.

Shareholders:

Yanhong Li
Signed by:    /s/ Yanhong Li

Hailong Xiang
Signed by:    /s/ Hailong Xiang

14

**Exhibit 4.50**

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on January 18, 2017:

**Pledgee**:

**Party A:**                    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address:       3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Pledgor:**

**Party B:**                    **Yanhong Li**
Address:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC owning 99.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated January 18, 2017, whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB2,160,423,600 (the "Loan").

4. Party A and Baidu Netcom entered into an Exclusive Technology Consulting and Services Agreement dated March 22, 2005 (the "Services Agreement"), pursuant to which Baidu Netcom shall pay Party A technical consulting and services fee (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Arrangement and Party A will be able to collect Service Fees from Baidu Netcom, Party B agrees to pledge his equity interest in Baidu Netcom as security for the Loan and the Service Fees. Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

6. Party A, Party B and other relevant parties have entered into a series of equity pledge agreements (collectively the "Original Equity Pledge Agreements") listed in Appendix I hereof, and both Parties hereto now agree to execute this Agreement to amend and restate the Original Equity Pledge Agreements. This Agreement shall supersede and replace the Original Equity Pledge Agreements as of the effective time provided herein.

1

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations and to be bound hereby:

1.    **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in Baidu Netcom legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2.    **Pledge**

The Pledgor will pledge all of his Equity Interest in Baidu Netcom to the Pledgee as security for (i) all his obligations under the Loan Arrangement and (ii) all obligations of Baidu Netcom under the Services Agreement. For purpose of this Agreement, "Pledge" refers to the priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure.

3.    **Rate of Pledge and Term of Pledge**

3.1 Rate of the Pledge

The rate of the Pledge shall be approximately 100%.

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Baidu Netcom and registered with the applicable authority of industrial and commercial administration, and shall remain in effect until two (2) years after obligations under the Principal Agreement have been fulfilled.

2

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the Pledge in accordance with this Agreement in the event that the Pledgor fails to perform his obligations under the Loan Arrangement or Baidu Netcom fails to perform its obligations under the Services Agreement.

4.     **Physical Possession of Documents**

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver his capital contribution certificate and the register of shareholders of Baidu Netcom to the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receive dividends from the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Baidu Netcom (See Appendix II) after execution of this Agreement.

5.     **Representations and Warranties of the Pledgor**

5.1 The Pledgor is the legal owner of the Equity Interest and has adopted shareholders' resolutions to approve the Pledge (See Appendix III).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.     **Covenants of the Pledgor**

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interest, create or permit the existence of any other pledges which may have any effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

6.1.3 timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

3

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events which may decrease the value of the Equity Interest or affect the Pledgor's performance of the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall use his best efforts to cooperate with all the registration, record or other procedures relating to the Pledge as required by relevant laws and regulations.

7. **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform his obligations under the Loan Arrangement;

7.1.2 Baidu Netcom fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreements;

4

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches the covenants under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8 Baidu Netcom is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a force majeure event;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of Baidu Netcom only partially performs or refuses to perform the payment obligation under the Services Agreements; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreements or requesting to exercise the Pledge in accordance with Article 8 hereof.

8.    **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreements, whichever is later.

5

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreements are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

## 9.   Assignment

9.1 The Pledgor shall not give away or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

## 10.   Effectiveness and Term

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Baidu Netcom's Register of Shareholders.

## 11.   Termination

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Baidu Netcom no longer has any outstanding obligations under the Services Agreements. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

12.   **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

13.   **Force Majeure**

13.1 A Force Majeure event refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war; provided, however, that any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

14.   **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

7

15. **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the Parties.

16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Fax: | 5992-7435 |
| Telephone: | 5992-8888 |

| | |
|---|---|
| Party B: | Yanhong Li |
| Address: | |
| Fax: 5992-7435 | |
| Telephone: | 010-59928888 |

17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement. This Agreement shall supersede the Original Equity Pledge Agreements previously executed by the Parties and other relevant parties, and the Original Equity Pledge Agreements shall terminate immediately after this Agreement becomes effective.

8

18.    **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19.    **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

20.    **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21.    **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one original. Both originals have the same legal effect.

[no text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

Legal Representative/Authorized Representative: /s/ Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Yanhong Li**

/s/:    Yanhong Li

10

Appendices:

1.    Original Equity Pledge Agreement

2.    Register of Shareholders of Beijing Baidu Netcom Technology Co., Ltd.

3.    Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.

11

**Appendix I**

**Original Equity Pledge Agreement**

| No. | Contract Name | Parties | Date of Execution |
|---|---|---|---|
| 1 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Yong Xu | 20050322 |
| 2 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Haoyu Shen | 20110119 |
| 3 | Update Agreement of Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; Haoyu Shen; Zhan Wang | 20110826 |
| 4 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20111201 |
| 5 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20151130 |
| 6 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li | 20151231 |

12

**Register of shareholders of Beijing Baidu Netcom Technology Co., Ltd.**

Name of the Shareholder:    Yanhong Li
ID number:    110108196811171874
Residence    Room 901, Suite 1 Building 1, Section 2, Shanghecun
    Residential Quarter, Haidian District, Beijing
Contribution Amount:    RMB2,160,423,600
Percentage of Share Capital:    99.5%
Number of the certificate of    001
capital contribution:

Yanhong Li holds 99.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Name of the Shareholder:    Hailong Xiang
ID number:    51220119770824001X
Residence    Room 301 60 Lane 1351 Hua Ling Road, Baoshan District, Shanghai
Contribution Amount:    RMB10,856,400
Percentage of Share Capital:    0.5%
Number of the certificate of    002
capital contribution:

Hailong Xiang holds 0.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Baidu Netcom Technology Co., Ltd.

Beijing Baidu Netcom Technology Co., Ltd.

Signature:    /s/ Zhixiang Liang

Name: Zhixiang Liang
Title: Legal representative
Date: January 18, 2017

13

**Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated January 18, 2017 between the shareholders of Beijing Baidu Netcom Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company that:

It is approved that the shareholders of the Company pledge all of their equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered on January 18, 2017 by the undersigned shareholders.

Shareholders:

Yanhong Li
Signed by: /s/ Yanhong Li _____

Hailong Xiang
Signed by: /s/ Hailong Xiang _____

14

**Exhibit 4.51**

**AMENDED AND RESTATED EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on January 18, 2017:

**Party A:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**    **Hailong Xiang**
ID No.:

**Party C:**    **Beijing Baidu Netcom Science Technology Co., Ltd.**
Address:    2/F Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS:**

1. Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2. Party C is a liability limited company incorporated in Beijing, the PRC;

3. Party B is a shareholder of Party C, owning 0.5% equity interests in Party C (the "**Equity Interest**");

4. Party A and Party B entered into a Amended and Restated Loan Agreement dated January 18, 2017, whereby Party B obtains a loan (the "**Loan Arrangement**");

5. Party A and Party C entered into a series of agreement on March 22, 2005, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"); and

6. Party A and Party B entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated January 18, 2017;

7. Party A and Party B have entered into a series of equity purchase and transfer option agreements (collectively the "Original Equity Purchase and Transfer Option Agreement") listed in Appendix I hereof, and both Parties hereto now agree to execute this Agreement to amend and restate the Original Equity Purchase and Transfer Option Agreement. This Agreement shall supersede and replace the Original Equity Purchase and Transfer Option Agreement as of the effective time provided herein.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1.    **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

1

Party B hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from Party B (the "**Transferor**"), a portion or all of the equity interests held by Party B in Party C (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in a substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

2

1.5 Payment

Payment manner of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees (if any) paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

3

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

4

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6  At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9  To transfer to Party A all dividends and any other form of profit distributed to it by Party C.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party C to repay the loan.


3.    **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

5

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4.    **Assignment of Agreement**

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party B and Party C and no further consent of Party B or Party C is required.

5.    **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above, and terminate on the date when all the Equity Interests held by Party B in Party C have been duly transferred to and under the name of Party A and/or the Designated Persons in accordance with this Agreement.

5.2 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6.    **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.     **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.     **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

| | |
|---|---|
| Party B: | Hailong Xiang |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

| | |
|---|---|
| Party C: | Beijing Baidu Netcom Science Technology Co., Ltd. |
| Address: | 2/F Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

7

9.    **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

    a.    Materials that are or will become known by the public (through no fault of the receiving party);

    b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

    c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10.    **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11.    **Miscellaneous**

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement and understanding of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof. This Agreement shall supersede the original exclusive equity purchase and transfer option agreement previously entered into by the Parties and other involved parties and such original exclusive equity purchase and transfer option agreement shall terminate immediately after this Agreement becomes effective.

8

11.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Hailong Xiang**

/s/: Hailong Xiang

**Party C: Beijing Baidu Netcom Science Technology Co., Ltd.**

/s/: Zhixiang Liang

Seal of Beijing Baidu Netcom Science Technology Co., Ltd.

10

**Appendix I**

**The Original Equity Purchase and Transfer Option Agreement**

| Number | Contract Name | Parties | Date |
|---|---|---|---|
| 1 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Hailong Xiang; Beijing Baidu Netcom Science Technology Co., Ltd. | June 13, 2016 |

11

**Exhibit 4.52**

**AMENDED AND RESTATED EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT**

This Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on January 18, 2017:

**Party A:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    3/F Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**    **Yanhong Li**
Address:

**Party C:**    **Beijing Baidu Netcom Science Technology Co., Ltd.**
Address:    2/F Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2. Party C is a liability limited company incorporated in Beijing, the PRC;

3. Party B is a shareholder of Party C, owning 99.5% equity interests in Party C (the "**Equity Interest**");

4. Party A and Party B entered into an Amended and Restated Loan Agreement dated January 18, 2017, whereby Party B obtains a loan from Party A (the "**Loan Arrangement**");

5. Party A and Party C entered into a series of agreement on March 22, 2005, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"); and

6. Party A and Party B entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated January 18, 2017; and

7. Party A, Party B and other relevant parties have entered into a series of exclusive equity purchase and transfer option agreements (collectively the "Original Option Agreements") listed in Appendix 1 hereof, and all the Parties hereto now agree to execute this Agreement to amend and restate the Original Option Agreements. This Agreement shall supersede and replace the Original Option Agreements as of the effective time provided herein.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1.    **Purchase and Sale of Equity Interest**

1

1.1 Granting of Rights

Party B hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from Party B (the "**Transferor**"), a portion or all of the equity interests held by Party B in Party C (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in a substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

2

1.5 Payment

Payment manner of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees (if any) paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2.   **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

3

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

4

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party C;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party C.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party C to repay the loan.


3.    **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

5

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4.    **Assignment of Agreement**

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party B and Party C and no further consent of Party B or Party C is required.

5.    **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 This Agreement shall remain valid for ten (10) years unless early terminated pursuant to the terms of this Agreement or other relevant agreement separately executed by the Parties. Party B and Party C confirm that this Agreement may be extended with Party A's written confirmation prior to the expiry of the effective term hereof without obtaining the consent of Party B or Party C; the extension period shall be determined by the Parties upon consultations.

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6.    **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6

6.2    Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.    **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.    **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

| | |
|---|---|
| Party B: | Yanhong Li |
| Address: | |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

| | |
|---|---|
| Party C: | Beijing Baidu Netcom Science Technology Co., Ltd. |
| Address: | 2/F Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 59927435 |
| Telephone: | 59928888 |

7

9.    **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

     a.    Materials that are or will become known by the public (through no fault of the receiving party);

     b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

     c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10.   **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11.   **Miscellaneous**

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

11.2   Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement and understanding of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof. This Agreement shall supersede the original exclusive equity purchase and transfer option agreement previously entered into by the Parties and other involved parties and such original exclusive equity purchase and transfer option agreement shall terminate immediately after this Agreement becomes effective.

11.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

9

[This page contains no body text]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/:　Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Yanhong Li**

/s/:　Yanhong Li

**Party C: Beijing Baidu Netcom Science Technology Co., Ltd.**

/s/:　Zhixiang Liang

Seal of Beijing Baidu Netcom Science Technology Co., Ltd.

10

Appendix 1

Original Option Agreement

| No. | Contract Name | Parties | Date of Execution |
|-----|---------------|---------|-------------------|
| 1 | Amended and Restated Exclusive Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; Yong Xu | 20050322 |
| 2 | Exclusive Option Agreement for Capital Increase Equity | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; | 20060210 |
| 3 | Exclusive Equity Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; | 20080306 |
| 4 | Supplementary Agreement to Amended and Restated Exclusive Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; Yong Xu | 20100422 |
| 5 | Update Agreement of Amended and Restated Exclusive Option Agreement and its Supplementary Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; Haoyu Shen; Zhan Wang | 20110826 |

11

| | | | |
|---|---|---|---|
| 6 | Amended and Restated Exclusive Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li | 20151130 |
| 7 | Amended and Restated Exclusive Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Baidu Netcom Science Technology Co., Ltd.; Yanhong Li; | 20151231 |

12

**Exhibit 4.53**

## Irrevocable Power of Attorney

I, Yanhong Li, citizen of the People's Republic of China (the " PRC") with ID No.:                         , is the shareholder holding 99.5% equity interests of Beijing Baidu Netcom Science Technology Co., Ltd. (the "Baidu Netcom"), hereby irrevocably appoint Hailong Xiang with the following powers and rights during the term of this Power of Attorney, with respect to my current and future equity interests in Baidu Netcom ("My Equity"):

I hereby appoint Hailong Xiang as my sole and exclusive agent, to exercise, on my behalf, all voting rights of shareholder in accordance with PRC laws and Baidu Netcom's Articles of Association at the shareholders' meetings of Baidu Netcom, including but not limited to the right to sell or transfer any or all of equity interests of Baidu Netcom held by me and to designate and appoint the general manager of Baidu Netcom as my authorized representative on the shareholders' meeting of Baidu Netcom.

The authorization and appointment are conditioned on that Hailong Xiang is acting as an employee of Baidu Online Network Technology (Beijing) Co., Ltd ("Baidu Online") and Baidu Online approves the authorization and appointment. Once Hailong Xiang loses his title or position in Baidu Online or Baidu Online notifies me to terminate the authorization and appointment, I will withdraw the authorization and appointment immediately and designate/authorize the other individual nominated by Baidu Online to exercise the full voting rights on my behalf at the shareholders' meetings of Baidu Netcom.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof so long as I hold equity interests in Baidu Netcom.

Signature:   /s/ Yanhong li

Date: June 13, 2016

1

**Exhibit 4.54**

**Irrevocable Power of Attorney**

I, Hailong Xiang, citizen of the People's Republic of China (the " PRC") with ID No.:                              , is the shareholder holding 0.5% equity interests of Beijing Baidu Netcom Science Technology Co., Ltd. (the "Baidu Netcom"), hereby irrevocably appoint Hailong Xiang with the following powers and rights during the term of this Power of Attorney, with respect to my current and future equity interests in Baidu Netcom ("My Equity"):

I hereby appoint Hailong Xiang as my sole and exclusive agent, to exercise, on my behalf, all voting rights of shareholder in accordance with PRC laws and Baidu Netcom's Articles of Association at the shareholders' meetings of Baidu Netcom, including but not limited to the right to sell or transfer any or all of equity interests of Baidu Netcom held by me and to designate and appoint the general manager of Baidu Netcom as my authorized representative on the shareholders' meeting of Baidu Netcom.

The authorization and appointment are conditioned on that Hailong Xiang is acting as an employee of Baidu Online Network Technology (Beijing) Co., Ltd ("Baidu Online") and Baidu Online approves the authorization and appointment. Once Hailong Xiang loses his title or position in Baidu Online or Baidu Online notifies me to terminate the authorization and appointment, I will withdraw the authorization and appointment immediately and designate/authorize the other individual nominated by Baidu Online to exercise the full voting rights on my behalf at the shareholders' meetings of Baidu Netcom.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof so long as I hold equity interests in Baidu Netcom.

Signature:    /s/ Hailong Xiang

Date: June 13, 2016

1

**Exhibit 4.55**

**Termination of Power of Attorney**

WHEREAS, Zhixiang Liang (ID No.                              ), as instructed by Baidu Online Network Technology (Beijing) Co., Ltd. (the "Baidu Online"), signed a Power of Attorney on April 23, 2012 authorizing Zhan Wang (ID No.                              ) to exercise on behalf of Zhixiang Liang all voting rights of shareholder at the shareholders' meetings of Beijing BaiduPay Science and Technology Co., Ltd. (the "Power of Attorney").

WHEREAS, Zhan Wang has resigned from Baidu Online Network Technology (Beijing) Co., Ltd.

NOW, THEREFORE, Baidu Online and Zhixiang Liang hereby confirm that the Power of Attorney, all authorizations and appointments thereunder, and all rights and interests obtained by Zhang Wang thereby, are terminated unconditionally as of October 18, 2016.

This Confirmation Letter is signed and effective as of October 18, 2016.

**Baidu Online Network Technology (Beijing) Co., Ltd.**

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Zhixiang Liang**

Signature:     /s/ Zhixiang Liang

1

**Exhibit 4.56**

### Irrevocable Power of Attorney

I, Zhixiang Liang, citizen of the People's Republic of China (the " PRC") with ID No.:                              , is the shareholder holding 5.418% equity interests of Beijing BaiduPay Science and Technology Co., Ltd.(the "BaiduPay"), hereby irrevocably appoint Hailong Xiang with the following powers and rights during the effective term of this Power of Attorney:

I hereby appoint Hailong Xiang to exercise, on my behalf, all voting rights of shareholder in accordance with PRC laws and BaiduPay's Articles of Association at the shareholders' meetings of BaiduPay, including but not limited to the right to sell or transfer any or all of equity interests of BaiduPay held by me and to designate and appoint the general manager of BaiduPay as my authorized representative on the shareholders' meeting of the BaiduPay.

The authorization and appointment above stated are conditioned on that Hailong Xiang is acting as an employee of Baidu Online Network Technology (Beijing) Co., Ltd (the "Baidu Online") and Baidu Online agrees the above stated authorization and appointment. Once Hailong Xiang quits or leaves Baidu Online or Baidu Online notifies me to terminate the authorization and appointment, I will withdraw the authorization and appointment immediately and designate/authorize any other individuals nominated by Baidu Online to exercise the full voting rights on my behalf at the shareholders' meetings of BaiduPay.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof as long as I hold equity interests in BaiduPay.

**Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

Date: October 18, 2016

1

**Exhibit 4.57**

**Acceptance of the Irrevocable Power of Attorney**

To:    Mr. Zhixiang Liang
       Baidu Online Network Technology (Beijing) Co., Ltd.

I, as an employee of Baidu Online Network Technology (Beijing) Co., Ltd. ("Baidu Online"), accept the appointment under the Irrevocable Power of Attorney signed by Zhixiang Liang on October 18, 2016 (the "Power of Attorney") to exercise on behalf of Zhixiang Liang all voting rights of shareholder at the shareholders' meetings of Beijing BaiduPay Science and Technology Co., Ltd. ("BaiduPay"), and undertake to Zhixiang Liang and Baidu Online as follows:

I    During the term of my appointment, I will exercise on behalf of Zhixiang Liang all voting rights of shareholder in strict compliance with instructions from Baidu Online, and take any actions (including any act or omission) at the shareholders' meeting of BaiduPay in accordance with instructions from Baidu Online, including without limitation to voting or abstaining from voting on any matters at the shareholders' meeting of BaiduPay, or signing any shareholder resolutions.

II   Once Baidu Online demands termination of the power of attorney relationship between Zhixiang Liang and myself, I understand that I will immediately lose my appointment under the Power of Attorney, return the Irrevocable Power of Attorney to Zhixiang Liang in accordance with instructions from Baidu Online, and return all files, documents, tapes, discs, plans, models or copies, correspondences and assets in relation to BaiduPay produced by myself or under my possession, retaining or control in connection with my appointment under the Power of Attorney.

**Hailong Xiang**

Signature:    /s/ Hailong Xiang

Date: October 18, 2016

1

**Exhibit 4.58**

**AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT**

This Amended and Restated Equity Pledge Agreement (this "Agreement") is entered into in Beijing, PRC by the following parties on October 18, 2016:

**Pledgee**:

**Party A:** **Baidu Online Network Technology (Beijing) Co., Ltd.**

Address: 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Pledgor:**

**Party B:** **Zhixiang Liang**

Address: 6/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**WHEREAS:**

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC owning 5.418% equity interests in Beijing BaiduPay Science and Technology Co., Ltd., a limited liability company registered in Beijing, the PRC (the "BaiduPay").

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated October 18, 2016, whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB216,720,000 (the "Loan"), for which amount Party B pledges equity interest.

4. Party A and BaiduPay entered into an Exclusive Technology Consulting and Services Agreement dated February 28, 2008 with infinite term, and then a Supplement to the Exclusive Technology Consulting and Service Agreement dated April 22, 2010, a Supplement II to the Exclusive Technology Consulting and Service Agreement and a Supplement Agreement, both dated September 6, 2011, to make supplement to the Exclusive Technology Consulting and Service Agreement (collectively, the "Services Agreements"). Under the Services Agreement, Party B shall pay fee for the technology consulting and services provided by Party A (the "Service Fees").

5. In order to ensure that Party B will perform its obligations under the Loan Arrangement and Party A will be able to collect Service Fees from BaiduPay, Party B agrees to pledge all his equity interest in BaiduPay as security for performance of his obligations under the Loan Arrangement and for the Service Fees. Party A (the "Pledgee") and Party B (the "Pledgor") intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

1

6. The Parties have entered into an Amended and Restated Equity Pledge Agreement dated December 22, 2015 (the "Original Equity Pledge Agreement"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Pledge Agreement, and this Agreement will replace and substitute the Original Equity Pledge Agreement as of the date of its effectiveness.

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations and to be bound hereby:

1. **Definitions and Interpretation**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interest": refers to all of the equity interest in BaiduPay legally held by the Pledgor.

1.3 "Rate of Pledge": refers to the ratio between the value of the Pledge under this Agreement and the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. **Pledge**

The Pledgor agrees to pledge all of his Equity Interest in BaiduPay to the Pledgee as security for (i) his obligations under the Loan Arrangement and (ii) BaiduPay's obligations under the Services Agreements. For purpose of this Agreement, "Pledge" refers to the right of the Pledgee to be entitled to priority in receiving payment in the form of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of the Equity Interest pledged by the Pledgor to the Pledgee.

3. **Rate of Pledge and Term of Pledge**

3.1 The rate of the Pledge

The rate of the Pledge shall be approximately 100%.

2

3.2 The term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of BaiduPay and when the pledge is registered with the Administration for Industry and Commerce and shall remain in effect until two (2) years after the obligations under the Principal Agreement will have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the pledged assets in accordance with this Agreement in the event that the Pledgor does not perform his obligations under the Loan Arrangement or BaiduPay does not perform his obligations under the Services Agreement.

4.    **Physical Possession of Documents**

4.1 During the term of the Pledge under this Agreement, the Pledgor shall deliver the physical possession of his Certificate of Capital Contribution and the Register of Shareholders of BaiduPay to the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receive dividends from the Equity Interest.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of BaiduPay (See Appendix I).

5.    **Representations and Warranties of the Pledgor**

5.1 The Pledgor is the legal owner of the Equity Interest pledged and has adopted shareholders' resolutions to approve the Pledge (See Appendix II).

5.2 Except for the benefit of the Pledgee, the Pledgor has not pledged the Equity Interest or created other encumbrance on the Equity Interest.

6.    **Covenants of the Pledgor**

6.1 During the term of this Agreement, the Pledgor covenants to the Pledgee for its benefit that the Pledgor shall:

6.1.1 Not transfer or assign the Equity Interest, create or permit the existence of any other pledges, which may have any effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 Comply with laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

3

6.1.3 Timely notify the Pledgee of any events or any notices received which may affect the Pledgor's right to all or any part of the Equity Interest, and any events or any received notices which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge obtained from this Agreement shall not be suspended or inhibited by any legal procedure initiated by the Pledgor or any successors of the Pledgor or any person authorized by the Pledgor or any other person.

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and make access to exercise the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment documents (if applicable and necessary) in connection with the certificate of the Equity Interest with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall compensate the Pledgee for all losses suffered by the Pledgee because of the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not perform any action/non-action which may affect the value of the Equity Interest to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any events which may affect the value decrease of the Equity Interest or the obligations under this Agreement, and shall provide security satisfactory to the Pledgee of the decreased value of the Equity Interest upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall use his best efforts to cooperate with all the registration, record or other procedures relating to the Pledge.

7.    **Event of Default**

7.1 Each of the following events shall be regarded as an Events of Default:

7.1.1  Pledgor fails to perform his obligations under the Loan Arrangement;

4

7.1.2 BaiduPay fails to pay the Services Fees in due course in full amount or perform other obligations under the Services Agreements;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof contains material misleading statements or errors and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4  The Pledgor breaches the covenants under Article 6 hereof;

7.1.5  The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interest or transfers or assigns the pledged Equity Interest without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is required to be repaid or performed prior to the scheduled due date because of a default; or (2) is due but cannot be repaid or performed as scheduled, causing the Pledgee to believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8  BaiduPay is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a force majeure event;

7.1.10 There have been adverse changes to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or custodian of BaiduPay only partially performs or refuses to perform the payment obligation under the Services Agreements; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to his act or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if the Pledgor knows or discovers that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been solved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs or at any time thereafter, may give a written notice of default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreements or requesting to exercise the Pledge in accordance with Article 8 hereof.

5

8.      **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written approval from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and full payment of all Service Fees under the Services Agreements, whichever is later.

8.2 The Pledgee shall give a notice of default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a notice of default in accordance with Article 7.3 or at any time thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest based on the conversion value thereof, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreements are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9.      **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee was an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Loan Arrangement, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10.     **Effectiveness and Term**

This Agreement is effective as of the date first set forth above and from the date when the pledge is recorded on BaiduPay's Register of Shareholders.

6

11.    **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreements have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and BaiduPay no longer has any outstanding obligations under the Services Agreements. Thereafter, the Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable.

12.    **Fees and Other Charges**

12.1 [The Pledgor] shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, [the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee].

12.2 [In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge)].

13. Force Majeure

13.1 Force Majeure, which includes but is not limited to acts of governments, acts of nature, fires, explosions, typhoons, floods, earthquake, tides, lightning or war, refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care. However, any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

14.    **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

7

15.   **Dispute Resolution**

15.1   This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to settle any dispute arising from the interpretation or performance of this Agreement through friendly consultation. In case no settlement can be reached through consultation, each party can submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration. The arbitration shall follow the current rules of CIETAC, the arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitration award shall be final and binding upon the Parties.

16.   **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

| | |
|---|---|
| Party A: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59928888 |
| Telephone: | 010-59928888 |

| | |
|---|---|
| Party B: | Zhixiang Liang |
| Address: | 6/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59927435 |
| Telephone: | 010-50817917 |

17.   **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

8

18.    **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

19.    **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

20.    **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21.    **Counterparts**

This Agreement is make in Chinese in two originals, with each Party holding one original. Both originals have the same legal effect.

[no text below]

9

[Signature Page]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

/s/: Zhixiang Liang

10

**Appendix I**

**Register of shareholders of Beijing BaiduPay Science and Technology Co., Ltd.**

Name of the Shareholder:               Beijing Baidu Netcom Science Technology Co., Ltd.
Address:                            2/F, No. 10 Shangdi 10th Street, Haidian District, Beijing
Contribution Amount:           RMB2,191.28 million
Percentage of Share Capital:    54.782%
Number of the certificate of
capital contribution:

Name of the Shareholder:               Zhixiang Liang
ID number:
Contribution Amount:           RMB216.72 million
Percentage of Share Capital:    5.418%
Number of the certificate of
capital contribution:

Name of the Shareholder:               Au Yi Heng Tong (Beijing) Co., Ltd.
Address:                            Section BE, 4/F., Building One, No. 10 Shangdi 10th Street, Haidian District, Beijing
Contribution Amount:           RMB1,592.00 million
Percentage of Share Capital:    39.8%
Number of the certificate of
capital contribution:

Liang Zhixiang holds 5.418% equity interests in Beijing BaiduPay Science and Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 5.418% of the equity interests in Beijing BaiduPay Science and Technology Co., Ltd.

Beijing Baidu Netcom Science Technology Co., Ltd.

/s/: Zhixiang Liang

Name: Zhixiang Liang

Title: Legal representative

Date: October 18, 2016

11

**Appendix II**

**Resolutions of the Shareholders' Meeting
of Beijing BaiduPay Science and Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated October 18, 2016 between the shareholders of Beijing BaiduPay Science and Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company that:

It is approved that Zhixiang Liang, a shareholder of the Company, pledges all of his equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered on October 18, 2016.

Shareholder: Beijing Baidu Netcom Science Technology Co., Ltd.

/s/: Zhixiang Liang

Title: Legal representative

Date: October 18, 2016

12

Exhibit 4.59

**AMENDED AND RESTATED**
**EXCLUSIVE EQUITY PURCHASE AND TRANSFER OPTION AGREEMENT**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "Agreement") is entered into by and among the following parties in Beijing, PRC on October 18, 2016:

**Party A:**     **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:     Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**     **Zhixiang Liang**
ID No.:

**Party C:**     **Beijing BaiduPay Science and Technology Co., Ltd.**
Address:     5/F., Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B and Party C are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A, is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**"), which has technology expertise and practical experience in computer software development and design, and also has rich experience and human resources in information technology and services;

2. Party C, a liability limited company incorporated in the PRC, is licensed by is licensed by Beijing Communications Administration to carry out the business of value-added telecommunication services such as Internet information services;

3. Party B is the shareholder of Party C, owning 5.418% equity interests in Party C (the "**Equity Interest**");

4. Party A and Party B entered into an Amended and Restated Loan Agreement dated October 18, 2016, whereby Party B obtains an interest-free loan up to RMB216,720,000 (the "**Loan Arrangement**") in connection with his investment in Party C;

5. Party A and Party C entered into an Exclusive Technology Consulting and Service Agreement dated February 28, 2008, and then a Supplement to the Exclusive Technology Consulting and Service Agreement dated April 22, 2010, a Supplement II to the Exclusive Technology Consulting and Service Agreement and a Supplement Agreement, both dated September 6, 2011, to make supplement to the Exclusive Technology Consulting and Service Agreement (collectively, the "**Services Agreements**");

6. Party A and Party B entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated October 18, 2016; and

1

7. The Parties have entered into an Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement dated December 22, 2015 (the "**Original Exclusive Option Agreement**"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Option Agreement, and this Agreement will replace and substitute the Original Option Agreement as of the date of its effectiveness.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1.    **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party B hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Article 1.3 of this Agreement, and at any time from the Transferor, a portion or all of the equity interests held by the Transferor in Party C (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party C hereby agrees to granting of the Option by Party B to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

2

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" means guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership, detainment or other security arrangements. However, it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws upon exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party A any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (excluding any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2.     **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party C

Party B and Party C hereby covenant, in relation to Party C:

2.1.1 Not to supplement, amend or modify Party C's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party C and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party C's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to create, succeed to, guarantee or permit any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party C's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party C's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party C's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party C is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party C's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party C to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party C's shareholders in any way without Party A's prior written consent. However, Party C shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request;

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2 Covenants Relating to the Transferor

Party B hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on Party B's Equity Interest in accordance with the Equity Pledge Agreement;

4

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party C's shareholders' meetings to approve Party C's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be the directors of Party C;

2.2.7 At any time, upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party C;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party C and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer all dividends and any other form of profit allocated by Party C to Party A.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party C needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide capital support; and

2.3.2 If Party C cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it shall give up the rights of requiring Party C to repay the loan.

3.    **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party C hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

5

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party C has good and marketable ownership interest in all of its assets and has not created any security interest on the said assets;

3.4 Party C has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigation, arbitration or administrative proceedings related to the Equity Interest, Party C's assets or Party C; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement.

4. **Assignment of Agreement**

4.1 Party B and Party C shall not assign their rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party B and Party C hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party without the consent of Party B and Party C, but such assignment shall be notified in writing to Party B and Party C.

5. **Effective Date and Term**

5.1 This Agreement shall be effective as of the date first set forth above.

5.2 This Agreement shall come into force when it is duly executed by each of the Parties and expires when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.3 If the duration of operation (including any extension thereof) of Party A or Party C is expired or terminated for other reasons within the term set forth in Article 5.2, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Article 4.2 hereof.

6

6.    **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7.    **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8.    **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; and (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation.

Party A:        Baidu Online Network Technology (Beijing) Co., Ltd.
Address:        Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile:      010-59928888
Telephone:      010-59928888

7

| | |
|---|---|
| Party B: | Zhixiang Liang |
| Address: | Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59927435 |
| Telephone: | 010-50817917 |

| | |
|---|---|
| Party C: | Beijing BaiduPay Science and Technology Co., Ltd. |
| Address: | 5/F, Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | 010-59928888 |
| Telephone: | 010-59928888 |

9. **<u>Confidentiality</u>**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

    a.    Materials that are or will become known by the public (through no fault of the receiving party);

    b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

    c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

10. **<u>Further Assurances</u>**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **<u>Miscellaneous</u>**

11.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

8

11.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreement of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

11.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

11.4   Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

11.5 Language and counterparts

This Agreement is executed in Chinese in three originals; each Party holds one original and each original has the same legal effect.

11.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

11.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or premature termination. Articles 6, 8 and 9 and this Article 11.7 shall survive the termination of this Agreement.

11.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

[No text below]

9

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself/herself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

/s/: Zhixiang Liang

**Party C: Beijing BaiduPay Science and Technology Co., Ltd.**

/s/: Zhixiang Liang

Seal of Beijing BaiduPay Science and Technology Co., Ltd.

10

**Exhibit 4.60**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "Agreement") is entered into on October 18, 2016 in Beijing, by and between:

**Party A:      Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:      Zhixiang Liang**
ID No.:

**WHEREAS**:

1.   Party A is a foreign invested enterprise incorporated under the laws of the PRC;

2.   Party B is a Chinese citizen, holding 5.418% of equity interests in Beijing BaiduPay Science and Technology Co., Ltd. ("BaiduPay"), and is a shareholder of BaiduPay;

3.   On December 22, 2015, Party A provided Party B with an interest-free loan of RMB90 million in connection with its investment in BaiduPay. With regards to such loan, Party A and Party B enter into an Amended and Restated Loan Agreement dated December 22, 2015 (the "Original Loan Agreement"); and

4.   The Parties intend to amend and restate the Original Loan Agreement agreed herein.

**NOW, THEREFORE**, Party A and Party B agree as follows through negotiations and to be bound hereby:

1.   Subject to the terms and conditions of this Agreement, Party A agrees to provide, and Party B agrees to accept, an interest-free loan in the amount of RMB216,720,000.00.

2.   Party B confirms receipt of such loan and has applied the entire loan amount to pay his investment in BaiduPay.

3.   The term of the loan under this Agreement shall commence on the date Party B receives such loan until the tenth (10th) anniversary of the date hereof, which term could be extended upon mutual written consent of the Parties. During the term of the loan or any extension thereto, Party A has the right to require immediate maturity of the loan with written notice to Party B for repayment of the loan in accordance to this Agreement if:

   (1)   Party B terminates, voluntarily or involuntarily, his employment with Party A or an affiliate of Party A;

   (2)   Party B is dead, deprived or restricted of civil capacity;

   (3)   Party B is found engaged or involved in any criminal act;

   (4)   Any third party files a claim against Party B that exceeds RMB100,000; or

1

(5)  To the extent permitted under the laws of the PRC, Party A or a person designated by Party A may invest in BaiduPay to conduct internet information service business, value-added telecommunication business and other business, and Party A has issued to Party B a written notice to exercise the option for purchase of equity in BaiduPay pursuant to Article 4 of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement.

4.  The parties herein agree and acknowledge that, to the extent and within the scope permitted by the laws of the PRC, Party A shall have the right but no obligation to purchase or designate any other person (including natural person, legal entity or any other entity) to purchase the equity interest in BaiduPay held by Party B in whole or in part (the "Option"), provided that Party A shall issue a written notice to purchase equity interests to Party B. Upon issuance of a written notice to exercise such Option by Party A, Party B shall, in accordance with Party A's intentions and instructions, immediately transfer the equity interest in BaiduPay held by him to Party A or other any person designated by Party A at its original investment price ("Original Investment Price") or, if otherwise required by law, any other price agreed upon by Party A. The Parties hereby agree and acknowledge that in connection with exercise of the Option by Party A, if the lowest price of equity interest subscription permitted under applicable laws and regulations is higher than the Original Investment Price, the subscription price payable by Party A or any other person designated by Party A shall be equal to such lowest price permitted by applicable laws and regulations. The parties agree to enter into an Amended and Restated Exclusive Equity Option Agreement regarding the Option.

5.  Both Parties hereby agree and acknowledge that Party B may repay the loan only in the following manner: if permitted by PRC laws, Party B or its successor or assign shall transfer the equity interests in BaiduPay to Party A or its designated persons and use the proceeds from such transfer to repay the loan under this Agreement, or otherwise agreed by the Parties.

6.  Both Parties hereby agree and acknowledge that, except as otherwise provided for herein, the loan under this Agreement is interest-free; provided, however, that if the loan becomes due and Party B needs to transfer his equity interests in BaiduPay to Party A or its designated person, and the actual transfer price is higher than the loan principal due to legal requirements or other reasons, the amount in excess of the loan principal, to the extent permitted by law, Party B agrees to pay such excessive amount, net of any applicable individual income tax, at the discretion of Party A.

7.  Both Parties hereby agree and acknowledge that Party B shall be deemed to have fully performed his obligations under this Agreement only if the following requirements are met:

(1)  Party B has transferred all his equity interests in BaiduPay to Party A and/or its designated persons; and

2

(2) Party B has paid the total proceeds from such transfer or the maximum amount (including principal and the highest loan interest permitted under then applicable law) allowed by applicable law as repayment of the loan to Party A.

8. To secure performance of his obligations under this Agreement, Party B agrees to pledge all his equity interests in BaiduPay to Party A (the "Equity Pledge"). Both Parties agree to enter into an Equity Pledge Agreement (the "Equity Pledge Agreement") regarding the Equity Pledge.

9. Party A represents and warrants to Party B that, as of the date of this Agreement:

(1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of PRC;

(2) Party A has the right to execute and perform this Agreement. The execution and performance of this Agreement by Party A comply with its business scope, articles of association and other organizational documents. Party A has obtained all necessary and appropriate approvals and authorizations for the execution and performance of this Agreement;

(3) The principal of the loan to Party B is legally owned by Party A;

(4) The execution and performance of this Agreement by Party A do not violate any laws, regulations, approvals, authorizations, notices, other governmental documents to which Party A is subject, any agreement signed by it with any third party or any undertaking made by it to any third party; and

(5) Upon execution by the Parties hereto, this Agreement shall constitute the legal, valid and binding obligations of Party A.

10. Party B represents and warrants to Party A that, as of the date of this Agreement until this Agreement terminates:

(1) BaiduPay is a limited liability company incorporated and validly existing under the laws of PRC and Party B is a legal holder of the equity interest of BaiduPay;

(2) Party B has the right to execute and perform this Agreement. The execution and performance of this Agreement by Party B comply with the business scope, articles of association and other organizational documents of BaiduPay. Party B has obtained all necessary and appropriate approvals and authorizations for the execution and performance of this Agreement;

(3) The execution and the performance of this Agreement by Party B do not violate any laws, regulations, approvals, authorizations, notices, other governmental documents to which Party B is subject, any agreement signed by Party B with any third party or any undertaking made by Party B to any third party;

3

(4)     Upon execution by the Parties hereto, this Agreement shall constitute the legal, valid and binding obligations of Party B;

(5)     Party B has paid contribution in full for its equity interests in BaiduPay in accordance with applicable laws and regulations;

(6)     Unless required under the Amended and Restated Equity Pledge Agreement and the Amended and Restated Equity Purchase and Transfer Option Agreement, Party B has not pledged or created any other security interest on, made any offer to any third party to transfer, accepted the offer of any third party to purchase, or execute agreement with any third party to transfer, Party B's equity interests in BaiduPay;

(7)     There are no pending or threatened disputes, litigation, arbitration or other administrative proceedings or other legal proceedings in connection with the equity interests of BaiduPay held by Party B; and

(8)     BaiduPay has received and completed all necessary governmental approval, license, registration and filing.

11.     Party B covenants that it shall, during the term of this Agreement:

(1)     Not sell, transfer, pledge or dispose in any other manner of his equity or other interests in BaiduPay, or allow the creation of other security interests thereon, without Party A's prior written consent, except for equity pledges or other rights created for the benefit of Party A;

(2)     Not vote at shareholder's meetings of BaiduPay or execute any shareholders' resolutions approving the sale, transfer, pledge, disposition in any other manner, or the creation of any other security interest on, any legal or beneficial interest in the equity of BaiduPay without Party A's prior written consent, except for the benefit of Party A or its designated persons;

(3)     Not vote at shareholder's meetings of BaiduPay or execute any shareholders' resolutions approving BaiduPay to merge or combine with, acquire or invest in any person without Party A's prior written consent;

(4)     Promptly inform Party A of any pending or threatened litigation, arbitration or regulatory proceeding concerning the equity interests of BaiduPay;

(5)     Execute all necessary or appropriate documents, take all necessary or appropriate actions, bring all necessary or appropriate lawsuits or assert all necessary and appropriate defenses against all claims in order to maintain his equity interests of BaiduPay;

(6)     Not commit any act or omission that may materially affect the assets, business and liabilities of BaiduPay without Party A's prior written consent;

4

(7)     Appoint any person nominated by Party A to be the director of BaiduPay;

(8)     Upon Party A's exercise of its Option, transfer promptly and unconditionally, all of Party B's equity interests in BaiduPay to Party A or any person designated by Party A, provided that such transfer is permitted under the laws of PRC;

(9)     Not request BaiduPay to distribute dividends or profits;

(10)    Once he has transferred his equity interests in BaiduPay to Party A or its designated persons, promptly repay, subject to applicable laws, the proceeds received for such transfer in full, as the loan principal and loan interests or capital utilization cost allowed by laws, to Party A; and

(11)    Comply strictly with the terms of this Agreement, and perform the obligations pursuant to this Agreement and not commit any act or omission that would affect the validity and enforceability of this Agreement.

12.    Party B, as the shareholder of BaiduPay, covenants that during the term of this Agreement, he shall cause BaiduPay:

(1)     Not to supplement, amend or modify its articles of association, or to increase or decrease its registered capital, or to change its capital structure in any way without Party A's prior written consent;

(2)     To maintain and operate its business and deal with matters prudently and effectively, in accordance with good financial and business rules and practices;

(3)     Not to sell, transfer, mortgage, dispose of in any other manner, or to create other security interest on, any of its assets, business or legal or beneficial right to its revenues without Party A's prior written consent;

(4)     Not to create, succeed to, guarantee or permit any liability, without Party A's prior written consent, except (i) the liability arising from the ordinary course of business, but not arising through Party B; and (ii) the liability reported to and approved by Party A in writing;

(5)     To operate persistently all the business and to maintain the value of its assets;

(6)     Not to execute any material contracts (for the purpose of this paragraph, a contract will be deemed material if the value of it exceeds RMB100,000), without Party A's prior written consent, other than those executed during the ordinary course of business;

(7)     To provide information concerning all of its operation and financial affairs upon Party A's request;

(8)     Not to merge or combine with, acquire or invest in, any other person without Party A's prior written consent;

5

(9)  Not to issue dividends to shareholders in any form without Party A's prior written consent; provided, however, that BaiduPay shall promptly distributable all its distributable profits to each of its shareholders upon Party A's request;

(10)  To inform promptly Party A of any pending or threatened suit, arbitration or regulatory proceeding concerning the assets, business or revenue of BaiduPay;

(11)  To execute all necessary or appropriate documents, take all necessary or appropriate actions, bring all necessary or appropriate lawsuits or assert all necessary and appropriate defenses against all claims in order to maintain the ownership of all its assets; and

(12)  To comply strictly with the terms of the Exclusive Technology Consulting and Service Agreement, the Supplement to the Exclusive Technology Consulting and Service Agreement dated April 22, 2010 between BaiduPay and Party A, the Supplement II to the Exclusive Technology Consulting and Service Agreement dated September 6, 2011 between BaiduPay and Party A (collectively, the "Services Agreements"), and any other agreements between Party A and BaiduPay, perform its obligations under the Services Agreements, and not commit any act or omission that would affect the validity and enforceability of the Services Agreements.

13.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assignees. Without prior written approval of Party A, Party B may not assign, pledge or otherwise transfer any right, benefit or obligation under this Agreement.

14.  Party B agrees that Party A may assign its rights and duties under this Agreement to a third party when it is necessary, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

15.  The execution, validity, interpretation, performance, amendment, termination and resolution of disputes in connection with this Agreement shall be governed by the laws of the PRC.

16.  Arbitration.

(1)  Both Parties shall resolve any dispute, conflict, or claim arising from the interpretation or performance (including any issue relating to the existence, validity and termination of this Agreement) in connection with this Agreement through friendly consultation. If no resolution is agreed upon by the Parties within thirty (30) day after one Party requests for the resolution, either Party may submit such dispute to China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in accordance with its rules then in effect. The arbitration award shall be final and binding upon the parties.

(2)  The seat of the arbitration shall be Beijing.

6

(3)    The language for the arbitration proceedings shall be Chinese.

17.    This Agreement shall be established as of the date hereof. Both Parties agree that the terms and conditions of this Agreement shall be effective as of the date on which Party B obtains the loan and shall expire when both Parties have fully performed their obligations under this Agreement.

18.    Party B may not terminate or revoke this Agreement unless (a) Party A commits a gross negligence, fraud or other material illegal acts; or (b) Party A is bankrupt.

19.    This Agreement may not be amended or modified except with a written agreement reached by both Parties. For any matter not provided herein, the Parties may enter into a supplement hereto in writing. Any amendment, modification, supplement or annex to this Agreement shall form an integral part of this Agreement.

20.    This Agreement constitutes the entire agreement of the Parties hereto with respect to the subject matters hereof and supersedes all prior verbal discussions or written agreements between the parties with respect to subject matters hereof.

21.    This Agreement is severable. If any clause of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall have no effect on the validity or enforceability of the remainder of this Agreement.

22.    Each party shall keep in strict confidence all information concerning the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23.    Any obligation arising from or becoming due under this Agreement before the expiration or early termination of this Agreement shall survive such expiration or early termination. The Articles 15, 16 and 22 of this Agreement shall survive the termination of this Agreement.

24.    This Agreement shall be made in two originals, with each Party holding one original. All originals shall have the same legal effect.

[No text below]

7

[No text on this page]

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed by himself, its legal representative or its duly authorized representative as of the date first written above.

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B: Zhixiang Liang**

/s/: Zhixiang Liang

8

**Exhibit 4.61**

**Amended and Restated Business Operating Agreement**

This Amended and Restated Business Operating Agreement (this "Agreement") is entered into among the following parties in Beijing, PRC as of October 18, 2016:

**Party A:**     **Baidu Online Network Technology (Beijing) Co., Ltd.**
**Address:**     3/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**     **Beijing BaiduPay Science and Technology Co., Ltd.**
**Address:**     5/F., Baidu Building B, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:**     **Zhixiang Liang**
**ID No.:**

**Party D:**     **Beijing Netcom Science Technology Co., Ltd.**
**Address:**     2/F., Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party E:**     **Au Yi Heng Tong (Beijing) Co., Ltd.**
**Address:**     Section BE, 4/F., Building One, No. 10 Shangdi 10th Street, Haidian District, Beijing

**WHEREAS:**

1.  Party A is a wholly foreign-owned enterprise duly incorporated and validly existing under the laws of the People's Republic of China (the "PRC"), which has the technology expertise and practical experience in the development and design of computer software, and also has rich experience and a team of professionals specializing in information technology and service;

2.  Party B is a limited liability company duly incorporated and validly existing under PRC law, which carries out the business of individually operating third party payment platform (provide online payment for e-commerce);

3.  Party C, Party D and Party E are shareholders of Party B, in which Party C owns 5.418%, Party D owns 54.782%, and Party E owns 39.8% of the equity interest;

4.  Party A has established a business relationship with Party B by entering into an Exclusive Technology Consulting and Services Agreement ( the "Services Agreement"), a Web Layout Copyright License Agreement and a Trademark License Agreement;

5.  Pursuant to the above-mentioned agreements between Party A and Party B, Party B shall pay certain sums of money to Party A. However, no account payable under those agreements has been paid, and the daily operations of Party B will have a material effect on Party B's ability to pay such account payable to Party A; and

6.  Party A, Party B, Party C and Party D have entered into a Business Operating Agreement dated as of February 28, 2008, which was supplemented by a Supplement to the Business Operating Agreement dated as of April 22, 2010 by Party A, Party B, Party C and Party D (collectively, the "Original Business Operating Agreement"). Party A, Party B, Party C, Party D and Party E hereby agree to enter into this Agreement to amend and restate the original Business Operating Agreement, which shall be so amended and restated as of the date on which this Agreement becomes effective.

**NOW THEREFORE,** through negotiations, all parties to this Agreement hereby agree as follows:

1.  Party A agrees, subject to the satisfaction of the relevant provisions herein by Party B, to be the guarantor of Party B in the contracts, agreements or transactions entered into between Party B and any third party in connection with Party B's business and operations, to provide full guarantees for the performance of such contracts, agreements or transactions by Party B. As counter-guarantee, Party B agrees to pledge the accounts receivable in its operations and all of its assets to Party A. According to the aforesaid guarantee arrangement, Party A, when necessary, is willing to enter into written guarantee contracts with Party B's counterparties to assume the guarantor's liabilities. Party B, Party C, Party D and Party E shall take all necessary actions (including, but not limited to, executing the relevant documents and filing the relevant registrations) to carry out the counter-guarantee arrangement with Party A.

1

2. In consideration of the requirements of Article 1 hereof and to ensure the performance of the various business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B, together with its shareholders Party C, Party D and Party E, hereby jointly agree that, without Party A's prior written consent, Party B shall not engage in any transaction that may materially affect its assets, liabilities, rights or operations (except that Party B may, in the ordinary course of its business, enter into business contracts or agreements, sell or purchase assets and create liens in favor of relevant counter parties as required by law.), including, but not limited to, the following:

2.1 To borrow money from any third party or assume any debt;

2.2 To sell to or acquire from any third party any asset or rights, including, but not limited to, any intellectual property rights;

2.3 To provide guarantee for any third party using its assets or intellectual property rights as collaterals; or

2.4 To assign to any third party its business contracts.

3. In order to ensure the performance of the various business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B, together with its shareholders Party C, Party D and Party E, hereby jointly agree to accept advices and guidance provided by Party A from time to time relating to its corporate policies on matters such as employment and dismissal of employees, daily operations and management, and financial management.

4. Party B, together with its shareholders Party C, Party D and Party E, hereby jointly agree that Party C, Party D and Party E shall appoint candidates recommended by Party A as directors of Party B, and Party B shall appoint Party A's senior executive officers recommended by Party A as its president, chief financial officer and other senior executive officers. If any of the above-mentioned senior executive officers of Party A leaves Party A, whether voluntarily or as a result of dismissal by Party A, he or she shall also lose his/her right to hold any position at Party B, and Party B shall appoint other senior executive officers of Party A recommended by Party A to fill such a position. The persons recommended by Party A in accordance with this Article 4 shall comply with the legal requirements regarding the qualifications of directors, presidents, chief financial officers, and other senior executive officers.

5. Party B, together with its shareholders Party C, hereby jointly agree and confirm that Party B shall first seek a guarantee from Party A if Party B needs any guarantee for its performance of any of its contracts or for any borrowing for working capital purposes in the course of its operations. In such cases, Party A shall have the right, but not the obligation, to provide the appropriate guarantee to Party B at Party A's sole discretion.

6. In the event that any of the agreements between Party A and Party B terminates or expires, Party A shall have the right, but not the obligation, to terminate all agreements between Party A and Party B including, but not limited to, the Services Agreement.

7. Any amendment or supplement to this Agreement shall be made in writing. The amendment or supplement duly executed by all parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

8. Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

9. Party B shall not assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement as Party A sees fit, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

2

10. Each party acknowledges and confirms that any oral or written materials exchanged pursuant to this Agreement are confidential. Each party shall keep confidential all such materials and not disclose any such materials to any third party without the prior written consent from the other party except in the following situations: (a) such materials are or will become known by the public (through no fault of the receiving party); (b) any materials as required to be disclosed by the applicable laws or rules of the stock exchange; or (c) any materials disclosed by each party to its legal or financial advisors relating to the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions set forth in this Article 10. Any disclosure of confidential information by the personnel of any party or by the entity engaged by such party shall be deemed as a disclosure by such party, and such party shall be liable for the breach under this Agreement. This Article 10 shall survive the invalidity, cancellation, termination or unenforceability of this Agreement for any reason.

11. This Agreement shall be governed by and interpreted in accordance with the laws of the PRC.

12. Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the parties in good faith through negotiations. In case no resolution can be reached by the parties through negotiations, either party may refer such dispute to the China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be in Beijing, and the language of the proceedings shall be Chinese. The arbitral award shall be final and binding upon both of the Parties.

13. This Agreement shall be executed by a duly authorized representative of each party and become effective as of the date first written above.

14. Notwithstanding Article 13 hereof, once effective, this Agreement shall constitute the entire agreement of the parties hereto with respect to the subject matters hereof and supersede all prior oral and/or written agreements and understandings by the parties with respect to the subject matters hereof.

15. The term of this Agreement is ten (10) years unless terminated earlier in accordance with the provisions of this Agreement or related agreements entered into by the parties. This Agreement may be extended only with the written consent of Party A before its expiration. The term of the extension shall be decided by the parties through negotiation. If the duration of operation (including any extension thereof) of Party A or Party B is expired or terminated for other reasons within the aforesaid term of this Agreement, this Agreement shall be terminated simultaneously, unless such party has already assigned its rights and obligations hereunder in accordance with Article 9 hereof.

16. This Agreement will terminate on the expiration date unless it is renewed in accordance with the relevant provision herein. During the term of this Agreement, Party B shall not terminate this Agreement. Notwithstanding the above stipulation, Party A shall have the right to terminate this Agreement at any time by issuing a thirty (30) days' prior written notice to Party B.

17. This Agreement shall be executed in five originals, with each party holding one original. All originals shall have the same legal effect.

[No text below on this page]

3

**IN WITNESS THEREOF,** each party hereto has caused this Agreement to be duly executed by himself/herself or a duly authorized representative on its behalf as of the date first written above.

**Party A:**　　**Baidu Online Network Technology (Beijing) Co., Ltd.**

/s/: Hailong Xiang
_____

Seal of Baidu Online Network Technology (Beijing) Co., Ltd.

**Party B:**　　**Beijing BaiduPay Science and Technology Co., Ltd.**

/s/: Zhixiang Liang
_____

Seal of Beijing BaiduPay Science and Technology Co., Ltd.

**Party C:**　　**Zhixiang Liang**

/s/: Zhixiang Liang
_____

**Party D:**　　**Beijing Netcom Science Technology Co., Ltd.**

/s/: Zhixiang Liang
_____

Seal of Beijing Netcom Science Technology Co., Ltd.

**Party E:**　　**Au Yi Heng Tong Co., Ltd.**

/s/: Haibo Fu
_____

Seal of Au Yi Heng Tong (Beijing) Co., Ltd.

4

**Exhibit 4.68**

**C L I F F O R D**

**C H A N C E**

**CLIFFORD CHANCE**
高 偉 紳 律 師 行

EXECUTION VERSION

**BAIDU, INC.**
AS BORROWER


ARRANGED BY


**BANK OF CHINA LIMITED CITIGROUP GLOBAL
MARKETS ASIA LIMITED DEUTSCHE BANK AG,
SINGAPORE BRANCH
THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED
AND
OTHERS**


WITH


**CITICORP INTERNATIONAL LIMITED**
ACTING AS AGENT


US$2,000,000,000 TERM AND REVOLVING CREDIT
FACILITIES AGREEMENT

**CONTENTS**

| Clause | | Page |
|---|---|---|
| 1. | Definitions and Interpretation | 1 |
| 2. | The Facilities | 21 |
| 3. | Purpose | 22 |
| 4. | Conditions of Utilisation | 22 |
| 5. | Utilisation | 23 |
| 6. | Repayment | 25 |
| 7. | Prepayment and Cancellation | 26 |
| 8. | Interest | 32 |
| 9. | Interest Periods | 33 |
| 10. | Changes to the Calculation of Interest | 33 |
| 11. | Fees | 35 |
| 12. | Tax Gross Up and Indemnities | 37 |
| 13. | Increased Costs | 42 |
| 14. | Mitigation by the Lenders | 43 |
| 15. | Other Indemnities | 44 |
| 16. | Costs and Expenses | 46 |
| 17. | Representations | 47 |
| 18. | Information Undertakings | 52 |
| 19. | Financial Covenants | 56 |
| 20. | General Undertakings | 58 |
| 21. | Events of Default | 67 |
| 22. | Changes to the Parties | 72 |
| 23. | Disclosure of Information | 78 |
| 24. | Role of the Agent and the Arrangers | 81 |
| 25. | Sharing Among the Finance Parties | 91 |
| 26. | Payment Mechanics | 94 |
| 27. | Set-off | 97 |
| 28. | Notices | 97 |
| 29. | Calculations and Certificates | 100 |
| 30. | Partial Invalidity | 100 |
| 31. | Remedies and Waivers | 101 |
| 32. | Amendments and Waivers | 101 |
| 33. | Restrictions on Debt Purchase Transactions | 102 |
| 34. | Counterparts | 103 |

| 35. | U.S.A. Patriot Act | 103 |
|---|---|---|
| 36. | Governing Law | 104 |
| 37. | Enforcement | 104 |
| 38. | Waiver of Jury Trial | 105 |
| Schedule 1 The Original Lenders | | 106 |
| Schedule 2 Conditions Precedent | | 108 |
| Schedule 3 Requests | | 110 |
| Part I Form of Utilisation Request | | 110 |
| Part II Form of Selection Notice | | 111 |
| Schedule 4 Form of Transfer Certificate | | 112 |
| Schedule 5 Form of Compliance Certificate | | 115 |
| Schedule 6 Timetables | | 117 |
| Schedule 7 Standing Payment Instructions | | 118 |

**THIS AGREEMENT** is dated <u>8 June</u> 2016 and made

**BETWEEN:**

(1)    **BAIDU, INC.**, an exempted company incorporated with limited liability under the laws of Cayman Islands with registration number 96019 whose registered office at P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands (the "**Borrower**");

(2)    **BANK OF CHINA LIMITED, CITIGROUP GLOBAL MARKETS ASIA LIMITED,DEUTSCHE BANK AG, SINGAPORE BRANCH** and **THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED** as original mandated lead arrangers and bookrunners (the "**Original MLABs**" and each an "**Original MLAB**");

(3)    **BANK OF COMMUNICATIONS CO., LTD. (ACTING THROUGH ITS OFFSHORE BANKING UNIT), DBS BANK LTD., NANYANG COMMERCIAL BANK, LIMITED, AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED, BANK OF AMERICA, N.A., BNP PARIBAS, CHINA CONSTRUCTION BANK (ASIA) CORPORATION LIMITED, HANG SENG BANK LIMITED, INDUSTRIAL AND COMMERCIAL BANK OF CHINA (ASIA) LIMITED, JPMORGAN CHASE BANK, N.A., HONG KONG BRANCH, MIZUHO BANK, LTD., STANDARD CHARTERED BANK (HONG KONG) LIMITED** and **WING LUNG BANK, LIMITED** as additional mandated lead arrangers and bookrunners (the "**Additional MLABs**" and each an "**Additional MLAB**");

(4)    **CATHAY UNITED BANK COMPANY LIMITED, HONG KONG BRANCH**, **CHINA MERCHANTS BANK CO., LTD., MEGA INTERNATIONAL COMMERCIAL BANK CO., LTD.** and **KGI BANK** as additional mandated lead arrangers (the "**Additional MLAs**" and each an "**Additional MLA**");

(5)    **THE FINANCIAL INSTITUTIONS** listed in Schedule 1 (*The Original Lenders*) as lenders (the "**Original Lenders**" and each an "**Original Lender**"); and

(6)    **CITICORP INTERNATIONAL LIMITED** as agent of the Finance Parties (other than itself) (the "**Agent**").

**IT IS AGREED** as follows:

**SECTION 1**
**INTERPRETATION**

1.    **DEFINITIONS AND INTERPRETATION**

1.1    **Definitions**

In this Agreement:

"**1940 Act**" means the U.S. Investment Company Act of 1940.

1

"**Administrative Parties**" means each of the Agent and the Arrangers (each an "**Administrative Party**").

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of any Holding Company of that person.

"**Anti-Bribery and Corruption Laws**" means:

(a)    the FCPA;

(b)    the UK Bribery Act of 2010;

(c)    all laws, rules and regulations (concerning or relating to bribery or corruption) issued, administered or enforced by any of the United States of America, the United Kingdom, the European Union (or any member state thereof), Hong Kong, the PRC, Singapore or any Governmental Agency of any of the foregoing; and

(d)    all laws, rules and regulations (concerning or relating to bribery or corruption) issued, administered or enforced by any other country or jurisdiction applicable to any Group Member from time to time or any other Governmental Agency having jurisdiction over any Group Member from time to time.

"**Anti-Money Laundering Laws**" means all applicable financial recordkeeping and reporting requirements and all applicable anti-money laundering laws and regulations of any of the United States, the United Kingdom, the European Union, the Cayman Islands, Hong Kong, the PRC and Singapore, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Agency in any such jurisdiction from time to time.

"**Anti-Terrorism Laws**" means any Executive Order, the U.S.A. Patriot Act, the Money Laundering Control Act of 1986, Public Law 99-570, the Currency and Foreign Transactions Reporting Act, 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., the Trading with the Enemy Act, 50 U.S.C. App. §§ 1 et seq., the US United Nations Participation Act, the US Syria Accountability and Lebanese Sovereignty Act, the US Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, the Iran Sanctions Act, Section 1245 of the National Defense Authorization Act of 2012, any other regulation issued under authority of any Executive Order or administered by OFAC (**provided that**, with respect to each of the foregoing, "Anti-Terrorism Laws" shall not include provisions that have been suspended or waived by applicable U.S. Governmental Agencies and for so long as such suspension or waiver (as the case may be) has not been revoked), the Prevention of Terrorism Act 2005 of the United Kingdom, any sanction implemented or effective in the United Kingdom under the United Nations Act 1946 or the Emergency Laws (Re-enactments and Repeals) Act 1964 or the Anti-Terrorism, Crime and Security Act 2001 of the United Kingdom or under the Treaty establishing the European Community, and any similar law, regulations and/or sanctions enacted, issued and/or administered by any of the United Nations, the United States, the United Kingdom, the European Union, the Cayman Islands, Hong Kong, the PRC and Singapore.

2

"**APLMA**" means the Asia Pacific Loan Market Association Limited.

"**Arrangers**" means the Original MLABs, the Additional MLABs and the Additional MLAs (each an "**Arranger**").

"**Assignment Agreement**" means, in relation to any assignment by any Lender of any or all of its rights under this Agreement, an assignment agreement substantially in a recommended form of the APLMA or any other form agreed between the applicable assignor, the applicable assignee and the Agent.

"**Auditors**" means one of PricewaterhouseCoopers, Ernst & Young, KPMG or Deloitte & Touche or any other firm mutually agreed to by the Borrower and the Agent (acting on the instructions of the Majority Lenders).

"**Authorisation**" means:

(a)     an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation, lodgement or registration; and/or

(b)     in relation to anything which will be fully or partly prohibited or restricted by law if a Governmental Agency intervenes or acts in any way within a specified period after lodgement, filing, registration or notification, the expiry of that period without intervention or action.

"**Availability Period**" means:

(a)     (in relation to Facility A) the Facility A Availability Period; or

(b)     (in relation to Facility B) the Facility B Availability Period.

"**Available Commitment**" means in relation to a Lender:

(a)     (in relation to Facility A) that Lender's Facility A Available Commitment; or

(b)     (in relation to Facility B) that Lender's Facility B Available Commitment.

"**Available Facility**" means:

(a)     (in relation to Facility A) the Facility A Available Facility; or

(b)     (in relation to Facility B) the Facility B Available Facility.

"**Baidu Netcom**" means Beijing Baidu Netcom Science Technology Co., Ltd. (北京 百度网讯科技有限公司), a company incorporated under the laws of the PRC with united social credit identification number 91110000802100433B.

"**Baidu Online**" means Baidu Online Network Technology (Beijing) Co., Ltd. (百度 在线网络技术 (北京) 有限公司), a company incorporated under the laws of the PRC with registration number 110000410144104.

3

"**Break Costs**" means the amount (if any) by which:

(a)       the interest (excluding any portion thereof attributable to the Margin) which a Finance Party should have received pursuant to the terms of this Agreement for the period from the date of receipt or recovery of all or any part of the principal amount of a Loan or an Unpaid Sum to the last day of the current Interest Period in respect of that Loan or that Unpaid Sum, had the principal amount of that Loan or had that Unpaid Sum so received or recovered been paid on the last day of that Interest Period;

exceeds:

(b)       the amount of interest which that Finance Party would be able to obtain by placing an amount equal to the principal amount of that Loan or equal to that Unpaid Sum so received or recovered by it on deposit with a leading bank in the Relevant Interbank Market for a period starting on the Business Day following such receipt or recovery and ending on the last day of that current Interest Period.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in Hong Kong, the PRC and Singapore and:

(a)       (in relation to any Utilisation Date or the delivery of any Utilisation Request or Selection Notice) London and Taiwan;

(b)       (in relation to any determination of a rate of interest) London; and

(c)       (in relation to any payment in US$) New York City.

"**Code**" means the US Internal Revenue Code of 1986, and the regulations promulgated and rulings issued thereunder.

"**Commitment**" means in relation to a Lender:

(a)       (in relation to Facility A) that Lender's Facility A Commitment; or

(b)       (in relation to Facility B) that Lender's Facility B Commitment.

"**Compliance Certificate**" means a certificate substantially in the form set out in Schedule 5 (*Form of Compliance Certificate*) and signed by an authorised signatory of the Borrower.

"**Confidential Information**" means all information relating to the Borrower, the Group, the Finance Documents or a Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or a Facility from either:

(a)       any member of the Group or any of its advisers; or

4

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers, in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

    (i)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 23 (*Disclosure of Information*); or

    (ii)    is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

    (iii)   is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a recommended form of the APLMA or in any other form agreed between the Borrower and the Agent.

"**Consolidated EBITDA**" has the meaning given to it in Clause 19.1 (*Financial definitions*).

"**Deal Site**" means "Debtdomain".

"**Debt Purchase Transaction**" means, in relation to a person, a transaction where such person:

(a)     purchases or acquires by way of assignment or transfer any rights and/or obligations in respect of;

(b)     enters into any sub-participation in respect of; or

(c)     enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

any Commitment in respect of any Facility (or any commitment represented thereby) or any amount outstanding under any Finance Document.

"**Default**" means an Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Equity Interest**" means, in relation to any person:

(a)     any shares of any class or capital stock of or equity interest (including, without limitation, partnership or membership interest) in such person or any depositary receipt in respect of any such shares, capital stock or equity interest;

5

(b)     any securities convertible or exchangeable (whether at the option of the holder thereof or otherwise and whether such conversion is conditional or otherwise) into any such shares, capital stock, equity interest or depositary receipt, or any depositary receipt in respect of any such securities; or

(c)     any option, warrant or other right to acquire any such shares, capital stock, equity interest, securities or depositary receipts referred to in paragraphs (a) and/or (b).

"**Event of Default**" means any event or circumstance specified in any of Clauses 21.1 (*Non-payment*) to 21.12 (*Material adverse change*).

"**Excluded Redeemable Preference Shares**" means:

(a)     certain redeemable preference shares issued by Qiyi on 14 November 2014 (representing 13.42% of the then outstanding equity interests in Qiyi) for a total consideration of US$300,000,000 on terms and conditions disclosed to the Arrangers prior to the date of this Agreement;

(b)     250,000,000 preference shares issued by Xiaodu Life Technology Ltd. on 1 October 2015 at par value for a total consideration of US$250,000,000 on terms and conditions disclosed to the Arrangers prior to the date of this Agreement;

(c)     29,473,685 preference shares issued by Xiaodu Life Technology Ltd. on 5 May 2016 at par value for a total consideration of US$70,000,000 and warrants for up to 21,052,632 preference shares to be issued at par value for a total consideration of US$50,000,000, in each case, on terms and conditions disclosed to the Arrangers prior to the date of this Agreement; and

(d)     any other redeemable preference shares which are not redeemable on or prior to the Final Maturity Date (other than at the option of the issuer thereof) or which are otherwise categorised as equity in the consolidated financial statements of the Borrower in accordance with GAAP.

"**Executive Orders**" means:

(a)     the US Executive Order No. 13224 on Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism, which came into effect on 23 September 2001, as amended;

(b)     the US Executive Order No. 13590 of 21 November 2011 authorising the imposition of certain sanctions with respect to the provision of goods, services, technology or support for Iran's energy and petrochemical sectors; and

(c)     any other US Executive Order issued and in effect in connection with restrictions on the export of goods or economic or trade sanctions,

(each an "**Executive Order**").

6

"**Facilities**" means Facility A and Facility B (each a "**Facility**").

"**Facility A**" means the term loan facility made or to be made available under this Agreement as described in paragraph (a) of Clause 2.1 (*The Facilities*).

"**Facility A Availability Period**" means the period from and including the date of this Agreement to and including the earlier of (a) the date falling 6 Months after the date of this Agreement and (b) the first date on which the Facility A Available Facility is zero.

"**Facility A Available Commitment**" means in relation to a Lender and save as otherwise provided in this Agreement, that Lender's Facility A Commitment *minus*:

(a)    the aggregate amount of its participation in any outstanding Facility A Loan (for such purpose taking into account the principal amount of each such Facility A Loan when it is made and disregarding any subsequent reduction in such principal amount); and

(b)    in relation to any proposed Utilisation, that Lender's participation in any Facility A Loan (other than the Facility A Loan the subject of such proposed Utilisation) that is due to be made on or before the Utilisation Date for such proposed Utilisation.

"**Facility A Available Facility**" means the aggregate for the time being of each Lender's Facility A Available Commitment.

"**Facility A Commitment**" means:

(a)    in relation to an Original Lender, the sum of the amount set opposite its name under the heading "Facility A Commitment" in Schedule 1 (*The Original Lenders*) and the amount of any other Facility A Commitment transferred to it pursuant to Clause 22 (*Changes to the Parties*); and

(b)    in relation to any other Lender, the amount of any Facility A Commitment transferred to it pursuant to Clause 22 (*Changes to the Parties*),

to the extent not cancelled or reduced under this Agreement or transferred by it pursuant to Clause 22 (*Changes to the Parties*).

"**Facility A Loan**" means, as the context requires, a loan made or to be made under Facility A or the principal amount outstanding for the time being of that loan.

"**Facility B**" means the revolving credit facility made or to be made available under this Agreement as described in paragraph (b) of Clause 2.1 (*The Facilities*).

"**Facility B Availability Period**" means the period from and including the date of this Agreement to and including the date falling 1 Month prior to the Final Maturity Date.

"**Facility B Available Commitment**" means in relation to a Lender and save as otherwise provided in this Agreement, that Lender's Facility B Commitment *minus*:

(a)    the aggregate amount of its participation in any outstanding Facility B Loan (for such purpose taking into account the principal amount of each such Facility B Loan when it is made and disregarding any subsequent reduction in such principal amount); and

(b)        in relation to any proposed Utilisation, that Lender's participation in any Facility B Loan (other than the Facility B Loan the subject of such proposed Utilisation) that is due to be made on or before the Utilisation Date for such proposed Utilisation,

**provided that**, for the purposes of calculating a Lender's Facility B Available Commitment in relation to any proposed Utilisation under Facility B only, the amount of that Lender's participation in any Facility B Loans that are due to be repaid or prepaid on or before the proposed Utilisation Date (for such proposed Utilisation) shall not be deducted from that Lender's Facility B Available Commitment.

"**Facility B Available Facility**" means the aggregate for the time being of each Lender's Facility B Available Commitment.

"**Facility B Commitment**" means:

(a)        in relation to an Original Lender, the sum of the amount set opposite its name under the heading "Facility B Commitment" in Schedule 1 (*The Original Lenders*) and the amount of any other Facility B Commitment transferred to it pursuant to Clause 22 (*Changes to the Parties*); and

(b)        in relation to any other Lender, the amount of any Facility B Commitment transferred to it pursuant to Clause 22 (*Changes to the Parties*),

to the extent not cancelled or reduced under this Agreement or transferred by it pursuant to Clause 22 (*Changes to the Parties*).

"**Facility B Loan**" means, as the context requires, a loan made or to be made under

Facility B or the principal amount outstanding for the time being of that loan.

"**Facility Office**" means the office or offices notified by a Lender to the Agent in writing on or before the date it becomes a Lender (or, following that date, by not less than five Business Days' written notice) as the office(s) through which it will perform its obligations under this Agreement.

"**FATCA**" means:

(a)        sections 1471 to 1474 of the Code or any associated regulations;

(b)        any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)        any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

8

"**FATCA Deduction**" means a deduction or withholding from a payment under a Finance Document required by FATCA.

"**FATCA Exempt Party**" means a Party that is entitled to receive payments free from any FATCA Deduction.

"**FCPA**" means the United States Foreign Corrupt Practices Act 1977, as amended, and the rules and regulations thereunder.

"**Fee Letters**" means any letter or letters referring to this Agreement or any Facility between one or more of the Administrative Parties (on the one hand) and the Borrower (on the other hand) setting out any of the fees referred to in Clause 11 (*Fees*) (each a "**Fee Letter**").

"**Final Maturity Date**" means the date falling 60 Months after the date of this Agreement.

"**Finance Documents**" means this Agreement, the Fee Letters, any Utilisation Request, any Selection Notice, any Compliance Certificate and any other document(s) designated as a "Finance Document" by the Agent and the Borrower (each a "**Finance Document**").

"**Finance Parties**" means the Agent, the Arrangers and the Lenders (each a "**Finance Party**").

"**Finance Lease**" means any lease or hire purchase contract which would, in accordance with GAAP, be treated as a finance or capital lease.

"**Financial Indebtedness**" means any indebtedness for or in respect of:

(a)      any moneys borrowed;

(b)      any redeemable preference shares;

(c)      any amount raised by acceptance under any acceptance credit facility (including any dematerialised equivalent thereof);

(d)      any amount raised pursuant to any bond, note, debenture, loan stock or other similar instrument;

(e)      the amount of any liability in respect of any Finance Lease;

(f)      receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(g)      any amount of any liability under an advance or deferred purchase agreement primarily entered into as a method of raising finance or to finance the acquisition of any asset;

(h)      any amount raised under any other transaction (including any forward sale or purchase agreement) of a type not referred to in any other paragraph of this definition having the commercial effect of a borrowing;

9

(i)        any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the marked to market value shall be taken into account);

(j)        any counter-indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and/or

(k)        the amount of any liability in respect of any guarantee or indemnity or similar assurance against financial loss for any of the items referred to in paragraphs (a) to (j) above.

"**Financial Quarter**" means the period commencing on the day after one Quarter Date and ending on the next Quarter Date.

"**Financial Year**" means the annual accounting period of the Group ending on 31 December in each year.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Governmental Agency**" means any government or any governmental agency, semi- governmental or judicial entity or authority (including, without limitation, any stock exchange or any self-regulatory organisation established under statute).

"**Group**" means the Borrower and its Subsidiaries from time to time.

"**Group Member**" means any member of the Group.

"**Holding Company**" means, in relation to a company, corporation or entity, any other company, corporation or entity in respect of which it is a Subsidiary.

"**Indirect Tax**" means any goods and services tax, consumption tax, value added tax or any tax of a similar nature.

"**Information Memorandum**" means the document in the form approved by the Borrower concerning, among other things, the Group which, at the Borrower's request and on its behalf, was or will be prepared in relation to the Facilities (or any part thereof) and has been or will be distributed by one or more of the Arrangers in connection with syndication of the Facilities (or any part thereof).

"**Initial Utilisation Date**" means the date on which the first Loan is made under this Agreement.

"**Interest Period**" means:

(a)        in relation to a Loan, any period determined in accordance with Clause 9 (*Interest Periods*); and/or

(b)        in relation to an Unpaid Sum, any period determined in accordance with Clause 8.3 (*Default interest*).

"**Interpolated Screen Rate**" means, in relation to LIBOR for any Loan or any Unpaid Sum and any Interest Period relating thereto, the rate per annum (rounded upwards to 4 decimal places) which results from interpolating on a linear basis between:

(a)        the rate per annum that is equal to the applicable Screen Rate for the longest period (for which that Screen Rate is available) which is less than the length of such Interest Period; and

(b)        the rate per annum that is equal to the applicable Screen Rate for the shortest period (for which that Screen Rate is available) which exceeds the length of such Interest Period,

each as of the Specified Time on the Quotation Day for the currency of such Loan or such Unpaid Sum and for such Interest Period.

"**Lender**" means:

(a)        any Original Lender; and/or

(b)        any bank, financial institution, trust, fund or other entity which has become a Party in accordance with Clause 22 (*Changes to the Parties*),

which in each case has not ceased to be a Party in accordance with the terms of this Agreement.

"**LIBOR**" means, in relation to any Loan or Unpaid Sum and any Interest Period relating thereto, the rate per annum equal to:

(a)        the applicable Screen Rate;

(b)        (if no Screen Rate is available for the currency of such Loan or such Unpaid Sum and a period equal in length to such Interest Period) the Interpolated Screen Rate for such Loan or such Unpaid Sum and such Interest Period; or

(c)        (if (i) no Screen Rate is available for the currency of such Loan or such Unpaid Sum and a period equal in length to such Interest Period and (ii) it is not possible to calculate the Interpolated Screen Rate for such Loan or such Unpaid Sum and such Interest Period) the Reference Bank Rate,

as of, in the case of paragraphs (a) and (c) above, the Specified Time on the Quotation Day for the currency of such Loan or Unpaid Sum and for a period equal in length to that Interest Period, **provided that** (in each case) if such rate is less than zero, LIBOR for such Loan or Unpaid Sum and such Interest Period shall (without prejudice to Clause 10.2 (*Market disruption*)) be deemed to be zero.

"**Loan**" means a Facility A Loan or a Facility B Loan.

"**London Business Day**" means a day (other than a Saturday or Sunday) on which commercial banks are open for general business including dealings in interbank deposits in London.

11

"**Majority Facility A Lenders**" means a Lender or Lenders whose Facility A Commitments aggregate 66 ⅔ per cent. or more of the Total Facility A Commitments (or, if the Total Facility A Commitments have been reduced to zero, aggregated 66 ⅔ per cent. or more of the Total Facility A Commitments immediately prior to the reduction of the Total Facility A Commitments to zero).

"**Majority Facility B Lenders**" means a Lender or Lenders whose Facility B Commitments aggregate 66 ⅔ per cent. or more of the Total Facility B Commitments (or, if the Total Facility B Commitments have been reduced to zero, aggregated 66 ⅔ per cent. or more of the Total Facility B Commitments immediately prior to the reduction of the Total Facility B Commitments to zero).

"**Majority Lenders**" means a Lender or Lenders whose Commitments (for any or all Facilities) aggregate 66 ⅔ per cent. or more of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated 66 ⅔ per cent. or more of the Total Commitments immediately prior to the reduction of the Total Commitments to zero).

"**Margin**" means 1.10 per cent. per annum.

"**Margin Stock**" means margin stock or "margin security" within the meaning of Regulation T, Regulation U and Regulation X.

"**Material Adverse Effect**" means a material adverse effect on:

(a)  the business or financial condition of the Group (taken as a whole);

(b)  the ability of the Borrower to perform its payment obligations under any or all of the Finance Documents; or

(c)  the legality, validity or enforceability of any or all of the Finance Documents or any or all of the rights or remedies of any Finance Party under any or all of the Finance Documents.

"**Material Subsidiary**" means, at any time, any Group Member whose:

(a)  revenue (calculated on a consolidated basis if such Group Member has any Subsidiary) represents 10 per cent. or more of the revenue of the Group (calculated on a consolidated basis); or

(b)  earnings before interest, Tax, depreciation and amortisation calculated on a similar basis as Consolidated EBITDA (calculated *mutatis mutandis* as if any reference in the definition of "Consolidated EBITDA" and any related definition to the Group were a reference to such Group Member and (if any) its Subsidiaries (on a consolidated basis)) represents 10 per cent. or more of Consolidated EBITDA.

12

Whether a Group Member meets any of the conditions set out in paragraphs (a) and/or (b) above shall be determined annually by reference to the period covered by the most recent audited consolidated financial statements of the Borrower delivered under this Agreement (and the Compliance Certificate delivered in respect of such financial statements) and (where available) the financial statements of that Group Member (for the period covered by such most recent audited consolidated financial statements of the Borrower), **provided** that if a person becomes a Group Member (whether as a result of acquisition or establishment or otherwise) or ceases to be a Group Member (whether as a result of disposal or otherwise) since the date as at which the latest audited consolidated financial statements of the Borrower delivered under this Agreement were prepared, such financial statements shall be deemed to be adjusted (on a *pro forma* basis as if such person had become or (as the case may be) ceased to be a Group Member with effect from the commencement of the period to which such financial statements relate) in order to take into account that person's becoming or (as the case may be) ceasing to be a Group Member.

A report by the Group's auditors (which shall be one of the Auditors) that a Group Member is or is not a Material Subsidiary (for the purposes of paragraphs (a) and/or (b) above) shall, in the absence of manifest error, be conclusive and binding on all Parties.

"**Month**" means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     (subject to paragraph (c) below) if the numerically corresponding day in that next calendar month (in which that period is to end) is not a Business Day, that period shall end on the next Business Day in that next calendar month if there is one, or if there is not, on the immediately preceding Business Day in that next calendar month;

(b)     if there is no numerically corresponding day in that next calendar month (in which that period is to end), that period shall end on the last Business Day in that next calendar month; and

(c)     if any period begins on the last Business Day of a calendar month, that period shall end on the last Business Day in the calendar month in which that period is to end.

The above rules will only apply to the last Month of any period.

"**OFAC**" means the Office of Foreign Assets Control of the US Department of the Treasury.

"**Original Financial Statements**" means the audited consolidated financial statements of the Borrower for its Financial Year ended 31 December 2015 and the unaudited consolidated financial statements of the Borrower for its Financial Quarter ended 31 March 2016.

"**Party**" means a party to this Agreement.

"**PRC**" means the People's Republic of China (which, for the purposes of this Agreement, does not include Hong Kong, the Special Administrative Region of Macau or Taiwan).

"**Qiyi**" means Qiyi.com. Inc.(奇艺有限公司), a company incorporated under the laws of the Cayman Islands with registered number WK-233914.

13

"**Quarter Dates**" means each of 31 March, 30 June, 30 September and 31 December (each a "**Quarter Date**").

"**Quotation Day**" means:

(a)   in relation to any period for which an interest rate is to be determined (other than any Interest Period referred to in paragraph (b)), two London Business Days before the first day of that period unless market practice differs in the Relevant Interbank Market, in which case the Quotation Day will be determined by the Agent in accordance with market practice in the Relevant Interbank Market (and if quotations would normally be given by leading banks in the Relevant Interbank Market on more than one day, the Quotation Day will be the last of those days); or

(b)   in relation to any Interest Period the duration of which is selected by the Agent pursuant to Clause 8.3 (*Default interest*), such date as may be determined by the Agent (acting reasonably).

"**Reference Bank Rate**" means, in relation to any Loan or Unpaid Sum and any period relating thereto, the arithmetic mean of the rates (rounded upwards to four decimal places) as supplied to the Agent at its request by each of the Reference Banks as the rate at which such Reference Bank could borrow funds in the London interbank market in the currency of such Loan or Unpaid Sum and for such period, were it to do so by asking for and then accepting interbank offers for deposits in reasonable market size in such currency and for such period.

"**Reference Banks**" means the principal London offices of (a) DBS Bank Ltd. and Mizuho Bank, Ltd. or (b) such other banks as may be appointed by the Agent after consultation with the Borrower.

"**Regulation T**" means Regulation T of the Board of Governors of the Federal Reserve System of the United States (or any successor thereof).

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System of the United States (or any successor thereof).

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System of the United States (or any successor thereof).

"**Related Fund**" in relation to a fund (the "**first fund**"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Interbank Market**" means the London interbank market.

"**Relevant Period**" means has the meaning given to it in Clause 19.1 (*Financial definitions*).

14

"**Repeating Representations**" means each of the representations and warranties set out in Clauses 17.1 (*Status*) to 17.6 (*Governing law and enforcement*) (inclusive), paragraphs (a) and (b) of 17.9 (*No default*), paragraph (c) of Clause 17.10 (*No misleading information*), Clause 17.11 (*Financial statements*), Clause 17.13 (*No proceedings pending or threatened*), Clause 17.14 (*Authorised Signatures*), Clause 17.15 (*Federal Reserve Regulations*) and Clause 17.17 (*Sanctions, anti-terrorism, anti-money laundering and anti-corruption*).

"**Restricted Material Subsidiaries**" means:

(a)     Baidu Netcom;

(b)     Baidu Online; and

(c)     any Group Member to or in favour of whom all or substantially all of the assets of any of Baidu Netcom or Baidu Online has been transferred or otherwise disposed of (whether in a single transaction or a series of transactions (whether related or not)),

(each a "**Restricted Material Subsidiary**").

"**Restricted Party**" means a person:

(a)     that is listed on, or owned or controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

(b)     that is located in or incorporated under the laws of, or owned or (directly or indirectly) controlled by, or acting on behalf of, a person located in or organised under the laws of any Sanctioned Jurisdiction; or

(c)     that is otherwise a target of Sanctions ("**target of Sanctions**" signifying a person with whom a US person or other national of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business or other activities).

"**Rollover Loan**" means one or more Facility B Loans:

(a)     made or to be made on the same day that a maturing Facility B Loan is due to be repaid;

(b)     the aggregate amount of which is equal to or less than the amount of that maturing Facility B Loan; and

(c)     made or to be made for the purpose of refinancing that maturing Facility B Loan and identified as a "Rollover Loan" or "Rollover Loans" in the Utilisation Request for such first-mentioned Facility B Loans.

"**Sanctioned Jurisdiction**" means, at any time, any country or territory that is the target of countrywide or territory-wide Sanctions (being, as at the date hereof, Cuba, Iran, North Korea, Sudan, Syria and the Crimea region in Ukraine).

"**Sanctions**" means any trade, economic or financial sanctions, embargoes, laws, regulations or restrictive measures administered, enacted or enforced by:

(a)     the European Union;

15

(b)      the United Kingdom;

(c)      the United Nations;

(d)      the US;

(e)      Hong Kong;

(f)      the PRC;

(g)      Singapore; and/or

(h)      the respective governmental institutions and agencies of any of the foregoing, including, without limitation, OFAC, the United Nations Security Council, the United States Department of State, the United States Department of the Treasury, Her Majesty's Treasury ("**HMT**") and the Hong Kong Monetary Authority (together the "**Sanctions Authorities**" and each a "**Sanctions Authority**").

"**Sanctions List**" means the "Specially Designated Nationals and Blocked Persons" list maintained by OFAC and the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by HMT, or any similar list maintained by, or any public announcement of Sanctions designation made by, any of the Sanctions Authorities.

"**Screen Rate**" means, in relation to any Loan or Unpaid Sum and any period relating thereto, the London interbank offered rate administered by ICE Benchmark Administration Limited (or any other person which takes over the administration of that rate) for the currency of such Loan or Unpaid Sum and such period, as displayed (before any correction, recalculation or republication by such administrator) on the appropriate page of the Thomson Reuters screen (being currently page LIBOR01 or LIBOR02) or, if such page is replaced or such service ceases to be available, such replacement page or service displaying such rate as the Agent may select after consultation with the Borrower and the Lenders.

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Selection Notice**" means a notice in substantially the form set out in Part II of Schedule 3 (*Requests*).

"**Specified Time**" means the applicable time determined in accordance with Schedule 6 (*Timetables*).

"**Standing Payment Instructions**" means, in relation to any Lender, the standing payment instructions for that Lender set out in Schedule 7 (*Standing Payment Instructions*) or in the Transfer Certificate or the Assignment Agreement relating to any assignment or transfer or rights and/or obligations under this Agreement to such Lender, in each case as amended from time to time by written instruction to the Agent by a duly authorised officer of such Lender, **provided that** such written instructions are made by letter in original.

16

"**Subsidiary**" means in relation to any company, corporation or entity, a company, corporation or entity:

(a)    which is controlled, directly or indirectly, by the first mentioned company, corporation or entity;

(b)    more than half the issued equity share capital, registered capital or equity interest of which is beneficially owned, directly or indirectly by the first mentioned company, corporation or entity;

(c)    which is a Subsidiary of another Subsidiary of the first mentioned company, corporation or entity; or

(d)    the financial condition or results of operation of which are or are required under GAAP to be consolidated for the purposes of the consolidated financial statements of the first mentioned company, corporation or entity,

and for this purpose, a company, corporation or entity shall be treated as being controlled by another if that other company, corporation or entity is able to direct its affairs and/or to control the majority of the composition of its board of directors or equivalent body.

"**Super Majority Lenders**" means a Lender or Lenders whose Commitments (for any or all Facilities) aggregate 80 per cent. or more of the Total Commitments (or, if the Total Commitments have been reduced to zero, aggregated 80 per cent. or more of the Total Commitments immediately prior to the reduction of the Total Commitments to zero).

"**Tax**" means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

"**Tax Deduction**" has the meaning given to such term in paragraph (a) of Clause 12.1 (*Definitions*).

"**Total Commitments**" means the aggregate of the Facility A Commitments and the Facility B Commitments, being US$2,000,000,000 at the date of this Agreement.

"**Total Facility A Commitments**" means the aggregate of the Facility A Commitments, being US$1,000,000,000 at the date of this Agreement.

"**Total Facility B Commitments**" means the aggregate of the Facility B Commitments, being US$1,000,000,000 at the date of this Agreement.

"**Transfer Certificate**" means a certificate substantially in the form set out in Schedule 4 (*Form of Transfer Certificate*) or any other form agreed between the Agent and the Borrower.

"**Transfer Date**" means, in relation to an assignment by a Lender of any or all of its rights under this Agreement or a transfer by a Lender of any or all of its rights and obligations under this Agreement, the later of:

(a)    the proposed Transfer Date specified in the Assignment Agreement relating to such assignment or (as the case may be) the Transfer Certificate relating to such transfer; and

17

(b)      the date on which the Agent executes the Assignment Agreement relating to such assignment or (as the case may be) the Transfer Certificate relating to such transfer.

"**Unpaid Sum**" means any sum due and payable but unpaid by the Borrower under any or all of the Finance Documents.

"**US**", "**U.S.**" and "**United States**" means the United States of America, its territories, possessions and other areas subject to the jurisdiction of the United States of America.

"**US Bankruptcy Code**" means Title 11 of the United States Code, 11 USC. 101 et seq., entitled "Bankruptcy".

"**U.S.A. Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

"**US Tax Obligor**" means the Borrower if:

(a)      it is resident for tax purposes in the US; or

(b)      its payments under the Finance Documents are from sources within the US for United States federal income tax purposes.

"**Utilisation**" means a utilisation of any Facility.

"**Utilisation Date**" means the date of a Utilisation, being the date on which the Loan (the subject of such Utilisation) is made or to be made.

"**Utilisation Request**" means a notice substantially in the form set out in Part I (*Form of Utilisation Request*) of Schedule 3 (*Requests*).

1.2    **Construction**

(a)      Unless a contrary indication appears, any reference in this Agreement to:

(i)      the Agent, any Arranger, any Administrative Party, any Finance Party, any Lender or any Party shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(ii)     a Finance Document or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended and/or restated from time to time;

(iii)    a document in "**agreed form**" is a document which is in the form agreed in writing by or on behalf of the Borrower and the Agent;

18

(iv) "**asset**" includes present and future properties, revenues and rights of every description;

(v) "**disposal**" includes any sale, lease, transfer, conveyance, assignment and other disposal of any asset or any interest therein (including, without limitation, any other transaction or arrangement pursuant to which the economic benefit of or beneficial interest in such asset is lost or diluted) and "**dispose**" shall be construed accordingly;

(vi) "**guarantee**" includes any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness (and "**guarantor**" shall be construed accordingly);

(vii) "**including**" shall be construed as "including without limitation" (and cognate expressions shall be construed similarly);

(viii) "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(ix) a Finance Party's "**participation**" in any Loan or Unpaid Sum includes an amount (in the currency of such Loan or Unpaid Sum) representing the fraction or portion (attributable to such Finance Party by virtue of the provisions of this Agreement) of the total amount of such Loan or Unpaid Sum and such Finance Party's rights under this Agreement and/or any other Finance Document in respect thereof;

(x) a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

(xi) a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or regulatory, self-regulatory or other authority or organisation;

(xii) any gender shall be construed to include a reference to each other gender;

(xiii) a provision of law is a reference to that provision as amended or re- enacted; and

(xiv) a time of day is a reference to Hong Kong time.

(b) Section, Clause and Schedule headings are for ease of reference only.

19

(c)     Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(d)     A Default (other than an Event of Default) is "**continuing**" if it has not been remedied or waived and an Event of Default is "**continuing**" if it has not been waived.

(e)     The "**equivalent**" of an amount in a given currency (the "**specified currency**") is a reference to the amount of any other currency which, when converted into the specified currency utilising the Agent's spot rate of exchange (or, if no such spot rate of exchange is quoted by the Agent, such other prevailing market rate of exchange selected by the Agent) for the purchase of the specified currency with that other currency at or about 11:00 a.m. (Hong Kong time) on the applicable date of determination, is equal to the applicable amount in the specified currency.

1.3     **Currency symbols and definitions**

"**$**", "**US$**", "**US dollar**", "**US dollars**", "**dollar**" and "**dollars**" denote lawful currency of the United States of America.

1.4     **Third party rights**

(a)     A person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the "**Third Parties Act**") to enforce or to enjoy the benefit of any term of this Agreement, except as otherwise provided in paragraph (b) of Clause 24.9 (*Exclusion of liability*) and Clause 24.18 (*Liability*).

(b)     Notwithstanding any provision of this Agreement (including paragraph (a) above), the Parties do not require the consent of any person who is not a Party to rescind, amend, vary or waive any provision of this Agreement at any time.

20

**SECTION 2**
**THE FACILITIES**

2.    **THE FACILITIES**

2.1    **The Facilities**

Subject to the terms of this Agreement, the Lenders agree to make available to the Borrower:

(a)    a US dollar term loan facility in an aggregate amount of up to the Total Facility A Commitments; and

(b)    a US dollar revolving credit facility in an aggregate amount of up to the Total Facility B Commitments.

2.2    **Finance Parties' rights and obligations**

(a)    The obligations of each Finance Party under the Finance Documents are several. Failure by a Finance Party to perform its obligations under any or all of the Finance Documents does not affect the obligations of any other Party under the Finance Documents. No Finance Party is responsible for the obligations of any other Finance Party under any or all of the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under any or all of the Finance Documents to a Finance Party from the Borrower shall be a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with paragraph (c) below. The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of a Loan or any other amount owed by the Borrower which relates to a Finance Party's participation in a Facility or its role under a Finance Document (including any such amount payable to the Agent on its behalf) is a debt owing to that Finance Party by the Borrower.

(c)    A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents. Each Finance Party shall be entitled to separately enforce its rights under the Finance Documents against the Borrower to recover any amount that is due and payable to it under any Finance Document (or to recover its share of any amount that is due and payable under any Finance Document) without the consent of any other Party; and nothing shall prejudice the rights of a Finance Party from separately enforcing its rights in relation to any debt arising under any Finance Document owing to it (or its share of any debt arising under a Finance Document), which debt is due and payable.

21

3.  **PURPOSE**

3.1  **Purpose**

The Borrower shall ensure that all amounts borrowed by it under the Facilities are applied towards:

(a)      financing the general corporate purposes of the Group; and/or

(b)      payment of fees, costs and expenses incurred by the Borrower in connection with the Finance Documents.

3.2  **Monitoring**

No Finance Party is bound to monitor or verify the application of any amount borrowed pursuant to this Agreement.

4.  **CONDITIONS OF UTILISATION**

4.1  **Initial conditions precedent**

(a)      The Borrower may not deliver a Utilisation Request unless the Agent has received all of the documents and other evidence listed in Schedule 2 (*Conditions Precedent*) in form and substance satisfactory to the Agent. The Agent shall notify the Borrower and the Lenders promptly upon being so satisfied.

(b)      Other than to the extent that the Majority Lenders notify the Agent in writing to the contrary before the Agent gives the notification described in paragraph (a) above, the Lenders authorise (but do not require) the Agent to give that notification. The Agent shall not be liable for any damages, costs or losses whatsoever as a result of giving any such notification.

4.2  **Further conditions precedent**

The Lenders will only be obliged to comply with Clause 5.4 (*Lenders' participation*) in relation to any Loan if on the date of the Utilisation Request (relating to such Loan) and on the proposed Utilisation Date (for such Loan):

(a)      (in the case of a Rollover Loan) the Agent has not given notice pursuant to Clause 21.13 (*Acceleration*) to the Borrower to declare that no Rollover Loan shall be made or (in the case of any Loan other than a Rollover Loan) no Default is continuing or would result from such proposed Loan; and

(b)      (in the case of any Loan other than a Rollover Loan) the representations and/or warranties to be repeated by the Borrower under any or all of the Finance Documents upon the date of any Utilisation Request or any Utilisation Date are true in all material respects (whether before or after giving effect to such proposed Loan).

4.3  **Maximum number of Loans**

(a)      The Borrower may not deliver a Utilisation Request if as a result of the proposed Utilisation, 10 or more Facility A Loans would be outstanding.

(b)      The Borrower may not request that any Loan be divided.

22

**SECTION 3**
**UTILISATION**

5.     **UTILISATION**

5.1    **Delivery of a Utilisation Request**

The Borrower may utilise a Facility by delivery to the Agent of a duly completed Utilisation Request not later than the Specified Time.

5.2    **Completion of a Utilisation Request**

(a)     Each Utilisation Request for a Loan under any Facility is irrevocable and will not be regarded as having been duly completed unless:

(i)     it identifies the Facility to be utilised;

(ii)     the proposed Utilisation Date is a Business Day within the Availability Period for such Facility;

(iii)     the currency and amount of such Loan (the subject of such Utilisation Request) comply with Clause 5.3 (*Currency and amount*); and

(iv)     the proposed first Interest Period complies with Clause 9 (*Interest Periods*).

(b)     Only one Loan in respect of each Facility may be requested in each Utilisation Request.

5.3    **Currency and amount**

(a)     The currency specified in a Utilisation Request must be US dollars.

(b)     The amount of the proposed Loan under any Facility specified in a Utilisation Request must be an amount which does not exceed the Available Facility for such Facility and which is (i) a minimum of US$50,000,000 and an integral multiple of US$10,000,000, or (ii) if less, the Available Facility for such Facility.

5.4    **Lenders' participation**

(a)     If the conditions set out in this Agreement have been met and subject to Clause 7.1 (*Illegality*) and paragraph (b) of Clause 6.2 (*Repayment of Facility B Loans*), each Lender shall make its participation in each Loan available by the Utilisation Date for such Loan through its Facility Office.

(b)     The amount of each Lender's participation in each Loan under any Facility will be equal to a proportion of such Loan, such proportion being equal to the proportion borne by such Lender's Available Commitment for such Facility to the Available Facility for such Facility immediately prior to making such Loan.

23

(c)     The Agent shall notify each Lender of the amount of each Loan and the amount of its participation in that Loan (and, in the case of a Facility B Loan and if different, the amount of its participation in that Loan to be made available to the Agent under Clause 26.1 (*Payments to the Agent*) in accordance with paragraph (b) of Clause 6.2 (*Repayment of Facility B Loans*)), in each case by the Specified Time.

5.5     **Cancellation of Available Facility**

On the expiry of the Availability Period in respect of any Facility (in the principal financial centre of the country of the currency in which such Facility is denominated):

(a)     the Available Commitment (if any) of each Lender in respect of such Facility shall be immediately and automatically reduced to zero; and

(b)     the Commitment of each Lender in respect of such Facility shall be immediately and automatically reduced by the amount (if any) of the Available Commitment of such Lender in respect of such Facility immediately before the reduction to zero of its Available Commitment in respect of such Facility in accordance with paragraph (a) above.

24

**SECTION 4**
**REPAYMENT, PREPAYMENT AND CANCELLATION**

6.    **REPAYMENT**

6.1    **Repayment of Facility A Loans**

(a)    The Borrower shall repay each Facility A Loan in full on the Final Maturity Date.

(b)    The Borrower may not re-borrow any part of Facility A which is repaid.

6.2    **Repayment of Facility B Loans**

(a)    Subject to paragraph (c), the Borrower shall repay each Facility B Loan in full on the last day of its Interest Period.

(b)    Without prejudice to the Borrower's obligation under paragraph (a) above, if: (i)

one or more Facility B Loans are to be made available to the Borrower in accordance with the provisions of this Agreement ("**New Facility B Loans**"):

(A)    on the same day that a maturing Facility B Loan is due to be repaid; and

(B)    in whole or in part for the purpose of refinancing such maturing Facility B Loan (as specified in the Utilisation Request(s) for such New Facility B Loans); and

(ii)    each Lender's aggregate participation in such New Facility B Loans (expressed as a percentage of the aggregate amount of such New Facility B Loans) is equal to such Lender's participation in such maturing Facility B Loan (expressed as a percentage of the aggregate amount of such Facility B Loan),

the aggregate amount of such New Facility B Loans shall, unless the Borrower notifies the Agent to the contrary in the Utilisation Request(s) for such New Facility B Loans, be treated as if applied in or towards repayment of such maturing Facility B Loan so that:

(A)    if the amount of such maturing Facility B Loan exceeds the aggregate amount of the New Facility B Loans:

(1)    the Borrower will only be required to make a payment under Clause 26.1 (*Payments to the Agent*) in an amount equal to that excess; and

(2)    each Lender's participation in such New Facility B Loans shall be treated as having been made available and applied by the Borrower in or towards repayment of that Lender's participation in such maturing Facility B Loan and that Lender will not be required to make a payment under Clause 26.1 (*Payments to the Agent*) in respect of its participation in such New Facility B Loans; and

25

(B) if the amount of such maturing Facility B Loan is equal to or less than the aggregate amount of such New Facility B Loans:

(1) the Borrower will not be required to make a payment under Clause 26.1 (*Payments to the Agent*); and

(2) each Lender will be required to make a payment under 26.1 (*Payments to the Agent*) in respect of its participation in such New Facility B Loans only to the extent that its participation in such New Facility B Loans exceeds that Lender's participation in such maturing Facility B Loan and the remainder of that Lender's participation in such New Facility B Loans shall be treated as having been made available and applied by the Borrower in or towards repayment of that Lender's participation in such maturing Facility B Loan.

(c) All of the Facility B Loans must be repaid in full on the Final Maturity Date.

## 7. PREPAYMENT AND CANCELLATION

### 7.1 Illegality

If, at any time, it is or will become unlawful in any applicable jurisdiction for a Lender to perform any of its obligations as contemplated by this Agreement or to fund or maintain its participation in any Loan or any part thereof:

(a) that Lender shall promptly notify the Agent upon becoming aware of that event and the Agent shall promptly notify the Borrower upon the receipt of such notification from that Lender;

(b) upon the Agent notifying the Borrower, the Available Commitment of that Lender for each Facility will be immediately cancelled and reduced to zero and the Lenders' Commitment for each Facility shall be reduced by the amount of the Available Commitment for such Facility so cancelled (and that Lender shall not be obliged to participate in the making of any Loan under any Facility); and

(c) to the extent that that Lender's participation in each Loan has not been transferred to another person pursuant to Clause 7.5 (*Right of repayment and cancellation in relation to a single Lender*), the Borrower shall repay that Lender's participation in each Loan on the last day of the Interest Period for such Loan occurring after the Agent has notified the Borrower or, if earlier, the date specified by that Lender in the notice delivered to the Agent (being no earlier than the last day of any applicable grace period permitted by law).

26

7.2    **Voluntary cancellation**

(a)    The Borrower may, if it gives the Agent not less than 10 Business Days' (or such shorter period as the Majority Facility A Lenders may agree) prior notice, reduce the Facility A Available Facility to zero or by such amount (being a minimum amount of US$50,000,000 and an integral multiple of US$10,000,000) as the Borrower may specify in such notice.

(b)    The Borrower may, if it gives the Agent not less than 10 Business Days' (or such shorter period as the Majority Facility B Lenders may agree) prior notice, reduce the Facility B Available Facility to zero or by such amount (being a minimum amount of US$50,000,000 and an integral multiple of US$10,000,000) as the Borrower may specify in such notice.

(c)    Any such reduction of the Available Facility for any Facility under this Clause 7.2 shall reduce the Commitments of the Lenders for such Facility rateably.

7.3    **Voluntary prepayment of Facility A Loans**

(a)    The Borrower may, if it gives the Agent not less than 10 Business Days' (or such shorter period as the Majority Facility A Lenders may agree) prior notice in writing, prepay the whole or any part of any Facility A Loan, **provided that**, in the case of any prepayment of any Facility A Loan in part, the amount of such prepayment reduces the amount of such Facility A Loan by an amount that is (i) not less than US$50,000,000 and (ii) if in excess of US$50,000,000, an integral multiple of US$10,000,000.

(b)    A Facility A Loan may only be prepaid under this Clause 7.3 after the last day of the Availability Period in respect of Facility A (or, if earlier, the day on which the Facility A Available Facility is zero).

7.4    **Voluntary prepayment of Facility B Loans**

The Borrower may, if it gives the Agent not less than 10 Business Days' (or such shorter period as the Majority Facility B Lenders may agree) prior notice in writing, prepay the whole or any part of any Facility B Loan, **provided that**, in the case of any prepayment of any Facility B Loan in part, the amount of such prepayment reduces the amount of such Facility B Loan by an amount that is (i) not less than US$50,000,000 and (ii) if in excess of US$50,000,000, an integral multiple of US$10,000,000.

7.5    **Right of repayment and cancellation in relation to a single Lender**

(a)    If:

(i)    any sum payable to any Lender by the Borrower is required to be increased under Clause 12.2 (*Tax gross-up*); or

(ii)    any Lender claims indemnification from the Borrower under Clause 12.3 (*Tax indemnity*) or Clause 13 (*Increased Costs*),

the Borrower may, whilst the circumstance giving rise to such requirement or indemnification continues, give the Agent and that Lender notice of its intention to procure the repayment of that Lender's participation in the Loans and the cancellation of the Commitment of that Lender for each Facility (a "**Cancellation Notice**").

27

(b)     On receipt of a Cancellation Notice referred to in paragraph (a) above in respect of any Lender, the Available Commitment of that Lender for each Facility shall immediately be cancelled and reduced to zero (and the Lenders' Commitment for each Facility shall be reduced by the amount of the Available Commitment for such Facility so cancelled).

(c)     On the last day of each Interest Period relating to any Loan which ends after the Borrower has given a Cancellation Notice under paragraph (a) above in respect of any Lender (or, if earlier, the date specified by the Borrower in that notice), the Borrower shall repay that Lender's participation in that Loan.

(d)     If:

(i)      any sum payable to any Lender by the Borrower is required to be increased under Clause 12.2 (*Tax gross-up*);

(ii)     any Lender claims indemnification from the Borrower under Clause 12.3 (*Tax indemnity*) or Clause 13 (*Increased Costs*);

(iii)    the Borrower becomes obliged to repay any Loan in accordance with Clause 7.1 (*Illegality*); or

(iv)     any Lender becomes a Non-Consenting Lender (as defined in paragraph (e) below),

the Borrower may, on not less than 10 Business Days' prior written notice to the Agent and that Lender of its intention to replace that Lender (a "**Replacement Notice**"), replace that Lender (a "**Replaced Lender**") by requiring such Replaced Lender to (and, to the extent permitted by law, such Replaced Lender shall) transfer pursuant to Clause 22 (*Changes to the Parties*) all (and not part only) of its rights and obligations under this Agreement to a Lender or any other bank, financial institution selected by the Borrower (a "**Replacement Lender**") which confirms (x) its willingness to assume and does assume all the obligations of such Replaced Lender in accordance with Clause 22 (*Changes to the Parties*) for a purchase price in cash payable, free and clear from any and all withholdings and deductions, at the time of such transfer equal to the sum of (and in the currency of) (A) the aggregate outstanding principal amount of such Replaced Lender's participation in each of the outstanding Loans, (B) all accrued interest (whether or not due) thereon, (C) any Break Costs that would have been payable to such Replaced Lender had such Replaced Lender received payment of its participation in each of the Loans and accrued interest thereon and other sums payable under the Finance Documents from the Borrower on the date of such transfer and (D) all other amounts owing or payable to such Replaced Lender under the Finance Documents, and (y) (in the case where such Replaced Lender is a Non-Consenting Lender) its consent to the waiver or amendment (that is the subject of the applicable Non-Consenting Event which constitutes such Replaced Lender as a Non-Consenting Lender).

28

(e)     The replacement of a Replaced Lender and the transfer of rights and obligations of such Replaced Lender to the applicable Replacement Lender pursuant to paragraph (d) above shall be subject to the following conditions:

(i)     without prejudice to paragraph (h) of Clause 24.11 (*Resignation of the Agent*), the Borrower shall have no right to replace the Agent;

(ii)    none of the Finance Parties (including without limitation such Replaced Lender) shall have any obligation to find a Replacement Lender;

(iii)   in no event shall such Replaced Lender be required to pay, account for or surrender to such Replacement Lender for any amount (including without limitation any fees) received or recovered by such Replaced Lender pursuant to the Finance Documents prior to or in respect of any time prior to such transfer;

(iv)    such Replaced Lender shall not be obliged to make such transfer or execute any Transfer Certificate in respect of such transfer unless it is satisfied (acting reasonably) that it has completed all "know your customer" and other similar procedures that it is required to conduct in relation to such transfer to such Replacement Lender (and the Replaced Lender shall perform such procedures as soon as reasonably practicable following delivery of a Replacement Notice to it in respect of such transfer and shall notify the Agent and the Borrower when it is satisfied that it has completed such procedures);

(v)     such Replaced Lender shall be paid the purchase price in respect of such transfer as set out in paragraph (d) by no later than the time of such transfer, and any and all costs and expenses incurred or to be incurred in connection with such transfer by such Replaced Lender shall be paid by the Borrower to such Replaced Lender no later than the time of such transfer;

(vi)    such Replacement Lender is not a Group Member or any Affiliate of a Group Member except with the prior written consent of the Agent (acting on the instructions of the Majority Lenders) **provided that** in no event shall such Replacement Lender be the Borrower;

(vii)   such Replaced Lender shall not be required to make any such transfer to the extent that such transfer is, or would be reasonably likely to result, in breach of or non-compliance with any applicable law or regulation, or any rules or regulations of any applicable securities exchange;

(viii)  in the event of a replacement of a Non-Consenting Lender such replacement must take place no later than 30 days after the date on which the Non-Consenting Event constituting such Replaced Lender a Non-Consenting Lender first arose; and

29

(ix)     in the case of paragraph (d)(i), (d)(ii) or (d)(iii), such Replaced Lender shall only be obliged to make such transfer if at the time of such transfer the circumstance giving rise to such requirement for increased payments to such Replaced Lender under Clause 12.2 (*Tax gross-up*) or such indemnification in favour of such Replaced Lender under Clause 12.3 (*Tax indemnity*) or Clause 13 (*Increased Costs*) or the Borrower's obligation to repay any Loan in accordance with Clause 7.1 (*Illegality*) (as the case may be) is continuing.

(f)     In the event that:

(i)     the Borrower or the Agent (at the request of the Borrower) has requested the Lenders to consent to a waiver or amendment of any provisions of the Finance Documents;

(ii)     the waiver or amendment in question requires the consent of all the Lenders; and

(iii)     the Super Majority Lenders have consented to such waiver or amendment,

then any Lender who does not and continues not to consent to such waiver or amendment shall be deemed a "**Non-Consenting Lender**" and such event shall be a "**Non-Consenting Event**".

## 7.6     Restrictions

(a)     Any notice of cancellation or prepayment given by any Party under this Clause 7 shall be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

(b)     Any prepayment under this Agreement shall be made together with accrued interest on the amount prepaid and, subject to any Break Costs, without premium or penalty.

(c)     The Borrower may not re-borrow any part of Facility A which is prepaid.

(d)     Unless a contrary indication appears in this Agreement, any part of Facility B which is prepaid or repaid may be re-borrowed during the Facility B Availability Period in accordance with the terms of this Agreement.

(e)     The Borrower shall not repay or prepay all or any part of the Loans or cancel or reduce all or any part of the Commitments or Available Commitments of the Lenders for any Facility except at the times and in the manner expressly provided for in this Agreement.

(f)     If any Commitment of any Lender in respect of any Facility is cancelled or reduced under this Agreement, such Commitment so cancelled or reduced may not be subsequently reinstated.

30

(g)     If the Agent receives a notice under this Clause 7 it shall promptly forward a copy of that notice to either the Borrower or the affected Lender, as appropriate.

(h)     If all or part of any Lender's participation in a Loan under any Facility is repaid or prepaid and is not available for redrawing (other than by reason of the operation of Clause 4.2 (*Further conditions precedent*)), an amount of that Lender's Commitment in respect of that Facility (equal to the amount of such Lender's participation in such Loan which is so repaid or prepaid) will be deemed to be cancelled on the date of such repayment or prepayment.

31

**SECTION 5**
**COSTS OF UTILISATION**

8.    **INTEREST**

8.1    **Calculation of interest**

The rate of interest on each Loan at any time during an Interest Period relating thereto is the percentage rate per annum which is the aggregate of the applicable:

(a)    Margin for such Loan;

(b)    LIBOR for such Loan and such Interest Period.

8.2    **Payment of interest**

On the last day of each Interest Period relating to a Loan the Borrower shall pay accrued interest on such Loan.

8.3    **Default interest**

(a)    If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on such overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which, subject to paragraph (b) below, is one (1) per cent. per annum higher than the rate which would have been payable if such overdue amount had, during the period of non-payment, constituted a Loan in the currency of such overdue amount for successive Interest Periods, each of a duration selected by the Agent (acting reasonably). Any interest accruing under this Clause 8.3 on any overdue amount owing by the Borrower shall be immediately payable by the Borrower on demand by the Agent.

(b)    If any Unpaid Sum consists of all or part of a Loan which became due on a day which was not the last day of an Interest Period relating to that Loan:

(i)    the first Interest Period for that Unpaid Sum shall have a duration equal to the unexpired portion of the current Interest Period relating to that Loan; and

(ii)    the rate of interest applying to that Unpaid Sum during that first Interest Period shall be one (1) per cent. per annum higher than the rate which would have applied if that Unpaid Sum had not become due.

(c)    Default interest (if unpaid) arising on any Unpaid Sum will be compounded with that Unpaid Sum at the end of each Interest Period applicable to that Unpaid Sum but will remain immediately due and payable.

8.4    **Notification of rates of interest**

The Agent shall promptly notify the Lenders and the Borrower of the determination of a rate of interest under this Agreement.

32

9.    **INTEREST PERIODS**

9.1    **Selection of Interest Periods**

(a)    Subject to the provisions of this Agreement:

(i)    the Borrower may select an Interest Period for any Loan in the Utilisation Request for such Loan or (if such Loan is a Facility A Loan which has already been borrowed) in a Selection Notice;

(ii)    each Selection Notice in respect of an Interest Period for any Facility A Loan is irrevocable and must be delivered to the Agent by the Borrower not later than three Business Days prior to the commencement of that Interest Period;

(iii)    if the Borrower fails to deliver a Selection Notice to the Agent in accordance with paragraph (a)(ii)) above in relation to any Interest Period for a Facility A Loan, such Interest Period will, subject to paragraph (b), be three Months; and

(iv)    the Borrower may (pursuant to paragraph (a)(i)) select an Interest Period for any Loan of one, two or three Month(s) or any other period agreed between the Borrower and the Agent (acting on the instructions of all the Lenders that have any participation in that Loan).

(b)    No Interest Period for any Loan shall extend beyond the Final Maturity Date.

(c)    Each Interest Period for a Facility A Loan shall start on the Utilisation Date for such Loan or (if such Facility A Loan has already been made) on the last day of the preceding Interest Period relating to such Loan.

(d)    A Facility B Loan has one Interest Period only and such Interest Period shall start on the Utilisation Date of that Facility B Loan.

9.2    **Non-Business Days**

If an Interest Period would otherwise end on a day which is not a Business Day, that Interest Period will instead end on the next Business Day.

9.3    **Consolidation of Facility A Loans**

If two or more Interest Periods relating to Facility A Loans end on the same date, then those Facility A Loans will be consolidated into, and treated as, a single Facility A Loan on the last day of such first-mentioned Interest Periods.

10.    **CHANGES TO THE CALCULATION OF INTEREST**

10.1    **Absence of quotations**

Subject to Clause 10.2 (*Market disruption*), if LIBOR for any sum and any Interest Period relating thereto is to be determined by reference to the Reference Banks but a Reference Bank does not supply a quotation by noon (London time) on the Quotation Day for such Interest Period, the applicable LIBOR shall be determined on the basis of the quotations of the remaining Reference Banks.

10.2   **Market disruption**

(a)   Subject to any alternative basis agreed and consented to as contemplated by paragraphs (a) and (b) of Clause 10.3 (*Alternative basis of interest or funding*), if a Market Disruption Event occurs in relation to a Loan for any Interest Period relating thereto, then the rate of interest on each Lender's participation in that Loan at any time during that Interest Period shall be the rate per annum which is the sum of:

(i)   the applicable Margin as at such time;

(ii)   (subject to paragraph (b)) the percentage rate per annum notified to the Agent by that Lender, as soon as practicable and in any event no later than five Business Days before interest is due to be paid in respect of that Interest Period (or such later date as may be acceptable to the Agent), as the cost to that Lender of funding its participation in that Loan from whatever source it may reasonably select (**provided that** if such percentage rate per annum is below zero, then such percentage rate per annum shall be deemed to be zero).

(b)   In relation to a Market Disruption Event (in respect of any Loan and any Interest Period relating thereto) falling within paragraph (c)(ii), if the percentage rate per annum notified by a Lender pursuant to paragraph (a)(ii) above in respect of such Loan and such Interest Period is less than LIBOR for such Loan and such Interest Period or if a Lender shall fail to notify the Agent of any such percentage rate per annum pursuant to paragraph (a)(ii) above in respect of such Loan and such Interest Period, then the cost of that Lender of funding its participation in such Loan for such Interest Period shall be deemed, for the purposes of paragraph (a)(ii) above, to be equal to LIBOR for such Loan and such Interest Period, and such Lender shall be deemed to have notified the Agent of such cost of funding pursuant to paragraph (a)(ii) above.

(c)   In this Agreement "**Market Disruption Event**" means in relation to any Loan and any Interest Period relating thereto:

(i)   at or about noon (London time) on the Quotation Day for such Loan and such Interest Period, LIBOR for such Loan and such Interest Period is to be determined by reference to the Reference Banks and none or only one of the Reference Banks supplies a rate to the Agent to determine LIBOR for such Loan and such Interest Period; or

(ii)   as at 5:00 p.m. (Hong Kong time) on the Business Day immediately following the Quotation Day for such Loan and such Interest Period, the Agent has received notifications from a Lender or Lenders (whose aggregate participations in such Loan exceed 35 per cent. of such Loan) that the cost to it or them of funding its/their participation(s) in such Loan from whatever source(s) it/they may reasonably select would be in excess of LIBOR for such Loan and such Interest Period.

34

(d) If a Market Disruption Event occurs in relation to any Loan and any Interest Period relating thereto, the Agent shall promptly notify the Lenders and the Borrower thereof upon becoming aware of the same.

10.3 **Alternative basis of interest or funding**

(a) If a Market Disruption Event occurs and the Agent or the Borrower so requires, the Agent and the Borrower shall enter into negotiations (for a period of not more than 30 days) with a view to agreeing a substitute basis for determining the rate of interest under this Agreement.

(b) Any alternative basis agreed pursuant to paragraph (a) above shall, with the prior consent of all the Lenders and the Borrower, be binding on all Parties.

(c) For the avoidance of doubt, in the event that no substitute basis is agreed at the end of such 30-day period, the rate of interest shall continue to be determined in accordance with the terms of this Agreement (including without limitation Clause 10.2 (*Market disruption*)).

10.4 **Break Costs**

(a) The Borrower shall, within ten Business Days of demand by a Finance Party, pay to that Finance Party its Break Costs attributable to all or any part of a Loan or any Unpaid Sum being paid by or recovered from the Borrower on a day other than the last day of an Interest Period for that Loan or that Unpaid Sum.

(b) Each Finance Party shall, as soon as reasonably practicable after a demand by the Agent, provide a certificate confirming the amount of its Break Costs in relation to any Loan or any Unpaid Sum and any Interest Period relating thereto.

11. **FEES**

11.1 **Commitment fee**

(a) The Borrower shall, in respect of Facility B, pay to the Agent (for the account of each Lender) a commitment fee in US dollars computed and accruing on a daily basis at the rate of 0.2 per cent. per annum on that Lender's Facility B Available Commitment on each day of the Facility B Availability Period. For such purposes, such Lender's commitment fee for Facility B in respect of any day during the Facility B Availability Period shall be calculated on such Lender's Facility B Available Commitment as at the close of business on such day (or, if any such day is not a Business Day, the immediately preceding Business Day).

(b) The accrued commitment fee under paragraph (a) is payable in arrears:

(i) on the last day of each successive period of three Months which ends during the Facility B Availability Period;

(ii) on the last day of the Facility B Availability Period; and

35

(iii)    if a Lender's Facility B Commitment is reduced to zero before the last day of the Facility B Availability Period, on the day on which such reduction to zero becomes effective.

**11.2    Arrangement fee**

The Borrower shall pay to the Agent (for the account of Citigroup Global Markets Asia Limited, Deutsche Bank AG, Singapore Branch and The Hongkong and Shanghai Banking Corporation Limited) an arrangement fee in the amount and at the times agreed in a Fee Letter.

**11.3    Agency fee**

The Borrower shall pay to the Agent (for its own account) an agency fee in the amount and at the times agreed in a Fee Letter.

**11.4    Deduction of fees**

Payment of the fees in Clause 11.2 (*Arrangement fee*) and/or Clause 11.3 (*Agency fee*) may, at the election of the Agent, be made out of the proceeds of the first Loan and the Agent is hereby irrevocably authorised to deduct the amount of such fees and apply the same towards payment of such fees on behalf of the Borrower.

36

**SECTION 6**
**ADDITIONAL PAYMENT OBLIGATIONS**

12.    **TAX GROSS UP AND INDEMNITIES**

12.1    **Definitions**

(a)    In this Agreement:

"**Tax Credit**" means a credit against, relief or remission for, or repayment of any Tax.

"**Tax Deduction**" means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

"**Tax Payment**" means an increased payment made by the Borrower to a Finance Party under Clause 12.2 (*Tax gross-up*) or a payment under Clause 12.3 (*Tax indemnity*).

(b)    Unless a contrary indication appears, in this Clause 12 a reference to "determines" or "determined" means a determination made in the absolute discretion of the person making the determination.

12.2    **Tax gross-up**

(a)    All payments to be made by the Borrower to any Finance Party under any of the Finance Documents shall be made free and clear of and without any Tax Deduction unless the Borrower is required to make a Tax Deduction, in which case the sum payable by the Borrower (in respect of which such Tax Deduction is required to be made) shall be increased to the extent necessary to ensure that such Finance Party receives a sum net of any deduction or withholding equal to the sum which it would have received had no such Tax Deduction been made or required to be made.

(b)    The Borrower shall promptly upon becoming aware that it must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Agent accordingly. Similarly, a Lender shall notify the Agent on becoming so aware in respect of a payment payable by the Borrower to that Lender. If the Agent receives such notification from a Lender it shall notify the Borrower.

(c)    If the Borrower is required to make a Tax Deduction, the Borrower shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(d)    Within thirty days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Borrower shall deliver to the Agent for the Finance Party entitled to the payment (to which such Tax Deduction relates) an original receipt (or a certified copy thereof) reasonably satisfactory to that Finance Party that such Tax Deduction has been made or (as applicable) any appropriate payment has been paid to the relevant taxing authority.

37

(e)    The Agent shall not have any duty or obligation to facilitate the making of any Tax Deduction by the Borrower.

**12.3    Tax indemnity**

(a)    Without prejudice to Clause 12.2 (*Tax gross-up*), if any Finance Party is required to make any payment of or on account of Tax on or in relation to any sum received or receivable under any of the Finance Documents (including any sum deemed for purposes of Tax to be received or receivable by such Finance Party whether or not actually received or receivable) or if any liability in respect of any such payment is asserted, imposed, levied or assessed against any Finance Party, the Borrower shall, within ten Business Days of demand of the Agent, promptly indemnify each Finance Party which suffers a loss or liability as a result against such payment or liability, together with any interest, penalties, costs and expenses payable or incurred in connection therewith, **provided that** this Clause 12.3 shall not apply to:

(i)    any Tax imposed on and calculated by reference to the net income actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which such Finance Party is incorporated; or

(ii)    any Tax imposed on and calculated by reference to the net income of the Facility Office of such Finance Party actually received or receivable by such Finance Party (but, for the avoidance of doubt, not including any sum deemed for purposes of Tax to be received or receivable by such Finance Party but not actually receivable) by the jurisdiction in which its Facility Office is located.

(b)    A Finance Party (other than the Agent) intending to make a claim under paragraph (a) shall notify the Agent of the event giving rise to such claim, whereupon the Agent shall notify the Borrower thereof.

(c)    A Finance Party shall, on receiving a payment from the Borrower under this Clause 12.3, notify the Agent.

**12.4    Tax Credit**

If the Borrower makes a Tax Payment in respect of a Finance Party and that Finance Party determines that:

(a)    a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)    that Finance Party has obtained and utilised that Tax Credit,

that Finance Party shall pay an amount to the Borrower which that Finance Party determines will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Borrower.

38

12.5    **Stamp taxes**

The Borrower shall:

(a)    pay all stamp duty, registration and other similar Taxes payable in respect of any Finance Document; and

(b)    within ten Business Days of demand, indemnify each Finance Party against any cost, loss or liability which that Finance Party incurs in relation to any or all stamp duty, registration and/or other similar Taxes paid or payable in respect of any Finance Document.

12.6    **Indirect Tax**

(a)    All amounts set out or expressed in any Finance Document to be payable by any Party to a Finance Party shall be deemed to be exclusive of any Indirect Tax. If any Indirect Tax is chargeable on any supply made by any Finance Party to any Party under or in connection with any Finance Document, that Party shall pay to such Finance Party (in addition to and at the same time as paying the consideration for such supply) an amount equal to the amount of such Indirect Tax.

(b)    Where a Finance Document requires any Party to reimburse a Finance Party for any costs or expenses, that Party shall also at the same time pay and indemnify that Finance Party against all Indirect Tax incurred by that Finance Party in respect of such costs or expenses to the extent that such Finance Party reasonably determines that it is not entitled to credit or repayment in respect of such Indirect Tax.

12.7    **FATCA Information**

(a)    Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

(i)    confirm to that requesting Party whether it is a FATCA Exempt Party or not a FATCA Exempt Party;

(ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b)    If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

39

(c)    Paragraph (a) above shall not oblige any Finance Party to do anything, and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

(i)    any law or regulation;

(ii)    any fiduciary duty; or

(iii)    any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides such requested confirmation, forms, documentation or other information.

(e)    If the Borrower is a US Tax Obligor or the Agent reasonably believes that its obligations under FATCA or any other applicable law or regulation require it, each Lender shall, within ten Business Days of:

(i)    where the Borrower is a US Tax Obligor and such Lender is an Original Lender, the date of this Agreement;

(ii)    where the Borrower is a US Tax Obligor on a Transfer Date and such Lender is a New Lender (in respect of any assignment or transfer by an Existing Lender to such New Lender), the Transfer Date in respect of such assignment or transfer; or

(iii)    where the Borrower is not a US Tax Obligor, the date of a request from the Agent,

supply to the Agent:

(A)    a withholding certificate on Form W-8, Form W-9 or any other relevant form; or

(B)    any withholding statement or other document, authorisation or waiver as the Agent may require to certify or establish the status of such Lender under FATCA or that other law or regulation.

(f)    The Agent shall provide any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) above to the Borrower.

(g)    If any withholding certificate, withholding statement, document, authorisation or waiver provided to the Agent by a Lender pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, that Lender shall promptly update it and provide such updated withholding certificate, withholding statement, document, authorisation or waiver to the Agent unless it is unlawful for that Lender to do so (in which case that Lender shall promptly notify the Agent). The Agent shall provide any such updated withholding certificate, withholding statement, document, authorisation or waiver to the Borrower.

40

(h)     The Agent may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from a Lender pursuant to paragraph (e) or (g) above without further verification. The Agent shall not be liable for any action taken by it under or in connection with paragraph (e), (f) or (g) above.

(i)     If a Lender fails to supply any withholding certificate, withholding statement, document, authorisation, waiver or information in accordance with paragraph (e) above, or any withholding certificate, withholding statement, document, authorisation, waiver or information provided by a Lender to the Agent is or becomes materially inaccurate or incomplete, then such Lender shall indemnify the Agent, within three Business Days of demand, against any cost, loss, Tax or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (including any related interest and penalties) in acting as Agent under the Finance Documents as a result of such failure.

(j)     If, in accordance with paragraph (f) above, the Agent provides the Borrower with sufficient information to determine its withholding obligations under FATCA, but the Borrower fails to withhold as required by FATCA, the Borrower shall indemnify the Agent, within three Business Days of demand, against any cost, loss, Tax or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (including any related interest and penalties) in acting as Agent under the Finance Documents as a result of such failure.

12.8    **FATCA Deduction**

(a)     Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of that payment for that FATCA Deduction.

(b)     Each Party shall promptly upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction) notify the Party to whom it is making the payment (to which such FATCA Deduction relates) and, in addition, shall notify the Borrower and the Agent and the Agent shall notify the other Finance Parties.

41

13.  **INCREASED COSTS**

13.1  **Increased costs**

(a)  Subject to Clause 13.3 (*Exceptions*), the Borrower shall, within ten Business Days of a demand by the Agent, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

  (i)  the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation; or

  (ii)  compliance with any law or regulation made, enacted, issued or put into effect after the date of this Agreement; or

  (iii)  the implementation or application of, or compliance with, Basel III or CRD IV or any law or regulation that implements or applies Basel III or CRD IV.

  The terms "law" and "regulation" in this paragraph (a) shall include, without limitation, any law or regulation concerning capital adequacy, prudential limits, liquidity, reserve assets or Tax.

(b)  In this Agreement:

  (i)  "**Basel III**" means:

    (A)  the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated;

    (B)  the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated; and

    (C)  any further guidance or standards published by the Basel Committee on Banking Supervision relating to "Basel III";

  (ii)  "**CRD IV**" means:

    (A)  Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms; and

    (B)  Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC;

42

(iii)    "**Increased Costs**" means:

(A)    a reduction in the rate of return from the Facility (or any part thereof) or on a Finance Party's (or its Affiliate's) overall capital;

(B)    an additional or increased cost; or

(C)    a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to the undertaking, funding or performance by that Finance Party of any of its obligations under any Finance Document or any participation of that Finance Party in any Loan or Unpaid Sum.

13.2    **Increased cost claims**

(a)    A Finance Party (other than the Agent) intending to make a claim pursuant to Clause 13.1 (*Increased costs*) shall notify the Agent of the event giving rise to such claim, following which the Agent shall promptly notify the Borrower.

(b)    Each Finance Party shall, as soon as practicable after a demand by the Agent, provide a certificate confirming the amount of its Increased Costs in respect of any claim made by such Finance Party under Clause 13.1 (*Increased costs*).

13.3    **Exceptions**

Clause 13.1 (*Increased costs*) does not apply to any Increased Cost to the extent such Increased Cost is:

(a)    attributable to a Tax Deduction that is required by law to be made by the Borrower and that is already compensated for by Clause 12.2 (*Tax gross-up*);

(b)    attributable to a FATCA Deduction required to be made by a Party;

(c)    compensated for by Clause 12.3 (*Tax indemnity*) (or would have been compensated for under Clause 12.3 (*Tax indemnity*) but was not so compensated solely because any of the exclusions in paragraph (a) of Clause 12.3 (*Tax indemnity*) applied); or

(d)    incurred by a Finance Party or an Affiliate of a Finance Party and is attributable to the wilful breach by such Finance Party or such Affiliate of any law or regulation.

14.    **MITIGATION BY THE LENDERS**

14.1    **Mitigation**

(a)    Each Finance Party shall, in consultation with the Borrower, take all reasonable steps to mitigate any circumstances which arise and which would result in any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (*Illegality*), Clause 12 (*Tax Gross Up and Indemnities*) or Clause 13 (*Increased costs*).

43

(b)    Paragraph (a) above does not in any way limit the obligations of the Borrower under the Finance Documents.

14.2   **Limitation of liability**

(a)    The Borrower shall indemnify each Finance Party, within ten Business Days of demand, for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 14.1 (*Mitigation*).

(b)    A Finance Party is not obliged to take any steps under Clause 14.1 (*Mitigation*) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

14.3   **Conduct of business by the Finance Parties**

No provision of this Agreement will:

(a)    interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any such claim; or

(c)    oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

15.    **OTHER INDEMNITIES**

15.1   **Currency indemnity**

(a)    If any sum due from the Borrower under any or all of the Finance Documents (a "**Sum**"), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the "**First Currency**") in which that Sum is payable into another currency (the "**Second Currency**") for the purpose of:

(i)    making or filing a claim or proof against the Borrower; or

(ii)   obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

the Borrower shall as an independent obligation, within ten Business Days of demand, indemnify each Finance Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of such conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt or recovery of that Sum.

44

(b)     The Borrower waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

15.2    **Other indemnities**

The Borrower shall, within ten Business Days of demand, indemnify each of the Finance Parties against any cost, loss or liability incurred by that Finance Party as a result of:

(a)     the occurrence of any Event of Default;

(b)     the Information Memorandum or any other information produced or approved by the Borrower or any Group Member being or being alleged to be misleading and/or deceptive in any respect;

(c)     any enquiry, investigation, subpoena (or similar order) or legal or arbitral proceedings with respect to the Borrower or with respect to any transactions contemplated or financed under any Finance Document;

(d)     a failure by the Borrower to pay any amount due under a Finance Document on its due date and in the currency in which such amount is due, including without limitation, any cost, loss or liability arising as a result of Clause 25 (*Sharing Among the Finance Parties*);

(e)     funding, or making arrangements to fund, its participation in a Loan requested by the Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by that Finance Party alone); or

(f)     a Loan (or part of a Loan) not being prepaid in accordance with a notice of prepayment given by the Borrower.

15.3    **Indemnity to the Agent**

The Borrower shall promptly (and in any event within ten Business Days of demand) indemnify the Agent against:

(a)     any cost, loss or liability incurred by the Agent (acting reasonably) as a result of:

    (i)     investigating any event which it reasonably believes is a Default;

    (ii)    any Default by the Borrower in respect of the performance of any of its obligations under the Finance Documents to which it is a party;

    (iii)   acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised; and/or

45

    (iv)     instructing lawyers, accountants, tax advisers, surveyors or other professional advisers or experts as permitted under this Agreement; and/or

(b)    any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct (as determined in a final non-appealable judgment of a court of competent jurisdiction)) in acting as Agent under the Finance Documents.

## 16.    COSTS AND EXPENSES

### 16.1    Transaction expenses

The Borrower shall pay each Administrative Party, promptly (and in any event within fifteen (15) Business Days of demand by such Administrative Party or on a date as may be mutually agreed between the Borrower and such Administrative Party), the amount of all costs and expenses (including without limitation legal fees, subject to any arrangements agreed between the Borrower and the relevant legal counsel) reasonably incurred by any or all of the Administrative Parties in connection with the negotiation, preparation, printing, execution, delivery and syndication of:

(a)    this Agreement and/or any other documents referred to in this Agreement; and/or

(b)    any other Finance Documents executed after the date of this Agreement.

### 16.2    Amendment costs

If the Borrower requests an amendment, waiver or consent or (b) an amendment is required pursuant to Clause 26.9 (*Change of currency*), the Borrower shall, within ten Business Days of demand, reimburse the Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Agent in responding to, evaluating, negotiating or complying with that request or requirement.

### 16.3    Enforcement costs

The Borrower shall, within ten Business Days of demand, pay to each Finance Party the amount of all costs and expenses (including legal fees) incurred by that Finance Party in connection with the enforcement of, or the preservation of any rights under any Finance Document.

**SECTION 7**
**REPRESENTATIONS, UNDERTAKINGS AND EVENTS OF DEFAULT**

17.     **REPRESENTATIONS**

The Borrower makes the representations and warranties set out in this Clause 17 to each Finance Party on the date of this Agreement.

17.1    **Status**

(a)     It is a corporation, duly incorporated, validly existing and in good standing under the laws of the Cayman Islands.

(b)     Each of it and the Material Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

(c)     It is acting as principal for its own account and not as agent or trustee in any capacity on behalf of any person in relation to the Finance Documents.

17.2    **Binding obligations**

The obligations expressed to be assumed by it in each Finance Document are, subject to any general principles of law limiting its obligations which are specifically referred to in any legal opinion delivered in accordance with Clause 4 (*Conditions of Utilisation*), legal, valid, binding and enforceable obligations.

17.3    **Non-conflict with other obligations**

The entry into and performance by it of, and the transactions contemplated by, the Finance Documents do not and will not:

(a)     conflict with any law or regulation applicable to it;

(b)     conflict with the constitutional documents of it or any of its Subsidiaries;

(c)     conflict with any agreement or instrument binding upon it or any of its Subsidiaries or any asset of it or any of its Subsidiaries; or

(d)     result in the existence of or oblige it or its Subsidiaries to create any Security over all or any of the assets of it or its Subsidiaries (other than any Security permitted by Clause 20.4 (*Negative pledge*)).

17.4    **Power and authority**

(a)     It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents and the transactions contemplated by the Finance Documents.

(b)     No limit on its powers will be exceeded as a result of the borrowing contemplated by the Finance Documents.

47

17.5    **Validity and admissibility in evidence**

All Authorisations required or desirable:

(a)        to enable it lawfully to enter into, exercise its rights and comply with its obligations in the Finance Documents;

(b)        to make the Finance Documents admissible in evidence in its jurisdiction of incorporation; and/or

(c)        for it and the Material Subsidiaries to carry on their respective business, and which are material,

have been obtained or effected and are in full force and effect.

17.6    **Governing law and enforcement**

Subject to any general principles of law limiting its obligations which are specifically referred to in any legal opinion delivered in accordance with Clause 4 (*Conditions of Utilisation*):

(a)        the choice of English law as the governing law of each Finance Document will be recognised and enforced in its jurisdiction of incorporation; and

(b)        any judgment obtained in England in relation to any Finance Document will be recognised and enforced in its jurisdiction of incorporation.

17.7    **Deduction of Tax**

It is not required under the law applicable where it is incorporated or resident or at its address specified in this Agreement to make any deduction for or on account of Tax from any payment it may make under any Finance Document.

17.8    **No filing or stamp taxes**

Under the law of its jurisdiction of incorporation it is not necessary that any of the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration or similar tax be paid on or in relation to any or all of the Finance Documents or the transactions contemplated by the Finance Documents except that Cayman Islands stamp duty will be payable on a Finance Document if that Finance Document is executed in, brought into, or produced to a court of, the Cayman Islands.

17.9    **No default**

(a)        No Event of Default is continuing or might reasonably be expected to result from the making of any Utilisation.

(b)        No other event or circumstance is outstanding which constitutes a default under any other agreement or instrument which is binding on it or any of its Subsidiaries or to which any asset of it or any of its Subsidiaries is subject to an extent or in a manner which has or could reasonably be expected to have a Material Adverse Effect.

48

(c)       No Default is continuing.

17.10    **No misleading information**

(a)       Any factual information contained in or provided by or on behalf of the Borrower or any Group Member for the purposes of the Information Memorandum was true and accurate in all material respects as at the date it was provided or as at the date (if any) at which it is stated.

(b)       Nothing has occurred or been omitted from the Information Memorandum and no information has been given or withheld that results in the information contained in the Information Memorandum being untrue or misleading in any material respect.

(c)       All written (including by way of electronic mail or other electronic means) information (other than the Information Memorandum) supplied by or on behalf of the Borrower or any Group Member in connection with the Finance Documents is true, complete and accurate in all material respects as at the date it was given or (if any) as at the date it is stated and is not misleading in any material respect.

17.11    **Financial statements**

(a)       Its financial statements most recently supplied to the Agent (which, as at the date of this Agreement, are its Original Financial Statements) were prepared in accordance with GAAP consistently applied save to the extent expressly disclosed in such financial statements.

(b)       Its financial statements most recently supplied to the Agent (which, as at the date of this Agreement, are its Original Financial Statements) give a true and fair view of (if audited) or fairly represent (if unaudited) the consolidated financial condition and operations of the Group as at the end of and during the applicable period to which such financial statements relate, save to the extent expressly disclosed in such financial statements.

(c)       There has been no material adverse change in the business or consolidated financial condition of the Group (taken as a whole) since 31 December 2015.

17.12    **Pari passu ranking**

Its payment obligations under the Finance Documents rank at least *pari passu* with the claims of all of its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

17.13    **No proceedings pending or threatened**

No litigation, arbitration, investigation or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, could reasonably be expected to have a Material Adverse Effect have (to the best of its knowledge and belief) been started or threatened, or are pending, against it or any of its Subsidiaries.

49

**17.14   Authorised Signatures**

Any person specified as its authorised signatory under Schedule 2 (*Conditions Precedent*) or paragraph (d) of Clause 18.4 (*Information: miscellaneous*) (in each case, to the extent not replaced as notified by the Borrower pursuant to paragraph (d) of Clause 18.4 (*Information: miscellaneous*)) is authorised to sign Utilisation Requests and Selection Notices and other notices on its behalf.

**17.15   Federal Reserve Regulations**

(a)   The Borrower is not engaged or will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.

(b)   None of the proceeds of the Loans or other extensions of credit under this Agreement will be used by any Group Member, directly or indirectly, for the purpose of buying or carrying any Margin Stock, for the purpose of reducing or retiring any Financial Indebtedness that was originally incurred to buy or carry any Margin Stock or for any other purpose which might cause all or any of the Loans or other extensions of credit under this Agreement to be considered a "purpose credit" within the meaning of Regulation U or Regulation X.

**17.16   Investment Companies**

None of (a) the Borrower or (b) any Subsidiary of the Borrower is or is required to be registered as an "investment company" under the 1940 Act.

**17.17   Sanctions, anti-terrorism, anti-money laundering and anti-corruption**

(a)   None of any Group Member or any director or officer of any Group Member or, to its knowledge, any agent or employee of, or any person acting on behalf of, any Group Member is a Restricted Party.

(b)   None of any Group Member or any director or officer of any Group Member or, to its knowledge, any employee of any Group Member is in violation of or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has violated, any applicable Sanctions.

(c)   None of any Group Member or any director or officer of any Group Member or, to its knowledge, any employee of, or any person acting on behalf of, any Group Member receives or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has received, funds or other property from a Restricted Party in violation of any applicable Sanctions or conducts or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has conducted, any activities or business dealings, directly or indirectly, with or for the benefit of a Restricted Party in violation of any applicable Sanctions.

(d)   None of any Group Member or any director or officer of any Group Member or, to its knowledge, any employee of, or any person acting on behalf of, any Group Member is engaging or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has engaged, directly or indirectly, in any transaction or conduct that could reasonably be expected to result in it becoming a Restricted Party, or which evades or avoids any applicable prohibitions or restrictions set forth in any applicable Sanctions.

(e)    None of any Group Member or any director or officer any Group Member or, to its knowledge, any agent, representative or employee of, or any person acting on behalf of, or any Affiliate of, any Group Member:

    (i)    has violated or is in violation of any Anti-Bribery and Corruption Laws;

    (ii)    has directly or indirectly paid, given or offered or promised to pay or give, or authorised the payment or giving of, directly or indirectly, any unlawful payment or improper transfer of value within the meaning of the FCPA or any other Anti-Bribery and Corruption Laws;

    (iii)    has directly or indirectly used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political office or activity or made any direct or indirect unlawful payment or improper transfer of value to any public official or any company employee from corporate funds; or

    (iv)    has been subject to any action, suit, proceeding, arbitration, litigation, regulatory or criminal investigation with regard to any actual or alleged unlawful payment, improper transfer of value or violation in any way of the FCPA or any other Anti-Bribery and Corruption Laws.

(f)    None of any Group Member or any director or officer of any Group Member or, to its knowledge, any employee of, or any person acting on behalf of, any Group Member:

    (i)    is in violation of or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has violated, any Anti-Money Laundering Laws or Anti- Terrorism Laws; or

    (ii)    or deals or engages in or, since the date that the representations and warranties under this Clause 17.17 were last made or deemed to be made, has dealt or engaged in, directly or indirectly, any transaction or activities relating to any property or interest in property blocked pursuant to any Sanctions in violation of any applicable Sanctions,

and no action, suit, proceeding, arbitration, litigation, regulatory or criminal investigation involving any Group Member or any director or officer of any Group Member or, to its knowledge, any agent, employee of, or any person acting on behalf of, any Group Member, with respect to any Anti-Money Laundering Laws or Anti-Terrorism Laws is pending or, to the knowledge of any Group Member, threatened.

(g)  Each of the Group Members has instituted and maintained systems, controls and other arrangements designed to:

(i)  promote and ensure compliance by the Group with all applicable Sanctions, Anti-Bribery and Corruption Laws, Anti-Money Laundering Laws and Anti-Terrorism Laws; and

(ii)  detect incidences of bribery and corruption.

17.18  **List of Material Subsidiaries**

The list of Material Subsidiaries delivered to the Agent pursuant to Clause 4.1 (*Initial conditions precedent*) is true, complete and accurate.

17.19  **Repetition**

(a)  All of the representations and warranties set out in this Clause 17 are deemed to be made by the Borrower in favour of each Finance Party on the date of delivery of the first Utilisation Request under this Agreement and on the Initial Utilisation Date, in each case by reference to the facts and circumstances then existing.

(b)  The Repeating Representations are deemed to be made by the Borrower on:

(i)  the date of each Utilisation Request (other than the first Utilisation Request delivered under this Agreement);

(ii)  each Utilisation Date (other than the Initial Utilisation Date); and

(iii)  the first day of each Interest Period relating to any Loan, in each case by reference to the facts and circumstances then existing.

(c)  The representations and warranties set out in Clause 17.10 (*No misleading information*) are deemed to be made by the Borrower, to the extent that they relate to the Information Memorandum, on the date the Information Memorandum is approved by the Borrower.

18.  **INFORMATION UNDERTAKINGS**

The undertakings in this Clause 18 remain in force from the date of this Agreement for so long as any amount is outstanding under any of the Finance Documents or any Commitment in respect of any Facility (or any commitment represented thereby) is in force.

18.1  **Financial statements**

The Borrower shall supply or procure the supply to the Agent in sufficient copies for all the Lenders:

(a)  as soon as the same become available, but in any event within 150 days after the end of each of its Financial Years, the audited consolidated financial statements of the Borrower for that Financial Year audited by an independent firm of certified public accountants (which shall be one of the Auditors); and

52

(b)     as soon as the same become available, but in any event within 120 days after the end of each of its Financial Quarters, the unaudited consolidated financial statements of the Borrower for that Financial Quarter,

**provided that**, in the case of any consolidated financial statements of the Borrower to be delivered pursuant to this Clause 18.1, such financial statements shall be deemed to be so delivered upon being posted onto any electronic website of (i) the U.S. Securities and Exchange Commission, (ii) NASDAQ and/or (iii) the Borrower.

18.2    **Compliance Certificate**

(a)     The Borrower shall supply to the Agent, with each set of financial statements in respect of any Financial Quarter ending 30 June or any Financial Year delivered under Clause 18.1 (*Financial statements*), a Compliance Certificate:

   (i)     setting out (in reasonable detail) computations as to compliance with Clause 19 (*Financial Covenants*) as at the date as at which (and in respect of the Relevant Period ending on the date as at which) such financial statements were prepared;

   (ii)    confirming that no Default has occurred and is continuing or, if a Default is continuing, specifying the nature of such Default and the steps being taken to remedy such Default; and

   (iii)   setting out an up-to-date list of Material Subsidiaries.

(b)     Each Compliance Certificate delivered under paragraph (a) shall be signed by an authorised signatory of the Borrower.

18.3    **Requirements as to financial statements**

(a)     The Borrower shall ensure that each set of financial statements delivered (or deemed delivered) pursuant to Clause 18.1 (*Financial statements*) shall be certified by an authorised signatory of the Borrower as giving a true and fair view of (if audited) or fairly representing (if unaudited) the consolidated financial condition and operations of the Group as at the end of and during the applicable period to which such financial statements relate.

(b)     The Borrower shall procure that each set of financial statements delivered (or deemed delivered) pursuant to Clause 18.1 (*Financial statements*) is prepared using GAAP, accounting practices and financial reference periods consistent with those applied in the preparation of the audited Original Financial Statements unless, in relation to any set of financial statements, it notifies the Agent that there has been a change in GAAP, accounting practices or reference periods and the auditors of the Borrower (which shall be one of the Auditors) deliver to the Agent:

   (i)     a description of any change necessary for those financial statements to reflect the GAAP, accounting practices and reference periods upon which the audited Original Financial Statements were prepared; and

53

(ii)     sufficient information, in form and substance as may be reasonably required by the Agent, to enable the Lenders to determine whether Clause 19 (*Financial Covenants*) has been complied with, to determine which Group Members are Material Subsidiaries and to make an accurate comparison between the financial position indicated in those financial statements and the audited Original Financial Statements.

Any reference in this Agreement to those financial statements shall be construed as a reference to those financial statements as adjusted to reflect the basis upon which the audited Original Financial Statements were prepared.

**18.4    Information: miscellaneous**

The Borrower shall supply to the Agent (in sufficient copies for all the Lenders, if the Agent so requests):

(a)     all documents dispatched by the Borrower to its creditors (or any class of them) generally at the same time as they are dispatched (to the extent such documents relate to any event or circumstance in relation to any Group Member falling within any of Clause 21.5 (*Cross default*), Clause 21.6 (*Insolvency*), Clause 21.7 (*Insolvency proceedings*) or Clause 21.8 (*Creditors' process*) (as if any reference in any of such Clauses to the Borrower or any Material Subsidiary included a reference to any Group Member) or any restructuring matter (howsoever described) which may have a material adverse effect on the ability of the Borrower to repay its indebtedness);

(b)     promptly upon becoming aware of them, the details of any litigation, investigation, arbitration or administrative proceedings which are current, threatened or pending against the Borrower or any Group Member and which might, if adversely determined, have a Material Adverse Effect;

(c)     promptly, such further information regarding the financial condition, business and operations of any Group Member or such further information in relation to the Borrower as any Finance Party (through the Agent) may reasonably request or such further information as may otherwise be required by appropriate laws and/or regulations;

(d)     promptly, notice of any change in authorised signatories of the Borrower signed by a director, company secretary or an authorised signatory (other than any authorised signatory which has been replaced or is to be replaced pursuant to a notice given by the Borrower under this paragraph (d)) of the Borrower accompanied by specimen signatures of any new authorised signatories of the Borrower; and

(e)     promptly, such information as the Agent may from time to time reasonably require for the performance of its obligations or the exercise of its rights under the Finance Documents.

**18.5    Notification of default**

(a)     The Borrower shall notify the Agent of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence.

54

(b)     Promptly upon a request by the Agent, the Borrower shall supply to the Agent a certificate signed by an authorised signatory on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying such Default and the steps, if any, being taken to remedy it).

18.6    **Use of websites**

(a)     The Borrower may satisfy its obligations under this Agreement to deliver any information in relation to those Lenders (the "**Website Lenders**") who accept this method of communication by posting this information onto an electronic website designated by the Borrower and the Agent (the "**Designated Website**") if:

(i)     the Agent expressly agrees (after consultation with each of the Lenders) that it will accept communication of such information by this method;

(ii)    both the Agent and the Borrower are aware of the address of and any relevant password specifications for the Designated Website; and

(iii)   such information is in a format previously agreed between the Borrower and the Agent.

(b)     If any Lender (a "**Paper Form Lender**") does not agree to the delivery of information electronically then the Agent shall notify the Borrower accordingly and the Borrower shall, at its own cost, supply information to the Agent (in sufficient copies for each Paper Form Lender) in paper form. In any event the Borrower shall, at its own cost, supply the Agent with at least one copy in paper form any information required to be provided by it under this Agreement.

(c)     The Agent shall supply each Website Lender with the address of and any relevant password specifications for the Designated Website following designation of that website by the Borrower and the Agent.

(d)     The Borrower shall promptly upon becoming aware of its occurrence notify the Agent if:

(i)     the Designated Website cannot be accessed due to technical failure;

(ii)    the password specifications for the Designated Website change;

(iii)   any new information which is required to be provided under this Agreement is posted onto the Designated Website;

(iv)    any existing information which has been provided under this Agreement and posted onto the Designated Website is amended; or

(v)     it becomes aware that the Designated Website or any information posted onto the Designated Website is or has been infected by any electronic virus or similar software.

(e)     If the Borrower notifies the Agent under paragraph (d)(i) or (d)(v) above, all information to be provided by the Borrower under this Agreement after the date of that notice shall be supplied in paper form unless and until the Agent and each Website Lender is satisfied that the circumstances giving rise to such notification are no longer continuing.

(f)     Any Website Lender may request, through the Agent, one paper copy of any information required to be provided under this Agreement which is posted onto the Designated Website. The Borrower shall at its own cost comply with any such request within ten Business Days.

18.7    **"Know your customer" checks**

(a)     The Borrower shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself or on behalf of any Lender (including for any Lender on behalf of any prospective new Lender)) in order for the Agent, such Lender or any prospective new Lender to conduct any "know your customer" or other similar procedures under applicable laws and regulations.

(b)     Each Lender shall promptly upon the request of the Agent supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Agent (for itself) in order for the Agent to conduct any "know your customer" or other similar procedures under applicable laws and regulations.

19.     **FINANCIAL COVENANTS**

The undertakings in this Clause 19 remain in force from the date of this Agreement for so long as any amount is outstanding under any of the Finance Documents or any Commitment in respect of any Facility (or any commitment represented thereby) is in force.

19.1    **Financialdefinitions**

In this Agreement:

"**Borrowings**" means, at any time, the aggregate outstanding principal, capital or nominal amount (and any fixed or minimum premium payable on prepayment or redemption) of any indebtedness of Group Members for or in respect of Financial Indebtedness (except any Financial Indebtedness falling within (x) paragraph (i) of the definition of "Financial Indebtedness" and (y) paragraph (k) of the definition of "Financial Indebtedness" (to the extent relating to any Financial Indebtedness falling within paragraph (i) of the definition of "Financial Indebtedness")).

"**Consolidated EBIT**" means, for any period, the consolidated operating profit of the Group (including the results from discontinued operations) before finance costs and tax for that period adjusted by:

(a)     taking no account of any Exceptional Item;

(b)     taking no account of any unrealised gains or losses on any derivative instrument or other financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis) which are reported through the consolidated income statement of the Group; and

56

(c)         taking no account of any expense referable to any equity-settled share-based compensation of employees.

"**Consolidated EBITDA**" means, for any period, Consolidated EBIT for that period after adding back (to the extent deducted) any amount attributable to any depreciation or amortisation and taking no account of any impairment charge or any reversal of any previous impairment charge made in such period.

"**Consolidated Net Finance Charges**" means, for any period, the aggregate amount of interest, commission, fees, discounts, prepayment fees, premiums or charges, and other finance payments in respect of Borrowings whether accrued, paid or payable and whether or not capitalised by Group Members (calculated on a consolidated basis) in respect of that period (and in each case excluding, for the avoidance of doubt, any such amount paid or payable by a Group Member to another Group Member):

(a)         **excluding** any non-recurring upfront or costs but including the effect of amortisation of such upfront or costs;

(b)         **including** the interest (but not the capital) element of leasing and hire purchase payments;

(c)         **including** any commission fees, discounts and other finance payments paid, payable or accrued by any Group Member to any counterparty (that is not a Group Member) under any interest rate hedging instrument during such period;

(d)         **deducting** any commission fees, discounts and other finance payments paid, payable or accrued by any counterparty (that is not a Group Member) to any Group Member under any interest rate hedging instrument during such period;

(e)         **taking no account of** any unrealised gains or losses on any derivative instrument (other than any such instrument that is accounted for on a hedge accounting basis); and

(f)         **deducting** any interest paid or payable to or accrued to the benefit of any Group Member (from any person that is not a Group Member) during such period on any cash deposits, cash equivalents or short term investments held by any Group Member,

and so that no amount shall be included or excluded more than once.

"**Consolidated Total Borrowings**" means, in respect of the Group, at any time, the aggregate of the liabilities of Group Members (on a consolidated basis) for or in respect of Borrowings (excluding the Excluded Redeemable Preference Shares) calculated at the nominal, principal or other amount at which such liabilities would be carried in a consolidated balance sheet of the Group drawn up at that time (or, in the case of any guarantee or indemnity or similar assurance against financial loss referred to in paragraph (k) in the definition of "Financial Indebtedness", the maximum liability under such guarantee or indemnity or similar assurance), in each case, for the avoidance of doubt, excluding any such liabilities owing by a Group Member to another Group Member.

57

"**Exceptional Item**" means any exceptional, one-off, non-recurring or extraordinary items.

"**Interest Cover**" means, in respect of any period, the ratio of Consolidated EBITDA to Consolidated Net Finance Charges for that period.

"**Leverage**" means, in respect of any period, the ratio of Consolidated Total Borrowings on the last day of that period to Consolidated EBITDA in respect of that period.

"**Relevant Periods**" means:

(a)        each period of twelve months ending on the last day of each Financial Year; and

(b)        each period of twelve months ending on the last day of the second Financial Quarter of each Financial Year,

(each a "**Relevant Period**").

### 19.2    Financial condition

The Borrower shall ensure that:

(a)        *Leverage*

Leverage in respect of each Relevant Period shall not exceed 3.50:1.00.

(b)        *Interest Cover*

Interest Cover in respect of each Relevant Period shall not be less than 4.00:1.00.

### 19.3    Financial testing

The financial covenants set out in Clause 19.2 (*Financial condition*) shall be calculated in accordance with GAAP (as applied to the audited Original Financial Statements) and tested semi-annually in respect of each Relevant Period by reference to each of the financial statements delivered under Clause 18.1 (*Financial statements*) and/or the Compliance Certificate relating thereto delivered pursuant to Clause 18.2 (*Compliance Certificate*).

### 20.    GENERAL UNDERTAKINGS

The undertakings in this Clause 20 remain in force from the date of this Agreement for so long as any amount is outstanding under any of the Finance Documents or any Commitment in respect of any Facility (or any commitment represented thereby) is in force.

20.1    **Authorisations**

The Borrower shall promptly:

(a)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)    supply certified copies to the Agent of,

any Authorisation required to enable it to perform its obligations under the Finance Documents and/or to ensure the legality, validity, enforceability or admissibility in evidence in its jurisdiction of incorporation of any Finance Document.

20.2    **Compliance with laws**

The Borrower shall, and shall procure that each Group Member will, comply in all respects with all laws to which it may be subject, if failure so to comply would, or could reasonably be expected to, have a Material Adverse Effect.

20.3    **Pari passu ranking**

The Borrower shall ensure that its payment obligations under the Finance Documents rank and continue to rank at least *pari passu* with the claims of all of its other unsecured and unsubordinated creditors, except for obligations mandatorily preferred by law applying to companies generally.

20.4    **Negative pledge**

In this Clause 20.4, "**Quasi-Security**" means any arrangement or transaction described in paragraph (b) below.

(a)    Without prejudice to paragraph (d), the Borrower shall not, and the Borrower shall procure that no Material Subsidiary will, create or permit to subsist any Security over any of its assets.

(b)    Without prejudice to paragraph (d), the Borrower shall not, and the Borrower shall procure that no Material Subsidiary will:

(i)    sell, transfer or otherwise dispose of any of its assets on terms whereby they are or may be leased to or re-acquired by the Borrower or any Material Subsidiary;

(ii)    sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iii)    enter into or permit to subsist any title retention arrangement;

(iv)    enter into or permit to subsist any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts; or

(v)    enter into or permit to subsist any other preferential arrangement having a similar effect,

59

in circumstances where such arrangement or transaction is entered into primarily as a method of raising Financial Indebtedness or of financing the acquisition of any asset.

(c)     Subject to paragraph (d), paragraphs (a) and (b) above do not apply to:

(i)     any netting or set-off or cash-pooling arrangement entered into by the Borrower or any Material Subsidiary in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of itself and/or of itself and of any other Group Member;

(ii)     any payment or close out netting or set-off arrangement pursuant to any hedging transaction entered into by the Borrower or any Material Subsidiary for the purpose of:

(A)     hedging any risk to which it is exposed in its ordinary course of trading; or

(B)     its interest rate or currency management operations which are carried out in the ordinary course of business and for non- speculative purposes only,

excluding, in each case, any Security or Quasi-Security under a credit support arrangement in relation to any hedging transaction;

(iii)     any Security or Quasi-Security over documents of title to goods and/or goods as part of letter of credit transactions (relating to the sale or purchase of such goods) entered into its ordinary course of trading;

(iv)     any lien arising by operation of law and in the ordinary course of trading, **provided that** any indebtedness which is secured thereby is paid when due or contested in good faith by appropriate proceedings and properly provisioned;

(v)     any Security or Quasi-Security over or affecting any asset acquired by the Borrower or any Material Subsidiary after the date of this Agreement if:

(A)     that Security or Quasi-Security was not created in contemplation of the acquisition of that asset by the Borrower or, as the case may be, such Material Subsidiary;

(B)     the principal amount secured by that Security or to which such Quasi-Security relates has not been increased in contemplation of, or since, the acquisition of that asset by the Borrower or, as the case may be, such Material Subsidiary; and

(C)     that Security or Quasi-Security is removed or discharged within 135 days of the date of acquisition of such asset by the Borrower or, as the case may be, such Material Subsidiary;

60

(vi)    any Security or Quasi-Security over or affecting any asset of any person which becomes a Group Member after the date of this Agreement, where that Security or Quasi-Security is created prior to the date on which that person becomes a Group Member, if:

(A)    that Security or Quasi-Security was not created in contemplation of the acquisition of any interest in that person by any Group Member;

(B)    the principal amount secured by that Security or to which that Quasi-Security relates has not increased in contemplation of or since the acquisition of any interest in that person by any Group Member; and

(C)    that Security or Quasi-Security is removed or discharged within 135 days of that person becoming a Group Member;

(vii)    any Security or Quasi-Security arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to the Borrower or any Material Subsidiary in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by any Group Member;

(viii)    any Security or Quasi-Security over accounts receivable generated by the Group's financial services business only (excluding, for the avoidance of doubt, any accounts receivable generated by the Group's core search services) to secure any notes or other indebtedness issued or incurred pursuant to any securitisation scheme or transaction;

(ix)    any Security or Quasi-Security granted with the prior written consent of the Agent (acting on the instructions of the Majority Lenders); or

(x)    any Security securing indebtedness the principal amount of which (when aggregated with the aggregate principal amount of any and all other indebtedness which has the benefit of Security given by any one or more Group Members other than any permitted under paragraphs (c)(i) to (ix) above) does not exceed US$100,000,000 (or its equivalent in another currency or currencies).

(d)    The Borrower shall procure that, save with the prior written consent of the Agent (acting on the instructions of the Majority Lenders), no Security or Quasi-Security shall be created by the Borrower or any other Group Member in respect of, or shall subsist over or affect, any Equity Interest in any Material Subsidiary (or any interest therein).

## 20.5    Disposals

(a)    The Borrower shall not, and the Borrower shall procure that no Material Subsidiary will, enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of any asset.

61

(b)    Subject to paragraph (c), paragraph (a) above does not apply to any sale, lease, transfer or other disposal:

(i)    made in the ordinary course of trading of the disposing entity;

(ii)    of assets in exchange for other assets comparable or superior as to type, value and quality;

(iii)    of obsolete or redundant vehicles, plant and equipment for cash;

(iv)    made to another Group Member;

(v)    of any asset which is a financial asset that has been classified in the latest audited consolidated financial statements of the Borrower as being available for sale;

(vi)    of any asset where:

(A)    such asset is being disposed as part of the Group's business strategy;

(B)    such disposal is for good and valuable consideration; and

(C)    no Default is continuing or would result from such disposal;

(vii)    of Equity Interests in Qiyi;

(viii)    with the prior written consent of the Agent (acting on the instructions of the Majority Lenders); or

(ix)    of any asset in any financial year of the Borrower, where the higher of the market value or consideration receivable in respect of such asset (when aggregated with the higher (in each case) of the market value or consideration receivable in respect of each other asset the subject of any other sale, lease, transfer or other disposal by any or all of the Borrower and the Material Subsidiaries during such financial year, other than any permitted under paragraphs (b)(i) to (b)(viii) above) does not exceed US$100,000,000 (or its equivalent in another currency or currencies).

(c)    The Borrower shall not, and the Borrower shall procure that no Group Member will, enter into a single transaction or a series of transactions (whether related or not) and whether voluntary or involuntary to sell, lease, transfer or otherwise dispose of:

(i)    any Equity Interest in any Restricted Material Subsidiary (or, in each case, any interest therein); or

(ii)    more than 10% of the aggregate shares of or equity interests in (or, in each case, any interest in more than 10% of the aggregate shares of or equity interests in) any Material Subsidiary (that is not Qiyi or a Restricted Material Subsidiary),

62

in each case, save with the prior written consent of the Agent (acting on the instructions of the Majority Lenders) or pursuant to any sale, lease, transfer or other disposal made by a Group Member to another Group Member (which sale, lease, transfer or other disposal does not reduce or have the effect of reducing the Borrower's ownership (whether direct or indirect) of the aggregate shares of or equity interests in any Restricted Material Subsidiary or any Material Subsidiary).

20.6    **Merger**

(a)    The Borrower shall not, and the Borrower shall procure that no Material Subsidiary will, enter into any amalgamation, demerger, merger or corporate reconstruction.

(b)    Paragraph (a) above does not apply to any amalgamation, merger or corporate reconstruction:

  (i)    entered into by the Borrower, **provided that**:

    (A)    the Borrower is the surviving entity of such amalgamation, merger or corporate reconstruction;

    (B)    all of the obligations expressed to be assumed by the Borrower under the Finance Documents shall be and continue to be legal, valid, binding and enforceable as against the Borrower (as the surviving entity of such amalgamation, merger or corporate reconstruction); and

    (C)    the Borrower shall have, at its own cost, procured the delivery to the Agent of a legal opinion (in form and substance reasonably satisfactory to the Agent (acting on the instructions of the Majority Lenders)) issued by legal counsel acceptable to the Agent confirming satisfaction of the requirements under paragraphs (A) and (B) above; or

  (ii)    entered into by a Material Subsidiary (other than the Borrower) **provided that** such Material Subsidiary (or, in the case of any amalgamation, merger or corporate reconstruction entered into by such Material Subsidiary with another Material Subsidiary, either one of such Material Subsidiaries) is the surviving entity of such amalgamation, merger or corporate reconstruction; or

  (iii)    entered into with the prior written consent of the Agent (acting on the instructions of the Majority Lenders, such instructions not to be unreasonably withheld or delayed),

**provided further that**, in each case under paragraphs (i) and (ii), (1) such amalgamation, merger or corporate reconstruction does not and could not be reasonably expected to have a Material Adverse Effect and (2) no Default is continuing or would occur as a result of such amalgamation, merger or corporate reconstruction.

63

20.7    **Change of business**

The Borrower shall procure that no change is made to the general nature or scope of the business of the Group (taken as a whole) from that carried on by the Group at the date of this Agreement, to the extent that such change would, or could reasonably be expected to, give rise to a material adverse effect on the business or financial condition of the Group (taken as a whole).

20.8    **Acquisitions**

(a)    The Borrower shall not, and the Borrower shall procure that no Material Subsidiary will, acquire any company, business, assets or undertaking or make any investment.

(b)    Paragraph (a) above does not apply to an acquisition or investment which is:

(i)    in respect of assets or businesses (or, in the case of any acquisition of any company or undertaking, the assets or businesses of such company or undertaking) in the same nature and of the same scope as, or complementary to, the Group's business as conducted on the date of this Agreement; or

(ii)    consistent with the Group's business strategy, provided that, in each case:

(A)    such acquisition or investment does not result in a breach of any Authorisation or of any other provision of this Agreement;

(B)    such acquisition or investment does not and could not reasonably be expected to have a Material Adverse Effect; and

(C)    no Default is continuing or would occur as a result of such acquisition or investment.

20.9    **Maintenance of corporate existence and books and records**

The Borrower shall, and shall procure that each Material Subsidiary will:

(a)    maintain its corporate existence and registration in the jurisdiction of its incorporation (other than, in the case of any Material Subsidiary that is not the Borrower, where such Material Subsidiary is not the surviving entity of any amalgamation, merger or corporate reconstruction to the extent permitted under Clause 20.6 (*Merger*)); and

(b)    keep and maintain proper books and records in accordance with GAAP in all material respects.

64

20.10    **Federal Reserve Regulations**

The Borrower shall not (and the Borrower shall ensure that no other Group Member will) use the Facilities (or any part thereof) in violation of any of Regulation T, Regulation U and Regulation X.

20.11    **Compliance with US Regulations**

The Borrower shall not (and the Borrower shall ensure that no other Group Member will) become required to be registered as an "investment company" under the 1940 Act.

20.12    **ERISA**

The Borrower shall not establish, become party to or incur any liability under any employee benefit plan under Title IV of the United States Employee Retirement Income Security Act of 1974.

20.13    **Anti-corruption law**

(a)    The Borrower shall not (and the Borrower shall ensure that no Group Member will) directly or indirectly use any of the proceeds of the Facilities (or any part thereof) for any purpose which would breach, or would cause any Group Member or any Finance Party to be in breach of, any Anti-Bribery and Corruption Laws.

(b)    The Borrower shall (and the Borrower shall ensure that each Group Member will) comply in all respects, and conduct its businesses in compliance, with all applicable Anti-Bribery and Corruption Laws.

(c)    The Borrower shall (and the Borrower shall ensure that each Group Member will) institute and maintain systems, controls and other arrangements designed to promote and ensure ongoing compliance by Group Members and by persons associated with any Group Member with all applicable Anti-Bribery and Corruption Laws.

20.14    **Sanctions, Anti-Terrorism Laws and Anti-Money Laundering Laws**

(a)    The Borrower shall (and the Borrower shall procure that each Group Member will) comply with, and conduct its business in compliance with, all applicable Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws. Without prejudice to the foregoing, the Borrower shall not, and the Borrower shall procure that no Group Member will, knowingly engage in any transaction that violates or would violate, or would cause any Group Member or any Finance Party to be in violation of, any of the applicable prohibitions set forth in any Sanctions, Anti-Money Laundering Laws or Anti-Terrorism Laws.

(b)    The Borrower shall ensure that none of the funds or assets of any Group Member that are used to repay the Facilities (or any part thereof) shall constitute property of, or shall be beneficially owned directly or indirectly by, any Restricted Party.

65

(c)    The Borrower shall not, and the Borrower shall procure that no Group Member will, fund all or part of any payment under any Finance Document out of proceeds derived from transactions that violates or would violate, or would cause any Group Member or any Finance Party to be in violation of, any of the applicable prohibitions set forth in any Sanctions, Anti-Money Laundering Laws or Anti-Terrorism Laws.

(d)    The Borrower shall not (and the Borrower shall procure that no Group Member will):

(i)    directly or, to the Borrower's best knowledge (after having made all reasonable investigations), indirectly use or allow to be used the proceeds of the Facilities (or any part thereof) or other transaction(s) contemplated by any Finance Document for any purpose which would violate, or cause any Group Member or any Finance Party to be in violation of, any applicable Sanctions, Anti-Money Laundering Laws or Anti-Terrorism Laws;

(ii)    directly or, to the Borrower's best knowledge (after having made all reasonable investigations), indirectly lend, invest, contribute or otherwise make available the proceeds of the Facilities (or any part thereof) to, or for the benefit of, or for financing the activities of, any Restricted Party in any manner which would violate, or cause any Group Member or any Finance Party to be in violation of, any applicable Sanctions; or

(iii)    directly or, to the Borrower's best knowledge (after having made all reasonable investigations), indirectly use or allow to be used the proceeds of the Facilities (or any part thereof):

(A)    in any other manner that would or might result in any Group Member or any Finance Party being in breach of any applicable Sanctions, Anti-Money Laundering Laws or Anti-Terrorism Laws or becoming a Restricted Party;

(B)    for business activities relating to any Sanctioned Jurisdiction, including any business activities involving persons or entities named on any Sanctions List in any manner which would violate, or cause any Group Member or any Finance Party to be in violation of, any applicable Sanctions.

(e)    The Borrower shall (and shall procure that each Group Member shall) continue to institute and maintain systems, controls and other arrangements designed to promote and ensure ongoing compliance by the Group with all applicable Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws.

20.15    **Taxation**

The Borrower shall, and shall ensure that each Group Member will, pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that:

(a)    such payment is being contested in good faith;

66

(b)     adequate reserves are being maintained for those Taxes and the costs required to contest them in accordance with GAAP; and

(c)     such payment can be lawfully withheld and failure to pay those Taxes does not have and could not reasonably be expected to have a Material Adverse Effect.

## 20.16   No delisting or suspension of the Borrower's shares

The Borrower shall ensure that:

(a)     its shares are at all times listed (and will not at any time cease to be listed) on the NASDAQ Global Select Market; and

(b)     trading of shares in the Borrower on the NASDAQ Global Select Market will not be suspended for more than 20 consecutive Trading Days (or such longer period as may be agreed between the Borrower and the Agent (acting on the instructions of the Majority Lenders)), unless such suspension is solely caused by administrative or technical reasons in the system of the NASDAQ Global Select Market (and for such purposes, "**Trading Day**" means a day (other than a Saturday or Sunday) on which the NASDAQ Global Select Market is open for trading).

## 21.     EVENTS OF DEFAULT

Each of the events or circumstances set out in Clause 21.1 (*Non-payment*) to Clause 21.12 (*Material adverse change*) is an Event of Default.

## 21.1    Non-payment

The Borrower does not pay on the due date any amount pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless:

(a)     its failure to pay is caused by administrative or technical error; and

(b)     payment of such amount is made within five Business Days of its due date.

## 21.2    Financial covenants

Any requirement of Clause 19 (*Financial Covenants*) is not satisfied.

## 21.3    Other obligations

(a)     The Borrower does not comply with any provision of Clause 20.16 (*No delisting or suspension of the Borrower's shares*); and/or

(b)     the Borrower does not comply with any provision of the Finance Documents (other than those referred to in paragraph (a) above, Clause 21.1 (*Non-payment*) and Clause 21.2 (*Financial covenants*)),

**provided that**, in respect of any failure to comply falling under paragraph (b) above, no Event of Default will occur in respect of such failure to comply if such failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (A) the Agent giving written notice to the Borrower or (B) the Borrower becoming aware of such failure to comply.

67

**21.4**    **Misrepresentation**

Any representation or statement made or deemed to be made by the Borrower in any or all of the Finance Documents or any other document delivered by or on behalf of the Borrower under or in connection with any Finance Document is or proves to have been incorrect or misleading in any material respect when made or deemed to be made unless the underlying circumstances (if capable of remedy) are remedied within 20 Business Days of the earlier to occur of (A) the Agent giving written notice to the Borrower or (B) the Borrower becoming aware of such underlying circumstances (it being understood that the subsequent provision of accurate information shall not in itself be deemed to cure any misrepresentation in respect of the accuracy of previous information provided).

**21.5**    **Cross default**

Any:

(a)    Financial Indebtedness of the Borrower or any Material Subsidiary is not paid when due nor within any originally applicable grace period;

(b)    Financial Indebtedness of the Borrower or any Material Subsidiary is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (however described);

(c)    commitment for any Financial Indebtedness of the Borrower or any Material Subsidiary is cancelled or suspended by a creditor of the Borrower or any Material Subsidiary as a result of an event of default (however described); or

(d)    creditor of the Borrower or any Material Subsidiary becomes entitled to declare any Financial Indebtedness of the Borrower or any Material Subsidiary due and payable prior to its specified maturity as a result of an event of default (however described),

**provided that** (i) paragraphs (a) to (d) above shall not apply to any Financial Indebtedness that is owing to a Group Member and (ii) no Event of Default will occur under this Clause 21.5 if the aggregate amount of Financial Indebtedness and/or commitment for Financial Indebtedness falling within paragraphs (a) to (d) above (for any and all of the Borrower and/or Material Subsidiaries) is less than US$100,000,000 (or its equivalent in any other currency or currencies).

**21.6**    **Insolvency**

(a)    The Borrower or any Material Subsidiary is or is presumed or deemed to be unable or admits inability to pay its debts as they fall due, suspends making payments on any of its debts or, by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors with a view to rescheduling any of its indebtedness;

68

(b)    the value of the assets of the Borrower or any Material Subsidiary is less than its liabilities (taking into account contingent and prospective liabilities); or

(c)    a moratorium is declared in respect of any indebtedness of the Borrower or any Material Subsidiary.

21.7    **Insolvency proceedings**

(a)    Any corporate action, legal proceedings or other procedure or step is taken or occurs in relation to:

(i)    the suspension of payments, a moratorium of any indebtedness, winding-up, dissolution, striking-off, administration, provisional supervision or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of the Borrower or any Material Subsidiary (other than any solvent reorganisation constituted by any amalgamation, merger or corporate reconstruction entered into by the Borrower or any Material Subsidiary, in each case, to the extent permitted under Clause 20.6 (*Merger*));

(ii)    a composition or arrangement with any creditor of the Borrower or any Material Subsidiary, or an assignment for the benefit of creditors generally of the Borrower or any Material Subsidiary or a class of such creditors;

(iii)    the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager, provisional supervisor or other similar officer in respect of the Borrower or any Material Subsidiary or any of its assets (other than any solvent liquidation of any Material Subsidiary (other than the Borrower) constituted by any amalgamation, merger or corporate reconstruction entered into by such Material Subsidiary, in each case, to the extent permitted under Clause 20.6 (*Merger*)); or

(iv)    enforcement of any Security over any assets of the Borrower or any Material Subsidiary where the aggregate value of any and all of the assets of the Borrower and/or Material Subsidiaries that are subject to any or all such enforcement is not less than US$100,000,000 (or its equivalent in any other currency or currencies),

or any analogous procedure or step is taken or occurs in any jurisdiction; or

(b)    any proceeding or case is commenced, with consent of the Borrower (or without the consent of the Borrower which (A) results in the entry of any order of relief or any order, judgment, decree, adjudication or appointment approving, ordering or giving effecting to any of (i) to (iii) below or (B) remains undismissed or undischarged for a period of 60 days of commencement), seeking:

(i)    the Borrower's reorganisation, liquidation, dissolution, arrangement or winding-up or the composition or re-adjustment of the Borrower's debts under the US Bankruptcy Code or other debtor relief laws of the United States;

69

(ii)   the appointment of a receiver, custodian, trustee, examiner, liquidator or the like of the Borrower or of all or any substantial part of the Borrower's property; or

(iii)   similar relief in respect of the Borrower under any law relating to the bankruptcy, insolvency, reorganisation, winding-up or composition or adjustment of debts.

Paragraph (a)(i) shall not apply to any corporate action, legal proceedings or other procedure or step (brought by any person that is not a Group Member) in relation to the winding-up, administration or dissolution of the Borrower or any Material Subsidiary which is being contested in good faith and with due diligence and is discharged or struck out within 30 days of commencement.

21.8   **Creditors' process**

Any expropriation, attachment, sequestration, distress or execution (or any analogous process in any jurisdiction) affects any asset or assets of the Borrower or any Material Subsidiary, **provided that** it shall not be an Event of Default under this Clause 21.8 if the aggregate value of any and all assets of any or all of the Borrower and Material Subsidiaries that are subject to any or all events and/or circumstances of expropriation, attachment, sequestration, distress, execution and/or analogous process does not exceed US$100,000,000 (or its equivalent in any other currency or currencies).

21.9   **Unlawfulness and invalidity**

(a)   It is or becomes unlawful for the Borrower to perform any of its obligations under the Finance Documents;

(b)   any obligation or obligations of the Borrower under any Finance Document are not or cease to be legal, valid, binding or enforceable and such illegality, invalidity, non-binding nature or unenforceability individually or cumulatively materially and adversely affects the interests of the Finance Parties under the Finance Documents; or

(c)   any Finance Document is not or ceases to be in full force and effect.

21.10   **Repudiation**

The Borrower rescinds or purports to rescind or repudiates or purports to repudiate any Finance Document or evidences an intention to rescind or repudiate any Finance Document.

21.11   **Cessation of business**

The Borrower suspends or ceases to carry on all or substantially all of its business or of the business of the Group (taken as a whole).

70

21.12    **Material adverse change**

Any event or circumstance occurs which the Majority Lenders reasonably believe would (whether individually or together with other events or circumstances) have a Material Adverse Effect.

21.13    **Acceleration**

On and at any time after the occurrence of an Event of Default which is continuing the Agent may, and shall if so directed by the Majority Lenders, by notice to the Borrower:

(a)    without prejudice to the participations of any or all of the Lenders in any Loans then outstanding:

 (i)    cancel the Available Commitments of the Lenders (in respect of any or all of the Facilities) and reduce them to zero whereupon they shall immediately be cancelled and reduced to zero (and the Commitments of the Lenders (in respect of such Facility or Facilities) shall be reduced by the same amount accordingly), **provided that** such reduction of the Commitments of the Lenders under any Facility shall be applied towards the Commitments of the Lenders under that Facility rateably; or

 (ii)    cancel any part of the Available Commitments of the Lenders (in respect of any or all of the Facilities) and reduce them accordingly, whereupon the applicable part of the Available Commitments of the Lenders (in respect of such Facility or Facilities) shall be cancelled (and the Commitments of the Lenders (in respect of such Facility or Facilities) shall be reduced by the same amount accordingly), **provided that** such reduction of the Available Commitments and the Commitments of the Lenders under any Facility shall be applied towards the Available Commitments and the Commitments of the Lenders under that Facility rateably;

(b)    declare that all or part of the Loans, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable;

(c)    declare that all or part of the Loans be payable on demand, whereupon they shall immediately become payable on demand by the Agent on the instructions of the Majority Lenders; and/or

(d)    declare that no Rollover Loan shall be made,

**provided that**, if an Event of Default under Clause 21.6 (*Insolvency*) or Clause 21.7 (*Insolvency proceedings*) shall occur in respect of the Borrower in a US court of competent jurisdiction, then without notice to the Borrower or any other person or any other act by the Agent or any other person, the Commitments of the Lenders (in respect of any or all of the Facilities) shall be automatically cancelled and reduced to zero and all of the Loans together with accrued interest and all other amounts accrued or outstanding under the Finance Documents shall automatically become 11 lediately due and payable without presentment demand protest or notice of any kind all of which are expressly waived

71

**SECTION 8**
**CHANGES TO PARTIES**

22.    **CHANGES TO THE PARTIES**

22.1    **Assignments and transfers by the Lenders**

Subject to this Clause 22, a Lender (the "**Existing Lender**") may:

(a)    assign any of its rights under this Agreement; or

(b)    transfer by novation any of its rights and/or obligations under this Agreement,

to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the "**New Lender**").

22.2    **Conditions of assignment or transfer**

(a)    The consent of the Borrower shall be required in respect of any assignment or transfer made in accordance with Clause 22.1 (*Assignments and transfers by the Lenders*), except for:

   (i)    any assignment or transfer made in favour of a Lender or an Affiliate of a Lender;

   (ii)    any assignment or transfer made at a time when an Event of Default is continuing.

(b)    The consent of the Borrower to any transfer or assignment by a Lender must not be unreasonably withheld or delayed, and shall be deemed to have been given 10 Business Days after such Lender has requested it unless such consent is expressly refused by the Borrower within that time.

(c)    The Existing Lender shall, simultaneously with the assignment or transfer by it of rights and/or obligations under this Agreement to the New Lender, assign to the New Lender a proportionate share of the rights held by it (in its capacity as Lender) under or in connection with the other Finance Documents.

(d)    A transfer by the Existing Lender to the New Lender will be effective only if the procedure set out in Clause 22.5 (*Procedure for transfer*) is complied with in respect of such transfer.

(e)    An assignment by the Existing Lender to the New Lender will be effective only if the procedure and conditions set out in Clause 22.6 (*Procedure for assignment*) are complied with in respect of such assignment (subject to paragraph (c) of Clause 22.6 (*Procedure for assignment*)).

(f)    Each New Lender, by executing the applicable Transfer Certificate or Assignment Agreement to which it is a party, confirms, for the avoidance of doubt, that the Agent has authority to execute on its behalf any amendment or waiver relating to any Finance Document that has been approved by or on behalf of the requisite Lender or Lenders in accordance with this Agreement on or prior to the date on which the applicable transfer or assignment from the applicable Existing Lender to such New Lender becomes effective in accordance with this Agreement and that it is bound by that decision to the same extent as such Existing Lender would have been had it remained a Lender.

72

22.3    **Assignment or transfer fee**

The New Lender shall, on the date upon which the relevant assignment or transfer by the Existing Lender to the New Lender takes effect, pay to the Agent (for its own account) a fee of US$2,500.00.

22.4    **Limitation of responsibility of Existing Lenders**

(a)    Unless expressly agreed to the contrary, an Existing Lender makes no representation or warranty and assumes no responsibility to a New Lender for:

(i)    the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents or any other documents;

(ii)    the financial condition of any Group Member or any Affiliate of any Group Member;

(iii)    the performance and observance by the Borrower of its obligations under any of the Finance Documents or any other documents; or

(iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)    Each New Lender confirms to the Existing Lender (which makes any assignment or transfer to such New Lender) and the other Finance Parties that it:

(i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of the Borrower, Group Members and their related entities in connection with its participation in this Agreement and/or the other Finance Documents and has not relied exclusively on any information provided to it by such Existing Lender in connection with any Finance Document; and

(ii)    will continue to make its own independent appraisal of the creditworthiness of the Borrower, Group Members and their related entities whilst any amount is or may be outstanding under any of the Finance Documents or any commitment represented by any Commitment in respect of any Facility is in force.

73

(c)     Nothing in any Finance Document obliges an Existing Lender to:

(i)     accept a re-assignment or re-transfer from a New Lender of any of the rights and obligations assigned or transferred under this Clause 22; or

(ii)    support any losses directly or indirectly incurred by a New Lender by reason of the non-performance by the Borrower of its obligations under any of the Finance Documents or otherwise.

22.5    **Procedure for transfer**

(a)     Subject to the conditions set out in Clause 22.2 (*Conditions of assignment or transfer*) a transfer by an Existing Lender of any or all of its rights and obligations under this Agreement to a New Lender is effected on the Transfer Date in accordance with paragraph (c) below. The Agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed Transfer Certificate appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Transfer Certificate, **provided that** the Agent shall have no obligation to execute any Transfer Certificate at any time earlier than the date that is 5 Business Days after its receipt of such Transfer Certificate.

(b)     The Agent shall not be obliged to execute a Transfer Certificate delivered to it by an Existing Lender and a New Lender unless it is satisfied that it has completed all "know your customer" and other similar procedures that it is required (including in accordance with internal policies) (or deems desirable) to conduct in relation to the transfer from such Existing Lender to such New Lender (the subject of such Transfer Certificate).

(c)     On the Transfer Date in respect of a transfer by an Existing Lender to a New Lender:

(i)     to the extent that in the Transfer Certificate (relating to such transfer) such Existing Lender seeks to transfer by novation its rights and obligations under this Agreement each of the Borrower and such Existing Lender shall be released from further obligations towards one another under this Agreement and their respective rights against one another under this Agreement shall be cancelled (being the "**Discharged Rights and Obligations**");

(ii)    each of the Borrower and such New Lender shall assume obligations towards one another and/or acquire rights against one another under this Agreement which differ from the Discharged Rights and Obligations only insofar as the Borrower and such New Lender have assumed and/or acquired the same in place of the Borrower and such Existing Lender;

(iii)   the Agent, the Arrangers, such New Lender and the other Lenders shall acquire the same rights and assume the same obligations between themselves as they would have acquired and assumed had such New Lender been originally party hereto as a Lender with the rights and/or obligations acquired or assumed by it as a result of the transfer (the subject of such Transfer Certificate) and to that extent the Agent, the Arrangers and such other Lenders (on one hand) and such Existing Lender (on the other hand) shall each be released from further obligations to each other under this Agreement; and

74

(iv)        such New Lender shall become a Party as a "Lender".

22.6      **Procedure for assignment**

(a)        Subject to the conditions set out in paragraph (d) below and Clause 22.2 (*Conditions of assignment or transfer*), an assignment by an Existing Lender of any or all of its rights under this Agreement to a New Lender may be effected on the Transfer Date in accordance with paragraph (b) below. The Agent shall, subject to paragraph (d)(ii), as soon as reasonably practicable after receipt by it of a duly completed Assignment Agreement appearing on its face to comply with the terms of this Agreement and delivered in accordance with the terms of this Agreement, execute that Assignment Agreement,**, provided that** the Agent shall have no obligation to execute any Assignment Agreement at any time earlier than the date that is 5 Business Days after its receipt of such Assignment Agreement.

(b)        On the Transfer Date relating to an assignment by an Existing Lender to a New Lender:

        (i)        such Existing Lender will assign absolutely to such New Lender the rights under the Finance Documents expressed to be the subject of assignment in such Assignment Agreement;

        (ii)      such Existing Lender will be released by the Borrower and the other Finance Parties from the obligations owed by it (the "**Relevant Obligations**") and expressed to be the subject of release in such Assignment Agreement; and

        (iii)     the New Lender shall become a Party as a "Lender" and shall be bound by obligations equivalent to the Relevant Obligations.

(c)        An Existing Lender may utilise procedures other than those set out in this Clause 22.6 to assign its rights under the Finance Documents (but not, without the consent of the Borrower or unless in accordance with Clause 22.5 (*Procedure for transfer*), to obtain a release by the Borrower from the obligations owed to the Borrower by that Existing Lender nor the assumption of equivalent obligations by the applicable New Lender) **provided that** the conditions set out in paragraph (d) below are complied with.

(d)        An assignment by an Existing Lender to a New Lender (whether pursuant to an Assignment Agreement or paragraph (c) above) will only be effective on:

        (i)        receipt by the Agent (whether in an Assignment Agreement or otherwise) of written confirmation from such New Lender (in form and substance satisfactory to the Agent) that such New Lender will assume the same obligations to the other Finance Parties as it would have been under if it were an Original Lender; and

75

(ii) performance by the Agent of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to such New Lender. The Agent shall promptly notify such Existing Lender and such New Lender of the completion of such checks. The Agent shall not be obliged to execute an Assignment Agreement delivered to it by an Existing Lender and a New Lender or any document delivered to it pursuant to paragraph (c) above unless it is satisfied that it has completed all "know your customer" and other similar procedures that it is required (or deems desirable) to conduct in relation to such assignment to such New Lender.

(e) The procedure set out in this Clause 22.6 shall not apply to any right or obligation under any Finance Document (other than this Agreement) if and to the extent its terms, or any laws or regulations applicable thereto, provide for or require a different means of assignment of such right or release or assumption of obligation or prohibit or restrict any assignment of such right or release or assumption of such obligation, unless such prohibition or restriction shall not be applicable to the applicable assignment, release and assumption or each condition of any applicable assignment, release and assumption shall have been satisfied.

## 22.7 Copy of Transfer Certificate or Assignment Agreement to Borrower

The Agent shall, as soon as reasonably practicable after it has executed a Transfer Certificate or an Assignment Agreement, send to the Borrower a copy of that Transfer Certificate or Assignment Agreement.

## 22.8 Existing consents and waivers

Each New Lender shall be bound by any consent, waiver, election or decision given or made by the applicable Existing Lender under or pursuant to any Finance Document prior to the coming into effect of the applicable assignment or transfer from such Existing Lender to such New Lender.

## 22.9 Exclusion of the Agent's liabilities

In relation to any assignment or transfer pursuant to this Clause 22, each Party acknowledges and agrees that the Agent shall not be obliged to:

(a) enquire as to the accuracy of any representation or warranty made by, or the status of, any person in respect of its eligibility as a Lender;

(b) attend to any registration or perfection requirements required in connection with such assignment or transfer or to ensure that such registration or perfection requirements are completed; and/or

(c) provide any New Lender with any information regarding any previous amendments or waivers in relation to any Finance Document.

76

22.10   **Sub-participation**

For the avoidance of doubt, each Lender may grant sub-participations in respect of any or all of its rights and/or obligations under any Finance Document to any person **provided that** the consent of the Borrower shall be required in respect of any such sub-participation except for:

(a)      any sub-participation where such Lender retains its voting rights under the Finance Documents (and is not required to exercise such voting rights at the discretion of any other person) (or retains such voting rights (and is not required to exercise such voting rights at the discretion of any other person) except for voting rights in relation to items that would require all Lenders' consent, approval or instructions pursuant to the terms of the Finance Documents);

(b)      any sub-participation in favour of a Lender or an Affiliate of a Lender;

(c)      any sub-participation made at a time when an Event of Default is continuing.

The consent of the Borrower under this Clause 22.10 must not be unreasonably withheld or delayed and the Borrower will be deemed to have given its consent ten (10) Business Days after a Lender has requested it unless such consent is expressly refused by the Borrower in writing within that time.

22.11   **Assignments and transfers to Group Members**

A Lender may not assign or transfer any of its rights and/or obligations under any Finance Document to any Group Member or any Affiliate of any Group Member, except with the prior written consent of the Agent (acting on the instructions of the Majority Lenders), **provided that** in no event shall any Lender assign or transfer any of its rights and/or obligations under any Finance Document to the Borrower.

22.12   **Security over Lenders' rights**

In addition to the other rights provided to Lenders under this Clause 22, each Lender may without consulting with or obtaining consent from the Borrower, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of that Lender including, without limitation:

(a)      any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)      in the case of any Lender which is a fund, any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by that Lender as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)      release such Lender from any of its obligations under the Finance Documents, or substitute the beneficiary of the relevant charge, assignment or other Security for such Lender as a party to any of the Finance Documents; or

77

    (ii)    require any payments to be made by the Borrower or grant to any person any rights that are more extensive than those required to be made or granted to such Lender under the Finance Documents.

**22.13**    **No assignments or transfers by the Borrower**

The Borrower may not assign or transfer any or all of its rights or obligations under any or all of the Finance Documents.

**23.**    **DISCLOSURE OF INFORMATION**

**23.1**    **Confidentiality**

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 23.2 (*Disclosure of Confidential Information*) and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

**23.2**    **Disclosure of Confidential Information**

Any Finance Party may deliver copies of the Finance Documents and/or disclose any information (including Confidential Information) received by it under or pursuant to any Finance Document or any other information about the Borrower, the Group, and/or the Finance Documents as that Finance Party shall consider appropriate (if, in relation to any of paragraphs (l)(i), (l)(ii) and (l)(iii) below, the person to whom any Confidential Information is to be disclosed has entered into a Confidentiality Undertaking, except that there shall be no requirement for any Confidentiality Undertaking if such recipient is subject to professional obligations to maintain the confidentiality of such Confidential Information) to:

(a)    any of its Affiliates and/or Related Funds;

(b)    any of its head office, branches and/or representative offices;

(c)    any other Finance Party;

(d)    any of the professional advisers of it or any person referred to in paragraphs (a) to (c) and/or any other person providing services to or agent or contractor of or any person referred to in paragraphs (a) to (c), including (**provided that** such professional adviser, person providing services or agent or contractor is under a duty of confidentiality, contractual or otherwise, to such Finance Party or such person referred to in paragraphs (a) to (c));

(e)    the Borrower;

(f)    any person permitted (in writing) by the Borrower;

(g)    any person to the extent required for the purpose of any litigation, arbitration or regulatory proceedings or procedure or in connection with any preservation or enforcement of any right or remedy under any Finance Document;

(h)    any person to whom, and to the extent that, information is requested or required to be disclosed by any applicable law or regulation or the rules or requirements of any applicable court, tribunal, securities exchange or supervisory, governmental, quasi-governmental, regulatory or self-regulatory body or authority;

(i)    any employee or officer of any Finance Party or any person falling within any of paragraphs (a) to (d) (where such disclosure is reasonably required for the performance of the duties or functions of such employee or officer);

(j)    any rating agency, insurer or insurance broker of, or any direct or indirect provider of credit protection to, such Finance Party (or any of its Affiliates, head office or other branch), **provided that** such person is informed of the confidential nature of such Confidential Information;

(k)    any person to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) in or over all or any of its rights under any Finance Document pursuant to Clause 22.12 (*Security over Lenders' rights*); or

(l)    any other person:

(i)    to (or through) whom that Finance Party assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under any Finance Document;

(ii)    with (or through) whom that Finance Party enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, the Facility, any Finance Document, the Borrower or any Group Member, or who invests directly or indirectly in any such sub- participation or other transaction; or

(iii)    who acquires or is proposing to acquire any interest in, or enters into or is proposing to enter into any merger, amalgamation or other similar arrangement with, that Finance Party.

The Borrower further acknowledges and agrees that some services, operational and processing procedures relating to the transactions or services contemplated under the Finance Document may from time to time be outsourced by any Finance Party to its regional or global processing centres, branches, Subsidiaries, representative offices, Affiliates, agents of any Finance Party and third parties selected by any Finance Party, wherever situated, and these service providers may from time to time be given access to information and data relating to the transactions or services contemplated under the Finance Documents for the purpose of or in relation to the services and procedures they perform. This Clause 23 is not, and shall not be deemed to constitute, an express or implied agreement by a Finance Party for a higher degree of confidentiality than that prescribed under any applicable law or regulation.

79

Notwithstanding any other provision in this Agreement or any other document, the Borrower acknowledges and agrees that each Finance Party (and each employee, representative or other agent of each Finance Party) may each disclose to any and all persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated under the Finance Documents and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such U.S. tax treatment and U.S. tax structure, other than any information for which non-disclosure is necessary in order to comply with applicable securities laws.

This Clause 23 supersedes any previous agreement between any of the Parties relation to the confidentiality of any such information or of any Finance Document.

80

**SECTION 9**
**THE FINANCE PARTIES**

24.    **ROLE OF THE AGENT AND THE ARRANGERS**

24.1    **Appointment of the Agent**

(a)    Each Finance Party (other than the Agent) appoints the Agent to act as its agent under and in connection with the Finance Documents.

(b)    Each Finance Party (other than the Agent) authorises the Agent to exercise the rights, powers, authorities and discretions specifically given to the Agent under or in connection with the Finance Documents together with any other incidental rights, powers, authorities and discretions.

24.2    **Duties of the Agent**

(a)    Subject to paragraph (b) below, the Agent shall promptly forward to a party to any Finance Document the original or a copy of any document which is delivered to the Agent for that party by any other party to any Finance Document.

(b)    Without prejudice to Clause 22.7 (*Copy of Transfer Certificate or Assignment Agreement to Borrower*), paragraph (a) above shall not apply to any Assignment Agreement or any Transfer Certificate or any notice or confirmation under paragraph (d)(i) of Clause 22.6 (*Procedure for assignment*).

(c)    Except where a Finance Document specifically provides otherwise, the Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to any party to any Finance Document.

(d)    If the Agent receives notice from any party to any Finance Document referring to a Finance Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify the other Finance Parties.

(e)    If the Agent is aware of the non-payment of any principal, interest, commitment fee or other fee payable to a Finance Party (other than any Administrative Party) under a Finance Document it shall promptly notify the other Finance Parties.

(f)    The Agent's duties under the Finance Documents are solely mechanical and administrative in nature. The Agent shall have no other duties, obligations and responsibilities save as expressly provided for in the Finance Documents to which it is a party (and no others shall be implied).

24.3    **Role of the Arrangers**

Except as specifically provided in the Finance Documents to which it is a party, none of the Arrangers shall have any obligations of any kind to any other Party under or in connection with any Finance Document.

81

24.4 **No fiduciary duties**

(a) Nothing in this Agreement constitutes any Administrative Party as a trustee or fiduciary of any other person.

(b) No Administrative Party shall be bound to account to any Lender for any sum or the profit element of any sum received by it for its own account.

24.5 **Business with the Group**

(a) Each Administrative Party may accept deposits from, lend money to and generally engage in any kind of banking or other business with the Borrower, any Group Member or any Affiliate of any of the foregoing.

(b) Each of the Finance Parties hereby irrevocably waives, in favour of the Agent, any conflict of interest which may arise by virtue of the Agent acting in various capacities under the Finance Documents or for other customers of the Agent. Each of the Finance Parties acknowledges that the Agent and its affiliates (together, the "**Agent Parties**") may have interests in, or may be providing or may in the future provide financial or other services to other parties with interests which a Finance Party may regard as conflicting with its interests and may possess information (whether or not material to the Finance Parties), other than as a result of the Agent acting as agent under the Finance Documents, that the Agent may not be entitled to share with any Finance Party.

(c) The Agent will not disclose Confidential Information obtained from any Finance Party (without its consent) to any of the Agent's other customers nor will it use on a Finance Party's behalf any Confidential Information obtained from any other customer. Without prejudice to the foregoing, each of the Finance Parties agrees that each of the Agent Parties may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of the Finance Documents.

24.6 **Rights and discretions of the Agent**

(a) The Agent may rely on:

(i) any representation, notice or document believed by it to be genuine, correct and appropriately authorised and shall have no duty to verify any signature on any document; and

(ii) any statement purportedly made by a director, authorised signatory or employee of any person regarding any matters which may reasonably be assumed to be within his knowledge or within his power to verify.

(b) The Agent may assume (unless it has received notice to the contrary in its capacity as agent for the Finance Parties) that:

(i) no Default has occurred (unless it has actual knowledge of a Default arising under Clause 21.1 (*Non-payment*)); and

82

(ii) any right, power, authority or discretion vested in any party to any Finance Document, the Majority Lenders or the applicable Lenders has not been exercised.

(c) The Agent may engage, pay for and rely on the advice or services of any lawyers, accountants, surveyors or other experts.

(d) The Agent may act in relation to the Finance Documents through its personnel, agents and affiliates. The Agent shall not be liable for the acts or omissions of any such agents **provided that** it has acted in good faith in the selection of such agents.

(e) The Agent may disclose to any other party to any Finance Document any information it reasonably believes it has received as agent under any Finance Document.

(f) Notwithstanding any other provision of any Finance Document to the contrary, neither the Agent nor any Finance Party is obliged to (i) do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality or (ii) disclose any information that is stated to be confidential.

(g) The Agent is not obliged to disclose to any Finance Party any details of any rate notified to the Agent by any Lender for the purpose of paragraph (a)(ii) of Clause 10.2 (*Market disruption*) or the identity of any such Lender.

24.7    **Majority Lenders' instructions**

(a) Unless a contrary indication appears in a Finance Document, the Agent shall (i) exercise any right, power, authority or discretion vested in it as Agent in accordance with any instructions given to it by the Majority Lenders (or, if so instructed by the Majority Lenders, refrain from exercising any right, power, authority or discretion vested in it as Agent) and (ii) not be liable for any act (or omission) if it acts (or refrains from taking any action) in accordance with such an instruction of the Majority Lenders.

(b) Unless a contrary indication appears in a Finance Document, any such instructions so given by the Majority Lenders will be binding on all of the Finance Parties.

(c) The Agent may refrain from acting in accordance with the instructions of the Majority Lenders (or, if appropriate, the applicable Lenders) until it has received such security as it may require for any cost, loss or liability (together with any associated Indirect Tax) which it may incur in complying with such instructions.

(d) In the absence of instructions from the Majority Lenders, (or, if appropriate, the applicable Lenders) the Agent may act (or refrain from taking action) as it considers to be in the best interest of the Lenders, **provided that** (for the avoidance of doubt) the Agent shall not be under any duty to take any action in the absence of such instructions.

83

(e)     The Agent is not authorised to act on behalf of and in the name of a Finance Party (without first obtaining that Finance Party's prior written consent) in any legal or arbitration proceedings relating to any Finance Document, **provided that** nothing herein shall prejudice the ability of the Agent to bring, defend or conduct any proceedings in its capacity as Agent (in the name of the Agent).

(f)     For the purposes of determining:

    (i)     Majority Lenders, Majority Facility A Lenders or Majority Facility B Lenders; or

    (ii)    whether the consent, instruction or vote of (A) Lenders holding any applicable percentage (including, for the avoidance of doubt, unanimity) of the Total Commitments, the Commitments in respect of any or all of the Facilities and/or participations in respect of any or all of the Loans or (B) any group of Lenders has been obtained in respect of any matter (including any amendment or waiver relating to any Finance Document),

a Lender may split its votes (as attributable to its Commitment(s) in respect of any or all of the Facilities and/or its participations in respect of any or all of the Loans) in whatever percentages it may specify, and may exercise such votes in different ways (and shall for such purpose be construed as different Lenders holding such percentages of such Commitments in respect of such Facilities and/or such percentages of such participations in respect of such Loans as so specified by such Lender respectively, **provided that** the aggregate of such percentages shall be equal to 100%).

## 24.8    **Responsibility for documentation**

No Administrative Party:

(a)     is responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by any Administrative Party, the Borrower or any other person given in or in connection with any Finance Document, the Information Memorandum or the transactions contemplated under any Finance Document;

(b)     is responsible for the legality, validity, effectiveness, adequacy or enforceability of any Finance Document or any other agreement, arrangement or document entered into, made or executed in anticipation of or in connection with any Finance Document; or

(c)     is responsible for any determination as to whether any information provided or to be provided to any Finance Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

84

24.9 **Exclusion of liability**

(a)  Without limiting paragraph (b) below, the Agent will not be liable (including, without limitation, for negligence or any other category of liability whatsoever) for any cost, loss or liability incurred by any Party as a consequence of:

    (i)  the Agent having taken or having omitted to take any action under or in connection with any Finance Document, unless directly caused by the Agent's gross negligence or wilful misconduct (as determined in a final non-appealable judgment of a court of competent jurisdiction); or

    (ii)  any delay (or any related consequences) in crediting an account with an amount required under any of the Finance Documents to be paid by the Agent if the Agent has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by the Agent for that purpose.

(b)  No Party (other than the Agent) may take any proceedings against any officer, employee or agent of the Agent in respect of any claim it might have against the Agent or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Finance Document, and any officer, employee or agent of the Agent may rely on this Clause 24.9 subject to Clause 1.4 (*Third party rights*) and the provisions of the Third Parties Act.

(c)  The Agent shall not be responsible for making, and shall not have any duty to make, any investigation in respect of or in any way be liable whatsoever for:

    (i)  the nature, status, creditworthiness or solvency of the Borrower, any Group Member or any other person;

    (ii)  the execution, legality, validity, adequacy (including without limitation adequacy of security, if any, relating to), admissibility in evidence or enforceability of any Finance Document or any other document entered into in connection therewith;

    (iii)  the scope, adequacy, accuracy or completeness of any representations, warranties or statements made by or on behalf of, or any information (whether oral or written) supplied by or on behalf of, the Borrower, any Group Member, or any other person under or in connection with any Finance Document or any document entered into in connection therewith;

    (iv)  the performance or observance by the Borrower or any other person with any provisions of any Finance Document or in any document entered into in connection therewith or the fulfilment or satisfaction of any conditions contained therein or relating thereto or as to the existence or occurrence at any time of any default, event of default or similar event contained therein or any waiver or consent which has at any time been granted in relation to any of the foregoing;

85

(v)     the existence, accuracy or sufficiency of any legal or other opinions, searches, reports, certificates, valuations or investigations delivered or obtained or required to be delivered or obtained at any time in connection with any Finance Document;

(vi)    the compliance of the provisions and contents of and the manner and formalities applicable to the execution of any Finance Document and any documents connected therewith, and/or compliance of any such provisions, contents, manner and/or formalities with any applicable laws or regulations;

(vii)   the failure to call for delivery of documents of title to or require any transfers, legal mortgages, charges or other further assurances in relation to any of the assets the subject matter of any of the Finance Documents or any other document; or

(viii)  any other matter or thing relating to or in any way connected with any document entered into in connection therewith whether or not similar to the foregoing.

(d)     The Agent shall not be responsible for any loss or damage, or any failure or delay in the performance of its obligations under any Finance Document if it is prevented from so performing its obligations by any reason which is beyond the control of the Agent, including, but not limited to, any existing or future law or regulation, any existing or future act of governmental authority, Act of God, flood, war whether declared or undeclared, terrorism, riot, rebellion, civil commotion, strike, lockout, other industrial action, general failure of electricity or other supply, aircraft collision, or technical failure of, accidental or mechanical or electrical breakdown of, or computer failure or other failure of, any money transmission system, or any event where, in the reasonable opinion of the Agent, performance of any duty or obligation under or pursuant to any Finance Document would or may be illegal or would result in the Agent being in breach of any law, rule, regulation, or any decree, order or judgment of any court, or practice, request, direction, notice, announcement or similar action (whether or not having the force of law) of any relevant government, government agency, regulatory authority, stock exchange or self-regulatory organisation to which the Agent is subject.

(e)     Notwithstanding any other term or provision of this Agreement to the contrary, the Agent shall not be liable under any circumstances for special, punitive, indirect or consequential loss or damage of any kind whatsoever, whether or not foreseeable, or for any loss of business, goodwill, opportunity or profit, whether arising directly or indirectly and whether or not foreseeable, even if the Agent is actually aware of or has been advised of the likelihood of such loss or damage and regardless of whether the claim for such loss or damage is made in negligence, for breach of contract, breach of trust, breach of fiduciary obligation or otherwise. For the avoidance of doubt, the provisions of this Clause 24.9 shall survive any termination or expiry of this Agreement or any resignation or removal of the Agent.

86

(f)    Nothing in this Agreement shall oblige any Administrative Party to carry out any "know your customer", anti-money laundering or other checks in relation to any person on behalf of any Lender and each of the Lenders confirms to each Administrative Party that it is solely responsible for any such checks it is required to carry out and that it may not rely on any such checks made by, or any statement in relation to such checks made by, any Administrative Party.

24.10    **Lenders' indemnity to the Agent**

(a)    Each Lender shall (in the proportion determined in accordance with paragraph (b) below) indemnify the Agent, within three Business Days of demand, against any cost, loss or liability (including, without limitation, for negligence or any other category of liability whatsoever) incurred by the Agent (otherwise than by reason of the Agent's gross negligence or wilful misconduct (as determined in a final non-appealable judgment of a court of competent jurisdiction)) in acting as Agent under the Finance Documents (unless the Agent has been reimbursed by the Borrower pursuant to a Finance Document in respect of the same cost, loss or liability).

(b)    Each Lender's proportion of such cost, loss or liability shall be:

(i)    if there is any Loan then outstanding, the proportion borne by (A) such Lender's aggregate participations in the Loan(s) then outstanding to (B) the aggregate amount of the Loans then outstanding;

(ii)    if no Loan is then outstanding and the Available Facility (in respect of any Facility) is then greater than zero, the proportion borne by (A) the aggregate of such Lender's Available Commitments (for any or all Facilities) to (B) the aggregate of the Available Facility (in respect of each Facility); or

(iii)    if no Loan is then outstanding and the Available Facility (in respect of each Facility) is then zero:

(A)    if the time when the Available Facility (in respect of each Facility) became zero falls after the time when each Loan ceased to be outstanding, the proportion borne by (A) the aggregate of such Lender's Available Commitments (for any or all Facilities) immediately before the Available Facility (in respect of each Facility) became zero to (B) the aggregate of the Available Facility (in respect of each Facility) immediately before the Available Facility (in respect of each Facility) became zero, or

(B)    if the time when each Loan ceased to be outstanding falls upon or after the time when the Available Facility (in respect of each Facility) became zero, the proportion borne by (A) the aggregate of such Lender's participations in the Loan(s) outstanding (immediately before the time when each Loan ceased to be outstanding) to (B) the aggregate amount of the Loans outstanding (immediately before the time when each Loan ceased to be outstanding).

87

24.11    **Resignation of the Agent**

(a)    The Agent may resign and appoint one of its Affiliates as successor by giving notice to the Lenders and the Borrower.

(b)    Alternatively the Agent may resign by giving notice to the Lenders and the Borrower, in which case the Majority Lenders (after consultation with the Borrower) may appoint a successor Agent.

(c)    If the Majority Lenders have not appointed a successor Agent in accordance with paragraph (b) above within 30 days after the applicable notice of resignation was given, the retiring Agent (after consultation with the Borrower) may appoint a successor Agent.

(d)    The retiring Agent shall make available to the successor Agent such documents and records and provide such assistance as the successor Agent may reasonably request for the purposes of performing its functions as Agent under the Finance Documents.

(e)    The Agent's resignation notice shall only take effect upon the appointment of a successor to the Agent.

(f)    Upon the appointment of a successor Agent, the retiring Agent shall be discharged from any further obligation in respect of the Finance Documents (other than its obligations under paragraph (d) above) but shall remain entitled to the benefit of this Clause 24 (and any agency fees for the account of such retiring Agent shall cease to accrue from such date and shall instead accrue in favour of such successor Agent).

(g)    The Majority Lenders may, by giving not less than 30 days' notice to the Agent, require it to resign in accordance with paragraph (b) above. In this event, the Agent shall resign in accordance with paragraph (b) above but the cost of complying with paragraph (d) above shall be for the account of the Borrower.

(h)    In the event of any gross negligence or wilful misconduct on the part of the Agent in acting as Agent under the Finance Documents, the Borrower may request the Majority Lenders to consider in good faith to require the Agent to resign pursuant to paragraph (g) above.

(i)    Any successor Agent and each of the other Parties shall have the same rights and obligations among themselves as they would have had had such successor Agent been originally party hereto as the Agent.

(j)    Clauses 15 (*Other Indemnities*) and 16 (*Costs and Expenses*) shall survive and remain in full force and effect in favour of any Agent that has resigned or been replaced.

88

24.12    **Confidentiality**

(a)    In acting as agent for the Finance Parties, the Agent shall be regarded as acting through its agency division which shall be treated as a separate entity from any other of its divisions or departments.

(b)    If information is received by another division or department of the Agent, it may be treated as confidential to that division or department and the Agent shall not be deemed to have notice of it.

(c)    The Agent shall not be obliged to disclose to any Finance Party any information supplied to it by the Borrower or any Affiliate of the Borrower on a confidential basis and for the purpose of evaluating whether any waiver or amendment is or may be required or desirable in relation to any Finance Document.

24.13    **Relationship with the Lenders**

(a)    Subject to Clause 26.2 (*Distributions by the Agent*), the Agent may treat each person shown in the records of the Agent as a Lender at the opening of business (in the place of the Agent's principal office as notified to the Finance Parties from time to time) as a Lender acting through its Facility Office:

(i)    entitled to or liable for an payment due under any Finance Document on that day as a Lender; and

(ii)    entitled to receive and act upon any notice, request, document or communication or make any decision or determination under any Finance Document made or delivered as a Lender on that day,

unless it has received not less than five Business Days' prior notice from that Lender to the contrary in accordance with the terms of this Agreement.

(b)    Each Finance Party shall provide the Agent with such information that the Agent may reasonably specify as being necessary or desirable to enable the Agent to perform its functions as the Agent.

(c)    Any Lender may by notice to the Agent appoint a person to receive on its behalf all notices, communications, information and documents to be made or despatched to that Lender under the Finance Documents. Such notice shall contain the address, fax number and (where communication by electronic mail or other electronic means is permitted under Clause 28.5 (*Electronic communication*)) electronic mail address and/or any other information required to enable the sending and receipt of information by that means (and, in each case, the department or officer, if any, for whose attention communication is to be made) and be treated as a notification of a substitute address, fax number, electronic mail address, department and officer by that Lender for the purposes of Clause 28.2 (*Addresses*) and paragraph (a)(iii) of Clause 28.5 (*Electronic communication*) and the Agent shall be entitled to treat such person as the person entitled to receive all such notices, communications, information and documents as though that person were that Lender.

89

24.14    **Credit appraisal by the Lenders**

Without affecting the responsibility of the Borrower for information supplied by it or on its behalf in connection with any Finance Document, each of the Lenders confirms to each Administrative Party that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Finance Document including but not limited to:

(a)    the financial condition, status and nature of the Borrower, Group Members and their respective Affiliates;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Finance Document and/or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document;

(c)    whether that Lender has recourse, and the nature and extent of that recourse, against any party to any Finance Document or any of its respective assets under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document; and

(d)    the adequacy, accuracy and/or completeness of the Information Memorandum and/or any other information provided by the Agent, any party to any Finance Document or by any other person under or in connection with any Finance Document, the transactions contemplated by the Finance Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Finance Document.

24.15    **Deduction from amounts payable by the Agent**

If any Party owes an amount to the Agent under any of the Finance Documents, the Agent may, after giving notice to such Party, deduct an amount not exceeding that amount from any payment to such Party which the Agent would otherwise be obliged to make under the Finance Documents and apply the amount deducted in or towards satisfaction of that amount owed by such Party to the Agent. For the purposes of the Finance Documents such Party shall be regarded as having received any amount so deducted.

24.16    **Agent's management time**

Any amount payable to the Agent under Clause 15.3 (*Indemnity to the Agent*), Clause 16 (*Costs and Expenses*) and/or Clause 24.10 (*Lenders' indemnity to the Agent*) shall include the cost of utilising the Agent's management time or other resources and will be calculated on the basis of such reasonable daily or hourly rates as the Agent may notify to the Borrower and the Lenders, and shall be in addition to any fee paid or payable to the Agent under Clause 11 (*Fees*).

90

24.17  **Money laundering**

Unless mandatorily required by applicable laws or regulations to which the Agent is subject, the Agent shall not be responsible to any Party for providing any certification or documents with respect to any information (except for any information in respect of itself) required for any anti-money laundering due diligence purpose. Such certificates and related documents shall be provided directly by the Borrower **provided that** the request for such information may be made through the Agent.

24.18  **Liability**

None of the Finance Parties or their respective Affiliates, officers, directors or agents shall have any liability to the Borrower or any of its Subsidiaries or be responsible to the Borrower or any of its Subsidiaries for (whether under contract, tort, any other theory of liability or otherwise) any special, indirect, consequential or punitive losses or damages incurred or suffered by the Borrower or any of its Subsidiaries under or in connection with any Finance Document or any transaction contemplated thereby, whether or not such Finance Party shall have been advised of the likelihood of such loss or damage, unless such loss or damage has been finally judicially determined to have primarily resulted from the wilful default or gross negligence of such Finance Party or, as the case may be, such Affiliate, officer, director or agent; and the Borrower hereby waives, releases and agrees not to sue upon (for itself and on behalf of each of its Subsidiaries) any claim for any such loss or damage, whether or not accrued and whether or not known or suspected to exist in its favour unless such loss or damage has been finally judicially determined to have primarily resulted from the wilful default or gross negligence of such Finance Party or, as the case may be, such Affiliate, officer, director or agent. Such Affiliates, officers, directors and agents may rely on this Clause 24.18 subject to Clause 1.4 (*Third party rights*) and the provisions of the Third Parties Act.

25.  **SHARING AMONG THE FINANCE PARTIES**

25.1  **Payments to Finance Parties**

If a Finance Party (a "**Recovering Finance Party**") receives or recovers (whether by set-off or otherwise) any amount from or in respect of the Borrower, other than through the Agent and in accordance with Clause 26 (*Payment Mechanics*), (such amount being a "**Recovered Amount**") and applies that amount to a payment due under any of the Finance Documents then:

(a)  the Recovering Finance Party shall, within three Business Days, notify details of such receipt or recovery, to the Agent;

(b)  the Agent shall determine whether such receipt or recovery is in excess of the amount that the Recovering Finance Party would have been paid had such receipt or recovery been received or made by the Agent and distributed in accordance with Clause 26 (*Payment Mechanics*), without taking account of any Tax which would be imposed on the Agent in relation to such receipt, recovery or distribution; and

91

(c)    the Recovering Finance Party shall, within three Business Days of demand by the Agent, pay to the Agent an amount (the "**Sharing Payment**") equal to such receipt or recovery less any amount which the Agent determines may be retained by the Recovering Finance Party as its share of any payment to be made (by reference to such receipt or recovery) in accordance with Clause 26.5 (*Partial payments*).

25.2    **Redistribution of payments**

The Agent shall treat the Sharing Payment as if it had been paid by the Borrower and distribute it between the Finance Parties (other than the Recovering Finance Party) (the "**Sharing Finance Parties**") in accordance with Clause 26.5 (*Partial payments*) towards the obligations owing to such Sharing Finance Parties.

25.3    **Recovering Finance Party's rights**

On a distribution by the Agent under Clause 25.2 (*Redistribution of payments*), as between the Borrower and the Recovering Finance Party, an amount of such Recovered Amount equal to such Sharing Payment shall be treated as not having been paid by the Borrower (and the Borrower shall be liable to the Recovering Finance Party for a debt equal to such Sharing Payment, which debt is immediately due and payable).

25.4    **Reversal of redistribution**

To the extent that any part of such Recovered Amount received or recovered by a Recovering Finance Party (which Recovered Amount gives rise to any Sharing Payment) becomes repayable and is repaid by that Recovering Finance Party, then:

(a)    each Sharing Finance Party shall, upon request of the Agent, pay to the Agent for account of that Recovering Finance Party an amount equal to (i) the appropriate part of its share of such Sharing Payment (that is attributable to such Recovered Amount so repayable and repaid by such Recovering Finance Party) together with (ii) an amount as is necessary to reimburse that Recovering Finance Party for its proportion of any interest on such part of such Sharing Payment (or on such part of such Recovered Amount to which such Sharing Payment is attributable) which that Recovering Finance Party is required to pay ((i) and (ii) being collectively the "**Redistributed Amount**"); and

(b)    as between the Borrower and each Sharing Finance Party, an amount equal to such Redistributed Amount shall be treated as not having been paid by the Borrower (and the Borrower shall be liable to such Sharing Finance Party for a debt equal to such Redistributed Amount, which debt is immediately due and payable).

92

25.5    **Exceptions**

(a)      This Clause 25 shall not apply to the extent that the Recovering Finance Party would not, after making any payment pursuant to this Clause, have a valid and enforceable claim against the Borrower.

(b)      A Recovering Finance Party is not obliged to share with any other Finance Party any amount which that Recovering Finance Party has received or recovered as a result of taking legal or arbitration proceedings, if:

(i)       it notified that other Finance Party of those legal or arbitration proceedings; and

(ii)      that other Finance Party had an opportunity to participate in those legal or arbitration proceedings but did not do so as soon as reasonably practicable having received notice and did not take separate legal or arbitration proceedings.

93

**SECTION 10**
**ADMINISTRATION**

26.   **PAYMENT MECHANICS**

26.1   **Payments to the Agent**

(a)   On each date on which the Borrower or a Lender is required to make a payment under a Finance Document, the Borrower or that Lender (as the case may be) shall make the same available to the Agent (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Agent as being customary at the time for settlement (in place of settlement) of transactions in the relevant currency in the place of payment.

(b)   Payment shall be made to such account in the principal financial centre of the country of the currency of such payment with such bank as the Agent specifies.

(c)   The Agent shall not be liable to account for interest on money paid to it by or recovered from the Borrower. Monies held by the Agent need not be segregated except as required by law.

(d)   Each payment of any amount made by the Borrower to the Agent in accordance with any Finance Document (including without limitation paragraph (a) above) is made to the Agent for and on behalf of each Finance Party to whom such amount is owing. The payment of any such amount to the Agent shall not in any way affect or prejudice the separate and independent nature of the debt owing to each such Finance Party, which may be enforced individually by each such Finance Party in the event that all or part of such debt remains unpaid when due.

26.2   **Distributions by the Agent**

(a)   Each payment received or recovered by the Agent under any Finance Documents for another Party shall, subject to Clause 26.3 (*Distributions to the Borrower*), Clause 26.4 (*Clawback*), Clause 26.5 (*Partial payments*) and Clause 24.15 (*Deduction from amounts payable by the Agent*), be made available by the Agent as soon as practicable after receipt or recovery to the Party entitled to receive payment in accordance with this Agreement (in the case of a Lender, for the account of its Facility Office as set out in the Standing Payment Instructions for such Lender), to such account as that Party may notify to the Agent by not less than five Business Days' notice with a bank in the principal financial centre of the country of the currency of such payment.

(b)   The Agent shall distribute payments received or recovered by it in relation to all or any part of a Loan to the applicable Lender(s) indicated in the records of the Agent as being so entitled on the applicable date, **provided that** the Agent is authorised to distribute payments to be made on the date on which any assignment or transfer becomes effective pursuant to Clause 22 (*Changes to the Parties*) to the applicable Lender(s) so entitled immediately before such assignment or transfer took place regardless of the period to which such payments relate.

94

(c)     The Agent is not under any obligation to make payment to any Finance Party on account of any amount owing by the Borrower to such Finance Party in the same currency as that in which such latter-mentioned amount is denominated.

26.3    **Distributions to the Borrower**

The Agent may (with the consent of the Borrower or in accordance with Clause 27 (*Set-off*)) apply any amount received by it for the Borrower in or towards payment (on the date and in the currency and funds of receipt) of any amount due from the Borrower under any or all of the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

26.4    **Clawback**

(a)     Where a sum is to be paid to the Agent under the Finance Documents for another Party, the Agent is not obliged to pay that sum to that other Party (or to enter into or perform any related exchange contract) until it has been able to establish to its satisfaction that it has actually received that sum.

(b)     To the extent that the Agent pays an amount to another Party and it proves to be the case that the Agent had not actually received that amount, then the Party to whom that amount (or the proceeds of any related exchange contract) was paid by the Agent shall on demand refund the same to the Agent together with interest on that amount from the date of payment to the date of receipt by the Agent, calculated by the Agent to reflect its cost of funds.

26.5    **Partial payments**

(a)     If the Agent receives or recovers an amount from or in respect of the Borrower under or in connection with any Finance Document which amount is insufficient to, or is not applied to, discharge all the amounts then due and payable by the Borrower under the Finance Documents, such amount shall be applied towards the obligations of the Borrower under the Finance Documents in the following order:

(i)      *first*, in or towards payment *pro rata* of any unpaid fees, costs and expenses of, and other amounts owing to, any Administrative Party (in each case for its own account) under the Finance Documents;

(ii)     *secondly*, in or towards payment *pro rata* of any accrued interest, fee (other than as provided in paragraph (a)(i) above) or commission due to any or all of the Finance Parties but unpaid under the Finance Documents;

(iii)    *thirdly*, in or towards payment *pro rata* of any principal due but unpaid under this Agreement; and

(iv)     *fourthly*, in or towards payment *pro rata* of any other sum due to any or all of the Finance Parties but unpaid under the Finance Documents.

95

(b)     The Agent shall, if so directed by the Majority Lenders, vary the order set out in paragraphs (a)(ii) to (iv) above.

(c)     Paragraphs (a) and (b) above will override any appropriation made by the Borrower.

**26.6    No set-off by the Borrower**

All payments to be made by the Borrower under any or all of the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

**26.7    Business Days**

(a)     Any payment which is due to be made under a Finance Document on a day that is not a Business Day shall be made on the next Business Day.

(b)     During any extension of the due date for payment of any principal or Unpaid Sum pursuant to paragraph (a) above, interest is payable on such principal or Unpaid Sum at the rate applicable on the original due date.

**26.8    Currency of account**

(a)     Subject to paragraphs (b) to (d) below, US dollar is the currency of account and payment for any sum from the Borrower under any Finance Document.

(b)     Each payment of interest shall be made in the currency in which the sum in respect of which such interest is payable was denominated when such interest accrued.

(c)     Each payment in respect of costs, expenses or Taxes shall be made in the currency in which such costs, expenses or Taxes are incurred.

(d)     Any amount expressed to be payable in a currency other than US dollar shall be paid in that other currency.

**26.9    Change of currency**

(a)     Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)     any reference in this Agreement to, and any obligations arising under this Agreement in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Agent (after consultation with the Borrower); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Agent (acting reasonably).

96

(b)     If a change in any currency of a country occurs, this Agreement will, to the extent the Agent (acting reasonably and after consultation with the Borrower) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the Relevant Interbank Market and otherwise to reflect the change in currency.

27.     **SET-OFF**

A Finance Party may set off any matured obligation due from the Borrower under any or all of the Finance Documents (to the extent beneficially owned by that Finance Party) against any matured obligation owed by that Finance Party to the Borrower, regardless of the place of payment, booking branch or currency of either obligation. If such obligations are in different currencies, that Finance Party may convert either obligation at a market rate of exchange in its usual course of business for the purpose of such set-off.

28.     **NOTICES**

28.1    **Communications in writing**

Any communication to be made by a Party to another Party under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by fax or letter, **provided that** no such communication to be made by a Party to the Borrower shall be made by fax unless the Borrower consents otherwise (and provides its fax number for such purpose).

28.2    **Addresses**

The address and (other than in the case of the Borrower) fax number (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is:

(a)     in the case of the Borrower, that identified with its name below;

(b)     in the case of any Lender, that notified in writing to the Agent on or prior to the date on which it becomes a Party;

(c)     in the case of the Agent, that identified with its name below; and

(d)     in the case of an Arranger, that identified with its name below,

or any substitute address or fax number or department or officer as that Party may notify to the Agent (or the Agent may notify to the other Parties, if a change is made by the Agent) by not less than five Business Days' notice.

28.3    **Delivery**

(a)     Any communication or document made or delivered by one Party to another Party under or in connection with any Finance Documents will be effective:

        (i)     if by way of fax, only when received in legible form; or

97

(ii)    if by way of letter, only when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 28.2 (*Addresses*), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Agent under or in connection with any Finance Document will be effective only when actually received by the Agent and then only if it is expressly marked for the attention of the department or officer identified with the Agent's signature below (or any substitute department or officer as the Agent shall specify for this purpose).

(c)    All notices from or to the Borrower under or in connection with any Finance Document shall be sent through the Agent.

28.4    **Notification of address and fax number**

Promptly upon changing its own address or fax number, the Agent shall notify the other Parties.

28.5    **Electronic communication**

(a)    Any communication to be made between any two Parties under or in connection with any Finance Document may be made by electronic mail or other electronic means, if those two Parties:

(i)    agree that, unless and until notified to the contrary, this is to be an accepted form of communication;

(ii)    notify each other in writing of their electronic mail address and/or any other information required to enable the sending and receipt of information by that means; and

(iii)    notify (by not less than five Business Days' notice) each other of any change to their address or any other such information supplied by them.

(b)    Any electronic communication made between any two Parties under or in connection with a Finance Document will be effective only when actually received in readable form and in the case of any electronic communication made by a Party to the Agent only if it is addressed in such a manner as the Agent shall specify for this purpose.

(c)    Each Party acknowledges and agrees that any electronic communication made by the Agent shall be in non-encrypted form unless, in relation to any such communication to a Lender:

(i)    prior written notice has been given by such Lender to the Agent that electronic communication to be received by it shall be in encrypted form; and

98

(ii)    the encryption tool to be used has been agreed between such Lender and the Agent.

(d)    Any electronic communication which becomes effective in accordance with this Clause 28.5 after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

(e)    The Borrower agrees and acknowledges that electronic means of communication may not be secure or virus or error free and could be intercepted, corrupted, lost, destroyed or arrive late, and none of the Finance Parties or their Affiliates will be liable to the Borrower for any of such occurrences. Each Finance Party may monitor, record and retain communications between such Finance Party and any other Party or the Borrower.

28.6    **Deal Site**

(a)    All notices, requests, consents, approvals, agreements or other communications by the Agent under or in respect of the Finance Documents may be given by publication on the Deal Site. Such communication shall include notices for notification for Lenders' participation in the Loan and for rates of interest.

(b)    Any communication posted on the Deal Site will be effective on the earlier of (i) one Business Day after such communication is posted on the Deal Site and (ii) receipt by the Agent of acknowledgement from the Deal Site that such communication has been posted and (in respect of notices, requests, consents, approvals, agreements or other communications by the Agent to the Borrower) the Borrower has been notified of such posting.

(c)    The Borrower consents to the inclusion of its logo (if applicable) on the Deal Site.

(d)    Subject to Clause 23 (*Disclosure of Information*) and paragraph (e) below, the Agent will promptly on request provide access to the Deal Site to one or more representatives of the other Parties.

(e)    Electronic mail contact details of a Party may be for individuals or "group" addresses of that Party. However in either case, each Party must ensure that all persons to whom it gives access can properly receive the information available on the Deal Site, including under Clause 23 (*Disclosure of Information*).

(f)    If the Deal Site is not available for any reason, promptly following this being brought to its attention, the Agent will provide communications to the Parties by another means of communications contemplated by this Clause 28. A Party shall notify the Agent promptly if it becomes aware that it is unable to access the Deal Site but shall be under no obligation to monitor access to the Deal Site.

99

(g)      Each of the other Parties agrees that the Agent is not liable for any liability, loss, damage, costs or expenses incurred or suffered by it as a result of its access or use of the Deal Site or inability to access or use the Deal Site, other than in the case of the gross negligence or wilful misconduct of the Agent as determined pursuant to a final non-appealable judgment of a court of competent jurisdiction.

(h)      The Agent may terminate the Deal Site after the earlier of (i) the Final Maturity Date and (ii) prepayment or cancellation in full of each of the Facilities, unless instructed otherwise by the Majority Lenders.

**28.7    English language**

(a)      Any notice given under or in connection with any Finance Document must be in English.

(b)      All other documents provided under or in connection with any Finance Document must be:

(i)       in English; or

(ii)      if not in English, and if so required by the Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**29.    CALCULATIONS AND CERTIFICATES**

**29.1    Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**29.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**29.3    Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the Relevant Interbank Market differs, in accordance with that market practice.

**30.    PARTIAL INVALIDITY**

If, at any time, any provision of the Finance Documents is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

100

31. **REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party, any right or remedy under the Finance Documents shall operate as a waiver or constitute an election to affirm any Finance Document. No election by a Finance Party to affirm any Finance Document shall be effective unless it is in writing. No single or partial exercise of any right or remedy by any Finance Party shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

32. **AMENDMENTS AND WAIVERS**

32.1 **Required consents**

(a) Subject to Clause 32.2 (*Exceptions*) any term of any Finance Document may be amended or waived only in writing and with the consent of the Majority Lenders and the Borrower. Any such amendment or waiver so made with such consent will be binding on all Parties.

(b) The Agent may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause.

32.2 **Exceptions**

(a) An amendment or waiver that has the effect of changing or which relates to:

(i) the definition of "Majority Facility A Lenders", "Majority Facility B Lenders", "Majority Lenders" or "Super Majority Lenders" in Clause 1.1 (*Definitions*);

(ii) an extension to the date of payment of any amount under the Finance Documents;

(iii) a reduction in the Margin or a reduction in the amount of, or any change in the currency of, any payment of principal, interest, fees or commission payable;

(iv) an increase in, or any change in the currency of, any Commitment in respect of any Facility;

(v) an extension of the period of availability for utilisation of any Commitment in respect of any Facility (or any commitment represented thereby);

(vi) any provision which expressly requires the consent of all the Lenders;

(vii) a change to the Borrower; or

101

(viii)    Clause 2.2 (*Finance Parties' rights and obligations*) and Clause 22 (*Changes to the Parties*),

shall not be made without the prior consent of all the Lenders.

(b)    An amendment or waiver that has the effect of changing or which relates to any shorter period as the Majority Facility A Lenders or, as the case may be the Majority Facility B Lenders may agree as contemplated in Clause 7.2 (*Voluntary cancellation*), Clause 7.3 (*Voluntary prepayment of Facility A Loans*) and/or Clause 7.4 (*Voluntary prepayment of Facility B Loans*) shall not be made without the agreement of the Majority Facility A Lenders or, as the case may be, the Majority Facility B Lenders.

(c)    An amendment or waiver which relates to the rights or obligations of an Administrative Party may not be effected without the consent of that Administrative Party.

(d)    In relation to any consent, waiver, amendment or other matter that requires the instructions of the Majority Facility A Lenders, the Majority Facility B Lenders or the Majority Lenders (excluding, in each case, any matter that requires the consent or instructions of all of the Lenders), if a Lender fails to respond to any request for such consent, waiver or amendment or instructions on such other matter within 20 Business Days (unless the Borrower and the Agent shall have agreed to a longer period of time in relation to such request), then the Commitment of such Lender (in respect of each Facility) and participation of such Lender in each Loan shall not be included and shall be deemed to be zero for the purposes of calculating the Commitments of the Lenders (in respect of any Facility), the Loan(s) and the respective participations of the Lenders in the Loan(s) for the purposes (but only for the purposes of) of ascertaining whether the instructions of the Majority Facility A Lenders, the Majority Facility B Lenders or, as the case may be, the Majority Lenders have been obtained in respect of such consent, waiver, amendment or other matter.

## 33.    RESTRICTIONS ON DEBT PURCHASE TRANSACTIONS

### 33.1    Prohibition on Debt Purchase Transactions

The Borrower shall not, and the Borrower shall procure that (except with the prior written consent of the Agent (acting on the instructions of the Majority Lenders)) no Group Member or any Affiliate of any Group Member shall, (a) enter into any Debt Purchase Transaction or (b) be or become an Affiliate of (i) a Lender or (ii) a party to a Debt Purchase Transaction of the type referred to in any of paragraphs (b) or (c) of the definition of "Debt Purchase Transaction".

### 33.2    Notification to other Lenders of Debt Purchase Transactions

Without prejudice to Clause 33.1 (*Prohibition on Debt Purchase Transactions*) and Clause 22.11 (*Assignments and transfers to Group Members*), any Group Member or any Affiliate of any Group Member which is or becomes a Lender or which enters into a Debt Purchase Transaction as a purchaser, an acquiror or a participant (or similar capacity) shall, by 5.00 pm on the Business Day following the day on which it entered into that Debt Purchase Transaction, notify the Agent of the extent of the Commitment(s) (in respect of any or all of the Facilities) (or any commitment represented thereby), any Loan or any amount(s) outstanding to which that Debt Purchase Transaction relates. The Agent shall promptly disclose such information to the Lenders.

102

34.   **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on such counterparts were on a single copy of this Agreement.

35.   **U.S.A. PATRIOT ACT**

Each Lender hereby notifies the Borrower that pursuant to the requirements of the U.S.A. Patriot Act, such Lender is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the U.S.A. Patriot Act.

103

**SECTION 11**
**GOVERNING LAW AND ENFORCEMENT**

36.    **GOVERNING LAW**

This Agreement and all non-contractual obligations arising from or in connection with this Agreement shall be governed by and construed in accordance with English law.

37.    **ENFORCEMENT**

37.1   **Jurisdiction of English Courts**

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute regarding the existence, validity or termination of this Agreement) (a "**Dispute**").

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    This Clause 37.1 is for the benefit of the Finance Parties only. As a result, no Finance Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties may take concurrent proceedings in any number of jurisdictions.

37.2   **Service of process**

Without prejudice to any other mode of service allowed under any relevant law, the Borrower:

(a)    irrevocably appoints Law Debenture Corporate Services Limited as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document; and

(b)    agrees that failure by a process agent to notify the Borrower of any process will not invalidate the proceedings concerned.

37.3   **Waiver of Immunity**

The Borrower irrevocably waives, to the extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from:

(a)    suit;

(b)    jurisdiction of any court;

(c)    relief by way of injunction or order for specific performance or recovery of property;

(d)    attachment of its assets (whether before or after judgment); and

104

(e)    execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any proceedings in the courts of any jurisdiction (and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any immunity in any such proceedings).

38.    **WAIVER OF JURY TRIAL**

**EACH OF THE PARTIES TO THIS AGREEMENT AGREES TO WAIVE IRREVOCABLY ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE DOCUMENTS REFERRED TO IN THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN THIS AGREEMENT. THIS WAIVER IS INTENDED TO APPLY TO ALL DISPUTES. EACH PARTY ACKNOWLEDGES THAT (A) THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, (B) IT HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT AND (C) IT WILL CONTINUE TO RELY ON THIS WAIVER IN FUTURE DEALINGS. EACH PARTY REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL ADVISERS AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS AFTER CONSULTATION WITH ITS LEGAL ADVISERS. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

**THIS AGREEMENT has been entered into on the date stated at the beginning of this Agreement.**

105

**SCHEDULE 1**
**THE ORIGINAL LENDERS**

| Name of Original Lender | Facility A Commitment (US$) | Facility B Commitment (US$) |
|---|---|---|
| Bank of Communications Co., Ltd. (acting through its Offshore Banking Unit) | 100,000,000 | 100,000,000 |
| Bank of China Limited, Los Angeles Branch | 80,000,000 | 80,000,000 |
| Citibank N.A., Hong Kong Branch | 50,000,000 | 50,000,000 |
| DBS Bank Ltd., Hong Kong Branch | 50,000,000 | 50,000,000 |
| Deutsche Bank AG, Singapore Branch | 50,000,000 | 50,000,000 |
| The Hongkong and Shanghai Banking Corporation Limited | 50,000,000 | 50,000,000 |
| Nanyang Commercial Bank, Limited | 50,000,000 | 50,000,000 |
| Australia and New Zealand Banking Group Limited | 40,000,000 | 40,000,000 |
| Bank of America, N.A. | 40,000,000 | 40,000,000 |
| Bank of China (Hong Kong) Limited | 40,000,000 | 40,000,000 |
| Bank of China Limited Macau Branch | 40,000,000 | 40,000,000 |
| BNP Paribas, acting through its Hong Kong branch | 40,000,000 | 40,000,000 |
| China Construction Bank (Asia) Corporation Limited | 40,000,000 | 40,000,000 |
| Hang Seng Bank Limited | 40,000,000 | 40,000,000 |
| Industrial and Commercial Bank of China (Asia) Limited | 40,000,000 | 40,000,000 |
| JPMorgan Chase Bank, N.A., Hong Kong Branch | 40,000,000 | 40,000,000 |
| Mizuho Bank, Ltd., Hong Kong Branch | 40,000,000 | 40,000,000 |
| Standard Chartered Bank (Hong Kong) Limited | 40,000,000 | 40,000,000 |
| Wing Lung Bank, Limited | 40,000,000 | 40,000,000 |

| Name of Original Lender | Facility A Commitment (US$) | Facility B Commitment (US$) |
|---|---:|---:|
| Cathay United Bank Company Limited, Hong Kong Branch | 25,000,000 | 25,000,000 |
| China Merchants Bank Co., Ltd. | 25,000,000 | 25,000,000 |
| Mega International Commercial Bank Co., Ltd. | 25,000,000 | 25,000,000 |
| KGI Bank | 15,000,000 | 15,000,000 |
| **Total:** | **1,000,000,000** | **1,000,000,000** |

107

**SCHEDULE 2**
**CONDITIONS PRECEDENT**

1. **The Borrower**

    (a) A certified copy of the constitutional documents of the Borrower together with its statutory registers (including its register of directors and its register of mortgages and charges) and an up-to-date certificate of good standing issued by the Registrar of Companies of the Cayman Islands.

    (b) A certified copy of a resolution of the board of directors of the Borrower:

        (i) approving the terms of, and the transactions contemplated by, the Finance Documents and resolving that it execute the Finance Documents;

        (ii) authorising a specified person or persons to execute the Finance Documents on its behalf; and

        (iii) authorising a specified person or persons, on its behalf, to sign and/or despatch all documents and notices (including any Utilisation Request and any Selection Notice) to be signed and/or despatched by it under or in connection with the Finance Documents.

    (c) Specimen signatures of one or more persons authorised by any resolution referred to in paragraph (b) above, **provided that** in the event that the specimen signature of any person so authorised is not provided, such person shall not be an authorised signatory for the purposes of this Agreement.

    (d) A certificate from the Borrower (signed by a director thereof) confirming that borrowing the Total Commitments would not cause any borrowing or similar limit binding on it to be exceeded.

    (e) A certificate of the Borrower (signed by a director thereof) certifying that each copy document specified in this Schedule 2 is correct, complete and in full force and effect as at a date no earlier than the date of this Agreement.

2. **Legal opinions**

    (a) A legal opinion in relation to English law from Clifford Chance, legal advisers to the Original MLABs as to English law.

    (b) A legal opinion in relation to Cayman Islands law from Mourant Ozannes, legal advisers to the Original MLABs as to the laws of the Cayman Islands.

3. **Finance Documents**

    Each of the following Finance Documents duly executed by the parties thereto:

    (a) this Agreement; and

    (b) each Fee Letter.

108

4.      **Other documents and evidence**

(a)      Evidence that any process agent referred to in Clause 37.2 (*Service of process*) has accepted its appointment.

(b)      A copy of any other Authorisation or other document, opinion or assurance which the Agent reasonably considers to be necessary or desirable (if it has notified the Borrower accordingly) in connection with the entry into and performance of the transactions contemplated by any Finance Document or for the validity and enforceability of any Finance Document.

(c)      The Original Financial Statements.

(d)      The list of Material Subsidiaries.

(e)      Evidence that the fees, costs and expenses then due from the Borrower pursuant to Clause 11 (*Fees*) and/or Clause 16 (*Costs and Expenses*) have been paid or will be paid by the Initial Utilisation Date.

(f)      All other documents and evidence as reasonably requested by any Finance Party which are required to enable it to conduct any "know your customer" or anti-money laundering or other procedures under applicable laws and regulations.

109

**SCHEDULE 3**
**REQUESTS**

**PART I**
**FORM OF UTILISATION REQUEST**

From:   Baidu, Inc.

To:   [      ] as Agent

Dated:

Dear Sirs

**Facilities agreement dated [   ] 2016 between, among others, Baidu, Inc. as borrower, [        ], [        ], [        ] and [        ] as original mandated lead arrangers and bookrunners and [        ] as agent (as amended from time to time, the "Facilities Agreement")**

1.   We refer to the Facilities Agreement. This is a Utilisation Request. Terms defined in or construed for the purposes of the Facilities Agreement shall have the same meaning in this Utilisation Request.

2.   We wish to borrow a Loan on the following terms:

| | |
|---|---|
| Facility under which such Loan is to be made: | [Facility A][Facility B] |
| Proposed Utilisation Date: | [      ] (or, if that is not a Business Day, the next Business Day) |
| Amount of such Loan: | US$[      ] or, if less, the Available Facility in respect of the above-mentioned Facility |
| First Interest Period relating to such Loan: | (subject to the provisions of the Facilities Agreement) [       ] |

3.   We confirm that each condition specified in Clause 4.2 (*Further conditions precedent*) of the Facilities Agreement is satisfied on the date of this Utilisation Request.

4.   [The proceeds of such Loan should be credited to [*account*].]

[*or*]

[This Loan is a Rollover Loan and is to be made for the purpose of refinancing in whole or in party the following Facility B Loan(s) maturing on the proposed Utilisation Date: [*insert relevant details*].]

5.   This Utilisation Request is irrevocable.

Yours faithfully

authorised signatory for
BaiduInc

110

**PART II**
**FORM OF SELECTION NOTICE**

From:    Baidu, Inc.

To:    [      ] as Agent

Dated:

Dear Sirs

**Facilities agreement dated [        ] between, among others, Baidu, Inc. as borrower, [      ], [      ], [      ] and [        ] as original mandated lead arrangers and bookrunners and [      ] as agent (as amended from time to time, the "Facilities Agreement")**

1.    We refer to the Facilities Agreement. This is a Selection Notice. Terms defined in or construed for the purposes of the Facilities Agreement shall have the same meaning in this Selection Notice.

2.    We refer to the following Facility A Loan[s] with an Interest Period ending on [      ]:

     [      ]*

3.    We request that the next Interest Period for the above Facility A Loan[s] be [      ].

4.    This Selection Notice is irrevocable.

Yours faithfully

_____
authorised signatory for
Baidu, Inc.

_____
*    Insert details of all Facility A Loans which have an Interest Period ending on the same date.

111

**SCHEDULE 4**
**FORM OF TRANSFER CERTIFICATE**

To:        [       ] as Agent

From:    [*name of the Existing Lender*] (the "**Existing Lender**") and [*name of the New Lender*] (the "**New Lender**")

Dated:

**Facilities agreement dated [                ] between, among others, Baidu, Inc. as borrower, [        ], [        ], [        ] and [            ] as original mandated lead arrangers and bookrunners and [        ] as agent (as amended from time to time, the "Facilities Agreement")**

1.    We refer to the Facilities Agreement. This is a Transfer Certificate. Unless otherwise defined herein, terms defined in or construed for the purposes of the Facilities Agreement shall have the same meaning in this Transfer Certificate.

2.    We refer to Clause 22.5 (*Procedure for transfer*) of the Facilities Agreement:

   (a)    The Existing Lender and the New Lender agree to the Existing Lender transferring to the New Lender by novation, in accordance with Clause 22.5 (*Procedure for transfer*) of the Facilities Agreement, all or part of the Existing Lender's Commitment(s) in respect of the applicable Facility or Facilities specified in the Schedule hereto and all or part of the Existing Lender's participation(s) in the applicable Loan(s) specified in the Schedule hereto, in each case together with related rights and obligations under the Facilities Agreement.

   (b)    The Existing Lender hereby assigns to the New Lender, with effect from the Transfer Date, a portion of the rights held by it (in its capacity as Lender) under or in connection with the Finance Documents (other than the Facilities Agreement) which corresponds with the rights and obligations under the Facilities Agreement transferred pursuant hereto.

   (c)    The proposed Transfer Date is [                ].

   (d)    The Facility Office and address, fax number and attention details for notices of the New Lender for the purposes of Clause 28.2 (*Addresses*) of the Facilities Agreement and the Standing Payment Instructions of the New Lender are set out in the Schedule hereto.

3.    The New Lender expressly acknowledges:

   (a)    the limitations on the Existing Lender's obligations set out in paragraphs (a) and (c) of Clause 22.4 (*Limitation of responsibility of Existing Lenders*) of the Facilities Agreement; and

   (b)    that it is the responsibility of the New Lender to ascertain whether any document is required or any formality or other condition requires to be satisfied to effect or perfect the transfer contemplated by this Transfer Certificate or otherwise to enable the New Lender to enjoy the full benefit of each Finance Document.

112

4.      The New Lender confirms that it is a "New Lender" within the meaning of Clause 22.1 (*Assignments and transfers by the Lenders*) of the Facilities Agreement.

5.      The New Lender confirms that the New Lender [is]/[is not]* a Group Member or an Affiliate of any Group Member.

6.      This Transfer Certificate may be executed in any number of counterparts and this has the same effect as if the signatures on such counterparts were on a single copy of this Transfer Certificate.

7.      This Transfer Certificate and any non-contractual obligations arising out of or in connection with it are governed by English law.

8.      This Transfer Certificate has been entered into by the Existing Lender and the New Lender on the date stated at the beginning of this Transfer Certificate.

---

*   Delete as appropriate. Any transfer of by the Existing Lender to the New Lender that is a Group Member or an Affiliate of any Group Member is subject to Clause 33 (*Restrictions on Debt Purchase Transactions*) and Clause 22.11 (*Assignments and transfers to Group Members*).

113

**THE SCHEDULE**

**Commitment(s)/participation(s) in Loan(s) to be transferred, and other particulars**

**Commitment(s) in respect of Facility [          ]/participation(s) in Loan(s) under Facility [          ] transferred**

Commitment in respect of such Facility transferred:                [          ]

    of which the Available Commitment
    in respect of such Facility transferred:                  [          ]

Participation(s) in outstanding Loan(s) under such Facility transferred        [          ]

**Administration particulars:**

New Lender's receiving account:                      [          ]

Address:                              [          ]

Telephone:                            [          ]

Facsimile:                            [          ]

Attn/Ref:                             [          ]

**Standing Payment Instructions:**                [          ]

[*name of Existing Lender*]                  [*name of New Lender*]

By: _____        By: _____

This Transfer Certificate is accepted by the Agent and the Transfer Date is confirmed as [          ].

[        ] as Agent

By: _____

Date:

114

**SCHEDULE 5**
**FORM OF COMPLIANCE CERTIFICATE**

To:    [        ] as Agent

From: Baidu, Inc.

Dated:

Dear Sirs

**Facilities agreement dated [              ] between, among others, Baidu, Inc. as borrower, [        ], [        ], [          ] and [          ] as original mandated lead arrangers and bookrunners and [ ] as agent (as amended from time to time, the "Facilities Agreement")**

We refer to the Facilities Agreement. This is a Compliance Certificate. Terms used in or construed for the purposes of the Facilities Agreement shall have the same meaning in this Compliance Certificate.

We confirm that:

1.      [the financial statements of the Borrower for the Financial Year ending on 31 December [        ] (the "**Test Date**") delivered by the Borrower pursuant to the Facilities Agreement give a true and fair view of the consolidated financial condition and operations of the Borrower as at the end of and during such Financial Year;]#

         [the financial statements of the Borrower for the Financial Quarter ending on 30 June [        ] (the "**Test Date**") (and the financial statements of the Borrower for each of the three immediately preceding Financial Quarters) delivered by the Borrower pursuant to the Facilities Agreement fairly represent the consolidated financial condition and operations of the Borrower as at the end of and during each such Financial Quarter (to such which financial statements relate);]##

2.      as at the last day of the Relevant Period ending on the Test Date, Consolidated Total Borrowings was [_____ ] and, in respect of such Relevant Period, Consolidated EBITDA was [_____]. Therefore Leverage in respect of such Relevant Period was [_____]:1.00 and the financial covenant set out in paragraph (a) of Clause 19.2 (*Financial condition*) of the Facilities Agreement [has/has not] been complied with;

3.      in respect of such Relevant Period, Consolidated Net Finance Charges was [_____]. Therefore Interest Cover in respect of such Relevant Period was [_____]:1.00 and the financial covenant set out in paragraph (b) of Clause 19.2 (*Financial condition*) of the Facilities Agreement [has/has not] been complied with; and

---

\#       Use this option for the audited consolidated financial statements of the Borrower in respect of any Financial Year.
\#\#     Use this option for the unaudited consolidated financial statements of the Borrower in respect of any Financial Quarter ending 30 June.

115

4.      the following companies constitute Material Subsidiaries for the purposes of the Facilities Agreement: [_____].

Computations in respect of paragraphs 2 and 3 above are attached to this Compliance Certificate.

[We confirm that no Default is continuing.]*

Signed:      _____
            Authorised signatory
            of
            Baidu, Inc.

---

*   If this statement cannot be made, the certificate should identify any Default that is continuing and the steps, if any, being taken to remedy it.

116

**SCHEDULE 6**
**TIMETABLES**

| | |
|---|---|
| Delivery of a duly completed Utilisation Request (Clause 5.1 (*Delivery of a Utilisation Request*)) or a Selection Notice (Clause 9.1 (*Selection of Interest Periods*)) | U - 3 Business Days |
| Agent notifies the Lenders of the applicable Loan in accordance with Clause 5.4 (*Lenders' participation*) | U - 2 Business Days |
| LIBOR is fixed | Quotation Day as of 11:00 a.m. (London time) |

Where:

U = the applicable Utilisation Date or the first day of the applicable Interest Period (as the case may be)

U – X Business Days = the day falling X Business Days prior to U

117

**SCHEDULE 7**
**STANDING PAYMENT INSTRUCTIONS**

**Bank of Communications Co., Ltd. (acting through its Offshore Banking Unit)**

| | |
|---|---|
| Correspondent Bank Name: | JPMorgan Chase Bank, N.A. |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Baidu Syndication |

**Bank of China Limited, Los Angeles Branch**

| | |
|---|---|
| Correspondent Bank Name: | Bank of China Limited, New York Branch |
| Correspondent Bank SWIFT Address: | |
| A.B.A Number: | |
| CHIP UID: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | OSD, Elaine Ho |
| Reference: | Baidu Inc. in favor of Bank of China, Los Angeles Branch |

118

**Citibank N.A., Hong Kong Branch**

| | |
|---|---|
| Correspondent Bank Name: | Citibank, N.A., New York Branch |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Regional Loans Agency |

**DBS Bank Ltd., Hong Kong Branch**

| | |
|---|---|
| Correspondent Bank Name: | Bank of New York, NY |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | HK Branch Operations – Loan Ops (Baidu, Inc.) |

**Deutsche Bank AG, Singapore Branch**

| | |
|---|---|
| Correspondent Bank Name: | Deutsche Bank Trust Company Americas, New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Loanops |

119

**The Hongkong and Shanghai Banking Corporation Limited**

| | |
|---|---|
| Correspondent Bank Name: | HSBC BANK USA, New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Re: Baidu for the attention of CIB/CMB Loans |

**Nanyang Commercial Bank, Limited**

| | |
|---|---|
| Correspondent Bank Name: | Bank of China, New York, NY |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | N/A |
| Beneficiary Bank SWIFT Address: | |
| UID No: | 092162 |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Baidu, Inc. – SYN 2016 |

**Australia and New Zealand Banking Group Limited**

| | |
|---|---|
| Correspondent Bank Name: | JPMorgan Chase Bank N.A. New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Lending Ops – Baidu Fee/Int Payment |

120

**Bank of America, N.A.**

Correspondent Bank Name:                          Bank of America New York

Correspondent Bank SWIFT Address:

Beneficiary Bank Account Name:

Beneficiary Bank Account Number:

Beneficiary Bank SWIFT Address:

Final Beneficiary Bank Account Name:

Final Beneficiary Bank Account Number:

Attention:                                        Trade Finance Service

**Bank of China (Hong Kong) Limited**

Correspondent Bank Name:                          Bank of China Limited, New York Branch

Correspondent Bank SWIFT Address:

Beneficiary Bank Account Name:

Beneficiary Bank Account Number:

Beneficiary Bank SWIFT Address:

Final Beneficiary Bank Account Name:              N/A

Final Beneficiary Bank Account Number:            N/A

Attention:                                        Loans Division (CFM2)
                                                  Reference: Baidu, Inc. 2016

**Bank of China Limited Macau Branch**

Correspondent Bank Name:                          Bank of China Limited, New York Branch

Correspondent Bank SWIFT Address:

Beneficiary Bank Account Name:

Beneficiary Bank Account Number:

Beneficiary Bank SWIFT Address:

Final Beneficiary Bank Account Name:              N/A

Final Beneficiary Bank Account Number:            N/A

Attention:                                        Corporate Loan Operation Division- Baidu

121

**BNP Paribas, acting through its Hong Kong branch**

| | |
|---|---|
| Correspondent Bank Name: | BNP Paribas, New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A Attention: |
| | CMLS-Baidu |

**China Construction Bank (Asia) Corporation Limited**

| | |
|---|---|
| Correspondent Bank Name: | Bank of America N.A., New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Wholesale Loans, principal / interest / fee payment for Baidu, Inc. |

**Hang Seng Bank Limited**

| | |
|---|---|
| Correspondent Bank Name: | HSBC Bank USA, New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Credit Services & Mortgage Department (CAN-GBS) |
| Reference: | Baidu, Inc. |

122

**Industrial and Commercial Bank of China (Asia) Limited**

| | |
|---|---|
| Correspondent Bank Name: | JPMorgan Chase Bank N.A., New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Loans Administration Department |

**JPMorgan Chase Bank, N.A., Hong Kong Branch**

| | |
|---|---|
| Correspondent Bank Name: | JPMorgan Chase Bank, N.A., New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | HKGLNO Asia Loan Operations – BAIDU2016 |

**Mizuho Bank, Ltd., Hong Kong Branch**

| | |
|---|---|
| Correspondent Bank Name: | Citibank N.A., New York Branch |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Loan Ops – Baidu, Inc. |

123

**Standard Chartered Bank (Hong Kong) Limited**

| | |
|---|---|
| Correspondent Bank Name: | Standard Chartered Bank New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | LPU, Loan payment for Baidu |

**Wing Lung Bank, Limited**

| | |
|---|---|
| Correspondent Bank Name: | JPMorgan Chase Bank N.A., New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Syn. Loan – Baidu, Inc., Attn: LOC |

**Cathay United Bank Company Limited, Hong Kong Branch**

| | |
|---|---|
| Correspondent Bank Name: | Citibank, New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Operations Dept - Loans, Re: Baidu 2016 |

124

**China Merchants Bank Co., Ltd.**

| | |
|---|---|
| Correspondent Bank Name: | China Merchants Bank H.O. Off-Shore Banking Center |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | N/A |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | BAIDU,INC. –Syndicated Loan |

**Mega International Commercial Bank Co., Ltd.**

| | |
|---|---|
| Correspondent Bank Name: | Mega International Commercial Bank Co., Ltd., New York Branch |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | N/A |
| Final Beneficiary Bank Account Number: | N/A |
| Attention: | Roger Chen / Chiao-Hsin Lin |

**KGI Bank**

| | |
|---|---|
| Correspondent Bank Name: | HSBC Bank USA New York |
| Correspondent Bank SWIFT Address: | |
| Beneficiary Bank Account Name: | |
| Beneficiary Bank Account Number: | |
| Beneficiary Bank SWIFT Address: | |
| Final Beneficiary Bank Account Name: | |
| Final Beneficiary Bank Account Number: | |
| Attention: | Pay for Baidu |

125

**SIGNATURES**

**THE BORROWER**

**BAIDU, INC.**

By: /s/ authorized signatory

| | |
|---|---|
| Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| Telephone: | |
| Email: | |
| Attention: | Yanjing Zheng, Director, FP&A Department |

With a copy to:

| | |
|---|---|
| Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| Telephone: | |
| Email: | |
| Attention: | Amy Tu, International and M&A Legal Affairs Department |

**ORIGINAL MLAB**

**BANK OF CHINA LIMITED**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | 21st Floor, No. 1515,West Nanjing Road,Shanghai |
| Telephone: | |
| Fax : | |
| Email: | |
| Attention: | Caizhe / Dailu |

**ORIGINAL MLAB**

**CITIGROUP GLOBAL MARKETS ASIA LIMITED**

By:      /s/ Vivian Tan

Title:   Managing Director


Address:              47F Citibank Tower, Citibank Plaza, 3 Garden Road, Hong Kong

Telephone:

Fax:

Email:

Attention:            Cheng Wei Han

**ORIGINAL MLAB**

**DEUTSCHE BANK AG, SINGAPORE BRANCH**

By:    /s/ Birendra Baid
Title:  Director

By:    /s/ Saurabh Jhalaria
Title:  Managing Director

| | |
|---|---|
| Address: | One Raffles Quay #16-00 South Tower, Singapore 048583 |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Amit Khattar |

**ORIGINAL MLAB**

**THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

By:  /s/ authorized signatory

Address:            Level 17, HSBC Main Building, 1 Queen's Road Central, Hong Kong
Fax:

Attention:          Transaction Management

**ADDITIONAL MLAB**

**BANK OF COMMUNICATIONS CO., LTD. (ACTING THROUGH ITS OFFSHORE BANKING UNIT)**

By:    /s/ Liu Ganghua
Title:    Acting CEO

| | |
|---|---|
| Address: | 188 Yincheng Zhong Road, Shanghai, 200120, China |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Baidu Syndication |

**BANK OF COMMUNICATIONS CO., LTD. (ACTING THROUGH ITS OFFSHORE BANKING UNIT)**

**ADDITIONAL MLAB**

**DBS BANK LTD.**

By:    /s/ Benjamin Wong

Title:   Senior Vice President

For credit matters

Address:             18th Floor, The Center, 99 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:          Angelo Leung / Kenneth Yuen / Serena Zuo

For operational matters

Address:             18th Floor, The Center, 99 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:          Colum Ting / Rocky Lam / Simon Ho

**ADDITIONAL MLAB**

**NANYANG COMMERCIAL BANK, LIMITED**

By:  /s/ authorized signatories

For credit matters:

Address: 10/F, 151 Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention: Mr. Daniel Jung / Ms. Churen Chan / Mr. Ocean Yeung

For operation matters:

Address: 6/F, 151 Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention: Ms. Wai In Fong / Ms. Lui Yuen Fun

Address: 17/F, Bank of China Centre, Olympian City, 11 Hoi Fai Road, West Kowloon, Hong Kong

Telephone:

Fax:

Email:

Attention: Ms. Lam Yee Man Rita / Ms. Chan Wai Ying

**ADDITIONAL MLAB**

**AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED**

By:    /s/ Sherzad Desai
Title:  Head of TMET Asia

      /s/ Tai Alan Pak Ling
Title:  Director, Loans Structuring & Execution Asia

| | |
|---|---|
| Address: | 22/F, Three Exchange Square, 8 Connaught Place Central, Hong Kong / |
| | 17/F Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Danny Sung / Cecilia Yan / Johnny Cheung / Ginny Wong / Ryan Choi |

**ADDITIONAL MLAB**

**BANK OF AMERICA, N.A.**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | 52/F Cheung Kong Centre, 2 Queen's Road Central, Central, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Client Service Team |

**ADDITIONAL MLAB**

**BNP PARIBAS**

By:      /s/ Stanislas De Tinguy
Title:   Managing Director

By:      /s/ Jwalant Nanavati
Title:   Managing Director

Address:            63/F, Two International Finance Centre,

                    8 Finance Street, Central,

                    Hong Kong

Telephone:

Fax:

Email:

Attention:          Stanislas de Tinguy / Rui Wang / Hao Gao

**ADDITIONAL MLAB**

**CHINA CONSTRUCTION BANK (ASIA) CORPORATION LIMITED**

By:      /s/ Ivan Siu Wah
         /s/ Benny Ha
Title:   General Manager of CBDI

For credit matters

Address:                25/F, CCB Tower, 3 Connaught Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Steve Chan / James Zhao

For operational matters

Address:                19/F, CCB Centre, 18 Wang Chiu Road, Kowloon Bay, Kowloon, Hong Kong

Telephone:

Fax:

Email:

Attention:              Cindy Hui / Ricky Hui

**ADDITIONAL MLAB**

**HANG SENG BANK LIMITED**

By:  /s/ Heung Hong-wing Frank
     /s/ Chun-man, Thomas

For credit matters

Address:              11/F, 83 Des Voeux Road, Central, Hong Kong

Telephone:

Email:

Attention:            Ms. Catherine Leung / Ms. Carmen Leung

For operational matters

Address:              11/F, 83 Des Voeux Road, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:            Mr. Richard Cheung / Mr. Jason Kwok / Mr. Ken Lam

**ADDITIONAL MLAB**

**INDUSTRIAL AND COMMERCIAL BANK OF CHINA (ASIA) LIMITED**

By:  /s/ authorized signatories

For credit matters

| | |
|---|---|
| Address: | 34/F, ICBC Tower, 3 Garden Road, Central, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Vincent Tse / Janet Chow |

For operational matters

| | |
|---|---|
| Address: | Level 13, Tower 1, Millennium City 1, No. 388 Kwun Tong Road, Kwun Tong, Kowloon, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Alex Lau / Edmund Law |

**ADDITIONAL MLAB**

**JPMORGAN CHASE BANK, N.A., HONG KONG BRANCH**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | Level 28 Chater House, 8 Connaught Road Central, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Jim Chan / Shirley Wong |

**ADDITIONAL MLAB**

**MIZUHO BANK, LTD.**

By:       /s/ Gabriel Tang
Title:    Joint General Manager

Address:                17/F, Two Pacific Place, 88 Queensway, Hong Kong

Telephone:

Fax:

Email:

Attention:              Ms. Monita Chang / Ms. Joey Mak

**ADDITIONAL MLAB**

**STANDARD CHARTERED BANK (HONG KONG) LIMITED**

By:    /s/ Cristian Jonsson

Title:  Global head, Loan Syndications, Standard Chartered Bank

Address:           25/F, Standard Chartered Bank Building, 4-4A Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention:         Frances Yao

**ADDITIONAL MLAB**

**WING LUNG BANK, LIMITED**

By:   /s/ He Xin, Wilson
Title:  Department Head, Corporate Banking Department

        /s/ Ng Wai Man, Raymond
Title:  Vice President

Address:         16/F, Wing Lung Bank Building

                45 Des Voeux Road Central

                Hong Kong

Telephone:

Fax:

Email:

Attention:     Mr. Raymond Ng / Mr. Keith So / Mr. Jason Chan / Mr. Boris Liu / Mr. Stephen Ng

**ADDITIONAL MLA**

**CATHAY UNITED BANK COMPANY LIMITED, HONG KONG BRANCH**

By:      /s/ Danny Tsai
Title:   Vice President , Chief Marketing Officer

Address:              20th Floor, LHT Tower, 31 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:           Cindy Cheung / Lily Tang

**ADDITIONAL MLA**

**CHINA MERCHANTS BANK CO., LTD.**

By:  /s/ authorized signatory

Address:        19/F., China Merchants Bank Tower, No. 7088 Shennan Boulevard, Shenzhen, P.R. China

Telephone:

Fax:

Email:

Attention:      Hu Cheng / Sun Zhaohua

**ADDITIONAL MLA**

**MEGA INTERNATIONAL COMMERCIAL BANK CO., LTD.**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | No.100, Chi-Lin Road, Taipei City 10424, Taiwan |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Roger Chen / Chiao-Hsin Lin / Lin Tung Liang |

**ADDITIONAL MLA**

**KGI BANK**

By:      /s/ Jean Wu
Title:   Executive Vice President

Address:              No.125, Sec. 5, Nanjing E. Road, Songshan Dist., Taipei City 10504, Taiwan

Telephone:

Fax:

Email:

Attention:            Kenneth Liu / Hong-wei Chien

**LENDER**

**BANK OF COMMUNICATIONS CO., LTD. (ACTING THROUGH ITS OFFSHORE BANKING UNIT)**

By:     /s/ Liu Ganghua
Title:   Acting CEO

Address:          188 Yincheng Zhong Road, Shanghai, 200120, China

Telephone:

Fax:

Email:

Attention:        Baidu Syndication

**LENDER**

**BANK OF CHINA LIMITED, LOS ANGELES BRANCH**

By: /s/ authorized signatory

| | |
|---|---|
| Address: | 444 S. Flower Street, 39th Floor Los Angeles, CA 90071 |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Bank of China Limited, Los Angeles Branch as designated by Bank of China Limited, Shanghai Branch, Jing An Sub-Branch |

**BANK OF CHINA LIMITED, LOS ANGELES BRANCH**

**LENDER**

**CITIBANK, N.A., HONG KONG BRANCH**

By:  /s/ Vivian Tan

| | |
|---|---|
| Address: | 44/F Citibank Tower, Citibank Plaza, |
| | 3 Garden Road, Central, |
| | Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Sabrina Gao / Megan Chan / Tricia Qiu |

**LENDER**

**DBS BANK LTD., HONG KONG BRANCH**

By:    /s/ Angelo Ka Kui Leung
Title:   Senior Vice President

For credit matters

Address:                18th Floor, The Center, 99 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Angelo Leung / Kenneth Yuen / Serena Zuo

For operational matters

Address:                18th Floor, The Center, 99 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Colum Ting / Rocky Lam / Simon Ho

**LENDER**

**DEUTSCHE BANK AG, SINGAPORE BRANCH**

By:   /s/ Birendra Baid

Title:  Director

       /s/ Saurabh Jhalaria

Title:  Managing Director

| | |
|---|---|
| Address: | One Raffles Quay #16-00 South Tower, Singapore 048583 |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | CPSG APAC / Steffen Limbach |

**LENDER**

**THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED**

By:     /s/ David Morton
Title:   Regional Head of Credit and Lending, Asia-Pacific

Address:           Level 16, HSBC Main Building, 1 Queens Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention:        Anqi Dong / Derek Leung

**LENDER**

**NANYANG COMMERCIAL BANK, LIMITED**

By:  /s/ authorized signatories _____

For credit matters:

Address:                10/F, 151 Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Mr. Daniel Jung / Ms. Churen Chan / Mr. Ocean Yeung

For operation matters:

Address:                6/F, 151 Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Ms. Wai In Fong / Ms. Lui Yuen Fun

Address:                17/F, Bank of China Centre, Olympian City, 11 Hoi Fai Road, West Kowloon, Hong Kong

Telephone:

Fax:

Email:

Attention:              Ms. Lam Yee Man Rita / Ms. Chan Wai Ying

**LENDER**

**AUSTRALIA AND NEW ZEALAND BANKING GROUP LIMITED**

By:      /s/ Shezad Desai
Title:   Head of TMET Asia

         /s/ Tai, Alan Pak Ling
Title:   Director, Loans Structuring & Execution Asia

Address:           22/F, Three Exchange Square, 8 Connaught Place Central, Hong Kong / 17/F Lincoln House, Taikoo Place, 979 King's Road, Quarry Bay, Hong Kong

Telephone:

Fax:

Email:

Attention:         Danny Sung / Cecilia Yan / Johnny Cheung / Ginny Wong / Ryan Choi

**LENDER**

**BANK OF AMERICA, N.A.**

By:      /s/ Linda Kang
Title:   Managing Director, Co-Head of China Local Corporates, Asia Pacific Corporate Banking Bank of America, N.A.

Address:              52/F Cheung Kong Centre, 2 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:            Client Service Team

**LENDER**

**BANK OF CHINA (HONG KONG) LIMITED**

By:  /s/ Chan Hoi Mao
     /s/ Chin Lai Ngan

Address:          17/F, Bank of China Centre, Olympian City, 11 Hoi Fai Road, West Kowloon, Hong Kong

Telephone:

Fax:

Email:

Attention:        Mr. Arthur Au / Ms. K. Y. Kwok / Ms. Venissa Fong / Ms. Judy Kwok

**LENDER**

**BANK OF CHINA LIMITED MACAU BRANCH**

By:   /s/ Wong Iao Kun
Title: Deputy Director, Credit Administration Department

Address:        13/F, Bank of China Building, Avenida Doutor Mario Soares, Macau

Telephone:

Fax:

Email:

Attention:        James Wong / Alex Ung / Chole Wong

**LENDER**

**BNP PARIBAS, ACTING THROUGH ITS HONG KONG BRANCH**

By:    /s/ Stanislas De Tinguy
Title:  Managing Director

By:    /s/ Jwalant nanawati
Title:  Managing Director

Address:            63/F, Two International Finance Centre,

                    8 Finance Street, Central,

                    Hong Kong

Telephone:

Fax:

Email:

Attention:          Stanislas de Tinguy / Rui Wang / Hao Gao

**LENDER**

**CHINA CONSTRUCTION BANK (ASIA) CORPORATION LIMITED**

By:    /s/ Ivan Siu Wah
         /s/ Benny Ha
Title:  General Manager of CBDI

For credit matters

| | |
|---|---|
| Address: | 25/F, CCB Tower, 3 Connaught Road Central, Central, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Steve Chan /James Zhao |

For operational matters

| | |
|---|---|
| Address: | 19/F, CCB Centre, 18 Wang Chiu Road, Kowloon Bay, Kowloon, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Cindy Hui / Ricky Hui |

**LENDER**

**HANG SENG BANK LIMITED**

By:  /s/ Heung Hon-Wing, Frank
     /s/ authorized signatory

For credit matters

Address:              11/F, 83 Des Voeux Road, Central, Hong Kong

Telephone:

Email:

Attention:           Ms. Catherine Leung / Ms. Carmen Leung

For operational matters

Address:              11/F, 83 Des Voeux Road, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:           Mr. Richard Cheung / Mr. Jason Kwok / Mr. Ken Lam

**LENDER**

**INDUSTRIAL AND COMMERCIAL BANK OF CHINA (ASIA) LIMITED**

By:  /s/ authorized signatories

For credit matters

Address:                34/F, ICBC Tower, 3 Garden Road, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:              Vincent Tse / Janet Chow

For operational matters

Address:                Level 13, Tower 1, Millennium City 1, No. 388 Kwun Tong Road, Kwun Tong, Kowloon, Hong Kong

Telephone:

Fax:

Email:

Attention:              Alex Lau / Edmund Law

**LENDER**

**JPMORGAN CHASE BANK, N.A., HONG KONG BRANCH**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | Level 28 Chater House, 8 Connaught Road Central, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Jim Chan / Shirley Wong |

**LENDER**

**MIZUHO BANK, LTD., HONG KONG BRANCH**

By:  /s/ Junya Hagishita

For credit matters

| | |
|---|---|
| Address: | 16/F., Sun Life Tower, The Gateway, Harbour City, Kowloon, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Ms. Betty Chung / Ms. Red Tang / Ms. Iris Kau / Ms. Edith Wong |

For operational matters

| | |
|---|---|
| Address: | 16/F., Sun Life Tower, The Gateway, Harbour City, Kowloon, Hong Kong |
| Telephone: | |
| Fax: | |
| Email: | |
| Attention: | Mr. Andy Lam / Ms. Mandy Pang / Mr. Andy Chu |

**LENDER**

**STANDARD CHARTERED BANK (HONG KONG) LIMITED**

By:      /s/ Darcy Lai
Title:   Regional Head, Corporate and Institutional Banking,
         Greater China and North Asia Standard Chartered Bank
         (Hong Kong) Limited

Address:              22/F, Standard Chartered Bank Building, 4-4A Des Voeux Road Central, Hong Kong

Telephone:

Fax:

Email:

Attention:            Lynn Sha / Julian Shen

**LENDER**

**WING LUNG BANK, LIMITED**

By:      /s/ He Xin, Wilson
Title:   Department Head, Corporate Banking Department

          /s/ Ng Wai Man, Raymond
Title:   Vice President


Address:              16/F, Wing Lung Bank Building
                      45 Des Voeux Road Central
                      Hong Kong

Telephone:

Fax:

Email:

Attention:            Mr. Raymond Ng / Mr. Keith So / Mr. Jason Chan / Mr. Boris Liu / Mr. Stephen Ng

**LENDER**

**CATHAY UNITED BANK COMPANY LIMITED, HONG KONG BRANCH**

By:     /s/ Danny Tsai
Title:  Vice President, Chief Marketing Officer

Address:        20th Floor, LHT Tower, 31 Queen's Road Central, Central, Hong Kong

Telephone:

Fax:

Email:

Attention:      Cindy Cheung / Lily Tang

**LENDER**

**CHINA MERCHANTS BANK CO., LTD.**

By:  /s/ authorized signatory

Address:            19/F., China Merchants Bank Tower, No. 7088 Shennan Boulevard, Shenzhen, P.R. China

Telephone:

Fax:

Email:

Attention:          Hu Cheng / Sun Zhaohua

**LENDER**

**MEGA INTERNATIONAL COMMERCIAL BANK CO., LTD.**

By:  /s/ authorized signatory

| | |
|---|---|
| Address: | No.100, Chi-Lin Road, Taipei City 10424, Taiwan |
| Telephone: | Fax: |
| Email: | |
| Attention: | Roger Chen / Chiao-Hsin Lin / Lin Tung Liang |

**LENDER**

**KGI BANK**

By:      /s/ Jean Wu
Title:   Executive Vice President

Address:              No.125, Sec. 5, Nanjing E. Road, Songshan Dist., Taipei City 10504, Taiwan

Telephone:

Fax:

Email:

Attention:            Kenneth Liu / Hong-wei Chien

**THE AGENT**

**CITICORP INTERNATIONAL LIMITED**

By:      /s/ Victor Tam
Title:   Vice President


Address:            10th Floor, Citi Tower, One Bay East,
                    83 Hoi Bun Road,
                    Kwun Tong, Kowloon,
                    Hong Kong

Telephone:

Fax:

Email:

Attention:          Client Administration Team / Transaction Management Team

                    Regional Loans Agency

**Exhibit 4.69**

**Execution Version**

**NOTE PURCHASE AGREEMENT**

This NOTE PURCHASE AGREEMENT, dated as of January 11, 2017 (this "Agreement"), is entered into by and among Qiyi.com, Inc., an exempted company incorporated under the laws of the Cayman Islands (the "Company") and the parties listed on Schedule 1 attached hereto (each party listed on Part A of Schedule 1, a "G1 Investor", and collectively, the "G1 Investors"; each party listed on Part B of Schedule 1, a "G2 Investor", and collectively, the "G2 Investors"; and the G1 Investors and G2 Investors collectively, the "Investors").

**RECITALS**

WHEREAS, subject to the terms and conditions set forth herein, (i) the Company desires to issue and sell to each G1 Investor, and each G1 Investor, severally and not jointly, desires to purchase from the Company, certain convertible promissory note(s) in substantially the form attached hereto as Exhibit A-1 (each, a "G1 Note", and collectively, the "G1 Notes") in the principal amount(s) set forth opposite such G1 Investor's name on Schedule 1, which shall be convertible into certain shares of the Company (the "G1 Conversion Shares"), and (ii) the Company desires to issue and sell to each G2 Investor, and each G2 Investor, severally and not jointly, desires to purchase from the Company, certain convertible promissory note(s) in substantially the form attached hereto as Exhibit A-2 (each, a "G2 Note", and collectively, the "G2 Notes"; the G1 Notes and G2 Notes collectively, the "Notes"), which shall be convertible into certain shares of the Company (the "G2 Conversion Shares", and collectively with the G1 Conversion Shares, the "Conversion Shares") at the per share conversion price and on the other terms stated therein.

NOW, THEREFORE, in consideration of the above premises and the agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I.**
**DEFINITIONS**

1.1 Definitions. As used in this Agreement, and unless the context requires a different meaning, the following terms have the meanings indicated:

"Adverse Legal Development" has the meaning set forth in the Sixth Restated Articles.

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or under common control with, the Person specified, including, in the case of the Investors, any investment capital fund now or hereafter existing which is controlled by, or under the common control of, substantially the same principal(s) that control the Investors. Notwithstanding the foregoing, the parties acknowledge and agree that (a) the name "Sequoia Capital" is commonly used to describe a variety of entities (collectively, the "Sequoia Entities") that are affiliated by ownership or operational relationship and engaged in a broad range of activities related to investing and securities trading and (b) notwithstanding any other provision of the Transaction Documents to the contrary, the Transaction Documents shall not be binding on, or restrict the activities of, any Sequoia Entity outside of the Sequoia China Sector Group. For purposes of the foregoing, the "Sequoia China Sector Group" means all Sequoia Entities (whether currently existing or formed in the future) that are principally focused on companies located in, or with connections to, the PRC.

1

"Agreement" has the meaning set forth in the preamble, as amended, supplemented or modified from time to time in accordance with the terms hereof.

"Baidu" means Baidu Holdings Limited, a company incorporated under the laws of the British Virgin Islands.

"Basket" has the meaning set forth in Section 8.4 of this Agreement.

"Beijing WFOE" means Beijing Qiyi Century Science & Technology Co., Ltd. ("北京奇艺世纪科技有限公司"), a wholly foreign-owned enterprise established under the laws of the PRC.

"Board of Directors" means the board of directors of the Company.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, Hong Kong or the PRC are authorized or required by law or executive order to close.

"Centre" has the meaning set forth in Section 10.9(b).

"Chongqing WFOE" means Chongqing Qiyi Tianxia Science & Technology Co., Ltd. ("重庆奇艺天下科技有限公司"), a wholly foreign-owned enterprise established under the laws of the PRC.

"Circular 37" means Circular 37 issued by SAFE on July 14, 2014, including any amendment, implementing rules, or official interpretation thereof, and any other rules and circulars issued by SAFE regulating filings or registrations of round-trip investment.

"Closing" has the meaning set forth in Section 2.2 of this Agreement.

"Closing Date" has the meaning set forth in Section 2.2 of this Agreement.

"Company" has the meaning set forth in the preamble to this Agreement.

"Consideration" has the meaning set forth in Section 2.1 of this Agreement.

"Contractual Obligations" means, as to any Person, any provision of any security or financial instrument, issued by such Person or of any agreement, undertaking, contract, license, engagement, lease, indenture, mortgage, deed of trust, purchase order, commitment or other instrument or contractual arrangement, to which such Person is a party or by which it or any of its property is bound.

"Control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person (including without limitation, the power to determine or cause the determination of equity investment), whether through the ownership of voting securities, by contract or otherwise.

2

"Control Documents" means the exclusive technology consulting and service agreements (独家技术咨询和服务协议), business operation agreements (业务经营协议), business cooperation agreements (业务合作协议), software license contracts (软件使用许可合同), trademark license agreements (商标许可协议), exclusive option agreements (独家购买权合同), voting rights proxy agreements (股东表决权委托行使协议), loan agreements (借款协议), and equity pledge agreements (股权质押协议) entered into between the Beijing WFOE, on one hand, and the applicable Domestic Enterprises and/or their shareholders, on the other hand, for the purpose of consolidating the financial statements of the Domestic Enterprises by the Company in accordance with the US GAAP.

"Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"Disclosure Schedule" means the schedule to be provided to the Investors by the Company attached hereto as Exhibit B.

"Domestic Enterprise" means each of (i) Beijing Dingxin Tianxia Science & Technology Co., Ltd. ("北京鼎新天下科技有限公司"), a limited liability company organized under the laws of the PRC, (ii) Beijing IQIYI Science & Technology Co., Ltd. ("北京爱奇艺科技有限公司"), a limited liability company organized under the laws of the PRC, (iii) Shanghai IQIYI Culture Media Co., Ltd. ("上海爱奇艺文化传媒有限公司"), a limited liability company organized under the laws of the PRC and (iv) Shanghai Zhong Yuan Network Co., Ltd. ("上海众源网络有限公司"), a limited liability company organized under the laws of the PRC, and collectively, the "Domestic Enterprises".

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interest (whether or not issued by such Person).

"Financial Statements" has the meaning set forth in Section 6(a) of Schedule 2.

"G1 Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"G1 Investors" has the meaning set forth in the preamble to this Agreement.

"G1 Notes" has the meaning set forth in the recitals of this Agreement.

"G2 Conversion Shares" has the meaning set forth in the recitals of this Agreement.

"G2 Investors" has the meaning set forth in the preamble to this Agreement.

"G2 Notes" has the meaning set forth in the recitals of this Agreement.

3

"Governmental Authority" means the government of any nation, state, city, locality or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any stock exchange or its governing body.

"Group Company" means each of the Company, the HK Subsidiary, the PRC Entities, together with their respective Subsidiaries, and "Group" refers to all of Group Companies collectively.

"HK Subsidiary" means Qiyi.com HK Limited, a company limited by shares incorporated under the laws of Hong Kong.

"Hong Kong" means the Hong Kong Special Administration Region of the PRC.

"Indemnified Party" has the meaning set forth in Section 8.1 of this Agreement.

"Indemnifying Party" has the meaning set forth in Section 8.1 of this Agreement.

"Initial Public Offering" means an initial public offering of any Equity Securities of the Company on New York Stock Exchange, NASDAQ Stock Market, the Hong Kong Stock Exchange or such other stock exchange approved by the Board of Directors.

"Investors" has the meaning set forth in the preamble to this Agreement.

"Key Employee" means each person listed in Schedule 4 attached hereto.

"Litigation" has the meaning set forth in Section 9(a) of Schedule 2 attached hereto.

"Long Stop Date" has the meaning set forth in Section 9.1 of this Agreement.

"Losses" has the meaning set forth in Section 8.1 of this Agreement.

"Material Adverse Effect" means any change, event, circumstance or effect, individually or when taken together with all other changes, events, circumstances, or effects that have occurred prior to the date of determination of the occurrence of the Material Adverse Effect, that (i) is, or would reasonably be expected to be, materially adverse to the business, operations, assets (including intangible assets), liabilities, condition (financial or otherwise), property, results of operations of the Group Companies, as a whole, or (ii) is or would reasonably be expected to materially impair the validity or enforceability of this Agreement or any of the other Transaction Documents against the Company or (iii) is or would reasonably be expected to materially and adversely affect the Company's ability to perform its material obligations under this Agreement, or any other Transaction Document, or in connection with the transactions contemplated hereunder or thereunder; provided, however, that in no event shall any of the following, alone or in combination, be deemed to constitute a Material Adverse Effect, nor shall any change, event or circumstance relating to or resulting from any of the following be taken into account in determining whether a Material Adverse Effect has occurred or would result: (i) general economic conditions in global or Chinese markets (including financial, banking, credit, currency and capital markets); (ii) fluctuations in currency exchange rates; (iii) conditions generally affecting the industry in which the Group Companies operate (but excluding any changes in applicable Requirements of Law or US GAAP that would, or would reasonably be expected to, result in a "Redemption Trigger Event" (as defined in the Sixth Restated Articles)); (iv) the commencement or material worsening of a war or armed hostilities or other national or international calamity, or the occurrence of any military or terrorist attack; (v) acts of God or natural disasters; and (vi) any actions taken, or failures to take action pursuant to or in accordance with this Agreement or at the request of the Investors or any change, event or circumstance solely resulting from such actions or failures to take action; which, in the case of any of the foregoing clauses (i) through (v) does not disproportionately affect the Group Companies, taken as a whole, relative to other comparable companies in the industries in which they operate.

4

"Notes" has the meaning set forth in the recitals of this Agreement.

"Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Ordinary Shares" means the ordinary shares of the Company with a par value of US$0.00001 each.

"Person" means any individual, firm, corporation, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, limited liability company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"Permitted Liens" means (i) liens disclosed on the Financial Statements, (ii) liens for taxes not yet due or being contested in good faith (and for which adequate accruals or reserves have been established on the Financial Statements), or (iii) liens which do not materially detract from the value or materially interfere with any present or intended use of any property or assets of the Company and/or the Group Companies.

"PRC" means the People's Republic of China excluding, for the purpose of this Agreement, Hong Kong, Macau and Taiwan.

"PRC Entities" means the Beijing WFOE, the Chongqing WFOE, the Domestic Enterprises and each of their respective Subsidiaries.

"Qualified Financing" means the Company's next preferred shares financing transaction on or before the first anniversary of the Closing Date, either (i) with a total investment amount or subscription price in such next preferred shares financing transaction of no less than US$100,000,000, which for the avoidance of doubt shall not include the principal amount of the Notes, or (ii) with the number of shares newly issued in such next preferred shares financing transaction constituting no less than 5% of the Company's total issued and outstanding share capital immediately prior to the consummation of such transaction, which for the avoidance of doubt shall not include the Conversion Shares.

"Requirements of Law" means, as to any Person, any law, statute, treaty, rule, regulation, order, right, privilege, qualification, license or franchise or determination of an arbitrator or a court or other Governmental Authority or stock exchange, in each case applicable or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

5

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"Series A Preferred Shares" means the series A preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series A-1 Junior Preferred Shares" means the series A-1 junior preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series B Preferred Shares" means the series B preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series C Preferred Shares" means the series C preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series D Preferred Shares" means the series D preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series E Preferred Shares" means the series E preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series F Preferred Shares" means the series F preferred shares of the Company with a par value of US$0.00001 each, with the rights and preferences set forth in the Sixth Restated Articles.

"Series G Preferred Shares" means, collectively, the Series G1 Preferred Shares and the Series G2 Preferred Shares.

"Series G1 Preferred Shares" means the series G1 preferred shares of the Company with a par value of US$0.00001 each, to be issued by the Company to the G1 Investors upon conversion of the G1 Notes at the election of the Company in accordance with the terms and conditions of the G1 Notes and containing the terms set forth in the Terms of Series G.

"Series G2 Preferred Shares" means the series G2 preferred shares of the Company with a par value of US$0.00001 each, to be issued by the Company to the G2 Investors upon conversion of the G2 Notes at the election of the Company in accordance with the terms and conditions of the G2 Notes and containing the terms set forth in the Terms of Series G.

"Shareholders Agreement" means the Fifth Amended and Restated Shareholders Agreement dated November 11, 2014 between the Company and the parties named therein.

6

"Sixth Restated Articles" means the Sixth Amended and Restated Memorandum and Articles of Association of the Company as adopted on, and effective as of, November 11, 2014.

"Subsidiaries" means, as of the relevant date of determination, (i) with respect to any Person, any other Person of which more than 50% of the voting power of the outstanding voting securities or more than 50% of the outstanding economic equity interest or ownership is held, directly or indirectly, by such Person and (ii) with respect to any Group Company, any other Person of which actual or *de facto* Control is held, directly or indirectly, by the applicable Group Company. Unless otherwise qualified, or the context otherwise requires, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of any of the Group Company.

"Tax" means all forms of taxation, estate, duties, deductions, withholdings, duties, imposts, levies, fees, charges, social security contributions and rates imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, state, federal or other governmental body in the PRC or any other jurisdiction and any interest, additional taxation, penalty, surcharge or fine in connection therewith.

"Terms of Investor Rights" means the terms and conditions of certain rights and provisions of the Investors upon conversion of the Notes at the election of the Company in the form attached hereto as Exhibit D.

"Terms of Series G" means the terms and conditions in respect of the Series G Preferred Shares in the form attached hereto as Exhibit C.

"Terms of Irrevocable Voting Undertaking and Proxy" means the terms and conditions of certain irrevocable voting undertaking and proxy and power of attorney in the form attached hereto as Exhibit E to be entered into by the G2 Investors holding G2 Conversion Shares immediately prior to and as a condition to the conversion of such G2 Notes into G2 Conversion Shares.

"Transaction Documents" means, collectively, this Agreement and the Notes.

"US GAAP" means United States generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession that are in effect from time to time, as codified and described in FASB Statement No. 168, The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles.

"US$" means the United States Dollar, the law currency of the United States of America.

1.2 Rules of Construction.

Interpretation of this Agreement shall be governed by the following rules of construction: (i) the words such as "herein," "hereinafter," "hereof," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including any Schedules or Exhibits hereto, as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires; (ii) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (iii) references to the terms Article, Section, Schedule and Exhibit are references to the Articles, Sections, Schedules and Exhibits to this Agreement, unless otherwise specified; (iv) references to "US$" shall mean U.S. dollars; (v) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (vi) the word "or" shall not be exclusive; (vii) references to "written" or "in writing" include in electronic form; (viii) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement; (ix) the parties hereto have each participated in the negotiation and drafting of this Agreement and if any ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement or any interim drafts thereof; (x) a reference to any Person includes such Person's successors and permitted assigns; (xi) any reference to "days" means calendar days unless Business Days are expressly specified; and (xii) when calculating the period of time before which, within which or following which any act is to be done or any step is taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

**ARTICLE II.**
**PURCHASE AND SALE OF NOTES**

2.1 Purchase and Sale of Notes.

Subject to the terms and conditions set forth herein and in the G1 Notes and G2 Notes, as applicable, (i) the Company agrees to issue and sell to each G1 Investor, and each G1 Investor, severally but not jointly, agrees to purchase from the Company, at the Closing, certain G1 Note(s) in the principal amount(s) set forth opposite such G1 Investor's name on Part A of Schedule 1, and (ii) the Company agrees to issue and sell to each G2 Investor, and each G2 Investor, severally but not jointly, agrees to purchase from the Company, at the Closing, certain G2 Note(s) in the principal amount(s) set forth opposite such G2 Investor's name on Part B of Schedule 1, in each case, for the amount of cash set forth opposite such Investor's name on Schedule 1 (the "Consideration").

2.2 Closing; Delivery.

(a) Unless this Agreement shall have terminated pursuant to Article IX, and subject to the satisfaction or waiver of the conditions set forth in Articles V and VI, the closing of the sale and purchase of the Notes (the "Closing,") shall take place remotely via the exchange of documents and signatures, as soon as practicable (but not later than the tenth (10th) Business Day) following the date upon which the conditions set forth in Articles V and VI shall be satisfied or waived in accordance with this Agreement, or at such other time and place that the Company and the Investors may agree in writing (the "Closing Date").

(b) On the Closing Date:

8

(i) each Investor shall deliver to the Company the Consideration as set forth opposite its name on <u>Schedule 1</u>, by wire transfer of immediately available funds to an account designated by the Company (which shall be provided to such Investor in writing at least five (5) Business Days prior to the Closing);

(ii) each Investor shall deliver to the Company the applicable Note(s) counter-signed by such Investor, agreeing to be bound by the terms and conditions of such Note(s); and

(iii) the Company shall issue and deliver to such Investor the applicable Note(s) as set forth opposite such Investor's name on <u>Schedule 1</u>.

2.3 <u>Use of Proceeds</u>.

The proceeds from the sale of the Notes to the Investors shall be used for general working capital purposes and capital expenditures of the Group Companies, subject to the approval by the Board of Directors in accordance with the Shareholders Agreement and the Sixth Restated Articles.

2.4 <u>Terms of Conversion Shares</u>.

(a) In the event that the Notes are converted upon the closing of the Qualified Financing in accordance with the terms and conditions of the Notes, the Conversion Shares will be subject to the same general terms and conditions applicable to the Equity Securities of the Company issued in the Qualified Financing, <u>provided</u> that, prior to the Initial Public Offering, the G2 Conversion Shares shall be non-voting shares and shall not entitle the holders of such G2 Conversion Shares to vote at any meeting of shareholders or any class of shareholders of the Company or to execute any written consent to, or dissent from, any matter in respect of which the shareholders or any class of shareholders of the Company are sought to express such consent or dissent without a meeting (including but not limited to the signing of resolutions in writing of the shareholders or any class of shareholders of the Company). Notwithstanding the foregoing, if the terms and conditions applicable to the Equity Securities issued in the Qualified Financing are less favorable than those contained in the Terms of Series G and the Terms of Investor Rights as set forth in <u>Exhibit C</u> and <u>Exhibit D</u>, respectively, the Investor holding the applicable Note(s) shall have the right to elect that the Terms of Series G and the Terms of Investor Rights shall instead apply to the conversion of such Note upon the closing of the Qualified Financing.

(b) In the event that the Notes are converted at the election of the Company in accordance with the terms and conditions of the Notes, (i) the Company agrees that, immediately prior to such conversion of the Notes, it will take all reasonable actions to adopt an amended and restated memorandum and articles of association of the Company, authorizing the issuance of Series G Preferred Shares and incorporating the Terms of Series G; and (ii) the Company and each Investor agrees that, upon such conversion of the Notes, the Company and each Investor shall enter into an amended and restated shareholders agreement, in a form to be agreed between the Company and the Investors and incorporating the Terms of Investor Rights.

2.5 <u>Dual-class Share Structure</u>.

9

In the event that the Notes are converted into Conversion Shares, each of the Investors hereby agree that the Company shall adopt a dual class ordinary share structure immediately prior to the completion of the Initial Public Offering, to the extent permitted by Laws applicable in the jurisdiction where the Company seeks to conduct the Initial Public Offering, such that (i) the Ordinary Shares will consist of Class A ordinary shares and Class B ordinary shares, with holders of Class A ordinary shares being entitled to one vote per share in respect of matters requiring the votes of shareholders while holders of Class B ordinary shares being entitled to more than one vote per share, (ii) Baidu and its Affiliates shall hold Class B ordinary shares and all other shareholders shall hold Class A ordinary shares, and (iii) Class A ordinary shares or the depositary shares representing Class A ordinary shares shall be listed on a stock exchange in the jurisdiction where the Company conducts the Initial Public Offering and tradable subject to restrictions under applicable Laws. Each of the Investors agrees that the number of votes represented by each Class B ordinary shares shall be fixed by Baidu in its discretion to ensure that the voting power held by Baidu and its Affiliates represent more than 50% of the total voting power of the Company immediately after the Initial Public Offering. Each of the Investors agrees and undertakes to take all necessary actions, including by means of voting at each meeting of shareholders of the Company or in lieu of any such meeting giving its written consent with respect to, as the case may be, all of its voting securities of the Company as may be necessary, to support and adopt the dual class ordinary share structure as described above in this paragraph.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each Investor that, except as set forth in the Disclosure Schedule, the representations and warranties set forth in Schedule 2 are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that each Investor in entering into this Agreement is relying on such representations and warranties.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Each of the Investors hereby, severally but not jointly, represents and warrants to the Company that the representations and warranties set forth in Schedule 3 are true and correct as of the date hereof and the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date) and acknowledges that the Company in entering into this Agreement is relying on such representations and warranties.

## ARTICLE V.
## CONDITIONS TO THE OBLIGATION OF THE INVESTORS TO CLOSE

The obligation of each of the Investors to purchase the Notes and to pay the Consideration therefor, severally but not jointly, at the Closing shall be subject to the satisfaction as determined by, or waiver in writing by, such Investor of the following conditions on or before the Closing Date.

10

5.1 <u>Representation and Warranties.</u> Each of the representations and warranties of the Company contained in <u>Article III</u> hereof (a) that are qualified by materiality or Material Adverse Effect shall be true and correct as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date), and (b) that are not qualified by materiality or Material Adverse Effect shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty (other than those set forth in <u>Section 1</u> (Corporate Matters), <u>Section 2</u> (Authorization and Validity of Transactions), and <u>Section 3</u> (Legal Compliance) of <u>Schedule 2</u> hereto), the condition set forth in this <u>Section 5.1</u> shall be deemed satisfied, unless the effect of all such breaches of representations and warranties taken as a whole result in a Material Adverse Effect.

5.2 <u>Compliance with Agreements.</u> The Company shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth in this Agreement that are required to be performed or complied with by it on or before the Closing Date.

5.3 <u>Compliance Certificate.</u> At the Closing, the Company shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Investors certifying that the conditions specified in <u>Section 5.1</u> and <u>Section 5.2</u> have been satisfied.

5.4 <u>Legal Opinion.</u> Such Investor shall have received a legal opinion issued by Walkers, the Company's Cayman counsel, addressed to such Investor and dated as of the Closing Date.

5.5 <u>No Material Adverse Change and Adverse Legal Development</u>. Since the date hereof, there shall have been no event or circumstances having a Material Adverse Effect and there shall have been no Adverse Legal Development.

5.6 <u>Consents and Approvals.</u> All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law and with respect to Contractual Obligations of the Company which are necessary or required in connection with the execution, delivery or performance by, or enforcement against, the Company of this Agreement and each of the other Transaction Documents shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities shall have expired without any action being taken or threatened.

5.7 <u>No Material Judgment or Order.</u> There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the purchase and sale of the Notes or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

5.8 <u>No Litigation.</u> No action, suit, proceeding, claim or dispute shall have been brought or otherwise arisen at law, in equity, in arbitration or before any Governmental Authority against any of the Group Companies which could, if adversely determined, have a Material Adverse Effect on the Group, taken as a whole.

11

5.9 <u>Proceedings and Documents.</u> All corporate and other proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions (including corporate resolutions and good standing certificate dated no earlier than ten (10) Business Days prior to the Closing) shall be reasonably satisfactory in substance and form to such Investor, and such Investor shall have received all such counterpart originals or certified or other copies of such documents as it may reasonably request.

## ARTICLE VI.
## <u>CONDITIONS TO THE OBLIGATION OF THE COMPANY TO CLOSE</u>

The obligation of the Company to issue and sell the Notes to each of the Investors at the Closing shall be subject to the satisfaction or waiver of the following conditions on or before the Closing Date:

6.1 <u>Representation and Warranties</u>. Each of the representations and warranties of such Investor contained in Article IV hereof shall be true and correct in all material respects as of the date hereof and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made on a specific date, at and on such specific date).

6.2 <u>Compliance with this Agreement</u>. Such Investor shall have performed and complied in all material respects with all of its agreements, obligations and conditions set forth herein that are required to be performed or complied with by such Investor on or before the Closing Date.

6.3 <u>Compliance Certificate.</u> At the Closing, such Investor shall have delivered a written certification dated the Closing Date in form and substance reasonably satisfactory to the Company certifying that the conditions specified in <u>Section 6.1</u> and <u>Section 6.2</u> have been satisfied.

6.4 <u>Payment of Consideration.</u> Each Investor shall have paid the applicable Consideration for the Notes to be purchased by such Investor at the Closing.

6.5 <u>Consents and Approvals.</u> All consents, exemptions, authorizations, or other actions by, or notice to, or filings with, Governmental Authorities and other Persons in respect of all Requirements of Law in connection with the execution, delivery or performance by, or enforcement against, such Investor of this Agreement and each of the other Transaction Documents shall have been obtained and be in full force and effect, and any notice or other similar periods in connection with any regulatory actions of Governmental Authorities applicable to such Investor shall have expired without any action being taken or threatened.

6.6 <u>No Material Judgment or Order</u>. There shall not be on the Closing Date any Order of a court of competent jurisdiction or any ruling of any Governmental Authority or any condition imposed under any Requirement of Law which would (a) prohibit or restrict (i) the issuance and sale of the Notes or (ii) the consummation of the transactions contemplated by this Agreement or any other Transaction Document, or (b) materially restrict the operation of the business of any of the Group Companies as conducted on the date hereof.

12

**ARTICLE VII.**
**COVENANTS**

7.1 <u>Further Assurances.</u> Each party hereto shall execute such documents and perform such further acts (including obtaining any consents, exemptions, authorizations or other actions by, or giving any notices to, or making any filings with, any Governmental Authority or any other Person) as may be reasonably required to carry out or to perform the provisions of this Agreement and to give effect to the terms and intent of this Agreement, including the satisfaction of all conditions set forth in <u>Article V</u> and <u>Article VI</u> above.

7.2 <u>Information.</u> From the date hereof until the earlier of the Closing or the termination pursuant to Section 9.1, (a) the Company shall promptly notify the Investors of any Litigation commenced or threatened in writing against any Group Company, and (b) each party hereto shall promptly notify other parties hereto of any breach, violation or non-compliance of any of its representations, warranties or covenants hereunder by such party.

7.3 <u>Completion of SAFE Registration.</u> Each of the Investors shall use their respective best efforts to complete their respective registration or filing as required by Circular 37.

7.4 <u>Voting Undertaking and Proxy.</u> In the event that any G2 Notes shall have been converted into G2 Conversion Shares, each G2 Investor holding such G2 Conversion Shares shall, immediately prior to and as a condition to such conversion, execute and deliver to Baidu an irrevocable voting undertaking and an irrevocable voting proxy and power of attorney incorporating the Terms of Irrevocable Voting Undertaking and Proxy.

7.5 <u>Compliance with Laws.</u> The Company shall, and shall procure each of the Group Companies to, use its commercially reasonable efforts to comply with applicable laws of the jurisdiction of its incorporation as well as applicable requirements of the competent Governmental Authorities that are necessary for operation of its business.

**ARTICLE VIII.**
**INDEMNIFICATION**

8.1 <u>Indemnification.</u> Except as otherwise provided in this <u>Article VIII</u>, (a) the Company, on the one hand, and (b) each Investor, severally but not jointly, on the other hand, (each, an "<u>Indemnifying Party</u>") agree to indemnify, defend and hold harmless each member of the other group and their respective Affiliates and the respective officers, directors, agents, employees, partners, members and Controlling persons of such member and its Affiliates (each, an "<u>Indemnified Party</u>") to the fullest extent permitted by law from and against any and all losses, Litigation, or written threats thereof (including any Litigation by a third party), damages, expenses (including reasonable fees, disbursements and other charges of counsel incurred by the Indemnified Party in any action between the Indemnifying Party and the Indemnified Party or between the Indemnified Party and any third party or otherwise) or other liabilities (collectively, "<u>Losses</u>") resulting from or arising out of any breach of any representation or warranty, covenant or agreement in this Agreement by the Indemnifying Party.

13

8.2 <u>Notification of Third Party Claim</u>. Each Indemnified Party under this <u>Article VIII</u> shall, promptly after the receipt of notice of the commencement of any Litigation by a third party against such Indemnified Party in respect of which indemnity may be sought from the Indemnifying Party under this <u>Article VIII</u>, notify the Indemnifying Party in writing of the commencement thereof. The omission of any Indemnified Party to so notify the Indemnifying Party of any such action shall not relieve the Indemnifying Party from any liability which it may have to such Indemnified Party (a) other than pursuant to this <u>Article VIII</u> or (b) under this <u>Article VIII</u> unless, and only to the extent that, such omission results in the Indemnifying Party's forfeiture of substantive rights or defenses which are material. In case any such Litigation shall be brought against any Indemnified Party, and it shall notify the Indemnifying Party of the commencement thereof, the Indemnifying Party shall be entitled to assume the defense thereof at its own expense, with counsel satisfactory to such Indemnified Party in its reasonable judgment; <u>provided</u>, <u>however</u>, that any Indemnified Party may, at its own expense, retain separate counsel to participate in such defense at its own expense. Notwithstanding the foregoing, in any Litigation in which both the Indemnifying Party, on the one hand, and an Indemnified Party, on the other hand, are, or are reasonably likely to become, a party, such Indemnified Party shall have the right to employ separate counsel at the Indemnifying Party's expense and to control its own defense of such Litigation if, in the reasonable opinion of counsel to such Indemnified Party, either (x) one or more defenses are available to the Indemnified Party that are not available to the Indemnifying Party or (y) a conflict or potential conflict exists between the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, that would make such separate representation advisable; <u>provided</u>, <u>however</u>, that the Indemnifying Party (i) shall not be liable for the fees and expenses of more than one counsel to all Indemnified Parties and (ii) shall reimburse the Indemnified Parties for all of such fees and expenses of such counsel incurred in any action between the Indemnified Parties and any third party, as such expenses are incurred. The Indemnifying Party agrees that it will not, without the prior written consent of each Indemnified Party, settle, compromise or consent to the entry of any judgment in any pending or threatened Litigation relating to the matters contemplated hereby (if such Indemnified Party is a party thereto or has been actually threatened to be made a party thereto) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising or that may arise out of such Litigation. The Indemnifying Party shall not be liable for any settlement of any Litigation effected against an Indemnified Party without its written consent, which shall not be unreasonably withheld. The rights accorded to an Indemnified Party hereunder shall be in addition to any rights that any Indemnified Party may have at common law, by separate agreement or otherwise; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing or anything to the contrary contained in this Agreement, nothing in this <u>Article VIII</u> shall restrict or limit any rights that any Indemnified Party may have to seek equitable relief.

8.3 <u>Contribution</u>. If the indemnification provided for in this <u>Article VIII</u> from the Indemnifying Party is unavailable to an Indemnified Party in respect of any Losses, the Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Losses, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Losses referred to above shall be deemed to include, subject to the limitations set forth in <u>Sections 8.1</u> and <u>8.2</u>, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding.

14

8.4 <u>Limitation of Liability</u>. An Indemnifying Party shall not have liability for any breach of any representation or warranty unless the aggregate amount of Losses incurred by the Indemnified Party and indemnifiable thereunder based upon, attributable to or resulting from the failure of any of the representations or warranties to be true and correct exceeds US$3,000,000 (the "<u>Basket</u>"), and, in such event, the Indemnifying Party shall be required to indemnify the entire amount of all such Losses; <u>provided</u>, <u>however</u>, that the foregoing Basket shall not apply to any Losses related to the failure to be true and correct of any of the representations and warranties set forth in <u>Section 1</u> (Corporate Matters) and <u>Section 2</u> (Authorization and Validity of Transactions) of <u>Schedule 2</u> hereto. The aggregate liability of the Indemnifying Party hereunder to each Indemnified Party for any breach of any representation or warranty shall not exceed the aggregate Consideration for the purchase of the applicable Notes. None of the parties shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action or claim arising out of or relating to this Agreement.

**ARTICLE IX.**
**TERMINATION OF AGREEMENT**

9.1 <u>Termination</u>. This Agreement may be terminated prior to the Closing:

(a) at any time on or prior to the Closing, by mutual written consent of the Company and the Investors;

(b) at the election of the Company or the Investors by written notice to the other parties hereto at any time after September 30, 2017, if the Closing shall not have occurred by such date (the "<u>Long Stop Date</u>"), unless such date is extended by the mutual written consent of the Company and the Investors; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 9.1(b)</u> shall not be available to any party whose breach of any representation, warranty, covenant or agreement under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(c) at the election of the Investors, if there has been a material breach of any representation, warranty, covenant or agreement on the part of the Company contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to the Company of such breach; or

(d) at the election of the Company, with respect to any Investor, if there has been a material breach of any representation, warranty, covenant or agreement on the part of such Investor contained in this Agreement, which breach has not been cured within twenty (20) Business Days after delivery of written notice to such Investor of such breach.

15

If this Agreement so terminates, it shall become null and void and have no further force or effect, except as otherwise provided in Section 9.2.

9.2 Survival. If this Agreement is terminated pursuant to Section 9.1, (a) this Agreement shall become void and of no further force and effect, except for the provisions of Sections 10.2 (Notices), 10.7 (Expenses), 10.8 (Governing Law), 10.9 (Dispute Resolution) and 10.12 (Publicity; Confidentiality), which shall survive the termination of this Agreement indefinitely or until the latest date permitted by law, (b) none of the parties hereto shall have any liability in respect of a termination of this Agreement pursuant to Section 9.1(a) or Section 9.1(b) (other than the party whose breach of a representation, warranty, covenant or agreement under this Agreement precipitated a termination pursuant to Section 9.1(b)), (c) nothing shall relieve any of the parties from liability for Losses resulting from the termination of this Agreement pursuant to Section 9.1(c) or Section 9.1(d), and (d) none of the parties hereto shall have any liability for speculative, indirect, punitive, unforeseeable or consequential damages or lost profits resulting from any legal action relating to the termination of this Agreement.

9.3 Termination Fee. If this Agreement is terminated (i) by the Company with respect to any Investor pursuant to Section 9.1(d) or (ii) by either the Company or any Investor pursuant to Section 9.1(b) as a result of (x) the failure by such Investor to fulfill the conditions set forth in Section 6.5 or (y) any other reason that is attributable to such Investor to consummate the Closing prior to the Long Stop Date, such Investor shall pay to the Company in immediately available funds an amount equal to 5% of such Investor's Consideration within three (3) Business Days after such termination.

## ARTICLE X.
## MISCELLANEOUS

10.1 Survival of Representations and Warranties. The representations and warranties made by each party hereto shall survive the Closing for a period of two (2) years (except for the Company's representations and warranties set forth in Section 7 (Taxes) of Schedule 2, which shall survive the Closing for a period of five (5) years) and shall terminate and be of no further force and effect thereafter, provide that if a claim is made by any party hereto to another party against whom such indemnity is sought with respect to any breach of a representation or warranty giving rise to the right of indemnity as set forth in Article VIII before the expiration of the applicable survival period, such representation or warranty, as applicable, shall survive the time at which it would otherwise terminate until such claim is solved or settled.

10.2 Notices.

(a) Any party hereto giving any notice or making any other communication pursuant to this Agreement shall give such notice or make such other communication in writing and shall use one of the following methods of delivery: personal delivery, courier with all fees prepaid or facsimile. A notice or other communication is effective only if the party hereto giving the notice or making the other communication has complied with the preceding sentence and if the addressee has received the notice or other communication; provided, that, a notice or other communication is deemed to have been received:

16

(i) if a notice or other communication is delivered in person, or sent by courier, upon receipt by the party hereto to whom the notice or other communication is addressed as indicated by the date on a signed receipt for such notice or other communication signed for or on behalf of such party; or

(ii) if a notice or other communication is sent by facsimile, upon receipt by the party hereto giving or making the notice or other communication of an acknowledgement or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the addressee's facsimile number.

(b) Any notice or other communication to a party hereto pursuant to this Agreement shall use the following address and facsimile number for such party (or such other address or facsimile number as such party may have notified to the other parties hereto pursuant to this Section 10.2):

if to the Company:

Qiyi.com, Inc.
17/F, Capital Development Tower
No.2, Haidian North 1st Street
Haidian District, Beijing 100080, PRC
Fax: 86-10-6267 7000
Attn: Wang Shuwen

if to an Investor, at the address or facsimile number as set forth in Schedule 1.

(c) A failure to deliver an informational copy of a notice or other communication to the applicable Person set forth in Section 10.2(b) above does not affect the effectiveness of a notice or other communication that is otherwise given in accordance with this Section.

(d) In the event that an addressee of a notice or communication rejects or otherwise refuses to accept a notice or other communication delivered or sent in accordance with this Section 10.2, or if the notice or other communication cannot be delivered because of a change in address for which no notice was given, then such notice or other communication is deemed to have been received upon such rejection, refusal or inability to deliver.

(e) Any party may by notice given in accordance with this Section 10.2 designate another address or Person for receipt of notices hereunder.

10.3 Successors and Assigns; Third Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. Neither the Company on the one hand, nor the Investors on the other hand, shall assign any of its rights or delegate or transfer any of its obligations under this Agreement without the written consent of the other side Except as otherwise provided herein, no Person other than the parties hereto and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

17

10.4 <u>Amendment and Waiver</u>.

(a) No failure or delay on any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies provided for herein are cumulative and are not exclusive of any remedies that may be available to the party hereto at law, in equity or otherwise.

(b) Except as otherwise expressly specified in this Agreement, any amendment, supplement or modification of or to any provision of this Agreement, any waiver of any provision of this Agreement, and any consent to any departure by the parties hereto from the terms of any provision of this Agreement, shall be effective and binding on the parties hereto (i) only if it is made or given in writing and signed by all of the parties hereto and (ii) only in the specific instance and for the specific purpose for which made or given.

10.5 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be as effective as delivery of a manually executed counterpart of a signature page of this Agreement.

10.6 <u>Specific Performance</u>. The parties hereto intend that each of the parties have the right to seek damages or specific performance in the event that any other party hereto fails to perform such party's obligations hereunder. Therefore, if any party shall institute any action or proceeding to enforce the provisions hereof, any party against whom such action or proceeding is brought hereby waives any claim or defense therein that the plaintiff party has an adequate remedy at law.

10.7 <u>Expenses</u>. All costs and expenses (including taxes, if any) incurred in connection with this Agreement, the other Transaction Documents and any transaction contemplated hereby and thereby shall be paid by the party incurring such cost or expense.

10.8 <u>Governing Law</u>. The laws of the State of New York (without giving effect to its conflicts of law principles) govern this Agreement and all matters arising out of or relating to this Agreement and any of the transactions contemplated hereby, including (a) its negotiation, execution, validity, interpretation, construction, performance and enforcement and (b) the rights and duties of the parties in whole or in part.

10.9 <u>Dispute Resolution</u>.

(a) Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination or validity hereof, shall be resolved through consultation. Such consultation shall begin immediately after one party hereto has delivered to the other parties hereto a written request for such consultation. If within thirty (30) days following the date on which such notice is given the dispute cannot be resolved, the dispute shall be submitted to arbitration upon the request of any party with notice to the other parties.

18

(b) The arbitration shall be conducted in Hong Kong under the auspices of the Hong Kong International Arbitration Centre (the "Centre"). There shall be three (3) arbitrators. Each opposing party to a dispute shall be entitled to appoint one arbitrator (where there are more than one party to one side of the dispute, the parties whose interests are aligned shall jointly appoint one arbitrator), and the third arbitrator shall be jointly appointed by the disputing parties or, failing such agreement by thirty (30) days after the appointment by each party of its arbitrator, the appointment of the third arbitrator shall be made by the Secretary General of the Centre.

(c) The arbitration proceedings shall be conducted in English. The arbitration tribunal shall apply the Arbitration Rules of the United Nations Commission on International Trade Law, as in effect at the time of the arbitration. However, if such rules are in conflict with the provisions of this Section 10.9, including the provisions concerning the appointment of arbitrators, the provisions of this Section 10.9 shall prevail.

(d) The arbitrators shall decide any dispute submitted by the parties to the arbitration strictly in accordance with the substantive law of the State of New York and shall not apply any other substantive law.

(e) Each party to an arbitration hereunder shall cooperate with the other in making full disclosure of and providing complete access to all information and documents requested by the other in connection with such arbitration proceedings, subject only to any confidentiality obligations binding on such party.

(f) The award of the arbitration tribunal shall be final and binding upon the disputing parties, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award. In the event of any failure of a party to this Agreement to comply with the award of the arbitration tribunal, the non-complying party shall be liable to the other parties for all reasonable costs and expenses of such enforcement.

(g) Either party shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal, but such relief shall only be sought on the ground that the award to which the party may be entitled would be ineffectual without interim relief.

(h) The costs of arbitration shall be borne by the losing party(ies), unless otherwise determined by the arbitration tribunal.

10.10 Severability. If any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired, unless the provisions held invalid, illegal or unenforceable shall substantially impair the benefits of the remaining provisions hereof.

10.11 Entire Agreement. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the parties hereto in respect of the subject matter contained herein and therein. There are no restrictions, promises, representations, warranties or undertakings, other than those set forth or referred to herein or therein. This Agreement, together with the exhibits and schedules hereto, and the other Transaction Documents supersede all prior agreements and understandings between the parties with respect to such subject matter.

19

10.12 <u>Publicity; Confidentiality</u>. None of the parties hereto shall issue a press release or public announcement or otherwise make any disclosure concerning (i) the provisions of this Agreement, the other Transactions Documents or the transactions contemplated hereby or thereby, (ii) the negotiations relating to this Agreement or the other Transaction Documents, or (iii) the information of the other parties received during the negotiations and execution of this Agreement and the other Transaction Documents without prior written approval by the Company and the Investors; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall restrict any party from disclosing information (a) that is already publicly available and not as a result of a breach of this <u>Section 10.12</u>, (b) that may be required by applicable Requirements of Law, <u>provided</u> that such party will use reasonable efforts to (i) notify the other party in advance of such disclosure so as to permit the other party to seek a protective order or otherwise contest such disclosure, and such party will use reasonable efforts to cooperate, at the expense of the other party, with the other party in pursuing any such protective order, and/or (ii) to obtain confidential treatment of any information so disclosed, (c) to such party's officers, directors, shareholders, investors, advisors, employees, members, partners, Controlling persons, auditors or counsel (as well as bona fide prospective lenders, investors, partners and advisors as long as such parties are subject to appropriate nondisclosure obligations) as may be reasonably required, or (d) to Persons from whom releases, consents or approvals are required, or to whom notice is required to be provided, pursuant to the transactions contemplated by the Transaction Documents or any Requirement of Law.

10.13 <u>Consultation With Counsel</u>. Each party hereto warrants that each of them has been represented and advised by legal counsel or has had full opportunity to be represented and advised by legal counsel with respect to this Agreement and all matters covered by it. Each of them represents and agrees that if it has elected not to be represented by legal counsel in the negotiation, preparation or execution of this Agreement, such election was made freely and voluntarily with full awareness of the consequences of the decision and that it is fully aware of the content and legal effect of this Agreement, and has executed or will execute this Agreement after independent investigation and without fraud, duress or undue influence.

[Signature Pages Follow]

20

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**COMPANY:**

**QIYI.COM, INC.**

By:    /s/ Gong Yu
Name:   GONG YU
Title:   Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G1 INVESTOR:**

**BAIDU HOLDINGS LIMITED**

By:    /s/ Yanhong Li
Name:  Yanhong Li
Title:  Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G1 INVESTOR:**

**BCCF CAPITAL LIMITED PARTNERSHIP**

By: /s/ Jianqiang Deng

Name:

Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G1 INVESTOR:**

**HARVEST REWARDS FUND LP**

By:  /s/ Changqi Lu
Name:
Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**MADRONE OPPORTUNITY FUND, L.P.**

By:    Madrone Capital Partners, LLC,

Its General Partner

By:    /s/ Greg Penner
Name:  Greg Penner
Title:   Manager

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**XIANG HE FUND I, L.P.**

By:     /s/ authorized signatory
Name:
Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**CMC CUE HOLDINGS LIMITED**

By:    /s/ Xian Chen
Name:   Xian Chen
Title:    Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**EASTONE INTERNATIONAL CO., LTD**

By:     /s/ authorized signatory
Name:
Title:

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**GORGEOUS RAINBOW LIMITED**

By:   /s/ Khalid Iton
Name:   Khalid Iton
Title:   Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**HH RSV-V HOLDINGS LIMITED**

By:    /s/ Jennifer Neo
Name:  Jennifer Neo
Title:  Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**HONEY BEST LIMITED**

By:    /s/ Jin Zheng
Name:  Jin Zheng
Title:   Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**IDG INFINITY FINANCIAL LIMITED**

By:    /s/ Yihong Guo

Name:  Yihong Guo

Title:   Authorized Signatory

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**RUN LIANG TAI (HONG KONG) INVESTMENT COMPANY LIMITED**

By:    /s/ Yang Yuxiang
Name:  Yang Yuxiang 杨宇翔
Title:   Director

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**SCC GROWTH IV HOLDCO A, LTD.**

By:   /s/ Ip Siu Wai Eva

Name:  Ip Siu Wai Eva

Title:   Authorized Signatory

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the undersigned have executed, or have caused to be executed, this Note Purchase Agreement as of the date first written above.

**G2 INVESTOR:**

**SILVERLINK CAPITAL LP**

By:   /s/ Andrew Tsuei
Name:  Andrew Tsuei
Title:  Managing Director of Silverlink Holdings Limited as General Partner

[SIGNATURE PAGE TO QIYI.COM, INC. NOTE PURCHASE AGREEMENT]

<u>Schedule 1</u>

<u>Part A</u>

<u>G1 Investors</u>

| Name and Address of Investors | Principal Amount of G1 Note | Consideration |
|---|---|---|
| **Baidu Holdings Limited** | US$300,000,000 | US$300,000,000 |
| Address:<br>No.10 Shangdi 10th Street,<br>Haidian District,<br>Beijing,100085, PRC<br>Fax: (86) 10 5992 0000 | | |
| **BCCF Capital Limited Partnership** | US$80,000,000 | US$80,000,000 |
| Address:<br>20/F, UNO Center Office,<br>No.2A, Jiangtai Road, Chaoyang District,<br>Beijing 100016, P.R. China<br>Attn: LI Ji<br>E-mail: ji.li@bccf.com.cn<br>Tel: (86) 10 5682 6952<br>Fax: (86) 10 5682 6998 | | |
| **Harvest Rewards Fund LP** | US$25,000,000 | US$25,000,000 |
| Address:<br>31/F, One Exchange Square, 8 Connaught Place,<br>Central, Hong Kong<br>Attn: 任剑琼<br>E-mail: renjianqiong@ample-harvest.com<br>Tel: (86) 18612205601<br>Fax: (852) 3921 8900 | | |
| **G1 TOTAL** | US$405,000,000 | US$405,000,000 |

SCHEDULE 1-1

Part B

G2 Investors

| Name and Address of Investors | Principal Amount of G2 Note | Consideration |
|---|---|---|
| **Madrone Opportunity Fund, L.P**. | US$50,000,000 | US$50,000,000 |
| Attn: Greg Penner<br>E-mail: greg@madronecap.com | | |
| **Xiang He Fund I, L.P.** | US$10,000,000 | US$10,000,000 |
| Address:<br>PO Box 309, Ugland House, Grand Cayman,<br>KY1-1104, Cayman Islands<br>Attn: Hesong Tang / Eva Wang<br>E-mail: htang@xianghecap.com /<br>ewang@xianghecap.com<br>Tel: (1) 650 666 7287 / (1) 650 319 5662 | | |
| **CMC CUE HOLDINGS LIMITED** | US$80,000,000 | US$80,000,000 |
| Address:<br>Unit 2208, North Building, Kerry Centre<br>1 Guanghua Road, Chaoyang District<br>Beijing, China<br>Attn: CHEN Xian<br>E-mail: alex.chen@cmccap.com<br>Fax: (86) 10 6561 1002 | | |
| **Eastone International Co., Ltd** | US$114,200,000 | US$114,200,000 |
| Address:<br>24/F, Building A, 4 Xing Gong Street, Sha He Kou<br>District<br>Dalian, Liaoning, China<br>Attn: Weifen Xu<br>E-mail: xuweifen1210@163.com<br>Tel: (86) 411 8889 1311; (86) 15998598082 | | |
| **Gorgeous Rainbow Limited** | US$220,000,000 | US$220,000,000 |
| Address:<br>Suite 1508, 15/F, Hutchison House,<br>10 Harcourt Road,<br>Central, Hong Kong<br>Attn: Joey CHEN<br>E-mail: jchen@boyucapital.com<br>Fax: (852) 3987 1711 | | |

SCHEDULE 1-2

| **HH RSV-V Holdings Limited** | US$350,000,000 | US$350,000,000 |

Address:
Floor 28, Building B, PingAn International Financial Center, No. 1-3, Xinyuan South Road, Chaoyang District, Beijing 100027 PRC
Attn: Paul Ma
E-mail: yma@hillhousecap.com; with a copy to
Legal@hillhousecap.com
Fax: (86) 10 5952 0882

| **Honey Best Limited** | US$80,000,000 | US$80,000,000 |

Address:
Room904, Tower E1, Oriental Plaza, No.1 East Chang'an Avenue, Dongcheng District, Beijing, PRC
Attn: CHAI Hua
E-mail: hua.chai@everbright-idg.com
Fax: (86) 10 8518 8718

| **IDG Infinity Financial Limited** | US$50,000,000 | US$50,000,000 |

Address:
c/o IDG Capital Management (HK) Ltd.
Unit 5505, 55/F., The Center
99 Queen's Road
Central, Hong Kong
Attn: Chi Sing HO
Fax: (852) 2529 1619

With a copy to:
Address: c/o IDG Capital Investment Consultancy (Beijing) Co., Ltd.
Floor 6, Tower A, COFCO Plaza, 8 Jianguomennei Dajie
Beijing, 100005, P.R. China
Attn: Mr. GUO Rui
Fax: (86) 10 8512 0225

SCHEDULE 1-3

| | | |
|---|---|---|
| **Run Liang Tai (Hong Kong) Investment Company Limited** | US$130,800,000 | US$130,800,000 |

Address:
9/F AMTEL BLDG 148 DES
VOEUX RD CENTRAL
CENTRAL HONG KONG
Attn: Meng Xiang Yun
Office Address:
SCG Parkside , 1006-1008 868
Yinghua Rd, Pudong Shanghai,
China
E-mail: xmeng@boliucapital.com
Fax: (86) 021 2612 0960-716

| | | |
|---|---|---|
| **SCC Growth IV Holdco A, Ltd.** | US$80,000,000 | US$80,000,000 |

Address:
Suite 3613, 36/F, Two Pacific Place, 88 Queensway
Hong Kong
Attn: Ip Siu Wai Eva
E-mail: eip@sequoiacap.com
Fax: (852) 2501 5249

| | | |
|---|---|---|
| **Silverlink Capital LP** | US$40,000,000 | US$40,000,000 |

Address:
Suite 1502, 15F, Beautiful Group Tower 74-77
Connaught Road Central
Central, HK
Attn: Theresa Teng
E-mail: theresa@silverlinkcapital.com

| | | |
|---|---|---|
| **G2 TOTAL** | US$1,205,000,000 | US$1,205,000,000 |

SCHEDULE 1-4

Schedule 2

Representations and Warranties of the Company

**Definitions**

In this Schedule 2, in addition to the capitalized terms defined in Article I of this Agreement, the following terms have the meanings as follows:

"Assets" means all assets, rights and privileges of any nature and all goodwill associated therewith, including all rights in respect of Contractual Obligations, all Intellectual Property, Technology and Equipment.

"Charter" means memorandum of association, articles of association, by-laws or other corporate constituting documents (including the business license for any entity organized under the laws of the PRC).

"Contingent Obligation" means, with respect to any Person, any agreement by such Person with respect to any Indebtedness (the "primary obligation") of another Person (the "primary obligor"), whether or not contingent, (a) to purchase, repurchase or otherwise acquire such primary obligations, (b) to advance or provide funds (i) for the payment or discharge of any such primary obligation, or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet item, level of income or financial condition of the primary obligor as required by or as a condition of any such primary obligation, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss or failure or inability by the primary obligor to perform any primary obligation. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof.

"Copyrights" means copyrights, mask work rights, database rights and design rights, whether or not registered, published or unpublished, and all registrations and applications for registration thereof, and all rights therein, whether provided by international treaties or conventions or otherwise.

"Environmental Laws" means laws, regulations and codes of the PRC or any other jurisdiction, as well as orders, decrees, judgments or injunctions, issued, promulgated, approved or entered thereunder relating to pollution, protection of the environment or public health and safety.

"Equipment" means all plant and machinery, tools and equipment, vehicles and office furniture, computer equipment and accessories and other tangible Assets.

"Financial Statements" has the meaning set forth in Section 6(a) of this Schedule 2.

"Indebtedness" means, as to any Person, without duplication, (a) all obligations of such Person for borrowed money (including, reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured), (b) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable and accrued commercial or trade liabilities arising in the ordinary course of business, (c) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person under leases which have been or should be, in accordance with the US GAAP, recorded as capital leases, (f) all indebtedness described in the foregoing clauses secured by any Lien (other than Liens in favor of lessors under leases other than leases included in clause (e)) on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is non-recourse to the credit of that Person, and (g) any Contingent Obligation of such Person.

SCHEDULE 2-1

"<u>Intellectual Property</u>" means rights relating to all of the following, whether protected, created or arising under the laws of PRC or any other foreign jurisdiction: (a) Patents, (b) Copyrights, (c) Trade Secrets, (d) Trademarks, (e) Internet Assets, and (f) all applications and registrations relating to any of the rights set forth in the foregoing clauses (a) to (e).

"<u>Internet Assets</u>" means all rights arising from, in, or in respect of any Internet domain names and other computer user identifiers and any rights in and to sites on the worldwide web, including rights in and to any text, graphics, audio and video files and html or other code incorporated in such sites.

"<u>knowledge</u>", with respect to the Company, means the Company's actual knowledge that has been brought to the attention of the Key Employees and/or director(s) of the Company.

"<u>Land Use Rights</u>" means with respect to the land on which the facilities of any Group Company are located, the land use rights granted in relation thereto under the relevant land use right certificates and real estate certificates.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), preemptive right, right of first refusal, or preference, priority, right or other security interest or preferential arrangement of any kind or nature whatsoever.

"<u>Litigation</u>" has the meaning set forth in <u>Section 9(a)</u> of this <u>Schedule 2</u>.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 5(a)</u> of this <u>Schedule 2</u>.

"<u>Patents</u>" means any patents and patent applications issued by any Governmental Authority or made in any jurisdiction, including any statutory invention registrations, divisions, continuations, continuations-in-part, substitutions thereof, whether or not patents are issued on such applications and whether or not such applications are modified, withdrawn or resubmitted, and any extensions, reissues, restorations and reexaminations of the foregoing.

"<u>Plan</u>" means any employee benefit plan, arrangement, policy, program, agreement or commitment, including any employment, consulting or deferred compensation agreement, executive compensation, bonus, incentive, pension, profit-sharing, savings, retirement, stock option, stock purchase or severance pay plan, any life, health, disability or accident insurance plan, whether oral or written, as to which any Group Company has or in the future could have any, direct or indirect, actual or contingent liability.

SCHEDULE 2-2

"Related Party", with respect to the Group Companies, means (i) any shareholder of the Company or any Subsidiary, (ii) any director of the Company or any Subsidiary, (iii) any Key Employee, (iv) any Relative of a director of the Company or any Subsidiary, and (v) any Person in which any shareholder or director of the Company or any Subsidiary or any Key Employee, has a majority equity interest.

"Relative" of a natural person means her/his spouse, parents, children, grandparents, grandchildren and siblings.

"Software" means any computer software programs, source code, object code, data and documentation, including any computer software programs that incorporate and run any Group Company's pricing models, formulae and algorithms.

"Technology" means, collectively, all designs, formulas, algorithms, procedures, techniques, ideas, know-how, Software, programs, models, routines, databases, tools, inventions, creations, improvements, works of authorship, recordings, graphs, drawings, reports, analyses, and other writings, and any other embodiment of the above, in any form, whether or not specifically listed herein.

"Trade Secrets" means any trade secrets, research records, processes, procedures, manufacturing formulae, technical know-how, proprietary technology, blue prints, designs, plans, inventions (whether patentable and whether reduced to practice), invention disclosures and improvements thereto, in each case, the value of which is contingent upon the maintenance of confidentiality thereof.

"Trademarks" means any trademarks, service marks, trade names, service names, trade dress, logos, and other product or service identifiers or identifiers of source, whether registered or unregistered, including all goodwill associated therewith and all common law rights, registrations and applications for registration thereof in any jurisdiction, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

**The Warranties**

1. **CORPORATE MATTERS**

   (a) <u>Organization, Good Standing and Qualification</u>. Each of the Group Companies has been duly incorporated and organized under the laws of the jurisdiction of its incorporation, and is validly existing and in compliance with all registration and approval requirements relating to its establishment as a company under the laws of the jurisdiction of its incorporation. Each of the Group Companies has the corporate power and authority to own and operate its Assets and properties and to carry on its business as currently conducted. Each of the Group Companies is qualified to do business and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction, except to the extent that the failure to be so qualified or be in good standing would not have, a Material Adverse Effect. Each PRC Entity has a valid business license issued by the State Administration for Industry and Commerce or its local branch, and has, since its establishment, carried on its business materially in compliance with the business scope set forth in its business license.

SCHEDULE 2-3

(b)    Charter Documents. All legal and procedural requirements and other formalities concerning such Charter and the arrangements set forth therein have been duly and properly complied with in all material respects.

(c)    Capitalization.

(i)    Ordinary Shares. As of the date hereof, the Company has authorized 3,500,000,000 Ordinary Shares, of which 342,548,237 are currently issued and outstanding. As of the Closing Date, the Company will have reserved 589,729,714 Ordinary Shares for issuance to officers, directors, employees and other service providers of the Company pursuant to (i) the employment agreement with the chief executive officer of the Company, and (ii) an equity incentive plan duly adopted by the Board of Directors and approved by the Company's shareholders (as amended from time to time, collectively the "Share Option Reserve").

(ii)    Preferred Shares. As of the date hereof, the Company has authorized 2,714,387,481 Preferred Shares: (i) 200,000,000 of which are designated as Series A Preferred Shares, all of which are issued and outstanding; (ii) 6,064,174 of which are designated as Series A-1 Junior Preferred Shares, all of which are issued and outstanding; (iii) 123,103,264 of which are designated as Series B Preferred Shares, all of which are issued and outstanding; (iv) 302,891,196 of which are designated as Series C Preferred Shares, all of which are issued and outstanding; (v) 848,682,647 of which are designated as Series D Preferred Shares, all of which are issued and outstanding, (vi) 686,646,383 of which are designated as Series E Preferred Shares, all of which are issued and outstanding, and (vii) 546,999,817 of which are designated as Series F Preferred Shares, all of which are issued and outstanding.

(iii)    HK Subsidiary. The authorized share capital of the HK Subsidiary on the date hereof is HK$10,000 divided into 10,000 shares with a par value of HK$1.00 each, one (1) share of which is issued and outstanding and held by the Company.

(iv)    PRC Entities. The registered capital of each of the PRC Entities on the date hereof is set forth opposite its name on Section 1(c) of the Disclosure Schedule, together with an accurate list of the registered shareholders of such registered capital.

(v)    Except for (i) the Transaction Documents, (ii) the Share Option Reserve, and (iii) the option to purchase the equity interest of the Domestic Enterprises as set forth in the Control Documents, there are no options, warrants, conversion privileges, subscription or purchase rights or other rights presently outstanding to purchase or otherwise acquire (i) any Equity Securities of the Group Companies or (ii) any other securities of the Group Companies and there are no commitments, contracts, agreements, arrangements or understandings by the Group Companies to issue any shares, capital stock or any Equity Securities or other securities of the Group Companies. The Conversion Shares, when issued to the Investors upon the conversion of the Notes, will be duly authorized, validly issued, fully paid and non-assessable, will be issued in compliance with the registration and qualification requirements of all applicable securities laws (assuming the accuracy of the representations and warranties of the Investors set forth in Article IV) and will be free and clear of all Liens, other than the pledge created under the Control Documents with respect to the equity interest of the Domestic Enterprises and except as set forth in the amended and restated shareholders agreement to be entered into upon the conversion of the Notes. All of the issued Equity Securities of the Group Companies are validly issued, fully paid and non-assessable, and were issued in compliance with the registration and qualification requirements of all applicable securities laws. The registered capital of each of the PRC Entities were timely contributed and such registered capital is nonassessable. All of the issued Equity Securities of the Group Companies are free and clear of any Lien (except as set forth in the Control Documents, the Shareholders Agreement and Requirements of Law).

SCHEDULE 2-4

(d) <u>Corporate Structure; Subsidiaries</u>. <u>Section 1(d)</u> of the Disclosure Schedule sets forth a complete structure chart showing Group Companies, and indicating the ownership and Control relationships among all Group Companies and the jurisdiction in which each Group Company was organized. No Group Company owns or Controls, directly or indirectly, any Equity Security in any other Person except as disclosed in <u>Section 1(d)</u> of the Disclosure Schedule.

**2. AUTHORIZATION AND VALIDITY OF TRANSACTIONS**

(a) <u>Authorization</u>. The Company has the power and authority to execute and deliver the Transaction Documents and the other agreements to which it is a party and the execution of which is contemplated hereunder as well as to perform its respective obligations thereunder. Except for such corporate actions on the part of the Company in connection with the conversion of the Notes, all corporate actions on the part of the Company necessary for the authorization, execution and delivery of, and the performance of all of its respective obligations under, the Transaction Documents have been taken or will be taken prior to the Closing Date.

(b) <u>Enforceability</u>. This Agreement and each other Transaction Document will be, when executed, a valid and binding obligation of and enforceable against the Company, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) laws relating to the availability of specific performance or injunctive relief.

(c) <u>Consents and Approvals</u>. Except for such Consents (as defined below) that will need to be made or obtained in connection with or as a result of the conversion of the Notes, all consents, licenses, permits, approvals, orders or authorizations of, or registrations, qualifications, designations, declarations or filing with, any Governmental Authority or any other third party ("<u>Consents</u>") which are required to be made or obtained by the Company in connection with the consummation of the transactions contemplated under this Agreement have been or will be obtained or made prior to and are effective as of the Closing.

SCHEDULE 2-5

(d) <u>No IP Litigation</u>. To the knowledge of the Company, except as disclosed in <u>Section 2(d)</u> of the Disclosure Schedule, none of the Group Companies has pending material Litigation in which the right of any Group Company to use, sell or license out its Intellectual Property or Technology has been contested.

(e) <u>No Breach</u>. The execution and delivery by the Company of each Transaction Document and the performance by the Company of its obligations under such documents do not:

(i) breach or constitute a default under (with or without notice, lapse of time or both) any Charter document of the Company;

(ii) result in a material breach of, or constitute a material default under (with or without notice, lapse of time or both), or give rise to a right of termination or cancellation with respect to any material Contractual Obligation to which the Company is a party or by which the Company or its material property or Assets is bound or result in the acceleration of any material obligation under any Contractual Obligation;

(iii) result in a material violation or breach of or default under (with or without notice, lapse of time or both) any Requirements of Law or of any order, writ, injunction, judgment or decree of any Governmental Authority by which such Person or its property of Assets is bound.

(f) <u>No Brokerage Fees</u>. No Person is entitled to receive from the Company or any of its Affiliates any finder's fee, brokerage or commission in connection with this Agreement and each other Transaction Document or the transactions contemplated hereby or thereby.

**3.    LEGAL COMPLIANCE**

(a) <u>Compliance with Laws</u>.

(i) Each of the Group Companies is, and has been (including without limitation, with respect to the carrying on of its business or the ownership of its properties), in compliance in all material respects with all applicable Requirements of Law. None of the Group Companies nor, to the knowledge of the Company, any of its directors, officers or senior management staff, has committed any criminal offence that could result in arrest or that carries a penalty that could include imprisonment, or any tort or any breach of any Requirements of Law, in either case relating to the carrying on of the business of any Group Companies. None of the equity holders of any of the Group Companies is or has at any time committed any criminal offence or been in violation of any applicable Requirements of Law relating to the carrying on of the business of any Group Company.

(ii) There are no Contractual Obligations or concerted practices to which any of the Group Companies is a party or by which any of the Group Companies is bound which are illegal or which contravene any applicable Requirements of Law in any material respects.

SCHEDULE 2-6

(iii)   Assuming the accuracy of the representations and warranties of the Investors set forth in <u>Article IV</u>, the offer, sale and issuance of the Notes and the issuance of the Conversion Shares upon the conversion of the Notes in conformity with the terms of this Agreement are exempt from the registration and prospectus delivery requirements of the United States Securities Act of 1933, as amended, and each other analogous provision of any other applicable body of securities law.

(b)   <u>Permits</u>. Each of the Group Companies has all material permits, approvals, authorizations, franchises and licenses necessary for the conduct of its business as currently conducted. None of the Group Companies is in breach of or default under any such permit, approval, authorization, franchise or license. All such permits approvals, authorizations, franchises and licenses will remain in full force and effect notwithstanding any transaction contemplated in connection with any Transaction Document. None of the Group Companies is in receipt of any letter or notice from any relevant Governmental Authority notifying revocation of any such permits or licenses issued to it for noncompliance or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by it. Each of the PRC Entities has been conducting their respective business activities within their respective permitted scopes of business or are otherwise operating their respective businesses in material compliance with all Requirements of Law and with all requisite licenses, permits and approvals granted by competent PRC Governmental Authorities. In respect of approvals, licenses or permits requisite for the conduct of any part of the business of any of the Group Companies which are subject to periodic renewal, none of the Group Companies has any reason to believe that such requisite renewals will not be timely granted by the relevant Governmental Authorities.

(c)   <u>Governmental Authority</u>. (i) There is no Governmental Authority or other Person that has:

(x)   instituted or, to the knowledge of the Company, threatened any action or investigation to restrain, prohibit or otherwise challenge the acquisition of the Notes by the Investors or any of the transactions contemplated in connection with the Transaction Documents; or

(y)   to the knowledge of the Company, proposed or adopted any Requirements of Law which would prohibit, materially restrict the operations of any of the Group Companies as currently conducted or currently proposed to be conducted.

(ii)   None of the information requested by any Governmental Authority in relation to the transactions contemplated by this Agreement is, in the reasonable opinion of the Company, unusual or otherwise outside the ordinary course.

(d)   <u>Compliance with Other Instruments</u>. None of the Group Companies is in, nor shall the conduct of its business as currently result in, a violation, breach or default of any term of the Charter documents of the Company or the PRC Entity (as the case may be), or in any material respect of any term or provision of any mortgage, indenture, contract, agreement or instrument to which the Company or the PRC Entity is a party or by which it or its property may be bound, or in any material respect of any provision of any judgment, decree, order, statute, rule or regulation applicable to or binding upon any of the Group Companies. None of the activities, agreements, commitments or rights of any of the Group Companies is ultra vires or unauthorized.

SCHEDULE 2-7

4.   **ASSETS**

(a)   <u>Title to Assets</u>. The Group Companies have good title to (free and clear of any Lien, except for Permitted Liens), or in the case of leased property and assets, have valid leasehold interests in, all its properties and assets (whether real, personal, tangible or intangible) reflected on the Financial Statements or acquired after June 30, 2016 except for properties and assets sold since June 30, 2016 in the ordinary course of business consistent with past practice or where the failure to have such good title or valid leasehold interests would not have a Material Adverse Effect. The foregoing properties and assets collectively represent in all material respects all properties and assets necessary for the conduct of the business of the Group Companies as presently conducted.

(b)   <u>Land Use Rights</u>. None of the Group Companies has at any time had any Land Use Rights or otherwise holds any title or other ownership interest to any real property.

(c)   <u>Leased Properties</u>. <u>Section 4 (c)</u> of the Disclosure Schedule lists all real property leased or subleased by the Group Companies. With respect to each lease and sublease in connection with all real property leased or subleased by the Group Companies:

(i) such lease or sublease is in full force and effect in all material respects, assuming the respective lessor holds valid title or land use rights to such properties;

(ii) (A) none of the Group Companies is, and to the knowledge of the Company, no other party to the lease or sublease is, in material default with respect to such lease or sublease, or (B) none of the Group Companies has received a written notice of default with respect to such lease or sublease;

(iii) there is no pending, or to the knowledge of the Company, threated condemnation, confiscation or eminent domain proceeding by any Governmental Authority with respect to the leased properties of the Group Companies which could cause a Material Adverse Effect on the Group Companies.

5.   **CONTRACTS AND TRANSACTIONS**

(a)   <u>Material Contracts</u>. With respect to each of the Contractual Obligations to which any of the Group Companies is a party (but excluding any Contractual Obligations that have been fully performed by all parties thereto, with no continuing obligations whatsoever by any party thereto), or by which it is bound, that: (i) was entered into outside of its ordinary course of business, (ii) involves total payments (contingent or otherwise) or revenues in excess of RMB400,000,000 individually with respect to each Contractual Obligation, (iii) involves any Related Party, (iv) extend for more than one year beyond the date of this Agreement, (v) are not terminable upon notice of thirty (30) days or less without incurring any penalty or obligation, (vi) contain exclusivity, non-competition, or similar clauses that impair, restrict or impose conditions on any of the Group Companies' right to offer or sell products or services in specified areas, during specified periods, or otherwise, other than those Contractual Obligations entered into by any Group Company during its ordinary course of business, (vii) transfer or license any Intellectual Property to or from the Group Companies (other than licenses granted in the ordinary course of business that also does not fall into any type from (ii) to (vi) and (viii), licenses from commercially readily available "off the shelf" computer software or licenses on the standard form of license agreement of the Group Companies), (viii) the termination of which would be reasonably likely to have a Material Adverse Effect or (ix) is otherwise material to the Group Companies (collectively, "<u>Material Contracts</u>"), the applicable Group Company is not in default (to the knowledge of the Company, nor with the giving of notice or passage of time, would be in default) in any material respect in the performance, observance or fulfillment of any of its obligations or covenants contained in any such Material Contract, and to the knowledge of the Company, none of the parties to any such Material Contract has indicated any intention to terminate, rescind, avoid or repudiate such Material Contract prior to the expiration of its term. Each Material Contract to which any of the Group Companies is a party has been duly authorized, executed and delivered by the applicable Group Company and, to the knowledge of the Company, by each other party thereto and constitutes the valid and binding obligation of the applicable Group Company and, to the knowledge of the Company, of each other party thereto, enforceable against the Group Companies and, to the knowledge of the Company, against each other party thereto, in accordance with its terms, except where such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) laws relating to the availability of specific performance or injunctive relief.

SCHEDULE 2-8

(b)    Performance. To the knowledge of the Company, there does not exist any fact, condition or circumstance which would render any material obligation under any Material Contract incapable of being performed.

**6.    FINANCIAL MATTERS**

(a)    Financial Statements. The Company has delivered or caused to be delivered to each Investor or its advisor (i) the unaudited and consolidated income statement for the six-month period ended June 30, 2016, and (ii) the unaudited consolidated balance sheet as of June 30, 2016 (collectively, the "Financial Statements"). The Financial Statements (x) are true, correct and complete in all material aspects and present fairly in all material aspects the financial condition of the Group Companies at the date or dates therein indicated and the results of operations for the period or periods therein specified, subject in the case of the unaudited Financial Statements to normal year-end audit adjustments, and (y) have been prepared in all material aspects in accordance with the US GAAP applied on a consistent basis throughout the periods indicated, except that the unaudited Financial Statements may not contain all footnotes required by US GAAP.

(b)    No Material Liabilities. Since June 30, 2016, neither the Company nor any PRC Entity has incurred any material liability or obligation, absolute or contingent (individually or in the aggregate) other than (i) in ordinary course of business, or (ii) duly approved by the Board of Directors pursuant to the then-existing Charter of the Company. Since June 30, 2016, except for any of the followings that would not have a Material Adverse Effect and other than those incurred in the ordinary course of business and those as contemplated by the Transaction Documents, none of the Group Companies has:

SCHEDULE 2-9

(i)     purchased, acquired, sold, transferred, leased or otherwise disposed of any material assets;

(ii)    created, assumed or discharged any material Lien (other than Permitted Liens); and

(iii)   commenced or settled any material Litigation.

(c)   <u>Financial Obligations</u>. There is no Indebtedness made, given, assumed, guaranteed, entered into or incurred, directly or indirectly, by or on behalf of any of the Group Companies; and there are no Liens (except Permitted Liens) on the Assets of any of the Group Companies or any part thereof, in each case except as set forth in the Control Documents, or as reflected on Financial Statements. None of the Group Companies has entered into any financing or "off balance sheet" arrangements.

**7.    TAXES**

(a)   There are no material Taxes due and payable by any of the Group Companies which have not been timely paid or withheld. There are no accrued and unpaid material Taxes of any of the Group Companies which are due, whether or not disputed.

(b)   Each of the Group Companies has timely filed or caused to be filed all returns for Taxes that it is required to file (including all applicable extensions), and all such Tax returns are accurate and complete in all material aspects. No Group Company has received any written claim made by a Tax Governmental Authority having jurisdiction over such Group Company claiming such Group Company fails to file returns for Taxes that such Group Company is subject to taxation by that jurisdiction.

(c)   With respect to all such Tax returns of any of the Group Companies, (i) there is no unassessed Tax deficiency proposed or, to the knowledge of the Company, threatened against any of the Group Companies and (ii) no audit is in progress with respect to any return for Taxes, no extension of time is in force with respect to any date on which any return for Taxes was or is to be filed and no waiver or agreement is in force for the extension of time for the assessment or payment of any Tax.

(d)   With respect to each Group Company, there is no pending investigation conducted by a Tax Governmental Authority having jurisdiction over such Group Company regarding its payment or withholding of Taxes.

(e)   There are no Liens (except Permitted Liens) for Taxes on the Assets of any of the Group Companies.

SCHEDULE 2-10

**8. INSURANCE**

(a) All of the insurance policies held by or on behalf of any of the Group Companies are valid and enforceable in accordance with their terms and are in full force and effect and cover risks associated with the Company's or applicable PRC Entity's business that are customarily insured against for companies similarly situated and in such amounts as are customarily insured against for companies similarly situated. None of such policies will be affected by, or terminate or lapse by reason of, any transaction contemplated in the Transaction Documents.

**9. CLAIMS AND PROCEEDINGS**

(a) <u>No Litigation</u>. Except as disclosed in <u>Section 9(a)</u> of the Disclosure Schedule, none of the Group Companies and any officer or director of any of the Group Companies (in his or her capacity as an officer or director) is engaged in, has pending or has been notified that it is the subject of any material action, suit, preceding, complaint, investigation, inquiry, claim, litigation, arbitration or administrative or criminal proceedings (collectively, "<u>Litigation</u>"), whether as plaintiff, defendant or otherwise. To the knowledge of the Company, there are no facts or circumstances likely to give rise to any material Litigation against any of the Group Companies or any officer or director thereof (in his or her capacity as an officer or director).

(b) <u>No Threatened Proceedings</u>. To the knowledge of the Company, there is no threatened Litigation against any of the Group Companies or any officer or director thereof (in his or her capacity as an officer or director).

(c) <u>Environmental Matters</u>. Each of the Group Companies is in compliance in all material respects with all applicable Environmental Laws, no material expenditures are or, to the knowledge of the Company, will be required in order to comply with any such laws.

**10. EMPLOYMENT AND LABOR RELATIONS**

(a) <u>Compliance with Law</u>. Each of the Group Companies has complied in all material respects with all applicable employment and labor laws, including laws and regulations pertaining to welfare funds, social benefits, medical benefits, insurance, retirement benefits, and pensions.

(b) <u>Employee Benefit Plans</u>. Each of the Group Companies has made all social security contributions (or similar contributions) in respect of or on behalf of all its employees in accordance with Requirements of Law in all material respects. Other than such social security contributions, none of the Group Companies maintains, or contributes to, or has any liability under, any Plan.

(c) <u>Key Employees</u>. Each Key Employee has entered into an employment agreement and other ancillary agreement(s) on confidentiality and proprietary information, intellectual property right of the Group Companies as well as such Key Employees' obligations of non-competition and non-solicitation.

(d) <u>Labor Relations</u>. (i) The Group Companies' labor practice are in compliance with the applicable Requirements of Law in all material aspects; (ii) there is (A) no grievance or arbitration proceeding arising out of or under collective bargaining agreements pending or, to the knowledge of the Company, threatened against any of the Group Companies, and (B) no strike, labor dispute, slowdown or stoppage pending or, to the knowledge of the Company, threatened against any of the Group Companies. To the knowledge of the Company, none of the Key Employees intends to terminate his/her employment with the Group Companies, as applicable. None of the Group Companies has discussed or taken any steps to terminate the employment of any Key Employee. To the knowledge of the Company, each Key Employee spends all, or substantially all, of his/her business time on the business of the Group Companies.

SCHEDULE 2-11

**11.   INTELLECTUAL PROPERTY**

(a)   The Company and/or an applicable Group Company is the owner of, or, to the knowledge of the Company, has the valid and subsisting license or right to use, all of the Intellectual Property (including the Internet websites) and Technology necessary to operate its existing business.

(b)   Section 11(b) of the Disclosure Schedule lists all material Intellectual Property license agreements which grant Intellectual Property to the Group Companies. Each of the Group Companies has performed in all material aspects, obligations imposed upon it thereunder, and is not, nor to the knowledge of the Company, is any other party thereto, in breach of or default thereunder in any material respect, nor is there any event which with notice or lapse of time or both would constitute a default in any material respect thereunder. To the knowledge of the Company, all of such Intellectual Property license agreements listed on Section 11(b) of the Disclosure Schedule are valid, enforceable and in full force and effect, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, fraudulent conveyance or transfer, moratorium or similar laws affecting the enforcement of creditors' rights generally and except for the termination or expiration pursuant to the terms and provisions thereof.

(c)   None of the Intellectual Property or Technology used, developed, sold, licensed or otherwise exploited by any of the Group Companies, or to the knowledge of the Company, made for, or sold or licensed to any of the Group Companies by any Person infringes upon or otherwise violates any Intellectual Property rights of any third Person, except to the extent that any such infringement or violation, individually or in the aggregate, would not have a Material Adverse Effect.

(d)   To the knowledge of the Company, no Person is infringing upon or otherwise violating the Intellectual Property rights of the Group Companies.

(e)   No employee or any former employee of the Group Companies has made a claim against the Group Companies that any of the Group Companies is utilizing Intellectual Property owned by such employee or former employee.

(f)   None of the Group Companies is a party to or bound by any license or other agreement requiring the payment by any of the Group Companies of any material royalty payment, excluding such agreements relating to Software licensed for use solely on the computers of any of the Group Companies, intra-company license agreements or video-contents related license agreements relating to the ordinary course of business of the Group Companies.

SCHEDULE 2-12

(g)  To the knowledge of the Company, no employee of any of the Group Companies is in material violation of any term of any Patent or invention disclosure agreement, any Patent or invention disclosure provisions in any employment agreement, confidentiality agreement, or any other contract or agreement. To the knowledge of the Company, none of the Key Employees is in material violation of any employment agreement or other employment-related agreement with any of the Group Companies, as applicable.

(h)  None of the Trade Secrets that are material to the business of the Group Companies, wherever located, the value of which is contingent upon maintenance of confidentiality thereof, has been disclosed to any Person other than the shareholders and employees of any of the Group Companies, except: (i) as required pursuant to the filing of a Patent application by the Group Companies or (ii) where such disclosure was properly made in the ordinary course of its business or for financing purposes or as required under the Control Documents, in either case subject to an agreement under which the recipient is obliged to maintain the confidentiality of such Trade Secrets and is restrained from further disclosing it or using it other than for the purposes for which it was disclosed by the Group Companies. None of the Group Companies is in material breach of any Contractual Obligations under which confidential information belonging to any Person is made available to the Group Companies.

(i)  It is not necessary for the business of any of the Group Companies as currently conducted to use any Intellectual Property or Technology owned by any director, officer, employee or consultant of any of the Group Companies (or persons the Group Companies presently intends to hire). To the knowledge of the Company, at no time during the conception or reduction to practice of any of the Intellectual Property or Technology of any of the Group Companies was any developer, inventor or other contributor to such Intellectual Property or Technology operating under any grants from any Governmental Authority or subject to any employment agreement, invention assignment, nondisclosure agreement or other Contractual Obligations with any Person other than the Group Companies that could adversely affect the rights of any of the Group Companies to its Intellectual Property or Technology.

(j)  All present and former employees and officers of each of the Group Companies have executed and delivered employment contracts containing proprietary invention provisions with the Group Companies, and are obligated under the terms thereof to assign all inventions made by them during the course of employment that relate to any work assigned and are developed using the financial support, supplies and facilities provided by the Group Companies to the Group Companies. No such employee of any of the Group Companies has excluded works or inventions made prior to his employment with or work for the Group Companies from his assignment of inventions pursuant to such proprietary invention agreements.

(k)  Network Redundancy and Computer Back-up.

(i)  The server hardware and supporting equipment (including communications equipment, terminals and hook-ups that interface with third party computer systems) used in the Company's and each PRC Entity's services network provide redundancy and meet industry standards relating to high availability; and

SCHEDULE 2-13

(ii)     Each of the Group Companies has made back-up copies of all material computer Software and databases utilized by it and maintain such Software and databases at a secure off-site location.

**12.    RELATED PARTY TRANSACTIONS**

(a)     All the transactions between any Group Company and the Related Party have been, in all material respects, entered into on an arm's length basis, in accordance with all the related party transaction decision-making formalities (if any and applicable) and not against the normal and reasonable interest of the Group Companies.

**13.    DISCLOSURE**

(a)     <u>No Misrepresentation</u>. No disclosure made against a representation or warranty by the Company in this Agreement (including exhibits and/or schedules thereto) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein, in light of the circumstances under which they were made, not misleading.

(b)     <u>Full Disclosure</u>. The Company has fully provided the Investors with all material information that the Investors have reasonably requested for deciding whether to purchase the Notes.

SCHEDULE 2-14

<u>Schedule 3</u>

<u>Representations and Warranties of the Investors</u>

In this <u>Schedule 3</u>, capitalized terms not otherwise defined have the meanings specified in <u>Schedule 2</u> to this Agreement, and if not defined therein, have the meanings set forth in <u>Article I</u> of this Agreement.

1. Such Investor is a limited partnership or limited liability company duly organized and validly existing in good standing under the laws of the jurisdiction of its formation.

2. Such Investor has the full power and authority to enter into, execute and deliver this Agreement and the other Transaction Documents to which it is a party and to perform its obligations contemplated hereby or thereby. The execution and delivery by such Investor of this Agreement and the other Transaction Documents to which it is a party and the performance by such Investor of its obligations contemplated hereby or thereby have been duly authorized by all necessary corporate actions of such Investor. This Agreement is and each of the other Transaction Documents to which it is a party, when executed by such Investor, will be a legal, valid and binding obligation of such Investor, enforceable against such Investor in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally.

3. Such Investor has had an opportunity to discuss the Group Companies' business, management, financial affairs and the terms and conditions of the offering of the Notes with the management of the Group Companies and has had an opportunity to review the Group Companies' facilities. The foregoing, however, does not limit or modify the representations and warranties of the Company in <u>Article III</u> of this Agreement or the right of such Investor to rely thereon.

4. Such Investor is either (i) an "accredited investor" within the meaning of Securities and Exchange Commission Rule 501 of Regulation D, as presently in effect, under the Securities Act, or (ii) not a "U.S. person" as defined in Rule 902 of Regulation S of the Securities Act. Such Investor has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Notes and is capable of bearing the economic risks of such investment.

5. The Notes to be acquired by such Investor pursuant to this Agreement are being or will be acquired for its own account and with no intention of distributing or reselling the Notes or any part thereof. If such Investor should in the future decide to dispose of any of such Notes, such Investor understands and agrees that it may do so only in compliance with the applicable securities laws, as then in effect, and the provisions in the Notes. Such Investor holds its interest in the Notes for itself beneficially and does not have any contract, undertaking, agreement, or arrangement with any Person to sell or transfer to any third party its interest (including beneficiary interest) in the Notes and is not acting as nominee or trustee or otherwise on behalf of any Person. Such Investor agrees to the imprinting, so long as required by law and to the extent applicable, of a legend on certificates representing all of its Notes and the Conversion Shares issuable upon conversion of its Notes to the following effect:

SCHEDULE 3-1

THE SECURITIES REPRESENTED BY THIS [CERTIFICATE][INSTRUMENT] HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR IN ANY JURISDICTION, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR OTHERWISE IN COMPLIANCE THEREWITH. THE SALE, ASSIGNMENT, HYPOTHECATION, PLEDGE, ENCUMBRANCE OR OTHER DISPOSITION (EACH A "TRANSFER") AND VOTING OF ANY OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE RESTRICTED BY THE TERMS OF A SHAREHOLDERS AGREEMENT AMONG THE COMPANY AND THE SHAREHOLDERS NAMED THEREIN, A COPY OF WHICH MAY BE INSPECTED AT THE COMPANY'S PRINCIPAL OFFICE. THE COMPANY WILL NOT REGISTER THE TRANSFER OF SUCH SECURITIES ON THE BOOKS OF THE COMPANY UNLESS AND UNTIL THE TRANSFER HAS BEEN MADE IN COMPLIANCE WITH THE TERMS OF THE SHAREHOLDERS AGREEMENT.

6. Such Investor understands that no public market now exists for the Notes or Conversion Shares, and that the Company has not made any assurances that a public market will ever exist for the Notes or Conversion Shares.

7. Such Investor acknowledges that it is not relying upon any Person other than the Company, its officers and directors, in making its investment or decision to invest in the Notes. Such Investor agrees that no Investor or the respective Controlling persons, officers, directors, partners, agents, or employees of any Investor shall be liable to any other Investor for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the purchase of the Notes.

SCHEDULE 3-2

**EXHIBIT 8.1**

**List of Principal Subsidiaries and Consolidated Affiliated Entities**

**Subsidiaries:**

Baidu Holdings Limited — Incorporated in the British Virgin Islands

Baidu (Hong Kong) Limited — Incorporated in Hong Kong

Baidu Online Network Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu (China) Co., Ltd. — Incorporated in the PRC

Baidu.com Times Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu International Technology (Shenzhen) Co., Ltd. — Incorporated in the PRC

Qiyi.com, Inc. — Incorporated in the Cayman Islands

91 Wireless Websoft Limited — Incorporated in the Cayman Islands

**Consolidated Affiliated Entities:**

Beijing Baidu Netcom Science Technology Co., Ltd. — Incorporated in the PRC

Beijing Perusal Technology Co., Ltd. — Incorporated in the PRC

Beijing BaiduPay Science and Technology Co., Ltd. — Incorporated in the PRC

**EXHIBIT 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Robin Yanhong Li, certify that:

1. I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 31, 2017

By: /s/ Robin Yanhong Li
     Name: Robin Yanhong Li
     Title:  Chief Executive Officer

**EXHIBIT 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Jennifer Xinzhe Li, certify that:

1. I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 31, 2017

By: /s/ Jennifer Xinzhe Li
    Name: Jennifer Xinzhe Li
    Title: Chief Financial Officer

**EXHIBIT 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Yanhong Li, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 31, 2017

By: /s/ Robin Yanhong Li
    Name: Robin Yanhong Li
    Title: Chief Executive Officer

**EXHIBIT 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jennifer Xinzhe Li, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 31, 2017

By:  /s/ Jennifer Xinzhe Li
     Name: Jennifer Xinzhe Li
     Title: Chief Financial Officer

**EXHIBIT 15.1**

[Maples and Calder (Hong Kong) LLP Letterhead]

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing 100085
The People's Republic of China

31 March 2017

Dear Sirs

**Baidu, Inc.**

We consent to the reference to our firm under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation Considerations" and "Item 16G. Corporate Governance" in Baidu Inc.'s Annual Report on Form 20-F for the year ended 31 December 2016 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2017, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc. of the summary of our opinion under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation Considerations" and "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder (Hong Kong) LLP

**EXHIBIT 15.2**

[Han Kun Law Offices Letterhead]

March 31, 2017

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing
People's Republic of China 100085

Dear Sir/Madam:

We hereby consent to the reference of our name under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in Baidu, Inc.'s Annual Report on Form 20-F for the year ended December 31, 2016 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2017, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc. of the summary of our opinion under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in the Annual Report. We also consent to the filing of this consent letter with the SEC as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ Han Kun Law Offices

**EXHIBIT 15.3**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan,

(2)    Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and

(3)    Registration Statement (Form F-3 No. 333-184757) of Baidu, Inc.;

of our reports dated March 31, 2017, with respect to the consolidated financial statements of Baidu, Inc. and the effectiveness of internal control over financial reporting of Baidu, Inc. included in this Annual Report (Form 20-F) of Baidu Inc. for the year ended December 31, 2016.

/s/ Ernst & Young Hua Ming LLP

Beijing, the People's Republic of China
March 31, 2017