# Exhibit T

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

**Form 20-F**

(Mark One)

☐　REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒　ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2017.**

or

☐　TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from　　　to**

or

☐　SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of event requiring this shell company report**

**For the transition period from _____ to _____**

**Commission file number: 000-51469**

# Baidu, Inc.
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**Baidu Campus**
**No. 10 Shangdi 10th Street**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Address of principal executive offices)**

**Herman Yu, Chief Financial Officer**
**Telephone: +(86 10) 5992-8888**
**Email: ir@baidu.com**
**Facsimile: +(86 10) 5992-0000**
**Baidu Campus**
**No. 10 Shangdi 10th Street,**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares (ten American depositary shares representing one Class A ordinary share, par value US$0.00005 per share) | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |
| Class A ordinary shares, par value US$0.00005 per share* | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

\*　Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
**None**
**(Title of Class)**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**27,614,978 Class A ordinary shares and 7,201,254 Class B ordinary shares, par value US$0.00005 per share, as of December 31, 2017.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.　Yes ☒　No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.　Yes ☐　No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.　Yes ☒　No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).　Yes ☒　No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒　　　　Accelerated filer ☐　　　　Non-accelerated filer ☐　　　　Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒　　　　International Financial Reporting Standards as issued by the International Accounting Standards Board ☐　　　　Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐

Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**Table of Contents**

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| INTRODUCTION |  |  | 1 |
| FORWARD-LOOKING INFORMATION |  |  | 1 |
| PART I |  |  | 2 |
|  | Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
|  | Item 2. | Offer Statistics and Expected Timetable | 2 |
|  | Item 3. | Key Information | 3 |
|  | Item 4. | Information on the Company | 43 |
|  | Item 4A. | Unresolved Staff Comments | 78 |
|  | Item 5. | Operating and Financial Review and Prospects | 79 |
|  | Item 6. | Directors, Senior Management and Employees | 109 |
|  | Item 7. | Major Shareholders and Related Party Transactions | 118 |
|  | Item 8. | Financial Information | 119 |
|  | Item 9. | The Offer and Listing | 120 |
|  | Item 10. | Additional Information | 121 |
|  | Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 130 |
|  | Item 12. | Description of Securities Other than Equity Securities | 131 |
| PART II |  |  | 132 |
|  | Item 13. | Defaults, Dividend Arrearages and Delinquencies | 132 |
|  | Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 132 |
|  | Item 15. | Controls and Procedures | 132 |
|  | Item 16A. | Audit Committee Financial Expert | 133 |
|  | Item 16B. | Code of Ethics | 133 |
|  | Item 16C. | Principal Accountant Fees and Services | 133 |
|  | Item 16D. | Exemptions from the Listing Standards for Audit Committees | 134 |
|  | Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 134 |
|  | Item 16F. | Change in Registrant's Certifying Accountant | 134 |
|  | Item 16G. | Corporate Governance | 134 |
|  | Item 16H. | Mine Safety Disclosure | 135 |
| PART III |  |  | 135 |
|  | Item 17. | Financial Statements | 135 |
|  | Item 18. | Financial Statements | 135 |
|  | Item 19. | Exhibits | 135 |
| SIGNATURES |  |  | 143 |

i

Table of Contents

## INTRODUCTION

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "we," "us," "our company," "our," or "Baidu" refers to Baidu, Inc., its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated affiliated entities in China, including but not limited to Beijing Baidu Netcom Science Technology Co., Ltd., or Baidu Netcom;

- "user traffic" or "traffic" refers generally to page views of a website, with "page views" measuring the number of web pages viewed by internet users over a specified period of time except that multiple page views of the same page viewed by the same user on the same day are counted only once;

- "China" or "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excluding Taiwan, Hong Kong and Macau;

- "shares" or "ordinary shares" refers to our ordinary shares, which include both Class A ordinary shares and Class B ordinary shares;

- "ADSs" refers to our American depositary shares, and we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share on May 12, 2010, which has the same effect as a 10-for-1 ADS split;

- "U.S. GAAP" refers to generally accepted accounting principles in the United States;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States; and

- all discrepancies in any table between the amounts identified as total amounts and the sum of the amounts listed therein are due to rounding.

## FORWARD-LOOKING INFORMATION

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by terminology such as "may," "will," "expect," "anticipate," "future," "intend," "plan," "believe," "estimate," "is/are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our growth strategies;

- our future business development, results of operations and financial condition;

- our ability to attract and retain users and customers and generate revenue and profit from our customers;

- our ability to retain key personnel and attract new talent;

- competition in the internet search, online marketing and other businesses in which we engage;

- the outcome of ongoing or any future litigation, including those relating to intellectual property rights; and

- PRC governmental regulations and policies relating to the internet, internet search and online marketing and the implementation of a corporate structure involving variable interest entities in China.

1

**Table of Contents**

We would like to caution you not to place undue reliance on these forward-looking statements and you should read these statements in conjunction with the risk factors disclosed in "Item 3D. Key Information—Risk Factors." Those risks are not exhaustive. We operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

**PART I**

**Item 1.**        **Identity of Directors, Senior Management and Advisers**

Not applicable.


**Item 2.**        **Offer Statistics and Expected Timetable**

Not applicable.

2

Table of Contents

**Item 3.        Key Information**

**A.        Selected Financial Data**

The following table presents the selected consolidated financial information for our company. The selected consolidated statements of comprehensive income data for the three years ended December 31, 2015, 2016 and 2017 and the consolidated balance sheets data as of December 31, 2016 and 2017 have been derived from our audited consolidated financial statements, which are included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive income data for the years ended December 31, 2013 and 2014 and the selected consolidated balance sheets data as of December 31, 2013, 2014 and 2015 have been derived from our audited consolidated financial statements for the years ended December 31, 2013, 2014 and 2015, which are not included in this annual report, with certain adjustment being made to the selected consolidated balance sheet data as of December 31, 2013 as a result of our exchange of shares in Qunar Cayman Islands Limited, or Qunar, with Ctrip.com International, Ltd., or Ctrip. Our historical results do not necessarily indicate results expected for any future periods. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our audited consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

| | Year Ended December 31, | | | | | |
| | 2013 | 2014 | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (In millions, except per share and per ADS data) | | | | | |
| **Consolidated Statements of Comprehensive Income Data:** | | | | | | |
| Revenues: | | | | | | |
| Online marketing services | 31,802 | 48,495 | 64,037 | 64,525 | 73,146 | 11,242 |
| Others | 142 | 557 | 2,345 | 6,024 | 11,663 | 1,792 |
| Total revenues | 31,944 | 49,052 | 66,382 | 70,549 | 84,809 | 13,034 |
| Operating costs and expenses: | | | | | | |
| Cost of revenues | (11,472) | (18,885) | (27,458) | (35,278) | (43,062) | (6,619) |
| Selling, general and administrative | (5,173) | (10,382) | (17,076) | (15,071) | (13,128) | (2,018) |
| Research and development | (4,107) | (6,981) | (10,176) | (10,151) | (12,928) | (1,987) |
| Total operating costs and expenses | (20,752) | (36,248) | (54,710) | (60,500) | (69,118) | (10,624) |
| Operating profit | 11,192 | 12,804 | 11,672 | 10,049 | 15,691 | 2,410 |
| Interest income | 1,309 | 1,993 | 2,362 | 2,342 | 3,154 | 485 |
| Interest expense | (447) | (629) | (1,041) | (1,158) | (1,615) | (248) |
| Income (loss) from equity method investments | 23 | (20) | 4 | (1,026) | (63) | (10) |
| Other income, net, including exchange gains or losses | 141 | 336 | 24,910 | 4,302 | 4,116 | 633 |
| Income before income taxes | 12,218 | 14,484 | 37,907 | 14,509 | 21,283 | 3,270 |
| Income taxes | (1,829) | (2,231) | (5,475) | (2,913) | (2,995) | (460) |
| Net income | 10,389 | 12,253 | 32,432 | 11,596 | 18,288 | 2,810 |
| Less: Net loss attributable to non-controlling interests | (163) | (944) | (1,232) | (36) | (13) | (2) |
| Net income attributable to Baidu, Inc. | 10,552 | 13,197 | 33,664 | 11,632 | 18,301 | 2,812 |
| Earnings per share for Class A and Class B ordinary shares[1] | | | | | | |
| Basic | 300.66 | 374.88 | 954.56 | 319.47 | 527.51 | 81.08 |
| Diluted | 300.23 | 373.43 | 951.49 | 318.62 | 524.08 | 80.55 |
| Earnings per ADS (1 Class A ordinary share is represented by 10 ADSs) | | | | | | |
| Basic | 30.07 | 37.49 | 95.46 | 31.95 | 52.75 | 8.11 |
| Diluted | 30.02 | 37.34 | 95.15 | 31.86 | 52.41 | 8.06 |

3

**Table of Contents**

(1) As holders of Class A and Class B ordinary shares have the same dividend right and the same participation right in our undistributed earnings, the basic and diluted net income per Class A ordinary share and Class B ordinary share are the same for all the periods presented during which there were two classes of ordinary shares. The weighted average number of ordinary shares represents the sum of the weighted average number of Class A and Class B ordinary shares. Please see "Earnings Per Share" under Note 18 to our audited consolidated financial statements included in this annual report for additional information regarding the computation of the per share amounts and the weighted average numbers of Class A and Class B ordinary shares.

| | As of December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | (In millions) | | | | | |
| **Consolidated Balance Sheets Data:** | | | | | | |
| Cash and cash equivalents | 9,692 | 13,853 | 9,960 | 10,898 | 11,084 | 1,704 |
| Restricted cash | 260 | 413 | 96 | 318 | 252 | 39 |
| Short-term investments | 27,482 | 42,699 | 57,969 | 71,196 | 89,381 | 13,738 |
| Goodwill | 16,864 | 17,419 | 15,396 | 15,342 | 15,806 | 2,429 |
| Long-term investments, net | 1,259 | 3,545 | 37,959 | 45,690 | 56,283 | 8,651 |
| Total assets | 70,357 | 99,118 | 147,853 | 181,997 | 251,728 | 38,689 |
| Total liabilities | 30,321 | 45,066 | 63,638 | 84,254 | 121,356 | 18,651 |
| Total Baidu, Inc. shareholders' equity | 37,796 | 51,072 | 80,256 | 92,274 | 115,346 | 17,729 |
| Total equity | 40,036 | 52,158 | 80,268 | 92,251 | 119,350 | 18,344 |

**Exchange Rate Information**

Our business is primarily conducted in China and almost all of our revenues are denominated in RMB. However, periodic reports made to shareholders will include current period amounts translated into U.S. dollars using the then current exchange rates, for the convenience of the readers. The conversion of RMB into U.S. dollars in this annual report is based on the exchange rate set forth in the H.10 statistical release of the Board of Governors of the Federal Reserve System. Unless otherwise noted, all translations from RMB to U.S. dollars and from U.S. dollars to RMB in this annual report were made at a rate of RMB6.5063 to US$1.00, the exchange rate in effect as of December 29, 2017. We make no representation that any RMB or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or RMB, as the case may be, at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of RMB into foreign exchange and through restrictions on foreign trade. On March 9, 2018, the exchange rate was RMB6.3285 to US$1.00.

4

Table of Contents

The following table sets forth information concerning exchange rates between the RMB and the U.S. dollar for the periods indicated:

| Period | Exchange Rate | | | |
| | Period-End | Average | Low | High |
| | (RMB per U.S. Dollar) | | | |
|--------|------------|---------|-----|------|
| 2013 | 6.0537 | 6.1412 | 6.2438 | 6.0537 |
| 2014 | 6.2046 | 6.1704 | 6.2591 | 6.0402 |
| 2015 | 6.4778 | 6.2869 | 6.4896 | 6.1870 |
| 2016 | 6.9430 | 6.6549 | 6.9580 | 6.4480 |
| 2017 | 6.5063 | 6.7350 | 6.9575 | 6.4773 |
| September | 6.6533 | 6.5690 | 6.6591 | 6.4773 |
| October | 6.6328 | 6.6254 | 6.6533 | 6.5712 |
| November | 6.6090 | 6.6200 | 6.6385 | 6.5967 |
| December | 6.5063 | 6.5932 | 6.6210 | 6.5063 |
| 2018 | | | | |
| January | 6.2841 | 6.4233 | 6.5263 | 6.2841 |
| February | 6.3280 | 6.3183 | 6.3471 | 6.2649 |
| March (through March 9, 2018) | 6.3285 | 6.3354 | 6.3565 | 6.3093 |

Source: Federal Reserve Statistical Release

(1)    Annual averages are calculated using the average of month-end rates of the relevant year. Monthly averages are calculated using the average of the daily rates during the relevant period.

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.    Risk Factors**

**Risks Related to Our Business**

*If we fail to retain existing customers or attract new customers for our online marketing services, our business, results of operations and growth prospects could be seriously harmed.*

We generate substantially all of our revenues from online marketing services, a substantial majority of which are derived from our pay-for-performance, or P4P, services. Our online marketing customers will not continue to do business with us if their investment does not generate sales leads and ultimately consumers, or if we do not deliver their web pages in an appropriate and effective manner. Our P4P customers may choose to discontinue their business with us, which are not subject to fixed-term contracts. In addition, third parties may develop and use certain technologies to block the display of our customers' advertisements and other marketing products on our Baidu platform, which may in turn cause us to lose customers and adversely affect our results of operations. Furthermore, as our auction-based P4P services enable our customers to bid for priority placement of their paid sponsored links, we may lose customers if they find the bidding mechanism not cost effective or otherwise not attractive. Additionally, if our users do not increase their search frequencies on our platform, or our content ecosystem fails to offer rich and quality content that meets users' tastes and preferences, or our users spend more time with or otherwise satisfy their search demands on competing platforms, or we otherwise experience user traffic decline due to any reason, it would be difficult for us to attract new customers or retain existing customers. Failure to retain our existing customers or attract new customers for our online marketing services could seriously harm our business, results of operations and growth prospects.

5

Table of Contents

In recent years, our revenues from online advertising have increased. We believe our large user base and traffic provide advertisers with a broad reach and optimal monetization results. However, we cannot assure you that we will be able to continue to attract new advertisers or retain our existing advertisers. If our advertisers determine that their expenditures on our platform do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels, such as television, outdoor media and other online marketing platforms, and reduce or discontinue business with us. Since most of our advertisers are not bound by long-term contracts, they may amend or terminate advertising arrangements with us easily without incurring liabilities. Failure to retain existing advertisers or attract new ones to advertise on our platform may materially and adversely affect our business, financial condition, results of operations and prospects.

We have in the past removed, and may in the future again remove, questionable paid search listings of some customers to ensure the quality and reliability of our search results. Such removal, whether temporary or permanent, may cause the affected customers to discontinue their business with us. We also examine the relevant business licenses and bank accounts of prospective customers prior to business engagement, as a quality control measure. In addition, we have taken steps to implement measures requested by PRC regulatory authorities, such as modifying paid search practices and limiting the amount of displays. We have also proactively implemented numerous additional measures to deliver a better user experience and build a safer and more trustworthy platform for users. Such measures have had a negative impact on the number of customers and our revenues in the short term. PRC regulations on online marketing services are evolving, and uncertainties remain with respect to the implementation of and compliance with new regulations that may emerge, which in turn may have a material adverse impact on our business, results of operations and growth prospects.

*If online marketing through internet search does not further grow in China, our ability to increase revenue and profitability could be materially and adversely affected.*

While the internet has developed to a more advanced stage in China, customers have many channels to conduct online marketing and promotion. As users may not spend as much time on internet search products as they used to, many current and potential customers may not use internet search products as one of their main online marketing channels to promote their products and services, and thus may not allocate a significant portion of their marketing budgets to online marketing through internet search products such as our P4P services, as compared to other methods of online marketing. Our ability to increase revenue and profitability from online marketing on PC and mobile internet may be adversely impacted by a number of factors, many of which are beyond our control, including:

- difficulties associated with developing a larger user base with demographic characteristics attractive to online marketing customers and maintaining and increasing user engagement;

- increased competition and potential re-allocation of marketing budgets and downward pressure on online marketing prices;

- higher customer acquisition costs due in part to the limited experience of small to medium-sized enterprises, or SMEs, with the internet as a marketing channel or due to competition;

- ineffectiveness of our online marketing delivery, tracking and reporting systems; and

- decreased use of internet or online marketing in China.

*Our business depends on a strong brand, and if we are not able to maintain and enhance our brand, our business and results of operations may be harmed.*

We believe that our brand "Baidu" has contributed significantly to the success of our business. We also believe that maintaining and enhancing the "Baidu" brand is critical to increasing the number of our users, customers, Baidu Union members and content providers. We have conducted various marketing and brand promotion activities, but we cannot assure you that these activities will achieve the brand promotion effect expected by us. If we fail to maintain and further promote the "Baidu" brand, or if we incur excessive expenses in this effort, our business and results of operations may be materially and adversely affected.

6

Table of Contents

In addition, any negative publicity about our company, our products and services, our employees, our business practices, or our search results or the platform to which our search results link, regardless of its veracity, could harm our brand image and in turn adversely affect our business and results of operations. We cannot assure you that we will be able to defuse negative publicity to the satisfaction of our investors, users, customers and business partners. From time to time, there has been negative publicity about our company and our business practice, which has adversely affected our public image and reputation during certain periods of intense negative publicity. For example, in 2016, Chinese media reported that a Chinese college student had died from cancer following unsuccessful treatment received at a hospital that the student had found through a paid search listing on Baidu. The negative publicity surrounding this incident has resulted in significant adverse impact on our public image and reputation. Intense negative publicity may divert our management's attention and may adversely impact our business. We cannot assure you that our brand, public image and reputation will not be materially and adversely affected in the future.

### *We face significant competition and may suffer from loss of users and customers as a result.*

We face significant competition in almost every aspect of our business, including competition from other companies that seek to provide internet search services to users and provide online marketing services to customers, as well as other companies that provide internet video services. For Baidu Core business, our main competitors in the Chinese internet market include China-based internet companies, such as Tencent, Alibaba, Sohu, Qihoo 360, ByteDance, Xiaomi and iFly Technology. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), user experience of the search results, quality, quantity and relevancy of content, availability and ease of use of products and services, distribution channels and the number of associated third-party websites/wapsites. For iQIYI, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video. Some of our competitors have significant financial resources, long operating histories and are experienced in attracting and retaining their users, accommodating their users' habits and preferences and managing customers. They may use their experience and resources to compete with us in a variety of ways, including competing for users and their time, customers, distributors, content, strategic partners and networks of third-party websites/wapsites, investing more heavily in research and development and making investments and acquisitions. If any of our competitors provides comparable or better Chinese language search experience or internet video services, our user traffic could decline significantly. Additionally, if the channels that we use to distribute services or products to our users and customers are no longer available to us, we may experience a decline in user traffic. Any such decline in traffic could weaken our brand and result in loss of users and customers, which could have a material and adverse effect on our results of operations.

We also face competition from other types of advertising media, such as newspapers, magazines, yellow pages, billboards, other forms of outdoor media, television, radio and mobile apps. Large companies in China generally allocate, and may continue to allocate, a limited portion of their budgets to online marketing, as opposed to traditional advertising and other forms of advertising media. If these companies do not devote a larger portion of their marketing budgets to online marketing services provided by us, or if our existing customers reduce the amount they spend on online marketing, our results of operations and growth prospects could be adversely affected.

### *If our expansions into new businesses are not successful, our future results of operations and growth prospects may be materially and adversely affected.*

As part of our growth strategy, we enter into new businesses from time to time by leveraging our large internet user base and advanced technology to generate additional revenue streams and through our development of new business lines or strategic investments in or acquisitions of other businesses. Expansions into new businesses may present operating, marketing and compliance challenges that differ from those that we currently encounter.

7

Table of Contents

In recent years, we have invested significant resources in the research and development of artificial intelligence (AI) technology and have made significant progress in the commercialization of AI technologies, such as conversational AI platform DuerOS, autonomous driving platform Apollo, AI cloud services and Baidu Feed. We plan to continue to contribute capital and other resources to our AI-enabled business operations. However, AI technology is rapidly evolving with significant uncertainties, and we cannot assure you that our investment and exploration in AI technology, including conversational AI, autonomous driving, AI cloud and Baidu Feed, will be successful. In addition, we may encounter regulatory uncertainties related to new business that we enter into. The laws and regulations related to AI technology and products are at early stage of development and still evolving in China. The effects of such laws and regulations remain unclear and may add uncertainty to the operation of our AI-related business. For example, as PRC regulatory framework on autonomous driving evolves, we may be required to comply with approval and other compliance requirements for autonomous driving road test promulgated by PRC authorities from time to time. See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Artificial Intelligence and Autonomous Driving Vehicles." We may confront other challenges as we enter new business domains, including lack of adoption of new products and services, lack of management talent in the new business, cost management and other factors required for the expansion of new businesses.

We also recently launched online content-related platforms, i.e., Baijiahao and Bear Paw Account. Baijiahao is a content provider platform that allows users such as writers to publish content, and Bear Paw Account is a smart content sorting and distribution hub, optimizing the distribution of content to potential audience. Baijiahao and Bear Paw account are critical components of our content ecosystem and rely on the participation and contribution of our users. If we fail to attract new users to and retain existing users of Baijiahao and Bear Paw Account, our future results of operations and growth prospects may be adversely affected. In addition, if we have to incur more costs in order to retain existing users or attract new users, our profitability may be adversely affected. We cannot assure you that we will be able to address these new challenges and continue to provide exceptional quality services. If we are not able to solve these issues, we may not be able to compete effectively. In addition, we expect to significantly increase content cost to attract large amount of quality content from Baijiahao content providers. If we have to incur more content costs and are unable to generate significant revenues to cover these costs, our profitability may be adversely affected.

***If we fail to continue to innovate and provide products, services and high-quality internet experience that attract and retain users, we may not be able to generate sufficient user traffic to remain competitive.***

Our success depends on providing products and services to attract users and enable users to have a high-quality internet experience. In order to attract and retain users and compete against our competitors, we must continue to invest significant resources in research and development to enhance our internet search advertising and, artificial intelligence (AI) technologies, improve our existing products and services, and introduce additional high-quality products and services, including AI-based products and services and feed services. If we are unable to anticipate user preferences or industry changes, or if we are unable to enhance the quality of our products and services on a timely basis or fail to provide sufficient content, we may suffer a decline in the size of our user base. Our results of operations may also suffer if our innovations do not respond to the needs of our users, are not appropriately timed with market opportunities or are not effectively brought to market. As search, advertising and AI technologies and new forms of devices and apps continue to develop, we may expend significant resources in research and development and strategic investments and acquisitions in order to remain competitive.

***If our content ecosystem fails to continually offer quality content in a cost effective manner, we may experience declines in user traffic and user engagement, our business and results of operations may be harmed.***

Our content ecosystem consists of our core search products, Baidu Feed, Baijiahao, Bear Paw Account, iQIYI, Baidu Maps, Baidu Post Bar, Baidu Knows, Baidu Encyclopedia and various other products. The success of our content ecosystem depends on our ability to attract content owners to contribute quality content to our

8

Table of Contents

platform by leveraging our user traffic and enhance user engagement through provision of attractive content, so as to create a virtuous cycle. We have relied, and will continue to rely, on third parties for part of the content offered in our content ecosystem. As the competition for quality content becomes increasingly intense in China, we cannot assure you that we will be able to manage our content acquisition costs effectively and generate sufficient revenues to outpace future increase in content spending. We may also be unable to renew some of our content licensing agreements upon their expiration or termination and any renewal of the content licensing agreements may involve higher costs or less favorable terms. If we are not able to license popular premium content on commercially reasonable terms or renew our content licensing agreements, our financial condition and results of operations may be materially and adversely affected. In addition, we have users contribute their content to our various products, including Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baijiahao, Bear Paw Account and iQIYI's user-generated content. If these parties fail to develop and maintain high-quality and engaging content, if our desired premium content becomes exclusive to our competitors, if we are unable to continue to grow our content offerings and stay competitive vis-à-vis other content platforms, or if a large number of our existing relationships are terminated, the attractiveness of our content offerings to users may be severely impaired. If we are unable to offer content that meets users' tastes and preferences on a continuing basis and in a cost effective manner, our user experience may deteriorate, we may suffer from reduced user traffic, our business and results of operations may be harmed.

***Our expansion into financial services may subject us to regulatory, credit, operational and reputational risks, each of which may have a material adverse effect on our business, results of operations and financial condition.***

We began to provide financial services in China in recent years. Our financial services mainly include wealth management and Baidu Consumer Credit, through which we offer education loans and consumer financing to meet consumers' cash expenditure needs.

PRC laws and regulations concerning the internet finance industry, particularly those governing credit lending, are evolving. Although we have taken careful measures to comply with the laws and regulations that are applicable to the financial services that we offer, the PRC government authorities may promulgate new policies, rules and regulations regulating the internet finance industry. For example, in December 2017, the PRC authorities issued a series of new rules to strengthen regulation on the micro loan business and online microcredit industry, which require, among others, that online microcredit companies suspend providing micro loans without a specific consumption scenario or specified use of loan proceeds and refrain from obtaining funds by transferring its credit assets through an online transaction platform or a local financial asset exchange, or through an online lending intermediary service agency. In addition, the government authority supervising the microcredit industry is conducting a special inspection and rectification on the compliance of online microcredit companies. See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Consumer Finance and Microcredit." If our financial services, especially our innovative solutions, were deemed to violate any PRC laws or regulations, our business, financial conditions and results of operations may be materially and adversely affected. We cannot assure you that our practices would not be deemed to violate any PRC laws or regulations, nor can we ensure that all business cooperators on our platform meet all the regulatory compliance requirements. Moreover, developments in the internet finance industry may lead to changes in PRC laws, regulations and policies or in the interpretation and application of existing laws, regulations and policies that may limit or restrict online consumer financing services and wealth management services like those we offer, which could materially and adversely affect our business and operations. Furthermore, we cannot rule out the possibility that the PRC government will institute a new licensing regime covering our financial services in the future. If such a licensing regime were introduced, we cannot assure you that we would be able to obtain any newly required license in a timely manner, or at all, which could materially and adversely affect our business and impede our ability to continue our operations.

As part of our financial services, we have adopted our own credit risk management, through leveraging our big data and computing analytical capabilities, and have taken various other measures to monitor and limit credit risks. However, the risk of nonpayment of loans is inherent in the finance business, and we are subject to credit

9

Table of Contents

risks resulting from defaults by consumers. While we employ statistical modelling and big data to carefully assess credit risks, credit risks are exacerbated in microcredit and consumer financing because there is relatively limited information available about the credit histories of the borrowers. There can be no assurances that our credit assessment and risk management are or will be sufficient to result in lower delinquencies. As we expand into new sub-sectors of consumer financing, our limited operational experience and lack of familiarity with the new areas may render our risk management less effective, thus exacerbating our credit risks. Furthermore, our ability to manage the quality and the associated credit risks of our loan portfolio may have significant impact on our results of operations. Deterioration in the overall quality of loan portfolio and increased exposure to credit risks may occur due to a variety of reasons, including factors beyond our control, such as a slowdown in the growth of the PRC or global economies or a liquidity or credit crisis in the PRC or global financial sectors, which may adversely affect the liquidity of our borrowers or their ability to repay or roll over their debt. Any significant deterioration in the asset quality of our financial services business and significant increase in associated credit risks may have a material adverse effect on our business, results of operations and financial condition.

Our financial services business also faces additional operational risks with respect to illegal or fraudulent activities, such as illegally accessing and using another's Baidu Wallet account, and providing false credit and other information or creating fictitious or "phantom" transactions with collaborators in order to obtain loans from us. Although we have implemented various measures to detect and reduce the occurrence of illegal or fraudulent activities, there can be no assurance that such measures will be effective in combating fraudulent activities. Significant increases in illegal or fraudulent activity could negatively impact our brand and reputation, lead us to take additional steps to reduce such risks, and cause us to incur additional expenses and costs, which may adversely affect our business, results of operations and financial condition.

Negative publicity about our partners, outsourced service providers or other counterparties, such as negative publicity about their debt collection practices and any failure by them to adequately protect the information of borrowers, to comply with applicable laws and regulations or to otherwise meet required quality and service standards could harm our reputation. Furthermore, any negative development in the internet finance industry, such as bankruptcies of companies providing similar services, or negative perception of the industry as a whole, could compromise our image, undermine the trust and credibility we have established and impose a negative impact on our business and results of operations.

***If we fail to keep up with rapid changes in technologies and user behavior, our future success may be adversely affected.***

Our future success will depend on our ability to respond to rapidly changing technologies, adapt our products and services to evolving industry standards and improve the performance and reliability of our products and services. Our failure to adapt to such changes could harm our business. In addition, changes in user behavior resulting from technological developments may also adversely affect us. For example, the number of people accessing the internet through mobile devices and internet of things, or IoTs, such as smartphones, tablets and smart (voice-activated internet) home devices, has increased in recent years, and we expect this trend to continue while 4G/5G and more advanced mobile communications technologies are broadly implemented. If we fail to develop products and technologies that are compatible with all mobile devices, IoTs and operating systems, or if the products and services we develop are not widely accepted and used by users of various mobile devices and IoTs, our position in the mobile internet and AI based may be adversely affected. In addition, the widespread adoption of new internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or integrate our products, services or infrastructure. If we fail to keep up with rapid technological changes to remain competitive, or consequently fail to retain users with products and services of exceptional quality, our future success may be materially and adversely affected.

10

Table of Contents

***Interruption or failure of our own information technology and communications systems or those of third-party service providers we rely upon could impair our ability to provide products and services, which could damage our reputation and harm our results of operations.***

Our ability to provide products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could interrupt our services. Service interruptions could reduce our revenue and profit and damage our brand if our systems are perceived to be unreliable. Our systems are vulnerable to damage or interruption as a result of terrorist attacks, wars, earthquakes, floods, fires, power loss, telecommunications failures, undetected errors or "bugs" in our software, computer viruses, interruptions in access to our platform through the use of "denial of service" or similar attacks, hacking or other attempts to harm our systems, and similar events. Some of our systems are not fully redundant, and our disaster recovery planning does not account for all possible scenarios. In February 2017, the service of Baidu App was inaccessible to users for forty-three minutes due to a system failure, which adversely affected our user experience then.

Our servers, which are hosted at third-party or our own internet data centers, are vulnerable to break-ins, sabotage and vandalism. The occurrence of natural disasters or closure of an internet data center by a third-party provider without adequate notice could result in lengthy service interruptions. In addition, our domain names are resolved into internet protocol (IP) addresses by systems of third-party domain name registrars and registries. Any interruptions or failures of those service providers' systems, which are beyond our control, could significantly disrupt our own services. If we experience frequent or persistent system failures on our platform, whether due to interruptions and failures of our own information technology and communications systems or those of third-party service providers that we rely upon, our reputation and brand could be severely harmed. The steps we take to increase the reliability and redundancy of our systems may cause us to incur heavy costs and reduce our operating margin, and may not be successful in reducing the frequency or duration of service interruptions.

***More people are using devices other than personal computers to access the internet. If users do not widely adopt versions of our search technology, products and services developed for these devices, our business could be adversely affected.***

The number of people who access the internet through devices other than personal computers, including mobile phones, smartphones, handheld computers, smart home devices and other smart devices, is increasing dramatically. The varying display sizes, functionality, and memory associated with some alternative devices may require us to tailor the user experience and interfaces to those devices and the versions of our products and services developed for these devices may not be compelling to users, manufacturers, or distributors of devices. Each manufacturer or distributor may establish unique technical standards for its devices, and our products and services may not work or be accessible on these devices. Some manufacturers may also elect not to include our products on their devices. In addition, search queries are increasingly being conducted through apps and services tailored to particular devices. A shift in user behavior to perform search queries on other devices or apps rather than a search engine could affect our share of the search market over time. As new devices and new platforms are continually being released, it is difficult to predict the future channels to access search. We may encounter challenges in developing versions of our products and services for use on these alternative devices, and we may need to devote significant resources to the creation, support, and maintenance of our products and services tailored for such devices. If we are unable to attract and retain a substantial number of alternative device manufacturers, distributors, and users to adopt and use our products and services, or if we are slow to develop products and technologies that are more compatible with alternative devices, we may fail to capture a significant share of an increasingly important portion of the market for online services, which could adversely affect our business.

11

Table of Contents

***We may not be able to manage our expanding operations effectively.***

We have significantly expanded our operations in recent years. We expect this expansion trend to continue as we grow our user and customer base and explore new opportunities. To manage the further expansion of our business and growth of our operations and personnel, we need to continually improve our operational and financial systems, procedures and controls, and expand, train, manage and maintain good relations with our growing employee base. We have experienced labor disputes in the past. Although these disputes were resolved promptly, we cannot assure you that there will not be any new labor disputes in the future. In addition, we must maintain and expand our relationships with other websites, internet companies and other third parties. Our current and future personnel, systems, procedures and controls may not be adequate to support our expanding operations.

***We may face intellectual property infringement claims and other related claims, which could be time-consuming and costly to defend and may result in an adverse impact over our operations.***

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property in internet-related industries, particularly in China, are uncertain and still evolving. As we face increasing competition and as litigation becomes more common in China in resolving commercial disputes, we face a higher risk of being the subject of intellectual property infringement claims. We may be subject to administrative actions brought by the PRC State Copyright Bureau and in the most severe scenario criminal prosecution for alleged copyright infringement, and as a result may be subject to fines and other penalties and be required to discontinue infringing activities. Furthermore, as we expand our operations outside of China, we may be subject to claims brought against us in jurisdictions outside of China.

Our search products and services link to materials in which third parties may claim ownership of trademarks, copyrights or other rights. As we adopt new technologies and roll out new products and services, we face the risk of being subject to intellectual property infringement claims that may arise from our use of new technologies and provision of new products and services. Our products and services including those based on cloud computing technology, such as Baidu Cloud Drive, Baidu WenKu and Baidu Post Bar, allow our users to upload, store and share documents, images, audio and videos on our servers, or share, link to or otherwise provide access to contents from other websites, and we also operate distribution platforms whereby developers can upload, share and sell their apps or games to users. Although we have made commercially reasonable efforts to request users or developers to comply with applicable intellectual property laws, we cannot ensure that all of our users or developers have the rights to upload or share these contents or apps. In addition, we have been and may continue to be subject to copyright or trademark infringement and other related claims from time to time, in China and internationally.

We have been making continuous efforts to keep ourselves informed of and to comply with all applicable laws and regulations affecting our business. However, PRC laws and regulations are evolving, and uncertainties still exist with respect to the legal standards as well as the judicial interpretation of the standards for determining liabilities of internet search and other internet service providers for providing links to content on third-party websites that infringe upon others' copyrights or hosting such content, or providing information storage space, file sharing technology or other internet services that are used by internet users to disseminate such content. The Supreme People's Court of China promulgated a judicial interpretation on infringement of the right of dissemination through internet in December 2012. This judicial interpretation, like certain court rulings and certain other judicial interpretations, provide that the courts will place the burden on internet service providers to remove not only links or contents that have been specifically mentioned in the notices of infringement from right holders, but also links or content they "should have known" to contain infringing content. The interpretation further provides that where an internet service provider has directly obtained economic benefits from any content made available by an internet user, it has a higher duty of care with respect to internet users' infringement of

12

Table of Contents

third-party copyrights. A guidance on the trial of audio/video sharing copyright disputes promulgated by the Higher People's Court of Beijing in December 2012 provides that where an internet service provider has directly obtained economic benefits from any audio/video content made available by an internet user who has no authorization for sharing such content, the internet service provider shall be presumed to be at fault. These interpretations could subject us and other internet service providers to significant administrative burdens and litigation risks.

We conduct our business operations primarily in China. There might be claims that we are subject to U.S. copyright laws, including the legal standards for determining indirect liability for copyright infringement, although we believe such claims are without merit. We cannot assure you that we will not be subject to copyright infringement lawsuits or other proceedings in the U.S. or elsewhere in the future.

Intellectual property litigation is expensive and time-consuming and could divert resources and management attention from the operations of our business. We are currently named as defendant in certain copyright infringement suits in connection with P4P, Baidu Post Bar, Baidu Cloud Drive, iQIYI and certain other products or services. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." There is no guarantee that the courts will accept our defenses and rule in our favor. If there is a successful claim of infringement, we may be required to discontinue the infringing activities, pay substantial fines and damages and/or enter into royalty or license agreements that may not be available on commercially acceptable terms, if at all. Our failure to obtain a license of the rights on a timely basis could harm our business. Any intellectual property litigation by third parties and/or negative publicity alleging our intellectual property infringement could have an adverse effect on our business, reputation, financial condition or results of operations. To address the risks relating to intellectual property infringement, we may have to substantially modify, limit or terminate some of our search services. Any such change could materially affect user experience and in turn have an adverse impact on our business.

***We have been and may again be subject to claims and investigations based on the content found on our platform, the results in our paid search listings or other products and services we offer.***

In addition to the content developed and posted on our platform by ourselves, our users are free to post information on Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baidu WenKu, Baijiahao and other sections of our platform, and our P4P customers may create text-based descriptions, image descriptions and other phrases to be used as text, images or keywords in our search listings, and users can also use our personal cloud computing service, Baidu Cloud Drive, to upload, store and share documents, images, audio and videos on our cloud servers. We have been and may continue to be subject to claims and investigations for intellectual property infringement, defamation, negligence or other legal theories based on the content found on our platform, the results in our paid search listings or our other products and services, which, with or without merit, may result in diversion of management attention and financial resources and negative publicity for our brand and reputation. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." Furthermore, if the content posted on our platform or found, stored or shared through our other products and services contains information that government authorities find objectionable, our platform or relevant products or services may be shut down and we may be subject to other penalties. See "—Risks Related to Doing Business in China—Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our platform and negative publicity in international media."

We have been, and may again in the future be, subject to claims, investigations or negative publicity based on the results in our paid search listings. Claims have been filed against us after we allowed certain customers to register keywords containing trademarks, trade names or brand names owned by others and displayed links to such customers' websites in our paid search listings. While we maintain a database of certain well-known trademarks and continually update our system algorithms and functions to guard against customers keywords containing the well-known trademarks that are owned by others, it is not possible for us to completely prevent

13

**Table of Contents**

our customers from bidding on keywords that contain trademarks, trade names or brand names owned by others. In 2016, PRC regulatory authorities required that we take several remedial measures, including: (i) immediately modifying our practice of providing online marketing services to medical, pharmaceutical, health care and other similar businesses, and refraining from providing online marketing services to medical organizations that do not have requisite qualifications from competent regulatory authorities; (ii) modifying our existing auction-based paid search practices, indicating clearly paid search results and the associated risks, and limiting the percentage of marketing information to no more than 30% on each web page; and (iii) establishing and enhancing user protection mechanisms and establishing a system to compensate users harmed by fraudulent marketing information. Such measures have had a negative impact on the number of customers and our revenues in the short term. In addition, there has been negative publicity about fraudulent information in our paid search listings. Although we have been continually enhancing our technology, control and oversight to prevent fraudulent websites, web pages and information from appearing in our paid search listings, there is no guarantee that the measures we have taken are effective at all times. Claims, investigations and negative publicity based on the results in our paid search listings, regardless of their merit, may divert management attention, severely disrupt our operations, adversely affect our results of operations and harm our reputation.

***Our business may be adversely affected if we were found to have failed to fulfill the additional obligations under the new online advertising rules.***

Although the PRC Advertising Law has not specified "paid search results" as a form of advertising, the Interim Administration Measures of Internet Advertising, or the Internet Advertising Measures, which was promulgated by the State Administration for Industry and Commerce and became effective on September 1, 2016, characterizes "paid search results" as a form of internet advertising from the perspective of regulating the online advertising business. Pursuant to the Internet Advertising Measures, we are subject to additional legal obligations to monitor our P4P customers' listings on our website during the course of our provision of P4P services. For example, we must examine, verify and record identity information of our P4P customers, such as the customer's name, address and contact information, and maintain an updated verification of such information on a regular basis. Moreover, we must examine supporting documentation provided by our P4P customers. Where a special government review is required for specific categories of advertisements before posting, we must confirm that the review has been performed and approval has been obtained. If the content of the advertisement is inconsistent with the supporting documentation, or the supporting documentation is incomplete, the advertisement cannot be published. The Chinese government may, from time to time, promulgate new advertising laws and regulations in the future to impose further requirements on online advertising services relating to medical, pharmaceutical, health care and other similar businesses. We cannot assure that we will be in compliance with the requirements under these new laws and regulations. Failure to comply with these obligations may subject us to fines and other administrative penalties. If advertisements shown on our platform are in violation of relevant PRC advertising laws and regulations, or if the supporting documentation and government approvals provided to us by our P4P customers in connection with the advertising content are not complete or accurate, we may be subject to legal liabilities and our reputation could be harmed. See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Advertisements and Online Advertising."

***We may be subject to patent infringement claims with respect to our P4P platform.***

Our technologies and business methods, including those relating to our P4P platform, may be subject to third-party claims or rights that limit or prevent their use. In June 2005, we applied for a patent in China for our P4P platform, but our application was rejected on the ground that it is not patentable. Certain U.S.-based companies, including Overture Services Inc., have been granted patents in the United States relating to P4P platforms and similar business methods and related technologies. While we believe that we are not subject to U.S. patent laws since we conduct our business operations primarily in China, we cannot assure you that U.S. patent laws would not be applicable to our business operations, or that holders of patents relating to a P4P platform would not seek to enforce such patents against us in the United States or China.

14

Table of Contents

Many parties are actively developing and seeking protection for internet-related technologies, including patent protection. They may hold patents issued or pending that relate to certain aspects of our technologies, products, business methods or services. Any patent infringement claims, regardless of their merits, could be time-consuming and costly to us. If we were sued for patent infringement claims with respect to our P4P platform and were found to infringe upon the patents and were not able to adopt non-infringing technologies, we may be severely limited in our ability to operate our P4P platform, which would have a material and adverse effect on our results of operations and prospects.

***Our business may be adversely affected by third-party software apps or practices that interfere with our receipt of information from, or provision of information to, our users, which may impair our users' experience.***

Our business may be adversely affected by third-party malicious or unintentional software apps that make changes to our users' computers and interfere with our products and services. These software apps may change our users' internet experience by hijacking queries to our platform, altering or replacing our search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience, which users may associate with our platform. These software apps may be difficult to remove or disable, may reinstall themselves and may circumvent other apps' efforts to block or remove them.

In addition, our business may be adversely affected by the practices of third-party website owners, content providers and developers which interfere with our ability to crawl and index their web pages and contents including apps. The ability to provide a superior user experience is critical to our success. If we are unable to successfully combat malicious third-party software apps that interfere with our products and services, our reputation may be harmed. If a significant number of website owners, content providers and developers prevent us from indexing and including their high-quality web pages and content including apps in our search results, or if we cannot effectively combat web spam from low-quality and irrelevant content websites, the quality of our search results may be impaired, which may damage our reputation and deter our current and potential users from using our products and services.

***We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.***

We rely on a combination of copyright, trademark and trade secret laws, as well as nondisclosure agreements and other methods to protect our intellectual property rights. The protection of intellectual property rights in China may not be as effective as those in the United States or other countries. The steps we have taken may be inadequate to prevent the misappropriation of our technology. Reverse engineering, unauthorized copying or other misappropriation of our technologies could enable third parties to benefit from our technologies without paying us. Moreover, unauthorized use of our technology could enable our competitors to offer products and services that compete with ours, which could harm our business and competitive position. We have in the past resorted to litigation to enforce our intellectual property rights, and may have to do so from time to time in the future. There is no guarantee that the competent courts will accept our claims and rule in our favor. Such litigation may result in substantial costs and diversion of resources and management attention.

***Our success depends on the continuing and collaborative efforts of our management team and other key personnel, and our business may be disrupted if we lose their services and are not able to find their successors in a timely manner.***

Our success depends heavily upon the continuing services of our management team, in particular our chairman and chief executive officer, Robin Yanhong Li. If one or more of our executives or other key personnel are unable or unwilling to continue in their present positions and we are not able to find their successors in a timely manner, our business may be disrupted and our financial condition and results of operations may be adversely affected. Competition for management and key personnel is intense, the pool of qualified candidates is

15

Table of Contents

limited, and we may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future.

If any of our executives or other key personnel joins a competitor or forms a competing company, we may not be able to successfully retain customers, distributors, know-how and key personnel. Each of our executive officers and key employees has entered into an employment agreement with us, containing confidentiality and non-competition provisions. If any disputes arise between any of our executives or key personnel and us, we cannot assure you the extent to which any of these agreements may be enforced.

*We rely on highly skilled personnel. If we are unable to retain or motivate them or hire additional qualified personnel, we may not be able to grow effectively.*

Our performance and future success depend on the talents and efforts of highly skilled individuals. We will need to continue to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization and business operations. Competition in the internet industry for qualified employees is intense. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees. As competition in the internet industry intensifies, it may be more difficult for us to hire, motivate and retain highly skilled personnel. If we do not succeed in attracting additional highly skilled personnel or retaining or motivating our existing personnel, we may be unable to grow effectively.

*Our strategy of investments and acquiring complementary businesses and assets may fail.*

As part of our business strategy, we have pursued, and intend to continue to pursue, selective strategic investments and acquisitions of businesses and assets that complement our existing business and help us execute our growth strategies. For example, we invested in Ctrip by exchanging our shares in Qunar for shares of Ctrip in 2015 and subscribed for additional Ctrip shares in 2016. In 2017, we led an investor consortium that invested RMB7.0 billion (US$1.0 billion) in exchange for public shares of China United Network Communications Limited through private placement. We intend to make other strategic investments and acquisitions in the future if suitable opportunities arise. Investments and acquisitions involve uncertainties and risks, including:

- potential ongoing financial obligations and unforeseen or hidden liabilities, including liability for infringement of third-party copyrights or other intellectual property;

- failure to achieve the intended objectives, benefits or revenue-enhancing opportunities;

- costs and difficulties of integrating acquired businesses and managing a larger business;

- in the case of investments where we do not obtain management and operational control, lack of influence over the controlling partner or shareholder, which may prevent us from achieving our strategic goals in the investments;

- possible loss of key employees of a target business;

- potential claims or litigation regarding our board's exercise of its duty of care and other duties required under applicable law in connection with any of our significant acquisitions or investments approved by the board;

- diversion of resources and management attention;

- regulatory hurdles and compliance risks, including the anti-monopoly and competition laws, rules and regulations of China and other jurisdictions and the enhanced compliance requirement for outbound acquisitions and investment under the laws and regulations of China; and

- in the case of acquisitions of businesses or assets outside of China, the need to integrate operations across different business cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries.

16

Table of Contents

Any failure to address these risks successfully may have a material and adverse effect on our financial condition and results of operations. Investments and acquisitions may require a significant amount of capital, which would decrease the amount of cash available for working capital or capital expenditures. In addition, if we use our equity securities to pay for investments and acquisitions, we may dilute the value of our ADSs and the underlying ordinary shares. If we borrow funds to finance investments and acquisitions, such debt instruments may contain restrictive covenants that could, among other things, restrict us from distributing dividends. Moreover, acquisitions may also generate significant amortization expenses related to intangible assets. We may also incur impairment charges to earnings for investments and acquired businesses and assets.

*We are subject to risks and uncertainties faced by companies in a rapidly evolving industry.*

We operate in the rapidly evolving internet industry, which makes it difficult to predict our future results of operations. Accordingly, you should consider our future prospects in light of the risks and uncertainties experienced by companies in evolving industries. Some of these risks and uncertainties relate to our ability to:

- maintain our leading position in the Chinese-language internet search market;

- offer attractive, useful and innovative products and services to attract and retain a larger user base;

- attract users' continuing use of internet search services;

- retain existing customers and attract additional customers and increase spending per customer;

- upgrade our technology to support increased traffic and expanded product and service offerings;

- further enhance our brand;

- respond to competitive market conditions;

- respond to evolving user preferences or industry changes;

- respond to changes in the regulatory environment and manage legal risks, including those associated with intellectual property rights;

- maintain effective control of our costs and expenses;

- execute our strategic investments and acquisitions and post-acquisition integrations effectively;

- attract, retain and motivate qualified personnel and maintain good relations with a young and growing work force; and

- build profitable operations in new markets and other overseas internet markets we have entered into.

If we are unsuccessful in addressing any of these risks and uncertainties, our business may be materially and adversely affected.

*Our historical growth rate may not be indicative of our future growth rate.*

We have experienced substantial growth in recent years. Our total revenues grew at a compound annual growth rate of 27.6% from 2013 to 2017. Our growth was driven in part by the growth in China's internet and online marketing industries, which may not be indicative of future growth or be sustainable. Our past growth rate may not be indicative of our future growth rate.

*Our indebtedness could adversely affect our financial condition and our ability to obtain additional capital on reasonable terms when necessary.*

As of December 31, 2017, we had an aggregate of RMB43.8 billion (US$6.7 billion) of outstanding indebtedness that will mature between 2018 and 2027, and we may incur additional indebtedness in the future.

17

Table of Contents

Our current and future debt requires us to dedicate a portion of our cash flow to service interest and principal payments and may limit our ability to engage in other transactions. Our ability to pay interest and repay the principal for our indebtedness is dependent upon our ability to manage our business operations, generate sufficient cash flows, raise additional capital and the other factors discussed in this section. There can be no assurance that we will be able to manage any of these risks successfully.

We may require additional capital to support our business growth or to respond to business opportunities, challenges or unforeseen circumstances. Our ability to obtain additional capital, if and when required, will depend on our business plans, investor demand, our operating performance, the condition of the capital markets, and other factors, and our indebtedness may limit our ability to borrow additional funds. We may have difficulty incurring new debt on terms that we would consider to be commercially reasonable. In addition, we may also need to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or that the terms of any refinancing may not be as favorable as the terms of our existing debt.

***Our results of operations may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.***

Our results of operations may fluctuate as a result of a number of factors, many of which are beyond our control. For these reasons, comparing our results of operations on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues may be significantly different from our historical or projected figures. Our results of operations in future quarters may fall below expectations. Any of these events could cause the price of our ADSs to fall. Any of the risk factors listed in this "Risk Factors" section, and in particular the following factors, could cause our results of operations to fluctuate from quarter to quarter:

- general economic conditions in China and economic conditions specific to the internet, internet search and online marketing industries;

- our ability to continue to attract users to our platform despite the emergence of mobile apps and other services;

- our ability to attract additional customers and increase spending per customer;

- the announcement or introduction of new or enhanced products and services by us or our competitors;

- the amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure;

- the results of our acquisitions of, or investments in, other businesses or assets;

- PRC regulations or government actions pertaining to activities on the internet, including various forms of entertainment, online payment and activities otherwise affecting our online marketing customers, and those relating to the products and services we provide;

- unforeseen events, such as negative publicity arising from widespread media coverage and other sources and labor disputes; and

- geopolitical events, natural disasters or epidemics.

Because of the rapid growth of our business, our historical results of operations may not be useful to you in predicting our future results of operations. Our user traffic tends to be seasonal. For example, we generally experience less user traffic during public holidays and other special event periods in China. In addition, advertising and other marketing spending in China has historically been cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. As we continue to grow, we expect that the cyclicality and seasonality in our business may cause our results of operations to fluctuate.

18

Table of Contents

*A severe and prolonged global economic recession and the slowdown in the Chinese economy may adversely affect our business, results of operations and financial condition.*

The global macroeconomic environment is facing challenges, including the end of quantitative easing by the U.S. Federal Reserve, the economic slowdown in the Eurozone since 2014 and uncertainties over the impact of Brexit. The growth of the Chinese economy has slowed down since 2012 compared to the previous decade and the trend may continue. According to the National Bureau of Statistics of China, China's gross domestic product (GDP) growth was 6.9% in 2017. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Europe and Africa. There have also been concerns on the relationship between China and other countries, including surrounding Asian countries, which may potentially lead to foreign investors closing down their business or withdrawing their investment in China and thus exiting the China market, and other economic effects. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any prolonged slowdown in the global or Chinese economy may have a negative impact on our business, results of operations and financial condition, and continued turbulence in the international markets may adversely affect our ability to access the capital markets to meet liquidity needs. Our customers may reduce or delay spending with us, while we may have difficulty expanding our customer base fast enough, or at all, to offset the impact of decreased spending by our existing customers. In addition, to the extent we offer credit to any customer and the customer experiences financial difficulties due to the economic slowdown, we could have difficulty collecting payment from the customer.

*Because we rely to a large extent on distributors in providing our online marketing services, failure to retain key distributors or attract additional distributors could materially and adversely affect our business. Moreover, there is no assurance that our direct sales model in some key geographic markets will continue to be successful.*

We rely, to a large extent, on a nationwide distribution network of third-party distributors for our sales to, and collection of payment from, our customers. If our distributors do not provide quality services to our customers or otherwise breach their contracts with our customers, we may lose customers and our results of operations may be materially and adversely affected. Since most of our distributors are not bound by long-term contracts, we cannot assure you that we will continue to maintain favorable relationships with them. If we fail to retain our key distributors or attract additional distributors on terms that are commercially reasonable, our business and results of operations could be materially and adversely affected.

We have transitioned to using our direct sales force to serve customers in some key geographic markets, such as Beijing, Shanghai, Suzhou and major cities in Guangdong Province. There is no assurance that our direct sales model in those markets will continue to be successful. If we fail to maintain an adequate direct sales force, retain existing customers and continue to attract new customers in those markets, our business, results of operations and prospects could be materially and adversely affected.

*We rely on our Baidu Union members for a significant portion of our revenues. If we fail to retain existing Baidu Union members or attract additional members, our revenue growth and profitability may be adversely affected.*

We pay Baidu Union members a portion of our revenues as we leverage traffic of the Baidu Union members' internet properties. Some of our Baidu Union members, however, may compete with us in one or more areas of our business. Therefore, they may decide in the future to terminate their relationships with us. If our Baidu Union members decide to use a competitor's or their own internet search services, our user traffic may decline, which may adversely affect our revenues. If we fail to attract additional Baidu Union members, our revenue growth may be adversely affected. In addition, if we have to share a larger portion of our revenues to retain existing Baidu Union members or attract additional members, our profitability may be adversely affected.

19

Table of Contents

***Our overseas operations may not be successful.***

We have launched products and services in local languages to internet users in several countries. It is uncertain when the operation will become profitable, if at all. In particular, we rely on local telecommunication operators and service providers to provide us with network services and data center hosting services, and our systems for these international products and services are not redundant across different regions and data centers. Any interruption to the internet infrastructure or any data center may render our products and services in the region unavailable.

We face certain risks inherent in doing business internationally, including:

- difficulties in developing, staffing and simultaneously managing a foreign operation as a result of distance, language and cultural differences;

- challenges in formulating effective local sales and marketing strategies targeting users from various jurisdictions and cultures, who have a diverse range of preferences and demands;

- challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

- dependence on local platforms in marketing our international products and services overseas;

- challenges in selecting suitable geographical regions for international business;

- longer customer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- compliance with applicable foreign laws and regulations and unexpected changes in laws or regulations;

- exposure to different tax jurisdictions that may subject us to greater fluctuations in our effective tax rate and potentially adverse tax consequences; and

- increased costs associated with doing business in foreign jurisdictions.

One or more of these factors could harm our overseas operations and consequently, could harm our overall results of operations.

***If we are unable to adapt or expand our existing technology infrastructure to accommodate greater traffic, content or additional customer requirements, our business may be harmed.***

Our Baidu platform regularly serves a large number of users and customers and delivers a large number of daily page views. Our technology infrastructure is highly complex and may not provide satisfactory service in the future, especially as the number of users and customers increases. We may be required to upgrade our technology infrastructure to keep up with the increasing traffic on our Baidu platform, such as increasing the capacity of our servers and the sophistication of our software. If we fail to adapt our technology infrastructure to accommodate greater traffic or customer requirements, our users and customers may become dissatisfied with our services and switch to our competitors' websites, which could harm our business.

***If we fail to detect fraudulent click-throughs, our customers' confidence in us could be damaged and our revenues could decline.***

We are exposed to the risk of click-through fraud on our paid search results. Click-through fraud occurs when a person clicks paid search results for a reason other than to view the underlying content of search results. Although our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively

20

Table of Contents

and thus capture and prevent some fraudulent click-throughs, there is no assurance that our anti-spam technology is able to detect and stop all fraudulent click-throughs. If we fail to detect fraudulent clicks or otherwise are unable to prevent this fraudulent activity, the affected customers may experience a reduced return on investments, or ROI, in our online marketing services and lose confidence in the integrity of our systems, and we may have to issue refunds to our customers. If this happens, we may be unable to retain existing customers or attract new customers for our online marketing services, and our online marketing revenues could decline. In addition, affected customers may also file legal actions against us claiming that we have over-charged or failed to refund them. Any such claims or similar claims, regardless of their merits, could be time-consuming and costly for us to defend against and could also adversely affect our brand and our customers' confidence in the integrity of our systems. We experienced a number of incidents involving fraudulent click-throughs in recent years. Although the amount of revenue involved in these incidents was immaterial, such cases of fraudulent click-throughs, if occurring on a large-scale and widespread manner, may damage the reputation of our search ecosystem.

***The successful operation of our business depends upon the performance and reliability of the internet infrastructure and fixed telecommunications networks in China.***

Our business depends on the performance and reliability of the internet infrastructure in China. Almost all access to the internet is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. In addition, the national networks in China are connected to the internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the internet. It is unpredictable whether a more sophisticated internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's internet infrastructure. In addition, the internet infrastructure in China may not support the demands associated with continued growth in internet usage.

We rely heavily on China Telecommunications Corporation, or China Telecom, China United Network Communications Group Company Limited, or China Unicom, and China Mobile Communications Corporation, or China Mobile, to provide us with network services and data center hosting services. We have entered into contracts with various local branches or subsidiaries of China Telecom, China Unicom and China Mobile to obtain data communications capacity. We have limited access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of these companies, or if these companies otherwise fail to provide the services. Any unscheduled service interruption could damage our reputation and result in a decrease in our revenues. Furthermore, we have no control over the costs of the services provided by these telecommunication companies. If the prices that we pay for telecommunications and internet services rise significantly, our gross margins could be adversely affected. In addition, if internet access fees or other charges to internet users increase, our user traffic may decrease, which in turn may harm our revenues.

***Failure of information security and privacy concerns could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.***

The internet industry is facing significant challenges with respect to information security and privacy, including the storage, transmission and sharing of confidential information. We transmit and store confidential and private information of our users, customers, distributors, content providers and Baidu Union members, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information.

We are required by PRC law to ensure the confidentiality, integrity, availability and authenticity of the information of our users, customers, distributors, content providers and Baidu Union members, which is also essential to maintaining their confidence in our online products and services. We have adopted strict information security policies and deployed advanced measures to implement the policies, including, among others, advanced

21

Table of Contents

encryption technologies. However, advances in technology, an increased level of sophistication and diversity of our products and services, an increased level of expertise of hackers, new discoveries in the field of cryptography or others can still result in a compromise or breach of the measures that we use. Because of our leading market position in the internet industry in China, we believe we are a particularly attractive target for security breaches and hacking attacks. We have experienced in the past, and may experience in the future, such attacks. In December 2012, the Standing Committee of the PRC National People's Congress promulgated the Decision on Strengthening Network Information Protection, or the Network Information Protection Decision, to enhance the legal protection of information security and privacy on the internet. The Network Information Protection Decision also requires internet operators to take measures to ensure confidentiality of information of users. In July 2013, the MIIT promulgated the Provisions on Protection of Personal Information of Telecommunication and Internet Users to regulate the collection and use of users' personal information in the provision of telecommunication service and internet information service in China. In November 2016, the Standing Committee of the National People's Congress promulgated the PRC Cyber Security Law, which requires, among others, that network operators take security measures to protect the network from unauthorized interference, damage and unauthorized access and prevent data from being divulged, stolen or tampered with. Significant capital, managerial and human resources are required to comply with legal requirements, enhance information security and to address any issues caused by security failures. If we are unable to protect our systems, and hence the information stored in our systems, from unauthorized access, use, disclosure, disruption, modification or destruction, such problems or security breaches could cause a loss or give rise to our liabilities to the owners of confidential information, such as our users, customers, distributors, content providers and Baidu Union members, subject us to penalties imposed by administrative authorities, and disrupt our operations. In addition, complying with various laws and regulations could cause us to incur substantial costs or require us to change our business practices, including our data practices, in a manner adverse to our business.

Furthermore, concerns have been expressed from time to time about whether our products, services or processes could compromise the privacy of users and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, and any negative publicity on our information safety or privacy protection mechanism and policy, even if unfounded, could damage our reputation and brand and adversely affect our business and results of operations.

***If we fail to maintain an effective system of internal control over financial reporting, we may lose investor confidence in the reliability of our financial statements.***

We are subject to reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on the company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of its internal control over financial reporting. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of the company's internal control over financial reporting. We have been subject to these requirements since the fiscal year ended December 31, 2006.

Our management has concluded that our internal control over financial reporting was effective as of December 31, 2017. See "Item 15. Controls and Procedures." Our independent registered public accounting firm has issued an attestation report, which has concluded that our internal control over financial reporting was effective in all material aspects as of December 31, 2017. However, if we fail to maintain an effective system of internal control over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal control over financial reporting at a reasonable assurance level. This could in turn result in loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs, management time and other resources in an effort to comply with Section 404 of the Sarbanes-Oxley Act and other requirements.

22

Table of Contents

*We have limited business insurance coverage.*

Insurance companies in China currently offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources.

*We face risks related to health epidemics, severe weather conditions and other outbreaks.*

Our business could be adversely affected by the effects of avian influenza, severe acute respiratory syndrome (SARS), the influenza A virus, Ebola virus, severe weather conditions or other epidemics or outbreaks. Health or other government regulations adopted in response to an epidemic, severe weather conditions such as snow storms, floods or hazardous air pollution, or other outbreaks may require temporary closure of our offices. Such closures may disrupt our business operations and adversely affect our results of operations.

**Risks Related to Our Corporate Structure**

*PRC laws and regulations governing our businesses and the validity of certain of our contractual arrangements are uncertain. If we are found to be in violation, we could be subject to sanctions. In addition, changes in PRC laws and regulations or changes in interpretations thereof may materially and adversely affect our business.*

The PRC government restricts or imposes conditions on foreign investment in internet content, advertising, audio and video services and mobile application distribution businesses. We and our PRC subsidiaries are considered foreign persons or foreign-invested enterprises under PRC foreign investment related laws. As a result, we and our PRC subsidiaries are subject to PRC legal restrictions on or conditions for foreign ownership of internet content, advertising, audio and video services and mobile application distribution businesses. Due to these restrictions and conditions, we operate our platform and conduct advertising, audio and video services and mobile application distribution businesses in China through our consolidated affiliated entities. As all the nominee shareholders of our consolidated affiliated entities are either PRC citizens or PRC domestic enterprises, these entities are therefore considered as PRC domestic enterprises under PRC law. The "nominee shareholders" refer to those shareholders who have pledged their equity interest in our consolidated affiliated entities to us and entered into exclusive equity purchase and transfer option agreements with us as part of the contractual arrangements. Our contractual arrangements with our consolidated affiliated entities and the nominee shareholders allow us to have the power to direct the activities of these entities that most significantly impact their economic performance. These contractual arrangements demonstrate our ability and intention to continue to exercise the ability to absorb losses or receive economic benefits that could potentially be significant to the affiliated entities. In 2015, 2016 and 2017, we derived approximately 31%, 35% and 34% of our total revenues, respectively, from our consolidated affiliated entities.

There are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including, but not limited to, the laws and regulations governing our business, or the enforcement and performance of our contractual arrangements with our consolidated affiliated entities, including but not limited to Baidu Netcom and the nominee shareholders. These laws and regulations may be subject to change, and their official interpretation and enforcement may involve substantial uncertainty. New laws and regulations that affect existing and proposed future businesses may also be applied retroactively.

Although we believe we comply with current PRC laws and regulations, we cannot assure you that the PRC government would agree that our contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. The PRC government has broad discretion in determining penalties for violations of laws and regulations. If the PRC government determines that we do not comply with applicable law, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, block

23

Table of Contents

our websites, require us to restructure our operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business. Any of these or similar occurrences could significantly disrupt our business operations or restrict us from conducting a substantial portion of our business operations, which could materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of any of our consolidated affiliated entities that most significantly impact its economic performance, and/or our failure to receive the economic benefits from any of our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

***Our contractual arrangements with our consolidated affiliated entities in China and the individual nominee shareholders may not be as effective in providing control over these entities as direct ownership.***

Since PRC law restricts or imposes conditions on foreign equity ownership in the internet sector, value-added telecommunication-based online advertising, online audio and video services and mobile app distribution companies in China, we operate our platform and conduct our value-added telecommunication-based online advertising, online audio and video services and mobile app distribution businesses through our consolidated affiliated entities in China. We have no equity interest in any of these entities and must rely on contractual arrangements to control and operate the businesses and assets held by our consolidated affiliated entities, including the domain names and trademarks that have been transferred from our subsidiaries to our consolidated affiliated entities in accordance with requirements of PRC law. These contractual arrangements may not be as effective in providing control over these entities as direct ownership. For example, our consolidated affiliated entities and the individual nominee shareholders could breach their contractual arrangements with us by, among other things, failing to operate our business, such as using the domain names and trademarks our subsidiaries have transferred to them or maintaining our platform, in an acceptable manner or taking other actions that are detrimental to our interests. If our consolidated affiliated entities or the individual nominee shareholders fail to perform their obligations under these contractual arrangements, we may have to incur substantial costs to enforce such arrangements, and rely on legal remedies under PRC law, including contract remedies, which may not be sufficient or effective. If we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to have the power to direct the activities that most significantly affect the economic performance of our consolidated affiliated entities, and we may lose control over the assets owned by our consolidated affiliated entities, including our *Baidu.com* domain name and website, and any other domain names and websites we have access to may not attract a large number of users and customers at the same level as *Baidu.com*. As a result, our ability to conduct our business may be materially and adversely affected, and we may not be able to consolidate the financial results of the relevant affiliated entities into our consolidated financial statements in accordance with U.S. GAAP, which may materially and adversely affect our results of operations and damage our reputation. In addition, we are in the process of updating the registration of new nominee shareholders of some consolidated affiliated entities with PRC governmental authorities, and we may not be able to claim against any third parties who acquire equity interests in good faith in the relevant consolidated affiliated entities from the original nominee shareholders before the new nominee shareholders are registered.

***Our contractual arrangements with our consolidated affiliated entities in China may result in adverse tax consequences to us.***

As a result of our corporate structure and the contractual arrangements between our subsidiaries and each of our consolidated affiliated entities in China, we are subject to VAT at a rate of 6% as a result of the VAT reform program on both revenues generated by our consolidated affiliated entities' operations in China and revenues derived from our subsidiaries' contractual arrangements with these consolidated affiliated entities. Where our consolidated affiliated entity is qualified as a VAT general taxpayer, the VAT charged by our subsidiaries on the revenues obtained from such consolidated affiliated entity based on the contractual arrangement between our subsidiaries and such consolidated affiliated entity will constitute input VAT for the consolidated affiliated

24

Table of Contents

entity, and will be creditable against output VAT arising in connection with VAT taxable activities carried out by the consolidated affiliated entity. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation" for more information on the VAT reform program. Moreover, we would be subject to adverse tax consequences if the PRC tax authorities were to determine that the contracts between our subsidiaries and these consolidated affiliated entities were not on an arm's-length basis and therefore constituted a favorable transfer pricing. Under the PRC Enterprise Income Tax Law, or the EIT Law, an enterprise must submit its annual tax return together with information on related-party transactions to the PRC tax authorities. The PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. For example, the PRC tax authorities could request that our consolidated affiliated entities adjust their taxable income upward for PRC tax purposes. Such adjustment could adversely affect us by increasing our consolidated affiliated entities' tax expenses without reducing our subsidiaries' tax expenses, which could subject our consolidated affiliated entities to interest due on late payments and other penalties for under-payment of taxes.

*We may have exposure to greater than anticipated tax liabilities.*

We are subject to enterprise income tax, or EIT, business tax, VAT, and other taxes in many provinces and cities in China and our tax structure is subject to review by various local tax authorities. The determination of our provision for income tax and other tax liabilities requires significant judgment. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. For example, if our P4P service is classified as a form of advertisement distribution service, we may be required to pay a cultural business construction fee, which is a 3% surcharge in addition to the applicable value-added tax, or VAT. In addition, if this classification of P4P services were to be retroactively applied, we might be subject to sanctions, including payment of delinquent fees and fines for the revenues generated from our P4P services prior to the classification. Moreover, under the EIT Law, the PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. Particularly, the State Administration of Tax issued a Public Notice, or Public Notice 16, in March 2015, to further regulate and strengthen the transfer pricing administration on outbound payments by a PRC enterprise to its overseas related parties. In addition to emphasizing that outbound payments by a PRC enterprise to its overseas related parties must comply with arm's-length principles, Public Notice 16 specifies certain circumstances whereby such payments are not deductible for the purpose of the enterprise income tax of the PRC enterprise, including payments to an overseas related party which does not undertake any function, bear any risk or has no substantial operation or activities, payments for services which do not enable the PRC enterprise to obtain direct or indirect economic benefits, or for services that are unrelated to the functions and risks borne by the PRC enterprise, or relate to the protection of the investment interests of the direct or indirect investor of the PRC enterprise, or for services that have already been purchased from a third party or undertaken by the PRC enterprise itself, and royalties paid to an overseas related party which only owns the legal rights of the intangible assets but has no contribution to the creation of such intangible assets. Although we believe all our related party transactions, including all payments by our PRC subsidiaries and consolidated affiliated entities to our non-PRC entities, are made on an arm's-length basis and our estimates are reasonable, the ultimate decisions by the relevant tax authorities may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

*The individual nominee shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may adversely affect our business. We do not have any arrangements in place to address such potential conflicts.*

We have designated individuals who are PRC nationals to be the nominee shareholders of our consolidated affiliated entities in China. For example, Robin Yanhong Li, our chairman, chief executive officer and co-founder, is also the principal nominee shareholder of Baidu Netcom, which is our principal consolidated affiliated entity.

25

Table of Contents

Although the individual nominee shareholders are contractually obligated to act in good faith and in our best interest, they may still have potential conflicts of interest with us. For example, some individual nominee shareholders of our consolidated affiliated entities do not have a significant equity stake in our company other than the share options granted to them. We cannot assure you that when conflicts of interest arise, any or all of these individuals will act in the best interests of our company or such conflicts will be resolved in our favor. In addition, these individuals may breach, cause our consolidated affiliated entities to breach or refuse to renew, the existing contractual arrangements with us. Currently, we do not have any arrangements to address potential conflicts of interest between these individuals and our company, except that we could exercise our transfer option under the exclusive equity purchase and transfer option agreement with the relevant individual nomine shareholder to request him/her to transfer all of his/her equity ownership in the relevant consolidated affiliated entity to a PRC entity or individual designated by us. We rely on Mr. Robin Yanhong Li, who is also a director of our company, to abide by the Cayman Islands law, which provides that directors owe a fiduciary duty to the company, and those who are also directors or officers of our PRC subsidiaries to abide by PRC law, which provides that directors and officers owe a fiduciary duty to the company. Such fiduciary duty requires directors and/or officers to act in good faith and in the best interests of the company and not to use their positions for personal gains. There are, however, no specific provisions under the Cayman Islands or PRC law on how to address potential conflicts of interest. If we cannot resolve any conflict of interest or dispute between us and the individual nominee shareholders of our consolidated affiliated entities, we would have to rely on legal proceedings, which could disrupt our business, distract management and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***We may be unable to collect long-term loans to the nominee shareholders of our consolidated affiliated entities in China.***

As of the date of this annual report, we have made long-term loans in an aggregate principal amount of RMB9.0 billion (US$1.4 billion) to the nominee shareholders of our consolidated affiliated entities. We extended these loans to enable the nominee shareholders to fund the capitalization of these entities. We may in the future provide additional loans to the nominee shareholders of our consolidated affiliated entities in China in connection with any increase in their capitalization to the extent necessary and permissible under applicable law. Our ability to ultimately collect these loans will depend on the profitability of these consolidated affiliated entities and their operational needs, which are uncertain.

***We are in the process of registering the pledges of equity interests by nominee shareholders of some of our consolidated affiliated entities, and we may not be able to enforce the equity pledges against any third parties who acquire the equity interests in good faith in the relevant consolidated affiliated entities before the pledges are registered.***

The nominee shareholders of each of our consolidated affiliated entities have pledged all of their equity interests in the relevant consolidated affiliated entities to our subsidiaries pursuant to equity pledge agreements under the contractual arrangements. An equity pledge agreement becomes effective among the parties upon execution. However, according to the PRC Property Rights Law, an equity pledge is not perfected as a security property right unless it is registered with the relevant local administration for industry and commerce. We are still in the process of registering the pledge relating to Baidu Netcom, as well as certain other consolidated affiliated entities, relating to recent equity interest transfers. Prior to the completion of the registration, we may not be able to successfully enforce the equity pledge against any third parties who have acquired property right interests in good faith in the equity interests in the relevant consolidated affiliated entities.

26

Table of Contents

**Risks Related to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on our business and operations.*

Most of our business operations are conducted in China. Accordingly, our business, results of operations, financial condition and prospects are affected by economic, political and social conditions in China generally and by continued economic growth in China as a whole.

China's economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

Growth of China's economy has been uneven, both geographically and among various sectors of the economy, and the growth of the Chinese economy has slowed down since 2012. Some of the government measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. Any stimulus measures designed to boost the Chinese economy may contribute to higher inflation, which could adversely affect our results of operations and financial condition. For example, certain operating costs and expenses, such as employee compensation and office operating expenses, may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets.

*Uncertainties with respect to the PRC legal system could adversely affect us.*

We conduct our business primarily through our subsidiaries and consolidated affiliated entities in China. Our operations in China are governed by PRC laws and regulations. Our subsidiaries are generally subject to laws and regulations applicable to foreign investments in China. The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value.

PRC laws and regulations have significantly enhanced the protections afforded to various forms of foreign investments in China for the past decades. However, China has not developed a fully integrated legal system and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, because these laws and regulations are relatively new, and because of the limited volume of published decisions and their nonbinding nature, the interpretation and enforcement of these laws and regulations involve uncertainties.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all. As a result, we may not be aware of our potential violation of these policies and rules. In addition, any litigation in China may be protracted and result in substantial costs and diversion of resources and management attention.

*We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet and related business and companies.*

The PRC government regulates the internet and related industry extensively, including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the internet industry. These internet-related

27

Table of Contents

laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainty. As a result, under certain circumstances it may be difficult to determine what actions or omissions may be deemed to be violations of applicable laws and regulations. Issues, risks and uncertainties relating to PRC government regulation of the internet industry include, but are not limited to, the following:

- We only have contractual control over our websites. We do not own the websites due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including online information services.

- The licensing requirements relating to the internet business in China are uncertain and evolving. This means that permits, licenses or operations at some of our PRC subsidiaries and consolidated affiliated entities may be subject to challenge, or we may not be able to obtain or renew certain permits or licenses, including without limitation, a Value-Added Telecommunication Business Operating License, which is issued by the MIIT, an Internet News License, which is issued by the State Internet Information Office, or the SIIO, a Short Messaging Service Access Code Certificate, which is issued by the MIIT, an Online Audio/Video Program Transmission License, which is issued by the State Administration of Press Publication, Radio, Film and Television, or the SAPPRFT, a Radio and Television Program Production License, which is issued by the SAPPRFT, a Surveying and Mapping Qualification Certificate for internet map services, which is issued by the National Administration of Surveying, Mapping and Geo-information, an Internet Culture Business Permit with the permitted scope of business covering online game operation and online game virtual currency issuance or trading, which is issued by the Ministry of Culture, an Internet Publication Service License, which is issued by the SAPPRFT, a Payment Service Permit, which is issued by the People's Bank of China, a Qualification Certificate for Internet Drug Information Services, which is issued by provincial branch of the State Food and Drug Administration, the approval for the establishment and operation of a microcredit company, which is granted by a local finance industry administration in China, and a China Air Transport Sales Agency Services Certificate, which is issued by China Air Transport Association. Failure to obtain or renew these permits and licenses may significantly disrupt our business, or subject us to sanctions, requirements to increase capital or other conditions or enforcement, or compromise enforceability of related contractual arrangements, or have other harmful effects on us.

- New laws and regulations may be promulgated to regulate internet activities, including online advertising and online payment. Other aspects of our online operations may be regulated in the future. If these new laws and regulations are promulgated, additional licenses may be required for our online operations. If our operations do not comply with these new regulations at the time they become effective, or if we fail to obtain any licenses required under these new laws and regulations, we could be subject to penalties.

We provide value-added telecommunications services through our consolidated affiliated entities, which hold the required licenses. In July 2006, the MIIT issued the Notice of the Ministry of Industry and Information Technology on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services. This notice prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. According to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by the license holder in its provision of value-added telecommunications services. The notice also requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain these facilities in the regions covered by its license. Baidu Netcom and Beijing BaiduPay Science and Technology Co., Ltd., or BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites.

As we enter into new businesses, we may encounter additional regulatory uncertainties. For example, the current PRC legal framework on autonomous cars or autonomous driving is still new and evolving. Pursuant to

28

Table of Contents

the local rules and regulations in Beijing and Shanghai, any entity intending to conduct a road testing of autonomous driving vehicles in Beijing and Beijing must file an application for road testing with a designated local agency supervising road testing of autonomous vehicles in these two cities, respectively. It also remains uncertain what additional compliance requirements we need to meet in order to undertake a road testing of our autonomous driving cars in other locations in China. Baidu Netcom, one of our consolidated affiliated entities, is in the process of applying for the approval of road testing in Beijing in accordance with the Beijing local rules and regulations. There is no guarantee that the road testing of our autonomous driving cars in other locations fully complies with local laws and regulations. If our road testing is deemed by local enforcement authority as a violation of the applicable traffic and transportation laws, we may have to suspend the testing, and the progress of our research and development of autonomous cars may be adversely affected.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business.

***Substantial uncertainties exist with respect to the enactment timetable, interpretation and implementation of draft PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

The Ministry of Commerce published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. While the Ministry of Commerce solicited comments on the draft, substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance and business operations in many aspects.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company should be treated as a foreign-invested enterprise, or an FIE. According to the definition set forth in the draft, FIEs refer to enterprises established in China pursuant to PRC law that are solely or partially invested by foreign investors. The draft specifically provides that entities established in China (without direct foreign equity ownership) but "controlled" by foreign investors, through contract or trust for example, will be treated as FIEs. Once an entity falls within the definition of FIE, it may be subject to foreign investment "restrictions" or "prohibitions" set forth in a "negative list" to be separately issued by the State Council later. If an FIE proposes to conduct business in an industry subject to foreign investment "restrictions" in the "negative list," the FIE must go through a market entry clearance by the Ministry of Commerce before being established. If an FIE proposes to conduct business in an industry subject to foreign investment "prohibitions" in the "negative list," it must not engage in the business. However, an FIE, during the market entry clearance process, may apply in writing to be treated as a PRC domestic enterprise if its foreign investor(s) is/are ultimately "controlled" by PRC government authorities and its affiliates and/or PRC citizens. In this connection, "control" is broadly defined in the draft to cover the following summarized categories: (i) holding 50% of more of the voting rights of the subject entity; (ii) holding less than 50% of the voting rights of the subject entity but having the power to secure at least 50% of the seats on the board or other equivalent decision making bodies, or having the voting power to exert material influence on the board, the shareholders' meeting or other equivalent decision making bodies; or (iii) having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations.

29

Table of Contents

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "—Risks Related to Our Corporate Structure" and "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders." Under the draft Foreign Investment Law, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is included in the "negative list" as restricted industry, the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC government authorities and its affiliates or PRC citizens). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

Through our dual-class share structure, Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, a PRC citizen, possessed and controlled 55.1% of the voting power of our company as of January 31, 2018. The draft Foreign Investment Law has not taken a position on what actions will be taken with respect to the existing companies with a VIE structure, whether or not these companies are controlled by Chinese parties. Moreover, it is uncertain whether the internet, value-added telecommunication-based online advertising, online audio and video services and mobile app distribution businesses, in which our variable interest entities operate, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as Ministry of Commerce market entry clearance, to be completed by companies with existing VIE structure like us, we face uncertainties as to whether such clearance can be timely obtained, or at all.

The draft Foreign Investment Law, if enacted as proposed, may also materially impact our corporate governance practice and increase our compliance costs. For instance, the draft Foreign Investment Law imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs.

***Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites and negative publicity in international media.***

The PRC government has adopted regulations governing internet access and distribution of news and other information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, contains terrorism or extremism content, or is reactionary, obscene, superstitious, fraudulent or defamatory. Failure to comply with these requirements may result in the revocation of licenses to provide internet content and other licenses and the closure of the concerned websites. In the past, failure to comply with these requirements has resulted in the closure of certain websites. The website operator may also be held liable for the censored information displayed on or linked to the website.

In particular, the MIIT has published regulations that subject website operators to potential liability for content displayed on their websites and the actions of users and others using their systems, including liability for violations of PRC laws and regulations prohibiting the dissemination of content deemed to be socially destabilizing. The Ministry of Public Security has the authority to order any local internet service provider to block any internet website at its sole discretion. From time to time, the Ministry of Public Security has stopped the dissemination over the internet of information which it believes to be socially destabilizing. The State Secrecy Bureau is also authorized to block any website it deems to be leaking state secrets or failing to meet the relevant regulations relating to the protection of state secrets in the dissemination of online information. Furthermore, we are required to report any suspicious content to relevant governmental authorities, and to undergo computer security inspections. If we fail to implement the relevant safeguards against security breaches, our websites may be shut down and our business and ICP licenses may be revoked.

30

Table of Contents

The Anti-Terrorism Law, which took effect on January 1, 2016, further requires internet service providers to verify the identity of their users, and to not provide services to anyone whose identity is unclear or who declines verification. Although the identity verification requirements are already embodied in some internet related regulations, the Anti-Terrorism Law extends these requirements to all types of internet services. The internet service providers are also required to provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities.

Although we attempt to monitor the content in our search results and on our online communities such as Baidu Post Bar, we are not able to control or restrict the content of other internet content providers linked to or accessible through our websites, or content generated or placed on our Baidu Post Bar message boards or our other online communities by our users. To the extent that PRC regulatory authorities find any content displayed on our websites illegal, they may require us to limit or eliminate the dissemination of such information on our websites. To the extent that PRC regulatory authorities find any content displayed on our websites objectionable, they may suggest that we limit or eliminate the dissemination of such information on our websites. If third-party websites linked to or accessible through our websites conduct unlawful activities such as online gambling on their websites, PRC regulatory authorities may require us to report such unlawful activities to relevant authorities and to remove the links to such websites, or they may suspend or shut down the operation of these third-party websites. PRC regulatory authorities may also temporarily block access to certain websites for a period of time for reasons beyond our control. Any of these actions may reduce our user traffic and adversely affect our business. In addition, we may be subject to penalties for violations of those regulations arising from information displayed on or linked to our websites, including a suspension or shutdown of our online operations.

Moreover, our compliance with PRC regulations governing internet access and distribution of news and other information over the internet may subject us to negative publicity or even legal actions outside of China. In May 2011, eight New York residents filed a lawsuit against us before the U.S. District Court for the Southern District of New York accusing us of aiding Chinese censorship in violation of the U.S. Constitution. In March 2014, the U.S. District Court for the Southern District of New York granted our motion for judgment on the pleadings based upon the First Amendment to the U.S. Constitution and dismissed with prejudice the plaintiffs' complaint in its entirety. Even though we have won the case, our reputation may continually be adversely affected among users and investors outside of China.

***The discontinuation of any of the preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition.***

Pursuant to the EIT Law, as further clarified by subsequent tax regulations implementing the EIT Law, foreign-invested enterprises and domestic enterprises are subject to EIT at a uniform rate of 25%. Certain enterprises may benefit from a preferential tax rate of 15% under the EIT Law if they qualify as "High and New Technology Enterprises strongly supported by the state," subject to certain general factors described in the EIT Law and the related regulations.

A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online Network Technology (Beijing) Co., Ltd., or Baidu Online, and Baidu Netcom are entitled to enjoy a preferential tax rate of 15% due to their qualification as "High and New Technology Enterprise," which has a term of three years. If any or some of these PRC subsidiaries and consolidated affiliated entities fail to maintain the "High and New Technology Enterprise" qualification, their applicable EIT rate will increase to 25%. Furthermore, Baidu Online was entitled to a preferential income tax rate of 10% for four consecutive years from 2013 to 2016 due to its "Key Software Enterprise" status designated by the relevant government authorities, so was Baidu China for 2015 and 2016, and Baidu International Technology (Shenzhen) Co., Ltd., or Baidu International, for 2016. Baidu Online, Baidu China and Baidu International will file with the local tax authority for the preferential tax rate of 10% for a "Key Software Enterprise" for 2017 before the end of May 2018, and will be subject to relevant governmental authorities' assessment. However, there is no assurance that any of these entities will continue to enjoy the preferential tax rate as a "Key Software Enterprise." See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax."

31

Table of Contents

The discontinuation of any of the above-mentioned preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain our current effective tax rate in the future.

***If our PRC subsidiaries declare and distribute dividends to their respective offshore parent companies, we will be required to pay more taxes, which could have a material and adverse effect on our result of operations.***

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The British Virgin Islands, where Baidu Holdings Limited, the direct parent company of our PRC subsidiaries Baidu Online and Baidu International, is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, Baidu (Hong Kong) Limited, which directly owns our PRC subsidiaries Baidu China and Baidu Times, is incorporated in Hong Kong. However, if Baidu (Hong Kong) Limited is not considered to be the beneficial owner of dividends paid to it by Baidu China and Baidu Times under the tax circulars promulgated in February 2009 and 2018, such dividends would be subject to withholding tax at a rate of 10%. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

***We may be deemed a PRC resident enterprise under the EIT Law, which could subject us to PRC taxation on our global income, and which may have a material and adverse effect on our results of operations.***

Under the EIT Law and related regulations, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a PRC resident enterprise and is subject to the EIT at the rate of 25% on its worldwide income as well as PRC EIT reporting obligations. The related regulations define the term "de facto management body" as "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise." The State Administration of Taxation issued SAT Circular 82 in April 2009, which provides certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled overseas-incorporated enterprise is located in China. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." Although the SAT Circular 82, the additional guidance and amendment apply only to overseas registered enterprises controlled by PRC enterprises, not to those controlled by PRC individuals or foreigners, the criteria set forth in SAT Circular 82 may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises or individuals. If we are deemed a PRC resident enterprise, we may be subject to the EIT at 25% on our global income, except that the dividends we receive from our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed as "dividends among qualified PRC resident enterprises." If we are deemed a PRC resident enterprise and earn income other than dividends from our PRC subsidiaries, a 25% EIT on our global income could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

32

Table of Contents

***Under PRC tax laws, dividends payable by us and gains on the disposition of our shares or ADSs may be subject to PRC taxation.***

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the EIT at the rate of 10% upon the dividends payable by us or upon any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our non-PRC resident enterprise shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident enterprise shareholders and ADS holders are subject to the EIT, your investment in our shares or ADSs could be materially and adversely affected.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is possible that such dividends and gains earned by non-resident individuals may be subject to PRC individual income tax at a rate of 20%. If we are required under PRC tax laws to withhold PRC income tax on dividends payable to our non-PRC investors that are non-resident individuals or if you are required to pay PRC income tax on the transfer of our shares or ADSs, the value of your investment in our shares or ADSs may be materially and adversely affected.

***Our subsidiaries and consolidated affiliated entities in China are subject to restrictions on paying dividends and making other payments to our holding company.***

Baidu, Inc. is our holding company incorporated in the Cayman Islands. As a result of the holding company structure, it currently relies on dividend payments from our subsidiaries in China. However, PRC regulations currently permit payment of dividends only out of accumulated profits, as determined in accordance with PRC accounting standards and regulations. Our subsidiaries and consolidated affiliated entities in China are also required to set aside a portion of their after-tax profits according to PRC accounting standards and regulations to fund certain reserve funds. The PRC government also imposes controls on the conversion of RMB into foreign currencies and the remittance of foreign currencies out of China. We may experience difficulties in completing the administrative procedures necessary to obtain and remit foreign currency. See "—Governmental control of currency conversion may affect the value of your investment." Furthermore, if our subsidiaries or consolidated affiliated entities in China incur debt on their own in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments. If our subsidiaries and consolidated affiliated entities in China are unable to pay dividends or make other payments to us, we may be unable to pay dividends on our ordinary shares and ADSs.

***Governmental control of currency conversion may affect the value of your investment.***

The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of foreign currency out of China. We receive most of our revenues in RMB. Under our current structure, our income at the Cayman Islands holding company level will primarily be derived from dividend payments from our PRC subsidiaries. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the

33

Table of Contents

future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders or ADS holders.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business.***

Baidu, Inc. is our offshore holding company conducting operations in China through our PRC subsidiaries and consolidated affiliated entities. We may make loans to our PRC subsidiaries and consolidated affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Loans by Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries, which are treated as foreign-invested enterprises under PRC law, or to our consolidated affiliated entities are subject to PRC regulations and foreign exchange loan registrations. Such loans to any of our PRC subsidiaries and consolidated affiliated entities to finance their activities cannot exceed a statutory upper limit and must be filed with SAFE through the online filing system of SAFE after the loan agreement is signed and at least three business days prior to the borrower withdraws any amount from the foreign loan. We may also decide to finance our PRC subsidiaries by means of capital contributions, in which case the PRC subsidiary is required to file the details of the capital contributions with the Ministry of Commerce or its local counterparts. If the business of the PRC subsidiary falls under the "restricted business" category under the Guidance Catalog of Industries for Foreign Investment or is subject to special requirements with respect to shareholding percentage and qualification of senior officers for the "encouraged business" category, the capital contributions to such PRC subsidiary must be approved by the Ministry of Commerce or its local counterparts. Meanwhile, we are not likely to finance the activities of our consolidated affiliated entities by means of capital contributions given the PRC legal restrictions on foreign ownership of internet, value-added telecommunication-based online advertising, online audio and video services and mobile app distribution businesses.

In June 2016, SAFE promulgated SAFE Circular No. 16, which removed certain restrictions previously provided under several SAFE circulars, including SAFE Circular No. 142, in respect of conversion by a foreign-invested enterprise of foreign currency registered capital into RMB and use of such RMB capital. However, SAFE Circular No. 16 continues to prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, and providing loans to non-affiliated enterprises except as permitted in the business scope.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, including SAFE Circulars referred to above, we cannot assure you that we will be able to complete the necessary government registrations or filings on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or consolidated affiliated entities or additional capital contributions by us to our PRC subsidiaries, and conversion of such loans or capital contributions into RMB. If we fail to complete such registrations or filings, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our ability to fund and expand our business.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The Notice on Issues Relating to the Administration of Foreign Exchange in Fund-Raising and Round-Trip Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or SAFE Circular No. 75, and a series of implementation rules and guidance issued by SAFE, including the circular relating to operating procedures that came into effect in July 2011, require PRC residents and PRC corporate entities to register with local branches of SAFE in connection with their direct or indirect offshore investment in

34

Table of Contents

an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which became effective on June 1, 2015. In accordance with SAFE Notice 13, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered, and updated registration when required, with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

As it is uncertain how the SAFE regulations described above will be interpreted or implemented, we cannot predict how these regulations will affect our business operations or future strategy. For example, we may be subject to more stringent review and approval process with respect to our foreign exchange activities, such as remittance of dividends and foreign currency-denominated borrowings, which may adversely affect our results of operations and financial condition. In addition, if we decide to acquire a PRC domestic company, we cannot assure you that we or the owners of such company will be able to obtain the necessary approvals or complete the necessary filings and registrations required by the SAFE regulations. This may restrict our ability to implement our acquisition strategy and could adversely affect our business and prospects.

35

Table of Contents

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC optionees fail to comply with these regulations in the future, we or our PRC optionees and their local employers may be subject to fines and legal sanctions.

***PRC regulations establish complex procedures for some acquisitions conducted by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, adopted by six PRC regulatory agencies in August 2006 and amended in June 2009, among other things, established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. In addition, the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises, issued by the Ministry of Commerce in August 2011, specify that mergers and acquisitions by foreign investors involved in "an industry related to national security" are subject to strict review by the Ministry of Commerce, and prohibit any activities attempting to bypass such security review, including by structuring the transaction through a proxy or contractual control arrangement. We believe that our business is not in an industry related to national security, but we cannot preclude the possibility that the Ministry of Commerce or other government agencies may publish explanations contrary to our understanding or broaden the scope of such security reviews in the future, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited. Moreover, the Anti-Monopoly Law requires that the Ministry of Commerce be notified in advance of any concentration of undertaking if certain filing thresholds are triggered. We may grow our business in part by directly acquiring complementary businesses in China. Complying with the requirements of the laws and regulations mentioned above and other PRC regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share. Our ability to expand our business or maintain or expand our market share through future acquisitions would as such be materially and adversely affected.

***Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, and as such, investors may be deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities. In May 2013, PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the China Securities Regulation Commission, or the CSRC, and the Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations

36

Table of Contents

undertaken by PCAOB, the CSRC or the Ministry of Finance in the United States and the PRC, respectively. PCAOB continues to be in discussions with the CSRC and the Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with PCAOB and audit Chinese companies that trade on U.S. exchanges.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

***Proceedings instituted by the SEC against certain PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act.***

In December 2012, the SEC brought administrative proceedings against five accounting firms in China, including our independent registered public accounting firm, alleging that they had refused to produce audit work papers and other documents related to certain other China-based companies under investigation by the SEC. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of these firms from practicing before the SEC for a period of six months. The decision is neither final nor legally effective unless and until reviewed and approved by the SEC. On February 12, 2014, four of these PRC-based accounting firms appealed to the SEC against this decision. In February 2015, each of the four PRC-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the CSRC. If the firms do not follow these procedures, the SEC could impose penalties such as suspensions, or it could restart the administrative proceedings.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to our delisting from the NASDAQ Global Select Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

***Fluctuation in the value of the RMB may have a material and adverse effect on our results of operations and the value of your investment.***

The value of the RMB against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in China's political and economic conditions and foreign exchange policies. In July 2005, the PRC government changed its decades-old policy of pegging the value of RMB to the U.S. dollar, and RMB appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the RMB and the U.S. dollar remained within a narrow band. Since June 2010, the RMB has fluctuated against the U.S. dollar, at times significantly and

37

Table of Contents

unpredictably, and in recent years the RMB has depreciated significantly against the U.S. dollar. Since October 1, 2016, the RMB has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and there is no guarantee that the RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Our revenues and costs are mostly denominated in RMB. Any significant revaluation of RMB may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars into RMB for our operations, appreciation of the RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, if we decide to convert our RMB into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs, repaying our U.S. dollar denominated notes or other payment obligations or for other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us. In addition, appreciation or depreciation in the value of the RMB relative to U.S. dollars would affect our financial results reported, regardless of any underlying change in our business or results of operations, as RMB is our reporting currency. For example, an appreciation of RMB against the U.S. dollar would result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated financial assets into RMB, our reporting currency, and foreign exchange losses reported in earnings for certain RMB denominated loans that overseas entities borrowed from our PRC entities. Conversely, a depreciation of RMB against the U.S. dollar would result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated notes and other indebtedness into RMB. Moreover, a significant depreciation of the RMB against the U.S. dollar may significantly reduce our earnings translated in the U.S. dollars, which in turn could adversely affect the price of our ADSs.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

***We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.***

In February 2015, the State Administration of Tax issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or Public Notice 7. Public Notice 7 extends its tax jurisdiction to not only indirect transfers but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax

38

Table of Contents

resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10% for the transfer of equity interests in a PRC resident enterprise. However, Public Notice 7 provides safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. On October 17, 2017, the State Administration of Taxation, or the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or SAT Bulletin 37, which came into effect on December 1, 2017. SAT Bulletin 37 further clarifies the practice and procedure of the withholding of non-resident enterprise income tax. Pursuant to Public Notice 7 and SAT Bulletin 37, both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under Public Notice 7 and SAT Bulletin 37. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under Public Notice 7 and SAT Bulletin 37. As a result, we may be required to expend valuable resources to comply with Public Notice 7 and SAT Bulletin 37 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under Public Notice 7 and SAT Bulletin 37 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under Public Notice 7 and SAT Bulletin 37, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

### Risks Related to Our ADSs

*The trading price of our ADSs has been volatile and may continue to be volatile regardless of our operating performance.*

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly results of operations;

- changes in financial estimates by securities research analysts;

- conditions in internet search and online marketing markets;

- changes in the operating performance or market valuations of other internet search or internet companies;

- announcements by us or our competitors or other internet companies of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

39

**Table of Contents**

- addition or departure of key personnel;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- litigation, government investigation or other legal or regulatory proceeding; and

- general economic or political conditions in China or elsewhere in the world.

In addition, the stock market in general, and the market prices for internet-related companies and companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. In particular, the global financial crisis and the ensuing economic recessions in many countries have contributed and may continue to contribute to extreme volatility in the global stock markets. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

*Substantial future sales or the perception of sales of our ADSs in the public market could cause the price of our ADSs to decline.*

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

*You may not have the same voting rights as the holders of our ordinary shares and may not receive voting materials in time to be able to exercise your right to vote.*

Except as described in this annual report and in the deposit agreement, holders of our ADSs will not be able to exercise voting rights attached to the shares evidenced by our ADSs on an individual basis. Holders of our ADSs will appoint the depositary or its nominee as their representative to exercise the voting rights attached to the shares represented by the ADSs. You may not receive voting materials in time to instruct the depositary to vote, and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. Upon our written request, the depositary will mail to you a shareholder meeting notice which contains, among other things, a statement as to the manner in which your voting instructions may be given, including an express indication that such instructions may be given or deemed given to the depositary to give a discretionary proxy to a person designated by us if no instructions are received by the depositary from you on or before the response date established by the depositary. However, no voting instruction will be deemed given and no such discretionary proxy will be given with respect to any matter as to which we inform the depositary that (i) we do not wish such proxy given, (ii) substantial opposition exists, or (iii) such matter materially and adversely affects the rights of shareholders.

40

Table of Contents

***You may not be able to participate in rights offerings and may experience dilution of your holdings as a result.***

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. Under the deposit agreement for the ADSs, the depositary will not offer those rights to ADS holders unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act of 1933, or exempt from registration under the Securities Act with respect to all holders of ADSs. We are under no obligation to file a registration statement with respect to any such rights or underlying securities or to endeavor to cause such a registration statement to be declared effective. In addition, we may not be able to take advantage of any exemptions from registration under the Securities Act. Accordingly, holders of our ADSs may be unable to participate in our rights offerings and may experience dilution in their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***You may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited, because we are incorporated under Cayman Islands law, conduct most of our operations in China and all of our executive officers reside outside of the United States.***

We are incorporated in the Cayman Islands, and conduct most of our operations in China through our subsidiaries and consolidated affiliated entities in China. All of our executive officers and a majority of our directors reside outside of the United States and some or all of the assets of these persons are located outside of the United States. As a result, it may not be possible to effect service of process within the United States or elsewhere outside of China upon our executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws.

It may also be difficult or impossible for you to bring an action against us or against our directors and executive officers in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and executive officers. There is no statutory recognition in the Cayman Islands of judgments obtained in the United States, although the courts of the Cayman Islands will generally recognize and enforce a non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. Moreover, our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of judgment of courts.

Our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2016 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against our directors and us, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States, and provides significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before the federal courts of the United States.

41

Table of Contents

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

### *Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.*

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering. Our co-founder, chairman and chief executive officer, Robin Yanhong Li, who acquired our shares prior to our initial public offering, holds our Class B ordinary shares. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate (as defined in our memorandum and articles of association) of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time Robin Yanhong Li and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share will be automatically and immediately converted into one Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

Due to the disparate voting powers attached to these two classes, certain shareholders have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage or prevent others from pursuing any potential merger, takeover or other change of control transactions with our company, which could deprive our shareholders and ADS holders of an opportunity to receive a premium for their shares or ADSs as part of a sale of our company and might reduce the price of our ADSs.

### *Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs.*

Our articles of association include certain provisions that could limit the ability of others to acquire control of our company, and therefore may deprive the holders of our ordinary shares and ADSs of the opportunity to sell their ordinary shares or ADSs at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure.

- Our board of directors has the authority, without approval by the shareholders, to issue up to a total of 10,000,000 preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may fix the designations, preferences, powers and other rights of the shares of a series of preferred shares.

- Our board of directors has the right to elect directors to fill a vacancy created by the increase of the board of directors or the resignation, death or removal of a director, which prevents shareholders from having the sole right to fill vacancies on our board of directors.

### *We may be classified as a passive foreign investment company, which could result in adverse U.S. federal income tax consequence to U.S. Holders of our ADSs or ordinary shares.*

A non-U.S. corporation, such as our own, will be considered a passive foreign investment company, or "PFIC," for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of

Table of Contents

the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets is generally determined by reference to the market price of the ADSs and ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules and because PFIC status is a fact-intensive determination made on an annual basis, no assurance may be given with respect to our PFIC status for the current or any future taxable year.

Based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, we believe that, even under the least favorable interpretations of what portion of goodwill and certain other assets are treated as "passive," we were not a PFIC for our taxable year ended December 31, 2016 or for our taxable year ended December 31, 2017. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2018 or for the foreseeable future. However, our PFIC status for the current taxable year ending December 31, 2018 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year). Under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive," we may have been a PFIC for 2015. We believe under more reasonable approaches for our circumstances that we were not a PFIC for our taxable year ended December 31, 2015. If you were a holder of our ADSs or ordinary shares during the taxable year ended December 31, 2015, you are urged to consult your tax advisor regarding the application of the PFIC rules to your investment.

If we were treated as a PFIC for any taxable year during which a U.S. Holder (defined below) held an ADS or an ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Item 10.E. Additional Information—Taxation—U.S. Federal Income Tax Considerations—Passive Foreign Investment Company."

**Item 4.    Information on the Company**

**A.    History and Development of the Company**

We were incorporated in the Cayman Islands in January 2000. Since our inception, we have conducted our operations in China principally through Baidu Online, our wholly owned subsidiary in Beijing, China. Since June 2001, we also have conducted part of our operations in China through Baidu Netcom, a consolidated affiliated entity in Beijing, China, which holds the licenses and approvals necessary to operate our platform and provide value-added telecommunication-based online advertising services. In more recent years, we have established additional subsidiaries inside and outside of China and assisted in establishing additional PRC consolidated affiliated entities to conduct part of our operations.

On August 5, 2005, we listed our ADSs on The NASDAQ National Market (later renamed The NASDAQ Global Market) under the symbol "BIDU." We and certain selling shareholders of our company completed the initial public offering of 4,604,224 ADSs, each then representing one Class A ordinary share, on August 10, 2005. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split. Our ADSs are currently traded on The NASDAQ Global Select Market.

In December 2008, our shareholders approved our name change from Baidu.com, Inc. to Baidu, Inc. In November 2009, we moved into our new corporate headquarters, which we name as Baidu Campus. Our principal executive offices are located at Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, the People's Republic of China. Our telephone number at this address is +86 (10) 5992-8888.

In November 2012, we obtained the controlling interest in iQIYI, Inc., or iQIYI, a prior equity method investee, and have since then consolidated its financial results into our consolidated financial statements. In

43

Table of Contents

May 2013, we acquired the online video business of PPStream Inc., or PPS, merged it with iQIYI and have since then consolidated its financial results into our consolidated financial statements. In the first quarter of 2017, iQIYI completed the issuance of certain convertible notes to a group of investors for an aggregate investment amount of US$1.53 billion, and we invested US$300 million in iQIYI as part of the note issuance. The convertible notes held by us were converted into series G1 preferred shares of iQIYI according to agreed terms in October 2017.

We consolidated the financial results of Qunar, an online travel services provider, in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In November 1, 2013, Qunar listed its ADSs, each representing three Class B ordinary shares of Qunar, on NASDAQ in connection with its initial public offering. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares in Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar, and we have become a major shareholder of Ctrip since October 2015. We subsequently acquired additional ordinary shares of Ctrip in 2016.

In August 2017, the Company's subsidiary that operated Baidu Deliveries, Xiaodu Life Technology Ltd., or Xiaodu, completed its merger with Rajax Holding, or Rajax, which operates the food delivery business under the ele.me brand in China. As a result of the merger, Xiaodu became a subsidiary of Rajax. We and Rajax have agreed to business cooperation across a broad base of products and services post the merger transaction.

### B.    Business Overview

We are the leading Chinese language internet search provider. In 2017, we updated our mission statement to be that "Baidu aims to make a complex world simpler through technology." We aim to achieve this mission through our two-pillar strategy: strengthening our mobile foundation and leading in artificial intelligence (AI).

Our business currently consists of two segments, Baidu Core and iQIYI. Baidu Core is primarily comprised of keyword-based marketing services, which target and are triggered by internet users' search queries. These services include P4P services and other online marketing services and AI-enabled new business initiatives. iQIYI is an innovative market-leading online entertainment service provider in China. iQIYI's platform features highly popular original content, as well as a comprehensive selection of professionally produced and partner-generated content.

Our website Baidu.com is the largest website in China and the fourth largest website globally, as measured by average daily visitors and page views during the three-month period ended December 31, 2017, according to Alexa.com, an internet analytics firm. In addition, our "Baidu" brand is one of the highest ranking brands in China in BrandZ Top 100 Most Valuable Chinese Brands 2017, a study published by Millward Brown Optimor, a brand strategy research company.

We conduct our operations primarily in China. Revenues generated from our operations in China accounted for approximately 98.9%, 97.8% and 97.8% of our total revenues in 2015, 2016 and 2017, respectively.

We serve four types of online participants:

*Users.* We aspire to provide the best experience to our users. To enrich user experience, we provide a broad range of products and services accessible through PCs and mobile devices. We offer search and other services on

44

Table of Contents

our Baidu platform that enables users to be connected to relevant information online, including web pages, news, images, documents, multimedia files and services, through links provided on our website and apps. We have invested in advanced technology such as AI to enhance user experience and deepen user engagement.

*Customers.* We deliver online marketing services to a diverse customer base operating in a variety of industries. In 2017, we had approximately 775,000 active online marketing customers. Consistent with previously reported numbers, the number of active online marketing customers excludes those from the group-buying and delivery related businesses. The online marketing customers consist of SMEs, large domestic businesses and multinational companies. Our customer base is diversified in terms of industries and geographical locations. The defined industries in which our customers operate include retail and ecommerce, network service, medical and healthcare, franchise investment, financial services, education, online games, transportation, construction and decoration, and business services. Customers in our top five industries contributed approximately 50% of our total online marketing revenues in 2017. Although we have customers located throughout China, we have a more active and larger customer base in the coastal regions, reflecting the current general economic demographics in China.

Customers for iQIYI primarily consist of advertisers, who are counted as part of our online marketing customers, and membership subscribers of online video contents.

We reach and serve our customers through our direct sales force as well as a network of third-party distributors across China. As many of our customers are SMEs, we use distributors to help us identify potential SME customers, collect payments and assist SMEs in setting up accounts with us and using our online marketing services. We have also engaged third-party agencies to identify and reach potential customers outside of China. Customers use our products and services through PCs and mobile devices. Mobile revenues accounted for 73.1% of our total revenues in 2017.

Since early May 2016, we have proactively implemented higher customer verification standards to improve customer quality and enhance user experience. While the verification initiative had a short term impact on our business, we believe the higher standards contribute to a healthier and more sustainable business for the long term.

*Baidu Union Members.* Baidu Union consists of a large number of third-party web content, software and mobile app providers. Baidu Union members can display on their properties our customers' promotional links that match the content of such members' properties. Some Baidu Union members also embed some of our products and services onto their properties. We allow Baidu Union members to provide high-quality and relevant search results to their users without the cost of building and maintaining advanced search capabilities in-house and to monetize their traffic through revenue sharing arrangements with us. We reward Baidu Union members through revenue-sharing arrangements. As a result of our continued effort to optimize the quality of Baidu Union members, the revenues contributed by Baidu Union members increased in 2017, along with the growth of revenues generated by our own properties.

*Content Providers.* Our content providers mainly consist of video copyright holders, apps owners who list their apps on our app store for users to download, users who contribute their valuable and copyrighted content to our products, and publishers, who share their content through Baijiahao accounts. We provide these content providers with a broad platform for them to present their content, and they contribute rich contents and resources to our content ecosystem. If we generate revenue from utilizing third-party content, we will purchase these content or share revenue with the content providers based on the terms of pre-agreed contracts.

45

Table of Contents

**Baidu Core**

*Baidu Core Products and Services for Users*

We focus on offering products and services that enable our users to find relevant information quickly and easily. We offer our main products and services to users through Baidu App and Baidu.com. These products and services can be accessed through PCs, mobile and smart devices.

**Baidu App.** Mobile Baidu, our flagship mobile app, has been rebranded as Baidu App. The rebranding reflects Baidu App as the main channel to experience Baidu services. Baidu App enables users to access our Baidu Search, Baidu Feed and other services using mobile devices, including smartphones. Baidu App supports text, voice and image search to better serve users of mobile devices. The updated Baidu App features enhanced voice input, improved feed display, intelligent search and augmented reality. In the fourth quarter of 2017, our Baidu App users' total daily time spent increased by approximately 30% from the same quarter of 2016.

**Baidu Search.** Users can also access our search and other services through mobile browsers, with which we have cooperation. In addition to traditional text inputs, our users can conduct AI-enable search through voice and image. Voice search integrates speech technology and the search technology to enhance the user experience by providing a naturalistic input alternative to traditional text input. Image search enables the use of the mobile device camera to capture images and uses visual goal automatic detection and recognition. We have endeavored to make the user experience smoother and more mobile native, through initiatives such as Top 1, whereby user queries are satisfied in the first, prominently displayed search result. We also aim to deepen our coverage of richer forms of content, including images, text, videos, and augmented and virtual reality. Users can also use Baidu Search to connect with transaction services, such as takeout delivery, movie ticket bookings, hotel reservations, flight bookings, other types of local lifestyle services.

Users can also retrieve information through search queries on PC devices. Based on the keywords in users' search queries and their search history, web search can recommend related topics, such as books, historical figures, movies and games, which may be of interest to the users in order to satisfy their potential search demands. In addition, we have become one of China's first search engines that are fully supportive of collection and search of https resources by continually promoting distribution of https-related resources, with a view to building a safer web-ecosystem and pushing forward the overall internet https-ilization in China.

**Baidu Feed.** Baidu Feed provides users with personalized timeline to meet their personal interests reflected in their past online behaviors, such as search and browsing, and their demographics. Baidu Feed complements our core search products and existing content ecosystem, and contributes strongly to user loyalty. In the fourth quarter of 2017, daily content distributed by Baidu Feed grew by over 20% compared with the prior quarter, and the percentage of video content distributed in Baidu Feed grew to 40% on average, up from 14% in the same quarter of the previous year.

**Bear Paw Account.** Bear Paw Account enables verified brands and businesses to aggregate their content from websites, wapsites and open-platform apps, which become searchable in one location and allow users to follow and engage with brands and businesses. Bear Paw Account provides users with an easy and effective way for users to access brands and businesses, leveraging our open ecosystem to secure traffic, retain users, contribute to brand building and achieve growth.

**Baijiahao.** Baijiahao is a publisher platform for content providers to publish content and build a fan base online. Baijiahao supports various content formats, including articles, albums, video, live broadcast, augmented reality and virtual reality. Our Content Provider AI Platform provides content providers with cutting edge AI tools to help automatically review material for edits, intelligently splice video into images, copyright protection, and more. In 2017, the number of content providers on our Baijiahao platform grew to 1 million at the year end from over 200,000 at the beginning of the year.

Table of Contents

**Baidu Post Bar.** Baidu Post Bar is a social media platform that attracts users through topics of common interest. Users post text, image, audio and video content and reply to original content, thus forming social networks around topics of discussions. Baidu Post Bar draws new users through close integration with search and user-generated content. Baidu Post Bar has become a popular platform for celebrity fans, online game players, online novel readers and virtual local communities as well as a platform that reflects current cultural trends.

**Haokan Videos.** Haokan Videos is an online short-form video aggregation platform. The platform, powered by Baidu's advanced AI algorithms, curates a rich and personalized library of user-generated short-form videos for our users. Haokan Videos also feature a wide array of user-friendly interactive tools, such as like, subscribe, archive, comment, share and search. Videos content creators can upload videos onto the platform in order to generate fan-followings and revenues through sharing arrangements with us.

**Baidu Knows.** Baidu Knows is a knowledge sharing platform built through interactive questions and answers among our users. The answers posted on Baidu Knows are generated by our users and expert residents on the platform, as well as specialists from businesses and government agencies. Users can access Baidu Knows through PCs, WAP and mobile apps and are also able to find requested answers to their questions directly from Baidu Search.

**Baidu Encyclopedia.** Baidu Encyclopedia is an evolving encyclopedia compiled by registered users. Baidu Encyclopedia's contents are generated by registered users who are experts in their respective fields, including medical care and studio arts. Baidu Encyclopedia has produced a number of characteristic columns, such as Encyclopedia of Intangible Cultural Heritage, Digital Museum and Recorder of History, among others, which aim to meet the high-quality content requirements of users. Baidu Encyclopedia is transitioning to a complete video-based knowledge source enabling users to acquire knowledge through short videos to enhance user experience.

**Baidu Education.** Baidu Education is an online platform of educational resources, whose products include Baidu WenKu, Baidu Yuedu and Baidu Classroom. Baidu WenKu is a repository of valuable documents and materials with a wide coverage of more than 50 disciplines in fundamental education, engineering sciences and technologies. Baidu Yuedu provides valuable library resources and personalized content recommendation. Baidu Classroom covers more than one million knowledge graphs, which can be utilized to aid teaching and study.

**Baidu Mobile Assistant.** Baidu Mobile Assistant is a mobile app marketplace designed for Android mobile devices. The platform offers an extensive and diversified array of apps, and selects and recommends high-quality apps based on big data analytics. Baidu Mobile Assistant helps users manage their smartphones, allowing users to download, upgrade, manage and delete apps easily and conveniently. Additionally, Baidu Mobile Assistant helps users optimize device memory and clean junk files. Through Mobile Open Platform, Baidu Mobile Assistant offers various skills for app developers, granting developers access to numerous apps and service contents. Baidu Mobile Assistant also helps app developers reach users through its app distribution and advertising platform.

**Baidu Mobile Guardian.** Baidu Mobile Guardian is a comprehensive phone security software, using mobile anti-virus technology. It can provide users with free system optimization, mobile handset accelerator, garbage data cleaning, system vulnerability defense, virus sweeper, data privacy, harassing phone intercept, secure payment and other features.

**DuerOS.** DuerOS is a conversational AI platform that enables hardware devices to hear, understand and fulfill the users' needs through voice activation. DuerOS has more than 130 partners building over 50 DuerOS-powered hardware products, including televisions, smart speakers, smartphones, smart headsets and more. DuerOS Intelligent Device Platform has launched turn-key solutions to cover various form factors, including televisions, smart speakers, smartphones, smart headsets and smart robots. DuerOS Bots Platform has attracted many developers to the ecosystem. Through DuerOS-powered devices, users can access DuerOS-powered skills in domains, including video and audio, smart home, information, entertainment and services, and more.

Table of Contents

**Baidu Wallet.** Baidu Wallet, formerly branded as BaiduPay, provides online and mobile payment services and enables our users to complete a closed loop transaction in a seamless manner, including purchases of local dining/takeout delivery offerings and transfers and bill payments. In addition, as our key financial services portal, Baidu Wallet mobile app integrates advanced data technology and is able to recommend consumer financing products or investment products that best fits users' demand.

**Baidu Consumer Credit.** Baidu Consumer Credit mainly provides installment payment services to consumers and services tens of millions of users through education loans and consumer financing to meet consumers' cash expenditure needs. Baidu Consumer Credit leverages search traffic to build multi-dimensional service access for multi-scenario customer reach, based on data mining to help accurately profile users. Additionally, Baidu Consumer Credit uses big data and AI technology as the foundation for its risk control and review system, enabling targeted user identification and streamlined credit review and approval.

**Baidu Wealth Management.** Baidu Wealth Management provides wealth management services by leveraging big data and technology. Baidu Wealth Management uses AI technology to analyze user risk profiles and Baidu data analytical capabilities to holistically assess the potential risks and returns for investment products. Baidu Wealth Management has established a team of experienced wealth management professionals to serve our customers.

**Baidu Maps.** Baidu Maps provides services relating to locations and intelligent routing and navigation. Baidu Maps aggregates and optimizes available, cost-effective traffic options and displays route timing and costs. Baidu Maps has also enabled intelligent voice assistant functionality.

**Baidu Cloud Drive.** Baidu Cloud Drive, formerly named Baidu Netdisk, is a personal cloud service platform. Users can upload personal data, such as documents, photos and address books from various devices, to Baidu Cloud Drive, and access their data from computing devices at any time. In 2017, Baidu Cloud Drive launched an AI-based intelligent cloud-based file management system that features picture classification, facial photo Search and ID intelligent identification function.

**Global Business.** We offer numerous mobile products and services for emerging and developed markets around the world. Our smartphone apps for overseas markets include DU Battery Saver, DU Speed Booster, ES File Explorer, DU Recorder, DU Caller, Photo Wonder, Simeji Japanese keyboard, Facemoji Keyboard and many other apps. Our mobile advertising solution, DU Ad Platform, is available to Android and iOS developers in over 200 countries and regions worldwide. Currently, thousands of developers worldwide use DU Ad Platform to maximize their monetization efficiency.

### Baidu Core Products and Services for Customers

We focus on providing customers with cost-effective and targeted marketing solutions. We generate a large majority of our revenues from online marketing services, including online marketing services based on search queries, contextuals, audience attributes, media and placement attributes and other forms. Our online marketing services generally comprise text links, images, multimedia files and interactive forms.

### Online Marketing Services Based on Search Queries

Online marketing services based on search queries are keyword-based marketing services targeted at and triggered by internet users' search queries, which include our P4P (pay for performance) services and other search query-based online marketing services, for example, BrandZone. Typically, a P4P customer pays us when users click on one of its website links on Baidu search result pages or Baidu Union members' properties, while a BrandZone customer pays us based on the duration of the placement on Baidu search result pages. Users could reach our P4P sponsored links and BrandZone on either mobile or non-mobile devices.

48

Table of Contents

**P4P.** Our auction-based P4P services enable our customers to bid for priority placement of their paid sponsored links. Our P4P platform enables our customers to reach users who search for information related to their products or services. Our P4P online marketing customers may choose to set a daily limit on the amount spent and may also choose to target only users accessing our website from specified regions in China and/or during a specific time period of the day.

Phoenix Nest, one of our current online marketing systems, is designed to improve relevance in paid search and increase value for customers, thus driving monetization efficiency. We have continually made enhancements to Phoenix Nest. We leverage our extensive resources, such as Baidu Encyclopedia and Baidu Images to recommend copyrighted images, which has increased the coverage and enhanced the quality of pictures in creative advertising. AI enables Phoenix Nest to improve online marketing targeting and relevance to users and enhances conversion for our online marketing customers. We have also broadened the adoption of Dynamic Ads, which incorporates product and user data from our online marketing customers to drive higher return on investment to our online marketing customers. In addition, in order to help customers efficiently obtain user leads and help users obtain services, we have launched a lead-generating product, through which the AI-enabled Phoenix Nest will recommend appropriate consulting, telephone and appointment services based on its understanding of user needs, increasing customer's conversion rate.

**BrandZone.** BrandZone is our branded display marketing product which allows the brand image of an advertiser to be prominently displayed on the search result page and in vertical search products in a structured and uniform manner. Customers can show integrated text description, image and video, on a prominent position of the search result page. The display position for BrandZone may also be shown on our vertical search products, including Baidu Knows and Baidu Image.

*Online Marketing Services through Baidu Feed*

Online marketing services through Baidu Feed can help customers precisely target the right feed users based on user data on the Baidu platform. Online marketing services through Baidu Feed are image-based or video-based online marketing services which appear between the feed headlines, or within the feed content. With our twin engine of search business, namely, P4P and Feed, we are able to deliver a more comprehensive, richer and a diversified offering to fulfill customer needs. A feed customer pays us based on the click-throughs of in-feed online marketing service to their platforms or displays of the advertisements for their products.

*Online Marketing Services Based on Contextuals, Audience Attributes, Media and Placement Attributes*

Online marketing services based on contextuals, audience attributes, media and placement attributes refer to our programmatic marketing service transaction system, which includes supply-side platform (SSP), demand-side platform (DSP), Baidu exchange service platform (BES), and data management platform (DMP). The transaction system supports the advertisement placement of standard creativity, intelligent creativity and customized creativity, as well as multiple payment methods including cost per time (CPT), cost per mille (CPM), cost per click (CPC) and cost per action (CPA). SSP covers media resources of Baidu and third-party Baidu Union members. SSP intelligently manages media advertising space inventory and optimizes marketing spending by analyzing matching content, target audience and characteristics of different media and platforms. DSP is an integrated sales service platform for advertisers and advertising agents, providing programmatic media purchase service. BES is a traffic transaction platform that combines DSP with media resources, by leveraging the traffic advantage and big data capabilities of BES. DMP integrates data from advertisers, Baidu and third-party data management platforms, which cover searches, offline visits, target audience tags, sequential placements and crowd portraits, in order to improve the effectiveness and accuracy of DSP.

*Other Search Products and Services for Customers*

**Baidu Cloud.** Baidu Cloud is a public cloud computing platform that offers IaaS (Infrastructure as a Service), PaaS (Platform as a Service), SaaS (Software as a Service) and AI2B (AI as a service) to enterprise

49

Table of Contents

customers and developers to build, test and deploy apps on our scalable and reliable infrastructure. Baidu Cloud is based on the same cloud computing technology that supports Baidu internal functions. Baidu Cloud provides a comprehensive set of services, such as IaaS-like computing, storage and networking, PaaS-like security, database technology, data analysis and learning, multimedia service, internet of things (IOT), digital marketing and websites, AI technology, and SaaS enabling customers to adopt apps as they need.

**Autonomous Driving.** We believe autonomous driving is an important area for future growth. We have leveraged our technical accumulation in AI and deep learning, and developed some industry-leading technologies in the autonomous driving field, including environment sensing, behavior prediction, planning control, operation system, high precision localization, high precision map and system safety. In 2017, we launched Apollo, our open source autonomous driving platform. Apollo has been designated by China's central government as the national autonomous driving platform. To date, we have been working with over 90 global and domestic industry partners to build our ecosystem to support autonomous driving.

## iQIYI

iQIYI is an innovative market-leading online entertainment service provider in China. iQIYI's platform features highly popular original content, as well as a comprehensive selection of professionally produced and partner-generated content. iQIYI is the largest internet video streaming service in China in terms of user time spent and average total monthly active users in 2017, according to iResearch. iQIYI generates revenues through membership services, online advertising services, and a suite of IP-related monetization methods, including content distribution. iQIYI has also established a track record of creating multiple channels of monetization through adapting a single popular work into a variety of entertainment products. For the three months ended December 31, 2017, iQIYI had approximately 421 million average mobile monthly active users and approximately 126 million average mobile daily active users. In December 2017, iQIYI's users watched a total of 9.2 billion hours of videos on the platform.

## Sales and Distribution

We offer Baidu Core products and services directly and through our distribution network. We have direct sales presence in Beijing, Shanghai, Suzhou and major cities in Guangdong Province, covering the major regional markets for our online marketing services.

The business distributors of Baidu Core products and services provide numerous services, including identifying customers, collecting payments, assisting customers in setting up accounts with us, suggesting keywords to maximize ROI and engaging in other marketing and educational services aimed at acquiring customers. We offer discounts to distributors as consideration for their services. We have relied on distributors for several reasons. Our P4P customer base in China is geographically diverse and fragmented, as many of our P4P customers are SMEs located in different regions in China. Moreover, SMEs are generally less experienced with online marketing as compared to large companies and therefore benefit from the extensive services provided by distributors. Finally, distributors serve as an important channel to reach SME customers throughout China and collect payments from them. We offer our online marketing services to medium and large corporate customers through third-party agencies and our direct sales force. We have also engaged third-party agencies to identify and reach the potential customers outside of China.

## Marketing

We focus on continually improving the quality of our products and services, as we believe satisfied users and customers are more likely to recommend our products and services to others. Through these efforts and the increased use of internet in China, we have built our brand with modest marketing expenditures.

We have implemented a number of marketing initiatives designed to promote our brand awareness among potential users, customers and Baidu Union members. In addition to our brand positioning in the market, we have

50

Table of Contents

also initiated a series of marketing activities to promote our products and technologies among existing and potential users and customers. In July 2017, we held Baidu AI Developers Conference, where we showcased Baidu's AI strategy, AI technology, and business development and solutions. At the Baidu World Conference held in November 2017, we launched a series of new products powered by Baidu AI technology and progress in commercialization achievements of Baidu AI technology. In January 2018, we held the Baidu World Conference in the United States, a day before the Consumer Electronics Show in Las Vegas and showcased Baidu autonomous driving and DuerOS.

**Competition**

For Baidu Core business, our primary competitors include U.S.-based internet search providers providing Chinese language internet search services and China-based internet companies. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), safety and user experience of search results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites. We also face competition from traditional advertising media.

*U.S.-based Internet Search Providers.* U.S.-based internet search providers, such as Google, have a strong global presence, well established brand names, more users and customers and significantly greater financial resources than we do. We may also continue to face competition from other existing competitors and new entrants in the Chinese language search market.

*China-based Internet Companies.* Chinese internet companies, such as Alibaba, Tencent, Sohu, Qihoo 360, ByteDance, Xiaomi and iFly Technology, offer a broad range of online services, including search and feed services. These companies have widely recognized brand names in China and significant financial resources. We compete with these internet companies primarily for user traffic, user time, content, advertising budget and marketing resources. We leverage our user traffic, product design and various marketing to enhance users' reliance on our platforms and services.

*Other Advertising Media.* Other advertising media, such as newspapers, yellow pages, magazines, billboards, other forms of outdoor media, television, radio and mobile apps compete for a share of our customers' marketing budgets. Large enterprises currently spend a relatively small percentage of their marketing budgets on online marketing as compared to other advertising media.

For iQIYI, our primary competitors include companies that operate online video websites in China, such as Youku-Tudou and Tencent Video, other internet media and entertainment services providers and major TV stations. We compete with these market players for both users and advertisers primarily on the basis of user base and demographics, quality and quantity of video content, brand name and user experience.

**Technology**

We operate five research labs under the umbrella of Baidu Research, the Institute of Deep Learning, Silicon Valley Artificial Intelligence (AI) Lab, Big Data Lab, Business Intelligence Lab, Robotics and Autonomous Driving Lab. We established the Institute of Deep Learning in January 2013. We opened the Silicon Valley AI Lab in May 2014, enhancing our research and development capabilities in Silicon Valley. In August 2014, we and the United Nations announced and started strategic cooperation and jointly established the Big Data Lab. In January 2018, we established the Business Intelligence Lab and the Robotics and Autonomous Driving Lab focusing on efficient data analysis and robotics.

We have developed a proprietary technological infrastructure which consists of technologies for web search, P4P, large-scale systems, AI and autonomous driving. Our established infrastructure serves as the backbone for our PC, mobile and AI platforms.

51

Table of Contents

*Search Technology*

Our search is powered by a set of advanced technologies including, among others, the following:

*Link Analysis.* Link analysis is a technique that determines the importance of a web page by evaluating the combination of the anchor texts and the number of web pages linked to that web page. We treat a link from web page A to web page B as a "vote" by page A in favor of page B. The subject of the "vote" is described in the anchor texts of that link. The more "votes" a web page gets, the higher the importance.

*Ranking.* We compare search queries with the content of web pages to help determine relevance. We have significantly improved the relevancy, freshness and authority of ranking using our machine learning modules to analyze the rich internet and user interaction data and prioritize the search results. For example, our technology determines the proximity of individual search terms to each other on a given web page, and prioritizes results where the search terms are near each other. Other aspects of a page's content are also considered. We have innovatively applied our machine learning technology to better understand the semantics beyond simple text of the keywords inputted by our users, allowing us to provide more relevant search results to users. Since 2013, we have applied deep learning technology in our search ranking system, and such technology is playing an increasingly important role in search. In addition, we have built a large scale computing service based on GPU cluster to handle future complex big data computing and prospective deep learning technology.

*Information Extraction.* We extract information from a web page using high performance algorithms and information extraction techniques. Our techniques enable us to understand web page content, delete extraneous data, build link structures, identify duplicate and junk pages and decide whether to include or exclude a web page based on its quality. Our techniques can process millions of web pages quickly. In addition, our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively.

*Web Crawling.* Our powerful computer clusters and intelligent scheduling algorithms allow us to crawl web pages efficiently. We can easily scale up our system to collect an ever-growing number of Chinese web pages. Our spider technology enables us to refresh web indices at intervals ranging from every few minutes to every few weeks. We set the index refresh frequency based on our knowledge of internet search users' needs and the nature of the information. For example, our news index is typically updated every five minutes, and can be as frequent as every minute, throughout the day given the importance of timely information for news. We also mine multimedia and other forms of files from web page repositories.

*Natural Language Processing.* Based on linguistics knowledge, big data and knowledge graphs, our natural language processing accumulates and integrates linguistics analysis, such as lexical, syntax and semantic analysis, with calculation, learning mechanisms and other natural language processing technologies. Our natural language processing also conducts research and development of language understanding and generation, dialogue, reading comprehension, machine translation, intelligent writing and other app systems. Natural language processing has opened up language understanding and interaction, machine translation and other core competencies. For search, natural language processing helps to understand user needs and web contents, optimize search results, support first-line accurate results, and enable voice broadcasting of search results, all enhancing user experience. For feed products, natural language processing continues to improve content understanding, recommendation algorithms, content generation and other technologies to optimize the personalized recommendation results, continuously improving the user experience and promoting healthy development of our feed content ecosystem.

*MIP (Mobile Instant Pages)* is a set of open technical standards applying to mobile webpages, which accelerates the loading of mobile webpages by adopting MIP-HTML norms, MIP-JS operating environment and MIP-Cache system. When mobile websites use this backend technology, the speed at which they can be visited from both Baidu Search and Baidu Feed is improved significantly. This not only enhances user experience, but also increases websites' page visit traffic. Nearly one billion webpages have adopted this technology to optimize user experience in China.

52

Table of Contents

*Lavas* is a solution package for developers to build user-friendly progressive web apps (PWA) platforms, which mainly aims to solve the dividing gap between search content distribution and in-app distribution, and the user experience issue of web platforms. The PWA platforms built on the Lavas system can solve the existing issues in the web through improving user experience and user retentions, which enables developers to focus on web ecosystem, and enrich the contents and improve the foundation of mobile search ecosystem.

**P4P Technology**

Our P4P platform serves billions of relevant, targeted sponsored links each day based on search terms users enter or content they view on the web page. Our key P4P technology includes:

*P4P Auction System.* We use a web-based auction system to enable customers to bid for keywords and automatically deliver relevant, targeted promotional links on Baidu's properties and Baidu Union members' properties. The system starts by screening the relevance between the sponsored links and a particular query. Our intelligent ranking system takes into consideration the quality factor of a sponsored link for a search query in addition to the price bid on the keyword. The quality factor of a sponsored link for a search query is determined based on the relevance and certain other factors. The relevance is determined based on the analysis of past search and click-through results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on both the quality factor of a sponsored link for a search query and the price bid on that keyword. We employ a dynamic mechanism in determining the minimum bidding price for each keyword.

*Phoenix Nest* is designed to generate more relevant results. Phoenix Nest helps customers more easily identify popular keywords and provides customers with tools for budget management and data for the effective measurement of ROI. We have been continually improving our click-through rate (CTR) estimation technology. For example, we have introduced deep neutral network (DNN) technology into our CTR estimation. We have also developed a new generation Phoenix Nest deep learning network CTR estimation modeling system, which enables the estimation of clicks on different combinations of advertisement materials and has significantly improved the timeliness of the model estimations. In 2017, we extended DNN CTR model to cover early stages of advertisement retrieval pipelines. With this creative DNN model, the online prediction speed of the advertisement retrieval increased by more than three times.

*Metric Retrieval Technology.* Metric retrieval learns how to match traffic and advertisements from massive behavioral data leveraging on deep learning technologies, and then applies this information to direct advertisement trigger. Traditional searches have both "candidate search" and "quality check," and any inconsistency between the two steps will be detrimental to the trigger effects. Metrics retrieval, however, first learns through metric learning a good representation of traffic and advertising, and then uses the representation and retrieval technology to directly retrieve the advertisement with high scores in modeling, so as to eliminate the gap from different steps and greatly enhance the trigger efficiency and the utilization rate of Phoenix Nest traffic.

*P4P Billing System.* We record every click and charge customers a fee by multiplying the number of clicks by the cost per click. Our system is designed to detect fraudulent clicks based on factors such as click patterns and timestamps. This system also computes the amount a Baidu Union member or a distributor should be paid. The billing information is integrated with our internal Oracle ERP financial system.

*P4P Customer Service System.* This system offers data and tools to analyze data for our customers to evaluate and optimize the performance of our online marketing services provided to them. Through this system, our customers can also manage information relating to online marketing services such as their budgets and time periods for the services.

*ProTheme Contextual Promotion Technology.* Our ProTheme technology employs techniques that consider factors such as theme finding, keyword analysis, word frequency and the overall link structure of the web to analyze the content of individual web pages and to match sponsored links in our P4P platform to the web pages

Table of Contents

almost instantaneously. With this targeting technology, we can automatically provide contextually relevant promotional links. For example, our technology can provide links offering tickets to fans of a specific sports team or a news story about that team.

*ROI-Constraint Auto-Targeting Technology*. For app-using customers, AI technology allows us to assist our customers to take account of factors, such as theme finding, keyword analysis, word frequency and the overall link structure of the web, analyze the content of individual web pages and match sponsored users' queries, so as to greatly enhance user experience. The technology has also been employed to manage the auction of customers, which has well-defined conversion measurement.

*URL-Targeting Technology*. We provide customers with a new bidding language based on original result URL, which can automatically capture user intentions and target the right audience, and ultimately help customers purchase long-tail traffic and enhance customer ROI.

### Large-Scale Systems and Technologies

*Large Size Cluster Management*. In order to provide highly efficient and stable search-related services as part of our Baidu Core business, we have developed an automated management platform for large size clusters. The platform enables us to intelligently manage and allocate resources and automatically debug and relocate services, thereby allowing tens of thousands of different source requests on the Baidu search engine and other non-search business to function stably across multiple internet data centers and thousands of servers.

*Storage*. We have developed an efficient, distributed and structured storage system to support Baidu Core products and services. Our storage system supports PB-level holistic, sequential data storage, and ten thousand times of real-time processing per second per device. Our storage system also has dynamic data attribute addition and subtraction function and historical data management capability.

*Distributed Computing System*. We have developed our proxy computing system, a comprehensive set of ultra-large scale distributed computer system, to increase the utility rate of idle resources, providing a strong base support for our core operations. Our proxy computing system has realized various distributed computing software stacks, such as resource isolation, resource distribution, computing modeling and application framework, and supports commonly used computing modules such as MapReduce, Spark, Stream and WebService.

*Indexing Technology*. Our indexing technology supports billions of daily search requests on over tens of thousands of servers located across multiple internet data centers of different network operators. Through our indexing technology, we have been able to index over one hundred billion of web pages without utilizing additional resources and have improved the freshness of indexed information.

### Artificial Intelligence (AI)

We have been investing in AI for a number of years. By 2017, we had integrated our core technologies, including natural language processing, knowledge graph, deep learning, speech, image and big data, to establish our AI Technology Platform Group (AIG). In the field of fundamental research, AIG has developed AI core technologies, such as natural language processing, knowledge graph, user profile, speech technology, vision technology and deep learning technology. AIG has also developed technologies including robot vision, 3D vision and edge computing. In terms of internal product support, AIG powers our core businesses including search, feed, P4P, Baidu Finance, DuerOS, autonomous driving and Baidu Cloud. In terms of external cooperation, AIG has opened up its core AI competences with more than 90 AI capabilities and solutions to help developers and partners innovate apps and jointly build a technological ecosystem. AIG is also exploring ways to apply AI technologies and accelerate the commercialization of AI products.

54

Table of Contents

**Intellectual Property**

We rely on a combination of patent, trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. We have 3,673 issued patents in China covering invention, utility model and design, and intend to apply for more patents to protect our core technologies and intellectual property. We also enter into confidentiality, non-compete and invention assignment agreements with our employees and consultants and nondisclosure agreements with selected third parties. "百度," our company's name "Baidu" in Chinese, has been recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning "百度," and the related logos, we have applied for registration of various other trademarks. We also have registered certain trademarks in the United States, Australia, Brazil, Canada, Hong Kong, India, Indonesia, Japan, Malaysia, Mexico, New Zealand, Russia, Singapore, South Africa, South Korea, Thailand, the European Union and several other jurisdictions. In addition, we have registered our domain name Baidu.com and certain other websites with China National Network Information Center, or CNNIC. We have also successfully registered *.Baidu* top-level domain names with the Internet Corporation for Assigned Names and Numbers (ICANN).

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement or other violations of intellectual property rights. Furthermore, the application of laws governing intellectual property rights in China and abroad is uncertain and evolving and could involve substantial risks to us. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations" and "—We may be subject to patent infringement claims with respect to our P4P platform."

**Regulations**

The PRC government extensively regulates the telecommunications industry, including the internet sector. The State Council, the MIIT and other relevant government authorities have promulgated an extensive regulatory scheme governing internet-related services. This section summarizes the principal PRC laws and regulations relating to our business.

In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.

China's internet industry, online advertising market and e-commerce market are evolving. There are substantial uncertainties regarding the interpretation and application of existing or proposed PRC laws and regulations. We cannot assure you that the PRC regulatory authorities would find that our corporate structure and our business operations comply with PRC laws and regulations. If the PRC government finds us to be in violation of PRC laws and regulations, we may be required to pay fines and penalties, obtain certain licenses or permits and change, suspend or discontinue our business operations until we comply with applicable PRC laws and regulations.

***Regulations on Value-Added Telecommunications Services and Internet Content Services***

*Internet content services.* The Telecommunications Regulations promulgated by the PRC State Council in September 2000 categorize all telecommunication businesses in the PRC as either basic or value-added. Internet

55

Table of Contents

content services, or ICP services, are classified as value-added telecommunication businesses. Pursuant to the Telecommunications Regulations, commercial operators of value-added telecommunications services must first obtain an operating license from the MIIT or its provincial level counterparts. The Administrative Measures on Internet Information Services, also promulgated by the PRC State Council in September 2000, require companies engaged in the provision of commercial internet content services to obtain an ICP license from the relevant government authorities before providing any commercial internet content services within the PRC. "Commercial internet content services" generally refer to provision of information service through public telecommunication network or internet for a fee. The Catalog of Classification of Telecommunications Services promulgated by the MIIT in December 2015 and taking effect from March 1, 2016 further divides ICP services into information publication platform and delivery services, information search and inquiry services, information communities platform services, instant message services, and information security and management services. We do not believe our P4P services conducted by our certain PRC subsidiaries are categorized as part of internet content services that require an ICP license under these regulations. Although Baidu Online conducts part of the P4P business by, among other things, examining and filtering P4P keywords, interacting with potential P4P customers, engaging in sales activities with our customers, P4P search results are displayed on the websites operated by Baidu Netcom, including Baidu.com. Baidu Netcom, as the owner of our domain name Baidu.com and holder of the necessary licenses and approvals, such as an ICP license, operates the website to list P4P search results and display other marketing and advertising content as an online advertising service provider.

The Administrative Measures for Telecommunication Business Operating License, promulgated by the MIIT with latest amendments becoming effective in July 2017, set forth the types of licenses required for value-added telecommunications services and the qualifications and procedures for obtaining such licenses. For example, a value-added telecommunications service operator providing commercial value-added services in multiple provinces is required to obtain an inter-regional license, whereas a value-added telecommunications service operator providing the same services in one province is required to obtain a local license.

*Content regulation*. National security considerations are an important factor in the regulation of internet content in China. The National People's Congress, the PRC's national legislature, has enacted laws with respect to maintaining the security of internet operation and internet content. Under these laws and applicable regulations, violators may be subject to penalties, including criminal sanctions, for internet content that:

- opposes the fundamental principles stated in the PRC constitution;

- compromises national security, divulges state secrets, subverts state power or damages national unity;

- harms the dignity or interests of the state;

- incites ethnic hatred or racial discrimination or damages inter-ethnic unity;

- undermines the PRC's religious policy or propagates heretical teachings or feudal superstitions;

- disseminates rumors, disturbs social order or disrupts social stability;

- disseminates obscenity or pornography, encourages gambling, violence, murder or fear or incites the commission of a crime;

- insults or slanders a third party or infringes upon the lawful rights and interests of a third party; or

- is otherwise prohibited by law or administrative regulations.

ICP operators are required to monitor their websites, including electronic bulletin boards. They may not post or disseminate any content that falls within the prohibited categories and must remove any such content from their websites. The PRC government may shut down the websites of ICP license holders that violate any of the above-mentioned content restrictions and revoke their ICP licenses. For instance, in 2017, the SIIO issued a series of regulatory documents providing that an ICP operator is obligated to monitor contents displayed and disseminated by users on its platform. These regulations apply to online services, including (i) online forum and

56

**Table of Contents**

community service, which allows users to publish information and interact with other users on an online forum, post bar or other form of online communities, (ii) online follow-up comment service, which allows users to post threads, reply to original content, leave messages and engage in live commenting with texts, symbols, expressions, pictures, audio/video on a website, mobile app or other forms of interactive platform; (iii) online group chat information service, which allows users to communicate and exchange information in a cyberspace created by the users on an online platform; (iv) online official account information service, which allows users to post texts, pictures, audio/video and other information in the form of an official account registered by the user on a website, mobile app or other network platform. Pursuant to these regulations, a service provider is required to, among others, (x) register and verify the identity information of each user, and (y) in the case of publication or dissemination of prohibited contents on the platform, take prompt rectification measures, including removing and terminating transmission of the illegal content, restricting the user right of the offender, banning the user account and shutting down the relevant forum or channel, and report to the regulatory authority.

*Restrictions on Foreign Ownership in Value-Added Telecommunications Services*

Pursuant to the Provisions on Administration of Foreign-Invested Telecommunications Enterprises, promulgated by the PRC State Council with the latest amendments becoming effective in February 2016, the ultimate foreign equity ownership in a value-added telecommunications service provider must not exceed 50%. However, the MIIT released an announcement in June 2015 to remove the restriction on foreign equity for "online data processing and transaction processing businesses (operational E-commerce)" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. The Guidance Catalog of Industries for Foreign Investment, as amended in 2017, allows a foreign investor to own more than 50% of the total equity interest in an e-commerce business. In order to acquire any equity interest in a value-added telecommunication business in China, a foreign investor must satisfy a number of stringent performance and operational experience requirements, including demonstrating a good track record and experience in operating a value-added telecommunication business overseas. Foreign investors that meet these requirements must obtain approvals from the MIIT and the Ministry of Commerce (or the Ministry of Commerce's authorized local counterparts), which retain considerable discretion in granting approvals. According to publicly available information, the PRC government has issued telecommunication business operating licenses to only a limited number of foreign-invested companies. We believe that it would be impracticable for us to acquire any equity interest in our consolidated affiliated entities without diverting management attention and resources. Moreover, we believe that our contractual arrangements with these entities and the individual nominee shareholders provide us with sufficient and effective control over these entities. Accordingly, we currently do not plan to acquire any equity interest in any of the consolidated affiliated entities.

A Notice on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, issued by the MIIT in July 2006, prohibits domestic telecommunication service providers from leasing, transferring or selling Telecommunication Business Operating Licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. Pursuant to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by such license holder in its provision of value-added telecommunications services. The notice further requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain the facilities in the regions covered by its license. If a license holder fails to comply with the requirements in the notice or cure any non-compliance, the MIIT or its local counterparts have the discretion to take measures against the license holder, including revoking its Value-Added Telecommunication Business Operating License.

Due to the restrictions under these PRC regulations, we operate our websites mainly through our PRC consolidated affiliated entities, such as Baidu Netcom, and operate an online payment platform through BaiduPay. Baidu Netcom and BaiduPay are our PRC consolidated affiliated entities, and are considered domestic PRC entities under PRC law given that the nominee shareholders are PRC citizens or PRC entities.

57

**Table of Contents**

Each of Baidu Netcom, BaiduPay and some of our other PRC consolidated affiliated entities holds a Value-Added Telecommunication Business Operating License. In compliance with the Notice of the MIIT on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, Baidu Netcom and BaiduPay, our consolidated affiliated entities, own the necessary domain names and trademarks, including pending trademark applications, and have the necessary personnel and facilities to operate our websites. It remains unclear whether the provision of online payment services by BaiduPay will require BaiduPay to apply for a Value-Added Telecommunication Business Operating License for "online data processing and transaction processing businesses" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT, although in practice many companies conducting such business do not apply for such license. Baidu Netcom, the parent company of BaiduPay, has received an Inter-Regional Value-Added Telecommunication Business Operating License with the permitted operation scope covering online data processing and transaction processing businesses. Baidu Netcom plans to submit an application to allow its subsidiary BaiduPay to operate online data processing and transaction processing businesses in 2017.

*Regulations on Mobile Internet Applications*

In August 2016, the SIIO promulgated the Administrative Provisions on Mobile Internet Application Information Services, or the Mobile Application Administrative Provisions. Pursuant to the Mobile Application Administrative Provisions, a mobile internet app refers to an app software that runs on mobile smart devices providing information services after being pre-installed, downloaded or embedded through other means. Mobile internet app providers refer to the owners or operators of mobile internet apps. Internet app stores refer to platforms which provide services related to online browsing, searching and downloading of app software and releasing of development tools and products through the internet.

Pursuant to the Mobile Application Administrative Provisions, an internet app program provider must verify a user's mobile phone number and other identity information under the principle of mandatory real name registration at the back-office end and voluntary real name display at the front-office end. An internet app provider must not enable functions that can collect a user's geographical location information, access user's contact list, activate the camera or recorder of the user's mobile smart device or other functions irrelevant to its services, nor is it allowed to conduct bundle installations of irrelevant app programs, unless it has clearly indicated to the user and obtained the user's consent on such functions and app programs. In respect of an internet app store service provider, the Mobile Application Administrative Provisions require that, among others, it must file a record with the local authority within 30 days after it rolls out the internet app store service online. It must also examine the authenticity, security and legality of internet app providers on its platform, establish a system to monitor app providers' credit and file a record of such information with relevant governmental authorities. If an app provider violates the regulations, the internet app store service provider must take measures to stop the violations, including giving a warning, suspension of release, withdrawal of the app from the platform, keeping a record of the incident and reporting the incident to the relevant governmental authorities.

In December 2016, the MIIT promulgated the Interim Measures on the Administration of Pre-Installation and Distribution of Applications for Mobile Smart Terminals, which came into effect on July 1, 2017. The Interim Measures aim to enhance the administration of mobile apps, and require, among others, that mobile phone manufacturers and internet information service providers must ensure that a mobile app, as well as its ancillary resource files, configuration files and user data can be uninstalled by a user on a convenient basis, unless it is a basic function software, which refers to a software that supports the normal functioning of the hardware and operating system of a mobile smart device.

*Regulations on Internet Information Search Service*

In June 2016, the SIIO promulgated the Administrative Provisions on Internet Information Search Services, or the Search Services Administrative Provisions, which took effect on August 1, 2016. Pursuant to the Search Services Administrative Provisions, internet information search service refers to the service whereby users can

58

Table of Contents

search for information that is collected from the internet and processed by computer technology. The Search Services Administrative Provisions requires that an internet information search service provider must not publish any information or contents prohibited by law in the form of links, abstracts, snapshots, associative words, related search or recommendations or otherwise. If an internet information search service provider identifies any search results that contain any information, website or app that is prohibited by law, it must stop displaying the search results, record the infraction and report it to the relevant governmental authority. In addition, an internet information search service provider is prohibited from seeking illegitimate interest by means of unauthorized disconnection of links, or provision of search results containing false information. If an internet information search service provider engages in paid search services, it must examine and verify the qualifications of its customers of the paid search services, specify the maximum percentage of search results as paid search results on a webpage, clearly distinguish paid search results from natural search results, and notably identify the paid search information item by item.

### Regulations on News Display

Displaying news on a website and disseminating news through the internet are highly regulated in the PRC. The Provisional Measures for Administrating Internet Websites Carrying on the News Displaying Business, jointly promulgated by the State Council News Office and the MIIT in November 2000, require an ICP operator (other than a government authorized news unit) to obtain an approval from the State Council News Office to post news on its website or disseminate news through the internet. Furthermore, the disseminated news must come from government-approved sources pursuant to contracts between the ICP operator and the sources, copies of which must be filed with the relevant government authorities.

In May 2017, the SIIO issued the Provisions on the Administration of Internet News Information Services, or the Internet News Regulation, and its implementing rules, which became effective on June 1, 2017. Pursuant to the Internet News Regulation and its implementing rules, if an entity intends to provide internet news information service, it is required to obtain an approval from the State Council News Office and receive an Internet News Information Service License. Internet news information service refers to editing, publishing and reprinting and the dissemination platform service of internet news through internet websites, mobile apps, forums, blogs, micro-blogs, official accounts, instant message tools, live-streaming and other similar means. Pursuant to the Internet News Regulation, no internet news information service organizations may take the form of a foreign-invested enterprise, whether a joint venture or a wholly foreign-owned enterprise, and no cooperation between internet news information service organizations and foreign-invested enterprises is allowed prior to the security evaluation by the SIIO.

Baidu Netcom obtained the Internet News Information Service License, which permits it to publish internet news pursuant to the relevant PRC laws and regulations, in December 2006, and had the license renewed in June 2010.

### Regulations on Internet Drug Information Services

According to the Provisions on the Administration of Internet Drug Information Services, which was issued by the State Food and Drug Administration in November 2017, an enterprise publishing drug-related information must obtain a qualification certificate from the provincial-level food and drug administration before it applies for the ICP license or files with the MIIT or its local provincial-level counterpart.

Baidu Netcom obtained the Qualification Certificate for Internet Drug Information Services, which permits it to publish drug-related information on its website, in November 2007, and had the certificate renewed in August 2017. We have several other entities in our group that have obtained the Qualification Certificate for Internet Drug Information Services.

59

Table of Contents

*Regulations on Internet Culture Activities*

The Internet Culture Administration Measures, promulgated by the Ministry of Culture and with the latest amendment becoming effective in December 2017, require ICP operators engaging in "internet culture activities" to obtain a permit from the Ministry of Culture. The "internet culture activities" include, among other things, online dissemination of internet cultural products (such as audio-video products, games, performances of plays or programs, works of art and cartoons) and the production, reproduction, importation, distribution and broadcasting of internet cultural products. Imported internet cultural products are subject to content review by the Ministry of Culture before they are disseminated online, while domestic internet cultural products must be filed with the local branch of the Ministry of Culture within 30 days following the online dissemination. Service providers are also required to conduct self-review of the content of internet cultural products before they are put on the internet or submitted to the Ministry of Culture for approvals or filings. Baidu Netcom was granted an Internet Culture Business Permit in April 2007, which was renewed again in November 2013. Some other entities in our group have also obtained an Internet Culture Business Permit.

The Several Suggestions on the Development and Administration of Internet Music, issued by the Ministry of Culture and becoming effective in November 2006, reiterate the requirement for an internet service provider to obtain the Internet Culture Business Permit to carry on any business of internet music products. In addition, foreign investors are prohibited from engaging in the internet culture business operation.

In October 2015, the Ministry of Culture promulgated a notice, which took effect on January 1, 2016, to further strengthen its regulation over online music, including requiring online platforms that allow users to upload self-created or performed music to set up real-time monitoring systems and requiring online music service providers to make quarterly filings of information related to their content self-review with the local counterpart of the Ministry of Culture from April 1, 2016.

*Regulations on Internet Publishing*

In February 2016, the State Administration of Press, Publication, Radio, Film and Television, or the SAPPRFT, and the MIIT jointly issued the Administrative Provisions on Internet Publishing Services, or the Internet Publishing Regulation, which took effect on March 10, 2016, and replaced the Interim Provisions for the Administration of Internet Publishing promulgated in 2002. The Internet Publishing Regulation requires that any entity engaged in the provision of online publications to the public via information networks obtain an Internet Publication License from the SAPPRFT. Online publications refer to digital works with editing, production, processing and other publishing features, provided to the public via information networks, which mainly include: (i) informative and thoughtful text, pictures, maps, games, animation, audio and video digitizing books and other original digital works in fields such as literature, art and science, (ii) digital works consistent with the content of published books, newspapers, periodicals, audio-visual products and electronic publications, (iii) the network literature database or other digital works formed through aforementioned works by selecting, organizing, compiling and other means, and (iv) other types of digital works determined by the SAPPRFT. The servers and storage facilities used by internet publishers must be located within the territory of the PRC. The Internet Publishing Regulation also provides that when an internet service provider provides manual intervention search ranking, advertising, promotion and other services to customers that provide internet publishing services, it is required to check and examine the Internet Publication Licenses obtained by the customers and the business scope of such licenses. Certain entities in our group have obtained the Internet Publication Licenses.

*Regulations on Broadcasting Audio/Video Programs through the Internet*

In December 2007, the State Administration of Radio, Film and Television, or the SARFT (currently known as SAPPRFT) and the MIIT jointly promulgated the Rules for the Administration of Internet Audio and Video Program Services, commonly known as "Document 56," which took effect on January 31, 2008. Pursuant to Document 56, an online audio/video service provider must obtain an Online Audio/Video Program Transmission

60

Table of Contents

License, which has a term of three years, and operate in accordance with the scope of the business as stipulated in the license. Furthermore, Document 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to some official answers to press inquiries published on the SARFT's website in February 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Document 56 may re-register and continue to operate without becoming state-owned or controlled, provided that the providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Document 56 was issued. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned businesses.

The PRC government has also promulgated a series of special regulatory measures governing live-streaming services. In November 2016, the SIIO promulgated the Administrative Provisions on Internet Live-streaming Service, which took effect on December 1, 2016. Pursuant to the Administrative Provisions, internet live-streaming service refers to continuous publishing of real-time information to the public on internet by means of video, audio, graphics, text or other forms, and an internet live-streaming service provider refers to an operator of the platform providing internet live-streaming service. In accordance with the administrative provisions, an internet live-streaming service provider must verify and register the identity information of publishers of live-streaming programs and users on its platform, and file the identity information of the publishers with the local governmental authority for record. Any internet live-streaming service provider engaging in news service must obtain internet news information service qualification and operate within the permitted scope of such qualification. In September 2016, the SAPPRFT issued a Circular on Strengthening Administration of Live-streaming Service of Network Audio/Video Programs. Pursuant to the circular, any entity that intends to engage in live audio/video broadcasting of major political, military, economic, social, cultural or sport events or activities, or live audio/video broadcasting of general social or cultural group activities, general sporting events or other organizational events, must obtain an Online Audio/Video Program Transmission License with a permitted operation scope covering the above business activities. Any entity or individual without qualification is prohibited from broadcasting live audio/radio programs involving news, variety shows, sports, interviews, commentary or other forms of programs through any online live-streaming platform or online live broadcasting booth, nor are they permitted to start a live broadcasting channel for any audio or radio programs. In addition, no entity or individual other than licensed radio stations or television stations are allowed to use "radio station," "television station," "broadcasting station," "TV" or other descriptive terms exclusive to television and radio broadcasting organizations to engage in any business on the internet without approval. Furthermore, the SIIO issued a notice in July 2017 which requires operators of internet news and information reproduction and broadcasting services, including commercial website apps that contain live-streaming features, and other internet live-streaming services, to file with the local SIIO starting from July 15, 2017.

Baidu Netcom has renewed its Online Audio/Video Program Transmission License, which remains valid until July 2018. iQIYI has an Online Audio/Video Program Transmission License that is valid until October 2018. Another entity in our group has an Online Audio/Video Program Transmission License that is valid until March 2020.

### Regulations on Payment Services by Non-financial Institutions

Pursuant to the People's Bank of China's Measures Concerning Payment Services by Non-financial Institutions, which took effect in September 2010, and its implementation rules, non-financial institutions that have been providing monetary transfer services as an intermediary between payees and payers, including online payment, issuance and acceptance of prepaid cards or bank cards, and other payment services as specified by the People's Bank of China, must obtain a license from the People's Bank of China prior to September 1, 2011, in order to continue providing monetary transfer services. BaiduPay applied for the license after the regulations mentioned above were promulgated and prior to September 1, 2011, and was granted the license for online payment in July 2013.

61

**Table of Contents**

In addition, in December 2015, the People's Bank of China promulgated the Administrative Measures on the Online Payment Business of Non-Bank Payment Institutions, or the Measures on Online Payment Business. The Measures on Online Payment Business requires payment institutions to comply with the "Know Your Client" principle and establish a client identification mechanism. Payment institutions shall register and verify the real name and basic identification of clients that open accounts with them. In addition, the Measures on Online Payment Business categorizes online payment accounts of individuals into three types, with each type subject to particular use of purposes and different limits on the amounts that can be paid from the accounts. Individuals that pass more verifications are entitled to open accounts that are allowed be used for more purposes and have higher caps on the amount payable through these accounts. For example, an individual client whose identity is verified by the payment institution or by a partner authorized by the payment institution face to face, or whose basic identity information is subject to multiple cross-validations by at least five legal and safe external channels in a non-face-to-face manner, may open Type-III payment accounts, the balance in which may be used for consumption, account transfers, and procurement of financial products. The accumulative amount of balance payment transactions through all payment accounts of the individual shall not exceed RMB200,000 (US$30,739) during a year (excluding account transfers from the payment account to the client's same-name bank account). An individual client that passes the verification of basic identity information in a non-face-to-face manner through at least one legal and safe external channel and opens a payment account with the institution for the first time may open a Type-I payment account, the balance in which may be used for consumption and account transfers only. The accumulative amount of balance payment transactions through such payment account shall not exceed RMB1,000 (US$154) (including account transfers from the payment account to the client's same-name bank account), from the date of the opening of the account.

In April 2016, the General Office of the State Council issued the Implementing Scheme for Special Rectification of Internet Financial Risks, which reiterates that a non-bank payment institution must not misappropriate or possess clients' reserves, and instead it must open a reserve account with the People's Bank of China or a qualified commercial bank. In addition, a non-bank payment institution must not use schemes to carry out any inter-bank clearing business in a disguised form. Instead, a non-bank payment institution must operate its inter-bank payment business through the inter-bank clearing system of the People's Bank of China or a qualified clearing institution.

In January 2017, the General Office of the People's Bank of China issued a Notice on Matters regarding Centralized Deposit and Management of Client's Reserves of Payment Institutions. Pursuant to the notice, commencing from April 17, 2017, a non-bank payment institution must deposit a certain percentage of its clients' reserve that it collects into a special deposit account and no interest will accrue on the deposited amount. The People's Bank of China will determine the deposit percentage for a non-bank payment institution based on the category of the payment business, risk control and compliance ratings of the non-bank payment institution. The deposit percentage ranges from 12% to 20% for an operator of an online payment business, 10% to 18% for an operator of a bank card bill acceptance and clearance business and 16% to 24% for an operator of an issuance and acceptance of pre-paid card business. If an entity engages in multiple types of payment businesses, the highest of the deposit percentages applicable to the different types of payment businesses will apply.

*Regulations on Consumer Finance and Microcredit*

The Guidance on the Pilot Establishment of Microcredit Companies, jointly promulgated by the China Banking Regulatory Commission and the People's Bank of China in 2008, allows provincial governments to approve the establishment of microcredit companies on a trial basis. Following this guidance, many provincial governments in China, including that of Shanghai and Chongqing, promulgated local implementing rules on the administration of local microcredit companies. The implementing rules issued by the Shanghai and Chongqing municipal governments provide that the sources of funds of a microcredit company must be limited to the capital contributions paid by its shareholders, monetary donations, and loans provided by no more than two banking financial institutions. The Shanghai Financial Services Office, the regulatory entity for microcredit companies in Shanghai, together with other local government authorities in Shanghai, issued additional administrative

62

Table of Contents

measures regulating microcredit companies in Shanghai, which require the paid capital contribution of a newly established microcredit company must be no less than RMB200 million (US$30.7 million), and provide that the authorities in Shanghai will provide additional support to microcredit companies that are established by the large-scale internet services enterprises and mainly engage in the internet microcredit business. In addition, pursuant to a circular issued by the Chongqing Financial Works Office, the regulatory entity for microcredit companies in Chongqing, the authorities in Chongqing have permitted certain qualified microcredit companies to conduct a cross-region microcredit business on the internet. We engage in microcredit businesses through two subsidiaries in Shanghai and Chongqing, both of which have obtained special approval for the establishment of a microcredit company from the local governmental authorities.

On December 1, 2017, the Head Office for Special Rectification of the Risk in Internet Finance and the Head Office for Special Rectification of the Risk in P2P Online Lending jointly issued the Circular on Regulation and Rectification of the "Cash Loan" Business, or Circular 141. Pursuant to Circular 141, "cash loans" are characterized as loans without a specific consumption scenario, specified use of loan proceeds, qualification requirement on the lender or security for the loans. Circular 141 sets forth several general compliance requirements for "cash loan" businesses, including, without limitation: (i) no institution or individual may engage in a lending business without a lending business operation permit; (ii) all the interest and fees charged for a loan must be combined and reflected in an annualized comprehensive fee rate, which must not exceed the cap set by the Supreme People's Court of the PRC on the interest rate charged by private lending; (iii) lending institutions and related intermediaries must fully disclose to the borrower in advance the terms and conditions of the loan, potential default liabilities and associated risks, comply with the "Know Your Client" principle and refrain from lending to a borrower without income; (iv) the term of a loan may not be extended more than twice; and (v) all institutions must enhance their internal risk controls and use the "data-driven" risk management model prudently. With respect to online microcredit companies, Circular 141 requires that the relevant regulatory authorities suspend approving the establishment of online microcredit companies and microcredit businesses across provinces. Online microcredit companies are required to suspend provision of micro-loans online with no specific consumption scenario or designated use of loan proceeds and gradually reduce the volume of such loans. Furthermore, online microcredit companies shall not sell or transfer in any form its credit assets through an online transaction platform or a local financial asset exchange, or source funds through an online lending information intermediary service agency.

In addition, the Head Office for Special Rectification of the Risks in P2P Online Lending issued the Implementation Plan of Special Rectification of Risks in Online Microcredit Business of Microcredit Companies, or Circular 56, on December 8, 2017. Pursuant to Circular 56, "online micro-loans" are defined as micro loans provided through the internet by microcredit companies controlled by internet enterprises. Consistent with Circular 141, Circular 56 outlines several key aspects of the government-initiated inspection and rectification plan on the online micro-loans industry, which cover, among others, (i) whether the online microcredit company complies with the qualification requirements to conduct an online micro-loan business; (ii) whether the shareholders of the online microcredit company have a sound reputation, tax payment record and financial condition and are in compliance with applicable laws and regulations; (iii) whether the funds for lending are owned by the microcredit company or sourced by it in legal means; (iv) whether the online microcredit company is involved in any transaction of assets-backed securitization or transfer of its credit assets and if so, its compliance with the filing requirements for the securitization products, legality of the securitized assets and the eligibility of the investors; (v) whether the aggregate annualized borrowing costs including interest and various transaction fees is within the limit set by the Supreme People's Court, and whether the online microcredit company deducts interest or transaction fees from the principal amount released to the borrower in advance; (vi) whether the means of collecting repayment are legal; (vii) whether the online microcredit company provides loans on campus, loans for down payment of housing loans, or online micro-loans with no specific consumption scenario or designated use of loan proceeds; and (viii) with respect to the loan business conducted in cooperation with third-party institutions, whether the online microcredit company outsources its core business, or accepts any credit enhancement service provided by any third-party institutions with no guarantee qualification. If an online microcredit company fails to meet the qualification or compliance requirements, the relevant regulatory

63

**Table of Contents**

authorities will order it to take rectification measures within a specific time period, and in the case of a serious violation, will revoke the microcredit business qualification of the online microcredit company.

### Regulations on Platform Services Relating to Sales of Securities Investment Funds

We provide wealth management services through a variety of investment products, including, among others, securities investment funds. In accordance with the Interim Provisions on the Administration of the Business Operations of Securities Investment Fund Distributors through Third-Party E-Commerce Platforms issued by the CSRC in March 2013, a third-party e-commerce platform for securities investment fund sales refers to the information system providing supporting services for online trading activities between fund investors and fund distributors. To qualify as an operator of a third-party e-commerce platform, an entity must satisfy a series of conditions, including, among others, that (i) it must be a PRC-incorporated entity with its website accessible within China; (ii) it must obtain a license for the relevant telecommunication business for more than three years; and (iii) it must have a sound credibility record without being subject to any substantial administrative or criminal penalty in the past three years. Pursuant to the interim provisions, if a third-party e-commerce platform engages in activities such as opening fund share trading accounts, publicizing and promoting the fund, processing subscriptions and redemptions of fund shares, or providing investment consultation or complaint settlement services relating to the fund, the operator of the platform will be deemed as conducting a securities investment fund sales business, and therefore must obtain a license for fund sales business. Besides, fund sellers on the platform are required to file with the CSRC. As we provide third-party platform services to our customers and securities investment fund distributors on our wealth management platform and do not provide fund sales-related services specified in the interim provisions, we believe we do not engage in a securities investment fund sales business and therefore are in compliance with relevant requirements.

### Regulations on Internet Map Services

According to the Administrative Rules of Surveying Qualification Certificate, as amended by the National Administration of Surveying, Mapping and Geo-information (formerly known as the State Bureau of Surveying and Mapping) in August 2014, the provision of internet map services by any non-surveying and mapping enterprise is subject to the approval of the National Administration of Surveying, Mapping and Geo-information and requires a Surveying and Mapping Qualification Certificate. Internet maps refer to maps called or transmitted through the internet. Pursuant to the Notice on Further Strengthening the Administration of Internet Map Services Qualification issued by the National Administration of Surveying, Mapping and Geo-information in December 2011, any entity without a Surveying and Mapping Qualification Certificate for internet map services is prohibited from providing any internet map services. According to the Provisions on the Administration of Examination of Maps effective on January 1, 2018, subject to limited exceptions, an enterprise must first apply for an approval by the relevant regulatory authority, if it intends to engage in any of the following activities: (i) publication, display, production, posting, import or export of a map or a product attached with a map, (ii) re-publication, re-display, re-production, re-posting, re-import or re-export of a map the content of which has been changed after it is approved, or other commercial products attached with such a map, and (iii) publication or display of a map or a product attached with a map overseas. The operator of an approved internet map is required to file the updated contents of the map with the relevant regulatory authority semi-annually, and re-apply for a new approval of the map when the two-year term of the existing approval expires.

Baidu Netcom provides online traffic information inquiry services as well as internet map services and has obtained a Surveying and Mapping Qualification Certificate for internet map services. Another entity in our group has also obtained the Surveying and Mapping Qualification Certificate. In accordance with the Provisions on the Administration of Examination of Maps, we have initiated the application for examination and approval of the maps that are used in our products.

64

Table of Contents

*Regulations on Online Games*

Pursuant to the Administrative Provisions on Internet Publishing Services and the Circular on Mobile Game Publishing Service, the online games services provided on our websites by our online game operator partners may be deemed as a type of "online publication service" provided by us, and we may be required to obtain an Internet Publication License from the SAPPRFT. Beijing Perusal and another entity in our group have obtained the Internet Publication Licenses. The required approval by the SAPPRFT of each online game provided on our websites is handled by our online game operator partners.

In accordance with the Interim Administration Measures of Online Games, promulgated by the Ministry of Culture in June 2010 and with the latest amendment becoming effective in December 2017, an ICP service provider operating online games must obtain an Internet Culture Business Permit. Baidu Netcom and some other entities in our group have obtained an Internet Culture Business Permit for operating online games. These measures also specify that the Ministry of Culture is responsible for the censorship of imported online games and the filing of records of domestic online games. The procedures for the filing of records of domestic online games must be conducted with the Ministry of Culture within 30 days after the commencement date of the online operation of these online games. The approval by or filing with the Ministry of Culture of each online game provided on our websites has been handled primarily by our online game operator partners.

In September 2009, the GAPP (currently known as the SAPPRFT) together with several other government agencies issued Circular 13, which explicitly prohibits foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. We offer online games provided by our game operator partners on our websites owned and operated by our consolidated affiliated entities. We also operate two smartphone app distribution platforms in China as well as a mobile game platform through our consolidated affiliated entities. If our contractual arrangements were deemed to be "indirect means" or "disguised form" under Circular 13, our relevant contractual arrangements may be challenged by the SAPPRFT or other governmental authorities. If we were found to be in violation of Circular 13 in the operation of our online game platform, the SAPPRFT, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending and revoking the relevant licenses and registrations.

*Regulations on Online Game Virtual Currency*

The Interim Administration Measures of Online Games require companies that (i) issue online game virtual currency (including prepaid cards and/or pre-payment or prepaid card points) or (ii) offer online game virtual currency transaction services to apply for the Internet Culture Business Permit from provincial branches of the Ministry of Culture. The regulations prohibit companies that issue online game virtual currency from providing services that would enable the trading of such virtual currency. Any company that fails to submit the requisite application will be subject to sanctions, including but not limited to termination of operation, confiscation of incomes and fines. The regulations also prohibit online game operators from allocating virtual items or virtual currency to players based on random selection through lucky draw, wager or lottery that involve cash or virtual currency directly paid by the players. In addition, companies that issue online game virtual currency must comply with certain specific requirements. For example, online games virtual currency can only be used for products and services related to the issuance company's own online games. Pursuant to a Circular issued by the Ministry of Culture in December 2016, which took effect on May 1, 2017, an online game operator must not allow online game virtual currency to exchange for legal currency or items, except in the case of termination of online game operation where the online game operator may refund the balance of online game virtual currency to players in

65

Table of Contents

the form of legal currency or in other means acceptable to the players. Moreover, pursuant to the circular, regulations applicable to online game virtual currency also apply to such other virtual items where the virtual items are issued by the online game operator, can be exchangeable for other virtual items or value-added services related to the games, and can be purchased with legal currency or online game virtual currency or exchanged for online game virtual currency. Baidu Netcom and some other entities in our group have obtained the Internet Culture Business Permit for issuing online game virtual currency.

### *Regulations on Advertisements and Online Advertising*

The PRC government regulates advertising, including online advertising, principally through the State Administration for Industry and Commerce. The PRC Advertising Law, as recently amended in April 2015, outlines the regulatory framework for the advertising industry, and allows foreign investors to own up to all equity interests in PRC advertising companies.

We conduct our value-added telecommunication-based online advertising business through Baidu Netcom, which is one of our consolidated affiliated entities in China and holds a business license that covers value-added telecommunication-based online advertising in its business scope. Our subsidiaries Baidu Times and Baidu China have also expanded their respective business license to cover advertising in their respective business scope.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the contents of the advertisements they prepare or distribute are true and in full compliance with applicable laws and regulations. For example, pursuant to PRC Advertising Law, advertisements must not contain, among other prohibited contents, terms such as "the state-level," "the highest grade," "the best" or other similar words. In addition, where a special government review is required for certain categories of advertisements before publishing, the advertisers, advertising operators and advertising distributors are obligated to confirm that such review has been performed and the relevant approval has been obtained. Pursuant to the PRC Advertising Law, the use of the internet to distribute advertisements shall not affect the normal use of the internet by users. Particularly, advertisements distributed on internet pages such as pop-up advertisements shall be indicated with a conspicuous mark for "close" to ensure the close of such advertisements by one click. Where internet information service providers know or should know that illegal advertisements are being distributed using their services, they shall prevent such advertisements from being distributed.

In addition to the above regulations, the Internet Advertising Measures also set forth certain compliance requirements for online advertising businesses. For example, search engine service providers must indicate paid search results as an advertisement and distinguish paid search results from natural search results on their websites. Advertising operators and distributors of internet advertisements must examine, verify and record identity information, such as name, address and contact information, of advertisers, and maintain an updated verification record on a regular basis. Moreover, advertising operators and advertising distributors must examine supporting documentation provided by advertisers and verify the contents of the advertisements against supporting documents before publishing. If the contents of advertisements are inconsistent with the supporting documentation, or the supporting documentation is incomplete, advertising operators and distributors must refrain from providing design, production, agency or publishing services. The Internet Advertising Measures also prohibit the following activities: (i) providing or using apps and hardware to block, filter, skip over, tamper with, or cover up lawful advertisements; (ii) using network access, network equipment and apps to disrupt the normal transmission of lawful advertisements or adding or uploading advertisements without authorization; and (iii) harming the interests of a third party by using fake statistics or traffic data.

Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the misleading information. In the case of serious violations, the State Administration for Industry and Commerce or its local branches may force the violator to terminate its advertising operation or even revoke its business license. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties.

66

Table of Contents

*Regulations on Artificial Intelligence and Autonomous Driving Vehicles*

We engage in the research and development of artificial intelligence (AI) technology and products, specifically autonomous driving vehicles. The Chinese government has issued a series of guidelines to encourage and support the research and development of AI technology, such as the Three-Year Implementing Plan for Internet Plus Artificial Intelligence issued in May 2016 and the Development Planning on the First Generation of Artificial Intelligence issued in July 2017. The laws and regulations on AI technology and products, however, are still new and evolving in China. Some local governments have issued rules and regulations to regulate road testing of autonomous driving cars. For example, Beijing local regulatory authorities promulgated the Guiding Opinions on Accelerating the Works of Road Testing of Autonomous Driving Cars (Trial Implementation) and Beijing Implementing Rules on the Administration of Road Testing of Autonomous Driving Cars (Trial Implementation) in December 2017 and a series of ancillary regulatory documents in February 2018 to regulate road testing of autonomous driving cars in Beijing, China.

According to the Beijing local rules and regulations mentioned above, any entity applying to conduct a road testing of autonomous driving vehicles must first file for approval with a special agency supervising road testing of autonomous driving vehicles. To qualify for the approval, an applicant entity must satisfy, among others, the following requirements: (i) in addition to a standardized monitoring system, operating status reminder system and data recording system, the vehicle under road testing must be equipped with an autonomous driving system that can switch between autonomous pilot model and human driving model and allows human driver to take control of the vehicle any time when necessary; (ii) the driver of the tested vehicle must be an employee of the applicant entity with a driving license, have a track record of safe driving for at least three years and have received training for operating the autonomous driving system; and (iii) the applicant entity must insure each tested vehicle for at least RMB5.0 million (US$768,485.9) against car accidents or provide a letter of guarantee covering the same. After receiving the approval, the approved entity needs to obtain a temporary license plate for each tested car and post an identification logo for autonomous driving test on each tested car. The approved entity is required to file a testing plan with the special agency at least five working days before the test and conduct the road test at designated areas during the designated period following the testing plan. During testing, the vehicle must not carry any person irrelevant to the test or carry out any brake test on the road. In the case of a car accident, the approved entity must upload the data, recorded on the vehicle involved to the special agency within 24 hours and report to the special agency the accident and the corresponding cause analysis and liability allocation within a stipulated time period. In addition, the supervising agency may suspend its approval of the entity and vehicles in the case of an accident.

Baidu Netcom, one of our consolidated affiliated entities, is in the process of applying for the approval of road testing in Beijing in accordance with the Beijing local rules and regulations.

*Tort Liability Law*

In accordance with the PRC Tort Liability Law, which became effective in July 2010, internet users and internet service providers bear tortious liabilities in the event that they infringe upon other persons' rights and interests through the internet. Where an internet user conducts tortious acts through internet services, the infringed person has the right to request the internet service provider take necessary actions such as deleting contents, screening and de-linking. Failing to take necessary actions after being informed, the internet service provider will be subject to joint and several liabilities with the internet user with regard to the additional damages incurred. Where an internet service provider knows that an internet user is infringing upon other persons' rights and interests through its internet service but fails to take necessary actions, it is jointly and severally liable with the internet user.

*Regulations on Intellectual Property Rights*

China has adopted legislation governing intellectual property rights, including patents, copyrights, trademarks, and domain names.

67

**Table of Contents**

*Patent.* The PRC Patent Law provides for patentable inventions, utility models and designs, which must meet three conditions: novelty, inventiveness and practical applicability. The State Intellectual Property Office under the State Council is responsible for examining and approving patent applications. A patent is valid for a term of twenty years in the case of an invention and a term of ten years in the case of utility models and designs.

*Copyright.* The PRC Copyright Law and its implementation rules extend copyright protection to products disseminated over the internet and computer software. There is a voluntary registration system administered by the China Copyright Protection Center. Creators of protected works enjoy personal and property rights, including, among others, the right of disseminating the works through information networks.

Pursuant to the relevant PRC regulations, rules and interpretations, ICP operators will be jointly liable with the infringer if they (a) participate in, assist in or abet infringing activities committed by any other person through the internet, (b) are or should be aware of the infringing activities committed by their website users through the internet, or (c) fail to remove infringing content or take other action to eliminate infringing consequences after receiving a warning with evidence of such infringing activities from the copyright holder. The court will determine whether an internet service provider should have known of their internet users' infringing activities based on how obvious the infringing activities are by taking into consideration a number of factors, including (i) the information management capabilities that the provider should have based on the possibility that the services provided by it may trigger infringing acts, (ii) the degree of obviousness of the infringing content, (iii) whether it has taken the initiative to select, edit, modify or recommend the contents involved, (iv) whether it has taken positive and reasonable measures against infringing acts, and (v) whether it has set up convenient programs to receive notices of infringement and made timely and reasonable responses to the notices. Where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it shall have a higher duty of care with respect to the internet user's act of infringement of others' copyrights. Advertisements placed for or other benefits particularly connected with specific contents may be deemed as direct economic benefits from such contents, but general advertising fees or service fees charged by an internet service provider for its internet services will not be included. In addition, where an ICP operator is clearly aware of the infringement of certain content against another's copyright through the internet, or fails to take measures to remove relevant contents upon receipt of the copyright holder's notice, and as a result, it damages the public interest, the ICP operator could be ordered to stop the tortious act and be subject to other administrative penalties such as confiscation of illegal income and fines. An ICP operator is also required to retain all infringement notices for a minimum of six months and to record the content, display time and IP addresses or the domain names related to the infringement for a minimum of 60 days.

An internet service provider may be exempted from liabilities for providing links to infringing or illegal content or providing other internet services which are used by its users to infringe others' copyright, if it does not know and does not have constructive knowledge that such content is infringing upon other parties' rights or is illegal. However, if the legitimate owner of the content notifies the internet service provider and requests removal of the links to the infringing content, the internet service provider would be deemed to have constructive knowledge upon receipt of such notification, but would be exempted from liabilities if it removes or disconnects the links to the infringing content at the request of the legitimate owner. At the request of the alleged infringer, the internet service provider should immediately restore links to content previously disconnected upon receipt of initial non-infringing evidence.

We have adopted measures to mitigate copyright infringement risks. For example, our policy is to remove links to web pages and materials uploaded by the users if we know these web pages or materials contain materials that infringe upon third-party rights or if we are notified by the legitimate copyright holder of the infringement with proper evidence.

*Software Products.* The Computer Software Copyright Registration Measures promulgated by the China Copyright Office on February 20, 2002, regulates software copyright registration, exclusive licensing contracts of software copyright and transfer agreements. Although such registration is not mandatory under PRC law,

68

Table of Contents

software copyright owners are encouraged to go through the registration process and registered software may receive better protection.

*Trademark.* The PRC Trademark Law and its implementation rules protect registered trademarks. The Trademark Office under the State Administration for Industry and Commerce handles trademark registrations and grants a term of ten years to registered trademarks. Trademark license agreements must be filed with the Trademark Office for record. " 百度 " is recognized as a well-known trademark in China by the Trademark Office under the State Administration for Industry and Commerce. In addition to owning " 百度 " and the related logos, we have applied for registration of various other trademarks.

*Domain name*. Domain names are protected under the Administrative Measures on the Internet Domain Names promulgated by the MIIT in August 2017, which became effective in November 2017. The MIIT is the major regulatory body responsible for the administration of the PRC internet domain names, and under the supervision of the MIIT, the China Internet Network Information Center, or CNNIC, is responsible for the daily administration of .cn domain names and Chinese domain names. According to the Circular on Administration of the Use of Domain Names for Internet Information Services issued by the MIIT in November 2017, only the internet information service provider itself or the shareholder(s), principal or senior management officer(s) of the internet information service provider are eligible to register the domain names used for the internet information services. We have registered *Baidu.cn*, *Baidu.com.cn*, *hao123.com* and certain other domain names with CNNIC.

### Regulations on Information Security

The National People's Congress has enacted legislation that prohibits use of the internet that breaches the public security, disseminates socially destabilizing content or leaks state secrets. Breach of public security includes breach of national security and infringement on legal rights and interests of the state, society or citizens. Socially destabilizing content includes any content that incites defiance or violations of PRC laws or regulations or subversion of the PRC government or its political system, spreads socially disruptive rumors or involves cult activities, superstition, obscenities, pornography, gambling or violence. State secrets are defined broadly to include information concerning PRC national defense, state affairs and other matters as determined by the PRC authorities.

Pursuant to applicable regulations, ICP operators must complete mandatory security filing procedures and regularly update information security and censorship systems for their websites with local public security authorities, and must also report any public dissemination of prohibited content.

In December 2015, the Standing Committee of the National People's Congress promulgated the Anti-Terrorism Law, which took effect on January 1, 2016. According to the Anti-Terrorism Law, telecommunication service operators or internet service providers shall (i) carry out pertinent anti-terrorism publicity and education to society; (ii) provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities; (iii) implement network security and information monitoring systems as well as safety and technical prevention measures to avoid the dissemination of terrorism information, delete the terrorism information, immediately halt its dissemination, keep relevant records and report to the competent departments once the terrorism information is discovered; and (iv) examine customer identities before providing services. Any violation of the Anti-Terrorism Law may result in severe penalties, including substantial fines.

In November 2016, the Standing Committee of the National People's Congress promulgated the Cyber Security Law, which took effect on June 1, 2017. In accordance with the Cyber Security Law, network operators must comply with applicable laws and regulations and fulfill their obligations to safeguard network security in conducting business and providing services. Network service providers must take technical and other necessary measures as required by laws, regulations and mandatory requirements to safeguard the operation of networks, respond to network security effectively, prevent illegal and criminal activities, and maintain the integrity, confidentiality and usability of network data.

69

**Table of Contents**

In addition, the State Secrecy Bureau has issued provisions authorizing the blocking of access to any website it deems to be leaking state secrets or failing to comply with the relevant legislation regarding the protection of state secrets during online information distribution. Specifically, internet companies in China with bulletin boards, chat rooms or similar services must apply for specific approval prior to operating such services.

Furthermore, the Provisions on Technological Measures for Internet Security Protection, promulgated by the Ministry of Public Security, require all ICP operators to keep records of certain information about its users (including user registration information, log-in and log-out time, IP address, content and time of posts by users) for at least 60 days and submit the above information as required by laws and regulations. The Network Information Protection Decision states that ICP operators must request identity information from users when ICP operators provide information publication services to the users. If ICP operators come across prohibited information, they must immediately cease the transmission of such information, delete the information, keep relevant records, and report to relevant government authorities.

Baidu Netcom, BaiduPay and some other entities in our group are ICP operators, and are therefore subject to the regulations relating to information security. They have taken measures to comply with these regulations. They are registered with the relevant government authority in accordance with the mandatory registration requirement. Baidu Netcom's policy is to remove links to web pages which to its knowledge contain information that would be in violation of PRC laws or regulations. In addition, we monitor our websites to ensure our compliance with the above-mentioned laws and regulations.

***Regulations on Internet Privacy***

The PRC Constitution states that PRC law protects the freedom and privacy of communications of citizens and prohibits infringement of these rights. In recent years, PRC government authorities have enacted legislation on internet use to protect personal information from any unauthorized disclosure. The Network Information Protection Decision provides that electronic information that identifies a citizen or involves privacy of any citizen is protected by law and must not be unlawfully collected or provided to others. ICP operators collecting or using personal electronic information of citizens must specify the purposes, manners and scopes of information collection and uses, obtain consent of the relevant citizens, and keep the collected personal information confidential. ICP operators are prohibited from disclosing, tampering with, damaging, selling or illegally providing others with, collected personal information. ICP operators are required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. The Administrative Measures on Internet Information Services prohibit an ICP operator from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. Pursuant to the Internet Electronic Messaging Service Administrative Measures, ICP operators that provide electronic messaging services must keep users' personal information confidential and must not disclose the personal information to any third party without the users' consent or unless required by law. According to the Provisions on Protection of Personal Information of Telecommunication and Internet Users, telecommunication business operators and ICP operators are responsible for the security of the personal information of users they collect or use in the course of their provision of services. Without obtaining the consent from the users, telecommunication business operators and ICP operators may not collect or use the users' personal information. The personal information collected or used in the course of provision of services by the telecommunication business operators or ICP operators must be kept in strict confidence, and may not be divulged, tampered with or damaged, and may not be sold or illegally provided to others. The ICP operators are required to take certain measures to prevent any divulgence of, damage to, tampering with or loss of users' personal information. In accordance with the Cyber Security Law, network operators must not collect personal information irrelevant to their services. In the event of any unauthorized disclosure, damage or loss of collected personal information, network operators must take immediate remedial measures, notify the affected users and report the incidents to the relevant authorities in a timely manner. If any user knows that a network operator illegally collects and uses his or her personal information in violation of laws, regulations or any agreement with the user, or the collected and stored personal information is inaccurate or wrong, the user has the right to request the network operator to delete or correct the relevant collected personal

70

Table of Contents

information. We collect and use our users' personal information only if our users give their informed consent, and we believe we have taken appropriate measures to protect the security of our users' personal information.

The relevant telecommunications authorities are further authorized to order ICP operators to rectify unauthorized disclosure. ICP operators are subject to legal liability, including warnings, fines, confiscation of illegal gains, revocation of licenses or filings, closing of the relevant websites, administrative punishment, criminal liabilities, or civil liabilities, if they violate relevant provisions on internet privacy. Pursuant to the Ninth Amendment to the Criminal Law issued by the Standing Committee of the National People's Congress in August 2015 and becoming effective in November 2015, any ICP provider that fails to fulfill the obligations related to internet information security administration as required by applicable laws and refuses to rectify upon orders, will be subject to criminal liability for (i) any dissemination of illegal information in large scale; (ii) any severe effect due to the leakage of the client's information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (x) sells or provides personal information to others unlawfully, or (y) steals or illegally obtains any personal information, will be subject to criminal liability in severe situations. In addition, the Interpretations of the Supreme People's Court and the Supreme People's Procuratorate of the PRC on Several Issues Concerning the Application of Law in Handling Criminal Cases of Infringing Personal Information, effective in June 2017, have clarified certain standards for the conviction and sentencing in relation to personal information infringement. The PRC government has the power and authority to order ICP operators to turn over personal information if an internet user posts any prohibited content or engages in illegal activities on the internet.

### Regulations on Foreign Exchange

#### Foreign Currency Exchange

Pursuant to the Foreign Currency Administration Rules, as amended, and various regulations issued by SAFE and other relevant PRC government authorities, RMB is freely convertible to the extent of current account items, such as trade related receipts and payments, interest and dividends. Capital account items, such as direct equity investments, loans and repatriation of investment, unless expressly exempted by laws and regulations, still require prior approval from SAFE or its provincial branch for conversion of RMB into a foreign currency, such as U.S. dollars, and remittance of the foreign currency outside of the PRC. After a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, became effective on June 1, 2015, instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals will be required to apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

Payments for transactions that take place within the PRC must be made in RMB. Foreign currency revenues received by PRC companies may be repatriated into China or retained outside of China in accordance with requirements and terms specified by SAFE.

#### Dividend Distribution

Wholly foreign-owned enterprises and Sino-foreign equity joint ventures in the PRC may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and regulations. Additionally, these foreign-invested enterprises may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the enterprise's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to employee welfare and bonus funds at their discretion. These reserves are not distributable as cash dividends.

71

Table of Contents

*Foreign Exchange Registration of Offshore Investment by PRC Residents*

Pursuant to SAFE's Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment via Overseas Special Purpose Vehicles, or SAFE Circular No. 75, issued in October 2005, and a series of implementation rules and guidance, including the circular relating to operating procedures that came into effect in July 2011, PRC residents, including PRC resident natural persons or PRC companies, must register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as an increase or decrease of capital contributed by PRC individuals, a share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with the SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. After SAFE Notice 13 became effective on June 1, 2015, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plans of Overseas Publicly-Listed Companies, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. Failure of the option holders to complete their SAFE registrations may subject these PRC employees to fines and legal sanctions and may also limit the ability of the

72

Table of Contents

overseas publicly listed company to contribute additional capital into its PRC subsidiary and limit the PRC subsidiary's ability to distribute dividends.

### Regulations on Labor

The Labor Contract Law, which became effective in January 2008, and its implementation rules, impose more restrictions on employers and have been deemed to increase labor costs for employers, compared to the Labor Law, which became effective in January 1995. For example, pursuant to the Labor Contract Law, an employer is obliged to sign a labor contract with an unlimited term with an employee if the employer continues to hire the employee after the expiration of two consecutive fixed-term labor contracts. The employer has to compensate the employee upon the expiration of a fixed-term labor contract, unless the employee refuses to renew such contract on terms the same as or more favorable to the employee than those contained in the expired contract. The employer also has to indemnify an employee if the employer terminates a labor contract without a cause permitted by law. In addition, under the Regulations on Paid Annual Leave for Employees, which became effective in January 2008, employees who have served more than one year for an employer are entitled to a paid vacation ranging from 5 to 15 days per year, depending on their length of service. Employees who waive such vacation time at the request of employers must be compensated for three times their regular salaries for each waived vacation day.

### Regulations on Taxation

For a discussion of applicable PRC tax regulations, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation."

### C.    Organizational Structure

The following is a list of our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:

| Name | Place of Formation | Relationship |
| --- | --- | --- |
| Baidu Holdings Limited | British Virgin Islands | Wholly owned subsidiary |
| Baidu (Hong Kong) Limited | Hong Kong | Wholly owned subsidiary |
| Baidu Online Network Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu (China) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu.com Times Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu International Technology (Shenzhen) Co., Ltd. | China | Wholly owned subsidiary |
| Chong Qing Baidu Micro-loan Co., Ltd. | China | Wholly owned subsidiary |
| Xian Chunhe Asset Management Co., Ltd. | China | Wholly owned subsidiary |
| Beijing Baidu Netcom Science Technology Co., Ltd. | China | Consolidated affiliated entity |
| Beijing Perusal Technology Co., Ltd. | China | Consolidated affiliated entity |
| Beijing BaiduPay Science and Technology Co., Ltd. | China | Consolidated affiliated entity |
| iQIYI, Inc. | Cayman Islands | Majority-owned subsidiary |
| 91 Wireless Websoft Limited | Cayman Islands | Wholly owned subsidiary |

73

Table of Contents

The following diagram illustrates our corporate structure, including our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:



---

\*    The diagram above omits the names of subsidiaries and consolidated affiliated entities that are insignificant individually and in the aggregate.

(1)  Beijing Baidu Netcom Science Technology Co., Ltd. is 99.5% owned by Mr. Robin Yanhong Li, our chairman and chief executive officer, and 0.5% owned by Mr. Hailong Xiang, an employee of ours. Please see "Item 6.E. Directors, Senior Management and Employees—Share Ownership" for Mr. Robin Yanhong Li's beneficial ownership in our company. Mr. Hailong Xiang's beneficial ownership of our company is less than 1% of our total outstanding shares.

(2)  Beijing Perusal Technology Co., Ltd. is 50% owned by Mr. Xiaodong Wang and 50% owned by Mr. Zhixiang Liang. Both Mr. Xiaodong Wang and Mr. Zhixiang Liang are employees of ours, and their respective beneficial ownership in our company is less than 1% of our total outstanding shares.

(3)  Beijing BaiduPay Science and Technology Co., Ltd. is 54.8% owned by Beijing Baidu Netcom Science Technology Co., Ltd., 5.4% owned by Mr. Zhixiang Liang and 39.8% owned by another consolidated affiliated entity controlled by us.

**Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders**

PRC laws and regulations restrict and impose conditions on foreign investment in internet content, advertising, audio and video services and mobile application distribution businesses. Accordingly, we operate these businesses in China through our consolidated affiliated entities. We have entered into a series of contractual arrangements with our consolidated affiliated entities and the nominee shareholders of our consolidated affiliated entities. These contractual arrangements enable us to:

- receive the economic benefits that could potentially be significant to our consolidated affiliated entities in consideration for the services provided by our subsidiaries;

- exercise effective control over our consolidated affiliated entities; and

- hold an exclusive option to purchase all or part of the equity interests in our consolidated affiliated entities when and to the extent permitted by PRC law.

74

Table of Contents

We do not have any equity interests in our consolidated affiliated entities. However, as a result of contractual arrangements, we have effective control over and are considered the primary beneficiary of these companies, and we have consolidated the financial results of these companies in our consolidated financial statements. If our consolidated affiliated entities or the nominee shareholders fail to perform their respective obligations under the contractual arrangements, we could be limited in our ability to enforce the contractual arrangements that give us effective control over our consolidated affiliated entities. Furthermore, if we are unable to maintain effective control, we would not be able to continue to consolidate the financial results of our consolidated affiliated entities in our financial statements. In 2015, 2016 and 2017, we derived approximately 31%, 35% and 34% of our total revenues, respectively, from our consolidated affiliated entities. For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulations." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

### Contractual Arrangements Relating to Baidu Netcom, Beijing Perusal and BaiduPay

The following is a summary of the material provisions of the agreements among (i) our wholly-owned PRC subsidiary, Baidu Online, (ii) each of Baidu Netcom, Beijing Perusal and BaiduPay, our principal consolidated affiliated entities, and (iii) the nominee shareholders of these consolidated affiliated entities.

### Exclusive Technology Consulting and Services Agreement

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay service fees to Baidu Online and Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The exclusive technology consulting and services agreement between Baidu Online and each of Beijing Perusal and BaiduPay contains substantially the same terms as those between Baidu Online and Baidu Netcom described above. Each of the agreements will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

In 2017, the amount of service fees Baidu Netcom paid to Baidu Online was 95% of its net income before income taxes. In 2015 and 2016, Baidu Netcom did not pay any service fees to Baidu Online due to Baidu Netcom's accumulated loss position. Beijing Perusal did not pay any service fees to Baidu Online due to Beijing Perusal's operating loss in 2015, 2016 and 2017. BaiduPay only paid an insignificant amount of service fees to Baidu Online in 2017 and did not pay any service fees to Baidu Online in 2015 and 2016 due to BaiduPay's accumulated loss position.

### Operating Agreement

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the right to appoint senior executives of Baidu Netcom. The nominee shareholders of Baidu Netcom must appoint candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will

75

Table of Contents

not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The operating agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and the respective nominee shareholders contains substantially the same terms as those described above. Each of the agreements will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom have entered into a software license agreement and a web layout copyright license agreement. Pursuant to these license agreements, Baidu Online has granted to Baidu Netcom the right to use, including but not limited to, a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement have been renewed since their original expiration and are in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The web layout copyright license agreements that Baidu Online has entered into with each of Beijing Perusal and BaiduPay contain substantially the same terms as those between Baidu Online and Baidu Netcom described above. Each of the agreements is in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement by and among Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have irrevocably granted Baidu Online or its designated person(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The nominee shareholders must remit to Baidu Online any amount that is paid by Baidu Online or its designated person(s) in connection with the purchased equity interest as permitted by the applicable laws. Baidu Online or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full amount. Any and all dividends and other capital distributions from Baidu Netcom to the nominee shareholders must be paid to Baidu Online in full amount. Baidu Online will provide unlimited financial support to Baidu Netcom, if Baidu Netcom becomes in need of any form of reasonable financial support in the normal operation of business. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online will unconditionally forgive any such loans to Baidu Netcom upon provision by Baidu Netcom of sufficient proof for its loss and incapacity to repay. The agreement will terminate upon the transfer by the nominee shareholders of Baidu Netcom of all their equity interests in Baidu Netcom to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or Baidu Netcom.

The exclusive equity purchase and transfer option agreement by and among Baidu Online, each of Beijing Perusal and BaiduPay and their respective nominee shareholders contains substantially the same terms as those described above. Each of the agreements will terminate upon the transfer by the nominee shareholders of Beijing Perusal or BaiduPay of all their equity interests in Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or the relevant consolidated affiliated entity.

76

Table of Contents

*Loan Agreements*

Pursuant to loan agreements amongst Baidu Online and the nominee shareholders of Baidu Netcom, Baidu Online provided interest-free loans with an aggregate amount of RMB2.2 billion (US$334 million) to the nominee shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from the sale of the nominee shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person(s). The term of each loan is ten years from the date of the agreement and can be extended with the written consent of both parties before expiration. With some of the loan agreements amended and renewed, the earliest will expire on January 17, 2027.

The loan agreements amongst Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contain substantially the same terms as those described above, except that the amount of loans extended to the nominee shareholders is RMB3.2 billion (US$491 million) and RMB217 million (US$33 million), respectively. The term of the loan agreements will expire on June 19, 2026 and October 17, 2026, respectively, and can be extended with the written consent of both parties before expiration.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement amongst Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom agree to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu Online. Each of the nominee shareholders of Baidu Netcom has executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. The proxy agreement will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the relevant nominee shareholder of Baidu Netcom holds any equity interests in Baidu Netcom.

Each of the proxy agreements and powers of attorney amongst Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above. Each of the proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the relevant nominee shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement amongst Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreements and Baidu Netcom's performance of its obligations under the exclusive technology consulting and service agreement. If Baidu Netcom or the nominee shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The nominee shareholders of Baidu Netcom agree not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term of or the fulfillment by Baidu Netcom and the nominee shareholders of their respective obligations under the exclusive technology consulting and service agreement and the loan agreements.

Each of the equity pledge agreements amongst Baidu Online and the nominee shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above.

We are still in the process of perfecting the equity pledges of Baidu Netcom described above by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law, due to a recent change in shareholder.

77

**Table of Contents**

Through design of the aforementioned agreements, the nominee shareholders of these affiliated entities have effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the affiliated entities' economic performance. Baidu Online obtains the ability to approve decisions made by the affiliated entities and the ability to acquire the equity interests in the affiliated entities when permitted by PRC law. Baidu Online is obligated to absorb losses of the affiliated entities that could potentially be significant to the affiliated entities through providing unlimited financial support to the affiliated entities or is entitled to receive economic benefits from the affiliated entities that could potentially be significant to the affiliated entities through the exclusive technology consulting and service fees. As a result of these contractual arrangements, Baidu Online is determined to be the primary beneficiary of these affiliated entities. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between us and these affiliated entities through these contractual arrangements, and we consolidate these affiliated entities through Baidu Online.

We have also entered into contractual arrangements with several other affiliated entities and their respective nominee shareholders through some of our subsidiaries other than Baidu Online, which result in these subsidiaries being the primary beneficiary of the relevant affiliated entities. As a result of these contractual arrangements, there exists a parent-subsidiary relationship between us and the relevant affiliated entities, and we consolidate these affiliated entities through the subsidiaries.

#### D.    Property, Plant and Equipment

Our corporate headquarters, Baidu Campus, is located in Shangdi, an area designated by the Beijing municipal government as the center of the city's information technology industry, and we own the office building on Baidu Campus. We also own another office building, Baidu Science Park, in Beijing. Besides Beijing, we own and occupy office buildings in Shanghai and Shenzhen.

We also lease some offices in Beijing, many other cities in China and places outside of China, such as Tokyo (Japan), California (USA), Thailand, Brazil and Indonesia.

We host our servers in China at the internet data centers of China Telecom, China Unicom and China Mobile in over ten selected cities in China, and we also have content delivery network locations in various cities across China. We plan to deploy additional data centers in 2018. We also have a data center in Shanxi, and we expect to complete construction in 2018.

In December 2011, we commenced construction of an office building in Shenzhen, which will serve as our international center in Southern China. Our capital expenditures in connection with the construction of this office building in Shenzhen was RMB196 million (US$30 million) in 2017. We currently expect to complete the planned construction in 2018.

In September 2012, we commenced construction of Shanxi Cloud Computing Center, which will serve as one of our internet data centers in China. Our capital expenditures in connection with the construction of Shanxi Cloud Computing Center was RMB261 million (US$40 million) in 2017. We expect to fully complete the planned construction in 2018.

We currently plan to fund these expenditures with our cash, cash equivalents, restricted cash, short-term investments and anticipated cash flows generated from our operating activities.

#### Item 4A.    Unresolved Staff Comments

None.

78

Table of Contents

**Item 5.**        **Operating and Financial Review and Prospects**

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3.D. Key Information—Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

**A.        Operating Results**

**Overview**

Our operations are primarily based in China, where we derive almost all of our revenues. Total revenues in 2017 were RMB84.8 billion (US$13.0 billion), a 20.2% increase over 2016. Operating profit in 2017 was RMB15.7 billion (US$2.4 billion), a 56.1% increase over 2016. Net income attributable to Baidu, Inc. in 2017 was RMB18.3 billion (US$2.8 billion), a 57.3% increase over 2016. Mobile revenues accounted for 73.1% of our total revenues in 2017.

Our total assets as of December 31, 2017 were RMB251.7 billion (US$38.7 billion), of which cash and cash equivalents amounted to RMB11.1 billion (US$1.7 billion). Our total liabilities as of December 31, 2017 were RMB121.4 billion (US$18.7 million), accounting for 48.2% of total liabilities, redeemable noncontrolling interest and equity. As of December 31, 2017, our retained earnings accumulated to RMB102.3 billion (US$15.7 billion).

We consolidated the financial results of Qunar in our consolidated financial statements from July 2011 to October 2015. In July 2011, we acquired a majority stake in Qunar. In October 2015, we completed a share exchange transaction with Ctrip, in which we exchanged 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of Qunar for 11,488,381 newly-issued ordinary shares of Ctrip, at an exchange ratio of 0.725 Ctrip ADSs per Qunar ADS. As a result of the transaction, we have ceased consolidating the financial results of Qunar since October 2015 and recognized a disposition gain of RMB24.4 billion. We subsequently acquired additional ordinary shares of Ctrip in 2016.

In May 2017, we sold the mobile game business to third-party purchasers. In August 2017, we exchanged the shares of Xiaodu, the subsidiary that operated Baidu Deliveries, with Rajax, which operates the food delivery business under the ele.me brand in China. Since then, Baidu Deliveries has been de-consolidated from our consolidated financial statements.

**Reorganization of Operating Segments**

In the second quarter of 2017, we reorganized our operating segments from three operating segments into two operating segments, namely Baidu Core and iQIYI. Starting from April 2017, search services and transaction services have been combined into one segment—Baidu Core. The change in operating segments reflects our adjustments to business strategies and operations, as we de-emphasized our transaction services business and shifted such resources to support our online marketing services. Our chief operating decision maker assesses the performance of our company and makes decisions in respect of the allocation of company resources by analyzing the operating results of these two operating segments separately.

79

Table of Contents

**Revenues**

We generate revenues from Baidu Core and iQIYI. The following table sets forth our revenues by segment, with each segment revenues including inter-segment revenues:

|  | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2015 | 2016 | 2017 | |
|  | RMB | RMB | RMB | US$ |
|  | | (In millions) | | |
| Revenues: | | | | |
| Baidu Core | 61,229 | 59,470 | 67,681 | 10,402 |
| iQIYI | 5,319 | 11,237 | 17,378 | 2,671 |

*Revenue Generation*

*Baidu Core*. We generate revenue from Baidu Core mainly by providing keyword-based marketing services, which target and are triggered by internet users' search queries, including primarily P4P services, other online marketing services and artificial intelligence-enabled new business initiatives. We expect that we will continue to earn a majority of our revenues from Baidu Core.

A majority of our revenues from Baidu Core are derived from our P4P services. Our P4P platform is an online marketplace that introduces internet search users to customers, who pay us a fee based on click-throughs for priority placement of their links in the search results. We recognize auction-based revenue from P4P services when a user clicks on a customer's link in the search results, based on the amount that the customer has agreed to pay for each click-through. Besides the traditional auction-based P4P services, revenues from online marketing services through Baidu Feed has grown rapidly since it was launched in 2016. Our feed platform helps customers target relevant feed users, and customers pay us based on a cost per click basis for in-feed marketing or ad displays of their products.

We also provide our customers with other performance-based and display-based online marketing services. For other performance-based online marketing services, our customers pay us based on performance criteria other than click-throughs, such as the number of app downloads on mobile devices, the number of users registered with our customers or the transaction volume. For display-based online marketing services, our customers pay us based on the duration or the number of ad displays placed on our properties and Baidu Union members' properties.

Our online marketing services have historically been driven by the general increase in our customers' online marketing budgets. The number of online marketing customers and average revenue per customer are the primary factors that affect the operating results of our online marketing services. Our online marketing customers are increasingly seeking marketing solutions with measurable results in order to maximize their ROI. To meet customers' needs, we will continue to evaluate the effectiveness of our various products and services and adjust the mix of our service offerings to optimize our customers' ROI. Any prolonged economic slowdown in China, however, may cause our customers to decrease or delay their online marketing spending, which could negatively affect our online marketing revenues of Baidu Core. We will continue to make efforts to grow our customer base, improve customer experience and optimize their marketing budget allocation/spending effectiveness on our platform to drive the growth of Baidu Core.

Apart from the online marketing services, a majority of other revenues from Baidu Core are derived from our provision of financial services. Our financial services provides installment payment services to consumers and wealth management services to third-party investors. We recognize the interest revenue of financial services on a net basis after deduction of interest cost incurred.

*iQIYI*. iQIYI is an innovative market-leading online entertainment service provider in China. iQIYI's platform features highly popular original content, as well as a comprehensive selection of professionally

80

Table of Contents

produced and partner-generated content. iQIYI derives a majority of its revenues from membership services and online advertising services.

iQIYI offers membership packages that allow the members to have access to its premium content, certain commercial skipping and other viewing privileges, and higher community status in iQIYI Paopao social platform. iQIYI also generates a small portion of membership services revenue from on-demand content purchased by the users.

iQIYI's online advertising revenues are recognized net of advertising agency rebates. Most of iQIYI's online advertising services are in the form of brand advertising. An increasing portion of online advertising services are in the form of in-feed advertising, which was launched in the fourth quarter of 2016.

*Collection*

For most Baidu Core services, we collect payments both from our customers directly and through our distributors. We require our P4P customers to pay a deposit before using our P4P services and remind them by an automated notice to replenish the accounts after their account balance falls below a designated amount. We deduct the amount due to us from the deposit paid by a customer when a user clicks on the customer's link in the search results. In addition, we offer payment terms to some of our customers based on their historical marketing placements and credibility. We also offer longer payment terms to certain qualified distributors, consistent with industry practice.

For most services provided by iQIYI, customers may enter into different payment terms based on their historical marketing placements and credibility. Users are also encouraged to purchase membership services to get enhanced user experience, and such payments are collected from the users by iQIYI or through agents such as China Mobile.

As of December 31, 2017, we had accounts receivable of RMB4.6 billion (US$703 million), net of allowance of RMB316 million (US$48 million).

**Operating Costs and Expenses**

Our operating costs and expenses consist of cost of revenues, selling, general and administrative expenses, and research and development expenses. Share-based compensation expenses are allocated among these three categories of operating costs and expenses, based on the nature of the work of the employees who have received share-based compensation. Our total operating costs and expenses increased significantly from 2015 to 2017 due to the growth of our business.

81

Table of Contents

*Cost of Revenues*

The following table sets forth the components of our cost of revenues both in absolute amount and as a percentage of total revenues for the periods indicated:

| | Year Ended December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **2015** | | **2016** | | **2017** | | |
| | **RMB** | **%** | **RMB** | **%** | **RMB** | **US$** | **%** |
| | (In millions, except percentages) | | | | | | |
| Total revenues | 66,382 | 100.0 | 70,549 | 100.0 | 84,809 | 13,034 | 100.0 |
| **Cost of revenues:** | | | | | | | |
| Sales tax and surcharges | (4,644) | (7.0) | (4,717) | (6.7) | (6,181) | (951) | (7.3) |
| Traffic acquisition costs | (8,861) | (13.3) | (10,373) | (14.7) | (9,657) | (1,484) | (11.4) |
| Bandwidth costs | (3,717) | (5.6) | (4,716) | (6.7) | (5,558) | (854) | (6.6) |
| Depreciation of servers and other equipment | (2,560) | (3.9) | (3,075) | (4.4) | (3,388) | (521) | (4.0) |
| Operational costs | (3,882) | (5.9) | (4,430) | (6.3) | (4,697) | (722) | (5.5) |
| Content costs | (3,745) | (5.6) | (7,864) | (11.1) | (13,398) | (2,059) | (15.9) |
| Share-based compensation expenses | (49) | (0.1) | (103) | (0.1) | (183) | (28) | (0.2) |
| Total cost of revenues | (27,458) | (41.4) | (35,278) | (50.0) | (43,062) | (6,619) | (50.9) |

*Traffic Acquisition Costs*. Traffic acquisition costs typically represent the portion of our online marketing revenues that we share with our Baidu Union members. We typically pay a Baidu Union member, based on a pre-arranged agreement, a portion of the online marketing revenues generated from valid click throughs by users of that member's properties.

*Bandwidth Costs*. Bandwidth costs are fees we pay to telecommunications carriers such as China Telecom and China Unicom for telecommunications services and for hosting our servers at their internet data centers. We expect our bandwidth costs, as variable costs, to increase with the increasing number of racks of servers and the increasing traffic from our websites and mobile platform. Our bandwidth costs could also increase if the telecommunication carriers increase their service charges.

*Depreciation of Servers and Other Equipment*. We include in our cost of revenues depreciation expenses of servers and other computer hardware that are directly related to our business operations and technical support.

*Operational Costs*. Operational costs include primarily salary and benefit expenses, intangible assets amortization, payment platform charges, delivery cost of Baidu Deliveries prior to its share exchange with Raiax Holding and other expenses incurred by our operating and technical support personnel. Salary and benefit expenses include wages, bonuses, medical insurance, unemployment insurance, pension benefits, employee housing fund and other welfare benefits.

*Content Costs*. Content costs consist primarily of the amortization and impairment of the licensed copyrights, amortization of capitalized produced content, and the fees paid to producers or distributors we paid for content published on our platform to their producers or distributors.

82

**Table of Contents**

*Operating Expenses*

The following table sets forth the components of our operating expenses in both absolute amount and as a percentage of total revenues for the periods indicated:

| | Year Ended December 31, | | | | | | |
| | 2015 | | 2016 | | 2017 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (In millions, except percentages) | | | | | | |
|---|---|---|---|---|---|---|---|
| Total revenues | 66,382 | 100.0 | 70,549 | 100.0 | 84,809 | 13,034 | 100.0 |
| Cost of revenues | (27,458) | (41.4) | (35,278) | (50.0) | (43,062) | (6,619) | (50.9) |
| **Operating expenses:** | | | | | | | |
| Selling, general and administrative | (17,076) | (25.7) | (15,071) | (21.4) | (13,128) | (2,018) | (15.5) |
| Research and development | (10,176) | (15.3) | (10,151) | (14.4) | (12,928) | (1,987) | (15.2) |
| Total operating costs and expenses | (54,710) | (82.4) | (60,500) | (85.8) | (69,118) | (10,624) | (81.6) |

*Selling, General and Administrative Expenses*

Our selling, general and administrative marketing expenses primarily consist of promotional and marketing expenses, salaries and benefits for our sales, marketing, general and administrative personnel, and legal, accounting and other professional services fees.

*Research and Development Expenses*

Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expense research and development costs as they are incurred, except for capitalized software development costs that fulfill the capitalization criteria under Accounting Standards Codification, or ASC, subtopic 350-40, *Intangibles-Goodwill and Other: Internal-Use Software.*

*Share-based Compensation Expenses*

Baidu, Inc. grants options and restricted shares to our employees, directors and consultants as share-based compensation awards. As of December 31, 2017, there was RMB592 million (US$91 million) unrecognized share-based compensation expenses related to options of Baidu, Inc., which are expected to be recognized over a weighted-average vesting period of 2.8 years. As of December 31, 2017, there was RMB5.3 billion (US$813 million) unrecognized share-based compensation expenses related to restricted shares of Baidu, Inc., which are expected to be recognized over a weighted-average vesting period of 2.9 years. To the extent the actual forfeiture rate is different from our original estimate, actual share-based compensation cost related to these awards may be different from our expectation.

Other subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in the aggregate.

83

Table of Contents

The following table sets forth the allocation of our share-based compensation expenses both in absolute amount and as a percentage of total share-based compensation expenses among our employees based on the nature of work they were assigned to perform:

| | Year Ended December 31, | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | 2016 | | 2017 | | |
| | RMB | % | RMB | % | RMB | US$ | % |
| | (In millions, except percentages) | | | | | | |
| **Allocation of Share-based Compensation Expenses** | | | | | | | |
| Cost of revenues | 49 | 3.6 | 103 | 5.9 | 183 | 28 | 5.6 |
| Selling, general and administrative | 487 | 35.1 | 429 | 24.4 | 973 | 150 | 30.0 |
| Research and development | 851 | 61.3 | 1,228 | 69.7 | 2,088 | 321 | 64.4 |
| Total share-based compensation expenses | 1,387 | 100.0 | 1,760 | 100.0 | 3,244 | 499 | 100.0 |

**Taxation**

*Cayman Islands and BVI*

We are not subject to income or capital gain tax under the current laws of the Cayman Islands and the British Virgin Islands. Additionally, upon payments of dividends by the Company, no Cayman Island withholding tax will be imposed.

*Hong Kong*

Subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under Hong Kong tax law, our subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there is no withholding tax in Hong Kong on remittance of dividends.

*Japan*

As a result of the Japanese tax regulations amendments, the statutory income tax rate has been reduced from 38.0% to approximately 35.6%, 33.5% and 31.7% effective for the years ended December 31, 2015, 2016 and 2017, respectively.

*PRC Enterprise Income Tax*

Effective from January 1, 2008, the PRC's statutory enterprise income tax, or EIT, rate is 25%. An enterprise may benefit from a preferential tax rate of 15% under the EIT Law if it qualifies as a "High and New Technology Enterprise" strongly supported by the state. Pursuant to the Administrative Measures on the Recognition of High and New Technology Enterprises, as amended in January 2016, the provincial counterparts of the Ministry of Science and Technology, the Ministry of Finance and the State Administration of Taxation make joint determination on whether an enterprise is qualified as a "High and New Technology Enterprise" under the EIT Law. In making such determination, these government agencies consider, among other factors, ownership of core technology, whether the key technology supporting the core products or services fall within the scope of high and new technology strongly supported by the state as specified in the measures, the ratios of research and development personnel to total personnel, the ratio of research and development expenditures to annual sales revenues, the ratio of revenues attributed to high and new technology products or services to total revenues, and other measures set forth in relevant guidance. A "High and New Technology Enterprise" certificate is effective for a period of three years. A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online and Baidu Netcom, obtained the "High and New Technology Enterprise" certificates. The related tax holiday under such "High and New Technology Enterprise" certificates of these entities will expire in 2018, 2019 or 2020.

84

Table of Contents

If any entity fails to maintain the "High and New Technology Enterprise" qualification under the EIT Law, its tax rate will increase, which could have a material and adverse effect on our results of operations and financial position. Historically, all of the PRC subsidiaries and consolidated affiliated entities mentioned above successfully re-applied for the certificates when the prior ones expired.

An enterprise may benefit from a preferential tax rate of 10% under the EIT law if it qualifies as a "Key Software Enterprise." Enterprises wishing to enjoy the "Key Software Enterprise" status will be subject to relevant governmental authorities' assessment each year as to whether they are entitled to the preferential tax rate of 10%. Due to the "Key Software Enterprise" status, Baidu Online was entitled to a preferential income tax rate of 10% for four consecutive years from 2013 to 2016, so was Baidu China for 2015 and 2016, and Baidu International for 2016. Prior to May 2016, a "Key Software Enterprise" used to be designated jointly by the National Development and Reform Commission, the MIIT, the Ministry of Commerce, the Ministry of Finance and the State Administration of Taxation. In May 2016, the four PRC governmental authorities jointly issued a notice, pursuant to which an enterprise may be entitled to the preferential income tax rate of 10% by filing with the local tax authority with supporting documentation proving its qualifications to be a "Key Software Enterprise" during its annual income tax filing process. The "Key Software Enterprise" status of Baidu Online, Baidu China and Baidu International for 2017 will be filed with tax authorities before the end of May 2018 and will be subject to relevant governmental authorities' assessment.

If our PRC subsidiaries or consolidated affiliated entities that have enjoyed preferential tax treatment no longer qualify for the preferential treatment, we will consider available options under applicable law that would enable us to qualify for alternative preferential tax treatment. To the extent we are unable to offset the impact of the expiration of existing preferential tax treatment with new tax exemptions, tax incentives or other tax benefits, the expiration of existing preferential tax treatment may cause our effective tax rate to increase. The amount of income tax payable by our PRC subsidiaries and consolidated affiliated entities in the future will depend on various factors, including, among other things, the results of operations and taxable income of, and the statutory tax rate applicable to, each of the entities. Our effective tax rate depends partially on the extent of the relative contribution of each of our subsidiaries and consolidated affiliated entities to our consolidated taxable income. In 2015, 2016 and 2017, our consolidated effective tax rate was 14%, 20% and 14%, respectively.

*Withholding Tax*

Under the EIT Law and its implementation rules, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its non-resident enterprise investors, and proceeds from any such non-resident enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to the EIT at the rate of 10%, namely withholding tax, unless the non-resident enterprise investor's jurisdiction of incorporation has a tax treaty or arrangement with China that provides for a reduced withholding tax rate or an exemption from withholding tax. The Caishui (2008) No. 1 Notice clarifies that undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 will be exempted from any withholding tax.

The British Virgin Islands, where Baidu Holdings Limited, the sole shareholder of certain of our PRC subsidiaries such as Baidu Online, was incorporated, does not have such a tax treaty with China.

Hong Kong, where Baidu (Hong Kong) Limited, our wholly owned subsidiary and the sole shareholder of certain of our PRC subsidiaries such as Baidu Times and Baidu China, was incorporated, has a tax arrangement with China that provides for a lower withholding tax rate of 5% on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. However, pursuant to a SAT Circular 81 issued by the State Administration of Taxation in February 2009, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from the reduced withholding tax rate on dividends due to a structure or

85

Table of Contents

arrangement designed for the primary purpose of obtaining favorable tax treatment, the PRC tax authorities may adjust the preferential tax treatment. Moreover, pursuant to a SAT Circular 9 issued by the State Administration of Taxation in February 2018, which will become effective from April 1, 2018 and supersede the SAT Circular 601 issued by the State Administration of Taxation in October 2009, a resident of a contracting state will not qualify for the benefits under the tax treaties or arrangements, if it is not the "beneficial owner" of the dividend, interest and royalty income. According to SAT Circular 9, a "beneficial owner" is required to have ownership and the right to dispose of the income or the rights and properties giving rise to the income, and generally engage in substantive business activities. An agent or conduit company will not be regarded as a "beneficial owner" and, therefore, will not qualify for treaty benefits. A conduit company normally refers to a company that is set up primarily for the purpose of evading or reducing taxes or transferring or accumulating profits. In addition, pursuant to a SAT Circular 60 issued by the State Administration of Taxation in August 2015, non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises may, if they determine by self-assessment that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply for the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-filing examinations by the relevant tax authorities.

If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, the dividend payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

*Tax Residence*

Under the EIT Law and its implementation rules, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a resident enterprise and will be subject to the EIT at the rate of 25% on its worldwide income. The term "de facto management body" refers to "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise."

Pursuant to SAT Circular 82 issued by the State Administration of Taxation in April 2009, an overseas registered enterprise controlled by a PRC company or a PRC company group will be classified as a "resident enterprise" with its "de facto management body" located within China if the following requirements are satisfied: (i) the senior management and core management departments in charge of its daily operations are mainly located in the PRC; (ii) its financial and human resources decisions are subject to determination or approval by persons or bodies located in the PRC; (iii) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (iv) no less than half of the enterprise's directors or senior management with voting rights reside in the PRC. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. Although the SAT Circular 82, the additional guidance and its amendment only apply to overseas registered enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners, the determining criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If our offshore entities are deemed PRC resident enterprises, these entities may be subject to the EIT at the rate of 25% on their global incomes, except that the dividends distributed by our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed "dividends among qualified resident enterprises."

Should our offshore entities be deemed as PRC resident enterprises, such changes could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

86

Table of Contents

### *PRC VAT in Lieu of Business Tax*

In November 2011, the Ministry of Finance and the State Administration of Taxation jointly issued two circulars setting forth the details of the pilot VAT reform program, which change the charge of sales tax from business tax to VAT for certain pilot industries. The VAT reform program initially applied only to the pilot industries in Shanghai, and was expanded to eight additional regions, including, among others, Beijing and Guangdong province, in 2012. In August 2013, the program was further expanded nationwide. In May 2016, the pilot program was extended to cover additional industry sectors such as construction, real estate, finance and consumer services.

With respect to all of our PRC entities for the period immediately prior to the implementation of the VAT reform program, revenues from our services are subject to a 5% PRC business tax. Revenues from our online advertising distribution services are subject to an additional 3% cultural business construction fee.

All of our PRC entities have been subject to VAT since August 1, 2013. These entities are required to pay VAT instead of business tax for services that are deemed by the relevant tax authorities to be within the pilot industries at a rate of 6%. In addition, cultural business construction fee is imposed at the rate of 3% on revenues derived from our online advertising distribution services.

### *PRC Urban Maintenance and Construction Tax and Education Surcharge*

Any entity, foreign-invested or purely domestic, or individual that is subject to consumption tax, VAT and business tax is also required to pay PRC urban maintenance and construction tax. The rates of urban maintenance and construction tax are 7%, 5% or 1% of the amount of consumption tax, VAT and business tax actually paid depending on where the taxpayer is located. All entities and individuals who pay consumption tax, VAT and business tax are also required to pay education surcharge at a rate of 3%, and local education surcharges at a rate of 2%, of the amount of VAT, business tax and consumption tax actually paid.

Table of Contents

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods indicated. The period-to-period comparisons of results of operations should not be relied upon as indicative of future performance.

| | Year ended December 31, | | | |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | |
| Revenues: | | | | |
| Online marketing services | 64,037 | 64,525 | 73,146 | 11,242 |
| Others | 2,345 | 6,024 | 11,663 | 1,792 |
| Total revenues | 66,382 | 70,549 | 84,809 | 13,034 |
| Operating costs and expenses(1): | | | | |
| Cost of revenues | (27,458) | (35,278) | (43,062) | (6,619) |
| Selling, general and administrative | (17,076) | (15,071) | (13,128) | (2,018) |
| Research and development | (10,176) | (10,151) | (12,928) | (1,987) |
| Total operating costs and expenses | (54,710) | (60,500) | (69,118) | (10,624) |
| Operating profit | 11,672 | 10,049 | 15,691 | 2,410 |
| Interest income | 2,362 | 2,342 | 3,154 | 485 |
| Interest expense | (1,041) | (1,158) | (1,615) | (248) |
| Other income, net, including exchange gains or losses | 24,910 | 4,302 | 4,116 | 633 |
| Income / (loss) from equity method investments | 4 | (1,026) | (63) | (10) |
| Taxation | (5,475) | (2,913) | (2,995) | (460) |
| Net income | 32,432 | 11,596 | 18,288 | 2,810 |
| Less: Net loss attributable to non-controlling interests | (1,232) | (36) | (13) | (2) |
| Net income attributable to Baidu, Inc. | 33,664 | 11,632 | 18,301 | 2,812 |
| | | | | |
| *(1) Share-based compensation expenses:* | | | | |
| *Cost of revenues* | (49) | (103) | (183) | (28) |
| *Selling, general and administrative* | (487) | (429) | (973) | (150) |
| *Research and development* | (851) | (1,228) | (2,088) | (321) |
| | (1,387) | (1,760) | (3,244) | (499) |

**Year Ended December 31, 2017 Compared to Year Ended December 31, 2016**

**Consolidated revenues.** Our total revenues increased by 20.2% from RMB70.5 billion in 2016 to RMB84.8 billion (US$13.0 billion) in 2017. Our online marketing revenues increased by 13.4% from RMB64.5 billion in 2016 to RMB73.1 billion (US$11.2 billion) in 2017. The number of our active online marketing customers decreased from approximately 982,000 in 2016 to approximately 775,000 in 2017, while the average revenue per customer increased from approximately RMB65,300 in 2016 to approximately RMB93,500 (US$14,371) in 2017. The decrease of our active online marketing customers was primarily due to the negative impact of implementing measures that we have taken to deliver a better user experience and build a safer and more trustworthy platform for users since May 2016. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying and delivery related businesses. The total number of paid clicks increased by 10.7% from 2016 to 2017.

88

**Table of Contents**

Other revenues increased by 93.6% from RMB6.0 billion in 2016 to RMB11.7 billion (US$1.8 billion) in 2017, which was mainly due to the growth of membership services of iQIYI and financial services.

**Consolidated operating costs and expenses.** Our consolidated operating costs and expenses increased by 14.2% from RMB60.5 billion in 2016 to RMB69.1 billion (US$10.6 billion) in 2017. This increase was primarily due to the expansion of our business, including the increase in content cost from iQIYI.

*Cost of Revenues.* Our cost of revenues increased by 22.1% from RMB35.3 billion in 2016 to RMB43.1 billion (US$6.6 billion) in 2017. This increase was primarily due to the following factors:

- *Traffic Acquisition Costs*. Our traffic acquisition costs decreased by 6.9% from RMB10.4 billion in 2016 to RMB9.7 billion (US$1.5 billion) in 2017. Traffic acquisition costs represent 11.4% of total revenues in 2017, compared to 14.7% in 2016. The decrease in our traffic acquisition costs was mainly due to the growing contribution of our online marketing services through Baidu Feed and iQIYI services, which incurred less traffic acquisition costs.

- *Bandwidth Costs and Depreciation Expenses*. Our bandwidth costs increased by 17.8% from RMB4.7 billion in 2016 to RMB5.6 billion (US$854 million) in 2017. Our depreciation expenses of servers and other equipment increased by 10.2% from RMB3.1 billion in 2016 to RMB3.4 billion (US$521 million) in 2017. The increases in these costs were mainly due to the expansion of our network infrastructure capacity in order to support growing business needs.

- *Sales Tax and Surcharges.* Our sales tax and surcharges increased by 31.0% from RMB4.7 billion in 2016 to RMB6.2 billion (US$951 million) in 2017, mainly resulting from the growth of our revenues as well as a larger portion of our revenues becoming subject to certain surcharges.

- *Operational Costs*. Our operational costs increased by 6.0% from RMB4.4 billion in 2016 to RMB4.7 billion (US$722 million) in 2017, primarily due to the increases in allowance for credit losses relating to micro loans and staff-related costs, which were partially offset by the decrease of delivery cost as a result of the share exchange of Xiaodu with Rajax.

- *Content Costs*. Our content costs increased by 70.4% from RMB7.9 billion in 2016 to RMB13.4 billion (US$2.1 billion) in 2017, primarily due to the rapid expansion of original content production and licensing of third-party contents by iQIYI.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses decrease by 12.9% from RMB15.1 billion in 2016 to RMB13.1 billion (US$2.0 billion) in 2017. This decrease was primarily due to the following factors:

- Marketing and promotion expenses decreased by 41.1% from RMB7.8 billion in 2016 to RMB4.6 billion (US$703 million) in 2017, primarily due to a continuous decrease in promotional spending relating to our transaction related services;

- Total salaries and benefits and staff-related expenses increased by 7.0% from RMB4.1 billion in 2016 to RMB4.4 billion (US$679 million) in 2017; and

- Share-based compensation expenses related to selling, general and administrative expenses increased by 126.7% from RMB429 million in 2016 to RMB973 million (US$150 million) in 2017.

*Research and Development Expenses.* Our research and development expenses increased by 27.4% from RMB10.2 billion in 2016 to RMB12.9 billion (US$2.0 billion) in 2017, primarily due to the increase in staff-related costs of research and development personnel.

**Operating profit.** As a result of the foregoing, we generated an operating profit of RMB15.7 billion (US$2.4 billion) in 2017, a 56.1% increase from RMB10.0 billion in 2016.

89

Table of Contents

*Other income, net, including exchange gains or losses.* Our other income, net, including exchange gains or losses was RMB4.1 billion (US$633 million) in 2017, compared to RMB4.3 billion in 2016. Other income, net, including exchange gains or losses in 2017, mainly consisted of an investment gain recognized as a result of our exchange of Xiaodu with Rajax.

*Income (loss) from equity method investments.* We had loss from equity method investments of RMB63 million (US$10 million) in 2017, as compared to loss from equity method investments of RMB1.0 billion in 2016, mainly attributable to our significant investee, Ctrip, which turned from loss-incurring position to profit-making in 2017.

*Taxation.* Our income tax expenses increased by 2.8% from RMB2.9 billion in 2016 to RMB3.0 billion (US$460 million) in 2017. The effective tax rate decreased from 20.1% in 2016 to 14.1% in 2017, mainly due to a nontaxable investment gain.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB11.6 billion in 2016 to RMB18.3 billion (US$2.8 billion) in 2017.

### Year Ended December 31, 2016 Compared to Year Ended December 31, 2015

*Consolidated revenues.* Our total revenues increased by 6.3% from RMB66.4 billion in 2015 to RMB70.5 billion in 2016. Our online marketing revenues increased slightly by 0.8% from RMB64.0 billion in 2015 to RMB64.5 billion in 2016. The number of our active online marketing customers decreased from approximately 1,049,000 in 2015 to approximately 982,000 in 2016 while the average revenue per customer increased from approximately RMB60,500 in 2015 to approximately RMB65,300 in 2016. The decrease of our active online marketing customers was primarily due to the measures we have implemented since May 2016, which included turning down customers who do not meet our new requirements, in order to deliver a better user experience and build a safer and more trustworthy platform for users. Consistent with previously reported numbers, the number of active online marketing customers and average revenue per customer exclude those for our group-buying and delivery related businesses. The total number of paid clicks increased by 10.6% from 2015 to 2016. The other revenues increased by 156.9% from RMB2.3 billion in 2015 to RMB6.0 billion in 2016, which was mainly due to the growth of membership services of iQIYI.

*Consolidated operating costs and expenses.* Our consolidated operating costs and expenses increased by 10.6% from RMB54.7 billion in 2015 to RMB60.5 billion in 2016. This increase was primarily due to the expansion of our business, and in particular the content cost of iQIYI.

*Cost of Revenues.* Our cost of revenues increased by 28.5% from RMB27.5 billion in 2015 to RMB35.3 billion in 2016. This increase was primarily due to the following factors:

- *Traffic Acquisition Costs.* Our traffic acquisition costs increased by 17.1% from RMB8.9 billion in 2015 to RMB10.4 billion in 2016. Traffic acquisition costs represent 14.7% of total revenues in 2016, compared to 13.3% in 2015. The increase in our traffic acquisition costs mainly reflected the change in the mix of Baidu Union members.

- *Bandwidth Costs and Depreciation Expenses.* Our bandwidth costs increased by 26.9% from RMB3.7 billion in 2015 to RMB4.7 billion in 2016. Our depreciation expenses of servers and other equipment increased by 20.1% from RMB2.6 billion in 2015 to RMB3.1 billion in 2016. The increases in these costs were mainly due to our investment in increasing our network infrastructure capacity.

- *Sales Tax and Surcharges.* Our sales tax and surcharges increased by 1.6% from RMB4.6 billion in 2015 to RMB4.7 billion in 2016, in line with the increase in revenues.

- *Operational Costs.* Our operational costs increased by 14.1% from RMB3.9 billion in 2015 to RMB4.4 billion in 2016, primarily due to the increases of delivery cost of Baidu Deliveries and staff-related costs, which were partially offset by the decrease of payment platform charges and intangible amortization expenses.

90

**Table of Contents**

- *Content Costs.* Our content costs increased by 110.0% from RMB3.7 billion in 2015 to RMB7.9 billion in 2016, primarily due to the increase in video content costs of iQIYI.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses decreased by 11.7% from RMB17.1 billion in 2015 to RMB15.1 billion in 2016. This decrease was primarily due to the following factors:

- Total salaries and benefits and staff-related expenses decreased by 3.2% from RMB4.3 billion in 2015 to RMB4.1 billion in 2016, primarily due to the decreased headcount of certain business resulting from the change from the direct sales model to distribution model during 2016;

- Marketing and promotion expenses decreased by 20.9% from RMB9.8 billion in 2015 to RMB7.8 billion in 2016, primarily due to the reduced promotional spending relating to our transaction related services;

- Total office operating expenses decreased by 22.0% from RMB658 million in 2015 to RMB514 million in 2016, primarily as a result of reduced office rental expenses as new buildings owned by us went into service; and

- Share-based compensation expenses allocated to selling, general and administrative expenses decreased by 11.8% from RMB487 million in 2015 to RMB429 million in 2016.

*Research and Development Expenses.* Our research and development expenses remained flat at RMB10.2 billion in 2016.

*Operating profit.* As a result of the foregoing, we generated an operating profit of RMB10.0 billion in 2016, a 13.9% decrease from RMB11.7 billion in 2015.

*Other income, net, including exchange gains or losses.* Our other income, net, including exchange gains or losses was RMB4.3 billion in 2016, compared to RMB24.9 billion in 2015. The other income, net, including exchange gains or losses in 2016, mainly consisted of the investment gain recognized as a result of our exchange of Uber (Cayman), Ltd., or Uber China, shares with Xiaoju Kuaizhi, Inc., or Didi.

*Income (loss) from equity method investments.* We had loss from equity method investments of RMB1.0 billion in 2016, as compared to income from equity method investments of RMB4 million in 2015 mainly due to the loss pick up of our significant investee, Ctrip.

*Taxation.* Our income tax expenses decreased by 46.8% from RMB5.5 billion in 2015 to RMB2.9 billion in 2016, primarily due to the significant tax expense recognized in 2015 in relation to our exchange of Qunar shares with Ctrip. The effective tax rate for 2016 was 20.1% as compared to 14.4% in 2015. Excluding the share exchange transaction impact for the past two years, the effective tax rate was flat year-over-year.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. decreased from RMB33.7 billion in 2015 to RMB11.6 billion in 2016.

### Segment Revenues

The following table sets forth our revenues by segment and year-over-year change rate for the periods indicated, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | | | |
| | 2015 | 2016 | | 2017 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | (In millions, except percentages) | | | | | |
| Revenues: | | | | | | |
| Baidu Core | 61,229 | 59,470 | (2.9) | 67,681 | 10,402 | 13.8 |
| iQIYI | 5,319 | 11,237 | 111.3 | 17,378 | 2,671 | 54.6 |

91

Table of Contents

*Baidu Core*. Baidu Core revenue increased by 13.8% from RMB59.5 billion in 2016 to RMB67.7 billion (US$10.4 billion) in 2017. This increase was primarily due to the increase in average revenue per customer, partially offset by the decrease in the number of customers, which was primarily due to the implementing measures that we have taken to deliver a better user experience and build a safer and more trustworthy platform for users since May 2016.

Baidu Core revenues decreased by 2.9% from RMB61.2 billion in 2015 to RMB59.5 billion in 2016. This decrease was primarily due to the implementing measures that we have taken to deliver a better user experience and build a safer and more trustworthy platform for users since May 2016, which had a negative impact on the number of customers and our revenues in the short term.

*iQIYI*. Our iQIYI revenues increased by 54.6% from RMB11.2 billion in 2016 to RMB17.4 billion (US$2.7 billion) in 2017. This increase was mainly attributable to the increase in membership services revenues and online marketing revenues.

iQIYI revenues increased by 111.3% from RMB5.3 billion in 2015 to RMB11.2 billion in 2016. This increase was mainly attributable to the increase in online marketing revenues and membership services revenues.

### Segment Operating Costs and Expenses

The following table sets forth our operating costs and expenses by segment and year-over-year change rate for the periods indicated:

|  | Year ended December 31, | | | | | |
|  | 2015 | 2016 | | 2017 | | |
|  | RMB | RMB | YoY% | RMB | US$ | YoY% |
|  | (In millions, except percentages) | | | | | |
| Operating Costs and Expenses: | | | | | | |
| Baidu Core | (47,179) | (46,597) | (1.2) | (47,966) | (7,373) | 2.9 |
| iQIYI | (7,746) | (14,027) | 81.1 | (21,331) | (3,278) | 52.1 |

*Baidu Core*. Operating costs and expenses of Baidu Core mainly consist of traffic acquisition costs, staff related costs, business tax and surcharges, depreciation and intangible amortization expenses, bandwidth costs, marketing and promotion expenses, and delivery costs.

Operating costs and expenses of Baidu Core were RMB48.0 billion (US$7.4 billion) in 2017, compared to RMB46.6 billion in 2016. The increase was primarily due to a 13.8% increase in salaries and benefits and staff-related expenses, a 74.8% increase in share-based compensation expenses, a 25.7% increase in sales tax and surcharges, a 264.6% increase in bad debt and credit loss of micro loans, a 9.8% increase in depreciation and amortization costs, a 171.3% increase in content cost incurred by growth in Baidu Feed, and a 22.0% increase in bandwidth costs, partially offset by a 52.9% decrease in marketing and promotion expenses, a 7.7% decrease in traffic acquisition cost and a 57.6% decrease in delivery costs, all compared to the figures in 2016.

Operating costs and expenses of Baidu Core were RMB46.6 billion in 2016, compared to RMB47.2 billion in 2015. The decrease was primarily due to a 25.0% decrease in promotion expenses, an 8.8% decrease in staff-related costs and a 38.4% decrease in payment platform charges, partially offset by a 16.7% increase in traffic acquisition costs, a 298.8% increase in delivery costs of Baidu Deliveries and an 18.0% increase in depreciation costs, all compared to the figures in 2015.

*iQIYI*. Operating costs and expenses of iQIYI mainly consist of content costs, bandwidth costs, staff related costs, marketing and promotion expenses, and business tax and surcharges.

92

Table of Contents

Operating costs and expenses of iQIYI were RMB21.3 billion (US$3.3 billion) in 2017, compared to RMB14.0 billion in 2016. The increase was primarily due to a 67.3% increase in content costs, a 51.3% increase in marketing and promotion expenses, a 43.8% increase in staff related costs, and a 54.5% increase in business tax and surcharges, compared to the figures in 2016.

Operating costs and expenses of iQIYI were RMB14.0 billion in 2016, compared to RMB7.7 billion in 2015. The increase was primarily due to a 104.1% increase in content costs, a 60.6% increase in bandwidth costs, a 50.1% increase in staff related costs, and an 83.7% increase in business tax and surcharges, compared to the figures in 2015.

**Inflation**

Inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the annual average percent changes in the consumer price index in China for 2015, 2016 and 2017 were 1.4%, 2.0% and 1.6%, respectively. The year-over-year percent change in the consumer price index for January 2016, 2017 and 2018 was increase of 1.8%, 2.5% and 1.5%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

**Foreign Currency**

The average exchange rate between the U.S. dollar and the RMB has declined from RMB8.1056 per U.S. dollar in July 2005 to RMB6.5063 per U.S. dollar in December 2017. As of December 31, 2017, we recorded RMB888 million (US$136 million) of net foreign currency translation loss in accumulated other comprehensive income as a component of shareholders' equity. We have not hedged exposures to exchange fluctuations using any hedging instruments. See also "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." and "Item 11. Quantitative and Qualitative Disclosures about Market Risk—Foreign Exchange Risk."

**Critical Accounting Policies**

We prepare financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities and the disclosure of our contingent assets and liabilities at the end of each fiscal period and the reported amounts of revenues and expenses during each fiscal period. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our significant accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

93

Table of Contents

### Consolidation of Affiliated Entities

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on internet content, advertising, audio and video services, and mobile app distribution businesses, we operate our websites and conduct our internet content, advertising, audio and video services, and mobile app distribution businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities through our subsidiaries, which obligate them to absorb losses of the VIEs' that could potentially be significant to the VIEs or entitle the Primary Beneficiaries to receive economic benefits from the VIEs that could potentially be significant to the VIEs. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities through our subsidiaries, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by SEC Regulation SX-3A-02 and ASC topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities through the subsidiaries, which are the primary beneficiaries of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurring. We will also continuously reconsider whether we are the primary beneficiaries of our affiliated entities as facts and circumstances change. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

### Segment Reporting

We historically had only one single reportable segment because our chief operating decision maker, or CODM, formerly relied on the consolidated results of operations when making decisions on allocating our resources and assessing our performance. Starting from the quarter ended June 30, 2015, we have reorganized our operation into three segments, namely the Search Services, Transaction Services and iQIYI, as a result of our expansion of offerings into multiple services.

Starting from April 2017, Search Services and Transaction Services were combined into one segment, namely, Baidu Core. The change in reportable segments reflects the Company's strategic shift and the operational change to scale back transaction services and focus on its core business. As of December 31, 2017, we had two reportable segments, namely, Baidu Core and iQIYI. Baidu Core mainly consists of performance-based online marketing services, other online marketing services, artificial intelligence-enabled new business initiatives and internet financial services. iQIYI is an online entertainment service provider that, offers original, professionally produced and partner-generated content on its platform.

Our chief executive officer, who has been identified as the CODM, reviews the operating results of Baidu Core and iQIYI in order to allocate resources and assess our performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280, *Segment Reporting*.

### Revenue Recognition

We recognize revenues based on the following principles:

### (1)    Performance-based online marketing services

*Cost-per-click.* Our auction-based P4P platform enables a customer to place its website link and related description on our search result list on the platform which could be accessed through personal computers or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on our platform and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's relevance to the keyword searched. Customers pay us only when a user clicks on one of its website links.

**Table of Contents**

Besides our traditional auction-based P4P services, we also display in-feed marketing to targeted users through Baidu Feed. Customers pay the Company when a targeted user clicks the in-feed marketing and turns to its platforms.

For the type of cost-per-clicks, revenue is recognized when all of the revenue recognition criteria set forth in ASC 605 are met, which is generally when a user clicks on one of the customer-sponsored links or in-feed marketing.

*Other performance-based online marketing services.* To the extent we provide online marketing services based on performance criteria other than cost-per-click, such as the number of downloads (and user registration) of mobile applications and the pre-determined ratios of completed transaction volumes, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

*(2)    Display-based online advertising services*

We provide display-based online advertising services to customers by integrating text description, image and video, and displaying the advertisement in a prominent position of the search result page, vertical search products or through Baidu Feed, we recognize revenue, in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on our platform or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

*(3)    Online marketing services involving Baidu Union*

Baidu Union is the program through which we expand distribution of our customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. We make payments to Baidu Union members for acquisition of traffic. We recognize gross revenue for the amount of fees we receive from our customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

*(4)    Membership services*

We offer membership services which provide subscribing members with access to the streaming of premium content in exchange for a non-refundable upfront membership fee. Membership periods range from one month to twelve months. The receipt of membership fees is initially recorded as deferred revenue and we recognize revenue ratably over the membership period as services are rendered.

*(5)    Financial services*

We offer financial services which include provision of installment payment services to consumers and wealth management services to third-party investors. Interest income earned from provision of financial services is reported as "Other revenues" and reported on a net basis after deduction of related interest costs incurred. Gross interest income and interest costs recognized for the years ended December 31, 2017 are RMB3.5 billion (US$543 million) and RMB1.9 billion (US$288 million), respectively. Gross interest income and interest cost for the years ended December 31, 2016 and 2015 are insignificant.

*(6)    Barter transactions*

*Nonmonetary exchanges of licensed copyrights of video contents.*

We enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights

95

Table of Contents

for each party to broadcast the licensed copyrights received only on its own platform. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges in accordance with ASC topic 845, or ASC 845, *Nonmonetary Transactions*, and record the transaction based on the fair value of the asset surrendered. Barter sublicensing revenues are recognized in accordance with ASC subtopic 926-605, *Entertainment-Films; Revenue Recognition* when all of the following criteria are met: persuasive evidence of a sub-licensing arrangement with a customer exists, the content is delivered or is available for immediate and unconditional delivery, the sub-license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, the arrangement fee is fixed or determinable and collection of the arrangement fee is reasonably assured, and when there are no other future obligations under the agreement. We estimate the fair value of the contents surrendered based on various factors, including comparable cash sublicensing transactions and relative size, scale, and market share of counterparties to the exchange.

The attributable cost of the barter transaction is recognized as cost of revenues from the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC topic 926, or ASC 926, *Entertainment—Films*.

*Other nonmonetary exchanges.*

We engage in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follow the guidance set forth in ASC 845. While nonmonetary transactions are generally recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. We also engage in certain advertising barter transactions and follow the guidance set forth in ASC subtopic 605-20, *Revenue Recognition: Services*. The advertising barter transactions generally are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which is generally nil. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

*(7)    Other revenue recognition related policies*

In accordance with ASC subtopic 605-25, or ASC 605-25, *Revenue Recognition: Multiple-Deliverable Revenue Arrangements*, for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and occurring at different times, we evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered a separate unit of accounting, we allocate the total consideration of the arrangement based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence of selling price, third-party evidence of selling price, or management's best estimate of the selling price, or BESP, and recognize revenue as each deliverable is provided. We consider all reasonably available information in determining the BESP, including both market and entity-specific factors.

We deliver some of our online marketing services to end customers through engaging third party distributors. In this context, we may provide cash incentives to distributors. The cash incentives are accounted for as reduction of revenue in accordance with ASC subtopic 605-50, *Revenue Recognition: Customer Payments and Incentives*.

We provide sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. We account for these award credits

96

Table of Contents

granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits is recorded as deferred revenue based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

### Share-based Compensation

We account for share-based compensation in accordance with ASC topic 718, or ASC 718, *Compensation-Stock Compensation*. We have elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award, or the modified awards. The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified award, we recognize share-based compensation over the vesting periods of the replacement award, which comprises (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term, and (ii) any unrecognized compensation cost of the original awards, using either the original term or the new term, whichever results in higher expenses for each reporting period.

We account for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees*. We use the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 also requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### Income Taxes

We recognize income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. We record valuation allowance against the amount of deferred tax assets that we determine is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date. For reconciliation of tax computed by applying the respective statutory income tax rate to pre-tax income, please see "Income taxes" under Note 13 to our audited consolidated financial statements.

We comply with the provisions of ASC topic 740, or ASC 740, *Income Taxes,* in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. We have elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2015, 2016 and 2017, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

97

Table of Contents

*Accounts Receivable, net of allowance*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. We generally do not require collateral from our customers.

We maintain allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. We review the accounts receivable on a periodic basis and make general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, we consider many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

*Loan and Interest Receivables, net of allowance*

Loan and interest receivables consist primarily of micro loans to individual borrowers. Such amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by us to the borrowers relating to the micro loans generally range from one to 36 months. The cash flows related to micro loans are included in the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represents our best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of debts. Our estimate of credit losses is primarily based on historical loss experience using a roll rate-based model applied to our loan and interest receivables portfolios. We consider many factors, including but not limited to, the age of the amounts due, payment history, the month of origination, the purpose of the loans, creditworthiness and financial condition of the borrower, terms of the loans, regulatory environment, and general economic conditions.

*Licensed Copyrights*

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability is recorded when the cost of the content is known, the content has been accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our platform. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. Licensed copyrights are presented on the balance sheet as current and non-current based on estimated time of usage.

The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net", respectively.

We have two types of licensed copyrights: (i) non-exclusive licensed copyrights and (ii) exclusive licensed copyrights. With respect to non-exclusive licensed copyrights, we have the right to broadcast the contents on our own platform. With Respect to exclusive licensed copyrights, in addition to the broadcasting right, we also have the right to sublicense the underlying contents to third parties.

Some non-exclusive licensed copyrights, mainly comprising newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the

98

Table of Contents

consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. The major factors that impact our viewership consumption patterns include film box office, ratings for television series and variety shows, user traffic on our platform, placement schedule, user tastes and preferences, emerging cultural trends, merchandising and marketing efforts. When the amortization pattern is revised, it is accounted for as a change in accounting estimate prospectively in accordance with ASC topic 250, or ASC 250, *Accounting Changes and Error Corrections*.

The purchase cost of exclusive licensed copyrights includes a broadcasting right and a right to sublicense to third parties, and we allocate the content cost to these two rights when the exclusive licensed copyrights are initially recognized based on the relative proportion of the total revenues that we estimate will be generated by each right. For the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership revenues, the content costs are amortized in accordance with ASC subtopic 920-350, or ASC 920-350, *Entertainment-Broadcasters: Intangibles—Goodwill and Other*, using the same method as non-exclusive licensed copyrights as described above. For the right to sublicense to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, the content costs are amortized in accordance with ASC 926 using an individual-film-forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. We revisit the forecasted total direct revenues on a periodic basis and any resulting changes to such estimates and the resulting amortization expense are accounted for prospectively as a change in accounting estimate in accordance with ASC 250.

On a periodic basis, we evaluate the program's usefulness of the broadcasting rights of the licensed copyrights and record such rights at the lower of unamortized cost or estimated net realizable value pursuant to the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, we estimate net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from the provision of online advertising and membership services, less any direct costs, over the remaining useful lives of non-exclusive licensed copyrights. We estimate advertising and membership cash flows for each category of the content. Estimates that impact advertising and membership cash flows include anticipated levels of demand for our online advertising and membership services and the expected selling prices of our advertisements and membership. For the right to sublicense to third parties, we assess recoverability in accordance with ASC 926-20.

### Impairment of Long-Lived Assets Other Than Goodwill

We evaluate long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360, or ASC 360, *Property, Plant and Equipment*.

When such events occur, we assess the recoverability of the assets group based on the undiscounted future cash flow the assets group is expected to generate and recognize an impairment loss when estimated undiscounted future cash flow expected to result from the use of the assets group plus net proceeds expected from disposition of the assets group, if any, is less than the carrying value of the assets group. If we identify an impairment, we reduce the carrying amount of the assets group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in our impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheet. The impairment charges of long-lived assets are nil, RMB1 million and RMB209 million (US$32 million) for the years ended December 31, 2015, 2016 and 2017, respectively.

99

Table of Contents

### Impairment of Goodwill

We assess goodwill for impairment in accordance with ASC subtopic 350-20, or ASC 350-20, *Intangibles—Goodwill and Other: Goodwill*, which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

As of December 31, 2017, we had two reporting units, consisting of Baidu Core and iQIYI.

We have the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If we believe, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and we are not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then we must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

In 2017, we performed a qualitative assessment for Baidu Core reporting unit. Based on the requirements of ASC350-20, we evaluated all relevant factors, including but not limited to macroeconomic conditions, industry and market conditions, financial performance, and our share price. We weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of the reporting unit, and further impairment testing on goodwill was unnecessary as of December 31, 2017.

We elected to assess goodwill for impairment using the two-step process for the iQIYI reporting unit. Significant management judgment is involved in determining the estimates and assumptions, and actual results may differ from the estimates and assumptions used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for the reporting unit, which could trigger future impairment. The judgment in estimating the fair value of the reporting unit includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expense growth rates, future capital expenditure and working capital level, as well as discount rate determined by weighted average cost of capital approach and the selection of comparable companies operating in similar businesses. We also reviewed marketplace data to assess the reasonableness of our assumptions, such as discount rate, operating margins and working capital level. The fair value of iQIYI exceeded its carrying amount, and therefore goodwill related to the reporting unit was not impaired and we were not required to perform further testing.

The impairment charges of goodwill are nil for the years ended December 31, 2015, 2016 and 2017.

### Impairment of Long-term Investments

Our long-term investments consist of cost method investments, equity method investments, available-for-sale investments and investments accounted for at fair value.

We periodically review our cost method investments and equity method investments for impairment. If we conclude that any of such investments is impaired, we will assess whether such impairment is other-than-

100

Table of Contents

temporary. Factors we consider to make such determination include the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

As available-for-sale investments are reported at fair value, when the decline in value is determined to be other-than-temporary, the impairment loss on the long-term available-for-sale investments would be recognized in the consolidated statements of comprehensive income.

Investments accounted for at fair value are recorded at fair value, and changes in fair value are recorded in the consolidated income statements in the period the change occurs.

Determination of fair value particularly for investments in privately-held companies, requires significant judgment to determine appropriate estimates and assumptions. Changes in these estimates and assumptions could affect the calculation of the fair value of the investments and the determination of whether any identified impairment is other-than-temporary. If impairment is considered other-than-temporary, the asset will be written down to its fair value and the corresponding charge will be recorded in the consolidated financial statements. Impairment charges on long-term investments for 2015, 2016 and 2017 were RMB117 million, RMB245 million and RMB597 million (US$92 million), respectively.

### Transfers of Financial Assets

We account for the transfers of financial assets in accordance with ASC topic 860, or ASC 860, *Transfers and Servicing*. For a transfer of financial assets to be considered as a sale, the assets would be removed from our consolidated balance sheets. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured borrowing included in "Amounts due to the third-party investors" on the consolidated balance sheets, the assets remain on the consolidated balance sheets as "Other invested securities" and the sale proceeds are recognized as our liability.

Certain financial assets that we bought as an agent on behalf of third-party investors have been isolated from us, even in the event of bankruptcy or other receivership. These financial assets and associated liabilities are not recorded on our consolidated balance sheets.

### Business Combination

We account for business combinations using the purchase method of accounting in accordance with ASC topic 805, *Business Combinations.* The purchase method accounting requires that the consideration transferred be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, we re-measured our previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

101

**Table of Contents**

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

**B.    Liquidity and Capital Resources**

As of December 31, 2017, our principal source of liquidity was RMB100.7 billion (US$15.5 billion) of cash, cash equivalents, restricted cash and short-term investments. Our cash and cash equivalents consist of cash on hand and investments in interest bearing demand deposit accounts, time deposits, money market funds and other liquid investments which have original maturities of three months or less. The short-term investments primarily consist of fixed-rate and adjustable-rate debt investments with original maturity of less than one year. We believe that our current cash, cash equivalents, restricted cash and short-term investments and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs, including our cash needs for working capital and capital expenditures, for at least the next 12 months. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our existing cash is insufficient to meet our requirements, we may seek to sell additional equity securities, debt securities or borrow from banks.

Furthermore, cash transfers from our PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to their parent companies outside of China or our company, or otherwise satisfy their foreign currency denominated obligations. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Governmental control of currency conversion may affect the value of your investment." As of December 31, 2017, our PRC subsidiaries and consolidated affiliated entities held RMB96.6 billion (US$14.8 billion) of cash, cash equivalents, restricted cash, and short-term investments, RMB428 million (US$66 million) of which were in the form of foreign currencies.

We have entered into the following loan transactions with commercial banks:

- In December 2014, we entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which we borrowed a two-year unsecured loan of US$150 million and a three-year unsecured loan of US$150 million. Both loans were intended for our general working capital and had a floating interest rate. In connection with the loan agreements, we entered into two interest swap agreements, pursuant to which the loans will be settled in a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans. The loans were fully repaid when they became due.

- In July 2015, we entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$150 million with a floating interest rate for general working capital purposes. In August 2015, we drew down US$150 million with a term of two years under the facility commitment. In connection with the loan agreement, we entered into an interest swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan. In August 2017, the loan was fully repaid when it became due.

- In August 2015, we entered into a loan agreement with The Hong Kong and Shanghai Banking Corporation Limited, pursuant to which we were entitled to borrow an unsecured US$ denominated loan of US$200 million, with a fixed annual interest rate of 1.42%, for general working capital

102

Table of Contents

purposes. In August 2015, we drew down US$200 million with a term of two years under the facility commitment. In August 2017, the loan was fully repaid when it became due.

- In January 2016, we entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which we were entitled to borrow a RMB denominated loan of RMB200 million (US$31 million) for one year with a fixed annual interest rate at 95% of the benchmark one-year lending rate published by the People's Bank of China. The loan was intended exclusively for iQIYI's general working capital purposes. In January 2016, we drew down RMB54 million (US$8 million) with a fixed interest rate of 4.13%. In February 2016, we drew down an additional RMB21 million (US$3 million) with a fixed interest rate of 4.13%. In December 2016, additional RMB26 million (US$4 million) was drawn down with a fixed interest rate of 4.13%. By the end of December 2017, the loan had been fully repaid.

- In June 2016, we entered into a five-year US$2.0 billion term and revolving facility agreement with a group of 21 arrangers. The facilities, a US$1.0 billion five-year unsecured floating rate loan and a US$1.0 billion five-year unsecured revolving facility, were priced at 110 basis points over LIBOR. The use of proceeds of the facilities were intended for general corporate purposes. In June 2016, we drew down two tranches of US$250 million under the facility commitment. In November 2016, we drew down additional two tranches of US$250 million under the facility commitment. In connection with the facilities, we entered into four interest rate swap agreements, pursuant to which US$250 million of the loans will be settled with a fixed annual interest rate of 2.11%, US$250 million of the loans will be settled with a fixed annual interest rate of 2.10%, and US$500 million of the loans will be settled with a fixed annual interest rate of 2.78%. As of December 31, 2017, we had an outstanding balance of US$1.0 billion under the two facilities, US$500 million of which will be due in June 2021 and US$500 million of which will be due in November 2021.

- In July 2016, we entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB200 million (US$31 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for our consumer credit business exclusively. In July 2016, we drew down RMB50 million (US$8 million) with a fixed interest rate of 4.35%. In August 2016, an additional RMB80 million (US$12 million) was drawn down with a fixed interest rate of 4.35%. By the end of December 2017, the loan had been fully repaid.

- In July 2016, we entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB150 million (US$23 million) for one year with an interest rate based on the Loan Prime Rate (LPR) plus 48.5 basis points. This facility is reserved for our consumer credit business exclusively. In September 2016, we drew down RMB150 million (US$23 million) with an interest rate of 4.78% under the facility. By the end of December 2017, the loan had been fully repaid.

- In August 2016, we entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB150 million (US$23 million) for one year with an interest rate based on LPR plus 26.75 basis points. This facility is reserved for our consumer credit business exclusively. In August 2016, we drew down RMB150 million (US$23 million) with an interest rate of 4.56% under the facility. In August 2017, the loan was fully repaid when it became due.

- In November 2016, we entered into a loan agreement with International Finance Corporation, pursuant to which we borrowed an unsecured RMB denominated loan of RMB500 million (US$77 million) with a term of one year. The loan is intended for our consumer credit business exclusively. In December 2016, we drew down RMB500 million (US$77 million) with a fixed interest rate of 4.92%. The loan was extended to December 2018 with an interest rate of 6.04% via a renewed contract signed by both parties when the original loan became due.

103

Table of Contents

- In November 2016, we entered into a loan agreement with China Merchants Bank (Shanghai Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB100 million (US$15 million) with a term of one year. The loan is to be used for our consumer credit business exclusively. In December 2016, we drew down RMB85 million (US$13 million) with a fixed interest rate of 4.18%. In January 2017, an additional RMB15 million (US$2 million) was drawn down with a fixed interest rate of 4.18%. The first loan withdrawal made in December 2016 was fully repaid when it became due.

- In April 2017, we entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which we were entitled to borrow a secured RMB denominated loan of RMB299 million (US$46 million) with an annual interest rate at 94% of benchmark three-year lending rate published by the People's Bank of China. The loan was intended exclusively for the general working capital of iQIYI. In April 2017, we drew down RMB299 million (US$46 million) with an interest rate of 4.47%. Pursuant to the agreement, the principal will be repaid by installments from September 2017 to April 2020. RMB5 million (US$1 million) was repaid when it became due. The amount repayable within twelve months was classified as "Long-term loans, current portion."

- In June 2017, we entered into a banking facility agreement with China Minsheng Bank (Beijing Branch), pursuant to which we were entitled to borrow a secured RMB denominated loan of RMB300 million (US$46 million) for one year with a fixed interest rate. The loan is intended for iQIYI's general working capital purposes. In November 2017, we drew down RMB132 million (US$20 million) with an interest rate of 4.78% and RMB62 million (US$10 million) with an interest rate of 5.00%, respectively.

- In August 2017, we entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which we were entitled to borrow a secured RMB denominated loan of RMB200 million (US$31 million) for one year with an interest rate based on LPR plus surcharges. The loan was intended for iQIYI's general working capital purposes. In September 2017, we drew down RMB106 million (US$16 million) with an effective interest rate of 4.11%.

- In August 2017, we entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB300 million (US$46 million) for one year with an annual interest rate at 116% of benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for our consumer credit business. In September 2017, we drew down RMB130 million (US$20 million) with an interest rate of 5.05%.

- In September 2017, we entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which we were entitled to borrow an unsecured RMB denominated loan of RMB300 million (US$46 million) for one year with an annual interest rate at 115% of benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for our consumer credit business. In September 2017, we drew down RMB300 million (US$46 million) with an interest rate of 5.00%.

We have conducted the following five rounds of debt securities issuance, which remain outstanding as of the date of this annual report:

- In November 2012, we issued an aggregate of US$1.5 billion senior unsecured notes in two equal tranches, due in 2017 and 2022, with stated annual interest rates of 2.25% and 3.50%, respectively. The net proceeds from the sale of the notes were used for general corporate purposes. In November 2017, notes with carrying value of US$750 million were fully repaid when they became due. As of December 31, 2017, the total carrying value and estimated fair value of the remaining notes were US$750 million and US$761 million. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2017. We are not subject to any financial covenants or other significant restrictions under the notes. During 2017, we paid an aggregate of US$43 million in interest payments related to these notes.

104

Table of Contents

- In August 2013, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2018, with stated annual interest rate of 3.25%. The net proceeds from the sale of the notes were used for general corporate purposes, including merger and acquisition activities. As of December 31, 2017, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2017. We are not subject to any financial covenants or other significant restrictions under the notes. During 2017, we paid an aggregate of US$33 million in interest payments related to these notes.

- In June 2014, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2019, with stated annual interest rate of 2.75%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2017, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$1.0 billion, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2017. We are not subject to any financial covenants or other significant restrictions under the notes. During 2017, we paid an aggregate of US$28 million in interest payments related to these notes.

- In June 2015, we issued an aggregate of US$750 million senior unsecured notes due in 2020, with stated annual interest rate of 3.00%, and an aggregate of US$500 million senior unsecured notes due in 2025, with stated annual interest rate of 4.13%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2017, the total carrying value and estimated fair value were US$750 million and US$753 million, respectively, with respect to the notes due in 2020, and US$500 million and US$520 million, respectively, with respect to the notes due in 2025. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2017. We are not subject to any financial covenants or other significant restrictions under the notes. During 2017, we paid an aggregate of US$43 million in interest payments related to these notes.

- In July 2017, we issued an aggregate of US$900 million senior unsecured notes due in 2022, with stated annual interest rate of 2.88%, and an aggregate of US$600 million senior unsecured notes due in 2027, with stated annual interest rate of 3.63%. The net proceeds from the sale of the notes were used to repay existing indebtedness and for general corporate purposes. As of December 31, 2017, the total carrying value and estimated fair value were US$900 million and US$891 million, respectively, with respect to the notes due in 2022, and US$600 million and US$594 million, respectively, with respect to the notes due in 2027. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2017. We are not subject to any financial covenants or other significant restrictions under the notes. During 2017, the interest payments related to these notes were nil.

We may use the net proceeds from our issuance and sale of the notes to fund the operations of our PRC subsidiaries by making additional capital contributions to our existing PRC subsidiaries, injecting capital to establish new PRC subsidiaries and/or providing loans to our PRC subsidiaries. Such transfer of funds from Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries is subject to the PRC regulatory restrictions and procedures: (i) capital increase of the existing PRC subsidiaries and establishment of new PRC subsidiaries must be either filed with or approved by the Ministry of Commerce or its local counterparts depending on whether the business of the PRC subsidiary is subject to restrictions with respect to foreign investment under PRC law, and registered with local banks authorized by SAFE; and (ii) loans to any of our PRC subsidiaries must not exceed the statutory limit and must be filed with SAFE. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business."

Table of Contents

As of December 31, 2017, we had RMB42.3 billion (US$6.5 billion) in long-term loans and notes payables (including current portion of RMB6.5 billion (US$1.0 billion)) and had RMB1.2 billion (US$191 million) in short-term loans.

### Cash Flows and Working Capital

As of December 31, 2015, 2016 and 2017, we had RMB68.0 billion, RMB82.4 billion and RMB100.7 billion (US$15.5 billion) in cash, cash equivalents, restricted cash and short-term investments.

The following table sets forth a summary of our cash flows for the years indicated:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | |
| | RMB | RMB | RMB | US$ |
| | (In millions) | | | |
| Net cash generated from operating activities | 19,771 | 22,258 | 32,880 | 5,054 |
| Net cash used in investing activities | (31,621) | (35,911) | (76,935) | (11,825) |
| Net cash generated from financing activities | 7,778 | 14,447 | 44,557 | 6,848 |
| Effect of exchange rate changes on cash and cash equivalents | 179 | 144 | (316) | (48) |
| Net (decrease) increase in cash and cash equivalents | (3,893) | 938 | 186 | 29 |
| Cash and cash equivalents at beginning of the period | 13,853 | 9,960 | 10,898 | 1,675 |
| Cash and cash equivalents at end of the period | 9,960 | 10,898 | 11,084 | 1,704 |

### Operating Activities

Net cash generated from operating activities increased to RMB32.9 billion (US$5.1 billion) in 2017 from RMB22.3 billion in 2016. This increase was primarily due to the integrated effect of increase in net income, as adjusted for non-operating items, non-cash items and changes in working capital.

Net cash generated from operating activities increased to RMB22.3 billion in 2016 from RMB19.8 billion in 2015. This increase was primarily due to the integrated effect of decrease in net income, as adjusted for share exchange impact, other non-operating items, non-cash items and changes in working capital.

### Investing Activities

Net cash used in investing activities increased to RMB76.9 billion (US$11.8 billion) in 2017 from RMB35.9 billion in 2016. This increase was primarily due to increased investment in loans, acquisition of intangible assets, purchase of long-term investments and the purchase of short-term investments.

Net cash used in investing activities increased to RMB35.9 billion in 2016 from RMB31.6 billion in 2015. This increase was primarily due to the increased acquisition of intangible assets, investment in loans and purchase of short-term investments. In 2016, we reclassified the net cash from changes in loan receivables from operating activities to investing activities. The impact on the cash flow statement for 2016 was insignificant.

### Financing Activities

Net cash generated from financing activities increased to RMB44.6 billion (US$6.8 billion) in 2017 from RMB14.4 billion in 2016. The increase was primarily due to proceeds from the sale of financial products, proceeds from secured borrowings from third-party financial institutions and proceeds from notes issuance and convertible notes issuance.

Net cash generated from financing activities was RMB14.4 billion in 2016, compared to net cash of RMB7.8 billion generated from financing activities in 2015. The increase was primarily due to proceeds from the sale of financial products and net proceeds from short-term and long-term debt in 2016.

**Table of Contents**

*Capital Expenditures*

We made capital expenditures of RMB5.2 billion, RMB4.2 billion and RMB4.8 billion (US$735 million) in 2015, 2016 and 2017, representing 7.9%, 5.9% and 5.6% of our total revenues, respectively. In 2017, our capital expenditures were primarily attributable to the purchase of servers, network equipment and other computer hardware to increase our network infrastructure capacity. We funded our capital expenditures primarily with net cash flows generated from operating activities.

We commenced construction of office buildings in Shenzhen in December 2011, and Shanxi Cloud Computing Center in September 2012, and we expect to complete the planned construction of these projects in 2018. See "Item 4.D. Information on the Company—Property, Plant and Equipment" for more details of our capital expenditures associated with these projects.

Our capital expenditures may increase in the future as our business continues to grow, in connection with the expansion and improvement of our network infrastructure and the construction of additional office buildings and cloud-computing based data centers. We currently plan to fund these expenditures with our current cash, cash equivalents, short-term investments and anticipated cash flow generated from our operating activities.

*Holding Company Structure*

Baidu, Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries and consolidated affiliated entities in China. As a result, although other means are available for us to obtain financing at the holding company level, Baidu, Inc.'s ability to pay dividends to the shareholders and to service any debt it may incur may depend upon dividends paid by our PRC subsidiaries and license and service fees paid by our PRC consolidated affiliated entities. If any of our subsidiaries incurs debt on its own behalf in the future, the instruments governing such debt may restrict its ability to pay dividends to Baidu, Inc. In addition, our PRC subsidiaries and consolidated affiliated entities are required to make appropriations to certain statutory reserve funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies.

Our PRC subsidiaries, being foreign-invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely, a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of our PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the board of directors of the PRC subsidiaries.

Our consolidated affiliated entities must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of our consolidated affiliated entities is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are at the discretion of our consolidated affiliated entities.

Under PRC laws and regulations, our PRC subsidiaries and consolidated affiliated entities are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. The amounts restricted include the paid-up capital and the statutory reserve funds of our PRC subsidiaries and the net assets of our consolidated affiliated entities in which we have no legal ownership, totaling approximately RMB10.6 billion, RMB13.7 billion and RMB18.6 billion (US$2.9 billion) as of December 31, 2015, 2016 and 2017, respectively.

Table of Contents

**C.     Research and Development**

We have a team of experienced engineers who are mostly based in Beijing, Shanghai, Shenzhen and Sunnyvale, California. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We have also recruited experienced engineers globally. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, artificial intelligence, deep learning and autonomous driving.

In the three years ended December 31, 2015, 2016 and 2017, our research and development expenditures, including share-based compensation expenses for research and development staff, were RMB10.2 billion, RMB10.2 billion and RMB12.9 billion (US$2.0 billion), representing 15.3%, 14.4% and 15.2% of our total revenues for the years ended December 31, 2015, 2016 and 2017, respectively. Our research and development expenses consist primarily of personnel-related costs. We have expensed substantially all of the development costs for the research and development of products and new functionality as incurred, except for certain internal-use software.

**D.     Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2017 that are reasonably likely to have a material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

**E.     Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any off-balance sheet derivative instruments. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**F.     Contractual Obligations**

The following table sets forth our contractual obligations by specified categories as of December 31, 2017:

| | | Payment Due by Period | | | |
| | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
|---|---|---|---|---|---|
| | | | (In RMB millions) | | |
| Long-Term Debt Obligations[1] | 46,224 | 7,580 | 13,023 | 18,020 | 7,601 |
| Capital Lease Obligations[2] | — | — | — | — | — |
| Operating Lease Obligations[3] | 7,652 | 4,446 | 2,627 | 455 | 124 |
| Purchase Obligations[4] | 17,110 | 6,645 | 8,210 | 1,330 | 925 |
| Total | 70,986 | 18,671 | 23,860 | 19,805 | 8,650 |

[1] The long-term debt obligations represent (i) senior unsecured notes due in 2022, (ii) senior unsecured notes due in 2018, (iii) senior unsecured notes due in 2019, (iv) senior unsecured notes due in 2020, (v) senior unsecured notes due in 2025, (vi) senior unsecured notes due in 2022 and 2027, (vii) a five-year loan under revolving facility from a syndicated group of 21 lenders and (viii) a three-year loan from Bank of China. The total interest to be paid for these loans is (i) RMB854 million (US$131 million), (ii) RMB212 million (US$33 million), (iii) RMB268 million (US$41 million), (iv) RMB366 million (US$56 million), (v) RMB1.0 billion (US$155 million), (vi) RMB347 million (US$53 million), (vii) RMB556 million (US$86 million), and (viii) RMB29 million (US$5 million) respectively. Please see "Loans Payable" under Note 11 and "Notes Payable" under Note 12 to our audited consolidated financial statements.

108

**Table of Contents**

(2)  Capital lease obligations represent our obligations for leasing servers, and the total amount of interest to be paid is RMB17 thousand (US$3 thousand).

(3)  Operating lease obligations represent our obligations for leasing premises and bandwidth.

(4)  Purchase obligations consist primarily of expenditures in connection with the expansion and improvement of network infrastructure, our plan to build or acquire additional office buildings and cloud computing-based data centers, and expenditures for video content.

Other than the contractual obligations set forth above, we do not have any contractual obligations that are long-term debt obligations, capital (finance) lease obligations, purchase obligations or other long-term liabilities reflected on our balance sheet.

**Item 6.        Directors, Senior Management and Employees**

**A.    Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
|---|---|---|
| Robin Yanhong Li | 49 | Chairman and Chief Executive Officer |
| Qi Lu | 56 | Vice Chairman, Group President and Chief Operating Officer |
| Herman Yu | 47 | Chief Financial Officer |
| Lee Liu | 53 | Senior Vice President |
| Hailong Xiang | 40 | Senior Vice President |
| Ya-Qin Zhang | 51 | President, New Business |
| James Ding | 52 | Independent Director |
| Brent Callinicos | 52 | Independent Director |
| Yuanqing Yang | 53 | Independent Director |

*Robin Yanhong Li* is co-founder, chairman and chief executive officer of our company, and oversees our overall strategy and business operations. Mr. Li has been serving as the chairman of our board of directors since our inception in January 2000 and as our chief executive officer since February 2004. Mr. Li served as our president from February 2000 to December 2003. Prior to founding our company, Mr. Li worked as a staff engineer for Infoseek, a pioneer in the internet search engine industry, from July 1997 to December 1999. Mr. Li was a senior consultant for IDD Information Services from May 1994 to June 1997. Mr. Li currently serves on the board of New Oriental Education & Technology Group Inc., a private educational services in China (NASDAQ: EDU), and Ctrip.com International, Ltd., an online travel agency in China (NASDAQ: CTRP). Mr. Li also acts as the vice chairman of the Internet Society of China (ISC). Mr. Li has also been a vice chairman of All-China Federation of Industry & Commerce and a member of the Chinese People's Political Consultative Conference since December 2012 and 2013, respectively. Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Qi Lu* joined us in January 2017 as chief operating officer and group president and has served as vice chairman of the board of directors since February 2017. Dr. Lu is in charge of products, technology, sales, marketing and operations, including our intelligent driving business. Prior to joining us, Dr. Lu most recently served as Microsoft's global executive vice president and led Applications and Services Group. Dr. Lu joined Microsoft in 2009 as president of its Online Services Group. Earlier in his career, Dr. Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies, and subsequently executive vice president in 2007. Dr. Lu holds both bachelor and master degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University. He holds over 40 US patents and has authored many papers in his field.

*Herman Yu* has served as our chief financial officer since September 2017 and is in charge of our overall finance functions. Prior to joining us, Mr. Yu served as chief financial officer of Weibo Corporation, a social

109

Table of Contents

media in China (NASDAQ: WB) from 2015 to 2017. Prior to Weibo, Mr. Yu worked at SINA Corporation, a portal in China (NASDAQ: SINA) from 2004 to 2015, with the last eight years as chief financial officer. Mr. Yu began his career at Arthur Andersen and held various finance and accounting management positions at Adobe Systems Inc., Cadence Design Systems, Inc. and VeriFone Systems, Inc. Mr. Yu is currently a director of 58.com Inc., an online classifieds listing company (NASDAQ: WUBA), ZTO Express Inc., an express delivery company (NYSE: ZTO), and Ctrip.com International, Ltd., an online travel agency (NASDAQ: CTRP). Mr. Yu, a California Certified Public Accountant, received a bachelor's degree in economics from the University of California, Santa Cruz, and a master's of accountancy from the University of Southern California.

*Lee Liu* currently serves as our senior vice president in charge of human resources functions. Prior to joining Baidu in April 2011, Mr. Liu served as the global vice president of human resources at Motorola from 2009 to 2011. Mr. Liu joined Motorola in 1989 and served in a variety of senior roles in the United States, Singapore and mainland China. Mr. Liu received a bachelor's and master's degree in microelectronics from Tianjin University, and an executive MBA degree from Peking University, and a Ph.D. in economics from Southwestern University of Finance and Economics. Mr. Liu also attended the MBA program on global leadership at the University of Texas-Austin.

*Hailong Xiang* has served as our senior vice president since October 2014 and as general manager of our search related business since April 2016. He is in charge of our search related business products and sales force management. Mr. Xiang joined us in February 2005 following our acquisition of Shanghai Qilang, an internet services firm established by Mr. Xiang in 2000. Mr. Xiang received his bachelor's degree in computer science from East China Normal University.

*Ya-Qin Zhang* currently serves as president of new businesses, in charge of emerging businesses and technology. Prior to joining Baidu in 2014, Dr. Zhang was a corporate vice president at Microsoft and the chairman of Microsoft Asia-Pacific R&D Group for a decade, leading Microsoft's overall research and development efforts in the Asia-Pacific region. Before joining Microsoft in 1999, Dr. Zhang was a director for the Multimedia Technology Laboratory at Sarnoff Corp. Dr. Zhang currently serves on the board of directors of Tarena International, Inc. a professional education service provider (NASDAQ: TEDU), Chinasoft International Ltd (HKEX: 354). and China Digital Video Holdings Ltd. (HKEX: 8280). Dr. Zhang is a fellow of Australia Academy of Technology and Engineering (ATSE) and the Institute of Electrical and Electronics Engineers (IEEE). Dr. Zhang received his bachelor's and master's degree in electrical engineering from the University of Science and Technology of China, and a Ph.D. in electrical engineering from George Washington University.

*James Ding* has served as our independent director since our initial public offering in August 2005. Mr. Ding is currently a managing director of GSR Ventures, which focus on early stage technology, health care and new media companies in China. Prior to that, Mr. Ding served as a co-chairman of the board of directors of AsiaInfo-Linkage Inc., a former NASDAQ-listed company, from July 2010 to January 2014. Prior to that, Mr. Ding served as the chairman of the board of AsiaInfo from April 2003 to July 2010, and a member of the board since AsiaInfo's inception in 1993. Mr. Ding served as the chief executive officer and president of AsiaInfo from 1999 to 2003 and as senior vice president and chief technology officer of AsiaInfo from 1993 to 1999. Mr. Ding currently serves as director of the board of AsiaInfo. Mr. Ding received a master's degree in information science from the University of California, Los Angeles and a bachelor's degree in chemistry from Peking University in China.

*Brent Callinicos* has served as our independent director since October 2015, and as the chairman of our audit committee since April 2016. Mr. Callinicos is currently an advisor for Virgin Hyperloop One and served as the chief operating officer and the chief financial officer of Virgin Hyperloop One from January 2017 to February 2018. Prior to that, Mr. Callinicos served as the chief financial officer of Uber Technologies Inc. from September 2013 to March 2015, and then as an advisor for 18 additional months. Prior to joining Uber, he worked at Google from January 2007 to September 2013, where he last served as vice president, treasurer and chief accountant. He also led green energy investments and financial services at Google Inc. From 1992 to 2007,

110

**Table of Contents**

he served in a variety of increasingly senior roles at Microsoft Corporation, where he last served as corporate vice-president and divisional chief financial officer of the Platforms and Services Division, and oversaw Microsoft's Worldwide Licensing and Pricing and Microsoft Financing. He currently serves on the board of directors of PVH Corp. (NYSE: PVH), and Rubicon Global, a private company. Mr. Callinicos is a certified public accountant. Mr. Callinicos received a bachelor's degree from the University of North Carolina at Chapel Hill and an M.B.A. degree from the Kenan-Flagler School of Business at Chapel Hill.

*Yuanqing Yang* has served as our independent director since October 2015. Mr. Yang is currently the chairman and chief executive officer of Lenovo Group Limited, a Hong Kong-listed company. Mr. Yang joined Lenovo in 1989 and has led the company from the initial China-based PC maker to a diversified global technology leader. In 2011, FinanceAsia named Mr. Yang the Best CEO in China. In 2004 and 2012, Mr. Yang was named one of the "CCTV China Annual Economic Figures." He was listed on Barron's list of Best CEOs in 2013, 2014 and 2015. In 2014, Mr. Yang won an Edison Achievement Award for Innovation. Mr. Yang currently serves as a deputy to the 13th National People's Congress of China. Mr. Yang holds a master's degree in computer science from the University of Science and Technology of China.

**B.    Compensation**

In 2017, we paid an aggregate of approximately RMB127 million (US$20 million) in cash compensation and granted options to purchase an aggregate of 133,861 Class A ordinary shares and 59,202 restricted Class A ordinary shares to our executive officers as of the date of this annual report as a group. We also paid an aggregate of approximately RMB407 thousand (US$63 thousand) in cash compensation and granted options to purchase an aggregate of 48 restricted Class A ordinary shares to our non-executive directors as of the date of this annual report as a group. Our PRC subsidiaries and consolidated affiliated entities are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, housing fund, unemployment insurance and other statutory benefits. Other than the above-mentioned statutory contributions mandated by applicable PRC law, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company except as required under applicable PRC law.

Our board of directors and shareholders approved the issuance of up to 5,040,000 ordinary shares upon exercise of awards granted under our 2000 option plan. Our 2000 option plan terminated in January 2010 upon the expiration of its ten-year term. At the annual general meeting held on December 16, 2008, our shareholders approved a 2008 share incentive plan, which has reserved an additional 3,428,777 Class A ordinary shares for awards to be granted pursuant to its terms. As of December 31, 2017, options to purchase an aggregate of 500,855 Class A ordinary shares and an aggregate of 1,274,500 restricted Class A ordinary shares had been granted under the 2008 share incentive plan.

111

Table of Contents

The following table summarizes, as of December 31, 2017, the outstanding options and restricted Class A ordinary shares that we had granted to our current directors and executive officers and to other individuals as a group. Each Class A ordinary share is represented by 10 ADSs.

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Robin Yanhong Li | 4,247 | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | 4,279 | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | 10,598 | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | 2,415 | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | 221(1) | — | February 24, 2014 | N/A |
| | 11,977 | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | 2,188(1) | — | February 11, 2015 | N/A |
| | 43,904 | 2,069.00 | April 16, 2015 | April 16, 2025 |
| | 43,904(1) | — | April 16, 2015 | N/A |
| | 2,638 | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | 9,060 | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | 2,649(1) | — | October 27, 2016 | N/A |
| | 5,864 | 1860.10 | February 22, 2017 | February 22, 2027 |
| | 5,520(1) | — | February 22, 2017 | N/A |
| Qi Lu | *(1) | — | February 22, 2017 | N/A |
| | * | 1,860.10 | February 22, 2017 | February 22, 2027 |
| Herman Yu | — | — | — | — |
| Lee Liu | * | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | *(1) | — | February 24, 2014 | N/A |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *(1) | — | February 11, 2015 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | February 22, 2017 | N/A |
| | * | 1,860.10 | February 22, 2017 | February 22, 2027 |
| Hailong Xiang | *(1) | — | February 24, 2014 | N/A |
| | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *(1) | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | February 22, 2017 | N/A |
| | * | 1860.10 | February 22, 2017 | February 22, 2027 |
| Ya-Qin Zhang | *(1) | — | October 29, 2014 | N/A |
| | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1860.10 | February 22, 2017 | February 22, 2027 |
| | *(1) | — | February 22, 2017 | N/A |
| James Ding | *(1) | — | February 25, 2016 | N/A |
| Brent Callinicos | *(1) | — | February 25, 2016 | N/A |
| | *(1) | — | July 28, 2016 | N/A |
| | *(1) | — | October 26, 2017 | N/A |
| Yuanqing Yang | *(1) | — | February 25, 2016 | N/A |
| | *(1) | — | October 26, 2017 | N/A |
| Other individuals as a group | 781,426 | — | — | — |

112

Table of Contents

---

\*       The options and restricted shares in aggregate held by each of these directors and officers represent less than 1% of our total outstanding shares.

(1)     Restricted shares.

The following paragraphs summarize the key terms of our 2008 share incentive plan adopted on December 16, 2008:

**2008 Share Incentive Plan**

*Types of Awards.* We may grant the following types of awards under our 2008 share incentive plan:

- options;

- restricted shares;

- restricted share units; and

- any other form of awards granted to a participant pursuant to the 2008 plan.

*Plan Administration.* The compensation committee of our board of directors administers our 2008 share incentive plan, but may delegate to a committee of one or more members of our board of directors the authority to grant or amend awards to participants other than independent directors and executive officers. The compensation committee will determine the provisions and terms and conditions of each award grant, including, but not limited to, the exercise price, the grant price or purchase price, any restrictions or limitations on the award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an award, based in each case on such considerations as the committee in its sole discretion determines. The compensation committee has the sole power and discretion to cancel, forfeit or surrender an outstanding award (whether or not in exchange for another award or combination or awards).

*Award Agreement.* Awards granted under our 2008 share incentive plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each award which may include the term of an award, the provisions applicable in the event the participant's employment or service ends, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an award.

*Eligibility.* We may grant awards to employees, directors and consultants of our company or any of our related entities, which include our subsidiaries or any entities in which we hold a substantial ownership interest. However, we may grant ISOs only to our employees and employees of our majority-owned subsidiaries.

*Acceleration of Awards upon Corporate Transactions.* The outstanding awards will accelerate (i) upon occurrence of a change-of-control corporate transaction where any person acquires at least 50% of the total combined voting power of our outstanding securities or the incumbent board members no longer constitute at least 50% of our board, or (ii) upon occurrence of any other change-of-control corporate transaction in which the successor entity does not assume our outstanding awards under our 2008 share incentive plan, provided that the plan participant remains an employee, consultant or member of our board of directors on the effective date of the corporate transaction. In such event, each outstanding award will become fully exercisable and all forfeiture restrictions on such award will lapse immediately prior to the specified effective date of the corporate transaction.

If the successor entity assumes our outstanding awards and later terminates the grantee's employment or service without cause within 12 months of the corporate transaction, or if the grantee resigns voluntarily with good reason, the outstanding awards automatically will become fully vested and exercisable. The compensation

113

**Table of Contents**

committee may also, in its sole discretion, upon or in anticipation of a corporate transaction, accelerate awards, purchase the awards from the plan participants, replace the awards, or provide for the payment of the awards in cash.

*Exercise Price and Term of Awards.* The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the compensation committee, the determination of which shall be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices of options mentioned in the preceding sentence shall be effective without the approval of our shareholders or the approval of the affected grantees. If we grant an ISO to an employee, who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of our share capital, the exercise price cannot be less than 110% of the fair market value of our ordinary shares on the date of that grant. The compensation committee will determine the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting. The term may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of our share capital.

*Restricted Shares and Restricted Share Units.* The compensation committee is also authorized to make awards of restricted shares and restricted share units. Except as otherwise determined by the compensation committee at the time of the grant of an award or thereafter, upon termination of employment or service during the applicable restriction period, restricted shares that are at the time subject to restrictions shall be forfeited or repurchased in accordance with the respective award agreements.

*Vesting Schedule.* The compensation committee determines, and the award agreement specifies, the vesting schedule of options and other awards granted. The compensation committee determines the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting, and also determines any conditions that must be satisfied before all or part of an option may be exercised. At the time of grant for restricted share units, the compensation committee specifies the date on which the restricted share units become fully vested and non-forfeitable, and may specify such conditions to vesting as it deems appropriate.

*Amendment and Termination.* With the approval of our board of directors, the compensation committee may at any time amend, suspend or terminate our 2008 share incentive plan. Amendments to our 2008 share incentive plan are subject to shareholder approval, to the extent required by law, or by stock exchange rules or regulations. Any amendment, suspension or termination of our 2008 share incentive plan must not adversely affect in any material way awards already granted without written consent of the recipient of such awards. Unless terminated earlier, our 2008 share incentive plan shall continue in effect for a term of ten years from the date of adoption.

## C.   Board Practices

### Board of Directors

Our board of directors has five directors. A director is not required to hold any shares in the company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested. A director may exercise all the powers of the company to borrow money, mortgage its undertakings, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. The remuneration to be paid to the directors is determined by the board of directors. There is no age limit requirement for directors.

### Committees of the Board of Directors

We have three committees under the board of directors: an audit committee, a compensation committee and a corporate governance and nominating committee. We have adopted a charter for each of the three committees.

114

Table of Contents

### Audit Committee

Our audit committee consists of Brent Callinicos, James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act. Our board of directors has determined that Mr. Callinicos is an audit committee financial expert as defined in the instructions to Item 16A of the Form 20-F. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;

- pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing annually the independence and quality control procedures of the independent auditors;

- reviewing and approving all proposed related party transactions;

- discussing the annual audited financial statements with the management;

- meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

- attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

In 2017, our audit committee held meetings or passed resolutions by unanimous written consent seven times.

### Compensation Committee

Our compensation committee consists of James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving our compensation structure, including all forms of compensation relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting while his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

In 2017, our compensation committee held meetings or passed resolutions by unanimous written consent five times.

### Corporate Governance and Nominating Committee

Our corporate governance and nominating committee consists of James Ding and Yuanqing Yang, both of whom satisfy the "independence" requirements of Rule 5605(a) (2) of the NASDAQ Stock Market Rules. The

115

**Table of Contents**

corporate governance and nominating committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee is responsible for, among other things:

- recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

- reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

- overseeing the board in the board's annual review of its own performance and the performance of the management; and

- considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required or required to be disclosed under the applicable laws or otherwise considered to be material.

In 2017, our corporate governance and nominating committee passed resolutions by unanimous written consent twice.

**Terms of Directors and Executive Officers**

All directors hold office until their successors have been duly elected and qualified. None of our directors is subject to a fixed term of office. In addition, the service agreements between us and the directors do not provide benefits upon termination of their services. Director nomination is subject to the approval of our corporate governance and nominating committee. Our shareholders may remove any director by ordinary resolution and may in like manner appoint another person in his stead. A valid ordinary resolution requires a majority of the votes cast at a shareholder meeting that is duly constituted and meets the quorum requirement. Officers are elected by and serve at the discretion of the board of directors.

**D.    Employees**

We had 41,467, 45,887 and 39,343 employees as of December 31, 2015, 2016 and 2017, respectively. As of December 31, 2017, we had 2,047 employees in management and administration, 20,563 employees in research and development, 4,341 employees in operation and service, and 12,392 employees in sales and marketing. As of December 31, 2017, we had 24,398 employees in Beijing, 14,684 employees outside of Beijing but within China, and 261 employees outside of China. We also hire temporary employees and contractors from time to time. Our employees are not covered by any collective bargaining agreement. We consider our relations with our employees to be generally good. However, as our operations and employee base further expand, we cannot assure you that we will always be able to maintain good relations with all of our employees. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may not be able to manage our expanding operations effectively."

**E.    Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our shares as of January 31, 2018 by:

- each of our current directors and executive officers; and

- each person known to us to own beneficially more than 5% of our shares.

116

Table of Contents

See "—B. Compensation" for more details on options and restricted shares granted to our directors and executive officers.

| Directors and Executive Officers: | Shares Beneficially Owned | |
| --- | --- | --- |
| | Number[1] | %[2] |
| Robin Yanhong Li[3] | 5,615,344 | 16.1% |
| Qi Lu | * | * |
| Herman Yu | — | — |
| Lee Liu | * | * |
| Ya-Qin Zhang | * | * |
| Hailong Xiang[4] | * | * |
| James Ding[5] | * | * |
| Brent Callinicos[6] | * | * |
| Yuanqing Yang[7] | * | * |
| All Directors and Executive Officers as a Group[8] | 5,671,083 | 16.3% |
| **Principal Shareholders:** | | |
| Handsome Reward Limited[9] | 5,490,000 | 15.8% |
| Baillie Gifford & Co (Scottish partnership)[10] | 2,281,972 | 6.6% |

\*      Less than 1% of our total outstanding Class A ordinary shares and Class B ordinary shares.

\*\*     Except for Hailong Xiang, James Ding, Yuanqing Yang and Brent Callinicos, the business address of our directors and executive officers is c/o Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(1)    The number of shares beneficially owned by each named director and executive officer includes the shares beneficially owned by such person, the shares underlying all options held by such person that have vested or will vest within 60 days after January 31, 2018, and restricted shares held by such person that will vest within 60 days after January 31, 2018. The options and restricted shares were granted under our 2008 share incentive plan.

(2)    Percentage of beneficial ownership of each named director and executive officer is based on 34,816,248 ordinary shares (consisting of 27,614,994 Class A ordinary shares and 7,201,254 Class B ordinary shares) of our company outstanding as of January 31, 2018, the number of ordinary shares underlying options that have vested or will vest within 60 days after January 31, 2018, and the number of restricted shares that will vest within 60 days after January 31, 2018, each as held by such person as of that date.

(3)    Includes (i) 37,665 Class A Ordinary Shares directly held by Mr. Li on record, (ii) 21,481 Class A ordinary shares in the form of ADSs held in the brokerage account of the administrator of the issuer's employee stock option program, (iii) 5,980 restricted Class A Ordinary Shares that had vested as of January 31, 2018, (iv) 60,218 Class A Ordinary Shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of January 31, 2018, and (v) 5,490,000 Class B Ordinary Shares held by Handsome Reward Limited, a British Virgin Islands company wholly owned and controlled by Mr. Li, and excludes 1,510,000 Class B Ordinary Shares owned by Melissa Ma, Mr. Li's wife, who also had the right to acquire 555 Class A Ordinary Shares upon the vesting of restricted share units granted under the Company's share incentive plan within 60 days after January 31, 2018, of which Mr. Li disclaims beneficial ownership.

(4)    The business address of Mr. Xiang is No.1 Baidu Technology Park Building, No.10 Xibeiwang East Road Haidian District, Beijing 100193, China.

(5)    The business address of Mr. Ding is 56/F, China World Tower 3, No. 1 Jianguomenwai Street, Chaoyang District, Beijing 100004, PRC.

(6)    The residential address of Mr. Callinicos is 4110 Woodleigh Lane, La Canada Flintridge, CA 91011. USA.

(7)    The business address of Mr. Yang is c/o Lenovo, No. 6 Shangdi West Road, Haidian District, Beijing 100085, PRC.

(8)    Includes ordinary shares, ordinary shares issuable upon exercise of options and restricted shares, held by all of our directors and executive officers as a group.

(9)    Represents 5,490,000 Class B ordinary shares held by Handsome Reward Limited, a British Virgin Island company wholly owned and controlled by Mr. Robin Yanhong Li. The business address of Handsome Reward Limited is c/o Robin Yanhong Li, Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(10)   Represents 2,281,972 Class A ordinary shares in the form of ADSs held by Baillie Gifford & Co (Scottish partnership), as reported on the Schedule 13G filed by Baillie Gifford & Co (Scottish partnership) on January 10, 2018. The percentage of beneficial ownership was calculated based on the total number of our ordinary shares outstanding as of January 31, 2018. The address of Baillie Gifford & Co (Scottish partnership) is Calton Square, 1 Greenside Row, Edinburgh EH1 3AN, Scotland, UK.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering in 2005. Holders of our Class B ordinary shares may choose to convert their Class B ordinary shares into the same number of Class A ordinary shares at any time. We are not aware of any arrangement that may, at a subsequent

117

**Table of Contents**

date, result in a change of control of our company. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our ADSs—Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial."

As of January 31, 2018, 34,816,248 of our ordinary shares were issued and outstanding. To our knowledge, approximately 79.8% of our total outstanding ordinary shares were held by four record shareholders in the United States, including approximately 79.2% held by The Bank of New York Mellon, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

**Item 7.        Major Shareholders and Related Party Transactions**

**A.    Major Shareholders**

Please refer to "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

**B.    Related Party Transactions**

See "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders."

Our subsidiaries, consolidated affiliated entities, and the subsidiaries of the consolidated affiliated entities have engaged, during the ordinary course of business, in a number of customary transactions with each other. All of these inter-company balances have been eliminated in consolidation.

As of December 31, 2015, 2016 and 2017, we had RMB2.0 billion, RMB357 million and RMB177 million (US$27 million), respectively, due from related parties. The decrease of the balance from December 31, 2016 to December 31, 2017 was primarily due to more timely settlement of transactions incurred in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of February 28, 2018 was RMB402 million (US$62 million). The decrease of the balance from December 31, 2015 to December 31, 2016 was primarily due to repayment of loans that we had provided to certain investees, offset by the increased transactions amount incurred in the ordinary course of business with certain investees that were determined to be related parties.

As of December 31, 2015, 2016 and 2017, we had RMB786 million, RMB459 million and RMB153 million (US$24 million), respectively, due to related parties. The decrease of the balance from December 31, 2016 to December 31, 2017 was primarily due to more timely settlement of transactions incurred in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of February 28, 2018 was RMB159 million (US$24 million). The decrease of the balance from December 31, 2015 to December 31, 2016 was primarily due to repayment of loans that certain investees had provided to us, offset by the increased transactions amount incurred in the ordinary course of business with certain investees that were determined to be related parties.

For the years ended December 31, 2015, 2016 and 2017, the related party transactions mainly represented the online marketing services that we provided to Ctrip (including Qunar), which were in the total amount of RMB89 million, RMB631 million and RMB750 million (US$115 million), respectively.

In 2015, 2016 and 2017, with the approval from our board of directors, we reimbursed Mr. Robin Yanhong Li the fees and expenses incurred in connection with his use of an aircraft beneficially owned by his family member for our business purposes. The hourly rate for use of the aircraft was determined based on an analysis of market rates for the charter of comparable aircrafts. The service charges for the use of the aircraft for 2015, 2016 and 2017 were insignificant.

118

**Table of Contents**

In 2015, 2016 and 2017, certain subsidiaries of ours rent an office building owned by the family members of Mr. Hailong Xiang, one of our executive officers and certain subsidiaries of ours purchased traffic from the companies owned by the family members of Mr. Hailong Xiang. The amount of rental expenses and traffic acquisition costs for 2015, 2016 and 2017 were insignificant.

**Share Options and Restricted Shares Grants**

Please refer to "Item 6.B. Directors, Senior Management and Employees—Compensation."

**C.    Interests of Experts and Counsel**

Not applicable.

**Item 8.    Financial Information**

**A.    Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

**Legal Proceedings**

From time to time, we have been involved in litigation or other disputes regarding, among other things, copyright and trademark infringement, defamation, unfair competition and labor disputes. Our search results provide links to materials, and our P4P, Baidu Post Bar, Baidu Cloud Drive, iQIYI and certain other products or services may contain materials, in which others may allege to own copyrights, trademarks or image rights or which others may claim to be defamatory or objectionable.

In 2017, 2,687 complaints were filed against us before various courts in China and Brazil, and the aggregate amount of the damages sought in these complaints totals approximately RMB861 million (US$132 million). As of December 31, 2017, 1,753 cases against us were pending before various courts in China and Brazil. The aggregate amount of damages sought under these pending cases is approximately RMB576 million (US$88 million).

For many of these legal proceedings, we are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial. However, we believe that such proceedings, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material and adverse effect on our results of operations, financial position and cash flows.

**Dividend Policy**

Baidu, Inc., our holding company in the Cayman Islands, has never declared or paid any dividends on our ordinary shares, nor do we have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

Our board of directors has complete discretion as to whether to distribute dividends, subject to Cayman Islands law. Even if our board of directors decides to pay dividends, the form, frequency and amount of our

119

**Table of Contents**

dividends will depend upon our future operations and earnings, capital requirements and surplus, financial condition, contractual restrictions and other factors that our board of directors may deem relevant. If we pay any dividends, our depositary will distribute such dividends to our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

**B.    Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item. 9    The Offer and Listing**

**A.    Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Market since August 5, 2005. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "BIDU." Prior to May 12, 2010, one ADS represented one Class A ordinary share. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split.

The following table provides the high and low trading prices for our ADSs on NASDAQ for (i) the years 2013, 2014, 2015, 2016 and 2017, (ii) each of the four quarters of 2016 and 2017, and (iii) each of the past six full months.

| | Trading Price | |
| --- | --- | --- |
| | High | Low |
| **Annual Highs and Lows** | | |
| 2013 | 181.25 | 82.98 |
| 2014 | 251.99 | 140.66 |
| 2015 | 234.67 | 100.00 |
| 2016 | 201.00 | 139.61 |
| 2017 | 274.97 | 165.82 |
| **Quarterly Highs and Lows** | | |
| First Quarter 2016 | 193.73 | 139.61 |
| Second Quarter 2016 | 201.00 | 155.28 |
| Third Quarter 2016 | 197.80 | 155.28 |
| Fourth Quarter 2016 | 187.24 | 159.54 |
| First Quarter 2017 | 188.54 | 165.82 |
| Second Quarter 2017 | 193.74 | 171.17 |
| Third Quarter 2017 | 248.00 | 179.63 |
| Fourth Quarter 2017 | 274.97 | 225.50 |
| **Monthly Highs and Lows** | | |
| September 2017 | 248.00 | 223.54 |
| October 2017 | 274.97 | 232.44 |
| November 2017 | 252.90 | 226.01 |
| December 2017 | 242.00 | 225.50 |
| January 2018 | 265.77 | 235.26 |
| February 2018 | 257.56 | 207.74 |
| March 2018 (through March 14, 2018) | 270.58 | 240.66 |

**B.    Plan of Distribution**

Not applicable.

120

**Table of Contents**

**C.**   **Markets**

Our ADSs have been listed on NASDAQ since August 5, 2005 under the symbol "BIDU".

**D.**   **Selling Shareholders**

Not applicable.

**E.**   **Dilution**

Not applicable.

**F.**   **Expenses of the Issue**

Not applicable.

**Item 10.**      **Additional Information**

**A.**   **Share Capital**

Not applicable.

**B.**   **Memorandum and Articles of Association**

The following are summaries of material provisions of our third amended and restated memorandum and articles of association, as well as the Companies Law (2016 Revision) insofar as they relate to the material terms of our ordinary shares.

**Registered Office and Objects**

The Registered Office of our company is at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands or at such other place as our board of directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Law (2016 Revision), as amended from time to time, or any other law of the Cayman Islands.

**Board of Directors**

See "Item 6.C. Directors, Senior Management and Employees—Board Practices—Board of Directors."

**Ordinary Shares**

*General.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are nonresidents of the Cayman Islands may freely hold and vote their shares.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Companies Law.

*Conversion.* Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances.

121

**Table of Contents**

Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder (as defined in our articles of incorporation), such Class B ordinary shares shall be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time our chairman and chief executive officer, Robin Yanhong Li, and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share shall be automatically and immediately converted into one share of Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

*Voting Rights.* All of our shareholders have the right to receive notice of shareholders' meetings and to attend, speak and vote at such meetings. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to 10 votes. A shareholder may participate at a shareholders' meeting in person, by proxy or by telephone conference or other communications equipment by means of which all the shareholders participating in the meeting can communicate with each other. At any shareholders' meeting, a resolution put to the vote of the meeting shall be decided on a poll conducted by the chairman of the meeting.

A quorum for a shareholders' meeting consists of one or more shareholders holding at least one third of the paid up voting share capital present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. We shall, if required by the Companies Law, hold a general meeting of shareholders as our annual general meeting and shall specify the meeting as such in the notices calling it. Our board of directors may call extraordinary general meetings, and they must on shareholders' requisition convene an extraordinary general meeting. A shareholder requisition is a requisition of shareholders holding at the date of deposit of the requisition not less than a majority of the voting power represented by the issued shares of our company as at that date carries the right of voting at general meetings of our company. Advance notice of at least five days is required for the convening of our annual general meeting and other shareholders' meetings.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the ordinary shares cast in a general meeting. A special resolution is required for matters such as a change of name. Holders of the ordinary shares may effect certain changes by ordinary resolution, including consolidating and dividing all or any of our share capital into shares of larger amount than our existing share capital and canceling any shares.

*Transfer of Shares.* Subject to the restrictions of our memorandum and articles of association, as applicable, any of our shareholders may transfer any or all of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

Our board of directors may, in their absolute discretion (except with respect to a transfer from a shareholder to its affiliate(s)), decline to register any transfer of shares without assigning any reason thereof. If our board of directors refuses to register a transfer they shall notify the transferee within two months of such refusal. Notwithstanding the foregoing, if a transfer complies with the holder's transfer obligations and restrictions set forth under applicable law (including but not limited to U.S. securities law provisions related to insider trading) and our articles of association, our board of directors shall promptly register such transfer. Further, any director is authorized to confirm in writing addressed to the registered office to authorize a share transfer and to instruct that the register of members be updated accordingly, provided that the transfer complies with the holder's transfer obligations and restrictions set forth under applicable law and our articles of association and such holder is not the director who authorizes the transfer or an entity affiliated with such director. Any director is authorized to execute a share certificate in respect of such shares for and on behalf of our company.

The registration of transfers may be suspended at such time and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended for more than 45 days in any year.

Table of Contents

*Liquidation.* On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of ordinary shares may be distributed among the holders of the ordinary shares as determined by the liquidator, subject to sanction of a special resolution of our company. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by such shareholders respectively.

*Calls on Shares and Forfeiture of Shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. The shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption of Shares.* Subject to the provisions of the Companies Law and our articles of association, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner as our board of directors may determine.

*Repurchase of Shares.* Subject to the provisions of the Companies Law and our articles of association, our board of directors may authorize repurchase of our shares in accordance with the manner of purchase specified in our articles of association without seeking shareholder approval.

*Variations of Rights of Shares.* All or any of the special rights attached to any class of shares may, subject to the provisions of the Companies Law, be varied either with the written consent of the holders of a majority of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Inspection of Books and Records.* No holders of our ordinary shares who is not a director shall have any right of inspecting any of our accounts, books or documents except as conferred by the Companies Law or authorized by the directors or by us in general meeting. However, we will make this annual report, which contains our audited financial statements, available to shareholders and ADS holders. See "Item 10.H. Additional Information—Documents on Display."

**Preferred Shares**

Our board of directors has the authority, without shareholder approval, to issue up to a total of 10,000,000 shares of preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may set the designations, preferences, powers and other rights of the shares of a series of preferred shares. While the issuance of preferred shares provides us with flexibility in connection with possible acquisitions or other corporate purposes, it could, among other things, have the effect of delaying, deferring or preventing a change of control transaction and could adversely affect the market price of our ADSs. We have no current plan to issue any preferred shares.

**C.    Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

**D.    Exchange Controls**

See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Foreign Exchange."

123

Table of Contents

**E.    Taxation**

The following summary of the material Cayman Islands, People's Republic of China and U.S. federal income tax consequences of an investment in our ADSs or ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or ordinary shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Tax Considerations**

According to Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, the Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within, the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Tax Considerations**

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the 10% EIT on the dividends payable by us or any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is also possible that such dividends and gains earned by non-resident individuals may be subject to the 20% PRC individual income tax. It is uncertain whether, if we are considered a PRC resident enterprise, holders of our shares or ADSs would be able to claim the benefit of tax treaties or arrangements entered into between China and other jurisdictions.

If we are required under the PRC tax law to withhold PRC income tax on our dividends payable to our non-PRC resident shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident shareholders and ADS holders are subject to the EIT or the individual income tax, your investment in our shares or ADSs could be materially and adversely affected.

**U.S. Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or ordinary shares as capital assets. This discussion is based on the tax laws of the United States as in effect on the date of this annual report on Form 20-F and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this annual report on Form 20-F, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

124

Table of Contents

- insurance companies;

- broker dealers;

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own ADSs or ordinary shares representing 10% or more of our voting power or value;

- persons whose functional currency is other than the U.S. dollar; or

- persons who acquired ADSs or ordinary shares pursuant to the exercise of any employee share option or otherwise as consideration.

**U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of ownership and disposition of ADSs or ordinary shares.**

The discussion below of the U.S. federal income tax consequences will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- a citizen or individual resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

- a trust that (i) is subject to the supervision of a court within the United States and the control of one or more United States persons or (ii) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or ordinary shares, or of persons who hold the ADSs or ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold ADSs, you will be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, or state, local or non-U.S. tax laws or the Medicare tax on certain net investment income. We have not

125

**Table of Contents**

sought, and will not seek, a ruling from the Internal Revenue Service (the "IRS"), or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

### Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares

Subject to the passive foreign investment company rules discussed below, the gross amount of all our distributions to you with respect to the ADSs or ordinary shares will be included in your gross income as dividend income on the date of receipt by the depositary, in the case of ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution paid will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to non-corporate U.S. Holders (including individual U.S. Holders), dividends may be taxed at the lower applicable capital gains rate provided that (i) the ADSs or ordinary shares are readily tradable on an established securities market in the United States or we are eligible for the benefit of the income tax treaty between the United States and the PRC, (ii) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend was paid or for the preceding taxable year, (iii) certain holding period requirements are met and (iv) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the NASDAQ Global Select Market will generally be considered to be readily tradable on an established securities market in the United States. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

For U.S. foreign tax credit purposes, dividends paid on the ADSs or ordinary shares will generally be treated as income from foreign sources and will generally constitute passive category income. If PRC withholding taxes apply to dividends paid to you with respect to the ADSs or ordinary shares, you may be able to obtain a reduced rate of PRC withholding taxes under the income tax treaty between the United States and the PRC if certain requirements are met. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends that are non-refundable under the income tax treaty between the United States and the PRC may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

### Sale, Exchange or Other Disposition of the ADSs or Ordinary Shares

Subject to the passive foreign investment company rules discussed below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss will generally be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC "resident enterprise" under PRC tax law, we may be eligible for the benefits of the income tax treaty between the United States and the PRC. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or ordinary shares, a U.S. Holder that is eligible for the benefits of the income tax treaty between the United States and the PRC may elect to treat such gain as PRC source income. U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

126

Table of Contents

*Passive Foreign Investment Company*

A non-U.S. corporation, such as our own, is considered a passive foreign investment company or "PFIC" for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test"). We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the shares. Although the law in this regard is not entirely clear, we treat our variable interest entities as being owned by us for U.S. federal income tax purposes because we control their management decisions and we are entitled to receive economic benefits that could potentially be significant to them and, as a result, we consolidate their results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of our variable interest entities for U.S. federal income tax purposes, we would likely be treated as a PFIC for our taxable year ended December 31, 2018 and for subsequent taxable years.

Based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, we believe that, even under the least favorable interpretations of what portion of goodwill and certain other assets are treated as "passive," we were not a PFIC for our taxable year ended December 31, 2016 or for our taxable year ended December 31, 2017. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. We do not expect to be a PFIC for our taxable year ending December 31, 2018 or for the foreseeable future. However, our PFIC status for the current taxable year ending December 31, 2018 will not be determinable until the close of the taxable year, and, accordingly, there is no guarantee that we will not be a PFIC for the current taxable year (or any future taxable year). Under certain interpretations of how one determines what portion of goodwill and certain other assets are treated as "passive," we may have been a PFIC for 2015. We believe under more reasonable approaches for our circumstances that we were not a PFIC for our taxable year ended December 31, 2015. If you were a holder of our ADSs or ordinary shares during the taxable year ended December 31, 2015, you are urged to consult your tax advisor regarding the application of the PFIC rules to your investment.

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In particular, because the total value of our assets for purposes of the asset test will generally be calculated using the market price of the ADSs and ordinary shares, our PFIC status will depend in large part on the market price of the ADSs and ordinary shares, which may fluctuate considerably. Accordingly, fluctuations in the market price of the ADSs and ordinary shares may result in our being a PFIC for any year. If we are a PFIC for any year during which you hold the ADSs or ordinary shares, we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADSs or ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to the ADSs or ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold ADSs or ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ADSs or ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than 125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs or ordinary shares,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, will be treated as ordinary income, and

127

Table of Contents

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or ordinary shares cannot be treated as capital, even if you hold the ADSs or ordinary shares as capital assets.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding paragraphs. The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury regulations. We expect that the ADSs will continue to be listed on the NASDAQ Global Select Market, which is a qualified exchange for these purposes, and, consequently, assuming that the ADSs are regularly traded, if you are a holder of ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC. However, a mark-to-market election may not be made with respect to our ordinary shares as they are not marketable stock. If you make a valid mark-to-market election for the ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs as of the close of your taxable year over your adjusted basis in such ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs, as well as to any loss realized on the actual sale or disposition of the ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs. Your basis in the ADSs will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or ordinary shares.

If you hold ADSs or ordinary shares in any year in which we are a PFIC, you will be required to file an annual information report containing such information as the U.S. Treasury may require.

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in ADSs or ordinary shares.

### *Information Reporting and Backup Withholding*

Dividend payments with respect to ADSs or ordinary shares and proceeds from the sale, exchange or redemption of ADSs or ordinary shares may be subject to information reporting to the IRS and possible U.S.

128

**Table of Contents**

backup withholding. Backup withholding will not apply to you, however, if you furnish a correct taxpayer identification number and make any other required certification or that are otherwise exempt from backup withholding. U.S. Holders that are required to establish their exempt status generally must provide such certification on IRS Form W-9. You should consult your tax advisor regarding the application of the U.S. information reporting and backup withholding rules.

Backup withholding is not an additional tax. Amounts withheld as backup withholding can be credited against your U.S. federal income tax liability, and you may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS and furnishing any required information in a timely manner.

Individual U.S. Holders and certain entities may be required to submit to the IRS certain information with respect to his or her beneficial ownership of the ADSs or ordinary shares, if such ADSs or ordinary shares are not held on his or her behalf by a financial institution. This law also imposes penalties if an individual U.S. Holder is required to submit such information to the IRS and fails to do so.

**F.    Dividends and Paying Agents**

Not applicable.

**G.    Statement by Experts**

Not applicable.

**H.    Documents on Display**

We are subject to the periodic reporting and other informational requirements of the Exchange Act, and are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. All information filed with the SEC can be obtained over the internet at the SEC's website at www.sec.gov or inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of documents, upon payment of a duplicating fee, by writing to the SEC. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish The Bank of New York Mellon, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at http://ir.baidu.com. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.    Subsidiary Information**

Not applicable.

129

**Table of Contents**

**Item 11.    Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to excess cash invested in short-term instruments with original maturities of less than a year and bank borrowings that have a floating rate of interest.

Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates, or we may suffer losses in principal if we have to sell securities which have declined in market value due to changes in interest rates. For example, as of December 31, 2017, we had RMB78.7 billion (US$12.1 billion) fixed-income short-term investments, with a weighted average duration of approximately 0.4 years. A hypothetical one percentage point (100 basis-point) increase in interest rates would have resulted in a decrease of approximately RMB393 million (US$60 million) in the fair value of our fixed-income short-term investments as of December 31, 2017. We have not been, and do not expect to be, exposed to material interest rate risks relating to our investment in short-term instruments, and therefore have not used any derivative financial instruments to manage such interest risk exposure.

Our exposure to interest rate risk also arises from our bank borrowings that have a floating rate of interest. The costs of floating rate borrowings may be affected by the fluctuations in the interest rates. We manage this risk by maintaining an appropriate mix between fixed and floating rate borrowings and through the use of interest rate swap contracts. In connection with the loan facilities entered into in June 2016, we entered into four interest rate swap agreements, which effectively convert the term loans from a variable interest rate to a fixed rate, thereby managing our exposure to changes in market interest rates under the term loans. See "Item 5.B. Operating and Financial Review and Prospects—Liquidity and Capital Resources."

**Foreign Exchange Risk**

Most of our revenues and costs are denominated in RMB, while a portion of our cash and cash equivalents, short-term financial assets, long-term investments, long-term loans payable and notes payable are denominated in U.S. dollars. Any significant revaluation of RMB against the U.S. dollar may materially affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADS in U.S. dollars. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on our results of operations and the value of your investment." In addition, we commenced operation in Japan in late 2007. To the extent we need to make capital injections into our Japan operation by converting U.S. dollars into Japanese Yen, we will be exposed to the fluctuations in the exchange rate between the U.S. dollar and the Japanese Yen. We have not used any derivative financial instruments to hedge exposure to foreign exchange risk.

The RMB appreciated by 6.71% against the U.S. dollar in 2017. As of December 31, 2017, we had RMB-denominated cash and cash equivalents, restricted cash and short-term investments of RMB96.9 billion, and U.S. dollar-denominated cash and cash equivalents, restricted cash and short-term investments of US$543 million. Assuming we had converted RMB96.9 billion into U.S. dollars at the exchange rate of RMB6.5063 for US$1.00 as of the end of 2017, our U.S. dollar cash balance would have been US$15.4 billion. If the RMB had appreciated by 10% against the U.S. dollar, our U.S. dollar cash balance would have been US$17.1 billion instead. Assuming we had converted US$543 million into RMB at the exchange rate of RMB6.5063 for US$1.00 as of the end of 2017, our RMB cash balance would have been RMB100.5 billion. If the RMB had appreciated by 10% against the U.S. dollar, our RMB cash balance would have been RMB100.1 billion instead. In addition, we had U.S. dollar-denominated long-term loans payable and notes payable of US$6.5 billion as of December 31, 2017. A hypothetical 10% increase in the exchange rate of the U.S. dollar against the RMB would have resulted in an increase of RMB4.2 billion (US$650 million) in the value of our U.S. dollar-denominated long-term loans payable and notes payable as of December 31, 2017.

130

**Table of Contents**

**Item 12.      Description of Securities Other than Equity Securities**

**A.      Debt Securities**

Not applicable.

**B.      Warrants and Rights**

Not applicable.

**C.      Other Securities**

Not applicable.

**D.      American Depositary Shares**

**Fees and Charges Our ADS holders May Have to Pay**

The Bank of New York Mellon, the depositary of our ADS program, collects its fees for delivery and surrender of ADSs directly from investors depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid. The Depositary's Office is located at a different address than its principal executive office. Its Office is located at 101 Barclay Street, New York, N.Y. 10286, and its principal executive office is located at 225 Liberty Street, New York, N.Y. 10286. The depositary's corporate trust office at which the ADSs will be administered is located at 101 Barclay Street, New York, New York 10286. The depositary's principal executive office is located at 225 Liberty Street, 21st Floor, New York, New York 10286.

| Persons depositing or withdrawing shares must pay: | For: |
| --- | --- |
| US$5.00 (or less) per 1,000 ADSs (or portion of 1,000 ADSs) | • Issuance of ADSs, including issuances resulting from a distribution of shares or rights or other property |
| US$0.05 (or less) per ADS | • Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| US$0.02 (or less) per ADS | • Any cash distribution to registered ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed had been shares and the shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to registered ADS holders |
| US$0.02 (or less) per ADS per calendar year (if the depositary has not collected any cash distribution fee during that year) | • Depositary services |
| Expenses of the depositary | • Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |
| | • Converting foreign currency to U.S. dollars |
| Registration or transfer fees | • Transfer and registration of shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw shares |

131

Table of Contents

| Persons depositing or withdrawing shares must pay: | For: |
|---|---|
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with investor relationship programs and any other program related to our ADS facility and the travel expense of our key personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. In 2018, we are expecting to receive approximately US$5 million (before tax) reimbursement from the depositary for our expenses incurred in connection with investor relationship programs related to the ADS facility and the travel expense of our key personnel in connection with such programs.

## PART II

**Item 13.    Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.    Material Modifications to the Rights of Security Holders and Use of Proceeds**

None.

**Item 15.    Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2017, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria

132

**Table of Contents**

established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2017.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2017, as stated in its report, which appears on page F-2 of this annual report on Form 20-F.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 16A.        Audit Committee Financial Expert**

Our board of directors has determined that Mr. Brent Callinicos, an independent director (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and chairman of our audit committee, is an audit committee financial expert.

**Item 16B.        Code of Ethics**

In July 2005, our board of directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors. We have posted a copy of our code of business conduct and ethics on our website at http://ir.baidu.com.

**Item 16C.        Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated.

| | 2016 | 2017 |
|---|---|---|
| Audit fees[1] | US$2,677,284 | US$3,147,371 |
| Audit-related fees[2] | US$ 284,664 | US$ 46,109 |
| Tax fees[3] | US$ 30,502 | US$ 32,190 |

(1)    "Audit fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements and assistance with and review of documents filed with the SEC. In 2016 and 2017, the audit refers to financial audit and audit pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

(2)    "Audit-related fees" means fees billed in 2016 and 2017 for professional services rendered by our principal auditors associated with certain due diligence projects.

(3)    "Tax fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for tax compliance, tax advice, and tax planning. In 2016 and 2017, the tax fees refer to fees paid to our principal auditors for reviewing the compliance of our tax documentation and providing tax advices.

**Table of Contents**

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee. Our audit committee has adopted a combination of two approaches in pre-approving proposed services: general pre-approval and specific pre-approval. With general approval, proposed services are pre-approved without consideration of specific case-by-case services; with specific approval, proposed services require the specific pre-approval of the audit committee. Unless a type of service has received general pre-approval, it will require specific pre-approval by our audit committee. Any proposed services exceeding pre-approved cost levels or budgeted amounts will also require specific pre-approval by our audit committee.

All requests or applications for services to be provided by our independent auditors that do not require specific approval by our audit committee will be submitted to our chief financial officer and must include a detailed description of the services to be rendered. The chief financial officer will determine whether such services are included within the list of services that have received the general pre-approval of the audit committee. The audit committee will be informed on a timely basis of any such services. Requests or applications to provide services that require specific approval by our audit committee will be submitted to the audit committee by both our independent auditors and our chief financial officer and must include a joint statement as to whether, in their view, the request or application is consistent with the SEC's rules on auditor independence.

**Item 16D.    Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

On October 22, 2015, our board of directors authorized a share repurchase program, under which we may repurchase up to US$2.0 billion of our ADSs or ordinary shares over 24 months from October 22, 2015 through October 21, 2017. The share repurchase program was publicly announced on October 29, 2015.

The table below is a summary of the shares repurchased by us in 2017. All shares were repurchased in the open market pursuant to the share repurchase program announced on October 29, 2015.

| Period | Total Number of ADSs Purchased | Average Price Paid Per ADS | Total Number of ADSs Purchased as Part of the Publicly Announced Plan | Approximate Dollar Value of ADSs that May Yet Be Purchased Under the Plan |
|---|---|---|---|---|
| March 1 – March 31, 2017 | 1,174,190 | US$170.66 | 1,174,190 | US$1,799,616,313 |
| April 1 – April 30, 2017 | — | — | — | — |
| May 1 – May 31, 2017 | — | — | — | — |
| June 1 – June 30, 2017 | 283,632 | US$176.58 | 283,632 | US$1,749,532,498 |
| July 1 – July 31, 2017 | — | — | — | — |
| August 1 – August 3, 2017 | 8 | US$224.54 | 8 | US$1,749,530,702 |
| **Total** | **1,457,830** | **US$171.81** | **1,457,830** | **US$1,749,530,702** |

**Item 16F.    Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.    Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3)

134

**Table of Contents**

permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholder meetings every year. We follow home country practice with respect to annual meetings and did not hold an annual meeting of shareholders in 2017. We may, however, hold annual shareholder meetings in the future if there are significant issues that require shareholders' approvals.

Other than the annual meeting practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.

**Item 16H.    Mine Safety Disclosure**

Not applicable.

## PART III

**Item 17.    Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.    Financial Statements**

The consolidated financial statements of Baidu, Inc., its subsidiaries and its consolidated affiliated entities are included at the end of this annual report.

**Item 19.    Exhibits**

| Exhibit Number | Description of Document |
|---|---|
| 1.1 | Third Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated by reference to Exhibit 99.2 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 2.1 | Registrant's Specimen American Depositary Receipt (incorporated by reference to Exhibit 1 of the prospectus filed with the Securities and Exchange Commission on January 5, 2009 pursuant to Rule 424(b)(3) under the Securities Act) |
| 2.2 | Registrant's Specimen Certificate for Class A Ordinary Shares (incorporated by reference to Exhibit 4.2 of Amendment No. 5 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on August 2, 2005) |
| 2.3 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 2.4 | Indenture, dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.5 | First Supplemental Indenture dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |

135

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 2.6 | Form of 2.250% Notes due 2017 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.7 | Form of 3.500% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.8 | Second Supplemental Indenture dated August 6, 2013 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.9 | Form of 3.250% Notes due 2018 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.10 | Third Supplemental Indenture dated June 9, 2014 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.11 | Form of 2.750% Notes due 2019 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.12 | Fourth Supplemental Indenture dated June 30, 2015 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.13 | Form of 3.00% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.14 | Form of 4.125% Notes due 2025 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.15 | Fifth Supplemental Indenture dated July 6, 2017 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 2.16 | Form of 2.875% Notes due 2022 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 2.17 | Form of 3.625% Notes due 2027 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 4.1 | 2000 Option Plan (amended and restated effective December 16, 2008) (incorporated by reference to Exhibit 99.3 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.2 | 2008 Share Incentive Plan (incorporated by reference to Exhibit 99.4 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.3 | Form of Indemnification Agreement between the Registrant and the Registrant's directors (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.4 | Form of Employment Agreement between the Registrant and an Executive Officer of the Registrant (incorporated by reference to Exhibit 10.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.5 | Translation of Exclusive Technology Consulting and Services Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.6 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |

136

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.6 | Translation of Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.7 | Translation of Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.5 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.8 | Translation of Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 99.8 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.9 | Translation of Proxy Agreement dated August 9, 2004 among Baidu Online, Baidu Netcom, Robin Yanhong Li and Eric Yong Xu (incorporated by reference to Exhibit 99.9 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.10 | Translation of the form of Technology Consulting and Services Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.19 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.11 | Translation of the form of Operating Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.20 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.12 | Translation of the form of Web Layout Copyright License Agreement between Baidu Online and a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.21 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.13 | Translation of the form of Proxy Agreement among Baidu Online, a consolidated affiliated PRC entity and the shareholders of the consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.22 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.14 | Translation of the form of Equity Pledge Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.23 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.15 | Translation of the form of Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.24 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.16 | Translation of the form of Loan Agreement between Baidu Online and the shareholder of a consolidated affiliated PRC entity (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on June 5, 2008) |
| 4.17 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal, dated as of April 22, 2010 (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.18 | Translation of the Web Layout Copyright License Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal (incorporated by reference to Exhibit 4.27 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |

137

**Table of Contents**

| <u>Exhibit<br>Number</u> | <div align="center">Description of Document</div> |
|---|---|
| 4.19 | Translation of the Technology Consulting and Services Agreement dated February 28, 2008 between Baidu Online and BaiduPay and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.33 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.20 | Translation of the Web Layout Copyright License Agreement dated February 28, 2008 between Baidu Online and BaiduPay (incorporated by reference to Exhibit 4.35 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.21 | Translation of the supplementary agreements, dated March 11, 2010 and April 22, 2010 to the Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.22 | Translation of the supplementary agreement dated March 1, 2010 to the Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.23 | Translation of the supplementary agreement dated April 22, 2010 to the Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.24 | Translation of the supplementary agreement to the Loan Agreement among Robin Yanhong Li, Baidu Netcom and Baidu Online dated September 6, 2011 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.25 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.26 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.27 | Translation of Supplementary Agreement among Baidu Online, BaiduPay, Baidu Netcom and Hu Cai dated September 6, 2011 (incorporated by reference to Exhibit 4.79 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.28 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.80 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.29 | Translation of the Supplementary Agreement to Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated September 6, 2011 (incorporated by reference to Exhibit 4.74 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 27, 2013) |
| 4.30 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.64 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |

<div align="center">138</div>

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.31 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.32 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Beijing Perusal dated August 15, 2013 (incorporated by reference to Exhibit 4.66 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.33 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and BaiduPay dated August 15, 2013 (incorporated by reference to Exhibit 4.67 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.34 | Translation of the Termination Agreements among Baidu Online, Beijing Perusal, Jiping Liu and Yazhu Zhang, former individual shareholders of Beijing Perusal, dated March 15, 2016 and May 3, 2016, respectively (incorporated by reference to Exhibit 4.34 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.35 | Translation of the Amended and Restated Loan Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 (incorporated by reference to Exhibit 4.35 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.36 | Translation of the Equity Transfer Agreements between Jiping Liu and Zhixiang Liang, between Jiping Liu and Xiaodong Wang, and between Yazhu Zhang and Xiaodong Wang, all dated May 3, 2016 (incorporated by reference to Exhibit 4.36 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.37 | Translation of Proxy Agreement among Zhixiang Liang and Baidu Online and of Proxy Agreement among Xiaodong Wang and Baidu Online, both dated May 3, 2016 (incorporated by reference to Exhibit 4.37 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.38 | Translation of the Operating Agreement among Baidu Online, Beijing Perusal, Zhixiang Liang, and Xiaodong Wang, dated May 3, 2016 (incorporated by reference to Exhibit 4.38 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.39 | Translation of the Amended and Restated Equity Pledge Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 (incorporated by reference to Exhibit 4.39 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.40 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreements among Baidu Online, Zhixiang Liang and Beijing Perusal, and among Baidu Online, Xiaodong Wang and Beijing Perusal, both dated June 20, 2016 (incorporated by reference to Exhibit 4.40 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.41 | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of Beijing Perusal, dated May 3, 2016 (incorporated by reference to Exhibit 4.41 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |

139

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 4.42 | Translation of Irrevocable Power of Attorney issued by Xiaodong Wang, the individual shareholder of Beijing Perusal, dated May 3, 2016 (incorporated by reference to Exhibit 4.42 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.43 | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Baidu Netcom, Robin Yanhong Li and Zhan Wang dated June 13, 2016 (incorporated by reference to Exhibit 4.43 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.44 | Translation of the Amended and Restated Loan Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 (incorporated by reference to Exhibit 4.44 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.45 | Translation of the Amended and Restated Loan Agreement between Baidu Online and Yanhong Li dated January 18, 2017 (incorporated by reference to Exhibit 4.45 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.46 | Translation of the Equity Transfer Agreement between Zhan Wang and Hailong Xiang dated June 13, 2016 (incorporated by reference to Exhibit 4.46 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.47 | Translation of the Proxy Agreement among Robin Yanhong Li, Hailong Xiang and Baidu Online dated June 13, 2016 (incorporated by reference to Exhibit 4.47 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.48 | Translation of the Operating Agreement among Baidu Online, Baidu Netcom, Robin Yanhong Li, Hailong Xiang dated June 13, 2016 (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.49 | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 (incorporated by reference to Exhibit 4.49 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.50 | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Yanhong Li dated January 18, 2017 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.51 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Hailong Xiang and Baidu Netcom dated January 18, 2017 (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.52 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Yanhong Li and Baidu Netcom dated January 18, 2017 (incorporated by reference to Exhibit 4.52 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.53 | Translation of Irrevocable Power of Attorney issued by Robin Yanhong Li, an individual shareholder of Baidu Netcom, dated June 13, 2016 (incorporated by reference to Exhibit 4.53 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.54 | Translation of Irrevocable Power of Attorney issued by Hailong Xiang, an individual shareholder of Baidu Netcom, dated June 13, 2016 (incorporated by reference to Exhibit 4.54 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |

| Exhibit Number | Description of Document |
|---|---|
| 4.55 | Translation of the Termination of Power of Attorney issued by Zhixiang Liang to Zhan Wang, dated October 18, 2016 (incorporated by reference to Exhibit 4.55 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.56 | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of BaiduPay, dated October 18, 2016 (incorporated by reference to Exhibit 4.56 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.57 | Translation of Acceptance of the Irrevocable Power of Attorney by Hailong Xiang, dated October 18, 2016 (incorporated by reference to Exhibit 4.57 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.58 | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Zhixiang Liang, dated October 18, 2016 (incorporated by reference to Exhibit 4.58 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.59 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement between Baidu Online, Zhixiang Liang and BaiduPay, dated October 18, 2016 (incorporated by reference to Exhibit 4.59 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.60 | Translation of the Amended and Restated Loan Agreement between Baidu Online and Zhixiang Liang, dated October 18, 2016 (incorporated by reference to Exhibit 4.60 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.61 | Translation of the Amended and Restated Operating Agreement among Baidu Online, BaiduPay, Zhixiang Liang, Baidu Netcom, and An Yi Heng Tong (Beijing) Co., Ltd., dated October 18, 2016 (incorporated by reference to Exhibit 4.61 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.62 | Share Exchange Agreement among Baidu, Inc., Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 24, 2015 (incorporated by reference to Exhibit 2 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 4, 2015) |
| 4.63 | Standstill Agreement between Baidu, Inc. and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 3 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 4, 2015) |
| 4.64 | Registration Rights Agreement between Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 4 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 4, 2015) |
| 4.65 | US$2,000,000,000 Facilities Agreement between the Registrant and other parties thereto dated June 8, 2016 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.66 | Note Purchase Agreement among IQIYI.com, Inc., Baidu Holdings Limited and other parties thereto dated January 11, 2017 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.67* | Merger Agreement among Rajax Holding, Rajax Merger Sub Limited, Xiaodu Life Technology Ltd and Baidu (Hong Kong) Limited, dated August 24, 2017 |

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 8.1* | List of Principal Subsidiaries and Consolidated Affiliated Entities |
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.14 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder (Hong Kong) LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Ernst & Young Hua Ming LLP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith
\*\*    Furnished herewith

142

**Table of Contents**

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

<div style="text-align: right;">

Baidu, Inc.

By:  /s/ Robin Yanhong Li
     Name: Robin Yanhong Li
     Title: Chairman and Chief Executive Officer

</div>

Date: March 15, 2018

<div style="text-align: center;">143</div>

**Table of Contents**

BAIDU, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page(s) |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 – F-3 |
| Consolidated Balance Sheets as of December 31, 2016 and 2017 | F-4 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2015, 2016 and 2017 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2015, 2016 and 2017 | F-6 – F-7 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2015, 2016 and 2017 | F-8 |
| Notes to the Consolidated Financial Statements | F-9 – F-66 |

F-1

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of Baidu, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Baidu, Inc. (the "Company") as of December 31, 2017 and 2016, and the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2017, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the consolidated financial position of Baidu, Inc. at December 31, 2017 and 2016, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 15, 2018 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the US federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. An audit includes performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures include examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Hua Ming LLP

We have served as the Company's auditor since 2007.
Beijing, The People's Republic of China
March 15, 2018

F-2

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of Baidu, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Baidu, Inc.'s internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the "COSO criteria"). In our opinion, Baidu, Inc. (the "Company") maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2017 and 2016, and the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2017, and the related notes of the Company and our report dated March 15, 2018 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 15, 2018

F-3

Table of Contents

BAIDU, INC.
CONSOLIDATED BALANCE SHEETS
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares and per share data)

| | Notes | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 10,898 | 11,084 | 1,704 |
| Restricted cash | | 318 | 252 | 39 |
| Short-term investments | 4 | 71,196 | 89,381 | 13,738 |
| Other invested securities | 4 | 7,748 | 18,350 | 2,820 |
| Accounts receivable, net of allowance of RMB177 and RMB316 (US$48) for 2016 and 2017, respectively | 5 | 4,109 | 4,571 | 703 |
| Loans and interest receivable, current portion net of allowances of RMB49 and RMB660 (US$101) for 2016 and 2017, respectively | 6 | 1,800 | 23,938 | 3,679 |
| Amounts due from related parties | 20 | 346 | 168 | 26 |
| Other current assets, net | 7 | 3,345 | 3,425 | 526 |
| **Total current assets** | | **99,760** | **151,169** | **23,235** |
| **Non-current assets:** | | | | |
| Fixed assets, net | 8 | 11,294 | 12,475 | 1,917 |
| Intangible assets, net | 9 | 3,872 | 5,467 | 840 |
| Goodwill | 9 | 15,342 | 15,806 | 2,429 |
| Long-term investments, net | 4 | 45,690 | 56,283 | 8,651 |
| Deferred tax assets, net | 13 | 1,100 | 1,532 | 235 |
| Loans and interest receivable, non-current portion net of allowances of RMB69 and RMB104 (US$16) for 2016 and 2017, respectively | 6 | 2,709 | 3,467 | 533 |
| Amounts due from related parties | 20 | 11 | 9 | 1 |
| Other non-current assets | | 2,219 | 5,520 | 848 |
| **Total non-current assets** | | **82,237** | **100,559** | **15,454** |
| **Total assets** | | **181,997** | **251,728** | **38,689** |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB20,915 and RMB18,775 (US$2,886) as of December 31, 2016 and 2017, respectively): | 1 | | | |
| Short-term loans | 11 | 1,115 | 1,244 | 191 |
| Accounts payable and accrued liabilities | 10 | 21,630 | 27,523 | 4,229 |
| Amounts due to the third-party investors | | 7,025 | 38,486 | 5,915 |
| Customer advances and deposits | | 6,032 | 6,785 | 1,043 |
| Deferred revenue | | 596 | 788 | 121 |
| Deferred income | | 566 | 568 | 87 |
| Long-term loans, current portion | 11 | 3,468 | 10 | 2 |
| Notes payable, current portion | 12 | 5,203 | 6,500 | 999 |
| Amounts due to related parties | 20 | 459 | 153 | 24 |
| Capital lease obligation | | 8 | — | — |
| **Total current liabilities** | | **46,102** | **82,057** | **12,611** |
| **Non-current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB1,107 and RMB5,151 (US$792) as of December 31, 2016 and 2017, respectively): | 1 | | | |
| Deferred income | | 28 | 73 | 11 |
| Long-term loans | 11 | 6,822 | 6,701 | 1,030 |
| Notes payable | 12 | 27,648 | 29,111 | 4,474 |
| Deferred tax liabilities | 13 | 3,589 | 3,375 | 519 |
| Other non-current liabilities | | 65 | 39 | 6 |
| **Total non-current liabilities** | | **38,152** | **39,299** | **6,040** |
| **Total liabilities** | | **84,254** | **121,356** | **18,651** |
| **Commitments and contingencies** | 15 | | | |
| **Redeemable noncontrolling interests** | 16 | **5,492** | **11,022** | **1,694** |
| **Equity** | | | | |
| Class A ordinary shares, par value US$0.00005 per share, 825,000,000 shares authorized, and 27,325,551 shares and 27,614,978 shares issued and outstanding as at December 31, 2016 and 2017, respectively | 17 | — | — | — |
| Class B ordinary shares, par value US$0.00005 per share, 35,400,000 shares authorized, and 7,401,254 shares and 7,201,254 shares issued and outstanding as at December 31, 2016 and 2017, respectively | 17 | — | — | — |
| Additional paid-in capital | | 8,323 | 12,088 | 1,858 |
| Retained earnings | 17 | 85,734 | 102,328 | 15,728 |
| Accumulated other comprehensive (loss) income | 17 | (1,783) | 930 | 143 |
| **Total Baidu, Inc. shareholders' equity** | | **92,274** | **115,346** | **17,729** |
| **Noncontrolling interests** | | **(23)** | **4,004** | **615** |
| **Total equity** | | **92,251** | **119,350** | **18,344** |
| **Total liabilities, redeemable noncontrolling interests and equity** | | **181,997** | **251,728** | **38,689** |

The accompanying notes are an integral part of the consolidated financial statements.

F-4

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares and per share (or ADS) data)

| | Notes | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Online marketing services | | 64,037 | 64,525 | 73,146 | 11,242 |
| Others | | 2,345 | 6,024 | 11,663 | 1,792 |
| **Total revenues** | | **66,382** | **70,549** | **84,809** | **13,034** |
| Operating costs and expenses: | | | | | |
| Cost of revenues | | (27,458) | (35,278) | (43,062) | (6,619) |
| Selling, general and administrative | | (17,076) | (15,071) | (13,128) | (2,018) |
| Research and development | | (10,176) | (10,151) | (12,928) | (1,987) |
| **Total operating costs and expenses** | | **(54,710)** | **(60,500)** | **(69,118)** | **(10,624)** |
| **Operating profit** | | **11,672** | **10,049** | **15,691** | **2,410** |
| Other income: | | | | | |
| Interest income | | 2,362 | 2,342 | 3,154 | 485 |
| Interest expense | | (1,041) | (1,158) | (1,615) | (248) |
| Foreign exchange income (loss), net | | 182 | 508 | (482) | (74) |
| Income (loss) from equity method investments | 4 | 4 | (1,026) | (63) | (10) |
| Others, net | 4 | 24,728 | 3,794 | 4,598 | 707 |
| **Total other income, net** | | **26,235** | **4,460** | **5,592** | **860** |
| **Income before income taxes** | | **37,907** | **14,509** | **21,283** | **3,270** |
| Income taxes | 13 | (5,475) | (2,913) | (2,995) | (460) |
| **Net income** | | **32,432** | **11,596** | **18,288** | **2,810** |
| Net loss attributable to noncontrolling interests | | 1,232 | 36 | 13 | 2 |
| **Net income attributable to Baidu, Inc.** | | **33,664** | **11,632** | **18,301** | **2,812** |
| Earnings per share for Class A and Class B ordinary shares: | 18 | | | | |
| Basic | | 954.56 | 319.47 | 527.51 | 81.08 |
| Diluted | | 951.49 | 318.62 | 524.08 | 80.55 |
| Earnings per ADS (1 Class A ordinary share equals 10 ADSs): | 18 | | | | |
| Basic | | 95.46 | 31.95 | 52.75 | 8.11 |
| Diluted | | 95.15 | 31.86 | 52.41 | 8.06 |
| Weighted average number of Class A and Class B ordinary shares outstanding: | | | | | |
| Basic | | 34,921,782 | 34,665,238 | 34,725,123 | 34,725,123 |
| Diluted | | 35,034,470 | 34,757,086 | 34,952,391 | 34,952,391 |
| Other comprehensive (loss) income: | 17 | | | | |
| Foreign currency translation adjustment | | (645) | (593) | 803 | 123 |
| Unrealized gains (losses) on available-for-sale investments, net of reclassification | | 295 | (57) | 1,575 | 242 |
| **Other comprehensive (loss) income, net of tax** | | **(350)** | **(650)** | **2,378** | **365** |
| **Comprehensive income** | | **32,082** | **10,946** | **20,666** | **3,175** |
| Comprehensive loss (income) attributable to noncontrolling interests and redeemable noncontrolling interests | | 1,056 | (291) | 348 | 53 |
| **Comprehensive income attributable to Baidu, Inc. ordinary shareholders** | | **33,138** | **10,655** | **21,014** | **3,228** |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from operating activities:** | | | | |
| Net income | 32,432 | 11,596 | 18,288 | 2,810 |
| Adjustments to reconcile net income to net cash generated from operating activities: | | | | |
| Depreciation of fixed assets and computer parts | 2,886 | 3,451 | 3,805 | 585 |
| Gain on disposal of fixed assets | (24) | (84) | (30) | (5) |
| Amortization of intangible assets and licensed copyrights | 2,975 | 4,876 | 7,943 | 1,221 |
| Deferred income tax, net | 2,261 | (14) | (756) | (116) |
| Share-based compensation | 1,387 | 1,760 | 3,244 | 499 |
| Provision for doubtful accounts | 247 | 269 | 585 | 90 |
| Investment income | (2,709) | (4,971) | (3,244) | (499) |
| Assets impairment | 117 | 421 | 2,358 | 362 |
| (Income) loss from equity method investments | (4) | 1,026 | 63 | 10 |
| Gain on disposal of subsidiaries | (24,436) | (1,247) | (5,550) | (853) |
| Barter transaction revenue | (350) | (382) | (763) | (117) |
| Other non-cash expenses (income) | 53 | (463) | 362 | 56 |
| Changes in operating assets and liabilities, net of effects of acquisitions and disposals: | | | | |
| Restricted cash | (1,555) | (222) | 52 | 8 |
| Accounts receivable | (869) | (238) | (721) | (111) |
| Amounts due from related parties | (796) | 1,594 | 178 | 27 |
| Other assets | (1,737) | 237 | 1,259 | 195 |
| Customer advances and deposits | 1,469 | 646 | 763 | 117 |
| Accounts payable and accrued liabilities | 7,529 | 4,092 | 5,100 | 784 |
| Deferred revenue | 211 | 221 | 203 | 31 |
| Deferred income | 19 | 17 | 47 | 7 |
| Amounts due to related parties | 665 | (327) | (306) | (47) |
| **Net cash generated from operating activities** | **19,771** | **22,258** | **32,880** | **5,054** |
| **Cash flows from investing activities:** | | | | |
| Acquisition of fixed assets | (5,230) | (4,189) | (4,779) | (735) |
| Acquisition of computer parts | (21) | (26) | (50) | (8) |
| Disposal of fixed assets | 33 | 55 | 44 | 7 |
| Acquisition of businesses, net of cash acquired (Note 3) | (333) | — | (553) | (85) |
| Acquisition of intangible assets | (2,493) | (6,296) | (9,122) | (1,402) |
| Capitalization of software costs | (31) | — | — | — |
| Purchases of held-to-maturity investments | (50,207) | (47,634) | (56,150) | (8,630) |
| Maturities of held-to-maturity investments | 51,962 | 46,143 | 49,580 | 7,620 |
| Purchases of available-for-sale investments | (126,156) | (182,342) | (209,628) | (32,219) |
| Sales and maturities of available-for-sale investments | 110,653 | 173,821 | 198,517 | 30,512 |
| Purchases of other long-term investments | (5,940) | (4,005) | (12,499) | (1,921) |
| Sales of other long-term investments | 23 | 303 | 19 | 3 |
| Cash distribution from long-term investments | 8 | 5 | 13 | 2 |
| (Payments in) proceeds from disposal of subsidiaries' shares | (3,541) | 275 | 1,445 | 222 |
| Micro loan origination and disbursement | (451) | (7,920) | (63,597) | (9,775) |
| Principal payments received on micro loans | 103 | 3,556 | 40,075 | 6,159 |
| Purchases of other invested securities | — | (8,968) | (38,167) | (5,866) |
| Sales and maturities of other invested securities | — | 1,311 | 27,917 | 4,291 |
| **Net cash used in investing activities** | **(31,621)** | **(35,911)** | **(76,935)** | **(11,825)** |

F-6

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from financing activities:** | | | | |
| Restricted cash released as collateral for borrowings | 102 | — | — | — |
| Repayments of short-term loans | (85) | (1,940) | (826) | (127) |
| Proceeds from short-term loans | 100 | 3,252 | 751 | 115 |
| Repayments of long-term loans | (2,173) | (1,042) | (3,330) | (512) |
| Proceeds from long-term loans | 2,162 | 6,633 | 299 | 46 |
| Payments of capital lease obligation | (59) | (53) | (8) | (1) |
| Proceeds from debt issuance | 10,407 | — | 9,926 | 1,526 |
| Payment of debt issuance costs | (52) | — | (17) | (3) |
| Repayment of long-term notes | — | — | (4,957) | (762) |
| Proceeds from issuance of convertible notes | — | — | 8,463 | 1,301 |
| Proceeds from issuance of subsidiaries' shares | 3,528 | 661 | 4,046 | 623 |
| Repurchase of ordinary shares | (6,377) | — | (1,723) | (265) |
| Proceeds from exercise of share options | 225 | 176 | 453 | 70 |
| Proceeds from third-party investors for sale of financial products | — | 10,426 | 101,189 | 15,552 |
| Repayment to third-party investors for sale of financial products | — | (3,666) | (82,987) | (12,755) |
| Proceeds from secured borrowings from third-party financial institutions | — | — | 16,008 | 2,460 |
| Repayment of secured borrowings from third-party financial institutions | — | — | (2,730) | (420) |
| **Net cash generated from financing activities** | 7,778 | 14,447 | 44,557 | 6,848 |
| **Effect of exchange rate changes on cash and cash equivalents** | 179 | 144 | (316) | (48) |
| **Net (decrease) increase in cash and cash equivalents** | (3,893) | 938 | 186 | 29 |
| Cash and cash equivalents at beginning of the year | 13,853 | 9,960 | 10,898 | 1,675 |
| Cash and cash equivalents at end of the year | 9,960 | 10,898 | 11,084 | 1,704 |
| **Supplemental disclosures:** | | | | |
| Interests paid | 867 | 1,111 | 758 | 117 |
| Income taxes paid | 2,763 | 2,402 | 3,300 | 507 |
| **Non-cash investing and financing activities:** | | | | |
| Capital lease obligation | 6 | 7 | — | — |
| Acquisition of fixed assets included in accounts payable and accrued liabilities | 1,028 | 903 | 1,167 | 179 |
| Acquisition of other non-current assets included in accounts payable and accrued liabilities | 44 | 37 | 50 | 8 |
| Acquisition of licensed copyrights included in accounts payable and accrued liabilities | 1,147 | 2,195 | 4,040 | 621 |
| Acquisition of licensed copyrights from nonmonetary content exchanges | 292 | 385 | 782 | 120 |
| Non-cash acquisitions of investments | 24,431 | 2,963 | 765 | 118 |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares)

| | Attributable to Baidu, Inc. | | | | | | |
| | Ordinary shares | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income (loss) | Noncontrolling interests | Total shareholders' equity |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
|---|---|---|---|---|---|---|---|
| **Balances at December 31, 2014** | **35,106,236** | **—** | **3,651** | **47,701** | **(280)** | **1,085** | **52,157** |
| Net income | — | — | — | 33,664 | — | (1,232) | 32,432 |
| Other comprehensive income (loss) | — | — | — | — | (526) | 34 | (492) |
| Business combination | — | — | 3 | — | — | 8 | 11 |
| Issuance of shares by the Company's subsidiaries | — | — | 976 | — | — | 959 | 1,935 |
| Issuance of convertible notes by a disposed subsidiary | — | — | 278 | — | — | 281 | 559 |
| Exercise of share-based awards | 103,952 | — | 254 | — | — | 25 | 279 |
| Share-based compensation | — | — | 1,240 | — | — | 143 | 1,383 |
| Accretion of redeemable noncontrolling interests | — | — | — | (329) | — | — | (329) |
| Repurchase and retirement of ordinary shares | (603,726) | — | — | (6,377) | — | — | (6,377) |
| Disposal of subsidiaries | — | — | — | — | — | (1,292) | (1,292) |
| **Balances at December 31, 2015** | **34,606,462** | **—** | **6,402** | **74,659** | **(806)** | **11** | **80,266** |
| Net income | — | — | — | 11,632 | — | (36) | 11,596 |
| Other comprehensive income (loss) | — | — | — | — | (977) | 2 | (975) |
| Exercise of share-based awards | 120,343 | — | 173 | — | — | — | 173 |
| Share-based compensation | — | — | 1,748 | — | — | — | 1,748 |
| Accretion of redeemable noncontrolling interests | — | — | — | (557) | — | — | (557) |
| **Balances at December 31, 2016** | **34,726,805** | **—** | **8,323** | **85,734** | **(1,783)** | **(23)** | **92,251** |
| Net income | — | — | — | 18,301 | — | (13) | 18,288 |
| Other comprehensive income (loss) | — | — | — | — | 2,713 | — | 2,713 |
| Issuance of shares by the Company's subsidiaries | — | — | 42 | — | — | 4,004 | 4,046 |
| Acquisition of noncontrolling interests in a subsidiary | — | — | 5 | — | — | (5) | — |
| Exercise of share-based awards | 235,210 | — | 454 | — | — | — | 454 |
| Share-based compensation | — | — | 3,264 | — | — | — | 3,264 |
| Accretion of redeemable noncontrolling interests | — | — | — | 17 | — | — | 17 |
| Repurchase and retirement of ordinary shares | (145,783) | — | — | (1,724) | — | — | (1,724) |
| Disposal of subsidiaries' shares | — | — | — | — | — | 41 | 41 |
| **Balances at December 31, 2017** | **34,816,232** | **—** | **12,088** | **102,328** | **930** | **4,004** | **119,350** |
| **Balances at December 31, 2017, in US$** | | **—** | **1,858** | **15,728** | **143** | **615** | **18,344** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

## 1.   ORGANIZATION, CONSOLIDATION AND PRESENTATION OF FINANCIAL STATEMENTS

Baidu, Inc. ("Baidu" or the "Company") was incorporated under the laws of the Cayman Islands on January 18, 2000.

As of December 31, 2017, the Company has subsidiaries incorporated in countries and jurisdictions including the People's Republic of China ("PRC"), Hong Kong, Japan, Cayman Islands and British Virgin Islands ("BVI"). As of December 31, 2017, the Company also effectively controls a number of variable interest entities ("VIEs") through the Primary Beneficiaries, as defined below. The VIEs include:

•   Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), controlled through Baidu Online Network Technology (Beijing) Co., Ltd. ("Baidu Online"), one of the Company's wholly-owned subsidiaries;

•   Beijing Perusal Technology Co., Ltd. ("Beijing Perusal"), controlled through Baidu Online; and

•   Beijing BaiduPay Science and Technology Co., Ltd. ("BaiduPay"), controlled through Baidu Online; and

•   Other VIEs controlled through by the Company's subsidiaries other than Baidu Online.

The Company, its subsidiaries, VIEs and subsidiaries of the VIEs are hereinafter collectively referred to as the "Group". The Group offers online marketing services, artificial intelligence-enabled new business initiatives, internet financial businesses and operates an online video platform offering advertising business and membership services through its content library. The Group's principal geographic market is in the PRC. The Company does not conduct any substantive operations of its own, but conducts its primary business operations through its subsidiaries and VIEs in the PRC.

PRC laws and regulations prohibit or restrict foreign ownership of internet content, advertising, audio and video services, and mobile application distribution businesses. To comply with these foreign ownership restrictions, the Group operates its websites and primarily provides services subject to such restriction in the PRC through the VIEs, the PRC legal entities that were established or whose equity shares were held by the individuals authorized by the Group. The paid-in capital of the VIEs was mainly funded by the Group through loans extended to the authorized individuals who were the shareholders of the VIEs. The Group has entered into proxy agreements or powers of attorney and exclusive equity purchase option agreement with the VIEs and nominee shareholders of the VIEs through the Group's subsidiaries ("Primary Beneficiaries"), which give the Primary Beneficiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Certain exclusive agreements have been entered into with the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, which obligate the Primary Beneficiaries to absorb losses of the VIEs' that could potentially be significant to the VIEs or entitle the Primary Beneficiaries to receive economic benefits from the VIEs that could potentially be significant to the VIEs. In addition, the Group has entered into certain agreements with the shareholders of the VIEs through the Primary Beneficiaries or their wholly-owned subsidiaries in the PRC, including loan agreements for the paid-in capital of the VIEs and share pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs.

Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Primary Beneficiaries and the VIEs through the aforementioned agreements with the shareholders of the VIEs. The shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Primary Beneficiaries. In addition, through the other exclusive agreements, which consist of operating agreements, technology consulting and services agreements and license agreements, the Primary

F-9

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Beneficiaries, by themselves or their wholly-owned subsidiaries in the PRC, demonstrate their ability and intention to continue to exercise the ability to absorb losses or receive economic benefits that could potentially be significant to the VIEs. The VIEs are subject to operating risks, which determine the variability of the Company's interest in those entities. Based on these contractual arrangements, the Company consolidates the VIEs as required by SEC Regulation S-X Rule 3A-02 and Accounting Standards Codification ("ASC") topic 810, *Consolidation*, because the Company holds all the variable interests of the VIEs through the Primary Beneficiaries.

Unrecognized revenue-producing assets held by the VIEs include certain internet content provisions and other licenses, domain names and trademarks. The internet content provisions and other licenses, which are held by the VIEs that provide the relevant services, are required under relevant PRC laws, rules and regulations for the operation of Internet businesses in the PRC, and therefore are integral to the Company's operations.

The principal terms of the agreements entered into amongst the VIEs, their respective shareholders and the Primary Beneficiaries are further described below.

### Loan Agreements

Pursuant to loan agreements amongst the shareholders of Baidu Netcom and Baidu Online, Baidu Online provided interest-free loans with an aggregate amount of RMB2.2 billion (US$334 million) to the shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from sale of the shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The terms of the loan agreements will expire on January 17, 2027 at the earliest and can be extended with the written consent of both parties before its expiration.

Each of the loan agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above, except that the amount of the loans extended to the respective shareholders is RMB3.2 billion (US$491 million) and RMB217 million (US$33 million), respectively. The term of the loan agreements will expire on June 19, 2026 and October 17, 2026, respectively, and can be extended with the written consent of both parties before its expiration.

### Exclusive Equity Purchase and Transfer Option Agreement

Pursuant to the exclusive equity purchase and transfer option agreement amongst the shareholders of Baidu Netcom, Baidu Netcom and Baidu Online, the shareholders of Baidu Netcom irrevocably granted Baidu Online or its designated person(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The shareholders should remit to Baidu Online any amount that is paid by Baidu Online or its designated person(s) in connection with the purchased equity interest. Baidu Online or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions from Baidu Netcom to its shareholders should be paid to Baidu Online in full amount. Baidu Online would provide unlimited financial support to Baidu Netcom if, in the normal operation of business, Baidu Netcom would become in need of any form of reasonable financial support. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online should unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement will terminate when the shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or Baidu Netcom.

F-10

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Each of the exclusive equity purchase and transfer option agreements amongst Baidu Online, Beijing Perusal and their shareholders, BaiduPay and their shareholders contains substantially the same terms as those described above. Each of the agreements will terminate upon the transfer of all the equity interests held by the shareholders of Beijing Perusal or BaiduPay, as the case may be, to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online, Beijing Perusal or BaiduPay.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom agreed to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu Online. The shareholders of Baidu Netcom have each executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. The proxy agreement would be in effect for an unlimited term unless terminated in writing by Baidu Online earlier. The power of attorney would be in effect for as long as the shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements amongst Baidu Online and the shareholders of Beijing Perusal and BaiduPay contains substantially the same terms as those described above. Each of the proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the shareholder of Beijing Perusal or BaiduPay holds any equity interests in Beijing Perusal or BaiduPay, as the case may be.

*Operating Agreement*

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the power to appoint senior executives of Baidu Netcom. The shareholders of Baidu Netcom must appoint the candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of Baidu Online or Baidu Netcom expires and extension is denied by the relevant approval authorities.

Each of the operating agreements amongst Baidu Online, Beijing Perusal and their shareholders, BaiduPay and their shareholders contains substantially the same terms as those described above. Each of the agreements will be in effect for an unlimited term, until the term of business of Baidu Online, Beijing Perusal or BaiduPay expires and extension is denied by the relevant approval authorities.

*Exclusive Technology Consulting and Services Agreement*

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and

F-11

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay service fees to Baidu Online and Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Each of the exclusive technology consulting and services agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains substantially the same terms as those described above.

*License Agreements*

Baidu Online and Baidu Netcom entered into a software license agreement and a web layout copyright license agreement (collectively, the "License Agreements"). Pursuant to the License Agreements between Baidu Online and Baidu Netcom, Baidu Online has granted to Baidu Netcom the right to use (including but not limited to) a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement were renewed since their original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Baidu Online entered into web layout copyright license agreements with both Beijing Perusal and BaiduPay. Each of the license agreements between Baidu Online and Beijing Perusal and between Baidu Online and BaiduPay contains substantially the same terms as those described above. Each of the web layout copyright license agreements was renewed since original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and services agreement. If Baidu Netcom or its shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholders of Baidu Netcom agreed not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term or the fulfillment by Baidu Netcom and its shareholders of their respective obligations under the exclusive technology consulting and services agreement and the loan agreement.

Each of the equity pledge agreements amongst Baidu Online and the respective shareholders of Beijing Perusal and BaiduPay contains substantially the same terms, including term period, as those described above.

The equity pledges of Baidu Netcom described above are in the process of perfecting by registration with the relevant local administration for industry and commerce as required for a property right under the PRC Property Rights Law, due to recent change in shareholder.

Through the design of the aforementioned agreements, the shareholders of the VIEs effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the VIEs' economic performance. Baidu Online obtains the ability to approve decisions made by the VIEs

F-12

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

and the ability to acquire the equity interests in the VIEs when permitted by PRC law. Baidu Online is obligated to absorb losses of the VIEs that could potentially be significant to the VIEs through providing unlimited financial support to the VIEs or is entitled to receive economic benefits from the VIEs that could potentially be significant to the VIEs through the exclusive technology consulting and service fees. As a result of these contractual agreements, Baidu Online is determined to be the primary beneficiary of the VIEs. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Company and the VIEs through these contractual agreements, and the Company consolidates the VIEs through Baidu Online.

There are similar agreements entered into by Primary Beneficiaries besides Baidu Online with their VIEs and the respective shareholders, which resulted in a parent-subsidiary relationship between the Company and these VIEs.

In the opinion of the Company's legal counsel, (i) the ownership structure relating to the VIEs of the Company is in compliance with existing PRC laws and regulations; (ii) the contractual arrangements with the VIEs and their shareholders are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and (iii) the performance of the VIEs and their shareholders is in compliance with the articles of association and business licenses of the VIEs.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability, through the Primary Beneficiaries, to enforce its rights under these contractual arrangements. Furthermore, shareholders of the VIEs may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC laws, the Company may be subject to penalties, which may include but not be limited to, the cancellation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other penalties may result in a material and adverse effect on the Company's ability to conduct its operations. In such case, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

F-13

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The following tables set forth the financial statement balances and amounts of the VIEs and their subsidiaries were included in the consolidated financial statements after the elimination of intercompany balances and transactions among VIEs and their subsidiaries within the Group:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| **Assets** | | | |
| Current | | | |
| Cash and cash equivalents | 3,087 | 4,045 | 622 |
| Short-term investments | 6,661 | 2,052 | 315 |
| Accounts receivable, net | 3,851 | 3,021 | 464 |
| Others | 3,247 | 5,280 | 812 |
| | 16,846 | 14,398 | 2,213 |
| Non-current | | | |
| Fixed assets, net | 1,438 | 2,845 | 437 |
| Intangible assets, net | 1,739 | 2,104 | 323 |
| Long-term investments, net | 4,616 | 10,614 | 1,631 |
| Others | 2,094 | 6,488 | 997 |
| | 9,887 | 22,051 | 3,388 |
| Total | 26,733 | 36,449 | 5,601 |
| **Third-party liabilities** | | | |
| Current | | | |
| Accounts payable and accrued liabilities | 12,695 | 14,073 | 2,163 |
| Customer advances and deposits | 1,654 | 2,288 | 352 |
| Others | 6,566 | 2,414 | 371 |
| | 20,915 | 18,775 | 2,886 |
| Non-current | 1,107 | 5,151 | 792 |
| Total | 22,022 | 23,926 | 3,678 |
| **Inter-company liabilities*** | | | |
| Inter-company payable to subsidiaries for technology consulting and service fees | 2,096 | 2,828 | 435 |
| Others | 2,729 | 4,605 | 708 |
| Total | 4,825 | 7,433 | 1,143 |

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Total revenues | 20,668 | 24,603 | 29,208 | 4,489 |
| Net loss | (4,398) | (464) | (626) | (96) |
| Net cash provided by operating activities | 3,563 | 2,737 | 3,698 | 569 |
| Net cash used in investing activities | (7,025) | (9,471) | (5,725) | (880) |
| Net cash provided by financing activities | 5,935 | 5,098 | 2,985 | 459 |

\*   Inter-company liabilities represent payable balances of each VIE due to its Primary Beneficiary. Amounts payable to other non-VIE subsidiaries within the Group were included in third party liabilities.

F-14

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

As of December 31, 2017, there was no pledge or collateralization of the VIEs' assets other than the aforementioned equity pledge agreements. The amount of the net assets of the VIEs was RMB5.1 billion (US$780 million) as of December 31, 2017. The creditors of the VIEs' third-party liabilities did not have recourse to the general credit of the Company in normal course of business. The Company did not provide or intend to provide financial or other supports not previously contractually required to the VIEs during the years presented.

### Basis of Presentation

The consolidated financial statements are prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

### Principles of Consolidation

The consolidated financial statements include the financial statements of the Company, its subsidiaries, VIEs and subsidiaries of the VIEs. All inter-company transactions and balances between the Company, its subsidiaries, VIEs and subsidiaries of the VIEs are eliminated upon consolidation. The Company included the results of operations of acquired businesses from the respective dates of acquisition.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the accounts receivable allowances, credit loss allowance for micro loan receivables, fair values of options to purchase the Company's or its subsidiaries' ordinary shares, fair values of certain debt and equity investments, amortization and impairment of licensed copyrights, impairment of long-lived assets, long-term investments and goodwill, the purchase price allocation and fair value of noncontrolling interests with respect to business combinations and acquisition of equity method investees, deferred tax valuation allowance and redeemable noncontrolling interests, among others. Management bases the estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

### Comparative Information

Certain items in the consolidated financial statements have been adjusted to conform with the current year's presentation to facilitate comparison.

### Currency Translation for Financial Statements Presentation

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.5063 per US$1.00 on December 29, 2017, the last business day in fiscal year 2017, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

F-15

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

## 2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Foreign Currency

The Company's functional currency is the US$. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC topic 830, *Foreign Currency Matters*. The Company uses the RMB as its reporting currency. The Company uses the exchange rate as of the balance sheet date to translate its assets and liabilities and the average daily exchange rate to translate its each month for income and expense items. Any translation gains (losses) are recorded in other comprehensive income (loss). Transactions denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing on the transaction dates. Assets and liabilities denominated in foreign currencies are translated into the functional currency at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in earnings as a component of "Other income, net".

### Segment Reporting

The Company historically had only one single reportable segment because the Company's chief operating decision maker ("CODM") formerly relied on the consolidated results of operations when making decisions on allocating resources and assessing performance of the Company. Starting from the quarter ended June 30, 2015, the Company reorganized its operation into three segments, consisting of the Search Services, Transaction Services and iQIYI as a result of its expansion of offerings into multiple services.

Starting from April 2017, Search Services and Transaction Services were combined into one segment, namely, Baidu Core. The change in reportable segments reflects the Company's strategic shift and the operational change to de-emphasized its transaction services business and shifted such resources to support its online marketing services. As of December 31, 2017, the Company had two reportable segments, Baidu Core and iQIYI. Baidu Core mainly provides keyword-based marketing services targeted at and triggered by internet users' search queries, which mainly include pay-for-performance ("P4P") services and other online marketing services, artificial intelligence-enabled new business initiatives and internet financial services. iQIYI is an online entertainment service provider that, offers original, professionally produced and partner-generated content on its platform.

The Company's chief executive officer, who has been identified as the CODM, now reviews the operating results of Baidu Core and iQIYI in order to allocate resources and assess the Company's performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC topic 280, *Segment Reporting*.

### Business Combinations

The Company accounts for its business combinations using the purchase method of accounting in accordance with ASC topic 805, *Business Combinations*. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Company acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations and all contractual contingencies as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over

F-16

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

(ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, the Company remeasures its previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Company determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, forecasted life cycle and forecasted cash flows over that period.

### Cash and Cash Equivalents

Cash and cash equivalents

Cash and cash equivalents primarily consist of cash, money market funds, investments in interest bearing demand deposit accounts, time deposits and highly liquid investments with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

Restricted cash

Restricted cash mainly consists of the cash reserved in escrow accounts for the remaining payments in relation to compensation for post-combination services, and the cash balances deposited at certain banks as online payment service deposits.

### Accounts Receivable, net of allowance

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Bad debts are written off as incurred. The Company generally does not require collateral from its customers.

The Company maintains allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, the Company considers many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### Receivables from Online Payment Agencies, net of allowance

Receivables from online payment agencies are cash due from the third-party online payment service providers for clearing transactions. The cash was paid or deposited by customers or users through these online payment agencies for services provided by the Company. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in

F-17

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

the period in which a loss is determined to be probable. Receivable balances are written off after all collection efforts have been exhausted. The balances are included in "Other current assets, net" on the consolidated balance sheets. As of December 31, 2016 and 2017, no allowance for doubtful accounts was provided for the receivables from online payment agencies.

*Loan and Interest Receivables, net of allowance*

Loan and interest receivables consist primarily of micro loans to individual borrowers. Such amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by the Company to the borrowers related to the micro loans generally range from one month to thirty-six months. The cash flows related to micro loans are included within the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represent the Company's best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of debts. The Company bases the allowance for loan and interest receivables credit losses primarily on historical loss experience using a roll rate-based model applied to the loan and interest receivables portfolios. The Company considers many factors, including but not limited to, the age of the amounts due, the payment history, the month of origination, the purpose of the loans, creditworthiness, financial conditions of the borrower, terms of the loans, regulatory environment, and the general economic conditions.

*Investments*

Short-term investments

All highly liquid investments with original maturities of greater than three months, but less than twelve months, are classified as short-term investments. Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments. The Company accounts for short-term investments in accordance with ASC topic 320 ("ASC 320"), *Investments – Debt and Equity Securities.* The Company classifies the short-term investments in debt and equity securities as "held-to-maturity" or "available-for-sale", whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the short-term investments are determined on a specific identification method, and such gains and losses are reflected in earnings during the period in which gains or losses are realized.

The securities that the Company has the positive intent and the ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with the Company's policy and ASC 320. The other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

In accordance with ASC 320, the securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

F-18

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale investments are reported at fair value, with unrealized gains and losses recorded in "Accumulated other comprehensive income (loss)". Realized gains or losses are included in earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities is recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

Other invested securities

Other invested securities represents the investments purchased by Baidu for its financial services and resold to third-party investors. These transactions do not meet the requirement of asset derecognition in accordance with ASC topic 860 ("ASC 860"), *Transfers and Servicing*. The Company recorded the proceeds related to the transactions as secured borrowings included in "Amounts due to the third-party investors" on the consolidated balance sheets, and assets pledged are included in "Other invested securities", on the consolidated balance sheets. Other invested securities were issued by financial institutions and have a variable rate of return that is indexed to the performance of underlying assets. The Company initially records these investments at cost, which approximates its fair value at inception and subsequently records these investments at fair value. Changes in the fair value are reflected in earnings. The cash flows related to purchases and maturities of other invested securities are classified as cash flows from investing activities while the proceeds and payments related to the sale of financial products are classified as cash flows from financing activities in the consolidated statement of cash flows.

Long-term investments

The Company's long-term investments consist of cost method investments, equity method investments, available-for-sale investments and investments accounted for at fair value.

In accordance with ASC subtopic 325-20, *Investments-Other: Cost Method Investments*, the Company carries at cost its investments in investees which do not have readily determinable fair value and the Company does not have significant influence. The Company only adjusts for other-than-temporary declines in fair value and distributions of earnings that exceed the Company's share of earnings since its investment. Management regularly evaluates the impairment of the cost method investments based on performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of investment.

Investments in entities in which the Company can exercise significant influence but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC topic 323 ("ASC 323"), *Investments-Equity Method and Joint Ventures*. Under the equity method, the Company initially records its investment at cost and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Company subsequently adjusts the carrying amount of its investment to recognize the Company's proportionate share of each equity investee's net income or loss into earnings after the date of investment. The Company will discontinue applying the equity method if an investment (and additional financial supports to the investee, if any) has been reduced to zero. If the Company is not required to advance additional funds to an investee and the equity-method investment in ordinary shares is reduced to zero, the Company would recognize losses based on its percentage of the investment with the

F-19

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

same liquidation preference for further investments made with a higher liquidation preference than ordinary shares. Such losses are first applied to those investments of a lower liquidation preference before being further applied to the investments of a higher liquidation preference. The Company evaluates the equity method investments for impairment under ASC 323. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

As available-for-sale investments are reported at fair value, when the decline in value is determined to be other-than-temporary, the impairment loss on the long-term available-for-sale investments would be recognized in the consolidated statements of comprehensive income.

In accordance with ASC topic 946-320, *Financial Services—Investment Companies, Investments—Debt and Equity Securities,* the Company accounts for long-term equity investments in unlisted companies held by consolidated investment companies at fair value. These investments were initially recorded at their transaction price net of transaction costs, if any. Fair value of these investments are re-measured periodically in accordance with ASC topic 820 (*"ASC 820"*)*, Fair Value Measurements and Disclosures.* These equity investments are classified within Level 3 in the fair value hierarchy, and changes in fair value are recorded in the consolidated income statements in the period the change occurs.

*Transfers of Financial Assets*

The Company accounts for the transfers of financial assets in accordance with ASC 860. Financial assets are derecognized from the Company's consolidated balance sheets if the transfer qualifies as sales. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured borrowing included in "Amounts due to the third-party investors" on the consolidated balance sheets. The assets remain on the consolidated balance sheets as "Other invested securities" and the sale proceeds are recognized as the Company's liability.

Certain financial assets that the Company bought as an agent on behalf of third-party investors have been isolated from the Company, even in bankruptcy or other receivership. These financial assets and associated liabilities are not recorded on the Company's consolidated balance sheets.

*Fair Value Measurements of Financial Instruments*

Financial instruments are in the form of cash and cash equivalents, restricted cash, short-term investments, other invested securities, accounts receivable, loan and interest receivables, amounts due from and due to related parties, other receivables, long-term investments, short-term loans, accounts payable and accrued liabilities, customer advances and deposits, derivative instruments, capital lease obligation, notes payable and long-term loans. The carrying amounts of these financial instruments, except for long-term cost method investments, long-term equity method investments, long-term available-for-sale investments, derivative instruments, notes payable and long-term loans, approximate their fair values because of their generally short maturities. Available-for-sale equity investments, other invested securities, investments accounted for at fair value, and derivative instruments were adjusted to fair value at each reporting date. The carrying amounts of long-term held-to-maturity investments and long-term loans approximate their fair values due to the fact that the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities. The fair value of notes payable is based on quoted price.

F-20

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

### *Research, Development and Computer Software*

Capitalization of software developed for internal use

The Company capitalized certain internal use software development costs in accordance with ASC subtopic 350-40, *Intangibles-Goodwill and Other: Internal-Use Software*, amounting to RMB33 million, RMB4 million and nil (US$ nil) for the years ended December 31, 2015, 2016 and 2017, respectively. The Company capitalizes certain costs relating to software acquired, developed, or modified solely to meet the Company's internal requirements and for which there are no substantive plans to market the software. These costs mainly include payroll and payroll-related costs for employees who are directly associated with and who devote time to the internal-use software projects during the application development stage. Capitalized internal-use software costs are included in "Intangible assets, net". The amortization expense for capitalized software costs amounted to RMB13 million, RMB7 million and RMB8 million (US$1 million) for the years ended December 31, 2015, 2016 and 2017, respectively. The unamortized amount of capitalized internal use software development costs was RMB30 million and RMB22 million (US$3 million) as of December 31, 2016 and 2017, respectively.

Research and development expenses

Research and development expenses consist primarily of personnel-related costs. The Company expensed substantially all development costs incurred in the research and development of new products and new functionality added to the existing products except for certain internal use software development costs.

### *Fixed Assets*

Fixed assets are stated at cost less accumulated depreciation. Depreciation is recorded on a straight-line basis over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Office building | – 45 years |
| Office building related facility, machinery and equipment | – 15 years |
| Computer equipment | – 3 to 5 years |
| Office equipment | – 3 to 5 years |
| Vehicles | – 5 years |
| Leasehold improvements | – over the shorter of lease terms or estimated useful lives of the assets |

Fixed assets have no estimated residual value except for the office building and its related facility, machinery and equipment, which have an estimated residual value of 4% of the cost.

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful life of fixed assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in earnings. All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when they are ready for their intended use.

Interest costs are capitalized if they are incurred during the acquisition, construction or production of a qualifying asset and such costs could have been avoided if expenditures for the assets have not been made. Capitalization of

F-21

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

interest costs commences when the activities to prepare the asset are in progress and expenditures and borrowing costs are being incurred. Interest costs are capitalized until the assets are ready for their intended use. Interest costs capitalized for the years ended December 31, 2015, 2016 and 2017 were insignificant.

### *Licensed Copyrights*

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability recorded when cost of the content is known, the content has been accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our internet platform. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net", respectively.

The Company has two types of licensed copyrights, (i) non-exclusive licensed copyrights and (ii) exclusive licensed copyrights. With non-exclusive licensed copyrights, the Company has the right to broadcast the contents on its own internet platform. While, with exclusive licensed copyrights, in addition to the broadcasting right, the Company also has the right to sublicense the underlying contents to third parties.

Non-exclusive licensed copyrights, mainly comprising of newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising of library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. The major factors that impact the viewership consumption patterns include film box office, ratings for television series and variety shows, user traffic on our platforms, placement schedule, user tastes and preferences, emerging cultural trends, merchandising and marketing efforts. When the amortization pattern is revised, it is accounted for as a change in accounting estimate prospectively in accordance with ASC 250 ("ASC 250"), *Accounting Changes and Error Corrections*.

The purchase cost of exclusive licensed copyrights includes a broadcasting right and a right to sublicense to third parties, and the Company allocates the content cost to these two rights when the exclusive licensed copyrights are initially recognized based on the relative proportion of our estimate of the total revenues that will be generated by each right. For the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership revenues, the content costs are amortized in accordance with ASC 920-350 ("ASC 920-350"), *Entertainment-Broadcasters: Intangibles—Goodwill and Other*, using the same method as non-exclusive licensed copyrights as described above. For the right to sublicense to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, the content costs are amortized in accordance with ASC topic 926 ("ASC 926"), *Entertainment—Films* using an individual-film-forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. The Company revisits the forecasted total direct revenues on a periodic basis and any resulting changes to such estimates and the resulting amortization expense are accounted for prospectively as a change in accounting estimate in accordance with ASC 250.

On a periodic basis, the Company evaluates the program usefulness of the broadcasting rights of its licensed copyrights and record such rights at the lower of unamortized cost or estimated net realizable value pursuant to

F-22

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, the Company estimates net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from the provision of online advertising and membership services, less any direct costs, over the remaining useful lives of non-exclusive licensed copyrights. The Company estimates advertising and membership cash flows for each category of the content. Estimates that impact advertising and membership cash flows include anticipated levels of demand for our online advertising and membership services and the expected selling prices of our advertisements and membership. For the right to sublicense to third parties, the Company assesses recoverability in accordance with ASC 926-20, *Entertainment—Films: Other Assets—Film Costs*.

### Goodwill and Intangible Assets

Goodwill

The Company assesses goodwill for impairment in accordance with ASC subtopic 350-20 ("ASC 350-20"), *Intangibles—Goodwill and Other: Goodwill*, which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20.

As of December 31, 2016, the Company had three reporting units, consisting of Search Services, Transaction Services, and iQIYI. As part of the combination of Search Services and Transaction Services segments into Baidu Core segment, the Company determined that there were only two reporting units, Baidu Core and iQIYI starting from April 2017. The goodwill previously allocated to Search Services and Transaction Services was reassigned to Baidu Core.

The Company has the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If the Company believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and the Company is not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then the Company must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

The Company performed a qualitative assessment for the Baidu Core reporting unit. Based on the requirements of ASC 350-20, the Company evaluated all relevant factors including, but not limited to, macroeconomic conditions, industry and market conditions, financial performance, and the share price of the Company. The Company weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of each of the reporting units, and further impairment testing on goodwill was unnecessary as of December 31, 2017.

F-23

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The Company elected to assess goodwill for impairment using the two-step process for the iQIYI reporting unit. Significant management judgment is involved in determining these estimates and assumptions, and actual results may differ from those used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit which could trigger future impairment. The judgment in estimating the fair value of a reporting unit includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expenses growth rates, future capital expenditures and working capital levels, as well as an appropriate discount rate determined by a weighted average cost of capital approach and the selection of comparable companies operating in similar businesses. The Company also reviewed marketplace data to assess the reasonableness of assumptions such as discount rate, operating margins, and working capital levels. The fair value of iQIYI exceeded its carrying amount, and therefore goodwill related to the iQIYI reporting unit was not impaired and the Company was not required to perform further testing.

Intangible assets

Intangible assets with finite lives are carried at cost less accumulated amortization. Land use rights are amortized using a straight-line method over the shorter of their estimated economic lives or the terms of the related land use right contracts. All other intangible assets with finite lives except for the sublicensing rights obtained from barter transactions and certain licensed copyrights are amortized using the straight-line method over the estimated economic lives.

Intangible assets have weighted average economic lives from the date of purchase as follows:

| | |
|---|---|
| Land use rights | – 50 years |
| Customer relationships | – 3 years |
| Software | – 4 years |
| Trademarks | – 10 years |
| User list | – 3 years |
| Licensed copyrights of video contents | – 3 years |
| Others | – 6 years |

Intangible assets with an indefinite useful life are not amortized and are tested for impairment annually or more frequently if events or changes in circumstances indicate that they might be impaired in accordance with ASC subtopic 350-30 ("ASC 350-30"), *Intangibles-Goodwill and Other: General Intangibles Other than Goodwill*.

***Impairment of Long-Lived Assets Other Than Goodwill***

The Company evaluates long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC topic 360, *Property, Plant and Equipment*. When such events occur, the Company assesses the recoverability of the asset group based on the undiscounted future cash flow the asset group is expected to generate and recognizes an impairment loss when estimated undiscounted future cash flow expected to result from the use of the asset group plus net proceeds expected from disposition of the asset group, if any, is less than the carrying value of the asset group. If the Company identifies an impairment, the Company reduces the carrying amount of the asset group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Company uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

***Revenue Recognition***

The Company recognizes revenue in accordance with ASC topic 605 ("ASC 605"), *Revenue Recognition*. Revenue is recognized when the following four revenue recognition criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been provided, (iii) the selling price is fixed or determinable, and (iv) collectability is reasonably assured.

Performance-based online marketing services

*Cost-per-click*

The Company's auction-based P4P platform enables a customer to place its website link and related description on the Company's search result list on the platform which could be accessed through personal computer or mobile devices. Customers make bids on keywords based on how much they are willing to pay for each click to their listings in the search results listed on the Company's platform and the relevance between the keywords and the customer's businesses. Internet users' search of the keyword will trigger the display of the listings. The ranking of the customer's listing depends on both the bidding price and the listing's relevance to the keyword searched. Customers pay the Company only when a user clicks on one of its website links.

Besides the Company's traditional auction-based P4P services, the Company also displays in-feed marketing to targeted users through Baidu Feed. Customers pay the Company when a targeted user clicks the in-feed marketing and turns to its platforms.

For the type of cost-per-clicks, revenue is recognized when all of the revenue recognition criteria set forth in ASC 605 are met, which is generally when a user clicks on one of the customer-sponsored links or in-feed marketing.

*Other performance-based online marketing services*

To the extent the Company provides online marketing services based on performance criteria other than cost-per-click, such as the number of downloads (and user registration) of mobile applications and the pre-determined ratios of completed transaction volumes, revenue is recognized when the specified performance criteria are met together with satisfaction of other applicable revenue recognition criteria as prescribed by ASC 605.

Display-based online advertising services

The Company provides display-based online advertising services to customer by integrating text description, image and video, and displaying the advertisements in a prominent position of the search result page, vertical search products or through Baidu Feed. The Company recognizes revenue in accordance with ASC 605, on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on the Company's platform, or on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Online marketing services involving Baidu Union

Baidu Union is the program through which the Company expands distribution of its customers' sponsored links or advertisements by leveraging traffic of the Baidu Union members' internet properties. The Company makes

F-25

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

payments to Baidu Union members for acquisition of traffic. The Company recognizes gross revenue for the amount of fees it receives from its customers. Payments made to Baidu Union members are included in cost of revenues as traffic acquisition costs.

Membership services

The Company offers membership services which provide subscribing members access to streaming of premium content in exchange for a non-refundable upfront membership fee. Membership periods range from one month to twelve months. The receipt of membership fees is initially recorded as deferred revenue and we recognize revenue ratably over the membership period as services are rendered.

Financial services

The Company offers financial services which include provision of installment payment services to consumers and wealth management services to third-party investors. Interest income earned from provision of financial services is reported as "Other revenues" and reported on a net basis after deduction of related interest costs incurred. Gross interest income and interest costs recognized for the year ended December 31, 2017 were RMB3.5 billion (US$543 million) and RMB1.9 billion (US$288 million), respectively. Gross interest income and interest costs recognized for the years ended December 31, 2016 and 2015 were insignificant.

Barter transactions

*Nonmonetary exchanges of licensed copyrights of video contents*

The Company enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only; each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. The Company accounts for these nonmonetary exchanges in accordance with ASC topic 845 ("ASC 845"), *Nonmonetary Transactions*, and records the transaction based on the fair value of the asset surrendered. Barter sublicensing revenues are recognized in accordance with ASC subtopic 926-605, *Entertainment-Films; Revenue Recognition* when all of the following criteria are met: persuasive evidence of a sub-licensing arrangement with a customer exists, the content is delivered or is available for immediate and unconditional delivery, the sub-license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale, the arrangement fee is fixed or determinable and collection of the arrangement fee is reasonably assured, and when there are no other future obligations under the agreement. The Company estimates the fair value of the contents surrendered based on various factors, including comparable cash sublicensing transactions and relative size, scale, and market share of counterparties to the exchange.

The attributable cost of the barter transaction is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC 926. The Company recognized barter sublicensing revenues of RMB350 million, RMB382 million and RMB763 million (US$117 million) and related costs of RMB265 million, RMB363 million and RMB650 million (US$100 million) for the years ended December 31, 2015, 2016 and 2017, respectively.

F-26

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

*Other nonmonetary exchanges*

The Company engages in certain barter transactions other than licensed copyrights of video contents from time to time and in such situations follows the guidance set forth in ASC 845. While nonmonetary transactions are recorded at fair value, if such value is not determinable within reasonable limits, or the transaction lacks commercial substance, or the transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange, the transaction is recognized based on the carrying value of the product or services provided. The Company also engages in certain advertising barter transactions and follows the guidance set forth in ASC subtopic 605-20, *Revenue Recognition: Services*. The advertising barter transactions are recorded at fair value. If the fair value of the advertising surrendered in the barter transaction is not determinable within required limits, the barter transaction is recorded based on the carrying amount of the advertising surrendered, which is generally nil. The amount of revenues recognized for barter transactions other than licensed copyrights of video contents was insignificant for each of the years presented.

Other revenue recognition related policies

In accordance with ASC subtopic 605-25 ("ASC 605-25"), *Revenue Recognition: Multiple-Deliverable Revenue Arrangements,* for arrangements that include multiple deliverables, primarily for advertisements to be displayed in different spots, placed under different forms and occurring at different times, the Company would evaluate all the deliverables in the arrangement to determine whether they represent separate units of accounting. For the arrangements with deliverable items to be considered a separate unit of accounting, the Company allocates the total consideration of the arrangements based on their relative selling price, with the selling price of each deliverable determined using vendor-specific objective evidence of selling price, third-party evidence of selling price, or management's best estimate of the selling price ("BESP"), and recognizes revenue as each service deliverable is provided. The Company considers all reasonably available information in determining the BESP, including both market and entity-specific factors.

The Company delivers some of its online marketing services to end customers through engaging third-party distributors. In this context, the Company may provide cash incentives to distributors. The cash incentives are accounted for as a reduction of revenue in accordance with ASC subtopic 605-50 ("ASC 605-50"), *Revenue Recognition: Customer Payments and Incentives*.

The Company provides sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. The Company accounts for these award credits granted to customers in conjunction with a current sale of products or services as a multiple-element arrangement by analogy to ASC 605-25. The consideration allocated to the award credits is recorded as deferred revenue, based on the assumption that the customer will purchase the minimum amount of future service necessary to obtain the maximum award credits available. The deferred revenue is recognized as revenue proportionately as the future services are delivered to the customer or when the award credits expire.

The Company provides coupons and credits to the end users in certain businesses. The coupons and credits can be used to reduce the purchase price or to redeem for gifts. Coupons issued to end users as a result of a concurrent sale are recognized as reductions of the corresponding revenue in accordance with ASC 605-50. Coupons issued to end users for free and without concurrent sales are recognized as advertising and promotional expenses upon the actual usage of the coupons. Credits provided to end users for redeeming gifts in the future are accrued as advertising and promotional expenses upon issuance.

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

*Cost of Revenues*

Cost of revenues consists primarily of sales taxes (including business tax and value-added tax) and surcharges, traffic acquisition costs, bandwidth costs, depreciation, content costs, payroll and related costs of operations.

The Company incurs sales taxes and surcharges in connection with the provision of online marketing services, technical and consultative service fees charged by its subsidiaries to VIEs and other taxable services in the PRC. In accordance with ASC subtopic 605-45, *Revenue Recognition: Principal Agent Considerations*, the Company includes the sales tax and surcharges incurred on its online marketing revenues in cost of revenues. The sales tax and surcharges in cost of revenues for the years ended December 31, 2015, 2016 and 2017 were RMB4.6 billion, RMB4.7 billion and RMB6.2 billion (US$951 million), respectively. Traffic acquisition costs represent the amounts paid or payable to Baidu Union members who direct search queries to the Company's websites or distribute the Company's customers' paid links through their properties. These payments are primarily based on revenue sharing arrangements under which the Company pays its Baidu Union members and other business partners a percentage of the fees it earns from its online marketing customers.

*Advertising and Promotional Expenses*

Advertising and promotional expenses, including advertisements through various forms of media and kinds of marketing and promotional activities, are included in "Selling, general and administrative expense" in the consolidated statements of comprehensive income (loss) and are expensed when incurred. Advertising and promotional expenses for the years ended December 31, 2015, 2016 and 2017 were RMB9.8 billion, RMB7.7 billion and RMB4.6 billion (US$700 million), respectively.

*Government Subsidies*

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. For certain government subsidies, there are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies of non-operating nature with no further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government subsidies with certain operating conditions are recorded as "deferred income" when received and will be recorded as operating income when the conditions are met.

*Leases*

Leases are classified as either capital or operating leases. Leases that transfer substantially all the benefits and risks incidental to the ownership of assets are accounted for as capital leases as if there was an acquisition of an asset and incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred.

*Income Taxes*

The Company recognizes income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. The Company records a valuation allowance against the amount of deferred tax assets that it determines is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date.

F-28

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The Company applies the provisions of ASC topic 740 ("ASC 740"), *Income Taxes*, in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company has elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2015, 2016 and 2017, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

*Share-based Compensation*

The Company accounts for share-based compensation in accordance with ASC topic 718 ("ASC 718"), *Compensation-Stock Compensation.* The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the replacement award, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of the original award, using either the original term or the new term, whichever results in higher expenses for each reporting period.

The Company accounts for share awards issued to non-employees in accordance with the provisions of ASC subtopic 505-50, *Equity: Equity-based Payments to Non-Employees*. The Company uses the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

*Earnings Per Share ("EPS")*

The Company computes earnings per Class A and Class B ordinary shares in accordance with ASC topic 260 ("ASC 260"), *Earnings Per Share*, using the two-class method. Under the provisions of ASC 260, basic earnings per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. The Company accounts for the accretion of the redeemable noncontrolling interests in the calculation of income available to ordinary shareholders of the Company used in the earnings per share calculation.

Diluted earnings per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, restricted shares subject to

F-29

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

forfeiture, and contracts that may be settled in the Company's stock or cash. The dilutive effect of outstanding stock options and restricted shares is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted earnings per Class A ordinary share assumes the conversion of Class B ordinary shares to Class A ordinary shares, while diluted earnings per Class B ordinary share does not assume the conversion of such shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting rights. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted earnings per Class A ordinary share, the undistributed earnings are equal to net income for that computation.

For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

### Contingencies

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, if such estimate can be made and material, or states that such estimate is immaterial if it can be estimated but immaterial, or discloses that an estimate cannot be made. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involves complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

### Concentration of Risks

Concentration of credit risk

Financial instruments that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, amounts due from related parties and loan receivables. As of December 31, 2017, the Company has RMB100.7 billion (US$15.5 billion) in cash and cash equivalents, restricted cash, and short-term investments, 95.95% and 4.05% of which are held by financial institutions in the PRC and international financial institutions outside of the PRC, respectively. The Company's total cash and cash equivalents, restricted cash, and short-term investments held at

F-30

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Bank of China, China Construction Bank, China Merchants Bank, and Bank of Communications exceeded 10%, representing 25.26%, 18.83%, 12.56% and 10.50% of the Company's total cash and cash equivalents, restricted cash, and short-term investments as of December 31, 2017, respectively.

PRC state-owned banks, such as Bank of China, are subject to a series of risk control regulatory standards, and PRC bank regulatory authorities are empowered to take over the operation and management when any of those banks faces a material credit crisis. The Company does not foresee substantial credit risk with respect to cash and cash equivalents, restricted cash and short-term investments held at the PRC state-owned banks. Meanwhile, China does not have an official deposit insurance program, nor does it have an agency similar to what was the Federal Deposit Insurance Corporation (FDIC) in the U.S. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable international financial institutions with high rating rates to place its foreign currencies. The Company regularly monitors the rating of the international financial institutions to avoid any potential defaults. There has been no recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and derived from revenue earned from customers and agents in China, which are exposed to credit risk. The risk is mitigated by credit evaluations the Company performs on its customers and its ongoing monitoring process of outstanding balances. The Company maintains reserves for estimated credit losses and these losses have generally been within its expectations. As of December 31, 2017 and 2016, the Company had no single customer with a receivable balance exceeding 10% of the total accounts receivable balance.

No customer or any Baidu Union member generated greater than 10% of total revenues in any of the years presented.

Amounts due from related parties are typically unsecured and repayable on demand. In evaluating the collectability of the amounts due from related parties balance, the Company considers many factors, including the related parties' repayment history and their credit-worthiness. An allowance for doubtful accounts is made when collection of the full amount is no longer probable.

Business and economic risks

The Company participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

The Company's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

Currency convertibility risk

Substantially all of the Company's businesses are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through Bank of China or other banks authorized

F-31

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

Foreign currency exchange rate risk

The functional currency and the reporting currency of the Company are the US$ and the RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, short-term investments, long-term investments and notes payable denominated in the US$. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The depreciation of the US$ against the RMB was approximately 6.29% in 2017. Most of the revenues and costs of the Company are denominated in RMB, while a portion of cash and cash equivalents, short-term financial assets, investments and notes payable are denominated in U.S. dollars. Any significant devaluation of RMB may materially and adversely affect the Company's cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, the ADS in US$.

*Derivative Instruments*

ASC topic 815 ("ASC 815"), *Derivatives and Hedging*, requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other comprehensive income depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings. The estimated fair values of derivative instruments are determined at discrete points in time based on the relevant market information. These estimates are calculated with reference to the market rates using industry standard valuation techniques. The fair value of the derivative instruments held by the Company was insignificant for all years presented.

*Recent Accounting Pronouncements*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09 ("ASU 2014-09"), *Revenue from Contracts with Customers.* ASU 2014-09 supersedes the revenue recognition requirements in ASC 605, and requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. ASU 2014-09 is originally effective for the annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. ASU 2015-14, *Revenue from Contracts with Customers*, defers the effective date of ASU 2014-09 by one year. As a result, ASU 2014-09 is effective for annual reporting periods beginning after December 15, 2017 and interim periods therein. Early adoption is permitted to the original effective date. The Company will adopt the new standard effective January 1, 2018, using the modified retrospective method. The cumulative effect of initially applying the guidance will be recognized at the date of initial application is not expected to be material and prior periods will not be retrospectively adjusted. The Company has substantially completed the assessment and implementation work, and the main impact will be the reclassification of value-added tax from cost of revenues to net against revenues. If presented net of value-added tax, revenues for the year ended December 31, 2017 would have been approximately 5.6% lower than currently presented.

F-32

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

In January 2016, the FASB issued ASU No. 2016-01 ("ASU 2016-01"), *Financial Instruments*. ASU 2016-01 requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net income. An entity may choose to measure equity investments that do not have readily determinable fair values at cost minus impairment, if any, plus or minus changes resulting from observable price changes in orderly transactions for the identical or a similar investment of the same issuer. ASU 2016-01 also simplifies the impairment assessment of equity investments without readily determinable fair values by requiring a qualitative assessment to identify impairment. When a qualitative assessment indicates that impairment exists, an entity is required to measure the investment at fair value. For public business entities, the amendments are effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption is permitted. The Company will adopt the new standard effective January 1, 2018. The adoption of ASU 2016-01 will increase the volatility of the Company's "Other income, net", resulting from the remeasurement of equity investments. The cumulative effect of initially applying the guidance is RMB676 million (US$104 million) will be reclassed from "Accumulated other comprehensive income" to "Retained earnings" at the date of initially applying the guidance.

In February 2016, the FASB issued ASU No. 2016-02 ("ASU 2016-02"), *Leases*. ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. The Company will adopt ASU 2016-02 in the first quarter of 2019. The Company is currently evaluating the impact of adopting this standard on its consolidated financial statements.

## 3.  BUSINESS COMBINATIONS

The total purchase consideration for business combinations were RMB332 million, nil and RMB721 million (US$111 million) for the years ended December 31, 2015, 2016 and 2017, respectively. The Company expected to complement its existing businesses and achieve significant synergies from such acquisitions. The acquired entities were considered insignificant, both individually and in aggregate. The results of the acquired entities' operations have been included in the Company's consolidated financial statements since their respective dates of acquisition.

Neither the results of operations since the acquisition dates nor the pro forma results of operations of the acquirees were presented because the effects of these business combinations, both individually and in aggregate, were not significant to the Company's consolidated results of operations.

## 4.  INVESTMENTS

### Short-term Investments

As of December 31, 2017, all of the short-term held-to-maturity investments were time deposits in commercial banks with maturities of less than one year. The short-term available-for-sale investments are debt securities with maturities of less than one year purchased from commercial banks and other financial institutions, and equity securities of a publicly listed company.

During the years ended December 31, 2015, 2016 and 2017, the Company recorded interest income from its short-term investments of RMB2.2 billion, RMB2.3 billion and RMB3.0 billion (US$455 million) in the consolidated statements of comprehensive income, respectively.

F-33

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The short-term held-to-maturity debt investments as well as the short-term available-for-sale debt investments will mature within one year.

### Long-term Investments

The Company's long-term investments consist of cost method investments, equity method investments, available-for-sale investments and investments accounted for at fair value.

Cost method investments

The carrying amount of cost method investments was RMB12.9 billion and RMB21.8 billion (US$3.3 billion) as of December 31, 2016 and 2017, respectively. The Company's investments in preferred shares of the investees are not considered in-substance common stock if these preferred shares contain substantive dividend preference, liquidation preference and/or redemption feature and if they do not have mandatory redemption features nor readily determinable fair values. Investments in these preferred shares are accounted for under the cost method.

In 2016, the Company exchanged its equity shares of Uber (Cayman), Ltd. ("Uber China"), with Xiaoju Kuaizhi, Inc. ("Didi"), a China based ridesharing company, upon the merger of the two companies. The Company recognized a total gain of RMB2.0 billion in "Other income, net", and the retained investment in Didi was accounted for as a cost method investment.

In May 2017, the Company completed the disposal of its mobile game business to third-party companies, a total gain of RMB923 million (US$142 million) was recognized in "Other income, net".

In August 2017, the Company completed the disposal of Xiaodu Life Technology Ltd ("Xiaodu"), a former subsidiary of the Company primarily engaged in the business of takeout delivery services, to Rajax Holding, a China based delivery company. The Company recognized a total gain of RMB4.6 billion (US$712 million) in "Other income, net", and also the retained an investment in Rajax Holding was accounted for as a cost method investment.

In October 2017, the Company completed the share purchase transaction of China United Network Communication Limited ("China Unicom"), listed telecommunications company in China. The total purchase consideration was RMB7.0 billion (US$1.1 billion) in cash with RMB4.0 billion (US$615 million) attributable to noncontrolling interest. The investment in China Unicom was held by a non wholly-owned subsidiary of the Company and was accounted for as a cost method investment due to a three-year holding requirement.

Equity method investments

*Equity Investment in Ctrip.com International, Ltd. ("Ctrip")* On October 26, 2015, the Company completed a share exchange transaction with Ctrip ("Ctrip transaction"), a company engaged in the online travelling business. The Company exchanged its beneficially owned 178,702,519 Class A ordinary shares and 11,450,000 Class B ordinary shares of its majority-owned subsidiary Qunar Cayman Islands Limited ("Qunar") in exchange for 11,488,381 newly-issued ordinary shares of Ctrip. The Company recognized a total gain of RMB24.4 billion from the Ctrip transaction in "Other income, net" in the consolidated statements of comprehensive income for the year ended December 31, 2015. In 2016, further shares were acquired by the Company, and as of December 31, 2017 the Company held approximately 19% of Ctrip's outstanding shares. The fair value of the Company's equity investment in Ctrip based on the market price of Ctrip's shares listed on the NASDAQ was RMB29.2 billion and RMB30.2 billion (US$4.6 billion) as of December 31, 2016 and 2017, respectively. The Company accounts for the investment in Ctrip as an equity method investment in accordance with ASC 323 due to its significant influence over the entity.

F-34

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The following tables set forth the summarized financial information of Ctrip:

|  | As of September 30,* | | |
|---|---|---|---|
|  | **2016** | **2017** | **2017** |
|  | **RMB** | **RMB** | **US$** |
|  | | **(In millions)** | |
| Current assets | 52,222 | 63,241 | 9,505 |
| Non-current assets | 83,336 | 99,986 | 15,028 |
| Current liabilities | 33,174 | 41,972 | 6,309 |
| Non-current liabilities | 31,128 | 37,590 | 5,650 |
| Noncontrolling interests | 3,678 | 1,935 | 291 |

|  | For the twelve months ended September 30,* | | | |
|---|---|---|---|---|
|  | **2015** | **2016** | **2017** | **2017** |
|  | **RMB** | **RMB** | **RMB** | **US$** |
|  | | **(In millions)** | | |
| Total revenues | 10,485 | 17,642 | 25,731 | 3,955 |
| Gross profit | 7,073 | 12,669 | 20,725 | 3,185 |
| (Loss) income from operations | (115) | (1,681) | 2,626 | 404 |
| Net income (loss) | 2,053 | (2,177) | 2,282 | 351 |
| Net income (loss) attributable to the investees | 2,208 | (2,000) | 2,284 | 351 |

\*   The Company adopted a one-quarter lag in reporting its share of equity income in Ctrip

During the year ended December 31, 2016, the Company derecognized a group of assets sold to a third party and deconsolidated several subsidiaries due to the loss of a controlling equity interest in the subsidiary or substantive participating rights granted to other minority shareholders of the subsidiaries. An aggregate gain of RMB1.4 billion was recognized in "Other income, net" during the year ended December 31, 2016 accordingly. The Company's retained interest in these subsidiaries were accounted for as equity method investments. Fair values of investments retained were estimated by using the income approach or market approach. Inputs used in these methodologies primarily included future cash flows, discount rate, and the selection of comparable companies operating in similar businesses. The transactions with these equity investees are aggregately disclosed in Note 20.

As of December 31, 2016 and 2017, besides Ctrip the Company held several other equity method investments through its subsidiaries or VIEs, all of which the Company can exercise significant influence but does not own a majority equity interest in or has control over. The carrying amount of all of the equity method investments including Ctrip was RMB32.3 billion and RMB31.4 billion (US$4.8 billion) as of December 31, 2016 and 2017, respectively. The Company excluded the summarized information for these other equity method investments, as the other equity investees were insignificant for all the years presented.

Available-for-sale equity investments and investments accounted for at fair value

Long-term available-for-sale equity investments represent investments in the equity securities of publicly listed companies. As the Company does not have significant influence over the investees, the investments were classified as available-for-sale and reported at fair value. Long-term investments accounted for at fair value represents certain equity investments of private companies. These investments are carried at fair value with realized or unrealized gains and losses recorded in the consolidated income statements.

F-35

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The methodology used in the determination of fair values for available-for-sale equity investments, other invested securities and investments accounted for at fair value are summarized in Note 22.

The total impairment charges on long-term investments were RMB117 million, RMB245 million and RMB597 million (US$92 million) for the years ended December 31, 2015, 2016 and 2017, respectively.

| | As of December 31, 2016 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Cost or Amortized cost RMB | Gross unrecognized holding gains RMB | Gross unrecognized holding losses RMB | Gross unrealized gains RMB | Gross unrealized losses RMB | Fair value RMB |
| | | | (In millions) | | | |
| **Short-term investments** | | | | | | |
| Fixed-rate held-to-maturity investments | 41,802 | 70 | (4) | | | 41,868 |
| Fixed-rate available-for-sale debt investments | 14,353 | | | 31 | (6) | 14,378 |
| Adjustable-rate available-for-sale debt investments | 14,674 | | | 313 | | 14,987 |
| Available-for-sale equity investments | 33 | | | | (4) | 29 |
| **Other invested securities** | 7,686 | | | 62 | | 7,748 |
| **Long-term investments** | | | | | | |
| Available-for-sale equity investments | 528 | | | | (31) | 497 |

| | As of December 31, 2017 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Cost or Amortized cost RMB | Gross unrecognized holding gains RMB | Gross unrecognized holding losses RMB | Gross unrealized gains RMB | Gross unrealized losses RMB | Fair value RMB | Fair value US$ |
| | | | | (In millions) | | | |
| **Short-term investments** | | | | | | | |
| Fixed-rate held-to-maturity investments | 48,666 | 47 | (18) | | | 48,695 | 7,484 |
| Fixed-rate available-for-sale debt investments | 29,550 | | | 477 | (5) | 30,022 | 4,614 |
| Adjustable-rate available-for-sale debt investments | 10,589 | | | 104 | | 10,693 | 1,643 |
| **Other invested securities** | 18,289 | | | 169 | (108) | 18,350 | 2,820 |
| **Long-term investments:** | | | | | | | |
| Available-for-sale equity investments | 2,077 | | | 742 | (46) | 2,773 | 426 |
| Investments accounted for at fair value | 307 | | | 14 | | 321 | 49 |

F-36

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

### 5.   ACCOUNTS RECEIVABLE

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2016**<br>**RMB** | **2017**<br>**RMB** | **2017**<br>**US$** |
| | **(In millions)** | | |
| Accounts receivable | 4,286 | 4,887 | 751 |
| Allowance for doubtful accounts | (177) | (316) | (48) |
| | 4,109 | 4,571 | 703 |

The movements in the allowance for doubtful accounts were as follows:

| | **2015**<br>**RMB** | **2016**<br>**RMB** | **2017**<br>**RMB** | **2017**<br>**US$** |
| --- | --- | --- | --- | --- |
| | | **(In millions)** | | |
| Balance as of January 1 | 94 | 190 | 177 | 27 |
| Amounts charged to expenses | 115 | 39 | 190 | 29 |
| Amounts written off | (19) | (52) | (51) | (8) |
| Balance as of December 31 | 190 | 177 | 316 | 48 |

### 6.   LOANS AND INTEREST RECEIVABLE

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2016**<br>**RMB** | **2017**<br>**RMB** | **2017**<br>**US$** |
| | **(In millions)** | | |
| Loans and interest receivable, current | 1,849 | 24,598 | 3,780 |
| Allowance for credit losses | (49) | (660) | (101) |
| Net loans and interest receivable, current | 1,800 | 23,938 | 3,679 |
| | | | |
| Loans and interest receivable, non-current | 2,778 | 3,571 | 549 |
| Allowance for credit losses | (69) | (104) | (16) |
| Net loans and interest receivable, non-current | 2,709 | 3,467 | 533 |

The movements in the allowance for credit losses were as follows:

| | **2015**<br>**RMB** | **2016**<br>**RMB** | **2017**<br>**RMB** | **2017**<br>**US$** |
| --- | --- | --- | --- | --- |
| | | **(In millions)** | | |
| Balance as of January 1 | — | 9 | 118 | 18 |
| Additions | 9 | 109 | 888 | 136 |
| Charge-offs | — | — | (242) | (37) |
| Balance as of December 31 | 9 | 118 | 764 | 117 |

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

## 7.   OTHER CURRENT ASSETS

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 RMB | 2017 RMB | 2017 US$ |
| | | (In millions) | |
| Prepaid expenses | 389 | 398 | 61 |
| Advances to suppliers | 923 | 764 | 117 |
| Receivables from online payment agencies | 410 | 312 | 48 |
| Deposits | 239 | 204 | 31 |
| Purchased copyrights | 593 | 819 | 126 |
| Others | 791 | 928 | 143 |
| | 3,345 | 3,425 | 526 |

## 8.   FIXED ASSETS

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 RMB | 2017 RMB | 2017 US$ |
| | | (In millions) | |
| Computer equipment | 15,193 | 18,354 | 2,821 |
| Office building | 3,247 | 4,003 | 615 |
| Office building related facility, machinery and equipment | 1,772 | 1,956 | 301 |
| Vehicles | 45 | 80 | 12 |
| Office equipment | 546 | 690 | 106 |
| Leasehold improvements | 316 | 341 | 52 |
| Construction in progress | 755 | 680 | 105 |
| | 21,874 | 26,104 | 4,012 |
| Accumulated depreciation and impairment | (10,580) | (13,629) | (2,095) |
| | 11,294 | 12,475 | 1,917 |

The Company obtained certain computer servers and equipment by entering into capital leases. The gross amount and the accumulated depreciation of these servers and equipment were RMB221 million and RMB210 million, respectively, as of December 31, 2016 and RMB198 million (US$30 million) and RMB198 million (US$30 million), respectively, as of December 31, 2017.

Depreciation expense of the fixed assets, including assets under capital leases, was RMB2.9 billion, RMB3.4 billion and RMB3.8 billion (US$580 million) for the years ended December 31, 2015, 2016 and 2017, respectively. The Company recognized impairment charges on fixed assets of nil, nil and RMB70 million (US$11 million) for the years ended December 31, 2015, 2016 and 2017, respectively.

## 9.   GOODWILL AND INTANGIBLE ASSETS

### Goodwill

There were three reporting units as of December 31, 2015 and 2016. Starting from April 2017, Search Services and Transaction Services were combined into one reporting unit, namely, Baidu Core, resulting in two reporting units, Baidu Core and iQIYI, as of December 31, 2017.

F-38

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The changes in carrying amount of goodwill for each reporting unit from December 31, 2015 to March 31, 2017 were as follow:

| | Search Services RMB | Transaction Services RMB | iQIYI RMB | Total RMB |
|---|---|---|---|---|
| | | (In millions) | | |
| Balance at December 31, 2015 | 10,823 | 1,297 | 3,276 | 15,396 |
| Goodwill disposed | (38) | (16) | — | (54) |
| Balance at December 31, 2016 | 10,785 | 1,281 | 3,276 | 15,342 |
| Goodwill acquired | 499 | — | — | 499 |
| Balance at March 31, 2017 | 11,284 | 1,281 | 3,276 | 15,841 |

The changes in carrying amount of goodwill for each reporting unit after March 31, 2017 were as follow:

| | Baidu Core RMB | iQIYI RMB | Total RMB |
|---|---|---|---|
| | | (In millions) | |
| Balance at March 31, 2017 | 12,565 | 3,276 | 15,841 |
| Goodwill acquired | 81 | — | 81 |
| Goodwill disposed | (116) | — | (116) |
| Balance at December 31, 2017 | 12,530 | 3,276 | 15,806 |
| Balance at December 31, 2017, in US$ | 1,926 | 503 | 2,429 |

### *Intangible Assets*

Finite-lived intangible assets

| | As of December 31, 2016 | | |
|---|---|---|---|
| | Gross carrying value RMB | Accumulated amortization and impairment RMB | Net carrying value RMB |
| | | (In millions) | |
| Land use right | 464 | (54) | 410 |
| Customer relationships | 463 | (462) | 1 |
| Software | 544 | (424) | 120 |
| Trademarks | 596 | (205) | 391 |
| User list | 699 | (657) | 42 |
| Licensed copyrights of video contents | 5,608 | (2,993) | 2,615 |
| Others | 738 | (459) | 279 |
| | 9,112 | (5,254) | 3,858 |

F-39

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

| | As of December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Gross carrying value | Accumulated amortization and impairment | Net carrying value | Net carrying value |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Land use right | 464 | (193) | 271 | 42 |
| Customer relationships | 463 | (463) | — | — |
| Software | 537 | (499) | 38 | 6 |
| Trademarks | 578 | (464) | 114 | 17 |
| User list | 677 | (667) | 10 | 2 |
| Licensed copyrights of video contents | 9,384 | (4,826) | 4,558 | 700 |
| Others | 1,066 | (591) | 475 | 73 |
| | 13,169 | (7,703) | 5,466 | 840 |

The Company recognized impairment loss on intangible assets of nil, RMB213 million and RMB529 million (US$81 million) for the years ended December 31, 2015, 2016 and 2017, respectively. Amortization expense of intangible assets for the years ended December 31, 2015, 2016 and 2017 were RMB2.5 billion, RMB4.7 billion and RMB7.9 billion million (US$1.2 billion ), respectively.

Estimated amortization expense relating to the existing intangible assets with finite lives for each of the next five years is as follows:

| | RMB | US$ |
| --- | --- | --- |
| | (In millions) | |
| For the years ending December 31, | | |
| 2018 | 2,540 | 390 |
| 2019 | 1,383 | 213 |
| 2020 | 813 | 125 |
| 2021 | 304 | 47 |
| 2022 | 118 | 18 |

Indefinite-lived intangible assets

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Domain names | 9 | — | — |
| Trademarks | 5 | 1 | — |
| | 14 | 1 | — |

F-40

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

## 10.   ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | **2016** | **2017** | **2017** |
|  | **RMB** | **RMB** | **US$** |
|  |  | **(In millions)** |  |
| Accrued payroll and welfare | 1,445 | 1,779 | 273 |
| Tax payable | 793 | 2,271 | 349 |
| Interest payable | 102 | 267 | 41 |
| Users' and distributors' deposits | 660 | 563 | 87 |
| Purchase of fixed assets and spare parts | 1,208 | 1,592 | 244 |
| Traffic acquisition costs | 1,968 | 2,482 | 381 |
| Bandwidth costs | 1,353 | 1,824 | 280 |
| Content acquisition costs | 3,360 | 5,866 | 902 |
| Funds collected on behalf of service providers | 1,606 | 529 | 81 |
| Payable to merchants | 469 | 330 | 51 |
| Accrued other operating expenses | 6,482 | 7,720 | 1,186 |
| Others | 2,184 | 2,300 | 354 |
|  | 21,630 | 27,523 | 4,229 |

## 11.   LOANS PAYABLE

### *Short-term Loans*

On January 22, 2016, iQIYI entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which iQIYI is entitled to borrow an unsecured RMB denominated loan of RMB200 million (US$31 million) for one year with a fixed annual interest rate at 95% of the benchmark one-year lending rate published by the People's Bank of China. The loan is intended for general working capital purposes. On January 29, 2016, iQIYI drew down RMB54 million (US$8 million) with a fixed interest rate of 4.13%. On February 26, 2016, iQIYI drew down an additional RMB21 million (US$3 million) with a fixed interest rate of 4.13%. On December 14, 2016, additional RMB26 million (US$4 million) was drawn down with a fixed interest rate of 4.13%. The loan was fully repaid when it became due.

On July 11, 2016, the Company entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB200 million (US$31 million) for one year with a fixed annual interest rate at benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for the consumer credit business exclusively. On July 19, 2016, the Company drew down RMB50 million (US$8 million) with a fixed interest rate of 4.35%. On August 8, 2016, an additional RMB80 million (US$12 million) was drawn down with a fixed interest rate of 4.35%. The loan was fully repaid when it became due.

On July 11, 2016, the Company entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB150 million (US$23 million) for one year with an interest rate based on the Loan Prime Rate ("LPR") plus 48.50 basis points. This facility is reserved for the consumer credit business exclusively. On September 23, 2016, the Company drew down RMB150 million (US$23 million) with an interest rate of 4.78% under the facility commitment. The loan was fully repaid when it became due.

F-41

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

On August 12, 2016, the Company entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB150 million (US$23 million) for one year with an interest rate based on LPR plus 26.75 basis points. This facility is reserved for the consumer credit business. On August 16, 2016, the Company drew down RMB150 million (US$23 million) with an interest rate of 4.56% under the facility commitment. The loan was fully repaid when it became due.

On November 17, 2016, the Company entered into a loan agreement with International Finance Corporation, pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB500 million (US$77 million) with a term of one year, and to be used for the consumer credit business exclusively. On December 9, 2016, the Company drew down RMB500 million (US$77 million) with a fixed interest rate of 4.92%. The loan was extended to December 8, 2018 with an interest rate of 6.04% via a renewed contract signed by both parties when the original loan became due.

On November 24, 2016, the Company entered into a loan agreement with China Merchants Bank (Shanghai Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB100 million (US$15 million) with a term of one year. Pursuant to the agreement the loan shall be used by the Company for the consumer credit business exclusively. On December 19, 2016, the Company drew down RMB85 million (US$13 million) with a fixed interest rate of 4.18%. On January 24, 2017, an additional RMB15 million (US$2 million) was drawn down with a fixed interest rate of 4.18%.The first loan withdrawal made on December 19, 2016 was fully repaid when it became due.

On June 12, 2017, iQIYI entered into a banking facility agreement with China Minsheng Bank (Beijing Branch), pursuant to which iQIYI is entitled to borrow a secured RMB denominated loan of RMB300 million (US$46 million) for one year with fixed interest rate. The loan is intended for general working capital purposes. On November 17, 2017, iQIYI drew down RMB132 million (US$20 million) with an interest rate of 4.78%. On November 30, 2017, iQIYI drew down RMB62 million (US$10 million) with an interest rate of 5.00%.

On August 15, 2017, iQIYI entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which iQIYI is entitled to borrow a secured RMB denominated loan of RMB200 million (US$31 million) for one year with an interest rate based on LPR plus surcharges. The loan is intended for general working capital purposes. On September 30, 2017, iQIYI drew down RMB106 million (US$16 million) with an effective interest rate of 4.11%.

On August 21, 2017, the Company entered into a banking facility agreement with China Merchants Bank (Beijing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB300 million (US$46 million) for one year with an annual interest rate at 116% of benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for consumer credit business purposes. On September 30, 2017, the Company drew down RMB130 million (US$20 million) with an interest rate of 5.05%.

On September 29, 2017, the Company entered into a banking facility agreement with China Citic Bank (Chongqing Branch), pursuant to which the Company is entitled to borrow an unsecured RMB denominated loan of RMB300 million (US$46 million) for one year with an annual interest rate at 115% of benchmark one-year lending rate published by the People's Bank of China. This facility is reserved for consumer credit business. On September 29, 2017, the Company drew down RMB300 million (US$46 million) with an interest rate of 5.00% under the facility commitment.

F-42

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

*Long-term Loans*

On December 9, 2014, the Company entered into two loan agreements with Bank of China (Los Angeles Branch), pursuant to which the Company borrowed two unsecured US$ denominated loans of RMB976 million (US$150 million) with a term of two years and RMB976 million (US$150 million) with a term of three years. Both loans are intended for the general working capital of the Company and have a floating interest rate. In connection with the loan agreements, the Company entered into two interest swap agreements, pursuant to which the loans will be settled with a fixed annual interest rate of 2.31% and 2.45%, respectively, during the respective term of the loans. The loans were fully repaid when they became due.

On July 17, 2015, the Company entered into a loan agreement with Sumitomo Mitsui Banking Corporation, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB976 million (US$150 million) with a floating interest rate. The loan is intended for the general working capital of the Company. On August 10, 2015, the Company drew down RMB976 million (US$150 million) with a term of two years under the facility commitment. In connection with the loan agreement, the Company entered into an interest rate swap agreement, pursuant to which the loan will be settled with a fixed annual interest rate of 1.41% during the term of the loan. The loan was fully repaid when it became due.

On August 25, 2015, the Company entered into a loan agreement with The Hong Kong and Shanghai Banking Corporation Limited, pursuant to which the Company is entitled to borrow an unsecured US$ denominated loan of RMB1.3 billion (US$200 million) with a fixed annual interest rate of 1.42%. The loan is intended for the general working capital of the Company. On August 28, 2015, the Company drew down RMB1.3 billion (US$200 million) with a term of two years under the facility commitment. The loan was fully repaid when it became due.

On June 8, 2016, the Company entered into a five-year term and revolving facility agreement with a group of 21 arrangers, pursuant to which the Company is entitled to borrow an unsecured US$ denominated floating rate loan of RMB6.5 billion (US$1.0 billion) with a term of five years and to borrow an unsecured US$ denominated revolving loan of RMB6.5 billion (US$1.0 billion) for five years. The facility was priced at 110 basis points over LIBOR and is intended for the general working capital of the Company. On June 22, 2016, the Company drew down two tranches of RMB1.6 billion (US$250 million) under the facility commitment. On November 25, 2016, the Company drew down an additional RMB1.6 billion (US$250 million) under the facility commitment. On November 26, 2016, an additional RMB1.6 billion (US$250 million) was drawn down under the facility commitment. In connection with the facility agreements, the Company entered into four interest rate swap agreements, pursuant to which the loans will be settled with a fixed annual interest rate of 2.11%, 2.10%, 2.78% and 2.78% respectively, during the respective term of the loans.

On April 10, 2017, iQIYI entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which the Company is entitled to borrow a secured RMB denominated loan of RMB299 million (US$46 million) with an annual interest rate at 94% of benchmark three-year lending rate published by the People's Bank of China. The loan is intended for the general working capital of the Company. On April 11, 2017, iQIYI drew down RMB299 million (US$46 million) with an interest rate of 4.47%, pursuant to the agreements, the principal shall be repaid by installments from September 21, 2017 to April 10, 2020. RMB5 million (US$1 million) was repaid when it became due. The amount repayable within twelve months was classified as "Long-term loans, current portion".

The interest rate swap agreements met the definition of a derivative in accordance with ASC 815. The derivatives related to the interest rate swap agreements are accounted at fair value and included in "Other non-current assets" on consolidated balance sheets.

F-43

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

**12.   NOTES PAYABLE**

*Baidu, Inc.*

On November 28, 2012, the Company issued and sold publicly two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750 million which will mature on November 28, 2017 (the "2017 Notes"), and (ii) an aggregate principal amount of US$750 million which will mature on November 28, 2022 (the "2022 Ten-year Notes"). On August 6, 2013, the Company issued and publicly sold another tranche of unsecured senior notes with an aggregate principal amount of US$1.0 billion which will mature on August 6, 2018 (the "2018 Notes"). On June 9, 2014, the Company issued and publicly sold the fourth tranche of unsecured senior notes with an aggregate principal amount of US$1.0 billion which will mature on June 9, 2019 (the "2019 Notes"). On June 30, 2015, the Company issued and publicly sold two tranches of unsecured senior notes: (i) an aggregate principal amount of US$750 million which will mature on June 30, 2020 (the "2020 Notes"), and (ii) an aggregate principal amount of US$500 million which will mature on June 30, 2025 (the "2025 Notes"). On July 6, 2017, the Company issued and publicly sold two tranches of unsecured senior notes: (i) an aggregate principal amount of US$900 million which will mature on July 6, 2022 (the "2022 Five-year Notes"), and (ii) an aggregate principal amount of US$600 million which will mature on July 6, 2027 (the "2027 Notes"). The 2017 Notes was fully repaid when it became due.

The 2017 Notes, 2018 Notes, 2019 Notes, 2020 Notes, 2022 Ten-year Notes, 2025 Notes, 2022 Five-year Notes and 2027 Notes are collectively referred to as the "Notes".

The 2017 Notes bear interest at the rate of 2.25% per annum and the 2022 Ten-year Notes bear interest at the rate of 3.50% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on May 28, 2013. The 2018 Notes bear interest at the rate of 3.25% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on February 6, 2014. The 2019 Notes bear interest at the rate of 2.75% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on December 9, 2014. The 2020 Notes bear interest at the rate of 3.00% per annum and the 2025 Notes bear interest at the rate of 4.13% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on December 30, 2015. At maturity, the Notes are payable at their principal amount plus accrued and unpaid interest thereon. The 2022 Five-year Notes bear interest at the rate of 2.88% per annum and the 2027 Notes bear interest at the rate of 3.63% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on January 6 and July 6 of each year.

The net proceeds from the Notes, which will be used for general corporate purposes, were RMB7.8 billion, nil and RMB10.1 billion (USD1.6 billion) for the years ended December 31, 2015, 2016 and 2017, respectively.

The Notes do not contain any financial covenants or other significant restrictions. In addition, the Notes are unsecured and rank lower than any secured obligation of the Group and have the same liquidation priority as any other unsecured liabilities of the Group, but senior to those expressly subordinated obligations, if any. The Company may, at its discretion, redeem all or any portion of the Notes at any time, at the principal amount plus any unpaid interest. As of December 31, 2017, the Company does not intend to redeem any portion of the Notes prior to the stated maturity dates. The Company has the obligation to redeem the Notes if a change in control occurs as defined in the indenture of the Notes.

The Notes were issued at a discount amounting to RMB121 million (US$19 million). The issuance costs of RMB172 million (US$26 million) were presented as a direct deduction from the principal amount of the Notes on the consolidated balance sheets. Both the discount and the issuance costs are amortized as interest expense using the effective interest rate method through the maturity dates of the Notes. The effective interest rate was

F-44

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

2.36%, 3.39%, 3.00%, 3.13%, 3.59%, 4.22% , 3.08% and 3.73% for the 2017 Notes, the 2018 Notes, the 2019 Notes, the 2020 Notes, the 2022 Ten-year Notes, the 2025 Notes, 2022 Five-year Notes and 2027 Notes, respectively.

### Subsidiaries—iQIYI

On January 25, 2017, iQIYI issued US$1.5 billion of convertible notes (the "iQIYI Notes") in a private placement, among which US$300 million was purchased by the Company and the remaining US$1.2 billion was purchased by external investors. The iQIYI Notes bear interest at a coupon rate of 1.50% per annum with a maturity date of January 25, 2018. The iQIYI Notes can be converted into preferred shares in a qualified financing or at iQIYI's election. The conversion option does not meet the definition of a derivative under ASC 815. On October 26, 2017, the US$1.5 billion iQIYI Notes and the related accrued interest were converted into 1,014,436,019 iQIYI's Series G preferred shares.

The principal amount and unamortized discount and debt issuance costs as of December 31, 2016 and 2017 were as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Principal amount | 32,988 | 35,782 | 5,500 |
| Unamortized discount and debt issuance costs | (137) | (171) | (27) |
| | 32,851 | 35,611 | 5,473 |

The following table summarizes the aggregate required repayments of the principal amounts of the Company's long-term debts, including the notes payable and loans payable (Note 11), in the succeeding five years and thereafter:

| | RMB | US$ |
| --- | --- | --- |
| | (In millions) | |
| For the years ending December 31, | | |
| 2018 | 6,516 | 1,002 |
| 2019 | 6,516 | 1,002 |
| 2020 | 5,154 | 792 |
| 2021 | 6,506 | 1,000 |
| 2022 | 10,735 | 1,650 |
| Thereafter | 7,157 | 1,100 |

## 13. INCOME TAXES

### Cayman Islands and BVI

Under the current laws of the Cayman Islands and BVI, the Company is not subject to tax on income or capital gains. Additionally, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

### Hong Kong

Subsidiaries in Hong Kong are subject to Hong Kong Profits Tax rate at 16.5%. They may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

F-45

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

*Japan*

As a result of the Japanese tax regulations amendments, the statutory income tax rate has been reduced from 38.0% to approximately 35.6%, 33.5% and 31.7% effective for the years ended December 31, 2015, 2016 and 2017, respectively.

*China*

Effective from January 1, 2008, the PRC's statutory, Enterprise Income Tax ("EIT") rate is 25%. Preferential EIT rates at 15% and 10% are available for qualified "High and New Technology Enterprises" ("HNTEs") and "Key Software Enterprise" ("KSE"), respectively. The HNTE certificate is effective for a period of three years and the KSE is subject to relevant governmental authorities' annual assessment based on self-assessment supporting documents filed with the tax authorities each year.

Baidu Online and Baidu China enjoyed a reduced tax rate of 10% as qualified KSEs in 2015 and 2016. Baidu International also enjoyed a reduced tax rate of 10% as qualified KSE in 2016. Certain other PRC subsidiaries and VIEs, including Baidu Netcom, are qualified HNTEs and enjoy a reduced tax rate of 15% for the years presented, which will expire in 2018, 2019 or 2020. An entity must file required supporting documents with the tax authorities before using the preferential rates. Whether the entity is entitled to enjoy a preferential rate as a KSE is subject to relevant governmental authorities' assessment each year. An entity could re-apply for the HNTE certificate when the prior certificate expires. Historically, all of the Company's subsidiaries and VIEs successfully re-applied for the certificates when the prior ones expired.

A certificate for the current year might be obtained in the following year as a result of the stringent inspection and approval process by the governmental authorities. The Company would record an income tax reversal in the year when the certificate is obtained for the over-paid or over-accrued provisional tax in connection with the grant of a more favorable tax rate for the prior year.

Under the current EIT Law, dividends for earnings derived from January 1, 2008 and onwards paid by PRC entities to any of their foreign non-resident enterprise investors are subject to a 10% withholding tax. A lower tax rate will be applied if tax treaty or arrangement benefits are available. Under the tax arrangement between the PRC and Hong Kong, the reduced withholding tax rate for dividends paid by PRC entities is 5% provided the Hong Kong investors meet the requirements as stipulated by relevant PRC tax regulations, such as the beneficiary owner test. Capital gains derived from PRC are also subject to a 10% PRC withholding tax.

Income (loss) before income taxes consists of:

|  | For the years ended December 31, | | | |
|  | 2015 | 2016 | 2017 | 2017 |
|  | RMB | RMB | RMB | US$ |
|  | | (In millions) | | |
| PRC | 16,878 | 18,194 | 22,088 | 3,394 |
| Non-PRC | 21,029 | (3,685) | (805) | (124) |
|  | 37,907 | 14,509 | 21,283 | 3,270 |

Except for the investment related gain recognized, the pre-tax losses from non-PRC operations consist primarily of operating costs, administration expenses, interest expenses and share-based compensation expenses.

F-46

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Income taxes consist of:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
| | (In millions) | | | |
| Current income tax | 3,214 | 3,462 | 4,224 | 649 |
| Income tax refund due to reduced tax rate | — | (535) | (473) | (73) |
| Adjustments of deferred tax assets due to change in tax rates | 80 | (13) | 7 | 1 |
| Deferred income tax (benefit) expense | 2,181 | (1) | (763) | (117) |
| | 5,475 | 2,913 | 2,995 | 460 |

The reconciliation of the actual income taxes to the amount of tax computed by applying the aforementioned statutory income tax rate to pre-tax income is as follows:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
| | (In millions, except for per share data) | | | |
| Expected taxation at PRC statutory tax rate | 9,477 | 3,627 | 5,321 | 818 |
| Effect of differing tax rates in different jurisdictions | (5,254) | 736 | 854 | 131 |
| Non-taxable income | (65) | (73) | (913) | (140) |
| Non-deductible expenses | 165 | 115 | 653 | 99 |
| Research and development super-deduction | (768) | (726) | (905) | (139) |
| Effect of PRC preferential tax rates and tax holiday | (1,547) | (1,851) | (2,095) | (322) |
| Effect of tax rate changes on deferred taxes | 80 | (13) | 7 | 1 |
| Over-accrued EIT for previous years | (249) | (520) | (579) | (89) |
| PRC withholding tax | 2,471 | 283 | 101 | 16 |
| Addition to valuation allowance | 1,165 | 1,335 | 551 | 85 |
| Taxation for the year | 5,475 | 2,913 | 2,995 | 460 |
| Effective tax rate | 14.44% | 20.08% | 14.07% | 14.07% |
| Effect of preferential tax rates inside the PRC on basic earnings per Class A and Class B ordinary share | 44.31 | 53.41 | 60.33 | 9.27 |

F-47

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The tax effects of temporary differences that gave rise to the deferred tax balances at December 31, 2016 and 2017 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Deferred tax assets: | | | |
| Provision for doubtful receivables | 138 | 287 | 44 |
| Accrued expenses, payroll and others | 2,715 | 2,849 | 438 |
| Fixed assets depreciation | 26 | 53 | 8 |
| Net operating loss carry-forward | 1,727 | 1,061 | 163 |
| Less: valuation allowance | (3,506) | (2,718) | (418) |
| Deferred tax assets, net | 1,100 | 1,532 | 235 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Deferred tax liabilities: | | | |
| Long-lived assets arising from acquisitions | 248 | 133 | 20 |
| Withholding tax on PRC subsidiaries' undistributed earnings | 633 | 586 | 91 |
| Withholding tax on capital gains derived from PRC | 2,708 | 2,656 | 408 |
| | 3,589 | 3,375 | 519 |

As of December 31, 2017, the Company had net losses of approximately RMB7.8 billion (US$1.2 billion) deriving from entities in the PRC, Hong Kong and Japan. The net loss in the PRC and Japan can be carried forward for five years and nine years, respectively, to offset future net profit for income tax purposes. The net loss of entities in the PRC and Japan will begin to expire in 2018, if not utilized. The net loss in Hong Kong can be carried forward without an expiration date.

The Company evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company elects to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2016 and 2017, there was no significant impacts from tax uncertainty on the Company's financial position and result of operations. The Company does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Company's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax years of 2013 through 2017 remain open to examination by the respective tax authorities. The Company may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

In 2013, the Company accrued RMB581 million of withholding tax for the potential remittance of earnings from the PRC subsidiaries to their offshore parent companies in the form of dividend distribution, because the Company believes that the underlying dividends will be distributed in the future considering future merger and acquisition activities. The Company did not provide for additional deferred income taxes and foreign withholding taxes on the undistributed earnings of foreign subsidiaries during the years presented on the basis of its intent to

F-48

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

permanently reinvest its foreign subsidiaries' earnings. As of December, 31 2017, the total amount of undistributed earnings from the PRC subsidiaries for which no withholding tax has been accrued was RMB113.1 billion (US$17.4 billion). Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable. In the case of its VIEs in the PRC, undistributed earnings were insignificant as of each of the balance sheet dates.

## 14. EMPLOYEE DEFINED CONTRIBUTION PLAN

Full time employees of the Group in the PRC participate in a government mandated multi-employer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the Group make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has no legal obligation for the benefits beyond the contributions. The total amounts for such employee benefits, which were expensed as incurred, were RMB2.2 billion, RMB2.3 billion and RMB2.6 billion (US$402 million) for the years ended December 31, 2015, 2016 and 2017, respectively.

## 15. COMMITMENTS AND CONTINGENCIES

### *Capital Commitments*

The Company's capital commitments primarily relate to commitments in connection with the expansion and improvement of its network infrastructure and its plan to build additional office buildings and cloud computing based data centers. Total capital commitments contracted but not yet reflected in the financial statements amounted to RMB547 million (US$84 million) as of December 31, 2017. All of the commitments relating to the network infrastructure are to be fulfilled in the next five years and the commitments relating to the office building and cloud computing based data centers will be settled in installments in the following years according to the construction progress.

### *Operating Lease Commitments*

The Company leases facilities in the PRC under non-cancelable operating leases expiring on different dates. Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. Total rental expense for offices was RMB647 million, RMB494 million and RMB507 million (US$78 million) for the years ended December 31, 2015, 2016 and 2017, respectively. Total operating lease expense for internet data center ("IDC") facilities was RMB3.7 billion, RMB4.7 billion and RMB5.6 billion (US$854 million) for the years ended December 31, 2015, 2016 and 2017 respectively.

Future minimum payments under non-cancelable operating leases with initial terms of one-year or more consist of the following as of December 31, 2017:

|  | RMB | US$ |
| --- | --- | --- |
|  | (In millions) | |
| 2018 | 4,446 | 683 |
| 2019 | 1,705 | 262 |
| 2020 | 922 | 142 |
| 2021 | 324 | 50 |
| 2022 | 131 | 20 |
| Thereafter | 124 | 19 |
|  | 7,652 | 1,176 |

F-49

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The Group's lease arrangements have no restriction or contingent rents. Certain lease arrangements have escalation clauses and renewal options with advance notice period of several months.

### Commitments for Licensed Copyrights

The Company enters into non-cancelable licensing agreements with third-party vendors to acquire licensed copyrights of video contents for its online video platform.

Future minimum payments under non-cancelable licensing agreements consist of the following as of December 31, 2017:

|  | RMB | US$ |
| --- | --- | --- |
|  | (In millions) | |
| 2018 | 6,146 | 945 |
| 2019 | 5,378 | 827 |
| 2020 | 2,801 | 430 |
| 2021 | 896 | 138 |
| 2022 | 417 | 64 |
| Thereafter | 925 | 142 |
|  | 16,563 | 2,546 |

### Guarantees

The Company accounts for guarantees in accordance with ASC topic 460 ("ASC 460"), *Guarantees.* Accordingly, the Company evaluates its guarantees if any to determine whether (a) the guarantee is specifically excluded from the scope of ASC 460, (b) the guarantee is subject to ASC 460 disclosure requirements only, but not subject to the initial recognition and measurement provisions, or (c) the guarantee is required to be recorded in the financial statements at fair value.

The corporate by-laws require that the Company indemnify its officers and directors, as well as those who act as directors and officers of other entities at the Company's request, against expenses, judgments, fines, settlements and other amounts actually and reasonably incurred in connection with any proceedings arising out of their services to the Company. In addition, the Company entered into separate indemnification agreements with each director and each executive officer of the Company that provide for indemnification of these directors and officers under similar circumstances and under additional circumstances. The indemnification obligations are more fully described in the by-laws and the indemnification agreements. The Company purchases standard directors and officers insurance to cover claims or a portion of the claims made against its directors and officers. Since a maximum obligation is not explicitly stated in the Company's by-laws or in the indemnification agreements and will depend on the facts and circumstances that arise out of any future claims, the overall maximum amount of the obligations cannot be reasonably estimated.

Historically, the Company was not required to make payments related to these obligations, and the fair value for these obligations was nil on the consolidated balance sheets as of December 31, 2016 and 2017.

### Litigation

The Group was involved in certain cases pending in various PRC and Brazil courts and arbitration as of December 31, 2017. These cases include copyright infringement cases, unfair competition cases, and defamation

F-50

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

cases, among others. Adverse results in these lawsuits may include awards of damages and may also result in, or even compel, a change in the Company's business practices, which could result in a loss of revenue or otherwise harm the business of the Company.

For many proceedings, the Company is currently unable to estimate the reasonably possible loss or a range of reasonably possible losses as the proceedings are in the early stages, and/or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible losses cannot be made. However, the Company believes that such matters, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material adverse effect on the Company's consolidated results of operations, financial position and cash flows. With respect to the limited number of proceedings for which the Company was able to estimate the reasonably possible losses or the range of reasonably possible losses, such estimated loss amounts were insignificant.

## 16. REDEEMABLE NONCONTROLLING INTERESTS

| | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|
| | | | (In millions) | |
| Balance as of January 1 | 1,895 | 3,948 | 5,492 | 844 |
| Other comprehensive income (loss) | 142 | 325 | (335) | (51) |
| Issuance of subsidiary shares | 1,582 | 662 | — | — |
| Disposal of subsidiary shares | — | — | (2,376) | (365) |
| Accretion of redeemable noncontrolling interests | 329 | 557 | (17) | (3) |
| Conversion of convertible notes of a subsidiary | — | — | 8,258 | 1,269 |
| Balance as of December 31 | 3,948 | 5,492 | 11,022 | 1,694 |

In November 2014, iQIYI completed a round of preferred shares financing with US$300 million from the external preferred shareholders. A negative accretion of RMB400 million (US$61 million) was recorded as an increase to the net income attributable to ordinary shareholders for the year ended December 31, 2017 as a result of the change in redemption price. As the above preferred shares are not currently redeemable and this change in redemption price was considered a change in accounting estimate in accordance with ASC topic 480 ("ASC 480"), *Distinguishing Liabilities from Equity,* and a new effective interest rate was determined and prospectively applied to accrete the carrying amount of the above preferred shares to the future expected contractual cash flows (the new redemption amount). In October 2017, the US$1.2 billion iQIYI Notes (Note 12) plus related interest purchased by external investors was converted to iQIYI's new round preferred shares. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of iQIYI, these preferred shares are accounted for as redeemable noncontrolling interests.

In October 2015, Xiaodu issued 250,000,000 preferred shares to certain shareholders for a total consideration of US$250 million. In May 2016, Xiaodu issued an additional 42,105,264 preferred shares to certain other shareholders for a total consideration of US$100 million. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of Xiaodu, these preferred shares are accounted for as redeemable noncontrolling interests. In August 2017, the Company completed the disposal of Xiaodu to Rajax Holding for its equity shares.

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The Company accounts for the changes in accretion to the redemption value in accordance with ASC 480. The Company elects to use the effective interest method to account for the changes of redemption value over the period from the date of issuance to the earliest redemption date of the noncontrolling interest.

### 17.  SHAREHOLDERS' EQUITY

*Ordinary Shares*

The authorized share capital consisted of 870,400,000 ordinary shares at a par value of US$0.00005 per share, of which 825,000,000 shares were designated as Class A ordinary shares, 35,400,000 as Class B ordinary shares, and 10,000,000 shares designated as preferred shares. The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting and conversion rights. Each share of Class A ordinary shares is entitled to one vote per share and is not convertible into Class B ordinary shares under any circumstances. Each share of Class B ordinary shares is entitled to ten votes per share and is convertible into one Class A ordinary share at any time by the holder thereof. Upon any transfer of Class B ordinary shares by the holder thereof to any person or entity that is not an affiliate of such holder, such Class B ordinary shares would be automatically converted into an equal number of Class A ordinary shares. The number of Class B ordinary shares transferred to Class A ordinary shares was nil, 91,667 and 200,000 in the years ended December 31, 2015, 2016 and 2017, respectively.

As of December 31, 2017, there were 27,614,978 and 7,201,254 Class A and Class B ordinary shares outstanding, respectively. As of December 31, 2016 and 2017, there were no preferred shares issued and outstanding.

On July 30, 2015, the Company announced a share repurchase program in which the Company proposed to acquire up to an aggregate of US$1.0 billion of its shares over the next 12 months. On October 29, 2015, the Company announced another share repurchase program under which the Company proposed to acquire up to an aggregate of US$2.0 billion of its shares over the next 24 months in the open market or through privately negotiated transactions, depending on market conditions and in accordance with applicable rules and regulations. The Company repurchased 603,726, nil and 145,783 Class A ordinary shares from the open market with an aggregate purchase price of US$990 million, nil and US$251 million during the years ended December 31, 2015, 2016 and 2017. The repurchased shares were cancelled under Cayman Islands law upon repurchase and the difference between the par value and the repurchase price was debited to retained earnings.

*Retained Earnings*

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Company's PRC subsidiaries, being foreign invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of the Company's PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the Company's subsidiaries.

In accordance with the China Company Laws, the Company's VIEs must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of the Company's VIEs is

F-52

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are made at the discretion of the Company's VIEs.

General reserve and statutory surplus funds are restricted to set-off against losses, expansion of production and operation and increasing registered capital of the respective company. Staff welfare and bonus fund and statutory public welfare funds are restricted to capital expenditures for the collective welfare of employees. The reserves are not allowed to be transferred to the Company in terms of cash dividends, loans or advances, nor are they allowed for distribution except under liquidation.

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2017 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| PRC statutory reserve funds | 441 | 488 | 75 |
| Unreserved retained earnings | 85,293 | 101,840 | 15,653 |
| Total retained earnings | 85,734 | 102,328 | 15,728 |

Under PRC laws and regulations, there are restrictions on the Company's PRC subsidiaries and VIEs with respect to transferring certain of their net assets to the Company either in the form of dividends, loans, or advances. Amounts of net assets restricted include paid in capital and statutory reserve funds of the Company's PRC subsidiaries and the net assets of the VIEs in which the Company has no legal ownership, totaling RMB13.7 billion and RMB18.6 billion (US$2.9 billion) as of December 31, 2016 and 2017, respectively.

Furthermore, cash transfers from the Company's PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of the PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to the Company, or otherwise satisfy their foreign currency denominated obligations.

F-53

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

***Accumulated Other Comprehensive Income (Loss)***

The changes in accumulated other comprehensive income (loss) by component, net of tax, were as follows:

| | Foreign currency translation adjustment RMB | Unrealized gains on available-for-sale investments RMB (In millions) | Total RMB |
|---|---|---|---|
| Balance at December 31, 2014 | (285) | 5 | (280) |
| Other comprehensive income (loss) before reclassification | (645) | 489 | (156) |
| Amounts reclassified from accumulated other comprehensive income | — | (194) | (194) |
| Net current-period other comprehensive income (loss) | (645) | 295 | (350) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (176) | — | (176) |
| Balance at December 31, 2015 | (1,106) | 300 | (806) |
| Other comprehensive income (loss) before reclassification | (593) | 515 | (78) |
| Amounts reclassified from accumulated other comprehensive income | — | (572) | (572) |
| Net current-period other comprehensive loss | (593) | (57) | (650) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (327) | — | (327) |
| Balance at December 31, 2016 | (2,026) | 243 | (1,783) |
| Other comprehensive income before reclassification | 732 | 2,574 | 3,306 |
| Amounts reclassified from accumulated other comprehensive income | 71 | (999) | (928) |
| Net current-period other comprehensive income | 803 | 1,575 | 2,378 |
| Other comprehensive loss attribute to noncontrolling interests and redeemable noncontrolling interests | 335 | — | 335 |
| Balance at December 31, 2017 | (888) | 1,818 | 930 |
| Balance at December 31, 2017, in US$ | (136) | 279 | 143 |

The amounts reclassified out of accumulated other comprehensive income represent realized foreign currency translation adjustments and gains on the available-for-sale investments upon their sales, which were then recorded in "Other income, net" in the consolidated statements of comprehensive income. The amounts reclassified were determined on the basis of specific identification.

The following table sets forth the tax effect allocated to each component of other comprehensive income (loss) for the years ended December 31, 2015, 2016 and 2017:

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2015 RMB | 2016 RMB | 2017 RMB (In millions) | 2017 US$ |
| Unrealized gains on available-for-sale investments | | | | |
| Other comprehensive loss before reclassification | (68) | (120) | (215) | (33) |
| Amounts reclassified from accumulated other comprehensive income | 29 | 110 | 163 | 25 |
| Net current-period other comprehensive loss | (39) | (10) | (52) | (8) |

F-54

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

**18.   EARNINGS PER SHARE ("EPS")**

A reconciliation of net income attributable to Baidu, Inc. in the consolidated statements of comprehensive income to the numerator for the computation of basic and diluted per share for the years ended December 31, 2015, 2016 and 2017 is as follows:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2017 |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Net income attributable to Baidu, Inc. | 33,664 | 11,632 | 18,301 | 2,812 |
| Accretion of the redeemable noncontrolling interests | (329) | (557) | 17 | 3 |
| Numerator for EPS computation | 33,335 | 11,075 | 18,318 | 2,815 |

F-55

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The following table sets forth the computation of basic and diluted earnings per Class A and Class B ordinary share.

| | For the years ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | | 2016 | | 2017 | | 2017 | |
| | Class A | Class B | Class A | Class B | Class A | Class A | Class B | Class B |
| | RMB | RMB | RMB | RMB | RMB | US$ | RMB | US$ |
| | (In millions, except for number of shares, per share and per ADS data) | | | | | | | |
| **Earnings per share – basic:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. | 26,183 | 7,152 | 8,710 | 2,365 | 14,488 | 2,226 | 3,830 | 589 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,428,861 | 7,492,921 | 27,263,984 | 7,401,254 | 27,464,760 | 27,464,760 | 7,260,363 | 7,260,363 |
| Denominator used for basic EPS | 27,428,861 | 7,492,921 | 27,263,984 | 7,401,254 | 27,464,760 | 27,464,760 | 7,260,363 | 7,260,363 |
| **Earnings per share – basic** | 954.56 | 954.56 | 319.47 | 319.47 | 527.51 | 81.08 | 527.51 | 81.08 |
| **Earnings per share – diluted:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. for diluted computation | 26,206 | 7,129 | 8,716 | 2,359 | 14,513 | 2,230 | 3,805 | 585 |
| Reallocation of net income attributable to Baidu, Inc. as a result of conversion of Class B to Class A shares | 7,129 | — | 2,359 | — | 3,805 | 585 | — | — |
| Numerator for diluted EPS calculation | 33,335 | 7,129 | 11,075 | 2,359 | 18,318 | 2,815 | 3,805 | 585 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,428,861 | 7,492,921 | 27,263,984 | 7,401,254 | 27,464,760 | 27,464,760 | 7,260,363 | 7,260,363 |
| Conversion of Class B to Class A ordinary shares | 7,492,921 | — | 7,401,254 | — | 7,260,363 | 7,260,363 | — | — |
| Share-based awards | 112,688 | — | 91,848 | — | 227,268 | 227,268 | — | — |
| Denominator used for diluted EPS | 35,034,470 | 7,492,921 | 34,757,086 | 7,401,254 | 34,952,391 | 34,952,391 | 7,260,363 | 7,260,363 |
| **Earnings per share – diluted** | 951.49 | 951.49 | 318.62 | 318.62 | 524.08 | 80.55 | 524.08 | 80.55 |
| **Earnings per ADS:** | | | | | | | | |
| Denominator used for earnings per ADS – basic | 274,288,610 | | 272,639,840 | | 274,647,600 | 274,647,600 | | |
| Denominator used for earnings per ADS – diluted | 350,344,700 | | 347,570,860 | | 349,523,910 | 349,523,910 | | |
| **Earnings per ADS – basic** | 95.46 | | 31.95 | | 52.75 | 8.11 | | |
| **Earnings per ADS – diluted** | 95.15 | | 31.86 | | 52.41 | 8.06 | | |

The Company did not include certain stock options and restricted shares in the computation of diluted earnings per share for the years ended December 31, 2015, 2016 and 2017 because those stock options and restricted shares were anti-dilutive for earnings per share for the respective years.

F-56

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

**19.   SHARE-BASED AWARDS PLAN**

*Baidu, Inc.*

Incentive compensation plans

In December 2008, the Company adopted a share incentive plan (the "2008 Plan"), which provides for the granting of share incentives, including incentive share options ("ISOs"), restricted shares and any other form of award pursuant to the 2008 Plan, to members of the board, employees and consultants of the Company. However, the Company may grant ISOs only to its employees. The Company reserved 3,428,777 ordinary shares for issuance under the 2008 Plan, which will expire in the year 2018. The vesting schedule, time and condition to exercise options will be determined by the compensation committee. The term of the options may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of the Company's share capital.

Under the 2008 Plan, share options are subject to vesting schedules varying from two to four years, the exercise price of an option may be amended or adjusted at the discretion of the compensation committee, the determination of which would be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices would be effective without the approval of the Company's shareholders or the approval of the affected grantees. If the Company grants an ISO to an employee who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of the Company's share capital, the exercise price cannot be less than 110% of the fair market value of the Company's ordinary shares on the date of that grant.

Starting from February 15, 2006, the Company granted restricted Class A ordinary shares of the Company ("Restricted Shares"). Terms for the Restricted Shares are the same as share options except that Restricted Shares do not require exercise and have a two to four years vesting term.

Share options

The following table summarizes the option activity for the year ended December 31, 2017:

| | Number of shares | Weighted average exercise price (US$) | Weighted average remaining contractual life (Years) | Aggregate intrinsic value (US$ in millions) |
|---|---|---|---|---|
| **Share options** | | | | |
| Outstanding, December 31, 2016 | 231,239 | 1,537.40 | 7.25 | 62 |
| Granted | 151,990 | 1,860.29 | | |
| Exercised | (57,072) | 1,177.53 | | |
| Forfeited/Cancelled | (10,760) | 1,691.10 | | |
| Outstanding, December 31, 2017 | 315,397 | 1,752.90 | 7.83 | 186 |
| Vested and expected to vest at December 31, 2017 | 266,234 | 1,729.96 | 7.67 | 163 |
| Exercisable at December 31, 2017 | 100,197 | 1,500.53 | 5.82 | 84 |

The aggregate intrinsic value in the table above represents the difference between the Company's closing stock price on the last trading day in 2017 and the exercise price.

Total intrinsic value of options exercised for the years ended December 31, 2015, 2016 and 2017 was RMB200 million, RMB143 million and RMB403 million (US$62 million), respectively. The total fair value of

F-57

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

options vested during the years ended December 31, 2015, 2016 and 2017 was RMB149 million, RMB225 million and RMB195 million (US$30 million), respectively.

As of December 31, 2017, there was RMB592 million (US$91 million) unrecognized share-based compensation cost related to share options. That deferred cost is expected to be recognized over a weighted-average vesting period of 2.8 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

The fair value of each option award was estimated on the date of grant using the Black-Scholes-Merton valuation model. The volatility assumption was estimated based on historical volatility of the Company's share price applying the guidance provided by ASC 718. Assumptions of the expected term were based on the vesting and contractual terms and employee demographics. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the assumptions used to estimate the fair values of the share options granted in the years presented:

| | For the years ended December 31 | | |
| --- | --- | --- | --- |
| | 2015 | 2016 | 2017 |
| Risk-free interest rate | 1.31%~1.36% | 1.13%~1.47% | 1.81%~2.08% |
| Dividend yield | — | — | — |
| Expected volatility range | 40.04%~40.57% | 38.91%~40.09% | 35.99%~38.41% |
| Weighted average expected volatility | 40.21% | 39.37% | 38.39% |
| Expected life (in years) | 5.02~5.13 | 5.75~5.92 | 4.99~6.01 |

In addition, the Company recognizes share-based compensation expense net of an estimated forfeiture rate and therefore only recognizes compensation cost for those shares expected to vest over the service period of the award. The estimation of the forfeiture rate is primarily based on historical experience of employee turnover. To the extent the Company revises this estimate in the future, the share-based payments could be materially impacted in the year of revision, as well as in the following years.

The exercise price of options granted during the years ended December 31, 2015, 2016 and 2017 equaled the market price of the ordinary shares on the grant date. The weighted-average grant-date fair value of options granted during the years ended December 31, 2015, 2016, and 2017 was US$790.00, US$659.70, and US$747.45, respectively.

Restricted Shares

Restricted Shares activity for the year ended December 31, 2017 was as follows:

| | Number of shares | Weighted average grant date fair value (US$) |
| --- | --- | --- |
| **Restricted Shares** | | |
| Unvested, December 31, 2016 | 707,271 | 1,801.15 |
| Granted | 427,579 | 1,977.57 |
| Vested | (178,138) | 1,777.22 |
| Forfeited/Cancelled | (137,042) | 1,792.96 |
| Unvested, December 31, 2017 | 819,670 | 1,899.37 |

F-58

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The total fair value of the Restricted Shares vested during the years ended December 31, 2015, 2016 and 2017 was RMB701 million, RMB1.1 billion, RMB2.1 billion (US$317 million), respectively. The weighted-average grant-date fair value of the Restricted Shares granted during the years ended December 31, 2015, 2016, and 2017 was US$1,979.30, US$1,755.90, and US$1,977.57, respectively.

As of December 31, 2017, there was RMB5.3 billion (US$813 million) unrecognized share-based compensation cost related to Restricted Shares. That deferred cost will be recognized over a weighted-average vesting period of 2.9 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

### Subsidiaries-iQIYI

iQIYI also has equity incentive plans granting share-based awards. As of December 31, 2017, there was RMB476 million (US$73 million) unrecognized compensation cost related to non-vested share options granted by iQIYI to its employees and directors. That deferred cost will be recognized over a weighted-average period of 2.8 years and may be adjusted for future changes in estimated forfeitures.

The following table summarizes the share-based compensation cost recognized by iQIYI:

| | For the years ended December 31, | | | |
| | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|
| | (In millions) | | | |
| Expensed as cost of revenues | 6 | 9 | 35 | 5 |
| Expensed as selling, general and administrative | 21 | 30 | 131 | 20 |
| Expensed as research and development | 17 | 23 | 67 | 11 |

### Subsidiaries-Others

Other subsidiaries apart from iQIYI also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in aggregate, for all years presented.

The following table summarizes the total share-based compensation cost recognized by the Group:

| | For the years ended December 31, | | | |
| | 2015 RMB | 2016 RMB | 2017 RMB | 2017 US$ |
|---|---|---|---|---|
| | (In millions) | | | |
| Expensed as cost of revenues | 49 | 103 | 183 | 28 |
| Expensed as selling, general and administrative | 487 | 429 | 973 | 150 |
| Expensed as research and development | 851 | 1,228 | 2,088 | 321 |
| Capitalized as part of internal-used software | 1 | — | — | — |

### 20.  RELATED PARTY TRANSACTIONS

The related party transactions mainly represented online marketing services provided by the Company to Ctrip (including Qunar), the total transaction amounts for the years ended December 31, 2015, 2016 and 2017 was RMB89 million, RMB631 million and RMB750 million (US$115 million), respectively. Other related party transactions, including the reimbursements to Mr. Robin Yanhong Li's use of an aircraft beneficially owned by his family member for the Company's business purposes and the rental expense for an office building owned by the family members of an executive officer, were insignificant for each of the years presented.

F-59

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

As of December 31, 2016 and 2017, amounts due from/due to related parties were as follows:

| | As of December 31, | | |
|---|---|---|---|
| | **2016**<br>**RMB** | **2017**<br>**RMB**<br>**(In millions)** | **2017**<br>**US$** |
| **Amounts due from related parties, current:** | | | |
| Qunar (i) | 25 | 35 | 5 |
| Ctrip (i) | 287 | 102 | 16 |
| Other related parties (i) | 34 | 31 | 5 |
| **Total** | 346 | 168 | 26 |
| **Amounts due from related parties, non-current:** | | | |
| Other related parties (ii) | 11 | 9 | 1 |
| **Amounts due to related parties, current:** | | | |
| Qunar (iii) | 275 | 23 | 4 |
| Ctrip (iii) | 125 | 99 | 15 |
| Other related parties (iii) | 59 | 31 | 5 |
| **Total** | 459 | 153 | 24 |

(i)     The balances mainly represent amounts arising from services the Company provided to its equity method investees in the ordinary course of business.
(ii)    The balances mainly represent rental deposits paid in advance to the related party of one of the executive officers. Pursuant to the rental agreements, certain subsidiaries of the Company rent an office building owned by the family members of the executive officer.
(iii)   The balances mainly represent amounts arising from services provided by the Company's equity method investees and cost method investees in the ordinary course of business.

**21.   SEGMENT REPORTING**

The operations of the Company are organized into two segments, consisting of Baidu Core and iQIYI. Baidu Core mainly consisting of keyword-based marketing services targeted at and triggered by internet users' search queries, which mainly include P4P services and other online marketing services, artificial intelligence-enabled new business initiatives and internet financial services. iQIYI is an online video platform with a content library that includes licensed movies, television series, cartoons, variety shows, self-produced programs and other programs.

The Company derives the results of the segments directly from its internal management reporting system. The CODM reviews the performance of each segment based on its operating results and uses these results to evaluate the performance of, and to allocate resources to, each of the segments. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented.

F-60

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The table below provides a summary of the Group's segment operating results for the years ended December 31, 2015.

| | For the year ended December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | **Baidu Core**<br>**RMB** | **iQIYI**<br>**RMB** | **Intersegment<br>eliminations &<br>adjustments<br>RMB** | **Consolidated<br>RMB** |
| | | | (In millions) | |
| **Revenues:** | | | | |
| Online marketing services | 60,312 | 3,400 | 325 | 64,037 |
| Other services | 917 | 1,919 | (491) | 2,345 |
| **Total revenues** | **61,229** | **5,319** | **(166)** | **66,382** |
| Operating costs and expenses: | | | | |
| Cost of revenues | (21,591) | (6,042) | 175 | (27,458) |
| Selling, general and administrative | (15,917) | (1,204) | 45 | (17,076) |
| Research and development | (9,671) | (500) | (5) | (10,176) |
| **Total operating costs and expenses** | **(47,179)** | **(7,746)** | **215** | **(54,710)** |
| **Operating profit (loss)** | **14,050** | **(2,427)** | **49** | **11,672** |
| Other income: | | | | |
| Interest income | 2,413 | 5 | (56) | 2,362 |
| Interest expense | (1,041) | (55) | 55 | (1,041) |
| Foreign exchange income (loss), net | 238 | (77) | 21 | 182 |
| Income (loss) from equity method investments | 5 | (1) | — | 4 |
| Other income (loss), net | 24,736 | (8) | — | 24,728 |
| **Total other income (loss), net** | **26,351** | **(136)** | **20** | **26,235** |
| **Income (loss) before income taxes** | **40,401** | **(2,563)** | **69** | **37,907** |
| Income taxes | (5,523) | (11) | 59 | (5,475) |
| **Net income (loss)** | **34,878** | **(2,574)** | **128** | **32,432** |

F-61

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The table below provides a summary of the Group's segment operating results for the years ended December 31, 2016.

|  | For the year ended December 31, 2016 | | | |
|  | Baidu Core<br>RMB | iQIYI<br>RMB | Intersegment<br>eliminations &<br>adjustments<br>RMB | Consolidated<br>RMB |
|  |  | | (In millions) | |
| **Revenues:** | | | | |
| Online marketing services | 57,944 | 5,650 | 931 | 64,525 |
| Other services | 1,526 | 5,587 | (1,089) | 6,024 |
| **Total revenues** | **59,470** | **11,237** | **(158)** | **70,549** |
| Operating costs and expenses: | | | | |
| Cost of revenues | (23,806) | (11,437) | (35) | (35,278) |
| Selling, general and administrative | (13,493) | (1,766) | 188 | (15,071) |
| Research and development | (9,298) | (824) | (29) | (10,151) |
| **Total operating costs and expenses** | **(46,597)** | **(14,027)** | **124** | **(60,500)** |
| **Operating profit (loss)** | **12,873** | **(2,790)** | **(34)** | **10,049** |
| Other income: | | | | |
| Interest income | 2,426 | 17 | (101) | 2,342 |
| Interest expense | (1,149) | (110) | 101 | (1,158) |
| Foreign exchange income (loss), net | 747 | (239) | — | 508 |
| Loss from equity method investments | (1,026) | — | — | (1,026) |
| Other income, net | 3,732 | 61 | 1 | 3,794 |
| **Total other income (loss), net** | **4,730** | **(271)** | **1** | **4,460** |
| **Income (loss) before income taxes** | **17,603** | **(3,061)** | **(33)** | **14,509** |
| Income taxes | (2,915) | (13) | 15 | (2,913) |
| **Net income (loss)** | **14,688** | **(3,074)** | **(18)** | **11,596** |

F-62

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

The table below provides a summary of the Group's operating segment operating results for the years ended December 31, 2017.

| | For the year ended December 31, 2017 | | | | | | | |
| | Baidu Core | | iQIYI | | Intersegment eliminations & adjustments | | Consolidated | |
| | RMB | US$ | RMB | US$ | RMB | US$ | RMB | US$ |
| | | | | (In millions) | | | | |
| **Revenues:** | | | | | | | | |
| Online marketing services | 63,880 | 9,818 | 8,159 | 1,254 | 1,107 | 170 | 73,146 | 11,242 |
| Other services | 3,801 | 584 | 9,219 | 1,417 | (1,357) | (209) | 11,663 | 1,792 |
| **Total revenues** | **67,681** | **10,402** | **17,378** | **2,671** | **(250)** | **(39)** | **84,809** | **13,034** |
| Operating costs and expenses: | | | | | | | | |
| Cost of revenues | (25,688) | (3,949) | (17,386) | (2,672) | 12 | 2 | (43,062) | (6,619) |
| Selling, general and administrative | (10,586) | (1,627) | (2,675) | (411) | 133 | 20 | (13,128) | (2,018) |
| Research and development | (11,692) | (1,797) | (1,270) | (195) | 34 | 5 | (12,928) | (1,987) |
| **Total operating costs and expenses** | **(47,966)** | **(7,373)** | **(21,331)** | **(3,278)** | **179** | **27** | **(69,118)** | **(10,624)** |
| **Operating profit (loss)** | **19,715** | **3,029** | **(3,953)** | **(607)** | **(71)** | **(12)** | **15,691** | **2,410** |
| Other income: | | | | | | | | |
| Interest income | 3,231 | 497 | 83 | 13 | (160) | (25) | 3,154 | 485 |
| Interest expense | (1,497) | (230) | (278) | (43) | 160 | 25 | (1,615) | (248) |
| Foreign exchange (loss) income, net | (883) | (136) | 401 | 62 | — | — | (482) | (74) |
| Income from equity method investments | (63) | (10) | — | — | — | — | (63) | (10) |
| Other income, net | 4,597 | 707 | 2 | — | (1) | — | 4,598 | 707 |
| **Total other income, net** | **5,385** | **828** | **208** | **32** | **(1)** | **—** | **5,592** | **860** |
| **Income (loss) before income taxes** | **25,100** | **3,857** | **(3,745)** | **(575)** | **(72)** | **(12)** | **21,283** | **3,270** |
| Income taxes | (3,001) | (461) | 8 | 1 | (2) | — | (2,995) | (460) |
| **Net income (loss)** | **22,099** | **3,396** | **(3,737)** | **(574)** | **(74)** | **(12)** | **18,288** | **2,810** |

## 22. FAIR VALUE MEASUREMENT

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 – Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets

Level 2 – Include observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

Level 3 – Unobservable inputs which are supported by little or no market activity

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

F-63

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

*Assets and Liabilities Measured or Disclosed at Fair Value*

In accordance with ASC 820, the Company measures available-for-sale investments, other invested securities and investments accounted for at fair value on a recurring basis. The fair value of time deposits are determined based on the prevailing interest rates in the market. The fair values of the Company's held-to-maturity investments as disclosed are determined based on the discounted cash flow model using the discount curve of market interest rates. The fair value of the Company's available-for-sale debt investments and other invested securities are measured using the income approach, based on quoted market interest rates of similar instruments and other significant inputs derived from or corroborated by observable market data. The fair values of the Company's available-for-sale equity investments in the equity securities of publicly listed companies are measured using quoted market prices. Investments accounted at the fair value are primarily in private companies, which do not have readily determinable market values. The fair value of these investments were categorized as Level 3 in the fair value hierarchy. The Company uses a combination of valuation methodologies, including market and income approaches based on the Company's best estimate, which is determined by using information including but not limited to the pricing of recent rounds of financing, future cash flow forecasts, liquidity factors and selection of the comparable companies.

The Company measures certain debt and equity investments at fair value on a nonrecurring basis only if an impairment charge is recognized. The Company's non-financial assets, such as intangible assets, goodwill and fixed assets, would be measured at fair value only if they were determined to be impaired on an other-than-temporary basis.

The fair value of notes payable were categorized as Level 2 in the fair value hierarchy.

F-64

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

Assets and liabilities measured or disclosed at fair value are summarized below:

| | Total fair value at December 31, 2016 | Fair value measurement or disclosure at December 31, 2016 using | | | Total losses |
| | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | |
| | RMB | RMB | RMB (In millions) | RMB | RMB |
|---|---|---|---|---|---|
| *Fair value disclosure (Notes 2 and 4)* | | | | | |
| Cash equivalents | | | | | |
|     Time deposits | 1,674 | | 1,674 | | |
|     Money market fund | 4,419 | 4,419 | | | |
| Short-term investments | | | | | |
|     Fixed-rate held-to-maturity investments | 41,868 | | 41,868 | | |
| Long-term notes payable | 33,253 | | 33,253 | | |
| *Fair value measurements* | | | | | |
| *Recurring* | | | | | |
| Short-term investments | | | | | |
|     Fixed-rate available-for-sale debt investments | 14,378 | | 14,378 | | |
|     Adjustable-rate available-for-sale debt investments | 14,987 | | 14,987 | | |
|     Available-for-sale equity investments | 29 | 29 | | | |
| Other invested securities | 7,748 | | 7,748 | | |
| Long-term investments | | | | | |
|     Available-for-sale equity investments | 497 | 497 | | | |
| *Non-recurring* | | | | | |
| Long-term investments | | | | 3 | (151) |
| Intangible assets | | | | — | (1) |
| **Total assets measured at fair value** | **37,639** | **526** | **37,113** | **3** | **(152)** |

F-65

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2015, 2016 and 2017

In 2016, the value of a cost method investment was written down to zero, as a result of declining financial performance and a change in the business circumstances of the investee. The corresponding impairment charge incurred was recorded in earnings for the year then ended.

| | Total fair value at December 31, 2017 | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) | Total losses | |
|---|---|---|---|---|---|---|---|
| | RMB | US$ | RMB | RMB (In millions) | RMB | RMB | US$ |
| **Fair value disclosure (Notes 2 and 4)** | | | | | | | |
| Cash equivalents | | | | | | | |
| Time deposits | 130 | 20 | | 130 | | | |
| Money market fund | 2,384 | 366 | 2,384 | | | | |
| Short-term investments | | | | | | | |
| Fixed-rate held-to-maturity investments | 48,695 | 7,484 | | 48,695 | | | |
| Long-term notes payable | 35,943 | 5,524 | | 35,943 | | | |
| **Fair value measurements** | | | | | | | |
| *Recurring* | | | | | | | |
| Short-term investments | | | | | | | |
| Fixed-rate available-for-sale debt investments | 30,022 | 4,614 | | 30,022 | | | |
| Adjustable-rate available-for-sale debt investments | 10,693 | 1,643 | | 10,693 | | | |
| Other invested securities | 18,350 | 2,820 | | 18,350 | | | |
| Long-term investments | | | | | | | |
| Available-for-sale equity investments | 2,773 | 426 | 2,773 | | | | |
| Investments accounted for at fair value | 321 | 49 | | | 321 | | |
| Other non-current assets | | | | | | | |
| Derivative Instruments | 168 | 26 | | 168 | | | |
| *Non-recurring* | | | | | | | |
| Long-term investments | | | | | 203 | (575) | (88) |
| Intangible assets | | | | | 272 | (139) | (21) |
| Fixed assets | | | | | — | (70) | (11) |
| Other non-current assets | | | | | 4 | (37) | (6) |
| **Total assets measured at fair value** | 62,327 | 9,578 | 2,773 | 59,233 | 800 | (821) | (126) |

In 2017, the carrying value of certain long-term investments were written down to their fair values, as a result of declining financial performances and changes in the business circumstances of these investees. The corresponding impairment charges incurred were recorded accordingly. The Company uses a combination of valuation methodologies including market and income approaches based on the Company's best estimate to determine the fair value of these investments. For investments in private companies, information considered by the Company including but not limited to the pricing of recent rounds of financing, future cash flow forecasts, liquidity factors, and selection of the comparable companies. For investments in listed companies, the Company mainly considered the quoted share price.

F-66

**Exhibit 4.67**

EXECUTION VERSION

**MERGER AGREEMENT**

**dated as of August 24, 2017**

**among**

**Rajax Holding**

**Rajax Merger Sub Limited**

**Xiaodu Life Technology Ltd**

**and**

**Baidu (Hong Kong) Limited**

**TABLE OF CONTENTS**

**Page**

Article I

THE MERGER

Section 1.1     The Merger                                                              2
Section 1.2     Effective Time                                                         2
Section 1.3     Closing of the Merger                                                 2
Section 1.4     Effects of the Merger                                                 2
Section 1.5     Memorandum and Articles of Association                                3
Section 1.6     Directors                                                             3
Section 1.7     Officers                                                              3

Article II

CONVERSION OF SECURITIES

Section 2.1     Conversion of Securities                                              3
Section 2.2     Consideration                                                         4
Section 2.3     Treatment of Xiaodu Options                                           5
Section 2.4     Surrender of Certificates                                             5
Section 2.5     Transfer Books; No Further Ownership Rights                           6
Section 2.6     Dissenting Shares                                                     6
Section 2.7     Lost, Stolen or Destroyed Certificates                               6
Section 2.8     Agreement of Fair Value                                               6
Section 2.9     Valuation Conditions                                                  7
Section 2.10    Post-Closing Valuation and Consideration Adjustment                  7

Article III

REPRESENTATIONS AND WARRANTIES OF XIAODU

ARTICLE IIIA

REPRESENTATIONS AND WARRANTIES OF BAIDU HK

Article IV

REPRESENTATIONS AND WARRANTIES OF RAJAX

Article V

COVENANTS RELATED TO CONDUCT OF BUSINESS

Section 5.1     Conduct of Business of Xiaodu                                         11
Section 5.2     Conduct of Business of Rajax and Rajax Merger Sub                     14
Section 5.3     Access to Information                                                 15

i

Article VI

ADDITIONAL AGREEMENTS

Section 6.1   Rajax G-1 Shares Lock-up Period                                      15
Section 6.2   Non-Solicit                                                         15
Section 6.3   Fees and Expenses                                                   15
Section 6.4   Confidentiality                                                     16
Section 6.5   Tax                                                                 16
Section 6.6   Specific Pre-Closing Covenants                                      16
Section 6.7   Other Covenants                                                     17
Section 6.8   Handover Checklist                                                  17
Section 6.9   Further Assurance                                                   17

Article VII

INDEMNIFICATION

Section 7.1   Survival                                                            18
Section 7.2   Indemnification by Approved Xiaodu Shareholders                     18
Section 7.3   Specific Indemnity by Baidu HK                                      20
Section 7.4   Indemnification by Rajax                                            20
Section 7.5   Reliance                                                            20
Section 7.6   Investigation                                                       20
Section 7.7   Procedures                                                          21
Section 7.8   Certain Limitations                                                 22
Section 7.9   Exclusive Remedy                                                    23

Article VIII

CONDITIONS TO CONSUMMATION OF THE MERGER

Section 8.1   Conditions to Each Party's Obligations to Effect the Merger         23
Section 8.2   Conditions to the Obligations of Rajax and Rajax Merger Sub         23
Section 8.3   Conditions to the Obligations of Xiaodu and Baidu HK                25

Article IX

TERMINATION; AMENDMENT; WAIVER

Section 9.1   Termination by Mutual Agreement                                     26
Section 9.2   Termination by Either Party                                         26
Section 9.3   Termination by Rajax                                                27
Section 9.4   Termination by Xiaodu                                               27
Section 9.5   Effect of Termination and Abandonment                              27

ii

Article X

MISCELLANEOUS

| Section 10.1 | Entire Agreement; Assignment | 28 |
|---|---|---|
| Section 10.2 | Notices | 28 |
| Section 10.3 | Governing Law; Jurisdiction | 30 |
| Section 10.4 | Descriptive Headings | 31 |
| Section 10.5 | No Third Party Beneficiaries | 31 |
| Section 10.6 | Severability | 31 |
| Section 10.7 | Specific Performance | 31 |
| Section 10.8 | Amendment | 31 |
| Section 10.9 | Extension; Waiver | 32 |
| Section 10.10 | Interpretation | 32 |
| Section 10.11 | Counterparts | 32 |

iii

**MERGER AGREEMENT**

THIS MERGER AGREEMENT (this "Agreement"), dated August 24, 2017 is by and among:

(1)    Rajax Holding, an exempted company organized under the laws of the Cayman Islands ("Rajax");

(2)    Rajax Merger Sub Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands and a direct wholly owned Subsidiary of Rajax ("Rajax Merger Sub");

(3)    Xiaodu Life Technology Ltd, an exempted company organized under the laws of the Cayman Islands ("Xiaodu"); and

(4)    Baidu (Hong Kong) Limited, a company organized under the laws of Hong Kong ("Baidu HK").

Each of Rajax, Rajax Merger Sub, Xiaodu and Baidu HK is referred to herein individually as a "Party" and collectively as the "Parties". Certain capitalized terms used in this Agreement are used as defined in Schedule 1.

**RECITALS**

WHEREAS, upon the terms and subject to the conditions of this Agreement and in accordance with the Companies Law (as revised) of the Cayman Islands (the "Cayman Companies Law"), Rajax and Xiaodu will enter into a business combination transaction pursuant to which Rajax Merger Sub will merge with and into Xiaodu (the "Merger"), with Xiaodu being the surviving company following the Merger;

WHEREAS, the respective boards of directors of Rajax and Rajax Merger Sub have (i) determined that it is in the best interests of Rajax and Rajax Merger Sub and their respective shareholders as a whole, and declared it advisable for Rajax and Rajax Merger Sub, respectively, to enter into this Agreement and the Plan of Merger (as defined below); (ii) approved the execution, delivery and performance by Rajax and Rajax Merger Sub, as applicable, of this Agreement and the Merger (and the consummation thereof) and the other transactions contemplated hereby; and (iii) obtained the authorization and approval of this Agreement, the Merger, the Plan of Merger and the issuance of the Rajax G-1 Shares (as defined below), as applicable, by the requisite shareholders' vote of Rajax and Rajax Merger Sub;

WHEREAS, the board of directors of Xiaodu (the "Xiaodu Board") has passed a set of resolutions of Xiaodu Board (the "Xiaodu Board Resolutions"), pursuant to which the Xiaodu Board has (i) determined that it is in the best interests of Xiaodu and the Xiaodu Shareholders as a whole, and declared it advisable, to enter into this Agreement and the Plan of Merger, and (ii) approved the terms of, the execution, delivery and performance by Xiaodu of, this Agreement and the Plan of Merger and the Merger (and the consummation thereof) and the other transactions contemplated hereby; and Xiaodu Shareholders have approved and authorized this Agreement, the Merger and the Plan of Merger by the Xiaodu Special Resolution (as defined in Schedule 7) and the Xiaodu Written Consent (as defined in Schedule 7).

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, Xiaodu, Baidu HK, Rajax and Rajax Merger Sub hereby agree as follows:

ARTICLE I

THE MERGER

Section 1.1    The Merger. At the Effective Time, upon the terms and subject to the conditions of this Agreement and in accordance with the Cayman Companies Law, Rajax Merger Sub shall be merged with and into Xiaodu. Following the Merger, Xiaodu shall continue as the surviving company (as defined under and for the purposes of the Cayman Companies Law) (the "Surviving Corporation") and Rajax Merger Sub shall be struck off the register of companies in the Cayman Islands, such that the separate corporate existence of Rajax Merger Sub shall cease pursuant to the provisions of the Cayman Companies Law.

Section 1.2    Effective Time. Subject to the provisions of this Agreement, Rajax, Rajax Merger Sub and Xiaodu shall execute a plan of merger (the "Plan of Merger") substantially in the form contained in Exhibit A attached hereto and the Parties shall file the Plan of Merger and all such other documents (including, without limitation, a director's declaration by a director of each of Rajax Merger Sub and Xiaodu made in accordance with Section 233(9) of the Cayman Companies Law) required to effect the Merger pursuant to the Cayman Companies Law with the Registrar of Companies of the Cayman Islands as provided in Section 233 of the Cayman Companies Law (the "Cayman Merger Documents"), and make such other filings or records and take such other actions as may be required in accordance with the applicable provisions of the Cayman Companies Law to make the Merger effective hereinafter, on or as soon as practicable after the Closing Date. The Merger shall become effective upon the date specified in the Plan of Merger in accordance with the Cayman Companies Law (the "Effective Time").

Section 1.3    Closing of the Merger. Unless otherwise mutually agreed in writing among Rajax, Rajax Merger Sub and Xiaodu, the closing of the Merger (the "Closing") will take place via the remote exchange of electronic documents and signatures on or immediately after the date of this Agreement (the "Closing Date"), which shall be the business day immediately following the satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions at the Closing).

Section 1.4    Effects of the Merger. The Merger shall have the effects as set out in this Agreement and as specified in the Cayman Companies Law. Without limiting the generality of the foregoing, and subject thereto, at the Effective Time:

(a)    the Surviving Corporation shall immediately succeed to and assume all the rights, property of every description, including choses in action, and the business, undertaking, goodwill, benefits, immunities and privileges, mortgages, charges or security interests and all Contracts, obligations, claims, debts and liabilities of each of Rajax Merger Sub and Xiaodu in accordance with the Cayman Companies Law; and

(b)    the separate corporate existence of Rajax Merger Sub shall cease.

2

Section 1.5    Memorandum and Articles of Association. At the Effective Time, the memorandum of association and articles of association of Rajax Merger Sub then in effect shall be the memorandum of association (the "Surviving Corporation Memorandum of Association") and articles of association (the "Surviving Corporation Articles of Association") respectively of the Surviving Corporation (except that, at the Effective Time, (i) the Surviving Corporation Memorandum of Association shall be amended to refer to the name of the Surviving Corporation as "Xiaodu Life Technology Ltd" and Clause 1 of the Surviving Corporation Memorandum of Association shall be amended to be and read as follows: "The name of the Company is Xiaodu Life Technology Ltd", and (ii) the Surviving Corporation Articles of Association shall be amended to refer to the name of the Surviving Corporation as "Xiaodu Life Technology Ltd"), in each case, until thereafter changed or amended as provided therein or by applicable Law.

Section 1.6    Directors. The directors of Rajax Merger Sub immediately prior to the Effective Time shall be the directors of the Surviving Corporation, each to hold office in accordance with the Surviving Corporation Articles of Association until their respective death, resignation, or removal or until their respective successors are duly elected and qualified.

Section 1.7    Officers. The officers (if any) of Rajax Merger Sub immediately prior to the Effective Time shall be the officers of the Surviving Corporation, each to hold office in accordance with the Surviving Corporation Articles of Association until successors are duly elected or appointed and qualified.

ARTICLE II

CONVERSION OF SECURITIES

Section 2.1    Conversion of Securities. At the Effective Time, by virtue of the Merger and without any action on the part of any of the Parties or any other shareholders of Xiaodu and Rajax Merger Sub:

(a)    Securities of Rajax Merger Sub. Each ordinary share, par value US$0.00001, of Rajax Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into one newly and validly issued, fully paid and nonassessable ordinary share, par value US$0.00001, of the Surviving Corporation. Such share(s) shall be the only issued and outstanding share(s) of the Surviving Corporation and the register of members of Xiaodu shall be updated promptly at the Effective Time to reflect such conversion.

(b)    Securities of Xiaodu. Each ordinary share, par value US$0.00001, Series Seed preferred share, par value US$0.00001, Series A preferred share, par value US$0.00001, Series B preferred share, par value US$0.00001, of Xiaodu issued and outstanding immediately prior to the Effective Time (individually, a "Xiaodu Share" and collectively, the "Xiaodu Shares"), shall, as of the Effective Time, (i) be cancelled by virtue of the Merger in exchange of the Merger Consideration as provided in Section 2.2 below and without any action on the part of its holder, (ii) no longer be issued or outstanding and shall cease to exist and the register of members of Xiaodu shall be updated promptly at the Effective Time to reflect such cancellation, and (iii) cease to have any rights with respect of such Xiaodu Shares except as otherwise provided for herein or under the Cayman Companies Law.

3

Section 2.2   Consideration.

(a)   Merger Consideration. Based on the Valuation (as defined below) of Xiaodu, the aggregate consideration for the Merger shall be US$480,000,000 ("Merger Consideration"), as may be adjusted pursuant to Section 2.10 below, payable by Rajax in the following manner at the Closing:

(i)   subject to Section 2.2(b) and Section 2.6 below, US$280,000,000 in the form of U.S. dollar cash without interest (the "Cash Consideration") shall be apportioned among and payable to the Xiaodu Shareholders as set out in column #5 of Schedule 2 attached hereto; provided that Rajax shall be entitled to hold back and refrain from paying such portion of the Cash Consideration allocated to the Undecided Xiaodu Shareholders; and

(ii)   subject to Section 2.6 below, 360,885,083 validly issued, fully paid, non-assessable Series G-1 Shares, par value US$0.0000125 per share, of Rajax (the "Rajax G-1 Shares") (such number of shares, the "Share Consideration"), with an issue price representing a US$6.4 billion pre-money valuation of the Rajax, shall be apportioned among and issued to the Xiaodu Shareholders as set out in column #7 of Schedule 2 attached hereto; provided that Rajax shall be entitled to hold back and refrain from issuing such portion of the Share Consideration allocated to the Undecided Xiaodu Shareholders.

(b)   Escrow Arrangement for Tax Filing.

(i)   The Parties agree that an aggregate amount of US$9,413,416 from the Cash Consideration, as apportioned among the applicable Xiaodu Shareholders (the "Tax Paying Xiaodu Shareholder") as set out in column #6 of Schedule 2 (the "Tax Escrow Amount") shall be deposited in an escrow account (the "Escrow Account") at the Closing pursuant to an escrow agreement (the "Escrow Agreement") to be entered into among JPMorgan Chase Bank, N.A. (the "Escrow Agent"), Rajax and Baidu HK (the "Xiaodu Shareholders Representative"). Xiaodu Shareholders Representative will pay the Escrow Agent the one-time administrative fee of US$5,000 ("Escrow Fees") on behalf of the Tax Paying Xiaodu Shareholders upon execution of the Escrow Agreement. The Escrow Fees will be allocated among the Tax Paying Xiaodu Shareholders in accordance with their respective pro rata share in the aggregate Merger Consideration of all Tax Paying Xiaodu Shareholders and be reimbursed to Baidu HK out of the balance remaining out of the Tax Escrow Amount, if any. After a Tax Paying Xiaodu Shareholder has filed the Tax Returns in accordance with Section 6.5, the relevant Tax Escrow Amount allocated to such Tax Paying Xiaodu Shareholder shall (i) either be paid to the competent Tax authority directly from the Escrow Account pursuant to written instruction by Rajax to the Escrow Agent (to be made in the sole discretion of Rajax) within five (5) days after Rajax has received such Tax payment notice issued by the competent Tax authority, with any balance remaining out of such relevant portion of the Tax Escrow Amount be concurrently released and distributed to such Tax Paying Xiaodu Shareholder; provided that the Escrow Fees allocated to such Tax Paying Xiaodu Shareholder will be released and distributed to Baidu HK, or (ii) otherwise be released and distributed to such Tax Paying Xiaodu Shareholder within five (5) days after Rajax has received evidence to its reasonable satisfaction that such Tax Paying Xiaodu Shareholder has fully paid the relevant PRC income Tax. In the event that the amount of Taxes applicable to and payable by any Tax Paying Xiaodu Shareholder as finally determined by the competent Tax authority is greater than the Tax Escrow Amount allocated to such Tax Paying Xiaodu Shareholder, such Tax Paying Xiaodu Shareholder shall pay the excess to the competent Tax authority within five (5) days after it has received such tax payment notice issued by the competent Tax authority, and shall indemnify and hold harmless the Rajax Indemnified Parties from and against any and all Indemnifiable Losses, resulting from or as a result of the failure by such Tax Paying Xiaodu Shareholder to pay such excess, in accordance with Section 7.2(c).

4

(ii)    The Parties further agree that with respect to each Undecided Xiaodu Shareholder, an aggregate amount of 10% of the Merger Consideration allocated to such Undecided Xiaodu Shareholder as set forth in column #4 of Schedule 2 ("Undecided Xiaodu Shareholder Tax Escrow Amount") shall be deposited in the Escrow Account at the Closing pursuant to the Escrow Agreement if Rajax determines to pay such portion of the Cash Consideration and issue such portion of the Share Consideration to such Undecided Xiaodu Shareholder prior to execution and delivery of the Deed of Undertaking by such Undecided Xiaodu Shareholder. After an Undecided Xiaodu Shareholder has filed the Tax Returns in accordance with Section 6.5, (i) in the event that Rajax has received evidence to its reasonable satisfaction that such Undecided Xiaodu Shareholder is not required by the competent Tax authority to pay any PRC income Tax for the transactions contemplated hereunder pursuant to the Announcement 7, the relevant Undecided Xiaodu Shareholder Tax Escrow Amount allocated to such Undecided Xiaodu Shareholder shall be released and distributed to such Undecided Xiaodu Shareholder within five (5) days after Rajax has received such evidence, and (ii) in the event that such Undecided Xiaodu Shareholder is required by the competent Tax authority to pay the PRC income Tax for the transactions contemplated hereunder pursuant to the Announcement 7, the relevant Undecided Xiaodu Shareholder Tax Escrow Amount shall either be paid to the competent Tax authority directly from the Escrow Account pursuant to written instruction by Rajax to the Escrow Agent (to be made in Rajax sole discretion) within five (5) days after Rajax has received such tax payment notice issued by the competent Tax authority, or otherwise be released to such Undecided Xiaodu Shareholder within five (5) days after Rajax has received evidence to its reasonable satisfaction that such Undecided Xiaodu Shareholder has fully paid the relevant PRC income Tax.

(iii)    The Parties hereby acknowledge that the Merger Consideration allocated to Approved Xiaodu Shareholders other than Tax Paying Xiaodu Shareholders shall not be subject to escrow arrangement.

Section 2.3    Treatment of Xiaodu Options. Each Xiaodu Option that is outstanding immediately prior to the Effective Time, whether unvested or vested, shall, at the Effective Time, no longer be outstanding and shall be cancelled.

Section 2.4    Surrender of Certificates. Promptly after the Effective Time, the Surviving Corporation shall mail to each registered holder of Xiaodu Shares immediately prior to the Effective Time instructions for effecting the surrender of any and all share certificates which have been issued representing Xiaodu Shares (the "Certificates"). Upon the cancellation of any Xiaodu Shares at the Effective Time, the registered holder of such cancelled Xiaodu Shares shall have no further rights in respect of such cancelled Xiaodu Shares except the right to receive its share of the Merger Consideration, and each Certificate in respect of such cancelled Xiaodu Shares shall be deemed to be cancelled at any time after the Effective Time.

5

Section 2.5    <u>Transfer Books; No Further Ownership Rights</u>. At the date of this Agreement, the register of members of Xiaodu shall be closed until the Effective Time, and thereafter there shall be no further registration of transfers on the register of members of the Surviving Corporation of Xiaodu Shares that were issued and outstanding between the date of this Agreement and the Effective Time. From and after the Effective Time, the holders of Xiaodu Shares issued and outstanding immediately prior to the Effective Time shall cease to have any rights with respect to such Xiaodu Shares, except as otherwise provided for herein or by applicable Law, and Rajax shall be the sole shareholder of the Surviving Corporation.

Section 2.6    <u>Dissenting Shares</u>. No Person who has validly exercised such Person's rights to dissent from the Merger pursuant to the Cayman Companies Law shall be entitled to receive the Merger Consideration with respect to Xiaodu Shares owned by such Person immediately prior to the Effective Time ("<u>Dissenters Shares</u>") unless and until such Person shall have effectively withdrawn or lost such Person's rights to dissent from the Merger under the Cayman Companies Law. If a holder of Dissenters Shares effectively withdraws its demand for, or loses its rights to, dissent from the Merger pursuant to the Cayman Companies Law with respect to any Dissenters Shares, such Xiaodu Shares shall cease to be Dissenters Shares. Each Dissenters Share shall be entitled to receive only the payment resulting from the procedure in Section 238 of the Cayman Companies Law. Xiaodu shall promptly give Rajax (i) copies of notices of objection, notices of dissent, any written demands for appraisal, attempted withdrawals of such demands, and any other instruments served pursuant to applicable Law that are received by Xiaodu relating to Xiaodu shareholders' rights to dissent from the Merger and (ii) the opportunity to direct or approve all offers, negotiations and proceedings with respect to demand for appraisal under the Cayman Companies Law. Xiaodu shall not, except with the prior written consent of Rajax, voluntarily make any payment with respect to any exercise by a shareholder of its rights to dissent from the Merger, any demands for appraisal, offer to settle or settle any such demands or approve any withdrawal of any such demands.

Section 2.7    <u>Lost, Stolen or Destroyed Certificates</u>. If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit or declaration of that fact by the Person claiming such Certificate to be lost, stolen or destroyed and, if required by the Surviving Corporation, an indemnity or the posting by such Person of a bond in such reasonable amount as the Surviving Corporation may direct as indemnity against any claim that may be made against it with respect to such lost, stolen or destroyed Certificate, the Surviving Corporation will deliver in exchange for such lost, stolen or destroyed Certificate the applicable portion of Cash Consideration and Share Consideration with respect to Xiaodu Shares formerly represented thereby pursuant to this Agreement.

Section 2.8    <u>Agreement of Fair Value</u>. Rajax, Rajax Merger Sub, Xiaodu, Baidu HK and other Approved Xiaodu Shareholders respectively agree that the Merger Consideration represents the fair value of Xiaodu Shares for the purposes of Section 238(8) of the Cayman Companies Law.

6

Section 2.9    Valuation Conditions. The equity value of the Xiaodu Group Companies as of the Closing (the "Valuation") is US$480,000,000; provided that the following pre-conditions ("Valuation Conditions") shall be true and correct as of the Closing:

(a)    the aggregate amount of interest bearing debt owed by the Xiaodu Group Companies to any person other than a Xiaodu Group Company (the "Debt") as of the Valuation Adjustment Date shall not be higher than US$4,000,000 ("Maximum Debt"); provided that an entrustment loan borrowed by the applicable Xiaodu Group Company from a third party bank with the principal amount of RMB220,000,000 shall not be included in calculation of the Debt;

(b)    the Xiaodu Group Companies shall, at the Valuation Adjustment Date, keep cash received by the Xiaodu Group Companies on behalf of any merchant or any city or logistics agent, if any, but are not otherwise required to keep any amount of cash at the Closing;

(c)    the daily average of the monthly gross merchandise volume of Xiaodu (the "GMV") generated in the period from June 1, 2017 to the Valuation Adjustment Date shall be no less than RMB48,570,000 (i.e., the daily average of the monthly GMV generated in April and May 2017); and

(d)    (A) the average of the monthly net loss of Xiaodu (the "Net Loss") generated in the preceding month of the month in which the Closing Date occurs shall be no greater than 130% times RMB112,500,000 (i.e., the average of the monthly Net Loss generated in April and May 2017); and (B) the ratio of Xiaodu Subsidies to GMV (the "Subsidies/GMV Ratio") generated during the period from July 1, 2017 to Valuation Adjustment Date shall not exceed 3.25%. "Xiaodu Subsidies" means subsidies provided by Xiaodu to its merchants and consumers.

Section 2.10    Post-Closing Valuation and Consideration Adjustment.

(a)    After the Closing Date, Rajax and Baidu HK shall review each Valuation Condition and determine whether the Valuation needs to be adjusted. For the purpose of such review, within thirty (30) days following the Closing Date, Rajax shall deliver to Baidu HK a calculation of the following items as of the Closing Date, together with such schedules and data as may be appropriate to support such calculation (collectively, the "Preliminary Adjustment Statement"): (i) the Valuation Adjustment Date Debt; (ii) the Valuation Adjustment Date Cash; (iii) the GMV of Xiaodu generated from June 1, 2017 to the Valuation Adjustment Date; and (iv) (A) the Net Loss of Xiaodu generated in the preceding month of the month in which the Closing Date occurs and (B) the Subsidies/GMV Ratio generated from July 1, 2017 to the Valuation Adjustment Date (the foregoing items (i) to (iv) are hereinafter referred to collectively as the "Preliminary Adjustment Items", and each a "Preliminary Adjustment Item").

(b)    Baidu HK shall have thirty (30) days following receipt of the Preliminary Adjustment Statement to review the calculation of Preliminary Adjustment Items and to notify Rajax in writing of any dispute regarding the amount of any Preliminary Adjustment Item set forth on the Preliminary Adjustment Statement (the "Adjustment Statement Dispute Notice") specifying the reasons therefor in reasonable detail. If no Adjustment Statement Dispute Notice is delivered by Baidu HK within such thirty (30)-day review period or if Baidu HK delivers a written acceptance of the Preliminary Adjustment Statement during such thirty (30)-day review period, then such Preliminary Adjustment Statement shall become final and binding as of the end of the thirty (30)-day review period or the date of receipt by Rajax of such written acceptance, as applicable.

7

(c)    In the event that Baidu HK shall have timely delivered an Adjustment Statement Dispute Notice to Rajax, Rajax and Baidu HK shall cooperate in good faith to resolve such dispute as promptly as practicable and, upon such resolution, if any, any adjustments to any Preliminary Adjustment Item shall be made as agreed upon in writing by Rajax and Baidu HK. If Rajax and Baidu HK are unable to resolve any such dispute within thirty (30) days of Baidu HK's delivery of such Adjustment Statement Dispute Notice (or such longer period as Rajax and Baidu HK shall mutually agree in writing), such dispute shall be submitted as promptly as practicable to the Independent Accounting Firm for resolution. The Independent Accounting Firm shall, acting as expert and not as arbitrator, use reasonable best efforts to deliver a revised calculation of the following items which are in dispute between Rajax and Baidu HK, together with such schedules and data as may be appropriate to support such calculation, within thirty (30) days of submission by the parties of the dispute to it and, in any case, as promptly as practicable after such submission (collectively, the "Revised Adjustment Statement"): (i) the Valuation Adjustment Date Debt; (ii) the Valuation Adjustment Date Cash; (iii) the GMV of Xiaodu generated from June 1, 2017 to the Valuation Adjustment Date; and (iv) (A) the Operating Loss of Xiaodu generated in the preceding month of the month in which the Closing Date occurs and (B) the Subsidies/GMV Ratio generated from July 1, 2017 to the Valuation Adjustment Date (the foregoing items (i) to (iv) are hereinafter referred to collectively as the "Revised Adjustment Items", and each a "Revised Adjustment Item"). The Revised Adjustment Statement and Revised Adjustment Items shall be final and binding on the parties; provided that (A) the Independent Accounting Firm may consider only those items and amounts (and related items and amounts) as to which Rajax and Baidu HK have disagreed within the time periods and on the terms specified above, and (B) the Independent Accounting Firm's determination of any Revised Adjustment Item may neither be less than the lower, nor more than the higher, of Rajax's and Baidu HK's respective calculations of such Preliminary Adjustment Item. Any expenses relating to the engagement of the Independent Accounting Firm in respect of its services pursuant to this Section 2.10(c) shall be borne by Rajax and Baidu HK in proportion to such party's loss, if any, resulting from the deviation of its calculation of the Preliminary Adjustment Items from the Revised Adjustment Items (e.g., if Rajax is awarded 60% of the difference between its claim and the claim of Baidu HK by the Independent Accounting Firm, it must pay 40% of the Independent Accounting Firm's expenses, and Baidu HK must pay the remaining 60% of such expenses). Rajax and Baidu HK each shall furnish the Independent Accounting Firm such work papers and other documents and information relating to the disputed issues as the Independent Accounting Firm shall reasonably request.

(d)    After the post-Closing review conducted by Rajax and Baidu HK in accordance with the process set forth in above Section 2.10(a)-(c):

(i)    If the absolute amount of the product (the "Net Debt") of Valuation Adjustment Date Cash minus Valuation Adjustment Date Debt minus cash received by the Xiaodu Group Companies on behalf of any merchant or any city or logistics agent as of the Valuation Adjustment Date (if any) minus any outstanding promotion and marketing fees (代理商激励基金和市场基金) incurred by, accrued or payable by any Xiaodu Group Company to all agents thereof as of June 30, 2017 which have not been paid by such Xiaodu Group Company as of the Closing Date, is greater than the sum of the Maximum Debt plus Cash Compensation, the adjustment amount shall equal to the amount of Net Debt exceeding the sum of the Maximum Debt plus Cash Compensation;

8

(ii)    If the daily average of the monthly GMV of Xiaodu generated in the period from June 1, 2017 to the Valuation Adjustment Date is less than RMB48,570,000, the adjustment amount shall equal to ten (10) times the difference of (A) the amount of RMB48,570,000 exceeding (B) such daily average of monthly GMV of Xiaodu generated in the period from June 1, 2017 to the Valuation Adjustment Date;

(iii)    If the Net Loss of Xiaodu generated in the preceding month of the month in which the Closing Date occurs is greater than 130% times RMB112,500,000, the adjustment amount shall equal to four (4) times the difference of (A) the amount of the Net Loss of Xiaodu generated in the preceding month of the month in which the Closing Date occurs exceeding (B) 130% times RMB112,500,000;

(iv)    If the Subsidies/GMV Ratio generated during the period from July 1, 2017 to the Valuation Adjustment Date exceeds 3.25%, the adjustment amount shall equal to four (4) times the difference of (A) the Xiaodu Subsidies incurred during the period from July 1, 2017 through the Valuation Adjustment Date exceeding (B) the product of the aggregate GMV of Xiaodu generated in the period from June 1, 2017 to the Valuation Adjustment Date multiplied by 3.25%;

(v)    If the sum of adjustment amount in Sections 2.10(d)(i) to 2.10(d)(iv) is greater than US$20,000,000 ("Total Adjustment Amount"), the difference between the Total Adjustment Amount and US$20,000,000 (the "Valuation Difference") shall be borne and payable by the Xiaodu Shareholders to Rajax as follows:

(1)    Rajax shall deliver a written notice to all of the Xiaodu Shareholders (other than the Dissenting Xiaodu Shareholders, if any), setting forth the Valuation Difference and details of a bank account designated by Rajax, within five (5) business days after the earliest of (A) the date on which Baidu HK accepts the Preliminary Adjustment Statement or (B) the date on which Baidu HK's 30-day review period expires where Baidu HK fails to deliver an Adjustment Statement Dispute Notice, in either case in accordance with Section 2.10(b), or (C) the date on which the Revised Adjustment Statement is delivered to Rajax and Baidu HK by the Independent Accounting Firm in accordance with Section 2.10(c), as the case may be; and within ten (10) business days after receiving such written notice from Rajax, each Xiaodu Shareholder shall pay Rajax an amount equal to its pro rata share of the Valuation Difference (being the product of the Valuation Difference multiplied by a fraction, the numerator of which is the aggregate amount of the Merger Consideration allocated to such Xiaodu Shareholder as set forth in column #4 of Schedule 2 and the denominator of which is the aggregate amount of the Merger Consideration) (the "Pro Rata Valuation Difference"); provided that each Xiaodu Shareholder who received the Share Consideration shall satisfy such payment obligation of Pro Rata Valuation Difference by first surrendering to Rajax, for no consideration or at the lowest redemption price allowed under Cayman Law, such number of Rajax G-1 Shares equal to the quotient of (A) the Pro Rata Valuation Difference allocated to such Xiaodu Shareholder plus the consideration, if any, payable by Rajax for redeeming such Rajax G-1 Shares, divided by (B) US$0.5541930353 (being the per share price of Rajax G-1 Shares). If a Xiaodu Shareholder does not have sufficient Rajax G-1 Shares to satisfy its obligation under this paragraph, such Xiaodu Shareholder shall still pay or cause to be paid its remaining Pro Rata Valuation Difference to the bank account designated by Rajax in the above-mentioned written notice within the above-mentioned ten (10) business day period. Notwithstanding anything to the contrary, with respect to any Pro Rata Valuation Difference allocated to any Undecided Xiaodu Shareholder, the Approved Xiaodu Shareholders shall pay Rajax such amount in US dollar cash within the above-mentioned ten (10) business day period in accordance with their respective pro rata share in the aggregate Merger Consideration of all Approved Xiaodu Shareholders.

9

(vi)   For the purposes of this Section 2.10, any conversion between USD and RMB amounts shall be based on the middle exchange rate of RMB against USD published by the Peoples' Bank of China on the Closing Date.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF XIAODU

Xiaodu warrants to Rajax and Rajax Merger Sub that each warranty set out in Schedule 3 is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

## ARTICLE IIIA

### REPRESENTATIONS AND WARRANTIES OF BAIDU HK

Baidu HK warrants to Rajax and Rajax Merger Sub that (i) each warranty set out in Schedule 3A, and (ii) to the Knowledge of Baidu HK, each warranty set out in Sections 1 to 4, 7, and 9 of Schedule 3, is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF RAJAX

Rajax warrants to Xiaodu and Baidu HK that each warranty set out in Schedule 4 is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

10

ARTICLE V

COVENANTS RELATED TO CONDUCT OF BUSINESS

Section 5.1   Conduct of Business of Xiaodu. Except as required by applicable Law or as expressly contemplated by this Agreement, during the period from the date hereof to the earlier of the Effective Time or the termination of this Agreement in accordance with Article IX, Xiaodu will, and will cause each of its Subsidiaries to: (a) conduct its operations in the ordinary and usual course of business consistent with past practice, (b) keep available the service of its current officers and employees and preserve its relationships with customers, advertisers, licensors, suppliers and others having business dealings with it, (c) pay or perform its debts, Taxes, and other obligations when due, (d) maintain its assets in a condition comparable to their current condition, reasonable wear, tear and depreciation excepted, (e) otherwise periodically report to Rajax concerning the status of its business, operations and finance, and (f) take all actions reasonably necessary, to consummate the transactions contemplated by this Agreement promptly, including the taking of all reasonable acts necessary to cause all of the conditions precedent setting forth in Section 8.1 and Section 8.2 to be satisfied. Without limiting the generality of the foregoing, and except as required by applicable Law, as otherwise contemplated in this Agreement or the Xiaodu Disclosure Schedule, from the date hereof until the earlier of the Effective Time or the termination of this Agreement in accordance with Article IX, Xiaodu will not, and will not permit its Subsidiaries or direct equity holders of any of its Xiaodu VIEs to, without the prior written consent of Rajax:

(a)   amend its memorandum and/or articles of association (or other similar governing instrument), other than to adopt the Surviving Corporation Memorandum of Articles and the Surviving Corporation Articles of Association with effect at the Effective Time;

(b)   authorize for issuance, issue, sell, pledge, dispose of, transfer, deliver or agree or commit to issue, sell, pledge, dispose of, transfer or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any share capital or any other securities convertible into or exchangeable for any share capital or any equity equivalents (including, without limitation, any stock options or stock appreciation rights), except for the issuance of Xiaodu Shares as required to be issued upon exercise or settlement of Xiaodu Options;

(c)   (i) split, combine, subdivide or reclassify any of its share capital; (ii) declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its share capital; (iii) enter into any agreement with respect to the voting of its share capital; (iv) make any other actual, constructive or deemed distribution in respect of any of its share capital or otherwise make any payments to shareholders in their capacity as such; or (v) redeem, repurchase or otherwise acquire any of its share capital or any share capital of any of its Subsidiaries, except (A) the withholding of Xiaodu's securities to satisfy Tax obligations with respect to Xiaodu Options or (B) the acquisition by Xiaodu of its securities in connection with the forfeiture of Xiaodu Options or (C) the acquisition by Xiaodu of its securities in connection with the net exercise of Xiaodu Options in accordance with the terms thereof;

(d)   place Xiaodu or any of its Subsidiaries into liquidation, dissolution, scheme of arrangement, merger, consolidation, restructuring, recapitalization redomiciliation or other reorganization (other than the Merger);

(e)   alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure or ownership of any of Xiaodu's Subsidiaries;

11

(f)   except pursuant to a Contract existing on the date of this Agreement (i) incur, modify, renew or assume any long term or short term debt or issue any debt securities in an amount exceeding RMB1,000,000 in the aggregate, except for (y) borrowings under existing lines of credit in the ordinary and usual course of business consistent with past practice and (z) interest-bearing debts subject to post-Closing adjustment pursuant to Section 2.10, (ii) prepay any debt, borrowings or obligations in excess of RMB1,000,000 in the aggregate prior to their stated maturity, (iii) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other person, except in the ordinary and usual course of business consistent with past practice and in amounts not material to Xiaodu and its Subsidiaries, taken as a whole, except for guarantees of obligations of wholly owned Subsidiaries of Xiaodu; (iv) make any loans, advances or capital contributions to, or investments in, any other person (other than to wholly owned Subsidiaries of Xiaodu, Xiaodu VIEs in accordance with the Xiaodu Control Documents and for advances for travel and other expenses to officers, directors and employees made in the ordinary course of business consistent with past practice); (v) charge, pledge, mortgage or otherwise encumber shares of capital stock of Xiaodu or its Subsidiaries; or (vi) charge, mortgage or pledge any of its material assets, tangible or intangible, or create or suffer to exist any Lien thereupon other than Permitted Liens;

(g)   except in the ordinary course of business or as may be required by Law (i) enter into, adopt, amend, extend or terminate any bonus, profit sharing, compensation, severance, termination, equity, stock option, stock appreciation right, restricted stock, performance unit, stock equivalent, stock purchase, pension, retirement, deferred compensation, labor, collective bargaining, employment, severance or other benefit or compensation agreement, trust, plan, fund, award or arrangement for the benefit or welfare of any director, officer or employee in any manner (other than the entry into or amendment of employment or labor contracts with newly hired or promoted employees or the termination of employment agreements or labor contracts with terminated employees in the ordinary course of business consistent with past practice); (ii) (except as required under any agreement, plan or arrangement in effect on the date hereof or by applicable Law, or routine increases in salaries in the ordinary course of business consistent with past practice) increase in any manner the compensation or benefits payable or to become payable to any director, officer or employee (including, without limitation, the granting of stock options or other equity awards); (iii) grant or increase any severance, termination or similar compensation or benefits payable to any director, officer or employee (except with respect to new hires and to employees in connection with promotions in the ordinary course of business consistent with past practice, or as required under any agreement, plan or arrangement in effect on the date hereof or by applicable Law); or (iv) accelerate the time of payment or vesting of, or the lapsing of restrictions with respect to, or fund or otherwise secure the payment of, any compensation or benefits payable or to become payable to any director, officer or employee under any benefit or compensation plan, agreement or arrangement;

(h)   (i) dispose of, license, transfer or grant to any Person any rights to Xiaodu's Intellectual Property other than consistent with past licensing practice in the ordinary course of business; (ii) abandon, permit to lapse or otherwise dispose of any Xiaodu's Intellectual Property; (iii) make any material change in the ownership or right to register any Xiaodu's Intellectual Property; or (iv) enter into any Contract with respect to or otherwise binding upon any Xiaodu's Intellectual Property other than, in the case of clauses (i) to (iv), in the ordinary course of business consistent with past licensing practice;

(i)   acquire, sell, lease, transfer or otherwise dispose of any assets material to Xiaodu Group Companies, take as a whole, except in the ordinary course of business consistent with past practice;

12

(j)   except as may be required as a result of a change in Law or in Accounting Standards, change any of the accounting principles used by it;

(k)   revalue in any material respect any of its assets, including, without limitation, writing down the value of inventory or writing-off notes or accounts receivable other than in the ordinary course of business consistent with past practice or as required by Accounting Standards;

(l)   (i) acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any corporation, partnership or other business organization or division thereof or any equity interest therein, if such acquisition would be material to Xiaodu Group Companies, taken as a whole or (ii) authorize any new capital expenditures, other than capital expenditures contemplated by Xiaodu's current plan approved by the Xiaodu Board prior to the date hereof that was made available to Rajax or that, in the aggregate, would not exceed RMB1,000,000 during any fiscal quarter;

(m)   make or revoke any material Tax election, or settle or compromise any material Tax liability, or change (or make a request to any taxing authority to change) any aspect of its method of accounting for Tax purposes in a material manner;

(n)   pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), other than the payment, discharge or satisfaction in the ordinary course of business consistent with past practice;

(o)   waive the benefits of, reduce the restriction periods or agree to modify in a manner adverse to Xiaodu or any of its Subsidiaries any non-competition, confidentiality, standstill or similar agreement to which Xiaodu or any of its Subsidiaries is a party;

(p)   settle or compromise any pending or threatened suit, action or claim relating to the transactions contemplated hereby (other than responding to takedown notices or other notices or accusations of potential infringement in a manner consistent with past practice in the ordinary course of business);

(q)   (i) cancel, materially modify, terminate or grant a waiver of any rights under any Xiaodu Material Contract in a manner adverse to Xiaodu or any of its Subsidiaries, (ii) enter into a new Contract that (A) contains, unless required by applicable Law, a change of control provision in favor of the other party or parties thereto or would otherwise require a payment to or give rise to any rights to such other party or parties in connection with the transactions contemplated by this Agreement or (iii) waive, release, cancel, convey or otherwise assign any material rights or claims under any such Xiaodu Material Contract or new Contract in a manner adverse to Xiaodu or any of its Subsidiaries;

(r)   enter into any new lines of business;

(s)   grant any Lien (other than Permitted Liens) on any assets material to Xiaodu Group Companies, take as a whole (other than non-exclusive licenses granted in the ordinary course of business); or

(t)   take, propose to take, or agree in writing or otherwise to take, any of the actions described in Section 5.1(a) through Section 5.1(s).

13

Section 5.2    <u>Conduct of Business of Rajax and Rajax Merger Sub</u>. Except as required by applicable Law or as expressly contemplated by this Agreement, during the period from the date hereof to the earlier of the Effective Time or the termination of this Agreement in accordance with <u>Article IX</u>, Rajax will, and will cause each of its Subsidiaries to, conduct its operations in the ordinary and usual course of business consistent with past practice and keep available the service of its current officers and employees and preserve its relationships with customers, advertisers, licensors, suppliers and others having business dealings with it. Rajax agrees that, until the earlier of the Effective Time or the termination of this Agreement in accordance with <u>Article IX</u>, except as required by applicable Law, as contemplated under this Agreement, the Alibaba SPA, or the transaction documents in relation to issuance of Rajax G-1 Shares or consented to by Xiaodu and Baidu HK (which consent shall not be unreasonably withheld, delayed or conditioned), it shall not, and it shall not permit any of its Subsidiaries to:

(a)    authorize for issuance, issue, sell, pledge, dispose of, transfer, deliver or agree or commit to issue, sell, pledge, dispose of, transfer or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase or otherwise) any share capital or any other securities convertible into or exchangeable for any share capital or any equity equivalents (including, without limitation, any stock options or stock appreciation rights), except for the allotment and issuance of Rajax G-1 Shares as Merger Consideration and the allotment and issuance of shares pursuant to any Rajax equity incentive plans;

(b)    (i) split, combine, subdivide or reclassify any of its share capital; (ii) declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its share capital; (iii) enter into any agreement with respect to the voting of its share capital; (iv) make any other actual, constructive or deemed distribution in respect of any of its share capital or otherwise make any payments to shareholders in their capacity as such; or (v) redeem, repurchase or otherwise acquire any of its share capital or any share capital of any of its Subsidiaries, except (A) the withholding of Rajax's securities to satisfy Tax obligations with respect to Rajax Options or (B) the acquisition by Rajax of its securities in connection with the forfeiture of Rajax Options or (C) the acquisition by Rajax of its securities in connection with the net exercise of Rajax Options in accordance with the terms thereof;

(c)    place Rajax or any of its Subsidiaries into liquidation, dissolution, scheme of arrangement, merger, consolidation, restructuring, recapitalization redomiciliation or other reorganization;

(d)    alter through merger, liquidation, reorganization, restructuring or in any other fashion the corporate structure or ownership of any of Rajax's Subsidiaries;

(e)    take, propose to take, or agree in writing or otherwise to take, any of the actions described in <u>Section 5.2(a)</u> through <u>Section 5.2(d)</u>.

14

Section 5.3   Access to Information. Subject to applicable Law, between the date hereof and the Effective Time, Xiaodu will give Rajax and Rajax Merger Sub and their authorized representatives (including counsel, financial advisors and auditors) reasonable access during normal business hours to all employees, officers, agents, Contracts and properties and to all books and records of Xiaodu and its Subsidiaries, will permit Rajax and Rajax Merger Sub to make such inspections as Rajax and Rajax Merger Sub may reasonably require and will cause Xiaodu's officers and those of its Subsidiaries to furnish Rajax and Rajax Merger Sub with such financial and operating data and other information with respect to the business, properties and personnel of Xiaodu and its Subsidiaries as Rajax or Rajax Merger Sub may from time to time reasonably request; provided that no investigation pursuant to this Section 5.3 shall affect or be deemed to modify any of the representations or warranties made by Xiaodu. For the avoidance of doubt, none of Xiaodu or any of its Subsidiaries shall be required to provide access to or to disclose information where such access or disclosure would (i) waive the attorney-client privilege of Xiaodu or any of its Subsidiaries (provided that Xiaodu shall use its reasonable best efforts to allow for such access or disclosure to the maximum extent that does not result in a loss of attorney-client privilege), (ii) contravene any applicable Law or requirements of Governmental Entities (provided that Xiaodu shall use its reasonable best efforts to make appropriate substitute arrangements to permit reasonable disclosure not in violation of such law or requirement) or (iii) breach the terms of a confidentiality agreement with a third party entered into prior to the date hereof (provided that Xiaodu shall use its reasonable best efforts to obtain the required Consent of such third party to such access or disclosure). If any information is withheld by Xiaodu or any of its Subsidiaries pursuant to the proviso to the preceding sentence, Xiaodu shall inform Rajax as to the general nature of what, and pursuant to which clause of the proviso in the preceding sentence such information, is being withheld.

ARTICLE VI

ADDITIONAL AGREEMENTS

Section 6.1   Rajax G-1 Shares Lock-up Period. The Parties agree that the Xiaodu Shareholders who receive Share Consideration shall be subject to the lock-up restrictions as set out in Section 4.4 of the Rajax ROFR Agreement.

Section 6.2   Non-Solicit.

(a)   Baidu HK shall not, and shall cause its controlled Affiliates not to, solicit any Xiaodu Employee of any Xiaodu Group Company to leave such Xiaodu Group Company, hire any individual who is an employee of any Xiaodu Group Company during the six (6)-month period immediately following the Closing, or employ or assist any other Person in employing such Xiaodu Employee; provided that the restrictions in this Section 6.2(a) shall not restrict Baidu HK or any of its controlled Affiliates from advertising for employment in a newspaper, trade publications or other media not targeted specifically at the Xiaodu Employees or hiring any employee who responds to such an advertisement or apply for employment with Baidu HK or any of its controlled Affiliates to the extent neither Baidu HK nor any of its controlled Affiliates solicited such employees in violation of this Section 6.2(a).

(b)   Baidu HK shall not, and shall cause its Affiliates not to, solicit any agent (including city and logistics agent) of any Xiaodu Group Company to terminate business dealings with such Xiaodu Group Company.

Section 6.3   Fees and Expenses. Whether or not the Merger is consummated, all Expenses (as hereinafter defined) incurred in connection with this Agreement, and the transactions contemplated hereby shall be paid by the Party incurring such Expenses. As used in this Agreement, "Expenses" includes all reasonable and documented out-of-pocket expenses (including, without limitation, all filing costs and reasonable fees and expenses of counsel, accountants, investment bankers, experts and consultants to a Party hereto and its Affiliates) incurred by a Party or on its behalf in connection with, or related to, the authorization, preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including the solicitation of shareholder approvals and all other matters related to the transactions contemplated hereby.

15

Section 6.4    Confidentiality. The terms and conditions of the Transaction Agreements (collectively, the "Merger Terms"), including their existence, shall be considered confidential information and shall not be disclosed by any of the Parties to any other Person except that (i) each Party, as appropriate, may disclose any of the Merger Terms to its current or bona fide prospective investors, employees, investment bankers, lenders, accountants and attorneys, in each case only where such Persons are under equally stringent nondisclosure obligations; and (ii) if any Party is requested or becomes legally compelled (including without limitation, pursuant to securities Laws) to disclose the existence or content of any of the Merger Terms in contravention of the provisions of this Section 6.4, such Party shall, to the extent legally permissible and reasonably practicable, promptly provide the other Parties with written notice of that fact so that such other Parties may seek a protective order, confidential treatment or other appropriate remedy and in any event shall furnish only that portion of the information that is legally required and shall exercise reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such information.

Section 6.5    Tax.

(a)    All transfer, documentary, sales, use, stamp, value added, income, capital gain or similar taxes and duties (including interest and penalties) incurred in connection with cancellation of Xiaodu's shares by a Person that is shareholder of the Xiaodu immediately prior to the Merger, including, in exchange for the applicable Merger Consideration, as contemplated in the Merger, if any, shall be paid by such shareholder when due.

(b)    In particular, each Xiaodu Shareholder shall, within the required time limits in accordance with applicable PRC Laws or such time limits that the competent tax authority having jurisdiction over such Xiaodu Shareholder expressly requires, make Tax Returns with the competent tax authority having jurisdiction over such Xiaodu Shareholder for the transactions contemplated hereunder in accordance with Article 9 of Announcement 7. Rajax shall, at its own expense, be entitled to appoint a tax advisor to participate in each Xiaodu Shareholder's meeting with competent tax authority and witness each Xiaodu Shareholder to submit Tax Returns. Each Approved Xiaodu Shareholder shall notify Rajax of their meeting with competent tax authority with at least five (5) business days' prior notice.

Section 6.6    Specific Pre-Closing Covenants.

(a)    Prior to Closing, Xiaodu and Baidu HK shall cause each of Baidu Wangxun and Baidu Zaixian to enter into an IP license agreement with Xiaodu Shenghuo in a form agreed among Baidu HK, Xiaodu and Rajax.

(b)    Prior to Closing, upon the request by Rajax, Xiaodu and Baidu HK shall procure that all nominee shareholders of each of Beijing Xinchi and Xiaodu Shenghuo shall have respectively entered into share transfer agreement with the Persons designated by Rajax in a form agreed among Baidu HK, Xiaodu and Rajax.

16

(c)    Prior to Closing, upon the request by Rajax, Xiaodu and Baidu HK shall procure that the relevant Xiaodu Control Documents entered into by nominee shareholders of each of Beijing Xinchi and Xiaodu Shenghuo be terminated, and procure Zhenbing Gong (巩振兵) in his capacity as the legal representative of Xiaodu WFOE enter into a new set of control documents with respect to each of Beijing Xinchi and Xiaodu Shenghuo.

(d)    Prior to Closing, Xiaodu shall procure that all of the outstanding promotion and marketing fees（代理商激励基金和市场基金）incurred by, accrued or payable by any Xiaodu Group Company to all agents thereof as of June 30, 2017 (i.e. RMB 86,539,237) be paid in full.

Section 6.7    <u>Other Covenants</u>. Baidu HK shall, if not yet completed upon Closing, procure its nominee shareholders of each Xiaodu VIE to cooperate with Rajax and any Xiaodu VIE to take all necessary actions, sign all necessary forms and documents, and make all necessary Tax filings (if applicable) to complete (i) the transfer by each such nominee shareholder of its equity interests in the applicable Xiaodu VIE to Persons designated by Rajax, (ii) the termination of the Xiaodu Control Documents to which such nominee shareholder is a party, and (iii) the termination of the share pledge registration with relevant authorities under the Xiaodu Control Documents, each within three (3) months after the Closing; <u>provided</u> that within five (5) business days after the Closing, Xiaodu and Baidu HK shall procure that (i) the relevant Xiaodu Control Documents entered into by nominee shareholders of Beijing Xunda be terminated, (ii) Zhenbing Gong (巩振兵) in his capacity as the legal representative of Xiaodu WFOE enter into a new set of control documents with respect to Beijing Xunda and (iii) the nominee shareholders of Beijing Xunda shall have entered into a share transfer agreement with the Persons designated by Rajax in a form agreed among Baidu HK, Xiaodu and Rajax. Baidu HK shall also procure its designated legal representative, directors and supervisors (if any) of any applicable Xiaodu VIE to cooperate with execution of all necessary application documents to the effect that such designees cease to act as the above position in each Xiaodu VIE.

Section 6.8    <u>Handover Checklist</u>. Within five (5) business days after the Closing Date, Baidu HK shall deliver or cause to be delivered to the Person(s) designated by Rajax any and all original corporate certificates, permits and licenses, seals and chops, bank accounts and U盾 for each Xiaodu Group Company together with a checklist on which all these delivered items are listed.

Section 6.9    <u>Further Assurance</u>. Upon the terms and subject to the conditions herein, each of the Parties hereto agrees to use its reasonable best efforts to take or cause to be taken all action, to do or cause to be done, to execute such further instruments, and to assist and cooperate with the other Parties hereto in doing, all things necessary, proper or advisable under applicable Laws or otherwise to consummate and make effective, in the most expeditious manner practicable, the Merger, the transactions contemplated by this Agreement and the Transaction Agreements, provided that except as expressly provided herein, no Party shall be obligated to grant any waiver of any condition or other waiver hereunder.

17

ARTICLE VII

INDEMNIFICATION

Section 7.1    Survival. The representation and warranties of each Party contained in Schedule 3, Schedule 3A and Schedule 4 of this Agreement shall survive the Closing for a period of twelve (12) months after the Effective Time; provided that (a) any of representations and warranties of any Party contained in Section 7 (Tax Matters) of Schedule 3 or Section 9 (Tax Matters) of Schedule 4 shall survive the Closing until the earlier of the tenth (10th) anniversary of the Closing and the expiration of the applicable statute of limitations under applicable Laws, and (b) any Fundamental Representation shall survive the Closing until the expiration of the applicable statute of limitations under applicable Laws. The covenants and agreements of each Party set forth in this Agreement shall survive the Effective Time until fully discharged in accordance with their terms, except for those covenants and agreements which shall be complied with or discharged prior to the Effective Time in accordance with the terms of this Agreement.

Section 7.2    Indemnification by Approved Xiaodu Shareholders.

(a)    General Indemnity.

(i)    Subject to the other provisions of this Article VII, effective as of the Closing, each Approved Xiaodu Shareholder shall indemnify and hold harmless Rajax, its Affiliates (which shall, after the Effective Time, include the Xiaodu Group Companies), the directors, employees, agents and representatives of Rajax or any of Affiliates, and the successors and assigns or Rajax and its Affiliates (each, a "Rajax Indemnified Party") from and against any losses, Liabilities, damages, Liens, penalties, costs and expenses, including but without limitation reasonable advisor's fees and other reasonable expenses of investigation and defense of any of the foregoing (collectively, "Indemnifiable Losses") actually incurred or suffered by such Rajax Indemnified Party as a result of, arising out of or in connection with (A) any breach of, or inaccuracy in, any representation or warranty made by Xiaodu in this Agreement and (B) any breach or violation of, or failure to perform, any covenants or agreements made, and to be performed by Xiaodu or such Xiaodu Shareholder, as applicable, in this Agreement; provided that each Approved Xiaodu Shareholder's indemnification obligations under this Section 7.2(a) shall be several, but not joint, and shall be allocated in accordance with such Approved Xiaodu Shareholder's pro rata share in the aggregate Merger Consideration of all Approved Xiaodu Shareholders.

(ii)    Subject to the other provisions of this Article VII and in addition to the obligations set forth in Section 7.2(a), effective as of the Closing, Baidu HK shall indemnify and hold harmless the Rajax Indemnified Parties against any Indemnifiable Losses actually incurred or suffered by such Rajax Indemnified Party as a result of, arising out of or in connection with (A) any breach of, or inaccuracy in, any representation or warranty made by Baidu HK in this Agreement and (B) any breach or violation of, or failure to perform, any covenants or agreements made by, or to be performed by Baidu HK in this Agreement.

18

(b)    Specific Indemnity. Notwithstanding anything contained in the Xiaodu Disclosure Schedule and Baidu HK Disclosure Schedule, (i) for a period of two (2) years after the Effective Time with respect to Section 7.2(b)(i) below, and (ii) for a period until expiration of the applicable statute of limitations under applicable Law with respect to Sections 7.2(b)(ii), 7.2(b)(iii) and 7.2(b)(iv)Section 7.2(b)(iv), each Approved Xiaodu Shareholder shall indemnify and hold harmless the Rajax Indemnified Parties from and against any and all Indemnifiable Losses, resulting from or as a result of:

(i)    failure by any Xiaodu Group Company to pay all social insurances and housing funds for any Xiaodu Employee, and any direct monetary penalties and fines (including interests or other amounts in connection therewith) assessed on any Xiaodu Group Company by a Governmental Entity due to, arising out of or as a result of such failure to pay all social insurances and housing funds for any Xiaodu Employee;

(ii)    any and all claims and Actions in any jurisdiction or location of whatsoever nature against Xiaodu, any Xiaodu Group Company or any Rajax Group Company by any Dissenting Xiaodu Shareholder or any Undecided Xiaodu Shareholder, including but not limited to any additional consideration required to be paid to any such Dissenting Xiaodu Shareholder or Undecided Xiaodu Shareholder exceeding such amount as apportioned to such Dissenting Xiaodu Shareholder or Undecided Xiaodu Shareholder in column # 4 of Schedule 2;

(iii)    the failure by any Undecided Xiaodu Shareholder to perform and discharge its obligations in accordance with Announcement 7 and other applicable PRC Laws; provided that any such Indemnifiable Losses shall first be applied towards the Undecided Xiaodu Shareholder Escrow Amount and the Approved Xiaodu Shareholders shall only be responsible for the Indemnifiable Losses in excess of the Undecided Xiaodu Shareholder Escrow Amount;

(iv)    any and all Taxes (or the non-payment thereof) of any Xiaodu Group Company for all taxable periods ending on or before the Closing and the portion through the end of the Closing for any taxable period that includes (but does not end on) the Closing, including but not limited to any and all Taxes that any Xiaodu Group Company has not contributed or paid for any Xiaodu Employee.

Each Approved Xiaodu Shareholder's indemnification obligations under this Section 7.2(b) shall be several, but not joint, and shall be allocated in accordance with such Approved Xiaodu Shareholder's pro rata share in the aggregate Merger Consideration of all Approved Xiaodu Shareholders as set forth in column # 4 of Schedule 2.

(c)    Redemption of Rajax G-1 Shares. Each Approved Xiaodu Shareholder who received the Share Consideration shall satisfy its indemnification obligations under this Section 7.2 by first surrendering to Rajax for redemption, for no consideration or at the lowest redemption price allowed under Cayman Law, such number of Rajax G-1 Shares equal to the quotient of (A) the Indemnifiable Losses allocated to such Approved Xiaodu Shareholder plus the consideration, if any, payable by Rajax for redeeming such Rajax G-1 Shares, divided by (B) US$0.5541930353 (being the per share price of Rajax G-1 Shares). If an Approved Xiaodu Shareholder does not have sufficient Rajax G-1 Shares to satisfy its indemnification obligations under this Section 7.2, such Approved Xiaodu Shareholder shall still pay or cause to be paid any remaining amount to Rajax in US dollar cash within ten (10) business days after a bank account has been designated by Rajax in writing.

19

Section 7.3    Specific Indemnity by Baidu HK. Baidu HK shall be responsible for any and all commitments and contingent Liabilities of any of the Xiaodu Group Companies to their agents (including city and logistics agents) which were made, agreed or committed before the Closing that are either evidenced by written Contracts or confirmed by courts or arbitration tribunals, including if such commitments and Liabilities are to be performed or payable after the Closing (the "Pre-Closing Agent Liabilities"). Baidu HK shall indemnify Rajax, on a dollar-for-dollar basis, against all payments made by the Xiaodu Group Companies to their agents in satisfying the Pre-Closing Agent Liabilities.

Section 7.4    Indemnification by Rajax. Subject to the other provisions of this Article VII, effective as of the Closing, Rajax shall indemnify and hold harmless each Approved Xiaodu Shareholder and each of its Affiliates, directors, employees, agents, representatives and successors and assignees (each, a "Xiaodu Indemnified Party") from and against any Indemnifiable Losses actually incurred or suffered by such Xiaodu Indemnified Party as a result of, arising out of or in connection with (i) any breach of, or inaccuracy in, any representation or warranty made by Rajax in this Agreement; or (ii) any breach or violation of, or failure to perform, any covenants or agreements made by, or to be performed by, Rajax in this Agreement. For the avoidance of doubt, upon and after the Closing, the Xiaodu Indemnified Parties shall exclude the Xiaodu Group Companies and their respective directors, employees, agents, representatives and successors and assignees.

Section 7.5    Reliance. Without limitation of Section 7.9, each Party hereto acknowledges and agrees that (i) Rajax and Rajax Merger Sub have entered into this Agreement in reliance on the representations and warranties, and covenants and agreements, made by Baidu HK and Xiaodu in this Agreement and (ii) Baidu HK and Xiaodu have entered into this Agreement in reliance on the representations and warranties, and covenants and agreements, made by Rajax and Rajax Merger Sub in this Agreement.

Section 7.6    Investigation. Except as otherwise provided in this Agreement, the right to indemnification will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Effective Time, with respect to the accuracy or inaccuracy of or compliance with, any representation, warranty, covenant or agreement made by a Party hereto or any other matter. The waiver of any condition based on the accuracy of any such representation or warranty, or on the performance of or compliance with any such covenant or agreement, will not affect the right to indemnification hereunder based on any such representation, warranty, covenant or agreement. No Rajax Indemnified Party or Xiaodu Indemnified Party, as applicable, shall be required to show reliance on any representation, warranty, certificate or other agreement in order for such Rajax Indemnified Party or Xiaodu Indemnified Party to be entitled to indemnification hereunder. Notwithstanding anything to the contrary in this Agreement, no Rajax Indemnified Party or Xiaodu Indemnified Party shall be entitled to make any claim under this Article VII (other than pursuant to Section 7.2(b) (Specific Indemnity) and Section 7.3 (Specific Indemnity by Baidu HK)) with respect to any Indemnifiable Losses arising out of matters or information included in the Rajax Disclosure Schedule (in the case of Xiaodu Indemnified Party) or the Xiaodu Disclosure Schedule (in the case of Rajax Indemnified Party).

20

Section 7.7    <u>Procedures</u>.

(a)    Any party seeking indemnification under this <u>Article VII</u> (an "<u>Indemnified Person</u>") shall notify the party from whom indemnification is being sought (an "<u>Indemnifying Person</u>"); <u>provided</u> that if indemnification is being sought by Rajax pursuant to <u>Section 7.2(a)</u>, references in this <u>Section 7.7</u> to any Indemnifying Person shall refer to the Xiaodu Shareholders Representative, acting on behalf of such Indemnifying Persons, and if indemnification is being sought against Rajax pursuant to <u>Section 7.4</u>, references in this <u>Section 7.7</u> to any Indemnified Person shall refer to the Xiaodu Shareholders Representative, acting on behalf of such Indemnified Persons, save that any Notice to be given to the Xiaodu Shareholders in respect of any indemnification sought pursuant to <u>Section 7.2(a)</u> shall be given to all Xiaodu Shareholders in writing of any facts or circumstances (including any action against such Indemnified Person) in respect of which any Indemnifying Person is or may be obligated to provide indemnification hereunder promptly after the receipt of notice or Knowledge thereof. Such notice (the "<u>Notice</u>") shall set forth in reasonable detail the facts and circumstances giving rise to such claim, the basis for indemnification and the good faith estimated amount of Indemnifiable Losses for which indemnification is sought (taking into account the information then available to the Indemnified Person). The failure of any Indemnified Person to notify any Indemnifying Person shall not relieve any Indemnifying Person from any Liability which it may have to such Indemnified Person under this <u>Article VII</u>, unless and to the extent the failure to so notify materially prejudices the Indemnifying Person. If the Indemnifying Person has timely disputed its indemnity obligation for any Indemnifiable Losses with respect to such claim, the Parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations within thirty (30) days after delivery of the notice by the Indemnifying Person, such dispute shall be resolved by arbitration pursuant to <u>Section 10.3</u>.

(b)    In the case of any claim for indemnification under this <u>Article VII</u> that involves a third party (a "<u>Third Party Claim</u>"), the Indemnifying Person will have the right to participate in, and, to the extent the Indemnifying Person so desires, to assume the defense thereof, with counsel reasonably satisfactory to the Indemnified Person. However, the Indemnified Person will have the right to retain separate counsel and to participate in the defense thereof at its sole cost and expense, except that the reasonable documented fees and expenses of such counsel shall be paid by the Indemnifying Person if representation of such Indemnified Person by the counsel retained by the Indemnifying Person would be, based on the opinion of counsel, inappropriate due to an actual conflict of interest between such Indemnified Person and any other party represented by such counsel in such Action. To the extent the Indemnified Person is entitled to indemnification hereunder in such matter and subject to the other limitations in this <u>Article VII</u>, the Indemnifying Person will be responsible for the expenses of such defense even if the Indemnifying Person does not elect to assume such defense. The Indemnifying Person shall not, except with the consent of the Indemnified Person (not to be unreasonably withheld, delayed or conditioned), consent to the entry of any judgment or enter into any settlement which does not include as a term thereof the unconditional release of the Indemnified Person of all Liability in respect of such Third Party Claim or litigation. The Indemnified Person shall not settle or compromise, or offer to settle or compromise any such Third Party Claim without the prior written consent of the Indemnifying Person (not to be unreasonably withheld, delayed or conditioned). Each Party shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

21

Section 7.8    Certain Limitations.

(a)    Subject to Section 7.8(e):

(i)    with respect to an Approved Xiaodu Shareholder, the maximum aggregate liability of such Approved Xiaodu Shareholder towards Rajax Indemnified Party under this Agreement in respect of any and all Indemnifiable Losses under Sections 7.2 and 7.3 shall not exceed the amount of Merger Consideration allocated to it as set out in column #4 of Schedule 2, as adjusted pursuant to Section 2.10, if applicable; with respect to Rajax, the maximum aggregate liability of Rajax towards any Approved Xiaodu Shareholder (and its Affiliates, directors, employees, agents, representatives and successors and assignees) under this Agreement in respect of any and all Indemnifiable Losses shall not exceed the amount equal to the product of (y) the number of Rajax G-1 Shares received by such Approved Xiaodu Shareholders as Merger Consideration multiplied by (z) US$0.5541930353; and

(ii)    (y) with respect to Indemnifiable Losses arising under Section 7.2(b)(i), no Indemnifying Person shall be liable for any Indemnifiable Losses otherwise indemnifiable by such Indemnifying Person under this Agreement unless the aggregate amount of all such Indemnifiable Losses exceeds RMB3,000,000, in which case the Indemnifying Person shall be liable for all such Indemnifiable Losses from the first dollar, and (z) with respect to any other Indemnifiable Losses (other than those arising from any breach of any Fundamental Representation, any covenant, Section 7.2(b)(i), Section 7.2(b)(ii), Section 7.2(b)(iii) or Section 7.3), no Indemnifying Person shall be liable for any Indemnifiable Losses otherwise indemnifiable by such Indemnifying Person under this Agreement unless the aggregate amount of all such Indemnifiable Losses indemnifiable by all Indemnifying Persons exceeds US$2,000,000, in each case, the Indemnifying Person shall be liable for all such Indemnifiable Losses from the first dollar.

(b)    Notwithstanding anything in this Agreement to the contrary, (i) any Indemnifiable Losses under this Article VII shall be calculated without giving effect to any qualification contained in any representation and warranty as to materiality, including material adverse effect; provided that such qualifications as to materiality, including material adverse effect, shall be given effect in determining whether there has been a breach or inaccuracy in any representation or warranty or covenant and (ii) no Indemnifying Person shall have any Liability under this Agreement for Indemnifiable Losses consisting of punitive, consequential, incidental or indirect damages.

(c)    The amount of Indemnifiable Losses recoverable against an Indemnifying Person shall be determined net of any amounts actually received by any Indemnified Person under any insurance policy, indemnity, reimbursement arrangement or other Contract or arrangement or from the Persons alleged to be responsible for such Indemnifiable Loss (and the Indemnified Person shall use all reasonable efforts to recover such amounts and shall, if such amounts are recovered after an Indemnifying Person has made an indemnity payment, promptly reimburse the Indemnifying Person for such payment made). If the Indemnified Person receives any amount from the Indemnifying Person but could have recovered all or a part of any Indemnifiable Losses from a third party, the Indemnified Person shall assign such of its rights to proceed against such third party as are necessary to permit the Indemnifying Person to recover from such third party.

22

(d)    No Indemnifying Person shall be liable under Article VII for any Indemnifiable Losses relating to any matter to the extent that any Indemnified Person has otherwise been compensated for such matter pursuant to the post-Closing valuation adjustment under Section 2.10.

(e)    Notwithstanding anything in this Agreement to the contrary, the limitations on indemnification and Liability set forth in this Section 7.8 shall not apply to a claim for Indemnifiable Losses arising out of fraud (involving deliberate deception) or willful misconduct by any Party.

Section 7.9    Exclusive Remedy. After the Effective Time, except as otherwise specifically provided in Section 2.10 and Section 10.7, and provided that none of the provisions of this Article VII shall limit any rights or remedies under any of the other Transaction Agreements, this Article VII will provide the exclusive remedy for any breach of warranty, covenant or other agreement or other claim arising out of this Agreement or the transactions contemplated hereby, under any legal or equitable principle. Except as provided in this Article VII or as specifically provided in Section 2.10 and Section 10.7, no claim shall be brought by any Party against any other Party or any of its Affiliates, and no recourse shall be granted against any of them, by virtue of or based upon any alleged misstatement or omission respecting an inaccuracy in or breach of any of the representations, warranties, covenants, agreement or other provisions set forth or contained in this Agreement.

ARTICLE VIII

CONDITIONS TO CONSUMMATION OF THE MERGER

Section 8.1    Conditions to Each Party's Obligations to Effect the Merger. The obligation of each Party to consummate the transactions contemplated by this Agreement is subject to the fulfillment at or prior to the Effective Time of each of the following conditions:

(a)    The Required Xiaodu Approvals and the Required Rajax Approvals shall remain effective.

(b)    No Governmental Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, executive order, decree, injunction or other order (whether temporary, preliminary or permanent) which (i) is in effect and (ii) has the effect of making the Merger illegal or otherwise prohibiting or preventing consummation of the Merger.

Section 8.2    Conditions to the Obligations of Rajax and Rajax Merger Sub. The obligation of Rajax and Rajax Merger Sub to consummate the transactions contemplated by this Agreement is subject to the fulfillment at or prior to the Effective Time of each of the following additional conditions, any or all of which may be waived in whole or part by Rajax and Rajax Merger Sub to the extent permitted by applicable Law:

(a)    Xiaodu Shareholders representing more than 80% of voting power of Xiaodu's total issued and outstanding preferred shares voting as a single class shall have signed and delivered the Deed of Undertaking in the form attached as Exhibit D.

23

(b)    The representations and warranties of Xiaodu set forth in Article III and Schedule 3 shall be true, correct and accurate in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of such date and time (except for representations and warranties made as of a specified date, only as of the specified date).

(c)    The representations and warranties of Baidu HK set forth in Article IIIA and Schedule 3A shall be true, correct and accurate in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of such date and time (except for representations and warranties made as of a specified date, only as of the specified date).

(d)    Xiaodu shall have performed or complied in all material respects with all covenants and agreements contained herein required to be performed or complied with by it prior to or at the time of the Closing, including any and all of its covenants set forth in Article VI.

(e)    Baidu HK shall have performed or complied in all material respects with all covenants and agreements contained herein required to be performed or complied with by it prior to or at the time of the Closing, including any and all of its covenants set forth in Article VI.

(f)    Since the date of this Agreement, there shall not have been any Xiaodu Material Adverse Effect.

(g)    The Xiaodu Share Incentive Plan shall have been terminated, and any and all Xiaodu Options and other warrant, securities and rights convertible or exchangeable into the shares of Xiaodu (including all vested and unvested Xiaodu Options) shall have been validly and effectively cancelled.

(h)    The Escrow Agreement, Rajax Shareholders Agreement and Rajax ROFR Agreement shall have been duly executed by Xiaodu and/or the applicable Approved Xiaodu shareholders.

(i)    Xiaodu Shareholders Agreement shall have been duly terminated or amended such that it will terminate as to all parties thereto at the Effective Time, and Xiaodu shall have delivered to Rajax a true and complete copy of evidence of such termination.

(j)    The Surviving Corporation Memorandum of Articles and the Surviving Corporation Articles of Association shall have been duly adopted (and any ancillary actions including re-designation of authorised but unissued preferred shares into authorised but unissued ordinary shares) by Xiaodu as the Surviving Corporation with effect at the Effective Time, by all necessary corporate actions of its shareholders and board of directors and remain effective.

(k)    Rajax shall have received (A) a PRC legal opinion issued by Baidu's PRC counsel and (B) a Cayman Islands legal opinion issued by Baidu's Cayman counsel, each dated as of the Closing Date, relating to the transactions contemplated by or referred to herein, issued to Rajax, in form and substance as agreed between Rajax and Xiaodu.

24

(l)    The number of Xiaodu's issued and outstanding preferred shares held by Xiaodu Shareholders that have validly exercised their rights to dissent from the Merger pursuant to the Cayman Companies Law shall be less than 20% of Xiaodu's total issued and outstanding preferred shares voting as a single class and no holder of Xiaodu's ordinary shares shall have validly exercised its right to dissent from the Merger pursuant to the Cayman Companies Law.

(m)    Xiaodu shall have delivered or caused to be delivered to Rajax duly signed resignations or removal letters, effective as of the Effective Time, of the directors of Xiaodu.

(n)    Xiaodu shall have delivered to Rajax (i) a certificate, dated as of the Closing Date, signed by an executive officer of Xiaodu, certifying as to the fulfillment of the conditions specified in Sections 8.2(b) and 8.2(d) above; (ii) a certificate, dated as of the Closing Date, signed by an executive officer of Baidu HK, certifying as to the fulfillment of the conditions specified in Sections 8.2(c) and 8.2(e) above; (iii) a certified copy of the Xiaodu Board Resolutions duly adopted by Xiaodu Board; (iv) a certified copy of the Xiaodu Special Resolution duly adopted by the Xiaodu Shareholders; (v) the scanned copies of the relevant Cayman Merger Documents signed on behalf of Xiaodu or its director(s), as applicable; (vi) a current certificate of good standing of Xiaodu issued by the Registrar of Companies in the Cayman Islands; (vii) a current certificate of incumbency of Xiaodu issued by the registered office provider of Xiaodu; (viii) certified copies of the certificate of incorporation, the certificate(s) of incorporation on change of name (if any), as well as the register of directors and officers, the register of members and the register of mortgages and charges (all certified by the registered office provider of Xiaodu with current date); and (ix) a draft version of the updated register of members and register of directors and officers of Xiaodu (reflecting the shareholder, directors and officers (if any) of Xiaodu immediately after the Effective Time).

Section 8.3    Conditions to the Obligations of Xiaodu and Baidu HK. The obligation of Xiaodu and Baidu HK to consummate the transactions contemplated by this Agreement is subject to the fulfillment at or prior to the Effective Time of each of the following conditions, any or all of which may be waived in whole or in part by Xiaodu and Baidu HK to the extent permitted by applicable Law:

(a)    The representations and warranties of Rajax set forth in Article IV and Schedule 4 shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date as if made on and as of such date and time (except for representations and warranties made as of a specified date, only as of the specified date).

(b)    Rajax and Rajax Merger Sub shall have performed or complied in all material respects with all covenants and agreements contained herein required to be performed or complied with by it prior to or at the time of the Closing.

(c)    Since the date of this Agreement, there shall not have been any Rajax Material Adverse Effect.

(d)    Rajax shall have delivered to Xiaodu a certificate, dated as of the Closing Date, signed by a designated director of Rajax and a designated director of Rajax Merger Sub, certifying as to the fulfillment of the conditions specified in Sections 8.3(a) and 8.3(b).

25

(e)   The Escrow Agreement, Plan of Merger, Rajax Shareholders Agreement and Rajax ROFR Agreement shall have been duly executed by Rajax and/or its Subsidiaries, as applicable.

(f)   The Rajax Amended Memorandum and Articles shall have been duly adopted by Rajax by all necessary corporate actions of its shareholders and remain effective.

(g)   Rajax shall have delivered a Cayman Islands legal opinion issued by Rajax's Cayman counsel, dated as of the Closing Date, on Rajax relating to the transactions contemplated by or referred to herein, issued to Xiaodu, in form and substance as agreed between Rajax and Xiaodu.

(h)   Rajax shall have delivered to Xiaodu (i) the scanned copies of the relevant Cayman Merger Documents signed on behalf of Rajax or its director(s), as applicable; (ii) a current certificate of good standing of Rajax issued by the Registrar of Companies in the Cayman Islands; (iii) a current certificate of incumbency of Rajax issued by the registered office provider of Rajax; (iv) certified copies of the certificate of incorporation, the certificate(s) of incorporation on change of name (if any), as well as the register of directors and officers, the register of members and the register of mortgages and charges (all certified by the registered office provider of Rajax with date); and (v) a draft version of the updated register of members of Rajax (reflecting the receipt by the Approved Xiaodu shareholders of Rajax G-1 Shares immediately after the Effective Time).

ARTICLE IX

TERMINATION; AMENDMENT; WAIVER

Section 9.1   Termination by Mutual Agreement. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by mutual written consent of the Parties.

Section 9.2   Termination by Either Party. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by either Rajax and Rajax Merger Sub, on one side, or Xiaodu and Baidu HK, on the other side, upon written notice to the other Party if:

(a)   the Merger shall not have been consummated within one (1) month after the date hereof (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 9.2(a) shall not be available to a Party if the failure of the Merger to have been consummated on or before the Termination Date was primarily due to the breach or failure of such Party to perform in a material respect any of its obligations under this Agreement; or

(b)   any Law, injunction or order having the effect set forth in Section 8.1(a) shall be in effect and shall have become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 9.2(b) shall not be available to a Party if the issuance of such final, non-appealable Law, injunction or order was primarily due to the breach or failure of such Party to perform in a material respect any of its obligations under this Agreement.

26

Section 9.3   Termination by Rajax. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by Rajax if:

(a)   there has been a breach of any representations, warranties, covenants or agreements made by Xiaodu or Baidu HK in this Agreement, such that the conditions set forth in Section 8.1 and Section 8.2 would not then be satisfied, and such breach or condition cannot be cured by the Termination Date, or if capable of being cured, shall not have been cured prior to the earlier of (i) thirty (30) days following receipt by Xiaodu of written notice of such breach or failure to perform from Rajax stating Rajax's intention to terminate this Agreement pursuant to this Section 9.3(a) and the basis for such termination (or, if earlier, the Termination Date) and (ii) the date that is five (5) business days prior to the Termination Date; provided that Rajax shall not have the right to terminate this Agreement pursuant to this Section 9.3(a) if it is then in material breach of any representations, warranties, covenants or other agreements hereunder that would result in any condition to Closing set forth in Section 8.3 not being satisfied; or

(b)   (i) all of the conditions set forth in Section 8.1 and Section 8.3 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied; (ii) Rajax has confirmed by notice to Xiaodu that all conditions set forth in Section 8.2 have been satisfied or that it is willing to waive any unsatisfied conditions in Section 8.2; and (iii) Xiaodu or Baidu HK fails to consummate the Merger within three (3) business days following the date the Closing should have occurred pursuant to Section 1.3.

Section 9.4   Termination by Xiaodu. This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time by Xiaodu if:

(a)   there has been a breach of any representation, warranties, covenant or agreement made by Rajax or Rajax Merger Sub in this Agreement, such that the conditions set forth in Section 8.1 and Section 8.3 would not then be satisfied, and such breach or condition cannot be cured by the Termination Date, or if capable of being cured, shall not have been cured prior to the earlier of (i) thirty (30) days following receipt by Rajax of written notice of such breach or failure to perform from Xiaodu stating Xiaodu's intention to terminate this Agreement pursuant to this Section 9.4(a) and the basis for such termination (or, if earlier, the Termination Date) and (ii) the date that is five (5) business days prior to the Termination Date; provided that Xiaodu shall not have the right to terminate this Agreement pursuant to this Section 9.4(a) if it is then in material breach of any representations, warranties, covenants or other agreements hereunder that would result in any condition to Closing set forth in Section 8.2 not being satisfied; or

(b)   (i) all of the conditions set forth in Section 8.1 and Section 8.2 (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied; (ii) Xiaodu has confirmed by notice to Rajax that all conditions set forth in Section 8.3 have been satisfied or that it is willing to waive any unsatisfied conditions in Section 8.3; and (iii) Rajax or Rajax Merger Sub fails to consummate the Merger within three business days following the date the Closing should have occurred pursuant to Section 1.3.

Section 9.5   Effect of Termination and Abandonment. In the event of termination of this Agreement and the abandonment of the Merger pursuant to this Article IX, written notice thereof shall be given to the other Party or Parties specifying the provision hereof pursuant to which such termination is made, and this Agreement shall become void and of no effect with no Liability on the part of any Party hereto (or of any of its Representatives); provided, however, that (i) this Section 9.5, Section 6.4 and Article X (in each case, subject to the terms thereof) shall remain in full force and effect and survive termination of this Agreement and (ii) nothing herein shall relieve any Party from Liability for fraud.

27

ARTICLE X

<u>MISCELLANEOUS</u>

Section 10.1   <u>Entire Agreement; Assignment</u>. This Agreement (including the Xiaodu Disclosure Schedule, the Rajax Disclosure Schedule, the Plan of Merger and other exhibits and annexes thereto) and the other Transaction Agreements, constitute the entire agreement between the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by operation of Law (including, but not limited to, by merger or consolidation) or otherwise by any of the Parties without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that prior to the Effective Time, Rajax Merger Sub may assign, in its sole discretion, any or all of its rights, interests and obligations under this Agreement to any Rajax wholly owned Subsidiary, but no such assignment shall relieve Rajax or Rajax Merger Sub of its obligations hereunder if such assignee does not perform such obligations. Any assignment in violation of the preceding sentence shall be void. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective successors and assigns.

Section 10.2   <u>Notices</u>. All notices, requests, instructions or other documents to be given under this Agreement shall be in writing and shall be deemed given if delivered personally or sent by registered or certified mail, postage prepaid, by facsimile (which is confirmed) or email transmission prior to 5 p.m. local time of the receiving Party, or on the next business day if sent after 5 p.m. local time of the receiving Party (<u>provided</u> that, if sent by facsimile or e-mail transmission, such notice or other communication shall be followed within one (1) business day by dispatch pursuant to one of the other methods described herein), or overnight courier (with proof of delivery) to a Party at the following address for such Party:

If to Rajax and Rajax Merger Sub:

Rajax Holding
Room 401, North Tower of MTR City Plaza, No. 1518, Jinshajiang
Road, Shanghai (上海市普陀区金沙江路1518弄2号近铁城市广场 401室)
Attention:      Xuhao Zhang (张旭豪)
Tel:            ******
Email:          ******

28

With a copy (which shall not constitute notice) to:

> DLA Piper UK LLP
> 36/F, Shanghai World Financial Center
> 100 Century Avenue, Shanghai
> China
> Telephone: ******
> Attention: Stewart Wang
> Facsimile: ******
> Email: ******

If to Xiaodu:

> Xiaodu Life Technology Ltd
> 中国北京海淀区信息路11号院
> 中国电子集团彩虹大厦二楼
> Attention:        ******
> Fax:
> Email: ******

If to Baidu HK:

> Baidu (Hong Kong) Limited
> Baidu Campus, No. 10, Shangdi 10th Street
> Haidian District, Beijing
> Attention:        HAN Luyao
> Fax:              ******
> Email: ******

With a copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> c/o 42/F, Edinburgh Tower, The Landmark
> 15 Queen's Road Central
> Hong Kong
> Telephone: ******
> Attention: Julie Z. Gao / Will H. Cai
> Facsimile: ******
> Email: ******

or to such other address as the Person to whom notice is given may have previously furnished to the other in writing in the manner set forth above. All notices, requests, instructions or other documents shall be deemed received on the date of actual receipt by the recipient thereof if received prior to 5:00 p.m. local time in the place of receipt and such day is a business day in the place of receipt. Otherwise, any such notice, request, instruction or other document shall be deemed not to have been received until the next succeeding business day in the place of receipt.

29

Section 10.3    <u>Governing Law; Jurisdiction.</u>

(a)    This Agreement shall be construed, performed and enforced in accordance with the Laws of Hong Kong Special Administrative Region of the PRC ("<u>Hong Kong</u>"), without regard to principles of conflict of Laws thereunder, except that the following matters arising out of or relating to this Agreement shall be construed, performed and enforced in accordance with the Laws of the Cayman Islands in respect of which the Parties hereby irrevocable submit it to the non-exclusive jurisdiction of the courts of the Cayman Islands: the Merger, the vesting of the rights, property, choses in action, business, undertaking, goodwill, benefits, immunities and privileges, Contracts, claims, debts and Liabilities of Rajax Merger Sub in Xiaodu, the cancellation of Xiaodu Shares in consideration of the issue of Rajax G-1 Shares and Cash Consideration, the rights provided for in Section 238 of the Cayman Companies Law with respect to any Dissenters Shares, the fiduciary or other duties of the Xiaodu Board and the board of directors of Rajax, and the internal corporate affairs of Xiaodu and Rajax, as well as any matters relating to <u>Article I</u> and <u>Article II</u> of this Agreement. Except as provided in prior sentence, any dispute, controversy or claim (each, a "<u>Dispute</u>") arising out of or relating to this Agreement, the other Transaction Agreements or the transactions contemplated hereby or thereby, or the interpretation, breach, termination, validity or invalidity hereof or thereof, including any proceeding against any Xiaodu Related Party or Rajax Related Party, shall be referred to arbitration upon the demand of any party to the Dispute with notice (the "<u>Arbitration Notice</u>") to the other.

(b)    The Dispute shall be settled by arbitration in Hong Kong administered by the Hong Kong International Arbitration Centre (the "<u>HKIAC</u>") in accordance with the Hong Kong International Arbitration Centre Administered Rules (the "<u>HKIAC Rules</u>") in force when the Arbitration Notice is submitted. There shall be three (3) arbitrators. Each of claimant and respondent shall appoint one (1) arbitrator and the third (3rd) arbitrator shall be appointed by the HKIAC Council.

(c)    The arbitral proceedings shall be conducted in English and Chinese. To the extent that the HKIAC Rules are in conflict with the provisions of this <u>Section 10.3</u>, including the provisions concerning the appointment of the arbitrators, the provisions of this <u>Section 10.3</u> shall prevail.

(d)    Each Party to the arbitration shall cooperate with each other Party to the arbitration in making full disclosure of and providing complete access to all information and documents requested by such other Party in connection with such arbitral proceedings, subject only to any confidentiality obligations binding on such Party.

(e)    The award of the arbitral tribunal shall be final and binding upon the Parties thereto, and the prevailing Party may apply to a court of competent jurisdiction for enforcement of such award.

(f)    The arbitral tribunal shall decide any Dispute submitted by the Parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong (without regard to principles of conflict of Laws thereunder) and shall not apply any other substantive Law.

(g)    Any Party to the Dispute shall be entitled to seek interim measures of protection and emergency relief, if possible, from any court of competent jurisdiction in accordance with the applicable Laws of the jurisdiction.

(h)    During the course of the arbitral tribunal's adjudication of the Dispute, this Agreement shall continue to be performed except with respect to the part in Dispute and under adjudication.

<div align="center">30</div>

Section 10.4    <u>Descriptive Headings</u>. The descriptive headings herein are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

Section 10.5    <u>No Third Party Beneficiaries</u>. This Agreement shall be binding upon and inure solely to the benefit of each Party hereto and its successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement; <u>provided</u> that each Rajax Indemnified Party and each Xiaodu Indemnified Party shall have the right to enforce the relevant terms of <u>Sections 7.2(a)</u> and <u>8.3</u> by reason of the Contracts (Rights of Third Parties) Act 1999, subject to (i) the rights of the Parties to amend or vary this Agreement without the consent of the Persons referred above, and (ii) the terms and conditions of this Agreement.

Section 10.6    <u>Severability</u>. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 10.7    <u>Specific Performance</u>. Without affecting any other rights or remedies that they may have, each of the Parties acknowledges and agrees that, in the event of any breach of, or any failure to perform, any specific provision of this Agreement prior to or at the Effective Time, the non-breaching Party would be irreparably and immediately harmed and monetary damages alone may not necessarily be an adequate remedy. It is accordingly agreed that each of the Parties shall (i) be entitled, in addition to any other remedy to which it may be entitled at law or in equity, to the remedies of injunction, specific performance and other equitable relief, or any combination of those remedies, in respect of any threatened or actual breach of any specific provision of this Agreement, (ii) waive, in any action against it for specific performance, injunctive relief or any other equitable remedy, the defense of the adequacy of a remedy at law, and (iii) waive any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance, injunctive relief or other equitable remedy. For the avoidance of doubt, each of Parties shall be entitled to enforce specifically the terms and provisions of this Agreement to prevent breaches of or enforce compliance with all the agreements and covenants contained in this Agreement, including those agreements and covenants of the other Party or Parties that require the other Party or Parties to (x) use its or their reasonable best efforts to cause the Closing to occur as soon as practicable and (y) effect the Merger. A Party's pursuit of specific performance, injunctive relief or any other equitable remedy at any time shall not be deemed an election of remedies or waiver of the right to pursue any other right or remedy to which such Party may be entitled, including the right to pursue remedies for Liabilities or damages incurred or suffered by such Party in the case of a breach of this Agreement.

Section 10.8    <u>Amendment</u>. This Agreement may not be amended except by an instrument in writing signed on behalf of the Parties.

31

Section 10.9    Extension; Waiver. At any time prior to the Effective Time, each Party hereto (for these purposes, Rajax and Rajax Merger Sub shall together be deemed one Party and Xiaodu and Baidu HK shall together be deemed the other Party) may (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or in any document, certificate or writing delivered pursuant hereto, or (c) waive compliance by the other Party with any of the agreements or conditions contained herein. Any agreement on the part of either Party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party. The failure of either Party hereto to assert any of its rights hereunder shall not constitute a waiver of such rights.

Section 10.10    Interpretation.

(a)    The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." All terms defined in this Agreement shall have the defined meanings contained herein when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time, amended, qualified or supplemented, including (in the case of agreements and instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

Section 10.11    Counterparts. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the Parties and delivered to the other Parties.

*[Remainder of page left intentionally blank; signature pages follow]*

32

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

<u>Rajax</u>:

**Rajax Holding**

By:   <u>/s/ Zhang Xuhao</u>
Name:  Zhang Xuhao
Title:   Authorized Signatory

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

Rajax Merger Sub:

**Rajax Merger Sub Limited**

By:    /s/ Zhang Xuhao
Name:  Zhang Xuhao
Title:   Authorized Signatory

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

Xiaodu:

**Xiaodu Life Technology Ltd**

By:    /s/ Gong Zhenbing
Name:   Gong Zhenbing
Title:    Authorized Signatory

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the day and year first above written.

Baidu HK:

**Baidu (Hong Kong) Limited**

By:     /s/ Yanhong Li
Name:   Yanhong Li
Title:   Authorized Signatory

Schedule 1

Definitions

"Accounting Standards" means, with respect to any of the Xiaodu Group Companies or any of the Rajax Group Company which is established in the PRC, the generally accepted accounting principles in the PRC, applied on a consistent basis; and with respect to other Xiaodu Group Companies or other Rajax Group Companies not established in the PRC or the consolidated financial statements of the Xiaodu Group Companies or the Rajax Group Companies (as applicable), the generally accepted accounting principles in the United States, applied on a consistent basis.

"Action" means any charge, claim, action, complaint, petition, investigation, appeal, suit, litigation or other similar proceeding initiated or conducted by a mediator, arbitrator or Governmental Entity, whether administrative, civil, regulatory or criminal, and whether at law or in equity, or otherwise under any applicable Law.

"Adjustment Statement Dispute Notice" shall have the meaning ascribed thereto in Section 2.10(b).

"Affiliate" means, as to any Person (i) any other Person that, directly or indirectly, controls, or is controlled by, or is under common control with, such Person. For this purpose, "control" of a given Person means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise; provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "controlled" and "controlling" have meanings correlative to the foregoing.

"Alibaba" means Ali Panini Investment Holding Limited, a business company incorporated under the Laws of Hong Kong.

"Alibaba SPA" means the Series G-1 Preferred Share Purchase Agreement to be entered into by Alibaba, Rajax and other parties thereto on the date hereof.

"Announcement 7" means the Announcement on Several Issues concerning the Corporate Income Tax on the Indirect Transfers of Assets by Non-Resident Enterprises issued by the State Administration of Taxation of the People's Republic of China on February 3, 2015.

"Approved Xiaodu Shareholders" means Baidu HK and each Xiaodu Shareholder who signs and delivers the Deed of Undertaking prior to or upon Closing.

"Arbitration Notice" shall have the meaning ascribed thereto in Section 10.3(a).

"Baidu HK" shall have the meaning ascribed thereto in Preamble.

"Baidu Wangxun" means 北京百度网讯科技有限公司, a company duly organized and existing under the Laws of the PRC.

S-1-1

"Beijing Xinchi" means Beijing Xinchi Supply Chain Management Co., Ltd. (北京新驰供应链管理有限公司), a company duly organized and existing under the Laws of the PRC.

"Beijing Xunda" means Beijing Xunda Delivery Co., Ltd. (北京讯达快递有限公司), a company duly organized and existing under the Laws of the PRC.

"Baidu Zaixian" means 百度在线网络技术(北京 )有限公司, a company duly organized and existing under the Laws of the PRC.

"Beijing Zhenxuan" means Beijing Zhenxuan Foods Co., Ltd. (北京甄选食品有限公司), a company duly organized and existing under the Laws of the PRC.

"Benefit Plan" means any employment contract, deferred compensation Contract, bonus plan, incentive plan, profit sharing plan, retirement contract or other employment compensation contract or any other plan which provides or provided benefits for any past or present employee, officer, consultant, and/or director of a Person or with respect to which contributions are or have been made on account of any past or present employee, officer, consultant, and/or director of such a Person.

"business day" means any day other than a Saturday or Sunday or a day on which banks are required or authorized to close in New York, New York, the Cayman Islands, Hong Kong or Shanghai, China.

"Business" means the business of establishing network connecting the online users to local restaurants, providing e-commerce solution by PC or mobile and any digital device, online sale of pre-packaged foods, and the distribution and logistics of takeaways.

"Cash Compensation" means an amount paid any Rajax Group Company to one or more Xiaodu Group Companies prior to the Closing Date, equal to RMB3,000,000 multiplied by the number of days starting from August 10, 2017 and ending on the Valuation Adjustment Date (inclusive of August 10, 2017 and the Valuation Adjustment Date).

"Cash Consideration" shall have the meaning ascribed thereto in Section 2.2(a)(i).

"Cayman Companies Law" shall have the meaning ascribed thereto in Recitals.

"Cayman Merger Documents" shall have the meaning ascribed thereto in Section 1.2.

"Certificate" shall have the meaning ascribed thereto in Section 2.4.

"CFC" means a controlled foreign corporation as defined in the Code.

"Charter Documents" means, with respect to a particular legal entity, the articles of incorporation, certificate of incorporation, formation or registration (including, if applicable, certificates of change of name), memorandum of association, articles of association, bylaws, articles of organization, limited liability company agreement, trust deed, trust instrument, operating agreement, joint venture agreement, shareholders' agreement, investors' rights agreement, business license, or similar or other constitutive, governing, or charter documents, or equivalent documents, of such entity.

"Closing" shall have the meaning ascribed thereto in Section 1.3.

"Closing Date" shall have the meaning ascribed thereto in Section 1.3.

"Code" means the Internal Revenue Code of 1986, as amended.

"Compliance Law" means collectively, all applicable Laws relating to anti-bribery, anti-corruption, anti-money laundering, record keeping and internal controls, including the Foreign Corrupt Practices Act of 1977, as amended, the PRC Law on Anti-Unfair Competition adopted on September 2, 1993, and the Interim Rules on Prevention of Commercial Bribery issued by the PRC State Administration of Industry and Commerce on November 15, 1996.

"Consent" means any consent, approval, authorization, release, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including any Governmental Entity.

"Contract" means any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument.

"Debt" shall have the meaning ascribed thereto in Section 2.9(a).

"Dissenters Shares" shall have the meaning ascribed thereto in Section 2.6.

"Dissenting Xiaodu Shareholders" means holders of Dissenters Shares.

"Effective Time" shall have the meaning ascribed thereto in Section 1.2.

"Equity Securities" means, with respect to any Person that is a legal entity, any and all shares of capital stock, membership interests, units, profits interests, ownership interests, equity interests, registered capital, and other equity securities of such Person, and any right, warrant, option, call, commitment, conversion privilege, preemptive right or other right to acquire any of the foregoing, or security convertible into, exchangeable or exercisable for any of the foregoing, or any Contract providing for the acquisition of any of the foregoing.

"Escrow Account" shall have the meaning ascribed thereto in Section 2.2(b)(i).

"Escrow Agent" shall have the meaning ascribed thereto in Section 2.2(b)(i).

"Escrow Agreement" shall have the meaning ascribed thereto in Section 2.2(b)(i).

"Escrow Fees" shall have the meaning ascribed thereto in Section 2.2(b)(i).

"Expenses" shall have the meaning ascribed thereto in Section 6.3.

"Fundamental Representations" means Sections 1 to 4 of Schedule 3.

"GMV" shall have the meaning ascribed thereto in Section 2.9(c).

"Governmental Entity" means any supranational, national, federal, state, local, provincial, municipal, foreign or other government or quasi-governmental authority or any department, regulatory or administrative agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

S-1-3

"Governmental Order" means any applicable order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before or under the supervision of any Governmental Entity.

"HKIAC" shall have the meaning ascribed thereto in Section 10.3(b).

"HKIAC Rules" shall have the meaning ascribed thereto in Section 10.3(b).

"Hong Kong" shall have the meaning ascribed thereto in Section 10.3(a).

"Indebtedness" of any Person means, without duplication, each of the following of such Person: (i) all indebtedness for borrowed money, (ii) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than trade payables entered into in the ordinary course of business), (iii) all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments, (iv) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced that are incurred in connection with the acquisition of properties, assets or businesses, (v) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to any property or assets acquired with the proceeds of such indebtedness (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to repossession or sale of such property), (vi) all obligations that are capitalized (including capitalized lease obligations), (vii) all obligations under banker's acceptance, letter of credit or similar facilities, (viii) all obligations in respect of any interest rate swap, hedge or cap agreement, and (ix) all guarantees issued in respect of the Indebtedness referred to in clauses (i) through (viii) above of any other Person, but only to the extent of the Indebtedness guaranteed.

"Indemnifiable Loss" shall have the meaning ascribed thereto in Section 7.2(a).

"Independent Accounting Firm" means Deloitte Touche Tohmatsu.

"Intellectual Property" means in any and all jurisdictions worldwide, all (i) patents, statutory invention registrations and invention disclosures, and all related continuations, continuations-in-part, divisionals, reissues, re-examinations, substitutions, and extensions thereof, (ii) trademarks, service marks, domain names, uniform resource locators, trade dress, trade names, logos and other identifiers of source, including the goodwill symbolized thereby or associated therewith, (iii) works of authorship (including software) and copyrights, (iv) confidential and proprietary information, including trade secrets and confidential and proprietary know-how, inventions, processes, models and methodologies, (v) rights of publicity, privacy and rights to personal information, (vi) registrations, applications, and renewals for any of the foregoing in (i)-(v), and (vii) all rights in the foregoing and in other similar intangible assets.

"Knowledge" or "know" means, with respect to any Person, means the actual knowledge of such Person and that knowledge which should have been acquired by such Person after making such due inquiry and exercising such due diligence as a prudent business person would have made or exercised in the management of his or her business affairs, including due inquiry of those officers, directors, key employees and professional advisers (including attorneys, accountants and consultants) of the Person and its Affiliates who could reasonably be expected to have knowledge of the matters in question.

S-1-4

"Law" means any and all publicly announced provisions of any applicable constitution, treaty, statute, law, regulation, ordinance, code, rule, or rule of common law, any governmental approval, concession, grant, franchise, license, agreement, directive, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Entity, in each case as amended, and any and all applicable Governmental Orders.

"Liabilities" means, with respect to any Person, all liabilities, obligations and commitments of such Person of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due.

"Lien" means, with respect to any asset (including, without limitation, any security) any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset.

"Maximum Debt" shall have the meaning ascribed thereto in Section 2.9(a).

"Merger Consideration" shall have the meaning ascribed thereto in Section 2.2(a).

"Merger Terms" shall have the meaning ascribed thereto in Section 6.4.

"Merger" shall have the meaning ascribed thereto in Recitals.

"Net Loss" shall have the meaning ascribed thereto in Section 2.9(d).

"Onshore Deposit" shall have the meaning ascribed thereto in Section 2.9(a).

"Order No. 10" means the Rules for Mergers with and Acquisitions of Domestic Enterprises by Foreign Investor 《关于外国投资者并购境内企业的规定》 jointly issued by the Ministry of Commerce, the State-owned Assets Supervision and Administration Commission, the State Administration of Taxation, the SAIC, the China Securities Regulatory Commission and the SAFE on August 8, 2006, or its amendments and interpretation promulgated by Ministry of Commerce from time to time.

"Permitted Liens" means (i) Liens for Taxes, assessments and governmental charges or levies not yet due and payable or that are being contested in good faith by appropriate proceedings; (ii) mechanics', carriers', workmen's, repairmen's, materialmen's or other Liens or security interests arising or incurred in the ordinary course of business in respect of amounts that are not yet due and payable; (iii) Liens that would be disclosed by a current survey or physical inspection of the real property; and (iv) any other Liens that have been incurred or suffered in the ordinary course of business and that are not material in amount or do not materially detract from the value of or materially impair the existing use of the property affected by such Lien.

S-1-5

"Person" means an individual, corporation, limited liability company, partnership, association, trust, unincorporated organization, other entity or group (as defined in the U.S. Securities Exchange Act of 1934, as amended).

"PFIC" means passive foreign investment company as defined in the Code.

"Plan of Merger" shall have the meaning ascribed thereto in Section 1.2.

"PRC" means the People's Republic of China, excluding, for purpose of this Agreement, Hong Kong, the Macau Administrative Region and Taiwan.

"Pre-Closing Agent Liabilities" shall have the meaning ascribed thereto in Section 7.3.

"Preliminary Adjustment Items" shall have the meaning ascribed thereto in Section 2.10(a).

"Preliminary Adjustment Statement" shall have the meaning ascribed thereto in Section 2.10(a).

"Pro Rata Valuation Difference" shall have the meaning ascribed thereto in Section 2.10(d)(v)(1).

"Public Official" means any executive, official, or employee of a Governmental Entity, political party or member of a political party, political candidate; executive, employee or officer of a public international organization; or director, officer or employee or agent of a wholly or partially state-owned, or partially state-owned, state-controlled, or state-operated enterprise, including a PRC state-owned, state-controlled, or state-operated enterprise.

"Rajax" shall have the meaning ascribed thereto in Preamble.

"Rajax Amended Memorandum and Articles" means, collectively, the Twelfth Amended and Restated Memorandum of Association of Rajax and the Twelfth Amended and Restated Articles of Association of Rajax, as each may be amended and/or restated from time to time.

"Rajax Control Documents" means the following Contracts collectively: (i) Exclusive Technology and Consulting Service Agreement (独家技术和咨询服务协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company on November 28, 2011, (ii) Exclusive Option Agreement (独家购买权协议) entered into by and among the Rajax WFOE, the Rajax Domestic Company and the equity holders of such Rajax Domestic Company on November 28, 2011, (iii) Power of Attorney (授权委托书) issued by each of the Rajax Principals respectively on November 28, 2011, and (iv) Share Pledge Agreement (股份质押合同) entered into by and among the Rajax WFOE, the Rajax Domestic Company and the equity holders of such Rajax Domestic Company on November 28, 2011.

"Rajax Disclosure Schedule" shall have the meaning ascribed thereto in Schedule 4.

"Rajax Domestic Company" means Shanghai Rajax Information & Technology, Ltd. (上海拉扎斯信息科技有限公司), a company incorporated under the Laws of the PRC.

S-1-6

"Rajax Financial Statements" shall have the meaning ascribed thereto in Section 11 of Schedule 4.

"Rajax G-1 Shares" shall have the meaning ascribed thereto in Section 2.2(a)(ii).

"Rajax Group Company" means each of Rajax, Rajax HK Subsidiary, Rajax WFOE, Rajax WFOE Subsidiary, Rajax Domestic Company together with each Subsidiary of any of the foregoing, and "Rajax Group Companies" refers to all of Rajax Group Companies collectively; for the purpose of this Agreement, prior to the Effective Time, excluding any Xiaodu Group Company.

"Rajax HK Subsidiary" means Rajax Holding (HK) Limited (拉扎斯控股香港有限公司), a company incorporated under the Laws of Hong Kong.

"Rajax Indemnified Parties" shall have the meaning ascribed thereto in Section 7.2(a).

"Rajax IP" shall have the meaning ascribed thereto in Section 19(i) of Schedule 4.

"Rajax Key Employee" means all employees of the Rajax Group Companies with positions of president, chief executive officer, chief financial officer, chief operating officer, chief technical officer, chief sales and marketing officer, general manager, any other managers reporting directly to any Rajax Group Company's board of directors, president or chief executive officer, and any other employee with the title of "vice president" or higher.

"Rajax Lease" shall have the meaning ascribed thereto in Section 17(ii) of Schedule 4.

"Rajax Material Adverse Effect" means any (i) event, occurrence, fact, condition, change or development that has had, has, or would have, individually or together with other events, occurrences, facts, conditions, changes or developments, a material adverse effect on the business, properties, assets, employees, operations, results of operations, condition (financial or otherwise), prospects, assets or Liabilities of the Rajax Group Companies taken as a whole, other than in the case of clause (i) any change, circumstance, event, effect or occurrence occurring after the date of this Agreement to the extent resulting from: (A) changes generally affecting the industry in which the Rajax Group Companies operate; (B) changes in general economic conditions, financial or capital markets in the PRC, the United States or any other jurisdiction in which any Rajax Group Company has substantial business operations, including changes in interest or exchange rates; (C) changes in Law or in generally accepted accounting principles or in Accounting Standards; (D) acts of war (whether or not declared), sabotage or terrorism, or any escalation or worsening of any such acts of war (whether or not declared), sabotage or terrorism; (E) pandemics, earthquakes, hurricanes, tornadoes or other natural disasters or similar force majeure events; (F) the announcement, pendency or performance of the transactions contemplated by this Agreement and the other Transaction Agreements, including the identity of, or any facts and circumstances relating to Xiaodu; provided that this clause (F) shall not apply with respect to any representation, warranty or covenant that addresses the consequences of entry into this Agreement and the other Transaction Agreements or the consummation of the transactions contemplated hereby and thereby; or (G) any action that is taken at the written request of or with the prior written consent of Xiaodu; provided, however, that any change, circumstance, event, effect or occurrence referred to in clauses (A), (B) or (C) does not adversely affect the Rajax Group Companies, taken as a whole, in a materially disproportionate manner as compared to other participants in the industry in which the Rajax Group Companies operate.

S-1-7

"<u>Rajax Material Contract</u>" shall have the meaning ascribed thereto in <u>Section 15(i)</u> of <u>Schedule 4</u>.

"<u>Rajax Merger Sub</u>" shall have the meaning ascribed thereto in Preamble.

"<u>Rajax Option</u>" means an option to purchase Rajax ordinary shares granted under the Rajax Share Incentive Plans.

"<u>Rajax Owned IP</u>" means all Intellectual Property owned by, purported to be owned by, or exclusively licensed to, the Rajax Group Companies.

"<u>Rajax Principal HoldCos</u>" means each of Mark X Taurus Investment Holdings Inc., Three Body Technology Inc., King Jack Investment Inc., and Three Stone Investment Inc., and Rajax Principal HoldCos means all of Rajax Principal HoldCos collectively.

"<u>Rajax Principals</u>" means each of Xuhao Zhang (张旭豪), Yuan Wang (汪渊), Jia Kang (康嘉), and Gaochao Deng (邓高潮), and the Rajax Principals means all of Rajax Principals collectively.

"<u>Rajax Registered IP</u>" means Intellectual Property throughout the world for which registrations are owned by or held in the name of, or for which applications have been made in the name of any Rajax Group Company.

"<u>Rajax Related Party</u>" means Rajax, Rajax Merger Sub, or any of their respective former, current and future general or limited partners, shareholders, managers, members, agents, directors, officers, employees or Affiliates.

"<u>Rajax Representatives</u>" shall have the meaning ascribed thereto in <u>Section 16(i)</u> of <u>Schedule 4</u>.

"<u>Rajax Required Governmental Consents</u>" shall have the meaning ascribed thereto in <u>Section 8(ii)</u> of <u>Schedule 4</u>.

"<u>Rajax ROFR Agreement</u>" means the Tenth Amended and Restated Right of First Refusal Agreement of Rajax entered into by and among the parties thereto dated as of the date hereof, as amended from time to time.

"<u>Rajax Share Incentive Plans</u>" means the Rajax Holding Share Incentive Plan, adopted by the board of directors and the shareholders of Rajax on September 19, 2012, as amended from time to time; and the Rajax Holding Share Incentive Plan, adopted by the board of directors and the shareholders of Rajax on May 7, 2014, as amended from time to time.

"<u>Rajax Shareholders Agreement</u>" means the Tenth Amended and Restated Shareholders Agreement of Rajax entered into by and among the parties thereto dated as of the date hereof, as amended from time to time.

"<u>Rajax Statement Date</u>" shall have the meaning ascribed thereto in <u>Section 11</u> of <u>Schedule 4</u>.

"Rajax Supplemental Control Documents" means the following documents collectively: (i) the Proxy Agreement (授权委托协议) entered into by and between the Rajax WFOE and each of the Rajax Principals respectively; (ii) the Intellectual Property Exclusive Option Agreement (知识产权独家认购协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company; (iii) the Domain Transfer Agreements(域名转让协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company; (iv) the Domain Transfer Agreement (域名转让协议) entered into by and between the Rajax Domestic Company and Xuhao Zhang; (v) the Patent Application Right Transfer Agreement (专利申请权转让协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company, all of which were dated August 27, 2012; and (vi) the spousal consent letters executed by each of Jiangman Du (杜江曼), Jingjing Chang (常婧婧), Yanxia Xiao (肖妍霞), and Manman Zhao (赵曼曼) (as the spouse of each equity holder of the Rajax Domestic Company) on 5 March 2016.

"Rajax WFOE Subsidiary" means Shanghai Zhuanshan Restaurant Management Co., Ltd. (上海馔山餐饮管理有限公司), a company incorporated under the Laws of the PRC.

"Rajax WFOE" means Rajax Network &Technology (Shanghai) Co., Ltd. (拉扎斯网络科技（上海）有限公司), a company incorporated under the Laws of the PRC.

"Restrictive Provision" means any provisions in the Contracts to which a Xiaodu Group Company is a party that restricts the ability of any Xiaodu Group Company or any other Person to conduct or engage in any business or activity with Rajax or Alibaba or any of their respective Affiliates.

"Revised Adjustment Statement" shall have the meaning ascribed thereto in Section 2.10(c).

"SAFE Rules and Regulations" means collectively, the Announcement 7, the Circular 13, the Circular 37 and any other applicable SAFE rules and regulations.

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"SAIC" means the State Administration for Industry and Commerce of the PRC or, with respect to the issuance of any business license or filing or registration to be effected by or with the State Administration of Industry and Commerce, any Governmental Entity which is similarly competent to issue such business license or accept such filing or registration under the Laws of the PRC.

"Series A Xiaodu Shareholder" means a shareholder holding Series A preferred shares of Xiaodu.

"Share Consideration" shall have the meaning ascribed thereto in Section 2.2(a)(ii).

"Subsidiary" means, when used with reference to any Person, (i) of which such party or any other Subsidiary of such party is a general or managing partner, or (ii) the outstanding voting securities or interests of which, having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization, are directly or indirectly owned or controlled by such party or by any one or more of its Subsidiaries, and, when use with reference to Xiaodu or Rajax, of which Xiaodu or Rajax, as applicable, consolidates in its consolidated financial statements as a variable interest entity in accordance with Accounting Standards.

S-1-9

"Subsidies/GMV Ratio" shall have the meaning ascribed thereto in Section 2.9(d).

"Surviving Corporation Articles of Association" shall have the meaning ascribed thereto in Section 1.5.

"Surviving Corporation Memorandum of Association" shall have the meaning ascribed thereto in Section 1.5.

"Surviving Corporation" shall have the meaning ascribed thereto in Section 1.1.

"Tax Escrow Amount" shall have the meaning ascribe there to in Section 2.2(b)(i).

"Tax Paying Xiaodu Shareholder" shall have the meaning ascribe there to in Section 2.2(b)(i).

"Tax Returns" means all federal, state, local, provincial and non-United States returns, declarations, statements, claims, reports, schedules, forms and information returns and, including any attachment thereto or amendment thereof, with respect to Taxes.

"Tax" or "Taxes" includes all forms of taxation, whenever created or imposed, and whether of the PRC, the United States or elsewhere, and whether imposed by a local, municipal, governmental, provincial, state, foreign, federal or other Governmental Entity, including all interest, penalties and additions imposed with respect to such amounts.

"Termination Date" shall have the meaning ascribed thereto in Section 9.2(a).

"Third Party Assets" shall have the meaning ascribed thereto in Section 15(iv) of Schedule 3.

"Total Adjustment Amount" shall have the meaning ascribed thereto in Section 2.10(d)(v).

"Transaction Agreements" means collectively, this Agreement, the Rajax Shareholders Agreement, the Escrow Agreement, the Rajax ROFR Agreement, the Surviving Corporation Memorandum of Association, the Surviving Corporation Articles of Association and the Rajax Amended Memorandum and Articles.

"Undecided Xiaodu Shareholders" means all Xiaodu Shareholders other than the Approved Xiaodu Shareholders and the Dissenting Xiaodu Shareholders.

"Undecided Xiaodu Shareholder Escrow Amount" shall have the meaning ascribed thereto in Section 2.2(b)(ii).

"US$" means the legal currency of the United States of America.

"Valuation Adjustment Date Cash" means the aggregate amount of all cash of Xiaodu and the Xiaodu Group Companies as of the Valuation Adjustment Date.

"Valuation Adjustment Date Debt" means all Debts of Xiaodu and the Xiaodu Group Companies as of the Valuation Adjustment Date.

"Valuation Adjustment Date" means the earlier of August 18, 2017 or the Closing Date.

"Valuation Conditions" shall have the meaning ascribed thereto in Section 2.9.

"Valuation Difference" shall have the meaning ascribed thereto in Section 2.10(d)(v).

"Valuation" shall have the meaning ascribed thereto in Section 2.9.

"Xiaodu" shall have the meaning ascribed thereto in Preamble.

"Xiaodu Board Resolutions" shall have the meaning ascribed thereto in Recitals.

"Xiaodu Board" shall have the meaning ascribed thereto in Recitals.

"Xiaodu Control Documents" means all of the agreements and documents set forth in Schedule 1A.

"Xiaodu Disclosure Schedule" shall have the meaning ascribed thereto in Schedule 3.

"Xiaodu Domestic Companies" means, collectively Beijing Zhenxuan, Xiaodu Shenghuo, Beijing Xunda and Beijing Xinchi.

"Xiaodu Employees" means current, former, or retired employees, officers, consultants, independent contractors providing individual services, agents or directors of Xiaodu or any Subsidiary of Xiaodu.

"Xiaodu Financial Statements" shall have the meaning ascribed thereto in Section 9 of Schedule 3.

"Xiaodu Group Companies" means, collectively, Xiaodu, Xiaodu HK Subsidiary, Xiaodu WFOE and Xiaodu Domestic Companies.

"Xiaodu HK Subsidiary" means Xiaodu Life Technology Hong Kong Limited, a company duly organized and existing under the Laws of Hong Kong.

"Xiaodu IP" shall have the meaning ascribed thereto in Section 17(i) of Schedule 3.

"Xiaodu Key Employees" means the employees as set forth on Section 18(iv) of the Xiaodu Disclosure Schedule.

"Xiaodu Lease" shall have the meaning ascribed thereto in Section 15(iii) of Schedule 3.

<center>S-1-11</center>

"Xiaodu Material Adverse Effect" means any (i) event, occurrence, fact, condition, change or development that has had, has, or would have, individually or together with other events, occurrences, facts, conditions, changes or developments, a material adverse effect on the business, properties, assets, employees, operations, results of operations, condition (financial or otherwise), prospects, assets or Liabilities of the Xiaodu Group Companies taken as a whole, other than in the case of clause (i) any change, circumstance, event, effect or occurrence occurring after the date of this Agreement to the extent resulting from: (A) changes generally affecting the industry in which the Xiaodu Group Companies operate; (B) changes in general economic conditions, financial or capital markets in the PRC, the United States or any other jurisdiction in which any Xiaodu Group Company has substantial business operations, including changes in interest or exchange rates; (C) changes in Law or in generally accepted accounting principles or in Accounting Standards; (D) acts of war (whether or not declared), sabotage or terrorism, or any escalation or worsening of any such acts of war (whether or not declared), sabotage or terrorism; (E) pandemics, earthquakes, hurricanes, tornadoes or other natural disasters or similar force majeure events; (F) the announcement, pendency or performance of the transactions contemplated by this Agreement and the other Transaction Agreements, including the identity of, or any facts and circumstances relating to Rajax provided that this clause (F) shall not apply with respect to any representation, warranty or covenant that addresses the consequences of entry into this Agreement and the other Transaction Agreements or the consummation of the transactions contemplated hereby and thereby; or (G) any action that is taken at the written request of or with the prior written consent of Rajax; provided, however, that any change, circumstance, event, effect or occurrence referred to in clauses (A), (B) or (C) does not adversely affect the Xiaodu Group Companies, taken as a whole, in a materially disproportionate manner as compared to other participants in the industry in which the Xiaodu Group Companies operate.

"Xiaodu Material Contracts" shall have the meaning ascribed thereto in Section 13(i) of Schedule 3.

"Xiaodu Option" means an option to purchase Xiaodu Shares granted pursuant to the Xiaodu Share Incentive Plan.

"Xiaodu Owned IP" means all Intellectual Property owned by, purported to be owned by, or exclusively licensed to, the Xiaodu Group Companies.

"Xiaodu Registered IP means Intellectual Property throughout the world for which registrations are owned by or held in the name of, or for which applications have been made in the name of any Xiaodu Group Company.

"Xiaodu Related Party" means Xiaodu and its Subsidiaries and any of their respective former, current and future officers, employees, directors, partners, shareholders, management members or Affiliates (excluding any Rajax Related Party).

"Xiaodu Representatives" shall have the meaning ascribed thereto in Section 14(i) of Schedule 3.

"Xiaodu Required Governmental Consents" shall have the meaning ascribed thereto in Section 6(ii) of Schedule 3.

"Xiaodu Share Incentive Plan" means the Xiaodu Life Technology Ltd 2015 Share Incentive Plan I, as amended and restated.

"Xiaodu Share(s)" shall have the meaning ascribed thereto in Section 2.1(b).

"Xiaodu Shareholders Agreement" means the amended and restated shareholders agreement by and among the parties thereto dated as of May 5, 2016.

S-1-12

"Xiaodu Shareholders Representative" shall have the meaning ascribed thereto in Section 2.2(b)(i).

"Xiaodu Shareholders" means the persons whose names are set out in column #1 of Schedule 2 attached hereto.

"Xiaodu Shenghuo" means Xiaodu Shenghuo (Beijing) Technology Co., Ltd. (小度生活（北京）科技有限公司), a company duly organized and existing under the Laws of the PRC.

"Xiaodu Special Resolution" shall have the meaning ascribed thereto in Schedule 7.

"Xiaodu Statement Date" shall have the meaning ascribed thereto in Section 0 of Schedule 3.

"Xiaodu Subsidies" shall have the meaning ascribed thereto in Section 2.9(d).

"Xiaodu VIEs" means, collectively, Xiaodu Shenghuo, Beijing Xunda and Beijing Xinchi.

"Xiaodu WFOE" means Beijing Xiaodu Information Technology Co., Ltd. (北京小度信息科技有限公司), a company duly organized and existing under the Laws of the PRC.

"Xiaodu Written Consent" shall have the meaning ascribed thereto in Schedule 7.

S-1-13

Schedule 1A

List of Xiaodu Control Documents

**Control Documents regarding Xiaodu Shenghuo**

1.    Exclusive Technology Consultation and Service Agreement between Xiaodu WFOE and Xiaodu Shenghuo dated October 1, 2015;

2.    Business Operation Agreement by and among Xiaodu WFOE, Xiaodu Shenghuo, Zhenbing Gong (巩振兵) and Fang Wei (韦方) dated October 1, 2015;

3.    Loan Agreement by and between Xiaodu WFOE and Zhenbing Gong (巩振兵) entered into in 2017; Loan Agreement by and between Xiaodu WFOE and Fang Wei (韦方) entered into in 2017;

4.    Exclusive Option Agreement by and among Xiaodu HK Subsidiary, Xiaodu WFOE, Xiaodu Shenghuo and Zhenbing Gong (巩振兵) entered into in 2017; Exclusive Option Agreement by and among Xiaodu HK Subsidiary, Xiaodu WFOE, Xiaodu Shenghuo and Fang Wei (韦方) entered into in 2017;

5.    Equity Interest Pledge Agreement by and between Xiaodu WFOE and Zhenbing Gong (巩振兵) entered into in 2017; Equity Interest Pledge Agreement by and between Xiaodu WFOE and Fang Wei (韦方) entered into in 2017;

6.    Shareholder Voting Right Proxy Agreement by and between Xiaodu HK Subsidiary and Zhenbing Gong (巩振兵) dated October 1, 2015; Shareholder Voting Right Proxy Agreement by and between Xiaodu HK Subsidiary and Fang Wei (韦方) dated October 1, 2015.

**Control Documents regarding Beijing Xinchi**

1.    Loan Agreement by and between Xiaodu WFOE and Dong Zhu (朱栋) dated October 26, 2015;

2.    Shareholder Voting Right Proxy Agreement by and between Xiaodu HK Subsidiary and Dong Zhu (朱栋) dated October 26, 2015;

S-1A-1

3.    Exclusive Option Agreement by and among Xiaodu HK Subsidiary, Xiaodu WFOE, Beijing Xinchi and Dong Zhu (朱栋) dated October 26, 2015;

4.    Equity Interest Pledge Agreement by and between Xiaodu WFOE and Dong Zhu (朱栋) dated October 26, 2015;

5.    Business Operation Agreement by and among Xiaodu WFOE, Beijing Xinchi and Dong Zhu (朱栋) dated October 26, 2015;

6.    Exclusive Technology Consultation and Service Agreement between Xiaodu WFOE and Beijing Xinchi dated October 26, 2015.

**Control Documents regarding Beijing Xunda**

1.    Loan Agreement by and between Xiaodu WFOE and Lei Yao (姚磊) dated October 23, 2015;

2.    Shareholder Voting Right Proxy Agreement by and between Xiaodu HK Subsidiary and Lei Yao (姚磊) dated October 23, 2015;

3.    Exclusive Option Agreement by and among Xiaodu HK Subsidiary, Xiaodu WFOE, Beijing Xunda and Lei Yao (姚磊) dated October 23, 2015;

4.    Equity Interest Pledge Agreement by and between Xiaodu WFOE and Lei Yao (姚磊) dated October 23, 2015;

5.    Business Operation Agreement by and among Xiaodu WFOE, Beijing Xunda and Lei Yao (姚磊) dated October 23, 2015;

6.    Exclusive Technology Consultation and Service Agreement between Xiaodu WFOE and Beijing Xunda dated October 23, 2015.

Schedule 2

Allocation of Merger Consideration

| Column #1<br><br>Xiaodu Shareholders | Column #2<br>Type of shares owned in Xiaodu | Column #3<br>Number of shares owned in Xiaodu | Column #4<br><br>Merger Consideration | Column #5<br>Amount of Cash Consideration to be paid in US$ | Column #6<br><br>Tax Escrow Amount | Column #7<br>No. Rajax G-1 Shares to be allotted and issued as Share Consideration |
|---|---|---|---|---|---|---|
| Baidu (Hong Kong) Limited | Series Seed Preferred Shares | 495,000,000 | | | | |
| | Series B Preferred Shares | 96,842,105 | US$276,000,000 | US$161,000,000 | — | 207,508,923 |
| Waterwood O2O Project Limited | Series A Preferred Shares | 125,000,000 | US$ 42,000,000 | US$ 24,500,000 | — | 31,577,445 |
| Hina Group Fund II, L.P. | Series A Preferred Shares | 5,000,000 | US$ 1,680,000 | US$ 980,000 | — | 1,263,098 |
| Hina Group Fund III, L.P. | Series A Preferred Shares | 70,000,000 | US$ 23,520,000 | US$ 13,720,000 | — | 17,683,369 |
| Tactic Smart Limited | Series A Preferred Shares | 25,000,000 | US$ 8,400,000 | US$ 4,900,000 | — | 6,315,489 |
| CICC ALPHA Active Investment Limited | Series A Preferred Shares | 25,000,000 | US$ 8,400,000 | US$ 4,900,000 | — | 6,315,489 |
| Sevva Investment Limited | Series B Preferred Shares | 8,421,053 | US$ 24,000,000 | US$ 14,000,000 | US$1,882,683 | 18,044,254 |
| Unicorn (HK) Capital Investment Co., Limited | Series B Preferred Shares | 12,631,579 | US$ 36,000,000 | US$ 21,000,000 | US$2,824,025 | 27,066,381 |
| Hina Hanking I Investment L.P. | Series B Preferred Shares | 21,052,632 | US$ 60,000,000 | US$ 35,000,000 | US$4,706,708 | 45,110,635 |
| GONGZB Holdings Limited | Restricted Shares | 5,500,000 | — | 0 | — | — |
| | **Total** | **889,447,369** | **US$480,000,000** | **US$280,000,000** | **US$9,413,416** | **360,885,083** |

S-2-1

Schedule 3

Warranties of Xiaodu

Except as set forth in the section of the disclosure schedule delivered to Rajax by Xiaodu on the date hereof (the "Xiaodu Disclosure Schedule"), attached as Schedule 5 hereto, that specifically relates to a specified section or subsection of this Schedule 3, or any other section or subsection of this Agreement to the extent that it is reasonably apparent that such information is relevant to such other section or subsection, Xiaodu warrants to Rajax and Rajax Merger Sub that each warranty set out in Schedule 3 is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

1.   Organization, Good Standing and Qualification. Each Xiaodu Group Company is duly organized, validly existing and in good standing (or equivalent status in the relevant jurisdiction) under, and by virtue of, the Laws of the place of its incorporation or establishment and has all requisite power and authority to own its properties and assets and to carry on its business as now conducted and as proposed to be conducted, and to perform each of its obligations under each of the Transaction Agreements and the Xiaodu Control Documents to which it is a party. Except as set forth in Section 1 of the Xiaodu Disclosure Schedule, each Xiaodu Group Company is qualified to do business in the manner presently conducted and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction where failure to be so qualified would be a Xiaodu Material Adverse Effect. Except as disclosed in Section 1 of the Xiaodu Disclosure Schedule, each Xiaodu Group Company that is a PRC entity has a valid business license issued by the SAIC or its local branch or other relevant Governmental Entities, and has, since its establishment, carried on its business in compliance with the business scope set forth in its business license. Except as disclosed in Section 1 of the Xiaodu Disclosure Schedule, there is no pending litigation against any of the Xiaodu Group Companies, and no legal proceedings have been initiated by or against any of the Xiaodu Group Companies for the liquidation, winding-up, striking off or dissolution of any of the Xiaodu Group Companies or for the appointment of a liquidator, receiver, trustee or similar officer of any of the Xiaodu Group Companies or of all or any of its assets, in any jurisdiction.

2.   Capitalization.

(i)   Xiaodu. Immediately prior to the Effective Time, the authorized share capital of Xiaodu shall be US$50,000 divided into (a) a total of 4,005,000,000 authorized Ordinary Shares, 5,500,000 of which are issued and outstanding, 111,798,604 of which have been reserved for issuance pursuant to the Xiaodu Share Incentive Plans and 995,000,000 of which have been reserved for issuance upon conversion of the Preferred Shares, (b) a total of 995,000,000 authorized preferred shares, 495,000,000 of which are designated as Series Seed preferred shares, all of which are issued and outstanding; 250,000,000 of which are designated as Series A preferred shares, all of which are issued and outstanding; and 250,000,000 of which are designated as Series B preferred shares, 138,947,369 of which are issued and outstanding. Section 2(i) of the Xiaodu Disclosure Schedule sets forth the capitalization table of Xiaodu as of immediately prior to the Closing and immediately after the Closing, reflecting all then outstanding and authorized Equity Securities of Xiaodu, the record and beneficial holders thereof, the issuance date, and the terms of any vesting applicable thereto.

S-3-1

(ii)    <u>Xiaodu HK Subsidiary</u>. The authorized share capital of the Xiaodu HK Subsidiary is set forth opposite its name on <u>Section 2(ii)</u> of the Xiaodu Disclosure Schedule, together with an accurate list of the record and beneficial owners of such authorized capital.

(iii)    <u>Xiaodu WFOE</u>. The registered capital of the Xiaodu WFOE is set forth opposite its name on <u>Section 2(iii)</u> of the Xiaodu Disclosure Schedule, together with an accurate list of the record and beneficial owners of such registered capital.

(iv)    <u>Xiaodu Domestic Companies</u>. The registered capital of the Xiaodu Domestic Companies is set forth opposite its name on <u>Section 2(iv)</u> of the Xiaodu Disclosure Schedule, together with an accurate list of the record and SAIC registered owners of such registered capital.

(v)    <u>No Other Securities</u>. Except as set forth in <u>Sections 2(i)-(vii)</u> of the Xiaodu Disclosure Schedule and for (a) the conversion privileges of the preferred shares, (b) certain rights provided in the Charter Documents of Xiaodu as currently in effect, and (c) certain rights provided in this Agreement and the Xiaodu Control Documents, as of the date of this Agreement and at the Closing, (1) there are no other authorized or outstanding Equity Securities of any Xiaodu Group Company; (2) no Equity Securities of any Xiaodu Group Company are subject to any preemptive rights, rights of first refusal (except to the extent provided by applicable Laws of the PRC) or other rights to purchase such Equity Securities or any other rights with respect to such Equity Securities, and (3) no Xiaodu Group Company is a party or subject to any Contract that affects or relates to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, any Equity Security of such Xiaodu Group Company. Except as set forth in the Xiaodu Shareholders Agreement, Xiaodu has not granted any registration rights or information rights to any other Person (except to the extent provided by applicable Laws of the PRC), nor is Xiaodu obliged to list any of the Equity Securities of any Xiaodu Group Companies on any securities exchange. Other than the Xiaodu Share Incentive Plans, no Xiaodu Group Company is bound by any equity incentive plan.

(vi)    <u>Issuance and Status</u>. All presently outstanding Equity Securities of each Xiaodu Group Company were duly and validly issued (or subscribed for) in compliance with all applicable Laws, preemptive rights of any Person, and applicable Contracts. Except for those disclosed in <u>Section 2(vi)</u> of the Xiaodu Disclosure Schedule, all share capital or registered capital, as the case may be, of each Xiaodu Group Company have been duly and validly issued, are fully paid (or subscribed for) and non-assessable, and are and as of the Closing shall be free of any and all Liens (except for any restrictions on transfer under the Xiaodu Control Documents, the Xiaodu Shareholders Agreement, the Charter Documents of Xiaodu and applicable Laws). Except as contemplated under the Transaction Agreements, the Xiaodu Control Documents, and set forth in <u>Section 2(vi)</u> of the Xiaodu Disclosure Schedule, there are no (a) resolutions pending to increase the share capital or registered capital of any Xiaodu Group Company or cause the liquidation, winding up, or dissolution of any Xiaodu Group Company, nor has any distress, execution or other process been levied against any Xiaodu Group Company, (b) dividends which have accrued or been declared but are unpaid by any Xiaodu Group Company, (c) obligations, contingent or otherwise, of any Xiaodu Group Company to repurchase, redeem, or otherwise acquire any Equity Securities, or (d) outstanding or authorized equity appreciation, phantom equity, equity plans or similar rights with respect to any Xiaodu Group Company.

<div align="center">S-3-2</div>

(vii)    Title. The shares held by Baidu HK in Xiaodu are free and clear of all Liens of any kind other than those arising under applicable Law or as set forth in the Transaction Agreements, Xiaodu Control Documents, or the Charter Documents of Xiaodu.

3.    Corporate Structure; Subsidiaries. Section 3 of the Xiaodu Disclosure Schedule sets forth a complete structure chart showing the Xiaodu Group Companies, and indicating the ownership and control relationships among all Xiaodu Group Companies, the nature of the legal entity which each Xiaodu Group Company constitutes, the jurisdiction in which each Xiaodu Group Company is organized, and each jurisdiction in which each Xiaodu Group Company is required to be qualified or licensed to do business as a foreign Person. To the Knowledge of Xiaodu, Kun Ming Wei Mei Investment LLP (昆明味美投资合伙企业) has not carried out any business operation since its formation.

4.    Authorization. Except as otherwise disclosed in Section 4 of the Xiaodu Disclosure Schedule, each of Baidu HK and Xiaodu has all requisite power and authority to execute and deliver the Transaction Agreements to which it is a party and to carry out and perform its obligations thereunder. Each of Transaction Agreements has been, or will be on or prior to the Closing, duly executed and delivered by each of Baidu HK and Xiaodu and constitutes valid and legally binding obligations of such party, enforceable against such party in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies; and (iii) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws.

5.    SAFE Rules and Regulations; Consents; No Conflicts. Except for those disclosed in Section 5 of the Xiaodu Disclosure Schedule, all SAFE Rules and Regulations have been fully complied with and all requisite approvals or registration certificates required under the SAFE Rules and Regulations in relation thereto have been duly and lawfully obtained and are in full force and effect, and to the Knowledge of Xiaodu, there exist no grounds on which any such approval or registration certificate may be cancelled or revoked or the Xiaodu Domestic Companies, the Xiaodu WFOE, or their respective legal representative may be subject to liability or penalties for misrepresentations or failures to disclose information to the issuing SAFE. To the Knowledge of Xiaodu, no Xiaodu Group Company has ever received any oral or written inquiries, notifications, orders or any other forms of official correspondence from SAFE with respect to any actual or alleged non-compliance with the SAFE Rules and Regulations. Except as set forth in Section 5 of the Xiaodu Disclosure Schedule, all Consents from or with any Governmental Entity or any other Person required in connection with the valid execution, delivery and performance of the Transaction Agreements and the consummation of the transactions contemplated by the Transaction Agreements have been duly obtained or completed (as applicable) and are in full force and effect. Except as set forth in Section 5 of the Xiaodu Disclosure Schedule, the execution, delivery and performance of each Transaction Agreement by each of Baidu HK and Xiaodu do not, and the consummation by such party of the transactions contemplated thereby will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any Consent under, or give any Person rights of termination, amendment, acceleration or cancellation under, with or without the passage of time or the giving of notice, any Governmental Order, any provision of the Charter Documents of any Xiaodu Group Company, any applicable Laws (including without limitation, Order No. 10 and the SAFE Rules and Regulations), or any Xiaodu Material Contract, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, any Xiaodu Group Company (including without limitation, any Indebtedness of such Xiaodu Group Company), or (iii) result in the creation of any Lien upon any of the material properties or assets of any Xiaodu Group Company other than Permitted Liens.

S-3-3

6.   Compliance with Laws; Consents.

(i)   Except as disclosed in the Section 6(i) of the Xiaodu Disclosure Schedule, each Xiaodu Group Company is in compliance in all material respects with all applicable Laws. The business of each Xiaodu Group Company as now conducted and as presently planned to be conducted are in compliance in all material respects with all applicable Laws. No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a material violation by any Xiaodu Group Company of, or a failure on the part of such entity to comply with, any applicable Laws, in any material respect, or (b) may give rise to any material obligation on the part of any Xiaodu Group Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature. None of the Xiaodu Group Companies has received any notice from any Governmental Entity regarding any of the foregoing. To the Knowledge of Xiaodu, no Xiaodu Group Company is under investigation with respect to a material violation of any Law.

(ii)   Except as set forth in Section 6(ii) of the Xiaodu Disclosure Schedule, all Consents from or with the relevant Governmental Entity required in respect of the due and proper establishment and operations of each Xiaodu Group Company as now conducted (collectively, the "Xiaodu Required Governmental Consents"), have been duly obtained or completed in accordance with all applicable Laws. Without limiting the generality of the foregoing, each store that has commenced operations at any time prior to the Closing has duly obtained both the Business License (营业执照) and the Food Operation License (食品经营许可证) from the relevant Governmental Entities and has completed its respective environmental assessment (if applicable).

(iii)   Except as set forth in the Xiaodu Disclosure Schedule, no Xiaodu Required Governmental Consent contains any materially burdensome restrictions or conditions, and each Xiaodu Required Governmental Consent is in full force and effect and will remain in full force and effect upon the consummation of the transactions contemplated hereby. None of the Xiaodu Group Companies is in material default under any Xiaodu Required Governmental Consent. To the Knowledge of Xiaodu, there is no reason to believe that any Xiaodu Required Governmental Consent which is subject to periodic renewal will not be granted or renewed. No Xiaodu Group Company has received any letter or other written communication from any Governmental Entity threatening or providing notice of revocation of any Xiaodu Required Governmental Consent issued to any Xiaodu Group Company or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by any Xiaodu Group Company.

S-3-4

7. <u>Tax Matters</u>. Except as disclosed in the applicable subsection of <u>Section 7</u> of the Xiaodu Disclosure Schedule:

(i)    All Tax Returns required to be filed on or prior to the date hereof with respect to each Xiaodu Group Company have been duly and timely filed (taking into account any extension of time to file granted or obtained) by such Xiaodu Group Company in accordance with the applicable Laws and all such Tax Returns are true, correct and complete in all material respects and were prepared in compliance with all applicable Laws. To the Knowledge of Xiaodu, each Xiaodu Group Company has paid in full all Taxes (whether or not shown on any Tax Return) required to be paid by it, except such Taxes, if any, as are being contested in good faith and as to which adequate reserve (determined in accordance with the Accounting Standards) have been provided in the Xiaodu Financial Statements. No deficiencies for any Taxes with respect to any Tax Returns have been asserted in writing by, and no notice of any pending action with respect to such Tax Returns has been received from, any Tax authority, and no dispute relating to any Tax Returns with any such Tax authority is outstanding or contemplated. To the Knowledge of Xiaodu, each Xiaodu Group Company has paid all Taxes owed by it which are due and payable (whether or not shown on any Tax Return) and withheld and timely remitted to the appropriate Governmental Entity all Taxes which it is obligated to withhold and remit from amounts owed to any employee, creditor, customer or any other Person.

(ii)    The provisions for Taxes in the Xiaodu Financial Statements fully reflect all unpaid Taxes of each Xiaodu Group Company (as determined in accordance with the Accounting Standards), whether or not assessed or disputed as of the date of the applicable Xiaodu Financial Statements. The unpaid Taxes of any Xiaodu Group Company (i) did not, as of the date of the applicable Xiaodu Financial Statements, exceed the reserve for Tax Liability (which shall not include any reserve established for deferred Taxes to reflect timing differences between book and Tax income) set forth on the face of the applicable Xiaodu Financial Statements (rather than in any notes thereto) and (ii) do not exceed that reserve as adjusted for the passage of time through the date of the Closing in accordance with the past custom and practice of each Xiaodu Group Company in filing its Tax Returns.

(iii)    No tax audits or administrative or judicial Tax proceedings by any Governmental Entity with respect to any Xiaodu Group Company is currently in progress, nor has any Xiaodu Group Company received any written notice issued by any Governmental Entity threatening the commencement of such foregoing proceedings. No assessment of Tax has been proposed in writing against any Xiaodu Group Company or any of their assets or properties. No Xiaodu Group Company has received from any Governmental Entity (including jurisdictions where such Xiaodu Group Company has not filed Tax Returns) any (i) notice indicating an intent to open audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Governmental Entity against such Xiaodu Group Company. No Xiaodu Group Company is subject to any waivers or extensions of applicable statutes of limitations with respect to Taxes for any year. Except for extensions applied for and granted in the ordinary practice of the applicable jurisdiction, no Xiaodu Group Company currently is the beneficiary of any extension of time within which to file any Tax Return.

(iv)    No Xiaodu Group Company is being the subject of any examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes that has not been resolved or has received any written notices of any threatened examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes. No Xiaodu Group Company is responsible for the Taxes of any other Person by reason of Contract, successor Liability, operation of Law or otherwise.

S-3-5

(v)    Since the Xiaodu Statement Date, no Xiaodu Group Company has incurred any material Taxes other than in the ordinary course of business consistent with past custom and practice. No Xiaodu Group Company has received any written claim from any Governmental Entity in a jurisdiction where such Xiaodu Group Company does not file Tax Returns that such Xiaodu Group Company is or may be subject to taxation by that jurisdiction. No Xiaodu Group Company is treated as a resident for Tax purposes of, or is otherwise subject to income Tax in, or has branch, permanent establishment, agency of other taxable presence in, any jurisdiction other than the jurisdiction in which it has been established. The Xiaodu Group Companies have fulfilled all the material terms, requirements and criteria for the continuance of all applicable Tax incentives, Tax holidays and Tax rulings, including concessional Tax rate, Tax relief, Tax exemption, Tax refund, Tax credit, and other Tax reduction agreement or order available under any applicable Law. Each such Tax incentives, Tax holidays, Tax rulings and other Tax reduction agreement or order is expected to remain in full effect throughout the current effective period thereof after the Closing and is not subject to reduction, revocation, cancellation or any other changes (including retroactive changes) in the future, and no Xiaodu Group Company has received any notice to the contrary or is aware of any event that may result in repeal, cancellation, revocation, or return of such entitlements. All exemptions, reductions and rebates of material Taxes granted to any Xiaodu Group Company by a Governmental Entity are in full force and effect and have not been terminated. No Xiaodu Group Company will be required to include material amounts in income, or exclude material items of deduction, or qualification for Tax exemption, Tax holiday, Tax credit, Tax incentive or Tax refund, in any taxable period beginning after the date of the Closing as a result of (i) a change in method of accounting occurring on or prior to the date of the Closing, (ii) agreement with any Governmental Entity executed on or prior to the date of the Closing, (iii) installment sale or open transaction disposition made on or prior to the date of the Closing, or (iv) prepaid amount received on or prior to the date of the Closing. The transactions contemplated under this Agreement and the other Transaction Agreements to which any Xiaodu Group Company is a party are not in violation of any applicable Law regarding Tax, and will not result in any Tax exemption, Tax holiday, Tax credit, Tax incentive, Tax refund being revoked, cancelled or terminated or trigger any Tax Liability for any Xiaodu Group Company. There are no Liens for Taxes (other than Permitted Liens) on any assets of any Xiaodu Group Company.

(vi)    The Xiaodu Group Companies are in compliance with all applicable transfer pricing Laws in all material respects, including the execution and maintenance of contemporaneous documentation substantiating the transfer pricing practices and methodology of the Xiaodu Group Companies. All of the transactions between any Xiaodu Group Company and any other Xiaodu Related Party have been effected on an arm's-length basis. There are no circumstances which have caused or could cause any Governmental Entity to make any transfer pricing adjustment to the profits of any Xiaodu Group Company, or require any such adjustment to be made to the terms on which any such transaction is treated as taking place, and no such adjustment has been made or threatened.

(vii)    No Xiaodu Group Company is a party to, involved with, bound by or otherwise subject to any Tax sharing, indemnity or allocation agreement or other similar arrangement with any Person (other than a commercial agreement entered into in the ordinary course of business and the principal purpose of which is not the sharing or allocation of Taxes) with respect to Taxes nor does any Xiaodu Group Company owe any amount under any such agreement. No Xiaodu Group Company is a member of an affiliated or combined taxation group with any Person other than the other Xiaodu Group Companies. No Xiaodu Group Company has any Liability for the Taxes of any Person (other than any other Xiaodu Group Company) as a result of such Xiaodu Group Company being part of or owned by, or ceasing to be part of or owned by, an affiliated, combined, consolidated, unitary or other similar group prior to the Closing, as a transferee or successor, by Contract or otherwise.

S-3-6

(viii)   No Xiaodu Group Company has entered into: (a) any transaction the sole or main purpose of which was the avoidance or deferral or reduction of Tax by any Xiaodu Group Company or any associated Person or (b) any transaction the objective of which was the exclusion or reduction of the amount of any income, profits, gains, sales, supplies or imports made or enjoyed by any Xiaodu Group Company or any associated Person for any Tax purpose, or the creation or increase of the amount of any deduction, loss, allowance or credit claimed or intended to be claimed by any Xiaodu Group Company or any associated Person for any Tax purpose, that may be challenged, disallowed or investigated by any Governmental Entity.

(ix)   Each Xiaodu Group Company has complied in all material respects with all statutory provisions rules, regulations, orders and directions in respect of any value added or similar Tax on consumption, has promptly submitted accurate returns, maintains full and accurate records, and has never been subject to any material interest, forfeiture, surcharge or penalty and is not a member of a group or consolidation with any other company for the purposes of value added Tax.

(x)   No Xiaodu Group Company has entered into any concession, agreements (including agreements for the deferred payment of any Tax Liability) or other formal or informal arrangement with any Governmental Entity relating to the Xiaodu Group Companies.

(xi)   Xiaodu will not be required to pay any Taxes under the Laws of the PRC with respect to the transactions contemplated by this Agreement and the other Transaction Agreements.

(xii)   Xiaodu is treated as a corporation for U.S. federal income tax purposes. No Xiaodu Group Company has filed any U.S. Tax election, including any entity classification election pursuant to any applicable U.S. Treasury Regulations. No Xiaodu Group Company is a PFIC, CFC or a U.S. Real Property Holding Corporation. No Xiaodu Group Company anticipates that it will become a PFIC, CFC or a U.S. Real Property Holding Corporation in the foreseeable future. No Xiaodu Group Company owns a less than twenty-five percent (25%) equity interest (by value) in any other entity.

8.   <u>Charter Documents; Books and Records</u>. Each Xiaodu Group Company has been in compliance in all material respects with its Charter Documents, and none of the Xiaodu Group Companies has violated or breached any of their respective Charter Documents in any material respect. Each Xiaodu Group Company maintains its books of accounts and records in the usual, regular and ordinary manner, on a basis consistent with prior practice, and which permits its Xiaodu Financial Statements (as defined below) to be prepared in accordance with the Accounting Standards. The register of members, the register of directors and officers and the register of mortgages and charges (if applicable) of each Xiaodu Group Company is correct and current, there has been no notice of any proceedings to rectify any such register, and to the Knowledge of Xiaodu there are no circumstances which might lead to any application for its rectification. All documents required to be filed by each Xiaodu Group Company with the applicable Governmental Entity in respect of the relevant jurisdiction in which such Xiaodu Group Company is being incorporated have been properly made up and filed.

<div align="center">S-3-7</div>

9.  <u>Financial Statements</u>.

(i)  <u>Section 9</u> of the Xiaodu Disclosure Schedule sets forth the audited consolidated balance sheet, statement of income and statement of cash flows for the Xiaodu Group Companies as of and for the fiscal year ended December 31, 2016 (the "<u>Xiaodu Statement Date</u>") (the "<u>Xiaodu Financial Statements</u>"). Except as otherwise disclosed in <u>Section 9</u> of the Xiaodu Disclosure Schedule, the Xiaodu Financial Statements (a) fairly present in all material respects the consolidated financial position, results of operations and cash flows of the Xiaodu Group Companies as of the dates and for the periods presented therein, and (b) were prepared in accordance with the Accounting Standards applied on a consistent basis throughout the periods presented. All of the accounts receivable owing to any of the Xiaodu Group Companies, including without limitation all accounts receivable set forth on the Xiaodu Financial Statements, constitute valid and enforceable claims and are current and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Xiaodu Financial Statements (which reserves are adequate). There are no material contingent or asserted claims, refusals to pay, or other rights of set-off with respect to any accounts receivable of any Xiaodu Group Company.

(ii)  No facts have come to the attention of Xiaodu that have caused Xiaodu to believe that the financial data and information of Xiaodu Group Companies set forth in <u>Schedule 9</u> attached hereto contain any untrue statement of a material fact.

10.  <u>Changes</u>. Since the Xiaodu Statement Date, each Xiaodu Group Company has (i) operated its business in the ordinary course consistent with its past practice, (ii) used its reasonable best efforts to preserve its business, (iii) collected receivables and paid payables and similar obligations in the ordinary course of business consistent with past practice, and (iv) not engaged in any new line of business or entered into any agreement, transaction or activity or made any commitment except those in the ordinary course of business consistent with past practice. Except for those disclosed in <u>Section 10</u> of the Xiaodu Disclosure Schedule or as expressly provided in the Transaction Agreements, since the Xiaodu Statement Date, there has not been:

(i)  any purchase, acquisition, sale, lease, disposal of or other transfer of any assets that are individually or in the aggregate material to its business, whether tangible or intangible, other than the purchase or sale of inventory in the ordinary course of business consistent with its past practice;

(ii)  any acquisition (by merger, consolidation or other combination, or acquisition of stock or assets, or otherwise) of any business or other Person or division thereof, or any sale or disposition of any business or division thereof;

(iii)  any sale, assignment, exclusive license, or transfer of any Intellectual Property of any Xiaodu Group Company (other than a transfer to Xiaodu or a wholly owned Xiaodu Group Company);

<div align="center">S-3-8</div>

(iv)   any waiver, termination, cancellation, settlement or compromise of a valuable right, debt or claim;

(v)   any incurrence, creation, assumption, repayment, satisfaction, or discharge of (A) any material Lien (other than Permitted Liens) or (B) any Indebtedness or guarantee, or the making of any loan or advance (other than reasonable and normal advances to employees for bona fide expenses that are incurred in the ordinary course of business consistent with its past practice), or the making of any investment or capital contribution;

(vi)   any amendment to or termination of any Xiaodu Material Contract, any entering of any new Contract that would have been a Xiaodu Material Contract if in effect on the date hereof, or any amendment to or waiver under any Charter Document;

(vii)   any change in any compensation arrangement or Contract with any employee of any Xiaodu Group Company, or adoption of any new Benefit Plan, or made any material change in any existing Benefit Plan;

(viii)   any declaration, setting aside or payment or other distribution in respect of any Equity Securities of any Xiaodu Group Company, or any issuance, transfer, redemption, purchase or acquisition of any Equity Securities by any Xiaodu Group Company;

(ix)   any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operation or business of any Xiaodu Group Company;

(x)   any material change in accounting principles, methods or practices or any revaluation of any of its assets;

(xi)   except in the ordinary course of business consistent with its past practice, settlement of any claim or assessment in respect of any material Taxes, entry or change of any material Tax election, change of any method of accounting resulting in a material amount of additional Tax or filing of any material amended Tax Return;

(xii)   any commencement or settlement of any material Action;

(xiii)   any authorization, sale, issuance, transfer, pledge or other disposition of any Equity Securities of any Xiaodu Group Company;

(xiv)   any resignation or termination of any Xiaodu Key Employee or any material group of employees of any Xiaodu Group Company;

(xv)   any transaction with any Xiaodu Related Party; or

(xvi)   any agreement or commitment to do any of the things described in this Section 10.

11.   Actions. Except for those disclosed in Section 11 of the Xiaodu Disclosure Schedule, there is no Action pending or, to the Knowledge of Xiaodu, adversely affecting any Xiaodu Group Company with respect to its businesses and there is no judgment or award unsatisfied against any Xiaodu Group Company, nor is there any Governmental Order in effect and binding on any Xiaodu Group Company or their respective assets or properties. There is no Action pending by any Xiaodu Group Company against any third party nor does any Xiaodu Group Company intend to commence any such Action. No Governmental Entity has at any time challenged or questioned in writing the legal right of any Xiaodu Group Company to conduct its business as presently being conducted.

12.    <u>Liabilities</u>. Except as disclosed in <u>Section 12</u> of the Xiaodu Disclosure Schedule, no Xiaodu Group Company has any Liabilities of the type required to be disclosed on a balance sheet except for (i) Liabilities set forth in the balance sheet that have not been satisfied since the Xiaodu Statement Date and (ii) current Liabilities incurred since the Xiaodu Statement Date in the ordinary course of business consistent with its past practices and which do not exceed US$500,000 in the aggregate. Except as disclosed in <u>Section 12</u> of the Xiaodu Disclosure Schedule and for the Indebtedness incurred in the ordinary course of business, none of the Xiaodu Group Companies has any Indebtedness that it has directly or indirectly created, incurred, assumed, or guaranteed, or with respect to which the Xiaodu Group Company has otherwise become directly or indirectly liable. None of the Xiaodu Group Companies is a guarantor or indemnitor of any Liabilities of any other Person (other than a Xiaodu Group Company).

13.    <u>Commitments</u>.

(i)    Except for the Transaction Agreements and the Xiaodu Control Documents, <u>Section 13(i)</u> of the Xiaodu Disclosure Schedule contains a complete and accurate list of all Xiaodu Material Contracts. "<u>Xiaodu Material Contracts</u>" means, collectively, any Contract to which a Xiaodu Group Company or any of its properties or assets is bound or subject to that (a) involves obligations (contingent or otherwise) or payments in excess of RMB2,000,000 or has an unexpired term in excess of one (1) year, (b) involves Intellectual Property that is material to a Xiaodu Group Company (other than generally available "off-the-shelf" shrink-wrap software licenses obtained by the Group on non-exclusive and non-negotiated terms), including without limitation, the licenses, (c) restricts the ability of a Xiaodu Group Company to compete or to conduct or engage in any business or activity or in any territory, (d) relates to the sale, issuance, grant, exercise, award, purchase, repurchase or redemption of any Equity Securities, (e) involves any provisions providing for exclusivity, non-compete, "change in control", "most favored nations", rights of first refusal or first negotiation or similar rights against any Xiaodu Group Company, or grants a power of attorney, agency or similar authority by any Xiaodu Group Company, (f) is with a Xiaodu Related Party, (g) involves Indebtedness, an extension of credit, a guaranty, deed of trust, or the grant of a Lien (other than trade credits in the ordinary course of business), (h) involves the lease, license or use of assets with an obligation of payment by any Xiaodu Group Company more than RMB150,000 per year, or the disposition or acquisition of a material amount of assets or of a business, (i) involves the waiver, compromise, or settlement of any material dispute, claim, litigation or arbitration, (j) involves the ownership or lease of, title to, use of, or any leasehold or other interest in, any real or personal property (except for personal property leases in the ordinary course of business and involving payments of less than RMB500,000 and real property leases in the ordinary course of business and involving rental payments of less than RMB150,000 per year), including without limitation, the Xiaodu Leases, (k) involves (i) the establishment, contribution to, or operation of a partnership, joint venture, alliance or similar entity, (ii) a sharing of profits or losses (including joint development and joint marketing Contracts), or (iii) any investment in, loan to or acquisition or sale of the securities, equity interests or assets of any Person which is material to the business of a Xiaodu Group Company, (l) is between any of the Xiaodu Domestic Company and another Xiaodu Group Company, (m) is with a Governmental Entity, state-owned enterprise, or sole-source supplier of any material product or service (other than utilities), (n) is a Benefit Plan, or a collective bargaining agreement or is with any labor union or other representatives of the employees, (o) is a brokerage or finder's agreement, or material sales agency, marketing or distributorship Contract, (p) is with the application platforms (including without limitation, the AppStore of Apple Inc. and the Android Market of Google Inc.), (q) relates to business cooperation with any shareholder of Xiaodu or any Affiliate of such shareholder, or (r) is otherwise material to a Xiaodu Group Company or is one on which a Xiaodu Group Company is substantially dependent.

S-3-10

(ii)    Except for those disclosed in Section 13(ii) of the Xiaodu Disclosure Schedule, each Xiaodu Material Contract is a valid and binding agreement of the Xiaodu Group Company that is a party thereto, the performance of which does not and will not violate, in any material respects, any applicable Law or Governmental Order, and is in full force and effect and enforceable against the parties thereto, except (x) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (y) as may be limited by Laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies, and for (z) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws. Each Xiaodu Group Company has duly performed all of its obligations in all material respects under each Xiaodu Material Contract to the extent that such obligations to perform have accrued, and no material breach or default, alleged material breach or alleged default, or event which would (with the passage of time, notice or both) constitute a material breach or default thereunder by such Xiaodu Group Company or, to the Knowledge of Xiaodu, any other party or obligor with respect thereto, has occurred, or as a result of the execution, delivery, and performance of the Transaction Agreements will occur. No Xiaodu Group Company has given notice (whether or not written) that it intends to terminate a Xiaodu Material Contract or that any other party thereto has breached, violated or defaulted under any Xiaodu Material Contract. No Xiaodu Group Company has received any notice (whether written or not) that it has breached, violated or defaulted under any Xiaodu Material Contract or that any other party thereto intends to terminate such Xiaodu Material Contract.

14.    Anti-Bribery, Anti-Corruption, Anti-Money Laundering and Sanctions; Absence of Government Interests.

(i)    Each Xiaodu Group Company and their respective directors, officers, employees and other Persons acting on their behalf (collectively, "Xiaodu Representatives") are and have been in compliance with all Compliance Laws. Furthermore, except for those disclosed in Section 14 of the Xiaodu Disclosure Schedule, no Public Official (x) holds an ownership or other economic interest, direct or indirect, in any of the Xiaodu Group Companies or in the contractual relationship formed by this Agreement or (y) serves as an officer, director or employee of any Xiaodu Group Company. Without limiting the foregoing, neither any Xiaodu Group Company nor any Xiaodu Representative has, directly or indirectly, offered, promised, given, authorized or paid any money or anything of value to any Public Official or to any Person under circumstances where any Xiaodu Group Company or Xiaodu Representative knew or ought to have known that all or a portion of such money or thing of value would be offered, given, paid or promised, directly or indirectly, to a Person:

(a)    for the purpose of influencing any act or decision of a Public Official in their official capacity; inducing a Public Official to act or omit to act in violation of lawful duties; securing any improper advantage; inducing a Public Official to influence or affect any act or decision of any Governmental Entity; or assisting any Xiaodu Group Company or any Xiaodu Representative in obtaining or retaining business for or with, or directing business to, any Person; or

S-3-11

(b)    in a manner that would constitute a breach of any Compliance Laws.

(ii)    Each Xiaodu Group Company has maintained complete and accurate books and records, and no assets of any Xiaodu Group Company have been used for the establishment of any unlawful or unrecorded fund of monies or other assets, or for the making of any unlawful or undisclosed payment.

(iii)    No Xiaodu Group Company or any of its Xiaodu Representatives has ever been found by a Governmental Entity to have violated any criminal or securities Law or is subject to any indictment or any government investigation for bribery. Except for those disclosed in Section 14 of the Xiaodu Disclosure Schedule, none of the beneficial owners of any Equity Securities or other interest in any Xiaodu Group Company or the current or former Xiaodu Representatives of any Xiaodu Group Company are or were Public Officials.

15.    Independent Business; Title; Properties.

(i)    Independent Business. Xiaodu is an independent business and has the resources at the Closing to operate its business after the Closing in such a manner that is consistent with its business operations before the Closing. The Xiaodu Group Companies shall be able to continuously own after the Closing all data, software, access, system, hardware and all other relevant assets that are currently used by such Xiaodu Group Companies in its ordinary course of business, except as otherwise disclosed in Section 15(i) of the Xiaodu Disclosure Schedule.

(ii)    Title; Personal Property. Each Xiaodu Group Company has good and valid title to all of its respective assets, whether tangible or intangible (including those reflected in the balance sheet, together with all assets acquired thereby since the Xiaodu Statement Date, but excluding those that have been disposed of since the Xiaodu Statement Date), in each case free and clear of all Liens, other than Permitted Liens. The foregoing assets collectively represent in all material respects all assets (including all rights and properties) necessary for the conduct of the business of each Xiaodu Group Company as presently conducted. Except for leased or licensed assets, no Person other than a Xiaodu Group Company owns any interest in any such assets. Except for those disclosed in Section 15(ii) of the Xiaodu Disclosure Schedule, all leases of real or personal property to which a Xiaodu Group Company is a party are fully effective and afford the Xiaodu Group Company valid leasehold possession of the real or personal property that is the subject of the lease.

(iii)    Real Property. No Xiaodu Group Company owns or has legal or equitable title or other right or interest in any real property other than as held pursuant to Xiaodu Leases. Section 15(iii) of the Xiaodu Disclosure Schedule sets forth each leasehold interest involving payment of rental of no less than RMB150,000 per year pursuant to which any Xiaodu Group Company holds any real property (a "Xiaodu Lease"), indicating the parties to such Xiaodu Lease, the address of the property demised under the Xiaodu Lease, the rent payable under the Xiaodu Lease and the term of the Xiaodu Lease. The particulars of the Xiaodu Leases as set forth in Section 15(iii) of the Xiaodu Disclosure Schedule are true and complete. To the Knowledge of Xiaodu, the lessor under each Xiaodu Lease is qualified and has obtained all Consents necessary to enter into such Xiaodu Lease. Except for those disclosed in Section 15(iii) of the Xiaodu Disclosure Schedule, each Xiaodu Lease is in compliance in all material respects with applicable Laws, including with respect to the ownership and operation of property and conduct of business as now conducted by the applicable Xiaodu Group Company which is a party to such Xiaodu Lease.

S-3-12

(iv)   Third Party Assets. Section 15(iv) of the Xiaodu Disclosure Schedule sets out a list of such data, software, access, system, hardware and all other relevant assets that are currently used by the Xiaodu Group Companies but not owned by the Xiaodu Group Companies (the "Third Party Assets") as well as any fees payable by the Xiaodu Group Companies for using such Third Party Assets.

16.   Related Party Transactions. Except for those disclosed in Section 16 of the Xiaodu Disclosure Schedule, (i) to the Knowledge of Xiaodu, no Xiaodu Related Party has any Contract, understanding, or proposed transaction with, or is indebted to, any Xiaodu Group Company or has any direct or indirect interest in any Xiaodu Group Company other than as set forth in Sections 2(i)-(iv) of the Xiaodu Disclosure Schedule, nor is any Xiaodu Group Company indebted (or committed to make loans or extend or guarantee credit) to any Xiaodu Related Party (other than for accrued salaries, for the current pay period, reimbursable expenses or other standard employee benefits); (ii) to the Knowledge of Xiaodu, no Xiaodu Related Party has any direct or indirect interest in any Person with which a Xiaodu Group Company is affiliated or with which a Xiaodu Group Company has a material business relationship (including any Person which purchases from or sells, licenses or furnishes to a Xiaodu Group Company any goods, intellectual or other property rights or services), or in any Contract to which a Xiaodu Group Company is a party or by which it may be bound or affected, and no Xiaodu Related Party directly or indirectly competes with, or has any interest in any Person that directly or indirectly competes with, any Xiaodu Group Company (other than ownership of less than one percent (1%) of the stock of publicly traded companies).

17.   Intellectual Property Rights.

(i)   Xiaodu IP. Except as disclosed in Section 17(i) of the Xiaodu Disclosure Schedule, each Xiaodu Group Company owns or otherwise has sufficient rights (including but not limited to the rights of development, maintenance, licensing and sale) to all Intellectual Property necessary and sufficient to conduct its business as currently conducted by such Xiaodu Group Company ("Xiaodu IP") without any conflict with or infringement of the rights of any other Person. Section 17(i) of the Xiaodu Disclosure Schedule sets forth a complete and accurate list of all Xiaodu Registered IP for each Xiaodu Group Company, including for each the relevant name or description, registration/certification or application number, and filing, registration or issue date.

(ii)   IP Ownership. Except for those disclosed in Section 17(ii) of the Xiaodu Disclosure Schedule, all Xiaodu Registered IP is owned by and registered or applied for in the name of a Xiaodu Group Company, is valid and subsisting and has not been abandoned, and all necessary registration, maintenance and renewal fees with respect thereto and currently due have been satisfied. No Xiaodu Group Company or any of its employees, officers or directors has taken any actions or failed to take any actions that would cause any Xiaodu Owned IP to be invalid, unenforceable or not subsisting. No Xiaodu Group Company has entered into any agreement with a Governmental Entity or a university, college, other educational institution, start-up incubator or entities with similar nature, or research center which would grant such entities a legal basis to claim the interests or ownership in and to any Xiaodu Owned IP. No material Xiaodu Owned IP is the subject of any Lien, license or other Contract granting rights therein to any other Person. No Xiaodu Group Company is or has been a member or promoter of, or contributor to, any industry standards bodies, patent pooling organizations or similar organizations that could require or obligate a Xiaodu Group Company to grant or offer to any Person any license or right to any material Xiaodu Owned IP. Except for those disclosed in Section 17(ii) of the Xiaodu Disclosure Schedule, no Xiaodu Owned IP is subject to any proceeding or outstanding Governmental Order or settlement agreement or stipulation that (a) restricts in any manner the use, transfer or licensing thereof, or the making, using, sale, or offering for sale of any Xiaodu Group Company's products or services, by any Xiaodu Group Company, or (b) may affect the validity, use or enforceability of such Xiaodu Owned IP. No Xiaodu Group Company has (a) transferred or assigned any material Xiaodu IP; (b) authorized the joint ownership of, any material Xiaodu IP; or (c) permitted the rights of any Xiaodu Group Company in any material Xiaodu IP to lapse or enter the public domain.

S-3-13

(iii)    <u>Infringement, Misappropriation and Claims</u>. To the Knowledge of Xiaodu, except as disclosed in <u>Section 17(iii)</u> of the Xiaodu Disclosure Schedule, no Xiaodu Group Company has violated, infringed or misappropriated in any material respect any Intellectual Property of any other Person, nor has any Xiaodu Group Company received any written notice alleging any of the foregoing. To the Knowledge of Xiaodu, except as disclosed in <u>Section 17(iii)</u> of the Xiaodu Disclosure Schedule, no Person has violated, infringed or misappropriated any material Xiaodu IP of any Xiaodu Group Company, and no Xiaodu Group Company has given any written notice to any other Person alleging any of the foregoing. Except as disclosed in <u>Section 17(iii)</u> of the Xiaodu Disclosure Schedule, no Person has challenged the ownership or use of any material Xiaodu IP by a Xiaodu Group Company. Except as disclosed in <u>Section 17(iii)</u> of the Xiaodu Disclosure Schedule, no Xiaodu Group Company has agreed to indemnify any Person for any infringement, violation or misappropriation of any Intellectual Property by such Person.

(iv)    <u>Assignments and Prior IP</u>. To the Knowledge of Xiaodu, except as disclosed in <u>Section 17(iv)</u> of the Xiaodu Disclosure Schedule, all employees, contractors, agents and consultants of a Xiaodu Group Company who are or were specifically employed or engaged in the creation of any Intellectual Property for such Xiaodu Group Company as well as all directors of each Xiaodu Group Company have executed an assignment of inventions agreement that vests in a Xiaodu Group Company exclusive ownership of all right, title and interest in and to such Intellectual Property, to the extent not already provided by Law. All employee inventors of Xiaodu Owned IP have received reasonable reward and remuneration from a Xiaodu Group Company for his/her service inventions or service technology achievements in accordance with the applicable Laws of the PRC. To the Knowledge of Xiaodu and except for those disclosed in <u>Section 17(iv)</u> of the Xiaodu Disclosure Schedule, it will not be necessary to utilize any Intellectual Property of any such Persons made prior to their employment by a Xiaodu Group Company, except for those that are exclusively owned by a Xiaodu Group Company, and none of such Intellectual Property has been utilized by any Xiaodu Group Company. To the Knowledge of Xiaodu, none of the employees, consultants or independent contractors, currently or previously employed or otherwise engaged by any Xiaodu Group Company, (a) is in violation of any current or prior confidentiality, non-competition or non-solicitation obligations to such Xiaodu Group Company or to any other Persons (including but not limited to former employers, if any), or (b) is obligated under any Contract, or subject to any Governmental Order, that would interfere with the use of his or her best efforts to promote the interests of the Xiaodu Group Companies or that would conflict with the business of such Xiaodu Group Company as presently conducted.

<div align="center">S-3-14</div>

(v)    Protection of IP. Each Xiaodu Group Company has taken reasonable and appropriate steps to protect, maintain and safeguard material Xiaodu IP and made all applicable filings, registrations and payments of fees in connection with the foregoing. To the extent that any Xiaodu IP has been developed or created independently or jointly by an independent contractor or other third party entrusted by any Xiaodu Group Company, such Xiaodu Group Company has a written agreement with such independent contractor or third party and has thereby obtained ownership of, and is the exclusive owner of all such independent contractor's or third party's Intellectual Property in such work, material or invention by operation of law or valid assignment.

18.    Labor and Employment Matters.

(i)    Except for those disclosed in Section 18(i) of the Xiaodu Disclosure Schedule, each Xiaodu Group Company has complied in all material respects with all applicable Laws related to labor or employment, including provisions thereof relating to wages, hours, working conditions, benefits, retirement, social welfare, equal opportunity and collective bargaining. To the Knowledge of Xiaodu, there is not pending or to the Knowledge of Xiaodu threatened, and there has not been since the incorporation of each Xiaodu Group Company, any Action relating to the violation or alleged violation of any applicable Laws by such Xiaodu Group Company related to labor or employment, including any charge or complaint filed by an employee with any Governmental Entity or any Xiaodu Group Company.

(ii)    Except for those disclosed in Section 18(ii) of the Xiaodu Disclosure Schedule, no Liability has been or is expected to be incurred by any Xiaodu Group Companies under or pursuant to any applicable Laws relating to any Benefit Plan or individual employment compensation agreement, and, to the Knowledge of Xiaodu, no event, transaction or condition has occurred or exists that would result in any such Liability to any Xiaodu Group Companies. Each of the Benefit Plans listed in Section 18(ii) of the Xiaodu Disclosure Schedule is and has at all times been in compliance in material respects with all applicable Laws (including without limitation, SAFE Rules and Regulations, if applicable), and all contributions to, and payments for each such Benefit Plan have been timely made. There are no pending or, to the Knowledge of Xiaodu, threatened Actions involving any Benefit Plan listed in Section 18(ii) of the Xiaodu Disclosure Schedule (except for claims for benefits payable in the normal operation of any Benefit Plan). Each Xiaodu Group Company maintains, and has fully funded, each Benefit Plan and any other labor-related plans if it is required by Law or by Contract to maintain and fully fund such Benefit Plan or other labor-related plan. Except for those disclosed in Section 18(ii) of the Xiaodu Disclosure Schedule, each Xiaodu Group Company is in compliance in all material respects with all Laws and Contracts relating to its provision of any form of social insurance, and has paid, or made provision for the payment of, all social insurance contributions required under applicable Laws and Contracts.

(iii)    There has not been, and there is not now pending or, to the Knowledge of Xiaodu, threatened, any strike, union organization activity, lockout, slowdown, picketing, or work stoppage or any unfair labor practice charge against any Xiaodu Group Company. No Xiaodu Group Companies is bound by or subject to (and none of their assets or properties is bound by or subject to) any written or oral Contract, commitment or arrangement with any labor union or any collective bargaining agreements.

(iv)    Section 18(iv) of the Xiaodu Disclosure Schedule sets forth the names and titles of all of the Xiaodu Key Employees as of the date hereof. Each Xiaodu Key Employee is currently devoting all of his or her business time to the conduct of the business of the applicable Xiaodu Group Company. No Xiaodu Key Employee is subject to any covenant restricting him/her from working for any Xiaodu Group Company. No Xiaodu Key Employee, is prohibited by any Contract or any Governmental Order from being employed by, or contracting with, such Xiaodu Group Company. No Xiaodu Group Company has received any notice alleging that any such violation has occurred. No Xiaodu Key Employee is currently working or, to the Knowledge of Xiaodu, plans to work for any other Person that competes with any Xiaodu Group Company, whether or not such individual is or will be compensated by such Person. No Xiaodu Key Employee or any group of employees of any Xiaodu Group Company has given any notice of an intent to terminate their employment with any Xiaodu Group Company, nor does any Xiaodu Group Company have a present intention to terminate the employment of any Xiaodu Key Employee or any group of employees.

19.    Insolvency. There has not been commenced against any Xiaodu Group Company an involuntary case under any applicable national, provincial, city, local or foreign bankruptcy, insolvency, receivership or similar laws now or hereafter in effect, or any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such person or for any substantial part of its property or for the winding up or liquidation of its affairs.

20.    Internal Controls. Each Xiaodu Group Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions by it are executed in accordance with management's general or specific authorization, (ii) transactions by it are recorded as necessary to permit preparation of financial statements in conformity with the Accounting Standards and to maintain asset accountability, (iii) access to assets of it is permitted only in accordance with management's general or specific authorization, (iv) the recorded inventory of assets is compared with the existing tangible assets at reasonable intervals and appropriate action is taken with respect to any material differences, (v) segregating duties for cash deposits, cash reconciliation, cash payment, proper approval is established, and (vi) no personal assets or bank accounts of the employees, directors, officers are mingled with the corporate assets or corporate bank account, and no Xiaodu Group Company uses any personal bank accounts of any employees, directors, officers thereof during the operation of the business.

21.    Insurance. Expect as for those disclosed in Section 21 of the Xiaodu Disclosure Schedule, none of any Xiaodu Group Company purchases or maintains any insurance or bond with respect to its operation of the business.

22.    Provision of Contracts Containing Restrictive Provisions. To the Knowledge of Xiaodu, Xiaodu has provided Rajax with all of the Contracts to which any Xiaodu Group Company is a party containing any Restrictive Provision.

S-3-16

Schedule 3A

Warranties of Baidu HK

Baidu HK warrants to Rajax and Rajax Merger Sub that (i) each warranty set out in this Schedule 3A, and (ii) to the Knowledge of Baidu HK, each warranty set out in Sections 1 to 4, 7 and 9 of Schedule 3, is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

1.  Organization and Good Standing. Baidu HK is a company duly organized, validly existing and in good standing (or equivalent status in the relevant jurisdiction) under the Laws of the jurisdiction of its incorporation or formation.

2.  Authorization. Baidu HK has all requisite power and authority to execute and deliver the Transaction Agreements to which it is a party and to carry out and perform its obligations thereunder. All action on the part of Baidu HK necessary for the authorization, execution and delivery of the Transaction Agreements to which it is a party, and the performance of all obligations of Baidu HK thereunder, has been taken or will be taken prior to the Closing. Each Transaction Agreement to which Baidu HK is a party has been, or will be on or prior to the Closing, duly executed and delivered by Baidu HK, enforceable against Baidu HK in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and for (iii) where applicable, the recognition and enforcement of arbitral awards being subject to relevant Laws.

4.  Actions. To Baidu HK's Knowledge, except for those disclosed in Section 11 of the Xiaodu Disclosure Schedule, there is no Action pending adversely affecting any Xiaodu Group Company with respect to its businesses and there is no judgment or award unsatisfied against any Xiaodu Group Company, nor is there any Governmental Order in effect and binding on any Xiaodu Group Company or their respective assets or properties. There is no Action pending by any Xiaodu Group Company against any third party nor does any Xiaodu Group Company intend to commence any such Action. No Governmental Entity has at any time challenged or questioned in writing the legal right of any Xiaodu Group Company to conduct its business as presently being conducted.

5.  Holding Company Status. Neither Xiaodu and Xiaodu HK Subsidiary has traded or incurred any liabilities or commitments (actual or contingent, present or future).

6.  Independent Business; Title; Properties.

    (i)  Independent Business. Xiaodu is an independent business and, to the Knowledge of Baidu HK, has the resources at the Closing to operate its business after the Closing in such a manner that is consistent with its business operations before the Closing. To the Knowledge of Baidu HK, the Xiaodu Group Companies shall be able to continuously own after the Closing all data, software, access, system, hardware and all other relevant assets that are currently used by such Xiaodu Group Companies in its ordinary course of business, except as otherwise disclosed in the Xiaodu Disclosure Schedule.

S-3A-1

    (ii)   <u>Third Party Assets</u>. <u>Section 15(iv)</u> of the Xiaodu Disclosure Schedule sets out a list of Xiaodu's Third Party Assets as well as any fees payable by the Xiaodu Group Companies for using such Third Party Assets.

    7.  <u>Conduct of Business and Compliance with Laws and Regulations</u>. To the Knowledge of Baidu HK, each Xiaodu Group Company has full corporate power and authority under its constitutional documents and applicable laws and regulations to own its properties and conduct its business, and conducts its business in accordance with applicable Laws, except for instances of non-compliance that would not have a Xiaodu Material Adverse Effect.

<div align="center">S-3A-2</div>

Schedule 4

Warranties of Rajax

Except as set forth in the section of the disclosure schedule delivered to Baidu HK by Rajax on the date hereof (the "Rajax Disclosure Schedule"), attached as Schedule 6 hereto, that specifically relates to a specified section or subsection of this Schedule 4, or any other section or subsection of this Agreement to the extent that it is reasonably apparent that such information is relevant to such other section or subsection, Rajax warrants to Xiaodu and Baidu HK that each warranty set out in Schedule 4 is true, accurate and not misleading as at the date of this Agreement and as at Closing as if repeated immediately before Closing (with references to the date of this Agreement being substituted by references to the Closing Date) by reference to the facts and circumstances then existing.

1.   Organization, Good Standing and Qualification. Each Rajax Group Company is duly organized, validly existing and in good standing (or equivalent status in the relevant jurisdiction) under, and by virtue of, the Laws of the place of its incorporation or establishment and has all requisite power and authority to own its properties and assets and to carry on its business as now conducted and as proposed to be conducted, and to perform each of its obligations under each of the Transaction Agreements, the Rajax Control Documents and the Rajax Supplemental Control Documents to which it is a party. Except as set forth in Section 1 of the Rajax Disclosure Schedule, each Rajax Group Company is qualified to do business in the manner presently conducted and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction where failure to be so qualified would be a Rajax Material Adverse Effect. Except as disclosed in Section 1 of the Rajax Disclosure Schedule, each Rajax Group Company that is a PRC entity has a valid business license issued by the SAIC or its local branch or other relevant Governmental Entities, and has, since its establishment, carried on its business in compliance with the business scope set forth in its business license.

2.   Capitalization and Voting Rights.

(i)   Rajax. Immediately prior to the Closing, the authorized share capital of Rajax shall be US$500,000 divided into (a) a total of 26,962,943,820 authorized ordinary shares, 591,311,917 of which are issued and outstanding, 856,132,057 of which have been reserved for issuance pursuant to the Rajax Share Incentive Plans, 1,033,558,41 of which have been reserved for issuance in respect of outstanding restricted share units and 13,037,056,180 of which have been reserved for issuance upon conversion of the preferred shares; (b) a total of 13,037,056,180 authorized preferred shares, 449,999,920 of which are designated as Series A preferred shares, all of which are issued and outstanding; 350,000,000 of which are designated as Series B preferred shares, all of which are issued and outstanding; 555,555,520 of which are designated as Series C preferred shares, all of which are issued and outstanding; 592,074,960 of which are designated as Series D preferred shares, all of which are issued and outstanding; 1,833,333,278 of which are designated as Series E preferred shares, all of which are issued and outstanding; 1,528,943,088 of which are designated as Series F preferred shares, all of which are issued and outstanding; 2,974,476,361 of which are designated as Series F-1 preferred shares; all of which are issued and outstanding; 1,865,592,383 of which are designated as Series G preferred shares; 782,937,131 of which are issued and outstanding, 2,887,080,670 of which are designated as Series G-1 preferred shares, none of which are issued and outstanding immediately prior to the Closing. Section 2(i) of the Rajax Disclosure Schedule set forth the capitalization table of each Rajax Group Company (other than Rajax) as of immediately prior to the Closing and immediately after the Closing, in each case reflecting all then outstanding and authorized Equity Securities of such Rajax Group Company, the record and beneficial holders thereof, the issuance date, and the terms of any vesting applicable thereto. Schedule 10 of this Agreement sets forth the capitalization table of Rajax immediately before the Closing.

S-4-1

(ii)   Rajax HK Subsidiary. The authorized share capital of the Rajax HK Subsidiary is, as of the date of this Agreement, HK$1,000, divided into 10,000,000 shares of HK$0.0000999 each, all of which will be issued and outstanding and held by Rajax.

(iii)   Rajax WFOE. The registered capital of the Rajax WFOE is set forth opposite its name on Section 2(iii) of the Rajax Disclosure Schedule, together with an accurate list of the record and beneficial owners of such registered capital.

(iv)   Rajax WFOE Subsidiary. The registered capital of the Rajax WFOE Subsidiary is set forth opposite its name on Section 2(iv) of the Rajax Disclosure Schedule, together with an accurate list of the record and beneficial owners of such registered capital.

(v)   Rajax Domestic Company. The registered capital of the Rajax Domestic Company is set forth opposite its name on Section 2(v) of the Rajax Disclosure Schedule, together with an accurate list of the record and SAIC registered owners of such registered capital.

(vi)   No Other Securities. Except as set forth in Sections 2(i)-(vii) of the Rajax Disclosure Schedule and for (a) the conversion privileges of the preferred shares, (b) certain rights provided in the Charter Documents of Rajax as currently in effect, and (c) certain rights provided in this Agreement, the Rajax Shareholders Agreement, the Rajax ROFR Agreement, the Share Restriction Agreements (as defined in the Rajax Amended Memorandum and Articles), the Rajax Control Documents and the Rajax Supplemental Control Documents, as of the date of this Agreement and at the Closing, (1) there are no other authorized or outstanding Equity Securities of any Rajax Group Company; (2) no Equity Securities of any Rajax Group Company are subject to any preemptive rights, rights of first refusal (except to the extent provided by applicable Laws of the PRC) or other rights to purchase such Equity Securities or any other rights with respect to such Equity Securities, and (3) no Rajax Group Company is a party or subject to any Contract that affects or relates to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, any Equity Security of such Rajax Group Company. Except as set forth in the Rajax Shareholders Agreement, Rajax has not granted any registration rights or information rights to any other Person (except to the extent provided by applicable Laws of the PRC), nor is Rajax obliged to list any of the Equity Securities of any Rajax Group Companies on any securities exchange. Other than the Rajax Share Incentive Plans, no Rajax Group Company is bound by any equity incentive plan.

(vii)   Issuance and Status. All presently outstanding Equity Securities of each Rajax Group Company were duly and validly issued (or subscribed for) in compliance with all applicable Laws, preemptive rights of any Person, and applicable Contracts. Except for those disclosed in Section 2(vii) of the Rajax Disclosure Schedule, all share capital or registered capital, as the case may be, of each Rajax Group Company have been duly and validly issued, are fully paid (or subscribed for) and non-assessable, and are and as of the Closing shall be free of any and all Liens (except for any restrictions on transfer under the Rajax Control Documents, the Rajax Shareholders Agreement, the Rajax ROFR Agreement, the Charter Documents of Rajax and applicable Laws). Except as contemplated under the Transaction Agreements, the Rajax Control Documents, the Rajax Supplemental Control Documents and as set forth in Section 2(vii) of the Rajax Disclosure Schedule, there are no (a) resolutions pending to increase the share capital or registered capital of any Rajax Group Company or cause the liquidation, winding up, or dissolution of any Rajax Group Company, nor has any distress, execution or other process been levied against any Rajax Group Company, (b) dividends which have accrued or been declared but are unpaid by any Rajax Group Company, (c) obligations, contingent or otherwise, of any Rajax Group Company to repurchase, redeem, or otherwise acquire any Equity Securities, or (d) outstanding or authorized equity appreciation, phantom equity, equity plans or similar rights with respect to any Rajax Group Company.

(viii)   Title. Except disclosed Section 2(viii) of the Rajax Disclosure Schedule, the shares held by the Rajax Principal HoldCos in Rajax are free and clear of all Liens of any kind other than those arising under applicable Law or as set forth in the Transaction Agreements, Rajax Control Documents, the Rajax Supplemental Control Documents or the Charter Documents of Rajax.

3.   Corporate Structure; Subsidiaries. Section 3 of the Rajax Disclosure Schedule sets forth a complete structure chart showing the Rajax Group Companies, and indicating the ownership and control relationships among all Rajax Group Companies, the nature of the legal entity which each Rajax Group Company constitutes, the jurisdiction in which each Rajax Group Company is organized, and each jurisdiction in which each Rajax Group Company is required to be qualified or licensed to do business as a foreign Person. No Rajax Group Company owns or controls, or has ever owned or controlled, directly or indirectly, any Equity Security, interest or share in any other Person or is or was a participant in any joint venture, partnership or similar arrangement. No Rajax Group Company is obligated to make any investment in or capital contribution in or on behalf of any other Person. Rajax was formed solely to acquire and hold the equity interests in the Rajax HK Subsidiary and the Rajax HK Subsidiary was formed solely to acquire and hold the equity interests in the Rajax WFOE. Except for those disclosed in Section 3 of the Rajax Disclosure Schedule, neither Rajax nor the Rajax HK Subsidiary has engaged in any other business and has not incurred any Liability since its formation. Each of the Rajax WFOE, the Rajax WFOE Subsidiary and the Rajax Domestic Company is engaged in the business as set forth in the Recitals and has no other business. Except for those disclosed in Section 3 of the Rajax Disclosure Schedule, no Rajax Principal and no Person owned or controlled by any Rajax Principal (other than a Rajax Group Company), is engaged in the Business or has any assets in relation to the Business or any Contract with any Rajax Group Company. All the historical changes to the share capital of each of the Rajax Group Companies and historical transfers of equity interest in each of the Rajax Group Companies were made in compliance with the applicable Laws and applicable Contracts, and there are no outstanding Liabilities in connection with such historical changes or historical transfers. Except for the Rajax Principal HoldCos, the Rajax Group Companies or otherwise as disclosed in Section 3 of the Rajax Disclosure Schedule, none of the Rajax Principals owns, directly or indirectly, legally or beneficially, any equity or other ownership interest in any Person (excluding companies whose shares are publicly traded on a recognized securities exchange).

4.   Authorization. Except as otherwise disclosed in Section 4 of the Rajax Disclosure Schedule, each of Rajax and Rajax Merger Sub has all requisite power and authority to execute and deliver the Transaction Agreements to which it is a party and to carry out and perform its obligations thereunder. The authorization, issuance (or reservation for issuance), sale and delivery of the Rajax G-1 Shares has been taken or will be taken prior to the Closing. Each of Transaction Agreements has been, or will be on or prior to the Closing, duly executed and delivered by each of Rajax and Rajax Merger Sub and constitutes valid and legally binding obligations of such party, enforceable against such party in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies; and (iii) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws.

5.  <u>Valid Issuance of Shares</u>. The Rajax G-1 Shares to be issued hereunder, when issued, delivered and paid for in accordance with the terms of this Agreement, for the consideration expressed herein, will be duly and validly issued, fully paid and non-assessable, free from any Liens (except for any restrictions on transfer under applicable Laws and under the Rajax Shareholders Agreement, the Rajax ROFR Agreement, and the Charter Documents of Rajax. The issuance of the Rajax G-1 Shares hereunder is not subject to any preemptive rights, rights of first refusal or similar rights, or such rights have been duly waived.

6.  <u>SAFE Rules and Regulations; Consents; No Conflicts</u>. Except for those disclosed in <u>Section 6</u> of the Rajax Disclosure Schedule, all SAFE Rules and Regulations have been fully complied with and all requisite approvals or registration certificates required under the SAFE Rules and Regulations in relation thereto have been duly and lawfully obtained and are in full force and effect, and to the Knowledge of Rajax, there exist no grounds on which any such approval or registration certificate may be cancelled or revoked or the Rajax Domestic Company, the Rajax WFOE, the Rajax WFOE Subsidiary or their respective legal representative may be subject to liability or penalties for misrepresentations or failures to disclose information to the issuing SAFE. Rajax has never received any oral or written inquiries, notifications, orders or any other forms of official correspondence from SAFE with respect to any actual or alleged non-compliance with the SAFE Rules and Regulations. Except as set forth in <u>Section 6</u> of the Rajax Disclosure Schedule, all Consents from or with any Governmental Entity or any other Person required in connection with the valid execution, delivery and performance of the Transaction Agreements, and the consummation of the transactions contemplated by the Transaction Agreements have been duly obtained or completed (as applicable) and are in full force and effect. Except as set forth in <u>Section 6</u> of the Rajax Disclosure Schedule, the execution, delivery and performance of each Transaction Agreement by each of Rajax and Rajax Merger Sub do not, and the consummation by such party of the transactions contemplated thereby will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any Consent under, or give any Person rights of termination, amendment, acceleration or cancellation under, with or without the passage of time or the giving of notice, any Governmental Order, any provision of the Charter Documents of any Rajax Group Company, any applicable Laws (including without limitation, Order No. 10 and the SAFE Rules and Regulations), or any Rajax Material Contract, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, any Rajax Group Company (including without limitation, any Indebtedness of such Rajax Group Company), or (iii) result in the creation of any Lien upon any of the material properties or assets of any Rajax Group Company other than Permitted Liens.

S-4-4

7.   <u>Offering</u>. Subject in part to the accuracy of Baidu HK's representations set forth in <u>Schedule 3</u> of this Agreement, the offer, sale and issuance of the Rajax G-1 Shares to applicable Approved Xiaodu Shareholders are exempt from the qualification, registration and prospectus delivery requirements of the Securities Act and any other applicable securities Laws.

8.   <u>Compliance with Laws; Consents</u>.

(i)   Except as disclosed in the <u>Section 8(i)</u> of the Rajax Disclosure Schedule, each Rajax Group Company is in compliance in all material respects with all applicable Laws. The business of each Rajax Group Company as now conducted and as presently planned to be conducted are in compliance in all material respects with all applicable Laws. No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a material violation by any Rajax Group Company of, or a failure on the part of such entity to comply with, any applicable Laws, in any material respect, or (b) may give rise to any material obligation on the part of any Rajax Group Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature. None of the Rajax Group Companies has received any notice from any Governmental Entity regarding any of the foregoing. To the Knowledge of Rajax, no Rajax Group Company is under investigation with respect to a material violation of any Law.

(ii)   Except as set forth in <u>Section 8(ii)</u> of the Rajax Disclosure Schedule, all Consents from or with the relevant Governmental Entity required in respect of the due and proper establishment and operations of each Rajax Group Company as now conducted (collectively, the "<u>Rajax Required Governmental Consents</u>"), have been duly obtained or completed in accordance with all applicable Laws. Without limiting the generality of the foregoing, each store that has commenced operations at any time prior to the Closing has duly obtained both the Business License (营业执照) and the Food Operation License (食品经营许可证) from the relevant Governmental Entities and has completed its respective environmental assessment (if applicable).

(iii)   Except as set forth in the Rajax Disclosure Schedule, no Rajax Required Governmental Consent contains any materially burdensome restrictions or conditions, and each Rajax Required Governmental Consent is in full force and effect and will remain in full force and effect upon the consummation of the transactions contemplated hereby. None of the Rajax Group Companies is in material default under any Rajax Required Governmental Consent. To the Knowledge of Rajax, there is no reason to believe that any Rajax Required Governmental Consent which is subject to periodic renewal will not be granted or renewed. No Rajax Group Company has received any letter or other written communication from any Governmental Entity threatening or providing notice of revocation of any Rajax Required Governmental Consent issued to any Rajax Group Company or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by any Rajax Group Company.

9.   <u>Tax Matters</u>. Except as disclosed in the applicable subsection of <u>Section 9</u> of the Rajax Disclosure Schedule:

(i)   All Tax Returns required to be filed on or prior to the date hereof with respect to each Rajax Group Company have been duly and timely filed (taking into account any extension of time to file granted or obtained) by such Rajax Group Company in accordance with the applicable Laws and all such Tax Returns are true, correct and complete and were prepared in compliance with all applicable Laws. To the Knowledge of Rajax, each Rajax Group Company has paid in full all Taxes (whether or not shown on any Tax Return) required to be paid by it, except such Taxes, if any, as are being contested in good faith and as to which adequate reserve (determined in accordance with the Accounting Standards) have been provided in the Rajax Financial Statements. No deficiencies for any Taxes with respect to any Tax Returns have been asserted in writing by, and no notice of any pending action with respect to such Tax Returns has been received from, any Tax authority, and no dispute relating to any Tax Returns with any such Tax authority is outstanding or contemplated. To the Knowledge of Rajax, each Rajax Group Company has paid all Taxes owed by it which are due and payable (whether or not shown on any Tax Return) and withheld and timely remitted to the appropriate Governmental Entity all Taxes which it is obligated to withhold and remit from amounts owed to any employee, creditor, customer or any other Person.

S-4-5

(ii)    The provisions for Taxes in the Rajax Financial Statements fully reflect all unpaid Taxes of each Rajax Group Company (as determined in accordance with the Accounting Standards), whether or not assessed or disputed as of the date of the applicable Rajax Financial Statements. The unpaid Taxes of any Rajax Group Company (i) did not, as of the date of the applicable Rajax Financial Statements, exceed the reserve for Tax Liability (which shall not include any reserve established for deferred Taxes to reflect timing differences between book and Tax income) set forth on the face of the applicable Rajax Financial Statements (rather than in any notes thereto) and (ii) do not exceed that reserve as adjusted for the passage of time through the date of the Closing in accordance with the past custom and practice of each Rajax Group Company in filing its Tax Returns.

(iii)    No Tax audits or administrative or judicial Tax proceedings by any Governmental Entity with respect to any Rajax Group Company is currently in progress, nor has any Rajax Group Company received any written notice issued by any Governmental Entity threatening the commencement of such foregoing proceedings. No assessment of Tax has been proposed in writing against any Rajax Group Company or any of their assets or properties. No Rajax Group Company has received from any Governmental Entity (including jurisdictions where such Rajax Group Company has not filed Tax Returns) any (i) notice indicating an intent to open audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Governmental Entity against such Rajax Group Company. No Rajax Group Company is subject to any waivers or extensions of applicable statutes of limitations with respect to Taxes for any year. Except for extensions applied for and granted in the ordinary practice of the applicable jurisdiction, no Rajax Group Company currently is the beneficiary of any extension of time within which to file any Tax Return.

(iv)    No Rajax Group Company is being the subject of any examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes that has not been resolved or has received any written notices of any threatened examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes. No Rajax Group Company is responsible for the Taxes of any other Person by reason of Contract, successor Liability, operation of Law or otherwise.

S-4-6

(v)    Since the Rajax Statement Date, no Rajax Group Company has incurred any material Taxes other than in the ordinary course of business consistent with past custom and practice. No Rajax Group Company has received any written claim from any Governmental Entity in a jurisdiction where such Rajax Group Company does not file Tax Returns that such Rajax Group Company is or may be subject to taxation by that jurisdiction. No Rajax Group Company is treated as a resident for Tax purposes of, or is otherwise subject to income Tax in, or has branch, permanent establishment, agency of other taxable presence in, any jurisdiction other than the jurisdiction in which it has been established. The Rajax Group Companies have fulfilled all the material terms, requirements and criteria for the continuance of all applicable Tax incentives, Tax holidays and Tax rulings, including concessional Tax rate, Tax relief, Tax exemption, Tax refund, Tax credit, and other Tax reduction agreement or order available under any applicable Law. Each such Tax incentives, Tax holidays, Tax rulings and other Tax reduction agreement or order is expected to remain in full effect throughout the current effective period thereof after the Closing and is not subject to reduction, revocation, cancellation or any other changes (including retroactive changes) in the future, and no Rajax Group Company has received any notice to the contrary or is aware of any event that may result in repeal, cancellation, revocation, or return of such entitlements. All exemptions, reductions and rebates of material Taxes granted to any Rajax Group Company by a Governmental Entity are in full force and effect and have not been terminated. No Rajax Group Company will be required to include material amounts in income, or exclude material items of deduction, or qualification for Tax exemption, Tax holiday, Tax credit, Tax incentive or Tax refund, in any taxable period beginning after the date of the Closing as a result of (i) a change in method of accounting occurring on or prior to the date of the Closing, (ii) agreement with any Governmental Entity executed on or prior to the date of the Closing, (iii) installment sale or open transaction disposition made on or prior to the date of the Closing, or (iv) prepaid amount received on or prior to the date of the Closing. The transactions contemplated under this Agreement and the other Transaction Agreements to which any Rajax Group Company is a party are not in violation of any applicable Law regarding Tax, and will not result in any Tax exemption, Tax holiday, Tax credit, Tax incentive, Tax refund being revoked, cancelled or terminated or trigger any Tax Liability for any Rajax Group Company. There are no Liens for Taxes (other than Permitted Liens) on any assets of any Rajax Group Company.

(vi)    The Rajax Group Companies are in compliance with all applicable transfer pricing Laws in all material respects, including the execution and maintenance of contemporaneous documentation substantiating the transfer pricing practices and methodology of the Rajax Group Companies. All of the transactions between any Rajax Group Company and any other Rajax Related Party have been effected on an arm's-length basis. There are no circumstances which have caused or could cause any Governmental Entity to make any transfer pricing adjustment to the profits of any Rajax Group Company, or require any such adjustment to be made to the terms on which any such transaction is treated as taking place, and no such adjustment has been made or threatened.

(vii)    No Rajax Group Company is a party to, involved with, bound by or otherwise subject to any Tax sharing, indemnity or allocation agreement or other similar arrangement with any Person (other than a commercial agreement entered into in the ordinary course of business and the principal purpose of which is not the sharing or allocation of Taxes) with respect to Taxes nor does any Rajax Group Company owe any amount under any such agreement. No Rajax Group Company is a member of an affiliated or combined taxation group with any Person other than the other Rajax Group Companies. No Rajax Group Company has any Liability for the Taxes of any Person (other than any other Rajax Group Company) as a result of such Rajax Group Company being part of or owned by, or ceasing to be part of or owned by, an affiliated, combined, consolidated, unitary or other similar group prior to the Closing, as a transferee or successor, by Contract or otherwise.

S-4-7

(viii)   No Rajax Group Company has entered into: (a) any transaction the sole or main purpose of which was the avoidance or deferral or reduction of Tax by any Rajax Group Company or any associated Person or (b) any transaction the objective of which was the exclusion or reduction of the amount of any income, profits, gains, sales, supplies or imports made or enjoyed by any Rajax Group Company or any associated Person for any Tax purpose, or the creation or increase of the amount of any deduction, loss, allowance or credit claimed or intended to be claimed by any Rajax Group Company or any associated Person for any Tax purpose, that may be challenged, disallowed or investigated by any Governmental Entity.

(ix)   Each Rajax Group Company has complied in all material respects with all statutory provisions rules, regulations, orders and directions in respect of any value added or similar Tax on consumption, has promptly submitted accurate returns, maintains full and accurate records, and has never been subject to any material interest, forfeiture, surcharge or penalty and is not a member of a group or consolidation with any other company for the purposes of value added Tax.

(x)   No Rajax Group Company has entered into any concession, agreements (including agreements for the deferred payment of any Tax Liability) or other formal or informal arrangement with any Governmental Entity relating to the Rajax Group Companies.

(xi)   Rajax will not be required to pay any Taxes under the Laws of the PRC with respect to the transactions contemplated by this Agreement and the other Transaction Agreements.

(xii)   Rajax is treated as a corporation for U.S. federal income tax purposes. No Rajax Group Company has filed any U.S. Tax election, including any entity classification election pursuant to any applicable U.S. Treasury Regulations. No Rajax Group Company is a PFIC, CFC or a U.S. Real Property Holding Corporation. No Rajax Group Company anticipates that it will become a PFIC, CFC or a U.S. Real Property Holding Corporation in the foreseeable future. No Rajax Group Company owns a less than twenty-five percent (25%) equity interest (by value) in any other entity.

10.   <u>Charter Documents; Books and Records</u>. Each Rajax Group Company has been in compliance in all material respects with its Charter Documents, and none of the Rajax Group Companies has violated or breached any of their respective Charter Documents in any material respect. Each Rajax Group Company maintains its books of accounts and records in the usual, regular and ordinary manner, on a basis consistent with prior practice, and which permits its Rajax Financial Statements (as defined below) to be prepared in accordance with the Accounting Standards. The register of members and directors (if applicable) of each Rajax Group Company is correct, there has been no notice of any proceedings to rectify any such register, and to the Knowledge of Rajax there are no circumstances which might lead to any application for its rectification. All documents required to be filed by each Rajax Group Company with the applicable Governmental Entity in respect of the relevant jurisdiction in which the such Rajax Group Company is being incorporated have been properly made up and filed.

<div align="center">S-4-8</div>

11.    Financial Statements. Section 11 of the Rajax Disclosure Schedule sets forth the audited consolidated balance sheet, statement of income and statement of cash flows for the Rajax Group Companies as of and for the fiscal year ended December 31, 2016 (the "Rajax Statement Date") (the "Rajax Financial Statements"). Except as otherwise disclosed in Section 11 of the Rajax Disclosure Schedule, the Rajax Financial Statements (a) fairly present in all material respects the consolidated financial position, results of operations and cash flows of the Rajax Group Companies as of the dates and for the periods presented therein, and (b) were prepared in accordance with the Accounting Standards applied on a consistent basis throughout the periods presented. All of the accounts receivable owing to any of the Rajax Group Companies, including without limitation all accounts receivable set forth on the Rajax Financial Statements, constitute valid and enforceable claims and are current and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Rajax Financial Statements (which reserves are adequate). There are no material contingent or asserted claims, refusals to pay, or other rights of set-off with respect to any accounts receivable of any Rajax Group Company.

12.    Changes. Since the Rajax Statement Date, each Rajax Group Company has (i) operated its business in the ordinary course consistent with its past practice, (ii) used its reasonable best efforts to preserve its business, (iii) collected receivables and paid payables and similar obligations in the ordinary course of business consistent with past practice, and (iv) not engaged in any new line of business or entered into any agreement, transaction or activity or made any commitment except those in the ordinary course of business consistent with past practice. Except for those disclosed in Section 12 of the Rajax Disclosure Schedule or as expressly provided in the Transaction Agreements, since the Rajax Statement Date, there has not been:

(i)    any purchase, acquisition, sale, lease, disposal of or other transfer of any assets that are individually or in the aggregate material to its business, whether tangible or intangible, other than the purchase or sale of inventory in the ordinary course of business consistent with its past practice;

(ii)    any acquisition (by merger, consolidation or other combination, or acquisition of stock or assets, or otherwise) of any business or other Person or division thereof, or any sale or disposition of any business or division thereof;

(iii)    any sale, assignment, exclusive license, or transfer of any Intellectual Property of any Rajax Group Company (other than a transfer to Rajax or a wholly owned Rajax Group Company);

(iv)    any waiver, termination, cancellation, settlement or compromise of a valuable right, debt or claim;

(v)    any incurrence, creation, assumption, repayment, satisfaction, or discharge of (A) any material Lien (other than Permitted Liens) or (B) any Indebtedness or guarantee, or the making of any loan or advance (other than reasonable and normal advances to employees for bona fide expenses that are incurred in the ordinary course of business consistent with its past practice), or the making of any investment or capital contribution;

(vi)    any amendment to or termination of any Rajax Material Contract, any entering of any new Contract that would have been a Rajax Material Contract if in effect on the date hereof, or any amendment to or waiver under any Charter Document;

S-4-9

(vii)   any change in any compensation arrangement or Contract with any employee of any Rajax Group Company, or adoption of any new Benefit Plan, or made any material change in any existing Benefit Plan;

(viii)   any declaration, setting aside or payment or other distribution in respect of any Equity Securities of any Rajax Group Company, or any issuance, transfer, redemption, purchase or acquisition of any Equity Securities by any Rajax Group Company;

(ix)   any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operation or business of any Rajax Group Company;

(x)   any material change in accounting principles, methods or practices or any revaluation of any of its assets;

(xi)   except in the ordinary course of business consistent with its past practice, settlement of any claim or assessment in respect of any material Taxes, entry or change of any material Tax election, change of any method of accounting resulting in a material amount of additional Tax or filing of any material amended Tax Return;

(xii)   any commencement or settlement of any material Action;

(xiii)   any authorization, sale, issuance, transfer, pledge or other disposition of any Equity Securities of any Rajax Group Company;

(xiv)   any resignation or termination of any Rajax Key Employee or any material group of employees of any Rajax Group Company;

(xv)   any transaction with any Rajax Related Party; or

(xvi)   any agreement or commitment to do any of the things described in this Section 12.

13.   Actions. Except for those disclosed in Section 13 of the Rajax Disclosure Schedule, there is no Action pending or, to the Knowledge of Rajax, adversely affecting any Rajax Group Company or any of the Rajax Principals or any of the Rajax Principal HoldCos with respect to its businesses and there is no judgment or award unsatisfied against any Rajax Group Company, nor is there any Governmental Order in effect and binding on any Rajax Group Company or their respective assets or properties. There is no Action pending by any Rajax Group Company against any third party nor does any Rajax Group Company intend to commence any such Action. No Governmental Entity has at any time challenged or questioned in writing the legal right of any Rajax Group Company to conduct its business as presently being conducted.

14.   Liabilities. Except as disclosed in Section 14 of the Rajax Disclosure Schedule, no Rajax Group Company has any Liabilities of the type required to be disclosed on a balance sheet except for (i) Liabilities set forth in the balance sheet that have not been satisfied since the Rajax Statement Date, and (ii) current Liabilities incurred since the Rajax Statement Date in the ordinary course of business consistent with its past practices and which do not exceed US$500,000 in the aggregate. Except as disclosed in Section 14 of the Rajax Disclosure Schedule and for the Indebtedness incurred in the ordinary course of business, none of the Rajax Group Companies has any Indebtedness that it has directly or indirectly created, incurred, assumed, or guaranteed, or with respect to which the Rajax Group Company has otherwise become directly or indirectly liable. None of the Rajax Group Companies is a guarantor or indemnitor of any Liabilities of any other Person (other than a Rajax Group Company).

S-4-10

15.  <u>Commitments</u>.

(i)  Except for the Transaction Agreements, the Rajax Control Documents and the Rajax Supplemental Control Documents, <u>Section 15(i)</u> of the Rajax Disclosure Schedule contains a complete and accurate list of all Rajax Material Contracts. "<u>Rajax Material Contracts</u>" means, collectively, any Contract to which a Rajax Group Company or any of its properties or assets is bound or subject to that (a) involves obligations (contingent or otherwise) or payments in excess of RMB2,000,000 or has an unexpired term in excess of one (1) year, (b) involves Intellectual Property that is material to a Rajax Group Company (other than generally-available "off-the-shelf" shrink-wrap software licenses obtained by the Group on non-exclusive and non-negotiated terms), including without limitation, the licenses, (c) restricts the ability of a Rajax Group Company to compete or to conduct or engage in any business or activity or in any territory, (d) relates to the sale, issuance, grant, exercise, award, purchase, repurchase or redemption of any Equity Securities, (e) involves any provisions providing for exclusivity, non-compete, "change in control", "most favored nations", rights of first refusal or first negotiation or similar rights against any Rajax Group Company, or grants a power of attorney, agency or similar authority by any Rajax Group Company, (f) is with a Rajax Related Party, (g) involves Indebtedness, an extension of credit, a guaranty, deed of trust, or the grant of a Lien (other than trade credits in the ordinary course of business), (h) involves the lease, license or use of assets with an obligation of payment by any Rajax Group Company more than RMB150,000 per year, or the disposition or acquisition of a material amount of assets or of a business, (i) involves the waiver, compromise, or settlement of any material dispute, claim, litigation or arbitration, (j) involves the ownership or lease of, title to, use of, or any leasehold or other interest in, any real or personal property (except for personal property leases in the ordinary course of business and involving payments of less than RMB500,000 and real property leases in the ordinary course of business and involving rental payments of less than RMB150,000 per year), including without limitation, the Rajax Leases, (k) involves (i) the establishment, contribution to, or operation of a partnership, joint venture, alliance or similar entity, (ii) a sharing of profits or losses (including joint development and joint marketing Contracts), or (iii) any investment in, loan to or acquisition or sale of the securities, equity interests or assets of any Person which is material to the business of a Rajax Group Company, (l) is between any of the Rajax Domestic Company and another Rajax Group Company, (m) is with a Governmental Entity, state-owned enterprise, or sole-source supplier of any material product or service (other than utilities), (n) is a Benefit Plan, or a collective bargaining agreement or is with any labor union or other representatives of the employees, (o) is a brokerage or finder's agreement, or material sales agency, marketing or distributorship Contract, (p) is with the application platforms (including without limitation, the AppStore of Apple Inc. and the Android Market of Google Inc.), (q) relates to business cooperation with any shareholder of Rajax or any Affiliate of such shareholder, or (r) is otherwise material to a Rajax Group Company or is one on which a Rajax Group Company is substantially dependent.

<div align="center">S-4-11</div>

(ii)    Except for those disclosed in Section 15(ii) of the Rajax Disclosure Schedule, each Rajax Material Contract is a valid and binding agreement of the Rajax Group Company that is a party thereto, the performance of which does not and will not violate, in any material respects, any applicable Law or Governmental Order, and is in full force and effect and enforceable against the parties thereto, except (x) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (y) as may be limited by Laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies, and for (z) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws. Each Rajax Group Company has duly performed all of its obligations in all material respects under each Rajax Material Contract to the extent that such obligations to perform have accrued, and no material breach or default, alleged material breach or alleged default, or event which would (with the passage of time, notice or both) constitute a material breach or default thereunder by such Rajax Group Company or, to the Knowledge of Rajax, any other party or obligor with respect thereto, has occurred, or as a result of the execution, delivery, and performance of the Transaction Agreements will occur. No Rajax Group Company has given notice (whether or not written) that it intends to terminate a Rajax Material Contract or that any other party thereto has breached, violated or defaulted under any Rajax Material Contract. No Rajax Group Company has received any notice (whether written or not) that it has breached, violated or defaulted under any Rajax Material Contract or that any other party thereto intends to terminate such Rajax Material Contract.

16.    Anti-Bribery, Anti-Corruption, Anti-Money Laundering and Sanctions; Absence of Government Interests.

(i)    Each Rajax Group Company and their respective directors, officers, employees and other persons acting on their behalf (collectively, "Rajax Representatives") are and have been in compliance with all Compliance Laws. Furthermore, except for those disclosed in Section 16 of the Rajax Disclosure Schedule, no Public Official (x) holds an ownership or other economic interest, direct or indirect, in any of the Rajax Group Companies or in the contractual relationship formed by this Agreement, or (y) serves as an officer, director or employee of any Rajax Group Company. Without limiting the foregoing, neither any Rajax Group Company nor any Rajax Representative has, directly or indirectly, offered, promised, given, authorized or paid any money or anything of value to any Public Official or to any Person under circumstances where any Rajax Group Company or Rajax Representative knew or ought to have known that all or a portion of such money or thing of value would be offered, given, paid or promised, directly or indirectly, to a Person:

(a)    for the purpose of influencing any act or decision of a Public Official in their official capacity; inducing a Public Official to act or omit to act in violation of lawful duties; securing any improper advantage; inducing a Public Official to influence or affect any act or decision of any Governmental Entity; or assisting any Rajax Group Company or any Rajax Representative in obtaining or retaining business for or with, or directing business to, any Person; or

(b)    in a manner that would constitute a breach of any Compliance Laws.

(ii)    Each Rajax Group Company has maintained complete and accurate books and records, and no assets of any Rajax Group Company have been used for the establishment of any unlawful or unrecorded fund of monies or other assets, or for the making of any unlawful or undisclosed payment.

S-4-12

(iii)   No Rajax Group Company or any of its Rajax Representatives has ever been found by a Governmental Entity to have violated any criminal or securities Law or is subject to any indictment or any government investigation for bribery. Except for those disclosed in Section 16 of the Rajax Disclosure Schedule, none of the beneficial owners of any Equity Securities or other interest in any Rajax Group Company or the current or former Rajax Representatives of any Rajax Group Company are or were Public Officials.

17.   Title; Properties.

(i)   Title; Personal Property. Each Rajax Group Company has good and valid title to all of its respective assets, whether tangible or intangible (including those reflected in the balance sheet, together with all assets acquired thereby since the Rajax Statement Date, but excluding those that have been disposed of since the Rajax Statement Date), in each case free and clear of all Liens, other than Permitted Liens. The foregoing assets collectively represent in all material respects all assets (including all rights and properties) necessary for the conduct of the business of each Rajax Group Company as presently conducted. Except for leased or licensed assets, no Person other than a Rajax Group Company owns any interest in any such assets. Except for those disclosed in Section 17(i) of the Rajax Disclosure Schedule, all leases of real or personal property to which a Rajax Group Company is a party are fully effective and afford the Rajax Group Company valid leasehold possession of the real or personal property that is the subject of the lease.

(ii)   Real Property. No Rajax Group Company owns or has legal or equitable title or other right or interest in any real property other than as held pursuant to Rajax Leases. Section 17(ii) of the Rajax Disclosure Schedule sets forth each leasehold interest involving payment of rental of no less than RMB150,000 per year pursuant to which any Rajax Group Company holds any real property (a "Rajax Lease"), indicating the parties to such Rajax Lease, the address of the property demised under the Rajax Lease, the rent payable under the Rajax Lease and the term of the Rajax Lease. The particulars of the Rajax Leases as set forth in Section 17(ii) of the Rajax Disclosure Schedule are true and complete. To the Knowledge of Rajax, the lessor under each Rajax Lease is qualified and has obtained all Consents necessary to enter into such Rajax Lease. Except for those disclosed in Section 17(ii) of the Rajax Disclosure Schedule, each Rajax Lease is in compliance in all material respects with applicable Laws, including with respect to the ownership and operation of property and conduct of business as now conducted by the applicable Rajax Group Company which is a party to such Rajax Lease.

18.   Related Party Transactions. Except for those disclosed in Section 18 of the Rajax Disclosure Schedule, (i) no Rajax Principal or his Affiliates, nor, to the Knowledge of Rajax, any other Rajax Related Party has any Contract, understanding, or proposed transaction with, or is indebted to, any Rajax Group Company or has any direct or indirect interest in any Rajax Group Company other than as set forth in Sections 2(i)-(iv) of the Rajax Disclosure Schedule, nor is any Rajax Group Company indebted (or committed to make loans or extend or guarantee credit) to any Rajax Related Party (other than for accrued salaries, for the current pay period, reimbursable expenses or other standard employee benefits); (ii) no Rajax Principal or his Affiliates, nor, to the Knowledge of Rajax, any other Rajax Related Party has any direct or indirect interest in any Person with which a Rajax Group Company is affiliated or with which a Rajax Group Company has a material business relationship (including any Person which purchases from or sells, licenses or furnishes to a Rajax Group Company any goods, intellectual or other property rights or services), or in any Contract to which a Rajax Group Company is a party or by which it may be bound or affected, and no Rajax Related Party directly or indirectly competes with, or has any interest in any Person that directly or indirectly competes with, any Rajax Group Company (other than ownership of less than one percent (1%) of the stock of publicly traded companies). Except for those disclosed in Section 18 of the Rajax Disclosure Schedule, no Rajax Group Company has made any loans or extended any credit to any Rajax Principal, Rajax Principal HoldCo or any other officer of any Rajax Group Company, which remain outstanding as of the date hereof.

19. Intellectual Property Rights.

(i) Rajax IP. Except as disclosed in Section 19(i) of the Rajax Disclosure Schedule, each Rajax Group Company owns or otherwise has sufficient rights (including but not limited to the rights of development, maintenance, licensing and sale) to all Intellectual Property necessary and sufficient to conduct its business as currently conducted by such Rajax Group Company ("Rajax IP") without any conflict with or infringement of the rights of any other Person. Section 19(i) of the Rajax Disclosure Schedule sets forth a complete and accurate list of all Rajax Registered IP for each Rajax Group Company, including for each the relevant name or description, registration/certification or application number, and filing, registration or issue date.

(ii) IP Ownership. Except for those disclosed in Section 19(ii) of the Rajax Disclosure Schedule, all Rajax Registered IP is owned by and registered or applied for in the name of a Rajax Group Company, is valid and subsisting and has not been abandoned, and all necessary registration, maintenance and renewal fees with respect thereto and currently due have been satisfied. No Rajax Group Company or any of its employees, officers or directors has taken any actions or failed to take any actions that would cause any Rajax Owned IP to be invalid, unenforceable or not subsisting. No Rajax Group Company has entered into any agreement with a Governmental Entity or a university, college, other educational institution, start-up incubator or entities with similar nature, or research center which would grant such entities a legal basis to claim the interests or ownership in and to any Rajax Owned IP. No material Rajax Owned IP is the subject of any Lien, license or other Contract granting rights therein to any other Person. No Rajax Group Company is or has been a member or promoter of, or contributor to, any industry standards bodies, patent pooling organizations or similar organizations that could require or obligate a Rajax Group Company to grant or offer to any Person any license or right to any material Rajax Owned IP. Except for those disclosed in Section 19(ii) of the Rajax Disclosure Schedule, no Rajax Owned IP is subject to any proceeding or outstanding Governmental Order or settlement agreement or stipulation that (a) restricts in any manner the use, transfer or licensing thereof, or the making, using, sale, or offering for sale of any Rajax Group Company's products or services, by any Rajax Group Company, or (b) may affect the validity, use or enforceability of such Rajax Owned IP. Each Rajax Principal has assigned and transferred to a Rajax Group Company any and all of his Intellectual Property related to the Business. No Rajax Group Company has (a) transferred or assigned any material Rajax IP; (b) authorized the joint ownership of, any material Rajax IP; or (c) permitted the rights of any Rajax Group Company in any material Rajax IP to lapse or enter the public domain.

(iii) Infringement, Misappropriation and Claims. To the Knowledge of Rajax, except as disclosed in Section 19(iii) of the Rajax Disclosure Schedule, no Rajax Group Company has violated, infringed or misappropriated in any material respect any Intellectual Property of any other Person, nor has any Rajax Group Company received any written notice alleging any of the foregoing. To the Knowledge of Rajax, except as disclosed in Section 19(iii) of the Rajax Disclosure Schedule, no Person has violated, infringed or misappropriated any material Rajax IP of any Rajax Group Company, and no Rajax Group Company has given any written notice to any other Person alleging any of the foregoing. Except as disclosed in Section 19(iii) of the Rajax Disclosure Schedule, no Person has challenged the ownership or use of any material Rajax IP by a Rajax Group Company. Except as disclosed in Section 19(iii) of the Rajax Disclosure Schedule, no Rajax Group Company has agreed to indemnify any Person for any infringement, violation or misappropriation of any Intellectual Property by such Person.

S-4-14

(iv)    Assignments and Prior IP. All material inventions and material know-how conceived by the Rajax Principals related to the business of such Rajax Group Company are currently owned exclusively by a Rajax Group Company. Except as disclosed in Section 19(iv) of the Rajax Disclosure Schedule, all employees, contractors, agents and consultants of a Rajax Group Company who are or were specifically employed or engaged in the creation of any Intellectual Property for such Rajax Group Company as well as all directors of each Rajax Group Company have executed an assignment of inventions agreement that vests in a Rajax Group Company exclusive ownership of all right, title and interest in and to such Intellectual Property, to the extent not already provided by Law. All employee inventors of Rajax Owned IP have received reasonable reward and remuneration from a Rajax Group Company for his/her service inventions or service technology achievements in accordance with the applicable Laws of the PRC. To the Knowledge of Rajax and except for those disclosed in Section 19(iv) of the Rajax Disclosure Schedule, it will not be necessary to utilize any Intellectual Property of any such Persons made prior to their employment by a Rajax Group Company, except for those that are exclusively owned by a Rajax Group Company, and none of such Intellectual Property has been utilized by any Rajax Group Company. To the Knowledge of Rajax, none of the employees, consultants or independent contractors, currently or previously employed or otherwise engaged by any Rajax Group Company, (a) is in violation of any current or prior confidentiality, non-competition or non-solicitation obligations to such Rajax Group Company or to any other Persons (including but not limited to former employers, if any), or (b) is obligated under any Contract, or subject to any Governmental Order, that would interfere with the use of his or her best efforts to promote the interests of the Rajax Group Companies or that would conflict with the business of such Rajax Group Company as presently conducted.

(v)    Protection of IP. Each Rajax Group Company has taken reasonable and appropriate steps to protect, maintain and safeguard material Rajax IP and made all applicable filings, registrations and payments of fees in connection with the foregoing. To the extent that any Rajax IP has been developed or created independently or jointly by an independent contractor or other third party entrusted by any Rajax Group Company, such Rajax Group Company has a written agreement with such independent contractor or third party and has thereby obtained ownership of, and is the exclusive owner of all such independent contractor's or third party's Intellectual Property in such work, material or invention by operation of law or valid assignment.

20.    Labor and Employment Matters.

(i)    Except for those disclosed in Section 20(i) of the Rajax Disclosure Schedule, each Rajax Group Company has complied in all material respects with all applicable Laws related to labor or employment, including provisions thereof relating to wages, hours, working conditions, benefits, retirement, social welfare, equal opportunity and collective bargaining. There is not pending or to the Knowledge of Rajax threatened, and there has not been since the incorporation of each Rajax Group Company, any Action relating to the violation or alleged violation of any applicable Laws by such Rajax Group Company related to labor or employment, including any charge or complaint filed by an employee with any Governmental Entity or any Rajax Group Company.

S-4-15

(ii)    Except for those disclosed in Section 20(ii) of the Rajax Disclosure Schedule, no Liability has been or is expected to be incurred by any Rajax Group Companies under or pursuant to any applicable Laws relating to any Benefit Plan or individual employment compensation agreement, and, to the Knowledge of Rajax, no event, transaction or condition has occurred or exists that would result in any such Liability to any Rajax Group Companies. Each of the Benefit Plans listed in Section 20(ii) of the Rajax Disclosure Schedule is and has at all times been in compliance in material respects with all applicable Laws (including without limitation, SAFE Rules and Regulations, if applicable), and all contributions to, and payments for each such Benefit Plan have been timely made. There are no pending or, to the Knowledge of Rajax, threatened Actions involving any Benefit Plan listed in Section 20(ii) of the Rajax Disclosure Schedule (except for claims for benefits payable in the normal operation of any Benefit Plan). Each Rajax Group Company maintains, and has fully funded, each Benefit Plan and any other labor-related plans if it is required by Law or by Contract to maintain and fully fund such Benefit Plan or other labor-related plan. Except for those disclosed in Section 20(ii) of the Rajax Disclosure Schedule, each Rajax Group Company is in compliance in all material respects with all Laws and Contracts relating to its provision of any form of social insurance, and has paid, or made provision for the payment of, all social insurance contributions required under applicable Laws and Contracts.

(iii)    There has not been, and there is not now pending or, to the Knowledge of Rajax, threatened, any strike, union organization activity, lockout, slowdown, picketing, or work stoppage or any unfair labor practice charge against any Rajax Group Company. No Rajax Group Companies is bound by or subject to (and none of their assets or properties is bound by or subject to) any written or oral Contract, commitment or arrangement with any labor union or any collective bargaining agreements.

(iv)    Section 20(iv) of the Rajax Disclosure Schedule sets forth the names and titles of all of the Rajax Key Employees of Rajax as of the date hereof. Each Rajax Key Employee is currently devoting all of his or her business time to the conduct of the business of the applicable Rajax Group Company. No Rajax Principal is subject to any covenant restricting him/her from working for any Rajax Group Company, and to the Knowledge of Rajax, no Rajax Key Employee (other than the Rajax Principals) is subject to any covenant restricting him/her from working for any Rajax Group Company. No Rajax Principal is prohibited by any Contract or any Governmental Order from being employed by, or contracting with, such Rajax Group Company, and to the Knowledge of Rajax, no Rajax Key Employee (other than the Rajax Principals), is prohibited by any Contract or any Governmental Order from being employed by, or contracting with, such Rajax Group Company. No Rajax Group Company has received any notice alleging that any such violation has occurred. No Rajax Key Employee is currently working or, to the Knowledge of Rajax, plans to work for any other Person that competes with any Rajax Group Company, whether or not such individual is or will be compensated by such Person. No Rajax Key Employee or any group of employees of any Rajax Group Company has given any notice of an intent to terminate their employment with any Rajax Group Company, nor does any Rajax Group Company have a present intention to terminate the employment of any Rajax Key Employee or any group of employees.

S-4-16

21.    Internal Controls. Each Rajax Group Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions by it are executed in accordance with management's general or specific authorization, (ii) transactions by it are recorded as necessary to permit preparation of financial statements in conformity with the Accounting Standards and to maintain asset accountability, (iii) access to assets of it is permitted only in accordance with management's general or specific authorization, (iv) the recorded inventory of assets is compared with the existing tangible assets at reasonable intervals and appropriate action is taken with respect to any material differences, (v) segregating duties for cash deposits, cash reconciliation, cash payment, proper approval is established, and (vi) no personal assets or bank accounts of the employees, directors, officers are mingled with the corporate assets or corporate bank account, and no Rajax Group Company uses any personal bank accounts of any employees, directors, officers thereof during the operation of the business.

22.    Insolvency. As of the date of this Agreement, (i) the aggregate assets, at a fair valuation, of each Rajax Group Company will exceed the aggregate debt of each such entity, as the debt becomes absolute and matures; and (ii) each Rajax Group Company will not have incurred or intended to incur debt beyond its ability to pay such debt as such debt becomes absolute and matures. There has not been commenced against any Rajax Group Company an involuntary case under any applicable national, provincial, city, local or foreign bankruptcy, insolvency, receivership or similar laws now or hereafter in effect, or any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such person or for any substantial part of its property or for the winding up or liquidation of its affairs.

23.    Insurance. Expect as for those disclosed in Section 23 of the Rajax Disclosure Schedule, none of any Rajax Group Company purchases or maintains any insurance or bond with respect to its operation of the business.

<center>S-4-17</center>

Schedule 7

Required Xiaodu Approvals

(A)    An affirmative vote of shareholders representing two-thirds or more of the votes of Xiaodu Shares present and voting in person or by proxy as a single class at Xiaodu shareholders meeting by way of a special resolution, authorizing and approving this Agreement, the Merger, the Plan of Merger and the transactions contemplated hereby (the "Xiaodu Special Resolution").

(B)    A written consent signed by holders of at least eighty percent (80%) of all the issued and outstanding preferred shares of Xiaodu voting as a single class, authorizing and approving this Agreement, the Merger, the Plan of Merger and the transactions contemplated hereby (the "Xiaodu Written Consent").

S-7-1

Schedule 8

Required Rajax Approvals

(A)    A written resolutions of the sole shareholder of Rajax Merger Sub authorizing and approving this Agreement, the Merger, the Plan of Merger and the transactions contemplated hereby.

(B)    An affirmative vote by the holders of shares of Rajax representing at least fifty percent (50%) of the aggregate voting power of all the issued and outstanding preferred shares of Rajax (voting together as a single class) and by the holders of Rajax shares representing at least fifty percent (50%) of the aggregate issued and outstanding ordinary shares of Rajax held by the Rajax Principal HoldCos, authorizing and approving this Agreement, the issuance of Rajax G-1 Shares and the transactions contemplated hereby.

(C)    A written consent and waiver in accordance with its articles of association and its shareholders agreement, authorizing and approving (and waiving any pre-emptive rights where applicable and waiving the deeming of a Deemed Liquidation Event (as defined in the Rajax Amended Memorandum and Articles) as a liquidation, dissolution or winding up of Rajax) this Agreement, the issuance of Rajax G-1 Shares and the transactions contemplated hereby.

S-8-1

**EXHIBIT 8.1**

**List of Principal Subsidiaries and Consolidated Affiliated Entities**

**Subsidiaries:**

Baidu Holdings Limited — Incorporated in the British Virgin Islands

Baidu (Hong Kong) Limited — Incorporated in Hong Kong

Baidu Online Network Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu (China) Co., Ltd. — Incorporated in the PRC

Baidu.com Times Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu International Technology (Shenzhen) Co., Ltd. — Incorporated in the PRC

IQIYI Inc. — Incorporated in the Cayman Islands

Chong Qing Baidu Micro-loan Co., Ltd. — Incorporated in the PRC

Xian Chunhe Asset Management Co., Ltd. — Incorporated in the PRC

91 Wireless Websoft Limited — Incorporated in the Cayman Islands

**Consolidated Affiliated Entities:**

Beijing Baidu Netcom Science Technology Co., Ltd. — Incorporated in the PRC

Beijing Perusal Technology Co., Ltd. — Incorporated in the PRC

Beijing BaiduPay Science and Technology Co., Ltd. — Incorporated in the PRC

**EXHIBIT 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Robin Yanhong Li, certify that:

1.   I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.   The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 15, 2018

By:   /s/ Robin Yanhong Li
Name:   Robin Yanhong Li
Title:   Chief Executive Officer

**EXHIBIT 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Herman Yu, certify that:

1.  I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 15, 2018

By:    /s/ Herman Yu
Name:    Herman Yu
Title:    Chief Financial Officer

**EXHIBIT 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Yanhong Li, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2018

By:       /s/ Robin Yanhong Li
Name:   Robin Yanhong Li
Title:    Chief Executive Officer

**EXHIBIT 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2017 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Herman Yu, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2018

By:     /s/ Herman Yu
Name:   Herman Yu
Title:   Chief Financial Officer

**EXHIBIT 15.1**

[Maples and Calder (Hong Kong) LLP Letterhead]

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing 100085
The People's Republic of China

15 March 2018

Dear Sirs

**Baidu, Inc.**

We consent to the reference to our firm under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation Considerations" and "Item 16G. Corporate Governance" in Baidu Inc.'s Annual Report on Form 20-F for the year ended 31 December 2017 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2018, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-218972) of the summary of our opinion under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Taxation Considerations" and "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder (Hong Kong) LLP

Maples and Calder (Hong Kong) LLP

**EXHIBIT 15.2**

[Han Kun Law Offices Letterhead]

March 15, 2018

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing
People's Republic of China 100085

Dear Sir/Madam:

We hereby consent to the reference of our name under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in Baidu, Inc.'s Annual Report on Form 20-F for the year ended December 31, 2017 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2018, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-218972) of Baidu, Inc. of the summary of our opinion under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in the Annual Report. We also consent to the filing of this consent letter with the SEC as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ Han Kun Law Offices

Han Kun Law Offices

**EXHIBIT 15.3**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)     Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan,

(2)     Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and

(3)     Registration Statement (Form F-3 No. 333-218972) of Baidu, Inc.

of our reports dated March 15, 2018, with respect to the consolidated financial statements of Baidu, Inc. and the effectiveness of internal control over financial reporting of Baidu, Inc. included in this Annual Report (Form 20-F) of Baidu, Inc. for the year ended December 31, 2017.

/s/ Ernst & Young Hua Ming LLP

Ernst & Young Hua Ming LLP
Beijing, the People's Republic of China
March 15, 2018

Case 1:20-cv-03794-DG-TAM    Document 65-20    Filed 03/03/23    Page 315 of 315
PageID #: 5127