# Exhibit U

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

**Form 20-F**

(Mark One)

☐    REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

or

☒    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2018.**

or

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from          to**

or

☐    SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of event requiring this shell company report**

**For the transition period from _____ to _____**

**Commission file number: 000-51469**

# Baidu, Inc.
**(Exact name of Registrant as specified in its charter)**

**N/A**
**(Translation of Registrant's name into English)**

**Cayman Islands**
**(Jurisdiction of incorporation or organization)**

**Baidu Campus**
**No. 10 Shangdi 10th Street**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Address of principal executive offices)**

**Herman Yu, Chief Financial Officer**
**Telephone: +(86 10) 5992-8888**
**Email: ir@baidu.com**
**Facsimile: +(86 10) 5992-0000**
**Baidu Campus**
**No. 10 Shangdi 10th Street,**
**Haidian District, Beijing 100085**
**The People's Republic of China**
**(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
| --- | --- |
| American depositary shares (ten American depositary shares representing one Class A ordinary share, par value US$0.00005 per share) | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |
| Class A ordinary shares, par value US$0.00005 per share* | The NASDAQ Stock Market LLC (The NASDAQ Global Select Market) |

\*    Not for trading, but only in connection with the listing on The NASDAQ Global Select Market of American depositary shares.

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**
**None**
**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**
**None**
**(Title of Class)**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**27,733,692 Class A ordinary shares and 7,201,254 Class B ordinary shares, par value US$0.00005 per share, as of December 31, 2018.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically, if any, every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                    Accelerated filer ☐                    Non-accelerated filer ☐                    Emerging growth company ☐

If a an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒                    International Financial Reporting Standards as issued by the International Accounting Standards Board ☐                    Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17 ☐

Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court.   Yes ☐   No ☐

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| INTRODUCTION | | 1 |
| FORWARD-LOOKING INFORMATION | | 1 |
| PART I | | 2 |
| Item 1. | Identity of Directors, Senior Management and Advisers | 2 |
| Item 2. | Offer Statistics and Expected Timetable | 2 |
| Item 3. | Key Information | 2 |
| Item 4. | Information on the Company | 44 |
| Item 4A. | Unresolved Staff Comments | 77 |
| Item 5. | Operating and Financial Review and Prospects | 77 |
| Item 6. | Directors, Senior Management and Employees | 108 |
| Item 7. | Major Shareholders and Related Party Transactions | 118 |
| Item 8. | Financial Information | 119 |
| Item 9. | The Offer and Listing | 121 |
| Item 10. | Additional Information | 121 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | 129 |
| Item 12. | Description of Securities Other than Equity Securities | 130 |
| PART II | | 132 |
| Item 13. | Defaults, Dividend Arrearages and Delinquencies | 132 |
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 132 |
| Item 15. | Controls and Procedures | 132 |
| Item 16A. | Audit Committee Financial Expert | 133 |
| Item 16B. | Code of Ethics | 133 |
| Item 16C. | Principal Accountant Fees and Services | 133 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | 134 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 134 |
| Item 16F. | Change in Registrant's Certifying Accountant | 134 |
| Item 16G. | Corporate Governance | 134 |
| Item 16H. | Mine Safety Disclosure | 134 |
| PART III | | 135 |
| Item 17. | Financial Statements | 135 |
| Item 18. | Financial Statements | 135 |
| Item 19. | Exhibits | 135 |
| SIGNATURES | | 143 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | | F-1 |

Table of Contents

**INTRODUCTION**

In this annual report, except where the context otherwise requires and for purposes of this annual report only:

- "we," "us," "our company," "our," or "Baidu" refers to Baidu, Inc., its subsidiaries, and, in the context of describing our operations and consolidated financial information, our consolidated affiliated entities in China, including but not limited to Beijing Baidu Netcom Science Technology Co., Ltd., or Baidu Netcom;

- "user traffic" or "traffic" refers generally to page views of a website, with "page views" measuring the number of web pages viewed by internet users over a specified period of time except that multiple page views of the same page viewed by the same user on the same day are counted only once;

- "DAU" for Baidu App refers to the number of unique mobile devices that have accessed Baidu App at least once during a day; "mobile DAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a day; "mobile MAUs," for our iQIYI platform, refers to the number of unique mobile devices that have accessed our platform through our iQIYI mobile app at least once during a month.

- "China" or "PRC" refers to the People's Republic of China, and solely for the purpose of this annual report, excluding Taiwan, Hong Kong and Macau;

- "shares" or "ordinary shares" refers to our ordinary shares, which include both Class A ordinary shares and Class B ordinary shares;

- "ADSs" refers to our American depositary shares, and we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share on May 12, 2010, which has the same effect as a 10-for-1 ADS split;

- "U.S. GAAP" refers to generally accepted accounting principles in the United States;

- "RMB" or "Renminbi" refers to the legal currency of China;

- "$," "dollars," "US$" or "U.S. dollars" refers to the legal currency of the United States; and

- all discrepancies in any table between the amounts identified as total amounts and the sum of the amounts listed therein are due to rounding.

**FORWARD-LOOKING INFORMATION**

This annual report on Form 20-F contains forward-looking statements that reflect our current expectations and views of future events. These statements are made under the "safe harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. You can identify these forward-looking statements by terminology such as "may," "will," "expect," "anticipate," "future," "intend," "plan," "believe," "estimate," "is/are likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to:

- our growth strategies;

- our future business development, results of operations and financial condition;

- our ability to attract and retain users and customers and generate revenue and profit from our customers;

- our ability to retain key personnel and attract new talent;

1

Table of Contents

- competition in the internet search, online marketing and other businesses in which we engage;

- the outcome of ongoing or any future litigation, including those relating to intellectual property rights; and

- PRC governmental regulations and policies relating to the internet, internet search and online marketing and the implementation of a corporate structure involving variable interest entities in China.

We would like to caution you not to place undue reliance on these forward-looking statements and you should read these statements in conjunction with the risk factors disclosed in "Item 3D. Key Information—Risk Factors." Those risks are not exhaustive. We operate in a rapidly evolving environment. New risks emerge from time to time and it is impossible for our management to predict all risk factors, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ from those contained in any forward-looking statement. We do not undertake any obligation to update or revise the forward-looking statements except as required under applicable law.

Unless otherwise noted, all translations from Renminbi to U.S. dollars and from U.S. dollars to Renminbi in this annual report are made at a rate of RMB6.8755 to US$1.00, the exchange rate in effect as of December 31, 2018 as set forth in the H.10 statistical release of The Board of Governors of the Federal Reserve System. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, or at all.

## PART I

**Item 1.       Identity of Directors, Senior Management and Advisers**

Not applicable.

**Item 2.       Offer Statistics and Expected Timetable**

Not applicable.

**Item 3.       Key Information**

**A.       Selected Financial Data**

The following table presents the selected consolidated financial information for our company. The selected consolidated statements of comprehensive income data and cash flow data for the three years ended December 31, 2016, 2017 and 2018 and the consolidated balance sheets data as of December 31, 2017 and 2018 have been derived from our audited consolidated financial statements, which are included in this annual report beginning on page F-1. The selected consolidated statements of comprehensive income data and cash flow data for the years ended December 31, 2014 and 2015 and the selected consolidated balance sheets data as of December 31, 2014, 2015 and 2016 have been derived from our audited consolidated financial statements for the years ended December 31, 2014, 2015 and 2016, which are not included in this annual report. Our historical results do not necessarily indicate results expected for any future periods. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related notes and "Item 5. Operating and Financial Review and Prospects" below. Our audited consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

Starting from January 1, 2018, we adopted ASC Topic 606, *Revenue from contracts with Customers* ("ASC 606"), which reclassifies value added taxes, or VAT, from cost of revenues to net against revenues, among other changes. The consolidated statement of comprehensive income data for the year ended December 31, 2018 presented below have been prepared in accordance with ASC 606, while the consolidated

2

**Table of Contents**

statements of comprehensive income data for the years ended December 31, 2016 and 2017 presented below have been prepared in accordance with ASC Topic 605, *Revenue Recognition* ("ASC 605").

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014(1) | 2015(1) | 2016(1) | 2017(1) | 2018(2) | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (In millions, except per share and per ADS data) | | | | | |
| **Consolidated Statements of Comprehensive Income Data:** | | | | | | |
| Revenues: | | | | | | |
| Online marketing services | 48,495 | 64,037 | 64,525 | 73,146 | 81,912 | 11,914 |
| Others | 557 | 2,345 | 6,024 | 11,663 | 20,365 | 2,962 |
| Total revenues | 49,052 | 66,382 | 70,549 | 84,809 | 102,277 | 14,876 |
| Operating costs and expenses: | | | | | | |
| Cost of revenues | 18,885 | 27,458 | 35,278 | 43,062 | 51,744 | 7,526 |
| Selling, general and administrative | 10,382 | 17,076 | 15,071 | 13,128 | 19,231 | 2,797 |
| Research and development | 6,981 | 10,176 | 10,151 | 12,928 | 15,772 | 2,294 |
| Total operating costs and expenses | 36,248 | 54,710 | 60,500 | 69,118 | 86,747 | 12,617 |
| Operating profit | 12,804 | 11,672 | 10,049 | 15,691 | 15,530 | 2,259 |
| Total other income, net | 1,680 | 26,235 | 4,460 | 5,592 | 11,795 | 1,715 |
| Income before income taxes | 14,484 | 37,907 | 14,509 | 21,283 | 27,325 | 3,974 |
| Income taxes | 2,231 | 5,475 | 2,913 | 2,995 | 4,743 | 690 |
| Net income | 12,253 | 32,432 | 11,596 | 18,288 | 22,582 | 3,284 |
| Less: Net income (loss) attributable to non-controlling interests | (944) | (1,232) | (36) | (13) | (4,991) | (726) |
| Net income attributable to Baidu, Inc. | 13,197 | 33,664 | 11,632 | 18,301 | 27,573 | 4,010 |

(1) VAT is presented in cost of revenues rather than net against revenues in accordance with the legacy revenue accounting standard (ASC 605)

(2) VAT is presented as net against revenues rather than in cost of revenues in accordance with the new revenue accounting standard (ASC 606)

| | As of December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | (In millions) | | | | | |
| **Consolidated Balance Sheets Data:** | | | | | | |
| Cash and cash equivalents | 13,853 | 9,960 | 10,898 | 11,084 | 27,638 | 4,020 |
| Restricted cash | 413 | 96 | 318 | 252 | 2,189 | 318 |
| Short-term investments | 42,699 | 57,969 | 71,196 | 89,381 | 111,626 | 16,235 |
| Total assets | 99,118 | 147,853 | 181,997 | 251,728 | 297,566 | 43,279 |
| Short-term loans | 93 | 100 | 1,115 | 1,244 | 3,046 | 443 |
| Long-term loans, current portion | 2,167 | 975 | 3,468 | 10 | 84 | 12 |
| Long-term loans | 1,860 | 3,240 | 6,822 | 6,701 | 7,456 | 1,084 |
| Notes payable, current portion | — | — | 5,203 | 6,500 | 6,871 | 999 |
| Notes payable | 21,557 | 30,702 | 27,648 | 29,111 | 42,735 | 6,216 |
| Convertible senior notes | — | — | — | — | 4,712 | 685 |
| Total liabilities | 45,066 | 63,638 | 84,254 | 121,356 | 121,814 | 17,716 |
| Total Baidu, Inc. shareholders' equity | 51,072 | 80,256 | 92,274 | 115,346 | 162,897 | 23,693 |

Table of Contents

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | (In millions) | | | | | |
| **Consolidated Cash Flow Data:** | | | | | | |
| Net cash generated from operating activities | 17,937 | 19,771 | 22,480 | 32,828 | 35,967 | 5,231 |
| Net cash used in investing activities | (22,468) | (31,621) | (35,911) | (76,949) | (34,460) | (5,012) |
| Net cash generated from financing activities | 8,612 | 7,778 | 14,447 | 44,557 | 15,082 | 2,194 |
| Net increase (decrease) in cash and cash equivalents[1] | 4,161 | (3,893) | — | — | — | — |
| Net increase in cash, cash equivalents and restricted cash[1] | — | — | 1,160 | 120 | 18,491 | 2,689 |

(1)   We adopted Accounting Standards Update No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash* on January 1, 2018 using the retrospective transition method. Restricted cash presented on the face of the consolidated balance sheets are included in cash and cash equivalents when reconciling beginning-of-period and end-of-period total amounts presented in the statements of cash flows for the periods of 2016, 2017 and 2018.

**B.   Capitalization and Indebtedness**

Not applicable.

**C.   Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.   Risk Factors**

**Risks Related to Our Business**

*If we fail to retain existing customers or attract new customers for our online marketing services, our business, results of operations and growth prospects could be seriously harmed.*

We generate a substantial majority of our revenues from online marketing services, a substantial majority of which are derived from our pay-for-performance, or P4P, services. Our online marketing customers will not continue to do business with us if their investment does not generate sales leads and ultimately consumers, or if we do not deliver their web pages in an appropriate and effective manner. Our P4P customers may choose to discontinue their business with us, which are not subject to fixed-term contracts. In addition, third parties may develop and use certain technologies to block the display of our customers' advertisements and other marketing products on our Baidu platform, which may in turn cause us to lose customers and adversely affect our results of operations. Furthermore, as our auction-based P4P services enable our customers to bid for priority placement of their paid sponsored links, we may lose customers if they find the bidding mechanism not cost effective or otherwise not attractive. Additionally, if our users do not increase their engagement on our platform, or our content ecosystem fails to offer rich and quality content that meets users' tastes and preferences, or our users spend more time with or otherwise satisfy their content consumption demands on competing platforms, or we otherwise experience user traffic decline due to any reason, it would be difficult for us to attract new customers or retain existing customers. Failure to retain our existing customers or attract new customers for our online marketing services could seriously harm our business, results of operations and growth prospects.

In recent years, our revenues from online marketing have increased. We believe our large user base and traffic provide advertisers with a broad reach and optimal monetization results. However, we cannot assure you that we will be able to continue to attract new advertisers or retain our existing advertisers. If our advertisers determine that their expenditures on our platform do not generate expected returns, they may allocate a portion or all of their advertising budgets to other advertising channels, such as television, outdoor media and other online marketing platforms, and reduce or discontinue business with us. Since most of our advertisers are not bound by long-term contracts, they may amend or terminate advertising arrangements with us easily without incurring liabilities. Failure to retain existing advertisers or attract new ones to advertise on our platform may materially and adversely affect our business, financial condition, results of operations and prospects.

4

Table of Contents

We have in the past removed, and may in the future again remove, questionable paid search listings of certain customers to ensure the quality and reliability of our search results. Such removal, whether temporary or permanent, may cause affected customers to discontinue their business with us. We also examine the relevant business licenses and bank accounts of prospective customers prior to business engagement, as a quality control measure. In addition, we have taken steps to implement measures requested by PRC regulatory authorities, such as modifying paid search practices and limiting the amount of displays. We have also proactively implemented numerous additional measures to deliver a better user experience and build a safer and more trustworthy platform for users. Such measures have had a negative impact on the number of customers and our revenues, although we believe such impact is likely to be temporary. PRC regulations on online marketing services are evolving, and uncertainties remain with respect to the implementation of and compliance with new regulations that may emerge, which in turn may have a material adverse impact on our business, results of operations and growth prospects.

***If online marketing through internet search and feed does not further grow in China, our ability to increase revenue and profitability could be materially and adversely affected.***

While the internet has developed to a more advanced stage in China, customers have many channels to conduct online marketing and promotion. As users may not spend as much time on internet search and feed products as they used to, many current and potential customers may not use internet search and feed products as one of their main online marketing channels to promote their products and services, and thus may not allocate a significant portion of their marketing budgets to online marketing through internet search and feed products such as our P4P services, as compared to other methods of online marketing. Our ability to increase revenue and profitability from online marketing on PC and mobile internet may be adversely impacted by a number of factors, many of which are beyond our control, including:

- difficulties associated with developing a larger user base with demographic characteristics attractive to online marketing customers and maintaining and increasing user engagement;

- increased competition and potential re-allocation of marketing budgets and downward pressure on online marketing prices;

- higher customer acquisition costs due in part to the limited experience of small to medium-sized enterprises, or SMEs, with the internet as a marketing channel or due to competition;

- decreased use of our search and paid click because search queries are increasingly being undertaken via voice-activated speakers, apps, social media or other platforms;

- growing reluctance of users to click on search results marked as advertisements;

- ineffectiveness of our online marketing delivery, tracking and reporting systems; and

- decreased use of internet or online marketing in China.

***Our business depends on a strong brand, and if we are unable to maintain and enhance our brand, our business and results of operations may be harmed.***

We believe that our brand "Baidu" has contributed significantly to the success of our business. We also believe that maintaining and enhancing the "Baidu" brand is critical to increasing the number of our users, customers, Baidu Union partners and content providers. We have conducted various marketing and brand promotion activities, but we cannot assure you that these activities will achieve the brand promotion effect expected by us. If we fail to maintain and further promote the "Baidu" brand, or if we incur excessive expenses in this effort, our business and results of operations may be materially and adversely affected.

In addition, any negative publicity about our company, our products and services, our employees, our business practices, our search results or the platform to which our search results link, regardless of its veracity, could harm our brand image and in turn adversely affect our business and results of operations. We cannot assure

5

Table of Contents

you that we will be able to defuse negative publicity to the satisfaction of our investors, users, customers and business partners. From time to time, there has been negative publicity about our company and our business practice, which has adversely affected our public image and reputation during certain periods of intense negative publicity. For example, in 2016, Chinese media reported that a Chinese college student had died from cancer following unsuccessful treatment received at a hospital that the student had found through paid search listings on Baidu, and similarly in 2018, Chinese media reported incidents where users had been defrauded by health care and logistics service providers that they found through search listings on Baidu. Also in 2018, an editorial falsely alleged that, unlike Google, Baidu was biased in displaying its feed content in its search results, in disregard of the analogous business model of Google displaying Youtube content in its search results. This editorial attracted the attention of the general public and Chinese media, including state-owned new agencies, and adversely affected our public image. The negative publicity surrounding these incidents have resulted in significant adverse impact on our public image and reputation. Intense negative publicity may divert our management's attention and may adversely impact our business. We cannot assure you that our brand, public image and reputation will not be materially and adversely affected in the future.

### *We face significant competition and may suffer from loss of users and customers as a result.*

We face significant competition in almost every aspect of our business, including competition from other companies that seek to provide internet search and feed services to users and provide online marketing services to customers, as well as other companies that provide internet video services. For Baidu Core business, our main competitors in the Chinese internet market include China-based internet companies, such as Alibaba, Tencent, ByteDance, Sohu and Qihoo 360. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), user experience of the search and feed services, quality, quantity and relevancy of content, availability and ease of use of products and services, distribution channels and the number of associated third-party websites/wapsites. For iQIYI, our primary competitors include companies that operate online video websites in China, such as Tencent Video and Youku-Tudou. Some of our competitors have significant financial resources, long operating histories and are experienced in attracting and retaining their users, accommodating their users' habits and preferences and managing customers. They may use their experience and resources to compete with us in a variety of ways, including competing for users and their time, customers, distributors, content, strategic partners and networks of third-party websites/wapsites, investing more heavily in research and development and making investments and acquisitions. If any of our competitors provides comparable or better Chinese language search experience or internet video services, our user traffic could decline significantly. Additionally, if the channels that we use to distribute services or products to our users and customers are no longer available to us, we may experience a decline in user traffic. Any such decline in traffic could weaken our brand and result in loss of users and customers, which could have a material and adverse effect on our results of operations.

We also face competition from other types of advertising media, such as newspapers, magazines, yellow pages, billboards, other forms of outdoor media, television, radio and mobile apps. Large companies in China generally allocate, and may continue to allocate, a limited portion of their budgets to online marketing, as opposed to traditional advertising and other forms of advertising media. If these companies do not devote a larger portion of their marketing budgets to online marketing services provided by us, or if our existing customers reduce the amount they spend on online marketing, our results of operations and growth prospects could be adversely affected.

### *If our expansions into new businesses are not successful, our future results of operations and growth prospects may be materially and adversely affected.*

As part of our growth strategy, we enter into new businesses from time to time by leveraging our large internet user base and advanced technology to generate additional revenue streams and through our development of new business lines or strategic investments in or acquisitions of other businesses. Expansions into new businesses may present operating, marketing and compliance challenges that differ from those that we currently encounter.

6

Table of Contents

In recent years, we have invested significant resources in the research and development of artificial intelligence (AI) technology and have made significant progress in the commercialization of AI technologies, such as AI-powered voice assistant platform DuerOS, autonomous driving platform Apollo, Baidu Cloud and Baidu Feed. We plan to continue to contribute capital and other resources to our AI-enabled business operations. However, AI technology is rapidly evolving with significant uncertainties, and we cannot assure you that our investment and exploration in AI technology, including AI-powered voice assistant, autonomous driving, Baidu Cloud and Baidu Feed, will be successful. Our operating results may also suffer if our innovation is not responsive to the needs of our users, customers and content providers, inappropriately timed with market opportunities, or marketed ineffectively. In addition, we may encounter regulatory uncertainties related to new businesses that we enter into. The laws and regulations related to AI technology and products are at early stage of development and still evolving in China. The effects of such laws and regulations remain unclear and may add uncertainty to the operation of our AI-related business. For example, as PRC regulatory framework on autonomous driving evolves, we may be required to comply with approval and other compliance requirements for autonomous driving road test and related data collection and sharing promulgated by PRC authorities from time to time. See "Item 4.B. Information on the Company—Business Overview—Regulations— Regulations on Artificial Intelligence and Autonomous Driving Vehicles." We may confront other challenges as we enter new business domains, including lack of adoption of new products and services, lack of management talent in the new business, cost management and other factors required for the expansion of new businesses.

***If we fail to continue to innovate and provide products, services and high-quality internet experience that attract and retain users, we may not be able to generate sufficient user traffic to remain competitive.***

Our success depends on providing products and services to attract users and enable users to have a high-quality internet experience. In order to attract and retain users and compete against our competitors, we must continue to invest significant resources in research and development to enhance our internet search marketing and, artificial intelligence (AI) technologies, improve our existing products and services, and introduce additional high-quality products and services, including AI-based products and services and feed services. If we are unable to anticipate user preferences or industry changes, enhance the quality of our products and services on a timely basis or fail to provide sufficient content, or provide services and products, including our smart devices, to our users' satisfaction, we may suffer a decline in the size of our user base. Our results of operations may also suffer if our innovations do not respond to the needs of our users, are not appropriately timed with market opportunities or are not effectively brought to market. As search, marketing and AI technologies and new forms of devices and apps continue to develop, we may expend significant resources in research and development and strategic investments and acquisitions in order to remain competitive.

***If our content ecosystem fails to continually offer quality content in a cost effective manner, we may experience declines in user traffic and user engagement, our business and results of operations may be harmed.***

Our content ecosystem consists of Baijiahao, Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, smart mini programs, iQIYI and various other products. The success of our content ecosystem depends on our ability to attract content owners to contribute quality content to our platform by leveraging our user traffic and enhance user engagement through provision of attractive content, so as to create a virtuous cycle. We have relied, and will continue to rely, on third parties for part of the content offered in our content ecosystem and some of our products include third party intellectual property. As the competition for quality content becomes increasingly intense in China, we cannot assure you that we will be able to manage our content acquisition costs effectively and generate sufficient revenues to outpace future increase in content spending. We may also be unable to renew some of our content or intellectual property licensing agreements upon their expiration or termination and any renewal of the content or intellectual property licensing agreements may involve higher costs or less favorable terms. If we are not able to license popular premium content on commercially reasonable terms or renew our content or intellectual property licensing agreements, our financial condition and results of operations may be materially and adversely affected. In addition, we have users contribute their content to our various products,

7

Table of Contents

including Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baijiahao, Quanmin, and iQIYI's user-generated content. If these parties fail to develop and maintain high-quality and engaging content, if our desired premium content becomes exclusive to our competitors, if we are unable to continue to grow our content offerings and stay competitive vis-à-vis other content platforms, or if a large number of our existing relationships are terminated, the attractiveness of our content offerings to users may be severely impaired. If we are unable to offer content that meets users' tastes and preferences on a continuing basis and in a cost effective manner, our user experience may deteriorate, we may suffer from reduced user traffic, our business and results of operations may be harmed.

***Our now-divested financial services business may subject us to operational and reputational risks, which may have a material adverse effect on our business, results of operations and financial condition.***

We have provided financial services in China in recent years. In August 2018, we completed the divestiture of a majority equity stake in our financial services business unit, which has been rebranded as Du Xiaoman Financial, or Du Xiaoman. After the divestiture, we hold a minority equity interest in Du Xiaoman and have since then deconsolidated the financial results of Du Xiaoman from our consolidated financial statements in accordance with U.S. GAAP. The financial services provided by the now-divested Du Xiaoman mainly include wealth management and consumer credit, through which Du Xiaoman offers education loans and consumer financing to meet consumers' cash expenditure needs.

PRC laws and regulations concerning the internet finance industry, particularly those governing wealth management and credit lending, are evolving. Although Du Xiaoman has taken careful measures to comply with the laws and regulations that are applicable to its financial services, the PRC government authorities may promulgate new policies, rules and regulations regulating the internet finance industry. We cannot assure you that the practices of Du Xiaoman would not be deemed to violate any PRC laws or regulations, nor can we ensure that all business cooperators on Du Xiaoman's platform meet all the regulatory compliance requirements. If Du Xiaoman were deemed to violate any PRC laws or regulations, we may be exposed to negative publicity as a result of the potential misconception that Du Xiaoman is still part of our consolidated group.

Furthermore, we are still the largest shareholder of Du Xiaoman and would be exposed to losses from Du Xiaoman. Under certain conditions, investors of Du Xiaoman can require Baidu or Du Xiaoman to redeem their shares. Occurrence of the such events could have a material adverse effect on our business, financial conditions and results of operations.

***If we fail to keep up with rapid changes in technologies and user behavior, our future success may be adversely affected.***

Our future success will depend on our ability to respond to rapidly changing technologies, adapt our products and services to evolving industry standards and improve the performance and reliability of our products and services. Our failure to adapt to such changes could harm our business. In addition, changes in user behavior resulting from technological developments may also adversely affect us. For example, the number of people accessing the internet through mobile devices and internet of things, or IoTs, such as smartphones, tablets and smart (voice-activated internet) home devices, has increased in recent years, and we expect this trend to continue while 5G and more advanced mobile communications technologies are broadly implemented. If we fail to develop products and technologies that are compatible with all mobile devices, IoTs and operating systems, or if the products and services we develop are not widely accepted and used by users of various mobile devices and IoTs, our position in the mobile internet and AI sectors may be adversely affected. In addition, the widespread adoption of new internet, networking or telecommunications technologies or other technological changes could require substantial expenditures to modify or integrate our products, services or infrastructure. If we fail to keep up with rapid technological changes to remain competitive, or consequently fail to retain users with products and services of exceptional quality, our future success may be materially and adversely affected.

8

Table of Contents

***Our increasing focus on cloud-based services presents execution, competitive and compliance risks.***

A growing part of our business involves cloud-based services available across a spectrum of computing devices. We are devoting significant resources to provide AI solutions, cloud infrastructure, and other services to enterprises and individuals. At the same time, our competitors are rapidly developing and deploying similar cloud-based services. Pricing and delivery models are evolving. Devices and form factors influence how users access services in the cloud and sometimes the user's choice of which suite of cloud-based services to use. Our success in cloud-based services strategy will depend on the level of adoption of our products and services. We may not establish market share sufficient to achieve scale necessary to achieve our business objectives or recoup costs incurred to build and maintain infrastructure to support our cloud-based services. It is uncertain whether our strategies will attract the users or generate the revenue required to succeed. If we fail to generate sufficient usage of our new products and services, we may not grow revenue in line with the costs associated with infrastructure development and research and development investments. This may negatively impact our results of operations and financial performance.

The development of cloud-based services is accompanied by regulatory compliance risks. For example, regulatory authorities in China are increasing enforcement efforts against non-compliance relating to companies operating content delivery networks, internet data centers, and internet service providers. However, the interpretation and application of relevant laws in China and elsewhere are often uncertain and in flux, and any failure or perceived failure to comply with all applicable laws and regulations may result in legal proceedings or regulatory actions against us, and could have a material adverse effect on our business and results of operations.

In the past, our peers have experienced data security and infrastructure stability issues arising out of their cloud businesses. Our cloud business may also encounter similar issues, which could have a material and adverse impact on our operations and financial performance.

***Issues in the adoption and use of artificial intelligence in our product offerings may result in reputational harm or liability.***

We are building AI into many of our product offerings and we expect this element of our business to grow. We envision a future in which AI operates in our services and applications such as voice assistant platform DuerOS, autonomous driving platform Apollo, AI cloud services and Baidu Feed, and the cloud helps our customers become more productive. As with many disruptive innovations, AI presents risks and challenges that could affect its adoption, and, therefore, our business. Our products and services based on AI may not be adopted by our users or customers. AI algorithms may be flawed. Datasets may be insufficient or contain biased information. Inappropriate or controversial data practices by us or others could impair the acceptance of our AI solutions. These deficiencies could undermine the decisions, predictions, or analysis AI applications produce, subjecting us to legal liability, and brand or reputational harm. Some AI scenarios present ethical issues. If we enable or offer AI solutions that are controversial because of their impact on human rights, privacy, employment, or other social issues, we may experience reputational harm or be exposed to liability.

***Interruption or failure of our own information technology and communications systems or those of third-party service providers we rely upon could impair our ability to provide products and services, which could damage our reputation and harm our results of operations.***

Our ability to provide products and services depends on the continuing operation of our information technology and communications systems. Any damage to or failure of our systems could interrupt our services. Service interruptions could reduce our revenue and profit and damage our brand if our systems are perceived to be unreliable. Our systems are vulnerable to damage or interruption as a result of terrorist attacks, wars, earthquakes, floods, fires, power loss, telecommunications failures, undetected errors or "bugs" in our software, computer viruses, interruptions in access to our platform through the use of "denial of service" or similar attacks, hacking or other attempts to harm our systems, and similar events. Some of our systems are not fully redundant,

9

Table of Contents

and our disaster recovery planning does not account for all possible scenarios. In February 2017, the service of Baidu App was inaccessible to users for forty-three minutes due to a system failure. In November 2018, multiple services including Baidu Search, Baidu Feed, Baidu Encyclopedia, Baidu Post Bar and Baidu Knows were inaccessible to users for seventy-three minutes due to a system failure. Such service disruptions adversely affected our user experience.

Our servers, which are hosted at third-party or our own internet data centers, are vulnerable to break-ins, sabotage and vandalism. The occurrence of natural disasters or closure of an internet data center by a third-party provider without adequate notice could result in lengthy service interruptions. In addition, our domain names are resolved into internet protocol (IP) addresses by systems of third-party domain name registrars and registries. Any interruptions or failures of those service providers' systems, which are beyond our control, could significantly disrupt our own services. If we experience frequent or persistent system failures on our platform, whether due to interruptions and failures of our own information technology and communications systems or those of third-party service providers that we rely upon, our reputation and brand could be severely harmed. The steps we take to increase the reliability and redundancy of our systems may cause us to incur heavy costs and reduce our operating margin, and may not be successful in reducing the frequency or duration of service interruptions.

### We may not be able to manage our expanding operations effectively.

We have significantly expanded our operations in recent years. We expect this expansion trend to continue as we grow our user and customer base and explore new opportunities. To manage the further expansion of our business and growth of our operations and personnel, we need to continually improve our operational and financial systems, procedures and controls, and expand, train, manage and maintain good relations with our growing employee base. We have experienced labor disputes in the past. Although these disputes were resolved promptly, we cannot assure you that there will not be any new labor disputes in the future. In addition, we must maintain and expand our relationships with other websites, internet companies and other third parties. Our current and future personnel, systems, procedures and controls may not be adequate to support our expanding operations.

### We may face intellectual property infringement claims and other related claims, which could be time-consuming and costly to defend and may result in an adverse impact over our operations.

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement of intellectual property rights, unfair competition, invasion of privacy, defamation and other violations of other parties' rights. The validity, enforceability and scope of protection of intellectual property in internet-related and AI-related industries, particularly in China, are uncertain and still evolving. As we face increasing competition and as litigation becomes more common in China in resolving commercial disputes, we face a higher risk of being the subject of intellectual property infringement claims. We may be subject to administrative actions brought by the PRC State Copyright Bureau and in the most severe scenario criminal prosecution for alleged copyright infringement, and as a result may be subject to fines and other penalties and be required to discontinue infringing activities. Furthermore, as we expand our operations outside of China, we may be subject to claims brought against us in jurisdictions outside of China.

Our search products and services link to materials in which third parties may claim ownership of trademarks, copyrights or other rights. As we adopt new technologies and roll out new products and services, we face the risk of being subject to intellectual property infringement claims that may arise from our use of new technologies and provision of new products and services. Our products and services including those based on content storage and sharing, such as Baidu WenKu, Baidu Post Bar, Baidu Encyclopedia, Baidu Knows and Baidu Feed, allow our users to upload, store and share documents, images, audio and videos on our servers, or share, link to or otherwise provide access to contents from other websites, and we also operate distribution platforms whereby developers can upload, share and sell their apps or games to users. Although we have made

10

Table of Contents

commercially reasonable efforts to request users or developers to comply with applicable intellectual property laws, we cannot ensure that all of our users or developers have the rights to upload or share these contents or apps. In addition, we have been and may continue to be subject to copyright or trademark infringement and other related claims from time to time, in China and internationally.

We have been making continuous efforts to keep ourselves informed of and to comply with all applicable laws and regulations affecting our business. However, PRC laws and regulations are evolving, and uncertainties still exist with respect to the legal standards as well as the judicial interpretation of the standards for determining liabilities of internet search and other internet service providers for providing links to content on third-party websites that infringe upon others' copyrights or hosting such content, or providing information storage space, file sharing technology or other internet services that are used by internet users to disseminate such content. The Supreme People's Court of China promulgated a judicial interpretation on infringement of the right of dissemination through internet in December 2012. This judicial interpretation, like certain court rulings and certain other judicial interpretations, provide that the courts will place the burden on internet service providers to remove not only links or contents that have been specifically mentioned in the notices of infringement from right holders, but also links or content they "should have known" to contain infringing content. The interpretation further provides that where an internet service provider has directly obtained economic benefits from any content made available by an internet user, it has a higher duty of care with respect to internet users' infringement of third-party copyrights. A guidance on the trial of audio/video sharing copyright disputes promulgated by the Higher People's Court of Beijing in December 2012 provides that where an internet service provider has directly obtained economic benefits from any audio/video content made available by an internet user who has no authorization for sharing such content, the internet service provider shall be presumed to be at fault. These interpretations could subject us and other internet service providers to significant administrative burdens and litigation risks.

We conduct our business operations primarily in China. There might be claims that we are subject to U.S. copyright laws, including the legal standards for determining indirect liability for copyright infringement, although we believe such claims are without merit. We cannot assure you that we will not be subject to copyright infringement lawsuits or other proceedings in the U.S. or elsewhere in the future.

Intellectual property litigation is expensive, time-consuming and could divert resources and management attention from the operations of our business. We are currently named as defendant in certain copyright infringement suits in connection with Baidu Feed, P4P, Baidu Post Bar, Baidu Search, iQIYI, Baidu WenKu, Baijiahao, Haokan and certain other products or services. See "Item 8.A. Financial Information—Consolidated Statements and Other Financial Information—Legal Proceedings." There is no guarantee that the courts will accept our defenses and rule in our favor. If there is a successful claim of infringement, we may be required to discontinue the infringing activities, pay substantial fines and damages and/or enter into royalty or license agreements that may not be available on commercially acceptable terms, if at all. Our failure to obtain a license of the rights on a timely basis could harm our business. Any intellectual property litigation by third parties and/or negative publicity alleging our intellectual property infringement could have an adverse effect on our business, reputation, financial condition or results of operations. To address the risks relating to intellectual property infringement, we may have to substantially modify, limit or terminate some of our search services. Any such change could materially affect user experience and in turn have an adverse impact on our business.

***We have been and may again be subject to claims and investigations in the ordinary course of business based on the content found on our platform, the results in our paid search listings or other products and services we offer, and could be impacted by unfavorable results of legal proceedings.***

We are subject to various legal proceedings and claims that have arisen in the ordinary course of business and have not yet been fully resolved, and new claims may arise in the future. In addition, agreements entered into by us sometimes include indemnification provisions which may subject us to costs and damages in the event of a claim against an indemnified third party. Regardless of the merit of particular claims, litigation may be

11

Table of Contents

expensive, time consuming, disruptive to our operations and distracting to management. In recognition of these considerations, we may enter into arrangements to settle litigation and resolve such disputes. No assurance can be given that such agreements can be obtained on acceptable terms or that litigation will not occur. These settlements may also significantly increase our operating expenses.

The outcome of litigation is inherently uncertain. If one or more legal matters were resolved against us or an indemnified third party in a reporting period for amounts in excess of management's expectations, our financial condition and operating results for that reporting period could be materially adversely affected. Further, such an outcome could result in significant compensatory, punitive or trebled monetary damages, disgorgement of revenue or profits, remedial corporate measures or injunctive relief against us that could materially adversely affect its financial condition and operating results.

In addition to the content developed and posted on our platform by ourselves, our users are free to post information on Baidu Post Bar, Baidu Knows, Baidu Encyclopedia, Baidu WenKu and other sections of our platform, our content providers may provide content through Baijiahao platform and our P4P customers may create text-based descriptions, image descriptions and other phrases to be used as text, images or keywords in our search listings, and users can also use our personal cloud computing service to upload, store and share documents, images, audio and videos on our cloud servers. We have been and may continue to be subject to claims and investigations for intellectual property ownership and infringement, defamation, negligence or other legal theories based on the content found on our platform, the results in our paid search listings or our other products and services, which, with or without merit, may result in diversion of management attention and financial resources and negative publicity for our brand and reputation. For example, in November 2018, an individual, together with his related company, filed a complaint for acts of defamation and liber per se, commercial disparagement, tortious inference with prospective business relations, intentional infliction of emotional distress and civil conspiracy against, among others, us and Robin Yanhong Li in his capacity as our chairman and chief executive officer in the Supreme Court of The State of New York. The complaint alleges, among other things, that the defendant parties published articles containing false and defamatory statements concerning the plaintiffs. The complaint seeks damages in an aggregate amount of US$11 billion, including US$10 billion punitive damages. The action remains at a preliminary stage. We believe the case is without merit and intend to defend ourselves vigorously. See "Item 8.A. Financial Information— Consolidated Statements and Other Financial Information—Legal Proceedings." Furthermore, if the content posted on our platform or found, stored or shared through our other products and services contains information that government authorities find objectionable, our platform or relevant products or services may be shut down and we may be subject to other penalties. See "—Risks Related to Doing Business in China—Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our platform and negative publicity in international media."

We have been, and may again in the future be, subject to claims, investigations or negative publicity based on the results in our paid search listings. Claims have been filed against us after we allowed certain customers to register keywords containing trademarks, trade names or brand names owned by others and displayed links to such customers' websites in our paid search listings. While we maintain a database of certain well-known trademarks and continually update our system algorithms and functions to guard against customers keywords containing the well-known trademarks that are owned by others, it is not possible for us to completely prevent our customers from bidding on keywords that contain trademarks, trade names or brand names owned by others. In 2016, PRC regulatory authorities required that we take several remedial measures, including: (i) immediately modifying our practice of providing online marketing services to medical, pharmaceutical, health care and other similar businesses, and refraining from providing online marketing services to medical health care organizations that do not have requisite qualifications from competent regulatory authorities; (ii) modifying our existing auction-based paid search practices, indicating clearly paid search results and the associated risks, and limiting the percentage of marketing information to no more than 30% on each web page; and (iii) establishing and enhancing user protection mechanisms and establishing a system to compensate users harmed by fraudulent marketing information. In addition, there has been negative publicity about fraudulent information in our paid

12

Table of Contents

search listings. Although we have been continually enhancing our technology, control and oversight to prevent fraudulent websites, web pages and information from appearing in our paid search listings, there is no guarantee that the measures we have taken are effective at all times. Claims, investigations and negative publicity based on the results in our paid search listings, regardless of their merit, may divert management attention, severely disrupt our operations, adversely affect our results of operations and harm our reputation.

***Liability claims against, or any unauthorized control or manipulation of our autonomous driving systems, could result in the loss of confidence in us, our brands and our products, and harm our business.***

Our autonomous driving platform Apollo contains complex information technology systems. We have designed, implemented and tested security measures intended to prevent unauthorized access to our Apollo platform, but there can be no assurance that vulnerabilities will not be identified in the future, or that our remediation efforts are or will be successful. Hackers have reportedly attempted, and may attempt in the future, to gain unauthorized access to modify, alter and use our Apollo platform to gain control of, or to change, functionality, user interface and performance characteristics of vehicles utilizing our Apollo platform, or to gain access to data stored in or generated by the vehicles. Any unauthorized access to or control of autonomous driving vehicles or their systems or any loss of data could result in death and personal injury, and legal claims or proceedings against us.

Our Apollo platform may be involved in crashes resulting in property damage, death or personal injury in the future, and such crashes may be the subject of significant public attention. We may face claims related to any misuse or failure of new technologies that we are pioneering, including our autonomous driving platform Apollo and related solutions, such as smart transportation. A successful product liability claim against us could require us to pay substantial monetary damages.

Moreover, product liability claims or reports of unauthorized access to our autonomous driving platform Apollo or data, regardless of their veracity, could generate substantial negative publicity about our products and business and could have material adverse impact on our brand, business, prospects and operating results.

***Our business may be adversely affected if we were found to have failed to fulfill the additional obligations under the new online advertising rules.***

Although the PRC Advertising Law has not specified "paid search results" as a form of advertising, the Interim Administration Measures of Internet Advertising, or the Internet Advertising Measures, which was promulgated by the State Administration for Industry and Commerce (currently known as State Administration for Market Regulation, or the NRTA) and became effective on September 1, 2016, characterizes "paid search results" as a form of internet advertising from the perspective of regulating the online advertising business. Pursuant to the Internet Advertising Measures, we are subject to additional legal obligations to monitor our P4P customers' listings on our website during the course of our provision of P4P services. For example, we must examine, verify and record identity information of our P4P customers, such as the customer's name, address and contact information, and maintain an updated verification of such information on a regular basis. Moreover, we must examine supporting documentation provided by our P4P customers. Where a special government review is required for specific categories of advertisements before posting, we must confirm that the review has been performed and approval has been obtained. If the content of the advertisement is inconsistent with the supporting documentation, or the supporting documentation is incomplete, the advertisement cannot be published. The Chinese government may, from time to time, promulgate new advertising laws and regulations in the future to impose further requirements on online advertising services relating to medical, pharmaceutical, health care and other similar businesses. We cannot assure that we will be in compliance with the requirements under these new laws and regulations. Failure to comply with these obligations may subject us to fines and other administrative penalties. If advertisements shown on our platform are in violation of relevant PRC advertising laws and regulations, or if the supporting documentation and government approvals provided to us by our P4P customers in connection with the advertising content are not complete or accurate, we may be subject to legal liabilities and

13

**Table of Contents**

our reputation could be harmed. See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Advertisements and Online Advertising."

### We may be subject to patent infringement claims with respect to our P4P platform.

Our technologies and business methods, including those relating to our P4P platform, may be subject to third-party claims or rights that limit or prevent their use. In June 2005, we applied for a patent in China for our P4P platform, but our application was rejected on the ground that it is not patentable. Certain U.S.-based companies, including Overture Services Inc., have been granted patents in the United States relating to P4P platforms and similar business methods and related technologies. While we believe that we are not subject to U.S. patent laws since we conduct our business operations primarily in China, we cannot assure you that U.S. patent laws would not be applicable to our business operations, or that holders of patents relating to a P4P platform would not seek to enforce such patents against us in the United States or China.

Many parties are actively developing and seeking protection for internet-related technologies, including patent protection. They may hold patents issued or pending that relate to certain aspects of our technologies, products, business methods or services. Any patent infringement claims, regardless of their merits, could be time-consuming and costly to us. If we were sued for patent infringement claims with respect to our P4P platform and were found to infringe upon the patents and were not able to adopt non-infringing technologies, we may be severely limited in our ability to operate our P4P platform, which would have a material and adverse effect on our results of operations and prospects.

### Our business may be adversely affected by third-party software apps or practices that interfere with our receipt of information from, or provision of information to, our users, which may impair our users' experience.

Our business may be adversely affected by third-party malicious or unintentional software apps that make changes to our users' computers and interfere with our products and services. These software apps may change our users' internet experience by hijacking queries to our platform, altering or replacing our search results, or otherwise interfering with our ability to connect with our users. The interference often occurs without disclosure to or consent from users, resulting in a negative experience, which users may associate with our platform. These software apps may be difficult to remove or disable, may reinstall themselves and may circumvent other apps' efforts to block or remove them.

In addition, our business may be adversely affected by the practices of third-party website owners, content providers and developers which interfere with our ability to crawl and index their web pages and contents including apps. The ability to provide a superior user experience is critical to our success. If we are unable to successfully combat malicious third-party software apps that interfere with our products and services, our reputation may be harmed. If a significant number of website owners, content providers and developers prevent us from indexing and including their high-quality web pages and content including apps in our search results, or if we cannot effectively combat web spam from low-quality and irrelevant content websites, the quality of our search results may be impaired, which may damage our reputation and deter our current and potential users from using our products and services.

### We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.

We rely on a combination of copyright, trademark and trade secret laws, as well as nondisclosure agreements and other methods to protect our intellectual property rights. The protection of intellectual property rights in China may not be as effective as those in the United States or other countries. The steps we have taken may be inadequate to prevent the misappropriation of our technology. Reverse engineering, unauthorized copying or other misappropriation of our technologies could enable third parties to benefit from our technologies without paying us. Moreover, unauthorized use of our technology could enable our competitors to offer products

14

Table of Contents

and services that compete with ours, which could harm our business and competitive position. We have in the past resorted to litigation to enforce our intellectual property rights, and may have to do so from time to time in the future. There is no guarantee that the competent courts will accept our claims and rule in our favor. Such litigation may result in substantial costs and diversion of resources and management attention.

***Our success depends on the continuing and collaborative efforts of our management team and other key personnel, and our business may be disrupted if we lose their services and are not able to find their successors in a timely manner.***

Our success depends heavily upon the continuing services of our management team, in particular our chairman and chief executive officer, Robin Yanhong Li. If one or more of our executives or other key personnel are unable or unwilling to continue in their present positions and we are not able to find their successors in a timely manner, our business may be disrupted and our financial condition and results of operations may be adversely affected. Competition for management and key personnel is intense, the pool of qualified candidates is limited, and we may not be able to retain the services of our executives or key personnel, or attract and retain experienced executives or key personnel in the future.

If any of our executives or other key personnel joins a competitor or forms a competing company, we may not be able to successfully retain customers, distributors, know-how and key personnel. Each of our executive officers and key employees has entered into an employment agreement with us, containing confidentiality and non-competition provisions. If any disputes arise between any of our executives or key personnel and us, we cannot assure you the extent to which any of these agreements may be enforced.

***We rely on highly skilled personnel. If we are unable to retain or motivate them or hire additional qualified personnel, we may not be able to grow effectively.***

Our performance and future success depend on the talents and efforts of highly skilled individuals. We will need to continue to identify, hire, develop, motivate and retain highly skilled personnel for all areas of our organization and business operations. Competition in the internet industry for qualified employees is intense. Our continued ability to compete effectively depends on our ability to attract new employees and to retain and motivate our existing employees. As competition in the internet industry intensifies, it may be more difficult for us to hire, motivate and retain highly skilled personnel. If we do not succeed in attracting additional highly skilled personnel or retaining or motivating our existing personnel, we may be unable to grow effectively.

***Our strategy of investments and acquiring complementary businesses and assets may fail.***

As part of our business strategy, we have pursued, and intend to continue to pursue, selective strategic investments and acquisitions of businesses and assets that complement our existing business and help us execute our growth strategies. For example, we invested in Ctrip by exchanging our shares in Qunar for shares of Ctrip in 2015 and subscribed for additional Ctrip shares in 2016. In 2017, we led an investor consortium that invested RMB7.0 billion (US$1.0 billion) in exchange for public shares of China United Network Communications Limited through private placement. We intend to make other strategic investments and acquisitions in the future if suitable opportunities arise. Investments and acquisitions involve uncertainties and risks, including:

- potential ongoing financial obligations and unforeseen or hidden liabilities, including liability for infringement of third-party copyrights or other intellectual property;

- failure to achieve the intended objectives, benefits or revenue-enhancing opportunities;

- costs and difficulties of integrating acquired businesses and managing a larger business;

- in the case of investments where we do not obtain management and operational control, lack of influence over the controlling partner or shareholder, which may prevent us from achieving our strategic goals in the investments;

15

Table of Contents

- possible loss of key employees of a target business;

- potential claims or litigation regarding our board's exercise of its duty of care and other duties required under applicable law in connection with any of our significant acquisitions or investments approved by the board;

- diversion of resources and management attention;

- regulatory hurdles and compliance risks, including the anti-monopoly and competition laws, rules and regulations of China and other jurisdictions and the enhanced compliance requirement for outbound acquisitions and investment under the laws and regulations of China; and

- in the case of acquisitions of businesses or assets outside of China, the need to integrate operations across different business cultures and languages and to address the particular economic, currency, political, and regulatory risks associated with specific countries.

Any failure to address these risks successfully may have a material and adverse effect on our financial condition and results of operations. Investments and acquisitions may require a significant amount of capital, which would decrease the amount of cash available for working capital or capital expenditures. In addition, if we use our equity securities to pay for investments and acquisitions, we may dilute the value of our ADSs and the underlying ordinary shares. If we borrow funds to finance investments and acquisitions, such debt instruments may contain restrictive covenants that could, among other things, restrict us from distributing dividends. Moreover, acquisitions may also generate significant amortization expenses related to intangible assets. We may also incur impairment charges to earnings for investments and acquired businesses and assets.

### We are exposed to fluctuations in the market values of our investments.

As part of our business strategy, we have investments in both private and public companies. In addition, after adopting ASC Topic 321, *investments—Equity Securities* ("ASC 321"), on January 1, 2018, we elected to use the measurement alternative to measure previously cost methods investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any. Equity securities with readily determinable fair values are measured at fair value, and any changes in fair value are recognized in earnings, instead of through other comprehensive income. Fair values of these investments can be negatively impacted by fluctuations in the share prices of public companies we own, the fair value of private companies we own, liquidity, credit deterioration or losses, financial results, foreign exchange rates, changes in interest rates, or other factors.

For example, the market value of our investment in Ctrip fell below its carrying value based on its quoted market prices on July 2018. As of December 31, 2018, the market value of our investment in Ctrip, based on the market closing price, was below its carrying value. We evaluated our investment in Ctrip for impairment and concluded that impairment was not necessary because the decline in market value of equity investment of Ctrip against its carrying amount was not other-than-temporary. However, we may suffer significant impairment loss or downward adjustments of our investment in Ctrip or other companies in the future. As a result, the value or liquidity of our cash equivalents and marketable securities could decline and result in a material impairment, which could materially adversely affect our financial condition and operating results.

### We are subject to risks and uncertainties faced by companies in a rapidly evolving industry.

We operate in the rapidly evolving internet industry, which makes it difficult to predict our future results of operations. Accordingly, you should consider our future prospects in light of the risks and uncertainties experienced by companies in evolving industries. Some of these risks and uncertainties relate to our ability to:

- maintain our leading position in the Chinese-language internet search market;

- offer attractive, useful and innovative products and services to attract and retain a larger user base;

16

Table of Contents

- attract users' continuing use of internet search services;

- retain existing customers and attract additional customers and increase spending per customer;

- upgrade our technology to support increased traffic and expanded product and service offerings;

- further enhance our brand;

- respond to competitive market conditions;

- respond to evolving user preferences or industry changes;

- respond to changes in the regulatory environment and manage legal risks, including those associated with intellectual property rights;

- maintain effective control of our costs and expenses;

- execute our strategic investments and acquisitions and post-acquisition integrations effectively;

- attract, retain and motivate qualified personnel and maintain good relations with a young and growing work force; and

- build profitable operations in new markets and other overseas internet markets we have entered into.

If we are unsuccessful in addressing any of these risks and uncertainties, our business may be materially and adversely affected.

### Our historical growth rate may not be indicative of our future growth rate.

We have experienced substantial growth in recent years. Our total revenues grew at a compound annual growth rate of 20% from 2014 to 2018. Our growth was driven in part by the growth in China's internet and online marketing industries, which may not be indicative of future growth or be sustainable. Our past growth rate may not be indicative of our future growth rate.

### Our indebtedness could adversely affect our financial condition and our ability to obtain additional capital on reasonable terms when necessary.

As of December 31, 2018, we had an aggregate of RMB64.9 billion (US$9.4 billion) of outstanding indebtedness that will mature between 2019 and 2028, which include RMB8.5 billion (US$1.2 billion) of outstanding indebtedness of iQIYI. See "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources." We may incur additional indebtedness in the future. Our current and future debt requires us to dedicate a portion of our cash flow to service interest and principal payments and may limit our ability to engage in other transactions. Our ability to pay interest and repay the principal for our indebtedness is dependent upon our ability to manage our business operations, generate sufficient cash flows, raise additional capital and the other factors discussed in this section. There can be no assurance that we will be able to manage any of these risks successfully.

Certain of our outstanding indebtedness include financial and other covenants. For example, certain of these covenants require iQIYI to maintain minimum liquidity. If we fail to comply with these covenants and are unable to remedy or obtain a waiver or amendment, an event of default would result. If an event of default were to occur, the lenders could, among other things, declare outstanding amounts due and payable. In addition, because certain outstanding notes of Baidu, Inc. contain customary cross default and cross acceleration provisions, an event of default or declaration of acceleration under a subsidiary's outstanding loan could also result in an event of default under these notes of Baidu, Inc., which would permit the notes holders to accelerate the repayment of the notes. If any of these notes is accelerated, we may be required to renegotiate, repay or refinance these obligations and may not have sufficient funds available to repay it, and our liquidity and financial position would be materially and adversely affected.

17

Table of Contents

We may require additional capital to support our business growth or to respond to business opportunities, challenges or unforeseen circumstances. Our ability to obtain additional capital, if and when required, will depend on our business plans, investor demand, our operating performance, the condition of the capital markets, and other factors, and our indebtedness may limit our ability to borrow additional funds. We may have difficulty incurring new debt on terms that we would consider to be commercially reasonable. In addition, we may also need to refinance a portion of our outstanding debt as it matures. There is a risk that we may not be able to refinance existing debt or that the terms of any refinancing may not be as favorable as the terms of our existing debt.

### *Our controlling interest in iQIYI may be diluted if iQIYI raises additional capital with the issuance and sale of additional equity in the future.*

iQIYI, our controlled subsidiary listed on the NASDAQ Global Market, may need additional capital in the future to fund its continued operations and support its business growth. As iQIYI will continue to invest in both original and licensed content and technology to support its growth, iQIYI may not be able to improve its working capital position or to achieve a surplus in the short term. In the future, should iQIYI require additional liquidity and capital resources to fund its business and operations, iQIYI may need to obtain additional financing, including issuing and selling additional equity or equity-linked securities, which would dilute our interest in iQIYI.

### *Our results of operations may fluctuate, which makes our results difficult to predict and could cause our results to fall short of expectations.*

Our results of operations may fluctuate as a result of a number of factors, many of which are beyond our control. For these reasons, comparing our results of operations on a period-to-period basis may not be meaningful, and you should not rely on our past results as an indication of our future performance. Our quarterly and annual revenues and costs and expenses as a percentage of our revenues may be significantly different from our historical or projected figures. Our results of operations in future quarters may fall below expectations. Any of these events could cause the price of our ADSs to fall. Any of the risk factors listed in this "Risk Factors" section, and in particular the following factors, could cause our results of operations to fluctuate from quarter to quarter:

- general economic conditions in China and economic conditions specific to the internet, internet search and online marketing industries;

- our ability to continue to attract users to our platform despite the emergence of mobile apps and other services;

- our ability to attract additional customers and increase spending per customer;

- the announcement or introduction of new or enhanced products and services by us or our competitors;

- the amount and timing of operating costs and capital expenditures related to the maintenance and expansion of our businesses, operations and infrastructure;

- the results of our acquisitions of, or investments in, other businesses or assets;

- PRC regulations or government actions pertaining to activities on the internet, including various forms of entertainment, online payment and activities otherwise affecting our online marketing customers, and those relating to the products and services we provide;

- unforeseen events, such as negative publicity arising from widespread media coverage and other sources and labor disputes; and

- geopolitical events, natural disasters or epidemics.

Because of the rapid growth of our business, our historical results of operations may not be useful to you in predicting our future results of operations. Our user traffic tends to be seasonal. For example, we generally

18

Table of Contents

experience less user traffic during public holidays and other special event periods in China. In addition, advertising and other marketing spending in China has historically been cyclical, reflecting overall economic conditions as well as budgeting and buying patterns. As we continue to grow, we expect that the cyclicality and seasonality in our business may cause our results of operations to fluctuate.

***A severe and prolonged global economic recession and the slowdown in the Chinese economy may adversely affect our business, results of operations and financial condition.***

The global macroeconomic environment is facing challenges, including the end of quantitative easing by the U.S. Federal Reserve, the economic slowdown in the Eurozone since 2014, uncertainties over the impact of Brexit and ongoing trade disputes and tariffs. The growth of the Chinese economy has slowed down since 2012 compared to the previous decade and the trend may continue. According to the National Bureau of Statistics of China, China's gross domestic product (GDP) growth was 6.6% in 2018. There is considerable uncertainty over the long-term effects of the monetary and fiscal policies adopted by the central banks and financial authorities of some of the world's leading economies, including the United States and China. There have been concerns over unrest and terrorist threats in the Middle East, Europe and Africa. There have also been concerns on the relationship between China and other countries, including surrounding Asian countries, which may potentially lead to foreign investors closing down their businesses or withdrawing their investments in China and, thus, exiting the China market, and other economic effects. In addition, there have also been concerns on the relationship between China and the U.S. following rounds of tariffs imposed by the U.S and retaliatory tariffs imposed by China. It is unclear whether these challenges and uncertainties will be contained or resolved, and what effects they may have on the global political and economic conditions in the long term. Economic conditions in China are sensitive to global economic conditions, as well as changes in domestic economic and political policies and the expected or perceived overall economic growth rate in China. Any prolonged slowdown in the global or Chinese economy may have a negative impact on our business, results of operations and financial condition, and continued turbulence in the international markets may adversely affect our ability to access the capital markets to meet liquidity needs. Our customers may reduce or delay spending with us, while we may have difficulty expanding our customer base fast enough, or at all, to offset the impact of decreased spending by our existing customers. In addition, to the extent we offer credit to any customer and the customer experiences financial difficulties due to the economic slowdown, we could have difficulty collecting payment from the customer.

***Because we rely on distributors, to a large extent, in providing our online marketing services, failure to retain key distributors or attract additional distributors could materially and adversely affect our business. Moreover, there is no assurance that our direct sales model in some key geographic markets will continue to be successful.***

We rely, to a large extent, on a nationwide distribution network of third-party distributors for our sales to, and collection of payment from, our customers. If our distributors do not provide quality services to our customers or otherwise breach their contracts with our customers, we may lose customers and our results of operations may be materially and adversely affected. Since most of our distributors are not bound by long-term contracts, we cannot assure you that we will continue to maintain favorable relationships with them. If we fail to retain our key distributors or attract additional distributors on terms that are commercially reasonable, our business and results of operations could be materially and adversely affected.

We have transitioned to using our direct sales force to serve customers in some key geographic markets, such as Beijing, Shanghai, Suzhou and major cities in Guangdong Province. There is no assurance that our direct sales model in those markets will continue to be successful. If we fail to maintain an adequate direct sales force, retain existing customers and continue to attract new customers in those markets, our business, results of operations and prospects could be materially and adversely affected.

19

Table of Contents

***We rely on Baidu Union partners for a significant portion of our revenues. If we fail to retain existing Baidu Union partners or attract additional members, our revenue growth and profitability may be adversely affected.***

We pay Baidu Union partners a portion of our revenues as we leverage traffic of the Baidu Union partners' internet properties. Some of Baidu Union partners, however, may compete with us in one or more areas of our business. Therefore, they may decide in the future to terminate their relationships with us. If Baidu Union partners decide to use a competitor's or their own internet search services, our user traffic may decline, which may adversely affect our revenues. If we fail to attract additional Baidu Union partners, our revenue growth may be adversely affected. In addition, if we have to share a larger portion of our revenues to retain existing Baidu Union partners or attract additional partners, our profitability may be adversely affected.

***Our overseas operations may not be successful.***

We have launched products and services in local languages to internet users in several countries. It is uncertain when the operation will become profitable, if at all. In particular, we rely on local telecommunication operators and service providers to provide us with network services and data center hosting services, and our systems for these international products and services are not redundant across different regions and data centers. Any interruption to the internet infrastructure or any data center may render our products and services in the region unavailable.

We face certain risks inherent in doing business internationally, including:

- difficulties in developing, staffing and simultaneously managing a foreign operation as a result of distance, language and cultural differences;

- challenges in formulating effective local sales and marketing strategies targeting users from various jurisdictions and cultures, who have a diverse range of preferences and demands;

- challenges in identifying appropriate local business partners and establishing and maintaining good working relationships with them;

- dependence on local platforms in marketing our international products and services overseas;

- challenges in selecting suitable geographical regions for international business;

- longer customer payment cycles;

- currency exchange rate fluctuations;

- political or social unrest or economic instability;

- compliance with applicable foreign laws and regulations and unexpected changes in laws or regulations;

- exposure to different tax jurisdictions that may subject us to greater fluctuations in our effective tax rate and potentially adverse tax consequences; and

- increased costs associated with doing business in foreign jurisdictions.

One or more of these factors could harm our overseas operations and consequently, could harm our overall results of operations.

***If we are unable to adapt or expand our existing technology infrastructure to accommodate greater traffic, content or additional customer requirements, our business may be harmed.***

Our Baidu platform regularly serves a large number of users and customers and delivers a large number of daily page views. Our technology infrastructure is highly complex and may not provide satisfactory service in the future, especially as the number of users and customers increases. We may be required to upgrade our technology

20

Table of Contents

infrastructure to keep up with the increasing traffic on our Baidu platform, such as increasing the capacity of our servers and the sophistication of our software. If we fail to adapt our technology infrastructure to accommodate greater traffic or customer requirements, our users and customers may become dissatisfied with our services and switch to our competitors' websites, which could harm our business.

***If we fail to detect fraudulent click-throughs, our customers' confidence in us could be damaged and our revenues could decline.***

We are exposed to the risk of click-through fraud on our paid search results. Click-through fraud occurs when a person clicks paid search results for a reason other than to view the underlying content of search results. Although our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively and thus capture and prevent some fraudulent click-throughs, there is no assurance that our anti-spam technology is able to detect and stop all fraudulent click-throughs. If we fail to detect fraudulent clicks or otherwise are unable to prevent this fraudulent activity, the affected customers may experience a reduced return on investments, or ROI, in our online marketing services and lose confidence in the integrity of our systems, and we may have to issue refunds to our customers. If this happens, we may be unable to retain existing customers or attract new customers for our online marketing services, and our online marketing revenues could decline. In addition, affected customers may also file legal actions against us claiming that we have over-charged or failed to refund them. Any such claims or similar claims, regardless of their merits, could be time-consuming and costly for us to defend against and could also adversely affect our brand and our customers' confidence in the integrity of our systems. We experienced a number of incidents involving fraudulent click-throughs in recent years. Although the amount of revenue involved in these incidents was immaterial, such cases of fraudulent click-throughs, if occurring on a large-scale and widespread manner, may damage the reputation of our search ecosystem.

***The successful operation of our business depends upon the performance and reliability of the internet infrastructure and fixed telecommunications networks in China.***

Our business depends on the performance and reliability of the internet infrastructure in China. Almost all access to the internet is maintained through state-owned telecommunication operators under the administrative control and regulatory supervision of the Ministry of Industry and Information Technology, or the MIIT. In addition, the national networks in China are connected to the internet through international gateways controlled by the PRC government. These international gateways are the only channels through which a domestic user can connect to the internet. It is unpredictable whether a more sophisticated internet infrastructure will be developed in China. We may not have access to alternative networks in the event of disruptions, failures or other problems with China's internet infrastructure. In addition, the internet infrastructure in China may not support the demands associated with continued growth in internet usage.

We rely heavily on China Telecommunications Corporation, or China Telecom, China United Network Communications Group Company Limited, or China Unicom, and China Mobile Communications Corporation, or China Mobile, to provide us with network services and data center hosting services. We have entered into contracts with various local branches or subsidiaries of China Telecom, China Unicom and China Mobile to obtain data communications capacity. We have limited access to alternative services in the event of disruptions, failures or other problems with the fixed telecommunications networks of these companies, or if these companies otherwise fail to provide the services. Any unscheduled service interruption could damage our reputation and result in a decrease in our revenues. Furthermore, we have no control over the costs of the services provided by these telecommunication companies. If the prices that we pay for telecommunications and internet services rise significantly, our gross margins could be adversely affected. In addition, if internet access fees or other charges to internet users increase, our user traffic may decrease, which in turn may harm our revenues.

21

Table of Contents

***Our business is subject to complex and evolving Chinese and international laws and regulations regarding privacy and data protection. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.***

We are required by privacy and data protection laws in China and other jurisdictions, including, without limitation, the PRC Cyber Security Law, to ensure the confidentiality, integrity and availability of the information of our users, customers, distributors, content providers and Baidu Union partners, which is also essential to maintaining their confidence in our online products and services. However, the interpretation and application of such laws in China and elsewhere are often uncertain and in flux.

In December 2012, the Standing Committee of the PRC National People's Congress promulgated the Decision on Strengthening Network Information Protection, or the Network Information Protection Decision, to enhance the legal protection of information security and privacy on the internet. The Network Information Protection Decision also requires internet operators to take measures to ensure confidentiality of information of users. In July 2013, the MIIT promulgated the Provisions on Protection of Personal Information of Telecommunication and Internet Users to regulate the collection and use of users' personal information in the provision of telecommunication service and internet information service in China. In November 2016, the Standing Committee of the National People's Congress promulgated the PRC Cyber Security Law, which requires, among others, that network operators take security measures to protect the network from unauthorized interference, damage and unauthorized access and prevent data from being divulged, stolen or tampered with. Significant capital, managerial and human resources are required to comply with legal requirements, enhance information security and to address any issues caused by security failures.

The PRC Cyber Security Law is relatively new and subject to interpretation by the regulator. Although we only gain access to user information that is necessary for, and relevant to, the services provided, the data we obtain and use may include information that is deemed as "personal information" under the PRC Cyber Security Law and related data privacy and protection laws and regulations. As such, we have adopted a series of measures to ensure that we comply with relevant laws and regulations in the collection, use, disclosure, storage, and security of user information.

While we take all these measures to comply with all applicable data privacy and protection laws and regulations, we cannot guarantee the effectiveness of the measures undertaken by us and business partners. The activities of third parties such as our customers and business partners are beyond our control. If our business partners violate the PRC Cyber Security Law and related laws and regulations relating to the protection of personal information, or fail to fully comply with the service agreements with us, or if any of our employees fail to comply with our internal control measures and misuse the information, we may be subject to penalties. Any failure or perceived failure to comply with all applicable data privacy and protection laws and regulations, or any failure or perceived failure of our business partners to do so, or any failure or perceived failure of our employees to comply with our internal control measures, may result in negative publicity and legal proceedings or regulatory actions against us, and could damage our reputation, discourage current and potential users and customers from using our products or services and subject us to fines and damages, which could have a material adverse effect on our business and results of operations.

There are a number of legislative proposals in the European Union and the United States, at both the federal and state level, as well as other jurisdictions that could impose new obligations in areas affecting our business. New laws or regulations concerning data protection, or the interpretation and application of existing consumer and data protection laws or regulations, which is often uncertain and in flux, may be inconsistent with our practices. The introduction of new products or other actions that we may take may subject us to additional laws, regulations, or other government scrutiny. Complying with new laws and regulations could cause us to incur substantial costs or require us to change our business practices in a manner materially adverse to our business. For example, if privacy concerns or regulatory restrictions prevent us from selling demographically targeted

22

Table of Contents

advertising, we may become less attractive to online advertising customers. In addition, some countries are considering or have passed legislation implementing data protection requirements or requiring local storage and processing of data or similar requirements that could increase the cost and complexity of delivering our services.

*Security breaches and improper access to or disclosure of our data or user data, or any system failure or compromise of our security, could harm our reputation and adversely affect our business.*

Our business is prone to cyber-attacks seeking unauthorized access to our data or user data or to disrupt our ability to provide services. Any failure to prevent or mitigate security breaches and improper access to or disclosure of our data or user data, such as personal information, names, accounts, user IDs and passwords, and payment or transaction related information, could result in the loss or misuse of such data, which could cause a loss or give rise to liabilities to the owners of confidential information, such as our users, customers, distributors, content providers and Baidu Union partners, subject us to penalties imposed by administrative authorities, and disrupt our operations. In addition, computer malware, viruses, social engineering (predominantly spear phishing attacks), and general hacking have become more prevalent in our industry, have occurred on our systems in the past, and may occur again on our systems in the future. We also regularly encounter attempts to create false or undesirable user accounts, purchase ads, or take other actions on our platform for purposes such as spamming, spreading misinformation, or other objectionable ends. As a result of our prominence, the size of our user base, and the types and volume of personal data on our systems, we believe that we are a particularly attractive target for such breaches and attacks. Such attacks may cause interruptions to the services we provide, degrade the user experience, cause users or customers to lose confidence and trust in our products and services, impair our internal systems, or result in financial harm to us.

We have adopted strict information security policies and deployed advanced measures to implement the policies, including, among others, advanced encryption technologies. However, we may not be able to implement adequate preventative measures or prevent compromises or breaches of our preventative measures due to the evolution of the sophistication of cyber-attacks, advances in technology, an increased level of sophistication and diversity of our products and services, an increased level of expertise of hackers, new discoveries in the field of cryptography or others, software bugs or other technical malfunctions, employee, contractor, or vendor error or malfeasance, government surveillance, or other evolving threats. As a result, we may incur significant costs in protecting against or remediating cyber-attacks.

In addition, some of our developers or other partners, such as those that help us measure the effectiveness of ads, may receive or store information provided by us or by our users through mobile or web applications integrated with our products. We provide limited information to such third parties based on the scope of services provided to us. However, if these third parties fail to adopt or adhere to adequate data security practices, or in the event of a breach of their networks, our data or our users' data may be improperly accessed, used, or disclosed.

Affected users or government authorities could initiate legal or regulatory actions against us in connection with any actual or perceived security breaches or improper disclosure of data, which could cause us to incur significant expense and liabilities or result in orders or consent decrees forcing us to modify our business practices. Such incidents or our efforts to remediate such incidents may also result in a decline in our user base or engagement levels. Any of these events could have a material and adverse effect on our business, reputation, or results of operations.

*Concerns and unfavorable media coverage relating to our privacy practices could damage our reputation, deter current and potential users and customers from using our products and services and negatively impact our business.*

The internet industry is facing significant challenges with respect to information security and privacy, including the storage, transmission and sharing of confidential information. The general public, our users, customers, distributors, content providers and Baidu Union partners are increasingly aware of the vulnerability of

23

Table of Contents

confidential and private information. We will continue to experience media or regulatory scrutiny of our actions or decisions regarding user privacy, content or advertising. Furthermore, concerns have been expressed from time to time about whether our products, services or processes could compromise the privacy of users and others.

We transmit and store confidential and private information of our users, customers, distributors, content providers and Baidu Union partners, such as personal information, including names, accounts, user IDs and passwords, and payment or transaction related information. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, and any negative publicity on our information safety or privacy protection mechanism and policy, even if unfounded, has in the past, and could adversely affect our business and results of operations and financial condition. Such concerns and negative publicity could damage our reputation and brand, and have an adverse effect on the size, engagement and loyalty of our user base, which could adversely affect our business and results.

*If we fail to maintain an effective system of internal control over financial reporting, we may lose investor confidence in the reliability of our financial statements.*

We are subject to reporting obligations under the U.S. securities laws. The SEC, as required by Section 404 of the Sarbanes-Oxley Act of 2002, adopted rules requiring every public company to include a management report on the company's internal control over financial reporting in its annual report, which contains management's assessment of the effectiveness of its internal control over financial reporting. In addition, an independent registered public accounting firm must attest to and report on the effectiveness of the company's internal control over financial reporting. We have been subject to these requirements since the fiscal year ended December 31, 2006.

Our management has concluded that our internal control over financial reporting was effective as of December 31, 2018. See "Item 15. Controls and Procedures." Our independent registered public accounting firm has issued an attestation report, which has concluded that our internal control over financial reporting was effective in all material aspects as of December 31, 2018. However, if we fail to maintain an effective system of internal control over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal control over financial reporting at a reasonable assurance level. This could in turn result in loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs, management time and other resources in an effort to comply with Section 404 of the Sarbanes-Oxley Act and other requirements.

*We have limited business insurance coverage.*

Insurance companies in China currently offer limited business insurance products. We do not have any business liability or disruption insurance coverage for our operations in China. Any business disruption may result in our incurring substantial costs and the diversion of our resources.

*We face risks related to health epidemics, severe weather conditions and other outbreaks.*

Our business could be adversely affected by the effects of avian influenza, severe acute respiratory syndrome (SARS), the influenza A virus, Ebola virus, severe weather conditions or other epidemics or outbreaks. Health or other government regulations adopted in response to an epidemic, severe weather conditions such as snow storms, floods or hazardous air pollution, or other outbreaks may require temporary closure of our offices. Such closures may disrupt our business operations and adversely affect our results of operations.

Table of Contents

**Risks Related to Our Corporate Structure**

*PRC laws and regulations governing our businesses and the validity of certain of our contractual arrangements are uncertain. If we are found to be in violation, we could be subject to sanctions. In addition, changes in PRC laws and regulations or changes in interpretations thereof may materially and adversely affect our business.*

The PRC government restricts or imposes conditions on foreign investment in internet content, value-added telecommunication-based online marketing, audio and video services and mobile application distribution businesses. We and our PRC subsidiaries are considered foreign persons or foreign-invested enterprises under PRC foreign investment related laws. As a result, we and our PRC subsidiaries are subject to PRC legal restrictions on or conditions for foreign ownership of internet content, value-added telecommunication-based online marketing, audio and video services and mobile application distribution businesses. Due to these restrictions and conditions, we operate our platform and conduct value-added telecommunication-based online marketing, audio and video services and mobile application distribution businesses in China through our consolidated affiliated entities. As all the nominee shareholders of our consolidated affiliated entities are either PRC citizens or PRC domestic enterprises, these entities are therefore considered as PRC domestic enterprises under PRC law. The "nominee shareholders" refer to those shareholders who have pledged their equity interest in our consolidated affiliated entities to us and entered into exclusive equity purchase and transfer option agreements with us as part of the contractual arrangements. Our contractual arrangements with our consolidated affiliated entities and the nominee shareholders allow us to have the power to direct the activities of these entities that most significantly impact their economic performance. These contractual arrangements demonstrate our ability and intention to continue to exercise the ability to absorb losses or receive economic benefits that could potentially be significant to the affiliated entities. In 2016, 2017 and 2018, we derived approximately 35%, 34% and 33% of our total revenues, respectively, from our consolidated affiliated entities.

There are substantial uncertainties regarding the interpretation and application of PRC laws and regulations, including, but not limited to, the laws and regulations governing our business, or the enforcement and performance of our contractual arrangements with our consolidated affiliated entities, including but not limited to Baidu Netcom and the nominee shareholders. These laws and regulations may be subject to change, and their official interpretation and enforcement may involve substantial uncertainty. New laws and regulations that affect existing and proposed future businesses may also be applied retroactively.

Although we believe we comply with current PRC laws and regulations, we cannot assure you that the PRC government would agree that our contractual arrangements comply with PRC licensing, registration or other regulatory requirements, with existing policies or with requirements or policies that may be adopted in the future. The PRC government has broad discretion in determining penalties for violations of laws and regulations. If the PRC government determines that we do not comply with applicable law, it could revoke our business and operating licenses, require us to discontinue or restrict our operations, restrict our right to collect revenues, block our websites, require us to restructure our operations, impose additional conditions or requirements with which we may not be able to comply, impose restrictions on our business operations or on our customers, or take other regulatory or enforcement actions against us that could be harmful to our business. Any of these or similar occurrences could significantly disrupt our business operations or restrict us from conducting a substantial portion of our business operations, which could materially and adversely affect our business, financial condition and results of operations. If any of these occurrences results in our inability to direct the activities of any of our consolidated affiliated entities that most significantly impact its economic performance, and/or our failure to receive the economic benefits from any of our consolidated affiliated entities, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

*Our contractual arrangements with our consolidated affiliated entities in China and the individual nominee shareholders may not be as effective in providing control over these entities as direct ownership.*

Since PRC law restricts or imposes conditions on foreign equity ownership in the internet sector, value-added telecommunication-based online marketing, online audio and video services and mobile application

25

**Table of Contents**

distribution companies in China, we operate our platform and conduct our value-added telecommunication-based online marketing, online audio and video services and mobile app distribution businesses through our consolidated affiliated entities in China. We have no equity interest in any of these entities and must rely on contractual arrangements to control and operate the businesses and assets held by our consolidated affiliated entities, including the domain names and trademarks that have been transferred from our subsidiaries to our consolidated affiliated entities in accordance with requirements of PRC law. These contractual arrangements may not be as effective in providing control over these entities as direct ownership. For example, our consolidated affiliated entities and the individual nominee shareholders could breach their contractual arrangements with us by, among other things, failing to operate our business, such as using the domain names and trademarks our subsidiaries have transferred to them or maintaining our platform, in an acceptable manner or taking other actions that are detrimental to our interests. If our consolidated affiliated entities or the individual nominee shareholders fail to perform their obligations under these contractual arrangements, we may have to incur substantial costs to enforce such arrangements, and rely on legal remedies under PRC law, including contract remedies, which may not be sufficient or effective. If we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, we may not be able to have the power to direct the activities that most significantly affect the economic performance of our consolidated affiliated entities, and we may lose control over the assets owned by our consolidated affiliated entities, including our *Baidu.com* domain name and website, and any other domain names and websites we have access to may not attract a large number of users and customers at the same level as *Baidu.com*. As a result, our ability to conduct our business may be materially and adversely affected, and we may not be able to consolidate the financial results of the relevant affiliated entities into our consolidated financial statements in accordance with U.S. GAAP, which may materially and adversely affect our results of operations and damage our reputation.

*Our contractual arrangements with our consolidated affiliated entities in China may result in adverse tax consequences to us.*

As a result of our corporate structure and the contractual arrangements between our subsidiaries and each of our consolidated affiliated entities in China, we are subject to VAT at a rate of 6% as a result of the VAT reform program on both service revenues generated by our consolidated affiliated entities' operations in China and revenues derived from our subsidiaries' contractual arrangements with these consolidated affiliated entities. Where our consolidated affiliated entity is qualified as a VAT general taxpayer, the VAT charged by our subsidiaries on the revenues obtained from such consolidated affiliated entity based on the contractual arrangement between our subsidiaries and such consolidated affiliated entity will constitute input VAT for the consolidated affiliated entity, and will be creditable against output VAT arising in connection with VAT taxable activities carried out by the consolidated affiliated entity. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation" for more information on the VAT reform program. Moreover, we would be subject to adverse tax consequences if the PRC tax authorities were to determine that the contracts between our subsidiaries and these consolidated affiliated entities were not on an arm's-length basis and therefore constituted a favorable transfer pricing. Under the PRC Enterprise Income Tax Law, or the EIT Law, an enterprise must submit its annual tax return together with information on related-party transactions to the PRC tax authorities. The PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. For example, the PRC tax authorities could request that our consolidated affiliated entities adjust their taxable income upward for PRC tax purposes. Such adjustment could adversely affect us by increasing our consolidated affiliated entities' tax expenses without reducing our subsidiaries' tax expenses, which could subject our consolidated affiliated entities to interest due on late payments and other penalties for under-payment of taxes.

*We may have exposure to greater than anticipated tax liabilities.*

We are subject to enterprise income tax, or EIT, VAT, and other taxes in many provinces and cities in China and our tax structure is subject to review by various local tax authorities. The determination of our provision for

26

Table of Contents

income tax and other tax liabilities requires significant judgment. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. For example, if our P4P service is classified as a form of advertisement distribution service, we may be required to pay a 3% cultural business construction fee. In addition, if this classification of P4P services were to be retroactively applied, we might be subject to sanctions, including payment of delinquent fees and fines for the revenues generated from our P4P services prior to the classification. Moreover, under the EIT Law, the PRC tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's-length principles. Particularly, pursuant to the Administrative Measures for Special Tax Adjustment and Investigation and Mutual Consultation Procedures issued by the State Administration of Tax in March 2017, if a PRC enterprise makes an outbound payment to its overseas related party which undertakes no functions, bears no risks or has no substantial operation or activities and such payment is inconsistent with arm's-length principles, the tax authorities may carry out a special tax adjustment based on the full amount deducted prior to tax. Although we believe all our related party transactions, including all payments by our PRC subsidiaries and consolidated affiliated entities to our non-PRC entities, are made on an arm's-length basis and our estimates are reasonable, the ultimate decisions by the relevant tax authorities may differ from the amounts recorded in our financial statements and may materially affect our financial results in the period or periods for which such determination is made.

***The individual nominee shareholders of our consolidated affiliated entities may have potential conflicts of interest with us, which may adversely affect our business. We do not have any arrangements in place to address such potential conflicts.***

We have designated individuals who are PRC nationals to be the nominee shareholders of our consolidated affiliated entities in China. For example, Robin Yanhong Li, our chairman, chief executive officer and co-founder, is also the principal nominee shareholder of Baidu Netcom, which is our principal consolidated affiliated entity.

Although the individual nominee shareholders are contractually obligated to act in good faith and in our best interest, they may still have potential conflicts of interest with us. For example, some individual nominee shareholders of our consolidated affiliated entities do not have a significant equity stake in our company other than the share options granted to them. We cannot assure you that when conflicts of interest arise, any or all of these individuals will act in the best interests of our company or such conflicts will be resolved in our favor. In addition, these individuals may breach, cause our consolidated affiliated entities to breach or refuse to renew, the existing contractual arrangements with us. Currently, we do not have any arrangements to address potential conflicts of interest between these individuals and our company, except that we could exercise our transfer option under the exclusive equity purchase and transfer option agreement with the relevant individual nomine shareholder to request him/her to transfer all of his/her equity ownership in the relevant consolidated affiliated entity to a PRC entity or individual designated by us. We rely on Mr. Robin Yanhong Li, who is also a director of our company, to abide by the Cayman Islands law, which provides that directors owe a fiduciary duty to the company, and those who are also directors or officers of our PRC subsidiaries to abide by PRC law, which provides that directors and officers owe a fiduciary duty to the company. Such fiduciary duty requires directors and/or officers to act in good faith and in the best interests of the company and not to use their positions for personal gains. There are, however, no specific provisions under the Cayman Islands or PRC law on how to address potential conflicts of interest. If we cannot resolve any conflict of interest or dispute between us and the individual nominee shareholders of our consolidated affiliated entities, we would have to rely on legal proceedings, which could disrupt our business, distract management and subject us to substantial uncertainty as to the outcome of any such legal proceedings.

***We may be unable to collect long-term loans to the nominee shareholders of our consolidated affiliated entities in China.***

As of the date of this annual report, we have made long-term loans in an aggregate principal amount of RMB11.4 billion (US$1.7 billion) to the nominee shareholders of our consolidated affiliated entities. We

27

Table of Contents

extended these loans to enable the nominee shareholders to fund the capitalization of these entities. We may in the future provide additional loans to the nominee shareholders of our consolidated affiliated entities in China in connection with any increase in their capitalization to the extent necessary and permissible under applicable law. Our ability to ultimately collect these loans will depend on the profitability of these consolidated affiliated entities and their operational needs, which are uncertain.

***We are in the process of registering the pledges of equity interests by nominee shareholders of some of our consolidated affiliated entities, and we may not be able to enforce the equity pledges against any third parties who acquire the equity interests in good faith in the relevant consolidated affiliated entities before the pledges are registered.***

The nominee shareholders of each of our consolidated affiliated entities have pledged all of their equity interests in the relevant consolidated affiliated entities to our subsidiaries pursuant to equity pledge agreements under the contractual arrangements. An equity pledge agreement becomes effective among the parties upon execution. However, according to the PRC Property Rights Law, an equity pledge is not perfected as a security property right unless it is registered with the relevant local administration for market regulation. We are still in the process of registering the pledge relating to certain consolidated affiliated entities, relating to recent equity interest transfers and capital increase. Prior to the completion of the registration, we may not be able to successfully enforce the equity pledge against any third parties who have acquired property right interests in good faith in the equity interests in the relevant consolidated affiliated entities.

*Risks Related to Doing Business in China*

***Changes in China's economic, political or social conditions or government policies could have a material and adverse effect on our business and operations.***

Most of our business operations are conducted in China. Accordingly, our business, results of operations, financial condition and prospects are affected by economic, political and social conditions in China generally and by continued economic growth in China as a whole.

China's economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development. The Chinese government also exercises significant control over China's economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

Growth of China's economy has been uneven, both geographically and among various sectors of the economy, and the growth of the Chinese economy has slowed down since 2012. Some of the government measures may benefit the overall Chinese economy, but may have a negative effect on us. For example, our financial condition and results of operations may be adversely affected by government control over capital investments or changes in tax regulations. Any stimulus measures designed to boost the Chinese economy may contribute to higher inflation, which could adversely affect our results of operations and financial condition. For example, certain operating costs and expenses, such as employee compensation and office operating expenses, may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets.

28

Table of Contents

*Uncertainties with respect to the PRC legal system could adversely affect us.*

We conduct our business primarily through our subsidiaries and consolidated affiliated entities in China. Our operations in China are governed by PRC laws and regulations. Our subsidiaries are generally subject to laws and regulations applicable to foreign investments in China. The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value.

PRC laws and regulations have significantly enhanced the protections afforded to various forms of foreign investments in China for the past decades. However, China has not developed a fully integrated legal system and recently enacted laws and regulations may not sufficiently cover all aspects of economic activities in China. In particular, because these laws and regulations are relatively new, and because of the limited volume of published decisions and their nonbinding nature, the interpretation and enforcement of these laws and regulations involve uncertainties.

Furthermore, the PRC legal system is based in part on government policies and internal rules, some of which are not published on a timely basis or at all. As a result, we may not be aware of our potential violation of these policies and rules. In addition, any litigation in China may be protracted and result in substantial costs and diversion of resources and management attention.

*We may be adversely affected by the complexity, uncertainties and changes in PRC regulation of internet and related business and companies.*

The PRC government regulates the internet and related industry extensively, including foreign ownership of, and the licensing and permit requirements pertaining to, companies in the internet industry. These internet-related laws and regulations are relatively new and evolving, and their interpretation and enforcement involve significant uncertainty. As a result, under certain circumstances it may be difficult to determine what actions or omissions may be deemed to be violations of applicable laws and regulations. Issues, risks and uncertainties relating to PRC government regulation of the internet industry include, but are not limited to, the following:

- We only have contractual control over our websites. We do not own the websites due to the restriction of foreign investment in businesses providing value-added telecommunications services in China, including online information services.

- The licensing requirements relating to the internet business in China are uncertain and evolving. This means that permits, licenses or operations at some of our PRC subsidiaries and consolidated affiliated entities may be subject to challenge, or we may not be able to obtain or renew certain permits or licenses, including without limitation, a Value-Added Telecommunication Business Operating License, which is issued by the MIIT, an Internet News License, which is issued by the State Internet Information Office, or the SIIO, a Short Messaging Service Access Code Certificate, which is issued by the MIIT, an Online Audio/Video Program Transmission License, which is issued by the State Administration of Press Publication, Radio, Film and Television, or the SAPPRFT (currently known as National Radio and Television Administration, or the NRTA), a Radio and Television Program Production License, which is issued by the NRTA, a Surveying and Mapping Qualification Certificate for internet map services, which is issued by the National Administration of Surveying, Mapping and Geo-information, an Internet Culture Business Permit with the permitted scope of business covering online game operation and online game virtual currency issuance or trading, which is issued by the Ministry of Culture, an Internet Publication Service License, which is issued by the National News and Publication Bureau, or the NNPB, a Publication Business Operating License, which is issued by NNPB, a Qualification Certificate for Internet Drug Information Services, which is issued by provincial branch of the State Food and Drug Administration, a China Air Transport Sales Agency Services Certificate, which is issued by China Air Transport Association, a Human Resource Services License, which is issued by the Ministry of Human Resources and Social Security, and a Commercial Performances License, which is issued by the municipal bureau of culture. Failure to obtain or renew

29

Table of Contents

these permits and licenses may significantly disrupt our business, or subject us to sanctions, requirements to increase capital or other conditions or enforcement, or compromise enforceability of related contractual arrangements, or have other harmful effects on us.

- New laws and regulations may be promulgated to regulate internet activities, including online advertising. Other aspects of our online operations may be regulated in the future. If these new laws and regulations are promulgated, additional licenses may be required for our online operations. If our operations do not comply with these new regulations at the time they become effective, or if we fail to obtain any licenses required under these new laws and regulations, we could be subject to penalties.

We provide value-added telecommunications services through our consolidated affiliated entities, which hold the required licenses. In July 2006, the MIIT issued the Notice of the Ministry of Industry and Information Technology on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services. This notice prohibits domestic telecommunication service providers from leasing, transferring or selling telecommunication business operating licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. According to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by the license holder in its provision of value-added telecommunications services. The notice also requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain these facilities in the regions covered by its license. Baidu Netcom, our consolidated affiliated entity, owns the necessary domain names and trademarks, including pending trademark applications and have the necessary personnel and facilities to operate our websites.

As we enter into new businesses, we may encounter additional regulatory uncertainties. For example, the current PRC legal framework on autonomous cars or autonomous driving is still new and evolving. Pursuant to the local rules and regulations in various cities including Beijing, Shanghai, Tianjin, and Chongqing, any entity intending to conduct a road testing of autonomous driving vehicles in these cities must file an application for road testing with a designated local agency supervising road testing of autonomous vehicles in these cities. It also remains uncertain what additional compliance requirements we need to meet in order to undertake a road testing of our autonomous driving cars in other locations in China. Baidu Netcom, one of our consolidated affiliated entities, has obtained permits to conduct road testing in Beijing and Tianjin. There is no guarantee that the road testing of our autonomous driving cars in other locations fully complies with local laws and regulations. If our road testing is deemed by local enforcement authority as a violation of the applicable traffic and transportation laws, we may have to suspend the testing, and the progress of our research and development of autonomous cars may be adversely affected.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the internet industry have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business.

***Uncertainties exist with respect to the interpretation and implementation of the newly enacted PRC Foreign Investment Law and how it may impact the viability of our current corporate structure, corporate governance and business operations.***

On March 15, 2019, the National People's Congress approved the Foreign Investment Law, which will come into effect on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-invested Enterprise Law, together with their implementation rules and ancillary regulations. The Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to

30

Table of Contents

unify the corporate legal requirements for both foreign and domestic investments. However, since it is relatively new, uncertainties still exist in relation to its interpretation and implementation. For instance, under the Foreign Investment Law, "foreign investment" refers to the investment activities directly or indirectly conducted by foreign individuals, enterprises or other entities in China. Though it does not explicitly classify contractual arrangements as a form of foreign investment, there is no assurance that foreign investment via contractual arrangement would not be interpreted as a type of indirect foreign investment activities under the definition in the future. In addition, the definition contains a catch-all provision which includes investments made by foreign investors through means stipulated in laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions promulgated by the State Council to provide for contractual arrangements as a form of foreign investment. In any of these cases, it will be uncertain whether our contractual arrangements will be deemed to be in violation of the market access requirements for foreign investment under the PRC laws and regulations. Furthermore, if future laws, administrative regulations or provisions prescribed by the State Council mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, corporate governance and business operations.

***Regulation and censorship of information disseminated over the internet in China may adversely affect our business, and subject us to liability for information displayed on or linked to our websites and negative publicity in international media.***

The PRC government has adopted regulations governing internet access and distribution of news and other information over the internet. Under these regulations, internet content providers and internet publishers are prohibited from posting or displaying over the internet content that, among other things, violates PRC laws and regulations, impairs the national dignity of China, contains terrorism or extremism content, or is reactionary, obscene, superstitious, fraudulent or defamatory. Failure to comply with these requirements may result in the revocation of licenses to provide internet content and other licenses and the closure of the concerned websites. In the past, failure to comply with these requirements has resulted in the closure of certain websites. The website operator may also be held liable for the censored information displayed on or linked to the website.

In particular, the MIIT has published regulations that subject website operators to potential liability for content displayed on their websites and the actions of users and others using their systems, including liability for violations of PRC laws and regulations prohibiting the dissemination of content deemed to be socially destabilizing. The Ministry of Public Security has the authority to order any local internet service provider to block any internet website at its sole discretion. From time to time, the Ministry of Public Security has stopped the dissemination over the internet of information which it believes to be socially destabilizing. The State Secrecy Bureau is also authorized to block any website it deems to be leaking state secrets or failing to meet the relevant regulations relating to the protection of state secrets in the dissemination of online information. Furthermore, we are required to report any suspicious content to relevant governmental authorities, and to undergo computer security inspections. If we fail to implement the relevant safeguards against security breaches, our websites may be shut down and our business and ICP licenses may be revoked.

The Anti-Terrorism Law, which took effect on January 1, 2016 and was amended on April 27, 2018, further requires internet service providers to verify the identity of their users, and to not provide services to anyone whose identity is unclear or who declines verification. Although the identity verification requirements are already embodied in some internet related regulations, the Anti-Terrorism Law extends these requirements to all types of internet services. The internet service providers are also required to provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities.

31

Table of Contents

Although we attempt to monitor the content in our search results and on our online communities such as Baidu Post Bar, we are not able to control or restrict the content of other internet content providers linked to or accessible through our websites, or content generated or placed on our Baidu Post Bar message boards or our other online communities by our users. To the extent that PRC regulatory authorities find any content displayed on our websites illegal, they may require us to limit or eliminate the dissemination of such information on our websites. To the extent that PRC regulatory authorities find any content displayed on our websites objectionable, they may suggest that we limit or eliminate the dissemination of such information on our websites. If third-party websites linked to or accessible through our websites conduct unlawful activities such as online gambling on their websites, PRC regulatory authorities may require us to report such unlawful activities to relevant authorities and to remove the links to such websites, or they may suspend or shut down the operation of these third-party websites. PRC regulatory authorities may also temporarily block access to certain websites for a period of time for reasons beyond our control. Any of these actions may reduce our user traffic and adversely affect our business. In addition, we may be subject to penalties for violations of those regulations arising from information displayed on or linked to our websites, including a suspension or shutdown of our online operations.

Moreover, our compliance with PRC regulations governing internet access and distribution of news and other information over the internet may subject us to negative publicity or even legal actions outside of China. In May 2011, eight New York residents filed a lawsuit against us before the U.S. District Court for the Southern District of New York accusing us of aiding Chinese censorship in violation of the U.S. Constitution. In March 2014, the U.S. District Court for the Southern District of New York granted our motion for judgment on the pleadings based upon the First Amendment to the U.S. Constitution and dismissed with prejudice the plaintiffs' complaint in its entirety, barring the plaintiffs from bringing an appeal or action based on the same claim. Even though we have won the case, our reputation may continually be adversely affected among users and investors outside of China.

***The discontinuation of any of the preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition.***

Pursuant to the EIT Law, as further clarified by subsequent tax regulations implementing the EIT Law, foreign-invested enterprises and domestic enterprises are subject to EIT at a uniform rate of 25%. Certain enterprises may benefit from a preferential tax rate of 15% under the EIT Law if they qualify as "High and New Technology Enterprises strongly supported by the state," subject to certain general factors described in the EIT Law and the related regulations.

A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online Network Technology (Beijing) Co., Ltd., or Baidu Online, and Baidu Netcom are entitled to enjoy a preferential tax rate of 15% due to their qualification as "High and New Technology Enterprise," which has a term of three years. If any or some of these PRC subsidiaries and consolidated affiliated entities fail to maintain the "High and New Technology Enterprise" qualification, their applicable EIT rate will increase to 25%. Furthermore, Baidu Online was entitled to a preferential income tax rate of 10% from 2010 to 2017 due to its "Key Software Enterprise" status, so was Baidu China for 2015 to 2017, and Baidu International Technology (Shenzhen) Co., Ltd., or Baidu International, for 2016 and 2017. Baidu Online, Baidu China and Baidu International will file with the local tax authority for the preferential tax rate of 10% for a "Key Software Enterprise" for 2018 before the end of May 2019, and will be subject to relevant governmental authorities' assessment. However, there is no assurance that any of these entities will continue to enjoy the preferential tax rate as a "Key Software Enterprise." See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax."

The discontinuation of any of the above-mentioned preferential income tax treatments currently available to us in the PRC could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain our current effective tax rate in the future.

32

Table of Contents

***If our PRC subsidiaries declare and distribute dividends to their respective offshore parent companies, we will be required to pay more taxes, which could have a material and adverse effect on our result of operations.***

Under the EIT Law and related regulations, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its foreign non-resident enterprise investors, and proceeds from any such foreign enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to a 10% withholding tax, unless the foreign enterprise investor's jurisdiction of incorporation has a tax treaty with China that provides for a reduced rate of withholding tax. Undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 are exempted from any withholding tax. The British Virgin Islands, where Baidu Holdings Limited, the direct parent company of our PRC subsidiaries Baidu Online and Baidu International, is incorporated, does not have such a tax treaty with China. Hong Kong has a tax arrangement with China that provides for a 5% withholding tax on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. For example, Baidu (Hong Kong) Limited, which directly owns our PRC subsidiaries Baidu China and Baidu Times, is incorporated in Hong Kong. However, if Baidu (Hong Kong) Limited is not considered to be the beneficial owner of dividends paid to it by Baidu China and Baidu Times under the tax circulars promulgated in February 2009 and 2018, such dividends would be subject to withholding tax at a rate of 10%. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, such payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

***We may be deemed a PRC resident enterprise under the EIT Law, which could subject us to PRC taxation on our global income, and which may have a material and adverse effect on our results of operations.***

Under the EIT Law and related regulations, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a PRC resident enterprise and is subject to the EIT at the rate of 25% on its worldwide income as well as PRC EIT reporting obligations. The related regulations define the term "de facto management body" as "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise." The State Administration of Taxation issued SAT Circular 82 in April 2009, which provides certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled overseas-incorporated enterprise is located in China. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. See "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation—PRC Enterprise Income Tax." Although the SAT Circular 82, the additional guidance and amendment apply only to overseas registered enterprises controlled by PRC enterprises, not to those controlled by PRC individuals or foreigners, the criteria set forth in SAT Circular 82 may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises or individuals. If we are deemed a PRC resident enterprise, we may be subject to the EIT at 25% on our global income, except that the dividends we receive from our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed as "dividends among qualified PRC resident enterprises." If we are deemed a PRC resident enterprise and earn income other than dividends from our PRC subsidiaries, a 25% EIT on our global income could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

33

Table of Contents

***Under PRC tax laws, dividends payable by us and gains on the disposition of our shares or ADSs may be subject to PRC taxation.***

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the EIT at the rate of 10% upon the dividends payable by us or upon any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. If we are required under the EIT Law to withhold PRC income tax on our dividends payable to our non-PRC resident enterprise shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident enterprise shareholders and ADS holders are subject to the EIT, your investment in our shares or ADSs could be materially and adversely affected.

Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is possible that such dividends and gains earned by non-resident individuals may be subject to PRC individual income tax at a rate of 20%. If we are required under PRC tax laws to withhold PRC income tax on dividends payable to our non-PRC investors that are non-resident individuals or if you are required to pay PRC income tax on the transfer of our shares or ADSs, the value of your investment in our shares or ADSs may be materially and adversely affected.

***Our subsidiaries and consolidated affiliated entities in China are subject to restrictions on paying dividends and making other payments to our holding company.***

Baidu, Inc. is our holding company incorporated in the Cayman Islands. As a result of the holding company structure, it currently relies on dividend payments from our subsidiaries in China. However, PRC regulations currently permit payment of dividends only out of accumulated profits, as determined in accordance with PRC accounting standards and regulations. Our subsidiaries and consolidated affiliated entities in China are also required to set aside a portion of their after-tax profits according to PRC accounting standards and regulations to fund certain reserve funds. The PRC government also imposes controls on the conversion of RMB into foreign currencies and the remittance of foreign currencies out of China. We may experience difficulties in completing the administrative procedures necessary to obtain and remit foreign currency. See "—Governmental control of currency conversion may affect the value of your investment." Furthermore, if our subsidiaries or consolidated affiliated entities in China incur debt on their own in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments. If our subsidiaries and consolidated affiliated entities in China are unable to pay dividends or make other payments to us, we may be unable to pay dividends on our ordinary shares and ADSs.

***Governmental control of currency conversion may affect the value of your investment.***

The PRC government imposes controls on the convertibility of RMB into foreign currencies and, in certain cases, the remittance of foreign currency out of China. We receive most of our revenues in RMB. Under our current structure, our income at the Cayman Islands holding company level will primarily be derived from dividend payments from our PRC subsidiaries. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the State Administration of Foreign Exchange, or SAFE, by complying with certain procedural requirements. However, approval from appropriate government authorities is required where RMB is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also at its discretion restrict access in the

34

Table of Contents

future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders or ADS holders.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business.***

Baidu, Inc. is our offshore holding company conducting operations in China through our PRC subsidiaries and consolidated affiliated entities. We may make loans to our PRC subsidiaries and consolidated affiliated entities, or we may make additional capital contributions to our PRC subsidiaries. Loans by Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries, which are treated as foreign-invested enterprises under PRC law, or to our consolidated affiliated entities are subject to PRC regulations and foreign exchange loan registrations. Such loans to any of our PRC subsidiaries and consolidated affiliated entities to finance their activities cannot exceed a statutory upper limit and must be filed with SAFE through the online filing system of SAFE after the loan agreement is signed and at least three business days prior to the borrower withdraws any amount from the foreign loan. We may also decide to finance our PRC subsidiaries by means of capital contributions, in which case the PRC subsidiary is required to file the details of the capital contributions with the Ministry of Commerce or its local counterparts. If the business of the PRC subsidiary falls under the "restricted business" category under the Guidance Catalog of Industries for Foreign Investment or is subject to special requirements with respect to shareholding percentage and qualification of senior officers for the "encouraged business" category, the capital contributions to such PRC subsidiary must be approved by the Ministry of Commerce or its local counterparts. Meanwhile, we are not likely to finance the activities of our consolidated affiliated entities by means of capital contributions given the PRC legal restrictions on foreign ownership of internet, value-added telecommunication-based online marketing, online audio and video services and mobile app distribution businesses.

In June 2016, SAFE promulgated SAFE Circular No. 16, which removed certain restrictions previously provided under several SAFE circulars, including SAFE Circular No. 142, in respect of conversion by a foreign-invested enterprise of foreign currency registered capital into RMB and use of such RMB capital. However, SAFE Circular No. 16 continues to prohibit foreign-invested enterprises from, among other things, using RMB fund converted from its foreign exchange capitals for expenditure beyond its business scope, and providing loans to non-affiliated enterprises except as permitted in the business scope.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, including SAFE Circulars referred to above, we cannot assure you that we will be able to complete the necessary government registrations or filings on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or consolidated affiliated entities or additional capital contributions by us to our PRC subsidiaries, and conversion of such loans or capital contributions into RMB. If we fail to complete such registrations or filings, our ability to capitalize or otherwise fund our PRC operations may be negatively affected, which could adversely affect our ability to fund and expand our business.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The Notice on Issues Relating to the Administration of Foreign Exchange in Fund-Raising and Round-Trip Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Companies, or SAFE Circular No. 75, and a series of implementation rules and guidance issued by SAFE, including the circular relating to operating procedures that came into effect in July 2011, require PRC residents and PRC corporate entities to register with local branches of SAFE in connection with their direct or indirect offshore investment in

35

Table of Contents

an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which became effective on June 1, 2015. In accordance with SAFE Notice 13, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered, and updated registration when required, with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders or ADS holders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

As it is uncertain how the SAFE regulations described above will be interpreted or implemented, we cannot predict how these regulations will affect our business operations or future strategy. For example, we may be subject to more stringent review and approval process with respect to our foreign exchange activities, such as remittance of dividends and foreign currency-denominated borrowings, which may adversely affect our results of operations and financial condition. In addition, if we decide to acquire a PRC domestic company, we cannot assure you that we or the owners of such company will be able to obtain the necessary approvals or complete the necessary filings and registrations required by the SAFE regulations. This may restrict our ability to implement our acquisition strategy and could adversely affect our business and prospects.

36

Table of Contents

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

In February 2012, SAFE promulgated the Notices on Issues concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. If we or our PRC optionees fail to comply with these regulations in the future, we or our PRC optionees and their local employers may be subject to fines and legal sanctions.

***PRC regulations establish complex procedures for some acquisitions conducted by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Enterprises by Foreign Investors, adopted by six PRC regulatory agencies in August 2006 and amended in June 2009, among other things, established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time-consuming and complex. In addition, the Implementing Rules Concerning Security Review on the Mergers and Acquisitions by Foreign Investors of Domestic Enterprises, issued by the Ministry of Commerce in August 2011, specify that mergers and acquisitions by foreign investors involved in "an industry related to national security" are subject to strict review by the Ministry of Commerce, and prohibit any activities attempting to bypass such security review, including by structuring the transaction through a proxy or contractual control arrangement. We believe that our business is not in an industry related to national security, but we cannot preclude the possibility that the Ministry of Commerce or other government agencies may publish explanations contrary to our understanding or broaden the scope of such security reviews in the future, in which case our future acquisitions in the PRC, including those by way of entering into contractual control arrangements with target entities, may be closely scrutinized or prohibited. Moreover, the Anti-Monopoly Law requires that the Ministry of Commerce be notified in advance of any concentration of undertaking if certain filing thresholds are triggered. We may grow our business in part by directly acquiring complementary businesses in China. Complying with the requirements of the laws and regulations mentioned above and other PRC regulations to complete such transactions could be time-consuming, and any required approval processes, including obtaining approval from the Ministry of Commerce, may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share. Our ability to expand our business or maintain or expand our market share through future acquisitions would as such be materially and adversely affected.

***Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, and as such, investors may be deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities. In May 2013, PCAOB announced that it had entered into a Memorandum of Understanding on Enforcement Cooperation with the China Securities Regulation Commission, or the CSRC, and the Ministry of Finance, which establishes a cooperative framework between the parties for the production and exchange of audit documents relevant to investigations

37

Table of Contents

undertaken by PCAOB, the CSRC or the Ministry of Finance in the United States and the PRC, respectively. PCAOB continues to be in discussions with the CSRC and the Ministry of Finance to permit joint inspections in the PRC of audit firms that are registered with PCAOB and audit Chinese companies that trade on U.S. exchanges. On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. The joint statement reflects a heightened interest in an issue that has vexed U.S. regulators in recent years. However, it remains unclear what further actions the SEC and PCAOB will take to address the problem.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

***Proceedings instituted by the SEC against certain PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act.***

In December 2012, the SEC brought administrative proceedings against five accounting firms in China, including our independent registered public accounting firm, alleging that they had refused to produce audit work papers and other documents related to certain other China-based companies under investigation by the SEC. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of these firms from practicing before the SEC for a period of six months. The decision is neither final nor legally effective unless and until reviewed and approved by the SEC. On February 12, 2014, four of these PRC-based accounting firms appealed to the SEC against this decision. In February 2015, each of the four PRC-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the CSRC. If the firms fail to meet specified criteria, during a period of four years starting from the settlement date, the SEC retains authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Additional remedies for any future noncompliance could include, as appropriate, an automatic six-month bar on a single firm's performance of certain audit work, commencement of additional proceedings against a firm, or in extreme cases the resumption of the current proceeding against all four firms.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to our delisting from the NASDAQ Global Select Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

38

Table of Contents

***Fluctuation in the value of the RMB may have a material and adverse effect on our results of operations and the value of your investment.***

The value of the RMB against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in China's political and economic conditions and foreign exchange policies. After the PRC government changed its policy of pegging the value of RMB to the U.S. dollar in 2005, the RMB has fluctuated against the U.S. dollar, at times significantly and unpredictably, and in recent years the RMB has depreciated significantly against the U.S. dollar. Since October 1, 2016, the RMB has joined the International Monetary Fund (IMF)'s basket of currencies that make up the Special Drawing Right (SDR), along with the U.S. dollar, the Euro, the Japanese yen and the British pound. In the fourth quarter of 2016, the RMB depreciated significantly in the backdrop of a surging U.S. dollar and persistent capital outflows of China. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and there is no guarantee that the RMB will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

Our revenues and costs are mostly denominated in RMB. Any significant revaluation of RMB may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. For example, to the extent that we need to convert U.S. dollars into RMB for our operations, appreciation of the RMB against the U.S. dollar would have an adverse effect on the RMB amount we would receive from the conversion. Conversely, if we decide to convert our RMB into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs, repaying our U.S. dollar denominated notes or other payment obligations or for other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us. In addition, appreciation or depreciation in the value of the RMB relative to U.S. dollars would affect our financial results reported, regardless of any underlying change in our business or results of operations, as RMB is our reporting currency. For example, an appreciation of RMB against the U.S. dollar would result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated financial assets into RMB, our reporting currency, and foreign exchange losses reported in earnings for certain RMB denominated loans that overseas entities borrowed from our PRC entities. Conversely, a depreciation of RMB against the U.S. dollar would result in foreign currency translation losses for financial reporting purposes when we translate our U.S. dollar denominated notes and other indebtedness into RMB. Moreover, a significant depreciation of the RMB against the U.S. dollar may significantly reduce our earnings translated in the U.S. dollars, which in turn could adversely affect the price of our ADSs.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert RMB into foreign currency. As a result, fluctuations in exchange rates may have a material adverse effect on your investment.

***We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.***

In February 2015, the State Administration of Tax issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or Public Notice 7. Public Notice 7 extends its tax jurisdiction to not only indirect transfers but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. Public Notice 7

39

Table of Contents

also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10% for the transfer of equity interests in a PRC resident enterprise. However, Public Notice 7 provides safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. On October 17, 2017, the State Administration of Taxation, or the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or SAT Bulletin 37, which came into effect on December 1, 2017. SAT Bulletin 37 further clarifies the practice and procedure of the withholding of non-resident enterprise income tax. Pursuant to Public Notice 7 and SAT Bulletin 37, both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties with respect to the reporting and consequences of private equity financing transactions, share exchange or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises, or sale or purchase of shares in other non-PRC resident companies or other taxable assets by us. Our company and other non-resident enterprises in our group may be subject to filing obligations or being taxed if our company and other non-resident enterprises in our group are transferors in such transactions, and may be subject to withholding obligations if our company and other non-resident enterprises in our group are transferees in such transactions, under Public Notice 7 and SAT Bulletin 37. For the transfer of shares in our company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under Public Notice 7 and SAT Bulletin 37. As a result, we may be required to expend valuable resources to comply with Public Notice 7 and SAT Bulletin 37 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our company and other non-resident enterprises in our group should not be taxed under these circulars. The PRC tax authorities have the discretion under Public Notice 7 and SAT Bulletin 37 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under Public Notice 7 and SAT Bulletin 37, our income tax costs associated with such transactions will be increased, which may have an adverse effect on our financial condition and results of operations. We have made acquisitions in the past and may conduct additional acquisitions in the future. We cannot assure you that the PRC tax authorities will not, at their discretion, adjust any capital gains and impose tax return filing obligations on us or require us to provide assistance to them for the investigation of any transactions we were involved in. Heightened scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.

**Risks Related to Our ADSs**

***The trading price of our ADSs has been volatile and may continue to be volatile regardless of our operating performance.***

The trading price of our ADSs has been and may continue to be subject to wide fluctuations. The market price for our ADSs may continue to be volatile and subject to wide fluctuations in response to factors including the following:

- actual or anticipated fluctuations in our quarterly results of operations;

- changes in financial estimates by securities research analysts;

40

Table of Contents

- conditions in internet search and online marketing markets;

- changes in the operating performance or market valuations of other internet search or internet companies;

- announcements by us or our competitors or other internet companies of new products, acquisitions, strategic partnerships, joint ventures or capital commitments;

- addition or departure of key personnel;

- public perception or negative news about our products or services;

- our share repurchase program;

- fluctuations of exchange rates between RMB and the U.S. dollar;

- litigation, government investigation or other legal or regulatory proceeding; and

- general economic or political conditions in China or elsewhere in the world.

In addition, the stock market in general, and the market prices for internet-related companies and companies with operations in China in particular, have experienced volatility that often has been unrelated to the operating performance of such companies. The securities of some China-based companies that have listed their securities in the United States have experienced significant volatility since their initial public offerings in recent years, including, in some cases, substantial declines in the trading prices of their securities. The trading performances of these companies' securities after their offerings may affect the attitudes of investors towards Chinese companies listed in the United States in general, which consequently may impact the trading performance of our ADSs, regardless of our actual operating performance. In addition, any negative news or perceptions about inadequate corporate governance practices or fraudulent accounting, corporate structure or other matters of other Chinese companies may also negatively affect the attitudes of investors towards Chinese companies in general, including us, regardless of whether we have engaged in any inappropriate activities. In particular, the global financial crisis, the ensuing economic recessions and deterioration in the credit market in many countries have contributed and may continue to contribute to extreme volatility in the global stock markets. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted options or other equity incentives.

***Substantial future sales or the perception of sales of our ADSs in the public market could cause the price of our ADSs to decline.***

Sales of our ADSs in the public market, or the perception that these sales could occur, could cause the market price of our ADSs to decline. Such sales also might make it more difficult for us to sell equity or equity-related securities in the future at a time and price that we deem appropriate. If any existing shareholder or shareholders sell a substantial amount of ADSs, the prevailing market price for our ADSs could be adversely affected. In addition, if we pay for our future acquisitions in whole or in part with additionally issued ordinary shares, your ownership interests in our company would be diluted and this, in turn, could have a material and adverse effect on the price of our ADSs.

***We cannot guarantee that our share repurchase program will be fully consummated or that our share repurchase program will enhance long-term shareholder value, and share repurchases could increase the volatility of the price of our ADSs and could diminish our cash reserves.***

On June 26, 2018, our board of directors authorized our company to repurchase up to US$1.0 billion of our ADSs or ordinary shares over 12 months from June 27, 2018 through June 26, 2019. The share repurchase program, authorized by our board of directors, does not obligate us to repurchase any specific dollar amount or to acquire any specific number of ADSs. The share repurchase program could affect the price of our ADSs and increase volatility and may be suspended or terminated at any time, which may result in a decrease in the trading price of our ADSs.

41

Table of Contents

***You may not have the same voting rights as the holders of our ordinary shares and may not receive voting materials in time to be able to exercise your right to vote.***

Except as described in this annual report and in the deposit agreement, holders of our ADSs will not be able to exercise voting rights attached to the shares evidenced by our ADSs on an individual basis. Holders of our ADSs will appoint the depositary or its nominee as their representative to exercise the voting rights attached to the shares represented by the ADSs. You may not receive voting materials in time to instruct the depositary to vote, and it is possible that you, or persons who hold their ADSs through brokers, dealers or other third parties, will not have the opportunity to exercise a right to vote. Upon our written request, the depositary will mail to you a shareholder meeting notice which contains, among other things, a statement as to the manner in which your voting instructions may be given, including an express indication that such instructions may be given or deemed given to the depositary to give a discretionary proxy to a person designated by us if no instructions are received by the depositary from you on or before the response date established by the depositary. However, no voting instruction will be deemed given and no such discretionary proxy will be given with respect to any matter as to which we inform the depositary that (i) we do not wish such proxy given, (ii) substantial opposition exists, or (iii) such matter materially and adversely affects the rights of shareholders.

***You may not be able to participate in rights offerings and may experience dilution of your holdings as a result.***

We may from time to time distribute rights to our shareholders, including rights to acquire our securities. Under the deposit agreement for the ADSs, the depositary will not offer those rights to ADS holders unless both the rights and the underlying securities to be distributed to ADS holders are either registered under the Securities Act of 1933, or exempt from registration under the Securities Act with respect to all holders of ADSs. We are under no obligation to file a registration statement with respect to any such rights or underlying securities or to endeavor to cause such a registration statement to be declared effective. In addition, we may not be able to take advantage of any exemptions from registration under the Securities Act. Accordingly, holders of our ADSs may be unable to participate in our rights offerings and may experience dilution in their holdings as a result.

***You may be subject to limitations on transfer of your ADSs.***

Your ADSs are transferable on the books of the depositary. However, the depositary may close its transfer books at any time or from time to time when it deems expedient in connection with the performance of its duties. In addition, the depositary may refuse to deliver, transfer or register transfers of ADSs generally when our books or the books of the depositary are closed, or at any time if we or the depositary deems it advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

***You may face difficulties in protecting your interests, and your ability to protect your rights through the U.S. federal courts may be limited, because we are incorporated under Cayman Islands law, conduct most of our operations in China and all of our executive officers reside outside of the United States.***

We are incorporated in the Cayman Islands, and conduct most of our operations in China through our subsidiaries and consolidated affiliated entities in China. All of our executive officers and a majority of our directors reside outside of the United States and some or all of the assets of these persons are located outside of the United States. As a result, it may not be possible to effect service of process within the United States or elsewhere outside of China upon our executive officers, including with respect to matters arising under U.S. federal securities laws or applicable state securities laws.

It may also be difficult or impossible for you to bring an action against us or against our directors and executive officers in the Cayman Islands or in China in the event that you believe that your rights have been infringed under the securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the

42

Table of Contents

assets of our directors and executive officers. There is no statutory recognition in the Cayman Islands of judgments obtained in the United States, although the courts of the Cayman Islands will generally recognize and enforce a non-penal judgment of a foreign court of competent jurisdiction without retrial on the merits. Moreover, our PRC counsel has advised us that the PRC does not have treaties with the United States or many other countries providing for the reciprocal recognition and enforcement of judgment of courts.

Our corporate affairs are governed by our memorandum and articles of association and by the Companies Law (2018 Revision) and common law of the Cayman Islands. The rights of shareholders to take legal action against our directors and us, actions by minority shareholders and the fiduciary responsibilities of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from English common law, which has persuasive, but not binding, authority on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedents in the United States. In particular, the Cayman Islands has a less developed body of securities laws as compared to the United States, and provides significantly less protection to investors. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action before the federal courts of the United States.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests through actions against our management, directors or major shareholders than would shareholders of a corporation incorporated in a jurisdiction in the United States.

***Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering. Our co-founder, chairman and chief executive officer, Robin Yanhong Li, who acquired our shares prior to our initial public offering, holds our Class B ordinary shares. Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate (as defined in our memorandum and articles of association) of such holder, such Class B ordinary shares will be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time Robin Yanhong Li and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share will be automatically and immediately converted into one Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

Due to the disparate voting powers attached to these two classes, certain shareholders have significant voting power over matters requiring shareholder approval, including election of directors and significant corporate transactions, such as a merger or sale of our company or our assets. This concentrated control could discourage or prevent others from pursuing any potential merger, takeover or other change of control transactions with our company, which could deprive our shareholders and ADS holders of an opportunity to receive a premium for their shares or ADSs as part of a sale of our company and might reduce the price of our ADSs.

***Our articles of association contain anti-takeover provisions that could adversely affect the rights of holders of our ordinary shares and ADSs.***

Our articles of association include certain provisions that could limit the ability of others to acquire control of our company, and therefore may deprive the holders of our ordinary shares and ADSs of the opportunity to

43

Table of Contents

sell their ordinary shares or ADSs at a premium over the prevailing market price by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. These provisions include the following:

- A dual-class ordinary share structure.

- Our board of directors has the authority, without approval by the shareholders, to issue up to a total of 10,000,000 preferred shares in one or more series. Our board of directors may establish the number of shares to be included in each such series and may fix the designations, preferences, powers and other rights of the shares of a series of preferred shares.

- Our board of directors has the right to elect directors to fill a vacancy created by the increase of the board of directors or the resignation, death or removal of a director, which prevents shareholders from having the sole right to fill vacancies on our board of directors.

***We may be classified as a passive foreign investment company, or PFIC, which could result in adverse U.S. federal income tax consequence to U.S. Holders of our ADSs or ordinary shares.***

A non-U.S. corporation, such as our own, will be considered a PFIC for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. The value of our assets is generally determined by reference to the market price of the ADSs and ordinary shares, which may fluctuate considerably. In addition, because there are uncertainties in the application of the relevant rules and because PFIC status is a fact-intensive determination made on an annual basis, no assurance may be given with respect to our PFIC status for the current or any future taxable year.

Based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, we believe that we were not a PFIC for our taxable year ended December 31, 2018. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. Our PFIC status for the current taxable year ending December 31, 2019 will not be determinable until the close of the taxable year, there can be no assurance that we will not be a PFIC for the current taxable year (or any future taxable year).

If we were treated as a PFIC for any taxable year during which a U.S. Holder (defined below) held an ADS or an ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Item 10.E. Additional Information—Taxation—U.S. Federal Income Tax Considerations—Passive Foreign Investment Company."

**Item 4.        Information on the Company**

**A.        History and Development of the Company**

We were incorporated in the Cayman Islands in January 2000. Since our inception, we have conducted our operations in China principally through Baidu Online, our wholly owned subsidiary in Beijing, China. Since June 2001, we also have conducted part of our operations in China through Baidu Netcom, a consolidated affiliated entity in Beijing, China, which holds the licenses and approvals necessary to operate our platform and provide value-added telecommunication-based online marketing services. In subsequent years, we have established additional subsidiaries inside and outside of China and assisted in establishing additional PRC consolidated affiliated entities to conduct part of our operations.

On August 5, 2005, we listed our ADSs on The NASDAQ National Market (later renamed The NASDAQ Global Market) under the symbol "BIDU." We and certain selling shareholders of our company completed the initial public offering of 4,604,224 ADSs, each then representing one Class A ordinary share, on August 10, 2005. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split. Our ADSs are currently traded on The NASDAQ Global Select Market.

44

Table of Contents

In December 2008, our shareholders approved our name change from Baidu.com, Inc. to Baidu, Inc. In November 2009, we moved into our new corporate headquarters, which we name as Baidu Campus. Our principal executive offices are located at Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, the People's Republic of China. Our telephone number at this address is +86 (10) 5992-8888.

In November 2012, we obtained the controlling interest in iQIYI, Inc., or iQIYI, a prior equity method investee, and have since then consolidated its financial results into our consolidated financial statements. In May 2013, we acquired the online video business of PPStream Inc., or PPS, merged it with iQIYI and have since then consolidated its financial results into our consolidated financial statements. In March 2018, iQIYI raised approximately US$2.4 billion of net proceeds through its initial public offering. iQIYI's American Depositary Shares trade on the NASDAQ Global Market under the symbol "IQ". We continue to control iQIYI and consolidate its financial results into our own in accordance with U.S. GAAP.

In August 2017, our subsidiary that operated Baidu Deliveries, Xiaodu Life Technology Ltd., or Xiaodu, completed its merger with Rajax Holding, or Rajax, which operates the food delivery business under the ele.me brand in China. As a result of the merger, Xiaodu became a subsidiary of Rajax. We and Rajax have agreed to business cooperation across a broad base of products and services post the merger transaction. In May 2018, we transferred all of our equity interests in Rajax, which operates the food delivery business under the ele.me brand in China, to Ali Panini Investment Limited.

In April 2018, we entered into definitive agreements with certain investors relating to our divestiture of a majority equity stake in our financial services business, which provides consumer credit, wealth management and other financial services and has been renamed as Du Xiaoman. The divestiture was completed in August 2018, following which we held a minority equity interest in Du Xiaoman and have deconsolidated the financial results of Du Xiaoman from our consolidated financial statements in accordance with U.S. GAAP.

## B.   Business Overview

We aim to make a complex world simpler through technology. We strive to achieve this mission through our two-pillar strategy: strengthen our mobile foundation and lead in artificial intelligence (AI).

Our business currently consists of two segments, Baidu Core and iQIYI. Baidu Core primarily comprises (1) search plus feed, such as Baidu App, our search business and supporting content, including Baidu Post Bar, Baidu Knows, and Baidu Encyclopedia, as well as our online marketing services, and (2) new AI businesses, such as DuerOS (voice assistant and related smart device business), Apollo (autonomous driving platform), and Baidu Cloud. iQIYI is an innovative market-leading online entertainment service provider in China. iQIYI's platform features original content, as well as a comprehensive selection of professionally-produced, partner-generated content and user-generated content.

We conduct our operations primarily in China. Revenues generated from our operations in China accounted for approximately 98%, 98% and 98% of our total revenues in 2016, 2017 and 2018, respectively.

**Baidu Core**

*Search and Feed*

*Products and Services for Users*

We aspire to provide the best experience to our users. To enrich user experience, we provide a broad range of products and services accessible through mobile devices, PCs and other smart devices. We offer search and other services on the Baidu platform that connect users to relevant information online, including web pages, news, images, documents, multimedia files, and services, through links provided on our website, apps and skills store, as well as native-app like experiences via our smart mini program.

45

Table of Contents

**Baidu App.** Our flagship app enables users to access our search, feed and other services through mobile devices. Baidu App offers twin-engine search-plus-feed functions that leverage our AI-powered algorithms and deep user insight to offer users a compelling experience. It features improved feed display, short videos, smart mini programs, enhanced voice input, text to speech and augmented reality search to better serve users of mobile devices. In December 2018, average DAUs of Baidu App reached 161 million, increasing 24% over the same period of 2017.

**Baidu Search.** Users can also access our search and other services through Baidu's other properties and Baidu Union partners. In addition to text inputs, our users can conduct AI-powered voice search, visual search and augmented reality search. Voice search integrates speech recognition and search technologies to enhance the user experience by providing a more natural and convenient input modality to text input. Visual search enables the use of smart phone cameras to capture images and retrieve related content on the web. AR search allows one's imagination to come alive. For example, popular museums in China create augmented reality clips for historical artifacts to allow museum attendees experience "going back in time" to see the artifacts in historical settings, and Baidu's AR search allows users to discover and watch these AR clips while touring the museums. We also endeavor to improve the search experience, through other AI-powered products such as Top 1, to satisfy user queries with the first displayed search result, which we believe will be an important capability with the adoption of smart devices with smaller screens. For example, a smart device with Baidu Smart Answer technologies can take a photo of a plant or a pet to identify the species and retrieve related information in a digital card.

**Baidu Feed.** Baidu Feed is a product within Baidu App that provides users with personalized timeline based on their demographics and interests. Baidu Feed complements our core search product, leverages Baidu AI recommendation algorithms and monetization platform, and contributes to user engagement and retention.

**Haokan.** Haokan is a short video app, offering a wide variety of user generated and professionally produced content often in coordination with multiple platform networks. Haokan allows users to upload, view, search, rate, share, favorite, comment, and follow. Video content creators and curators can distribute their content to build a fan base and receive revenue share for their content contribution.

**Quanmin.** Quanmin is a flash video app for users to create and share short videos, usually less than one minute long with the following orientation: musical, dance, comedy, acting and lip-sync, and live videos. Users can shoot or upload flash videos and edit them with built-in special effects, filters and stickers. Contents are distributed in personalized timeline powered by Baidu AI recommendation algorithms.

**Baidu Post Bar.** Baidu Post Bar is a social media platform that builds online communities based on topical interest. Users can post text, image, audio and video content and reply to original curation, forming valuable discussion groups. Baidu Post Bar draws new users through close integration with search and user generated content, and has been a popular platform for celebrity fans, online game players and online novel readers to build communities for topical discussions, especially about current cultural trends.

**Baidu Knows.** Baidu Knows is a question-and-answer community where questions are asked, answered, and organized by our users. The answers posted on Baidu Knows are generated by our users, professionals, enterprises and governmental agencies. Baidu Knows also leverages Baidu's search capabilities to help users find answers to their questions on the web.

**Baidu Encyclopedia.** Baidu Encyclopedia is an online encyclopedia, compiled by experts in specialized fields. It features high-quality columns, such as Encyclopedia of Intangible Cultural Heritage, Digital Museum and Recorder of History, as well as a complete video-based knowledge source.

**Baidu Maps.** Baidu Maps provides locations, intelligent routing and navigation. Baidu Maps aggregates available travel options, displaying route timing and estimated costs. Baidu Maps also offers voice assistant functionality, supporting voice activation, multi-round conversation, and complex commands.

46

Table of Contents

**Baidu Input Method Editor, or Baidu IME.** Baidu IME is a Chinese-language mobile keyboard, which utilizes Baidu AI to improve input accuracy, remembers corrections and offers a custom dictionary of new or uncommon words. Baidu IME supports advanced functions such as extended voice input, smart punctuation recommendation, voice message translation, voice modification and contextual speech detection. Users can create personalized emojis with Baidu IME's augmented virtual reality function.

**Overseas Products.** We offer a series of products and services in overseas markets, including popIn (ad recommendation platform), Simeji (most popular mobile keyboard in Japan) and Facemoji (Simeji's international edition).

### *Products and Services for Customers*

*Online Marketing Services*

We deliver online marketing services to a diverse customer base. Consisting of SMEs, large domestic businesses and multinational companies, our customer base is diversified in terms of industries and geographical locations. The defined industries in which our customers operate include retail, personal care, medical and healthcare, franchising, financial services, education, online game services, auto/logistics, real estate and home furnishing, and business services. Customers in our top five industries contributed slightly over half of our total online marketing revenues in 2018. Although our customers are located throughout China, we have a more active and larger customer base in the coastal regions, reflecting the current general economic demographics in China.

Online marketing services include P4P (pay for performance) services and non-P4P services. Typically, a P4P customer pays us when users click on one of its website links on Baidu search result pages or Baidu Union partners' properties, while a non-P4P customer pays us based on the duration of the placement on Baidu search result pages.

**P4P.** Our auction-based P4P services allow customers to bid for priority placement of paid sponsored links and reach users who search for information related to their products or services. Customers may choose to purchase search-based, feed-based and other online marketing services and have the option to set daily allowances target users by geography in China and specify the time period for their campaign.

Search-based marketing services are mainly provided to customers through our proprietary online marketing system Phoenix Nest which drives monetization efficiency by improving relevance in paid search and optimizing value for our customers. We have made continuous improvements to Phoenix Nest ad monetization on our platform, including the initiatives below:

- Dynamic Ads: Delivers highly personalized search-based and feed-based online marketing by incorporating customers' product catalogs and user insights through Baidu AI. Dynamic Ads has been adopted by our online marketing customers in ecommerce/retail, travel, auto and real estate sectors.

- oCPX: Enables customers to bid for online marketing services based on pre-defined results, including optimized cost per click, impression and view. oCPX provides marketing customers with more options to optimize lead generation.

- Action ads: Comes in a wide range of ad formats, including click-to-call, click-to-chat, click-to-download, and click-to-buy, to help marketing customers achieve better conversion.

- Moonrise: Employs reinforcement learning to improve customers' online marketing with recommendation of better keywords, photos or videos from Baidu's huge content library, to increase conversion and overall marketing effectiveness.

Feed-based marketing services usually comprise image-based or video-based online marketing services, appearing between the feed headlines, or within the feed content. It is powered by Baidu AI to better match online marketing customers with their targeted audience, while optimizing user experience.

47

Table of Contents

Our twin-engine search plus feed online marketing services enable the delivery of comprehensive, diversified and rich marketing offerings to fulfill customer needs.

**Non-P4P.** Our non-P4P services provide display-based marketing services and other online marketing services based on performance criteria other than cost per click, or CPC. Customers can choose different mix of our service offerings to optimize their ROI.

BrandZone allows customers to display integrated text, logo, image and video in a structured and uniform manner on a prominent position of the search result page or in vertical search products, such as Baidu Knows.

Programmatic marketing platform supports the placement of advertisement using standard, intelligent or customized creativity, different purchasing methods (guaranteed delivery or real time bidding), and multiple payment methods. Baidu Union partners may use our content recommendation system to provide feed content and ads to their users.

*Partners of Search and Feed*

We attract numerous business partners, which helped create opportunities for us to cooperate with these business partners in research and development and business operations and establish long term business relationship.

**Baidu Union partners.** Baidu Union consists of a large number of third-party websites and mobile apps. We match our customers' promotional links to the properties of Baidu Union partners. Some Baidu Union partners also embed our products and services onto their properties. We allow Baidu Union partners to provide high-quality, relevant search results to their users without incurring the cost of development and maintenance for advanced search capabilities and monetize their traffic through revenue sharing arrangements with us.

**Baijiahao, or BJH.** Our network of 1.9 million content provider accounts, aggregates news articles, photos, short videos, live videos and augmented reality clips from multiple channel networks (MCNs), media outlets, and other professional sources for our feed product.

**Other Partners.** We enable a massive pool of content providers to contribute a broad range of content and resources on our platform, and to provide a rich, valuable content ecosystem to our users. Our content providers consist of MCNs, media outlets, curators, professional content publishers, video and other content copyright holders, app and smart mini program developers, and brands and businesses that offer various online contents on our platform.

*New AI Businesses*

Our new AI businesses comprise new business initiatives, including DuerOS (voice assistant and related smart device business), Apollo (autonomous driving platform), and Baidu Cloud. These businesses are powered by Baidu AI, based on Baidu Brain, our customer insights and other big data, and leading AI capabilities.

**DuerOS.** DuerOS is a cross-platform voice assistant with an installed base of over 200 million and monthly voice queries reaching 1.6 billion in December 2018. With a network of over 300 partners, DuerOS is installed on smart devices (in homes and hotels), smart phones, children watches and story machines. We released four DuerOS-powered Xiaodu branded smart devices in 2018, including Xiaodu smart speaker and Xiaodu smart display, the first smart speaker in China with a display. Equipped with over 1,000 skills in genres such as education, cooking, gaming and entertainment, the DuerOS skills store has been released for test trials.

**Apollo.** Apollo, our open source autonomous driving platform, supports commercial production of autonomous driving vehicles and incorporates autonomous driving capabilities, including valet parking. In July

48

Table of Contents

2017, Kinglong Automotive released Apolong L4 minibus, the first autonomous shuttle bus without steering wheel made commercially available in China. Designated by the Chinese government as the autonomous driving platform on the "national team," Apollo has garnered over 135 OEMs, Tier 1 parts suppliers and other strategic partners. Although autonomous driving is at an early stage of development, we believe autonomous driving and smart transportation, in partnership with municipalities to provide AI solutions to improve traffic flow, air pollution and road hazards, will be important growth areas for us in the future.

**Baidu Cloud.** Baidu Cloud primarily provides AI solutions, cloud infrastructure and other services to enterprises and individuals. Our goal is to offer a comprehensive set of products, services and tools to enable enterprises to improve productivity and operational efficiency through the use of Baidu AI and cloud infrastructure. For example, the use of Baidu AI customer solutions to automate customer call centers in lieu of IVR system and a large team of call center personnel. Baidu Cloud offers general and industry-specific AI solutions, serving industries, including financial services, media, gaming and telecommunications, while supporting internal usage.

## iQIYI

iQIYI is an innovative market-leading online entertainment service provider in China. For the year of 2018, iQIYI's average mobile MAUs were 455 million, and its average mobile DAUs were 135 million. On average, users spent 9.4 billion hours per month watching video content on iQIYI platform through all devices, and spent 1.6 hours per day per user watching video content on its mobile apps during the year.

iQIYI's platform features original content, as well as a comprehensive selection of professionally produced content, or PPC, partner generated content, or PGC, and user generated content, or UGC.

### PPC

**Original content.** iQIYI's original content includes high quality content produced in-house and those produced in collaboration with third-parties. iQIYI obtains the intellectual property rights through production, adaptation or purchase from third parties, while the partners, typically established entertainment production companies, are responsible for content development and production. iQIYI maintains a high degree of control during the content development and production process.

**Licensed content.** iQIYI provides users with a curated selection of high-quality PPC from third parties. iQIYI licenses video content typically at fixed rates for a specified term, and pay licensing fees generally in installments upon signing of the contacts and during the licenses period. iQIYI also exchanges rights to distribute licensed content with other internet video streaming services to enrich our content library. In certain cases, iQIYI has the right of first refusal to purchase new content produced by the licensor.

### PGC and UGC

iQIYI collaborates with a large number of selected partners to supplement its video content portfolio with PGC, and incentivizes them to submit high-quality content through our revenue-sharing mechanism. PGC expands iQIYI's video collection to cover long-tail content to capture a broader user base. Furthermore, PGC promotes iQIYI's brand, drives user engagement and enhances user stickiness.

iQIYI has established a track record of creating multiple channels of monetization through adapting single popular works into a variety of entertainment products. iQIYI generates revenues primarily through membership services, online advertising, content distribution and other services.

### Membership Services

iQIYI's membership services generally provide subscribing members with superior entertainment experience that is embodied in various membership privileges. Subscribing members have early access or binge-

49

Table of Contents

watch option to certain drama series aired exclusively on iQIYI platform. Subscribing members also have access to a large collection of VIP-only content comprises drama series, movies, animations, and cartoons, etc. Membership privileges generally include substantially ad-free streaming, 1080P/4K high-definition video, enhanced audio experience, accelerated downloads and others. Subscribing member privileges also include coupons and discounts on paid on-demand films, as well as special privilege in offline events, such as exclusive access to live concerts. The number of subscribing members increased 72% from 50.8 million as of December 31, 2017 to 87.4 million as of December 31, 2018. Excluding individuals with trial memberships, the number of subscribing members increased by 72% from 50.0 million as of December 31, 2017 to 86.1 million as of December 31, 2018.

### *Online Advertising*

The prices of iQIYI's advertising services depend upon various factors, including form and size of the advertising, level of sponsorship, popularity of the content or event in which the advertisements will be placed, and specific targeting requirements. Prices for the brand advertising service purchased by each advertiser or advertising agency are fixed under sales contracts. iQIYI's feed-based online marketing services are competitively priced through an online bidding process.

### Sales and Distribution

We offer Baidu Core products and services directly and through our distribution network. We have direct sales presence in Beijing, Shanghai, Shenzhen, Guangzhou, Dongguan and Suzhou, covering the major regional markets for our online marketing services.

The business distributors of Baidu Core products and services provide numerous services, including identifying customers, collecting payments, assisting customers in setting up accounts with us, suggesting keywords to maximize ROI and engaging in other marketing and educational services aimed at acquiring customers. We offer discounts to distributors as consideration for their services. We have relied on distributors for several reasons. Our P4P customer base in China is geographically diverse and fragmented, as many of our P4P customers are SMEs located in different regions in China. Moreover, SMEs are generally less experienced with online marketing, as compared to large companies, and, therefore, benefit from the extensive services provided by distributors. Finally, distributors serve as an important channel to reach SME customers throughout China and collect payments from them. We offer our online marketing services to medium and large corporate customers through third-party agencies and our direct sales force. We have also engaged third-party agencies to identify and reach potential customers outside of China.

iQIYI's brand advertising is sold primarily through third-party advertising agencies, including members of American Association of Advertising Agencies, or 4As, and leading Chinese advertising agencies, as well as by us directly. Feed-based advertising services is sold primarily through third-party advertising agencies, whose existing long-term relationships and network resources we strategically leverage, to increase our sales and expand our advertiser base. Depending on the type of advertiser and content, the duration of an advertising agreement is typically 12 months.

### Marketing

We focus on continually improving the quality of our products and services, as we believe satisfied users and customers are more likely to recommend our products and services to others. Through these efforts and the increased use of internet in China, we have built our brand with modest marketing expenditures.

We have implemented a number of marketing initiatives designed to promote our brand awareness among potential users, customers and Baidu Union partners. In addition to our brand positioning in the market, we have also initiated a series of marketing activities to promote our products and technologies among existing and potential users and customers, including, but not limited to, Baidu Developer Conference and Baidu World. In addition, we have increased spending in channel and brand marketing over the last year, to increase awareness and drive traffic growth for the family of Baidu apps, including Baidu App, Haokan and Quanmin.

Table of Contents

**Competition**

For Baidu Core business, our primary competitors are mainly internet companies and online marketing platforms in China. We compete with these entities for both users and customers on the basis of user traffic, quality (relevance), safety and user experience of search (and other marketing and advertising) results, availability and ease of use of products and services, the number of customers, distribution channels and the number of associated third-party websites. We also face competition from U.S.-based internet search providers providing Chinese language services and traditional advertising media.

*Internet Companies and Online Marketing Platforms in China.* Chinese internet companies, such as Alibaba, Tencent, ByteDance, Sohu and Qihoo 360, offer a broad range of online services, including search and feed services. These companies have widely recognized brand names in China and significant financial resources. We compete with these internet companies primarily for user traffic, user time, content, advertising budget and marketing resources. We leverage our user traffic, product design and various marketing to enhance users' reliance on our platforms and services.

*U.S.-based Internet Search Providers.* U.S.-based internet search providers, such as Google, have a strong global presence, well established brand names, more users and customers and significantly greater financial resources than we do. We may also continue to face competition from other existing competitors and new entrants in the Chinese language search and online marketing market.

*Other Advertising Media.* Other advertising media, such as newspapers, yellow pages, magazines, billboards, other forms of outdoor media, television, radio and mobile apps compete for a share of our customers' marketing budgets. Large enterprises currently spend a relatively small percentage of their marketing budgets on online marketing as compared to other advertising media.

For iQIYI, our primary competitors include companies that operate online video sites in China, such as Tencent Video and Youku Tudou. We also compete with other internet media and entertainment services, such as internet and social platforms that offer content in emerging and innovative media formats, as well as major TV stations. We compete with these market players for both users and advertisers primarily on the basis of user base and demographics, quality and quantity of video content, brand name and user experience.

**Technology**

We established several research labs in China and the U.S. to enhance our research and development capabilities, and to focus on efficient data analysis, robotics and other areas. In 2018, we joined Berkeley DeepDrive, a research alliance that studies state-of-the-art technologies in computer vision and machine learning for automotive applications to develop Apollo.

We have developed a proprietary technological infrastructure which consists of technologies for artificial intelligence, search, P4P and large-scale systems. Our established infrastructure serves as the backbone for our mobile, PC and AI platforms.

*Artificial Intelligence (AI)*

We have been investing in AI for a number of years, particularly in the areas of natural language processing, knowledge graph, user understanding, speech technology, computer vision, augmented reality, data science and deep learning technology. Baidu AI powers our core businesses, including search, feed, ad monetization platforms, DuerOS, Apollo and Baidu Cloud. Through Baidu AI Open Platform, we have opened up Baidu AI capabilities to third-party developers and provided them with tool kits to access Baidu AI capabilities through Baidu Cloud. We are also exploring ways to apply AI technologies and accelerate the commercialization of AI products and services.

51

Table of Contents

*Baidu Brain.* The latest iteration of Baidu Brain 3.0 announced a new phase of "multi-modal deep semantic understanding," which refers to the comprehensive and multi-dimensional semantic understanding of many categories of data and information, such as text, sound, pictures, videos, and more. The multi-modal semantics underlying Baidu Brain consist of data semantics, knowledge semantics, visual semantic analysis, speech semantic integration, and natural language semantic understanding.

The technology of data semantics transforms the immense multi-element, heterogeneous and multimodal data in the physical world, society and cyber space into a holistic semantic network containing hundreds of billions of nodes and trillions of relationships. It can then summarize rules, refine knowledge and discover values to promote the development of economy and society. The knowledge graph includes hundreds of millions of entities and hundreds of billions of facts. The basic entity-graph consists of entities, attributes and relationships. Additionally, attention graphs, events, multimedia, and industry-knowledge have also been constructed for different application scenarios and knowledge forms. All the heterogeneous data and knowledge constitute the foundation of Baidu Brain.

*Visual Semantic Analysis.* Visual semantics allow the machine to understand videos from the perspective of a viewer and extract structured semantic knowledge. For example, when visual semantic technology is applied to video analysis of the FIFA World Cup, it is capable of recognizing the players, referees, and balls in the video. It can also capture movements, such as shooting, scoring, corner kicks, free kicks, substitutions and more. From this semantic knowledge, it automates interpretation, such as collection of highlights or statistical analysis of data. Visual semantic technology can transform videos into structured semantic knowledge by recognizing people, movements, items and associated time series. This information can be applied to real-world situations, such as shopping at a supermarket, enhancing a customer's shopping experience in a stall-free supermarket. It can also assist store managers in operations analysis and optimization.

*Speech semantic Integration.* Baidu Brain has developed an innovative speech recognition architecture that leverages and integrates multi-grained acoustic and semantic features, which breaks through the limitations of traditional big data analysis methods. Baidu Brain also developed the first end-to-end, online, Chinese-speech synthesis engine based on Bi-LSTM models, which utilize over 100 hours of voice recordings from a single speaker and comprise a large speech library. These techniques have been implemented for the purpose of far-field speech recognition and the so-called "endless conversation" in the DuerOS voice assistant.

*Natural Language Semantic Understanding.* Speech semantic integration and natural language processing technology can enable machines to identify and understand verbal communication accurately and achieve a natural human-machine dialogue. With the aid of natural language processing technology, Baidu Brain has read tremendous volume of online articles, enabling it to hold large amounts of knowledge on entities and facts.

**Search Technology**

Our search is powered by a set of industry-leading technologies, including the following, among others:

*Ranking.* We compare search queries with the content on web pages to help determine relevance. We have significantly improved the relevancy, freshness and authority of ranking using our machine learning modules to analyze the rich internet and user interaction data and prioritize the search results. For example, our technology determines the proximity of individual search terms to each other on a given web page, and prioritizes results where the search terms are near each other. Other aspects of a page's content are also considered. We have innovatively applied our machine learning technology to better understand the semantics beyond simple text of the keywords inputted by our users, allowing us to provide more relevant search results to users. Since 2013, we have applied deep learning in our search ranking system, and such technology is playing an increasingly important role in search. In addition, we have built large scale computing capabilities based on GPU clusters, to handle prospective complex big data and deep learning computing.

52

Table of Contents

*Content-based indexing and ranking system.* With the outbreak of heterogeneous resources (such as video and pictures) on the Internet, traditional web-based resource (url)-based search indexing and ranking systems have been unable to adapt to current development trends. To this end, Baidu innovatively built up a content-based indexing and ranking system. The system converts various resources such as web pages, videos, and pictures into content by means of extraction and clustering, and indexes and ranks the content as the smallest unit, which greatly improves our search engine's indexing capability of heterogeneous resources, making it better adapted to the development trend of Internet resources. At the same time, we have fully utilized our proprietary AI technology and extensively applied deep learning techniques to the understanding of text, video, pictures and other content, which greatly improved the content matching and sorting results and user experience.

*Video Search.* Video content is growing as an explosive trend in the ecosystem of Internet content. As a new general-purpose content format, video is more intuitive and easy to understand, and has a larger information capacity than graphic content. We believe that video search can make search more vivid and real, and has the same extensive demand satisfaction capability as graphic search. An increasing number of users are switching from graphic search to video search. The next-generation general-purpose search (video search) is beginning to take shape. With deep learning algorithm being applied to video analytics, we are vigilant in providing the best video search experience to our users.

*Information Extraction.* We extract information from a web page using high performance algorithms and information extraction techniques. Our techniques enable us to understand web page content, delete extraneous data, build link structures, identify duplicate and junk pages and decide whether to include or exclude a web page based on its quality. Our techniques can process millions of web pages quickly. In addition, our anti-spam algorithms and tools can identify and respond to spam web pages quickly and effectively.

*Web Crawling.* Our powerful computer clusters and intelligent scheduling algorithms allow us to crawl web pages efficiently. We can easily scale up our system to collect an ever-growing number of Chinese web pages. Our spider technology enables us to refresh web indices at different intervals and the index refresh frequency is set based on our knowledge of internet search users' needs and the nature of the information. We also mine multi-media and other format of content from web page repositories.

*Natural Language Processing.* Based on linguistics knowledge, big data and knowledge graphs, our natural language processing accumulates and integrates linguistics analysis, such as lexical, syntax and semantic analysis, with calculation, learning mechanisms and other natural language processing technologies. Our natural language processing also conducts research and development of language understanding and generation, dialogue, reading comprehension, machine translation, intelligent writing and other app systems. Natural language processing has opened up language understanding and interaction, machine translation and other core competencies. For search, natural language processing helps to understand user needs and web contents, optimize search results, support first-line accurate results, and enable voice broadcasting of search results, all enhancing user experience. For feed products, natural language processing continues to improve content understanding, recommendation algorithms, content generation and other technologies to optimize the personalized recommendation results, continuously improving the user experience and promoting healthy development of our feed content ecosystem.

*MIP (Mobile Instant Pages)* is a set of open technical standards applying to mobile webpages, which accelerates the loading of mobile webpages by adopting MIP-HTML norms, MIP-JS operating environment and MIP-Cache system. When mobile websites use this backend technology, the speed at which they can be visited from both Baidu Search and Baidu Feed is improved significantly. This not only enhances user experience, but also increases websites' page visit traffic. In 2018, we scaled up the adoption of MIP technology and updated applicable technical standards to MIP 2.0. We have also introduced Progressive Web App (PWA), a software development methodology that provides hybrid features from regular web pages (or websites) and a mobile application, in our MIP 2.0 standards, with the goal of improving user experience on mobile devices for websites developed using the MIP 2.0 standards.

53

Table of Contents

*Extraction and Analysis of Behavioral Information of Mobile Internet User*s. We extract behavioral information from users of mobile Internet using high performance algorithms and information extraction techniques. Our techniques enable us to understand complex user behaviors metrics such as like and dislike votes, shares, clicks and followers to effectively rank the quality and popularity of information, which in turn allows us to provide our users more accurate search results.

*XuperChain.* XuperChain, a blockchain framework, features technologies, such as multiple smart contract interpreters, pluggable consensus mechanism and variant type signature algorithms. XuperChain, which can be easily integrated into mobile and IoT devices, has a three-dimensional network architecture, taking full advantage of in-chain parallel technology and super node technology to boost blockchain performance. XuperChain-based applications are available in the areas of copyright protection, food safety and smart city.

### P4P Technology

Our P4P platform serves billions of relevant, targeted sponsored links each day based on search terms users enter or content they view on the web page. Our key P4P technology includes:

*P4P Auction System.* We use a web-based auction system to enable customers to bid for keywords and automatically deliver relevant, targeted promotional links on Baidu's properties and Baidu Union partners' properties. The system starts by screening the relevance between the sponsored links and a particular query. Our intelligent ranking system takes into consideration the quality factor of a sponsored link for a search query in addition to the price bid on the keyword. The quality factor of a sponsored link for a search query is determined based on the relevance and certain other factors. The relevance is determined based on the analysis of past search and click-through results. Links to customers' websites are ranked according to a comprehensive ranking index, calculated based on both the quality factor of a sponsored link for a search query and the price bid on that keyword. We employ a dynamic mechanism in determining the minimum bidding price for each keyword. In addition, we have developed a new automatic auction system based on deep reinforcement learning and automated machine learning technologies, which enables us to automatically update our auction mechanism for better optimization.

*Phoenix Nest.* Designed to generate more relevant results, Phoenix Nest helps customers to identify popular keywords and provides them with tools for budget management and marketing effectiveness measurement. We have been continually improving our click-through rate (CTR) estimation technology. For example, we have introduced deep neutral network (DNN) technology into our CTR estimation. We have also developed a new generation Phoenix Nest deep learning network CTR estimation modeling system, which enables the estimation of clicks on different combinations of advertisement materials and has significantly improved the timeliness of the model estimations. In 2018, we upgraded the framework of our AIBOX deep learning algorithms and introduced high performance heterogeneous computing hardware, which led to significant improvement in computing efficiency and cost reduction. We have also transformed our existing DNN technology by introducing CTR 4.0, which greatly improved the computing and model estimation efficiency of our systems.

*Metric Retrieval Technology.* Metric retrieval learns how to match traffic and advertisements from massive behavioral data leveraging on deep learning technologies, and then applies this information to direct advertisement trigger. Traditional searches have both "candidate search" and "quality check," and any inconsistency between the two steps will be detrimental to the trigger effects. Metrics retrieval, however, first learns through metric learning a good representation of traffic and advertising, and then uses the representation and retrieval technology to directly retrieve the advertisement with high scores in modeling, so as to eliminate the gap from different steps and greatly enhance the trigger efficiency and the utilization rate of Phoenix Nest traffic. To reflect that user behavioral data has a graph data structure, instead of a binary data structure, we expanded our metric retrieval technology, so that it could generate metrics based on the graph data structure. This development significantly improved estimation efficiency of Metric Retrieval and trigger efficiency and utilization rate of Phoenix Nest traffic.

54

Table of Contents

*Content Auto-Generation Technology.* Based on materials and website content provided by our customers and with considerations for our customer's needs, we use our content auto-generation technology to automatically generate advertisements attractive to our users which in turn help our customers achieve better click and conversion rates. Our content auto-generation technology allows us to utilize bi-directional long short-term memory (LSTM) network offline to improve the expressivity of our programming models and Word2Vec online to expand the candidate pool. Based on our AI video generation technology, we are able to produce promotional videos for our customers for free.

*oCPC Delivery System.* We restructured our delivery system for marketing services with the following parameters:

- we aim to build a close looped commercial data ecosystem by providing our customers with various access methods such as bulk copy program utility (BCP), application programming interface (API) and JavaScript. Our customers can customize their own performance target metrics by selecting from 16 categories of conversion target metrics, including but not limited to app launch rate, click rate and validated form entry;

- we utilize parallel estimation of conversion rates in multiple scenarios based on multi-task DNN model and BS-CVRO dual-tower model, which builds a solid foundation for ranking of conversion rates and improvement of trigger efficiency and utilization rate;

- we optimize resource allocation for our customers with the introduction of conversion rate factors in our deep reinforcement learning auction mechanism, which directly improves conversion rate and marginal return for our customers; and

- we built the ANN marketing conversion trigger model that allows for significant improvement in the relevance of keywords in paid search, which in turn lifts trigger and monetization efficiency for Phoenix Nest.

*P4P Billing System.* We record every click and charge customers a fee by multiplying the number of clicks by the CPC. Our system is designed to detect fraudulent clicks based on factors, such as click patterns and timestamps. This system also computes the amount a Baidu Union partner or distributor should be paid. The billing information is integrated with our internal financial system.

*P4P Customer Service System.* This system offers data and tools to analyze data for our customers to evaluate and optimize the performance of our online marketing services provided to them. Through this system, our customers can also manage information relating to online marketing services, such as their budgets and time periods for the services.

*ProTheme Contextual Promotion Technology.* Our ProTheme technology employs techniques that consider factors such as theme finding, keyword analysis, word frequency and the overall link structure of the web to analyze the content of individual web pages and to match sponsored links in our P4P platform to the web pages almost instantaneously. With this targeting technology, we can automatically provide contextually relevant promotional links. For example, our technology can provide links offering tickets to fans of a specific sports team or a news story about that team.

*ROI-Constraint Auto-Targeting Technology.* For app-using customers, AI technology allows us to assist our customers to take account of factors, such as theme finding, keyword analysis, word frequency and the overall link structure of the web, analyze the content of individual web pages and match sponsored users' queries, so as to greatly enhance user experience. The technology has also been employed to manage the auction of customers, which has well-defined conversion measurement.

### Large-Scale Systems and Technologies

*Large Size Cluster Management.* In order to provide highly efficient and stable search-related services as part of our Baidu Core business, we have developed an automated management platform for large size clusters.

55

Table of Contents

The platform enables us to intelligently manage and allocate resources and automatically debug and relocate services, thereby allowing tens of thousands of different source requests on the Baidu search engine and other non-search business to function stably across multiple internet data centers and thousands of servers.

*Storage.* We have developed an efficient, distributed and structured storage system to support Baidu Core products and services. Our storage system supports PB-level holistic, sequential data storage, and ten thousand times of real-time processing per second per device. Our storage system also has dynamic data attribute addition and subtraction function and historical data management capability.

*Distributed Computing System.* We have developed our proxy computing system, a comprehensive set of ultra-large scale distributed computer system, to increase the utility rate of idle resources, providing a strong base support for our core operations. Our proxy computing system has realized various distributed computing software stacks, such as resource isolation, resource distribution, computing modeling and application framework, and supports commonly used computing modules such as MapReduce, Spark, Stream and WebService.

*Indexing Technology.* Our indexing technology supports billions of daily search requests on over tens of thousands of servers located across multiple internet data centers of different network operators. Through the development in our indexing technology, we have been able to update our index with freshly generated information within seconds. For our indexing technology, we have incorporated deep learning technology like latent semantic indexing that built upon our existing semantic matching technology to significantly improve our retrieval rate.

**Intellectual Property**

We rely on a combination of patent, trademark, copyright and trade secret protection laws in China and other jurisdictions, as well as confidentiality procedures and contractual provisions to protect our intellectual property and our brand. We have over 4,000 issued patents in China covering invention, utility model and design, and intend to apply for more patents to protect our core technologies and intellectual property. We also enter into confidentiality, non-compete and invention assignment agreements with our employees and consultants and nondisclosure agreements with selected third parties. "百度," our company's name "Baidu" in Chinese, has been recognized as a well-known trademark in China by the Trademark Office of National Intellectual Property Administration under the State Administration for Market Regulation. In addition to owning "百度," and the related logos, we have applied for registration of various other trademarks. We also have registered certain trademarks in the United States, Australia, Brazil, Canada, Hong Kong, India, Indonesia, Japan, Malaysia, Mexico, New Zealand, Russia, Singapore, South Africa, South Korea, Thailand, the European Union and several other jurisdictions. In addition, we have registered our domain name Baidu.com and certain other websites with China National Network Information Center, or CNNIC. We have also successfully registered *.Baidu* top-level domain names with the Internet Corporation for Assigned Names and Numbers (ICANN).

Internet, technology and media companies are frequently involved in litigation based on allegations of infringement or other violations of intellectual property rights. Furthermore, the application of laws governing intellectual property rights in China and abroad is uncertain and evolving and could involve substantial risks to us. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may face intellectual property infringement claims and other related claims that could be time-consuming and costly to defend and may result in an adverse impact over our operations" and "—We may be subject to patent infringement claims with respect to our P4P platform."

**Regulations**

The PRC government extensively regulates the telecommunications industry, including the internet sector. The State Council, the MIIT and other relevant government authorities have promulgated an extensive regulatory

56

Table of Contents

scheme governing internet-related services. This section summarizes the principal PRC laws and regulations relating to our business.

In the opinion of Han Kun Law Offices, our PRC legal counsel, (i) the ownership structure relating to our consolidated affiliated entities complies with current PRC laws and regulations; (ii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," our contractual arrangements with our consolidated affiliated entities and the nominee shareholders are valid and binding on all parties to these arrangements and do not violate current PRC laws or regulations; and (iii) subject to the disclosure and risks disclosed under "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure," "—Risks Related to Doing Business in China" and "—Regulations," the business operations of our consolidated affiliated entities, as described herein, comply with current PRC laws and regulations in all material respects.

China's internet industry, online marketing market and e-commerce market are evolving. There are substantial uncertainties regarding the interpretation and application of existing or proposed PRC laws and regulations. We cannot assure you that the PRC regulatory authorities would find that our corporate structure and our business operations comply with PRC laws and regulations. If the PRC government finds us to be in violation of PRC laws and regulations, we may be required to pay fines and penalties, obtain certain licenses or permits and change, suspend or discontinue our business operations until we comply with applicable PRC laws and regulations.

### Regulations on Value-Added Telecommunications Services and Internet Content Services

*Value-added telecommunications services and Internet content services*. The Telecommunications Regulations promulgated by the PRC State Council in September 2000 categorize all telecommunication businesses in the PRC as either basic or value-added. Pursuant to the Telecommunications Regulations, commercial operators of value-added telecommunications services must first obtain a Value-Added Telecommunication Business Operating License from the MIIT or its provincial level counterparts. The Administrative Measures for Telecommunication Business Operating License, promulgated by the MIIT with latest amendments becoming effective in September 2017, set forth the types of licenses required for value-added telecommunications services and the qualifications and procedures for obtaining such licenses. For example, a value-added telecommunications service operator providing commercial value-added services in multiple provinces is required to obtain an inter-regional license, whereas a value-added telecommunications service operator providing the same services in one province is required to obtain a local license. Baidu Netcom and some of our other PRC consolidated affiliated entities hold such Value-Added Telecommunication Business Operating Licenses.

Internet content services, or ICP services, are classified as one of the value-added telecommunication businesses. The Administrative Measures on Internet Information Services, promulgated by the PRC State Council in September 2000, require companies engaged in the provision of commercial internet content services to obtain a Value-added Telecommunication Business Operation Permit for ICP services, or an ICP license from the relevant government authorities before providing any commercial internet content services within the PRC. "Commercial internet content services" generally refer to provision of information service through public telecommunication network or internet for a fee. The Catalog of Classification of Telecommunications Services promulgated by the MIIT in December 2015 and taking effect from March 1, 2016 further divides ICP services into information publication platform and delivery services, information search and inquiry services, information communities platform services, instant message services, and information security and management services. We do not believe our P4P services conducted by our certain PRC subsidiaries are categorized as part of internet content services that require an ICP license under these regulations. Although Baidu Online conducts part of the P4P business by, among other things, examining and filtering P4P keywords, interacting with potential P4P customers, engaging in sales activities with our customers, P4P search results are displayed on the websites operated by Baidu Netcom, including Baidu.com. Baidu Netcom, as the owner of our domain name Baidu.com

57

Table of Contents

and holder of the necessary licenses and approvals, such as an ICP license, operates the website to list P4P search results and display other marketing and advertising content as an online marketing service provider.

*Content regulation.* National security considerations are an important factor in the regulation of internet content in China. The National People's Congress, the PRC's national legislature, has enacted laws with respect to maintaining the security of internet operation and internet content. Under these laws and applicable regulations, violators may be subject to penalties, including criminal sanctions, for internet content that:

- opposes the fundamental principles stated in the PRC constitution;

- compromises national security, divulges state secrets, subverts state power or damages national unity;

- harms the dignity or interests of the state;

- incites ethnic hatred or racial discrimination or damages inter-ethnic unity;

- undermines the PRC's religious policy or propagates heretical teachings or feudal superstitions;

- disseminates rumors, disturbs social order or disrupts social stability;

- disseminates obscenity or pornography, encourages gambling, violence, murder or fear or incites the commission of a crime;

- insults or slanders a third party or infringes upon the lawful rights and interests of a third party; or

- is otherwise prohibited by law or administrative regulations.

ICP operators are required to monitor their websites, including electronic bulletin boards. They may not post or disseminate any content that falls within the prohibited categories and must remove any such content from their websites. The PRC government may shut down the websites of ICP license holders that violate any of the above-mentioned content restrictions and revoke their ICP licenses. For instance, in 2017, the SIIO issued a series of regulatory documents providing that an ICP operator is obligated to monitor contents displayed and disseminated by users on its platform. These regulations apply to online services, including (i) online forum and community service, which allows users to publish information and interact with other users on an online forum, post bar or other form of online communities, (ii) online follow-up comment service, which allows users to post threads, reply to original content, leave messages and engage in live commenting with texts, symbols, expressions, pictures, audio/video on a website, mobile app or other forms of interactive platform; (iii) online group chat information service, which allows users to communicate and exchange information in a cyberspace created by the users on an online platform; (iv) online official account information service, which allows users to post texts, pictures, audio/video and other information in the form of an official account registered by the user on a website, mobile app or other network platform. Pursuant to these regulations, a service provider is required to, among others, (x) register and verify the identity information of each user, and (y) in the case of publication or dissemination of prohibited contents on the platform, take prompt rectification measures, including removing and terminating transmission of the illegal content, restricting the user right of the offender, banning the user account and shutting down the relevant forum or channel, and report to the regulatory authority.

In addition, in November 2018, the SIIO issued a notice to require ICP operators to conduct security assessments on their Internet information services if their services include forums, blogs, microblogs, chat rooms, communication groups, public accounts, short videos, online live-streaming, information sharing, mini programs or such other functions that provide channels for the public to express opinions or have the capability of mobilizing the public to engage in specific activities. ICP operators must conduct self-assessment on, among others, the legality of new technology involved in the services and the effectiveness of security risk prevention measures, and file the assessment report to local competent Internet information office and public security authority.

58

Table of Contents

*Restrictions on Foreign Ownership in Value-Added Telecommunications Services*

Pursuant to the Provisions on Administration of Foreign-Invested Telecommunications Enterprises, promulgated by the PRC State Council with the latest amendments becoming effective in February 2016, the ultimate foreign equity ownership in a value-added telecommunications service provider must not exceed 50%. However, the MIIT released an announcement in June 2015 to remove the restriction on foreign equity for "online data processing and transaction processing businesses (operational E-commerce)" as provided in the Catalog of Telecommunication Businesses promulgated by the MIIT. The Guidance Catalog of Industries for Foreign Investment, as amended in 2017, and Special Administrative Measures (Negative List) for Foreign Investment Access issued in 2018 allow a foreign investor to own more than 50% of the total equity interest in an e-commerce business. In order to acquire any equity interest in a value-added telecommunication business in China, a foreign investor must satisfy a number of stringent performance and operational experience requirements, including demonstrating a good track record and experience in operating a value-added telecommunication business overseas. Foreign investors that meet these requirements must obtain approvals from the MIIT and the Ministry of Commerce (or the Ministry of Commerce's authorized local counterparts), which retain considerable discretion in granting approvals. According to publicly available information, the PRC government has issued telecommunication business operating licenses to only a limited number of foreign-invested companies. We believe that it would be impracticable for us to acquire any equity interest in our consolidated affiliated entities without diverting management attention and resources. Moreover, we believe that our contractual arrangements with these entities and the individual nominee shareholders provide us with sufficient and effective control over these entities. Accordingly, we currently do not plan to acquire any equity interest in any of the consolidated affiliated entities.

A Notice on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, issued by the MIIT in July 2006, prohibits domestic telecommunication service providers from leasing, transferring or selling Telecommunication Business Operating Licenses to any foreign investor in any form, or providing any resources, sites or facilities to any foreign investor for their illegal operation of a telecommunication business in China. Pursuant to this notice, either the holder of a Value-Added Telecommunication Business Operating License or its shareholders must directly own the domain names and trademarks used by such license holder in its provision of value-added telecommunications services. The notice further requires each license holder to have the necessary facilities, including servers, for its approved business operations and to maintain the facilities in the regions covered by its license. If a license holder fails to comply with the requirements in the notice or cure any non-compliance, the MIIT or its local counterparts have the discretion to take measures against the license holder, including revoking its Value-Added Telecommunication Business Operating License.

Due to the restrictions under these PRC regulations, we operate our websites mainly through our PRC consolidated affiliated entities, such as Baidu Netcom. Baidu Netcom is our PRC consolidated affiliated entity, and is considered a domestic PRC entity under PRC law given that the nominee shareholders are PRC citizens or PRC entities.

Baidu Netcom and some of our other PRC consolidated affiliated entities holds a Value-Added Telecommunication Business Operating License. In compliance with the Notice of the MIIT on Intensifying the Administration of Foreign Investment in Value-Added Telecommunications Services, Baidu Netcom owns the necessary domain names and trademarks, including pending trademark applications, and have the necessary personnel and facilities to operate our websites.

*Regulations on Mobile Internet Applications*

In June 2016, the SIIO promulgated the Administrative Provisions on Mobile Internet Application Information Services, or the Mobile Application Administrative Provisions, which became effective on August 1, 2016. Pursuant to the Mobile Application Administrative Provisions, a mobile internet app refers to an app

59

Table of Contents

software that runs on mobile smart devices providing information services after being pre-installed, downloaded or embedded through other means. Mobile internet app providers refer to the owners or operators of mobile internet apps. Internet app stores refer to platforms which provide services related to online browsing, searching and downloading of app software and releasing of development tools and products through the internet.

Pursuant to the Mobile Application Administrative Provisions, an internet app program provider must verify a user's mobile phone number and other identity information under the principle of mandatory real name registration at the back-office end and voluntary real name display at the front-office end. An internet app provider must not enable functions that can collect a user's geographical location information, access user's contact list, activate the camera or recorder of the user's mobile smart device or other functions irrelevant to its services, nor is it allowed to conduct bundle installations of irrelevant app programs, unless it has clearly indicated to the user and obtained the user's consent on such functions and app programs. In respect of an internet app store service provider, the Mobile Application Administrative Provisions require that, among others, it must file a record with the local authority within 30 days after it rolls out the internet app store service online. It must also examine the authenticity, security and legality of internet app providers on its platform, establish a system to monitor app providers' credit and file a record of such information with relevant governmental authorities. If an app provider violates the regulations, the internet app store service provider must take measures to stop the violations, including giving a warning, suspension of release, withdrawal of the app from the platform, keeping a record of the incident and reporting the incident to the relevant governmental authorities.

In December 2016, the MIIT promulgated the Interim Measures on the Administration of Pre-Installation and Distribution of Applications for Mobile Smart Terminals, which came into effect on July 1, 2017. The Interim Measures aim to enhance the administration of mobile apps, and require, among others, that mobile phone manufacturers and internet information service providers must ensure that a mobile app, as well as its ancillary resource files, configuration files and user data can be uninstalled by a user on a convenient basis, unless it is a basic function software, which refers to a software that supports the normal functioning of the hardware and operating system of a mobile smart device.

### Regulations on Internet Information Search Service

In June 2016, the SIIO promulgated the Administrative Provisions on Internet Information Search Services, or the Search Services Administrative Provisions, which took effect on August 1, 2016. Pursuant to the Search Services Administrative Provisions, internet information search service refers to the service whereby users can search for information that is collected from the internet and processed by computer technology. The Search Services Administrative Provisions requires that an internet information search service provider must not publish any information or contents prohibited by law in the form of links, abstracts, snapshots, associative words, related search or recommendations or otherwise. If an internet information search service provider identifies any search results that contain any information, website or app that is prohibited by law, it must stop displaying the search results, record the infraction and report it to the relevant governmental authority. In addition, an internet information search service provider is prohibited from seeking illegitimate interest by means of unauthorized disconnection of links, or provision of search results containing false information. If an internet information search service provider engages in paid search services, it must examine and verify the qualifications of its customers of the paid search services, specify the maximum percentage of search results as paid search results on a webpage, clearly distinguish paid search results from natural search results, and notably identify the paid search information item by item.

### Regulations on News Display

Displaying news on a website and disseminating news through the internet are highly regulated in the PRC. The Provisional Measures for Administrating Internet Websites Carrying on the News Displaying Business, jointly promulgated by the State Council News Office and the MIIT in November 2000, require an ICP operator (other than a government authorized news unit) to obtain an approval from the State Council News Office to post

60

Table of Contents

news on its website or disseminate news through the internet. Furthermore, the disseminated news must come from government-approved sources pursuant to contracts between the ICP operator and the sources, copies of which must be filed with the relevant government authorities.

In May 2017, the SIIO issued the Provisions on the Administration of Internet News Information Services, or the Internet News Regulation, and its implementing rules, which became effective on June 1, 2017. Pursuant to the Internet News Regulation and its implementing rules, if an entity intends to provide internet news information service, it is required to obtain an approval from the State Council News Office and receive an Internet News Information Service License. Internet news information service refers to editing, publishing and reprinting and the dissemination platform service of internet news through internet websites, mobile apps, forums, blogs, micro-blogs, official accounts, instant message tools, live-streaming and other similar means. Pursuant to the Internet News Regulation, no internet news information service organizations may take the form of a foreign-invested enterprise, whether a joint venture or a wholly foreign-owned enterprise, and no cooperation between internet news information service organizations and foreign-invested enterprises is allowed prior to the security evaluation by the SIIO.

Baidu Netcom obtained the Internet News Information Service License, which permits it to publish internet news pursuant to the relevant PRC laws and regulations, in December 2006, and had the license renewed in October 2018.

### Regulations on Internet Drug Information Services

According to the Provisions on the Administration of Internet Drug Information Services, which was issued by the State Food and Drug Administration in November 2017, an enterprise publishing drug-related information must obtain a qualification certificate from the provincial-level food and drug administration before it applies for the ICP license or files with the MIIT or its local provincial-level counterpart.

Baidu Netcom obtained the Qualification Certificate for Internet Drug Information Services, which permits it to publish drug-related information on its website, in November 2007, and had the certificate renewed in August 2017. We have several other entities in our group that have obtained the Qualification Certificate for Internet Drug Information Services.

### Regulations on Internet Culture Activities

The Internet Culture Administration Measures, promulgated by the Ministry of Culture and with the latest amendment becoming effective in December 2017, require ICP operators engaging in "internet culture activities" to obtain a permit from the Ministry of Culture. The "internet culture activities" include, among other things, online dissemination of internet cultural products (such as audio-video products, games, performances of plays or programs, works of art and cartoons) and the production, reproduction, importation, distribution and broadcasting of internet cultural products. Imported internet cultural products are subject to content review by the Ministry of Culture before they are disseminated online, while domestic internet cultural products must be filed with the local branch of the Ministry of Culture within 30 days following the online dissemination. Service providers are also required to conduct self-review of the content of internet cultural products before they are put on the internet or submitted to the Ministry of Culture for approvals or filings. Baidu Netcom was granted an Internet Culture Business Permit in April 2007, which was renewed again in September 2018. Some other entities in our group have also obtained an Internet Culture Business Permit.

The Several Suggestions on the Development and Administration of Internet Music, issued by the Ministry of Culture and becoming effective in November 2006, reiterate the requirement for an internet service provider to obtain the Internet Culture Business Permit to carry on any business of internet music products. In addition, foreign investors are prohibited from engaging in the internet culture business operation.

61

**Table of Contents**

In October 2015, the Ministry of Culture promulgated a notice, which took effect on January 1, 2016, to further strengthen its regulation over online music, including requiring online platforms that allow users to upload self-created or performed music to set up real-time monitoring systems and requiring online music service providers to make quarterly filings of information related to their content self-review with the local counterpart of the Ministry of Culture from April 1, 2016.

### *Regulations on Internet Publishing*

In February 2016, the SAPPRFT (currently known as the NNPB), and the MIIT jointly issued the Administrative Provisions on Internet Publishing Services, or the Internet Publishing Regulation, which took effect on March 10, 2016, and replaced the Interim Provisions for the Administration of Internet Publishing promulgated in 2002. The Internet Publishing Regulation requires that any entity engaged in the provision of online publications to the public via information networks obtain an Internet Publication License from the NNPB. Online publications refer to digital works with editing, production, processing and other publishing features, provided to the public via information networks, which mainly include: (i) informative and thoughtful text, pictures, maps, games, animation, audio and video digitizing books and other original digital works in fields such as literature, art and science, (ii) digital works consistent with the content of published books, newspapers, periodicals, audio-visual products and electronic publications, (iii) the network literature database or other digital works formed through aforementioned works by selecting, organizing, compiling and other means, and (iv) other types of digital works determined by the NNPB. The servers and storage facilities used by internet publishers must be located within the territory of the PRC. The Internet Publishing Regulation also provides that when an internet service provider provides manual intervention search ranking, advertising, promotion and other services to customers that provide internet publishing services, it is required to check and examine the Internet Publication Licenses obtained by the customers and the business scope of such licenses. Certain entities in our group have obtained the Internet Publication Licenses.

### *Regulations on Broadcasting Audio/Video Programs through the Internet*

In December 2007, the State Administration of Radio, Film and Television, or the SARFT (currently known as NRTA) and the MIIT jointly promulgated the Rules for the Administration of Internet Audio and Video Program Services, commonly known as "Document 56," which took effect on January 31, 2008. Pursuant to Document 56, an online audio/video service provider must obtain an Online Audio/Video Program Transmission License, which has a term of three years, and operate in accordance with the scope of the business as stipulated in the license. Furthermore, Document 56 requires all online audio/video service providers to be either wholly state-owned or state-controlled. According to some official answers to press inquiries published on the SARFT's website in February 2008, officials from the SARFT and the MIIT clarified that online audio/video service providers that already had been operating lawfully prior to the issuance of Document 56 may re-register and continue to operate without becoming state-owned or controlled, provided that the providers have not engaged in any unlawful activities. This exemption will not be granted to online audio/video service providers established after Document 56 was issued. In addition, foreign-invested enterprises are not allowed to engage in the above-mentioned businesses. On March 16, 2018, the NRTA issued the Notice on Further Regulating the Transmission Orders of Internet Audio and Video Program, pursuant to which, among others, (i) online streaming platforms shall not illegally capture, edit, or reprogram audio-video programs, (ii) the movie clips and prevue broadcasted on the platform shall come from the licensed broadcasting and television programs; and (iii) the platform shall verify qualifications of sponsors for programs on the platform and shall refrain from accepting sponsorship or advertising from or cooperating in any other form with any unlicensed online audio/video service providers.

The PRC government has also promulgated a series of special regulatory measures governing live-streaming services. In November 2016, the SIIO promulgated the Administrative Provisions on Internet Live-streaming Service, which took effect on December 1, 2016. Pursuant to the Administrative Provisions, internet live-streaming service refers to continuous publishing of real-time information to the public on internet by means of video, audio, graphics, text or other forms, and an internet live-streaming service provider refers to an operator of

Table of Contents

the platform providing internet live-streaming service. In accordance with the administrative provisions, an internet live-streaming service provider must verify and register the identity information of publishers of live-streaming programs and users on its platform, and file the identity information of the publishers with the local governmental authority for record. Any internet live-streaming service provider engaging in news service must obtain internet news information service qualification and operate within the permitted scope of such qualification. In September 2016, the SAPPRFT (currently known as the NRTA) issued a Circular on Strengthening Administration of Live-streaming Service of Network Audio/Video Programs. Pursuant to the circular, any entity that intends to engage in live audio/video broadcasting of major political, military, economic, social, cultural or sport events or activities, or live audio/video broadcasting of general social or cultural group activities, general sporting events or other organizational events, must obtain an Online Audio/Video Program Transmission License with a permitted operation scope covering the above business activities. Any entity or individual without qualification is prohibited from broadcasting live audio/radio programs involving news, variety shows, sports, interviews, commentary or other forms of programs through any online live-streaming platform or online live broadcasting booth, nor are they permitted to start a live broadcasting channel for any audio or radio programs. In addition, no entity or individual other than licensed radio stations or television stations are allowed to use "radio station," "television station," "broadcasting station," "TV" or other descriptive terms exclusive to television and radio broadcasting organizations to engage in any business on the internet without approval. Furthermore, the SIIO issued a notice in July 2017 which requires operators of internet news and information reproduction and broadcasting services, including commercial website apps that contain live-streaming features, and other internet live-streaming services, to file with the local SIIO starting from July 15, 2017. The Circular on Tightening the Administration of Internet Live-Streaming Services jointly issued jointly by the MIIT, the SIIO and several other government agencies in August 2018 reiterates the license requirements for online-streaming service providers and requires the operator to file with the local public security authority within 30 days after it commences the service online.

Baidu Netcom has renewed its Online Audio/Video Program Transmission License, which remains valid until July 2021. iQIYI has an Online Audio/Video Program Transmission License that is valid until October 2021. Another entity in our group has an Online Audio/Video Program Transmission License that is valid until March 2020.

### Regulations on Internet Map Services

According to the Administrative Rules of Surveying Qualification Certificate, as amended by the National Administration of Surveying, Mapping and Geo-information (formerly known as the State Bureau of Surveying and Mapping) in August 2014, the provision of internet map services by any non-surveying and mapping enterprise is subject to the approval of the National Administration of Surveying, Mapping and Geo-information and requires a Surveying and Mapping Qualification Certificate. Internet maps refer to maps called or transmitted through the internet. Pursuant to the Notice on Further Strengthening the Administration of Internet Map Services Qualification issued by the National Administration of Surveying, Mapping and Geo-information in December 2011, any entity without a Surveying and Mapping Qualification Certificate for internet map services is prohibited from providing any internet map services. According to the Provisions on the Administration of Examination of Maps effective on January 1, 2018, subject to limited exceptions, an enterprise must first apply for an approval by the relevant regulatory authority, if it intends to engage in any of the following activities: (i) publication, display, production, posting, import or export of a map or a product attached with a map, (ii) re-publication, re-display, re-production, re-posting, re-import or re-export of a map the content of which has been changed after it is approved, or other commercial products attached with such a map, and (iii) publication or display of a map or a product attached with a map overseas. The operator of an approved internet map is required to file the updated contents of the map with the relevant regulatory authority semi-annually, and re-apply for a new approval of the map when the two-year term of the existing approval expires.

Baidu Netcom provides online traffic information inquiry services as well as internet map services and has obtained a Surveying and Mapping Qualification Certificate for internet map services. Another entity in our

63

Table of Contents

group has also obtained the Surveying and Mapping Qualification Certificate. In accordance with the Provisions on the Administration of Examination of Maps, we have initiated the application for examination and approval of the maps that are used in our products.

### Regulations on Online Games

Pursuant to the Administrative Provisions on Internet Publishing Services and the Circular on Mobile Game Publishing Service, the online games services provided on our websites by our online game operator partners may be deemed as a type of "online publication service" provided by us, and we may be required to obtain an Internet Publication License from the NNRB. Beijing Perusal and another entity in our group have obtained the Internet Publication Licenses. The required approval by the NNRB of each online game provided on our websites is handled by our online game operator partners.

In accordance with the Interim Administration Measures of Online Games, promulgated by the Ministry of Culture in June 2010 and with the latest amendment becoming effective in December 2017, an ICP service provider operating online games must obtain an Internet Culture Business Permit. Baidu Netcom and some other entities in our group have obtained an Internet Culture Business Permit for operating online games. These measures also specify that the Ministry of Culture is responsible for the censorship of imported online games and the filing of records of domestic online games. The procedures for the filing of records of domestic online games must be conducted with the Ministry of Culture within 30 days after the commencement date of the online operation of these online games. The approval by or filing with the Ministry of Culture of each online game provided on our websites has been handled primarily by our online game operator partners.

In September 2009, the GAPP (currently known as the NNRB) together with several other government agencies issued Circular 13, which explicitly prohibits foreign investors from participating in online game operating businesses through wholly-owned enterprises, equity joint ventures or cooperative joint ventures in China. Circular 13 expressly prohibits foreign investors from gaining control over or participating in PRC operating companies' online game operations through indirect means, such as establishing joint venture companies, entering into contractual arrangements with or providing technical support to the operating companies, or through a disguised form, such as incorporating user registration, user account management or payment through game cards into online game platforms that are ultimately controlled or owned by foreign investors. We offer online games provided by our game operator partners on our websites owned and operated by our consolidated affiliated entities. We also operate two smartphone app distribution platforms in China as well as a mobile game platform through our consolidated affiliated entities. If our contractual arrangements were deemed to be "indirect means" or "disguised form" under Circular 13, our relevant contractual arrangements may be challenged by the NNRB or other governmental authorities. If we were found to be in violation of Circular 13 in the operation of our online game platform, the NNRB, in conjunction with relevant regulatory authorities, would have the power to investigate and deal with such violations, including in the most serious cases, suspending and revoking the relevant licenses and registrations.

### Regulations on Online Game Virtual Currency

The Interim Administration Measures of Online Games require companies that (i) issue online game virtual currency (including prepaid cards and/or pre-payment or prepaid card points) or (ii) offer online game virtual currency transaction services to apply for the Internet Culture Business Permit from provincial branches of the Ministry of Culture. The regulations prohibit companies that issue online game virtual currency from providing services that would enable the trading of such virtual currency. Any company that fails to submit the requisite application will be subject to sanctions, including but not limited to termination of operation, confiscation of incomes and fines. The regulations also prohibit online game operators from allocating virtual items or virtual currency to players based on random selection through lucky draw, wager or lottery that involve cash or virtual currency directly paid by the players. In addition, companies that issue online game virtual currency must comply with certain specific requirements. For example, online games virtual currency can only be used for products and

64

**Table of Contents**

services related to the issuance company's own online games. Pursuant to a Circular issued by the Ministry of Culture in December 2016, which took effect on May 1, 2017, an online game operator must not allow online game virtual currency to exchange for legal currency or items, except in the case of termination of online game operation where the online game operator may refund the balance of online game virtual currency to players in the form of legal currency or in other means acceptable to the players. Moreover, pursuant to the circular, regulations applicable to online game virtual currency also apply to such other virtual items where the virtual items are issued by the online game operator, can be exchangeable for other virtual items or value-added services related to the games, and can be purchased with legal currency or online game virtual currency or exchanged for online game virtual currency. Baidu Netcom and some other entities in our group have obtained the Internet Culture Business Permit for issuing online game virtual currency.

*Regulations on Advertisements and Online Advertising*

The PRC government regulates advertising, including online advertising, principally through the State Administration for Market Regulation. The PRC Advertising Law, as recently amended in October 2018, outlines the regulatory framework for the advertising industry, and allows foreign investors to own up to all equity interests in PRC advertising companies.

We conduct our value-added telecommunication-based online advertising business through Baidu Netcom, which is one of our consolidated affiliated entities in China and holds a business license that covers value-added telecommunication-based online advertising in its business scope. Our subsidiaries Baidu Times and Baidu China have also expanded their respective business license to cover advertising in their respective business scope.

Advertisers, advertising operators and advertising distributors are required by PRC advertising laws and regulations to ensure that the contents of the advertisements they prepare or distribute are true and in full compliance with applicable laws and regulations. For example, pursuant to PRC Advertising Law, advertisements must not contain, among other prohibited contents, terms such as "the state-level," "the highest grade," "the best" or other similar words. In addition, where a special government review is required for certain categories of advertisements before publishing, the advertisers, advertising operators and advertising distributors are obligated to confirm that such review has been performed and the relevant approval has been obtained. Pursuant to the PRC Advertising Law, the use of the internet to distribute advertisements shall not affect the normal use of the internet by users. Particularly, advertisements distributed on internet pages such as pop-up advertisements shall be indicated with a conspicuous mark for "close" to ensure the close of such advertisements by one click. Where internet information service providers know or should know that illegal advertisements are being distributed using their services, they shall prevent such advertisements from being distributed.

In addition to the above regulations, the Internet Advertising Measures also set forth certain compliance requirements for online advertising businesses. For example, search engine service providers must indicate paid search results as an advertisement and distinguish paid search results from natural search results on their websites. Advertising operators and distributors of internet advertisements must examine, verify and record identity information, such as name, address and contact information, of advertisers, and maintain an updated verification record on a regular basis. Moreover, advertising operators and advertising distributors must examine supporting documentation provided by advertisers and verify the contents of the advertisements against supporting documents before publishing. If the contents of advertisements are inconsistent with the supporting documentation, or the supporting documentation is incomplete, advertising operators and distributors must refrain from providing design, production, agency or publishing services. The Internet Advertising Measures also prohibit the following activities: (i) providing or using apps and hardware to block, filter, skip over, tamper with, or cover up lawful advertisements; (ii) using network access, network equipment and apps to disrupt the normal transmission of lawful advertisements or adding or uploading advertisements without authorization; and (iii) harming the interests of a third party by using fake statistics or traffic data.

Violation of these regulations may result in penalties, including fines, confiscation of advertising income, orders to cease dissemination of the advertisements and orders to publish an advertisement correcting the

65

**Table of Contents**

misleading information. In the case of serious violations, the State Administration for Market Regulation or its local branches may force the violator to terminate its advertising operation or even revoke its business license. Furthermore, advertisers, advertising operators or advertising distributors may be subject to civil liability if they infringe on the legal rights and interests of third parties.

### Regulations on Artificial Intelligence and Autonomous Driving Vehicles

We engage in the research and development of artificial intelligence (AI) technology and products, specifically autonomous driving vehicles. The Chinese government has issued a series of guidelines to encourage and support the research and development of AI technology, such as the Three-Year Implementing Plan for Internet Plus Artificial Intelligence issued in May 2016 and the Development Planning on the First Generation of Artificial Intelligence issued in July 2017. In particular, the MIIT, the Ministry of Public Security and the Ministry of Transport, issued the Circular on the Norms on Administration of Road Testing of Autonomous Driving Vehicles (Trial Implementation) in April 2018, which became effective from May 1, 2018 and is the primary regulation governing protocol of road testing of autonomous driving vehicles in China. Pursuant to this circular, any entity intending to conduct a road testing of autonomous driving vehicles must apply for and obtain a road-testing certificate and a temporary license plate for each tested car. To qualify for these required licenses, an applicant entity must satisfy, among others, the following requirements: (i) it must be an independent legal person registered under PRC law with the capacity to conduct manufacturing, technological research or testing of automobiles and automobile parts, which has established protocol to test and assess the performance of autonomous driving system and is capable of conducting real-time remote monitor of the tested cars; (ii) the vehicle under road testing must be equipped with a driving system that can switch between autonomous pilot model and human driving model in a safe, quick and simple manner and allows human driver to take control of the vehicle any time immediately when necessary; (iii) the tested vehicle must be equipped with the function of recording, storing and real-time monitoring the condition of the vehicle and is able to transmit real-time data of the vehicle, such as the driving model, location and speed; (iv) the applicant entity must sign an employment contract or a labor service contract with the driver of the tested vehicle, who must be a licensed driver with more than three years' driving experience and a track record of safe driving and is familiar with the testing protocol for autonomous driving system and proficient in operating the system; (v) the applicant entity must insure each tested vehicle for at least RMB5 million against car accidents or provide a letter of guarantee covering the same. During testing, the testing entity should post a noticeable identification logo for autonomous driving test on each tested car and should not use autonomous driving model unless in the permitted testing areas specified in the road-testing certificate. If the testing entity intends to conduct road testing in the region beyond the administrative territory of the certificate issuing authority, it must apply for a separate road-testing certificate and a separate temporary license plate from the relevant authority supervising the road-testing of autonomous cars in that region. In addition, the testing entity is required to submit to the road-testing certificate issuing authority a periodical testing report every six months and a final testing report within one month after completion of the road testing. In the case of a car accident causing severe injury or death of personnel or vehicle damage, the testing entity must report the accident to the road-testing certificate issuing authority within 24 hours and submit a comprehensive analysis report in writing covering cause analysis, final liability allocation results, etc. within five working days after the traffic enforcement agency determines the liability for the accident. Some local governments, such as Beijing, Shanghai, Chongqing, Hunan and Fujian, have issued local rules and regulations to regulate road testing of autonomous driving cars accordingly.

### Tort Liability Law

In accordance with the PRC Tort Liability Law, which became effective in July 2010, internet users and internet service providers bear tortious liabilities in the event that they infringe upon other persons' rights and interests through the internet. Where an internet user conducts tortious acts through internet services, the infringed person has the right to request the internet service provider take necessary actions such as deleting contents, screening and de-linking. Failing to take necessary actions after being informed, the internet service provider will be subject to joint and several liabilities with the internet user with regard to the additional damages

66

**Table of Contents**

incurred. Where an internet service provider knows that an internet user is infringing upon other persons' rights and interests through its internet service but fails to take necessary actions, it is jointly and severally liable with the internet user.

### Regulations on Intellectual Property Rights

China has adopted legislation governing intellectual property rights, including patents, copyrights, trademarks, and domain names.

*Patent.* The PRC Patent Law provides for patentable inventions, utility models and designs, which must meet three conditions: novelty, inventiveness and practical applicability. The State Intellectual Property Office under the State Council is responsible for examining and approving patent applications. A patent is valid for a term of twenty years in the case of an invention and a term of ten years in the case of utility models and designs.

*Copyright.* The PRC Copyright Law and its implementation rules extend copyright protection to products disseminated over the internet and computer software. There is a voluntary registration system administered by the China Copyright Protection Center. Creators of protected works enjoy personal and property rights, including, among others, the right of disseminating the works through information networks.

Pursuant to the relevant PRC regulations, rules and interpretations, ICP operators will be jointly liable with the infringer if they (a) participate in, assist in or abet infringing activities committed by any other person through the internet, (b) are or should be aware of the infringing activities committed by their website users through the internet, or (c) fail to remove infringing content or take other action to eliminate infringing consequences after receiving a warning with evidence of such infringing activities from the copyright holder. The court will determine whether an internet service provider should have known of their internet users' infringing activities based on how obvious the infringing activities are by taking into consideration a number of factors, including (i) the information management capabilities that the provider should have based on the possibility that the services provided by it may trigger infringing acts, (ii) the degree of obviousness of the infringing content, (iii) whether it has taken the initiative to select, edit, modify or recommend the contents involved, (iv) whether it has taken positive and reasonable measures against infringing acts, and (v) whether it has set up convenient programs to receive notices of infringement and made timely and reasonable responses to the notices. Where an internet service provider has directly obtained economic benefits from any contents made available by an internet user, it shall have a higher duty of care with respect to the internet user's act of infringement of others' copyrights. Advertisements placed for or other benefits particularly connected with specific contents may be deemed as direct economic benefits from such contents, but general advertising fees or service fees charged by an internet service provider for its internet services will not be included. In addition, where an ICP operator is clearly aware of the infringement of certain content against another's copyright through the internet, or fails to take measures to remove relevant contents upon receipt of the copyright holder's notice, and as a result, it damages the public interest, the ICP operator could be ordered to stop the tortious act and be subject to other administrative penalties such as confiscation of illegal income and fines. An ICP operator is also required to retain all infringement notices for a minimum of six months and to record the content, display time and IP addresses or the domain names related to the infringement for a minimum of 60 days.

An internet service provider may be exempted from liabilities for providing links to infringing or illegal content or providing other internet services which are used by its users to infringe others' copyright, if it does not know and does not have constructive knowledge that such content is infringing upon other parties' rights or is illegal. However, if the legitimate owner of the content notifies the internet service provider and requests removal of the links to the infringing content, the internet service provider would be deemed to have constructive knowledge upon receipt of such notification, but would be exempted from liabilities if it removes or disconnects the links to the infringing content at the request of the legitimate owner. At the request of the alleged infringer, the internet service provider should immediately restore links to content previously disconnected upon receipt of initial non-infringing evidence.

67

Table of Contents

We have adopted measures to mitigate copyright infringement risks. For example, our policy is to remove links to web pages and materials uploaded by the users if we know these web pages or materials contain materials that infringe upon third-party rights or if we are notified by the legitimate copyright holder of the infringement with proper evidence.

*Software Products*. The Computer Software Copyright Registration Measures promulgated by the China Copyright Office on February 20, 2002, regulates software copyright registration, exclusive licensing contracts of software copyright and transfer agreements. Although such registration is not mandatory under PRC law, software copyright owners are encouraged to go through the registration process and registered software may receive better protection.

*Trademark*. The PRC Trademark Law and its implementation rules protect registered trademarks. The Trademark Office of National Intellectual Property Administration under the State Administration for Market Regulation handles trademark registrations and grants a term of ten years to registered trademarks. Trademark license agreements must be filed with the Trademark Office of National Intellectual Property Administration for record. " 百度 " is recognized as a well-known trademark in China by the Trademark Office of National Intellectual Property Administration under the State Administration for Market Regulation. In addition to owning " 百度 " and the related logos, we have applied for registration of various other trademarks.

*Domain name*. Domain names are protected under the Administrative Measures on the Internet Domain Names promulgated by the MIIT in August 2017, which became effective in November 2017. The MIIT is the major regulatory body responsible for the administration of the PRC internet domain names, and under the supervision of the MIIT, the China Internet Network Information Center, or CNNIC, is responsible for the daily administration of .cn domain names and Chinese domain names. According to the Circular on Administration of the Use of Domain Names for Internet Information Services issued by the MIIT in November 2017, only the internet information service provider itself or the shareholder(s), principal or senior management officer(s) of the internet information service provider are eligible to register the domain names used for the internet information services. We have registered *Baidu.cn*, *Baidu.com.cn*, *hao123.com* and certain other domain names with CNNIC.

### Regulations on Information Security

The National People's Congress has enacted legislation that prohibits use of the internet that breaches the public security, disseminates socially destabilizing content or leaks state secrets. Breach of public security includes breach of national security and infringement on legal rights and interests of the state, society or citizens. Socially destabilizing content includes any content that incites defiance or violations of PRC laws or regulations or subversion of the PRC government or its political system, spreads socially disruptive rumors or involves cult activities, superstition, obscenities, pornography, gambling or violence. State secrets are defined broadly to include information concerning PRC national defense, state affairs and other matters as determined by the PRC authorities.

Pursuant to applicable regulations, ICP operators must complete mandatory security filing procedures and regularly update information security and censorship systems for their websites with local public security authorities, and must also report any public dissemination of prohibited content.

In December 2015, the Standing Committee of the National People's Congress promulgated the Anti-Terrorism Law, which took effect on January 1, 2016 and was amended on April 27, 2018. According to the Anti-Terrorism Law, telecommunication service operators or internet service providers shall (i) carry out pertinent anti-terrorism publicity and education to society; (ii) provide technical interfaces, decryption and other technical support and assistance for the competent departments to prevent and investigate terrorist activities; (iii) implement network security and information monitoring systems as well as safety and technical prevention measures to avoid the dissemination of terrorism information, delete the terrorism information, immediately halt its dissemination, keep relevant records and report to the competent departments once the terrorism information

68

**Table of Contents**

is discovered; and (iv) examine customer identities before providing services. Any violation of the Anti-Terrorism Law may result in severe penalties, including substantial fines.

In November 2016, the Standing Committee of the National People's Congress promulgated the Cyber Security Law, which took effect on June 1, 2017. In accordance with the Cyber Security Law, network operators must comply with applicable laws and regulations and fulfill their obligations to safeguard network security in conducting business and providing services. Network service providers must take technical and other necessary measures as required by laws, regulations and mandatory requirements to safeguard the operation of networks, respond to network security effectively, prevent illegal and criminal activities, and maintain the integrity, confidentiality and usability of network data.

In addition, the State Secrecy Bureau has issued provisions authorizing the blocking of access to any website it deems to be leaking state secrets or failing to comply with the relevant legislation regarding the protection of state secrets during online information distribution. Specifically, internet companies in China with bulletin boards, chat rooms or similar services must apply for specific approval prior to operating such services.

Furthermore, the Provisions on Technological Measures for Internet Security Protection, promulgated by the Ministry of Public Security, require all ICP operators to keep records of certain information about its users (including user registration information, log-in and log-out time, IP address, content and time of posts by users) for at least 60 days and submit the above information as required by laws and regulations. The Network Information Protection Decision states that ICP operators must request identity information from users when ICP operators provide information publication services to the users. If ICP operators come across prohibited information, they must immediately cease the transmission of such information, delete the information, keep relevant records, and report to relevant government authorities.

Baidu Netcom and some other entities in our group are ICP operators, and are therefore subject to the regulations relating to information security. They have taken measures to comply with these regulations. They are registered with the relevant government authority in accordance with the mandatory registration requirement. Baidu Netcom's policy is to remove links to web pages which to its knowledge contain information that would be in violation of PRC laws or regulations. In addition, we monitor our websites to ensure our compliance with the above-mentioned laws and regulations.

### *Regulations on Internet Privacy*

The PRC Constitution states that PRC law protects the freedom and privacy of communications of citizens and prohibits infringement of these rights. In recent years, PRC government authorities have enacted legislation on internet use to protect personal information from any unauthorized disclosure. The Network Information Protection Decision provides that electronic information that identifies a citizen or involves privacy of any citizen is protected by law and must not be unlawfully collected or provided to others. ICP operators collecting or using personal electronic information of citizens must specify the purposes, manners and scopes of information collection and uses, obtain consent of the relevant citizens, and keep the collected personal information confidential. ICP operators are prohibited from disclosing, tampering with, damaging, selling or illegally providing others with, collected personal information. ICP operators are required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. The Administrative Measures on Internet Information Services prohibit an ICP operator from insulting or slandering a third party or infringing upon the lawful rights and interests of a third party. According to the Provisions on Protection of Personal Information of Telecommunication and Internet Users, telecommunication business operators and ICP operators are responsible for the security of the personal information of users they collect or use in the course of their provision of services. Without obtaining the consent from the users, telecommunication business operators and ICP operators may not collect or use the users' personal information. The personal information collected or used in the course of provision of services by the telecommunication business operators or ICP operators must be kept in strict confidence, and may not be divulged, tampered with or damaged, and may

69

Table of Contents

not be sold or illegally provided to others. The ICP operators are required to take certain measures to prevent any divulgence of, damage to, tampering with or loss of users' personal information. In accordance with the Cyber Security Law, network operators must not collect personal information irrelevant to their services. In the event of any unauthorized disclosure, damage or loss of collected personal information, network operators must take immediate remedial measures, notify the affected users and report the incidents to the relevant authorities in a timely manner. If any user knows that a network operator illegally collects and uses his or her personal information in violation of laws, regulations or any agreement with the user, or the collected and stored personal information is inaccurate or wrong, the user has the right to request the network operator to delete or correct the relevant collected personal information. We collect and use our users' personal information only if our users give their informed consent, and we believe we have taken appropriate measures to protect the security of our users' personal information.

The relevant telecommunications authorities are further authorized to order ICP operators to rectify unauthorized disclosure. ICP operators are subject to legal liability, including warnings, fines, confiscation of illegal gains, revocation of licenses or filings, closing of the relevant websites, administrative punishment, criminal liabilities, or civil liabilities, if they violate relevant provisions on internet privacy. Pursuant to the Ninth Amendment to the Criminal Law issued by the Standing Committee of the National People's Congress in August 2015 and becoming effective in November 2015, any ICP provider that fails to fulfill the obligations related to internet information security administration as required by applicable laws and refuses to rectify upon orders, will be subject to criminal liability for (i) any dissemination of illegal information in large scale; (ii) any severe effect due to the leakage of the client's information; (iii) any serious loss of evidence of criminal activities; or (iv) other severe situations, and any individual or entity that (x) sells or provides personal information to others unlawfully, or (y) steals or illegally obtains any personal information, will be subject to criminal liability in severe situations. In addition, the Interpretations of the Supreme People's Court and the Supreme People's Procuratorate of the PRC on Several Issues Concerning the Application of Law in Handling Criminal Cases of Infringing Personal Information, effective in June 2017, have clarified certain standards for the conviction and sentencing in relation to personal information infringement. The PRC government has the power and authority to order ICP operators to turn over personal information if an internet user posts any prohibited content or engages in illegal activities on the internet.

### Regulations on Foreign Exchange

#### Foreign Currency Exchange

Pursuant to the Foreign Currency Administration Rules, as amended, and various regulations issued by SAFE and other relevant PRC government authorities, RMB is freely convertible to the extent of current account items, such as trade related receipts and payments, interest and dividends. Capital account items, such as direct equity investments, loans and repatriation of investment, unless expressly exempted by laws and regulations, still require prior approval from SAFE or its provincial branch for conversion of RMB into a foreign currency, such as U.S. dollars, and remittance of the foreign currency outside of the PRC. After a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, became effective on June 1, 2015, instead of applying for approvals regarding foreign exchange registrations of foreign direct investment and overseas direct investment from SAFE, entities and individuals will be required to apply for such foreign exchange registrations from qualified banks. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration.

Payments for transactions that take place within the PRC must be made in RMB. Foreign currency revenues received by PRC companies may be repatriated into China or retained outside of China in accordance with requirements and terms specified by SAFE.

#### Dividend Distribution

Wholly foreign-owned enterprises and Sino-foreign equity joint ventures in the PRC may pay dividends only out of their accumulated profits, if any, as determined in accordance with PRC accounting standards and

70

Table of Contents

regulations. Additionally, these foreign-invested enterprises may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the enterprise's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to employee welfare and bonus funds at their discretion. These reserves are not distributable as cash dividends.

*Foreign Exchange Registration of Offshore Investment by PRC Residents*

Pursuant to SAFE's Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment via Overseas Special Purpose Vehicles, or SAFE Circular No. 75, issued in October 2005, and a series of implementation rules and guidance, including the circular relating to operating procedures that came into effect in July 2011, PRC residents, including PRC resident natural persons or PRC companies, must register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as an increase or decrease of capital contributed by PRC individuals, a share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with the SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. We have notified holders of ordinary shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. After SAFE Notice 13 became effective on June 1, 2015, entities and individuals are required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, directly examine the applications and conduct the registration. We are aware that Mr. Robin Yanhong Li, our chairman, chief executive officer and principal shareholder, who is a PRC resident, has registered with the relevant local SAFE branch. We, however, cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to distribute dividends to or obtain foreign exchange-dominated loans from our company.

In February 2012, SAFE promulgated the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plans of Overseas Publicly-Listed Companies, or the Stock Option Rule, replacing the earlier rules promulgated in March 2007. Under the Stock

71

**Table of Contents**

Option Rule, PRC residents who are granted stock options by an overseas publicly listed company are required, through a PRC agent or PRC subsidiary of such overseas publicly listed company, to register with SAFE and complete certain other procedures. We and our PRC resident employees who have been granted stock options are subject to these regulations. We have designated our PRC subsidiary Baidu Online to handle the registration and other procedures required by the Stock Option Rule. Failure of the option holders to complete their SAFE registrations may subject these PRC employees to fines and legal sanctions and may also limit the ability of the overseas publicly listed company to contribute additional capital into its PRC subsidiary and limit the PRC subsidiary's ability to distribute dividends.

### Regulations on Labor

The Labor Contract Law, which became effective in January 2008, and its implementation rules, impose more restrictions on employers and have been deemed to increase labor costs for employers, compared to the Labor Law, which became effective in January 1995. For example, pursuant to the Labor Contract Law, an employer is obliged to sign a labor contract with an unlimited term with an employee if the employer continues to hire the employee after the expiration of two consecutive fixed-term labor contracts. The employer has to compensate the employee upon the expiration of a fixed-term labor contract, unless the employee refuses to renew such contract on terms the same as or more favorable to the employee than those contained in the expired contract. The employer also has to indemnify an employee if the employer terminates a labor contract without a cause permitted by law. In addition, under the Regulations on Paid Annual Leave for Employees, which became effective in January 2008, employees who have served more than one year for an employer are entitled to a paid vacation ranging from 5 to 15 days per year, depending on their length of service. Employees who waive such vacation time at the request of employers must be compensated for three times their regular salaries for each waived vacation day.

### Regulations on Taxation

For a discussion of applicable PRC tax regulations, see "Item 5.A. Operating and Financial Review and Prospects—Operating Results—Taxation."

### C.   Organizational Structure

The following is a list of our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:

| Name | Place of Formation | Relationship |
| --- | --- | --- |
| Baidu Holdings Limited | British Virgin Islands | Wholly owned subsidiary |
| Baidu (Hong Kong) Limited | Hong Kong | Wholly owned subsidiary |
| Baidu Online Network Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu (China) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu.com Times Technology (Beijing) Co., Ltd. | China | Wholly owned subsidiary |
| Baidu International Technology (Shenzhen) Co., Ltd. | China | Wholly owned subsidiary |
| Beijing Baidu Netcom Science Technology Co., Ltd. | China | Consolidated affiliated entity |
| Beijing Perusal Technology Co., Ltd. | China | Consolidated affiliated entity |
| iQIYI, Inc. | Cayman Islands | Majority-owned subsidiary |

72

Table of Contents

The following diagram illustrates our corporate structure, including our principal subsidiaries and consolidated affiliated entities as of the date of this annual report on Form 20-F:



\*    The diagram above omits the names of subsidiaries and consolidated affiliated entities that are insignificant individually and in the aggregate.

(1)    Beijing Baidu Netcom Science Technology Co., Ltd. is 99.5% owned by Mr. Robin Yanhong Li, our chairman and chief executive officer, and 0.5% owned by Mr. Hailong Xiang, an employee of ours. Please see "Item 6.E. Directors, Senior Management and Employees—Share Ownership" for Mr. Robin Yanhong Li's beneficial ownership in our company. Mr. Hailong Xiang's beneficial ownership of our company is less than 1% of our total outstanding shares.

(2)    Beijing Perusal Technology Co., Ltd. is 50% owned by Mr. Lu Wang and 50% owned by Mr. Zhixiang Liang. Both Mr. Lu Wang and Mr. Zhixiang Liang are employees of ours, and their respective beneficial ownership in our company is less than 1% of our total outstanding shares.

**Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders**

PRC laws and regulations restrict and impose conditions on foreign investment in internet content, value-added telecommunication-based online marketing, audio and video services and mobile application distribution businesses. Accordingly, we operate these businesses in China through our consolidated affiliated entities. We have entered into a series of contractual arrangements with our consolidated affiliated entities and the nominee shareholders of our consolidated affiliated entities. These contractual arrangements enable us to:

- receive the economic benefits that could potentially be significant to our consolidated affiliated entities in consideration for the services provided by our subsidiaries;

73

Table of Contents

- exercise effective control over our consolidated affiliated entities; and

- hold an exclusive option to purchase all or part of the equity interests in our consolidated affiliated entities when and to the extent permitted by PRC law.

We do not have any equity interests in our consolidated affiliated entities. However, as a result of contractual arrangements, we have effective control over and are considered the primary beneficiary of these companies, and we have consolidated the financial results of these companies in our consolidated financial statements. If our consolidated affiliated entities or the nominee shareholders fail to perform their respective obligations under the contractual arrangements, we could be limited in our ability to enforce the contractual arrangements that give us effective control over our consolidated affiliated entities. Furthermore, if we are unable to maintain effective control, we would not be able to continue to consolidate the financial results of our consolidated affiliated entities in our financial statements. In 2016, 2017 and 2018, we derived approximately 35%, 34% and 33% of our total revenues, respectively, from our consolidated affiliated entities. For a detailed description of the regulatory environment that necessitates the adoption of our corporate structure, see "Item 4.B. Information on the Company—Business Overview—Regulations." For a detailed description of the risks associated with our corporate structure, see "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

In August 2018, we completed the divestiture of a majority equity stake in our financial services business. The divested financial services business has been renamed as Du Xiaoman. After the divestiture, we hold a minority equity interest in Du Xiaoman and have deconsolidated the financial results of Du Xiaoman from our consolidated financial statements in accordance with U.S. GAAP.

### Contractual Arrangements Relating to Baidu Netcom and Beijing Perusal

The following is a summary of the material provisions of the contractual arrangements relating to Baidu Netcom and Beijing Perusal.

#### Exclusive Technology Consulting and Services Agreement

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide to Baidu Netcom technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and e-commerce technical services. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay service fees to Baidu Online and Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The exclusive technology consulting and services agreement between Baidu Online and Beijing Perusal contains substantially the same terms as those between Baidu Online and Baidu Netcom described above. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

In 2017, the amount of service fees Baidu Netcom paid to Baidu Online was 95% of its net income before income taxes. In 2016 and 2018, Baidu Netcom did not pay any service fees to Baidu Online due to Baidu Netcom's accumulated loss position. Beijing Perusal did not pay any service fees to Baidu Online due to Beijing Perusal's operating loss in 2016, 2017 and 2018.

#### Operating Agreement

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and

74

**Table of Contents**

financial affairs. Baidu Online has the right to appoint senior executives of Baidu Netcom. The nominee shareholders of Baidu Netcom must appoint candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The operating agreement by and among Baidu Online and Beijing Perusal and the nominee shareholders of Beijing Perusal contains substantially the same terms as those described above. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*License Agreements*

Baidu Online and Baidu Netcom have entered into a software license agreement and a web layout copyright license agreement. Pursuant to these license agreements, Baidu Online has granted to Baidu Netcom the right to use, including but not limited to, a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement have been renewed since their original expiration and are in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

The web layout copyright license agreements that Baidu Online has entered into with Beijing Perusal contain substantially the same terms as those between Baidu Online and Baidu Netcom described above. The agreement is in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement by and among Baidu, Inc., Baidu Online, Baidu Netcom and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have irrevocably granted Baidu, Inc. or its designated person(s) (including Baidu Online) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The nominee shareholders must remit to Baidu Online any amount that is paid by Baidu Online in connection with the purchased equity interest as requested by Baidu, Inc. or its designated person(s) (including Baidu Online) to the extent permitted by the applicable laws. Baidu, Inc. or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full amount. Any and all dividends and other capital distributions from Baidu Netcom to the nominee shareholders must be paid to Baidu, Inc. in full amount. Baidu, Inc. or its designated person(s) (including Baidu Online) also have the exclusive right to cause the nominee shareholders of Baidu Netcom to transfer their equity interest in Baidu Netcom to Baidu, Inc. or any designated third party. Baidu, Inc. will provide unlimited financial support to Baidu Netcom, if Baidu Netcom becomes in need of any form of reasonable financial support in the normal operation of business. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu, Inc. (through Baidu Online), Baidu, Inc. will unconditionally forgive any such loans to Baidu Netcom upon provision by Baidu Netcom of sufficient proof for its loss and incapacity to repay. The agreement will terminate upon the transfer by the nominee shareholders of Baidu Netcom of all their equity interests in Baidu Netcom to Baidu, Inc. or its designated person(s) or upon expiration of the term of business of Baidu, Inc. or Baidu Netcom.

Table of Contents

The exclusive equity purchase and transfer option agreement by and among Baidu, Inc., Baidu Online, Beijing Perusal and the nominee shareholders of Beijing Perusal contains substantially the same terms as those described above. The agreement will terminate upon the transfer by the nominee shareholders of Beijing Perusal of all their equity interests in Beijing Perusal, as the case may be, to Baidu, Inc. or its designated person(s) or upon expiration of the term of business of Baidu, Inc. or the relevant consolidated affiliated entity.

*Loan Agreements*

Pursuant to loan agreements amongst Baidu Online and the nominee shareholders of Baidu Netcom, Baidu Online provided the loans with an aggregate amount of RMB6.4 billion (US$934 million) to the nominee shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from the sale of the nominee shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person(s). Each loan agreement will expire upon the fulfillment of the obligations under such loan agreement. With some of the loan agreements amended and renewed, the earliest will expire on May 6, 2028.

The loan agreements amongst Baidu Online and the nominee shareholders of Beijing Perusal contain substantially the same terms as those described above, except that the amount of loans extended to the nominee shareholders is RMB3.2 billion (US$465 million). The loan agreements with the two nominee shareholders of Beijing Perusal will expire on March 30, 2028 and June 27, 2028 respectively, and can be extended with the written consent of both parties before expiration.

*Proxy Agreement/Power of Attorney*

Pursuant to the proxy agreement amongst Baidu, Inc. and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom agree to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu, Inc. Each of the nominee shareholders of Baidu Netcom has executed an irrevocable power of attorney to appoint the person(s) designated by Baidu, Inc. as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. Any action taken by such attorney-in-fact in relation to the entrusted rights shall be directed and approved by Baidu, Inc. The proxy agreement will be in effect for as long as the relevant nominee shareholder of Baidu Netcom holds any equity interests in Baidu Netcom unless terminated in writing by Baidu, Inc. Each of the powers of attorney will be in effect for as long as the relevant nominee shareholder of Baidu Netcom holds any equity interests in Baidu Netcom.

The proxy agreements and powers of attorney amongst Baidu, Inc. and the nominee shareholders of Beijing Perusal contain substantially the same terms as those described above. The proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu, Inc. The powers of attorney will be in effect for as long as the relevant nominee shareholder of Beijing Perusal holds any equity interests in Beijing Perusal.

*Equity Pledge Agreement*

Pursuant to the equity pledge agreement amongst Baidu Online and the nominee shareholders of Baidu Netcom, the nominee shareholders of Baidu Netcom have pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreements and Baidu Netcom's performance of its obligations under the exclusive technology consulting and service agreement. If Baidu Netcom or the nominee shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The nominee shareholders of Baidu Netcom agree not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term of or the fulfillment by Baidu Netcom and the nominee shareholders of their respective obligations under the exclusive technology consulting and service agreement and the loan agreements.

76

Table of Contents

The equity pledge agreements amongst Baidu Online and the nominee shareholders of Beijing Perusal contains substantially the same terms as those described above.

Through design of the aforementioned agreements, the nominee shareholders of these affiliated entities have effectively assigned their full voting rights to Baidu, Inc., which gives Baidu, Inc. the power to direct the activities that most significantly impact the affiliated entities' economic performance. Baidu, Inc. obtains the ability to approve decisions made by the affiliated entities and the ability to acquire the equity interests in the affiliated entities when permitted by PRC law. Baidu, Inc. is obligated to absorb losses of the affiliated entities that could potentially be significant to the affiliated entities through providing unlimited financial support to the affiliated entities or is entitled to receive economic benefits from the affiliated entities that could potentially be significant to the affiliated entities through the exclusive technology consulting and service fees. As a result of these contractual arrangements, Baidu, Inc. is determined to be the primary beneficiary of these affiliated entities. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between us and these affiliated entities through these contractual arrangements, and we consolidate these affiliated entities through Baidu, Inc.

We have also entered into contractual arrangements with several other affiliated entities and their respective nominee shareholders through some of our subsidiaries other than Baidu Online, which result in these subsidiaries being the primary beneficiary of the relevant affiliated entities. As a result of these contractual arrangements, there exists a parent-subsidiary relationship between us and the relevant affiliated entities, and we consolidate these affiliated entities through the subsidiaries.

### D.    Property, Plant and Equipment

Our corporate headquarters, Baidu Campus, is located in Shangdi, an area designated by the Beijing municipal government as the center of the city's information technology industry, and we own the office building on Baidu Campus. We also own another office building, Baidu Science Park, in Beijing. We are in the process of obtaining the land use permit with the local authority and may be required to pay an unspecified amount of land transaction fee. Besides Beijing, we own and occupy office buildings in Shanghai and Shenzhen.

We also lease some offices in Beijing, many other cities in China and places outside of China, such as Tokyo (Japan), California (USA), Thailand, Brazil and Indonesia.

We host our servers in China at the internet data centers of China Telecom, China Unicom and China Mobile in over ten selected cities in China, and we also have content delivery network locations in various cities across China. We plan to deploy additional data centers in 2019.

In December 2011, we commenced construction of an office building in Shenzhen, which will serve as our international center in Southern China. We currently expect to complete the planned construction in 2019.

In 2018, we completed the construction of Shanxi cloud computing center, which will serve as one of our internet data centers in China.

### Item 4A.    Unresolved Staff Comments

None.

### Item 5.    Operating and Financial Review and Prospects

The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our audited consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3.D. Key Information—Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

77

Table of Contents

**A.    Operating Results**

**Overview**

Our operations are primarily based in China, where we derive almost all of our revenues. Total revenues in 2018 were RMB102.3 billion (US$14.9 billion), growing by 21% from 2017 (or 28%, if both years' revenues were net of VAT). In 2017 and 2018, we divested certain non-core businesses, including Baidu Deliveries, Du Xiaoman, and others. These divested businesses together generated approximately RMB4.1 billion and RMB3.1 billion in revenues for the year ended December 31, 2017 and 2018, respectively. Operating profit in 2018 was RMB15.5 billion (US$2.3 billion), a 1% decrease from 2017. Net income attributable to Baidu, Inc. in 2018 was RMB27.6 billion (US$4.0 billion), a 51% increase from 2017.

Our total assets as of December 31, 2018 were RMB297.6 billion (US$43.3 billion), of which cash and cash equivalents and restricted cash amounted to RMB29.8 billion (US$4.3 billion). Our total liabilities as of December 31, 2018 were RMB121.8 billion (US$17.7 billion), accounting for 41% of total liabilities, redeemable noncontrolling interest and equity. As of December 31, 2018, our retained earnings accumulated to RMB129.2 billion (US$18.8 billion).

**Reorganization of Operating Segments**

In the second quarter of 2017, we reorganized our operating segments from three operating segments into two operating segments, namely Baidu Core and iQIYI. Starting from April 2017, search services and transaction services have been combined into one segment—Baidu Core. The change in operating segments reflects our adjustments to business strategies and operations, as we de-emphasized our transaction services business and shifted such resources to support our online marketing services. Our chief operating decision maker assesses the performance of our company and makes decisions in respect of the allocation of company resources by analyzing the operating results of these two operating segments separately.

**Revenues**

*Revenue Generation*

*Baidu Core*. Baidu Core revenues primarily comprise (i) auction-based P4P online marketing services that include search-based and feed-based online marketing services; (ii) non-P4P services provide display-based online marketing services and other online marketing services based on performance criteria other than CPC, and (iii) other services from new AI business initiatives, such as DuerOS (voice assistant and related smart device business), Apollo (autonomous driving platform), and Baidu Cloud. We expect that we will continue to earn a majority of our revenues from Baidu Core.

A majority of our revenues from Baidu Core are derived from P4P services. Our P4P platform is an online marketplace that introduces internet search users to customers, who pay us a fee based on click-throughs for priority placement of their links in the search results. We recognize auction-based revenue from P4P services when a user clicks on a customer's link in the search results, based on the amount that the customer has agreed to pay for each click-through. Besides the traditional auction-based P4P services, feed-based online marketing services has grown rapidly since it was launched in 2016. Our feed platform helps customers target relevant feed users, and customers pay us based on a CPC basis or ad displays of their products.

We also provide our customers with other performance-based and display-based online marketing services. For other performance-based online marketing services, our customers pay us based on performance criteria other than CPC, such as the number of app downloads on mobile devices, the number of users registered with our customers or the transaction volume. For display-based online marketing services, our customers pay us based on the duration or the number of ad displays placed on our properties and Baidu Union partners' properties.

78

Table of Contents

Our online marketing services have historically been driven by the general increase in our customers' online marketing budgets. Our online marketing customers are increasingly seeking marketing solutions with measurable results in order to maximize their ROI. To meet customers' needs, we will continue to evaluate the effectiveness of our various products and services and adjust the mix of our service offerings to optimize our customers' ROI. Any prolonged economic slowdown in China, however, may cause our customers to decrease or delay their online marketing spending, which could negatively affect our online marketing revenues of Baidu Core. We will continue to make efforts to grow our customer base, improve customer experience and optimize their marketing budget allocation/spending effectiveness on our platform to drive the growth of Baidu Core.

Apart from the online marketing services, we derive revenue from other services of Baidu Core by providing services such as Baidu Cloud and financial services. In August 2018, we completed the divestiture of a majority equity stake in Du Xiaoman (financial services business), reducing our holding to a minority equity interest, and, thus have deconsolidated the financial results of Du Xiaoman from our consolidated financial statements in accordance with U.S. GAAP.

*iQIYI.* iQIYI is a leading internet video streaming service in China. iQIYI's platform features highly popular original content, as well as a comprehensive selection of professionally produced content, partner-generated content, and user-generated content. iQIYI derives a majority of its revenues from membership services and online marketing services.

iQIYI offers membership packages that allow the members to have access to streaming of a library of premium content, certain commercial skipping and other viewing privileges, and higher community status in iQIYI Paopao social platform. iQIYI also generates a small portion of membership services revenue from on-demand content purchased by the users and sale of other membership cards.

iQIYI's online marketing revenues are recognized net of online marketing agency rebates. Most of iQIYI's online marketing services are in the form of brand advertising and feed-based online marketing services.

### Collection

For most of Baidu Core services, we collect payments from our customers directly and through our distributors. We require our P4P customers to pay a deposit before using our P4P services and remind them by an automated notice to replenish the accounts after their account balance falls below a designated amount. We deduct the amount due to us from the deposit paid by a customer when a user clicks on the customer's link in the search results. In addition, we offer payment terms to some of our customers based on their historical marketing placements and credibility. We also offer longer payment terms to certain qualified distributors, consistent with industry practice.

For most services provided by iQIYI, customers may enter into different payment terms based on their historical marketing placements and credibility. Users are also encouraged to upfront purchase membership services to get enhanced user experience, and such payments are collected from the users by iQIYI or through agents such as China Mobile.

As of December 31, 2018, we had accounts receivable of RMB6.0 billion (US$875 million), net of allowance of RMB599 million (US$87 million) and contract assets of RMB1.4 billion (US$206 million), net of allowance for doubtful accounts of RMB21 million (US$3 million).

### Operating Costs and Expenses

Our operating costs and expenses consist of cost of revenues, selling, general and administrative expenses, and research and development expenses. Share-based compensation expenses are allocated among these three

79

**Table of Contents**

categories of operating costs and expenses, based on the nature of the work of the employees who have received share-based compensation.

### Cost of Revenues

Our costs of revenues consist of content costs, traffic acquisition costs, bandwidth costs and other cost of revenues.

*Content Costs*. Content costs primarily consist of the amortization and impairment of the licensed copyrights, amortization and direct expensing of produced content, and the fees paid to producers or distributors we paid for content published on our platform to their producers or distributors.

*Traffic Acquisition Costs*. Traffic acquisition costs typically represent the portion of our online marketing revenues that we share with Baidu Union partners. We typically pay a Baidu Union partner, based on a pre-arranged agreement, a portion of the online marketing revenues generated from valid click throughs by users of that partner's properties.

*Bandwidth Costs*. Bandwidth costs are fees we pay to telecommunications carriers such as China Telecom, China Mobile and China Unicom for telecommunications services and for hosting our servers at their internet data centers.

*Other cost of revenues.* Other cost of revenues include depreciation, operational costs, cost of goods sold on hardware devices and share-based compensation. Depreciation expenses of servers and other computer hardware that are directly related to our business operations and technical support. Operational costs include primarily salary and benefit expenses, intangible assets amortization, payment platform charges and other expenses incurred by our operating and technical support personnel.

### Operating Expenses

Our operating expenses consist of selling, general and administrative expenses, and research and development expenses.

### Selling, General and Administrative Expenses

Our selling, general and administrative marketing expenses primarily consist of promotional and marketing expenses, salaries and benefits for our sales, marketing, general and administrative personnel, and legal, accounting and other professional services fees.

### Research and Development Expenses

Research and development expenses primarily consist of salaries and benefits for research and development personnel. We expense research and development costs as they are incurred, except for capitalized software development costs that fulfill the capitalization criteria under Accounting Standards Codification ("ASC").

### Share-based Compensation Expenses

Baidu, Inc. grants options and restricted shares to our employees, directors and consultants as share-based compensation awards. As of December 31, 2018, there was RMB337 million (US$49 million) unrecognized share-based compensation expenses related to options of Baidu, Inc., which are expected to be recognized over a weighted-average vesting period of 2.4 years. As of December 31, 2018, there was RMB5.2 billion (US$762 million) unrecognized share-based compensation expenses related to restricted shares of Baidu, Inc., which are expected to be recognized over a weighted-average vesting period of 2.7 years. To the extent the actual forfeiture rate is different from our original estimate, actual share-based compensation cost related to these awards may be different from our expectation.

80

**Table of Contents**

iQIYI grants options and restricted shares to its employees, directors, officers and consultants as share-based compensation awards. As of December 31, 2018, there were RMB1.4 billion (US$207 million) of unrecognized share-based compensation costs related to iQIYI's equity awards that are expected to be recognized over a weighted-average vesting period of 3.0 years. Total unrecognized compensation costs may be adjusted for future changes in estimated forfeitures.

Other subsidiaries also have equity incentive plans granting share-based awards. Total share-based compensation expenses recognized and unrecognized were insignificant, both individually and in the aggregate.

**Taxation**

***Cayman Islands and British Virgin Islands***

We are not subject to income or capital gain tax under the current laws of the Cayman Islands and the British Virgin Islands. Additionally, upon payments of dividends by the Company, no Cayman Island withholding tax will be imposed.

***Hong Kong***

Subsidiaries in Hong Kong are subject to the uniform tax rate of 16.5%. Under Hong Kong tax law, our subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there is no withholding tax in Hong Kong on remittance of dividends.

***Japan***

As a result of the Japanese tax regulations amendments, the effective income tax rates are approximately 33%, 32% and 31% for the years ended December 31, 2016, 2017 and 2018, respectively.

***PRC Enterprise Income Tax***

Effective from January 1, 2008, the PRC's statutory enterprise income tax, or EIT, rate is 25%. An enterprise may benefit from a preferential tax rate of 15% under the EIT Law if it qualifies as a "High and New Technology Enterprise" strongly supported by the state. Pursuant to the Administrative Measures on the Recognition of High and New Technology Enterprises, as amended in January 2016, the provincial counterparts of the Ministry of Science and Technology, the Ministry of Finance and the State Administration of Taxation make joint determination on whether an enterprise is qualified as a "High and New Technology Enterprise" under the EIT Law. In making such determination, these government agencies consider, among other factors, ownership of core technology, whether the key technology supporting the core products or services fall within the scope of high and new technology strongly supported by the state as specified in the measures, the ratios of research and development personnel to total personnel, the ratio of research and development expenditures to annual sales revenues, the ratio of revenues attributed to high and new technology products or services to total revenues, and other measures set forth in relevant guidance. A "High and New Technology Enterprise" certificate is effective for a period of three years. A number of our PRC subsidiaries and consolidated affiliated entities, such as Baidu Online and Baidu Netcom, obtained the "High and New Technology Enterprise" certificates. The related tax holiday under such "High and New Technology Enterprise" certificates of these entities will expire in 2019, 2020 and 2021.

If any entity fails to maintain the "High and New Technology Enterprise" qualification under the EIT Law, its tax rate will increase, which could have a material and adverse effect on our results of operations and financial position. Historically, all of the PRC subsidiaries and consolidated affiliated entities mentioned above successfully re-applied for the certificates when the prior ones expired.

81

Table of Contents

An enterprise may benefit from a preferential tax rate of 10% under the EIT law if it qualifies as a "Key Software Enterprise." Enterprises wishing to enjoy the "Key Software Enterprise" status will be subject to relevant governmental authorities' assessment each year as to whether they are entitled to the preferential tax rate of 10%. Due to the "Key Software Enterprise" status, Baidu Online was entitled to a preferential income tax rate of 10% from 2010 to 2017, so was Baidu China for 2015 to 2017, and Baidu International for 2016 and 2017. Prior to May 2016, a "Key Software Enterprise" used to be designated jointly by the National Development and Reform Commission, the MIIT, the Ministry of Commerce, the Ministry of Finance and the State Administration of Taxation. In May 2016, the four PRC governmental authorities jointly issued a notice, pursuant to which an enterprise may be entitled to the preferential income tax rate of 10% by filing with the local tax authority with supporting documentation proving its qualifications to be a "Key Software Enterprise" during its annual income tax filing process. The "Key Software Enterprise" status of Baidu Online, Baidu China and Baidu International for 2018 will be filed with tax authorities before May 2019 and will be subject to relevant governmental authorities' assessment.

If our PRC subsidiaries or consolidated affiliated entities that have enjoyed preferential tax treatment no longer qualify for the preferential treatment, we will consider available options under applicable law that would enable us to qualify for alternative preferential tax treatment. To the extent we are unable to offset the impact of the expiration of existing preferential tax treatment with new tax exemptions, tax incentives or other tax benefits, the expiration of existing preferential tax treatment may cause our effective tax rate to increase. The amount of income tax payable by our PRC subsidiaries and consolidated affiliated entities in the future will depend on various factors, including, among other things, the results of operations and taxable income of, and the statutory tax rate applicable to, each of the entities. Our effective tax rate depends partially on the extent of the relative contribution of each of our subsidiaries and consolidated affiliated entities to our consolidated taxable income. In 2016, 2017 and 2018, our consolidated effective tax rate was 20%, 14% and 17%, respectively.

*Withholding Tax*

Under the EIT Law and its implementation rules, dividends, interests, rent or royalties payable by a foreign-invested enterprise, such as our PRC subsidiaries, to any of its non-resident enterprise investors, and proceeds from any such non-resident enterprise investor's disposition of assets (after deducting the net value of such assets) are subject to the EIT at the rate of 10%, namely withholding tax, unless the non-resident enterprise investor's jurisdiction of incorporation has a tax treaty or arrangement with China that provides for a reduced withholding tax rate or an exemption from withholding tax. The Caishui (2008) No. 1 Notice clarifies that undistributed profits earned by foreign-invested enterprises prior to January 1, 2008 will be exempted from any withholding tax.

The British Virgin Islands, where Baidu Holdings Limited, the sole shareholder of certain of our PRC subsidiaries such as Baidu Online, was incorporated, does not have such a tax treaty with China.

Hong Kong, where Baidu (Hong Kong) Limited, our wholly owned subsidiary and the sole shareholder of certain of our PRC subsidiaries such as Baidu Times and Baidu China, was incorporated, has a tax arrangement with China that provides for a lower withholding tax rate of 5% on dividends subject to certain conditions and requirements, such as the requirement that the Hong Kong resident enterprise own at least 25% of the PRC enterprise distributing the dividend at all times within the 12-month period immediately preceding the distribution of dividends and be a "beneficial owner" of the dividends. However, pursuant to a SAT Circular 81 issued by the State Administration of Taxation in February 2009, if the relevant PRC tax authorities determine, in their discretion, that a company benefits from the reduced withholding tax rate on dividends due to a structure or arrangement designed for the primary purpose of obtaining favorable tax treatment, the PRC tax authorities may adjust the preferential tax treatment. Moreover, pursuant to a SAT Circular 9 issued by the State Administration of Taxation in February 2018, which became effective from April 1, 2018 and superseded the SAT Circular 601 issued by the State Administration of Taxation in October 2009, a resident of a contracting state will not qualify for the benefits under the tax treaties or arrangements, if it is not the "beneficial owner" of the dividend, interest

82

Table of Contents

and royalty income. According to SAT Circular 9, a "beneficial owner" is required to have ownership and the right to dispose of the income or the rights and properties giving rise to the income, and generally engage in substantive business activities. An agent or conduit company will not be regarded as a "beneficial owner" and, therefore, will not qualify for treaty benefits. A conduit company normally refers to a company that is set up primarily for the purpose of evading or reducing taxes or transferring or accumulating profits. In addition, pursuant to a SAT Circular 60 issued by the State Administration of Taxation in August 2015, non-resident enterprises are not required to obtain pre-approval from the relevant tax authority in order to enjoy the reduced withholding tax rate. Instead, non-resident enterprises may, if they determine by self-assessment that the prescribed criteria to enjoy the tax treaty benefits are met, directly apply for the reduced withholding tax rate, and file necessary forms and supporting documents when performing tax filings, which will be subject to post-filing examinations by the relevant tax authorities.

If our PRC subsidiaries declare and distribute profits earned after January 1, 2008 to us in the future, the dividend payments will be subject to withholding tax, which will increase our tax liability and reduce the amount of cash available to our company.

### Tax Residence

Under the EIT Law and its implementation rules, an enterprise established outside of the PRC with "de facto management body" within the PRC is considered a resident enterprise and will be subject to the EIT at the rate of 25% on its worldwide income. The term "de facto management body" refers to "the establishment that exercises substantial and overall management and control over the production, business, personnel, accounts and properties of an enterprise."

Pursuant to SAT Circular 82 issued by the State Administration of Taxation in April 2009, an overseas registered enterprise controlled by a PRC company or a PRC company group will be classified as a "resident enterprise" with its "de facto management body" located within China if the following requirements are satisfied: (i) the senior management and core management departments in charge of its daily operations are mainly located in the PRC; (ii) its financial and human resources decisions are subject to determination or approval by persons or bodies located in the PRC; (iii) its major assets, accounting books, company seals, and minutes and files of its board and shareholders' meetings are located or kept in the PRC; and (iv) no less than half of the enterprise's directors or senior management with voting rights reside in the PRC. The State Administration of Taxation issued additional rules to provide more guidance on the implementation of SAT Circular 82 in July 2011, and issued an amendment to SAT Circular 82 delegating the authority to its provincial branches to determine whether a Chinese-controlled overseas-incorporated enterprise should be considered a PRC resident enterprise, in January 2014. Although the SAT Circular 82, the additional guidance and its amendment only apply to overseas registered enterprises controlled by PRC enterprises and not those controlled by PRC individuals or foreigners, the determining criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" test should be applied in determining the tax resident status of offshore enterprises, regardless of whether they are controlled by PRC enterprises, individuals or foreigners.

If our offshore entities are deemed PRC resident enterprises, these entities may be subject to the EIT at the rate of 25% on their global incomes, except that the dividends distributed by our PRC subsidiaries may be exempt from the EIT to the extent such dividends are deemed "dividends among qualified resident enterprises."

Should our offshore entities be deemed as PRC resident enterprises, such changes could significantly increase our tax burden and materially and adversely affect our cash flow and profitability.

### PRC VAT in Lieu of Business Tax

In November 2011, the Ministry of Finance and the State Administration of Taxation jointly issued two circulars setting forth the details of the pilot VAT reform program, which change the charge of sales tax from

83

Table of Contents

business tax to VAT for certain pilot industries. The VAT reform program initially applied only to the pilot industries in Shanghai, and was expanded to eight additional regions, including, among others, Beijing and Guangdong province, in 2012. In August 2013, the program was further expanded nationwide. In May 2016, the pilot program was extended to cover additional industry sectors such as construction, real estate, finance and consumer services.

With respect to all of our PRC entities for the period immediately prior to the implementation of the VAT reform program, revenues from our services are subject to a 5% PRC business tax. Revenues from our online advertising distribution services are subject to an additional 3% cultural business construction fee.

All of our PRC entities have been subject to VAT since August 1, 2013. These entities are required to pay VAT instead of business tax for services that are deemed by the relevant tax authorities to be within the pilot industries at a rate of 6%. In addition, cultural business construction fee is imposed at the rate of 3% on revenues derived from our online marketing distribution services.

### PRC Urban Maintenance and Construction Tax and Education Surcharge

Any entity, foreign-invested or purely domestic, or individual that is subject to consumption tax, VAT and business tax is also required to pay PRC urban maintenance and construction tax. The rates of urban maintenance and construction tax are 7%, 5% or 1% of the amount of consumption tax, VAT and business tax actually paid depending on where the taxpayer is located. All entities and individuals who pay consumption tax, VAT and business tax are also required to pay education surcharge at a rate of 3%, and local education surcharges at a rate of 2%, of the amount of VAT, business tax and consumption tax actually paid.

84

Table of Contents

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods indicated. The period-to-period comparisons of results of operations should not be relied upon as indicative of future performance.

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016[2] | 2017[2] | 2018[3] | |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| **Consolidated Statements of Comprehensive Income Data** | | | | |
| Revenues: | | | | |
| Online marketing services | 64,525 | 73,146 | 81,912 | 11,914 |
| Others | 6,024 | 11,663 | 20,365 | 2,962 |
| Total revenues | 70,549 | 84,809 | 102,277 | 14,876 |
| Operating costs and expenses[1]: | | | | |
| Cost of revenues | 35,278 | 43,062 | 51,744 | 7,526 |
| Selling, general and administrative | 15,071 | 13,128 | 19,231 | 2,797 |
| Research and development | 10,151 | 12,928 | 15,772 | 2,294 |
| Total operating costs and expenses | 60,500 | 69,118 | 86,747 | 12,617 |
| Operating profit | 10,049 | 15,691 | 15,530 | 2,259 |
| Total other income | 4,460 | 5,592 | 11,795 | 1,715 |
| Income taxes | 2,913 | 2,995 | 4,743 | 690 |
| Net income | 11,596 | 18,288 | 22,582 | 3,284 |
| Less: Net income (loss) attributable to non-controlling interests | (36) | (13) | (4,991) | (726) |
| Net income attributable to Baidu, Inc. | 11,632 | 18,301 | 27,573 | 4,010 |
| | | | | |
| (1)  Share-based compensation expenses are allocated in operating costs and expenses as follows: | | | | |
| Cost of revenues | 103 | 183 | 224 | 33 |
| Selling, general and administrative | 429 | 973 | 1,725 | 251 |
| Research and development | 1,228 | 2,088 | 2,727 | 397 |
| | 1,760 | 3,244 | 4,676 | 681 |

(2)  VAT is presented in the cost of revenues rather than net against revenues in accordance with the legacy revenue accounting standard (ASC 605).

(3)  VAT is presented as net against revenues rather than in the cost of revenues in accordance with the new revenue accounting standard (ASC 606).

Starting from January 1, 2018, we adopted a new revenue accounting standard (ASC 606), which reclassifies VAT from cost of revenues to net against revenues among other changes. The consolidated statement of comprehensive income data for the year ended December 31, 2018 presented above have been prepared in accordance with ASC 606 and exclude the impact of VAT, while the consolidated statements of comprehensive income data for the years ended December 31, 2017 and 2016 presented above have been prepared in accordance with the legacy revenue accounting standard (ASC 605) and, unlike the consolidated statement of comprehensive income data for the year ended December 31, 2018, include the impact of VAT.

85

Table of Contents

The following table presents the impact of VAT for the years ended December 31, 2016, 2017 and 2018:

| | For the years ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2016 | December 31, 2017 | December 31, 2018 | |
| | RMB | RMB | RMB | US$ |
| **Impact of VAT** | | | | |
| Online marketing services | 3,539 | 4,036 | 4,834 | 703 |
| Others | 381 | 732 | 1,246 | 181 |
| Total impact of VAT | 3,920 | 4,768 | 6,080 | 884 |

***Year Ended December 31, 2018 Compared to Year Ended December 31, 2017***

To facilitate the comparison of operating results and trends in the years ended December 31, 2018 and 2017, we excluded the impact of VAT for the year ended December 31, 2017, to present on the same basis as the year ended December 31, 2018 when we compare the revenues, cost of revenues and total operating costs and expenses, and calculate the corresponding percentage changes in the paragraphs below.

*Consolidated revenues.* Our total revenues in 2018 were RMB102.3 billion (US$14.9 billion), growing by 21% from 2017 to 2018 (or 28%, if both years' revenues were net of VAT). Our online marketing revenues were RMB81.9 billion (US$11.9 billion) in 2018, growing by 12% year over year (or 19% year over year, if both years' revenues were net of VAT).

Online marketing revenues for Baidu Core in 2018 were RMB72.6 billion (US$10.6 billion) growing by 20% year over year (if both years' revenues were net of VAT), mainly due to strength in education, franchising, personal care, and business services sectors, while financial services, media and entertainment, and machinery and equipment sectors were less vibrant. During 2018, we began to implement a healthcare initiative in an attempt to require marketing customers to move their landing sites onto our structured data platform. In addition, certain sectors such as online game services and financial services were impacted by industry-specific policy changes. These changes dampened revenue growth in the respective areas, compared to the year before. The total number of paid clicks increased by 34% year over year.

Online marketing revenues for iQIYI in 2018 were RMB9.3 billion (US$1.4 billion), growing by 21% year over year (if both years' revenues were net of VAT), primarily due to our improved efficiency in the monetization of brand advertising business, driven by iQIYI's strong and expanding library of self-produced and licensed content, as well as the growth of feed-based advertising business, partially offset by tightening advertising budget of advertisers. Average brand advertising revenues per brand advertiser in 2018 were RMB6.7 million (US$1.0 million), increasing by 25% year over year (if both years' revenues were net of VAT).

Other revenues in 2018 were RMB20.4 billion (US$3.0 billion), increasing by 75% year over year (or 86% year over year, if both years' revenues were net of VAT), which was primarily due to the robust growth in iQIYI membership services, cloud and other businesses.

*Consolidated operating costs and expenses.* Our consolidated operating costs and expenses in 2018 were RMB86.7 billion (US$12.6 billion), increasing by 26% year over year (or 35% year over year, if both years' cost of revenues were net of VAT). This increase was primarily due to the expansion of our business.

*Cost of Revenues.* Our cost of revenues in 2018 were RMB51.7 billion (US$7.5 billion), increasing by 20% from 2017 (or 35%, if both years' cost of revenues were net of VAT). This increase was primarily due to the following factors:

- *Content Costs.* Our content costs increased by 75% from RMB13.4 billion in 2017 to RMB23.5 billion (US$3.4 billion) in 2018, primarily due to iQIYI's increased investment in content costs and, to a lesser

86

Table of Contents

extent, in content for Baijiahao (BJH accounts), our feed content network. We expect our content costs to rise in absolute dollars, as we plan to further expand our content offering, particularly in video format.

- *Traffic Acquisition Costs (TAC)*. Our traffic acquisition costs increased by 18% from RMB9.7 billion in 2017 to RMB11.4 billion (US$1.7 billion) in 2018. The increase in our traffic acquisition costs was mainly in line with the increase in our online marketing services. We expect our TAC to rise in absolute dollars, as bidding for TAC traffic has become more competitive.

- *Bandwidth Costs*. Our bandwidth costs increased by 17% from RMB5.6 billion in 2017 to RMB6.5 billion (US$944 million) in 2018. The increase in bandwidth costs was mainly due to the increasing demand from feed, video and cloud. We expect our bandwidth costs, as variable costs, to increase with the increasing number of racks of servers and increasing traffic from our websites, mobile platform and cloud customers. Our bandwidth costs could also increase if the telecommunication carriers increase their service charges.

- *Other cost of revenues*. Our other cost of revenues in 2018 were RMB10.3 billion (US$1.5 billion), decreasing by 28% from 2017 (or increasing by 7%, if both years' other cost of revenues were net of VAT). We began selling smart devices in 2018, and we anticipate the volume of hardware sales to increase at a more rapid pace in 2019, which, if materializes, will result in higher cost of goods sold.

*Selling, General and Administrative Expenses*. Our selling, general and administrative expenses increased by 46% from RMB13.1 billion in 2017 to RMB19.2 billion (US$2.8 billion) in 2018, primarily due to increased investment in channel and promotional spending. In the first half of 2018, we primarily promoted Baidu App. In the latter half of 2018, we included Haokan (short video) and Quanmin (flash video) in our promotion spending. We expect marketing costs to rise in absolute dollars, as we plan to promote all three apps and other products, if we find such promotions to be effective.

*Research and Development Expenses*. Our research and development expenses increased by 22% from RMB12.9 billion in 2017 to RMB15.8 billion (US$2.3 billion) in 2018, primarily due to the increase in research and development personnel related expenses. We expect research and development expenses to rise in absolute dollars, as we plan to make new hires and adjust for salary increases in 2019.

*Operating profit*. As a result of the foregoing, we generated an operating profit of RMB15.5 billion (US$2.3 billion) in 2018, a 1% decrease from RMB15.7 billion in 2017.

*Total other income*. Our total other income was RMB11.8 billion (US$1.7 billion) in 2018, compared to RMB5.6 billion in 2017. Total other income in 2018 mainly comprises gains from the disposal of Du Xiaoman (financial services business) and fair value gains on private company equity investments in accordance with ASC 321, adopted on January 1, 2018. Total other income in 2017 mainly comprises an investment gain recognized as a result of our exchange of Xiaodu with Rajax.

*Income taxes*. Our income tax expenses increased by 58% from RMB3.0 billion in 2017 to RMB4.7 billion (US$690 million) in 2018. The effective tax rate increased from 14% in 2017 to 17% in 2018, primarily due to iQIYI not being able to utilize tax benefit from its losses in the current period.

*Net loss attributable to noncontrolling interests*. Net loss attributable to noncontrolling interests was RMB 5.0 billion ($726 million), compared to RMB13 million in 2017. The increase was primarily due to losses from iQIYI allocated to noncontrolling interests subsequent to its IPO.

*Net income attributable to Baidu, Inc*. As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB18.3 billion in 2017 to RMB27.6 billion (US$4.0 billion) in 2018.

87

Table of Contents

***Year Ended December 31, 2017 Compared to Year Ended December 31, 2016***

***Consolidated revenues.*** Our total revenues increased by 20% from RMB70.5 billion in 2016 to RMB84.8 billion in 2017.

Our online marketing revenues increased by 13% from RMB64.5 billion in 2016 to RMB73.1 billion in 2017. Online marketing revenues for Baidu Core in 2017 was RMB63.9 billion growing 10% year over year, mainly due to strength in online game services, education and franchising sectors, while retail, real estate and home furnishing, personal care and auto/logistics sectors were less vibrant. The growth in our online marketing revenues was affected by the implementation of certain measures toward healthcare and medical customers in May 2016, to improve user experience and build a safer and more trustworthy marketing platform. The total number of paid clicks increased by 11% year over year.

Online marketing revenues for iQIYI in 2017 were RMB8.2 billion, growing 44% year over year, as result of the increase of brand advertising, which is primarily due to the increase in average brand advertising revenue per brand advertiser, driven mainly by the increased attractiveness and efficiency of iQIYI's advertising services, as well as the growth of our feed-based advertising service launched in the fourth quarter of 2016. Average brand advertising revenues per brand advertiser in 2017 were RMB5.7 million, increasing by 16% year over year.

Other revenues increased by 94% from RMB6.0 billion in 2016 to RMB11.7 billion in 2017, which was mainly due to the growth of membership services of iQIYI and financial services.

***Consolidated operating costs and expenses.*** Our consolidated operating costs and expenses increased by 14% from RMB60.5 billion in 2016 to RMB69.1 billion in 2017, primarily due to the expansion of our business, including the increase in content cost from iQIYI.

*Cost of Revenues.* Our cost of revenues increased by 22% from RMB35.3 billion in 2016 to RMB43.1 billion in 2017, primarily due to the following factors:

- *Content Costs*. Our content costs increased by 70% from RMB7.9 billion in 2016 to RMB13.4 billion in 2017, primarily due to the rapid expansion of original content production and licensing of third-party contents by iQIYI.

- *Traffic Acquisition Costs*. Our traffic acquisition costs decreased by 7% from RMB10.4 billion in 2016 to RMB9.7 billion in 2017, primarily due to the growing contribution of our online marketing services through Baidu Feed and iQIYI services, which incurred less traffic acquisition costs.

- *Bandwidth Costs and Depreciation Expenses*. Our bandwidth costs increased by 18% from RMB4.7 billion in 2016 to RMB5.6 billion in 2017. Our depreciation expenses of servers and other equipment increased by 10% from RMB3.1 billion in 2016 to RMB3.4 billion in 2017, primarily due to the expansion of our network infrastructure capacity in order to support growing business needs.

- *Other cost of revenues*. Our *other cost of revenues* increased by 17% from RMB12.3 billion in 2016 to RMB14.4 billion in 2017.

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses decreased by 13% from RMB15.1 billion in 2016 to RMB13.1 billion in 2017, primarily due to a decrease in promotional spending relating to our transaction related services.

*Research and Development Expenses.* Our research and development expenses increased by 27% from RMB10.2 billion in 2016 to RMB12.9 billion in 2017, primarily due to the increase in staff-related costs of research and development personnel.

88

**Table of Contents**

*Operating profit.* As a result of the foregoing, we generated an operating profit of RMB15.7 billion in 2017, a 56% increase from RMB10.0 billion in 2016.

*Total other income.* Our total other income was RMB5.6 billion in 2017, compared to RMB4.5 billion in 2016. Total other income in 2017 mainly consisted of an investment gain recognized as a result of our exchange of Xiaodu with Rajax.

*Income taxes.* Our income tax expenses increased by 3% from RMB2.9 billion in 2016 to RMB3.0 billion in 2017. The effective tax rate decreased from 20% in 2016 to 14% in 2017, mainly due to a nontaxable investment gain.

*Net income attributable to Baidu, Inc.* As a result of the foregoing, net income attributable to Baidu, Inc. increased from RMB11.6 billion in 2016 to RMB18.3 billion in 2017.

*Segment Revenues*

The following table sets forth our revenues by segment and year-over-year change rate for the periods indicated, with each segment revenues including inter-segment revenues:

| | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | | 2018 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | (In millions, except percentages) | | | | | |
| Revenues: | | | | | | |
| Baidu Core | 59,470 | 67,681 | 14 | 78,271 | 11,384 | 22(1) |
| iQIYI | 11,237 | 17,378 | 55 | 24,989 | 3,634 | 52(2) |

(1)   The revenue in 2017 was RMB63,903 million excluding the impact of RMB3,778 million of VAT.
(2)   The revenue in 2017 was RMB16,396 million excluding the impact of RMB982 million of VAT.

*Baidu Core*. Baidu Core revenue was RMB78.3 billion (US$11.4 billion) in 2018, increasing by 16% year over year (or 22% year over year, if both years' revenues were net of VAT). This increase was primarily due to the increase in online marketing revenues.

Baidu Core revenue increased by 14% from RMB59.5 billion in 2016 to RMB67.7 billion in 2017. This increase was primarily due to the increase in online marketing revenues.

*iQIYI*. iQIYI revenues was RMB25.0 billion (US$3.6 billion) in 2018, increasing by 44% from 2017 (or 52%, if both years' revenues were net of VAT). This increase was mainly attributable to the increase in membership services revenues and online marketing revenues.

iQIYI revenues increased by 55% from RMB11.2 billion in 2016 to RMB17.4 billion in 2017. This increase was mainly attributable to the increase in membership services revenues and online marketing revenues.

Table of Contents

***Segment Operating Costs and Expenses***

The following table sets forth our operating costs and expenses by segment and year-over-year change rate for the periods indicated:

| | Year ended December 31, | | | | | |
| | 2016 | 2017 | | 2018 | | |
| | RMB | RMB | YoY% | RMB | US$ | YoY% |
| | | | (In millions, except percentages) | | | |
| Operating Costs and Expenses: | | | | | | |
| Baidu Core | 46,597 | 47,966 | 3 | 54,463 | 7,921 | 23[1] |
| iQIYI | 14,027 | 21,331 | 52 | 33,295 | 4,842 | 64[2] |

(1) The operating costs and expenses in 2017 was RMB44,188 million excluding the impact of RMB3,778 million of VAT.
(2) The operating costs and expenses in 2017 was RMB20,349 million excluding the impact of RMB982 million of VAT.

***Baidu Core***. Operating costs and expenses of Baidu Core mainly consist of traffic acquisition costs, staff related costs, depreciation and intangible amortization expenses, bandwidth costs, marketing and promotion expenses, and delivery costs.

*Cost of revenues*. The cost of revenues of Baidu Core in 2018 were RMB25.4 billion (US$3.7 billion) decreasing 1% year over year (or increasing 16% year over year, if both years' cost of revenues were net of VAT), primarily due to an increase in content costs for Baijiahao (BJH accounts), our feed content network, and increases in bandwidth costs and traffic acquisition costs.

*Selling, general and administrative expenses*. The selling, general and administrative expenses of Baidu Core increased by 45% from RMB10.6 billion in 2017 to RMB15.3 billion (US$2.2 billion) in 2018, primarily due to increasing investment in channel and promotional marketing.

*Research and development expenses*. The research and development expenses of Baidu Core increased by 18% from RMB11.7 billion in 2017 to RMB13.8 billion (US$2.0 billion) in 2018, primarily due to an increase in personnel-related expenses.

Operating costs and expenses of Baidu Core were RMB48.0 billion in 2017, compared to RMB46.6 billion in 2016. The increase was primarily due to a 14% increase in salaries and benefits and staff-related expenses, a 75% increase in share-based compensation expenses, a 26% increase in sales tax and surcharges, a 265% increase in bad debt and credit loss of micro loans, a 10% increase in depreciation and amortization costs, a 171% increase in content cost related to BJH accounts, and a 22% increase in bandwidth costs, partially offset by a 53% decrease in marketing and promotion expenses, a 8% decrease in traffic acquisition cost and a 58% decrease in delivery costs.

***iQIYI.*** Operating costs and expenses of iQIYI mainly consist of content costs, bandwidth costs, staff related costs, marketing and promotion expenses, and business tax and surcharges.

*Cost of revenues*. The cost of revenues of iQIYI in 2018 were RMB27.1 billion (US$3.9 billion), increasing by 56% year over year (or 65% year over year, if both years' cost of revenues were net of VAT), primarily due to an increase in content costs.

*Selling, general and administrative expenses*. The selling, general and administrative expenses of iQIYI increased by 56% from RMB2.7 billion in 2017 to RMB4.2 billion (US$606 million) in 2018, primarily due to the increasing investment in channel and content-related promotional marketing.

*Research and development expenses*. The research and development expenses of iQIYI increased by 57% from RMB1.3 billion in 2017 to RMB2.0 billion (US$290 million) in 2018, primarily due to an increase in personnel-related costs.

90

Table of Contents

Operating costs and expenses of iQIYI were RMB21.3 billion in 2017, compared to RMB14.0 billion in 2016. The increase was primarily due to a 67% increase in content costs, a 51% increase in marketing and promotion expenses, a 44% increase in staff related costs, and a 55% increase in business tax and surcharges, compared to the figures in 2016.

**Inflation**

Inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the annual average percent changes in the consumer price index in China for 2016, 2017 and 2018 were 2.0%, 1.6% and 2.1%, respectively. The year-over-year percent change in the consumer price index for January 2017, 2018 and 2019 was increase of 2.5%, 1.5% and 1.7%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China. For example, certain operating costs and expenses, such as employee compensation and office operating expenses may increase as a result of higher inflation. Additionally, because a substantial portion of our assets consists of cash and cash equivalents and short-term investments, high inflation could significantly reduce the value and purchasing power of these assets. We are not able to hedge our exposure to higher inflation in China.

**Foreign Currency**

The exchange rate between the U.S. dollar and the RMB has declined from RMB8.1056 per U.S. dollar in July 2005 to RMB6.8755 per U.S. dollar in December 2018. As of December 31, 2018, we recorded RMB592 million (US$86 million) of net foreign currency translation loss in accumulated other comprehensive income as a component of shareholders' equity. We have not hedged exposures to exchange fluctuations using any hedging instruments. See also "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on your investment." and "Item 11. Quantitative and Qualitative Disclosures about Market Risk—Foreign Exchange Risk."

**Critical Accounting Policies**

We prepare financial statements in accordance with U.S. GAAP, which requires us to make judgments, estimates and assumptions that affect the reported amounts of our assets and liabilities and the disclosure of our contingent assets and liabilities at the end of each fiscal period and the reported amounts of revenues and expenses during each fiscal period. We continually evaluate these judgments and estimates based on our own historical experience, knowledge and assessment of current business and other conditions, our expectations regarding the future based on available information and assumptions that we believe to be reasonable, which together form our basis for making judgments about matters that are not readily apparent from other sources. Since the use of estimates is an integral component of the financial reporting process, our actual results could differ from those estimates. Some of our accounting policies require a higher degree of judgment than others in their application.

The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our financial statements. For further information on our critical accounting policies, see Note 2 to our consolidated financial statements. We believe the following accounting policies involve the most significant judgments and estimates used in the preparation of our financial statements.

*Consolidation of Affiliated Entities*

In order to comply with PRC laws and regulations limiting foreign ownership of or imposing conditions on internet content, advertising, audio and video services, and mobile app distribution businesses, we operate our websites and conduct our internet content, advertising, audio and video services, and mobile app distribution

91

**Table of Contents**

businesses through our affiliated entities in China by means of contractual arrangements. We have entered into certain exclusive agreements with the affiliated entities directly or through our subsidiaries, which obligate us to absorb losses of the VIEs' that could potentially be significant to the VIEs or entitle the Primary Beneficiaries to receive economic benefits from the VIEs that could potentially be significant to the VIEs. In addition, we have entered into certain agreements with the affiliated entities and the nominee shareholders of affiliated entities directly or through our subsidiaries, which enable us to direct the activities that most significantly affect the economic performance of the affiliated entities. Based on these contractual arrangements, we consolidate the affiliated entities as required by ASC Topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities directly or through the subsidiaries, which are the primary beneficiaries of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurring. We will also continuously reconsider whether we are the primary beneficiaries of our affiliated entities as facts and circumstances change. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Corporate Structure."

*Segment Reporting*

As of December 31, 2017 and 2018, we had two reportable segments, Baidu Core and iQIYI. Baidu Core mainly provides search-based, feed-based, and other online marketing services, as well as new artificial intelligence business. Search Service and Transaction Service were combined into Baidu Core beginning April 2017, to reflect our strategic and operating change to de-emphasize our transaction services business and shift more resources to support our online marketing and other services. iQIYI is an online entertainment service provider that offers original, professionally produced and partner-generated content on its platform. In early April 2018, iQIYI completed its IPO on the Nasdaq Global Market.

Our chief executive officer, who has been identified as the chief operating decision marker, ("CODM"), reviews the operating results of Baidu Core and iQIYI, to allocate resources and assess our performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC Topic 280, *Segment Reporting*.

*Revenue Recognition*

We adopted ASC 606 from January 1, 2018, using the modified retrospective method. Revenues for the year ended December 31, 2018 were presented under ASC 606, and revenues for the years ended December 31, 2017 and 2016 were not adjusted and continue to be presented under ASC 605. The cumulative effect of adopting ASC 606 resulted in an increase of RMB933 million (US$136 million) to the opening balance of retained earnings at January 1, 2018, which is primarily related to our online marketing revenues. Revenue is recognized when control of promised goods or services is transferred to our customers in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services.

**(1)    *Performance-based online marketing services***

*Cost per click*

Our auction-based P4P platform enables a customer to bid for priority placement of their paid sponsored links. The P4P platform enables customers to reach users who search for information related to their products or services. The P4P services include search-based online marketing services and feed-based online marketing services. The P4P online marketing customers may choose to set a daily limit on the amount spent and may also choose to target only users assessing our website from specified regions in China and/or during a specified time period of the day.

Besides our traditional auction-based P4P services, we also display feed-based marketing to targeted the right feed users based on user data on our platform. Customers pay us when a targeted user clicks the feed-based marketing and are directed to its platforms.

92

Table of Contents

Revenue is recognized when all of the revenue recognition criteria are met, which is generally when a user clicks on one of the customer-sponsored links or feed-based marketing.

*Other performance-based online marketing services*

To the extent we provide online marketing services based on performance criteria other than CPC, such as the number of downloads (and user registration) of mobile apps and the pre-determined ratios of completed transaction volumes, revenue is recognized when the specified performance criteria is met along with the satisfaction of other applicable revenue recognition criteria.

*(2)   Display advertisements*

We provide display-based online marketing services to our customers by integrating text description, image and video, and displaying the advertisement in a prominent position of the search result page, vertical search products or Baidu Feed. We recognize revenue on a pro-rata basis over the contractual term for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on our platform, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

*(3)   Online marketing services involving Baidu Union*

Baidu Union is a program through which we expand distribution of our customers' sponsored links or advertisements by leveraging the traffic of Baidu Union partners' internet properties. We make payments to Baidu Union partners for the acquisition of traffic. We are the principal in these transactions, as we are primarily responsible for fulfilling the service, have discretion in establishing pricing and controls the advertising inventory before the transfer to customers. Therefore, revenue is recognized on a gross basis on the amount of fees it billed to our customers. Payments made to Baidu Union partners are recorded as traffic acquisition costs, which are included in "Cost of revenues" in the consolidated statements of comprehensive income.

*(4)   Membership services*

We offer membership services that provide subscribing members access to stream a library of premium content or personal cloud service in exchange for upfront non-refundable membership fees. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue, and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which we acquire and control before they are transferred to customers.

*(5)   Content distribution*

We generate revenues from sub-licensing content licensed from third party vendors for cash and through nonmonetary exchanges mainly with other online video broadcasting companies. The exclusive licensing agreements we enter into with vendors have a definitive license period and provides us the rights to sub-license these contents to other third parties. We enter into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, we receive the sub-license fee upfront under the sub-licensing arrangements and do not have any future obligation once we have provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sub-license period). The sub-license fees are recognized in accordance with ASC 606 and represents a license of functional intellectual property that grants the right to use our licensed copyrights, and recognized at the point in time when the licensed copyright is made available for the customer's use and benefit.

93

Table of Contents

We also enter into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. We account for these nonmonetary exchanges in accordance with ASC 606, and records the transaction based on the fair value of the asset received starting from January 1, 2018. Barter sublicensing revenue are recognized in accordance with the same ASC 606 criteria above. We estimate the fair value of the licensed copyrights received based on various factors, including broadcasting schedule, cast and crew, theme and popularity, box office and market share of counterparties to the exchange. The attributable cost of cash sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC Topic 926, *Entertainment-Films*, ("ASC 926").

*(6)*    *Nonmonetary transactions*

We engage in certain nonmonetary transactions other than licensed copyrights of video contents, such as advertising, from time to time. The transaction price of the nonmonetary consideration is measured at fair value at contract inception. If fair value cannot be reasonably estimated, we measures the consideration indirectly by reference to the standalone selling price of the services promised to the customer in exchange for the consideration.

*(7)*    *Financial services*

Before the divestiture of Du Xiaoman, we offer financial services which include provision of installment payment services to consumers and wealth management services to third-party investors. Interest income earned from provision of financial services is reported as "Other revenues" and reported on a net basis after deduction of related interest costs incurred.

In August 2018, we completed the divestiture of a majority equity stake in Du Xiaoman, our financial services business, following which we held a minority equity interest in Du Xiaoman and have deconsolidated the financial results of Du Xiaoman from our consolidated financial statements in accordance with U.S. GAAP.

*(8)*    *Other revenue recognition related policies*

For arrangements that include multiple performance obligations, primarily for advertisements to be displayed in different spots, placed under different forms and displayed at different times, we would evaluate all the performance obligations in the arrangement to determine whether each performance obligation is distinct. Consideration is allocated to each performance obligation based on its standalone selling price. If a promised good or service does not meet the criteria to be considered distinct, it is combined with other promised goods or services until a distinct bundle of goods or services exists.

Timing of revenue recognition may differ from the timing of invoicing to customers. For certain services customers are required to pay before the services are delivered to the customer. When either party to a revenue contract has performed, we recognize a contract asset or a contract liability in the consolidated balance sheet, depending on the relationship between the entity's performance and the customer's payment. Contract liabilities were mainly related to fees for membership services to be provided over the membership period, which were presented as deferred revenue on the consolidated balance sheets. The increase in deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from our customers.

We do not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which we recognize revenue at the amount to which it has the right to invoice for services performed.

94

Table of Contents

We provide sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. We account for these incentives granted to customers as variable consideration. The amount of variable consideration is measured based on the most likely amount of incentives to be provided to customers.

### Share-based Compensation

We account for share-based compensation in accordance with ASC Topic 718, *Compensation-Stock Compensation*, ("ASC 718"). We have elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award, or the modified awards. The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified award, we recognize share-based compensation over the vesting periods of the replacement award, which comprises (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term, and (ii) any unrecognized compensation cost of the original awards, using either the original term or the new term, whichever results in higher expenses for each reporting period.

We account for share awards issued to non-employees in accordance with the provisions of ASC Subtopic 505-50, *Equity: Equity-based Payments to Non-Employees*. We use the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### Income Taxes

We recognize income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. We record valuation allowance against the amount of deferred tax assets that we determine is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date. For reconciliation of tax computed by applying the respective statutory income tax rate to pre-tax income, please see "Income taxes" under Note 13 to our audited consolidated financial statements.

We apply the provisions of ASC Topic 740, *Income Taxes*, ("ASC 740"), in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. We have elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income.

### Accounts Receivable, net of allowance

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Receivable balances are written off when they are deemed uncollectible. We generally do not require collateral from our customers.

Table of Contents

We maintain allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. We review the accounts receivable on a periodic basis and make general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, we consider many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

### Loan and Interest Receivables, net of allowance

Loan and interest receivables consist primarily of micro loans to individual borrowers. Such amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by us to the borrowers relating to the micro loans generally range from one to thirty-six months. The cash flows related to micro loans are included in the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represents our best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of debts. We base the allowance for loan and interest receivables credit losses primarily on historical loss experience using a roll rate-based model applied to the loan and interest receivables portfolios. We consider many factors, including but not limited to, the age of the amounts due, the payment history, the month of origination, the purpose of the loans, creditworthiness, financial conditions of the borrower, terms of the loans, regulatory environment, and the general economic conditions. In August 2018, we completed the divestiture of our financial services business. Consequently, the loan and interest receivable balances were derecognized from our consolidated balance sheet upon disposal.

### Licensed Copyrights

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability recorded when cost of the content is known, the content has been accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our internet platform. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net," respectively. The licensed copyrights include non-exclusive licensed copyrights and exclusive licensed copyrights. For non-exclusive licensed copyrights, we have the right to broadcast the contents only on our Internet platform. For exclusive licensed copyrights, in addition to the broadcasting rights, we also have the right to sublicense the contents to third parties.

Non-exclusive licensed copyrights, mainly comprising newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. The major factors that impact the viewership consumption patterns include film box office, ratings for television series and variety shows, user traffic on our platforms, placement schedule, user tastes and preferences, emerging cultural trends, merchandising and marketing efforts. Revisions to the amortization pattern are accounted for as a change in accounting estimate prospectively in accordance with ASC Topic 250, *Accounting Changes and Error Corrections*, ("ASC 250").

The purchase cost of exclusive licensed copyrights includes the right to broadcast and the right to sublicense to third parties. We allocate the content cost to these two rights when the exclusive licensed copyrights are

96

Table of Contents

initially recognized, based on the relative proportion of our estimate of the total revenues that will be generated by each right. For the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership revenues, the content costs are amortized in accordance with ASC 920-350, ("ASC 920-350"), *Entertainment-Broadcasters: Intangibles—Goodwill and Other*, using the same method as non-exclusive licensed copyrights described above. Content costs related to the right to sublicense to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, are amortized in accordance with ASC 926 using an individual-film-forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. We revisit the forecasted total direct revenues on a periodic basis and any changed estimates will result in a revised fraction applied to the net carrying amount of the right to sublicense. The difference between expenses determined using the new estimates and any amounts previously expensed during the fiscal year is recognized in the period of revision.

On a periodic basis, we evaluate the program usefulness of the broadcasting rights of its licensed copyrights and record such rights at the lower of unamortized cost or estimated net realizable value pursuant to the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, we estimate net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from the provision of online advertising and membership services, less any direct costs, over the remaining useful lives of non-exclusive licensed copyrights. We estimate advertising and membership cash flows for each category of the content. Estimates that impact advertising and membership cash flows include anticipated levels of demand for our online advertising and membership services and the expected selling prices of our advertisements and memberships. For the right to sublicense to third parties, we assess recoverability in accordance with ASC Subtopic 926-20, *Entertainment—Films: Other Assets—Film Costs*, ("ASC 926-20").

### *Produced Content, net*

We produce and contract external parties to produce films and episodic series to exhibit on our websites. Produced content includes direct production costs, production overhead and acquisition costs and is stated at the lower of unamortized cost or estimated fair value. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films, including profit sharing, distribution and/or other rights. Produced content exceeding the total revenues to be earned ("ultimate revenues") is expensed as cost of revenues.

We use the individual-film-forecast-computation method and amortizes the produced content based on the ratio of current period actual revenue (numerator) to estimated remaining unrecognized ultimate revenue as of the beginning of the fiscal year (denominator) in accordance with ASC 926-20. We revisit the forecasted ultimate revenues on a periodic basis and any changed estimates will result in a revised fraction applied to the net carrying amount of the right to sublicense, and the difference between expenses determined using the new estimates and any amounts previously expensed during the fiscal year is recognized in the period of revision.

We review unamortized produced content costs for impairment whenever events or circumstances indicate that the fair value of the produced content may be less than its unamortized cost. Produced content was presented as "Other non-current assets" on the consolidated balance sheets.

### *Impairment of Long-Lived Assets Other Than Goodwill*

We evaluate long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC Topic 360, *Property, Plant and Equipment*.

When such events occur, we assess the recoverability of the an asset group based on the undiscounted future cash flow the an asset group is expected to generate and recognize an impairment loss when estimated

97

**Table of Contents**

undiscounted future cash flow expected to result from the use of the an asset group plus net proceeds expected from disposition of the an asset group, if any, is less than the carrying value of the an asset group. If we identify an impairment, we reduce the carrying amount of the an asset group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. We use estimates and judgments in our impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheet.

*Impairment of Goodwill*

We assess goodwill for impairment in accordance with ASC Subtopic 350-20, , *Intangibles—Goodwill and Other: Goodwill*, ("ASC 350-20"), which requires that goodwill be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20. As of December 31, 2017 and 2018, we had two reporting units, consisting of Baidu Core and iQIYI.

We have the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If we believe, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, we consider primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and we are not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then we must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

We performed qualitative assessments for the reporting unit of Baidu Core in 2017 and 2018. Based on the requirements of ASC350-20, we evaluated all relevant factors, including but not limited to macroeconomic conditions, industry and market conditions, financial performance, and our share price. We weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of Baidu Core, and further impairment testing on goodwill was unnecessary as of December 31, 2017 and 2018.

We elected to assess goodwill for impairment using the two-step process for the reporting unit of iQIYI. Subsequent to iQIYI's IPO, we primarily considered the quoted market price of iQIYI's share to determine the fair value of the reporting unit. Before its IPO, significant management judgment was involved in determining these estimates and assumptions, and actual results may differ from those used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit which could trigger future impairment. The judgment in estimating the fair value of a reporting unit includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expenses growth rates, future capital expenditures and working capital levels, as well as an appropriate discount rate determined by a weighted average cost of capital approach and the selection of comparable companies operating in similar businesses. We also reviewed observable market data to assess the reasonableness of assumptions such as discount rate, operating margins, and working capital levels. As of December 31, 2017 and 2018, the fair value of iQIYI exceeded its carrying amount, and therefore goodwill related to the iQIYI reporting unit was not impaired and we were not required to perform further testing.

98

Table of Contents

*Impairment of Long-term Investments*

Our long-term investments consist of equity investments with and equity investments without readily determinable fair value, equity method investments, available-for-sale debt investments and other investments accounted for at fair value.

Prior to adopting ASC 321 on January 1, 2018, we carry at cost its investments in investees that do not have readily determinable fair value and over which we do not have significant influence, in accordance with ASC Subtopic 325-20, *Investments-Other: Cost Method Investments*. We only adjust the carrying value of such investments for other-than-temporary decline in fair value and for distribution of earnings that exceed the Company's share of earnings since its investment. We regularly evaluate the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

After the adoption of ASC 321 from January 1, 2018, for equity investments measured at fair value with changes in fair value record in earnings, we do not assess whether those securities are impaired. For those equity investment that we select to use the measurement alternative, we make a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, the entity has to estimate the investment's fair value in accordance with ASC Topic 820, *Fair Value Measurements and Disclosures*, ("ASC 820"). If the fair value is less than the investment's carrying value, the entity has to recognize an impairment loss in net income equal to the difference between the carrying value and fair value.

Available-for-sale debt investments are convertible debt instruments issued by private companies, which are measured at fair value, with unrealized gains or losses recorded in accumulated other comprehensive income.

We evaluate the equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amount of the investment might not be recoverable. Factors considered by us when determining whether an investment has been other-than-temporarily-impaired, includes but not limited to the length of the time and the extent to which the market value has been less than cost, the financial performance and near-term prospects of the investee, and our intent and ability to retain the investment till recovery of its cost. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

In 2018, we evaluated the investment in Ctrip for impairment, taking into consideration, including, but not limited to, the duration, degree and causes of the decline in stock price, our intent and ability to hold the investment, recoveries in market price subsequent to the balance sheet date, and Ctrip's financial performance and near-term prospects. Based on the evaluation, we concluded that the decline in market value of the investment in Ctrip did not meet the threshold of other-than-temporary.

Determination of fair value particularly for investments in private companies, requires significant judgment to determine appropriate estimates and assumptions.

*Transfers of Financial Assets*

We account for the transfers of financial assets in accordance with ASC Topic 860, *Transfers and Servicing*, ("ASC 860"). Financial assets are derecognized from our consolidated balance sheets if the transfer qualifies as sales. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured

99

**Table of Contents**

borrowing included in "Amounts due to the third-party investors" on the consolidated balance sheets. The assets remain on the consolidated balance sheets as "Other invested securities" and the sale proceeds are recognized as our liability. All other invested securities and liability balances were derecognized from the consolidated balance sheet upon disposal of the financial services business.

### *Business Combinations*

We account for our business combinations using the purchase method of accounting in accordance with ASC Topic 805, *Business Combinations.* The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities we acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, we re-measured our previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. We determine discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of asset, and forecasted cash flows over that period.

### B.    Liquidity and Capital Resources

As of December 31, 2018, our principal source of liquidity was RMB141.5 billion (US$20.6 billion) of cash, cash equivalents, restricted cash and short-term investments. Our cash and cash equivalents consist of cash on hand and investments in interest bearing demand deposit accounts, time deposits, money market funds and other liquid investments which have original maturities of three months or less. The short-term investments primarily consist of fixed-rate and adjustable-rate debt investments with original maturity of less than one year. We believe that our current cash, cash equivalents, restricted cash and short-term investments and anticipated cash flow from operations will be sufficient to meet our anticipated cash needs, including our cash needs for working capital, capital expenditures and debt repayment, for at least the next 12 months. We may, however, require additional cash due to changing business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If our or iQIYI's existing cash is insufficient to meet our requirements, we may seek to sell additional equity securities, debt securities or borrow from banks.

Furthermore, cash transfers from our PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to their parent companies outside of China or our company, or otherwise satisfy their foreign currency denominated obligations. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Governmental control of currency conversion may affect the value of your

100

**Table of Contents**

investment." As of December 31, 2018, our PRC subsidiaries and consolidated affiliated entities held RMB115.2 billion (US$16.7 billion) of cash, cash equivalents, restricted cash, and short-term investments, RMB11.2 billion (US$1.6 billion) of which were in the form of foreign currencies.

The total outstanding balance of our short-term loans as of December 31, 2018 amounted to RMB3.0 billion (US$443 million), which consisted of borrowings from financial institutions and were repayable within one year. The repayment of all short-term loans are either guaranteed by iQIYI's subsidiaries or collateralized by iQIYI's office building and restricted cash. As of December 31, 2018, the weighted average interest rates for the outstanding borrowings were approximately 4.47%, and the aggregate amounts of unused lines of credit for short-term loans were RMB781 million (US$114 million).

We have entered into the following long-term loan transactions with commercial banks:

- In June 2016, we entered into a five-year term and revolving facility agreement with a group of 21 syndicated bankers, pursuant to which we are entitled to borrow an unsecured US$ denominated floating rate loan of US$1.0 billion with a term of five years and to borrow an unsecured US$ denominated revolving loan of US$1.0 billion for five years. The facility was priced at 110 basis points over LIBOR and is intended for our general working capital purposes. In June 2016, we drew down two tranches of US$250 million each under the facility commitment. In November 2016, we drew down another two tranches of US$250 million each under the facility commitment. In connection with the facility agreements, we entered into four interest rate swap agreements, pursuant to which the loans would be settled with a fixed annual interest rate of 2.11%, 2.10%, 2.78% and 2.78% respectively, during the respective term of the loans.

iQIYI has entered into the following long-term loan transactions with commercial banks:

- In April 2017, iQIYI entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which iQIYI is entitled to borrow a secured RMB denominated loan of RMB299 million for the general working capital of iQIYI. In April 2017, iQIYI drew down RMB299 million with an interest rate of 4.47%, pursuant to the agreement, the principal shall be repaid by installments from September 2017 to April 2020. RMB15 million was repaid when it became due. The amount repayable within the next twelve months were classified as "Long-term loans, current portion."

- In December 2018, certain supplier invoices of RMB525 million (US$76 million) selected by iQIYI were factored to a financial institution, or the factored receivables, at a discount. These supplier invoices were recorded as accounts payables in our consolidated balance sheet. The factored receivables were further transferred to a securitization vehicle, whereby debt securities securitized by the factored receivables. The debt securities were issued to third party investors for the gross proceeds of RMB446 million (US$65 million), with maturities in December 2019 and December 2020. The proceeds raised from issuance of the asset-backed debt securities were used by the financial institution to factor the supplier invoices. At the same time, the credit terms of iQIYI's corresponding trade payables were extended to mirror the maturity of the asset-backed debt securities. The securitization vehicle was consolidated because iQIYI was determined to be the primary beneficiary. As of December 31, 2018, the outstanding borrowings from third-party investors was RMB444 million (US$65 million) and the effective interest rate was 7.00%. The balance of RMB74 million (US$11 million) of the loan is repayable within one year and is included in "Long-term loans, current portion" and the remaining balance of RMB370 million (US$54 million) of the loan is included in non-current "Long-term loans" on the consolidated balance sheet.

We have conducted the following seven rounds of debt securities issuance, which remain outstanding as of the date of this annual report:

- In November 2012, we issued an aggregate of US$750 million senior unsecured notes due in 2022, ("2022 Ten-year Notes"), with stated annual interest rates of 3.50%. The net proceeds from the sale of

101

**Table of Contents**

the notes were used for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value of these notes were US$750 million and US$940 million. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, we paid an aggregate of US$26 million in interest payments related to these notes.

- In August 2013, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2018, ("2018 Notes"), with stated annual interest rate of 3.25%. The net proceeds from the sale of the notes were used for general corporate purposes, including merger and acquisition activities. In August 2018, the notes with carrying value of US$1.0 billion were fully repaid when they became due. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, we paid an aggregate of US$33 million in interest payments related to these notes.

- In June 2014, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2019, ("2019 Notes"), with stated annual interest rate of 2.75%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value of these notes were US$1.0 billion and US$698 million, respectively. The estimated fair value was based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, we paid an aggregate of US$28 million in interest payments related to these notes.

- In June 2015, we issued an aggregate of US$750 million senior unsecured notes due in 2020, ("2020 Notes"), with stated annual interest rate of 3.00%, and an aggregate of US$500 million senior unsecured notes due in 2025, ("2025 Notes"), with stated annual interest rate of 4.13%. The net proceeds from the sale of the notes were used for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value were US$750 million and US$679 million, respectively, with respect to the 2020 Notes, and US$500 million and US$830 million, respectively, with respect to the 2025 Notes. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. During 2018, we paid an aggregate of US$43 million in interest payments related to these notes.

- In July 2017, we issued an aggregate of US$900 million senior unsecured notes due in 2022, ("2022 Five-year Notes"), with stated annual interest rate of 2.88%, and an aggregate of US$600 million senior unsecured notes due in 2027, ("2027 Notes"), with stated annual interest rate of 3.63%. The net proceeds from the sale of the notes were used to repay existing indebtedness and for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value were US$900 million and US$1.1 billion, respectively, with respect to the 2022 Five-year Notes, and US$600 million and US$1.1 billion, respectively, with respect to the 2027 Notes. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, the interest payments related to these notes were US$48 million.

- In March 2018, we issued an aggregate of US$1.0 billion senior unsecured notes due in 2023, ("2023 Notes"), with stated annual interest rate of 3.88%, and an aggregate of US$500 million senior unsecured notes due in 2028, ("2028 March Notes"), with stated annual interest rate of 4.38%. The net proceeds from the sale of the notes were used to repay existing indebtedness and for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value were US$1.0 billion and US$1.5 billion, respectively, with respect to the 2023 Notes, and US$500 million and US$960 million, respectively, with respect to the 2028 March Notes. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, the interest payments related to these notes were US$30 million.

102

Table of Contents

- In November 2018, we issued an aggregate of US$600 million senior unsecured notes due in 2024, ("2024 November Notes"), with stated annual interest rate of 4.38%, and an aggregate of US$400 million senior unsecured notes due in 2028, ("2028 November Notes"), with stated annual interest rate of 4.88%. In December 2018, we issued an aggregate of US$250 million senior unsecured notes due in 2024, ("2024 December Notes"), with stated annual interest rate of 4.38%, which constitute a further issuance of, and be fungible with and be consolidated and form a single series with the 2024 November Notes. The net proceeds from the sale of the notes were used to repay existing indebtedness and for general corporate purposes. As of December 31, 2018, the total carrying value and estimated fair value were US$600 million and US$1.0 billion, respectively, with respect to the 2024 November Notes, US$400 million and US$771 million, respectively, with respect to the 2028 November Notes, and US$250 million and US$427 million, respectively, with respect to the 2024 December Notes. The estimated fair values were based on quoted prices for our publicly-traded debt securities as of December 31, 2018. We are not subject to any financial covenants or other significant restrictions under the notes. In 2018, the interest payments related to these notes were nil.

iQIYI has conducted the following issuance of convertible notes, which remain outstanding as of the date of this annual report:

- In December 2018, iQIYI issued US$750 million convertible senior notes due 2023 ("iQIYI 2023 Convertible Notes"). The iQIYI 2023 Convertible Notes are senior, unsecured obligations of iQIYI, and interest is payable semi-annually in cash at a rate of 3.75% per annum with a maturity date of December 1, 2023, unless previously repurchased, redeemed or converted prior to such date. The initial conversion rate of the iQIYI 2023 Convertible Notes is 37.1830 of iQIYI's ADSs per US$1,000 principal amount of the iQIYI 2023 Convertible Notes. Upon conversion, the Company will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

  Concurrently with the issuance of the iQIYI 2023 Convertible Notes, iQIYI purchased a call option on iQIYI's ADS with certain counterparties at a price of US$68 million. The capped call exercise price is equal to the initial conversion price of the iQIYI 2023 Convertible Notes and the cap price is US$38.42 per ADS, subject to certain adjustments under the terms of the capped call transactions. The cost of the capped call was recorded as a reduction of the iQIYI's additional paid-in capital on the consolidated balance sheets with no subsequent changes in fair value be recorded.

  As the conversion option may be settled entirely or partially in cash at iQIYI's option, iQIYI separated the iQIYI 2023 Convertible Notes into liability and equity components in accordance with ASC 470-20, *Debt with Conversion and Other Options*. The carrying amount of the liability component was calculated by measuring the fair value of a similar liability that does not have an associated conversion feature. The carrying amount of the equity component representing the conversion option was determined by deducting the fair value of the liability component from the initial proceeds and recorded as additional paid-in capital. Debt issuance costs were allocated to the liability and equity components using the same proportions as the proceeds from the iQIYI 2023 Convertible Notes. The difference between the principal amount of the iQIYI 2023 Convertible Notes and the liability component is considered debt discount and is amortized at an effective interest rate of 7.04% to accrete the discounted carrying value of the iQIYI 2023 Convertible Notes to its face value on December 1, 2021, the put date of the iQIYI 2023 Convertible Notes.

  As of December 31, 2018, the principal amount of the liability component was RMB5.2 billion (US$750 million), unamortized debt discount was RMB446 million (US$65 million). The carrying amount of the equity component was RMB362 million (US$53 million).

We may use the net proceeds from our issuance and sale of the notes to fund the operations of our PRC subsidiaries by making additional capital contributions to our existing PRC subsidiaries, injecting capital to establish new PRC subsidiaries and/or providing loans to our PRC subsidiaries. Such transfer of funds from

Table of Contents

Baidu, Inc. or any of our offshore subsidiaries to our PRC subsidiaries is subject to the PRC regulatory restrictions and procedures: (i) capital increase of the existing PRC subsidiaries and establishment of new PRC subsidiaries must be either filed with or approved by the Ministry of Commerce or its local counterparts depending on whether the business of the PRC subsidiary is subject to restrictions with respect to foreign investment under PRC law, and registered with local banks authorized by SAFE; and (ii) loans to any of our PRC subsidiaries must not exceed the statutory limit and must be filed with SAFE. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from making loans to our PRC subsidiaries or consolidated affiliated entities, or making additional capital contributions to our PRC subsidiaries, which could adversely affect our ability to fund and expand our business."

As of December 31, 2018, we had RMB57.1 billion (US$8.3 billion) in long-term loans and notes payables (including current portion of RMB7.0 billion (US$1.0 billion)), RMB4.7 billion (US$685 million) in long-term convertible notes and RMB3.0 billion (US$443 million) in short-term loans. Our loans and notes payable, long-term convertible notes and short-term loans include those of iQIYI hereinafter. As of December 31, 2018, iQIYI had RMB728 million (US$106 million) in long-term loans payables (including current portion of RMB84 million (US$12 million)), RMB4.7 billion (US$685 million) in long-term convertible notes and RMB3.0 billion (US$443 million) in short-term loans.

### Cash Flows and Working Capital

As of December 31, 2016, 2017 and 2018, we had RMB82.4 billion, RMB100.7 billion and RMB141.5 billion (US$20.6 billion) in cash, cash equivalents, restricted cash and short-term investments.

The following table sets forth a summary of our cash flows for the years indicated:

| | Year ended December 31, | | | |
| | 2016 | 2017 | 2018 | |
| | RMB | RMB | RMB | US$ |
| | (In millions) | | | |
| Net cash generated from operating activities | 22,480 | 32,828 | 35,967 | 5,231 |
| Net cash used in investing activities | (35,911) | (76,949) | (34,460) | (5,012) |
| Net cash generated from financing activities | 14,447 | 44,557 | 15,082 | 2,194 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 144 | (316) | 1,902 | 276 |
| Net increase in cash, cash equivalents and restricted cash | 1,160 | 120 | 18,491 | 2,689 |
| Cash, cash equivalents and restricted cash at beginning of the year | 10,056 | 11,216 | 11,336 | 1,649 |
| Cash, cash equivalents and restricted cash at end of the year | 11,216 | 11,336 | 29,827 | 4,338 |

### Operating Activities

Net cash generated from operating activities increased to RMB36.0 billion (US$5.2 billion) in 2018 from RMB32.8 billion in 2017. This increase was primarily due to an increase of RMB 4.3 billion (US$ 625 million) in net income, an increase of RMB4.5 billion (US$657 million) in amortization of intangible assets and licensed copyrights, and partially offset by an increase of RMB4.4 billion (US$641 million) in investment income.

Net cash generated from operating activities increased to RMB32.8 billion in 2017 from RMB22.5 billion in 2016. This increase was primarily due to an increase of RMB6.7 billion in net income, an increase of RMB3.1 billion in amortization of intangible assets and licensed copyrights, and partially offset by an increase of RMB4.3 billion in gain on disposal of subsidiaries.

104

Table of Contents

*Investing Activities*

Net cash used in investing activities decreased to RMB34.5 billion (US$5.0 billion) in 2018 from RMB76.9 billion in 2017. This decrease was primarily due to a decrease of RMB44.6 billion (US$6.5 billion) in our net cash outflow relating to the financial services business we divested in 2018, and an increase of RMB7.8 billion (US$1.1 billion) in our net cash inflow relating to the disposal of certain subsidiaries and loans provided to related parties, partially offset by an increase of RMB5.2 billion (US$757 million) in net cash outflow relating to purchasing short-term investments, an increase of RMB4.4 billion (US$637 million) in acquisition of intangible assets and an increase of RMB4.0 billion (US$581 million) in acquisition of property, plant and equipment.

Net cash used in investing activities increased to RMB76.9 billion in 2017 from RMB35.9 billion in 2016. This increase was primarily due to an increase of our net cash outflow relating to the financial services business of RMB21.8 billion, an increase of RMB8.5 billion in purchase of long-term investments, and an increase of RMB 7.7 billion in the purchase of short-term investments.

*Financing Activities*

Net cash generated from financing activities decreased to RMB15.1 billion (US$2.2 billion) in 2018 from RMB44.6 billion in 2017. The decrease was primarily due to a decrease in our net cash inflow of RMB52.8 billion (US$7.7 billion) relating to the financial services business we divested in 2018, partially offset by an increase of RMB11.6 billion (US$1.7 billion) in the proceeds from non-controlling shareholders of our subsidiaries, which was primarily due to the initial public offering of iQIYI's ADSs, and an increase of RMB8.1 billion (US$1.2 billion) in net proceeds from issuance of long-term notes.

Net cash generated from financing activities increased to RMB44.6 billion in 2017 from RMB14.4 billion in 2016. The increase was primarily due to an increase of RMB24.7 billion in proceeds relating to the financial services business, an increase of RMB9.9 billion in net proceeds from issuance of long-term notes and an increase of RMB8.5 billion in net proceeds from issuance of convertible notes issuance.

**Capital Expenditures**

We made capital expenditures of RMB4.2 billion, RMB4.8 billion and RMB8.8 billion (US$1.3 billion) in 2016, 2017 and 2018, representing 6%, 6% and 9% of our total revenues (excluding the impact of VAT in 2016 and 2017), respectively. In 2018, our capital expenditures were primarily attributable to the purchase of servers, network equipment and other computer hardware to increase our network infrastructure capacity. We funded our capital expenditures primarily with net cash flows generated from operating activities.

In December 2011, we commenced construction of an office building in Shenzhen, which will serve as our international center in Southern China. Our cash-based capital expenditures in connection with the construction of this office building in Shenzhen was RMB189 million (US$27 million) in 2018. We currently expect to complete the planned construction in 2019.

In 2018, we completed the construction of Shanxi cloud computing center, which will serve as one of our internet data centers in China. Our cash-based capital expenditures in connection with the construction of Shanxi cloud computing center was RMB257 million (US$37 million) in 2018.

Our capital expenditures may increase in the future as our business continues to grow, in connection with the expansion and improvement of our network infrastructure and the construction of additional office buildings and cloud-computing based data centers. We currently plan to fund these expenditures with our current cash, cash equivalents, restricted cash, short-term investments and anticipated cash flow generated from our operating activities.

Table of Contents

*Holding Company Structure*

Baidu, Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries and consolidated affiliated entities in China. As a result, although other means are available for us to obtain financing at the holding company level, Baidu, Inc.'s ability to pay dividends to the shareholders and to service any debt it may incur may depend upon dividends paid by our PRC subsidiaries and license and service fees paid by our PRC consolidated affiliated entities. If any of our subsidiaries incurs debt on its own behalf in the future, the instruments governing such debt may restrict its ability to pay dividends to Baidu, Inc. In addition, our PRC subsidiaries and consolidated affiliated entities are required to make appropriations to certain statutory reserve funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies.

Our PRC subsidiaries, being foreign-invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely, a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of our PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the board of directors of the PRC subsidiaries.

Our consolidated affiliated entities must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of our consolidated affiliated entities is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are at the discretion of our consolidated affiliated entities.

Under PRC laws and regulations, our PRC subsidiaries and consolidated affiliated entities are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. The amounts restricted include the paid-up capital and the statutory reserve funds of our PRC subsidiaries and the net assets of our consolidated affiliated entities in which we have no legal ownership, totaling approximately RMB13.7 billion, RMB18.6 billion and RMB25.7 billion (US$3.7 billion) as of December 31, 2016, 2017 and 2018, respectively.

**C.    Research and Development**

We have a team of experienced engineers who are mostly based in Beijing, Shanghai, Shenzhen and Sunnyvale, California. We recruit most of our engineers locally and have established various recruiting and training programs with leading universities in China. We have also recruited experienced engineers globally. We compete aggressively for engineering talent to help us address challenges such as Chinese language processing, artificial intelligence, deep learning and autonomous driving.

In the three years ended December 31, 2016, 2017 and 2018, our research and development expenditures, including share-based compensation expenses for research and development staff, were RMB10.2 billion, RMB12.9 billion and RMB15.8 billion (US$2.3 billion), representing 14%, 15% and 15% of our total revenues for the years ended December 31, 2016, 2017 and 2018, respectively. Our research and development expenses consist primarily of personnel-related costs. We have expensed substantially all of the development costs for the research and development of products and new functionality as incurred, except for certain internal-use software.

**D.    Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2018 that are reasonably likely to have a

106

Table of Contents

material and adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future results of operations or financial conditions.

### E.    Off-Balance Sheet Arrangements

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any off-balance sheet derivative instruments. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

### F.    Contractual Obligations

The following table sets forth our contractual obligations by specified categories as of December 31, 2018:

| | | Payment Due by Period | | | |
|---|---|---|---|---|---|
| | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| | | (In RMB millions) | | | |
| Long-term debt obligations[1] | 73,546 | 9,042 | 16,305 | 26,318 | 21,881 |
| Purchase obligations for fixed assets | 220 | 213 | 2 | 5 | — |
| Operating lease obligations[2] | 2,789 | 1,820 | 711 | 214 | 44 |
| Purchase obligations for video content[3] | 23,576 | 8,834 | 11,769 | 1,923 | 1,050 |
| Investment commitment obligations[4] | 1,371 | NA | NA | NA | NA |
| Total | 101,502 | 19,909 | 28,787 | 28,460 | 22,975 |

(1)   Including estimated interest payments of RMB10.9 billion in total (RMB2.1 billion, RMB3.6 billion, RMB2.9 billion and RMB2.3 billion over the periods of less than one year, one to three years, three to five years and more than five years from December 31, 2018, respectively). Please see "Loans Payable" under Note 10, "Notes Payable" under Note 11 and "Convertible Notes" under Note 12 to our audited consolidated financial statements.
(2)   Operating lease obligations represent our obligations for leasing premises and bandwidth usage.
(3)   Purchase obligations for video content consist primarily of expenditures for video content under non-cancelable agreements for licensed copyrights and produced content.
(4)   Investment commitment obligations primarily relate to capital contributions obligation under certain arrangements. The payment due by period will be determined by the need of the investees and is not settled.

Other than the contractual obligations set forth above, we do not have any contractual obligations that are long-term debt obligations, capital (finance) lease obligations, purchase obligations, investment commitment obligations or other long-term liabilities reflected on our consolidated balance sheet.

107

**Table of Contents**

**Item 6.**        **Directors, Senior Management and Employees**

**A.    Directors and Senior Management**

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
| --- | --- | --- |
| Robin Yanhong Li | 50 | Chairman of the Board of Directors and Chief Executive Officer |
| Herman Yu | 48 | Chief Financial Officer |
| Ya-Qin Zhang | 52 | President, New Business* |
| Hailong Xiang | 41 | Senior Vice President |
| Lee Liu | 53 | Senior Vice President |
| Haifeng Wang | 47 | Senior Vice President |
| Qi Lu | 57 | Vice Chairman of the Board of Directors |
| James Ding | 53 | Independent Director |
| Brent Callinicos | 53 | Independent Director |
| Yuanqing Yang | 54 | Independent Director |

\*    Mr. Ya-Qin Zhang has decided to retire and step down from his role in October 2019.

*Robin Yanhong Li* is co-founder, chairman of the Board of Directors and chief executive officer of Baidu, and oversees our overall strategy and business operations. Mr. Li has been serving as the chairman of our board of directors since our inception in January 2000 and as our chief executive officer since February 2004. Mr. Li served as our president from February 2000 to December 2003. Prior to founding our company, Mr. Li worked as a staff engineer for Infoseek, a pioneer in the search industry, and as a senior consultant for IDD Information Services. Mr. Li currently serves on the board of New Oriental Education & Technology Group Inc., a private educational services in China (NYSE: EDU), and Ctrip.com International, Ltd., an online travel agency in China (NASDAQ: CTRP). Mr. Li acts as the vice chairman of the Internet Society of China (ISC). Mr. Li received a bachelor's degree in information science from Peking University in China and a master's degree in computer science from the State University of New York at Buffalo.

*Herman Yu* has served as our chief financial officer since September 2017 and is in charge of our overall finance functions. Prior to joining Baidu, Mr. Yu served as the chief financial officer of Weibo Corporation, a social media in China (NASDAQ: WB) from 2015 to 2017. Prior to Weibo, Mr. Yu worked at SINA Corporation, a portal in China (NASDAQ: SINA) from 2004 to 2015, with the last eight years as chief financial officer. Mr. Yu began his career at Arthur Andersen and held various finance and accounting management positions at Adobe Systems Inc., Cadence Design Systems, Inc. and VeriFone Systems, Inc. Mr. Yu currently serves on the board of directors of 58.com Inc., an online classifieds listing company (NYSE: WUBA), ZTO Express Inc., an express delivery company (NYSE: ZTO), and Ctrip.com International, Ltd., an online travel agency (NASDAQ: CTRP). Mr. Yu, a California Certified Public Accountant, received a bachelor's degree in economics from the University of California, Santa Cruz, and a master's degree in accountancy from the University of Southern California.

*Ya-Qin Zhang* currently serves as president of new business in charge of intelligent driving and other emerging businesses. Prior to joining Baidu in 2014, Dr. Zhang was a corporate vice president at Microsoft and chairman of Microsoft Asia-Pacific R&D Group for a decade, leading Microsoft's overall research and development efforts in the Asia-Pacific region. Before joining Microsoft in 1999, Dr. Zhang was a director for the Multimedia Technology Laboratory at Sarnoff Corp. Dr. Zhang currently serves on the board of directors of Tarena International, Inc. a professional education service provider (NASDAQ: TEDU) and Chinasoft International Ltd (HKEX: 354). Dr. Zhang is a fellow of Australia Academy of Technology and Engineering (ATSE) and the Institute of Electrical and Electronics Engineers (IEEE). Dr. Zhang received his bachelor's and master's degree in electrical engineering from the University of Science and Technology of China, and a Ph.D. in electrical engineering from George Washington University.

108

**Table of Contents**

*Hailong Xiang* has served as our senior vice president since October 2014 and as general manager of our search and feed related business since April 2016. He is in charge of our search and feed related business products and sales force management. Mr. Xiang joined us in February 2005 following our acquisition of Shanghai Qilang, an internet services firm established by Mr. Xiang in 2000. Mr. Xiang received his bachelor's degree in computer science from East China Normal University.

*Lee Liu* currently serves as our senior vice president in charge of human resources and administration functions. Prior to joining Baidu in April 2011, Mr. Liu served as the global vice president of human resources at Motorola from 2009 to 2011. Mr. Liu joined Motorola in 1989 and served in a variety of senior roles in the United States, Singapore and mainland China. Mr. Liu received a bachelor's and master's degree in microelectronics from Tianjin University, and an executive MBA degree from Peking University, and a Ph.D. in economics from Southwestern University of Finance and Economics. Mr. Liu also attended the MBA program on global leadership at the University of Texas-Austin.

*Haifeng Wang* has served as our senior vice president in May 2018. Dr. Wang oversees our research and development efforts in artificial intelligence as well as other technology groups. From 2014 to 2017, Dr. Wang oversaw our core search products. From 2002 to 2010, Dr. Wang served as the chief research scientist at Toshiba's R&D Center. Dr. Wang is the president of National Engineering Laboratory for Deep Learning Technology and Applications, and a fellow and the former president of the Association for Computational Linguistics (ACL) and the founding chair of ACL's Asia-Pacific chapter in 2018. He obtained his bachelor's, master's, and Ph.D. degrees in computer science from the Harbin Institute of Technology.

*Qi Lu* has served as vice chairman of the board of directors since February 2017. Dr. Lu served as our chief operating officer from January 2017 to June 2018. Dr. Lu is currently the founding chief executive officer of Y Combinator China and head of Y Combinator Research. Prior to joining Baidu, Dr. Lu served as Microsoft's global executive vice president, overseeing the Applications and Services Group. Dr. Lu joined Microsoft in 2009 as president of Online Services. Earlier in his career, Dr. Lu joined Yahoo! in 1998, later becoming senior vice president in charge of search and advertising technologies, and subsequently executive vice president in 2007. Dr. Lu holds both bachelor and master degrees in computer science from Fudan University in Shanghai and a Ph.D. in computer science from Carnegie Mellon University. He holds over 40 US patents and has authored many papers in his field.

*James Ding* has served as our independent director since our initial public offering in August 2005. Mr. Ding is currently a managing director of GSR Ventures, which focuses on early stage companies in the artificial intelligence, big data, information technology related healthcare, virtual reality/augmented reality and new media sectors. Prior to that, Mr. Ding served as a co-chairman of the board of directors of AsiaInfo-Linkage Inc., a former NASDAQ-listed company, from July 2010 to January 2014. Mr. Ding also served as the chairman of the board of AsiaInfo from April 2003 to July 2010, and has served as a member of the board since AsiaInfo's inception in 1993. Mr. Ding served as the chief executive officer and president of AsiaInfo from 1999 to 2003 and as senior vice president and chief technology officer of AsiaInfo from 1993 to 1999. Mr. Ding currently serves as director of the board of AsiaInfo. Mr. Ding received a master's degree in information science from the University of California, Los Angeles and a bachelor's degree in chemistry from Peking University in China.

*Brent Callinicos* has served as our independent director since October 2015, and as the chairman of our audit committee since April 2016. Mr. Callinicos served as the chief operating officer and the chief financial officer of Virgin Hyperloop One from January 2017 to February 2018. Prior to that, Mr. Callinicos served as the chief financial officer of Uber Technologies Inc. from September 2013 to March 2015, and then as an advisor for 18 additional months. Prior to joining Uber, he worked at Google from January 2007 to September 2013, where he last served as vice president, treasurer and chief accountant. He also led green energy investments and financial services at Google Inc. From 1992 to 2007, he served in a variety of increasingly senior roles at Microsoft Corporation, where he last served as corporate vice-president and divisional chief financial officer of the Platforms and Services Division, and oversaw Microsoft's Worldwide Licensing and Pricing and Microsoft

109

**Table of Contents**

Financing. He currently serves on the board of directors of PVH Corp. (NYSE: PVH), and Rubicon Global, a private company. Mr. Callinicos is a certified public accountant. Mr. Callinicos received a bachelor's degree from the University of North Carolina at Chapel Hill and an M.B.A. degree from the Kenan-Flagler School of Business at Chapel Hill.

*Yuanqing Yang* has served as our independent director since October 2015. Mr. Yang is currently the chairman and chief executive officer of Lenovo Group Limited, a Hong Kong-listed company, a director of Sureinvest Holdings Limited and Taikang Insurance Group. Mr. Yang joined Lenovo in 1989 and has led the company from the initial China-based PC maker to a diversified global technology leader. In 2011, *FinanceAsia* named Mr. Yang the Best CEO in China. In 2004 and 2012, Mr. Yang was named one of the "CCTV China Annual Economic Figures." He was on *Barron's* list of Best CEOs in 2013, 2014 and 2015. In 2014, Mr. Yang won an Edison Achievement Award for Innovation. Mr. Yang currently serves as a deputy to the 13th National People's Congress of China. Mr. Yang holds a master's degree in computer science from the University of Science and Technology of China.

**B.    Compensation**

In 2018, we paid an aggregate of approximately RMB85 million (US$12 million) in cash compensation and granted options to purchase an aggregate of 15,090 Class A ordinary shares and 22,477 restricted Class A ordinary shares to our executive officers as a group. We also paid an aggregate of approximately RMB452,000 (US$66,000) in cash compensation and granted options to purchase an aggregate of 13,341 restricted Class A ordinary shares to our non-executive directors as a group. Our PRC subsidiaries and consolidated affiliated entities are required by law to make contributions equal to certain percentages of each employee's salary for his or her pension insurance, medical insurance, housing fund, unemployment insurance and other statutory benefits. Other than the above-mentioned statutory contributions mandated by applicable PRC law, we have not set aside or accrued any amount to provide pension, retirement or other similar benefits to our executive officers and directors. No executive officer is entitled to any severance benefits upon termination of his or her employment with our company except as required under applicable PRC law.

Our board of directors and shareholders approved the issuance of up to 5,040,000 ordinary shares upon exercise of awards granted under our 2000 option plan. Our 2000 option plan terminated in January 2010 upon the expiration of its ten-year term. At the annual general meeting held on December 16, 2008, our shareholders approved a 2008 share incentive plan, which has reserved an additional 3,428,777 Class A ordinary shares for awards to be granted pursuant to its terms. Our 2008 share incentive plan terminated in December 2018 upon the expiration of its ten-year term. On July 20, 2018, our board of directors approved a 2018 share incentive plan, which has reserved an additional 3,443,950 Class A ordinary shares for awards to be granted pursuant to its terms. As of December 31, 2018, options to purchase an aggregate of 477,869 Class A ordinary shares and an aggregate of 1,505,426 restricted Class A ordinary shares had been granted under the 2008 and 2018 share incentive plans.

110

Table of Contents

The following table summarizes, as of December 31, 2018, the outstanding options and restricted Class A ordinary shares that we had granted to our current directors and executive officers and to other individuals as a group. Each Class A ordinary share is represented by 10 ADSs.

| Name | Ordinary Shares Underlying Outstanding Options | Exercise Price (US$/Share) | Grant Date | Expiration Date |
|---|---|---|---|---|
| Robin Yanhong Li | 4,247 | 1,058.90 | January 25, 2011 | January 25, 2021 |
| | 4,279 | 1,418.30 | February 16, 2012 | February 16, 2022 |
| | 10,598 | 1,083.00 | January 31, 2013 | January 31, 2023 |
| | 2,415 | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | 11,977 | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | 1,094 | — | February 11, 2015 | N/A |
| | 43,904 | 2,069.00 | April 16, 2015 | April 16, 2025 |
| | 29,269 | — | April 16, 2015 | N/A |
| | 2,638 | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | 9,060 | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | 1,766 | — | October 27, 2016 | N/A |
| | 5,864 | 1,860.10 | February 22, 2017 | February 22, 2027 |
| | 4,140 | — | February 22, 2017 | N/A |
| | 9,932 | — | February 9, 2018 | N/A |
| Herman Yu | * | 0.1 | February 9, 2018 | February 9, 2028 |
| | * | 0.1 | February 9, 2018 | February 9, 2028 |
| Ya-Qin Zhang | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,860.10 | February 22, 2017 | February 22, 2027 |
| | *(1) | — | February 22, 2017 | N/A |
| | *(1) | — | February 9, 2018 | N/A |
| Hailong Xiang | * | 2,245.50 | October 29, 2014 | October 29, 2024 |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | February 22, 2017 | N/A |
| | * | 1,860.10 | February 22, 2017 | February 22, 2027 |
| | *(1) | — | February 9, 2018 | N/A |
| Lee Liu | * | 1,725.30 | February 24, 2014 | February 24, 2024 |
| | *(1) | — | February 11, 2015 | N/A |
| | * | 2,146.70 | February 11, 2015 | February 11, 2025 |
| | * | 1,582.20 | February 25, 2016 | February 25, 2026 |
| | *(1) | — | October 27, 2016 | N/A |
| | * | 1,751.00 | October 27, 2016 | October 27, 2026 |
| | *(1) | — | February 22, 2017 | N/A |
| | * | 1,860.10 | February 22, 2017 | February 22, 2027 |
| | *(1) | — | February 9, 2018 | N/A |
| Haifeng Wang | *(1) | — | February 11, 2015 | N/A |
| | *(1) | — | February 25, 2016 | N/A |
| | *(1) | — | February 22, 2017 | N/A |
| | * | 1,878.60 | April 27, 2017 | April 27, 2027 |
| | *(1) | — | April 27, 2017 | N/A |
| | *(1) | — | February 9, 2018 | N/A |
| | *(1) | — | July 21, 2018 | N/A |
| Qi Lu | *(1) | — | February 22, 2017 | N/A |
| | *(1) | — | July 21, 2018 | N/A |
| James Ding | *(1) | — | February 9, 2018 | N/A |
| Brent Callinicos | *(1) | — | February 9, 2018 | N/A |
| Yuanqing Yang | *(1) | — | February 9, 2018 | N/A |
| Other individuals as a group | 809,536 | — | — | — |

111

Table of Contents

---

\*        The options and restricted shares in aggregate held by each of these directors and officers represent less than 1% of our total outstanding shares.

(1)    Restricted shares.

The following paragraphs summarize the key terms of our 2008 share incentive plan adopted on December 16, 2008 and our 2018 share incentive plan adopted on July 20, 2018:

*2008 Share Incentive Plan*

*Types of Awards.* We may grant the following types of awards under our 2008 share incentive plan:

- options;

- restricted shares;

- restricted share units; and

- any other form of awards granted to a participant pursuant to the 2008 plan.

*Plan Administration.* The compensation committee of our board of directors administers our 2008 share incentive plan, but may delegate to a committee of one or more members of our board of directors the authority to grant or amend awards to participants other than independent directors and executive officers. The compensation committee will determine the provisions and terms and conditions of each award grant, including, but not limited to, the exercise price, the grant price or purchase price, any restrictions or limitations on the award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an award, based in each case on such considerations as the committee in its sole discretion determines. The compensation committee has the sole power and discretion to cancel, forfeit or surrender an outstanding award (whether or not in exchange for another award or combination or awards).

*Award Agreement.* Awards granted under our 2008 share incentive plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each award which may include the term of an award, the provisions applicable in the event the participant's employment or service ends, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an award.

*Eligibility.* We may grant awards to employees, directors and consultants of our company or any of our related entities, which include our subsidiaries or any entities in which we hold a substantial ownership interest. However, we may grant ISOs only to our employees and employees of our majority-owned subsidiaries.

*Acceleration of Awards upon Corporate Transactions.* The outstanding awards will accelerate (i) upon occurrence of a change-of-control corporate transaction where any person acquires at least 50% of the total combined voting power of our outstanding securities or the incumbent board members no longer constitute at least 50% of our board, or (ii) upon occurrence of any other change-of-control corporate transaction in which the successor entity does not assume our outstanding awards under our 2008 share incentive plan, provided that the plan participant remains an employee, consultant or member of our board of directors on the effective date of the corporate transaction. In such event, each outstanding award will become fully exercisable and all forfeiture restrictions on such award will lapse immediately prior to the specified effective date of the corporate transaction.

If the successor entity assumes our outstanding awards and later terminates the grantee's employment or service without cause within 12 months of the corporate transaction, or if the grantee resigns voluntarily with good reason, the outstanding awards automatically will become fully vested and exercisable. The compensation

112

Table of Contents

committee may also, in its sole discretion, upon or in anticipation of a corporate transaction, accelerate awards, purchase the awards from the plan participants, replace the awards, or provide for the payment of the awards in cash.

*Exercise Price and Term of Awards.* The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the compensation committee, the determination of which shall be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices of options mentioned in the preceding sentence shall be effective without the approval of our shareholders or the approval of the affected grantees. If we grant an ISO to an employee, who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of our share capital, the exercise price cannot be less than 110% of the fair market value of our ordinary shares on the date of that grant. The compensation committee will determine the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting. The term may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of our share capital.

*Restricted Shares and Restricted Share Units.* The compensation committee is also authorized to make awards of restricted shares and restricted share units. Except as otherwise determined by the compensation committee at the time of the grant of an award or thereafter, upon termination of employment or service during the applicable restriction period, restricted shares that are at the time subject to restrictions shall be forfeited or repurchased in accordance with the respective award agreements.

*Vesting Schedule.* The compensation committee determines, and the award agreement specifies, the vesting schedule of options and other awards granted. The compensation committee determines the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting, and also determines any conditions that must be satisfied before all or part of an option may be exercised. At the time of grant for restricted share units, the compensation committee specifies the date on which the restricted share units become fully vested and non-forfeitable, and may specify such conditions to vesting as it deems appropriate.

*Amendment and Termination.* With the approval of our board of directors, the compensation committee may at any time amend, suspend or terminate our 2008 share incentive plan. Amendments to our 2008 share incentive plan are subject to shareholder approval, to the extent required by law, or by stock exchange rules or regulations. Any amendment, suspension or termination of our 2008 share incentive plan must not adversely affect in any material way awards already granted without written consent of the recipient of such awards. Unless terminated earlier, our 2008 share incentive plan shall continue in effect for a term of ten years from the date of adoption.

### *2018 Share Incentive Plan*

*Types of Awards.* We may grant the following types of awards under our 2018 share incentive plan:

- options;

- restricted shares;

- restricted share units; and

- any other form of awards granted to a participant pursuant to the 2018 plan.

*Plan Administration.* The compensation committee of our board of directors administers our 2018 share incentive plan, but may delegate to a committee of one or more members of our board of directors the authority to grant or amend awards to participants other than independent directors and executive officers. The compensation committee will determine the provisions and terms and conditions of each award grant, including, but not limited to, the exercise price, the grant price or purchase price, any restrictions or limitations on the award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an award, and

113

Table of Contents

accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an award, based in each case on such considerations as the committee in its sole discretion determines. The compensation committee has the sole power and discretion to cancel, forfeit or surrender an outstanding award (whether or not in exchange for another award or combination or awards).

*Award Agreement.* Awards granted under our 2018 share incentive plan are evidenced by an award agreement that sets forth the terms, conditions and limitations for each award which may include the term of an award, the provisions applicable in the event the participant's employment or service ends, and our authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an award.

*Eligibility.* We may grant awards to employees, directors and consultants of our company or any of our related entities, which include our subsidiaries or any entities in which we hold a substantial ownership interest. However, we may grant ISOs only to our employees and employees of our majority-owned subsidiaries.

*Acceleration of Awards upon Corporate Transactions.* The outstanding awards will accelerate (i) upon occurrence of a change-of-control corporate transaction where any person acquires at least 50% of the total combined voting power of our outstanding securities or the incumbent board members no longer constitute at least 50% of our board, or (ii) upon occurrence of any other change-of-control corporate transaction in which the successor entity does not assume our outstanding awards under our 2018 share incentive plan, provided that the plan participant remains an employee, consultant or member of our board of directors on the effective date of the corporate transaction. In such event, each outstanding award will become fully exercisable and all forfeiture restrictions on such award will lapse immediately prior to the specified effective date of the corporate transaction.

If the successor entity assumes our outstanding awards and later terminates the grantee's employment or service without cause within 12 months of the corporate transaction, or if the grantee resigns voluntarily with good reason, the outstanding awards automatically will become fully vested and exercisable. The compensation committee may also, in its sole discretion, upon or in anticipation of a corporate transaction, accelerate awards, purchase the awards from the plan participants, replace the awards, or provide for the payment of the awards in cash.

*Exercise Price and Term of Awards.* The exercise price per share subject to an option may be amended or adjusted in the absolute discretion of the compensation committee, the determination of which shall be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices of options mentioned in the preceding sentence shall be effective without the approval of our shareholders or the approval of the affected grantees. If we grant an ISO to an employee, who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of our share capital, the exercise price cannot be less than 110% of the fair market value of our ordinary shares on the date of that grant. The compensation committee will determine the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting. The term may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of our share capital.

*Restricted Shares and Restricted Share Units.* The compensation committee is also authorized to make awards of restricted shares and restricted share units. Except as otherwise determined by the compensation committee at the time of the grant of an award or thereafter, upon termination of employment or service during the applicable restriction period, restricted shares that are at the time subject to restrictions shall be forfeited or repurchased in accordance with the respective award agreements.

*Vesting Schedule.* The compensation committee determines, and the award agreement specifies, the vesting schedule of options and other awards granted. The compensation committee determines the time or times at which an option may be exercised in whole or in part, including exercise prior to vesting, and also determines

114

Table of Contents

any conditions that must be satisfied before all or part of an option may be exercised. At the time of grant for restricted share units, the compensation committee specifies the date on which the restricted share units become fully vested and non-forfeitable, and may specify such conditions to vesting as it deems appropriate.

*Amendment and Termination.* With the approval of our board of directors, the compensation committee may at any time amend, suspend or terminate our 2018 share incentive plan. To the extent the Company decides to not to follow home country practice, Amendments to our 2018 share incentive plan are subject to shareholder approval, to the extent required by law, or by stock exchange rules or regulations,. Any amendment, suspension or termination of our 2018 share incentive plan must not adversely affect in any material way awards already granted without written consent of the recipient of such awards. Unless terminated earlier, our 2018 share incentive plan shall continue in effect for a term of ten years from the date of adoption.

**C.    Board Practices**

**Board of Directors**

Our board of directors has five directors. A director is not required to hold any shares in the company by way of qualification. A director may vote with respect to any contract, proposed contract or arrangement in which he is materially interested. A director may exercise all the powers of the company to borrow money, mortgage its undertakings, property and uncalled capital, and issue debentures or other securities whenever money is borrowed or as security for any obligation of the company or of any third party. The remuneration to be paid to the directors is determined by the board of directors. There is no age limit requirement for directors.

**Committees of the Board of Directors**

We have three committees under the board of directors: an audit committee, a compensation committee and a corporate governance and nominating committee. We have adopted a charter for each of the three committees.

*Audit Committee*

Our audit committee consists of Brent Callinicos, James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules and Rule 10A-3 under the Exchange Act. Our board of directors has determined that Mr. Callinicos is an audit committee financial expert as defined in the instructions to Item 16A of the Form 20-F. The audit committee oversees our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee is responsible for, among other things:

- appointing, retaining and overseeing the work of the independent auditors, including resolving disagreements between the management and the independent auditors relating to financial reporting;

- pre-approving all auditing and non-auditing services permitted to be performed by the independent auditors;

- reviewing annually the independence and quality control procedures of the independent auditors;

- reviewing and approving all proposed related party transactions;

- discussing the annual audited financial statements with the management;

- meeting separately with the independent auditors to discuss critical accounting policies, management letters, recommendations on internal controls, the auditor's engagement letter and independence letter and other material written communications between the independent auditors and the management; and

- attending to such other matters that are specifically delegated to our audit committee by our board of directors from time to time.

115

Table of Contents

In 2018, our audit committee held meetings or passed resolutions by unanimous written consent seven times.

### Compensation Committee

Our compensation committee consists of James Ding and Yuanqing Yang, all of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules. The compensation committee assists the board in reviewing and approving our compensation structure, including all forms of compensation relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting while his compensation is deliberated. The compensation committee is responsible for, among other things:

- reviewing and approving, or recommending to the board for its approval, the compensation for our chief executive officer and other executive officers;

- reviewing and recommending to the board for determination with respect to the compensation of our non-employee directors;

- reviewing periodically and approving any incentive compensation or equity plans, programs or similar arrangements; and

- selecting compensation consultant, legal counsel or other adviser only after taking into consideration all factors relevant to that person's independence from management.

In 2018, our compensation committee held meetings or passed resolutions by unanimous written consent five times.

### Corporate Governance and Nominating Committee

Our corporate governance and nominating committee consists of James Ding and Yuanqing Yang, both of whom satisfy the "independence" requirements of Rule 5605(a)(2) of the NASDAQ Stock Market Rules. The corporate governance and nominating committee assists the board of directors in selecting individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee is responsible for, among other things:

- recommending to the board nominees for election or re-election to the board or for appointments to fill any vacancies;

- reviewing annually the performance of each incumbent director in determining whether to recommend such director for an additional term;

- overseeing the board in the board's annual review of its own performance and the performance of the management; and

- considering, preparing and recommending to the board such policies and procedures with respect to corporate governance matters as may be required or required to be disclosed under the applicable laws or otherwise considered to be material.

In 2018, our corporate governance and nominating committee passed resolutions by unanimous written consent once.

### Terms of Directors and Executive Officers

All directors hold office until their successors have been duly elected and qualified. None of our directors is subject to a fixed term of office. In addition, the service agreements between us and the directors do not provide benefits upon termination of their services. Director nomination is subject to the approval of our corporate

116

Table of Contents

governance and nominating committee. Our shareholders may remove any director by ordinary resolution and may in like manner appoint another person in his stead. A valid ordinary resolution requires a majority of the votes cast at a shareholder meeting that is duly constituted and meets the quorum requirement. Officers are elected by and serve at the discretion of the board of directors.

**D.    Employees**

We had 45,887, 39,343 and 42,267 employees as of December 31, 2016, 2017 and 2018, respectively. As of December 31, 2018, we had 21,774 employees in research and development, 13,324 employees in sales and marketing, 4,926 employees in operation and service, and 2,243 employees in management and administration. As of December 31, 2018, we had 25,845 employees in Beijing, 16,080 employees outside of Beijing but within China, and 342 employees outside of China. We also hire temporary employees and contractors from time to time. Our employees are not covered by any collective bargaining agreement. We consider our relations with our employees to be generally good. However, as our operations and employee base further expand, we cannot assure you that we will always be able to maintain good relations with all of our employees. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our Business—We may not be able to manage our expanding operations effectively."

**E.    Share Ownership**

The following table sets forth information with respect to the beneficial ownership of our shares as of January 31, 2019 by:

- each of our current directors and executive officers; and

- each person known to us to own beneficially more than 5% of our shares.

See "—B. Compensation" for more details on options and restricted shares granted to our directors and executive officers.

| Directors and Executive Officers: | Shares Beneficially Owned | |
| --- | --- | --- |
| | Number(1) | %(2) |
| Robin Yanhong Li(3) | 5,654,180 | 16.1% |
| Herman Yu | * | * |
| Ya-Qin Zhang | * | * |
| Hailong Xiang(4) | * | * |
| Lee Liu | * | * |
| Haifeng Wang | * | * |
| Qi Lu | * | * |
| James Ding(5) | * | * |
| Brent Callinicos(6) | * | * |
| Yuanqing Yang(7) | * | * |
| All Directors and Executive Officers as a Group(8) | 5,704,475 | 16.3% |
| **Principal Shareholders:** | | |
| Handsome Reward Limited(9) | 5,490,000 | 15.6% |
| Baillie Gifford & Co (Scottish partnership)(10) | 1,811,319 | 5.2% |

---

\*    Less than 1% of our total outstanding Class A ordinary shares and Class B ordinary shares.

\*\*    Except for Hailong Xiang, James Ding, Yuanqing Yang and Brent Callinicos, the business address of our directors and executive officers is c/o Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(1)    The number of shares beneficially owned by each named director and executive officer includes the shares beneficially owned by such person, the shares underlying all options held by such person that have vested or will vest within 60 days after January 31, 2019, and restricted shares held by such person that will vest within 60 days after January 31, 2019. The options and restricted shares were granted under our 2008 share incentive plan.

117

Table of Contents

(2)  Percentage of beneficial ownership of each named director and executive officer is based on 34,936,512 ordinary shares (consisting of 27,735,258 Class A ordinary shares and 7,201,254 Class B ordinary shares) of our company outstanding as of January 31, 2019, the number of ordinary shares underlying options that have vested or will vest within 60 days after January 31, 2019, and the number of restricted shares that will vest within 60 days after January 31, 2019, each as held by such person as of that date.

(3)  Includes (i) 37,665 Class A Ordinary Shares directly held by Mr. Li on record, (ii) 21,481 Class A ordinary shares in the form of ADSs held in the brokerage account of the administrator of our employee stock option program, (iii) 24,193 restricted Class A Ordinary Shares that had vested as of January 31, 2019, (iv) 80,841 Class A Ordinary Shares issuable upon exercise of options and vesting of restricted shares within 60 days after the date of January 31, 2019, (v) 5,490,000 Class B Ordinary Shares held by Handsome Reward Limited, a British Virgin Islands company wholly owned and controlled by Mr. Li, and (vi) excludes 1,510,000 Class B Ordinary Shares owned by Melissa Ma, Mr. Li's wife, who also had 2,917 ADSs in the brokerage account of the administrator of our employee stock option program and the right to acquire 870 Class A Ordinary Shares upon the vesting of restricted share units granted under the Company's share incentive plan within 60 days after January 31, 2019, of which Mr. Li disclaims beneficial ownership.

(4)  The business address of Mr. Xiang is No.1 Baidu Technology Park Building, No.10 Xibeiwang East Road Haidian District, Beijing 100193, China.

(5)  The business address of Mr. Ding is 56/F, China World Tower 3, No. 1 Jianguomenwai Street, Chaoyang District, Beijing 100004, PRC.

(6)  The residential address of Mr. Callinicos is 4110 Woodleigh Lane, La Canada Flintridge, CA 91011. USA.

(7)  The business address of Mr. Yang is c/o Lenovo, No. 6 Shangdi West Road, Haidian District, Beijing 100085, PRC.

(8)  Includes ordinary shares, ordinary shares issuable upon exercise of options and restricted shares, held by all of our directors and executive officers as a group.

(9)  Represents 5,490,000 Class B ordinary shares held by Handsome Reward Limited, a British Virgin Island company wholly owned and controlled by Mr. Robin Yanhong Li. The business address of Handsome Reward Limited is c/o Robin Yanhong Li, Baidu, Inc., Baidu Campus, No. 10 Shangdi 10th Street, Haidian District, Beijing 100085, PRC.

(10)  Represents 1,811,319 Class A ordinary shares in the form of ADSs held by Baillie Gifford & Co (Scottish partnership), as reported on the Schedule 13G filed by Baillie Gifford & Co (Scottish partnership) on January 9, 2019. The percentage of beneficial ownership was calculated based on the total number of our ordinary shares outstanding as of January 31, 2019. The address of Baillie Gifford & Co (Scottish partnership) is Calton Square, 1 Greenside Row, Edinburgh EH1 3AN, Scotland, UK.

Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares are entitled to one vote per share, while holders of Class B ordinary shares are entitled to ten votes per share. We issued Class A ordinary shares represented by our ADSs in our initial public offering in 2005. Holders of our Class B ordinary shares may choose to convert their Class B ordinary shares into the same number of Class A ordinary shares at any time. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company. See "Item 3.D. Key Information—Risk Factors—Risks Related to Our ADSs—Our dual-class ordinary share structure with different voting rights could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial."

As of January 31, 2019, 34,936,512 of our ordinary shares were issued and outstanding. To our knowledge, approximately 80% of our total outstanding ordinary shares were held by four record shareholders in the United States, including approximately 79% held by The Bank of New York Mellon, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our ordinary shares in the United States.

**Item 7.        Major Shareholders and Related Party Transactions**

**A.    Major Shareholders**

Please refer to "Item 6.E. Directors, Senior Management and Employees—Share Ownership."

**B.    Related Party Transactions**

See "Item 4.C. Information on the Company—Organizational Structure—Contractual Arrangements with Our Consolidated Affiliated Entities and the Nominee Shareholders."

Our subsidiaries, consolidated affiliated entities, and the subsidiaries of the consolidated affiliated entities have engaged, during the ordinary course of business, in a number of customary transactions with each other. All of these inter-company balances have been eliminated in consolidation.

118

**Table of Contents**

As of December 31, 2016, 2017 and 2018, we had RMB357 million, RMB177 million and RMB5.1 billion (US$739 million), respectively, due from related parties. The increase of the balance from December 31, 2017 to December 31, 2018 was primarily due to the provision of loans to certain related parties, including Du Xiaoman. The decrease of the balance from December 31, 2016 to December 31, 2017 was primarily due to more timely settlement of transactions incurred in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of February 28, 2019 was RMB4.8 billion (US$699 million).

As of December 31, 2016, 2017 and 2018, we had RMB459 million, RMB153 million and RMB6.1 billion (US$885 million), respectively, due to related parties. The increase of the balance from December 31, 2017 to December 31, 2018 was primarily due to the borrowing of loans from certain related parties, including Du Xiaoman. The decrease of the balance from December 31, 2016 to December 31, 2017 was primarily due to more timely settlement of transactions incurred in the ordinary course of business with certain investees that were determined to be related parties. The amount outstanding as of February 28, 2019 was RMB5.4 billion (US$778 million).

In 2016, 2017 and 2018, related party transactions with Ctrip (including Qunar) mainly comprised the online marketing services that we provided to Ctrip (including Qunar), which were in the total amount of RMB631 million, RMB750 million and RMB774 million (US$113 million), respectively.

In August 2018, we completed the divestiture of Du Xiaoman, following which we recognized our minority equity interest in Du Xiaoman as an equity method investment and Du Xiaoman became a related party. For the year ended December 31, 2018, related party transactions with Du Xiaoman mainly comprised the online marketing services that we provided to Du Xiaoman, which was in the total amount of RMB254 million (US$37 million), and loan transactions. In 2018, we provided multiple short-term loans to Du Xiaoman in the amount of RMB12.0 billion (US$1.7 billion) with interest rates ranging from 5.00% to 7.00%. As of December 31, 2018, all short-term loans extended to Du Xiaoman have been repaid in full. In 2018, we provided three term loans to Du Xiaoman in the amount of RMB3.8 billion (US$559 million) with terms ranging from two to five years, which are intended for working capital purposes. These loans bear interests rates ranging from 4.28% to 5.00%. The amount outstanding as of February 28, 2019 was RMB3.8 billion (US$559 million), In 2018, Du Xiaoman provided us with two term loans in the amount of RMB3.4 billion (US$487 million) with terms of three and five years, which are intended for general corporate purposes. These loans bear interests rates ranging from 3.78% to 4.28%. The amount outstanding as of February 28, 2019 was RMB3.4 billion (US$487 million).

In 2016, 2017 and 2018, with the approval from our board of directors, we reimbursed Mr. Robin Yanhong Li the fees and expenses incurred in connection with his use of an aircraft beneficially owned by his family member for our business purposes. The hourly rate for use of the aircraft was determined based on an analysis of market rates for the charter of comparable aircrafts. The service charges for the use of the aircraft for 2016, 2017 and 2018 were insignificant.

**Share Options and Restricted Shares Grants**

Please refer to "Item 6.B. Directors, Senior Management and Employees—Compensation."

**C.   Interests of Experts and Counsel**

Not applicable.

**Item 8.   Financial Information**

**A.   Consolidated Statements and Other Financial Information**

We have appended consolidated financial statements filed as part of this annual report.

119

Table of Contents

**Legal Proceedings**

From time to time, we have been involved in litigation or other disputes regarding, among other things, copyright and trademark infringement, defamation, unfair competition and labor disputes. Our search results provide links to materials, and our P4P, Baidu WenKu, Baidu Post Bar, Baidu Encyclopedia, Baidu Knows, Baidu Feed, iQIYI and certain other products or services may contain materials, in which others may allege to own copyrights, trademarks or image rights or which others may claim to be defamatory or objectionable.

In 2018, 3,097 complaints were filed against us before various courts in China, and the aggregate amount of the damages sought in these complaints totals approximately RMB746 million (US$109 million). As of December 31, 2018, 2,165 cases against us were pending before various courts in China. The aggregate amount of damages sought under these pending cases is approximately RMB1.2 billion (US$176 million). In 2018, three complaints were filed against us before various courts outside China, and the aggregate amount of the damages sought in these complaints totals approximately RMB76.3 billion (US$11.1 billion). As of December 31, 2018, 11 cases against us were pending before various courts outside China. The aggregate amount of damages sought under these pending cases is approximately RMB76.3 billion (US$11.1 billion).

In November 2018, an individual, together with his related company, filed a complaint for acts of defamation and liber per se, commercial disparagement, tortious inference with prospective business relations, intentional infliction of emotional distress and civil conspiracy against, among others, us and Robin Yanhong Li in his capacity as our chairman and chief executive officer in the Supreme Court of The State of New York. The complaint alleges, among other things, that the defendant parties published articles containing false and defamatory statements concerning the plaintiffs. The complaint seeks damages in an aggregate amount of US$11 billion, including US$10 billion punitive damages. The action remains in a very preliminary stage. We believe the case is without merit and intend to defend ourselves vigorously.

For many of these legal proceedings, we are currently unable to estimate the reasonably possible loss or a range of reasonably possible loss as the proceedings are in the early stages, or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such proceedings, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible loss cannot be made. With respect to the limited number of proceedings for which we are able to estimate the reasonably possible loss or the range of reasonably possible loss, such estimates are immaterial. However, we believe that such proceedings, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material and adverse effect on our results of operations, financial position and cash flows.

**Dividend Policy**

Baidu, Inc., our holding company in the Cayman Islands, has never declared or paid any dividends on our ordinary shares, nor do we have any present plan to pay any cash dividends on our ordinary shares in the foreseeable future. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

Our board of directors has complete discretion as to whether to distribute dividends, subject to Cayman Islands law. Even if our board of directors decides to pay dividends, the form, frequency and amount of our dividends will depend upon our future operations and earnings, capital requirements and surplus, financial condition, contractual restrictions and other factors that our board of directors may deem relevant. If we pay any dividends, our depositary will distribute such dividends to our ADS holders to the same extent as holders of our ordinary shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

120

**Table of Contents**

**B.**  **Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

**Item 9.**  **The Offer and Listing**

**A.**  **Offering and Listing Details**

Our ADSs have been listed on The NASDAQ Global Market since August 5, 2005. Our ADSs currently trade on The NASDAQ Global Select Market under the symbol "BIDU." Prior to May 12, 2010, one ADS represented one Class A ordinary share. On May 12, 2010, we effected a change of the ADS to Class A ordinary share ratio from 1 ADS representing 1 Class A ordinary share to 10 ADSs representing 1 Class A ordinary share. The ratio change has the same effect as a 10-for-1 ADS split.

**B.**  **Plan of Distribution**

Not applicable.

**C.**  **Markets**

Our ADSs have been listed on NASDAQ since August 5, 2005 under the symbol "BIDU".

**D.**  **Selling Shareholders**

Not applicable.

**E.**  **Dilution**

Not applicable.

**F.**  **Expenses of the Issue**

Not applicable.

**Item 10.**  **Additional Information**

**A.**  **Share Capital**

Not applicable.

**B.**  **Memorandum and Articles of Association**

The following are summaries of material provisions of our third amended and restated memorandum and articles of association, as well as the Companies Law (2018 Revision) insofar as they relate to the material terms of our ordinary shares.

**Registered Office and Objects**

The Registered Office of our company is at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands or at such other place as our board of directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Law (2018 Revision), as amended from time to time, or any other law of the Cayman Islands.

121

Table of Contents

**Board of Directors**

See "Item 6.C. Directors, Senior Management and Employees—Board Practices—Board of Directors."

**Ordinary Shares**

*General.* Our ordinary shares are divided into Class A ordinary shares and Class B ordinary shares. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. All of our outstanding ordinary shares are fully paid and non-assessable. Certificates representing the ordinary shares are issued in registered form. Our shareholders who are nonresidents of the Cayman Islands may freely hold and vote their shares.

*Dividends.* The holders of our ordinary shares are entitled to such dividends as may be declared by our board of directors subject to the Companies Law.

*Conversion.* Each Class B ordinary share is convertible into one Class A ordinary share at any time by the holder thereof. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any transfer of Class B ordinary shares by a holder thereof to any person or entity which is not an affiliate of such holder (as defined in our articles of association), such Class B ordinary shares shall be automatically and immediately converted into the equal number of Class A ordinary shares. In addition, if at any time our chairman and chief executive officer, Robin Yanhong Li, and his affiliates collectively own less than 5% of the total number of the issued and outstanding Class B ordinary shares, each issued and outstanding Class B ordinary share shall be automatically and immediately converted into one share of Class A ordinary share, and we shall not issue any Class B ordinary shares thereafter.

*Voting Rights.* All of our shareholders have the right to receive notice of shareholders' meetings and to attend, speak and vote at such meetings. In respect of matters requiring shareholders' vote, each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to 10 votes. A shareholder may participate at a shareholders' meeting in person, by proxy or by telephone conference or other communications equipment by means of which all the shareholders participating in the meeting can communicate with each other. At any shareholders' meeting, a resolution put to the vote of the meeting shall be decided on a poll conducted by the chairman of the meeting.

A quorum for a shareholders' meeting consists of one or more shareholders holding at least one third of the paid up voting share capital present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative. We shall, if required by the Companies Law, hold a general meeting of shareholders as our annual general meeting and shall specify the meeting as such in the notices calling it. Our board of directors may call extraordinary general meetings, and they must on shareholders' requisition convene an extraordinary general meeting. A shareholder requisition is a requisition of shareholders holding at the date of deposit of the requisition not less than a majority of the voting power represented by the issued shares of our company as at that date carries the right of voting at general meetings of our company. Advance notice of at least five days is required for the convening of our annual general meeting and other shareholders' meetings.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes attaching to the ordinary shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the ordinary shares cast in a general meeting. A special resolution is required for matters such as a change of name. Holders of the ordinary shares may effect certain changes by ordinary resolution, including consolidating and dividing all or any of our share capital into shares of larger amount than our existing share capital and canceling any shares.

*Transfer of Shares.* Subject to the restrictions of our memorandum and articles of association, as applicable, any of our shareholders may transfer any or all of his or her ordinary shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

122

Table of Contents

Our board of directors may, in their absolute discretion (except with respect to a transfer from a shareholder to its affiliate(s)), decline to register any transfer of shares without assigning any reason thereof. If our board of directors refuses to register a transfer they shall notify the transferee within two months of such refusal. Notwithstanding the foregoing, if a transfer complies with the holder's transfer obligations and restrictions set forth under applicable law (including but not limited to U.S. securities law provisions related to insider trading) and our articles of association, our board of directors shall promptly register such transfer. Further, any director is authorized to confirm in writing addressed to the registered office to authorize a share transfer and to instruct that the register of members be updated accordingly, provided that the transfer complies with the holder's transfer obligations and restrictions set forth under applicable law and our articles of association and such holder is not the director who authorizes the transfer or an entity affiliated with such director. Any director is authorized to execute a share certificate in respect of such shares for and on behalf of our company.

The registration of transfers may be suspended at such time and for such periods as our board of directors may from time to time determine, provided, however, that the registration of transfers shall not be suspended for more than 45 days in any year.

*Liquidation.* On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of ordinary shares may be distributed among the holders of the ordinary shares as determined by the liquidator, subject to sanction of a special resolution of our company. If our assets available for distribution are insufficient to repay all of the paid-up capital, the assets will be distributed so that the losses are borne by our shareholders proportionately to the capital paid up, or which ought to have been paid up, at the commencement of the winding up on the shares held by such shareholders respectively.

*Calls on Shares and Forfeiture of Shares.* Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 days prior to the specified time and place of payment. The shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption of Shares.* Subject to the provisions of the Companies Law and our articles of association, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner as our board of directors may determine.

*Repurchase of Shares.* Subject to the provisions of the Companies Law and our articles of association, our board of directors may authorize repurchase of our shares in accordance with the manner of purchase specified in our articles of association without seeking shareholder approval.

*Variations of Rights of Shares.* All or any of the special rights attached to any class of shares may, subject to the provisions of the Companies Law, be varied either with the written consent of the holders of a majority of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Inspection of Books and Records.* No holders of our ordinary shares who is not a director shall have any right of inspecting any of our accounts, books or documents except as conferred by the Companies Law or authorized by the directors or by us in general meeting. However, we will make this annual report, which contains our audited financial statements, available to shareholders and ADS holders. See "Item 10.H. Additional Information—Documents on Display."

**Preferred Shares**

Our board of directors has the authority, without shareholder approval, to issue up to a total of 10,000,000 shares of preferred shares in one or more series. Our board of directors may establish the number of

123

**Table of Contents**

shares to be included in each such series and may set the designations, preferences, powers and other rights of the shares of a series of preferred shares. While the issuance of preferred shares provides us with flexibility in connection with possible acquisitions or other corporate purposes, it could, among other things, have the effect of delaying, deferring or preventing a change of control transaction and could adversely affect the market price of our ADSs. We have no current plan to issue any preferred shares.

**C.    Material Contracts**

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

**D.    Exchange Controls**

See "Item 4.B. Information on the Company—Business Overview—Regulations—Regulations on Foreign Exchange."

**E.    Taxation**

The following summary of the material Cayman Islands, People's Republic of China and U.S. federal income tax consequences of an investment in our ADSs or ordinary shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This summary does not deal with all possible tax consequences relating to an investment in our ADSs or ordinary shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Tax Considerations**

According to Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, the Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within, the jurisdiction of the Cayman Islands. The Cayman Islands is not party to any double tax treaties that are applicable to any payments made to or by our company. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Tax Considerations**

If we are considered a PRC resident enterprise under the EIT Law, our shareholders and ADS holders who are deemed non-resident enterprises may be subject to the 10% EIT on the dividends payable by us or any gains realized from the transfer of our shares or ADSs, if such income is deemed derived from China, provided that (i) such foreign enterprise investor has no establishment or premises in China, or (ii) it has establishment or premises in China but its income derived from China has no real connection with such establishment or premises. Furthermore, if we are considered a PRC resident enterprise and relevant PRC tax authorities consider the dividends we pay with respect to our shares or ADSs and the gains realized from the transfer of our shares or ADSs to be income derived from sources within the PRC, it is also possible that such dividends and gains earned by non-resident individuals may be subject to the 20% PRC individual income tax. It is uncertain whether, if we are considered a PRC resident enterprise, holders of our shares or ADSs would be able to claim the benefit of tax treaties or arrangements entered into between China and other jurisdictions.

If we are required under the PRC tax law to withhold PRC income tax on our dividends payable to our non-PRC resident shareholders and ADS holders, or if any gains realized from the transfer of our shares or ADSs by our non-PRC resident shareholders and ADS holders are subject to the EIT or the individual income tax, your investment in our shares or ADSs could be materially and adversely affected.

124

Table of Contents

**U.S. Federal Income Tax Considerations**

The following discussion is a summary of U.S. federal income tax considerations under present law of the ownership and disposition of the ADSs or ordinary shares. This summary applies only to investors that are U.S. Holders (as defined below) and that hold the ADSs or ordinary shares as capital assets. This discussion is based on the tax laws of the United States as in effect on the date of this annual report on Form 20-F and on U.S. Treasury regulations in effect or, in some cases, proposed, as of the date of this annual report on Form 20-F, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing authorities are subject to change, which change could apply retroactively and could affect the tax considerations described below.

The following discussion does not deal with the tax consequences to any particular investor or to persons in special tax situations such as:

- banks;

- financial institutions;

- insurance companies;

- broker dealers;

- persons that elect to mark their securities to market;

- tax-exempt entities;

- persons liable for the alternative minimum tax;

- regulated investment companies;

- certain expatriates or former long-term residents of the United States;

- governments or agencies or instrumentalities thereof;

- persons holding an ADS or ordinary share as part of a straddle, hedging, conversion or integrated transaction;

- persons that actually or constructively own ADSs or ordinary shares representing 10% or more of our voting power or value;

- persons who are required to recognize income for U.S. federal income tax purposes no later than when such income is taken into account in applicable financial statements;

- persons whose functional currency is other than the U.S. dollar; or

- persons who acquired our ADSs or ordinary shares pursuant to the exercise of any employee share option or otherwise as compensation.

**U.S. Holders are urged to consult their tax advisors about the application of the U.S. federal tax rules to their particular circumstances as well as the state, local and foreign tax consequences to them of ownership and disposition of our ADSs or ordinary shares.**

The discussion below of the U.S. federal income tax consequences will apply if you are a "U.S. Holder." You are a "U.S. Holder" if you are the beneficial owner of our ADSs or ordinary shares and you are, for U.S. federal income tax purposes,

- a citizen or individual resident of the United States;

- a corporation (or other entity subject to tax as a corporation for U.S. federal income tax purposes) that is created or organized in or under the laws of the United States, any State or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

125

Table of Contents

- a trust that (i) is subject to the supervision of a court within the United States and the control of one or more U.S. persons or (ii) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

This discussion does not consider the tax treatment of partnerships or other pass-through entities that hold the ADSs or ordinary shares, or of persons who hold the ADSs or ordinary shares through such entities. If a partnership (or other entity classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of the ADSs or ordinary shares, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement will be complied with in accordance with their terms. If you hold our ADSs, you will be treated as the holder of the underlying ordinary shares represented by those ADSs for U.S. federal income tax purposes.

This discussion does not address any aspect of U.S. federal non-income tax laws, such as gift or estate tax laws, or state, local or foreign tax laws or the Medicare tax on certain net investment income. We have not sought, and will not seek, a ruling from the Internal Revenue Service (the "IRS"), or an opinion as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court.

### *Taxation of Dividends and Other Distributions on the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, the gross amount of all our distributions to you with respect to the ADSs or ordinary shares will be included in your gross income as dividend income on the date of receipt by the depositary, in the case of our ADSs, or by you, in the case of ordinary shares, but only to the extent that the distribution is paid out of our current or accumulated earnings and profits (computed under U.S. federal income tax principles). Because we do not intend to determine our earnings and profits on the basis of U.S. federal income tax principles, any distribution paid will generally be treated as a "dividend" for U.S. federal income tax purposes. Dividends paid by us will not be eligible for the dividends-received deduction allowed to corporations in respect of dividends received from U.S. corporations.

With respect to non-corporate U.S. Holders (including individual U.S. Holders), dividends may be taxed at the lower applicable capital gains rate provided that (i) the ADSs or ordinary shares are readily tradable on an established securities market in the United States or we are eligible for the benefit of the income tax treaty between the United States and the PRC, or the Treaty, (ii) we are not a passive foreign investment company (as discussed below) for either our taxable year in which the dividend was paid or for the preceding taxable year, (iii) certain holding period requirements are met and (iv) such non-corporate U.S. Holders are not under an obligation to make related payments with respect to positions in substantially similar or related property. For this purpose, ADSs listed on the NASDAQ Global Select Market will generally be considered to be readily tradable on an established securities market in the United States. You should consult your tax advisor regarding the availability of the lower rate for dividends paid with respect to our ADSs or ordinary shares.

For U.S. foreign tax credit purposes, dividends paid on the ADSs or ordinary shares will generally be treated as income from foreign sources and will generally constitute passive category income. If PRC withholding taxes apply to dividends paid to you with respect to the ADSs or ordinary shares, you may be able to obtain a reduced rate of PRC withholding taxes under the Treaty. In addition, subject to certain conditions and limitations, PRC withholding taxes on dividends that are non-refundable under the Treaty may be treated as foreign taxes eligible for credit against your U.S. federal income tax liability. If you do not elect to claim a foreign tax credit, you may instead claim a deduction for U.S. federal income tax purposes in respect of such withholding, but only for a year in which you elect to do so for all creditable foreign income taxes. You should consult your tax advisor regarding the creditability of any PRC tax.

126

Table of Contents

*Sale, Exchange or Other Disposition of the ADSs or Ordinary Shares*

Subject to the passive foreign investment company rules discussed below, you will recognize gain or loss on any sale, exchange or other taxable disposition of an ADS or ordinary share equal to the difference between the amount realized for the ADS or ordinary share and your tax basis in the ADS or ordinary share. The gain or loss will generally be capital gain or loss. If you are a non-corporate U.S. Holder, including an individual U.S. Holder, who has held the ADS or ordinary share for more than one year, you will generally be eligible for reduced tax rates. The deductibility of capital losses is subject to limitations. Any such gain or loss that you recognize will generally be treated as U.S. source income or loss for foreign tax credit limitation purposes, which will generally limit the availability of foreign tax credits. However, in the event we are deemed to be a PRC "resident enterprise" under PRC tax law, we may be eligible for the benefits of the Treaty. In such event, if PRC tax were to be imposed on any gain from the disposition of the ADSs or ordinary shares, a U.S. Holder that is eligible for the benefits of the Treaty may elect to treat such gain as PRC source income. U.S. Holders should consult their tax advisors regarding the creditability of any PRC tax.

*Passive Foreign Investment Company*

A non-U.S. corporation, such as our own, is considered a PFIC for any taxable year if either (i) at least 75% of its gross income is passive income, or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income (the "asset test"). We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the shares. Although the law in this regard is not entirely clear, we treat our variable interest entities as being owned by us for U.S. federal income tax purposes because we control their management decisions and we are entitled to receive economic benefits that could potentially be significant to them and, as a result, we consolidate their results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of our variable interest entities for U.S. federal income tax purposes, we would likely be treated as a PFIC for our taxable year ended December 31, 2019 and for subsequent taxable years.

Based on the market price of our ADSs and ordinary shares, the value of our assets, and the composition of our assets and income, we believe that we were not a PFIC for our taxable year ended December 31, 2018. However, given the lack of authority and the highly factual nature of the analyses, no assurance can be given. Our PFIC status for the current taxable year ending December 31, 2019 will not be determinable until the close of the taxable year, there can be no assurance that we will not be a PFIC for the current taxable year (or any future taxable year).

We must make a separate determination each year as to whether we are a PFIC. As a result, our PFIC status may change. In particular, because the total value of our assets for purposes of the asset test will generally be calculated using the market price of the ADSs and ordinary shares, our PFIC status will depend in large part on the market price of the ADSs and ordinary shares, which may fluctuate considerably. Accordingly, fluctuations in the market price of the ADSs and ordinary shares may result in our being a PFIC for any year. If we are a PFIC for any year during which you hold the ADSs or ordinary shares, we will generally continue to be treated as a PFIC for all succeeding years during which you hold such ADSs or ordinary shares. However, if we cease to be a PFIC, provided that you have not made a mark-to-market election, as described below, you may avoid some of the adverse effects of the PFIC regime by making a deemed sale election with respect to the ADSs or ordinary shares, as applicable.

If we are a PFIC for any taxable year during which you hold our ADSs or ordinary shares, you will be subject to special tax rules with respect to any "excess distribution" that you receive and any gain you realize from a sale or other disposition (including a pledge) of the ADSs or ordinary shares, unless you make a mark-to-market election as discussed below. Distributions you receive in a taxable year that are greater than

127

Table of Contents

125% of the average annual distributions you received during the shorter of the three preceding taxable years or your holding period for the ADSs or ordinary shares will be treated as an excess distribution. Under these special tax rules:

- the excess distribution or gain will be allocated ratably over your holding period for the ADSs or ordinary shares,

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we became a PFIC, will be treated as ordinary income, and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for you for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

The tax liability for amounts allocated to years prior to the year of disposition or "excess distribution" cannot be offset by any net operating losses for such years, and gains (but not losses) realized on the sale of the ADSs or ordinary shares cannot be treated as capital, even if you hold the ADSs or ordinary shares as capital assets.

Alternatively, a U.S. Holder of "marketable stock" (as defined below) in a PFIC may make a mark-to-market election for such stock of a PFIC to elect out of the tax treatment discussed in the two preceding paragraphs. The mark-to-market election is available only for "marketable stock," which is stock that is traded in other than *de minimis* quantities on at least 15 days during each calendar quarter, or "regularly traded," on a qualified exchange or other market, as defined in applicable Treasury regulations. We expect that the ADSs will continue to be listed on the NASDAQ Global Select Market, which is a qualified exchange for these purposes, and, consequently, assuming that the ADSs are regularly traded, if you are a holder of our ADSs, it is expected that the mark-to-market election would be available to you were we to become a PFIC. However, a mark-to-market election may not be made with respect to our ordinary shares as they are not marketable stock. If you make a valid mark-to-market election for the ADSs, you will include in income each year an amount equal to the excess, if any, of the fair market value of the ADSs as of the close of your taxable year over your adjusted basis in such ADSs. You are allowed a deduction for the excess, if any, of the adjusted basis of the ADSs over their fair market value as of the close of the taxable year. Such deductions, however, are allowable only to the extent of any net mark-to-market gains on the ADSs included in your income for prior taxable years. Amounts included in your income under a mark-to-market election, as well as gain on the actual sale or other disposition of the ADSs, are treated as ordinary income. Ordinary loss treatment also applies to the deductible portion of any mark-to-market loss on the ADSs, as well as to any loss realized on the actual sale or disposition of the ADSs, to the extent that the amount of such loss does not exceed the net mark-to-market gains previously included for such ADSs. Your basis in the ADSs will be adjusted to reflect any such income or loss amounts. If you make such a mark-to-market election, tax rules that apply to distributions by corporations which are not PFICs would apply to distributions by us (except that the lower applicable capital gains rate would not apply).

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder may continue to be subject to the general PFIC rules described above with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

Alternatively, a U.S. Holder may avoid the PFIC tax consequences described above in respect to its ADSs and ordinary shares by making a timely "qualified electing fund," or QEF, election. To comply with the requirements of a QEF election, a U.S. Holder must receive certain information from us. Because we do not intend to provide such information, however, such election will not be available to you with respect to the ADSs or ordinary shares.

If you hold our ADSs or ordinary shares in any year in which we are a PFIC, you will be required to file an annual information report containing such information as the U.S. Treasury may require.

128

**Table of Contents**

You are urged to consult your tax advisor regarding the application of the PFIC rules to your investment in our ADSs or ordinary shares.

**F.    Dividends and Paying Agents**

Not applicable.

**G.    Statement by Experts**

Not applicable.

**H.    Documents on Display**

We are subject to the periodic reporting and other informational requirements of the Exchange Act, and are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. All information filed with the SEC can be obtained over the internet at the SEC's website at www.sec.gov or inspected and copied at the public reference facilities maintained by the SEC at 100 F Street, N.E., Washington, D.C. 20549. You can request copies of documents, upon payment of a duplicating fee, by writing to the SEC. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish The Bank of New York Mellon, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

In accordance with NASDAQ Stock Market Rule 5250(d), we will post this annual report on Form 20-F on our website at http://ir.baidu.com. In addition, we will provide hardcopies of our annual report free of charge to shareholders and ADS holders upon request.

**I.    Subsidiary Information**

Not applicable.

**Item 11.    Quantitative and Qualitative Disclosures about Market Risk**

**Interest Rate Risk**

Our exposure to interest rate risk primarily relates to excess cash invested in short-term instruments with original maturities of less than a year and bank borrowings that have a floating rate of interest.

Investments in both fixed rate and floating rate interest earning instruments carry a degree of interest rate risk. Fixed rate securities may have their fair market value adversely impacted due to a rise in interest rates, while floating rate securities may produce less income than expected if interest rates fall. Due in part to these factors, our future investment income may fall short of expectations due to changes in interest rates, or we may suffer losses in principal if we have to sell securities which have declined in market value due to changes in interest rates. For example, as of December 31, 2018 we had RMB101.7 billion (US$14.8 billion) fixed-income short-term investments, with a weighted average duration of approximately 0.5 years. A hypothetical one

129

**Table of Contents**

percentage point (100 basis-point) increase in interest rates would have resulted in a decrease of approximately RMB196 million (US$28 million) in the fair value of our fixed-income short-term investments as of December 31, 2018. We have not been, and do not expect to be, exposed to material interest rate risks relating to our investment in short-term instruments, and therefore have not used any derivative financial instruments to manage such interest risk exposure.

Our exposure to interest rate risk also arises from our bank borrowings that have a floating rate of interest. The costs of floating rate borrowings may be affected by the fluctuations in the interest rates. We manage this risk by maintaining an appropriate mix between fixed and floating rate borrowings and through the use of interest rate swap contracts. In connection with the loan facilities entered into in June 2016, we entered into four interest rate swap agreements, which effectively convert the term loans from a variable interest rate to a fixed rate, thereby managing our exposure to changes in market interest rates under the term loans. See "Item 5.B. Operating and Financial Review and Prospects—Liquidity and Capital Resources."

**Foreign Exchange Risk**

Most of our revenues and costs are denominated in RMB, while a portion of our cash and cash equivalents, restricted cash, short-term financial assets, long-term investments, long-term loans payable, notes payable and convertible senior notes are denominated in U.S. dollars. Any significant revaluation of RMB against the U.S. dollar may materially affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADS in U.S. dollars. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Fluctuation in the value of the RMB may have a material and adverse effect on our results of operations and the value of your investment." In addition, we commenced operation in Japan in late 2007. To the extent we need to make capital injections into our Japan operation by converting U.S. dollars into Japanese Yen, we will be exposed to the fluctuations in the exchange rate between the U.S. dollar and the Japanese Yen. We have not used any derivative financial instruments to hedge exposure to foreign exchange risk.

The RMB depreciated by 5% against the U.S. dollar in 2018. As of December 31, 2018, we had RMB-denominated cash and cash equivalents, restricted cash and short-term investments of RMB104.0 billion, and U.S. dollar-denominated cash and cash equivalents, restricted cash and short-term investments of US$5.4 billion. Assuming we had converted RMB104.0 billion into U.S. dollars at the exchange rate of RMB6.8755 for US$1.00 as of the end of 2018, our U.S. dollar cash balance would have been US$20.5 billion. If the RMB had appreciated by 10% against the U.S. dollar, our U.S. dollar cash balance would have been US$22.2 billion instead. Assuming we had converted US$5.4 billion into RMB at the exchange rate of RMB6.8755 for US$1.00 as of the end of 2018, our RMB cash balance would have been RMB141.2 billion. If the RMB had appreciated by 10% against the U.S. dollar, our RMB cash balance would have been RMB137.5 billion instead. In addition, we had U.S. dollar-denominated long-term loans payable, notes payable and convertible senior notes of US$9.0 billion as of December 31, 2018. A hypothetical 10% increase in the exchange rate of the U.S. dollar against the RMB would have resulted in an increase of RMB6.2 billion (US$900 million) in the value of our U.S. dollar-denominated long-term loans payable and notes payable as of December 31, 2018.

**Item 12.    Description of Securities Other than Equity Securities**

**A.    Debt Securities**

Not applicable.

**B.    Warrants and Rights**

Not applicable.

Table of Contents

**C.** **Other Securities**

Not applicable.

**D.** **American Depositary Shares**

**Fees and Charges Our ADS holders May Have to Pay**

The Bank of New York Mellon is the depositary of our ADS program. A holder of ADSs may have to pay certain fees of The Bank of New York Mellon, as depositary, and certain taxes, registration and transfer charges and fees and governmental charges and fees. The depositary collects fees for delivery and surrender of ADSs directly from holders depositing shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to holders by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deductions from cash distributions or by directly billing holders or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to deliver ADSs or deposited shares or to forward any distributions until its fees for those services are paid. The Depositary's Office is located at 240 Greenwich Street, New York, New York 10286.

| Persons depositing or withdrawing shares must pay: | For: |
|---|---|
| US$5.00 or less per 100 ADSs (or portion thereof) | • Issuance of ADSs, including issuances resulting from a distribution of shares or rights or other property |
| US$5.00 or less per 100 ADS (or portion thereof) | • Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| US$0.02 or less per ADS (or portion thereof) | • Any cash distribution to ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed had been shares and the shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to ADS holders |
| US$0.02 or less per ADS (or portion thereof) per calendar year (if the depositary has not collected any cash distribution fee during that year) | • Depositary services |
| Expenses of the depositary | • Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |
| | • Converting foreign currency to U.S. dollars |
| Registration or transfer fees | • Transfer and registration of shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw shares |
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

**Fees and Other Payments Made by the Depositary to Us**

The depositary has agreed to reimburse us annually for our expenses incurred in connection with investor relationship programs and any other program related to our ADS facility and the travel expense of our key

131

**Table of Contents**

personnel in connection with such programs. The depositary has also agreed to provide additional payments to us based on the applicable performance indicators relating to our ADS facility. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not necessarily tied to the amount of fees the depositary collects from investors. In 2019, we are expecting to receive certain insignificant amount of reimbursement from the depositary for our expenses incurred in connection with investor relationship programs related to the ADS facility and the travel expense of our key personnel in connection with such programs.

PART II

**Item 13.      Defaults, Dividend Arrearages and Delinquencies**

    None.

**Item 14.      Material Modifications to the Rights of Security Holders and Use of Proceeds**

    None.

**Item 15.      Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

    Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

    Based upon that evaluation, our management has concluded that, as of December 31, 2018, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

    Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) of the Exchange Act, based on criteria established in the framework in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2018.

    Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness of our internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

    Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2018, as stated in its report, which appears on page F-2 of this annual report on Form 20-F.

132

**Table of Contents**

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 16A.    Audit Committee Financial Expert**

Our board of directors has determined that Mr. Brent Callinicos, an independent director (under the standards set forth in NASDAQ Stock Market Rule 5605(a)(2) and Rule 10A-3 under the Exchange Act) and chairman of our audit committee, is an audit committee financial expert.

**Item 16B.    Code of Ethics**

In July 2005, our board of directors adopted a code of business conduct and ethics that applies to our directors, officers, employees and advisors. We have posted a copy of our code of business conduct and ethics on our website at http://ir.baidu.com.

**Item 16C.    Principal Accountant Fees and Services**

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated.

|  | 2017 (RMB in thousands) | 2018 (RMB in thousands) |
|---|---|---|
| Audit fees[1] | 20,313 | 29,074 |
| Audit-related fees[2] | 300 | 4,697 |
| Tax fees[3] | 209 | 208 |

(1)    "Audit fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements and assistance with and review of documents filed with the SEC. In 2017 and 2018, the audit refers to financial audit and audit pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.

(2)    "Audit-related fees" means fees billed in 2017 and 2018 for professional services rendered by our principal auditors associated with certain due diligence projects.

(3)    "Tax fees" means the aggregate fees billed in each of the fiscal years listed for professional services rendered by our principal auditors for tax compliance, tax advice, and tax planning. In 2017 and 2018, the tax fees refer to fees paid to our principal auditors for reviewing the compliance of our tax documentation and providing tax advices.

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee. Our audit committee has adopted a combination of two approaches in pre-approving proposed services: general pre-approval and specific pre-approval. With general approval, proposed services are pre-approved without consideration of specific case-by-case services; with specific approval, proposed services require the specific pre-approval of the audit committee. Unless a type of service has received general pre-approval, it will require specific pre-approval by our audit committee. Any proposed services exceeding pre-approved cost levels or budgeted amounts will also require specific pre-approval by our audit committee.

All requests or applications for services to be provided by our independent auditors that do not require specific approval by our audit committee will be submitted to our chief financial officer and must include a detailed description of the services to be rendered. The chief financial officer will determine whether such services are included within the list of services that have received the general pre-approval of the audit

133

**Table of Contents**

committee. The audit committee will be informed on a timely basis of any such services. Requests or applications to provide services that require specific approval by our audit committee will be submitted to the audit committee by both our independent auditors and our chief financial officer and must include a joint statement as to whether, in their view, the request or application is consistent with the SEC's rules on auditor independence.

**Item 16D.    Exemptions from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

On June 26, 2018, our board of directors authorized a share repurchase program, under which we may repurchase up to US$1.0 billion of our ADSs or ordinary shares over 12 months from June 27, 2018 through June 26, 2019. The share repurchase program was publicly announced on June 27, 2018. The table below is a summary of the shares repurchased by us in 2018. All shares were repurchased in the open market pursuant to the share repurchase program announced on June 27, 2018.

| Period | Total Number of ADSs Purchased | Average Price Paid Per ADS | Total Number of ADSs Purchased as Part of the Publicly Announced Plan | Approximate Dollar Value of ADSs that May Yet Be Purchased Under the Plan |
|---|---|---|---|---|
| June 1 – June 30, 2018 | 778,448 | US$ 239.98 | 778,448 | US$ 813,188,360 |
| August 1 – August 31, 2018 | 1,293,200 | US$ 232.29 | 1,293,200 | US$ 512,786,923 |
| September 1 – September 30, 2018 | 2 | US$ 231.86 | 2 | US$ 512,786,460 |
| **Total** | **2,071,650** | **US$ 235.18** | **2,071,650** | **US$ 512,786,460** |

**Item 16F.    Change in Registrant's Certifying Accountant**

Not applicable.

**Item 16G.    Corporate Governance**

NASDAQ Stock Market Rule 5620 requires each issuer to hold an annual meeting of shareholders no later than one year after the end of the issuer's fiscal year-end. However, NASDAQ Stock Market Rule 5615(a)(3) permits foreign private issuers like us to follow "home country practice" in certain corporate governance matters. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to hold annual shareholder meetings every year. We follow home country practice with respect to annual meetings and did not hold an annual meeting of shareholders in 2018. We may, however, hold annual shareholder meetings in the future if there are significant issues that require shareholders' approvals. In the third quarter of 2018, our board of directors approved a 2018 share incentive plan. We relied on home country practice exemption and did not convene a shareholder meeting to approve the 2018 share incentive plan. Maples and Calder (Hong Kong) LLP, our Cayman Islands counsel, has provided a letter to the NASDAQ Stock Market certifying that under Cayman Islands law, we are not required to obtain shareholder approval in respect of the adoption of a stock option or other equity compensation arrangement, or an amendment to the stock option or other equity compensation plan.

Other than the practice described above, there are no significant differences between our corporate governance practices and those followed by U.S. domestic companies under NASDAQ Stock Market Rules.

**Item 16H.    Mine Safety Disclosure**

Not applicable.

134

Table of Contents

**PART III**

**Item 17.**      **Financial Statements**

We have elected to provide financial statements pursuant to Item 18.

**Item 18.**      **Financial Statements**

The consolidated financial statements of Baidu, Inc., its subsidiaries and its consolidated affiliated entities are included at the end of this annual report.

**Item 19.**      **Exhibits**

| Exhibit Number | Description of Document |
| --- | --- |
| 1.1 | Third Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated by reference to Exhibit 99.2 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 2.1 | Registrant's Specimen American Depositary Receipt (incorporated by reference to Exhibit 1 of the prospectus filed with the Securities and Exchange Commission on January 5, 2009 pursuant to Rule 424(b)(3) under the Securities Act) |
| 2.2 | Registrant's Specimen Certificate for Class A Ordinary Shares (incorporated by reference to Exhibit 4.2 of Amendment No. 5 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on August 2, 2005) |
| 2.3 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 to our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 2.4 | Indenture, dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.5 | First Supplemental Indenture dated November 28, 2012 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.6 | Form of 2.250% Notes due 2017 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.7 | Form of 3.500% Notes due 2022 (incorporated by reference to Exhibit 4.2 to Form 6-K furnished with the Securities and Exchange Commission on November 28, 2012) |
| 2.8 | Second Supplemental Indenture dated August 6, 2013 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.9 | Form of 3.250% Notes due 2018 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on August 6, 2013) |
| 2.10 | Third Supplemental Indenture dated June 9, 2014 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.11 | Form of 2.750% Notes due 2019 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on June 9, 2014) |
| 2.12 | Fourth Supplemental Indenture dated June 30, 2015 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |

135

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 2.13 | Form of 3.00% Notes due 2020 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.14 | Form of 4.125% Notes due 2025 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 2, 2015) |
| 2.15 | Fifth Supplemental Indenture dated July 6, 2017 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 2.16 | Form of 2.875% Notes due 2022 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 2.17 | Form of 3.625% Notes due 2027 (incorporated by reference to Exhibit 4.1 to Form 6-K furnished with the Securities and Exchange Commission on July 7, 2017) |
| 2.18 | Sixth Supplemental Indenture dated March 29, 2018 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.19 | Form of 3.875% Notes due 2023 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.20 | Form of 4.375% Notes due 2028 (incorporated by reference to Exhibit 4.5 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.21 | Seventh Supplemental Indenture dated November 14, 2018 between the Registrant and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.8 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.22 | Form of 4.375% Notes due 2024 (incorporated by reference to Exhibit 4.8 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.23 | Form of 4.875% Notes due 2028 (incorporated by reference to Exhibit 4.8 to Form 6-K furnished with the Securities and Exchange Commission on November 15, 2018) |
| 2.24* | Indenture dated December 4, 2018 between iQIYI, Inc. and Citicorp International Limited, as trustee |
| 2.25* | Form of 3.75% Notes due 2023 |
| 4.1 | 2000 Option Plan (amended and restated effective December 16, 2008) (incorporated by reference to Exhibit 99.3 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.2 | 2008 Share Incentive Plan (incorporated by reference to Exhibit 99.4 of Form 6-K furnished with the Securities and Exchange Commission on December 17, 2008) |
| 4.3 | Form of Indemnification Agreement between the Registrant and the Registrant's directors (incorporated by reference to Exhibit 10.3 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.4 | Form of Employment Agreement between the Registrant and an Executive Officer of the Registrant (incorporated by reference to Exhibit 10.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.5 | Translation of Exclusive Technology Consulting and Services Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom and the supplementary agreement dated April 22, 2010 (incorporated by reference to Exhibit 4.6 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.6 | Translation of Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.4 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |

136

**Table of Contents**

| Exhibit Number | Description of Document |
|---|---|
| 4.7 | Translation of Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 99.5 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.8 | Translation of Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 99.8 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.9 | Translation of Proxy Agreement dated August 9, 2004 among Baidu Online, Baidu Netcom, Robin Yanhong Li and Eric Yong Xu (incorporated by reference to Exhibit 99.9 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 4.10* | English summary of the form of Exclusive Technology Consulting and Services Agreement/Exclusive Business Cooperation Agreement between a subsidiary of the Registrant and a consolidated affiliated PRC entity |
| 4.11* | English summary of the form of Operating Agreement among a subsidiary of the Registrant, a consolidated affiliated PRC entity and the shareholders of consolidated PRC entity |
| 4.12* | English summary of the form of Web Layout Copyright License Agreement, Software License Agreement and Trademark License Agreement between a subsidiary of the Registrant and a consolidated affiliated PRC entity |
| 4.13* | English summary of the form of Proxy Agreement/Power of Attorney among a subsidiary of the Registrant, a consolidated affiliated PRC entity and the shareholders of the consolidated affiliated PRC entity |
| 4.14* | English summary of the form of Equity Pledge Agreement between a subsidiary of the Registrant and the shareholder of a consolidated affiliated PRC entity |
| 4.15* | English summary of the form of Exclusive Equity Purchase Option Agreement among a subsidiary of the Registrant, a consolidated affiliated PRC entity, the shareholders of a consolidated affiliated PRC entity and an offshore Holding company (if applicable) |
| 4.16* | English summary of the form of Loan Agreement between a subsidiary of the Registrant and the shareholder of a consolidated affiliated PRC entity |
| 4.17 | Translation of the Supplementary Agreement to Exclusive Technology Consulting and Services Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal, dated as of April 22, 2010 (incorporated by reference to Exhibit 4.25 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.18 | Translation of the Web Layout Copyright License Agreement dated June 23, 2006 between Baidu Online and Beijing Perusal (incorporated by reference to Exhibit 4.27 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.19 | Translation of the supplementary agreements, dated March 11, 2010 and April 22, 2010 to the Software License Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.20 | Translation of the supplementary agreement dated March 1, 2010 to the Web Layout Copyright License Agreement dated March 1, 2004 between Baidu Online and Baidu Netcom and the supplementary agreement dated August 9, 2004 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |

137

**Table of Contents**

| Exhibit Number | Description of Document |
| --- | --- |
| 4.21 | Translation of the supplementary agreement dated April 22, 2010 to the Operating Agreement dated March 22, 2005 between Baidu Online and Baidu Netcom (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2011) |
| 4.22 | Translation of the supplementary agreement to the Loan Agreement among Robin Yanhong Li, Baidu Netcom and Baidu Online dated September 6, 2011 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.23 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.24 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated January 30, 2011 (incorporated by reference to Exhibit 4.69 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 29, 2012) |
| 4.25 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.64 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.26 | Translation of the supplementary agreement to the Software License Agreement between Baidu Online and Baidu Netcom dated August 15, 2013 (incorporated by reference to Exhibit 4.65 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.27 | Translation of the supplementary agreement to the Web Layout Copyright License Agreement between Baidu Online and Beijing Perusal dated August 15, 2013 (incorporated by reference to Exhibit 4.66 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 28, 2014) |
| 4.28 | Translation of the Termination Agreements among Baidu Online, Beijing Perusal, Jiping Liu and Yazhu Zhang, former individual shareholders of Beijing Perusal, dated March 15, 2016 and May 3, 2016, respectively (incorporated by reference to Exhibit 4.34 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.29 | Translation of the Amended and Restated Loan Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 (incorporated by reference to Exhibit 4.35 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.30 | Translation of the Equity Transfer Agreements between Jiping Liu and Zhixiang Liang, between Jiping Liu and Xiaodong Wang, and between Yazhu Zhang and Xiaodong Wang, all dated May 3, 2016 (incorporated by reference to Exhibit 4.36 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.31 | Translation of Proxy Agreement among Zhixiang Liang and Baidu Online and of Proxy Agreement among Xiaodong Wang and Baidu Online, both dated May 3, 2016 (incorporated by reference to Exhibit 4.37 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.32 | Translation of the Operating Agreement among Baidu Online, Beijing Perusal, Zhixiang Liang, and Xiaodong Wang, dated May 3, 2016 (incorporated by reference to Exhibit 4.38 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |

138

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 4.33 | Translation of the Amended and Restated Equity Pledge Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated June 20, 2016 (incorporated by reference to Exhibit 4.39 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.34 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreements among Baidu Online, Zhixiang Liang and Beijing Perusal, and among Baidu Online, Xiaodong Wang and Beijing Perusal, both dated June 20, 2016 (incorporated by reference to Exhibit 4.40 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.35 | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, the individual shareholder of Beijing Perusal, dated May 3, 2016 (incorporated by reference to Exhibit 4.41 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.36 | Translation of Irrevocable Power of Attorney issued by Xiaodong Wang, the individual shareholder of Beijing Perusal, dated May 3, 2016 (incorporated by reference to Exhibit 4.42 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.37 | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Baidu Netcom, Robin Yanhong Li and Zhan Wang dated June 13, 2016 (incorporated by reference to Exhibit 4.43 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.38 | Translation of the Amended and Restated Loan Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 (incorporated by reference to Exhibit 4.44 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.39 | Translation of the Amended and Restated Loan Agreement between Baidu Online and Yanhong Li dated January 18, 2017 (incorporated by reference to Exhibit 4.45 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.40 | Translation of the Equity Transfer Agreement between Zhan Wang and Hailong Xiang dated June 13, 2016 (incorporated by reference to Exhibit 4.46 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.41 | Translation of the Proxy Agreement among Robin Yanhong Li, Hailong Xiang and Baidu Online dated June 13, 2016 (incorporated by reference to Exhibit 4.47 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.42 | Translation of the Operating Agreement among Baidu Online, Baidu Netcom, Robin Yanhong Li, Hailong Xiang dated June 13, 2016 (incorporated by reference to Exhibit 4.48 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.43 | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Hailong Xiang dated January 18, 2017 (incorporated by reference to Exhibit 4.49 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.44 | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Yanhong Li dated January 18, 2017 (incorporated by reference to Exhibit 4.50 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.45 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Hailong Xiang and Baidu Netcom dated January 18, 2017 (incorporated by reference to Exhibit 4.51 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |

139

| Exhibit Number | Description of Document |
|---|---|
| 4.46 | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu Online, Yanhong Li and Baidu Netcom dated January 18, 2017 (incorporated by reference to Exhibit 4.52 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.47 | Translation of Irrevocable Power of Attorney issued by Robin Yanhong Li, an individual shareholder of Baidu Netcom, dated June 13, 2016 (incorporated by reference to Exhibit 4.53 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.48 | Translation of Irrevocable Power of Attorney issued by Hailong Xiang, an individual shareholder of Baidu Netcom, dated June 13, 2016 (incorporated by reference to Exhibit 4.54 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.49 | Standstill Agreement between Baidu, Inc. and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 3 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 4, 2015) |
| 4.50 | Registration Rights Agreement between Baidu Holdings Limited and Ctrip.com International, Ltd. dated October 26, 2015 (incorporated by reference to Exhibit 4 of our Report on Schedule 13D filed with the Securities and Exchange Commission with respect to Ctrip.com International, Ltd. on November 4, 2015) |
| 4.51 | US$2,000,000,000 Facilities Agreement between the Registrant and other parties thereto dated June 8, 2016 (incorporated by reference to Exhibit 4.68 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2017) |
| 4.52* | Share Purchase Agreement among Ali Panini Investment Limited, certain individuals, their respective holding companies, and selling shareholders party thereto, Ali Panini Investment Holding Limited and Rajax Holding, dated April 2, 2018 |
| 4.53 | Merger Agreement among Rajax Holding, Rajax Merger Sub Limited, Xiaodu Life Technology Ltd and Baidu (Hong Kong) Limited, dated August 24, 2017 (incorporated by reference to Exhibit 4.67 of our Annual Report on Form 20-F filed with the Securities and Exchange Commission on March 31, 2018) |
| 4.54* | Share Purchase Agreement among Baidu Holdings Limited, Baidu (Hong Kong) Limited, 91 Wireless Websoft Limited and certain investors party thereto, dated April 28, 2018 and as amended on August 21, 2018 |
| 4.55* | Amended and Restated Shareholders Agreement among Baidu Holdings Limited, Baidu (Hong Kong) Limited, Duxiaoman (Cayman) Limited and certain investors party thereto, dated November 17, 2018 |
| 4.56* | 2018 Share Incentive Plan |
| 4.57* | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Baidu Netcom, Robin Yanhong Li, Hailong Xiang and Baidu, Inc. dated March 31, 2018 |
| 4.58* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Hailong Xiang dated May 7, 2018 |
| 4.59* | Translation of the Amended and Restated Loan Agreement between Baidu Online and Yanhong Li dated May 7, 2018 |
| 4.60* | Translation of the Proxy Agreement between Robin Yanhong Li and Baidu, Inc. dated March 31, 2018 |
| 4.61* | Translation of the Proxy Agreement between Hailong Xiang and Baidu, Inc. dated March 31, 2018 |

140

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 4.62* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu, Inc., Baidu Netcom, Baidu Online and Hailong Xiang dated May 7, 2018 |
| 4.63* | Translation of the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement among Baidu, Inc., Baidu Netcom, Baidu Online and Yanhong Li dated May 7, 2018 |
| 4.64* | Translation of Irrevocable Power of Attorney issued by Robin Yanhong Li, an individual shareholder of Baidu Netcom, March 31, 2018 |
| 4.65* | Translation of Irrevocable Power of Attorney issued by Hailong Xiang, an individual shareholder of Baidu Netcom, dated March 31, 2018 |
| 4.66* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Hailong Xiang dated May 7, 2018 |
| 4.67* | Translation of the Amended and Restated Equity Pledge Agreement between Baidu Online and Yanhong Li dated May 7, 2018 |
| 4.68* | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Beijing Perusal, Zhixiang Liang, Xiaodong Wang, and Baidu, Inc. dated March 31, 2018 |
| 4.69* | Translation of the Loan Agreements between Baidu Online and Zhixiang Liang, and between Baidu Online and Xiaodong Wang, both dated March 31, 2018 |
| 4.70* | Translation of Proxy Agreements between Zhixiang Liang and Baidu, Inc., and between Xiaodong Wang and Baidu, Inc., dated March 31, 2018 |
| 4.71* | Translation of Irrevocable Power of Attorney issued by Zhixiang Liang, an individual shareholder of Beijing Perusal, March 31, 2018 |
| 4.72* | Translation of Irrevocable Power of Attorney issued by Xiaodong Wang, an individual shareholder of Beijing Perusal, March 31, 2018 |
| 4.73* | Translation of the Exclusive Equity Purchase and Transfer Option Agreement among Baidu, Inc., Baidu Online, Zhixiang Liang and Beijing Perusal, dated March 31, 2018 |
| 4.74* | Translation of the Exclusive Equity Purchase and Transfer Option Agreement among Baidu, Inc., Baidu Online, Xiaodong Wang and Beijing Perusal, dated March 31, 2018 |
| 4.75* | Translation of the Termination Agreement of Current Control Contracts among Baidu Online, Beijing Perusal, Zhixiang Liang, Xiaodong Wang, and Baidu, Inc. dated June 28, 2018 |
| 4.76* | Translation of the Equity Transfer Agreements between Xiaodang Wang and Lu Wang, dated June 28, 2018 |
| 4.77* | Translation of the Operating Agreement among Baidu Online, Beijing Perusal, Zhixiang Liang, and Lu Wang, dated June 28, 2018 |
| 4.78* | Translation of the Loan Agreement between Baidu Online and Lu Wang, dated June 28, 2018 |
| 4.79* | Translation of Proxy Agreement between Lu Wang and Baidu, Inc., dated June 28, 2018 |
| 4.80* | Translation of Irrevocable Power of Attorney issued by Lu Wang, an individual shareholder of Beijing Perusal, dated June 28, 2018 |
| 4.81* | Translation of the Exclusive Equity Purchase and Transfer Option Agreements among Baidu, Inc., Baidu Online, Lu Wang and Beijing Perusal, dated June 28, 2018 |
| 4.82* | Translation of the Pledge Agreement between Baidu Online and Lu Wang, dated June 28, 2018 |
| 4.83* | Translation of the Termination Agreement of Current Control Contracts among Baidu, Inc, Baidu Online, BaiduPay, Zhixiang Liang, Baidu Netcom, An Yi Heng Tong (Beijing) Co., Ltd., and Hailong Xiang, dated July 8, 2018 |
| 8.1* | List of Principal Subsidiaries and Consolidated Affiliated Entities |

141

Table of Contents

| Exhibit Number | Description of Document |
|---|---|
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.14 of our Registration Statement on Form F-1 (file no. 333-126534) filed with the Securities and Exchange Commission on July 12, 2005) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Maples and Calder (Hong Kong) LLP |
| 15.2* | Consent of Han Kun Law Offices |
| 15.3* | Consent of Ernst & Young Hua Ming LLP |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*      Filed herewith
\*\*     Furnished herewith

142

**Table of Contents**

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Baidu, Inc.

By: /s/ Robin Yanhong Li
        Name: Robin Yanhong Li
        Title: Chairman and Chief Executive Officer

Date: March 15, 2019

143

**Table of Contents**

BAIDU, INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

|  | Page(s) |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 – F-3 |
| Consolidated Balance Sheets as of December 31, 2017 and 2018 | F-4 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2016, 2017 and 2018 | F-5 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2016, 2017 and 2018 | F-6 – F-7 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2016, 2017 and 2018 | F-8 – F-9 |
| Notes to the Consolidated Financial Statements | F-10 – F-71 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of Baidu, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Baidu, Inc. (the "Company") as of December 31, 2017 and 2018, the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2018, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Baidu, Inc. at December 31, 2017 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 15, 2019 expressed an unqualified opinion thereon.

**Adoption of New Accounting Standards**

As discussed in Note 2 to the consolidated financial statements, the Company changed its method for accounting for revenue from contracts with customers using a modified retrospective approach and its method for accounting for the recognition, measurement, presentation and disclosure of certain equity securities in the year ended December 31, 2018.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the US federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Ernst & Young Hua Ming LLP

We have served as the Company's auditor since 2007.
Beijing, The People's Republic of China
March 15, 2019

F-2

**Table of Contents**

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Shareholders and the Board of Directors of Baidu, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Baidu, Inc.'s internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the "COSO criteria"). In our opinion, Baidu, Inc. (the "Company") maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2017 and 2018, the related consolidated statements of comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2018, and the related notes of the Company and our report dated March 15, 2019 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 15, 2019

F-3

**Table of Contents**

BAIDU, INC.
CONSOLIDATED BALANCE SHEETS
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares and per share data)

| | Notes | As of December 31, 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 11,084 | 27,638 | 4,020 |
| Restricted cash | | 252 | 2,189 | 318 |
| Short-term investments | 4 | 89,381 | 111,626 | 16,235 |
| Other invested securities | 4 | 18,350 | — | — |
| Accounts receivable, net of allowance of RMB316 and RMB599 (US$87) for 2017 and 2018, respectively | 5 | 4,571 | 6,015 | 875 |
| Loans and interest receivable, current portion net of allowances of RMB660 and RMB nil (US$ nil) for 2017 and 2018, respectively | | 23,938 | — | — |
| Amounts due from related parties | 20 | 168 | 785 | 114 |
| Other current assets, net | 6 | 3,425 | 6,841 | 995 |
| **Total current assets** | | **151,169** | **155,094** | **22,557** |
| **Non-current assets:** | | | | |
| Fixed assets, net | 7 | 12,475 | 17,903 | 2,604 |
| Intangible assets, net | 8 | 5,467 | 9,181 | 1,335 |
| Goodwill | 8 | 15,806 | 18,536 | 2,696 |
| Long-term investments, net | 4 | 56,283 | 80,454 | 11,702 |
| Deferred tax assets, net | 13 | 1,532 | 2,324 | 338 |
| Loans and interest receivable, non-current portion net of allowances of RMB104 and RMB nil (US$ nil) for 2017 and 2018, respectively | | 3,467 | — | — |
| Amounts due from related parties | 20 | 9 | 4,297 | 625 |
| Other non-current assets | | 5,520 | 9,777 | 1,422 |
| **Total non-current assets** | | **100,559** | **142,472** | **20,722** |
| **Total assets** | | **251,728** | **297,566** | **43,279** |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB18,775 and RMB19,851 (US$2,887) as of December 31, 2017 and 2018, respectively): | 1 | | | |
| Short-term loans | 10 | 1,244 | 3,046 | 443 |
| Accounts payable and accrued liabilities | 9 | 27,523 | 35,381 | 5,147 |
| Amounts due to the third-party investors | | 38,486 | — | — |
| Customer advances and deposits | | 6,785 | 7,338 | 1,067 |
| Deferred revenue | | 788 | 1,883 | 274 |
| Deferred income | | 568 | 523 | 76 |
| Long-term loans, current portion | 10 | 10 | 84 | 12 |
| Notes payable, current portion | 11 | 6,500 | 6,871 | 999 |
| Amounts due to related parties | 20 | 153 | 1,727 | 251 |
| **Total current liabilities** | | **82,057** | **56,853** | **8,269** |
| **Non-current liabilities** (including amounts of the consolidated VIEs without recourse to the primary beneficiaries of RMB5,151 and RMB11,790 (US$1,715) as of December 31, 2017 and 2018, respectively): | 1 | | | |
| Deferred revenue | | — | 1,309 | 190 |
| Deferred income | | 73 | 54 | 8 |
| Long-term loans | 10 | 6,701 | 7,456 | 1,084 |
| Notes payable | 11 | 29,111 | 42,735 | 6,216 |
| Convertible senior notes | 12 | — | 4,712 | 685 |
| Deferred tax liabilities | 13 | 3,375 | 4,099 | 596 |
| Amounts due to related parties | 20 | — | 4,360 | 634 |
| Other non-current liabilities | | 39 | 236 | 34 |
| **Total non-current liabilities** | | **39,299** | **64,961** | **9,447** |
| **Total liabilities** | | **121,356** | **121,814** | **17,716** |
| Commitments and contingencies | 15 | | | |
| Redeemable noncontrolling interests | 16 | **11,022** | **716** | **104** |
| **Equity** | | | | |
| Class A ordinary shares, par value US$0.00005 per share, 825,000,000 shares authorized as at December 31, 2017 and 2018; 27,614,978 shares and 27,733,692 shares issued and outstanding as at December 31, 2017 and 2018, respectively | 17 | — | — | — |
| Class B ordinary shares, par value US$0.00005 per share, 35,400,000 shares authorized as at December 31, 2017 and 2018; 7,201,254 shares and 7,201,254 shares issued and outstanding as at December 31, 2017 and 2018, respectively | 17 | — | — | — |
| Additional paid-in capital | | 12,088 | 33,441 | 4,864 |
| Retained earnings | 17 | 102,328 | 129,246 | 18,798 |
| Accumulated other comprehensive income | 17 | 930 | 210 | 31 |
| **Total Baidu, Inc. shareholders' equity** | | **115,346** | **162,897** | **23,693** |
| **Noncontrolling interests** | | **4,004** | **12,139** | **1,766** |
| **Total equity** | | **119,350** | **175,036** | **25,459** |
| **Total liabilities, redeemable noncontrolling interests and equity** | | **251,728** | **297,566** | **43,279** |

The accompanying notes are an integral part of the consolidated financial statements.

F-4

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares and per share (or ADS) data)

| | Notes | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
| Revenues: | | | | | |
| Online marketing services | | 64,525 | 73,146 | 81,912 | 11,914 |
| Others | | 6,024 | 11,663 | 20,365 | 2,962 |
| **Total revenues** | 2 | **70,549** | **84,809** | **102,277** | **14,876** |
| Operating costs and expenses: | | | | | |
| Cost of revenues | | 35,278 | 43,062 | 51,744 | 7,526 |
| Selling, general and administrative | | 15,071 | 13,128 | 19,231 | 2,797 |
| Research and development | | 10,151 | 12,928 | 15,772 | 2,294 |
| **Total operating costs and expenses** | | **60,500** | **69,118** | **86,747** | **12,617** |
| **Operating profit** | | **10,049** | **15,691** | **15,530** | **2,259** |
| Other income: | | | | | |
| Interest income | | 2,342 | 3,154 | 4,451 | 647 |
| Interest expense | | (1,158) | (1,615) | (1,883) | (274) |
| Foreign exchange income (loss), net | | 508 | (482) | (122) | (18) |
| Loss from equity method investments | 4 | (1,026) | (63) | (79) | (11) |
| Others, net | 4 | 3,794 | 4,598 | 9,428 | 1,371 |
| **Total other income, net** | | **4,460** | **5,592** | **11,795** | **1,715** |
| **Income before income taxes** | | **14,509** | **21,283** | **27,325** | **3,974** |
| Income taxes | 13 | 2,913 | 2,995 | 4,743 | 690 |
| **Net income** | | **11,596** | **18,288** | **22,582** | **3,284** |
| Less: net income (loss) attributable to noncontrolling interests | | (36) | (13) | (4,991) | (726) |
| **Net income attributable to Baidu, Inc.** | | **11,632** | **18,301** | **27,573** | **4,010** |
| Earnings per share for Class A and Class B ordinary shares: | 18 | | | | |
| Basic | | 319.47 | 527.51 | 786.36 | 114.37 |
| Diluted | | 318.62 | 524.08 | 780.27 | 113.49 |
| Earnings per ADS (1 Class A ordinary share equals 10 ADSs): | 18 | | | | |
| Basic | | 31.95 | 52.75 | 78.64 | 11.44 |
| Diluted | | 31.86 | 52.41 | 78.03 | 11.35 |
| Weighted average number of Class A and Class B ordinary shares outstanding: | | | | | |
| Basic | | 34,665,238 | 34,725,123 | 34,898,589 | 34,898,589 |
| Diluted | | 34,757,086 | 34,952,391 | 35,171,043 | 35,171,043 |
| Other comprehensive (loss) income: | 17 | | | | |
| Foreign currency translation adjustments | | (593) | 803 | 194 | 28 |
| Unrealized (losses) gains on available-for-sale investments, net of reclassification | | (57) | 1,575 | 92 | 14 |
| **Other comprehensive (loss) income, net of tax** | | **(650)** | **2,378** | **286** | **42** |
| **Comprehensive income** | | **10,946** | **20,666** | **22,868** | **3,326** |
| Less: comprehensive income (loss) attributable to noncontrolling interests and redeemable noncontrolling interests | | 291 | (348) | (3,985) | (580) |
| **Comprehensive income attributable to Baidu, Inc.** | | **10,655** | **21,014** | **26,853** | **3,906** |

The accompanying notes are an integral part of the consolidated financial statements.

F-5

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from operating activities:** | | | | |
| Net income | 11,596 | 18,288 | 22,582 | 3,284 |
| Adjustments to reconcile net income to net cash generated from operating activities: | | | | |
| Depreciation of fixed assets and computer parts | 3,451 | 3,805 | 3,730 | 543 |
| Gain on disposal of fixed assets | (84) | (30) | (51) | (7) |
| Amortization of intangible assets and licensed copyrights | 4,876 | 7,943 | 12,457 | 1,812 |
| Deferred income tax, net | (14) | (756) | (761) | (111) |
| Share-based compensation | 1,760 | 3,244 | 4,676 | 681 |
| Provision for doubtful accounts | 269 | 585 | 451 | 66 |
| Investment income | (4,971) | (3,244) | (7,648) | (1,112) |
| Amortization and impairment of assets | 421 | 2,358 | 3,655 | 532 |
| Loss from equity method investments | 1,026 | 63 | 79 | 11 |
| Gain on disposal of subsidiaries | (1,247) | (5,550) | (5,525) | (804) |
| Barter transaction revenue | (382) | (763) | (1,083) | (158) |
| Other non-cash (income) expenses | (463) | 362 | 124 | 18 |
| Changes in operating assets and liabilities, net of effects of acquisitions and disposals: | | | | |
| Accounts receivable | (238) | (721) | (1,611) | (234) |
| Amounts due from related parties | 1,594 | 178 | 527 | 77 |
| Other assets | 237 | 1,259 | (1,333) | (195) |
| Customer advances and deposits | 646 | 763 | 510 | 74 |
| Accounts payable and accrued liabilities | 4,092 | 5,100 | 4,094 | 595 |
| Deferred revenue | 221 | 203 | 402 | 58 |
| Deferred income | 17 | 47 | (64) | (9) |
| Amounts due to related parties | (327) | (306) | 756 | 110 |
| **Net cash generated from operating activities** | **22,480** | **32,828** | **35,967** | **5,231** |
| **Cash flows from investing activities:** | | | | |
| Acquisition of fixed assets | (4,189) | (4,779) | (8,772) | (1,276) |
| Acquisition of computer parts | (26) | (50) | (89) | (13) |
| Disposal of fixed assets | 55 | 44 | 43 | 6 |
| Acquisition of businesses, net of cash acquired | — | (553) | (1,978) | (288) |
| Acquisition of intangible assets | (6,296) | (9,122) | (13,501) | (1,964) |
| Purchases of held-to-maturity investments | (47,634) | (56,150) | (27,640) | (4,020) |
| Maturities of held-to-maturity investments | 46,143 | 49,580 | 49,040 | 7,133 |
| Purchases of available-for-sale investments | (182,342) | (209,628) | (284,149) | (41,328) |
| Sales and maturities of available-for-sale investments | 173,821 | 198,517 | 239,861 | 34,886 |
| Purchases of other long-term investments | (4,005) | (12,499) | (9,891) | (1,439) |
| Sales of other long-term investments | 303 | 19 | 2,524 | 367 |
| Cash distribution from long-term investments | 5 | 13 | 47 | 7 |
| Disposal of subsidiaries' shares | 275 | 1,431 | 5,581 | 812 |
| Loans provided to related parties | — | — | (8,632) | (1,255) |
| Repayment of loans provided to related parties | — | — | 12,270 | 1,785 |
| Micro loan origination and disbursement | (7,920) | (63,597) | (35,824) | (5,210) |
| Principal payments received on micro loans | 3,556 | 40,075 | 38,063 | 5,536 |
| Purchases of other invested securities | (8,968) | (38,167) | (16,362) | (2,380) |
| Sales and maturities of other invested securities | 1,311 | 27,917 | 24,949 | 3,629 |
| **Net cash used in investing activities** | **(35,911)** | **(76,949)** | **(34,460)** | **(5,012)** |

The accompanying notes are an integral part of the consolidated financial statements.

F-6

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"))

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| **Cash flows from financing activities:** | | | | |
| Proceeds from short-term loans | 3,252 | 751 | 3,787 | 551 |
| Repayments of short-term loans | (1,940) | (826) | (1,055) | (153) |
| Proceeds from long-term loans | 6,633 | 299 | 1,168 | 170 |
| Repayments of long-term loans | (1,042) | (3,330) | (98) | (14) |
| Loans borrowed from related parties | — | — | 3,732 | 543 |
| Payments of capital lease obligation | (53) | (8) | — | — |
| Proceeds from issuance of long-term notes, net of issuance costs | — | 9,909 | 18,050 | 2,626 |
| Repayment of long-term notes | — | (4,957) | (6,846) | (996) |
| Proceeds from issuance of convertible notes, net of issuance costs | — | 8,463 | 5,035 | 732 |
| Purchase of capped call | — | — | (465) | (68) |
| Proceeds from issuance of subsidiaries' shares | 661 | 4,046 | 15,689 | 2,282 |
| Repurchase of ordinary shares | — | (1,723) | (3,312) | (482) |
| Proceeds from exercise of share options | 176 | 453 | 676 | 98 |
| Proceeds from third-party investors for sale of financial products | 10,426 | 101,189 | 15,143 | 2,202 |
| Repayment to third-party investors for sale of financial products | (3,666) | (82,987) | (33,376) | (4,854) |
| Proceeds from secured borrowings from third-party financial institutions | — | 16,008 | 10,380 | 1,510 |
| Repayment of secured borrowings from third-party financial institutions | — | (2,730) | (13,426) | (1,953) |
| **Net cash generated from financing activities** | **14,447** | **44,557** | **15,082** | **2,194** |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | 144 | (316) | 1,902 | 276 |
| **Net increase in cash, cash equivalents and restricted cash** | **1,160** | **120** | **18,491** | **2,689** |
| Cash, cash equivalents and restricted cash at beginning of the year | 10,056 | 11,216 | 11,336 | 1,649 |
| Cash, cash equivalents and restricted cash at end of the year | 11,216 | 11,336 | 29,827 | 4,338 |
| **Supplemental disclosures:** | | | | |
| Interest paid | 1,111 | 1,205 | 1,579 | 230 |
| Income taxes paid | 2,402 | 3,300 | 5,509 | 801 |
| **Non-cash investing and financing activities:** | | | | |
| Acquisition of fixed assets included in accounts payable and accrued liabilities | 903 | 1,167 | 1,516 | 220 |
| Acquisition of licensed copyrights included in accounts payable and accrued liabilities | 2,195 | 4,040 | 6,337 | 922 |
| Acquisition of licensed copyrights from nonmonetary content exchanges | 385 | 782 | 642 | 93 |
| Non-cash acquisitions of investments | 2,963 | 765 | 764 | 111 |

The accompanying notes are an integral part of the consolidated financial statements.

F-7

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares)

| | Attributable to Baidu, Inc. | | | | | | |
| | Ordinary shares | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive (loss) income | Noncontrolling interests | Total shareholders' equity |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
| **Balances at December 31, 2015** | **34,606,462** | **—** | **6,402** | **74,659** | **(806)** | **11** | **80,266** |
| Net income | — | — | — | 11,632 | — | (36) | 11,596 |
| Other comprehensive (loss) income | — | — | — | — | (977) | 2 | (975) |
| Exercise of share-based awards | 120,343 | — | 173 | — | — | — | 173 |
| Share-based compensation | — | — | 1,748 | — | — | — | 1,748 |
| Accretion of redeemable noncontrolling interests | — | — | — | (557) | — | — | (557) |
| **Balances at December 31, 2016** | **34,726,805** | **—** | **8,323** | **85,734** | **(1,783)** | **(23)** | **92,251** |
| Net income | — | — | — | 18,301 | — | (13) | 18,288 |
| Other comprehensive income | — | — | — | — | 2,713 | — | 2,713 |
| Issuance of shares by the Company's subsidiaries | — | — | 42 | — | — | 4,004 | 4,046 |
| Acquisition of noncontrolling interests in a subsidiary | — | — | 5 | — | — | (5) | — |
| Exercise of share-based awards | 235,210 | — | 454 | — | — | — | 454 |
| Share-based compensation | — | — | 3,264 | — | — | — | 3,264 |
| Accretion of redeemable noncontrolling interests | — | — | — | 17 | — | — | 17 |
| Repurchase and retirement of ordinary shares | (145,783) | — | — | (1,724) | — | — | (1,724) |
| Disposal of subsidiaries' shares | — | — | — | — | — | 41 | 41 |
| **Balances at December 31, 2017** | **34,816,232** | **—** | **12,088** | **102,328** | **930** | **4,004** | **119,350** |

The accompanying notes are an integral part of the consolidated financial statements.

F-8

Table of Contents

BAIDU, INC.
CONSOLIDATED STATEMENTS OF SHAREHOLDERS' EQUITY (CONTINUED)
(Amounts in millions of Renminbi ("RMB"), and in millions of U.S. Dollars ("US$"), except for number of shares)

| | Attributable to Baidu, Inc. | | | | | | |
| | Ordinary shares | | Additional paid-in capital | Retained earnings | Accumulated other comprehensive income (loss) | Noncontrolling interests | Total shareholders' equity |
| | Number of shares | Amount | | | | | |
| | | RMB | RMB | RMB | RMB | RMB | RMB |
|---|---|---|---|---|---|---|---|
| Balances at December 31, 2017 | 34,816,232 | — | 12,088 | 102,328 | 930 | 4,004 | 119,350 |
| Cumulative effect of accounting change | — | — | — | 2,787 | (1,854) | — | 933 |
| Net income | — | — | — | 27,573 | — | (4,991) | 22,582 |
| Other comprehensive income | — | — | — | — | 1,134 | 1,006 | 2,140 |
| Business combinations | — | — | 75 | — | — | 1,312 | 1,387 |
| Issuance of shares by the Company's subsidiaries | — | — | 14,984 | — | — | (733) | 14,251 |
| Exercise of share-based awards | 325,879 | — | 689 | — | — | — | 689 |
| Share-based compensation | — | — | 4,340 | — | — | 217 | 4,557 |
| Accretion of redeemable noncontrolling interests | — | — | — | (130) | — | (16) | (146) |
| Repurchase and retirement of ordinary shares | (207,165) | | — | (3,312) | — | — | (3,312) |
| Disposal of subsidiaries' shares | — | — | 1,323 | — | — | 235 | 1,558 |
| Conversion of iQIYI preferred shares recognized as redeemable noncontrolling interests to ordinary shares | — | — | — | — | — | 11,150 | 11,150 |
| Equity component of convertible senior notes, net of issuance costs | — | — | 206 | — | — | 156 | 362 |
| Purchase of capped call | — | — | (264) | — | — | (201) | (465) |
| Balances at December 31, 2018 | 34,934,946 | — | 33,441 | 129,246 | 210 | 12,139 | 175,036 |
| Balances at December 31, 2018, in US$ | | — | 4,864 | 18,798 | 31 | 1,766 | 25,459 |

The accompanying notes are an integral part of the consolidated financial statements

F-9

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

## 1.    ORGANIZATION, CONSOLIDATION AND PRESENTATION OF FINANCIAL STATEMENTS

Baidu, Inc. ("Baidu" or the "Company") was incorporated under the laws of the Cayman Islands on January 18, 2000. The Company, its subsidiaries, VIEs and subsidiaries of the VIEs are hereinafter collectively referred to as the "Group."

As of December 31, 2018, the Company has subsidiaries incorporated in countries and jurisdictions including the People's Republic of China ("PRC"), Hong Kong, Japan, Cayman Islands and British Virgin Islands ("BVI"). As of December 31, 2018, the Company also effectively controls a number of variable interest entities ("VIEs") through the Primary Beneficiaries, as defined below. The VIEs include:

•    Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), controlled by the Company;

•    Beijing Perusal Technology Co., Ltd. ("Beijing Perusal"), controlled by the Company; and

•    Other VIEs controlled by the Company or the Company's subsidiaries, including VIEs of iQIYI, Inc. ("iQIYI VIEs")

The Group offers online marketing services, operates AI-powered new business initiatives, and operates an online video platform offering membership services of its content library and online marketing services. The Group's principal geographic market is in the PRC. The Company does not conduct any substantive operations of its own, but conducts its primary business operations through its subsidiaries and VIEs in the PRC.

PRC laws and regulations prohibit or restrict foreign ownership of internet content, advertising, audio and video services, and mobile application distribution businesses. To comply with these foreign ownership restrictions, the Group operates its websites and primarily provides services subject to such restriction in the PRC through the VIEs, the PRC legal entities that were established or whose equity shares were held by the individuals authorized by the Group. The paid-in capital of the VIEs was mainly funded by the Company or its subsidiaries through loans extended to the authorized individuals who were the shareholders of the VIEs. The Company or its subsidiaries have entered into proxy agreements or powers of attorney and exclusive equity purchase option agreement with the VIEs and nominee shareholders of the VIEs through the Company or its subsidiaries ("Primary Beneficiaries"), which give the Primary Beneficiaries the power to direct the activities that most significantly affect the economic performance of the VIEs and to acquire the equity interests in the VIEs when permitted by the PRC laws, respectively. Certain exclusive agreements have been entered into with the VIEs through the Primary Beneficiaries or their subsidiaries in the PRC, which obligate the Primary Beneficiaries to absorb losses or receive economic benefits of the VIEs' that could potentially be significant to the VIEs or entitle the Primary Beneficiaries to receive economic benefits from the VIEs that could potentially be significant to the VIEs. In addition, the Company or its subsidiaries have entered into certain agreements with the shareholders of the VIEs through the Primary Beneficiaries or their subsidiaries, including loan agreements for the paid-in capital of the VIEs and equity pledge agreements for the equity interests in the VIEs held by the shareholders of the VIEs.

Despite the lack of legal majority ownership, there exists a parent-subsidiary relationship between the Primary Beneficiaries and the VIEs through the aforementioned agreements with the shareholders of the VIEs. The shareholders of the VIEs effectively assigned all of their voting rights underlying their equity interest in the VIEs to the Primary Beneficiaries. In addition, through the other exclusive agreements, which consist of operating agreements, technology consulting and services agreements and license agreements, the Primary Beneficiaries, by themselves or their subsidiaries in the PRC, demonstrate their ability and intention to continue to exercise the ability to absorb losses or receive economic benefits that could potentially be significant to the VIEs. The VIEs are subject to operating risks, which determine the variability of the Company's interest in those entities. Based

F-10

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

on these contractual arrangements, the Company consolidates the VIEs as required by Accounting Standards Codification ("ASC") Topic 810, *Consolidation*.

Unrecognized revenue-producing assets held by the VIEs include certain internet content provisions and other licenses, domain names and trademarks. The internet content provisions and other licenses, which are held by the VIEs that provide the relevant services, are required under relevant PRC laws, rules and regulations for the operation of Internet businesses in the PRC, and therefore are integral to the Company's operations.

The principal terms of the agreements entered into amongst the VIEs, their respective shareholders and the Primary Beneficiaries before the amendments made in March 2018 are further described below.

*Loan Agreements*

Pursuant to loan agreements amongst the shareholders of Baidu Netcom and Baidu Online Network Technology (Beijing) Co., Ltd. ("Baidu Online"), one of the Company's subsidiaries, Baidu Online provided interest-free loans in an aggregate amount of RMB6.4 billion (US$934 million) to the shareholders of Baidu Netcom solely for the latter to fund the capitalization of Baidu Netcom. The loans can be repaid only with the proceeds from the sale of the shareholders' equity interest in Baidu Netcom to Baidu Online or its designated person. The terms of the loan agreements will expire on May 6, 2028 at the earliest and can be extended with the written consent of both parties before its expiration.

Each of the loan agreements amongst Baidu Online or other subsidiaries and the respective shareholders of Beijing Perusal or other VIEs contains substantially the same terms as those described above, except that the amount of the loans and the contract expiry date varies. The amount of loans extended to the respective shareholders of Beijing Perusal is RMB3.2 billion (US$465 million). The term of the loan agreements will expire on March 30, 2028 and June 27, 2028, and can be extended with the written consent of both parties before its expiration.

*Exclusive Equity Purchase and Transfer Option Agreement*

Pursuant to the exclusive equity purchase and transfer option agreement amongst the shareholders of Baidu Netcom, Baidu Netcom and Baidu Online, the shareholders of Baidu Netcom irrevocably granted Baidu Online or its designated person(s) an exclusive option to purchase, to the extent permitted under PRC law, all or part of the equity interests in Baidu Netcom for the cost of the initial contributions to the registered capital or the minimum amount of consideration permitted by applicable PRC law. The shareholders should remit to Baidu Online any amount that is paid by Baidu Online or its designated person(s) in connection with the purchased equity interest. Baidu Online or its designated person(s) have sole discretion to decide when to exercise the option, whether in part or in full. Any and all dividends and other capital distributions made by Baidu Netcom to its shareholders should be repaid to Baidu Online in full amount. Baidu Online would provide unlimited financial support to Baidu Netcom if, in the normal operation of business, Baidu Netcom would become in need of any form of reasonable financial support. If Baidu Netcom were to incur any loss and as a result cannot repay any loans from Baidu Online, Baidu Online should unconditionally forgive any such loans to Baidu Netcom given that Baidu Netcom provides sufficient proof for its loss and incapacity to repay. The agreement will terminate when the shareholders of Baidu Netcom have transferred all their equity interests in Baidu Netcom to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online or Baidu Netcom.

Each of the exclusive equity purchase and transfer option agreements amongst Baidu Online or other subsidiaries, Beijing Perusal and their shareholders, or other VIEs and their shareholders contains substantially the same terms as those described above. Each of the agreements will terminate upon the transfer of all the equity

F-11

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

interests held by the shareholders of Beijing Perusal or other VIEs, as the case may be, to Baidu Online or its designated person(s) or upon expiration of the term of business of Baidu Online, Beijing Perusal or other VIEs.

### Proxy Agreement/Power of Attorney

Pursuant to the proxy agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom agreed to entrust all the rights to exercise their voting power and any other rights as shareholders of Baidu Netcom to the person(s) designated by Baidu Online. The shareholders of Baidu Netcom have each executed an irrevocable power of attorney to appoint the person(s) designated by Baidu Online as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval. The proxy agreement would be in effect for an unlimited term unless terminated in writing by Baidu Online. The power of attorney would be in effect for as long as the shareholders of Baidu Netcom hold any equity interests in Baidu Netcom.

Each of the proxy agreements or shareholder voting rights trust agreements amongst Baidu Online or other subsidiaries and the shareholders of Beijing Perusal and other VIEs contains substantially the same terms as those described above. Each of the proxy agreements will be in effect for an unlimited term unless terminated in writing by Baidu Online. Each of the powers of attorney will be in effect for as long as the shareholder of Beijing Perusal or other VIEs holds any equity interests in Beijing Perusal or other VIEs, as the case may be.

### Operating Agreement

Pursuant to the operating agreement amongst Baidu Online, Baidu Netcom and the shareholders of Baidu Netcom, Baidu Online provides guidance and instructions on Baidu Netcom's daily operations and financial affairs. Baidu Online has the power to appoint senior executives of Baidu Netcom. The shareholders of Baidu Netcom must appoint the candidates recommended by Baidu Online as their representatives on Baidu Netcom's board of directors. In addition, Baidu Online agrees to guarantee Baidu Netcom's performance under any agreements or arrangements relating to Baidu Netcom's business arrangements with any third party. In return, Baidu Netcom agrees that without the prior consent of Baidu Online, Baidu Netcom will not engage in any transactions that could materially affect the assets, liabilities, rights or operations of Baidu Netcom, including, without limitation, incurrence or assumption of any indebtedness, sale or purchase of any assets or rights, incurrence of any encumbrance on any of its assets or intellectual property rights in favor of a third party or transfer of any agreements relating to its business operation to any third party. The agreement will be in effect for an unlimited term, until the term of business of Baidu Online or Baidu Netcom expires and extension is denied by the relevant approval authorities.

Each of the operating agreements amongst Baidu Online or other subsidiaries, Beijing Perusal and their shareholders or other VIEs and their shareholders contains substantially the same terms as those described above. Each of the agreements will be in effect for an unlimited term, until the term of business of Baidu Online, Beijing Perusal or other VIEs expires and extension is denied by the relevant approval authorities.

### Exclusive Technology Consulting and Services Agreement

Pursuant to the exclusive technology consulting and services agreement between Baidu Online and Baidu Netcom, Baidu Online has the exclusive right to provide technology consulting and services related to, among other things, the maintenance of servers, software development, design of advertisements, and e-commerce technical services to Baidu Netcom. Baidu Online owns the intellectual property rights resulting from the performance of this agreement. Baidu Netcom agrees to pay service fees to Baidu Online and Baidu Online has the right to adjust the service fees at its sole discretion without the consent of Baidu Netcom. The agreement will be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Each of the exclusive technology consulting and services agreements between Baidu Online or other subsidiaries and Beijing Perusal or other VIEs contains substantially the same terms as those described above, except the basis of determining the service fees may differ.

### License Agreements

Baidu Online and Baidu Netcom entered into a software license agreement and a web layout copyright license agreement (collectively, the "License Agreements"). Pursuant to the License Agreements between Baidu Online and Baidu Netcom, Baidu Online has granted to Baidu Netcom the right to use (including but not limited to) a software license and a web layout copyright license. Baidu Netcom may only use the licenses in its own business operations. Baidu Online has the right to adjust the service fees at its sole discretion. The software license agreement and web layout copyright license agreement were renewed since their original expiration and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

Baidu Online entered into web layout copyright license agreements with Beijing Perusal. Each of the license agreements between the Baidu Online and Beijing Perusal or other VIEs contains substantially the same terms as those described above. Each of the web layout copyright license agreements was renewed in 2013 and would be in effect for an unlimited term, until the term of business of one party expires and extension is denied by the relevant approval authorities.

### Equity Pledge Agreement

Pursuant to the equity pledge agreement between Baidu Online and the shareholders of Baidu Netcom, the shareholders of Baidu Netcom pledged all of their equity interests in Baidu Netcom to Baidu Online to guarantee their obligations under the loan agreement and Baidu Netcom's performance of its obligations under the exclusive technology consulting and services agreement. If Baidu Netcom or its shareholders breach their respective contractual obligations, Baidu Online, as the pledgee, will be entitled to certain rights, including the right to sell the pledged equity interests. The shareholders of Baidu Netcom agreed not to dispose of the pledged equity interests or take any actions that would prejudice Baidu Online's interest. The equity pledge agreement will expire two years after expiration of the term or the fulfillment by Baidu Netcom and its shareholders of their respective obligations under the exclusive technology consulting and services agreement and the loan agreement.

Each of the equity pledge agreements amongst Baidu Online or other subsidiaries and the shareholders of Beijing Perusal or other VIEs contains substantially the same terms, including its term to expiration, as those described above.

Through the design of the aforementioned agreements, the shareholders of the VIEs effectively assigned their full voting rights to Baidu Online, which gives Baidu Online the power to direct the activities that most significantly impact the VIEs' economic performance. Baidu Online obtains the ability to approve decisions made by the VIEs and the ability to acquire the equity interests in the VIEs when permitted by PRC law. Baidu Online is obligated to absorb losses or receive economic benefits of the VIEs that could potentially be significant to the VIEs through providing unlimited financial support to the VIEs or is entitled to receive economic benefits from the VIEs that could potentially be significant to the VIEs through the exclusive technology consulting and service fees. As a result of these contractual agreements, Baidu Online is determined to be the primary beneficiary of the VIEs. Despite the lack of technical majority ownership, there exists a parent-subsidiary relationship between the Company and the VIEs through these contractual agreements, and the Company consolidates the VIEs through Baidu Online.

There are similar agreements entered into amongst iQIYI, Inc. ("iQIYI"), iQIYI subsidiaries, iQIYI VIEs, and the respective shareholders, which resulted in a parent-subsidiary relationship between iQIYI and iQIYI VIEs.

F-13

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

In March 2018, the contractual agreements for certain VIEs, including Baidu Netcom and Beijing Perusal, were amended to include the following terms:

a.   Exclusive equity purchase and transfer option agreement

The Company has (i) an exclusive option to purchase, when and to the extent permitted under PRC laws, all or part of the equity interests in the VIE or all or part of the assets held by the VIE, (ii) an exclusive right to cause the nominee shareholders to transfer their equity interest in the VIE to the Company or any designated person and (iii) an obligation to provide unlimited financial support to the VIEs when the VIEs become in need of any form of reasonable financial support in the normal operation of business. If the VIEs were to incur any loss and as a result cannot repay any loans from the Company, the Company will unconditionally forgive any such loans to the VIEs upon provision by the VIEs of sufficient proof for its loss and incapacity to repay.

b.   Proxy Agreements/Power of Attorney

The appointment of any individuals to exercise the powers and rights assigned pursuant to the Proxy Agreement requires the approval of the Company. All the activities in relation to such powers and rights assigned are directed and approved by the Company. The shareholders of the VIEs agreed to entrust all the rights to exercise their voting power and any other rights as shareholders of the VIEs to the person(s) designated by the Company. The shareholders of the VIEs have each executed an irrevocable power of attorney to appoint the person(s) designated by the Company as their attorney-in-fact to vote on their behalf on all matters requiring shareholder approval.

As a result, the power and the rights pursuant to the Proxy Agreements have since been effectively reassigned from Baidu Online to the Company which has the power to direct the activities of the VIEs that most significantly impact the VIEs' economic performance. The Company is also obligated to absorb the expected losses or receive economic benefits of the VIE through the financial support as described above. Therefore, the Company has replaced Baidu Online as the Primary Beneficiary of Baidu Netcom and Beijing Perusal since March 2018. As the VIEs were subject to indirect control by the Company through its subsidiaries immediately before and direct control immediately after the contractual agreements were amended, the change of the primary beneficiary of the VIEs was accounted for as a common control transaction based on the carrying amount of the net assets transferred.

In the opinion of the Company's legal counsel, (i) the ownership structure relating to the VIEs of the Company is in compliance with existing PRC laws and regulations; (ii) the contractual arrangements with the VIEs and their shareholders are valid, binding and enforceable, and will not result in any violation of PRC laws or regulations currently in effect; and (iii) the performance of the VIEs and their shareholders is in compliance with the articles of association and business licenses of the VIEs.

However, uncertainties in the PRC legal system could cause the Company's current ownership structure to be found in violation of any existing and/or future PRC laws or regulations and could limit the Company's ability, through the Primary Beneficiaries, to enforce its rights under these contractual arrangements. Furthermore, shareholders of the VIEs may have interests that are different with those of the Company, which could potentially increase the risk that they would seek to act in contrary to the terms of the aforementioned agreements.

In addition, if the current structure or any of the contractual arrangements were found to be in violation of any existing or future PRC laws, the Company may be subject to penalties, which may include but not be limited to, the cancellation or revocation of the Company's business and operating licenses, being required to restructure the Company's operations or discontinue the Company's operating activities. The imposition of any of these or other

F-14

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

penalties may result in a material and adverse effect on the Company's ability to conduct its operations. In such case, the Company may not be able to operate or control the VIEs, which may result in deconsolidation of the VIEs.

The following tables set forth the financial statement balances and amounts of the VIEs and their subsidiaries were included in the consolidated financial statements after the elimination of intercompany balances and transactions among VIEs and their subsidiaries within the Group:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2017 RMB | 2018 RMB (In millions) | 2018 US$ |
| **Assets** | | | |
| Current | | | |
| Cash and cash equivalents | 4,045 | 1,895 | 276 |
| Short-term investments | 2,052 | 2,912 | 424 |
| Accounts receivable, net | 3,021 | 4,091 | 595 |
| Others | 5,280 | 4,642 | 675 |
| | 14,398 | 13,540 | 1,970 |
| Non-current | | | |
| Fixed assets, net | 2,845 | 4,183 | 608 |
| Intangible assets, net | 2,104 | 4,032 | 586 |
| Long-term investments, net | 10,614 | 18,923 | 2,752 |
| Others | 6,488 | 12,639 | 1,838 |
| | 22,051 | 39,777 | 5,784 |
| Total | 36,449 | 53,317 | 7,754 |
| **Third-party liabilities** | | | |
| Current | | | |
| Accounts payable and accrued liabilities | 14,073 | 13,889 | 2,020 |
| Customer advances and deposits | 2,288 | 2,402 | 349 |
| Others | 2,414 | 3,560 | 518 |
| | 18,775 | 19,851 | 2,887 |
| Non-current | | | |
| Long-term loans | 4,788 | 10,495 | 1,527 |
| Others | 363 | 1,295 | 188 |
| | 5,151 | 11,790 | 1,715 |
| Total | 23,926 | 31,641 | 4,602 |
| **Inter-company liabilities *** | | | |
| Inter-company payable to subsidiaries for technology consulting and service fees | 2,828 | 1,926 | 280 |
| Others | 4,605 | 10,768 | 1,566 |
| Total | 7,433 | 12,694 | 1,846 |

\*   Inter-company liabilities represent payable balances of each VIE due to subsidiaries within the Group pursuant to the technology consulting and service agreements. Other payables to non-VIE subsidiaries within the Group were included in third-party liabilities.

F-15

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| | (In millions) | | | |
| Total revenues | 24,603 | 29,208 | 33,992 | 4,944 |
| Net loss | (464) | (626) | (6,834) | (994) |
| Net cash provided by (used in) operating activities | 2,737 | 3,698 | 2,396 | 348 |
| Net cash provided by (used in) investing activities | (9,471) | (5,725) | (16,674) | (2,425) |
| Net cash provided by (used in) financing activities | 5,098 | 2,985 | 11,916 | 1,733 |

As of December 31, 2018, there was no pledge or collateralization of the VIEs' assets that can only be used to settle obligations of the VIEs, other than aforementioned in the equity pledge agreements and collateralization of a VIE's office building as described in Note 10. The amount of the net assets of the VIEs was RMB9.0 billion (US$1.3 billion) as of December 31, 2018. The creditors of the VIEs' third-party liabilities did not have recourse to the general credit of the Company in normal course of business. The Company did not provide or intend to provide financial or other supports not previously contractually required to the VIEs during the years presented.

### Basis of Presentation

The consolidated financial statements are prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

### Principles of Consolidation

The consolidated financial statements include the financial statements of the Company, its subsidiaries, VIEs and subsidiaries of the VIEs. All inter-company transactions and balances between the Company, its subsidiaries, VIEs and subsidiaries of the VIEs are eliminated upon consolidation. The Company included the results of operations of acquired businesses from the respective dates of acquisition.

### Use of Estimates

The preparation of the financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Management evaluates estimates, including those related to the standalone selling prices of performance obligations of revenue contracts, accounts receivable and contract assets allowances, credit loss allowance for micro loan receivables, fair values of certain debt and equity investments, amortization and impairment of licensed copyrights and produced content, ultimate revenue of produced content, fair value of nonmonetary content exchanges, impairment of long-lived assets, long-term investments and goodwill, the purchase price allocation and fair value of noncontrolling interests with respect to business combinations, deferred tax valuation allowance, and redeemable noncontrolling interests, among others. Management bases the estimates on historical experience and on various other assumptions that are believed to be reasonable, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results could differ from these estimates.

F-16

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

### *Currency Translation for Financial Statements Presentation*

Translations of amounts from RMB into US$ for the convenience of the reader have been calculated at the exchange rate of RMB6.8755 per US$1.00 on December 31, 2018, the last business day in fiscal year 2018, as published on the website of the United States Federal Reserve Board. No representation is made that the RMB amounts could have been, or could be, converted into U.S. dollars at such rate.

### 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### *Foreign Currency*

The Company's functional currency is the US$. The Company's subsidiaries, VIEs and subsidiaries of the VIEs determine their functional currencies based on the criteria of ASC Topic 830, *Foreign Currency Matters*. The Company uses the RMB as its reporting currency. The Company uses the exchange rate as of the balance sheet date to translate its assets and liabilities and the average daily exchange rate for each month to translate its income and expense items to reporting currency. Any translation gains (losses) are recorded in other comprehensive income (loss). Transactions denominated in foreign currencies are measured and recorded into the functional currency at the exchange rates prevailing on the transaction dates. Assets and liabilities denominated in foreign currencies other than functional currency are remeasured into the functional currency at the exchange rates prevailing at the balance sheet date. Exchange gains and losses are included in earnings as a component of "Other income, net."

### *Segment Reporting*

As of December 31, 2017 and 2018, the Company had two reportable segments, Baidu Core and iQIYI. Baidu Core mainly provides search-based, feed-based, and other online marketing services, as well as new artificial intelligence business. Search Services and Transaction Services were combined into Baidu Core beginning April 2017, to reflect the Company's strategic and operational change to de-emphasize its transaction services business and shift more resources to support its online marketing and other services. iQIYI is an online entertainment service provider that, offers original, professionally produced and partner-generated content on its platform. In early April 2018, iQIYI completed its initial public offering ("IPO") on the Nasdaq Global Market.

The Company's chief executive officer, who has been identified as the chief operating decision marker ("CODM"), reviews the operating results of Baidu Core and iQIYI, to allocate resources and assess the Company's performance. Accordingly, the financial statements include segment information which reflects the current composition of the reportable segments in accordance with ASC Topic 280, *Segment Reporting*.

### *Business Combinations*

The Company accounts for its business combinations using the purchase method of accounting in accordance with ASC Topic 805, *Business Combinations*. The purchase method of accounting requires that the consideration transferred to be allocated to the assets, including separately identifiable assets and liabilities the Company acquired, based on their estimated fair values. The consideration transferred in an acquisition is measured as the aggregate of the fair values at the date of exchange of the assets given, liabilities incurred, and equity instruments issued as well as the contingent considerations as of the acquisition date. The costs directly attributable to the acquisition are expensed as incurred. Identifiable assets, liabilities and contingent liabilities acquired or assumed are measured separately at their fair value as of the acquisition date, irrespective of the extent of any

F-17

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

noncontrolling interests. The excess of (i) the total of cost of acquisition, fair value of the noncontrolling interests and acquisition date fair value of any previously held equity interest in the acquiree over (ii) the fair value of the identifiable net assets of the acquiree, is recorded as goodwill. If the cost of acquisition is less than the fair value of the net assets of the subsidiary acquired, the difference is recognized directly in earnings.

In a business combination achieved in stages, the Company remeasures its previously held equity interest in the acquiree immediately before obtaining control at its acquisition-date fair value and the re-measurement gain or loss, if any, is recognized in earnings.

The determination and allocation of fair values to the identifiable assets acquired, liabilities assumed and noncontrolling interests is based on various assumptions and valuation methodologies requiring considerable judgment from management. The most significant variables in these valuations are discount rates, terminal values, the number of years on which to base the cash flow projections, as well as the assumptions and estimates used to determine the cash inflows and outflows. The Company determines discount rates to be used based on the risk inherent in the related activity's current business model and industry comparisons. Terminal values are based on the expected life of assets, and forecasted cash flows over that period.

### *Cash, Cash Equivalents and Restricted Cash*

Cash and cash equivalents

Cash and cash equivalents primarily consist of cash, money market funds, investments in interest bearing demand deposit accounts, time deposits and highly liquid investments with original maturities of three months or less from the date of purchase and are stated at cost which approximates their fair value.

Restricted cash

Restricted cash mainly consists of the cash reserved in escrow accounts at certain banks as online payment service deposits and cash pledged for bank loan facility.

In November 2016, the FASB issued Accounting Standards Update No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash*, which requires companies to include amounts generally described as restricted cash and restricted cash equivalents in cash and cash equivalents when reconciling beginning-of-period and end-of-period total amounts presented in the statement of cash flows. The Company adopted the new standard effective January 1, 2018, using the retrospective transition method. All restricted cash was presented on the face of the consolidated balance sheet as "Restricted cash."

### *Accounts Receivable, net of allowance*

Accounts receivable are recognized and carried at the original invoiced amount less an allowance for any potential uncollectible amounts. An estimate for doubtful debts is made when collection of the full amount is no longer probable. Receivable balances are written off when they are deemed uncollectible. The Company generally does not require collateral from its customers.

The Company maintains allowances for doubtful accounts for estimated losses resulting from the failure of customers to make payments on time. The Company reviews the accounts receivable on a periodic basis and makes general and specific allowances when there is doubt as to the collectability of individual balances. In evaluating the collectability of individual receivable balances, the Company considers many factors, including the age of the balance, the customer's payment history, its current credit-worthiness and current economic trends.

F-18

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

### *Receivables from Online Payment Agencies, net of allowance*

Receivables from online payment agencies are funds due from the third-party online payment service providers for clearing transactions. Funds were paid or deposited by customers or users through these online payment agencies for services provided by the Company. The Company carefully considers and monitors the credit worthiness of the third-party payment service providers used. An allowance for doubtful accounts is recorded in the period in which a loss is determined to be probable. Receivable balances are written off when they are deemed uncollectible. The balances are included in "Other current assets, net" on the consolidated balance sheets. As of December 31, 2017 and 2018, no allowance for doubtful accounts was provided for the receivables from online payment agencies.

### *Loan and Interest Receivables, net of allowance*

Loan and interest receivables consist primarily of micro loans to individual borrowers. Such amounts are recorded at the principal net of allowance for credit losses relating to micro loans, and include accrued interest receivable as of the balance sheet date. The loan periods granted by the Company to the borrowers related to the micro loans generally range from one month to thirty-six months. The cash flows related to micro loans are included within the cash flows from investing activities category in the consolidated statement of cash flows.

Allowance for credit losses relating to micro loans represent the Company's best estimate of the losses inherent in the outstanding portfolio of loans. Judgment is required to determine the allowance amounts and whether such amounts are adequate to cover potential credit losses, and periodic reviews are performed to ensure such amounts continue to reflect the best estimate of the losses inherent in the outstanding portfolio of debts. The Company bases the allowance for loan and interest receivables credit losses primarily on historical loss experience using a roll rate-based model applied to the loan and interest receivables portfolios. The Company considers many factors, including but not limited to, the age of the amounts due, the payment history, the month of origination, the purpose of the loans, creditworthiness, financial conditions of the borrower, terms of the loans, regulatory environment, and the general economic conditions. In August 2018, the Company completed the divestiture of its financial services business, and related loan and interest receivable balances were derecognized from the consolidated balance sheet upon disposal (Note 4).

### *Investments*

Short-term investments

All highly liquid investments with original maturities of greater than three months, but less than twelve months, are classified as short-term investments. Investments that are expected to be realized in cash during the next twelve months are also included in short-term investments.

The Company accounts for short-term debt investments in accordance with ASC Topic 320, *Investments—Debt Securities* ("ASC 320"). The Company classifies the short-term investments in debt as "held-to-maturity," "trading" or "available-for-sale," whose classification determines the respective accounting methods stipulated by ASC 320. Dividend and interest income, including amortization of the premium and discount arising at acquisition, for all categories of investments in securities are included in earnings. Any realized gains or losses on the sale of the short-term investments are determined on a specific identification method, and such gains and losses are reflected in earnings during the period in which gains or losses are realized.

Securities that the Company has positive intent and ability to hold to maturity are classified as held-to-maturity securities and stated at amortized cost. For individual securities classified as held-to-maturity securities, the

F-19

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Company evaluates whether a decline in fair value below the amortized cost basis is other-than-temporary in accordance with ASC 320. Other-than-temporary impairment loss is recognized in earnings equal to the entire excess of the debt security's amortized cost basis over its fair value at the balance sheet date of the reporting period for which the assessment is made.

Securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities, in accordance with ASC 320. Unrealized holding gains and losses for trading securities are included in earnings.

Debt investments not classified as trading or as held-to-maturity are classified as available-for-sale debt securities, which are reported at fair value, with unrealized gains and losses recorded in "Accumulated other comprehensive income." An impairment loss on the available-for-sale debt securities is recognized in the consolidated statements of comprehensive income when the decline in value is determined to be other-than-temporary.

Other invested securities

Other invested securities represent investments purchased by the Company for its financial services business and are resold to third-party investors. These transactions do not meet the requirements of asset derecognition in accordance with ASC Topic 860, *Transfers and Servicing* ("ASC 860"). The Company records the proceeds related to these transactions as secured borrowings included in "Amounts due to the third-party investors" on the consolidated balance sheets, and assets pledged are included in "Other invested securities" on the consolidated balance sheets. Other invested securities are issued by financial institutions and have a variable rate of return that is indexed to the performance of underlying assets. The Company initially records these investments at cost, which approximates its fair value at inception and subsequently records these investments at fair value. Changes in the fair value are reflected in earnings. The cash flows related to purchases and maturities of other invested securities are classified as cash flows from investing activities, while proceeds and payments related to the sale and purchase of financial products are classified as cash flows from financing activities in the consolidated statements of cash flows. All other invested securities balances were derecognized from the consolidated balance sheet upon the disposal of the financial services business (Note 4).

Long-term investments

The Company's long-term investments consist of equity investments with and equity investments without readily determinable fair value, equity method investments, available-for-sale debt investments and other investments accounted for at fair value.

Prior to adopting ASC Topic 321, *Investments—Equity Securities* ("ASC 321") on January 1, 2018, the Company carries at cost its investments in investees that do not have readily determinable fair value and over which the Company does not have significant influence, in accordance with ASC Subtopic 325-20, *Investments-Other: Cost Method Investments*. The Company only adjusts the carrying value of such investments for other-than-temporary decline in fair value and for distribution of earnings that exceed the Company's share of earnings since its investment.

Management regularly evaluates the impairment of the cost method investments based on the performance and financial position of the investee as well as other evidence of market value. Such evaluation includes, but is not limited to, reviewing the investee's cash position, recent financing, projected and historical financial performance, cash flow forecasts and financing needs. An impairment loss is recognized in earnings equal to the

F-20

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

excess of the investment's cost over its fair value at the balance sheet date of the reporting period for which the assessment is made. The fair value would then become the new cost basis of the investment.

Subsequent to the Company's adoption of ASC 321 on January 1, 2018, the cumulative effect of RMB1.9 billion (US$270 million) representing the unrealized gains and losses of available-for-sale equity securities before the adoption was recorded as an adjustment to the opening retained earnings. Pursuant to ASC 321, equity investments, except for those accounted for under the equity method, those that result in consolidation of the investee and certain other investments, are measured at fair value, and any changes in fair value are recognized in earnings. For equity securities without readily determinable fair value and do not qualify for the existing practical expedient in ASC Topic 820, *Fair Value Measurements and Disclosures* ("ASC 820") to estimate fair value using the net asset value per share (or its equivalent) of the investment, the Company elected to use the measurement alternative to measure those investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any. Equity securities with readily determinable fair value are measured at fair values, and any changes in fair value are recognized in earnings.

Pursuant to ASC 321, for equity investments measured at fair value with changes in fair value recorded in earnings, the Company does not assess whether those securities are impaired. For those equity investments that the Company elects to use the measurement alternative, the Company makes a qualitative assessment of whether the investment is impaired at each reporting date. If a qualitative assessment indicates that the investment is impaired, the entity has to estimate the investment's fair value in accordance with the principles of ASC 820. If the fair value is less than the investment's carrying value, the entity has to recognize an impairment loss in net income equal to the difference between the carrying value and fair value.

Available-for-sale debt investments are convertible debt instruments issued by private companies, which are measured at fair value, with unrealized gains or losses recorded in accumulated other comprehensive income.

Investments in entities in which the Company can exercise significant influence but does not own a majority equity interest or control are accounted for using the equity method of accounting in accordance with ASC Topic 323, *Investments-Equity Method and Joint Ventures* ("ASC 323"). Under the equity method, the Company initially records its investment at cost and the difference between the cost of the equity investee and the fair value of the underlying equity in the net assets of the equity investee is recognized as equity method goodwill, which is included in the equity method investment on the consolidated balance sheets. The Company subsequently adjusts the carrying amount of its investment to recognize the Company's proportionate share of each equity investee's net income or loss into earnings. The Company will discontinue applying the equity method if an investment (plus additional financial support provided to the investee, if any) has been reduced to zero. When the Company has other investments in its equity-method investee and is not required to advance additional funds to that investee, the Company would continue to report its share of equity method losses in its statement of comprehensive income after its equity-method investment in ordinary shares has been reduced to zero, to the extent of and as an adjustment to the adjusted basis of the Company's other investments in the investee. Such losses are first applied to those investments of a lower liquidation preference before being further applied to the investments of a higher liquidation preference. The Company adopted a one-quarter lag in reporting for its share of equity income (loss) in all of its investees.

The Company evaluates the equity method investments for impairment whenever events or changes in circumstances indicate that the carrying amount of the investment might not be recoverable. Factors considered by the Company when determining whether an investment has been other-than-temporarily-impaired, includes, but not limited to, the length of the time and the extent to which the market value has been less than cost, the

F-21

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

financial performance and near-term prospect of the investee, and the Company's intent and ability to retain the investment until the recovery of its cost. An impairment loss on the equity method investments is recognized in earnings when the decline in value is determined to be other-than-temporary.

In accordance with ASC 946-320 *Financial Services—Investment Companies, Investments—Debt and Equity Securities,* the Company accounts for long-term equity investments in unlisted companies held by consolidated investment companies at fair value. These investments were initially recorded at their transaction price net of transaction costs, if any. Fair value of these investments are re-measured periodically in accordance with ASC 820.

*Transfers of Financial Assets*

The Company accounts for the transfers of financial assets in accordance with ASC 860. Financial assets are derecognized from the Company's consolidated balance sheets if the transfer qualifies as sales. If the conditions for sale required by ASC 860 are not met, the transfer is considered to be a secured borrowing included in "Amounts due to the third-party investors" on the consolidated balance sheets. The assets remain on the consolidated balance sheets as "Other invested securities" and the sale proceeds are recognized as the Company's liability. All other invested securities and liability balances were derecognized from the consolidated balance sheet upon disposal of the financial services business (Note 4).

*Fair Value Measurements of Financial Instruments*

Financial instruments are in the form of cash and cash equivalents, restricted cash, short-term investments, other invested securities, accounts receivable, loan and interest receivables, amounts due from and due to related parties, other receivables, long-term investments, short-term loans, accounts payable and accrued liabilities, customer advances and deposits, derivative instruments, notes payable, convertible senior notes and long-term loans. The carrying values of the aforementioned financial instruments included in current assets and liabilities approximate their respective fair values because of their general short maturities. The carrying amounts of long-term loans approximate fair values as the related interest rates approximate rates currently offered by financial institutions for similar debt instruments of comparable maturities.

*Fixed Assets*

Fixed assets are stated at cost less accumulated depreciation. Depreciation is recorded on a straight-line basis over the shorter of the estimated useful lives of the assets or the term of the related lease, as follows:

| | |
|---|---|
| Office building | – 43 to 45 years |
| Office building related facility, machinery and equipment | – 15 years |
| Computer equipment | – 3 to 5 years |
| Office equipment | – 3 to 5 years |
| Vehicles | – 5 years |
| Leasehold improvements | – over the shorter of lease terms or estimated useful lives of the assets |

Fixed assets have no estimated residual value except for the office building and its related facility, machinery and equipment, which have an estimated residual value of 4% of the cost.

F-22

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterments that extend the useful life of fixed assets are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the asset and accumulated depreciation accounts with any resulting gain or loss reflected in earnings. All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed assets items and depreciation of these assets commences when they are ready for their intended use.

Interest costs are capitalized if they are incurred during the acquisition, construction or production of a qualifying asset and such costs could have been avoided if expenditures for the assets have not been made. Capitalization of interest costs commences when the activities to prepare the asset are in progress and expenditures and borrowing costs are being incurred. Interest costs are capitalized until the assets are ready for their intended use. Interest costs capitalized for the years ended December 31, 2016, 2017 and 2018 were insignificant.

*Licensed Copyrights*

Licensed copyrights consist of professionally-produced content such as movies, television series, variety shows, sports and other video content acquired from external parties. The license fees are capitalized and, unless prepaid, a corresponding liability recorded when cost of the content is known, the content has been accepted by us in accordance with the conditions of the license agreement and the content is available for its first showing on our internet platform. Licensed copyrights are carried at the lower of unamortized cost or net realizable value. The current and non-current portions of licensed copyrights of video content are recorded in "Other current assets, net" or "Intangible assets, net," respectively. Licensed copyrights include non-exclusive and exclusive content. For non-exclusive licensed copyrights, the Company only has the right to broadcast the content on its internet platform. For exclusive licensed copyrights, in addition to the broadcasting rights, the Company also has the right to sublicense the content to third parties.

Non-exclusive licensed copyrights, mainly comprising of newly released movies, television series and seasonal variety shows, are generally amortized using an accelerated method based on historical viewership consumption patterns. Other non-exclusive licensed copyrights, mainly comprising of library movies, television series and variety shows and certain non-episodic features, are amortized on a straight-line basis, as the consumption pattern based on historical viewing data supports this amortization method. Estimates of the consumption patterns for licensed copyrights are reviewed periodically and revised, if necessary. The major factors that impact the viewership consumption patterns include film box office, ratings for television series and variety shows, user traffic on our platforms, placement schedule, user tastes and preferences, emerging cultural trends, merchandising and marketing efforts. Revisions to the amortization pattern are accounted for as a change in accounting estimate prospectively in accordance with ASC Topic 250, *Accounting Changes and Error Corrections* ("ASC 250").

The purchase cost of exclusive licensed copyrights includes the right to broadcast and the right to sublicense to third parties. The Company allocates content cost to these two rights when the exclusive licensed copyrights are initially recognized, based on the relative proportion of our estimate of the total revenues that will be generated by each right. Content costs related to the broadcasting right, which is the portion of an exclusive licensed copyright that generates direct and indirect advertising and membership revenues, are amortized in accordance with ASC Subtopic 920-350, *Entertainment-Broadcasters: Intangibles—Goodwill and Other* ("ASC 920-350"), using the same method as non-exclusive licensed copyrights described above. For the right to sublicense to third parties, which is the portion of an exclusive licensed copyright that generates direct revenues, are amortized in accordance with ASC Topic 926, *Entertainment—Films* ("ASC 926") using an individual-film-

F-23

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

forecast-computation method, which amortizes such costs based on the ratio of the actual sublicensing revenues generated for the current period to the total sublicensing revenues estimated to be generated by the sublicensing right. The Company reviews the forecasted total direct revenues on a periodic basis and any change in estimate will result in a revised fraction applied to the net carrying amount of the right to sublicense. The difference between expenses determined using the new estimates and any amounts previously expensed during the fiscal year is recognized in the period of revision.

On a periodic basis, the Company evaluates the program usefulness of the broadcasting rights of its licensed copyrights and record such rights at the lower of unamortized cost or estimated net realizable value pursuant to the guidance in ASC 920-350. When there is a change in the expected usage of licensed copyrights, the Company estimates net realizable value of licensed copyrights to determine if any impairment exists.

Net realizable value is determined by estimating the expected cash flows generated from the provision of online advertising and membership services, less any direct costs, over the remaining useful lives of non-exclusive licensed copyrights. The Company estimates advertising and membership cash flows for each category of content. Estimates that impact advertising and membership cash flows include anticipated levels of demand for the Company's online advertising and membership services and the expected selling prices of the Company's advertisements and memberships. For the right to sublicense to third parties, the Company assesses recoverability in accordance with ASC Subtopic 926-20, *Entertainment—Films: Other Assets —Film Costs* ("ASC 926-20"). The Company recognized impairment charges on licensed copyrights of RMB212 million, RMB390 million and RMB181 million (US$26 million) for the years ended December 31, 2016, 2017 and 2018, respectively.

### *Goodwill and Intangible Assets*

Goodwill

The Company assesses goodwill for impairment in accordance with ASC Subtopic 350-20, *Intangibles—Goodwill and Other: Goodwill* ("ASC 350-20"), which requires that goodwill to be tested for impairment at the reporting unit level at least annually and more frequently upon the occurrence of certain events, as defined by ASC 350-20. As of December 31, 2017 and 2018, the Company has two reporting units, consisting of Baidu Core and iQIYI.

The Company has the option to assess qualitative factors first to determine whether it is necessary to perform the two-step test in accordance with ASC 350-20. If the Company believes, as a result of the qualitative assessment, that it is more-likely-than-not that the fair value of the reporting unit is less than its carrying amount, the two-step quantitative impairment test described above is required. Otherwise, no further testing is required. In the qualitative assessment, the Company considers primary factors such as industry and market considerations, overall financial performance of the reporting unit, and other specific information related to the operations. In performing the two-step quantitative impairment test, the first step compares the carrying amount of the reporting unit to the fair value of the reporting unit based on either quoted market prices of the ordinary shares or estimated fair value using a combination of the income approach and the market approach. If the fair value of the reporting unit exceeds the carrying value of the reporting unit, goodwill is not impaired and the Company is not required to perform further testing. If the carrying value of the reporting unit exceeds the fair value of the reporting unit, then the Company must perform the second step of the impairment test in order to determine the implied fair value of the reporting unit's goodwill. The fair value of the reporting unit is allocated to its assets and liabilities in a manner similar to a purchase price allocation in order to determine the implied fair value of the reporting unit goodwill. If the carrying amount of the goodwill is greater than its implied fair value, the excess is recognized as an impairment loss.

F-24

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The Company performed qualitative assessments for the reporting unit of Baidu Core in 2017 and 2018. Based on the requirements of ASC 350-20, the Company evaluated all relevant factors including, but not limited to, macroeconomic conditions, industry and market conditions, financial performance, and the share price of the Company. The Company weighed all factors in their entirety and concluded that it was not more-likely-than-not the fair value was less than the carrying amount of Baidu Core, and further impairment testing on goodwill was unnecessary as of December 31, 2017 and 2018.

The Company elected to assess goodwill for impairment using the two-step process for the reporting unit of iQIYI. Subsequent to iQIYI's IPO, the Company primarily considered the quoted market price of iQIYI's share to determine the fair value of the reporting unit. Before its IPO, significant management judgment was involved in determining these estimates and assumptions, and actual results may differ from those used in valuations. Changes in these estimates and assumptions could materially affect the determination of fair value for each reporting unit which could trigger future impairment. The judgment in estimating the fair value of a reporting unit includes forecasts of future cash flows, which are based on our best estimate of future revenue and operating expenses growth rates, future capital expenditures and working capital levels, as well as an appropriate discount rate determined by a weighted average cost of capital approach and the selection of comparable companies operating in similar businesses. The Company also reviewed observable market data to assess the reasonableness of assumptions such as discount rate, operating margins, and working capital levels. As of December 31, 2017 and 2018, the fair value of iQIYI exceeded its carrying amount, and therefore goodwill related to the iQIYI reporting unit was not impaired and the Company was not required to perform further testing.

Intangible assets

Intangible assets with finite lives are carried at cost less accumulated amortization. Land use rights are amortized using a straight-line method over the shorter of their estimated useful lives or the terms of the related land use right contracts. All other intangible assets with finite lives are amortized using the straight-line method over the estimated useful lives, except for the sublicensing rights and certain licensed copyrights.

Intangible assets have weighted average useful lives from the date of purchase as follows:

| | |
|---|---|
| Land use rights | – 50 years |
| Customer relationships | – 3 years |
| Software | – 5 years |
| Trademarks | – 9 years |
| User list | – 3 years |
| Licensed copyrights of video contents | – 3 years |
| Others | – 6 years |

Intangible assets with an indefinite useful life are not amortized and are tested for impairment annually or more frequently if events or changes in circumstances indicate that they might be impaired in accordance with ASC Subtopic 350-30, *Intangibles-Goodwill and Other: General Intangibles Other than Goodwill* ("ASC 350-30").

***Produced Content, net***

The Company produces and contracts external parties to produce films and episodic series to exhibit on its websites. Produced content includes direct production costs, production overhead and acquisition costs and is stated at the lower of unamortized cost or estimated fair value. Produced content also includes cash expenditures made to acquire a proportionate share of certain rights to films including profit sharing, distribution and/or other

F-25

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

rights. Produced content exceeding the total revenues to be earned ("ultimate revenue") is expensed as cost of revenues.

The Company uses the individual-film-forecast-computation method and amortizes the produced content based on the ratio of current period actual revenue (numerator) to estimated remaining unrecognized ultimate revenue as of the beginning of the fiscal year (denominator) in accordance with ASC 926-20. The Company reviews the forecasted ultimate revenues on a periodic basis and any change in estimate will result in a revised fraction applied to the net carrying amount of the right to sublicense, and the difference between expenses determined using the new estimates and any amounts previously expensed during the fiscal year is recognized in the period of revision.

The Company reviews unamortized produced content costs for impairment whenever events or circumstances indicate that the fair value of the produced content may be less than its unamortized cost. Produced content was presented as "Other non-current assets" on the consolidated balance sheets, the carrying amounts were RMB1.6 billion and RMB3.7 billion (US$543 million), respectively, as of December 31, 2017 and 2018.

### *Impairment of Long-Lived Assets Other Than Goodwill*

The Company evaluates long-lived assets, such as fixed assets and purchased or internally developed intangible assets with finite lives, for impairment whenever events or changes in circumstances indicate the carrying value of an asset may not be recoverable in accordance with ASC Topic 360, *Property, Plant and Equipment*. When such events occur, the Company assesses the recoverability of the asset group based on the undiscounted future cash flow the asset group is expected to generate and recognizes an impairment loss when estimated undiscounted future cash flow expected to result from the use of the asset group plus net proceeds expected from disposition of the asset group, if any, is less than the carrying value of the asset group. If the Company identifies an impairment, the Company reduces the carrying amount of the asset group to its estimated fair value based on a discounted cash flow approach or, when available and appropriate, to comparable market values. The Company uses estimates and judgments in its impairment tests and if different estimates or judgments had been utilized, the timing or the amount of any impairment charges could be different. Asset groups to be disposed of would be reported at the lower of the carrying amount or fair value less costs to sell, and no longer depreciated. The assets and liabilities of a disposal group classified as held for sale would be presented separately in the appropriate asset and liability sections of the consolidated balance sheets.

### *Revenue Recognition*

The Company adopted ASC Topic 606 *Revenue from Contracts with Customers* ("ASC 606"), from January 1, 2018, using the modified retrospective method. Revenues for the year ended December 31, 2018 were presented under ASC 606, and revenues for the years ended December 31, 2017 and 2016 were not adjusted and continue to be presented under ASC Topic 605, *Revenue Recognition*. The cumulative effect of adopting ASC 606 resulted in an increase of RMB933 million (US$136 million) to the opening balance of retained earnings at January 1, 2018, which is primarily related to the Company's online marketing revenues.

Revenue is recognized when control of promised goods or services is transferred to the Company's customers in an amount of consideration to which an entity expects to be entitled to in exchange for those goods or services. Starting from January 1, 2018, value added taxes ("VAT") was reclassified from cost of revenue to net against revenues in accordance with ASC 606. The Company recognized VAT of RMB3.9 billion, RMB4.8 billion and RMB6.1 billion (US$884 million) for the years ended December 31, 2016, 2017 and 2018, respectively. Other than the presentation of VAT, the impact from adopting ASC 606 was not material to the Company's consolidated financial statements as of and for the year ended December 31, 2018.

F-26

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following table presents the Company's revenues disaggregated by revenue source:

| | For the years ended | | | |
| --- | --- | --- | --- | --- |
| | December 31, 2016 | December 31, 2017 | December 31, 2018 | December 31, 2018 |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Online marketing | 64,525 | 73,146 | 81,912 | 11,914 |
| iQIYI membership service | 3,759 | 6,532 | 10,603 | 1,542 |
| iQIYI content distribution | 501 | 1,192 | 2,163 | 315 |
| Interest income earned from provision of financial services | 222 | 1,658 | 1,724 | 251 |
| Others | 1,542 | 2,281 | 5,875 | 854 |
| Other revenue | 6,024 | 11,663 | 20,365 | 2,962 |
| Total revenue | 70,549 | 84,809 | 102,277 | 14,876 |

The Company's revenue recognition policies effective on the adoption date of ASC 606 are as follows:

Performance-based online marketing services

*Cost-per-click*

The Company's auction-based P4P platform enables customers to bid for priority placement of their paid sponsored links. The P4P platform enables customers to reach users who search for information related to their products or services. The P4P services include search-based online marketing services and feed-based online marketing services. The P4P online marketing customers may choose to set a daily limit on the amount spent and may also choose to target only users accessing our website from specified regions in China and/or during a specific time period of the day.

Besides the Company's traditional search-based P4P services, the Company also displays feed-based marketing to target the right feed users based on user data on the Company's platform. Customers pay the Company when a targeted user clicks the feed-based marketing and are directed to its platforms.

Revenue is recognized when all of the revenue recognition criteria are met, which is generally when a user clicks on one of the customer-sponsored links or feed-based marketing.

*Other performance-based online marketing services*

To the extent the Company provides online marketing services based on performance criteria other than cost-per-click, such as the number of downloads (and user registration) of mobile apps and the pre-determined ratios of completed transaction volumes, revenue is recognized when the specified performance criteria are met along with the satisfaction of other applicable revenue recognition criteria.

Display advertisements

The Company provides display-based online advertising services to its customers by integrating text description, image and video, and displaying the advertisement in a prominent position of the search result page, vertical search products or Baidu Feed. The Company recognizes revenue on a pro-rata basis over the contractual term

F-27

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

for cost per time advertising arrangements commencing on the date the customer's advertisement is displayed on the Company's platform, or based on the number of times that the advertisement has been displayed for cost per thousand impressions advertising arrangements.

Online marketing services involving Baidu Union

Baidu Union is a program through which the Company expands distribution of its customers' sponsored links or advertisements by leveraging the traffic of Baidu Union partners' internet properties. The Company makes payments to Baidu Union partners for the acquisition of traffic. The Company is the principal in these transactions, as it is primarily responsible for fulfilling the service, has discretion in establishing pricing and controls the advertising inventory before the transfer to customers. Therefore, revenue is recognized on a gross basis on the amount of fees it billed to its customers. Payments made to Baidu Union partners are recorded as traffic acquisition costs, which are included in "Cost of revenues" in the consolidated statements of comprehensive income.

Membership services

The Company offers membership services that provide subscribing members access to stream a library of premium content or personal cloud service in exchange for upfront non-refundable membership fees. When the receipt of membership fees is for services to be delivered over a period of time, the receipt is initially recorded as deferred revenue and revenue is recognized ratably over the membership period as services are rendered. Membership services revenue also includes fees earned from on-demand content purchases made by members and the sale of the right to services such as other memberships, which the Company acquires and controls before they are transferred to the customers.

Content distribution

The Company generates revenues from sub-licensing content licensed from third party vendors for cash and through nonmonetary exchanges mainly with other online video broadcasting companies. The exclusive licensing agreements the Company enters into with vendors has a definitive license period and provides the Company the rights to sub-license these contents to other third parties. The Company enters into a non-exclusive sub-license agreement with a sub-licensee for a period that falls within the original exclusive license period. For cash sub-licensing transactions, the Company receives the sub-license fee upfront under the sub-licensing arrangements and does not have any future obligation once it has provided the underlying content to the sub-licensee (which is provided at or before the beginning of the sub-license period). The sub-license fees are recognized in accordance with ASC 606 and represents a license of functional intellectual property that grants a right to use the Company's licensed copyrights, and recognized at the point in time when the licensed copyright is made available for the customer's use and benefit.

The Company also enters into nonmonetary transactions to exchange online broadcasting rights of licensed copyrights with other online video broadcasting companies from time to time. The exchanged licensed copyrights provide rights for each party to broadcast the licensed copyrights received on its own website only. Each transferring party retains the right to continue broadcasting the exclusive content on its own website and/or sublicense the rights to the content it surrendered in the exchange. The Company accounts for these nonmonetary exchanges in accordance with ASC 606, and records the transaction based on the fair value of the asset received starting from January 1, 2018. Barter sublicensing revenue are recognized in accordance with the same ASC 606 criteria above. The Company estimates the fair value of the licensed copyrights received based on various factors, including broadcasting schedule, cast and crew, theme and popularity, box office and market share of

F-28

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

counterparties to the exchange. The attributable cost of cash sublicensing transactions, whether for cash or through nonmonetary exchanges, is recognized as cost of revenues through the amortization of the sublicensing right component of the exclusive licensed copyright, computed using the individual-film-forecast-computation method in accordance with ASC 926.

The Company recognized barter sublicensing revenues of RMB382 million, RMB763 million and RMB1.1 billion (US$158 million) and related costs of RMB363 million, RMB650 million and RMB1.0 billion (US$149 million) for the years ended December 31, 2016, 2017 and 2018, respectively.

Nonmonetary transactions

The Company engages in certain nonmonetary transactions other than licensed copyrights of video contents, such as advertising, from time to time. The transaction price of the nonmonetary consideration is measured at fair value at contract inception. If fair value cannot be reasonably estimated, the Company measures the consideration indirectly by reference to the standalone selling price of the services promised to the customer in exchange for the consideration. Revenues recognized on advertising barter transactions were immaterial for the years ended December 31, 2016, 2017 and 2018.

Financial services

The Company offers financial services which include provision of installment payment services to consumers and wealth management services to third-party investors. Interest income earned from provision of financial services is reported as "Other revenues" and reported on a net basis after deduction of related interest costs incurred. The Company recognized gross interest income of RMB3.5 billion and RMB3.3 billion (US$483 million) and interest costs of RMB1.9 billion and RMB1.6 billion (US$232 million) for the years ended December 31, 2017 and 2018, respectively. Gross interest income and interest costs recognized for the year ended December 31, 2016 were insignificant. The financial services business was disposed of in August 2018 (Note 4).

Other revenue recognition related policies

For arrangements that include multiple performance obligations, primarily for advertisements to be displayed in different spots, placed under different forms and displayed at different times, the Company would evaluate all the performance obligations in the arrangement to determine whether each performance obligation is distinct. Consideration is allocated to each performance obligation based on its standalone selling price. If a promised good or service does not meet the criteria to be considered distinct, it is combined with other promised goods or services until a distinct bundle of goods or services exists.

Timing of revenue recognition may differ from the timing of invoicing to customers. For certain services customers are required to pay before the services are delivered to the customer. When either party to a revenue contract has performed, the Company recognizes a contract asset or a contract liability in the consolidated balance sheet, depending on the relationship between the entity's performance and the customer's payment. Contract liabilities were mainly related to fees for membership services to be provided over the membership period, which were presented as deferred revenue on the consolidated balance sheets. The increase in deferred revenue as compared to the year ended December 31, 2017 is a result of the increase in consideration received from the Company's customers.

The opening balance of contract assets were RMB832 million as of January 1, 2018. As of December 31, 2018, contract assets of RMB1.4 billion (US$206 million), net of allowance for doubtful accounts of RMB21 million (US$3 million) were recognized and included in "Other current assets, net" on the consolidated balance sheet.

F-29

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The Company does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which the Company recognizes revenue at the amount to which it has the right to invoice for services performed.

The Company provides sales incentives to customers which entitle them to receive reductions in the price of the online marketing services by meeting certain cumulative consumption requirements. The Company accounts for these incentives granted to customers as variable consideration and net against revenue. The amount of variable consideration is measured based on the most likely amount of incentives to be provided to customers.

### Cost of Revenues

Cost of revenues consists primarily of traffic acquisition costs, bandwidth costs, depreciation, content costs, payroll and related costs of operations. Starting from January 1, 2018, VAT was recorded net against revenue instead of as cost of revenue.

Traffic acquisition costs represent the amounts paid or payable to Baidu Union partners who direct search queries to the Company's websites or distribute the Company's customers' paid links through their properties. These payments are primarily based on revenue sharing arrangements under which the Company pays its Baidu Union partners and other business partners a percentage of the fees it earns from its online marketing customers.

### Advertising and Promotional Expenses

Advertising and promotional expenses, including advertisements through various forms of media and kinds of marketing and promotional activities, are included in "Selling, general and administrative expense" in the consolidated statements of comprehensive income (loss) and are expensed when incurred. Advertising and promotional expenses for the years ended December 31, 2016, 2017 and 2018 were RMB7.7 billion, RMB4.6 billion and RMB10.1 billion (US$1.5 billion), respectively.

### Government Subsidies

Government subsidies primarily consist of financial subsidies received from provincial and local governments for operating a business in their jurisdictions and compliance with specific policies promoted by the local governments. For certain government subsidies, there are no defined rules and regulations to govern the criteria necessary for companies to receive such benefits, and the amount of financial subsidy is determined at the discretion of the relevant government authorities. The government subsidies of non-operating nature with no further conditions to be met are recorded as non-operating income in "Other income, net" when received. The government subsidies with certain operating conditions are recorded as "deferred income" when received and will be recorded as operating income when the conditions are met.

### Leases

Leases are classified as either capital or operating leases. Leases that transfer substantially all the benefits and risks incidental to the ownership of assets are accounted for as capital leases as if there was an acquisition of an asset and incurrence of an obligation at the inception of the lease. All other leases are accounted for as operating leases wherein rental payments are expensed as incurred.

### Income Taxes

The Company recognizes income taxes under the liability method. Deferred income taxes are recognized for differences between the financial reporting and tax bases of assets and liabilities at enacted tax rates in effect for the years in which the differences are expected to reverse. The Company records a valuation allowance against

F-30

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

the amount of deferred tax assets that it determines is not more-likely-than-not to be realized. The effect on deferred taxes of a change in tax rates is recognized in earnings in the period that includes the enactment date.

The Company applies the provisions of ASC Topic 740, *Income Taxes* ("ASC 740"), in accounting for uncertainty in income taxes. ASC 740 clarified the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company has elected to classify interest and penalties related to an uncertain tax position (if and when required) as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2016, 2017 and 2018, the amounts of unrecognized tax benefits as well as interest and penalties associated with uncertainty in income taxes were insignificant.

### *Share-based Compensation*

The Company accounts for share-based compensation in accordance with ASC Topic 718, *Compensation-Stock Compensation* ("ASC 718"). The Company has elected to recognize share-based compensation using the straight-line method for all share-based awards issued with no performance conditions. For awards with performance conditions, compensation cost is recognized on an accelerated basis if it is probable that the performance condition will be achieved.

Forfeitures are estimated based on historical experience and are periodically reviewed. Cancellation of an award accompanied by the concurrent grant of a replacement award is accounted for as a modification of the terms of the cancelled award ("modified awards"). The compensation costs associated with the modified awards are recognized if either the original vesting condition or the new vesting condition is achieved. Total recognized compensation cost for the awards is at least equal to the fair value of the awards at the grant date unless at the date of the modification the performance or service conditions of the original awards are not expected to be satisfied. The incremental compensation cost is measured as the excess of the fair value of the replacement award over the fair value of the cancelled award at the cancellation date. Therefore, in relation to the modified awards, the Company recognizes share-based compensation over the vesting periods of the replacement award, which comprises, (i) the amortization of the incremental portion of share-based compensation over the remaining vesting term and (ii) any unrecognized compensation cost of the original award, using either the original term or the new term, whichever results in higher expenses for each reporting period.

The Company accounts for share awards issued to non-employees in accordance with the provisions of ASC Subtopic 505-50, *Equity: Equity-based Payments to Non-Employees*. The Company uses the Black-Scholes-Merton option pricing model method to measure the value of options granted to non-employees at each vesting date to determine the appropriate charge to share-based compensation. ASC 718 requires share-based compensation to be presented in the same manner as cash compensation rather than as a separate line item.

### *Earnings Per Share ("EPS")*

The Company computes earnings per Class A and Class B ordinary shares in accordance with ASC Topic 260, *Earnings Per Share* ("ASC 260"), using the two-class method. Under the provisions of ASC 260, basic earnings per share is computed using the weighted average number of ordinary shares outstanding during the period except that it does not include unvested ordinary shares subject to repurchase or cancellation. The Company adjusts for the accretion of the redeemable noncontrolling interests in the calculation of income available to ordinary shareholders of the Company used in the earnings per share calculation.

Diluted earnings per share is computed using the weighted average number of ordinary shares and, if dilutive, potential ordinary shares outstanding during the period. Potentially dilutive securities such as convertible senior

F-31

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

notes have been excluded from the computation of diluted net income per share if their inclusion is anti-dilutive. Potential ordinary shares consist of the incremental ordinary shares issuable upon the exercise of stock options, restricted shares subject to forfeiture, and contracts that may be settled in the Company's stock or cash. The dilutive effect of outstanding stock options and restricted shares is reflected in diluted earnings per share by application of the treasury stock method. The computation of the diluted earnings per Class A ordinary share assumes the conversion of Class B ordinary shares to Class A ordinary shares, while diluted earnings per Class B ordinary share does not assume the conversion of such shares.

The liquidation and dividend rights of the holders of the Company's Class A and Class B ordinary shares are identical, except with respect to voting rights. As a result, and in accordance with ASC 260, the undistributed earnings for each year are allocated based on the contractual participation rights of the Class A and Class B ordinary shares as if the earnings for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed earnings are allocated on a proportionate basis. Further, as the conversion of Class B ordinary shares is assumed in the computation of the diluted earnings per Class A ordinary share, the undistributed earnings are equal to net income for that computation.

For the purposes of calculating the Company's basic and diluted earnings per Class A and Class B ordinary shares, the ordinary shares relating to the options that were exercised are assumed to have been outstanding from the date of exercise of such options.

### Contingencies

The Company records accruals for certain of its outstanding legal proceedings or claims when it is probable that a liability will be incurred and the amount of loss can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal proceedings or claims that could affect the amount of any accrual, as well as any developments that would make a loss contingency both probable and reasonably estimable. The Company discloses the amount of the accrual if it is material.

When a loss contingency is not both probable and estimable, the Company does not record an accrued liability but discloses the nature and the amount of the claim, if material. However, if the loss (or an additional loss in excess of the accrual) is at least reasonably possible, then the Company discloses an estimate of the loss or range of loss, unless it is immaterial or an estimate cannot be made. The assessment of whether a loss is probable or reasonably possible, and whether the loss or a range of loss is estimable, often involves complex judgments about future events. Management is often unable to estimate the loss or a range of loss, particularly where (i) the damages sought are indeterminate, (ii) the proceedings are in the early stages, or (iii) there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. In such cases, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, including eventual loss, fine, penalty or business impact, if any.

### Concentration of Risks

Concentration of credit risk

Financial instruments that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, short-term investments, accounts receivable, and amounts due from related parties. As of December 31, 2018, the Company has RMB141.5 billion (US$20.6 billion) in cash and cash equivalents, restricted cash, and short-term investments, 94% and 6% of which are held by financial institutions in the PRC and international financial institutions outside of the PRC, respectively. The Company's total cash and cash equivalents, restricted cash, and short-term investments held at four financial

F-32

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

institutions in the PRC exceeded 10%, representing 37%, 15%, 13%, and 11% of the Company's total cash and cash equivalents, restricted cash, and short-term investments as of December 31, 2018, respectively.

PRC state-owned banks, such as Bank of China, are subject to a series of risk control regulatory standards, and PRC bank regulatory authorities are empowered to take over the operation and management when any of those banks faces a material credit crisis. The Company does not foresee substantial credit risk with respect to cash and cash equivalents, restricted cash and short-term investments held at the PRC state-owned banks. Meanwhile, China does not have an official deposit insurance program, nor does it have an agency similar to what was the Federal Deposit Insurance Corporation (FDIC) in the U.S. In the event of bankruptcy of one of the financial institutions in which the Company has deposits or investments, it may be unlikely to claim its deposits or investments back in full. The Company selected reputable international financial institutions with high rating rates to place its foreign currencies. The Company regularly monitors the rating of the international financial institutions to avoid any potential defaults. There has been no recent history of default in relation to these financial institutions.

Accounts receivable are typically unsecured and derived from revenue earned from customers and agents in China, which are exposed to credit risk. The risk is mitigated by credit evaluations the Company performs on its customers and its ongoing monitoring process of outstanding balances. The Company maintains reserves for estimated credit losses and these losses have generally been within its expectations. As of December 31, 2017 and 2018, the Company had no single customer with a receivable balance exceeding 10% of the total accounts receivable balance.

No customer or any Baidu Union partner generated greater than 10% of total revenues in any of the three years presented.

Amounts due from related parties are typically unsecured. In evaluating the collectability of the amounts due from related parties balance, the Company considers many factors, including the related parties' repayment history and their credit-worthiness. An allowance for doubtful accounts is made when collection of the full amount is no longer probable.

Business and economic risks

The Company participates in a dynamic high technology industry and believes that changes in any of the following areas could have a material adverse effect on the Company's future financial position, results of operations or cash flows: changes in the overall demand for services and products; changes in business offerings; competitive pressures due to new entrants; advances and new trends in new technologies and industry standards; changes in bandwidth suppliers; changes in certain strategic relationships or customer relationships; regulatory considerations; copyright regulations; brand maintenance and enhancement; and risks associated with the Company's ability to attract and retain employees necessary to support its growth.

The Company's operations could be adversely affected by significant political, economic and social uncertainties in the PRC.

Currency convertibility risk

Substantially all of the Company's businesses are transacted in RMB, which is not freely convertible into foreign currencies. All foreign exchange transactions take place either through Bank of China or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the People's Bank of China. Approval of foreign currency payments by the People's Bank of China or other regulatory institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

F-33

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Foreign currency exchange rate risk

The functional currency and the reporting currency of the Company are the US$ and the RMB, respectively. The Company's exposure to foreign currency exchange rate risk primarily relates to cash and cash equivalents, restricted cash, short-term investments, long-term investments, notes payable and convertible senior notes denominated in the US$. On June 19, 2010, the People's Bank of China announced the end of the RMB's de facto peg to the US$, a policy which was instituted in late 2008 in the face of the global financial crisis, to further reform the RMB exchange rate regime and to enhance the RMB's exchange rate flexibility. On March 15, 2014, the People's Bank of China announced the widening of the daily trading band for RMB against US$. The appreciation of the US$ against the RMB was approximately 5.67% in 2018. Most of the revenues and costs of the Company are denominated in RMB, while a portion of cash and cash equivalents, restricted cash, short-term investments, long-term investments, notes payable and convertible senior notes are denominated in U.S. dollars. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future. Any significant fluctuation of the valuation of RMB may materially affect the Company's cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, the ADS in US$.

***Derivative Instruments***

ASC Topic 815, *Derivatives and Hedging* ("ASC 815"), requires all contracts which meet the definition of a derivative to be recognized on the balance sheet as either assets or liabilities and recorded at fair value. Changes in the fair value of derivative financial instruments are either recognized periodically in earnings or in other comprehensive income depending on the use of the derivative and whether it qualifies for hedge accounting. Changes in fair values of derivatives not qualified as hedges are reported in earnings.

***Recent Accounting Pronouncements***

In February 2016, the FASB issued ASU No. 2016-02, *Leases* ("ASU 2016-02"). ASU 2016-02 specifies the accounting for leases. For operating leases, ASU 2016-02 requires a lessee to recognize a right-of-use asset and a lease liability, initially measured at the present value of the lease payments, in its balance sheet. The standard also requires a lessee to recognize a single lease cost, calculated so that the cost of the lease is allocated over the lease term, on a generally straight-line basis. ASU 2016-02 is effective for public business entities for annual reporting periods and interim periods within those years beginning after December 15, 2018. The Company will adopt ASU 2016-02 on January 1, 2019 using by modified retrospective method and will not restate comparable periods. The Company will elect the package of practical expedients permitted under the transition guidance, which allow the Company to carry forward the historical lease classification, the assessment whether a contract is or contains a lease and initial direct costs for any leases that exist prior to adoption of the new standard. The Company will also elect the practical expedient not to separate lease and non-lease components for certain classes of underlying assets and the short-term lease exemption for contracts with lease terms of 12 months or less. Certain operating leases related to land use right, offices and internet data center ("IDC") facilities will be subject to ASU 2016-02 and right-of-use assets and lease liabilities will be recognized on the Company's consolidated balance sheet. The Company currently believes the most significant change will be related to the recognition of right-of-use assets and lease liabilities on the Company's balance sheet for certain in-scope operating leases. The Company does not expect any material impact on net assets and the consolidated statement of comprehensive income as a result of adopting the new standard.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments-Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13") which requires the measurement and recognition of expected credit losses for financial assets held at amortized cost. ASU 2016-13 replaces the

F-34

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

existing incurred loss impairment model with an expected loss methodology, which will result in more timely recognition of credit losses. ASU 2016-13 is effective for annual reporting periods, and interim periods within those years, beginning after December 15, 2019. The Company is currently in the process of evaluating the impact of the adoption of ASU 2016-13 on its consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, *Compensation—Stock Compensation (Topic 718)：Improvements to Nonemployee Share-Based Payment Accounting to simplify the accounting for share-based payments to nonemployees* ("ASU 2018-07") by aligning it with the accounting for share-based payments to employees, with certain exceptions. Under the guidance, the measurement of equity-classified nonemployee awards will be fixed at the grant date, which may lower their cost and reduce volatility in the income statement. The guidance is effective for public business entities in annual periods beginning after December 15, 2018, and interim periods within those years. Early adoption is permitted, including in an interim period. The ASU 2018-07 will impact the accounting of the share-based awards granted to non-employees and the Company does not expect a significant impact on its consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13") which eliminates, adds and modifies certain disclosure requirements for fair value measurements. Under the guidance, public companies will be required to disclose the range and weighted average used to develop significant unobservable inputs for Level 3 fair value measurements. The guidance is effective for all entities for fiscal years beginning after December 15, 2019 and for interim periods within those fiscal years, but entities are permitted to early adopt either the entire standard or only the provisions that eliminate or modify the requirements. The Company does not expect a significant impact on its consolidated financial statements.

In March 2019, the FASB issued ASU 2019-02, *Improvements to Accounting for Costs of Films and License Agreements for Program Materials* ("ASU 2019-02") which improves GAAP by aligning the accounting for production costs of an episodic television series with the accounting for production costs of films by removing the content distinction for capitalization. In addition, ASU 2019-02 requires that an entity test a film or license agreement for program material within the scope of ASC 920-350 for impairment at a film group level when the film or license agreement is predominantly monetized with other films and/or license agreements. The presentation and disclosure requirements in ASU 2019-02 also increase the transparency of information provided to users of financial statements about produced and licensed content. This update will be effective for the Company's fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. The Company is currently in the process of evaluating the effect that the adoption of ASU 2019-02 will have on the consolidated financial statements and related disclosures.

F-35

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

**3.    BUSINESS COMBINATIONS**

*Business combinations in 2018:*

During the year ended December 31, 2018, the Company completed several business combinations, to complement its existing businesses and achieve synergies. The acquired entities individually and in aggregate were in significant. Results of the acquired entities' operations have been included in the Company's consolidated financial statements since the acquisition dates.

|  | RMB | US$ |
| --- | --- | --- |
|  | (In millions) | |
| Purchase consideration | 2,378 | 346 |
| Net assets acquired, excluding intangible assets and the related deferred tax liabilities | 1,545 | 225 |
| Intangible assets, net | 1,424 | 207 |
| Deferred tax liabilities | (292) | (42) |
| Pre-existing equity interests | (1,651) | (240) |
| Noncontrolling interests | (1,312) | (191) |
| Redeemable noncontrolling interests (Note 16) | (698) | (102) |
| Goodwill | 3,362 | 489 |
|  | 2,378 | 346 |

The aggregate purchase price allocation includes acquisition of certain acquirees, which were equity method investees of the Company prior to the acquisitions. In aggregate, a re-measurement gain relating to the Company's pre-existing equity interest of RMB630 million (US$92 million) was recognized during the year ended December 31, 2018. The Company applied the equity method of accounting by recognizing its share of the profit or loss in these equity method investees up to their respective dates of acquisition.

Goodwill, which is non-deductible for tax purpose, is primarily attributable to the synergies expected to be achieved from the acquisitions.

Neither the results of operations since the acquisition dates nor the pro forma results of operations of the acquirees were presented because the effects of these business combinations, individually and in the aggregate, were not significant to the Company's consolidated results of operations.

The valuations used in the purchase price allocation described above were determined by the Company with the assistance of independent third party valuation firms. The valuation reports considered generally accepted valuation methodologies such as the income, market and cost approaches. As the acquirees are all private companies, the fair value estimates of pre-existing equity method investments or noncontrolling interests are based on significant inputs that market participants would consider, which mainly include (a) discount rates, (b) a projected terminal values based on future cash flows (c) financial multiples of companies in the same industries and (d) adjustments for lack of control or lack of marketability.

**4.    INVESTMENTS**

***Short-term Investments***

As of December 31, 2018, the Company's short-term investments comprised of only debt securities. All of the short-term held-to-maturity investments were deposits in commercial banks with maturities of less than one year

F-36

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

and the Company has the positive intent and ability to hold those securities to maturity. The short-term available-for-sale investments include wealth management products issued by commercial banks and other financial institutions.

During the years ended December 31, 2016, 2017 and 2018, the Company recorded interest income from its short-term investments of RMB2.3 billion, RMB3.0 billion and RMB3.9 billion (US$564 million) in the consolidated statements of comprehensive income, respectively.

***Long-term Investments***

Equity investments at fair value with readily determinable fair value

Equity investments at fair value with readily determinable fair value represent investments in the equity securities of publicly listed companies for which the Company does not have significant influence. The equity investments were accounted for as available-for-sale equity investments prior to the adoption of ASC 321. Starting in January 1, 2018 after adopting ASC 321, these investments were classified as equity investments at fair value with readily determinable fair value and reported at fair value. Changes in fair value are recognized in earnings, instead of accumulated other comprehensive income.

Equity investments at fair value without readily determinable fair value

Equity investments at fair value without readily determinable fair value were accounted as cost method investments prior to adopting ASC 321. As of December 31, 2017, the carrying amount of the Company's cost method investments was RMB21.8 billion. In accordance with ASC 321, the Company elected to use the measurement alternative to measure such investments at cost, less any impairment, plus or minus changes resulting from observable price changes in orderly transactions for identical or similar investments of the same issuer, if any. As of December 31, 2018, the carrying amount of the Company's equity investments measured at fair value using the measurement alternative was RMB29.3 billion (US$4.3 billion), net of RMB1.3 billion (US$191 million) in accumulated impairment. Impairment charges recognized on equity investments measured at fair value using the measurement alternative was RMB455 million (US$66 million) for the year end December 31, 2018. During the year ended December 31, 2018, certain equity investments were remeasured based on observable price changes in orderly transactions for an identical or similar investment of the same issuer, the aggregate carrying amount of these investments was RMB21.6 billion (US$3.1 billion) as of December 31, 2018.

Total unrealized and realized gains and losses of equity securities without readily determinable fair values in 2018 were as follows:

|  | For the year ended December 31, 2018 | |
| --- | --- | --- |
|  | **RMB** | **US$** |
|  | **(In millions)** | |
| Gross unrealized gains (upward adjustments) | 7,119 | 1,035 |
| Gross unrealized losses (downward adjustments excluding impairment) | (2,412) | (351) |
| Net unrealized gains and losses on equity securities held | 4,707 | 684 |
| Net realized gains on equity securities sold | 124 | 18 |
| Total net gains recognized in other income, net | 4,831 | 702 |

F-37

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

In 2016, the Company exchanged its equity shares of Uber (Cayman), Ltd. ("Uber China"), with Xiaoju Kuaizhi, Inc. ("Didi"), a China based ridesharing company, upon the merger of the two companies. The Company recognized a total gain of RMB2.0 billion in "Other income, net" and the retained investment in Didi was accounted for as a cost method investment. After the adoption of ASC 321, this investment is measured at fair value using the measurement alternative.

In May 2017, the Company completed the disposal of its mobile game business to third-party companies, a total gain of RMB923 million was recognized in "Other income, net."

In August 2017, the Company completed the disposal of Xiaodu Life Technology Ltd ("Xiaodu"), a former subsidiary of the Company primarily engaged in the business of takeout delivery services, to Rajax Holding, a China based delivery company. The Company recognized a total gain of RMB4.6 billion in "Other income, net" in 2017.

In October 2017, the Company completed the share purchase transaction of China United Network Communication Limited ("China Unicom"), listed telecommunications company in China. The total purchase consideration was RMB7.0 billion in cash with RMB4.0 billion attributable to noncontrolling interest. The investment in China Unicom was held by a non-wholly-owned subsidiary of the Company and was accounted for as a cost method investment due to a three-year holding requirement before adopting ASC 321. Subsequent to the adoption of ASC 321 it was accounted as an equity investments at fair value using the measurement alternative.

Equity method investments

*Equity Investment in Ctrip.com International, Ltd. ("Ctrip")*

As of December 31, 2018, the Company held approximately 19% of Ctrip's outstanding shares, which had a fair value of RMB19.6 billion (US$2.8 billion) as of December 31, 2018 , based on the market closing price. The Company is considered to have significant influence over Ctrip and accounts for such investment as an equity method investment in accordance with ASC 323.

As of December 31, 2018, the market value of the Company's investment in Ctrip, based on the market closing price, was below its carrying value. The Company evaluated the investment in Ctrip for impairment, taking into consideration, including, but not limited to, the duration, degree and causes of the decline in stock price, the Company's intent and ability to hold the investment, recoveries in market price subsequent to the balance sheet date, and Ctrip's financial performance and near-term prospects. Based on the evaluation, the Company concluded that the decline in market value of the investment in Ctrip did not meet the threshold of other-than-temporary.

F-38

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following tables set forth the summarized financial information of Ctrip:

| | As of September 30, (i) | | |
|---|---|---|---|
| | 2017 (ii) | 2018 | 2018 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Current assets | 63,241 | 84,464 | 12,285 |
| Non-current assets | 99,986 | 104,906 | 15,258 |
| Current liabilities | 41,972 | 69,065 | 10,045 |
| Non-current liabilities | 37,590 | 30,318 | 4,410 |
| Noncontrolling interests | 1,935 | 2,231 | 324 |

| | For the twelve months ended September 30, (i) | | | |
|---|---|---|---|---|
| | 2016 (ii) | 2017 (ii) | 2018 (ii) | 2018 (ii) |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Total revenues | 17,642 | 25,731 | 29,944 | 4,355 |
| Gross profit | 12,669 | 20,725 | 24,019 | 3,493 |
| (Loss) income from operations | (1,681) | 2,626 | 3,302 | 480 |
| Net (loss) income | (2,177) | 2,282 | 2,807 | 408 |
| Net (loss) income attributable to the investees | (2,000) | 2,284 | 2,806 | 408 |

(i) The Company adopted a one-quarter lag in reporting its share of equity income in Ctrip
(ii) Ctrip adopted ASC 606 (on a fully retrospective basis) and ASC 321 (collectively "new standards") from January 1, 2018. The impact of the new standards on the Company's financial statement is immaterial, and the prior period financial information of Ctrip was not restated.

*Disposal of financial services business*

In April 2018, the Company entered into definitive agreements relating to the disposal of its wholly-owned financial services business, which provided consumer credit, wealth management and other financial services. To facilitate the divestiture, the Company conducted a series of legal restructuring and recapitalization of entities conducting the financial services business ("Du Xiaoman"), which were accounted for as transactions under common control.

In August 2018, Du Xiaoman issued preferred shares to third-party investors, which resulted in the Company becoming a minority shareholder of Du Xiaoman. Accordingly, Du Xiaoman was deconsolidated from the Group and a disposal gain of RMB5.5 billion (US$803 million) was recognized in "Other income, net," including RMB4.2 billion (US$604 million) relates to the re-measurement of the Company's retained investment in Du Xiaoman. The disposal of Du Xiaoman did not meet the definition of a discontinued operation per ASC Subtopic 205-20, *Presentation of Financial Statements —Discontinued Operations*, as the divestiture did not represent a shift in strategy nor had a major impact to the Group's operation and financial results.

The Company retained an equity interest of 41% on a fully diluted basis, and accounted for Du Xiaoman as an equity method investment in accordance with ASC 323, as it retained significant influence over Du Xiaoman. The carrying amount of the Du Xiaoman investment in excess of the Company's proportionate interest in Du Xiaoman was recognized as equity method goodwill of RMB3.5 billion (US$512 million), intangible assets of

F-39

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

RMB851 million (US$124 million) and related deferred tax liabilities of RMB213 million (US$31 million).

During the year ended December 31, 2016, the Company derecognized a group of assets sold to a third party and deconsolidated several subsidiaries due to the loss of a controlling equity interest in the subsidiary or substantive participating rights granted to other minority shareholders of the subsidiaries. An aggregate gain of RMB1.4 billion was recognized in "Other income, net" during the year ended December 31, 2016 accordingly. The Company's retained interest in these subsidiaries were accounted for as equity method investments.

As of December 31, 2017 and 2018, in addition to the aforementioned equity method investments, the Company held other equity method investments through its subsidiaries or VIEs and over which had significant influence. The carrying amount of the Company's equity method investments, including Ctrip, was RMB31.4 billion and RMB44.1 billion (US$6.4 billion) as of December 31, 2017 and 2018, respectively (see also Note 20).

For the year ended December 31, 2018, equity method investments excluding Ctrip held by the Company in aggregate have met the significance criteria as defined under Rule 4-08(g) of Regulation S-X. Financial information for the Company's equity method investments other than Ctrip are summarized as a group as follow:

| | As of September 30,[i] | | |
| --- | --- | --- | --- |
| | 2017[ii] RMB | 2018[ii] RMB | 2018[ii] US$ |
| | | (In millions) | |
| Current assets | 4,914 | 100,313 | 14,590 |
| Non-current assets | 653 | 11,050 | 1,607 |
| Current liabilities | 579 | 78,935 | 11,481 |
| Non-current liabilities | 21 | 2,718 | 395 |
| Noncontrolling interests | 2 | 1,706 | 248 |

| | For the twelve months ended September 30, [i] | | | |
| --- | --- | --- | --- | --- |
| | 2016 [ii] RMB | 2017 [ii] RMB | 2018 [ii] RMB | 2018[ii] US$ |
| | | (In millions) | | |
| Total revenues | 963 | 1,681 | 4,633 | 674 |
| Gross profit | 290 | 671 | 916 | 133 |
| Loss from operations | (359) | (303) | (418) | (61) |
| Net loss | (373) | (310) | (372) | (54) |
| Net loss attributable to the investees | (396) | (311) | (352) | (51) |

(i)   The Company adopted a one-quarter lag in reporting its shares of equity income in all of its investees.
(ii)  Financial information of equity method investees were presented under legacy GAAP, the impact of the new standards on the Company's financial statements is insignificant.

Investment accounted for at fair value

Long-term equity investments in unlisted companies held by consolidated investment companies are accounted for at fair value in accordance with ASC Subtopic 946-320, *Financial Services—Investment Companies, Investments—Debt and Equity Securities*. These investments are carried at fair value with realized or unrealized gains and losses recorded in "Other income, net" in the consolidated statements of comprehensive income.

F-40

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The methodology used in the determination of fair values for held-to-maturity debt investments, available-for-sale debt investments, equity investments with readily determinable fair values and other investment securities accounted for at fair value were disclosed in Note 22.

Investments classification as of December 31, 2017 and 2018 were shown as below:

| | As of December 31, 2017 | | | | | |
| | Cost or Amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value |
| | RMB | RMB | RMB | RMB | RMB | RMB |
| | | | (In millions) | | | |
| **Short-term investments** | | | | | | |
| Held-to-maturity debt investments | 48,666 | 47 | (18) | — | — | 48,695 |
| Available-for-sale debt investments | 40,139 | — | — | 581 | (5) | 40,715 |
| **Other invested securities** | 18,289 | — | — | 169 | (108) | 18,350 |
| **Long-term investments** | | | | | | |
| Available-for-sale equity investments | 2,077 | — | — | 742 | (46) | 2,773 |
| Investments accounted for at fair value | 307 | — | — | 14 | — | 321 |

| | As of December 31, 2018 | | | | | | |
| | Cost or Amortized cost | Gross unrecognized holding gains | Gross unrecognized holding losses | Gross unrealized gains | Gross unrealized losses | Fair value | |
| | RMB | RMB | RMB | RMB | RMB | RMB | US$ |
| | | | (In millions) | | | | |
| **Short-term investments** | | | | | | | |
| Held-to-maturity debt investments | 27,388 | 119 | — | — | — | 27,507 | 4,001 |
| Available-for-sale debt investments | 83,100 | — | — | 1,216 | (78) | 84,238 | 12,252 |
| **Long-term investments** | | | | | | | |
| Equity investments at fair value with readily determinable fair value | 5,605 | — | — | 664 | (1,841) | 4,428 | 644 |
| Available-for-sale debt investment | 1,167 | — | — | — | — | 1,167 | 170 |
| Investments accounted for at fair value | 1,139 | — | — | 318 | — | 1,457 | 212 |

5.    ACCOUNTS RECEIVABLE

| | As of December 31, | | |
| | 2017 | 2018 | 2018 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| Accounts receivable | 4,887 | 6,614 | 962 |
| Allowance for doubtful accounts | (316) | (599) | (87) |
| | 4,571 | 6,015 | 875 |

F-41

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The movements in the allowance for doubtful accounts were as follows:

| | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|
| | | (In millions) | | |
| Balance as of January 1 | 190 | 177 | 316 | 46 |
| Amounts charged to expenses | 39 | 190 | 299 | 43 |
| Amounts written off | (52) | (51) | (16) | (2) |
| Balance as of December 31 | 177 | 316 | 599 | 87 |

**6.   OTHER CURRENT ASSETS**

| | As of December 31, | | |
|---|---|---|---|
| | 2017 RMB | 2018 RMB | 2018 US$ |
| | | (In millions) | |
| Prepaid expenses | 398 | 658 | 96 |
| Advances to suppliers | 764 | 1,686 | 245 |
| Receivables from online payment agencies | 312 | 892 | 130 |
| Deposits | 204 | 247 | 36 |
| Licensed copyrights | 819 | 1,176 | 171 |
| Contract assets, net | — | 1,415 | 206 |
| Others | 928 | 767 | 111 |
| | 3,425 | 6,841 | 995 |

**7.   FIXED ASSETS**

| | As of December 31, | | |
|---|---|---|---|
| | 2017 RMB | 2018 RMB | 2018 US$ |
| | | (In millions) | |
| Computer equipment | 18,354 | 26,186 | 3,809 |
| Office building | 4,003 | 4,168 | 606 |
| Office building related facility, machinery and equipment | 1,956 | 2,168 | 315 |
| Vehicles | 80 | 190 | 28 |
| Office equipment | 690 | 813 | 118 |
| Leasehold improvements | 341 | 352 | 51 |
| Construction in progress | 680 | 720 | 105 |
| | 26,104 | 34,597 | 5,032 |
| Accumulated depreciation and impairment | (13,629) | (16,694) | (2,428) |
| | 12,475 | 17,903 | 2,604 |

The Company entered into capital leases for certain computer servers and equipment. The gross amount and the accumulated depreciation of these servers and equipment were RMB198 million and RMB198 million, respectively, as of December 31, 2017 and RMB201 million (US$29 million) and RMB201 million (US$29 million), respectively, as of December 31, 2018.

F-42

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Depreciation expense of the fixed assets, including assets under capital leases, was RMB3.4 billion, RMB3.8 billion and RMB3.7 billion (US$536 million) for the years ended December 31, 2016, 2017 and 2018, respectively. The Company recognized impairment charges on fixed assets of nil, RMB70 million and nil for the years ended December 31, 2016, 2017 and 2018, respectively.

## 8.  GOODWILL AND INTANGIBLE ASSETS

*Goodwill*

The Company had three reporting units as of December 31 2016. Starting from April 2017, Search Services and Transaction Services were combined into one reporting unit, namely, Baidu Core, resulting in two reporting units, Baidu Core and iQIYI, as of December 31, 2017 and 2018.

The changes in the carrying amount of goodwill for each reporting unit from December 31, 2016 to March 31, 2017 were as follows:

| | Search Services RMB | Transaction Services RMB (In millions) | iQIYI RMB | Total RMB |
|---|---|---|---|---|
| Balance at December 31, 2016 | 10,785 | 1,281 | 3,276 | 15,342 |
| Goodwill acquired | 499 | — | — | 499 |
| Balance at March 31, 2017 | 11,284 | 1,281 | 3,276 | 15,841 |

The changes in the carrying amount of goodwill for each reporting unit after March 31, 2017 was as follows:

| | Baidu Core RMB | iQIYI RMB (In millions) | Total RMB |
|---|---|---|---|
| Balance at March 31, 2017 | 12,565 | 3,276 | 15,841 |
| Goodwill acquired | 81 | — | 81 |
| Goodwill disposed | (116) | — | (116) |
| Balance at December 31, 2017 | 12,530 | 3,276 | 15,806 |
| Goodwill acquired | 2,750 | 612 | 3,362 |
| Goodwill disposed | (569) | — | (569) |
| Foreign currency translation and other adjustments | (63) | — | (63) |
| Balance at December 31, 2018 | 14,648 | 3,888 | 18,536 |
| Balance at December 31, 2018, in US$ | 2,130 | 566 | 2,696 |

F-43

Case 1:20-cv-03794-DG-TAM    Document 65-21    Filed 03/03/23    Page 191 of 944
PageID #: 5318

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

*Intangible Assets*

| | As of December 31, 2017 | | |
| | Gross carrying value | Accumulated amortization and impairment | Net carrying value |
| | RMB | RMB | RMB |
| | | (In millions) | |
| Land use right | 464 | (193) | 271 |
| Customer relationships | 463 | (463) | — |
| Software | 537 | (499) | 38 |
| Trademarks | 579 | (464) | 115 |
| User list | 677 | (667) | 10 |
| Licensed copyrights | 9,384 | (4,826) | 4,558 |
| Others | 1,066 | (591) | 475 |
| | 13,170 | (7,703) | 5,467 |

| | As of December 31, 2018 | | | |
| | Gross carrying value | Accumulated amortization and impairment | Net carrying value | Net carrying value |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Land use right | 464 | (199) | 265 | 39 |
| Customer relationships | 589 | (476) | 113 | 16 |
| Software | 693 | (513) | 180 | 26 |
| Trademarks | 942 | (501) | 441 | 64 |
| User list | 684 | (681) | 3 | — |
| Licensed copyrights | 18,081 | (11,324) | 6,757 | 983 |
| Others | 2,291 | (869) | 1,422 | 207 |
| | 23,744 | (14,563) | 9,181 | 1,335 |

The Company recognized impairment loss on intangible assets excluding licensed copyrights of RMB1 million, RMB139 million and RMB5 million (US$0.7 million) for the years ended December 31, 2016, 2017 and 2018, respectively.

Amortization expense of intangible assets and licensed copyrights were RMB4.9 billion, RMB7.9 billion and RMB12.5 billion (US$1.8 billion), for the years ended December 31, 2016, 2017 and 2018 respectively.

Estimated amortization expense relating to the existing intangible assets with finite lives for each of the next five years is as follows:

| | RMB | US$ |
| | (In millions) | |
| For the years ending December 31, 2019 | 4,096 | 596 |
| 2020 | 2,566 | 373 |
| 2021 | 1,196 | 174 |
| 2022 | 348 | 51 |
| 2023 | 308 | 45 |

The carrying amounts of intangible assets with an indefinite useful life were insignificant as of December 31, 2017 and 2018.

F-44

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

## 9.    ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

|  | As of December 31, | | |
|---|---|---|---|
|  | 2017 | 2018 | 2018 |
|  | RMB | RMB | US$ |
|  |  | (In millions) |  |
| Accrued payroll and welfare | 1,779 | 1,898 | 276 |
| Tax payable | 2,271 | 2,342 | 341 |
| Interest payable | 267 | 382 | 56 |
| Users' and distributors' deposits | 563 | 661 | 96 |
| Purchase of fixed assets and computer parts | 1,592 | 1,890 | 275 |
| Traffic acquisition costs | 2,482 | 2,911 | 423 |
| Bandwidth costs | 1,824 | 2,085 | 303 |
| Content acquisition costs | 5,866 | 8,873 | 1,291 |
| Funds collected on behalf of service providers | 529 | 353 | 51 |
| Payable to merchants | 330 | 340 | 50 |
| Accrued other operating expenses | 7,720 | 10,680 | 1,553 |
| Others | 2,300 | 2,966 | 432 |
|  | 27,523 | 35,381 | 5,147 |

## 10.    LOANS PAYABLE

### Short-term Loans

Short-term loans as of December 31, 2017 and 2018 amounted to RMB1.2 billion and RMB3.0 billion (US$443 million), respectively, which consisted of RMB denominated borrowings from financial institutions in the PRC and were repayable within one year.

|  | As of December 31, | | |
|---|---|---|---|
|  | 2017 | 2018 | 2018 |
|  | RMB | RMB | US$ |
|  |  | (In millions) |  |
| Secured short-term loans borrowed by iQIYI [i] | 299 | 3,046 | 443 |
| Unsecured short-term loans borrowed by financial service business [ii] | 945 | — | — |
|  | 1,244 | 3,046 | 443 |

(i)    The repayment of all short-term loans are guaranteed by subsidiaries of iQIYI and either collateralized by an office building of one of iQIYI's VIEs with a carrying amount of RMB575 million (US$84 million) as of December 31, 2018 or collateralized by restricted cash balances totaling RMB2.2 billion (US$316 million) as of December 31, 2018.

(ii)    The loan balance was derecognized from the consolidated balance sheet upon disposal of the financial services business (Note 4).

As of December 31, 2017 and 2018, the weighted average interest rates for the outstanding borrowings were approximately 4.86% and 4.47%, respectively, and the aggregate amounts of unused lines of credit for short-term loans were RMB360 million and RMB781 million (US$114 million), respectively.

F-45

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

***Long-term Loans***

*Baidu*

In June 2016, the Company entered into a five-year term and revolving facility agreement with a group of 21 syndicated bankers, pursuant to which the Company is entitled to borrow an unsecured US$ denominated floating rate loan of US$1.0 billion with a term of five years and to borrow an unsecured US$ denominated revolving loan of US$1.0 billion for five years. The facility was priced at 110 basis points over LIBOR and is intended for the general working capital of the Company. In June 2016, the Company drew down two tranches of US$250 million each under the facility commitment. In November 2016, the Company drew down another two tranches of US$250 million each under the facility commitment. In connection with the facility agreements, the Company entered into four interest rate swap agreements, pursuant to which the loans would be settled with a fixed annual interest rate of 2.11%, 2.10%, 2.78% and 2.78% respectively, during the respective term of the loans.

The interest rate swap agreements met the definition of a derivative in accordance with ASC 815. The derivatives related to the interest rate swap agreements are accounted at fair value and included in "Other non-current assets" on the consolidated balance sheets.

*iQIYI*

In April 2017, iQIYI entered into a three-year loan agreement with Bank of China (Shanghai Branch), pursuant to which the Company is entitled to borrow a secured RMB denominated loan of RMB299 million for the general working capital of iQIYI. In April 2017, iQIYI drew down RMB299 million with an interest rate of 4.47%, pursuant to the agreement, the principal shall be repaid by installments from September 2017 to April 2020. RMB15 million was repaid when it became due. The amount repayable within twelve months were classified as "Long-term loans, current portion."

In December 2018, certain supplier invoices selected by iQIYI of RMB525 million (US$76 million) were factored to a financial institution ("the factored receivables") at a discount. These supplier invoices were recorded as accounts payables in the Company's consolidated balance sheet. The factored receivables were further transferred to a securitization vehicle, whereby debt securities securitized by the factored receivables. The debt securities were issued to third party investors for the gross proceeds of RMB446 million (US$65 million), with maturities in December 2019 and December 2020. The proceeds raised from issuance of the asset-backed debt securities were used by the financial institution to factor the supplier invoices. At the same time, the credit terms of the iQIYI's corresponding trade payables were extended to mirror the maturity of the asset-backed debt securities. The securitization vehicle was consolidated because iQIYI was determined to be the primary beneficiary. As of December 31, 2018, the outstanding borrowings from third-party investors was RMB444 million (US$65 million) and the effective interest rate was 7.00%. The balance of RMB74 million (US$11 million) of the loan is repayable within one year and is included in "Long-term loans, current portion" and the remaining balance of RMB370 million (US$54 million) of the loan is included in non-current "Long-term loans" on the consolidated balance sheet.

F-46

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

**11.    NOTES PAYABLE**

*Baidu, Inc.*

The Company issued and publicly sold unsecured senior notes, the detail of each tranches are shown as flow:

| | Issue date | Principal amount (US$ million) | Mature date | Effective interest rate |
|---|---|---|---|---|
| 2017 Notes | November 28, 2012 | 750 | November 28, 2017 | 2.36%* |
| 2022 Ten-year Notes | November 28, 2012 | 750 | November 28, 2022 | 3.59% |
| 2018 Notes | August 6, 2013 | 1,000 | August 6, 2018 | 3.39%* |
| 2019 Notes | June 9, 2014 | 1,000 | June 9, 2019 | 3.00% |
| 2020 Notes | June 30, 2015 | 750 | June 30, 2020 | 3.13% |
| 2025 Notes | June 30, 2015 | 500 | June 30, 2025 | 4.22% |
| 2022 Five-year Notes | July 6, 2017 | 900 | July 6, 2022 | 3.08% |
| 2027 Notes | July 6, 2017 | 600 | July 6, 2027 | 3.73% |
| 2023 Notes | March 29, 2018 | 1,000 | September 29, 2023 | 3.99% |
| 2028 March Notes | March 29, 2018 | 500 | March 29, 2028 | 4.50% |
| 2024 November Notes | November 14, 2018 | 600 | May 14, 2024 | 4.51% |
| 2028 November Notes | November 14, 2018 | 400 | November 14, 2028 | 4.99% |
| 2024 December Notes | December 10, 2018 | 250 | May 14, 2024 | 4.54% |

\*   The 2017 Notes and 2018 Notes were fully repaid when they became due.

The 2017 Notes, 2018 Notes, 2019 Notes, 2020 Notes, 2022 Ten-year Notes, 2025 Notes, 2022 Five-year Notes, 2027 Notes, 2023 Notes, 2028 March Notes, 2024 November Notes, 2028 November Notes and 2024 December Notes are collectively referred to as the "Notes."

The 2017 Notes bear interest at the rate of 2.25% per annum and the 2022 Ten-year Notes bear interest at the rate of 3.50% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on May 28, 2013.

The 2018 Notes bear interest at the rate of 3.25% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on February 6, 2014.

The 2019 Notes bear interest at the rate of 2.75% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on December 9, 2014.

The 2020 Notes bear interest at the rate of 3.00% per annum and the 2025 Notes bear interest at the rate of 4.13% per annum. Interests are payable semi-annually in arrears on and of each year, beginning on December 30, 2015.

The 2022 Five-year Notes bear interest at the rate of 2.88% per annum and the 2027 Notes bear interest at the rate of 3.63% per annum. Interest are payable semi-annually in arrears on and of each year, beginning on January 6, 2018.

The 2023 Notes bear interest at the rate of 3.88% per annum and the 2028 March Notes bear interest at the rate of 4.38% per annum. Interest are payable semi-annually in arrears on and of each year, beginning on September 29, 2018.

F-47

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The 2024 November Notes bear interest at the rate of 4.38% per annum and the 2028 November Notes bear interest at the rate of 4.88% per annum. Interest are payable semi-annually in arrears on and of each year, beginning on May 14, 2019.

The 2024 December Notes bear interest at the rate of 4.38% per annum. Interest are payable semi-annually in arrears on and of each year, beginning on May 14, 2019.

At maturity, the Notes are payable at their principal amount plus accrued and unpaid interest thereon.

The Notes do not contain any financial covenants or other significant restrictions. In addition, the Notes are unsecured and rank lower than any secured obligation of the Group and have the same liquidation priority as any other unsecured liabilities of the Group, but senior to those expressly subordinated obligations, if any. The Company may, at its discretion, redeem all or any portion of the Notes at any time, at the greater of the principal amount and the make whole amount plus accrued and unpaid interest. In addition, for the Notes issued during the year ended December 31, 2018, the Company may at its discretion, redeem all or any portion of the Notes at one or three months before the maturity date of respective notes, at a price equal to the greater of 100% of the principal amount of such Notes plus accrued and unpaid interest, if any, to (but not including) the redemption date. As of December 31, 2018, the Company does not intend to redeem any portion of the Notes prior to the stated maturity dates. For certain Notes, the Company has the obligation to redeem the Notes if a change in control occurs as defined in the indenture of the Notes.

The unpaid Notes were issued at a discount amounting to RMB160 million (US$25 million). The total issuance costs of RMB225 million (US$35 million) were presented as a direct deduction from the principal amount of the Notes on the consolidated balance sheets. Both the discount and the issuance costs are amortized as interest expense using the effective interest rate method through the maturity dates of the Notes.

The principal amount and unamortized discount and debt issuance costs as of December 31, 2017 and 2018 were as follows:

|  | As of December 31, | | |
| --- | --- | --- | --- |
|  | 2017 | 2018 | 2018 |
|  | RMB | RMB | US$ |
|  |  | (In millions) | |
| Principal amount | 35,782 | 49,867 | 7,253 |
| Unamortized discount and debt issuance costs | (171) | (261) | (38) |
|  | 35,611 | 49,606 | 7,215 |

The following table summarizes the aggregate required repayments of the principal amounts of the Company's long-term debts, including the notes payable and loans payable (Note10), in the succeeding five years and thereafter:

|  | RMB | US$ |
| --- | --- | --- |
|  | (In millions) | |
| For the years ending December 31, 2019 | 6,960 | 1,012 |
| 2020 | 5,801 | 844 |
| 2021 | 6,876 | 1,000 |
| 2022 | 11,345 | 1,650 |
| 2023 | 6,876 | 1,000 |
| Thereafter | 19,595 | 2,850 |

F-48

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

### 12.    CONVERTIBLE NOTES

*iQIYI 2018 Convertible Notes*

In January 2017, iQIYI issued US$1.5 billion of convertible notes (the "iQIYI 2018 Convertible Notes") in a private placement, among which US$300 million was purchased by the Company and the remaining US$1.2 billion was purchased by external investors. The iQIYI 2018 Convertible Notes bear interest at a coupon rate of 1.50% per annum with a maturity date of January 25, 2018. The iQIYI Notes can be converted into preferred shares in a qualified financing or at iQIYI's election. The conversion option does not meet the definition of a derivative under ASC 815. On October 26, 2017, the US$1.5 billion iQIYI 2018 Convertible Notes and the related accrued interest were converted into 1,014,436,019 iQIYI's Series G preferred shares. Upon the completion of IPO, all preferred shares were converted into Class A ordinary shares of iQIYI (Note 16).

*iQIYI 2023 Convertible Notes*

In December 2018, iQIYI issued US$750 million convertible senior notes due 2023 ("iQIYI 2023 Convertible Notes"). The iQIYI 2023 Convertible Notes are senior, unsecured obligations of iQIYI, and interest is payable semi-annually in cash at a rate of 3.75% per annum with a maturity date of December 1, 2023, unless previously repurchased, redeemed or converted prior to such date. The initial conversion rate of the iQIYI 2023 Convertible Notes is 37.1830 of iQIYI's ADSs per US$1,000 principal amount of the iQIYI 2023 Convertible Notes. Upon conversion, the Company will pay or deliver to such converting holders, as the case may be, cash, ADSs, or a combination of cash and ADSs, at its election.

Concurrently with the issuance of the iQIYI 2023 Convertible Notes, iQIYI purchased a call option on the Company's ADS with certain counterparties at a price of US$68 million. The capped call exercise price is equal to the initial conversion price of the iQIYI 2023 Convertible Notes and the cap price is US$38.42 per ADS, subject to certain adjustments under the terms of the capped call transactions. The cost of the capped call was recorded as a reduction of the Company's additional paid-in capital on the consolidated balance sheets with no subsequent changes in fair value be recorded.

As the conversion option may be settled entirely or partially in cash at iQIYI's option, the Company separated the iQIYI 2023 Convertible Notes into liability and equity components in accordance with ASC 470-20, *Debt with Conversion and Other Options*. The carrying amount of the liability component was calculated by measuring the fair value of a similar liability that does not have an associated conversion feature. The carrying amount of the equity component representing the conversion option was determined by deducting the fair value of the liability component from the initial proceeds and recorded as additional paid-in capital. Debt issuance costs were allocated to the liability and equity components using the same proportions as the proceeds from the iQIYI 2023 Convertible Notes. The difference between the principal amount of the iQIYI 2023 Convertible Notes and the liability component is considered debt discount and is amortized at an effective interest rate of 7.04% to accrete the discounted carrying value of the iQIYI 2023 Convertible Notes to its face value on December 1, 2021, the put date of the iQIYI 2023 Convertible Notes.

As of December 31, 2018, the principal amount of the liability component was RMB5.2 billion (US$750 million), unamortized debt discount was RMB446 million (US$65 million). The carrying amount of the equity component was RMB362 million (US$53 million).

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

**13.   INCOME TAXES**

*Cayman Islands and BVI*

Under the current laws of the Cayman Islands and BVI, the Company is not subject to tax on income or capital gains. Additionally, upon payments of dividends by the Company to its shareholders, no Cayman Islands withholding tax will be imposed.

*Hong Kong*

Subsidiaries in Hong Kong are subject to Hong Kong Profits Tax rate at 16.5%. They may be exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

*Japan*

As a result of the Japanese tax regulations amendments, the effective income tax rate are approximately 33%, 32% and 31% for the years ended December 31, 2016, 2017 and 2018, respectively.

*China*

Effective from January 1, 2008, the PRC's statutory, Enterprise Income Tax ("EIT") rate is 25%. Preferential EIT rates at 15% and 10% are available for qualified "High and New Technology Enterprises" ("HNTEs") and "Key Software Enterprise" ("KSE"), respectively. The HNTE certificate is effective for a period of three years and the KSE is subject to relevant governmental authorities' annual assessment based on self-assessment supporting documents filed with the tax authorities each year.

Baidu Online, Baidu China and Baidu International enjoyed a reduced tax rate of 10% as qualified KSEs in 2016 and 2017. Certain other PRC subsidiaries and VIEs, including Baidu Netcom, are qualified HNTEs and enjoy a reduced tax rate of 15% for the years presented, which will expire in 2019, 2020 and 2021. An entity must file required supporting documents with the tax authorities before using the preferential rates. Whether the entity is entitled to enjoy a preferential rate as a KSE is subject to relevant governmental authorities' assessment each year. An entity could re-apply for the HNTE certificate when the prior certificate expires. Historically, all of the Company's subsidiaries and VIEs successfully re-applied for the certificates when the prior ones expired.

A certificate for the current year might be obtained in the following year as a result of the stringent inspection and approval process by the governmental authorities. The Company would record an income tax reversal in the year when the certificate is obtained for the over-paid or over-accrued provisional tax in connection with the grant of a more favorable tax rate for the prior year.

Under the current EIT Law, dividends for earnings derived from January 1, 2008 and onwards paid by PRC entities to any of their foreign non-resident enterprise investors are subject to a 10% withholding tax. A lower tax rate will be applied if tax treaty or arrangement benefits are available. Under the tax arrangement between the PRC and Hong Kong, the reduced withholding tax rate for dividends paid by PRC entities is 5% provided the Hong Kong investors meet the requirements as stipulated by relevant PRC tax regulations, such as the beneficiary owner test. Capital gains derived from PRC are also subject to a 10% PRC withholding tax.

F-50

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Income (loss) before income taxes consists of:

|  | For the years ended December 31, | | | |
|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2018 |
|  | RMB | RMB | RMB | US$ |
|  | (In millions) | | | |
| PRC | 18,194 | 22,088 | 23,524 | 3,421 |
| Non-PRC | (3,685) | (805) | 3,801 | 553 |
|  | 14,509 | 21,283 | 27,325 | 3,974 |

Except for the investment related gain recognized, the pre-tax losses from non-PRC operations consist primarily of operating costs, administration expenses, interest expenses and share-based compensation expenses.

Income taxes consist of:

|  | For the years ended December 31, | | | |
|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2018 |
|  | RMB | RMB | RMB | US$ |
|  | (In millions) | | | |
| Current income tax | 3,462 | 4,224 | 6,184 | 900 |
| Income tax refund due to reduced tax rate | (535) | (473) | (680) | (99) |
| Adjustments of deferred tax assets due to change in tax rates | (13) | 7 | — | — |
| Deferred income tax benefit | (1) | (763) | (761) | (111) |
|  | 2,913 | 2,995 | 4,743 | 690 |

The reconciliation of the actual income taxes to the amount of tax computed by applying the aforementioned statutory income tax rate to pre-tax income is as follows:

|  | For the years ended December 31, | | | |
|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2018 |
|  | RMB | RMB | RMB | US$ |
|  | (In millions, except for per share data) | | | |
| Expected taxation at PRC statutory tax rate | 3,627 | 5,321 | 6,831 | 994 |
| Effect of differing tax rates in different jurisdictions | 736 | 854 | 493 | 72 |
| Non-taxable income | (73) | (913) | (1,555) | (226) |
| Non-deductible expenses | 115 | 653 | 935 | 136 |
| Research and development super-deduction | (726) | (905) | (1,047) | (152) |
| Effect of PRC preferential tax rates and tax holiday | (1,851) | (2,095) | (2,250) | (327) |
| Effect of tax rate changes on deferred taxes | (13) | 7 | — | — |
| Over-accrued EIT for previous years | (520) | (579) | (616) | (90) |
| PRC withholding tax | 283 | 101 | 553 | 80 |
| Addition to valuation allowance | 1,335 | 551 | 1,399 | 203 |
| Taxation for the year | 2,913 | 2,995 | 4,743 | 690 |
| Effective tax rate | 20% | 14% | 17% | 17% |
| Effect of preferential tax rates inside the PRC on basic earnings per Class A and Class B ordinary share | 53.41 | 60.33 | 64.47 | 9.38 |

F-51

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The tax effects of temporary differences that gave rise to the deferred tax balances at December 31, 2017 and 2018 are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2018 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| **Deferred tax assets:** | | | |
| Provision for doubtful receivables | 287 | 252 | 37 |
| Accrued expenses, payroll and others | 2,849 | 4,284 | 622 |
| Fixed assets depreciation | 53 | 60 | 9 |
| Net operating loss carry-forward | 1,061 | 1,609 | 234 |
| Less: valuation allowance | (2,718) | (3,881) | (564) |
| Deferred tax assets, net | 1,532 | 2,324 | 338 |

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2018 | 2018 |
| | RMB | RMB | US$ |
| | | (In millions) | |
| **Deferred tax liabilities:** | | | |
| Long-lived assets arising from acquisitions | 133 | 360 | 52 |
| Withholding tax on PRC subsidiaries' undistributed earnings | 586 | 619 | 90 |
| Tax on capital gains | 2,460 | 2,778 | 404 |
| Other | 196 | 342 | 50 |
| | 3,375 | 4,099 | 596 |

As of December 31, 2018, the Company had tax losses of approximately RMB9.5 billion (US$1.4 billion) deriving from entities in the PRC, Hong Kong and Japan. The tax losses in Japan can be carried forward for nine years to offset future taxable profit. The tax losses in PRC can be carried forward for five years to offset future taxable profit, and the period was extended to 10 years for entities qualified as HNTE in 2018 and thereafter. The tax losses of entities in the PRC and Japan will begin to expire in 2019, if not utilized. The tax losses in Hong Kong can be carried forward without an expiration date.

The Company evaluated its income tax uncertainty under ASC 740. ASC 740 clarifies the accounting for uncertainty in income taxes by prescribing the recognition threshold a tax position is required to meet before being recognized in the financial statements. The Company elects to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive income. As of and for the years ended December 31, 2017 and 2018, there was no significant impacts from tax uncertainty on the Company's financial position and result of operations. The Company does not expect the amount of unrecognized tax benefits would increase significantly in the next 12 months. In general, the PRC tax authorities have up to five years to conduct examinations of the tax filings of the Company's PRC subsidiaries. Accordingly, the PRC subsidiaries' tax years of 2013 through 2018 remain open to examination by the respective tax authorities. The Company may also be subject to the examinations of the tax filings in other jurisdictions, which are not material to the consolidated financial statements.

In 2013, the Company accrued RMB581 million of withholding tax for the potential remittance of earnings from the PRC subsidiaries to their offshore parent companies in the form of dividend distribution, because the Company believes that the underlying dividends will be distributed in the future considering future merger and

F-52

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

acquisition activities. The Company did not provide for additional deferred income taxes and foreign withholding taxes on the undistributed earnings of foreign subsidiaries during the years presented on the basis of its intent to permanently reinvest its foreign subsidiaries' earnings. As of December, 31 2018, the total amount of undistributed earnings from the PRC subsidiaries for which no withholding tax has been accrued was RMB144.4 billion (US$21.0 billion). Determination of the amount of unrecognized deferred tax liability related to these earnings is not practicable. In the case of its VIEs in the PRC, undistributed earnings were insignificant as of each of the balance sheet dates.

## 14.   EMPLOYEE DEFINED CONTRIBUTION PLAN

Full time employees of the Group in the PRC participate in a government mandated multi-employer defined contribution plan pursuant to which certain pension benefits, medical care, unemployment insurance, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the Group make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has no legal obligation for the benefits beyond the contributions. The total amounts for such employee benefits, which were expensed as incurred, were RMB2.3 billion, RMB2.6 billion and RMB2.9 billion (US$426 million) for the years ended December 31, 2016, 2017 and 2018, respectively.

## 15.   COMMITMENTS AND CONTINGENCIES

### *Capital Commitments*

The Company's capital commitments primarily relate to commitments in connection with the expansion and improvement of its network infrastructure and its plan to build additional office buildings and cloud computing based data centers. Total capital commitments contracted but not yet reflected in the financial statements amounted to RMB220 million (US$32 million) as of December 31, 2018. All of the commitments relating to the network infrastructure are to be fulfilled in the next five years and the commitments relating to the office building and cloud computing based data centers will be settled in installments in the following years according to the construction progress.

### *Operating Lease Commitments*

The Company leases facilities in the PRC under non-cancelable operating leases expiring on different dates. Payments under operating leases are expensed on a straight-line basis over the periods of the respective leases. Total rental expense for offices was RMB494 million, RMB507 million and RMB485 million (US$71 million) for the years ended December 31, 2016, 2017 and 2018, respectively. Total operating lease expense for IDC facilities was RMB4.7 billion, RMB5.6 billion and RMB6.5 billion (US$944 million) for the years ended December 31, 2016, 2017 and 2018 respectively.

F-53

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Future minimum payments under non-cancelable operating leases with initial terms of one-year or more consist of the following as of December 31, 2018:

|  | RMB | US$ |
|---|---|---|
|  | (In millions) | |
| 2019 | 1,820 | 265 |
| 2020 | 453 | 66 |
| 2021 | 258 | 38 |
| 2022 | 119 | 17 |
| 2023 | 95 | 14 |
| Thereafter | 44 | 6 |
|  | 2,789 | 406 |

The Group's lease arrangements have no restriction or contingent rents. Certain lease arrangements have escalation clauses and renewal options with advance notice period of several months.

*Licensed Copyrights and Produced Content Commitments*

Future minimum payments under non-cancelable agreements for licensed copyrights and produced content consist of the following as of December 31, 2018:

|  | RMB | US$ |
|---|---|---|
|  | (In millions) | |
| 2019 | 8,834 | 1,285 |
| 2020 | 6,977 | 1,015 |
| 2021 | 4,792 | 697 |
| 2022 | 980 | 142 |
| 2023 | 943 | 137 |
| Thereafter | 1,050 | 153 |
|  | 23,576 | 3,429 |

*Investment Commitments*

The Company's investment commitments primarily relate to capital contributions obligation under certain arrangements. The total investment commitments contracted but not yet reflected in the financial statements amounted to RMB1.4 billion (US$199 million).

*Guarantees*

The Company accounts for guarantees in accordance with ASC Topic 460, *Guarantees* ("ASC 460"). Accordingly, the Company evaluates its guarantees if any to determine whether (a) the guarantee is specifically excluded from the scope of ASC 460, (b) the guarantee is subject to ASC 460 disclosure requirements only, but not subject to the initial recognition and measurement provisions, or (c) the guarantee is required to be recorded in the financial statements at fair value.

The corporate by-laws require that the Company indemnify its officers and directors, as well as those who act as directors and officers of other entities at the Company's request, against expenses, judgments, fines, settlements

F-54

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

and other amounts actually and reasonably incurred in connection with any proceedings arising out of their services to the Company. In addition, the Company entered into separate indemnification agreements with each director and each executive officer of the Company that provide for indemnification of these directors and officers under similar circumstances and under additional circumstances. The indemnification obligations are more fully described in the by-laws and the indemnification agreements. The Company purchases standard directors and officers insurance to cover claims or a portion of the claims made against its directors and officers. Since a maximum obligation is not explicitly stated in the Company's by-laws or in the indemnification agreements and will depend on the facts and circumstances that arise out of any future claims, the overall maximum amount of the obligations cannot be reasonably estimated.

Historically, the Company was not required to make payments related to these obligations, and the fair value for these obligations was nil on the consolidated balance sheets as of December 31, 2017 and 2018.

*Litigation*

The Group was involved in certain cases pending in various PRC, Japan, U.S. and Brazil courts and arbitration as of December 31, 2018. These cases include copyright infringement cases, unfair competition cases, and defamation cases, among others. Adverse results in these lawsuits may include awards of damages and may also result in, or even compel, a change in the Company's business practices, which could result in a loss of revenue or otherwise harm the business of the Company.

For many proceedings, the Company is currently unable to estimate the reasonably possible loss or a range of reasonably possible losses as the proceedings are in the early stages, and/or there is a lack of clear or consistent interpretation of laws specific to the industry-specific complaints among different jurisdictions. As a result, there is considerable uncertainty regarding the timing or ultimate resolution of such matters, which includes eventual loss, fine, penalty or business impact, if any, and therefore, an estimate for the reasonably possible loss or a range of reasonably possible losses cannot be made. However, the Company believes that such matters, individually and in the aggregate, when finally resolved, are not reasonably likely to have a material adverse effect on the Company's consolidated results of operations, financial position and cash flows. With respect to the limited number of proceedings for which the Company was able to estimate the reasonably possible losses or the range of reasonably possible losses, such loss estimates were insignificant.

## 16.   REDEEMABLE NONCONTROLLING INTERESTS

| | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
|---|---|---|---|---|
| | | (In millions) | | |
| Balance as of January 1 | 3,948 | 5,492 | 11,022 | 1,603 |
| Business combination (Note 3) | — | — | 698 | 102 |
| Other comprehensive income (loss) | 325 | (335) | — | — |
| Issuance of subsidiary shares | 662 | — | — | — |
| Disposal of subsidiary shares | — | (2,376) | — | — |
| Accretion of redeemable noncontrolling interests | 557 | (17) | 146 | 21 |
| Conversion of convertible notes of iQIYI | — | 8,258 | — | — |
| Conversion of iQIYI preferred shares recognized as redeemable noncontrolling interests to ordinary shares | — | — | (11,150) | (1,622) |
| Balance as of December 31 | 5,492 | 11,022 | 716 | 104 |

F-55

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

In November 2014, iQIYI completed a round of preferred shares financing with US$300 million from the external preferred shareholders. In October 2017, the US$1.2 billion iQIYI 2018 Convertible Notes (Note 12) plus related interest purchased by external investors was converted to iQIYI's new round preferred shares. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of iQIYI, these preferred shares are accounted for as redeemable noncontrolling interests. Upon completion of the IPO of iQIYI, all preferred shares of iQIYI held by external preferred shareholders were automatically re-designated and converted on a one-for-one basis into Class A ordinary shares of iQIYI.

In October 2015, Xiaodu issued 250,000,000 preferred shares to certain shareholders for a total consideration of US$250 million. In May 2016, Xiaodu issued an additional 42,105,264 preferred shares to certain other shareholders for a total consideration of US$100 million. As the preferred shares could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of Xiaodu, these preferred shares were accounted for as redeemable noncontrolling interests. In August 2017, the Company completed the disposal of Xiaodu to Rajax Holding in exchange for its equity shares.

In October, 2018 the Company acquired additional shares of a former equity method investee, resulting in the investee becoming a subsidiary of the Company. The subsidiary had issued 159,820,917 outstanding preferred shares to certain shareholders, which could be redeemed by such shareholders upon the occurrence of certain events that are not solely within the control of the subsidiary. Therefore, these preferred share were accounted for as redeemable noncontrolling interests (Note 3).

The Company accounts for the changes in accretion to the redemption value in accordance with ASC Topic 480, *Distinguishing Liabilities from Equity.* The Company elects to use the effective interest method to account for the changes of redemption value over the period from the date of issuance to the earliest redemption date of the noncontrolling interest.

## 17.    SHAREHOLDERS' EQUITY

### Ordinary Shares

The authorized share capital consisted of 870,400,000 ordinary shares at a par value of US$0.00005 per share, of which 825,000,000 shares were designated as Class A ordinary shares, 35,400,000 as Class B ordinary shares, and 10,000,000 shares designated as preferred shares. The rights of the holders of Class A and Class B ordinary shares are identical, except with respect to voting and conversion rights. Each share of Class A ordinary shares is entitled to one vote per share and is not convertible into Class B ordinary shares under any circumstances. Each share of Class B ordinary shares is entitled to ten votes per share and is convertible into one Class A ordinary share at any time by the holder thereof. Upon any transfer of Class B ordinary shares by the holder thereof to any person or entity that is not an affiliate of such holder, such Class B ordinary shares would be automatically converted into an equal number of Class A ordinary shares. The number of Class B ordinary shares transferred to Class A ordinary shares was 91,667 shares, 200,000 shares and nil in the years ended December 31, 2016, 2017 and 2018, respectively.

As of December 31, 2018, there were 27,733,692 and 7,201,254 Class A and Class B ordinary shares outstanding, respectively. As of December 31, 2017 and 2018, there were no preferred shares issued and outstanding.

On July 30, 2015, the Company announced a share repurchase program in which the Company proposed to acquire up to an aggregate of US$1.0 billion of its shares over the next 12 months. On October 29, 2015, the Company announced a share repurchase program under which the Company proposed to acquire up to an

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

aggregate of US$2.0 billion of its shares over the next 24 months. On June 27, 2018, the Company announced a share repurchase program under which the Company proposed to acquire up to an aggregate of US$1.0 billion of its ordinary shares over the next 12 months in the open market or through privately negotiated transactions, depending on market conditions and in accordance with applicable rules and regulations.

The Company repurchased nil, 145,783 and 207,165 Class A ordinary shares from the open market with an aggregate purchase price of nil, RMB1.7 billion and RMB3.3 billion (US$482 million) during the years ended December 31, 2016, 2017 and 2018. The repurchased shares were cancelled under Cayman Islands law upon repurchase and the difference between the par value and the repurchase price was debited to retained earnings.

*Retained Earnings*

In accordance with the Regulations on Enterprises with Foreign Investment of China and their articles of association, the Company's PRC subsidiaries, being foreign invested enterprises established in China, are required to make appropriations to certain statutory reserves, namely a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Each of the Company's PRC subsidiaries is required to allocate at least 10% of its after-tax profits to a general reserve fund until such fund has reached 50% of its respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the Company's subsidiaries.

In accordance with the China Company Laws, the Company's VIEs must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Each of the Company's VIEs is required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of its respective registered capital. Appropriations to the statutory public welfare fund and the discretionary surplus fund are made at the discretion of the Company's VIEs.

General reserve and statutory surplus funds are restricted to set-off against losses, expansion of production and operation and increasing registered capital of the respective company. Staff welfare and bonus fund and statutory public welfare funds are restricted to capital expenditures for the collective welfare of employees. The reserves are not allowed to be transferred to the Company in terms of cash dividends, loans or advances, nor are they allowed for distribution except under liquidation.

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2018** | **2018** |
| | **RMB** | **RMB** | **US$** |
| | | **(In millions)** | |
| PRC statutory reserve funds | 488 | 515 | 75 |
| Unreserved retained earnings | 101,840 | 128,731 | 18,723 |
| Total retained earnings | 102,328 | 129,246 | 18,798 |

Under PRC laws and regulations, there are restrictions on the Company's PRC subsidiaries and VIEs with respect to transferring certain of their net assets to the Company either in the form of dividends, loans, or advances. Amounts of net assets restricted include paid in capital and statutory reserve funds of the Company's PRC subsidiaries and the net assets of the VIEs in which the Company has no legal ownership, totaling RMB18.6 billion and RMB25.7 billion (US$3.7 billion) as of December 31, 2017 and 2018, respectively.

F-57

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Furthermore, cash transfers from the Company's PRC subsidiaries to their parent companies outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of the PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to the Company, or otherwise satisfy their foreign currency denominated obligations.

*Accumulated Other Comprehensive Income (Loss)*

The changes in accumulated other comprehensive income (loss) by component, net of tax, were as follows:

| | Foreign currency translation adjustment RMB | Unrealized gains on available-for-sale investments RMB (In millions) | Total RMB |
|---|---|---|---|
| **Balance at December 31, 2015** | **(1,106)** | **300** | **(806)** |
| Other comprehensive income (loss) before reclassification | (593) | 515 | (78) |
| Amounts reclassified from accumulated other comprehensive income | — | (572) | (572) |
| Net current-period other comprehensive loss | (593) | (57) | (650) |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (327) | — | (327) |
| **Balance at December 31, 2016** | **(2,026)** | **243** | **(1,783)** |
| Other comprehensive income before reclassification | 732 | 2,574 | 3,306 |
| Amounts reclassified from accumulated other comprehensive income | 71 | (999) | (928) |
| Net current-period other comprehensive income | 803 | 1,575 | 2,378 |
| Other comprehensive loss attribute to noncontrolling interests and redeemable noncontrolling interests | 335 | — | 335 |
| **Balance at December 31, 2017** | **(888)** | **1,818** | **930** |
| Cumulative effect of accounting change* | — | (1,854) | (1,854) |
| Other comprehensive income before reclassification | 114 | 4,117 | 4,231 |
| Amounts reclassified from accumulated other comprehensive income | 80 | (2,171) | (2,091) |
| Net current-period other comprehensive income | 194 | 92 | 286 |
| Other comprehensive income attribute to noncontrolling interests and redeemable noncontrolling interests | (1,006) | — | (1,006) |
| **Balance at December 31, 2018** | **(1,700)** | **1,910** | **210** |
| **Balance at December 31, 2018, in US$** | **(247)** | **278** | **31** |

*   Adjustment of net unrealized gains related to available-for-sale equity investments from accumulated other comprehensive income to opening retained earnings as a result of the adoption of ASC 321 on January 1, 2018.

The amounts reclassified out of accumulated other comprehensive income represent realized foreign currency translation adjustments and gains on the available-for-sale investments upon their sales, which were then recorded in "Other income, net" in the consolidated statements of comprehensive income. The amounts reclassified were determined on the basis of specific identification.

F-58

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following table sets forth the tax effect allocated to each component of other comprehensive income (loss) for the years ended December 31, 2016, 2017 and 2018:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Unrealized gains on available-for-sale investments | | | | |
| Other comprehensive loss before reclassification | (120) | (215) | (409) | (60) |
| Amounts reclassified from accumulated other comprehensive income | 110 | 163 | 328 | 48 |
| Net current-period other comprehensive loss | (10) | (52) | (81) | (12) |

18. **EARNINGS PER SHARE ("EPS")**

A reconciliation of net income attributable to Baidu, Inc. in the consolidated statements of comprehensive income to the numerator for the computation of basic and diluted per share for the years ended December 31, 2016, 2017 and 2018 is as follows:

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2018 |
| | RMB | RMB | RMB | US$ |
| | | (In millions) | | |
| Net income attributable to Baidu, Inc. | 11,632 | 18,301 | 27,573 | 4,010 |
| Accretion of the redeemable noncontrolling interests | (557) | 17 | (130) | (19) |
| Numerator for EPS computation | 11,075 | 18,318 | 27,443 | 3,991 |

F-59

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following table sets forth the computation of basic and diluted earnings per Class A and Class B ordinary share.

| | For the years ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2016** | | **2017** | | **2018** | | **2018** | |
| | Class A RMB | Class B RMB | Class A RMB | Class B RMB | Class A RMB | Class A US$ | Class B RMB | Class B US$ |
| | | | (In millions, except for number of shares, per share and per ADS data) | | | | | |
| **Earnings per share – basic:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. | 8,710 | 2,365 | 14,488 | 3,830 | 21,780 | 3,167 | 5,663 | 824 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,263,984 | 7,401,254 | 27,464,760 | 7,260,363 | 27,697,335 | 27,697,335 | 7,201,254 | 7,201,254 |
| Denominator used for basic EPS | 27,263,984 | 7,401,254 | 27,464,760 | 7,260,363 | 27,697,335 | 27,697,335 | 7,201,254 | 7,201,254 |
| Earnings per share – basic | 319.47 | 319.47 | 527.51 | 527.51 | 786.36 | 114.37 | 786.36 | 114.37 |
| **Earnings per share – diluted:** | | | | | | | | |
| **Numerator** | | | | | | | | |
| Allocation of net income attributable to Baidu, Inc. for diluted computation | 8,716 | 2,359 | 14,513 | 3,805 | 21,824 | 3,174 | 5,619 | 817 |
| Reallocation of net income attributable to Baidu, Inc. as a result of conversion of Class B to Class A shares | 2,359 | — | 3,805 | — | 5,619 | 817 | — | — |
| Numerator for diluted EPS calculation | 11,075 | 2,359 | 18,318 | 3,805 | 27,443 | 3,991 | 5,619 | 817 |
| **Denominator** | | | | | | | | |
| Weighted average ordinary shares outstanding | 27,263,984 | 7,401,254 | 27,464,760 | 7,260,363 | 27,697,335 | 27,697,335 | 7,201,254 | 7,201,254 |
| Conversion of Class B to Class A ordinary shares | 7,401,254 | — | 7,260,363 | — | 7,201,254 | 7,201,254 | — | — |
| Share-based awards | 91,848 | — | 227,268 | — | 272,454 | 272,454 | — | — |
| Denominator used for diluted EPS | 34,757,086 | 7,401,254 | 34,952,391 | 7,260,363 | 35,171,043 | 35,171,043 | 7,201,254 | 7,201,254 |
| Earnings per share – diluted | 318.62 | 318.62 | 524.08 | 524.08 | 780.27 | 113.49 | 780.27 | 113.49 |
| **Earnings per ADS:** | | | | | | | | |
| Denominator used for earnings per ADS – basic | 272,639,840 | | 274,647,600 | | 276,973,350 | 276,973,350 | | |
| Denominator used for earnings per ADS – diluted | 347,570,860 | | 349,523,907 | | 351,710,430 | 351,710,430 | | |
| Earnings per ADS – basic | 31.95 | | 52.75 | | 78.64 | 11.44 | | |
| Earnings per ADS – diluted | 31.86 | | 52.41 | | 78.03 | 11.35 | | |

The Company did not include certain stock options, restricted shares and the effect of convertible senior notes in the computation of diluted earnings per share for the years ended December 31, 2016, 2017 and 2018 because those stock options and restricted shares were anti-dilutive for earnings per share for the respective years.

**19.    SHARE-BASED AWARDS PLAN**

*Baidu, Inc.*

2008 Share Incentive plan

In December 2008, the Company adopted a share incentive plan (the "2008 Plan"), which provides for the granting of share incentives, including incentive share options ("ISOs"), restricted shares and any other form of award pursuant to the 2008 Plan, to members of the board, employees, consultants and non-employees of the

F-60

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Company. The Company reserved 3,428,777 ordinary shares for issuance under the 2008 Plan, which expired in the year 2018. The vesting schedule, time and condition to exercise options was determined by the compensation committee. The term of the options may not exceed ten years from the date of the grant, except that five years is the maximum term of an ISO granted to an employee who holds more than 10% of the voting power of the Company's share capital.

Under the 2008 Plan, share options are subject to vesting schedules varying from two to four years, the exercise price of an option may be amended or adjusted at the discretion of the compensation committee, the determination of which would be final, binding and conclusive. To the extent not prohibited by applicable laws or exchange rules, a downward adjustment of the exercise prices would be effective without the approval of the Company's shareholders or the approval of the affected grantees. If the Company grants an ISO to an employee who, at the time of that grant, owns shares representing more than 10% of the voting power of all classes of the Company's share capital, the exercise price cannot be less than 110% of the fair market value of the Company's ordinary shares on the date of that grant.

2018 Share Incentive Plan.

In July 2018, the Company adopted a share incentive plan (the "2018 Plan"), which provides for the granting of share incentives, including ISOs, restricted shares and any other form of award pursuant to the 2018 Plan, to members of the board, employees, consultants, and non-employees of the Company. The 2018 Plan has a ten-year term and a maximum number of 3,443,950 Class A ordinary shares available for issuance pursuant to all awards under the 2018 Plan. As of December 31, 2018, the Company has not granted any awards under the 2018 Plan.

Starting from February 15, 2006, the Company granted restricted Class A ordinary shares of the Company ("Restricted Shares"). Terms for the Restricted Shares are the same as share options except that Restricted Shares do not require exercise and have a two to four years vesting term.

Share options

The following table summarizes the option activity for the year ended December 31, 2018:

|  | Number of shares | Weighted average exercise price (US$) | Weighted average remaining contractual life (Years) | Aggregate intrinsic value (US$ in millions) |
|---|---|---|---|---|
| **Share options** | | | | |
| Outstanding, December 31, 2017 | 315,397 | 1,753 | 8 | 186 |
| Granted | 85,159 | 1,775 | | |
| Exercised | (66,727) | 1,608 | | |
| Forfeited/Cancelled | (108,145) | 1,864 | | |
| Outstanding, December 31, 2018 | 225,684 | 1,751 | 7 | 40 |
| Vested and expected to vest at December 31, 2018 | 191,811 | 1,713 | 7 | 38 |
| Exercisable at December 31, 2018 | 108,639 | 1,542 | 6 | 31 |

The aggregate intrinsic value in the table above represents the difference between the Company's closing stock price on the last trading day in 2018 and the exercise price.

F-61

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Total intrinsic value of options exercised for the years ended December 31, 2016, 2017 and 2018 was RMB143 million, RMB403 million and RMB 474 million (US$69 million), respectively. The total fair value of options vested during the years ended December 31, 2016, 2017 and 2018 was RMB225 million, RMB195 million and RMB 956 million (US$139 million), respectively.

As of December 31, 2018, there was RMB337 million (US$49 million) unrecognized share-based compensation cost related to share options, which is expected to be recognized over a weighted-average vesting period of 2.4 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

The fair value of each option award was estimated on the date of grant using the Black-Scholes-Merton valuation model. The volatility assumption was estimated based on historical volatility of the Company's share price applying the guidance provided by ASC 718. Assumptions of the expected term were based on the vesting and contractual terms and employee demographics. The risk-free rate for periods within the contractual life of the option is based on the U.S. Treasury yield curve in effect at the time of grant.

The following table presents the assumptions used to estimate the fair values of the share options granted in the years presented:

| | For the years ended December 31 | | |
| --- | --- | --- | --- |
| | 2016 | 2017 | 2018 |
| Risk-free interest rate | 1.13%~1.47% | 1.81%~2.08% | 2.57% |
| Dividend yield | — | — | — |
| Expected volatility range | 38.91%~40.09% | 35.99%~38.41% | 34.47%~35.36% |
| Weighted average expected volatility | 39.37% | 38.39% | 34.81% |
| Expected life (in years) | 5.75~5.92 | 4.99~6.01 | 4.89~6.25 |

In addition, the Company recognizes share-based compensation expense net of an estimated forfeiture rate and therefore only recognizes compensation cost for those shares expected to vest over the service period of the award. The estimation of the forfeiture rate is primarily based on historical experience of employee turnover. To the extent the Company revises this estimate in the future, the share-based payments could be materially impacted in the year of revision, as well as in the following years.

The exercise price of options granted during the years ended December 31, 2016, 2017 and 2018 equaled the market price of the ordinary shares on the grant date. The weighted-average grant-date fair value of options granted during the years ended December 31, 2016, 2017, and 2018 was US$660, US$747, and US$1,029, respectively.

F-62

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Restricted Shares

Restricted Shares activity for the year ended December 31, 2018 was as follows:

| | Number of shares | Weighted average grant date fair value (US$) |
| --- | --- | --- |
| **Restricted Shares** | | |
| Unvested, December 31, 2017 | 819,670 | 1,899 |
| Granted | 427,642 | 2,232 |
| Vested | (259,152) | 1,920 |
| Forfeited/Cancelled | (196,716) | 1,952 |
| Unvested, December 31, 2018 | 791,444 | 2,060 |

The total fair value of the Restricted Shares vested during the years ended December 31, 2016, 2017 and 2018 was RMB1.1 billion, RMB2.1 billion, RMB3.4 billion (US$498 million), respectively. The weighted-average grant-date fair value of the Restricted Shares granted during the years ended December 31, 2016, 2017, and 2018 was US$1,756, US$1,978, and US$2,232, respectively.

As of December 31, 2018, there was RMB5.2 billion (US$762 million) unrecognized share-based compensation cost related to Restricted Shares. That deferred cost will be recognized over a weighted-average vesting period of 2.7 years. To the extent the actual forfeiture rate is different from the original estimate, actual share-based compensation costs related to these awards may be different from expectation.

***Subsidiaries-iQIYI***

2010 Equity Incentive Plan

In October 2010, iQIYI adopted its 2010 Equity Incentive Plan (the "iQIYI 2010 Plan"), which permits the grant of restricted shares, options and share appreciation rights to the employees, directors, officers and consultants to purchase iQIYI's ordinary shares. The iQIYI 2010 Plan is valid and effective for a term of ten years commencing from its adoption. Except for service conditions, there were no other vesting conditions for all the awards under the 2010 Plan. As of December 31, 2018, the share option pool under the iQIYI 2010 Plan approved by the Board of Directors of iQIYI was 589,729,714 iQIYI's ordinary shares. All options granted vest over a four-year period, with 25% of the awards vesting on the first anniversary, and the remaining 75% of the awards vesting on a quarterly basis thereafter.

F-63

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following table sets forth the summary of employee option activity under the iQIYI's 2010 Plan:

| | Number of shares | Weighted average exercise price ( US$ ) | Weighted average remaining contractual life (Years) | Aggregate intrinsic value ( US$ in millions) |
|---|---|---|---|---|
| Outstanding, December 31, 2017 | 306,266,366 | 0.45 | | |
| Granted | 112,846,527 | 0.51 | | |
| Forfeited | (13,474,664) | 0.51 | | |
| Exercised | (25,059,198) | 0.42 | | |
| Outstanding, December 31, 2018 | 380,579,031 | 0.47 | 9 | 630 |
| Vested and expected to vest at December 31, 2018 | 382,422,243 | 0.46 | 7 | 635 |
| Exercisable at December 31, 2018 | 184,247,256 | 0.42 | 6 | 314 |

As of December 31, 2018, there was RMB1.4 billion (US$207 million) unrecognized share-based compensation cost related to share options granted by iQIYI. That deferred cost is expected to be recognized over a weighted-average vesting period of 3 years.

2017 Share Incentive Plan

In November 2017, iQIYI adopted its 2017 Share Incentive Plan (the "iQIYI 2017 Plan"). Under the iQIYI 2017 Plan, iQIYI is authorized to grant options, restricted shares and restricted share units to members of the board, employees, consultants and other individuals for which the maximum aggregate number of ordinary shares which may be issued pursuant to all awards is 720,000 iQIYI's ordinary shares. The iQIYI 2017 Plan is valid and effective for a term of ten years commencing from its adoption. Except for service conditions, there are no other vesting conditions for all the awards issued under the 2017 Plan. As of December 31, 2018, the unrecognized share-based compensation cost related to its Restricted Shares is insignificant.

The following table summarizes the share-based compensation cost recognized by iQIYI:

| | For the years ended December 31, | | | |
|---|---|---|---|---|
| | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
| | | (In millions) | | |
| Expensed as cost of revenues | 9 | 35 | 83 | 12 |
| Expensed as selling, general and administrative | 30 | 131 | 369 | 54 |
| Expensed as research and development | 23 | 67 | 104 | 16 |

F-64

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The following table summarizes the total share-based compensation cost recognized by the Group:

| | For the years ended December 31, | | | |
| | 2016 RMB | 2017 RMB | 2018 RMB | 2018 US$ |
| --- | --- | --- | --- | --- |
| | (In millions) | | | |
| Expensed as cost of revenues | 103 | 183 | 224 | 33 |
| Expensed as selling, general and administrative | 429 | 973 | 1,725 | 251 |
| Expensed as research and development | 1,228 | 2,088 | 2,727 | 397 |
| | 1,760 | 3,244 | 4,676 | 681 |

## 20. RELATED PARTY TRANSACTIONS

Related party transactions primarily related to online marketing services provided by the Company to Ctrip, which amounted to RMB631 million, RMB750 million and RMB774 million (US$113 million) for the years ended December 31, 2016, 2017 and 2018, respectively. The Company also provided online marketing services, cloud services and other services to Du Xiaoman, revenue for services provided amounted to RMB256 million (US$37 million) for the year ended December 31, 2018. Other related party transactions were insignificant for each of the years presented, which included the reimbursements to Mr. Robin Yanhong Li's use of an aircraft beneficially owned by his family member for the Company's business purposes and the rental expense for an office building owned by the family members of an executive officer for the Company's business purposes.

As of December 31, 2017 and 2018, amounts due from/due to related parties were as follows:

| | As of December 31, | | |
| | 2017 RMB | 2018 RMB | 2018 US$ |
| --- | --- | --- | --- |
| | | (In millions) | |
| **Amounts due from related parties, current:** | | | |
| Ctrip [i] | 137 | 58 | 8 |
| Du Xiaoman [ii] | — | 77 | 11 |
| Other related parties [iii] | 31 | 650 | 95 |
| **Total** | 168 | 785 | 114 |
| **Amounts due from related parties, non-current:** | | | |
| Du Xiaoman [ii] | — | 3,884 | 565 |
| Other related parties [iv] | 9 | 413 | 60 |
| **Total** | 9 | 4,297 | 625 |
| **Amounts due to related parties, current:** | | | |
| Du Xiaoman [v] | — | 934 | 136 |
| Ctrip [vi] | 122 | 12 | 2 |
| Other related parties [vii] | 31 | 781 | 113 |
| **Total** | 153 | 1,727 | 251 |
| **Amounts due to related parties, non-current:** | | | |
| Du Xiaoman [viii] | — | 3,729 | 542 |
| Other related parties [ix] | — | 631 | 92 |
| **Total** | — | 4,360 | 634 |

(i)     The balances mainly represent amounts arising from services the Company provided to Ctrip.

F-65

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

(ii)     The balance represents long-term loans due from Du Xiaoman with interest rates ranging from 4.28% to 5.00%, and amounts arising from services the Company provided to Du Xiaoman. In 2018, the Company provided short-term loans in the amount of RMB12.0 billion (US$1.7 billion) to Du Xiaoman, which were fully repaid as of December 31, 2018.

(iii)    The balances mainly represent short-term interest-bearing loans provided to investees of the Company.

(iv)    The balance consist of amount due from the Company's investees in the ordinary course of business and rental deposits paid in advance to the related party of one of the executive officers.

(v)     The balance represents amount due to Du Xiaoman services provided by Du Xiaoman to the Company in the ordinary course of business and for other unsettled payments

(vi)    The balances mainly represent amounts arising from services provided by Ctrip.

(vii)   The balances mainly represent an interest-bearing loan provided by an investee and amounts arising from services provided by the Company's investees.

(viii)  The balance represents mainly long-term loans provided by Du Xiaoman with interest rates ranging from 3.78% to 4.28%.

(ix)    The balance represents mainly deferred revenue relating to the future services to be provided by the Company's subsidiary to an equity method investee.

## 21.    SEGMENT REPORTING

The operations of the Company are organized into two segments, consisting of Baidu Core and iQIYI. Baidu Core mainly provides search-based and feed-based online marketing service, other online marketing services, and new artificial intelligence businesses. iQIYI is an online entertainment service provider that, offers original, professionally produced and partner-generated content on its platform.

The Company derives the results of the segments directly from its internal management reporting system. The CODM reviews the performance of each segment based on its operating results and uses these results to evaluate the performance of, and to allocate resources to, each of the segments. Because substantially all of the Group's long-lived assets and revenues are located in and derived from the PRC, geographical segments are not presented. The table below provides a summary of the Group's segment operating results for the years ended December 31, 2016.

F-66

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

| | For the year ended December 31, 2016 | | | |
| | Baidu Core | iQIYI | Intersegment eliminations & adjustments | Consolidated |
| | RMB | RMB | RMB | RMB |
| | | | (In millions) | |
|---|---|---|---|---|
| **Total revenues** | **59,470** | **11,237** | **(158)** | **70,549** |
| Operating costs and expenses: | | | | |
|    Cost of revenues | 23,806 | 11,437 | 35 | 35,278 |
|    Selling, general and administrative | 13,493 | 1,766 | (188) | 15,071 |
|    Research and development | 9,298 | 824 | 29 | 10,151 |
| **Total operating costs and expenses** | **46,597** | **14,027** | **(124)** | **60,500** |
| **Operating profit (loss)** | **12,873** | **(2,790)** | **(34)** | **10,049** |
| **Total other income (loss), net** | **4,730** | **(271)** | **1** | **4,460** |
| **Income (loss) before income taxes** | **17,603** | **(3,061)** | **(33)** | **14,509** |
| Income taxes | 2,915 | 13 | (15) | 2,913 |
| **Net income (loss)** | **14,688** | **(3,074)** | **(18)** | **11,596** |
| Less: net income (loss) attributable to noncontrolling interests | (30) | — | (6) | (36) |
| **Net income attributable to Baidu, Inc.** | **14,718** | **(3,074)** | **(12)** | **11,632** |

The table below provides a summary of the Group's operating segment operating results for the years ended December 31, 2017.

| | For the year ended December 31, 2017 | | | |
| | Baidu Core | iQIYI | Intersegment eliminations & adjustments | Consolidated |
| | RMB | RMB | RMB | RMB |
| | | | (In millions) | |
|---|---|---|---|---|
| **Total revenues** | **67,681** | **17,378** | **(250)** | **84,809** |
| Operating costs and expenses: | | | | |
|    Cost of revenues | 25,688 | 17,386 | (12) | 43,062 |
|    Selling, general and administrative | 10,586 | 2,675 | (133) | 13,128 |
|    Research and development | 11,692 | 1,270 | (34) | 12,928 |
| **Total operating costs and expenses** | **47,966** | **21,331** | **(179)** | **69,118** |
| **Operating profit (loss)** | **19,715** | **(3,953)** | **(71)** | **15,691** |
| **Total other income (loss), net** | **5,385** | **208** | **(1)** | **5,592** |
| **Income (loss) before income taxes** | **25,100** | **(3,745)** | **(72)** | **21,283** |
| Income taxes | 3,001 | (8) | 2 | 2,995 |
| **Net income (loss)** | **22,099** | **(3,737)** | **(74)** | **18,288** |
| Less: net income (loss) attributable to noncontrolling interests | (9) | — | (4) | (13) |
| **Net income (loss) attributable to Baidu, Inc.** | **22,108** | **(3,737)** | **(70)** | **18,301** |

F-67

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

The table below provides a summary of the Group's operating segment operating results for the years ended December 31, 2018.

| | For the year ended December 31, 2018 | | | | | | | |
| | Baidu Core | | iQIYI | | Intersegment eliminations | | Consolidated | |
| | RMB | US$ | RMB | US$ | RMB | US$ | RMB | US$ |
| | | | | | (In millions) | | | |
| **Total revenues** | **78,271** | **11,384** | **24,989** | **3,634** | **(983)** | **(142)** | **102,277** | **14,876** |
| Operating costs and expenses: | | | | | | | | |
|   Cost of revenues | 25,370 | 3,689 | 27,133 | 3,946 | (759) | (109) | 51,744 | 7,526 |
|   Selling, general and administrative | 15,310 | 2,227 | 4,168 | 606 | (247) | (36) | 19,231 | 2,797 |
|   Research and development | 13,783 | 2,005 | 1,994 | 290 | (5) | (1) | 15,772 | 2,294 |
| **Total operating costs and expenses** | **54,463** | **7,921** | **33,295** | **4,842** | **(1,011)** | **(146)** | **86,747** | **12,617** |
| **Operating profit (loss)** | **23,808** | **3,463** | **(8,306)** | **(1,208)** | **28** | **4** | **15,530** | **2,259** |
| **Total other income (loss), net** | **13,169** | **1,915** | **(676)** | **(98)** | **(698)** | **(102)** | **11,795** | **1,715** |
| **Income (loss) before income taxes** | **36,977** | **5,378** | **(8,982)** | **(1,306)** | **(670)** | **(98)** | **27,325** | **3,974** |
| Income taxes | 4,664 | 678 | 79 | 12 | — | — | 4,743 | 690 |
| **Net income (loss)** | **32,313** | **4,700** | **(9,061)** | **(1,318)** | **(670)** | **(98)** | **22,582** | **3,284** |
| Less: net income (loss) attributable to noncontrolling interests | (1,292) | (188) | 49 | 7 | (3,748) | (545) | (4,991) | (726) |
| **Net income (loss) attributable to Baidu, Inc.** | **33,605** | **4,888** | **(9,110)** | **(1,325)** | **3,078** | **447** | **27,573** | **4,010** |

## 22. FAIR VALUE MEASUREMENT

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

| | | |
|---|---|---|
| Level 1 | – | Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets. |
| Level 2 | – | Include observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data. |
| Level 3 | – | Unobservable inputs which are supported by little or no market activity. |

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

F-68

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

*Assets and Liabilities Measured or Disclosed at Fair Value*

In accordance with ASC 820, the Company measures available-for-sale investments, other invested securities, investments accounted for at fair value, equity securities with readily determinable fair value and derivatives instruments on a recurring basis. The fair value of time deposits are determined based on the prevailing interest rates in the market. The fair values of the Company's held-to-maturity investments as disclosed are determined based on the discounted cash flow model using the discount curve of market interest rates. The fair value of the Company's available-for-sale debt investments and other invested securities are measured using the income approach, based on quoted market interest rates of similar instruments and other significant inputs derived from or corroborated by observable market data. The fair values of the Company's equity investments in the equity securities of publicly listed companies are measured using quoted market prices. Investments accounted at the fair value and available-for-sale debt investment are primarily investments in private companies, which do not have readily determinable market values. The fair value of these investments were categorized as Level 3 in the fair value hierarchy. The Company uses a combination of valuation methodologies, including market and income approaches based on the Company's best estimate, which is determined by using information including but not limited to the pricing of recent rounds of financing, future cash flow forecasts, liquidity factors and selection of the comparable companies.

The Company measures long-term investments at fair value on a nonrecurring basis, in the cases of an impairment charge is recognized, fair value of an investment is remeasured in an acquisition/a disposal, and an orderly transaction for identical or similar investments of the same issuer was identified for equity investments the Company elected to use the measurement alternative. The Company's non-financial assets, such as intangible assets, goodwill and fixed assets, would be measured at fair value only if they were determined to be impaired on an other-than-temporary basis.

The fair value of notes payable is extracted directly from the quoted market price. The Company classifies the fair value of the convertible senior notes as Level 3 within the fair value hierarchy due to the lack of observable market data and activity. The Company carries the convertible senior notes at face value less unamortized debt discount and issuance costs on its consolidated balance sheet, and presents the fair value for required disclosure purposes only. For further information on the convertible senior notes see Note 12.

F-69

**Table of Contents**

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

Assets and liabilities measured on a recurring basis or disclosed at fair value are summarized below:

| | Total fair value at December 31, 2017 RMB | Fair value measurement or disclosure at December 31, 2017 using | | |
| --- | --- | --- | --- | --- |
| | | Quoted prices in active markets for identical assets (Level 1) RMB | Significant other observable inputs (Level 2) RMB | Significant unobservable inputs (Level 3) RMB |
| | | (In millions) | | |
| *Fair value disclosure* | | | | |
| **Cash equivalents** | | | | |
| Time deposits | 130 | | 130 | |
| Money market fund | 2,384 | 2,384 | | |
| **Short-term investments** | | | | |
| Held-to-maturity debt investments | 48,695 | | 48,695 | |
| **Long-term notes payable** | 35,943 | | 35,943 | |
| *Fair value measurements on a recurring basis* | | | | |
| **Short-term investments** | | | | |
| Available-for-sale debt investments | 40,715 | | 40,715 | |
| **Other invested securities** | 18,350 | | 18,350 | |
| **Long-term investments** | | | | |
| Available-for-sale equity investments | 2,773 | 2,773 | | |
| Investments accounted for at fair value | 321 | | | 321 |
| **Other non-current assets** | | | | |
| Derivative instruments | 168 | | 168 | |
| **Total assets measured at fair value** | **62,327** | **2,773** | **59,233** | **321** |

F-70

Table of Contents

BAIDU, INC.
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
FOR THE YEARS ENDED DECEMBER 31, 2016, 2017 and 2018

| | Total fair value at December 31, 2018 | | Fair value measurement or disclosure at December 31, 2018 using | | |
| | | | Quoted prices in active markets for identical assets (Level 1) | Significant other observable inputs (Level 2) | Significant unobservable inputs (Level 3) |
| | RMB | US$ | RMB | RMB | RMB |
| | | | (In millions) | | |
|---|---|---|---|---|---|
| *Fair value disclosure* | | | | | |
| **Cash equivalents** | | | | | |
| Time deposits | 4,264 | 620 | | 4,264 | |
| Money market fund | 3,723 | 541 | 3,723 | | |
| **Short-term investments** | | | | | |
| Held-to-maturity debt investments | 27,507 | 4,001 | | 27,507 | |
| **Long-term notes payable** | 68,763 | 10,001 | | 68,763 | |
| **Convertible senior notes** | 4,923 | 716 | | | 4,923 |
| *Fair value measurements on a recurring basis* | | | | | |
| **Short-term investments** | | | | | |
| Available-for-sale debt investments | 79,558 | 11,571 | | 79,558 | |
| **Long-term investments** | | | | | |
| Equity investments at fair value with readily determinable fair value | 4,428 | 644 | 4,428 | | |
| Investments accounted for at fair value | 1,457 | 212 | | | 1,457 |
| Available-for-sale debt investments | 1,167 | 170 | | | 1,167 |
| **Other non-current assets** | | | | | |
| Derivative instruments | 193 | 28 | | 187 | 6 |
| **Total assets measured at fair value** | **86,803** | **12,625** | **4,428** | **79,745** | **2,630** |
| **Accounts payable and accrued liabilities** | | | | | |
| Derivative instruments | 123 | 18 | | | 123 |
| **Amounts due to related parties, non-current** | | | | | |
| Financial liability | 341 | 50 | | 341 | |
| **Total liabilities measured at fair value** | **464** | **68** | **—** | **341** | **123** |

Assets measured at fair value on a non-recurring basis

The Company measures non-financial assets such as long-term investments on a nonrecurring basis when impairment charges are recognized. These nonrecurring fair value measurements use significant unobservable inputs (Level 3). The Company recognized long-term investment charges of RMB245 million, RMB597 million and RMB622 million (US$90 million) for the years ended December 31, 2016, 2017 and 2018, respectively, due to declining financial performances and changes in business circumstances of these investees. The Company uses a combination of valuation methodologies, including market and income approaches based on the Company's best estimate to determine the fair value of these investments. For investments in private companies, information considered by the Company include but are not limited to the pricing of recent rounds of financing, future cash flow forecasts, and liquidity factors. Inputs used in these methodologies primarily include future cashflows, discount rate, and the selection of comparable companies operating in similar businesses. For investments in listed companies, the Company mainly considered the quoted share price.

F-71

**Exhibit 2.24**

IQIYI, INC.

AND

CITICORP INTERNATIONAL LIMITED,

as Trustee

INDENTURE

Dated as of December 4, 2018

3.75% Convertible Senior Notes due 2023

**TABLE OF CONTENTS**

PAGE

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions*                                                                1
Section 1.02. *References to Interest*                                                     15

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01. *Designation and Amount*                                                     16
Section 2.02. *Form of Notes*                                                              16
Section 2.03. *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts* 17
Section 2.04. *Execution, Authentication and Delivery of Notes*                            18
Section 2.05. *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary* 19
Section 2.06. *Mutilated, Destroyed, Lost or Stolen Notes*                                 26
Section 2.07. *Temporary Notes*                                                            27
Section 2.08. *Cancellation of Notes Paid, Converted, Etc.*                                27
Section 2.09. *CUSIP Numbers*                                                              28
Section 2.10. *Additional Notes; Repurchases*                                              28
Section 2.11. *Appointment of Authenticating Agent*                                        28

ARTICLE 3
SATISFACTION AND DISCHARGE

Section 3.01. *Satisfaction and Discharge*                                                 29

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

Section 4.01. *Payment of Principal and Interest*                                          29
Section 4.02. *Maintenance of Office or Agency*                                            29
Section 4.03. *Appointments to Fill Vacancies in Trustee's Office*                         30
Section 4.04. *Provisions as to Paying Agent*                                              30
Section 4.05. *Existence*                                                                  31
Section 4.06. *Rule 144A Information Requirement and Annual Reports*                        31
Section 4.07. *Additional Amounts*                                                         33
Section 4.08. *Stay, Extension and Usury Laws*                                             36
Section 4.09. *Compliance Certificate; Statements as to Defaults*                          36
Section 4.10. *Further Instruments and Acts*                                               36

ARTICLE 5
LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01. *Lists of Holders*                                                      36
Section 5.02. *Preservation and Disclosure of Lists*                                 37

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01. *Events of Default*                                                    37
Section 6.02. *Acceleration; Rescission and Annulment*                               38
Section 6.03. *Additional Interest*                                                  39
Section 6.04. *Payments of Notes on Default; Suit Therefor*                          40
Section 6.05. *Application of Monies Collected by Trustee*                           42
Section 6.06. *Proceedings by Holders*                                               43
Section 6.07. *Proceedings by Trustee*                                               44
Section 6.08. *Remedies Cumulative and Continuing*                                   44
Section 6.09. *Direction of Proceedings and Waiver of Defaults by Majority of Holders* 44
Section 6.10. *Notice of Defaults and Events of Default*                             45
Section 6.11. *Undertaking to Pay Costs*                                             45

ARTICLE 7
CONCERNING THE TRUSTEE

Section 7.01. *Duties and Responsibilities of Trustee*                               46
Section 7.02. *Reliance on Documents, Opinions, Etc.*                                47
Section 7.03. *No Responsibility for Recitals, Etc.*                                 50
Section 7.04. *Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes* 50
Section 7.05. *Monies and ADSs to Be Held in Trust*                                  51
Section 7.06. *Compensation and Expenses of Trustee*                                 51
Section 7.07. *Officer's Certificate as Evidence*                                    52
Section 7.08. *Eligibility of Trustee*                                               52
Section 7.09. *Resignation or Removal of Trustee*                                    52
Section 7.10. *Acceptance by Successor Trustee*                                      54
Section 7.11. *Succession by Merger, Etc.*                                           54
Section 7.12. *Trustee's Application for Instructions from the Company*              55

ARTICLE 8
CONCERNING THE HOLDERS

Section 8.01. *Action by Holders*                                                    55
Section 8.02. *Proof of Execution by Holders*                                        55
Section 8.03. *Who Are Deemed Absolute Owners*                                       55
Section 8.04. *Company-Owned Notes Disregarded*                                      56
Section 8.05. *Revocation of Consents; Future Holders Bound*                         56

ii

ARTICLE 9
HOLDERS' MEETINGS

Section 9.01. *Purpose of Meetings* — 57
Section 9.02. *Call of Meetings by Trustee* — 57
Section 9.03. *Call of Meetings by Company or Holders* — 57
Section 9.04. *Qualifications for Voting* — 57
Section 9.05. *Regulations* — 58
Section 9.06. *Voting* — 58
Section 9.07. *No Delay of Rights by Meeting* — 59

ARTICLE 10
SUPPLEMENTAL INDENTURES

Section 10.01. *Supplemental Indentures Without Consent of Holders* — 59
Section 10.02. *Supplemental Indentures with Consent of Holders* — 60
Section 10.03. *Effect of Supplemental Indentures* — 61
Section 10.04. *Notation on Notes* — 61
Section 10.05. *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee* — 61

ARTICLE 11
CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01. *Company May Consolidate, Etc.* — 62
Section 11.02. *Successor Corporation to Be Substituted* — 62
Section 11.03. *Opinion of Counsel to Be Given to Trustee* — 63

ARTICLE 12
IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 12.01. *Indenture and Notes Solely Corporate Obligations* — 63

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01. *Conversion Privilege* — 64
Section 14.02. *Conversion Procedure; Settlement Upon Conversion* — 66
Section 14.03. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes* — 71
Section 14.04. *Adjustment of Conversion Rate* — 73
Section 14.05. *Adjustments of Prices* — 84
Section 14.06. *Class A Ordinary Shares to Be Fully Paid* — 84

iii

Section 14.07. *Effect of Recapitalizations, Reclassifications and Changes of the Class A Ordinary Shares*   84
Section 14.08. *Certain Covenants*   86
Section 14.09. *Responsibility of Trustee*   87
Section 14.10. *Notice to Holders Prior to Certain Actions*   87
Section 14.11. *Stockholder Rights Plans*   88
Section 14.12. *Limit on Issuance of ADSs Upon Conversion*   88
Section 14.13. *Termination of Depositary Receipt Program*   88
Section 14.14. *Exchange In Lieu Of Conversion*   89

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01. *Repurchase at Option of Holders*   89
Section 15.02. *Repurchase at Option of Holders Upon a Fundamental Change*   92
Section 15.03. *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice*   94
Section 15.04. *Deposit of Repurchase Price or Fundamental Change Repurchase Price*   95
Section 15.05. *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*   96

ARTICLE 16
OPTIONAL REDEMPTION

Section 16.01. *Optional Redemption for Changes in the Tax Law of the Relevant Taxing Jurisdiction*   96

ARTICLE 17
MISCELLANEOUS PROVISIONS

Section 17.01. *Provisions Binding on Company's Successors*   98
Section 17.02. *Official Acts by Successor Corporation*   98
Section 17.03. *Addresses for Notices, Etc.*   98
Section 17.04. *Governing Law; Jurisdiction*   99
Section 17.05. *Submission to Jurisdiction; Service of Process*   100
Section 17.06. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee*   100
Section 17.07. *Legal Holidays*   101
Section 17.08. *No Security Interest Created*   101
Section 17.09. *Benefits of Indenture*   101
Section 17.10. *Table of Contents, Headings, Etc.*   101
Section 17.11. *Execution in Counterparts.*   101
Section 17.12. *Severability*   101
Section 17.13. *Waiver of Jury Trial*   101
Section 17.14. *Force Majeure*   101
Section 17.15. *Calculations*   102
Section 17.16. *USA PATRIOT Act*   102

iv

**EXHIBIT**

Exhibit A    Form of Note                                                                                                 A-1

v

INDENTURE dated as of December 4, 2018 between IQIYI, INC., a Cayman Islands exempted company, as issuer (the "**Company**," as more fully set forth in Section 1.01) and CITICORP INTERNATIONAL LIMITED, a private company limited by shares incorporated in Hong Kong, as trustee (the "**Trustee**," as more fully set forth in Section 1.01).

W I T N E S S E T H:

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issuance of its 3.75% Convertible Senior Notes due 2023 (the "**Notes**"), initially in an aggregate principal amount not to exceed US$750,000,000, and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note, the Form of Notice of Conversion, the Form of Fundamental Change Repurchase Notice, the Form of Repurchase Notice and the Form of Assignment and Transfer to be borne by the Notes are to be substantially in the forms hereinafter provided; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee, as in this Indenture provided, the valid, binding and legal obligations of the Company, and this Indenture a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1
DEFINITIONS

Section 1.01. *Definitions.* The terms defined in this Section 1.01 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.01. The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**Additional ADSs**" shall have the meaning specified in Section 14.03(a).

"**Additional Amounts**" shall have the meaning specified in Section 4.07(a).

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 4.06(d), Section 4.06(e) and Section 6.03, as applicable.

"**ADS**" means an American Depositary Share, issued pursuant to the Deposit Agreement, representing seven Class A Ordinary Shares of the Company as of the date of this Indenture, and deposited with the ADS Custodian.

"**ADS Custodian**" means JPMorgan Chase Bank, N.A., with respect to the ADSs delivered pursuant to the Deposit Agreement, or any successor entity thereto.

"**ADS Depositary**" means JPMorgan Chase Bank, N.A., as depositary for the ADSs, or any successor entity thereto.

"**ADS Price**" shall have the meaning specified in Section 14.03(c).

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing. Notwithstanding anything to the contrary herein, the determination of whether one Person is an "**Affiliate**" of another Person for purposes of this Indenture shall be made based on the facts at the time such determination is made or required to be made, as the case may be, hereunder.

"**Agent Parties**" shall have the meaning specified in Section 7.02(l).

"**Agents**" means the Paying Agent, the Transfer Agent, the Note Registrar, the Conversion Agent and the Bid Solicitation Agent, in each case, unless the Company is acting in such capacity.

"**Applicable PRC Rate**" means (i) in the case of deduction or withholding of PRC income tax, 10%, (ii) in the case of deduction or withholding of PRC value added tax (including any related local levies), 6.72%, or (iii) in the case of deduction or withholding of both PRC income tax and PRC value added tax (including any related local levies), 16.72%.

"**Authenticating Agent**" shall have the meaning specified in Section 2.11.

"**Bid Solicitation Agent**" means the Company or any Person appointed by the Company to solicit bids for the Trading Price in accordance with Section 14.01(b)(i). The Company shall initially act as the Bid Solicitation Agent.

2

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it hereunder.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**" means, with respect to any Note, each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in the State of New York, the Cayman Islands or, in the case of a payment under the Indenture, place of payment are authorized or obligated by law or executive order to close.

"**Capital Stock**" means, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

"**Cash Settlement**" shall have the meaning specified in Section 14.02(a).

"**Change in Law**" shall have the meaning specified in clause (e) of the definition of "Fundamental Change" below.

"**Change in Tax Law**" shall have the meaning specified in Section 16.01(b).

"**Class A Ordinary Shares**" means the Class A ordinary shares of the Company, par value US$0.00001 per share, at the date of this Indenture, subject to Section 14.07.

"**Class B Ordinary Shares**" means the Class B ordinary shares of the Company, par value US$0.00001 per share, at the date of this Indenture, subject to Section 14.07.

"**Clause A Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause B Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause C Distribution**" shall have the meaning specified in Section 14.04(c).

"**close of business**" means 5:00 p.m. (New York City time).

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Combination Settlement**" shall have the meaning specified in Section 14.02(a).

"**Commission**" means the U.S. Securities and Exchange Commission.

"**Common Equity**" of any Person means Capital Stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

3

"**Company**" shall have the meaning specified in the first paragraph of this Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Group**" shall have the meaning specified in clause (e) of the definition of "Fundamental Change" below.

"**Company Notice**" shall have the meaning specified in Section 15.01(a).

"**Company Order**" means a written order of the Company, signed by an Officer and delivered to the Trustee.

"**Conversion Agent**" means Citibank, N.A., the conversion agent with respect to the Notes appointed pursuant to a Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter dated as of the date of this Indenture and, subject to the provisions of such Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter, shall also include any successor conversion agent.

"**Conversion Consideration**" shall have the meaning specified in Section 14.14(a).

"**Conversion Date**" shall have the meaning specified in Section 14.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 14.01(a).

"**Conversion Price**" means as of any time, US$1,000, *divided by* the Conversion Rate as of such time.

"**Conversion Rate**" shall have the meaning specified in Section 14.01(a).

"**Corporate Trust Office**" means the designated office of the Trustee at which at any time this Indenture shall be administered, which office at the date hereof is located at 39/F, Champion Tower, 3 Garden Road, Central, Hong Kong, Attention: Agency and Trust, Facsimile: + 852 2323 0279, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the designated corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Company).

"**Daily Conversion Value**" means, for each of the 40 consecutive Trading Days during the Observation Period, 2.5% of the product of (a) the Conversion Rate on such Trading Day and (b) the Daily VWAP for such Trading Day.

"**Daily Measurement Value**" means the Specified Dollar Amount (if any), *divided by* 40.

"**Daily Settlement Amount**," for each of the 40 consecutive Trading Days during the Observation Period, shall consist of:

(a) cash in an amount equal to the lesser of (i) the Daily Measurement Value and (ii) the Daily Conversion Value on such Trading Day; and

4

(b) if the Daily Conversion Value on such Trading Day exceeds the Daily Measurement Value, a number of ADSs equal to (i) the difference between the Daily Conversion Value and the Daily Measurement Value, *divided by* (ii) the Daily VWAP for such Trading Day.

"**Daily VWAP**" means, for each of the 40 consecutive Trading Days during the relevant Observation Period, the per ADS volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "IQ <equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such Trading Day (or if such volume-weighted average price is unavailable, the market value of one ADS on such Trading Day determined, using a volume-weighted average method, by a nationally recognized independent investment banking firm retained for this purpose by the Company). The "**Daily VWAP**" shall be determined without regard to after-hours trading or any other trading outside of the regular trading session trading hours.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including, without limitation, the Redemption Price, the Fundamental Change Repurchase Price, the Repurchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**delivered**" means, with respect to any notice to be delivered, given or mailed to a Holder pursuant to this Indenture, notice (x) given to the Depositary (or its designee) pursuant to the standing instructions from the Depositary or its designee, including by electronic mail in accordance with accepted practices or procedures at the Depositary (in the case of a Global Note) or (y) mailed to such Holder by first class mail, postage prepaid, at its address as it appears on the Note Register, in each case in accordance with Section 17.03. Notice so "delivered" shall be deemed to include any notice to be "mailed" or "given," as applicable, under this Indenture.

"**Deposit Agreement**" means the Deposit Agreement, dated as of March 28, 2018, among the Company, the ADS Depositary, and the holders and owners from time to time of the ADSs issued thereunder, delivered thereunder or, if amended or supplemented as provided therein, as so amended or supplemented.

"**Depositary**" means, with respect to each Global Note, the Person specified in Section 2.05(c) as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Designated Financial Institution**" shall have the meaning specified in Section 14.14(a).

"**Distributed Property**" shall have the meaning specified in Section 14.04(c).

"**DTC**" means The Depository Trust Company, a New York corporation.

5

"**Effective Date**" shall have the meaning specified in Section 14.03(c), except that, as used in Section 14.04 and Section 14.05, "**Effective Date**" means the first date on which ADSs trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant share split or share combination, as applicable.

"**Event of Default**" shall have the meaning specified in Section 6.01.

"**Ex-Dividend Date**" means the first date on which the ADSs trade on the applicable exchange or in the applicable market, regular way, without the right to receive the issuance, dividend or distribution in question, from the Company or, if applicable, from the seller of the ADSs on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Exchange Election**" shall have the meaning specified in Section 14.14(a).

"**Expiring Rights**" means any rights, options or warrants to purchase Class A Ordinary Shares or ADSs that expire on or prior to the Maturity Date.

"**FATCA**" shall have the meaning specified in Section 4.07(a)(i)(D).

"**Form of Assignment and Transfer**" shall mean the "Form of Assignment and Transfer" attached as Attachment 4 to the Form of Note attached hereto as Exhibit A.

"**Form of Note**" shall mean the "Form of Note" attached hereto as Exhibit A.

"**Form of Fundamental Change Repurchase Notice**" shall mean the "Form of Fundamental Change Repurchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

"**Form of Notice of Conversion**" shall mean the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**Form of Repurchase Notice**" shall mean the "Form of Repurchase Notice" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Fundamental Change**" shall be deemed to have occurred at the time after the Notes are originally issued if any of the following occurs:

(a) except as described in clause (b) below, (A) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries, the employee benefit plans of the Company and its Subsidiaries and any Permitted Holder, files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Company's ordinary share capital (including ordinary share capital held in the form of ADSs) representing more than 50% of the voting power of the Company's ordinary share capital or (B) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act files a Schedule TO or any schedule, form or report under the Exchange Act disclosing that such person or group has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of more than 50% of the Company's then outstanding Class A Ordinary Shares (including Class A Ordinary Shares held in the form of ADSs); *provided*, however, that for purposes of clause (B), in calculating the beneficial ownership percentage of the Class A Ordinary Shares held by any Permitted Holder, any Class A Ordinary Shares (including Class A Ordinary Shares held in the form of ADSs) issued or issuable on conversion of Class B Ordinary Shares, or conversion, exchange or exercise of other securities, in any such case beneficially owned directly or indirectly by any Permitted Holder on the date hereof or issued or issuable by the Company to any Permitted Holder after the date hereof pursuant to rights attached to, or a dividend or other distribution on, any such Class B Ordinary Shares or other securities so owned on the date hereof (or any Class A Ordinary Shares into which they may convert or be exchanged or exercised) shall be excluded from both the numerator and denominator;

(b) the consummation of (A) any recapitalization, reclassification or change of the Class A Ordinary Shares or the ADSs (other than changes resulting from a subdivision or combination) as a result of which the Class A Ordinary Shares or the ADSs would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation or merger of the Company or any similar transaction pursuant to which the Class A Ordinary Shares or the ADSs will be converted into cash, securities or other property; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries and consolidated affiliated entities, taken as a whole, to any Person other than one of the Company's Subsidiaries or consolidated affiliated entities; *provided*, *however*, that a transaction described in clause (B) in which the holders of all classes of the Company's ordinary share capital immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions vis-à-vis each other as such ownership immediately prior to such transaction shall not be a Fundamental Change pursuant to this clause (b);

(c) the shareholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company;

(d) the ADSs (or Class A Ordinary Shares or other Common Equity or American Depositary Shares in respect of Reference Property) cease to be listed or quoted on any of The NASDAQ Global Select Market, The NASDAQ Global Market or The New York Stock Exchange, (or any of their respective successors) and none of the ADSs, Class A Ordinary Shares, other Common Equity and American Depositary Shares in respect of Reference Property is listed or quoted on one of The NASDAQ Global Select Market, The NASDAQ Global Market or The New York Stock Exchange (or any of their respective successors) within one Trading Day of such cessation; or

7

(e) any change in or amendment to the laws, regulations and rules of the PRC or the official interpretation or official application thereof (a "**Change in Law**") that results in (x) the Company, its subsidiaries and its consolidated affiliated entities (collectively, the "**Company Group**") (as in existence immediately subsequent to such Change in Law), as a whole, being legally prohibited from operating substantially all of the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) as of the last date of the period described in the Company's consolidated financial statements for the most recent fiscal quarter and (y) the Company being unable to continue to derive substantially all of the economic benefits from the business operations conducted by the Company Group (as in existence immediately prior to such Change in Law) in the same manner as reflected in the Company's consolidated financial statements for the most recent fiscal quarter;

*provided*, *however*, that a transaction or transactions described in clause (a) or (b) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by holders of the ADSs, excluding cash payments for fractional ADSs and cash payments made pursuant to dissenters' appraisal rights, in connection with such transaction or transactions consists of shares of Common Equity or ADSs in respect of Common Equity that are listed or quoted on any of The NASDAQ Global Select Market, The NASDAQ Global Market or The New York Stock Exchange (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions and as a result of such transaction or transactions such consideration, excluding cash payments for fractional ADSs, becomes Reference Property for the Notes.

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 15.02(c).

"**Fundamental Change Repurchase Date**" shall have the meaning specified in Section 15.02(a).

"**Fundamental Change Repurchase Notice**" shall have the meaning specified in Section 15.02(b)(i).

"**Fundamental Change Repurchase Price**" shall have the meaning specified in Section 15.02(a).

"**Global Note**" shall have the meaning specified in Section 2.05(b).

"**Holder**," as applied to any Note, or other similar terms, shall mean any Person in whose name at the time a particular Note is registered on the Note Register.

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

8

"**Interest Payment Date**" means each June 1 and December 1 of each year, beginning on June 1, 2019.

"**Last Reported Sale Price**" of the ADSs on any date means the closing sale price per ADS (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the principal U.S. national or regional securities exchange on which the ADSs are traded. If the ADSs are not listed for trading on a U.S. national or regional securities exchange on the relevant date, the "**Last Reported Sale Price**" shall be the last quoted bid price for the ADSs in the over-the-counter market on the relevant date as reported by OTC Markets Group Inc. or a similar organization. If the ADSs are not so quoted, the "**Last Reported Sale Price**" shall be the average of the mid-point of the last bid and ask prices for the ADSs on the relevant date from each of at least three nationally recognized independent investment banking firms selected by the Company for this purpose. The "Last Reported Sale Price" shall be determined without regard to after-hours trading or any other trading outside of regular trading session hours.

"**Make-Whole Fundamental Change**" means any transaction or event described in clause (a), (b), (d) or (e) of the definition of Fundamental Change (determined after giving effect to any exceptions to or exclusions from such definition, including in the *proviso* immediately succeeding clause (e) of the definition thereof, but without regard to the *proviso* in clause (b) of the definition thereof).

"**Market Disruption Event**" means, for the purposes of determining amounts due upon conversion (a) a failure by the primary U.S. national or regional securities exchange or market on which the ADSs are listed or admitted for trading to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the ADSs for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the relevant stock exchange or otherwise) in the ADSs or in any options contracts or futures contracts relating to the ADSs.

"**Maturity Date**" means December 1, 2023.

"**Measurement Period**" shall have the meaning specified in Section 14.01(b)(i).

"**Merger Event**" shall have the meaning specified in Section 14.07(a).

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Note Register**" shall have the meaning specified in Section 2.05(a).

"**Note Registrar**" shall have the meaning specified in Section 2.05(a).

9

"**Notes Fungibility Date**" means the date, if any, following the Resale Restriction Termination Date on which all of the Rule 144A Notes and all of the Regulation S Notes are no longer Restricted Securities, do not bear the restrictive legend required by Section 2.05(c), are fungible for U.S. securities law purposes and are assigned an identical, unrestricted CUSIP number.

"**Notice of Conversion**" shall have the meaning specified in Section 14.02(b).

"**Observation Period**" with respect to any Note surrendered for conversion means: (i) subject to clause (ii), if the relevant Conversion Date occurs prior to June 1, 2023, the 40 consecutive Trading Day period beginning on, and including, the second Trading Day immediately succeeding such Conversion Date; (ii) if the relevant Conversion Date occurs on or after the date of the Company's issuance of a Redemption Notice with respect to the Notes pursuant to Section 16.01 and prior to the relevant Redemption Date, the 40 consecutive Trading Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding such Redemption Date; and (iii) subject to clause (ii), if the relevant Conversion Date occurs on or after June 1, 2023, the 40 consecutive Trading Days beginning on, and including, the 41st Scheduled Trading Day immediately preceding the Maturity Date.

"**Offering Memorandum**" means the preliminary offering memorandum dated November 28, 2018, as supplemented by the pricing term sheet dated November 29, 2018, relating to the offering and sale of the Notes.

"**Officer**" means, with respect to the Company, the Chairman, the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Secretary, or any Vice President (in each case, whether or not such person is designated by a number or numbers or word or words added before or after the title of such person).

"**Officer's Certificate**," when used with respect to the Company, means a certificate that is delivered to the Trustee and that is signed by an Officer of the Company. Each such certificate shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section. The Officer giving an Officer's Certificate pursuant to Section 4.09 shall be the principal executive, financial or accounting officer of the Company.

"**open of business**" means 9:00 a.m. (New York City time).

"**Opinion of Counsel**" means an opinion in writing signed by legal counsel, who may be an employee of or counsel to the Company, or other counsel who is reasonably acceptable to the Trustee, that is delivered to the Trustee, which opinion may contain customary exceptions and qualifications as to the matters set forth therein. Each such opinion shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section 17.06.

"**Optional Redemption**" shall have the meaning specified in Section 16.01.

"**Ordinary Shares**" means the Class A Ordinary Shares and the Class B Ordinary Shares.

10

"**outstanding**," when used with reference to Notes, shall, subject to the provisions of Section 8.04, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

(a) Notes theretofore canceled by the Trustee or accepted by the Trustee for cancellation;

(b) Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c) Notes that have been paid pursuant to Section 2.06 or Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 2.06 unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d) Notes converted pursuant to Article 14 and required to be cancelled pursuant to Section 2.08;

(e) Notes redeemed pursuant to Article 16; and

(f) Notes repurchased by the Company pursuant to the third sentence of Section 2.10.

"**Paying Agent**" means Citibank, N.A., the paying agent with respect to the Notes appointed pursuant to a Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter dated as of the date of this Indenture and, subject to the provisions of such Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter, shall also include any successor paying agent.

"**Paying Agent Office**" means the designated office of the Paying Agent at which at any time this Indenture shall be administered, which office at the date hereof is located at 388 Greenwich Street, 14th Floor, New York, New York 10013, USA, Attention: Agency and Trust, Facsimile: +1 201 258 3567, or such other address as the Paying Agent may designate from time to time by notice to the Holders and the Company, or the designated office of any successor paying agent (or such other address as such successor paying agent may designate from time to time by notice to the Holders and the Company).

"**Permitted Holder**" means (i) any holder or "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Class B Ordinary Shares as of the date hereof and permitted transferees of such holder or beneficial owner under the terms of the Class B Ordinary Shares as of the date hereof and (ii) any "group" within the meaning of Section 13(d) of the Exchange Act consisting of one or more Permitted Holders.

11

"**Person**" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"**Physical Notes**" means permanent certificated Notes in registered form issued in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof.

"**Physical Settlement**" shall have the meaning specified in Section 14.02(a).

"**PRC**" means the People's Republic of China, excluding, for the purpose of this Indenture only, Taiwan, Hong Kong, and Macau.

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.06 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Class A Ordinary Shares (directly or in the form of ADSs) (or other applicable security) have the right to receive any cash, securities or other property or in which the Class A Ordinary Shares (directly or in the form of ADSs) (or such other security) are exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of security holders entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors, statute, contract or otherwise).

"**Redemption Date**" shall have the meaning specified in Section 16.01(b).

"**Redemption Notice**" shall have the meaning specified in specified in Section 16.01(b).

"**Redemption Price**" shall have the meaning specified in Section 16.01(b).

"**Redemption Reference Date**" shall have the meaning specified in Section 14.03(g).

"**Redemption Reference Price**" shall have the meaning specified in Section 14.03(g).

"**Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Regular Record Date**," with respect to any Interest Payment Date, shall mean the May 15 or November 15 (whether or not such day is a Business Day) immediately preceding the applicable June 1 or December 1 Interest Payment Date, respectively.

"**Regulation S**" means Regulation S under the Securities Act or any successor to such regulation.

12

"**Regulation S Notes**" means the Notes initially offered and sold outside the United States pursuant to Regulation S.

"**Relevant Jurisdiction**" shall have the meaning specified in Section 4.07(a).

"**Relevant Taxing Jurisdiction**" shall have the meaning specified in Section 4.07(a).

"**Repurchase Date**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Expiration Time**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Notice**" shall have the meaning specified in Section 15.01(a).

"**Repurchase Price**" shall have the meaning specified in Section 15.01(a).

"**Resale Restriction Termination Date**" shall have the meaning specified in Section 2.05(c).

"**Responsible Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter relating to this Indenture is referred because of such Person's knowledge of and familiarity with the particular subject and who, in each case, shall have direct responsibility for the administration of this Indenture.

"**Restricted Securities**" shall have the meaning specified in Section 2.05(c).

"**Rule 144**" means Rule 144 as promulgated under the Securities Act.

"**Rule 144A**" means Rule 144A as promulgated under the Securities Act.

"**Rule 144A Notes**" means the notes initially offered and sold pursuant to Rule 144A.

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the principal U.S. national or regional securities exchange or market on which the ADSs are listed or admitted for trading. If the ADSs are not so listed or admitted for trading, "**Scheduled Trading Day**" means a Business Day.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Settlement Amount**" has the meaning specified in Section 14.02(a)(iv).

13

"**Settlement Method**" means, with respect to any conversion of Notes, Physical Settlement, Cash Settlement or Combination Settlement, as elected (or deemed to have been elected) by the Company.

"**Settlement Notice**" has the meaning specified in Section 14.02(a)(iii).

"**Significant Subsidiary**" means a Subsidiary of the Company that meets the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X under the Exchange Act. Each of the Company's consolidated affiliated entities will be deemed to be a "subsidiary" for the purposes of the definition of "significant subsidiary" in Article 1, Rule 1-02 of Regulation S-X.

"**Specified Dollar Amount**" means the maximum cash amount per US$1,000 principal amount of Notes to be received upon conversion as specified in the Settlement Notice related to any converted Notes (or deemed specified pursuant to Section 14.02(a)(iii)).

"**Spin-Off**" shall have the meaning specified in Section 14.04(c).

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person. For the avoidance of doubt, the term "Subsidiary" or "Subsidiaries" should include the Company's consolidated affiliated entities, including its variable interest entities and their Subsidiaries.

"**Successor Company**" shall have the meaning specified in Section 11.01(a).

"**Trading Day**" means a day on which (i) trading in the ADSs (or other security for which a closing sale price must be determined) generally occurs on The NASDAQ Global Market or, if the ADSs (or such other security) are not then listed on The NASDAQ Global Market, on the principal other U.S. national or regional securities exchange on which the ADSs (or such other security) are then listed or, if the ADSs (or such other security) are not then listed on a U.S. national or regional securities exchange, on the principal other market on which the ADSs (or such other security) are then traded and (ii) a Last Reported Sale Price for the ADSs (or closing sale price for such other security) is available on such securities exchange or market; *provided* that, if the ADSs (or such other security) are not so listed or traded, "**Trading Day**" means a Business Day; and *provided*, *further*, that for purposes of determining amounts due upon conversion only, "**Trading Day**" means a day on which (x) there is no Market Disruption Event and (y) trading in the ADSs generally occurs on The NASDAQ Global Market or, if the ADSs are not then listed on The NASDAQ Global Market, on the principal other U.S. national or regional securities exchange on which the ADSs are then listed or, if the ADSs are not then listed on a U.S. national or regional securities exchange, on the principal other market on which the ADSs are then listed or admitted for trading, except that if the ADSs are not so listed or admitted for trading, "**Trading Day**" means a Business Day.

14

"**Trading Price**" means, with respect to the Notes and any date of determination, the average of the secondary market bid quotations obtained by the Bid Solicitation Agent for US$1,000,000 principal amount of Notes at approximately 3:30 p.m., New York City time, on such determination date from three independent nationally recognized securities dealers the Company selects for this purpose; *provided* that if three such bids cannot reasonably be obtained by the Bid Solicitation Agent but two such bids are obtained, then the average of the two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, that one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one bid for US$1,000,000 principal amount of Notes from a nationally recognized securities dealer on any determination date, then the Trading Price per US$1,000 principal amount of Notes on such determination date shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate.

"**transfer**" shall, as used in Section 2.05(c) and Section 2.05(d), have the meaning specified in Section 2.05(c).

"**Transfer Agent**" means Citibank, N.A., the transfer agent with respect to the Notes appointed pursuant to a Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter dated as of the date of this Indenture and, subject to the provisions of such Paying Agent, Transfer Agent, Conversion Agent and Registrar Appointment Letter, shall also include any successor transfer agent.

"**Trigger Event**" shall have the meaning specified in Section 14.04(c).

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture; *provided*, *however*, that in the event the Trust Indenture Act of 1939 is amended after the date hereof, the term "Trust Indenture Act" shall mean, to the extent required by such amendment, the Trust Indenture Act of 1939, as so amended.

"**Trustee**" means the Person named as the "**Trustee**" in the first paragraph of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "**Trustee**" shall mean or include each Person who is then a Trustee hereunder.

"**unit of Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Valuation Period**" shall have the meaning specified in Section 14.04(c).

Section 1.02. *References to Interest.* Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in this Indenture shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of Section 4.06(d), Section 4.06(e) and Section 6.03. Unless the context otherwise requires, any express mention of Additional Interest in any provision hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

15

ARTICLE 2
ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES

Section 2.01. *Designation and Amount.* The Notes shall be designated as the "3.75% Convertible Senior Notes due 2023." The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is initially limited to US$750,000,000, subject to Section 2.10 and except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes pursuant to Section 2.05, Section 2.06, Section 2.07, Section 10.04, Section 14.02 and Section 15.04.

Section 2.02. *Form of Notes.* The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officer executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect redemptions, repurchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Note Registrar, at the direction of the Trustee in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture. Payment of principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, a Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

16

Section 2.03. *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts.* (a) The Notes shall be issuable in registered form without coupons in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof. Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of such Note. Accrued interest on the Notes shall be computed on the basis of a 360-day year composed of twelve 30-day months and, for partial months, on the basis of actual days elapsed over a 30-day month.

(b) The Person in whose name any Note (or its Predecessor Note) is registered on the Note Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date. Interest shall be payable at the office or agency of the Company maintained by the Company for such purposes in the contiguous United States, which shall initially be the Paying Agent Office. The Company shall pay, or cause the Paying Agent to pay (to the extent funded by the Company), interest (i) on any Physical Notes to Holders holding Physical Notes by wire transfer in immediately available funds to the account within the United States specified by the Holder or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c) Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i) The Company may elect to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee in its sole discretion shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided. Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Company shall promptly notify the Trustee and Holders of the proposed payment of such Defaulted Amounts and the special record date therefor at its address as it appears in the Note Register or by electronic means to the Depositary in the case of Global Notes, not less than 10 days prior to such special record date. Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so delivered, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.03(c). The Trustee shall have no responsibility whatsoever for the calculation of any Defaulted Amounts.

17

(ii) The Company may make payment of any Defaulted Amounts in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after written notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed practicable by the Trustee.

Section 2.04. *Execution, Authentication and Delivery of Notes.* The Notes shall be signed in the name and on behalf of the Company by the manual or facsimile signature of any of its Chief Executive Officer, President, Chief Financial Officer, Treasurer, Secretary or any of its Executive or Senior Vice Presidents. Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note which has been duly authenticated and delivered by the Trustee.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Notes, and the Trustee in accordance with such Company Order shall authenticate and deliver such Notes, without any further action by the Company hereunder; *provided* that the Trustee shall be entitled to receive an Officer's Certificate and an Opinion of Counsel with respect to the issuance, authentication and delivery of such Notes.

The Company Order shall specify the amount of Notes to be authenticated (including the initial amount of Rule 144A Notes and the initial amount of Regulation S Notes) the applicable rate at which interest will accrue on such Notes, the date on which the original issuance of such Notes is to be authenticated, the date from which interest will begin to accrue, the date or dates on which interest on such Notes will be payable and the date on which the principal of such Notes will be payable and other terms relating to such Notes. The Trustee shall thereupon authenticate and deliver said Notes to or upon the written order of the Company (as set forth in such Company Order).

Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the form of Note attached as Exhibit A hereto, executed manually by an authorized officer of the Trustee, shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certificate by the Trustee upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

18

In case any Officer of the Company who shall have signed any of the Notes shall cease to be such Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the Person who signed such Notes had not ceased to be such Officer of the Company; and any Note may be signed on behalf of the Company by such Persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such Person was not such an Officer.

Section 2.05. *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary.* (a) The Company shall cause to be kept at the Paying Agent Office a register (the register maintained in such office or in any other office or agency of the Company designated pursuant to Section 4.02, the "**Note Register**") in which, subject to such reasonable regulations as it may prescribe, the Company shall provide for the registration of Notes and of transfers of Notes. Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time. Citibank, N.A. is hereby initially appointed the "**Note Registrar**" for the purpose of registering Notes and transfers of Notes as herein provided. The Company may appoint one or more co-Note Registrars in accordance with Section 4.02.

Prior to the Notes Fungibility Date, upon surrender for registration of transfer of any Rule 144A Note or Regulation S Note, as the case may be, to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Rule 144A Notes or Regulation S Notes, as the case may be, of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture. Following the Notes Fungibility Date, upon surrender for registration of transfer of any Note to the Note Registrar or any co-Note Registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and not bearing the restrictive legends required by Section 2.05(c).

Prior to the Notes Fungibility Date, Rule 144A Notes and Regulation S Notes, as the case may be, may be exchanged for other Rule 144A Notes or Regulation S Notes, as the case may be, of any authorized denominations and of a like aggregate principal amount, upon surrender of the Rule 144A Notes or Regulation S Notes, as the case may be, to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02. Whenever any Rule 144A Notes or Regulation S Notes, as the case may be, are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Rule 144A Notes or Regulation S Notes, as the case may be, that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding. Following the Notes Fungibility Date, Notes may be exchanged for other Notes of any authorized denominations and of a like aggregate principal amount but not bearing the restrictive legend required by Section 2.05(c), upon surrender of the Notes to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02. Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding.

19

All Notes presented or surrendered for registration of transfer or for exchange, repurchase or conversion shall (if so required by the Company, the Trustee, the Note Registrar or any co-Note Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney-in-fact duly authorized in writing.

No service charge shall be imposed by the Company, the Transfer Agent, the ADS Depositary, the Note Registrar, any co-Note Registrar or the Paying Agent for any exchange or registration of transfer of Notes, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of new Notes issued upon such exchange or registration of transfer being different from the name of the Holder of the old Notes surrendered for exchange or registration of transfer. The Company shall pay the ADS Depositary's fees for issuance of the ADSs.

None of the Company, the Trustee, the Note Registrar or any co-Note Registrar shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion, (ii) any Notes, or a portion of any Note, surrendered for repurchase (and not withdrawn) in accordance with Article 15 or (iii) any Notes selected for redemption in accordance with Article 16 or (iv) any Notes between a Regular Record Date and corresponding Interest Payment Date.

All Notes issued upon any registration of transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(b) So long as the Notes are eligible for book-entry settlement with the Depositary, unless otherwise required by law, subject to the fourth paragraph from the end of Section 2.05(c) all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary. The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note shall be effected through the Depositary in accordance with this Indenture (including the restrictions on transfer set forth herein) and the applicable procedures of the Depositary therefor. Prior to the Notes Fungibility Date, the Rule 144A Notes shall be represented by one or more Global Notes and the Regulation S Notes shall be represented by one or more separate Global Notes. Following the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes may be represented by one or more of the same Global Notes.

20

(c) Every Note that bears or is required under this Section 2.05(c) to bear the legend set forth in this Section 2.05(c) (together with any ADSs (including the Class A Ordinary Shares represented thereby) delivered upon conversion of the Notes that is required to bear the legend set forth in Section 2.05(d), collectively, the "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in this Section 2.05(c) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section 2.05(c) and Section 2.05(d), the term "**transfer**" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the last date of original issuance of the Notes, or such shorter period of time as permitted by Rule 144 or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than ADSs (including the Class A Ordinary Shares represented thereby) issued upon conversion thereof, which shall bear the legend set forth in Section 2.05(d), if applicable) shall bear a legend in substantially the following form (unless such Notes have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing, with notice thereof to the Trustee):

THIS SECURITY, THE AMERICAN DEPOSITARY SHARES DELIVERABLE UPON CONVERSION OF THIS SECURITY, IF ANY, AND THE CLASS A ORDINARY SHARES REPRESENTED THEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) LOCATED OUTSIDE THE UNITED STATES AND IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF IQIYI, INC. (THE "**COMPANY**"), AND

21

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) TO A NON-U.S. PERSON OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY OR PERSON THAT HAS BEEN AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY DURING THE THREE IMMEDIATELY PRECEDING MONTHS MAY PURCHASE, OTHERWISE ACQUIRE OR OWN THIS NOTE OR A BENEFICIAL INTEREST HEREIN.

No transfer of any Note prior to the Resale Restriction Termination Date will be registered by the Note Registrar unless the applicable box on the Form of Assignment and Transfer has been checked.

Any Note (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.05, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.05(c) and shall not be assigned a restricted CUSIP number. The Company shall be entitled to instruct the Trustee in writing to so surrender any Global Note as to which such restrictions on transfer shall have expired in accordance with their terms for exchange, and, upon such instruction, the Trustee shall so surrender such Global Note for exchange; and any new Global Note so exchanged therefor shall not bear the restrictive legend specified in this Section 2.05(c) and shall not be assigned a restricted CUSIP number. The Company shall promptly notify the Trustee in writing upon the occurrence of the Resale Restriction Termination Date and after a registration statement, if any, with respect to the Notes or the ADSs (including the Class A Ordinary Shares represented thereby) issued upon conversion of the Notes has been declared effective under the Securities Act. Any exchange pursuant to the foregoing paragraph shall be in accordance with the applicable procedures of the Depositary.

22

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in this Section 2.05(c)), a Global Note may not be transferred as a whole or in part except (i) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary and (ii) for exchange of a Global Note or a portion thereof for one or more Physical Notes in accordance with the second immediately succeeding paragraph.

The Depositary shall be a clearing agency registered under the Exchange Act. The Company initially appoints The Depository Trust Company to act as Depositary with respect to each Global Note. Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee as custodian for Cede & Co.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days or (iii) an Event of Default with respect to the Notes has occurred and is continuing and, subject to the Depositary's applicable procedures, a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note, the Company shall execute, and the Trustee, upon receipt of an Officer's Certificate and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding to such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Trustee such Global Notes shall be canceled.

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(c) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, or, in the case of clause (iii) of the immediately preceding paragraph, the relevant beneficial owner, shall instruct the Trustee. Upon execution and authentication, the Trustee shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

23

At such time as all interests in a Global Note have been converted, canceled, repurchased, redeemed or transferred, such Global Note shall be, upon receipt thereof, canceled by the Trustee in accordance with standing procedures and existing instructions of the Depositary. At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, repurchased, redeemed or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and existing instructions of the Depositary, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Trustee, to reflect such reduction or increase.

None of the Company, the Trustee, any agent of the Company or any agent of the Trustee shall have any responsibility or liability for the payment of amounts to beneficial holders, any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(d) Until the Resale Restriction Termination Date, any certificate representing ADSs (including the Class A Ordinary Shares represented thereby) issued upon conversion of such Note shall bear a legend in substantially the following form (unless the Note or such ADSs (including the Class A Ordinary Shares represented thereby) has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such ADS or the Class A Ordinary Shares represented thereby have been issued upon conversion of Notes that have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Trustee and the ADS Depositary):

THE CLASS A ORDINARY SHARES ("SHARES") REPRESENTED BY THE AMERICAN DEPOSITARY SHARES (THE "**ADSs**") EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND, ACCORDINGLY, THE ADSs AND THE SHARES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION OF ADSs OR OF A BENEFICIAL INTEREST THEREIN, THE ACQUIRER:

(1)  REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "**QUALIFIED INSTITUTIONAL BUYER**" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) LOCATED OUTSIDE THE UNITED STATES AND IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF IQIYI, INC. (THE "**COMPANY**"), AND

24

(2)    AGREES FOR THE BENEFIT OF THE COMPANY AND THE DEPOSITARY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THE ADSs OR THE SHARES OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)    TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B)    PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)    TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)    TO A NON-U.S. PERSON OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E)    PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY OR PERSON THAT HAS BEEN AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY DURING THE THREE IMMEDIATELY PRECEDING MONTHS MAY PURCHASE, OTHERWISE ACQUIRE OR OWN THE ADSs OR A BENEFICIAL INTEREST THEREIN.

Any such ADSs as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of the certificates representing such ADSs for exchange in accordance with the procedures of the ADS Depositary, be exchanged for a new certificate or certificates for a like aggregate number of ADSs, which shall not bear the restrictive legend required by this Section 2.05(d).

25

(e) Any Note or ADS delivered upon the conversion or exchange of any Note that is repurchased or owned by any Affiliate of the Company may not be resold by such Affiliate unless registered under the Securities Act or resold pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act in a transaction that results in such Note or ADS, as the case may be, no longer being a "restricted security" (as defined under Rule 144). The Company shall cause any Note that is repurchased or owned by it to be surrendered to the Paying Agent for cancellation in accordance with Section 2.08.

(f) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any securities laws or restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Depositary participants or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(g) Neither the Trustee nor any agent shall have any responsibility or liability for any actions taken or not taken by the Depositary.

Section 2.06. *Mutilated, Destroyed, Lost or Stolen Notes.* In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its written request the Trustee shall authenticate and deliver, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen. In every case the applicant for a substituted Note shall furnish to the Company and to the Trustee such security, pre-funding and/or indemnity as may be required by them to save each of them harmless from any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company and to the Trustee evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee may authenticate any such substituted Note and deliver the same upon the receipt of such security, pre-funding and/or indemnity as the Trustee and the Company may require. No service charge shall be imposed by the Company, the Transfer Agent, the ADS Depositary, the Note Registrar, any co-Note Registrar or the Paying Agent upon the issuance of any substitute Note, but the Company may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required in connection therewith as a result of the name of the Holder of the new substitute Note being different from the name of the Holder of the old Note that became mutilated or was destroyed, lost or stolen. In case any Note that has matured or is about to mature or has been surrendered for required repurchase or is about to be converted in accordance with Article 14 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company and to the Trustee such security, pre-funding and/or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, and the Trustee evidence of their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

26

Every substitute Note issued pursuant to the provisions of this Section 2.06 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued hereunder. To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement, payment, redemption, conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement, payment, redemption, conversion or repurchase of negotiable instruments or other securities without their surrender.

Section 2.07. *Temporary Notes.* Pending the preparation of Physical Notes, the Company may execute and the Trustee shall, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed). Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Physical Notes but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company. Every such temporary Note shall be executed by the Company and authenticated by the Trustee upon the same conditions and in substantially the same manner, and with the same effect, as the Physical Notes. Without unreasonable delay, the Company shall execute and deliver to the Trustee Physical Notes (other than any Global Note) and thereupon any or all temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 4.02 and the Trustee shall authenticate and deliver in exchange for such temporary Notes an equal aggregate principal amount of Physical Notes. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Physical Notes authenticated and delivered hereunder.

Section 2.08. *Cancellation of Notes Paid, Converted, Etc.* The Company shall cause all Notes surrendered for the purpose of payment, repurchase, redemption, registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's agents, Subsidiaries, consolidated affiliated entities or Affiliates), to be delivered and surrendered to the Trustee for cancellation. All Notes delivered to the Trustee shall be canceled promptly by it, and except for Notes surrendered for transfer or exchange, no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall dispose of canceled Notes in accordance with its customary procedures and, after such disposition, shall deliver a certificate of such cancellation and disposition to the Company, at the Company's written request in a Company Order.

27

Section 2.09. *CUSIP Numbers.* The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" or "ISIN" numbers, as applicable. Prior to the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes shall have different "CUSIP" numbers. Following the Notes Fungibility Date, the Rule 144A Notes and the Regulation S Notes shall have the same "CUSIP" or "ISIN" number, as applicable.

Section 2.10. *Additional Notes; Repurchases.* The Company may, without the consent of the Holders and notwithstanding Section 2.01, reopen this Indenture and issue additional Notes hereunder with the same terms as the Notes initially issued hereunder (except for any differences in the issue price, the issue date and interest accrued, if any) in an unlimited aggregate principal amount; *provided* that if any such additional Notes are not fungible with the Notes initially issued hereunder for U.S. federal income tax or securities law purposes, such additional Notes shall have a separate CUSIP number from both the Rule 144A Notes and the Regulation S Notes. Prior to the issuance of any such additional Notes, the Company shall deliver to the Trustee a Company Order, an Officer's Certificate and an Opinion of Counsel, such Officer's Certificate and Opinion of Counsel to cover such matters required by Section 17.06. In addition, the Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), repurchase Notes in the open market or otherwise, whether by the Company or through its Subsidiaries or consolidated affiliated entities or through a private or public tender or exchange offer or through counterparties to private agreements. The Company shall cause any Notes so repurchased to be surrendered to the Trustee for cancellation in accordance with Section 2.08, and they will no longer be considered "outstanding" under this Indenture upon their cancellation. The Company may also enter into cash-settled swaps or other derivatives with respect to the Notes. For the avoidance of doubt, any Notes underlying such cash-settled swaps or other derivatives shall not be required to be surrendered to the Trustee for cancellation in accordance with Section 2.08 and will continue to be considered "outstanding" for purposes of this Indenture, subject to the provisions of Section 8.04.

Section 2.11. *Appointment of Authenticating Agent.* As long as any Notes remain outstanding, the Trustee may, by an instrument in writing, appoint with the approval of the Company an authenticating agent (an "**Authenticating Agent**"), which shall be authorized to act on behalf of the Trustee to authenticate Notes pursuant to this Indenture. Notes authenticated by such Authenticating Agent shall be entitled to the benefits of this Indenture and shall be valid and obligatory for all purposes as if authenticated by the Trustee. Whenever reference is made in this Indenture to the authentication and delivery of Notes by the Trustee or to the Trustee's certificate of authentication, such reference shall be deemed to include authentication and delivery on behalf of the Trustee by an Authenticating Agent and a certificate of authentication executed on behalf of the Trustee by an Authenticating Agent. Such Authenticating Agent shall at all times be a Person that is eligible pursuant to the Trust Indenture Act to act as such and that has a combined capital and surplus of at least US$50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

28

ARTICLE 3
SATISFACTION AND DISCHARGE

Section 3.01. *Satisfaction and Discharge.* This Indenture shall upon request of the Company contained in an Officer's Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute instruments acknowledging satisfaction and discharge of this Indenture as reasonably requested by the Company, when (a) (i) all Notes theretofore authenticated and delivered (other than Notes which have been destroyed, lost or stolen and which have been replaced, paid or converted as provided in Section 2.06 and have been delivered to the Trustee for cancellation); or (ii) the Company has deposited with the Trustee or delivered to Holders, as applicable, after the Notes have become due and payable, whether on the Maturity Date, the Redemption Date, the Repurchase Date, any Fundamental Change Repurchase Date, upon conversion or otherwise, cash, ADSs or a combination thereof, as applicable, solely to satisfy the Company's Conversion Obligation, sufficient, without consideration of reinvestment, to pay all of the outstanding Notes and all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with. Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 7.06 shall survive.

ARTICLE 4
PARTICULAR COVENANTS OF THE COMPANY

Section 4.01. *Payment of Principal and Interest.* The Company covenants and agrees that it will cause to be paid the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

Section 4.02. *Maintenance of Office or Agency.* The Company will maintain in the contiguous United States of America, an office or agency (which will be the Paying Agent Office initially) where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase or for conversion and where notices in respect of the Notes and this Indenture may be made. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made at the Paying Agent Office.

29

The Company may also from time to time designate as co-Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the contiguous United States of America for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency. The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable.

The Company initially designates Citibank, N.A. as the Paying Agent, Note Registrar and Conversion Agent and the Paying Agent Office shall be considered as one such office or agency of the Company for each of the aforesaid purposes.

Section 4.03. *Appointments to Fill Vacancies in Trustee's Office.* The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 7.10, a Trustee, so that there shall at all times be a Trustee hereunder.

Section 4.04. *Provisions as to Paying Agent.* (a) If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.04:

(i) that it will hold all sums held by it as such agent for the payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes for the benefit of the Holders of the Notes;

(ii) that it will give the Trustee prompt written notice of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

(iii) that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held.

The Company shall, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, deposit with the Paying Agent a sum in immediately available funds sufficient to pay such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or accrued and unpaid interest and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee in writing of any failure to take such action; *provided* that such deposit must be received by the Paying Agent by 10:00 a.m., New York City time, on the relevant due date.

(b) If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

(c) Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held by the Company in trust or by any Paying Agent as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts. Upon the occurrence of any event specified in Section 6.01(i) or Section 6.01(j), the Trustee or one of its affiliates shall automatically become the Paying Agent.

(d) Subject to applicable escheatment laws, any money or property deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, and accrued and unpaid interest on, or in satisfaction of its Conversion Obligation with respect to, any Note and remaining unclaimed for two years after such principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) or interest has become due and payable, or such Conversion Obligation became due, shall be paid or delivered, as the case may be, to the Company on request of the Company contained in an Officer's Certificate, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such money or property, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 4.05. *Existence.* Subject to Article 11, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effect its corporate existence.

Section 4.06. *Rule 144A Information Requirement and Annual Reports.* (a) At any time the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company shall, so long as any of the Notes, any ADSs deliverable upon conversion thereof or any Class A Ordinary Shares underlying ADSs deliverable upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and shall, upon written request, provide to any Holder, beneficial owner or prospective purchaser of such Notes or the ADSs deliverable upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or ADSs pursuant to Rule 144A. The Company shall take such further action as any Holder or beneficial owner of such Notes or such ADSs may reasonably request to the extent from time to time required to enable such Holder or beneficial owner to sell such Notes or ADSs in accordance with Rule 144A, as such rule may be amended from time to time.

31

(b) The Company shall provide to the Trustee within 15 days after the same are required to be filed with the Commission, copies of any documents or reports that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (giving effect to any applicable grace period provided by Rule 12b-25 under the Exchange Act). Any such document or report that the Company files with the Commission via the Commission's EDGAR system or any successor thereof shall be deemed to be provided to the Trustee for purposes of this Section 4.06(b) at the time such documents are filed via the EDGAR system or such successor, it being understood that the Trustee shall not be responsible for determining whether such filings have been made. If the Notes become convertible into Reference Property consisting in whole or in part of shares of Capital Stock of any parent company of the Company pursuant to the terms of this Indenture described under Section 14.07 and such parent company provides a full and unconditional guarantee of the notes, the U.S. Securities and Exchange Commission reports of such parent company shall be deemed to satisfy the foregoing reporting requirements.

(c) Delivery of the reports and documents described in subsection (b) above to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute actual or constructive notice or knowledge of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officer's Certificate).

(d) If, at any time during the six-month period beginning on, and including, the date that is six months after the last date of original issuance of the Notes, the Company fails to timely file any document or report that it is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (after giving effect to all applicable grace periods thereunder and other than reports on Form 6-K), or the Notes are not otherwise freely tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (as a result of restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes), the Company shall pay Additional Interest on the Notes. Such Additional Interest shall accrue on the Notes at the rate of 0.50% per annum of the principal amount of the Notes outstanding for each day during such period for which the Company's failure to file has occurred and is continuing or the period during which the Notes are not freely tradable, as the case may be. As used in this Section 4.06(d), documents or reports that the Company is required to "file" with the Commission pursuant to Section 13 or 15(d) of the Exchange Act does not include documents or reports that the Company furnishes to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(e) If, and for so long as, the restrictive legend on the Notes specified in Section 2.05(c) has not been removed, the Notes are assigned a restricted CUSIP or the Notes are not otherwise freely tradable by Holders thereof other than, in each case by or with respect to, the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes) as of the 376th day after the last date of original issuance of the Notes, the Company shall pay Additional Interest on the Notes at a rate equal to 0.50% per annum of the principal amount of Notes outstanding until the restrictive legend has been removed from the Notes in accordance with Section 2.05(c), the Notes have been assigned an unrestricted CUSIP and the Notes are freely tradable by Holders other than the Company's Affiliates or Holders that were the Company's Affiliates at any time during the three months immediately preceding (without restrictions pursuant to U.S. securities laws or the terms of this Indenture or the Notes) as of the 376th day after the last date of original issuance of the Notes.

32

(f) Additional Interest will be payable in arrears on each Interest Payment Date following accrual in the same manner as regular interest on the Notes and subject to Section 4.06(d).

(g) The Additional Interest that is payable in accordance with Section 4.06(d) or Section 4.06(e) shall be in addition to, and not in lieu of, any Additional Interest that may be payable as a result of the Company's election pursuant to Section 6.03. In no event shall Additional Interest accrue on any day under the terms of this Indenture (including any Additional Interest payable pursuant to Section 4.06(d) and Section 4.06(e) together with any Additional Interest payable pursuant to Section 6.03) at an annual rate in excess of 0.50%, in the aggregate, for any violation or Default caused by the Company's failure to be current in respect of its Exchange Act reporting obligations.

(h) If Additional Interest is payable by the Company pursuant to Section 4.06(d) or Section 4.06(e), the Company shall deliver to the Trustee an Officer's Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid such Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee an Officer's Certificate setting forth the particulars of such payment.

Section 4.07. *Additional Amounts.* (a) All payments and deliveries made by, or on behalf of, the Company or any successor to the Company under or with respect to this Indenture and the Notes, including payments of principal (including, if applicable, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and payments of cash and/or deliveries of ADSs (together with payments of cash for any fractional ADS) upon conversion of the Notes, will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Company or any successor to the Company is, for tax purposes, organized or resident or doing business (each, as applicable, a "**Relevant Taxing Jurisdiction**") or through which payment is made or deemed made (together with each Relevant Taxing Jurisdiction, a "**Relevant Jurisdiction**," and in each case, any political subdivision or taxing authority thereof or therein), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Company or any successor to the Company shall pay to each Holder such additional amounts ("**Additional Amounts**") as may be necessary to ensure that the net amount received by the Holders after such withholding or deduction (and after deducting any taxes on the Additional Amounts) will equal the amounts that would have been received by such Holders had no such withholding or deduction been required; *provided* that no Additional Amounts will be payable:

33

(i) for or on account of:

(A) any tax, duty, assessment or other governmental charge that would not have been imposed but for:

(1) the existence of any present or former connection between the Holder or beneficial owner of such Note and the Relevant Jurisdiction, other than merely holding such Note or the receipt of payments thereunder, including such Holder or beneficial owner being or having been a national, domiciliary or resident of such Relevant Jurisdiction or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

(2) the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on such Note or the payment of cash and/or the delivery of ADSs (together with payment of cash for any fractional ADS) upon conversion of such Note became due and payable pursuant to the terms thereof or was made or duly provided for, unless the Holder would have been entitled to such Additional Amounts on the last day of the 30-day period;

(3) the failure of the Holder or beneficial owner to comply with a timely request from the Company or any successor of the Company, addressed to the Holder, to provide certification, information, documents or other evidence concerning such Holder's or beneficial owner's nationality, residence, identity or connection with the Relevant Jurisdiction, or to make any declaration or satisfy any other reporting requirement relating to such matters, if and to the extent that due and timely compliance with such request is required by statute, regulation or administrative practice of the Relevant Jurisdiction in order to reduce or eliminate any withholding or deduction as to which Additional Amounts would have otherwise been payable; or

(4) the presentation of such Note (in cases in which presentation is required) for payment in the Relevant Jurisdiction, unless such Note could not have been presented for payment elsewhere;

34

(B) any estate, inheritance, gift, sale, transfer, excise, personal property or similar tax, assessment or other governmental charge;

(C) any tax, duty, assessment or other governmental charge that is payable otherwise than by withholding from payments or deliveries under or with respect to the Notes;

(D) any tax, assessment, withholding or deduction required by sections 1471 through 1474 of the Code ("**FATCA**"), any current or future Treasury Regulations or rulings promulgated thereunder, any law, regulation or other official guidance enacted in any jurisdiction implementing FATCA, any intergovernmental agreement between the United States and any other jurisdiction to implement FATCA or any law enacted by such other jurisdiction to give effect to such agreement, or any agreement with the U.S. Internal Revenue Service under FATCA; or

(E) any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (A), (B), (C) or (D); or

(ii) with respect to any payment of the principal of (including the Redemption Price, the Repurchase Price and Fundamental Change Repurchase Price, if applicable) and interest on such Note or the payment of cash and/or the delivery of ADSs (together with payment of cash for any fractional ADS) upon conversion of such Note to a Holder, if the Holder is a fiduciary, partnership or person other than the sole beneficial owner of that payment to the extent that such payment would be required to be included in the income under the laws of the Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor with respect to the fiduciary, a partner or member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner, member or beneficial owner been the Holder thereof.

(b) The Trustee and Paying Agent shall also be entitled to make any withholding or deduction pursuant to an agreement described in Section 1471(b) of the Code or otherwise imposed pursuant to FATCA and any regulations or agreements thereunder or official interpretations thereof.

(c) Any reference in this Indenture or the Notes in any context to the payment of cash and/or the delivery of ADSs (together with payments of cash for any fractional ADS), as applicable, upon conversion of any Note or the payment of principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) and interest on any Note or any other amount payable with respect to such Note, shall be deemed to include payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable with respect to that amount pursuant to this Section 4.07.

(d) If the Company or its successor is required to make any deduction or withholding from any payments or deliveries with respect to the Notes, it will deliver to the Trustee, the Paying Agent and the Holders official tax receipts evidencing the remittance to the relevant tax authorities of the amounts so withheld or deducted.

35

(e) The Trustee shall have no obligation to determine whether any Additional Amounts are payable under the Indenture or the amount thereof.

(f) The foregoing obligations shall survive termination or discharge of this Indenture.

Section 4.08. *Stay, Extension and Usury Laws.* The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.09. *Compliance Certificate; Statements as to Defaults.* The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2018) an Officer's Certificate stating that a review has been conducted of the Company's activities under this Indenture and the Company has fulfilled its obligations hereunder, and whether the authorized Officers thereof have knowledge of any Default by the Company that occurred during the previous year that is then continuing and, if so, specifying each such Default and the nature thereof.

In addition, the Company shall deliver to the Trustee, as soon as possible, and in any event within 30 days after the Company becomes aware of the occurrence of any Default, an Officer's Certificate setting forth the details of such Default, its status and the action that the Company is taking or proposing to take in respect thereof.

Section 4.10. *Further Instruments and Acts.* Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

ARTICLE 5
LISTS OF HOLDERS AND REPORTS BY THE COMPANY AND THE TRUSTEE

Section 5.01. *Lists of Holders.* The Company covenants and agrees that it will furnish or cause to be furnished to the Trustee, semi-annually, not more than 5 days after each June 1 and December 1 in each year beginning with June 1, 2019, and at such other times as the Trustee may request in writing, within 5 days after receipt by the Company of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form as the Trustee may reasonably require of the names and addresses of the Holders as of a date not more than 15 days (or such other date as the Trustee may reasonably request in order to so provide any such notices) prior to the time such information is furnished, except that no such list need be furnished so long as the Trustee is acting as Note Registrar.

36

Section 5.02. *Preservation and Disclosure of Lists.* The Trustee shall preserve, in as current a form as is reasonably practicable, all information as to the names and addresses of the Holders contained in the most recent list furnished to it as provided in Section 5.01 or maintained by the Trustee in its capacity as Note Registrar, if so acting. The Trustee may destroy any list furnished to it as provided in Section 5.01 upon receipt of a new list so furnished.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01. *Events of Default.* The following events shall be "**Events of Default**" with respect to the Notes:

(a) default in any payment of interest or Additional Amounts, if any, on any Note when due and payable and the default continues for a period of 30 days;

(b) default in the payment of principal of any Note when due and payable on the Maturity Date, upon Optional Redemption, upon any required repurchase, upon declaration of acceleration or otherwise;

(c) failure by the Company to comply with its obligation to convert the Notes in accordance with this Indenture upon exercise of a Holder's conversion right and such failure continues for a period of five Business Days;

(d) failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 15.02(c), notice of a Make-Whole Fundamental Change in accordance with Section 14.03(a) or notice of a specified corporate event in accordance with Section 14.01(b)(ii) or 14.01(b)(iii), in each case, when due and such failure continues for a period of five Business Days;

(e) failure by the Company to comply with its obligations under Article 11;

(f) failure by the Company for 60 days after written notice from the Trustee or by the Trustee at the request of the Holders of at least 25% in aggregate principal amount of the Notes then outstanding has been received by the Company to comply with any of its other agreements contained in the Notes or this Indenture;

(g) default by the Company or any Significant Subsidiary of the Company with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed in excess of US$60 million (or the foreign currency equivalent thereof) in the aggregate by the Company and/or any such Significant Subsidiary, whether such indebtedness now exists or shall hereafter be created (i) resulting in such indebtedness becoming or being declared due and payable prior to its stated maturity or (ii) constituting a failure to pay the principal or interest of any such debt when due and payable at its stated maturity, upon required repurchase, upon declaration of acceleration or otherwise and in each case, such indebtedness is not discharged, or such acceleration is not otherwise cured or rescinded, within 30 days;

37

(h) a final judgment for the payment of US$60 million (or the foreign currency equivalent thereof) or more (excluding any amounts covered by insurance) rendered against the Company or any Significant Subsidiary of the Company, which judgment is not paid, bonded or otherwise discharged or stayed within 60 days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(i) the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

(j) an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 30 consecutive days.

Section 6.02. *Acceleration; Rescission and Annulment*. If one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company or any of its Significant Subsidiaries), unless the principal of all of the Notes shall have already become due and payable, the Trustee may by notice in writing to the Company, or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.04, by notice in writing to the Company and to the Trustee may, at its sole discretion and without further notice, and the Trustee at the request of such Holders accompanied by security, pre-funding and/or indemnity satisfactory to the Trustee and otherwise subject to the limitations set forth in this Indenture, shall, declare 100% of the principal of, and accrued and unpaid interest on, all the Notes to be due and payable immediately, and upon any such declaration the same shall become and shall automatically be immediately due and payable, notwithstanding anything contained in this Indenture or in the Notes to the contrary. If an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company or any of its Significant Subsidiaries occurs and is continuing, 100% of the principal of, and accrued and unpaid interest on, all Notes shall become and shall automatically be immediately due and payable without any action on the part of the Trustee. If an Event of Default occurs and is continuing, the Agents and any other agents of the Company appointed under this Indenture will be required to act on the direction of the Trustee.

38

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum in immediately available funds sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest to the extent that payment of such interest is enforceable under applicable law, and on such principal at the rate per annum borne by the Notes *plus* one percent) and amounts due to the Trustee pursuant to Section 7.06, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all existing Events of Default under this Indenture, other than the nonpayment of the principal of and accrued and unpaid interest on Notes that shall have become due solely by such acceleration, shall have been cured or waived pursuant to Section 6.09, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal of, or accrued and unpaid interest on, any Notes, (ii) a failure to repurchase any Notes when required or (iii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes.

Section 6.03. *Additional Interest*. Notwithstanding anything in this Indenture or in the Notes to the contrary, to the extent the Company elects, the sole remedy for Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) shall after the occurrence of such an Event of Default (which will be the 60th day after written notice is provided to the Company pursuant to Section 6.01(f)) consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to:

(a) 0.25% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the date on which such an Event of Default first occurs and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 180th day immediately following, and including, the date on which such Event of Default first occurred; and

39

(b) if such Event of Default has not been cured or validly waived prior to the 181st day immediately following, and including, the date on which such Event of Default first occurred, 0.50% per annum of the principal amount of the Notes outstanding for each day during the period beginning on, and including, the 181st day immediately following, and including, the date on which such an Event of Default first occurred and ending on the earlier of (i) the date on which such Event of Default is cured or validly waived and (ii) the 360th day immediately following, and including, the date on which such Event of Default first occurred.

Interest payable pursuant to this Section 6.03 shall be in addition to, not in lieu of, any Additional Interest payable pursuant to Section 4.06(d) or Section 4.06(e). In no event shall Additional Interest accrue on the Notes on any day under this Indenture (including any Additional Interest payable pursuant to this Section 6.03 together with any Additional Interest payable pursuant to Section 4.06(d) and Section 4.06(e)) at an annual rate accruing in excess of 0.50%, in the aggregate, for any violation or Default caused by the Company's failure to be current in respect of its Exchange Act reporting obligations. If the Company so elects, such Additional Interest shall be payable in the same manner and on the same dates as regular interest on the Notes. On the 361st day after such Event of Default (if the Event of Default with respect to the Company's obligations under Section 4.06(b) is not cured or waived prior to such day), the Notes will be subject to acceleration as provided in Section 6.02. In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.03 or the Company elected to make such payment but does not pay the Additional Interest when due, the Notes shall be subject to acceleration as provided in Section 6.02.

In order to elect to pay Additional Interest as the sole remedy during the first 180 days after the occurrence of any Event of Default described in the immediately preceding paragraph, the Company must notify in writing all Holders of the Notes, the Trustee and the Paying Agent of such election prior to the beginning of such 180-day period. Upon the Company's failure to timely give such written notice, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

Section 6.04. *Payments of Notes on Default; Suit Therefor.* If an Event of Default described in clause (a) or (b) of Section 6.01 shall have occurred, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate per annum borne by the Notes at such time *plus* one percent, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 7.06. If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may at its sole discretion and without further notice institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated; *provided* that the Trustee will not be bound to make any such proceeding unless (i) it shall have been so directed by the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, (ii) it shall have been indemnified, pre-funded and/or secured to its satisfaction and (iii) the Trustee is satisfied that the act or exercise of any of the rights or powers vested in it by this Indenture will not result in any of its directors, officers, employees or agents incurring personal liability.

40

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under Title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.04, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 7.06; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for reasonable compensation, expenses, advances and disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under Section 7.06, incurred by it up to the date of such distribution. To the extent that such payment of reasonable compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property that the Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

41

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.09 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders, and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders, and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.05. *Application of Monies Collected by Trustee.* Any monies or property collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

**First**, to the payment of all amounts due the Trustee under Section 7.06 and any payments due to the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar;

**Second**, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, the Notes in default in the order of the date due of the payments of such interest, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate per annum borne by the Notes at such time, *plus* one percent (including, without duplication, any additional interest on such overdue payments pursuant to Section 6.04), such payments to be made ratably to the Persons entitled thereto;

**Third**, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate per annum borne by the Notes at such time *plus* one percent, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price and the cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price) and accrued and unpaid interest; and

42

**Fourth**, to the payment of the remainder, if any, to the Company.

Section 6.06. *Proceedings by Holders.* Except to enforce the right to receive payment of principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price) or interest when due, or the right to receive payment or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a) such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

(b) Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to pursue the remedy;

(c) such Holders shall have offered to the Trustee such security, pre-funding and/or indemnity satisfactory to it against any loss, liability or expense to be incurred therein or thereby;

(d) the Trustee does not comply with such written request within 60 days after the later of its receipt of such written request and the offer of security, pre-funding and/or indemnity; and

(e) no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60-day period pursuant to Section 6.09,

it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder (it being further understood that the Trustee shall not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to any other Holder), or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders (except as otherwise provided herein). For the protection and enforcement of this Section 6.06, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, (y) accrued and unpaid interest on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

43

Section 6.07. *Proceedings by Trustee.* In case of an Event of Default, the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law; *provided* that the Trustee will not be bound to make any such proceeding unless (i) it shall have been so directed by the Holders of at least 25% in aggregate principal amount of the Notes then outstanding, (ii) it shall have been indemnified, pre-funded and/or secured to its satisfaction and (iii) the Trustee is satisfied that the act or exercise of any of the rights or powers vested in it by this Indenture will not result in any of its directors, officers, employees or agents incurring personal liability.

Section 6.08. *Remedies Cumulative and Continuing.* Except as provided in the last paragraph of Section 2.06, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.06, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

Section 6.09. *Direction of Proceedings and Waiver of Defaults by Majority of Holders.* The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to the Notes; *provided, however*, that the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction. The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder (it being understood that the Trustee shall not have an affirmative duty to ascertain whether or not any such direction is unduly prejudicial to any other Holder), or if it is not provided with security, pre-funding and/or indemnity to its satisfaction. In addition, the Trustee will not be required to expend its own funds under any circumstances. The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (i) a default in the payment of accrued and unpaid interest on, or the principal (including, if applicable, the Redemption Price, Repurchase Price or Fundamental Change Repurchase Price) of, the Notes when due that has not been cured pursuant to the provisions of Section 6.02, (ii) a failure by the Company to pay or deliver, or cause to be delivered, as the case may be, the consideration due upon conversion of the Notes or (iii) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected. Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.09, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

44

Section 6.10. *Notice of Defaults and Events of Default.* If a Default or Event of Default occurs and is continuing and is notified in writing to a Responsible Officer of the Trustee, the Trustee shall, within 90 days after the Responsible Officer of the Trustee receives such written notice or obtains such knowledge, send to all Holders (at the Company's expense) as the names and addresses of such Holders appear upon the Note Register, notice of all Defaults known to a Responsible Officer, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that the Trustee shall not be deemed to have knowledge of any occurrence of a Default or an Event of Default unless a Responsible Officer of the Trustee has received written notice. Except in the case of a Default in the payment of the principal of (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as the Trustee (in its sole discretion) in good faith determines that the withholding of such notice is in the interests of the Holders.

Section 6.11. *Undertaking to Pay Costs.* All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.11 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of or accrued and unpaid interest on any Note (including, but not limited to, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price with respect to the Notes being repurchased as provided in this Indenture) on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note in accordance with the provisions of Article 14.

45

ARTICLE 7
CONCERNING THE TRUSTEE

Section 7.01. *Duties and Responsibilities of Trustee.* In case an Event of Default has occurred that has not been cured or waived, and if a Responsible Officer of the Trustee has written notice or actual knowledge of such event, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs; *provided* that if an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any of the Holders unless such Holders have offered (and, if requested, provided) to the Trustee indemnity, pre-funding or security satisfactory to it against the losses, costs, expenses and liabilities that might be incurred by it in compliance with such request or direction.

No provision of this Indenture shall be construed to relieve the Trustee from liability for its own grossly negligent action, its own grossly negligent failure to act or its own willful misconduct, except that:

(a) prior to the occurrence of an Event of Default of which a Responsible Officer of the Trustee has written notice or actual knowledge of and after the curing or waiving of all Events of Default that may have occurred:

(i) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture to the extent of its own gross negligence or willful misconduct and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith on its part, the Trustee and each Agent may conclusively and without liability rely, and will be protected in acting, or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, approval, security, bond, debenture, note, other evidence of indebtedness or other paper or document (whether in original, email or any other form of electronic communication or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person. The Trustee and each Agent need not investigate any fact or matter stated in the document, but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations or other facts stated therein);

(b) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved by a decision of a court of competent jurisdiction that the Trustee was grossly negligent in ascertaining the pertinent facts;

46

(c) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(d) whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section;

(e) the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co-Note Registrar with respect to the Notes;

(f) if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively and without liability rely on its failure to receive such notice as reason to act as if no such event occurred;

(g) in the absence of written investment direction from the Company, all cash received by the Trustee shall be placed in a non-interest bearing trust account, and in no event shall the Trustee be liable for the selection of investments or for investment losses incurred thereon or for losses incurred as a result of the liquidation of any such investment prior to its maturity date or the failure of the party directing such investments prior to its maturity date or the failure of the party directing such investment to provide timely written investment direction, and the Trustee shall have no obligation to invest or reinvest any amounts held hereunder in the absence of such written investment direction from the Company;

(h) in the event that the Trustee or any of its affiliates is also acting as Note Registrar, Paying Agent, Conversion Agent, Bid Solicitation Agent or Transfer Agent hereunder, the rights and protections afforded to the Trustee pursuant to this Article 7 shall also be afforded to such Note Registrar, Paying Agent, Conversion Agent, Bid Solicitation Agent or Transfer Agent; and

(i) under no circumstances shall the Trustee be liable in its individual capacity for the obligations evidenced by the Notes.

None of the provisions contained in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur personal financial liability in the performance of any of its duties or in the exercise of any of its rights or powers.

Section 7.02. *Reliance on Documents, Opinions, Etc.* Except as otherwise provided in Section 7.01:

(a) any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed); and any Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

47

(b) the Trustee may consult with counsel or other professional advisors of its selection and require an Opinion of Counsel and any written or verbal advice of such counsel or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(c) the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(d) in connection with the exercise by it of its trusts, powers, authorities or discretions (including, without limitation, any modification, waiver, authorization or determination), the Trustee shall have regard to the general interests of the Holders as a class but shall not have regard to any interests arising from circumstances particular to individual Holders (whatever their number) and in particular, but without limitation, shall not have regard to the consequences of the exercise of its trusts, powers, authorities or discretions for individual Holders (whatever their number) resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any country, state or territory and a Holder shall not be entitled to require, nor shall any Holder be entitled to claim, from the Company, the Trustee or any other Person any indemnification or payment in respect of any tax consequence of any such exercise upon individual Holders except to the extent already provided in Section 4.07 or Section 14.02(e) and/or any undertaking given in addition to, or in substitution for, Section 4.07 or Section 14.02(e) pursuant to this Indenture;

(e) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, delegates, custodians, nominees or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent, delegate, representative, custodian, nominee or attorney appointed by it with due care hereunder;

(f) the permissive rights of the Trustee enumerated herein shall not be construed as duties;

(g) the Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(h) the Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture;

(i) in no event shall the Trustee be liable for any consequential, punitive, special or indirect loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

48

(j) neither the Trustee nor any Agent shall be charged with knowledge of any Default or Event of Default with respect to the Notes, unless either (1) in the case of the Trustee, a Responsible Officer shall have actual knowledge of such Default or Event of Default or (2) it has received express written notice of such Default or Event of Default;

(k) the Trustee shall treat information provided hereunder as confidential, but (unless consent is prohibited by law) the Company hereby consents to the processing, transfer and disclosure by the Trustee of any information relating to it provided hereunder to and between branches, subsidiaries, representative offices, affiliates and agents of the Trustee solely in connection with the discharge of the Trustee's trusts, powers, authorities, duties and obligations under this Indenture, wherever situated, for confidential use (including to service providers selected by the Trustee with due care for data processing, statistical and risk analysis purposes and for compliance with applicable law). The Trustee and any such branch, subsidiary, representative office, affiliate, agent or third party may transfer and disclose any such information only to the extent required or requested by any applicable law, regulatory authority, court or legal process, including any auditor of the Company and including any payor or payee as required by applicable law, and may use (and its performance will be subject to the rules of) any communications, clearing or payment systems, intermediary bank or other system. The Company acknowledges that the transfers permitted by this Section 7.02(k) may include transfers to jurisdictions which do not have strict data protection or data privacy laws;

(l) the Company hereby irrevocably waives, in favor of the Trustee and the Agents, any conflict of interest that may arise by virtue of the Trustee and/or the Agents acting in various capacities under the Notes or this Indenture or for other customers of the Trustee and the Agents. The Company acknowledges that the Trustee and the Agents and their respective affiliates (together, the "**Agent Parties**") may have interests in, or may be providing or may in the future provide financial or other services to other parties with interests which the Company may regard as conflicting with its interests and may possess information (whether or not material to the Company) other than as a result of the Trustee and/or the Agents acting as the Trustee and/or the Agents hereunder, that the Trustee and/or the Agents may not be entitled to share with the Company. The Trustee and the Agents will not disclose confidential information obtained from the Company (without its consent) to any of the Trustee and/or the Agents' other customers or affiliates nor will it use on behalf of the Company any confidential information obtained from any other customer. Without prejudice to the foregoing, the Company agrees that the Agent Parties may deal (whether for its own or its customers' account) in, or advise on, securities of any party and that such dealing or giving of advice, will not constitute a conflict of interest for the purposes of the Notes or this Indenture;

(m) the Trustee shall be entitled to take any action or to refuse to take any action which the Trustee regards as necessary for the Trustee to comply with any applicable law, regulation or fiscal requirement, court order, or the rules, operating procedures or market practice of any relevant stock exchange or other market or clearing system;

49

(n) notwithstanding anything else contained in this Indenture, each of the Trustee and the Agents may refrain without liability from (i) doing anything which would or might in its opinion acting reasonably be illegal or contrary to, or would result in the Trustee or any Agent being in breach of, any law of any jurisdiction or any directive, rule, regulation, request, direction, notice, announcement or similar action of any agency, regulatory authority, stock exchange or self-regulatory organization of any jurisdiction (including, without limitation, Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act), or which would or might otherwise render it liable to any person and may do anything which is, in its opinion, necessary to comply with any such law, directive or regulation or (ii) doing anything which may cause the Trustee to be considered a sponsor of a covered fund under Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act and any regulations promulgated thereunder. Furthermore, the Trustee may also refrain from taking any action if, in its opinion based upon advice of counsel, it would not have the power to do the relevant thing in the relevant jurisdiction by virtue of any applicable law in such jurisdiction or if it is determined by any court or other competent authority in such jurisdiction that it does not have such power; and

(o) in the event the Trustee receives inconsistent or conflicting requests and indemnity, security and/or pre-funding from two or more groups of Holders, each representing less than a majority in aggregate principal amount of the Notes then outstanding, pursuant to the provisions of this Indenture, the Trustee, in its sole and absolute discretion, may determine what action, if any, will be taken.

Section 7.03. *No Responsibility for Recitals, Etc.* The recitals, statements, warranties and representations contained herein and in the Notes (except in the Trustee's certificate of authentication) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the accuracy or correctness of the same or the execution, legality, effectiveness, adequacy, genuineness, validity, enforceability or admissibility in evidence of this Indenture or of the Notes. The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture. Notwithstanding the generality of the foregoing, each Holder shall be solely responsible for making its own independent appraisal of, and investigation into, the financial condition, creditworthiness, condition, affairs, status and nature of the Company, and the Trustee shall not at any time have any responsibility for the same and each Holder shall not rely on the Trustee in respect thereof.

Section 7.04. *Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes.* The Trustee, any Paying Agent, any Conversion Agent, Bid Solicitation Agent (if other than the Company or any Affiliate thereof) or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent, Bid Solicitation Agent or Note Registrar, and nothing herein shall obligate any of them to account for any profits earned from any business or transactional relationship.

50

Section 7.05. *Monies and ADSs to Be Held in Trust.* All monies and ADSs received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received. Money and ADSs held by the Trustee in trust or by the Paying Agent hereunder need not be segregated from other funds or property except to the extent required by law. Neither the Trustee nor the Paying Agent shall be under any liability for interest on any money or ADSs received by it hereunder.

Section 7.06. *Compensation and Expenses of Trustee.* (a) The Company covenants and agrees to pay to the Trustee, in any capacity under this Indenture, from time to time, and the Trustee shall be entitled to, compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture in any capacity thereunder (including the reasonable compensation and the expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as shall have been caused by its gross negligence or willful misconduct as determined by a final, non-appealable decision of a court of competent jurisdiction. The Company also covenants to indemnify the Trustee in any capacity under this Indenture and any other document or transaction entered into in connection herewith and its officers, directors, attorneys, employees and agents, and to hold them harmless against, any loss, claim (provided that the Company need not pay for settlement of any such claim made without its consent, which consent shall not be unreasonably withheld), damage, liability or expense incurred without gross negligence or willful misconduct on the part of the Trustee, its officers, directors, agents, attorneys or employees, as the case may be, as determined by a final, non-appealable decision of a court of competent jurisdiction, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim of liability in the premises. The obligations of the Company under this Section 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior lien to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of Section 6.05, funds held in trust herewith for the benefit of the Holders of particular Notes. The Trustee's right to receive payment of any amounts due under this Section 7.06 shall not be subordinate to any other liability or indebtedness of the Company. The indemnity under this Section 7.06(a) is payable upon demand by the Trustee. The obligation of the Company under this Section 7.06(a) shall survive the satisfaction and discharge of the Indenture and payment of the Notes, the termination of this Indenture and the resignation or removal of the Trustee. The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld. The indemnification provided in this Section 7.06(a) shall extend to the officers, directors, attorneys, agents and employees of the Trustee. Subject to Section 7.02(e), any negligence or misconduct of any agent, delegate, attorney or representative, in each case, of the Trustee, shall not affect indemnification of the Trustee.

51

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents incur expenses or render services after an Event of Default specified in Section 6.01(i) or Section 6.01(j) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws. If a Default or Event of Default shall have occurred or if the Trustee finds it expedient or necessary or is requested by the Company and/or the Holders to undertake duties which are of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under this Indenture, the Company will pay such additional remuneration as the Company and the Trustee have separately agreed in writing.

(b) The Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar shall be entitled to the compensation to be agreed upon in writing with the Company for all services rendered by it under this Indenture, and the Company agrees promptly to pay such compensation and to reimburse the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar for its out-of-pocket expenses (including reasonable fees and expenses of counsel) incurred by it in connection with the services rendered by it under this Indenture. The Company hereby agrees to indemnify the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar and their respective officers, directors, agents and employees and any successors thereto for, and to hold it harmless against, any loss, liability or expense (including reasonable fees and expenses of counsel) incurred without gross negligence or willful misconduct on its part, as determined by a final, non-appealable decision of a court of competent jurisdiction, arising out of or in connection with its acting as the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar hereunder. The obligations of the Company under this paragraph (b) shall survive the payment of the Notes, the termination of the Indenture and the resignation or removal of the Paying Agent, the Transfer Agent, the Conversion Agent and the Note Registrar.

Section 7.07. *Officer's Certificate as Evidence.* Except as otherwise provided in Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Trustee, and such Officer's Certificate shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 7.08. *Eligibility of Trustee.* There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act to act as such and has a combined capital and surplus of at least US$50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article.

Section 7.09. *Resignation or Removal of Trustee.* (a) The Trustee may at any time resign by giving 30 days' written notice of such resignation to the Company. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the mailing of such notice of resignation to the Company, the resigning Trustee may appoint a successor trustee on behalf of and at the expense of the Company or it may, upon ten Business Days' notice to the Company and the Holders and at the expense of the Company, petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months may, subject to the provisions of Section 6.11, on behalf of himself or herself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

52

(b) In case at any time any of the following shall occur:

(i) the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(ii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in either case, the Company may by a Board Resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 6.11, any Holder who has been a bona fide holder of a Note or Notes for at least six months may, on behalf of himself or herself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(c) The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may remove the Trustee by giving 30 days written notice to the Trustee and nominate a successor trustee that shall be deemed appointed as successor trustee unless within ten days after notice to the Company of such nomination the Company objects thereto, in which case the Trustee so removed or any Holder, upon the terms and conditions and otherwise as in Section 7.09(a) provided, may petition any court of competent jurisdiction for an appointment of a successor trustee.

(d) Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.10.

Section 7.10. *Acceptance by Successor Trustee.* Any successor trustee appointed as provided in Section 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the trustee ceasing to act shall, upon payment of any amounts then due to it pursuant to the provisions of Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a senior lien to which the Notes are hereby made subordinate on all money or property held or collected by such trustee as such, except for funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due to it pursuant to the provisions of Section 7.06.

No successor trustee shall accept appointment as provided in this Section 7.10 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 7.08.

Upon acceptance of appointment by a successor trustee as provided in this Section 7.10, each of the Company and the successor trustee, at the written direction and at the expense of the Company shall deliver or cause to be delivered notice of the succession of such trustee hereunder to the Holders at their addresses as they shall appear on the Note Register. If the Company fails to deliver such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be delivered at the expense of the Company.

Section 7.11. *Succession by Merger, Etc.* Any corporation or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of Section 7.08.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor trustee or to authenticate Notes in the name of any predecessor trustee shall apply only to its successor or successors by merger, conversion or consolidation.

54

Section 7.12. *Trustee's Application for Instructions from the Company.* Any application by the Trustee for written instructions from the Company (other than with regard to any action proposed to be taken or omitted to be taken by the Trustee that affects the rights of the Holders of the Notes under this Indenture) may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any Officer that the Company been deemed to have been given pursuant to Section 17.03, unless any such Officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

## ARTICLE 8
### CONCERNING THE HOLDERS

Section 8.01. *Action by Holders.* Whenever in this Indenture it is provided that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced (a) by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing, or (b) by the record of the Holders voting in favor thereof at any meeting of Holders duly called and held in accordance with the provisions of Article 9, or (c) by a combination of such instrument or instruments and any such record of such a meeting of Holders. Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may fix, but shall not be required to, in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action.

Section 8.02. *Proof of Execution by Holders.* Subject to the provisions of Section 7.01, Section 7.02 and Section 9.05, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar. The record of any Holders' meeting shall be proved in the manner provided in Section 9.06.

Section 8.03. *Who Are Deemed Absolute Owners.* The Company, the Trustee, any Paying Agent, any Transfer Agent, any Conversion Agent and any Note Registrar may deem the Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account of the principal of and (subject to Section 2.03) accrued and unpaid interest on such Note, for the purpose of conversion of such Note and for all other purposes under this Indenture; and none of the Company, the Trustee, any Transfer Agent, any Paying Agent, any Conversion Agent or any Note Registrar shall be affected by any notice to the contrary. The sole registered holder of a Global Note shall be the Depositary or its nominee. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or ADSs so paid or delivered, effectual to satisfy and discharge the liability for monies payable or ADSs deliverable upon any such Note. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any owner of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such owner's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

55

Section 8.04. *Company-Owned Notes Disregarded.* In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company, by any Subsidiary thereof or by any Affiliate of the Company or any Subsidiary thereof shall be disregarded and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes in respect of which a Responsible Officer is notified in writing shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.04 if the pledgee shall establish its right to so act with respect to such Notes and that the pledgee is not the Company, a Subsidiary thereof or an Affiliate of the Company or a Subsidiary thereof. Within five days of acquisition of the Notes by any of the above described persons or entities, the Company shall furnish to the Trustee promptly an Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 7.01, the Trustee shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

Section 8.05. *Revocation of Consents; Future Holders Bound.* At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Note. Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

56

ARTICLE 9
HOLDERS' MEETINGS

Section 9.01. *Purpose of Meetings.* A meeting of Holders may be called at any time and from time to time pursuant to the provisions of this Article 9 for any of the following purposes:

(a) to give any notice to the Company or to the Trustee or to give any directions to the Trustee permitted under this Indenture, or to consent to the waiving of any Default or Event of Default hereunder and its consequences, or to take any other action authorized to be taken by Holders pursuant to any of the provisions of Article 6;

(b) to remove the Trustee and nominate a successor trustee pursuant to the provisions of Article 7;

(c) to consent to the execution of an indenture or indentures supplemental hereto pursuant to the provisions of Article 10; or

(d) to take any other action authorized to be taken by or on behalf of the Holders of any specified aggregate principal amount of the Notes under any other provision of this Indenture or under applicable law.

Section 9.02. *Call of Meetings by Trustee.* The Trustee may at any time call a meeting of Holders to take any action specified in Section 9.01, to be held at such time and at such place as the Trustee shall determine. Notice of every meeting of the Holders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting and the establishment of any record date pursuant to Section 8.01, shall be delivered to Holders of such Notes at their addresses as they shall appear on the Note Register. Such notice shall also be delivered to the Company. Such notices shall be delivered not less than 20 nor more than 90 days prior to the date fixed for the meeting.

Any meeting of Holders shall be valid without notice if the Holders of all Notes then outstanding are present in person or by proxy or if notice is waived before or after the meeting by the Holders of all Notes then outstanding, and if the Company and the Trustee are either present by duly authorized representatives or have, before or after the meeting, waived notice.

Section 9.03. *Call of Meetings by Company or Holders.* In case at any time the Company, pursuant to a Board Resolution, or the Holders of at least 10% of the aggregate principal amount of the Notes then outstanding, shall have requested the Trustee to call a meeting of Holders, by written request setting forth in reasonable detail the action proposed to be taken at the meeting, and the Trustee shall not have delivered the notice of such meeting within 20 days after receipt of such request, then the Company or such Holders may determine the time and the place for such meeting and may call such meeting to take any action authorized in Section 9.01, by delivering notice thereof as provided in Section 9.02.

Section 9.04. *Qualifications for Voting.* To be entitled to vote at any meeting of Holders a Person shall (a) be a Holder of one or more Notes on the record date pertaining to such meeting or (b) be a Person appointed by an instrument in writing as proxy by a Holder of one or more Notes on the record date pertaining to such meeting. The only Persons who shall be entitled to be present or to speak at any meeting of Holders shall be the Persons entitled to vote at such meeting and their counsel and any representatives of the Trustee and its counsel and any representatives of the Company and its counsel.

57

Section 9.05. *Regulations.* Notwithstanding any other provisions of this Indenture, the Trustee may make such reasonable regulations as it may deem advisable for any meeting of Holders, in regard to proof of the holding of Notes and of the appointment of proxies, and in regard to the appointment and duties of inspectors of votes, the submission and examination of proxies, certificates and other evidence of the right to vote, and such other matters concerning the conduct of the meeting as it shall think fit.

The Trustee shall, by an instrument in writing, appoint a temporary chairman of the meeting, unless the meeting shall have been called by the Company or by Holders as provided in Section 9.03, in which case the Company or the Holders calling the meeting, as the case may be, shall in like manner appoint a temporary chairman. A permanent chairman and a permanent secretary of the meeting shall be elected by vote of the Holders of a majority in aggregate principal amount of the Notes represented at the meeting and entitled to vote at the meeting.

Subject to the provisions of Section 8.04, at any meeting of Holders each Holder or proxyholder shall be entitled to one vote for each US$1,000 principal amount of Notes held or represented by him or her; *provided*, *however*, that no vote shall be cast or counted at any meeting in respect of any Note challenged as not outstanding and ruled by the chairman of the meeting to be not outstanding. The chairman of the meeting shall have no right to vote other than by virtue of Notes held by it or instruments in writing as aforesaid duly designating it as the proxy to vote on behalf of other Holders. Any meeting of Holders duly called pursuant to the provisions of Section 9.02 or Section 9.03 may be adjourned from time to time by the Holders of a majority of the aggregate principal amount of Notes represented at the meeting, whether or not constituting a quorum, and the meeting may be held as so adjourned without further notice.

Minutes shall be made of all resolutions and proceedings at every meeting and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting of Holders of the Notes, shall be conclusive evidence of the matters in them. Until the contrary is proved every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

Section 9.06. *Voting.* The vote upon any resolution submitted to any meeting of Holders shall be by written ballot on which shall be subscribed the signatures of the Holders or of their representatives by proxy and the outstanding aggregate principal amount of the Notes held or represented by them. The permanent chairman of the meeting shall appoint two inspectors of votes who shall count all votes cast at the meeting for or against any resolution and who shall make and file with the secretary of the meeting their verified written reports in duplicate of all votes cast at the meeting. A record in duplicate of the proceedings of each meeting of Holders shall be prepared by the secretary of the meeting and there shall be attached to said record the original reports of the inspectors of votes on any vote by ballot taken thereat and affidavits by one or more Persons having knowledge of the facts setting forth a copy of the notice of the meeting and showing that said notice was delivered as provided in Section 9.02. The record shall show the aggregate principal amount of the Notes voting in favor of or against any resolution. The record shall be signed and verified by the affidavits of the permanent chairman and secretary of the meeting and one of the duplicates shall be delivered to the Company and the other to the Trustee to be preserved by the Trustee, the latter to have attached thereto the ballots voted at the meeting.

58

Any record so signed and verified shall be conclusive evidence of the matters therein stated.

Section 9.07. *No Delay of Rights by Meeting.* Nothing contained in this Article 9 shall be deemed or construed to authorize or permit, by reason of any call of a meeting of Holders or any rights expressly or impliedly conferred hereunder to make such call, any hindrance or delay in the exercise of any right or rights conferred upon or reserved to the Trustee or to the Holders under any of the provisions of this Indenture or of the Notes.

ARTICLE 10
SUPPLEMENTAL INDENTURES

Section 10.01. *Supplemental Indentures Without Consent of Holders.* The Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense and direction, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency;

(b) to provide for the assumption by a Successor Company of the obligations of the Company under this Indenture pursuant to Article 11;

(c) to add guarantees with respect to the Notes;

(d) to secure the Notes;

(e) to add to the covenants or Events of Default of the Company for the benefit of the Holders or surrender any right or power conferred upon the Company under this Indenture or the Notes;

(f) upon the occurrence of any transaction or event described in Section 14.07(a), to (i) provide that the Notes are convertible into Reference Property, subject to Section 14.03, and (ii) effect the related changes to the terms of the Notes described under Section 14.07(a), in each case, in accordance with Section 14.07;

(g) to make any change that does not adversely affect the rights or interests of any Holder in any material respect; or

59

(h) to conform the provisions of this Indenture or the Notes to the "Description of the Notes" section of the Offering Memorandum, as certified by the Company in an Officer's Certificate.

Upon the written request of the Company, the Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to, but may in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02. *Supplemental Indentures with Consent of Holders.* With the consent (evidenced as provided in Article 8) of the Holders of at least a majority of the aggregate principal amount of the Notes then outstanding (determined in accordance with Article 8 and including, without limitation, consents obtained in connection with a repurchase of, or tender or exchange offer for, Notes), the Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided*, *however*, that, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a) reduce the amount of Notes whose Holders must consent to an amendment;

(b) reduce the rate of or extend the stated time for payment of interest on any Note;

(c) reduce the principal of or extend the Maturity Date of any Note;

(d) make any change that adversely affects the conversion rights of any Notes;

(e) reduce the Redemption Price, the Repurchase Price or the Fundamental Change Repurchase Price of any Note or amend or modify in any manner adverse to the Holders the Company's obligation to make such payments, whether through an amendment or waiver of provisions in the covenants, definitions or otherwise;

(f) make any Note payable in a currency other than U.S. dollars;

(g) change the ranking of the Notes;

(h) impair the right of any Holder to receive payment of principal and interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Note;

60

(i) change the Company's obligation to pay Additional Amounts on any Note; or

(j) make any change in this Article 10 that requires each Holder's consent or in the waiver provisions in Section 6.02 or Section 6.09.

Upon the written request of the Company, and upon the filing with the Trustee of evidence of the consent of the requisite Holders as aforesaid and subject to Section 10.05, the Trustee shall join with the Company in the execution of such supplemental indenture unless (i) the Trustee has not received an Opinion of Counsel stating that such supplemental indenture is authorized and permitted by the terms of this Indenture and not contrary to law or (ii) such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Holders do not need under this Section 10.02 to approve the particular form of any proposed supplemental indenture. It shall be sufficient if such Holders approve the substance thereof. After any supplemental indenture becomes effective under Section 10.01 or Section 10.02, the Company shall send to the Holders (with a copy to the Trustee) a notice briefly describing such supplemental indenture. However, the failure to give such notice to all the Holders, or any defect in the notice, will not impair or affect the validity of the supplemental indenture.

Section 10.03. *Effect of Supplemental Indentures.* Upon the execution of any supplemental indenture pursuant to the provisions of this Article 10, this Indenture shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 10.04. *Notation on Notes.* Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article 10 may, at the Company's expense, bear a notation as to any matter provided for in such supplemental indenture. If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated upon receipt of a Company Order, by the Trustee and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

Section 10.05. *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee.* In addition to the documents required by Section 17.06, the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant hereto complies with the requirements of this Article 10 and is permitted or authorized by this Indenture and with respect to such Opinion of Counsel, that such supplemental indenture is the valid and binding obligation of the Company enforceable in accordance with its terms, subject to customary exceptions and qualifications.

ARTICLE 11
CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01. *Company May Consolidate, Etc. on Certain Terms.* Subject to the provisions of Section 11.02, the Company shall not consolidate with, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, unless:

(a) the resulting, surviving or transferee Person (the "**Successor Company**"), if not the Company, shall be a corporation organized and existing under the laws of the United States of America, any State thereof, the District of Columbia, the Cayman Islands, the British Virgin Islands, Bermuda or Hong Kong and the Successor Company (if not the Company) shall expressly assume, by supplemental indenture all of the obligations of the Company under the Notes and this Indenture (including, for the avoidance of doubt, the obligation to pay Additional Amounts pursuant to Section 4.07); and

(b) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing under this Indenture.

For purposes of this Section 11.01, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Company to another Person, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Company to another Person.

Section 11.02. *Successor Corporation to Be Substituted.* In case of any such consolidation, merger, sale, conveyance, transfer or lease and upon the assumption by the Successor Company, by supplemental indenture, executed and delivered to the Trustee of the due and punctual payment of the principal of and accrued and unpaid interest on all of the Notes (including, for the avoidance of doubt, any Additional Amounts), the due and punctual delivery or payment, as the case may be, of any consideration due upon conversion of the Notes (including, for the avoidance of doubt, any Additional Amounts) and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such Successor Company (if not the Company) shall succeed to and, except in the case of a lease of all or substantially all of the Company's properties and assets, shall be substituted for the Company, with the same effect as if it had been named herein as the party of the first part. Such Successor Company thereupon may cause to be signed, and may issue either in its own name or in the name of the Company any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such Successor Company instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes that previously shall have been signed and delivered by the Officers of the Company to the Trustee for authentication, and any Notes that such Successor Company thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under this Indenture as the Notes theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Notes had been issued at the date of the execution hereof. In the event of any such consolidation, merger, sale, conveyance or transfer (but not in the case of a lease), upon compliance with this Article 11 the Person named as the "Company" in the first paragraph of this Indenture (or any successor that shall thereafter have become such in the manner prescribed in this Article 11) may be dissolved, wound up and liquidated at any time thereafter and, except in the case of a lease, such Person shall be released from its liabilities as obligor and maker of the Notes and from its obligations under this Indenture and the Notes.

62

In case of any such consolidation, merger, sale, conveyance, transfer or lease, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 11.03. *Opinion of Counsel to Be Given to Trustee.* No consolidation, merger, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or lease and any such assumption and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this Article 11.

ARTICLE 12

IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 12.01. *Indenture and Notes Solely Corporate Obligations.* No recourse for the payment of the principal of or accrued and unpaid interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, Officer or director or Subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

63

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01. *Conversion Privilege.*

(a) Subject to and upon compliance with the provisions of this Article 14, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is US$1,000 principal amount or an integral multiple thereof) of such Note (i) subject to satisfaction of the conditions described in Section 14.01(b), at any time prior to the close of business on the Business Day immediately preceding June 1, 2023 under the circumstances and during the periods set forth in Section 14.01(b), and (ii) regardless of the conditions described in Section 14.01(b), on or after June 1, 2023 and prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, in each case, at an initial conversion rate of 37.1830 ADSs (subject to adjustment as provided in this Article 14, the "**Conversion Rate**") per US$1,000 principal amount of Notes (subject to, and in accordance with, the settlement provisions of Section 14.02, the "**Conversion Obligation**").

(b) (i) Prior to the close of business on the Business Day immediately preceding June 1, 2023, a Holder may surrender all or any portion of its Notes for conversion at any time during the five Business Day period immediately after any ten consecutive Trading Day period (the "**Measurement Period**") in which the Trading Price per US$1,000 principal amount of Notes, as determined following a request by a Holder of Notes in accordance with this subsection (b)(i), for each Trading Day of the Measurement Period was less than 98% of the product of the Last Reported Sale Price of the ADSs on each such Trading Day and the Conversion Rate on each such Trading Day. The Trading Prices shall be determined by the Bid Solicitation Agent pursuant to this subsection (b)(i) and the definition of Trading Price set forth in this Indenture. The Company shall provide written notice to the Bid Solicitation Agent (if other than the Company) of the three independent nationally recognized securities dealers selected by the Company pursuant to the definition of Trading Price, along with appropriate contact information for each. The Bid Solicitation Agent (if other than the Company) shall have no obligation to determine the Trading Price per US$1,000 principal amount of Notes unless the Company has requested such determination in writing, and the Company shall have no obligation to make such request (or, if the Company is acting as Bid Solicitation Agent, the Company shall have no obligation to determine the Trading Price per US$1,000 principal amount of Notes) unless a Holder provides the Company with reasonable evidence that the Trading Price per US$1,000 principal amount of Notes on any Trading Day would be less than 98% of the product of the Last Reported Sale Price of the ADSs on such Trading Day and the Conversion Rate on such Trading Day, at which time the Company shall instruct the Bid Solicitation Agent (if other than the Company) in writing to determine, or if the Company is acting as Bid Solicitation Agent, the Company shall determine, the Trading Price per US$1,000 principal amount of Notes beginning on the next Trading Day and on each successive Trading Day until the Trading Price per US$1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate. At such time as the Company directs the Bid Solicitation Agent in writing to solicit bid quotations, the Company will provide the Bid Solicitation Agent with the names and contact details of the three independent nationally recognized securities dealers the Company selects, and the Company will direct those securities dealers to provide bids to the Bid Solicitation Agent. If (x) the Company is not acting as Bid Solicitation Agent, and the Company does not, when the Company is required to, instruct the Bid Solicitation Agent to determine the Trading Price per US$1,000 principal amount of Notes when obligated as provided in the preceding sentence, or if the Company instructs the Bid Solicitation Agent in writing to obtain bids and the Bid Solicitation Agent fails to make such determination, or (y) the Company is acting as Bid Solicitation Agent and the Company fails to make such determination when obligated as provided in the preceding sentence, then, in either case, the Trading Price per US$1,000 principal amount of Notes shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate on each Trading Day of such failure. If the Trading Price condition set forth above has been met, the Company shall so notify the Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing. If, at any time after the Trading Price condition set forth above has been met, the Trading Price per US$1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the ADSs and the Conversion Rate for such date, the Company shall so notify in writing the Holders, the Trustee and the Conversion Agent (if other than the Trustee).

64

(ii) If, prior to the close of business on the Business Day immediately preceding June 1, 2023, the Company elects to:

(A) issue to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per share that is less than the average of the Last Reported Sale Prices of the ADSs, *divided by* the number of Class A Ordinary Shares then represented by one ADS, for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance; or

(B) distribute to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) the Company's assets, securities or rights to purchase securities of the Company, which distribution has a per share value, as determined by the Board of Directors, exceeding 10% of (i) the Last Reported Sale Price of the ADSs on the Trading Day preceding the date of announcement for such distribution, *divided by* (ii) the number of Class A Ordinary Shares then represented by one ADS,

then, in either case, the Company shall notify all Holders of the Notes, the Trustee and the Conversion Agent (if other than the Trustee) in writing at least 43 Scheduled Trading Days prior to the Ex-Dividend Date for such issuance or distribution. Once the Company has given such notice, a Holder may surrender all or any portion of its Notes for conversion at any time until the earlier of (1) the close of business on the Business Day immediately preceding the Ex-Dividend Date for such issuance or distribution and (2) the Company's announcement that such issuance or distribution will not take place, in each case, even if the Notes are not otherwise convertible at such time.

65

(iii) If a transaction or event that constitutes a Fundamental Change or a Make-Whole Fundamental Change occurs prior to the close of business on the Business Day immediately preceding June 1, 2023, regardless of whether a Holder has the right to require the Company to repurchase the Notes pursuant to Section 15.02, or if the Company is a party to a consolidation, merger, binding share exchange, or transfer or lease of all or substantially all of its assets that occurs prior to the close of business on the Business Day immediately preceding June 1, 2023, in each case, pursuant to which the ADSs would be converted into cash, securities or other assets, all or any portion of a Holder's Notes may be surrendered for conversion at any time from or after the actual effective date of such transaction) until 35 Trading Days after the actual effective date of such transaction or, if such transaction also constitutes a Fundamental Change, until the related Fundamental Change Repurchase Date. The Company shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing as promptly as practicable following the date the Company publicly announces such transaction.

(iv) Prior to the close of business on the Business Day immediately preceding June 1, 2023, a Holder may surrender all or any portion of its Notes for conversion at any time during any calendar quarter commencing after the calendar quarter ending on March 31, 2019 (and only during such calendar quarter), if the Last Reported Sale Price of the ADSs for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on, and including, the last Trading Day of the immediately preceding calendar quarter is greater than or equal to 130% of the Conversion Price on each applicable Trading Day. The Company shall determine at the beginning of each calendar quarter commencing after March 31, 2019 whether the Notes may be surrendered for conversion in accordance with this clause (iv) and shall notify the Holders, the Trustee and the Conversion Agent (if other than the Trustee) in writing if the Notes become convertible in accordance with this clause (iv).

(v) If the Company calls any or all of the Notes for redemption pursuant to Article 16, then a Holder may surrender all or any portion of its Notes for conversion at any time prior to the close of business on the second Business Day prior to the Redemption Date, even if the Notes are not otherwise convertible at such time. After that time, the right to convert shall expire under this clause (v), unless the Company defaults in the payment of the Redemption Price.

Section 14.02. *Conversion Procedure; Settlement Upon Conversion.*

(a) Subject to this Section 14.02, Section 14.03(b) and Section 14.07(a), upon conversion of any Note, the Company shall pay or deliver, as the case may be, to the converting Holder, in respect of each US$1,000 principal amount of Notes being converted, cash ("**Cash Settlement**"), ADSs, together with cash, if applicable, in lieu of delivering any fractional ADSs in accordance with subsection (j) of this Section 14.02 ("**Physical Settlement**") or a combination of cash and ADSs, together with cash, if applicable, in lieu of delivering any fractional ADS in accordance with subsection (j) of this Section 14.02 ("**Combination Settlement**"), at its election, as set forth in this Section 14.02.

66

(i) All conversions for which the relevant Conversion Date occurs after the Company's issuance of a Redemption Notice with respect to the Notes and prior to the related Redemption Date, and all conversions for which the relevant Conversion Date occurs on or after June 1, 2023 shall be settled using the same Settlement Method.

(ii) Except for any conversions for which the relevant Conversion Date occurs after the Company's issuance of a Redemption Notice with respect to the Notes but prior to the related Redemption Date, and any conversions for which the relevant Conversion Date occurs on or after June 1, 2023, the Company shall use the same Settlement Method for all conversions with the same Conversion Date, but the Company shall not have any obligation to use the same Settlement Method with respect to conversions with different Conversion Dates.

(iii) If, in respect of any Conversion Date (or the period described in the third immediately succeeding set of parentheses, as the case may be), the Company elects a Settlement Method, the Company shall deliver a written notice (the "**Settlement Notice**") of the relevant Settlement Method in respect of such Conversion Date (or such period, as the case may be) to converting Holders, the Trustee and the Conversion Agent (if other than the Trustee) no later than the close of business on the Trading Day immediately following the relevant Conversion Date (or, in the case of any conversions for which the relevant Conversion Date occurs after the date of issuance of a Redemption Notice with respect to the Notes and prior to the related Redemption Date, in such Redemption Notice or on or after June 1, 2023, no later than June 1, 2023). If the Company does not elect a Settlement Method prior to the deadline set forth in the immediately preceding sentence, the Company shall no longer have the right to elect Cash Settlement or Physical Settlement and the Company shall be deemed to have elected Combination Settlement in respect of its Conversion Obligation, and the Specified Dollar Amount per US$1,000 principal amount of Notes shall be equal to US$1,000. Such Settlement Notice shall specify the relevant Settlement Method and in the case of an election of Combination Settlement, the relevant Settlement Notice shall indicate the Specified Dollar Amount per US$1,000 principal amount of Notes. If the Company delivers a Settlement Notice electing Combination Settlement in respect of its Conversion Obligation but does not indicate a Specified Dollar Amount per US$1,000 principal amount of Notes in such Settlement Notice, the Specified Dollar Amount per US$1,000 principal amount of Notes shall be deemed to be US$1,000.

(iv) The cash, ADSs or a combination of cash and ADSs, as applicable, in respect of any conversion of Notes (the "**Settlement Amount**") shall be computed as follows:

67

(A) if the Company elects to satisfy its Conversion Obligation in respect of such conversion by Physical Settlement, the Company shall deliver to the converting Holder in respect of each US$1,000 principal amount of Notes being converted a number of ADSs equal to the Conversion Rate in effect on the Conversion Date;

(B) if the Company elects to satisfy its Conversion Obligation in respect of such conversion by Cash Settlement, the Company shall pay to the converting Holder in respect of each US$1,000 principal amount of Notes being converted cash in an amount equal to the sum of the Daily Conversion Values for each of the 40 consecutive Trading Days during the related Observation Period; and

(C) if the Company elects (or is deemed to have elected) to satisfy its Conversion Obligation in respect of such conversion by Combination Settlement, the Company shall pay or deliver, as the case may be, in respect of each US$1,000 principal amount of Notes being converted, a Settlement Amount equal to the sum of the Daily Settlement Amounts for each of the 40 consecutive Trading Days during the related Observation Period.

(v) The Daily Settlement Amounts (if applicable) and the Daily Conversion Values (if applicable) shall be determined by the Company promptly following the last day of the Observation Period. Promptly after such determination of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering any fractional ADS, the Company shall notify the Trustee and the Conversion Agent (if other than the Trustee) in writing of the Daily Settlement Amounts or the Daily Conversion Values, as the case may be, and the amount of cash payable in lieu of delivering fractional ADSs. The Trustee and the Conversion Agent (if other than the Trustee) shall have no responsibility for any such determination.

(b) Subject to Section 14.02(e), before any Holder of a Note shall be entitled to convert a Note as set forth above, such Holder shall (i) in the case of a Global Note, comply with the procedures of the Depositary in effect at that time and, if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h) and (ii) in the case of a Physical Note (1) complete, manually sign and deliver a duly completed irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile, PDF or other electronic transmission thereof) (a "**Notice of Conversion**") at the office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any ADSs to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Conversion Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h). The Trustee (and if different, the Conversion Agent) shall notify the Company of any conversion pursuant to this Article 14 on the Conversion Date, or promptly following instructions for such conversion. No Notice of Conversion with respect to any Notes may be delivered, and no Notes may be surrendered for conversion, by a Holder thereof if such Holder has also delivered a Fundamental Change Repurchase Notice or Repurchase Notice to the Company in respect of such Notes and has not validly withdrawn such Fundamental Change Repurchase Notice or Repurchase Notice, as the case may be, in accordance with Section 15.03.

68

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c) A Note shall be deemed to have been converted immediately prior to the close of business on the date (the "**Conversion Date**") that the Holder has complied with the requirements set forth in subsection (b) above. Except as set forth in Section 14.03(b) and Section 14.07(a), the Company shall pay or deliver, as the case may be, the consideration due in respect of the Conversion Obligation on the second Business Day immediately following the relevant Conversion Date, if the Company elects Physical Settlement, or on the second Business Day immediately following the last Trading Day of the relevant Observation Period, in the case of any other Settlement Method. If any ADSs are due to a converting Holder, the Company shall issue or cause to be issued, and deliver (if applicable) to such Holder, or such Holder's nominee or nominees, the full number of ADSs to which such Holder shall be entitled, in book-entry format through the Depositary, in satisfaction of the Company's Conversion Obligation.

(d) In case any certificated Note shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by the Company or Trustee, with payment of a sum sufficient to cover any documentary, stamp or similar issue or transfer tax or similar governmental charge required by law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e) If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp, issue, transfer or similar tax due on the delivery of any ADSs upon conversion of the Notes (or the issuance of the underlying Class A Ordinary Shares, unless the tax is due because the Holder requests such ADSs (or the Class A Ordinary Shares) to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax. The Company shall pay the ADS Depositary's fees for the issuance of the ADSs.

(f) Except as provided in Section 14.04, no adjustment shall be made for dividends on any ADSs issued upon the conversion of any Note as provided in this Article 14.

69

(g) Upon the conversion of an interest in a Global Note, the Trustee, or the ADS Custodian at the direction of the Trustee, shall make a notation on such Global Note as to the reduction in the principal amount represented thereby. The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

(h) Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below. The Company's settlement of the full Conversion Obligation shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the relevant Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited. Upon a conversion of Notes into a combination of cash and ADSs, accrued and unpaid interest will be deemed to be paid first out of the cash paid upon such conversion. Notwithstanding the foregoing, if Notes are converted after the close of business on a Regular Record Date and prior to the open of business on the corresponding Interest Payment Date, Holders of such Notes as of the close of business on such Regular Record Date will receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the conversion. However, Notes surrendered for conversion during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by an amount in U.S. dollars equal to the amount of interest payable on the Notes so converted (regardless of whether the converting Holder was the holder of record on the corresponding Regular Record Date); *provided* that no such payment shall be required (1) for conversions following the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified a Redemption Date that is after a Regular Record Date and on or prior to the second Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the third Business Day immediately succeeding such Interest Payment Date); (3) if the Company has specified a Fundamental Change Repurchase Date that is after a Regular Record Date and on or prior to the Business Day immediately succeeding the corresponding Interest Payment Date (or, if such Interest Payment Date is not a Business Day, the second Business Day immediately succeeding such Interest Payment Date); or (4) to the extent of any Defaulted Amounts, if any Defaulted Amounts exists at the time of conversion with respect to such Note. Neither the Trustee nor the Conversion Agent (if other than the Trustee) will have any duty to determine or verify determination by the Company of whether any of the conditions to conversion have been satisfied.

(i) The Person in whose name any ADSs shall be issuable upon conversion shall be treated as a stockholder of record as of the close of business on the relevant Conversion Date (if the Company elects to satisfy the related Conversion Obligation by Physical Settlement) or the last Trading Day of the relevant Observation Period (if the Company elects to satisfy the related Conversion Obligation by Combination Settlement), as the case may be. Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j) The Company shall not issue any fractional ADSs upon conversion of the Notes and shall instead pay cash in lieu of delivering any fractional ADS issuable upon conversion based on the Daily VWAP for the relevant Conversion Date (in the case of Physical Settlement) or based on the Daily VWAP for the last Trading Day of the relevant Observation Period (in the case of Combination Settlement). For each Note surrendered for conversion, if the Company has elected (or is deemed to have elected) Combination Settlement, the full number of ADSs that shall be issued upon conversion thereof shall be computed on the basis of the aggregate Daily Settlement Amounts for the relevant Observation Period and any fractional shares remaining after such computation shall be paid in cash.

70

Section 14.03. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make-Whole Fundamental Changes.*
(a) If a Make-Whole Fundamental Change occurs prior to the Maturity Date and a Holder elects to convert its Notes in connection with such Make-Whole Fundamental Change, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional ADSs (the "**Additional ADSs**"), as described below. A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make-Whole Fundamental Change if the relevant Notice of Conversion is received by the Conversion Agent from, and including, the Effective Date of the Make-Whole Fundamental Change up to, and including, the second Business Day immediately prior to the related Fundamental Change Repurchase Date (or, in the case of a Make-Whole Fundamental Change that would have been a Fundamental Change but for the *proviso* in clause (b) of the definition thereof, the 35th Trading Day immediately following the Effective Date of such Make-Whole Fundamental Change). The Company shall provide written notification to Holders, the Trustee and the Conversion Agent (if other than the Trustee) of the Effective Date of any Make-Whole Fundamental Change and issue a press release announcing such Effective Date no later than five Business Days after such Effective Date.

(b) Upon surrender of Notes for conversion in connection with a Make-Whole Fundamental Change, the Company shall, at its option, satisfy the related Conversion Obligation by Physical Settlement, Cash Settlement or Combination Settlement in accordance with Section 14.02; *provided, however*, that if, at the effective time of a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property following such Make-Whole Fundamental Change is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make-Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the ADS Price for the transaction and shall be deemed to be an amount of cash per US$1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional ADSs), *multiplied by* such ADS Price.

(c) The number of Additional ADSs, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below, based on the date on which the Make-Whole Fundamental Change occurs or becomes effective (the "**Effective Date**") and the price (the "**ADS Price**") paid (or deemed to be paid) per ADS in the Make-Whole Fundamental Change. If the holders of the ADSs receive in exchange for their ADSs only cash in a Make-Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the ADS Price shall be the cash amount paid per ADS. Otherwise, the ADS Price shall be the average of the Last Reported Sale Prices of the ADSs over the five Trading Day period ending on, and including, the Trading Day immediately preceding the Effective Date of the Make-Whole Fundamental Change.

71

(d) The ADS Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate of the Notes is otherwise adjusted. The adjusted ADS Prices shall equal the ADS Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the ADS Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional ADSs set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 14.04.

(e) The following table sets forth the number of Additional ADSs to be received per US$1,000 principal amount of Notes pursuant to this Section 14.03 for each ADS Price and Effective Date set forth below:

| Effective Date | ADS Price | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | US$19.21 | US$20.00 | US$22.50 | US$25.00 | US$26.89 | US$30.00 | US$35.00 | US$40.00 | US$45.00 | US$50.00 | US$60.00 | US$70.00 | US$80.00 | US$90.00 | US$100.00 |
| December 4, 2018 | 14.8732 | 13.5630 | 10.2911 | 7.9984 | 6.7136 | 5.1703 | 3.6074 | 2.6613 | 2.0367 | 1.5932 | 1.0003 | 0.6199 | 0.3598 | 0.1784 | 0.0536 |
| December 1, 2019 | 14.8732 | 13.2805 | 9.7440 | 7.3328 | 6.0212 | 4.4987 | 3.0386 | 2.2053 | 1.6773 | 1.3110 | 0.8258 | 0.5130 | 0.2973 | 0.1461 | 0.0436 |
| December 1, 2020 | 14.8732 | 13.0335 | 9.1053 | 6.5360 | 5.1978 | 3.7163 | 2.3960 | 1.7035 | 1.2898 | 1.0106 | 0.6425 | 0.4016 | 0.2328 | 0.1137 | 0.0329 |
| December 1, 2021 | 14.8732 | 12.8170 | 8.1160 | 5.5300 | 4.1960 | 2.7830 | 1.6569 | 1.1488 | 0.8718 | 0.6896 | 0.4452 | 0.2800 | 0.1619 | 0.0778 | 0.0209 |
| December 1, 2022 | 14.8732 | 12.8170 | 7.4360 | 4.3932 | 2.9286 | 1.5920 | 0.8140 | 0.5635 | 0.4391 | 0.3538 | 0.2327 | 0.1473 | 0.0845 | 0.0390 | 0.0095 |
| December 1, 2023 | 14.8732 | 12.8170 | 7.2614 | 2.8170 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The exact ADS Prices and Effective Dates may not be set forth in the table above, in which case:

(i) if the ADS Price is between two ADS Prices in the table above or the Effective Date is between two Effective Dates in the table, the number of Additional ADSs shall be determined by a straight-line interpolation between the number of Additional ADSs set forth for the higher and lower ADS Prices and the earlier and later Effective Dates, as applicable, based on a 365-day year;

(ii) if the ADS Price is greater than US$100.00 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate; and

(iii) if the ADS Price is less than US$19.21 per ADS (subject to adjustment in the same manner as the ADS Prices set forth in the column headings of the table above pursuant to subsection (d) above), no Additional ADSs shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the Conversion Rate per US$1,000 principal amount of Notes exceed 52.0562 ADSs, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 14.04.

72

(f) Nothing in this Section 14.03 shall prevent an adjustment to the Conversion Rate pursuant to Section 14.04.

(g) If the Holder elects to convert its Notes in connection with the Company's election to redeem the Notes in respect of a Change in Tax Law pursuant to Section 16.01, the Conversion Rate shall be increased by a number of additional ADSs determined pursuant to this Section 14.03(g). The Company shall settle conversions of Notes as described in Section 14.02 and, for the avoidance of doubt, pay Additional Amounts, if any, with respect to any such conversion.

A conversion shall be deemed to be "in connection with" the Company's election to redeem the Notes in respect of a Change in Tax Law if the relevant Notice of Conversion is received by the Conversion Agent during the period from, and including, the date the Company provides the related notice of redemption to Holders until the close of business on the second Business Day immediately preceding the Redemption Date (or, if the Company fails to pay the Redemption Price, such later date on which the Company pays the Redemption Price).

Simultaneously with providing such notice of redemption, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time.

The number of additional ADSs by which the Conversion Rate will be increased in the event the Company elects to redeem the Notes in respect of a Change in Tax Law will be determined by reference to the table in clause (e) above based on the Redemption Reference Date and the Redemption Reference Price (each as defined below), but determined for purposes of this Section 14.03(g) as if (x) the Holder had elected to convert its Notes in connection with a Make-Whole Fundamental Change, (y) the applicable "Redemption Reference Date" were the "Effective Date" as specified in clause (c) above and (z) the applicable "Redemption Reference Price" were the "ADS price" as specified in clause (c) above. For this purpose, the date on which the Company delivers notice of redemption is the "**Redemption Reference Date**" and the average of the Last Reported Sale Prices of the ADSs over the five Trading Day immediately preceding, the date the Company delivers such notice of redemption is the "**Redemption Reference Price**."

Section 14.04. *Adjustment of Conversion Rate.* If the number of Class A Ordinary Shares represented by the ADSs is changed, after the date of this Indenture, for any reason other than one or more of the events described in this Section 14.04, the Company shall make an appropriate adjustment to the Conversion Rate such that the number of Class A Ordinary Shares represented by the ADSs upon which conversion of the Notes is based remains the same.

Notwithstanding the adjustment provisions described in this Section 14.04, if the Company distributes to holders of the Class A Ordinary Shares any cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company (but excluding Expiring Rights) and a corresponding distribution is not made to holders of the ADSs, but, instead, the ADSs shall represent, in addition to Class A Ordinary Shares, such cash, rights, options, warrants, shares of Capital Stock or similar equity interest, evidences of indebtedness or other assets or property of the Company, then an adjustment to the Conversion Rate described in this Section 14.04 shall not be made until and unless a corresponding distribution (if any) is made to holders of the ADSs, and such adjustment to the Conversion Rate shall be based on the distribution made to the holders of the ADSs and not on the distribution made to the holders of the Class A Ordinary Shares. However, in the event that the Company issues or distributes to all holders of the Class A Ordinary Shares any Expiring Rights, notwithstanding the immediately preceding sentence, the Company shall adjust the Conversion Rate pursuant to Section 14.04(b) (in the case of Expiring Rights described in clause (b) below entitling holders of the Class A Ordinary Shares for a period of not more than 45 calendar days after the announcement date of such issuance to subscribe for or purchase Class A Ordinary Shares or ADSs) or Section 14.04(c) (in the case of all other Expiring Rights).

73

For the avoidance of doubt, if any event described in this Section 14.04 results in a change to the number of Class A Ordinary Shares represented by the ADSs, then such a change shall be deemed to satisfy the Company's obligation to effect the relevant adjustment to the Conversion Rate on account of such an event to the extent to which such change reflects what a corresponding change to the Conversion Rate would have been on account of such event.

The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs, except that the Company shall not make any adjustments to the Conversion Rate if Holders of the Notes participate (other than in the case of a (x) share split or share combination or (y) a tender or exchange offer), at the same time and upon the same terms as holders of the ADSs and solely as a result of holding the Notes, in any of the transactions described in this Section 14.04, without having to convert their Notes, as if they held a number of ADSs equal to the Conversion Rate, *multiplied by* the principal amount (expressed in thousands) of Notes held by such Holder. Neither the Trustee nor the Conversion Agent shall have any responsibility to monitor the accuracy of any calculation of adjustment of the Conversion Rate and the same shall be conclusive and binding on the Holders, absent manifest error. Notice of such adjustment to the Conversion Rate shall be given by the Company promptly in writing to the Holders, the Trustee and the Conversion Agent and shall be conclusive and binding on the Holders, absent manifest error.

(a) If the Company exclusively issues Class A Ordinary Shares as a dividend or distribution on the Class A Ordinary Shares, or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

CR$_0$  =  the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the ADSs of such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split or share combination, as applicable;

74

| | | |
|---|---|---|
| $CR_1$ | = | the Conversion Rate in effect after the open of business on such Ex-Dividend Date or Effective Date, as applicable; |
| $OS_0$ | = | the number of Class A Ordinary Shares outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date, as applicable (before giving effect to any such dividend, distribution, split or combination) ; and |
| $OS_1$ | = | the number of Class A Ordinary Shares outstanding immediately after giving effect to such dividend, distribution, share split or share combination. |

Any adjustment made under this Section 14.04(a) shall become effective immediately after the open of business on the Ex-Dividend Date for the ADSs for such dividend or distribution, or immediately after the open of business on the Effective Date for such share split or share combination, as applicable. If any dividend or distribution of the type described in this Section 14.04(a) is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

(b) If the Company issues to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs) (other than in connection with a stockholder rights plan) any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the announcement date of such issuance, to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than the average of the Last Reported Sale Prices of the Class A Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Class A Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of such issuance, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the ADSs for such issuance; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date; |
| $OS_0$ | = | the number of Class A Ordinary Shares outstanding immediately prior to the open of business on such Ex-Dividend Date; |
| $X$ | = | the total number of Class A Ordinary Shares (directly or in the form of ADSs) deliverable pursuant to such rights, options or warrants; and |

75

Y    =    the number of Class A Ordinary Shares equal to (i) the aggregate price payable to exercise such rights, options or warrants, *divided by* (ii) the quotient of (a) the average of the Last Reported Sale Prices of the ADSs over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement of the issuance of such rights, options or warrants *divided by* (b) the number of Class A Ordinary Shares then represented by one ADS.

Any increase made under this Section 14.04(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the Ex-Dividend Date for the ADSs for such issuance. To the extent that Class A Ordinary Shares or ADSs are not delivered after the expiration of such rights, options or warrants, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of Class A Ordinary Shares actually delivered (directly or in the form of ADSs). If such rights, options or warrants are not so issued, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such the Ex-Dividend Date for the ADSs for such issuance had not occurred.

For purposes of this Section 14.04(b) and Section 14.01(b)(ii)(A), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase Class A Ordinary Shares (directly or in the form of ADSs) at a price per Ordinary Share that is less than such average of the Last Reported Sale Prices of the Class A Ordinary Shares or the ADSs, as the case may be (*divided by*, in the case of the ADSs, the number of Class A Ordinary Shares then represented by one ADS), for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of announcement for such issuance, and in determining the aggregate offering price of such Class A Ordinary Shares or ADSs, there shall be taken into account any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

(c) If the Company distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs), excluding (i) dividends, distributions or issuances as to which an adjustment was effected pursuant to Section 14.04(a) or Section 14.04(b), (ii) dividends or distributions paid exclusively in cash as to which an adjustment was effected pursuant to Section 14.04(d), and (iii) Spin-Offs as to which the provisions set forth below in this Section 14.04(c) shall apply (any of such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities of the Company, the "**Distributed Property**"), then the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

76

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such distribution; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the close of business on such Ex-Dividend Date; |
| $SP_0$ | = | the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and |
| $FMV$ | = | the fair market value (as determined by the Board of Directors) of the Distributed Property with respect to each outstanding Class A Ordinary Share (directly or in the form of ADSs) on the Ex-Dividend Date for the ADSs for such distribution. |

Any increase made under the portion of this Section 14.04(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for the ADSs for such distribution. If such distribution is not so paid or made, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such distribution had not been declared. Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "SP0" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, in respect of each US$1,000 principal amount thereof, at the same time and upon the same terms as holders of the ADSs receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate in effect on the Record Date for the ADSs for the distribution.

With respect to an adjustment pursuant to this Section 14.04(c) where there has been a payment of a dividend or other distribution on the Class A Ordinary Shares (directly or in the form of ADSs) of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (a "**Spin-Off**"), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{FMV_0 + MP_0}{MP_0}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the end of the Valuation Period; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the end of the Valuation Period; |
| $FMV_0$ | = | the average of the Last Reported Sale Prices of the Capital Stock or similar equity interest distributed to holders of the Class A Ordinary Shares (directly or in the form of ADSs) applicable to one Class A Ordinary Share (determined by reference to the definition of Last Reported Sale Price as set forth in Section 1.01 as if references therein to the ADSs were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the Ex-Dividend Date of the Spin-Off (the "**Valuation Period**"); and |

77

MP0  =  the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the Valuation Period.

The increase to the Conversion Rate under the preceding paragraph shall occur at the close of business on the last Trading Day of the Valuation Period; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the Valuation Period, references to "10" in the preceding paragraph shall be deemed to be replaced with such lesser number of Trading Days as have elapsed between the Ex-Dividend Date of such Spin-Off and the Conversion Date in determining the Conversion Rate and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any Trading Day that falls within the relevant Observation Period for such conversion and within the Valuation Period, references to "10" in the preceding paragraph shall be deemed to be replaced with such lesser number of Trading Days as have elapsed between the Ex-Dividend Date of such Spin-Off and such Trading Day in determining the Conversion Rate as of such Trading Day.

For purposes of this Section 14.04(c) (and subject in all respect to Section 14.11), rights, options or warrants distributed by the Company to all holders of the Class A Ordinary Shares (directly or in the form of ADSs) entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Class A Ordinary Shares (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such Class A Ordinary Shares (directly or in the form of ADSs); (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Class A Ordinary Shares (directly or in the form of ADSs), shall be deemed not to have been distributed for purposes of this Section 14.04(c) (and no adjustment to the Conversion Rate under this Section 14.04(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 14.04(c). If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Indenture, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex-Dividend Date with respect to new rights, options or warrants with such rights (in which case the existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 14.04(c) was made, (1) in the case of any such rights, options or warrants that shall all have been redeemed or purchased without exercise by any holders thereof, upon such final redemption or purchase (x) the Conversion Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Conversion Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per Ordinary Share redemption or purchase price received by a holder or holders of Class A Ordinary Shares (directly or in the form of ADSs) with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Class A Ordinary Shares (directly or in the form of ADSs) as of the date of such redemption or purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been issued.

78

For purposes of Section 14.04(a), Section 14.04(b) and this Section 14.04(c), if any dividend or distribution to which this Section 14.04(c) is applicable also includes one or both of:

(A) a dividend or distribution of Class A Ordinary Shares (directly or in the form of ADSs) to which Section 14.04(a) is applicable (the "**Clause A Distribution**"); or

(B) a dividend or distribution of rights, options or warrants to which Section 14.04(b) is applicable (the "**Clause B Distribution**"),

then (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 14.04(c) is applicable (the "**Clause C Distribution**") and any Conversion Rate adjustment required by this Section 14.04(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Conversion Rate adjustment required by Section 14.04(a) and Section 14.04(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Ex-Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex-Dividend Date of the Clause C Distribution and (II) any Class A Ordinary Shares (directly or in the form of ADSs) included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex-Dividend Date or Effective Date" within the meaning of Section 14.04(a) or "outstanding immediately prior to the open of business on such Ex-Dividend Date" within the meaning of Section 14.04(b).

(d) If any cash dividend or distribution is made to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs), the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - C}$$

79

where,

CR$_0$   =   the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for the ADSs for such dividend or distribution;

CR$_1$   =   the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date;

SP$_0$   =   the Last Reported Sale Price of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) on the Trading Day immediately preceding the Ex-Dividend Date for such dividend or distribution; and

C   =   the amount in cash per Class A Ordinary Share the Company distributes to all or substantially all holders of the Class A Ordinary Shares (directly or in the form of ADSs).

Any increase pursuant to this Section 14.04(d) shall become effective immediately after the open of business on the Ex-Dividend Date for the ADSs for such dividend or distribution. If such dividend or distribution is not so paid, the Conversion Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to be the Conversion Rate that would then be in effect if such dividend or distribution had not been declared. Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "SP$_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, for each US\$1,000 principal amount of Notes, at the same time and upon the same terms as holders of the ADSs, the amount of cash that such Holder would have received if such Holder owned a number of ADSs equal to the Conversion Rate on the Record Date for the ADSs for such cash dividend or distribution.

(e) If the Company or any of its Subsidiaries make a payment in respect of a tender or exchange offer for the Class A Ordinary Shares (directly or in the form of ADSs), to the extent that the cash and value of any other consideration included in the payment per Ordinary Share exceeds the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{AC + (SP_1 \times OS_1)}{OS_0 \times SP_1}$$

where,

CR$_0$   =   the Conversion Rate in effect immediately prior to the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

CR$_1$   =   the Conversion Rate in effect immediately after the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

80

AC = the aggregate value of all cash and any other consideration (as determined by the Board of Directors) paid or payable for Class A Ordinary Shares or ADSs, as the case may be, purchased in such tender or exchange offer;

$OS_0$ = the number of Class A Ordinary Shares outstanding immediately prior to the date such tender or exchange offer expires (prior to giving effect to the purchase of all Class A Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer);

$OS_1$ = the number of Class A Ordinary Shares outstanding immediately after the date such tender or exchange offer expires (after giving effect to the purchase of all Class A Ordinary Shares or ADSs, as the case may be, accepted for purchase or exchange in such tender or exchange offer); and

$SP_1$ = the average of the Last Reported Sale Prices of the ADSs (*divided by* the number of Class A Ordinary Shares then represented by one ADS) over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires.

The increase to the Conversion Rate under this Section 14.04(e) shall occur at the close of business on the 10th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; *provided* that (x) in respect of any conversion of Notes for which Physical Settlement is applicable, if the relevant Conversion Date occurs during the 10 Trading Days immediately following, and including, the Trading Day next succeeding the expiration date of any tender or exchange offer, references to "10" or "10th" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed between the date that such tender or exchange offer expires and the Conversion Date in determining the Conversion Rate and (y) in respect of any conversion of Notes for which Cash Settlement or Combination Settlement is applicable, for any Trading Day that falls within the relevant Observation Period for such conversion and within the 10 Trading Days immediately following, and including, the Trading Day next succeeding the expiration date of any tender or exchange offer, references to "10" or "10th" in the preceding paragraph shall be deemed replaced with such lesser number of Trading Days as have elapsed between the expiration date of such tender or exchange offer and such Trading Day in determining the Conversion Rate as of such Trading Day.

    (f) Notwithstanding this Section 14.04 or any other provision of this Indenture or the Notes, if a Conversion Rate adjustment becomes effective on any Ex-Dividend Date, and a Holder that has converted its Notes on or after such Ex-Dividend Date and on or prior to the related Record Date would be treated as the record holder of the ADSs as of the related Conversion Date as described under Section 14.02(i) based on an adjusted Conversion Rate for such Ex-Dividend Date, then, notwithstanding the Conversion Rate adjustment provisions in this Section 14.04, the Conversion Rate adjustment relating to such Ex-Dividend Date shall not be made for such converting Holder. Instead, such Holder shall be treated as if such Holder were the record owner of the ADSs on an unadjusted basis and participate in the related dividend, distribution or other event giving rise to such adjustment. Notwithstanding this Section 14.04 or any other provision of this Indenture or the Notes, the Company will not be required to adjust the Conversion Rate unless such adjustment would require an increase or decrease of at least one percent; *provided*, *however*, that any such minor adjustments that are not required to be made will be carried forward and taken into account in any subsequent adjustment, and *provided*, *further*, that any such adjustment of less than one percent that has not been made shall be made upon the occurrence of (i) the Effective Date for any Fundamental or Make-Whole Fundamental Change, (ii) in the case of any Note to which Physical Settlement applies, the relevant Conversion Date, and, in the case of any Note to which Cash Settlement or Combination Settlement applies, each Trading Day of the applicable Observation Period and (iii) every one year anniversary of the first date of original issuance of the Notes. In addition, the Company shall not account for such deferrals when determining whether any of the conditions to the conversion have been satisfied or what number of ADSs a Holder would have held on a given day had it converted its Notes.

81

(g) Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of Class A Ordinary Shares or ADSs or any securities convertible into or exchangeable for Class A Ordinary Shares or ADSs or the right to purchase Class A Ordinary Shares or ADSs or such convertible or exchangeable securities.

(h) In addition to those adjustments required by clauses (a), (b), (c), (d) and (e) of this Section 14.04, and to the extent permitted by applicable law and subject to the applicable rules of The NASDAQ Global Market and any other securities exchange on which any of the Company's securities are then listed, the Company from time to time may increase the Conversion Rate by any amount for a period of at least 20 Business Days if the Board of Directors determines that such increase would be in the Company's best interest, and the Company may (but is not required to) increase the Conversion Rate to avoid or diminish any income tax to holders of the Class A Ordinary Shares or the ADSs or rights to purchase Class A Ordinary Shares or ADSs in connection with a dividend or distribution of Class A Ordinary Shares or ADSs (or rights to acquire Class A Ordinary Shares or ADSs) or similar event.

(i) Notwithstanding anything to the contrary in this Article 14, the Conversion Rate shall not be adjusted:

(i) upon the issuance of any Class A Ordinary Shares or ADSs pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in Class A Ordinary Shares or ADSs under any plan;

(ii) upon the issuance of any Class A Ordinary Shares or ADSs or options or rights to purchase those Class A Ordinary Shares or ADSs pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of the Company's Subsidiaries;

(iii) upon the repurchase of any Ordinary Shares pursuant to an open-market share repurchase program or other buyback transaction that is not a tender offer or exchange offer of the nature described in clause (e) of this Section 14.04 above;

82

(iv) upon the issuance of any Class A Ordinary Shares or ADSs pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (ii) of this subsection and outstanding as of the date the Notes were first issued;

(v) solely for a change in the par value of the Class A Ordinary Shares or ADSs; or

(vi) for accrued and unpaid interest, if any.

(j) All calculations and other determinations under this Article 14 shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000) of an ADS.

(k) If an adjustment to the Conversion Rate otherwise required by this Section 14.04 would result in a change of less than 1% to the Conversion Rate, then, notwithstanding the foregoing, the Company may, at its election, defer and carry forward such adjustment, except that all such deferred adjustments must be given effect immediately upon the earliest to occur of the following: (i) when all such deferred adjustments would result in an aggregate change of at least 1% to the Conversion Rate, (ii) on the Conversion Date for any Notes (in the case of Physical Settlement), (iii) on each Trading Day of any Observation Period related to any conversion of Notes (in the case of Cash Settlement or Combination Settlement), (iv) on the Effective Date of any Make-Whole Fundamental Change, in each case, unless the adjustment has already been made and (v) every one year anniversary of the date of this Indenture. In addition, the Company shall not account for such deferrals when determining whether any of the conditions described in Section 14.01(b) have been satisfied or what number of ADSs a Holder would have held on a given day had it converted its notes.

(l) Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly deliver to the Trustee (and the Conversion Agent if not the Trustee) an Officer's Certificate setting forth (i) the adjusted Conversion Rate, (ii) the subsection of this Section 14.04 pursuant to which such adjustment has been made, showing in reasonable detail the facts upon which such adjustment is based, and (iii) the date as of which such adjustment is effective, and such Officer's Certificate shall be conclusive evidence of the accuracy of such adjustment absent manifest error. Unless and until a Responsible Officer of the Trustee shall have received such Officer's Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall deliver such notice of such adjustment of the Conversion Rate to each Holder at its last address appearing on the Note Register of this Indenture. Failure to deliver such notice shall not affect the legality or validity of any such adjustment. Neither the Trustee nor any Conversion Agent shall be under any duty or responsibility with respect to any such certificate or the information and calculations contained therein.

(m) For purposes of this Section 14.04, the number of Class A Ordinary Shares at any time outstanding shall not include Class A Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs) so long as the Company does not pay any dividend or make any distribution on Class A Ordinary Shares held in the treasury of the Company (directly or in the form of ADSs), but shall include Class A Ordinary Shares issuable in respect of scrip certificates issued in lieu of fractions of Class A Ordinary Shares.

Section 14.05. *Adjustments of Prices.* Whenever any provision of this Indenture requires the Company to calculate the Last Reported Sale Prices, the Daily VWAPs, the Daily Conversion Values, the Daily Settlement Amounts, the ADS Price for purposes of a Make-Whole Fundamental Change or the Redemption Reference Price for purposes of our election to redeem the notes in connection with changes in tax laws over a span of multiple days, the Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Conversion Rate that becomes effective pursuant to Section 14.04, or any event requiring an adjustment to the Conversion Rate pursuant to Section 14.04 where the Ex-Dividend Date, Effective Date or expiration date, as the case may be, of the event occurs, at any time during the period when such Last Reported Sale Prices, ADS Prices, the Daily VWAPs, the Daily Conversion Values or the Daily Settlement Amounts are to be calculated.

Section 14.06. *Class A Ordinary Shares to Be Fully Paid.* The Company shall provide, free from preemptive rights, out of its authorized but unissued Class A Ordinary Shares or Class A Ordinary Shares held in treasury, a sufficient number of Class A Ordinary Shares that corresponds to the number of ADSs due upon conversion of the Notes from time to time as such Notes are presented for conversion (assuming that at the time of computation of such number of Class A Ordinary Shares, all such Notes would be converted by a single Holder and that Physical Settlement were applicable).

Section 14.07. *Effect of Recapitalizations, Reclassifications and Changes of the Class A Ordinary Shares.*

(a) In the case of:

(i) any recapitalization, reclassification or change of the ADSs or Class A Ordinary Shares (other than changes resulting from a subdivision or combination),

(ii) any consolidation, merger, combination or similar transaction involving the Company,

(iii) any sale, lease or other transfer to a third party of the consolidated assets of the Company and the Company's Subsidiaries substantially as an entirety or

(iv) any statutory share exchange,

84

in each case, as a result of which the ADS or the Class A Ordinary Shares would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such event, a "**Merger Event**"), then, prior to or at the effective time of such Merger Event, the Company or the successor or purchasing Person, as the case may be, shall execute with the Trustee a supplemental indenture permitted under Section 10.01(f) providing that, at and after the effective time of such Merger Event, the right to convert each US$1,000 principal amount of Notes shall be changed into a right to convert such principal amount of Notes into the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of ADSs equal to the Conversion Rate immediately prior to such Merger Event would have owned or been entitled to receive (the "**Reference Property**," with each "**unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one ADS is entitled to receive) upon such Merger Event; *provided*, *however*, that at and after the effective time of the Merger Event (A) the Company shall continue to have the right to determine the form of consideration to be paid or delivered, as the case may be, upon conversion of Notes in accordance with Section 14.02 and (B) (I) any amount payable in cash upon conversion of the Notes in accordance with Section 14.02 shall continue to be payable in cash, (II) any ADSs that the Company would have been required to deliver upon conversion of the Notes in accordance with Section 14.02 shall instead be deliverable in the amount and type of Reference Property that a holder of that number of ADSs would have been entitled to receive in such Merger Event and (III) the Daily VWAP shall be calculated based on the value of a unit of Reference Property that a holder of one ADS would have received in such transaction.

If the Merger Event causes the ADSs or Class A Ordinary Shares to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of holder election), then (i) the Reference Property into which the Notes will be convertible shall be deemed to be the weighted average of the types and amounts of consideration actually received by the holders of ADSs, and (ii) the unit of Reference Property for purposes of the immediately preceding paragraph shall refer to the consideration referred to in clause (i) attributable to one ADS. If the holders of the ADSs or Class A Ordinary Shares receive only cash in such Merger Event, then for all conversions for which the relevant Conversion Date occurs after the effective date of such Merger Event (A) the consideration due upon conversion of each US$1,000 principal amount of Notes shall be solely cash in an amount equal to the Conversion Rate in effect on the Conversion Date (as may be increased by any Additional ADSs pursuant to Section 14.03), *multiplied by* the price paid per ADS or Class A Ordinary Share, as applicable, in such Merger Event and (B) the Company shall satisfy the Conversion Obligation by paying cash to converting Holders on the second Business Day immediately following the relevant Conversion Date. The Company shall provide written notice to Holders, the Trustee and the Conversion Agent (if other than the Trustee) of such weighted average as soon as practicable after such determination is made.

Such supplemental indenture described in the second immediately preceding paragraph shall provide for anti-dilution and other adjustments that shall be as nearly equivalent as is practicable to the adjustments provided for in this Article 14 (it being understood that no such adjustments shall be required with respect to any portion of the Reference Property that does not consist of shares of Common Equity (however evidenced) or depositary receipts in respect thereof). If, in the case of any Merger Event, the Reference Property includes shares of stock, securities or other property or assets (including cash or any combination thereof) of a Person other than the Company or the successor or purchasing Person, as the case may be, in such Merger Event, then such other Person shall also execute such supplemental indenture, and such supplemental indenture shall contain such additional provisions to protect the interests of the Holders of the Notes, including the right of Holders to require the Company to repurchase their Notes upon a Fundamental Change pursuant to Section 15.02 and the right of Holders to require the Company to repurchase their Notes on December 1, 2021 pursuant to Section 15.01, as the Board of Directors shall consider necessary by reason of the foregoing.

85

(b) [*RESERVED*]

(c) The Company shall not become a party to any Merger Event unless its terms are consistent with this Section 14.07. None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into cash, ADSs or a combination of cash and ADSs, as applicable, as set forth in Section 14.01 and Section 14.02 prior to the effective date of such Merger Event.

(d) The above provisions of this Section shall similarly apply to successive Merger Events.

Section 14.08. *Certain Covenants.* (a) The Company covenants that all ADSs delivered upon conversion of Notes, and all Class A Ordinary Shares represented by such ADSs, will be fully paid and non-assessable by the Company and free from all taxes, liens and charges with respect to the issue thereof.

(b) The Company covenants that, if any ADSs to be provided for the purpose of conversion of Notes hereunder, or any Class A Ordinary Shares represented by such ADSs, require registration with or approval of any governmental authority under any federal or state law before such ADSs may be validly issued upon conversion, the Company will, to the extent then permitted by the rules and interpretations of the Commission, secure such registration or approval, as the case may be.

(c) The Company further covenants that if at any time the ADSs shall be listed on any national securities exchange or automated quotation system the Company will list and keep listed, so long as the ADSs shall be so listed on such exchange or automated quotation system, any ADSs deliverable upon conversion of the Notes.

(d) The Company further covenants to take all actions and obtain all approvals and registrations required with respect to the conversion of the Notes into ADSs and the issuance, and deposit into the ADS facility, of the Class A Ordinary Shares represented by such ADSs. The Company also undertakes to maintain, as long as any Notes are outstanding, the effectiveness of a registration statement on Form F-6 relating to the ADSs and an adequate number of ADSs available for issuance thereunder such that ADSs can be delivered in accordance with the terms of this Indenture, the Notes and the Deposit Agreement upon conversion of the Notes.

Section 14.09. *Responsibility of Trustee.* The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any ADSs, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto. Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any ADSs or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion, the accuracy or inaccuracy of any mathematical calculation or formulae under this Indenture, whether by the Company or any Person so authorized by the Company for such purpose under this Indenture or the failure by the Company to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Without limiting the generality of the foregoing, neither the Trustee nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to Section 14.07 relating either to the kind or amount of ADSs or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such Section 14.07 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 7.01, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such supplemental indenture) with respect thereto. Neither the Trustee nor the Conversion Agent shall be responsible for determining whether any event contemplated by Section 14.01(b) has occurred that makes the Notes eligible for conversion or no longer eligible therefor until the Company has delivered to the Trustee and the Conversion Agent the notices referred to in Section 14.01(b) with respect to the commencement or termination of such conversion rights, on which notices the Trustee and the Conversion Agent may conclusively rely, and the Company agrees to deliver such notices to the Trustee and the Conversion Agent immediately after the occurrence of any such event or at such other times as shall be provided for in Section 14.01(b). Except as otherwise expressly provided herein, neither the Trustee nor any other agent acting under this Indenture (other than the Company, if acting in such capacity) shall have any obligation to make any calculation or to determine whether the Notes may be surrendered for conversion pursuant to this Indenture, or to notify the Company or the Depositary or any of the Holders if the Notes have become convertible pursuant to the terms of this Indenture.

Section 14.10. *Notice to Holders Prior to Certain Actions.* In case of any:

(a) action by the Company or one of its Subsidiaries that would require an adjustment in the Conversion Rate pursuant to Section 14.04 or Section 14.11;

(b) Merger Event; or

(c) voluntary or involuntary dissolution, liquidation or winding-up of the Company or any of its Subsidiaries;

87

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Indenture), the Company shall cause to be filed with the Trustee and the Conversion Agent (if other than the Trustee) and to be delivered to each Holder at its address appearing on the Note Register, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such action by the Company or one of its Subsidiaries or, if a record is not to be taken, the date as of which the holders of Class A Ordinary Shares or ADSs, as the case may be, of record are to be determined for the purposes of such action by the Company or one of its Subsidiaries, or (ii) the date on which such Merger Event, dissolution, liquidation or winding-up is expected to become effective or occur, and the date as of which it is expected that holders of Class A Ordinary Shares or ADSs, as the case may be, of record shall be entitled to exchange their Class A Ordinary Shares or ADSs, as the case may be, for securities or other property deliverable upon such Merger Event, dissolution, liquidation or winding-up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such action by the Company or one of its Subsidiaries, Merger Event, dissolution, liquidation or winding-up.

Section 14.11. *Stockholder Rights Plans.* To the extent that the Company has a rights plan in effect upon conversion of the Notes, each ADS, if any, delivered upon such conversion shall be entitled to receive (either directly or in respect of the Class A Ordinary Shares underlying such ADSs) the appropriate number of rights, if any, and the certificates representing the ADSs delivered upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such stockholder rights plan, as the same may be amended from time to time. However, if, prior to any conversion, the rights have separated from the Class A Ordinary Shares underlying the ADSs in accordance with the provisions of the applicable stockholder rights plan, the Conversion Rate shall be adjusted at the time of separation as if the Company distributed to all or substantially all holders of the Class A Ordinary Shares Distributed Property as provided in Section 14.04(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

Section 14.12. *Limit on Issuance of ADSs Upon Conversion.* Notwithstanding anything to the contrary in this Indenture, if an event occurs that would result in an increase in the Conversion Rate by an amount in excess of limitations imposed by any shareholder approval rules or listing standards of any national or regional securities exchange that are applicable to the Company, the Company will, at its option, either obtain stockholder approval of any issuance of ADSs upon conversion of the Notes in excess of such limitations or pay cash in lieu of delivering any ADSs otherwise deliverable upon conversions in excess of such limitations based on the Daily VWAP for each Trading Day of the relevant Observation Period in respect of which, in lieu of delivering ADSs, the Company pays cash pursuant to this Section 14.12.

Section 14.13. *Termination of Depositary Receipt Program.* If the Class A Ordinary Shares cease to be represented by ADSs issued under a depositary receipt program sponsored by the Company, all references in this Indenture to the ADSs shall be deemed to have been replaced by a reference to the number of Class A Ordinary Shares (and other property, if any) represented by the ADSs on the last day on which the ADSs represented the Class A Ordinary Shares and as if the Class A Ordinary Shares and the other property had been distributed to holders of the ADSs on that day. In addition, all references to the Last Reported Sale Price of the ADSs will be deemed to refer to the Last Reported Sale Price of the Class A Ordinary Shares, and other appropriate adjustments, including adjustments to the Conversion Rate, will be made to reflect such change. In making such adjustments, where currency translations between U.S. dollars and any other currency are required, the exchange rate in effect on the date of determination will apply. The Company shall provide written notice to the Holders, the Trustee and the Conversion Agent (if other than the Trustee) upon the occurrence of the foregoing.

88

Section 14.14. *Exchange In Lieu Of Conversion.* (a) When a Holder surrenders its Notes for conversion, the Company may, at its election (an "**Exchange Election**"), direct the Conversion Agent to deliver, on or prior to the Business Day immediately following the Conversion Date, such Notes to one or more financial institutions designated by the Company (each, a "**Designated Financial Institution**") for exchange in lieu of conversion. In order to accept any Notes surrendered for conversion, the Designated Financial Institution(s) must agree to timely pay and/or deliver, as the case may be, in exchange for such Notes, the cash, ADSs or a combination thereof, as applicable, that would otherwise be due upon conversion pursuant to Section 14.02 (the "**Conversion Consideration**"). If the Company makes an Exchange Election, the Company shall, by the close of business on the Business Day following the relevant Conversion Date, notify in writing the Trustee, the Conversion Agent (if other than the Trustee) and the Holder surrendering Notes for conversion that the Company has made the Exchange Election and the Company shall promptly notify the Designated Financial Institution(s) of the relevant deadline for delivery of the Conversion Consideration and the type of Conversion Consideration to be paid and/or delivered, as the case may be.

(b) Any Notes exchanged by the Designated Financial Institution(s) shall remain outstanding, subject to applicable procedures of the Depositary. If the Designated Financial Institution(s) agree(s) to accept any Notes for exchange but does not timely pay and/or deliver, as the case may be, the related Conversion Consideration, or if such Designated Financial Institution(s) does not accept the Notes for exchange, the Company shall pay and/or deliver, as the case may be, the relevant Conversion Consideration, as, and at the time, required pursuant to this Indenture as if the Company had not made the Exchange Election.

(c) The Company's designation of any Designated Financial Institution(s) to which the Notes may be submitted for exchange does not require such Designated Financial Institution(s) to accept any Notes.

ARTICLE 15
REPURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01. *Repurchase at Option of Holders*(a) . (a) Each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash on December 1, 2021 (the "**Repurchase Date**"), all of such Holder's Notes, or any portion thereof that is an integral multiple of US$1,000 principal amount, at a repurchase price (the "**Repurchase Price**") that is equal to 100% of the principal amount of the Notes to be repurchased, *plus* accrued and unpaid interest to, but excluding, the Repurchase Date; *provided* that any such accrued and unpaid interest shall be paid not to the Holders submitting the Notes for repurchase on the Repurchase Date but instead to the Holders of such Notes at the close of business on the Regular Record Date immediately preceding the Repurchase Date. Not later than 20 Business Days prior to the Repurchase Date, the Company shall mail a notice (the "**Company Notice**") by first class mail to the Trustee, to the Paying Agent and to each Holder at its address shown in the Note Register of the Note Registrar (and to beneficial owners as required by applicable law). The Company Notice shall include a form of Repurchase Notice to be completed by a holder and shall state:

89

(i) the last date on which a Holder may exercise its repurchase right pursuant to this Section 15.01 (the "**Repurchase Expiration Time**");

(ii) the Repurchase Price;

(iii) the Repurchase Date;

(iv) the name and address of the Conversion Agent and Paying Agent;

(v) that the Notes with respect to which a Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Repurchase Notice in accordance with the terms of this Indenture;

(vi) that the Holder shall have the right to withdraw any Notes surrendered prior to the Repurchase Expiration Time; and

(vii) the procedures a Holder must follow to exercise its repurchase rights under this Section 15.01 and a brief description of those rights.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Company Notice shall be prepared by the Company.

Simultaneously with providing the Company Notice, the Company shall publish a notice containing the information included in the Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.01.

Repurchases of Notes under this Section 15.01 shall be made, at the option of the Holder thereof, upon:

(A) delivery to the Paying Agent by the Holder of a duly completed notice (the "**Repurchase Notice**") in the form set forth in Attachment 3 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in global notes, if the Notes are Global Notes, in each case during the period beginning at any time from the open of business on the date that is 20 Business Days prior to the Repurchase Date until the close of business on the second Business Day immediately preceding the Repurchase Date; and

90

(B) delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Repurchase Notice (together with all necessary endorsements) at the Paying Agent Office, or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Repurchase Price therefor.

Each Repurchase Notice shall state:

(A) in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

(B) the portion of the principal amount of the Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

(C) that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Repurchase Notice contemplated by this Section 15.01 shall have the right to withdraw, in whole or in part, such Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date by delivery of a duly completed written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

The Paying Agent shall promptly notify the Company of the receipt by it of any Repurchase Notice or written notice of withdrawal thereof.

No Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered for repurchase pursuant to this Section 15.01 by a Holder thereof to the extent such Holder has also delivered a Fundamental Change Repurchase Notice with respect to such Note in accordance with Section 15.02 and not validly withdrawn such Fundamental Change Repurchase Notice in accordance with Section 15.03.

(b) Notwithstanding the foregoing, no Notes may be repurchased by the Company at the option of the Holders on the Repurchase Date if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such Repurchase Date (except in the case of an acceleration resulting from a default by the Company in the payment of the Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a default by the Company in the payment of the Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

91

Section 15.02. *Repurchase at Option of Holders Upon a Fundamental Change*. (a) If a Fundamental Change occurs at any time, each Holder shall have the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes, or any portion thereof that is equal to US$1,000 or an integral multiple of US$1,000, on the Business Day (the "**Fundamental Change Repurchase Date**") notified in writing by the Company as set forth in Section 15.02(c) that is not less than 20 Business Days or more than 35 Business Days following the date of the Fundamental Change Company Notice, at a repurchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest thereon to, but excluding, the Fundamental Change Repurchase Date (the "**Fundamental Change Repurchase Price**"), unless the Fundamental Change Repurchase Date falls after a Regular Record Date but on or prior to the Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay the full amount of accrued and unpaid interest to Holders of record as of such Regular Record Date on such Interest Payment Date, and the Fundamental Change Repurchase Price shall be equal to 100% of the principal amount of Notes to be repurchased pursuant to this Article 15.

(b) Repurchases of Notes under this Section 15.02 shall be made, at the option of the Holder thereof, upon:

(i) delivery to the Paying Agent by a Holder of a duly completed notice (the "**Fundamental Change Repurchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in Global Notes, if the Notes are Global Notes, in each case on or before the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date; and

(ii) delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent at any time after delivery of the Fundamental Change Repurchase Notice (together with all necessary endorsements for transfer) or book-entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Repurchase Price therefor.

The Fundamental Change Repurchase Notice in respect of any Notes to be repurchased shall state:

(i) in the case of Physical Notes, the certificate numbers of the Notes to be delivered for repurchase;

(ii) the portion of the principal amount of Notes to be repurchased, which must be US$1,000 or an integral multiple thereof; and

92

(iii) that the Notes are to be repurchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Fundamental Change Repurchase Notice must comply with appropriate Depositary procedures.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Fundamental Change Repurchase Notice contemplated by this Section 15.02 shall have the right to withdraw, in whole or in part, such Fundamental Change Repurchase Notice at any time prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

The Paying Agent shall promptly notify the Company of the receipt by it of any Fundamental Change Repurchase Notice or written notice of withdrawal thereof.

No Fundamental Change Repurchase Notice with respect to any Notes may be delivered and no Note may be surrendered for repurchase pursuant to this Section 15.02 by a Holder thereof to the extent such Holder has also delivered a Repurchase Notice with respect to such Note in accordance with Section 15.01 and not validly withdrawn such Repurchase Notice in accordance with Section 15.03.

(c) On or before the 20th calendar day after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders, the Trustee and the Paying Agent (if other than the Trustee) a written notice (the "**Fundamental Change Company Notice**") of the occurrence of the effective date of the Fundamental Change and of the repurchase right at the option of the Holders arising as a result thereof. In the case of Physical Notes, such notice shall be by first class mail or, in the case of Global Notes, such notice shall be delivered in accordance with the applicable procedures of the Depositary. Simultaneously with providing such notice, the Company shall publish a notice containing the information set forth in the Fundamental Change Company Notice in a newspaper of general circulation in The City of New York or publish such information on the Company's website or through such other public medium as the Company may use at that time. Each Fundamental Change Company Notice shall specify:

(i) the events causing the Fundamental Change;

(ii) the date of the Fundamental Change;

(iii) the last date on which a Holder may exercise the repurchase right pursuant to this Article 15;

(iv) the Fundamental Change Repurchase Price;

(v) the Fundamental Change Repurchase Date;

(vi) the name and address of the Paying Agent;

93

(vii) if applicable, the Conversion Rate and any adjustments to the Conversion Rate;

(viii) that the Notes with respect to which a Fundamental Change Repurchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Repurchase Notice in accordance with the terms of this Indenture; and

(ix) the procedures that Holders must follow to require the Company to repurchase their Notes.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' repurchase rights or affect the validity of the proceedings for the repurchase of the Notes pursuant to this Section 15.02.

At the Company's request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company and delivered to the Trustee no later than 2 Business Days (or such shorter period as is acceptable to the Trustee) prior to the date the Fundamental Change Company Notice is to be sent.

(d) Notwithstanding the foregoing, no Notes may be repurchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a default by the Company in the payment of the Fundamental Change Repurchase Price with respect to such Notes), or any instructions for book-entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Repurchase Notice with respect thereto shall be deemed to have been withdrawn.

Section 15.03. *Withdrawal of Repurchase Notice or Fundamental Change Repurchase Notice.* A Repurchase Notice or Fundamental Change Repurchase Notice may be withdrawn (in whole or in part) by means of a duly completed written notice of withdrawal delivered to the Paying Agent in accordance with this Section 15.03 at any time prior to the close of business on the second Business Day immediately preceding the Repurchase Date or prior to the close of business on the second Business Day immediately preceding the Fundamental Change Repurchase Date, as the case may be, specifying:

(i) the principal amount of the Notes with respect to which such notice of withdrawal is being submitted, which principal amount must be in principal amounts of US $1,000 or an integral multiple of US $1,000,

94

(ii) if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(iii) the principal amount, if any, of such Note that remains subject to the original Repurchase Notice or Fundamental Change Repurchase Notice, as the case may be, which portion must be in principal amounts of US$1,000 or an integral multiple of US$1,000;

*provided*, *however*, that if the Notes are Global Notes, the notice must comply with appropriate procedures of the Depositary.

Section 15.04. *Deposit of Repurchase Price or Fundamental Change Repurchase Price.* (a) The Company will deposit with the Paying Agent, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in Section 4.04(b)) on or prior to 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, an amount of money sufficient to repurchase all of the Notes to be repurchased at the appropriate Repurchase Price or Fundamental Change Repurchase Price. Subject to receipt of funds and/or Notes by the Paying Agent, payment for Notes surrendered for repurchase (and not withdrawn in accordance with Section 15.03) will be made on the later of (i) the Repurchase Date or Fundamental Change Repurchase Date, as the case may be (*provided* the Holder has satisfied the conditions in Section 15.01 or Section 15.02, as the case may be) and (ii) the time of book-entry transfer or the delivery of such Note to the Paying Agent by the Holder thereof in the manner required by Section 15.01 or Section 15.02, as applicable, by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Note Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Paying Agent shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Repurchase Price or Fundamental Change Repurchase Price, as the case may be.

(b) If by 10:00 a.m., New York City time, on the Repurchase Date or Fundamental Change Repurchase Date, as the case may be, the Paying Agent holds money sufficient to make payment on all the Notes or portions thereof that are to be repurchased on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, then, with respect to the Notes that have been properly surrendered for repurchase to the Paying Agent and not validly withdrawn, on such Repurchase Date or Fundamental Change Repurchase Date, as the case may be, (i) such Notes will cease to be outstanding, (ii) interest will cease to accrue on such Notes (whether or not book-entry transfer of the Notes has been made or the Notes have been delivered to the Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate (other than the right to receive the Repurchase Price or Fundamental Change Repurchase Price, as the case may be).

(c) Upon surrender of a certificated Note that is to be repurchased in part pursuant to Section 15.01 or Section 15.02, the Company shall execute and instruct the Trustee who shall authenticate and deliver to the Holder a new certificated Note in an authorized denomination equal in principal amount to the unrepurchased portion of the certificated Note surrendered.

95

Section 15.05. *Covenant to Comply with Applicable Laws Upon Repurchase of Notes*. In connection with any repurchase offer, the Company will, if required:

(a) comply with the provisions of Rule 13e-4, Rule 14e-1 and any other tender offer rules under the Exchange Act;

(b) file a Schedule TO or other required schedule under the Exchange Act; and

(c) otherwise comply with all federal and state securities laws in connection with any offer by the Company to repurchase the Notes;

in each case, so as to permit the rights and obligations under this Article 15 to be exercised in the time and in the manner specified in this Article 15.

The Company shall not be required to purchase, or to make an offer to purchase, the Notes upon a Fundamental Change if a third party makes such an offer in the same manner, at the same time, for the same or greater price and otherwise in compliance with the requirements for an offer made by us as set forth above in this Section 15.05 and such third party purchases all Notes properly surrendered and not validly withdrawn under its offer in the same manner, at the same time, for the same or greater price and otherwise in compliance with the requirements for an offer made by us as set forth above in this Section 15.05.

Notwithstanding anything to the contrary in this Indenture, to the extent that the provisions of any federal or state securities laws or other applicable laws or regulations adopted after the date on which the Notes are first issued conflict with the provisions of this Indenture relating to the Company's obligations to repurchase the Notes upon a Fundamental Change, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under such provisions of this Indenture by virtue of such conflict.

ARTICLE 16
OPTIONAL REDEMPTION

Section 16.01. *Optional Redemption for Changes in the Tax Law of the Relevant Taxing Jurisdiction*. Other than as described in this Article 16, the Notes may not be redeemed by the Company at its option prior to maturity. If the Company has, or on the next Interest Payment Date would, become obligated to pay to the Holder of any Note Additional Amounts, as a result of:

(a) any change or amendment on or after November 29, 2018 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date that is after November 29, 2018, after such later date) in the laws or any rules or regulations of a Relevant Taxing Jurisdiction; or

(b) any change on or after November 29, 2018 (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date that is after November 29, 2018, after such later date) in an interpretation, administration or application of such laws, rules or regulations by any legislative body, court, governmental agency, taxing authority or regulatory or administrative authority of such Relevant Taxing Jurisdiction (including the enactment of any legislation and the announcement or publication of any judicial decision or regulatory or administrative interpretation or determination);

96

(each, a "**Change in Tax Law**"), the Company may, at its option, redeem all but not part of the Notes (except in respect of certain Holders that elect otherwise as described below) at a "**Redemption Price**" equal to 100% of the principal amount plus accrued and unpaid interest, if any, to, but not including the date on which the Notes are redeemed (the "**Redemption Date**"), including, any Additional Amounts with respect to such Redemption Price; *provided* that the Company may only redeem the Notes if: (i) the Company cannot avoid such obligations by taking commercially reasonable measures available to the Company (*provided* that changing the jurisdiction of incorporation of the Company shall be deemed not to be a commercially reasonable measure); and (ii) the Company delivers to the Trustee an opinion of outside legal counsel or a tax advisor of recognized standing in the Relevant Taxing Jurisdiction and an Officer's Certificate attesting to such Change in Tax Law and obligation to pay Additional Amounts.

Notwithstanding anything to the contrary herein, neither the Company nor any successor Person may redeem any of the Notes in the case that Additional Amounts are payable in respect of PRC withholding tax at the Applicable PRC Rate or less solely as a result of the Company or its successor Person being considered a PRC tax resident under the PRC Enterprise Income Tax Law.

If the Redemption Date occurs after a Regular Record Date and on or prior to the corresponding Interest Payment Date, the Company shall pay on the Interest Payment Date the full amount of accrued and unpaid interest, if any, due on such Interest Payment Date to the record holder of the Notes on the Regular Record Date corresponding to such Interest Payment Date, and the Redemption Price payable to the Holder who presents a Note for redemption shall be equal to 100% of the principal amount of such Note, including, for the avoidance of doubt, any Additional Amounts with respect to such Redemption Price.

The Company shall give Holders of Notes (with a copy to the Trustee) not less than 43 Scheduled Trading Days' but no more than 60 Scheduled Trading Days' notice (a "**Redemption Notice**") prior to the Redemption Date. Simultaneously with providing such notice, the Company shall publish a notice containing this information in a newspaper of general circulation in The City of New York or publish the information on the Company's website or through such other public medium as the Company may use at that time. The Redemption Date must be a Business Day and cannot fall after the Maturity Date.

Upon receiving such notice of redemption, each Holder shall have the right to elect to not have its Notes redeemed, in which case the Company shall not be obligated to pay any Additional Amounts on any payment with respect to such Notes solely as a result of such Change in Tax Law that resulted in the obligation to pay such Additional Amounts (whether upon conversion, required repurchase, maturity or otherwise, and whether in cash, ADSs, or a combination thereof, Reference Property or otherwise) after the Redemption Date (or, if the Company fails to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price), and all future payments with respect to such Notes shall be subject to the deduction or withholding of such Relevant Taxing Jurisdiction and taxes required by law to be deducted or withheld as a result of such Change in Tax Law; *provided* that, notwithstanding the foregoing, if a Holder electing not to have its Notes redeemed converts its Notes in connection with the Company's election to redeem the Notes in respect of such Change in Tax Law pursuant to Section 14.03(g) the Company shall be obligated to pay Additional Amounts, if any, with respect to such conversion.

97

Subject to the applicable procedures of DTC in the case of Global Notes, a Holder electing to not have its Notes redeemed must deliver to the Company, with a copy to the Paying Agent a written notice of election so as to be received by the Company and the Paying Agent or otherwise by complying with the requirements for conversion in Section 14.02(b) prior to the close of business on the second Business Day immediately preceding the Redemption Date. A Holder may withdraw any notice of election (other than such a deemed notice of election in connection with a conversion) by delivering to the Company and the Paying Agent a written notice of withdrawal prior to the close of business on the Business Day immediately preceding the Redemption Date (or, if the Company fail to pay the Redemption Price on the Redemption Date, such later date on which the Company pays the Redemption Price). If no election is made, the Holder shall have its Notes redeemed without any further action.

No Notes may be redeemed if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date.

ARTICLE 17
MISCELLANEOUS PROVISIONS

Section 17.01. *Provisions Binding on Company's Successors.* All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 17.02. *Official Acts by Successor Corporation.* Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 17.03. *Addresses for Notices, Etc.* Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be deemed to have been sufficiently given or made, for all purposes if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed (until another address is filed by the Company with the Trustee) to iQIYI, Inc., 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing, 100080, People's Republic of China, Attention: Secretary. Any notice, direction, request or demand hereunder to or upon the Paying Agent shall be deemed to have been given or made by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the Paying Agent Office or sent electronically in PDF format. Any notice, direction, request or demand hereunder to or upon the Trustee shall be deemed to have been given or made by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the Corporate Trust Office or sent electronically in PDF format. Notwithstanding any other provision of the Indenture, notices to the Trustee shall only be deemed received upon actual receipt thereof by a Responsible Officer.

98

So long as and to the extent that the Notes are represented by Global Notes and such Global Notes are held by DTC, notices to owners of beneficial interests in the global notes may be given by delivery of the relevant notice to DTC for communication by it to entitled account holders.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.

Any notice or communication delivered to a Holder shall be mailed to it by first class mail, postage prepaid, at its address as it appears on the Note Register or delivered by electronic mail and shall be sufficiently given to it if so delivered within the time prescribed.

Failure to mail or deliver a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed or delivered in the manner provided above, it is duly given, whether or not the addressee receives it.

Section 17.04. *Governing Law; Jurisdiction.* THIS INDENTURE AND EACH NOTE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE AND EACH NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS THEREOF).

The Company irrevocably consents and agrees, for the benefit of the Holders from time to time of the Notes and the Trustee, that any legal action, suit or proceeding against it with respect to obligations, liabilities or any other matter arising out of or in connection with this Indenture or the Notes may be brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and, until amounts due and to become due in respect of the Notes have been paid, hereby irrevocably consents and submits to the non-exclusive jurisdiction of each such court *in personam*, generally and unconditionally with respect to any action, suit or proceeding for itself in respect of its properties, assets and revenues.

The Company irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings arising out of or in connection with this Indenture brought in the courts of the State of New York or the courts of the United States located in the Borough of Manhattan, New York City, New York and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

99

Section 17.05. *Submission to Jurisdiction; Service of Process.* The Company irrevocably appoints Law Debenture Corporate Services Inc., 801 2nd Avenue, Suite 403, New York, New York 10017, as its authorized agent in the Borough of Manhattan in the City of New York upon which process may be served in any such suit or proceeding, and agrees that service of process upon such agent, and written notice of said service to the Company by the person serving the same to iQIYI, Inc., 9/F, iQIYI Innovation Building, No. 2 Haidian North First Street, Haidian District, Beijing, 100080, People's Republic of China, Attention: Secretary, shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company further agrees to take any and all action as may be necessary to maintain such designation and appointment of such agent in full force and effect for a period of five and a half years from the date of this Indenture. If for any reason such agent shall cease to be such agent for service of process, the Company shall forthwith appoint a new agent of recognized standing for service of process in the State of New York and deliver to the Holders and the Trustee a copy of the new agent's acceptance of that appointment within ten Business Days of such acceptance. Nothing herein shall affect the right of the Trustee, any Agent or any Holder to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Company in any other court of competent jurisdiction. To the extent that the Company has or hereafter may acquire any sovereign or other immunity from jurisdiction of any court or from any legal process with respect to itself or its property, the Company irrevocably waives such immunity in respect of its obligations hereunder or under any Note.

Section 17.06. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee.* Upon any application or demand by the Company to the Trustee to take any action under any of the provisions of this Indenture, the Company shall, if requested by the Trustee, furnish to the Trustee an Officer's Certificate and an Opinion of Counsel stating that such action is permitted by the terms of this Indenture.

Each Officer's Certificate and Opinion of Counsel provided for, by or on behalf of the Company in this Indenture and delivered to the Trustee with respect to compliance with this Indenture (other than the Officer's Certificates provided for in Section 4.09) shall include (a) a statement that the person signing such certificate is familiar with the requested action and this Indenture; (b) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (c) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed judgment as to whether or not such action is permitted by this Indenture; and (d) a statement as to whether or not, in the judgment of such person, such action is permitted by this Indenture and that all covenants and conditions precedent in the Indenture have been complied with.

Notwithstanding anything to the contrary in this Section 17.06, if any provision in this Indenture specifically provides that the Trustee shall or may receive an Opinion of Counsel in connection with any action to be taken by the Trustee or the Company hereunder, the Trustee shall be entitled to such Opinion of Counsel.

100

Section 17.07. *Legal Holidays.* In any case where any Interest Payment Date, Fundamental Change Repurchase Date, Repurchase Date, Conversion Date or Maturity Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue in respect of the delay.

Section 17.08. *No Security Interest Created.* Nothing in this Indenture or in the Notes, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

Section 17.09. *Benefits of Indenture.* Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the Holders, the parties hereto, any Paying Agent, any Conversion Agent, any Note Registrar and their successors hereunder, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 17.10. *Table of Contents, Headings, Etc.* The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 17.11. *Execution in Counterparts.* This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 17.12. *Severability.* In the event any provision of this Indenture or in the Notes shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

Section 17.13. *Waiver of Jury Trial.* EACH OF THE COMPANY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 17.14. *Force Majeure.* In no event shall the Trustee or the Agents be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee or the Agents, as the case may be, shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 17.15. *Calculations*. Except as otherwise provided herein, the Company shall be responsible for making all calculations called for under the Notes. These calculations include, but are not limited to, determinations of the Last Reported Sale Prices of the ADSs, the Daily VWAPs, the Daily Conversion Values, the Daily Settlement Amounts, accrued interest payable on the Notes, the number of Additional ADSs to be added to the Conversion Rate upon a Make-Whole Fundamental Change, if any, and the Conversion Rate of the Notes. The Company shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders. The Company shall provide a schedule of its calculations to each of the Trustee, the Paying Agent and the Conversion Agent, and each of the Trustee, the Paying Agent and the Conversion Agent is entitled to rely conclusively and without liability upon the accuracy of the Company's calculations without independent verification. The Trustee will forward the Company's calculations to any registered Holder of Notes upon the written request of that Holder at the sole cost and expense of the Company.

Section 17.16. *USA PATRIOT Act*. The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as it may request in order for the Trustee to satisfy the requirements of the USA PATRIOT Act.

[*Remainder of page intentionally left blank*]

102

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

IQIYI, INC.

By:  /s/ Xiaodong Wang
　　　Name: Xiaodong Wang
　　　Title: Chief Financial Officer

CITICORP INTERNATIONAL LIMITED, as Trustee

By:  /s/ Terence Yeung
　　　Name: Terence Yeung
　　　Title: Vice President

**Exhibit 2.25**

[FORM OF FACE OF NOTE]

[INCLUDE FOLLOWING LEGEND IF A GLOBAL NOTE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT HEREUNDER IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[INCLUDE FOLLOWING LEGEND IF A RESTRICTED SECURITY]

[THIS SECURITY, THE AMERICAN DEPOSITARY SHARES DELIVERABLE UPON CONVERSION OF THIS SECURITY, IF ANY, AND THE CLASS A ORDINARY SHARES REPRESENTED THEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS (A) A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR (B) LOCATED OUTSIDE THE UNITED STATES AND IS NOT A U.S. PERSON (WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT AND THAT IT AND ANY SUCH ACCOUNT IS NOT AN AFFILIATE OF IQIYI, INC. (THE "**COMPANY**"), AND

(2) AGREES FOR THE BENEFIT OF THE COMPANY THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

A-1

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) TO A NON-U.S. PERSON OUTSIDE THE UNITED STATES IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT, OR

(E) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE).

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(E) ABOVE, THE COMPANY, THE DEPOSITARY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

NO AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY OR PERSON THAT HAS BEEN AN AFFILIATE (AS DEFINED IN RULE 144 UNDER THE SECURITIES ACT) OF THE COMPANY DURING THE THREE IMMEDIATELY PRECEDING MONTHS MAY PURCHASE, OTHERWISE ACQUIRE OR OWN THIS NOTE OR A BENEFICIAL INTEREST HEREIN.]

A-2

IQIYI, INC.

3.75% Convertible Senior Note due 2023

No. [_____]                                          [Initially]1 US$_____

CUSIP No. [_____]

ISIN No. [_____]

iQIYI, Inc., a company duly organized and validly existing under the laws of the Cayman Islands (the "**Company**," which term includes any successor company or corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to [CEDE & CO.]2 [_____]3, or registered assigns, the principal sum [as set forth in the "Schedule of Exchanges of Notes" attached hereto]4 [of US$[_____]]5, which amount, taken together with the principal amounts of all other outstanding Notes, shall not, unless permitted by the Indenture, exceed US$750,000,000 in aggregate at any time, in accordance with the rules and procedures of the Depositary, on December 1, 2023, and interest thereon as set forth below.

This Note shall bear interest at the rate of 3.75% per year from December 4, 2018, or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until December 1, 2023. Interest is payable semi-annually in arrears on each June 1 and December 1, commencing on June 1, 2019, to Holders of record at the close of business on the preceding May 15 and November 15 (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 4.06(d), Section 4.06(e) and Section 6.03 of the within-mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of such Section 4.06(d), Section 4.06(e) and Section 6.03, and any express mention of the payment of Additional Interest in any provision therein shall not be construed as excluding Additional Interest in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate per annum borne by the Notes *plus* one percent, subject to the enforceability thereof under applicable law, from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.03(c) of the Indenture.

---

1       Include if a Global Note.
2       Include if a Global Note.
3       Include if a Physical Note.
4       Include if a Global Note.
5       Include if a Physical note.

A-3

The Company shall pay the principal of and interest on this Note, so long as such Note is a Global Note, by wire transfer in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note. As provided in and subject to the provisions of the Indenture, the Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose. The Company has initially designated Citibank, N.A. as its Paying Agent, Conversion Agent and Note Registrar in respect of the Notes and the Paying Agent Office as a place where Notes may be presented for payment or for registration of transfer.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this Note into cash, ADSs or a combination of cash and ADSs, as applicable, on the terms and subject to the limitations set forth in the Indenture. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York (without regard to the conflicts of laws provisions thereof).**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been signed manually by the Trustee under the Indenture.

[*Remainder of page intentionally left blank*]

A-4

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

IQIYI, INC.

By: _____

    Name:
    Title:

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION

CITICORP INTERNATIONAL LIMITED,
as Trustee, certifies that this is one of the Notes described
in the within-named Indenture.

By: _____

    Authorized signatory

A-5

[FORM OF REVERSE OF NOTE]

IQIYI, INC.
3.75% Convertible Senior Note due 2023

This Note is one of a duly authorized issue of Notes of the Company, designated as its 3.75% Convertible Senior Notes due 2023 (the "**Notes**"), limited to the aggregate principal amount of US$750,000,000, all issued or to be issued under and pursuant to an Indenture dated as of December 4, 2018 (the "**Indenture**"), between the Company and Citicorp International Limited (the "**Trustee**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Company and the Holders of the Notes. Additional Notes may be issued in an unlimited aggregate principal amount, subject to certain conditions specified in the Indenture. The Rule 144A Notes and the Regulation S Notes initially have separate CUSIP numbers and will initially not be fungible.

In case certain Events of Default, as defined in the Indenture, shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture. In case certain Events of Default relating to a bankruptcy (or similar proceeding) with respect to the Company or a Significant Subsidiary of the Company shall have occurred, the principal of, and interest on, all Notes shall automatically become immediately due and payable, as set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments in respect of the principal amount on the Maturity Date, the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, as the case may be, to the Holder who surrenders a Note to the Paying Agent to collect such payments in respect of the Note. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

Subject to the terms and conditions of the Indenture, Additional Amounts will be paid in connection with any payments made and deliveries caused to be made by the Company or any successor to the Company under or with respect to the Indenture and the Notes, including, but not limited to, payments of principal (including, if applicable the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price), payments of interest and the payment of cash and/or deliveries of ADSs (together with payments for any fractional ADS) upon conversion of the Notes to ensure that the net amount received by the beneficial owner after any applicable withholding or deduction (and after deducting any taxes on the Additional Amounts) will equal the amount that would have been received by such beneficial owner had no such withholding or deduction been required.

A-6

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay or cause to be delivered, as the case may be, the principal (including the Redemption Price, the Repurchase Price and the Fundamental Change Repurchase Price, if applicable) of, accrued and unpaid interest on, and the consideration due upon conversion of, this Note at the place, at the respective times, at the rate and in the lawful money or ADSs, as the case may be, herein prescribed.

The Notes are issuable in registered form without coupons in minimum denominations of US$1,000 principal amount and integral multiples of US$1,000 in excess thereof. At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Company may not redeem the Notes prior to the Maturity Date, except in the event of certain Changes in Tax Law as described in Section 16.01 of the Indenture. No sinking fund is provided for the Notes.

The Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Repurchase Date at a price equal to the Repurchase Price.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option, to require the Company to repurchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of US$1,000 or integral multiples thereof) on the Fundamental Change Repurchase Date at a price equal to the Fundamental Change Repurchase Price.

A-7

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, during certain periods and upon the occurrence of certain conditions specified in the Indenture, prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, to convert any Notes or portion thereof that is US$1,000 or an integral multiple thereof, into cash, ADSs or a combination of cash and ADSs, as applicable, at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

Terms used in this Note and defined in the Indenture are used herein as therein defined.

A-8

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common

UNIF GIFT MIN ACT = Uniform Gifts to Minors Act

CUST = Custodian

TEN ENT = as tenants by the entireties

JT TEN = joint tenants with right of survivorship and not as tenants in common

Additional abbreviations may also be used though not in the above list.

A-9

SCHEDULE A[6]

SCHEDULE OF EXCHANGES OF NOTES

IQIYI, INC.
3.75% Convertible Senior Notes due 2023

The initial principal amount of this Global Note is [_____] UNITED STATES DOLLARS (US$[_____]). The following increases or decreases in this Global Note have been made:

| Date of exchange | Amount of decrease in principal amount of this Global Note | Amount of increase in principal amount of this Global Note | Principal amount of this Global Note following such decrease or increase | Signature of authorized signatory of Trustee |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

---

[6]    Include if a global note.

A-10

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

To:   IQIYI, INC.

JPMORGAN CHASE BANK, N.A., as Depositary for the ADSs

CITIBANK, N.A., as Conversion Agent

The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, into cash, ADSs or a combination of cash and ADSs, as applicable, in accordance with the terms of the Indenture referred to in this Note, and directs that any cash payable and ADSs deliverable upon such conversion, together with any cash payable for any fractional ADS, and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below. If any ADSs or any portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any in accordance with Section 14.02(d) and Section 14.02(e) of the Indenture. Any amount required to be paid to the undersigned on account of interest accompanies this Note.

In connection with the conversion of this Note, or the portion hereof below designated, the undersigned acknowledges, represents to and agrees with the Company that the undersigned is not an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company and has not been an "affiliate" (as defined in Rule 144 under the Securities Act) of the Company during the three months immediately preceding the date hereof

[The undersigned further certifies:

1. The undersigned acknowledges (and if the undersigned is acting for the account of another person, that person has confirmed that it acknowledges) that the Restricted Securities received upon conversion of this Note (or securities represented thereby) have not been and are not expected to be registered under the Securities Act.

2. The undersigned further certifies that either:

(a) The undersigned is, and at the time any ADSs are delivered in conversion of its Notes will be, the holder of the ADSs and the Class A Ordinary Shares represented thereby, and (i) the undersigned is not a U.S. person (as defined in Regulation S under the Securities Act) and is located outside the United States (within the meaning of Regulation S) and acquired, or have agreed to acquire and will have acquired, the Notes being converted and the ADSs and the Class A Ordinary Shares represented thereby being delivered in the conversion outside the United States and (ii) the undersigned is not in the business of buying and selling securities or, if the undersigned is in such business, the undersigned did not acquire the Notes being converted from the Company or any affiliate thereof in the initial distribution of the Notes.

1

OR

(b) The undersigned is a broker-dealer acting on behalf of its customer; its customer has confirmed to the undersigned that it is, and at the time any ADSs are delivered in conversion of our Notes will be, the holder of the ADSs and the Class A Ordinary Shares represented thereby, and (i) it is not a U.S. person (as defined in Regulation S under the Securities Act) and it is located outside the United States (within the meaning of Regulation S and acquired, or have agreed to acquire and will have acquired, the Notes being converted and the ADSs and the Class A Ordinary Shares represented thereby being delivered in the conversion outside the United States and (ii) it is not in the business of buying and selling securities or, if it is in such business, it did not acquire the Notes being converted from the Company or any affiliate thereof in the initial distribution of the Notes.

OR

(c) The undersigned is a qualified institutional buyer (as defined in Rule 144A under the Securities Act) acting for its own account or for the account of one or more qualified institutional buyers and the undersigned is (or such account or accounts are) the sole beneficial owner(s) of any ADSs to be received upon conversion of the Notes.

3. The undersigned acknowledges that the undersigned (and any such other account) may not continue to hold or retain any interest in Restricted Securities received upon conversion of this Note if the undersigned (or such other account) becomes an Affiliate of the Company.

4. The undersigned agrees (and if the undersigned is acting for the account of another person, that person has confirmed that it agrees) that, unless and until the undersigned (or such other account) is notified by the Depositary that the restrictive legend on such Restricted Security has been removed from such security, the undersigned (and such other account) will not offer, sell, pledge or otherwise transfer the Restricted Security (or securities represented by such Restricted Security) except in accordance with the restrictions set forth in that legend and any applicable securities laws of the United States and any state thereof.]7

---

7    Include if a Restricted Security.

2

Dated: _____

_____
_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if ADSs
are to be issued, or Notes are to be
delivered, other than to and in the
name of the registered holder.

Fill in for registration of ADSs if
to be issued, and Notes if to
be delivered, other than to and in the
name of the registered holder:

_____
(Name)

_____
(Street Address)

_____
(City, State and Zip Code)
Please print name and address

Principal amount to be converted (if less than all):
US$_____,000

NOTICE: The above signature(s) of the Holder(s) hereof
must correspond with the name as written upon the face of
the Note in every particular without alteration or
enlargement or any change whatever.

_____
Social Security or Other Taxpayer
Identification Number

3

**ATTACHMENT 2**

[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]

To:   IQIYI, INC.

CITIBANK, N.A., as Paying Agent

The undersigned registered owner of this Note hereby acknowledges receipt of a notice from iQIYI, Inc. (the "**Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Repurchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 15.02 of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, and (2) if such Fundamental Change Repurchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest thereon to, but excluding, such Fundamental Change Repurchase Date.

In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

Certificate Number(s): _____

Dated: _____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed
by an eligible Guarantor Institution
(banks, stock brokers, savings and
loan associations and credit unions)
with membership in an approved
signature guarantee medallion program
pursuant to Securities and Exchange
Commission Rule 17Ad-15 if ADSs are to be issued, or
Notes are to be delivered, other than to and in the name of
the registered holder.

1

Fill in for registration of ADSs if to be issued, and Notes if to be delivered, other than to and in the name of the registered holder:

_____

(Name)

_____

(Street Address)

_____

(City, State and Zip Code)
Please print name and address

_____

Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all):
US$_____,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

2

**ATTACHMENT 3**

[FORM OF REPURCHASE NOTICE]

To:   iQIYI, Inc.

      Citibank, N.A., as Paying Agent

      The undersigned registered owner of this Note hereby acknowledges receipt of a notice from iQIYI, Inc. (the "**Company**") regarding the right of Holders to elect to require the Company to repurchase the entire principal amount of this Note, or the portion thereof (that is US$1,000 principal amount or an integral multiple thereof) below designated, in accordance with the applicable provisions of the Indenture referred to in this Note, at the Repurchase Price to the registered Holder hereof.

      In the case of certificated Notes, the certificate numbers of the Notes to be purchased are as set forth below:

      Certificate Number(s): _____

Dated: _____

 

 

_____
Signature(s)

_____
Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all):
US$_____,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

1

**ATTACHMENT 4**

To: Citicorp International Limited, as Trustee and Citibank, N.A., as Note Registrar

[FORM OF ASSIGNMENT AND TRANSFER]

For value received _____ hereby sell(s), assign(s) and transfer(s) unto _____ (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints _____ attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

In connection with any transfer of the within Note occurring prior to the Resale Restriction Termination Date, as defined in the Indenture governing such Note, the undersigned confirms that such Note is being transferred:

☐    To iQIYI, Inc. or a subsidiary thereof; or

☐    Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended [("**Rule 144A**"), and the undersigned confirms that the undersigned reasonably believes that the transferee of such Note is a "qualified institutional buyer" (within the meaning of Rule 144A) that is purchasing for its own account or for the account of another qualified institutional buyer and the undersigned has provided such transferee notice that the transfer is being made in reliance on Rule 144A][8]; or

☐    Outside the United States in accordance with Regulation S under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended (if available).

---

[8]    Include if Regulation S Note.

1

Dated: _____

_____

_____
Signature(s)

_____
Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor
Institution (banks, stock brokers, savings and loan
associations and credit unions) with membership in an
approved signature guarantee medallion program pursuant
to Securities and Exchange Commission Rule 17Ad-15 if
Notes are to be delivered, other than to and in the name of
the registered holder.

NOTICE: The signature on the assignment must correspond with the name as written upon the face of the Note in every particular without alteration or
enlargement or any change whatever.

2

Exhibit 4.10

- ***Exclusive Technology Consulting and Services Agreement / Exclusive Business Cooperation Agreement (the "Exclusive Services Agreement")***

**Parties**:

(1)    An applicable PRC Subsidiary; and

(2)    an applicable Consolidated Entity.


**Key Terms:**

(1)    During the term of the Exclusive Services Agreement, the PRC Subsidiary shall, as the exclusive technology consulting and services provider of the Consolidated Entity, provide the exclusive technology consulting and services, among other things, the maintenance of servers, software development and upgrade, design of advertisements, and e-commerce technical services, etc..

The Consolidated Entity agrees to accept the exclusive technology consulting and services provided by the PRC Subsidiary and further agrees that, during the term of such agreement, without the prior written consent of the PRC Subsidiary, it shall not, (i) accept any similar technology consulting and services provided by any third party, or (ii) enter into cooperation relationship with any third party with respect to the services provided under such agreement. Under the Exclusive Services Agreements regarding several Consolidated Entities, the PRC Subsidiary has additional right to designate a third-party to provide such technology consulting and services.

(2)    Both parties agree to calculate and pay the fees for exclusive technology consulting and services (the "**Fee**") in accordance with the Exclusive Services Agreement. Under the Exclusive Services Agreements entered into by and between several PRC Subsidiaries and their corresponding Consolidated Entities, the PRC Subsidiary is entitled to adjust and amend the method of calculation and payment from time to time at its sole discretion without the consent of the Consolidated Entity. In addition, the Consolidated Entity's shareholder(s) shall pledge the equity interests of the Consolidated Entity in favor of the PRC Subsidiary for securing the payment of the Fees under such agreement.

(3)    The PRC Subsidiary shall be the sole owner of any intellectual property obtained through the research and development by the PRC Subsidiary and any derivative rights arising from the performance of this Agreement or any other agreement reached by both parties, including, but not limited to, patent application rights, copyrights or other intellectual property rights of the software, technical documents and materials and the right to license or transfer such intellectual properties, etc. During the term of the Exclusive Services Agreement, if the Consolidated Entity needs to use the PRC Subsidiary's software program, system or other intellectual properties, both parties shall sign a separate agreement to specify the scope, method and fee of such license.

1

(4)     Under some Exclusive Services Agreements, the agreement will be in effect for an unlimited term until the term of business of one party expires and extension is denied by the relevant approval authorities. For other Exclusive Services Agreements, the agreement will be in effect for a long period of time, such as 10 years or 20 years, and will be extended at the sole discretion of the PRC Subsidiary.

2

**Exhibit 4.11**

- *Operation Agreement*

   **Parties**:

   (1)    An applicable PRC Subsidiary;

   (2)    an applicable Consolidated Entity; and

   (3)    each shareholder(s) of such Consolidated Entity (each a "**Nominee Shareholder**").


   **Key Terms:**

   (1)    Subject to compliance with the relevant provisions under the Operation Agreement by the Consolidated Entity, the PRC Subsidiary agrees, to be a guarantor of the Consolidated Entity in relation to the Consolidated Entity's due performance of its obligations under the contracts, agreements or transactions entered into between such Consolidated Entity and any third party in connection with the Consolidated Entity's business and operations. As counter-guarantee, the Consolidated Entity agrees to pledge all the accounts receivable generated in its operations and mortgage all of its assets in favor of the PRC Subsidiary. In furtherance of the aforesaid guarantee arrangement, the PRC Subsidiary may, to the extent as necessary, enter into a written guarantee contract with the creditor of the Consolidated Entity to specify the surety obligation of the PRC Subsidiary. The Consolidated Entity and the Nominee Shareholder(s) shall take all necessary actions to carry out the counter-guarantee arrangement with the PRC Subsidiary, including, but not limited to, executing the relevant documents and filing the relevant registrations.

   (2)    In consideration of the requirements of item (1) above and to ensure the performance of the various business agreements between the PRC Subsidiary and the Consolidated Entity and the payment by the Consolidated Entity of the amounts payable to the PRC Subsidiary thereunder, the Consolidated Entity and the Nominee Shareholder(s) jointly and severally agree that, without the PRC Subsidiary's prior written consent, the Consolidated Entity shall not engage in any transaction that may materially affect its assets, liabilities, rights or operations (except that the Consolidated Entity may, in the ordinary course of its business, enter into business contracts or agreements, sell or purchase assets and create liens in favor of relevant counter parties as required by law.), including, but not limited to, the following:

      (i)     To borrow money from any third party or assume any debt;

      (ii)    To sell to or acquire from any third party any asset or rights, including, but not limited to, any intellectual property rights;

      (iii)   To provide guarantee for any third party with its assets or intellectual property rights as collaterals; or

1

     (iv)    To assign to any third party its business contracts.

(3)    In order to ensure the performance of the various business agreements between the PRC Subsidiary and the Consolidated Entity and the payment by the Consolidated Entity of the amounts payable to the PRC Subsidiary thereunder, the Consolidated Entity and the Nominee Shareholder(s) jointly and severally agree to accept advices and guidance provided by the PRC Subsidiary from time to time relating to its corporate governance, such as employment and dismissal of employees, daily operations and management, and financial management.

(4)    Under some Operation Agreements, the agreement will be in effect for an unlimited term until the term of business of one party expires and extension is denied by the relevant approval authorities. For other Exclusive Services Agreements, the agreement will be in effect for a long period of time, such as 10 years or 20 years, and will be extended at the sole discretion of the PRC Subsidiary.

2

**Exhibit 4.12**

- ***Web Layout Copyright License Agreement (the "Web Layout Agreement")***

The contractual agreements regarding some Consolidated Entities additionally include a Web Layout Copy Right License Agreement with the principal terms and conditions as follows.

**Parties:**

(1)    An applicable PRC Subsidiary (for the purpose of the Web Layout Agreement, the "**Licensor**"); and

(2)    an applicable Consolidated Entity (for the purpose of the Web Layout Agreement, the "**Licensee**").

**Key Terms:**

(1)    Based on the terms and conditions of the Web Layout Agreement, the Licensor agrees to grant to the Licensee, and the Licensee agrees to accept a license to use certain copyright owned by the Licensor (the "**Web Copyright**") in the PRC. The Licensor shall have the sole and exclusive ownership of the Web Copyright, including all improvements, updates, derivative products and intellectual property rights thereof, whether such improvements, updates, derivative products and intellectual property rights are created by the Licensor or the Licensee.

(2)    The license to use the Web Copyright granted by the Licensor to the Licensee is effective only for the business operation of certain websites set forth in this Web Layout Agreement (the "**Websites**") by the Licensee. The Licensee agrees that it will not use, or authorize any use, directly or indirectly, of the Web Copyright on any other website or media, unless otherwise provided for in the Web Layout Agreement. The right to use the Web Copyright granted by the Licensor to the Licensee is effective only in the PRC. The Licensee agrees not to use or authorize any use of the Web Copyright, directly or indirectly, in any other region. The Licensor shall not license a third party to use the Web Copyright without the consent of the Licensee.

(3)    The Licensor agrees to provide necessary assistance to the Licensee to protect the Licensor's rights with respect to the Web Copyrights. In the event that third parties make claims with respect to the Web Copyright, the Licensor may, at its discretion, respond to such claim in its own name, in the name of the Licensee or in the name of both Licensor and Licensee. If any third party infringes upon the Web Copyright, the Licensee shall notify the Licensor immediately in writing of such infringement of which the Licensee has knowledge, and only the Licensor has the right to take actions against such infringing parties.

1

(4)    The Licensor agrees to pay the Licensee license fees, the specific amount and payment method of which are set forth in the Web Layout Agreement.

(5)    The rights and obligations licensed by the Licensor to the Licensee pursuant to this Web Layout Agreement shall not be assigned, pledged, sublicensed without the prior written consent of the Licensor.

(6)    Under some Web Layout Agreements, the agreement will be in effect for an unlimited term, unless otherwise expressly stated in such Web Layout Agreement.

- ***Software License Agreement***

The contractual agreements regarding some Consolidated Entities additionally include a Software License Agreement with the principal terms and conditions as follows.

**Parties:**

(1)    An applicable PRC Subsidiary (for the purpose of the Software License Agreement, the "**Licensor**"); and

(2)    an applicable Consolidated Entity (for the purpose of the Software License Agreement, the "**Licensee**").

**Key Terms:**

(1)    Based on the terms and conditions of the Software License Agreement, the Licensor agrees to grant, and the Licensee agrees to accept a license to use the software owned by the Licensor set forth in the Software License Agreement (the "**Software**") in PRC. The license under the Software License Agreement is a non-exclusive, non-assignable and non-transferable license. The Licensor shall have the sole and exclusive ownership of the Software, including any improvement, upgrades and derived products, no matter whether such improvement, upgrades and derived products are created by the Licensor or the Licensee.

(2)    The Software granted to the Licensee shall only be used to process the internal data on the system designated by the Licensor. When the Licensee cannot use the Software in the designated system, it may use the Software in its spare system. The Licensee shall not sub-license the Software to others or use the Software in the third party's training, business share, lease without the prior written consent from the Licensor, unless otherwise provided in the Software License Agreement. The use right granted under this Software License Agreement is only valid in the PRC, and the Licensee agrees not to directly or indirectly use or authorize any third party to use the Software in any other region.

2

(3)    The Licensee agrees to pay the Licensor the Software license fees, the specific amount and payment method of which are set forth in the Software License Agreement.

(4)    Under some Software License Agreements, the agreement will be in effect for an unlimited term, unless otherwise expressly stated in such Software License Agreement. For other Software License Agreements, the agreement will be in effect for a long period of time, such as 5 years, and will be extended at the sole discretion of the PRC Subsidiary.

- ***Trademark License Agreement***

The contractual agreements regarding some Consolidated Entities additionally include a Trademark License Agreement with the principal terms and conditions as follows.

**Parties:**

(1)    An applicable PRC Subsidiary (for the purpose of the Trademark License Agreement, the "**Licensor**"); and

(2)    an applicable Consolidated Entity (for the purpose of the Trademark License Agreement, the "**Licensee**").

**Key Terms:**

(1)    Based on the terms and conditions in the Trademark License Agreement, the Licensor agrees to grant to the Licensee, and the Licensee agrees to accept an exclusive license to use all or any of the trademarks as specified in this Trademark License Agreement (the "**Trademarks**"), and to display any design, character, symbol, and visual representation of the Trademarks. Without the prior written permission of the Licensee, the Licensor shall not license any third party to use the Trademarks.

(2)    The license of the Trademarks granted by the Licensor to the Licensee shall be effective only to certain websites operated by the Licensee. The Licensee agrees that it will not, directly or indirectly use or authorize any use, of the Trademarks by any other means, unless otherwise provided under the Trademark License Agreement. The license granted shall be effective only in the PRC, and the Licensee must not, directly or indirectly, use or authorize any use of the Trademarks in any other region.

(3)    The Licensee agrees to pay the Licensor license fees, the specific amount and payment method of which are set forth in the Trademark License Agreement.

3

(4)    The Trademark License Agreement will be in effect for a period of 5 years, and will be automatically renewed, unless the Licensor requests a termination in writing.

4

**Exhibit 4.13**

- *Proxy Agreement/Power of Attorney*

To effectuate the proxy arrangement regarding the shareholder rights of the Nominee Shareholders, the relevant parties entered into a specific proxy agreement, or the Nominee Shareholder(s) issued a power of attorney to the PRC Subsidiary.

A.    Proxy Agreement

**Parties**:

(1)    An Offshore Holding Company or its applicable PRC Subsidiary (as applicable) (for the purpose of the Proxy Agreement, the "**Authorized Party**"); and

(2)    the Nominee Shareholder(s) of the applicable Consolidated Entity (for the purpose of the Proxy Agreement, the "**Authorizer**").

**Key Terms:**

(1)    The Authorizer agrees to irrevocably entrust the person designated by the Authorized Party to exercise on his/her/its behalf all shareholder's voting rights and other shareholder's rights at the shareholders' meeting of the applicable Consolidated Entity in accordance with PRC law and such Consolidated Entity's articles of association, including, but not limited to, with respect to (i) the sale or transfer of all or part of the Authorizer's equity interests in such Consolidated Entity, (ii) convening, attending and holding shareholders' meetings of such Consolidated Entity, (iii) the appointment and election of the directors (or the executive director), supervisor, manager and other senior management officer of such Consolidated Entity, (iv) reviewing and approving the profit distribution scheme and loss recovery scheme of such Consolidated Entity, (v) adoption of the merger with any other entity, separation, liquidation or change of the corporation form of such Consolidated Entity, (vi) approval of the business and investment plan of such Consolidated Entity, and (vii) amendment to such Consolidated Entity's articles of association.

(2)    The Authorized Party agrees to designate a person to accept the entrustment by the Authorizer pursuant to the Proxy Agreement, and such person shall represent the Authorizer in the exercise of such Authorizer's voting rights and other shareholder rights pursuant to the Proxy Agreement.

(3)    The Authorizer acknowledges that, regardless of the change of his/her equity interests in the Company, he/she/it shall entrust the person designated by the Authorized Party with all of his/her/its voting rights and other shareholder rights.

1

(4)   The Authorizer acknowledges that if the Authorized Party withdraws the appointment of the relevant person to whom the Authorizer has entrusted his/her voting rights and other shareholder rights, such Authorizer will withdraw his/her authorization for this person and authorize other persons designated by the Authorized Party to exercise his/her/its voting rights and other shareholder's rights at the shareholders' meeting of the Consolidated Entity.

(5)   Under some of the Proxy Agreements, the Authorized Party may request the Authorizer to issue a separate power of attorney to further set forth the above authorization.

(6)   The Proxy Agreement will be in effect for an unlimited term as long as the Authorizer holds any equity interest in the Consolidated Entity.

B.   Power of Attorney

Shareholder(s) of certain Consolidated Entities issued a Power of Attorney which was accepted by the applicable PRC Subsidiary and acknowledged by such Consolidated Entity.

**Parties**:

(1)   the applicable Consolidated Entity;

(2)   the Nominee Shareholder(s) of such Consolidated Entity (for the purpose of the Power of Attorney, the "**Authorizer**"); and

(3)   the applicable PRC Subsidiary (for the purpose of the Power of Attorney, the "**Authorized Party**").

**Key Terms:**

(1)   The Authorized Party is authorized, as the Authorizer's sole and exclusive agent and attorney, to act on behalf of such Authorizer with respect to all rights and matters concerning the equity interests such Authorizer holds in the Consolidated Entity that (the "**Authorizer's Equity Interest**"), including without limitation to: (i) convening and attending shareholders' meetings of the Consolidated Entity; (ii) exercising all of the shareholder's rights and shareholder's voting rights that the Authorizer is entitled to under the laws of China and the articles of association of such Consolidated Entity; (iii) handling the sale, transfer, pledge or disposition of the Authorizer's Equity Interest (in part or in whole), including without limitation executing all necessary equity transfer documents and other documents for disposal of the Authorizer's Equity Interest and fulfilling all necessary procedures; (iv) representing the Authorizer in executing any resolutions and minutes as a shareholder (and a director) of such Consolidated Entity; (v) nominating, electing, designating, appointing or removing on behalf of such Authorizer the legal representative, directors, supervisors, general managers, chief executive officer and other senior management members of such Consolidated Entity; and (vi) approving the amendments to the company's articles of association. Without written consent by the Authorized Party, the Authorizer has no right to increase, decrease, transfer, pledge, or by any other manner to dispose or change the Authorizer's Equity Interest.

2

(2)    The Authorized Party shall have the power and authority to, on behalf of the Authorizer, execute all and any supplementary agreements, ancillary documents, modifications, and/or amended and restated versions in relation to the contractual arrangements, by and among the Authorized Party, the Consolidated Entity and/or the Authorizer, and any documents and agreements the Authorizer shall sign as required in the aforesaid contractual arrangements (including without limitation the "Equity Transfer Contract" as required under the Exclusive Option Agreement (as defined below)), and perform the obligations under the aforesaid contractual arrangements.

(3)    All the actions associated with the Authorizer's Equity Interest conducted by the Authorized Party shall be deemed as such Authorizer's own actions, and all the documents related to the Authorizer Equity Interest executed by the Authorized Party shall be deemed to be executed by such Authorizer. The Authorizer shall acknowledge and ratify the actions taken by the Authorized Party and the documents executed by the Authorized Party in relation to the Authorizer's Equity Interest.

(4)    The Authorizer agrees that the Authorized Party has the right to re-authorize or assign one or multiple matters and its rights related to such matters under the Power of Attorney to any other person or entity at its own discretion and without obtaining the prior consent of the Authorizer. If required by PRC laws, the Authorized Party shall designate a qualified PRC citizen to handle such matters and exercise such rights as set forth in the Power of Attorney.

(5)    In the Power of Attorneys regarding certain Consolidated Entity, the Authorizer covenants to, during the terms of the Power of Attorney and subject to the PRC laws, return and deliver the share dividend and any other assets that he/she/it receives from the distribution of the Consolidated Entity within three (3) days after he/she/it receives such proceeds and assets.

(6)    The Proxy Agreement will be in effect for an unlimited term as long as the Authorizer holds any equity interest in the Consolidated Entity.

3

**Exhibit 4.14**

- *Equity Pledge Agreement*

**Parties**:

(1)    an applicable PRC Subsidiary (for the purpose of the Equity Interest Agreement, the "**Pledgee**");

(2)    each Nominee Shareholder of an applicable Consolidated Entity (for the purpose of the Equity Interest Agreement, the "**Pledger**"); and

(3)    the corresponding Consolidated Entity is an additional signing party in some cases.

**Key Terms:**

(1)    Each Pledger agrees to pledge all of his/her/its equity interest (the "**Equity Interest**") in the Consolidated Entity in favor of the Pledgee as security for (i) his/her/its obligations under the Loan Agreement (if applicable) and (ii) the Consolidated Entity's obligations under the Exclusive Services Agreement.

(2)    The Pledge shall take effect as of the date when the pledge of the Equity Interest is registered with the competent market regulation authorities.

(3)    During the term of the Pledge, the Pledgee shall be entitled to enforce the right of Equity Interest pledge in accordance with the Equity Pledge Agreement in the case of an event of default.

(4)    During the effective term of the Equity Pledge Agreement, the Pledgor shall deliver the physical possession of his/her/its original certificate of capital contribution and the register of shareholders of the Consolidated Entity to the Pledgee. The Pledgee shall be entitled to collect the dividends for the Equity Interest.

(5)    During the effective term of the Equity Pledge Agreement, the Pledgor covenants to the Pledgee as follows, among others:

    (i)    he/she/it must not transfer or assign any pledged Equity Interest, or create or permit the existence of any other pledges which may have an adverse effect on the rights or benefits of the Pledgee without prior written consent of the Pledgee;

    (ii)    he/she/it must furnish the Pledgee with all the governmental notices, orders or instruction with respect to the pledge as contemplated under the Equity Pledge Agreement and comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

1

(iii)    he/she/it must timely notify the Pledgee of every event and notice he/she/it receives (x) which may affect the Pledgor's right to all or any part of the pledged Equity Interest, or (y) which may change the Pledgor's warranties and obligations under the Equity Pledge Agreement or affect the Pledgor's performance of its obligations thereunder.

(6)    Each of the following events, among others, constitutes an event of default under the Equity Pledge Agreement:

(i)    the Pledgor fails to perform his/her/its obligations under the Loan Agreement;

(ii)    the Consolidated Entity fails to pay any service fee under the Exclusive Services Agreement;

(iii)    any representation or warranty made by the Pledgor under the Equity Pledge Agreement is misleading or incorrect, or the Pledgor breaches any of such representation or warranty;

(iv)    the Pledgor breaches his/her/its covenants under the Equity Pledge Agreement;

(v)    the Pledgor waives, relinquishes, transfers or assigns any pledged Equity Interest without prior written consent of the Pledgee; and

(vi)    the Consolidated Entity is incapable of repaying debts.

2

**Exhibit 4.15**

- ***Exclusive Equity Purchase Option Agreement (the "Exclusive Option Agreement")***

**Parties**:

(1)    an Offshore Holding Company (if applicable), which is a signing party to the Exclusive Option Agreement regarding some Consolidated Entities;

(2)    an applicable PRC Subsidiary;

(3)    an applicable Consolidated Entity; and

(4)    each Nominee Shareholder of such Consolidated Entity.

**Key Terms:**

(1)    Each Nominee Shareholder irrevocably grants to the Offshore Holding Company or its applicable PRC Subsidiary (as applicable) (the "**Option Right Holder**") an exclusive option to purchase or cause any one or more designated persons (the "**Designated Persons**") to purchase at any time from the Nominee Shareholder, to the extent permitted under PRC law, a portion of, or all of, the equity interests held by such Nominee Shareholder in the Consolidated Entity according to the steps determined by the Option Right Holder and at the price specified in such Exclusive Option Agreement (the "**Option**").

(2)    Subject to PRC law and regulations, the Option Right Holder and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Notice**") to the Nominee Shareholder, specifying the equity interest to be purchased from the Nominee Shareholder (the "**Purchased Equity Interest**") and the manner of such purchase.

(3)    (i) Under the Exclusive Option Agreements of certain Consolidated Entities, the purchase price of the Purchased Equity Interest (the "**Purchase Price**") shall be equal to the consideration actually paid by the Nominee Shareholder for acquiring such Purchased Equity Interest, unless then applicable PRC laws and regulations require another price based on appraisal value of the Purchased Equity Interest or imposes other restrictions on determination of the Purchase price. If the applicable PRC laws require an appraisal of the Purchased Equity Interest or stipulate other restrictions on the Purchase Price at the time of the Offshore Holding Company's exercise of the Option, the Parties agree that the Purchase Price shall be the lowest price as permitted by the applicable law; (ii) however, under the Exclusive Option Agreements of other Consolidated Entities, the Purchase Price shall be free or the lowest price as permitted by the applicable law.

(4)    The manner of payment of the Purchase Price shall be determined through negotiations between the Option Right Holder (and/or the Designated Persons) and the Nominee Shareholder at the time of exercise of the Option. Subject to applicable laws, the Nominee Shareholder shall return to the Option Right Holder and/or the Designated Persons all the consideration he/she/it receives from the Option Right Holder and/or the Designated Persons in connection with the Purchased Equity Interest. If a Loan Agreement is signed as a part of the contractual agreement, the Nominee Shareholder shall effectuate such return by applying the entire consideration to repay the principal amount, interest accrued thereon and any conditional lending cost of the loan under the Loan Agreement.

1

(5)    The Nominee Shareholder and the Consolidated Entity shall jointly and severally covenant not to undertake, among others, any of the following actions without the prior written consent of the Option Right Holder:

(i)    to supplement, amend or modify the Consolidated Entity's articles of association in any way, or to increase or decrease the registered capital of the Consolidated Entity, or to change the shareholding structure of the Consolidated Entity in any manner;

(ii)    to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of the Consolidated Entity's assets, business or legal or beneficial interests in the revenue of the Consolidated Entity;

(iii)    to create, assume or guarantee any liability, except for (i) liabilities incurred in the ordinary course of business, excluding loans; and (ii) liabilities as disclosed to and approved by the Option Right Holder in writing;

(iv)    to merge or consolidate with, or acquire or invest in, any entity; and

(v)    to distribute dividends to the Consolidated Entity's shareholders in any way, except the case where the Consolidated Entity shall promptly distribute all or part of its distributable profits to its shareholders upon the Option Right Holder's request.

(6)    The Nominee Shareholder covenants not to undertake, among others, any of the following actions without the prior written consent of the Option Right Holder:

(i)    to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest he/she/it holds in the Consolidated Entity at any time during the term of the Exclusive Option Agreement, other than the pledge created on the Consolidated Entity's equity interest in accordance with the Equity Pledge Agreement;

(ii)    to vote for or sign any shareholders' resolution at the Consolidated Entity's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest that the Nominee Shareholder holds in the Consolidated Entity, except for the benefit of the Option Right Holder or its designated persons;

2

(iii)  to vote for or sign any shareholders' resolution at the Consolidated Entity's shareholders' meetings to approve the Consolidated Entity's merger or consolidation with, acquisition of or investment in, any entity.

(7)  Each Nominal Shareholder undertakes to (i) procure the shareholders' meeting of the Consolidated Entity to approve the transfer of the Purchased Equity Interest pursuant to the terms and conditions of the Exclusive Option Agreement; and (ii) waive all his/her/its right of first refusal (if any) with respect to the equity interest transfer between other Nominal Shareholder(s) and the PRC Subsidiary (or the Offshore Holding Company) as contemplated under the Exclusive Option Agreement.

(8)  The Exclusive Option Agreement will be in effect for an unlimited term until all equity interests held by the Nominal Shareholder in the Consolidated Entity have been transferred or assigned to the Option Right Holder and/or Designated Persons in accordance with this Exclusive Option Agreement.

3

**Exhibit 4.16**

- *Loan Agreement*

In addition to the above agreements, the contractual agreements with respect to some Consolidated Entities also include a loan agreement with the principal terms and conditions as below.

**Parties**:

(1)    an applicable PRC Subsidiary (for the purpose of the Loan Agreement, the "**Lender**"); and

(2)    the Nominee Shareholder(s) of an applicable Consolidated Entity (for the purpose of the Loan Agreement, the "**Borrower**").

**Key Terms:**

(1)    The Lender agrees to provide to the Borrower, and the Borrower agrees to accept a loan with a certain principal amount in RMB in accordance with the terms and conditions of the Loan Agreement.

(2)    The loan shall be only used by the Borrower for acquiring the equity interest in the Consolidated Entity.

(3)    The term of the loan commences from the date when the Borrower receives the loan until ten (10) years after the execution of the Loan Agreement and may be renewed upon written agreement of the parties thereto.

(4)    If any of the following events occurs, the Lender may, by serving a written notice to the Borrower, demand that the loan under the Loan Agreement should become due and payable immediately and the Borrower should immediately repay the loan in the manner as specified in the Loan Agreement:

   (i)    The Borrower resigns from or is dismissed by the Lender or its affiliates;

   (ii)   The Borrower dies or becomes a person without capacity or with limited capacity for civil acts;

   (iii)  The Borrower commits a crime or is involved in a crime;

   (iv)   Any other third party claims more than a specific amount against the Borrower;

   (v)    Any representations or warranties are proved untrue when such representations or warranties were made by the Borrower or contains any error(s) in any material aspects; or the Borrower breaches any of such representation or warranty; or

   (vi)   Subject to PRC laws, the Lender has notified the Borrower and/or the Consolidated Entity in writing of exercising its purchase option in accordance with the Exclusive Option Agreement.

1

(5) Both parties agree and confirm that, if at the time of the Lender's exercise of the purchase option under the Exclusive Option Agreement, the lowest purchase price permitted under the then applicable laws and regulations is higher than the original investment price actually paid by the Borrower, the purchase price to exercise the option shall be such lowest price permitted by the applicable law. Both parties agree to execute an Exclusive Option Agreement to specify the above matters.

(6) Both parties agree and confirm that the Nominee Shareholder must repay the loan only in the following manner: if permitted by PRC laws, the Borrower or its successor or assign shall transfer the equity interests in the Consolidated Entity to the Offshore Holding Company/Lender or its designated persons and use the proceeds from such transfer to repay the loan, when the loan is due and the Lender gives a written notice.

(7) The Borrower, among others, covenants that:

(i) He/she/it must not sell, transfer, pledge or otherwise dispose in any other manner of his/her/its equity or other interests in the Consolidated Entity, or allow the creation of other security interests thereon, without the Lender's prior written consent, except for equity pledges or other rights created for the benefit of the Lender;

(ii) He/she/it must not vote for at shareholder's meetings of the Consolidated Entity or execute any shareholders' resolutions approving the sale, transfer, pledge, disposition in any other manner, or the creation of any other security interest on, any legal or beneficial interest in the equity of the Consolidated Entity without the Lender's prior written consent, except for those for the benefit of the Lender or its designated persons;

(iii) He/she/it must not vote for at shareholder's meetings of the Consolidated Entity or execute any shareholders' resolutions approving the Consolidated Entity to merge or combine with, acquire or invest in any entity without the Lender's prior written consent;

(iv) He/she/it must promptly inform the Lender of any pending or threatened litigation, arbitration or regulatory proceeding concerning the equity interests of the Consolidated Entity; and

(v) He/she/it must not commit any act or omission that may materially affect the assets, business and liabilities of the Consolidated Entity without the Lender's prior written consent;

(vi) He/she/it must procure the Consolidated Entity to maintain and operate its business and deal with matters prudently and effectively, in accordance with good financial and business rules and practices

2

(8)     The Borrower further covenants that he/she/it shall cause the Consolidated Entity not to engage in any of the following actions without the Lender's prior written consent:

(i)     To supply, amend or modify its articles of association, or to increase or decrease its registered capital, or to change its capital structure in any way;

(ii)     To sell, transfer, mortgage, dispose of in any other manner, or to create other security interest on, any of its assets, business or the legal or beneficial right to its revenues;

(iii)     To create, assume, guarantee or permit any liability, except for (i) liabilities incurred in the ordinary course of business, excluding loans; and (ii) liabilities as disclosed to and approved by the Lender in writing; and

(iv)     To distribute dividends to its shareholders in any form, except for the case where the Consolidated Entity shall promptly distributable all its distributable profits to each of its shareholders upon the Lender's request.

3

**Exhibit 4.52**

SHARE PURCHASE AGREEMENT

by and among

ALI PANINI INVESTMENT LIMITED,

each of the individuals and their respective holding companies listed on <u>Schedule I</u> attached hereto,

each of the Selling Shareholders (as defined herein) listed on <u>Schedule II</u> attached hereto,

ALI PANINI INVESTMENT HOLDING LIMITED,

and

RAJAX HOLDING

Dated as of April 2, 2018

**TABLE OF CONTENTS**

**Page**

ARTICLE I

DEFINED TERMS AND INTERPRETATION

| | | |
|---|---|---|
| SECTION 1.01 | Defined Terms | 2 |
| SECTION 1.02 | Other Defined Terms | 14 |
| SECTION 1.03 | Interpretations | 16 |

ARTICLE II

PURCHASE AND SALE

| | | |
|---|---|---|
| SECTION 2.01 | Purchase and Sale of Shares | 17 |
| SECTION 2.02 | Closing; Closing Date | 18 |
| SECTION 2.03 | Closing Deliverables | 18 |
| SECTION 2.04 | Escrow Arrangements | 20 |
| SECTION 2.05 | Post-Closing Audit Adjustment | 21 |
| SECTION 2.06 | Company Share Awards | 23 |

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

| | | |
|---|---|---|
| SECTION 3.01 | Organization, Good Standing and Qualification | 25 |
| SECTION 3.02 | Capitalization and Voting Rights | 25 |
| SECTION 3.03 | Corporate Structure; Subsidiaries | 28 |
| SECTION 3.04 | Authorization | 28 |
| SECTION 3.05 | SAFE Rules and Regulations; Consents; No Conflicts | 29 |
| SECTION 3.06 | Compliance with Laws; Consents | 29 |
| SECTION 3.07 | Tax Matters | 30 |
| SECTION 3.08 | Charter Documents; Books and Records | 33 |
| SECTION 3.09 | Financial Statements | 33 |
| SECTION 3.10 | Changes | 34 |
| SECTION 3.11 | Actions | 35 |
| SECTION 3.12 | Liabilities | 36 |
| SECTION 3.13 | Commitments | 36 |
| SECTION 3.14 | Anti-Bribery, Anti-Corruption, Anti-Money Laundering and Sanctions; Absence of Government Interests | 38 |
| SECTION 3.15 | Title Properties | 38 |
| SECTION 3.16 | Related Party Transactions | 39 |
| SECTION 3.17 | Intellectual Property Rights | 39 |
| SECTION 3.18 | Labor and Employment Matters | 41 |
| SECTION 3.19 | Internal Controls | 42 |

i

SECTION 3.20   Insolvency                                                        43
SECTION 3.21   Disclosure                                                        43
SECTION 3.22   Insurance                                                         43
SECTION 3.23   Employee-Related Companies                                        43
SECTION 3.24   Business Contracts of the Domestic Company                        44
SECTION 3.25   Certain Operating Metrics                                         44
SECTION 3.26   Registered Address of the Domestic Company and the WFOE           44
SECTION 3.27   Third Parties Providing Catering Services                         44
SECTION 3.28   Series G-1 Post-Closing Covenants                                 44
SECTION 3.29   Anti-Takeover Provisions                                          44
SECTION 3.30   Brokers                                                           44

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

SECTION 4.01   Corporate Organization                                            44
SECTION 4.02   Purchaser Ownership                                               45
SECTION 4.03   Authority Relative to This Agreement                              45
SECTION 4.04   Consents                                                          45
SECTION 4.05   Sufficient Funds                                                  45

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF EACH SHAREHOLDER

SECTION 5.01   Corporate Organization                                            46
SECTION 5.02   Title                                                             46
SECTION 5.03   Authority Relative to This Agreement                              46
SECTION 5.04   Consents                                                          46

ARTICLE VI

CONDUCT OF BUSINESS PENDING THE CLOSING

SECTION 6.01   Conduct of Business by the Company Pending the Closing            47

ARTICLE VII

ADDITIONAL AGREEMENTS

SECTION 7.01   Access to Information                                             51
SECTION 7.02   No Solicitation of Transactions                                   51
SECTION 7.03   Notification of Certain Matters                                   52
SECTION 7.04   Participation in Litigation                                       53
SECTION 7.05   Resignations                                                      53
SECTION 7.06   Confidentiality; Public Announcements                             53
SECTION 7.07   SAFE Registration                                                 53

ii

| SECTION 7.08 | Tax Filings and Payments | 54 |
|---|---|---|
| SECTION 7.09 | Domestic Company Equity Transfers | 55 |
| SECTION 7.10 | Registration of Share Pledge | 55 |
| SECTION 7.11 | Replacement of Management | 56 |
| SECTION 7.12 | Permits and Licenses Amendment | 56 |
| SECTION 7.13 | Further Assurances; Filings | 56 |
| SECTION 7.14 | Audited 2017 Financial Statements | 56 |
| SECTION 7.15 | Release of Claims | 57 |
| SECTION 7.16 | Compliance with Anti-Corruption Laws | 57 |
| SECTION 7.17 | Approved Sale | 57 |
| SECTION 7.18 | Shareholders Representative | 58 |
| SECTION 7.19 | Release of Share Charge | 58 |
| SECTION 7.20 | Integration Committee | 59 |
| SECTION 7.21 | Termination of Certain Agreements | 59 |

ARTICLE VIII

CONDITIONS TO THE CLOSING

| SECTION 8.01 | Conditions to the Obligations of Each Party | 59 |
|---|---|---|
| SECTION 8.02 | Conditions to the Obligations of Purchaser | 59 |
| SECTION 8.03 | Conditions to the Obligations of the Selling Shareholders | 61 |

ARTICLE IX

TERMINATION AND INDEMNIFICATION

| SECTION 9.01 | Termination | 62 |
|---|---|---|
| SECTION 9.02 | Effect of Termination | 63 |
| SECTION 9.03 | Indemnity | 63 |
| SECTION 9.04 | Indemnification Procedures | 64 |
| SECTION 9.05 | Limitations on Indemnity | 65 |
| SECTION 9.06 | Tax Treatment of Indemnification Payments | 67 |

ARTICLE X

GENERAL PROVISIONS

| SECTION 10.01 | Successors and Assigns | 67 |
|---|---|---|
| SECTION 10.02 | Governing Law | 67 |
| SECTION 10.03 | Dispute Resolution | 67 |
| SECTION 10.04 | Notices | 68 |
| SECTION 10.05 | Rights Cumulative; Specific Performance | 68 |
| SECTION 10.06 | Fees and Expenses | 69 |
| SECTION 10.07 | Restriction on the Use of Name | 69 |
| SECTION 10.08 | Finder's Fee | 70 |
| SECTION 10.09 | Severability | 70 |

| | | |
|---|---|---|
| SECTION 10.10 | Amendments and Waivers | 70 |
| SECTION 10.11 | No Waiver | 71 |
| SECTION 10.12 | Delays or Omissions | 71 |
| SECTION 10.13 | No Presumption | 71 |
| SECTION 10.14 | Counterparts | 71 |
| SECTION 10.15 | Entire Agreement | 71 |

| | |
|---|---|
| SCHEDULE I | Principals and Principal Holdcos |
| SCHEDULE II | Selling Shareholders |
| SCHEDULE III | Capitalization Table |
| SCHEDULE IV | Certain Group Companies |
| SCHEDULE V | Notices |
| SCHEDULE VI | Key Employees |
| SCHEDULE VII | Company Disclosure Schedule |
| SCHEDULE VIII | Selling Shareholders Disclosure Schedule |

| | |
|---|---|
| EXHIBIT A-1 | Form of Deed of Transfer for Selling Shareholders |
| EXHIBIT A-2 | Form of Deed of Transfer for the Rollover Shareholder |
| EXHIBIT B | Form of Cayman Islands Legal Opinion |
| EXHIBIT C | Benchmark Date Net Debt Calculation Principles |

iv

THIS SHARE PURCHASE AGREEMENT (this "Agreement") is made and entered into on April 2, 2018 by and among:

1.  Ali Panini Investment Limited, a company organized under the Laws of the Cayman Islands ("Purchaser"),

2.  each of the individuals and their respective holding companies listed on Schedule I attached hereto (each such individual, a "Principal" and collectively, the "Principals", and each such holding company, a "Principal Holdco" and collectively, the "Principal Holdcos"),

3.  each of the Persons (as defined herein) listed on Column 1 of Schedule II attached hereto (including each of the Former Company Share Award Holders (as defined herein) listed in Appendix A thereto, as may be updated and delivered by the Company to Purchaser prior to the Closing) (each such Person, a "Selling Shareholder" and collectively, the "Selling Shareholders"),

4.  Ali Panini Investment Holding Limited, a business company incorporated under the Laws of Hong Kong (the "Rollover Shareholder"), and

5.  Rajax Holding, a company organized under the Laws of the Cayman Islands (the "Company").

Each of the parties to this Agreement as of the date hereof, and each Exercising Company Share Award Holder (as defined herein) and Rollover Option Holder (as defined herein) who becomes a party to this Agreement prior to the Closing in accordance with the terms hereof, is referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, the Selling Shareholders and the Rollover Shareholder collectively own all of the issued and outstanding Ordinary Shares (as defined herein) and Preferred Shares (as defined herein) of the Company (collectively, the "Shares");

WHEREAS, each Selling Shareholder desires to sell to Purchaser, and Purchaser desires to purchase from each Selling Shareholder, for cash such type and number of Shares as set forth opposite such Selling Shareholder's name under Columns 2 and 3 of Schedule II attached hereto upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Rollover Shareholder and Purchaser desire that the Rollover Shareholder will roll over and exchange all of its Shares for newly issued shares of Purchaser; and

WHEREAS, this Agreement and the transactions contemplated hereby have been duly (i) approved by the Board (as defined herein) and (ii) approved in writing by each of the "Drag Holders" under the ROFR Agreement (as defined herein), and are being implemented as an "Approved Sale" under the ROFR Agreement and the Memorandum and Articles (as defined herein).

1

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, each of the Parties hereby agrees as follows:

## ARTICLE I

## DEFINED TERMS AND INTERPRETATION

SECTION 1.01 <u>Defined Terms</u>. For purposes of this Agreement:

"<u>Accounting Standards</u>" means, with respect to any of the Group Companies which is established in the PRC, PRC GAAP, applied on a consistent basis; and with respect to other Group Companies not established in the PRC or the consolidated financial statements of the Group Companies, the generally accepted accounting principles in the United States, applied on a consistent basis.

"<u>Action</u>" means any charge, claim, action, complaint, petition, investigation, appeal, suit, litigation, grievance, inquiry or other proceeding, whether administrative, civil, regulatory or criminal, whether at law or in equity, or otherwise under any applicable Law, and whether or not before any mediator, arbitrator or Governmental Authority.

"<u>Affiliate</u>" means, with respect to a Person, any other Person that, directly or indirectly, Controls, is Controlled by or is under common Control with such Person. Solely for the purpose of this Agreement and notwithstanding the foregoing, (i) "Affiliate" of Purchaser means Alibaba Group Holding Limited and its Controlled Affiliates, and (ii) the Person that owns the tradename of "蚂蚁金服" or domain name www.antfin.com and the Internet Content Provider License for the operation of such domain name (currently known as "浙江蚂蚁小微金融服务集团股份有限公司") or, the ultimate holding entity that Controls such Person and the Controlled Affiliates of such ultimate holding entity shall be deemed to be Affiliates of Purchaser.

"<u>Aggregate Selling Shareholders Percentage</u>" means a percentage equal to (i) the number of Aggregate Sale Shares divided by (ii) the sum of the number of Aggregate Sale Shares plus the aggregate number of Rollover Shares.

"<u>Agreement</u>" has the meaning set forth in the Preamble, which shall, for the avoidance of doubt, include all exhibits and schedules hereto.

"<u>Alibaba Business Cooperation Agreement</u>" means the Business Cooperation Agreement, dated as of February 8, 2016, by and among the Rajax WFOE, the Rajax Domestic Company, certain Affiliates of the Rollover Shareholder and certain other parties thereto, as amended and supplemented from time to time.

"<u>Alibaba Director</u>" has the meaning set forth in the Shareholders Agreement.

2

"Associate" means, with respect to any Person, (i) a corporation or organization (other than the Group Companies) of which such Person is a senior management personnel or partner or is, directly or indirectly, the record or beneficial owner of five (5) percent or more of any class of Equity Securities of such corporation or organization, (ii) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar capacity, or (iii) any relative or spouse of such Person, or any relative of such spouse.

"Baidu Agreements" means the following contracts collectively: (i) Business Cooperation Agreement I (业务合作协议（一）) dated August 24, 2017 by and among Baidu Wangxun Technology Co., Ltd.(北京百度网讯科技有限公司, "Baidu Wangxun"), Baidu (Hong Kong) Limited, Xiaodu Shenghuo, Rajax Holding, Rajax WFOE and Rajax Domestic Company; (ii) Business Cooperation Agreement II (业务合作协议（二）) dated August 24, 2017 by and among Baidu Wangxun, Xiaodu Shenghuo, Rajax WFOE and Rajax Domestic Company; (iii) Trademark Transfer Agreement (商标转让协议) dated August 24, 2017 by and among Baidu Wangxun, Xiaodu WFOE and Xinchi; and (iv) License Agreement (许可协议) dated August 24, 2017 by and among Baidu Wangxun, Baidu Online Network Technology (Beijing) Co., Ltd. (百 度在线网络技术（北京）有限公司) and Xiaodu WFOE.

"Benchmark Date" means February 28, 2018.

"Benchmark Date Net Debt" means, as of 11:59 p.m. (Hong Kong time) on the Benchmark Date, an amount in USD equal to: (i) the sum of the amounts attributable to each of the line items under the heading "Indebtedness" in Exhibit C as of such time, *minus* (ii) the sum of the amounts attributable to each of the line items under the heading "Cash and Cash Equivalents" in Exhibit C as of such time, calculated in accordance with the Calculation Principles.

"Benefit Plan" means any employment Contract, deferred compensation Contract, bonus plan, incentive plan, profit sharing plan, retirement Contract or other employment compensation Contract or any other plan which provides or provided benefits for any past or present employee, officer, consultant, and/or director of a Person or with respect to which contributions are or have been made on account of any past or present employee, officer, consultant, and/or director of such a Person.

"Big Four Accounting Firm" means one of the four largest international accounting firms and their respective Affiliates, which are commonly referred to by the respective brand names of Deloitte, PricewaterhouseCoopers, Ernst & Young and KPMG.

"Board" or "Board of Directors" means the board of directors of the Company.

"Business Day" means any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks are required or authorized by Law to be closed in the PRC or Hong Kong.

"Calculation Principles" means the calculation principles and procedures with respect to Benchmark Date Net Debt set forth on Exhibit C hereto, the component items of which shall be determined on a basis consistent with the Accounting Principles.

3

"Captive Structure" means the structure under which the WFOEs Controls the Domestic Companies through the Control Documents and Supplemental Control Documents.

"Cash and Cash Equivalents" means all cash and cash equivalents held by the Group Companies at such time, determined in accordance with the Accounting Standards.

"CFC" means a controlled foreign corporation as defined in Section 957(a) of the Code.

"Charter Documents" means, with respect to a particular legal entity, the articles of incorporation, certificate of incorporation, formation or registration (including, if applicable, certificates of change of name), memorandum of association, articles of association, bylaws, articles of organization, limited liability company agreement, trust deed, trust instrument, operating agreement, joint venture agreement, business license, or similar or other constitutive, governing, or charter documents, or equivalent documents, of such entity.

"Circular 13" means the *Circular of the State Administration of Foreign Exchange on Further Simplifying and Improving the Foreign Exchange Administration Policies for Direct Investment* (Huifa (2015) No. 13) issued by SAFE with effect from June 1, 2015, as amended.

"Circular 37" means the *Circular of the State Administration of Foreign Exchange on Relevant Issues concerning Foreign Exchange Administration of Offshore Investment and Financing and Round Trip Investment through Offshore Special Purpose Companies by PRC Residents* (Huifa (2014) No. 37) issued by SAFE on July 14, 2014, as amended.

"Circular 7" means the *Notice of the State Administration of Foreign Exchange on Issues concerning the Foreign Exchange Administration of Domestic Individuals' Participation in Equity Incentive Plans of Overseas Listed Companies* (Huifa (2012) No. 7) issued by SAFE on February 15, 2012, as amended.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"CITICPE" means collectively, CE Takeout Limited and CE Takeout II Limited.

"Company Option" means each option award issued by the Company pursuant to the ESOP that entitles the holder thereof to purchase one (1) Ordinary Share upon the vesting of such award.

"Company Owned IP" means all Intellectual Property owned by, purported to be owned by, or exclusively licensed to, the Group Companies.

"Company Parties" means, collectively, the Group Companies, the Principals and the Principal Holdcos.

4

"Company Registered IP" means all Intellectual Property for which registrations are owned by or held in the name of, or for which applications have been made in the name of, any Group Company.

"Company Share Award" means each Company Option and each RSU.

"Competing Proposal" means any proposal or offer relating to any of the following (other than the Transactions or such other transaction involving only the Rollover Shareholder, Purchaser and/or their Affiliates): (a) any merger, reorganization, consolidation, share exchange, business combination scheme of arrangement, amalgamation, recapitalization, liquidation, dissolution, joint venture or other similar transaction involving the Company or any of the other Group Companies, (b) any direct or indirect sale, assignment, exchange, transfer, pledge, encumbrance or disposal of in any way, or grant of any interest or right with respect to the disposition of (any of the foregoing, a "Transfer"), lease or license of any assets of the Company or any of the other Group Companies, (c) any direct or indirect Transfer of any equity securities of the Company or any of the other Group Companies to any Person, (d) any Company Change of Control (as defined in the Memorandum and Articles) and (e) any other transaction which would hinder or impede the execution, implementation or consummation of the Transactions or such other transaction involving only Rollover Shareholder Purchaser, and/or their Affiliates.

"Consent" means any consent, approval, authorization, release, waiver, permit, grant, franchise, concession, agreement, license, exemption or order of, registration, certificate, declaration or filing with, or report or notice to, any Person, including any Governmental Authority.

"Contract" means, a contract, agreement, understanding, indenture, note, bond, loan, instrument, lease, mortgage, franchise, license, commitment, purchase order, and other legally binding arrangement, whether written or oral.

"Control" of a given Person means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise; provided, that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

"Control Documents" means the contracts set out in Section 1.01(a) to the Company Disclosure Schedule.

"Data Protection Laws" means Laws in respect of online data protection, including without limitation, Provisions on Protecting the Personal Information of Telecommunications and Internet Users (电信和互联网用户个人信息保护规定), Decision of the Standing Committee of National People's Congress on Strengthening Information Protection on Networks (全国人大常委关于加强网络信息保护的决定) and Interpretation by the Supreme People's Court and the Supreme People's Procuratorate on Several Issues concerning the Application of Law in respect of the Handling of Criminal Cases of Infringing on Citizens' Personal Information (最高人民法院、最高人民检察院关于办理侵犯公民个人信息刑事案 件适用法律若干问题的解释).

5

"Domestic Companies" means, collectively, the Rajax Domestic Company, Xiaodu Shenghuo, Xunda and Xinchi.

"Employee-Related Companies" means Shanghai Taizhou Network & Technology Co., Ltd. (上海泰舟网络科技有限公司) ("Taizhou") and Shanghai Yuchuan Network & Technology Co., Ltd. (上海育川网络科技有限公司) ("Yuchuan").

"Equity Securities" means, with respect to any Person that is a legal entity, any and all shares of capital stock, membership interests, units, profits interests, phantom interests, ownership interests, equity interests, registered capital, and other equity securities of such Person, and any right, warrant, option, call, commitment, conversion privilege, preemptive right or other right to acquire any of the foregoing, or security convertible into, exchangeable or exercisable for any of the foregoing, or any Contract providing for the acquisition of any of the foregoing.

"ESOP" means the Rajax Holding Share Incentive Plan, adopted by the Board and the shareholders of the Company on May 7, 2014, as amended from time to time in accordance with the terms thereof and the Shareholders Agreement effective at that time.

"Exercise Price" means, with respect to any Company Option, the exercise price per Share underlying such Company Option.

"Exercising Company Share Award Holders" means the holders of Company Options as of the date of this Agreement who exercise such Company Options and are issued Shares in respect thereof at any time prior to the Closing, a true and accurate list of whom shall be delivered by the Company to Purchaser prior to the Closing.

"FCPA" means Foreign Corrupt Practices Act of 1977, as amended.

"Food Safety Laws" means Laws in respect of catering services provided through online orders, including without limitation, Food Safety Law of the PRC (中华人民共和国食品安全法), Measures for the Investigation and Handling of Illegalities of Online Food Safety (网络食品安全违法行为查处办法), Measures for the Supervision and Administration of Food Safety of Online Catering Services (网络餐饮服务食品安全监督管理办法), Shanghai Supervision Regulation on Online Catering Service (上海市网络餐饮服务监督管理办法) and Beijing Interim Supervision Measures of Online Food Business (北京市网络食品经营监督管理办法 (暂行).

"Former Company Share Award Holders" means the Selling Shareholders listed in Appendix A of Schedule II attached hereto and, if any, the Exercising Company Share Award Holders who shall each be treated as a Selling Shareholder listed in an updated Appendix A of Schedule II to be delivered by the Company to Purchaser prior to the Closing. For the avoidance of doubt, "Former Company Share Award Holders" shall not include any financial or strategic investors of the Company.

6

"Fundamental Warranties" means each of the representations and warranties set forth in Section 3.01, Section 3.02, Section 3.03, and Section 3.04.

"Governmental Authority" means (i) any government of any nation, federation, province or state or any other political subdivision thereof, (ii) any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any government authority, agency, department, board, commission or instrumentality of the PRC or any other country, or any political subdivision thereof, (iii) any court, tribunal or arbitrator, (iv) any self-regulatory organization, (v) any public international organization, such as the United Nations or the World Bank and (vi) any securities exchange.

"Governmental Order" means any applicable order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before or under the supervision of any Governmental Authority.

"Group Company" means each of the Company and the entities set forth in Schedule IV hereto and each Subsidiary of any of the foregoing, and "Group" refers to all of Group Companies collectively.

"Indebtedness" of any Person means, without duplication, each of the following of such Person: (i) all indebtedness for borrowed money; (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument; (iii) all reimbursement and other obligations with respect to banker's acceptances, letters of credit, surety bonds and similar obligations; (iv) all payment obligations under any interest rate, foreign exchange or other swaps, options, derivatives and other hedging agreements or arrangements that will be payable upon termination thereof (assuming they were terminated on the date of determination); (v) amounts owing as deferred purchase price for property or services, including all seller notes and "earn out" payments, whether or not matured; (vi) indebtedness secured by a Lien on assets or properties, (vii) obligations or commitments to repay deposits or other amounts advanced by and owing to third parties, (viii) all obligations under capitalized leases, (ix) all obligations to purchase, redeem, retire, defease or otherwise acquire for value any capital stock or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (x) all obligations pursuant to securitization or factoring program or arrangement, (xi) all obligations or undertakings to maintain or cause to be maintained the financial position or covenants of others or to purchase the obligations or property of others, (xii) all direct or indirect guarantees or sureties for indebtedness, obligations, claim or liability of the type referred to in clauses (i) through (xi) above, (xiii) all reserves for litigation, (xiv) all deferred revenues, (xv) any other debt like items, including unsettled payables (other than trade account payables) to any Selling Shareholder or any Subsidiary of such Selling Shareholder and shortfall in contributions to any Benefit Plan (xvi) with respect to any indebtedness, obligation, claim or liability of the type referred to in clauses (i) through (xiv) above, all accrued and unpaid interest, premiums, penalties, breakage costs, unwind costs, fees, termination costs, redemption costs, expenses and other charges with respect thereto, (xvii) Taxes with respect to any taxable period (or any portion thereof) ending on or before the Closing Date that were not previously paid by any Group Company, and (xviii) any net payable owning to Baidu, Inc. and its Subsidiaries.

7

"Indemnifiable Loss" means, with respect to any Person, any action, claim, cost, damage, deficiency, diminution in value, disbursement, expense, liability, loss, obligation, penalty or settlement of any kind or nature imposed on or otherwise incurred or suffered by such Person, including without limitation, interest, penalties, reasonable legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement and Taxes payable by such Person by reason of the indemnification.

"Injunction" means, as of any date, any final, non-appealable judgment, restraining order or permanent injunction, which is in effect as of such date that prohibits the consummation of the Transactions and has been issued by any Governmental Authority in any jurisdiction that is material to the business of Purchaser, the Company and/or their respective Affiliates.

"Intellectual Property" means any and all (i) patents, patent rights and applications therefor and reissues, reexaminations, continuations, continuations-in-part, divisions, and patent term extensions thereof, (ii) inventions (whether patentable or not), discoveries, improvements, concepts, innovations and industrial models, (iii) registered and unregistered copyrights, copyright registrations and applications, mask works and registrations and applications therefor, author's rights and works of authorship (including artwork, Software, computer programs, source code, object code and executable code, firmware, development tools, files, records and data, and related documentation), (iv) URLs, web sites, web pages and any part thereof, (v) technical information, know-how, trade secrets, drawings, designs, design protocols, specifications, proprietary data, customer lists, databases, proprietary processes, technology, formulae, and algorithms and other intellectual property, (vi) trade names, trade dress, trademarks, domain names, service marks, logos, business names, and registrations and applications therefor, and (vii) the goodwill symbolized or represented by the foregoing.

"JD Agreements" means, collectively, (i) the O2O Platform Cooperation Agreement (O2O 平台合作协议), dated as of April 8, 2015, between Jiangsu Jingdong Information Technology Co., Ltd. (江苏京东信息技术有限公司) and the Rajax WFOE; (ii) the Supplemental Agreement (补充协议书), dated as of October 9, 2015, between Jiangsu Jingdong Information Technology Co., Ltd. and the Rajax WFOE; and (iii) Promotion Cooperation Agreement (推广合作协议), dated April 8, 2015, between Jiangsu Jingdong Information Technology Co., Ltd. and the Rajax WFOE.

"Key Employee" means all employees of the Group Companies with positions of president, chief executive officer, chief financial officer, chief operating officer, chief technical officer, chief sales and marketing officer, general manager, any other managers reporting directly to any Group Company's Board of Directors, president or chief executive officer, and any other employee with the title of "vice president" or higher.

8

"Knowledge" means, with respect to the Company Parties, the actual knowledge of any of the Principals, and that knowledge which should have been acquired by each such individual after making such due inquiry and exercising such due diligence as a prudent business person would have made or exercised in the management of his or her business affairs, including but not limited to due inquiry of all officers, directors, employees, consultants and professional advisers (including attorneys, accountants and auditors) of the Group and of its Affiliates who could reasonably be expected to have knowledge of the matters in question.

"Law" or "Laws" means any and all publicly announced provisions of any applicable constitution, treaty, statute, law, regulation, ordinance, code, rule, or rule of common law, any governmental approval, concession, grant, franchise, license, agreement, directive, requirement, or other governmental restriction or any similar form of decision of, or determination by, or any interpretation or administration of any of the foregoing by, any Governmental Authority, in each case as amended, and any and all applicable Governmental Orders.

"Liabilities" means, with respect to any Person, all liabilities, obligations and commitments of such Person of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due.

"Lien" means any claim, charge, easement, encumbrance, lease, covenant, security interest, lien, option, pledge, rights of others, or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by Contract, understanding, law, equity or otherwise.

"Majority Ordinary Holders" has the meaning given to such term in the Memorandum and Articles.

"Majority Preferred Holders" has the meaning given to such term in the Memorandum and Articles.

"Material Adverse Effect" means any (i) event, occurrence, fact, condition, change or development that has had, has, or would have, individually or together with other events, occurrences, facts, conditions, changes or developments, a material adverse effect on the business, properties, assets, employees, operations, results of operations, condition (financial or otherwise), prospects, assets or liabilities of the Group taken as a whole, provided that any reduction in the Group Companies' cash flow or working capital amount occurring from conducting their businesses in the ordinary course of business consistent with past practice shall not by itself constitute a "Material Adverse Effect" (but the event, occurrence, fact, condition, change or development underlying such reduction may be considered in determining whether a Material Adverse Effect has occurred), (ii) material impairment of the ability of any Party (other than Purchaser and/or the Rollover Shareholder) to perform the material obligations of such party under any Transaction Documents, any Control Documents or any Supplemental Control Documents, or (iii) material impairment of the validity or enforceability of this Agreement or any other Transaction Document, any Control Documents, or any Supplemental Control Documents against any Party hereto or thereto (other than Purchaser and/or the Rollover Shareholder).

9

"Memorandum and Articles" means, collectively, the Twelfth Amended and Restated Memorandum of Association and the Twelfth Amended and Restated Articles of Association of the Company, adopted on August 22, 2017 and effective on August 24, 2017.

"MOFCOM" means the Ministry of Commerce of the PRC or, with respect to any matter to be submitted for examination and approval by the Ministry of Commerce, any Governmental Authority which is similarly competent to examine and approve such matter under the laws of the PRC.

"Order No. 10" means the Rules for Mergers with and Acquisitions of Domestic Enterprises by Foreign Investors (关于外国投资者并购境内企业的规定) jointly issued by the MOFCOM, the State-owned Assets Supervision and Administration Commission, the State Administration of Taxation, the SAIC, the China Securities Regulatory Commission and the SAFE initially on August 8, 2006, as amended.

"Ordinary Shares" means ordinary shares, par value US$0.0000125 per share, of the Company.

"Paying Agent" means JPMorgan Chase Bank, N.A., or another internationally recognized bank or trust company selected by Purchaser.

"Permitted Liens" means (i) Liens for Taxes not yet delinquent or the validity of which are being contested in good faith and for which there are adequate reserves on the applicable financial statements, (ii) Liens incurred in the ordinary course of business, which (x) do not individually or in the aggregate materially detract from the value, use, or transferability of the assets that are subject to such Liens, and (y) were not incurred in connection with the borrowing of money, and (iii) Liens contemplated under the Captive Structure.

"Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity.

"PFIC" means a passive foreign investment company as defined in Section 1297(a) of the Code.

"PRC" means the People's Republic of China, but solely for the purposes of this Agreement and the other Transaction Documents, excluding the Hong Kong Special Administrative Region, the Macau Special Administrative Region and the islands of Taiwan.

"PRC Anti-Unfair Competition Law" means the Anti-Unfair Competition Law of the PRC (中华人民共和国反不正当竞争法) promulgated by the Standing Committee of the National People's Congress of the PRC and effective on September 2, 1993, as amended from time to time.

"PRC GAAP" means PRC generally accepted accounting principles.

10

"PRC Group Companies" means, collectively, each of the Group Companies incorporated under the Laws of the PRC, including but not limited to the Rajax PRC Companies and the Xiaodu PRC Companies.

"Preferred Shares" means, collectively, the series A preferred shares, par value US$0.0000125 per share, of the Company (the "Series A Preferred Shares"), the series B preferred shares, par value US$0.0000125 per share, of the Company (the "Series B Preferred Shares"), the series C preferred shares, par value US$0.0000125 per share, of the Company (the "Series C Preferred Shares"), the series D preferred shares, par value US$0.0000125 per share, of the Company (the "Series D Preferred Shares"), the series E preferred shares, par value US$0.0000125 per share, of the Company (the "Series E Preferred Shares"), the series F preferred shares, par value US$0.0000125 per share, of the Company (the "Series F Preferred Shares"), the series F-1 preferred shares, par value US$0.0000125 per share, of the Company (the "Series F-1 Preferred Shares"), the series G preferred shares, par value US$0.0000125 per share, of the Company (the "Series G Preferred Shares"), and the series G-1 preferred shares, par value US$0.0000125 per share, of the Company (the "Series G-1 Preferred Shares").

"Prohibited Person" means any Person that is (i) a national or resident of any U.S. embargoed or restricted country, (ii) included on, or Affiliated with any Person on, the United States Commerce Department's Denied Parties List, Entities and Unverified Lists; the U.S. Department of Treasury's Specially Designated Nationals, Specially Designated Narcotics Traffickers or Specially Designated Terrorists, or the Annex to Executive Order No. 13224; the Department of State's Debarred List; UN Sanctions, or (iii) a Person with whom business transactions, including exports and re-exports, are restricted by a U.S. Governmental Authority, including, in each clause above, any updates or revisions to the foregoing and any newly published rules.

"Public Official" means any executive, official, or employee of a Governmental Authority, political party or member of a political party, political candidate; executive, employee or officer of a public international organization; or director, officer or employee or agent of a wholly or partially state-owned, or partially state-owned, state-Controlled, or state-operated enterprise, including a PRC state-owned, state-Controlled, or state-operated enterprise.

"Purchaser Parties" means collectively, Purchaser and the Rollover Shareholder.

"Qualified Tax Advisor" means such Big Four Accounting Firms approved by Purchaser in writing, or such other professional tax advisor as may be agreed in writing between Shareholders Representative and Purchaser, for the purposes of carrying out the actions set forth in Section 7.08.

"Rajax PRC Companies" means the Rajax WFOE, the Rajax Domestic Company, the Rajax WFOE Subsidiary, Hongyi, Pengxun, Zhiguan and Fengniao.

"Related Party" means any Affiliate, senior management, director, supervisory board member, or holder of any Equity Security of any Group Company, and any Affiliate or Associate of any of the foregoing.

11

"Restrictive Provisions" means any provisions in the Contracts to which a Group Company is a party that restricts the ability of any Group Company or any other Person to conduct or engage in any business or activity with Alibaba or any of its Affiliates.

"ROFR Agreement" means the Tenth Amended and Restated Right of First Refusal & Co-Sale Agreement entered into by and among the parties named therein on August 24, 2017.

"Rollover Employee Options" means certain Company Options issued and outstanding as of, or issued after, the date of this Agreement which remain unexercised as of the Closing and which are listed in the Rollover Employee Option Confirmation Letter.

"Rollover Employee Shares" means the Ordinary Shares listed as "Rollover Employee Shares" in Column 2 of Appendix A to Schedule II which were issued upon the exercise of Company Options on or after February 28, 2018 and prior to the Closing.

"RSU" means the restricted share units, pursuant to which certain number of Ordinary Shares have been reserved for issuance to the Principals and/or Principal Holdcos.

"SAFE" means the State Administration of Foreign Exchange of the PRC.

"SAFE Rules and Regulations" means collectively, Circular 7, Circular 13, Circular 37 and any other applicable SAFE rules and regulations.

"SAIC" means the State Administration for Industry and Commerce of the PRC or, with respect to the issuance of any business license or filing or registration to be effected by or with the State Administration of Industry and Commerce, any Governmental Authority which is similarly competent to issue such business license or accept such filing or registration under the Laws of the PRC.

"Seller Pro Rata Share" shall mean, with respect to a Selling Shareholder, a fraction, the numerator of which is the total number of Sale Shares of such Selling Shareholder and the denominator of which is the total number of Aggregate Sale Shares.

"Sequoia" shall mean, collectively, Sequoia Capital CV IV Holdco, Ltd. and Sequoia Capital China GF Holdco III-A, Ltd.

"Share Restriction Agreements" means, collectively, the Share Restriction Agreements, each dated August 24, 2015, executed by the Company, the Principals and the Principal Holdcos and certain other parties thereto.

"Shareholder Pro Rata Share" shall mean, (a) with respect to a Selling Shareholder, a fraction, the numerator of which is the total number of Sale Shares of such Selling Shareholder and the denominator of which is the sum of (i) the total number of Aggregate Sale Shares and (ii) the total number of Rollover Shares, and (b) with respect to the Rollover Shareholder, a fraction, the numerator of which is the total number of Rollover Shares and the denominator of which is the sum of (i) the total number of Aggregate Sale Shares and (ii) the total number of Rollover Shares.

12

"Shareholders Agreement" means the Tenth Amended and Restated Shareholders Agreement entered into by and among the parties named therein on August 24, 2017.

"Social Insurance" means any form of social insurance required under applicable Laws, including without limitation, the PRC national and local contributions for pensions, medical insurance, unemployment insurance, work-related injury insurance, pregnancy benefits, and housing accumulation funds.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, including all source code and executable code, whether embodied in software, firmware or otherwise, documentation, development tools, designs, files, verilog files, RTL files, HDL, VHDL, net lists, records, data and mask works; and (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, and all rights therein.

"Specified Laws" means the PRC Anti-Unfair Competition Law, Data Protection Laws, Food Safety Laws, Telecommunication Regulation of the PRC (中华人民共和国电信条例), Content of Categories of Telecommunication Business (2015) (电信业务分类目录 (2015年版) ) and Notice of Ministry of Industry and Information Technology on Removing the Restrictions on Foreign Equity Ratios in Online Data Processing (Operating E-commerce) Business (工业和信息化部关于放开在线数据处理与交易处理业务 (经营类电子商务)外资股比限制的通告 ).

"Stores" means the stores owned by the Rajax WFOE Subsidiary from time to time.

"Subsidiary" means, with respect to any given Person, any other Person that is Controlled directly or indirectly by such given Person.

"Supplemental Control Documents" means the following documents collectively: (i) the Proxy Agreement (授权委托协议) entered into by and between the Rajax WFOE and each of the Principals respectively; (ii) the Intellectual Property Exclusive Option Agreement (知识产权独家认购协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company; (iii) the Domain Transfer Agreements (域名转让协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company; (iv) the Domain Transfer Agreement (域名转让协议) entered into by and between the Rajax Domestic Company and Xuhao Zhang; (v) the Patent Application Right Transfer Agreement (专利申请权转让协议) entered into by and between the Rajax WFOE and the Rajax Domestic Company, all of which were dated August 27, 2012; and (vi) the spousal consent letters executed by each of Jiangman Du (杜江曼), Jingjing Chang (常婧婧), Yanxia Xiao (肖妍霞), and Manman Zhao (赵曼曼) (as the spouse of each equity holder of the Rajax Domestic Company) on 5 March 2016.

"Taxes" means (i) in the PRC: (a) any national, provincial, municipal, or local taxes, charges, fees, levies, or other assessments, including, without limitation, all net income (including enterprise income tax and individual income withholding tax), turnover (including value-added tax, business tax, and consumption tax), resource (including urban and township land use tax), special purpose (including land value-added tax, urban maintenance and construction tax, and additional education fees), property (including urban real estate tax and land use fees), documentation (including stamp duty and deed tax), filing, recording, social insurance (including pension, medical, unemployment, housing, and other social insurance withholding), tariffs (including import duty and import value-added tax), and estimated and provisional taxes, charges, fees, levies, or other assessments of any kind whatsoever, (b) all interest, penalties (administrative, civil or criminal), or additional amounts imposed by any Governmental Authority in connection with any item described in clause (a) above, and (c) any form of transferee liability imposed by any Governmental Authority in connection with any item described in clauses (a) and (b) above, and (ii) in any jurisdiction other than the PRC: all similar Liabilities as described in clause (i)(a) and (i)(b) above.

13

"Tax Return" means any return, report or statement showing Taxes, used to pay Taxes, or required to be filed with respect to any Tax (including any elections, declarations, schedules or attachments thereto, and any amendment thereof), including any information return, claim for refund, amended return or declaration of estimated or provisional Tax.

"Transaction Documents" means collectively, this Agreement, the Escrow Agreement, and each of the other agreements and documents otherwise required in connection with implementing the transactions contemplated by any of the foregoing.

"U.S. Real Property Holding Corporation" has the meaning as defined in Section 897(c)(2) of the Code.

"Warrantors" means, collectively, the Principals and the Principal Holdcos.

"WFOEs" means, collectively, the Rajax WFOE and the Xiaodu WFOE.

"Xiaodu Group" means, collectively, the Xiaodu Cayman Company, the Xiaodu HK Company, the Xiaodu PRC Companies and each Subsidiary of any of the foregoing.

"Xiaodu PRC Companies" means, collectively, the Xiaodu WFOE, Xiaodu Shenghuo, Xunda, Xinchi and Zhenxuan.

SECTION 1.02 Other Defined Terms. The following terms shall have the meanings defined for such terms in the Sections set forth below:

| Defined Term | Location of Definition |
|---|---|
| Accounting Firm | Section 2.05(b) |
| Accounting Firm Determination | Section 2.05(b) |
| Aggregate Purchase Price | Section 2.01(a) |
| Aggregate Sale Shares | Section 2.01(a) |
| Arbitration Notice | Section 10.03(a) |
| Asserted Action | Section 9.04(a) |
| Asserted Liability | Section 9.04(a) |
| Audit and Indemnity Escrow Account | Section 2.04(b) |
| Audit and Indemnity Escrow Amount | Section 2.04(b) |

14

| | |
|---|---|
| Audit and Indemnity Escrow Fees | Section 2.04(b) |
| Audit Difference | Section 2.05(a) |
| Audited 2017 Financial Statements | Section 7.14 |
| Closing | Section 2.02 |
| Closing Audit | Section 2.05(b) |
| Closing Date | Section 2.02 |
| Company | Preamble |
| Company Disclosure Schedule | Article III |
| Company IP | Section 3.17(a) |
| Compliance Laws | Section 3.14(a) |
| Deferred Payment Agreement | Section 2.06(b) |
| Dispute | Section 10.03(a) |
| Escrow Agent | Section 2.04(a) |
| Escrow Agreement | Section 2.04(a) |
| Fengniao | Schedule IV |
| Financial Statements | Section 3.09 |
| Grace Period | Section 9.05(a) |
| HKIAC | Section 10.03(b) |
| HKIAC Rules | Section 10.03(b) |
| Hong Kong | Section 10.02 |
| Hongyi | Schedule IV |
| Indemnifying Parties | Section 9.03(a) |
| Indemnifying Party | Section 9.03(a) |
| Integration Committee | Section 7.20 |
| Key Employees | Section 3.18(d) |
| Lease | Section 3.15(b) |
| Material Contracts | Section 3.13(a) |
| Maximum Net Debt Amount | Section 2.05(a) |
| New Business License | Section 7.09 |
| New Control Documents | Section 8.02(j) |
| Onshore Equity Transfer | Section 7.09 |
| Parties | Preamble |
| Party | Preamble |
| Payment Fund | Section 2.03(c)(i) |
| Pengxun | Schedule IV |
| Per Share Purchase Price | Section 2.01(a) |
| Principal | Preamble |
| Principal Holdco | Preamble |
| Principal Holdcos | Preamble |
| Principals | Preamble |
| Pro Rata Audit Difference | Section 2.05(e) |
| Pro Rata Indemnity Amount | Section 9.04(b) |
| Purchase Price | Section 2.01(a) |
| Purchaser | Preamble |
| Purchaser Indemnified Parties | Section 9.03(a) |
| Purchaser Share | Section 2.01(b) |

15

| | |
|---|---|
| Rajax Domestic Company | Schedule IV |
| Rajax HK Subsidiary | Schedule IV |
| Rajax WFOE | Schedule IV |
| Rajax WFOE Subsidiary | Schedule IV |
| Relevant Obligations | Section 2.06(c) |
| Relevant PRC Tax Authority | Section 7.08(b) |
| Representatives | Section 3.14(a) |
| Required Governmental Consents | Section 3.06(b) |
| Rollover Employee Option Confirmation Letter | Section 2.06(b) |
| Rollover Option Holder | Section 2.06(b) |
| Rollover Option Holders | Section 2.06(b) |
| Rollover Purchase Price | Section 2.06(b) |
| Rollover Share | Section 2.01(b) |
| Rollover Shareholder | Preamble |
| Rollover Shares | Section 2.01(b) |
| Sale Shares | Section 2.01(a) |
| Selling Shareholder | Preamble |
| Selling Shareholders | Preamble |
| Selling Tax | Section 7.08(a) |
| Share Purchases | Section 2.01(a) |
| Share Rollover | Section 2.01(b) |
| Shareholders Disclosure Schedule | Article V |
| Shareholders Representative | Section 7.18 |
| Shares | Recitals |
| Statement Date | Section 3.09 |
| Survival Period | Section 9.05(b) |
| Takeover Statute | Section 3.29 |
| Tax Escrow Account | Section 2.04(a) |
| Tax Escrow Amount | Section 2.04(a) |
| Tax Escrow Fees | Section 2.04(a) |
| Termination Date | Section 9.01(b)(i) |
| Transactions | Section 2.01(b) |
| Undisputed Indemnity Amount | Section 9.04(c) |
| Xiaodu Cayman Company | Schedule IV |
| Xiaodu HK Company | Schedule IV |
| Xiaodu Shenghuo | Schedule IV |
| Xiaodu WFOE | Schedule IV |
| Xinchi | Schedule IV |
| Xunda | Schedule IV |
| Zhenxuan | Schedule IV |
| Zhiguan | Schedule IV |

SECTION 1.03 Interpretations. For all purposes of this Agreement, except as otherwise expressly herein provided, (i) the terms defined in Article I shall have the meanings assigned to them in this Article I and include the plural as well as the singular, (ii) all accounting terms not otherwise defined herein have the meanings assigned under the Accounting Standards, (iii) all references in this Agreement to designated "Sections" and other subdivisions are to the designated Sections and other subdivisions of the body of this Agreement, (iv) pronouns of either gender or neuter shall include, as appropriate, the other pronoun forms, (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section or other subdivision, (vi) all references in this Agreement to designated Schedules and Exhibits are to the Schedules and Exhibits attached to this Agreement, (vii) references to this Agreement, any other Transaction Documents and any other document shall be construed as references to such document as the same may be amended, supplemented or novated from time to time, (viii) the term "or" is not exclusive, (ix) the term "including" will be deemed to be followed by ", but not limited to," (x) the terms "shall," "will," and "agrees" are mandatory, and the term "may" is permissive, (xi) the phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements, and "direct or indirect" has the correlative meaning, (xii) the term "voting power" refers to the number of votes attributable to the shares (on an as-converted basis) in accordance with the terms of the Memorandum and Articles, (xiii) the headings used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement, (xiv) references to Laws include any such Law modifying, re-enacting, extending or made pursuant to the same or which is modified, re-enacted, or extended by the same or pursuant to which the same is made, and (xv) all references to U.S. dollars or to "US$" are to currency of the United States of America, all references to RMB are to currency of the PRC and all references to "HK$" are to currency of Hong Kong (and each shall be deemed to include reference to the equivalent amount in other currencies).

16

**ARTICLE II**

**PURCHASE AND SALE**

SECTION 2.01 <u>Purchase and Sale of Shares</u>.

(a) <u>Share Purchases</u>. Upon the terms and subject to the conditions contained herein, at the Closing, each Selling Shareholder shall, severally but not jointly, sell and transfer to Purchaser, and Purchaser shall purchase and acquire from each Selling Shareholder (the "<u>Share Purchases</u>"), the entire legal and beneficial ownership (together with all rights now or hereafter attaching to them, including all rights to any dividend or other distribution declared, made or paid after the date of this Agreement) of all of such Selling Shareholder's Shares, which type and number of Shares is set forth opposite such Selling Shareholder's name under Columns 2 and 3 of Schedule II hereto (including Appendix A thereto) (the "<u>Sale Shares</u>" of such Selling Shareholder, and the aggregate of all Sale Shares of the Selling Shareholders to be purchased by Purchaser hereunder, the "<u>Aggregate Sale Shares</u>"), free and clear of all Liens, in exchange for an aggregate purchase price in cash in U.S. Dollars in the amount set forth opposite such Selling Shareholder's name under Column 4 of Schedule II hereto (including Appendix A thereto) (the "<u>Purchase Price</u>" payable to such Selling Shareholder, and the aggregate of all Purchase Prices to be paid by Purchaser to the Selling Shareholders pursuant to this <u>Section 2.01</u>, the "<u>Aggregate Purchase Price</u>"). The Aggregate Purchase Price (and the Purchase Price payable to each Selling Shareholder by Purchaser) reflects a per share purchase price of US$0.6517400968, inclusive of all applicable Selling Tax (the "<u>Per Share Purchase Price</u>").

17

(b) Restructuring. Upon the terms and subject to the conditions contained herein, at the Closing, each of the Shares held by the Rollover Shareholder immediately prior to the Closing (each, a "Rollover Share", and collectively, the "Rollover Shares") shall be rolled over and exchanged for 5,200,953,827 validly issued, fully paid and non-assessable ordinary shares, par value US$0.0001 per share, of Purchaser (the "Purchaser Shares"), with no cash consideration to be paid by Purchaser to the Rollover Shareholder (the "Share Rollover", and together with the Share Purchases, the "Transactions").

SECTION 2.02 Closing; Closing Date. Upon the terms and subject to the conditions contained herein, the closing of the Transactions (the "Closing") shall take place at 9:00 p.m. (Hong Kong time) on a date no later than ten (10) Business Days after the satisfaction or waiver of the conditions set forth in Article VIII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions), which date shall be no later than twenty (20) Business Days after the date of this Agreement, or any other date or time agreed in writing by Purchaser and the Shareholders Representative (the "Closing Date") at the offices of Simpson Thacher & Bartlett, 35/F ICBC Tower, 3 Garden Road, Central, Hong Kong, or at another place agreed in writing by Purchaser and the Shareholders Representative.

SECTION 2.03 Closing Deliverables.

(a) Closing Deliverables by the Selling Shareholders and the Rollover Shareholder. At the Closing:

(i) each Selling Shareholder shall, severally but not jointly, deliver or cause to be delivered to Purchaser a deed of transfer, in the form of Exhibit A-1 hereto and duly executed by such Selling Shareholder or a Director of the Company on behalf of such Selling Shareholder, dated as of the Closing Date, with respect to the sale and transfer of all of such Selling Shareholder's Sale Shares to Purchaser;

(ii) (A) each Selling Shareholder shall, severally but not jointly, deliver to Purchaser, the original share certificate(s) representing all of such Selling Shareholder's Sale Shares or, if such original share certificate(s) could not be located and delivered to Purchaser at the Closing, then such relevant Selling Shareholder shall deliver to Purchaser an affidavit and indemnity for the lost share certificate(s) in form and substance acceptable to Purchaser and the registered office provider of the Company in respect of such Selling Shareholders' Sale Shares, or (B) the Shareholders Representative shall deliver to Purchaser a written confirmation from the Company's registered office that such share certificate(s) will be cancelled at the Closing;

(iii) the Rollover Shareholder shall deliver or cause to be delivered to Purchaser a deed of transfer, in the form of Exhibit A-2 hereto and duly executed by the Rollover Shareholder, dated as of the Closing Date, with respect to the rollover and exchange of all of the Rollover Shareholder's Rollover Shares for the Purchaser Shares;

(iv) the Rollover Shareholder shall deliver to Purchaser, the original share certificate(s) representing all of the Rollover Shareholder's Rollover Shares or, if such original share certificate(s) could not be located and delivered to Purchaser at the Closing, an affidavit and indemnity for the lost share certificate(s) in form and substance acceptable to Purchaser and the registered office provider of the Company in respect of the Rollover Shareholder's Rollover Shares; and

18

(v) each of the Principals and Principal Holdcos, CITICPE, and Sequoia shall deliver to Purchaser the resignation letter of its respective appointee serving as a Director prior to the Closing, effective as of the Closing, and the Principals and Principal Holdcos shall deliver to Purchaser the resignation letter of the Mr. Wei CHENG (from his directorship) prior to the Closing, effective as of the Closing.

(b) <u>Closing Deliverables by the Company</u>. At the Closing, the Company shall, and the Principals and the Principal Holdcos shall cause the Company to, deliver or cause to be delivered to Purchaser:

(i) the register of members, dated as of the Closing and certified by the registered office provider of the Company, updated to reflect the Transactions and Purchaser's ownership of the Aggregate Sale Shares and Rollover Shares, free and clear of all Liens;

(ii) one or more share certificates in the name of Purchaser (and/or its designee), dated as at the Closing Date and duly executed on behalf of the Company, collectively evidencing the ownership by Purchaser (and/or its designee) of the Aggregate Sale Shares and Rollover Shares;

(iii) the shareholders' registry of the Rajax Domestic Company, Xiaodu Shenghuo, Xunda and Xinchi, each of which certified to be a true and correct copy by the Company, where the Purchaser's designated individual is, as of the Closing Date, recorded as the holder of 100% of the equity interest of such Group Companies;

(iv) the original (or if the original is not available, copy) of each of the current version of the constitutional documents (including the articles of association, shareholders agreement, limited partnership agreement and all amendments thereto) of each Group Company;

(v) the official chop, financial chop and contract chop of each Group Company and all other chops capable of representing any Group Company (if any), the books and accounts of each Group Company;

(vi) the originals and all duplicates of the current business license of each PRC Group Company;

(vii) the originals of the IC card foreign exchange registration certificate (IC卡外汇登记证), the permits for opening bank accounts (银行开户许可证), the bank account signature cards (银行印鉴卡), and the USB Keys (U盾) to operate all existing bank accounts of each PRC Group Company (if applicable); and

19

(viii) the originals of all the forms and documents required by the relevant banks to effect the change of authorized signatures to all bank accounts of each Group Company, duly affixed with the company chop of such Group Company.

(c) Closing Deliverables by Purchaser. At the Closing, subject to the terms and conditions hereunder, Purchaser shall, subject to the receipt by Purchaser or its representative of each of the documents required to be delivered by each of the Selling Shareholders, the Rollover Option Holders and the Rollover Shareholder, as applicable, pursuant to Section 2.03(a) and the Company pursuant to Section 2.03(b):

(i) pay or cause to be paid to the Paying Agent cash in an amount equal to (A) the sum of (x) the Aggregate Purchase Price payable to all Selling Shareholders (other than the Former Company Share Award Holders), (y) the relevant portion of the Aggregate Purchase Price payable in cash to all Former Company Share Award Holders, and (z) the relevant portion of the aggregate Rollover Purchase Prices payable in cash to all Rollover Option Holders, in each case of (y) and (z), in accordance with Section 2.06 and the Deferred Payment Agreements except as otherwise provided in, and subject to the terms of, the Deferred Payment Agreements, *minus* (B) the sum of (x) the Tax Escrow Amount, (y) the Audit and Indemnity Escrow Amount and (z) the aggregate amounts payable in cash to all Former Company Share Award Holders and Rollover Option Holders after the Closing pursuant to the Deferred Payment Agreements (such cash being hereinafter referred to as the "Payment Fund"); provided that Purchaser shall remain liable for payment of Purchase Price to each Selling Shareholder, and Rollover Purchase Price to each Rollover Option Holder, following the Closing subject to and in accordance with the terms and conditions of this Agreement and, in the case of the Former Company Share Award Holders and Rollover Option Holders, the relevant Deferred Payment Agreements;

(ii) pay or cause to be paid to the Escrow Agent, in accordance with the Escrow Agreement, an amount equal to the sum of the Tax Escrow Amount and the Audit and Indemnity Escrow Amount, by wire transfer of immediately available funds to the Tax Escrow Account and the Audit and Indemnity Escrow Account, respectively; and

(iii) issue a share certificate in the name of the Rollover Shareholder, dated as of the Closing Date and duly executed by Purchaser, evidencing the ownership by the Rollover Shareholder of the Purchaser Shares.

SECTION 2.04 Escrow Arrangements.

(a) The Parties agree that an aggregate amount equal to ten percent (10%) of the Aggregate Purchase Price, as apportioned among the Selling Shareholders as set out in Column 5 of Schedule II (including Appendix A thereto) (the "Tax Escrow Amount"), shall be deducted from the Aggregate Purchase Price payable at Closing and deposited in an escrow account (the "Tax Escrow Account") at the Closing pursuant to an escrow agreement (the "Escrow Agreement") to be entered into among JPMorgan Chase Bank, N.A. (the "Escrow Agent"), Purchaser and the Shareholders Representative. Purchaser and the Shareholders Representative shall enter into the Escrow Agreement with the Escrow Agent as promptly as practicable following the date hereof. Any administrative fees and expenses of the Escrow Agent ("Tax Escrow Fees") will be paid using funds distributed from the Tax Escrow Account (for the avoidance of doubt, each Selling Shareholders' obligation to the Tax Escrow Fees shall be several but not joint). The Tax Escrow Fees will be allocated among each of the Selling Shareholders in accordance with its Seller Pro Rata Share thereof. After a Selling Shareholder (or Purchaser, on behalf of such Selling Shareholder) has filed the Tax Returns in accordance with Section 7.08, the relevant Tax Escrow Amount allocated to such Selling Shareholder (net of such Selling Shareholder's allocated portion of the Tax Escrow Fees) shall be (and Purchaser shall deliver written instructions to instruct the Escrow Agent to cause the relevant Tax Escrow Amount to be): (i) released and paid to the Relevant PRC Tax Authority to settle any Selling Tax of such Selling Shareholder directly from the Tax Escrow Account pursuant to written instruction by Purchaser to the Escrow Agent, subject to the prior written consent of such Selling Shareholder or the Shareholders Representative, within five (5) Business Days after Purchaser has received an explanation letter prepared by the Qualified Tax Advisor together the account details of the tax collection account of such Relevant PRC Tax Authority, with any balance remaining out of such relevant portion of the Tax Escrow Amount to be concurrently released and distributed to such Selling Shareholder within ten (10) Business Days thereafter, (ii) released and distributed to such Selling Shareholder within ten (10) Business Days after Purchaser has received the tax payment receipt ("税收缴款书" in Chinese) or such other adequate evidence to its reasonable satisfaction that such Selling Shareholder has fully paid the relevant Selling Tax, or (iii) released and distributed to such Selling Shareholder within ten (10) Business Days after Purchaser has received adequate evidence to its reasonable satisfaction that no such Taxes are required to be paid by such Selling Shareholder in connection with the Transactions.

20

(b) The Parties further agree that an aggregate amount equal to nine percent (9%) of the Aggregate Purchase Price, as apportioned among each Selling Shareholder as set out in Column 6 of Schedule II (including Appendix A thereto) (the "Audit and Indemnity Escrow Amount"), shall be deducted from the Aggregate Purchase Price payable at Closing and deposited in an escrow account (the "Audit and Indemnity Escrow Account") at the Closing pursuant to the Escrow Agreement. Any administrative fees and expenses of the Escrow Agent ("Audit and Indemnity Escrow Fees") will be paid using funds distributed from the Audit and Indemnity Escrow Account (for the avoidance of doubt, each Selling Shareholders' obligation to the Audit and Indemnity Escrow Fees shall be several but not joint). The Audit and Indemnity Escrow Fees will be allocated among each of the Selling Shareholders in accordance with its Seller Pro Rata Share thereof. The Escrow Agent shall make disbursements from the Audit and Indemnity Escrow Account pursuant to written instruction by Purchaser to the Escrow Agent in accordance with Section 2.05 and Section 9.04.

SECTION 2.05 Post-Closing Audit Adjustment.

(a) The Per Share Purchase Price is based on the enterprise valuation of the Group Companies as of 11:59 p.m. (Hong Kong time) on the Benchmark Date being equal to US$9,500,000,000. The Aggregate Purchase Price is subject to the Benchmark Date Net Debt being not greater than US$446,245,236 (the "Maximum Net Debt Amount"). In the event that the Benchmark Date Net Debt is greater than the sum of (i) the Maximum Net Debt Amount and (ii) US$10,000,000 (such excess amount, the "Audit Difference"), the Aggregate Purchase Price shall be reduced by the entire amount of the Audit Difference (such reduction to be effected in respect of the Purchase Price payable to each Selling Shareholder through a reduction in the Audit and Indemnity Escrow Amount allocated to each Selling Shareholder) in accordance with the terms of this Section 2.05.

22

(b) After the Closing Date, Purchaser shall engage PricewaterhouseCoopers and/or its PRC domestic affiliates (the "Accounting Firm") to audit the consolidated balance sheet, statement of income and statement of cash flows of the Group as of and for the period beginning on January 1, 2018 and ending as of the Closing Date in conformity with the Accounting Standards (the "Closing Audit"). Purchaser shall direct the Accounting Firm to deliver to Purchaser and the Shareholders Representative, as soon as practicable following the Closing Date but in any event within sixty (60) days after the Closing Date, a statement based on the results of the Closing Audit (the "Accounting Firm Determination") setting forth the Accounting Firm's calculation of (i) the Benchmark Date Net Debt calculated in accordance with the Calculation Principles and (ii) the Audit Difference, if any. For the avoidance of doubt, in the event that the Benchmark Date Net Debt set forth in the Accounting Firm Determination is equal to or less than the sum of (i) the Maximum Net Debt Amount and (ii) US$10,000,000, there shall be no Audit Difference.

(c) The Company shall, and Purchaser, the Company, the Principals and the Principal Holdcos shall cause each Group Company to, provide the Accounting Firm with reasonable access to all relevant books and records and other documents, personnel and representatives of the Group Companies and other items reasonably requested by the Accounting Firm in connection with the Closing Audit or for purposes of delivering the Accounting Firm Determination, and such Parties shall otherwise reasonably cooperate with the Accounting Firm in connection therewith. Notwithstanding anything to the contrary contained in this Agreement, the fees and expenses of the Accounting Firm shall be borne by each of the Selling Shareholders and the Rollover Shareholder, severally but not jointly, based on their respective Shareholder Pro Rata Shares.

(d) The Parties agree that (i) the Accounting Firm Determination shall be deemed to be final, conclusive, binding and non-appealable, absent fraud or manifest error, (ii) the procedures set forth in this Section 2.05 shall be the sole and exclusive remedy with respect to the determination as to whether there is an Audit Difference and (iii) the Accounting Firm Determination shall be enforceable as an arbitral award, and judgment may be entered thereupon in any court having jurisdiction over the Party against which such determination is to be enforced.

(e) In the event that an Audit Difference is determined pursuant to this Section 2.05, Purchaser shall deliver written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Purchaser an aggregate amount equal to (i) the Audit Difference multiplied by (ii) the Aggregate Selling Shareholders Percentage (the "Audit Difference Payment"). The Audit and Indemnity Escrow Amount allocated to each Selling Shareholder shall be reduced by an amount equal to its Seller Pro Rata Share of the Audit Difference Payment (the "Pro Rata Audit Difference"). After any disbursements required to be made to Purchaser pursuant to this Section 2.05(e) have been made, any remaining Audit and Indemnity Escrow Amount allocated to each Selling Shareholder shall remain in the Audit and Indemnity Escrow Amount for purposes of satisfying such Selling Shareholder's indemnification obligations pursuant to Section 9.03 and Section 9.04.

22

(f) On the date immediately following the second (2nd) year anniversary of the Closing, but subject to any disbursements required to be made to Purchaser pursuant to (i) Section 2.05(e) and (ii) Section 9.03 and Section 9.04 with respect to any Undisputed Indemnity Amount of any pending claims thereunder, Purchaser shall deliver written instructions to the Escrow Agent instructing the Escrow Agent to deliver to each Selling Shareholder any then remaining Audit and Indemnity Escrow Amount allocated to such Selling Shareholder, less the amount of any then pending but unresolved claims which are supported by reasonable evidence of such claimed amount under Section 9.03 which shall be held in the Audit and Indemnity Escrow Account until resolved in accordance with Section 9.04 and distributed accordingly.

SECTION 2.06 Company Share Awards; ESOP.

(a) As soon as practicable following the date hereof, the Board or the compensation committee of the Board, as applicable, shall (i) terminate the ESOP and any relevant award agreements applicable to the ESOP, as of the Closing, (ii) cancel each Company Share Award that is outstanding and unexercised (including the Rollover Employee Options, subject to Section 2.06(b)), whether or not vested or exercisable, as of the Closing, and (iii) otherwise effectuate the provisions of this Section 2.06. From and after the Closing, neither Purchaser nor the Company shall be required to issue any Ordinary Shares, other share capital of the Company or any other consideration (other than as required pursuant to the Deferred Payment Agreements referenced in this Section 2.06) to any Person pursuant to or in settlement of any Company Share Award.

(b) Prior to the Closing, Purchaser and the Company shall agree with each other and enter into a written confirmation letter (the "Rollover Employee Option Confirmation Letter"), setting forth (i) a list of each holder of Rollover Employee Options (each such holder, a "Rollover Option Holder" and collectively, the "Rollover Option Holders"), (ii) the number of Rollover Employee Options held by such Rollover Option Holder, (iii) the number of Ordinary Shares underlying such Rollover Employee Options, (iv) the aggregate purchase price in U.S. Dollars payable to such Rollover Option Holder (which reflects a purchase price per Ordinary Share underlying such Rollover Employee Options equal to the Per Share Purchase Price) (the "Rollover Purchase Price"), (v) the relevant Tax Escrow Amount allocated to such Rollover Option Holder, and (vi) the relevant Audit and Indemnity Escrow Amount allocated to such Rollover Option Holder, in each case of clauses (v) and (vi) determined in accordance with the Relevant Obligations, subject to Section 2.06(c). In exchange for the cancellation of each Rollover Option Holder's Rollover Employee Options, such Rollover Option Holder shall have the right to (i) receive a cash payment of all or a portion of the Rollover Purchase Price payable to such Rollover Option Holder at the Closing (subject to further reduction and deferral of a portion of such cash payment in accordance with the applicable Deferred Payment Agreement) and/or, (ii) in lieu of receiving a cash payment of a portion of such Rollover Purchase Price, roll over and exchange all or a portion of their Rollover Employee Options into Equity Securities of an Affiliate of Purchaser, in each case subject to the terms and conditions of this Agreement and a Deferred Payment Agreement to be executed and delivered by such Rollover Option Holder and Purchaser in accordance with the terms hereof.

(c) Notwithstanding anything to the contrary contained herein and without prejudice to the express obligations of the Rollover Option Holders hereunder, and subject to the applicable Deferred Payment Agreement of each Rollover Option Holder, the obligations of and provisions binding on each Selling Shareholder pursuant to Section 2.04, Section 2.05, Section 7.08, Section 7.15, Section 7.17, Section 7.18, Section 9.03, Section 9.04, Section 9.05 and Section 9.06 (collectively, the "Relevant Obligations") shall apply, *mutatis mutandis,* to each Rollover Option Holder as if references therein (i) to the Selling Shareholders, individually or collectively, were to Rollover Option Holders, individually or collectively, as applicable, (ii) to the Sale Shares of a Selling Shareholder and the Aggregate Sale Shares of all Selling Shareholders were to the Ordinary Shares underlying the Rollover Employee Options held by a Rollover Option Holder and the aggregate Ordinary Shares underlying the Rollover Employee Options held by all Rollover Option Holders, respectively, for purposes of determining the Aggregate Selling Shareholders Percentage, Seller Pro Rata Share and Shareholder Pro Rata Share in the Relevant Obligations, (iii) to the Purchase Price payable to a Selling Shareholder and the Aggregate Purchase Price payable to all Selling Shareholders were to the Rollover Purchase Price payable to each Rollover Option Holder and the aggregate Rollover Purchase Prices payable to all Rollover Option Holders, respectively, solely for purposes of Section 2.04, Section 2.05 and Section 9.06, and (iv) to any information under Schedule II were to the relevant information under the Rollover Employee Option Confirmation Letter, and references to each other defined term as used therein shall be construed accordingly. For the avoidance of doubt, with respect to the Sections providing for the Relevant Obligations and any defined term used therein, (i) each Rollover Option Holder shall be deemed a "Selling Shareholders" for the purposes thereof, (ii) the Ordinary Shares underlying the Rollover Employee Options shall be deemed "Sale Shares", and shall be counted towards the "Aggregate Sale Shares", for the purposes of determining the Aggregate Selling Shareholders Percentage, Seller Pro Rata Share and Shareholder Pro Rata Share in the Relevant Obligations; and (iii) the Rollover Purchase Price payable to each Rollover Option Holder shall be deemed "Purchase Price" and shall be counted towards the "Aggregate Purchase Price", solely for purposes of Section 2.04, Section 2.05 and Section 9.06. Each Rollover Option Holder agrees to be bound by each of the Relevant Obligations.

23

(d) As soon as practicable following the date hereof and prior to the Closing, each of the Former Company Share Award Holders and Rollover Option Holders, on the one hand, and Purchaser, on the other hand, shall enter into one or more agreements in a form agreed between Purchaser and the Company (each, a "Deferred Payment Agreement"), pursuant to which such Former Company Share Award Holder or Rollover Option Holder, as applicable, will agree to (i) defer its receipt in cash of a portion of the Purchase Price or Rollover Purchase Price, as applicable, payable to such Person for specified periods of time and be subject to certain restrictions and conditions to the receipt of such deferred portion of the Purchase Price or Rollover Purchase Price, as applicable, and/or (ii) in lieu of receiving a cash payment of a portion of such Purchase Price or Rollover Purchase Price, as applicable, roll over and exchange all or a portion of its Rollover Employee Shares or Rollover Employee Options, as applicable, into Equity Securities of an Affiliate of Purchaser and be subject to certain restrictions and conditions applicable thereto. As soon as practicable after Purchaser and the Company have agreed on the form of the Deferred Payment Agreements and prior to the Closing, the Company shall (A) prepare and distribute to each Former Company Share Award Holder and Rollover Option Holder the applicable Deferred Payment Agreement, (B) cause each Former Company Share Award Holder and holder of Rollover Employee Options to execute the applicable Deferred Payment Agreement prior to the Closing, and (C) deliver all such executed Deferred Payment Agreements to Purchaser. Prior to the Closing, Purchaser shall execute each of the Deferred Payment Agreements which has been duly executed by the Former Company Share Award Holders and holders of Rollover Employee Options, as applicable, and delivered by the Company to Purchaser. As soon as practicable following the date hereof and in any event prior to the Closing, the Company shall cause each Exercising Company Share Award Holder and Rollover Option Holder to deliver to Purchaser and the Shareholders Representative a counterpart, duly executed by such Person, to this Agreement.

24

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Subject to such exceptions as may be specifically set forth in the Company Disclosure Schedule delivered by the Company Parties to Purchaser as of the date hereof and attached to this Agreement as Schedule VII (the "Company Disclosure Schedule"), each of the Warrantors jointly and severally represents and warrants to Purchaser that the following representations and warranties are true and correct as of the date hereof and as of the Closing Date:

SECTION 3.01 Organization, Good Standing and Qualification. Each Group Company is duly organized, validly existing and in good standing (or equivalent status in the relevant jurisdiction) under, and by virtue of, the Laws of the place of its incorporation or establishment and has all requisite power and authority to own its properties and assets and to carry on its business as now conducted and as proposed to be conducted, and to perform each of its obligations under each of the Transaction Documents, the Control Documents and the Supplemental Control Documents to which it is a party. Except as set forth in Section 3.01 of the Company Disclosure Schedule, each Group Company is qualified to do business in the manner presently conducted and is in good standing (or equivalent status in the relevant jurisdiction) in each jurisdiction where failure to be so qualified would be a Material Adverse Effect. Except as disclosed in Section 3.01 of the Company Disclosure Schedule, each Group Company that is a PRC entity has a valid business license issued by the SAIC or its local branch or other relevant Governmental Authorities, and has, since its establishment, carried on its business in compliance with the business scope set forth in its business license.

SECTION 3.02 Capitalization and Voting Rights.

(a) Company. Immediately prior to the Closing, the authorized share capital of the Company shall be US$500,000 divided into (a) a total of 26,962,943,820 authorized Ordinary Shares, 2,079,515,800 (subject to any change due to any exercise of Company Options prior to the Closing) of which are issued and outstanding and 13,037,056,180 of which have been reserved for issuance upon conversion of the Preferred Shares, (b) a total of 13,037,056,180 authorized Preferred Shares, 449,999,920 of which are designated as Series A Preferred Shares, all of which are issued and outstanding; 350,000,000 of which are designated as Series B Preferred Shares, all of which are issued and outstanding; 555,555,520 of which are designated as Series C Preferred Shares, all of which are issued and outstanding; 592,074,960 of which are designated as Series D Preferred Shares, all of which are issued and outstanding; 1,833,333,278 of which are designated as Series E Preferred Shares, all of which are issued and outstanding; 1,528,943,088 of which are designated as Series F Preferred Shares, all of which are issued and outstanding; 2,974,476,361 of which are designated as Series F-1 Preferred Shares, all of which are issued and outstanding; 1,865,592,383 of which are designated as Series G Preferred Shares, 782,937,131 of which are issued and outstanding, and 2,887,080,670 of which are designated as Series G-1 Preferred Shares, 2,314,175,599 of which are issued and outstanding immediately prior to the Closing. Section 3.02(a) of the Company Disclosure Schedule sets forth the capitalization table of each Group Company (other than the Company) as of immediately prior to the Closing, reflecting all then outstanding and authorized Equity Securities of such Group Company, the record and beneficial holders thereof, the issuance date, and the terms of any vesting applicable thereto. Schedule III of this Agreement sets forth the capitalization table of the Company, on a fully-diluted and as-converted basis immediately before the Closing.

25

(b) <u>Xiaodu Cayman Company</u>. The authorized share capital of the Xiaodu Cayman Company is, as of the date of this Agreement, US$50,000, divided into 5,000,000,000 shares of US$ 0.00001 each, 1 of which is issued and outstanding and held by the Company.

(c) <u>Rajax HK Subsidiary</u>. The authorized share capital of the Rajax HK Subsidiary is, as of the date of this Agreement, HK$1,000, divided into 10,000,000 shares, all of which is issued and outstanding and held by the Company.

(d) <u>Xiaodu HK Company</u>. The authorized share capital of the Xiaodu HK Company is, as of the date of this Agreement, HK$1, divided into 1 share, all of which is issued and outstanding and held by the Xiaodu Cayman Company.

(e) <u>WFOE</u>. The registered capital of each WFOE is set forth opposite its name on <u>Section 3.02(e)</u> of the Company Disclosure Schedule, together with an accurate list of the record and beneficial owners of such registered capital.

(f) <u>Rajax WFOE Subsidiary</u>. The registered capital of the Rajax WFOE Subsidiary is set forth opposite its name on <u>Section 3.02(f)</u> of the Company Disclosure Schedule, together with an accurate list of the record and beneficial owners of such registered capital.

(g) <u>Domestic Company</u>. The registered capital of each Domestic Company is set forth opposite its name on <u>Section 3.02(g)</u> of the Company Disclosure Schedule, together with an accurate list of the record and SAIC registered owners of such registered capital.

(h) <u>No Other Securities</u>. Except as set forth in <u>Section 3.02(h)</u> of the Company Disclosure Schedule and for (i) the conversion privileges of the Preferred Shares provided in the Charter Documents of the Company as currently in effect, (ii) certain rights expressly provided in the Charter Documents of the Company as currently in effect, and (iii) certain rights expressly provided in this Agreement, the Memorandum and Articles, the Shareholders Agreement, the ROFR Agreement, the Share Restriction Agreements, the Control Documents and the Supplemental Control Documents, as of the date of this Agreement and at the Closing, (x) there are no other authorized or outstanding Equity Securities of any Group Company; (y) no Equity Securities of any Group Company are subject to any preemptive rights, rights of first refusal (except to the extent provided by applicable PRC Laws) or other rights to purchase such Equity Securities or any other rights with respect to such Equity Securities, and (z) no Group Company is a party or subject to any Contract that affects or relates to the voting or giving of written consents with respect to, or the right to cause the redemption, or repurchase of, any Equity Security of such Group Company. Except as set forth in the Shareholders Agreement, the Company has not granted any registration rights or information rights to any other Person (except to the extent provided by applicable PRC Laws), nor is the Company obliged to list any of the Equity Securities of any Group Companies on any securities exchange. Except as contemplated under the Transaction Documents, the Control Documents and the Supplemental Control Documents, there are no voting or similar agreements which relate to the share capital or registered capital of any Group Company. Other than the ESOP, no Group Company is bound by any equity incentive plan. There are no commitments or agreements of any character to which any Group Company is bound obligating any Group Company to accelerate or otherwise alter the vesting of any Company Share Award as a result of the Transactions, and each Company Share Award may, by its terms, be treated at the Closing as set forth in <u>Section 2.06</u>.

26

(i) <u>Issuance and Status</u>. All presently outstanding Equity Securities of each Group Company were duly and validly issued (or subscribed for) in compliance with all applicable Laws, preemptive rights of any Person, and applicable Contracts. Except for those disclosed in <u>Section 3.02(i)</u> of the Company Disclosure Schedule, all share capital or registered capital, as the case may be, of each Group Company have been duly and validly issued, are fully paid (or subscribed for) and non-assessable, and are and as of the Closing shall be free of any and all Liens (except for any restrictions on transfer under the Control Documents, the Shareholders Agreement, the ROFR Agreement, the Memorandum and Articles and applicable Laws). Except as contemplated under the Transaction Documents, the Control Documents, the Supplemental Control Documents and set forth in <u>Section 3.02(i)</u> of the Company Disclosure Schedule, there are no (i) resolutions pending to increase the share capital or registered capital of any Group Company or cause the liquidation, winding up, or dissolution of any Group Company, nor has any distress, execution or other process been levied against any Group Company, (ii) dividends which have accrued or been declared but are unpaid by any Group Company, (iii) obligations, contingent or otherwise, of any Group Company to repurchase, redeem, or otherwise acquire any Equity Securities, or (iv) outstanding or authorized equity appreciation, phantom equity, equity plans or similar rights with respect to any Group Company.

(j) <u>Title</u>. Except disclosed <u>Section 3.02(j)</u> of the Company Disclosure Schedule, the Shares held by the Principal Holdcos are free and clear of all Liens of any kind other than those arising under applicable Law or as set forth in the Transaction Documents, Control Documents, the Supplemental Control Documents or the Memorandum and Articles.

(k) <u>Company Share Awards</u>. <u>Section 3.02(k)</u> of the Company Disclosure Schedule sets forth the following information with respect to each Company Share Award outstanding as of the date hereof: (i) the name of the Company Share Award recipient; (ii) the particular ESOP or RSU tranche pursuant to which such Company Share Award was granted and the type of such Company Share Award; (iii) the number and type of Ordinary Shares subject to such Company Share Award; (iv) the exercise or purchase price of such Company Share Award; (v) the date on which such Company Share Award was granted; (vi) the vesting schedule or other vesting conditions, if any, of each such Company Share Award; and (vii) the date on which such Company Share Award expires. The Company has made available to the Purchaser Parties accurate and complete copies of (x) the ESOP and the agreements documenting the RSU tranches pursuant to which the Company has granted the Company Share Awards that are currently outstanding, (y) the form of all award agreements evidencing such Company Share Awards and (z) any award agreements evidencing any Company Share Award with terms that are materially different from those set forth in the form of award agreement.

27

SECTION 3.03 Corporate Structure; Subsidiaries. Section 3.03 of the Company Disclosure Schedule sets forth a complete structure chart showing the Group Companies, and indicating the ownership and Control relationships among all Group Companies, the nature of the legal entity which each Group Company constitutes, the jurisdiction in which each Group Company was organized, and each jurisdiction in which each Group Company is required to be qualified or licensed to do business as a foreign Person. No Group Company owns or Controls, or has ever owned or Controlled, directly or indirectly, any Equity Security, interest or share in any other Person or is or was a participant in any joint venture, partnership or similar arrangement. No Group Company is obligated to make any investment in or capital contribution in or on behalf of any other Person. The Company was formed solely to acquire and hold the equity interests in the Rajax HK Subsidiary and Xiaodu Cayman Company. The Rajax HK Subsidiary was formed solely to acquire and hold the equity interests in the Rajax WFOE. The Xiaodu Cayman Company was formed solely to acquire and hold the equity interests in the Xiaodu HK Company. The Xiaodu HK Company was formed solely to acquire and hold the equity interests in the Xiaodu WFOE. Except for those disclosed in Section 3.03 of the Company Disclosure Schedule, neither the Company nor the Rajax HK Subsidiary, the Xiaodu Cayman Company, the Xiaodu HK Company has engaged in any other business and has not incurred any Liability since its formation. Each of the PRC Group Companies is engaged in the Business (as defined in the Shareholders Agreement) and has no other business. Except for those disclosed in Section 3.03 of the Company Disclosure Schedule, no Principal and no Person owned or Controlled by any Principal (other than a Group Company), is engaged in the Business or has any assets in relation to the Business or any Contract with any Group Company. All the historical changes to the share capital of each of the Group Companies and historical transfers of equity interest in each of the Group Companies were made in compliance with the applicable Laws and applicable Contracts, and there are no outstanding Liabilities in connection with such historical changes or historical transfers. Except for the Principal Holdcos, the Group Companies or otherwise as disclosed in Section 3.03 of the Company Disclosure Schedule, none of the Principals owns, directly or indirectly, legally or beneficially, any equity or other ownership interest in any Person (excluding companies whose shares are publicly traded on a recognized securities exchange).

SECTION 3.04 Authorization. Except as otherwise disclosed in Section 3.04 of the Company Disclosure Schedule, each Warrantor has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party and to carry out and perform its obligations thereunder. All action on the part of each party to the Transaction Documents (other than the Purchaser Parties) (and, as applicable, its officers, directors and shareholders) necessary for the authorization, execution and delivery of the Transaction Documents and the performance of all obligations of each such party (including approval of the Transaction Documents and the Transactions, as applicable, by the Board, Rollover Shareholder, the Majority Ordinary Holders and the Majority Preferred Holders, in each case, in accordance with the Memorandum and Articles, the Shareholders Agreement and the ROFR Agreement) has been taken or will be taken prior to the Closing. Each of the Transaction Documents has been, or will be on or prior to the Closing, duly executed and delivered by each party thereto (other than the Purchaser Parties) and constitutes valid and legally binding obligations of such party, enforceable against such party in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies; and for (iii) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws.

28

SECTION 3.05 <u>SAFE Rules and Regulations; Consents; No Conflicts</u>. Except for those disclosed in <u>Section 3.05</u> of the Company Disclosure Schedule, all SAFE Rules and Regulations have been fully complied with and all requisite approvals or registration certificates required under the SAFE Rules and Regulations in relation thereto have been duly and lawfully obtained and are in full force and effect, and to the Knowledge of the Company Parties, there exist no grounds on which any such approval or registration certificate may be cancelled or revoked or the PRC Group Companies or their respective legal representative may be subject to liability or penalties for misrepresentations or failures to disclose information to the issuing SAFE. None of the Company Parties has received any oral or written inquiries, notifications, orders or any other forms of official correspondence from SAFE with respect to any actual or alleged non-compliance with the SAFE Rules and Regulations. Except as set forth in <u>Section 3.05</u> of the Company Disclosure Schedule, all Consents from or with any Governmental Authority or any other Person required in connection with the valid execution, delivery and performance of the Transaction Documents, and the consummation of the transactions contemplated by the Transaction Documents, in any case on the part of any party thereto (other than the Purchaser Parties), have been duly obtained or completed (as applicable) and are in full force and effect. Except as set forth in <u>Section 3.05</u> of the Company Disclosure Schedule, the execution, delivery and performance of each Transaction Document by each party thereto (other than the Purchaser Parties), and the consummation by such party of the transactions contemplated thereby, do not and will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any Consent under, or give any Person rights of termination, amendment, acceleration or cancellation under, with or without the passage of time or the giving of notice, any Governmental Order, any provision of the Charter Documents of any Group Company, the Shareholders Agreement, the ROFR Agreement, any applicable Laws (including without limitation, Order No. 10 and the SAFE Rules and Regulations), or any Material Contract, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, any Group Company (including without limitation, any indebtedness of such Group Company), or (iii) result in the creation of any Lien upon any of the material properties or assets of any Group Company other than Permitted Liens.

SECTION 3.06 <u>Compliance with Laws; Consents</u>.

(a) Except as disclosed in the <u>Section 3.06(a)</u> of the Company Disclosure Schedule, each Group Company is in compliance in all material respects with all applicable Laws, including without limitation, the Specified Laws. The business of each Group Company as now conducted and as presently planned to be conducted are in compliance in all material respects with all applicable Laws, including without limitation, the Specified Laws. No event has occurred and no circumstance exists that (with or without notice or lapse of time) (a) may constitute or result in a material violation by any Group Company of, or a failure on the part of such entity to comply with, any applicable Laws, including without limitation, any Specified Laws, in any material respect, or (b) may give rise to any material obligation on the part of any Group Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature. None of the Group Companies has received any notice from any Governmental Authority regarding any of the foregoing. To the Knowledge of the Company Parties, no Group Company is under investigation with respect to a material violation of any Law.

29

(b) Except as set forth in Section 3.06(b) of the Company Disclosure Schedule, all Consents from or with the relevant Governmental Authority required in respect of the due and proper establishment and operations of each Group Company as now conducted (collectively, the "Required Governmental Consents"), have been duly obtained or completed in accordance with all applicable Laws. Section 3.06(b) of the Company Disclosure Schedule sets forth a complete list of such Required Governmental Consents (or, with respect to the Stores, such material Required Governmental Consents) which each of the Group Companies has obtained, together with, except in the case of the Stores, the name of the entity issuing each such Required Governmental Consent. Without limiting the generality of the foregoing, each Store that has commenced operations at any time prior to the applicable Closing has duly obtained both the business license (营业执照) and the food operation license (食品经营许可证) from the relevant Governmental Authorities and has completed its respective environmental assessment (if applicable).

(c) Except as set forth in the Company Disclosure Schedule, no Required Governmental Consent contains any materially burdensome restrictions or conditions, and each Required Governmental Consent is in full force and effect and will remain in full force and effect upon the consummation of the transactions contemplated hereby. None of the Group Companies is in material default under any Required Governmental Consent. To the Knowledge of the Company Parties, there is no reason to believe that any Required Governmental Consent which is subject to periodic renewal will not be granted or renewed. No Group Company has received any letter or other written communication from any Governmental Authority threatening or providing notice of revocation of any Required Governmental Consent issued to any Group Company or the need for compliance or remedial actions in respect of the activities carried out directly or indirectly by any Group Company.

SECTION 3.07 Tax Matters. Except as disclosed in the applicable subsection of Section 3.07 of the Company Disclosure Schedule:

(a) All Tax Returns required to be filed on or prior to the date hereof with respect to each Group Company has been duly and timely filed (taking into account any extension of time to file granted or obtained) by such Group Company in accordance with the applicable Laws and all such Tax Returns are true, correct and complete in all material respects and were prepared in compliance with all applicable Laws. Each Group Company has paid in full all Taxes (whether or not shown on any Tax Return) required to be paid by it, except such Taxes, if any, as are being contested in good faith and as to which adequate reserve (determined in accordance with the Accounting Standards) have been provided in the Financial Statements. No deficiencies for any Taxes with respect to any Tax Returns have been asserted in writing by, and no notice of any pending action with respect to such Tax Returns has been received from, any Tax authority, and no dispute relating to any Tax Returns with any such Tax authority is outstanding or contemplated. Each Group Company has paid all Taxes owed by it which are due and payable (whether or not shown on any Tax Return) and withheld and timely remitted to the appropriate Governmental Authority all Taxes which it is obligated to withhold and remit from amounts owing to any employee, creditor, customer or any other Person.

30

(b) The provisions for Taxes in the Financial Statements fully reflect all unpaid Taxes of each Group Company (as determined in accordance with the Accounting Standards and the applicable Tax Laws), whether or not assessed or disputed as of the date of the applicable Financial Statements. The unpaid Taxes of any Group Company (i) did not, as of the date of the applicable Financial Statements, exceed the reserve for Tax liability (which shall not include any reserve established for deferred Taxes to reflect timing differences between book and Tax income) set forth on the face of the applicable Financial Statements (rather than in any notes thereto) and (ii) do not exceed that reserve as adjusted for the passage of time through the date of the Closing in accordance with the past custom and practice of each Group Company in filing its Tax Returns.

(c) No tax audits or administrative or judicial Tax proceedings by any Governmental Authority with respect to any Group Company is currently in progress, nor has any Group Company received any written notice issued by any Governmental Authority threatening the commencement of such foregoing proceedings. No assessment of Tax has been proposed in writing against any Group Company or any of their assets or properties. No Group Company has received from any Governmental Authority (including jurisdictions where such Group Company has not filed Tax Returns) any (i) notice indicating an intent to open audit or other review, (ii) request for information related to Tax matters, or (iii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Governmental Authority against such Group Company. No Group Company is subject to any waivers or extensions of applicable statutes of limitations with respect to Taxes for any year. Except for extensions applied for and granted in the ordinary practice of the applicable jurisdiction, no Group Company currently is the beneficiary of any extension of time within which to file any Tax Return.

(d) No Group Company is being the subject of any examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes that has not been resolved or has received any written notices of any threatened examination or investigation by any Tax authority relating to the conduct of its business or the payment or withholding of Taxes. No Group Company is responsible for the Taxes of any other Person by reason of contract, successor liability, operation of Law or otherwise.

(e) Since the Statement Date, no Group Company has incurred any material Taxes other than in the ordinary course of business consistent with past custom and practice. No Group Company has received any written claim from any Governmental Authority in a jurisdiction where such Group Company does not file Tax Returns that such Group Company is or may be subject to taxation by that jurisdiction. No Group Company is treated as a resident for Tax purposes of, or is otherwise subject to income Tax in, or has branch, permanent establishment, agency of other taxable presence in, any jurisdiction other than the jurisdiction in which it has been established. The Group Companies have fulfilled all the material terms, requirements and criteria for the continuance of all applicable Tax incentives, Tax holidays and Tax rulings, including concessional Tax rate, Tax relief, Tax exemption, Tax refund, Tax credit, and other Tax reduction agreement or order available under any applicable Law. Each such Tax incentives, Tax holidays, Tax rulings and other Tax reduction agreement or order is expected to remain in full effect throughout the current effective period thereof after the Closing and is not subject to reduction, revocation, cancellation or any other changes (including retroactive changes) in the future, and no Group Company has received any notice to the contrary or is aware of any event that may result in repeal, cancellation, revocation, or return of such entitlements. All exemptions, reductions and rebates of material Taxes granted to any Group Company by a Governmental Authority are in full force and effect and have not been terminated. No Group Company will be required to include material amounts in income, or exclude material items of deduction, or qualification for Tax exemption, Tax holiday, Tax credit, Tax incentive or Tax refund, in any taxable period beginning after the date of the Closing as a result of (i) a change in method of accounting occurring on or prior to the date of the Closing, (ii) agreement with any Governmental Authority executed on or prior to the date of the Closing, (iii) installment sale or open transaction disposition made on or prior to the date of the Closing, or (iv) prepaid amount received on or prior to the date of the Closing. The transactions contemplated under this Agreement and the other Transaction Documents to which any Group Company is a party are not in violation of any applicable Law regarding Tax, and will not result in any Tax exemption, Tax holiday, Tax credit, Tax incentive, Tax refund being revoked, cancelled or terminated or trigger any Tax liability for any Group Company. There are no Liens for Taxes (other than Permitted Liens) on any assets of any Group Company.

31

(f) The Group Companies are in compliance with all applicable transfer pricing Laws, including the execution and maintenance of contemporaneous documentation substantiating the transfer pricing practices and methodology of the Group Companies. All of the transactions between any Group Company and any other Related Party have been effected on an arm's length basis. There are no circumstances which have caused or could cause any Governmental Authority to make any transfer pricing adjustment to the profits of any Group Company, or require any such adjustment to be made to the terms on which any such transaction is treated as taking place, and no such adjustment has been made or threatened.

(g) No Group Company is a party to, involved with, bound by or otherwise subject to any Tax sharing, indemnity or allocation agreement or other similar arrangement with any Person (other than a commercial agreement entered into in the ordinary course of business and the principal purpose of which is not the sharing or allocation of Taxes) with respect to Taxes nor does any Group Company owe any amount under any such agreement. No Group Company is a member of an affiliated or combined taxation group with any Person other than the other Group Companies. No Group Company has any Liability for the Taxes of any Person (other than any other Group Company) as a result of such Group Company being part of or owned by, or ceasing to be part of or owned by, an affiliated, combined, consolidated, unitary or other similar group prior to the Closing, as a transferee or successor, by contract or otherwise.

(h) No Group Company has entered into: (i) any transaction the sole or main purpose of which was the avoidance or deferral or reduction of Tax by any Group Company or any associated Person; or (ii) any transaction the objective of which was the exclusion or reduction of the amount of any income, profits, gains, sales, supplies or imports made or enjoyed by any Group Company or any associated Person for any Tax purpose, or the creation or increase of the amount of any deduction, loss, allowance or credit claimed or intended to be claimed by any Group Company or any associated Person for any Tax purpose, that may be challenged, disallowed or investigated by any Governmental Authority.

32

(i) Each Group Company has complied with all statutory provisions rules, regulations, orders and directions in respect of any value added or similar Tax on consumption, has promptly submitted accurate returns, maintains full and accurate records, and has never been subject to any interest, forfeiture, surcharge or penalty and is not a member of a group or consolidation with any other company for the purposes of value added Tax.

(j) No Group Company has entered into any concession, agreements (including agreements for the deferred payment of any Tax liability) or other formal or informal arrangement with any Governmental Authority relating to the Group Companies.

(k) The Company will not be required to pay any Taxes under PRC Law with respect to the transactions contemplated by this Agreement and the other Transaction Documents.

(l) The Company is treated as a corporation for U.S. federal income tax purposes. No Group Company has filed any U.S. Tax election, including any entity classification election pursuant to any applicable U.S. Treasury Regulations. No Group Company is a PFIC, CFC or a U.S. Real Property Holding Corporation. No Group Company anticipates that it will become a PFIC, CFC or a U. S. Real Property Holding Corporation in the foreseeable future. No Group Company owns a less than twenty-five percent (25%) equity interest (by value) in any other entity.

SECTION 3.08 Charter Documents; Books and Records. The Charter Documents of each Group Company are in the form made available to the Purchaser Parties. Each Group Company has been in compliance in all material respects with its Charter Documents, and none of the Group Companies has violated or breached any of their respective Charter Documents in any material respect. Each Group Company maintains its books of accounts and records in the usual, regular and ordinary manner, on a basis consistent with prior practice, and which permits its Financial Statements to be prepared in accordance with the Accounting Standards. The register of members and directors (if applicable) of each Group Company is correct, there has been no notice of any proceedings to rectify any such register, and to the Knowledge of the Company Parties there are no circumstances which might lead to any application for its rectification. All documents requiring to be filed by each Group Company with the applicable Governmental Authority in respect of the relevant jurisdiction in which the relevant Group Companies is being incorporated have been properly made up and filed.

SECTION 3.09 Financial Statements. Section 3.09 of the Company Disclosure Schedule sets forth (a)(i) the audited consolidated balance sheet, statement of income and statement of cash flows for the Group (excluding the Xiaodu Group Companies) as of and for the fiscal year ended December 31, 2016 (the "Statement Date") and (ii) the audited consolidated balance sheet, statement of income and statement of cash flows for the Xiaodu Group as of and for the fiscal year ended on the Statement Date, (b) the unaudited consolidated balance sheet, statement of income and statement of cash flows for the Group as of and for the twelve (12) months ended December 31, 2017 (the "Unaudited 2017 Financial Statements"), and (c) the unaudited consolidated balance sheet, statement of income and statement of cash flows for the Group as of and for the one month ended January 31, 2018 ((a), (b) and (c) collectively, the "Financial Statements"). When delivered pursuant to Section 7.14, the Audited 2017 Financial Statements shall be deemed to be included in the definition of "Financial Statements". Except as otherwise disclosed in Section 3.09 of the Company Disclosure Schedule, the Financial Statements (i) have been prepared in accordance with the books and records of the Group, (ii) fairly present in all material respects the consolidated financial position, results of operations and cash flows of the Group as of the dates and for the periods presented therein, and (iii) were prepared in accordance with the Accounting Standards applied on a consistent basis throughout the periods presented. All of the accounts receivable owing to any of the Group Companies, including without limitation all accounts receivable set forth on the Financial Statements, constitute valid and enforceable claims and are current and collectible in the ordinary course of business in all material respects, net of any reserves shown on the Financial Statements (which reserves are adequate). There are no material contingent or asserted claims, refusals to pay, or other rights of set-off with respect to any accounts receivable of any Group Company.

33

SECTION 3.10 <u>Changes</u>. Since the Statement Date, each Group Company (i) has operated its business in the ordinary course consistent with its past practice, (ii) used its reasonable best efforts to preserve its business, (iii) collected receivables and paid payables and similar obligations in the ordinary course of business consistent with past practice, and (iv) not engaged in any new line of business or entered into any agreement, transaction or activity or made any commitment except those in the ordinary course of business consistent with past practice. Since the Statement Date, no Material Adverse Effect has occurred. Except for those disclosed in <u>Section 3.10</u> of the Company Disclosure Schedule or as expressly provided in the Transaction Documents, since the Statement Date, there has not been:

(a) any purchase, acquisition, sale, lease, disposal of or other transfer of any assets that are individually or in the aggregate material to its business, whether tangible or intangible, other than the purchase or sale of inventory in the ordinary course of business consistent with its past practice;

(b) any acquisition (by merger, consolidation or other combination, or acquisition of stock or assets, or otherwise) of any business or other Person or division thereof, or any sale or disposition of any business or division thereof;

(c) any sale, assignment, exclusive license, or transfer of any Intellectual Property of any Group Company (other than a transfer to the Company or a wholly-owned Group Company);

(d) any waiver, termination, cancellation, settlement or compromise of a valuable right, debt or claim;

(e) any incurrence, creation, assumption, repayment, satisfaction, or discharge of (A) any material Lien (other than Permitted Liens) or (B) any Indebtedness (other than Indebtedness incurred, created, assumed, repaid, satisfied or discharged in the ordinary course of business provided that such Indebtedness in the ordinary course of business of all of the Group Companies does not exceed US$5,000,000 in the aggregate) or guarantee, or the making of any loan or advance (other than reasonable and normal advances to employees for bona fide expenses that are incurred in the ordinary course of business consistent with its past practice), or the making of any investment or capital contribution;

34

(f) any amendment to or termination of any Material Contract, any entering of any new Contract that would have been a Material Contract if in effect on the date hereof, or any amendment to or waiver under any Charter Document;

(g) any change in any compensation arrangement or Contract with any employee of any Group Company, or adoption of any new Benefit Plan, or made any material change in any existing Benefit Plan;

(h) any declaration, setting aside or payment or other distribution in respect of any Equity Securities of any Group Company, or any issuance, transfer, redemption, purchase or acquisition of any Equity Securities by any Group Company;

(i) any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the assets, properties, financial condition, operation or business of any Group Company;

(j) any material change in accounting principles, methods or practices or any revaluation of any of its assets;

(k) except in the ordinary course of business consistent with its past practice, settlement of any claim or assessment in respect of any material Taxes, entry or change of any material Tax election, change of any method of accounting resulting in a material amount of additional Tax or filing of any material amended Tax Return;

(l) any commencement or settlement of any material Action;

(m) any authorization, sale, issuance, transfer, pledge or other disposition of any Equity Securities of any Group Company;

(n) any resignation or termination of any Key Employee of any Group Company or any material group of employees of any Group Company;

(o) any transaction with any Related Party; or

(p) any agreement or commitment to do any of the things described in this Section 3.10.

SECTION 3.11 Actions. Except for those disclosed in Section 3.11 of the Company Disclosure Schedule, there is no Action pending or, to the Knowledge of the Company Parties, adversely affecting any Group Company or any of the Principals or any of the Principal Holdcos with respect to its businesses and there is no judgment or award unsatisfied against any Group Company, nor is there any Governmental Order in effect and binding on any Group Company or their respective assets or properties. There is no Action pending by any Group Company against any third party nor does any Group Company intend to commence any such Action. No Governmental Authority has at any time challenged or questioned in writing the legal right of any Group Company to conduct its business as presently being conducted.

35

SECTION 3.12 <u>Liabilities</u>. Except as disclosed in <u>Section 3.12</u> of the Company Disclosure Schedule, no Group Company has any Liabilities of the type required to be disclosed on a balance sheet except for (i) Liabilities set forth in the balance sheet that have not been satisfied since the Statement Date, and (ii) current Liabilities incurred since the Statement Date in the ordinary course of the Group's business consistent with its past practices and which do not exceed US$500,000 in the aggregate. Except as disclosed in <u>Section 3.12</u> of the Company Disclosure Schedule and for Indebtedness incurred in the ordinary course of business, none of the Group Companies has any Indebtedness that it has directly or indirectly created, incurred, assumed, or guaranteed, or with respect to which the Group Company has otherwise become directly or indirectly liable. None of the Group Companies is a guarantor or indemnitor of any Liabilities of any other Person (other than a Group Company).

SECTION 3.13 <u>Commitments</u>.

(a) Except for the Transaction Documents, the Control Documents and the Supplemental Control Documents, <u>Section 3.13(a)</u> of the Company Disclosure Schedule contains a complete and accurate list of all Material Contracts. "<u>Material Contracts</u>" means, collectively, any Contract to which a Group Company or any of its properties or assets is bound or subject to that (a) involves obligations (contingent or otherwise) or payments in excess of RMB2,000,000 or has an unexpired term in excess of one year, (b) involves Intellectual Property that is material to a Group Company (other than generally-available "off-the-shelf" shrink-wrap Software licenses obtained by the Group on non-exclusive and non-negotiated terms), including without limitation, the licenses, (c) restricts the ability of a Group Company to compete or to conduct or engage in any business or activity or in any territory (including any Contracts containing Restrictive Provisions), (d) relates to the sale, issuance, grant, exercise, award, purchase, repurchase or redemption of any Equity Securities, (e) involves any provisions providing for exclusivity, non-compete, "change in control", "most favored nations", rights of first refusal or first negotiation or similar rights against any Group Company, or grants a power of attorney, agency or similar authority by any Group Company, (f) is with a Related Party, (g) involves Indebtedness, an extension of credit, a guaranty, deed of trust, or the grant of a Lien (other than trade Indebtedness and credits in the ordinary course of business), (h) involves the lease, license or use of assets with an obligation of payment by any Group Company more than RMB150,000 per year, or the disposition or acquisition of a material amount of assets or of a business, (i) involves the waiver, compromise, or settlement of any material dispute, claim, litigation or arbitration, (j) involves the ownership or lease of, title to, use of, or any leasehold or other interest in, any real or personal property (except for personal property leases in the ordinary course of business and involving payments of less than RMB500,000 and real property leases in the ordinary course of business and involving rental payments of less than RMB150,000 per year), including without limitation, the Leases, (k) involves (i) the establishment, contribution to, or operation of a partnership, joint venture, alliance or similar entity, (ii) a sharing of profits or losses (including joint development and joint marketing Contracts), or (iii) any investment in, loan to or acquisition or sale of the securities, equity interests or assets of any Person which is material to the business of a Group Company, (l) is between any of the Domestic Company and another Group Company, (m) is with a Governmental Authority, state-owned enterprise, or sole-source supplier of any material product or service (other than utilities), (n) is a Benefit Plan, or a collective bargaining agreement or is with any labor union or other representatives of the employees, (o) is a brokerage or finder's agreement, or material sales agency, marketing or distributorship Contract, (p) is with the application platforms (including without limitation, the AppStore of Apple Inc. and the Android Market of Google Inc.), (q) relates to business cooperation with any shareholder of the Company or any Affiliate of such shareholder (including but not limited to the Baidu Agreements and the Alibaba Business Cooperation Agreement), or (r) is otherwise material to a Group Company or is one on which a Group Company is substantially dependent.

36

(b) A true, fully-executed copy of each Material Contract including all amendments and supplements thereto has been delivered or otherwise made available to the Purchaser Parties. Except for those disclosed in Section 3.13(b) of the Company Disclosure Schedule, each Material Contract is a valid and binding agreement of the Group Company that is a party thereto, the performance of which does not and will not violate, in any material respects, any applicable Law or Governmental Order, and is in full force and effect and enforceable against the parties thereto, except (x) as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws of general application affecting enforcement of creditors' rights generally, and (y) as may be limited by Laws relating to the availability of specific performance, injunctive relief or other remedies in the nature of equitable remedies, and for (z) where applicable, the recognition and enforcement of arbitral award being subject to relevant Laws. Each Group Company has duly performed all of its obligations in all material respects under each Material Contract to the extent that such obligations to perform have accrued, and no material breach or default, alleged material breach or alleged default, or event which would (with the passage of time, notice or both) constitute a material breach or default thereunder by such Group Company or, to the Knowledge of the Company Parties, any other party or obligor with respect thereto, has occurred, or as a result of the execution, delivery, and performance of the Transaction Documents will occur. No Group Company has given notice (whether or not written) that it intends to terminate a Material Contract or that any other party thereto has breached, violated or defaulted under any Material Contract. No Group Company has received any notice (whether written or not) that it has breached, violated or defaulted under any Material Contract or that any other party thereto intends to terminate such Material Contract.

(c) Each of the JD Agreements has been duly terminated in accordance with its terms (including any provisions therein that purport to survive the termination thereof), and there are no continuing obligations or liabilities under any JD Agreement on the part of any Group Company or other party thereto. No Group Company is a party to any Contract with Jiangsu Jingdong Information Technology Co., Ltd. or any of its Affiliates.

(d) There is no material breach of any covenant or agreement contained in the Alibaba Business Cooperation Agreement by any Warrantor.

(e) No Group Company or any of its properties or assets is bound or subject to any Contract containing Restrictive Provisions.

37

SECTION 3.14 <u>Anti-Bribery, Anti-Corruption, Anti-Money Laundering and Sanctions; Absence of Government Interests</u>.

(a) Each Group Company and their respective directors, officers, employees and other persons acting on their behalf (collectively, "<u>Representatives</u>") are and have been in compliance with all applicable Laws relating to anti-bribery, anti-corruption, anti-money laundering, record keeping and internal controls (collectively, the "<u>Compliance Laws</u>"), including the FCPA. Furthermore, except for those disclosed in <u>Section 3.14</u> of the Company Disclosure Schedule, no Public Official (x) holds an ownership or other economic interest, direct or indirect, in any of the Group Companies or in the contractual relationship formed by this Agreement, or (y) serves as an officer, director or employee of any Group Company. Without limiting the foregoing, neither any Group Company nor any Representative has, directly or indirectly, offered, promised, given, authorized or paid any money or anything of value to any Public Official or to any person under circumstances where any Group Company or Representative knew or ought to have known that all or a portion of such money or thing of value would be offered, given, paid or promised, directly or indirectly, to a Person:

(i) for the purpose of influencing any act or decision of a Public Official in their official capacity; inducing a Public Official to act or omit to act in violation of lawful duties; securing any improper advantage; inducing a Public Official to influence or affect any act or decision of any Governmental Authority; or assisting any Group Company or any Representative in obtaining or retaining business for or with, or directing business to, any Person; or

(ii) in a manner that would constitute a breach of any Compliance Laws.

(b) Each Group Company has maintained complete and accurate books and records, and no assets of any Group Company have been used for the establishment of any unlawful or unrecorded fund of monies or other assets, or for the making of any unlawful or undisclosed payment.

(c) No Group Company or any of its Representatives has ever been found by a Governmental Authority to have violated any criminal or securities Law or is subject to any indictment or any government investigation for bribery. Except for those disclosed in <u>Section 3.14</u> of the Company Disclosure Schedule, none of the beneficial owners of any Equity Securities or other interest in any Group Company or the current or former Representatives of any Group Company are or were Public Officials.

(d) No Group Company or any of its Representatives is a Prohibited Person, and no Prohibited Person will be given an offer to become an employee, officer, consultant or director of any Group Company. No Group Company has conducted or agreed to conduct any business, or entered into or agreed to enter into any transaction with a Prohibited Person.

SECTION 3.15 <u>Title Properties</u>.

(a) <u>Title; Personal Property</u>. Each Group Company has good and valid title to all of its respective assets, whether tangible or intangible (including those reflected in the balance sheet, together with all assets acquired thereby since the Statement Date, but excluding those that have been disposed of since the Statement Date), in each case free and clear of all Liens, other than Permitted Liens. The foregoing assets collectively represent in all material respects all assets (including all rights and properties) necessary for the conduct of the business of each Group Company as presently conducted. Except for leased or licensed assets, no Person other than a Group Company owns any interest in any such assets. Except for those disclosed in <u>Section 3.15(a)</u> of the Company Disclosure Schedule, all leases of real or personal property to which a Group Company is a party are fully effective and afford the Group Company valid leasehold possession of the real or personal property that is the subject of the lease.

38

(b) Real Property. No Group Company owns or has legal or equitable title or other right or interest in any real property other than as held pursuant to Leases. Section 3.15(b) of the Company Disclosure Schedule sets forth each leasehold interest involving payment of rental of no less than RMB150,000 per year pursuant to which any Group Company holds any real property (a "Lease"), indicating the parties to such Lease, the address of the property demised under the Lease, the rent payable under the Lease and the term of the Lease. The particulars of the Leases as set forth in Section 3.15(b) of the Company Disclosure Schedule are true and complete. To the Knowledge of the Company Parties, the lessor under each Lease is qualified and has obtained all Consents necessary to enter into such Lease. Except for those disclosed in Section 3.15(i) and Section 3.15(b) of the Company Disclosure Schedule, each Lease is in compliance in all material respects with applicable Laws, including with respect to the ownership and operation of property and conduct of business as now conducted by the applicable Group Company which is a party to such Lease.

SECTION 3.16 Related Party Transactions. Except for those disclosed in Section 3.16 of the Company Disclosure Schedule, (i) no Principal or his Affiliates, nor, to the Knowledge of the Company Parties, any other Related Party has any Contract, understanding, or proposed transaction with, or is indebted to, any Group Company or has any direct or indirect interest in any Group Company other than as set forth in Section 3.02 of the Company Disclosure Schedule, nor is any Group Company indebted (or committed to make loans or extend or guarantee credit) to any Related Party (other than for accrued salaries, for the current pay period, reimbursable expenses or other standard employee benefits); (ii) no Principal or his Affiliates, nor, to the Knowledge of the Company Parties, any other Related Party has any direct or indirect interest in any Person with which a Group Company is affiliated or with which a Group Company has a material business relationship (including any Person which purchases from or sells, licenses or furnishes to a Group Company any goods, intellectual or other property rights or services), or in any Contract to which a Group Company is a party or by which it may be bound or affected, and no Related Party directly or indirectly competes with, or has any interest in any Person that directly or indirectly competes with, any Group Company (other than ownership of less than one percent (1%) of the stock of publicly traded companies). Except for those disclosed in Section 3.16 of the Company Disclosure Schedule, no Group Company has made any loans or extended any credit to any Principal, Principal Holdco or any other officer of any Group Company, which remain outstanding as of the date hereof.

SECTION 3.17 Intellectual Property Rights.

39

(a) <u>Company IP</u>. Except as disclosed in <u>Section 3.17(a)</u> of the Company Disclosure Schedule, each Group Company owns or otherwise has sufficient rights (including but not limited to the rights of development, maintenance, licensing and sale) to all Intellectual Property necessary and sufficient to conduct its business as currently conducted by such Group Company ("<u>Company IP</u>") without any conflict with or infringement of the rights of any other Person. <u>Section 3.17(a)</u> of the Company Disclosure Schedule sets forth a complete and accurate list of all Company Registered IP for each Group Company, including for each the relevant name or description, registration/certification or application number, and filing, registration or issue date.

(b) <u>IP Ownership</u>. Except for those disclosed in <u>Section 3.17(b)</u> of the Company Disclosure Schedule, all Company Registered IP is owned by and registered or applied for in the name of a Group Company, is valid and subsisting and has not been abandoned, and all necessary registration, maintenance and renewal fees with respect thereto and currently due have been satisfied. No Group Company or any of its employees, officers or directors has taken any actions or failed to take any actions that would cause any Company Owned IP to be invalid, unenforceable or not subsisting. No Group Company has entered into any agreement with a Governmental Authority or a university, college, other educational institution, start-up incubator or entities with similar nature, or research center which would grant such entities a legal basis to claim the interests or ownership in and to any Company Owned IP. No material Company Owned IP is the subject of any Lien, license or other Contract granting rights therein to any other Person. No Group Company is or has been a member or promoter of, or contributor to, any industry standards bodies, patent pooling organizations or similar organizations that could require or obligate a Group Company to grant or offer to any Person any license or right to any material Company Owned IP. Except for those disclosed in <u>Section 3.17(b)</u> of the Company Disclosure Schedule, no Company Owned IP is subject to any proceeding or outstanding Governmental Order or settlement agreement or stipulation that (a) restricts in any manner the use, transfer or licensing thereof, or the making, using, sale, or offering for sale of any Group Company's products or services, by any Group Company, or (b) may affect the validity, use or enforceability of such Company Owned IP. Each Principal has assigned and transferred to a Group Company any and all of his Intellectual Property related to the Business. No Group Company has (a) transferred or assigned any material Company IP; (b) authorized the joint ownership of, any material Company IP; or (c) permitted the rights of any Group Company in any material Company IP to lapse or enter the public domain.

(c) <u>Infringement, Misappropriation and Claims</u>. To the Knowledge of the Company Parties, except as disclosed in <u>Section 3.17(c)</u> of the Company Disclosure Schedule, no Group Company has violated, infringed or misappropriated in any material respect any Intellectual Property of any other Person, nor has any Group Company received any written notice alleging any of the foregoing. To the Knowledge of the Company Parties, except as disclosed in <u>Section 3.17(c)</u> of the Company Disclosure Schedule, no Person has violated, infringed or misappropriated any material Company IP of any Group Company, and no Group Company has given any written notice to any other Person alleging any of the foregoing. Except as disclosed in <u>Section 3.17(c)</u> of the Company Disclosure Schedule, no Person has challenged the ownership or use of any material Company IP by a Group Company. Except as disclosed in <u>Section 3.17(c)</u> of the Company Disclosure Schedule, no Group Company has agreed to indemnify any Person for any infringement, violation or misappropriation of any Intellectual Property by such Person.

40

(d) <u>Assignments and Prior IP</u>. All material inventions and material know-how conceived by the Principals related to the business of such Group Company are currently owned exclusively by a Group Company. All employees, contractors, agents and consultants of a Group Company who are or were specifically employed or engaged in the creation of any Intellectual Property for such Group Company as well as all directors of each Group Company (but not including the Alibaba Director) have executed an assignment of inventions agreement that vests in a Group Company exclusive ownership of all right, title and interest in and to such Intellectual Property, to the extent not already provided by Law. All employee inventors of Company Owned IP have received reasonable reward and remuneration from a Group Company for his/her service inventions or service technology achievements in accordance with the applicable PRC Laws. To the Knowledge of the Company Parties and except for those disclosed in <u>Section 3.17(d)</u> of the Company Disclosure Schedule, it will not be necessary to utilize any Intellectual Property of any such Persons made prior to their employment by a Group Company, except for those that are exclusively owned by a Group Company, and none of such Intellectual Property has been utilized by any Group Company. To the Knowledge of the Company Parties, none of the employees, consultants or independent contractors, currently or previously employed or otherwise engaged by any Group Company, (a) is in violation of any current or prior confidentiality, non-competition or non-solicitation obligations to such Group Company or to any other Persons (including but not limited to former employers, if any), or (b) is obligated under any Contract, or subject to any Governmental Order, that would interfere with the use of his or her best efforts to promote the interests of the Group Companies or that would conflict with the business of such Group Company as presently conducted.

(e) <u>Protection of IP</u>. Each Group Company has taken reasonable and appropriate steps to protect, maintain and safeguard material Company IP and made all applicable filings, registrations and payments of fees in connection with the foregoing. To the extent that any Company IP has been developed or created independently or jointly by an independent contractor or other third party entrusted by any Group Company, such Group Company has a written agreement with such independent contractor or third party and has thereby obtained ownership of, and is the exclusive owner of all such independent contractor's or third party's Intellectual Property in such work, material or invention by operation of law or valid assignment.

SECTION 3.18 <u>Labor and Employment Matters</u>.

(a) Except for those disclosed in <u>Section 3.18(a)</u> of the Company Disclosure Schedule, each Group Company has complied in all material respects with all applicable Laws related to labor or employment, including provisions thereof relating to wages, hours, working conditions, benefits, retirement, social welfare, equal opportunity and collective bargaining. There is not pending or to the Knowledge of the Company Parties threatened, and there has not been since the incorporation of each Group Company, any Action relating to the violation or alleged violation of any applicable Laws by such Group Company related to labor or employment, including any charge or complaint filed by an employee with any Governmental Authority or any Group Company.

41

(b) Except for those disclosed in <u>Section 3.18(b)</u> of the Company Disclosure Schedule, no Liability has been or is expected to be incurred by any Group Companies under or pursuant to any applicable Laws relating to any Benefit Plan or individual employment compensation agreement, and, to the Knowledge of the Company Parties, no event, transaction or condition has occurred or exists that would result in any such Liability to any Group Companies. Each of the Benefit Plans listed in <u>Section 3.18(b)</u> of the Company Disclosure Schedule is and has at all times been in compliance in material respects with all applicable Laws (including without limitation, SAFE Rules and Regulations, if applicable), and all contributions to, and payments for each such Benefit Plan have been timely made. There are no pending or, to the Knowledge of the Company Parties, threatened Actions involving any Benefit Plan listed in <u>Section 3.18(b)</u> of the Company Disclosure Schedule (except for claims for benefits payable in the normal operation of any Benefit Plan). Each Group Company maintains, and has fully funded, each Benefit Plan and any other labor-related plans if it is required by Law or by Contract to maintain and fully fund such Benefit Plan or other labor-related plan. Except for those disclosed in <u>Section 3.18(b)</u> of the Company Disclosure Schedule, each Group Company is in compliance in all material respects with all Laws and Contracts relating to its provision of any form of Social Insurance, and has paid, or made provision for the payment of, all Social Insurance contributions required under applicable Laws and Contracts.

(c) There has not been, and there is not now pending or, to the Knowledge of the Company Parties, threatened, any strike, union organization activity, lockout, slowdown, picketing, or work stoppage or any unfair labor practice charge against any Group Company. No Group Companies is bound by or subject to (and none of their assets or properties is bound by or subject to) any written or oral Contract, commitment or arrangement with any labor union or any collective bargaining agreements.

(d) <u>Schedule VI</u> hereto sets forth the names and titles of all of the key employees (the "<u>Key Employees</u>") of the Company as of the date hereof. Each Key Employee is currently devoting all of his or her business time to the conduct of the business of the applicable Group Company. No Principal is subject to any covenant restricting him/her from working for any Group Company, and to the Knowledge of the Company Parties, no Key Employee (other than the Principals) is subject to any covenant restricting him/her from working for any Group Company. No Principal is prohibited by any Contract or any Governmental Order from being employed by, or contracting with, such Group Company, and to the Knowledge of the Company Parties, no Key Employee (other than the Principals), is prohibited by any Contract or any Governmental Order from being employed by, or contracting with, such Group Company. No Group Company has received any notice alleging that any such violation has occurred. No Key Employee is currently working or, to the Knowledge of the Company Parties, plans to work for any other Person that competes with any Group Company, whether or not such individual is or will be compensated by such Person. No Key Employee or any group of employees of any Group Company has given any notice of an intent to terminate their employment with any Group Company, nor does any Group Company have a present intention to terminate the employment of any Key Employee or any group of employees.

SECTION 3.19 <u>Internal Controls</u>. Each Group Company maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions by it are executed in accordance with management's general or specific authorization, (ii) transactions by it are recorded as necessary to permit preparation of financial statements in conformity with the Accounting Standards and to maintain asset accountability, (iii) access to assets of it is permitted only in accordance with management's general or specific authorization, (iv) the recorded inventory of assets is compared with the existing tangible assets at reasonable intervals and appropriate action is taken with respect to any material differences, (v) segregating duties for cash deposits, cash reconciliation, cash payment, proper approval is established, and (vi) no personal assets or bank accounts of the employees, directors, officers are mingled with the corporate assets or corporate bank account, and no Group Company uses any personal bank accounts of any employees, directors, officers thereof during the operation of the business.

42

SECTION 3.20 <u>Insolvency</u>. As of the date of this Agreement, (i) the aggregate assets, at a fair valuation, of each Group Company will exceed the aggregate debt of each such entity, as the debt becomes absolute and matures; and (ii) each Group Company will not have incurred or intended to incur debt beyond its ability to pay such debt as such debt becomes absolute and matures. There has not been commenced against any Group Company an involuntary case under any applicable national, provincial, city, local or foreign bankruptcy, insolvency, receivership or similar laws now or hereafter in effect, or any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such person or for any substantial part of its property or for the winding up or liquidation of its affairs.

SECTION 3.21 <u>Disclosure</u>. Each Warrantor has provided the Purchaser Parties with all the information regarding the Group as agreed in this Agreement or otherwise requested by the Purchaser Parties in writing for deciding whether to consummate the Transactions. No representation or warranty by the Warrantors in this Agreement and no information or materials provided by the Company Parties to the Purchaser Parties in connection with the negotiation or execution of this Agreement or any agreement contemplated hereby contains any untrue statement of a material fact, or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances in which they are made, not misleading. Except as set forth in this Agreement or the Company Disclosure Schedule, there is no fact that the Company Parties have not disclosed to the Purchaser Parties in response to the Purchaser Parties' enquiry and of which any of its officers, directors or executive employees has Knowledge and that has had or would reasonably be expected to have a Material Adverse Effect.

SECTION 3.22 <u>Insurance</u>. Expect as for those disclosed in <u>Section 3.22</u> of the Company Disclosure Schedule, none of any Group Company purchases or maintains any insurance or bond with respect to its operation of the Business..

SECTION 3.23 <u>Employee-Related Companies</u>. The Employee-Related Companies have not engaged in any operation or business. Yuchuan has (a) completed the transfer of all legally available funds in its accounts to a Group Company, (b) fully repaid all debts owed by it or any of its shareholders to a Group Company, and (c) has been duly deregistered in accordance with applicable Law. The Company is in effective Control over Taizhou. Except for the trademark set forth in <u>Section 3.23</u> of the Company Disclosure Schedule, Taizhou does not hold any material assets owned or used by the Group Companies.

43

SECTION 3.24 <u>Business Contracts of the Domestic Company</u>. From and after September 1, 2016, the Rajax Domestic Company and Xiaodu Shenghuo have been the sole provider of value-added telecommunication services under any Contract to which the WFOEs and/or the Domestic Companies is a party and pursuant to which the WFOEs and/or the Domestic Companies have agreed to provide value-added telecommunication services.

SECTION 3.25 <u>Certain Operating Metrics</u>. The results of operation of the Group Companies as measured by certain operating metrics set forth in in the letter regarding such operating metrics, which was delivered by the Warrantors to Purchaser prior to the date of this Agreement, are true and accurate in all respects as of the relevant dates.

SECTION 3.26 <u>Registered Address of the Domestic Company and the WFOE</u>. Each of the Domestic Companies and the WFOEs has (i) updated its registered address to be consistent with its actual premises at which it conducts its operation and (ii) updated all of its permits and licenses to the extent necessary and required by the competent Governmental Authorities.

SECTION 3.27 <u>Third Parties Providing Catering Services</u>. Except as for those set forth in <u>Section 3.27</u> of the Company Disclosure Schedule, no Person is providing catering services for the Rajax WFOE Subsidiary as agents and/or partners (联营门店合作方).

SECTION 3.28 <u>Series G-1 Post-Closing Covenants</u>. Except as set forth in <u>Section 3.28</u> of the Company Disclosure Schedule, each Company Party is in compliance with its obligations under Section 7.1(ix), Section 7.1(x), Section 7.1(xi), Section 7.1(xii) and Section 7.1(xiii) of the Alibaba Series G-1 SPA (as defined in the Shareholders Agreement).

SECTION 3.29 <u>Anti-Takeover Provisions</u>. The Company is not party to a shareholder rights agreement, "poison pill" or similar agreement or plan. The Board of Directors has taken all necessary action so that any takeover, anti-takeover, moratorium, "fair price", "control share" or other similar Laws enacted under any Laws applicable to the Company (each, a "<u>Takeover Statute</u>") does not, and will not, apply to this Agreement or the Transactions other than the CICL.

SECTION 3.30 <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of the Company.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Company and the Selling Shareholders that:

SECTION 4.01 <u>Corporate Organization</u>. Purchaser is duly organized, validly existing and in good standing under the laws of the Cayman Islands and has the requisite corporate or similar power and authority to own, lease and operate its properties and assets to carry on its business as it is now being conducted.

44

SECTION 4.02 <u>Purchaser Ownership</u>. All of the issued and outstanding share capital of Purchaser is, and at the Closing will be, solely owned by Rollover Shareholder. Purchaser was formed solely for the purpose of engaging in the Transactions, and it has not conducted any business prior to the date hereof and has no, and prior to the Closing will have no, assets, liabilities or obligations of any nature other than in connection with those incident to its formation and capitalization pursuant to this Agreement and the Transactions.

SECTION 4.03 <u>Authority Relative to This Agreement</u>. Each of the Purchaser Parties has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party, to carry out and perform its obligations thereunder and to consummate the Transactions. All action on the part of each of the Purchaser Parties necessary for the authorization, execution and delivery of the Transaction Documents to which it is a party, and the performance of all obligations of the Purchaser Parties thereunder, has been taken or will be taken prior to the Closing. Each Transaction Document to which a Purchaser Party is a party has been, or will be on or prior to the Closing, duly executed and delivered by such Purchaser Party, enforceable against such Purchaser Party in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies, and (iii) where applicable, the recognition and enforcement of arbitral awards being subject to relevant Laws

SECTION 4.04 <u>Consents</u>. All Consents from or with any Governmental Authority or any other Person required in connection with the valid execution, delivery and performance of the Transaction Documents, and the consummation of the transactions contemplated by the Transaction Documents, in any case on the part of the Purchaser Parties, have been duly obtained or completed (as applicable) and are in full force and effect. The execution, delivery and performance of each Transaction Document by each Purchaser Party, and the consummation by the such Purchaser Party of the transactions contemplated thereby, do not and will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any Consent under, or give any Person rights of termination, amendment, acceleration or cancellation under, with or without the passage of time or the giving of notice, any Governmental Order, any provision of the Charter Documents of such Purchaser Party, any applicable Laws, or any material contract to which such Purchaser Party is a party, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, such Purchaser Party (including without limitation, any indebtedness of such Purchaser Party), or (iii) result in the creation of any Lien upon any of the material properties or assets of such Purchaser Party other than Permitted Liens.

SECTION 4.05 <u>Sufficient Funds</u>. At the Closing, Purchaser will have available sufficient funds to pay the Aggregate Purchase Price in accordance with and subject to the terms and conditions of this Agreement.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF EACH SHAREHOLDER

Subject to such exceptions as may be specifically set forth in the disclosure schedule delivered by the Selling Shareholders and the Rollover Shareholder to Purchaser, as of the date hereof and attached to this Agreement as Schedule VIII (the "Selling Shareholders Disclosure Schedule"), each Selling Shareholder and the Rollover Shareholder hereby, severally but not jointly, represents and warrants to Purchaser (but only with respect to itself and its Shares) that:

SECTION 5.01 Corporate Organization. Such Selling Shareholder or the Rollover Shareholder, as applicable, is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has the requisite corporate or similar power and authority to own, lease and operate its properties and assets to carry on its business as it is now being conducted.

SECTION 5.02 Title. Such Selling Shareholder is the beneficial and record owner of the Sale Shares of such Selling Shareholder free and clear of all Liens (other than any Liens created under the Memorandum and Articles, the Shareholders Agreement and the ROFR Agreement), and the Rollover Shareholder is the beneficial and record owner of the Rollover Shares and clear of all Liens (other than any Liens created under the Memorandum and Articles, the Shareholders Agreement and the ROFR Agreement). The Sale Shares of such Selling Shareholder and the Rollover Shares of the Rollover Shareholder, as applicable, are duly authorized, validly issued, fully paid and non-assessable. Upon the update of the register of members of the Company at the Closing, Purchaser will have valid title to the Sale Shares of such Selling Shareholder and the Rollover Shares of the Rollover Shareholder, as applicable, free and clear of all Liens.

SECTION 5.03 Authority Relative to This Agreement. Such Selling Shareholder or the Rollover Shareholder, as applicable, has all requisite power and authority to execute and deliver the Transaction Documents to which it is a party, to carry out and perform its obligations thereunder and to consummate the Transactions. All action on the part of such Selling Shareholder or the Rollover Shareholder, as applicable, necessary for the authorization, execution and delivery of the Transaction Documents to which it is a party, and the performance of all obligations of such Selling Shareholder or the Rollover Shareholder, as applicable, thereunder, has been taken or will be taken prior to the Closing. Each Transaction Document to which such Selling Shareholder or the Rollover Shareholder, as applicable, is a party has been, or will be on or prior to the Closing, duly executed and delivered by such Selling Shareholder or the Rollover Shareholder, as applicable, enforceable against such Selling Shareholder or the Rollover Shareholder, as applicable, in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by Laws relating to the availability of specific performance, injunctive relief, or other equitable remedies and (iii) for, where applicable, the recognition and enforcement of arbitral awards being subject to relevant Laws.

SECTION 5.04 Consents. Except as set forth in Section 5.04 of the Selling Shareholders Disclosure Schedule, all Consents from or with any Governmental Authority or any other Person required in connection with the valid execution, delivery and performance of the Transaction Documents, and the consummation of the transactions contemplated by the Transaction Documents, in any case on the part such Selling Shareholder or the Rollover Shareholder, as applicable, have been duly obtained or completed (as applicable) and are in full force and effect. Except as set forth in Section 5.04 of the Selling Shareholders Disclosure Schedule, the execution, delivery and performance of each Transaction Document by such Selling Shareholder or the Rollover Shareholder, as applicable, and the consummation by such party of the transactions contemplated thereby, do not and will not, (i) result in any violation of, be in conflict with, or constitute a default under, require any Consent under, or give any Person rights of termination, amendment, acceleration or cancellation under, with or without the passage of time or the giving of notice, any Governmental Order, any provision of the Charter Documents of such Selling Shareholder or the Rollover Shareholder, as applicable, any applicable Laws, or any material contract to which such Selling Shareholder or the Rollover Shareholder, as applicable, is a party, (ii) result in any termination, modification, cancellation, or suspension of any material right of, or any augmentation or acceleration of any material obligation of, such Selling Shareholder or the Rollover Shareholder, as applicable, (including without limitation, any indebtedness of such Selling Shareholder or the Rollover Shareholder, as applicable), or (iii) result in the creation of any Lien upon any of the material properties or assets of such Selling Shareholder or the Rollover Shareholder, as applicable, other than Permitted Liens.

46

**ARTICLE VI**

**CONDUCT OF BUSINESS PENDING THE CLOSING**

SECTION 6.01 Conduct of Business by the Company Pending the Closing.

(a) Each of the Company, the Principals and the Principal Holdcos agrees that, between the date of this Agreement and the Closing, except as required by applicable Law or as set forth in Section 6.01 of the Company Disclosure Schedule, unless Purchaser shall otherwise provide its prior written consent:

(i) the businesses of the Group Companies shall be conducted only in, and no Group Company shall take any action except in, a lawfully permitted manner in the ordinary course of business consistent with past practice (subject to each of the Company, the Principal and the Principal Holdcos acting in a prudent and professional manner taking into account the Group Companies' cash flow and liquidity);

(ii) the Company shall use its reasonable best efforts to preserve substantially intact the business organization of the Group Companies, maintain in effect all Required Governmental Consents, keep available the services of the current officers, Key Employees, and key consultants and contractors of the Group Companies and preserve the current material relationships and goodwill of the Group Companies with Governmental Authorities, key customers and suppliers, and any other persons with which any Group Company has material business relations; and

(iii) (A) the business of the Company shall be restricted to the holding of shares or equity interest in the Rajax HK Subsidiary and the Xiaodu Cayman Company, (B) the business of the Rajax HK Subsidiary shall be restricted to the holding of shares or equity interest in the Rajax WFOE, (C) the business of the Xiaodu Cayman Company shall be restricted to the holding of shares or equity interest in the Xiaodu HK Company, and (D) the business of the Xiaodu HK Company shall be restricted to the holding of shares or equity interest in the Xiaodu WFOE.

47

(b) In furtherance and without limitation of Section 6.01(a), except as set forth in Section 6.01(b) of the Company Disclosure Schedule, or as required by applicable Law, the Company will not (and the Principals and the Principal Holdcos will ensure that no Group Company will) and will not permit any other Group Company to between the date of this Agreement and the Closing, directly or indirectly, do, or propose to do, any of the following without the prior written consent of Purchaser:

(i) amend or otherwise change the Charter Documents of the Company or make any material amendments to the Charter Documents of any other Group Company;

(ii) issue, sell, transfer, lease, sublease, license, pledge, dispose of, grant or encumber, or authorize the issuance, sale, transfer, lease, sublease, license, pledge, disposition, grant or encumbrance of, (A) any shares of any class of any Group Company, or any options, warrants, convertible securities or other rights of any kind (including any Company Share Award) to acquire any shares, or any other ownership interest (including, without limitation, any phantom interest), of any Group Company (other than in connection with the exercise or settlement of any Company Share Awards outstanding on the date hereof in accordance with the applicable ESOP or RSU tranche and applicable award agreement), or (B) any material property or assets (whether real, personal or mixed, and including leasehold interests, intangible property and Intellectual Property) of the Group Companies (other than sale of such property or assets, in each case, in the ordinary course of business and consistent with past practice);

(iii) declare, set aside, make or pay any dividend or other distribution, payable in cash, shares, property or otherwise, with respect to any of its shares, other than dividends or other distributions from any Group Company to the Company or another Group Company which is wholly-owned by the Company;

(iv) reclassify, combine, split, subdivide or redeem, or purchase or otherwise acquire, directly or indirectly, any of its shares, or any options, warrants, convertible securities or other rights exchangeable into or convertible or exercisable for any of its share capital, in each case other than in connection with the settlement of any Company Share Awards in accordance with the applicable ESOP or RSU tranche and this Agreement;

(v) (A) effect or commence any liquidation, dissolution, scheme of arrangement, merger, consolidation, amalgamation, recapitalization, restructuring, reorganization or similar transaction involving any Group Company (other than the Transactions or any merger or consolidation among wholly-owned Subsidiaries of the Company), or (B) create any new Subsidiaries;

48

(vi) (A) acquire (including, without limitation, by merger, consolidation, scheme of arrangement, amalgamation or acquisition of stock or assets or any other business combination) or make any capital contribution or investment in any corporation, partnership, other business organization or any division thereof (other than a wholly-owned Subsidiary of the Company), or (B) acquire any assets (other than (x) in the ordinary course of business consistent with past practice or (y) assets of a wholly-owned Subsidiary of the Company);

(vii) (A) incur, assume, alter, amend or modify any Indebtedness, guarantee any Indebtedness, or issue any debt securities, in each case, in excess of US$200,000 individually or US$1,000,000 in the aggregate, or (B) make (x) any loans or advances to any director or executive officer of the Company or (y) any loans or advances in excess of US$50,000 individually or US$1,000,000 in the aggregate to any other person, in each case, other than (i) Indebtedness receivable or payable solely between or among the Group Companies and (ii) Indebtedness incurred in the ordinary course of business of the relevant Group Company, provided that such Indebtedness incurred in the ordinary course of business of all of the Group Companies does not exceed US$5,000,000 in the aggregate;

(viii) create or grant any Lien on any material assets (including material Intellectual Property) of any Group Company other than in the ordinary course of business consistent with past practice;

(ix) (A) authorize, or make any commitment with respect to, any single capital expenditure committed by any Group Company after the date of this Agreement which is in excess of US$500,000, unless included in the Company's current budget and operating plan approved by the Board of Director, or (B) authorize or make any commitment with respect to capital expenditures committed by any Group Company after the date of this Agreement which are, in the aggregate (including capital expenditures included in the Company's budget and operating plan), in excess of US$500,000 for the Group Companies taken as a whole, in each case other than ordinary course expenditures necessary to maintain existing assets in good repair; or

(x) guarantee the performance or other obligations of any person (other than guarantees in connection with any Indebtedness as permitted by the foregoing clause (vii));

(xi) except as otherwise required by Law or pursuant to any Benefit Plan in existence as of the date hereof, (A) enter into any new employment or compensatory agreements in connection with employment or service (including the renewal of any such agreements), or terminate or amend any such agreements, with any director or officer of any Group Company or any other employee or individual service provider of any Group Company who has an annual base salary in excess of US$100,000, (B) grant or provide any severance or termination payments or benefits to any director, officer, employee or individual service provider of any Group Company other than pursuant to any agreement executed prior to the date hereof which is listed in Section 3.18(b) of the Company Disclosure Schedule, (C) increase the compensation, bonus or pension, welfare, severance or other benefits of, pay any bonus to, or grant, issue or make any new equity awards to any director, officer, employee or individual service provider of any Group Company, except annual base salary increases to non-officer employees of any Group Company made in the ordinary course consistent with past practice, (D) establish, adopt, amend or terminate any Benefit Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be a Benefit Plan if it were in existence as of the date of this Agreement or amend the terms of any outstanding Company Share Awards, save as contemplated under this Agreement or the Deferred Payment Agreements, (E) take any action to accelerate or otherwise alter the vesting or payment, or fund or in any other way secure the payment, of compensation or benefits under the Benefit Plans, to the extent not already required in any such plan, including voluntarily accelerating the vesting of any Company Share Award in connection with the Transactions, save as contemplated under this Agreement or the Deferred Payment Agreements, or (F) change any actuarial or other assumptions used to calculate funding obligations with respect to any Benefit Plan or to change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by applicable Law;

49

(xii) make any material changes with respect to any method of financial accounting, or financial accounting policies or procedures, except as required by changes in applicable Law;

(xiii) enter into, or materially amend or modify, or consent to the termination of any Material Contract (or any Contract that would be a Material Contract if such Contract had been entered into prior to the date hereof), or amend, waive, modify or consent to the termination of any Group Company's material rights thereunder, in each case, other than such actions taken in the ordinary course of business of the relevant Group Company with respect to the categories of Material Contract set forth in items (h) and (j) of the definition of "Material Contracts";

(xiv) enter into any Contract between any of the Group Companies, on the one hand, and any of their respective directors or officers, on the other hand (except as permitted under Section 6.01(b)(xi) or otherwise as contemplated under this Agreement or the Deferred Payment Agreements);

(xv) terminate or cancel, let lapse, or amend or modify in any material respect, other than renewals in the ordinary course of business, any material insurance policies maintained by it which is not promptly replaced by a comparable amount of insurance coverage with reputable independent insurance companies or underwriters;

(xvi) commence any material Action (other than in respect of collection of amounts owed in the ordinary course of business) or settle any Action other than any settlement involving only the payment of monetary damages not in excess of US$500,000 not relating to this Agreement or the Transactions;

(xvii) engage in the conduct of any new line of business material to the Group Companies, taken as a whole;

50

(xviii) permit any item of material Intellectual Property to lapse or to be abandoned, dedicated, or disclaimed, other than (i) with respect to such Intellectual Property that is no longer used or useful in any of the Group Companies' businesses and (ii) as required pursuant to Contracts in effect prior to the date hereof which have been provided or otherwise made available to the Purchaser Parties, fail to perform or make any applicable filings, recordings or other similar actions or filings with respect to material Intellectual Property, or fail to pay all required fees and taxes required or advisable to maintain and protect its interest in material Intellectual Property;

(xix) make or change any material Tax election, amend any material Tax Return, enter into any material closing agreement with respect to Taxes, surrender any right to claim a material refund of Taxes, settle or finally resolve any material controversy with respect to Taxes, consent to any extension or waiver of the statute of limitations applicable to any Tax claim or assessment relating to the Group Companies, or change any method of Tax accounting;

(xx) make any material changes with respect to key operational strategies of any Group Company, including any material changes to such Group Company's strategy on provision of subsidies and policies regarding such Group Company's merchants;

(xxi) dismiss or give notice of dismissal to, more than fifty (50) employees of the Group in the aggregate; or

(xxii) authorize or agree to take any of the foregoing actions, or enter into any letter of intent (binding or nonbinding) or similar written agreement or arrangement with respect to any of the foregoing.

## ARTICLE VII

## ADDITIONAL AGREEMENTS

SECTION 7.01 <u>Access to Information</u>. Prior to the Closing, the Company, the Principals and the Principal Holdcos shall allow Purchaser to conduct a full independent investigation, review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Group, and the Company, the Principals and the Principal Holdcos shall cause Purchaser and its Representatives to be promptly provided all due diligence materials and information requested by Purchaser or its Representatives (including financial and operating data and making available any auditor reports and work papers) and sufficient access to the personnel, properties, facilities, books and records of the Group Companies for such purpose.

SECTION 7.02 <u>No Solicitation of Transactions</u>. The Company, the Principals and the Principal Holdcos shall ensure that no Group Company and none of the directors or officers of any Group Company shall, and each Representative of the Company (including, without limitation, any investment banker, attorney or accountant retained by it or any Group Company), shall be directed not to, and each Selling Shareholder shall not, in each case, directly or indirectly, (i) solicit, initiate or encourage (including by way of furnishing information in a manner designed to encourage), or take any other action to facilitate, any inquiries or discussions (including with any of the Company's shareholders) or the making of any Competing Proposal (including, without limitation, any proposal or offer to its shareholders) that constitutes, or would reasonably be expected to lead to, any Competing Proposal, or (ii) enter into, maintain or continue discussions or negotiations with, or provide any nonpublic information relating to any Group Company or the Transactions to, any person or entity in connection with, or in order to obtain, an Competing Proposal, or (iii) agree to, approve, adopt, endorse or recommend (or publicly propose to agree to approve, adopt, endorse or recommend) any Competing Proposal, or enter into any letter of intent, confidentiality agreement, term sheet, Contract, commitment, obligation, arrangement or understanding contemplating or otherwise relating to, or consummate, any Competing Proposal, or (iv) authorize or permit any of the officers, directors or Representatives of any Group Company to take any action set forth in clauses (i) through (iii) above. The Company shall notify Purchaser in writing as promptly as practicable (and in any event within twenty-four (24) hours after the Company has knowledge thereof), of any proposal or offer, or any request for information or other inquiry or request, that could reasonably be expected to lead to an Competing Proposal, specifying (x) the material terms and conditions thereof (including material amendments or proposed material amendments) and providing, if applicable, copies of any written requests, proposals or offers, including proposed agreements, (y) the identity of the party making such proposal or offer or inquiry or contact, and (z) whether the Company has determined to provide confidential information to such person in violation of this <u>Section 7.02</u>.

51

SECTION 7.03 <u>Notification of Certain Matters</u>. Each of the Company, the Principals, the Principal Holdcos and the Selling Shareholders shall promptly notify Purchaser, and Purchaser shall promptly notify the Shareholders Representative, in writing of:

(a) any written notice or other written communication from any person alleging that the consent of such person is or may be required in connection with the Transactions;

(b) any written notice or other written communication from any Governmental Authority in connection with the Transactions;

(c) any Actions commenced or, to the knowledge of the Company, the Principals, the Principal Holdcos or such Selling Shareholder, on the one hand, or the knowledge of Purchaser, on the other hand, threatened against any Group Company or Purchaser or any of its Subsidiaries, as the case may be, that, if pending on the date of this Agreement, would have been required to have been disclosed by such Party pursuant to any of such Party's representations and warranties contained herein, or that relate to such Party's ability to consummate the Transactions; and

(d) if a breach of any representation or warranty or failure to perform any covenant or agreement on the part of such Party set forth in this Agreement shall have occurred that would cause the conditions set forth in <u>Section 8.01</u>, <u>Section 8.02</u>, or <u>Section 8.03</u> not to be satisfied; together, in each case, with a copy of any such notice, communication or Action; <u>provided</u>, that the delivery of any notice pursuant to this <u>Section 7.03</u> shall not (A) cure any breach of, or non-compliance with, any other provision of this Agreement, (B) be deemed to amend or supplement the Company Disclosure Schedule, or (C) limit or otherwise affect the remedies available hereunder to the Party receiving such notice; <u>provided</u> that, in the event that Purchaser elects to consummate the Closing regardless of such notice, none of the Purchaser Indemnified Parties shall have the right to make any claim for indemnification under <u>Section 9.03</u> to the extent that the Indemnifiable Losses sought in such claim, directly or indirectly, result from, are as a result of or relate to such events, facts or changes which occurred after the date of this Agreement and constituted a Material Adverse Effect, as disclosed in any notice pursuant to this <u>Section 7.03</u>.

52

SECTION 7.04 <u>Participation in Litigation</u>. Prior to the Closing, (a) each of Purchaser, on the one hand, and the Company, the Principals and the Principal Holdcos, on the other hand, shall give prompt notice to the other of any Actions by shareholders of the Company commenced or, to the knowledge of Purchaser, on the one hand, or the Company, the Principals and the Principal Holdcos, on the other hand, as the case may be, threatened, against any Group Company and/or its directors which relate to this Agreement or the Transactions, and (b) the Company, the Principals and the Principal Holdcos shall give Purchaser the opportunity to, at Purchaser's cost, participate in the defense or settlement of any such shareholder Action against such Group Company and/or its directors relating to this Agreement or the Transactions, and no such Action shall be settled or compromised, and none of the Company, the Principal or the Principal Holdcos shall take any action to adversely affect or prejudice any such Action, without Purchaser's prior written consent.

SECTION 7.05 <u>Resignations</u>. On the Closing Date, each of the Principals and Principal Holdcos, CITICPE, and Sequoia shall deliver to Purchaser the resignation letter of its respective appointee serving as a Director prior to the Closing, effective as of the Closing, and the Principals and Principal Holdcos shall deliver to Purchaser the resignation letter of the Mr. Wei CHENG (from his directorship) prior to the Closing, effective as of the Closing.

SECTION 7.06 <u>Confidentiality; Public Announcements</u>. Each of the Parties (other than Purchaser) agrees that it will not, and will ensure that the Company and its Representatives will not, directly or indirectly, without Purchaser's prior written consent, make any disclosure of or announce the existence and terms of this Agreement, Purchaser's identity or any information pertaining to or provided by Purchaser or its Representatives in connection therewith or otherwise relating to the transactions contemplated hereunder, to any other Person. Except as may be required by applicable Law, the press release announcing the execution of this Agreement shall be issued only in such form as agreed upon by Purchaser. Thereafter, each Party hereto (other than Purchaser) shall consult with Purchaser before issuing any press release, having any communication with the press (whether or not for attribution), making any other public statement or scheduling any press conference with respect to this Agreement or the Transactions and shall not, without the prior written consent of Purchaser, issue any such press release, have any such communication, make any such other public statement or schedule any such press conference prior to such consultation.

SECTION 7.07 <u>SAFE Registration</u>. After the Closing, if requested or required by SAFE or the applicable bank, each of the Principals and Principal Holdcos shall take all reasonable actions at the request of the Purchaser to facilitate the WFOEs in making outbound payments to offshore Affiliates thereof, including by submitting application to the SAFE for amending or cancelling the existing SAFE registration of such Principal or Principal Holdco in light of the change of his or its (indirect) equity interest in the Company; provided that such obligations of the Principals and Principal Holdcos shall cease upon the cancellation pursuant to the applicable SAFE Rules and Regulations by the Principals of their existing SAFE registration which was made in accordance with Circular 37 prior to the Closing in respect of their outbound investment in their respective Principal Holdcos. For the purpose of the this <u>Section 7.07</u>, SAFE shall include all of its local branches, where applicable.

53

SECTION 7.08 Tax Filings and Payments.

(a) The Parties hereby acknowledge, covenant and agree that (i) none of Purchaser, the Company or any of their respective Affiliates (including any Group Company) shall have any obligation to pay any Tax of any nature that is required by applicable Law to be paid by any Selling Shareholder or its Affiliates or their respective direct and indirect partners, members and shareholders arising out of the transactions contemplated by this Agreement and the other Transaction Documents (the "Selling Tax" of such Selling Shareholder); and (ii) each Selling Shareholder agrees to bear and pay, severally but not jointly, any and all Selling Taxes with respect to such Selling Shareholder's Sale Shares.

(b) The Selling Shareholders shall, acting through the Shareholders Representative, as soon as possible after the date hereof, jointly engage and authorize the Qualified Tax Advisor to, as soon as possible after the date hereof, and in any event, within thirty (30) days after the date hereof, duly and properly make with the applicable PRC Tax Government Authority (being the PRC Tax Government Authority to which such filings are to be made pursuant to applicable Law) (the "Relevant PRC Tax Authority") the relevant Tax filings and disclosures that are required by applicable Law (including Circular 7) in connection with the Transactions, and each Selling Shareholder shall (i) permit Purchaser to, (A) in its sole discretion, make a joint filing with such Selling Shareholder in respect of the Transactions, or (B) with the consent of the Shareholders Representative, make such filing on behalf of such Selling Shareholder if Purchaser so elects and (ii) provide, or cause the Qualified Tax Advisor to provide, Purchaser with adequate evidence (as specified below in this Section 7.08) that such Tax filings have been made in accordance with applicable Law as soon as reasonably practicable. Each Selling Shareholder agrees to cooperate with the Qualified Tax Advisor and provide all necessary documents for such Tax filings. The Company shall bear the fees payable to the Qualified Tax Advisor in connection with the preparation of the joint tax filing and disclosure of the transaction under this Section 7.08(b), and each Selling Shareholder shall, severally but not jointly, bear any and all other fees payable to the Qualified Tax Advisor in connection with such Selling Shareholder's Sale Shares (including but not limited to, for the avoidance of doubt, any fees payable in connection with any Tax filings to settle the tax liability, tax treaty relief application and other tax services made with respect to such Selling Shareholder's Sale Shares). Each Selling Shareholder agrees to use its reasonable best efforts to, after such Tax filing, promptly submit, or cause the Qualified Tax Advisor to submit, all documents supplementally requested by the Relevant PRC Tax Authority in connection with such Tax filing with a copy delivered to Purchaser simultaneously therewith, and provide, or cause the Qualified Tax Advisor to provide, updates to Purchaser upon Purchaser's reasonable request as to the determination (and delivers to Purchaser assessment notices issued by the Relevant PRC Tax Authority in connection with such determination) and payment status of any Taxes assessed by the Relevant PRC Tax Authority in respect of such Selling Shareholder in connection with the Transactions. For purposes of this Section 7.08, the following shall be adequate evidence that a Tax filing has been made in respect of Selling Shareholder:

54

(i) (x) an acknowledgement or receipt in respect of the filing by or on behalf of such Selling Shareholder issued by the Relevant PRC Tax Authority or (y) the original signature of an official of the Relevant PRC Tax Authority on the duplicate of the filing documents submitted by or on behalf of such Selling Shareholder; or

(ii) an explanation letter or email prepared by the Qualified Tax Advisor, attaching a copy of the filing made and confirming that they have submitted the filing on behalf of such Selling Shareholder with the Relevant PRC Tax Authority in accordance with this Section 7.08, and confirming that the Relevant PRC Tax Authority does not issue, and has not issued, any acknowledgement or receipt in respect of the filing.

(c) Such Selling Shareholder shall, or shall cause the Qualified Tax Advisor to, on a monthly basis follow up with the Relevant PRC Tax Authority on any assessment of the Tax filings of such Selling Shareholder, promptly respond to any requests by the Relevant PRC Tax Authorities for additional information or materials, and give updates to Purchaser upon Purchaser's reasonable request (and in any event not less frequently than monthly in the absence of such requests) as to any development in the assessment of any Taxes by the Relevant PRC Tax Authority and the payment of any such Taxes so assessed. Without prejudice to the foregoing, if such Selling Shareholder or any of its Affiliates receives any notice or demand from any PRC Tax Authority in respect of the Transactions, such Selling Shareholder shall as soon as reasonably practicable provide, or cause the Qualified Tax Advisor to provide, a true and complete copy of such notice or demand to Purchaser.

(d) Each Selling Shareholder shall, severally but not jointly, indemnify and hold harmless, on an after-tax basis, the Purchaser Indemnified Parties forthwith on demand from and against all Selling Taxes and Indemnifiable Losses (which, for the avoidance of doubt, shall include any loss of cost basis) incurred or suffered by such Purchaser Indemnified Party arising or resulting from or in connection with any breach such Selling Shareholder of any of their obligations under this Section 7.08.

SECTION 7.09 Domestic Company Equity Transfers. The Principals shall, as soon as legally and practically possible, and in any event within three (3) months after the Closing, duly transfer, or cause to be transferred, all of the Equity Securities in each Domestic Company to persons that are PRC Persons designated by Purchaser, such that such persons in the aggregate will hold 100% of the Equity Securities in such Domestic Company (the "Onshore Equity Transfer"), and where applicable, obtain, or cause to be obtained, a new business license issued by SAIC reflecting such share transfer (the "New Business License").

SECTION 7.10 Registration of Share Pledge. The Principals shall, as soon as legally and practically possible, and in any event within three (3) months after the Closing, cause each Domestic Company to complete the termination of the existing share pledge registration with relevant authorities under the Control Documents.

55

SECTION 7.11 <u>Replacement of Management</u>. The Principals shall, (a) as soon as legally and practically possible, and in any event within three (3) months after the Closing, (i) cause each PRC Group Company to complete with the relevant SAIC, the change of the legal representative, directors, management and officers of such PRC Group Company and (ii) deliver to Purchaser the receipts issued by such SAIC in connection with such change; and (b) at the request of Purchaser and where applicable, and in any event within twelve (12) months after the Closing, cause any person designated by a PRC Group Company as the representative (including as chief representative, director, supervisor or legal representative) of such PRC Group Company, a branch of such PRC Group Company or an investee company (including the branch (if applicable) of such investee company) in which such PRC Group Company holds any equity interests, to sign any document that is required by the competent local authority for the change of such representative to the person as designated by Purchaser.

SECTION 7.12 <u>Permits and Licenses Amendment</u>. The Principals shall use their commercially reasonable efforts to (i) cause the Rajax Domestic Company and Xiaodu Shenghuo to, as soon as practicable but in no event later than six (6) months after the Closing, complete the amendment of its Telecommunication and Information Services Operation License (电信与信息服务业务经营许可证) to reflect the transfer of equity interests in the Rajax Domestic Company and Xiaodu Shenghuo to Persons designated by Purchaser, and (ii) cause Xiaodu Shenghuo to, as soon as practicable, but in no event later than six (6) months after the Closing, complete the amendment of its Internet Drug Information Service Qualification Certificate (互联网药品信息服务资格证书) to reflect the transfer of equity interests in Xiaodu Shenghuo to such Persons designated by Purchaser.

SECTION 7.13 <u>Further Assurances; Filings</u>. Upon the terms and subject to the conditions herein, (i) each of the Parties hereto agrees to use its reasonable best efforts to take or cause to be taken all action, to do or cause to be done, to execute such further instruments, and to assist and cooperate with the other Parties hereto in doing, all things necessary, proper or advisable under applicable Laws or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by the Transaction Documents, and (ii) the Principals hereto agree to cause the legal representatives, directors, supervisors and officers of each PRC Group Company to take or cause to be taken all action, to do or cause to be done, to execute such further instruments, and to assist and cooperate with the other Parties hereto in doing, all things necessary, proper or advisable under applicable Laws or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by the Transaction Documents; <u>provided</u>, in each case, that except as expressly provided herein, no Person shall be obligated to grant any waiver of any condition or other waiver hereunder.

SECTION 7.14 <u>Audited 2017 Financial Statements</u>. The Company shall, and the Principals and the Principal Holdcos shall cause the Company to, prepare, or cause to be prepared and deliver to Purchaser as soon as practicable after the date hereof, the audited consolidated balance sheet, statement of income and statement of cash flows for the Group as of and for the fiscal year ended December 31, 2017 (the "<u>Audited 2017 Financial Statements</u>"), together with the auditors report thereon.

SECTION 7.15 Release of Claims. With automatic effect upon the Closing, each Selling Shareholder, on behalf of itself and on behalf of its shareholders or members, as applicable, assigns and beneficiaries and, to the extent acting in a representative capacity, its creditors, directors, officers, managers, employees, investors, Affiliates, representatives, successors and assigns of any of them, agrees to release each of the Group Companies and their respective directors, shareholders, officers and employees, including the Principals and/or the Principal Holdco, from any and all actions, causes of action, suits, debts, accounts, bonds, bills, covenants, contracts, controversies, obligations, claims, counterclaims, demands, damages, costs, expenses, compensation or liabilities of every kind and any nature whatsoever, in each case whether absolute or contingent, liquidated or unliquidated, known or unknown, direct or derivative ("Claims"), such Selling Shareholder may bring, which Claims arise from, relate to, or are in connection with, such Selling Shareholder's ownership of Shares, the Transactions, any and all documents, contracts, agreements, instrument and deeds entered into in connection with the Transactions, and all procedures conducted and all documentation executed or adopted (including notices and authorization documentation) for purposes of facilitating or consummating the Transactions, other than any Claims for breach of this Agreement.

SECTION 7.16 Compliance with Anti-Corruption Laws. Up to the Closing, no Principal, Principal Holdco or Group Company shall, or shall permit any of their Subsidiaries or Affiliates or any of their respective directors, officers, managers, employees, independent contractors, representatives or agents to offer, promise, authorize or make any payment to, or otherwise contribute any item of value to, directly or indirectly, to any third party, including any Public Official, which in each case, would constitute a violation of any Compliance Laws. Up to the Closing, the Principals, the Principal Holdcos and the Group shall, and shall cause each of their Subsidiaries and Affiliates to cease all of their respective activities, as well as remediate any actions taken by any Principal, Principal Holdco, Group Company, their Subsidiaries or Affiliates, or any of their respective directors, officers, managers, employees, independent contractors, representatives or agents that would constitute a violation of any Compliance Laws. Up to the Closing, the Principals, Principal Holdcos and the Group Companies shall, and shall cause each of their Subsidiaries and Affiliates to maintain complete and accurate books and records and systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) consistent with the requirements of the Compliance Laws.

SECTION 7.17 Approved Sale. In connection with the Transactions which constitute an "Approved Sale" for purposes of the Memorandum and Articles and the ROFR Agreement, each of the Selling Shareholders shall comply with its obligations under Articles 123, 124 and 125 of the Memorandum and Articles and Sections 5.1, 5.2 and 5.3 of the ROFR Agreement. The Company, the Principals and the Principal Holdcos shall facilitate each of the Directors designated by the Board in exercising, and direct each such Director to exercise, in full the irrevocable power of attorney and proxy granted pursuant to Article 124 of the Memorandum and Articles and Section 5.3 of the ROFR Agreement to take all necessary actions and execute and deliver all documents reasonably necessary to effectuate the terms of this Agreement and the Transactions.

57

SECTION 7.18 Shareholders Representative. Each of the Selling Shareholders (including the Former Company Share Award Holders), by virtue of its, his or her execution and delivery of this Agreement (directly, by proxy or pursuant to a power of attorney), hereby irrevocably constitutes and appoints Xuhao Zhang, a Principal and the Chief Executive Officer of the Company as of the date of this Agreement (the "Shareholders Representative"), to be such Selling Shareholder's true and lawful representative, agent and attorney-in-fact to act on such Selling Shareholder's behalf with respect to any actions permitted to be taken by such Selling Shareholder, or any of them, after the date of this Agreement in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby, in accordance with the terms and conditions of the Transaction Documents. In such representative capacity, the Shareholders Representative shall take or refrain from taking, and the Selling Shareholders each agree that the Shareholders Representatives may take or refrain from taking, any and all actions which the Shareholders Representative reasonably believes, acting in good faith, to be necessary or appropriate under this Agreement and the other Transaction Documents (except as provided above) for and on behalf of the Selling Shareholders, as fully and effectively as if the Selling Shareholders were acting on their own behalf. Each reference in this Agreement or any other Transaction Document to an action to be taken by the Selling Shareholders shall, with respect to the Selling Shareholders, be taken by the Shareholders Representative on their behalf pursuant to this Section 7.18. Each Selling Shareholder hereby ratifies and confirms, and agrees to ratify and confirm in the future upon the request of the Shareholders Representative, any action taken by the Shareholders Representative in the exercise of the agency and power of attorney granted to the Shareholders Representative pursuant to this Section 7.18, which agency and power of attorney, being coupled with an interest, is irrevocable and a durable agency and power of attorney and shall survive the death, incapacity or incompetence of such Selling Shareholder. Each of Purchaser and the Escrow Agent shall be entitled to conclusively rely upon the directions, instructions and notice of the Shareholders Representative, when it is acting in their capacity as such under this Section 7.18, without being required to undertake any independent investigation or verification, and any notice provided in accordance with this Agreement to or from the Shareholders Representative in its capacity as such shall be conclusively deemed to have been provided to or from each of the Selling Shareholders, as applicable. The Shareholders Representative shall not have any liability to any of the Selling Shareholders arising out of or relating to any action taken or omission made in good faith by the Shareholders Representative (in its capacity as such) pursuant to this Agreement, and each Selling Shareholder shall, severally but not jointly, indemnify, defend and hold harmless the Shareholders Representative with respect to all actions so taken or omissions made on behalf of such Selling Shareholder up to the net proceeds received by such Selling Shareholder in connection with the Transactions.

SECTION 7.19 Release of Share Charge. The Rollover Shareholder shall, and Purchaser shall cause the Rollover Shareholder to, execute and deliver to the Principals a deed of release and all other documents necessary for discharging and releasing the security interests created on certain Ordinary Shares owned by the Principal Holdcos under that certain equity mortgage over shares dated January 30, 2018 by and between the Principals, the Principal Holdcos and the Rollover Shareholder, prior to the sale and transfer of such Ordinary Shares by the Principals to Purchaser at the Closing.

58

SECTION 7.20 <u>Integration Committee</u>. Promptly after signing, the Company, Principals, Principal Holdcos and Purchaser shall establish a transition planning team (the "<u>Integration Committee</u>"), comprised of individuals appointed by Purchaser and the Chief Executive Officer of the Company. Subject to applicable Law, the Integration Committee shall be responsible for facilitating a transition and integration planning process to ensure the successful transition of management of the operations of the Group Companies to Purchaser after the Closing, which may include the inclusion of various employees of Purchaser and its Affiliates into certain operational and management roles within the Group at the direction of the Integration Committee. Subject to applicable Law, the Integration Committee shall be responsible for developing, and monitoring the development of, an action plan for the integration of the Group into the business of Purchaser and its Affiliates, and between the date hereof and the Closing, shall be responsible for overseeing and directing the ongoing operations and management of the Company.

SECTION 7.21 <u>Termination of Certain Agreements</u>. Each of the Parties hereto hereby acknowledges and agrees that the Shareholders Agreement and the ROFR Agreement automatically terminate upon the Closing.

# ARTICLE VIII

## CONDITIONS TO THE CLOSING

SECTION 8.01 <u>Conditions to the Obligations of Each Party</u>. The obligations of Purchaser, each Selling Shareholder, each Rollover Option Holder, the Rollover Shareholder and the Company to consummate the Transactions are subject to the satisfaction or waiver (where permissible) of the following conditions:

(a) <u>No Injunction</u>. No Governmental Authority of competent jurisdiction shall have issued any injunction, restraining order or judgment which is then in effect that prohibits the consummation of the Transactions.

(b) <u>Escrow Agreement</u>. The Escrow Agreement shall have been duly entered by the parties thereto.

SECTION 8.02 <u>Conditions to the Obligations of Purchaser</u>. The obligations of Purchaser to consummate the Transactions are subject to the satisfaction or waiver (where permissible) of the following additional conditions:

(a) <u>Representations and Warranties of the Warrantors</u>. (i) The Fundamental Warranties shall have been true and complete in all respects when made and shall be true and complete in all respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing Date, except in each case for those representations and warranties that address matters only as of a particular date, which representations will have been true and complete in all respects as of such particular date, and (ii) each of the representations and warranties of the Warrantors contained in <u>Article III</u> (other than the Fundamental Warranties) shall have been true and complete in all material respects when made and shall be true and complete in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing Date, except in each case for those representations and warranties that address matters only as of a particular date, which representations will have been true and complete in all material respects as of such particular date.

59

(b) <u>Agreements and Covenants of the Company Parties</u>. Each Company Party shall have performed and complied with, in all material respects, all covenants, obligations and conditions contained in the Transaction Documents that are required to be performed or complied with by such Company Party on or before the Closing.

(c) <u>Closing Certificate</u>. The Warrantors shall have executed and delivered to Purchaser a certificate dated as of the Closing Date (i) stating that each of the relevant conditions specified in <u>Section 8.01</u> and <u>Section 8.02</u> (but not including <u>Section 8.02(d)</u> and <u>Section 8.02(e)</u>) have been fulfilled as of the Closing, and (ii) attaching thereto (A) the Charter Documents of the Group Companies (other than the Stores) as then in effect and (B) copies of all resolutions approved by the shareholders and boards of directors of each Group Company that is a party to a Transaction Document related to the transactions contemplated hereby, and (C) the good standing certificate with respect to the Company and the certificate of continuing registration with respect to each of the Rajax HK Subsidiary and Xiaodu HK Company dated no more than ten (10) Business Days prior to such Closing, and with respect to the Group Companies which are incorporated under the Laws of the PRC, the business licenses of such entity (other than the Stores).

(d) <u>Representations and Warranties of the Selling Shareholders</u>. Each of the representations and warranties of the Selling Shareholders contained in <u>Article V</u> shall have been true and complete when made and shall be true and complete on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the Closing Date, except in each case for those representations and warranties that address matters only as of a particular date, which representations will have been true and complete as of such particular date.

(e) <u>Agreements and Covenants of the Selling Shareholders and Rollover Option Holders</u>. Each Exercising Company Share Award Holder and Rollover Option Holder shall have become a party to this Agreement by delivering to Purchaser and the Shareholders Representative a counterpart, duly executed by such Person, to this Agreement. Each Selling Shareholder (other than the Company Parties) and each Rollover Option Holder shall have performed and complied with all covenants, obligations and conditions contained in the Transaction Documents that are required to be performed or complied with by them, on or before the Closing.

(f) <u>Cayman Islands Legal Opinion</u>. Purchaser shall have received from the Cayman Islands counsel to the Company, a legal opinion in the form attached as <u>Exhibit B</u> hereto, dated as of the Closing, regarding the validity of the Transactions under Cayman Islands law.

(g) <u>PRC Legal Opinion</u>. Purchaser shall have received from the PRC counsel to the Company, a legal opinion in a form to be agreed between the Company and Purchaser prior to the Closing, dated as of the Closing (which shall cover substantially, among other matters, the matters set forth in the legal opinions delivered in connection with the issuance of the Series G-1 Preferred Shares to the Rollover Shareholder, but revised to cover the Xiaodu PRC Companies).

60

(h) Audited 2017 Financial Statements. Purchaser shall have received the Audited 2017 Financial Statements, together with the auditors report thereon, and none of the net assets, revenue or net profit/loss line items set forth in such Audited 2017 Financial Statements shall be less than 90% of the corresponding line items set forth in Unaudited 2017 Financial Statements, which amounts shall be calculated without taking into account any difference arising from (i) Tax assets or liabilities; (ii) interest accrued on related party transactions between Group Companies; (iii) stock-based compensation of any Group Company; (iv) potential inventory loss; (v) impairment, amortization and depreciation of long-term assets (including intangible assets and goodwill); (vi) accounting adjustment to the promissory note and accrued interest thereon owed to Koubei; (vii) accounting adjustment relating to the Preferred Shares; and (viii) changes arising solely as a result of calculating and recognizing revenue in accordance with PRC GAAP instead of the Accounting Standards utilized in the Unaudited 2017 Financial Statements.

(i) Application Forms for Domestic Company Equity Transfer. All application forms and relevant materials necessary for the Onshore Equity Transfer shall have been duly signed by all necessary parties and delivered to Purchaser in form and substance agreed by Purchaser.

(j) Control Documents. The Control Documents of each Domestic Company shall have been amended and restated (in form and substance reasonably satisfactory to Purchaser) to reflect the Onshore Equity Transfer (such amended and restated Control Documents, collectively, the "New Control Documents");

(k) Application Forms for Registration of Share Pledges. All application forms and relevant materials necessary for the termination of the existing share pledge registration with relevant authorities under the Control Documents shall have been duly signed by all necessary parties and delivered to Purchaser in form and substance agreed by Purchaser;

(l) Application Forms for Replacement of Legal Representatives. All application forms and relevant materials necessary for the replacement of the legal representative, directors, management and officers of each PRC Group Company as requested by Purchaser shall have been duly signed by all necessary parties and delivered to Purchaser in form and substance agreed by Purchaser; and

(m) Material Adverse Effect. Since the date of this Agreement, there shall not have occurred and be continuing a Material Adverse Effect.

SECTION 8.03 Conditions to the Obligations of the Selling Shareholders. The obligations of the Selling Shareholders to consummate the Transactions are subject to the satisfaction or waiver (where permissible) of the following additional conditions:

(a) Representations and Warranties of Purchaser. The representations and warranties of Purchaser contained in Article IV shall have been true and complete when made and shall be true and complete on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing, except in either case for those representations and warranties that address matters only as of a particular date, which representations will have been true and complete as of such particular date.

61

(b) *Agreements and Covenants of Purchaser*. Purchaser shall have performed and complied with all covenants, obligations and conditions contained in this Agreement that are required to be performed or complied with by Purchaser on or before the Closing.

## ARTICLE IX

## TERMINATION AND INDEMNIFICATION

SECTION 9.01 <u>Termination</u>. This Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing, as follows:

(a) by mutual written consent of Purchaser and the Shareholders Representative;

(b) by any of Purchaser or Shareholders Representative if:

(i) the Closing shall not have occurred on or before the date that is ninety (90) days after the date of this Agreement (such date as may be extended in accordance with this <u>Section 9.01(b)(i)</u>, the "<u>Termination Date</u>"), <u>provided</u> that the right to terminate this Agreement pursuant to this <u>Section 9.01(b)(i)</u> shall not be available to Purchaser or the Shareholders Representative, as applicable, if the circumstances described in this <u>Section 9.01(b)(i)</u> are primarily caused by a failure by Purchaser or any Selling Shareholder (including the Shareholders Representative) or Rollover Option Holder, as applicable, to comply with its obligations under this Agreement; or

(ii) an Injunction shall have been issued;

(c) by Purchaser:

(i) if there shall have been a breach of any representation, warranty, covenant or agreement on the part of any Company Party set forth in this Agreement (including a failure by any such Company Party to complete the Closing subject to and in accordance with <u>Article II</u>), or if any representation or warranty of the Company shall have become untrue, in either case such that the condition set forth in <u>Section 8.02(a)</u> or the condition set forth in <u>Section 8.02(b)</u> would not be satisfied; and

(ii) solely with respect to the Share Purchase related to a specific Selling Shareholder's Sale Shares, if there shall have been a breach of any representation, warranty, covenant or agreement by such Selling Shareholder set forth in this Agreement (including a failure by any such Selling Shareholder to complete the Closing subject to and in accordance with <u>Article II</u>), or if any representation or warranty of such Selling Shareholder shall have become untrue, in either case such that the condition set forth in <u>Section 8.02(d)</u> or the condition set forth in <u>Section 8.02(e)</u> would not be satisfied; <u>provided</u>, <u>however</u>, that, in each case, Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 9.01(c)(i)</u> if Purchaser is then in material breach of any of its representations, warranties, covenants or other agreements hereunder; or

62

(d) by the Shareholders Representative if there shall have been a breach of any representation, warranty, covenant or agreement on the part of Purchaser set forth in this Agreement, or if any representation or warranty of Purchaser shall have become untrue, in either case such that the condition set forth Section 8.03(a) or the condition set forth in Section 8.03(b) would not be satisfied; provided, however, that Shareholders Representative shall not have the right to terminate this Agreement pursuant to this Section 9.01(d) if any Selling Shareholder (including the Shareholders Representative) or Rollover Option Holder is then in material breach of any of its representations, warranties, covenants or other agreements hereunder.

SECTION 9.02 Effect of Termination. In the event of the termination of this Agreement pursuant to Section 9.01, this Agreement shall forthwith become void, and there shall be no liability under this Agreement on the part of any party hereto (or any Representatives of any party hereto) other than for breaches of this Agreement prior to the date of such termination; provided, however, that the terms of Section 7.06, this Article IX and Article X shall survive any termination of this Agreement.

SECTION 9.03 Indemnity.

(a) Subject to the limitations on indemnities set forth in Section 9.05, from and after the Closing, each of the Selling Shareholders (such Selling Shareholders, for purposes of this Section 9.03(a), and each Selling Shareholder for purposes of Section 9.03(b), each an "Indemnifying Party" and collectively, the "Indemnifying Parties") shall, severally but not jointly, on a pro rata basis in accordance with Section 9.04(b), indemnify and hold harmless Purchaser, its Affiliates, the directors, employees, agents and representatives of Purchaser or any of its Affiliates, and the successors and assigns of Purchaser and its Affiliates (collectively, the "Purchaser Indemnified Parties") from and against an amount equal to (x) the Aggregate Selling Shareholders Percentage multiplied by (y) any and all Indemnifiable Losses, including any reduction in value of the Company's or the Group Companies' assets, any increase in their liabilities, any dilution of Purchaser's interests in the Group Companies or any diminution in the value of Purchaser's interests in the Group Companies, directly or indirectly, resulting from or relating to (i) any breach of any representation or warranty made by the Warrantors in Article III, or (ii) any breach of the agreements and covenants of the Company, the Principals, and the Principal Holdcos in Section 6.01.

(b) Subject to the limitations on indemnities set forth in Section 9.05, from and after the Closing, each Selling Shareholder shall, severally but not jointly, indemnify and hold harmless the Purchaser Indemnified Parties from and against any and all Indemnifiable Losses, directly or indirectly, resulting from or relating to any breach of any representation or warranty made by such Selling Shareholder as to itself in Article V.

63

SECTION 9.04 Indemnification Procedures.

(a) If any Purchaser Indemnified Party believes that it has a claim that may give rise to an indemnity obligation hereunder (the "Asserted Liability"), such Purchaser Indemnified Party shall give prompt written notice to (i) in the case of a claim made pursuant to Section 9.03(a), the Shareholders Representative, and (ii) in the case of a claim made pursuant to Section 9.03(b), the relevant Selling Shareholder, of the assertion of any claim or the commencement of any suit, action or proceeding by a third party in respect of which indemnity may be sought by such Purchaser Indemnified Party under Section 9.03 (an "Asserted Action"), which notice shall set forth the basis on which such claim is being made, the material facts related thereto, and the amount of the claim asserted; provided that the failure to promptly provide such notice shall not affect the Purchaser Indemnified Parties' rights under Section 9.03 unless such notice is not provided to Shareholders Representative or the relevant Selling Shareholder, as applicable, within the applicable Survival Period or except to the extent such failure is actually materially prejudicial to the rights and obligations of the relevant Indemnifying Parties in connection with such claim. In the event that such notice of a claim is so given within the applicable Survival Period, the right to pursue such claim will survive such Survival Period until such claim is finally resolved and any obligations with respect to such claim has been fully satisfied. The relevant Indemnifying Party shall be entitled to, at its cost and by counsel of its own choosing (which shall be reasonably acceptable to the relevant Purchaser Indemnified Party), assume and control the defense of an Asserted Action brought by a third party against such Purchaser Indemnified Party if it provides written notice of such election to such Purchaser Indemnified Party within ten (10) Business Days of notice of such Asserted Action which includes an acknowledgement of such Indemnifying Party's indemnification obligations in respect of such Asserted Action. If the relevant Indemnifying Party validly elects to assume and control the defense of such Asserted Action in accordance with this Section 9.04(a), (i) the Purchaser Indemnified Party shall cooperate fully (at the cost of the Indemnifying Party) with the Indemnifying Party and its counsel in the investigation, defense and settlement thereof, and (ii) no such Asserted Action shall be settled or compromised, and no Purchaser Indemnified Party shall take any action to adversely affect or prejudice any such Asserted Action without the Indemnifying Party's prior written consent (not to be unreasonably withheld or delayed). If the relevant Indemnifying Party does not validly elect to assume and control the defense of such Asserted Action in accordance with this Section 9.04(a), the relevant Purchaser Indemnified Party shall have the right to assume and control the defense of such Asserted Action and all reasonable costs and expenses in connection therewith shall constitute Indemnifiable Losses.

(b) Each Indemnifying Party's indemnification obligations pursuant to Section 9.03(a) shall be satisfied from the funds remaining in the Audit and Indemnity Escrow Account at any given time, and such funds shall be the sole source of recovery with respect to any Indemnifiable Losses pursuant to Section 9.03(a). Each Indemnifying Party's indemnification obligations pursuant to Section 9.03(b) shall be satisfied, first, from the funds remaining in the Audit and Indemnity Escrow Account at any given time which are allocated to the applicable Selling Shareholder and, thereafter, by such applicable Selling Shareholder. Each Selling Shareholder shall bear, severally but not jointly, (i) its Seller Pro Rata Share of any indemnification obligation of the Indemnifying Parties pursuant to Section 9.03(a), subject to the limitation set forth in the first sentence of this Section 9.04(b) (the "Pro Rata Indemnity Amount") and (ii) the full amount of any indemnification obligation of such Selling Shareholder in its capacity as an Indemnifying Party pursuant to Section 9.03(b).

64

(c) In the event that any indemnification obligation has become payable by any Indemnifying Party pursuant to Section 9.03 (and, if such indemnification obligation has been disputed by the applicable Indemnifying Party, such indemnification obligation is ultimately agreed by such Indemnifying Party or has been determined by an arbitral award in accordance with Section 10.03) (the "Undisputed Indemnity Amount"), Purchaser and Shareholders Representative shall deliver joint written instructions to the Escrow Agent instructing the Escrow Agent to deliver to Purchaser from the Audit and Indemnity Escrow Amount allocated to such Indemnifying Party (i) in the case of a claim made pursuant to Section 9.03(a), such Selling Shareholder's Pro Rata Indemnity Amount with respect to the Undisputed Indemnity Amount and (ii) in the case of a claim made pursuant to Section 9.03(b), the full amount of such Undisputed Indemnity Amount of such Selling Shareholder in its capacity as an Indemnifying Party thereunder.

(d) If any Indemnifying Party is required to deduct or withhold any amounts from any indemnification obligation payable to the Purchaser Indemnified Parties under Section 9.03, the amount of such Indemnifying Party's indemnification obligation shall be increased such that the net payment received by the Purchaser Indemnified Parties, after any such deduction or withholding, equals the amount of the Indemnifying Party's indemnification obligation under Section 9.03.

SECTION 9.05 Limitations on Indemnity.

(a) The Indemnifying Parties and Purchaser acknowledge that the indemnities under Section 9.03 shall be subject to the following provisions: (i) the Purchaser Indemnified Parties shall not bring any indemnity claim under Section 9.03(a)(i) against the Indemnifying Parties for breach of representations or warranties set forth under Article III, to the extent that relevant exceptions have been fairly disclosed in the Company Disclosure Schedule; (ii) the total liability of each Indemnifying Party in respect of all relevant indemnification claims under Section 9.03(a) brought by the Purchaser Indemnified Parties is limited to the Audit and Indemnity Escrow Amount allocated to the applicable Selling Shareholder, except for fraud or willful misconduct of the Warrantors, the Company and/or such Selling Shareholder; (iii) without prejudice to Section 9.05(a)(ii), the total liability of each Selling Shareholder in respect of any and all indemnification claims or other claims under this Article IX or otherwise in law or in equity brought by the Purchaser Indemnified Parties shall not exceed the net proceeds received by, including the amounts held in the Audit and Indemnity Escrow Account and Tax Escrow Account on behalf of, such Selling Shareholder in connection with the Transactions, except for fraud or willful misconduct of such Selling Shareholder; (iv) the Indemnifying Parties are not liable to indemnify any Purchaser Indemnified Party in respect of any claims under this Agreement to the extent that such claims would not have arisen but for a change in any law, regulation or government decrees promulgated after the Closing; (v) the Indemnifying Parties shall not be liable for any claim made pursuant to Section 9.03 if (A) the alleged breach which is the subject of the claim is remediable and has been remedied by the relevant Indemnifying Party without cost or liability to the Group, to the reasonable satisfaction of Purchaser, within thirty (30) Business Days after the date on which the notice of such claim is received by Shareholders Representative or the relevant Selling Shareholder, as applicable (the "Grace Period"), and (B) no Indemnifiable Loss is incurred by any Purchaser Indemnified Party seeking indemnification after the completion of such remedial actions conducted within the Grace Period, and (vi) no claims arising out of this Agreement may be made against any of the Principals and no Liabilities in connection with such claims shall be borne by any of the Principals (other than indirectly through their ownership of the Principal Holdcos). In addition, the Indemnifying Parties and Purchaser acknowledge that the Indemnifying Parties shall not be obligated to indemnify any Indemnified Party under Section 9.03(a) unless the aggregate Indemnifiable Losses incurred by the Indemnified Parties in connection with any claims brought under Section 9.03(a), cumulatively and in the aggregate, exceed US$2,000,000, in which case, the Indemnifying Parties shall be liable for all such Indemnifiable Losses from the first dollar.

65

(b) The representations and warranties of the Warrantors in Article III shall survive the Closing until the second (2nd) anniversary of the Closing, provided that (i) the Fundamental Warranties shall survive the Closing indefinitely and (ii) the survival period for any indemnification obligation relating to any claim of liability for Taxes attributable to any breach of any representation or warranty made in Section 3.07 shall survive the Closing until the earlier of the tenth (10th) anniversary of the Closing and the expiration of the applicable statute of limitations under applicable Laws. The representations and warranties of each Selling Shareholder in Article V shall survive the Closing indefinitely. The applicable survival periods set forth in this Section 9.05(b) shall be referred to as the "Survival Period". The right of the Purchaser Indemnified Parties to make a claim under Section 9.03 shall be subject to the Purchaser Indemnified Parties making a claim pursuant to Section 9.03 prior to the expiration of the applicable Survival Period.

(c) In no event shall any Party be liable under this Agreement for any punitive, exemplary, or special damages of any kind or nature. Where one and the same set of facts qualifies under more than one provision entitling a party to a claim or remedy under this Agreement, there shall be only one claim or remedy. In calculating amounts payable to a Purchaser Indemnified Party, the amount of Indemnifiable Losses shall be determined without duplication of any other Indemnifiable Losses for which an indemnification claim has been made or could be made with respect to any other representation, warranty, obligation or agreement and shall be computed net of (i) any amounts actually recovered by the Purchaser Indemnified Party under any insurance policy with respect to such Indemnifiable Losses and (ii) any amounts actually recovered by the Purchaser Indemnified Party from any other third party with respect to such Indemnifiable Losses, in each case, net of any costs and expenses of any Purchaser Indemnified Party in connection with such recovered amounts.

(d) The amount of any indemnity payments made pursuant to this Agreement shall be reduced (but not below zero) by the amount of any actual net reduction in cash payments for Taxes actually realized by any Purchaser Indemnified Party, in the year of the claim, as a result of the Indemnifiable Losses giving rise to such indemnity claim.

(e) Notwithstanding anything to the contrary contained in this Agreement, in no event shall any Purchaser Indemnified Party be entitled to indemnification to the extent any Indemnifiable Losses were attributable to such Purchaser Indemnified Party's own fraud or willful misconduct.

(f) Notwithstanding anything to the contrary contained herein and without prejudice to Section 10.05 with respect to non-monetary damages and related equitable remedies, except in the case of fraud or willful misconduct, Section 9.03 shall be the exclusive remedy after the Closing for monetary damages against any Selling Shareholder by any Purchaser Indemnified Party in connection with any Transaction Document.

66

SECTION 9.06 Tax Treatment of Indemnification Payments. All indemnification payments made under Section 9.03 shall be treated as adjustments to the Aggregate Purchase Price and the Purchase Price for the applicable Selling Shareholder for Tax purposes, unless otherwise required by applicable Law.

**ARTICLE X**

**GENERAL PROVISIONS**

SECTION 10.01 Successors and Assigns. Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties hereto whose rights or obligations hereunder are affected by such terms and conditions. This Agreement and the rights and obligations therein may not be assigned by any Warrantor without the prior written consent of Purchaser, and this Agreement and the rights and obligations therein may not be assigned by Purchaser except to an Affiliate thereof. Nothing in this Agreement, express or implied, is intended to confer upon any Party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

SECTION 10.02 Governing Law. This Agreement shall be governed by and construed under the Laws of the Hong Kong Special Administrative Region of the PRC ("Hong Kong"), without regard to principles of conflict of Laws thereunder.

SECTION 10.03 Dispute Resolution.

(a) Any dispute, controversy or claim arising out of or relating to this Agreement, or the interpretation, breach, termination, validity or invalidity thereof (each, a "Dispute"), shall be referred to arbitration upon the demand of either party to the Dispute with notice (the "Arbitration Notice") to the other.

(b) The Dispute shall be settled by arbitration in Hong Kong by the Hong Kong International Arbitration Centre (the "HKIAC") in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules (the "HKIAC Rules") in force when the Arbitration Notice is submitted in accordance with the HKIAC Rules. There shall be three (3) arbitrators. The HKIAC shall select the arbitrators, who shall be qualified to practice law in Hong Kong.

(c) The arbitral proceedings shall be conducted in English. To the extent that the HKIAC Rules are in conflict with the provisions of this Section, including the provisions concerning the appointment of the arbitrators, the provisions of this Section shall prevail.

(d) Each party to the arbitration shall cooperate with each other party to the arbitration in making full disclosure of and providing complete access to all information and documents requested by such other party in connection with such arbitral proceedings, subject only to any confidentiality obligations binding on such party.

67

(e) The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award.

(f) The arbitral tribunal shall decide any Dispute submitted by the parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong (without regard to principles of conflict of Laws thereunder) and shall not apply any other substantive Law.

(g) Any party to the Dispute shall be entitled to seek preliminary injunctive relief, if possible, from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

(h) During the course of the arbitral tribunal's adjudication of the Dispute, this Agreement shall continue to be performed except with respect to the part in dispute and under adjudication.

SECTION 10.04 Notices. Any notice required or permitted pursuant to this Agreement shall be given in writing and shall be given either personally or by sending it by next-day or second-day courier service, fax, electronic mail or similar means to the address of the relevant Party as shown on Schedule V (or at such other address as such Party may designate by fifteen (15) days' advance written notice to the other Parties to this Agreement given in accordance with this Section). Where a notice is sent by next-day or second-day courier service, service of the notice shall be deemed to be effected by properly addressing, pre-paying and sending by next-day or second-day service through an internationally-recognized courier a letter containing the notice, with a written confirmation of delivery, and to have been effected at the earlier of (i) delivery (or when delivery is refused) and (ii) expiration of two (2) Business Days after the letter containing the same is sent as aforesaid. Where a notice is sent by fax or electronic mail, service of the notice shall be deemed to be effected by properly addressing, and sending such notice through a transmitting organization, with a written confirmation of delivery, and to have been effected on the day the same is sent as aforesaid, if such day is a Business Day and if sent during normal business hours of the recipient, otherwise the next Business Day. Notwithstanding the foregoing, to the extent a "with a copy to" address is designated, notice must also be given to such address in the manner above for such notice, request, consent or other communication hereunder to be effective.

SECTION 10.05 Rights Cumulative; Specific Performance. Subject to express limitations of liability of a Party under this Agreement, each and all of the various rights, powers and remedies of a party hereto will be considered to be cumulative with and in addition to any other rights, powers and remedies which such Party may have at Law or in equity in the event of the breach of any of the terms of this Agreement. The exercise or partial exercise of any right, power or remedy will neither constitute the exclusive election thereof nor the waiver of any other right, power or remedy available to such Party. Without limiting the foregoing, the Parties hereto acknowledge and agree irreparable harm may occur for which money damages would not be an adequate remedy in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement (including the other parties' obligation to consummate the Transactions, subject in each case to the terms and conditions of this Agreement), in addition to any other remedy at law or equity. Each Party hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

68

SECTION 10.06 <u>Fees and Expenses</u>. Each Party shall bear its own legal, accounting and other out-of-pocket costs and expenses incurred by such Party in connection with the negotiation, execution, delivery and performance of this Agreement and other Transaction Documents and the transactions contemplated hereby and thereby.

SECTION 10.07 <u>Restriction on the Use of Name</u>. Without the prior written consent of Alibaba, none of the Group Companies and the Parties hereto (other than Alibaba) shall, and each foregoing Person shall cause its Affiliates not to, (i) use in advertising, publicity, announcements, or otherwise, the name of Alibaba or any Affiliate of Alibaba, either alone or in combination of, including "阿里巴巴" (Chinese equivalent for "Alibaba"), "淘宝" (Chinese equivalent for "Taobao"), "阿里" (Chinese equivalent for "Ali"), "全球速卖通" (Chinese brand for "AliExpress"), "淘" (Chinese equivalent for "Tao"), "天猫" (Chinese equivalent for "Tmall"), "聚划算" (Chinese equivalent for "Juhuasuan"), "飞猪" (Chinese equivalent for "Fliggy"), "阿里妈妈" (Chinese equivalent for "Alimama"), "阿里云" (Chinese equivalent for "Alibaba Cloud"), "口碑" (Chinese equivalent for "Koubei'), "虾米" (Chinese equivalent for "Xiami"), "蚂蚁金服" (Chinese brand for "Ant Financial"), "蚂蚁" (Chinese equivalent for "Ant"), "蚂蚁财富" (Chinese equivalent for "Ant Fortune"), "支付宝" (Chinese brand for "Alipay"), "1688", "一达通" (Chinese brand for "OneTouch"), "友盟" (Chinese equivalent for "Umeng"), "阿里音乐" (Chinese equivalent for "Alibaba Music"), "阿里星球" (Chinese equivalent for "Alibaba Planet"), "优视" (Chinese equivalent for "UC/UCWeb"), "高德地图" (Chinese brand for "AMAP"), "钉钉" (Chinese brand for "DingTalk"), "余额宝" (Chinese equivalent for "Yu'e Bao"), "招财宝" (Chinese equivalent for "Zhaocaibao"), "芝麻信用" (Chinese equivalent for "Zhima Credit"), "网商银行" (Chinese brand for "MYbank"), "阿里通信" (Chinese equivalent for "AliTelecom"), "优酷" (Chinese equivalent for "YOUKU"), "Alibaba", "Taobao", "Ali", "AliExpress", "Tao", "Tmall", "Juhuasuan", "Fliggy", "Alimama", "Alibaba Cloud", "YunOS", "Koubei", "Xiami", "Ant Financial", "Ant", "Ant Fortune", "Alipay", "OneTouch", "Umeng", "Alibaba Music", "Alibaba Planet", "UCWeb", "UC", "AMAP", "DingTalk", "Yu'e Bao", "Zhaocaibao", "Zhima Credit", "MYbank", "AliTelecom", "YOUKU", the associated devices and logos of the above brands (including but not limited to the smiling face device of Alibaba Group, the cow device of Alibaba.com, the ant device of Taobao, the Tao doll device of Taobao, the cat device of Tmall, the Ju doll device of Juhuasuan, the bracket device of Alibaba Cloud, the cloud device of YunOS, the pig device of Fliggy, the wing device of Dingtalk, the ant device of Ant Financial, the lion device and the Zhixiaobao device of Alipay, the ingot device of Zhaocaibao, the sesame device of Zhima Credit together with the Gaoxiaode device and the paper aeroplane device of AutoNavi), or any company name, trade name, trademark, service mark, domain name, device, design, symbol or any abbreviation, contraction or simulation thereof owned or used by Alibaba or any of its Affiliates, or (ii) represent, directly or indirectly, that any product or services provided by any Group Company has been approved or endorsed by Alibaba or any of its Affiliates.

69

SECTION 10.08 Finder's Fee. Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which Purchaser or any of its officers, partners, employees or representatives is responsible in connection with the transaction contemplated herein. The Company agrees to indemnify and hold harmless Purchaser from any liability for any commission or compensation in the nature of a finders' fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible in connection with the transaction contemplated herein.

SECTION 10.09 Severability. In case any provision of the Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal, or unenforceable under any such applicable Law in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such Law, or, if for any reason it is not deemed so modified, it shall be invalid, illegal, or unenforceable only to the extent of such invalidity, illegality, or limitation on enforceability without affecting the remaining provisions of this Agreement, or the validity, legality, or enforceability of such provision in any other jurisdiction. Without limitation of the foregoing, notwithstanding any claim or determination regarding the validity, legality, enforceability or binding nature of this Agreement with respect to any individual Party, this Agreement shall be valid, binding and enforceable with respect to each other Party, and nothing herein and no such claim or determination shall in any way limit Purchaser's right to treat the agreements herein with each Party as a separate, severable agreements, enforce this Agreement with respect to an individual Party and separately consummate the transactions hereunder with respect to an individual Party.

SECTION 10.10 Amendments and Waivers. Any term of this Agreement may be amended, only with the written consent of each of (i) the Company, (ii) the holders of a majority of the voting power of the Ordinary Shares held by the Principals (through their Principal Holdcos) who are then employees of the Company, (iii) the Shareholders Representative, and (iv) Purchaser; provided however that no amendment or waiver shall be effective or enforceable in respect of any Selling Shareholder if such amendment or waiver affects such Selling Shareholder in a materially adverse and materially disproportionate manner from the other Selling Shareholders. Any amendment effected in accordance with this paragraph shall be binding upon each of the Parties hereto. Notwithstanding the foregoing, the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Party against whom such waiver is sought. For the avoidance of doubt, Purchaser may, in its sole discretion, waive any of the conditions set forth in Section 8.01(b) or Section 8.02 with respect to any one or more Selling Shareholders and to consummate individual Share Purchases with respect to any one or more Selling Shareholders; provided that Purchaser shall deliver a written notice of any such individual Share Purchase to the Shareholders Representative on the date of such individual consummation of such individual Share Purchase.

SECTION 10.11 <u>No Waiver</u>. Failure to insist upon strict compliance with any of the terms, covenants, or conditions hereof will not be deemed a waiver of such term, covenant, or condition, nor will any waiver or relinquishment of, or failure to insist upon strict compliance with, any right, power or remedy power hereunder at any one or more times be deemed a waiver or relinquishment of such right, power or remedy at any other time or times.

SECTION 10.12 <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other Party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting Party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.

SECTION 10.13 <u>No Presumption</u>. The Parties acknowledge that any applicable Law that would require interpretation of any claimed ambiguities in this Agreement against the Party that drafted it has no application and is expressly waived. If any claim is made by a Party relating to any conflict, omission or ambiguity in the provisions of this Agreement, no presumption or burden of proof or persuasion will be implied because this Agreement was prepared by or at the request of any Party or its counsel.

SECTION 10.14 <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile, PDF and e-mailed copies of signatures shall be deemed to be originals for purposes of the effectiveness of this Agreement.

SECTION 10.15 <u>Entire Agreement</u>. This Agreement (including the Exhibits and Schedules hereto) and the other Transaction Documents together with all schedules and exhibits hereto and thereto, constitute the full and entire understanding and agreement among the Parties with regard to the subjects hereof and thereof, and supersede all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof.

71

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers or authorized representatives thereunto duly authorized.

PURCHASER:

ALI PANINI INVESTMENT LIMITED

By /s/ Timothy Alexander Steinert
Name:  Timothy Alexander Steinert
Title:   Authorized Signatory

[Panini IV – Signature Page to Share Purchase Agreement]

PRINCIPALS:

/s/ Xuhao Zhang
Xuhao Zhang (張旭豪)

/s/ Yuan Wang
Yuan Wang (汪淵)

/s/ Jia Kang
Jia Kang (康嘉)

/s/ Gaochao Deng
Gaochao Deng (鄧高潮)

[Panini – Signature Page to Share Purchase Agreement]

PRINCIPAL HOLDCOS:

**Mark X Taurus Investment Holdings Inc**.

By:  /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:   Director

**Three Body Technology Inc**.

By:  /s/ Yuan Wang
Name:  Yuan Wang (汪淵)
Title:   Director

**King Jack Investment Inc**.

By:  /s/ Jia Kang
Name:  Jia Kang (康嘉)
Title:   Director

**Three Stone Investment Inc**.

By:  /s/ Gaochao Deng
Name:  Gaochao Deng (鄧高潮)
Title:   Director

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Legend Giant Group Limited**

By:  /s/ Chen Hao
Name:  Chen Hao
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**MATRIX PARTNERS CHINA II HONG KONG
LIMITED**

By:  /s/ Yibo SHAO
Name:  Yibo SHAO
Title:    Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Sequoia Capital CV IV Holdco, Ltd.**

By:  /s/ Ip Siu Wai Eva
Name:  Ip Siu Wai Eva
Title:   Authorized Signatory

**Sequoia Capital China GF Holdco III-A, Ltd.**

By:  /s/ Ip Siu Wai Eva
Name:  Ip Siu Wai Eva
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement - Rajax Holding]

SELLING SHAREHOLDERS:

**Sevva Investment Limited**

By: /s/ Cheung Wing Hong Shannon
Name: Cheung Wing Hong Shannon
Title: Director

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Tactic Smart Limited**

By:  /s/ Wen Quan
Name:  Wen Quan
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**CE Takeout Limited**

By:  /s/ Wu Jingyang
Name:  Wu Jingyang
Title:   Authorized Signatory

**CE Takeout II Limited**

By:  /s/ Wu Jingyang
Name:  Wu Jingyang
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**CMC Element Investment Limited**

By:  /s/ CHEN Xian
Name:  CHEN Xian
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**GOPHER HARVEST FUND LP**

By: /s/ Yin Zhe
Name: Yin Zhe
Title: Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Shanghai Jize Investment Center (Limited Partnership)**（上海基澤投資中心（有限合夥））

By:  /s/ Yin Zhe
Name:  Yin Zhe
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Shanghai Gefei Cuicheng Investment Center (LP)** (上海歌斐翠誠投資中心（有限合夥）)

By:  /s/ Zeng Chun
Name:  Zeng Chun
Title:    Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Hefei Zhong'an Gefei Strategic Emerging Industries Fund Investment Partnership (LP)**
(合肥中安歌斐戰略新興產業基金投資合夥企業（有限合夥））

By:  /s/ Zeng Chun

Name:  Zeng Chun
Title:    Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**GSR Ventures III, L.P.**

By:  /s/ Richard Lim
Name:  Richard Lim
Title:   Authorized Signatory

**Banean Holdings Ltd**

By:  /s/ Waiping Leong
Name:  Waiping Leong
Title:   Authorized Signatory

**GSR Ventures Seal.** Notwithstanding any of the provisions in this Agreement, this Agreement shall not be effective until the signature page(s) of GSR Ventures III, L.P. are accompanied by a seal or chop of such fund or its general partner.

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Shanghai Huasheng Leading Venture Capital (Limited Partnership)**（上海華晟領勢創業投資合夥企業（有限合夥））

By: /s/ Wang Xinwei _____
Name:  Wang Xinwei
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Shanghai Huasheng Lingfei Equity Investment (Limited Partnership)** (上海華晟領飛股權投資合夥企業（有限合夥）)

By: /s/ Wang Xinwei
Name:  Wang Xinwei
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**JD.com E-Commerce (Investment) Hong Kong Corporation Limited**

By: /s/ WANG Nani
Name:  WANG Nani
Title:  Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Unicorn (HK) Capital Investment Co., Limited**

By:  /s/ Dan CHEN
Name:  Dan CHEN
Title:   Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Baidu (Hong Kong) Limited**

By: /s/ Xuhao Zhang
Name: Xuhao Zhang (張旭豪)
Title: Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**CICC ALPHA Active Investment Limited**

By:  /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:   Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**DianPing Holdings Ltd.**

By:  /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**High Mark Enterprise Development Limited**

By:  /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Hina Group Fund II, L.P.**

By: /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

**Hina Group Fund III, L.P.**

By: /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

**Hina Hanking I Investment L.P.**

By: /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Horizon Thrive International Limited**

By: /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:  Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**HUA XIN 1 PTE. LTD.**

By: /s/ Xuhao Zhang
Name: Xuhao Zhang (張旭豪)
Title: Authorized Signatory under Power of
Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**HUA XIN 2 PTE. LTD.**

By: /s/ Xuhao Zhang

Name: Xuhao Zhang (張旭豪)

Title: Authorized Signatory under Power of Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

                                                    **HUA XIN 3 PTE. LTD.**

                                                    By:  /s/ Xuhao Zhang
                                                    _____
                                                    Name:  Xuhao Zhang (張旭豪)
                                                    Title:   Authorized Signatory under Power of
                                                             Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

<u>SELLING SHAREHOLDERS:</u>

**Slender West Lake Investment Limited**

By: /s/ Xuhao Zhang
Name: Xuhao Zhang (張旭豪)
Title: Authorized Signatory under Power of
        Attorney and Proxy

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Rosebook Holding Limited**

By:  /s/ Xuhao Zhang
Name:  Xuhao Zhang (張旭豪)
Title:    Authorized Signatory

**Three Body Technology Inc.**

By:  /s/ Yuan Wang
Name:  Yuan Wang (汪淵)
Title:    Authorized Signatory

**King Jack Investment Inc.**

By:  /s/ Jia Kang
Name:  Jia Kang (康嘉)
Title:    Authorized Signatory

**The Kunpen Limited**

By:  /s/ Gaochao Deng
Name:  Gaochao Deng (鄧高潮)
Title:    Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

**Worldwide Access Investment Limited**

By: /s/ Ge Xu
Name: Ge Xu
Title: Authorized Signatory

**Dragon Universe Investment Inc.**

By: /s/ Yulong Luo
Name: Yulong Luo
Title: Authorized Signatory

**Qinyang Technology Limited**

By: /s/ Xuefeng Zhang
Name: Xuefeng Zhang
Title: Authorized Signatory

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

/s/ ZHOU Zhengchuan
**ZHOU Zhengchuan**

/s/ CHEN Yulong
**CHEN Yulong**

/s/ XU Ge
**XU Ge**

/s/ CHEN Qi
**CHEN Qi**

/s/ CHEN Yuming
**CHEN Yuming**

/s/ DAI Zhenkai
**DAI Zhenkai**

/s/ FAN Xiaofeng
**FAN Xiaofeng**

/s/ GAO Guobin
**GAO Guobin**

/s/ GAO Wei
**GAO Wei**

/s/ GUO Haochuan
**GUO Haochuan**

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

/s/ HAN Donghua
**HAN Donghua**

/s/ HU Jian
**HU Jian**

/s/ HUANG Nian
**HUANG Nian**

/s/ HUANG Ping
**HUANG Ping**

/s/ JIANG Xinwei
**JIANG Xinwei**

/s/ JIN Qianchen
**JIN Qianchen**

/s/ JIN Xin
**JIN Xin**

/s/ LAN Jiangang
**LAN Jiangang**

/s/ LI Baoxin
**LI Baoxin**

/s/ LI Haiyan
**LI Haiyan**

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

/s/ LI Lei
**LI Lei**

/s/ LI Lixun
**LI Lixun**

/s/ LI Ming
**LI Ming**

/s/ LI Yan
**LI Yan**

/s/ MAO Ruizhe
**MAO Ruizhe**

/s/ MAO Pengcheng
**MAO Pengcheng**

/s/ Min Jie
**Min Jie**

/s/ PAN Yuan
**PAN Yuan**

/s/ PU Zhihua
**PU Zhihua**

/s/ SHI Jianing
**SHI Jianing**

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

/s/ TANG Lei
**TANG Lei**

/s/ TU Yanping
**TU Yanping**

/s/ WAN Jiabao
**WAN Jiabao**

/s/ WANG Qiuxiao
**WANG Qiuxiao**

/s/ WANG Taizhou
**WANG Taizhou**

/s/ WANG Yong
**WANG Yong**

/s/ WEI Hai
**WEI Hai**

/s/ XIA Liebo
**XIA Liebo**

/s/ XIN Jingbo
**XIN Jingbo**

/s/ XING Juan
**XING Juan**

[Panini – Signature Page to Share Purchase Agreement]

SELLING SHAREHOLDERS:

/s/ XU Mengyun
**XU Mengyun**

/s/ YANG Gengsheng
**YANG Gengsheng**

/s/ YAO Zhen
**YAO Zhen**

/s/ YU Lixin
**YU Lixin**

/s/ ZANG Yunfei
**ZANG Yunfei**

/s/ ZHANG Hao
**ZHANG Hao**

/s/ ZHANG Yi
**ZHANG Yi**

[Panini – Signature Page to Share Purchase Agreement]

ROLLOVER SHAREHOLDER:

**Ali Panini Investment Holding Limited**

By /s/ Timothy Alexander Steinert
Name:  Timothy Alexander Steinert
Title:   Authorized Signatory

[Panini IV – Signature Page to Share Purchase Agreement]

COMPANY:

**Rajax Holdings**

By: /s/ Xuhao Zhang
Name: Xuhao Zhang (張旭豪)
Title: Director

[Panini – Signature Page to Share Purchase Agreement]

**SCHEDULE I**

LIST OF PRINCIPALS AND PRINCIPAL HOLDCOS

| Principal | ID Card Number | Principal Holdco |
|---|---|---|
| Xuhao Zhang (张旭豪) | 310103198504094033 | Mark X Taurus Investment Holdings Inc. |
| Yuan Wang (汪渊) | 342221198804241555 | Three Body Technology Inc. |
| Jia Kang (康嘉) | 612701198502030610 | King Jack Investment Inc. |
| Gaochao Deng (邓高潮) | 130984198705035118 | Three Stone Investment Inc. |

**<u>SCHEDULE II</u>**

SELLING SHAREHOLDERS

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|
| **Selling Shareholder** | **Type of shares owned in Rajax** | **Number of shares owned in Rajax** | **Purchase Price** | **Tax Escrow Amount[1]** | **Audit and Indemnity Escrow Amount[2]** |
| Mark X Taurus Investment Holdings Inc. | Ordinary Shares | 458,288,880 | 298,685,239.01 | 29,868,523.90 | 26,881,671.51 |
| Three Body Technology Inc. | Ordinary Shares | 110,614,540 | 72,091,931.01 | 7,209,193.10 | 6,488,273.79 |
| King Jack Investment Inc. | Ordinary Shares | 15,816,618 | 10,308,324.15 | 1,030,832.42 | 927,749.17 |
| Three Stone Investment Inc. | Ordinary Shares | 4,472,095 | 2,914,643.63 | 291,464.36 | 262,317.93 |
| Banean Holdings Ltd | Series A Preferred Shares | 9,000,000 | 5,865,660.87 | 586,566.09 | 527,909.48 |
| CE Takeout Limited | Series E Preferred Shares | 458,333,320 | 298,714,202.34 | 29,871,420.23 | 26,884,278.21 |
| CE Takeout II Limited | Series F Preferred Shares | 186,456,474 | 121,521,160.41 | 12,152,116.04 | 10,936,904.44 |
| DianPing Holdings Ltd. | Series D Preferred Shares | 550,000,000 | 358,457,053.24 | 35,845,705.32 | 32,261,134.79 |
|  | Series E Preferred Shares | 152,777,773 | 99,571,400.56 | 9,957,140.06 | 8,961,426.05 |
|  | Series A Preferred Shares | 440,999,920 | 287,417,330.55 | 28,741,733.06 | 25,867,559.75 |
| GSR Ventures III, L.P. | Series B Preferred Shares | 50,000,000 | 32,587,004.84 | 3,258,700.48 | 2,932,830.44 |
|  | Series C Preferred Shares | 77,777,760 | 50,690,884.83 | 5,069,088.48 | 4,562,179.63 |
|  | Series E Preferred Shares | 11,458,333 | 7,467,855.06 | 746,785.51 | 672,106.96 |
| High Mark Enterprise Development Limited | Series E Preferred Shares | 39,000,000 | 25,417,863.78 | 2,541,786.38 | 2,287,607.74 |
|  | Series E Preferred Shares | 152,777,773 | 99,571,400.56 | 9,957,140.06 | 8,961,426.05 |
| Horizon Thrive International Limited | Series F Preferred Shares | 37,291,295 | 24,304,232.21 | 2,430,423.22 | 2,187,380.90 |
| HUA XIN 1 PTE. LTD. | Series F Preferred Shares | 186,456,475 | 121,521,161.07 | 12,152,116.11 | 10,936,904.50 |
| HUA XIN 2 PTE. LTD. | Series F Preferred Shares | 96,957,366 | 63,191,003.10 | 6,319,100.31 | 5,687,190.28 |
| HUA XIN 3 PTE. LTD. | Series F Preferred Shares | 52,207,812 | 34,025,924.45 | 3,402,592.45 | 3,062,333.20 |
| JD.com E-Commerce (Investment) Hong Kong Corporation Limited | Series E Preferred Shares | 336,944,433 | 219,600,197.38 | 21,960,019.74 | 19,764,017.76 |
|  | Series F Preferred Shares | 130,519,532 | 85,064,812.42 | 8,506,481.24 | 7,655,833.12 |
| Legend Giant Group Limited | Series E Preferred Shares | 6,000,000 | 3,910,440.58 | 391,044.06 | 351,939.65 |
|  | Series B Preferred Shares | 300,000,000 | 195,522,029.04 | 19,552,202.90 | 17,596,982.61 |
|  | Series C Preferred Shares | 100,000,000 | 65,174,009.68 | 6,517,400.97 | 5,865,660.87 |
| Matrix Partners China II Hong Kong Limited | Series D Preferred Shares | 21,638,560 | 14,102,717.19 | 1,410,271.72 | 1,269,244.55 |
|  | Series E Preferred Shares | 38,194,443 | 24,892,849.98 | 2,489,285.00 | 2,240,356.50 |
| Sequoia Capital China GF Holdco III-A. Limited | Series E Preferred Shares | 255,902,770 | 166,782,096.09 | 16,678,209.61 | 15,010,388.65 |
|  | Series F Preferred Shares | 130,519,533 | 85,064,813.07 | 8,506,481.31 | 7,655,833.18 |
|  | Series C Preferred Shares | 377,777,760 | 246,212,913.87 | 24,621,291.39 | 22,159,162.25 |
| Sequoia Capital CV IV Holdco, Ltd. | Series D Preferred Shares | 20,436,400 | 13,319,221.31 | 1,331,922.13 | 1,198,729.92 |
|  | Series E Preferred Shares | 381,944,433 | 248,928,501.74 | 24,892,850.17 | 22,403,565.16 |
| Slender West Lake Investment Limited | Series F Preferred Shares | 130,519,532 | 85,064,812.42 | 8,506,481.24 | 7,655,833.12 |
| Shanghai Huasheng Leading Venture Capital (Limited Partnership) | Series F Preferred Shares | 37,291,295 | 24,304,232.21 | 2,430,423.22 | 2,187,380.90 |
| Shanghai Huasheng Lingfei Equity Investment (Limited Partnership) | Series F Preferred Shares | 149,165,179 | 97,216,928.20 | 9,721,692.82 | 8,749,523.54 |
| CMC Element Investment Limited | Series F Preferred Shares | 186,456,474 | 121,521,160.41 | 12,152,116.04 | 10,936,904.44 |
| GOPHER CHINA HARVEST FUND LP | Series F Preferred Shares | 74,582,590 | 48,608,464.43 | 4,860,846.44 | 4,374,761.80 |
| Shanghai Jize Investment Center (Limited Partnership) | Series F Preferred Shares | 74,582,590 | 48,608,464.43 | 4,860,846.44 | 4,374,761.80 |

| | | | | | |
|---|---|---|---|---|---|
| Shanghai Gefei Cuicheng Investment Center (LP) | Series F Preferred Shares | 37,291,294 | 24,304,231.56 | 2,430,423.16 | 2,187,380.84 |
| Hefei Zhong'an Gefei Strategic Emerging Industries Fund Investment Partnership (LP) | Series F Preferred Shares | 18,645,647 | 12,152,115.78 | 1,215,211.58 | 1,093,690.42 |
| Baidu (Hong Kong) Limited | Series G-1 Preferred Shares | 748,836,549 | 488,046,804.93 | 48,804,680.49 | 43,924,212.44 |
| Hina Group Fund II, L.P. | Series G-1 Preferred Shares | 1,263,098 | 823,211.61 | 82,321.16 | 74,089.04 |
| Hina Group Fund III, L.P. | Series G-1 Preferred Shares | 17,683,369 | 11,524,960.62 | 1,152,496.06 | 1,037,246.46 |
| Hina Hanking I Investment L.P. | Series G-1 Preferred Shares | 45,110,635 | 29,400,409.62 | 2,940,040.96 | 2,646,036.87 |
| Tactic Smart Limited | Series G-1 Preferred Shares | 6,315,489 | 4,116,057.41 | 411,605.74 | 370,445.17 |
| CICC ALPHA Active Investment Limited | Series G-1 Preferred Shares | 6,315,489 | 4,116,057.41 | 411,605.74 | 370,445.17 |
| Sevva Investment Limited | Series G-1 Preferred Shares | 18,044,254 | 11,760,163.85 | 1,176,016.39 | 1,058,414.75 |
| Unicorn (HK) Capital Investment Co., Limited | Series G-1 Preferred Shares | 27,066,381 | 17,640,245.77 | 1,764,024.58 | 1,587,622.12 |
| Former Company Share Award Holders – see Appendix A | | | | | |
| **TOTAL** | | **6,769,734,163** | **4,412,107,198.68** | **441,210,719.88** | **397,089,647.92** |

[1]   Note: Tax Escrow Amount for each Selling Shareholder shall be 10% of the Purchase Price (Column 4) to be paid to such Selling Shareholder.

[2]   Note: Audit / Indemnity Escrow Amount for each Selling Shareholder shall be 9% of the Purchase Price (Column 4) to be paid to such Selling Shareholder.

APPENDIX A
TO SCHEDULE II

FORMER COMPANY SHARE AWARD HOLDERS

| | Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 |
|---|---|---|---|---|---|---|
| **Former Company Share Award Holders** | | **Type of shares owned in Rajax** | **Number of shares owned in Rajax** | **Purchase Price** | **Tax Escrow Amount[1]** | **Audit and Indemnity Escrow Amount[2]** |
| Rosebook Holding Limited | | Ordinary Shares | 897,500,089 | 584,936,794.88 | 58,493,679.49 | 52,644,311.54 |
| Three Body Technology Inc. | | Ordinary Shares | 72,884,355 | 47,501,656.58 | 4,750,165.66 | 4,275,149.09 |
| King Jack Investment Inc. | | Ordinary Shares | 125,616,479 | 81,869,296.18 | 8,186,929.62 | 7,368,236.66 |
| The Kunpen Limited | | Ordinary Shares | 2,459,478 | 1,602,940.43 | 160,294.04 | 144,264.64 |
| Worldwide Access Investment Limited | | Ordinary Shares | 66,189,976 | 43,138,661.37 | 4,313,866.14 | 3,882,479.52 |
| Dragon Universe Investment Inc. | | Ordinary Shares | 100,988,034 | 65,817,951.05 | 6,581,795.11 | 5,923,615.59 |
| Qinyang Technology Limited | | Ordinary Shares | 50,269,688 | 32,762,771.32 | 3,276,277.13 | 2,948,649.42 |
| ZHOU Zhengchuan | | Ordinary Shares | 3,770,823 | 2,457,596.55 | 245,759.66 | 221,183.69 |
| CHEN Yulong | | Ordinary Shares | 9,778,787 | 6,373,227.59 | 637,322.76 | 573,590.48 |
| XU Ge | | Ordinary Shares | 14,000,000 | 9,124,361.36 | 912,436.14 | 821,192.52 |
| CHEN Qi | | Ordinary Shares | 1,800,000 | 1,173,132.17 | 117,313.22 | 105,581.90 |
| CHEN Yuming | | Ordinary Shares | 1,500,000 | 977,610.15 | 97,761.02 | 87,984.91 |
| DAI Zhenkai | | Ordinary Shares | 3,615,980 | 2,356,679.16 | 235,667.92 | 212,101.12 |
| FAN Xiaofeng | | Ordinary Shares | 1,500,000 | 977,610.15 | 97,761.02 | 87,984.91 |
| GAO Guobin | | Ordinary Shares | 2,374,654 | 1,547,657.23 | 154,765.72 | 139,289.15 |
| GAO Wei | | Ordinary Shares | 2,579,593 | 1,681,224.19 | 168,122.42 | 151,310.18 |
| GUO Haochuan | | Ordinary Shares | 1,650,170 | 1,075,481.96 | 107,548.20 | 96,793.38 |
| HAN Donghua | | Ordinary Shares | 1,665,590 | 1,085,531.79 | 108,553.18 | 97,697.86 |
| HU Jian | | Ordinary Shares | 1,600,000 | 1,042,784.15 | 104,278.42 | 93,850.57 |
| HUANG Nian | | Ordinary Shares | 1,601,704 | 1,043,894.72 | 104,389.47 | 93,950.52 |
| HUANG Ping | | Ordinary Shares | 3,925,543 | 2,558,433.77 | 255,843.38 | 230,259.04 |
| JIANG Xinwei | | Ordinary Shares | 1,482,324 | 966,089.99 | 96,609.00 | 86,948.10 |
| JIN Qianchen | | Ordinary Shares | 3,615,980 | 2,356,679.16 | 235,667.92 | 212,101.12 |
| JIN Xin | | Ordinary Shares | 6,066,269 | 3,953,630.75 | 395,363.08 | 355,826.77 |
| LAN Jiangang | | Ordinary Shares | 1,505,107 | 980,938.58 | 98,093.86 | 88,284.47 |
| LI Baoxin | | Ordinary Shares | 6,347,424 | 4,136,870.73 | 413,687.07 | 372,318.37 |
| LI Haiyan | | Ordinary Shares | 2,551,383 | 1,662,838.60 | 166,283.86 | 149,655.47 |
| LI Lei | | Ordinary Shares | 2,445,774 | 1,594,008.98 | 159,400.90 | 143,460.81 |
| LI Lixun | | Ordinary Shares | 4,031,501 | 2,627,490.85 | 262,749.09 | 236,474.18 |
| LI Ming | | Ordinary Shares | 4,900,309 | 3,193,727.86 | 319,372.79 | 287,435.51 |
| LI Yan | | Ordinary Shares | 1,500,000 | 977,610.15 | 97,761.02 | 87,984.91 |
| MAO Ruizhe | | Ordinary Shares | 2,171,450 | 1,415,221.03 | 141,522.10 | 127,369.89 |
| MAO Pengcheng | | Ordinary Shares | 3,338,967 | 2,176,138.68 | 217,613.87 | 195,852.48 |
| Min Jie | | Ordinary Shares | 12,713,308 | 8,285,772.59 | 828,577.26 | 745,719.53 |
| PAN Yuan | | Ordinary Shares | 1,000,000 | 651,740.10 | 65,174.01 | 58,656.61 |
| PU Zhihua | | Ordinary Shares | 2,853,808 | 1,859,941.10 | 185,994.11 | 167,394.70 |
| SHI Jianing | | Ordinary Shares | 1,839,124 | 1,198,630.85 | 119,863.09 | 107,876.78 |
| TANG Lei | | Ordinary Shares | 5,238,125 | 3,413,896.09 | 341,389.61 | 307,250.65 |
| TU Yanping | | Ordinary Shares | 2,246,407 | 1,464,073.52 | 146,407.35 | 131,766.62 |
| WAN Jiabao | | Ordinary Shares | 1,500,000 | 977,610.15 | 97,761.02 | 87,984.91 |
| WANG Qiuxiao | | Ordinary Shares | 3,328,802 | 2,169,513.74 | 216,951.37 | 195,256.24 |
| WANG Taizhou | | Ordinary Shares | 8,969,213 | 5,845,595.75 | 584,559.58 | 526,103.62 |
| WANG Yong | | Ordinary Shares | 1,831,812 | 1,193,865.33 | 119,386.53 | 107,447.88 |
| WEI Hai | | Ordinary Shares | 3,676,250 | 2,395,959.53 | 239,595.95 | 215,636.36 |
| XIA Liebo | | Ordinary Shares | 1,619,407 | 1,055,432.47 | 105,543.25 | 94,988.92 |
| XIN Jingbo | | Ordinary Shares | 15,868,111 | 10,341,884.20 | 1,034,188.42 | 930,769.58 |
| XING Juan | | Ordinary Shares | 1,191,267 | 776,396.47 | 77,639.65 | 69,875.68 |
| XU Mengyun | | Ordinary Shares | 2,597,989 | 1,693,213.60 | 169,321.36 | 152,389.22 |
| YANG Gengsheng | | Ordinary Shares | 1,382,016 | 900,715.24 | 90,071.52 | 81,064.37 |

| | | | | | |
|---|---|---|---|---|---|
| YAO Zhen | Ordinary Shares | 1,529,949 | 997,129.11 | 99,712.91 | 89,741.62 |
| YU Lixin | Ordinary Shares | 7,420,676 | 4,836,352.09 | 483,635.21 | 435,271.69 |
| ZANG Yunfei | Ordinary Shares | 1,298,196 | 846,086.39 | 84,608.64 | 76,147.78 |
| ZHANG Hao | Ordinary Shares | 3,615,980 | 2,356,679.16 | 235,667.92 | 212,101.12 |
| ZHANG Yi | Ordinary Shares | 1,375,796 | 896,661.42 | 89,666.14 | 80,699.53 |
| **TOTAL** | | **1,490,323,667** | **971,303,691.01** | **97,130,369.18** | **87,417,332.18** |

[1]    Note: Tax Escrow Amount for each Former Company Share Award Holders shall be 10% of the Purchase Price (Column 4) to be paid to such Former Company Share Award Holders.

[2]    Note: Audit / Indemnity Escrow Amount for each Former Company Share Award Holders shall be 9% of the Purchase Price (Column 4) to be paid to such Former Company Share Award Holders.

**SCHEDULE III**

CAPITALIZATION TABLE OF THE COMPANY

| Ordinary Shares | Number | Percentage |
|---|---|---|
| Mark X Taurus Investment Holdings Inc. | 458,288,880 | 3.30653681% |
| Three Body Technology Inc. | 110,614,540 | 0.79807969% |
| King Jack Investment Inc. | 15,816,618 | 0.11411630% |
| Three Stone Investment Inc. | 4,472,095 | 0.03226600% |
| Former Company Share Award Holders – see Appendix A to Schedule II | 1,490,323,667 | 10.75262847% |
| **Subtotal** | **2,079,515,800** | **15.00362727%** |
| **ESOP** | **399,075,395** | **2.87931377%** |
| **Series A Preferred Shares** | | |
| Banean Holdings Ltd | 9,000,000 | 0.06493466% |
| GSR Ventures III, L.P. | 440,999,920 | 3.18179762% |
| **Subtotal** | **449,999,920** | **3.24673228%** |
| **Series B Preferred Shares** | | |
| GSR Ventures III, L.P. | 50,000,000 | 0.36074809% |
| Matrix Partners China II Hong Kong Limited | 300,000,000 | 2.16448857% |
| **Subtotal** | **350,000,000** | **2.52523666%** |
| **Series C Preferred Shares** | | |
| Sequoia Capital CV IV Holdco, Ltd. | 377,777,760 | 2.72565214% |
| GSR Ventures III, L.P. | 77,777,760 | 0.56116358% |
| Matrix Partners China II Hong Kong Limited | 100,000,000 | 0.72149619% |
| **Subtotal** | **555,555,520** | **4.00831191%** |
| **Series D Preferred Shares** | | |
| DianPing Holdings Ltd. | 550,000,000 | 3.96822904% |
| Matrix Partners China II Hong Kong Limited | 21,638,560 | 0.15612139% |
| Sequoia Capital CV IV Holdco, Ltd. | 20,436,400 | 0.14744785% |
| **Subtotal** | **592,074,960** | **4.27179828%** |
| **Series E Preferred Shares** | | |
| CE Takeout Limited | 458,333,320 | 3.30685744% |
| Slender West Lake Investment Limited | 381,944,433 | 2.75571453% |
| JD.com E-Commerce (Investment) Hong Kong Corporation Limited | 336,944,433 | 2.43104125% |

| | | |
|---|---:|---:|
| High Mark Enterprise Development Limited | 39,000,000 | 0.28138351% |
| Legend Giant Group Limited | 6,000,000 | 0.04328977% |
| DianPing Holdings Ltd. | 152,777,773 | 1.10228581% |
| Matrix Partners China II Hong Kong Limited | 38,194,443 | 0.27557145% |
| Sequoia Capital China GF Holdco III-A. Limited | 255,902,770 | 1.84632874% |
| GSR Ventures III, L.P. | 11,458,333 | 0.08267144% |
| Horizon Thrive International Limited | 152,777,773 | 1.10228581% |
| **Subtotal** | **1,833,333,278** | **13.22742975%** |
| **Series F Preferred Shares** | | |
| CE Takeout II Limited | 186,456,474 | 1.34527636% |
| Horizon Thrive International Limited | 37,291,295 | 0.26905527% |
| HUA XIN 1 PTE. LTD. | 186,456,475 | 1.34527636% |
| HUA XIN 2 PTE. LTD. | 96,957,366 | 0.69954370% |
| HUA XIN 3 PTE. LTD. | 52,207,812 | 0.37667737% |
| JD.com E-Commerce (Investment) Hong Kong Corporation Limited | 130,519,532 | 0.94169345% |
| Slender West Lake Investment Limited | 130,519,532 | 0.94169345% |
| Sequoia Capital China GF Holdco III-A. Limited | 130,519,533 | 0.94169346% |
| Shanghai Huasheng Leading Venture Capital (Limited Partnership) | 37,291,295 | 0.26905527% |
| Shanghai Huasheng Lingfei Equity Investment (Limited Partnership) | 149,165,179 | 1.07622108% |
| CMC Element Investment Limited | 186,456,474 | 1.34527636% |
| GOPHER CHINA HARVEST FUND LP | 74,582,590 | 0.53811055% |
| Shanghai Jize Investment Center (Limited Partnership) | 74,582,590 | 0.53811055% |
| Shanghai Gefei Cuicheng Investment Center (LP) | 37,291,294 | 0.26905527% |
| Hefei Zhong'an Gefei Strategic Emerging Industries Fund Investment Partnership (LP) | 18,645,647 | 0.13452763% |
| **Subtotal** | **1,528,943,088** | **11.03126613%** |
| **Series F-1 Preferred Shares** | | |
| Ali Panini Investment Holding Limited | 2,974,476,361 | 21.46073361% |
| **Series G Preferred Shares** | | |
| Ali Panini Investment Holding Limited | 782,937,131 | 5.64886157% |
| **Series G-1 Preferred Shares** | | |
| Ali Panini Investment Holding Limited | 1,443,540,335 | 10.41508852% |
| Baidu (Hong Kong) Limited | 748,836,549 | 5.40282717% |
| Hina Group Fund II, L.P. | 1,263,098 | 0.00911320% |
| Hina Group Fund III, L.P. | 17,683,369 | 0.12758483% |

| | | |
|---|---:|---:|
| Hina Hanking I Investment L.P. | 45,110,635 | 0.32547151% |
| Tactic Smart Limited | 6,315,489 | 0.04556601% |
| CICC ALPHA Active Investment Limited | 6,315,489 | 0.04556601% |
| Sevva Investment Limited | 18,044,254 | 0.13018861% |
| Unicorn (HK) Capital Investment Co., Limited | 27,066,381 | 0.19528291% |
| **Subtotal** | **2,314,175,599** | **16.69668877%** |
| **Total** | **13,860,087,052** | **100.00000000%** |

**SCHEDULE IV**

LIST OF CERTAIN GROUP COMPANIES

1.　Rajax Holding (HK) Limited (拉扎斯控股香港有限公司), a company incorporated under the Laws of Hong Kong (the "Rajax HK Subsidiary"),

2.　Rajax Network &Technology (Shanghai) Co., Ltd. (拉扎斯网络科技(上海)有限公司 ), a company incorporated under the Laws of the PRC (the "Rajax WFOE"),

3.　Shanghai Rajax Information & Technology, Ltd. (上海拉扎斯信息科技有限公司), a company incorporated under the Laws of the PRC (the "Rajax Domestic Company"),

4.　Shanghai Zhuanshan Restaurant Management Co., Ltd. (上海馔山餐饮管理有限公司), a company incorporated under the Laws of the PRC (the "Rajax WFOE Subsidiary"),

5.　Shanghai Hongyi Information and Technology Co., Ltd. (上海泓弈信息科技有限公司), a company incorporated under the Laws of the PRC ("Hongyi"),

6.　Shanghai Pengxun Culture Communication Co., Ltd. (上海鹏逊文化传播有限公司), a company incorporated under the Laws of the PRC ("Pengxun"),

7.　Shanghai Zhiguan Information and Technology Co., Ltd. (上海止观信息科技有限公司 ), a company incorporated under the Laws of the PRC ("Zhiguan"),

8.　Hangzhou Fengniao Investment Management Co., Ltd.(杭州蜂鸟投资管理有限公司) ("Fengniao"),

9.　Jiangsu Rajax Information & Technology, Ltd. (江苏拉扎斯信息科技有限公司) (the "Jiangsu Company")

10.　Xiaodu Life Technology Limited ("Xiaodu Cayman Company"),

11.　Xiaodu Life Technology Hong Kong Limited (小度生活科技香港有限公司) ("Xiaodu HK Company"),

12.　Beijing Xiaodu Information Technology Co., Ltd.(北京小度信息科技有限公司 ) ("Xiaodu WFOE"),

13.　Xiaodu Shenghuo (Beijing) Technology Co., Ltd.(小度生活（北京）科技有限公司) ("Xiaodu Shenghuo"),

14.　Beijing Xunda Delivery Co., Ltd.(北京迅达快递有限公司) ("Xunda"),

15.    Beijing Xinchi Supply Chain Management Co., Ltd.(北京新驰供应链管理有限公司) ("Xinchi"), and

16.    Beijing Zhenxuan Foods Co., Ltd.(北京甄选食品有限公司) ("Zhenxuan").

## SCHEDULE V

ADDRESS FOR NOTICES

If to the Company:

| | |
|---|---|
| Address: | Room 401, North Tower of MTR City Plaza, No. 1518, Jinshajiang Road, Shanghai (上海市普陀区金沙江路 1518 弄 2 号 近铁城市 广场 401 室) |
| Tel: | 021- 80241717 |
| Fax: | N/A |
| Attn: | Xuhao Zhang (张旭豪) |

If to the Principals and the Principal Holdcos:

| | |
|---|---|
| Address: | No.3, Lane 148, Nanchang Road, Shanghai (上海市南昌路 148 弄 3 号) |
| Tel: | 13482200180 |
| Fax: | N/A |
| Attn: | Xuhao Zhang (张旭豪) |

If to the Shareholders Representative (on behalf of the Selling Shareholders):

| | |
|---|---|
| Address: | No.3, Lane 148, Nanchang Road, Shanghai (上海市南昌路 148 弄 3 号) |
| Tel: | 13482200180 |
| Fax: | N/A |
| Attn: | Xuhao Zhang (张旭豪) |

If to Purchaser and/or the Rollover Shareholder:

| | |
|---|---|
| Address: | c/o Alibaba Group Services Limited 26th Floor, Tower One Times Square, 1 Matheson Street Causeway Bay, Hong Kong S.A.R. |
| Fax: | + (852) 2215-5200 |
| Email: | legalnotice@hk.alibaba-inc.com |
| Attn: | General Counsel |

with a copy to:

Simpson Thacher & Bartlett
35/F ICBC Tower
3 Garden Road
Central, Hong Kong
Fax:    + (852) 2869-7694
Email: ksudol@stblaw.com
Attn:   Kathryn King Sudol

<u>**SCHEDULE VI**</u>

LIST OF KEY EMPLOYEES

| **姓名** | **职位** |
|---|---|
| 张旭豪 | CEO&创始合伙人 |
| 康嘉 | COO&创始合伙人 |
| 汪渊 | 资深副总裁**&**创始合伙人 |
| 罗宇龙 | 资深副总裁 |
| 张雪峰 | CTO |
| 徐舸 | CFO |
| 金鑫 | 副总裁 |
| 信景波 | 资深副总裁 |
| 黄念 | 副总裁 |
| 王三虎 | 首席食品安全官 |
| 姜新维 | 廉正部高级总监 |
| 张怿 | 设计部总监 |

**SCHEDULE VII**

COMPANY DISCLOSURE SCHEDULE

**SCHEDULE VIII**

SELLING SHAREHOLDERS DISCLOSURE SCHEDULE

**EXHIBIT A-1**

FORM OF DEED OF INSTRUMENT OF TRANSFER

FOR SELLING SHAREHOLDERS

RAJAX HOLDING

(incorporated in the Cayman Islands)

**DEED OF INSTRUMENT OF TRANSFER**

Date:

[*Name of transferor*] (the "Transferor") for good and valuable consideration does hereby transfer to Ali Panini Investment Limited of P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY – 1205 Cayman Islands (the "Transferee"), the shares of Rajax Holding, a company organized under the laws of the Cayman Islands ("Rajax Holding" or the "Company"), set forth in the schedule below registered in the name of the Transferor (the "Shares") to hold unto the Transferee (the "Transfer"). All of the cash consideration payable to the Transferor in connection with the Transfer shall be delivered to the Transferor in accordance with the wire transfer instructions set forth in the schedule below.

Reference is made to the Share Purchase Agreement, dated [●], by and among Rajax Holding, the Transferee, and the other parties named therein (as the same may be amended or modified, the "Share Purchase Agreement"). Terms used but not defined herein shall have the meaning given them in the Share Purchase Agreement.

Notwithstanding any provision in the Share Purchase Agreement, the Memorandum and Articles, the Shareholders Agreement or the ROFR Agreement (the "Transaction Documents") or any provision of applicable law to the contrary, as of and following the Closing:

(i) the undersigned hereby expressly and irrevocably waives, and shall be deemed to have irrevocably waived, any and all claims and right to recourse against the Company and each other Group Company, and their respective directors, shareholders, officers and employees, whether by subrogation or otherwise, (a) with respect to any breach, violation or non-compliance by the Company or any other Group Company of any provision in any Transaction Document (provided, however, that the foregoing waiver shall not apply with respect to any breach by the Company of any covenant or agreement in the Share Purchase Agreement to be performed or complied with after the Closing) and (b) with respect to, arising from, or in connection with, such Selling Shareholder's ownership of Shares at any time prior to the Closing;

(ii) the undersigned hereby acknowledges that he/she/it has transferred to Purchaser all legal and beneficial ownership interests, and all rights related thereto, in such Sale Shares and, upon receipt of the Purchase Price payable in respect of the undersigned's Sale Shares in accordance with the Share Purchase Agreement, the undersigned hereby expressly and irrevocably waives any and all rights to retain or hold any legal or beneficial ownership interest or any other voting, transfer or other rights or interests in any of such Sale Shares (provided, however, that the foregoing waiver shall not apply with respect to any breach by Purchaser of any covenant or agreement in the Share Purchase Agreement to be performed or complied with after the Closing);

(iii) the undersigned hereby acknowledges that the Transactions (which, for the avoidance of doubt, includes this Transfer) constitute an "Approved Sale" for purposes of the Memorandum and Articles and the ROFR Agreement and that the obligations of the undersigned under Articles 123, 124 and 125 of the Memorandum and Articles and Sections 5.1, 5.2 and 5.3 of the ROFR Agreement apply to this Transfer; and

(iv) the undersigned hereby approves, confirms and ratifies all actions taken on behalf of the undersigned by such one or more Directors as designated by the Board through such Director(s)' exercise of the irrevocable power of attorney and proxy granted pursuant to Article 124 of the Memorandum and Articles and Section 5.3 of the ROFR Agreement, including such actions taken by such Director(s) to execute and deliver all documents reasonably necessary to effectuate the terms of the Share Purchase Agreement and the Transactions.

This Deed of Instrument of Transfer is governed by and is to be construed according to the laws of the Cayman Islands.

SCHEDULE TO THE DEED OF INSTRUMENT OF TRANSFER

**Shares to be transferred**

Name of Company: Rajax Holding
Class of Shares:
Number of Shares:

**Wire Transfer Instruction of the Transferor**

Bank Name:
Bank Address:
Bank Code:
SWIFT:
Other Bank Reference Number (as necessary):
Correspondent Bank Details (if any):
Account Number:
Beneficiary Name:
Beneficiary Address:

*(Signature Page Follows)*

Executed and delivered as a deed by [*Name of signatory*] [as attorney in fact and proxy][1] for and on behalf of the Transferor

[*Name of Transferor*]

_____
Name:
Title:

*(if the Transferor is an individual)* [2]

_____
Name of Witness:
Title of Witness:

We hereby agree to take the Shares and have them registered in our name in the Register of Members of the Company.

ALI PANINI INVESTMENT LIMITED

_____
Name:
Title:    Duly authorised signatory for and on behalf of the Transferee/Purchaser

_____

[1]    **Note to Draft:** Only for those Transferors who have failed to sign the Instrument of Transfer. Otherwise the Transferors themselves should sign.
[2]    **Note to Draft:** If the Transferor is a private individual a witness should countersign and print name and address.

**EXHIBIT A-2**

FORM OF DEED OF INSTRUMENT OF TRANSFER

FOR THE ROLLOVER SHAREHOLDER

RAJAX HOLDING

(incorporated in the Cayman Islands)

**DEED OF INSTRUMENT OF TRANSFER**

Date:

[*Name of transferor*] (the "Transferor") for good and valuable consideration does hereby transfer to Ali Panini Investment Limited of P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY – 1205 Cayman Islands (the "Transferee"), the shares of Rajax Holding, a company organized under the laws of the Cayman Islands ("Rajax Holding" or the "Company"), set forth in the schedule below registered in the name of the Transferor (the "Shares") to hold unto the Transferee (the "Transfer").

Reference is made to the Share Purchase Agreement, dated [●], by and among Rajax Holding, the Transferee, and the other parties named therein (as the same may be amended or modified, the "Share Purchase Agreement"). Terms used but not defined herein shall have the meaning given them in the Share Purchase Agreement.

Notwithstanding any provision in the Share Purchase Agreement, the Memorandum and Articles, the Shareholders Agreement or the ROFR Agreement (the "Transaction Documents") or any provision of applicable law to the contrary, as of and following the Closing:

(i) the undersigned hereby expressly and irrevocably waives, and shall be deemed to have irrevocably waived, any and all claims and right to recourse against the Company and each other Group Company, and their respective directors, shareholders, officers and employees, whether by subrogation or otherwise, (a) with respect to any breach, violation or non-compliance by the Company or any other Group Company of any provision in any Transaction Document (provided, however, that the foregoing waiver shall not apply with respect to any breach by the Company of any covenant or agreement in the Share Purchase Agreement to be performed or complied with after the Closing) and (b) with respect to, arising from, or in connection with, such Selling Shareholder's ownership of Shares at any time prior to the Closing;

(ii) the undersigned hereby acknowledges that it has transferred to Purchaser all legal and beneficial ownership interests, and all rights related thereto, in such Sale Shares and, upon receipt of the Purchase Price payable in respect of the undersigned's Sale Shares in accordance with the Share Purchase Agreement, the undersigned hereby expressly and irrevocably waives any and all rights to retain or hold any legal or beneficial ownership interest or any other voting, transfer or other rights or interests in any of such Sale Shares (provided, however, that the foregoing waiver shall not apply with respect to any breach by Purchaser of any covenant or agreement in the Share Purchase Agreement to be performed or complied with after the Closing);

(iii) the undersigned hereby acknowledges that the Transactions (which, for the avoidance of doubt, includes this Transfer) constitutes an "Approved Sale" for purposes of the Memorandum and Articles and the ROFR Agreement and that the obligations of the undersigned under Articles 123, 124 and 125 of the Memorandum and Articles and Sections 5.1, 5.2 and 5.3 of the ROFR Agreement apply to this Transfer; and

(iv) the undersigned hereby approves, confirm and ratifies all actions taken on behalf of the undersigned by such one or more Directors as designated by the Board through such Director(s)' exercise of the irrevocable power of attorney and proxy granted pursuant to Article 124 of the Memorandum and Articles and Section 5.3 of the ROFR Agreement, including such actions taken by such Director(s) to execute and deliver all documents reasonably necessary to effectuate the terms of the Share Purchase Agreement and the Transactions.

This Deed of Instrument of Transfer is governed by and is to be construed according to the laws of the Cayman Islands.

SCHEDULE TO THE DEED OF INSTRUMENT OF TRANSFER

**Shares to be transferred**

Name of Company: Rajax Holding
Class of Shares:
Number of Shares:

(*Signature Page Follows*)

Executed and delivered as a deed by [*Name of signatory*] as authorised signatory for and on behalf of the Transferor

[*Name of Transferor*]

_____
Name:
Title:

We hereby agree to take the Shares and have them registered in our name in the Register of Members of the Company.

ALI PANINI INVESTMENT LIMITED

_____
Name:
Title:   Duly authorised signatory for and on behalf of the Transferee/Purchaser

**EXHIBIT B**

FORM OF CAYMAN ISLANDS LEGAL OPINION

Agreed Form

**(SUBJECT TO REVIEW AND APPROVAL BY THE OPINIONS COMMITTEE)**

[**Name of Purchaser**]                                                     **Email** ndavies@applebyglobal.com
[**Address**]                                                                           vchan@applebyglobal.com

                                                                    **Direct Dial** +852 2905 5769
                                                                                      +852 2905 5759

                                                                              **Tel** +852 2523 8123
                                                                              **Fax** +852 2524 5548

Hong Kong Office
2206-19 Jardine House
1 Connaught Place                                                    **Appleby Ref** 438632.0001
Central
Hong Kong                     Dear Sirs

Tel +852 2523 8123
Fax +852 2524 5548

applebyglobal.com
                              **Rajax Holding** (**Company**)

                              **INTRODUCTION**

                              This opinion as to Cayman Islands law is addressed to you in connection with the transfer of all of the Issued
                              Shares (as defined below) of the Company (**Share Transfer**) from the Selling Shareholders (as defined in the
                              Document) and the Rollover Shareholder (as defined in the Document) to [**NAME**] (**Purchaser**), and the
Managing Partner              document listed in Part 1 of Schedule 1 (**Document**).
Cameron Adderley

Partners                      **OUR REVIEW**
Judy Lee
Eliot Simpson                 For the purposes of giving this opinion we have examined and relied upon the Document and the documents
Fiona Chan                    listed in Part 2 of Schedule 1. We have not examined any other documents, even if they are referred to in the
Nicholas Davies               Document.
Paul Cheuk
Chris Cheng                   In giving this opinion we have relied upon and assume the accuracy and completeness of the Director's
                              Certificate, the Certificate of Incumbency, and the Registers (all as defined in Part 2 of Schedule 1), the
                              contents of which we have not verified.

                              For the purposes of giving this opinion we have carried out the Litigation Search described in Part 3 of
                              Schedule 1.

                              We have not made any other enquiries concerning the Company and in particular we have not investigated or
                              verified any matter of fact or opinion (whether set out in the Document or elsewhere) other than as expressly
                              stated in this opinion.

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

Unless otherwise defined herein, capitalised terms have the meanings assigned to them in Schedule 1.

**LIMITATIONS**

Our opinion is limited to, and should be construed in accordance with, the laws of the Cayman Islands at the date of this opinion. We express no opinion on the laws of any other jurisdiction.

This opinion is limited to the matters stated in it and does not extend to, and is not to be extended by implication, to any other matters. We express no opinion on the commercial implications of the Document or whether they give effect to the commercial intentions of the parties.

This opinion is given solely for the benefit of the addressee(s) in connection with the matters referred to herein and, except with our prior written consent it may not be transmitted or disclosed to or used or relied upon by any other person or be relied upon for any other purpose whatsoever, save as, and to the extent provided, below.

A copy of this opinion may be provided where required by law or judicial process and (b) for the purpose of information only to the addressee's affiliates, professional advisers, auditors, insurers and regulators.

**ASSUMPTIONS AND RESERVATIONS**

We give the following opinions on the basis of the assumptions set out in Schedule 2 (Assumptions), which we have not verified, and subject to the reservations set out in Schedule 3 (Reservations).

**OPINIONS**

1. **Incorporation and Status**: The Company is an exempted company duly incorporated with limited liability and existing under the laws of the Cayman Islands and is a separate legal entity. The Company is in good standing with the Registrar of Companies of the Cayman Islands (**Cayman Registrar**). The Company possesses the capacity to sue and be sued in its own name.

2. **Capacity**: The Company has the requisite capacity, power and authority to enter into, execute and deliver the Document to which it is a party and to perform its obligations under them.

2

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

3. **Authorisation**: The Company has taken all necessary corporate action to authorise (i) the Share Transfer and (ii) the execution and delivery of the Document and the performance of the Company's obligations thereunder.

4. **Execution and Binding Obligations**: The Document has been duly executed by or on behalf of the Company and constitutes legal, valid and binding obligations of the Company, enforceable against the Company.

5. **No Conflict**: The Share Transfer, and the due execution and delivery by the Company of the Document and the performance by the Company of its obligations thereunder, will not (i) contravene any provisions of the Constitutional Documents or (ii) violate or contravene any applicable Cayman Islands law, public rule or regulation.

6. **Consents and Approvals**: No consent, approval, licence or authorisation is required from any governmental, judicial or public body or authority in the Cayman Islands in connection with (i) the Share Transfer, and (ii) the execution and delivery by the Company of the Document or the performance by the Company of its obligations under them. No consent, approval, licence, authorisation, validation or exemption is required from any governmental or public body or authority in the Cayman Islands in connection with, subject to the payment of the appropriate stamp duty, enforcement of the Document against the Company.

7. **Registrations**: It is not necessary in order to ensure the legality, validity, enforceability or admissibility in evidence in proceedings of the obligations of the Company under the Document or the rights of the parties that the Document or any other document be notarised, filed, registered or recorded in the Cayman Islands.

8. **Arbitration:** The submission by the Company to arbitration pursuant to the terms of the Document is not contrary to Cayman Islands law and would be recognised by the courts of the Cayman Islands as a legal, valid and binding submission, if such submission is legal, valid and binding under all relevant laws (other than the Cayman Islands).

9. **Enforcement of Arbitration Award:**

   (A) An award made in pursuance of an arbitration agreement in a foreign country (being a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted by the United Nations Conference on International Commercial Arbitration on 10 June 1958) may be enforced with leave of the courts and judgment entered in terms of the award and such leave shall not be refused except:

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

(a) if the person against whom the award is invoked proves that:

    (i) a party to the relevant arbitration agreement was (under the law applicable to him) under some incapacity;

    (ii) the relevant arbitration agreement was not valid under the law to which the parties subjected it or, failing any indication thereof, was bit valid under the law of the country where the award was made;

    (iii) such person was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present their case;

    (iv) subject to 9(C) below, the award deals with an issue not contemplated by or not falling within the terms of the submission to arbitration or contains decisions on matters beyond the scope of the submission to arbitration;

    (v) the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties or, failing such agreement, with the law of the country where the arbitration took place; or

    (vi) the award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which or under the law of which it was made;

(b) if the award is in respect of a matter which is not capable of settlement by arbitration or if it would be contrary to public policy to enforce the award.

(B) An award which contains decisions on matters not submitted to arbitration may be enforced to the extent that it contains decisions on matters submitted to arbitration which can be separated from those on matters not so submitted.

4

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

(C) Where an application for the setting aside of an award has been made to such a competent authority as is mentioned in sub-paragraph 9(A)(a)(vi) the court before which the enforcement of the award is sought may, if it thinks fit, adjourn the proceedings and may on the application of the party seeking to enforce the award order the other party to give security.

10. **Choice of Governing Law**: The choice of the laws of Hong Kong Special Administrative Region of the Peoples' Republic of China (**Hong Kong**) as the proper law to govern the Document would be recognised, upheld and applied by the courts of the Cayman Islands as a valid choice of law and the proper law of the Document in proceedings brought before them in relation to the Document except for those laws (i) which such courts consider to be procedural in nature; (ii) which are revenue or penal laws; or (iii) the application of which would be inconsistent with public policy as that term is interpreted under Cayman Islands law.

11. **Residence**: The Purchaser would not be deemed to be resident, domiciled or carrying on business, or subject to taxation, in the Cayman Islands, or in violation of any Cayman Islands law, by reason solely of the negotiation, preparation, execution, performance, enforcement of, and/or receipt of any payment due from the Company under the Document or the Share Transfer, nor is it necessary for the execution, delivery, performance and enforcement of the Document or the Share Transfer that the Purchaser be licensed, authorised or qualified to carry on business in the Cayman Islands.

12. **Interest Limitations**: There is no applicable usury or interest limitation law in the Cayman Islands which would restrict the recovery of payments or the performance by the Company of its obligations under the Document.

13. **Taxes**: Other than stamp duty, there are no registration, documentary or any similar taxes or duties of any kind payable in the Cayman Islands (a) in connection with the signature, performance or enforcement by legal proceedings of the Document, or (b) in respect of the Share Transfer.

14. **Withholding Taxes**: The Company is not required under Cayman Islands law to make any deduction or withholding for or on account of any tax from any payment to be made in accordance with the terms of the Document. The Selling Shareholders are not required under Cayman Islands law to make any withholding for or on account of any tax in connection with the Share Transfer.

15. **No Immunity**: The Company is not entitled to immunity from suit or enforcement of a judgment on the ground of sovereignty or otherwise in the courts of the Cayman Islands in respect of proceedings against it in relation to the Document and the execution of the Document and performance of its obligations under the Document by the Company constitute private and commercial acts.

5

16. **Winding Up and Litigation**: Based solely upon the Litigation Search:

(a) [no] court proceedings are pending against the Company; and

(b) [no] court proceedings have been started by or against the Company for the liquidation, winding-up or dissolution of the Company or for the appointment of a liquidator, receiver, trustee or similar officer of the Company or of all or any of its assets.

17. **Authorised Share Capital**: Based solely upon a review of the Constitutional Documents and the Certificate of Incumbency, as of [**DATE**], the authorised share capital of the Company was US$500,000 divided into (i) 26,962,943,820 ordinary shares of par value US$0.0000125 each (**Ordinary Shares**); (ii) 449,999,920 series A preferred shares of par value US$0.0000125 each (**Series A Preferred Shares**); (iii) 350,000,000 series B preferred shares of par value US$0.0000125 each (**Series B Preferred Shares**); (iv) 555,555,520 series C preferred shares of par value US$0.0000125 each (**Series C Preferred Shares**); (v) 592,074,960 series D preferred shares of par value US$0.0000125 each (**Series D Preferred Shares**); (vi) 1,833,333,278 series E preferred shares of par value US$0.0000125 each (**Series E Preferred Shares**); (vii) 1,528,943,088 series F preferred shares of par value US$0.0000125 each (**Series F Preferred Shares**); (viii) 2,974,476,361 series F-1 preferred shares of par value US$0.0000125 each (**Series F-1 Preferred Shares**); (ix) 1,865,592,383 series G preferred shares of par value US$0.0000125 each (**Series G Preferred Shares**); and (x) 2,887,080,670 series G-1 preferred shares of par value US$0.0000125 each (**Series G-1 Preferred Shares**).

18. **Issued Share Capital**: Based solely upon a review of the Register of Members, as of [**DATE**], the issued share capital of the Company was US$138,382.4383 divided into (i) [591,311,917] Ordinary Shares, (ii) 449,999,920 Series A Preferred Shares, (iii) 350,000,000 Series B Preferred Shares, (iv) 555,555,520 Series C Preferred Shares, (v) 592,074,960 Series D Preferred Shares, (vi) 1,833,333,278 Series E Preferred Shares, (vii) 1,528,943,088 Series F Preferred Shares, (viii) 2,974,476,361 Series F-1 Preferred Shares, (ix) 782,937,131 Series G Preferred Shares, and (x) 1,411,962,890 Series G-1 Preferred Shares (collectively the **Issued Shares**).

6

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

19. **Registered Member**: Based solely on our review of the Register of Members, as of [**DATE**], the registered member of the Company was [**NAME**], being the holder of all the Issued Shares.

Yours faithfully

DRAFT

**Appleby**

7

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ Mauritius ☐ Seychelles ☐ Shanghai

Schedule 1

**Part 1**

**The Document**

A scanned copy of the executed Hong Kong-law governed share purchase agreement dated [**DATE**] 2018 made between, among others, the Purchaser, the Selling Shareholders, the Rollover Shareholder and the Company.

**Part 2**

**Other Documents Examined**

1. A scanned copy of the certificate of incorporation of the Company dated 8 June 2011 (**Certificate of Incorporation**).

2. A scanned copy of the twelfth amended and restated memorandum of association and articles of association (**Articles**) of the Company adopted on 22 August 2017 and effective on 24 August 2017 (together the **Constitutional Documents**).

3. A scanned copy of the executed Hong Kong-law governed tenth amended and restated right of first refusal and co-sale agreement dated 24 August 2017 made between, among others, the Company and its shareholders (**ROFR**).

4. Scanned copies of the executed deed of instruments of transfer of the Company, all dated [**DATE**], made between each of the Selling Shareholders and the Rollover Shareholder (as transferor) and the Purchaser (as transferee).

5. A scanned copy of the certificate of incumbency of the Company dated [**DATE**] 2018, and issued by the registered office provider of the Company (**Certificate of Incumbency**).

6. A scanned copy of the certificate of good standing dated [**DATE**] issued by the Cayman Registrar in respect of the Company (**Certificate of Good Standing**).

7. A scanned copy of the unanimous written resolutions of the directors of the Company dated [**DATE**] (**Directors' Resolutions**).

8. A scanned copy of the unanimous written resolutions of the shareholders of the Company dated 22 August 2017 (**Shareholders' Resolutions**).

8

9. A scanned copy of the Hong Kong-law governed [consent agreement] in respect of the Share Transfer dated [**DATE**] (**Shareholders' Consent**), granted by the Majority Ordinary Holders and the Majority Preferred Holders (including Alibaba) (capitalised terms as defined in the Articles).

10. A scanned copy of the Hong Kong-law governed [approved sale notice] in respect of the Share Transfer dated [**DATE**] (**Approved Sale Notice**), issued by the Company.

11. A scanned copy of the Register of Members of the Company dated [**DATE**] (**Register of Members**).

12. A scanned copy of the Register of Members of the Company dated [**DATE**] ([**DATE**] **Register of Members**).

13. A scanned copy of the Register of Directors and Officers of the Company dated [**DATE**] (**Register of Directors and Officers**),

   (the Register of Members and the Register of Directors and Officers, together the **Registers**)

14. A scanned copy of the director's certificate of the Company dated [**DATE**], confirming certain matters of fact and opinion of the Company (**Director's Certificate**).

15. A copy of the results of the Litigation Search.

**Part 3**

**Search**

1. A search of the entries and filings shown and available for inspection in respect of the Company in the Register of Writs and other Originating Process maintained at the Clerk of the Courts Office in George Town, Cayman Islands for the period from as revealed by a search conducted as at [**TIME**]am on [**DATE**] 2018 for the period of one year preceding such search in respect of the Company (**Litigation Search**).

9

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

Schedule 2

**Assumptions**

We have assumed:

1.  (i) that the originals of all documents examined in connection with this opinion are authentic, accurate and complete; and (ii) the authenticity, accuracy completeness and conformity to original documents of all documents submitted to us as copies;

2.  that there has been no change to the information contained in the Certificate of Incorporation and the Registers and that the Constitutional Documents remain in full force and effect and are unamended;

3.  that the signatures, initials and seals on all documents and certificates submitted to us as originals or copies of executed originals are authentic, and the signatures and initials on any Document executed by the Company are the signatures and initials of a person or persons authorised by the Company, by resolution of its board of directors or any power of attorney granted by the Company, to execute such Document;

4.  that where incomplete documents, drafts or signature pages only have been supplied to us for the purposes of issuing this opinion, the original documents have been duly completed and correspond in all material respects with the last version of the relevant documents examined by us prior to giving our opinion;

5.  that the Document does not differ in any material respects from any drafts of the same which we have examined and upon which this opinion is based;

6.  that each of the parties (other than the Company under Cayman Islands law) is incorporated, organised or registered (as the case may be) and in good standing (where such concept is legally relevant) under the laws which govern its capacity and has the capacity, power and authority, has fulfilled all internal authorisation procedures and completed all applicable filings and formalities, and has obtained all authorisations, approvals, consents, licences and exemptions required under the laws of any relevant jurisdiction to execute, deliver and perform its respective obligations under the Document and the transactions contemplated thereby and has taken all necessary corporate and other action required and completed all applicable formalities required to authorise the execution of the Document and the performance of its obligations under them;

7.  the due execution and delivery of the Document by each of the parties thereto (other than execution by the Company under Cayman Islands law);

10

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

8. that the Document constitutes, or when executed will constitute, legal, valid, binding and enforceable obligations of all parties thereto (save for the Company under Cayman Islands law) in accordance with their governing law;

9. that the choice of laws as the governing law of the Document has been made in good faith and is valid and binding under the laws of all relevant jurisdictions (other than the Cayman Islands);

10. that, insofar as any obligation under the Document is to be performed by any of the parties thereto in any jurisdiction outside of the Cayman Islands, its performance will be legal and effective in accordance with the law of any jurisdiction to which they are subject or in which they are respectively constituted and established;

11. that no party to the Document by having entered into and performing the transactions contemplated by the Document will be in breach of any other agreement, deed, trust deed or licence to which it is a party or by which it is bound;

12. the truth, accuracy and completeness of all representations and warranties or statements of fact or law (other than as to the laws of the Cayman Islands in respect of matters upon which we have expressly opined) made in the Document and any correspondence submitted to us;

13. the accuracy, completeness and currency of the records and filing systems maintained at the public offices where we have searched or enquired or have caused searches or enquiries to be conducted, that such search and enquiry did not fail to disclose any information which had been filed with or delivered to the relevant body but had not been processed at the time when the search was conducted and the enquiries were made, and that the information disclosed by the Litigation Search is accurate and complete in all respects and such information has not been materially altered since the date and time of the Litigation Search;

14. that the Company was not unable to pay its debts as they became due when it executed the Document and did not become unable to do so as a result of the execution and delivery of the Document or the performance of its obligations under the Document;

15. that none of the Company's directors or its registered office has received any notice of any litigation or threatened litigation to which the Company is or may be party;

11

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

16. that the Company has not (i) received notice of any stop notice under Order 50 of the Grand Court Rules in respect of any of its shares or (ii) issued any restrictions notice under the Companies Law in respect of the registration of the beneficial ownership of any of its shares, which restrictions notice has not been withdrawn by the Company or ceased by court order;

17. that (i) the Document is in the form of the document approved in the Directors' Resolutions and the Consent, (ii) the Resolutions have been adopted in accordance with the relevant provisions of the Constitutional Documents and the Companies Law; (iii) all interests of the directors of the Company on the subject matter of the Directors' Resolutions, if any, were declared and disclosed in accordance with the law and Constitutional Documents, (iv) the Resolutions have not been revoked, amended or superseded, in whole or in part, and remain in full force and effect at the date of this opinion, and (v) the directors of the Company have concluded that the entry by the Company into the Document and such other documents approved by the Directors' Resolutions and the transactions contemplated thereby are *bona fide* in the best interests of the Company and for a proper purpose of the Company;

18. that the Register of Directors and Officers accurately reflects the names of all directors and officers of the Company as at the date the Resolutions were passed or adopted, the date the Document was executed and as at the date of this opinion;

19. that the Register of Members accurately reflects the names of the sole member of the Company as at the date of this opinion, and that the [**DATE**] Register of Members accurately reflects the names of all members of the Company as at the date the Resolutions were passed or adopted and the date the Document was executed;

20. that there is no matter affecting the authority of the directors of the Company to effect entry by the Company into the Document including breach of duty, lack of good faith, not disclosed by the Constitutional Documents or the Resolutions, which would have any adverse implications in relation to the opinions expressed herein;

21. that there are no records of the Company, agreements, documents or arrangements other than the Constitutional Documents, the Resolutions and the documents expressly referred to herein as having been examined by us which materially affect, amend or vary the transactions contemplated in the Document or restrict the powers and authority of the directors of the Company in any way which would affect opinions expressed herein;

22. that the Document does not relate to or affect any immovable or movable property situate in the Cayman Islands;

12

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

23. that the entry into the Document and carrying out each of the transactions referred to therein will not conflict with or breach any applicable economic, anti-money laundering, anti-terrorist financing or other sanctions;

24. that any applicable escrow conditions have been met;

25. that the Share Transfer constitutes an Approved Sale (as defined in the Constitutional Documents) pursuant to, and all the necessary steps have been taken under, Articles 123 - 125 of the Articles and Section 5 of the ROFR;

26. that the transactions contemplated by the Document are private acts for commercial purposes and not sovereign acts; the property against which enforcement is to be taken or sought to be taken is used or intended to be used for commercial purposes only; none of the parties to the Document is the sovereign or other head of a country, a state-owned or governmental entity, a government or quasi-government entity, or the central bank or other monetary authority of any country; the transactions contemplated by the Document are not related to anything done in the exercise of sovereign and/or governmental authority;

27. that the directors or members of the Company have not taken any steps to have the Company struck off or placed in liquidation, no steps have been taken to wind up the Company and no receiver has been appointed over any of the Company's property or assets; and

28. that there are no matters of fact or law (excluding matters of Cayman Islands law) affecting the enforceability of the Document that have arisen since the execution of the Document which would affect the opinions expressed herein.

13

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

Schedule 3

**Reservations**

Our opinion is subject to the following:

1.  **Enforcement**: The term "enforceable" as used in this opinion means that there is a way of ensuring that each party performs an agreement or that there are remedies available for breach. Notwithstanding that the obligations established by the Document are obligations which the Cayman Islands courts would generally enforce, they may not necessarily be capable of enforcement in all circumstances in accordance with their terms. In particular, but without limitation:

    (a)  enforcement and priority may be limited by laws relating to bankruptcy, insolvency, reorganisation, liquidation, court schemes, schemes of arrangements, moratoriums or other laws of general application relating to, or affecting the rights of, creditors generally;

    (b)  enforcement may be limited by the principles of unjust enrichment or by general principles of equity and we express no opinion as to the availability of equitable remedies or as to any matters which are within the discretion of the courts of the Cayman Islands, even where such remedies are included in the Document (for example equitable remedies such as the grant of an injunction or an order for specific performance may not be available where liquidated damages are considered an adequate remedy);

    (c)  claims may become barred by prescription or may be or become subject to defences of set-off, counterclaim, estoppel and similar defences;

    (d)  obligations to be performed outside the Cayman Islands may not be enforceable in the Cayman Islands to the extent that performance would be illegal or contrary to public policy under the laws of that foreign jurisdiction;

    (e)  enforcement may be limited to the extent that matters which we have expressly assumed in this opinion will be done, have not been done;

    (f)  the enforcement of the obligations of the parties to the Document may be limited by the law applicable to obligations held to have been frustrated by events happening after their execution;

    (g)  enforcement of obligations may be invalidated by reason of fraud, duress, misrepresentation or undue influence;

14

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

(h)    where the performance of payment obligations is contrary to the exchange control regulations of any country in the currency of which such amounts are payable, such obligations may not be enforceable in the Cayman Islands;

(i)    any provision of a Document purporting to impose an obligation on a person who is not a party to the Document (a **Third Party)** is unenforceable against that Third Party. Any provision in a Document purporting to grant rights to a Third Party is unenforceable by that Third Party except to the extent that the relevant Document expressly provides that the Third Party may, in its own right, enforce such rights in accordance with (and subject to) the Contracts (Rights of Third Parties) Law, 2014; and

(j)    matters of procedure on enforcement of the Document and *forum conveniens* will be governed by and determined in accordance with the *lex fori.*

2.    **Penalties**: Any provision as to the payment of additional money consequent on the breach of any provision of a Document by any person expressed to be a party to it, whether expressed by way of penalty, additional or default interest, liquidated damages or otherwise, may be unenforceable if it could be established that such additional payment constitutes a penalty rather than a compensatory amount.

3.    **Severability**: Severability provisions contained in the Document may not be binding and the question of whether or not provisions may be severed would be determined by the Cayman Islands courts at their discretion, having regard to such matters as whether a particular severance would accord with public policy or involve the courts in making a new contract for the parties.

4.    **Other Obligations**: We express no opinion as to whether the acceptance, execution or performance of the Company's obligations under the Document will result in the breach of or infringe any other agreement, deed or document (other than the Constitutional Documents) entered into by or binding on the Company.

5.    **Determination**: Notwithstanding the provisions of the Document, a determination, designation, calculation or certificate of any party to the Document, as to any matter provided for in such Document might, in certain circumstances, be held in the Cayman Islands courts not to be final, conclusive or binding (for example, if it could be shown to have been fraudulent or erroneous on its face, manifestly inaccurate, made on an unreasonable or arbitrary basis or not to have been reached in good faith) and the Document will not necessarily escape judicial enquiry into the merit of any claim by any party in that respect.

15

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

6. **Discretion**: Where a party to the Document is vested with a discretion or may determine a matter in its opinion or is given the right to determine a conclusive calculation or determination, the Cayman Islands courts, if called upon to consider the question, may require that such discretion be exercised reasonably or that such opinion be based upon reasonable grounds or may determine that such right is not finally binding.

7. **Modification of Document**: We express no view on any provision in the Document requiring written amendments and waivers of any of the provisions of such Document insofar as it suggests that oral or other modification, amendments or waivers could not be effectively agreed upon or granted by or between the parties or implied by the course of conduct of the parties.

8. **Limitations on Liability**: The effectiveness of any terms releasing or limiting a party from a liability or duty owed is limited by law.

9. **Jurisdiction**: Where a Document provides for the submission to the exclusive or non-exclusive jurisdiction of the Cayman Islands courts, the court may decline to accept jurisdiction in any matter where (a) it determines that some other jurisdiction is a more appropriate or convenient forum; (b) another court of competent jurisdiction has made a determination in respect of the same matter; or (c) litigation is pending in respect of the same matter in another jurisdiction.

10. **Concurrent Proceedings**: Proceedings may be stayed in the Cayman Islands if concurrent proceedings in respect of the same matter are or have been commenced in another jurisdiction. Notwithstanding any provision in the Document that all disputes arising under or in connection with the Document should be brought before the competent court in the jurisdiction specified in the Document, a Cayman Islands court has discretion to refuse to stay proceedings in the Cayman Islands if it is satisfied that it is just and equitable to do so and may grant leave to serve Cayman Islands proceedings outside of the Cayman Islands.

11. **Foreign Law**: Relevant foreign law will not be applied by the Cayman Islands courts if it is not pleaded and proved, is not a *bona fide* and lawful choice of law, or it would be contrary to public policy for that law to be applied.

12. **Currency of Court Judgments**: The Cayman Islands Grand Court Rules 1995 expressly contemplate that judgments may be granted by the Grand Court of the Cayman Islands in currencies other than Cayman Islands dollars or United States dollars. Such Rules provide for various specific rates of interest payable upon judgment debts according to the currency of the judgment.

16

Bermuda ☐ British Virgin Islands ☐ Cayman Islands ☐ Guernsey ☐ Hong Kong ☐ Isle of Man ☐ Jersey ☐ Mauritius ☐ Seychelles ☐ Shanghai

13. **Costs**: A Cayman Islands court may refuse to give effect to any provisions of the Document in respect of costs of unsuccessful litigation brought before the Cayman Islands court or where that court has itself made an order for costs.

14. **Conversion of Debts**: In the event the Company is placed into liquidation, the Cayman Islands court is likely to require that all debts are converted (at the official exchange rate at the date of conversion) into and paid in a common currency which is likely to be Cayman Islands dollars or United States dollars.

15. **Stamp Duty**: Cayman Islands stamp duty will be payable if the Document is executed in or brought to the Cayman Islands, or produced before a Cayman Islands court. An unstamped document which is required to be stamped may not be admissible in evidence until duly stamped and unstamped documents may be subject to penalties and interest for late stamping. Certain criminal offences may also be committed in connection with unstamped documents.

16. **Litigation Search**: The Litigation Search is not conclusively capable of revealing whether or not there is any originating process, amended originating process pending or any appeal pending in proceedings in which any party is a defendant or respondent as notice of these matters might not be entered on the court registers immediately. The Litigation Search would not reveal any proceedings against any predecessor entities that may have merged with or into any party under the laws of any jurisdiction nor any proceedings against any of the parties in a name other than the relevant party's current name.

17. **Summary Court Register**: We have not examined the register of the summary court of the Cayman Islands on the basis that claims in such court are limited to a maximum of approximately USD24,000.

18. **Preferences**: Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by a company at a time when that company was unable to pay its debts within the meaning of section 93 of the Companies Law, and made or granted in favour of a creditor with a view to giving that creditor a preference over the other creditors of the Company, would be invalid pursuant to section 145(1) of the Companies Law, if made, incurred, taken or suffered within the six months preceding the commencement of a liquidation of the Company. Such actions will be deemed to have been made with a view to giving such creditor a preference if it is a "related party" of the Company. A creditor shall be treated as a related party if it has the ability to control a company or exercise significant influence over a company in making financial and operating decisions.

17

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

19. **Undervalues**: Any disposition of property made at an undervalue by or on behalf of a company and with an intent to defraud its creditors (which means an intention to wilfully defeat an obligation owed to a creditor), shall be voidable (i) under section 146 of the Companies Law at the instance of the company's official liquidator, and (ii) under the Fraudulent Dispositions Law, at the instance of a creditor thereby prejudiced.

20. **Defrauding Creditors**: If any business of a company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the Cayman Islands court may declare that any persons who were knowingly parties to the carrying on of the business of the company in such manner are liable to make such contributions, if any, to the company's assets as the court thinks proper.

21. **Good Standing**: Our opinion as to good standing is based solely upon receipt of the Certificate of Good Standing issued by the Cayman Registrar. The Company shall be deemed to be in good standing under section 200A of the Companies Law on the date of issue of the certificate if all fees and penalties under the Companies Law have been paid and the Cayman Registrar has no knowledge that the Company is in default under the Companies Law.

22. **Fettering of Statutory Powers**: We express no opinion as to the validity or binding effect of any provision in the Document which provides that the Company will not exercise its statutory powers. This may constitute an unlawful fetter on the statutory powers of the Company.

23. **Corporate Documents**: The Registry of Companies in the Cayman Islands is not public in the sense that copies of the Company's memorandum of association and articles of association and information on directors and shareholders are not publicly available. We have therefore obtained copies of the corporate documents specified in Schedule 1 and relied exclusively on such copies for the verification of such corporate information.

24. **Director's Certificate**: We have relied upon statements and representations made to us in the Director's Certificate provided to us by an authorised director of the Company for the purposes of this opinion. We have made no independent verification of the matters referred to in the Director's Certificate, and we qualify our opinion to the extent that the statements or representations made in the Director's Certificate are not accurate in any respect.

25. **Register of Members**: Our opinion is subject to the Register of Members not containing any manifest error and the absence of fraud or other extraordinary circumstances which may lead to the Register of Members being rectified pursuant to an order of Court issued in accordance with the Companies Law or other competent court.

Bermuda ▢ British Virgin Islands ▢ Cayman Islands ▢ Guernsey ▢ Hong Kong ▢ Isle of Man ▢ Jersey ▢ Mauritius ▢ Seychelles ▢ Shanghai

26. **Document with an "as of" Date**: We express no opinion on the effectiveness of the date of the Document that is an agreement which is dated as of or with effect from a date prior to that on which it is authorised, executed, and delivered by all parties thereto.

19

Bermuda □ British Virgin Islands □ Cayman Islands □ Guernsey □ Hong Kong □ Isle of Man □ Jersey □ Mauritius □ Seychelles □ Shanghai

**EXHIBIT C**

**BENCHMARK DATE NET DEBT CALCULATION PRINCIPLES**

| 模拟 2018.2 | | | | |
|---|---|---|---|---|
| **Items** | **Amount in USD** | **Original Amount** | **Currency** | **Notes** |
| **(-) Indebtedness** | **1,253,882,498** | | | |
| Short term loan | 775,772,203 | 4,926,153,491 | RMB | Including: (1) Onshore loan from bank, with offshore cash deposited, (2) Loan from Alibaba, (3) Onshore loan from Guangfa Bank of Rmb300m, (4) Loan of Rmb168m in Feb.2018 |
| Notes payable | 200,000,000 | 200,000,000 | USD | Loan due to Koubei |
| Interest payable for Koubei loan | 8,230,137 | 8,230,137 | USD | Interest due to Koubei, 2% per annum, period: 2016.2.8-2018.2.28 |
| Interest payable for bank loan | 9,308,790 | 59,110,820 | RMB | Interest due to bank |
| Accounts payables | 57,722,967 | 366,540,842 | RMB | Historical net payable due to Baidu before merger (at closing date: Rmb366m) |
| Other payables | 69,641,105 | 442,221,014 | RMB | Deposit from merchants, City agents, delivery companies |
| Other payables | 40,332,808 | 256,113,328 | RMB | Consideration payable for Baidu Waimai merger |
| Other debt like items | 92,874,488 | 589,753,000 | RMB | Potential tax liability（蜂鸟众包配送员的劳务个税风险以及其他个人劳务个税风险） |
| **(+) Cash and Cash Equivalents** | **807,637,262** | | | |
| Bank | 88,661,417 | 563,000,000 | RMB | Based on the cashflow forecast as of Feb. 28, 2018 (including Rm300m low risk investment purchased from bank, and cash in Alipay and Wechat) |
| Restricted cash | 683,974,836 | 4,343,240,206 | RMB | Cash deposited in offshore bank |
| Interest receivable | 8,988,267 | 57,075,495 | RMB | Interest receivable from bank, including 9m for Feb. 2018 interest |
| Other receivable-deposit | 7,902,506 | 50,180,912 | RMB | Deposited paid by the company |
| Other receivable | 18,110,236 | 115,000,000 | RMB | Loan due from Dianwoda |
| **Notes**: 1 USD = 6.35 RMB | | | | |
| FX | 6.35 | | | |

**Exhibit 4.54**

**SHARE PURCHASE AGREEMENT AMENDMENT**

This SHARE PURCHASE AGREEMENT AMENDMENT (this "Amendment") is made as of August 21, 2018, by and among Baidu Holdings Limited, a company incorporated under the laws of the British Virgin Islands ("Baidu"), Baidu (Hong Kong) Limited, a company incorporated with limited liability under the laws of Hong Kong ("Baidu HK") and a wholly-owned Subsidiary of Baidu, TPG Bellwether, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands ("TPG"), Beacon Group Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands, ("Carlyle," and together with TPG, the "Lead Investors" and each a "Lead Investor"), Taikang Kaitai Special Opportunity Fund II Segregated Portfolio, a segregated portfolio company incorporated under the laws of the Cayman Islands ("Taikang"), CB Finance Investment Limited, a business company incorporated under the laws of the British Virgin Islands ("CB Finance"), Express Success Investments Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("Express Success"), Wellrich Investment Fund Limited Partnership, an exempted limited partnership organized under the laws of the Cayman Islands ("Wellrich," collectively with Carlyle, Taikang, CB Finance and Express Success, the "Other Investors" and each an "Other Investor"), and 91 Wireless Websoft Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Company," and together with Baidu and Baidu HK, the "Seller Parties" and each, a "Seller Party"). Baidu, Baidu HK, the Company, the Lead Investors and the Other Investors are each referred to herein as a "Party," and collectively as the "Parties." TPG and the Other Investors are referred to herein as the "Investors."

W I T N E S S E T H :

WHEREAS, the parties hereto have entered into a share purchase agreement dated April 28, 2018 (the "Share Purchase Agreement"); and

WHEREAS, pursuant to Section 6.3 of the Share Purchase Agreement, the Parties have agreed to enter into this Amendment to amend certain provisions of the Share Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, each Party hereby agrees as follows:

1.  Definitions and Interpretation. All capitalized terms used but not defined in this Amendment shall have the meaning assigned to such terms in the Share Purchase Agreement and the rules of interpretation and construction set forth in Section 1.1 of the Share Purchase Agreement shall also apply to this Amendment.

1

2.    Amendments.

    a.    Section 2.1(b) is hereby deleted and replaced in its entirety with the following:

"Baidu Subscription. Upon the terms and subject to the conditions of this Agreement and the Framework Business Cooperation Agreement, at the Closing, Baidu HK shall subscribe for, and the Company shall issue and deliver to Baidu HK, such number of Ordinary Shares (the "Baidu Subscription Shares"), at a price per Ordinary Share of US$16.4502 (as rounded, on the Base Case) (being the same as the per share Investor Subscription Price), at an aggregate consideration valued at US$126,984,127. Each of Baidu and Baidu HK hereby, jointly and severally, acknowledges and agrees that in consideration of (i) the Baidu Subscription Shares issued to Baidu HK by the Company, and (ii) payment of service fee of RMB 317 million (the "Service Fee") received by Affiliates of Baidu pursuant to that certain agreements entered into by and among the applicable Affiliates of the Company and the applicable Affiliates of Baidu (the "Service Purchase Agreement"), the Company and applicable Affiliates of the Company shall be deemed to have paid in full for (i) RMB317 million in value of the services that are in the process of being provided by applicable Affiliates of Baidu pursuant to the Service Purchase Agreement (the "RMB317 Million Services"); and (ii) RMB483 million in value of the services that have been provided by applicable Affiliates of Baidu under the Framework Business Cooperation Agreement (the "RMB483 Million Services"). For the avoidance of doubt, all Parties agree and acknowledge that, (i) for the purpose of the calculation as set forth in this paragraph, US$126,984,127 shall be translated into RMB800 million (for the avoidance of doubt, the exchange rate on April 28, 2018 is used); and (ii) the aggregate consideration for the Baidu Subscription Shares shall be deemed to be paid by (x) the performance by Baidu and its applicable Affiliates of the RMB 317 Million Services and the RMB 483 Million Services and (y) the payment by applicable Affiliates of Baidu of RMB317 million pursuant to those certain donation agreements entered into by and among the applicable Affiliates of the Company and the applicable Affiliates of Baidu, which shall be further used by applicable Affiliates of the Company as payment of the Services Fee (as defined above) paid to Affiliates of Baidu. The number of the Baidu Subscription Shares shall be 7,719,306, on the Base Case."

    b.    Section 2.5(a)(i) is hereby deleted and replaced in its entirety with the following:

"Closing Net Assets Attributable to Shareholders of Parent" means the consolidated total assets, minus the consolidated total liabilities, and minus the noncontrolling interests of the Principal Business, as determined as of 12:01 a.m. (Hong Kong time) on the Closing Date and shown on the Closing Balance Sheet, for the avoidance of doubt disregarding the Baidu Restructuring Cash, any Investment Subscription Price, or the USD equivalent of RMB2,000,000,000, received by Chongqing Baidu Micro-credit Co., Ltd. (重庆百度小额贷款有限公司) in accordance with Section B.1.1 of the Restructuring Plan. The Parties agree that for the purposes of calculating the Closing Net Assets Attributable to Shares of Parent, (i) the value of the Net Assets attributable to the invested amount provided under the transaction documents attached to the Disclosure Schedule as Appendix 3.2(d), irrespective of the appreciation or depreciation of the underlying investment, shall be RMB500,000,000 and (ii) the Company shall be deemed to own one hundred percent (100%) of the equity interest in Beijing Baiyuxin Credit Reference Co., Ltd. (北京百誉信征信有限公司).

2

c.   Section 2.5(a)(iii) is hereby deleted and replaced in its entirety with the following:

"Target Net Assets Attributable to Shareholders of Parent" means RMB9,000,000,000.

d.   Section 2.5(b) is hereby deleted and replaced in its entirety with the following:

e.   "Closing Statement. As soon as practicable, but not later than ten (10) days following the Closing Date, PricewaterhouseCoopers, or another "Big Four" firm of independent certified public accountants mutually agreed upon by the Lead Investors, shall be engaged for the preparation and delivery, within fifty (50) days from the date of its engagement, to each Investor and the Seller Parties a statement (the "Closing Statement") consisting of (i) an audited consolidated balance sheet of the Principal Business as determined as of 12:01 a.m. (Hong Kong time) on the Closing Date and reasonable supporting documentation therefor, together with a report of such independent certified public accountant thereon, (the "Closing Balance Sheet"), and (ii) a statement setting forth the Closing Net Assets Attributable to Shareholders of Parent. The Closing Statement (and each component thereof) shall be prepared in accordance with the definitions in this Agreement and US GAAP applied on a basis consistent with those used in the preparation of the Financial Statements."

f.   Exhibit C of the Share Purchase Agreement is hereby deleted and replaced in its entirety with Exhibit A attached hereto.

g.   Exhibit E of the Share Purchase Agreement is hereby deleted and replaced in its entirety with Exhibit B attached hereto.

3.   Miscellaneous.

a.   No Further Amendment. Except as expressly amended and/or superseded by this Amendment, the Share Purchase Agreement remains and shall remain in full force and effect. This Amendment shall not constitute an amendment or waiver of any provision of the Share Purchase Agreement, except as expressly set forth herein. Upon the execution and delivery hereof, the Share Purchase Agreement shall thereupon be deemed to be amended as hereinabove set forth as fully and with the same effect as if the amendments made hereby were originally set forth in the Share Purchase Agreement. This Amendment and the Share Purchase Agreement shall each henceforth be read, taken and construed as one and the same instrument, but such amendments and supplements shall not operate so as to render invalid or improper any action heretofore taken under the Share Purchase Agreement. If and to the extent there are any inconsistencies between the Share Purchase Agreement and this Amendment with respect to the matters set forth herein, the terms of this Amendment shall control.

3

b.   <u>Entire Agreement</u>. Notwithstanding Section 6.7 of the Share Purchase Agreement, the Share Purchase Agreement as amended by this Amendment constitutes the entire agreement of the Parties with respect to the subject matter set forth in the Share Purchase Agreement and supersede any prior understandings, negotiations, agreements or representations by or among the parties hereto, written or oral, to the extent they related in any way to the subject matter hereof or thereof.

c.   <u>Additional Provisions</u>. The provisions of Section 6.2(Governing Law; Arbitration), Section 6.3(Amendment; Waiver), Section 6.5(Assignment), Section 6.6(Notices), Section 6.9(Fees and Expenses), Section 6.13 through and including Section 6.16 of the Share Purchase Agreement shall apply *mutatis mutandis* to this Amendment.

[Remainder of this page intentionally left blank]

4

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**BAIDU HOLDINGS LIMITED**

By:   /s/ Yanhong Li
Name:  Yanhong Li
Title:  Director

**BAIDU (HONG KONG) LIMITED**

By:   /s/ Herman Yu
Name:  Herman Yu
Title:  Director

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**91 WIRELESS WEBSOFT LIMITED**

By:      /s/ Da Zhou
Name:  Da Zhou
Title:   Director

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**TPG BELLWETHER, LTD.**

By: /s/ Michael LaGatta
Name: Michael LaGatta
Title: Vice President

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**BEACON GROUP LIMITED**

By: /s/ Norma Kuntz

Name: Norma Kuntz

Title: Director

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**TAIKANG KAITAI SPECIAL OPPORTUNITY FUND II SEGREGATED PORTFOLIO**

By:     /s/ Zhang Le
Name:  Zhang Le
Title:   Managing Director, Taikang Asset Management
          (Hong Kong) Co.Ltd

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**CB FINANCE INVESTMENT LIMITED**

By:    /s/ Ching Nar Cindy Chan

Name:  Ching Nar Cindy Chan

Title:  Director

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

**EXPRESS SUCCESS INVESTMENTS LIMITED**

By:    /s/ Yang Raorao, Peng Ching
Name:  Yang Raorao, Peng Ching
Title:  Director

[Signature Page to Amendment Agreement]

IN WITNESS WHEREOF, the parties hereto have duly executed this Amendment as of the day and year first written above.

WELLRICH INVESTMENT FUND LIMITED
PARTNERSHIP

By:    /s/ ZHENG Jun
Name:  ZHENG Jun
Title:   Director

[Signature Page to Amendment Agreement]

**EXHIBIT A**

**RESTRUCTURING PLAN**

**EXHIBIT B**

**FORM OF TRANSITION SERVICES AGREEMENT**

**SHARE PURCHASE AGREEMENT**

by and among

**BAIDU HOLDINGS LIMITED**

**BAIDU (HONG KONG) LIMITED**

**TPG BELLWETHER, LTD.**

and

**91 WIRELESS WEBSOFT LIMITED**

Dated April 28, 2018

TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| ARTICLE I INTERPRETATION | | | 2 |
| Section 1.1 | Definitions | | 2 |
| Section 1.2 | Interpretation | | 12 |
| ARTICLE II SUBSCRIPTION AND PURCHASE | | | 13 |
| Section 2.1 | Subscription and Purchase | | 13 |
| Section 2.2 | Escrow; Letter of Credit; Closing | | 14 |
| Section 2.3 | Payment and Delivery | | 15 |
| Section 2.4 | Conditions | | 16 |
| Section 2.5 | Closing Date Payment Adjustment | | 19 |
| ARTICLE III REPRESENTATIONS AND WARRANTIES | | | 22 |
| Section 3.1 | Representations and Warranties of Baidu and Baidu HK | | 22 |
| Section 3.2 | Representations and Warranties of the Company | | 25 |
| Section 3.3 | Representations and Warranties of Each Investor | | 39 |
| ARTICLE IV COVENANTS | | | 40 |
| Section 4.1 | Conduct of Business of the Company | | 40 |
| Section 4.2 | Operation of the Principal Business | | 42 |
| Section 4.3 | Additional Covenants | | 42 |
| Section 4.4 | Compliance with ABAC Laws | | 44 |
| Section 4.5 | Compliance with Anti-Money Laundering and Sanctions Laws | | 44 |
| Section 4.6 | Restructuring | | 44 |
| Section 4.7 | Misallocated Assets; Misdirected Payments and Correspondence | | 45 |
| Section 4.8 | Tax Matters | | 46 |
| Section 4.9 | Further Assurances | | 47 |
| Section 4.10 | ESOP | | 47 |
| Section 4.11 | Most Favored Nation | | 47 |
| Section 4.12 | Related Party Arrangements | | 47 |
| Section 4.13 | Insurance | | 47 |
| Section 4.14 | Release | | 48 |
| Section 4.15 | Business Compliance | | 48 |

ARTICLE V INDEMNIFICATION                                                      49
    Section 5.1    Survival of the Representations and Warranties     49
    Section 5.2    Indemnification                                 50
    Section 5.3    Third Party Claims                              51
    Section 5.4    Tax Indemnity                                   52
    Section 5.5    Direct Claims                                   52
    Section 5.6    Limitations on Liability                        52
    Section 5.7    Tax Treatment of Indemnity Payments             53
    Section 5.8    Indemnity for Wealth Management Products         54

ARTICLE VI MISCELLANEOUS                                                       55
    Section 6.1    Disclosure Schedule References                  55
    Section 6.2    Governing Law; Arbitration                      55
    Section 6.3    Amendment; Waiver                               55
    Section 6.4    Binding Effect                                  55
    Section 6.5    Assignment                                      56
    Section 6.6    Notices                                         56
    Section 6.7    Entire Agreement                                57
    Section 6.8    Severability                                    57
    Section 6.9    Fees and Expenses                               57
    Section 6.10    Confidentiality                                57
    Section 6.11    Termination                                    58
    Section 6.12    Put Right                                      60
    Section 6.13    Third Party Rights                             60
    Section 6.14    Headings                                       60
    Section 6.15    Counterparts; Effectiveness                    61
    Section 6.16    Specific Performance                           61
    Section 6.17    Public Announcements                           61

**Schedules**

Schedule 1        Subscription of Series A Preferred Shares

**Exhibits**

Exhibit A        Form of Articles
Exhibit B        Form of Shareholders Agreement
Exhibit C        Restructuring Plan
Exhibit D        Form of Framework Business Cooperation Agreement
Exhibit E        Form of Transition Services Agreement
Exhibit F        Capitalization Table
Exhibit G        Legal Opinion Items

ii

**SHARE PURCHASE AGREEMENT**

This Share Purchase Agreement (this "Agreement") is entered into as of April 28, 2018, by and among Baidu Holdings Limited, a company incorporated under the laws of the British Virgin Islands ("Baidu"), Baidu (Hong Kong) Limited, a company incorporated with limited liability under the laws of Hong Kong ("Baidu HK") and a wholly-owned Subsidiary of Baidu, TPG Bellwether, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands ("TPG") and 91 Wireless Websoft Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Company", and together with Baidu and Baidu HK, the "Seller Parties" and each, a "Seller Party"). Baidu, Baidu HK, TPG and the Company are each referred to herein as a "Party," and collectively as the "Parties." Each other Person which executes and delivers a counterpart signature page to this Agreement as an "Other Investor" after the date hereof and on or prior to April 30, 2018 pursuant to Section 2.1(a) is referred to herein as an "Other Investor," and collectively as the "Other Investors" and shall thereupon be deemed to have entered into, and be party to, this Agreement and the terms "Party" and "Parties" shall thereafter be construed accordingly to include such Other Investor and the Other Investors, respectively. TPG and the Other Investors (if any) are referred to herein as the "Investors".

**W I T N E S S E T H:**

WHEREAS, the Seller Parties and certain of their respective Affiliates desire to restructure their financial services business and contribute, transfer or otherwise spin off to the Group the Principal Business pursuant to the Restructuring Plan, and on completion of the Restructuring, the Principal Business will be owned by the Group;

WHEREAS, Baidu HK is the sole shareholder of the Company and prior to Closing, Baidu HK will invest the Baidu Restructuring Cash in the Company in consideration for the issuance of additional Ordinary Shares to Baidu HK;

WHEREAS, in consideration for certain contributions to be made to the Company by Baidu pursuant to the Framework Business Cooperation Agreement, subject to the terms and conditions herein, Baidu HK desires to subscribe for, and the Company desires to issue, the Baidu Subscription Shares, at the Closing;

WHEREAS, subject to the terms and conditions herein, each Investor desires to subscribe for, and the Company desires to issue, certain Series A Preferred Shares, at the Closing, for an aggregate Investor Subscription Price for all Investors which is within the Investor Subscription Range, such that (a) at the bottom end of such range (i) TPG will hold 27.8333% of the issued share capital of the Company on a fully diluted basis immediately following the Closing, and (ii) the Investors collectively will hold 38.9666% of the issued share capital of the Company on a fully diluted basis immediately following the Closing, and (b) at the top end of such range (i) TPG will hold 25.9784% of the issued share capital of the Company on a fully diluted basis immediately following the Closing, and (ii) the Investors collectively will hold 51.6972% of the issued share capital of the Company on a fully diluted basis immediately following the Closing, in either case, after taking into account the Ordinary Shares held and subscribed for by Baidu HK at the Closing and the Ordinary Shares reserved for issuance pursuant to the ESOP as contemplated under this Agreement. The relevant actual percentages to be held by TPG and the Investors at the Closing shall be extrapolated from the foregoing based on the final aggregate amount of the Investor Subscription Price when determined after April 30, 2018. The subscription for the Investor Subscriptions Shares shall take place at a pre-money valuation of the Company of US$1,825,396,825, on the Base Case; and

WHEREAS, the Seller Parties and the Investors desire for the Company (or certain Affiliates thereof) and Baidu (or certain Affiliates thereof) to enter into the Framework Business Cooperation Agreement and the Transition Services Agreement, in each case on the Closing Date.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, the Parties agree as follows:

**ARTICLE I**

**INTERPRETATION**

Section 1.1 Definitions. As used in this Agreement, the following terms shall have the following respective meanings:

"Affiliate" of a Person shall mean (a) in the case of a Person other than a natural person, any other Person that, from time to time, directly or indirectly Controls, is Controlled by or is under common Control with such Person and (b) in the case of a natural person, any other Person that, from time to time, is directly or indirectly Controlled by such Person or is a Relative of such Person.

"Agreement" shall have the meaning set forth in the Preamble.

"Articles" shall mean the Amended and Restated Memorandum And Articles of Association of the Company, in the form attached hereto as Exhibit A.

"Authorization" shall have the meaning set forth in Section 3.1(d).

"Baidu" shall have the meaning set forth in the Preamble.

"Baidu HK" shall have the meaning set forth in the Preamble.

"Baidu Parent" shall mean Baidu, Inc., an exempted company incorporated with limited liability under the laws of the Cayman Islands.

"Baidu Parties" shall mean Baidu Parent and each of its Subsidiaries (including any variable interest entities Controlled by such Subsidiaries) which has owned or operated or owns or operates any part of the Principal Business or will contribute any part of the Principal Business to the Group, including any Contributed Asset; provided that no Group Company shall be a Baidu Party.

"Baidu Restructuring Cash" shall mean the difference of the (a) the aggregate purchase price payable by the Group Companies for the purchase of all of the Equity Securities in the Group Companies and Contributed Assets from the Baidu Parties in the Restructuring, as determined pursuant to the Restructuring Plan, minus (b) the product of aggregate Investor Subscription Price for all the Investors multiplied by a fraction, (x) the numerator of which is 6.5, and (y) the denominator of which is 11.5.

2

"Board" shall mean the board of directors of the Company.

"Bulletin 7" shall mean the Bulletin on Certain Issues regarding Equity Transfers by Non-Resident Enterprises issued by the State Administration of Taxation of the PRC on February 3, 2015.

"Business Day" shall mean any day other than Saturday, Sunday or another day on which commercial banks located in the Cayman Islands, New York, the PRC or Hong Kong are authorized or required by law or executive order to be closed and on which no tropical cyclone warning No. 8 or above and no "black" rainstorm warning signal is hoisted in Hong Kong at any time between 8:00 a.m. and 6:00 p.m. Hong Kong time.

"Capitalization Table" shall mean the capitalization table setting out the capitalization of each of the Group Companies on a fully diluted basis as of the date hereof, immediately prior to the Closing and immediately following the Closing, as attached hereto as Exhibit F in Excel format (including the formulas incorporated therein).

"Chief Executive Officer" shall mean Mr. Guang ZHU (朱光) or any other duly appointed chief executive officer of the Group prior to the Closing Date.

"Claim Notice" shall have the meaning set forth in Section 5.3(a).

"Closing" shall have the meaning set forth in Section 2.2(a).

"Closing Date" shall mean the date on which the Closing occurs.

"Company" shall have the meaning set forth in the Preamble.

"Company Employee Agreement" shall mean any management, employment, severance, change in control, transaction bonus, consulting, or other similar contract between any Group Company or, with respect to any Transferred Employee, any Baidu Party, on the one hand, and any current or former Company Personnel, on the other hand, pursuant to which any Group Company or Baidu Party has any Liability.

"Company Employee Plan" shall mean any plan, program, policy, practice, contract or other arrangement providing for compensation, severance, termination pay, deferred compensation, performance awards, share or share-related awards, material fringe benefits or other material employee benefits or remuneration of any kind, whether written or unwritten, that is maintained, contributed to or required to be contributed to by any Group Company or, with respect to any Transferred Employee, any Baidu Party, for the benefit of any current or former Company Personnel, or with respect to which any Group Company or Baidu Party has or would reasonably be expected to have any Liability.

3

"<u>Company Software</u>" shall mean any Software owned by any of the Group Companies or any Baidu Party in connection with the Principal Business and licensed, distributed or otherwise available (or in development to be licensed, distributed or otherwise made available) to any customer or potential customer of any Group Company or the Principal Business.

"<u>Confidential Information</u>" shall have the meaning set forth in Section 6.10(a).

"<u>Contemplated Transactions</u>" shall mean the transactions contemplated by the Transaction Documents.

"<u>Contract</u>" shall mean, as to any Person, a contract, agreement, indenture, note, bond, loan, instrument, lease, mortgage, franchise, license, commitment, purchase order, and other legally binding arrangement, whether written or oral.

"<u>Contributed Assets</u>" shall mean all assets, properties, rights, Intellectual Property, Information Technology, employees, Contracts and Permits (i) set out in the Restructuring Plan to be transferred or otherwise contributed by the relevant Baidu Parties to the Group or (ii) owned or leased by the Group Companies.

"<u>Control</u>" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management of a Person, whether through the ownership of voting securities, by contract, credit arrangement or proxy, as trustee, executor or agent or otherwise. For purposes of this definition, a Person shall be deemed to Control another Person if such first Person, directly or indirectly, owns or holds more than 50% of the voting Equity Securities in such other Person for the general election of directors, or if such first Person, directly or indirectly, controls the board of directors, managing partner or other similar governing body or position of such other Person. The terms "<u>Controlled</u>" and "<u>Controls</u>" shall have meanings correlative to the foregoing.

"<u>Control Documents</u>" shall mean, collectively, the agreements made from time to time, which enable the Company to exclusively Control, and consolidate in its financial statements the results of, each Group Company that is a variable interest entity in the form as agreed by TPG and the Seller Parties as soon as practicable after the date hereof, *provided* that the nominee shareholders of each Group Company that is a variable interest entity shall be employees of the Principal Business as agreed by TPG and the Seller Parties.

"<u>Director Indemnification Agreements</u>" shall mean the respective indemnification agreements to be entered into by and between the Company and each director appointed to the Board in the form as agreed by TPG and the Seller Parties as soon as practicable after the date hereof.

"<u>Disclosure Schedule</u>" shall mean the disclosure schedule dated the date hereof in respect of this Agreement, which has been provided to, and receipt of which has been acknowledged by, TPG as of such date.

4

"Encumbrance" shall mean (a) any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable Law, (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person and (c) any adverse claim as to title, possession or use.

"Equity Securities" shall mean, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests (whether or not such derivative securities are issued by such Person).

"Escrow Agent" shall mean, with respect to each Investor (except TPG if it exercises its right to provide the Letter of Credit pursuant to Section 2.2(b)), the financial institution as agreed by the Company, Baidu and such Investor prior to the 5th Business Day after April 30, 2018.

"Escrow Agreement" shall mean, with respect to each Investor (except TPG if it exercises its right to provide the Letter of Credit pursuant to Section 2.2(b)), the Escrow Agreement to be entered into by and among the Company, Baidu, such Investor and the applicable Escrow Agent as soon as practicable (after completion of the Escrow Agent's "Know Your Customer" requirements) after April 30, 2018, in the form as agreed among the parties thereto as soon as practicable after the date hereof.

"Escrow Amount" shall have the meaning set forth in Section 2.2(a).

"Escrow Percentage" shall mean (a) 2% in the case of the Lead Investors, or (b) 10% in the case of any other Investor.

"ESOP" shall mean the employee equity incentive plan of the Company, pursuant to which 26,631,606 Ordinary Shares shall be reserved for issuance, on the Base Case, to be adopted by the Company in the form as agreed by TPG and the Seller Parties as soon as practicable after the date hereof.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"Framework Business Cooperation Agreement" shall mean the Framework Business Cooperation Agreement to be entered into by and among certain Group Companies and Baidu and/or its Affiliates, in the form attached hereto as Exhibit D.

"fully diluted basis" shall mean, for the purpose of calculating share numbers, that the calculation is to be made assuming that all outstanding options, warrants and other Equity Securities directly or indirectly convertible into or exercisable or exchangeable for Ordinary Shares (whether or not by their terms then currently convertible, exercisable or exchangeable) and Equity Securities which have been reserved for issuance pursuant to the ESOP have been so converted, exercised, exchanged or issued.

5

"Fundamental Representations" shall mean the representations and warranties set forth in Sections 3.1(a), (b), (c), (e), (g)(ii), (h) and (i) and Sections 3.2(a), (b), (c), (d), (e), (f), (n)(ii), (w) and (x).

"Governmental Authority" shall mean any government or political subdivision thereof, whether on a federal, central, state, provincial, municipal or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department, office, leading group or team, inter-authorities leading and/or coordination bodies or other instrumentality thereof, interim or permanent, and any governing body of any securities exchange.

"Group" or "Group Companies" shall mean, collectively, the Company and its Subsidiaries, including any Person that becomes a Subsidiary of the Company at or prior to the completion of the Restructuring, and a "Group Company" shall mean any of them.

"HKIAC" shall have the meaning set forth in Section 6.2.

"Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China.

"Indebtedness" shall mean, as of any time with respect to any Person, without duplication, (a) all Liabilities for borrowed money, whether current or funded, secured or unsecured, all obligations evidenced by bonds, debentures, notes or similar instruments, (b) all Liabilities for the deferred purchase price of property, other than trade payables in the ordinary course outstanding for 90 days or less, (c) all Liabilities in respect of any lease of, or other arrangement conveying the right to use, real or personal property, or a combination thereof, which Liabilities are required to be classified and accounted for under US GAAP as capital leases, (d) all Liabilities for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction securing obligations of a type described in clauses (a), (b) or (c) above to the extent of the obligation secured, and all Liabilities as obligor, guarantor, or otherwise, to the extent of the obligation secured, (e) all guarantees of obligations of any other Person with respect to any of the foregoing and (f) any accrued and unpaid interest on any of the foregoing.

"Indemnified Parties" shall have the meaning set forth in Section 5.2(a).

"Indemnifying Party" shall have the meaning set forth in Section 5.2(a).

"Indemnity Notice" shall have the meaning set forth in Section 5.5.

"Information Technology" shall mean all computer systems, telecommunication systems, Software (and the tangible media on which it is stored) and hardware including source and object code, cabling, routers, switched, racks, servers, PCs, laptops, terminals, scanners, printers, all associated peripherals and all other information technology assets, including all documentation relating to the foregoing, (a) owned or used by any of the Group Companies or (b) licensed or leased to any of the Group Companies.

6

"Initial Budget" shall mean the initial budget of the Group as adopted by the Company on or prior to the Closing in the form agreed by TPG and the Seller Parties.

"Initial Business Plan" shall mean the initial business plan of the Group as adopted by the Company on or prior to the Closing in the form agreed by TPG and the Seller Parties.

"Intellectual Property" shall mean any and all (a) patents (including all reissues, divisionals, provisionals, continuations, continuations in part, re-examinations, renewals and extensions thereof), patent applications, and other patent rights, (b) trademarks, service marks, tradenames, brand names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with all goodwill associated with any of the foregoing and applications, registrations and renewals in connection therewith, (c) copyrights, mask works, and copyrightable works, and all applications, registrations for and renewals in connection therewith, (d) internet domain names, web addresses, web pages, websites and related content, accounts with Twitter, Facebook, Instagram, and other social media companies and the content found thereon and related thereto, and uniform resource locators, (e) proprietary Software, including source code, object code and supporting documentation for such Software, (f) trade secrets and proprietary information, including confidential business information, technical data, customer lists, data collections, methods and inventions (whether or not patentable and where or not reduced to practice), (g) copies and tangible embodiments of any of the foregoing, (h) all other intellectual property, whether or not registrable, in each case, under any Law or statutory provision or common law doctrine in any country, and (i) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"Investor Subscription Price" shall have the meaning set forth in Section 2.1(a).

"Investor Subscription Shares" shall have the meaning set forth in Section 2.1(a).

"Investor Subscription Range" shall mean any amount between US$1,400,000,000 and US$1,990,000,000.

"Investors" shall have the meaning set forth in the Preamble.

"Key Employees" shall mean the Persons named as key employees in the Restructuring Plan.

"Knowledge" of any Person shall mean the knowledge of such Person (and in the case of any Person which is not an individual, any of such Person's directors or officers).

7

"Law" or "Laws" shall mean all applicable laws, regulations, rules and Orders of any Governmental Authority, securities exchange or other self-regulating body, including any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment. For the avoidance of doubt, with respect to the Principal Business, "Law" or "Laws" shall also include administrative/regulatory policies of any applicable Governmental Authority, securities exchange or other self-regulating body, as reflected in guidance received from such Governmental Authority in the form of notices, correspondences or written communication with such Governmental Authority from time to time, or otherwise reflected in their administrative or regulatory practice.

"Lead Investor" shall mean (a) TPG and (b) such Other Investor as selected by the Company which shall have (i) become a party to this Agreement pursuant to Section 2.1(a) on or prior to April 30, 2018, (ii) agreed to subscribe for Investor Subscription Shares for an aggregate Investor Subscription Price not less than US$300,000,000 at the Closing, upon the terms and subject to the conditions of this Agreement, (iii) been designated by Baidu HK as the Investor (other than TPG) that will provide to the Company after Closing certain strategic resources to the satisfaction of Baidu, and (iv) the right to appoint the Strategic Investor Director pursuant to the Shareholders Agreement on Closing.

"Leases" shall mean all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guarantees and other agreements with respect thereto, pursuant to which any Group Company or any Baidu Party holds any Leased Real Property.

"Liabilities" shall mean any and all debts, liabilities, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, and whenever or however arising (including whether arising out of any contract or tort based on negligence or strict liability).

"Licensed Intellectual Property" shall mean all Intellectual Property owned by any Person other than a Group Company and licensed or sublicensed to any Group Company, or any Baidu Party for use in the Principal Business, or for which any Group Company, or any Baidu Party for use in the Principal Business, has obtained a covenant not to be sued.

"Losses" shall have the meaning set forth in Section 5.2(a).

"Majority Series A Preferred Shareholders" shall have the meaning set forth in the Shareholders Agreement.

"Material Adverse Effect" shall mean any event, fact, circumstance or occurrence that, individually or in the aggregate, results in or would reasonably be expected to result in a material adverse change in or a material adverse effect on (a) the condition, assets, liabilities, results of operations or business of the Principal Business and the Group taken as a whole or (b) the ability of any of the Seller Parties or their respective Affiliates to consummate the Contemplated Transactions; provided, that in determining whether a Material Adverse Effect has occurred pursuant to clause (a) above, there shall be excluded any effect on the Principal Business or the Group to the extent relating to or arising in connection with (i) any action required to be taken pursuant to the terms and conditions of this Agreement or any other Transaction Documents or taken at the written direction of the Investors, or (ii) the announcement or consummation of the Contemplated Transactions.

8

"Open Source Software" shall mean any and all Software that (a) is distributed under an open source license, including (by way of example only) the GNU General Public License, GNU Lesser General Public License, Apache License, Mozilla Public License, BSD License, MIT License, any other license approved as an open source license by the Open Source Initiative, and any derivative of the foregoing licenses, or (b) is otherwise licensed under any terms or conditions that could require that any Software be (i) made available or distributed in source code form; (ii) licensed for the purpose of making derivative works; (iii) licensed under terms that allow reverse engineering, reverse assembly or disassembly of any kind; or (iv) redistributable at no charge.

"Order" shall mean any order, ruling, decision, verdict, decree, writ, subpoena, mandate, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before or under the supervision of any Governmental Authority.

"Ordinary Shares" shall mean the ordinary shares, par value US$0.0001 per share, in the share capital of the Company.

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by the Group Companies, or the Baidu Parties for use in the Principal Business.

"Parties" shall have the meaning set forth in the Preamble.

"Party" shall have the meaning set forth in the Preamble.

"Person" shall mean any natural person, firm, partnership, association, corporation, company, trust, public body or government or other entity of any kind or nature.

"PRC" shall mean the People's Republic of China, but for purposes of this Agreement, excluding Hong Kong, the Macau Special Administrative Region and Taiwan.

"Principal Business" shall mean the business of providing, distributing, selling and issuing financial services and products and Internet financial services and products, including (without limitation) online and mobile payment services, lending services, consumer finance services, installment payment services and wealth management services and products, as such business is conducted by the Baidu Parties and the Group Companies.

"Relative" of a natural person means such Person's spouse, parents, children and siblings, whether by blood, marriage or adoption.

9

"Restructuring" means the contribution of the Principal Business to the Group by the relevant Baidu Parties pursuant to and in accordance with the details set forth in the Restructuring Plan, and the other transactions expressly contemplated by the Restructuring Plan.

"Restructuring Documents" shall mean any agreements, documents or certificates delivered pursuant thereto or pursuant to the Restructuring, each in such form as agreed by TPG and the Seller Parties.

"Restructuring Plan" shall mean the Restructuring Plan in the form attached hereto as Exhibit C.

"SEC" shall mean the Securities and Exchange Commission of the United States of America.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"Series A Preferred Shares" shall mean the Series A preferred shares, par value US$0.0001 per share, in the share capital of the Company.

"Shareholders Agreement" shall mean the Shareholders Agreement to be entered into by and among the Company, Baidu, Baidu HK and the Investors, in the form attached hereto as Exhibit B.

"Shares" shall mean, collectively, the Ordinary Shares and the Series A Preferred Shares.

"Software" shall mean any and all (a) computer programs, applications, systems and software, including any and all software implementations of algorithms, models and methodologies and any and all source code, object code, development and design tools, applets, compilers and assemblers, (b) databases and compilations, including any and all libraries and collections of data whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) technology supporting, and the contents and audiovisual displays of, any internet site(s), and (e) documentation and media, including user manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing recorded.

"Strategic Investor Director" shall have the meaning set forth in the Shareholders Agreement.

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, which is Controlled by such Person. For the avoidance of doubt, a "variable interest entity" Controlled by a Person shall be deemed to be a Subsidiary of such Person.

10

"Tax" shall mean any tax, duty, deduction, withholding, impost, levy, fee, assessment or charge of any nature whatsoever (including income, franchise, value added, sales, use, excise, stamp, customs, documentary, transfer, withholding, property, capital, employment, payroll, ad valorem, net worth or gross receipts taxes and any social security, unemployment or other mandatory contributions) imposed, levied, collected, withheld or assessed by any local, municipal, regional, urban, governmental, state, national or other Governmental Authority and any interest, addition to tax, penalty, surcharge or fine in connection therewith, including any obligations to indemnify or otherwise assume, bear or succeed to the liability of any other Person with respect to any of the foregoing items by virtue of any Laws or contractual arrangements.

"Tax Grant" shall mean any Tax exemption, Tax holiday or reduced Tax rate granted by a Taxing Authority with respect to the Company or any of its Subsidiaries that is not generally available to Persons without specific application therefor.

"Tax Return" shall mean any Tax return, statement, report, election, declaration, disclosure, schedule or form (including any estimated tax or information return or report) filed or required to be filed with any Taxing Authority by the Company or any Subsidiary.

"Threshold" shall have the meaning set forth in Section 5.3(a).

"Third Party Claim" shall have the meaning set forth in Section 5.3(a).

"Transaction Documents" shall mean, collectively, this Agreement, the Articles, the Shareholders Agreement, the Transition Services Agreement, the Restructuring Plan, the Framework Business Cooperation Agreement, the Director Indemnification Agreements, the Restructuring Documents, the Control Documents and any other agreements, documents or certificates delivered pursuant hereto or thereto.

"Transfer Tax" shall mean any transfer, documentary, sales, use, stamp, registration, value added or other similar Tax (including any penalties and interest).

"Transferred Employees" shall mean all employees of the Baidu Parties who are involved in the Principal Business and whose employment will be transferred to the Group Companies pursuant to the Restructuring.

"Transition Services Agreement" shall mean the Transition Services Agreement to be entered into by and among certain Group Companies and Baidu and/or its Affiliates, in the form attached hereto as Exhibit E.

"US GAAP" shall mean the Generally Accepted Accounting Principles of the United States of America.

"Wealth Management Asset" shall mean the underlying assets of the Wealth Management Products distributed, sold or issued by any of the Baidu Parties and the Group Companies.

"Wealth Management Business" shall mean the fund-raising activities in the manner of distributing, selling or issuing wealth management products of, among others, delegated entrustment plan ("定向委托计划"), delegated financing plan ("定向融资计划"), wealth management plan ("理财计划"), assets management plan ("资产管理计划"), or investment rights assignment ("收益权转让"), as carried out by any of the Baidu Parties and the Group Companies.

11

"Wealth Management Product" shall mean any wealth management product distributed, sold or issued by any Group Company or any Baidu Party in connection with the Wealth Management Business prior to the Closing (for the avoidance of doubt, including any such product distributed, sold or issued prior to the Closing but which remains outstanding after the Closing). Such Wealth Management Products shall be considered as outstanding as of a particular date as long as their underlying assets are not fully paid off as of such date.

Section 1.2 Interpretation. Unless the express context otherwise requires:

(a) the words "hereof," "hereby," "hereto," "herein," and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b) the terms defined in the singular have a comparable meaning when used in the plural, and vice versa;

(c) any references herein to "US$" are to United States Dollars, and any references herein to "RMB" are to PRC Renminbi;

(d) any references herein to a specific Section, Schedule or Exhibit or to the Recitals or Preamble shall refer, respectively, to Sections, Schedules, Exhibits, Recitals or Preamble of this Agreement, unless otherwise specified;

(e) wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;"

(f) references herein to any gender shall include each other gender as the context requires;

(g) the word "or" shall not be exclusive;

(h) references to "written" or "in writing" include in electronic form;

(i) the Parties have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption of burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement;

(j) reference to any Person includes such Person's successors and permitted assigns;

(k) any reference to "days" shall mean calendar days unless Business Days are expressly specified;

12

(l) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day;

(m) any reference to any Law shall be deemed to refer to the applicable Law in effect as of the date hereof (unless the applicable Law addressed matters as of an earlier date, in which case, applicable Law shall be deemed to mean the applicable Law in effect as of that date);

(n) any reference in this Agreement to any agreement or instrument (other than the Disclosure Schedule) is a reference to that agreement or instrument as amended, novated or supplemented; and

(o) if any amount in a certain currency is to be translated into an equivalent amount in another currency, such translation shall be done at the relevant daily spot rate of exchange reported by the People's Bank of China which appears on the Reuters Screen "SAEC" Page at the end of the day on the second Business Day immediately prior to the date on which such amount is required to be paid.

**ARTICLE II**
**SUBSCRIPTION AND PURCHASE**

Section 2.1 <u>Subscription and Purchase</u>.

(a) <u>Subscription of the Investor Subscription Shares</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing, each Investor shall subscribe for, and the Company shall issue and deliver to such Investor, such number of Series A Preferred Shares as set forth against its name in Schedule 1 hereto in the column entitled "Number of Series A Preferred Shares Subscribed for" (the "<u>Investor Subscription Shares</u>"), free and clear of all Encumbrances other than transfer restrictions imposed thereon by applicable securities Laws or similar Laws, for a subscription price set forth against its name in Schedule 1 hereto in the column entitled "Investor Subscription Price" (the "<u>Investor Subscription Price</u>"); provided, that from the date hereof until April 30, 2018, (i) the Company shall agree to issue and deliver Series A Preferred Shares to one or more Other Investors, (ii) each Other Investor shall execute and deliver to the other Parties a counterpart signature page to this Agreement as an "Other Investor", and (iii) subject to Section 2.1(c), Schedule 1 hereto shall be deemed amended to add each Other Investor, the Investor Subscription Price for such Other Investor as agreed between the Company and such Other Investor (and notified to TPG in writing by the Company within the same day of such agreement) and the Investor Subscription Shares for such Other Investor (which shall be the quotient of (A) the Investor Subscription Price for such Other Investor divided by (B) the same price per Series A Preferred Share as TPG's per share Investor Subscription Price); provided, further, that (x) the sum of the aggregate Investor Subscription Price for all Other Investors, plus the aggregate Investor Subscription Price for TPG shall be within the Investor Subscription Range, (y) at least one of the Other Investors shall be the other Lead Investor and shall have agreed to subscribe for Investor Subscription Shares for an aggregate Investor Subscription Price not less than US$300,000,000 at the Closing, upon the terms and subject to the conditions of this Agreement (the conditions set forth in sub-clauses (x) and (y) above, the "<u>Additional Subscription Conditions</u>") and (z) in no event shall TPG's Investor Subscription Price be deemed amended pursuant to this Section 2.1(a). The per share Investor Subscription Price shall be US$16.4502, as rounded, on the Base Case.

13

(b) Baidu Subscription. Upon the terms and subject to the conditions of this Agreement and the Framework Business Cooperation Agreement, at the Closing, Baidu HK shall subscribe for, and the Company shall issue and deliver to Baidu HK, such number of Ordinary Shares (the "Baidu Subscription Shares"), at a price per Ordinary Share of US$16.4502 (as rounded, on the Base Case) (being the same as the per share Investor Subscription Price), at an aggregate consideration valued at US$126,984,127. Each of Baidu and Baidu HK hereby, jointly and severally, acknowledges and agrees that in consideration of the Baidu Subscription Shares issued to Baidu HK by the Company, applicable Affiliates of the Company shall be deemed to have paid, and shall receive credit, for such US$126,984,127 in value of the services to be provided by applicable Affiliates of Baidu under the Framework Business Cooperation Agreement. The number of the Baidu Subscription Shares shall be 7,719,306, on the Base Case.

(c) Capitalization Table. The Parties agree that the Capitalization Table set forth in Exhibit F assumes the Investors will subscribe for Series A Preferred Shares for an aggregate Investor Subscription Price of US$1,825,396,825 (the "Base Case"). The subscription for the Investor Subscription Shares shall take place at a pre-money valuation of the Company of US$1,825,396,825, on the Base Case. In the event that the amount of aggregate Investor Subscription Price is different from the Base Case, the subscription for the Investor Subscription Shares shall take place at a pre-money valuation of the Company that equals to (i) US$2,857,142,857, minus (ii) the product of aggregate Investor Subscription Price for all the Investors multiplied by a fraction, (x) the numerator of which is 6.5, and (y) the denominator of which is 11.5. The aggregate number of outstanding Ordinary Shares of the Company on a fully diluted basis immediately prior to the Closing (after taking into account the Ordinary Shares reserved for issuance pursuant to the ESOP as contemplated under this Agreement) is 110,965,024, on the Base Case. In the event that the assumption in the first sentence of this Section 2.1(c) shall vary (but in any event within the parameters set forth in this Agreement), the share numbers and percentages in the Capitalization Table, and used in this Agreement as derived from the Capitalization Table on the Base Case, shall be appropriately adjusted or re-calculated to reflect such variation pursuant to the formulas incorporated in the Capitalization Table. For the avoidance of doubt, in no event shall the Investor Subscription Price for TPG (as set forth in Schedule 1) or the Investor Subscription Range be varied, or the aggregate Investor Subscription Price paid by the Investors be over the top end of the Investor Subscription Range.

Section 2.2 Escrow; Letter of Credit; Closing.

(a) Subject to Section 2.2(b), on the later of (i) any date within five (5) Business Days after April 30, 2018, or (ii) the execution and delivery of the Escrow Agreement by the applicable Escrow Agent, pursuant to the applicable Escrow Agreement, each Investor shall pay or cause to be paid to a non-interest bearing bank account, designated in writing by the Escrow Agent to such Investor, an amount (with respect to such Investor, the "Escrow Amount") equal to (x) the Investor Subscription Price as applicable to such Investor, multiplied by (y) such Investor's Escrow Percentage, in US$ by wire transfer of immediately available funds, such payment obligation to be satisfied by delivery of evidence of an irrevocable payment instruction by such Investor to the Company. Each Investor's Escrow Amount shall be used to reduce such Investor's Investor Subscription Price, be returned to such Investor, or be forfeited by such Investor to the Company, as the case may be, in accordance with this Agreement (including, without limitation, Section 2.3(a) and Section 6.11(c)) and pursuant to the Escrow Agreement.

14

(b) The Seller Parties agree that, at the sole discretion of TPG, as an alternative to the payment of the Escrow Amount pursuant to Section 2.2(a), TPG shall have the right to provide to the Company a standby letter of credit or bank guarantee (the "Letter of Credit") in the face amount equal to its Escrow Amount, for the benefit of the Company, which may be drawn by the Company in accordance with the terms thereof in the event that the Escrow Amount would have been forfeited by TPG to the Company pursuant to Section 6.11(c) if TPG had paid the Escrow Amount pursuant to Section 2.2(a).

(c) The closing of transactions contemplated in Section 2.1 (collectively, the "Closing") shall take place electronically on the twelfth (12th) Business Day following the satisfaction or waiver of the conditions set forth in Section 2.4(a) (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and place as the Seller Parties and the applicable Investor(s) may agree in writing with respect to such Investor(s). The consummation of the transactions contemplated in Section 2.1(b) shall not be conditioned on the conditions set forth in Section 2.4, but shall be conditioned on and be held substantially concurrently with the consummation of the transactions contemplated in Section 2.1(a).

Section 2.3 Payment and Delivery.

(a) At the Closing:

(i) each Investor shall pay and deliver, or cause to be paid and delivered, (1) to the Company an amount equal to the Investor Subscription Price less the Escrow Amount paid by such Investor, or if applicable in the case of TPG, provided through the Letter of Credit, pursuant to Section 2.2, in US$ by wire transfer of immediately available funds, to such bank account designated in writing by the Company to such Investor no later than five (5) Business Days prior to the Closing Date, such payment obligation to be satisfied by delivery of evidence of an irrevocable payment instruction by such Investor to the Company on the Closing Date;

(ii) the Company shall deliver to each Investor (A) a certified true copy of the register of members of the Company evidencing (x) such Investor as the holder of the Investor Subscription Shares and (y) the capitalization of the Company as of immediately after the Closing and completion of the transactions contemplated by Sections 2.1, and (B) a certified true copy of the register of directors of the Company evidencing the appointment of the directors appointed by the applicable Investor to the Board pursuant to the Shareholders Agreement; and

(iii) the Company shall deliver to Baidu HK (A) a certified true copy of the register of members of the Company evidencing (x) Baidu HK as the holder of the Baidu Subscription Shares and (y) the capitalization of the Company as of immediately after the Closing and completion of the transactions contemplated by Sections 2.1, and (B) a certified true copy of the register of directors of the Company evidencing the appointment of the directors appointed by Baidu HK to the Board pursuant to the Shareholders Agreement.

15

(b) <u>Share Certificates</u>. Within ten (10) Business Days after the Closing Date, the Company shall deliver one or more duly executed share certificates (i) to each Investor in respect of the Investor Subscription Shares issued to such Investor, and (ii) to Baidu HK in respect of the Baidu Subscription Shares. Each of the share certificates in respect of any of the Investor Subscription Shares, and the Ordinary Shares owned by Baidu HK at the Closing (including the Baidu Subscription Shares) will be endorsed with the following legend:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "<u>ACT</u>") OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS SECURITY MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN THE APPLICABLE SHAREHOLDERS AGREEMENT, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON REQUEST TO THE HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

Section 2.4 <u>Conditions</u>.

(a) <u>Conditions to Each Investor's Obligations to Effect the Closing</u>. The obligation of each Investor to consummate the transactions contemplated by Section 2.1 is subject to the satisfaction, on or before the Closing Date, of the following conditions, any of which may be waived in writing by any Investor (for purposes of the Closing with respect of such Investor) in its sole discretion:

(i) (A) The Fundamental Representations shall have been true and accurate in all respects and (B) the representations and warranties of Baidu and Baidu HK contained in Section 3.1 and the representations and warranties of the Company contained in Section 3.2 (in each case, other than the Fundamental Representations) shall have been true and accurate in all respects (in the case of any such representation or warranty containing any materiality or Material Adverse Effect qualifier) or in all material respects (in the case of any such representation or warranty without any materiality or Material Adverse Effect qualifier), in the case of sub-clauses (A) and (B) above, as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date).

(ii) The Seller Parties shall have performed and complied in all material respects with all, and not be in breach or default in any material respect under any, agreements, covenants, conditions and obligations contained in this Agreement and the other Transaction Documents that are required to be performed or complied with on or before the Closing Date.

16

(iii) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, prevents, prohibits or otherwise makes illegal the consummation of the Contemplated Transactions, or imposes any damages or penalties in connection with the Contemplated Transactions; and no Action shall have been instituted or threatened by any Governmental Authority or any third party that seeks to restrain, enjoin, prevent, prohibit or otherwise make illegal the consummation of the Contemplated Transactions, or imposes any damages or penalties in connection with the consummation of the Contemplated Transactions.

(iv) The Baidu Parties and the Group Companies shall have obtained any and all Authorizations necessary for the issuance by the Company of the Investor Subscription Shares to such Investor and the entry by any Baidu Party or any Group Company into the Transaction Documents to which it is a party and the performance by it of its obligations contemplated thereby, all of which shall be in full force and effect.

(v) The Baidu Restructuring Cash shall have been invested.

(vi) The Payment Business License (《支付业务许可证》) possessed by Beijing Baifubao Technology Co., Ltd. (北京百付宝科技有限公司, "Baifubao") (the expiration date of which is July 5, 2018) shall have been duly renewed with the competent Governmental Authorities.

(vii) No event, development or circumstances shall have occurred or come to exist which, individually or in the aggregate, has resulted in a Material Adverse Effect.

(viii) The portion of the Restructuring to be completed prior to the Closing pursuant to, and the obligations of each of the Baidu Parties and the Group Companies to be performed prior to the Closing under, the Restructuring Plan shall have been completed in accordance with the Restructuring Plan to the reasonable satisfaction of TPG.

(ix) Baidu and the Company shall have delivered to such Investor a duly executed certificate, dated the Closing Date, certifying that the conditions set forth in Section 2.4(a)(i), Section 2.4(a)(ii), Section 2.4(a)(iii), Section 2.4(a)(iv), Section 2.4(a)(v), Section 2.4(a)(vi), Section 2.4(a)(vii), Section 2.4(a)(viii), Section 2.4(a)(xiii), Section 2.4(a)(xv), Section 2.4(a)(xvi), Section 2.4(a)(xvii) and Section 2.4(a)(xviii) have been satisfied.

(x) Baidu or the Company shall have delivered to such Investor a copy of each of the Shareholders Agreement and the Director Indemnification Agreements, duly executed by all of the parties thereto other than the Investors and the director appointed by the applicable Investor to the Board pursuant to the Shareholders Agreement.

17

(xi) Baidu or the Company shall have delivered to such Investor a copy of each of the Framework Business Cooperation Agreement and the Transition Services Agreement, duly executed by all of the parties thereto.

(xii) Baidu or the Company shall have delivered to such Investor legal opinions issued to the Investors by the Company's Cayman Islands and PRC legal counsels, dated the Closing Date, relating to the Contemplated Transactions and including those items set forth on Exhibit G.

(xiii) (A) The Articles shall have been duly adopted by the Company and shall remain in full force and effect, (B) the Initial Budget and the Initial Business Plan shall have been adopted by the Company, and (C) the ESOP shall have been adopted by the Company and shall remain in full force and effect.

(xiv) TPG shall have appointed two directors to the Board and the other Lead Investor shall have appointed the Strategic Investor Director to the Board pursuant to the Shareholders Agreement.

(xv) The Board and the shareholders of the Company shall have adopted resolutions approving the Contemplated Transactions.

(xvi) Other than the matters set forth on Section 2.4(a)(xvi) of the Disclosure Schedule, all Permits required for the operation of the Principal Business shall be in possession of the Group and such Permits shall be valid and in full force and effect.

(xvii) Each Transferred Employee contemplated under the Restructuring Documents to be transferred to the Group Companies prior to the Closing shall have duly transferred pursuant to and in accordance with the Restructuring Documents, and each Key Employee shall be employed by a Group Company.

(xviii) All notices, consents or approvals in connection with the matters set forth on Section 2.4(a)(xviii) of the Disclosure Schedule shall have been delivered or obtained, as applicable.

(xix) All Contemplated Transactions under Sections 2.1(a) and 2.1(b) shall occur concurrently at the Closing.

(b) Conditions to Baidu's, Baidu HK's and the Company's Obligations to Effect the Closing. The obligation of Baidu, Baidu HK and the Company to consummate the transactions contemplated by Section 2.1 with any Investor is subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which may be waived in writing by Baidu, Baidu HK or the Company in its sole discretion:

(i) The representations and warranties of such Investor contained in Section 3.3 shall have been true and accurate in all respects (in the case of any such representation or warranty containing any materiality qualification) or in all material respects (in the case of any such representation or warranty without any materiality qualification) as of the date of this Agreement and as of the Closing Date as if made on and as of the Closing Date (except for such representations and warranties that are made as of a specific date, which shall speak only as of such date).

18

(ii) Such Investor shall have performed and complied in all material respects with all, and not be in breach or default in any material respect under any, agreements, covenants, conditions and obligations contained in this Agreement and the other Transaction Documents that are required to be performed or complied with on or before the Closing Date.

(iii) No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law (whether temporary, preliminary or permanent) that is in effect and restrains, enjoins, prevents, prohibits or otherwise makes illegal the consummation of the Contemplated Transactions, or imposes any damages or penalties in connection with the Contemplated Transactions; and no Action shall have been instituted or threatened by any Governmental Authority or any third party that seeks to restrain, enjoin, prevent, prohibit or otherwise make illegal the consummation of the Contemplated Transactions, or imposes any damages or penalties in connection with the consummation of the Contemplated Transactions.

(iv) Such Investor shall have delivered to the Company a copy of each of the Shareholders Agreement and the Director Indemnification Agreement (if applicable) in respect of the director nominated by the Investors to the Board, duly executed by such Investor or such director (as the case may be).

Section 2.5 <u>Closing Date Payment Adjustment</u>.

(a) For purposes of this Agreement:

(i) "<u>Closing Net Assets Attributable to Shareholders of Parent</u>" means the consolidated total assets, minus the consolidated total liabilities, and minus the noncontrolling interests of the Principal Business, as determined as of 12:01 a.m. (Hong Kong time) on the Closing Date and shown on the Closing Balance Sheet, for the avoidance of doubt disregarding the Baidu Restructuring Cash or any Investment Subscription Price.

(ii) "<u>Post-Closing Adjustment Amount</u>" means an amount, which may be a positive or a negative number, equal to the Final Closing Net Assets Attributable to Shareholders of Parent minus the Target Net Assets Attributable to Shareholders of Parent.

(iii) "<u>Target Net Assets Attributable to Shareholders of Parent</u>" means the USD equivalent of RMB9,000,000,000.

(iv) For purposes of this Section 2.5, to the extent any portion of the Restructuring is not completed prior to the Closing, pro forma adjustments shall be made to the extent required on the same basis as if such portion of the Restructuring were effective at the Closing Date.

19

(b) <u>Closing Statement</u>. As soon as practicable, but not later than ten (10) days following the Closing Date, PricewaterhouseCoopers, or another "Big Four" firm of independent certified public accountants mutually agreed upon by the Lead Investors, shall be engaged for the preparation and delivery, within fifty (50) days from the date of its engagement, to each Investor and the Seller Parties a statement (the "<u>Closing Statement</u>") consisting of (i) an audited consolidated balance sheet of the Principal Business as determined as of 12:01 a.m. (Hong Kong time) on the Closing Date and reasonable supporting documentation therefor, together with a report of such independent certified public accountant thereon, (the "<u>Closing Balance Sheet</u>"), and (ii) a statement setting forth the Closing Net Assets Attributable to Shareholders of Parent. The Closing Statement (and each component thereof) shall be prepared in accordance with the definitions in this Agreement and US GAAP applied on a basis consistent with those used in the preparation of the Financial Statements, except that the following shall be adopted in the preparation of the Closing Statement: Accounting Standards Update 2016-13, Financial Instruments—Credit Losses (Topic 326) issued by the Financial Accounting Standards Board on June 16, 2016.

(c) <u>Dispute Notice</u>. The Closing Statement shall become final, binding and conclusive upon each Investor and the Seller Parties on the thirtieth (30th) day following the Investor's receipt of the Closing Statement, unless on or prior to such thirtieth day any Seller Party delivers to the Company and each Lead Investor a written notice (a "<u>Dispute Notice</u>") specifying in reasonable detail each item that such Seller Party disputes (each, a "<u>Disputed Item</u>"), and to the extent such Seller Party is reasonably able to so specify, the amount in dispute for each Disputed Item (it being understood that such Seller Party shall be deemed to have agreed to all other items and amounts in the Closing Statement as to which such Seller Party did not dispute).

(d) <u>Resolution Period</u>. If the Company and the Lead Investors receive a Dispute Notice, then the Seller Parties and the Lead Investors shall seek in good faith to resolve the Disputed Items within the fifteen (15) days from the date the Company and each Lead Investor receive the Dispute Notice (the "<u>Resolution Period</u>"). If the Seller Parties and the Lead Investors reach agreement with respect to any Disputed Items, the Closing Statement shall be deemed to be revised to reflect such agreement.

(e) <u>Independent Accountant</u>. If the Seller Parties and the Lead Investors are unable to resolve all of the Disputed Items during the Resolution Period, then the Seller Parties and the Lead Investors shall jointly engage and submit the unresolved Disputed Items (the "<u>Unresolved Items</u>") to a partner in the Hong Kong office of an internationally recognized independent public accounting firm (other than independent certified public accounting firm that prepared the Closing Statement pursuant to Section 2.5(b)) appointed by mutual agreement of the Seller Parties and the Lead Investors (the "<u>Independent Accountant</u>"); *provided* that, if Seller Parties and the Lead Investors do not appoint an Independent Accountant within ten (10) days after the end of the Resolution Period, they shall request the HKIAC to appoint as the Independent Accountant a partner in the Hong Kong office of an internationally recognized independent public accounting firm that has not had a material relationship with the Seller Parties, the Lead Investors, or any of their respective Affiliates within the preceding two years, and such appointment shall be final, binding and conclusive on the Seller Parties and the Lead Investors. The Independent Accountant shall act as an arbitrator to determine, based solely on presentations by the Seller Parties and the Lead Investors and not by independent review, only the Unresolved Items still in dispute and shall be limited to those adjustments, if any, required to be made for the Closing Statement to comply with the provisions of this Agreement. The parties shall agree, promptly after the Independent Accountant has been appointed, on procedures governing the resolution of any dispute by the Independent Accountant; *provided* that if the parties fail to agree on such procedures, the dispute resolution procedures of the HKIAC shall govern. The Seller Parties and the Lead Investors shall use their reasonable best efforts to cause the Independent Accountant to issue its written determination regarding the Unresolved Items within thirty (30) days after such items are submitted for review. The Independent Accountant shall make a determination with respect to the Unresolved Items only and in a manner consistent with this Section 2.5, the definitions in this Agreement and US GAAP applied on a basis consistent with those used in the preparation of the Financial Statements, but in all instances in accordance with US GAAP (except that the following shall be adopted in the preparation of the Closing Statement: Accounting Standards Update 2016-13, Financial Instruments—Credit Losses (Topic 326) issued by the Financial Accounting Standards Board on June 16, 2016), and in no event shall the Independent Accountant's determination of the Unresolved Items be for an amount that is outside the range of the Seller Parties' and the Lead Investors' disagreement. Each Party shall use its reasonable best efforts to furnish to the Independent Accountant such work papers and other documents and information pertaining to the Unresolved Items as the Independent Accountant may reasonably request. The determination of the Independent Accountant shall be final, binding and conclusive upon the Seller Parties and the Investors, absent manifest error, and the Closing Statement shall be deemed to be revised to reflect such determination upon receipt thereof. The fees, expenses and costs of the Independent Accountant shall be borne equally by Baidu (on the one hand) and the Investors (on the other hand, and as among the Investors, on a pro rata basis according to their respective number of Investor Subscription Shares).

20

(f) <u>Access to Information</u>. Each Party shall use its reasonable best efforts to provide promptly to the other Parties all information and reasonable access to service providers and accountants as such other Parties shall reasonably request in connection with preparation and review of the Closing Statement or the Dispute Notice, as the case may be, including all work papers of the accountants who audited, compiled or reviewed such statements or notices (subject to a party and its representatives executing a customary non-reliance agreement if required by the other party's accountants in connection herewith), and shall otherwise cooperate in good faith with such other party to arrive at a final determination of the Closing Statement.

(g) <u>Final Closing Net Assets Attributable to Shareholders of Parent</u>. The Closing Net Assets Attributable to Shareholders of Parent as finally determined pursuant to this Section 2.5 shall be deemed the "<u>Final Closing Net Assets Attributable to Shareholders of Parent</u>."

(h) <u>Adjustment Amount</u>. If and only if the Post-Closing Adjustment Amount is a negative amount, then Baidu and Baidu HK hereby, jointly and severally, undertakes that it shall, within three (3) business days after the determination of the Final Closing Net Assets Attributable to Shareholders of Parent, pay or cause to be paid an amount equal to the Post-Closing Adjustment Amount to the Company, in cash by wire transfer of immediately available funds account designated by the Company in writing or in any other manner as agreed by the Company.

21

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Section 3.1 <u>Representations and Warranties of Baidu and Baidu HK</u>. Subject to Section 6.1, each of Baidu and Baidu HK hereby, jointly and severally, represents and warrants to each Investor the following as of the date hereof and as of the Closing Date, and, with respect to Section 3.1(g)(ii) and Section 3.1(h), as of the date hereof, the Closing Date and the date on which the Restructuring is completed:

(a) <u>Authority</u>. Each Baidu Party has full power and authority to enter into, execute and deliver each Transaction Document to which it is or will be a party and to perform its obligations thereunder. The execution and delivery by each Baidu Party of each Transaction Document to which it is or will be a party and the performance by it of its obligations thereunder have been duly authorized by all requisite actions on its part.

(b) <u>Valid Agreement</u>. Each Transaction Document to which any Baidu Party is or will be a party has been or will be duly executed and delivered by such Baidu Party and constitutes, or when executed and delivered in accordance herewith will constitute, the legal, valid and binding obligations of such Baidu Party, enforceable against such Baidu Party in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) <u>Non-Contravention; Litigation</u>. Neither the execution and delivery of each Transaction Document to which any Baidu Party is or will be a party nor the consummation of any of the Contemplated Transactions will (i) violate any provision of the organizational documents of such Baidu Party or violate any Law or Order to which such Baidu Party is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of or creation of an Encumbrance under or create in any party the right to accelerate, terminate, modify or cancel any Contract to which such Baidu Party is a party, by which such Baidu Party is bound or to which any of such Baidu Party's assets are subject. There is no action, suit, litigation, arbitration, investigation, claim or proceeding (an "Action") pending or, to the Knowledge of the Baidu Parties, threatened in writing against any Baidu Party that (A) questions the validity of this Agreement or the right of any Baidu Party to enter into each Transaction Document to which it is or will be a party or to consummate the Contemplated Transactions or (B) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d) <u>Consents and Approvals</u>. None of the execution and delivery of each Transaction Document to which any Baidu Party is or will be a party, the consummation of any of the Contemplated Transactions nor the performance by any Baidu Party of each Transaction Document to which such Baidu Party is or will be a party in accordance with its terms requires any consent, approval, order, license or authorization of, registration, certificate, declaration or filing with or notice to any Governmental Authority or any other Person (each, an "<u>Authorization</u>"), except for those Authorizations expressly set forth in the Transaction Documents.

22

(e) <u>Compliance with Laws</u>. None of the Baidu Parties has been in violation in any material respect of any applicable Law or Order applicable in relation to its operation of the Principal Business since its establishment.

(f) <u>Anti-bribery, Anti-corruption, Anti-money Laundering and Sanctions</u>.

(i) <u>Anti-bribery and Anti-corruption</u>. Each of the Baidu Parties and, to the Knowledge of the Baidu Parties, their Affiliates and their respective directors, officers, managers, employees, independent contractors, representatives, agents and other Persons acting on their behalf (collectively, "<u>Representatives</u>") are and have been in compliance with all applicable Laws relating to anti-bribery, anti-corruption, record keeping and internal control laws (collectively, the "<u>ABAC Laws</u>") in connection with the Principal Business. Without limiting the foregoing, in connection with the Principal Business, neither any Baidu Party nor, to the Knowledge of the Baidu Parties, any of its Representatives has, directly or indirectly, offered, authorized, promised, condoned, participated in, consummated, or received notice of any allegation or request for information of, or has information that would lead a reasonable person to believe there is a high likelihood of, (1) the making of any gift or payment of anything of value to any public official by any Person to obtain any improper advantage, affect or influence any act or decision of any such public official, or assist any Baidu Party in obtaining or retaining business for, or with, or directing business to, any Person; (2) the taking of any action by any Person which (A) would violate the United States Foreign Corrupt Practices Act of 1977, as amended ("<u>FCPA</u>"), if taken by an entity subject to the FCPA, (B) would violate the U.K. Bribery Act, if taken by an entity subject to the U.K. Bribery Act, or (C) could reasonably be expected to constitute a violation of any applicable ABAC Law; (3) the making of any false or fictitious entries in the books or records of any Baidu Party by any Person; or (4) the using of any assets of any Baidu Party for the establishment of any unlawful or unrecorded fund of monies or other assets, or the making of any unlawful or undisclosed payment. The Baidu Parties have established reasonable internal controls and procedures intended to ensure compliance with the Laws in connection with the Principal Business.

(ii) <u>Sanctions</u>. None of the Baidu Parties or, to the Knowledge of the Baidu Parties, any of their respective Representatives, is owned or Controlled by a Person that is targeted by or the subject of any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury ("<u>OFAC</u>"), or by the U.S. Department of State, or any sanctions imposed by the European Union (including under Council Regulation (EC) No. 194/2008), the United Nations Security Council, Her Majesty's Treasury or any other relevant Governmental Authority or has engaged in any activities that would be in violation of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as amended or the Iran Sanctions Act, as amended, or sanctions and measures imposed by the United Nations or any other relevant Governmental Authority (collectively, the "<u>Sanctions Laws</u>"). None of the Baidu Parties or, to the Knowledge of the Baidu Parties, any of their respective Representatives, has been investigated or is being investigated or is subject to a pending or, to the Knowledge of the Baidu Parties, threatened investigation in relation to any Sanctions Laws by any law enforcement, regulatory or other Governmental Authority or any customer or supplier, or has admitted to, or been found by a court in any jurisdiction to have engaged in any violation of any Sanctions Laws or been debarred from bidding for any contract or business, and to the Knowledge of the Baidu Parties, there are no circumstances which are likely to give rise to any such investigation, admission, finding or disbarment.

23

(iii) <u>Anti-Money Laundering</u>. The operations of the Baidu Parties in connection with the Principal Business are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, to the extent applicable, the applicable anti-money laundering statutes of all jurisdictions where the Baidu Parties conduct business, the rule and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority (collectively, the "<u>Anti-Money Laundering Laws</u>"). The Baidu Parties have instituted, maintain and enforce policies and procedures designed to ensure compliance with Anti-Money Laundering Laws in connection with the Principal Business. For the past five years, in connection with the Principal Business, none of the Baidu Parties have been penalized for or threatened to be charged with, or given notice of any violation of, or, to the Knowledge of the Baidu Parties, under investigation with respect to, any Anti-Money Laundering Laws, and no Action by or before any court, Governmental Authority or any arbitrator involving any of the Baidu Parties with respect to Anti-Money Laundering Laws is pending or threatened.

(g) <u>Principal Business; Contributed Assets</u>.

(i) <u>Ordinary Course</u>. The Principal Business has been carried on in the ordinary course and is a going concern. There is no existing fact or circumstance that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Principal Business.

(ii) <u>Sufficiency of Assets; Contributed Assets</u>. The assets, properties and rights owned or leased by the Group Companies and the other Contributed Assets constitute all of the assets, properties and rights (tangible and intangible) that are necessary for the conduct of the Principal Business as conducted as of the date hereof. As of the date hereof, the relevant Baidu Parties and the Group Companies have good and marketable title in and to, or a valid leasehold interest in, each of the Contributed Assets, free and clear of all Encumbrances other than the Encumbrances expressly provided for in the Transaction Documents. Upon the completion of the Restructuring, the Group Companies will have good and marketable title in and to, or a valid leasehold interest in, each of the Contributed Assets, free and clear of all Encumbrances other than the Encumbrances expressly provided for in the Transaction Documents.

(iii) The Contributed Assets have been maintained in accordance with prudent practice in all material respects and in compliance with Laws in all material respects.

24

(h) <u>Restructuring Documents</u>. Each Restructuring Document to which any Baidu Party is or will be a party will, upon execution, constitute the legal, valid and binding obligation of each party thereto, enforceable against such party in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. The execution, delivery and performance of, and compliance with, the Restructuring Documents by the parties thereto will not result in any violation, breach or default, with or without the passage of time or the giving of notice or both, of any organizational document of any Baidu Party, any Contract to which any Baidu Party is a party or by which any Baidu Party is bound or any Law or Order to which any Baidu Party is subject.

(i) <u>Finders' Fees</u>. Except for Huatai Securities whose fees and expenses will be paid by Baidu and the Company pursuant to the Restructuring Documents and will not be paid by any Investor, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of any Baidu Party or any Group Company who might be entitled to any fee or commission in connection with the Contemplated Transactions.

Section 3.2 <u>Representations and Warranties of the Company</u>. Subject to Section 6.1, the Company hereby represents and warrants to each Investor the following as of the date hereof and as of the Closing Date, and, with respect to Section 3.2(n)(ii), as of the date hereof, the Closing Date and the date on which the Restructuring is completed:

(a) <u>Due Formation</u>. Each Group Company is duly formed, validly existing and in good standing in its jurisdiction of organization and has all requisite power and authority to carry on its business as it is currently being conducted. The organizational documents, each as amended to date, of each Group Company are in full force and effect. No Group Company is in violation of any of the provisions of its organizational documents in any material respect.

(b) <u>Authority</u>. Each Group Company has full power and authority to enter into, execute and deliver each Transaction Document to which it is or will be a party and to perform its obligations thereunder. The execution and delivery by each Group Company of each Transaction Document to which it is or will be a party and the performance by such Group Company of its obligations thereunder have been duly authorized by all requisite actions on its part.

(c) <u>Valid Agreement</u>. Each Transaction Document to which any Group Company is or will be a party has been or will be duly executed and delivered by such Group Company and constitutes, or when executed and delivered in accordance herewith will constitute, the legal, valid and binding obligations of such Group Company, enforceable against it in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

25

(d) <u>Capitalization</u>.

(i) As of the date hereof, the authorized share capital of the Company is US$50,000 divided into a total of 500,000,000 Ordinary Shares, 10,000 of which are issued and outstanding. Immediately prior to the Closing, the authorized share capital of the Company is US$50,000 divided into, on the Base Case, a total of 389,034,977 Ordinary Shares , 84,333,418 of which will be issued and outstanding, and 110,965,023 Series A Preferred Shares, none of which are issued and outstanding. The Capitalization Table accurately describes the capitalization of each Group Company on a fully diluted basis as of the date hereof, immediately prior to the Closing and immediately following the Closing, in each case reflecting all the then outstanding Equity Securities in such Group Company and the record and beneficial holders thereof, and the name and jurisdiction of organization of each Group Company. All of the outstanding Equity Securities in each Group Company are duly authorized, validly issued, fully paid and non-assessable, free and clear of all Encumbrances.

(ii) Except for certain rights provided in or contemplated by the Transaction Documents (including relevant Control Documents) and provided under applicable Laws and the outstanding Equity Securities set forth in the Capitalization Table, (1) there are no outstanding Equity Securities in any Group Company, (2) no Equity Securities in any Group Company are subject to any preemptive rights, rights of first refusal or first offer or other rights to purchase such Equity Securities or any other rights with respect to such Equity Securities, (3) no Group Company is a party or subject to any Contract that affects or relates to the voting or giving of written consents with respect to any Equity Securities in such Group Company, (4) there are no obligations, contingent or otherwise, of any Group Company to issue, repurchase, redeem or otherwise acquire any Equity Securities, and (5) there are no dividends which have accrued or been declared but are unpaid by any Group Company.

(iii) Section 3.2(d)(iii) of the Disclosure Schedule sets forth (1) the name of each Person in which the Company holds, directly or indirectly, a minority interest in such Person's Equity Securities (each, a "<u>Joint Venture Affiliate</u>"), (2) a description of the interests in each such Joint Venture Affiliate and (3) the name of each immediate owner of any such interest and its percentage interest. The interest of the Company in each Joint Venture Affiliate is owned by the Company, directly or indirectly, free and clear of all Encumbrances.

(e) <u>Due Issuance and Delivery</u>. The Investor Subscription Shares have been duly authorized and, when issued and delivered to and paid for by the applicable Investor pursuant to this Agreement, will be validly issued, fully paid and non-assessable, free and clear of all Encumbrances (except for restrictions arising under the Securities Act or created by virtue of the Transaction Documents). Upon delivery and entry into the register of members of the Company of the Investor Subscription Shares, such Investor shall have good and valid title to the Investor Subscription Shares, free and clear of all Encumbrances (except for restrictions arising under the Securities Act or created by virtue of the Transaction Documents). The Ordinary Shares issuable upon conversion of the Investor Subscription Shares will be reserved for issuance at and after the Closing and, upon issuance in accordance with the terms of the Articles, will be duly and validly issued, fully paid and non-assessable, free and clear of all Encumbrances (except for restrictions arising under the Securities Act or created by virtue of the Transaction Documents).

26

(f) <u>Non-Contravention</u>. Neither the execution and delivery of each Transaction Document to which any Group Company is or will be a party nor the consummation of any of the Contemplated Transactions will (i) violate any provision of the organizational documents of any Group Company or violate any Law or Order to which any Group Company is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of or creation of an Encumbrance under or create in any party the right to accelerate, terminate, modify or cancel any Contract to which any Group Company is a party, by which any Group Company or the Principal Business is bound or to which any assets of any Group Company or the Principal Business are subject.

(g) <u>Litigation</u>. There is no Action pending or threatened in writing against any Group Company or affecting the Principal Business that (A) questions the validity of this Agreement or the right of any Group Company to enter into each Transaction Document to which it is or will be a party or to consummate the Contemplated Transactions, or (B) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h) <u>Consents and Approvals</u>. None of the execution and delivery of each Transaction Document to which any Group Company is or will be a party, the consummation of any of the Contemplated Transactions nor the performance by any Group Company of each Transaction Document to which such Group Company is or will be a party in accordance with its terms requires any Authorization, except for those Authorizations expressly set forth in the Transaction Documents.

(i) <u>Compliance with Laws</u>. None of the Group Companies or any Baidu Party in relation to the Principal Business, has been in violation in any material respect with any Law or Order applicable to it since its establishment.

(j) <u>Permits</u>. Each of the Group Companies and the Baidu Parties in relation to the Principal Business is in possession of all material licenses, franchises, permits, certificates, approvals or other similar authorizations of any Governmental Authority necessary (i) to carry on and operate the Principal Business, and (ii) to own, lease, operate and use the Contributed Assets (collectively, the "<u>Permits</u>") and such Permits are valid and in full force and effect. On the Closing Date, the Group Companies shall be in possession of all Permits. None of the Group Companies and the Baidu Parties is in default under, and no condition exists that with notice or lapse of time or both would constitute a default under, any of the Permits and none of the Permits will be terminated or impaired or become terminable, in whole or in part, as a result of the Contemplated Transactions. None of the Group Companies and the Baidu Parties is party to any Action seeking the revocation, suspension, termination, adverse modification or impairment of any Permit.

27

(k) <u>Anti-bribery, Anti-corruption, Anti-money Laundering and Sanctions</u>.

(i) <u>Anti-bribery and Anti-corruption</u>. Each of the Group Companies and, to the Knowledge of the Group Companies, their Affiliates and their respective <u>Representatives</u> are and have been in compliance with all applicable laws relating to anti-bribery, anti-corruption, record keeping and internal control laws (collectively, the "<u>ABAC Laws</u>") in connection with the Principal Business. Without limiting the foregoing, in connection with the Principal Business, neither any Group Company nor, to the Knowledge of the Group Companies, any of its Representatives has, directly or indirectly, offered, authorized, promised, condoned, participated in, consummated, or received notice of any allegation or request for information of, or has information that would lead a reasonable person to believe there is a high likelihood of, (1) the making of any gift or payment of anything of value to any public official by any Person to obtain any improper advantage, affect or influence any act or decision of any such public official, or assist any Group Company in obtaining or retaining business for, or with, or directing business to, any Person; (2) the taking of any action by any Person which (A) would violate the United States Foreign Corrupt Practices Act of 1977, as amended ("<u>FCPA</u>"), if taken by an entity subject to the FCPA, (B) would violate the U.K. Bribery Act, if taken by an entity subject to the U.K. Bribery Act, or (C) could reasonably be expected to constitute a violation of any applicable ABAC Law; (3) the making of any false or fictitious entries in the books or records of any Group Company by any Person; or (4) the using of any assets of any Group Company for the establishment of any unlawful or unrecorded fund of monies or other assets, or the making of any unlawful or undisclosed payment. The Group Companies have established reasonable internal controls and procedures intended to ensure compliance with the Laws in connection with the Principal Business.

(ii) <u>Sanctions</u>. None of the Group Companies or, to the Knowledge of the Group Companies, any of their respective Representatives, is owned or Controlled by a Person that is targeted by or the subject of any sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury ("<u>OFAC</u>"), or by the U.S. Department of State, or any sanctions imposed by the European Union (including under Council Regulation (EC) No. 194/2008), the United Nations Security Council, Her Majesty's Treasury or any other relevant Governmental Authority or has engaged in any activities that would be in violation of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as amended or the Iran Sanctions Act, as amended, or sanctions and measures imposed by the United Nations or any other relevant Governmental Authority (collectively, the "<u>Sanctions Laws</u>"). None of the Group Companies or, to the Knowledge of the Group Companies, any of their respective Representatives, has been investigated or is being investigated or is subject to a pending or, to the Knowledge of the Group Companies, threatened investigation in relation to any Sanctions Laws by any law enforcement, regulatory or other Governmental Authority or any customer or supplier, or has admitted to, or been found by a court in any jurisdiction to have engaged in any violation of any Sanctions Laws or been debarred from bidding for any contract or business, and to the Knowledge of the Group Companies, there are no circumstances which are likely to give rise to any such investigation, admission, finding or disbarment.

(iii) <u>Anti-Money Laundering</u>. The operations of the Group Companies in connection with the Principal Business are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, to the extent applicable, the applicable anti-money laundering statutes of all jurisdictions where the Group Companies conduct business, the rule and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority (collectively, the "<u>Anti-Money Laundering Laws</u>"). The Group Companies have instituted, maintain and enforce policies and procedures designed to ensure compliance with Anti-Money Laundering Laws in connection with the Principal Business. For the past five years, in connection with the Principal Business, none of the Group Companies have been penalized for or threatened to be charged with, or given notice of any violation of, or, to the Knowledge of the Group Companies, under investigation with respect to, any Anti-Money Laundering Laws, and no Action by or before any court, Governmental Authority or any arbitrator involving any of the Group Companies with respect to Anti-Money Laundering Laws is pending or threatened.

28

(l) Financial Statements; No Undisclosed Liabilities; Intercompany Accounts.

(i) The Company have made available to the Investors the unaudited pro forma consolidated balance sheet as of December 31, 2017 (the "Balance Sheet Date") and the related unaudited pro forma consolidated income statement for the year ended December 31, 2017 of the Principal Business (collectively, the "Financial Statements"). The Financial Statements present a true and fair view of, in conformity with the US GAAP applied on a consistent basis, the consolidated financial position of the Principal Business as of the date thereof and their consolidated results of operations for the periods then ended (subject to normal year-end adjustments in the case of any unaudited interim financial statements). The Financial Statements do not reflect the assets, liabilities or operations of any entity or business other than the Principal Business and the Group Companies. The Group Companies have prepared and maintained their financial accounts, based on which the Financial Statements have been prepared, on a consistent basis in accordance with applicable Laws and applicable accounting standards and principles. The Group Companies' accounting records are in the Group Companies' possession or under their control and have been maintained in all material respects in accordance with applicable Laws.

(ii) Neither the Group Companies nor the Principal Business has any Liabilities, except for Liabilities (1) reflected or reserved for in the Financial Statements, (2) incurred after the Balance Sheet Date in the ordinary course of business consistent with past practice, or (3) which individually do not exceed US$1,000,000.

(iii) Section 3.2(k)(iii) of the Disclosure Schedule contains a complete list of each intercompany Indebtedness in excess of US$100,000 as of the Balance Sheet Date between Baidu or any of its Affiliates (other than the Group Companies), on the one hand, and any of the Group Companies, on the other hand. Since the Balance Sheet Date, there has not been any accrual of Liability that is individually in excess of US$1,000,000 by any Group Company to Baidu or any of its Affiliates (other than the Group Companies) or any other transaction that is individually in excess of US$1,000,000 between any Group Company and Baidu or any of its Affiliates (other than the Group Companies), except in the ordinary course of business of the consistent with past practice.

29

(m) <u>Absence of Certain Changes</u>.

(i) Since the Balance Sheet Date, the business of the Group Companies and the Principal Business have been conducted in the ordinary course consistent with past practices (except as required by applicable Laws) and there has not been any event, development or circumstances that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ii) From the Balance Sheet Date until the date hereof, there has not been any action taken by any Group Company or any action taken by any Baidu Party with respect to the Principal Business that, if taken during the period from the date of this Agreement through the Closing Date without the Investors' consent, would constitute a breach of Section 4.1.

(n) <u>Principal Business; Contributed Assets</u>.

(i) <u>Ordinary Course</u>. The Principal Business has been carried on in the ordinary course and is a going concern. There is no existing fact or circumstance that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Principal Business.

(ii) <u>Sufficiency of Assets; Contributed Assets</u>. The assets, properties and rights owned or leased by the Group Companies and the other Contributed Assets constitute all of the assets, properties and rights (tangible and intangible) that are necessary for the conduct of the Principal Business as conducted as of the date hereof. As of the date hereof, the relevant Baidu Parties and the Group Companies have good and marketable title in and to, or a valid leasehold interest in, each of the Contributed Assets, free and clear of all Encumbrances other than the Encumbrances expressly provided for in the Transaction Documents. Upon the completion of the Restructuring, the Group Companies will have good and marketable title in and to, or a valid leasehold interest in, each of the Contributed Assets free and clear of all Encumbrances other than the Encumbrances expressly provided for in the Transaction Documents.

(iii) The assets, properties and rights owned by the Group Companies and the other Contributed Assets have been maintained in accordance with prudent practice in all material respects and in compliance with Laws in all material respects.

(o) <u>Material Contracts</u>.

(i) Each Contract to which any Group Company is a party or that is related to the Principal Business described in clauses (1) through (14) below of Section 3.2(o)(i), whether or not disclosed in the Disclosure Schedule, is referred to herein as a "<u>Material Contract</u>." Each Material Contract is a valid and binding agreement and is in full force and effect, and none of the parties thereto is in default or breach in any material respect under the terms of any such Material Contract, and, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, no event or circumstance has occurred that, with notice or lapse of time or both, would constitute any event of default thereunder.

(ii) Except as disclosed in Section 3.2(o)(ii) of the Disclosure Schedule, none of the Group Companies and the Baidu Parties relating to the Principal Business is a party to or bound by:

30

(1) any Contract relating to the issuance of any Equity Securities of any Group Company;

(2) any Contract that involves payments (or a series of payments) to or from any Person, contingent or otherwise, of US$1,000,000 or more individually or in the aggregate with respect to a series of related agreements, in cash, property or services;

(3) any partnership, joint venture or other similar Contract or arrangement;

(4) any Contract relating to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) for a consideration in excess of US$1,000,000;

(5) any Contract relating to Indebtedness or any guarantee of such Indebtedness (in either case, whether incurred, assumed, guaranteed or secured by any asset) in excess of US$5,000,000;

(6) any Contract involving the waiver, compromise, or settlement of any material Action;

(7) any agency, dealer, sales representative, marketing or other similar Contract with an amount in excess of US$1,000,000;

(8) any Contract that limits the freedom of any Group Company to compete in any line of business or with any Person or in any area or which would so limit the freedom of any Group Company after the Closing Date;

(9) any Contract between any Group Company on the one hand and (A) Baidu or any of Baidu's Affiliates (other than the other Group Companies), (B) any Affiliate of any Group Company (other than the other Group Companies), (C) any director or officer of any Group Company or of any Person described in clause (A) or (B), or (D) any Affiliate of any natural person described in clause (A), (B) or (C), on the other hand, except for the employment agreements relating to services as employees, officers or directors of any Group Company and the Transaction Documents;

(10) any Contract with Governmental Authorities material to the operation of any Group Company party thereto or the Principal Business;

(11) any Contract that involves prohibition of payment of dividends or distributions in respect of the Equity Interests of any Group Company;

(12) any Contract with an amount in excess of US$1,000,000 that will be terminated or varied upon a change of control involving any Group Company or the consummation of the Contemplated Transactions, will subject such change of control or the Contemplated Transactions to the consent of any Person or will trigger any payment to any Person as a result of such change of control or the consummation of the Contemplated Transactions;

31

(13) any Contract material to the operation of any Group Company party thereto or the Principal Business (including license agreements, research agreements, development agreements, distribution agreements, settlement agreements, consent to use agreements and covenant not to sue, but excluding licenses for commercial off-the-shelf Software that are generally available on nondiscriminatory pricing terms which have an aggregate acquisition cost of US$100,000 or less) pursuant to which any Group Company, or any Baidu Party in connection with the Principal Business, obtains the right to use or a covenant not to be sued under, any Intellectual Property or grants the right to use, or a covenant not to be sued under, any Intellectual Property; or

(14) any other agreement, commitment, arrangement, plan or Contract not made in the ordinary course of business that is material to the Group Companies and the Principal Business, taken as a whole.

(p) <u>Properties</u>. None of the Group Companies owns any real property. Section 3.2(p) of the Disclosure Schedule sets forth the address of the location of each leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by any Group Company, or any Baidu Party that is used in the operation of the Principal Business (collectively, the "<u>Leased Real Property</u>"). Each Group Company, and each Baidu Party, has a valid leasehold interest in all of its Leased Real Property free and clear of any and all Encumbrances. With respect to each Lease, (i) such Lease is legal, valid, binding, enforceable and in full force and effect, (ii) the possession and quiet enjoyment of the Leased Real Property by applicable Group Company or Baidu Party under such Lease has not been disturbed and there are no material disputes with respect to such Lease, and (iii) neither any Group Company or Baidu Party, nor any other party to the Lease is in material breach or material default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a material breach or material default, or permit the termination, modification or acceleration of rent under such Lease. Except as would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Group Company has title to, or a valid leasehold interest in, as applicable, all personal property used in its business, and each Baidu Party has title to, or a valid leasehold interest in, as applicable, all personal property that is used in the operation of the Principal Business, in each case, free and clear of any and all Encumbrances, and such personal property is in good operating condition and repair in all material respects.

(q) <u>Tax Matters</u>.

(i) *Filing and Payment*. (1) All Tax Returns have been filed when due in accordance with all applicable Laws; (2) all Tax Returns that have been filed were true and complete in all material respects; and (3) all Taxes shown as due and payable on any Company Return have been timely paid, or withheld and remitted, to the appropriate Governmental Authority. Each Baidu Party has timely paid (or has caused to be paid), or has withheld and remitted (or caused to be withheld and remitted) to the appropriate Governmental Authority for Taxes related to the Contributed Assets, the nonpayment of which would result in an Encumbrance on any Contributed Asset or otherwise would result in any Group Company being liable for such Taxes.

32

(ii) *Retention of Tax Information*. The Group Companies have maintained proper, accurate and adequate records to enable each of them to comply with its obligations to (1) prepare any accounts necessary to comply with the Tax Law; and (2) retain necessary records as to comply with the Tax Law. The records referred to in tax warranty have been retained for the period required by law and will be available to the Investor upon request.

(iii) *Financial Records*. The charges, accruals and reserves for Taxes with respect to the Group Companies reflected on the books of the Group Companies on a consolidated basis are adequate to cover Tax liabilities accruing through the end of the last period for which the Group Companies ordinarily record items on their respective books. Since the end of the last period for which the Group Companies ordinarily record items on their respective books, no Group Company has engaged in any transaction, or taken any other action, other than in the ordinary course of business, that would materially impact any Tax asset, Tax liability of any Group Company.

(iv) *Procedure and Compliance*. There is no claim, audit, action, suit, proceeding or investigation now pending or threatened in writing against or with respect to any Group Company relating to Taxes. To the Knowledge of the Group Companies, there are no facts or circumstances that might give rise to such claim, audit, action, suit, proceeding or investigation that would have a Material Adverse Effect.

(v) *Taxing Jurisdictions*. No claim has been made by any Governmental Authority in any jurisdiction where any Group Company does not file Tax Returns that the Group Company is or may be required to file any tax return, or pay tax, in such jurisdiction.

(vi) *Tax Exemptions*. The Group Companies have complied in all material respects with the conditions stipulated in each Tax Grant and the transactions expressly contemplated by this Agreement will not adversely affect the eligibility of any Group Company for any Tax Grant.

(vii) *Tax Rulings*. Each of the Tax rulings, advice, consents and clearances from any Governmental Authority ("Rulings") affecting any Group Company is valid and effective and has been complied with, and no action has been taken to prejudice the application of any Ruling.. All particulars given to any Governmental Authority in connection with any Ruling fully and accurately disclose all facts and circumstances material for such Governmental Authority's decision.

(viii) *Anti-avoidance*. No Group Company has entered into or been party to any tax shelter or similar transaction which is considered abusive of any applicable Tax law.

(ix) *Restructuring*. No restructuring of the Group prior to the Closing shall give rise to a Tax Liability, nor adversely impact the Tax attributes, of any Group Company. The Seller Parties have disclosed to the Investor all details of any proposed Restructuring of the Group prior to implementing such Restructuring.

33

(x) *No U.S. tax elections.* None of the Company or any Subsidiary has ever filed any election for U.S. Tax purposes (including any entity classification election).

(xi) *Tax Sharing Agreements.* None of the Company is required to pay Tax of any other Person under any Tax Sharing Agreement or similar agreement or under any Laws applicable to consolidated or affiliated Tax groups.

(xii) *Passive Foreign Investment Company.* The Company is not, and does not expect to be, a passive foreign investment company for U.S. federal income tax purposes

(r) <u>Intellectual Property</u>.

(i) Section 3.2(r)(i) of the Disclosure Schedule contains a true and complete list of all registrations or applications for registrations included in the Owned Intellectual Property.

(ii) The Licensed Intellectual Property and the Owned Intellectual Property together constitute all the Intellectual Property Rights necessary to, or used or held for use in, the conduct of the business of the Group Companies and the Principal Business as currently conducted. Except as contemplated under the Transaction Documents, (A) there exist no restrictions on the disclosure, use, license or transfer of the Owned Intellectual Property, and (B)the consummation of the Contemplated Transactions will not alter, encumber, impair or extinguish any Owned Intellectual Property or Licensed Intellectual Property.

(iii) None of the Group Companies, or, in connection with the Principal Business, any Baidu Party, has infringed, misappropriated or otherwise violated any Intellectual Property of any third person. There is no Action pending against or, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, threatened against or affecting, any of the Group Companies or, in connection with the Principal Business, any Baidu Party, any present or former officer, director or employee of any Group Company or, in connection with the Principal Business, any Baidu Party (A) based upon, or challenging or seeking to deny or restrict, the rights of the Group Companies or such Baidu Party in any of the Owned Intellectual Property and the Licensed Intellectual Property, (B) alleging the use of the Owned Intellectual Property or the Licensed Intellectual Property or any services provided, processes used or products manufactured, used, imported, offered for sale or sold by the Group Companies or such Baidu Party do or may conflict with, misappropriate, infringe or otherwise violate any Intellectual Property of any third party or (C) alleging that any of the Group Companies or such Baidu Parties have infringed, misappropriated or otherwise violated any Intellectual Property of any third party.

34

(iv) The Group Companies, or, in connection with the Principal Business, the Baidu Parties are the sole owners of all Owned Intellectual Property and hold all right, title and interest in and to all Owned Intellectual Property and the Licensed Intellectual Property, free and clear of any Encumbrances. None of the Owned Intellectual Property and Licensed Intellectual Property material to the operation of the business of the Group Companies or the Principal Business have been adjudged invalid or unenforceable in whole or part, and, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, all such Owned Intellectual Property and Licensed Intellectual Property are valid and enforceable.

(v) The Group Companies and, in connection with the Principal Business, the Baidu Parties have taken all actions necessary to maintain and protect the Owned Intellectual Property and their rights in Licensed Intellectual Property, including payment of applicable maintenance fees and filing of applicable statement of use.

(vi) To the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, no Person has infringed, misappropriated or otherwise violated any Owned Intellectual Property or Licensed Intellectual Property. The Group Companies and the Baidu Parties in connection with the Principal Business have taken reasonable steps in accordance with normal industry practice to maintain the confidentiality of all Intellectual Property of the Group Companies and the Baidu Parties that are material to the business or operation of the Group Companies or the Principal Business and the value of which to any of the Group Companies or the Principal Business is contingent upon maintain the confidentiality thereof. None of the Intellectual Property of the Baidu Parties that are material to the business or operation of any of the Group Companies or the Principal Business and the value of which to any of the Group Companies or the Principal Business is contingent upon maintaining the confidentiality thereof, has been disclosed other than to employees, representatives and agents of the Group Companies and the Baidu Parties all of whom are bound by written confidentiality agreements substantially in the form previously disclosed to Investors.

(vii) To the extent that any Intellectual Property has been developed or created by a third party (including any current or former employee of any of the Group Companies and Baidu Parties) for the Principal Business, the Group Companies and, in connection with the Principal Business, the Baidu Parties have a written agreement with such third party with respect thereto, and the Group Companies and, in connection with the Principal Business, the Baidu Parties thereby either (A) has obtained ownership of and is the exclusive owner of, or (B) has obtained a valid and unrestricted right to exploit, sufficient for the conduct of its business as currently conducted, such Intellectual Property.

(viii) The Information Technology is fully functional and operate and perform in a manner that permits the Group Companies, and the Baidu Parties in connection with the Principal Business, to conduct their respective businesses or the Principal Business as currently conducted. The Group Companies, and Baidu Parties in connection with the Principal Business, have taken all commercially reasonable actions to protect the confidentiality, integrity, operation and security of the Information Technology (and all information and transactions stored or contained therein or transmitted thereby) against any unauthorized, use, access, interruption, malfunction, modification, or corruption, including the implementation and periodic testing of commercially reasonable (A) data backup, (B) disaster avoidance and recovery procedures, (C) business continuity procedures, and (D) encryption and other security protocol technology. There has been no material unauthorized use, access, interruption, modification, corruption or malfunction of any information technology (or any information or transactions stored or contained therein or transmitted thereby), and to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, the Information Technology are free of all viruses, worms, trojan horses and other malicious Software code.

35

(ix) The Group Companies and the Baidu Parties in connection with the Principal Business, have at all times complied with all applicable Laws relating to privacy, data protection and the collection and use of personal information and user information gathered or accessed in the course of the operation of the Group Companies or the Principal Business in all material aspects. The Group Companies and the Baidu Parties in connection with the Principal Business have at all times complied in all aspects with all rules, policies and procedures established by the Group Companies, and the Baidu Parties in connection with the Principal Business, from time to time with respect to the foregoing. Except as would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, no claims have been asserted or threatened against any of the Group Companies, or any Baidu Party in connection with the Principal Business (and to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, no such claims are likely to be asserted or threatened against the Group Companies or any of the Baidu Parties in connection with the Principal Business) by any Person alleging a violation of such Person's privacy, personal or confidentiality rights under any such laws, regulations, rules, policies or procedures. The consummation of the Contemplated Transactions will not breach or otherwise cause any violation of any such laws, regulations, rules, policies or procedures.

(s) <u>Insurance</u>. The Group Companies and the Baidu Parties in connection with the Principal Business maintain insurance coverage with reputable insurers in such amounts and covering such risks as are in accordance with normal industry practice for companies engaged in businesses similar to that of the Principal Business. None of the Group Companies and the Baidu Parties in connection with the Principal Business has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without a significant increase in cost. None of the Group Companies and the Baidu Parties in connection with the Principal Business have received any written notice of any threatened termination of, material premium increase with respect to, or material alteration of coverage under, any of its respective insurance policies. None of the Group Companies and the Baidu Parties in connection with the Principal Business have been denied any insurance coverage which it has sought or for which it has applied.

(t) <u>Labor and Employment Matters</u>.

(i) To the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, no key employee of the Principal Business (including the Transferred Employees) has indicated by written notice to any of the Baidu Parties and the Group Companies that he or she intends to resign or retire as a result of the Contemplated Transactions.

36

(ii) Each Group Company has entered into employment contracts with all of its employees (including all members of its senior management) or deploy its employees through third party dispatching firms in compliance with applicable Laws, and the compensation paid by such Group Company to such employees under the relevant employment contracts constitutes all the income and benefits such employees may validly claim from such Group Company, and there are no other agreements or arrangements in connection with such employee's compensation. Each Transferred Employee has entered into employment contract with a Baidu Party, and the compensation paid by such Baidu Party to such Transferred Employee under the relevant employment contract constitutes all the income and benefits such Transferred Employee may validly claim from such Baidu Party, and there are no other agreements or arrangements in connection with such Transferred Employee's compensation.

(iii) There are no material controversies pending or, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, threatened between any Group Company and its employees, contractors, subcontractors, agents or other persons engaged by it in connection with their businesses or any Baidu Party and its employees, contractors, subcontractors, agents or other persons whose services are dedicated to the Principal Business (collectively, "Company Personnel"). No Group Company, nor any Baidu Party with respect to Company Personnel, is a party to or bound by any collective bargaining agreement or other labor union contract applicable to persons employed by it, there are no labor unions, works councils or other organizations representing or purporting to represent any Company Personnel, nor are there any organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit which could affect any Group Company, nor any Baidu Party with respect to Company Personnel. There are no unfair labor practice complaints pending or threatened against any Group Company, nor any Baidu Party with respect to Company Personnel, before any Governmental Authority. There is no strike, slowdown, work stoppage or lockout, or similar activity or, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, the threat thereof, by or with respect to any Company Personnel nor has there been any such occurrence during the past five (5) years.

(iv) Each Group Company, and each Baidu Party with respect to Company Personnel, is in compliance with all applicable Laws relating to employment and employment practices, including those related to wages, social insurance and housing fund registrations, social security benefits, holidays and leave, collective bargaining terms and conditions of employment and the payment and withholding of taxes and other sums as required by the appropriate Governmental Authority and has withheld and paid in full to the appropriate Governmental Authority, or is holding for payment not yet due to such Governmental Authority, all amounts required to be withheld from or paid with respect to Company Personnel (including the withholding and payment of all individual income taxes and contributions to social security benefits payable), and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing. Each Group Company, and each Baidu Party with respect to Company Personnel, has paid in full to all of its Company Personnel or adequately accrued for in accordance with US GAAP consistently applied all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such Company Personnel and there is no claim with respect to payment of wages, salary, commission or overtime pay that has been asserted or is now pending or threatened before any Governmental Authority with respect to any persons currently or formerly employed or engaged by any Group Company, or any Baidu Party with respect to Company Personnel. There is no charge of discrimination in employment or employment practices, for any reason, including, without limitation, age, gender, race, religion or other legally protected category, which has been asserted or is now pending or threatened before any Governmental Authority with respect to any Company Personnel.

37

(v) Each Company Employee Plan and each Company Employee Agreement is and has at all times been operated and administered in compliance with the provisions thereof and all applicable Laws. Each contribution or other payment that is required to have been accrued or made under or with respect to any Company Employee Plan has been duly accrued and made on a timely basis. There are no Actions, or, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, threatened against any Company Employee Plan or against the assets of any Company Employee Plan.

(u) <u>Environmental Matters</u>. The operations of the Group Companies and the Principal Business do not involve the use, disposal or release of hazardous or toxic substances or the protection or restoration of the environment or human exposure to hazardous or toxic substances. No Group Company, nor any Baidu Party with respect to the Principal Business, has been penalized by Governmental Authorities for violation of any applicable environmental Law or Order related thereto.

(v) <u>Insolvency</u>. No bankruptcy, insolvency or judicial composition proceedings concerning the Baidu Parties or any Group Company have been applied for. To the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, no circumstances exist which would require an application for any bankruptcy, insolvency or judicial composition proceedings concerning the Baidu Parties or any Group Company nor do any circumstances exist according to any applicable bankruptcy or insolvency laws which would justify the avoidance of this Agreement. No steps have been taken, or, to the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, proposed in relation to the winding-up, bankruptcy, administration, insolvency or dissolution of any Baidu Party or any Group Company, nor, o the Knowledge of the Group Companies and the Baidu Parties in connection with the Principal Business, has any analogous procedure or step been taken or proposed in any jurisdiction in relation to any Baidu Party or any Group Company. Neither the Baidu Parties nor any Group Company is insolvent under the laws of its jurisdiction of incorporation or unable to pay its debts as they fall due and neither Baidu Parties nor any Group Company has stopped paying its debts or indicated an intention to do so.

(w) <u>Restructuring Documents</u>. Each Restructuring Document to which any Group Company is or will be a party will, upon execution, constitute the legal, valid and binding obligation of each party thereto, enforceable against such party in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies. The execution, delivery and performance of, and compliance with, the Restructuring Documents by the parties thereto will not result in any violation, breach or default, with or without the passage of time or the giving of notice or both, of any organizational document of any Group Company, any Contract to which any Group Company is a party or by which any Group Company is bound or any Law or Order to which any Group Company is subject.

38

(x) <u>Finders' Fees</u>. Except for Huatai Securities whose fees and expenses will be paid by Baidu and the Company pursuant to the Restructuring Documents and will not be paid by any Investor, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of any Baidu Party or any Group Company who might be entitled to any fee or commission in connection with the Contemplated Transactions.

Section 3.3 <u>Representations and Warranties of Each Investor</u>. Each Investor hereby severally and not jointly represents and warrants to Baidu, Baidu HK and the Company the following, in respect of itself only, as of the date hereof and as of the Closing Date:

(a) <u>Authority</u>. The Investor has full power and authority to enter into, execute and deliver each Transaction Document to which it is or will be a party and to perform its obligations thereunder. The execution and delivery by the Investor of each Transaction Document to which it is or will be a party and the performance by the Investor of its obligations thereunder have been duly authorized by all requisite actions on its part.

(b) <u>Valid Agreement</u>. Each Transaction Document to which the Investor is or will be a party has been or will be duly executed and delivered by the Investor and constitutes, or when executed and delivered in accordance herewith will constitute, the legal, valid and binding obligations of the Investor, enforceable against the Investor in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(c) <u>Non-Contravention; Litigation</u>. Neither the execution and delivery of each Transaction Document to which the Investor is or will be a party nor the consummation of any of the Contemplated Transactions will (i) violate any provision of the organizational documents of the Investor or violate any Law or Order to which the Investor is subject or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of or creation of an Encumbrance under or create in any party the right to accelerate, terminate, modify or cancel any Contract to which the Investor is a party, by which the Investor is bound or to which any of the Investor's assets are subject. There is no Action pending or, to the Knowledge of the Investor, threatened against the Investor that questions the validity of this Agreement or the right of the Investor to enter into this Agreement or to consummate the Contemplated Transactions.

(d) <u>Consents and Approvals</u>. None of the execution and delivery by the Investor of each Transaction Document to which the Investor is a party, the consummation by the Investor of any of the Contemplated Transactions nor the performance by the Investor of each Transaction Document to which the Investor is a party in accordance with its terms requires any Authorization, except for those Authorizations as have been or will have been obtained, made or given on or prior to the Closing Date.

(e) Status and Investment Intent.

(i) <u>Experience</u>. The Investor has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Investor Subscription Shares. The Investor is capable of bearing the economic risks of such investment, including a complete loss of its investment.

(ii) <u>Purchase Entirely for Own Account</u>. The Investor is acquiring the Investor Subscription Shares pursuant to this Agreement for its own account for investment purposes only and not with the view nor intention to resell, distribute or otherwise dispose thereof, other than to certain of its Affiliates. The Investor does not have any direct or indirect arrangement or understanding with any other Person to distribute the Investor Subscription Shares in violation of the Securities Act or any other applicable state securities law.

(iii) <u>Restricted Securities</u>. The Investor acknowledges that the Investor Subscription Shares are "restricted securities" that have not been registered under the Securities Act or any applicable state securities law. The Investor further acknowledges that, absent an effective registration under the Securities Act, the Investor Subscription Shares may only be offered, sold or otherwise transferred (1) to the Company, (2) outside the United States of America in accordance with Rule 904 of Regulation S under the Securities Act or (3) pursuant to an exemption from registration under the Securities Act.

(iv) <u>Status of Investors</u>. The Investor is (i) purchasing the Investor Subscription Shares outside the United States in compliance with Regulation S under the Securities Act, or (ii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act.

**ARTICLE IV**
**COVENANTS**

Section 4.1 <u>Conduct of Business of the Company</u>. From the date hereof until the Closing Date, except as expressly contemplated by this Agreement or the Restructuring Plan or with the prior written consent of each Lead Investor (which consent shall not be unreasonably withheld, delayed or conditioned), the Company shall not, and the Company shall cause each of the Group Companies, and Baidu will cause the Baidu Parties with respect to the Principal Business, not to:

(a) amend its organizational documents;

(b) split, combine or reclassify any Equity Security in any Group Company;

40

(c) issue, deliver or dispose of any Equity Securities in any Group Company, other than the issuance of any Equity Securities of any wholly owned Subsidiary of the Company to the Company or any other wholly owned Subsidiary of the Company;

(d) effect or commence any liquidation, dissolution, scheme of arrangement, merger, consolidation, amalgamation, restructuring, reorganization or similar transaction involving any Group Company;

(e) declare or pay any dividends on authorize or make other distributions in respect of any of its Equity Securities;

(f) acquire (by merger, consolidation or otherwise), directly or indirectly, any assets, securities, properties, interests or businesses, other than such acquisitions in an amount not to exceed US$1,000,000 individually or US$5,000,000 in the aggregate;

(g) sell, lease or otherwise dispose of, or create or incur any Encumbrance on, any assets, securities, properties or interests of any Group Company or that would be a Contributed Asset, with a value in excess of US$1,000,000 individually or US$5,000,000 in the aggregate;

(h) create, incur, assume, suffer to exist or otherwise be liable with respect to any Indebtedness, or incur capital expenditures or similar obligations or liabilities, in excess of US$1,000,000 individually or US$5,000,000 in the aggregate, except for such actions taken by the Group Companies in the ordinary course of business consistent with past practice;

(i) (A) hire or retain the Chief Executive Officer, or any officer, employee or individual who reports directly to Chief Executive Officer (other than his personal assistant) and the business unit heads of the Group Company's Wealth Management Business, third party payment service business and micro-credit business, (B) terminate the service of any officer, employee or individual independent contractor with annual base compensation of RMB3,000,000 or more, other than for "cause" or take any action that is reasonably likely to give rise to a "good reason" (or any term of similar import) claim; (C) increase in any manner any compensation, bonus, benefits payable or severance entitlements of any officer, director, employee or individual independent contractor, except such increases or payments that, in the aggregate, do not cause an increase in the labor costs of the Group Companies or the Principal Business, taken as a whole, by more than 15%; or (D) adopt, enter into or amend any Company Employee Plan;

(j) enter into any new line of business, or abandon or discontinue any existing lines of business;

(k) make any change in any method of accounting for financial reporting, except for any such change required by reason of a concurrent change in US GAAP, as agreed to by its independent public accountants;

41

(l) enter into, amend or modify in any material respect or terminate any Material Contract (or any Contract that would have been a Material Contract if in effect on the date hereof) or otherwise waive, release or assign any material rights, claims or benefits;

(m) settle, or offer or propose to settle, (i) any material Action with an amount in excess of US$1,000,000, or (ii) any Action that relates to the Contemplated Transactions;

(n) sell, lease, license, sublicense, modify, terminate, abandon or permit to lapse, transfer or dispose of, create or incur any Encumbrance on, or otherwise fail to take any action necessary to maintain, enforce or protect any Owned Intellectual Property or their rights in any Licensed Intellectual Property;

(o) disclose or permit the disclosure of any source code for any of the Company Software, other than in the ordinary course of business to employees, contractors, consultants, representatives and agents of the Group Companies who are bound by written and enforceable confidentiality and/or non-disclosure agreements;

(p) terminate or cancel, let lapse, or amend or modify in any material respect, other than renewals in the ordinary course of business, any material insurance policies maintained by it which is not promptly replaced by a comparable amount of insurance coverage;

(q) undertake any action or fail to take any action that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(r) agree, resolve or commit to do any of the foregoing.

Section 4.2 Operation of the Principal Business. From the date hereof until the Closing Date, the Seller Parties shall, and Baidu shall cause the Baidu Parties to, ensure that the Principal Business is carried out in the ordinary course of business consistent with past practice (except as required by applicable Laws), and shall, and Baidu shall cause the Baidu Parties to, use commercially reasonable efforts to preserve the Baidu Parties' relationships with customers, suppliers, lenders and other Persons having business dealings relating to the Principal Business, maintain in effect all of the Permits, and manage its working capital in connection with the Principal Business (including the timing of collection of accounts receivable and of the payment of accounts payable) in the ordinary course of business. The Seller Parties shall, and Baidu shall cause the Baidu Parties to, ensure that the Principal Business is conducted in a manner which complies with all applicable Laws in all material respects.

Section 4.3 Additional Covenants. From the date hereof until the Closing Date, the Seller Parties shall, Baidu shall ensure that each of the Baidu Parties will, and the Company shall ensure that each of the Group Companies will, do the following:

42

(a) <u>Access to Information</u>. provide each of the Investors and their respective authorized representatives reasonable access to the Principal Business and the Group Companies and the books and records of the Group Companies and the Baidu Parties relating to the Principal Business, the Contributed Assets and the Group Companies, including for purposes of audit and inspection, and make available or cause to be made available to each of the Investors and their respective authorized representatives all information with respect to, instruct the employees, counsel and financial advisors of the Baidu Parties to cooperate with the Investors in their investigation of, the Principal Business, the Contributed Assets and the Group Companies, in each case, as such Person may reasonably request;

(b) <u>Books and Records</u>. maintain the books and records of the Principal Business and the Group Companies in the ordinary course;

(c) <u>Compliance with Laws</u>. comply in all material respects with all Laws applicable to the Principal Business and the Contributed Assets.

(d) <u>Notices of Certain Events</u>. promptly notify the Investors of:

(i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(ii) any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions by the recipient of such notice;

(iii) any Actions commenced or, to its knowledge threatened against, relating to or involving or otherwise affecting any Baidu Party that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.2(f) or that relate to the consummation of the Contemplated Transactions;

(iv) any inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Section 2.4(a)(i), Section 2.4(a)(iv), Section 2.4(a)(vi), Section 2.4(a)(vii), Section 2.4(a)(viii), Section 2.4(a)(xvi), Section 2.4(a)(xvii) or Section 2.4(a)(xviii) not to be satisfied; and

(v) any failure of any Seller Party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

*provided*, *however*, that the delivery of any notice pursuant to this Section 4.3(d) shall not limit or otherwise affect the remedies available hereunder to the Party receiving that notice.

43

Section 4.4 <u>Compliance with ABAC Laws</u>. Each Seller Party covenants that it shall not, and the Company shall not permit any Group Company, the Affiliates of any Group Company or any of their respective Representatives, to promise, authorize or make any payment to, or otherwise contribute any item of value to, directly or indirectly, to any third party, including any non-U.S. official, in each case, in violation of the ABAC Laws. Each Seller Party further covenants that it shall, and the Company shall cause each of the Group Companies and the Affiliates of each Group Company to, cease all of its or their respective activities, as well as remediate any actions taken by any Group Company or its Affiliates, or any of their respective Representatives in violation of ABAC Laws. Each Seller Party further covenants that it shall, and the Company shall cause each of the Group Companies and the Affiliates of each Group Company to, maintain systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to ensure compliance with ABAC Laws.

Section 4.5 <u>Compliance with Anti-Money Laundering and Sanctions Laws</u>. Each Seller Party shall, and the Company shall cause the Group Companies, the Affiliates of each Group Company and their respective Representatives to comply with all applicable Anti-Money Laundering laws and Sanctions Laws. The Company covenants that the Group Companies shall continue to maintain and enforce policies and procedures designed to ensure compliance with the Anti-Money Laundering Laws. The Company further covenants that none of the Group Companies, the Affiliates of each Group Company or any of their respective Representatives will engage, directly or indirectly, in (1) any business or activities with any person that is the target of any applicable Sanctions Laws, or (2) any activities that would reasonably be expected to result in any of the Group Companies becoming the target of any applicable Sanctions Laws.

Section 4.6 <u>Restructuring</u>.

(a) The Seller Parties shall, Baidu shall cause the Baidu Parties to, and the Company shall cause the Group Companies to, negotiate, prepare and finalize in good faith the Restructuring Documents as soon as practicable following the date hereof.

(b) From the date hereof until the expiration of the term of the Framework Restructuring Agreement, each of Seller Parties shall, Baidu shall cause the Baidu Parties to, and the Company shall cause the Group Companies to, provide any Investor, at the request of such Investor, with (i) an update on the status of the Restructuring after the completion of any material step thereto and (ii) relevant documentation (if any) evidencing such update.

(c) The Seller Parties shall, and Baidu shall cause the Baidu Parties to, and the Company shall cause the Group Companies to, duly perform each of its obligations under the Restructuring Plan to meet any applicable deadlines and consummate the Restructuring in accordance with the Restructuring Plan and in compliance with all applicable PRC Laws in all material respects.

(d) To the extent that any necessary actions in order to effect the Restructuring are not completed on the Closing Date, the Seller Parties shall, and Baidu shall cause the Baidu Parties to, and the Company shall cause the Group Companies to, undertake all steps necessary to complete these actions as soon as reasonably possible after Closing.

44

(e) Subject to the terms and conditions of the Restructuring Plan, the Restructuring will be effective as of the date set forth in the Restructuring Plan and consequently, subject to the other provisions of this Agreement, the Seller Parties shall, and Baidu shall cause the Baidu Parties to, and the Company shall cause the Group Companies to, take all necessary action to procure that the benefit and risk of the Principal Business, will be for the account of the Company and its Subsidiaries in accordance with the Restructuring Plan. Without limitation of the foregoing, with respect to any Contributed Asset which shall not have been transferred to the Group Companies prior to the Closing (each, a "Non-Transferred Asset"), until such transfer is completed to the extent permitted by applicable Law and by the terms of such Non-Transferred Asset, each Seller Party shall use its reasonable best efforts to enter into arrangements, effective as of the Closing or as promptly as practicable thereafter, to provide to the Parties the economic and operational equivalent of the transfer of such Non-Transferred Asset to the Group and the performance by the Group of the obligations thereunder as of the Closing and, in furtherance of the foregoing, (i) the Company or its designated Group Company shall, as agent or subcontractor for Baidu (or, as applicable, its relevant Affiliate), pay, perform and discharge fully the Liabilities of Baidu (or, as applicable, its relevant Affiliate) thereunder from and after the Closing Date in accordance with any such alternate arrangement and (ii) Baidu shall, or shall cause its relevant Affiliate to hold in trust for and pay to the Company or its designated Group Company promptly upon receipt thereof, all the income, proceeds and other consideration received by Baidu (or, as applicable, its relevant Affiliate) to the extent related to such Non-Transferred Asset in connection with and in accordance with the terms of any such alternate arrangement.

Section 4.7 Misallocated Assets; Misdirected Payments and Correspondence.

(a) If, following the Closing, any right, property or asset not forming part of the Principal Business is found to be owned or held by a Group Company, or any right, property or asset that is not a Contributed Asset is otherwise found to have been transferred to any Group Company in error, then the Company shall transfer, or shall cause the applicable Group Company to transfer, such right, property or asset (and any related Liability) as soon as practicable to Baidu or any other Baidu Party designated by Baidu. If, following the Closing, any right, property or asset that is a Contributed Asset is found to have been retained by any Baidu Party in error, then Baidu shall transfer, or shall cause the applicable Baidu Party to transfer, such right, property or asset (and any related Liability) as soon as practicable to the Company or a Group Company as designated by the Company.

(b) Following the Closing, Baidu shall, and shall cause the Baidu Parties to, promptly forward to the Company or a Group Company designated by the Company (i) any payment which under the terms of this Agreement belongs to the Group Companies that is received by any Baidu Party after the Closing and (ii) copies of any communications received by any Baidu Party after the Closing from a customer or other business partner to the extent related to the Group or the Principal Business.

(c) Following the Closing, the Company shall, and shall cause the Group Companies to, promptly forward to Baidu or any Baidu Party designated by Baidu (i) any payment which per the terms of this Agreement belongs to any Baidu Party that is received by the Group after the Closing and (ii) copies of any communications received by the Group after the Closing from a customer or other business partner to the extent related to any Baidu Party.

45

Section 4.8 <u>Tax Matters</u>.

(a) Without the prior written consent of the Investors, none of Baidu, the Company, any of the Company's Subsidiaries and any Affiliate of Baidu shall, to the extent it may affect or relate to the Company or any of its Subsidiaries, make or change any material Tax election, change any annual Tax accounting period, adopt or change any method of Tax accounting, file any amended material Tax Return, enter into any closing agreement, settle any material Tax claim or assessment, surrender any right to claim a material Tax refund, offset or other reduction in Tax liability or, if it would have the effect of increasing the Tax liability or reducing any Tax asset of the Company, any of its Subsidiaries or an Investor, take or omit to take any other action outside of the ordinary course of business.

(b) All Transfer Taxes incurred with respect to the subscription of the Investor Subscription Shares shall be paid by the Company when due, and the Company will at its own expense, file all necessary Tax Returns with respect to all such Transfer Taxes.

(c) As soon as practicable, Baidu and Baidu HK shall, and shall cause each Baidu Party to, handle its PRC tax affairs on its own or through its own agents and, to the extent required, submit the Tax reports and/or other documentation as required pursuant to Bulletin 7 and any other PRC Tax Laws (the "<u>Indirect Transfer Tax Filing Documents</u>") relating to the indirect sale of the PRC Group Companies or otherwise with respect to the transactions contemplated under this Agreement and such Indirect Transfer Tax Filing Documents shall, to the Seller Parties' Knowledge, be true and accurate in all material respects. In particular, Baidu and Baidu HK shall, and shall cause the Baidu Parties to:

(i) prior to any filing, deliver to the Investors a copy of all draft Indirect Transfer Tax Filing Documents and provide the Investors and their respective tax advisors with a reasonable opportunity to review and comment on such Indirect Transfer Tax Filing Documents;

(ii) promptly after completion of the filing, deliver to the Investors a copy of the Indirect Transfer Tax Filing Documents and an acknowledgement receipt in respect of the filing issued by the appropriate PRC Tax authority or the original signature of the PRC Tax authority on the duplicate of the Indirect Transfer Tax Filing Documents submitted; and

(iii) if any PRC Tax authority requires any Taxes to be paid pursuant to Bulletin 7 in connection with the transactions contemplated under the Transaction Documents, pay, or cause the Baidu Parties to pay, such Taxes in the amount and at the time as agreed by Baidu, Baidu HK or any other Baidu Party and the PRC Tax authorities and provide the Investors with the relevant documents (being tax payment certificate(s) issued by the relevant PRC Tax authorities) evidencing the payment of such Taxes.

46

Section 4.9 <u>Further Assurances</u>. From the date hereof until the Closing Date, the Parties shall use their commercially reasonable efforts to satisfy the conditions precedent to the consummation of the Contemplated Transactions. Without limiting the foregoing, prior to and at the Closing Date, each Party shall cooperate with the other Parties without any further consideration to make all filings with, and to obtain all consents of, any Governmental Authority or any other Person under any permit, license, agreement, indenture or other instrument (including any consents), and to take all such other actions as such party may reasonably be requested to take by the other party from time to time, consistent with the terms of this Agreement and the other Transaction Documents, in order to effectuate the provisions and purposes of this Agreement and the other Transaction Documents and the Contemplated Transactions.

Section 4.10 <u>ESOP</u>. The Seller Parties shall cause the Company to adopt the ESOP as soon as practicable prior to the Closing Date.

Section 4.11 <u>Most Favored Nation</u>. The Seller Parties each represent and warrant that none of the Seller Parties, nor any of their respective Affiliates, has entered into or shall enter into any Contract, side letter or similar agreement with any investor or its Affiliate in connection with the Contemplated Transactions or any similar investment in the Company or any of the Group Companies which would take place from the date hereof through the thirtieth (30th) day after the Closing Date (a "Side Letter") that has the effect of establishing rights or otherwise benefiting such investor or its Affiliate in a manner more favorable in any material respect to such investor or its Affiliate than the rights and benefits established in favor of each Lead Investor by this Agreement and the other Transaction Documents unless, in any such case, such Lead Investor is offered the opportunity to receive such rights and benefits by being provided with a copy of such Side Letter and is given thirty (30) days after receipt thereof to elect in writing (delivered to Baidu) to receive such more favorable rights or benefits; provided that, for the avoidance of doubt, the Lead Investor (other than TPG) shall have no right under this Section 4.11 to elect to receive the rights and benefits established in favor of TPG by this Agreement and the other Transaction Documents.

Section 4.12 <u>Related Party Arrangements</u>. Except for the Transaction Documents and any transactions on arm's length basis in the ordinary course of business, on or prior to the Closing Date, the Seller Parties will terminate or settle in full or cause to be terminated or settled in full all contracts and all intercompany accounts between any Group Company, on the one hand, and Baidu or any of its Affiliates (other than the Group Companies) or any of their respective directors or executive officers, on the other hand, prior to the Closing, and, as of immediately prior to the Closing, all Liabilities thereunder shall be deemed to have been satisfied, in Baidu's reasonable discretion, by repayment, capital contribution, distribution, forgiveness, offset, or any combination of the foregoing, and, after the Closing, neither Baidu or any of its Affiliates (other than the Group Companies), on the one hand, nor any of the Group Companies, on the other hand, shall be bound thereby or have any further Liability thereunder to the other party.

Section 4.13 <u>Insurance</u>.

(a) Except as set forth in this Section 4.13, coverage of the Group Companies under any insurance policy of any Baidu or its Affiliates (other than the Group Companies) shall cease as of the Closing Date.

47

(b) Baidu shall, and shall cause its Affiliates to, use reasonable best efforts to ensure that the Group Companies shall, to the extent covered as of the date hereof or the Closing Date, continue to have coverage under each insurance policy in effect with respect thereto at any time prior to the Closing (each, a "Specified Policy") in accordance with the terms and conditions thereof from and after the Closing Date for any loss, liability or damage suffered with respect to any incident or event occurring prior to the Closing.

(c) In the case of any Specified Policy that is a "claims made basis" policy, from the Closing Date until the policy expiration date (including any renewal thereof) of such policy (if later than the Closing Date), and in the case of any Specified Policy that is an "occurrence basis" policy, after the Closing Date, Baidu shall, and shall cause its Affiliates to, use their reasonable efforts to assist the Group Companies in asserting claims for any Loss suffered after the Closing with respect to any incident or event occurring prior to the Closing, to the extent such Loss is covered by the terms of such Specified Policy. This Section 4.13(c) shall not affect Baidu's, Baidu HK's or any other Baidu Party's indemnification obligations pursuant to Article V.

Section 4.14 Release. Each of Baidu and Baidu HK, on behalf of itself and its Affiliates (other than the Group Companies), equityholders, directors, officers, employees and representatives (in their capacities as such), hereby releases each Group Company and each of its respective Affiliates, equityholders, directors, officers, employees and representatives (collectively, the "Released Parties") from any and all Actions, causes of action, suits, Indebtedness, dues, sums of money, accounts, reckoning, bonds, bills, Liabilities, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, Losses, judgments, extents, executions, claims and demands (each, a "Released Claim") and agrees not to bring or threaten to bring or otherwise join or participate in any Released Claim against the Released Parties or any of them, relating to, arising out of or in connection with any facts or circumstances, directly or indirectly, relating to any Group Company or any Group Company's properties, assets or Liabilities which existed on or prior to the Closing, provided, however, that the foregoing shall not apply to or prevent any claim or Action for breach of any Transaction Document.

Section 4.15 Business Compliance.

(a) The Company shall cause the Group Companies to rectify the business models of the wealth management products, including but not limited to "Dingqiying" (定期盈), "Dinghuoying" (定活盈) and "Huoqiying" (活期盈), and complete the cleaning up of the existing volume of such wealth management products in accordance with all applicable Laws and regulations, including but not limited to the *Notice of Carrying Out the Clean-up and Rectification on the Illegal Business Undertaken by Internet Platforms and Various Types of Exchange Centers* (《关于对互联网平台与各类交易场所合作从事违法违规业务开展清理整顿的通知》 (整治办函[2017]64号)) and the *Circular on Strengthening the Rectification of Developing Asset Management Business via Internet and Implementing Acceptance Work* (《关于加大通过互联网开展资产管理业务整治力度及开展验收工作的通知》 (整治办函[2018]29号)), in a timely manner, and in any case no later than the later of (i) December 31, 2018 or (ii) any rectification deadline imposed by relevant Governmental Authorities.

48

(b) The Company shall cause the Group Companies to complete the reduction of the leverage ratio of Chongqing Baidu Micro-credit Co., Ltd. (重庆百度小额贷款有限公司) in accordance with all applicable laws and regulations, including but not limited to the *Interim Measures for the Financing of Chongqing Micro-credit Companies* (《重庆市小额贷款公司融资监管暂行办法》(渝金发[2012]11号)) and within time limit set out by Chongqing Finance Affairs Office (重庆市金融工作办公室), but in any case no later than the later of (i) October 31, 2018 or (ii) any rectification deadline imposed by relevant Governmental Authorities.

(c) The Company shall cause Shanghai Baidu Micro-credit Co., Ltd(上海百度小额贷款有限公司) to obtain the formal approval issued by the local authorities for carrying out "Internet Micro-credit" business in a timely manner.

(d) The Company shall cause the Group Companies to rectify the current business model of loan facilitation business carried out by the Group Companies, including but not limited to the credit enhancement provided by Xi'an Chunhe Assets Management Co., Ltd. (西安春禾资产管理有限公司), in accordance with all applicable laws and regulations, including but not limited to the *Regulations on the Administration of Financing Guarantee Companies* (《融资担保公司监督管理条例》) and the *Notice on Rectification of Cash Loan Businesses*《关于规范整顿"现金贷"业务的通知》(整治办函[2017]141号)), in a timely manner.

(e) The Company shall cause Beijing Baidu Baiying Technology Co., Ltd. (北京百度百盈科技有限公司) to obtain the Fund Sales License in a timely manner, but in any case no later than August 31, 2018.

## ARTICLE V
## INDEMNIFICATION

Section 5.1 <u>Survival of the Representations and Warranties</u>. All representations and warranties made by Baidu, Baidu HK or the Company to the Investors contained in Section 3.1 and Section 3.2 or by the Investors to Baidu, Baidu HK and the Company contained in Section 3.3 shall survive for a period of twenty-four (24) months following the Closing Date; *provided*, that the Fundamental Representations shall survive indefinitely or until the latest date permitted by Law; and *provided further*, that all representations and warranties contained in Section 3.2(q) relating to Taxes shall survive until the expiry of any applicable statute of limitation period. Notwithstanding the foregoing, if an Indemnified Party asserts any claim in writing pursuant to Section 5.2 resulting from or arising out of an alleged breach of any such representation or warranty on or prior to the applicable expiration date of such representation or warranty, such representation or warranty shall survive, solely with respect to such asserted claim, until such claim has been finally resolved. The covenants and agreements of each Party contained in this Agreement shall survive the Closing until they are terminated, whether by the performance thereof, their respective express terms or as a matter of applicable Law.

49

Section 5.2 <u>Indemnification</u>.

(a) From and after the Closing, Baidu and Baidu HK shall, jointly and severally, indemnify and hold each Investor and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns harmless from and against any losses, claims, damages, judgments, fines, Taxes, expenses and Liabilities of any kind or nature whatsoever, including any investigative and legal expenses incurred in connection with, and any amounts paid in settlement of, any pending or threatened Action and any incidental, indirect or consequential damages, losses, expenses or Liabilities, and any lost profits or diminution in value) (collectively, "<u>Losses</u>") resulting from or arising out of (A) the breach of any representation or warranty of Baidu and Baidu HK contained in this Agreement, and (B) the breach of any covenant of Baidu, Baidu HK or any Baidu Party contained in this Agreement, (C) Liabilities of any Group Company (1) resulting from or arising out of the operation or conduct by Baidu Parent or any of its Affiliates of any businesses now, previously or hereafter conducted by such Persons other than the Principal Business, or (2) which are not expressly contemplated to be transferred to the Group Companies in the Transaction Documents, or (D) the Restructuring, any failure to fully complete the Restructuring or any failure of the Baidu Parties to transfer (1) any of the Contributed Assets or Permits to the Group Companies, or (2) any of the Equity Securities of the Group Companies (other than the Company) to the Company, in accordance with the Restructuring Plan (the matters referred to in sub-clauses (C) and (D) above, collectively, the "<u>Restructuring Indemnity Matters</u>").

(b) From and after the Closing, the Company shall indemnify and hold each Investor and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns harmless from and against any Losses resulting from or arising out of (A) the breach of any representation or warranty of the Company contained in this Agreement, (B) the breach of any covenant of the Company contained in this Agreement or (C) any of the Restructuring Indemnity Matters.

(c) From and after the Closing, the Company shall indemnify and hold each Baidu Party and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns harmless from and against any Losses resulting from or arising out of the operation or conduct by any Baidu Party in connection with the Principal Business prior to the Closing Date, except for any Liabilities that are borne or assumed by, or shall remain with (including, without limitation, Liabilities indemnifiable by Baidu and Baidu HK pursuant to Section 5.2(a)), any Baidu Parties under any Transaction Document (including without limitation, Section 5.8 and Section 6.12 of this Agreement).

(d) From and after the Closing, each Investor severally and not jointly shall indemnify and hold the Company and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns harmless from and against any Losses resulting from or arising out of (A) the breach of any representation or warranty of such Investor contained in this Agreement or (B) the breach of any covenant of such Investor contained in this Agreement.

(e) For purposes of this Agreement, (A) "<u>Indemnifying Party</u>" means Baidu and Baidu HK (with respect to Section 5.2(a)), the Company (with respect to Section 5.2(b) and Section 5.2(c)) and each Investor (with respect to Section 5.2(d)); and (B) "<u>Indemnified Parties</u>" means, collectively, each Investor and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns (with respect to Section 5.2(a) and 5.2(b)), Baidu and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns (with respect to Section 5.2(c)), and the Company and its Affiliates, and their respective directors, officers, employees, agents, successors and assigns (with respect to Section 5.2(d)).

50

(f) For purposes of applying the indemnification remedies provided in this Article V, when determining whether any breach has occurred or calculating the amount of any Losses relating thereto, in each case, the representations, warranties and covenants made by any Indemnifying Party in this Agreement shall be considered and applied without regard to any reference as to materiality, Material Adverse Effect or similar materiality qualifications set forth therein.

Section 5.3 Third Party Claims.

(a) If any third party shall notify any Indemnified Party in writing with respect to any matter involving a claim by such third party (a "Third Party Claim") which such Indemnified Party believes would give rise to a claim for indemnification against an Indemnifying Party under this Article V, then the Indemnified Party shall promptly following receipt of notice of such claim transmit to the Indemnifying Party a written notice (a "Claim Notice") describing in reasonable detail the nature of the Third Party Claim, a copy of all papers served with respect to such claim (if any) and the basis of the Indemnified Party's request for indemnification under this Agreement. Notwithstanding the foregoing, no failure or delay in providing such Claim Notice shall constitute a waiver or otherwise modify the Indemnified Party's right to indemnification hereunder, except to the extent that the Indemnifying Party shall have been materially and adversely prejudiced by such failure or delay. If the Indemnifying Party does not notify the Indemnified Party in writing within 30 days from receipt of such Claim Notice that the Indemnifying Party disputes such claim for indemnification under this Agreement, the Indemnifying Party shall be deemed to have accepted and agreed with such claim for indemnification under this Agreement.

(b) Upon the receipt of a Claim Notice with respect to a Third Party Claim, the Indemnifying Party shall have the right to assume the defense of any Third Party Claim by notifying the Indemnified Party in writing within 30 days of receipt of such Claim Notice that the Indemnifying Party elects to assume the defense of such Third Party Claim, and upon delivery of such notice by the Indemnifying Party, the Indemnifying Party shall have the right to fully control and settle the relevant proceeding; provided, that any such settlement shall require the prior written consent of the Indemnified Party. Notwithstanding the foregoing, the Indemnifying Party shall not be entitled to assume the defense of any Third Party Claim if (i) the Third Party Claim relates to or arises in connection with any criminal action, (ii) the Third Party Claim seeks an injunction or equitable relief against any Indemnified Party, or (iii) the Indemnifying Party has not acknowledged that such Third Party Claim is subject to indemnification pursuant to this Article V.

(c) If requested by the Indemnifying Party, the Indemnified Party shall, at the sole cost and expense of the Indemnifying Party, cooperate reasonably with the Indemnifying Party and its counsel in contesting any Third Party Claim which the Indemnifying Party elects to contest, including in connection with the making of any related counterclaim against the third party asserting the Third Party Claim or any cross complaint against any Person. The Indemnified Party shall have the right to receive copies of all pleadings, notices and communications with respect to such Third Party Claim, other than any privileged communications between the Indemnifying Party and its counsel, and shall be entitled, at its sole cost and expense, to retain separate co-counsel and participate in, but not control, any defense or settlement of any Third Party Claim assumed by the Indemnifying Party pursuant to Section 5.3(b).

51

(d) In the event that the Indemnifying Party fails to elect to assume the defense of a Third Party Claim within thirty (30) days of receipt of the relevant Claim Notice or otherwise fails to continue the defense of the Indemnified Party in good faith, the Indemnified Party may, at its option, defend, settle, compromise or pay such action or claim at the expense of the Indemnifying Party.

Section 5.4 <u>Tax Indemnity</u>. Without limiting the foregoing, Baidu and Baidu HK shall, jointly and severally, indemnify the Investors, the Company, any Subsidiary or an Affiliate thereof for any Tax incurred or assessed pursuant to any applicable Law, including Bulletin 7 as a result of the Restructuring or any transfer of the Series A Preferred Shares or Ordinary Shares by Baidu HK or any Baidu Party pursuant to this Agreement (including as a result of any failure of the Baidu Parties to report any such transfer or pay Tax in respect thereof, any failure of any Investor to withhold on the purchase price or any adjustment to an Investor's tax basis in the Series A Preferred Shares pursuant to Bulletin 7).

Section 5.5 <u>Direct Claims</u>. If any Indemnified Party has a claim against any Indemnifying Party hereunder which does not involve a Third Party Claim, the Indemnified Party shall promptly transmit to the Indemnifying Party a written notice (the "<u>Indemnity Notice</u>") describing in reasonable detail the nature of the claim, the Indemnified Party's best estimate of the amount of Losses attributable to such claim and the basis of the Indemnified Party's request for indemnification under this Agreement; <u>provided</u>, that no failure or delay in providing such Indemnity Notice shall constitute a waiver or otherwise modify the Indemnified Party's right to indemnification hereunder, except to the extent that the Indemnifying Party shall have been materially and adversely prejudiced by such failure or delay. If the Indemnifying Party does not notify the Indemnified Party within 30 days from its receipt of the Indemnity Notice that the Indemnifying Party disputes such claim, the Indemnifying Party shall be deemed to have accepted and agreed with such claim.

Section 5.6 <u>Limitations on Liability</u>

(a) Deductible.

(i) Absent fraud and willful breach and except in the case of a breach of any Fundamental Representation, no Indemnifying Party shall be liable under Section 5.2(a)(A), Section 5.2(b)(A) or Section 5.2(d)(A) unless and until the aggregate amount of all relevant claims thereunder (regardless of how relevant Indemnified Party allocates such amount among such Sections in its claims) exceeds RMB3,000,000 (the "<u>Threshold</u>") (in which case the Indemnifying Party shall be responsible for the full amount of such claim from dollar one).

(b) Absent fraud, no Indemnifying Party shall be liable under Section 5.2(c) unless and until the aggregate amount of all relevant claims thereunder exceeds RMB10,000,000 (in which case the Indemnifying Party shall be responsible for the full amount of such claim from dollar one).

52

(c) <u>Maximum Liability</u>. Absent fraud and willful breach, (i) the maximum aggregate liability of Baidu and Baidu HK towards the Indemnified Parties of any Investor in respect of all Losses under Section 5.2(a) shall not exceed RMB6,500,000,000; (ii) the maximum aggregate liability of the Company towards the Indemnified Parties of any Investor in respect of all Losses under Section 5.2(b) shall not exceed the product of (x) such Investor's Investor Subscription Price and (y) a fraction, the numerator of which is 5 and the denominator of which is 11.5; (iii) the maximum aggregate liability of the Company towards the Indemnified Parties in respect of all Losses under Section 5.2(c) shall not exceed RMB100,000,000; and (iv) the maximum aggregate liability of any Investor towards the Indemnified Parties in respect of all Losses under Section 5.2(d) shall not exceed the product of (x) such Investor's Investor Subscription Price and (y) a fraction, the numerator of which is 5 and the denominator of which is 11.5.

(d) <u>Double Claims</u>. No Indemnifying Party shall be required to compensate any Indemnified Party more than once (whether under this Agreement or any other Transaction Document) in respect of the same Loss.

(e) <u>Exclusive Remedy</u>. Notwithstanding any provision to the contrary in this Agreement, from and after the Closing, except in the case of fraud or a willful breach, this Article V shall be the sole and exclusive remedy of the Indemnified Parties for any claim with respect to any and all Losses arising out of or resulting from this Agreement; *provided*, that nothing in this Article V shall affect any Party' right to seek and obtain any equitable relief to which such Party may be entitled pursuant to Section 6.15 or TPG's rights pursuant to Section 6.12. Notwithstanding anything to the contrary contained in the foregoing, the foregoing limitation shall not apply with respect to claims, Losses or other matters arising out of, relating to or resulting from any Transaction Document other than this Agreement.

(f) <u>No Seller Claims against Group</u>. Baidu and Baidu HK undertakes not to (and will procure that each of its Affiliates do not) make any claim against a Group Company or a director, officer or employee of a Group Company which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by a Group Company or a director, officer or employee of a Group Company for the purpose of assisting Baidu and/or its Affiliates to make a representation, give a warranty or prepare the Disclosure Schedule pursuant to this Agreement, or any other matter in relation to which any Investor is an Indemnified Party hereunder.

Section 5.7 <u>Tax Treatment of Indemnity Payments</u>. The Parties agree to treat any indemnity payment made pursuant to this Article V as an adjustment to the Investor Subscription Price, for all income tax purposes. If an Indemnifying Party is required to deduct or withhold from a payment under Section 5.2 to an Indemnified Party any Tax, the Indemnifying Party agrees to pay on demand from the Indemnified Party such additional amounts as shall be required so that the net amount received by such Indemnified Party after such deduction or withholding shall equal the amount that would have been received by such Indemnified Party had no such deduction or withholding been made.

53

Section 5.8 <u>Indemnity for Wealth Management Products</u>. Notwithstanding anything to the contrary contained in this Agreement, if any Wealth Management Assets causes or otherwise leads to any decrease in the consolidated net assets of the Group Companies from the Closing to September 30, 2019, which is determined on a consistent basis same as used in the preparation of the Closing Statement (any amount of such decrease, the "<u>Wealth Management Loss</u>"):

(a) Unless and until the aggregate amount of all Wealth Management Losses exceeds RMB540,000,000, Baidu and Baidu HK shall, jointly and severally, indemnify the Investors for the amount of such Wealth Management Loss, within 10 Business Days after the written request of any Lead Investor, (i) by transferring to the Investors, for no additional consideration, such aggregate number of Ordinary Shares (the "<u>Wealth Management Share Number</u>") which would reduce Baidu HK's ownership percentage in the Company at the Closing by a fraction (expressed as a percentage), (x) the numerator of which is the amount of such Wealth Management Loss in RMB, and (y) the denominator of which RMB18,000,000,000, or (ii) by permitting the Investors to subscribe, at par value, for an aggregate number of Series A Preferred Shares equal to the Wealth Management Share Number from the Company, and immediately thereafter causing the Company to repurchase from Baidu HK, at par value, an amount of Ordinary Shares equal to the Wealth Management Share Number. Such number of Ordinary Shares, in the case of clause (i) above, or Series A Preferred Shares, in the case of clause (ii) above, shall be allocated to the Investors on a pro rata basis according to their respective number of Investor Subscription Shares. The Parties shall take all necessary steps to effect such transfer of Ordinary Shares to the Investors by Baidu HK and the re-designation of each Ordinary Share so transferred as a Series A Preferred Share immediately upon the effectiveness of the transfer, in the case of clause (i) above, or the subscription for Series A Preferred Shares by the Investors and repurchase of Ordinary Shares from Baidu HK by the Company, in the case of clause (ii) above.

(b) If the aggregate amount of all Wealth Management Losses exceeds RMB540,000,000, the Company shall indemnify the amount of any further Wealth Management Loss within 10 Business Days after the written request of any Lead Investor, by paying to each Investor in US$ by wire transfer of immediately available funds an amount equal to the product of (i) the amount of such further Wealth Management Losses and (ii) a fraction, the numerator of which is the number of Investor Subscription Shares subscribed by such Investor at the Closing, and the denominator of which is the aggregate number of Investors Subscription Shares subscribed by the Investors at the Closing.

(c) Notwithstanding anything in this Section 5.8 to the contrary absent fraud and willful breach, (i) Baidu and Baidu HK shall not be liable to indemnify for any Wealth Management Loss pursuant to Section 5.8(a) unless and until the aggregate amount of all Wealth Management Losses exceeds RMB150,000,000 (in which case Baidu and Baidu HK shall be responsible for the full amount of such claim from dollar one pursuant to Section 5.8(a)), and (ii) the aggregate amount of all Wealth Management Losses indemnifiable by Baidu, Baidu HK and the Company pursuant to this Section 5.8 shall not exceed the RMB equivalent of US$500,000,000.

54

**ARTICLE VI**
**MISCELLANEOUS**

Section 6.1 <u>Disclosure Schedule References</u>. The Parties agree that any reference in a particular Section of the Disclosure Schedule shall be deemed to be an exception to or, as applicable, a disclosure for purposes of (i) the representations and warranties, or covenants, as applicable, of the relevant Party that are contained in the corresponding Section of this Agreement and (ii) any other representations and warranties of such Party that is contained in this Agreement, regardless of the absence of an express cross-reference thereto, if the relevance of that reference as an exception to or a disclosure for purposes of such representations, warranties or covenants would be reasonably apparent. The Parties acknowledge and agree that the Disclosure Schedule may include certain items and information solely for informational purposes for the convenience of the Investors, and the disclosure by the Company, Baidu or Baidu HK of any matter in the Disclosure Schedule shall not constitute an acknowledgment by the Company, Baidu or Baidu HK that the matter is required to be disclosed by the terms of this Agreement or that the matter is material.

Section 6.2 <u>Governing Law; Arbitration</u>. This Agreement shall be governed by and interpreted in accordance with the laws of Hong Kong. Any dispute arising out of or relating to this Agreement, including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration at the Hong Kong International Arbitration Centre (the "<u>HKIAC</u>") in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules in force when the relevant arbitration notice is received by the HKIAC. There shall be three arbitrators. Each side in dispute shall have the right to appoint one arbitrator, and the third arbitrator shall be appointed by the HKIAC. The language to be used in the arbitration proceedings shall be English. Each of the Parties irrevocably waives any immunity to jurisdiction to which it may be entitled or become entitled (including immunity to pre-award attachment, post-award attachment or otherwise) in any arbitration proceedings and/or enforcement proceedings against it arising out of or based on this Agreement or the Contemplated Transactions. The award of the arbitration tribunal shall be final and binding upon the Parties, and the prevailing Party may apply to a court of competent jurisdiction for enforcement of such award. Any Party shall be entitled to seek preliminary injunctive relief from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

Section 6.3 <u>Amendment; Waiver</u>. This Agreement shall not be amended or modified except by an agreement in writing executed by the Parties. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy.

Section 6.4 <u>Binding Effect</u>. This Agreement shall inure to the benefit of, and be binding upon, each of the Parties and their respective heirs, successors and permitted assigns and legal representatives.

55

Section 6.5 <u>Assignment</u>. Neither this Agreement nor any of the rights, duties or obligations hereunder may be assigned by any Party without the express written consent of the other Parties. Any purported assignment in violation of the foregoing sentence shall be null and void. Notwithstanding the foregoing, any Investor may assign any of its rights hereunder to any one or more of its Affiliates; *provided* that no such assignment shall relieve such Investor of its obligations hereunder or enlarge, alter or change any obligation of any other Party or due to such Investor,.

Section 6.6 <u>Notices</u>. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) in writing and served by personal delivery upon the Party for whom it is intended, (b) if delivered by facsimile or electronic mail with receipt confirmed or (c) if delivered by certified mail, registered mail or courier service, return receipt received, to the Party at the address set forth below:

If to Baidu or Baidu HK, at:

| | |
|---|---|
| Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| Attn: | Shanshan Bi |
| Email: | bishanshan@baidu.com |

With a copy (which shall not constitute notice) to:

| | |
|---|---|
| Address: | Skadden, Arps, Slate, Meagher & Flom LLP 42/F Edinburgh Tower, The Landmark, 15 Queen's Road Central, Hong Kong |
| Attn: | Z. Julie Gao |
| Facsimile: | +852 3910 4863 |
| Email: | julie.gao@skadden.com |

If to the Company, at:

| | |
|---|---|
| Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| Attn: | Wen WU |
| Email: | wuwen01@baidu.com |

If to TPG, at:

| | |
|---|---|
| Address: | Suite 3300 Fort Worth, TX 76102 United States |
| Attn: | Legal and Compliance Department |
| Facsimile: | +1 (817) 871-4001 |

56

With a copy (which shall not constitute notice) to:

|  |  |
|---|---|
| Address: | Davis Polk & Wardwell |
|  | 18th Floor, The Hong Kong Club |
|  | Building |
|  | 3A Chater Road |
|  | Central, Hong Kong |
| Attn: | Miranda So |
| Facsimile: | +852 2533 1773 |
| Email: | miranda.so@davispolk.com |

If to any Other Investor, at the address for notice set forth on its counterpart signature page hereto.

Any Party may change its address for purposes of this Section 6.6 by giving the other Parties written notice of the new address in the manner set forth above.

Section 6.7 <u>Entire Agreement</u>. This Agreement, together with the Schedules and Exhibits and the other Transaction Documents, constitutes the entire understanding and agreement among the Parties with respect to the matters covered hereby and thereby, and all prior agreements and understandings, oral or in writing, if any, among the Parties with respect to the matters covered hereby and thereby are superseded by this Agreement and the other Transaction Documents. In the event of any inconsistency between any provision of this Agreement and any provision of any other Transaction Document, the provisions of this Agreement shall prevail, and the Parties shall cause such inconsistent provision of such other Transaction Document to be promptly amended in order to conform to this Agreement.

Section 6.8 <u>Severability</u>. If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. If any provision of this Agreement shall be adjudged to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be deemed modified to the minimum degree necessary to make such provision valid and enforceable under applicable Law, and that such modified provision shall thereafter be enforced to the fullest extent possible.

Section 6.9 <u>Fees and Expenses</u>. Except as otherwise provided in this Agreement, the Parties will bear their respective expenses incurred in connection with the negotiation, preparation and execution of the Transaction Documents and the Contemplated Transactions, including fees and expenses of attorneys, accountants, consultants and financial advisors.

Section 6.10 <u>Confidentiality</u>.

(a) Subject to Section 6.10(b) and Section 6.10(c), each Party shall keep confidential and shall not disclose to any Person the existence and provisions of any Transaction Document, the negotiations relating to any Transaction Document and any non-public material or information with respect to the business, technology, financial conditions or other aspects of the other Parties or their respective Affiliates (collectively, "<u>Confidential Information</u>").

57

(b) Confidential Information shall not include any information that is (i) previously known on a non-confidential basis by the receiving Party, (ii) in the public domain through no fault of such receiving Party, its Affiliates or its or its Affiliates' officers, directors or employees, (iii) received from a Person other than any of the other Parties or their respective representatives or agents, so long as such Person was not, to the best knowledge of the receiving Party, subject to a duty of confidentiality to such other Party or (iv) developed independently by the receiving Party without reference to confidential information of the disclosing Party.

(c) Notwithstanding Section 6.10(a):

(i) any Party may disclose Confidential Information to the extent that such disclosure is required under applicable Laws or any judicial or regulatory process or is requested by any Governmental Authority or other regulatory body, including the rules and requirements of the SEC and any securities exchange; provided, that such Party shall, to the extent permitted by Law and so far as it is practicable, provide the other Parties with prompt notice of such requirement or request and cooperate with the other Parties at such other Parties' request and cost to enable such other Parties to seek an appropriate protection order or remedy; and

(ii) any Party may disclose Confidential Information to its Affiliates and its and its Affiliates' respective officers, directors, employees, agents, professional advisors and representatives on a need-to-know basis; provided, that such Party shall use commercially reasonable efforts to ensure that each such Person to which it discloses Confidential Information strictly abides by the confidentiality obligations hereunder and shall be responsible for any breach of confidentiality obligations by such Person; and

(iii) any Investor may disclose Confidential Information to the disclosure is made to any beneficial owner of any Investor in the ordinary course of investment reporting or any existing or to any prospective equity or debt financing source of any Investor or any of its Affiliates in connection with any ordinary course fund raising activities, as long as the recipient has been advised of the confidential nature of such information.

Section 6.11 Termination.

(a) This Agreement may be terminated at any time prior to the Closing:

(i) by the written consent of each of the Parties;

(ii) by any Seller Party or any Investor only with respect to such Investor if the Closing shall not have been consummated on or before December 31, 2018; or

(iii) by Baidu, Baidu HK or the Company by written notice to any Investor only with respect to such Investor if (A) all of the conditions to the obligations of such Investor to consummate the transactions contemplated by Section 2.1 (other than those conditions that by their terms are to be satisfied at the Closing) have been satisfied or duly waived; (B) Baidu, Baidu HK and the Company have notified such Investor in writing that the event referred to in Section 6.11(a)(iii)(A) above has occurred, and that Baidu, Baidu HK and the Company are ready, willing and able to consummate the Closing; and (C) such Investor fails to consummate the transactions contemplated by Section 2.1(a) within fifteen (15) Business Days after the delivery of the written notice referred to in Section 6.11(a)(iii)(B) above;

58

(iv) by any Party by written notice to the other Parties if any Governmental Authority shall have issued any Order or taken any other action permanently restraining, enjoining, preventing, prohibiting or otherwise making illegal the consummation of the Contemplated Transactions and such Order or other action has become final and non-appealable; provided, that a Party shall have no right to terminate this Agreement pursuant to this Section 6.11(a)(iv) if the imposition of such Order or other action was caused by the breach by such Party or its Affiliate of any representation, warranty or covenant in this Agreement, the Framework Restructuring Agreement or any Restructuring Document;

(v) by an Investor only with respect to such Investor if there exists a material breach of any representation, warranty, covenant or agreement of any Seller Party such that the condition set forth in Section 2.4(a)(i) or Section 2.4(a)(ii) would not be satisfied and such breach has not been cured, or is incapable of being cured, by such Seller Party (as the case may be) within 30 days following its receipt of notice from the Investor of such breach;

(vi) by Baidu or the Company only with respect to an Investor if there exists a material breach of any representation or warranty of such Investor such that the condition set forth in Section 2.4(b)(i) would not be satisfied and such breach has not been cured, or is incapable of being cured, by such Investor within 30 days following its receipt of notice from Baidu or the Company (as the case may be) of such breach; or

(vii) by TPG only if the Additional Subscription Conditions shall not have been satisfied on or prior to April 30, 2018.

(b) Upon the termination of this Agreement pursuant to this Section 6.11, this Agreement (other than Article I, Article V and this Article VI) shall become void and have no further force or effect; provided, that no such termination shall relieve any Party of liability for any breach of this Agreement prior to such termination.

(c) Notwithstanding anything to the contrary herein: (A) if this Agreement is terminated with respect to any Investor in accordance with (x) Section 6.11(a)(iii), or (y) Section 6.11(a)(vi), then the Escrow Amount paid by or on behalf of such Investor shall immediately and forever be forfeited to the Company, and such Investor shall take all actions necessary, appropriate or as requested by the Company or the Escrow Agent to effect the forfeiture and the transfer of the Escrow Amount from the Escrow Agent to the Company; (B) if this Agreement is terminated with respect to any Investor for any other reason, then (xx) the Escrow Amount paid by or on behalf of such Investor shall be immediately returned to such Investor, and Baidu and the Company shall take all actions necessary, appropriate or as requested by such Investor to effect the transfer of the Escrow Amount from the Escrow Agent to such Investor, and (yy) if applicable, the Letter of Credit shall be immediately terminated.

59

Section 6.12 Put Right.

(a) If the indirect transfer of Equity Interests of Beijing BaiduPay Science and Technology Co., Ltd. (北京百付宝科技有限公司) and/or Chongqing Baidu Mini Lending Co., Ltd. (重庆百度小额贷款有限公司) to the Company has not been completed in accordance with the Restructuring Plan by the Restructuring Longstop Date, at any time thereafter, following the written request of the Majority Series A Preferred Shareholders, each holder of Series A Preferred Shares shall have the right, but not the obligation, to sell to Baidu all of the Series A Preferred Shares held by such holder by written notice to the Company and Baidu (the "Put Notice").

(b) If any holder of Series A Preferred Shares delivers a Put Notice (the "Put Investor"), Baidu and Baidu HK hereby, jointly and severally, undertakes to pay to the Put Investor, in respect of each Series A Preferred Share to be sold in the Put Notice (each, a "Put Share"), an amount in cash (the "Put Price") equal to:

$$IP \times (1.10)^N + D$$

WHERE

IP = the per share Investor Subscription Price (as adjusted for any share split, share dividend, subdivision, combination, reclassification or other similar event)

N = a fraction the numerator of which is the number of calendar days between the Closing Date and the date of actual payment of the Put Price in respect of such Put Share and the denominator of which is 365

D = any accrued but unpaid dividends on such Put Share (as adjusted for any share split, share dividend, subdivision, combination, reclassification or other similar event)

(c) Baidu and/or Baidu HK shall pay the aggregate Put Price to the Put Investor in US$ by wire transfer of immediately available funds, and the Put Investor shall transfer its Put Shares to Baidu, on a date to be determined at the discretion of Baidu, but in any event no later than 45 days after the date of the Put Notice.

(d) "Restructuring Longstop Date" means the date that falls one (1) year after the Closing Date, which may be extended by the written consent of Baidu and TPG.

Section 6.13 Third Party Rights. Except as provided in Section 5.2, a Person that is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce any term of, or enjoy any benefit under, this Agreement.

Section 6.14 Headings. The headings of the various Articles and Sections of this Agreement are inserted merely for convenience and do not expressly or by implication limit, define or extend the specific terms of the Article or Section so designated.

60

Section 6.15 <u>Counterparts; Effectiveness</u>. This Agreement may be executed in one or more counterparts (including the counterpart of any Other Investor which executes and delivers such counterpart pursuant to Section 2.1(a)), including counterparts transmitted by facsimile or e-mail, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument. Delivery of executed signature pages by facsimile or electronic transmission (via scanned PDF) by all Parties will constitute effective and binding execution and delivery of this Agreement. The Seller Parties and TPG agree that this Agreement shall become effective and be binding immediately as between such Parties when each such Party shall have received counterparts hereof signed by all of such other Parties on the date first hereinabove mentioned, and shall not be conditional on, or affected by, the entry into this Agreement by any Other Investors.

Section 6.16 <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 6.17 <u>Public Announcements</u>. The Parties agree to consult with each other before issuing any press release or making any public disclosure or statement with respect to the existence or terms of this Agreement or the Contemplated Transactions and, except for any press releases and public disclosure or statements the making of which may be required by applicable Law or any listing agreement with any national securities exchange, will not issue any such press release or make any such public statement without the prior consent of the Seller Parties and TPG.

**[SIGNATURE PAGES FOLLOW]**

61

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**BAIDU HOLDINGS LIMITED**

By:     /s/ Yonhong Li
Name:   Yonhong Li
Title:  Director

**BAIDU (HONG KONG) LIMITED**

By:     /s/ Herman Yu
Name:   Herman Yu
Title:  Director

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**TPG BELLWETHER, LTD.**

By:    /s/ Michael LaGatta

Name:  Michael LaGatta
Title:   Vice President

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**91 WIRELESS WEBSOFT LIMITED**

By:    /s/ Da Zhou
Name:  Da Zhou
Title:   Director

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**Beacon Group Limited**

By:      /s/ Norma Kuntz
Name:   Norma Kuntz
Title:    Director

Address for Notice:

Address: 1001 Pennsylvania Avenue, Washing DC, 20004-2505
Attn: Norma Kuntz
Email: Norma.Kuntz@Carlyle.com

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**OTHER INVESTOR**

**Kaitai International Funds SPC for and on behalf of Taikang Kaitai Special
Opportunity Fund II Segregated Portfolio**

By:      /s/ Zhang Le
Name:   Zhang Le
Title:    Managing Director, Taikang Asset Management
          (Hong Kong) Company Limited

Address for Notice:

Address: Unit 4911-13, 49/F, The Center, 99 Queen's Road Central, Hong Kong
Attn: Nelson Yeung
Email: nelson_yeung@taikangamc.com.cn

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**OTHER INVESTOR**

**CB FINANCE INVESTMENT LIMITED**

By:    /s/ Ching Nar Cindy Chan
Name:  Ching Nar Cindy Chan
Title:  Director

Address for Notice:

Address:
Attn:
Email:

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**OTHER INVESTOR**

**EXPRESS SUCCESS INVESTMENTS LIMITED**

By:      /s/ Yang Rao Rao; Peng Cheng
Name:   Yang Rao Rao; Peng Cheng
Title:    Director

Address for Notice:

Address: 10/F., Agricultural Bank of China Tower, 50 Connaught Road Central, HK
Attn: Yang Rao Rao
Email: yangraorao@abci.com.hk

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed on the day and year first above written.

**OTHER INVESTOR**

**Wellrich Investment Fund Limited Partnership**

Acting by its general partner Springwell Capital Investment Limited

By:    /s/ ZHENG Jun

Name:    ZHENG Jun

Title:    Director

Address for Notice:

Address: 301-1 No.35 Jinshifang Street, Xicheng District, Beijing, P.R.China

Attn: Jason SHI

Email: jasonshi@htsc.com

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

Schedule 1
Subscription of Series A Preferred Shares

| Name of Investor | Number of Series A Preferred Shares Subscribed for | Investor Subscription Price | |
|---|---|---|---|
| TPG Bellwether, Ltd. | 54,147,422 | US$ | 1,000,000,000 |
| Beacon Group Limited | 27,073,711 | US$ | 500,000,000 |
| Taikang Kaitai Special Opportunity Fund II Segregated Portfolio | 8,122,113 | US$ | 150,000,000 |
| CB Finance Investment Limited | 5,414,742 | US$ | 100,000,000 |
| Express Success Investments Limited | 5,414,742 | US$ | 100,000,000 |
| Wellrich Investment Fund Limited Partnership | 4,331,794 | US$ | 80,000,000 |
| TOTAL | 104,504,524 | US$ | 1,930,000,000 |

Exhibit A

Form of Articles

Exhibit B

Form of Shareholders Agreement

Exhibit C

Restructuring Plan

Exhibit D

Form of Framework Business Cooperation Agreement

Exhibit E

Form of Transition Services Agreement

Exhibit F

Capitalization Table

Exhibit G

Legal Opinion Items

*Cayman Islands Legal Opinion*

*It is acknowledged that the following items shall be included in the executed Cayman Islands legal opinion dated as of the Closing subject to necessary assumptions, customary qualifications added therein, those disclosed in the disclosure schedule and the actual conditions relevant to the following items as of the Closing.*

1.  The Company is an exempted company duly incorporated with limited liability, validly existing under the laws of the Cayman Islands and in good standing with the Registrar of Companies in the Cayman Islands (the "**Registrar**").

2.  The Company has full corporate power and authority to execute and deliver the documents to which it is a party (the "**Documents**") and to perform its obligations under the Documents.

3.  The Documents to which the Company is a party have been duly authorised and executed and, when delivered by the Company, will constitute the legal, valid and binding obligations of the Company enforceable in accordance with their respective terms.

4.  The execution, delivery and performance of the Documents to which the Company is a party, the consummation of the transactions contemplated thereby and the compliance by the Company with the terms and provisions thereof do not:

    (i)   contravene any law, or public rule or regulation of the Cayman Islands applicable to the Company which is currently in force; or

    (ii)  contravene the Memorandum and Articles.

5.  Neither:

    (i)   the execution, delivery or performance of any of the Documents to which the Company is a party; nor

    (ii)  the consummation or performance of any of the transactions contemplated thereby by the Company,

    requires the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action in respect of any Cayman Islands governmental or judicial authority or agency.

6.  The law (if any) chosen in each of the Documents to which the Company is a party to govern its interpretation would be upheld as a valid choice of law in any action on that Document in the courts of the Cayman Islands (the "**Courts**").

7. There are no stamp duties, income taxes, withholdings, levies, registration taxes, or other duties or similar taxes or charges now imposed, or which under the present laws of the Cayman Islands could in the future become imposed, in connection with the enforcement or admissibility in evidence of the Documents or on any payment to be made by the Company or any other person pursuant to the Documents.

8. The Company will not be deemed to be resident, domiciled or carrying on business in the Cayman Islands by reason only of the execution, delivery, performance or enforcement of the Documents to which it is party.

9. A judgment obtained in a foreign court will be recognised and enforced in the Courts without any re-examination of the merits at common law, by an action commenced on the foreign judgment in the Grand Court of the Cayman Islands (the "**Grand Court**"), where the judgment:

    (i) is final and conclusive;

    (ii) is one in respect of which the foreign court had jurisdiction over the defendant according to Cayman Islands conflict of law rules;

    (iii) is either for a liquidated sum not in respect of penalties or taxes or a fine or similar fiscal or revenue obligations or, in certain circumstances, for in personam non-money relief (following *Bandone Sdn Bhd v Sol Properties Inc. [2008] CILR 301*); and

    (iv) was neither obtained in a manner, nor is of a kind enforcement of which is contrary to natural justice or the public policy of the Cayman Islands.

10. It is not necessary under the laws of the Cayman Islands that any of the Documents be registered or recorded in any public office or elsewhere in the Cayman Islands in order to ensure the validity or enforceability of any of the Documents.

11. It is not necessary under the laws of the Cayman Islands:

    (i) in order to enable any party to any of the Documents to enforce their rights under the Documents; or

    (ii) solely by reason of the execution, delivery and performance of the Documents,

    that the Company should be licensed, qualified or otherwise entitled to carry on business in the Cayman Islands or any other political subdivision thereof.

12. There are no actions, suits or proceedings pending against the Company before the Grand Court and no steps have been, or are being, taken compulsorily to wind up the Company.

13. The Companies Law provides that upon registration, the Memorandum and Articles bind the Company and members thereof to the same extent as if each member had subscribed his name thereto, and there were in such Memorandum and Articles contained a covenant on the part of the member to conform to all the conditions and regulations contained in such Memorandum and Articles subject to the provisions of the Companies Law.

14. In relation to the Series A Preferred Shares:

   (a) [specify number] the Series A Preferred Shares have been duly authorised and were validly allotted and issued to [insert TPG and other investor entities] on [Date] 2018.

   (b) the Series A Preferred Shares carry such rights as are attributed to them in the Memorandum and Articles.

*PRC Legal Opinion*

*It is acknowledged that the following items shall be included in the executed PRC legal opinion dated as of the Closing subject to necessary assumptions, customary qualifications added therein, those disclosed in the disclosure schedule and the actual conditions relevant to the following items as of the Closing.*

1. Due incorporation, valid existence and good standing of the PRC Group Companies.

2. Effectiveness and validness of the articles of association, business licenses and approval certificate/filings of the PRC Group Companies and no breach thereof.

3. Each PRC Group Company has all necessary approvals, filings and registration required for the establishment and maintenance of the enterprise legal person status and to conduct its business and such approvals/filings/registrations are in full force and effect.

4. Businesses currently conducted by the PRC Group Companies comply with the PRC Laws or consistent with common industry practice in all material aspects

5. Full contribution of registered capital of the PRC Group Companies.

6. No options over equity interests of the PRC Group Companies except for the Control Documents.

7. No outstanding rights to issue any equity interest in the PRC Group Companies.

8. Full corporate power and authority to own and use its properties and other assets owned by it, free and clear of any mortgage or pledge.

9. Due registration and good title to all registered Intellectual Property of the PRC Group Companies listed in the Transaction Documents and no current disputes with respect to violation or infringement of any intellectual property rights of others.

10. No notice from any Governmental Authority assessing any Tax deficiency against, or imposing any penalty on the PRC Group Companies.

11. No winding up, dissolution, bankruptcy or liquidation for the PRC Group Companies.

12. Each PRC Group Company is legally capable of suing and being sued and can be the subject of any legal proceedings in the PRC courts and can legally assume relevant civil liabilities.

13. No pending action, suit, arbitration, proceeding, inquiry, investigation or governmental proceeding by or against any PRC Group Company or its properties.

14. Full power and authority for the relevant PRC Group Companies and their shareholders to execute and perform the Control Documents to which they are parties.

15. Full power and authority for the PRC Group Companies to execute and perform the Transaction Documents. Legal binding, validness and enforceability of each Transaction Document against the PRC Group Companies excluding the Control Documents.

16. Legal ability of distributing dividends out of the PRC by WFOE.

17. Legal binding, validness and enforceability of the Material Contracts excluding the Control Documents.

18. Validness and enforceability of choice of laws and dispute resolution under the PRC Laws.

Exhibit 4.55

**AMENDED AND RESTATED**

**SHAREHOLDERS AGREEMENT**

**by and among**

**DUXIAOMAN (CAYMAN) LIMITED**
**(度小满金融（开曼）有限公司)**

**BAIDU HOLDINGS LIMITED**

**BAIDU (HONG KONG) LIMITED**

**and**

**INVESTOR SHAREHOLDERS AS LISTED HEREIN**

**Dated November 17, 2018**

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---:|
| SECTION 1 INTERPRETATION |  | 2 |
| SECTION 2 OBLIGATIONS OF THE SHAREHOLDERS |  | 12 |
| SECTION 3 RESTRICTIONS ON TRANSFER OF SHARES |  | 12 |
| SECTION 4 PREEMPTIVE RIGHTS |  | 18 |
| SECTION 5 CORPORATE GOVERNANCE |  | 21 |
| SECTION 6 REGISTRATION RIGHTS |  | 29 |
| SECTION 7 COVENANTS |  | 29 |
| SECTION 8 CONFIDENTIALITY |  | 37 |
| SECTION 9 TERM AND TERMINATION |  | 38 |
| SECTION 10 NOTICES |  | 38 |
| SECTION 11 MISCELLANEOUS |  | 39 |
| SECTION 12 GOVERNING LAW AND DISPUTE RESOLUTION |  | 43 |

**SCHEDULES**

| SCHEDULE 1 | SHAREHOLDING STRUCTURE OF THE COMPANY |
|---|---|
| SCHEDULE 2 | REGISTRATION RIGHTS |
| SCHEDULE 3 | LIST OF COMPANY COMPETITORS |
| SCHEDULE 4 | LIST OF BAIDU RESTRICTED PERSONS |
| SCHEDULE 5 | PERSONS SUBJECT TO NON-SOLICITATION |
| SCHEDULE 6 | LIST OF FINANCIAL LICENSES |

**EXHIBITS**

| EXHIBIT A | FORM OF DEED OF ADHERENCE |
|---|---|
| EXHIBIT B | MANAGEMENT BONUS SHARE FORMULA |

2

**AMENDED AND RESTATED SHAREHOLDERS AGREEMENT** (this "<u>Agreement</u>") made on November 17, 2018

**BY AND AMONG:**

(1)  Duxiaoman (Cayman) Limited (度小满金融（开曼）有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "<u>Company</u>");

(2)  Baidu Holdings Limited, a company incorporated under the laws of the British Virgin Islands ("<u>Baidu Holdings</u>"), and a wholly owned subsidiary of Baidu, Inc., an exempted company incorporated with limited liability under the laws of the Cayman Islands;

(3)  Baidu (Hong Kong) Limited, a company incorporated under the laws of Hong Kong ("<u>Baidu</u>"), and a wholly owned subsidiary of Baidu Holdings;

(4)  TPG Asia VII SF Pte. Ltd., a private company limited by shares incorporated under the laws of Singapore (together with any successors and assigns, "<u>TPG Asia</u>"), TPG Growth IV SF Pte. Ltd., a private company limited by shares incorporated under the laws of Singapore (together with any successors and assigns, "<u>TPG Growth</u>"), and The Rise Fund SF Pte. Ltd., a private company limited by shares incorporated under the laws of Singapore (together with any successors and assigns, "<u>Rise Fund</u>," and together with TPG Asia and TPG Growth, "<u>TPG</u>")

(5)  Beacon Group Limited, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("<u>Carlyle</u>");

(6)  Taikang Kaitai Special Opportunity Fund II Segregated Portfolio, a segregated portfolio company incorporated under the laws of the Cayman Islands ("<u>Taikang</u>");

(7)  CB Finance Investment Limited, a business company incorporated under the laws of the British Virgin Islands ("<u>CB Finance</u>");

(8)  ABCI Innovative Investment, an exempted company incorporated with limited liability under the laws of the Cayman Islands ("<u>Express Success</u>"); and

(9)  Wellrich Investment Fund Limited Partnership, an exempted limited partnership organized under the laws of the Cayman Islands ("<u>Wellrich</u>," together with Carlyle, Taikang, CB Finance, Express Success, and, together with TPG, the "<u>Investor Shareholders</u>").

**RECITALS:**

1.  As of the date hereof, Baidu and the Investor Shareholders collectively own, legally and beneficially, all of the issued share capital of the Company. The share ownership and certain other particulars of the Company and each Shareholder are set forth in <u>Schedule 1</u>.

2.  The Parties wish to provide for certain matters relating to the management, operation and other aspects of the Company and its Subsidiaries and the transfer of Shares.

**AGREEMENT:**

**SECTION 1**
**INTERPRETATION**

1.1  Definitions. In this Agreement, unless the context otherwise requires, the following words and expressions have the following meanings:

"Act" means the Companies Law (2018 Revision) of the Cayman Islands, as amended, modified or re-enacted from time to time.

"Affiliate" of a Person means (a) in the case of a Person other than a natural person, any other Person that, from time to time, directly or indirectly Controls, is Controlled by or is under common Control with such Person and (b) in the case of a natural person, any other Person that, from time to time, is directly or indirectly Controlled by such Person or is a Relative of such Person; provided, that the Group Companies shall be deemed not to be Affiliates of any Shareholder.

"Articles" means the amended and restated memorandum and articles of association of the Company adopted by the Company on or about the date hereof.

"Authorization" means any consent, approval, order, license or authorization of, registration, certificate, declaration or filing with or notice to any Governmental Authority.

"Baidu Restricted Person" means any Person listed in Schedule 4 hereto, or any Affiliate of such Person; provided, that a "Baidu Restricted Person" shall not include any Eligible Fund in which any Baidu Restricted Person makes or holds a *bona fide* investment.

"Board" means the board of directors of the Company.

"Budget" means the annual budget for the Group, setting out the detailed budget of the Group for the relevant Fiscal Year, as may be adopted by the Group from time to time in accordance with this Agreement and the Articles.

"Business Day" means any day other than Saturday, Sunday or another day on which commercial banks located in the Cayman Islands, New York, the PRC or Hong Kong are authorized or required by law or executive order to be closed and on which no tropical cyclone warning No. 8 or above and no "black" rainstorm warning signal is hoisted in Hong Kong at any time between 8:00 a.m. and 6:00 p.m. Hong Kong time.

2

"Business Plan" means the annual business plan for the Group, setting out details of all material matters relating to the operation, development and business of the Group, as may be adopted by the Group from time to time in accordance with this Agreement and the Articles.

"Chairman" means the chairman of the Board.

"Chief Executive Officer" shall mean Mr. Guang ZHU (朱光) or any other duly appointed chief executive officer of the Group.

"Closing" shall have the meaning set forth in the Share Purchase Agreement.

"Company Competitor" means any Person listed in Schedule 3 hereto, or any Affiliate of such Person; provided, that (i) Schedule 3 may be updated once per fiscal year by the mutual agreement of Baidu and the Majority Series A Preferred Shareholders in writing and each such amendment to be effective upon delivery of written notice thereof to the Company and the Shareholders, and (ii) any Person so added to Schedule 3 must be a Person whose main business competes with the main business of the Group Companies; provided, further, that any Institutional Fund which makes an investment in any Company Competitor shall not be a Company Competitor and shall not be included in Schedule 3.

"Company Secretary" means the company secretary of the Company.

"Contract" means, as to any Person, a contract, agreement, indenture, note, bond, loan, instrument, lease, mortgage, franchise, license, commitment, purchase order, and other legally binding arrangement, whether written or oral.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management of a Person, whether through the ownership of voting securities, by contract, credit arrangement or proxy, as trustee, executor or agent or otherwise. For purposes of this definition, a Person shall be deemed to Control another Person if such first Person, directly or indirectly, owns or holds more than 50% of the voting Equity Securities in such other Person for the general election of directors, or if such first Person, directly or indirectly, controls the board of directors, managing partner or other similar governing body or position of such other Person. The terms "Controlled" and "Controls" shall have meanings correlative to the foregoing.

"Control Documents" means, collectively, the agreements made from time to time, which enable the Company to exclusively Control, and consolidate in its financial statements the results of, any VIE Entity.

"Director" means a director of the Board (including any duly appointed alternate director).

3

"Director Indemnification Agreements" means the respective indemnification agreements entered into by and between the Company and each director appointed to the Board on or about the date hereof.

"Eligible Fund" means, with respect to any Person, any investment fund or asset management vehicle (which may, for the avoidance of doubt, be a hedge fund, venture capital fund or private equity fund) that (i) engages in the investment activities in the ordinary course of its business, and (ii) does not Control, is not Controlled by, and is not under common Control with, directly or indirectly, such Person.

"Encumbrance" means (a) any mortgage, charge (whether fixed or floating), pledge, lien, hypothecation, assignment, deed of trust, title retention, security interest or other encumbrance of any kind securing, or conferring any priority of payment in respect of, any obligation of any Person, including any right granted by a transaction which, in legal terms, is not the granting of security but which has an economic or financial effect similar to the granting of security under applicable law, (b) any proxy, power of attorney, voting trust agreement, interest, option, right of first offer, negotiation or refusal or transfer restriction in favor of any Person and (c) any adverse claim as to title, possession or use.

"Equity Securities" means, with respect to any Person, such Person's capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such capital stock, membership interests, partnership interests, registered capital, joint venture or other ownership interests (whether or not such derivative securities are issued by such Person).

"ESOP" means the amended and restated employee equity incentive plan of the Company adopted by the Company on or about the date hereof, pursuant to which 27,612,632 Ordinary Shares shall be reserved for issuance, as amended and duly adopted in accordance with this Agreement and the Articles.

"Financial License" means each financial services related license or permit as set forth in Schedule 6 hereto.

"Fiscal Year" means the fiscal year of the Company, which ends on December 31.

"Framework Business Cooperation Agreement" means the Framework Business Cooperation Agreement entered into by and among certain Group Companies and Baidu Holdings and/or its Affiliates on or about the date hereof.

"Framework Restructuring Agreement" shall have the meaning set forth in the Share Purchase Agreement.

4

"Governmental Authority" means any government or political subdivision thereof, whether on a federal, central, state, provincial, municipal or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof and any governing body of any securities exchange.

"Group" or "Group Companies" means, collectively, the Company and its Subsidiaries, and a "Group Company" means any of them.

"Hong Kong" means the Hong Kong Special Administrative Region of the People's Republic of China.

"Information Technology" means all computer systems, telecommunication systems, software (and the tangible media on which it is stored) and hardware including source and object code, cabling, routers, switched, racks, servers, PCs, laptops, terminals, scanners, printers and all associated peripherals, excluding in all cases Intellectual Property.

"Initial Budget" shall have the meaning set forth in the Share Purchase Agreement.

"Initial Business Plan" shall have the meaning set forth in the Share Purchase Agreement.

"Institutional Fund" means any investment fund or asset management vehicle (which may, for the avoidance of doubt, be a hedge fund, venture capital fund or private equity fund) that (i) engages in the investment activities in the ordinary course of its business, and (ii) does not Control, is not Controlled by, and is not under common Control with, directly or indirectly, any Company Competitor.

"Intellectual Property" means any and all (a) patents (including all reissues, divisionals, provisionals, continuations, continuations in part, re-examinations, renewals and extensions thereof), patent applications, and other patent rights, (b) trademarks, service marks, tradenames, brand names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with all goodwill associated with any of the foregoing and applications, registrations and renewals in connection therewith, (c) copyrights, mask works, and copyrightable works, and all applications, registrations for and renewals in connection therewith, (d) internet domain names, web addresses, web pages, websites and related content, accounts with Twitter, Facebook, Instagram, and other social media companies and the content found thereon and related thereto, and uniform resource locators, (e) proprietary Software, including source code, object code and supporting documentation for such Software, (f) trade secrets and proprietary information, including confidential business information, technical data, customer lists, data collections, methods and inventions (whether or not patentable and where or not reduced to practice), (g) copies and tangible embodiments of any of the foregoing, (h) all other intellectual property, whether or not registrable, in each case, under any law or statutory provision or common law doctrine in any country, and (i) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

5

"Key Employees" means Guang ZHU (朱光), Xuyang ZHANG (张旭阳), Wen WU (吴闻), Dongliang XU (许冬亮), Yunfeng SUN (孙云丰) and any other employee with an annual compensation of at least RMB2,000,000, of any Group Company.

"Majority Series A Preferred Shareholders" means Shareholders holding at least 50% of the then issued and outstanding Series A Preferred Shares.

"Order" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before or under the supervision of any Governmental Authority.

"Ordinary Shares" means the ordinary shares, par value US$0.0001 per share, in the share capital of the Company.

"Party" or "Parties" means any signatory or the signatories to this Agreement and any Person or Persons who subsequently becomes a party to this Agreement as provided herein.

"Person" means any natural person, firm, partnership, association, corporation, company, trust, public body or government or other entity of any kind or nature.

"PRC" means the People's Republic of China, but for purposes of this Agreement, excluding Hong Kong, the Macau Special Administrative Region and Taiwan.

"PRC GAAP" means the Generally Accepted Accounting Principles of the PRC.

"Qualified IPO" means a firm-commitment underwritten initial public offering of Ordinary Shares or of shares of a listing vehicle Affiliated with Company for purposes of consummating a Qualified IPO for the Group (or securities representing such Ordinary Shares or shares of the listing vehicle) (an "IPO") on a Recognized Exchange with a valuation that meets the following criteria: (a) if an IPO occurs prior to the 30th month anniversary of the Closing, the per share offering price in such IPO should be at least 175% of the Series A Issue Price, (b) if an IPO occurs at or after the 30th month anniversary of the Closing but prior to the 48th month anniversary of the Closing, the per share offering price in such IPO should be at least 200% of the Series A Issue Price, or (c) if an IPO occurs at or after the 48th month anniversary of the Closing, the per share offering price in such IPO should be at least 230% of the Series A Issue Price; provided, that such minimum valuation requirement may be waived in writing by Baidu and the Majority Series A Preferred Shareholders.

6

"Recognized Exchange" means the main board of The Stock Exchange of Hong Kong Limited, the Nasdaq Stock Market, the New York Stock Exchange, the Shanghai Stock Exchange, the Shenzhen Stock Exchange or another internationally recognized securities exchange as may be approved by the Board (including the affirmative consent of at least two Investor Directors).

"Regulatory Approvals" means all Authorizations from any Governmental Authority.

"Related Party" means any of the following: (a) any Person who beneficially owns, directly or indirectly, more than 5% of any voting securities or ownership interests in any Group Company (other than any other Group Company), (b) any director, officer or Key Employee of any Group Company and (c) any Person in which any of the Persons referred to in (a) or (b) holds, directly or indirectly, more than 5% of the voting securities or ownership interests. For the avoidance of doubt, none of the Group Companies shall be deemed to be a Related Party of the Company.

"Relative" of a natural person means such Person's spouse, parents, children and siblings, whether by blood, marriage or adoption.

"Restructuring Documents" shall have the meaning set forth in the Share Purchase Agreement.

"SEC" means the Securities and Exchange Commission of the United States of America or any other federal agency at the time administering the Securities Act.

"Securities Act" means the Securities Act of 1933 of the United States of America, as amended, or any similar federal statute and the rules and regulations of the SEC thereunder, all as the same shall be in effect at the time.

"Series A Issue Price" means the price per share of US$ 15.8658 at which the Series A Preferred Shares are issued, subject to any adjustment pursuant to the Share Purchase Agreement and adjustments made for share splits, share subdivision, share combination and the like according to the Articles.

"Series A Preferred Shares" means the Series A preferred shares, par value US$0.0001 per share, in the share capital of the Company.

"Share Purchase Agreement" means the Share Purchase agreement, dated April 28, 2018 and as amended from time to time, entered into by and among Baidu, Baidu Holdings, TPG Bellwether, Ltd., the Company and the other parties thereto.

"Shareholders" means the holders of any Share(s), and in the case of any Shareholder that is a natural person shall be deemed to include the estate of such Shareholder and the executor, conservator, committee or other similar legal representative of such Shareholder or such Shareholder's estate following the death or incapacitation of such Shareholder.

7

"Shares" means, collectively, the Ordinary Shares and/or the Series A Preferred Shares.

"Side Agreement to the Framework Business Cooperation Agreement" means that certain agreement to be entered into on or about the Closing Date by and among the parties to the Framework Business Cooperation Agreement for the purposes of implementing the agreements therein as mutually agreed upon among the Company, any Baidu Director and any TPG Director.

"Software" shall mean any and all (a) computer programs, applications, systems and software, including any and all software implementations of algorithms, models and methodologies and any and all source code, object code, development and design tools, applets, compilers and assemblers, (b) databases and compilations, including any and all libraries and collections of data whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) technology supporting, and the contents and audiovisual displays of, any internet site(s), and (e) documentation and media, including user manuals and training materials, relating to or embodying any of the foregoing or on which any of the foregoing recorded.

"Strategic Investor" shall mean the Shareholder that provides to the Company certain strategic resources to the satisfaction of Baidu. For the avoidance of doubt, neither Baidu or any of its Affiliates may be designated as the Strategic Investor.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, which is Controlled by such Person. For the avoidance of doubt, a "variable interest entity" Controlled by a Person shall be deemed to be a Subsidiary of such Person.

"Trade Sale" means any of the following: (a) a merger or consolidation in which (i) the Company is a constituent party or (ii) a Subsidiary of the Company is a constituent party and the Company issues Shares pursuant to such merger or consolidation, except for any such merger or consolidation in which the Shares outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, a majority of voting power of the capital stock or a majority of equity value of (x) the surviving or resulting corporation or (y) if the surviving or resulting corporation is a wholly-owned Subsidiary of another corporation immediately following such merger or consolidation, the parent corporation of such surviving or resulting corporation; (b) the sale, transfer or other disposition, in a single transaction or a series of related transactions, of outstanding Shares representing greater than 50% of the voting power or equity value of the Company; and (c) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or a series of related transactions, by any Group Company of all or substantially all of the assets of the Group taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more Subsidiaries of the Company if substantially all of the assets of the Group taken as a whole are held by such Subsidiary or Subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly-owned Subsidiary of the Company.

8

"Transaction Documents" means, collectively, this Agreement, the Share Purchase Agreement, the Articles, the Transition Services Agreement, the Framework Business Cooperation Agreement, the Director Indemnification Agreements, the Restructuring Documents, the Control Documents and any other agreements, documents or certificates delivered pursuant hereto or thereto.

"Transition Services Agreement" shall mean the Transition Services Agreement entered into by and among certain Group Companies and Baidu Holdings and/or its Affiliates on or about the date hereof.

"US GAAP" means the Generally Accepted Accounting Principles of the United States of America.

"US$" means United States Dollars, the lawful currency of the United States of America.

"VIE Entity" means any variable interest entity whose assets and financial results are consolidated into the financial statements of the Company, including Shanghai Youyang New Media Information Technology Co., Ltd. (上海优扬新媒信息技术有限公司) on Closing.

1.2    Terms Defined Elsewhere in this Agreement. The following terms are defined in this Agreement as follows:

| Term | Section |
| --- | --- |
| "ABAC Laws" | Section 7.5(b) |
| "Acceptance Notice" | Section 3.4(d) |
| "Agreement" | Preamble |
| "Anti-Money Laundering Laws" | Section 7.5(c) |
| "Baidu" | Preamble |
| "Baidu Holdings" | Preamble |
| "Baidu Director" | Section 5.2(a) |
| "CFC" | Section 7.14 |
| "Code" | Section 7.14 |
| "Company" | Preamble |
| "Confidential Information" | Section 8.1 |
| "Dispute" | Section 13.2 |
| "Electing Offeree" | Section 3.4(c) |
| "Excess Offered Shares" | Section 3.4(c) |
| "Excess Securities" | Section 4.3(a) |
| "First Offer Allocation" | Section 3.4(c) |

9

| | |
|---|---|
| "First Offer Right" | Section 3.4(a) |
| "Fully Participating Shareholder" | Section 4.3(a) |
| "HKIAC" | Section 13.2 |
| "Investor Director" | Section 5.2(a) |
| "Investor Shareholders" | Preamble |
| "Issuance Period" | Section 4.3(c) |
| "Issuance Securities" | Section 4.1(a) |
| "Non-Electing Offerees" | Section 3.4(c) |
| "OFAC" | Section 7.5(c) |
| "Offer Period" | Section 3.4(d) |
| "Offer Price" | Section 3.4(b) |
| "Offered Shares" | Section 3.4(b) |
| "Offerees" | Section 3.4(b) |
| "Permitted Transferee" | Section 3.3(d) |
| "PFIC" | Section 7.15 |
| "Preemptive Acceptance Notice" | Section 4.3(a) |
| "Preemptive Acceptance Period" | Section 4.3(a) |
| "Preemptive Offer" | Section 4.2(b) |
| "Preemptive Offer Notice" | Section 4.2(a) |
| "Preemptive Rightholders" | Section 4.1(a) |
| "Pro Rata Share" | Section 4.1(b) |
| "Proposed Issuance" | Section 4.2(a) |
| "Proposed Recipient" | Section 4.1(a) |
| "Remaining Shares" | Section 3.4(f) |
| "Representatives" | Section 7.5(b) |
| "Sanctions Laws" | Section 7.5(c) |
| "Shareholders Meeting" | Section 5.1 |
| "Tag-Along Notice" | Section 3.5(a)(ii) |
| "Tag-Along Offeree" | Section 3.5(a)(ii) |
| "Tag-Along Right" | Section 3.5(a)(i) |
| "Transfer" | Section 3.1 |
| "Transfer Notice" | Section 3.4(b) |
| "Transferee" | Section 3.4(f) |
| "Transferring Shareholder" | Section 3.4(b) |

1.3    Interpretation.

(a)    "Directly or Indirectly". The phrase "directly or indirectly" means directly, or indirectly through one or more intermediate Persons or through contractual or other arrangements and "direct or indirect" has the correlative meaning.

(b)    Gender and Number. Unless the context otherwise requires, all words (whether gender-specific or gender neutral) shall be deemed to include each of the masculine, feminine and neuter genders, and words importing the singular include the plural and vice versa.

(c)    Headings. Headings are included for convenience only and shall not affect the construction of any provision of this Agreement.

10

(d)     "Include" not Limiting. "Include," "including," "are inclusive of" and similar expressions are not expressions of limitation and shall be construed as if followed by the words "without limitation".

(e)     Law. References to "law" or "laws" shall include all applicable laws, regulations, rules and Orders of any Governmental Authority, securities exchange or other self-regulating body, including any common or customary law, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment; and "lawful" shall be construed accordingly.

(f)     "Person". A reference to any "Person" shall, where the context permits, include such Person's executors, administrators, legal representatives and permitted successors and assigns.

(g)     References to Documents. References to this Agreement include the Schedules and Exhibits, which form an integral part hereof. A reference to any Section, Recital, Schedule or Exhibit is, unless otherwise specified, to such Section of or Recital, Schedule or Exhibit to this Agreement. The words "hereof," "hereunder," "hereto" and words of like import, unless the context requires otherwise, refer to this Agreement as a whole and not to any particular Section hereof or Recital, Schedule or Exhibit hereto. References to any document (including this Agreement and the Articles) are references to that document as amended, consolidated, supplemented, novated or replaced from time to time.

(h)     Share Calculations. In calculations of share numbers, references to "fully diluted basis" mean that the calculation is to be made assuming that all outstanding options, warrants and other Equity Securities directly or indirectly convertible into or exercisable or exchangeable for Ordinary Shares (whether or not by their terms then currently convertible, exercisable or exchangeable) and Equity Securities which have been reserved for issuance pursuant to the Incentive Plans have been so converted, exercised, exchanged or issued. Any share calculation that makes reference to a specific date shall be appropriately adjusted to take into account any share split, share consolidation or similar event after such date.

(i)     Statutory References. A reference to a statute or statutory provision includes, to the extent applicable at any relevant time:

    (i)     that statute or statutory provision as from time to time consolidated, modified, re-enacted or replaced by any other statute or statutory provision;

    (ii)    any repealed statute or statutory provision which it re-enacts (with or without modification); and

    (iii)   any subordinate legislation or regulation made under the relevant statute or statutory provision.

11

(j)     Business Day. If the day on or by which a payment must be made is not a Business Day, such payment may be made on or by the Business Day immediately following such day.

(k)     Writing. References to writing include any mode of reproducing words in a legible and non-transitory form including emails and faxes.

**SECTION 2**
**OBLIGATIONS OF THE SHAREHOLDERS**

2.1     Shareholder Obligations. Each Shareholder and Baidu Holdings shall, and Baidu Holdings shall cause Baidu to, comply with the provisions of this Agreement in relation to its investment in the Company and in transacting business with the Company, and shall exercise its rights and powers in accordance with and so as to give effect to this Agreement.

**SECTION 3**
**RESTRICTIONS ON TRANSFER OF SHARES**

3.1     General. No Shareholder shall, and Baidu Holdings shall not permit Baidu to, sell, give, assign, hypothecate, pledge, encumber, grant a security interest in or otherwise dispose of or suffer to exist (whether by operation of law or otherwise) any Encumbrance on any Shares or any right, title or interest therein or thereto (each, a "Transfer"), except as expressly permitted by this Section 3. Any attempt to Transfer any Shares in violation of the preceding sentence shall be null and void *ab initio*, such Transfer shall not confer on any transferee or purported transferee any rights whatsoever and no Party (including the Company) shall recognize or register any such Transfer.

3.2     Restrictions on Transfers. Notwithstanding any other provision of this Agreement:

(a)     no Transfer may be made pursuant to this Section 3 unless (i) the transferee has agreed in writing to be bound by the terms and conditions of this Agreement pursuant to a Deed of Adherence substantially in the form attached hereto as Exhibit A, (ii) the transferee is not a Company Competitor, (iii) the Transfer complies in all respects with the other applicable provisions of this Agreement, and (iv) the Transfer complies in all respects with applicable securities laws; and

(b)     each of the following shall require the prior written consent of Baidu, which consent may be given or withheld in the sole discretion of Baidu: (i) any Transfer of Ordinary Shares or other Equity Securities of the Company to a Baidu Restricted Person, and (ii) any Trade Sale to or involving any Baidu Restricted Person, or any merger, amalgamation, consolidation, division, scheme of arrangement or any other type of corporate restructuring involving any Group Company and any Baidu Restricted Person;

12

(c)     each of the following shall require the prior written consent of Baidu and the Majority Series A Preferred Shareholders, which consent may be given or withheld in the sole discretion of Baidu and the Majority Series A Preferred Shareholders: any Transfer of Ordinary Shares or other Equity Securities of the Company issued pursuant to the ESOP or any other Incentive Plan or the bonus share arrangements set forth in Section 7.13, unless such Transfer is permitted by Section 3.3 and the terms of the ESOP or applicable Incentive Plan and the award agreement (or a similar agreement) thereunder; and

(d)     the following shall require the prior written consent of the Majority Series A Preferred Shareholders, which consent may be given or withheld in the sole discretion of the Majority Series A Preferred Shareholder: any Transfer of Ordinary Shares or other Equity Securities of the Company held by Baidu or any of its Permitted Transferees if such Transfer would reduce the total number of Shares beneficially owned by Baidu and its Affiliates to less than 71,125,129 Shares, representing 30% of the total number of Shares on an as-converted, fully diluted basis immediately after Closing.

3.3     Permitted Transfers. The following Transfers may be made without compliance with the provisions of Section 3.4 or Section 3.5:

(a)     any Transfer by a Shareholder to an Affiliate of such Shareholder; provided, that the transferee is not a Company Competitor;

(b)     any Transfer by a Shareholder that is a natural person to a trust for the benefit of a Relative of such Shareholder; provided, that such Shareholder is the sole trustee of such trust;

(c)     any Transfer by Baidu pursuant to Section 5.8 of the Share Purchase Agreement or by any holder of Series A Preferred Shares pursuant to Section 6.12 of the Share Purchase Agreement;

(d)     any Transfer by any Initial Investor Shareholder pursuant to the bonus share arrangements set forth in Section 7.13; or

(e)     any Transfer of Equity Securities to the Company pursuant to a repurchase right or right of first refusal held by the Company in the event of a termination of employment relationship.

A Person described with respect to a Shareholder in clause (a) or (b) of this Section 3.3 is hereinafter referred to as a "Permitted Transferee" of such Shareholder. If a transferee of Shares pursuant to clause (a) or (b) of this Section 3.3 at any time ceases to be a Permitted Transferee of the transferring Shareholder, the transferee shall promptly Transfer such Shares back to such transferring Shareholder. As a condition to any Transfer by Baidu to any Permitted Transferee, such Permitted Transferee hereby undertakes to the Investor Shareholders that it shall be jointly and severally liable with Baidu for each of the obligations of Baidu set forth in Section 5.8(a) of the Share Purchase Agreement as if such provisions are hereby incorporated by reference into this Agreement, *mutatis mutandis*.

13

3.4    Right of First Offer of the Shareholders.

(a)    Transfers Subject to Right of First Offer. Subject to Section 3.3, if any Shareholder proposes to Transfer any Shares, each of Baidu and holders of the Series A Preferred Shares shall have a right of first offer (the "First Offer Right") with respect to such Transfer as provided in this Section 3.4.

(b)    Transfer Notice. If a Shareholder (the "Transferring Shareholder") proposes to Transfer any Shares held by it to any Person (other than a Permitted Transferee), the Transferring Shareholder shall send a written notice (the "Transfer Notice") to the Company, Baidu and all holders of the Series A Preferred Shares (Baidu and such holders, the "Offerees"), which notice shall state (i) the name of the Transferring Shareholder, (ii) the number and the type of Shares to be Transferred (the "Offered Shares"), (iv) the amount of the proposed consideration for each Share for the Transfer (the "Offer Price") and (v) other material terms and conditions of the proposed Transfer.

(c)    Rights of the Offerees. Each Offeree shall have the right, exercisable through the delivery of an Acceptance Notice as provided in Section 3.4(d), to purchase a portion of the Offered Shares (up to such Offeree's First Offer Allocation) at a purchase price per Share equal to the Offer Price, and upon the other terms and conditions set forth in the Transfer Notice. Each Offeree shall have the right to purchase up to such number of Offered Shares as is equal to the total number of Offered Shares multiplied by a fraction, the numerator of which is the number of Shares held by such Offeree and the denominator of which is the number of Shares held by all of the Offerees (such number, an Offeree's "First Offer Allocation"), in each case (for both the numerator and the denominator) on an as-converted, fully diluted basis as of the date of the Transfer Notice. In addition, in the event that one or more Offerees ("Non-Electing Offerees") declines or is deemed pursuant to Section 3.4(d) to have waived its First Offer Right, or does not purchase its full First Offer Allocation, each Offeree electing to purchase its full First Offer Allocation (such Offeree, an "Electing Offeree") shall have the right as provided in Section 3.4(e)to purchase all or a portion of the Offered Shares not so purchased by the Non-Electing Offerees ("Excess Offered Shares"). An Offeree may assign to any Permitted Transferee of such Offeree its right to acquire Offered Shares pursuant to this Section 3.4; provided, that such Permitted Transferee is not a Baidu Restricted Person unless otherwise approved by Baidu pursuant to Section 3.2(b).

14

(d)    Exercise of Rights. The First Offer Right of each Offeree under Section 3.4(c) shall be exercisable by delivering a written notice of exercise (an "Acceptance Notice") to the Transferring Shareholder within a period of 20 days after the date of the Transfer Notice (the "Offer Period"), with a copy to each other Offeree. Each Acceptance Notice shall include a statement of (i) the number of Shares held by such Offeree and (ii) the maximum number of Offered Shares that such Offeree is willing to purchase (which may be less than, equal to, or greater than such Offeree's First Offer Allocation, up to the total number of Offered Shares). An Acceptance Notice shall be irrevocable and shall constitute a binding agreement by such Offeree to purchase the relevant number of Offered Shares determined in accordance with Section 3.4(c) and Section 3.4(e). The failure of an Offeree to give an Acceptance Notice within the Offer Period shall constitute a waiver of such Offeree's First Offer Right with respect to the relevant Transfer.

(e)    Allocation of Offered Shares. Each Offeree shall have the right to purchase such number of Offered Shares as elected in such Offeree's Acceptance Notice, if such number does not exceed such Offeree's First Offer Allocation. If the number of Offered Shares as elected in such Offeree's Acceptance Notice exceeds such Offeree's First Offer Allocation, such Electing Offeree shall have the right to purchase such number of Excess Offered Shares as elected in such Electing Offeree's Acceptance Notice; provided, that if the number of Excess Offered Shares is less than the aggregate number of Excess Offered Shares that the Electing Offerees have indicated a willingness to purchase in their respective Acceptance Notices, the Excess Offered Shares shall be allocated by the Transferring Shareholder and agreed by all Electing Offerees in a fair manner such that each Electing Offeree shall have a right to purchase (i) not less than the total number of Excess Offered Shares multiplied by a fraction, the numerator of which is the number of Shares held by such Electing Offeree and the denominator of which is the number of Shares held by all Electing Offerees, in each case (for both the numerator and the denominator) on an as-converted, fully diluted basis as of the date of the Transfer Notice, and (ii) not more than the maximum number of Excess Offered Shares specified in such Electing Offeree's Acceptance Notice.

(f)    Sale to Third Party Purchaser. If the Offerees do not elect in the aggregate to purchase all of the Offered Shares, the Transferring Shareholder may Transfer, subject to Section 3.5, the remaining Offered Shares (the "Remaining Shares") to any Person (the "Transferee"); provided, that (i) such sale is bona fide, (ii) the price per Share for the Transfer to the Transferee is a price not less than the Offer Price and the Transfer is otherwise on terms and conditions no less favorable to the Transferring Shareholder than those set forth in the Transfer Notice, (iii) the Transfer is made within three months after the giving of the Transfer Notice, (iv) the Transferee is not a Company Competitor, and (v) the Transferee is not a Baidu Restricted Person unless otherwise approved by Baidu pursuant to Section 3.2(b). If such a Transfer does not occur within such three-month period for any reason, the restrictions provided for herein shall be revived, and no Transfer of Shares may be made by the Transferring Shareholder thereafter without again making an offer to the Offerees in accordance with this Section 3.4.

15

(g)    Closing. The closing of any purchase of Offered Shares by an Offeree shall be held at the principal office of the Company at 11:00 a.m. local time on the 15th day after the giving of the Acceptance Notice by such Offeree or at such other time and place as the parties to the transaction may agree. The said 15-day period shall be extended for an additional period of up to 45 days if necessary to obtain any Regulatory Approvals required for such purchase and payment. At such closing, the Transferring Shareholder shall deliver share certificates representing the relevant Offered Shares and an updated draft register of members showing the Offeree as the holder of the Offered Shares, accompanied by duly executed instruments of transfer and the Transferring Shareholder's portion of the requisite stamp duty and transfer taxes or fees, if any. Such Offered Shares shall be free and clear of any Encumbrance (other than Encumbrances arising under this Agreement, the Articles and applicable securities laws or attributable to actions by such Offeree acquiring such Offered Shares), and the Transferring Shareholder shall so represent and warrant and shall further represent and warrant that it is the beneficial and record owner of such Offered Shares. Each Offeree purchasing Offered Shares shall deliver at the relevant closing (or as otherwise agreed between the Transferring Shareholder and such Offeree) payment in full of the Offer Price for relevant Offered Shares. At such closing, all of the parties to the transaction shall execute such additional documents as may be necessary or appropriate to effect the sale of such Offered Shares to such Offeree. Any stamp duty or transfer taxes or fees payable on the transfer of any Offered Shares shall be borne and paid equally by the Transferring Shareholder and the relevant Offeree.

3.5    Tag-Along Rights.

(a)    Tag-Along Rights on Transfer.

(i)    Tag-Along Right. If a Transferring Shareholder proposes to make a Transfer, an Offeree that does not exercise its First Offer Right in accordance with Section 3.4 shall have the right (the "Tag-Along Right") but not the obligation to require the Transferee in such Transfer to purchase from such Offeree, for the same consideration per Share and upon the same terms and conditions as applicable to the Transferring Shareholder, up to a maximum number of Shares as is equal to the Remaining Shares multiplied by a fraction, the numerator of which is the number of Shares held by such Offeree and the denominator of which is the aggregate number of Shares held by the Transferring Shareholder and the Offerees exercising the Tag-Along Right, in each case (for both the numerator and the denominator) on an as-converted, fully diluted basis as of the date of the Transfer Notice. If an Offeree elects to exercise its Tag-Along Right, the number of Shares to be Transferred by the Transferring Shareholder shall be reduced accordingly.

16

(ii)  Tag-Along Notice. If an Offeree elects to exercise its Tag-Along Right (the "Tag-Along Offeree"), such Tag-Along Offeree shall deliver a written notice (the "Tag-Along Notice") of such election to the Transferring Shareholder within the Offer Period, specifying the number of Shares with respect to which it wishes to sell pursuant to the Tag-Along Right, subject to the maximum number of Shares calculated pursuant to Section 3.5(a)(i). Such notice shall be irrevocable and shall constitute a binding agreement by such Shareholder to Transfer up to such number of Shares on the terms and conditions set forth in the Transfer Notice. The failure of the Tag-Along Offeree to give a Tag-Along Notice within the Offer Period shall constitute a waiver of such Tag-Along Offeree's Tag-Along Right.

(iii)  Allocation of Remaining Shares. Within five Business Days after the expiration of the Offer Period, the Transferring Shareholder shall send a notice to each Tag-Along Offeree specifying (1) the number of Remaining Shares, (2) the identity of each Tag-Along Offeree, (3) the number and type of Shares that each Tag-Along Offeree has requested to sell and (4) the number and the type of Shares that each Tag-Along Offeree shall sell to the Transferee.

(b)  Consummation. The closing of the sale of Shares pursuant to the Tag-Along Right shall occur simultaneously with the Transfer of Shares by the Transferring Shareholder to the Transferee. If any Offeree has duly elected to exercise its Tag-Along Right and the proposed Transferee declines to or otherwise fails to purchase Shares from such Offeree, the Transferring Shareholder shall not make the proposed Transfer, and if purported to be made, such Transfer shall be void.

(c)  Notwithstanding anything herein to the contrary, if the Tag-Along Offerees are required to provide any representations or indemnities in connection with any sale of Shares pursuant to the Tag-Along Right (other than representations and indemnities concerning each Tag-Along Offeree's title to the Shares and authority, power and right to enter into and consummate the sale without contravention of any law or agreement), liability for misrepresentation or indemnity shall (as to such Tag-Along Offerees) be expressly stated to be several but not joint and each Tag-Along Offeree shall not be liable for more than its pro rata share (based on the number of Shares sold) of any liability for misrepresentation or indemnity, (ii) benefit from all of the same provisions of the definitive agreements as the Transferring Shareholder and (iii) be required to bear no more than their proportionate share of any escrows, holdbacks or adjustments in purchase price.

17

3.6   <u>Avoidance of Restrictions</u>. The Parties agree that the Transfer restrictions in this Agreement and in the Articles shall not be capable of being avoided by the holding of Shares indirectly through a company or other entity that can itself be sold in order to dispose of an interest in Shares free of such restrictions. Any Transfer or other disposal of any shares (or other interest) resulting in any change in the Control of a Shareholder or of any company (or other entity) having Control over that Shareholder shall be treated as being a Transfer of the Shares held by that Shareholder, and the provisions of this Agreement and the Articles that apply in respect of the Transfer of Shares shall thereupon apply in respect of the Shares so held.

3.7   <u>Transfer of Convertible Securities</u>. Any Transfer of Equity Securities convertible into or exercisable or exchangeable for Shares shall be deemed for the purposes of this Section 3 to be a Transfer of Shares.

3.8   <u>Notice of Transfer</u>. After registering any Transfer of Shares or other Equity Securities on its books, the Company shall promptly send a notice to each Shareholder stating that such Transfer has taken place and setting forth the name of the transferor, the name of the transferee and the number and type or class of Equity Securities involved.

3.9   <u>Termination of Transfer Restrictions</u>. The provisions of this Section 3 shall terminate upon the completion of a Qualified IPO, and shall not apply to any Transfer of Shares pursuant to a Qualified IPO.

**SECTION 4**
**PREEMPTIVE RIGHTS**

4.1   <u>Restrictions</u>.

(a)   Except as provided under Section 4.1(c), the Company shall not issue any securities (including any Equity Securities or any debt or other securities of any kind) of any type or class ("<u>Issuance Securities</u>") to any Person (the "<u>Proposed Recipient</u>") unless the Company has offered each of Baidu and holders of the Series A Preferred Shares (Baidu and such holders, the "<u>Preemptive Rightholders</u>") in accordance with the provisions of this Section 4 the right to purchase such Preemptive Rightholder's Pro Rata Share of such Issuance Securities for a per unit consideration, payable solely in cash, equal to the per unit consideration to be paid by the Proposed Recipient and otherwise on the same terms and conditions as are offered to the Proposed Recipient.

18

(b)    For the purposes of this Section 4, the "Pro Rata Share" of a Preemptive Rightholder with respect to Issuance Securities at any time shall be calculated as the product of (i) the number of Issuance Securities and (ii) a fraction, the numerator of which is the total number of Shares held by such Shareholder and the denominator of which is the total number of Shares held by all Preemptive Rightholders, in each case (for both the numerator and the denominator) on an as-converted, fully diluted basis as of the date of the Preemptive Offer Notice.

(c)    The restrictions set out in Section 4.1(a) shall not apply to (i) any issuance of Ordinary Shares upon the conversion of Series A Preferred Shares, (ii) any issuance pursuant to a Qualified IPO, (iii) any issuance of Shares pursuant to the ESOP or any other Incentive Plan, (iv) any issuance of Equity Securities in connection with a bona fide business acquisition by the Company, whether by merger, consolidation, amalgamation or other business combination transaction, joint venture, sale or exchange of securities or other similar transaction involving the Company or a Group Company, approved in accordance with this Agreement and the Articles, (v) any issuance of Equity Securities in connection with any share split, share dividend, subdivision, combination, reclassification or other similar event in which all Shares are entitled to participate on a pro-rata basis in accordance with the Articles, and (v) any issuance of Equity Securities pursuant to Section 5.8 of the Share Purchase Agreement.

4.2    Preemptive Offer Notice.

(a)    Not less than 20 days before a proposed issuance of securities other than in connection with an issuance permitted under Section 4.1(c) (a "Proposed Issuance"), the Company shall deliver to each Preemptive Rightholder a written notice (a "Preemptive Offer Notice"), which shall set forth (i) the number, type and terms of such Issuance Securities, (ii) the consideration to be received by the Company in connection with the Proposed Issuance and (iii) a summary of any other material terms and conditions of the Proposed Issuance, including the name of the Proposed Recipient and the proposed issuance date. Such Preemptive Offer Notice shall be accompanied by any written offer, if any, from the Proposed Recipient to purchase such Issuance Securities.

(b)    The Company shall, by delivering the Preemptive Offer Notice, offer each Preemptive Rightholder the option to acquire all or any portion of such holder's Pro Rata Share of the Issuance Securities (the "Preemptive Offer"). The Preemptive Offer shall remain open and irrevocable for the period set forth below (and, to the extent that the Preemptive Offer is accepted during such period, until the consummation of the issuance contemplated by the Preemptive Offer).

19

4.3   <u>Exercise of Preemptive Rights</u>.

(a)   Each Preemptive Rightholder shall have the right, exercisable by such holder through the delivery of a written notice (a "<u>Preemptive Acceptance Notice</u>") to the Company within a period of 15 days after the date of the Preemptive Offer Notice (the "<u>Preemptive Acceptance Period</u>"), to purchase up to its Pro Rata Share of the Issuance Securities at the purchase price and on the terms and conditions stated in the Preemptive Offer Notice. Each Preemptive Acceptance Notice shall specify the maximum number of Issuance Securities such Preemptive Rightholder will purchase (which may be less than, equal to, or greater than such Preemptive Rightholder's Pro Rata Share of the Issuance Securities, up to the total number of Issuance Securities). The failure of a Preemptive Rightholder to give a Preemptive Acceptance Notice within the Preemptive Acceptance Period shall constitute a waiver of such Preemptive Rightholder's preemptive rights under this Section 4.3 with respect to the relevant Preemptive Offer. If any Preemptive Rightholder does not exercise or has waived its preemptive rights under this Section 4.3 or elects to exercise such rights with respect to less than its Pro Rata Share of the Issuance Securities, any Preemptive Rightholder that has elected to exercise its preemptive rights under this Section 4.3 with respect to at least its full Pro Rata Share of the Issuance Securities (a "<u>Fully Participating Shareholder</u>") shall be entitled to purchase from the Company up to an additional number of Issuance Securities equal to the product of (i) the aggregate number of Issuance Securities over which no Preemptive Rightholder has exercised its preemptive rights under this Section 4.3 ("<u>Excess Securities</u>") and (ii) a fraction, the numerator of which is the total number of Shares held by such Fully Participating Shareholder and the denominator of which is the total number of Shares held by all of the Fully Participating Shareholders that elect to purchase Excess Securities, in each case (for both the numerator and the denominator) on an as-converted, fully diluted basis as of the date of the Preemptive Offer Notice. The Company shall continue to offer additional pro rata portions to Fully Participating Shareholders choosing to purchase their full pro rata portion of such Excess Securities under this Section 4.3(a) until the earlier of (A) all Issuance Securities have been purchased by the Preemptive Rightholders or (ii) all Preemptive Rightholders have purchased the maximum number of Issuance Securities indicated in their respective Preemptive Acceptance Notice.

(b)   All sales of Issuance Securities to the Preemptive Rightholders subject to any Preemptive Offer Notice shall be consummated contemporaneously at the offices of the Company on a mutually agreed Business Day within 20 Business Days after the expiration of the Preemptive Acceptance Period. The delivery by the Company of an updated register of members and share certificates or other instruments, if any, evidencing such Issuance Securities shall be made on such date against payment of the purchase price for such Issuance Securities.

20

(c) If any Issuance Securities set forth in the Preemptive Offer Notice remain unpurchased or unsubscribed after all of the Preemptive Rightholders have either exercised or waived their respective preemptive rights under this Section 4.3, then the Company may issue all or any portion of such remaining Issuance Securities, at a price not less than the purchase price and on terms and conditions not more favorable to the Proposed Recipient than the purchase price, terms and conditions stated in the Preemptive Offer Notice, at any time within 60 days after the expiration of the Preemptive Acceptance Period (the "Issuance Period"); provided, that in connection with and as a condition to such issuance (solely in the case of any issuance of Shares), each Proposed Recipient that is not then a party to this Agreement shall execute and deliver to the Company a Deed of Adherence substantially in the form attached hereto as Exhibit A; provided, further, that if such issuance is subject to any Regulatory Approval, the Issuance Period shall be extended until the expiration of the fifth Business Day following the receipt of all such Regulatory Approvals, but in no event later than 90 days following the expiration of the Preemptive Acceptance Period. In the event that any of such remaining Issuance Securities is not issued during the Issuance Period, the right of the Company to issue such remaining Issuance Securities shall expire and the obligations of the Company under this Section 4 shall be revived and such remaining Issuance Securities shall not be issued unless first re-offered to the Preemptive Rightholders in accordance with this Section 4.

(d) Any issuance of securities by the Company without compliance by the Company with this Section 4 shall be void and of no force and effect.

4.4 Termination of Rights. The preemptive rights under this Section 4 shall terminate upon the completion of a Qualified IPO, and shall not apply to any issuance pursuant to a Qualified IPO.

**SECTION 5**
**CORPORATE GOVERNANCE**

5.1 General. From and after the date hereof, each Shareholder shall, and Baidu Holdings shall cause Baidu to, vote its Shares at any regular or special meeting of Shareholders (a "Shareholders Meeting"), and shall take all other actions necessary, to give effect to the provisions of this Agreement and to ensure the inclusion in the Articles of the rights and privileges of the Shareholders included in this Agreement. In addition, each Shareholder shall, and Baidu Holdings shall cause Baidu to, vote its Shares at any Shareholders Meeting, upon any matter submitted for action by the Shareholders or with respect to which such Shareholder may vote, in conformity with the provisions of this Agreement.

21

5.2    Board of Directors.

(a)    Number and Composition. The number of Directors constituting the entire Board shall be up to seven (7). Each Shareholder shall, and Baidu Holdings shall cause Baidu to, vote its Shares at any Shareholders Meeting called for the purpose of filling the positions on the Board or in any written consent of Shareholders executed for such purpose to elect, and shall take all other actions necessary to ensure the election to the Board of:

(i)    (A) three (3) nominees appointed by Baidu, for so long as Baidu and its Permitted Transferees beneficially own in the aggregate at least 20% of the total number of Shares on an as-converted, fully diluted basis, (B) two (2) nominees appointed by Baidu, for so long as Baidu and its Permitted Transferees beneficially own in the aggregate at least 10% but less than 20% of the total number of Shares on an as-converted, fully diluted basis, or (C) one (1) nominee appointed by Baidu, for so long as Baidu and its Permitted Transferees beneficially own in the aggregate at least 5% but less than 10% of the total number of Shares on an as-converted, fully diluted basis (each such nominee appointed pursuant to this Section 5.2(a)(i), a "Baidu Director");

(ii)    one (1) member of the Senior Management appointed in accordance with Section 5.5(a) and Section 5.5(b) (the "Senior Management Director");

(iii)    (A) two (2) nominees appointed by TPG, for so long as TPG and its Permitted Transferees beneficially own in the aggregate at least 90% of the number of Shares held by TPG immediately after the Closing (as adjusted for share splits, share subdivision, share combination and the like), or (B) one (1) nominee appointed by TPG, for so long as TPG and its Permitted Transferees beneficially own in the aggregate at least 45% of the number of Shares held by TPG immediately after the Closing (as adjusted for share splits, share subdivision, share combination and the like) (each such nominee appointed pursuant to Section 5.2(a)(iii)(A) or Section 5.2(a)(iii)(B), a "TPG Director"); and

(iv)    one (1) nominee appointed by the Strategic Investor (the "Strategic Investor Director", together with the nominees appointed pursuant to Section 5.2(a)(iii), each an "Investor Director").

(b)    Removal and Replacement of Directors.

(i)    A Director shall be removed from the Board, with or without cause, upon, and only upon, the request of the Shareholder who nominated him, unless such Director resigns voluntarily or the term of his service expires, in which case the Shareholder entitled to appoint a replacement Director shall be entitled to nominate a replacement to be appointed to the Board to fill the vacancy thus created.

22

      (ii)    Each Director may only be appointed to and removed from the Board by the relevant Shareholder in accordance with this Agreement and the Articles.

(c)    <u>Chairman</u>. Subject to Section 5.2(a)(i), the Chairman shall be a Baidu Director selected by Baidu. The Chairman shall not have a casting vote.

5.3    <u>Board Meetings</u>.

(a)    <u>Frequency and Location</u>. Meetings of the Board shall take place at least once every quarter. Meetings shall be held in a location approved by a majority of the Directors.

(b)    <u>Notice</u>. A meeting of the Board may be called by the Chairman or any Director giving notice in writing to the Company Secretary specifying the date, time and agenda for such meeting. The Company Secretary shall upon receipt of such notice give a copy of such notice to all Directors, accompanied by copies of all papers relevant for such meeting. Not less than seven days' notice shall be given to all Directors; provided, that such notice period may be reduced with the written consent of all of the Directors, or waived by any Director who does not receive timely notice with the written consent of that Director or by his presence at the meeting.

(c)    <u>Quorum</u>. All meetings of the Board shall require a quorum of at least four (4) incumbent Directors, including at least one (1) Baidu Director and a TPG Director. If a quorum is not present within one hour from the time appointed for the meeting, the meeting shall adjourn to the same place and time seven days later, at which meeting at least three (3) incumbent Directors present (including at least one (1) Baidu Director) shall constitute a quorum.

(d)    <u>Voting</u>. At any Board meeting, each Director may cast one vote. Any Director may, by prior written notice to the Company Secretary, authorize another Person to attend and vote by proxy for such Director at any Board meeting. Subject to Section 5.3(g), Section 5.5 and Section 5.8, the adoption of any resolution of the Board shall require the affirmative vote of a majority of the Directors present at a duly constituted meeting of the Board. The Board shall not at any meeting adopt any resolution approving or disapproving any matter that is not specified on the agenda for such meeting unless all Directors are present at such meeting and vote in favor of such resolution.

(e)    <u>Remote Participation</u>. Directors may participate in Board meetings by telephone or video conference, and such participation shall constitute presence for purposes of the quorum provisions of Section 5.3(c).

23

(f)   <u>Expenses</u>. The Company shall bear reasonable costs of attendance of Directors at Board meetings.

(g)   <u>Action by Written Resolution</u>. Subject to Section 5.8, any action that may be taken by the Directors at a meeting may instead be taken by a written resolution signed by all of the Directors.

5.4   <u>Board Approval</u>. Subject to Section 5.5 and Section 5.8, all matters in relation to the operation and management of the Group shall be decided by the Board at a quorate Board meeting or by a written resolution signed by all of the Directors.

5.5   <u>Board Reserved Matters</u>.

(a)   Subject to Section 5.5(b), Section 5.8 and any additional requirements imposed by the Act, the Company shall not and shall procure each other Group Company not to, and no Shareholders shall cause any Group Company to, take, permit to occur, approve, authorize, agree or commit to do any of the following actions, whether in a single transaction or a series of related transactions, whether directly or indirectly and whether or not by amendment, merger, consolidation, scheme of arrangement, amalgamation or otherwise, without the affirmative consent of a majority of the Directors in office; <u>provided</u>, that in respect of Section 5.5(a)(i), Section 5.5(a)(ii), Section 5.5(a)(iii), Section 5.5(a)(vi), Section 5.5(a)(vii), Section 5.5(a)(viii), Section 5.5(a)(xi) and Section 5.5(a)(xii), the affirmative consent of at least one Baidu Director shall also be required; <u>provided</u>, <u>further</u>, that in respect of Section 5.5(a)(xii), the affirmative consent of the Strategic Investor Director shall also be required:

   (i)    the approval or amendment of, or any deviation from, any Budget or Business Plan;

   (ii)   the entry into any contract or commitment by any Group Company with any Related Party (other than the Side Agreement to the Business Cooperation Agreement), or the termination or material amendment of or waiver under any such contract or commitment, including the Restructuring Documents, the Framework Business Cooperation Agreement and the Transition Services Agreement;

   (iii)  any purchase or other acquisition by any Group Company of another Person or the business and/or assets of another Person, or the investment by any Group Company in any Person, exceeding the total amount intended for such purchase, acquisition or investment as set out in any Budget or Business Plan approved in accordance with this Section 5.5 and Section 5.8;

24

(iv)    the declaration or payment of any dividend or other distribution;

(v)    any loan or advancement to any Related Party of any Group Company by any Group Company;

(vi)    the incurrence of any indebtedness or assumption of any financial obligation, or any issue, assumption, guarantee or creation of any indebtedness in the nature of borrowings, by any Group Company in excess of US$1,000,000 in a single transaction or US$5,000,000 in the aggregate;

(vii)    any sale, transfer or other disposal of, or the incurrence of any Encumbrance on, any assets of any Group Company valued in excess of US$1,000,000 in a single transaction or US$5,000,000 in the aggregate;

(viii)    subject to 5.10, the appointment, replacement or termination of, or the approval or amendment of any employment terms of, Chief Executive Officer, or any officer, employee or individual who reports directly to Chief Executive Officer (other than his personal assistant) and the business unit heads of the Group Company's Wealth Management Business, third party payment service business and micro-credit business (collectively, the "Senior Management");

(ix)    commence, terminate or settle any litigation or arbitration in which the amount in dispute is or could reasonably be expected to exceed US$1,000,000;

(x)    any change in the equity ownership of the VIE Entity or any termination or modification to or waiver of rights under any of the Control Documents;

(xi)    the establishment of any committee of the Board and the composition thereof; and

(xii)    the appointment or replacement of the Senior Management Director; provided, however, any existing Senior Management Director shall recuse him or herself from any casting any vote on any action by the Board to effect the removal of such Senior Management Director.

(b)    Notwithstanding any provision to the contrary in this Agreement, in addition to the requirements set out in Section 5.5(a), for so long as any TPG Director is appointed to the Board, the affirmative consent of at least one TPG Director shall also be required in respect of any of the following actions:

25

(i)    any material amendment of the Initial Business Plan or the Initial Budget, and any adoption (or amendment) of any other business plan or budget for the Group thereafter to the extent such business plan or budget (or amendment) deviates materially from the Initial Business Plan or the Initial Budget (it being agreed, without limitation, that (x) with respect to any business plan, any entry into a new line of business or termination of an existing line of business shall be deemed material, and (y) with respect to any budget, any deviation over 5% of any line item therein compared to the previously effective budget shall be deemed material);

(ii)    the approval (or amendment) of the compensation and remuneration terms of any member of the Senior Management; and

(iii)    any action described in Section 5.5(a)(ii), Section 5.5(a)(iii), Section 5.5(a)(vi), Section 5.5(a)(vii), Section 5.5(a)(xi) or Section 5.5(a)(xii).

5.6    <u>Board Committees</u>. Subject to Section 5.5, the Board may establish one or more committees, such as a compensation committee and an audit committee.

5.7    <u>Governance in Relation to the Group Companies</u>. The Company shall cause (a) the board of directors of each other Group Company to be the same size as the Board and the directors thereof to be nominated in the same manner as the Directors as set out in Section 5.2(a), and (b) the quorum, voting arrangements and other procedures with respect to the respective boards of directors of the Group Companies, as well as other corporate governance matters, to be the same as those set forth in this Section 5, in each case to the extent permitted by applicable law.

5.8    <u>Protective Provisions</u>. Notwithstanding any other provision of this Agreement, the Articles or any of the constitutional documents of any other Group Company or otherwise but subject to and without prejudice to the provisions in Section 5.2, the Company shall not and shall procure each other Group Company not to, and no Shareholders shall cause any Group Company to, take, permit to occur, approve, authorize, agree or commit to do any of the following actions, whether in a single transaction or a series of related transactions, whether directly or indirectly and whether or not by amendment, merger, consolidation, scheme of arrangement, amalgamation or otherwise, without the prior written consent of (i) Baidu and (ii) the Majority Series A Preferred Shareholders:

(a)    any amendment or change of any rights, preferences, privileges or powers of or affecting, or the restrictions provided for the benefit of, any Ordinary Shares or Series A Preferred Shares;

(b)    the creation, allotment or issue of any Equity Securities in any Group Company or the grant of any option or rights to subscribe for or to convert an instrument into such Equity Securities to any Person, other than any issuance of Ordinary Shares upon the conversion of any Series A Preferred Shares, any issuance of Equity Securities pursuant to Section 5.8 of the Share Purchase Agreement, and any issuance of securities or grant of options pursuant to the Incentive Plans;

26

(c) any purchase, repurchase, redemption or retirement of any Equity Securities in any Group Company, other than any redemption of any Series A Preferred Shares in accordance with the Articles, any repurchase of Equity Securities pursuant to Section 5.8 of the Share Purchase Agreement, and any repurchase of any Ordinary Shares held by a director, employee or consultant of any Group Company upon the termination of his employment with the Group pursuant to a share restriction agreement approved by the Board;

(d) any amendment or modification to or waiver under the Articles or any material amendment or modification to or waiver under any of the constitutional documents of any other Group Company;

(e) the adoption, material amendment or termination of any equity incentive, purchase or participation plan for the benefit of employees, officers, directors, contractors, advisors or consultants of any Group Company (including the ESOP) (such plans as adopted pursuant to this Agreement and the Articles are collectively referred to as the "Incentive Plans");

(f) any purchase or other acquisition by any Group Company of another Person or the business and/or assets of another Person in an amount in excess of US$1,000,000 in a single transaction or US$5,000,000 in the aggregate;

(g) any engagement by any Group Company in any business materially different from that described in the then current Business Plan, or the ceasing of any business undertaking of any Group Company;

(h) any liquidation, dissolution or winding up of any Group Company;

(i) any change in the equity ownership of the VIE Entity or any termination or modification to or waiver of rights under any of the Control Documents;

(j) any material change in the accounting methods or policies, or any appointment of or change in the independent auditors, of any Group Company;

(k) any divestiture or sale of an interest in any Group Company, partnership or joint venture;

(l) the listing of any securities in any Group Company on any securities exchange, other than a Qualified IPO;

27

(m) the incurrence of any indebtedness or assumption of any financial obligation, or any issue, assumption, guarantee or creation of any indebtedness in the nature of borrowings, by any Group Company, in each case in an amount in excess of US$1,000,000 in a single transaction or US$5,000,000 in the aggregate;

(n) any sale, transfer or other disposal of, or the incurrence of any Encumbrance on, any assets of any Group Company, in each case in an amount in excess of US$1,000,000 in a single transaction or US$5,000,000 in the aggregate;

(o) a Trade Sale or any merger, amalgamation, consolidation, division, scheme of arrangement or any other type of corporate restructuring involving any Group Company; and

(p) any changes to the composition of and appointments of the Board, including but not limited to increasing or decreasing the number of Directors.

5.9 <u>Shareholder Vote Required by the Act</u>. Notwithstanding any provision to the contrary in this Agreement, where any of the actions set out in Section 5.8 requires the approval of the Shareholders in accordance with the Act, and the requisite approval has not yet been obtained in accordance with Section 5.8, the Shareholders who vote against such action at a shareholders meeting of the Company shall have such number of votes as is equal to the aggregate number of votes of the Shareholders who voted in favor of such action plus one.

5.10 <u>Removal of Senior Management</u>. Notwithstanding any provision to the contrary in this Agreement, upon occurrence of any of the following events, at the request of Baidu or the Majority Series A Preferred Shareholders, the Company shall remove and dismiss any member of the Senior Management as requested by Baidu or the Majority Series A Preferred Shareholders:

(a) any willful misconduct or gross negligence of such Person that results in any material adverse effect on any Group Company; or

(b) for each of any two consecutive Fiscal Years, (i) the actual net revenue of the Group for that Fiscal Year being lower than 80% of the average of the net revenue of the Group for those two consecutive Fiscal Years as provided for in Initial Budget or Budget, as applicable, or (ii) the actual net profit of the Group for that Fiscal Year being lower than 80% of the average of the net profit of the Group for those two consecutive Fiscal Years as provided for in Initial Budget or Budget, as applicable.

28

5.11 <u>Observer Rights</u>. For so long as Baidu has the right to appoint any Director pursuant to Section 5.2(a)(i), Baidu shall have the right to invite one (1) representative of one (1) Shareholder to attend all meetings of the Board in a nonvoting observer capacity and, in this respect, shall give such representative copies of all notices, minutes, consents, and other materials that the Company provides to the Directors; <u>provided</u>, however, that such representative shall agree to hold in confidence and trust all information so provided; and <u>provided</u> further, that the Company reserves the right to withhold any information and to exclude such representative from any meeting or portion thereof if access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel or result in disclosure of trade secrets or a conflict of interest, or if such Shareholder or its representative is a Company Competitor.

5.12 <u>Enforcement of Certain Documents</u>. The Parties hereby agree that, notwithstanding any provision to the contrary in this Agreement, any Investor Director shall have the full power and authority to cause any Group Company to take necessary actions to exercise any of its rights under and enforce any provisions of any Contract, transaction, payable/receivable or other arrangement between Baidu or any of its Affiliates, on the one hand, and any Group Company, on the other hand, including without limitation, the Restructuring Documents, the Framework Business Cooperation Agreement and the Transition Services Agreement (including making claims under such Contracts) if such Investor Director believes in good faith that such actions would be in the best interests of the Company.

**SECTION 6**
**REGISTRATION RIGHTS**

6.1 <u>Generally</u>. The Holders (as defined in Schedule 2) shall be entitled to the registration rights set out in <u>Schedule 2</u>.

6.2 <u>Non-U.S. Jurisdictions</u>. In the event that the Company (or, as the case may be, the relevant entity resulting from any merger, reorganization or other arrangements made by the Company for the purposes of a public offering) intends to effect a public offering of its securities outside of the United States of America, the Holders (as defined in Schedule 2) shall, to the extent permitted by applicable law, have the same registration rights (or rights as similar to such registration rights).

**SECTION 7**
**COVENANTS**

7.1 <u>Inspection Rights</u>. For so long as any Shareholder and its Permitted Transferees hold in the aggregate at least 3% of the Shares on an as-converted, fully diluted basis, at the prior written request of such Shareholder, the Company shall, and shall cause each of the other Group Companies to, grant such Shareholder and its authorized representatives access, at all reasonable times during normal business hours, to the facilities and books, records, documents and other written information in the possession of the Group Companies as such Shareholder may reasonably request and the right to discuss the business, operations and conditions of the Group Companies with the directors, officers, employees, accountants, legal counsels, investment bankers and other advisors of the Group Companies; <u>provided</u>, that any on-site inspection of any Shareholder or any of its representatives shall not affect the normal operation of the Group Companies.

29

7.2   <u>Information Rights</u>.

(a)   For so long as any Shareholder and its Permitted Transferees hold in the aggregate at least 3% of the Shares on an as-converted, fully diluted basis, the Company shall provide to such Shareholder:

    (i)   audited consolidated financial statements of the Group for the previous Fiscal Year, audited by a "Big Four" accounting firm (or another accounting firm acceptable to Baidu and the Majority Series A Preferred Shareholders), within 90 days after the end of each Fiscal Year;

    (ii)   unaudited consolidated financial statements of the Group for the previous fiscal quarter within 45 days after the end of each fiscal quarter;

    (iii)   a detailed draft Budget for the following Fiscal Year at least 45 days before the end of each Fiscal Year;

    (iv)   a detailed draft Business Plan for the following Fiscal Year at least 45 days before the end of each Fiscal Year;

    (v)   copies of all documents or other information sent to the other Shareholders; and

    (vi)   copies of other documents and information as such Shareholder may reasonably request.

(b)   All financial statements delivered by the Company pursuant to Section 7.2(a)(i) and Section 7.3(a)(ii) shall be prepared in accordance with US GAAP.

(c)   In addition to the other information rights that TPG, the Strategic Investor and their respective Permitted Transferees may have under this Agreement, at the Company's cost and expense and upon written request from TPG, the Strategic Investor, or their respective Permitted Transferees, the Company shall provide TPG, the Strategic Investor and their respective Permitted Transferees with such information, data and analysis as such Shareholder may reasonably require in order to enable such Shareholder to satisfy its internal and external social impact monitoring, analysis and reporting requirements, which shall be provided as soon as practicable. Notwithstanding anything to the contrary contained in this Agreement, TPG, the Strategic Investor and their respective Permitted Transferees shall maintain the information rights set forth in this Section 7.2(c) for so long as such Shareholder holds any Shares.

30

7.3 <u>Books and Records</u>. The Company shall, and shall cause each of the other Group Companies to, keep proper, complete and accurate books of account in its functional currency and the currency of the jurisdiction in which such Group Company is organized, in each case in accordance with (a) US GAAP or PRC GAAP and (b) applicable laws. The Company shall have its accounts and those of each other Group Company audited annually in accordance with such standards by a "Big Four" accounting firm or another accounting firm acceptable to Baidu and the Majority Series A Preferred Shareholders.

7.4 <u>Budgets and Business Plans</u>. Subject to Section 5.5 and except for the Initial Budget and the Initial Business Plan, the Board shall adopt each Budget and Business Plan within 45 days after the commencement of the relevant Fiscal Year. If in any Fiscal Year a draft Budget or Business Plan is not approved in accordance with Section 5.5, the previous Fiscal Year's Budget or Business Plan (as the case may be), adjusted for inflation, shall continue to apply unless and until a new Budget or Business Plan (as the case may be) is approved in accordance with Section 5.5.

7.5 <u>Compliance with Laws</u>.

(a) The Company shall ensure that each of the Group Companies (i) conducts its business in compliance in all material respects with all applicable laws and (ii) obtains, makes and maintains in effect all Authorizations required and material for the due and proper establishment and operations of such Group Company in accordance with applicable laws.

(b) <u>Compliance with Anti-bribery and Anti-corruption Laws</u>. The Company shall not, and shall not permit any Group Company, the Affiliates of any Group Company or any of their respective directors, officers, managers, employees, independent contractors, representatives, agents and other Persons acting on their behalf (collectively, "<u>Representatives</u>"), to promise, authorize or make any payment to, or otherwise contribute any item of value to, directly or indirectly, to any third party, including any non-U.S. official, in each case, in violation of all applicable laws relating to anti-bribery, anti-corruption, record keeping and internal control laws (collectively, the "<u>ABAC Laws</u>"). The Company shall, and shall cause each of the Group Companies and the Affiliates of each Group Company to, cease all of its or their respective activities, as well as remediate any actions taken by any Group Company or its Affiliates, or any of their respective Representatives in violation of ABAC Laws. The Company shall, and shall cause each of the Group Companies and the Affiliates of each Group Company to, maintain systems of internal controls (including, but not limited to, accounting systems, purchasing systems and billing systems) to ensure compliance with ABAC Laws.

31

(c)    <u>Compliance with Anti-money Laundering and Sanctions Laws</u>. The Company shall, and shall cause the Group Companies, the Affiliates of each Group Company and their respective Representatives to comply with all applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, to the extent applicable, the applicable anti-money laundering statutes of all jurisdictions where the Group Companies conduct business, the rule and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Authority (collectively, the "<u>Anti-Money Laundering Laws</u>") and sanctions administered by the Office of Foreign Assets Control of the U.S. Department of Treasury ("<u>OFAC</u>"), or by the U.S. Department of State, or any sanctions imposed by the European Union (including under Council Regulation (EC) No. 194/2008), the United Nations Security Council, Her Majesty's Treasury or any other relevant Governmental Authority or has engaged in any activities that would be in violation of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, as amended, or the Iran Sanctions Act, as amended, or sanctions and measures imposed by the United Nations or any other relevant Governmental Authority (collectively, the "<u>Sanctions Laws</u>"). The Group Companies shall continue to maintain and enforce policies and procedures designed to ensure compliance with the Anti-Money Laundering Laws. None of the Group Companies, the Affiliates of each Group Company or any of their respective Representatives will engage, directly or indirectly, in (1) any business or activities with any person that is the target of any applicable Sanctions Laws, or (2) any activities that would reasonably be expected to result in any of the Group Companies becoming the target of any applicable Sanctions Laws.

32

7.6    <u>Arrangements on the Subsidiary Level</u>. The Company shall, and shall cause each of its Affiliates to, take or cause to be taken all actions, to do or cause to be done all things necessary or appropriate to comply with and give effect to each of the agreements made in connection with the transactions contemplated by the Transaction Documents to which the Company or any of its Affiliates is a party. Without limiting the generality of the foregoing, the Company shall cause its Affiliates to, and Baidu Holdings shall cause its Affiliates to, perform their respective covenants and agreements set forth herein, which, unless otherwise agreed by Baidu Netcom (as defined below) and An Yi Heng Tong (as defined below), shall also be reflected in the Shareholders Agreement by Beijing BaiduPay Science and Technology Co., Ltd., a Subsidiary of the Company incorporated in the PRC ("<u>BaiduPay</u>"), and its shareholders (the "<u>BaiduPay Shareholders Agreement</u>", Chinese name "北京百付宝科技有限公司股东协议") to be entered into on or after the date hereof, such that (a) BaiduPay continues to be directly held 60% by An Yi Heng Tong (Beijing) Technology Co., Ltd. ("<u>An Yi Heng Tong</u>") and 40% by Beijing Baidu Netcom Science Technology Co., Ltd., one of Baidu Holdings' Subsidiaries in the PRC ("<u>Baidu Netcom</u>") and/or other Affiliates of Baidu Holdings (which 40% voting and economic interest must not be diluted without the prior written consent of Baidu Holdings), (b) any future incurrence of indebtedness or issuance of Equity Securities of any form shall be prohibited without the prior written consent of Baidu Holdings (which consent may be given or withheld in the sole discretion of Baidu Holdings), and in the event that Baidu Holdings gives the prior written consent, Baidu Netcom (and/or another Affiliate of Baidu Holdings as Baidu Holdings may designate) shall have a right to purchase such percentage of the indebtedness or Equity Securities held by An Yi Heng Tong at zero or nominal consideration so that Baidu Netcom (or another Affiliate of Baidu Holdings) maintains the 40% voting and economic interest in BaiduPay, (c) in the event that the Company or any of its Affiliates materially breaches Sections 5.2.1 to 5.2.3 of the Framework Business Cooperation Agreement regarding provision of third-party payment services to Baidu Holdings and/or any of its Affiliates, and such material breach is not cured in accordance with Section 5.2.5 of the Framework Business Cooperation Agreement, (A) Baidu Holdings shall have the right to acquire another entity holding a third-party payment business permit from any third party notwithstanding anything to the contrary set forth in the Framework Business Cooperation Agreement or another Transaction Document, and (B) Baidu Netcom (and/or another Affiliate of Baidu Holdings as Baidu Holdings may designate) shall have an option, which can be exercised by serving a written notice to An Yi Heng Tong to sell the then entire equity interests in BaiduPay held by Baidu Netcom to An Yi Heng Tong or another Group Company designated by the Company, at net asset value, upon which Baidu shall have no equity interest in BaiduPay (the "<u>Put Option</u>"), and (d) any license, lease, transfer, encumbrance or disposal of any Intellectual Property or assets of BaiduPay shall require the prior written consent of Baidu Holdings. Upon completion of the acquisition of the third-party payment business permit holding entity referred to in clause (c)(A) above by Baidu Holdings, An Yi Heng Tong shall have an option, which can be exercised by serving a written notice to Baidu Netcom, to purchase the then entire equity interests in BaiduPay held by Baidu Netcom at net asset value, upon which Baidu Holdings shall have no equity interest in BaiduPay (the "<u>Call Option</u>", together with the Put Option, "<u>Options</u>"). Upon the completion of the exercise of either Option, the Company shall transfer and shall cause all its relevant Affiliates to transfer to Baidu Netcom (and/or another Affiliate of Baidu Holdings as Baidu Holdings may designate) all third-party payment service related Intellectual Properties at no additional consideration ("<u>Payment IP Transfer</u>"). The Shareholders shall, and shall cause each of its Affiliates including the Company, to, take or cause to be taken all actions, to do or cause to be done all things necessary or appropriate to enter into the BaiduPay Shareholders Agreement and give full force and effect to the Options and Payment IP Transfer set forth herein.

33

7.7    Control Documents. Each of the Parties shall, and shall ensure that each of its Affiliates and any shareholder of the VIE Entity designated by it, performs its obligations under the Control Documents to the fullest extent, carries out the terms and the intent of the Control Documents and ensures that each Control Document is valid and binding, in full force and effect and enforceable in accordance with its terms. Any termination or modification to or waiver of rights under any of the Control Documents shall require the requisite prior written consent or approval in accordance with Section 5.8 and the Articles. If any of the Control Documents becomes illegal, void or unenforceable under any applicable laws after the date hereof, the Group Companies shall use their best efforts to devise a feasible alternative legal structure reasonably satisfactory to Baidu and the Majority Series A Preferred Shareholders that gives effect to the intentions of the parties in each Control Document and the economic arrangement thereunder as closely as possible and maintains the economic interests of the Shareholders and consolidates the financial results of the Group Companies into the Company's financial statements.

7.8    Baidu's Undertaking. Each of Baidu and Baidu Holdings hereby, jointly and severally, agrees that, prior to the Qualified IPO, it shall take necessary actions to ensure that the Group Companies will maintain all Financial Licenses which are required for the business operations of the Group Companies; provided, that if there is any update or renewal of any Financial License in connection with the business operations currently covered by such Financial License as a result of any applicable laws or regulations, covenant by Baidu and Baidu Holdings in this Section 7.8 shall also cover such Financial License (as updated or renewed) which would be required for the business operations covered by the relevant Financial License as currently conducted by the Group Companies; provided, further, if any action of any Group Company is the cause of any loss of any Financial License, and Baidu and Baidu Holdings have used commercially reasonable efforts, including but not limited to Baidu exercising its rights under this Agreement to vote against such action, then Baidu and Baidu Holdings shall not be liable for any such loss.

7.9    Protection of Intellectual Property and Information Technology. The Company shall, and shall cause each of the Group Companies to, take all reasonable steps to protect and maintain its material Intellectual Property and Information Technology, including (a) registering its material trademarks, brand names, domain names and copyrights, (b) taking precautions to preserve the availability, security and integrity of its Information Technology and the data and information stored thereon and (c) requiring each of its executive directors and Key Employees to enter into an employment agreement with it which includes provisions in respect of confidentiality, non-competition and work product ownership right assignment in form and substance reasonably satisfactory to Baidu and the Majority Series A Preferred Shareholders. The Company shall not, and shall ensure that none of the Group Companies, make any material changes to such employment agreements without the prior written consent of Baidu and the Majority Series A Preferred Shareholders.

7.10   Control of Subsidiaries. The Company shall institute and keep in place such arrangements as are reasonably satisfactory to Baidu and the Majority Series A Preferred Shareholders such that the Company shall at all times (a) Control the operations of each other Group Company and (b) be permitted to properly consolidate the financial results for each other Group Company (including the VIE Entities) in the consolidated financial statements of the Group prepared under US GAAP.

34

7.11    <u>Qualified IPO</u>. The Company shall use its reasonable best efforts to consummate a Qualified IPO within sixty (60) months after the date hereof.

7.12    [Reserved].

7.13    <u>Other Management Incentives</u>. The Parties understand and agree that in addition to and outside the scope of the ESOP, the senior management of the Group shall be entitled to receive bonus shares from each Investor Shareholder which held Series A Shares as of the Closing (the "<u>Initial Investor Shareholders</u>"), to be calculated based on the net cash proceeds received by such Initial Investor Shareholder from the sale of all of the Series A Shares held by it as of the Closing pursuant to the formula set forth in Exhibit B, such bonus shares to be allocated among any senior management of the Group as determined by a majority (by value) of the Initial Investor Shareholders, with no less than 40% allocated to the Chief Executive Officer of the Group; <u>provided</u> that such bonus shares shall not result in any dilution of Baidu's then ownership interest in the Company; <u>provided</u> <u>further</u> that such bonus share arrangement, allocation and the calculation formula may be amended with the consent of two-thirds (by value) of the Initial Investor Shareholders. Each member of senior management that receives bonus shares shall be responsible for compliance with all applicable laws, including without limitation, promptly filing and paying , any taxes under applicable law.

7.14    <u>Controlled Foreign Corporation</u>. The Company will provide written notice to an Investor as soon as practicable if at any time the Company becomes aware that it or any Group Company has become a "controlled foreign corporation" ("<u>CFC</u>") within the meaning of Section 957 of the United States Internal Revenue Code of 1986, as amended (the "<u>Code</u>"). In addition, upon an Investor's request, and to the extent permitted under applicable law, the Company will provide to an Investor such information as is in its possession (or that the Company can reasonably obtain) concerning the identity of its shareholders and their owners in order to assist such Investor in determining whether the Company is a CFC. If the Investor determines that the Company or any Group Company is a CFC and that the Investor is a "United States shareholder" with respect to the Company or any Group Company within the meaning of Section 951(b) of the Code, the Company shall (and shall procure that each Group Company shall) provide the Investor with full cooperation and any information reasonably required by the Investor to comply with U.S. tax law, including information necessary to calculate earnings and profits under U.S. federal income tax principles and the Investor's pro rata share of the Company's "Subpart F income" (as defined in Section 952 of the Code). The company shall make this information available for any relevant year by March 15 of the following year.

35

7.15 <u>Passive Foreign Investment Company</u>. The Company shall (and the Company shall procure that each Group Company shall) use its best efforts to avoid being a "passive foreign investment company" within the meaning of Section 1297 of the Code ("<u>PFIC</u>") for any taxable year. Upon an Investor's request, and to the extent permitted under applicable law, the Company will provide to an Investor such information as is in its possession (or that the Company can reasonably obtain) to assist such Investor in determining whether the Company or any Group Company is a PFIC. If the Investor determines that the Company or any Group Company is or may be a PFIC, the Company shall (and the Company shall procure that each Group Company shall) provide such Investor with annual information in the form satisfactory to such Investor as soon as reasonably practicable following the end of each taxable year of such Investor (but in no event later than forty-five (45) days following the end of each such taxable year) as may be necessary to enable the Investor to file a "Qualified Electing Fund" election pursuant to Section 1295 of the Code.

7.16 <u>Non-Competition; Non-Solicitation</u>.

(a) Each of Baidu and Baidu Holdings hereby, jointly and severally, undertakes to the Company and the Investor Shareholders that it shall, and shall cause Baidu, Inc. and its applicable Affiliates to, comply with the covenants set forth in Section 15 (*Non-Competition*) of the Framework Business Cooperation Agreement as if such covenants are hereby incorporated by reference into this Agreement, *mutatis mutandis*.

(b) Until the sixth (6th) anniversary of the Closing, for so long as the number of Shares collectively beneficially owned by Baidu and its Affiliates exceeds the number of Shares collectively beneficially owned by any other Shareholder and such Shareholder's Affiliates (in each case, on an as-converted, fully diluted basis), each of Baidu and Baidu Holdings hereby, jointly and severally, undertakes that it shall not, and shall cause its Affiliates and its and such Affiliates' officers, employees, agents and representatives not to, directly or indirectly contact, approach or solicit for the purpose of offering employment to or hiring or retaining, or hire or retain, any Person as set out in <u>Schedule 5</u>.

(c) It is the intent of the Parties that the provisions of this Section 7.16 shall be enforced to the fullest extent permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. If any particular provision or portion of this Section 7.16 shall be adjudicated to be invalid or unenforceable, such provision or portion thereof shall be deemed amended to the minimum extent necessary to render such provision or portion valid and enforceable, such amendment to apply only with respect to the operation of such provision or portion in the particular jurisdiction in which such adjudication is made.

36

(d)    The Parties acknowledge that damages and remedies at law for any breach of this Section 7.16 would be inadequate and, any Investor Shareholder shall be entitled to specific performance and other equitable remedies (including an injunction) and such other relief as a court or tribunal may deem appropriate in addition to any other remedies such Investor Shareholder may have in the event of a breach of this Agreement.

**SECTION 8**
**CONFIDENTIALITY**

8.1    <u>General Obligation</u>. Subject to Section 8.2 and Section 8.3, each Party shall keep confidential and shall not disclose to any Person the existence and provisions of any Transaction Document, the negotiations relating to any Transaction Document and any non-public material or information with respect to the business, technology, financial conditions or other aspects of the other Parties or their respective Affiliates (collectively, "<u>Confidential Information</u>").

8.2    <u>Exclusions</u>. Confidential Information shall not include any information that is (a) previously known on a non-confidential basis by the receiving Party, (b) in the public domain through no fault of such receiving Party, its Affiliates or its or its Affiliates' officers, directors or employees, (c) received from a Person other than any of the other Parties or their respective representatives or agents, so long as such other Person was not, to the best knowledge of the receiving Party, subject to a duty of confidentiality to such other Party or (d) developed independently by the receiving Party without reference to confidential information of the disclosing Party.

8.3    <u>Exemptions</u>. Notwithstanding Section 8.1:

(a)    any Party may disclose Confidential Information to the extent that such disclosure is required under applicable laws or any judicial or regulatory process or is requested by any Governmental Authority or other regulatory body, including the rules and requirements of the SEC and any securities exchange; <u>provided</u>, that such Party shall, to the extent permitted by law and so far as it is practicable, provide the other Parties with prompt notice of such requirement or request and cooperate with the other Parties at such other Parties' request and cost to enable such other Parties to seek an appropriate protection order or remedy;

(b)    any Party may disclose Confidential Information to its Affiliates and its and its Affiliates' respective officers, directors, employees, agents, professional advisors and representatives on a need-to-know basis; <u>provided</u>, that such Party shall use commercially reasonable efforts to ensure that each such Person to which it discloses Confidential Information strictly abides by the confidentiality obligations hereunder and shall be responsible for any breach of confidentiality obligations by such Person;

37

(c)    any Party may disclose Confidential Information to any *bona fide* prospective purchaser or investors of any Equity Securities of the Company; and

(d)    any Investor may disclose Confidential Information for fund or inter-fund reporting purposes.

## SECTION 9
## TERM AND TERMINATION

9.1    Effective Date; Termination. This Agreement shall become effective upon the execution hereof by all of the Parties and shall continue in effect until the earliest to occur of (a) the mutual agreement in writing by all the Parties to terminate this Agreement; (b) the completion of a Qualified IPO; provided, that Section 6 shall survive a Qualified IPO; and (c) only with respect to a Shareholder, upon such Shareholder ceasing to own any Shares.

9.2    Effects of Termination. If this Agreement is terminated pursuant to Section 9.1(b), this Agreement shall become null and void and of no further force and effect, except that the Parties shall continue to be bound by the provisions of this Section 9, Section 1, Section 3.3, Section 6, Section 8, Section 10, Section 11 (other than Section 11.1), Section 12 and, in the case of Baidu Holdings, Baidu and its Permitted Transferees, Section 7.16. If this Agreement is terminated pursuant to Section 9.1(c), this Agreement shall become of no further force and effect upon the relevant Shareholder, except that such Shareholder shall continue to be bound by the provisions of this Section 9, Section 1, Section 8, Section 10, Section 11, Section 12 and, in the case of Baidu Holdings, Baidu and its Permitted Transferees, Section 7.16. Nothing in this Section 9.2 shall be deemed to release any Party from any liability for any breach of this Agreement prior to the effective date of such termination.

## SECTION 10
## NOTICES

10.1    Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) in writing and served by personal delivery upon the Party for whom it is intended, (b) if delivered by facsimile or electronic mail with receipt confirmed or (c) if delivered by certified mail, registered mail or courier service, return receipt received, to the Party at the address set forth below:

If to the Company, at:

|  |  |
|---|---|
| Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| Attn: | Wen WU |
| Email: | wuwen01@baidu.com |

38

If to Baidu or Baidu Holdings, at:

| | | |
|---|---|---|
| | Address: | Baidu Campus, No. 10, Shangdi 10th Street, Haidian District, Beijing 100085, People's Republic of China |
| | Attn: | Shanshan Bi |
| | Email: | bishanshan@baidu.com |

With a copy (which shall not constitute notice) to:

| | | |
|---|---|---|
| | Address: | Skadden, Arps, Slate, Meagher & Flom LLP 42/F Edinburgh Tower, The Landmark, 15 Queen's Road Central, Hong Kong |
| | Attn: | Z. Julie Gao |
| | Facsimile: | +852 3910 4863 |
| | Email: | julie.gao@skadden.com |

If to TPG, at:

| | | |
|---|---|---|
| | Address: | Suite 3300 Fort Worth, TX 76102 United States |
| | Attn: | Legal and Compliance Department |
| | Facsimile: | +1 (817) 871-4001 |

With a copy (which shall not constitute notice) to:

| | | |
|---|---|---|
| | Address: | Davis Polk & Wardwell 18th Floor, The Hong Kong Club Building 3A Chater Road Central, Hong Kong |
| | Attn: | Miranda So |
| | Facsimile: | +852 2533 1773 |
| | Email: | miranda.so@davispolk.com |

10.2   Any Party may change its address for purposes of Section 10.1 by giving the other Parties written notice of the new address in the manner set forth above.

**SECTION 11
MISCELLANEOUS**

11.1   <u>Legend</u>. Each share certificate in respect of any Shares now held or hereafter acquired by any Shareholder shall, for as long as this Agreement is effective, bear a legend as follows:

39

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "ACT") OR UNDER THE SECURITIES LAWS OF ANY STATE. THIS SECURITY MAY NOT BE TRANSFERRED, SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR (B) AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN THE APPLICABLE SHAREHOLDERS AGREEMENT, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY AND WILL BE FURNISHED UPON REQUEST TO THE HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

11.2    Supremacy. If there is any discrepancy between any provision of this Agreement and any provision of the Articles or the constitutional documents of any other Group Company, the provisions of this Agreement shall prevail, and the Parties shall cause the Articles or the constitutional documents of the relevant Group Company (as the case may be) to be promptly amended, to the extent permitted by applicable law, in order to conform to this Agreement.

11.3    Assignment.

(a)    This Agreement shall inure to the benefit of, and be binding upon, the successors and Persons to whom a Shareholder transfers Equity Securities in the Company in a Transfer permitted under this Agreement; provided, that in each case such Person signs a Deed of Adherence substantially in the form attached hereto as Exhibit A.

(b)    The Parties agree that, TPG shall be entitled to transfer or assign (i) its right to appoint one Director under Section 5.2(a)(iii) to any transferee in any Transfer permitted under this Agreement as long as such transferee and/or its Affiliates acquires from TPG or its Permitted Transferees in the aggregate at least 45% of the number of Shares held by TPG immediately after the Closing (as adjusted for share splits, share subdivision, share combination and the like), and (ii) its right to appoint two Directors under Section 5.2(a)(iii) to any transferee in any Transfer permitted under this Agreement as long as such transferee and/or its Affiliates acquires from TPG or its Permitted Transferees in the aggregate at least 90% of the number of Shares held by TPG immediately after the Closing (as adjusted for share splits, share subdivision, share combination and the like). Prior to any transfer or assignment by TPG of the right to appoint any Director pursuant to the immediately preceding sentence, TPG shall notify Baidu of such proposed transfer or assignment in writing specifying the identity of the proposed transferee, and Baidu shall deliver to TPG its consent thereto (which consent shall not be unreasonably withheld or conditioned) within five Business Days after receipt of such notice. For the avoidance of doubt, if Baidu does not deliver any written consent within such five-Business-Day period, it shall be deemed to have provided its written consent with respect to such transfer or assignment by TPG of the right to appoint a Director to such transferee. The Parties further agree that in the event TPG transfers or assigns its right to appoint one or both Directors under Section 2.5(a)(iii), (A) TPG shall be entitled to designate which Director pursuant to Section 2.5(a)(iii) shall be deemed the "TPG Director" for purposes of Sections 5.3(c), 5.5(b) and 7.13 (and thereafter, references therein to the "TPG Director" shall refer to such Director so designated) and (B) the references to "TPG" in Section 5.2(a)(iii) shall be deemed to refer to the applicable transferee in such Transfer, and/or TPG if sub-clause (A) above applies, as applicable.

40

(c)    The Parties agree that Baidu shall not be entitled to transfer or assign its right to appoint any Directors under Section 5.2(a)(i) to any transferee, other than its Permitted Transferee in a Transfer permitted under this Agreement.

11.4    <u>No Agency</u>. No Shareholder, acting solely in its capacity as a Shareholder, shall act as an agent of the Company or have any authority to act for or to bind the Company, except as authorized by the Board. For the purposes of this Section 11.4, unless acting expressly and solely in its capacity as a Shareholder, any Shareholder who is a director, officer or employee of any Group Company acting in the ordinary course of business of any Group Company shall be conclusively deemed to act for and on behalf of, and shall not be regarded as acting as an agent of, such Group Company. Any Shareholder that takes any action or binds the Company in violation of this Section 11.4 shall be solely responsible for, and shall indemnify the Company and each other Shareholder against, any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever (including any investigative, legal and other expenses reasonably incurred in connection with, and any amounts paid in settlement of, any pending or threatened legal action or proceeding) that the Company or such other Shareholders (as the case may be) may at any time become subject to or liable for by reason of such violation.

11.5    <u>No Partnership</u>. The Shareholders expressly do not intend hereby to form a partnership, either general or limited, under any jurisdiction's partnership law. The Shareholders do not intend to be partners to one another, or partners as to any third party, or create any fiduciary relationship among themselves, by virtue of their status as Shareholders. To the extent that any Shareholder, by word or action, represents to another Person that any Shareholder is a partner or that the Company is a partnership, the Shareholder making such representation shall be liable to each of the other Shareholders that incur any losses, claims, damages, liabilities, judgments, fines, obligations, expenses and liabilities of any kind or nature whatsoever (including any investigative, legal or other expenses reasonably incurred in connection with, and any amount paid in settlement of, any pending or threatened legal action or proceeding) arising out of or relating to such representation.

41

11.6     Amendment. This Agreement may only be amended, modified or supplemented with a written instrument executed by Baidu and the Majority Series A Preferred Shareholders; *provided*, any amendment, waiver or modification of any provision of this Agreement that would adversely affect (i) any right, power or privilege which has been granted specifically to any Shareholder or (ii) any Shareholders in a manner that is disparate from the manner in which it affects other Shareholders in the same class, in the case of clause (i) or (ii) above, may be effected only with the consent of the Shareholders so affected.

11.7     Waiver. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Party waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of the same preclude any further exercise thereof or the exercise of any other right, power or remedy.

11.8     Entire Agreement. This Agreement (together with the schedules and exhibits hereto) and the other Transaction Documents constitute the entire understanding and agreement among the Parties with respect to the matters covered hereby and thereby, and all prior agreements and understandings, oral or in writing, if any, among the Parties with respect to the matters covered hereby and thereby are superseded by this Agreement and the other Transaction Documents.

11.9     Severability. If any provision of this Agreement is inoperative or unenforceable for any reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to any extent whatsoever. If any provision of this Agreement shall be adjudged to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be deemed modified to the minimum degree necessary to make such provision valid and enforceable under applicable law, and that such modified provision shall thereafter be enforced to the fullest extent possible.

11.10    Third Party Rights. Except as provided in Schedule 2, a Person that is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Ordinance (Chapter 623 of the Laws of Hong Kong) to enforce any term of, or enjoy any benefit under, this Agreement.

11.11    Consent to Specific Performance. The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof, and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

42

11.12   Counterparts. This Agreement may be executed in one or more counterparts, including counterparts transmitted by facsimile or e-mail, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument. Delivery of executed signature pages by facsimile or electronic transmission (via scanned PDF) by all Parties will constitute effective and binding execution and delivery of this Agreement.

11.13   Aggregation of Shares. All Shares held or acquired by the Permitted Transferees of a Shareholder shall be aggregated together for the purpose of determining the availability of any rights for such Shareholder under this Agreement.

11.14   Joint and Several Liability. Without limiting any of the obligations of Baidu Holdings, Baidu and its Permitted Transferees under this Agreement, Baidu Holdings agrees and acknowledges that it shall be jointly and severally responsible for the obligations of Baidu and its Permitted Transferees under this Agreement. Notwithstanding any provision to the contrary in this Agreement, Baidu shall remain responsible for the obligations of Baidu and its Permitted Transferees under this Agreement as long as any of Baidu and its Permitted Transferees is still bound by any provision of this Agreement.

## SECTION 12
## GOVERNING LAW AND DISPUTE RESOLUTION

12.1   Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of Hong Kong.

12.2   Arbitration. Any dispute arising out of or relating to this Agreement ("Dispute"), including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration at the Hong Kong International Arbitration Centre (the "HKIAC") in accordance with the Hong Kong International Arbitration Centre Administered Arbitration Rules in force when the relevant arbitration notice is received by the HKIAC. There shall be three arbitrators. The claimants to the Dispute shall collectively shall have the right to appoint one arbitrator, the respondents to the Dispute shall have the right to appoint one arbitrator, and the third arbitrator shall be appointed by the HKIAC. The language to be used in the arbitration proceedings shall be English. Each of the Parties irrevocably waives any immunity to jurisdiction to which it may be entitled or become entitled (including immunity to pre-award attachment, post-award attachment or otherwise) in any arbitration proceedings and/or enforcement proceedings against it arising out of or based on this Agreement. The award of the arbitration tribunal shall be final and binding upon the Parties, and the prevailing Party may apply to a court of competent jurisdiction for enforcement of such award. Any Party shall be entitled to seek preliminary injunctive relief from any court of competent jurisdiction pending the constitution of the arbitral tribunal.

[Remainder of this page intentionally left blank]

43

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**DUXIAOMAN (CAYMAN) LIMITED**
by its duly authorised attorney
in the presence of :



/s/ Hu Yeru
_____
Signature of Witness

/s/ ZHU GUANG
_____
Signature of authorised attorney

Name of Witness: Hu Yeru
Address:

Name: Zhu Guang
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**BAIDU HOLDINGS LIMITED**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Yuling Ma
Signature of Witness

/s/ Robin Yanhong Li
Signature of authorised attorney

Name of Witness:    Yuling Ma
Address:            Baidu Campus, No 10
                    Shangdi 10th Street
                    Haidian
                    Beijing, 100085 China

Name: Robin Yanhong Li
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**BAIDU (HONG KONG) LIMITED**
by its duly authorised attorney
in the presence of :



| | |
|---|---|
| /s/ Yuling Ma | /s/ Herman Yu |
| Signature of Witness | Signature of authorised attorney |

Name of Witness:   Yuling Ma

Address:              Baidu Campus, No 10
                          Shangdi 10th Street
                          Haidian
                          Beijing, 100085 China

Name: Herman Yu
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**TPG ASIA VII SF PTE. LTD.**
by its duly authorised attorney
in the presence of :



/s/ Yvonne Tong
_____
Signature of Witness

/s/ Lee Wei Sheng
_____
Signature of authorised attorney

Name of Witness: Yvonne Tong
Address: 80 Raffles Place #15-01
UOB Plaza 1, Singapore 048624

Name: Lee Wei Sheng
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**TPG GROWTH IV SF PTE. LTD.**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Jess Tan

Signature of Witness

/s/ Francis Woo

Signature of authorised attorney

Name of Witness: Jess Tan
Address: 80 Raffles Place #15-01
         UOB Plaza 1
         Singapore 048624

Name: Francis Woo
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**THE RISE FUND SF PTE. LTD.**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Yvonne Tong
_____
Signature of Witness

/s/ Lee Wei Sheng
_____
Signature of authorised attorney

Name of Witness: Yvonne Tong
Address: 80 Raffles Place #15-01
          UOB Plaza 1
          Singapore 048624

Name: Lee Wei Sheng
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**BEACON GROUP LIMITED**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Monique Sands _____          /s/ Karen McMonagle _____
Signature of Witness                             Signature of authorised attorney

Name of Witness: Monique Sands                   Name: Karen McMonagle
Address: 1001 Pennsylvania Ave NW                Title: Director
Suite 220 South
Washington, DC 20004

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**TAIKANG KAITAI SPECIAL OPPORTUNITY FUND II SEGREGATED PORTFOLIO**
by its duly authorised attorney
in the presence of :

( L.S. )

/s/ Yeung Ying Kit                                      /s/ Le Zhang
Signature of Witness                                Signature of authorised attorney

Name of Witness: Yeung Ying Kit            Name: Le Zhang
Address: Unit 4911, 49/F, The Center,     Title: Director
No. 99 Queen's Road, Central. HK

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**CB FINANCE INVESTMENT LIMITED**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Fu Wai CHUK                                            /s/ Ching Nar Cindy CHAN
Signature of Witness                                        Signature of authorised attorney

Name of Witness: Fu Wai CHUK                     Name: Ching Nar Cindy CHAN
Address: Suites 3201-06, One Pacific              Title: Director
Place, 88 Queensway, Hong Kong

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

IN WITNESS WHEREOF, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**ABCI INNOVATIVE INVESTMENT**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Kevin Lee                                                    /s/ Lu Li
Signature of Witness                                  Signature of authorised attorney

Name of Witness: Kevin Lee                  Name: Lu Li
Address: 10/F, Agricultural Bank of China Tower,   Title: Authorized
50 connaught Road Central,                     Signatory
Hong Kong


[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

**IN WITNESS WHEREOF**, the undersigned has executed and delivered this Agreement as a deed on the date first above written.

**EXECUTED** and **DELIVERED**
as a deed by and in the name of
**WELLRICH INVESTMENT FUND LIMITED PARTNERSHIP**
by its duly authorised attorney
in the presence of :

L.S.

/s/ Xing Xiaoting
Signature of Witness

Name of Witness: Xing Xiaoting
Address: 301-1 No. 35 Jinshifang Street, Xicheng District, Beijing, P.R.China

/s/ Zheng Jun
Signature of authorised attorney

Name: Zheng Jun
Title: Director

[SIGNATURE PAGE TO SHAREHOLDERS AGREEMENT]

**SCHEDULE 1**

**SHAREHOLDING STRUCTURE OF THE COMPANY**

Company's authorized capital: US$50,000 divided into 378,354,697 Ordinary Shares of par value US$0.0001 each and 121,645,303 Series A Preferred Shares of par value US$0.0001 each.

Share ownership as of the date hereof:

| Name of Shareholder | Number and type of Shares held | Shareholding percentage on an as-converted, fully diluted basis |
|---|---|---|
| Baidu (Hong Kong) Limited | 96,775,901 Ordinary Shares | 40.8193% |
| TPG Asia VII SF Pte. Ltd. | 48,847,206 Series A Preferred Shares | 20.6034% |
| TPG Growth IV SF Pte. Ltd. | 9,454,298 Series A Preferred Shares | 3.9877% |
| The Rise Fund SF Pte. Ltd. | 4,727,149 Series A Preferred Shares | 1.9939% |
| Beacon Group Limited | 31,514,326 Series A Preferred Shares | 13.2925% |
| Taikang Kaitai Special Opportunity Fund II Segregated Portfolio | 5,546,521 Series A Preferred Shares | 2.3395% |
| CB Finance Investment Limited | 6,302,867 Series A Preferred Shares | 2.6585% |
| ABCI Innovative Investment | 1,260,573 Series A Preferred Shares | 0.5317% |
| Wellrich Investment Fund Limited Partnership | 5,042,292 Series A Preferred Shares | 2.1268% |
| Shares reserved for the ESOP | 27,612,632 Ordinary Shares | 11.6468% |

**SCHEDULE 2**

**REGISTRATION RIGHTS**

1.  <u>General</u>. The Holders (as defined below) shall be entitled to the following rights with respect to any potential public offering of the Shares in the United States of America and shall be entitled to reasonably analogous or equivalent rights with respect to any other offering of securities in any other jurisdiction pursuant to which the Company undertakes to publicly offer or list such securities for trading on a Recognized Exchange. The rights provided hereunder shall terminate with respect to any Holder at the earlier of (a) five years after the completion of a Qualified IPO and (b) after the completion of a Qualified IPO, if and when all Registrable Securities held by such Holder may then be sold without registration in any 90-day period pursuant to Rule 144 promulgated under the Securities Act.

2.  <u>Definitions</u>. In this Schedule 2, the following capitalized terms shall have the following meanings:

    "<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

    "<u>Form F-3</u>" means the Form F-3 under the Securities Act as is in effect on the date hereof or any successor registration form under the Securities Act subsequently adopted by the SEC that permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

    "<u>Holder</u>" means any Person owning of record Registrable Securities that have not been sold to the public or pursuant to Rule 144 promulgated under the Securities Act or any permitted assignee of record of such Registrable Securities to whom rights under this Agreement have been duly assigned in accordance with this Agreement.

    "<u>register</u>," "<u>registered</u>" and "<u>registration</u>" refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement.

    "<u>Registrable Securities</u>" means (a) any Ordinary Shares issued or to be issued pursuant to the conversion of any Series A Preferred Shares; (b) any Ordinary Shares issued or issuable upon the conversion or exercise of any warrant, right or other security which is issued as a dividend or other distribution with respect to, or in exchange for or in replacement of, any Series A Preferred Shares described in (a); (c) any Ordinary Shares issued to or held by Baidu or its Affiliates (other than the management members of any Group Company and any transferee of the Ordinary Shares held by any management member of any Group Company) and (d) any Ordinary Shares owned or acquired by the Investors. Notwithstanding the foregoing, "<u>Registrable Securities</u>" shall exclude any Registrable Securities sold by a Person in a transaction in which rights under this Agreement are not assigned in accordance with this Agreement or any Registrable Securities sold in a public offering, whether sold pursuant to Rule 144 promulgated under the Securities Act, in a registered offering, or otherwise.

"Registrable Securities then outstanding" shall mean the number of Ordinary Shares that are Registrable Securities and are then issued and outstanding or are issuable upon conversion of Series A Preferred Shares then issued and outstanding, or issuable upon conversion or exercise of any warrant, right or other security then outstanding.

3.    Demand Registration.

(a)    Request by Holders. If the Company shall, at any time after the earlier of (i) the fifth anniversary of the date hereof and (ii) the expiration of six months after an IPO or a direct listing of Ordinary Shares or of shares of a listing vehicle Affiliated with Company for purposes of consummating a Qualified IPO for the Group (or securities representing such Ordinary Shares or shares of the listing vehicle) at any securities exchange, receive a written request from the Holders of at least 10% of the Registrable Securities that the Company file a registration statement under the Securities Act covering the registration of Registrable Securities pursuant to this Section 3 of Schedule 2, then the Company shall, within ten Business Days of the receipt of such written request, give written notice of such request ("Request Notice") to all Holders, and use all reasonable efforts to effect, as soon as practicable, the registration under the Securities Act of all Registrable Securities that Holders (including other Shareholders who so) request to be registered and included in such registration by written notice given by such Holders to the Company within 20 Business Days after receipt of the Request Notice, subject only to the limitations of this Section 3 of Schedule 2; provided, that the Registrable Securities requested by all Holders to be registered pursuant to such request must have a market value in excess of US$5,000,000; provided, further, that the Company shall not be obligated to effect any such registration if the Company has, within the six-month period preceding the date of such request, already effected a registration under the Securities Act pursuant to this Section 3 of Schedule 2 or Section 5 of Schedule 2, or in which the Holders had an opportunity to participate pursuant to the provisions of Section 4 of Schedule 2, other than a registration from which the Registrable Securities of Holders have been excluded (with respect to all or any portion of the Registrable Securities the Holders requested be included in such registration) pursuant to the provisions of Section 4(a) of Schedule 2.

(b)    <u>Underwriting</u>. If the Holders initiating the registration request under this Section 3 of Schedule 2 ("<u>Initiating Holders</u>") intend to distribute the Registrable Securities covered by their request by means of an underwriting, then they shall so advise the Company as a part of their request made pursuant to this Section 3 of Schedule 2, and the Company shall include such information in the Request Notice. In such event, the right of any Holder to include its Registrable Securities in such registration shall be conditional upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting by the Holders of a majority of the Registrable Securities being registered and reasonably acceptable to the Company (including a market stand-off agreement of up to 180 days if required by such underwriter or underwriters). Notwithstanding any other provision of this Section 3 of Schedule 2, if the underwriter(s) advise(s) the Company in writing that marketing factors require a limitation of the number of securities to be underwritten, then the Company shall so advise all Holders of Registrable Securities which would otherwise be registered and underwritten pursuant hereto, and the number of Registrable Securities that may be included in the underwriting shall be reduced as required by the underwriter(s) and allocated among the Holders of Registrable Securities on a pro rata basis according to the number of Registrable Securities then outstanding held by each Holder requesting registration (including the Initiating Holders); <u>provided</u>, that (i) the number of Registrable Securities included in any such registration shall not be reduced below 30% of the aggregate number of Registrable Securities for which inclusion has been requested and (ii) the number of Registrable Securities that are shares to be included in such underwriting and registration shall not be reduced unless all other securities are first entirely excluded from the underwriting and registration; <u>provided</u>, further, that if, as a result of such underwriter cutback, the Initiating Holders cannot include in the underwritten offering at least 50% of the Registrable Securities that they have requested to be included therein, then such registration shall not be deemed to constitute one of the three demand registrations to which the Holders are entitled pursuant to Section 3(c) of Schedule 2. Any Registrable Securities excluded and withdrawn from such underwriting shall be withdrawn from the registration. If the underwriter does not limit the number of Registrable Securities to be underwritten, the Company may include its securities for its own account in such registration if the underwriter so agrees and if the number of Registrable Securities that would otherwise have been included in such registration and underwriting will not thereby be limited.

(c)    <u>Maximum Number of Demand Registrations</u>. The Company shall not be obligated to effect more than three registrations pursuant to this Section 3 of Schedule 2.

(d)    <u>Deferral</u>. Notwithstanding the foregoing, the Company shall not be required to effect a registration pursuant to this Section 3 of Schedule 2:

(i)    during the period starting with the date 60 days prior to the Company's good faith estimate of the date of the filing of, and ending on a date 180 days following the effective date of, a Company-initiated registration subject to Section 4 of Schedule 2 below, so long as that the Company is actively employing in good faith all reasonable efforts to cause such registration statement to become effective;

(ii) if the Initiating Holders propose to dispose of Registrable Securities that may be registered on Form F-3 pursuant to Section 5 of Schedule 2;

(iii) if the Company shall furnish to Holders requesting the filing of a registration statement pursuant to this Section 3 of Schedule 2 a certificate signed by the Chairman of the Board or chief executive officer of the Company stating that in the good faith judgment of the Board, it would be materially detrimental to the Company and the Shareholders for such registration statement to be filed, in which event the Company shall have the right to defer such filing for a period of not more than 90 days after receipt of the request of the Initiating Holders; provided, that the Company may not utilize this right of deferral more than once in any 12-month period; or

(iv) in any particular jurisdiction in which the Company would be required to qualify to do business or execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already qualified to do business or subject to service in such jurisdiction and except as may be required by the Securities Act.

(e) Expenses. All expenses incurred in connection with any registration pursuant to this Section 3 of Schedule 2, including all United States federal, "blue sky" and all foreign registration, filing and qualification fees, printer's and accounting fees and fees and disbursements of counsel for the Company including reasonable expenses of one legal counsel for the Holders (but excluding underwriters' discounts and commissions), shall be borne by the Company. Each Holder participating in a registration pursuant to this Section 3 of Schedule 2 shall bear such Holder's proportionate share (based on the total number of shares sold in such registration other than for the account of the Company) of all discounts, commissions or other similar amounts payable to underwriter(s) or brokers, in connection with such offering by the Holders.

4. Piggyback Registrations. The Company shall notify all Holders of Registrable Securities in writing at least 20 days prior to filing any registration statement under the Securities Act for purposes of effecting a public offering of securities of the Company (including registration statements relating to secondary offerings of securities of the Company, but excluding registration statements relating to any registration under Section 3 of Schedule 2 or Section 5 of Schedule 2 or to any employee benefit plan or a corporate reorganization) and will afford each such Holder an opportunity to include in such registration statement all or any part of the Registrable Securities then held by such Holder. Each Holder desiring to include in any such registration statement all or any part of the Registrable Securities held by such Holder shall within 18 days after receipt of the above-described notice from the Company, so notify the Company in writing, and in such notice shall inform the Company of the number of Registrable Securities such Holder wishes to include in such registration statement. If a Holder decides not to include all of its Registrable Securities in any registration statement thereafter filed by the Company, such Holder shall nevertheless continue to have the right to include any Registrable Securities in any subsequent registration statement or registration statements as may be filed by the Company with respect to offerings of its securities, all upon the terms and conditions set forth herein.

(a)  Right to Terminate Registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 4 of Schedule 2 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration. The expenses of such withdrawn registration shall be borne by the Company in accordance with Section 4(c) of Schedule 2.

(b)  Underwriting. If a registration statement under which the Company gives notice under this Section 4 of Schedule 2 is for an underwritten offering, then the Company shall so advise the Holders of Registrable Securities. In such event, the right of any such Holder's Registrable Securities to be included in a registration pursuant to this Section 4 of Schedule 2 shall be conditional upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their Registrable Securities through such underwriting shall enter into an underwriting agreement in customary form with the managing underwriter or underwriters selected for such underwriting (including a market stand-off agreement of up to 180 days if required by such underwriter or underwriters). Notwithstanding any other provision of this Section 4 of Schedule 2, if the managing underwriter(s) determine(s) in good faith that marketing factors require a limitation of the number of shares to be underwritten, then the managing underwriter(s) may exclude shares (including up to 70% of the Registrable Securities) from the registration and the underwriting, and the number of shares that may be included in the registration and the underwriting shall be allocated first to the Company and second to each of the Holders requesting inclusion of their Registrable Securities in such registration statement on a pro rata basis based on the total number of Registrable Securities then held by each such Holder; provided, that the right of the underwriter(s) to exclude shares (including Registrable Securities) from the registration and underwriting as described above shall be restricted so that (i) the number of Registrable Securities included in any such registration is not reduced below 30% of the aggregate number of Registrable Securities for which inclusion has been requested and (ii) all shares that are not Registrable Securities and all shares held by any other Person, including any Person who is an employee, officer, consultant or director of the Company (or any Subsidiary of the Company), shall first be excluded entirely from such registration and underwriting before any Registrable Securities are so excluded. If any Holder disapproves of the terms of any such underwriting, such Holder may elect to withdraw therefrom by written notice to the Company and the underwriter(s), delivered at least ten Business Days prior to the effective date of the registration statement. Any Registrable Securities excluded or withdrawn from such underwriting shall be excluded and withdrawn from the registration. For any Holder that is a partnership, the Holder and the partners and retired partners of such Holder, or the estates and family members of any such partners and retired partners and any trusts for the benefit of any of the foregoing Persons, and for any Holder that is a corporation, the Holder and all corporations that are Affiliates of such Holder, shall be deemed to be a single "Holder," and any pro rata reduction with respect to such "Holder" shall be based upon the aggregate amount of shares carrying registration rights owned by all entities and individuals included in such "Holder," as defined in this sentence.

(c)     Expenses. All expenses incurred in connection with a registration pursuant to this Section 4 of Schedule 2 (excluding underwriters' and brokers' discounts and commissions), including all United States federal, "blue sky" and all foreign registration, filing and qualification fees, printers' and accounting fees and fees and disbursements of counsel for the Company and reasonable expenses of one legal counsel for the Holders, shall be borne by the Company.

(d)     Not Demand Registration. Registration pursuant to this Section 4 of Schedule 2 shall not be deemed to be a demand registration as described in Section 3 of Schedule 2. Except as otherwise provided herein, there shall be no limit on the number of times the Holders may request registration of Registrable Securities under this Section 4 of Schedule 2.

5.     Form F-3 Registration. The Company shall use commercially reasonable efforts to qualify for registration on Form F-3. Subject to the terms of this Section 5 of Schedule 2, if the Company qualifies for registration on Form F-3 (or any comparable form for registration in a jurisdiction other than the United States of America), any Holder of the Registrable Securities then outstanding may request that the Company effects a registration on Form F-3 (or an equivalent registration in a jurisdiction outside of the United States of America) and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, including any registration statement filed under the Securities Act providing for the registration of, and the sale on a continuous or a delayed basis by the Holders of, all of the Registrable Securities pursuant to Rule 415 under the Securities Act and/or any similar rule that may be adopted by the SEC. In case the Company shall receive such a request, the Company will:

(a)     Notice. Promptly give written notice of the proposed registration and the Holder's or Holders' request therefor, and any related qualification or compliance, to all other Holders of Registrable Securities; and

(b)    Registration. As soon as practicable, effect such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holders or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within 14 Business Days after the Company provides the notice contemplated by Section 5(a) of Schedule 2; provided, that the Company shall not be obligated to effect any such registration, qualification or compliance pursuant to this Section 5 of Schedule 2:

(i)    if Form F-3 is not available for such offering by the Holders;

(iii)    if the Company shall furnish to the Holders a certificate signed by the president or chief executive officer of the Company stating that in the good faith judgment of the Board, it would be materially detrimental to the Company and the Shareholders for such Form F-3 Registration to be effected at such time, in which event the Company shall have the right to defer the filing of the Form F-3 registration statement no more than once during any 12-month period for a period of not more than 60 days after receipt of the request of the Holder or Holders under this Section 5 of Schedule 2;

(iv)    if the Company has, within the six-month period preceding the date of such request, already effected a registration under the Securities Act other than a registration from which the Registrable Securities of Holders have been excluded (with respect to all or any portion of the Registrable Securities the Holders requested be included in such registration) pursuant to the provisions of Section 4(a) of Schedule 2; or

(v)    in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance, unless the Company is already qualified to do business or subject to service of process in such jurisdiction.

(c)    Expenses. The Company shall pay all expenses incurred in connection with each registration requested pursuant to this Section 5 of Schedule 2 (excluding underwriters' or brokers' discounts and commissions), including all United States federal, "blue sky" and all foreign registration, filing and qualification fees, printers' and accounting fees and fees and disbursements of counsel and reasonable expenses of one legal counsel for the Holders.

(d)    Not Demand Registration. Form F-3 registrations under this Section 5 of Schedule 2 shall not be deemed to be demand registrations as described in Section 3 of Schedule 2. Except as otherwise provided herein, there shall be no limit on the number of times the Holders may request registration of Registrable Securities under this Section 5 of Schedule 2.

(e)     Resale Shelf; Alternative Transactions. At any time when the Company is eligible to file a registration statement on Form F-3 for a secondary offering of equity securities pursuant to Rule 415 under the Securities Act (a "Resale Shelf"), any registration statement requested pursuant to this Agreement shall be made as a Resale Shelf. During the period of effectiveness of a Resale Shelf, any resale of shares of Registrable Securities pursuant to this Schedule 2 shall be in the form of a "takedown" from such Resale Shelf rather than a separate registration statement. The Company shall use its commercially reasonable efforts to cooperate in a timely manner with any request of the Holders in respect of any block trade, hedging transaction or other transaction that is registered pursuant to a Resale Shelf that is not a firm commitment underwritten offering (each, an "Alternative Transaction"), including entering into customary agreements with respect to such Alternative Transactions (and providing customary representations, warranties, covenants and indemnities in such agreements) as well as providing other reasonable assistance in respect of such Alternative Transactions of the type applicable to a public offering, to the extent customary for such transactions.

6.     Obligations of the Company. Whenever required to effect the registration of any Registrable Securities under this Agreement the Company shall, as expeditiously as reasonably possible:

(a)     Registration Statement. Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use all reasonable efforts to cause such registration statement to become effective for the lesser of (i) 180 days (or, in the case of a Resale Shelf, three years from the effective date of the registration statement) and (ii) such shorter period which will terminate when all Registrable Securities covered by such registration statement have been sold; provided, that, before filing a registration statement or prospectus or any amendments or supplements thereto, the Company shall provide counsel for Holders with an adequate and appropriate opportunity to review and comment on such registration statement and each prospectus included therein (and each amendment or supplement thereto) to be filled with the SEC.

(b)     Amendments and Supplements. Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(c)     Prospectuses. Furnish to the Holders such number of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of the Registrable Securities owned by them that are included in such registration.

(d)    <u>Blue Sky</u>. Use all reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders; <u>provided</u>, that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)    <u>Underwriting</u>. In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement in usual and customary form, with the managing underwriter(s) of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)    <u>Notification</u>. Promptly notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(g)    <u>Opinion and Comfort Letter</u>. Furnish, at the request of any Holder requesting registration of Registrable Securities, on the date that such Registrable Securities are delivered to the underwriter(s) for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated as of such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting registration, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) a "comfort" letter dated as of such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering and reasonably satisfactory to a majority in interest of the Holders requesting registration, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities.

Notwithstanding any of the foregoing provisions, the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 3 of Schedule 2 or Section 5 of Schedule 2 if the registration request is subsequently withdrawn at the request of the Holders of a majority of the Registrable Securities to be registered (in which case the participating Holders requesting for the withdrawal shall bear such expenses), unless, in the case of a registration requested under Section 3 of Schedule 2, all of the Holders of the Registrable Securities agree to forfeit their right to one demand registration pursuant to Section 3 of Schedule 2.

7.  <u>Furnish Information</u>. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Schedule 2 with respect to the Registrable Securities of the selling Holders that such selling Holders shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to timely effect the Registration of their Registrable Securities. In this connection, each selling Holder shall be required to represent and warrant to the Company that all such information which is given in writing expressly for inclusion in such registration is true and accurate in all material respects.

8.  <u>No Registration Rights to Third Parties</u>. Without the prior consent of the Holders of at least 75% of the Registrable Securities then outstanding, the Company covenants and agrees that it shall not grant, or cause or permit to be created for the benefit of any Person or entity any registration rights of any kind (whether similar to the demand, "piggyback" or Form S-3 or Form F-3 registration rights described in this Schedule 2, or otherwise) relating to any securities of the Company, other than rights that are subordinate in right to the Holders.

9.  <u>Assignment</u>. The registration rights under this Schedule 2 may be transferred or assigned to any transferee of Ordinary Shares or Series A Preferred Shares, as the case may be.

10. <u>Market Stand-Off Agreement</u>. Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Company's initial public offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed 180 days), (a) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any Ordinary Shares or any securities convertible into or exercisable or exchangeable for Ordinary Shares (whether such shares or any such securities are then owned by the Holder or are thereafter acquired) or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Ordinary Shares, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of Ordinary Shares or such other securities, in cash or otherwise. The foregoing provisions of this Section 10 of Schedule 2 shall apply only to a Company's initial public offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Holders if all officers and directors and greater than 5% of the Shareholders enter into similar agreements. The underwriters in connection with the Company's initial public offering are intended third party beneficiaries of this Section 10 of Schedule 2 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each Holder (and the shares or securities of every other Person subject to the foregoing restriction) until the end of such period.

11.  Indemnification and Contribution.

(a)  Indemnification by the Company. To the extent permitted by law, the Company will indemnify and hold harmless each Holder, its partners, directors, officers, legal counsel and each Person who controls such Holder (within the meaning the Securities Act or the Exchange Act) from and against any and all losses, claims, damages, liabilities and expenses or any action or proceeding in respect thereof (including reasonable costs of investigation and reasonable attorneys' fees and expenses) (each, a "Liability" and collectively, "Liabilities") to which they may become subject under the Securities Act, the Exchange Act or other United States federal or state law, insofar as such Liability arising out of or based upon (i) any untrue, or allegedly untrue, statement of a material fact contained in any registration statement, prospectus or free-writing prospectus filed in connection with any registration hereunder or in any amendment or supplement thereto (each a "Disclosure Document") or (ii) the omission or alleged omission to state in any Disclosure Document any material fact required to be stated therein or necessary to make the statements therein not misleading under the circumstances such statements were made; provided, that that the indemnity agreement contained in this Section 11(a) of Schedule 2 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the written consent of the Company (which consent shall not be unreasonably withheld), nor the Company shall be held liable in any such case to the extent that any such Liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission contained in such Disclosure Document in reliance upon and in conformity with information concerning such Holder furnished in writing to the Company by or on behalf of such Holder expressly for use therein. The indemnity contained in this Section 11(a) of Schedule 2 shall be in addition to any liability the Company may otherwise have. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such Holder or any indemnified party under this Section 11(a) of Schedule 2 and shall survive the transfer of securities by such Holder or any indemnified party.

(b)  Indemnification by Holders. To the extent permitted by law, in connection with any offering in which a Holder is participating pursuant to Section 3 of Schedule 2, Section 4 of Schedule 2 or Section 5 of Schedule 2, such Holder will severally and not jointly indemnify and hold harmless the Company, each of its directors and officers, the other Holders and any of such other Holder's partners, directors, officers, legal counsel, any underwriter retained by the Company and each Person who controls the Company, the other Holders or such underwriter (within the meaning of the Securities Act or the Exchange Act) to the same extent as the foregoing indemnity from the Company to the Holders (including indemnification of their respective partners, directors, officers, legal counsel and controlling Persons), but only to the extent that Liabilities arise out of or are based upon a statement or alleged statement or an omission or alleged omission that was made in reliance upon and in conformity with information with respect to such Holder furnished in writing to the Company by or on behalf of such Holder expressly for use in such Disclosure Document; provided, that that the indemnity agreement contained in this Section 11(b) of Schedule 2 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the written consent of the Holder (which consent shall not be unreasonably withheld), and that the total amount to be indemnified by such Holder pursuant to this Section 11(b) of Schedule 2 shall be limited to the net proceeds (after deducting any underwriters' discounts and commissions) received by such Holders in the offering to which such Disclosure Document relates.

(c)    <u>Conduct of Indemnification Proceedings</u>. Any Person entitled to indemnification or contribution under this Schedule 2 (the "<u>Indemnified Party</u>") agrees to give prompt written notice to the indemnifying party (the "<u>Indemnifying Party</u>") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; <u>provided</u>, that the failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of any Liability that it may have to the Indemnified Party under this Schedule 2 (except to the extent that the Indemnifying Party is materially prejudiced or otherwise forfeits substantive rights or defenses by reason of such failure). If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party. Each Indemnified Party shall have the right to employ separate counsel in any such action and participate in the defense thereof, but the reasonable and documented out-of-pocket fees and expenses of such counsel shall be paid by the Indemnified Party unless (i) the Indemnifying Party agrees to pay the same, (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party or (iii) the named parties to any such action (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and such parties have been advised by such counsel that either (1) representation of such Indemnified Party and the Indemnifying Party by the same counsel would be inappropriate under applicable standards of professional conduct or (2) there may be one or more legal defenses available to the Indemnified Party which are different from or additional to those available to the Indemnifying Party. In any of such cases, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party, it being understood, however, that the Indemnifying Party shall not be liable for the reasonable and documented out-of-pocket fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all Indemnified Parties and all such reasonable and documented out-of-pocket fees and expenses shall be reimbursed as incurred. No Indemnifying Party shall be liable for any settlement entered into without its written consent, which consent shall not be unreasonably withheld. No Indemnifying Party shall, without the consent of such Indemnified Party, effect any settlement of any pending or threatened proceeding in respect of which such Indemnified Party is a party and indemnity has been sought under this Schedule 2 by such Indemnified Party, unless such settlement includes an unconditional release of such Indemnified Party from all liability for claims that are the subject matter of such proceeding.

(d)     Contribution. If the indemnification provided for in this Section 11 of Schedule 2 from the Indemnifying Party is unavailable to an Indemnified Party under this Schedule 2 or insufficient to hold harmless an Indemnified Party in respect of any Liabilities referred to in this Schedule 2, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Liabilities in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions which resulted in such Liabilities, as well as any other relevant equitable considerations. The relative faults of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action. The amount paid or payable by a party as a result of the Liabilities referred to above shall be deemed to include, subject to the limitations set forth in this Schedule 2, any reasonable and documented out-of-pocket legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding; provided, that the total amount to be contributed by any Holder shall be limited to the net proceeds (after deducting any underwriters' discounts and commissions) received by such Holder in the offering. The Parties agree that it would not be just and equitable if contribution pursuant to this Section 11(d) of Schedule 2 were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

12.  Reports. The Company covenants that it shall (a) use commercially reasonable efforts to file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and (b) take such action as may be required from time to time to enable such Holders to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 under the Securities Act, as such rule may be amended from time to time, or (ii) any similar rules or regulations hereafter adopted by the SEC. The Company shall, upon the request of any Holder, deliver to such Holder a written statement as to whether it has complied with such requirements.

**SCHEDULE 3**

**LIST OF COMPANY COMPETITORS**

**SCHEDULE 4**

**LIST OF BAIDU RESTRICTED PERSONS**

**SCHEDULE 5**

**PERSONS SUBJECT TO NON-SOLICITATION**

**SCHEDULE 6**

**LIST OF FINANCIAL LICENSES**

**EXHIBIT A**

**FORM OF DEED OF ADHERENCE**

**THIS DEED** is made the [        ] day of [        ] by [*name of new shareholder*], [a citizen of [        ] with [        ] passport no. [        ] and [his/her] residential address at [        ] / [a company incorporated with limited liability under the laws of [        ] with its registered office at [        ]] (the "**New Shareholder**").

**WHEREAS**

(A)   By a [transfer of OR subscription for] [*description of equity securities*] dated [of even date herewith], [[*name of transferor*], [a citizen of [        ] with [        ] passport no. [        ] and [his/her] residential address at [        ] / [a company incorporated with limited liability under the laws of [        ] with its registered office at [        ] (the "**Transferor**") agreed to transfer to the New Shareholder] / [the New Shareholder subscribed for] [*number*] [*description of equity securities*]], [par value US$[        ] each], in the capital of Duxiaoman (Cayman) Limited (度小满金融（开曼）有限公司), an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office at [        ] (the "**Company**") (together, the ["**Transferred Shares**" OR "**Subscribed Shares**"]).

(B)   This Deed is entered into in compliance with the terms of the shareholders agreement dated [        ] made by and among, *inter alios*, the Company and its shareholders (as amended, the "**Shareholders Agreement**").

**NOW THEREFORE IT IS HEREBY AGREED** as follows:

(1)   Unless the context otherwise requires, (i) words and expressions used in this Deed shall have the same meaning assigned to them in the Shareholders Agreement; and (ii) the rules of interpretation contained in Section 1.3 of the Shareholders Agreement shall apply to the construction of this Deed.

(2)   The New Shareholder hereby confirms that it has been supplied with a copy of the Shareholders Agreement.

(3)   The New Shareholder hereby assumes the benefit of the rights [of the Transferor] [of a Shareholder] under the Shareholders Agreement in respect of the [Transferred Shares OR Subscribed Shares] and the burden of [the Transferor's] [a Shareholder's] obligations under the Shareholders Agreement to be performed after the date hereof in respect of the [Transferred Shares OR Subscribed Shares].

(4)   The New Shareholder hereby agrees to be bound by the Shareholders Agreement in all respects as if the New Shareholder were a party to the Shareholders Agreement as [*description of capacity*]] and to perform:

    (i)   [all the obligations of the Transferor in that capacity thereunder; and]

(ii)    all the obligations expressed to be imposed on such a party to the Shareholders Agreement;

[in both cases,] to be performed on or after the date hereof.

(5)    The New Shareholder hereby further agrees and covenants that (a) the [acquisition, owning and holding of Transferred Shares / subscription, owning and holding of Subscribed Shares] is in full compliance with the requirements of all applicable laws; and (b) if requested by the Company, the New Shareholder shall provide such assurances, representations, documents and materials as the Company may deem necessary or desirable to assure compliance with all applicable laws.

(6)    This Deed is made for the benefit of:

(i)    the parties to the Shareholders Agreement; and

(ii)    any other Person who may after the date of the Shareholders Agreement (and whether or not prior to, on or after the date hereof) assume any rights or obligations under the Shareholders Agreement and be permitted to do so by the terms thereof;

and this Deed shall be irrevocable without the written consent of the Company acting on their behalf (in each case only for so long as they hold any Equity Securities in the Company).

(7)    [For the avoidance of doubt, if applicable, nothing in this Deed shall release the Transferor from any liability in respect of any obligations under the Shareholders Agreement due to be performed prior to the date of this Deed.]

(8)    None of the holders of Shares:

(i)    makes any representation or warranty or assumes any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of the Shareholders Agreement (or any agreement entered into pursuant thereto); or

(ii)    makes any representation or warranty or assumes any responsibility with respect to the content of any information regarding the Company or any Group Company or otherwise relates to the acquisition of equity securities in the Company; or

(iii)    assumes any responsibility for the financial condition of the Company or any Group Company or any other party to the Shareholders Agreement or any other document or for the performance and observance by the Company or any other party to the Shareholders Agreement or any other document (save as expressly provided therein);

and any and all conditions and warranties, whether express or implied by law or otherwise, are excluded.

(9)    The New Shareholder's address for notices, demands and all other communications under the Shareholders Agreement is as follows:

[*name of New Shareholder*]

| | | |
|---|---|---|
| Address: | [ | ] |
| Postal Code: | [ | ] |
| Fax Number: | [ | ] |
| Email: | [ | ] |
| Attention: | [ | ] |

(10)   This Deed shall be read as one with the Shareholders Agreement so that any reference in the Shareholders Agreement to "this Agreement" and similar expressions shall include this Deed.

(11)   This Deed shall be governed by and interpreted in accordance with the laws of Hong Kong.

**[SIGNATURE PAGE TO FOLLOW]**

IN WITNESS WHEREOF this Deed of Adherence is executed as a deed on the date and year first above written.

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| | ) |
| **SEALED** with the **COMMON SEAL** | ) |
| | ) |
| of [*name of new shareholder*] | ) |
| | ) |
| and **SIGNED** by [        ] | ) |
| | ) |
| (Director) | ) |
| | ) |
| in the presence of:- | ) |
| | ) |
| | ) |
| Name of witness: | ) |
| Address of witness: | ) |

[*Or, if the New Shareholder is an individual:*]

| | |
|---|---|
| **EXECUTED AS A DEED** | ) |
| | ) |
| **SIGNED SEALED AND DELIVERED** | ) |
| | ) |
| by [*name of new shareholder*] | ) |
| | ) |
| the holder of [        ] | ) |
| | ) |
| [Passport / ID Card] No. [        ] | ) |
| | ) |
| in the presence of: | ) |
| | ) |
| | ) |
| Name of witness: | ) |
| Address of witness: | ) |

**EXHIBIT B**

**MANAGEMENT BONUS SHARE FORMULA**

The table below sets forth how many bonus shares the management shall be entitled to in the event all Initial Investor Shareholders have sold all the Series A Preferred Shares held by them immediately after the Closing (the "Hypothetical Total Exit Transaction"). Where a Hypothetical Total Exit Transaction occurs during the time periods specified in the tables below and the net cash proceeds actually received by the Initial Investor Shareholders in respect of the sale of all such Series A Preferred Shares (net of any bonus shares to be transferred to management pursuant to Section 7.13 and this Exhibit B) generated a return exceeding the thresholds specified in the tables below, the bonus shares to be transferred to management shall equal to either (i) [4]% of the total Series A Preferred Shares outstanding immediately after the Closing, or (ii) [8]% of the total Series A Preferred Shares outstanding immediately after the Closing (each, a "Hypothetical Bonus Share Amount").

Notwithstanding the above, whether any Initial Investor Shareholder shall be required to transfer bonus shares to management shall be determined only by reference to the net cash proceeds actually received by it in respect of the Series A Preferred Shares owned by it immediately after the Closing (net of any bonus shares to be transferred to management pursuant to Section 7.13 and this Exhibit B), and whether such net cash proceeds generated a return to such Initial Investor Shareholder exceeding the thresholds specified in the tables below and during the time periods specified in the tables below. In the event such conditions are met, the bonus shares to be transferred by such Initial Investor Shareholder to management shall be the product of the applicable Hypothetical Bonus Share Amount, multiplied by a fraction where the numerator is the number of Series A Preferred Shares held by such Initial Investor Shareholder immediately after the Closing and the denominator is the number of Series A Preferred Shares held by all Initial Investor Shareholders immediately after the Closing. For the avoidance of doubt, each Initial Closing Investor's obligation under Section 7.13 shall be several, and not joint. Note: "Net MoM" in the tables below should be determined after net of any bonus shares to be transferred to management pursuant to Section 7.13 and this Exhibit B.

**[4]%**

|  | Net MoM |
|---|---|
| Month 0-18 |  |
| Month 19-30 |  |
| Month 31-48 |  |
| Month 49-60 |  |

**[8]%**

|  | Net MoM |
|---|---|
| Month 0-18 |  |
| Month 19-30 |  |
| Month 31-48 |  |
| Month 49-60 |  |

**Exhibit 4.56**

**BAIDU, INC.**

**2018 SHARE INCENTIVE PLAN**

**ARTICLE 1**

**PURPOSE**

The purpose of this 2018 Share Incentive Plan (the "Plan") is to promote the success and enhance the value of Baidu, Inc., a company incorporated under the laws of the Cayman Islands (the "Company") by linking the personal interests of the members of the Board, Employees, and Consultants to those of the Company's shareholders and by providing such individuals with an incentive for outstanding performance to generate superior returns to Company shareholders. The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract, and retain the services of members of the Board, Employees, and Consultants upon whose judgment, interest, and special effort the successful conduct of the Company's operation is largely dependent.

**ARTICLE 2**

**DEFINITIONS AND CONSTRUCTION**

Wherever the following terms are used in the Plan, they shall have the meanings specified below, unless the context clearly indicates otherwise. The singular pronoun shall include the plural where the context so indicates.

2.1 "Applicable Laws" means (i) the laws of the Cayman Islands as they relate to the Company and its Shares; (ii) the legal requirements relating to the Plan and the Awards under applicable provisions of the corporate, securities, tax and other laws, rules, regulations and government orders; and (iii) the rules of any applicable stock exchange, of any jurisdiction applicable to Awards granted to residents therein.

2.2 "Award" means an Option, Restricted Share, Restricted Share Unit or any other form of award granted to a Participant pursuant to the Plan.

2.3 "Award Agreement" means any written agreement, contract, or other instrument or document evidencing an Award, including through electronic medium.

2.4 "Board" means the Board of Directors of the Company from time to time.

2.5 "Code" means the Internal Revenue Code of 1986 of the United States, as amended.

2.6 "Committee" means the committee of the Board described in Article 9.

2.7 "Consultant" means any consultant or adviser if: (a) the consultant or adviser renders bona fide services to a Service Recipient; (b) the services rendered by the consultant or adviser are not in connection with the offer or sale of securities in a capital-raising transaction and do not directly or indirectly promote or maintain a market for the Company's securities; and (c) the consultant or adviser is a natural person who has contracted directly with the Service Recipient to render such services.

2.8 "Corporate Transaction" means any of the following transactions or occurrences, *provided*, *however*, that the Committee shall determine whether multiple transactions are related, and its determination shall be final, binding and conclusive:

(a) an amalgamation, arrangement, consolidation or scheme of arrangement (i) in which the Company is not the surviving entity, except for any such transaction the principal purpose of which is to change the jurisdiction in which the Company is incorporated or (ii) following which the holders of the voting securities of the Company do not continue to hold more than fifty percent (50%) of the combined voting power of the voting securities of the surviving entity;

(b) the sale, transfer or other disposition of all or substantially all of the assets of the Company (including the capital stock or other equity securities of the Company's Subsidiaries and Related Entities);

(c) the completion of a voluntary or insolvent liquidation or dissolution of the Company;

(d) the direct or indirect acquisition by any person or related group of persons (other than the Company or a person that directly or indirectly controls, is controlled by, or is under common control with, the Company) of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) of securities possessing at least fifty percent (50%) of the total combined voting power of the Company's outstanding securities; or

(e) the individuals who, as of the Effective Date, are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least fifty percent (50%) of the Board; provided that if the election, or nomination for election by the Company's shareholders, of any new member of the Board is approved by the Incumbent Board pursuant to then the effective Articles of Association of the Company, such new member of the Board shall be considered as a member of the Incumbent Board.

2.9 "Disability" means that the Participant qualifies to receive long-term disability payments under the Service Recipient's long-term disability insurance program, as it may be amended from time to time, to which the Participant provides services regardless of whether the Participant is covered by such policy. If the Service Recipient to which the Participant provides service does not have a long-term disability plan in place, "Disability" means that a Participant is unable to carry out the responsibilities and functions of the position held by the Participant by reason of any medically determinable physical or mental impairment for a period of not less than 180 consecutive days. A Participant will not be considered to have incurred a Disability unless he or she furnishes proof of such impairment sufficient to satisfy the Committee in its discretion.

2

2.10 "Effective Date" shall have the meaning set forth in Section 10.1.

2.11 "Employee" means any person, including an officer or member of the Board of the Company, any Parent, Subsidiary or Related Entity of the Company, who is in the employ of a Service Recipient, subject to the control and direction of the Service Recipient as to both the work to be performed and the manner and method of performance. The payment of a director's fee by a Service Recipient shall not be sufficient to constitute "employment" by the Service Recipient.

2.12 "Exchange Act" means the Securities Exchange Act of 1934 of the United States, as amended.

2.13 "Fair Market Value" means, as of any date, the value of Shares determined as follows:

(a) If the Shares are listed on one or more established and regulated stock exchanges or national market systems, including without limitation, The Nasdaq Global Market, its Fair Market Value shall be the closing sales price for such shares (or the closing bid, if no sales were reported) as quoted on the principal exchange or system on which the Shares are listed (as determined by the Committee) on the last trading date, on which such closing sales price or closing bid was reported, prior to the date of determination, as reported in *The Wall Street Journal* or such other source as the Committee deems reliable;

(b) If the Shares are regularly quoted on an automated quotation system (including the OTC Bulletin Board) or by a recognized securities dealer, its Fair Market Value shall be the closing sales price for such shares as quoted on such system or by such securities dealer on the date of determination, but if selling prices are not reported, the Fair Market Value of a Share shall be the mean between the high bid and low asked prices for the Shares on the date of determination (or, if no such prices were reported on that date, on the last date such prices were reported), as reported in *The Wall Street Journal* or such other source as the Committee deems reliable; or

(c) In the absence of an established market for the Shares of the type described in (a) and (b), above, the Fair Market Value thereof shall be determined by the Committee in good faith and in its discretion by reference to (i) the placing price of the latest private placement of the Shares and the development of the Company's business operations and the general economic and market conditions since such latest private placement, (ii) other third party transactions involving the Shares and the development of the Company's business operation and the general economic and market conditions since such sale, (iii) an independent valuation of the Shares, or (iv) such other methodologies or information as the Committee determines to be indicative of Fair Market Value, relevant.

2.14 "Good Reason" means the occurrence after a Corporate Transaction of any of the following events or conditions unless consented to by the Participant:

3

(a) a decrease in the Participant's base salary and/or a material decrease in his or her standard management bonus plan or employee benefits as in effect at any time within six (6) months preceding the date of a Corporate Transaction or at any time thereafter;

(b) a material adverse change in the Participant's title, authority, responsibilities or duties, as measured against his or her title, authority, responsibilities or duties immediately prior to such change, as in effect at any time within six (6) months preceding the date of a Corporate Transaction or at any time thereafter;

(c) the imposition of a requirement that such Participant relocate more than sixty (60) miles from his or her current primary residence, or that the principal place of business of the Company be relocated more than sixty (60) miles from the city of Beijing, China; or

(d) death or Disability of the Participant.

2.15 "Incentive Share Option" means an Option that is intended to meet the requirements of Section 422 of the Code or any successor provision thereto.

2.16 "Independent Director" means a member of the Board who qualifies as an "independent director" as defined under the Nasdaq Marketplace Rules.

2.17 "Non-Qualified Share Option" means an Option that is not intended to be an Incentive Share Option.

2.18 "Option" means a right granted to a Participant pursuant to Article 5 of the Plan to purchase a specified number of Shares at a specified price during specified time periods. An Option may be either an Incentive Share Option or a Non-Qualified Share Option.

2.19 "Participant" means a person who, as a member of the Board, Consultant or Employee, has been granted an Award pursuant to the Plan.

2.20 "Parent" means a parent corporation under Section 424(e) of the Code.

2.21 "Plan" means this 2018 Share Incentive Award Plan, as it may be amended from time to time.

2.22 "Related Entity" means any business, corporation, partnership, limited liability company or other entity in which the Company, a Parent or Subsidiary of the Company holds a substantial ownership interest, directly or indirectly but which is not a Subsidiary and which the Board designates as a Related Entity for purposes of the Plan.

2.23 "Restricted Share" means a Share awarded to a Participant pursuant to Article 6 that is subject to certain restrictions and may be subject to risk of forfeiture.

2.24 "Restricted Share Unit" means the right granted to a Participant pursuant to Article 6 to receive a Share at a future date.

4

2.25 "Securities Act" means the Securities Act of 1933 of the United States, as amended.

2.26 "Service Recipient" means the Company, any Parent or Subsidiary of the Company and any Related Entity to which a Participant provides services as an Employee, Consultant or as a Director.

2.27 "Shares" means Class A Ordinary Shares, par value US$0.00005 per share, of the Company, and such other securities of the Company that may be substituted for Shares pursuant to Article 8.

2.28 "Subsidiary" means any corporation or other entity of which a majority of the outstanding voting shares or voting power is beneficially owned directly or indirectly by the Company.

**ARTICLE 3**

**SHARES SUBJECT TO THE PLAN**

3.1 Number of Shares.

(a) Subject to the provisions of Article 8 and Section 3.1(b), the maximum aggregate number of Shares which may be issued pursuant to all Awards under the Plan shall be 3,443,950, being ten percent (10%) of the total number of Class A and Class B ordinary shares issued and outstanding as of June 30, 2018.

(b) To the extent that an Award terminates, expires, or lapses for any reason, or is settled in cash and not Shares, then any Shares subject to the Award shall again be available for the grant of an Award pursuant to the Plan. To the extent permitted by Applicable Laws, Shares issued in assumption of, or in substitution for, any outstanding awards of any entity acquired in any form or combination by the Company or any Parent or Subsidiary of the Company shall not be counted against Shares available for grant pursuant to the Plan. Shares delivered by the Participant or withheld by the Company upon the exercise of any Award under the Plan, in payment of the exercise price thereof or tax withholding thereon, may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). If any Restricted Shares are forfeited by the Participant or repurchased by the Company, such Shares may again be optioned, granted or awarded hereunder, subject to the limitations of Section 3.1(a). Notwithstanding the provisions of this Section 3.1(b), no Shares may again be optioned, granted or awarded if such action would cause an Incentive Share Option to fail to qualify as an incentive share option under Section 422 of the Code.

3.2 Shares Distributed. Any Shares distributed pursuant to an Award may consist, in whole or in part, of authorized and unissued Shares, treasury Shares (subject to Applicable Laws) or Shares purchased on the open market. Additionally, in the discretion of the Committee, American Depository Shares in an amount equal to the number of Shares which otherwise would be distributed pursuant to an Award may be distributed in lieu of Shares in settlement of any Award. If the number of Shares represented by an American Depository Share is other than on a one-to-one basis, the limitations of Section 3.1 shall be adjusted to reflect the distribution of American Depository Shares in lieu of Shares.

5

## ARTICLE 4

### ELIGIBILITY AND PARTICIPATION

4.1 Eligibility. Persons eligible to participate in this Plan include Employees, Consultants, and all members of the Board, as determined by the Committee.

4.2 Participation. Subject to the provisions of the Plan, the Committee may, from time to time, select from among all eligible individuals, those to whom Awards shall be granted and shall determine the nature and amount of each Award. No individual shall have any right to be granted an Award pursuant to this Plan.

4.3 Jurisdictions. In order to assure the viability of Awards granted to Participants employed in various jurisdictions, the Committee may provide for such special terms as it may consider necessary or appropriate to accommodate differences in local law, tax policy, or custom applicable in the jurisdiction in which the Participant resides or is employed. Moreover, the Committee may approve such supplements to, or amendments, restatements, or alternative versions of, the Plan as it may consider necessary or appropriate for such purposes without thereby affecting the terms of the Plan as in effect for any other purpose; *provided*, *however*, that no such supplements, amendments, restatements, or alternative versions shall increase the share limitations contained in Section 3.1 of the Plan. Notwithstanding the foregoing, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate any Applicable Laws.

## ARTICLE 5

### OPTIONS

5.1 General. The Committee is authorized to grant Options to Participants on the following terms and conditions:

(a) Exercise Price. The exercise price per Share subject to an Option shall be determined by the Committee and set forth in the Award Agreement which may be a fixed or variable price related to the Fair Market Value of the Shares; *provided*, *however*, that no Option may be granted to an individual subject to taxation in the United States at less than the Fair Market Value on the date of grant. The exercise price per Share subject to an Option may be amended or adjusted in the absolute discretion of the Committee or the Board, the determination of which shall be final, binding and conclusive. For the avoidance of doubt, to the extent not prohibited by Applicable Laws (including any applicable exchange rule), a downward adjustment of the exercise prices of Options mentioned in the preceding sentence shall be effective without the approval of the Company's shareholders or the approval of the affected Participants.

(b) Time and Conditions of Exercise. The Committee shall determine the time or times at which an Option may be exercised in whole or in part, including exercise prior to vesting; *provided* that the term of any Option granted under the Plan shall not exceed ten years, except as provided in Section 11.1. The Committee shall also determine the conditions, if any, that must be satisfied before all or part of an Option may be exercised.

6

(c) <u>Payment</u>. The Committee shall determine the methods by which the exercise price of an Option may be paid, the form of payment, including, without limitation (i) cash or check denominated in U.S. Dollars, (ii) to the extent permissible under the Applicable Laws, cash or check in Chinese Renminbi, (iii) cash or check denominated in any other local currency as approved by the Committee, (iv) Shares held for such period of time as may be required by the Committee in order to avoid adverse financial accounting consequences and having a Fair Market Value on the date of delivery equal to the aggregate exercise price of the Option or exercised portion thereof, (v) the delivery of a notice that the Participant has placed a market sell order with a broker with respect to Shares then issuable upon exercise of the Option, and that the broker has been directed to pay a sufficient portion of the net proceeds of the sale to the Company in satisfaction of the Option exercise price; *provided* that payment of such proceeds is then made to the Company upon settlement of such sale, (vi) other property acceptable to the Committee with a Fair Market Value equal to the exercise price, or (vii) any combination of the foregoing. Notwithstanding any other provision of the Plan to the contrary, no Participant shall be permitted to pay the exercise price of an Option in any method which would violate Applicable Law, including without limitation Section 13(k) of the Exchange Act.

(d) <u>Evidence of Grant</u>. All Options shall be evidenced by an Award Agreement between the Company and the Participant. The Award Agreement shall include such additional provisions as may be specified by the Committee.

5.2 <u>Incentive Share Options</u>. Incentive Share Options may be granted to Employees of the Company, a Parent, or a Subsidiary of the Company. Incentive Share Options may not be granted to Employees of a Related Entity or to Independent Directors or Consultants. The terms of any Incentive Share Options granted pursuant to the Plan, in addition to the requirements of Section 5.1, must comply with the following additional provisions of this Section 5.2:

(a) <u>Expiration of Option</u>. An Incentive Share Option may not be exercised to any extent by anyone after the first to occur of the following events:

(i) Ten years from the date it is granted, unless an earlier time is set in the Award Agreement;

(ii) Three months after the Participant's termination of employment as an Employee other than for Disability or death; and

(iii) One year after the date of the Participant's termination of employment or service on account of Disability or death. Upon the Participant's Disability or death, any Incentive Share Options exercisable at the Participant's Disability or death may be exercised by the Participant's legal representative or representatives, by the person or persons entitled to do so pursuant to the Participant's last will and testament, or, if the Participant fails to make testamentary disposition of such Incentive Share Option or dies intestate, by the person or persons entitled to receive the Incentive Share Option pursuant to the applicable laws of descent and distribution.

7

(b) <u>Individual Dollar Limitation</u>. The aggregate Fair Market Value (determined as of the time the Option is granted) of all Shares with respect to which Incentive Share Options are first exercisable by a Participant in any calendar year may not exceed US$100,000 or such other limitation as imposed by Section 422(d) of the Code, or any successor provision. To the extent that Incentive Share Options are first exercisable by a Participant in excess of such limitation, the excess shall be considered Non-Qualified Share Options.

(c) <u>Exercise Price</u>. The exercise price of an Incentive Share Option shall be equal to the Fair Market Value on the date of grant. However, the exercise price of any Incentive Share Option shall be granted to any individual who, at the date of grant, owns Shares possessing more than ten percent of the total combined voting power of all classes of shares of the Company only if such Option is granted at a price that is not less than 110% of Fair Market Value on the date of grant and the Option is exercisable for no more than five years from the date of grant.

(d) <u>Transfer Restriction</u>. The Participant shall give the Company prompt notice of any disposition of Shares acquired by exercise of an Incentive Share Option within (i) two years from the date of grant of such Incentive Share Option or (ii) one year after the transfer of such Shares to the Participant.

(e) <u>Expiration of Incentive Share Options</u>. No Award of an Incentive Share Option may be made pursuant to this Plan after the tenth anniversary of the Effective Date.

(f) <u>Right to Exercise</u>. During a Participant's lifetime, an Incentive Share Option may be exercised only by the Participant.

## ARTICLE 6

## RESTRICTED SHARES AND RESTRICTED SHARE UNITS

6.1 <u>Grant of Restricted Shares</u>. The Committee is authorized to make Awards of Restricted Shares and/or Restricted Share Units to any Participant selected by the Committee in such amounts and subject to such terms and conditions as determined by the Committee. All Awards of Restricted Shares shall be evidenced by an Award Agreement.

6.2 <u>Issuance and Restrictions</u>. Restricted Shares shall be subject to such restrictions on transferability and other restrictions as the Committee may impose (including, without limitation, limitations on the right to vote Restricted Shares or the right to receive dividends on the Restricted Share). These restrictions may lapse separately or in combination at such times, pursuant to such circumstances, in such installments, or otherwise, as the Committee determines at the time of the grant of the Award or thereafter.

6.3 <u>Forfeiture/Repurchase</u>. Except as otherwise determined by the Committee at the time of the grant of the Award or thereafter, upon termination of employment or service during the applicable restriction period, Restricted Shares that are at that time subject to restrictions shall be forfeited or repurchased in accordance with the Award Agreement; *provided*, *however*, that the Committee may (a) provide in any Restricted Share Award Agreement that restrictions or forfeiture and repurchase conditions relating to Restricted Shares will be waived in whole or in part in the event of terminations resulting from specified causes, and (b) in other cases waive in whole or in part restrictions or forfeiture and repurchase conditions relating to Restricted Shares.

8

6.4 <u>Certificates for Restricted Shares</u>. Restricted Shares granted pursuant to the Plan may be evidenced in such manner as the Committee shall determine. If certificates representing Restricted Shares are registered in the name of the Participant, certificates must bear an appropriate legend referring to the terms, conditions, and restrictions applicable to such Restricted Shares, and the Company may, at its discretion, retain physical possession of the certificate until such time as all applicable restrictions lapse.

6.5 <u>Restricted Share Units.</u> At the time of grant, the Committee shall specify the date or dates on which the Restricted Share Units shall become fully vested and nonforfeitable, and may specify such conditions to vesting as it deems appropriate. At the time of grant, the Committee shall specify the maturity date applicable to each grant of Restricted Share Units which shall be no earlier than the vesting date or dates of the Award and may be determined at the election of the grantee. On the maturity date, the Company shall, subject to Sections 7.4 and 7.5, transfer to the Participant one unrestricted, fully transferable Share for each Restricted Share Unit scheduled to be paid out on such date and not previously forfeited.

**ARTICLE 7**

**PROVISIONS APPLICABLE TO AWARDS**

7.1 <u>Award Agreement</u>. Awards under the Plan shall be evidenced by Award Agreements that set forth the terms, conditions and limitations for each Award which may include the term of an Award, the provisions applicable in the event the Participant's employment or service terminates, and the Company's authority to unilaterally or bilaterally amend, modify, suspend, cancel or rescind an Award.

7.2 <u>Limits on Transfer</u>. No right or interest of a Participant in any Award may be pledged, encumbered, or hypothecated to or in favor of any party other than the Company or a Subsidiary, or shall be subject to any lien, obligation, or liability of such Participant to any other party other than the Company or a Subsidiary. Except as otherwise provided by the Committee, no Award shall be assigned, transferred, or otherwise disposed of by a Participant other than by will or the laws of descent and distribution. The Committee by express provision in the Award or an amendment thereto may permit an Award (other than an Incentive Share Option) to be transferred to, exercised by and paid to certain persons or entities related to the Participant, including but not limited to members of the Participant's family, charitable institutions, or trusts or other entities whose beneficiaries or beneficial owners are members of the Participant's family and/or charitable institutions, or to such other persons or entities as may be expressly approved by the Committee, pursuant to such conditions and procedures as the Committee may establish. Any permitted transfer shall be subject to the condition that the Committee receive evidence satisfactory to it that the transfer is being made for estate and/or tax planning purposes (or to a "blind trust" in connection with the Participant's termination of employment or service with the Company or a Subsidiary to assume a position with a governmental, charitable, educational or similar non-profit institution) and on a basis consistent with the Company's lawful issue of securities.

9

7.3 <u>Beneficiaries</u>. Notwithstanding Section 7.2, a Participant may, in the manner determined by the Committee, designate a beneficiary to exercise the rights of the Participant and to receive any distribution with respect to any Award upon the Participant's death. A beneficiary, legal guardian, legal representative, or other person claiming any rights pursuant to the Plan is subject to all terms and conditions of the Plan and any Award Agreement applicable to the Participant, except to the extent the Plan and Award Agreement otherwise provide, and to any additional restrictions deemed necessary or appropriate by the Committee. If the Participant is married and resides in a community property jurisdiction, a designation of a person other than the Participant's spouse as his or her beneficiary with respect to more than 50% of the Participant's interest in the Award shall not be effective without the prior written consent of the Participant's spouse. If no beneficiary has been designated or survives the Participant, payment shall be made to the person entitled thereto pursuant to the Participant's will or the laws of descent and distribution. Subject to the foregoing, a beneficiary designation may be changed or revoked by a Participant at any time provided the change or revocation is filed with the Committee.

7.4 <u>Share Certificate</u>. Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates evidencing Shares pursuant to the exercise of any Award, unless and until the Board has determined, with advice of counsel, that the issuance and delivery of such Shares is in compliance with all Applicable Laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the Shares are listed or traded. All Share certificates delivered pursuant to the Plan are subject to any stop-transfer orders and other restrictions as the Committee deems necessary or advisable to comply with all Applicable Laws, and the rules of any national securities exchange or automated quotation system on which the Shares are listed, quoted, or traded. The Committee may place legends on any Share certificate to reference restrictions applicable to the Share. In addition to the terms and conditions provided herein, the Board may require that a Participant make such reasonable covenants, agreements, and representations as the Board, in its discretion, deems advisable in order to comply with any such laws, regulations, or requirements. The Committee shall have the right to require any Participant to comply with any timing or other restrictions with respect to the settlement or exercise of any Award, including a window-period limitation, as may be imposed in the discretion of the Committee.

7.5 <u>Paperless Administration</u>. Subject to Applicable Laws, the Committee may make Awards, provide applicable disclosure and procedures for exercise of Awards by an internet website or interactive voice response system for the paperless administration of Awards.

7.6 <u>Foreign Currency</u>. A Participant may be required to provide evidence that any currency used to pay the exercise price of any Award were acquired and taken out of the jurisdiction in which the Participant resides in accordance with Applicable Laws, including foreign exchange control laws and regulations. In the event the exercise price for an Award is paid in Chinese Renminbi or other foreign currency, as permitted by the Committee, the amount payable will be determined by conversion from U.S. dollars at the official rate promulgated by the People's Bank of China for Chinese Renminbi, or for jurisdictions other than the People's Republic of China, the exchange rate as selected by the Committee on the date of exercise.

10

**ARTICLE 8**

**CHANGES IN CAPITAL STRUCTURE**

8.1 <u>Adjustments</u>. In the event of any distribution, share split, combination or exchange of Shares, amalgamation, arrangement or consolidation, reorganization of the Company, including the Company becoming a subsidiary in a transaction not involving a Corporate Transaction, spin-off, recapitalization or other distribution (other than normal cash dividends) of Company assets to its shareholders, or any other change affecting the Shares or the share price of a Share, the Committee shall make such proportionate and equitable adjustments, if any, to reflect such change with respect to (a) the aggregate number and type of shares that may be issued under the Plan (including, but not limited to, adjustments of the limitations in Section 3.1 and substitutions of shares in a parent or surviving company); (b) the terms and conditions of any outstanding Awards (including, without limitation, any applicable performance targets or criteria with respect thereto); and (c) the grant or exercise price per share for any outstanding Awards under the Plan. The form and manner of any such adjustments shall be determined by the Committee in its sole discretion.

8.2 <u>Outstanding Awards – Corporate Transactions</u>. Except as provided otherwise in an individual Award Agreement or any other written agreement entered into by and between the Company and a Participant, in the event of a Corporate Transaction:

(a) If the Award is either (i) assumed by the successor entity or Parent thereof or replaced with a comparable Award (as determined by the Committee) with respect to shares of the capital stock of the successor entity or Parent thereof or (ii) replaced with a cash incentive program of the successor entity which preserves the compensation element of such Award existing at the time of the Corporate Transaction and provides for subsequent payout in accordance with the same vesting schedule applicable to such Award, then such Award (if assumed), the replacement Award (if replaced), or the cash incentive program automatically shall become fully vested, exercisable and payable and be released from any restrictions on transfer (other than transfer restrictions applicable to Options) and repurchase or forfeiture rights, immediately upon termination of the Participant's employment or service with all Service Recipients within twelve (12) months of the Corporate Transaction without cause or voluntarily by the Participant for Good Reason.

(b) If a Participant's Awards are not converted, assumed, or replaced by a successor, as described in clause (a) above, such Awards shall become fully exercisable and all forfeiture restrictions on such Awards shall lapse immediately prior to the specified effective date of such Corporate Transaction, *provided* that the Participant remains an Employee, Consultant or member of the Board on the effective date of the Corporate Transaction.

(c) Notwithstanding clause (a) or clause (b) above, upon an occurrence of a Corporate Transaction set forth in Sections 2.8(d) and 2.8(e), a Participant's Awards shall become fully exercisable and the forfeiture restrictions with respect to such amount shall lapse.

11

(d) Upon, or in anticipation of, a Corporate Transaction, the Committee may in its sole discretion provide for (i) any and all Awards outstanding hereunder to terminate at a specific time in the future and shall give each Participant the right to exercise such Awards during a period of time as the Committee shall determine, (ii) either the purchase of any Award for an amount of cash equal to the amount that could have been attained upon the exercise of such Award or realization of the Participant's rights had such Award been currently exercisable or payable or fully vested (and, for the avoidance of doubt, if as of such date the Committee determines in good faith that no amount would have been attained upon the exercise of such Award or realization of the Participant's rights, then such Award may be terminated by the Company without payment), (iii) the replacement of such Award with other rights or property selected by the Committee in its sole discretion or the assumption of or substitution of such Award by the successor or surviving corporation, or a parent or subsidiary thereof, with appropriate adjustments as to the number and kind of Shares and prices, or (iv) provide for payment of Awards in cash based on the value of Shares on the date of the Corporate Transaction plus reasonable interest on the Award through the date such Award would otherwise be vested or have been paid in accordance with its original terms, if necessary to comply with Section 409A of the Code.

8.3 <u>Outstanding Awards – Other Changes</u>. In the event of any other change in the capitalization of the Company or corporate change other than those specifically referred to in this Article 8, the Committee may, in its absolute discretion, make such adjustments in the number and class of shares subject to Awards outstanding on the date on which such change occurs and in the per share grant or exercise price of each Award as the Committee may consider appropriate to prevent dilution or enlargement of rights.

8.4 <u>No Other Rights</u>. Except as expressly provided in the Plan, no Participant shall have any rights by reason of any subdivision or consolidation of shares of any class, the payment of any dividend, any increase or decrease in the number of shares of any class or any dissolution, liquidation, merger, or consolidation of the Company or any other corporation. Except as expressly provided in the Plan or pursuant to action of the Committee under the Plan, no issuance by the Company of shares of any class, or securities convertible into shares of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number of shares subject to an Award or the grant or exercise price of any Award.

## ARTICLE 9

### ADMINISTRATION

9.1 <u>Committee</u>. The Plan shall be administered by the Compensation Committee of the Board; *provided*, *however* that the Compensation Committee may delegate to a committee of one or more members of the Board the authority to grant or amend Awards to Participants other than Independent Directors and executive officers of the Company. The Committee shall consist of at least two individuals, each of whom qualifies as a non-employee director within the meaning of Rule 16b-3(b)(3) under the Exchange Act. Reference to the Committee shall refer to the Board if the Compensation Committee has not been established or ceases to exist and the Board does not appoint a successor Committee. Notwithstanding the foregoing, the full Board, acting by majority of its members in office shall conduct the general administration of the Plan if required by Applicable Laws, and with respect to Awards granted to Independent Directors and for purposes of such Awards the term "Committee" as used in the Plan shall be deemed to refer to the Board.

12

9.2 <u>Action by the Committee</u>. A majority of the Committee shall constitute a quorum. The acts of a majority of the members present at any meeting at which a quorum is present, and acts approved in writing by a majority of the Committee in lieu of a meeting, shall be deemed the acts of the Committee. Each member of the Committee is entitled to, in good faith, rely or act upon any report or other information furnished to that member by any officer or other employee of the Company or any Subsidiary, the Company's independent certified public accountants, or any executive compensation consultant or other professional retained by the Company to assist in the administration of the Plan.

9.3 <u>Authority of Committee</u>. Subject to any specific designation in the Plan, the Committee has the exclusive power, authority and discretion to:

(a) Designate eligible Employees, members of the Board and Consultants to receive Awards;

(b) Determine the type or types of Awards to be granted to each Participant;

(c) Determine the number of Awards to be granted and the number of Shares to which an Award will relate;

(d) Determine the terms and conditions of any Award granted pursuant to the Plan, including, but not limited to, the exercise price, grant price, or purchase price, any restrictions or limitations on the Award, any schedule for lapse of forfeiture restrictions or restrictions on the exercisability of an Award, and accelerations or waivers thereof, any provisions related to non-competition and recapture of gain on an Award, based in each case on such considerations as the Committee in its sole discretion determines;

(e) Determine whether, to what extent, and pursuant to what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Shares, other Awards, or other property, or an Award may be canceled, forfeited, or surrendered (whether or not in exchange for another Award or combination of Awards);

(f) Prescribe the form of each Award Agreement, which need not be identical for each Participant;

(g) Decide all other matters that must be determined in connection with an Award;

(h) Establish, adopt, or revise any rules and regulations as it may deem necessary or advisable to administer the Plan;

(i) Interpret the terms of, and any matter arising pursuant to, the Plan or any Award Agreement; and

13

(j) Make all other decisions and determinations that may be required pursuant to the Plan or as the Committee deems necessary or advisable to administer the Plan.

9.4 <u>Decisions Binding</u>. The Committee's interpretation of the Plan, any Awards granted pursuant to the Plan, any Award Agreement and all decisions and determinations by the Committee with respect to the Plan are final, binding, and conclusive on all parties.

## ARTICLE 10

### EFFECTIVE AND EXPIRATION DATE

10.1 <u>Effective Date</u>. The Plan is effective as of the date it is adopted and approved by the Board in accordance with the applicable provisions of the Company's Memorandum of Association and Articles of Association (the "<u>Effective Date</u>").

10.2 <u>Expiration Date</u>. The Plan will expire on, and no Award may be granted pursuant to the Plan after, the tenth anniversary of the Effective Date. Any Awards that are outstanding on the tenth anniversary of the Effective Date shall remain in force according to the terms of the Plan and the applicable Award Agreement.

## ARTICLE 11

### AMENDMENT, MODIFICATION, AND TERMINATION

11.1 <u>Amendment, Modification, And Termination</u>. With the approval of the Board, at any time and from time to time, the Committee may terminate, amend or modify the Plan; *provided*, *however*, that unless the Company decides to follow home country practice, (a) to the extent necessary and desirable to comply with Applicable Laws, or stock exchange rules, the Company shall obtain shareholder approval of any Plan amendment in such a manner and to such a degree as required, and (b) shareholder approval is required for any amendment to the Plan that (i) increases the number of Shares available under the Plan (other than any adjustment as provided by Article 8), (ii) permits the Committee to extend the term of the Plan or the exercise period for an Option beyond ten years from the date of grant, or (iii) results in a material increase in benefits or a change in eligibility requirements.

11.2 <u>Awards Previously Granted</u>. Except with respect to amendments made pursuant to Section 12.15, no termination, amendment, or modification of the Plan shall adversely affect in any material way any Award previously granted pursuant to the Plan without the prior written consent of the Participant.

14

**ARTICLE 12**

**GENERAL PROVISIONS**

12.1 No Rights to Awards. No Participant, employee, or other person shall have any claim to be granted any Award pursuant to the Plan, and neither the Company nor the Committee is obligated to treat Participants, employees, and other persons uniformly.

12.2 No Shareholders Rights. No Award gives the Participant any of the rights of a Shareholder of the Company unless and until Shares are in fact issued to such person in connection with such Award.

12.3 Taxes. No Shares shall be delivered under the Plan to any Participant until such Participant has made arrangements acceptable to the Committee for the satisfaction of any income and employment tax withholding obligations under Applicable Laws. The Company or any Subsidiary shall have the authority and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy all applicable taxes (including the Participant's payroll tax obligations) required or permitted by law to be withheld with respect to any taxable event concerning a Participant arising as a result of this Plan. The Committee may in its discretion and in satisfaction of the foregoing requirement allow a Participant to elect to have the Company withhold Shares otherwise issuable under an Award (or allow the return of Shares) having a Fair Market Value equal to the sums required to be withheld. Notwithstanding any other provision of the Plan, the number of Shares which may be withheld with respect to the issuance, vesting, exercise or payment of any Award (or which may be repurchased from the Participant of such Award after such Shares were acquired by the Participant from the Company) in order to satisfy all of the Participant's income and payroll tax liabilities with respect to the issuance, vesting, exercise or payment of the Award shall, unless specifically approved by the Committee, be limited to the number of Shares which have a Fair Market Value on the date of withholding or repurchase equal to the aggregate amount of such liabilities based on the minimum statutory income and payroll tax withholding rates that are applicable to such supplemental taxable income under Applicable Laws.

12.4 No Right to Employment or Services. Nothing in the Plan or any Award Agreement shall interfere with or limit in any way the right of the Service Recipient to terminate any Participant's employment or services at any time, nor confer upon any Participant any right to continue in the employ or service of any Service Recipient.

12.5 Effect of Plan upon Other Compensation Plans. The adoption of the Plan shall not affect any other compensation or incentive plans in effect for any Service Recipient. Nothing in the Plan shall be construed to limit the right of any Service Recipient: (a) to establish any other forms of incentives or compensation for Employees, members of the Board or Consultants, or (b) to grant or assume options or other rights or awards otherwise than under the Plan in connection with any proper corporate purpose including without limitation, the grant or assumption of options in connection with the acquisition by purchase, lease, merger, consolidation or otherwise, of the business, stock or assets of any corporation, partnership, limited liability company, firm or association.

15

12.6 <u>Unfunded Status of Awards</u>. The Plan is intended to be an "unfunded" plan for incentive compensation. With respect to any payments not yet made to a Participant pursuant to an Award, nothing contained in the Plan or any Award Agreement shall give the Participant any rights that are greater than those of a general creditor of the Company or any Subsidiary.

12.7 <u>Indemnification</u>. To the extent allowable pursuant to applicable law, each member of the Committee or of the Board shall be indemnified and held harmless by the Company from any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by such member in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action or failure to act pursuant to the Plan and against and from any and all amounts paid by him or her in satisfaction of judgment in such action, suit, or proceeding against him or her; *provided* that he or she gives the Company an opportunity, at its own expense, to handle and defend the same before he or she undertakes to handle and defend it on his or her own behalf. The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled pursuant to the Company's Memorandum of Association and Articles of Association, as a matter of law, or otherwise, or any power that the Company may have to indemnify them or hold them harmless.

12.8 <u>Relationship to other Benefits</u>. No payment pursuant to the Plan shall be taken into account in determining any benefits pursuant to any pension, retirement, savings, profit sharing, group insurance, welfare or other benefit plan of the Company or any Subsidiary except to the extent otherwise expressly provided in writing in such other plan or an agreement thereunder.

12.9 <u>Expenses</u>. The expenses of administering the Plan shall be borne by the Company and its Subsidiaries.

12.10 <u>Titles and Headings</u>. The titles and headings of the Sections in the Plan are for convenience of reference only and, in the event of any conflict, the text of the Plan, rather than such titles or headings, shall control.

12.11 <u>Fractional Shares</u>. No fractional Share shall be issued and the Committee shall determine, in its discretion, whether cash shall be given in lieu of fractional shares or whether such fractional shares shall be eliminated by rounding up or down as appropriate.

12.12 <u>Government and Other Regulations</u>. The obligation of the Company to make payment of awards in Shares or otherwise shall be subject to all Applicable Laws and to such approvals by government agencies as may be required. The Company shall be under no obligation to register any of the Shares paid pursuant to the Plan under the Securities Act or any other similar law in any applicable jurisdiction. If the Shares paid pursuant to the Plan may in certain circumstances be exempt from registration pursuant to the Securities Act or other Applicable Laws, the Company may restrict the transfer of such Shares in such manner as it deems advisable to ensure the availability of any such exemption.

12.13 <u>Governing Law</u>. The Plan and all Award Agreements shall be construed in accordance with and governed by the laws of the Cayman Islands.

16

12.14 <u>Section 409A</u>. To the extent that the Committee determines that any Award granted under the Plan is or may become subject to Section 409A of the Code, the Award Agreement evidencing such Award shall incorporate the terms and conditions required by Section 409A of the Code. To the extent applicable, the Plan and the Award Agreements shall be interpreted in accordance with Section 409A of the Code and the U.S. Department of Treasury regulations and other interpretative guidance issued thereunder, including without limitation any such regulation or other guidance that may be issued after the Effective Date. Notwithstanding any provision of the Plan to the contrary, in the event that following the Effective Date the Committee determines that any Award may be subject to Section 409A of the Code and related U.S. Department of Treasury guidance (including such U.S. Department of Treasury guidance as may be issued after the Effective Date), the Committee may adopt such amendments to the Plan and the applicable Award agreement or adopt other policies and procedures (including amendments, policies and procedures with retroactive effect), or take any other actions, that the Committee determines is necessary or appropriate to (a) exempt the Award from Section 409A of the Code and /or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A of the Code and related U.S. Department of Treasury guidance.

12.15 <u>Appendices</u>. The Committee may approve such supplements, amendments or appendices to the Plan as it may consider necessary or appropriate for purposes of compliance with applicable laws or otherwise and such supplements, amendments or appendices shall be considered a part of the Plan; *provided*, *however*, that no such supplements shall increase the share limitations contained in Section 3.1 of the Plan.

\* \* \* \* \*

17

**Exhibit 4.57**

**Termination Agreement of Current Control Contracts**

This Termination Agreement of Current Control Contracts (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China (the "**PRC**," for purposes of this Agreement excluding Hong Kong, Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a wholly foreign owned enterprise duly formed and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party B: Beijing Baidu Netcom Science Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at 2/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party C: Yanhong Li**, a PRC citizen, ID No.        ; and
     **Hailong Xiang**, a PRC citizen, ID No.    ;


And

**Party D**: **Baidu Inc.**, a company duly formed and validly existing under the laws of the Cayman Islands, with its registered address at M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as "Other Parties."


**WHEREAS:**

(1)    Each of Party A, Party B and Party C has signed the documents listed in Exhibit 1 attached hereto (collectively the "**Current Control Documents**"; for avoidance of any doubt, "all" and/or "any" of the Current Control Documents referenced herein are limited to the documents listed in Exhibit 1 attached hereto) prior to the date hereof; and

(2)    Pursuant to the terms and subject to the conditions herein, each Party agrees to terminate all of the Current Control Documents and enter into the new control documents listed in Exhibit 2 attached hereto (the "**New Control Documents**").

**NOW, THEREFORE**, the Parties agree as follows through negotiations:

**1.    Termination of Current Control Documents**

1.1    Each of Party A, Party B and Party C hereby irrevocably agrees and acknowledges that all of the Current Control Documents shall terminate and cease to have any effect as of the date hereof.

1.2    As of the date hereof, each of Party A, Party B and Party C shall have no right under all and/or any of the Current Control Documents, or be required to fulfill any obligation thereunder; *provided, however*, that any rights exercised and obligations fulfilled by each of Party A, Party B and Party C on reliance of the Current Control Documents shall remain valid, no Party is required to return any payment, income or interest of any kind received by it or in its actual possession on reliance of the Current Control Documents, and any amount which has become due and payable among Party A, Party B and Party C shall be paid accordingly.

1.3    Unless otherwise provided in Section 1.2 above, each of Party A, Party B and Party C hereby irrevocably and unconditionally waive any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties directly or indirectly in connection with or arising from all and/or any of the Current Control Documents.

1.4    Without prejudice to the generality of Sections 1.2 and 1.3 above, as of the date hereof, each of Party A, Party B and Party C hereby waives any commitment, debt, claim, demand, obligation and liability of any kind or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, in connection with or arising from the Current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.    Execution of New Control Documents**

2.1    Each of the Parties agrees and acknowledges that subject to fulfilment of the terms under Article 1, each of the Parties shall enter into the New Control Documents listed in Exhibit 2 and agree to exercise their respective rights and undertake their respective covenants, obligations and duties in accordance therewith.

3.  **Representations and Warranties**

3.1  **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal rights, powers and authorities to execute this Agreement and all contracts and documents referenced herein to which it is a party, and execution of this Agreement represents expression of its genuine intent;

(2) none of its execution and performance of this Agreement will constitute breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or requirement for it to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents referenced herein to which it is a party, and for its compliance with and performance of its obligations hereunder and thereunder.

4.  **Covenants**

4.1  In order to duly terminate the rights and obligations under the Current Control Documents, each Party shall execute all documents and take all actions that are necessary or advisable, provide active support for the Other Parties in obtaining relevant government approvals and/or registration documents and effecting relevant termination procedures.

5.  **Termination**

5.1  Except for the circumstances expressly provided herein, the Parties agree to terminate this Agreement:

(1) by all of the Parties through negotiation, and all expenses and losses incurred therefrom shall be borne respectively by the incurring Party; or

(2) by the non-defaulting Party if the intent of this Agreement is incapable of fulfilment due to a Party's breach of its obligations hereunder.

6.  **Breach Liabilities and Indemnification**

6.1  Any Party shall be deemed in breach of this Agreement if it breaches or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

6.2    Unless otherwise expressly agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Party for any cost, liability or any loss (including without limitation any interest accrued therefrom and legal fees) incurred by the non-defaulting Party. The total amount of indemnity payable by the defaulting Party to the non-defaulting Party shall be the loss arising from such breach.

**7.    Governing Law and Dispute Resolution**

7.1    The formation of this Agreement and its validity, interpretation, performance and resolution of any dispute arising from this Agreement shall be governed by and construed in accordance with the laws of the PRC.

7.2    All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through negotiations in good faith.

7.3    Any Party may submit any dispute arising from this Agreement to China International Economic and Trade Arbitration Commission (CIETAC) for arbitration in Beijing in accordance with its arbitration rules and procedures then in effect. The arbitral tribunal shall consist of three arbitrators appointed in accordance with the arbitration rules, with one arbitrator appointed by the claimant, one arbitrator by the respondent and the third arbitrator by the two appointed arbitrators after consultation or by the CIETAC. The arbitration shall proceed on confidential basis in Chinese. The arbitral award shall be final and binding upon all Parties.

7.4    During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**8.    Confidentiality**

8.1    The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement, and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for any disclosure:

(1) to the auditor, legal advisor and any other person engaged by it in the ordinary course of business, provided that such person shall be obliged to keep in confidence any information relating to this Agreement acquired by it during such engagement; and

(2) which could be otherwise accessible by the public, or is expressly required by law, regulation or relevant stock exchange authority.

**9.    Miscellaneous**

9.1    This Agreement shall become effective upon signature of all of the Parties.

9.2    The Parties may amend or modify this Agreement through negotiations. Any such amendment or modification shall be made in writing and become effective upon signature of all of the Parties.

9.3    If any provision hereof be held invalid or unenforceable, such provision shall be deemed to have never existed herein and have no effect upon validity of the remainder of this Agreement, and the Parties shall negotiate to provide for a new provision to the extent permissible by law to ensure that the intent of the original provision be realized to the maximum extent.

9.4    Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall operate as its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

9.5    This Agreement is made in five originals with one thereof for each Party, and each of the originals shall be equally binding.

*(No text below, Signatures to follow)*

**IN WITNESS WHEREOF**, each Party has executed or caused this Termination Agreement of Current Control Contracts to be executed by its authorized representative on its behalf as of the date first written above with immediate effect.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature: /s/ Hailong Xiang
Name:
Title: Legal Representative

**Party B:**

**Beijing Baidu Netcom Science Technology Co., Ltd. (seal)**

Signature: /s/ Zhixiang Liang
Name:
Title: Legal Representative

**Party C:**

**Yanhong Li**

Signature: /s/ Yanhong Li

**Xianghai Long**

Signature: /s/ Xianghai Long

**Party D:**

**Baidu, Inc.**

Signature: /s/ Yanhong Li
Name:
**Title: Director**

**Exhibit 1**

List of Current Control Documents

| No. | Document Name | Signed by | Signed on |
|-----|---------------|-----------|-----------|
| 1 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; and Beijing Baidu Netcom Science Technology Co., Ltd. | January 18, 2017 |
| 2 | Proxy Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; and Hailong Xiang | June 13, 2016 |
| 3 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li | January 18, 2017 |
| 4 | Power of Attorney | Yanhong Li | June 13, 2016 |
| 5 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Hailong Xiang; and Beijing Baidu Netcom Science Technology Co., Ltd. | January 18, 2017 |
| 6 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Hailong Xiang | January 18, 2017 |
| 7 | Power of Attorney | Hailong Xiang | June 13, 2016 |

**Exhibit 2**

List of New Control Documents

| No. | Document Name | To be signed by |
|---|---|---|
| 1 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Yanhong Li; and Beijing Baidu Netcom Science Technology Co., Ltd. |
| 2 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li |
| 3 | Proxy Agreement | Baidu, Inc. and Yanhong Li |
| 4 | Power of Attorney | Yanhong Li |
| 5 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Hailong Xiang; and Beijing Baidu Netcom Science Technology Co., Ltd. |
| 6 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Hailong Xiang |
| 7 | Proxy Agreement | Baidu, Inc. and Hailong Xiang |
| 8 | Power of Attorney | Hailong Xiang |

**Exhibit 4.58**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "**Agreement**") is made as of May 7, 2018 in Beijing, by and between:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**
  Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Hailong Xiang**
  ID Card No.

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2. Party B is a Chinese citizen holding 0.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("**Baidu Netcom**"); and

3. Party A and Party B have entered into an Loan Agreement dated March 31, 2018 (the "**Original Loan Agreement**"), under which Party A lent a loan equal to RMB10,856,400 to Party B for payment of the price of its acquiring 0.5% equity interests in Baidu Netcom. Party A and Party B intend to enter into this Agreement to replace the Original Loan Agreement and set forth their respective new rights and obligations.

**NOW, THEREFORE,** Party A and Party B agree as follows through negotiations:

1. Pursuant to the terms and subject to the conditions of this Agreement, Party A agrees to provide to Party B and Party B agrees to accept, a loan at an aggregate amount of RMB32,106,400.

2. Party B confirms its receipt of the loan and has applied the loan in its entirety to pay the price for its acquiring equity interests in Baidu Netcom.

3. The term of the loan under this Agreement shall commence on the day of receipt of the loan by Party B until the 10th anniversary of the date on which this Agreement is executed, which term is renewable upon agreement by the Parties in writing; *provided, however*, that the loan provided hereunder could be accelerated for immediate repayment by Party B pursuant to this Agreement at the request of Party A in writing at any time during the term of the loan or any renewal thereof if:

  (1) Party B resigns from or is dismissed by Party A or any affiliate of Party A;

  (2) Party B is dead, without civil legal capacity or with limited civil legal capacity;

  (3) Party B is found with criminal offense or involvement therein;

(4)  A claim is raised against Party B by any third party for an amount exceeding RMB100,000; or

(5)  Subject to the laws of the PRC, Party A or any of its nominees may make investment in Baidu Netcom for operation of value-added telecommunication services and other services, such as internet information services, and Baidu, Inc. or any of its nominees has elected to exercise its option by issuing a written notice to Party B to purchase the equity interests in Baidu Netcom under the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement referenced in article 4 hereof.

4.  It is agreed and acknowledged that, subject to and to the extent permitted by the laws of the PRC, Baidu, Inc., as the holding company of Party A, shall have the right but no obligation to purchase or nominate any other person (including any natural person, legal entity or other entity) to purchase all or any part of the equity interests in Baidu Netcom held by Party B (the "**Call Option**"), provided that Baidu, Inc. shall issue a written notice to Party B to exercise the Call Option. Upon Baidu, Inc.'s issuance of such written notice, Party B shall, as requested and instructed by Party A, immediately transfer all of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees at the original investment price (the "**Original Investment Price**") or any other price acceptable to Baidu, Inc. required under applicable laws. It is agreed and acknowledged that upon exercising the Call Option by Baidu, Inc., if the lowest price of the equity interests permitted under applicable laws is higher than the Original Investment Price, the price payable by Baidu, Inc. or any of its nominees shall be the lowest price permitted under applicable laws. The Parties agree to enter into an Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement with respect to the foregoing in this Article 4.

5.  It is agreed and acknowledged that Party B shall repay the loan only as follows: upon its maturity and at the request of Party A in writing, the loan provided hereunder shall be repaid by Party B (or any of its heirs, successors or assigns) with the proceeds from transfer of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees to the extent permitted under the PRC laws, or otherwise agreed by the Parties.

6.  It is agreed and acknowledged that in connection with transfer of the equity interests by Party B to Baidu, Inc. or any of its nominees upon maturity of the loan, if the proceeds from such transfer are legally required to or otherwise exceed the principal of the loan, Party B agrees to pay such excess amount, net of any individual income tax and other taxes and fees payable by Party B, to Baidu, Inc. or any of its nominees at sole decision of Baidu, Inc. to the extent permissible by the law.

7.  It is agreed and acknowledged that Party B shall not be deemed to have fulfilled its obligations under this Agreement until:

2

(1) it has transferred all of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees; and

(2) it has paid to Party A all of the proceeds from the equity interest transfer or the maximum amount thereof permitted under applicable laws (including principal and the highest interest accrued thereupon permitted under applicable laws) as repayment of the loan.

8. To secure performance of its obligations under this Agreement, Party B agrees to pledge all of his equity interests in Baidu Netcom to Party A (the "**Equity Pledge**"). It is acknowledged that an Amend and Restated Equity Pledge Agreement in respect of the foregoing in this Article 8 has been made as of [   ], 2018.

9. As of the date hereof, Party A represents and warrants to Party B that:

(1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

(2) Party A has the right to execute and perform this Agreement. The execution and performance of this agreement by Party A comply with its business scope, articles or any other organization document, and Party A has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

(3) The principal of the loan to Party B is legally owned by Party A;

(4) Execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any covenant made by Party A to any third party; and

(5) This Agreement, once executed, shall constitute legal, valid obligations of Party A and enforceable against Party A in accordance with its terms.

10. As of the date hereof until the end of this Agreement, Party B represents and warrants to Party A that:

(1) Baidu Netcom is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is a legal holder of the equity interests in Baidu Netcom;

(2) Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with the articles or any other organizational document of Baidu Netcom, and Party B has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

3

(3)    Execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any covenant made by Party B to any third party;

(4)    This Agreement, once executed, shall constitute legal, valid obligations of Party B and enforceable against Party B in accordance with its terms;

(5)    Party B has made all contributions required by law for its holding equity interests in Baidu Netcom;

(6)    Unless otherwise provided under the Amended and Restated Equity Pledge Agreement and the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement, Party B does not create any mortgage, pledge or other security over its equity interests in Baidu Netcom, or make any offer to any third party to transfer its equity interests, or make any promise as to any offer to purchase its equity interests from any third party, or execute any agreement with any third party to transfer its equity interests;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests in Baidu Netcom held by Party B; and

(8)    Baidu Netcom has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes that during the term of this Agreement, it shall:

(1)    not sell, transfer, pledge or otherwise dispose of its equity interests or other interests in Baidu Netcom, or to allow creation of any other security interest thereupon without the prior written consent of Party A, except for the equity pledge or other right created for the benefit of Party A;

(2)    not vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder's meetings permitting sale, transfer, pledge or other disposal of any of its legal or beneficiary ownership of the equity interests in Baidu Netcom or creation of any other security interest thereupon without the prior written consent of Party A, except for those made to Party A or any of its nominees;

(3)    not vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder meetings permitting Baidu Netcom to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)    promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Baidu Netcom;

4

(5) execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of equity interests in Baidu Netcom;

(6) refrain from any act and/or omission that may materially affect the assets, business and liabilities of Baidu Netcom without the prior written consent of Party A;

(7) appoint any person nominated by Party A as executive director of Baidu Netcom, upon Party A's request;

(8) in connection with Party A's exercise of the Call Option provided hereunder, transfer promptly and unconditionally all equity interests in Baidu Netcom held by Party B to Party A and/or any of its nominees, to the extent and within the scope permissible under the laws of the PRC;

(9) not request Baidu Netcom to distribute dividends or profits to it;

(10) upon transfer of its equity interests in Baidu Netcom to Party A or any of its nominees, pay the entire proceeds received by it from transfer of the equity interests to Party A as repayment of the loan or otherwise to the extent permitted under the laws of the PRC; and

(11) strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that could affect the validity and enforceability of this Agreement.

12. Party B undertakes that in its capacity of a shareholder of Baidu Netcom and during the term of this Agreement, it shall procure Baidu Netcom:

(1) not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2) to maintain its existence and handle matters prudently and affectively in accordance with good financial and business rules and practices;

(3) not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4) not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except for any liabilities (i) arising from the ordinary or day-to-day course of business instead of through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

5

(5)    to operate all businesses on a continued basis and maintain the value of its assets;

(6)    not to execute any material contracts (for the purpose of this Section 12(6), a contract will be deemed material if its value exceeds RMB500,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)    to provide all information regarding its operations and financial affairs at Party A's request;

(8)    not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)    not to distribute dividends to the shareholders without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)   to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)   to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets; and

(12)   to strictly comply with the terms of the Exclusive Technology Consulting and Services Agreement dated March 1, 2004, the Exclusive Technology Consulting and Services Supplementary Agreement dated August 9, 2004, and the Exclusive Technology Consulting and Services Agreement dated March 22, 2005, each by Baidu Netcom and Party A (collectively, the "**Service Agreement**") and other agreements, duly perform its obligations thereunder, and refrain from any act or omission that could affect the validity and enforceability thereof.

13.   This Agreement is binding upon, and inures the benefit of, each of the Parties and their respective heirs, successors and permitted assigns. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.   Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

6

15. Execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

   (1) Both Parties shall strive to resolve any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through negotiations in good faith. If no resolution is made within thirty (30) days after one Party requests for such resolution, either Party may submit such matter to China International Economic and Trade Arbitration Commission (the "**CIETAC**") in accordance with its then-effect rules. The arbitration award shall be final and conclusive and binding upon the Parties.

   (2) The place of the arbitration shall be Beijing.

   (3) The arbitration language shall be Chinese.

17. This Agreement shall be made as of the date of its execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and expire on the date when each Party has completed its obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A is found with gross negligence, fraud, or other material misconduct; or (2) Party A is in bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreements of the Parties with respect to the transaction herein and supersedes all prior verbal discussions and written agreements between the Parties, including without limitation the Original Loan Agreement. The Original Loan Agreement shall terminate as of the date on which this Agreement becomes effective and cease to have any effect upon the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any term shall not affect the validity or enforceability of the remainder of this Agreement.

22. Each Party shall strictly protect the confidentiality of any information regarding the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

7

23.    Any obligation that is accrued or becomes due prior to expiry or early termination of this Agreement shall survive such expiry or early termination. Sections 15, 16, and 22 shall survive expiry or termination of this Agreement.

24.    This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

8

[Signature page only]

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd.
(seal)**

Signature:  /s/
                 Legal representative/authorized representative

**Party B:**

**Hailong Xiang**

Signature:    /s/ Hailong Xiang

9

**Exhibit 4.59**

**Amended and Restated Loan Agreement**

This Amended and Restated Loan Agreement (this "**Agreement**") is made as of May 7, 2018 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:    Yanhong Li**
ID Card No.

**WHEREAS**:

1.    Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2.    Party B is a Chinese citizen holding 99.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("**Baidu Netcom**"); and

3.    Party A and Party B have entered into an Loan Agreement dated March 31, 2018 (the "**Original Loan Agreement**"), under which Party A lent a loan equal to RMB2,160,423,600 to Party B for payment of the price of its acquiring 99.5% equity interests in Baidu Netcom. Party A and Party B intend to enter into this Agreement to replace the Original Loan Agreement and set forth their respective new rights and obligations.

**NOW, THEREFORE,** Party A and Party B agree as follows through negotiations:

1.    Pursuant to the terms and subject to the conditions of this Agreement, Party A agrees to provide to Party B and Party B agrees to accept, a loan at an aggregate amount of RMB6,389,173,600.

2.    Party B confirms its receipt of the loan and has applied the loan in its entirety to pay the price for its acquiring equity interests in Baidu Netcom.

3.    The term of the loan under this Agreement shall commence on the day of receipt of the loan by Party B until the 10th anniversary of the date on which this Agreement is executed, which term is renewable upon agreement by the Parties in writing; *provided, however*, that the loan provided hereunder could be accelerated for immediate repayment by Party B pursuant to this Agreement at the request of Party A in writing at any time during the term of the loan or any renewal thereof if:

(1)    Party B resigns from or is dismissed by Party A or any affiliate of Party A;

(2)    Party B is dead, without civil legal capacity or with limited civil legal capacity;

(3)    Party B is found with criminal offense or involvement therein;

(4)    A claim is raised against Party B by any third party for an amount exceeding RMB100,000; or

(5)    Subject to the laws of the PRC, Party A or any of its nominees may make investment in Baidu Netcom for operation of value-added telecommunication services and other services, such as internet information services, and Baidu, Inc. or any of its nominees has elected to exercise its option by issuing a written notice to Party B to purchase the equity interests in Baidu Netcom under the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement referenced in article 4 hereof.

4.    It is agreed and acknowledged that, subject to and to the extent permitted by the laws of the PRC, Baidu, Inc., as the holding company of Party A, shall have the right but no obligation to purchase or nominate any other person (including any natural person, legal entity or other entity) to purchase all or any part of the equity interests in Baidu Netcom held by Party B (the "**Call Option**"), provided that Baidu, Inc. shall issue a written notice to Party B to exercise the Call Option. Upon Baidu, Inc.'s issuance of such written notice, Party B shall, as requested and instructed by Party A, immediately transfer all of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees at the original investment price (the "**Original Investment Price**") or any other price acceptable to Baidu, Inc. required under applicable laws. It is agreed and acknowledged that upon exercising the Call Option by Baidu, Inc., if the lowest price of the equity interests permitted under applicable laws is higher than the Original Investment Price, the price payable by Baidu, Inc. or any of its nominees shall be the lowest price permitted under applicable laws. The Parties agree to enter into an Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement with respect to the foregoing in this Article 4.

5.    It is agreed and acknowledged that Party B shall repay the loan only as follows: upon its maturity and at the request of Party A in writing, the loan provided hereunder shall be repaid by Party B (or any of its heirs, successors or assigns) with the proceeds from transfer of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees to the extent permitted under the PRC laws, or otherwise agreed by the Parties.

6.    It is agreed and acknowledged that in connection with transfer of the equity interests by Party B to Baidu, Inc. or any of its nominees upon maturity of the loan, if the proceeds from such transfer are legally required to or otherwise exceed the principal of the loan, Party B agrees to pay such excess amount, net of any individual income tax and other taxes and fees payable by Party B, to Baidu, Inc. or any of its nominees at sole decision of Baidu, Inc. to the extent permissible by the law.

2

7.  It is agreed and acknowledged that Party B shall not be deemed to have fulfilled its obligations under this Agreement until:

    (1)  it has transferred all of its equity interests in Baidu Netcom to Baidu, Inc. or any of its nominees; and

    (2)  it has paid to Party A all of the proceeds from the equity interest transfer or the maximum amount thereof permitted under applicable laws (including principal and the highest interest accrued thereupon permitted under applicable laws) as repayment of the loan.

8.  To secure performance of its obligations under this Agreement, Party B agrees to pledge all of his equity interests in Baidu Netcom to Party A (the "**Equity Pledge**"). It is acknowledged that an Amend and Restated Equity Pledge Agreement in respect of the foregoing in this Article 8 has been made as of [    ], 2018.

9.  As of the date hereof, Party A represents and warrants to Party B that:

    (1)  Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

    (2)  Party A has the right to execute and perform this Agreement. The execution and performance of this agreement by Party A comply with its business scope, articles or any other organization document, and Party A has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

    (3)  The principal of the loan to Party B is legally owned by Party A;

    (4)  Execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any covenant made by Party A to any third party; and

    (5)  This Agreement, once executed, shall constitute legal, valid obligations of Party A and enforceable against Party A in accordance with its terms.

10.  As of the date hereof until the end of this Agreement, Party B represents and warrants to Party A that:

    (1)  Baidu Netcom is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is a legal holder of the equity interests in Baidu Netcom;

    (2)  Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with the articles or any other organizational document of Baidu Netcom, and Party B has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

3

(3)    Execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any covenant made by Party B to any third party;

(4)    This Agreement, once executed, shall constitute legal, valid obligations of Party B and enforceable against Party B in accordance with its terms;

(5)    Party B has made all contributions required by law for its holding equity interests in Baidu Netcom;

(6)    Unless otherwise provided under the Amended and Restated Equity Pledge Agreement and the Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement, Party B does not create any mortgage, pledge or other security over its equity interests in Baidu Netcom, or make any offer to any third party to transfer its equity interests, or make any promise as to any offer to purchase its equity interests from any third party, or execute any agreement with any third party to transfer its equity interests;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests in Baidu Netcom held by Party B; and

(8)    Baidu Netcom has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes that during the term of this Agreement, it shall:

(1)    not sell, transfer, pledge or otherwise dispose of its equity interests or other interests in Baidu Netcom, or to allow creation of any other security interest thereupon without the prior written consent of Party A, except for the equity pledge or other right created for the benefit of Party A;

(2)    not vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder's meetings permitting sale, transfer, pledge or other disposal of any of its legal or beneficiary ownership of the equity interests in Baidu Netcom or creation of any other security interest thereupon without the prior written consent of Party A, except for those made to Party A or any of its nominees;

(3)    not vote for, support or execute any shareholder resolutions at Baidu Netcom's shareholder meetings permitting Baidu Netcom to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)    promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Baidu Netcom;

4

(5)    execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of equity interests in Baidu Netcom;

(6)    refrain from any act and/or omission that may materially affect the assets, business and liabilities of Baidu Netcom without the prior written consent of Party A;

(7)    appoint any person nominated by Party A as executive director of Baidu Netcom, upon Party A's request;

(8)    in connection with Party A's exercise of the Call Option provided hereunder, transfer promptly and unconditionally all equity interests in Baidu Netcom held by Party B to Party A and/or any of its nominees, to the extent and within the scope permissible under the laws of the PRC;

(9)    not request Baidu Netcom to distribute dividends or profits to it;

(10)    upon transfer of its equity interests in Baidu Netcom to Party A or any of its nominees, pay the entire proceeds received by it from transfer of the equity interests to Party A as repayment of the loan or otherwise to the extent permitted under the laws of the PRC; and

(11)    strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that could affect the validity and enforceability of this Agreement.

12.    Party B undertakes that in its capacity of a shareholder of Baidu Netcom and during the term of this Agreement, it shall procure Baidu Netcom:

(1)    not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2)    to maintain its existence and handle matters prudently and affectively in accordance with good financial and business rules and practices;

(3)    not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4)    not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except for any liabilities (i) arising from the ordinary or day-to-day course of business instead of through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

5

(5)   to operate all businesses on a continued basis and maintain the value of its assets;

(6)   not to execute any material contracts (for the purpose of this Section 12(6), a contract will be deemed material if its value exceeds RMB500,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)   to provide all information regarding its operations and financial affairs at Party A's request;

(8)   not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)   not to distribute dividends to the shareholders without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)  to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)  to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets; and

(12)  to strictly comply with the terms of the Exclusive Technology Consulting and Services Agreement dated March 1, 2004, the Exclusive Technology Consulting and Services Supplementary Agreement dated August 9, 2004, and the Exclusive Technology Consulting and Services Agreement dated March 22, 2005, each by Baidu Netcom and Party A (collectively, the "**Service Agreement**") and other agreements, duly perform its obligations thereunder, and refrain from any act or omission that could affect the validity and enforceability thereof.

13.  This Agreement is binding upon, and inures the benefit of, each of the Parties and their respective heirs, successors and permitted assigns. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.  Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

6

15. Execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

    (1) Both Parties shall strive to resolve any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through negotiations in good faith. If no resolution is made within thirty (30) days after one Party requests for such resolution, either Party may submit such matter to China International Economic and Trade Arbitration Commission (the "**CIETAC**") in accordance with its then-effect rules. The arbitration award shall be final and conclusive and binding upon the Parties.

    (2) The place of the arbitration shall be Beijing.

    (3) The arbitration language shall be Chinese.

17. This Agreement shall be made as of the date of its execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and expire on the date when each Party has completed its obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A is found with gross negligence, fraud, or other material misconduct; or (2) Party A is in bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreements of the Parties with respect to the transaction herein and supersedes all prior verbal discussions and written agreements between the Parties, including without limitation the Original Loan Agreement. The Original Loan Agreement shall terminate as of the date on which this Agreement becomes effective and cease to have any effect upon the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any term shall not affect the validity or enforceability of the remainder of this Agreement.

22. Each Party shall strictly protect the confidentiality of any information regarding the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

7

23. Any obligation that is accrued or becomes due prior to expiry or early termination of this Agreement shall survive such expiry or early termination. Sections 15, 16, and 22 shall survive expiry or termination of this Agreement.

24. This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

8

[Signature page only]

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd.**
**(seal)**

Signature: /s/
‾‾‾‾‾‾‾‾‾‾Legal representative/authorized representative‾‾‾‾‾

**Party B:**

**Yanhong Li**

Signature: /s/ Yanhong Li‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

9

**Exhibit 4.60**

**Proxy Agreement**

This Proxy Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu, Inc.**, with registered address at M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

And

**Party B: Yanhong Li**, with ID No.

**WHEREAS:**

1.  Party B is a citizen of the PRC and shareholder of Beijing Baidu Netcom Science Technology Co., Ltd. ("**Baidu Netcom**"). As of the date hereof, Party B holds 99.5% equity interests in Baidu Netcom ("**Party B's Equity**").

2.  Pursuant to the terms and subject to the conditions of this Agreement, Party B agrees to authorize a PRC company or individual designated by Party A to exercise its rights as a shareholder of Baidu Netcom on its behalf, and Party A agrees to accept such authorization.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.  Party B hereby agrees to irrevocably authorize any entity or individual designated by Party A to exercise on its behalf all of the voting and other rights as a shareholder empowered by the law and Baidu Netcom's articles of association at the shareholders' meeting of Baidu Netcom, including without limitation any right regarding sale, transfer, pledge or disposal of all or part of Party B's equity interests in Baidu Netcom; convening, attending and presiding over shareholders' meeting of Baidu Netcom as an authorized representative of Baidu Netcom's shareholders; electing and replacing any executive director, director, supervisor, principal and other senior management; considering and approving profit distribution and loss make-up plans of Baidu Netcom; adopting resolution regarding merger, division, liquidation or change of status of Baidu Netcom; deciding upon the business strategy and investment plan of Baidu Netcom; and amending articles of association of Baidu Netcom.

2.  Party A agrees to designate any entity or individual permitted under applicable laws to accept the authorization of Party B under Article 1 hereof, and such entity or individual shall exercise Party B's voting and other rights as a shareholder on behalf of Party B under this Agreement. As of the date hereof, Party A hereby designates Hailong Xiang as the authorized individual to exercise voting and other rights as a shareholder on behalf of Party B under this Agreement. For avoidance of any doubt, Party A shall have the discretion to replace any entity or individual designated by it or designate any other entity or individual to exercise such voting and other rights on behalf of Party B.

3.  Party B hereby acknowledges that, regardless of any change of its equity interests in Baidu Netcom, any entity or individual designated by Party A shall be authorized to exercise all of the voting and other rights as a shareholder on behalf of Party B.

4.  Party B hereby acknowledges that if Party A withdraws its designation of the authorized entity or individual, it shall immediately withdraw its authorization to such entity or individual, and authorize any other entity or individual designated by Party A to exercise all of its voting and other rights as a shareholder at the shareholders' meeting of Baidu Netcom. During the term of this Agreement, Party B waives and cease to exercise by itself any and all of the rights relating to Party B's Equity that have been authorized to Party A under this Agreement.

5.  This Agreement shall be effective upon execution by the Parties or their respective legal or authorized representatives as of the date first written above. This Agreement shall remain permanently valid unless otherwise expressly provided hereunder or terminated by Party A in writing. If any Party's operating term expires during the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If any Party's application to renew its operating term fails to obtain approval or consent from competent authority, this Agreement shall terminate upon the end of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

6.  This Agreement shall remain valid as long as Party B is a holder of any equity interest in Baidu Netcom. During the term of this Agreement, unless otherwise required by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time with a written notice to Party B no less than thirty (30) days in advance.

7.  No amendment to this Agreement shall be made unless by agreement of the Parties in writing. Any duly executed amendment or supplement hereto by the Parties is an integral part of, and shall have the same binding effect with, this Agreement.

8.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with any applicable law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the remainder hereof.

9.  All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Party or any other address designated and notified to such Party from time to time by hand, mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with marking of the mailing day on the postmark), or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; (c) at the time of receipt shown on the transmission acknowledgement if it is sent by fax; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

2

Party A:   Baidu, Inc.
Address:   M&C Services Limited, PO Box 309, Ugland House, Grand Cayman,
KY1-1104, Cayman Islands
Attention:      Yanhong Li
Fax:
Tel:

Party B:

Yanhong Li
Address:
Fax:
Tel:

10. Unless with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement at its own discretion provided that Party A is required to give a written notice to such effect to Party B, and no further consent of Party B is required thereof.

11. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not resulting from unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable laws or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to confidential obligations similar to those provided in this Article. Disclosure by any employee of or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be held liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

12.

(1)   The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2)   Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If negotiations fail, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing and the arbitration language shall be Chinese. The arbitral award shall be final and binding upon both Parties.

13. This Agreement, once becoming effective, constitutes the entire agreements and understandings between the Parties with respect to the subject matter hereof, and supersedes in their entirety all prior oral and written agreements and understandings between the Parties with respect to the subject matter hereof.

3

14.   This Agreement shall be executed in two originals, and each Party shall hold one thereof.   Both originals shall have the same legal effect.

(No text below)

4

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:   /s/ Yanhong Li
Title:        Director

**Party B:**

**Yanhong Li**

Signature:   /s/ Yanhong Li

5

**Exhibit 4.61**

**Proxy Agreement**

This Proxy Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu, Inc.**, with registered address at M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

And

**Party B: Hailong Xiang**, with ID No.

**WHEREAS:**

1.  Party B is a citizen of the PRC and shareholder of Beijing Baidu Netcom Science Technology Co., Ltd. ("**Baidu Netcom**"). As of the date hereof, Party B holds 0.5% equity interests in Baidu Netcom ("**Party B's Equity**").

2.  Pursuant to the terms and subject to the conditions of this Agreement, Party B agrees to authorize a PRC company or individual designated by Party A to exercise its rights as a shareholder of Baidu Netcom on its behalf, and Party A agrees to accept such authorization.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.  Party B hereby agrees to irrevocably authorize any entity or individual designated by Party A to exercise on its behalf all of the voting and other rights as a shareholder empowered by the law and Baidu Netcom's articles of association at the shareholders' meeting of Baidu Netcom, including without limitation any right regarding sale, transfer, pledge or disposal of all or part of Party B's equity interests in Baidu Netcom; convening, attending and presiding over shareholders' meeting of Baidu Netcom as an authorized representative of Baidu Netcom's shareholders; electing and replacing any executive director, director, supervisor, principal and other senior management; considering and approving profit distribution and loss make-up plans of Baidu Netcom; adopting resolution regarding merger, division, liquidation or change of status of Baidu Netcom; deciding upon the business strategy and investment plan of Baidu Netcom; and amending articles of association of Baidu Netcom.

2.  Party A agrees to designate any entity or individual permitted under applicable laws to accept the authorization of Party B under Article 1 hereof, and such entity or individual shall exercise Party B's voting and other rights as a shareholder on behalf of Party B under this Agreement. As of the date hereof, Party A hereby designates Hailong Xiang as the authorized individual to exercise voting and other rights as a shareholder on behalf of Party B under this Agreement. For avoidance of any doubt, Party A shall have the discretion to replace any entity or individual designated by it or designate any other entity or individual to exercise such voting and other rights on behalf of Party B.

3.  Party B hereby acknowledges that, regardless of any change of its equity interests in Baidu Netcom, any entity or individual designated by Party A shall be authorized to exercise all of the voting and other rights as a shareholder on behalf of Party B.

4.  Party B hereby acknowledges that if Party A withdraws its designation of the authorized entity or individual, it shall immediately withdraw its authorization to such entity or individual, and authorize any other entity or individual designated by Party A to exercise all of its voting and other rights as a shareholder at the shareholders' meeting of Baidu Netcom. During the term of this Agreement, Party B waives and cease to exercise by itself any and all of the rights relating to Party B's Equity that have been authorized to Party A under this Agreement.

5.  This Agreement shall be effective upon execution by the Parties or their respective legal or authorized representatives as of the date first written above. This Agreement shall remain permanently valid unless otherwise expressly provided hereunder or terminated by Party A in writing. If any Party's operating term expires during the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If any Party's application to renew its operating term fails to obtain approval or consent from competent authority, this Agreement shall terminate upon the end of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

6.  This Agreement shall remain valid as long as Party B is a holder of any equity interest in Baidu Netcom. During the term of this Agreement, unless otherwise required by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time with a written notice to Party B no less than thirty (30) days in advance.

7.  No amendment to this Agreement shall be made unless by agreement of the Parties in writing. Any duly executed amendment or supplement hereto by the Parties is an integral part of, and shall have the same binding effect with, this Agreement.

8.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with any applicable law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the remainder hereof.

9.  All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Party or any other address designated and notified to such Party from time to time by hand, mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with marking of the mailing day on the postmark), or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; (c) at the time of receipt shown on the transmission acknowledgement if it is sent by fax; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

2

Party A:      Baidu, Inc.
Address:      M&C Services Limited, PO Box 309, Ugland House, Grand Cayman,
KY1-1104, Cayman Islands
Attention:    Yanhong Li
Fax:
Tel:

Party B:

Hailong Xiang
Address:
Fax:
Tel:

10. Unless with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement at its own discretion provided that Party A is required to give a written notice to such effect to Party B, and no further consent of Party B is required thereof.

11. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not resulting from unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable laws or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to confidential obligations similar to those provided in this Article. Disclosure by any employee of or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be held liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

12.

(1) The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2) Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If negotiations fail, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing and the arbitration language shall be Chinese. The arbitral award shall be final and binding upon both Parties.

13. This Agreement, once becoming effective, constitutes the entire agreements and understandings between the Parties with respect to the subject matter hereof, and supersedes in their entirety all prior oral and written agreements and understandings between the Parties with respect to the subject matter hereof.

3

14.   This Agreement shall be executed in two originals, and each Party shall hold one thereof.   Both originals shall have the same legal effect.

(No text below)

4

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:   /s/ Yanhong Li

Title:        Director

**Party B:**

**Hailong Xiang**

Signature:   /s/ Hailong Xiang

5

**Exhibit 4.62**

**Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on May 7, 2018:

| | |
|---|---|
| **Party A:** | **Baidu, Inc.** |
| Address: | M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| **Party B:** | **Baidu Online Network Technology (Beijing) Co., Ltd.** |
| Address: | 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| **Party C:** | **Hailong Xiang** |
| ID No.: | |
| **Party D:** | **Beijing Baidu Netcom Science Technology Co., Ltd.** |
| Address: | 2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |

In this Agreement, Party A, Party B, Party C and Party D are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A is a Cayman Islands company incorporated under the laws of Cayman Islands and an affiliate of Party B;

2. Party B is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

3. Party D is a liability limited company incorporated in Beijing, the PRC;

4. Party C is a shareholder of Party D, owning 0.5% equity interests in Party D (the "**Equity Interest**");

5. Party B and Party C entered into an Amended and Restated Loan Agreement dated May 7, 2018 (the "**Loan Agreement**"), whereby Party C obtains a loan up to RMB32,106,400 from Party B;

6. Party B and Party D entered into a series of agreement dated March 22, 2005, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"), whereby Party B provides exclusive technology consulting and services to Party D; and

7. Party B and Party C entered into an Amended and Restated Equity Pledge Agreement dated May 7, 2018(the "**Equity Pledge Agreement**"), whereby Party C transfers all of the Equity Interest to Party B;

8. Party A and Party C entered into a Proxy Agreement dated March 31, 2018 (the "**Proxy Agreement**"), whereby Party C authorizes the entity or individual designated by Party A to exercise all voting and other rights of Party C as a shareholder at the shareholders meeting of Party D; and

9. The Parties have entered into an Exclusive Equity Purchase and Transfer Option Agreement dated March 31, 2018 (the "**Original Exclusive Equity Purchase and Transfer Option Agreement**"). The Parties desire to enter into this Agreement to restate and amend the Original Exclusive Equity Purchase and Transfer Option Agreement, and this Agreement shall replace and supersede the Original Exclusive Equity Purchase and Transfer Option Agreement once this Agreement becomes effective.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

**1. Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party C hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, and at any time from Party C (the "**Transferor**"), a portion or all of the equity interests held by Party C in Party D (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party D hereby agrees to granting of the Option by Party C to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means any individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements; _provided, however_, that it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be made in the manner determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party B any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party D

Party C and Party D hereby covenant, in relation to Party D:

2.1.1 Not to supplement, amend or modify Party D's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party D and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party D's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party D's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party D's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party D's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party D is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party D's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party D to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party D's shareholders in any way without Party A's prior written consent; *provided, however*, that Party D shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request; and

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D.

2.2 Covenants Relating to the Transferor

Party C hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

4

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve Party D's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party D;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party D and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party D.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party D needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party D cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party D to repay the loan.

5

3. **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party D hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party D has good and marketable ownership of all of its assets and has not created any security interest on the said assets;

3.4 Party D has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party D's assets or Party D; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement and the restrictions provided under the Proxy Agreement and hereunder.

4. **Assignment of Agreement**

4.1 Neither Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party C and Party D hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party C and Party D and no further consent of Party C or Party D is required.

## 5. **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above and expire when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.2 If the duration of operation (including any extension thereof) of Party A or Party D is expired or terminated for other reasons within the term set forth in Section 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Section 4.2 hereof.

## 6. **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

## 7. **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

## 8. **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

7

| | |
|---|---|
| Party A: | Baidu, Inc. |
| Address: | M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| Attention: | Yanhong Li |
| Facsimile: | |
| Telephone: | |

| | |
|---|---|
| Party B: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |

| | |
|---|---|
| Party C: | Hailong Xiang |
| Address: | |
| Facsimile: | |
| Telephone: | |

| | |
|---|---|
| Party C: | Beijing Baidu Netcom Science Technology Co., Ltd. |
| Address: | 2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |

9. **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

   a.   Materials that are or will become known by the public (through no fault of the receiving party);

   b.   Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

   c.   Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

8

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Breach Liabilities**

11.1 Party A shall have the right to terminate this Agreement and/or hold Party C or Party D liable for any damages if Party C or Party D is in material breach of any provision under this Agreement. This Section 11.1 shall not be prejudicial to any other right of Party A under this Agreement.

11.2 Unless otherwise legally required, neither Party C or Party D may terminate or otherwise end this Agreement under any circumstance.

12. **Miscellaneous**

12.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

12.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreements of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

12.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

12.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

9

12.5 Language and counterparts

This Agreement is executed in Chinese in four originals; each Party holds one original and each original has the same legal effect.

12.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

12.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or early termination. Articles 6, 8 and 9 and this Section 12.7 shall survive the termination of this Agreement.

12.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

(No text below)

10

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:   /s/ Yanhong Li
Title:        Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:   /s/ Hailong Xiang
Title:        Legal Representative

**Party C:**

**Hailong Xiang**

Signature:   /s/ Hailong Xiang

**Party D:**

**Beijing Baidu Netcom Science Technology Co., Ltd. (seal)**

Signature:   /s/ Zhixiang Liang
Title:        Legal Representative

11

**Exhibit 4.63**

**Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement**

This Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on May 7, 2018:

**Party A:**    **Baidu, Inc.**
Address:    M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**Party B:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:**    **Yanhong Li**
ID No.:

**Party D:**    **Beijing Baidu Netcom Science Technology Co., Ltd.**
Address:    2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

In this Agreement, Party A, Party B, Party C and Party D are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A is a Cayman Islands company incorporated under the laws of Cayman Islands and an affiliate of Party B;

2. Party B is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

3. Party D is a liability limited company incorporated in Beijing, the PRC;

4. Party C is a shareholder of Party D, owning 99.5% equity interests in Party D (the "**Equity Interest**");

5. Party B and Party C entered into an Amended and Restated Loan Agreement dated May 7, 2018 (the "**Loan Agreement**"), whereby Party C obtains a loan up to RMB6,389,173,600 from Party B;

6. Party B and Party D entered into a series of agreement dated March 22, 2005, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"), whereby Party B provides exclusive technology consulting and services to Party D; and

7. Party B and Party C entered into an Amended and Restated Equity Pledge Agreement dated May 7, 2018 (the "**Equity Pledge Agreement**") , whereby Party C transfers all of the Equity Interest to Party B;

8. Party A and Party C entered into a Proxy Agreement dated March 31, 2018 (the "**Proxy Agreement**"), whereby Party C authorizes the entity or individual designated by Party A to exercise all voting and other rights of Party C as a shareholder at the shareholders meeting of Party D; and

9. The Parties have entered into an Exclusive Equity Purchase and Transfer Option Agreement dated March 31, 2018 (the "**Original Exclusive Equity Purchase and Transfer Option Agreement**"). The Parties desire to enter into this Agreement to restate and amend the Original Exclusive Equity Purchase and Transfer Option Agreement, and this Agreement shall replace and supersede the Original Exclusive Equity Purchase and Transfer Option Agreement once this Agreement becomes effective.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1. **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party C hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, and at any time from Party C (the "**Transferor**"), a portion or all of the equity interests held by Party C in Party D (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party D hereby agrees to granting of the Option by Party C to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means any individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements; _provided, however_, that it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be made in the manner determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party B any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party D

Party C and Party D hereby covenant, in relation to Party D:

2.1.1 Not to supplement, amend or modify Party D's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party D and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party D's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party D's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party D's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party D's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party D is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party D's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party D to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party D's shareholders in any way without Party A's prior written consent; *provided, however*, that Party D shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request; and

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D.

2.2 Covenants Relating to the Transferor

Party C hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

4

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve Party D's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party D;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party D and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party D.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party D needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party D cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party D to repay the loan.

5

3. **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party D hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party D has good and marketable ownership of all of its assets and has not created any security interest on the said assets;

3.4 Party D has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party D's assets or Party D; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement and the restrictions provided under the Proxy Agreement and hereunder.

4. **Assignment of Agreement**

4.1 Neither Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party C and Party D hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party C and Party D and no further consent of Party C or Party D is required.

6

5. **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above and expire when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.2 If the duration of operation (including any extension thereof) of Party A or Party D is expired or terminated for other reasons within the term set forth in Section 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Section 4.2 hereof.

6. **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7. **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8. **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

7

Party A:          Baidu, Inc.
Address:          M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands
Attention:        Yanhong Li
Facsimile:
Telephone:


Party B:          Baidu Online Network Technology (Beijing) Co., Ltd.
Address:          3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile:
Telephone:


Party C:          Yanhong Li
Address:
Facsimile:
Telephone:


Party C:          Beijing Baidu Netcom Science Technology Co., Ltd.
Address:          2/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile:
Telephone:


9. **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

   a.    Materials that are or will become known by the public (through no fault of the receiving party);

   b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

   c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

8

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Breach Liabilities**

11.1 Party A shall have the right to terminate this Agreement and/or hold Party C or Party D liable for any damages if Party C or Party D is in material breach of any provision under this Agreement. This Section 11.1 shall not be prejudicial to any other right of Party A under this Agreement.

11.2 Unless otherwise legally required, neither Party C or Party D may terminate or otherwise end this Agreement under any circumstance.

12. **Miscellaneous**

12.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

12.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreements of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

12.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

12.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

9

12.5 Language and counterparts

This Agreement is executed in Chinese in four originals; each Party holds one original and each original has the same legal effect.

12.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

12.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or early termination. Articles 6, 8 and 9 and this Section 12.7 shall survive the termination of this Agreement.

12.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

(No text below)

10

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:    /s/ Yanhong Li

Title:         Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd.
(seal)**

Signature:    /s/ Hailong Xiang

Title:         Legal Representative

**Party C:**

**Yanhong Li**

Signature:    /s/ Yanhong Li

**Party D:**

**Beijing Baidu Netcom Science Technology Co., Ltd. (seal)**

Signature:    /s/ Zhixiang Liang

Title:         Legal Representative

11

**Exhibit 4.64**

**Power of Attorney**

I, Yanhong Li, a citizen of the People's Republic of China (the "PRC") with ID No. and the shareholder holding 99.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. (the "Baidu Netcom"), hereby irrevocably authorizes pursuant to the Proxy Agreement dated hereof by myself and Baidu, Inc. and designation of Baidu, Inc., Hailong Xiang with the following powers and rights in connection with my current and future shareholding in the Baidu Netcom during the term of this Power of Attorney:

To exercise solely and exclusively on my behalf all of the voting rights as a shareholder at the shareholders' meeting of Baidu Netcom under the PRC laws and the articles of association of Baidu Netcom, including without limitation any vote on sale or transfer of any or all of equity interests in Baidu Netcom, and designating and appointing the general manager of Baidu Netcom as my authorized representative on the shareholders' meeting of Baidu Netcom.

Such authorization is premised on the condition that Hailong Xiang is an employee of Baidu, Inc. and its affiliates, and Baidu, Inc. agrees to such authorization. Once Hailong Xiang is no longer an employee of Baidu, Inc. or I am notified by Baidu, Inc. to terminate such authorization, I will immediately withdraw such authorization to him and designate/authorize any other person nominated by Baidu, Inc. to exercise all of the voting rights on my behalf at the shareholders' meeting of Baidu Netcom.

Unless otherwise expressly provided herein and as long as I am a holder of equity interests in Baidu Netcom, this Power of Attorney is irrevocable and continues to have effect as of the date hereof.

(Signature): /s/ Yanhong Li
Date:        March 31, 2018

**Exhibit 4.65**

**Power of Attorney**

I, Hailong Xiang, a citizen of the People's Republic of China (the "PRC") with ID No. and the shareholder holding 0.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. (the "Baidu Netcom"), hereby irrevocably authorizes pursuant to the Proxy Agreement dated hereof by myself and Baidu, Inc. and designation of Baidu, Inc., Hailong Xiang with the following powers and rights in connection with my current and future shareholding in the Baidu Netcom during the term of this Power of Attorney:

To exercise solely and exclusively on my behalf all of the voting rights as a shareholder at the shareholders' meeting of Baidu Netcom under the PRC laws and the articles of association of Baidu Netcom, including without limitation any vote on sale or transfer of any or all of equity interests in Baidu Netcom, and designating and appointing the general manager of Baidu Netcom as my authorized representative on the shareholders' meeting of Baidu Netcom.

Such authorization is premised on the condition that Hailong Xiang is an employee of Baidu, Inc. and its affiliates, and Baidu, Inc. agrees to such authorization. Once Hailong Xiang is no longer an employee of Baidu, Inc. or I am notified by Baidu, Inc. to terminate such authorization, I will immediately withdraw such authorization to him and designate/authorize any other person nominated by Baidu, Inc. to exercise all of the voting rights on my behalf at the shareholders' meeting of Baidu Netcom.

Unless otherwise expressly provided herein and as long as I am a holder of equity interests in Baidu Netcom, this Power of Attorney is irrevocable and continues to have effect as of the date hereof.

(Signature):   /s/ Hailong Xiang

Date:   March 31, 2018

**Exhibit 4.66**

### AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT

This Equity Pledge Agreement (this "Agreement") is made as of May 7, 2018 in Beijing, PRC by and between:

**Pledgee:**

**Party A:**            **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address:        3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing;

And

**Pledgor:**

**Party B:**            **Hailong Xiang**
ID No.
Address:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC holding 0.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated May 7, 2018 (the "Loan Agreement"), whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB32,106,400 (the "Loan").

4. Party A and Baidu Netcom entered into an Exclusive Technology Consulting and Services Agreement dated March 22, 2005 (the "Services Agreement"), pursuant to which Baidu Netcom shall pay Party A technical consulting and services fees (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will repay the Loan equal to RMB32,106,400 under the Loan Agreement and Party A will be able to collect the Service Fees from Baidu Netcom, Party B agrees to pledge its equity interests in Baidu Netcom (i.e., a registered capital equal to RMB32,106,400) as security for the Loan and other obligations under the Loan Arrangement and the Service Agreement. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

6. The Parties have entered into a series of equity pledge agreements listed in Appendix I attached hereto (collectively, the "Original Equity Pledge Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Pledge Agreements, and this Agreement shall replace and supersede the Original Equity Pledge Agreements as of the date of its becoming effective.

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations:

1. **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interests": refers to all of the equity interests in Baidu Netcom legally held by the Pledgor (for purpose of this Agreement, the Equity Interests pledged herein means the registered capital equal to RMB32,106,400).

1.3 "Ratio of Pledge": refers to the proportion of the value of the Pledge under this Agreement to the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. **Pledge**

The Pledgor will pledge all of his Equity Interests in Baidu Netcom to the Pledgee as security for (i) all his obligations under the Loan Arrangement (i.e., RMB32,106,400) and (ii) all obligations of Baidu Netcom under the Services Agreement (the "Secured Obligations"). "Pledge" refers to the priority entitled to the Pledgee in receiving proceeds from disposal of all or part of the Equity Interests at a discounted value, or auction or sale of the Equity Interests pledged hereunder.

3. **Ratio of Pledge and Term of Pledge**

3.1 Ratio of the Pledge

The Ratio of the Pledge shall be approximately 100%.

2

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Baidu Netcom and registered with the competent industrial and commercial authority, and shall remain in effect until two (2) years after all Secured Obligations under the Principal Agreement have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the Pledge in accordance with this Agreement in the event that the Pledgor fails to perform his obligations under the Loan Arrangement or Baidu Netcom fails perform its obligations under the Services Agreement.

## 4. Possession of Pledge Documents

4.1 During the Term of Pledge under this Agreement, the Pledgor shall deliver its capital contribution certificate and the register of shareholders of Baidu Netcom to the possession of the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receiving dividends arising from the Equity Interests.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Baidu Netcom (See Appendix II) after the date of this Agreement.

## 5. Representations and Warranties of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interests and has approved the Pledge with resolutions adopted at its shareholders meeting (See Appendix III).

5.2 Except for the benefit of the Pledgee, no other pledge or security has been created upon the Equity Interests.

## 6. Covenants of the Pledgor

6.1 During the term of this Agreement, the Pledgor covenants for its benefits of the Pledgee that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interests, create or permit creation of any other pledge which could affect the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

3

6.1.3 timely notify the Pledgee of any event or any notice to its knowledge which may affect the Pledgor's right to all or any part of the Equity Interests, and any event or any notice to its knowledge which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge under this Agreement shall not be disrupted or prejudiced by any legal proceeding initiated by the Pledgor or any successor of the Pledgor or any person authorized by the Pledgor or any other person.

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment (if applicable and necessary) in connection with the certificate of the Equity Interests with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall indemnify the Pledgee for all losses suffered by the Pledgee due to the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not make any action/omission which may affect the value of the Equity Interests so as to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any event which may decrease the value of the Equity Interests or affect the Pledgor's performance of the obligations under this Agreement, and shall provide assets acceptable to the Pledgee as guarantee for the decreased value of the Equity Interests upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall make best efforts to cooperate with all the registration, filing or other procedures relating to the Pledge as required by relevant laws and regulations.

## 7. **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform its obligations under the Loan Arrangement, including without limitation the obligation to repay the Loan of RMB32,106,400 under the Loan Agreement;

4

7.1.2 Baidu Netcom fails to make due and full payment of the Services Fees or perform other obligations under the Services Agreement;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof is materially misleading or erroneous, and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches any covenant under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interests or transfers or assigns the pledged Equity Interests without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is accelerated for repayment due to any default; or (2) fails to be duly repaid or performed and makes the Pledgee believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8 Baidu Netcom is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a Force Majeure event;

7.1.10 There have been adverse change to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or receiver of Baidu Netcom only partially performs or refuses to perform the payment obligation under the Services Agreement; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to its action or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if it becomes knowledge of the Pledgor that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been resolved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreement or requesting to exercise the Pledge in accordance with Article 8 hereof.

5

8. **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written consent from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreement, whichever is later.

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest at a discounted value, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreement are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9. **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10. **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Baidu Netcom's Register of Shareholders.

6

## 11. **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Baidu Netcom no longer has any outstanding obligations under the Services Agreement. The Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable thereafter.

## 12. **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

## 13. Force Majeure

13.1 A Force Majeure event refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war; provided, however, that any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

## 14. **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

## 15. **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to resolve any dispute arising from the interpretation or performance of this Agreement through negotiations in good faith. If the negotiations fail, either Party may submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with its rules then in effect. The arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitral award shall be final and binding upon the Parties.

## 16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A: Baidu Online Network Technology (Beijing) Co., Ltd.
Address: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:
Telephone:

Party B: Hailong Xiang
Address:
Telephone:

## 17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreements of the Parties hereto with respect to the subject matter herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

## 18. **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

8

19. **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

20. **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21. **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one thereof. All originals shall have the same legal effect.

(No text below)

9

(Signature page only)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:  /s/ Legal Representative/Authorized Representative

**Party B:**

**Hailong Xiang**

Signature:  /s/ Hailong Xiang

10

Appendices:

1.    Original Equity Pledge Agreements

2.    Register of Shareholders of Beijing Baidu Netcom Technology Co., Ltd.

3.    Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.

11

**Appendix I**

**Original Equity Pledge Agreements**

| Reference number | Name of Agreement | Signed by | Dated |
|---|---|---|---|
| 1 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Hailong Xiang | June 13, 2016 |
| 2 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Hailong Xiang | January 18, 2017 |

12

**Appendix II**

**Register of shareholders of Beijing Baidu Netcom Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Yanhong Li |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB6,389,173,600 |
| Percentage of Share Capital: | 99.5% |
| Number of capital contribution certificate: | 001 |

Yanhong Li holds 99.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

| | |
|---|---|
| Name of the Shareholder: | Hailong Xiang |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB32,106,400 |
| Percentage of Share Capital: | 0.5% |
| Number of capital contribution certificate: | 002 |

Hailong Xiang holds 0.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Baidu Netcom Technology Co., Ltd.

Beijing Baidu Netcom Technology Co., Ltd. (seal)

Signature:  /s/ Zhixiang Liang
Name: Zhixiang Liang
Title: Legal representative
Date: May 7, 2018

13

**Appendix III**

**Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated May 7, 2018 between the shareholders of Beijing Baidu Netcom Technology Co., Ltd. (the "Company") and Baidu Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company as follows:

It is approved that the shareholders of the Company pledge all of their equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered dated May 7, 2018 by the undersigned shareholders.

Shareholders:

Yanhong Li

Signature:  /s/ Yanhong Li

Hailong Xiang

Signature:  /s/ Hailong Xiang

14

**Exhibit 4.67**

### AMENDED AND RESTATED EQUITY PLEDGE AGREEMENT

This Amended and Restated Equity Pledge Agreement (this "Agreement") is made as of May 7, 2018 in Beijing, PRC by and between:

**Pledgee**:

**Party A:**       **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address:       3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing;

And

**Pledgor**:

**Party B:**    **Yanhong Li**
ID No.
Address:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC holding 99.5% equity interests in Beijing Baidu Netcom Science Technology Co., Ltd. ("Baidu Netcom"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into an Amended and Restated Loan Agreement dated May 7, 2018 (the "Loan Agreement"), whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB6,389,173,600 (the "Loan").

4. Party A and Baidu Netcom entered into an Exclusive Technology Consulting and Services Agreement dated March 22, 2005 (the "Services Agreement"), pursuant to which Baidu Netcom shall pay Party A technical consulting and services fees (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will repay the Loan equal to RMB6,389,173,600 under the Loan Agreement and Party A will be able to collect the Service Fees from Baidu Netcom, Party B agrees to pledge its equity interests in Baidu Netcom (i.e., a registered capital equal to RMB6,389,173,600) as security for the Loan and other obligations under the Loan Arrangement and the Service Agreement. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

6. The Parties have entered into a series of equity pledge agreements listed in Appendix I attached hereto (collectively, the "Original Equity Pledge Agreements"). The Parties hereby agree to enter into this Agreement to amend and restate the Original Equity Pledge Agreements, and this Agreement shall replace and supersede the Original Equity Pledge Agreements as of the date of its becoming effective.

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations:

1. **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interests": refers to all of the equity interests in Baidu Netcom legally held by the Pledgor (for purpose of this Agreement, the Equity Interests pledged herein means the registered capital equal to RMB6,389,173,600).

1.3 "Ratio of Pledge": refers to the proportion of the value of the Pledge under this Agreement to the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. **Pledge**

The Pledgor will pledge all of his Equity Interests in Baidu Netcom to the Pledgee as security for (i) all his obligations under the Loan Arrangement (i.e., RMB6,389,173,600) and (ii) all obligations of Baidu Netcom under the Services Agreement (the "Secured Obligations"). "Pledge" refers to the priority entitled to the Pledgee in receiving proceeds from disposal of all or part of the Equity Interests at a discounted value, or auction or sale of the Equity Interests pledged hereunder.

3. **Ratio of Pledge and Term of Pledge**

3.1 Ratio of the Pledge

The Ratio of the Pledge shall be approximately 100%.

2

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Baidu Netcom and registered with the competent industrial and commercial authority, and shall remain in effect until two (2) years after all Secured Obligations under the Principal Agreement have been fulfilled.

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the Pledge in accordance with this Agreement in the event that the Pledgor fails to perform his obligations under the Loan Arrangement or Baidu Netcom fails perform its obligations under the Services Agreement.

## 4. Possession of Pledge Documents

4.1 During the Term of Pledge under this Agreement, the Pledgor shall deliver its capital contribution certificate and the register of shareholders of Baidu Netcom to the possession of the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receiving dividends arising from the Equity Interests.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Baidu Netcom (See Appendix II) after the date of this Agreement.

## 5. Representations and Warranties of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interests and has approved the Pledge with resolutions adopted at its shareholders meeting (See Appendix III).

5.2 Except for the benefit of the Pledgee, no other pledge or security has been created upon the Equity Interests.

## 6. Covenants of the Pledgor

6.1 During the term of this Agreement, the Pledgor covenants for its benefits of the Pledgee that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interests, create or permit creation of any other pledge which could affect the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

3

6.1.3 timely notify the Pledgee of any event or any notice to its knowledge which may affect the Pledgor's right to all or any part of the Equity Interests, and any event or any notice to its knowledge which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

6.2 The Pledgor agrees that the Pledgee's right to the Pledge under this Agreement shall not be disrupted or prejudiced by any legal proceeding initiated by the Pledgor or any successor of the Pledgor or any person authorized by the Pledgor or any other person.

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment (if applicable and necessary) in connection with the certificate of the Equity Interests with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall indemnify the Pledgee for all losses suffered by the Pledgee due to the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not make any action/omission which may affect the value of the Equity Interests so as to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any event which may decrease the value of the Equity Interests or affect the Pledgor's performance of the obligations under this Agreement, and shall provide assets acceptable to the Pledgee as guarantee for the decreased value of the Equity Interests upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall make best efforts to cooperate with all the registration, filing or other procedures relating to the Pledge as required by relevant laws and regulations.

## 7. **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform its obligations under the Loan Arrangement, including without limitation the obligation to repay the Loan of RMB6,389,173,600 under the Loan Agreement;

4

7.1.2 Baidu Netcom fails to make due and full payment of the Services Fees or perform other obligations under the Services Agreement;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof is materially misleading or erroneous, and/or the Pledgor breaches any warranty in Article 5 hereof;

7.1.4 The Pledgor breaches any covenant under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interests or transfers or assigns the pledged Equity Interests without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is accelerated for repayment due to any default; or (2) fails to be duly repaid or performed and makes the Pledgee believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8 Baidu Netcom is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a Force Majeure event;

7.1.10 There have been adverse change to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or receiver of Baidu Netcom only partially performs or refuses to perform the payment obligation under the Services Agreement; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to its action or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if it becomes knowledge of the Pledgor that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been resolved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreement or requesting to exercise the Pledge in accordance with Article 8 hereof.

8. **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written consent from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreement, whichever is later.

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest at a discounted value, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreement are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.

9. **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.

10. **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Baidu Netcom's Register of Shareholders.

6

## 11. **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Baidu Netcom no longer has any outstanding obligations under the Services Agreement. The Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable thereafter.

## 12. **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

## 13. Force Majeure

13.1 A Force Majeure event refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war; provided, however, that any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

## 14. **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

7

## 15. **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to resolve any dispute arising from the interpretation or performance of this Agreement through negotiations in good faith. If the negotiations fail, either Party may submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with its rules then in effect. The arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitral award shall be final and binding upon the Parties.

## 16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:
Telephone:

Party B:    Yanhong Li
Address:
Telephone:

## 17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreements of the Parties hereto with respect to the subject matter herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

## 18. **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

8

19. **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

20. **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21. **Counterparts**

This Agreement is made in Chinese in two originals, with each Party holding one thereof. All originals shall have the same legal effect.

(No text below)

9

(Signature page only)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature: /s/ Legal Representative/Authorized Representative

**Party B:**

**Yanhong Li**

Signature: /s/ Yanhong Li

10

Appendices:

1.    Original Equity Pledge Agreements

2.    Register of Shareholders of Beijing Baidu Netcom Technology Co., Ltd.

3.    Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.

11

**Appendix I**

**Original Equity Pledge Agreements**

| Reference number | Name of Agreement | Signed by | Dated |
|---|---|---|---|
| 1 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Yanhong Li and Yong Xu | March 22, 2005 |
| 2 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Haoyu Shen | January 19, 2011 |
| 3 | Update to Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd., Yanhong Li, Haoyu Shen and Zhan Wang | August 26, 2011 |
| 4 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li | December 1, 2011 |
| 5 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li | November 30, 2015 |
| 6 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li | December 31, 2015 |
| 7 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Yanhong Li | January 18, 2017 |

12

**Appendix II**

**Register of shareholders of Beijing Baidu Netcom Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Yanhong Li |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB6,389,173,600 |
| Percentage of Share Capital: | 99.5% |
| Number of capital contribution certificate: | 001 |

Yanhong Li holds 99.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

| | |
|---|---|
| Name of the Shareholder: | Hailong Xiang |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB32,106,400 |
| Percentage of Share Capital: | 0.5% |
| Number of capital contribution certificate: | 002 |

Hailong Xiang holds 0.5% equity interests in Beijing Baidu Netcom Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Baidu Netcom Technology Co., Ltd.

Beijing Baidu Netcom Technology Co., Ltd. (seal)

Signature: /s/ Zhixiang Liang
Name: Zhixiang Liang
Title:  Legal representative
Date:  May 7, 2018

13

**Appendix III**

**Resolutions of the Shareholders' Meeting of Beijing Baidu Netcom Technology Co., Ltd.**

In respect of the Amended and Restated Equity Pledge Agreement dated May 7, 2018 between the shareholders of Beijing Baidu Netcom Technology Co., Ltd. (the "Company") and Baidu Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company as follows:

It is approved that the shareholders of the Company pledge all of their equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered dated May 7, 2018 by the undersigned shareholders.

Shareholders:

Yanhong Li

Signature:   /s/ Yanhong Li

Hailong Xiang

Signature:   /s/ Hailong Xiang

14

**Exhibit 4.68**

**Termination Agreement of Current Control Contracts**

This Termination Agreement of Current Control Contracts (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China (the "**PRC**," for purposes of this Agreement excluding Hong Kong, Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a wholly foreign owned enterprise duly formed and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party B: Beijing Perusal Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at A2 2/F, Building 17, Zhongguancun Software Park, 8 Dong Bei Wang West Road, Haidian District, Beijing;

**Party C: Xiaodong Wang**, a PRC citizen, ID No.        ; and
    **Zhixiang Liang**, a PRC citizen, ID No.   ;

And

**Party D**: **Baidu Inc.**, a company duly formed and validly existing under the laws of the Cayman Islands, with its registered address at M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as "Other Parties."

**WHEREAS:**

(1)    Each of Party A, Party B and Party C has signed the documents listed in Exhibit 1 attached hereto (collectively the "**Current Control Documents**"; for avoidance of any doubt, "all" and/or "any" of the Current Control Documents referenced herein are limited to the documents listed in Exhibit 1 attached hereto) prior to the date hereof; and

(2)    Pursuant to the terms and subject to the conditions herein, each Party agrees to terminate all of the Current Control Documents and enter into the new control documents listed in Exhibit 2 attached hereto (the "**New Control Documents**").

**NOW, THEREFORE**, the Parties agree as follows through negotiations:

**1.    Termination of Current Control Documents**

1.1    Each of Party A, Party B and Party C hereby irrevocably agrees and acknowledges that all of the Current Control Documents shall terminate and cease to have any effect as of the date hereof.

1.2    As of the date hereof, each of Party A, Party B and Party C shall have no right under all and/or any of the Current Control Documents, or be required to fulfill any obligation thereunder; *provided, however*, that any rights exercised and obligations fulfilled by each of Party A, Party B and Party C on reliance of the Current Control Documents shall remain valid, no Party is required to return any payment, income or interest of any kind received by it or in its actual possession on reliance of the Current Control Documents, and any amount which has become due and payable among Party A, Party B and Party C shall be paid accordingly.

1.3    Unless otherwise provided in Section 1.2 above, each of Party A, Party B and Party C hereby irrevocably and unconditionally waive any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties directly or indirectly in connection with or arising from all and/or any of the Current Control Documents.

1.4    Without prejudice to the generality of Sections 1.2 and 1.3 above, as of the date hereof, each of Party A, Party B and Party C hereby waives any commitment, debt, claim, demand, obligation and liability of any kind or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, in connection with or arising from the Current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.    Execution of New Control Documents**

2.1    Each of the Parties agrees and acknowledges that subject to fulfilment of the terms under Article 1, each of the Parties shall enter into the New Control Documents listed in Exhibit 2 and agree to exercise their respective rights and undertake their respective covenants, obligations and duties in accordance therewith.

3.   **Representations and Warranties**

3.1   **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal rights, powers and authorities to execute this Agreement and all contracts and documents referenced herein to which it is a party, and execution of this Agreement represents expression of its genuine intent;

(2) none of its execution and performance of this Agreement will constitute breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or requirement for it to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents referenced herein to which it is a party, and for its compliance with and performance of its obligations hereunder and thereunder.

4.   **Covenants**

4.1   In order to duly terminate the rights and obligations under the Current Control Documents, each Party shall execute all documents and take all actions that are necessary or advisable, provide active support for the Other Parties in obtaining relevant government approvals and/or registration documents and effecting relevant termination procedures.

5.   **Termination**

5.1   Except for the circumstances expressly provided herein, the Parties agree to terminate this Agreement:

(1) by all of the Parties through negotiation, and all expenses and losses incurred therefrom shall be borne respectively by the incurring Party; or

(2) by the non-defaulting Party if the intent of this Agreement is incapable of fulfilment due to a Party's breach of its obligations hereunder.

6.   **Breach Liabilities and Indemnification**

6.1   Any Party shall be deemed in breach of this Agreement if it breaches or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

6.2    Unless otherwise expressly agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Party for any cost, liability or any loss (including without limitation any interest accrued therefrom and legal fees) incurred by the non-defaulting Party. The total amount of indemnity payable by the defaulting Party to the non-defaulting Party shall be the loss arising from such breach.

**7.    Governing Law and Dispute Resolution**

7.1    The formation of this Agreement and its validity, interpretation, performance and resolution of any dispute arising from this Agreement shall be governed by and construed in accordance with the laws of the PRC.

7.2    All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through negotiations in good faith.

7.3    Any Party may submit any dispute arising from this Agreement to China International Economic and Trade Arbitration Commission (CIETAC) for arbitration in Beijing in accordance with its arbitration rules and procedures then in effect. The arbitral tribunal shall consist of three arbitrators appointed in accordance with the arbitration rules, with one arbitrator appointed by the claimant, one arbitrator by the respondent and the third arbitrator by the two appointed arbitrators after consultation or by the CIETAC. The arbitration shall proceed on confidential basis in Chinese. The arbitral award shall be final and binding upon all Parties.

7.4    During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**8.    Confidentiality**

8.1    The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement, and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for any disclosure:

(1) to the auditor, legal advisor and any other person engaged by it in the ordinary course of business, provided that such person shall be obliged to keep in confidence any information relating to this Agreement acquired by it during such engagement; and

(2) which could be otherwise accessible by the public, or is expressly required by law, regulation or relevant stock exchange authority.

**9.    Miscellaneous**

9.1    This Agreement shall become effective upon signature of all of the Parties.

9.2    The Parties may amend or modify this Agreement through negotiations. Any such amendment or modification shall be made in writing and become effective upon signature of all of the Parties.

9.3    If any provision hereof be held invalid or unenforceable, such provision shall be deemed to have never existed herein and have no effect upon validity of the remainder of this Agreement, and the Parties shall negotiate to provide for a new provision to the extent permissible by law to ensure that the intent of the original provision be realized to the maximum extent.

9.4    Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall operate as its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

9.5    This Agreement is made in five originals with one thereof for each Party, and each of the originals shall be equally binding.

*(No text below, Signatures to follow)*

**IN WITNESS WHEREOF**, each Party has executed or caused this Termination Agreement of Current Control Contracts to be executed by its authorized representative on its behalf as of the date first written above with immediate effect.


**Party A:**


**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:   /s/ Hailong Xiang
Name:
Title:        Legal Representative


**Party B:**


**Beijing Perusal Technology Co., Ltd. (seal)**

Signature:   /s/ Hailong Xiang
Name:
Title:        Legal Representative


**Party C:**


**Xiaodong Wang**

Signature:   /s/ Xiaodong Wang


**Zhixiang Liang**

Signature:   /s/ Zhixiang Liang


**Party D:**


**Baidu, Inc.**

Signature:   /s/ Yanhong Li
Name:
**Title:        Director**

**Exhibit 1**

List of Current Control Documents

| No. | Document Name | Signed by | Signed on |
|---|---|---|---|
| 1 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Xiaodong Wang; and Beijing Perusal Technology Co., Ltd. | June 20, 2016 |
| 2 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang | June 20, 2016 |
| 3 | Proxy Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang | May 3, 2016 |
| 4 | Power of Attorney | Xiaodong Wang | May 3, 2016 |
| 5 | Amended and Restated Exclusive Equity Purchase and Transfer Option Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Zhixiang Liang; and Beijing Perusal Technology Co., Ltd. | June 20, 2016 |
| 6 | Amended and Restated Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Zhixiang Liang | June 20, 2016 |
| 7 | Proxy Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Zhixiang Liang | May 3, 2016 |
| 8 | Power of Attorney | Zhixiang Liang | May 3, 2016 |

**Exhibit 2**

List of New Control Documents

| No. | Document Name | To be signed by |
| --- | --- | --- |
| 1 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Xiaodong Wang; and Beijing Perusal Technology Co., Ltd. |
| 2 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang |
| 3 | Proxy Agreement | Baidu, Inc. and Xiaodong Wang |
| 4 | Power of Attorney | Xiaodong Wang |
| 5 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Xiaodong Wang; and Beijing Perusal Technology Co., Ltd. |
| 6 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Zhixiang Liang |
| 7 | Proxy Agreement | Baidu, Inc. and Zhixiang Liang |
| 8 | Power of Attorney | Zhixiang Liang |

**Exhibit 4.69**

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, by and between:

**Party A:    Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:    Zhixiang Liang**
ID Card No.

**WHEREAS**:

1.    Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2.    Party B is a Chinese citizen holding 50% equity interests in Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"); and

3.    Party A and Party B have entered into an Amended and Restated Loan Agreement dated June 20, 2016 (the "**Original Loan Agreement**"), under which Party A lent a loan equal to RMB1,598,440,000 to Party B for payment of the price of its acquiring 50% equity interests in Beijing Perusal. The Original Loan Agreement was terminated by a Termination Agreement dated March 31, 2018 made by Party A, Party B, Beijing Perusal and any other party thereto. Party A and Party B intend to enter into this Agreement to replace the Original Loan Agreement and set forth their respective new rights and obligations.

**NOW, THEREFORE,** Party A and Party B agree as follows through negotiations:

1.    Pursuant to the terms and subject to the conditions of this Agreement, Party A confirms that it has provided to Party B and Party B has agreed to accept, a loan at an aggregate amount of RMB1,598,440,000.

2.    Party B confirms its receipt of the loan and has applied the loan in its entirety to pay the price for its acquiring equity interests in Beijing Perusal.

3.    The term of the loan under this Agreement shall commence on the day of receipt of the loan by Party B until the 10th anniversary of the date on which this Agreement is executed, which term is renewable upon agreement by the Parties in writing; *provided, however*, that the loan provided hereunder could be accelerated for immediate repayment by Party B pursuant to this Agreement at the request of Party A in writing at any time during the term of the loan or any renewal thereof if:

  (1)    Party B resigns from or is dismissed by Party A or any affiliate of Party A;

(2)   Party B is dead, without civil legal capacity or with limited civil legal capacity;

(3)   Party B is found with criminal offense or involvement therein;

(4)   A claim is raised against Party B by any third party for an amount exceeding RMB100,000; or

(5)   Subject to the laws of the PRC, Party A or any of its nominees may make investment in Beijing Perusal for operation of value-added telecommunication services and other services, such as internet information services, and Baidu, Inc. or any of its nominees has elected to exercise its option by issuing a written notice to Party B to purchase the equity interests in Beijing Perusal under the Exclusive Equity Purchase and Transfer Option Agreement referenced in article 4 hereof.

4.   It is agreed and acknowledged that, subject to and to the extent permitted by the laws of the PRC, Baidu, Inc., as the holding company of Party A, shall have the right but no obligation to purchase or nominate any other person (including any natural person, legal entity or other entity) to purchase all or any part of the equity interests in Beijing Perusal held by Party B (the "**Call Option**"), provided that Baidu, Inc. shall issue a written notice to Party B to exercise the Call Option. Upon Baidu, Inc.'s issuance of such written notice, Party B shall, as requested and instructed by Party A, immediately transfer all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees at the original investment price (the "**Original Investment Price**") or any other price acceptable to Baidu, Inc. required under applicable laws. It is agreed and acknowledged that upon exercising the Call Option by Baidu, Inc., if the lowest price of the equity interests permitted under applicable laws is higher than the Original Investment Price, the price payable by Baidu, Inc. or any of its nominees shall be the lowest price permitted under applicable laws. The Parties agree to enter into an Exclusive Equity Purchase and Transfer Option Agreement with respect to the foregoing in this Article 4.

5.   It is agreed and acknowledged that Party B shall repay the loan only as follows: upon its maturity and at the request of Party A in writing, the loan provided hereunder shall be repaid by Party B (or any of its heirs, successors or assigns) with the proceeds from transfer of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees to the extent permitted under the PRC laws, or otherwise agreed by the Parties.

6.   It is agreed and acknowledged that in connection with transfer of the equity interests by Party B to Baidu, Inc. or any of its nominees upon maturity of the loan, if the proceeds from such transfer are legally required to or otherwise exceed the principal of the loan, Party B agrees to pay such excess amount, net of any individual income tax and other taxes and fees payable by Party B, to Baidu, Inc. or any of its nominees at sole decision of Baidu, Inc. to the extent permissible by the law.

2

7.    It is agreed and acknowledged that Party B shall not be deemed to have fulfilled its obligations under this Agreement until:

(1)    it has transferred all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees; and

(2)    it has paid to Party A all of the proceeds from the equity interest transfer or the maximum amount thereof permitted under applicable laws (including principal and the highest interest accrued thereupon permitted under applicable laws) as repayment of the loan.

8.    To secure performance of its obligations under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Perusal to Party A (the "**Equity Pledge**"). It is acknowledged that an Amend and Restated Equity Pledge Agreement in respect of the foregoing in this Article 8 has been made as of June 20, 2016.

9.    As of the date hereof, Party A represents and warrants to Party B that:

(1)    Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

(2)    Party A has the right to execute and perform this Agreement. The execution and performance of this agreement by Party A comply with its business scope, articles or any other organization document, and Party A has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

(3)    The principal of the loan to Party B is legally owned by Party A;

(4)    Execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any covenant made by Party A to any third party; and

(5)    This Agreement, once executed, shall constitute legal, valid obligations of Party A and enforceable against Party A in accordance with its terms.

10.    As of the date hereof until the end of this Agreement, Party B represents and warrants to Party A that:

(1)    Beijing Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is a legal holder of the equity interests in Beijing Perusal;

(2)    Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with the articles or any other organizational document of Beijing Perusal, and Party B has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

3

(3)    Execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any covenant made by Party B to any third party;

(4)    This Agreement, once executed, shall constitute legal, valid obligations of Party B and enforceable against Party B in accordance with its terms;

(5)    Party B has made all contributions required by law for its holding equity interests in Beijing Perusal;

(6)    Unless otherwise provided under the Amended and Restated Equity Pledge Agreement and the Exclusive Equity Purchase and Transfer Option Agreement, Party B does not create any mortgage, pledge or other security over its equity interests in Beijing Perusal, or make any offer to any third party to transfer its equity interests, or make any promise as to any offer to purchase its equity interests from any third party, or execute any agreement with any third party to transfer its equity interests;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests in Beijing Perusal held by Party B; and

(8)    Beijing Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes that during the term of this Agreement, it shall:

(1)    not sell, transfer, pledge or otherwise dispose of its equity interests or other interests in Beijing Perusal, or to allow creation of any other security interest thereupon without the prior written consent of Party A, except for the equity pledge or other right created for the benefit of Party A;

(2)    not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder's meetings permitting sale, transfer, pledge or other disposal of any of its legal or beneficiary ownership of the equity interests in Beijing Perusal or creation of any other security interest thereupon without the prior written consent of Party A, except for those made to Party A or any of its nominees;

(3)    not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder meetings permitting Beijing Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)    promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Beijing Perusal;

4

(5) execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of equity interests in Beijing Perusal;

(6) refrain from any act and/or omission that may materially affect the assets, business and liabilities of Beijing Perusal without the prior written consent of Party A;

(7) appoint any person nominated by Party A as executive director of Beijing Perusal, upon Party A's request;

(8) in connection with Party A's exercise of the Call Option provided hereunder, transfer promptly and unconditionally all equity interests in Beijing Perusal held by Party B to Party A and/or any of its nominees, to the extent and within the scope permissible under the laws of the PRC;

(9) not request Beijing Perusal to distribute dividends or profits to it;

(10) upon transfer of its equity interests in Beijing Perusal to Party A or any of its nominees, pay the entire proceeds received by it from transfer of the equity interests to Party A as repayment of the loan or otherwise to the extent permitted under the laws of the PRC; and

(11) strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that could affect the validity and enforceability of this Agreement.

12. Party B undertakes that in its capacity of a shareholder of Beijing Perusal and during the term of this Agreement, it shall procure Beijing Perusal:

(1) not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2) to maintain its existence and handle matters prudently and affectively in accordance with good financial and business rules and practices;

(3) not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4) not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except for any liabilities (i) arising from the ordinary or day-to-day course of business instead of through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

5

(5)  to operate all businesses on a continued basis and maintain the value of its assets;

(6)  not to execute any material contracts (for the purpose of this Section 12(6), a contract will be deemed material if its value exceeds RMB500,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)  to provide all information regarding its operations and financial affairs at Party A's request;

(8)  not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)  not to distribute dividends to the shareholders without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)  to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)  to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets; and

(12)  to strictly comply with the terms of the Exclusive Technology Consulting and Services Agreement dated June 23, 2006 and the Exclusive Technology Consulting and Services Supplementary Agreement dated April 22, 2010, each by Beijing Perusal and Party A (collectively, the "**Service Agreement**") and other agreements, duly perform its obligations thereunder, and refrain from any act or omission that could affect the validity and enforceability thereof.

13.  This Agreement is binding upon, and inures the benefit of, each of the Parties and their respective heirs, successors and permitted assigns. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.  Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.  Execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16. Arbitration

    (1) Both Parties shall strive to resolve any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through negotiations in good faith. If no resolution is made within thirty (30) days after one Party requests for such resolution, either Party may submit such matter to China International Economic and Trade Arbitration Commission (the "**CIETAC**") in accordance with its then-effect rules. The arbitration award shall be final and conclusive and binding upon the Parties.

    (2) The place of the arbitration shall be Beijing.

    (3) The arbitration language shall be Chinese.

17. This Agreement shall be made as of the date of its execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and expire on the date when each Party has completed its obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A is found with gross negligence, fraud, or other material misconduct; or (2) Party A is in bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreements of the Parties with respect to the transaction herein and supersedes all prior verbal discussions and written agreements between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any term shall not affect the validity or enforceability of the remainder of this Agreement.

22. Each Party shall strictly protect the confidentiality of any information regarding the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is accrued or becomes due prior to expiry or early termination of this Agreement shall survive such expiry or early termination. Sections 15, 16, and 22 shall survive expiry or termination of this Agreement.

7

24.    This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

8

[Signature page only]

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature: /s/ Legal representative/authorized representative

**Party B:**

**Zhixiang Liang**

Signature:   /s/ Zhixiang Liang

9

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, by and between:

**Party A:**   **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**   **Xiaodong Wang**
ID Card No.

**WHEREAS:**

1.   Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2.   Party B is a Chinese citizen holding 50% equity interests in Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"); and

3.   Party A and Party B have entered into an Amended and Restated Loan Agreement dated June 20, 2016 (the "**Original Loan Agreement**"), under which Party A lent a loan equal to RMB1,598,440,000 to Party B for payment of the price of its acquiring 50% equity interests in Beijing Perusal. The Original Loan Agreement was terminated by a Termination Agreement dated March 31, 2018 made by Party A, Party B, Beijing Perusal and any other party thereto. Party A and Party B intend to enter into this Agreement to replace the Original Loan Agreement and set forth their respective new rights and obligations.

**NOW, THEREFORE,** Party A and Party B agree as follows through negotiations:

1.   Pursuant to the terms and subject to the conditions of this Agreement, Party A confirms that it has provided to Party B and Party B has agreed to accept, a loan at an aggregate amount of RMB1,598,440,000.

2.   Party B confirms its receipt of the loan and has applied the loan in its entirety to pay the price for its acquiring equity interests in Beijing Perusal.

3.   The term of the loan under this Agreement shall commence on the day of receipt of the loan by Party B until the 10th anniversary of the date on which this Agreement is executed, which term is renewable upon agreement by the Parties in writing; *provided, however*, that the loan provided hereunder could be accelerated for immediate repayment by Party B pursuant to this Agreement at the request of Party A in writing at any time during the term of the loan or any renewal thereof if:

   (1)   Party B resigns from or is dismissed by Party A or any affiliate of Party A;

(2) Party B is dead, without civil legal capacity or with limited civil legal capacity;

(3) Party B is found with criminal offense or involvement therein;

(4) A claim is raised against Party B by any third party for an amount exceeding RMB100,000; or

(5) Subject to the laws of the PRC, Party A or any of its nominees may make investment in Beijing Perusal for operation of value-added telecommunication services and other services, such as internet information services, and Baidu, Inc. or any of its nominees has elected to exercise its option by issuing a written notice to Party B to purchase the equity interests in Beijing Perusal under the Exclusive Equity Purchase and Transfer Option Agreement referenced in article 4 hereof.

4. It is agreed and acknowledged that, subject to and to the extent permitted by the laws of the PRC, Baidu, Inc., as the holding company of Party A, shall have the right but no obligation to purchase or nominate any other person (including any natural person, legal entity or other entity) to purchase all or any part of the equity interests in Beijing Perusal held by Party B (the "**Call Option**"), provided that Baidu, Inc. shall issue a written notice to Party B to exercise the Call Option. Upon Baidu, Inc.'s issuance of such written notice, Party B shall, as requested and instructed by Party A, immediately transfer all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees at the original investment price (the "**Original Investment Price**") or any other price acceptable to Baidu, Inc. required under applicable laws. It is agreed and acknowledged that upon exercising the Call Option by Baidu, Inc., if the lowest price of the equity interests permitted under applicable laws is higher than the Original Investment Price, the price payable by Baidu, Inc. or any of its nominees shall be the lowest price permitted under applicable laws. The Parties agree to enter into an Exclusive Equity Purchase and Transfer Option Agreement with respect to the foregoing in this Article 4.

5. It is agreed and acknowledged that Party B shall repay the loan only as follows: upon its maturity and at the request of Party A in writing, the loan provided hereunder shall be repaid by Party B (or any of its heirs, successors or assigns) with the proceeds from transfer of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees to the extent permitted under the PRC laws, or otherwise agreed by the Parties.

6. It is agreed and acknowledged that in connection with transfer of the equity interests by Party B to Baidu, Inc. or any of its nominees upon maturity of the loan, if the proceeds from such transfer are legally required to or otherwise exceed the principal of the loan, Party B agrees to pay such excess amount, net of any individual income tax and other taxes and fees payable by Party B, to Baidu, Inc. or any of its nominees at sole decision of Baidu, Inc. to the extent permissible by the law.

2

7. It is agreed and acknowledged that Party B shall not be deemed to have fulfilled its obligations under this Agreement until:

   (1) it has transferred all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees; and

   (2) it has paid to Party A all of the proceeds from the equity interest transfer or the maximum amount thereof permitted under applicable laws (including principal and the highest interest accrued thereupon permitted under applicable laws) as repayment of the loan.

8. To secure performance of its obligations under this Agreement, Party B agrees to pledge all of his equity interests in Beijing Perusal to Party A (the "**Equity Pledge**"). It is acknowledged that an Amend and Restated Equity Pledge Agreement in respect of the foregoing in this Article 8 has been made as of June 20, 2016.

9. As of the date hereof, Party A represents and warrants to Party B that:

   (1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

   (2) Party A has the right to execute and perform this Agreement. The execution and performance of this agreement by Party A comply with its business scope, articles or any other organization document, and Party A has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

   (3) The principal of the loan to Party B is legally owned by Party A;

   (4) Execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any covenant made by Party A to any third party; and

   (5) This Agreement, once executed, shall constitute legal, valid obligations of Party A and enforceable against Party A in accordance with its terms.

10. As of the date hereof until the end of this Agreement, Party B represents and warrants to Party A that:

   (1) Beijing Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is a legal holder of the equity interests in Beijing Perusal;

   (2) Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with the articles or any other organizational document of Beijing Perusal, and Party B has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

3

(3)    Execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any covenant made by Party B to any third party;

(4)    This Agreement, once executed, shall constitute legal, valid obligations of Party B and enforceable against Party B in accordance with its terms;

(5)    Party B has made all contributions required by law for its holding equity interests in Beijing Perusal;

(6)    Unless otherwise provided under the Amended and Restated Equity Pledge Agreement and the Exclusive Equity Purchase and Transfer Option Agreement, Party B does not create any mortgage, pledge or other security over its equity interests in Beijing Perusal, or make any offer to any third party to transfer its equity interests, or make any promise as to any offer to purchase its equity interests from any third party, or execute any agreement with any third party to transfer its equity interests;

(7)    There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests in Beijing Perusal held by Party B; and

(8)    Beijing Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11.    Party B undertakes that during the term of this Agreement, it shall:

(1)    not sell, transfer, pledge or otherwise dispose of its equity interests or other interests in Beijing Perusal, or to allow creation of any other security interest thereupon without the prior written consent of Party A, except for the equity pledge or other right created for the benefit of Party A;

(2)    not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder's meetings permitting sale, transfer, pledge or other disposal of any of its legal or beneficiary ownership of the equity interests in Beijing Perusal or creation of any other security interest thereupon without the prior written consent of Party A, except for those made to Party A or any of its nominees;

(3)    not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder meetings permitting Beijing Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4)    promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Beijing Perusal;

4

(5)     execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of equity interests in Beijing Perusal;

(6)     refrain from any act and/or omission that may materially affect the assets, business and liabilities of Beijing Perusal without the prior written consent of Party A;

(7)     appoint any person nominated by Party A as executive director of Beijing Perusal, upon Party A's request;

(8)     in connection with Party A's exercise of the Call Option provided hereunder, transfer promptly and unconditionally all equity interests in Beijing Perusal held by Party B to Party A and/or any of its nominees, to the extent and within the scope permissible under the laws of the PRC;

(9)     not request Beijing Perusal to distribute dividends or profits to it;

(10)    upon transfer of its equity interests in Beijing Perusal to Party A or any of its nominees, pay the entire proceeds received by it from transfer of the equity interests to Party A as repayment of the loan or otherwise to the extent permitted under the laws of the PRC; and

(11)    strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that could affect the validity and enforceability of this Agreement.

12.  Party B undertakes that in its capacity of a shareholder of Beijing Perusal and during the term of this Agreement, it shall procure Beijing Perusal:

(1)     not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2)     to maintain its existence and handle matters prudently and affectively in accordance with good financial and business rules and practices;

(3)     not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4)     not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except for any liabilities (i) arising from the ordinary or day-to-day course of business instead of through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

5

(5)    to operate all businesses on a continued basis and maintain the value of its assets;

(6)    not to execute any material contracts (for the purpose of this Section 12(6), a contract will be deemed material if its value exceeds RMB500,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)    to provide all information regarding its operations and financial affairs at Party A's request;

(8)    not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)    not to distribute dividends to the shareholders without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)   to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)   to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets; and

(12)   to strictly comply with the terms of the Exclusive Technology Consulting and Services Agreement dated June 23, 2006 and the Exclusive Technology Consulting and Services Supplementary Agreement dated April 22, 2010, each by Beijing Perusal and Party A (collectively, the "**Service Agreement**") and other agreements, duly perform its obligations thereunder, and refrain from any act or omission that could affect the validity and enforceability thereof.

13.   This Agreement is binding upon, and inures the benefit of, each of the Parties and their respective heirs, successors and permitted assigns. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.   Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.   Execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

6

16. Arbitration

    (1)    Both Parties shall strive to resolve any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through negotiations in good faith. If no resolution is made within thirty (30) days after one Party requests for such resolution, either Party may submit such matter to China International Economic and Trade Arbitration Commission (the "**CIETAC**") in accordance with its then-effect rules. The arbitration award shall be final and conclusive and binding upon the Parties.

    (2)    The place of the arbitration shall be Beijing.

    (3)    The arbitration language shall be Chinese.

17. This Agreement shall be made as of the date of its execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and expire on the date when each Party has completed its obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A is found with gross negligence, fraud, or other material misconduct; or (2) Party A is in bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreements of the Parties with respect to the transaction herein and supersedes all prior verbal discussions and written agreements between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any term shall not affect the validity or enforceability of the remainder of this Agreement.

22. Each Party shall strictly protect the confidentiality of any information regarding the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is accrued or becomes due prior to expiry or early termination of this Agreement shall survive such expiry or early termination. Sections 15, 16, and 22 shall survive expiry or termination of this Agreement.

7

24.   This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

8

[Signature page only]

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:  /s/ Legal representative/authorized representative

**Party B:**

**Xiaodong Wang**

Signature:  /s/ Xiaodong Wang

9

**Exhibit 4.70**

**Proxy Agreement**

This Proxy Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu, Inc.**, with registered address at M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

And

**Party B: Zhixiang Liang**, with ID No.

**WHEREAS:**

1.  Party B is a citizen of the PRC and shareholder of Beijing Perusal Technology Co., Ltd. ("**Beijing perusal**"). As of the date hereof, Party B holds 50% equity interests in Beijing Perusal ("**Party B's Equity**").

2.  Pursuant to the terms and subject to the conditions of this Agreement, Party B agrees to authorize a PRC company or individual designated by Party A to exercise its rights as a shareholder of Beijing Perusal on its behalf, and Party A agrees to accept such authorization.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.  Party B hereby agrees to irrevocably authorize any entity or individual designated by Party A to exercise on its behalf all of the voting and other rights as a shareholder empowered by the law and Beijing Perusal's articles of association at the shareholders' meeting of Beijing Perusal, including without limitation any right regarding sale, transfer, pledge or disposal of all or part of Party B's equity interests in Beijing perusal; convening, attending and presiding over shareholders' meeting of Beijing perusal as an authorized representative of Beijing perusal's shareholders, and designating and electing directors and chairperson of Beijing Perusal as an authorized representative of the shareholders of Beijing Perusal at the shareholders' meeting.

2.  Party A agrees to designate any entity or individual permitted under applicable laws to accept the authorization of Party B under Article 1 hereof, and such entity or individual shall exercise Party B's voting and other rights as a shareholder on behalf of Party B under this Agreement. As of the date hereof, Party A hereby designates Hailong Xiang as the authorized individual to exercise voting and other rights as a shareholder on behalf of Party B under this Agreement. For avoidance of any doubt, Party A shall have the discretion to replace any entity or individual designated by it or designate any other entity or individual to exercise such voting and other rights on behalf of Party B.

3.  Party B hereby acknowledges that, regardless of any change of its equity interests in Beijing Perusal, any entity or individual designated by Party A shall be authorized to exercise all of the voting and other rights as a shareholder on behalf of Party B. If Party B transfers its equity interests in Beijing Perusal to any individual or entity other than Party A or any individual or entity designated by Party A (the "**Transferee**"), it shall procure and ensure that the Transferee shall authorize any individual or entity designated by Party A to exercise voting and any other rights as a shareholder on its behalf by entering into an agreement which form and content are similar to those of this Agreement in conjunction with its signing any equity transfer agreement.

4.  Party B hereby acknowledges that if Party A withdraws its designation of the authorized entity or individual, it shall immediately withdraw its authorization to such entity or individual, and authorize any other entity or individual designated by Party A to exercise all of its voting and other rights as a shareholder at the shareholders' meeting of Beijing Perusal.

5.  This Agreement shall be effective upon execution by the Parties or their respective legal or authorized representatives as of the date first written above.

6.  This Agreement shall remain permanently valid unless otherwise expressly provided hereunder or terminated by Party A in writing. If any Party's operating term expires during the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If any Party's application to renew its operating term fails to obtain approval or consent from competent authority, this Agreement shall terminate upon the end of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

7.  This Agreement shall remain valid as long as Party B is a holder of any equity interest in Beijing Perusal. During the term of this Agreement, unless otherwise required by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time with a written notice to Party B no less than thirty (30) days in advance.

8.  No amendment to this Agreement shall be made unless by agreement of the Parties in writing. Any duly executed amendment or supplement hereto by the Parties is an integral part of, and shall have the same binding effect with, this Agreement.

9.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with any applicable law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the remainder hereof.

10. All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Party or any other address designated and notified to such Party from time to time by hand, mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with marking of the mailing day on the postmark), or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; (c) at the time of receipt shown on the transmission acknowledgement if it is sent by fax; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

2

Party A:    Baidu, Inc.
Address:    M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands
Attention: Yanhong Li
Fax:
Tel:

Party B:

Zhixiang Liang
Address:
Fax:
Tel:

11.    Unless with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement at its own discretion provided that Party A is required to give a written notice to such effect to Party B, and no further consent of Party B is required thereof.

12.    Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not resulting from unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable laws or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to confidential obligations similar to those provided in this Article. Disclosure by any employee of or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be held liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

13.

(1)    The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2)    Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If negotiations fail, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing and the arbitration language shall be Chinese. The arbitral award shall be final and binding upon both Parties.

3

14. This Agreement, once becoming effective, constitutes the entire agreements and understandings between the Parties with respect to the subject matter hereof, and supersedes in their entirety all prior oral and written agreements and understandings between the Parties with respect to the subject matter hereof.

15. This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

4

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:          /s/ Yanhong Li
Title:                Director

**Party B:**

**Zhixiang Liang**

Signature:          /s/ Zhixiang Liang

5

**Proxy Agreement**

This Proxy Agreement (this "**Agreement**") is made as of March 31, 2018 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu, Inc.**, with registered address at M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

And

**Party B: Xiaodong Wang**, with ID No.

**WHEREAS:**

1. Party B is a citizen of the PRC and shareholder of Beijing Perusal Technology Co., Ltd. ("**Beijing perusal**"). As of the date hereof, Party B holds 50% equity interests in Beijing Perusal ("**Party B's Equity**").

2. Pursuant to the terms and subject to the conditions of this Agreement, Party B agrees to authorize a PRC company or individual designated by Party A to exercise its rights as a shareholder of Beijing Perusal on its behalf, and Party A agrees to accept such authorization.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1. Party B hereby agrees to irrevocably authorize any entity or individual designated by Party A to exercise on its behalf all of the voting and other rights as a shareholder empowered by the law and Beijing Perusal's articles of association at the shareholders' meeting of Beijing Perusal, including without limitation any right regarding sale, transfer, pledge or disposal of all or part of Party B's equity interests in Beijing perusal; convening, attending and presiding over shareholders' meeting of Beijing perusal as an authorized representative of Beijing perusal's shareholders, and designating and electing directors and chairperson of Beijing Perusal as an authorized representative of the shareholders of Beijing Perusal at the shareholders' meeting.

2. Party A agrees to designate any entity or individual permitted under applicable laws to accept the authorization of Party B under Article 1 hereof, and such entity or individual shall exercise Party B's voting and other rights as a shareholder on behalf of Party B under this Agreement. As of the date hereof, Party A hereby designates Hailong Xiang as the authorized individual to exercise voting and other rights as a shareholder on behalf of Party B under this Agreement. For avoidance of any doubt, Party A shall have the discretion to replace any entity or individual designated by it or designate any other entity or individual to exercise such voting and other rights on behalf of Party B.

3.  Party B hereby acknowledges that, regardless of any change of its equity interests in Beijing Perusal, any entity or individual designated by Party A shall be authorized to exercise all of the voting and other rights as a shareholder on behalf of Party B. If Party B transfers its equity interests in Beijing Perusal to any individual or entity other than Party A or any individual or entity designated by Party A (the "**Transferee**"), it shall procure and ensure that the Transferee shall authorize any individual or entity designated by Party A to exercise voting and any other rights as a shareholder on its behalf by entering into an agreement which form and content are similar to those of this Agreement in conjunction with its signing any equity transfer agreement.

4.  Party B hereby acknowledges that if Party A withdraws its designation of the authorized entity or individual, it shall immediately withdraw its authorization to such entity or individual, and authorize any other entity or individual designated by Party A to exercise all of its voting and other rights as a shareholder at the shareholders' meeting of Beijing Perusal.

5.  This Agreement shall be effective upon execution by the Parties or their respective legal or authorized representatives as of the date first written above.

6.  This Agreement shall remain permanently valid unless otherwise expressly provided hereunder or terminated by Party A in writing. If any Party's operating term expires during the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If any Party's application to renew its operating term fails to obtain approval or consent from competent authority, this Agreement shall terminate upon the end of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

7.  This Agreement shall remain valid as long as Party B is a holder of any equity interest in Beijing Perusal. During the term of this Agreement, unless otherwise required by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time with a written notice to Party B no less than thirty (30) days in advance.

8.  No amendment to this Agreement shall be made unless by agreement of the Parties in writing. Any duly executed amendment or supplement hereto by the Parties is an integral part of, and shall have the same binding effect with, this Agreement.

9.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with any applicable law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the remainder hereof.

10. All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Party or any other address designated and notified to such Party from time to time by hand, mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with marking of the mailing day on the postmark), or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; (c) at the time of receipt shown on the transmission acknowledgement if it is sent by fax; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

2

Party A:    Baidu, Inc.
Address:   M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands
Attention: Yanhong Li
Fax:
Tel:

Party B:

Xiaodong Wang
Address:
Fax:
Tel:

11.  Unless with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement at its own discretion provided that Party A is required to give a written notice to such effect to Party B, and no further consent of Party B is required thereof.

12.  Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not resulting from unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable laws or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to confidential obligations similar to those provided in this Article. Disclosure by any employee of or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be held liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

13.

(1)  The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2)  Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If negotiations fail, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing and the arbitration language shall be Chinese. The arbitral award shall be final and binding upon both Parties.

3

14. This Agreement, once becoming effective, constitutes the entire agreements and understandings between the Parties with respect to the subject matter hereof, and supersedes in their entirety all prior oral and written agreements and understandings between the Parties with respect to the subject matter hereof.

15. This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

4

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:      /s/ Yanhong Li
Title:          Director

**Party B:**

**Xiaodong Wang**

Signature:      /s/ Xiaodong Wang

5

**Exhibit 4.71**

### POWER OF ATTORNEY

I, Zhixiang Liang, a citizen of the People's Republic of China (the " **PRC**") with ID No. and a shareholder holding 50% equity interests of Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"), hereby irrevocably authorizes, pursuant to the Proxy Agreement dated hereof between me and Baidu, Inc., as well as by designation of Baidu, Inc., Hailong Xiang with the following powers and rights in respect of my existing and future equity holding in Beijing Perusal ("**My Equity**") during the term of this Power of Attorney:

Hailong Xiang is hereby authorized as my sole and exclusive agent to exercise on my behalf all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal in accordance with PRC laws and the articles of Beijing Perusal, including without limitation the right to sell or transfer any or all of My Equity, and to designate and appoint the general manager of Beijing Perusal as my authorized representative at the shareholders' meeting of Beijing Perusal.

Such authorization is premised on the condition that Hailong Xiang is an employee of Baidu, Inc. and its affiliates, and Baidu, Inc. agrees to such authorization. Once Hailong Xiang's employment with Baidu, Inc. and its affiliates terminates, or I am notified by Baidu, Inc. to terminate such authorization, I will withdraw the authorization made hereunder immediately and designate/authorize any other person nominated by Baidu, Inc. to exercise all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof as long as I holds equity interests in Beijing Perusal.

(Signature):    /s/ Zhixiang Liang

Date: March 31, 2018

1

**Exhibit 4.72**

**POWER OF ATTORNEY**

I, Xiaodong Wang, a citizen of the People's Republic of China (the " **PRC**") with ID No. and a shareholder holding 50% equity interests of Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"), hereby irrevocably authorizes, pursuant to the Proxy Agreement dated hereof between me and Baidu, Inc., as well as by designation of Baidu, Inc., Hailong Xiang with the following powers and rights in respect of my existing and future equity holding in Beijing Perusal ("**My Equity**") during the term of this Power of Attorney:

Hailong Xiang is hereby authorized as my sole and exclusive agent to exercise on my behalf all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal in accordance with PRC laws and the articles of Beijing Perusal , including without limitation the right to sell or transfer any or all of My Equity, and to designate and appoint the general manager of Beijing Perusal as my authorized representative at the shareholders' meeting of Beijing Perusal.

Such authorization is premised on the condition that Hailong Xiang is an employee of Baidu, Inc. and its affiliates, and Baidu, Inc. agrees to such authorization. Once Hailong Xiang's employment with Baidu, Inc. and its affiliates terminates, or I am notified by Baidu, Inc. to terminate such authorization, I will withdraw the authorization made hereunder immediately and designate/authorize any other person nominated by Baidu, Inc. to exercise all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof as long as I holds equity interests in Beijing Perusal.

(Signature): /s/ Xiaodong Wang

Date: March 31, 2018

1

**Exhibit 4.73**

**Exclusive Equity Purchase and Transfer Option Agreement**

This Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on March 31, 2018:

**Party A:**    **Baidu, Inc.**
Address:    M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**Party B:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:**    **Zhixiang Liang**
ID No.:

**Party D:**    **Beijing Perusal Technology Co., Ltd.**
Address:    A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

In this Agreement, Party A, Party B, Party C and Party D are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A is a Cayman Islands company incorporated under the laws of Cayman Islands and an affiliate of Party B;

2. Party B is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

3. Party D is a liability limited company incorporated in Beijing, the PRC;

4. Party C is a shareholder of Party D, owning 50% equity interests in Party D (the "**Equity Interest**");

5. Party B and Party C entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party C obtains a loan up to RMB1,598,440,000 from Party B (the "**Loan Arrangement**") in connection with its acquiring 50% equity interests in Party D (the "**Original Loan Agreement**"). A Termination Agreement is made as of [ ], 2018 by and among Party B, Party C, Party D and other parties thereto to terminate the Original Loan Agreement, and as of the same date thereof Party B, Party C and Party D entered into a new Loan Agreement to replace the Original Loan Agreement and set forth new rights and obligations of each parties thereto (the "**New Loan Agreement**"). It is acknowledged in the New Loan Agreement that Party B continue to be the creditor of the loan of RMB1,598,440,000 provided by it to Party C;

6. Party B and Party D entered into a series of agreement dated June 23, 2006, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"), whereby Party B provides exclusive technology consulting and services to Party D; and

7. Party B and Party C entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated June 20, 2016, whereby Party C transfers all of the Equity Interest to Party B; and

8. Party A and Party C entered into a Proxy Agreement dated [    ], 2018 (the "**Proxy Agreement**"), whereby Party C authorizes the entity or individual designated by Party A to exercise all voting and other rights of Party C as a shareholder at the shareholders meeting of Party D.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1. **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party C hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, and at any time from Party C (the "**Transferor**"), a portion or all of the equity interests held by Party C in Party D (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party D hereby agrees to granting of the Option by Party C to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means any individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements; *provided, however*, that it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be made in the manner determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party B any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party D

Party C and Party D hereby covenant, in relation to Party D:

2.1.1 Not to supplement, amend or modify Party D's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party D and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party D's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party D's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party D's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party D's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party D is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party D's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party D to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party D's shareholders in any way without Party A's prior written consent; *provided, however*, that Party D shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request; and

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D.

4

2.2 Covenants Relating to the Transferor

Party C hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve Party D's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party D;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party D and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party D.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party D needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party D cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party D to repay the loan.

5

3. **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party D hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party D has good and marketable ownership of all of its assets and has not created any security interest on the said assets;

3.4 Party D has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party D's assets or Party D; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement and the restrictions provided under the Proxy Agreement and hereunder.


4. **Assignment of Agreement**

4.1 Neither Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party C and Party D hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party C and Party D and no further consent of Party C or Party D is required.

6

5. **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above and expire when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.2 If the duration of operation (including any extension thereof) of Party A or Party D is expired or terminated for other reasons within the term set forth in Section 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Section 4.2 hereof.

6. **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7. **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8. **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

7

| Party A: | Baidu, Inc. |
| Address: | M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| Attention: | Yanhong Li |
| Facsimile: | |
| Telephone: | |

| Party B: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |

| Party C: | Zhixiang Liang |
| Address: | |
| Facsimile: | |
| Telephone: | |

| Party C: | Beijing Perusal Technology Co., Ltd. |
| Address: | A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |

9. **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

   a.   Materials that are or will become known by the public (through no fault of the receiving party);

   b.   Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

   c.   Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

8

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Breach Liabilities**

11.1 Party A shall have the right to terminate this Agreement and/or hold Party C or Party D liable for any damages if Party C or Party D is in material breach of any provision under this Agreement. This Section 11.1 shall not be prejudicial to any other right of Party A under this Agreement.

11.2 Unless otherwise legally required, neither Party C or Party D may terminate or otherwise end this Agreement under any circumstance.

12. **Miscellaneous**

12.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

12.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreements of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

12.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

12.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

9

12.5 Language and counterparts

This Agreement is executed in Chinese in four originals; each Party holds one original and each original has the same legal effect.

12.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

12.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or early termination. Articles 6, 8 and 9 and this Section 12.7 shall survive the termination of this Agreement.

12.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

(No text below)

10

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:    /s/ Yanhong Li
Title:    Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:    Legal Representative

**Party C:**

**Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

**Party D:**

**Beijing Perusal Technology Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:    Legal Representative

11

Exhibit 4.74

**Exclusive Equity Purchase and Transfer Option Agreement**

This Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on March 31, 2018:

**Party A:    Baidu, Inc.**
Address:    M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**Party B:    Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:    Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:    Xiaodong Wang**
ID No.:

**Party D:    Beijing Perusal Technology Co., Ltd.**
Address:    A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

In this Agreement, Party A, Party B, Party C and Party D are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS**:

1. Party A is a Cayman Islands company incorporated under the laws of Cayman Islands and an affiliate of Party B;

2. Party B is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

3. Party D is a liability limited company incorporated in Beijing, the PRC;

4. Party C is a shareholder of Party D, owning 50% equity interests in Party D (the "**Equity Interest**");

5. Party B and Party C entered into an Amended and Restated Loan Agreement dated June 20, 2016, whereby Party C obtains a loan up to RMB1,598,440,000 from Party B (the "**Loan Arrangement**") in connection with its acquiring 50% equity interests in Party D (the "**Original Loan Agreement**"). A Termination Agreement is made as of [ ], 2018 by and among Party B, Party C, Party D and other parties thereto to terminate the Original Loan Agreement, and as of the same date thereof Party B, Party C and Party D entered into a new Loan Agreement to replace the Original Loan Agreement and set forth new rights and obligations of each parties thereto (the "**New Loan Agreement**"). It is acknowledged in the New Loan Agreement that Party B continue to be the creditor of the loan of RMB1,598,440,000 provided by it to Party C;

6. Party B and Party D entered into a series of agreement dated June 23, 2006, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"), whereby Party B provides exclusive technology consulting and services to Party D; and

7. Party B and Party C entered into an Amended and Restated Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated June 20, 2016, whereby Party C transfers all of the Equity Interest to Party B; and

8. Party A and Party C entered into a Proxy Agreement dated [   ], 2018 (the "**Proxy Agreement**"), whereby Party C authorizes the entity or individual designated by Party A to exercise all voting and other rights of Party C as a shareholder at the shareholders meeting of Party D.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

1. **Purchase and Sale of Equity Interest**

1.1 Granting of Rights

Party C hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, and at any time from Party C (the "**Transferor**"), a portion or all of the equity interests held by Party C in Party D (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party D hereby agrees to granting of the Option by Party C to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means any individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

2

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the substance and form satisfactory to Party A;

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements; *provided, however*, that it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be made in the manner determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party B any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party D

Party C and Party D hereby covenant, in relation to Party D:

2.1.1 Not to supplement, amend or modify Party D's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party D and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party D's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

3

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party D's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party D's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party D's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party D is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party D's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party D to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party D's shareholders in any way without Party A's prior written consent; *provided, however*, that Party D shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request; and

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D.

4

2.2 Covenants Relating to the Transferor

Party C hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve Party D's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party D;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party D and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party D.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party D needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party D cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party D to repay the loan.

5

3. **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party D hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party D has good and marketable ownership of all of its assets and has not created any security interest on the said assets;

3.4 Party D has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party D's assets or Party D; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement and the restrictions provided under the Proxy Agreement and hereunder.

4. **Assignment of Agreement**

4.1 Neither Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party C and Party D hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party C and Party D and no further consent of Party C or Party D is required.

6

5. **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above and expire when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

5.2 If the duration of operation (including any extension thereof) of Party A or Party D is expired or terminated for other reasons within the term set forth in Section 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Section 4.2 hereof.

6. **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

7. **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

8. **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

7

| | |
|---|---|
| Party A: | Baidu, Inc. |
| Address: | M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands |
| Attention: | Yanhong Li |
| Facsimile: | |
| Telephone: | |
| | |
| Party B: | Baidu Online Network Technology (Beijing) Co., Ltd. |
| Address: | 3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |
| | |
| Party C: | Xiaodong Wang |
| Address: | |
| Facsimile: | |
| Telephone: | |
| | |
| Party C: | Beijing Perusal Technology Co., Ltd. |
| Address: | A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing |
| Facsimile: | |
| Telephone: | |

9. **<u>Confidentiality</u>**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

    a.    Materials that are or will become known by the public (through no fault of the receiving party);

    b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

    c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

8

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Breach Liabilities**

11.1 Party A shall have the right to terminate this Agreement and/or hold Party C or Party D liable for any damages if Party C or Party D is in material breach of any provision under this Agreement. This Section 11.1 shall not be prejudicial to any other right of Party A under this Agreement.

11.2 Unless otherwise legally required, neither Party C or Party D may terminate or otherwise end this Agreement under any circumstance.

12. **Miscellaneous**

12.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

12.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreements of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

12.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

12.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

9

12.5 Language and counterparts

This Agreement is executed in Chinese in four originals; each Party holds one original and each original has the same legal effect.

12.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

12.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or early termination. Articles 6, 8 and 9 and this Section 12.7 shall survive the termination of this Agreement.

12.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

(No text below)

10

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:    /s/ Yanhong Li
Title:        Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:        Legal Representative

**Party C:**

**Xiaodong Wang**

Signature:    /s/ Xiaodong Wang

**Party D:**

**Beijing Perusal Technology Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:        Legal Representative

11

**Exhibit 4.75**

**Termination Agreement of Current Control Contracts**

This Termination Agreement of Current Control Contracts (this "**Agreement**") is made as of June 28, 2018 in Beijing, the People's Republic of China (the "**PRC**," for purposes of this Agreement excluding Hong Kong, Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**, a wholly foreign owned enterprise duly formed and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party B: Beijing Perusal Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at A2 2/F, Building 17, Zhongguancun Software Park, 8 Dong Bei Wang West Road, Haidian District, Beijing;

**Party C: Zhixiang Liang**, a PRC citizen, ID No.    ; and
        **Xiaodong Wang**, a PRC citizen, ID No.    ;


And

**Party D**: **Baidu Inc.**, a company duly formed and validly existing under the laws of the Cayman Islands, with its registered address at M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as "Other Parties."


**WHEREAS:**

(1)    Each of the Parties has signed the documents listed in Exhibit 1 attached hereto (collectively the "**Current Control Documents**") prior to the date hereof; and

(2)    Pursuant to the terms and subject to the conditions herein, each of the Parties agrees to terminate all of the Current Control Documents.

**NOW, THEREFORE**, the Parties agree as follows through negotiations:

**1.    Termination of Current Control Documents**

1.1    Each of the Parties hereby irrevocably agrees and acknowledges that all of the Current Control Documents shall terminate and cease to have any effect as of the date hereof.

1.2  As of the date hereof, each of the Parties shall have no right under all and/or any of the Current Control Documents, or be required to fulfill any obligation thereunder; *provided, however*, that (i) any rights exercised and obligations fulfilled by each of the Parties on reliance of the Current Control Documents shall remain valid, no Party is required to return any payment, income or interest of any kind received by it or in its actual possession on reliance of the Current Control Documents, and any amount which has become due and payable among Party A, Party B and Party C shall be paid accordingly; notwithstanding the foregoing, Xiaodong Wang shall return to Party A an   amount of RMB 159,844 equal to the entire principal and interest accrued thereupon under the Loan Agreement listed in Exhibit 1 pursuant to the same Loan Agreement; and (ii) Party A, Party B and Party C shall make application with the competent industrial and commercial authority having jurisdiction over Party B within [30] business days as of the date hereof to cancel the registered pledge of the equity interests in Party B made by Xiaodong Wang in favor of Party A under the Current Control Documents.

1.3  Unless otherwise provided in Section 1.2 above, each of the Parties hereby irrevocably and unconditionally waives any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties directly or indirectly in connection with or arising from all and/or any of the Current Control Documents.

1.4  Without prejudice to the generality of Sections 1.2 and 1.3 above, as of the date hereof, each of the Parties hereby waives any commitment, debt, claim, demand, obligation and liability of any kind or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, in connection with or arising from the Current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.    Representations and Warranties**

2.1  **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal rights, powers and authorities to execute this Agreement and all contracts and documents referenced herein to which it is a party, and execution of this Agreement represents expression of its genuine intent;

(2) none of its execution and performance of this Agreement will constitute breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or requirement for it to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents referenced herein to which it is a party, and for its compliance with and performance of its obligations hereunder and thereunder.

**3.    Covenants**

3.1    In order to duly terminate the rights and obligations under the Current Control Documents, each Party shall execute all documents and take all actions that are necessary or advisable, provide active support for the Other Parties in obtaining relevant government approvals and/or registration documents and effecting relevant termination procedures.

**4.    Termination**

4.1    Except for the circumstances expressly provided herein, the Parties agree to terminate this Agreement:

(1) by all of the Parties through negotiation, and all expenses and losses incurred therefrom shall be borne respectively by the incurring Party; or

(2) by the non-defaulting Party if the intent of this Agreement is incapable of fulfilment due to a Party's breach of its obligations hereunder.

**5.    Breach Liabilities and Indemnification**

5.1    Any Party shall be deemed in breach of this Agreement if it breaches or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

5.2    Unless otherwise expressly agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Party for any cost, liability or any loss (including without limitation any interest accrued therefrom and legal fees) incurred by the non-defaulting Party. The total amount of indemnity payable by the defaulting Party to the non-defaulting Party shall be the loss arising from such breach.

**6.    Governing Law and Dispute Resolution**

6.1    The formation of this Agreement and its validity, interpretation, performance and resolution of any dispute arising from this Agreement shall be governed by and construed in accordance with the laws of the PRC.

6.2 All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through negotiations in good faith.

6.3 Any Party may submit any dispute arising from this Agreement to China International Economic and Trade Arbitration Commission (CIETAC) for arbitration in Beijing in accordance with its arbitration rules and procedures then in effect. The arbitral tribunal shall consist of three arbitrators appointed in accordance with the arbitration rules, with one arbitrator appointed by the claimant, one arbitrator by the respondent and the third arbitrator by the two appointed arbitrators after consultation or by the CIETAC. The arbitration shall proceed on confidential basis in Chinese. The arbitral award shall be final and binding upon all Parties.

6.4 During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

## 7. Confidentiality

7.1 The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement, and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for any disclosure:

(1) to the auditor, legal advisor and any other person engaged by it in the ordinary course of business, provided that such person shall be obliged to keep in confidence any information relating to this Agreement acquired by it during such engagement; and

(2) which could be otherwise accessible by the public, or is expressly required by law, regulation or relevant stock exchange authority.

## 8. Miscellaneous

8.1 This Agreement shall become effective upon signature of all of the Parties.

8.2 The Parties may amend or modify this Agreement through negotiations. Any such amendment or modification shall be made in writing and become effective upon signature of all of the Parties.

8.3 If any provision hereof be held invalid or unenforceable, such provision shall be deemed to have never existed herein and have no effect upon validity of the remainder of this Agreement, and the Parties shall negotiate to provide for a new provision to the extent permissible by law to ensure that the intent of the original provision be realized to the maximum extent.

8.4   Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall operate as its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

8.5   This Agreement is made in five originals with one thereof for each Party, and each of the originals shall be equally binding.

(*No text below, Signatures to follow*)

IN WITNESS WHEREOF, each Party has executed or caused this Termination Agreement of Current Control Contracts to be executed by its authorized representative on its behalf as of the date first written above with immediate effect.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature: /s/ Hailong Xiang
Name:
Title:        Legal Representative

**Party B:**

**Beijing Perusal Technology Co., Ltd. (seal)**

Signature: /s/ Hailong Xiang
Name:
Title:        Legal Representative

**Party C:**

**Zhixiang Liang**

Signature: /s/ Zhixiang Liang

**Xiaodong Wang**

Signature: /s/ Xiaodong Wang

**Party D:**

**Baidu, Inc.**

Signature: /s/ Yanhong Li
Name:
**Title:        Director**

**Exhibit 1**

List of Current Control Documents

| No. | Document Name | Signed by | Signed on |
|---|---|---|---|
| 1 | Operating Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing Perusal Technology Co., Ltd.; and Xiaodong Wang | May 3, 2016 |
| 2 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang | March 31, 2018 |
| 3 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Xiaodong Wang and Beijing Perusal Technology Co., Ltd. | March 31, 2018 |
| 4 | Proxy Agreement | Baidu, Inc. and Xiaodong Wang | March 31, 2018 |
| 5 | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang | June 20, 2016 |
| 6 | Power of Attorney | Xiaodong Wang | March 31, 2018 |
| 7 | Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Xiaodong Wang | June 20, 2016 |

Exhibit 4.76

**Equity Transfer Agreement**

This Equity Transfer Agreement (this "**Agreement**") is entered into as of June 28, 2018 in Beijing, the People's Republic of China (the "PRC"), by and between:

**Party A: Xiaodong Wang (the "Transferor")**
ID No.
Address:

**Party B: Lu Wang (the "Transferee")**
ID No.
Address:

The Parties above are collectively referred to as the "Parties," individually as a "Party."

**WHEREAS:**

(1)    Party A holds 50% equity interests in Beijing Perusal Technology Co., Ltd. (the "**Company**"), representing a capital contribution of RMB1,580,000,000;

(2)    Party A desires to transfer to Party B all of its capital contribution in the Company equal to RMB1,580,000,000, representing 50% equity interests of the Company (the "**Subject Equity**"); and

(3)    Party B intends to accept the transfer of the Subject Equity.

**NOW, THEREFORE,** the Parties agree as follows through negotiations:

**1.    Transfer of Target Equity**

1.1    Party A agrees to transfer to Party B, and Party B agrees to accept the transfer of, **50%** of the equity interests in the Company held by Party A, at a price of RMB**1,598,440,000** (the "**Transfer Price**").

1.2    The Parties shall take all actions and execute all documents necessary to complete the procedures for shareholder change registration, including without limitation filing a change application to the industrial and commercial authority, amending the Company's articles of association, and effecting relevant change registration procedures.

1.3    The equity transfer shall be closed on the date hereof, as of which date Party A will cease to own the Subject Equity and any rights and interests attached thereto, and Party B will become a shareholder of the Company, own the Subject Equity and any rights and interests attached thereto, exercise the rights and fulfill the obligations and duties as a shareholder in accordance with the Company's articles of association.

**2.    Liabilities for Breach**

If either Party is in material breach of any provision provided hereunder, the non-defaulting Party may terminate this Agreement and hold the defaulting Party liable for any damages. This Article 2 will not affect any other right granted to either Party in accordance with the law.

**3.    Governing Law and Dispute Resolution**

3.1    The formation, validity, interpretation, performance, amendment and termination of this Agreement as well as the resolution of disputes hereunder shall be governed by the laws of the People's Republic of China.

3.2    Any dispute arising from the interpretation and performance of the terms hereunder shall first be resolved by the Parties through negotiations in good faith. If the negotiations fail within thirty (30) days after a Party makes the request of negotiations in writing, either Party may submit the dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing. The arbitral award shall be final and binding upon both Parties.

3.3    In the occurrence of any dispute arising as a result of interpretation and performance of this Agreement or during the process of arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**4.    Miscellaneous**

4.1    The Parties may amend and supplement this Agreement in writing. The agreements to amend and/or supplement this Agreement between the Parties constitute integral parts of this Agreement and shall have equal legal effect as this Agreement.

4.2    Should any one or more provisions hereunder be held invalid, void or unenforceable in any respect under any law or regulation, the validity, legality or enforceability of the other provisions hereof will not be affected or prejudiced in any respect. The Parties shall negotiate in faith to seek to replace such invalid, void or unenforceable provision(s) with valid one(s) to the maximum extent permissible by the law and closest to the expectations of the Parties, to accomplish an economic effect as similar as possible.

4.3    This Agreement shall be formed as of the date on which both Parties affix their signatures and seals, and shall become effective as of the date on which the approval authority renders its approval, until both Parties complete their respective obligations hereunder.

4.4    This Agreement is made in five counterparts, one for each Party, one maintained by the Company and the other two shall be filed to relevant approval authority for record. All counterparts shall be equally binding.

(Remainder of the page intentionally left blank)

2

(Signature page of the Equity Transfer Agreement)

**IN WITNESS WHEREOF**, each Party hereto has executed this Equity Transfer Agreement as of the date first written above.

**Party A:**

**Xiaodong Wang**

Signature:   /s/Xiaodong Wang

**Party B:**

**Lu Wang**

Signature:   /s/Lu Wang

3

**Exhibit 4.77**

**Business Operating Agreement**

This Business Operating Agreement (this "**Agreement**") is entered into as of June 28, 2018 in Beijing, the People's Republic of China ("**PRC**," for purposes of this Agreement, excluding Hong Kong Macau and Taiwan) by and among:

**Party A: Baidu Online Network Technology (Beijing) Co., Ltd.**

RegisteredAddress: Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B: Beijing Perusal Technology Co., Ltd.**

RegisteredAddress: A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing

**Party C: Zhixiang Liang**, a PRC citizen, ID No.

And

**Party D**: **Lu Wang**, a PRC citizen, ID No.

**WHEREAS:**

1.  Party A is a wholly foreign-owned enterprise duly incorporated and validly existing under the laws of the PRC, has the technology expertise and practical experience in the development and design of computer software, as well as rich experience and human resources specializing in information technology and services;

2.  Party B is a limited liability company duly incorporated and validly existing under PRC law, is permitted by Beijing Telecommunications Administration to provide internet information services and other value-added telecommunication services, and is permitted by Beijing Industrial and Commercial Administration to provide internet-based advertising services;

3.  Each of Party C and Party D is a shareholder of Party B owning 50% equity interests in Party B;

4.  Party A and Party B have established business relationship by entering into an Exclusive Technology Consulting and Services Agreement and a supplement thereto (the "**Services Agreement**"), a Web Layout Copyright License Agreement, a Trademark License Agreement, and a Domain Name License Agreement; and

5.  Pursuant to the above-mentioned agreements between Party A and Party B, Party B shall make certain payments to Party A, and the business operations of Party B will have a material effect on Party B's ability to make such payments to Party A.

**NOW THEREFORE,** the Parties agree as follows through negotiations:

1. Party A agrees, subject to satisfaction of applicable provisions herein by Party B, to be the guarantor of Party B in the contracts, agreements or transactions entered into between Party B and any third party in connection with Party B's business operations, to provide full guarantees for performance of such contracts, agreements or transactions by Party B. As counter-guarantee, Party B agrees to pledge the accounts receivable in its operations and all of its assets to Party A. Based on the above guarantee arrangement, Party A, when necessary, is willing to enter into written guarantee contracts with Party B's counterparties to assume the guarantor's liabilities. Party B, Party C and Party D shall take all necessary actions (including without limitation executing relevant documents and filing relevant registrations) to carry out the counter-guarantee arrangement with Party A.

2. In consideration of the requirements of Article 1 hereof and to ensure performance of the various business agreements between Party A and Party B and payment by Party B of the amounts payable to Party A thereunder, Party B, Party C and Party D hereby agree that, without Party A's prior written consent, Party B shall not engage in any transaction that may materially affect its assets, liabilities, rights or operations (other than execution of any business contract or agreement, sale or purchase of any asset by Party B in its ordinary course of business and receipt of legal rights by applicable counterparties as a result thereof), including without limitation the following:

   2.1 To borrow money from any third party or assume any debt;

   2.2 To sell to or acquire from any third party any asset or right, including without limitation any intellectual property rights;

   2.3 To create any security upon any of its assets or intellectual property rights in favor of any third party; or

   2.4 To assign any of its business contracts to any third party.

3. In order to ensure the performance of all of the business agreements between Party A and Party B and the payment by Party B of the amounts payable to Party A thereunder, Party B, Party C and Party D hereby agree to accept advice and guidance provided by Party A from time to time relating to Party B's policies on matters such as employment and dismissal of employees, daily operations and management, and financial management.

4. Party B, Party C and Party D hereby agree that Party C and Party D shall appoint the candidate recommended by Party A as directors of Party B, and Party B shall appoint any member recommended by Party A from its senior management to serve as the general manager, financial director and any other senior management position of Party B. If such member of Party A's senior management terminates its employment with Party A voluntarily or by dismissal of Party A, such member shall be no longer qualified to serve at any position in Party B; under such circumstance, Party B shall appoint any other member recommended by Party A from its senior management to fill the position vacated by such circumstance. Any candidate recommended by Party A to Party B shall meet the qualifications legally required for director, general manager, financial director or any other senior management position.

5. Party B, Party C and Party D hereby agree and acknowledge that Party B shall seek guaranty from Party A in priority if such guaranty is needed for its performing any contract or borrowing any working capital loan in connection with its business operations; under such circumstance, Party A shall be obliged to provide guaranty to Party B as appropriate in its own discretion.

2

6. In the event that any agreement between Party A and Party B terminates or expires, Party A shall have the right, but not the obligation, to terminate all agreements between Party A and Party B, including without limitation the Services Agreement.

7. Any amendment or supplement to this Agreement shall be made in writing. The amendment or supplement duly executed by all parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

8. Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of jurisdiction of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

9. None of Party B, Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A. Party B, Party C and Party D hereby agree that Party A may assign its rights and obligations under this Agreement as Party A considers it necessary to do so, in which case Party A only needs to give a written notice to Party B and no further consent of Party B is required.

10. Each party acknowledges and confirms that any oral or written information exchanged pursuant to this Agreement are confidential. Each party shall keep confidential all such information and not disclose any such information to any third party without the prior written consent from the other party except for any information which: (a) is or will become known to the public (without any fault of the receiving party); (b) is required to be disclosed by the applicable laws or rules of stock exchange; or (c) is disclosed by each party to its legal or financial advisor relating to the transactions contemplated by this Agreement, provided that such legal or financial advisor shall comply with the confidentiality provisions set forth in this Article 10. Disclosure of any confidential information by the employee of or any entity engaged by any Party shall be deemed as disclosure by such Party, and such disclosing Party shall be liable for breach under this Agreement. This Article 10 shall survive the invalidity, cancellation, termination or unenforceability of this Agreement for any reason.

11. This Agreement shall be governed by and construed in accordance with the laws of the PRC.

12. Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. IF no resolution is reached by the Parties through negotiations, any Party may submit such dispute to the China International Economic and Trade Arbitration Commission (the "CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be in Beijing, and the language of the proceedings shall be Chinese. The arbitral award shall be final and binding upon all of the Parties.

3

13. This Agreement shall be executed by a duly authorized representative of each Party and become effective as of the date first written above.

14. Once effective, this Agreement shall constitute the entire agreement of the Parties with respect to the subject matters hereof and supersede all prior oral and written agreements and understandings by the Parties with respect to the subject matters hereof.

15. This Agreement shall remain permanently valid unless early terminated as expressly agreed in this Agreement or by Party A in writing. If the duration of operation (including any extension thereof) of Party A or Party B is expired or terminated for any other reason within the aforesaid term of this Agreement, such Party shall timely renew its duration of operation to enable this Agreement to continue to be valid and implementable. If a Party's application to renew its duration of operation fails to obtain the approval or consent of any competent authority, this Agreement shall be terminated simultaneously with the expiration or termination of the duration of operation of such Party.

16. During the term of this Agreement, unless due to commitment of any gross negligence or fraud by Party A towards Party B, none of Party B, Party C or Party D may early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time by issuing a thirty (30) days' prior written notice to Party B and Party C.

17. All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Parties or other addresses designated and notified to such Party from time to time via personal delivery, registered mail, post prepaid mail, recognized express delivery service or fax. The notices shall be deemed to have been duly served (a) upon sent if sent by personal delivery, (b) on the tenth (10th) day after the post-prepaid registered airmail is sent (shown on the postmark) if sent by mail, or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; and (c) at the time of receipt shown on the transmission acknowledgement if sent via fax.

**Party A:**      **Baidu Online Network Technology (Beijing) Co., Ltd.**

Address:      3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attention:    Hailong Xiang
Fax:          Tel:

**Party B:**      **Beijing Perusal Technology Co., Ltd.**

Address:      A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W), Haidian District, Beijing
Attention:    Hailong Xiang
Fax:
Tel:

**Party C:**

Address:      Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attention:    Zhixiang Liang
Fax:
Tel:

**Party D:**

Address:      Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Attention:    Lu Wang

4

18.   This Agreement is made in four originals, with each party holding one original. All originals shall have the same legal effect.

(No text below)

5

(Signature page)

**IN WITNESS THEREOF,** each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:          Legal Representative

**Party B:**

**Beijing Perusal Technology Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Title:          Legal Representative

**Party C:**

**Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

**Party D:**

**Lu Wang**

Signature:    /s/ Lu Wang

6

**Beijing Perusal Technology Co., Ltd.**

**Shareholders Resolution**

All shareholders of Beijing Perusal Technology Co., Ltd. (the "**Company**") convened an extraordinary meeting at the conference room of the Company on June 28, 2018. The required quorum of the meeting is fulfilled with presence of two shareholders exercising 100% votes of all shareholders of the Company. The following resolutions are adopted at the meeting:

1. Approving the Company's execution, delivery and performance of the Business Operating Agreement with Baidu Online Network Technology (Beijing) Co., Ltd., and/or the shareholders of the Company, and the Exclusive Equity Purchase and Transfer Option Agreement and the Proxy Agreement with Lu Wang (being a new shareholder of the Company), Baidu, Inc., and/or Baidu Online Network Technology (Beijing) Co., Ltd.

2. Authorizing the legal representative of the Company to, on behalf of the Company, execute the agreements and documents contemplated in Section 1 with the parties thereto, and take all actions necessary to complete the transactions contemplated under this Resolution.

It is hereby resolved.

(No text below)

(Signature page of Shareholders Resolution of Beijing Perusal Technology Co., Ltd.)

For and on behalf of all shareholders:

**Zhixiang Liang**                                              **Lu Wang**

Signature:  /s/ Zhixiang Liang                                 Signature:  /s/ Lu Wang

**Baidu Online Network Technology (Beijing) Co., Ltd.**

**Decision of General Manager**

Hailong Xiang, being the General Manager of Baidu Online Network Technology (Beijing) Co., Ltd. (the "**Company**"), hereby decides as follows in writing on June 28, 2018 pursuant to the articles of association of the Company:

1. Approving the Company's execution, delivery and performance of the Business Operating Agreement with Beijing Perusal Technology Co., Ltd. and/or its shareholders.

2. Approving the Company's execution, delivery and performance of the Loan Agreement and the Equity Pledge Agreement with Beijing Perusal Technology Co., Ltd. and/or Lu Wang (being a new shareholder of Beijing Perusal Technology Co., Ltd.).

3. Approving the Company's execution, delivery and performance of the Exclusive Equity Purchase and Transfer Option Agreement with Baidu, Inc., Beijing Perusal Technology Co., Ltd. and/or Lu Wang (being a new shareholder of Beijing Perusal Technology Co., Ltd.).

4. Authorizing the legal representative of the Company to, on behalf of the Company, execute the foregoing agreements and documents with the parties thereto, and take all actions necessary to complete the transactions contemplated under this Resolution.

It is hereby decided.

(No text below)

(Signature page of Decision of General Manager of Baidu Online Network Technology (Beijing) Co., Ltd.)

**Hailong Xiang**

Signature:   /s/ Hailong Xiang

**Baidu Online Network Technology (Beijing) Co., Ltd.**

**Shareholder Resolution**

Baidu Holdings Limited, being the sole shareholder of Baidu Online Network Technology (Beijing) Co., Ltd. (the "**Company**"), hereby resolves as follows in writing on June 28, 2018 pursuant to the articles of association of the Company:

1. Approving the Company's execution, delivery and performance of the Business Operating Agreement with Beijing Perusal Technology Co., Ltd. and/or its shareholders.

2. Approving the Company's execution, delivery and performance of the Loan Agreement and the Equity Pledge Agreement with Beijing Perusal Technology Co., Ltd. and/or Lu Wang (being a new shareholder of Beijing Perusal Technology Co., Ltd.).

3. Approving the Company's execution, delivery and performance of the Exclusive Equity Purchase and Transfer Option Agreement with Baidu, Inc., Beijing Perusal Technology Co., Ltd. and/or Lu Wang (being a new shareholder of Beijing Perusal Technology Co., Ltd.).

4. Authorizing the legal representative of the Company to, on behalf of the Company, execute the foregoing agreements and documents with the parties thereto, and take all actions necessary to complete the transactions contemplated under this Resolution.

It is hereby resolved.

(No text below)

(Signature page of Shareholder Resolution of Baidu Online Network Technology (Beijing) Co., Ltd.)

For and on behalf of:

**Baidu Holdings Limited (seal)**

Signature:   /s/ Yihong Li
Title:          Director

**Beijing Perusal Technology Co., Ltd.**

**Shareholders Resolution**

All shareholders of Beijing Perusal Technology Co., Ltd. (the "**Company**") convened an extraordinary meeting at the conference room of the Company on June 28, 2018. The required quorum of the meeting is fulfilled with presence of two shareholders exercising 100% votes of all shareholders of the Company. The following resolutions are adopted at the meeting:

1. Approving transfer of 50% equity interests in the Company (representing a registered capital of the Company equal to RMB1,580,000,000) held by Xiaodong Wang, a shareholder of the Company, to Lu Wang at the price of RMB1,598,440,000.

2. Each of the shareholders of the Company hereby waives its right of first refusal relating to the transfer contemplated in Section 1.

3. Approving to include Lu Wang as a new shareholder of the Company, and the presence of both Lu Wang and Zhixiang Liang shall be the required quorum of any shareholders meeting of the Company to be held hereafter.

4. Approving amendment to the articles of the Company.

5. Authorizing the legal representative of the Company to, on behalf of the Company, execute the foregoing agreements and documents with the parties thereto, and take all actions necessary to complete the transactions contemplated under this Resolution.

It is hereby resolved.

(No text below)

(Signature page of Shareholders Resolution of Beijing Perusal Technology Co., Ltd.)

For and on behalf of all shareholders:

**Zhixiang Liang**                                                   **Xiaodong Wang**

Signature:  /s/ Zhixiang Liang                    Signature:  /s/ Xiaodong Wang

Exhibit 4.78

**Loan Agreement**

This Loan Agreement (this "**Agreement**") is made as of June 28, 2018 in Beijing, by and between:

**Party A:**    **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address: 3/F, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party B:**    **Lu Wang**
ID Card No.

**WHEREAS:**

1.  Party A is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

2.  Party B is a Chinese citizen holding 50% equity interests in Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"); and

3.  Party A agrees to provide to Party B, and Party B agrees to accept, a loan equal to RMB1,598,440,000 for the purposes contemplated herein.

**NOW, THEREFORE,** Party A and Party B agree as follows through negotiations:

1.  Pursuant to the terms and subject to the conditions of this Agreement, Party A confirms that it has provided to Party B and Party B has agreed to accept, a loan at an aggregate amount of RMB1,598,440,000.

2.  Party B confirms its receipt of the loan and has applied the loan in its entirety to pay the price for its acquiring equity interests in Beijing Perusal.

3.  The term of the loan under this Agreement shall commence on the day of receipt of the loan by Party B until the 10th anniversary of the date on which this Agreement is executed, which term is renewable upon agreement by the Parties in writing; *provided, however*, that the loan provided hereunder could be accelerated for immediate repayment by Party B pursuant to this Agreement at the request of Party A in writing at any time during the term of the loan or any renewal thereof if:

    (1)    Party B resigns from or is dismissed by Party A or any affiliate of Party A;

    (2)    Party B is dead, without civil legal capacity or with limited civil legal capacity;

    (3)    Party B is found with criminal offense or involvement therein;

    (4)    A claim is raised against Party B by any third party for an amount exceeding RMB100,000; or

(5)  Subject to the laws of the PRC, Party A or any of its nominees may make investment in Beijing Perusal for operation of value-added telecommunication services and other services, such as internet information services, and Baidu, Inc. or any of its nominees has elected to exercise its option by issuing a written notice to Party B to purchase the equity interests in Beijing Perusal under the Exclusive Equity Purchase and Transfer Option Agreement referenced in article 4 hereof.

4.  It is agreed and acknowledged that, subject to and to the extent permitted by the laws of the PRC, Baidu, Inc., as the holding company of Party A, shall have the right but no obligation to purchase or nominate any other person (including any natural person, legal entity or other entity) to purchase all or any part of the equity interests in Beijing Perusal held by Party B (the "**Call Option**"), provided that Baidu, Inc. shall issue a written notice to Party B to exercise the Call Option. Upon Baidu, Inc.'s issuance of such written notice, Party B shall, as requested and instructed by Party A, immediately transfer all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees at the original investment price (the "**Original Investment Price**") or any other price acceptable to Baidu, Inc. required under applicable laws. It is agreed and acknowledged that upon exercising the Call Option by Baidu, Inc., if the lowest price of the equity interests permitted under applicable laws is higher than the Original Investment Price, the price payable by Baidu, Inc. or any of its nominees shall be the lowest price permitted under applicable laws. The Parties agree to enter into an Exclusive Equity Purchase and Transfer Option Agreement with respect to the foregoing in this Article 4.

5.  It is agreed and acknowledged that Party B shall repay the loan only as follows: upon its maturity and at the request of Party A in writing, the loan provided hereunder shall be repaid by Party B (or any of its heirs, successors or assigns) with the proceeds from transfer of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees to the extent permitted under the PRC laws, or otherwise agreed by the Parties.

6.  It is agreed and acknowledged that in connection with transfer of the equity interests by Party B to Baidu, Inc. or any of its nominees upon maturity of the loan, if the proceeds from such transfer are legally required to or otherwise exceed the principal of the loan, Party B agrees to pay such excess amount, net of any individual income tax and other taxes and fees payable by Party B, to Baidu, Inc. or any of its nominees at sole decision of Baidu, Inc. to the extent permissible by the law.

7.  It is agreed and acknowledged that Party B shall not be deemed to have fulfilled its obligations under this Agreement until:

(1)  it has transferred all of its equity interests in Beijing Perusal to Baidu, Inc. or any of its nominees; and

(2)  it has paid to Party A all of the proceeds from the equity interest transfer or the maximum amount thereof permitted under applicable laws (including principal and the highest interest accrued thereupon permitted under applicable laws) as repayment of the loan.

2

8. To secure performance of its obligations under this Agreement, Party B agrees to pledge all of its equity interests in Beijing Perusal to Party A (the "**Equity Pledge**"). It is acknowledged that an Equity Pledge Agreement in respect of the foregoing in this Article 8 has been made as of June 28, 2018.

9. As of the date hereof, Party A represents and warrants to Party B that:

    (1) Party A is a wholly foreign-owned enterprise incorporated and validly existing under the laws of the PRC;

    (2) Party A has the right to execute and perform this Agreement. The execution and performance of this agreement by Party A comply with its business scope, articles or any other organization document, and Party A has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

    (3) The principal of the loan to Party B is legally owned by Party A;

    (4) Execution and performance of this Agreement by Party A does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party A and any third party, or any covenant made by Party A to any third party; and

    (5) This Agreement, once executed, shall constitute legal, valid obligations of Party A and enforceable against Party A in accordance with its terms.

10. As of the date hereof until the end of this Agreement, Party B represents and warrants to Party A that:

    (1) Beijing Perusal is a limited liability company incorporated and validly existing under the laws of the PRC and Party B is a legal holder of the equity interests in Beijing Perusal;

    (2) Party B has the right to execute and perform this Agreement. The execution and performance by Party B of this Agreement comply with the articles or any other organizational document of Beijing Perusal, and Party B has obtained all approvals and authorizations necessary and appropriate for its execution and performance of this Agreement;

    (3) Execution and performance of this Agreement by Party B does not violate any law, regulation, approval, authorization, notice or other governmental document by which it is bound or affected, or any agreement between Party B and any third party, or any covenant made by Party B to any third party;

3

(4) This Agreement, once executed, shall constitute legal, valid obligations of Party B and enforceable against Party B in accordance with its terms;

(5) Party B has made all contributions required by law for its holding equity interests in Beijing Perusal;

(6) Unless otherwise provided under the Equity Pledge Agreement and the Exclusive Equity Purchase and Transfer Option Agreement, Party B does not create any mortgage, pledge or other security over its equity interests in Beijing Perusal, or make any offer to any third party to transfer its equity interests, or make any promise as to any offer to purchase its equity interests from any third party, or execute any agreement with any third party to transfer its equity interests;

(7) There are no pending or potential disputes, litigation, arbitration, administrative proceedings or other legal proceedings in connection with the equity interests in Beijing Perusal held by Party B; and

(8) Beijing Perusal has completed all necessary governmental approvals, licenses, registrations and filings.

11. Party B undertakes that during the term of this Agreement, it shall:

(1) not sell, transfer, pledge or otherwise dispose of its equity interests or other interests in Beijing Perusal, or to allow creation of any other security interest thereupon without the prior written consent of Party A, except for the equity pledge or other right created for the benefit of Party A;

(2) not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder's meetings permitting sale, transfer, pledge or other disposal of any of its legal or beneficiary ownership of the equity interests in Beijing Perusal or creation of any other security interest thereupon without the prior written consent of Party A, except for those made to Party A or any of its nominees;

(3) not vote for, support or execute any shareholder resolutions at Beijing Perusal's shareholder meetings permitting Beijing Perusal to merge or combine with, or acquire or invest in, any person without Party A's prior written consent;

(4) promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to the equity interests of Beijing Perusal;

(5) execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of equity interests in Beijing Perusal;

4

(6) refrain from any act and/or omission that may materially affect the assets, business and liabilities of Beijing Perusal without the prior written consent of Party A;

(7) appoint any person nominated by Party A as executive director of Beijing Perusal, upon Party A's request;

(8) in connection with Party A's exercise of the Call Option provided hereunder, transfer promptly and unconditionally all equity interests in Beijing Perusal held by Party B to Party A and/or any of its nominees, to the extent and within the scope permissible under the laws of the PRC;

(9) not request Beijing Perusal to distribute dividends or profits to it;

(10) upon transfer of its equity interests in Beijing Perusal to Party A or any of its nominees, pay the entire proceeds received by it from transfer of the equity interests to Party A as repayment of the loan or otherwise to the extent permitted under the laws of the PRC; and

(11) strictly comply with the terms of this Agreement, perform the obligations under this Agreement, and refrain from any act or omission that could affect the validity and enforceability of this Agreement.

12. Party B undertakes that in its capacity of a shareholder of Beijing Perusal and during the term of this Agreement, it shall procure Beijing Perusal:

(1) not to supplement, amend or modify its articles of association, or increase or decrease its registered capital, or to change its capital structure in any form without the prior written consent of Party A;

(2) to maintain its existence and handle matters prudently and affectively in accordance with good financial and business rules and practices;

(3) not to sell, transfer, mortgage or otherwise dispose of, nor to permit the creation of any other security interest on, any of its legal or beneficial interests in its assets, business or income without the prior written consent of Party A, at any time as of the date of this Agreement;

(4) not to incur, succeed, guarantee or permit the existence of any liabilities without the prior written consent of Party A, except for any liabilities (i) arising from the ordinary or day-to-day course of business instead of through Party B; and (ii) disclosed to Party A or approved by Party A in writing;

(5) to operate all businesses on a continued basis and maintain the value of its assets;

5

(6)  not to execute any material contracts (for the purpose of this Section 12(6), a contract will be deemed material if its value exceeds RMB500,000) without the prior written consent of Party A, other than those executed during the ordinary course of business;

(7)  to provide all information regarding its operations and financial affairs at Party A's request;

(8)  not to merge or combine with, acquire or invest in, any other person without the prior written consent of Party A;

(9)  not to distribute dividends to the shareholders without the prior written consent of Party A, and upon Party A's request, to promptly distribute all distributable profits to the shareholders.

(10)  to promptly inform Party A of any pending or threatened litigation, arbitration or administrative proceeding relating to its assets, business or revenue;

(11)  to execute all necessary or appropriate documents, take all necessary or appropriate actions and bring all necessary or appropriate lawsuits or make all necessary and appropriate defenses against all claims in order to maintain its ownership of its assets; and

(12)  to strictly comply with the terms of the Exclusive Technology Consulting and Services Agreement dated June 23, 2006 and the Exclusive Technology Consulting and Services Supplementary Agreement dated April 22, 2010, each by Beijing Perusal and Party A (collectively, the "**Service Agreement**") and other agreements, duly perform its obligations thereunder, and refrain from any act or omission that could affect the validity and enforceability thereof.

13.  This Agreement is binding upon, and inures the benefit of, each of the Parties and their respective heirs, successors and permitted assigns. Without prior written consent of Party A, Party B shall not transfer, pledge or otherwise assign any of its rights, interests or obligations hereunder.

14.  Party B agrees that Party A may assign its rights and obligations hereunder to a third party by a written notice to Party B when it considers necessary. No further consent from Party B is required for such transfer.

15.  Execution, validity, interpretation, performance, amendment, termination and dispute resolution of this Agreement are governed by the laws of the PRC.

16.  Arbitration

6

(1)    Both Parties shall strive to resolve any dispute, conflicts, or claims arising from the interpretation or performance (including any issue relating to the existence, validity and termination) of this Agreement through negotiations in good faith. If no resolution is made within thirty (30) days after one Party requests for such resolution, either Party may submit such matter to China International Economic and Trade Arbitration Commission (the "**CIETAC**") in accordance with its then-effect rules. The arbitration award shall be final and conclusive and binding upon the Parties.

(2)    The place of the arbitration shall be Beijing.

(3)    The arbitration language shall be Chinese.

17. This Agreement shall be made as of the date of its execution, and the Parties agree and confirm that the terms and conditions of this Agreement will become effective from the date when Party B receives the loan and expire on the date when each Party has completed its obligations hereunder.

18. Party B shall not terminate or revoke this Agreement under any circumstances unless (1) Party A is found with gross negligence, fraud, or other material misconduct; or (2) Party A is in bankruptcy.

19. This Agreement shall not be amended or modified without the written consent of the Parties hereto. Any matters not agreed upon in this Agreement may be supplemented by all Parties through the execution of a written agreement. The above amendments, modifications, supplements and any attachment of this Agreement shall be integral parts of this Agreement.

20. This Agreement constitutes the entire agreements of the Parties with respect to the transaction herein and supersedes all prior verbal discussions and written agreements between the Parties.

21. This Agreement is severable. The invalidity or unenforceability of any term shall not affect the validity or enforceability of the remainder of this Agreement.

22. Each Party shall strictly protect the confidentiality of any information regarding the other Party's business, operation, financial situation or other confidential information obtained under this Agreement or during the performance of this Agreement.

23. Any obligation that is accrued or becomes due prior to expiry or early termination of this Agreement shall survive such expiry or early termination. Sections 15, 16, and 22 shall survive expiry or termination of this Agreement.

24. This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

7

[Signature page only]

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd.**
**(seal)**

Signature: /s/
Legal representative/authorized representative

**Party B:**

**Lu Wang**

Signature: /s/ Lu Wang

8

**Exhibit 4.79**

**Proxy Agreement**

This Proxy Agreement (this "**Agreement**") is made as of June 28, 2018 in Beijing, the People's Republic of China ("PRC," for purposes of this Agreement, excluding Hong Kong, Macau and Taiwan) by and between:

**Party A: Baidu, Inc.**, with registered address at M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands;

And

**Party B: Lu Wang**, with ID No.

**WHEREAS:**

1.  Party B is a citizen of the PRC and shareholder of Beijing Perusal Technology Co., Ltd. ("**Beijing perusal**").   As of the date hereof, Party B holds 50% equity interests in Beijing Perusal ("**Party B's Equity**").

2.  Pursuant to the terms and subject to the conditions of this Agreement, Party B agrees to authorize a PRC company or individual designated by Party A to exercise its rights as a shareholder of Beijing Perusal on its behalf, and Party A agrees to accept such authorization.

**NOW, THEREFORE**, the Parties hereby agree as follows:

1.  Party B hereby agrees to irrevocably authorize any entity or individual designated by Party A to exercise on its behalf all of the voting and other rights as a shareholder empowered by the law and Beijing Perusal's articles of association at the shareholders' meeting of Beijing Perusal, including without limitation any right regarding sale, transfer, pledge or disposal of all or part of Party B's equity interests in Beijing perusal; convening, attending and presiding over shareholders' meeting of Beijing perusal as an authorized representative of Beijing perusal's shareholders, and designating and electing the general manager of Beijing Perusal as an authorized representative of the shareholders of Beijing Perusal at the shareholders' meeting.

2.  Party A agrees to designate any entity or individual permitted under applicable laws to accept the authorization of Party B under Article 1 hereof, and such entity or individual shall exercise Party B's voting and other rights as a shareholder on behalf of Party B under this Agreement. As of the date hereof, Party A hereby designates Hailong Xiang as the authorized individual to exercise voting and other rights as a shareholder on behalf of Party B under this Agreement. For avoidance of any doubt, Party A shall have the discretion to replace any entity or individual designated by it or designate any other entity or individual to exercise such voting and other rights on behalf of Party B.

3.  Party B hereby acknowledges that, regardless of any change of its equity interests in Beijing Perusal, any entity or individual designated by Party A shall be authorized to exercise all of the voting and other rights as a shareholder on behalf of Party B.   If Party B transfers its equity interests in Beijing Perusal to any individual or entity other than Party A or any individual or entity designated by Party A (the "**Transferee**"), it shall procure and ensure that the Transferee shall authorize any individual or entity designated by Party A to exercise voting and any other rights as a shareholder on its behalf by entering into an agreement which form and content are similar to those of this Agreement in conjunction with its signing any equity transfer agreement.

4.  Party B hereby acknowledges that if Party A withdraws its designation of the authorized entity or individual, it shall immediately withdraw its authorization to such entity or individual, and authorize any other entity or individual designated by Party A to exercise all of its voting and other rights as a shareholder at the shareholders' meeting of Beijing Perusal.

5.  This Agreement shall be effective upon execution by the Parties or their respective legal or authorized representatives as of the date first written above.

6.  This Agreement shall remain permanently valid unless otherwise expressly provided hereunder or terminated by Party A in writing. If any Party's operating term expires during the term of this Agreement, such Party shall timely renew its operating term to enable this Agreement to be continually valid and implementable. If any Party's application to renew its operating term fails to obtain approval or consent from competent authority, this Agreement shall terminate upon the end of such Party's operating term, unless such Party has transferred its rights and obligations pursuant to Article 10 hereof.

7.  This Agreement shall remain valid as long as Party B is a holder of any equity interest in Beijing Perusal. During the term of this Agreement, unless otherwise required by law, Party B may not cancel, early terminate or end this Agreement. Notwithstanding the foregoing, Party A shall have the right to terminate this Agreement at any time with a written notice to Party B no less than thirty (30) days in advance.

8.  No amendment to this Agreement shall be made unless by agreement of the Parties in writing. Any duly executed amendment or supplement hereto by the Parties is an integral part of, and shall have the same binding effect with, this Agreement.

9.  Should any provision hereof be held invalid or unenforceable due to its inconsistency with any applicable law, such provision shall be deemed invalid only to the extent governed by such law without affecting the validity of the remainder hereof.

10. All notices or other correspondences required to be sent by any Party hereunder shall be made in Chinese and delivered to the following addresses of the other Party or any other address designated and notified to such Party from time to time by hand, mail or fax. The notices shall be deemed to have been duly served (a) on the day of delivery if it is sent by hand, (b) on the tenth (10th) day after it is sent by post-prepaid registered airmail (with marking of the mailing day on the postmark), or on the fourth (4th) day after the notice is handed to an internationally recognized express delivery service; (c) at the time of receipt shown on the transmission acknowledgement if it is sent by fax; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

2

Party A: Baidu, Inc.
Address: M&C Services Limited, PO Box 309, Ugland House, Grand Cayman,
KY1-1104, Cayman Islands
Attention: Yanhong Li
Fax:
Tel:

Party B:

Lu Wang
Address:
Fax:
Tel:

11. Unless with Party A's prior written consent, Party B shall not transfer its rights and obligations hereunder to any third party. Party B hereby agrees that Party A may assign its rights and obligations under this Agreement at its own discretion provided that Party A is required to give a written notice to such effect to Party B, and no further consent of Party B is required thereof.

12. Both Parties acknowledge and confirm that any oral or written information exchanged between the Parties in connection with this Agreement are confidential, and both Parties shall keep all such information confidential and not disclose any such information to any third person, except for the information which: (a) is known or will be known by the public (not resulting from unauthorized disclosure by the Party receiving such information); (b) is required to be disclosed by applicable laws or rules or regulations of a stock exchange; or (c) needs to be disclosed to a Party's legal or financial advisor in connection with the transaction contemplated hereby, provided that such advisor shall be subject to confidential obligations similar to those provided in this Article. Disclosure by any employee of or entity engaged by any Party shall be deemed disclosure by such Party, and such disclosing Party shall be held liable for breach of this Agreement. This Article shall survive any invalidity, amendment, termination, dissolution or unenforceability of this Agreement for any reason whatsoever.

13.

(1) The formation, validity, interpretation, performance, amendment and termination of and resolution of any dispute under this Agreement shall be governed by the laws of the PRC.

(2) Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall first be resolved by the Parties in good faith through negotiations. If negotiations fail, any Party may submit such dispute to China International Economic and Trade Arbitration Commission for arbitration in accordance with its arbitration rules then in effect. The arbitration shall be held in Beijing and the arbitration language shall be Chinese. The arbitral award shall be final and binding upon both Parties.

3

14. This Agreement, once becoming effective, constitutes the entire agreements and understandings between the Parties with respect to the subject matter hereof, and supersedes in their entirety all prior oral and written agreements and understandings between the Parties with respect to the subject matter hereof.

15. This Agreement shall be executed in two originals, and each Party shall hold one thereof. Both originals shall have the same legal effect.

(No text below)

4

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.


**Party A:**

**Baidu, Inc.**

Signature:   /s/ Yanhong Li _____

Title:        Director

**Party B:**

**Lu Wang**

Signature:   /s/ Lu Wang _____

5

**Exhibit 4.80**

**POWER OF ATTORNEY**

I, Lu Wang, a citizen of the People's Republic of China (the " **PRC**") with ID No. and a shareholder holding 50% equity interests of Beijing Perusal Technology Co., Ltd. ("**Beijing Perusal**"), hereby irrevocably authorizes, pursuant to the Proxy Agreement dated hereof between me and Baidu, Inc., as well as by designation of Baidu, Inc., Hailong Xiang with the following powers and rights in respect of my existing and future equity holding in Beijing Perusal ("**My Equity**") during the term of this Power of Attorney:

Hailong Xiang is hereby authorized as my sole and exclusive agent to exercise on my behalf all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal in accordance with PRC laws and the articles of Beijing Perusal, including without limitation the right to sell or transfer any or all of My Equity, and to designate and appoint the general manager of Beijing Perusal as my authorized representative at the shareholders' meeting of Beijing Perusal.

Such authorization is premised on the condition that Hailong Xiang is an employee of Baidu, Inc. and its affiliates, and Baidu, Inc. agrees to such authorization. Once Hailong Xiang's employment with Baidu, Inc. and its affiliates terminates, or I am notified by Baidu, Inc. to terminate such authorization, I will withdraw the authorization made hereunder immediately and designate/authorize any other person nominated by Baidu, Inc. to exercise all of my rights as a shareholder to vote at shareholders' meetings of Beijing Perusal.

Unless otherwise expressly provided herein, this Power of Attorney is irrevocable and continues to have effect as of the date hereof as long as I holds equity interests in Beijing Perusal.

(Signature):   /s/ Lu Wang

Date: June 28, 2018

1

**Exhibit 4.81**

**Exclusive Equity Purchase and Transfer Option Agreement**

This Exclusive Equity Purchase and Transfer Option Agreement (this "**Agreement**") is entered into by and among the following parties in Beijing, PRC on June 28, 2018:

**Party A:**   **Baidu, Inc.**
Address:   M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**Party B:**   **Baidu Online Network Technology (Beijing) Co., Ltd.**
Address:   Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing

**Party C:**   **Lu Wang**
ID No.:

**Party D:**   **Beijing Perusal Technology Co., Ltd.**
Address:   A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road (W),
Haidian District, Beijing

In this Agreement, Party A, Party B, Party C and Party D are called collectively as the "**Parties**" and each of them is a "**Party**."

**WHEREAS:**

1. Party A is a Cayman Islands company incorporated under the laws of Cayman Islands and an affiliate of Party B;

2. Party B is a wholly foreign-owned enterprise incorporated under the laws of the People's Republic of China (the "**PRC**");

3. Party D is a liability limited company incorporated in Beijing, the PRC;

4. Party C is a shareholder of Party D, owning 50% equity interests in Party D (the "**Equity Interest**");

5. Party B and Party C entered into a Loan Agreement dated June 28, 2018, whereby Party C obtains a loan up to RMB1,598,440,000 from Party B in connection with its acquiring 50% equity interests in Party D;

6. Party B and Party D entered into a series of agreement dated June 23, 2006, including the Exclusive Technology Consulting and Services Agreement (the "**Services Agreements**"), whereby Party B provides exclusive technology consulting and services to Party D; and

7. Party B and Party C entered into an Equity Pledge Agreement (the "**Equity Pledge Agreement**") dated June 28, 2018, whereby Party C transfers all of the Equity Interest to Party B; and

8. Party A and Party C entered into a Proxy Agreement dated June 28, 2018 (the "**Proxy Agreement**"), whereby Party C authorizes the entity or individual designated by Party A to exercise all voting and other rights of Party C as a shareholder at the shareholders meeting of Party D.

**NOW, THEREFORE**, the Parties agree as follows through negotiations and to be bound hereby:

## 1. Purchase and Sale of Equity Interest

1.1 Granting of Rights

Party C hereby irrevocably grants to Party A an option to purchase or cause any one or more designated persons ("**Designated Persons**") to purchase, to the extent permitted under PRC law, according to the steps determined by Party A, at the price specified in Section 1.3 of this Agreement, and at any time from Party C (the "**Transferor**"), a portion or all of the equity interests held by Party C in Party D (the "**Option**"). No Option shall be granted to any third party other than Party A and/or the Designated Persons. Party D hereby agrees to granting of the Option by Party C to Party A and/or the Designated Persons. For purpose of this Section 1.1 and this Agreement, "person" means any individual, corporation, joint venture, partnership, enterprise, trust or unincorporated organization.

1.2 Exercise Steps

Subject to PRC law and regulations, Party A and/or the Designated Persons may exercise the Option by issuing a written notice (the "**Option Notice**") to the Transferor, specifying the equity interest to be purchased from the Transferor (the "**Purchased Equity Interest**") and the manner of such purchase.

1.3 Purchase Price

1.3.1 If Party A exercises the Option, the purchase price of the Purchased Equity Interest ("**Purchase Price**") shall be equal to the actual paid-in capital paid by the Transferor for the Purchased Equity Interest, unless then applicable PRC laws and regulations require appraisal of the Purchased Equity Interest or other restrictions on the Purchase price.

1.3.2 If the applicable PRC laws require appraisal of the Purchased Equity Interest or other restrictions on the Purchase Price at the time that Party A exercises the Option, the Parties agree that the Purchase Price shall be set at the lowest price permissible under applicable law.

1.4 Transfer of the Purchased Equity Interest

At each exercise of the Option:

1.4.1 The Transferor shall, in accordance the terms and conditions of this Agreement and the Option Notice in connection with the Purchased Equity Interest, enter into an equity transfer agreement with Party A and/or the Designated Persons (as applicable) for each transfer in the substance and form satisfactory to Party A;

2

1.4.2 The Transferor shall execute all other requisite contracts, agreements or documents, obtain all requisite government approvals and consents, and take all necessary actions to unconditionally transfer the valid ownership of the Purchased Equity Interest to Party A and/or the Designated Persons free of any security interest, and cause Party A and/or the Designated Persons to be the registered owner(s) of the Purchased Equity Interest. For purpose of this Section 1.4.2 and this Agreement, "Security Interest" includes without limitation guaranty, mortgage, pledge, third-party right or interest, any share option, right of acquisition, right of first refusal, right of set-off, ownership retention or other security arrangements; *provided, however*, that it does not include any security interest arising under the Equity Pledge Agreement.

1.5 Payment

Payment of the Purchase Price shall be made in the manner determined through negotiations between Party A and/or the Designated Persons and the Transferor in accordance with then applicable laws at the exercise of the Option. The Parties hereby agree that, subject to applicable laws, Transferor shall repay to Party B any amount that is paid by Party A and/or the Designated Persons to the Transferor in connection with the Purchased Equity Interest (which amount may be net of any tax and other fees paid by the Transferor in connection with the proposed transaction contemplated under the transfer agreement).

2. **Covenants Relating to the Equity Interest**

2.1 Covenants Relating to Party D

Party C and Party D hereby covenant, in relation to Party D:

2.1.1 Not to supplement, amend or modify Party D's articles of association in any way, or to increase or decrease its registered capital, or to change its registered capital structure in any way without Party A's prior written consent;

2.1.2 To maintain the corporate existence of Party D and operate its business and deal with matters prudently and effectively according to good financial and business rules and practices;

2.1.3 Not to sell, transfer, mortgage or otherwise dispose of, or permit any other security interest to be created on, any of Party D's assets, business or legal or beneficial interests in its revenue at any time after the signing of this Agreement without Party A's prior written consent;

2.1.4 Not to incur, succeed to, guarantee or permit the existence of any liability, without Party A's prior written consent, except (i) liabilities arising from the normal course of business, but not arising from loans; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3

2.1.5 To operate persistently all the business in the normal course of business to maintain the value of Party D's assets, and not to commit any act or omission that would affect its operations and asset value;

2.1.6 Without prior written consent by Party A, not to enter into any material agreement, other than agreements entered into in Party D's normal course of business (for purpose of this paragraph, an agreement will be deemed material if its value exceeds RMB500,000);

2.1.7 Not to provide loans or credit to any person without Party A's prior written consent;

2.1.8 To provide all information relating to Party D's operations and financial conditions upon the request of Party A;

2.1.9 To purchase and maintain insurance from insurance companies accepted by Party A. The amount and category of the insurance shall be the same as those of the insurance normally procured by companies engaged in similar businesses and possessing similar properties or assets in the area where Party D is located;

2.1.10 Not to merge or consolidate with, or acquire or invest in, any person without Party A's prior written consent;

2.1.11 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning Party D's assets, business or revenue;

2.1.12 To execute all necessary or appropriate documents, take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order for Party D to maintain the ownership over all its assets;

2.1.13 Not to distribute dividends to Party D's shareholders in any way without Party A's prior written consent; *provided, however*, that Party D shall promptly distribute all or part of its distributable profits to its shareholders upon Party A's request; and

2.1.14 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D.

2.2 Covenants Relating to the Transferor

Party C hereby covenants:

2.2.1 Not to sell, transfer, mortgage or otherwise dispose of, or allow any other security interest to be created on, the legal or beneficial interest in the Equity Interest at any time after the signing of this Agreement without Party A's prior written consent, other than the pledge created on the Transferor's Equity Interest in accordance with the Equity Pledge Agreement;

2.2.2 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve the sale, transfer, mortgage or disposition in any other manner of, or the creation of any other security interest on, any legal or beneficial interest in the Equity Interest, except to or for the benefit of Party A or its designated persons;

4

2.2.3 Without Party A's prior written consent, not to vote for or sign any shareholders' resolution at Party D's shareholders' meetings to approve Party D's merger or consolidation with, acquisition of or investment in, any person;

2.2.4 To promptly notify Party A of any pending or threatened suit, arbitration or administrative proceedings concerning the Equity Interest owned by it;

2.2.5 To execute all necessary or appropriate documents, to take all necessary or appropriate actions and to bring all necessary or appropriate claims or to make all necessary and appropriate defenses against all claims in order to maintain his ownership over the Equity Interest;

2.2.6 At the request of Party A, to appoint persons nominated by Party A to be executive directors of Party D;

2.2.7 At any time upon the request of Party A, to transfer its Equity Interest immediately and unconditionally to the representative designated by Party A, and waive its preemptive right with respect to the transfer of equity interest by the other shareholder of Party D;

2.2.8 To fully comply with the provisions of this Agreement and the other agreements entered into jointly or respectively by and among the Transferor, Party D and Party A, perform all obligations under these agreements and not commit any act or omission that would affect the validity and enforceability of these agreements; and

2.2.9 To transfer to Party A all dividends and any other form of profit distributed to it by Party D.

2.3 Covenants Relating to Party A

Party A hereby covenants:

2.3.1 If Party D needs any loan or other capital support in its business, under acceptable and reasonable scope, Party A shall provide such capital support without imposing any condition or restriction; and

2.3.2 If Party D cannot repay the loan from Party A as loss incurred and has sufficient evidence to prove, Party A agrees that it will unconditionally give up its right to require Party D to repay the loan.

3. **Representations and Warranties**

As of the date of this Agreement and each transfer date, each of the Transferor and Party D hereby represents and warrants to Party A as follows:

3.1 It has the power and authority to execute and deliver this Agreement, and any equity transfer agreement (the "**Transfer Agreement**") to which it is a party for each transfer of the Purchased Equity under this Agreement and to perform its obligations under this Agreement and any Transfer Agreement. Once executed, this Agreement and any Transfer Agreement to which it is party will constitute a legal, valid and binding obligation of it enforceable against it in accordance with its terms;

3.2 The execution, delivery and performance of this Agreement or any Transfer Agreement by it will not: (i) violate any relevant PRC laws and regulations; (ii) conflict with its articles of association or other organizational documents; (iii) violate or constitute a default under any contract or instrument to which it is party or that binds upon it; (iv) violate any condition for the grant and/or continued effectiveness of any permit or approval granted to it; or (v) cause any permit or approval granted to it to be suspended, cancelled or attached with additional conditions;

3.3 Party D has good and marketable ownership of all of its assets and has not created any security interest on the said assets;

3.4 Party D has no outstanding liabilities, except (i) liabilities arising in its normal course of business; and (ii) liabilities disclosed to Party A and approved by Party A in writing;

3.5 There are currently no existing, pending or threatened litigations, arbitrations or administrative proceedings related to the Equity Interest, Party D's assets or Party D; and

3.6 The Transferor has good and marketable ownership interest in the Equity Interest and has not created any security interest on such Equity Interest, other than the security interest pursuant to the Equity Pledge Agreement and the restrictions provided under the Proxy Agreement and hereunder.

4. **Assignment of Agreement**

4.1 Neither Party C or Party D may assign its rights and obligations under this Agreement to any third party without the prior written consent of Party A.

4.2 Party C and Party D hereby agree that Party A may assign all its rights and obligation under this Agreement to a third party as Party A sees fit, in which case Party A only needs to give a written notice to Party C and Party D and no further consent of Party C or Party D is required.

5. **Effectiveness and Term**

5.1 This Agreement shall be effective as of the date first set forth above and expire when all Equity Interest held by Party B is transferred to Party A and/or Designated Persons in accordance with this Agreement.

6

5.2 If the duration of operation (including any extension thereof) of Party A or Party D is expired or terminated for other reasons within the term set forth in Section 5.1, this Agreement shall be terminated simultaneously, except in the situation where Party A has assigned its rights and obligations in accordance with Section 4.2 hereof.

## 6. **Applicable Law and Dispute Resolution**

6.1 Applicable Law

The formation, validity, interpretation and performance of and resolution of any dispute arising from this Agreement shall be protected and governed by the laws of the PRC.

6.2 Dispute Resolution

Any dispute arising in connection with the interpretation and performance of the provisions of this Agreement shall be resolved by the Parties in good faith through negotiations. In case no resolution can be reached by the Parties within thirty (30) days after either party makes a request for dispute resolution through negotiations, either party may refer such dispute to China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with CIETAC's arbitration rules then in effect. The seat of arbitration shall be Beijing and language of proceedings shall be Chinese. The arbitral award shall be final and binding upon the Parties.

## 7. **Taxes and Expenses**

Every Party shall, in accordance with PRC laws, bear any and all transfer and registration taxes, expenses and charges incurred by or levied on it with respect to the preparation and execution of this Agreement and each Transfer Agreement and the consummation of the transactions contemplated under this Agreement and each Transfer Agreement.

## 8. **Notices**

Any notice or other communication forms which is given by the parties hereto shall be in Chinese and delivered personally to the addresses listed as below or the addresses designated by the Parties. The notice time which is deemed as the time when the notice actually reaches the addressee follows: (a) the notice time of the notice delivered personally shall be the day when the person conducts the delivery; (b) the notice time of the notice delivered as mail shall be the tenth (10th) day following the mailing date of the registered mail by air (marked by seal) or shall be the fourth (4th) day following the day handing to internally recognized delivery services organizations; (c) the notice time of the notice delivered by facsimile shall be the acceptance time on the delivery confirmation; and (d) on the day of successful delivery if it is delivered by electronic mail evidenced by the confirmation generated from the mail delivery system or without receipt of delivery failure or return message from the mail delivery system within 24 hours.

7

Party A:      Baidu, Inc.
Address:      M&C Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104,
              Cayman Islands
Attention:    Yanhong Li
Facsimile:
Telephone:

Party B:      Baidu Online Network Technology (Beijing) Co., Ltd.
Address:      3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Facsimile:
Telephone:

Party C:      Lu Wang
Address:
Facsimile:
Telephone:

Party C:      Beijing Perusal Technology Co., Ltd.
Address:      A2 2/F No. 17 Building Zhongguancun Software Park, 8 East Bei Wang Road
              (W), Haidian District, Beijing

Facsimile:
Telephone:


9. **Confidentiality**

The Parties acknowledge and confirm any oral or written materials exchanged by the Parties in connection with this Agreement are confidential. The Parties shall maintain the confidentiality of all such materials. Without the written approval by the other Parties, any Party shall not disclose to any third party any relevant materials, but the following circumstances shall be excluded:

    a.    Materials that are or will become known by the public (through no fault of the receiving party);

    b.    Materials required to be disclosed by the applicable laws or rules of the stock exchange; and

    c.    Materials disclosed by each Party to its legal or financial advisors relating the transactions contemplated by this Agreement, and such legal or financial advisors shall comply with the confidentiality provisions similar to this article.

The disclosure of information by the staff or consultants of any party shall be deemed as disclosure by the party itself. This Article 9 shall survive any invalidity, termination, expiration or unenforceability of this Agreement.

8

10. **Further Assurances**

The Parties agree to promptly execute documents and take further actions that are reasonably required for, or beneficial to, the purpose of performing the provisions and carrying out the intent of this Agreement.

11. **Breach Liabilities**

11.1 Party A shall have the right to terminate this Agreement and/or hold Party C or Party D liable for any damages if Party C or Party D is in material breach of any provision under this Agreement.   This Section 11.1 shall not be prejudicial to any other right of Party A under this Agreement.

11.2 Unless otherwise legally required, neither Party C or Party D may terminate or otherwise end this Agreement under any circumstance.

12. **Miscellaneous**

12.1 Amendment, Modification or Supplement

Any amendment or supplement to this Agreement shall be made by the Parties in writing. The amendments or supplements duly executed by each Party shall be deemed as a part of this Agreement and shall have the same legal effect as this Agreement.

12.2 Entire Agreement

Notwithstanding Article 5 of this Agreement, the Parties acknowledge that once this Agreement becomes effective, it shall constitute the entire agreements of the Parties with respect to the subject matters hereof and shall supersede all prior oral and/or written agreements and understandings by the Parties with respect to the subject matters hereof.

12.3 Severability

If any provision of this Agreement is judged to be invalid, illegal or unenforceable in any respect according to any applicable law or regulation, the validity, legality and enforceability of the other provisions hereof shall not be affected or impaired in any way. The Parties shall, through good-faith negotiations, replace those invalid, illegal or unenforceable provisions with valid provisions that may bring about economic effects as similar as possible to those from such invalid, illegal or unenforceable provisions.

12.4 Headings

The headings contained in this Agreement are for the convenience of reference only and shall not be used for the interpretation or explanation or otherwise affect the meaning of the provisions of this Agreement.

9

12.5 Language and counterparts

This Agreement is executed in Chinese in four originals; each Party holds one original and each original has the same legal effect.

12.6 Successor

This Agreement shall bind upon and inure to the benefit of the successors and permitted assigns of each Party.

12.7 Survival

Any obligation arising from or becoming due under this Agreement before its expiration or premature termination shall survive such expiration or early termination. Articles 6, 8 and 9 and this Section 12.7 shall survive the termination of this Agreement.

12.8 Waiver

Any Party may waive the terms and conditions of this Agreement by a written instrument signed by the Parties. Any waiver by a Party to a breach by the other Parties in a specific situation shall not be construed as a waiver to any similar breach by the other Parties in other situations.

(No text below)

10

(Signature page)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu, Inc.**

Signature:   /s/ Yanhong Li
Title:        Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:   /s/ Hailong Xiang
Title:        Legal Representative

**Party C:**

**Lu Wang**

Signature:   /s/ Lu Wang

**Party D:**

**Beijing Perusal Technology Co., Ltd. (seal)**

Signature:   /s/ Hailong Xiang
Title:        Legal Representative

11

**Exhibit 4.82**

## EQUITY PLEDGE AGREEMENT

This Equity Pledge Agreement (this "Agreement") is made as of June 28, 2018 in Beijing, PRC by and between:

**Pledgee**:

**Party A:**            **Baidu Online Network Technology (Beijing) Co., Ltd.**
Registered Address:      3/F, Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing;

And

**Pledgor:**

**Party B:**            **Lu Wang**
ID No.
Address:

**WHEREAS**:

1. Party A is a wholly foreign-owned enterprise registered in Beijing, the People's Republic of China (the "PRC").

2. Party B is a citizen of the PRC holding 50.0% equity interests in Beijing Perusal Technology Co., Ltd. ("Beijing Perusal"), a limited liability company registered in Beijing, the PRC.

3. Party A and Party B entered into a Loan Agreement dated June 28, 2018 (the "Loan Agreement"), whereby Party B obtains a loan (the "Loan Arrangement") up to a total amount of RMB1,598,440,000 (the "Loan").

4. Party A and Beijing Perusal entered into an Exclusive Technology Consulting and Services Agreement dated June 23, 2006 (the "Services Agreement") with permanent term, pursuant to which Beijing Perusal shall pay Party A technical consulting and services fees (the "Service Fees") for the technology consulting and services provided by Party A.

5. In order to ensure that Party B will perform its obligations under the Loan Agreement and Party A will be able to collect the Service Fees from Beijing Perusal, Party B agrees to pledge its equity interests in Beijing Perusal (i.e., a registered capital equal to RMB1,580,000,000) as security for the Loan (i.e., RMB1,598,440,000) and other obligations under the Loan Arrangement and the Service Agreement. Party A and Party B intend to enter into this Agreement to specify their respective rights and obligations in respect of such pledge.

**NOW THEREFORE**, the Pledgee and the Pledgor agree as follows through negotiations:

1. **Definitions**

Unless otherwise provided in this Agreement, the following terms shall have the following meanings:

1.1 "Pledge": refers to the full content of Article 2 hereunder.

1.2 "Equity Interests": refers to all of the equity interests in Beijing Perusal legally held by the Pledgor (for purpose of this Agreement, the Equity Interests pledged herein means the registered capital equal to RMB1,580,000,000).

1.3 "Ratio of Pledge": refers to the proportion of the value of the Pledge under this Agreement to the total amount of the Service Fees and the Loan.

1.4 "Term of Pledge": refers to the period provided for under Article 3.2 hereunder.

1.5 "Principal Agreement": refers to the Services Agreements and the agreements under the Loan Arrangement.

1.6 "Event of Default": refers to any event listed in Article 7.1 hereunder.

1.7 "Notice of Default": refers to the notice of default issued by the Pledgee in accordance with this Agreement.

2. **Pledge**

The Pledgor will pledge all of his Equity Interests in Beijing Perusal (i.e., a registered capital equal to RMB1,580,000,000) to the Pledgee as security for (i) all his obligations under the Loan Arrangement (i.e., RMB1,598,440,000) and (ii) all obligations of Beijing Perusal under the Services Agreement (the "Secured Obligations"). "Pledge" refers to the priority entitled to the Pledgee in receiving proceeds from disposal of all or part of the Equity Interests at a discounted value, or auction or sale of the Equity Interests pledged hereunder.

3. **Ratio of Pledge and Term of Pledge**

3.1 Ratio of the Pledge

The Ratio of the Pledge shall be approximately 100%.

3.2 Term of the Pledge

3.2.1 The Pledge shall take effect as of the date when the pledge of the Equity Interest is recorded in the Register of Shareholders of Beijing Perusal and registered with the competent industrial and commercial authority, and shall remain in effect until two (2) years after all Secured Obligations under the Principal Agreement have been fulfilled.

2

3.2.2 During the term of the Pledge, the Pledgee shall be entitled to dispose of the Pledge in accordance with this Agreement in the event that the Pledgor fails to perform his obligations under the Loan Arrangement or Beijing Perusal fails perform its obligations under the Services Agreement.

### 4. Possession of Pledge Documents

4.1 During the Term of Pledge under this Agreement, the Pledgor shall deliver its capital contribution certificate and the register of shareholders of Beijing Perusal to the possession of the Pledgee within one (1) week from the date of this Agreement.

4.2 The Pledgee shall be entitled to receiving dividends arising from the Equity Interests.

4.3 The Pledge under this Agreement will be recorded in the Register of Shareholders of Beijing Perusal (See Appendix I) after the date of this Agreement.

### 5. Representations and Warranties of the Pledgor

5.1 The Pledgor is the legal owner of the Equity Interests and has approved the Pledge with resolutions adopted at its shareholders meeting (See Appendix II).

5.2 Except for the benefit of the Pledgee, no other pledge or security has been created upon the Equity Interests.

### 6. Covenants of the Pledgor

6.1 During the term of this Agreement, the Pledgor covenants for its benefits of the Pledgee that the Pledgor shall:

6.1.1 not transfer or assign the Equity Interests, create or permit creation of any other pledge which could affect the rights or benefits of the Pledgee without prior written consent of the Pledgee;

6.1.2 comply with and implement the laws and regulations with respect to the pledge of rights; present to the Pledgee the notices, orders or suggestions with respect to the Pledge issued or made by relevant government authorities within five (5) days upon receiving such notices, orders or suggestions; comply with such notices, orders or suggestions or, alternatively, at the reasonable request of the Pledgee or with consent from the Pledgee, raise objection to such notices, orders or suggestions; and

6.1.3 timely notify the Pledgee of any event or any notice to its knowledge which may affect the Pledgor's right to all or any part of the Equity Interests, and any event or any notice to its knowledge which may change the Pledgor's warranties and obligations under this Agreement or affect the Pledgor's performance of its obligations under this Agreement.

3

6.2 The Pledgor agrees that the Pledgee's right to the Pledge under this Agreement shall not be disrupted or prejudiced by any legal proceeding initiated by the Pledgor or any successor of the Pledgor or any person authorized by the Pledgor or any other person.

6.3 The Pledgor promises to the Pledgee that in order to protect or perfect the security for the payment of the Loan and the Services Fees, the Pledgor shall execute in good faith and cause other parties who have interests in the Pledge to execute, all title certificates and contracts and/or to perform any other actions (and cause other parties who have interests to take action) as required by the Pledgee and facilitate the exercise of the rights and authorization vested in the Pledgee under this Agreement.

6.4 The Pledgor promises to the Pledgee that he will execute all amendment (if applicable and necessary) in connection with the certificate of the Equity Interests with the Pledgee or its designated person (being a natural person or a legal entity) and, within a reasonable period, provide to the Pledgee all notices, orders and decisions about the Pledge as the Pledgee deems necessary.

6.5 The Pledgor promises to the Pledgee that he will comply with and perform all the guarantees, covenants, warranties, representations and conditions for the benefit of the Pledgee. The Pledgor shall indemnify the Pledgee for all losses suffered by the Pledgee due to the Pledgor's failure to perform in whole or in part its guarantees, covenants, warranties, representations and conditions.

6.6 During the term of this Agreement, the Pledgor will not make any action/omission which may affect the value of the Equity Interests so as to maintain or increase the value. The Pledgor shall timely notify the Pledgee of any event which may decrease the value of the Equity Interests or affect the Pledgor's performance of the obligations under this Agreement, and shall provide assets acceptable to the Pledgee as guarantee for the decreased value of the Equity Interests upon the Pledgee's request.

6.7 To the extent permitted under applicable laws or regulations, the Pledgor shall make best efforts to cooperate with all the registration, filing or other procedures relating to the Pledge as required by relevant laws and regulations.

7. **Event of Default**

7.1 Each of the following events shall be regarded as an Event of Default:

7.1.1 Pledgor fails to perform its obligations under the Loan Arrangement, including without limitation the obligation to repay the Loan of RMB1,598,440,000 under the Loan Agreement;

7.1.2 Beijing Perusal fails to make due and full payment of the Services Fees or perform other obligations under the Services Agreement;

7.1.3 Any representation or warranty made by the Pledgor in Article 5 hereof is materially misleading or erroneous, and/or the Pledgor breaches any warranty in Article 5 hereof;

4

7.1.4 The Pledgor breaches any covenant under Article 6 hereof;

7.1.5 The Pledgor breaches any other provision of this Agreement;

7.1.6 The Pledgor waives the pledged Equity Interests or transfers or assigns the pledged Equity Interests without prior written consent from the Pledgee;

7.1.7 Any of the Pledgor's external loans, guaranties, compensations, undertakings or other obligations (1) is accelerated for repayment due to any default; or (2) fails to be duly repaid or performed and makes the Pledgee believe that the Pledgor's ability to perform the obligations hereunder has been affected;

7.1.8 Beijing Perusal is incapable of repaying its general debts or other debts;

7.1.9 This Agreement becomes illegal or the Pledgor is not capable of continuing to perform the obligations hereunder due to any reason other than a Force Majeure event;

7.1.10 There have been adverse change to the properties owned by the Pledgor, causing the Pledgee to believe that the capability of the Pledgor to perform the obligations hereunder has been affected;

7.1.11 The successor or receiver of Beijing Perusal only partially performs or refuses to perform the payment obligation under the Services Agreement; and

7.1.12 The breach of the other provisions of this Agreement by the Pledgor due to its action or omission.

7.2 The Pledgor shall immediately give a written notice to the Pledgee if it becomes knowledge of the Pledgor that any event specified under Article 7.1 hereof or any event that may result in the foregoing events has occurred.

7.3 Unless an event of default under Article 7.1 hereof has been resolved to the Pledgee's satisfaction, the Pledgee, at any time when the event of default occurs thereafter, may give a written Notice of Default to the Pledgor, requiring the Pledgor to immediately make full payment of the outstanding amount under the Loan Arrangement or under the Services Agreement or requesting to exercise the Pledge in accordance with Article 8 hereof.

8. **Exercise of the Pledge**

8.1 The Pledgor shall not transfer or assign the Equity Interest without prior written consent from the Pledgee prior to the full performance of his obligations under the Loan Arrangement and supplementary agreement and full payment of all Service Fees under the Services Agreement, whichever is later.

5

8.2 The Pledgee shall give a Notice of Default to the Pledgor when the Pledgee exercises the Pledge.

8.3 Subject to Article 7.3, the Pledgee may exercise the Pledge when the Pledgee gives a Notice of Default in accordance with Article 7.3 or at any time thereafter.

8.4 The Pledgee is entitled to priority in receiving payment in the form of all or part of the Equity Interest at a discounted value, or from the proceeds from the auction or sale of all or part of the Equity Interest in accordance with legal procedure, until the outstanding debt and all other payables of the Pledgor under Loan Arrangement and Services Agreement are repaid.

8.5 The Pledgor shall not hinder the Pledgee from exercising the Pledge in accordance with this Agreement and shall give necessary assistance so that the Pledgee could fully exercise its Pledge.


9. **Assignment**

9.1 The Pledgor shall not assign or transfer its rights and obligations hereunder without prior consent from the Pledgee.

9.2 This Agreement shall be binding upon the Pledgor and his successors and be binding on the Pledgee and each of its successors and permitted assigns.

9.3 To the extent permitted by law, the Pledgee may transfer or assign any or all of its rights and obligations under the Loan Arrangement and supplementary agreements to any person (natural person or legal entity) designated by it at any time. In that case, the assignee shall have the same rights and obligations as those of the Pledgee as if the assignee were an original party hereto. When the Pledgee transfers or assigns the rights and obligations under the Services Agreement, Loan Arrangement and supplementary agreements, it is only required to provide a written notice to the Pledgor, and at the request of the Pledgee, the Pledgor shall execute the relevant agreements and/or documents with respect to such transfer or assignment.

9.4 After the Pledgee has been changed as a result of a transfer or an assignment, the new parties to the Pledge shall execute a new pledge contract.


10. **Effectiveness and Term**

This Agreement is executed on the date first set forth above and becomes effective from the date when the pledge is recorded on Beijing Perusal's Register of Shareholders.


11. **Termination**

This Agreement shall terminate when the loan under the Loan Arrangement and the Services Fees under the Services Agreement have been fully repaid and the Pledgor no longer has any outstanding obligations under the Loan Arrangement and Beijing Perusal no longer has any outstanding obligations under the Services Agreement. The Pledgee shall cancel or terminate this Agreement as soon as reasonably practicable thereafter, .

6

## 12. **Fees and Other Charges**

12.1 The Pledgor shall be responsible for all of the fees and actual expenses in relation to this Agreement including, but not limited to, legal fees, production costs, stamp tax and any other taxes and charges. If the Pledgee pays the relevant taxes in accordance with the laws, the Pledgor shall fully indemnify the Pledgee for such taxes paid by the Pledgee.

12.2 In the event that the Pledgee has to make a claim against the Pledgor by any means as a result of the Pledgor's failure to pay any tax or expense payable by the Pledgor under this Agreement, the Pledgor shall be responsible for all the expenses arising from such claim (including but not limited to any taxes, handling fees, management fees, litigation fees, attorney's fees, and various insurance premiums in connection with the disposition of the Pledge).

## 13. Force Majeure

13.1 A Force Majeure event refers to any unforeseen event that is beyond a party's reasonable control and cannot be prevented with reasonable care, which includes but is not limited to acts of governments, changes of law, acts of God, fires, explosions, typhoons, floods, earthquake, tides, lightning or war; provided, however, that any insufficiency of creditworthiness, capital or financing shall not be regarded as an event beyond a party's reasonable control. The affected party by Force Majeure shall promptly notify the other party of such event resulting in exemption.

13.2 In the event that the affected party is delayed or prevented from performing its obligations under this Agreement by Force Majeure, and only to the extent of such delay and prevention, the affected party shall not be liable for obligations under this Agreement. The affected party shall take appropriate measures to minimize or remove the effects of Force Majeure and attempt to resume performance of the obligations that were delayed or prevented by the event of Force Majeure. After the event of Force Majeure is removed, both Parties agree to resume the performance of this Agreement using their best efforts.

## 14. **Confidentiality**

The Parties acknowledge and confirm that all the oral and written materials exchanged relating to this Agreement are confidential. Each party must keep such materials confidential and cannot disclose such materials to any other third party without the other party's prior written approval, unless: (a) the public knows or will know the materials (not due of the disclosure by the receiving party); (b) the disclosed materials are required by law or stock exchange rules to be disclosed; or (c) materials relating to the transactions under this Agreement are disclosed to the Parties' legal or financial advisors, who must keep them confidential as well. Disclosure of the confidential information by employees or institutions hired by the Parties is deemed as an act by the Parties, therefore, subjecting them to liability.

7

15. **Dispute Resolution**

15.1 This Agreement shall be governed by and construed in accordance with PRC law.

15.2 The Parties shall strive to resolve any dispute arising from the interpretation or performance of this Agreement through negotiations in good faith. If the negotiations fail, either Party may submit such matter to the China International Economic and Trade Arbitration Commission ("CIETAC") for arbitration in accordance with its rules then in effect. The arbitration proceedings shall be conducted in Chinese and shall take place in Beijing, PRC. The arbitral award shall be final and binding upon the Parties.

16. **Notice**

Any notice which is given by the Parties hereto for the purpose of performing the rights and obligations hereunder shall be in writing. If such notice is delivered personally, the time of notice is the time when such notice actually reaches the addressee; where such notice is transmitted by telex or facsimile, the notice time is the time when such notice is transmitted. If such notice does not reach the addressee on a business day or reaches the addressee after business hours, the next business day following such day is the date of notice. The delivery place is the address first written above for each of the Parties hereto or the address advised by such party in writing, including facsimile and telex, from time to time.

Party A:          Baidu Online Network Technology (Beijing) Co., Ltd.
Address:          Baidu Building, No. 10 Shangdi 10th Street, Haidian District, Beijing
Fax:
Telephone:

Party B:          Lu Wang
Address:
Telephone:

17. **Entire Agreement**

Notwithstanding provisions in Article 10 hereof, the Parties agree that this Agreement constitutes the entire agreements of the Parties hereto with respect to the subject matter herein upon its effectiveness and supersedes and replaces all prior oral and/or written agreements and understandings relating to the subject matters of this Agreement.

18. **Severability**

Should any provision of this Agreement be held invalid or unenforceable because of inconsistency with applicable laws, such provision shall be invalid or unenforceable only to the extent of such applicable laws without affecting the validity or enforceability of the remainder of this Agreement.

8

19. **Appendices**

The appendices to this Agreement shall constitute an integral part of this Agreement.

20. **Amendment or Supplement**

20.1 The Parties may amend or supplement this Agreement by written agreement. The amendments or supplements to this Agreement duly executed by both Parties shall form an integral part of this Agreement and shall have the same legal effect as this Agreement.

20.2 This Agreement and any amendments, modifications, supplements, additions or changes hereto shall be in writing and shall be effective upon being executed and sealed by the Parties hereto.

21. **Counterparts**

This Agreement is made in Chinese in three originals, with each Party holding one thereof and the remainder filed with competent authority. All originals shall have the same legal effect.

(No text below)

9

(Signature page only)

**IN WITNESS WHEREOF**, each Party has executed or caused this Agreement to be executed by its legal or authorized representative on its behalf as of the date first written above.

**Party A:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:  <u>/s/ Legal Representative/Authorized Representative</u>

**Party B:**

**Lu Wang**

Signature:  <u>/s/ Lu Wang</u>

10

Appendices:

1.    Register of Shareholders of Beijing Perusal Technology Co., Ltd.

2.    Resolutions of the Shareholders' Meeting of Beijing Perusal Technology Co., Ltd.

11

**Appendix I**

**Register of shareholders of Beijing Perusal Technology Co., Ltd.**

| | |
|---|---|
| Name of the Shareholder: | Zhixiang Liang |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB1,580,000,000.00 |
| Percentage of Share Capital: | 50% |

| | |
|---|---|
| Name of the Shareholder: | Lu Wang |
| ID number: | |
| Residence: | |
| Contribution Amount: | RMB1,580,000,000.00 |
| Percentage of Share Capital: | 50% |

Zhixiang Liang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Lu Wang holds 50% equity interests in Beijing Perusal Technology Co., Ltd., the entirety of which has been pledged to Baidu Online Network Technology (Beijing) Co., Ltd.

Baidu Online Network Technology (Beijing) Co., Ltd. is the pledgee of 100% of the equity interests in Beijing Perusal Technology Co., Ltd.

Beijing Perusal Technology Co., Ltd. (seal)

Signature: /s/ Hailong Xiang
Name:    Hailong Xiang
Title:    Legal representative
Date:    June 28, 2018

12

**Appendix II**

**Resolutions of the Shareholders' Meeting of Beijing Perusal Technology Co., Ltd.**

In respect of the Equity Pledge Agreement dated June 28, 2018 between the shareholders of Beijing Perusal Technology Co., Ltd. (the "Company") and Beijing Online Network Technology (Beijing) Co., Ltd., a resolution is unanimously adopted at the shareholders' meeting of the Company as follows:

It is approved that the shareholders of the Company pledge all of their equity interests in the Company to Baidu Online Network Technology (Beijing) Co., Ltd.

The resolution was signed and delivered dated June 28, 2018 by the undersigned shareholders.

**Shareholders:**

Zhixiang Liang
Signature:    /s/ Zhixiang Liang

Lu Wang
Signature:    /s/ Lu Wang

13

**Exhibit 4.83**

**Termination Agreement of Current Control Contracts**

This Termination Agreement of Current Control Contracts (this "**Agreement**") is made as of July 8, 2018 in Beijing, the People's Republic of China (the "**PRC**," for purposes of this Agreement excluding Hong Kong, Macau and Taiwan) by and among:

**Party A: Baidu Inc.**, a company duly formed and validly existing under the laws of the Cayman Islands, with its registered address at M&C Corporate Services Limited, P.O. Box 309 GT, Ugland House, Grand Cayman, KY1-1104, Cayman Islands.

**Party B: Baidu Online Network Technology (Beijing) Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at 3/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party C: Beijing BaiduPay Science and Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at 5/F, Block B, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party D: Zhixiang Liang**, a PRC citizen, ID No.        ;

**Party E: Beijing Baidu Netcom Science Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at 2/F, Baidu Plaza, No. 10 Shangdi 10th Street, Haidian District, Beijing;

**Party F: An Yi Heng Tong (Beijing) Technology Co., Ltd.**, a limited liability company duly formed and validly existing under the PRC laws, with its registered address at Section BE, 4/F, Building One, No. 10 Shangdi 10th Street, Haidian District, Beijing;

And

**Party G: Hailong Xiang**, a PRC citizen, ID No.        .

In this Agreement, each of the Parties above are collectively referred to as the "Parties," individually as a "Party," and mutually as "Other Parties."

**WHEREAS:**

(1)  Each of Party A, Party B, Party C, Party D, Party E, Party F and Party G has signed the documents listed in Exhibit 1 attached hereto (collectively the "**Current Control Documents**"; for avoidance of any doubt, "all" and/or "any" of the Current Control Documents referenced herein are limited to the documents listed in Exhibit 1 attached hereto) prior to the date hereof; and

(2)   Pursuant to the terms and subject to the conditions herein, each of the Parties agrees to terminate all of the Current Control Documents.

**NOW, THEREFORE**, the Parties agree as follows through negotiations:

**1.   Termination of Current Control Documents**

1.1   Each of Party A, Party B, Party C, Party D, Party E, Party F and Party G hereby irrevocably agrees and acknowledges that all of the Current Control Documents shall terminate and cease to have any effect as of the date hereof.

1.2   As of the date hereof, each of Party A, Party B, Party C, Party D, Party E, Party F and Party G shall have no right under all and/or any of the Current Control Documents, or be required to fulfill any obligation thereunder; _provided, however_, that any rights exercised and obligations fulfilled by each of the Parties on reliance of the Current Control Documents shall remain valid, no Party is required to return any payment, income or interest of any kind received by it or in its actual possession on reliance of the Current Control Documents, and any amount which has become due and payable among Party A, Party B, Party C, Party D, Party E, Party F and Party G shall be paid accordingly.

1.3   Unless otherwise provided in Section 1.2 above, each of Party A, Party B, Party C, Party D, Party E, Party F and Party G hereby irrevocably and unconditionally waives any dispute, claim, demand, right, obligation, liability, action, contract or cause of action of any kind or nature it had, has or may have against the Other Parties directly or indirectly in connection with or arising from all and/or any of the Current Control Documents.

1.4   Without prejudice to the generality of Sections 1.2 and 1.3 above, as of the date hereof, each of Party A, Party B, Party C, Party D, Party E, Party F and Party G hereby waives any commitment, debt, claim, demand, obligation and liability of any kind or nature that such Party or any of its successors, heirs, assigns or estate executors had, has or may have against the Other Parties and their respective current and past directors, officers, employees, counsels and agents, affiliates of the forgoing persons and the respective successors and assigns of each of the foregoing, in connection with or arising from the Current Control Documents, including claims and cause of action at law or equity, whether initiated or not, absolute or contingent, known or unknown.

**2.   Representations and Warranties**

2.1   **Mutual Representations and Warranties**. Each of the Parties represents and warrants to the Other Parties that:

(1) it has full legal rights, powers and authorities to execute this Agreement and all contracts and documents referenced herein to which it is a party, and execution of this Agreement represents expression of its genuine intent;

(2) none of its execution and performance of this Agreement will constitute breach of any organizational document to which it is a party or by which it is bound, any agreement executed or permit obtained by it, or result in its breach of or requirement for it to obtain any judgment, ruling, order or consent issued by a court, government authority or regulatory body; and

(3) it has obtained all consents, approvals and authorizations necessary for its valid execution of this Agreement, all contracts and documents referenced herein to which it is a party, and for its compliance with and performance of its obligations hereunder and thereunder.

**3.    Covenants**

3.1    In order to duly terminate the rights and obligations under the Current Control Documents, each Party shall execute all documents and take all actions that are necessary or advisable, provide active support for the Other Parties in obtaining relevant government approvals and/or registration documents and effecting relevant termination procedures (including without limitation the procedures to cancel registered equity pledge).

**4.    Termination**

4.1    Except for the circumstances expressly provided herein, the Parties agree to terminate this Agreement:

(1) by all of the Parties through negotiation, and all expenses and losses incurred therefrom shall be borne respectively by the incurring Party; or

(2) by the non-defaulting Party if the intent of this Agreement is incapable of fulfilment due to a Party's breach of its obligations hereunder.

**5.    Breach Liabilities and Indemnification**

5.1    Any Party shall be deemed in breach of this Agreement if it breaches or fails to perform any of its representations, warranties, covenants, obligations and liabilities set forth herein.

5.2    Unless otherwise expressly agreed herein, any Party in breach of this Agreement shall indemnify the non-defaulting Party for any cost, liability or any loss (including without limitation any interest accrued therefrom and legal fees) incurred by the non-defaulting Party. The total amount of indemnity payable by the defaulting Party to the non-defaulting Party shall be the loss arising from such breach.

**6.     Governing Law and Dispute Resolution**

6.1     The formation of this Agreement and its validity, interpretation, performance and resolution of any dispute arising from this Agreement shall be governed by and construed in accordance with the laws of the PRC.

6.2     All disputes arising from the performance of this Agreement or in connection with this Agreement shall be resolved by the Parties through negotiations in good faith.

6.3     Any Party may submit any dispute arising from this Agreement to China International Economic and Trade Arbitration Commission (CIETAC) for arbitration in Beijing in accordance with its arbitration rules and procedures then in effect. The arbitral tribunal shall consist of three arbitrators appointed in accordance with the arbitration rules, with one arbitrator appointed by the claimant, one arbitrator by the respondent and the third arbitrator by the two appointed arbitrators after consultation or by the CIETAC. The arbitration shall proceed on confidential basis in Chinese. The arbitral award shall be final and binding upon all Parties.

6.4     During the arbitration, except the matters under dispute and pending arbitration, each Party shall continue to exercise its other rights and fulfill its other obligations hereunder.

**7.     Confidentiality**

7.1     The Parties shall be obliged to keep confidential this Agreement and matters relating to this Agreement, and none of the Parties may disclose any matter relating hereto to a third party other than the Parties hereto without the written consent of the Other Parties, except for any disclosure:

(1) to the auditor, legal advisor and any other person engaged by it in the ordinary course of business, provided that such person shall be obliged to keep in confidence any information relating to this Agreement acquired by it during such engagement; and

(2) which could be otherwise accessible by the public, or is expressly required by law, regulation or relevant stock exchange authority.

**8.     Miscellaneous**

8.1     This Agreement shall become effective upon signature of all of the Parties.

8.2     The Parties may amend or modify this Agreement through negotiations. Any such amendment or modification shall be made in writing and become effective upon signature of all of the Parties.

8.3    If any provision hereof be held invalid or unenforceable, such provision shall be deemed to have never existed herein and have no effect upon validity of the remainder of this Agreement, and the Parties shall negotiate to provide for a new provision to the extent permissible by law to ensure that the intent of the original provision be realized to the maximum extent.

8.4    Unless otherwise provided herein, no failure or delay in exercising any right, power or privilege hereunder by a Party shall operate as its waiver of such right, power or privilege, nor shall single or partial exercise of such right, power or privilege preclude the exercise of any other right, power and privilege.

8.5    This Agreement is made in seven originals with one thereof for each Party, and each of the originals shall be equally binding.

*(No text below, Signatures to follow)*

**IN WITNESS WHEREOF**, each Party has executed or caused this Termination Agreement of Current Control Contracts to be executed by its authorized representative on its behalf as of the date first written above with immediate effect.

**Party A:**

**Baidu, Inc.**

Signature:    /s/ Yanhong Li
Name:
Title**:**        Director

**Party B:**

**Baidu Online Network Technology (Beijing) Co., Ltd. (seal)**

Signature:    /s/ Hailong Xiang
Name:
Title:        Legal Representative

**Party C:**

**Beijing BaiduPay Science and Technology Co., Ltd. (seal)**

Signature:    /s/ Zhixiang Liang
Name:
Title:        Legal Representative

**Party D:**

**Zhixiang Liang**

Signature:    /s/ Zhixiang Liang

**Party E:**

**Beijing Baidu Netcom Science Technology Co., Ltd. (seal)**

Signature:    /s/ Zhixiang Liang
Name:
Title:        Legal Representative

**Party F:**

**An Yi Heng Tong (Beijing) Technology Co., Ltd. (seal)**

Signature:   /s/ Haibo Fu
Name:
Title:       Legal Representative

**Party G:**

**Hailong Xiang**

Signature:   /s/ Hailong Xiang

**Exhibit 1**

List of Current Control Documents

| No. | Document Name | Signed by | Signed on |
|---|---|---|---|
| 1 | Exclusive Technology Consulting and Services Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | February 28, 2008 |
| 2 | Web Layout Copyright License Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | February 28, 2008 |
| 3 | Supplementary Agreement to the Exclusive Technology Consulting and Services Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | April 22, 2010 |
| 4 | Supplementary Agreement II to the Exclusive Technology Consulting and Services Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | September 6, 2011 |
| 5 | Supplementary Agreement I to Web Layout Copyright License Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | September 6, 2011 |
| 6 | Supplementary Agreement I to Web Layout Copyright License Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Beijing BaiduPay Science and Technology Co., Ltd. | August 15, 2013 |

| 7  | Amended and Restated Operating Agreement | Baidu Online Network Technology (Beijing) Co., Ltd.; Beijing BaiduPay Science and Technology Co., Ltd.; Zhixiang Liang; Beijing Baidu Netcom Science Technology Co., Ltd.; and An Yi Heng Tong (Beijing) Technology Co., Ltd. | October 18, 2016 |
|----|------------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|------------------|
| 8  | Amended and Restated Equity Pledge Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Zhixiang Liang | October 18, 2016 |
| 9  | Letter of Guarantee | Hailong Xiang | October 18, 2016 |
| 10 | Exclusive Equity Purchase and Transfer Option Agreement | Baidu, Inc.; Baidu Online Network Technology (Beijing) Co., Ltd.; Zhixiang Liang; and Beijing BaiduPay Science and Technology Co., Ltd. | March 31, 2018 |
| 11 | Proxy Agreement | Baidu, Inc. and Zhixiang Liang | March 31, 2018 |
| 12 | Loan Agreement | Baidu Online Network Technology (Beijing) Co., Ltd. and Zhixiang Liang | March 31, 2018 |
| 13 | Power of Attorney | Zhixiang Liang | March 31, 2018 |

**Exhibit 8.1**

**List of Principal Subsidiaries and Consolidated Affiliated Entities**

**Subsidiaries:**

Baidu Holdings Limited — Incorporated in the British Virgin Islands

Baidu (Hong Kong) Limited — Incorporated in Hong Kong

Baidu Online Network Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu (China) Co., Ltd. — Incorporated in the PRC

Baidu.com Times Technology (Beijing) Co., Ltd. — Incorporated in the PRC

Baidu International Technology (Shenzhen) Co., Ltd. — Incorporated in the PRC

Qiyi.com, Inc. — Incorporated in the Cayman Islands

**Consolidated Affiliated Entities:**

Beijing Baidu Netcom Science Technology Co., Ltd. — Incorporated in the PRC

Beijing Perusal Technology Co., Ltd. — Incorporated in the PRC

**Exhibit 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Robin Yanhong Li, certify that:

1.  I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

   (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

   (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

   (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 15, 2019

By:     /s/ Robin Yanhong Li
Name:   Robin Yanhong Li
Title:   Chief Executive Officer

**Exhibit 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Herman Yu, certify that:

1.   I have reviewed this annual report on Form 20-F of Baidu, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.   The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f) and 15d-15(f)) for the company and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.   The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent function):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 15, 2019

By:      /s/ Herman Yu
Name:   Herman Yu
Title:    Chief Financial Officer

**Exhibit 13.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robin Yanhong Li, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2019

By:    /s/ Robin Yanhong Li
Name:  Robin Yanhong Li
Title:   Chief Executive Officer

**Exhibit 13.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**

In connection with the Annual Report of Baidu, Inc. (the "Company") on Form 20-F for the year ended December 31, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Herman Yu, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 15, 2019

By:   /s/ Herman Yu
Name:   Herman Yu
Title:   Chief Financial Officer

**Exhibit 15.1**

[Maples and Calder (Hong Kong) LLP Letterhead]

Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing 100085
The People's Republic of China

15 March 2019

Dear Sirs

**Baidu, Inc.**

We consent to the reference to our firm under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Tax Considerations" and "Item 16G. Corporate Governance" in Baidu Inc.'s Annual Report on Form 20-F for the year ended 31 December 2018 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2019, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-218972) of Baidu, Inc. of the summary of our opinion under the heading "Item 10.E. Additional Information—Taxation—Cayman Islands Tax Considerations" and "Item 16G. Corporate Governance" in the Annual Report. We also consent to the filing with the SEC of this consent letter as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Yours faithfully,

/s/ Maples and Calder (Hong Kong) LLP

Maples and Calder (Hong Kong) LLP

**Exhibit 15.2**

[Han Kun Law Offices Letterhead]

March 15, 2019
Baidu, Inc.
Baidu Campus
No. 10 Shangdi 10th Street
Haidian District, Beijing
People's Republic of China 100085

Dear Sir/Madam:

We hereby consent to the reference of our name under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in Baidu, Inc.'s Annual Report on Form 20-F for the year ended December 31, 2018 (the "**Annual Report**"), which will be filed with the Securities and Exchange Commission (the "**SEC**") in the month of March 2019, and further consent to the incorporation by reference into the Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan, Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and Registration Statement (Form F-3 No. 333-218972) of Baidu, Inc. of the summary of our opinion under the heading "Item 4.B. Information on the Company—Business Overview—Regulations" in the Annual Report. We also consent to the filing of this consent letter with the SEC as an exhibit to the Annual Report.

In giving such consent, we do not thereby admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, or under the Securities Exchange Act of 1934, in each case, as amended, or the regulations promulgated thereunder.

Very truly yours,

/s/ Han Kun Law Offices

Han Kun Law Offices

**Exhibit 15.3**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1)    Registration Statement (Form S-8 No. 333-129374) pertaining to Baidu, Inc.'s 2000 Option Plan,

(2)    Registration Statement (Form S-8 No. 333-158678) pertaining to Baidu, Inc.'s 2008 Share Incentive Plan, and

(3)    Registration Statement (Form F-3 No. 333-218972) of Baidu, Inc.

of our reports dated March 15, 2019, with respect to the consolidated financial statements of Baidu, Inc. and the effectiveness of internal control over financial reporting of Baidu, Inc. included in this Annual Report (Form 20-F) of Baidu, Inc. for the year ended December 31, 2018.

/s/ Ernst & Young Hua Ming LLP

Beijing, The People's Republic of China
March 15, 2019