UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE iQIYI, INC. SECURITIES LITIGATION | Master File No. 1:20-cv-01830-DG-TAM |
| | **Oral Argument Requested** |
| IN RE BAIDU, INC. SECURITIES LITIGATION | Master File No. 1:20-cv-3794-DG-TAM |
| | **Oral Argument Requested** |

**LEAD PLAINTIFFS' JOINT MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' COMMON MOTION
TO DISMISS THE *iQIYI* AND *BAIDU* ACTIONS**

Date of Service: January 30, 2023

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF RELEVANT FACTS ..................................................................... 3

      A.    The Background of Baidu and iQIYI........................................................... 3

      B.    iQIYI Reaped Over $2.0 Billion in Cash from American Investors in Its IPO ...... 4

      C.    Defendants Lured Investors into Baidu and iQIYI by Touting iQIYI's Key
            Financial And Operating Performance Metrics ....................................... 4

            1.    iQIYI's Offering Documents Contained False And Misleading
                  Statements ................................................................................... 4

            2.    Defendants Touted Inflated Viewership Metrics And Revenues
                  Throughout the Class Period........................................................ 5

      D.    Investors Ultimately Learned the Truth Over the Course of Several Events ......... 7

III.  ARGUMENT ................................................................................................................ 8

      A.    Legal Standard on a Motion to Dismiss..................................................... 8

      B.    The Complaints Adequately Alleged Actionable Misstatements ............ 8

            1.    Defendants Overstated Daily Active Users ............................... 10

            2.    Defendants Overstated Deferred Revenue ................................. 13

            3.    Membership Services Revenue Was Overstated ....................... 18

            4.    iQIYI Improperly Accounted for Its Xin'ai Sports Investment................ 20

      C.    The iQIYI Complaint Alleges Viable Securities Act Claims .............................. 24

IV.   THE COMPLAINTS ADEQUATELY PLEAD SECTION 20(a) ................................... 24

V.    CONCLUSION............................................................................................................ 25

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC,*
2005 WL 2385854 (S.D.N.Y. Sept. 26, 2005)...................................................................... 11

*Brown v. China Integrated Energy, Inc.,*
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ............................................................................. 13

*Christine Asia Co. Ltd. v. Ma,*
718 F. App'x 20 (2d Cir. 2017) ..................................................................................... 8, 20

*Dean v. China Agritech, Inc.,*
2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) .................................................................. 14

*Dresner v. Utility.com, Inc.,*
371 F. Supp. 2d 476 (S.D.N.Y. 2005)............................................................................... 12

*Eastman Kodak Co. v. Henry Bath LLC,*
936 F.3d 86 (2d Cir. 2019).............................................................................................. 11

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford,*
794 F.3d 297 (2d Cir. 2015)............................................................................................... 8

*Fait v. Regions Fin. Corp.,*
655 F.3d 105 (2d Cir. 2011).............................................................................................. 22

*Harris v. AmTrust Financial Services, Inc.,*
135 F. Supp. 3d 155 (S.D.N.Y. 2015).......................................................................... 22, 23

*Harris v. AmTrust Fin. Servs., Inc.,*
649 F. App'x 7 (2d Cir. 2016) .......................................................................................... 17

*Henning v. Orient Paper, Inc.,*
2011 WL 2909322 (C.D. Cal. July 20, 2011) .......................................................... 11, 14, 17

*Herman & MacLean v. Huddleston,*
459 U.S. 375 (1983)......................................................................................................... 24

*Ho v. Duoyuan Glob. Water, Inc.,*
887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................... 9, 11, 15, 16

*In re Advanced Battery Technologies, Inc. Securities LItigation,*
2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)......................................................... 14, 15, 17

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
693 F. Supp. 2d 241 (S.D.N.Y. 2010) .......................................................................... 23

*In re AmTrust Financial Services, Inc. Securities Litigation*,
2020 WL 2787117 (S.D.N.Y. Apr. 20, 2020) ........................................................ 22, 23

*In re A-Power Energy Generation System Ltd. Securities Litigation*,
2012 WL 1983341 (C.D. Cal. May 31, 2012) ......................................................... 11, 16

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) .......................................................................... 12

*In re Autodesk, Inc. Sec. Litig.*,
132 F. Supp. 2d 833 (N.D. Cal. 2000) .......................................................................... 15

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ............................................................... 22

*In re China Educ. All., Inc. Sec. Litig.*,
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ................................................................. 9

*In re China Valves Tech. Sec. Litig.*,
979 F. Supp. 2d 395 (S.D.N.Y. 2013) .......................................................................... 14

*In re China XD Plastics Co. Ltd. Securities Litigation*,
2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016) ........................................................ 11, 17

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2020 WL 3026564 (D.N.J. June 5, 2020) ..................................................................... 19

*In re Computer Assocs. Class Action Sec. Litig.*,
75 F. Supp. 2d 68 (E.D.N.Y. 1999) .............................................................................. 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
308 F. Supp. 2d 249 (S.D.N.Y. 2004) .......................................................................... 12

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012) .......................................................................... 12

*In re Glob. Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) .......................................................................... 24

*In re KeySpan Corp.,*
*Sec. Litig.*, 2003 WL 21981806 (E.D.N.Y. July 30, 2003) ......................................... 20

*In re L & L Energy, Inc. Sec. Litig.*,
   908 F. Supp. 2d 1147 (W.D. Wash. 2012) ................................................................ 14, 17

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
   2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ................................................................ 15

*In re Netflix, Inc. Securities Litigation*,
   2005 WL 1562858 (N.D. Cal. June 28, 2005) ............................................................ 13

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ........................................................................................ 12

*In re Silvercorp Metals, Inc. Sec. Litig.*,
   26 F. Supp. 3d 266 (S.D.N.Y. 2014) ......................................................................... 16

*In re Twinlab Corp. Sec. Litig.*,
   103 F. Supp. 2d 193 (E.D.N.Y. 2000) ....................................................................... 24

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ...................................................................................... 13

*In re XL Fleet Corp. Sec. Litig.*,
   2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ................................................................ 9

*Lewy v. SkyPeople Fruit Juice, Inc.*,
   2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ............................................................ 15

*Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012) ....................................................................... 12

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ...................................................................................... 24

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) ....................................................................... 15

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...................................................................................................... 8

*McIntire v. China MediaExpress Holdings, Inc.*,
   927 F. Supp. 2d 105 (S.D.N.Y. 2013) ..................................................................... 9, 16

*Miller Inv. Tr. v. Morgan Stanley & Co. Inc.*,
   879 F. Supp. 2d 158 (D. Mass. 2012) ....................................................................... 13

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
709 F.3d 109 (2d Cir. 2013).................................................................................... 18

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)..................................................................................... 22, 23

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).................................................................................... 18

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad,
Anónima*, 339 F. Supp. 3d 169 (S.D.N.Y. 2018) ...................................................... 19

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)......................................................... 13

*Schick v. Ernst & Young*,
141 F.R.D. 23 (S.D.N.Y. 1992) .............................................................................. 13

*Shaev v. Baker*,
2017 WL 1735573 (N.D. Cal. May 4, 2017) ........................................................... 19

*Snellink v. Gulf Res., Inc.*,
870 F. Supp. 2d 930 (C.D. Cal. 2012) .............................................................. 14, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................ 8, 17

## **Statutes**

15 U.S.C. §78u-4(b)(2)(A)............................................................................................ 8

## **Rules**

Fed. R. Civ. P. 12(g)(2)............................................................................................... 9

## I.   INTRODUCTION

The iQIYI Complaint[1] alleges claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") against iQIYI, a Chinese online entertainment service company, and certain of its executives, for misrepresentations made from March 29, 2018 through August 13, 2020, inclusive (the "iQIYI Class Period") and strict liability claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against Baidu, iQIYI, and certain of iQIYI's executives, directors, and underwriters in connection with iQIYI's March 29, 2018 $2.25 billion initial public offering ("IPO"). The Baidu Complaint[2] alleges claims under Sections 10(b) and 20(a) of the Exchange Act against Baidu, one of the most well-known internet companies in China, host of one of the country's largest search engines, and a majority owner of iQIYI, iQIYI itself, and certain of their executives, for misrepresentations made between April 8, 2016 and August 13, 2020, inclusive (the "Baidu Class Period"). Pursuant to the Court's October 6, 2022 Order, Plaintiffs in the *iQIYI* and *Baidu* actions submit this joint memorandum in opposition to

---

[1] The "iQIYI Complaint" refers to the Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed in *In re iQIYI, Inc. Securities Litigation*, No. 1:20-cv-1830 (DG) (TAM) (ECF No. 104) and is cited as "IQ ¶__". Defendants in the iQIYI action are iQIYI, Inc. ("iQIYI"), Baidu, Inc. ("Baidu"), Yu Gong, Xiaodong Wang, Robin Yanhong Li, Qi Lu, Herman Yu, Xuyang Ren, Victor Zhixiang Liang, Chuan Wang, Giselle Manon, Goldman Sachs (Asia) LLC, Credit Suisse Securities (USA) LLC, Merrill Lynch, Pierce, Fenner & Smith, Incorporated, China Renaissance Securities (Hong Kong) Limited, Citigroup Global Markets Inc., and UBS Securities LLC. "IQ Plaintiffs" shall refer to Lead Plaintiffs Robert J. Gereige, M.D. and Ronald L. Hershberger.

[2] The "Baidu Complaint" refers to the Consolidated Class Action Complaint filed in *In re Baidu, Inc. Securities Litigation*, No. 1:20-cv-3794 (DG) (TAM) (ECF No. 48) and is cited as "Baidu ¶__". Defendants in the Baidu Action are Baidu, iQIYI, Yu Gong, Xiaodong Wang, Robin Yanhong Li, Jennifer Li, and Herman Yu. "Baidu Plaintiffs" shall refer to Lead Plaintiffs Benjamin Paz Tchimino, Inveriones B Y J Limitada, Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, and Central Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987.

Defendants' Motion to dismiss the iQIYI and Baidu Complaints.[3]

In order to raise $2.25 billion in its IPO at the highest possible price per share, Defendants inflated iQIYI's viewership figures—measured as the number of Daily Active Users ("DAUs"), as well as deferred revenue. Their goal was to make iQIYI's business appear to be larger and more successful. This inflation of viewership figures and revenues was difficult to conceal and was ultimately uncovered.

Investors of both iQIYI and Baidu began to learn the truth on April 7, 2020, when global financial research firm Wolfpack Research released a report detailing that iQIYI overstated its user base, revenue, and deferred revenue (the "Wolfpack Report"), causing iQIYI's share price to drop 4.3% over two days, and Baidu's share price to drop 4% the next full trading day. To mitigate its share price decline, iQIYI immediately reassured investors that the Wolfpack Report was flawed. However, investors learned the full truth on August 13, 2020, when iQIYI disclosed what they admittedly had known for approximately four months—that the SEC and NASDAQ had already initiated investigations into iQIYI based on the allegations in the Wolfpack Report, causing iQIYI's share price to fall by another 11.4% and Baidu's share price to fall by an additional 6%.[4]

Defendants' Motion primarily attacks the Wolfpack Report, credit reports, and third-party

---

[3] "MTD" or "Motion" refers to Defendants' Joint Memorandum of Law in Support of Defendants' Common Motion to Dismiss the *iQIYI* and *Baidu* Actions. The "IQ MTD" shall refer to the iQIYI Defendants' memorandum in support of their motion. The "Baidu MTD" shall refer to the Baidu Defendants' memorandum in support of their motion.

[4] The investigations into iQIYI come in the midst of a heightened concern over transparency issues with China-based companies in general. Indeed, at the forefront of the U.S. Securities and Exchange Commission's ("SEC") recent agenda has been a growing concern over "Chinese companies [] systematically flouting U.S. rules," which pressured lawmakers to conduct "thorough investigations of U.S. listed Chinese companies' concerning lack of transparency." *See* Ex. 1. These problems prompted SEC Chairman Gary Gensler to issue a statement on investor protection on July 30, 2021, asking his staff to "engage in targeted additional reviews of filings for companies with significant China-based operations" because these issues "are at the heart of the SEC's mandate to protect investors in U.S. capital markets." *See* Ex. 2.

reports from leading industry research firms, claiming that any contradictions between the Company's SEC filings and such reports cannot establish falsity because the reports are biased, inaccurate, or unreliable. However, in cases such as this where plaintiffs allege that a company's financial figures are overstated as compared to its Chinese regulatory or tax filings, courts regularly hold the complaint adequately pleads falsity. *See* Section III.B.2. Courts routinely find as credible reports filed with the State Administration for Industry and Commerce ("SAIC") and other People's Republic of China ("PRC") filings, such as tax filings and credit reports that aggregate a company's financials. *Id.*

The iQIYI Defendants' efforts to dismiss the iQIYI Complaint's Securities Act claims also fall flat. The Section 11 claim does not sound in fraud merely because it is based on some of the same misrepresentations alleged in the Section 10(b) claim. An overwhelming majority of cases hold that when, as here, a complaint separates its Sections 10(b) and 11 claims, and disclaims all fraud as to the Section 11 claim, the Section 11 claim does not sound in fraud. The Court should deny defendants' Motion in its entirety.

## II.   STATEMENT OF RELEVANT FACTS

### A.   The Background of Baidu and iQIYI

Baidu is a PRC-based internet services company incorporated in the Cayman Islands in 2000, which is a majority owner of iQIYI. During the Class Period, Baidu operated in three segments: (1) search services; (2) transactions services; and (3) iQIYI. Baidu ¶¶29–30. iQIYI— the self-proclaimed Netflix of China—is a PRC-based online video streaming entertainment provider. Baidu ¶¶32–33; IQ ¶¶22–23. iQIYI generates revenue from two primary sources: (i) monthly, quarterly, or annual membership subscriptions; and (ii) advertising. Both are dependent on, and a function of, the number of customers subscribing to iQIYI's service and viewing its programs. Baidu ¶34; IQ ¶24.

3

In November 2012, Baidu obtained the controlling interest in what was then Qiyi.com (now iQIYI). Baidu ¶35. Because iQIYI is a subsidiary and critical asset of Baidu, Baidu discloses iQIYI's financial results as one of three reporting segments of its business. *Id*. Throughout the Class Period, iQIYI was a fast growing and rapidly expanding part of Baidu's business, with revenue growth that outpaced Baidu's non-iQIYI business in every year of the Baidu Class Period. As such, iQIYI was one of Baidu's most critical assets. Baidu ¶38. Given iQIYI's importance to Baidu, revenue reporting was of the utmost importance to Baidu investors. Baidu ¶41. Officers of Baidu stressed this importance in Annual Reports and in earnings calls repeatedly during the Class Period. Baidu ¶¶40, 42–43.

**B.    iQIYI Reaped Over $2.0 Billion in Cash from American Investors in Its IPO**

Notwithstanding the façade iQIYI created to appear as if it abided by all applicable SEC rules and regulations concerning its reporting and disclosure requirements, iQIYI in reality was an opaque organization, making it difficult for investors to independently verify iQIYI's reported figures, or to understand iQIYI's corporate structure and accounting methods both prior to and during the Baidu and iQIYI Class Periods. Baidu ¶45; IQ ¶25. Indeed, iQIYI operated through a complex web of companies, and third-party research and governmental filings related to iQIYI's operations were not readily accessible to U.S. investors due to this complex corporate web, limitations imposed by the PRC government, and language barriers. Baidu ¶¶45–47; IQ ¶¶25–27.

**C.    Defendants Lured Investors into Baidu and iQIYI by Touting iQIYI's Key Financial And Operating Performance Metrics**

**1.    iQIYI's Offering Documents Contained False And Misleading Statements**

On March 29, 2018, iQIYI completed its IPO pursuant to the Offering Documents, issuing 125 million ADSs at $18.00 per share—reaping iQIYI $2.25 billion in proceeds. *Id.* The Offering Documents contained materially overstated DAU and deferred revenue figures. Baidu ¶¶48–54;

4

IQ ¶¶316–328. At the time of the IPO, Baidu owned approximately 69.7% of iQIYI, and Baidu remains the majority owner of iQIYI, valued at more than $5 billion based on the iQIYI offering price. Baidu ¶37.

### 2. Defendants Touted Inflated Viewership Metrics And Revenues Throughout the Class Period

Prior to and throughout the Baidu and iQIYI Class Periods, Defendants inflated key metrics to make iQIYI appear more successful. Because a majority of iQIYI's revenue depends on the number of users subscribed to iQIYI, the key metrics to which investors look when investing in streaming companies like iQIYI are DAUs and membership services (*i.e.*, subscription) revenue generated from those users. Baidu ¶¶48–54; IQ ¶¶30–34. Similarly, because iQIYI accounted for, on average, over 20% of Baidu's overall revenue, iQIYI's DAUs and revenues were critically important to Baidu shareholders. Baidu ¶39. Investors also tracked iQIYI's deferred revenues which represented its pipeline of subscription revenue that it would recognize ratably over the monthly, quarterly, or annual subscription period. *Id.*

The iQIYI Defendants touted materially inflated DAUs in iQIYI's Offering Documents and 2018 and 2019 annual reports. Baidu ¶55; IQ ¶36. The Baidu Defendants touted iQIYI's inflated DAUs in its 2018 and 2019 Annual Reports, as well as a Form 424B2 filed with the SEC on April 4, 2020. Baidu ¶¶61–63. Two leading industry research firms that cover China's mobile internet market—QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora")—reported that the true average DAUs were substantially lower than iQIYI reported to investors. Baidu ¶65; IQ ¶41. Specifically, according to QuestMobile, iQIYI overstated its DAUs for 2015, 2016, and 2017 by 50%, 33.4%, and 11.5%, respectively, and for the full years 2018 and 2019 by 10.4% and 22.5%, respectively. *Id.* Likewise, according to Aurora, between December 2017 and March 2019, iQIYI never had more than 90 million mobile DAU despite the Company

reporting 126 million mobile DAU for the fourth quarter of 2017 and 135.4 million mobile DAU for 2018. Baidu ¶¶66–67; IQ ¶¶42–43. Notably, plaintiffs were able to obtain the QuestMobile and Aurora data only after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are published only in Chinese and not readily obtainable by investors. Baidu ¶65; IQ ¶41.

Defendants also materially inflated iQIYI's deferred revenue from 2015 to 2017. Baidu 83¶; IQ ¶59. Specifically, according to Chinese credit reports detailing financial data from iQIYI's Variable Interest Entities' ("VIEs") PRC tax filings, iQIYI overstated its deferred revenue for the years 2015, 2016, and 2017 by 261.7%, 165.5%, and 86.2%, respectively. Baidu ¶¶83–84; IQ ¶¶59–60. Because Baidu incorporated iQIYI's deferred revenue numbers into its own, Baidu's deferred revenue numbers were also false and misleading from 2015 to 2017. Baidu ¶¶180–189.

Defendants similarly misstated iQIYI's membership services revenue. Baidu ¶71; IQ ¶47. According to fundamental accounting concepts governing the relationship between membership services revenue and deferred revenue, deferred revenues are positively correlated with the increase in paying members and corresponding increase in membership services revenue that iQIYI was reporting. Baidu ¶¶76–78; IQ ¶¶52–54. But, based upon an analysis performed on data from the Class Period, the previously highly-correlated relationship began inexplicably diverging during the fourth quarter of 2018 ("Q4 FY 2018") and the first quarter of 2019 ("Q1 FY 2019")— signaling that iQIYI's revenue metrics were overstated. Baidu ¶¶77–82; IQ ¶¶53–58.

Furthermore, to mask the difference between iQIYI's actual figures and its overstated reported figures, iQIYI entered into a joint venture on August 6, 2018 called Beijing Xin'ai Sports Media Technology Co., Ltd ("Xin'ai"). Baidu ¶¶88–89; IQ ¶¶63–64, 79. Defendants explained that Xin'ai was a crucial investment for iQIYI. Baidu ¶¶90–92; IQ ¶¶65–68. iQIYI claimed to

purchase a 32% interest for RMB32,250,000 cash and a promise to provide RMB763,750,000 of future goods and services. iQIYI violated GAAP accounting standards by accounting for its obligation to transfer goods and services to Xin'ai in the future as deferred revenue. This treatment was improper and misleading because GAAP accounting standards required iQIYI to record that future obligation as a liability. Baidu ¶¶93–110; IQ ¶¶69–86. iQIYI thus overstated its deferred revenue by RMB763,750,000 as a result of the Xin'ai transaction. Baidu ¶111; IQ ¶87.

### D.    Investors Ultimately Learned the Truth Over the Course of Several Events

On April 7, 2020, during market hours, the Wolfpack Report revealed that iQIYI's viewership and revenue figures were materially overstated. Baidu ¶¶4, 112; IQ ¶¶3, 88. The Wolfpack Report detailed iQIYI's PRC regulatory filings and third-party Chinese research and financial reports, showing how and why iQIYI overstated its DAUs, membership services revenues, and deferred revenues. Baidu ¶¶112–115; IQ ¶¶88–91. As a result, iQIYI's share price fell 4.3% over the course of two days, and Baidu's fell 4% on the next full trading day. Baidu ¶116; IQ ¶92. Defendants continued to mislead investors, however, reassuring them that "the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company." Baidu ¶117; IQ ¶93. On August 13, 2020, after the market closed, investors learned the true extent of defendants' wrongdoing when they announced that the SEC was investigating iQIYI based on the Wolfpack Report's allegations. Baidu ¶118; IQ ¶94.[5] iQIYI also disclosed that it engaged advisers to conduct an internal review. *Id.* Critically, on August 14, 2020, Defendant Wang revealed that Defendants knew for about four months that NASDAQ and the SEC had opened inquiries into iQIYI based on

---

[5] Notably, the SEC is still actively investigating iQIYI. *See, e.g.*, iQIYI's Form 20-F, filed with the SEC on March 28, 2022 ("The SEC's Division of Enforcement is seeking the production of certain financial and operating records dating from January 1, 2018, as well as documents related to certain acquisitions and investments that were identified in the Wolfpack Report.").

the Wolfpack Report. Baidu ¶119; IQ ¶95. As a result, iQIYI's share price fell 11.4% that same day and Baidu's fell 6% the following day. Baidu ¶121; IQ ¶96.

## III.   ARGUMENT

### A.   Legal Standard on a Motion to Dismiss

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must . . . accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). Courts must also construe the "complaint in the light most favorable to the [p]laintiffs, and [] draw reasonable inferences in the [p]laintiffs' favor." *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017).

To state a Section 10(b) claim, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives*, 563 U.S. at 37-38. The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. §78u-4(b)(2)(A); *see* the Baidu and iQIYI Oppositions for a detailed discussion regarding scienter. However, "this pleading standard does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is 'unaided by discovery' at the motion to dismiss stage." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

### B.   The Complaints Adequately Alleged Actionable Misstatements

Defendants assert that the Complaints do not adequately allege that their statements

concerning DAUs, membership services revenues, and deferred revenues, were false or misleading. MTD at 11–26.[6] Defendants' primary defense is that the Wolfpack Report is biased and PRC filings are inaccurate. MTD at 11–12. An author's bias or even short position does not render a report unreliable or not credible at the motion to dismiss stage. *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at \*5 (S.D.N.Y. Feb. 17, 2022) (noting that "[t]he majority of courts . . . have held that a short-seller report . . . does not implicate the same skepticism as a traditional anonymous source," and that a short-seller report can be "deemed credible by the market as reflected in the significant drop in [the company's] share price on the day the report was published as well as the next trading day"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (denying dismissal in part, observing that attacks on the inherent reliability of short-seller reports have "been repeatedly rejected in prior cases" and finding that the court "must accept the factual allegations contained in [short-seller reports] as sufficiently reliable as a factual source for Plaintiffs' allegations"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 563–64 (S.D.N.Y. 2012) (denying dismissal, in part, because "[e]ven though [d]efendants claim that [the analyst] is a biased party, and that it openly admits the possible inaccuracy of the [r]eport, 'the reliability of the report is a question of fact'"); *In re China Educ. All., Inc. Sec. Litig.*, 2011 WL 4978483, at \*2, \*4 (C.D. Cal. Oct. 11, 2011) (denying dismissal and holding that despite Chinese analyst having short positions and a "motive to cause [the] stock to decline," such issue was "a factual dispute not appropriate for resolution at this stage"). Further, Defendants attempt to distract the Court by cherry-picking reasons for why the Court should take

---

[6] Defendants also contest the falsity of Defendants' statements reassuring investors that the Wolfpack Report lacked merit (MTD at 26; ¶¶146–147). However, Defendants waived this argument when they failed to challenge the falsity of these statements in their initial motion to dismiss. *See* Fed. R. Civ. P. 12(g)(2).

their word that iQIYI's SEC filings were more accurate than their own Chinese tax and regulatory filings and credible third-party reports. However, at bottom, the fact that every viewership and revenue metric that iQIYI reported was materially overstated underscores that iQIYI leveraged its opaque reporting and accounting standards to raise billions of dollars from U.S. investors in violation of the federal securities laws.

### 1.    Defendants Overstated Daily Active Users

The Complaints allege Defendants overstated iQIYI's DAUs based on two independent third-party research firms' reports. Defendants' suggestion that QuestMobile and Aurora measured DAUs differently than iQIYI and that iQIYI's SEC filings should trump QuestMobile and Aurora reports is baseless[7] and contradicts iQIYI's prior statements. MTD at 12–15. iQIYI regularly recognizes the accuracy and reliability of third-party research firms' data, particularly QuestMobile's. At numerous earnings calls, iQIYI and Baidu repeatedly cited QuestMobile data and other third-party research firms' data to support the Company's performance and also asked investors to rely on those data.[8] Now, Defendants reverse course and deny the reliability of these

---

[7] QuestMobile is a leading big data analytics firm in China focusing on mobile internet and monitors more than 750 million mobile devices every month. *See* https://www.linkedin.com/company/questmobile/. Aurora also is a leading data analytics platform and data solutions provider in China and, as of December 31, 2020, its services covered approximately 1.4 billion monthly active unique mobile devices, accounting for approximately 90% of mobile device coverage in China. *See* Ex. 3.

[8] *See* Ex. 4: iQIYI Q4 2018 Earnings Call (Defendant Gong: "Thanks to the popular digital novel of same name, our iQIYI reading app ranked among the top 10 mobile apps with the fastest growing user base in 2018 according to *QuestMobile*."); Ex. 8: Baidu Q3 2017 Earnings Call (Defendant Li: "Daily user time spent on Mobile Baidu grew 15% sequentially in the third quarter, the fastest among apps in China with DAUs over 100 million, according to *QuestMobile*."); Ex. 9: Baidu 2018 Q3 Earnings Call (Defendant Li: "*QuestMobile*, a third-party research firm, recently cited Baidu's family of apps together generates 980 million monthly active users, putting Baidu in the top 3 of MAUs in China, in its Autumn Report on Mobile Internet."); Ex. 10: Baidu 2018 Q4 Earnings Call (Defendant Li: "As a result, Haokan [Baidu's short video app] was the second fastest-growing app among the top 10 short video apps in China in terms of DAUs, MAUs and total daily time spent during the 3 months ending December, according to *QuestMobile*."); Ex. 11:

reputable third-party research firms' data. Such self-contradictory argument is nothing more than an improper request for the Court to credit their version of the facts over Plaintiffs' particularized and corroborative allegations from numerous third parties, the accuracy of which had been repeatedly recognized by iQIYI. *Ho*, 887 F. Supp. 2d at 563–64 (rejecting arguments that a report was "unreliable and unsubstantiated" because "the reliability of the report is a question of fact"). Indeed, courts have upheld falsity allegations based upon the corroboration of third-party reports, such as those at issue here. *AIG Glob. Sec. Lending Corp. v. Banc of Am. Sec., LLC*, 2005 WL 2385854, at *12 (S.D.N.Y. Sept. 26, 2005) (falsity allegations concerning overstated financials upheld where the "estimates were shown to be wrong in a subsequent report prepared by a third-party servicer"); *Henning v. Orient Paper, Inc.*, 2011 WL 2909322, at *4, *6 (C.D. Cal. July 20, 2011) (falsity established for statements based on corroborating third-party report). The Court must construe all facts in the light most favorable to Plaintiffs. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019).[9]

---

Baidu 2020 Q1 Earnings Call (Defendant Li: "First, according to **QuestMobile**, Baidu App was one of the fastest growing in DAUs among the Top 10 apps in China in February."); *see also* Ex. 5: iQIYI Q2 2019 Earnings Call (Dahlia Wei, iQIYI Director of Investor Relations: "For your questions on competitive landscape. I do not think there's much change now compared to 6 months ago. ***I will suggest some third-party data for you***, among others, of course. The first two is iResearch and **QuestMobile**, which provides the platform matrix, for example, DAU, MAU and total time spent."); Ex. 6: iQIYI Q3 2019 Earnings Call (Defendant Gong: "According to **QuestMobile**, there are more than 600 million mobile [i]nternet users in the third-tier and below cities."); Ex. 12: Baidu Form 6-K (Feb. 27, 2019) (citing to QuestMobile data for DAU number support).

[9] Defendants' citation to *In re China XD Plastics Co. Ltd. Securities Litigation* is misplaced as it did not address comparing different metrics as Defendants' contend here; the court criticized plaintiffs for comparing a company's SEC filings to an incomplete set of the PRC subsidiaries' filings. 2016 WL 1241522, at *5–*6 (S.D.N.Y. Mar. 23, 2016). Further, Defendants' reliance on *In re A-Power Energy Generation System Ltd. Securities Litigation*, 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012) is inapposite. The court found a lack of falsity only because "[p]laintiff does not appear to have alleged that compliance with PRC's GAAP is even required when filing with the SAIC or that A–Power's subsidiaries prepared their filings in compliance with GAAP." *Id.*

11

Defendants' argument that the Complaints do not allege the amount by which Defendants misstated iQIYI's DAUs is unavailing. MTD at 14–15. First, the Complaints allege such facts by precisely charting the true amounts of iQIYI's DAUs according to QuestMobile and Aurora. Baidu ¶¶64–67; IQ ¶¶40–43. Second, Plaintiffs are not required to "precisely quantify the amount by which financial statements were overstated." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488 (S.D.N.Y. 2004); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (not alleging "exact amount the earnings have been overstated[] [was] not fatal"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 403 (S.D.N.Y. 2012) (adequately alleged falsity despite not identifying "amount of overstatement").[10]

Defendants also argue that the Complaints' allegations are contradictory since the amount of DAUs reported by QuestMobile and Aurora were not identical. MTD at 13–14 & n.10. But "absolute precision" is not required for a pleading. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 260 (S.D.N.Y. 2004). "Any information that sheds light on whether class period statements were false or materially misleading is relevant." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). That such figures differed slightly does not lessen their evidentiary value. The key point is that ***both*** showed that iQIYI's reported figures were materially inflated.[11]

---

[10] Defendants' reliance on *Lighthouse Financial Group v. Royal Bank of Scotland Group, PLC*, 902 F. Supp. 2d 329 (S.D.N.Y. 2012) for this proposition (MTD at 14) is unavailing. Unlike that case, the Complaints explicitly lay out what the actual DAUs should have been and the sources from which those numbers were obtained. *Dresner v. Utility.com, Inc.* is likewise distinguishable because in addition to the amounts, the accounts alleged to have been delinquent were also different (*e.g.*, "uncollectible accounts" vs. "uncollected receivables"), so the court reasoned that "[p]laintiffs provide[d] no specific allegations regarding what accounts or types of accounts were allegedly delinquent." 371 F. Supp. 2d 476, 500 (S.D.N.Y. 2005).

[11] Defendants' assertion that the statement about iQIYI's user base being "massive" and "highly engaged" was puffery is wrong because iQIYI's user base is measured by its DAUs (*i.e.*, it is

## 2. Defendants Overstated Deferred Revenue

Defendants take issue with the credit reports (which Plaintiffs obtained as part of their in-depth investigation into iQIYI's financial reporting abroad) that are based on PRC tax filings by iQIYI's VIEs and demonstrate that iQIYI inflated the deferred revenues it reported in its SEC filings. MTD at 15–19; Baidu ¶83; IQ ¶59. Defendants incorrectly claim that Plaintiffs fail to establish the credit reports are accurate and more reliable than iQIYI's SEC filings. MTD at 17–18. To the contrary, the Complaints allege that the "deferred revenue reported in iQIYI's credit reports are the correct amount of deferred revenue because the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs," and that "[f]ilings with the SAIC and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers . . . are subject to penalties imposed in China for filing false documents with the SAIC or PRC tax authorities." Baidu ¶¶85–86, 108, 162; IQ ¶¶61–62, 135. Courts have found the same allegations sufficient. *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1114–16 (C.D. Cal. 2012) (PRC filings "are 'presumably accurate' since a company submitting false information to Chinese regulators is subject to substantial fines and serious criminal penalties"); *Miller Inv. Tr. v. Morgan Stanley & Co. Inc.*,

---

objectively verifiable), and Defendants made that statement in the context of "driv[ing] [iQIYI's] revenue growth." Baidu ¶151; IQ ¶124; *see Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *2, *9–*10 (N.D. Cal. Mar. 31, 2021) ("puffery . . . is incapable of objective verification," and misstatement "must be read in context to determine if it can be understood as an 'integral part of a representation'"). Further, despite Defendants' assertion that the Complaints failed to allege facts that the user base was not "massive," Defendants concealed the inflated nature of iQIYI's DAUs, and "so-called half-truths . . . will support claims for securities fraud." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016). *In re Netflix, Inc. Securities Litigation*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) is distinguishable because the statement there—"consumers love our service"—was not verifiable because the complaint did not allege metrics that could refute that claim. Defendants also argue that Plaintiffs were required to allege the amount that the membership services revenue was overstated, relying on *Schick v. Ernst & Young*, 141 F.R.D. 23 (S.D.N.Y. 1992). MTD at 20. For the same reasons laid out in Section III.B.1, this argument, too, fails.

879 F. Supp. 2d 158, 164 (D. Mass. 2012) (finding that Chinese regulatory filings are likely more accurate than their American equivalents because "Chinese extradition policies make it difficult to hold Chinese officers and directors of American corporations liable for violations").[12]

Indeed, courts routinely find falsity established when a complaint alleges that a company's reported financial or operating performance metrics in its SEC filings differ from those reported by its operating subsidiaries in China. Particularly instructive here is *In re Advanced Battery Technologies, Inc. Securities Litigation*, where the court found that falsity was established based on the discrepancy between a company's SEC and Chinese SAIC filings. 2012 WL 3758085, at *6 (S.D.N.Y. Aug. 29, 2012).[13] There, plaintiffs alleged that a Chinese company "grossly overstated its revenue and operating margins"; specifically, "the revenue and net income that [defendant] reported to [SAIC] differs greatly from that reported in its SEC filings." *Id.* at *1–*2. In denying defendants' motion to dismiss, the court relied on facts showing that SAIC filings contradicted SEC filings and found that the "[SAIC] filings strongly suggest that [defendant] kept two sets of books—one for its Chinese regulator and one for the Americans." *Id.* at *10. Although "[d]efendants also suggest[ed] that Chinese and U.S. accounting practices may differ," the court held that "establishing that would require extensive evidence from experts." *Id.*; *Orient Paper*, 2011 WL 2909322, at *4 (upholding complaint where plaintiffs relied on Chinese credit reports to

---

[12] For the reasons just stated, *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395 (S.D.N.Y. 2013) and *In re L & L Energy, Inc. Sec. Litig.*, 908 F. Supp. 2d 1147, 1153 (W.D. Wash. 2012) do not compel a different result. In any event, "[t]hough the accuracy of Plaintiffs' financial data financial data may be disputed, it would be premature to dismiss the case in light of these factual disputes at the pleading stage." *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 938 (C.D. Cal. 2012).

[13] The court in *Advanced Battery* relied heavily on *Dean v. China Agritech, Inc.*, 2011 WL 5148598 (C.D. Cal. Oct. 27, 2011), where "**plaintiffs alleged that the results reported in China were accurate, and the SEC results grossly overstated**," and, as a result, the court "denied a motion to dismiss the complaint, holding that **this allegation alone sufficed to plead falsity**." 2012 WL 3758085, at *10 (emphasis added).

demonstrate falsity of overstated financials in SEC filings and noting that "the underlying truth of the credit reports on which [p]laintiffs rely are a factual dispute inappropriate for determination on a motion to dismiss").

Defendants further call into question the authorship and reliability of the credit reports, including how the credit reports extracted the information, even though it was obtained from iQIYI's official PRC tax filings.[14] MTD at 17. These arguments are red herrings. Even if the credit reports were "anonymous" (and they are not),[15] the reports nevertheless are sufficient to establish falsity. *Advanced Battery*, 2012 WL 3758085, at *6 (falsity established based on an "***anonymous*** blogger/analyst" report that concluded defendant engaged in fraud). The Complaints allege the reports specifically covered the years 2015 to 2017 (Baidu ¶¶83–84; IQ ¶¶59–60), rebutting Defendants' assertion that the Complaints do not specify the reporting periods covered. MTD at 17.

Moreover, contrary to Defendants' contention that Plaintiffs do not allege that the credit reports were prepared in accordance with GAAP (MTD at 17–18), the Complaints do in fact allege the information in the credit reports came from PRC tax filings that require revenue be prepared

---

[14] Defendants' reliance on *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) is inapposite. There, the court criticized plaintiffs for relying on internal reports without identifying the contents of the reports or how those contents contradicted defendants' statements. Here, the Complaints allege that the credit reports contain such figures—based on iQIYI's PRC tax filings—which, when compared to the reported deferred revenue numbers, demonstrate Defendants misled investors. Reliance on *Long Miao v. Fanhua, Inc.* is also misplaced because there a short-seller report contained obvious factual inaccuracies and counsel did not attempt to corroborate the report. 442 F. Supp. 3d 774, 802–03 (S.D.N.Y. 2020). The court held that "[w]hen properly utilized and suitably corroborated or particularized, factual representations by CWs and in short-seller reports may enable a securities fraud complaint to clear the bar set by the PSLRA." *Id.* at 804 (citing *Ho*, 887 F. Supp. 2d at 564; *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *3–*4 (S.D.N.Y. Jan. 27, 2014); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012)). Plaintiffs have done exactly that here.

[15] The name of the credit reporting company is CreditVision, which is a Gladtrust product. *See* http://www.gladtrust.com/products?tip=report.

according to PRC GAAP. Baidu ¶136; IQ ¶266. The Complaints further allege that PRC GAAP is the same as U.S. GAAP in all material respects for revenue and deferred revenue. Baidu ¶¶126–127, 137–147; IQ ¶¶255, 267–277. The court in *Ho* suggested that it was proper to compare SEC and SAIC filings to show falsity. 2012 WL 1983341, at *8. *Ho*, 887 F. Supp. 2d at 567–68. The plaintiffs in *Ho* "allege[d] that discrepancies between filings made with the . . . SAIC in China for two [of defendant's] subsidiaries . . . for the years 2006 to 2008 and the financial statements for those same years included in the SEC . . . Forms . . . , demonstrate that the SEC filings [were] false." *Id.* at 567 (alleging a violation of Section 11 of the Securities Act). The complaint in *Ho* isolated the financials of the relevant subsidiaries contained within the SEC filings that it contended were overstated, and compared them with each of the relevant subsidiaries' filings with the SAIC. Thus, this Court found that the comparison was "substantively appropriate." *Id.* at 568; *see also In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 270–73 (S.D.N.Y. 2014) (finding that discrepancy between SEC and SAIC filings was sufficient to plead falsity); *China MediaExpress*, 927 F. Supp. 2d at 125 (same). Here, too, the Complaints allege the iQIYI's SAIC filings "are required to be prepared according to PRC GAAP, which . . . is the same as U.S. GAAP for all relevant purposes," that "Chinese GAAP is substantially the same as U.S. GAAP," and that "global accounting regulators have issued reports specifically stating that there are no differences between U.S. GAAP and Chinese GAAP." Baidu ¶¶132, 137–147; IQ ¶¶105, 110–112, 267–277.

Defendants also argue that the Complaints improperly rely on the aggregate amount of deferred revenues reported by each of iQIYI's VIEs. MTD at 16–17. However, Defendants' argument simply ignores the Complaints' allegations that GAAP required iQIYI to consolidate its VIEs under GAAP, and it did so. Baidu ¶¶83 n.9, 86–87; IQ ¶¶59 n.14, 62; *Snellink*, 870 F. Supp. 2d at 938 ("Plaintiffs allege [defendant's] revenues come exclusively from its two

16

subsidiaries, . . . thus, assuming [subsidiaries'] filings are accurate, [defendant] grossly overstated its financial position in its SEC filings.").[16] At the very least, such questions regarding the reports' accuracy and the appropriate measurement (MTD at 16–18), are questions of fact not appropriately decided at this stage. *Advanced Battery*, 2012 WL 3758085, at \*10; *Orient Paper*, 2011 WL 2909322, at \*4.

Finally, the Baidu Complaint alleges that Baidu's deferred revenue numbers were "materially false and/or misleading because they incorporated iQIYI's deferred revenue numbers which . . . were materially false and misleading." Baidu ¶192. The Baidu Complaint also clearly alleges why the iQIYI deferred revenues were false and misleading. Baidu ¶¶68–87. At the pleading stage, plaintiffs allegations must be treated as true. *Tellabs*, 551 U.S. at 322. The Baidu Defendants, however, challenge the falsity of Baidu's deferred revenue figures, on two separate grounds. MTD at 19.

The first argument, that plaintiffs have failed to establish that iQIYI's deferred revenue was false, fails for the reasons described in detail above. The second argument, that Baidu reports "[c]ustomer advances and deposits" separately from "[d]eferred revenue," such that plaintiffs have not established falsity, fails for at least two reasons. *Id*. First, the Baidu Defendants have offered *no evidence* that iQIYI's deferred revenue is incorporated into "[c]ustomer advances and deposits"

---

[16] The cases that Defendants rely on for the point that Plaintiffs cannot aggregate the deferred revenue of iQIYI's VIEs are distinguishable. Unlike in *Harris v. AmTrust Fin. Servs., Inc.*, 649 F. App'x 7, 10 (2d Cir. 2016) where the defendant company explicitly stated that its reported losses would differ between filings, the Complaints allege that iQIYI's very own accounting policies required iQIYI to consolidate its VIEs' deferred revenues, as well as comply with GAAP in doing so, thereby assuring that the aggregate deferred revenues reported by iQIYI's VIEs equal iQIYI's reported deferred revenues. Similarly, unlike here, the plaintiffs in *China XD*, 2016 WL 1241522, at \*5 admitted that the SAIC data did not include financials for several subsidiaries and failed to even identify the defendant's subsidiaries, and the plaintiff in *L&L Energy*, 908 F. Supp. 2d at 1153 included information in the aggregate amount that the company "excluded from the SEC numbers."

as opposed to "[d]eferred revenue," as Plaintiffs allege (Baidu ¶192); they merely raise the specter that it is possible. Importantly, they do dispute that iQIYI's deferred revenue is incorporated in some way to Baidu's financials.[17] *Id.* Further, what line Baidu incorporates iQIYI's deferred revenue is a question of fact, not properly resolved on this motion to dismiss. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact"). Second, by the 2019 fiscal year, as demonstrated by the Baidu Form 20-F, filed with the SEC on March 13, 2020 (within the Baidu Class Period), Baidu merged the "[c]ustomer advances and deposits" and "[d]eferred revenue" lines into one line entitled "[c]ustomer deposits and deferred revenue." Fumerton Dec. Ex. V. at 162. Thus, Plaintiffs have sufficiently alleged the falsity of Baidu's deferred revenue.

### 3.    Membership Services Revenue Was Overstated

Plaintiffs' accounting analysis showing the positive correlation between membership services revenue and deferred revenues—and the unexplained divergence of this relationship in Q4 FY 2018 and Q1 FY 2019 (Baidu ¶¶68–82; IQ ¶¶44–56)—conclusively establish that iQIYI materially overstated its membership services revenue figures. Defendants offer several of their own possible scenarios for why the two figures *may* have diverged in Q4 FY 2018 and Q1 FY 2019 absent fraud. MTD at 20–22. Notably, Defendants neither dispute that membership services revenue and deferred revenue generally are positively correlated, nor explain what caused the divergence in those quarters. "[T]he existence of other, competing inferences does not prevent the plaintiff's desired inference from qualifying as reasonable." *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013). Indeed, Defendants do not show any

---

[17] To the extent that Baidu incorporates iQIYI's deferred revenue into its "[c]ustomer advances and deposits" as opposed to its "[d]eferred revenue," this is easily fixed through a concise amendment to the Baidu Complaint.

facts on which these competing inferences exist. They offer hypotheticals untethered from objective reality.[18]

Defendants' feeble attempt to explain how deferred revenue could shrink in the face of rising membership and increasing revenues is easily proven false since Defendants assume that new members only join in the first month of the quarter and not the second or third months of the quarter. But, in reality, members join every month. When corrected, it becomes clear that deferred revenue must increase when membership is increasing. *See* Appendix A. Defendants' other assertion that average subscription lengths might be decreasing (causing declining deferred revenue) is false because iQIYI's SEC filings show that average subscription lengths increased from six to eight months in that time frame. Baidu ¶81; IQ ¶57.

Defendants' hypothetical scenarios should be disregarded at this stage in light of the Complaint's thorough analysis of historical data from the Class Period, showing that in Q4 FY 2018 and Q1 FY 2019, iQIYI's membership services revenues continued to increase while deferred revenues dropped drastically—indicating that one or both of the metrics were inflated. Baidu ¶77; IQ ¶53; *Shaev v. Baker*, 2017 WL 1735573, at *14 (N.D. Cal. May 4, 2017) ("[B]y focusing on other hypothetical explanations . . . , [] Defendants improperly ignore the rule that any inferences reasonably drawn from the factual allegations of the complaint must be viewed in the light most favorable to the plaintiffs."); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *12 (D.N.J. June 5, 2020) (finding it "defie[d] logic at the pleading stage to infer"

---

[18] While Defendants cite *Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d 169, 177 (S.D.N.Y. 2018) for the premise that courts can rely on "alternative explanations so obvious that they render plaintiff's inferences unreasonable," the explanations Defendants here offer are only "other factors" that hypothetically "***could*** cause" a divergence between deferred revenues and membership services revenues (MTD at 20–22), which is far from rendering Plaintiffs' explanation "***so obviously***" unreasonable.

defendants' hypothetical scenario over plaintiffs'). Thus, such "alternative explanations" cannot overcome Plaintiffs' particularized allegations establishing that iQIYI overstated its revenues as "a motion to dismiss is not a trial." *In re KeySpan Corp. Sec. Litig.*, 2003 WL 21981806, at \*16 (E.D.N.Y. July 30, 2003); *see also Christine Asia*, 718 F. App'x at 23 (remanding because court "fail[ed] to treat the complaint in the light most favorable to the [p]laintiffs, and to draw reasonable inferences in the [p]laintiffs' favor").

Lastly, Defendants contend the Complaints are contradictory because they benchmark membership services revenues against deferred revenues to show that membership services revenues were inflated at one point in the Class Periods, and that deferred revenues were inflated at another point. MTD at 22. But these figures were alleged as false and misleading *at different times* in the Class Period. Specifically, the Complaints allege that Defendants overstated deferred revenue for the years 2015 to 2017 (Baidu ¶¶83–84; IQ ¶¶59–60), and overstated membership services revenue after that in Q4 FY 2018 and Q1 FY 2019 (by pointing to the decline in deferred revenue) (Baidu ¶¶77–80; IQ ¶¶53–56). Accordingly, Defendants' attempts to improperly conflate the Complaints' allegations fail.

### 4.    iQIYI Improperly Accounted for Its Xin'ai Sports Investment

The Complaints show how iQIYI fraudulently characterized the purchase of a 32% interest in Xin'ai Sports. Baidu ¶¶93–110; IQ ¶¶69–86. iQIYI claims it paid RMB32,250,000 cash and promised to contribute RMB763,750,000 of goods and services to Xin'ai in the future for its 32% interest. *Id.* iQIYI recorded the investment by increasing equity investments by RMB796,000,000 and crediting cash RMB32,250,000 and Deferred Revenue RMB763,750,000. *Id.* In short, iQIYI manufactured RMB763,750,000 of deferred revenue by falsely recording the future payment in kind as deferred revenue. Baidu ¶111; IQ ¶87.

As a preliminary matter, the Complaints allege that iQIYI never promised to provide

20

RMB763,750,000 of future goods and services to Xin'ai Sports. Baidu ¶¶109–110; IQ ¶¶85–86. The audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports, state that iQIYI made a RMB38.25 mm cash only investment into Xin'ai Sports and received 38.25% of the equity in return (rather than investing RMB32.25mm of cash and RMB763.75mm of non-cash consideration reported in iQIYI's financial statements for 32%). These facts are confirmed by a document filed by DDMC with the Shanghai Stock Exchange on August 7, 2018, as well as by Qixin (a respected third-party platform aggregating SAIC and other government records in PRC). Baidu ¶109; IQ ¶85.[19] If the Court accepts as true the three PRC financial reports Plaintiffs cite, as it must, then iQIYI never promised to provide any future goods or services to Xin'ai Sports and there can be no basis to record RMB763,750,000 of future goods and services as deferred revenue. The accounting for the transaction was purely fictional. By engaging in this sham accounting for its investment in Xin'ai Sports, iQIYI created RMB763,750,000 of fake deferred revenue, which it used to prop up and avoid detection of its fraudulent DAUs and revenue growth figures. Baidu ¶¶110–111; IQ ¶¶86–87.

Even if one ignores the three corroborative financial reports showing that iQIYI never exchanged a promise to provide RMB 763,750,000 of future goods and services as part of its purchase of its interest in Xin'ai Sports (Baidu ¶109; IQ ¶85), iQIYI's accounting for the transaction is still fraudulent for two additional reasons. First, the Complaints specifically allege that, based on the applicable accounting principles, iQIYI should have recorded its future obligations to Xin'ai as a liability—not as deferred revenue. Baidu ¶¶101–106; IQ ¶¶77–82. Second, iQIYI never attributed any cost of revenue to the revenue it subsequently recorded related

---

[19] Defendants dispute the reliability and accuracy of these reports. MTD at 24 n.16. For the same reasons iQIYI's tax filings are accurate and reliable, so too are these documents.

21

to goods and services provided to Xin'ai as part of its investment. Baidu ¶¶107–108; IQ ¶¶83–84. This allowed iQIYI to falsely record all of the revenue as profit and ignore all associated costs, thus, understating expenses and overstating profit. *Id.*

Defendants make two fallacious arguments for why GAAP could permit Defendants to classify iQIYI's obligation as deferred revenue. First, they say that iQIYI's decision to report the obligation as deferred revenue was a "subjective judgment," which they claim creates a higher burden for Plaintiffs to establish their accounting misclassification as improper. MTD at 23. Even if one assumes that iQIYI did promise to provide RMB767,750,0000 of future goods and services to Xin'ai, GAAP still does not permit iQIYI's accounting treatment. The Complaints explain that well-accepted GAAP rules required Defendants to classify iQIYI's obligation as a liability, not deferred revenue—taking any purported subjectivity out of the equation. Baidu ¶¶101–106; IQ ¶¶77–82.[20] GAAP does not grant an entity the "subjective judgment" to misclassify liabilities on its balance sheet. Only "where there is no objective standard for an accounting decision, that decision should be construed as a statement of opinion and be analyzed under *Omnicare.*" *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *6 (S.D.N.Y. May 24, 2018); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (loan loss reserves "not a matter of objective fact" but "inherently subjective").[21] The types of judgments Defendants' case citations refer to are items that require estimation such as loss or other reserves or where GAAP specifically

---

[20] Accordingly, Defendants' citation to *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) is unavailing. Nor does *Harris v. AmTrust Financial Services, Inc.* change the calculus because, unlike here, the complaint there conceded that "management has tremendous discretion to determine the current year's loss and loss adjustment expense." 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015), *aff'd,* 649 F. App'x 7 (2d Cir. 2016).
[21] *In re AmTrust Financial Services, Inc. Securities Litigation* does not compel a contrary conclusion since the court dismissed plaintiffs' claims because they did not allege what accounting standard should have applied. 2020 WL 2787117, at *1 (S.D.N.Y. Apr. 20, 2020).

22

permits a choice among alternative accounting treatments.[22] Here, there is no need to estimate or make any subjective judgment and no acceptable alternative. As shown below, GAAP does not permit the accounting treatment iQIYI used. Thus, even if iQIYI's accounting treatment could be considered an opinion, it is false because Defendants made it without a reasonable basis. *Omnicare*, 575 U.S. at 194–96.

Second, Defendants cite to ASC 610-20-32-4 for their contention that iQIYI was permitted to record its purported non-cash promise of future goods and services as deferred revenue. MTD at 23–24. Defendants incorrectly describe the provisions of ASC 610-20-32-4, as applicable to a "promise [to provide] goods or services" in the future "in exchange for a noncontrolling interest." *Id.* at 24. ASC 610-20-32-4 actually states: "If an entity ***transfers control of a distinct nonfinancial asset*** or distinct in substance nonfinancial asset in exchange for a noncontrolling interest, the entity shall consider the noncontrolling interest received from the counterparty as noncash consideration and shall measure it in accordance with the guidance in paragraphs 606-10-32-21 through 32-24."[23] ASC 610-20-32-4 applies only to a ***transfer of control of a distinct nonfinancial asset***. The Xin'ai transaction does not fit the requirements for such accounting treatment because iQIYI did not "transfer control of a distinct nonfinancial asset." At the time of its investment, it had not transferred control of any of the future goods or services to Xin'ai. It had only made a promise to do so at some future date. Thus, iQIYI could not treat the promise to provide future goods and services as deferred revenue under ASC 610-20-32-4. Defendants take issue with this obvious reading of ASC 610-20-32-4, but such accounting questions "raise issues of fact that cannot be resolved on a motion to dismiss." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693

---

[22] *Id.* at *2; *Harris*, 135 F. Supp. 3d at 171.

[23] A copy of ASC 610-20-32-4 is attached as Exhibit 7.

F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) (whether GAAP was violated and what was "generally accepted" are factual issues not appropriate for motion to dismiss).

### C.    The iQIYI Complaint Alleges Viable Securities Act Claims

Defendants argue that the iQIYI Complaint did not allege any actionable misrepresentations in the Offering Documents. Not true. "Section 11 places a relatively minimal burden on a plaintiff." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 201 (E.D.N.Y. 2000) (same). A "defendant's knowledge of the misrepresentations is not an element of a Section 11 claim; indeed, a defendant can be held liable even for an innocent misstatement." *Twinlab*, 103 F. Supp. 2d at 203. Additionally, unless a Section 11 claim sounds in fraud—which, here, it does not[24]—Section 11 claims require only "notice pleading," *i.e.*, are "subject only to the 'short and plain statement' requirements of [Rule 8]." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).

The Registration Statement materially inflated DAUs and deferred revenue figures. IQ ¶¶318–320, 324–325. Contrary to the DAU and deferred revenue figures contained in the Offering Documents, reports from leading research firms, QuestMobile and Aurora, and credit reports based on iQIYI's PRC tax filings, demonstrate that iQIYI's DAUs and deferred revenue were, in reality, significantly less than those figures in the Offering Documents. IQ ¶¶321–323, 326–328. These allegations easily overcome Rule 8's pleading requirements.

## IV.    THE COMPLAINTS ADEQUATELY PLEAD SECTION 20(a)

Defendants do not address the Complaints' Sections 20(a) claims, nor do they contest

---

[24] The iQIYI Plaintiffs' Section 11 claims do not sound in fraud. *See* Opposition to Defendants' Motions to Dismiss the *iQIYI* Action for Failure to Plead Scienter, Loss Causation, and Standing, filed concurrently.

Defendants did in fact possess control. Thus, Defendants have waived any argument concerning this cause of action. Because the Complaints adequately allege Sections 10(b), the Complaints likewise adequately allege Section 20(a).

## V.    CONCLUSION

Accordingly, the Court should deny the motion in its entirety.

DATED: January 30, 2023                                  Respectfully submitted,

<div style="margin-left: 50%;">

**THE ROSEN LAW FIRM, P.A.**
*/s/ Laurence M. Rosen*
Phillip Kim
Laurence M. Rosen
Jing Chen
Daniel Tyre-Karp
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com
         jchen@rosenlegal.com
         dtyrekarp@rosenlegal.com

**LABATON SUCHAROW LLP**
James W. Johnson
Michael H. Rogers
David J. Schwartz
James T. Christie
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
         mrogers@labaton.com
         dschwartz@labaton.com
         jchristie@labaton.com

*Co-Lead Counsel for iQIYI Lead Plaintiffs and the Class*

**Robbins Geller Rudman
   & Dowd LLP**
Robert M. Rothman

</div>

25

William J. Geddish
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
Fax: (631) 367-1173
Email: rrothman@rgrdlaw.com
        wgeddish@rgrdlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Jonathan Stern
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        jstern@rosenlegal.com

*Co-Lead Counsel for Baidu Lead Plaintiffs and the Class*

26