UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ————————————————— x | | |
| In re BAIDU, INC. SECURITIES LITIGATION | : : : : x | Master File No. 1:20-cv-03794-DG-TAM <br><br> <u>CLASS ACTION</u> <br><br> **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
THE BAIDU ACTION**

Date of Service: January 30, 2023

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT ...............................................................................................................................4

I.     Plaintiffs Adequately Allege a Strong Inference of Scienter................................................4

       A.     Defendants Had Access to Information Contradicting Their Public Statements Regarding iQIYI – a "Core Operation" of Baidu..................................5

             1.     Defendants Had Access to iQIYI's DAUs and Revenue............................5

             2.     iQIYI Was a "Core Operation" of Baidu, Further Supporting a Strong Inference of Scienter .........................................................................7

       B.     Defendants Had a Duty to Monitor iQIYI's Revenue and DAUs ..........................9

       C.     Defendants' Denials Regarding the Wolfpack Report Establish that They Either Investigated and Ultimately Lied About the Findings, or Were Reckless in Failing to Undergo a Proper Investigation ........................................12

             1.     Defendants' Denial of the Wolfpack Report Supports Scienter ...............12

             2.     Defendants' Delay in Reporting the Investigations Supports Scienter ...................................................................................................13

       D.     iQIYI Knew the Xin'ai Sports Deal Accounting Violated GAAP ........................14

II.    Plaintiffs Adequately Allege Loss Causation ..................................................................15

       A.     The Denial of the Wolfpack Report........................................................................16

       B.     Defendants Disclose the SEC and NASDAQ Investigations ...............................18

       C.     The Challenges to the Inveriones Plaintiffs Are Without Merit...........................19

CONCLUSION............................................................................................................................21

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ...............................................................................4

*Bank v. Icot Holdings, LLC*,
  2020 WL 10224833
  (E.D.N.Y. Sept. 29, 2020).................................................................................................20

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
  2021 WL 2646353
  (E.D.N.Y. June 28, 2021) .................................................................................................18

*Bishins v. Cleanspark, Inc.*,
  2023 WL 112558
  (S.D.N.Y. Jan. 5, 2023).....................................................................................................18

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ........................................................................................17

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014).........................................................................................15, 17

*Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ........................................................................................18

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ........................................................................................16

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
  322 F. Supp. 3d 676 (D. Md. 2018)..................................................................................20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)................................................................................7

*Dobina v. Weatherford Int'l Ltd.*,
  909 F. Supp. 2d 228 (S.D.N.Y. 2012)..........................................................................10, 11

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................................15

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  343 F.3d 189 (2d Cir. 2003)..............................................................................................15

**Page**

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)........................................................................................5

*Fogarazzo v. Lehman Brothers, Inc.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) ...............................................................................17

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................10

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000).......................................................................................4

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591
  (E.D.N.Y. July 26, 2016) ..........................................................................................11

*Gordon v. Sonar Cap. Mgmt. LLC*,
  2014 WL 3900560
  (S.D.N.Y. Aug. 1, 2014) ............................................................................................20

*Gordon v. Vanda Pharms. Inc.*,
  2021 WL 911755
  (E.D.N.Y. Mar. 10, 2021) ..........................................................................................18

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)........................................................................8

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004)........................................................................................19

*Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)....................................................................8, 9

*In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*,
  529 F. Supp. 3d 111 (S.D.N.Y. 2021).........................................................................9

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)...................................................................7, 11

*In re Avon Sec. Litig.*,
  2019 WL 6115349
  (S.D.N.Y. Nov. 18, 2019) ...................................................................................7, 8, 10

**Page**

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)...................................................................13

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F.3d 36 (2d Cir. 2000)...............................................................................4

*In re Centerline Holding Co. Securities Litigation*,
    380 F. App'x 91 (2d Cir. 2010) ......................................................................14

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600
    (S.D.N.Y. May 24, 2018)...........................................................................9, 10

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 1549485
    (N.D. Cal. May 1, 2017) ..................................................................................6

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)............................................................................20

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012)...............................................................9

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) .................................................13, 15, 19

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561
    (S.D.N.Y. Dec. 2, 2013).............................................................................7, 8

*In re Lions Gate Entertainment Corp. Securities Litigation*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...............................................................14

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).............................................................5, 6

*In re Mylan N.V. Sec. Litig.*,
    2018 WL 1595985
    (S.D.N.Y. Mar. 28, 2018) ..............................................................................8

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010).........................................................................15

**Page**

*In re Oxford Health Plans, Inc., Sec. Litig.*,
191 F.R.D. 369 (S.D.N.Y. 2000) ......................................................................................20

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)..................................................................................................5

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)........................................................................................14, 16

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)...............................................................................17

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629
(S.D.N.Y. Feb. 17, 2022) ..................................................................................................18

*In re XP Inc. Securities Litigation*,
2021 WL 861917
(E.D.N.Y. Mar. 8, 2021) ...................................................................................................14

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)................................................................................................13

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)..............................................................................................12

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020).................................................................................................11

*Janbay v. Canadian Solar, Inc.*,
2012 WL 1080306
(S.D.N.Y. Mar. 30, 2012). .........................................................................................16, 19

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)........................................................................................12, 13

*Karimi v. Deutsche Bank Aktiengesellschaft*,
2022 WL 2114628
(S.D.N.Y. June 13, 2022)..................................................................................................12

**Page**

*Kux-Kardos v. VimpelCom, Ltd.*,
   151 F. Supp. 3d 471 (S.D.N.Y. 2016)....................................................................................19

*Lea v. TAL Education Group*,
   837 F. App'x 20 (2d Cir. 2020) ..................................................................................17, 18

*Lematta v. Casper Sleep, Inc.*,
   2022 WL 4637795
   (E.D.N.Y. Sept. 30, 2022)........................................................................................4, 5

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)......................................................................................15, 21

*Lumen v. Anderson*,
   2011 WL 3794144
   (W.D. Mo. Aug. 24, 2011)...........................................................................................20

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)..........................................................................13

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ..................................................................................19

*Noto v. 22nd Century Grp., Inc.*,
   2023 WL 122305
   (W.D.N.Y. Jan. 6, 2023) .............................................................................................19

*Noto v. 22nd Century Grp., Inc.*,
   35 F. 4th 95 (2d Cir. 2022) ....................................................................................12, 14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..............................................................................9, 11, 15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)..............................................................................8

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   2020 WL 1877821
   (S.D.N.Y. Apr. 14, 2020)..............................................................................................10

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)...............................................................................19

**Page**

*Rolf v. Blyth, Eastman Dillon & Co.*,
    570 F.2d 38 (2d Cir. 1978)......................................................................................12

*S.E.C. v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018).....................................................................13

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................5, 6

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ..............................................................................11

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................................5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................4

*Yannes v. SCWorx Corp.*,
    2021 WL 2555437
    (S.D.N.Y. June 21, 2021)..........................................................................................9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78j(b)......................................................................................................................1
    §78t(a)......................................................................................................................1
    §78u-4(b)(2)(A) .......................................................................................................4

Federal Rules of Civil Procedure
    Rule 8......................................................................................................................15
    Rule 12(b)(6)...........................................................................................................15
    Rule 15....................................................................................................................21
    Rule 15(a)(2)...........................................................................................................21
    Rule 23....................................................................................................................20
    Rule 23(a)(3)...........................................................................................................20

Private Securities Litigation Reform Act of 1995 ........................................................4

Pursuant to this Court's Text Order dated October 6, 2022, Plaintiffs submit this Memorandum of Law in Opposition to the Defendants' Motion to Dismiss the Baidu Action. Pursuant to that Order, this Memorandum of Law incorporates by reference Lead Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Motion to Dismiss the iQIYI and Baidu Actions, served on January 30, 2023 (the "Joint Memorandum"), which addresses the common facts and false and misleading statements at issue in both the iQIYI and Baidu Actions. This Memorandum addresses the additional issues of scienter and loss causation in the Baidu Action.[1]

## PRELIMINARY STATEMENT

Having established falsity for the statements at issue in this action (*see* the Joint Memorandum), Plaintiffs merely need to plead scienter and loss causation to allege claims under Sections 10(b) and 20(a) of the Exchange Act. Because Plaintiffs adequately allege both of these elements, Defendants' Motion to Dismiss the Baidu Action should be denied in its entirety.

As to scienter, Plaintiffs have adequately alleged that Defendants made materially false and misleading statements with a culpable state of mind. Defendants made material misrepresentations to Baidu investors concerning iQIYI's revenues, its number of daily active users ("DAUs"), and an investment in Xin'ai Sports. As Baidu's fastest growing and most important business segment, iQIYI, in general, and its key operating metrics, DAUs and revenue, in particular, were of critical importance to both iQIYI and Baidu. As a result, Defendants clearly had access to the true numbers, but nonetheless chose to make contrary representations to investors. Recognizing the common sense fact that senior executives have access to critical data regarding their business, the Second Circuit has adopted the "core operations" doctrine. Under that doctrine, knowledge of a company's key operating metrics is imputed to defendants. There can be no dispute that iQIYI was a core operation

---

[1]  Any terms not defined in the Joint Memorandum, or herein, are defined in the Baidu Complaint. All citations and quotations are omitted unless otherwise stated.

of Baidu, as during the Class Period, iQIYI accounted for as much as 26.67% of Baidu's total revenue, well exceeding the percentage of revenue that Courts hold is sufficient for a division to be deemed a core operation – enabling this Court to impute knowledge of the true facts to Defendants.

Further establishing Defendants' knowledge of iQIYI's true DAUs and revenue is that the Individual Defendants were under a legal duty to monitor that information, especially considering they were signatories to iQIYI's Registration Statement.  Similarly, scienter is bolstered by the fact that Defendants Gong and Wang signed SOX certifications for iQIYI, and Defendants Y. Li and Yu signed SOX certifications for Baidu, with each attesting to the accuracy of financial reporting, the disclosure of any material changes to internal control over financial reporting, and the disclosure of all fraud.  That the Defendants continued to repeat these false and misleading financial results to investors throughout the Baidu Class Period further supports scienter.

Defendants' scienter is additionally buttressed by the fact that, after rumors of Defendants' misdeeds began to leak into the market through the Wolfpack Report, iQIYI and the Defendants falsely denied the Report's accuracy, and then waited more than four months to notify shareholders that the SEC and NASDAQ were investigating iQIYI for the very misconduct alleged therein.  As a result, it is reasonable to infer Defendants' scienter on the basis of the fact that they either lied about the results of an investigation upon which they based their denial, or were reckless in failing to conduct an investigation prior to denying the veracity of the Wolfpack Report.

With respect to Xin'ai Sports, the Plaintiffs have alleged, through at least three independent sources, that defendants' accounting intentionally violated GAAP, establishing scienter.

Defendants' arguments against scienter, including that there was no duty for the Defendants to disclose the SEC and NASDAQ investigations, fail.  Defendants themselves put these investigations into play when they denied the findings of the Wolfpack Report – findings that

ultimately formed the basis of the ongoing investigations.

As to loss causation, Plaintiffs have established two corrective disclosures: (i) on April 7, 2020, when, during market hours, the Wolfpack Report was released, and the price of Baidu ADSs closed down 4% the next full trading day; and (ii) on August 13, 2020, when, in both a press release and a related earnings call, Defendants admitted iQIYI had been under investigation by the SEC and NASDAQ for months, and the price of Baidu ADSs closed down 6% the next full trading day. Courts in this circuit have repeatedly found that the release of a short-seller report and the announcement of government investigations can form the basis of a corrective disclosure. These events, and the resulting drop in the price of Baidu ADSs, establish loss causation.

Defendants raise a host of challenges in an attempt to negate the well-pled allegations regarding loss causation, but they all fail. Defendants first argue that there is no loss causation because the price of Baidu ADSs did not fall until the day following the release of the Wolfpack Report. But as Plaintiffs' expert will later explain, loss causation is not defeated because the market took one day to incorporate the Wolfpack Report's information into the market price of Baidu ADSs. On the contrary, courts in this circuit routinely allow for a multi-day window for loss causation – and the Baidu ADSs clearly dropped the day following the announcement. Defendants' attempt to argue that the information in the Wolfpack Report was already public similarly fails, as this argument has recently been rejected by the Second Circuit. Finally, Defendants' attempt to challenge the standing of the Inveriones Plaintiffs because they sold their shares before the Wolfpack Report. But this argument is non-dispositive, and in any event, is more properly raised at a later time.

In light of Plaintiffs' strong scienter and loss causation allegations, this Court should sustain the Baidu Complaint in its entirety.

- 3 -

## ARGUMENT

### I. Plaintiffs Adequately Allege a Strong Inference of Scienter

Plaintiffs have adequately alleged Defendants' scienter. The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A). In its analysis, the court "must consider the complaint in its entirety" because the "inquiry . . . is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Indeed, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" rather, an inference is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. While the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" (*id*.), a "tie . . . goes to the plaintiff" at this stage. *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

Scienter need not be plead with "great specificity," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir. 2000), but can simply be pled "either '[]by alleging facts to show that defendants had both motive and opportunity to commit fraud, or . . . that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).[2] Allegations comprising evidence of recklessness include that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public

---

[2] "[T]he absence of a motive allegation is not fatal" as scienter may be based on conscious disregard or recklessness. *Tellabs*, 551 U.S. at 325; *see also Ganino*, 228 F.3d at 170 (when allegations establish "conscious or reckless misbehavior, [a court] need not also consider" motive).

- 4 -

statements were not accurate; or (4) failed to check information they had a duty to monitor." *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at \*14 (E.D.N.Y. Sept. 30, 2022) (quoting *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015)).  In addition, while the most straightforward way to raise an inference of scienter for a corporation is to plead it for an individual defendant whose intent could be imputed to the corporation, it is also possible to plead an inference of corporate scienter without pleading any individual defendant's scienter. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008).

**A.     Defendants Had Access to Information Contradicting Their Public Statements Regarding iQIYI – a "Core Operation" of Baidu**

**1.     Defendants Had Access to iQIYI's DAUs and Revenue**

Having access to information that contradicts their public statements is one way to establish scienter for individual defendants.  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76-77 (2d Cir. 2001) (scienter pled where defendants had access to information contradicting statements about declining sales and increasing returns of its products, and failed to correct accounting information regarding these results in their representations).  Due to the importance of iQIYI to Baidu and the Individual Defendants, the Defendants clearly had access to information that contradicted their public statements regarding iQIYI's revenues and DAUs.  iQIYI was one of only three (and later two) of Baidu's reporting segments, and its fastest growing source of revenue, accounting for upwards of 26.67% of Baidu's total revenue (Baidu ¶¶3, 35, 39).  Because the best way to value Baidu's ownership of iQIYI was by examining iQIYI's DAUs and revenue, Defendants had access to that information.[3]  *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1135, 1146 (N.D. Cal. 2017)

---

[3]  Because the Baidu Complaint adequately alleges scienter against the Individual Defendants, it has alleged scienter against Baidu and iQIYI as well.  *See*, *e.g.*, *Dynex*, 531 F.3d at 195.  In addition, "it is possible to raise the require[d] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id*.  Given the importance of iQIYI's DAUs and revenue, it is reasonable to infer that communications regarding DAUs and revenue were made by senior executives, whose scienter can be imputed to Baidu and iQIYI.  *See In re Moody's Corp. Sec.*

(upholding 10-b claim based on misstatement of DAU metrics, which was Twitter's "primary user engagement metric," because it would be "absurd" for defendants to not know about adverse DAU trends during the class period, because the "information [the Court] imput[es] to [Defendants,] is fundamental to operations of [Twitter's] business"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ("[A]s the leaders of the company, [the individual defendants] had access to [materially relevant business information] and could have sought it out.").

In fact, iQIYI generated over 75% of its revenue from its DAUs, and it was the most accurate way for investors to assess iQIYI's overall viewership numbers. Baidu ¶¶210-211. iQIYI's SEC filings, in fact, stated that a "massive and highly engaged user base," which includes DAUs, was one of iQIYI's key competitive strengths, and that iQIYI's success "was primarily attributable" to those key competitive strengths. Baidu ¶212. Defendant Wang emphasized the importance of DAUs, when he stated in an October 31, 2018 Press Release that "[m]embership services . . . [was] the biggest revenue contributor for [iQIYI]." Defendant Wang likewise stated in a February 21, 2019 announcement of Fourth Quarter results that "[m]embership business continued to be the main engine driving our growth." Baidu ¶219. Even the media recognized this fact, stating, "[i]t's clear from iQIYI's strategy [] that it intends membership services to be the anchor of its business." Baidu ¶220. And as to deferred revenue, its importance cannot be understated – customer memberships (and the membership services revenues derived therefrom) are the largest portion of deferred revenue and represented at least 80% of total deferred revenue. Baidu ¶70.

Xin'ai Sports was also critically important to iQIYI, such that defendants had access to information about it, as well. On August 20, 2019, as part of iQIYI's earnings call for the Second

---

*Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.").

Quarter of 2019, Defendant Yu asserted that Xin'ai was "an important part of our content library." Baidu ¶91. On the same call, Defendant Yu reaffirmed that "sports content is obviously a very important racetrack for us." *Id*. Based on the above, it is plausible to conclude that Defendants knew, or at least recklessly disregarded, that iQIYI was inflating its DAUs and revenue.

Thus, because Defendants had access to information regarding iQIYI's DAUs, revenue, and transaction in Xin'ai Sports that contradicted their public statements, scienter has been established for the Individual Defendants.

### 2. iQIYI Was a "Core Operation" of Baidu, Further Supporting a Strong Inference of Scienter

Because iQIYI can be considered a core operation of Baidu, knowledge of iQIYI's true DAUs and revenue can be imputed to Defendants, which supports an inference of scienter. Recognizing the unremarkable proposition that senior executives have access to information regarding the major components of their business, the Second Circuit has adopted the "core operations" doctrine. Specifically, the Second Circuit has "endorsed the idea behind the core operations doctrine as enhancing, if not independently supporting, an inference of scienter." *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012). The doctrine holds that "[k]nowledge . . . can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's . . . statements were false when issued." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004); *see also In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("The 'core operations doctrine' permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business, even without specific allegations that senior management had actual knowledge of such information."); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y.

Dec. 2, 2013) ("[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business").

Here, the Individual Defendants were all "key officers" with significant responsibilities for overseeing the business of Baidu, and its subsidiary iQIYI. Baidu ¶¶20-28. Further, iQIYI was one of only three (and later two) reporting segments of Baidu's business, and its fastest growing source of revenue. Baidu ¶¶3, 35. During the Class Period, iQIYI contributed a significant percentage of Baidu's total revenue. In fact, by 2019, iQIYI accounted for 26.67% of Baidu's total revenue. Baidu ¶39. Thus, because of iQIYI's importance to Baidu, Plaintiffs have established an inference that as senior executives of Baidu and iQIYI, Defendants had actual knowledge of iQIYI's operating results, further supporting scienter. *Hi-Crush Partners*, 2013 WL 6233561, at *26 (finding core operations supported scienter where 18% of the company's revenues were at issue); *Avon*, 2019 WL 6115349, at *20 (finding core operations supported scienter where 21% of the company's revenues were at issue); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 852-53 (S.D.N.Y. 2019) (finding core operations supported scienter where 23% of the company's revenues were at issue); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (finding core operations supported scienter where "a significant source of revenue" was at issue); *see also In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) ("It requires no stretch of the imagination to infer that, due to their positions at the company and the importance of [the product] to [the company's] operations, Defendants 'knew facts or had access to information suggesting that their public statements' . . . 'were not accurate'"); *Hoi Ming Michael Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) ("'Knowledge of the falsity of a company's financial statements

can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued.'"). Because iQIYI was a "core operation" of Baidu, knowledge of iQIYI's actual operating results can be imputed to the Individual Defendants.

### B.     Defendants Had a Duty to Monitor iQIYI's Revenue and DAUs

Defendants' scienter is further buttressed by the fact that they had a duty to monitor iQIYI's revenue and DAUs, not only because of the importance to Baidu's overall business (*see* Section I.A.2), but also as a precondition to signing SEC filings, including the iQIYI Registration Statement and SOX certifications. *See Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *4 (S.D.N.Y. June 21, 2021) ("'[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness . . . where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor[.]'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). As signatories of the Registration Statement, Defendants Gong, Wang, Y. Li, and Yu (*see* Baidu ¶150) were obligated to familiarize themselves with iQIYI's DAU, one of the most critical metrics of iQIYI's success, as well as its revenue, which during the Baidu Class Period accounted for as much as 26.67% of Baidu's total revenue. *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 174 (S.D.N.Y. 2021) (finding CFO "had a duty to familiarize himself with the facts relevant to the core operations of the company and the financial reporting of those operations" and that it was "reasonable to infer that in the course of such duties, . . . recognize[] that [the company] was not in the strong financial position that it represented publicly"); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("In order to speak so knowledgeably" about these issues, defendants "must have educated [themselves]" about them, "presumably both by reading [iQIYI's] financial reports and by performing [their] own due diligence"); *see also In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *9

- 9 -

(S.D.N.Y. May 24, 2018) (scienter imputed where officers "not only had access to the facts underlying the [c]ompany's financial reporting, they were responsible for it and attested to its accuracy by signing or certifying the [c]ompany's [SEC filings]").

The fact that Defendants Gong and Wang signed SOX certifications for iQIYI, and Defendants Y. Li and Yu signed SOX certifications for Baidu, further supports scienter. In those sworn certifications, each of those defendants attested to the accuracy of financial reporting, the disclosure of any material changes of internal controls over financial reporting, and the disclosure of all fraud. Baidu ¶¶230-237. Not only do these certifications further support the inference that the Defendants had access to the relevant financial and user data of iQIYI and Baidu, they also establish a legal duty to monitor that information. Indeed, where defendants "attest[] to the adequacy of their internal controls in the SOX certifications," courts have found an additional indicia of scienter. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at \*14 (S.D.N.Y. Apr. 14, 2020); *see also Avon*, 2019 WL 6115349, at \*21 ("In particular, 'accounting manipulations involving premature revenue recognition' – such as those alleged here – 'are especially indicative of conscious misbehavior since such schemes do not commonly occur inadvertently.'"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (defendants' participation in designing and evaluating the internal controls is relevant to scienter); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (internal control deficiencies "contribute to an inference of scienter" for those who comment on the same internal controls). Thus Defendants Gong and Wang and Defendants Y. Li and Yu knew, or were at least reckless in not knowing, the underlying facts that rendered statements about IQIYI's DAUs and revenues materially false and misleading. Baidu ¶¶230-237.

The Individual Defendants' frequent communications in SEC filings and representations to

- 10 -

the market about iQIYI, its DAUs, and its revenue, also supports that they were critical to Baidu, as well as an inference that Defendants knew their statements were false when made. *See Dobina*, 909 F. Supp. 2d at 246 ("Where a statement is made repeatedly regarding an issue of specific personal interest to the officers, the allegations will more readily give rise to the requisite strong inference of scienter."); *Atlas Air*, 324 F. Supp. 2d at 489 (that defendant frequently spoke about topics supports conclusion that he had "intimate knowledge of those facts or should have known of them"); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it.").[4] Defendants made numerous statements, throughout the Class Period, that either directly discussed iQIYI's DAUs or revenues, or incorporated those revenues into Baidu's own financials. Baidu ¶¶150-155, 159, 176-180, 182-191.  Given these public statements, it would be illogical to conclude that the Individual Defendants did not have a duty to monitor the true state of iQIYI.

At a minimum, if Defendants failed to monitor these key operating metrics and obvious accounting irregularities within them, they were reckless in failing to do so, equally establishing scienter.  *Novak*, 216 F.3d at 308 ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."); *Atlas Air*, 324 F. Supp. 2d at 491 ("[D]efendants were not entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading.").

Therefore, scienter can be imputed to the Individual Defendants because, through their

---

[4]  *Sinay v. CNOOC Ltd.*, 554 F. App'x 40 (2d Cir. 2014), which defendants relied on in attempting to rebut the core operations doctrine, is inapposite because there the plaintiff did not even allege the doctrine. *Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020), is similarly unhelpful, in that there, defendants only alleged that the product at issue was a "key product" for Defendant.  Here, the allegations show that iQIYI contributed as high as 26.67% of Baidu's revenue during the Baidu Class Period, was one of three reporting segments, and was its fastest grower.  Baidu ¶¶3, 35, 39.

signing of the iQIYI Registration Statement, and the SOX certifications, the Individual Defendants had a duty to monitor iQIYI's DAUs and revenue, and in failing to do so, they were reckless.

**C.**     **Defendants' Denials Regarding the Wolfpack Report Establish that They Either Investigated and Ultimately Lied About the Findings, or Were Reckless in Failing to Undergo a Proper Investigation**

Defendants' refusal to acknowledge the investigations by the SEC and NASDAQ, while at the same time disputing the contents of the Wolfpack Report, further supports defendants' scienter.

**1.     Defendants' Denial of the Wolfpack Report Supports Scienter**

The day the Wolfpack Report was released (April 7, 2020), iQIYI issued a press release on its website that referenced the Wolfpack Report by name, and provided that "[t]he Company believes that the [Wolfpack Report] contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company."  Baidu ¶117.

Of course, if Defendants failed to conduct an investigation prior to issuing their denial, the denial itself would *at least* be reckless, and supportive of scienter.  *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47-48 (2d Cir. 1978) (finding recklessness where "representations were conclusorily made . . . without investigation and with utter disregard for whether there was a basis for the assertions"); *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 n.43 (3d Cir. 2009) (defendant's denial of unusual discounting without a factual basis for the denial would "present[] an obvious risk of misleading investors"); *see also Noto v. 22nd Century Grp., Inc.*, 35 F. 4th 95, 106 (2d Cir. 2022) (denial of SEC investigation, after omitting any mention of it, was an "admission of the materiality of its nondisclosure . . . [o]therwise, the Company would not have tried to hide it"); *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at *11 (S.D.N.Y. June 13, 2022) ("Public denials . . . are also recognized to support an inference of scienter.").

However, if Defendants conducted an investigation, they clearly would have been on notice that their denial was false.  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("[C]onscious

misbehavior . . . is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."); *see also Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (strong inference of scienter where complaint alleged that defendants had received results of investigation before filing 10-K, but failed to disclose them); *S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018) ("Actual knowledge of or conscious disregard of numerous red flags can establish scienter."). Either way, Defendants' denial of the accuracy of the Wolfpack Report supports scienter.

### 2. Defendants' Delay in Reporting the Investigations Supports Scienter

Additionally, Defendants' scienter is bolstered because they waited more than four months to notify investors and the market that the SEC and NASDAQ were investigating iQIYI for the very misconduct denied in the April 7, 2020 press release – the very misconduct alleged in this Complaint. Baidu ¶118. This delay in providing the market with key information regarding investigations into conduct that iQIYI had already denied, confirms Defendants' understanding of the veracity of the claims made in the Wolfpack Report. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (scienter established where defendants "waited to disclose" government investigations); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (fact that the government "launched an investigation" contributed to a strong inference of scienter).

Defendants, in response, are left to argue that they had no duty to disclose the investigations. Baidu MTD at 5. But, by denying the contents of the Wolfpack Report, Defendants put it and its

contents at issue.   Therefore, Defendants had a duty to disclose that the government was investigating iQIYI for the very contents of the Wolfpack Report.  *Noto*, 35 F. 4th at 105 (finding that a company had a duty to disclose SEC investigation into accounting controls, when they had made affirmative statements regarding accounting weaknesses); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (noting that it is "well-established precedent in this Circuit" that "'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic. . . .  That is because, at the moment the company chooses to speak, it takes upon itself the obligation to ***speak truthfully***, and it is the breach of ***that*** obligation which forms the basis for the §10(b) claim") (emphasis in original). Thus, whether or not Defendants had a duty to disclose the investigations, which they undoubtedly did, the investigations are successfully being used here as evidence of the Defendants' scienter.[5]

### D.   iQIYI Knew the Xin'ai Sports Deal Accounting Violated GAAP

The Baidu Complaint also alleges that numerous sources, available to the Individual Defendants, indicated that iQIYI's reported accounting of the Xin'ai Sports deal was improper.  To start, the audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports with iQIYI, disclosed that iQIYI made an investment of RMB38.25 mm cash into Xin'ai Sports and received 38.25% of the equity in return.  This is in stark contrast to what iQIYI represented in its financial statements – that iQIYI invested RMB32.25 mm of cash and RMB763.75 mm of non-cash consideration for 32% equity in Xin'ai Sports.  Baidu ¶109.  The audited financial statements of Wuhan DDMC are confirmed by financial statements that Xin'ai Sports itself filed with the Shanghai Stock Exchange on August 7, 2018, as well as by Qixin, a respected third-party

---

[5] Defendants' reliance on *In re Lions Gate Entertainment Corp. Securities Litigation*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016), *In re XP Inc. Securities Litigation*, 2021 WL 861917, at *9 (E.D.N.Y. Mar. 8, 2021) and *In re Centerline Holding Co. Securities Litigation*, 380 F. App'x 91 (2d Cir. 2010) is misplaced, because the investigations in those cases were not offered as evidence of scienter.

platform aggregating SAIC and other government records in the PRC.  *Id*.

As alleged in the Baidu Complaint, and described throughout, Xin'ai was of great importance to iQIYI's business, as even confirmed by Defendant Gong.  Baidu ¶221.  As directors or officers of iQIYI and Baidu, direct and indirect investors in Xin'ai, and officers of PRC-based companies, Defendants had access to information that showed iQIYI's true investment into Xin'ai Sports.  Thus, iQIYI's recording of RMB736,75 mm of deferred revenue is false and misleading, as evidenced by at least the three sources above.  Thus, Defendants had direct "knowledge of facts or access to information contradicting their public statements," establishing scienter.  *Gentiva*, 932 F. Supp. 2d at 372 (quoting *Novak*, 216 F.3d at 308); *see also* Section I.A.1 (discussing access to information).

## II.    Plaintiffs Adequately Allege Loss Causation

Plaintiffs' burden to plead loss causation "is not a heavy one."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  In fact, loss causation is governed by Rule 8, requiring only "'a short and plain statement of the claim showing that the pleader is entitled to relief[.]'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  This standard is "not meant to impose a great burden upon a plaintiff," and a securities fraud complaint is sufficient so long as it sets forth what the alleged loss and causal connection to the fraud "might be." *Id.* at 347.  If there is a question of whether the "loss was caused by an intervening event . . . the chain of causation . . . is a matter of proof at trial and [should not be] decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Plaintiffs may plead loss causation "*either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010)).

"Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Vivendi*, 838 F.3d at 262.

### A.    The Denial of the Wolfpack Report

The Baidu Complaint alleges that on April 7, 2020, during market hours, Wolfpack released the Wolfpack Report, detailing among other things, how iQIYI had misled investors and failed to disclose pertinent information related to iQIYI's DAUs and revenue figures.  Baidu ¶112.  The Baidu Complaint further alleges that, following the publication of the Wolfpack Report, Baidu's ADSs fell $4.46 per ADS, or 4%, to close at $97.33 on the next full trading day, April 8, 2020, thereby damaging investors.  Baidu ¶116.  There is no dispute that the Wolfpack Report was over 35 pages long, and contained intricate multi-country accounting and financial analyses based on complex filings made in Chinese.  The fact that it took the market one day to digest its findings is no barrier to establishing loss causation.

Defendants, in response, argue that Plaintiffs cannot rely on the Wolfpack Report to allege loss causation because "Baidu's ADS price remained flat, closing at $101.79 on the day the report was issued . . . compared to $102.94 the day before."  Baidu MTD at 6.[6]  Defendants' argument is one typically reserved for class certification or summary judgment, and not decided on a motion to dismiss.  In fact, at the appropriate time, Plaintiffs' expert will explain why it is no impediment to loss causation that the market took one day to begin to incorporate the Wolfpack Report into the price of Baidu ADSs.  Indeed, courts in this circuit routinely accept a multi-day window for loss causation.  *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 22 (2d Cir. 2017) (vacating district court decision where, among other things, it did not credit a two-day window for loss causation);

---

[6]  *Janbay v. Canadian Solar, Inc.*, relied on by Defendants (Baidu MTD at 6), is distinguishable, in that there, the stock did not drop *at all* following the alleged disclosing event.  2012 WL 1080306, at *16 (S.D.N.Y. Mar. 30, 2012).

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015) (noting in context of class certification motion that a two- or three-day window "is common in event studies"); *Fogarazzo v. Lehman Brothers, Inc.*, 263 F.R.D. 90, 104 (S.D.N.Y. 2009) (applying a three day loss causation window and certifying class); *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 372 (S.D.N.Y. 2009) (applying three day window at summary judgment).  Here, the Wolfpack Report was released intra-day.  The fact that the market reacted the very next day, after investors had an opportunity to read and consider the Wolfpack Report's conclusions, does not establish that the price failed to react to the Wolfpack Report.  *Barclays*, 750 F.3d at 233-34 (loss causation adequately pled where market reacted negatively one day after a corrective disclosure was made); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287-88 (S.D.N.Y. 2008) (same).

Defendants' second argument, that the information in the Wolfpack Report was already public (Baidu MTD at 6), fares no better.  As the Baidu Complaint makes clear, "much of the third-party research related to iQIYI's operations, such as mobile advertising data, financial research and governmental filings, were not easily accessible to the public because of limitations imposed by the Chinese government and language barriers."  Baidu ¶47; *see also* Baidu ¶4 n.1.  Indeed, United States-based investors could not have been expected to obtain and discern this type of information prior to the Wolfpack Report's release.  Recently, in *Lea v. TAL Education Group*, 837 F. App'x 20 (2d Cir. 2020), the Second Circuit held that, despite the fact that a short-seller report stated that "all information contained herein . . . has been obtained from public sources," the report formed the basis of an appropriate corrective disclosure because "much of the information, including SAIC filings of multiple entities in a different language and Chinese court judgments, ***was not readily accessible*** to

- 17 -

investors" *Id*. at 28 (emphasis added).[7]

Regardless, courts in this circuit have repeatedly found short-seller reports constitute corrective disclosures. *See, e.g.*, *Bishins v. Cleanspark, Inc.*, 2023 WL 112558, at *13 (S.D.N.Y. Jan. 5, 2023); *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021); *Gordon v. Vanda Pharms. Inc.*, 2021 WL 911755, at *4 (E.D.N.Y. Mar. 10, 2021); *see also In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022) ("'The majority of courts . . . have held that a short-seller report . . . does not implicate the same skepticism as a traditional anonymous source.'").

**B.    Defendants Disclose the SEC and NASDAQ Investigations**

But the Wolfpack Report did not reveal the full truth, especially considering that Defendants denied its assertions. Additional supporting facts were hidden by Defendants until months later, when, on August 13, 2020, after the close of business, iQIYI issued a press release announcing its Financial Results for the Second Quarter of 2020, and disclosed that the SEC's Division of Enforcement had opened an investigation into iQIYI based on the allegations in the Wolfpack Report and had requested financial records, operating records, and other documents from iQIYI. Baidu ¶118. Later that night, on the related earnings call, Defendant Wang revealed, for the first time, that Defendants knew that NASDAQ and the SEC had opened inquiries into iQIYI based on the Wolfpack Report for about three to four months—*i.e.*, shortly after the publication of the Wolfpack Report. On this news, Baidu ADSs fell $7.83 per ADS, or 6%, to close at $116.74 on August 14, 2020, thereby further damaging investors. Baidu ¶121.

Relying primarily on distinguishable out-of-circuit authority, Defendants argue that the announcement of an investigation is an insufficient basis on which to allege loss causation. Baidu

---

[7] Because courts have found that information from Chinese-based sources *are not* public, reliance on *Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013) (Baidu MTD at 6 n.2), is misplaced.

- 18 -

MTD at 7.  Defendants again, however, are wrong.  In this Circuit, the announcement of an SEC investigation is sufficient to establish loss causation.  *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at \*13 (W.D.N.Y. Jan. 6, 2023) (disclosure of SEC investigation qualified as disclosure); *Kux-Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 477 (S.D.N.Y. 2016) ("the announcement of . . . investigations may qualify as partial disclosures for purposes of loss causation") (quoting *Gentiva*, 932 F. Supp. 2d at 388); *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 620 (S.D.N.Y. 2015) ("the disclosure of an investigation 'into a particular business practice can be sufficient to allege loss causation with respect to alleged misstatements regarding that practice'") (collecting cases).[8]

## C.    The Challenges to the Inveriones Plaintiffs Are Without Merit

In a last-ditch effort to attack loss causation, Defendants argue that the Inveriones Plaintiffs "must be dismissed, as they sold all their Baidu shares *before* the Wolfpack Report."  Baidu MTD at 7-8 (emphasis in original).  But, like all their prior arguments, Defendants' argument here is flawed and without merit, because the Second Circuit has explicitly recognized that, "it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim," and that a lead plaintiff need not have "standing to sue on every available cause of action."  *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82 (2d Cir. 2004).

Defendants make much of the Central Pennsylvania Teamsters' arguments at the lead plaintiff stage. But, at that time, the Central Pennsylvania Teamsters *clairvoyantly* argued that, if the Inveriones Plaintiffs were appointed, "***Defendants would argue*** that any declines in value

---

[8] *Janbay* is easily distinguishable, because there, the court found the investigation was not linked to the fraudulent conduct alleged in the complaint. 2012 WL 1080306, at \*15.  The Baidu Complaint does not suffer from this flaw, as the investigation is into the exact facts underlying the fraud that the Complaint alleges.  Baidu ¶¶112-116, 118-119.  Aside from *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013) being out of circuit authority, this district, in *Gentiva*, has already expressly rejected its holding.  *See* 932 F. Supp. 2d at 387 ("the Court rejects the idea that the disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure").

experienced by such investors are nothing more than non-recoverable trading losses." *See* Central Pennsylvania Teamsters Pension Funds' Memorandum of Law in Opposition to the Competing Motions for Appointment as Lead Plaintiff, filed January 21, 2022 (ECF No. 41 at 2) (emphasis added). Although that day has come, Defendants' argument fails for a host of reasons. First, in appointing the Inveriones Plaintiffs, Judge Kuntz already seemingly considered this argument, and rejected it. *See* So Ordered Joint Stipulation, filed April 5, 2022 (ECF No. 45).[9]

Next, this type of argument is more properly raised at the class certification stage, where plaintiffs must make a showing that they are typical of other class members. *See* Fed. R. Civ. P. 23(a)(3) (requiring that, when selecting a class representative, "the claims or defenses of the representative parties are typical of the claims or defenses of the class"); *see also Bank v. Icot Holdings, LLC*, 2020 WL 10224833, at *3 (E.D.N.Y. Sept. 29, 2020) (denying motion to dismiss where "defendants argue that the plaintiff has not shown that he can meet Rule 23's typicality requirement, but that is 'exactly the sort of issue that would be litigated and decided in the context of a motion for class certification'"); *Gordon v. Sonar Cap. Mgmt. LLC*, 2014 WL 3900560, at *3 (S.D.N.Y. Aug. 1, 2014) (finding it is premature, at the motion to dismiss stage, to determine whether in-and-out traders would ultimately be able to prove loss causation) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39 (2d Cir. 2009)).[10]

Finally, Defendants' argument is specific to the Inveriones Plaintiffs, and thus, is non-

---

[9] Defendants argue that because the Inveriones and Central Pennsylvania Teamsters "team[ed] up . . . the Court did not have the opportunity to rule on Inveriones lack of causation." Baidu MTD at 8. But, the court was under no obligation to accept the stipulation as filed, and could have stricken the Inveriones Plaintiffs at that time. The court, however, declined to do so.

[10] To be clear, courts in this circuit have held that even if a lead plaintiff fails to meet the requirements of Fed. R. Civ. P. 23 at class certification, they should still continue to serve as a lead plaintiff. *In re Oxford Health Plans, Inc., Sec. Litig.*, 191 F.R.D. 369, 378-79 (S.D.N.Y. 2000); *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 682 (D. Md. 2018); *Lumen v. Anderson*, 2011 WL 3794144, at *2 (W.D. Mo. Aug. 24, 2011).

dispositive. Conceding this point, Defendants have raised no such argument against the Central Pennsylvania Teamsters.

## CONCLUSION

For the reasons above, and those included within the Opposition to the Common Motion to Dismiss, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss the Baidu Complaint. If the Court dismisses all or part of the Baidu Complaint, Plaintiffs respectfully request leave to amend, which should be freely given. *See* Fed. R. Civ. P. 15(a)(2); *see also Loreley*, 797 F.3d at 190 (reaffirming "liberal standard" of Rule 15 and recognizing that, "[w]ithout the benefit of a ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies"). Plaintiffs would amend to add a May 16, 2019 partial corrective disclosure, after which Baidu's stock plummeted $25.39 per share, or 16.5%, which would undoubtedly correct the Inveriones Plaintiffs' alleged standing issue, would strengthen the allegations to address Defendants' argument regarding Baidu's deferred revenue (Joint Memorandum at 18 n.17), and would address any other deficiencies the Court identifies.

DATED: January 30, 2023                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           ROBERT M. ROTHMAN
                                           WILLIAM J. GEDDISH


                                           */s/ Robert M. Rothman*
                                           ROBERT M. ROTHMAN

                                           58 South Service Road, Suite 200
                                           Melville, NY 11747
                                           Telephone: 631/367-7100
                                           631/367-1173 (fax)
                                           rrothman@rgrdlaw.com
                                           wgeddish@rgrdlaw.com

- 21 -

THE ROSEN LAW FIRM, P.A.
PHILLIP KIM
LAURENCE M. ROSEN
JONATHAN STERN
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: 212/686-1060
212/202-3827 (fax)
pkim@rosenlegal.com
lrosen@rosenlegal.com
jstern@rosenlegal.com

*Attorneys for Plaintiffs and Lead Counsel for the Class*