UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
IN RE iQIYI, INC. SECURITIES LITIGATION      :  20-cv-01830 (DG) (TAM)
:
:  **ECF CASE**
:
:  **Oral Argument Requested**
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
IN RE BAIDU, INC. SECURITIES LITIGATION      :  20-cv-3794 (DG) (TAM)
:
:  **ECF CASE**
:
:  **Oral Argument Requested**
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' COMMON MOTION TO DISMISS THE *iQIYI* AND *BAIDU* ACTIONS
<u>FOR FAILURE TO PLEAD ANY MATERIAL MISSTATEMENT OR OMISSION</u>**

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Defendants Goldman
Sachs (Asia) LLC, Credit Suisse
Securities (USA) LLC, Merrill Lynch,
Pierce, Fenner & Smith, Incorporated,
China Renaissance Securities (Hong
Kong) Limited, Citigroup Global
Markets Inc., and UBS Securities LLC
(the "Underwriter Defendants")*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000

*Attorneys for Defendants iQIYI, Inc.,
Baidu, Inc., Yu Gong, Xiaodong
Wang, Robin Yanhong Li, Qi Lu,
Herman Yu, Victor Zhixiang Liang,
and Giselle Manon*

Served on: March 3, 2023

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 2

I. PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION ................................. 2

  1. Plaintiffs Fail To Allege iQIYI's Daily Active Users Were Overstated ................. 3

  2. Plaintiffs Fail To Allege iQIYI's Deferred Revenues Were Overstated ................. 4

  3. Plaintiffs Fail To Allege Membership Revenues Were Misstated ......................... 5

  4. Plaintiffs Fail To Allege a Misstatement Regarding Xin'ai Sports ....................... 7

CONCLUSION .................................................................................................................... 9

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Advanced Battery Technologies, Inc. Securities Litigation*,
No. 11-cv-2279 (CM), 2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012)...............................4

*In re AmTrust Financial Services, Inc. Securities Litigation*,
No. 17-cv-1545 (LAK), 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ..............................7

*In re A-Power Energy Generation Systems Ltd. Securities Litigation*,
No. MDL 11-2302 (GW) (CWx), 2012 WL 1983341 (C.D. Cal. May 31, 2012)...........3, 4

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................6, 7

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................................................6

*In re BofI Holding, Inc. Securities Litigation*,
977 F.3d 781 (9th Cir. *2020), cert. denied sub nom BofI Holding, Inc. v. Houston
Municipal Employees Pensi*on System, 142 S. Ct. 71 (2021) ............................................2

*In re China Education Alliance, Inc. Securities Litigation*,
No. 10-cv-9239 (CAS) (JCx), 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .....................2

*In re China XD Plastics Co. Securities Litigation*,
No. 14-cv-05308 (GBD), 2016 WL 1241522 (S.D.N.Y. Mar. 23, 2016).......................5, 8

*Cortec Industries, Inc. v. Sum Holding L.P.*,
949 F.2d 42 (2d Cir. 1991)................................................................................................8

*Dean v. China Agritech, Inc.*,
No. 11-cv-01331 (RGK) (PJWx), 2011 WL 5148598 (C.D. Cal. Oct. 27, 2011) ..............4

*In re DraftKings Inc. Securities Litigation*,
No. 21-cv-5739 (PAE), 2023 WL 145591 (S.D.N.Y. Jan. 10, 2023)................................2

*In re Elan Corp. Securities Litigation*,
543 F. Supp. 2d 187 (S.D.N.Y. 2008)................................................................................2

*Harris v. AmTrust Financial Services, Inc.*,
649 F. App'x 7 (2d Cir. 2016) ......................................................................................4, 8

*Ho v. Duoyuan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)................................................................................2

*N.J. Carpenters Health Fund v. Royal Bank of Scottish Group, PLC*,
709 F.3d 109 (2d Cir. 2013).................................................................................6

*In re UBS AG Se*c. Litig.,
No. 07-cv-11225 (RJS), 2012 WL 4471265 n.18 (S.D.N.Y. Sept. 28, 2012), *aff'd
sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS
AG*, 752 F.3d 173 (2d Cir. 2014) .................................................................4, 7

## STATUTES

15 U.S.C. § 78u-4(b)(1)(B)...................................................................................5

Defendants respectfully submit this reply memorandum of law in further support of their joint motion to dismiss the *iQIYI* Action and the *Baidu* Action for failure to allege a material misstatement or omission.[1]

## PRELIMINARY STATEMENT

Doubling down on their blind reliance on an admittedly biased short-seller report, Plaintiffs' Opposition highlights their multiple independent pleading failures and confirms that these actions should be dismissed in their entirety with prejudice. All of Plaintiffs' claims should be dismissed for failure to plead falsity.

Plaintiffs spend much of their Opposition mischaracterizing Defendants' pleading arguments as factual disputes and attempting to shift the burden to Defendants to disprove their claims. But these tactics cannot obscure the complaint's fundamental pleading flaws. The Opposition has no answer to the reliability and apples-to-oranges comparison issues that foreclose Plaintiffs' Daily Active Users ("DAUs") and deferred revenue claims. Plaintiffs' disregard of obvious alternative explanations and their failure to plead non-conclusory allegations defeat their membership services revenue claim and their Xin'ai Sports transaction claims. Whether asserted under the Securities Act or Exchange Act, Plaintiffs fail to allege any material misstatement or omission in iQIYI's or Baidu's public filings. This alone warrants dismissal of all claims before even considering the additional independent grounds for dismissal laid out in the related motions to dismiss (which Defendants incorporate by reference here).

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in Defendants' Joint Memorandum of Law in Support of their Motion to Dismiss for Failure to Allege Any Material Misstatement or Omission ("Common MTD"). "Opposition" or "Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Failure to Allege Any Material Misstatement or Omission. All citations and internal quotation marks are omitted, and all emphases in quotations are added, unless otherwise indicated.

## ARGUMENT

### I.     PLAINTIFFS FAIL TO ALLEGE ANY MISREPRESENTATION

The Opposition does not dispute that both Complaints are largely copied from the Wolfpack Report, devoid of well-pleaded allegations documenting Plaintiffs' or counsel's efforts to corroborate the short seller's claims. Such complaints raise reliability concerns that call for a "particular need for close scrutiny." *In re DraftKings Inc. Sec. Litig.*, No. 21-cv-5739 (PAE), 2023 WL 145591, at *19 (S.D.N.Y. Jan. 10, 2023) (quoting *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020)). This is not a premature factual dispute. (*See* Opp. at 9.) The PSLRA requires Plaintiffs to plead "the reliability of the[ir] sources." *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008).[2] That said, contrary to Plaintiffs' claim, Defendants' "primary defense" is ***not*** "that the Wolfpack Report is biased and PRC filings are inaccurate." (Opp. at 9.) The problem with the Wolfpack Report is its methodology, not merely its author's motives. The short seller's admitted bias should be taken in account, however, when assessing the Wolfpack Report's assumptions, extrapolations, and conclusions. *See DraftKings*, 2023 WL 145591, at *18. Additionally, Defendants do not contend that "iQIYI's SEC filings were more accurate than their own Chinese tax and regulatory filings." (Opp. at 10.) The SEC filings and PRC filings are apples and oranges, addressing different metrics under different standards.

---

[2]   The observation in *In re China Education Alliance, Inc. Securities Litigation*, No. 10-cv-9239 CAS (JCx), 2011 WL 4978483, at *5 (C.D. Cal. Oct. 11, 2011), that the reliability of a short seller's report is "a question of fact" has been called into substantial question by the Ninth Circuit's subsequent holding that courts should treat short sellers' reports with a heavy dose of skepticism, as short sellers have a "financial incentive to convince others to sell." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2020), *cert. denied sub nom BofI Holding, Inc. v. Houston Municipal Employees Pension System*, 142 S. Ct. 71 (2021). *Ho v. Duoyuan Global Water, Inc.* relies on the same questionable holding in *China Education*, and in any case, is inapposite, as it addressed a motion to strike. 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012). (*See* Opp. at 9.)

### 1.    Plaintiffs Fail To Allege iQIYI's Daily Active Users Were Overstated

Absent *common measurements*, no comparison with other sources can show that a company's reported metrics were false.  *See In re A-Power Energy Generation Sys. Ltd. Sec. Litig.*, No. MDL 11-2302 (GW) (CWx), 2012 WL 1983341, at *8 (C.D. Cal. May 31, 2012).  Here, the Complaints make no attempt to show that QuestMobile, Aurora, and iQIYI calculated DAUs the same way.  Thus, nothing can be inferred from the fact that QuestMobile's and Aurora's estimates (which even differ from each other) are lower than the Company's reported DAUs.  *Id.*

Nonetheless, Plaintiffs argue that QuestMobile's estimates should be credited over the Company's actual data because iQIYI has cited QuestMobile in the past.  (Opp. at 10.)  But as the Opposition itself shows, iQIYI cited QuestMobile only for comparative claims and market trends.  (*Id.* at 10 n.8.)  iQIYI has never represented that QuestMobile's DAU estimates should be relied on for any other purpose, much less said that QuestMobile calculates DAUs the same way iQIYI does or that third-party data is more accurate or reliable than iQIYI's internal data.  (*Id.*)  Plaintiffs also ignore that QuestMobile and Aurora disclaim the accuracy of their estimates.  (Br. at 14.)

Furthermore, contrary to Plaintiffs' assertion that QuestMobile and Aurora "precisely chart[] the *true amounts*" of iQIYI's DAUs (Opp. at 12), their DAU estimates differ significantly from *each other* (*e.g.*, 86.1 million vs. 113 million for Q4 2017).  (*iQIYI* Compl. ¶¶ 41-42; *Baidu* Compl. ¶¶ 65-66.)  In fact, these differences exceed the alleged difference between QuestMobile's and the Company's DAU figures (*e.g.*, 113 million vs. 126 million for Q4 2017).  (*Id.* ¶ 41.)  The contradictory nature of Plaintiffs' allegations alone warrants dismissal.[3]

---

[3]   Notwithstanding the inconsistency, QuestMobile's, Aurora's, and iQIYI's DAU numbers all support iQIYI's statement that it has a "massive and highly engaged user base." (*iQIYI* Compl. ¶ 124; *Baidu* Compl. ¶ 151.)  Even if that claim were not inactionable puffery (and it is), Plaintiffs fail to allege any facts demonstrating it was false or misleading.  (*See* Opp. at 12 n.11.)

3

### 2.   Plaintiffs Fail To Allege iQIYI's Deferred Revenues Were Overstated

Plaintiffs' deferred revenue claim has the same apples-and-oranges problem: it compares iQIYI's reported "***customer advances and*** deferred revenue" with deferred revenue alone derived from third-party sources.  (Br. at 15-16.)  Even setting aside all the other problems with Plaintiffs' sources (discussed below), their failure to account for the impact of customer advances precludes any inference from the mere fact that Plaintiffs' deferred revenue estimate differs from iQIYI's reported ***customer advances and*** deferred revenue.  *See A-Power Energy*, 2012 WL 1983341, at *8.  The Opposition ignores, and thus concedes, this dispositive pleading defect.  *In re UBS AG Sec. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *18 n.18 (S.D.N.Y. Sept. 28, 2012) ("in its opposition brief, Lead Plaintiff did not directly address [certain] of the UBS Defendants' arguments . . . ; therefore, it has conceded the point by silence"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).

Moreover, in *Harris v. AmTrust Financial Services, Inc.*, 649 F. App'x 7 (2d Cir. 2016), the Second Circuit expressed serious skepticism of whether, as a matter of law, plaintiffs can allege falsity by showing "that the aggregate . . . of an issuer's individual subsidiaries' financial statements filed with [PRC] regulators materially differed from the consolidated [financials] reported to the SEC."  *Id.* at 10 n.3.  Instead of grappling with *Harris*, Plaintiffs cite authorities that "are inapposite because, unlike [*Harris*]"—and this case—those cases "involve allegations that a *single legal entity* had reported materially different results in different jurisdictions."  *Id.*[4]

But even assuming, notwithstanding *Harris*, that Plaintiffs theoretically could allege falsity

---

[4]   *See In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11-cv-2279 (CM), 2012 WL 3758085, at *10 (S.D.N.Y. Aug. 29, 2012) (comparing one entity's SAIC and SEC filings); *Dean v. China Agritech, Inc.*, No. 11-cv-01331 (RGK) (PJWx), 2011 WL 5148598, at *2 (C.D. Cal. Oct. 27, 2011) (same).

by aggregating the filings of iQIYI's VIEs, Plaintiffs must at least "separately identify" the VIEs and "separately present the relevant financial data for any subsidiary so an accurate aggregate comparison can be made to [the] SEC filings." *In re China XD Plastics Co. Sec. Litig.*, No. 14-cv-05308 (GBD), 2016 WL 1241522, at *5 (S.D.N.Y. Mar. 23, 2016). Plaintiffs did not. Their incantation that "GAAP required iQIYI to consolidate its VIEs" in its SEC filings (Opp. at 16) misses the point, as not every iQIYI VIE has to file financials in China (and Plaintiffs do not argue otherwise). Absent well-pleaded allegations that the VIEs that reported their financials in China were *exactly* the same ones reflected in iQIYI's SEC consolidated financials, "an accurate aggregate comparison" cannot be made. *China XD*, 2016 WL 1241522, at *5.

Moreover, Plaintiffs do not even purport to base their comparison on actual filings with the Chinese authorities. Instead, Plaintiffs' allegations are based on third-party "*credit reports*." (Opp. at 10.) Plaintiffs' failure to explain how the credit reports extracted information, and what steps, if any, Plaintiffs took to confirm the accuracy of the information raises serious reliability concerns about sources of data that are key to Plaintiffs' comparison exercise.[5]

Lastly, the *Baidu* Plaintiffs improperly try to shift the burden to Defendants to explain how Baidu consolidates iQIYI's financial results with its own. (Opp. at 17-18.) The PSLRA requires *Plaintiffs* to plead with particularity which aspects of Baidu's financial statements they contend are false and why. *See* 15 U.S.C. § 78u-4(b)(1)(B).

### 3.      Plaintiffs Fail To Allege Membership Revenues Were Misstated

Plaintiffs cannot dispute that some or all of what they themselves call "innocent explanation[s]" (*iQIYI* Compl. ¶ 57; *Baidu* Compl. ¶ 81) can account for the alleged divergence

---

[5]   Tellingly, despite improperly submitting a slew of documents with their Opposition that are not referenced in the Complaint, Plaintiffs still have not provided these alleged credit reports.

between membership revenue and deferred revenue in Q4 2018 and Q1 2019.  (Br. at 20-21.) Nonetheless, Plaintiffs ask this Court to "disregard[]" these innocent alternative explanations "at this stage." (Opp. at 19.)  But "[w]here a complaint pleads facts that are ***merely consistent*** with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a motion to dismiss, Defendants do not have to definitively "explain what caused the divergence." (Opp. at 18.)  *See Iqbal*, 556 U.S. at 680 (dismissing claim "*more likely* explained by[] lawful" conduct).[6]

Here, the divergence between deferred revenue and membership revenue is "just as much," if not more, "in line with a wide swath of rational and competitive business" realities as with any vague inference of fraud.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  The Opening Brief illustrates how differences in timing and price could cause such a divergence. (Br. at 21.[7]) Another variation of that example (*see* Appendix II below) shows how the divergence could occur even if "average subscription lengths increased" during the relevant periods.  (Opp. at 19.) Plaintiffs also do not deny, and thus concede, that the divergence could be explained by a significant drop in virtual currency or increase in on-demand purchases (*see iQIYI* Compl. ¶¶ 44-45; *Baidu* Compl. ¶¶ 68-69).  In short, there are a multitude of obvious, innocuous explanations for the divergence that Plaintiffs have chosen to ignore, even after these alternative explanations have been brought to Plaintiffs' attention.  "Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."

---

[6]   Even Plaintiffs' cases acknowledge that dismissal is warranted if "at least one . . . competing inference[] rises to the level of an 'obvious alternative explanation.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013).

[7]   Plaintiffs' attempt to disprove Defendants' example fails. (Opp. at 19.)  Appendix I below illustrates how different membership *types* (annual, quarterly, monthly) could cause the same trend shown in the Opening Brief—wherein deferred revenues decrease as membership revenues increase (Br. at 21)—even assuming "members join every month" (Opp. at 19).

6

*Twombly*, 550 U.S. at 570.

Moreover, the mere noncorrelation between two metrics does not show which one is correct.  Plaintiffs acknowledge they have taken inconsistent positions, claiming at one point that membership services revenue was inflated, as evidenced by lagging deferred revenue numbers, but asserting elsewhere that iQIYI's deferred revenue figures are inaccurate.  (*iQIYI* Compl. ¶¶ 53, 59; *Baidu* Compl. ¶¶ 77, 83.)  Yet they insist that iQIYI allegedly inflated the two metrics "at different times."  (Opp. at 20.)  Putting aside the cherry-picking, this response fails to explain why iQIYI allegedly benefited from the inflation of one metric at one point, but not another, and fails to allege any particularized facts to show what the "correct" metric should have been at the relevant times and by how much the reported metric was inflated over the "correct" amounts.

### 4.    Plaintiffs Fail To Allege a Misstatement Regarding Xin'ai Sports

To plead falsity for iQIYI's Xin'ai transaction accounting, "plaintiffs must plead first that an ASC topic or section of a particular topic objectively was the only correct guidance to apply." *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-cv-1545 (LAK), 2019 WL 4257110, at *16 (S.D.N.Y. Sept. 9, 2019).  (Br. at 23-24.)  Plaintiffs fail to do so, relying instead on naked assertions that "GAAP still does not permit iQIYI's accounting treatment" and there is "no acceptable alternative."  (Opp. at 22.)  But such "[t]hreadbare recitals" should be disregarded.[8]  *Iqbal*, 556 U.S. at 678; *see In re AmTrust*, 2019 WL 4257110, at *16.  Plaintiffs repeatedly insist that "iQIYI

---

[8]    Plaintiffs argue iQIYI's application of ASC 606 was false because it "did not 'transfer control of a distinct nonfinancial asset,'" but "only made a promise to do so at some future date." (Opp. at 23.)  Even accepting *arguendo* Plaintiffs' reading of accounting standards, their claim is belied by their own allegations, which concede that iQIYI's 2018 Annual Report "disclose[d] revenue from content licensed to an equity investee," showing that some nonfinancial assets had been transferred by the date of its disclosure. (*iQIYI* Compl.¶ 84; *Baidu* Compl.¶ 108.)  Plaintiffs also "conceded . . . by silence" that the application of ASC 606 was proper because Xin'ai meets the definition of a customer, and that iQIYI did in fact report costs of revenues. *UBS AG*, 2012 WL 4471265, at *18 n.18.  (Br. at 25 n.14.)

7

should have recorded its future obligations to Xin'ai as a liability—not as deferred revenue." (Opp. at 21; *see also id.* at 6, 18.)  But deferred revenue *is* a liability.  (Ex. C at F-4.)

The Opposition also contends that "iQIYI never promised to provide . . . future goods and services to Xin'ai Sports" because the PRC financial statements for Wuhan DDMC (iQIYI's partner in the venture) allegedly do not reflect such a promise.  (Opp. at 21.)  This argument fails for four reasons.  First, because iQIYI's disclosure did not break out the cash and noncash components of the investment, iQIYI could not have misstated them.  (Br. at 24 n.16.)  Second, courts are rightly skeptical of attempts to establish falsity by comparing the filings of *different* entities.  *Harris*, 649 F. App'x at 10 n.3.  (*See supra* § I.A.2.)  Third, Plaintiffs fail to allege any basis to conclude that Wuhan DDMC's PRC financials *should have* included such information, as Wuhan DDMC was not to provide or receive any of the goods and services at issue.  *See China XD*, 2016 WL 1241522, at *5.  In any event, Wuhan DDMC's Shanghai Stock Exchange filing on August 8, 2018—a document of which this Court may take judicial notice[9]—states that "iQiyi will provide support to Xin'ai Sports in terms of traffic and advertising," i.e., the very noncash consideration that Plaintiffs claim iQIYI fabricated.  (Ex. Y at 2.)  Fourth, Plaintiffs' "failure to attach or even reference comparable data" from the documents is an "independent pleading failure," as it is "virtually impossible" to ascertain the purpose of the documents or whether they include complete information on the transaction.  *China XD*, 2016 WL 1241522, at *5 n.12.

---

[9]    *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (defendants may produce documents "integral to the complaint" and "public disclosure documents" of which a "plaintiff has been put on notice").  Defendants attach hereto as Exhibits X and Y the August 7, 2018 document filed with the Shanghai Stock Exchange referenced in the Complaint (*iQIYI* ¶ 85), and a related filing on the same topic on the very next day.

## CONCLUSION

For the foregoing reasons, and those demonstrated in the related briefs, both the *iQIYI*

Action and the *Baidu* Action should be dismissed in their entirety with prejudice.


Dated: New York, New York
       March 3, 2023

                                                          Respectfully submitted,


/s/ William J. Sushon                                     /s/ Robert A. Fumerton
Jonathan Rosenberg                                        Scott D. Musoff
William J. Sushon                                         Robert A. Fumerton
O'MELVENY & MYERS LLP                                     Michael C. Griffin
7 Times Square                                            SKADDEN, ARPS, SLATE,
New York, New York 10036                                    MEAGHER & FLOM LLP
(212) 326-2000                                            One Manhattan West
jrosenberg@omm.com                                        New York, New York 10001
wsushon@omm.com                                           Telephone: (212) 735-3000
                                                          scott.musoff@skadden.com
*Attorneys for Defendants Goldman Sachs*                  robert.fumerton@skadden.com
*(Asia) LLC; Credit Suisse Securities (USA)*              michael.griffin@skadden.com
*LLC; Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated; China Renaissance Securities*              *Attorneys for Defendants iQIYI, Inc.,*
*(Hong Kong) Limited; Citigroup Global*                   *Baidu, Inc., Yu Gong, Xiaodong Wang, Robin*
*Markets Inc.; and UBS Securities LLC*                    *Yanhong Li, Qi Lu, Herman Yu, Victor*
                                                          *Zhixiang Liang, and Giselle Manon*

**APPENDIX I**
**Relationship Between Deferred Revenue, Membership Services Revenue and Subscription Type[1]**

| New Members | Subscription Plan Type | Deferred Revenues | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
| | | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
| Member 1 | Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 2 | Monthly | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 3* | Annual | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 | 20 |
| Member 4* | Annual | | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 |
| Member 5 | Monthly | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 6 | Monthly | | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 7* | Annual | | | | | | | 99 | 90 | 81 | 72 | 63 | 54 |
| Member 8 | Monthly | | | | | | | | 0 | 0 | 0 | 0 | 0 |
| Member 9 | Monthly | | | | | | | | | 0 | 0 | 0 | 0 |
| Member 10* | Annual | | | | | | | | | | 99 | 90 | 81 |
| Member 11 | Monthly | | | | | | | | | | | 0 | 0 |
| Member 12 | Monthly | | | | | | | | | | | | 0 |
| **Total Deferred Revenues** | | | | **110** | | 80 + 90 = **170** | | | 50 + 60 + 81 = **191** | | | 20 + 30 + 54 + 81 = **185** | |

*\* Members marked with an asterisk (\*) correspond with Members 1, 2, 3, and 4 listed in the original table included in the Opening Brief (Br. at 15).*

Explanatory Notes:
Member 1 signs up for a monthly subscription plan in January.  Member 2 signs up for a monthly plan in February.  Membership 3 signs up for an annual plan in March.  Etc., etc.

This chart demonstrates that deferred revenues may decrease (*e.g.*, from Q3 ($191) to Q4 ($185)) while membership services revenues continue to increase, even assuming that new "members join every month."  (Opp. at 15.)

---

[1]  This example adopts the same assumptions as the Opening Brief, *i.e.*, in Q1 and Q2, annual memberships are offered for $120/year, with $10 recognized each month, and in Q3 and Q4, annual memberships are offered at a 10% discount of $108/year, with $9 recognized each month. (Br. at 14–15.)  It further assumes that in all quarters, monthly memberships are offered at $10/month and monthly fees are recognized immediately (resulting in zero deferred revenue) and quarterly memberships are offered at $30/month with $10 recognized each month.

**APPENDIX II**
**Relationship between Deferred Revenue, Membership Services Revenue,**
**Subscription Type and Average Subscription Length[2]**

| New Members | Subscription Type | Deferred Revenues | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | | | Q2 | | | Q3 | | | Q4 | | |
| | | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. |
| Member 1A | Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 1B | Monthly | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 2A | Monthly | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 2B | Monthly | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 3A* | Annual | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 | 20 |
| Member 3B | Monthly | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 4A* | Annual | | | | 110 | 100 | 90 | 80 | 70 | 60 | 50 | 40 | 30 |
| Member 4B | Monthly | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 5A | Monthly | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 5B | Monthly | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 6A | Monthly | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 6B | Monthly | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 7A* | Annual | | | | | | | 99 | 90 | 81 | 72 | 63 | 54 |
| Member 7B | Quarterly | | | | | | | 20 | 10 | 0 | 20 | 10 | 0 |
| Member 8A | Monthly | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 8B | Monthly | | | | | | | 0 | 0 | 0 | 0 | 0 | 0 |
| Member 9A | Monthly | | | | | | | | 0 | 0 | 0 | 0 | 0 |
| Member 9B | Monthly | | | | | | | | 0 | 0 | 0 | 0 | 0 |
| Member 10A* | Annual | | | | | | | | | | 99 | 90 | 81 |
| Member 10B | Quarterly | | | | | | | | | | 20 | 10 | 0 |
| Member 11A | Monthly | | | | | | | | | | | 0 | 0 |
| Member 11B | Monthly | | | | | | | | | | | 0 | 0 |
| Member 12A | Monthly | | | | | | | | | | | | 0 |
| Member 12B | Monthly | | | | | | | | | | | | 0 |
| **Total Deferred Revenue** | | **110** | | | 80 + 90 = **170** | | | 50 + 60 + 81 = **191** | | | 20 + 30 + 54 + 81 = **185** | | |
| **Ave. Subscription Length** (by month) | | (1 + 1 + 1 + 1 + 12 + 1) / 6 = **2.83** | | | (1 + 1 + 1 + 1 + 12 + 1 + 12 + 1 + 1 + 1 + 1 + 1) / 12 = **2.83** | | | (1 + 1 + 1 + 1 + 12 + 1 + 12 + 1 + 1 + 1 + 1 + 1 + 12 + 3 + 1 + 1 + 1 +1 + 1) / 18 = **2.94** | | | (1 + 1 + 1 + 1 + 12 + 1 + 12 + 1 + 1 + 1 + 1 + 1 + 1 + 12 + 3 + 1 + 1 +1 + 1 + 12 + 3 + 1 + 1 +1 + 1) / 24 = **3** | | |

*Members marked with an asterisk (*) correspond with Members 1, 2, 3, and 4 listed in the original table included in the Opening Brief (Br. at 15).*

Explanatory Notes:
Members 1A and 1B sign up for monthly plans in January.  Members 2A and 2B sign up for monthly plans in February.  In March, Member 3A signs up for an *annual* plan while Member 3B signs up for a *monthly* subscription plan.

This chart demonstrates that deferred revenues may decrease (from Q3 ($191) to Q4 ($185)) while membership services revenues continue to increase, even when "average subscription lengths increased" (Opp. at 15) during the relevant period (from Q1 (2.83 months) to Q4 (3 months)).

---

[2]     This example adopts the same assumptions as Appendix B above (*supra* n.1).  It further assumes that two new members are added each month. In Q1 and Q2, one new member purchases an annual subscription, and five purchase monthly subscriptions. In Q3 and Q4, one new member purchases an annual subscription, one purchases a quarterly, and four purchase monthly subscriptions, thereby increasing the average subscription period.