# Exhibit D

73 F.4th 1220
United States Court of Appeals, Eleventh Circuit.

Norman MACPHEE, Individually and on Behalf
of all others similarly situated. et al., Plaintiff,

Carpenters Pension Fund of Illinois, Plaintiff-Appellant,

v.

MIMEDX GROUP, INC., Michael J.
Senken, Parker H. Petit, Cherry Bekaert LLP,
William C. Taylor, Defendants-Appellees,

Christopher M. Cashman, Defendant.

No. 22-10633
|
Filed: 07/10/2023

**Synopsis**

**Background:** Pension fund and other stockholders brought class actions against medical products company, its external auditor, and three of its former executives for securities fraud under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Actions were consolidated. The United States District Court for the Northern District of Georgia, No. 1:18-cv-00830-WMR, William M. Ray, II, J., 2021 WL 7210372, granted defendants' motions to dismiss for lack of standing and failure to state a claim, entered judgment in defendants' favor, then, 2022 WL 619702, denied stockholders' motion for relief from judgment and for leave to amend. Stockholders appealed.

**Holdings:** The Court of Appeals, Lagoa, Circuit Judge, held that:

[1] fund's failure to plead facts supporting loss causation did not preclude fund from establishing traceability requirement for Article III standing;

[2] fund adequately alleged basis for Article III standing;

[3] company's public statements that disclosed some truthful information but did not reveal alleged fraudulent scheme did not constitute corrective disclosures;

[4] articles and reports containing public information did not constitute corrective disclosures;

[5] results of internal investigation, revealed after fund sold its shares, did not constitute corrective disclosures;

[6] Court of Appeals would review post-judgment motion to amend complaint under rules governing motions to alter or amend judgment or for relief from final judgment; and

[7] fund's argument about misapplication of law did not support relief under rule governing relief from final judgment for non-enumerated reasons.

Affirmed in part and vacated in part.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Lack of Standing; Motion to Dismiss for Failure to State a Claim; Motion to Amend the Complaint; Motion to Alter or Amend Judgment; Motion for Relief from Order or Judgment.

West Headnotes (51)

**[1]    Federal Courts** 🔑 Pleadings; Dismissal

When reviewing a ruling on a motion to dismiss, the Court of Appeals must accept all well-pleaded facts contained in the operative complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff.

**[2]    Federal Courts** 🔑 Standing

Whether a plaintiff has standing to sue is a threshold jurisdictional question that the Court of Appeals reviews de novo.

2 Cases that cite this headnote

**[3]    Federal Courts** 🔑 Dismissal or nonsuit in general

The Court of Appeals reviews de novo a district court's order dismissing a complaint.

2 Cases that cite this headnote

**[4]    Federal Courts** 🔑 Pleadings; Dismissal

When reviewing an order dismissing a complaint, the Court of Appeals must accept as

Case 1:20-cv-03794-DG-TAM    Document 74-4    Filed 02/23/24    Page 3 of 27 PageID #: 6788

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

true all of the factual allegations contained in a complaint, but it is not bound to accept as true a legal conclusion couched as a factual allegation.

2 Cases that cite this headnote

**[5]    Federal Civil Procedure** ⌕ Insufficiency in general

**Federal Civil Procedure** ⌕ Matters deemed admitted;  acceptance as true of allegations in complaint

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.

**[6]    Federal Civil Procedure** ⌕ Insufficiency in general

A claim has facial plausibility, as necessary to survive a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 8, 12(b)(6).

**[7]    Federal Civil Procedure** ⌕ Claim for relief in general

While the plausibility standard for stating a claim to relief is not akin to a probability requirement, it requires more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 8.

**[8]    Federal Courts** ⌕ Altering, amending, modifying, or vacating judgment or order;  proceedings after judgment

The Court of Appeals reviews the denial of a motion to alter or amend a judgment for abuse of discretion. Fed. R. Civ. P. 59(e), 60(b).

**[9]    Federal Courts** ⌕ Pleading

The Court of Appeals reviews the denial of a motion for leave to amend for abuse of discretion. Fed. R. Civ. P. 15(a)(2).

**[10]    Federal Civil Procedure** ⌕ In general;  injury or interest

**Federal Courts** ⌕ Case or Controversy Requirement

To have a case or controversy, a litigant must establish that he has standing. U.S. Const. art. 3, § 2, cl. 1.

**[11]    Federal Civil Procedure** ⌕ In general;  injury or interest

**Federal Civil Procedure** ⌕ Causation;  redressability

To establish Article III standing, a plaintiff must show (1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. U.S. Const. art. 3, § 2, cl. 1.

**[12]    Federal Courts** ⌕ Class actions

In the context of a class action, if none of named the plaintiffs purporting to represent the class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class. U.S. Const. art. 3, § 2, cl. 1.

**[13]    Federal Civil Procedure** ⌕ Representation of class;  typicality;  standing in general

A plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, even if the persons described in the class definition would have standing themselves to sue. U.S. Const. art. 3, § 2, cl. 1.

**[14]    Federal Civil Procedure** ⌕ In general;  injury or interest

Article III standing must be determined as of the time that the plaintiff's complaint is filed. U.S. Const. art. 3, § 2, cl. 1.

[15] **Federal Civil Procedure** 🔑 Causation; redressability

In evaluating the "traceability" requirement for Article III standing, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

[16] **Federal Civil Procedure** 🔑 Causation; redressability

In examining the traceability of the plaintiff's injury to the defendant's conduct, as an element of Article III standing, a court is concerned with something less than the concept of proximate cause, as for standing purposes, a plaintiff is not required to prove causation beyond a reasonable doubt or by clear and convincing evidence; instead, even harms that flow indirectly from the action in question can be said to be fairly traceable to that action for standing purposes. U.S. Const. art. 3, § 2, cl. 1.

1 Case that cites this headnote

[17] **Federal Civil Procedure** 🔑 Causation; redressability

Article III standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties. U.S. Const. art. 3, § 2, cl. 1.

[18] **Securities Regulation** 🔑 In general; privity

Issue of whether loss of value in pension fund's shares in medical products company between time of purchase and time of sale reflected market's reaction to corrective disclosures regarding company's alleged fraudulent scheme to inflate reported revenue pertained to merits of fund's securities fraud claims against company,

its former executives, and its former auditor, not to whether fund satisfied traceability requirement for Article III standing to assert such claims at time it filed complaint, and thus, any failure on fund's part to allege loss-causation element of its claims under § 10(b) and Rule 10b-5 did not require dismissal of complaint for lack of standing. U.S. Const. art. 3, § 2, cl. 1; Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

[19] **Federal Civil Procedure** 🔑 In general; injury or interest

**Federal Courts** 🔑 Case or Controversy Requirement

A plaintiff's failure to adequately allege an element of a cause of action, and thus to state a claim, is not the same as the nonexistence of a case or controversy for purposes of Article III standing. U.S. Const. art. 3, § 2, cl. 1.

[20] **Securities Regulation** 🔑 Causation; existence of injury

Pension fund adequately alleged that at time it filed complaint against medical products company, its former executives, and its former auditor for securities fraud under § 10(b) and Rule 10b-5, fund had Article III standing to assert such claims; fund alleged that decrease in value of its shares in company between times when fund purchased such shares and times when it sold shares resulted from defendants' misleading statements about company's revenue growth, after corrective disclosures revealed defendants' fraudulent scheme involving improper revenue recognition, sales, and distribution practices. U.S. Const. art. 3, § 2, cl. 1; Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

[21] **Federal Civil Procedure** 🔑 Pleading

For purposes of an Article III standing analysis, a court will generally accept the allegations

Case 1:20-cv-03794-DG-TAM   Document 74-4   Filed 02/23/24   Page 5 of 27 PageID #: 6790

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

that a defendant's actions were wrong and then ask whether a particular plaintiff's rights were violated by them. U.S. Const. art. 3, § 2, cl. 1.

**[22]** **Securities Regulation** 🔑 Manipulative, Deceptive or Fraudulent Conduct

To state a securities fraud claim under § 10(b), a plaintiff must plausibly allege the following elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b).

**[23]** **Securities Regulation** 🔑 Fraud on the market

Fraud-on-the-market claims under § 10(b) and Rule 10b-5 arise from the "efficient market hypothesis," which provides that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business; an efficient capital market rapidly and efficiently digests all available information and translates that information into the processed form of a market price, as millions of stock shares change hands daily and a critical mass of market makers study the available information and influence the stock prices through trades and recommendations. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[24]** **Securities Regulation** 🔑 Fraud on the market

A "fraud on the market," as a theory of causation supporting a securities fraud claim, occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market; just as an efficient market translates all available truthful information into the stock price, it processes the publicly disseminated falsehood and prices it into the stock as well, such that the market price of the

stock will include an artificial, inflationary value, reflecting the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation.

**[25]** **Securities Regulation** 🔑 Fraud on the market

Under the fraud-on-the-market theory of causation supporting a securities fraud claim, so long as a falsehood remains uncorrected once publicly disseminated to an informationally efficient market, the falsehood will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflationary value to the stock; if and when the misinformation is finally corrected by the release of truthful information, called a "corrective disclosure," the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price.

**[26]** **Securities Regulation** 🔑 Causation; existence of injury

The loss-causation element of securities fraud claims under § 10(b) and Rule 10b-5 requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[27]** **Securities Regulation** 🔑 Causation; existence of injury

To establish loss causation for a securities fraud claim under § 10(b), a plaintiff must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b).

**[28]** **Securities Regulation** 🔑 Fraud on the market

To establish loss causation under a fraud-on-the-market theory, a plaintiff bringing a securities fraud claim under § 10(b) and

Rule 10b-5 must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff. Securities Exchange Act of 1934 §§ 10, 21D, 15 U.S.C.A. §§ 78j(b), 78u-4(b); 17 C.F.R. § 240.10b-5(b).

**[29]** **Securities Regulation** 🔑 Pleading

At the pleading stage in a securities fraud action under § 10(b) and Rule 10b-5, it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[30]** **Securities Regulation** 🔑 Causation; existence of injury

In order to satisfy the loss-causation element of a securities fraud claim under § 10(b) and Rule 10b-5, while a plaintiff need not show that the defendant's misconduct was the sole and exclusive cause of the plaintiff's injury, it must show that the defendant's act was a substantial or significant contributing cause of the loss. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[31]** **Securities Regulation** 🔑 Causation; existence of injury

When a plaintiff purchases stock shares at an artificially inflated price attributed to fraudulent misrepresentations, and the plaintiff subsequently sells those shares at a lower price, the loss the plaintiff suffered from that lower price, in and of itself, is not dispositive of loss causation, as an element of a securities fraud claim under § 10(b) and Rule 10b-5; rather, it must be determined whether the lower price reflects a corrective disclosure of the fraud or a misrepresentation, in which case there is

loss causation, or whether it instead reflects changed economic circumstances, changed investor expectations, or new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[32]** **Securities Regulation** 🔑 Causation; existence of injury

By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement for claims under § 10(b) and Rule 10b-5 ensures that the federal securities laws do not become a system of investor insurance that reimburses investors for any decline in the value of their investments. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

**[33]** **Securities Regulation** 🔑 Fraud on the market

To demonstrate loss causation in a securities fraud case involving a fraud-on-the-market theory, a plaintiff must: (1) identify a "corrective disclosure," that is, a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud; (2) show that the stock's price dropped soon after that corrective disclosure; and (3) eliminate other possible explanations for the price drop, such that the factfinder can infer that it is more probable than not that it was the corrective disclosure, as opposed to other possible depressive factors, that caused at least a substantial amount of the price drop.

**[34]** **Securities Regulation** 🔑 Fraud on the market

To demonstrate loss causation in a securities fraud case under a fraud-on-the-market theory, the plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures.

**[35]    Securities Regulation** 🔑 Fraud on the market

Corrective disclosure, as is necessary to support a securities fraud claim based on a fraud-on-the-market theory of loss causation, can come from any source and take any form from which the market can absorb the information and react, so long as the disclosures revealed to the market the falsity of the prior misstatements.

**[36]    Securities Regulation** 🔑 Fraud on the market

In the analysis of loss causation in a securities fraud case under a fraud-on-the-market theory, it is critical to ask whether, even if the plaintiffs paid an inflated price for the stock as a result of the fraud or in reliance on it, the relevant truth eventually came out and thereby caused the plaintiffs to suffer losses.

**[37]    Securities Regulation** 🔑 Fraud on the market

For a disclosure to be corrective, as necessary to support a securities fraud claim under a fraud-on-the-market theory of loss causation, it need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company; if events or information that are not the subject of the misrepresentation cause the stock's price to drop, the investor has still suffered no loss on account of the misrepresentation because the fraud-induced inflation is still priced into the shares.

**[38]    Securities Regulation** 🔑 Fraud on the market

Because a corrective disclosure, as is necessary to support a securities fraud claim under a fraud-on-the-market theory of loss causation, must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory; this is because the "efficient market" theory posits that all publicly available information about a security is reflected in the market price of the security.

**[39]    Securities Regulation** 🔑 Fraud on the market

A corollary of the "efficient market" hypothesis, for purposes of a securities fraud claim relying on the fraud-on-the-market theory of loss causation, is that disclosure of confirmatory information, or information already known by the market, will not cause a change in the stock price because the market has already digested that information and incorporated it into the price; thus, to support loss causation, corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time.

**[40]    Securities Regulation** 🔑 Fraud on the market

Where a purchaser of stock sells its shares before the relevant truth begins to leak out into the market, the misrepresentation will not have led to any loss, for purposes of the loss-causation element of a securities fraud claim based on a fraud-on-the-market theory; however, once the truth is revealed, investors who purchased the stock at inflated prices, as well as those who still hold their stock, will suffer economic loss, because they will no longer be able to recoup the inflationary component of their purchase price by reselling their stock in the newly calibrated marketplace.

**[41]    Securities Regulation** 🔑 Fraud on the market

Alleged public statements by medical products company that disclosed some truthful information, such as company's parting of ways with distributor and resultant decrease in company's revenue from $3 million to $2 million, but failed to disclose company's use of distributors in fraudulent scheme to inflate revenues through improper revenue recognition, sales, and distribution practices did not constitute corrective disclosures establishing loss-causation element of stockholders' § 10(b) and Rule 10b-5 claims against company under fraud-on-the-market theory; company's statements served to conceal alleged ongoing fraud by misleading public about company's

finances and business practices, not to correct any falsehood, such that alleged falsehoods continued to taint price of company's shares. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[42]    Securities Regulation** 👉 Causation; existence of injury

News articles and securities analysts' reports on medical products company's business practices only repeated information already in public domain, and, thus, did not constitute corrective disclosures supporting loss-causation element of stockholders' § 10(b) and Rule 10b-5 claims against company based on allegations that company concealed fraudulent scheme to inflate revenue, even if share prices fell after each article or report; authors of articles and reports included disclaimers stating their work was based on publicly available information, stockholders did not identify any information in articles or reports that was new, non-public, or otherwise not readily available, and decline of stock price reflected changed investor expectations resulting from negative analysis and reporting. Securities Exchange Act of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[43]    Securities Regulation** 👉 Fraud on the market

Pension fund sold all its shares of medical products company before internal investigation by company's auditing committee allegedly revealed that company engaged in fraudulent scheme to inflate reported revenue using improper sales, distribution, and revenue recognition practices, and, thus, company's earlier announcement that investigation would be performed and that release of certain financial statements would be delayed did not constitute corrective disclosure supporting fund's claims against company for securities fraud under § 10(b) and Rule 10b-5 under fraud-on-the-market theory of loss causation. Securities Exchange Act

of 1934 § 10, 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5(b).

More cases on this issue

**[44]    Courts** 👉 Number of judges concurring in opinion, and opinion by divided court

When faced with an intra-circuit split, the Court of Appeals must apply the "earliest case rule," which states that when circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel.

1 Case that cites this headnote

**[45]    Federal Courts** 👉 Pleading

Court of Appeals would review stockholder's motion to amend its securities fraud complaint against company, former executives, and auditor under rules applying to motions to alter or amend judgment and motions for relief from final judgment or order, not rule governing motions to amend complaints, where stockholder had not exercised its right to amend as matter of course prior to entry of judgment, and stockholder moved to amend after district court had granted defendants' motion to dismiss for failure to state a claim and entered judgment stating stockholder's "action" was "dismissed." Fed. R. Civ. P. 15(a), 59(e), 60(b).

1 Case that cites this headnote
More cases on this issue

**[46]    Federal Civil Procedure** 👉 Error by court, clerk, or jury
**Federal Civil Procedure** 👉 Further evidence or argument

The only grounds for granting a motion to alter or amend a judgment are newly-discovered evidence or manifest errors of law or fact. Fed. R. Civ. P. 59.

2 Cases that cite this headnote

Case 1:20-cv-03794-DG-TAM    Document 74-4    Filed 02/23/24    Page 9 of 27 PageID #: 6794

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

**[47]    Federal Civil Procedure** 🔑 Further evidence or argument

A motion to alter or amend a judgment within 28 days of its entry cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment. Fed. R. Civ. P. 59(e).

2 Cases that cite this headnote

**[48]    Federal Civil Procedure** 🔑 Catch-all provisions

Relief from a final judgment based on any non-enumerated reason that justifies relief is an extraordinary remedy and requires a showing of extraordinary circumstances to justify the reopening of a final judgment. Fed. R. Civ. P. 60(b)(6).

2 Cases that cite this headnote

**[49]    Federal Civil Procedure** 🔑 Error by court, clerk, or jury

**Federal Civil Procedure** 🔑 Catch-all provisions

In the rule governing relief from a final judgment, the provision allowing such relief based on mistakes in the application of law and the provision allowing such relief "for any other reason that justifies relief" are mutually exclusive, and a court cannot grant relief under the latter provision for any reason which the court could consider under the former. Fed. R. Civ. P. 60(b)(1), 60(b)(6).

2 Cases that cite this headnote

**[50]    Federal Courts** 🔑 Altering, amending, modifying, or vacating judgment or order; proceedings after judgment

The Court of Appeals reviews a district court's decision to grant or deny relief from a judgment for abuse of discretion. Fed. R. Civ. P. 59(e), 60(b).

**[51]    Federal Civil Procedure** 🔑 Error by court, clerk, or jury

**Federal Civil Procedure** 🔑 Catch-all provisions

Stockholder's argument that district court erred in applying governing law when it granted company's motion to dismiss securities fraud action for failure to state a claim did not permit district court to grant stockholder's post-judgment motion to amend complaint, which was equivalent to motion for relief from final judgment, under provision of rule allowing relief from final judgment for any non-enumerated reason that justified relief; argument fell squarely within provision of relief-from-judgment rule enumerating "mistake" as ground for such motions, which was mutually exclusive with provision allowing relief "for any other reason that justified relief." Fed. R. Civ. P. 60(b)(1), 60(b)(6).

3 Cases that cite this headnote
More cases on this issue

**\*1227** Appeal from the United States District Court for the Northern District of Georgia, D.C. Docket No. 1:18-cv-00830-WMR

**Attorneys and Law Firms**

Douglas Wilens, Stephen Astley, Bailie Heikkinen, Andrew T. Rees, Jack Reise, Elizabeth A. Shonson, Robbins Geller Rudman & Dowd, LLP, Boca Raton, FL, John C. Herman, Herman Jones, LLP, Atlanta, GA, Arthur C. Leahy, Hillary B. Stakem, Robbins Geller Rudman & Dowd, LLP, San Diego, CA, for Plaintiff-Appellant.

Robert R. Long, IV, Keith R. Blackwell, Elizabeth Gingold Clark, Timothy J. Fitzmaurice, Alston & Bird, LLP, Atlanta, GA, Walter C. Carlson, Sidley Austin, LLP, Chicago, IL, Robert M. Garsson, Isaac S. Greaney, Sidley Austin, LLP, New York, NY, for Defendant-Appellee MiMedx Group, Inc.

Henry D. Fellows, Jr., Michael Coleman Gretchen, Ethan McLeod Knott, Fellows LaBriola, LLP, Atlanta, GA, for Defendant-Appellee Michael J. Senken.

William G. Leonard, Continuum Legal Group LLP, Atlanta, GA, for Defendants-Appellees Parker H. Petit, William C. Taylor.

John S. Moran, Francis Aul, Louis D. Greenstein, Charles William McIntyre, Nathan Robert Pittman, McGuireWoods, LLP, Washington, DC, Keisha Oldacre Coleman, Ballard Spahr, LLP, Atlanta, GA, for Defendant-Appellee Cherry Bekaert LLP.

Before Rosenbaum, Lagoa, Circuit Judges, and Wetherell, District Judge.[*]

[*] Honorable T. Kent Wetherell, II, United States District Judge, for the Northern District of Florida, sitting by designation.

### Opinion

Lagoa, Circuit Judge:

 **\*1228**  This appeal asks us to determine whether a series of allegations made by Carpenters Pension Fund of Illinois sufficiently demonstrates loss causation as to its claims under § 10(b) of Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission Rule 10b-5 against MiMedx Group, Inc., certain former MiMedx corporate executives, and Cherry Bekaert LLP at the motion to dismiss stage. The district court dismissed Carpenters's action, finding that none of the complaint's allegations occurring before the date Carpenters sold its MiMedx stock constituted a partial corrective disclosure sufficient to demonstrate loss causation.

Carpenters contends that the district court erred in its loss causation analysis. Carpenters further argues that the district court erred in denying its post-judgment motion for relief from judgment, as well as its post-judgment request for leave to amend its complaint. After careful review, and with the benefit of oral argument, we conclude that the district court erred in finding that Carpenters lacked standing to bring its Exchange Act claims against Defendants and vacate that portion of the district court's order. But we affirm the district court's order dismissing Carpenters's second amended complaint for failure to plead loss causation. We also affirm the district court's order denying Carpenters's post-judgment motion, including the denial of Carpenters's request for leave to amend.

### I. RELEVANT BACKGROUND

 **[1]**  At the motion to dismiss stage, we must accept all well-pleaded facts contained in the operative complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Accordingly, our discussion of the relevant facts comes from Carpenters's second amended complaint.

### \*1229  A. The Parties

MiMedx is a Florida corporation headquartered in Marietta, Georgia. From April 25, 2013, through November 7, 2018, MiMedx's common stock was publicly traded on the NASDAQ under the ticker symbol "MDXG." Parker H. Petit was appointed as CEO, President, and Chairman of the Board of Directors of MiMedx in 2009. Michael J. Senken was CFO of MiMedx from January 15, 2010, through June 6, 2018. William C. Taylor joined MiMedx on September 22, 2009, as COO and President and later became a Director on October 25, 2011.[1] Cherry Bekaert is a certified public accounting firm headquartered in Richmond, Virginia, with an office in Atlanta, Georgia. The firm served as MiMedx's external auditor for fiscal years 2008 through 2016 and was dismissed by MiMedx on August 4, 2017. For purposes of this appeal, we refer to MiMedx, Petit, Senken, and Taylor collectively as the "MiMedx Defendants" and refer to the MiMedx Defendants and Cherry Bekaert collectively as "Defendants."

[1] Petit, Senken, and Taylor were terminated for cause on or effective as of June 30, 2018.

Carpenters is the lead plaintiff in this consolidated securities class action. Carpenters purchased 41,080 shares of MiMedx common stock in three separate transactions between August 2017 and October 2017, and later sold those shares in December 2017. Carpenters reinvested in MiMedx by purchasing 39,200 shares of common stock on January 16, 2018, which it later sold on February 26, 2018.

MiMedx is a "leading global supplier of amniotic tissue products" and "designs, manufactures, and sells products derived from human placental tissues ... donated by mothers after childbirth." "These products are sold in the form of sheets or wraps to be applied to a patient's skin (often referred

Case 1:20-cv-03794-DG-TAM    Document 74-4    Filed 02/23/24    Page 11 of 27 PageID #: 6796

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

to as 'grafts' or 'tissues') or in the form of micronized powders to be applied to a patient's skin either topically or by injection."

After Petit joined MiMedx, the company acquired a proprietary sterilization process called "PURION," which "was designed to maximize production yield while minimizing processing costs." Using the PURION process, MiMedx developed two commercial products during the Class Period [2] : EpiFix and AmnioFix. EpiFix is a wound care product intended to treat inflammation and various types of chronic wounds. AmnioFix is a surgical, sports medicine, and orthopedics ("SSO") product "to treat inflammation, minimize scar tissue formation, and treat conditions such as tendonitis, plantar fasciitis, lateral epicondylitis, medical epicondylitis, bursitis, strains, and sprains." EpiFix is covered by Medicare, Medicaid, and private insurance, but AmnioFix is not.

[2]     The Class Period is defined as the period from March 7, 2013, through June 29, 2018.

MiMedx operates a business segment named Regenerative Biomaterials that includes all of its products and reports its revenue in two separate product categories: Wound Care and SSO. The majority of MiMedx's revenues come from domestic sales to health care customers in the United States; its customers can be broken down into government customers, e.g., the U.S. Department of Veterans Affairs and Department of Defense, and private customers, e.g., hospitals, clinics, doctor's offices.

### B. Factual Background

#### 1. General Allegations Relating to the MiMedx Defendants

After MiMedx acquired PURION, the company reported "explosive growth" from the first quarter of 2012 to the third quarter of 2017, meeting or exceeding revenue **\*1230** guidance in all but one of the quarters. For example, in 2016, MiMedx reported annual revenue of over $245 million, around a 3,000 percent increase from 2011.

But "[u]nbeknownst to investors," MiMedx's "remarkable growth" and "flawless" performance during the Class Period were "predicated on myriad improper and illicit sales and distribution practices, as well as a massive accounting fraud perpetrated at the behest of its executive leadership."

Defendants "emphasized shortterm business goals over compliance and ethics," "purposely took action to disregard revenue recognition rules" under Generally Accepted Accounting Principles ("GAAP") and to "manipulate the timing and recognition of revenue, acted against employees who raised concerns about [MiMedx's] practices[,] and marginalized [MiMedx's] legal and accounting departments and advisors." During the Class Period, MiMedx trained sales representatives to infiltrate, influence, and offer illegal inducements—e.g., free meals and paid speeches—to doctors and their staff to encourage the use of MiMedx products. MiMedx also employed many unlawful practices to guarantee reimbursement for its products from third-party payors such as Medicare and Medicaid and manipulated charitable donations to subsidize customer use of its products.

To give the appearance of consistent revenue growth, the MiMedx Defendants orchestrated a massive fraudulent scheme, exploiting their close relationships with distributors to engage in a multitude of improper revenue recognition practices and artificially inflate MiMedx's sales in order to achieve revenue guidance. Beginning in 2012, MiMedx partnered with a purportedly independent distributor, AvKARE, Inc., to sell products to the VA. But, as later admitted, the MiMedx Defendants had an undisclosed side arrangement with AvKARE, which allowed them to maintain control over the distribution and sale of products to the VA and which they used to stock VA shelves with unordered and unneeded product. As a result, VA shelves were soon "absolutely overflowing," with product "spilling out of every cabinet available," causing VA employees to question MiMedx's practices. While the MiMedx Defendants planned to "feather[ ] back" overstocked product as returns in future reporting periods, there was simply too much product to return without raising red flags or jeopardizing MiMedx's ability to meet quarterly projections. Thus, MiMedx employed various schemes to conceal excess inventories, avoid product returns, and "clean up the books."

Similar to its arrangement with AvKARE, MiMedx relied on several commercial distributors to provide much needed revenue injections at the end of quarters. MiMedx had close ties to these distributors and leaned on them to take significant quantities of often-unneeded product at quarter end so that MiMedx could appear to meet its financial guidance. In return for inflating its sales figures (and enabling MiMedx to prematurely recognize revenue in violation of GAAP), MiMedx provided the distributors with highly favorable, off-book terms, including reduced prices, special financing, and

lax return policies. Through this channel-stuffing scheme, MiMedx inflated its financial results by millions of dollars.

### 2. Alleged Partial Corrective Disclosure

Carpenters contends that, over the course of several years, the "truth regarding Defendants' extensive misconduct leaked into the market through a series of partial corrective disclosures, culminating in MiMedx's admission that nearly six years of financial results were tainted by fraud, and the forced resignations of Petit, Taylor, and Senken for misconduct." Carpenters further contends that the second **\*1231** amended complaint identifies numerous partial corrective disclosures between December 31, 2014, and December 5, 2018, which "caused statistically significant drops in MiMedx's stock price" and allegedly corrected the stock price's artificial inflation. These alleged partial corrective disclosures identified by Carpenters are:

(a) On December 31, 2014, MiMedx issued a press release announcing that it received a civil subpoena from the U.S. Department of Health and Human Services in connection with the Department's investigation into MiMedx's sales and marketing activities. In this press release, Petit stated:

> I can assure you that the corporate officers at MiMedx are not aware of anything that would stimulate this ... investigation. We have continually maintained and improved a robust compliance program. We have been very focused on the thoroughness of our compliance policies and our staff adhering to those policies. For instance, MiMedx employees participate in a thorough training program regarding our policies and the standards that have been established and enforced to assure their understanding and adherence to our compliance programs. Employees may convey anonymously and directly to senior management and our Board of Directors any form of concern, complaint or inquiry related to our compliance programs or other issues. With the significant growth we are experiencing, this has been and continues to be an initiative in which we devote considerable time, attention and resources.
>
> ....
>
> We screen all of our applicants very carefully. With respect to former ABH [ 3 ] applicants, we sought additional input from some former ABH corporate management who

joined MiMedx and who were familiar with the suspected violations and the individuals involved.

[3] ABH is a subsidiary of Shire Pharmaceuticals LLC, which competed with MiMedx in the wound care market. MiMedx grew its sales force by acquiring sales representatives from ABH.

(b) On October 13, 2015, MiMedx hosted an analyst day during which MiMedx discussed parting ways with CPM, its largest U.S. commercial distributor. This departure negatively impacted MiMedx's third quarter 2015 figures by $2 million to $3 million. According to Carpenters, the subsequent decline in MiMedx's stock price on these days would have been steeper had the MiMedx Defendants revealed the "true scope of their fraud and dependence on CPM and its network of sub-distributors ... to facilitate their improper sales and distribution practices, including channel stuffing."

(c) On April 10, 2016, "MiMedx issued a press release announcing that 1Q16 revenue fell short of forecasted guidance by $2 million." On this day, MiMedx recorded its first revenue miss after seventeen quarters of meeting or exceeding its revenue guidance. Petit stated that the company was disappointed that its revenue "fell short of [the] forecasted guidance by about two million dollars." According to Carpenters, "Petit misleadingly attributed this shortfall to 'growing pains' resulting from the initial effects of the installation of a Sales Management System on the sales organization, the realignment of certain sales management to prepare SSO for autonomous growth, and the assimilation of Stability." [4] **\*1232** Petit further falsely emphasized that the "first quarter issues resulting in our lower than expected revenues are not competitive related or systemic to advanced wound care or our SSO business." But, in reality, "the shortfall was the result of [the MiMedx] Defendants' systemic channel stuffing practices and fraudulent revenue recognition scheme catching up to them."

[4] In January 2016, MiMedx acquired Stability, a Tennessee-based commercial distributor that MiMedx had been using "to help make up for the revenue shortfall resulting from the winding down of MiMedx's relationship with CPM."

(d) On December 15, 2016, Luke Tornquist and Jess Kruchoski, former MiMedx employees, "filed a lawsuit against MiMedx and Petit for their termination in response to declaring concerns about a channel stuffing scheme to inflate revenue." The same day, Petit responded with a press release

characterizing their allegations as "not factual and fallacious." Petit also misled the market by asserting Kruchoski and Tornquist were terminated due to their sale of competitors' products, not the concerns they raised about Defendants' conduct."

(e) On May 23, 2017, Joe Munda, a securities analyst from First Analysis, "issued a report concerning the Company's relationship with AvKARE," stating the relationship was "evolving and confusing" and MiMedx's valuation appeared stretched. According to Carpenters's complaint, Munda's report was based on non-public facts gathered during his investigation into MiMedx, which included conversations with former sales representatives, VA personnel, and other industry participants.

(f) On September 7, 2017, *The Capital Forum* issued an article reporting on an investigation into MiMedx's channel stuffing scheme at VA facilities. The VA disclosed this investigation when it denied a Freedom of Information Act request submitted by *The Capital Forum* based on what the VA described as "an ongoing law enforcement investigation." The same day, MiMedx released a press release that allegedly "misleadingly downplayed former employees' channel stuffing allegations, and threatened short sellers making arguments based on prior allegations." Carpenters also alleged that the press release misleadingly claimed that MiMedx was not a target of the investigation but instead was assisting in it and that none of MiMedx's executives directed terminated individuals to provide gifts and meals to VA employees in violation of federal law and MiMedx policies.

(g) On September 20, 2017, Aurelius Value "issued a report questioning MiMedx's improper channel stuffing in violation of GAAP and the Company's reliance on distributors" based on its research including communication with a former MiMedx sales representative. Viceroy Research "also issued a 35-page report discussing improper kickback and bribery schemes," based on "non-public internal MiMedx documents, including excerpted communications between employees, which revealed that improper conduct at MiMedx was pervasive and directed by senior management." In response, MiMedx issued a press release in which it stated that those reports "have virtually no basis in fact, are littered with innuendo and contain many statements that are simply not correct." MiMedx characterized the reports as "a concerted short seller attack by numerous entities."

(h) On September 27, 2017, Aurelius issued a report claiming that MiMedx's second audit committee investigation,[5] which concluded on March 1, 2017, and had determined that MiMedx had not engaged in **\*1233** any wrongdoing, was not independent because members on the committee had "longstanding ties to" MiMedx and Petit, contrary to Petit's statements touting the independence of the investigation. Two days later, MiMedx issued a press release in response, in which Petit stated:

> I encourage all MiMedx shareholders to thoroughly review and consider our document posted today on our website. As you are aware, MiMedx and all other public companies are governed by federal regulations prohibiting the dissemination of false and misleading information about the Company; unfortunately, organizations like Viceroy Research and Aurelius Value are not held to those standards and often such organizations have little to no accountability for the misinformation they publish. Both the Viceroy Research report and the Aurelius Value report indicate that either they are short in MDXG, or that the reader should assume they are short in MDXG.

[5]    MiMedx's audit committee had conducted a previous investigation from late 2015 to early 2016 based on a complaint from MiMedx's former Controller, Mark Andersen. This first audit committee investigation ended in February 2016, with the audit committee concluding that Andersen's allegations lacked merit.

(i) On October 23, 2017, Munda issued a report "concerning MiMedx excluding its analysts from asking questions on calls and noting unanswered questions about its dealings with the VA." Munda suspended his price target for MiMedx. The next day, Citron Research "posted a video on YouTube concerning [MiMedx's] use of third parties to inflate financials," based on existing and new research.

(j) On November 16, 2017, Viceroy issued a report "revealing, among other things, that MiMedx fraudulently exploited the insurance reimbursement system by manipulating the insurance codes used for medical procedures involving MiMedx products." The "report revealed that MiMedx sent legal material to its former employees requesting that they not contact regulatory agencies, included in its settlement terms that the former employees retract prior statements in direct violation of federal regulations, and hid its improper conduct on confidentiality grounds."

(k) On November 20, 2017, MiMedx issued a press release responding to the recent short seller reports, including Viceroy's. According to Carpenters, this press release caught the market's attention and raised concerns given MiMedx's "unorthodox defense" and "significant time and resources" devoted to the growing allegations of fraudulent conduct.

(l) On February 15, 2018, Aurelius issued an "Open Letter to the MiMedx Auditors" regarding improper accounting practices amounting to a "serious and pervasive fraud." Aurelius's letter also stated that MiMedx was filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested in order to hit sales targets and that Aurelius's letter relied on "exhaustive forensic research."

(m) On February 20, 2018, MiMedx announced a third audit committee investigation and the postponement of its 2017 Form 10-K. MiMedx explained that this investigation was "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," including "the accounting treatment of certain distributor contracts." But, according to Carpenters, MiMedx continued to mislead investors by stating that "based on information available to date ... the outcome of such investigation should not have a material impact on revenue guidance for 2018."

(n) On February 22, 2018, "*The Wall Street Journal* reported improper payments to more than 20 doctors for the use of MiMedx products." MiMedx held a conference call the next day "wherein the Company downplayed the delay in the filing of its 2017 Form 10-K but expressed uncertainty in the timeframe" for the third audit committee investigation. On the call, **\*1234** Petit stated that the timeframe for the investigation's completion had not been determined, and Taylor stated that MiMedx's management was not in control of the audit committee's timeline and that the committee's

investigation involved "current and prior period [ ] matters" and "sales and distributor practices." Also on the call, the MiMedx Defendants stated that they "certainly believe you can expect our revenue growth to continue at a rapid rate," that MiMedx's revenue guidance for the year would be from \$383 to 387 million," and that its "cash flow remains very strong." Petit claimed that MiMedx was a victim of "illegal short-sellers with a value destructive agenda" while Taylor claimed that the third audit committee investigation would not affect "operational performance" and that MiMedx was experiencing "rapid growth."

As noted above, Carpenters did not own any MiMedx stock after February 26, 2018. Carpenters, however, alleges that the following events occurring during the Class Period were partial corrective disclosures relevant to its claims.

On February 26, 2018, a *Bloomberg* article disclosed a Department of Justice ("DOJ") investigation into MiMedx for overcharging the government for its products and into MiMedx's distribution practices.

In response to the *Bloomberg* article, on February 27, 2018, MiMedx released a "misleading press release" stating it was unaware of any DOJ investigation, denying the *Bloomberg* allegations as an illegal short selling attack since September 2017, and claiming that terminated employees were retaliating by acting in concert with the short sellers. MiMedx directed news writers to its "effective" rebuttals of the allegations. Its press release also reassured investors that the accusations should not affect performance and that "management remains confident in the Company's ability to deliver operational and clinical success in the months and years to come."

On March 15, 2018, MiMedx admitted it was under investigation by the DOJ, but on the same day, MiMedx issued a press release in which Petit provided "misleadingly positive statements" about MiMedx's financial performance. Next, on April 26, 2018, MiMedx issued another misleading press release, stating that it was enjoying overwhelmingly strong sales and financial results and that it was raising revenue guidance. On May 8, 2018, "the DOJ released a statement that a federal grand jury returned [an indictment of VA employees] for conspiracy to commit health care fraud involving benefits received from MiMedx employees." On June 7, 2018, MiMedx disclosed that nearly six years of financials were materially incorrect, requiring their restatement and also announced that Senken departed the

Case 1:20-cv-03794-DG-TAM    Document 74-4    Filed 02/23/24    Page 15 of 27 PageID #: 6800

**MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)**
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

company. Then, on July 2, 2018, "MiMedx disclosed that Petit and Taylor resigned from their positions," linking the resignations to findings from the third audit committee investigation. [6]

[6]   In 2019, Petit and Taylor were charged via indictment with one count of securities fraud and one count of conspiracy to commit securities fraud, make false SEC filings, and obstruct MiMedx's auditor. *See* Indictment, *United States v. Petit*, No. 19-cr-850-JSR (S.D.N.Y. Nov. 25, 2019), ECF No. 1. The charges concerned transactions in 2015 with four MiMedx distributors. *Id.* Petit was convicted of securities fraud but acquitted of conspiracy; Taylor was acquitted of securities fraud but convicted of conspiracy. Jury Verdict, *Petit* (S.D.N.Y. Nov. 19, 2020), ECF No. 121. The SEC has also filed a civil enforcement action against Petit, Taylor, and Senken, which remains pending. *See SEC v. MiMedx Grp., Inc.*, No. 1:19-cv-10927-NRB (S.D.N.Y. Nov. 26, 2019).

### 3. Allegations Specific to Cherry Bekaert

Carpenters alleged that Cherry Bekaert "repeatedly issued clean audit opinions **\*1235** concerning the accuracy of MiMedx's financial statements and the effectiveness of" MiMedx's internal control over financial reporting ("ICFR"), which were relied upon by investors. But despite Cherry Bekaert's original certifications and audit opinions, MiMedx's financial statements for the fiscal years ending in 2012, 2013, 2014, 2015, and 2016 were materially misstated and did not comply with GAAP. And contrary to Cherry Bekaert's assertion, MiMedx's ICFR was not effective for those years. According to Carpenters, Cherry Bekaert consistently failed to conduct its audits in accordance with the Public Company Account Oversight Board ("PCAOB") standards because it did not: "properly plan and perform its audits to address key fraud risks, including revenue recognition; exercise due care or professional skepticism; obtain sufficient competent evidential matter; appropriately test related party transactions and potential illegal acts; properly assess the Company's ICFR; or identify areas of material weakness." Nor did Cherry Bekaert exercise professional skepticism and expand the scope of the audits, and its reckless disregard of MiMedx's red flags was evidenced by Ernst & Young LLP subsequently raising serious questions about MiMedx's

revenue recognition and the adequacy of the first two audit committee investigations.

In particular, Carpenters complaint alleged that "Cherry Bekaert violated PCAOB standards either by failing to identify the fraud risk of improper revenue recognition in planning its audit or by failing to perform required auditing procedures to address the risk." It did not appropriately audit sales to AvKARE and others. Nor did it abide by related party auditing standards during the Class Period. It also ignored red flags associated with whistleblower complaints and the first two audit committee investigations.

Carpenters contended that the MiMedx Defendants' misrepresentations did not absolve Cherry Bekaert of liability because Cherry Bekaert failed "to follow up on significant red flags associated with the misrepresented sales transactions, and it placed undue reliance on management representations over independent, third-party evidence." Carpenters also contended that Cherry Bekaert's clean audit opinions certifying the accuracy of MiMedx's financial statements and the effectiveness of MiMedx's ICFR for the years 2012 to 2016 were false and misleading statements, given that those statements could not be relied on and had to be restated and that the ICFR were ineffective.

On August 4, 2017, MiMedx replaced Cherry Bekaert with Ernst & Young. Carpenters asserts that this replacement happened in "the midst of the unraveling fraud, including investigations, whistleblower litigation, and the SEC's request for ... findings" from the second audit committee investigation.

### C. District Court Proceedings

On February 23, 2018, Norman MacPhee filed a securities fraud class action suit against MiMedx, Senken, and Petit. Carpenters moved, pursuant to the Private Securities Litigation Reform Act of 1995, to consolidate MacPhee's action and a separate action filed by Matthew Kline. Carpenters also moved to be appointed lead plaintiff for the putative class. On January 16, 2019, the district court granted Carpenters's motion.

After its appointment as lead plaintiff, Carpenters filed a consolidated complaint. Defendants filed four separate motions to dismiss that complaint. While those motions were pending, the parties agreed, with the district court's

approval, that Carpenters could file the second amended **\*1236** complaint, which is the operative complaint in this case.

In the second amended complaint, Carpenters brought the following claims on behalf of the putative class: (1) Count I for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under that Act, 17 C.F.R. § 240.10b-5(b), against the MiMedx Defendants; (2) Count II for violations of § 10(b) and Rule 10b-5 against Cherry Bekaert; and (3) Count III for violations of § 20(a) of the Exchange Act against Petit, Taylor, and Senken. The putative class consisted of "all persons or entities that purchased or otherwise acquired the publicly traded common stock of MiMedx between March 7, 2013 and June 29, 2018, inclusive, and who were damaged thereby," excluding Defendants, the officers and directors of MiMedx, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

As to loss causation—the primary issue on appeal—Carpenters alleged that the "timing and magnitude" of the decline in price of MiMedx common stock in response to the alleged "partial disclosures" discussed above negated any inference that the losses suffered by Carpenters "were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct." Carpenters noted that there was clear divergence of MiMedx's company stock price compared to the NASDAQ Composite Index, as well as the NASDAQ Biotechnology Index. It alleged that the price drops in MiMedx stock would have been more significant "if the full truth regarding MiMedx's improper sales and distribution practices and fraudulent revenue scheme had been known." But Carpenters claimed that the "Defendants continued to make false and misleading statements downplaying, denying, and concealing the fraud in order to maintain an appearance of the Company's legitimacy and to artificially prop up its stock price." And "the rapid declines," once the "truth was revealed," "served to remove artificial inflation from the price of MiMedx common stock, and were direct and foreseeable consequences of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market and a materialization of the risks concealed by Defendants' fraud." As a result, Carpenters and the class suffered true economic losses that were a direct and proximate result of Defendants' fraudulent scheme, misrepresentations, and omissions that artificially inflated the stock.

Defendants all moved to dismiss the second amended complaint. The MiMedx Defendants argued that Carpenters lacked standing and could not plead loss causation because no corrective disclosure of the alleged fraud occurred before Carpenters sold all of its MiMedx stock in February 2018. They asserted that Carpenters could not have it "both ways" by simultaneously arguing that a misstatement itself constituted a corrective disclosure. As to the news articles and analyst reports cited by Carpenters, they stated that those reports were obtained from information already in the public domain and thus were not corrective because they did not disclose new information. As to the lawsuits and investigations alleged in the second amended complaint, they argued that the commencement of an investigation, without more, is insufficient under this Court's precedent to constitute a corrective disclosure. And because there were no corrective disclosures alleged prior to Carpenters selling all of its stock, the MiMedx Defendants argued that Carpenters's investment losses were wholly unrelated to the misrepresentations alleged in the second **\*1237** amended complaint. Cherry Bekaert adopted the MiMedx Defendants' arguments while asserting other grounds for dismissal.

The district court dismissed the second amended complaint. In its order, the district court explained that in order to have standing Carpenters was required to plausibly allege a causal connection between its injury and Defendants' challenged actions. As relevant here, the district court found that Carpenters could not establish loss causation because it sold all of its MiMedx stock before any corrective disclosure revealed to the market the falsity of a prior statement.

In reaching its conclusion, the district court explained that the second amended complaint alleged fifteen "partial disclosures" before Carpenters sold its stock, which fell into three categories: (1) allegedly misleading disclosures by MiMedx; (2) news articles and analyst reports; and (3) lawsuit and investigation announcements. As to the first category, the district court found that Carpenters was improperly relying on the disclosures to be both misstatements and corrective disclosures. The district court also found that those disclosures did not reveal the pertinent truth regarding the alleged fraudulent conduct.

As to the second category, the district court found that the reports and articles "only repeated information that was already in the public domain." But, the district court reasoned, a corrective disclosure requires disclosure of *new*

Case 1:20-cv-03794-DG-TAM    Document 74-4    Filed 02/23/24    Page 17 of 27 PageID #: 6802

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

information; the repackaging of already-public information by an analyst was insufficient to constitute a corrective disclosure.

As to the third category, the district court explained that the investigation announcements, without more, were not corrective disclosures because they did not reveal to the market that the company's previous statements were false or fraudulent. While stock prices may fall as a result of such announcements, the court reasoned that the decline in stock price is due to the investigation or lawsuit potentially being seen as adding a risk of future corrective action. While Carpenters argued that the announcements were corrective because they were followed "by related disclosures that further informed investors of Defendants' actual wrongdoing," the district court declined to apply language from a footnote in our decision in *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013), which hypothesized that "[i]t may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure ... when the investigation is coupled with a later finding of fraud or wrongdoing." As such, the district court determined that the announcements regarding (1) the lawsuit by former employees, (2) the government investigations, and (3) MiMedx's own internal investigation cannot be considered corrective disclosures because they only reveal the risk of a future corrective disclosure and are not corrective themselves.

Turning to standing, the district court stated that Carpenters must sufficiently allege "that the fraud-induced inflation that was baked into the purchase price of the MiMedx stock was subsequently removed from the stock's price by a corrective disclosure, thereby causing the loss." But, the district court explained, when the shares are sold before the pertinent truth regarding the representations is revealed through a corrective disclosure, the losses are not attributable to the misrepresentations. The district court found that because there were no corrective disclosures before Carpenters sold all of its MiMedx common stock, Carpenters's investment losses were not fairly traceable to the alleged misrepresentations, as the artificial inflation was **\*1238** still "baked into" the stock's price when Carpenters sold its shares.

Carpenters subsequently filed a motion for relief from judgment and for leave to amend pursuant to Federal Rules of Civil Procedure 59(e), 60(b), and 15(a)(2). Carpenters argued that in dismissing its claims the district court erred in focusing solely on the pre-February 26, 2018, disclosures

because when "a complaint alleges that the undisclosed truth leaked out over time, the court must cumulatively analyze the series of partial disclosures alleged to determine whether loss causation was adequately pled, rather than engage in an individual analysis of each distinct disclosure." Carpenters also argued that the district court mischaracterized some of the alleged disclosures, particularly those involving the investigations, and improperly applied this Court's decision in *Meyer*. Alternatively, Carpenters sought leave to amend the second amended complaint to add additional allegations and add an additional plaintiff—Amalgamated Bank, an investor that held MiMedx shares through the end of the Class Period.

The district court denied Carpenters's post-judgment motion. The district court found that the motion failed under Rule 59(e) because Carpenters predominately raised the same arguments it had raised in support of the second amended complaint. As to Rule 60(b), the district court rejected Carpenters's argument that it had misapplied the law. Further, the district court denied Carpenters's motion for leave to amend, explaining that because Carpenters waited until after judgment was entered to seek such relief, Rule 15(a) did not apply and that because Carpenters was not entitled to relief under Rule 59(e) or 60(b), it was not entitled to leave to amend post-judgment.

This appeal ensued.

## II. STANDARDS OF REVIEW

**[2]** Whether a plaintiff has standing to sue is a threshold jurisdictional question that we review *de novo*. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc).

**[3]** **[4]** **[5]** **[6]** **[7]** We also review *de novo* a district court's order dismissing a complaint. *FindWhat*, 658 F.3d at 1295. We "must accept as true all of the [factual] allegations contained in a complaint," but we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* While the plausibility standard is not akin to a "probability requirement," it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

**[8]  [9]**   We review the denial of a motion to alter or amend a judgment under Rules 59(e) and 60(b), as well as the denial of a motion for leave to amend, for abuse of discretion. *Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co.,* 508 F.3d 1337, 1341 (11th Cir. 2007) (Rule 59(e)); *Arthur v. Thomas,* 739 F.3d 611, 628 (11th Cir. 2014) (Rule 60(b)); *Rosenberg v. Gould,* 554 F.3d 962, 965 (11th Cir. 2009) (motion for leave to amend).

### III. ANALYSIS

We divide our discussion into three parts. First, we address the threshold issue **\*1239** of whether Carpenters had standing to bring its claims under the Exchange Act. Second, we determine whether Carpenters plausibly pleaded loss causation as to its Exchange Act claims in the second amended complaint. Finally, we address whether the district court erred in denying Carpenters's post-judgment motions under Rules 59(e) and 60(b), including its request for leave to amend the second amended complaint under Rule 15(a)(2).

### A. Standing

**[10]  [11]  [12]  [13]  [14]**   Article III of the United States Constitution limits federal courts to deciding "Cases" or "Controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections* ("*GALEO*"), 36 F.4th 1100, 1113 (11th Cir. 2022) (quoting *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019)). To establish Article III standing, the plaintiff "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, —— U.S. ——, 141 S. Ct. 2190, 2203, 210 L.Ed.2d 568 (2021). Additionally, in the context of a class action, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1211 (11th Cir. 2019) (quoting *O'Shea v. Littleton,*

414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). Indeed, "a plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, even if the persons described in the class definition would have standing themselves to sue." *Id.* (quoting *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir. 1987)); *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting cases and explaining that this Court has an obligation to assure itself that a plaintiff has Article III standing at the outset of litigation but that standing does not have to be maintained throughout all stages of litigation). Further, "Article III standing must be determined as of the time that the Plaintiff's complaint is filed." *A&M,* 925 F.3d at 1212.

**[15]  [16]  [17]**   The disputed element of Article III standing at issue here is traceability, i.e., that the injury was likely caused by the defendant. As we have stated, in evaluating Article III's "traceability" requirement, the plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *GALEO*, 36 F.4th at 1115 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Traceability, along with the other elements of standing, is "determined at the time the plaintiff's complaint is filed." *GALEO*, 36 F.4th at 1113 (quoting *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014)). In examining the traceability of the plaintiff's injury to the defendant's conduct, "we are concerned with something less than the concept of 'proximate cause,' " as, "for standing purposes," a plaintiff "is not required to prove causation beyond a reasonable doubt or by clear and convincing evidence." *Focus on the Family*, 344 F.3d at 1273 (emphasis removed); *accord Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) ("We've made it clear that the traceability requirement is less stringent than proximate cause."). "Instead, **\*1240** even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family*, 344 F.3d at 1273. In other words, "standing is not defeated merely because the alleged injury can be fairly traced to the actions of both parties and non-parties." *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1247 (11th Cir. 1998).

In its dismissal order, the district court found that Carpenters's investment losses were not fairly traceable to Defendants' alleged misrepresentations because "the artificial inflation

caused by the misrepresentations was still 'baked into' the stock's price" when Carpenters sold its stock, meaning that Carpenters's loss was wholly unrelated to the alleged misrepresentations. In other words, the district court concluded that, because Carpenters failed to plausibly plead loss causation as to its claims under § 10(b) of the Exchange Act, it failed to establish traceability for purposes of Article III standing.

[18]  [19]  We conclude that the district court erred in finding that Carpenters lacked standing at the time it filed its suit as to its § 10(b) claims. The district court appears to have equated a failure to adequately allege an element of a cause of action and thus a failure to state a claim with the nonexistence of a "Case" or "Controversy" for purposes of Article III standing. But they are not the same. And while a plaintiff may both lack standing and fail to state a claim, it is also true that a plaintiff can meet the requirement for constitutional standing but nonetheless fail to state a claim. For example, in *Meyer*, despite concluding that the plaintiff failed to adequately allege loss causation—a conclusion we reach here as well—we did not dismiss for lack of standing, but instead for failure to state a claim. 710 F.3d at 1196–202; *see also Moody v. Holman*, 887 F.3d 1281, 1285 (11th Cir. 2018) (explaining that courts "must not 'confuse weakness on the merits with the absence of Article III standing' " (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800, 135 S.Ct. 2652, 192 L.Ed.2d 704 (2015))).

[20]  [21]  Put very broadly, for purposes of a standing analysis, a court will generally accept the allegations that a defendant's actions were wrong and then ask whether a particular plaintiff's rights were violated by them. While there are certainly nuances and exceptions to this broad characterization, when Carpenters filed its complaint, it had standing to bring its § 10(b) claims. Carpenters alleged it suffered a decrease in the value of its MiMedx shares that was caused by—or fairly traceable to—Defendants' allegedly misleading statements and actions about MiMedx. Taken as true, the allegations sufficiently satisfy our test for Article III's traceability requirement. And Carpenters's loss would likely be redressed by a ruling in its favor.

We now turn to the merits of this appeal.

**B. Loss Causation**

[22]  Carpenters's claims against Defendants in this case are based on § 10(b) of the Exchange Act[7] and Rule 10b-5 promulgated **\*1241** there-under.[8] To state a claim under § 10(b), a plaintiff must plausibly allege the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

[7]  Section 10(b), codified at 15 U.S.C. § 78j(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement1 any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[8]  Rule 10b-5, in relevant part, provides that "[i]t shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5.

[23]  Carpenters's claims rely on a "fraud-on-the-market" theory of causation. Fraud-on-the-market claims arise from the efficient market hypothesis, which provides that "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *FindWhat*, 658 F.3d at 1309–10 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 241, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). "[A]n efficient capital market rapidly and efficiently digests all available information and translates

that information into 'the processed form of a market price,' " as millions of stock shares change hands daily and "a critical mass of 'market makers' study the available information and influence the stock prices through trades and recommendations." *Id.* at 1310 (quoting *Basic,* 485 U.S. at 243–44, 248, 108 S.Ct. 978).

 **[24]** **[25]** "A 'fraud on the market' occurs when a material misrepresentation is knowingly disseminated to an informationally efficient market." *Id.* As we explained in *FindWhat*:

> Just as an efficient market translates all available *truthful* information into the stock price, the market processes the publicly disseminated *falsehood* and prices it into the stock as well. The market price of the stock will then include an artificial "inflationary" value—the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation. So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day. If and when the misinformation is finally corrected by the release of truthful information (often called a "corrective disclosure"), the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price.

*Id.* (emphasis in original) (citations omitted).

 **[26]** **[27]** **[28]** The central issue in this appeal is the loss causation element of Carpenters's § 10(b) claims. The loss causation element "requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *Id.* at 1309. To establish loss causation for a § 10(b) claim, "a plaintiff must offer 'proof of a causal connection between the misrepresentation and the investment's subsequent decline in value.' " *Meyer,* 710 F.3d at 1195 (quoting *Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1448 (11th Cir. 1997)); **\*1242** *accord* 15 U.S.C. § 78u-4(b). Stated another way, in a fraud on the market theory like the one Carpenters proceeds under here, "the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.' " *Id.* (quoting *Hubbard v. BankAtlantic Bancorp., Inc.,* 688 F.3d 713, 725 (11th Cir. 2012)).

 **[29]** **[30]** **[31]** **[32]** At the pleading stage, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). But while "the plaintiff need not show that the defendant's misconduct was the 'sole and exclusive cause' " of its injury, it must show that "the defendant's act was a 'substantial' or 'significant contributing cause' " of the loss. *FindWhat,* 658 F.3d at 1309 (quoting *Robbins,* 116 F.3d at 1447). For example, when a plaintiff purchases stock shares at an artificially inflated price attributed to fraudulent misrepresentations, and the plaintiff subsequently sells those shares at a lower price, the loss the plaintiff suffered from that lower price, in and of itself, is not dispositive of loss causation. *See Dura,* 544 U.S. at 342, 125 S.Ct. 1627 ("Normally, in cases such as this one (*i.e.,* fraud-on-the-market cases), an inflated purchase price will not itself constitute or proximately cause the relevant economic loss."); *see also Meyer,* 710 F.3d at 1195. Rather, it must be determined whether the lower price reflects a "corrective disclosure" of the fraud or a misrepresentation—in which case, there is loss causation—or, instead, reflects "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Meyer,* 710 F.3d at 1196 (quoting *Dura,* 544 U.S. at 342, 125 S.Ct. 1627). Therefore, "[b]y ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not 'becom[e] a system of investor insurance that reimburses investors for any decline in the value of their investments.' " *Id.* (second alteration in original) (quoting *Robbins,* 116 F.3d at 1447).

MacPhee v. MiMedx Group, Inc., 73 F.4th 1220 (2023)
Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

[33]   [34]   [35]   [36]   Turning to the requirements for a plaintiff to demonstrate loss causation in a fraud-on-the-market case, the plaintiff must: (1) identify a "corrective disclosure," i.e., "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud"; (2) show that the stock's price dropped soon after that corrective disclosure; and (3) eliminate other possible explanations for the price drop, such that "the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of the price drop." *Id.* at 1196–97 (quoting *FindWhat*, 658 F.3d at 1311–12). Additionally, the plaintiff "need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures.' " *Id.* at 1197 (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009)). Corrective disclosure "can come from any source" and "take any form from which the market can absorb [the information] and react," so long as the disclosures " 'reveal[ed] to the market the falsity' of **\*1243** the prior misstatements.' " *FindWhat*, 658 F.3d at 1311 n.28 (first alteration in original) (first quoting Matthew L. Fry, *Pleading and Proving Loss Causation in Fraud-on-the-MarketBased Securities Suits Post-Dura Pharmaceuticals*, 36 Sec. Reg. L.J. 31, 64–71 (2008); then quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005)). Thus, the following question is critical to the loss causation analysis: "even if the plaintiffs paid an inflated price for the stock as a result of the fraud (i.e., even if the plaintiffs relied), did the relevant truth eventually come out and thereby cause the plaintiffs to suffer losses?" *Meyer*, 710 F.3d at 1197 (quoting *FindWhat*, 658 F.3d at 1312).

[37]   Other principles also guide us in determining whether a disclosure is "corrective." For a disclosure to be "corrective," it "need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* (quoting *In re Williams Sec. Litig.–WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)); *accord FindWhat*, 658 F.3d at 1311 n.28 (explaining that, to qualify as a corrective disclosure, it "must share the same subject matter as the prior misstatement; only then can the disclosure be said to have a '*corrective* effect,' rather than merely a '*negative* effect' "). Indeed, if events or information that are "not the subject of the misrepresentation" cause a stock's price to drop, "the investor has still suffered no loss *on account of the misrepresentation* ... because the fraud-induced inflation is still priced into the shares." *Meyer*, 710 F.3d at 1196.

[38]   [39]   Additionally, "because a corrective disclosure must reveal a previously concealed truth, it obviously must disclose new information, and cannot be merely confirmatory." *FindWhat*, 658 F.3d at 1311 n.28. This is because the "efficient market theory ... posits that all publicly available information about a security is reflected in the market price of the security." *Meyer*, 710 F.3d at 1197 (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 691 (11th Cir. 2010) (Tjoflat, J., concurring in part and dissenting in part)). And "[a] corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price" because "the market has already digested that information and incorporated it into the price." *FindWhat*, 658 F.3d at 1310. Thus, "[c]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Meyer*, 710 F.3d at 1197–98 (quoting *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011)).

[40]   Moreover, where a purchaser of stock sells its shares "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342, 125 S.Ct. 1627. But once the truth is revealed, investors who purchased the stock at inflated prices—and, critically, those "*who still hold their stock*"—"will suffer economic loss, because they will no longer be able to recoup the inflationary component of their purchase price by reselling their stock in the newly calibrated marketplace." *FindWhat*, 658 F.3d at 1315 (emphasis added). That is because "[w]hen the truth underlying the falsehood is finally revealed, ... the market will digest the new information and cease attributing the artificial inflation to the price." *Id.*

With these principles in mind, we now turn to whether any of the alleged disclosures in the second amended complaint qualify as corrective disclosures at the pleading stage. We begin by analyzing the **\*1244** disclosures based on the following categories: (1) "allegedly misleading corrective disclosures"; (2) "news articles and analyst reports"; and (3) "lawsuits and investigations." [9] We then look to the disclosures cumulatively and address Carpenters's remaining arguments.

9       Carpenters argues that the district court improperly employed a categorial approach because the

grouping of the disclosures by source "completely stripped them of their context and timing." We recognize that "a plaintiff need not rely on a single, complete corrective disclosure" and instead can show "the truth gradually leaked out into the marketplace 'through a series of partial disclosures.' " *Meyer*, 710 F.3d at 1197 (quoting *Lormand*, 565 F.3d at 261). But decisions from this Court, *see id.* at 1197–202, and other circuits, *see, e.g., Katyle*, 637 F.3d at 473–77, have employed similar categorization in addressing whether disclosures qualify as corrective for purposes of demonstrating loss causation. We thus do not believe that the district court committed error in how it approached its analysis; there is no indication that the district court, in grouping the types of disclosures, "completely stripped them of their context and timing." Nonetheless, our analysis concludes by explicitly considering all the alleged partial disclosures cumulatively.

### 1. *"Allegedly Misleading Corrective Disclosures"*

In its order, the district court grouped several of the alleged disclosures based on Carpenters's assertion that they "revealed the truth of the fraud" even though they "were accompanied by misstatements and omissions that ... misled investors about the true extent of the fraud."

Carpenters alleged that on October 13, 2015, MiMedx held an analyst day conference call where it "revealed that it had parted ways with a distributor (later determined to be CPM), which negatively impacted the Company's 3Q15 results by $2 million to $3 million." According to Carpenters, MiMedx's stock price subsequently dropped based on the market's view that MiMedx lost a major distributor, but this drop "would have been worse if Defendants revealed the true scope of their fraud" and their use of the distributor "to facilitate their improper sales and distribution practices, including channel stuffing." Additionally, on April 10, 2016, MiMedx issued a press release announcing its financial results for the first quarter of 2016, in which it recorded its first revenue miss after seventeen quarters of meeting or exceeding its revenue guidance. Carpenters alleged that this misleading press release led to a drop in MiMedx's stock price, but the decline would have been worse had Defendants revealed the truth. Finally, on November 20, 2017, MiMedx issued a press release announcing it had added materials to its website to address "Misinformation Disseminated Through Short Sellers," even though, Carpenters claimed, Defendants were aware of the truth.

As to these disclosures, the district court relied on *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29 (2d Cir. 2009), and found that Carpenters was improperly trying to use these disclosures "both ways," i.e., by characterizing them as both misleading and corrective.

Carpenters argues that the district court overstated *In re Flag Telecom*'s holding. In that case, after the defendants disclosed that a portion of their revenue for the previous year was based on certain transactions that could be used in a way to defraud investors, the defendant company's stock dropped forty-six percent. *Id.* at 31–32. The plaintiff-investors, including those who had sold their stock before the corrective disclosure, brought a securities class action against the defendants. *Id.* at 32, 37. The district court denied the defendants' **\*1245** motion to dismiss, and the Second Circuit reversed. *Id.*

The Second Circuit began by noting that those plaintiffs who had sold prior to the corrective disclosure "must prove that the loss they suffered was both foreseeable and caused by the 'materialization of the concealed risk.' " *Id.* at 40. The court then addressed the plaintiffs' argument that "the truth about demand and profitability began to leak into the market as early as [a year prior to the corrective disclosure] through 'industry events,' " with specific news concerning the defendants leaking into the market several months later and causing the share price to depress further. *Id.* at 41. The Second Circuit noted that these "industry events" were in the context of the defendants' misleading statements themselves, and not evidence of the defendants' corrective disclosure. *See id.* The court stated that plaintiffs could not "have it both ways" by alleging the defendants made certain misstatements (i.e., the defendant company was doing well compared to other companies) while simultaneously alleging that the misstatements constituted corrective disclosures (i.e., that the other companies were not doing well). *Id.* To do so would "tend to transform a private securities action into a partial downside insurance policy." *Id.* (quoting *Dura*, 544 U.S. at 347–48, 125 S.Ct. 1627).

 **[41]** Carpenters contends that *In re Flag Telecom* is distinguishable because it is a "unique case where plaintiffs effectively (and partially) pled themselves out of class certification." Carpenters argues that, by contrast, the disclosures in its pleading "revealed truthful information to the market, but also continued to conceal the fraud." We

disagree. After reviewing these three disclosures, MiMedx did not correct any "falsehood" in any of these alleged disclosures. *See FindWhat*, 658 F.3d at 1310 ("So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day."). Indeed, accepting these allegations as true, they show that Defendants provided misleading statements to conceal the alleged ongoing fraud by the company and, at the time, the market continued to digest this misinformation.

Accordingly, we conclude that the district court did not err in concluding these alleged disclosures were not corrective and did not establish loss causation. [10]

[10]    Carpenters also relies on the Ninth Circuit's decision in *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), for the proposition that "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." We find *Mineworkers' Pension Scheme* inapposite, given that Carpenters, unlike the plaintiffs in *Mineworkers' Pension Scheme*, sold its MiMedx stock before the truth about these disclosures was revealed. Under *Dura*, when the purchaser of stock sells its shares "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." 544 U.S. at 342, 125 S.Ct. 1627; *see also FindWhat*, 658 F.3d at 1310.

### 2. "News Articles and Analyst Reports"

Turning to this second category of alleged disclosures, Carpenters alleges that the district court erred in its analysis because it "misunderstood the critical role that analysts and investigative journalists play in the securities markets, ignored the specific information those third parties imparted to MiMedx investors during the Class Period, and impermissibly drew factual inferences against" Carpenters. We disagree.

 **\*1246**  As explained above, a "disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price"; "[c]orrective disclosures must present facts to the market that are new, that

is, publicly revealed for the first time." *Meyer*, 710 F.3d at 1197–98 (alteration in original) (first quoting *FindWhat*, 658 F.3d at 1310; then quoting *Katyle*, 637 F.3d at 473). We have held that when "the material portions" of articles or reports are "gleaned entirely from public filings and other publicly available information," the use of that publicly available information is "fatal" to a claim of loss causation. *See id.* at 1198. Additionally, in *Meyer*, we rejected the argument that " 'expert analysis of the source material' that was previously unavailable to the market" constitutes a corrective disclosure, reasoning that "the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure." *Id.* at 1199. Indeed, "if the information relied upon in forming an opinion was previously known to the market, the only thing actually disclosed to the market when the opinion is released *is the opinion itself,* and such an opinion, standing alone, cannot 'reveal[ ] to the market the falsity' " of the company's prior misrepresentations. *Id.* (alteration and emphasis in original) (quoting *FindWhat*, 658 F.3d at 1311 n.28). And, if the opposite were true, "then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst's negative analysis of public filings as a corrective disclosure." *Id.*

 **[42]**  Carpenters argues that numerous securities analysts' reports uncovered new information for investors regarding MiMedx's fraudulent business practices and "each fresh report expanded on prior ones, reflecting new information developed through the analysts' due diligence." Reviewing the reports and articles alleged in the second amended complaint, we disagree and conclude that, under *Meyer*, they do not qualify as corrective disclosures. As the district court noted, each report and article only repeated information already in the public domain, demonstrated by the disclaimers made by the authors of those reports and articles stating that they were based on publicly available information. *Cf. id.* at 1198 ("The Einhorn Presentation contained a disclaimer on the second slide of the presentation stating that all of the information in the presentation was 'obtained from publicly available sources.' Indeed, the material portions of the Einhorn Presentation were gleaned entirely from public filings and other publicly available information."). Nor does Carpenters identify any new, non-public, or otherwise not readily available information contained in any of these reports or articles.

Further, while MiMedx's stock price may have dropped in response to the release of each of these reports, we confronted

the same circumstances in *Meyer*, where we concluded that the alleged disclosure of an analyst report was not corrective for purposes of loss causation. *See id.* at 1199–200. In doing so, we reasoned that "because the information used in the presentation had already been public for some time," the decline of the stock price "was not due to the fact that the presentation was revelatory of any fraud, but was instead due to 'changed investor expectations' after an investor who wielded great clout in the industry voiced a negative opinion about the Company." *Id.* at 1200. Similar reasoning holds true here. [11]

[11] Carpenters also argues that courts regularly hold that the market may learn of possible fraud from analysts and newspapers questioning a company's financial results, relying on authority from other circuits. *See, e.g.*, *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014) ("While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace."); *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 243 (1st Cir. 2013) ("To preclude a plaintiff from relying on analyst reports that expose the limitations of a defendant's statements could permit the defendant to 'defeat liability by refusing to admit the falsity of its prior misstatements.' " (quoting *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009))). While other circuits may have different standards for considering whether analyst reports and news articles can qualify as corrective disclosures, we are bound to apply *Meyer*. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008). And here Carpenters asks us to apply other circuits' standards instead of our own without providing a principled basis to distinguish this case from *Meyer*.

**\*1247** Accordingly, because the analyst reports and news articles alleged by Carpenters in the second amended complaint did not disclose any new or non-public information, *id.* at 1198, the district court did not err in concluding that those reports and articles did not qualify as corrective disclosures.

### 3. "Lawsuits and Investigations"

We now consider whether the announcements of lawsuits and investigations into Defendants' fraudulent practices—(1) a whistleblower lawsuit by former employees of MiMedx, (2) a federal government investigation, and (3) MiMedx's own internal investigation, i.e., the third audit committee investigation, coupled with the postponement of certain financial statements—qualify as corrective disclosures. The district court concluded that they were not, declining to hold that a lawsuit or investigation announcement could be considered retroactively as a corrective disclosure upon a later finding of fraud or wrongdoing.

In *Meyer*, we held that "the commencement of an SEC investigation, without more, is insufficient to constitute a corrective disclosure for purposes of § 10(b)" because "[t]he announcement of an investigation reveals just that —an investigation—and nothing more." 710 F.3d at 1201. We explained that while "stock prices may fall upon the announcement of an SEC investigation, ... that is because the investigation can be seen to portend an added *risk* of future corrective action." *Id.* (emphasis in original). But, we reasoned, that added risk did "not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." *Id.*

In footnote 13 of *Meyer*, however, we hypothesized about the possibility that an SEC investigation could qualify as a basis for a corrective disclosure. *Id.* at 1201 n.13. We explained that *Meyer*'s holding was that "the disclosure of an SEC investigation, standing alone and without any subsequent disclosure of actual wrongdoing, does not 'reveal[ ] to the market the pertinent truth' of anything, and therefore does not qualify as a corrective disclosure." *Id.* (alteration in original) (quoting *FindWhat*, 658 F.3d at 1311). We noted that it was "impossible to say that an SEC investigation was the moment when the 'relevant truth beg[an] to leak out' if the truth never actually leaked out." *Id.* (alteration in original) (quoting *Dura*, 544 U.S. at 342, 125 S.Ct. 1627). But we explained that "[i]t may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure for purposes of *opening the class period* when the investigation is coupled *with a later* **\*1248** *finding of fraud or wrongdoing*." *Id.* (emphasis added).

On appeal, Carpenters primarily focuses on MiMedx's announcement of the third auditing committee investigation, accompanied by the postponement of certain financial statements. Carpenters argues that the announcement of that internal investigation "becomes corrective in light of MiMedx's subsequent announcements of unreliable financial results, a forthcoming restatement, and forced resignations" and that "the market understood that something was wrong."

 **[43]**  But we need not decide the question posed by footnote 13 of *Meyer*, i.e., whether it is possible for the announcement of an investigation "to qualify as a partial corrective disclosure for purposes of opening the class period when the investigation is coupled with a later finding of fraud or wrongdoing," *see id.*, because Carpenters sold all of its MiMedx stock on February 26, 2018, before the later finding of fraud or wrongdoing alleged in the second amended complaint. *Dura* and *FindWhat* are both instructive. In *Dura*, the Supreme Court stated that if a purchaser sells its stock shares "before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." 544 U.S. at 342, 125 S.Ct. 1627. Subsequently, in *FindWhat*, we applied *Dura* and held that "[w]hen the truth underlying the falsehood is finally revealed, ... the market will digest the new information and cease attributing the artificial inflation to the price" and that, "[a]t that time, investors who purchased at inflated prices (*and who still hold their stock*) will suffer economic loss." 658 F.3d at 1315 (emphasis added).

Because Carpenters sold its MiMedx stock on February 26, 2018—months before Defendants' fraud and wrongdoing alleged in the second amended complaint was revealed— we conclude that Carpenters's reliance on the hypothetical considered in footnote 13 of *Meyer* is foreclosed by our decision in *FindWhat*, as Carpenters sold its stock before "the truth underlying [Defendants'] falsehood" was finally revealed. [12] *See FindWhat,* 658 F.3d at 1315. Accordingly, we hold that the alleged disclosures in this category—the announcements of an internal investigation, a government investigation, and a whistleblower lawsuit—did not qualify as corrective disclosures.

[12]    For similar reasons, we are unpersuaded by Carpenters's reliance on the Fifth Circuit's decision in *Amedisys,* 769 F.3d at 324, and the Ninth Circuit's decision in *Lloyd v. CVB Financial Corp.,* 811 F.3d 1200 (9th Cir. 2016).

### 4. The Alleged Disclosures Cumulatively and Carpenters's Remaining Arguments

Even considering cumulatively all of Carpenters's alleged partial disclosures before it sold its shares of MiMedx stock, we conclude that they do not qualify as a series of partial corrective disclosures to demonstrate loss causation under our precedent in *FindWhat* and *Meyer*. Most critically, Carpenters sold its MiMedx stock shares before the relevant truth "leak[ed] out," *Dura,* 544 U.S. at 342, 125 S.Ct. 1627, "reveal[ing] to the market the falsity" of MiMedx's prior representations, *Meyer,* 710 F.3d at 1199 (quoting *FindWhat,* 658 F.3d at 1311 n.28).

And none of Carpenters's other remaining arguments change our conclusion. Carpenters characterizes our decision in *Meyer* as taking a more "restrictive view" of what types of disclosures qualify as corrective than the Supreme Court's decision in *Dura* and relies on cases from other circuits throughout its briefing. But even if **\*1249** other circuits have different standards for considering what disclosures qualify as corrective for purposes of loss causation, we are bound to apply *Meyer* under the prior precedent rule. *See United States v. Vega-Castillo,* 540 F.3d 1235, 1236 (11th Cir. 2008) ("Under the prior precedent rule, we are bound to follow a prior binding precedent 'unless and until it is overruled by this court en banc or by the Supreme Court.' " (quoting *United States v. Brown,* 342 F.3d 1245, 1246 (11th Cir. 2003))). Carpenters also urges us to adopt a "a loss causation pleading standard that considers all partial disclosures cumulatively through the end of a class period, and apply that standard to all class members equally, regardless of when they sold stock." However, Carpenters's argument is foreclosed by the Supreme Court's decision in *Dura* and our decisions in *FindWhat* and *Meyer*.

We thus conclude that the district court did not err in dismissing the second amended complaint for failing to sufficiently plead loss causation as to its securities fraud claims against Defendants. [13]

[13]    In light of this conclusion, we need not address Cherry Bekaert's alternative arguments for affirmance.

### C. Carpenters's Post-judgment Motion and Request for Leave to Amend

Finally, we turn to whether the district court erred in denying Carpenters post-judgment motion under Rules 59(e) and 60(b) to vacate the judgment. Carpenters argues that the district court erred in not allowing it to file, under Rule 15(a)(2), [14] a third amended complaint, which sought to add as a plaintiff Amalgamated Bank, an investor that Carpenters claims held MiMedx shares through the end of the Class Period. Carpenters further argues that the district court improperly denied the motion without explanation, as the court only stated that Rule 15(a) did not apply after judgment was entered and because Carpenters was "not entitled to relief under either Rule 59(e) or 60(b), [it was] also not entitled to leave to amend."

[14]   Federal Rule of Civil Procedure 15(a) provides, in relevant part:

> (a) Amendments Before Trial.
> (1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:
> (A) 21 days after serving it, or
> (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
> (2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

 [44]   We recognize that there is some tension in our circuit's case law on the proper standard for a court to evaluate a *post-judgment* motion for leave to amend, i.e., whether the standards of Rule 15(a) or the standards of Rules 59(e) and 60(b) apply. *Compare Jacobs v. Tempur-Pedic Int'l, Inc.,* 626 F.3d 1327, 1344 (11th Cir. 2010) ("[Rule] 15(a) has no application once the district court has dismissed the complaint and entered final judgment for the defendant. Post-judgment, the plaintiff may seek leave to amend if he is granted relief under Rule 59(e) or Rule 60(b)(6)." (alteration in original) (citations omitted) (quoting *United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1361 n.22 (11th Cir. 2006)), *with Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns,*

*Inc.,* 376 F.3d 1065, 1077 (11th Cir. 2004) (stating that under Rule 15(a)'s standard that a court "should freely give leave [to amend] when justice so requires" and that the Supreme Court's decision in **\*1250** *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), applies to a plaintiff's motion to amend its complaint after the judgment). When faced with an intra-circuit split, we must apply the "earliest case" rule, which states that "when circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel." *Morrison v. Amway Corp.,* 323 F.3d 920, 929 (11th Cir. 2003).

Applying the earliest case rule, the earliest decision from our Circuit on this issue is *Czeremcha v. International Ass'n of Machinists & Aerospace Workers, AFL-CIO,* 724 F.2d 1552 (11th Cir. 1984). In *Czeremcha,* the plaintiff argued that he had a right to amend his complaint as a matter of course under Rule 15(a) after the complaint was dismissed. *Id.* at 1555. We explained that we had not "expressly decided the issue" of whether the right to amend under Rule 15(a) "dissolv[es] upon the granting of the motion to dismiss." *Id.* We also noted the criticism that decisions "holding that the plaintiff has an absolute right under Rule 15(a) to amend after dismissal of the complaint as frustrating 'the desire for certainty in the termination of litigation.' " *Id.* at 1556 (quoting Moore's Federal Practice ¶ 15.07[2]). "In light of this criticism and the confusion in this circuit's case law on the issue," we concluded that we were adopting "the rule that after a complaint is dismissed the right to amend under Rule 15(a) terminates." *Id.* But we also held that a plaintiff "may still move the court for leave to amend, and such amendments should be granted liberally," although "[s]uch a motion would be inappropriate ... if the court has clearly indicated either that no amendment is possible or that dismissal of the complaint also constitutes dismissal of the action." *Id.* at 1556 & n.6 (footnote omitted). We further held that the plaintiff could move for relief under Rules 59(e) or 60(b) "on the basis of proposed amendments even after the action is dismissed and final judgment is entered." *Id.* at 1556. In doing so, we explained that "Rule 59(e) or 60(b) would apply only once the action is dismissed" because "a dismissal of the complaint is not tantamount to a dismissal of the action unless the court so specifies." *Id.* at 1556 n.9.

 [45]   We conclude that *Czeremcha* and its reasoning applies equally to post-judgment motions to amend where the plaintiff has not exercised its right under Rule 15(a)(1) to amend as a matter of course and, as here, to post-judgment

motions where the plaintiff has already amended its complaint and the district court has discretion in granting leave to amend. Applying *Czeremcha*, the record here reflects that, on the same date the district court entered its order dismissing the second amended complaint, it entered final judgment stating that the "action" was "dismissed." Accordingly, we review the district court's denial of Carpenters's post-judgment request for leave to amend under the standards governing Rules 59(e) and 60(b).

 **[46]   [47]   [48]   [49]   [50]**  Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." "The only grounds for granting [a Rule 59] motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999)). But a "Rule 59(e) motion [cannot be used] to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Id.* (alteration in original) (quoting *Michael Linet, Inc. v. Village of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005)). **\*1251**  Additionally, under Rule 60(b)(1), a party may seek relief from a final judgment based on mistakes in the application of law. *See Parks v. U.S. Life & Credit Corp.*, 677 F.2d 838, 839–40 (11th Cir. 1982). And Rule 60(b)(6) provides that a "court may relieve a party ... from a final judgment ... for any other reason that justifies relief." Relief from judgment under Rule 60(b)(6), however, is an extraordinary remedy and requires a showing of "extraordinary circumstances" to justify the reopening of a final judgment. *Arthur*, 739 F.3d at 628 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005)). Rules 60(b)(1) and (6) "are mutually exclusive," and "a court cannot grant relief under (b)(6) for any reason which the court could consider under (b)(1)." *Cavaliere v. Allstate Ins. Co.*, 996 F.2d 1111, 1115 (11th Cir. 1993) (quoting *Solaroll Shade & Shutter Corp. v. Bio-Energy Sys., Inc.*, 803 F.2d 1130, 1133 (11th Cir. 1986)). We review a district court's decision to grant or deny relief under Rule 59(e) or under Rule 60(b) for abuse of discretion. *Shuford,* 508 F.3d at 1341; *Arthur*, 739 F.3d at 628.

 **[51]**  As to Rule 59(e), we also conclude that the district court did not abuse its discretion in determining that Carpenters sought to relitigate arguments it had already raised before entry of judgment. *See Michael Linet*, 408 F.3d at 763. As to Rule 60(b)(1), for the reasons stated above, we find no mistake in the district court's application of the law in this case that would change the outcome of this case. And, as to Rule 60(b)(6), the district court found that Carpenters's motion primarily focused on the court's purported "mistakes in the application of the law," which fall squarely under Rule 60(b)(1). Indeed, Carpenters did not argue that there were any "extraordinary circumstances" justifying the reopening of the final judgment in this case. *See Arthur*, 739 F.3d at 628. We therefore conclude that the district court did not abuse its discretion in denying relief under Rule 60(b)(1) and (6). And because the district court did not abuse its discretion in denying Carpenters relief under Rules 59(e) and 60(b), we conclude that the district court did not abuse its discretion in denying Carpenters's post-judgment request for leave to amend its complaint a third time.

### IV. CONCLUSION

For the reasons discussed above, we conclude that the district court erred in finding that Carpenters lacked standing to bring its Exchange Act claims against Defendants and vacate that portion of the district court's order. But we affirm the district court's order dismissing Carpenters's second amended complaint for failure to plead loss causation. We also affirm the district court's order denying Carpenters's post-judgment motion, including the denial of Carpenters's request for leave to amend.

**VACATED IN PART, AFFIRMED IN PART.**

**All Citations**

73 F.4th 1220, Fed. Sec. L. Rep. P 101,629, 116 Fed.R.Serv.3d 506, 29 Fla. L. Weekly Fed. C 2723

---