UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
In re iQIYI, Inc. Securities Litigation

**MEMORANDUM & ORDER**
20-CV-01830 (DG) (TAM)


---------------------------------------------------------------X
In re Baidu, Inc. Securities Litigation

20-CV-03794 (DG) (TAM)



---------------------------------------------------------------X
DIANE GUJARATI, United States District Judge:

On March 11, 2024, Lead Plaintiffs Robert J. Gereige, M.D. and Ronald L. Hershberger

(together, the "*iQIYI* Plaintiffs") filed the operative Second Amended Consolidated Class

Action Complaint ("*iQIYI* SACC") in *In re iQIYI, Inc. Securities Litigation*, No. 20-CV-01830

(the "*iQIYI* Action") against Defendants iQIYI, Inc. ("iQIYI"); Yu Gong ("Gong"); Xiaodong

Wang ("X. Wang," and together with Defendant Gong, the "*iQIYI* Individual Defendants");

Baidu, Inc. ("Baidu," and collectively with iQIYI and the *iQIYI* Individual Defendants, the

"*iQIYI* Exchange Act Defendants"); Robin Yanhong Li ("Y. Li"); Qi Lu ("Lu"); Herman Yu

("Yu"); Xuyang Ren ("Ren"); Victor Zhixiang Liang ("Liang"); Chuan Wang ("C. Wang");

Giselle Manon ("Manon," and collectively with Y. Li, Lu, Yu, Ren, Liang, and C. Wang, the

"*iQIYI* Director Defendants"); Goldman Sachs (Asia) LLC ("Goldman Sachs"); Credit Suisse

Securities (USA) LLC ("Credit Suisse"); Merrill Lynch, Pierce, Fenner & Smith, Incorporated

("Merrill Lynch"); China Renaissance Securities (Hong Kong) Limited ("China Renaissance");

Citigroup Global Markets Inc. ("Citigroup"); UBS Securities LLC ("UBS," and collectively

with Goldman Sachs, Credit Suisse, Merrill Lynch, China Renaissance, and Citigroup, the

"*iQIYI* Underwriter Defendants").  *See generally iQIYI* ECF No. 175.[1]  The *iQIYI* Director

Defendants, the *iQIYI* Underwriter Defendants, and the *iQIYI* Exchange Act Defendants are

referred to herein, collectively, as the "*iQIYI* Defendants."

Also on March 11, 2024, Lead Plaintiffs Benjamin Paz Tchimino, Inveriones B Y J

Limitada, Central Pennsylvania Teamsters Pension Fund – Defined Benefit Plan, and Central

Pennsylvania Teamsters Pension Fund – Retirement Income Plan 1987 (collectively, the "*Baidu*

Plaintiffs," and together with the *iQIYI* Plaintiffs, "Plaintiffs") filed the operative Amended

Consolidated Class Action Complaint ("*Baidu* ACC") in *In re Baidu, Inc. Securities Litigation*,

No. 20-CV-03794 (the "*Baidu* Action") against Defendants Baidu; iQIYI; Y. Li; Yu; Jennifer

Xinzhe Li ("X. Li"); Gong; X. Wang (collectively with Defendants Y. Li, Yu, X. Li, and Gong,

the "*Baidu* Individual Defendants").  *See generally Baidu* ECF No. 75.[2]  Defendant Baidu,

Defendant iQIYI, and the *Baidu* Individual Defendants are referred to herein, collectively, as

the "*Baidu* Defendants."  The *Baidu* Defendants and the *iQIYI* Defendants are referred to

herein, together, as "Defendants."[3]

The Court refers herein to the *iQIYI* SACC and the *Baidu* ACC, together, as the

"Operative Complaints."

The *iQIYI* SACC contains approximately 392 paragraphs and spans 112 pages and the

*Baidu* ACC contains approximately 313 paragraphs and spans 86 pages.  The Court has

---

[1]  The Court uses "*iQIYI* ECF No." to refer to filings on the docket of the *iQIYI* Action.

[2]  The Court uses "*Baidu* ECF No." to refer to filings on the docket of the *Baidu* Action.

[3]  Familiarity with the detailed procedural history and background of the *iQIYI* Action and the *Baidu* Action – including with the *Lee* Action, *see iQIYI* ECF No. 1; the *Le Rivage* Action, *see* No. 20-CV-02653 (E.D.N.Y.); the *Jenkins* Action, *see* No. 20-CV-03068 (E.D.N.Y.); the *Alagappan* Action, *see Baidu* ECF No. 1; and the *Nampally* Action, *see* No. 20-CV-04430 (E.D.N.Y.) – is assumed herein.

considered all allegations contained in the Operative Complaints, including those not expressly referenced herein.

The *iQIYI* SACC is brought in four Counts.  Count I asserts Violation of Section 10(b) of the Exchange Act ("Section 10(b)") and SEC Rule 10b-5 ("Rule 10b-5") against iQIYI and the *iQIYI* Individual Defendants.  *See iQIYI* SACC ¶¶ 252-61.  Count II asserts Violation of Section 20(a) of the Exchange Act ("Section 20(a)") against the *iQIYI* Individual Defendants and Baidu.  *See iQIYI* SACC ¶¶ 262-67.[4]  Count III asserts Violations of Section 11 of the Securities Act ("Section 11") against iQIYI, the *iQIYI* Individual Defendants, the *iQIYI* Director Defendants, and the *iQIYI* Underwriter Defendants.  *See iQIYI* SACC ¶¶ 379-87.  Count IV asserts Violations of Section 15 of the Securities Act ("Section 15") against Baidu and the *iQIYI* Individual Defendants.  *See iQIYI* SACC ¶¶ 388-92.[5]

The *iQIYI* Plaintiffs bring the Exchange Act claims individually and on behalf of all persons and entities who, during the period from March 29, 2018 through August 13, 2020, inclusive (the "*iQIYI* Class Period"), purchased the publicly traded common stock of iQIYI on the NASDAQ stock exchange or on any U.S.-based trading platform and were allegedly damaged thereby (the "Exchange Act Class").  *See iQIYI* SACC at 2; *see also iQIYI* SACC at 2 n.1 (setting forth certain exclusions from the Exchange Act Class).  The *iQIYI* Plaintiffs seek, *inter alia*, "compensatory damages in favor of Plaintiffs and the other Exchange Act Class members against all Exchange Act Defendants, jointly and severally, for all damages sustained as a result of Exchange Act Defendants' wrongdoing," including interest, as well as reasonable costs and expenses, including counsel fees and expert fees.  *See iQIYI* SACC at 80-81.

---

[4]  The Court refers herein to Counts I and II, together, as the "Exchange Act Claims."

[5]  The Court refers herein to Counts III and IV, together, as the "Securities Act Claims."

The *iQIYI* Plaintiffs bring the Securities Act claims individually and on behalf of a class (the "Securities Act Class") consisting of all persons and entities who purchased or otherwise acquired iQIYI common stock pursuant and traceable to iQIYI's Registration Statement and Prospectus (together, the "Offering Documents") issued in connection with the initial public offering completed on or about March 28, 2018 (the "IPO"). *See iQIYI* SACC ¶ 268; *see also iQIYI* SACC ¶ 275 n.4. The *iQIYI* Plaintiffs seek, *inter alia*, "damages in favor of Plaintiffs and the other Securities Act Class members against all Securities Act Defendants, jointly and severally, together with interest thereon," as well as reasonable costs and expenses, including counsel fees and expert fees. *See iQIYI* SACC at 112.

The *Baidu* ACC is brought in two Counts. Count I asserts Violation of Section 10(b) and Rule 10b-5 against all *Baidu* Defendants. *See Baidu* ACC ¶¶ 298-307. Count II asserts Violation of Section 20(a) against Defendants Y. Li, Yu, and X. Li. *See Baidu* ACC ¶¶ 308-13.

The *Baidu* ACC is brought on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Baidu American Depositary Shares ("ADSs") between April 8, 2016 and August 13, 2020, both dates inclusive (the "*Baidu* Class Period"). *See Baidu* ACC ¶ 1. The *Baidu* Plaintiffs seek, *inter alia*, "damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged" in the *Baidu* ACC, "prejudgment and post-judgment interest," and attorneys' fees, expert fees, and other costs. *See Baidu* ACC at 85-86.

Pending before the Court are (1) the Common Motion to Dismiss the *iQIYI* and *Baidu* Actions for Failure to Plead Any Material Misstatement or Omission, *see* Notice of Motion, *iQIYI* ECF No. 156, *Baidu* ECF No. 61; Joint Memorandum of Law in Support of Defendants' Common Motion to Dismiss ("Defs.' Joint Br."), *iQIYI* ECF No. 158, *Baidu* ECF No. 63; Declaration of Robert A. Fumerton in Support of Defendants' Motions to Dismiss ("Fumerton

Declaration"), *iQIYI* ECF No. 160, *Baidu* ECF No. 65;[6] Joint Reply Memorandum of Law in Further Support of Defendants' Common Motion to Dismiss ("Defs.' Joint Reply"), *iQIYI* ECF No. 164, *Baidu* ECF No. 69; Reply Declaration of Robert A. Fumerton in Further Support of Defendants' Motions to Dismiss ("Fumerton Reply Declaration"), *iQIYI* ECF No. 166, *Baidu* ECF No. 71,[7] (2) the Motion to Dismiss the *iQIYI* Action for Failure to Plead Scienter, Loss Causation, and Standing, *see* Notice of Motion, *iQIYI* ECF No. 157; Joint Memorandum of Law in Support of Motion to Dismiss the *iQIYI* Action ("Defs.' *iQIYI* Br."), *iQIYI* ECF No. 159; Fumerton Declaration; Reply Memorandum of Law in Further Support of Motion to Dismiss the *iQIYI* Action ("Defs.' *iQIYI* Reply"), *iQIYI* ECF No. 165; Fumerton Reply Declaration, and (3) the Motion to Dismiss the *Baidu* Action for Failure to Plead Scienter and Loss Causation, *see* Notice of Motion, *Baidu* ECF No. 62; Memorandum of Law in Support of Motion to Dismiss the *Baidu* Action ("Defs.' *Baidu* Br."), *Baidu* ECF No. 64; Fumerton Declaration; Reply Memorandum of Law in Further Support of Motion to Dismiss the *Baidu* Action ("Defs.' *Baidu* Reply"), *Baidu* ECF No. 70; Fumerton Reply Declaration.  *See also* Supplemental Memorandum of Law in Support of Defendants' Motions to Dismiss the *iQIYI* and *Baidu* Actions ("Defs.' Supp. Br."), *iQIYI* ECF No. 176, *Baidu* ECF No. 76; Supplemental Reply Memorandum of Law in Further Support of Defendants' Motions to Dismiss the *iQIYI* and *Baidu* Actions ("Defs.' Supp. Reply"), *iQIYI* ECF No. 178, *Baidu* ECF No. 78.[8]

---

[6]   Together with the Fumerton Declaration, Defendants submitted twenty-three exhibits ("Fumerton Exs."").  *See iQIYI* ECF Nos. 160-1 to 160-23; *Baidu* ECF Nos. 65-1 to 65-23.  In citing to these exhibits, the Court uses the letters assigned to the exhibits in the Fumerton Declaration.

[7]   Together with the Fumerton Reply Declaration, Defendants submitted two exhibits.  *See iQIYI* ECF Nos. 166-1, 166-2; *Baidu* ECF Nos. 71-1, 71-2.

[8]   Each motion is brought pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of

The respective Plaintiffs oppose the respective motions.  *See* Lead Plaintiffs' Joint Memorandum of Law in Opposition to Defendants' Common Motion to Dismiss the *iQIYI* and *Baidu* Actions ("Pls.' Joint Br."), *iQIYI* ECF No. 161, *Baidu* ECF No. 66; Memorandum of Law in Opposition to Defendants' Motions to Dismiss the *iQIYI* Action for Failure to Plead Scienter, Loss Causation, and Standing ("Pls.' *iQIYI* Br."), *iQIYI* ECF No. 162; Declaration of Laurence M. Rosen in Support of Lead Plaintiffs' Joint Opposition to Defendants' Common Motion to Dismiss ("Rosen Declaration"), *iQIYI* ECF No. 163, *Baidu* ECF No. 68;[9] Memorandum of Law in Opposition to Motion to Dismiss the Baidu Action ("Pls.' *Baidu* Br."), *Baidu* ECF No. 67; *see also* Plaintiffs' Supplemental Joint Memorandum of Law in Opposition to Defendants' Motions to Dismiss the *iQIYI* and *Baidu* Actions ("Pls.' Supp. Br."), *iQIYI* ECF No. 177, *Baidu* ECF No. 77.

For the reasons set forth below, Defendants' motions to dismiss are granted and the *iQIYI* SACC and *Baidu* ACC are dismissed.[10]

---

Civil Procedure and Section 101(b) of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(2).  *See iQIYI* ECF Nos. 156, 157; *Baidu* ECF Nos. 61, 62.

[9]   Together with the Rosen Declaration, Plaintiffs submitted twelve exhibits.  *See iQIYI* ECF Nos. 163-1 to 163-12; *Baidu* ECF Nos. 68-1 to 68-12.

[10]   The parties appear to request oral argument in connection with their supplemental briefing.  *See* Defs.' Supp. Br. at 1; Pls.' Supp. Br. at 1.  The request for oral argument is denied.  The parties have presented their respective arguments clearly in their written submissions and additional oral argument is not necessary at this stage of the proceedings, particularly in light of the fulsome February 26, 2024 oral argument, discussed below.

BACKGROUND[11]

I.      Factual Background

A.      Defendants iQIYI and Baidu

As alleged in the Operative Complaints, iQIYI – hailed as the "Netflix of China" – is a Beijing, China-based online streaming entertainment provider.  *See iQIYI* SACC ¶¶ 29, 269; *Baidu* ACC ¶ 39.  As alleged in the *Baidu* ACC, Baidu is one of the most well-known Internet companies based in the People's Republic of China ("PRC") and owned a majority stake in iQIYI throughout the *Baidu* Class Period.  *See Baidu* ACC ¶ 2; *see also iQIYI* SACC ¶¶ 28 (alleging, *inter alia*, that Baidu owned a majority of iQIYI and maintained 92.7% voting control), 344 (alleging, *inter alia*, that since iQIYI launched in 2010, Baidu has been iQIYI's controlling shareholder).[12]  As alleged in the *Baidu* ACC, Baidu reported on iQIYI's financials and other metrics in its filings with the SEC and in other public statements, and consolidated iQIYI's financial statements with its own.  *See Baidu* ACC ¶ 2.

The *Baidu* Plaintiffs allege that iQIYI was the fastest growing segment of Baidu's business in terms of revenue, and as such, iQIYI was one of Baidu's most critical assets.  *See Baidu* ACC ¶¶ 3, 45.  The *Baidu* Plaintiffs allege that given iQIYI's importance to Baidu, and iQIYI's need for continuous cash flows, the integrity of iQIYI's revenue reporting was of the utmost importance to Baidu investors.  *See Baidu* ACC ¶¶ 47-48; *see also Baidu* ACC ¶¶ 49-50.

Plaintiffs allege that, like Netflix, iQIYI's customers primarily access iQIYI's

---

[11]  In light of the substantial overlap between the *iQIYI* SACC and the *Baidu* ACC, the Court sets forth the allegations together here and does not in all instances note minor discrepancies. The Court has, however, considered any such discrepancies.  When analyzing whether a particular complaint should be dismissed, the Court considers the allegations contained in that particular complaint.

[12]  Both iQIYI and Baidu listed their ADSs on the NASDAQ.  *See iQIYI* SACC ¶¶ 23, 329; *Baidu* ACC ¶ 38.

entertainment offerings content through a monthly or annual subscription which allows them to view iQIYI's entertainment programs.  *See iQIYI* SACC ¶¶ 30, 270; *Baidu* ACC ¶ 40.  Plaintiffs allege that iQIYI's two primary sources of revenue – membership subscriptions and advertising – are both dependent on, and a function of, the number of customers subscribing to iQIYI's service and viewing its programs.  *See iQIYI* SACC ¶¶ 31, 271; *Baidu* ACC ¶ 41.

Plaintiffs further allege that "active users" is one of the most important metrics investors look to when investing in a media company like iQIYI because iQIYI generates a majority (over 75%) of its revenue through a combination of selling subscriptions to its online streaming service and by selling advertisements on its platform, and that the most accurate way for investors to assess iQIYI's overall viewership numbers was by looking to the number of daily active users ("DAUs") that were using iQIYI's platform.  *See iQIYI* SACC ¶¶ 38-39, 278-79; *Baidu* ACC ¶¶ 56-57.  Plaintiffs further allege that the other key metric for assessing iQIYI's success was its membership services revenue, which was primarily the revenue iQIYI generated from membership subscriptions for its streaming services.  *See iQIYI* SACC ¶¶ 41, 281; *Baidu* ACC ¶ 59.  Plaintiffs allege that because service subscriptions are generally for future services that are to be performed by iQIYI, U.S. Generally Accepted Accounting Principles ("GAAP") required iQIYI to record subscription payments as deferred revenue that is recognized ratably over the term of the subscription.  *See iQIYI* SACC ¶¶ 41, 281; *Baidu* ACC ¶ 59.  Plaintiffs further allege that iQIYI's primary source of deferred revenue is the sale of customer memberships.  *See iQIYI* SACC ¶¶ 41, 281; *Baidu* ACC ¶ 60.  Plaintiffs allege that accordingly, daily active user metrics and deferred revenue were crucial metrics to investors and served as the two leading indicators for the growth and success of iQIYI's membership services and advertising revenues.  *See iQIYI* SACC ¶¶ 42, 282; *Baidu* ACC ¶ 61.

Plaintiffs allege that prior to and during the *iQIYI* and *Baidu* Class Periods, "it was extremely difficult for investors to understand iQIYI's corporate structure and accounting methods," as iQIYI operates "through a complex web of on-shore and off-shore companies," which results in "an inherently unclear accounting structure," *see iQIYI* SACC ¶¶ 32, 272; *Baidu* ACC ¶ 52; that although iQIYI purportedly operates under U.S. GAAP and the U.S. Public Company Accounting Oversight Board ("PCAOB"), iQIYI acknowledges that its annual report is prepared by an auditor who is not inspected by the PCAOB, and gaining 100% transparency into iQIYI's membership numbers and financial information, and accounting for such financial information, is "difficult and, in some cases, not possible," *see iQIYI* SACC ¶ 33; *Baidu* ACC ¶ 53; *see also iQIYI* SACC ¶ 273 (alleging that iQIYI acknowledges that the Registration Statement was prepared by an auditor who is not inspected by the PCAOB); and that because much of the third-party research related to iQIYI's operations such as mobile advertising data, financial research, and governmental filings was not easily accessible because of limitations imposed by the Chinese government and language barriers, U.S. investors were forced to rely almost entirely on the substantive representations and financial data contained in iQIYI's SEC filings, *see iQIYI* SACC ¶¶ 34, 274; *Baidu* ACC ¶ 54 (also alleging that U.S. investors were forced to place increased reliance on the substantive representations and financial data contained in Baidu's SEC filings).

### B.    Additional Defendants

#### 1.    *Baidu* Individual Defendants

As alleged in the *Baidu* ACC, Defendant Y. Li is Baidu's co-founder and served as Baidu's Chief Executive Officer ("CEO") and Chairman during the *Baidu* Class Period, *see Baidu* ACC ¶ 27; Defendant Yu served as Baidu's Chief Financial Officer ("CFO") from

September 2017 through at least October 2021, *see Baidu* ACC ¶ 29; Defendant X. Li served as Baidu's CFO from March 2008 until September 2017, *see Baidu* ACC ¶ 31; Defendant Gong is and was at all pertinent times iQIYI's CEO, Principal Executive Officer, and a Director of iQIYI's board, *see Baidu* ACC ¶ 32; and Defendant X. Wang was, at all pertinent times, iQIYI's CFO and Principal Financial and Accounting Officer, *see Baidu* ACC ¶ 33.

### 2. *iQIYI* Individual Defendants

As alleged in the *iQIYI* SACC, Defendant Gong is and was at all pertinent times iQIYI's CEO, Principal Executive Officer, and a Director, *see iQIYI* SACC ¶ 25, and Defendant X. Wang is and was at all pertinent times iQIYI's CFO and Principal Financial and Accounting Officer, *see iQIYI* SACC ¶ 26.

### 3. *iQIYI* Director Defendants

The *iQIYI* Plaintiffs allege that Defendant Y. Li was at all pertinent times the Chairman of iQIYI's Board of Directors and reviewed, contributed to, participated in drafting, and signed iQIYI's Registration Statement. *See iQIYI* SACC ¶ 335; *see also Baidu* ACC ¶ 28. As alleged in the *iQIYI* SACC, Defendants Lu, Yu, Ren, Liang, and C. Wang were at all pertinent times Directors of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of iQIYI's Registration Statement. *See iQIYI* SACC ¶¶ 336-40; *see also Baidu* ACC ¶ 30. As further alleged in the *iQIYI* SACC, Defendant Manon was at all pertinent times the authorized representative in the United States of iQIYI and reviewed, contributed to, and signed or authorized the signing and issuance of iQIYI's Registration Statement. *See iQIYI* SACC ¶ 341.

### 4. *iQIYI* Underwriter Defendants

As alleged in the *iQIYI* SACC, Defendants Goldman Sachs, Credit Suisse, Merrill

Lynch, China Renaissance, Citigroup, and UBS are investment banking firms that acted as underwriters of iQIYI's IPO, helping to draft and disseminate the IPO documents.  *See iQIYI SACC* ¶¶ 345-50.  The *iQIYI* SACC alleges, *inter alia*, that the Underwriter Defendants specialize in, among other things, underwriting public offerings of securities; that the Underwriter Defendants shared millions of dollars in fees collectively; that the Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from iQIYI, met with potential investors and presented highly favorable information about iQIYI, its operations, and its financial prospects; that representatives of the Underwriter Defendants assisted iQIYI and the *iQIYI* Individual Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business and operations of iQIYI – *i.e.*, a "due diligence" investigation – and that during the course of their due diligence, the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning iQIYI's most up-to-date operational and financial results and prospects; and that agents of the Underwriter Defendants met with iQIYI's lawyers, management, and top executives and engaged in drafting sessions, during which sessions understandings were reached as to (1) the strategy to best accomplish the IPO, (2) the terms of the IPO, including the price at which iQIYI securities would be sold, (3) the language to be used in iQIYI's Registration Statement, (4) what disclosures about iQIYI would be made in its Registration Statement, and (5) what responses would be made to the SEC in connection with its review of iQIYI's Registration Statement.  *See iQIYI* SACC ¶ 353.

### C.  Relevant Events

#### 1.  IPO

As alleged in the Operative Complaints, on February 27, 2018, iQIYI filed its

Registration Statement on Form F-1 with the SEC in connection with the IPO, and, after several amendments, the SEC declared the Registration Statement effective on March 28, 2018. *See iQIYI* SACC ¶¶ 35, 275; *Baidu* ACC ¶ 43. Plaintiffs allege that on March 29, 2018, iQIYI conducted its IPO pursuant to the Offering Documents and issued 125 million ADSs to the public at the offering price of $18.00 per share, and as a result of the offering, iQIYI received approximately $2,182,500,000 in proceeds upon the IPO's completion, after underwriting discounts and commission. *See iQIYI* SACC ¶¶ 35, 275; *Baidu* ACC ¶ 43. Plaintiffs allege that following the IPO, iQIYI shares traded on the NASDAQ market; that along with being listed on a major U.S. exchange came heightened regulatory requirements as well as the requirements of the federal securities laws; and that as part of those requirements, iQIYI was required to file accurate, audited, GAAP-compliant financial statements with the SEC. *See iQIYI* SACC ¶¶ 36, 276; *Baidu* ACC ¶ 51.

### 2.    Xin'ai Sports Venture

As alleged in the Operative Complaints, on August 6, 2018, iQIYI issued a press release announcing that iQIYI would partner with Super Sports Media, a subsidiary of DDMC Group, to set up a joint venture named Beijing Xin'ai Sports Media Technology Co., Ltd ("Xin'ai Sports"). *See iQIYI* SACC ¶ 77; *Baidu* ACC ¶ 102.

Plaintiffs allege that, according to iQIYI's SEC filings, in July 2018, iQIYI acquired a 32% interest in Xin'ai Sports for a combination of cash and non-cash consideration totaling RMB796,000. *See iQIYI* SACC ¶ 82; *Baidu* ACC ¶ 106.[13] Plaintiffs further allege that the non-cash portion of the consideration iQIYI purportedly paid to acquire its equity interest in Xin'ai

---

[13] The Operative Complaints note in the sections discussing the Xin'ai Sports venture that RMB amounts are in 1,000s. *See iQIYI* SACC ¶ 82 n.16; *Baidu* ACC ¶ 101 n.11.

Sports totaled RMB763,750 and iQIYI recorded this non-cash consideration as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai," *see iQIYI* SACC ¶ 83; *Baidu* ACC ¶ 107, and that approximately 96% of the acquisition price was non-cash consideration that iQIYI recorded as deferred revenue related to property and services iQIYI was to provide to Xin'ai in the future, *see iQIYI* SACC ¶ 84; *Baidu* ACC ¶ 108.

Plaintiffs allege that the notes to iQIYI's financial statements disclose that iQIYI recognized total revenue from content licensed to an "equity investee" in the amount of RMB88,457 for the year ended December 31, 2018, and RMB443,503 for the year ended December 31, 2019; that no cost of revenues is reported associated with the content licensed to the equity investee; and that 2018 was the first year iQIYI recognized revenue for content licensed to an equity investee and iQIYI held no other significant equity method investments in 2018 and 2019, evidencing that the revenue iQIYI recognized in those years is directly attributable to iQIYI's equity method investment in Xin'ai Sports. *See iQIYI* SACC ¶ 85; *Baidu* ACC ¶ 109.

### 3.   Press Releases Regarding Financial and Operating Results

As alleged in the Operative Complaints, on May 16, 2019, during after-market hours, iQIYI issued a press release announcing its financial and operating results for the first quarter of fiscal year 2019, which press release reported, *inter alia*, a decline in iQIYI's deferred revenue from RMB2.195 billion to RMB1.960 billion. *See iQIYI* SACC ¶ 102; *Baidu* ACC ¶ 126. The *iQIYI* Plaintiffs allege that this announcement caused the price of iQIYI common stock to fall by $1.34 per share, or 6.58%, to close at $19.04 per share on May 17, 2019. *See iQIYI* SACC ¶ 104; Fumerton Ex. B at 7.

The *Baidu* Plaintiffs allege that, on May 16, 2019, during after-market hours, Baidu issued a press release announcing its financial and operating results for the first quarter of fiscal year 2019, which press release reported, *inter alia*, a decline in Baidu's deferred revenue from RMB1.883 billion in the fourth quarter of 2018 to RMB1.774 billion in the first quarter of 2019. *See Baidu* ACC ¶ 126.  The *Baidu* Plaintiffs allege that this announcement and iQIYI's announcement caused the price of Baidu's ADSs to fall by $25.39 per share, or 16.52%, to close at $128.31 per share on May 17, 2019.  *See Baidu* ACC ¶ 128; Fumerton Ex. Q at 18.[14]

### 4.   Wolfpack Report

As alleged in the Operative Complaints, on April 7, 2020, during market hours, Wolfpack Research – a global financial research and due diligence firm – released a report (the "Wolfpack Report") detailing, *inter alia*, how iQIYI had misled investors and failed to disclose pertinent information related to iQIYI's user numbers and revenue figures.  *See iQIYI* SACC ¶¶ 2-3, 105; *Baidu* ACC ¶¶ 10, 129; *see also* Fumerton Ex. H (the Wolfpack Report); *Baidu* ACC ¶ 10 (alleging that the Wolfpack Report cited to public and private information, including financial statements that iQIYI filed with the Chinese government, as well as other reliable Chinese sources).

The *iQIYI* Plaintiffs allege that the publication of the Wolfpack Report at 10:35 a.m. on April 7, 2020 caused iQIYI's share price to immediately fall $2.75 per share to $14.51 at 10:45 a.m. and that iQIYI's share price closed at $16.51 per share at the end of the next trading day on April 8, 2020, a 4.3% decline, damaging investors.  *See iQIYI* SACC ¶ 109.  The *Baidu* Plaintiffs allege that publication of the Wolfpack Report caused Baidu ADSs to fall $4.46 per

---

[14]  The Court notes that the *Baidu* ACC's reference to "$19.04" rather than $128.31, *see Baidu* ACC ¶ 128, appears to be a typographical error.

ADS, or 4%, to close at $97.33 on the next full trading day, April 8, 2020, thereby damaging investors. *See Baidu* ACC ¶ 133.

Plaintiffs allege that on April 7, 2020, iQIYI issued a press release on its website denying the allegations made in the Wolfpack Report and assuring investors that iQIYI is in compliance with all rules and regulations. *See iQIYI* SACC ¶ 110; *Baidu* ACC ¶ 134.

### 5.   Disclosure of Investigations

Plaintiffs allege that on August 13, 2020, iQIYI issued a press release announcing its financial results for the second quarter of 2020, which press release disclosed that the SEC's Division of Enforcement had opened an investigation into iQIYI based on the allegations in the Wolfpack Report and had requested financial records, operating records, and other documents from iQIYI as part of the investigation, and further disclosed that iQIYI's Audit Committee had engaged professional advisers to conduct an internal review of iQIYI's books and records. *See iQIYI* SACC ¶ 111; *Baidu* ACC ¶ 135. The *iQIYI* Plaintiffs allege that iQIYI issued the press release on its website at 4:30 p.m., causing the price of iQIYI shares to drop $4.25 by 4:32 p.m. to $17.50 per share. *See iQIYI* SACC ¶ 113.

Plaintiffs allege that on August 14, 2020, iQIYI hosted an earnings call with analysts to discuss its financial results for the second quarter of 2020, and that on the call, Defendant X. Wang revealed for the first time that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants knew for about three to four months that NASDAQ and the SEC had opened inquiries into iQIYI based on the Wolfpack Report. *See iQIYI* SACC ¶ 112; *Baidu* ACC ¶ 136. The *iQIYI* Plaintiffs allege that following these disclosures, iQIYI's ADS price fell $2.49 per share, or 11.4%, to close at $19.26 on August 14, damaging investors. *See iQIYI* SACC ¶ 113.

The *Baidu* Plaintiffs allege that on August 13, 2020, Baidu hosted an earnings call where

Defendant Yu acknowledged the existence of the SEC investigation.  *See Baidu* ACC ¶ 137. The *Baidu* Plaintiffs allege that, on this news, Baidu ADSs fell $7.83 per ADS, or 6%, to close at $116.74 on August 14, 2020.  *See Baidu* ACC ¶ 138.

The *Baidu* Plaintiffs allege that on October 5, 2020, Baidu filed a Form 6-K with the SEC disclosing interim financial results, and also stated that the SEC investigation into iQIYI based on the allegations in the Wolfpack Report was still ongoing.  *See Baidu* ACC ¶ 140.

Plaintiffs allege that on March 9, 2021, iQIYI filed its Form 20-F with the SEC for the year ending December 31, 2020, which revealed that the SEC's investigation into iQIYI based on the allegations in the Wolfpack Report was still ongoing.  *See iQIYI* SACC ¶ 114; *Baidu* ACC ¶ 141.  The *Baidu* Plaintiffs allege that on that same day, Baidu filed its 2020 Annual Report and also acknowledged that the SEC investigation was still ongoing.  *See Baidu* ACC ¶ 141.

### D.   Alleged Misstatements[15]

#### 1.   Daily Active Users

Plaintiffs allege that, according to data from two leading industry research firms that cover China's mobile internet market – QuestMobile Research Institute ("QuestMobile") and Aurora Mobile Limited ("Aurora") – the actual average mobile DAUs were substantially lower than iQIYI reported to investors.  *See iQIYI* SACC ¶¶ 48, 286; *Baidu* ACC ¶ 72.[16]  Plaintiffs

---

[15]  In the *iQIYI* SACC and the *Baidu* ACC, Plaintiffs use bold and italics to highlight alleged misstatements.  *See iQIYI* SACC ¶ 139; *Baidu* ACC ¶ 165.  The Court retains Plaintiffs' bold and italics.

[16]  Plaintiffs allege that they were able to obtain the QuestMobile and Aurora data only after conducting extensive research and data analysis of PRC media reports and archived industry reports, which are only published in Chinese and not readily obtainable by investors.  *See iQIYI* SACC ¶¶ 48 n.5, 286 n.42; *Baidu* ACC ¶ 72 n.4.

allege that, according to data from QuestMobile, the true average mobile DAUs for iQIYI for

2015, 2016, and 2017 were overstated by 50%, 33.4%, and 11.5%, respectively, and iQIYI's

DAUs for the full years 2018 and 2019 were overstated by 10.4% and 22.5%, respectively.  *See*

*iQIYI* SACC ¶¶ 49 (setting forth chart of DAUs as reported by QuestMobile and iQIYI), 147,

287, 362; *Baidu* ACC ¶¶ 72 (setting forth same chart), 174.  Plaintiffs also allege that Aurora's

data corroborates QuestMobile's data, and that according to Aurora's data, between December

2017 and March 2019, iQIYI never had more than 90 million mobile DAUs, despite iQIYI and

Baidu reporting DAUs in excess of that number during the same periods.  *See iQIYI* SACC

¶¶ 51-52, 148, 289, 363; *Baidu* ACC ¶¶ 75-76, 175.  Plaintiffs further allege that iQIYI,

QuestMobile, and Aurora each used the same methodology for calculating DAUs: the number

of unique devices that used iQIYI's apps at least once during the day.  *See iQIYI* SACC ¶¶ 48,

286; *Baidu* ACC ¶ 72.

Plaintiffs allege that iQIYI's Registration Statement, which was signed by Defendants

Gong, X. Wang, Y. Li, Lu, Yu, Ren, Liang, and C. Wang, *see iQIYI* SACC ¶¶ 140, 320; *Baidu*

ACC ¶ 167; *see also* Fumerton Ex. A (iQIYI Registration Statement), stated that iQIYI's

number of DAUs were higher than they actually were.  *See iQIYI* SACC ¶¶ 141, 358; *Baidu*

ACC ¶ 168.  Specifically, Plaintiffs allege that the Registration Statement contained the

following misstatements concerning iQIYI's DAUs:

- That iQIYI has "***a massive and highly engaged user base, which drives [its] revenue growth***."  *See iQIYI* SACC ¶¶ 141, 358; *Baidu* ACC ¶ 168.

- That "[b]etween the fourth quarters of 2015 and 2016, ***[the Company's] average mobile DAUs increased by 42.0% from 88.3 million to 125.4 million***, and [its] average mobile MAUs increased by 10.9% from 365.5 million to 405.4 million."  *See iQIYI* SACC ¶¶ 142, 360; *Baidu* ACC ¶ 169.

- That "[b]etween the fourth quarters of 2016 and 2017, ***[the Company's] average mobile DAUs increased by 0.5% from 125.4 million to 126.0 million***, and [its] average mobile

MAUs increased by 3.9% from 405.4 million to 421.3 million." *See iQIYI* SACC ¶¶ 143, 359; *Baidu* ACC ¶ 170.

Plaintiffs further allege that on March 15, 2019, iQIYI filed with the SEC its annual report on Form 20-F for the year ended December 31, 2018 (the "2018 iQIYI Annual Report"). *See iQIYI* SACC ¶ 144; *Baidu* ACC ¶ 171.[17]  Plaintiffs allege that the 2018 iQIYI Annual Report stated that "[f]or the year of 2018, our average mobile MAUs were 454.5 million and *our average mobile DAUs were 135.4 million.*" *See iQIYI* SACC ¶ 144; *Baidu* ACC ¶ 171. The *Baidu* Plaintiffs allege that a similar statement was set forth in the 2018 Baidu Annual Report, also filed on March 15, 2019.  *See Baidu* ACC ¶¶ 196-97 (alleging that the 2018 Baidu Annual Report stated that "[f]or the year of 2018, iQIYI's average mobile MAUs were 455 million, *and its average mobile DAUs were 135 million*").[18]

Plaintiffs allege that on March 12, 2020, iQIYI filed with the SEC its annual report on Form 20-F for the year ended December 31, 2019 (the "2019 iQIYI Annual Report").  *See iQIYI* SACC ¶ 145; *Baidu* ACC ¶ 172.[19]  Plaintiffs allege that the 2019 iQIYI Annual Report stated that "[f]or the year of 2019, our average mobile MAUs were 476.0 million and *our average*

---

[17] Plaintiffs allege that attached to the 2018 iQIYI Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.  *See iQIYI* SACC ¶ 144; *Baidu* ACC ¶ 171.

[18] The *Baidu* Plaintiffs allege that attached to the 2018 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud.  *See Baidu* ACC ¶ 196.

[19] As with the 2018 iQIYI Annual Report, Plaintiffs allege that attached to the 2019 iQIYI Annual Report were certifications pursuant to SOX signed by Defendants Gong and Wang attesting to the accuracy of financial reporting, the disclosure of any material changes to iQIYI's internal control over financial reporting, and the disclosure of all fraud.  *See iQIYI* SACC ¶ 145; *Baidu* ACC ¶ 172.

*mobile DAUs were 139.9 million.*"  *See iQIYI* SACC ¶ 145; *Baidu* ACC ¶ 172.  The *Baidu* Plaintiffs allege that a similar statement was set forth in the 2019 Baidu Annual Report filed on March 13, 2020.  *See Baidu* ACC ¶¶ 198-99 (alleging that the 2019 Baidu Annual Report stated that "[f]or the year of 2019, iQIYI's average mobile MAUs were 476 million, ***and its average mobile DAUs were 140 million***").[20]

The *Baidu* Plaintiffs further allege that on April 4, 2020, Baidu issued a Prospectus on Form 424B2 that stated, in pertinent part, that "[f]or the year of 2019, iQIYI's average mobile MAUs were 476.0 million, and its ***average mobile DAUs were 139.9 million***."  *See Baidu* ACC ¶ 200.

Plaintiffs allege that the statements identified above regarding iQIYI's DAUs were material misstatements because iQIYI had substantially fewer mobile DAUs than were disclosed in the Registration Statement and iQIYI's 2018 and 2019 Annual Reports.  *See iQIYI* SACC ¶¶ 146-47; *Baidu* ACC ¶¶ 173, 201; *see also iQIYI* SACC ¶ 285 (alleging that iQIYI's reported DAU numbers were, as a result of the Securities Act Defendants' negligence, significantly overstated).

### 2.    Deferred Revenue

Plaintiffs allege that certain of iQIYI's and Baidu's reported deferred revenue amounts were overstated.  Specifically, Plaintiffs allege that the iQIYI Registration Statement misrepresented the amount of iQIYI's deferred revenue, as evidenced by reliable data in third-party credit reports that "show that the deferred revenue of iQIYI's operating subsidiaries was

---

[20] As with the 2018 Baidu Annual Report, the *Baidu* Plaintiffs allege that attached to the 2019 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud.  *See Baidu* ACC ¶ 198.

substantially lower" than disclosed in the Registration Statement, when accounting for the exact same entities.  *See iQIYI* SACC ¶¶ 149, 292; *Baidu* ACC ¶¶ 176-77.  Plaintiffs allege that the amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's Variable Interest Entities ("VIEs")[21] and allege that filings with the Chinese State Administration for Industry and Commerce ("SAIC") and PRC tax authorities are the most accurate sources of financial information for a PRC-based company because Chinese companies and their officers often operate beyond the reach of criminal and civil judgments and sanctions imposed by American courts but are subject to penalties imposed in China for false documents with the SAIC or PRC tax authorities.  *See iQIYI* SACC ¶¶ 154, 370; *Baidu* ACC ¶ 182.  Further, Plaintiffs allege that the difference in reported revenues in China and the U.S. is not attributable to different standards in the two countries, as the accounting standards in China and the U.S. are the same with respect to the recording of deferred revenue.  *See iQIYI* SACC ¶¶ 116, 294; *Baidu* ACC ¶ 143.  And Plaintiffs allege that iQIYI's use of VIEs does not explain why iQIYI's deferred revenues it reported in the PRC are substantially different than the deferred revenues it reported in the U.S.  *See iQIYI* SACC ¶¶ 138, 319; *Baidu* ACC ¶ 164.

Plaintiffs allege that the iQIYI Registration Statement contained the following misstatements concerning iQIYI's deferred revenue amounts:

- That iQIYI's customer advances and deferred revenue was ***RMB339,880,000*** as of December 31, 2015; ***RMB796,703,000*** as of December 31, 2016; and ***RMB1,633,649,000***

---

[21] As alleged by the *iQIYI* Plaintiffs, VIEs are entities controlled by a company by means other than a majority of voting rights and iQIYI primarily conducts its business in China through VIEs because PRC laws and regulations prohibit or restrict foreign ownership of companies. *See iQIYI* SACC ¶ 68 n.15.  The *iQIYI* Plaintiffs further allege that iQIYI conducts its business in China through VIEs Beijing iQIYI, Shanghai iQIYI, Shanghai Zhong Yuan, iQIYI Pictures, and Beijing iQIYI Cinema, and their respective subsidiaries.  *See iQIYI* SACC ¶ 68 n.15.

as of December 31, 2017.  *See iQIYI* SACC ¶¶ 150, 365; *Baidu* ACC ¶ 178.[22]

- That the combined customer advances and deferred revenue for iQIYI's five VIEs was ***RMB796,255,000*** as of December 31, 2016 and ***RMB1,633,197,000*** as of December 31, 2017.  *See iQIYI* SACC ¶¶ 151, 366; *Baidu* ACC ¶ 179.

Plaintiffs further allege that, with respect to iQIYI's alleged overstated deferred revenue amounts in 2015, iQIYI reported in its Registration Statement RMB339,880,000 of consolidated deferred revenue compared to the actual amount of only RMB93,963,000 of deferred revenue as reported for its VIEs in PRC tax filings, and that "the Registration Statement stated that customer advances and deferred revenue for iQIYI's five VIEs represented over 99.9% of iQIYI's consolidated customer advances and deferred revenue for 2016 and 2017, so the same is likely true for 2015."  *See iQIYI* SACC ¶¶ 153, 293; *Baidu* ACC ¶ 181.

The *Baidu* Plaintiffs allege that on April 8, 2016, Baidu filed with the SEC its annual report for the year ended December 31, 2015 (the "2015 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li and that the 2015 Baidu Annual Report stated that Baidu's deferred revenue was ***RMB375,672,000*** for 2015.  *See Baidu* ACC ¶¶ 202-03.[23]

The *Baidu* Plaintiffs allege that on March 31, 2017, Baidu filed with the SEC its annual report for the year ended December 31, 2016 (the "2016 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li and that the 2016 Baidu Annual Report stated that Baidu's deferred revenues were ***RMB375,672,000*** for 2015 and ***RMB596,460,000*** for 2016.  *See Baidu* ACC

---

[22] Plaintiffs allege that these amounts purportedly consolidated iQIYI's VIEs and other subsidiaries.  *See iQIYI* SACC ¶¶ 150, 365; *Baidu* ACC ¶ 178.

[23] The *Baidu* Plaintiffs allege that attached to the 2015 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and X. Li attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud.  *See Baidu* ACC ¶ 202.

¶¶ 204-05.[24]

The *Baidu* Plaintiffs allege that on March 15, 2018, Baidu filed with the SEC its annual report for the year ended December 31, 2017 (the "2017 Baidu Annual Report") on a Form 20-F signed by Defendant Y. Li and that the 2017 Annual Report stated that Baidu's deferred revenues were **RMB596,460,000** for 2016 and **RMB788,000,000** for 2017.  *See Baidu* ACC ¶¶ 206-07.[25]

Plaintiffs allege that the 2018 iQIYI Annual Report contained the following misstatement concerning iQIYI's deferred revenue amounts: that iQIYI's consolidated customer advances and deferred revenue were **RMB1,633,649,000** as of December 31, 2017, and that customer advances and deferred revenue for iQIYI's five VIEs were **RMB1,633,197,000** as of December 31, 2017.  *See iQIYI* SACC ¶ 155; *Baidu* ACC ¶ 183.  And the *Baidu* Plaintiffs allege that the 2018 Baidu Annual Report stated that Baidu's deferred revenues were **RMB788,000,000** for 2017 and **RMB1,883,000,000** for 2018.  *See Baidu* ACC ¶ 209.

The *Baidu* Plaintiffs allege that the 2019 Baidu Annual Report stated that Baidu's customer deposits and deferred revenues were **RMB9,221,000,000** for 2018 and **11,062,000,000** for 2019.  *See Baidu* ACC ¶ 211; Fumerton Ex. V (2019 Baidu Annual Report).[26]

---

[24] The *Baidu* Plaintiffs allege that attached to the 2016 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and X. Li attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud.  *See Baidu* ACC ¶ 204.

[25] The *Baidu* Plaintiffs allege that attached to the 2017 Baidu Annual Report were certifications pursuant to SOX signed by Defendants Y. Li and Yu attesting to the accuracy of financial reporting, the disclosure of any material changes to Baidu's internal control over financial reporting, and the disclosure of all fraud.  *See Baidu* ACC ¶ 206.

[26] The Court notes that the *Baidu* ACC's reference to "11,062,000,000,000" rather than 11,062,000,000, *see Baidu* ACC ¶ 211, appears to be a typographical error.

### 3.    Membership Services Revenue

Plaintiffs further allege that iQIYI materially misstated membership services revenue during the *iQIYI* and *Baidu* Class Periods.  *See iQIYI* SACC ¶ 56; *Baidu* ACC ¶ 80.  Plaintiffs allege that deferred revenues should track and be positively correlated with the increase in paying members and the corresponding increase in membership services revenue – *i.e.*, if paying members and membership services revenue are increasing, so should deferred revenue, and if deferred revenue decreases, membership services revenue and the number of paying members should decrease.  *See iQIYI* SACC ¶ 61; *Baidu* ACC ¶ 85.  Plaintiffs allege, however, that as it pertains to iQIYI's performance during the *iQIYI* and *Baidu* Class Periods, there was a material divergence between the two reported amounts, and that at times during the *iQIYI* and *Baidu* Class Periods, iQIYI experienced increasing membership service revenue while at the same time experiencing decreasing deferred revenue.  *See iQIYI* SACC ¶ 62; *Baidu* ACC ¶ 86.  Plaintiffs allege that the divergence in iQIYI's increasing paying members and membership services revenues and its decreasing deferred revenue balances indicates that the *iQIYI* Exchange Act Defendants and the *Baidu* Defendants were overstating the number of paying members and therefore the amount of membership services revenue.  *See iQIYI* SACC ¶ 62; *Baidu* ACC ¶ 86; *see also iQIYI* SACC ¶¶ 63-67; *Baidu* ACC ¶¶ 87-91.

### 4.    Xin'ai Sports

Plaintiffs allege that given the irreconcilable disparity between iQIYI's (1) real user and revenue figures; and (2) overstated reported user and revenue figures, iQIYI needed a way to make it seem as though iQIYI's deferred revenue tracked the purported user and revenue growth iQIYI was touting to investors and that to do so, iQIYI used fraudulent accounting of an equity investment, in violation of GAAP, that generated RMB763,750 of deferred revenue for

iQIYI "out of thin air."  *See iQIYI* SACC ¶ 76; *Baidu* ACC ¶ 101.[27]

Plaintiffs allege that iQIYI's characterization of its obligation to transfer goods and services to Xin'ai Sports as deferred revenue was improper.  *See iQIYI* SACC ¶ 92 (alleging that iQIYI's investment in Xin'ai Sport was not a revenue contract and that, under GAAP, the transaction should have been recorded as a liability, not as deferred revenue later to be recognized as revenue in iQIYI's income statement); *Baidu* ACC ¶ 116 (same); *see also iQIYI* SACC ¶ 95 (alleging, *inter alia*, that by classifying the obligation as deferred revenue and later recognizing the transfer as revenue, iQIYI significantly overstated its reported revenues); *Baidu* ACC ¶ 119 (same).

Plaintiffs further allege that in addition to overstating revenue, iQIYI also recognized profit on the overstated revenue.  *See iQIYI* SACC ¶ 97; *Baidu* ACC ¶ 121.  And, Plaintiffs allege that the *iQIYI* Exchange Act Defendants and the *Baidu* Defendants "invented" the non-cash investment in Xin'ai Sports "out of thin air."  *See iQIYI* SACC ¶¶ 98-101 (alleging, *inter alia*, that the audited financial statements of Wuhan DDMC, the other major equity investor in Xin'ai Sports, disclose that iQIYI made a RMB38.25mm cash-only investment into Xin'ai Sports and received 38.25% of the equity in return and make no mention of any non-cash contributions by any of the investors – much less the RMB763.75mm of non-cash consideration reported in iQIYI's financial statements); *Baidu* ACC ¶¶ 122-25 (same).  Plaintiffs allege that by engaging in this "sham accounting" for its investment in Xin'ai Sports, iQIYI created RMB763,750 of deferred revenue, which it used to prop up and avoid detection of its fraudulent subscriber and revenue growth figures iQIYI was reporting to investors.  *See iQIYI* SACC

---

[27] As noted above, the Operative Complaints note in the sections discussing the Xin'ai Sports venture that RMB amounts are in 1,000s.

¶ 101; *Baidu* ACC ¶ 125.

Plaintiffs allege that the 2018 iQIYI Annual Report contained the following

misstatements concerning iQIYI's equity investment in Xin'ai Sports:

- That "***[t]he excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 (US$88,648) was recognized as basis differences and investment goodwill***."  *See Baidu* ACC ¶ 186; *iQIYI* SACC ¶ 159 (without bold and italics).

- That ***RMB763,750*** was reported as "[a]cquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."  *See iQIYI* SACC ¶ 160; *Baidu* ACC ¶ 187 (alteration accepted).

Plaintiffs allege that the 2019 iQIYI Annual Report contained the following

misstatements concerning iQIYI's equity investment in Xin'ai Sports:

- That "***[t]he excess of the carrying value of the investment over the proportionate share of Xin'ai's net assets of RMB609,502 was recognized as basis differences and investment goodwill***" and "***[a]s of December 31, 2019, the Group's equity interest was diluted to 26% of Xin'ai's total equity due to a subsequent round of equity financing***."  *See Baidu* ACC ¶ 188; *iQIYI* SACC ¶ 162 (without bold and italics).

- That ***RMB763,750*** was reported as "[a]cquisition of long-term investments with non-cash consideration," which iQIYI ultimately recorded as "deferred revenue related to content distribution, licenses of intellectual property and traffic support services to be provided to Xin'ai."  *See iQIYI* SACC ¶ 163; *Baidu* ACC ¶ 189 (alteration accepted).

### 5.    Wolfpack Report

Plaintiffs allege that on April 7, 2020, the Wolfpack Report was published and revealed

to investors for the first time that iQIYI's user numbers and deferred revenues were inflated.

*See iQIYI* SACC ¶ 165; *Baidu* ACC ¶ 192.  Plaintiffs further allege that on April 7, 2020, iQIYI

issued a press release on its website stating in relevant part:

> The Company has been made aware of and reviewed the short seller report published by Wolfpack Research on April 7, 2020.  ***The Company believes that the report contains numerous errors, unsubstantiated statements and misleading conclusions and interpretations regarding information relating to the Company.***

> ***The Company emphasizes that it has always been and will remain committed to maintaining high standards of corporate governance and internal control, as well as transparent and timely disclosure in compliance with the applicable rules and regulations of the Securities and Exchange Commission and the Nasdaq Global Select Market.***

*See iQIYI* SACC ¶ 165; *Baidu* ACC ¶ 192.  Plaintiffs allege that these statements were materially false and misleading for the same reasons set forth as to why the statements regarding DAUs, deferred revenue, and Xin'ai sports were materially false and misleading.  *See iQIYI* SACC ¶ 166; *Baidu* ACC ¶ 193.

### E.   Scienter-Related Allegations

The *iQIYI* SACC and the *Baidu* ACC include various allegations purporting to establish scienter with respect to the *iQIYI* Exchange Act Defendants and the *Baidu* Defendants, respectively.

Plaintiffs assert that the *iQIYI* Exchange Act Defendants' and the *Baidu* Defendants' review of contrary information supports scienter.  Specifically, Plaintiffs allege that the *iQIYI* Exchange Act Defendants and the *Baidu* Defendants monitored and reviewed iQIYI's DAUs and third-party research reports containing information contrary to the *iQIYI* Exchange Act Defendants' and the *Baidu* Defendants' alleged misrepresentations.  *See iQIYI* SACC ¶¶ 196-98 (alleging, *inter alia*, that *iQIYI* Exchange Act Defendants regularly referenced QuestMobile data during the *iQIYI* Class Period; that iQIYI directed investors to rely on QuestMobile data for a platform matrix consisting of DAU numbers during iQIYI's second quarter 2019 earnings call; and that the *iQIYI* Exchange Act Defendants' constant reliance on and reference to QuestMobile data demonstrates that they in fact had access to such QuestMobile reports and reviewed such reports and underlying data contained therein); *Baidu* ACC ¶¶ 232-35 (alleging, *inter alia*, that Defendant Li referenced the QuestMobile data during various Baidu earnings calls).  Plaintiffs

further allege, *inter alia*, that the *iQIYI* Exchange Act Defendants' and *Baidu* Defendants' review of iQIYI's VIEs' PRC tax filings containing contrary facts concerning iQIYI's deferred revenue supports an inference of scienter, *see iQIYI* SACC ¶¶ 199-200 (alleging, *inter alia*, that as the legal representative, Defendant Gong was responsible for ensuring the accuracy of the VIEs' PRC tax filings); *Baidu* ACC ¶¶ 236-37 (same), and that iQIYI's management regularly reviewed iQIYI's financial statements during the *iQIYI* and *Baidu* Class Periods, *see iQIYI* SACC ¶¶ 201-06; *Baidu* ACC ¶¶ 238-42.  And the *Baidu* ACC alleges that Baidu's management reviewed Baidu's financial statements and data contained therein, which necessarily included user metrics and revenue figures.  *See Baidu* ACC ¶¶ 243-45.

Plaintiffs additionally allege that the *iQIYI* Individual Defendants' and *Baidu* Individual Defendants' knowledge of iQIYI's allegedly inflated DAUs, membership service revenues, and deferred revenues can be inferred because these facts were critical to iQIYI's core operations, *see iQIYI* SACC ¶¶ 207-21; *Baidu* ACC ¶¶ 247-62, that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants having waited months to tell investors about the SEC and NASDAQ investigations supports a strong inference of scienter, *see iQIYI* SACC ¶¶ 222-24; *Baidu* ACC ¶¶ 263-65, and that iQIYI's accounting treatment of the Xin'ai Sports investment supports a strong inference of scienter, *see iQIYI* SACC ¶¶ 225-26 (alleging that the *iQIYI* Exchange Act Defendants used this investment to "mask the disparity between iQIYI's real and overstated deferred revenue figures"); *Baidu* ACC ¶¶ 266-67 (alleging same with respect to *Baidu* Defendants).

Plaintiffs also allege that Defendant Gong's and Defendant X. Wang's SOX certifications support a strong inference of scienter, *see iQIYI* SACC ¶¶ 227-30; *Baidu* ACC ¶¶ 268-71, and the *Baidu* Plaintiffs allege that Defendant Y. Li's, Defendant X. Li's, and

Defendant Yu's SOX certifications support a strong inference of scienter, *see Baidu* ACC

¶¶ 272-75.

## II.     Procedural Background

On August 18, 2022, the Court held a conference regarding the potential consolidation

of the *Baidu* Action and *iQIYI* Action.  *See iQIYI* August 18, 2022 Minute Entry; *Baidu* August

18, 2022 Minute Entry.  By Order issued September 6, 2022, the Court, in light of the common

questions of law and fact at issue in the *iQIYI* and *Baidu* Actions, directed the parties to jointly

propose a schedule for the coordinated briefing of motion(s) to dismiss in the actions.  *See iQIYI*

September 6, 2022 Order; *Baidu S*eptember 6, 2022 Order.

On September 30, 2022, the parties filed a letter jointly proposing three tracks of motion

to dismiss briefing: (1) a motion by all Defendants to dismiss both actions for failure to allege

any actionable misrepresentation or omission; (2) a motion by all Defendants in the *iQIYI*

Action to dismiss the *iQIYI* Action on any additional grounds; and (3) a motion by all

Defendants in the *Baidu* Action to dismiss the *Baidu* Action on any additional grounds.  *See*

*iQIYI* ECF No. 153; *Baidu* ECF No. 55.  By Order dated October 6, 2022, the Court set a

briefing schedule.  *See* October 6, 2022 Order.

On March 3, 2023, the three instant motions were filed.

On February 23, 2024, Defendants filed a letter providing notice of supplemental

authority.  *See iQIYI* ECF No. 172; *Baidu* ECF No. 74.

On February 26, 2024, oral argument was held on the motions to dismiss.  *See iQIYI*

February 26, 2024 Minute Entry; *Baidu* February 26, 2024 Minute Entry; *see also* Transcript of

February 26, 2024 Oral Argument ("Tr."), *iQIYI* ECF No. 174.  At oral argument, the parties

were heard on the motions; Plaintiffs were granted leave to file amended consolidated

complaints in the *iQIYI* and *Baidu* Actions; the Court set a schedule for the filing of amended

consolidated complaints and for supplemental briefing; and the Court held in abeyance

Defendants' Motions to Dismiss, *iQIYI* ECF Nos. 156, 157; *Baidu* ECF Nos. 61, 62, pending

the filing of the amended consolidated complaints and supplemental briefing. *See iQIYI*

February 26, 2024 Minute Entry; *Baidu* February 26, 2024 Minute Entry; *see also generally* Tr.

On March 11, 2024, Plaintiffs filed amended consolidated complaints. *See iQIYI* ECF

No. 175; *Baidu* ECF No. 75.

On March 25, 2024, Defendants filed their consolidated supplemental brief. *See iQIYI*

ECF No. 176; *Baidu* ECF No. 76. On April 8, 2024, Plaintiffs filed their response. *See iQIYI*

ECF No. 177; *Baidu* ECF No. 77. On April 22, 2024, Defendants filed their reply. *See iQIYI*

ECF No. 178; *Baidu* ECF No. 78.

## STANDARD OF REVIEW

Rule 8(a) of the Federal Rules of Civil Procedure provides:

> A pleading that states a claim for relief must contain: (1) a short and plain statement
> of the grounds for the court's jurisdiction, unless the court already has jurisdiction
> and the claim needs no new jurisdictional support; (2) a short and plain statement
> of the claim showing that the pleader is entitled to relief; and (3) a demand for the
> relief sought, which may include relief in the alternative or different types of relief.

Fed. R. Civ. P. 8(a).

A "short and plain statement of the claim" is required "in order to give the defendant fair

notice of what the claim is and the grounds upon which it rests." *See Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007) (quotation and ellipsis omitted).

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, a complaint must plead "enough facts to state a claim to relief that is

plausible on its face." *Twombly*, 550 U.S. at 570. A claim is plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court must "accept all 'well-pleaded factual allegations' in the complaint as true" and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Lynch v. City of N.Y.*, 952 F.3d 67, 74-75 (2d Cir. 2020) (first quoting *Iqbal*, 556 U.S. at 679; then quoting *Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009)).  However, "more than labels and conclusions" are required and "formulaic recitation[s] of the elements of a cause of action will not do."  *See Twombly*, 550 U.S. at 555.  Factual allegations "must be enough to raise a right to relief above the speculative level," and dismissal is proper where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *See id.* at 558.  A court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions."  *See Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Twombly*, 550 U.S. at 555)); *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (noting that "factual allegations must be sufficient to support necessary legal conclusions").  "In considering a motion to dismiss for failure to state a claim, '[a] district court is normally required to look only to the allegations on the face of the complaint,'" though "[it] may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice."  *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

A complaint alleging securities fraud must also satisfy the heightened pleading

requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b).  *See Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012).  Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud."  *See* Fed. R. Civ. P. 9(b).  To satisfy this requirement, "a plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quoting *Anschutz*, 690 F.3d at 108).  "The PSLRA expanded on the Rule 9(b) standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which a belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Anschutz*, 690 F.3d at 108 (alteration accepted) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)); *see also* 15 U.S.C. § 78u-4(b)(1), (2).

"Rule 9(b) requires that 'in a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible.'"  *Greco v. Qudian Inc.*, No. 20-CV-00577, 2022 WL 4226022, at *25 (S.D.N.Y. Sept. 13, 2022) (alteration accepted) (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009)).

## DISCUSSION

For the reasons set forth below, each of the Operative Complaints is dismissed in its entirety.

## I.   Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC are Dismissed for Failure to State a Claim

As set forth below, Plaintiffs have failed to state a claim under Section 10(b) and Rule

10b-5.  Accordingly, Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC must be

dismissed.

## A.      Applicable Law

Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange -- [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

> Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"To state a claim for securities fraud under these provisions a plaintiff must allege that

each defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in

connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5)

that the plaintiff's reliance was the proximate cause of its injury." *In re Synchrony Fin. Sec.*

*Litig.*, 988 F.3d at 167 (quotation omitted).[28]

"[T]o be actionable under Section 10(b) and Rule 10b-5, the alleged misstatement or omission must be material." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic*, 485 U.S. at 231). Assessing materiality is "a fact-specific inquiry." *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.* ("*ECA*"), 553 F.3d 187, 197 (2d Cir. 2009).

"[E]xpressions of puffery and corporate optimism do not give rise to securities violations." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Statements are considered expressions of puffery when they are "too general to cause a reasonable investor to rely upon them." *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (quoting *ECA*, 553 F.3d at 206).

To adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(2)(A). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "To qualify as 'strong' . . . an

---

[28] Here, Defendants challenge Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC on the grounds that the Operative Complaints fail to plead any actionable misstatement or omission, fail to plead scienter, and fail to plead loss causation. *See generally* Defs.' Joint Br.; Defs.' *iQIYI* Br.; Defs.' *Baidu* Br.; Defs.' Supp. Br.

inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  "The strength of an inference cannot be decided in a vacuum," and "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.  "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff must allege that a defendant "'benefitted in some concrete and personal way from the purported fraud.'"  *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)).  "General allegations that the defendants acted in their economic self-interest are not enough." *Ganino*, 228 F.3d at 170.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry.  Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198 (citations omitted).

As an alternative to establishing scienter through allegations regarding motive and opportunity, a plaintiff can "raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly

greater' if there is no motive." *See ECA*, 553 F.3d at 198-99 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). "Recklessness is sufficient to establish scienter only if the defendants' actions represent 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 37 (2d Cir. 2018) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).

"At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" *ECA*, 553 F.3d at 199 (quoting *Novak*, 216 F.3d at 311). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (rejecting plaintiff's argument that plaintiff had raised an inference of scienter by alleging that defendants failed to review or check information that they had a duty to monitor where plaintiff had "not specifically identified any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements"); *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (stating that "Second Circuit cases uniformly rely on allegations that [1] *specific* contradictory information was available to the defendants [2] *at the same time* they made their misleading statements" and that "bare assertions that the defendants, due to their high-level positions in the Company, had

access to adverse undisclosed financial information through internal corporate documents, meetings, and reports, without any further facts or details will not suffice to create a strong inference of scienter" (quotations omitted) (alteration accepted)).

"Where a defendant is a corporation," a plaintiff must "plead[] facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quotation omitted). "In exceedingly rare instances, a statement may be so dramatic that collective corporate scienter may be inferred." *Id.* at 99 (quotation omitted).

### B.    Plaintiffs Have Failed to Establish a Strong Inference of Scienter

Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC must be dismissed because Plaintiffs have failed to adequately plead scienter with respect to any Defendant.

### 1.    Motive and Opportunity

In arguing that they have adequately pled scienter, Plaintiffs appear to rely principally on their assertion that they have adequately alleged circumstantial evidence of conscious misbehavior or recklessness, not on motive and opportunity. To the extent that Plaintiffs argue that they have adequately alleged motive and opportunity, they appear to rely on the Operative Complaints' allegations regarding iQIYI's accounting treatment of the Xin'ai Sports investment. *See* Pls.' Supp. Br. at 2-3 n.3 (arguing that "Defendants were motivated to create deferred revenue out of thin air to cover up the overstated revenue figures" (referencing *iQIYI* SACC ¶ 225; *Baidu* ACC ¶ 266)).[29]

---

[29]  Indeed, as correctly noted by Defendants, *see* Defs.' Supp. Br. at 3, the Operative Complaints omit allegations contained in the prior consolidated complaints regarding certain Defendants' financial motivation to mislead investors. *Compare iQIYI* Amended Consolidated Class Action Complaint ¶¶ 190-91, *iQIYI* ECF No. 104; *Baidu* Consolidated Class Action Complaint ¶¶ 228-29, *Baidu* ECF No. 48, *and iQIYI* SACC; *Baidu* ACC.

Plaintiffs, however, cannot establish motive and opportunity through allegations of generalized "motives possessed by virtually all corporate insiders," *see Novak*, 216 F.3d at 307, such as a motive to "mask the disparity between iQIYI's real and overstated deferred revenue figures," *see iQIYI* SACC ¶ 225; *Baidu* ACC ¶ 266.[30]

Plaintiffs have failed to sufficiently allege a strong inference of scienter through motive and opportunity.

### 2.   Circumstantial Evidence

With respect to circumstantial evidence of conscious misbehavior or recklessness, Plaintiffs principally allege that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants reviewed information contrary to Defendants' public statements – specifically, contrary information contained in iQIYI's DAUs, certain third-party research reports, and iQIYI's VIEs' PRC tax filings, *see iQIYI* SACC ¶¶ 196-206; *Baidu* ACC ¶¶ 232-46; that the *iQIYI* Individual Defendants' and *Baidu* Individual Defendants' knowledge of iQIYI's allegedly inflated user numbers and deferred revenues can be inferred because these facts were critical to iQIYI's core operations, *see iQIYI* SACC ¶¶ 207-21; *Baidu* ACC ¶¶ 247-62;[31] that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants waited months to tell investors about the SEC and NASDAQ investigations, *see iQIYI* SACC ¶¶ 222-24; *Baidu* ACC ¶¶ 263-65; and that Defendants Gong,

---

[30] Moreover, as noted by Defendants, the timing of the Xin'ai Sports venture – which occurred in 2018 – undercuts Plaintiffs' theory that the Xin'ai Sports venture was designed to mask the alleged disparity between iQIYI's real and overstated deferred revenue figures – which disparity Plaintiffs allege occurred for iQIYI's deferred revenue for 2015-2017. *See* Defs.' Supp. Reply at 5-6.

[31] The *Baidu* Plaintiffs additionally allege that given Baidu's majority ownership of iQIYI, and that iQIYI was a critical asset and the principal driver of Baidu's growth during the *Baidu* Class Period, Defendants Y. Li, X. Li, and Yu were well aware that iQIYI's performance was critical to Baidu as well. *See Baidu* ACC ¶ 261.

Wang, Y. Li, X. Li, and Yu executed SOX certifications, *see iQIYI* SACC ¶¶ 227-30; *Baidu* ACC ¶¶ 268-75.[32]

Here, assessed holistically, the allegations in the Operative Complaints do not demonstrate strong circumstantial evidence of conscious misbehavior or recklessness.

Plaintiffs do not sufficiently allege that any Defendant knew or had access to *specific* reports or statements containing information contradicting public statements. *See Novak*, 216 F.3d at 309; *Dynex*, 531 F.3d at 196.[33]  Although Plaintiffs allege that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants admitted to monitoring iQIYI's DAUs, *see iQIYI* SACC ¶¶ 6, 197; *Baidu* ACC ¶ 5, 233; that iQIYI's management periodically met with iQIYI's Audit Committee to review and discuss iQIYI's financial statements, *see iQIYI* SACC ¶¶ 8, 201-04; and that Baidu's management periodically met with Baidu's Audit Committee, *Baidu* ACC ¶¶ 7, 243-44, Plaintiffs do not allege that any Defendant – or the iQIYI Audit Committee or Baidu Audit Committee – was presented with specific internal DAU data or reports contradicting Defendants' public statements.  And, although Plaintiffs allege that the *iQIYI* Exchange Act Defendants and *Baidu* Defendants "undoubtedly were aware" that their "public statements were false and misleading as they repeatedly referenced data from QuestMobile," *see iQIYI* SACC ¶ 9; *Baidu* ACC ¶ 8; *see also iQIYI* SACC ¶ 198; *Baidu* ACC ¶¶ 234-35, Plaintiffs do not allege that any Defendant reviewed any specific QuestMobile reports – or any other

---

[32]  Further, Plaintiffs argue that "[b]ecause the Baidu Complaint adequately alleges scienter against the Individual Defendants, it has alleged scienter against Baidu and iQIYI as well." *See* Pls.' *Baidu* Br. at 5 n.3.

[33]  When asked by the Court at the February 26, 2024 oral argument whether Plaintiffs had "any allegations that any individual defendant was presented with information that was contrary" to Defendants' alleged misstatements, counsel responded: "We don't have specific direct evidence of them seeing a document."  *See* Tr. at 30.

third-party reports – that contradicted iQIYI's reported DAUs.[34]  Further, Plaintiffs' allegations

regarding the availability of sources purportedly indicating that the accounting of the Xin'ai

Sports venture was improper, *see iQIYI* SACC ¶ 99; *Baidu* ACC ¶ 123, fall short in light of the

absence of specific allegations in the Operative Complaints regarding any Defendant's review

or knowledge of those sources.  And, Plaintiffs' generalized assertion that "[d]ue to the

importance of iQIYI to Baidu and the [*Baidu*] Individual Defendants, the [*Baidu*] Defendants

clearly had access to information that contradicted their public statements regarding iQIYI's

revenues and DAUs," *see* Pls.' *Baidu* Br. at 5; *see also* Pls.' *Baidu* Br. at 6-7, is unavailing.[35]

Plaintiffs' argument that scienter is further buttressed by the fact that Defendants had a

duty to monitor iQIYI's revenue and DAUs, *see* Pls.' *Baidu* Br. at 9; *see also* Pls.' *iQIYI* Br. at

4 (arguing that "Defendants had a duty to familiarize themselves with the facts relevant to the

core operations of [iQIYI] and the financial reporting of those operations" (alteration accepted)

(quotation omitted)); Pls.' *Baidu* Br. at 11 (stating that "[a]t a minimum, if Defendants failed to

monitor these key operating metrics and obvious accounting irregularities within them, they

were reckless in failing to do so"), and Plaintiffs' argument that the *Baidu* Individual

Defendants' frequent communications in SEC filings and representations to the market about

iQIYI, its DAUs, and its revenue supports that those metrics were critical to Baidu and supports

---

[34]  In any event, as discussed below, the QuestMobile and Aurora data does not plausibly
establish that iQIYI's reported DAUs were misstated.

[35]  Further, as Defendants persuasively argue, Plaintiffs' allegation that "Defendant Gong must
have signed off on the Shanghai VIEs' tax returns – which contained the true deferred
revenue amounts that contradicted the amounts . . . disclosed to investors," *see iQIYI* SACC
¶ 200; *Baidu* ACC ¶ 237, does not indicate whether Defendant Gong must have reviewed
deferred revenue of *all five* of iQIYI's VIEs.  *See* Defs.' Supp. Br. at 5; Defs.' Supp. Reply at
5.  In any event, for the reasons discussed below in connection with the Court's analysis of
the *iQIYI* Plaintiffs' Section 11 claim, the deferred revenue reported in VIE tax returns does
not plausibly establish the falsity of the deferred revenue reported by iQIYI or Baidu.

an inference that Defendants knew their statements were false when made, *see* Pls.' *Baidu* Br. at 10-11, are unavailing, particularly in light of Plaintiffs' failure to sufficiently allege that any *specific* contradictory information would have come to light in a reasonable investigation by Defendants. *See Dynex*, 531 F.3d at 196; *see also, e.g.*, *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 493 (S.D.N.Y. 2021) (concluding that "absent particularized allegations of specific information Defendants had at their disposal that rendered their statements false or misleading, allegations of circumstantial evidence – such as the individual Defendants' senior positions, control over [the defendant company], regulatory certifications, and the relative importance of [the company's strategy] – are not sufficient to plead scienter, even considered in their totality" and collecting cases).

Plaintiffs' reliance on allegations regarding Defendants' purported delay in disclosing the SEC and NASDAQ investigations also is unavailing. As an initial matter, Plaintiffs do not sufficiently allege that Defendants had a duty to disclose such investigations. *See generally iQIYI* SACC; *Baidu* ACC; *see also, e.g.*, *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 24 (S.D.N.Y. 2016) (concluding that "[b]ecause there is no clear case law that would require the disclosure of the SEC investigation . . . in the absence of a pre-existing duty to disclose, the plaintiffs cannot show that the defendants acted" with the requisite scienter).[36] Moreover, any purported delay in disclosing investigations does not support a strong inference that Defendants were "trying to downplay the Wolfpack Report by making investors think the

---

[36] The *Baidu* ACC conclusorily asserts that Defendants did have an affirmative duty to disclose the investigations. *See Baidu* ACC ¶ 265. The Court, however, is not bound to accept conclusory allegations. *See Faber*, 648 F.3d at 104. And, Plaintiffs' argument that "by denying the contents of the Wolfpack Report, Defendants put it and its contents at issue" and therefore "Defendants had a duty to disclose that the government was investigating iQIYI for the very contents of the Wolfpack Report," *see* Pls.' *Baidu* Br. at 13-14, is unpersuasive.

allegations from the report were untrue," *see iQIYI* SACC ¶ 224; *Baidu* ACC ¶ 265 – a more compelling inference is that Defendants did not believe it was necessary to immediately address the report.  *See Tellabs*, 551 U.S. at 314; *see also, e.g.*, *In re Lions Gate*, 165 F. Supp. 3d at 24.

Plaintiffs' allegations that iQIYI's user numbers and revenue figures were part of iQIYI's core operations and that iQIYI was part of Baidu's core operations do not save Plaintiffs' scienter theory.  Although the United States Court of Appeals for the Second Circuit has not expressly determined whether the core operations doctrine survives as a viable theory of scienter following the enactment of the PSLRA, *see Frederick v. Mechel OAO*, 475 F. App'x 353, 356 & n.5 (2d Cir. 2012); *see also Swanson v. Danimer Sci., Inc.*, No. 23-7674-CV, 2024 WL 4315109, at *2 (2d Cir. Sept. 27, 2024), courts have held that the doctrine can provide supplemental support for allegations of scienter, even if it cannot establish scienter independently, *see City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (collecting cases); *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011).  Here, Plaintiffs' allegations regarding core operations are insufficient to establish any Defendant's scienter.

In addition, Plaintiffs' reliance on SOX certifications is unavailing, as Plaintiffs have failed to sufficiently allege any Defendant's awareness of or recklessness to the allegedly materially misleading nature of the statements at issue.  *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615 (S.D.N.Y. 2015) (stating that "[t]he plaintiff cannot raise an inference of fraudulent intent based on the signing of a certification without alleging any facts to show a concomitant awareness of or recklessness to the materially misleading nature of the statements"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-CV-08846, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) (concluding that

plaintiff's reliance on defendant's SOX certifications was unavailing, noting that plaintiff had not "offered any particularized allegation of an inference that the [SOX certifications] were not honestly and reasonably believed to be true when made" (alteration accepted) (ellipsis and quotation omitted)).  Plaintiffs' argument that Defendants' denial of the accuracy of the Wolfpack Report supports scienter, *see* Pls.' *Baidu* Br. at 12-13; *see also* Pls.' *iQIYI* Br. at 5 (stating that Defendants' "false exculpatory statements prove their scienter"), is unavailing for the same reason – *i.e.*, that Plaintiffs have not plausibly alleged that those denials were not honestly and reasonably believed to be true when made.[37]

Plaintiffs have failed to allege strong circumstantial evidence of conscious misbehavior or recklessness sufficient to demonstrate scienter with respect to any Defendant.[38]

* * *

Plaintiffs have failed to adequately plead scienter.   Accordingly, Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC are dismissed for failure to state a claim.[39]

---

[37] Further, as noted by Defendants, many of Plaintiffs' arguments as to circumstantial evidence are particularly weak – or do not apply at all – with respect to Baidu and its executives.  *See* Defs.' *Baidu* Reply at 3 (arguing that it would be "unreasonable to presume, under the core operations doctrine, that **Baidu's** executives knew of any alleged fraud occurring at **iQIYI** simply because iQIYI is a large investment for Baidu" and that "Plaintiffs do not allege that Baidu's executives had any involvement with iQIYI's accounting" or "that Baidu's executives had anything to do with iQIYI's denial of the Wolfpack Report or disclosure of the SEC and NASDAQ investigations").

[38] Contrary to Plaintiffs' assertion, *see* Pls.' *Baidu* Br. at 5 n.3, Plaintiffs have failed to adequately plead corporate scienter.  Plaintiffs do not plead facts that give rise to a strong inference that someone whose intent could be imputed to iQIYI or Baidu acted with the requisite scienter.  *See Dynex*, 531 F.3d at 195.  As set forth above, Plaintiffs have failed to establish a strong inference of scienter as to any individual Defendant.  And Plaintiffs do not allege any statement "so 'dramatic' that collective corporate scienter may be inferred."  *See Jackson*, 960 F.3d at 99 (quoting *Dynex*, 531 F.3d at 195-96).

[39] In light of the above, the Court need not – and does not – reach the issues of whether Plaintiffs have adequately pled that any Defendant made an actionable misstatement or omission in connection with the Exchange Act claims or whether Plaintiffs have adequately

II.   **Count II of the *iQIYI* SACC and Count II of the *Baidu* ACC are Dismissed for Failure to State a Claim**

In light of the dismissal of Count I of the *iQIYI* SACC and Count I of the *Baidu* ACC, Count II of the *iQIYI* SACC and Count II of the *Baidu* ACC must be dismissed for failure to state a claim.

In Count II of the *iQIYI* SACC and Count II of the *Baidu* ACC, Plaintiffs bring claims under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiffs have failed to adequately plead a primary violation of the Exchange Act in the *iQIYI* SACC and the *Baidu* ACC, Count II of each complaint must be dismissed.

---

pled loss causation. *See, e.g.*, *Hutchinson v. Perez*, No. 12-CV-01073, 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) ("Since the Court must dismiss the Amended Complaint if Plaintiff fails to adequately plead scienter, I need not reach loss causation or misleading statements and omissions under the PSLRA."), *amended*, No. 12-CV-01073, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013).

**III.    Count III of the *iQIYI* SACC is Dismissed for Failure to State a Claim**

As set forth below, the *iQIYI* Plaintiffs have failed to state a claim under Section 11.

Accordingly, Count III of the *iQIYI* SACC must be dismissed.[40]

**A.    Applicable Law**

Section 11 of the Securities Act provides in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).

Section 11 "imposes strict liability on issuers and signatories, and negligence liability on

underwriters, for material misstatements or omissions in a registration statement." *See Fed.*

---

[40] The *iQIYI* Plaintiffs' Section 11 claim is premised on allegedly untrue statements contained in the *iQIYI* Registration Statement regarding iQIYI's DAUs and deferred revenue. *See iQIYI* SACC ¶¶ 358-71.

*Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99

(2d Cir. 2017) (quotation omitted).  To state a claim under Section 11, a "plaintiff must allege

that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket

following the offering; (2) the defendant participated in the offering in a manner sufficient to

give rise to liability under section 11; and (3) the registration statement contained an untrue

statement of a material fact or omitted to state a material fact required to be stated therein or

necessary to make the statements therein not misleading."  *In re Morgan Stanley Info. Fund Sec.

Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010) (quotation omitted).  "The definition of materiality

is the same for [Section 11] as it is under section 10(b) of the Exchange Act."  *Id.* at 360.

The Second Circuit has stated that although "[f]raud is not an element or a requisite to a

claim under Section 11" and "a plaintiff need allege no more than negligence to proceed under

Section 11," claims under Section 11 "may be – and often are – predicated on fraud," and

"claims that do rely upon averments of fraud are subject to the test of Rule 9(b)."  *See Rombach*,

355 F.3d at 171.

To determine whether the allegations underlying a Section 11 claim are premised on

fraud, "[t]he question is whether a plaintiff's allegations 'are classically associated with fraud.'"

*See In re Synchrony*, 988 F.3d at 173 (quoting *Rombach*, 355 F.3d at 172); *see also In re

Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 392 (E.D.N.Y. 2013) (stating that "courts have looked

at the following to indicate that a Section 11 claim sounds in fraud: (1) the complaint contains

merely a blanket disclaimer that the plaintiffs do not allege fraud for the purposes of the

Securities Act claims; (2) the allegations themselves include classic fraud language; (3) the

complaint does not show any basis for the claims that is nonfraudulent; and (4) the plaintiffs do

not separate the factual allegations supporting the fraud claims and negligence claims, but rather

require the courts to parse the complaints"); *see also In re NIO, Inc. Sec. Litig.*, No. 19-CV-01424, 2021 WL 3566300, at *5 (E.D.N.Y. Aug. 12, 2021) (stating that courts "will also consider whether the 'gravamen of the complaint is plainly fraud,' or whether alternative bases of liability exist" (quoting *Rombach*, 355 F.3d at 172)).

### B.   The Section 11 Claim Does Not Sound in Fraud

As an initial matter, Defendants argue that the Section 11 claim in the *iQIYI* SACC sounds in fraud and thus should be analyzed under the heightened pleading standard of Rule 9(b) as opposed to under Rule 8. *See* Defs.' Joint Br. at 10-11.[41]   Specifically, Defendants argue that although the *iQIYI* Plaintiffs put their Exchange Act and Securities Act allegations into separate sections in the *iQIYI* SACC, the gravamen of both sets of claims is fraud, as the Securities Act claims are based on the same alleged misrepresentations as the Exchange Act claims, *see* Defs.' Joint Br. at 10-11, and that "[t]he *iQIYI* Plaintiffs' superficial changes to their Securities Act allegations – such as sprinkling the word 'negligence' throughout and changing 'false and misleading' to 'untrue' – do not alter the substance of their claims, which is that iQIYI's Registration Statement artificially inflated DAUs and customer advances and deferred revenue to defraud investors."  *See* Defs.' Supp. Br. at 5-6 (citations omitted).  Plaintiffs dispute that the Securities Act claims sound in fraud, arguing that these claims sound in negligence – *i.e.*, Defendants' failure to conduct an adequate and reasonable investigation into the business and operations of iQIYI.  *See* Pls.' *iQIYI* Br. at 14-15; *see also* Pls.' Supp. Br. at 5-6 (asserting

---

[41] Defendants further argue that because the Section 11 claim sounds in fraud, the *iQIYI* Plaintiffs must establish scienter to state a claim and that the "Securities Act claims, like the Exchange Act claims, therefore must be dismissed for failure to plead scienter."  *See* Defs.' *iQIYI* Br. at 8-11.  Plaintiffs argue that they are not required to allege scienter for their Section 11 claim.  *See* Pls.' *iQIYI* Br. at 15-17.  In light of the below, the Court need not address these arguments.

that "[n]ot only does the Section 11 claim disclaim any allegation of fraud, it is also separated from the Section 10(b) claim, alleges that the Securities Act Defendants acted negligently without using classic fraud language, and alleges alternative grounds for liability – negligence").

The Section 11 claim here does not sound in fraud.  The *iQIYI* SACC asserts that the "Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud," *see iQIYI* SACC ¶ 268 (expressly excluding and disclaiming any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct and expressly not incorporating by reference any allegations contained in Sections I-XIII of the *iQIYI* SACC), and separates the Exchange Act claims from the Securities Act claims, *see generally iQIYI* SACC.  Further, the Securities Act section of the *iQIYI* SACC does not use "classic fraud language."  *See In re NIO*, 2021 WL 3566300, at *5; *see, e.g.*, *iQIYI* SACC ¶¶ 277 (alleging that Offering Documents contained inflated viewership and revenue numbers "as a result of Securities Act Defendants' negligence"), 283, 285, 290, 294, 362. Although the Exchange Act claims and Securities Act claims share common factual allegations, the allegations contained in the Securities Act section of the *iQIYI* SACC provide an alternative basis of liability – namely, negligence – and notably, the *iQIYI* Director Defendants and *iQIYI* Underwriter Defendants are not defendants to the Exchange Act claims.  *See In re NIO*, 2021 WL 3566300, at *5; *see also, e.g.*, *iQIYI* SACC ¶¶ 334 (alleging that the Individual Defendants owed a duty to the purchasers of the shares of iQIYI to make a reasonable and diligent investigation of the statements contained in the Offering Documents and are liable to Plaintiffs for breach of that duty), 343 (alleging same with respect to Director Defendants), 353 (alleging same with respect to Underwriter Defendants).

For the reasons set forth below, however, Count III of the *iQIYI* SACC nevertheless must be dismissed.

### C.     The *iQIYI* Plaintiffs Have Failed to Allege an Untrue Statement of a Material Fact

Count III of the *iQIYI* SACC must be dismissed because the *iQIYI* Plaintiffs have failed to adequately plead an untrue statement of a material fact.

### 1.     The *iQIYI* Plaintiffs Have Failed to Allege an Untrue Statement of a Material Fact with Respect to DAUs

Defendants argue that the *iQIYI* Plaintiffs fail to allege that Defendants overstated iQIYI's DAUs.  *See* Defs.' Joint Br. at 12-15; Defs.' Supp. Br. at 6-7.  Specifically, Defendants argue, *inter alia*, that the *iQIYI* SACC's "single new conclusory allegation about DAUs" – that QuestMobile and Aurora each used the same methodology for calculating DAUs: the number of unique devices that used iQIYI's apps at least once during the day – makes Plaintiffs' misrepresentation claim "even less plausible," because QuestMobile's and Aurora's respective estimates of iQIYI's DAUs differ so greatly from each other.  *See* Defs.' Supp. Br. at 6 (noting that "for some periods, QuestMobile's estimates differ more from Aurora's than from iQIYI's"); *see also* Defs.' Joint Br. at 14-15 (arguing that Plaintiffs fail to plead the amount by which iQIYI's DAUs were allegedly misstated); Defs.' Supp. Reply at 8 (asserting that "[u]ltimately, all Plaintiffs allege is that QuestMobile, Aurora, and iQIYI each came up with different numbers" and that Plaintiffs "allege nothing to establish whose numbers were correct or, more to the point, that iQIYI's reported DAUs were false").  Defendants suggest that "[o]ne obvious potential explanation is that the three companies used different underlying data."  *See* Defs.' Supp. Br. at 6 n.4; *see also* Defs.' Supp. Br. at 7 (arguing that Plaintiffs fail to adequately allege the basis for their assertion that QuestMobile, Aurora, and iQIYI calculate DAUs in the

same way).  Further, Defendants state that QuestMobile and Aurora expressly disclaimed the

accuracy and completeness of their respective estimates.  *See* Defs.' Joint Br. at 14.  And

Defendants argue that "[t]o the extent Plaintiffs challenge iQIYI touting its 'massive and highly

engaged user base,' such statements are inactionable puffery" and, "[i]n any event, Plaintiffs'

own allegations show that iQIYI's user base was massive and highly engaged."  *See* Defs.' Joint

Br. at 15 n.11 (citations omitted).[42]

In opposition, Plaintiffs argue, *inter alia*, that the *iQIYI* SACC's new allegations

establish that QuestMobile and Aurora were using the same methodology as iQIYI to calculate

average DAUs, *see* Pls.' Supp. Br. at 7; that iQIYI regularly recognizes the accuracy and

reliability of third-party research firms' data, particularly QuestMobile's, *see* Pls.' Joint Br. at

10 (stating that "[a]t numerous earnings calls, iQIYI and Baidu repeatedly cited QuestMobile

data and other third-party research firms' data to support the Company's performance and also

asked investors to rely on those data"); *see also* Pls.' Supp. Br. at 7; that in any event, reliability

of the QuestMobile and Aurora reports is a question of fact that cannot be decided at the

pleading stage, *see* Pls.' Supp. Br. at 7; that Plaintiffs are not required to precisely quantify the

amount by which financial statements were overstated and, in response to Defendants'

arguments that the amounts of DAUs reported by QuestMobile and Aurora were not identical,

---

[42] Defendants additionally argue that the *iQIYI* SACC fails to sufficiently allege an untrue statement of a material fact because Plaintiffs improperly rely "solely" on a short-seller report.  *See* Defs.' Joint Br. at 11-12.  Here, however, given Plaintiffs' representations regarding their research and analysis, *see, e.g.*, *iQIYI* SACC ¶ 286 n.42, and Plaintiffs' reliance on sources other than the Wolfpack Report, Plaintiffs' reliance on the Wolfpack Report is insufficient in itself to warrant dismissal.  *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (concluding that plaintiff's suggestion "that a complaint's reliance on a short-seller report inherently requires dismissal" was "wrong," noting that courts have sustained complaints relying on short seller reports "where independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers' reports").

that "absolute precision" is not required for a pleading, *see* Pls.' Joint Br. at 12; and that

Defendants' assertion that the statement about iQIYI's user base being "massive" and "highly

engaged" was puffery is wrong because iQIYI's user base is objectively verifiable, *see* Pls.'

Joint Br. at 12-13 n.11 (arguing that "despite Defendants' assertion that the Complaints failed to

allege facts that the user base was not 'massive,' Defendants concealed the inflated nature of

iQIYI's DAUs, and so-called half-truths will support claims for securities fraud" (ellipsis and

quotation omitted)).

Here, the *iQIYI* Plaintiffs have failed to allege any untrue statement of a material fact

with respect to DAUs.

As an initial matter, the *iQIYI* Plaintiffs have failed to plausibly allege falsity with

respect to the statement regarding iQIYI's "massive and highly engaged user base," *see iQIYI*

SACC ¶ 358, because such statement is an expression of puffery.

Further, although the *iQIYI* SACC alleges that iQIYI, QuestMobile, and Aurora each

used the same methodology for calculating DAUs, *see iQIYI* SACC ¶ 286, the *iQIYI* Plaintiffs

also allege that QuestMobile's and Aurora's estimates of iQIYI's DAUs differ significantly

from each other.  For example, the *iQIYI* Plaintiffs allege that iQIYI's DAUs according to

QuestMobile were 113 million in the fourth quarter of 2017, 122.6 million in 2018, and 114.2

million in 2019, *see iQIYI* SACC ¶ 147; *see also iQIYI* SACC ¶ 287, and also allege that

"[a]ccording to Aurora's data, between December 2017 and March 2019, iQIYI never had more

than 90 million mobile DAU," *see iQIYI* SACC ¶ 52 (emphasis omitted); *see also iQIYI* SACC

¶ 289.  The *iQIYI* Plaintiffs do not, however, allege any facts accounting for the discrepancy

between these estimates.[43]  That QuestMobile's and Aurora's estimates differ greatly from one

another – without explanation – renders the allegations that those estimates differ from iQIYI's

reported DAUs insufficient to plausibly allege the falsity of iQIYI's public statements.

Construing all reasonable inferences in the light most favorable to the *iQIYI* Plaintiffs,

the Court cannot conclude that the discrepancies among the various DAU reports renders

plausible – rather than speculative – Plaintiffs' theory that iQIYI misstated its DAUs.

The *iQIYI* Plaintiffs have failed to allege an untrue statement of a material fact with

respect to DAUs.

### 2. The *iQIYI* Plaintiffs Have Failed to Allege an Untrue Statement of a Material Fact with Respect to Deferred Revenue

Defendants argue that the *iQIYI* Plaintiffs fail to allege that Defendants overstated

iQIYI's deferred revenue.  *See* Defs.' Joint Br. at 15-19; Defs.' Supp. Br. at 7-9.  Defendants

argue, *inter alia*, that Plaintiffs plead no basis to infer that the third-party credit reports on

which Plaintiffs rely are accurate and comparable to iQIYI's SEC filings, as iQIYI's SEC

filings, unlike the VIEs' filings, do not individually report deferred revenue, *see* Defs.' Joint Br.

at 16 (arguing, *inter alia*, that "the comparisons Plaintiffs seek to draw are apples-to-oranges");

*see also* Defs.' Supp. Br. at 8 (arguing that Plaintiffs fail to allege facts establishing that the

"deferred revenue" metric in the PRC credit reports is the same as the "customer advances and

deferred revenue" metric reported in iQIYI's Registration Statement and noting that "[o]n their

face, the two metrics are different, as the latter includes customer advances"); that Plaintiffs

have failed to allege anything about how the PRC tax filings were prepared, including under

---

[43]  Plaintiffs' omission of allegations to account for the discrepancy between QuestMobile's and Aurora's estimates of iQIYI's DAUs is notable given that the issue of DAUs – specifically, the issue of comparison of QuestMobile's, Aurora's, and iQIYI's respective DAU figures – was highlighted in briefing and during oral argument.

what accounting principles, *see* Defs.' Supp. Br. at 8 (noting that Plaintiffs do not allege that the PRC tax filings underlying the credit reports were for the SAIC, that Plaintiffs acknowledge that the SAIC is distinct from the State Tax Bureau, and that "all [Plaintiffs] allege about filings with the State Tax Bureau is that 'all revenue earned from any source by the entity must be recorded as revenue during the fiscal year such revenue is earned'" (quoting *iQIYI* SACC ¶ 126; *Baidu* ACC ¶ 153)); *see also* Defs.' Joint Br. at 17 (arguing that Plaintiffs "do not allege who authored the third-party reports, when they were published or for what purpose, what reporting periods were covered, or what methodologies were used (including whether they were prepared in accordance with GAAP)"); and that there is no merit to Plaintiffs' suggestion that submissions to PRC tax authorities are the most accurate sources of financial information, *see* Defs.' Joint Br. at 18 (asserting that courts have recognized that the civil and criminal consequences of false filings in the United States are more severe than those in China).

In opposition, Plaintiffs argue, *inter alia*, that they have sufficiently established that the credit reports are accurate and more reliable than iQIYI's SEC filings, *see* Pls.' Joint Br. at 13-14 (arguing that courts have found allegations regarding penalties imposed in China for filing false documents with the SAIC and PRC tax authorities sufficient to establish the accuracy of filings); that courts routinely find falsity established when a complaint alleges that a company's reported financial or operating performance metrics in its SEC filings differ from those reported by its operating subsidiaries in China, *see* Pls.' Joint Br. at 14-15; that Defendants' arguments regarding the authorship and reliability of the credit reports are "red herrings," *see* Pls.' Joint Br. at 15 (arguing that the credit reports are not anonymous and stating that the *iQIYI* SACC alleges that the reports specifically covered the years 2015 to 2017); and that Plaintiffs have alleged that the information in the credit reports came from PRC tax filings that require revenue

to be prepared according to PRC GAAP, which Plaintiffs allege is the same as U.S. GAAP in all material respects for revenue and deferred revenue, *see* Pls.' Joint Br. at 15-16; *see also* Pls.' Supp. Br. at 8.[44]

Here, the *iQIYI* Plaintiffs have failed to allege any untrue statement of a material fact with respect to deferred revenue.

As an initial matter, and critically, as Defendants correctly note, the metrics that the *iQIYI* Plaintiffs seek to have the Court compare – "customer advances and deferred revenue," the line item set forth in the iQIYI Registration Statement, and "deferred revenue," the line item purportedly set forth the third-party credit reports – are different on their face. *See* Defs.' Supp. Br. at 8. Although the *iQIYI* Plaintiffs assert in supplemental briefing that the PRC tax filings disclose customer advances and deferred revenue under a single line item, there is no such allegation in the *iQIYI* SACC, and the *iQIYI* Plaintiffs have not filed the referenced third-party credit reports. *See Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-CV-10452, 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) (stating that "[a] complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion").

Further, as Defendants correctly note, Plaintiffs' allegations do not plausibly establish that it is otherwise appropriate to compare the deferred revenue numbers allegedly reported in the third-party credit reports and the deferred revenue numbers reported in iQIYI's Registration Statement. Although the *iQIYI* Plaintiffs allege that PRC law requires financial statements filed with the SAIC by iQIYI's subsidiaries to be audited by Chinese CPA firms in conformance with

---

[44] Plaintiffs also assert, in their supplemental briefing, that "the tax filings, as cited in the credit reports that Plaintiffs' counsel reviewed, disclose customer advances and deferred revenue under a single line item – just like iQIYI's SEC filings." *See* Pls.' Supp. Br. at 8-9 n.10.

Chinese GAAP, *see iQIYI* SACC ¶ 305, and that Chinese GAAP is substantially the same as U.S. GAAP, *see iQIYI* SACC ¶ 306; *see also iQIYI* SACC ¶¶ 307-08, 313-15, the *iQIYI* Plaintiffs do not allege that the deferred revenue reported in the third-party credit reports was based on filings with the SAIC.  Indeed, the *iQIYI* Plaintiffs allege only that the "amounts reported in the credit reports are taken from the PRC tax filings of iQIYI's VIEs" and the *iQIYI* Plaintiffs make clear that the SAIC and "PRC tax authorities" are distinct.  *See iQIYI* SACC ¶ 370 (discussing how filings with the SAIC *and PRC tax authorities* are the most accurate sources of financial information for a PRC-based company).  Contrary to Plaintiffs' assertion in briefing, the *iQIYI* SACC does not in fact allege that filings with the PRC tax authorities were required to comply with GAAP.  Accordingly, the *iQIYI* Plaintiffs have not plausibly alleged that the two values – the deferred revenue of iQIYI's five VIEs purportedly reported in the third-party credit reports and the deferred revenue of iQIYI's five VIEs reported in iQIYI's Registration Statement – should be equivalent.[45]

The *iQIYI* Plaintiffs have failed to establish that iQIYI's Registration Statement contained an untrue statement of a material fact with respect to iQIYI's deferred revenue.

\* \* \*

Because the *iQIYI* Plaintiffs have failed to plead any untrue statement of a material fact regarding iQIYI's DAUs or deferred revenue figures, Count III of the *iQIYI* SACC must be

---

[45] And indeed, the issue of whether the two values should be equivalent was raised by Defendants in briefing, *see* Defs.' Joint Br. at 18 (arguing, *inter alia*, that "Plaintiffs do not allege that PRC tax filings are filed with the SAIC or are required to comply with GAAP"), and at oral argument, *see* Tr. at 14 (counsel arguing, with respect to the credit reports, that "[Plaintiffs] don't tell you what PRC tax filings are reflected on them" and "[Plaintiffs] don't tell you which definition of deferred revenue, is it GAAP, or is it something else" and that "these things are needed to be pled").

dismissed for failure to state a claim.[46]

## IV.   Count IV of the *iQIYI* SACC is Dismissed for Failure to State a Claim

In light of the dismissal of Count III of the *iQIYI* SACC, Count IV of the *iQIYI* SACC

must be dismissed for failure to state a claim.

In Count IV of the *iQIYI* SACC, the *iQIYI* Plaintiffs assert violations of Section 15 of

the Securities Act, which provides, *inter alia*:

> Every person who, by or through stock ownership, agency, or otherwise, or who,
> pursuant to or in connection with an agreement or understanding with one or more
> other persons by or through stock ownership, agency, or otherwise, controls any
> person liable under sections 77k or 77*l* of this title, shall also be liable jointly and
> severally with and to the same extent as such controlled person to any person to
> whom such controlled person is liable, unless the controlling person had no
> knowledge of or reasonable ground to believe in the existence of the facts by
> reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*(a).

Section 15 creates liability for individuals or entities that control any person liable under

Section 11.  *See In re Morgan Stanley*, 592 F.3d at 358 (stating that "the success of a claim

under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under

section[] 11"); *see also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 352

(S.D.N.Y. 2003) (stating that "[i]n order to establish a prima facie Section 15 claim, a plaintiff

need only establish (1) control, and (2) an underlying violation of Section 11").

Because the *iQIYI* Plaintiffs have failed to adequately plead a primary violation of

Section 11, Count IV of the *iQIYI* SACC must be dismissed.

## CONCLUSION

For the reasons set forth above, the motions to dismiss, *iQIYI* ECF Nos. 156, 157; *Baidu*

---

[46]  In light of the above, the Court need not – and does not – reach the issue of whether Plaintiffs
have standing under Section 11's damages framework or reach the issue of loss causation.

ECF Nos. 61, 62, are GRANTED and the Operative Complaints, *iQIYI* ECF No. 175; *Baidu*

ECF No. 75, are DISMISSED.[47]

The Clerk of Court is directed to enter judgment in case No. 20-CV-01830 and in case

No. 20-CV-03794 and to close both cases.

SO ORDERED.

*/s/ Diane Gujarati*
DIANE GUJARATI
United States District Judge

Dated:  September 30, 2024
        Brooklyn, New York

---

[47] Dismissal is without leave to further amend.  As an initial matter, Plaintiffs do not appear to seek leave to amend.  *See generally* Pls.' Supp. Br.  Moreover, Plaintiffs were apprised of the pleading defects by way of Defendants' motions to dismiss and the oral argument held on February 26, 2024; Plaintiffs were given an opportunity to amend and availed themselves of that opportunity; and there is no indication that Plaintiffs could provide additional allegations that might cure the defects set forth above and lead to a different result.  Under these circumstances, leave to amend is not warranted.  *See Gallop v. Cheney*, 642 F.3d 364, 369-70 (2d Cir. 2011); *Gregory*, 757 F. App'x at 39.